1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   JOHN D. ECHEVERRIA
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and
    Blake Graham, in their official capacities*

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                        CIVIL DIVISION

13

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** |
| **v.** | |
| | **VOLUME 30 OF 37** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:    5A |
| | Judge:          Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS[i]** | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, *Frontier Law and Order—10 Essays*, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325-1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

i The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America,*" Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

THE FRENCH WARS AND THE REVOLUTION



*Company of Military Collectors & Historians*
Plate 191. Revolutionary rifleman in typical
dress and equipment. Drawing by H. Charles
McBarron, Jr. Courtesy the Company of Mili-
tary Collectors & Historians.

however, a standard model was adopted. A second followed in 1766, and a third
in 1777. These arms may be described briefly as follows: [18]

*Musketoon, Model 1763*

Round barrel 31 inches long. Full stock prolonged to the very muzzle.
The lock resembles the infantry musket. All furniture is brass ex-
cept the swivels and swivel bar, which are iron. Both the front and mid-
dle bands are double, the middle band supporting a sling swivel, and
the rear band supporting the forward end of the swivel bar. The rear
end of the swivel bar is held by the rear lock plate screw. A second
swivel is fastened to the underside of the butt. Thus, having both reg-

[ 177 ]



Herman M. Leonard Collection, National Rifle Association
Plate 192. German jaeger rifle of the type used in the Revolution.

ular sling swivels and a swivel bar the musketoon could be carried either on a regular sling or on a shoulder belt and snap. The iron ramrod has a button head. Total length: 45 inches.

*Musketoon, Model 1766*

The stock is shortened, stopping 14 inches from the muzzle. There is one band, of iron, to which the swivel band is attached. The iron front sight is attached to the barrel.

*Musketoon, Model 1777 (Heavy Cavalry)*

Similar to the model 1766, but longer. The barrel is $33\frac{1}{3}$ inches long, and the overall length is 46 inches. The bands and swivel bar are brass. The stock has a cheek piece, and the iron ramrod has a pear-shaped head.

The British and French muskets and musketoons thus far described made up the bulk of such arms found in America during the period under consideration. There were also, however, some American made firearms and, particularly during the Revolution, some arms from other European countries.

From the earliest periods American gunsmiths had made and repaired military firearms. There were certain general characteristics that marked their production, but individual tastes and abilities as well as a lack of specific regulations prevented any approach to uniformity. Militia laws usually required every man to own a firearm. It had to be a flintlock but there was normally no other restriction. A few colonies did set minimum lengths for musket and carbine barrels. Massachusetts and Connecticut, for instance, required musket barrels to be at least 42 inches long and carbine barrels at least 30 inches long, but no maximum was set. Thus all manner of variation was possible.[19]

The bulk of these American made firearms of the early 18th century resembled their British contemporaries. The barrels were almost always pin fastened. Escutcheon plates similar to those on the Brown Bess are often found, and in general the hardware resembled that on British pieces, although it was frequently iron instead of brass. Sometimes, of course, actual pieces from British

[ 178 ]

Compendium_Roth
Page 0428

## THE FRENCH WARS AND THE REVOLUTION

or French muskets were used to produce these arms. The thrifty colonist would not think of throwing away anything so valuable as a gun part, and consequently these parts were used over and over again in many different combinations until they finally wore out.

The stocks also normally followed British design although there were two distinctive local variations. Particularly noticeable is the fat belly and massive comb of the muskets and other long arms made in the Hudson Valley where the Dutch influence carried over in stocks as well as in hardware. In New England generally, the slender so-called "Queen Anne" stock with the bottom line of the butt slightly concave, was highly popular. There were some fat bellied stocks in New England, too, but normally they were flatter and lacked the heavy comb of the Hudson Valley products. Naturally these stocks were made of American woods, usually either black walnut or maple. It is possible for an expert in such matters to distinguish American walnut from European varieties even after it has suffered the rigors of two or more centuries, but a curly maple stock is a relatively sure sign of American workmanship recognizable even to the layman.

The average colonist could not afford to own a selection of guns, and so he normally chose one which would serve him well in hunting and also pass inspection on muster days. Thus the distinction between military and sporting arms is almost lost. Some examples of each, of course, are quite obvious, but a great many fall in between and are known to collectors generally as "semi-military." These arms are usually sturdy pieces. Their caliber varies normally between .70 and .75. They do not have sling swivels, and since a man was allowed his choice between a sword and a bayonet, they usually do not have bayonet studs.

With the coming of the American Revolution and the consequent dire need



*Author's Collection, National Rifle Association*

Plate 193. American blunderbuss stocked in curly maple, c. 1720-1730.

[ 179 ]

## ARMS AND ARMOR IN COLONIAL AMERICA



Herb Glass Collection, National Rifle Association

Plate 194. English blunderbuss by Oakes of London, dated 1718. Despite its very slight flare, this gun scattered shot in a wider pattern than the widely flared American gun illustrated above.

for arms, however, there was a decided change in the entire situation. Every means to obtain arms was exploited including confiscation, contract production by American smiths, purchase abroad, and the purchase of all available arms already in the country. In addition many soldiers brought their own weapons with them and theoretically received a special compensation for doing so.

Those firearms made by individual gunsmiths under contract to local committees and councils of safety have so caught the attention and fired the imagination of collectors that considerable confusion has developed over what may and what may not legitimately be called a Committee of Safety musket. The term is frequently used to denote any American musket made and used during the Revolution, but this is obviously inaccurate usage. Many arms were made in America and used during the war with no connection whatsoever with a committee of safety. Again, the phrase cannot be used to designate all muskets purchased and issued by committees or councils of safety, for these included foreign arms as well as nondescript guns picked up wherever they could be found. In its pure sense, the phrase "Committee of Safety musket" can refer only to those muskets made under a specific contract for a particular committee or council of safety.

Once these premises are accepted, it immediately becomes apparent that the number of guns that can be accurately called Committee of Safety muskets is sharply curtailed. For one thing, the first committee contracts were not let until the late spring and early summer of 1775. Therefore there could have been no Committee of Safety muskets at Concord or Lexington or Bunker Hill. Also, as new state constitutions were written and new governments established, the functions of the committees and councils of safety devolved upon other

[ 180 ]



Plate 195. Drawing by Herbert A. Sherlock.

*Company of Military Collectors & Historians*

[ 181 ]

Compendium_Roth
Page 0431

# ARMS AND ARMOR IN COLONIAL AMERICA



*U. S. National Museum*

Plate 196. British wall piece believed to have been used on a gunboat in the naval battles on Lake Champlain. The caliber is 15/16 of an inch, and the overall length is 72¾ inches.

bodies. Thus the period of the true Committee of Safety musket lasted only two or three years on the average, and since the output during that time was never great the number of guns falling into that category was remarkably small.

The most important fact about these Committee of Safety muskets, however, is that the contracts under which they were made were very specific. From them it is possible to obtain not only descriptions of the guns manufactured for each colony in that short period, but also, through a survey of all these contracts, a good picture of the type of firearm preferred generally in America at the outbreak of the Revolution.

Before reviewing the specifications of the individual colonies in detail, it is of interest to note that the Continental Congress in Philadelphia took con-



*Joe Kindig, Jr. Collection*

Plate 197. American iron-mounted swivel gun from the Chesapeake Bay area.



*West Point Museum*

Plate 198. Rappahannock Forge wall rifle.

[ 182 ]

## THE FRENCH WARS AND THE REVOLUTION

siderable interest in the local programs and frequently offered advice to individual colonial governments. In July 1775, two resolutions were passed indicating the type of musket in favor with that national body. Then, on November 4, the following detailed resolution was passed:

> *Resolved* That it be recommended to the several Assemblies or conventions of the colonies respectively, to set and keep their gunsmiths at work, to manufacture good fire locks, with bayonets; each firelock to be made with a good bridle lock, ¾ of an inch bore, and of good substance at the breech, the barrel to be 3 feet 8 inches in length, the bayonet to be 18 inches in the blade, with a steel ramrod, the upper loop thereof to be trumpet mouthed: that the price to be given be fixed by the Assembly or convention, or committee of safety of each colony. . . .[20]

Massachusetts set up its specifications the day before Congress passed its detailed resolution; yet the musket called for is of the same design preferred by Congress:

> . . . *Resolved*, That for every effective and substantial Fire-Arm which shall be manufactured in this Colony with a barrel of three feet and nine inches in length that will carry an ounce ball, a good bayonet with a blade not less than eighteen inches in length, a steel ramrod with a spring to retain the same, two loops for gun strings, and the maker's name stamped or engraved on the lock . . . and resemble in construction, and, as nearly as may be, equal in goodness with the King's new arms there shall be allowed . . . the sum of three Pounds.[21]

The maker of the gun was required to prove it at his own risk with 4½ inches of powder, a ball, and wads on each. Some of the guns were then to be stamped MB (Massachusetts Bay) on the barrel near the lock.[22]

Connecticut set its standards as early as April 1775, when the following bill was passed by the General Assembly:'

> *Resolved*, That the three thousand stands of arms to be procured for the use of this Colony be of the following dimensions, to wit: the length of the barrel three feet ten inches, the diameter of the bore from inside to inside three-quarters of an inch, the length of the blade of the bayonet fourteen inches, the length of the socket four inches and one quarter; that the barrels be of a suitable thickness, with iron ramrods, a good substantial lock, and a good stock well mounted with brass and marked with the name or initial letters of the maker's name.[23]

All such arms manufactured in the colony by May 1, 1775 were to be pur-

[ 183 ]

## ARMS AND ARMOR IN COLONIAL AMERICA

chased "at a reasonable price." In March 1776, the committee purchased some imported barrels and locks that fitted the specifications and passed them out to local gunsmiths for stocking and mounting. After May 1776 Connecticut also began the practice of impressing needed guns from their owners. These impressed arms were then stamped with the initials of their former owners with the promise that payment would be made in due time.[24]

Rhode Island apparently set up no specifications for its arms. For the most part it relied on the unusually ample supply of public arms which had been built up in the magazines of its various towns throughout the entire colonial period. Beginning in 1776, these guns were supplemented by purchases from individual citizens and dealers and later by imports from foreign countries. One distinguishing characteristic, however, is found in the fact that all arms purchased were ordered to be stamped with the Rhode Island coat of arms and the letters CR.[25]

New Hampshire, like Rhode Island, let no specific contract for arms. Instead the colony periodically appropriated money and sent out agents to purchase whatever they could find in the line of serviceable firearms. One of the



*Author's Collection*

Plate 199. British military pistols, late type above, early model below.

[ 184 ]

## THE FRENCH WARS AND THE REVOLUTION

favorite hunting grounds for these agents was the Salem-Marblehead area of Massachusetts. Eventually conditions became so bad that when Washington wrote the colony in 1777 to ask about the possibility of purchasing some muskets for the use of Continental troops, the Committee of Safety was forced to reply:

> "Fire arms cannot be procured from us that can be depended upon."
> They added they were also practically without undependable ones.[26]

In New York, the Committee of Safety supplied contracting gunsmiths with a "Brown Bess" and an English lock as patterns and required them to follow them both in design and quality.[27]

Pennsylvania required that its muskets have barrels 3 feet 8 inches long "well fortify'd, the bore of sufficient size to carry 17 Balls to the Pound." The bayonets were to have blades 16 inches long. Contractors were issued a pattern, apparently a "Brown Bess," to guide them in the construction of the desired gun. Since Pennsylvania gunsmiths were so well known, the colony was faced with a particular problem. Buyers from other states were purchasing most of their products. To put an end to this situation, the Pennsylvania Council of Safety passed a law forbidding anyone to take a firearm out of the colony without a specific license. In March of 1776 the council established a provincial gunlock factory since the main deterrent to the swift production of muskets was a shortage of locks.[28]

Complete data on the arms purchases of New Jersey are not available, and nothing at all has been found on those of Delaware. From such records as are obtainable, however, it appears that New Jersey relied more on scattered purchases than on systematic contracts. The nearby Pennsylvania gunsmiths were a special temptation until that state forbade the exportation of firearms.[29]

Maryland defined its standards on August 30, 1775, when it required:
> . . . good subsantial proved Musquets, 3½ Feet in the Barrell, and of three Quarters of an Inch in the Bore, with good double Bridle Locks, black walnut or Maple Stocks and plain strong brass mountings, Bayonets with Steel Blades 17 Inches long, steel Ramrods, double Screws, priming Wires, and Brushes fitted thereto, with a pair of brass Molds for every Eighty Musquets to cast 12 Bullets on one Side, and on the other side, to cast Shot of such Size, as the Musket will chamber three of them, for such a Sum not exceeding Ten Dollars and two Thirds of a Dollar in Bills of Credit. . . .[30]

Another statement a short time later indicated that the barrels were pin fastened. Some barrels were later especially ordered with full inch bores. The Council appointed Thomas Ewing as an inspector in Baltimore, and there he proved all submitted muskets with an ounce of powder and two balls. He

[ 185 ]

ARMS AND ARMOR IN COLONIAL AMERICA



*West Point Museum*

Plate 200. One of a pair of silver-mounted pistols by Hawkins of London which are believed to have belonged to George Washington.

[ 186 ]

## THE FRENCH WARS AND THE REVOLUTION

had a proof stamp made at that time. The initials or device that this stamp bore are not definitely known, although two muskets found in Maryland and conforming to that Colony's specifications bear a proof mark somewhat resembling a *fleur de lys* [see cut].

Ewing was a rigid inspector, once rejecting as many as 19 out of 32 muskets presented to him, but the Council was forced to abandon its standards at least to the extent of accepting iron as well as brass mountings and single-bridled as well as double-bridled locks. Which bridle was omitted is not clear, but it was probably the arm from the pan to the frizzen since that was the second of the two bridles to come into general use. Like Connecticut, Maryland was also forced to import suitable barrels and locks in March 1776 and hire local gunsmiths to stock and mount them. In another move to correct the shortage of locks, the Council established a state gun lock factory at Frederick in 1776.[31]

Virginia pursued a path somewhat different from those of the other colonies and established a state manufactory in the very beginning. Under the leadership principally of Fielding Lewis and Charles Dick, the Fredericksburg Manufactory proceeded in the fall of 1775 to repair arms already in the colony and in the late spring of 1776 it began also to manufacture arms, generally following the British pattern but somewhat lighter and often mounted in iron instead of brass. Two complete muskets made in the Fredericksburg Manufactory have survived along with one lock on a repaired musket. The barrel lengths in the two complete specimens measure 39 inches and 37 inches respectively. The Manufactory continued in operation until 1783, but lack of funds and labor after 1780 seriously hampered its work and relegated it primarily to the position of a repair shop.[32]

At the same time Virginia contracted with individual gunsmiths and such private establishments as James Hunter's Rappahannock Forge at Falmouth, across the river from the Fredericksburg Manufactory. A typical contract called for 200 stands of arms:

> . . . to consist each of a Good Musket three feet eight Inches in the Barrel, three quarters of an Inch bore Steel rammers, the upper thimble trumpet mouthed the lower thimble with a spring to retain the ramrod, bridle Lock, brass mounting, a Bayonet eighteen inches blade with a Scabbard, one pair bullet moulds, to mould sixteen Bullets, to every forty guns; a priming wire & brush to each musket.[33]

In the southern colonies of North Carolina, South Carolina and Georgia an entirely different situation prevailed. The war came more slowly to this area, with only two engagements before 1777. Consequently there was more time in which to procure arms. Also, the West Indies and Bermuda were close at hand and easy to reach. The ports of these islands were soon swarming with

[ 187 ]

Compendium_Roth
Page 0437

### ARMS AND ARMOR IN COLONIAL AMERICA

war profiteers who possessed large stocks of good and bad European arms. It was natural, therefore, that these colonies should turn to that source for the bulk of their supplies. Even so, some few arms were purchased locally, and in regard to these, the Georgia Council of Safety on January 2, 1776, passed a resolution to the effect that all such guns should conform as nearly as possible to the specifications set forth by the Continental Congress.[34]

An analysis of all of the above specifications leads to some interesting conclusions. There is a remarkable similarity in the requirements for all these muskets. All specify iron or steel ramrods and bridle locks. Calibers are all about .75. Barrel lengths are remarkably even, most of them 44 to 46 inches with only Maryland and possibly New York and Pennsylvania as short as 42 inches. In every instance barrels are to be pin fastened. In fine, all resembled the British "Brown Bess." Also, contrary to the popular myth that Committee of Safety muskets were not marked because of the fear British reprisals, many were marked, some colonies even requiring it.

With all these specifications available, it would seem reasonable that a student could expect to examine a given specimen and determine immediately whether it was or was not a Committee of Safety musket. This, unfortunately,



*Mount Vernon Ladies' Association*

Plate 201. Pair of British brass barrelled pistols by Wooley which are believed to have been owned by George Washington.

[ 188 ]

## THE FRENCH WARS AND THE REVOLUTION



*Herbert A. Sherlock Collection*
Plate 202. Scottish enlisted man's pistol by Bissell marked "RHR" on the barrel.

is not the case. There are very few muskets in existence today which meet all the qualifications established by any colony.

There are two possible explanations for this situation; either practically no Committee of Safety muskets have survived, or individual contractors deviated from the specifications. In regard to the first possibility, it is true that such muskets would be expected to have an unusually low rate of survival. They were made and issued during the early years of the war; they saw severe service; and there was no steady supply of replacements. Also, since they were worn out and since they were not of the newer and more popular French pattern and caliber, many of those that remained in government arsenals at the end of the war were weeded out when the "third class" arms were sold or broken up for spare parts. Thus the possibility of almost total destruction is good.

On the other hand, the possibility that individual contractors deviated somewhat from specifications is also good. This possibility is enhanced by the fact that there are muskets in existence today which bear the names of men who had Committee contracts and which, while conforming in general to the Committee pattern, differ in one or two details. The most frequently found variance is in the barrel length, but in some few instances it is the caliber that differs from the specified size. Naturally, the marks on some of these specimens are suspect. On others, however, the marks are apparently genuine, and the piece is obviously American. With these latter pieces, then, the important question is posed: Are these guns Committee of Safety muskets or does the fact that they differ in some degree from the contract specifications disqualify them? In this connection it is known that Maryland was forced to accept iron as well

[ 189 ]

ARMS AND ARMOR IN COLONIAL AMERICA

as brass mountings and single-bridled as well as double-bridled locks, and it seems probable that other colonies made similar exceptions as long as the pieces complied with the general specifications.

In addition to the arms produced in America, many more firearms were imported from Europe both by individual colonies and by Congress. Benjamin Franklin, who had been a colonial representative in England, left orders for arms with French, Dutch and even English dealers before returning to America at the outbreak of hostilities. Pliarne Penet et cie, a French firm, sent one of their members to Philadelphia in 1775 and contracted with the Secret Committee of Congress for firearms. In the spring of 1776 Congress sent Silas Deane, a merchant and former member of Congress from Connecticut, to France to obtain arms and military equipment as well as to induce the French government to lend money and perhaps to enter the war as an ally. In addition to these contacts, emissaries from various colonies traveled in Europe, purchasing arms in France, Holland, and Prussia; while European concerns sent arms to ports in the West Indies and Bermuda where they made contact with colonial agents.[33]

Of all the arms imported from foreign countries, by far the most came from France. The largest number of French arms and the best ones were obtained by Deane from the French government. France had been severely beaten in the series of wars with England for control of the American Continent, and the French government was therefore predisposed to help the colonies in their struggle with Great Britain in any way it could. One way was to supply arms. To sell arms directly to the colonies could be construed by England as an overt act of war, and so a dummy corporation was set up under the name of Roderique Hortalez et cie.

In charge of this corporation was an agent named Pierre Caron de Beaumarchais, who took his orders directly from the French foreign minister. It was with these men that Deane had his dealings, and through this subterfuge arms and equipment were released from the French arsenals and shipped to America. Because of English protests the ships were forced to clear for the French West Indies, and some actually went there and left their stores to be picked up by American ships. Others sailed directly to America. In all, 10 ships carried these stores to the colonists, the first arriving in April, 1777 and the last in November of that year. Only one was captured by the British. By early 1778 the French were openly at war with Great Britain, and the false trading company and private means of shipping were no longer necessary. Thereafter arms were sent directly from the Government, and also French officers like Lafayette sometimes brought arms with them for their own troops.[34]

Other arms purchased in France were not necessarily as good as the standard French army muskets. The profiteers bought their stocks just as cheaply

[ 190 ]

Compendium_Roth
Page 0440

# THE FRENCH WARS AND THE REVOLUTION



*Author's Collection*

Plate 203. Scottish enlisted man's pistol by Waters.

as they could, and consequently they had many obsolete and poorly made arms. Pliarne Penet et cie were among the worst offenders. An offshoot of this company operating under the name of James Gruel & Co. bought their guns in Liege in the Austrian Netherlands (modern Belgium); and the Belgian muskets of that period were just as bad as those of the 19th century.[87]

The muskets obtained by contract in Holland, although relatively few in number, were good arms. They were both shorter and lighter than either the English or French muskets, comparing almost to the officers' fusils of those countries. The .65 caliber barrel was round and attached to the stock by three brass bands, the first of which was double and very long (8 inches). It is the light construction and the long front band which form the most easily recognizable characteristics of these guns. Among those specimens still surviving, the name most often found on the lockplate is Thone, Amsterdam. The barrel usually bears the Amsterdam proof mark. Almost every known surviving specimen of a Dutch musket in America can be traced to Massachusetts, indicating the probability of a state contract. Since Franklin was a representative of the Colony of Massachusetts when he placed his contract in Holland, it is possible that these arms derive from that source.

All of these arms, domestic or imported, that belonged to the regular army were supposed to be so marked. The first order was issued January 30, 1777, and follow-up orders were sent out periodically during the next three or four months directing that all arms of any sort belonging to the United States should be

[ 191 ]

ARMS AND ARMOR IN COLONIAL AMERICA

marked "United States" in "such parts as will receive the impression." The same directive applied also to accoutrements and tools. Both stamps and brands were made bearing the several variants of the inscription that are known to have been used—"US," "U States," and United States." It should be emphasized that these marks were put only on those arms belonging to the country as a whole. Those arms belonging to individual states were marked or not according to the desires of the local authorities.[38]

One other large group of muskets was also present in America during the period under consideration. These were the arms carried by the German auxiliaries of the British army during the Revolution. These muskets were of many types, depending upon the arms situation in the individual principalities from which the different regiments came. With the exception of Prussia, the weapons picture in Germany was most confused. Individual rulers bought and sold entire weapons or parts to each other depending upon which one had manufacturing facilities, which one had needs, and which one had surpluses. Also, the arms with which they equipped the forces they rented the British were not necessarily their best but often represented the dregs of their arsenals.

Nevertheless there are certain characteristics that mark most German muskets (or Hessian muskets as they are popularly called). No matter whether the piece is pin-fastened or banded, the mountings are brass. The butt plate is thin so that it frequently cracks through at the angle of the tang, which is long, and extends far up the comb. The stock is heavy, having a particularly massive butt with a high comb. The lock also is large, particularly the frizzen, which is often square across the top. All have an elliptical brass front sight either on the barrel or front band. The bayonet stud is usually under the barrel.

One particular type of German musket that can readily be recognized is the Prussian model. It is slightly lighter than the others. The wrist of the stock is long, and the short comb is particularly angular and narrow. The barrel is fastened to the stock with 10 separate pins and a tang screw. Because of Frederick the Great's well-known opposition to sending German troops to America, few of these muskets reached this country. Nevertheless two are known, both traditionally captured at the Battle of Bennington. If this tradition is correct, and the fact that the only two known specimens are both attributed to this engagement seems to indicate that it may be, it is possible that the Brunswick grenadiers may have been equipped with this arm.[39]

In addition to the smooth bore musket which formed the principal weapon of the period, there were also some rifles. Most important of these was the American rifle or 'Kentucky" or "Pennsylvania" rifle as it is popularly called. Developed on the frontier, principally by the German gunsmiths who settled in Pennsylvania, it attracted world-wide attention during the American Revolution,

[ 192 ]

## THE FRENCH WARS AND THE REVOLUTION

and the development and perfection of this rifle was the only American contribution to military science during the entire period from 1689-1783. In all other respects, American military men retreated from their advanced position and followed the lead of Europe, sometimes, in fact, becoming even more conservative than the older countries.

There was no new principle involved in the American rifle. The theory of rifling was centuries old. The use of greased cloth patches around the ball to insure a tight fit in the rifling has often been advanced as an American innovation, but in reality it had long been used in Germany. What the Americans did do was to lengthen the barrel for greater accuracy, improve the balance, and develop a new and distinct style of construction and decoration. More important, however, the dependence of the frontiersman on his gun for food and protection and his daily use of it for these purposes led to a high degree of proficiency in its use by a relatively large segment of the population. In Germany, the ancestral home of the American rifle, shooting contests with the rifle had once been a very popular sport, but in the 18th century the custom almost ceased. Only a few foresters and wealthy individuals had either the opportunity or the inclination to become marksmen.[40]

There is little or no reliable information concerning the formative years of the American rifle. The German and Swiss gunsmiths who developed it did



*Lexington Historical Society*
Plate 204. Scottish pistols carried by Major Pitcairn at the battle of Lexington.

[ 193 ]

ARMS AND ARMOR IN COLONIAL AMERICA

not reach Pennsylvania in any numbers until after 1710. Undoubtedly their first products were exactly the same as those they had been accustomed to manufacture at home, although they probably used the native maple that later became almost the trademark of the American rifle. In all such developments change comes gradually, and it is probable that the first true American or "Kentucky" type did not emerge until almost the middle of the century, and even after that some smiths still made rifles that were predominantly German in character.

There is much popular misunderstanding today concerning the dating of the developments in Kentucky rifle design. It is a common mistake for the layman to assign a Revolutionary date to the much more numerous specimens of the late 1780's and 90's. Once a few of the scarce specimens that are truly Revolutionary have been studied, however, the difference becomes apparent.

Despite the differences that are to be expected wherever individual craftsmanship is involved, there are certain characteristics common to most of these early rifles. The lock is hand-forged, usually without a mark. The lock plate is attenuated at the rear to a long point. The lower line of the plate is often slightly concave. The cock is goosenecked and lacks the incised decorations of the later imported locks. The lines of its curves are also usually less angular. The pan is often filed with several facets rather than being rounded, and frequently there is no bridle for the frizzen.

The stock is relatively straight and heavy. The deep drop so characteristic of later rifles is either missing altogether or present in only a slight degree. The wrist appears slender when viewed from the side, but is actually quite thick from side to side as it joins the butt which is sometimes as much as 3 inches thick. The shoulder end of the butt lacks the sharp crescent so characteristic of later rifles and is relatively straight. There is almost always some raised carving. It may be slight, perhaps no more than a slight decoration around the lock and tang mortises, the beginning of the comb, or on the cheek piece, or sometimes a raised edge along the ramrod groove. Some examples, naturally, have more than this, but almost all have some. Other decoration is slight or non-existent. The multiple brass and silver inlays are of a later period.

There are two or three equally characteristic shapes for the mountings. The fore-end cap is normally short, usually only about an inch long, and it is attached by a screw which enters the bottom flat of the barrel. The trigger guard is wide and heavy. It is double; that is, there is a section behind the loop in which the trigger is housed. The strip of metal that crosses this space is almost straight, not sharply crescentic as in later models. Usually this guard is attached to the stock by a pin in front of the bow and a screw in back of it. The key plate is simple, fairly large, and often held by three screws, two going across and holding the lock, and the rear one simply entering the wood of the stock. The patch box

[ 194 ]

## THE FRENCH·WARS AND THE REVOLUTION

cover is simple, usually of brass, hinged at the fore end, but sometimes it is a sliding cover of wood.

As has been emphasized before, when individual craftsmanship and initiative are involved, it is impossible to date a given piece accurately by the presence or absence of any one feature. The general appearance of the whole gun and the relationship of all the features to each other must be carefully weighed, in addition to the known facts about the maker if it is a signed piece, before a tentative date can be assigned to it.

Since the period of the greatest production and variation of the American rifle occurred after 1783 and also since the rifle was only secondarily a military weapon, it would be beyond the scope of this work to trace the development



*U. S. National Museum*

Plate 205. Queen Anne screw-barrelled pocket pistols by Cornforth.

[ 195 ]

## ARMS AND ARMOR IN COLONIAL AMERICA

of the type any further. Rather, it is more to the point to trace its appearance and influence on the military scene.

The rifle was used only slightly in the French Wars. Insofar as those wars involved settlers on the frontiers of Pennsylvania and Maryland in raids and Indian depredations, these frontiersmen used their rifles in reply, and after the end of the last of the French Wars in 1763, they continued to use their rifles against the Indians until the end of the troubles caused by Pontiac's conspiracy when relative peace along the frontier allowed them to concentrate principally upon hunting. Rifles, however, were not used to any extent in the military campaigns conducted by the British. The anonymous author of a letter describing the Braddock expedition against the French at Pittsburg in 1755 said of the French fire that it was "like Poping shots, with little explosion, only a kind of Whiszing noise; (which is a proof the Enemy's Arms were rifle Barrels)." Actually, there is no evidence that the French had rifles, but the letter is an indication that the men on the expedition were acquainted with that weapon.[41]

When the American Revolution broke out, however, riflemen were among the first to spring to the colors. The Act of June 14, 1775 which was the birth of the United States army, authorized the raising of 10 companies of riflemen, six from Pennsylvania and two each from Virginia and Maryland "to join the army near Boston, to be employed there as light infantry. . . ." John Adams wrote his wife concerning this act and added of the ten companies of riflemen:

> "These are an excellent species of light infantry. They use a peculiar kind of musket, called a rifle. It has circular or—grooves [sic] within the barrel, and carries a ball with great exactness to great distances."[42]

The first of these rifle companies under Daniel Morgan reached Washington at Cambridge, Massachusetts late in July, and soon the other companies joined them. Hugh Stevenson's company from what is now West Virginia, Cresnap's and Price's companies, both raised in and around Frederick, Maryland, and eight companies from Pennsylvania organized into a battalion under Col. William Thompson. Here these rifle companies, now 12 in number, put on demonstrations of skill with the rifle that spread their fame far and wide, as one company reputedly placed all their shots in a 7-inch target at 250 yards, and a marksman from Virginia put eight successive shots through a board 5 x 7 inches at 60 yards.[43]

The rifle had thus arrived upon the military scene as a force to be reckoned with. Many modern accounts have been written praising it highly as a weapon and making extreme claims for it as the most important single arm of the war. It is interesting, however, to examine the actual record and see just how well

[ 196 ]

## THE FRENCH WARS AND THE REVOLUTION



U. S. National Museum

Plate 206. Screw-barrelled pocket pistols with box locks and silver wire inlay.

the rifle really did serve in that conflict and what contemporary soldiers thought of it.

First of all, the rifle's greatest asset was its accuracy even at long range. Many tales have been recounted about this quality, but perhaps the best comments are those of Major George Hanger, the trained British marksman, whose comments about the musket were quoted above. Recounting an experience, Major Hanger wrote:

> Colonel, now General Tarleton, and myself, were standing a few yards out of a wood, observing the situation of a part of the enemy which we intended to attack. There was a rivulet in the enemy's front, and a mill on it, to which we stood directly with our horses' heads fronting, observing their motions. It was absolutely a plain field between us and the mill; not so much as a single bush on it. Our orderly-bugler stood behind us about three yards, but with his horse's side to our horses' tails. A rifleman passed over the milldam, evidently observing two officers, and laid himself down on his belly; for in such positions, they always lie, to take a good shot at a long distance. He took a deliberate

[ 197 ]

and cool shot at my friend, at me, and at the bugle-horn man. Now observe how well this fellow shot. It was in the month of August, and not a breath of wind was stirring. Colonel Tarleton's horse and mine, I am certain, were not anything like two feet apart; for we were in close consultation, how we should attack with our troops which laid 300 yards in the wood, and could not be perceived by the enemy. A rifle-ball passed between him and me; looking directly to the mill I evidently observed the flash of the powder. I directly said to my friend, "I think we had better move, or we shall have two or three of these gentlemen shortly amusing themselves at our expense." The words were hardly out of my mouth when the bugle-horn man behind me, and directly central, jumped off his horse and said, "Sir, my horse is shot." The horse staggered, fell down, and died. . . . Now speaking of this rifleman's shooting, nothing could be better. . . . I have passed several times over this ground and ever observed it with the greatest attention; and I can positively assert that the distance he fired from at us was full 400 yards."

Major Hanger participated in the Burgoyne campaign, and consequently became a prisoner of war after the battle of Saratoga when that whole British army surrendered. This event gave him an even better chance to study the American rifle, as he reported:

I have many times asked the American backwoodsman what was the most their best marksmen could do; they have constantly told me that an expert rifleman, provided he can draw good and true sight . . . can hit the head of a man at 200 yards. I am certain that provided an American rifleman was to get a perfect aim at 300 yards at me standing still, he most undoubtedly would hit me, unless it was a very windy day. . . .[45]

So much for the rifle's advantages; its disadvantages were serious. It was not equipped with a bayonet, and it was slow to load. The lack of a bayonet left the rifleman helpless in the face of a charge and powerless to charge himself. The technique of loading was briefly this. A charge of powder was poured down the barrel. Then a greased patch was centered over the bore, a bullet placed on this and both rammed down together with the bullet being wrapped in the patch and thus ensuring a tight fit. It was impossible to use prepared ammunition such as that employed with the muskets, although a device was developed which helped with the patching of the bullet. This device consisted of a board with several holes bored through it. In each hole the user inserted a patched bullet so that when the time came he could place the hole over the bore and push the patched

[ 198 ]

Compendium_Roth
Page 0448

## THE FRENCH WARS AND THE REVOLUTION

bullet right down the barrel. Still the charge had to be measured separately, and the patched bullet had to be seated accurately, instead of just being thrown in as was the case with the musket.

It will be remembered from the discussion of the musket how much emphasis was placed on rapidity of fire and consequently how adversely the slowness of the rifle would affect it as a military weapon can well be imagined. The emphasis on the use of the bayonet was not then mentioned, but it should be borne in mind that battles were frequently decided in hand-to-hand combat with the bayonet. Once the opposing troops closed with each other there was no time to reload. The American defeat at Bunker Hill was at least partially attributable to the lack of bayonets, and Samuel Webster, pleading for bayonets after the battle, declared "'tis barbarous to let men be obliged to oppose Bayonets with only gun Barrells. . . ." With this Gen. John Sullivan agreed and



*U. S. National Museum*

Plate 207. Double-barrelled holster pistols with box locks and silver mounts by Parke of London which belonged to Gen. Daniel Roberdeau.

[ 199 ]

## ARMS AND ARMOR IN COLONIAL AMERICA

added his plea for more bayonets so that the same situation would not be repeated.[46]

The popular myth that the Revolution was fought between American troops who shot from behind trees and stone walls and British soldiers who were silly enough to stand in tight formations in the open is completely fallacious. With the exception of Kings Mountain, and of the retreat from Concord and Lexington no major battle of the war followed this pattern. Even at Concord the American forces charged down the hill toward the British at the Bridge, and at Lexington the Minute-men were drawn up in a line across the village green, quite in the open. American troops generally fought in the accepted European fashion as any tactical study of the battles of the Revolution quickly reveals. The Continental "Regulars" took pride in their firm ranks and their bayonet charges. At Stony Point the muskets were unloaded and American bayonets alone carried the day. Baron von Steuben, the celebrated drill master of the Continental Army, never taught "backwoods" warfare, and Washington in the climatic Yorktown campaign exhorted his men to place their principal reliance on the bayonet.[47]

Fortunately it is not necessary to depend upon theory for the contemporary military opinion concerning the rifle as a military weapon. There are many written comments by leading officers from both sides. Washington worried about the lack of bayonets and for that reason ordered Morgan's men to carry spears. He also felt there were far too many riflemen in the army. General "Mad" Anthony Wayne said he never wanted to see another rifle, at least without a bayonet, and even then he would prefer a musket. When Maryland proposed to send a rifle company to Philadelphia for the Continental Army, the Secretary of the Board of War replied that they would be delighted to have the men, but—

"If muskets were given then instead of rifles the service would be more benefitted, as there is a superabundance of riflemen in the Army. Were it in the power of Congress to supply musketts they would speedily reduce the number of rifles and replace them with the former, as they are more easily kept in order, can be fired oftener and have the advantage of Bayonetts."[48]

The British officers also soon appraised the situation and lost their early apprehensions of the rifleman's prowess. Lt. Col. John Simcoe, commander of the famed Queen's Rangers, declared:

"The riflemen, however dexterous in the use of their arm, were by no means the most formidable of the rebel troops; their not being

[ 200 ]

## THE FRENCH WARS AND THE REVOLUTION

armed with bayonets, permitted their opponents to take liberties with them which otherwise would have been highly improper."[49]

The *Middlesex Journal* of December 31, 1776 quoted another British officer as remarking:

> . . . about twilight is found the best season for hunting the rebels in the woods, at which time their rifles are of very little use; and they are not found so serviceable in a body as musketry, a rest being requisite at all times, and before they are able to make a second discharge, it frequently happens that they find themselves run through the body by the push of a bayonet, as a rifleman is not entitled to any quarter.[50]

Even Major Hanger, the great admirer of the rifle's accuracy, wrote:

> Riflemen as riflemen only, are a very feeble foe and not to be trusted alone any distance from camp; and at the outposts they must ever be supported by regulars, or they will constantly be beaten in, and compelled to retire.[51]



*Author's Collection*

Plate 208. French enlisted men's pistols. Model 1776 above, model 1763 below.

[ 201 ]

ARMS AND ARMOR IN COLONIAL AMERICA



*Sam E. Smith Collection*

Plate 209. American made pistol of the Revolution with brass mounts and a maple stock found in Pennsylvania.

Again, Hanger:

. . . meeting a corps of rifle-men, namely *riflemen only*. I would treat them the same as my friend Colonel Abercrombie, . . . treated Morgan's riflemen. When Morgan's riflemen came down to Pennsylvania from Canada, flushed with success gained over Burgoyne's army, they marched to attack our light infantry, under Colonel Abercrombie. The moment they appeared before him he ordered his troops to charge them with the bayonet; not one man out of four, had time to fire, and those that did had no time given them to load again; the light infantry not only dispersed them instantly but drove them for miles over the country. They never attacked, or even looked at, our light infantry again, without a regular force to support them.[85]

What, then, was the usefulness of the American rifle as a military weapon? As has been noted, it had accuracy and range, but it was handicapped by its slowness and lack of a bayonet. Obviously it was useless as an arm for regular infantry, but its assets and the special skills of its users made it a fine weapon for certain troops, such as light infantry, scouts, snipers, and skirmishers supported by regular troops. Morgan himself recognized this, and at the battle of Cowpens when he had command of a force embodying both riflemen and regular infantry, he used them in that manner. He deployed his army in three lines, the first two embodying militia and riflemen and the third line composed of regular infantry. As the battle developed the first two lines, according to instructions, took as heavy a toll of the advancing British as they could and then

[ 202 ]

## THE FRENCH WARS AND THE REVOLUTION

retired behind the line of regulars which met the enemy with a volley and the bayonet.

Riflemen were also expert in coping with the Indian allies of the British in the North. They had long been used to dealing with the Indians on their own frontiers, and so took to this task naturally. Washington had this in mind when he sent Morgan's riflemen to join the army opposing Burgoyne on his march south from Canada. In announcing the action he wrote to General Horatio Gates:

> I am forwarding . . . Colonel Morgan's corps of riflemen, amounting to about 500. These are all chosen men, selected from the Army at large, well acquainted with the use of rifles, and with that mode of fighting which is necessary to make them a good counterpoise to the Indian . . .[53]

The rifle, then, was not, as some have claimed, "the gun that won the American Revolution," but supported by musketry and used in accordance with its special attributes, it was a very useful and deadly weapon.

In addition to the American rifles, there were also two types of rifles used in the British army, the British Ferguson and the German jaeger. The Ferguson will be discussed later with other breech-loading and repeating weapons, but since both the American and German rifles were descended from a common ancestor, the close relationship between the two invites a comparison here. Their advantages and disadvantages were similar, and the men who used them had much in common.

The German soldiers who carried the jaeger rifles were trained woodsmen and hunters, and they were expert marksmen. Shortly after the war began, George III realized the need for such men to act as light infantry and skirmishers in the forests of America. Consequently, beginning with the treaty of January 9, 1776 with Brunswick, companies of these men were frequently requested from the various German states who supplied troops. Thus these riflemen filled from the very beginning the role that was assigned to the American riflemen only after much trial and argument.[54]

The rifles that these men used differed from one another as greatly as did the American rifles of the period. Most of them were privately purchased or presentation pieces and thus were non-regulation. Yet, like the American rifles, there was a general uniformity of design which characterized them. They were short, usually about 44 or 46 inches in overall length. The locks were comparatively large and closely resembled those on the German muskets. The mountings, which were normally brass, included two ramrod thimbles, an exceptionally deep and long trigger guard, and a butt plate and screw plate similar to those on the muskets. Sometimes there was a brass fore-end cap on the stock, but often

[ 203 ]

## ARMS AND ARMOR IN COLONIAL AMERICA

there was none. Almost all had patch boxes in the butt with sliding wooden covers, but some hinged brass covers were also used. Attachments for a sling were provided by a brass swivel near the fore end and a button-like stud on the butt below the extension of the trigger guard. The barrel was pin-fastened, and the ramrods were of wood.

Much has been written about the effectiveness of the German rifle. Unfortunately much of it has been purely imaginary. One of the most popular of all these myths about these arms, is that the ball fit the bore so tightly that the soldier was forced to carry a mallet wih him in order to drive it down the barrel. All of this was advanced to prove that the German rifle was a slow and laborious weapon to load and required special paraphernalia which was apt to be lost. Actually such was not the case. No mallet was needed. In fact, the same system of greased patches used in America was widely known and practiced in Germany, and the jaeger could load his rifle just as swiftly as the Pennsylvanian.[55]

The chief drawbacks of the German rifle were the same as those of its American counterpart. Although loading was not the long laborious process that some have pictured it, it was still slower than the musket, and it had no bayonet. Because of these factors, the jaegers carried swords and were used only as light infantry or as marksmen supported by musketry, just as their American counterparts finally came to be employed.

Conversely, the advantage of the German rifle was the same as that of the American. It was highly accurate and effective at long ranges. This was a source of contemporary amazement to some Americans, and even as late the siege of Yorktown one of the Continental soldiers posted opposite some jaegers wrote with apparent surprise:

> ". . . a few shot were fired at different times in the Day and about sunset from the Enemy's Redoubts—we had five or six men wounded; one mortally & two others by the same Ball. The Execution was much more than might have been expected from the Distance, the dispersed situation of our Men and the few shot fired."[56]

There were, in addition to the standard muskets and rifles, certain special purpose military firearms. These included the blunderbuss, the genade launcher, and the wall piece or rampart gun.

The blunderbuss, so often erroneously associated with the early 17th century in the popular mind, really came into its own in the 18th century. As was noted previously, there were a few blunderbusses in America prior to 1700, but they were rare. The blunderbuss was a weapon designed to do great execution against a tightly pressed group in a confined space. A contemporary work described them as "proper for the defence of a barrack, stair case, or door."

[ 204 ]

# THE FRENCH WARS AND THE REVOLUTION



*William M. Locke Collection*

Plate 210. Rappahannock Forge pistol.

It was also a fine arm for quelling a riot in a street or courtyard or for repelling boarders on ships. The greater urbanization that came with the 18th century as well as a coinciding increase in naval activities considerably enlarged the demand for this type of fire arm, and hundreds were produced to satisfy it.[57]

Washington at one time considered arming the American cavalry with blunderbusses and wrote the Board of War:

It appears to me that Light Blunderbusses on account of the quantity of shot they will carry will be preferable to Carbines, for Dragoons, as the Carbines only carry a single ball especially in case of close action.[58]

The Board, however, demurred, and the carbine remained the standard cavalry weapon.[59]

Nevertheless, the Americans did make use of the blunderbuss as a naval weapon, and so did the British. These weapons are found with both iron and brass barrels. Usually for naval use the iron barrels were covered with black paint as a deterrent to the corrosive action of salt air and water. In all respects except for the shorter barrel, the large bore, and the flaring muzzle, these arms resembled the contemporary muskets, and consequently they can be dated by the same characteristics.

The grenade launcher as part of a standard musket seems to have been a specifically English development, and from there it spread to America. Two types of launchers were made. One consisted of a detachable launching cup that attached to the muzzle of a modified musket, and the other was a mortar-like arrangement built into the butt of a specially designed gun. Examples of both types exist in the Tower of London, the earliest bearing the cypher of James II, and later ones dated 1728, 1739, 1740, 1744, and 1747.[60]

[ 205 ]

ARMS AND ARMOR IN COLONIAL AMERICA

Two men were required to operate the launcher with the detachable muzzle cup. One man held the musket (which had been loaded with powder only) with its butt against the ground. The second man placed the grenade in the cup and lit its fuse. The soldier holding the musket then pulled the trigger and prayed that the piece wouldn't misfire. Muskets intended for use with the grenade cup were made with shorter and stouter barrels than the normal infantry musket. One example in the museum of the Royal United Service Institution has a barrel of only 33 inches as compared with the 46 inch barrel of the contemporary infantry musket.[61]

The other type of grenade launcher worked on the principle of the mortar. In the all metal butt was a cup with a hinged cover. A steel rest, which folded up into the underside of the forestock when not in use, was attached to the stock between the trigger guard and the "swell." In order to fire this launcher, the musket was placed with the muzzle (presumably plugged) on the ground. The rest was pulled out to steady the piece, and the hinged cover of the cup was opened. The cup in this instance was fired like a mortar and was provided with a vent and pan with a sliding cover. Consequently the next step was to place a charge of powder in the cup; then open and prime the pan, seat the grenade and light its fuse; and then fire the charge in the cup. Probably two men were required to operate this launcher also.[62]

In 1694 Maryland ordered 10 "hand mortars" from Great Britain. It is not absolutely clear from the comments what type it was that Maryland received, but indications are that it was the type with the muzzle cup. It is a matter of record, however, that the Maryland authorities were not pleased with them when they were received. They admitted that they were "good of the Sort," but directed their agent in England to try to find some that could be discharged in such a way that the fire from the charge in the barrel would ignite the fuse of the grenade and thus enable one man to operate the apparatus without assistance and with less danger to himself and his gun if the piece misfired.[63]

The final form of special purpose weapon, the wall or rampart piece, almost enters the field of heavy ordnance. It has been included here, however, because it followed the general design of the contemporary musket, differing only in size and in the addition of a bar for a swivel. The idea of the rampart gun is almost as old as the conception of the fire arm. Known variously as an *arquebus à croc* or amusette, it was simply a huge musket—or later sometimes a rifle—designed to fire at greater ranges than the ordinary arm. It could not carry the power nor approach the range of even a small cannon, but its vastly lighter weight made it adaptable for use on small boats and in quickly erected forts where it was not practical to transport cannon.

The usual wall piece of the early 18th century and the Revolution was

[ 206 ]

## THE FRENCH WARS AND THE REVOLUTION

a smooth-bored flintlock. In France, some matchlocks were still used for the purpose at the very beginning of the century. It remained for America, however, to introduce the real innovation in the form of the rifled rampart gun.[64]

These rifled wall pieces were made early in the Revolution and quickly proved effective. On February 4, 1776, Fielding Lewis, Commissioner of the Fredericksburg Manufactory, wrote his brother-in-law, George Washington, that:

"... I propose making a Rifle next week to carry a quarter of a pound ball. If it answers my expectation, a few of them will keep off ships of war from our narrow Rivers, and be usefull in the beginning of an engagement by land . . ."[65]

It is not definitely known that Lewis achieved his goal and produced these rifles. No surviving specimens are known. There are, however, four surviving specimens made at the famed Rappahannock Forge, a private enterprise under



*U. S. National Museum*
Plate 211. European silver-mounted pistols with Rappahannock Forge locks which belonged to Gen. Charles Lee.

[ 207 ]

## ARMS AND ARMOR IN COLONIAL AMERICA

the direction of James Hunter and located directly across the river from Fredericksburg. These huge rifles all weigh in the neighborhood of 50 pounds and are roughly five feet long. They are full stocked, have sliding wooden patch boxes and wooden ramrods. The brass mountings are reminiscent of those on the lighter rifles of the period. Three of the surviving specimens have round barrels, the fourth is octagonal. The design of the exterior parts of the locks resemble those on the Fredericksburg muskets so closely that a common origin or at least a common pattern is suggested.[66]

General Charles Lee attested to the effectiveness of these weapons when he wrote Washington from Williamsburg on May 10, 1776, "I am likewise furnishing myself with four-ounced rifle-amusettes, which will carry an infernal distance; the two-ounced hit a half sheet of paper 500 yards distance."[67]

In addition to these various long arms, pistols were also an important weapon in the period under consideration. They were carried by officers of all branches of the service, by cavalry troopers and by sailors. And, as always, they were the personal weapon of the well-to-do private citizen with which he protected his person and his possessions against intruders and defended his honor on the duelling ground.

Just as the British musket wielded the dominant influence on American long arms up through the early years of the Revolution, so the British pistol held sway among the hand guns. The reasons for this situation were the same: the predominance of imports from Great Britain and the familiarity with British service arms through the frequent wars of the period.

The British military pistol apparently was not standardized as early as the musket. During the reigns of William III and Queen Anne these pistols normally had a barrel length of 14 inches and a caliber of approximately .66. In all instances the barrels were pin fastened to the walnut stock. The butt was bulbous and covered by a brass cap with projections extending up the sides of the grip. All mountings were brass, and the ramrods were wooden. The points of difference were minor, but generally included the length to which the butt cap projection extended up the grip, the presence or absence of a bridle on the frizzen, the design of the key plate, the presence or absence of square filing at the breech, and the presence or absence of an escutcheon plate.[68]

By the time of George I (1714-1727), however, British service pistols had achieved the same degree of uniformity as the muskets. The 12 inch .60 caliber barrels were round for their entire length, and there was an ornamental raised band at the breech similar to the ones on the muskets. There was neither rear nor front sight. The lock was similar to those on the muskets but smaller. Usually it simply bore the maker's name, although some carried the royal cypher. The extensions of the butt cap ran well up the sides of the grip. The

[ 208 ]

# THE FRENCH WARS AND THE REVOLUTION



*Joe Kindig, Jr. Collection*
Plate 212. "Kentucky" pistols of the Revolution. Both are maple stocked, and the lower is signed J. Hills.

two ramrod thimbles resembled those on the musket, and the wooden ramrod was capped with brass. There were occasional differences in two items: most escutcheon plates resembled those on the musket, but some were oval; and some key plates were irregular although the majority were of the standard musket pattern, convex with a tail.

About 1760 the second really standard model of the holster pistol was adopted. In this model the barrel length was reduced to 9 inches, and the calibre was increased to .69. The lock resembled that on the 3rd model Brown Bess with the pierced and slotted jaw screw and the top jaw of the flint vise notched to fit around the tang of the cock. Markings were stamped instead of engraved. The extensions of the butt cap were reduced to vestigial lobes. The grip became thicker and shorter, and the escutcheon plate disappeared. The key plate was flat and without a tail, and the number of ramrod thimbles was reduced to one.

In addition to the service holster pistols for cavalry, there were also some government pistols made for navy use. These pistols differed from the holster pistols in that they sometimes had flat reinforced cocks and were equipped with

[ 209 ]

Compendium_Roth
Page 0459

ARMS AND ARMOR IN COLONIAL AMERICA

belt hooks on the reverse side. Also, during the reign of George III, they tended to retain the longer barrel of the George II type.

The service pistols described above were carried by enlisted men. Officers carried pistols which generally resembled the issue arms, but which were usually better made and frequently shorter and lighter. Since these pistols were privately purchased and remained the personal property of the officers, they frequently bore nicely modeled mountings, with open work key plates and mask decorations on the butt caps. Often these mountings were of silver since that metal became popular for such purposes about the turn of the century, and frequently there was a silver wire inlay around the escutcheon plate on the grip. The brass barrel also became a popular innovation because of its rust resistant qualities, and officers' pistols of the period with such barrels are frequently encountered.[69]

In addition to the standard British pistols described above, there was also one highly specialized type which saw service in America. This was the Scottish pistol carried by the officers and enlisted men of the several Highland regiments which were sent to this country. The Highland infantry regiments were the only ones in the British army in which every private was equipped with a pistol. These pistols were distinctive in both their exterior form and their mechanism.

Externally the most striking characteristic was the fact that they were all metal, the stock being made of brass. They had no trigger guards, and the trigger itself was usually ball-shaped. The butt was often bilobate in what was known as a kidney or fish-tail shape or else it possessed two scroll-like extensions curving inward below the termination of the butt proper which gave rise to the descriptive "ramshorn" butt appellation. In the center of the butt was a finial which coud be unscrewed and used as a vent pick or oiler. The lock plate was normally cut square across the rear end, and there was usually no bridle from the pan to the frizzen. The ramrod was iron, and there was an iron belt hook on the left side of the stock.

Internally the lock mechanism was reminiscent of the earlier dog lock. The sear acted laterally. There was no half-cock position, and the cock was secured in the full position by the end of the sear which passed through the lock plate and protruded in front of it.

These service pistols were made usually in England, rather than Scotland. Many of those surviving today bear the mark of John Waters of London. Before 1758 these pistols were also often marked HR (Highland Regiment). After 1758 the markings RHR (Royal Highland Regiment) is more frequently found.

Officers' pistols resembled those of enlisted men except that they were usually better made and elaborately decorated. Usually the stocks of officers' pistols were iron instead of brass, and they were frequently inlaid with precious metals. A fine pair of such Scottish officers' pistols with chiseled iron stocks said

[ 210 ]

THE FRENCH WARS AND THE REVOLUTION



*Author's Collection*
Plate 213. Prussian pistol. The jaw screw and upper jaw of the cock are inaccurate replacements. Virginia bought some Prussian pistols during the Revolution.

to have been used by Major Pitcairn of the Royal Marines at the battle of Lexington is now located in the Hancock-Adams house there.

In England where a network of roads made coach travel the common means of transportation, the holster pistol was largely replaced by smaller belt and pocket pistols for all but military purposes early in the 18th century. In America, however, the changes were not so rapid. Nevertheless, some of the smaller pistols were used here from the beginning, and when the Revolution began some American officers used them as the only weapon they had.

Some of these civilian pistols differed only from the military types in the matter of size. There was, however, one important variety quite distinct from the holster type—the screw-barreled pistol. The principal of this weapon, which allowed the barrel to be unscrewed and loaded at the breech, had been known and used in a limited way from the middle 1600's. It was not until the closing years of the 17th century and the early 1700's, however, that it became popular.

In their earliest form these pistols had barrels which screwed into a breech which extended approximately as far forward as the front end of the lock plate. The lock was of the conventional type. The stock, narrower in the grip and not so bulbous in the butt, extended as far forward as the fore-end of the breech. The butt cap lacked the side extensions of the military type but often had a single extension which carried a short distance up the back of the grip. The escutcheon plate, when there was one, and the key plate were of the standard type, often finely molded and decorated with open work design. The usual metals for these mountings were brass or silver, although a few with chiseled iron or steel mounts are known.[70]

With the reign of Queen Anne an important innovation occurred in the design of these arms. The breech and lock housing were forged in one piece,

[ 211 ]

ARMS AND ARMOR IN COLONIAL AMERICA

and the stock was attached at the back of this structure by an iron strap which formed the bottom of the lock action. There was also a change in the external mechanism of the lock which replaced the V-shaped frizzen spring with a curved spring fitted between the pan and the cock. Some screw-barreled pistols with separate locks of the conventional pattern continued to be made, but they are usually distinguishable from the earlier ones by their mounts.[71]

About the middle of the 18th century a further change occurred in the construction of these pistols with the adoption of the "box" lock. This change shifted the cock, pan and frizzen to a position in the center of the pistol, with the pan directly on top of the barrel. In most of these screw-barreled pistols the stock was round in cross section. Some, however, are found with flat sided grips and without butt caps, but most of these were made after 1783.[72]

Second to the British pistols in the influence they wielded on American arms were the French hand guns. Prior to the American Revolution the number of French pistols in America was small. There were, of course, a few in the French colonies, and some were carried by French soldiers in the colonial wars. Yet, since English pistol production in the early 18th century far outdistanced that of any other country in Europe, many of these even had British-made weapons. Just as with the musket, the era of French dominance in American pistols came with the Revolution. Then quantities of the French arms were imported and used, and after the conflict a French pistol was chosen as a model for future American hand guns.

Unlike the British hand guns, there was no standard French pistol model until 1763. Prior to that time the type of arm was left to the decision of the individual corps, the only qualification being that all calibers in the units should be the same. In 1763, an approved model was adopted and fabricated in the Royal manufactories, which previously had been concerned only with the infantry muskets.[73]

There were two versions of the model 1763 pistol, one for cavalry and one for navy use. The difference lay in the mountings which were iron for cavalry, brass for navy. Otherwise they were exactly the same. The .67 caliber barrel was 9 inches long and round throughout its entire length. It was attached to the stock by a tang screw and a long double band at the muzzle, which was held in position by a retaining spring on the obverse side. The walnut stock was long and relatively straight with a hardly noticeable swell at the butt. The butt cap fitted the butt closely and possessed a single short extension up the back of the grip. The key plate resembled those on the contemporary muskets. The ramrod was iron with a button head and decorative turnings just below it. The lock was similar to that on the 1763 infantry musket. It was marked with the name of the manufactory on the lock plate in front of the cock. The year of manufacture

[ 212 ]

## THE FRENCH WARS AND THE REVOLUTION

was engraved on the barrel tang, and the last two digits of the year of manufacture were stamped on the breech immediately behind the proof marks. As the years passed the lock of the pistol was modified more or less in keeping with the changes in the musket. The cock became convex as did the rear of the lock plate, and the pan changed from its original faceted design to a rounded shape. Even in the navy model, however, the pan remained iron.[14]

In 1776, the French adopted a second model which was first manufactured and marked in 1777. The new model differed considerably from its predecessor and indeed resembled no other contemporary pistol. The .67 caliber barrel was 7½ inches long. It was round and tapered gradually toward the muzzle. It was received in a breech casing of brass which fitted around it on both sides and underneath. This housing also held the lock and received the iron ramrod. The cock and frizzen were iron, but the pan was brass and cast as an integral part of the housing. The frizzen spring was inverted underneath the pan, running in a direction opposite from the conventional one. The butt dropped sharply and was covered by a brass butt cap somewhat similar to the one on the preceding model. A back strap of iron connected it with the barrel tang. There was no fore stock. Those pistols intended for naval use were equipped with a belt hook. The lock was marked with the name of the manufactory in an arc under the cock, and the barrel was marked in the same manner as the preceding model. It was this pistol that served as the model for the first pistols made under contract to the new United States government at the end of the Revolution.[15]

What few pistols were made in America during the early years of the 18th century generally followed the standard British forms. Most Americans of the social classes that were apt to own personal pistols preferred to purchase the products of British gunsmiths, and so it was not until the period of the Revolution that a sufficient number of pistols were made in America to permit a general description or classification. During the conflict there appear to have been two general types of pistol manufactured here. One was a close imitation of the British holster pistol of the period. The other was the so-called "Kentucky" pistol. The former differed from its prototype only in workmanship and materials, such as the wood used in the stocks and the very thin brass used in the mountings. The latter was a distinct American type.[16]

These American pistols differed markedly from other contemporary pistols in a number of respects. They were stocked most often with curly maple or a fruit wood, although some with walnut stocks are known. They usually had octagonal barrels or were at least octagonal at the breech. They had both front and rear sights in a period when few pistols had either; and they were frequently rifled.

There were also other distinguishing characteristics. The grips were sharply

[ 213 ]

Compendium_Roth
Page 0463

ARMS AND ARMOR IN COLONIAL AMERICA



*Douglas C. Fonda, Jr. Collection, Courtesy Robert Abels*
Plate 214. English "Cookson" rifle, late 17th century.

curved, ending in a slender butt with either a close-fitting butt cap or none at all. The mountings were usually brass and resembled those on contemporary American rifles. Frequently there was neither fore-end cap nor ramrod thimble. The barrels were pin-fastened, and the locks were hand-forged, differing only in size from those on the rifles.

Many theories have been advanced concerning whether the "Kentucky" pistol was a civilian or military arm. Probably it was a little of both. However, since almost all known specimens appear to have been made either during the Revolution or War of 1812, it would seem that they were originally made primarily as side arms for American officers in those conflicts.

With the coming of the American Revolution two other types of pistol were

[ 214 ]

Compendium_Roth
Page 0464

## THE FRENCH WARS AND THE REVOLUTION

introduced to the American scene, the Dutch and the German. Just as the colonists purchased muskets from the Dutch so they also acquired pistols, although in much smaller quantities.

The German pistols used in this country were extremely few in number. The officers of the German troops brought their own personal weapons just as did their French and British counterparts, and they differed just as widely. There were only a few mounted units, and some of these relied principally on the carbine. And there were no German sailors. The service pistols that were used were acquired in the same way as the muskets and thus varied just as greatly. There were, however, certain general similarities. They were brass mounted, the barrels were round, pin-fastened, and of large caliber, often about .75. Cocks were frequently convex and reinforced. Ramrods were iron and occasionally attached to the barrel by a swivel. And almost always there was the typical elliptical brass front sight.

In addition to these standard muzzle-loading firearms of the period, there were also some breech-loaders and even some repeating arms. The desire for breech-loading and repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century.

The first mention of a repeating weapon in America was made by Samuel Niles, who recorded that in September 1722 certain Indians

> . . . were also entertained with the sight of a curious gun, made by Mr. [John] Pim of Boston,—a curious piece of workmanship,—which though loaded but once, yet was discharged eleven times following, with bullets, in the space of two minutes each of which went through a double door at fifty yards' distance.[77]

The principle on which Pim's gun operated is not known, but it could well have been that patented in London by Abraham Hill in 1664. Hill's mechanism was copied by several other English gunsmiths of his own time, notably John Cookson and John Shaw and by a host of others throughout the 18th century. Another John Cookson (1701-1762), probably a lineal descendant of Hill's contemporary, was a gunsmith in Massachusetts, active after about 1720, and he advertised in the *Boston Gazette* of April 12 and April 26, 1756 that he could make a repeating arm similar to those made by Hill and his forebear. Thus this type of repeating flintlock, popular in England from the third quarter of the 17th century, was known and manufactured in Massachusetts early in the 18th century and is therefore a likely candidate for the type made and used by Pim.[78]

The interrelationship of Hill and the Cooksons is worthy of some slight elaboration because of the misconceptions that have been prevalent in America

[ 215 ]

Compendium_Roth
Page 0465

## ARMS AND ARMOR IN COLONIAL AMERICA

for the past quarter of a century. Because the first example of a gun built on the Hill system which achieved widespread notice in America had been made by John Cookson of London, his name was applied to all such guns by the majority of American collectors. Thus the Hill became known as the "Cookson type" repeating flintlock in this country. The picture was further complicated because the first specimen described here had had its date of manufacture altered so that it appeared to have been made a century before it actually was. Since the date it bore was obviously wrong, and since a John Cookson who advertised that he could make such guns lived in Massachusetts, there has been a tendency to accept the American maker as the one and only Cookson. Some have even listed him as the inventor of the type. John Cookson of London, however, has long been known to students in England, and several of these repeating guns made by him and bearing late 17th century dates are preserved in Great Britain. Thus there were definitely two John Cooksons, probably directly related, who made the Hill type of repeating flintlock, one working in England and one in America.[79]

The mechanism of the Hill repeating flintlock was ingenious. The butt contained two tubular cavities, one above the other, which could be filled from the outside through openings with hinged or pivoted covers on the left side. The uppermost of these cavities was filled with balls, the lower with powder. Between these cavities and the barrel was a cylindrical breech block which pivoted on an axis perpendicular to that of the bore. This cylinder could be revolved by means of a lever attached to its left end. Bored in the side of this cylinder were two cavities which could be aligned either with the cavities in the butt or with the bore by moving the lever. Cut into the side of the breech block near the right end of the cylinder was a shallow depression which served as the bottom of the priming pan.

The method of loading was swift and simple. The tubular cavities in the butt were filled separately with powder and balls, and a small magazine in front of the cock was filled with priming powder. Then the muzzle of the piece was pointed up, and the lever was pulled backward revolving the breech cylinder one half turn. This aligned simultaneously the two cavities in the cylinder with those in the butt. The muzzle was then depressed, allowing a ball to fall into one cavity and enough powder for a charge into the other. At the same time the action cocked the piece and moved the hollow serving as the bottom of the pan under the priming magazine where it also was filled. As soon as these actions had been accomplished the lever was returned to its original position. As it revolved the cylinder back again it aligned first one and then the other of its cavities with the bore. The first to align with the bore was the one containing the ball. As it did so the ball rolled forward to the anterior end of the chamber

[ 216 ]

## THE FRENCH WARS AND THE REVOLUTION



*U. S. National Museum*

Plate 215. Officer's model Ferguson rifle and bayonet presented by Ferguson to Frederick De Peyster.

where a slight decrease in the diameter of the bore prevented it from going further. Next to align itself was the cavity containing the powder, and this also deposited its contents in the chamber. The same action returned the pan filled with powder to its proper place and pushed the frizzen into operating position. Thus with a simple forward and back movement of the lever the gun was loaded, cocked and primed.

The Hill was an efficient, fast-acting gun. Its great drawback was that it required many hours of work by a highly skilled gunsmith to produce one. Alignments had to be perfect, and the seal against the explosion in the chamber had to be secure or the powder in the magazine would also ignite. In the United States National Museum are preserved the remnants of one of these guns in which the seal was not adequate. Because of these factors the Hill was made by fine craftsmen in many countries for well over 100 years, but the expense of manufacture confined its use primarily to wealthy sportsmen.

Another type of repeating flintlock used in America was that invented by Joseph Belton of Philadelphia. Belton offered his gun to Congress, April 11, 1777, and his letter of that date is the only known surviving evidence of the operation of the piece.

To the Honorable Continental Congress
May it Please your Honors,

I would just informe this Honorable Assembly, that I have discovered an improvement, in the use of Small Armes, wherein a common small arm, may be maid to discharge eight balls one after another, in eight, five or three seconds of time, & each one to do execution five & twenty, or thirty yards, and after so discharg'd to be loaded and fir'd with cartrage as [useal?], which I am ready to prove by experimental proof, and can with eaquel ease fix them so as to discharge sixteen or twenty, in sixteen, ten or five seconds of time, which I have kept as yet a secret, thinking that in two or three Months we might have an armey thus equipt, which our enemy should know nothing of, till they should be maid to know it in the field, to their immortal sorrow—

[ 217 ]

Compendium_Roth
Page 0467

And if you Gentlemen are desirous to enquire into this improvement, your Humble Servant, is ready to wait upon you at any time, or place, or he may be waited on at the Widow Ford's, in Walnut Street, between second & third Street.

from Your most Obedient
Humble Servant
Joseph Belton[80]

Philadelphia April 11th 1777

Congress acted swiftly and apparently put some of Belton's guns in service, for on May 3 they passed the following resolution:

*Resolved*, That . . . Belton be authorized and appointed to superintend, and direct the making or altering of one hundred muskets, on the construction exhibited by him and called "the new improved gun" which will discharge eight rounds with once loading; and that he receive a reasonable compensation for his trouble, and be allowed all just and necessary expences.[81]

With only this meager description, it is impossible to determine exactly how the Belton improvement operated. The reference to predetermined timing of shots and the number of charges, however, would seem to indicate that a fuse or powder train was involved and that once the first charge was ignited, the rest followed automatically.

The only breech-loading arm that was used in any quantity as a military weapon during the period, however, was a rifle developed by Col. Patrick Ferguson of the British Army. In this arm, a plug operating on a screw passed vertically through the breech of the barrel. The lower end of this plug was attached to the trigger guard which acted as a handle. One revolution of the trigger guard in a clockwise direction lowered the plug until its top was flush with the bottom of the chamber in the breech. The plug being thus depressed left a hole in the top of the barrel which communicated directly with the bore. In order to load the gun the barrel was pointed slightly downward, the trigger guard revolved and the plug accordingly depressed. A ball was dropped into the hole in the top of the barrel where it rolled forward until stopped by the lands of the rifling at the end of the chamber. The ball was followed by a charge of powder which was measured simply by filling the cavity of the chamber behind the ball. The trigger-guard was then revolved in a counter-clockwise direction, closing the opening in the top of the barrel and forcing out any excess powder that might have been poured in. The pan was primed separately, and the piece was ready for firing.

The Ferguson rifle was a simple and efficient weapon. Its versatility, ac-

[ 218 ]

## THE FRENCH WARS AND THE REVOLUTION



National Park Service

Plate 216. Enlisted man's Ferguson rifle with breech open.

curacy, and rapidity of fire were demonstrated by its inventor at Woolwich on June 1, 1776 before a board of distinguished army officers. A contemporary account declared that:

> . . . he made some experiments . . . with the rifle gun on a new construction which astonished all beholders. The like had never before been done with any other small arms. Notwithstanding a heavy rain and the high wind, he fired during the space of four or five minutes at the rate of four shots per minute, at a target two hundred yards distance. He next fired six shots in one minute, and also fired (while advancing at the rate of four miles an hour) four times in a minute. He then poured a bottle of water into the pan and barrell of the piece when loaded so as to wet every grain of the powder, and in less than half a minute he fired with it as well as ever without extracting the ball. Lastly, he hit the bull's eye lying on his back on the ground, incredible as it may seem to many, considering the variations of the wind and the wetness of the weather. He only missed the target three times during the whole course of the experiments.[32]

Despite the obvious excellence of the Ferguson rifle and its advantages over the standard British military arms, it was used by very few troops in the American Revolution. It is probable that only Ferguson's own company of light infantry in the 71st Regiment was armed with them, although there is a slight possibility that both light infantry companies of the 71st had them. At most, this would indicate a total of less than 200 Ferguson rifles in use.

The records of the use of these arms in America are very sketchy, but it would appear that their primary service was during the New Jersey campaign of 1777 and 1778. They were very definitely used at Brandywine, September 11, 1777, where Ferguson was seriously wounded. While Ferguson was recuperating from his wound, the rifles were retired from use. According to tradition he reassembled the rifle-corps upon his return to duty and used them in his famous engagement at Little Egg Harbor against the Pulaski Legion.

[ 219 ]

## ARMS AND ARMOR IN COLONIAL AMERICA

It is also stated that the remaining rifles were captured by the Americans at Stony Point July 16, 1779. This is by no means certain, however. Ferguson's men were there, but the American list of captured supplies makes no mention of any breech-loading rifles, and no comment on the part of any of the participants has been found that refers to them. It would seem that such an unusual weapon would have elicited some comment. Ferguson himself had meantime been detached from his corps and sent to the South with Sir Henry Clinton as Inspector-General of Loyalist troops. There he was killed on October 7, 1780 at the battle of Kings Mountain.[83]

The Ferguson rifle was not an entirely new invention. Rather it was an improvement over several existing systems. There had been guns with plugs that screwed out of the breech for many years. Some had even been attached to the trigger guard. A musket or rifle on this principle had been recommended for use by engineers in the British army many years before the American Revolution. In all of these systems, however, the plug passed through only one thickness of the barrel and had to be completely removed in order to load. Then it had to be inserted again. All this gave rise to several difficulties. There was the possibility of losing the plug while loading. Also there was the difficulty of aligning the threads of the screws correctly before the plug could be returned, no mean feat for a man under fire. Finally, these plugs had all been made with conventional threads which required several turns in order to remove the plug from the barrel.[84]

Ferguson's improvements over these systems were several. The breech plug passing entirely through the barrel left a hole at the top for loading while the plug remained in the lower thickness. Thus the plug was never removed, ran no risk of being lost or becoming fouled with dirt, and the threads were always aligned for a return to a closed position. Also the plug was made with a fast traveling thread that allowed it to be dropped its complete length in only one turn of the trigger guard. Ferguson further added ingenious channels cut in the thread which greatly reduced powder fouling, and he equipped his rifles with adjustable sights.

Two of the small group of Ferguson rifles used in America during the Revolution have survived the ravages of time. One is a typical private soldier's weapon with a standard government lock and the serial number 2. The other is a fine specimen of an officer's model made by Durs Egg, a well known English gunsmith who later produced many sporting rifles on the Ferguson system.

The private soldier's Ferguson, now preserved at Morristown National Historical Park, is patterned after the contemporary Brown Bess, but with a few notable exceptions. Aside from the breech mechanism and the sight, these dif-

[ 220 ]

## THE FRENCH WARS AND THE REVOLUTION



*National Park Service*

Plate 217. Top of breech of enlisted man's Ferguson rifle showing opening, sight and sling swivel.

ferences include the method of fastening the barrel to the stock by keys instead of pins, the placement of the rear swivel on the side of the stock opposite the lock, and the placement of the bayonet stud underneath the barrel thus requiring a special bayonet. Finally, it had a wooden ramrod, and neither of the forward two ramrod thimbles were trumpet shaped.[85]

The officer's model Ferguson rifle is preserved in the United States National Museum. It is a particularly historic weapon in that it is the piece presented personally by Ferguson to Captain De Peyster, his second in command in the Southern Campaign. This piece differs from the contemporary officer's fusil in the same fashion as the private's weapon differed from the contemporary musket.

The bayonet which fitted these weapons differed considerably from the ordinary bayonet. As was noted above, the fact that the stud was on the underside of the barrel necessitated a bayonet with its slots on the opposite side of the socket from those on the regular infantry bayonets. There were, however, other differences. The blade was wide and flat, not triangular like the musket bayonets, and it was 25½ inches long—7½ inches longer than the musket bayonet.

These, then, were the principal firearms in a century which saw little change. The period began in 1689 with the muzzle-loading smooth-bore musket and pistol as the most popular weapons. In 1783, almost a hundred years later, the period ended with the same weapons still supreme, and without even any notable improvements in their design or construction. Breech-loaders and repeaters had appeared frequently on the scene but had made little impression upon it. The rifle had been developed and achieved considerable prominence as a sporting arm, but it still possessed drawbacks that prevented it from becoming an important military weapon. Changes, however, were not far off. In a few

[ 221 ]

Compendium_Roth
Page 0471

# ARMS AND ARMOR IN COLONIAL AMERICA

years the percussion cap would be invented, then the expanding bullet which made the rifle the supreme military arm, and finally the metallic cartridge which ushered in the era of the breech-loader and repeater. Change, when it came, was swift. The 18th century was the quiet prelude to these dramatic events.

---

## NOTES—CHAPTER FIVE

1. There are many military texts and drill manuals of the period which are useful. The following is a selected list of some of the better volumes. *Fortification and Military Discipline*, London, 1688. Nicholas Boone, *Military Discipline*, Boston, 1701. *The Perfection of Military Discipline after the Newest Method as Practiced in England and Ireland, &c.*, 4th edition, London, 1702. William Brattle, *Sundry Rules and Directions for Drawing up a Regiment*, Boston, 1733. Humphrey Bland, *A Treatise of Military Discipline*, 4th edition, London, 1740. William Windham, *A Plan of Discipline Composed for the Use of the Militia of the County of Norfolk*, London, 1759. Timothy Pickering, Jr., *An Easy Plan of Discipline for a Militia*, Salem, Massachusetts, 1775. Lewis Nicola, *A Treatise of Military Exercise Calculated for the Use of the Americans*, Philadelphia, 1776. M. de Lamont and the Chevalier de la Valliere, *The Art of War*, Philadelphia, 1776. Richard Lambert, 6th Earl of Cavan, *A New System of Military Discipline, Founded upon Principle*, Philadelphia, 1776. Col. David Dundas, *Principles of Military Movements Chiefly Applied to Infantry*, London, 1788. Friedrich Wilhelm August Heinrich Ferdinand, Baron Von Steuben, *Regulations for the Order and Discipline of the Troops of the United States*, editions of 1778, 1779, 1794, and others. Pickering's *Plan* is particularly useful to the beginner because it explains everything in minute detail. Windham and Bland were probably the two books most widely accepted in American military circles in the years just prior to the Revolution.

2. *Ibid.*

3. Thomas Simes, *The Military Medley*, London, 1768, 28.

4. Frederick Mackenzie, *A British Fusilier in Revolutionary Boston*, Allen French, editor, Cambridge, 1926, 28, 29. For Washington's attitude toward target practice with the musket see General Instructions to all Captains of Companies, July 29, 1757 in George Washington, *The Writings of George Washington*, John C. Fitzpatrick, editor, 39 vols., Washington, 1931-1944, II, 113. Also Washington to Maj. Andrew Lewis, April 21, 1758, *ibid.*, 180, 181.

5. Col. George Hanger, *To All Sportsmen and Particularly to Farmers, and Gamekeepers*, London, 1814, 205.

6. Order for a 100 Barrells of Powder and 200 muskets for Maryland, October 15, 1691, Browne, *Archives of Maryland*, VIII, 287. "Proceedings of the Council of Maryland, 1694-97," *ibid.*, XX, 40, 248. W. Shirley to Horatio Sharpe, April 24, 1756, *ibid.*, VI, 392. Godolphin to Col. Nicholson, August 20, 1702, Palmer and Fluornoy, *Calendar*, I, 80, 81. Col. Robert Hunter to the Lords of Trade, November 30, 1709, O'Callaghan, *Documents*, V, 113. "Minutes of the General Assembly," May 11, 1758, Hoadly, *Conn. Records*, XI, 123, 124. "Minutes of the Connecticut General Assembly, May, 1772," *ibid.*, XIII, 615, 616. Copy of Bond on the Part of Pennsylvania to the King for Arms, &c., 1755, Samuel Hazard and others, editors, *Pennsylvania Archives*, 17 vols., Philadelphia, 1852-1892, II, 500. "Journal of the House of Representatives," July 22, 1711, Nathaniel Bouton, and others, editors, *New Hampshire State Papers*, 40 vols., Manchester, New Hampshire, 1867-1941, XIX, 19, 20. "Records of the Council," May 20, 1712, *ibid.*, II, 684. Letter from the Earl of Egremont, December 12, 1761, *ibid.*, I, 811. Harold L. Peterson, "Committee of Safety Muskets," *The American Rifleman*, February, 1950, 26-28.

7. George, *Guns and Rifles*, 74, 75.

8. *Ibid.*

9. George, *Guns and Rifles*, 81, 106.

10. *Ibid.*, 80, 81, 113, 114, 173. Alm, *Eldhandvapen*, I, 323-325. Simes, *Military Medley*, in unpaged "Military Dictionary" under "Firelock." Lambert, *Military Discipline*, 18-23. "Firelock," George Smith, *An Universal Military Dictionary*, London, 1779. See also articles under the same heading in Charles James, *A New and Enlarged Military Dictionary*, 3rd edition, 2 vols., London, 1810; and William Duane, *A Military Dictionary*, Philadelphia, 1810.

11. Lawson, *Uniforms*, II, 42. Percy Sumner, "Morier's Paintings of Grenadiers, 1751," *Journal of the Society for Army Historical Research*, XVIII (1939), 215, 216.

12. Lawson, *Uniforms*, II, 45, 46.

[ 222 ]

# THE FRENCH WARS AND THE REVOLUTION

13. George, *Guns and Rifles*, 149. Lawson, *Uniforms*, II, 46.

14. Percy Sumner, "Private, Light Troop, 11th Dragoons, c. 1760," *Journal of the Society for Army Historical Research*, XVIII (1939), 187. Major G. Tylden, "The Use of Firearms by Cavalry," *ibid.*, XIX (1940), 15.

15. This lock is now in the museum at Guilford Court House National Military Park, North Carolina.

16. Margerand, *Armement*, 21-43. Maurice Bottet, *Monographie de L'Armes A Feu Portative des Armées Françaises*, n.d., 1-11. James E. Hicks, *Notes on French Ordnance*, Mount Vernon, New York, 1938, 13-16.

17. Bottet, *Armes A Feu*, 6, 8.

18. *Ibid.*, 4, 5. Hicks *French Ordnance*, 15, 16.

19. An Act for Regulating the Militia, May, 1741, Hoadley, *Connecticut Records*, VIII, 380. Boone, *Military Discipline*, 73, 74. Governor Hardy to the Lords of Trade, June 16, 1756, O'Callaghan, *Documents*, VII, 3. An Act for the Better Regulating and Training the Militia, 1755, Henning, *Statutes*, VI, 536, 537. An Act for Settling the Militia, 1705, *ibid.*, III, 338. An Act for the better Regulation of the Militia, 1738, *ibid.*, V, 17.

20. Worthington C. Ford, editor, *Journals of the Continental Congress, 1774-1789*, 23 vols., Washington, 1904-1909, II, 188, 190, III, 322.

21. Peter Force, compiler, *American Archives*, 4th series, 6 vols., Washington, 1837-1846, III, 1496-1497.

22. *Ibid.*

23. Minutes of the General Assembly, April 1775, Hoadley, *Connecticut Records*, XIV, 420; May 1775, *ibid.*, XV, 17, 18.

24. Minutes of the General Assembly, October 1775, Hoadley, *Connecticut Records*, XV, 137; March 22, 1776, *ibid.*, 254, 255; May 1776, *ibid.*, 304, 305; June 1776, *ibid.*, 420, 421.

25. Proceedings of the General Assembly, March 18, 1776, John R. Bartlett, editor, *Records of the Colony of Rhode Island and Providence Plantation*, 10 vols., Providence, 1856-1865, VII, 477, *et passim*.

26. Maj. Jonathan Child to Committee of Safety, July 14, 1776, Bouton, *New Hampshire Papers*, VIII, 304, 305; Committee in Moultonborough to Jonathan Moulton of Hampton, July 15, 1776, *ibid.*, 305; Committee of Safety to Washington, February 21, 1777, *ibid.*, 496, 497; *et passim*.

27. Proceedings of the Provincial Congress, June 30, 1775, O'Callaghan, *Documents*, XV, 13, 14.

28. Minutes of the Council of Safety, February 28, 1776, William H. Engle and others, editors, *Pennsylvania Archives*, 2nd series, 16 vols., Harrisburg, 1890, X, 498; July 3, 1775, *ibid.*, 282; March 6, 1776, *ibid.*, 304.

29. William Whitehead, and others, editors, *New Jersey Archives*, 39 vols., Newark, 1880-1946, *passim*.

30. "Journal and Correspondence of the Council of Safety 1775-76," Browne, *Archives of Maryland*, XI, 75.

31. Charles Beatty to Council, September 20, 1775, Browne, *Archives of Maryland*, XI, 81. Ewing to Council, February 12, 1776, *ibid.*, 155. Journal of the Council of Safety, August 17, 1777, *ibid.*, XVI, 219; July 29, 1777, *ibid.*, X, 320; August 16, 1777, *ibid.*, 335. Council of Safety to Richard Bond, November 15, 1776, *ibid.*, XII, 449; Council of Safety to Col. H. Holingworth, May 14, 1777, *ibid.*, XVI, 253. Benjamin Rumsey to Council of Safety, March 7, 1776, *ibid.*, XI, 211, 212. Council of Safety to Daniel Bowly, March 14, 1776, *ibid.*, 247. Council of Safety to the Commissioners of the Gunlock Manufactory in Frederick Town, July 30, 1776, *ibid.*, XII, 142.

32. Robert L. Miller, "Fredericksburg Manufactory Muskets," *Military Collector & Historian*, III, no. 3 (September 1951), 63-65.

33. September 28, 1776, H. R. McIlwaine, editor, *Journals of the Council of the State of Virginia*, 2 vols., Richmond, 1931, I, 177, 178.

34. Journal of the Council of Safety, January 2, 1776, Allen D. Candler, compiler, *The Revolutionary Records of the State of Georgia*, 3 vols., Atlanta, 1908, I, 85, *et passim*. Journal of the Council of Safety for the Province of South Carolina, 1775, (Collections of the South Carolina Historical Society) II, III, Charleston, 1858, 1859, 199-201, 213, 214, *et passim*. William L. Saunders, editor, *The Colonial Records of North Carolina*, 10 vols., Raleigh, 1886-1890, IX, X, *passim*.

35. Silas Deane to Secret Committee, August 18, 1776, Charles Isham, editor, *Deane Papers*, (Collections of the New York Historical Society, 1886-1890) 5 vols., I, 195-218. Henri Doniol, *Histoire de la Participation de la France à l'Etablissement des Etats-Unis d'Amerique*, 6 vols., Paris, 1886, I, 133, 377, 482. Robert Morris to Council of Safety, December 23, 1778, Hazzard, *Pennsylvania Archives*, VII, 125, 126; May 10, 1779, *ibid.*, 386. Heads of an Agreement Made Between the Committee of Congress & Hodges & Bayard & Co., February 2, 1776, *ibid.*, IV, 708. Instructions to Captain Forsythe, January 1776, Browne, *Archives of Maryland*, XI, 98. William Lee to Governor Jefferson, September 24, 1779, Palmer and Flournoy, *Calendar of Va. State Papers*, I, 328, 331. Henry Laurens to Elisha Sawyer, January 19, 1776, *Journal of Council of Safety of South Carolina*, III, 199-201. Laurens to Capt. Joseph Darrell, January 24, 1776, *ibid.*, 213, 214. Harold L. Peterson, *Silas Deane in France*, typescript of Master of Arts thesis, University of Wisconsin, 1946, 21.

36. Peterson, *Silas Deane*, 21-45.

37. William Lee to Governor Jefferson, September 24, 1779, Palmer and Flournoy, *Calendar of Virginia State Papers*, I, 328-331. Peterson, *Silas Deane*, 27, 28.

[ 223 ]

Compendium_Roth
Page 0473

38. January 30, February 1, February 14, February 24, 1777, Ford, *Journals of the Continental Congress*, VII, 74, 85, 119, 120, 151. Washington to Lt. Col. Benjamin Flower, March 31, 1777, Washington, *Writings*, VII, 341; to Gen. Alexander McDougall, April 17, 1777, *ibid.*, 424, 428. General Orders, Morristown, N. J., April 18, 1777, *ibid.*, 428. Washington to Gen. Samuel H. Parsons, April 23, 1777, *ibid.*, 457.

39. Of the two known specimens of the Prussian musket in America, one is in The West Point Museum. The other, originally found in New England, is now in the museum at Guilford Courthouse National Military Park, North Carolina.

40. Gustav Freytag, "The Citizen and His Shooting Festivals," reprinted in *The Gun Collector*, no. 37, 587-612. G. Charter Harrison, Jr., "The Kentucky Rifle Credo," *The Gun Collector*, no. 38, 617-626. John G. W. Dillin, *The Kentucky Rifle*, 3rd edition, New York, 1946, *passim*. Stephen V. Grancsay, "The Craft of the Early American Gunsmith," *Bulletin of the Metropolitan Museum of Art*, VI, No. 2 (October, 1947), 54-61.

41. Anonymous letter in Braddock's campaign, July 25, 1755, Stanley Pargellis, editor, *Military Affairs in North America, 1748-1765*, New York, 1936, 115.

42. Ford, *Journals of the Continental Congress*, II, 89, 90. John Adams to Abigail Adams, June 17, 1775, John and Abigail Adams, *Familiar Letters of John Adams and his Wife, Abigail Adams During the Revolution*, edited by Charles Francis Adams, New York, 1876, 65, 66.

43. James R. Bright, "The Rifle in Washington's Army," *The American Rifleman*, XCV, No. 8 (August 1947), 8. "Gazette," *Military Collector & Historian*, III, No. 2 (June 1951), 50, 51.

44. Hanger, *To All Sportsmen*, 122-124, 144.

45. *Ibid.*, 207-210.

46. Webster to Committee of Safety, June 21, 1775, Bouton, *New Hampshire State Papers*, VII, 526. Sullivan to Committee, July 19, 1775, *ibid.*, 565.

47. September 27, 1781, *Orderly Book for the Siege of Yorktown, from September 26, 1781 to November 2, 1781*, Philadelphia, 1865, 5.

48. Richard Peters to the Council of Safety, October 26, 1776, Browne, *Archives of Maryland*, XII, 405. Bright, "Rifle," 10. Washington to Morgan, June 13, 1777, Washington, *Writings*, VIII, 236. Wayne to Peters, February 3, 1778, Antony Wayne, *Papers*, Revolutionary Series, transcribed by Henry B. Dawson, 1860, from original manuscripts in possession of the Wayne family, 10 bound folios, Morristown National Historical Park, Ill.

49. John G. Simcoe, *Simcoe's Military Journal*, New York, 1844, 257.

50. Frank Moore, *Diary of the American Revolution*, 2 vols. New York, 1860, 349, 350.

51. Hanger, 199, 200.

52. *Ibid.*

53. Washington, *Writings*, IX, 78, 102.

54. Edward J. Lowell, *The Hessians and Other German Auxiliaries of Great Britain in the Revolutionary War*, New York, 1884, *passim*. Charles M. Lefferts, *Uniforms of the American, British, French and German Armies in the War of the American Revolution, 1775-1783*, New York, 1926, 261-278.

55. Harrison, *Kentucky Rifle Credo*, 617-626. Grancsay, *American Powder Horns*, 7, 8.

56. St. George Tucker, "St. George Tucker's Journal of the Siege of Yorktown, 1781," edited by Edward M. Riley, *The William and Mary Quarterly*, Third series, V, no. 3 (July 1948), 381.

57. "Blunderbuss," in "Military Dictionary" section of Simes, *Military Medley*. For a report on test-firing blunderbusses see Harold L. Peterson, "Did It Work," *American Rifleman*, February 1955, 20-23.

58. Washington to Board of War, April 4, 1779, Washington, *Writings*, XIV, 331.

59. Washington to Board of War, April 15, 1779, *ibid.*, 390.

60. George, *Guns and Rifles*, 73. Charles Ffoulkes, *Arms and Armament*, London, 1945, 65. Lawson, *Uniforms*, II, 48. Herbert A. Sherlock, "Early British Grenade Launchers," *Military Collector & Historian*, III, No. 2 (June 1951) 44-46.

61. *Ibid.*

62. *Ibid.*

63. December 18, 1695, "Proceedings of the Council of Maryland, 1694-97," Browne, *Archives of Maryland*, XX, 446, 447. March 3, 1696/7, "Proceedings of the Council of Maryland, 1696/7-98," *ibid.*, XXIII, 75.

64. Saint Remy, *Memoires d'Artillerie*, I, 326.

65. Col. Lewis to Washington, February 4, 1776, *Washington Papers*, Manuscript Division, Library of Congress.

66. Miller, "Fredericksburg Manufactory Muskets," 63-65. The existing specimens of Rappahannock Forge wall guns are located at the following places: one at the United States Military Academy Museum, West Point, New York, one in the museum at the Springfield Arsenal, Springfield, Massachusetts, and two in the museum at Rock Island Arsenal, Rock Island, Illinois.

67. *Washington Papers*, Library of Congress.

68. George, *Pistols and Revolvers*, 38. Major G. Tylden, "The Use of Firearms by Cavalry," *Journal of the Society for Army Historical Research*, XIX (1940), 14.

69. George, *Pistols and Revolvers*, 49-56.

70. *Ibid.*, 50-52.

71. *Ibid.*

72. *Ibid.*, 52, 53.

73. Bottet, *Armes a Feu*, 4, 5.

[ 224 ]

Compendium_Roth
Page 0474

# ARMS AND ARMOR IN COLONIAL AMERICA

74. *Ibid.* Hicks, *French Ordnance*, 80, 86.

75. *Ibid.*

76. George N. Hyatt, "The Kentucky Pistol," Dillin, *Kentucky Rifle*, 125-127.

77. Samuel Niles, *A Summary Historical Narrative of the Wars in New England with the French and Indians in the Several Parts of the Country*, Massachusetts Historical Society *Collections*, 4th series V (1861), 347.

78. George, *Guns and Rifles*, 69, 137, 138. Robert E. Gardner, *Five Centuries of Gunsmiths, Swordsmiths and Armourers, 1400-1900*, Columbus, Ohio, 1948, 25. *Boston Gazette*, April 12, 26, 1756. Stephen Van Rensselaer, *American Firearms*, Watkins Glen, New York, 1947, 55, 56.

79. *Illustrated Catalogue of United States Cartridge Company's Collection of Firearms*, Lowell, Massachusetts, n.d., 17-19. Metschl, *Nunnemacher Collection*, I, 84-87. George, *Guns and Rifles*, 69, 137, 138. L. D. Satterlee and Arcadi Gluckman,

*American Gun Makers*, Buffalo, New York, 1945, 34.

80. *Papers of the Continental Congress*, Manuscript Division, Library of Congress, I, No. 41, 123, 124.

81. Ford, *Journals of the Continental Congress*, VII, 324.

82. *Annual Register*, XIX (1776), 148.

83. *Political Magazine, Naval, Military, and Literary*, January, 1781, 125. Dawson, *Wayne Papers*, V, VI, VII, passim. Henry P. Johnston, *The Storming of Stony Point*, New York, 1900, passim. George, *Guns and Rifles*, 148-152.

84. George, *Guns and Rifles*, 149. Metschl, *Nunnemacher Collection*, I, 87, 88. Lawson, *Uniforms*, II, 195, 196.

85. Harold L. Peterson, "The Private Soldier's Ferguson Rifle," *Military Collector & Historian*, II, No. 4 (December 1950), 60-62.

[ 225 ]

Compendium_Roth
Page 0475

# Chapter Six

# *Ammunition and Equipment*

IN AMMUNITION, as well as in firearms, the period from 1689 to 1783 was characterized by gradual improvements on existing forms and a trend toward standardization. There were no revolutionary new developments. The composition of gun powder remained the same as it had been for the previous two centuries, and the spherical lead ball continued as the standard missile.

It continued to be the practice to load a musket with several balls, usually one regular full-sized ball and a few buck shot. The number of buck shot varied. One recruit in the "Standing Army" in 1777 mentioned having 64 rounds of ammunition with three buck shot each, a number which became standard in the next century. Washington, however, recommended that the men load for their first volley "with one musket ball and four or eight buck Shott, according to the strength of their pieces . . ." And General Henry Dearborn went still further as he reported in describing an incident during the American assult on Quebec, December 31, 1775:

> I Clapt up my Piece which was Charged with a ball and Ten Buck shott certainly to give him his due, But to my great mortification my Gun did not go off . . .

The heavy snowstorm during which the attack was made had apparently wet the priming powder in Dearborn's musket and thus saved his adversary from receiving a very lethal charge.[1]

Sometimes the balls were cut or otherwise mutilated, and sometimes other hard objects were used, thus giving rise to contemporary "atrocity stories." After the battle of Lexington and Concord, for instance, the British protested that the Americans had cut their musket balls so that they separated into four pieces upon firing, and a Boston surgeon who examined the wounded also reported the use of old nails and angular pieces of iron. Somewhat later, British General Howe wrote Washington:

[ 227 ]



The Arms
& Armour
Series

# DAGGERS & FIGHTING KNIVES OF THE WESTERN WORLD
## from the Stone Age till 1900

HAROLD L. PETERSON

Compendium_Roth
Page 0477



# The Arms & Armour Series

# DAGGERS & FIGHTING KNIVES OF THE WESTERN WORLD
## from the Stone Age till 1900

### HAROLD L. PETERSON



ARMS AND ARMOUR SERIES

*General Editor:* CLAUDE BLAIR

Other titles in this Series

REVOLVING ARMS by A. W. F. Taylerson
ORIENTAL ARMOUR by H. Russell Robinson

*In preparation:*
HUNTING WEAPONS by Howard Blackmore
ITALIAN FIREARMS by James Lavin
ENGLISH PISTOLS, 1650–1750 by F. Wilkinson and A. Littler
ENGLISH ARMOUR by Claude Blair

Compendium_Roth
Page 0479

# Daggers and Fighting Knives
## of the Western World

From the Stone Age till 1900

by

## HAROLD L. PETERSON



WALKER & COMPANY · NEW YORK

Compendium_Roth
Page 0480

# CONTENTS

|  | *page* |
| --- | --- |
| LIST OF PLATES | vii |
| ACKNOWLEDGEMENTS | xi |
| PREFACE | |
| CHAPTER ONE | |
| Origins of the Dagger and Fighting Knife | I |
| CHAPTER TWO | |
| Medieval Daggers | 12 |
| CHAPTER THREE | |
| The Sixteenth Century | 36 |
| CHAPTER FOUR | |
| The Seventeenth Century | 47 |
| CHAPTER FIVE | |
| The Eighteenth Century | 58 |
| CHAPTER SIX | |
| The Nineteenth Century | 67 |
| Select Bibliography | 81 |
| Index | 83 |

Compendium_Roth
Page 0481

All rights reserved. No portion of this work may be reproduced without permission except for brief passages for the purpose of review.

Library of Congress Catalog Card Number: 67–23087

First published in the United States of America in 1968 by Walker and Company, a division of Publications Development Corporation.

Printed and manufactured in Great Britain



*399
P442d

69 22

SAN FRANCISCO
PUBLIC LIBRARY

Jacket design by Michael N.

driven into the wood until it held fast by friction. Sometimes a fer-
rule or two of iron, brass or pewter were added for extra strength.
There was no pommel. Scabbards were of harness leather or raw-
hide without metal mounts, hand sewn and shaped to fit the blade.

The second form of knife was purely and simply a butcher
knife, just as the contemporary documents seem to suggest.
Judging from the number of accounts which use this descriptive
term, it was probably the more common of the two forms of
knife. The one excavated and clearly datable blade represents
just this type (Plate 78). It was found in the parapet of an earth-
work erected by American troops near Fort Ticonderoga in 1777
in such a position that it could only have got there when the
work was being built. It is a single-edged blade with a very
slightly curved back and an edge that curves from the short
choil all the way to the point. The tang is narrow, and it is not in
a direct line with the back, but slightly towards the centre of the
blade. A few fragments of the original wooden handle still
remain. This handle was obviously a simple cylinder of wood
without a ferrule, but in other instances antler was quite probably
used as well (Plate 79). The scabbard would have been similar to
that described for the dagger.

Such knives as these were carried thrust through the belt, not
suspended from it. Normally they were worn on an angle at the right
front with the point towards the left and the handle to the right. At
times they might be slipped farther around to the side, but they
were kept far enough front so that they did not interfere with the
powder horn or hunting bag which hung under the right arm.

Both types of knife seem to have developed early in the eight-
eenth century as settlers pushed westward into the Appalachians.
They remained in use through the opening years of the nineteenth
century, but gradually began to give way to more sophisticated
knives imported from England or made by cutlers on the Eastern
Seaboard. When the frontier moved beyond the Mississippi River
they disappeared completely.

The rifleman's knife was the latest of the three principal
eighteenth-century types to appear. It was also the first to vanish.
The Mediterranean dirk lasted through much of the nineteenth
century. The Scottish dirk persists to this day, but all reached the
height of their development in the eighteenth century. Their
later history was anticlimax.



**80.** Folding knife of the late eighteenth century large enough to have been used for fighting. The *navaja* was generally similar but had a handle that was slightly curved and that tapered to a point. *Richard Lennington Collection*

**81.** English folding pocket dagger of the mid nineteenth century. It belonged to John Wilkes Booth, assassin of President Abraham Lincoln. *U.S. National Park Service*

**82.** English folding dagger and sheath of the late nineteenth century. *Leon C. Jackson Collection*



**83.** (*top*) American made bowie knife by John D. Chevalier, New York City. *James E. Serven Collection*

**84.** (*centre*) Sheffield bowie marked "W & S Butcher for Gravely & Wreaks/New York". The blade is 11¾ inches long. The grips are tortoise shell, the mounts German silver, and the sheath covered in red leather. *Norman Tapley Collection*

**85.** (*left*) Sheffield bowie with horn grips and an alligator embossed on the German silver pommel. The blade is marked "Garrick/works/Sheffield" along with such mottoes as "The Hunters Companion". This knife was used by Lewis Payne to stab Secretary of State Seward the night of Lincoln's assassination. *Dr. John K. Lattimer Collection*

**86.** (*right*) Sheffield bowie with spear point and horse head pommel. The mounts are German silver. *Courtesy, Ben Palmer*

Compendium_Roth
Page 0485



**87.** (*top*) Sheffield bowie with table cutlery handle and etched blade made by G. Woodhead. *Herb Glass Collection*

**88.** Confederate bowie with iron knuckle-bow and tinned iron sheath. *John D. Hammer Collection*

**89.** Sheffield bowie by George Wostenholm carried by a Union soldier during the Civil War. The grips are antler, and the knife is typical of the later and simpler bowie knives. *Courtesy, William Shemerluk*

Compendium_Roth
Page 0486



94. Push dagger of the type popular in the American South and West in the 1850s and 1860s. This specimen was made by Will & Fink, San Francisco. *United States National Museum, Washington*



95. Push dagger with unusual double cross-pieces made by Dufilho of New Orleans. *John D. Hammer Collection*





96-104. British naval dirks. Left to right: (1) midshipman's dirk of 1856 with white fish-skin grip and lion head pommel; (2) volunteer's dirk of about 1846 with ivory grips and a lion head pommel; (3) short dirk with the quillons in the form of the crown and flukes of an anchor, c. 1800–10; (4) light dirk with grooved blade, c. 1800–10; (5) five-ball type dirk with so-called pillow pommel and crown and anchor badge, 1790–1810; (6) dirk with blued and gilded blade and lion head pommel, c. 1810–20; (7) dirk or short hanger with lion head pommel, c. 1800. *Top:* Midshipman's dirk of 1878, as fitted with the lengthened blade, blued and gilt. *Bottom:* Midshipman's dirk of the pattern adopted in 1891 with an etched blade. This specimen bears the Tudor crown of 1901 in the badge. *National Maritime Museum, Greenwich*



105. (*left*) American naval dirk of Capt. Stephen Decatur, *c.* 1800–5. The grip is ivory; the mounts and scabbard, brass. *U.S. Naval Academy Museum, Annapolis*

106. (*right*) American naval dirk, *c.* 1812–20. *Hermann W. Williams Collection*

107. (*left*) American naval dirk of Capt. John Downes, *c.* 1830. *U.S. Naval Academy Museum, Annapolis*

108. (*right*) American naval dirk of the pattern of 1869. *U.S. Naval Academy Museum, Annapolis*

*Chapter Six*

# The Nineteenth Century



Several factors influenced the history of daggers and fighting knives during the nineteenth century, but perhaps one of the most important was the growing industrial revolution. Water-power had been used for tilt-hammers and grinding wheels for centuries, but the early years of the nineteenth century witnessed the increasing use of such mechanized tools. Water-driven buffers joined an increasing array of grinders. Drop-forges for bolsters, guards and pommels became common, as did other mechanical aids. Increased precision in manufacture brought true assembly-line production to the field of knife manufacture and standard mass-produced models became increasingly common. The 'custom made' knife continued to be manufactured throughout the century, but by the 1890s it was hard-pressed by the standardized commercial product. Small local cutlers continued to make knives in all countries, but the wares of such big cutlery centres as Sheffield and Solingen found ever-widening markets throughout the Western world.

During the nineteenth century the knife and dagger continued to decline in importance until they reached their nadir in the 1880s and 1890s. The Scottish and Mediterranean dirks were made and worn through most of the period, but they were appurtenances of native costume rather than weapons. Naval dirks appeared and gained in popularity, especially during the first half of the century, but again they were more emblems of rank than weapons, and even they had fallen largely into disuse by 1900. Folding knives designed for fighting became popular among the gipsies, working people and sailors of Spain and Portugal between 1800 and 1850, but these were comparatively few in number and of little importance. The idea of military knives as weapons for private soldiers was still almost unexplored.

The one major exception to the general lack of interest in the knife as a weapon was found in America, especially in the southern and western states. There, men of all walks of life, law-abiding as well as criminal, were accustomed to wear a knife as a necessary part of their garb. Congressmen and senators even carried them into the United States Capitol. These were not mere decorations. The men who wore them did so for a purpose. It was a violent era, and a man might need a weapon at a moment's notice. The small pistol and the knife answered such a need, and so they were widely popular. This situation seems to have developed especially in the late 1820s and gained in momentum as the sectional strife which led to the American Civil War bred increased personal as well as political hostilities. The climax came in the 1850s. Then the war itself followed, and in the succeeding calm the practice of carrying knives gradually ceased, even in the West. While the period of conflict lasted this was the climate that produced the bowie knife, and the push dagger as well as countless other unnamed knives, but these, too, had all disappeared well before 1900. They mark the last appearance of the fighting knife and dagger as prominent civilian weapons before the forces of law and order and general decorum triumphed over personal violence.

*Folding Knives*

As noted above, the folding knife, known in Spain as the *navaja*, was the weapon of the gipsy, the peasant, the labourer and the sailor. It could be a tool, but it was also considered a weapon. At least one guide to the technique of wielding this knife was published in Madrid in 1849 and called *Manuel del Baratero ô Arte de Manejar la Navaja el Cuchillo y la Tijera de los Jitanos*. As the title indicates, it dealt not only with the *navaja*, but also the fixed-bladed knife and even scissors as gipsy weapons. Spaniards of the lower classes were evidently resourceful in their choice of arms.

As judged by surviving examples, the *navaja* varied considerably in size. It was always a single-bladed weapon, but that blade varied from 3 or 4 ins. in length to a full foot and sometimes even more. Perhaps the average length of a good-sized *navaja* blade was 6 to 8 ins. Despite their low origin and purpose, the steel of the blade was usually good and well tempered. The blade was locked in its open position by a spring catch. To release it, it was usually necessary to pull up on a ring, chain or flange provided

for the purpose and so free the nose of the catch. The blade was then loose and could be returned to its closed position. Other *navaja* blades acted against a spring in the manner of a modern jack knife. The back of the blade was normally straight or slightly convex. The edge started parallel to the back, then curved up to meet it at the point.

The handles of the *navaja* were usually made of cow horn with iron linings. They curved in the direction of the edge of the blade and tapered from the hinge end to the tip that housed the point of the blade. As peasant and labourers' weapons they were normally completely plain and undecorated.

As is often the case with such simple weapons, no one knows exactly when they originated or when they ceased to be carried. Some specimens are known which may date from the eighteenth century, but it is difficult to be certain. The manual mentioned above gives one firm date for their use at mid-century and indicates by its comments that such knives had been popular for many years by that ime. The *navaja* may well have continued in use until 1900 or later, at least in remote parts of the Iberian Peninsula, but it certainly had lost its popularity well before that time. Thus one may safely assume that this was primarily a nineteenth-century knife, though it probably had its origins in the eighteenth century.[1]

The *navaja* was not the only large clasp knife that could be used for a weapon. Elsewhere in Europe big folding knives appeared, and though there are no other manuals or specific references to their use as weapons, their very size indicates that this was their purpose (Plate 80). After all, a knife with a 10- or 12-in. blade is too big for the normal uses of a pocket or pen knife. These large folding knives are often indistinguishable from the *navaja* except that the special spring catch for the blade and its release ring are seldom encountered outside the Iberian Peninsula and near-by northern Africa. Also brass or iron bolsters that add strength to the pivot of the blade seem to be more common outside the area of the *navaja*. These big single-bladed knives that are so closely allied to the *navaja* were definitely made at least as early as the second half of the eighteenth century, for dated and associated specimens are known, and this is one more reason for assigning such a date to the *navaja* as well. Unlike the *navaja*,

[1] See also the note on p. 80.

Compendium_Roth
Page 0492

however, these big knives seem to have disappeared early in the nineteenth century as far as the rest of Europe was concerned.

The idea of a folding weapon did not disappear, however. In the middle and late nineteenth century a small group of folding knives appeared that came to be known as folding dirks, folding daggers or pocket daggers. Both Sheffield and Solingen produced them in some quantity and variety. Some were designed to be carried in the pocket with blades that were no longer than the hilt, so that they could be safely folded up with the edge and point covered (Plate 81). Others were so long that even when folded the blade projected (Plate 82). One especially long specimen survives with a blade $16\frac{3}{4}$ ins. long when extended and 10 ins. long when closed. It is so designed that it can be used either open or closed, depending upon the length of the blade the user felt desirable for the circumstances. Such a knife necessarily required a scabbard. Most, but not all, of these folding daggers boasted simple cross quillons, but a few had only a bolster. Blades might be double- or single-edged, and the handles assumed a variety of forms, but always there was a bolster at the pivot and usually a pommel at the other end.

The extent to which folding daggers were used in Europe is unknown. It seems unlikely that they found a big market in either England or Germany, where they were made. Rather, America seems to have been the intended sales area. The decoration on surviving specimens often includes the eagle and other American motifs. John Wilkes Booth, the assassin of President Abraham Lincoln in 1865, had a Sheffield-made folding dagger in his pocket when he was killed by pursuing soldiers after the tragedy, and sufficient examples of the genre are found in the United States to indicate this country as the primary market.

### Bowie Knives

Few knives of recent years have captured the imagination as thoroughly as the bowie knife. It immediately conjures up a picture of a rough and ready environment with violence an ever-present threat. This is just as true of the time when the knife was actually used as it is today. Visitors to the United States from Europe were awed by the huge knife and felt constrained to comment about it at length in their writings. Citizens from the north-eastern part of the country felt the same reaction when they

ventured south or west into the area of the bowie knife's domination. Even in its own domain, state legislatures in Tennessee, Alabama, and Mississippi passed laws covering the use, transfer, or even public handling of the dread weapon in an attempt to minimize what they considered its violent influence.

The history of the bowie knife begins in 1827. In that year the famous American frontiersman and soldier, James Bowie (1795-1836), was given a knife by his brother Rezin. Little is known about this weapon except that it had a straight, single-edged blade 9¼ ins. long and 1½ ins. wide and had been designed by Rezin himself for use in hunting. Jim Bowie used the knife in several adventures and became very attached to it as a weapon. Then, in 1830, he is reputed to have asked an Arkansas blacksmith named James Black to make him an improved version of it. There is little support for this tale save Black's own testimony given many years later when the knife had become famous—and even he did not indicate the nature of the improvements. Possibly they included adding a false edge at the point and, just possibly, the introduction of the clipped point in which the back swoops to meet the edge in a concave line.

Whatever the design of the original bowie knife, its fame spread rapidly across the land. Bowie's exploits in knife-fighting, and his heroic death at the Alamo in 1836 attracted tremendous attention. People everywhere wanted a knife like Bowie's—even if they did not know exactly what that weapon looked like. They did know that it was a big all-purpose fighting knife stout to attack another human, split a bear's skull, lop off a sapling with a single blow or dig in hard ground. They generally agreed that it was single-edged, but beyond that no one seemed to care. All big single-edged fighting knives soon came to be called bowie knives.

The first of these bowie knives were made by American smiths in the old Southwest—Mississippi, Arkansas, Louisiana, and Texas, and possibly also in Tennessee and Missouri (Plate 83). Blades ranged in length on an average from 9 to 15 ins., and they might be 1½-2 ins. wide. They were often well made, but lacked the high finish of later imported models. Guards usually consisted of simple quillons, sometimes bent in an S curve, or else just a plate of brass or iron. Grips were commonly wood, antler, or bone, and they might be made in either one or two pieces. Normally there were no inscriptions, or decorations though a few of the

Compendium_Roth
Page 0494

better cutlers, such as Searles of Baton Rouge, might mark their products. On a few of the early blacksmith-made specimens there was another interesting feature. This was a strip of hardened brass fastened along the back of the blade and usually keyed both to the blade and the cross guard. Supposedly this strip was designed to catch the edge of an opponent's knife and prevent it from slipping off in a parry. Knives with original strips of brass are extremely rare today, and the addition of such strips to later knives has proved a great temptation to forgers. Collectors should remember that these strips are found only on the big American-made specimens, never on English imports, and that they are attached mechanically to the blade, not simply soldered or sweated in place.

Within a very few years of the appearance of the early American bowie knives, English products began to reach the American market. George Wostenholm, founder of the Washington Works in Sheffield, had a representative in America as early as 1830, and he personally made visits in 1836 and later to study the market for knives. Wostenholm probably made more and better bowies than any other English firm. His trademark of I*XL became so much of a standard that other companies began to imitate it with such variants as XLNT, I*XCD, NON*XL, and the like. Ranging behind Wostenholm came such other Sheffield firms as Joseph Rodgers & Sons, Edward Barnes, and Alexander, and behind these came a whole host of others. Some tried to enhance the American appeal of their products by marking blades and scabbards with the letters US separated by a star or NY separated by a federal shield. None, however, had any official connexion with the United States Government or the State of New York. The marks were purely decorative and suggestive.

It was with these English imports that the great variety of form characterizing the secondary bowies first began to appear. Some of them followed the classical form with large blades and clipped points. Most, however, offered the spear point which was symmetrical in its conformation with both the true edge and the false edge coming together in convex curves. Still others introduced the slanted point with the back angling to meet the edge in a straight line. Blades ran all the way from 6 to 14 or 15 ins. At the same time, the false edge changed in character. Whereas it had almost always been sharpened in the American forms, it was

Compendium_Roth
Page 0495

often a simple swage or bevel in the English versions and not functional at all.

Bowie-knife hilts also increased in variety with the appearance of the English-made specimens (Plate 85). White brass, German silver, sterling, and coin silver joined brass and iron as metals for mounts. Usually, these mounts consisted of a guard, a ferrule at the base of the grips, sometimes an escutcheon plate on one side of the grips, and often a cap or pommel at the butt end of the hilt. Grips might be made of one or two pieces of wood, bone, ivory, mother-of-pearl, horn, antler, tortoise shell, silver, or German silver.

Blade decoration also reached new heights. Generally these enrichments were acid etched on the metal and left bright. In a few instances, however, blueing and gilding were used to enhance the etching, and in later types a gilt background was sometimes employed to accent the bright unetched areas. Most of these decorations involved the use of patriotic or jingoistic slogans designed to capture the fancy of American buyers, but there were also references to the search for gold after 1849 and, still later, mottoes related to the conflict over slavery, such as 'Death to Abolition' or 'Death to Traitors'. Some knives simply identified themselves as 'A Sure Defence' or the 'Self Protector', 'The American Hunting Knife' or 'The Genuine Arkansas Toothpick'. In addition to these etched designs, there were also a large number of simple stampings that included pictures of sphinxes, mounted hunters, dogs, deer, lions, unicorns, and the like with such words as 'Try Me', 'The Hunter's Companion', 'Alabama Hunting Knife', and references to General Zachary Taylor's victory at Buena Vista in the Mexican War.

Hilts also were decorated in a variety of fashions. One of the most popular designs was copied from the table cutlery of the era with scrollwork and shells (Plate 87). These hilts were usually made of German silver or of true silver, but gutta-percha was also employed. There were pommels shaped like horses' heads or shells as well as representations of the legendary half-horse half-alligator symbol of the backwoods rifleman (Plate 87). Sometimes, too, there were state crests, especially the Louisiana pelican with its young, patriotic motifs such as eagles, flags, federal shields, and the word 'Liberty'.

Bowie knife scabbards varied according to whether they were

made in England or America. Sheffield specimens were normally constructed of pressed paper or cardboard with a thin veneer of coloured leather. They were handsome sheaths in red, yellow, green, blue, purple or brown, among other colours, and normally there was also some gilt tooling in the form of a decorative border and sometimes a stamped central design as well. There were also metal mounts in the form of a locket with a stud and a tip or chape. The locket was a relatively narrow band, occasionally with scalloped edges, but more often straight. The tip followed the contour of the knife point. German silver was the most popular for these mounts, but for very fancy specimens real silver might also be used. American scabbards in general followed the same design as the English products, but they were normally made of black harness-leather, which was much stouter than the English construction. Some American scabbards had no metal mounts at all, and those that did offered a greater variety of metals, including brass, iron and tinned iron as well as silver and German silver. Some American scabbards had studs on the throat so that the knife could be thrust through the belt in the traditional fashion with the stud serving to hold it in place. Other American sheaths, however, are equipped with belt-loops or even complete frogs for suspension. Since the English scabbards of pressed paper were so flimsy that they usually disintegrated after a short period of hard use, many Sheffield bowies are found today with American sheaths made by some local saddler or cobbler to replace the original. In such instances, even the original metal mounts have failed to survive, because the new leather was so much thicker that they could not be made to fit.

The American Civil War marked the turning-point in the history of the bowie knife. At the outset the big knife was a popular weapon on both sides (Plate 89). Confederate troops especially prized it, and many big knives with knuckle guards were produced for the war (Plate 88). Some of these were actually short-swords, though the records continued to call them bowies or side knives. By the end of the conflict men of both armies had largely abandoned such arms as superfluous, and the era of peace and easing tensions which followed saw the custom of wearing knives decline sharply. Buffalo hunters and cowboys and some other westerners carried big knives for a while, but these became more and more hunting knives rather than weapons. Their size

diminished, and their handles soon began to sport grips made of hard rubber or various synthetic materials. By 1880 the true bowie knife had vanished.

*American Daggers*

Side by side with the bowie another series of knives developed in America that represented almost a throwback to the quillon daggers of the sixteenth century or at least a continuation of the rifleman's daggers a hundred years earlier (Plate 90). They boasted straight double-edged blades that tapered from hilt to point in either a straight or slightly convex line. Their guards were true quillons, sometimes straight, sometimes curved towards the blade and sometimes S-curved (Plate 91). The grips were normally, one piece, without a true pommel, and made of wood, antler bone, ivory or even silver. A number of these daggers are known mounted in silver and complete with silver scabbards, and their dates of origin appear to range from the 1790s until about 1830. Many have military motifs or associations, and it is presumed that they were worn by Army officers when they were off duty and did not wish to carry a sword (Plates 92 and 93). Fancy presentation daggers were also made as late as the 1860s.

Alongside the fine silver daggers and the presentation specimens there were also a large number of cruder specimens with big blades, heavy iron guards, and one-piece handles of wood or antler. Examples have been excavated at a number of fur trading-post sites of the early nineteenth century, and the type seems to have remained in use through much of the bowie period, though it was never as popular as the single-edged knife. Some students have tried to distinguish these daggers with the name Arkansas toothpick, a term which appears in contemporary documents. It appears, however, that this is an artificial distinction. Most early writers seem to have used the terms bowie knife and Arkansas toothpick synonymously, with the latter actually as a joking reference to the state that supposedly gave birth to the bowie knife.

There was also one final form of dagger that seems to have been unique to America and to the early nineteenth century. This was the so-called push dagger (Plates 94 and 95). It consisted of a short double-edged blade that sprang from a cylindrical stem. This stem, in turn, passed through a transverse handle, usually

made of wood, bone, or ivory. The dagger was grasped with the stem passing between the second and third fingers, so that the blow would be delivered with a punching motion somewhat similar to that used with the Indian katar. Scabbards might be leather or metal, and frequently they were designed to be hung upside down under the wearer's jacket. A spring catch engaged a hole in the base of the blade to hold the knife in place and keep it from falling out, and a little hook at the tip of the scabbard privided for suspension. Surviving specimens of this form that can be dated all come from the 1848-60 period, and they seem to be associated with the South and West.

*Naval Dirks*

The naval dirk was a special weapon that seems first to have appeared in the late eighteenth century and gained its real period of popularity in the nineteenth century. At different periods midshipmen and naval cadets wore dirks as their only weapon, and at other times Regular officers up to and including flag rank wore them with their undress uniforms, sometimes both afloat and ashore, sometimes only afloat. New regulations appeared to change the situation every few years.

In Great Britain references to midshipmen wearing dirks date back at least to 1775, but in the regulations of 1805 swords were specifically listed for them and dirks were not mentioned. Probably they continued in use, however, for in 1825 midshipmen, volunteers (later naval cadets) and masters assistants were specifically forbidden to wear dirks. This was changed two years later, when dirks were ordered for volunteers, but the reinstitution was short-lived and they were again shelved in favour of swords in 1846. Ten years later the dirk returned in full force when midshipmen, naval cadets, and masters assistants lost their swords for good. Dirks remained in use for these groups through the rest of the century, and finally in 1936 even paymaster cadets who had never had any weapon were allowed to wear them.

Interestingly enough, although dirks are mentioned with some regularity in naval orders there are no illustrations or descriptions of them until 1856. Thus a great diversity of designs existed, and the student must attempt to assign dates to surviving specimens on the basis of their design and decoration or on their known association with a given individual (Plates 96-104). This

naturally leaves room for considerable error, but certain general phases of evolution do seem to be identifiable. During the period before 1825 two main types of dirk seem to have been in general use. One was a straight double-edged weapon with a slender blade between 8 and 18 ins. long. Often it had a central fuller; at other times it was diamond-shaped in cross-section. Grips were normally ivory and of one piece, often rectangular in section and sometimes reeded. Pommels were sometimes simple caps, and at other times they resembled those on contemporary swords with faceted sides. This was especially true of one group of dirks that reflected the design of the contemporary five-ball swords (so-called because of the appearance of five balls as decoration on their knuckle bows and counter guards) and were generally much more substantial weapons than the usual dirk of the period. These five-ball dirks had a branch on the obverse side of their S-curved quillons decorated with the ball design as contrasted with the commoner dirk that boasted no such branch on its similarly curved guard. Early in the nineteenth century these light straight dirks were joined by another pattern with a stout curved blade 14-16 ins. long. These were single-edged weapons, flat-sided, and decorated with etching, blueing, and gilding for about two-thirds of their length. The hilts somewhat resembled those on contemporary swords. Grips were normally made of wood, bone, or ivory, and they were ribbed or grooved to offer a better hold. There was normally a ferrule at the base of the grips, a backstrap, and a pommel that might be either a simple cap or a lion's head. A chain connected the pommel with the quillons. At one time it was thought that these dirks dated as late as 1827, but it now seems more likely that they appeared as early as 1810 or 1812, when the same design became popular in America. Indeed, since American designs normally copied those of Great Britain or France, it is quite possible that these curved British dirks may be even earlier.

Between 1827 and 1846 the most popular dirk again seems to have been a straight double-edged weapon, but this time it was a slightly heavier arm, and the hilt was quite different. The primary material for the grips remained ivory, but they were usually turned with a series of ridges instead of being straight sided. The pommel also featured a lion head in low relief on the cap.

In 1856 the first specifically designated model of dirk became

Compendium_Roth
Page 0500

regulation. It was a stouter arm than any of the previous models except the five-ball and the curved types. The blade was straight, about 1¼ ins. wide and 12 or 13 ins. long. It was single-edged, but there was a false edge near the point. In response to complaints from midshipmen who had to fight ashore with this weapon during the Indian Mutiny the blade was lengthened to 17¾ ins. about 1870. The grips were covered with white fish skin and bound with twisted wire like those on contemporary naval swords. There was a ferrule at the base of the grips and a backstrap that terminated in a lion-head pommel with a loop in its mouth for a sword knot. The quillons were slightly S-curved and terminated in acorn finials on both ends.

The pattern of 1856 remained the general standard for British naval dirks for the rest of the century. There were minor variations, of course. Some time in the 1870s blued and gilt decorations became standard for blades, but they disappeared and were replaced by bright etching against a frosted background about 1891. Plaques with wreath crown and anchors also appeared on the centre of the quillons where they crossed the blade in the 1870s and they remained standard at least for the rest of the century.

American dirks had a shorter history, but just as great a variety of designs as their British counterparts. The first recorded reference to dirks in the United States Navy appears in the regulations of 1802 with the statement that they were not to be worn on shore. This would seem to indicate that the dirk was already in use and that it had been for some time. Dirks are again mentioned in the regulations of 1813, when both officers and midshipmen were permitted to wear them with undress uniform. Then there is a hiatus of fifty-six years without any reference to the weapon in official orders or regulations, although there is considerable evidence that it continued to be a popular arm. In 1869 the silence is broken and an official model dirk described and illustrated. The dirk is mentioned again in the regulations of 1876, and then it drops completely from sight in official orders. There is no indication when the dirk was abandoned, but it probably disappeared within ten years of the 1876 regulation, and it was certainly gone before the turn of the century.

With no official dirk pattern before 1869, the choice of design was left to the taste of the individual officer, just as it had been in

the British Navy. Nevertheless, certain general patterns pre-dominated in various periods. The first American dirks were stout daggers with straight double-edged blades that tapered evenly from hilt to point (Plate 105). Usually they were a flat diamond-shape in cross-section. These blades might be 9 or 10 ins. long and perhaps 1½ ins. wide at the guard. This guard consisted of wide quillons normally made of gilded brass. There was usually a gilded brass ferrule at the base of the faceted bone or ivory grips and no pommel. Scabbards were either gilt brass or leather with gilt brass mounts.

Before 1810 these heavy straight dirks gave way to a curved version very like those popular with British naval officers (Plate 106). Even the popular length of from 14 to 16 ins. measured in a straight line from hilt to point was retained in the American versions. Instead of the British lion for a pommel, however, the American dirks boasted eagle heads and sometimes the gilt etched decorations of the blade featured American motifs. Other-wise they were almost identical weapons.

About 1820 the popularity of these curved dirks was dented by the reappearance of a straight-bladed dagger (Plate 107). It was considerably lighter than the earlier design, however, and normally it had an etched blade whereas the first pattern had always been plain. Hilts varied; some were made entirely of gilt brass, but most boasted small quillons or a circular counter-guard of brass and one-piece ivory or bone grips. Some had no pommel whatsoever; some offered a knob made as part of the grips. By 1825 these straight dirks had completely superseded the curved pattern, and they are believed to have remained in use until the appearance of the first official pattern in 1869.

This 1869 model was a simple and somewhat crude arm (Plate 108). It was intended only for midshipmen, for officers were forebidden to carry dirks. It retained the straight double-edged blade of its predecessors. The quillons, however, became stouter and more functional, and they bore simple incised decorations. The grips were made of wood covered with white fish skin and wrapped with wire like those on contemporary naval officer's swords. The eagle head returned to the pommel, but it was a crude and ugly casting. The scabbard was made of black leather with plain brass mounts and two carrying rings for suspension. The regulations of 1876 mentioned the dirk, but do not describe

Compendium_Roth
Page 0502

it. Presumably it remained the same, so that it was this unlovely weapon which marked the end of the dirk in American naval history.

Other nations in addition to Great Britain and the United States also recognized the naval dirk. Denmark probably had the greatest variety of designs, but most seafaring countries saw at least a few worn by their naval officers and midshipmen. Interestingly enough, the story is largely the same everywhere. The regulations and orders are silent on design, so that it is necessary to date specimens by style and other secondary means. On the whole straight double-edged types have predominated with only a few curved patterns outside Great Britain and America. All were primarily products of the nineteenth century, and in most cases they fell from use before the century was over. Some, like the British, however, seem still to have been in use when the year 1900 brought an end to the era.

With the beginning of the nineteenth century the history of the dagger and fighting knife seems to have passed its nadir. Right at the outset trench knives were introduced by both sides during World War I, so that the common soldier was once again equipped with a knife designed primarily for combat. World War II brought an even greater variety of knife weapons for soldiers and marines. There were bowie types, stilettos, true daggers, and a host of other designs. Bayonets that could be also used as fighting knives reappeared in quantity for the first time since the seventeenth century, and even the dress dagger was revived in Germany, Italy, and their conquered territories during the 1930s and 1940s. So far has the pendulum swung that American astronauts now carry big all-purpose knives with fighting guards on their trips through space. Many collectors are already interested in these products of the twentieth century, even though it is still too early to know what the overall contribution of this hundred years will be. So far all signs seem to indicate that the history which began some 500,000 years ago still has a long way to go.

NOTE—Since the above was written the Editor has drawn my attention to two references to *The Navaja and its use in Spain* by Charles d'Avillier and Gustave Doré (London, 1881, pp. 85 and 213–5). Among other things the authors describe how they 'had the curiosity to take lessons from a professor [of fencing with the navaja], who disclosed the secrets of his science, aided by an ordinary cane in case of the bare blade'.

Compendium_Roth
Page 0503

# Select Bibliography

The literature of daggers and fighting knives is extensive if one considers all of the catalogues which include some examples of this type of weapon and all books and magazine articles which mention them or give hurried histories. The old *Zeitschrift für Historische Waffenkunde* alone offers hundreds of articles in which daggers are discussed. The following list attempts only to suggest writings that are especially useful to collectors because of their detailed treatment of broad aspects of the subject. It is intended primarily as a guide for further reading and for assistance in the identification of specimens.

Abels, Robert, *Classic Bowie Knives*, New York, 1967.

Blair, Claude, *European & American Arms*, London, 1962.

Blair, Claude, and John Wallace, 'Scots—or still English?' *Scottish Art Review*, IX, No. 1 (1963), 11-15, 34-57.

Bosson, Clement, 'Les Dagues Suisses', *Geneva*, XII (1964), 167-98.

Childe, V. Gordon, *The Bronze Age*, Cambridge, 1930.

Dean, Bashford, *Catalogue of European Daggers*, New York, 1929.

Jacobsen, Holger, 'Marinens Vagtdolke', *Vaabenhistoriske Aarbøger*, VII, (1952-4), 107-32.

Keener, William G., *Bowie Knives from the Collections of Robert Abels and the Ohio Historical Society*, Columbus, Ohio, 1962.

Laking, Sir Guy F., *A Record of European Armour and Arms through Seven Centuries*, 5 vols., London, 1920-22.

Mann, Sir James, *Wallace Collection Catalogues, European Arms and Armour*, 2 vols., London, 1962.

May, Commander W. E., and A. N. Kennard, *Naval Swords and Firearms*, London, 1962.

Norman, A. V. B., 'Early Military Dirks in the Scottish United Services Museum, Edinburgh', *Journal of the Arms and Armour Society*, IV, No. 1, (March 1962), 1-23.

Oakes, R. Ewart, *The Archaeology of Weapons*, London, 1960.

Peterson, Harold L., *American Knives*, New York, 1958.

Rodriguez Lorente, J. J., 'The XVth Century Ear Dagger. Its Hispano-Moresque Origin', *Gladius*, III (1964), 67-87.

Seitz, Heribert, *Blankwaffen*, 2 vols., Brunswick, 1965-7.

Terenzi, Marcello, *Considerazioni su di un tipo di pugnale detto Stiletto da Bombardiere*, Rome, 1962.

Ullmann, Konrad, 'Dolchmesser, Dolch und Kurzwehren des 15, und 16. Jahrhunderts in Kernraum der Hanse', *Waffen- und Kostümkunde*, Dritte Folge III (1961), 1-13, 114-27.

Wegeli, Rudolf, *Inventar der Waffensammlung des Bernischen historischen Museums in Bern*, 4 vols., Berne, 1942-48. Volume II deals with daggers.

Whitelaw, Charles, 'The Origin and Development of the Highland Dirk', *The Transactions of the Glasgow Archaeological Society*, New Series, V (1908), 32-42.

# WAVES OF GLOBAL TERRORISM

Compendium_Roth
Page 0505

# DAVID C. RAPOPORT

# WAVES OF GLOBAL TERRORISM

From 1879 to the Present

Columbia University Press  /  *New York*

Compendium_Roth
Page 0506



Columbia University Press
*Publishers Since 1893*
New York   Chichester, West Sussex
cup.columbia.edu
Copyright © 2022 Columbia University Press
All rights reserved

Library of Congress Cataloging-in-Publication Data
Names: Rapoport, David C., author.
Title: Waves of global terrorism : from 1879 to the present / David C. Rapoport.
Description: New York : Columbia University Press, [2022] |
Includes bibliographical references and index.
Identifiers: LCCN 2021046718 (print) | LCCN 2021046719 (ebook) |
ISBN 9780231133029 (hardback ; alk. paper) | ISBN 9780231133036 (paperback ;
alk. paper) | ISBN 9780231507844 (ebook)
Subjects: LCSH: Terrorism—History.
Classification: LCC HV6431 .R367 2022  (print) | LCC HV6431  (ebook) |
DDC 363.325—dc23
LC record available at https://lccn.loc.gov/2021046718
LC ebook record available at https://lccn.loc.gov/2021046719



Columbia University Press books are printed on permanent
and durable acid-free paper.
Printed in the United States of America

Cover design: Avivah Rapoport
Cover images: Shutterstock and VectorStock

*This book is dedicated to my lovely wife, Barbara,*

*whose intense commitment made it possible.*

# 2

## THE FIRST WAVE: ANARCHIST, 1879–1920s

*The heroes and heroines of the "People's Will" established terrorism as a noble activity in the eyes of later generations. They created the image of the virtuous assassin.*

———————

—PHILLIP POMPER

I n 1879, the First Wave began in Russia and, after becoming a global phenomenon, largely receded by the mid-1920s. Two political events in Russia were crucial in generating the wave. In 1861, Czar Alexander II introduced extraordinary political reforms, in an attempt to make Russia more like Western Europe, but those reforms were only partially success-ful, inspiring some Russians to make more effective efforts. University stu-dents created the first terrorist group, Narodnaya Volya (People's Will). The wave persisted for over forty years, though individual groups rarely lasted more than five. The assassination of prominent public figures was the prin-cipal tactic. Efforts were always made to seek international support, for example, foreign bases, diasporas, etc.

Outside of Russia, anarchists were the wave's most conspicuous element; they produced the "Golden Age of Assassination" (1892 to 1901), in which more monarchs, presidents, and prime ministers were assassinated than ever before. The wave's high point was between 1890 and 1910, a time that also produced furious antiterror sentiment, prompting many anarchists to abandon terror and seek other methods for achieving their goals.

## RUSSIA

The English political philosopher Thomas Hobbes argued that an effort to overthrow a government requires three conditions: discontent, hope for success, and the transfer of legitimacy. Discontent is common everywhere, but no matter how deeply embedded it is, those most directly affected will not take up arms without the hope that success is possible. This explains why slaves rarely revolt; they lack confidence or are overcome by the fear that they will only make their situation worse.[1] In those rare occasions when a slave revolt did materialize, it normally collapsed quickly. The only successful slave revolt in history occurred in Haiti between 1791 and 1804.[2]

The genesis of Russian terrorism confirms Hobbes's analysis. Recruits came from the middle and upper classes. They were young people; the young are more confident in their physical capacities and generally have more hope than the older generation. Very few terrorists came from the lower classes, where self-confidence is less common, a pattern we will see repeated in every subsequent wave. In the Russian case, no member of the executive committee of Narodnaya Volya (People's Will), the first terrorist organization, had reached the age of thirty. The children of gentry (the class immediately below the nobility) supplied over half of the recruits; the clergy and wealthy merchants produced 12 and 10 percent, respectively.[3]

Every wave is associated with important political events that demonstrate in a striking way to a new generation that the conventional political worldview is no longer relevant. Potential terrorists become convinced that those in power no longer have legitimacy, that they no longer inspire confidence

66

in their right to rule (Hobbes's third requirement), and that revolutionaries now have a political strength they lacked before.

The Crimean War (1853–1856) transformed Russia.[4] Czar Nicholas I aimed to gain Ottoman territories. Russia's army, crucial in the Napoleonic Wars and afterward, was Europe's largest military force. But the British and French, who supported the Ottomans, humiliated Russia. Russian technology was outdated. Russian generals were old and incompetent, and colonels frequently sold the best equipment and pocketed their men's pay. "Russia had been beaten on the Crimean Peninsula, and the military feared that it would inevitably be beaten again unless steps were taken to surmount its military weakness."[5]

Czar Nicholas's successor, Alexander II, pressed for industrialization, believing Russia had to make itself more like the Western democracies to regain its strength. In 1861, he freed around 25 million serfs, one-third of Russia's population, with a stroke of the pen. By contrast, 4 million U.S. slaves were only freed after a four-year civil war costing hundreds of thousand deaths, the nineteenth century's most deadly war. Three years after abolishing serfdom, the czar established local self-governments, "Westernized" the judicial system, abolished capital punishment, and relaxed censorship.

Alexander II was described as "Czar Liberator" throughout the world. Hopes were aroused but could not be quickly fulfilled, as indicated by the fact that the government lacked the money to help the newly free serfs purchase land. In the wake of inevitable disappointments, populist movements aiming to transform the system more profoundly appeared. University students led the way. Various riots and arson attacks occurred. Sergei Nechaev's extraordinary *Revolutionary Catechism* (1869) analyzed the commitment revolutionaries must have.[6]

Mikhail Bakunin's vision that agrarian communes were destined to be the final social form inspired the populists; when he died in 1876, university students commemorated him by making a "mad rush" to live among the "people" to prepare them for their future in anarchist communes. But peasants seemed indifferent, and students sensed that their speeches and pamphlets merely made the peasants think they were "idle word spillers."

67

THE FIRST WAVE: ANARCHIST, 1879–1920s

Peasants instead helped the police, and soon some 1,600 students were in preventative detention.

The group Land and Liberty was then created to further the student cause; its  Disorganizing Section was charged with freeing comrades and deterring police spies. But the Disorganizing Section also assassinated several policemen, alienating the peasants more. Land and Liberty decided to return to the cities, which were now flooded with penniless former serfs more sympathetic to radical activities. The decision to retreat from the countryside was also shaped by the outcome of the St. Petersburg Trial of the 193 (1877–1878). "The jurors were impressed by the youthful idealism of the defendants; 153 defendants were acquitted and forty . . . given mild sentences."[7]

Then an extraordinary and wholly unanticipated event dramatically reinforced the belief that publicity in the city and the courtroom had enormous value. Vera Zasulich, a "lone wolf" (one acting solely on her own initiative), wounded General Trepov, the governor of St. Petersburg who in 1878 had flogged a political prisoner even though Alexander II had outlawed corporal punishment.[8]

The government was confident she would be convicted and decided to treat her as an "ordinary" criminal subject to a jury trial instead of the court-martial political criminals normally received. The minister of justice told the czar that "the jurors would deliver a guilty verdict and thereby teach a sobering lesson to the insane small coterie of revolutionaries [showing] that the Russian people bow before the Czar, revere him and are always ready to defend his faithful servants."[9]

The jurors were petty bureaucrats, a class believed most likely to support the prosecution.[10] Prominent government officials, including the foreign minister and minister of finance, were in attendance. But contrary to all expectations, the trial in effect quickly became that of the governor. Zasulich said her aim was to prevent similar abuses in the future. When asked why she had thrown her pistol to the ground instead of killing him, she responded that she was a "terrorist, *not* a killer."[11] In ten minutes the jury declared her "innocent." The court's president described the bizarre aftermath. "It is impossible for one who was not a witness to imagine either

68

the outburst of sounds which drowned out the foreman's voice or the move-
ment like an electrical shock [that] rushed past along the whole room. The
cries of unrestrained joy, hysterical sobbing, desperate applause, the tread
of feet, cries of 'Bravo! Hurrah! Good girl! Vera! Verochka!' all merged in
one crash."[12] Jurors lifted her onto their shoulders, and outside the court-
house enormous crowds greeted her with thunderous applause. The next
day, German newspapers predicted a revolution would soon occur.

Police, attempting to calm the crowd, killed one demonstrator and
wounded another. The government then compromised its difficult situation
further. The czar annulled the verdict, but police attempts to arrest Zasu-
lich failed; she had fled to Switzerland. Perhaps the acquittal might have
vindicated the legal system and helped sustain the government, but the sub-
sequent hypocrisy and striking incompetence increased hopes that a nec-
essary struggle against the system would succeed. The government "made
Zasulich the martyr she would have been if convicted and imprinted the
trial in [the] people's consciousness."[13] Her trial became "the most momen-
tous in the history of Imperial Russia."[14] Lone wolves struck prominent offi-
cials in several cities, killing four. Stepniak, an émigré, returned from
London to kill his victim. When he returned, he was feted by the promi-
nent Americans Mark Twain and George Kennan.[15] Zasulich's act stimu-
lated similar ones outside Russia. Within four months, four failed attempts
against monarchs in Prussia, Spain, and Italy had taken place, stimulating
a widely held belief that Europe was experiencing an international anar-
chist conspiracy.

An abortive attempt to assassinate Czar Alexander II occurred in
April 1879. A few months later, Narodnaya Volya was created. Nikolai
Morozov, a founder, noted that "Zasulich's shot was the starting point for
the whole struggle that followed."[16] Vera Figner, an executive committee
member, wrote, "It began to seem ridiculous to punish the servant . . . and
leave the master untouched," inducing the group to become committed to
assassinating the czar.

Assassination and secrecy are two necessary ingredients for success.
Political assassination in the present circumstances, is the sole means of

69

Compendium_Roth
Page 0513

THE FIRST WAVE: ANARCHIST, 1879–1920s

self-defense and one of the best means of agitation. By dealing a blow at the very center of governmental organization, its awful force will give a mighty shock to the whole regime . . . an electric current throughout the entire state and will cause disruption and confusion in all its activities.

Secrecy gives a small group the ability to fight against millions of organized, obvious and visible enemies making the group truly terrifying. . . . From this point onwards, the enemy will have no choice but to go always in fear of his life never knowing whence and when the avenging hand will strike. Political assassination is the carrying out of the revolution in the present.

Because publicity was crucial, Figner, originally committed to the countryside, became convinced that the city was the best place to function. "Terrorist acts in the countryside passed virtually unnoticed. You could not even judge what impression they created. . . . They did not excite the villager . . . who did not experience the fear, the dangers, and the joy of a struggle. When they occurred in the city acts of terror, like electric impulses . . . ran through the minds of the young and society and raised their spirits."[17] The city supplied facilities for printing and quick distribution; Narodnaya Volya established a press

capable of producing up to 3,000 copies in a single run of clean, professional-grade newsprint to create respect for the message giver. It is example that is needed . . . and not just in name alone, but in action. We need energetic, utterly dedicated people, prepared to gamble all and to sacrifice everything. We need martyrs whose legend is far greater than their real worth and their contributions to the work.[18]

Later, when Figner was a prisoner likely to receive a death sentence, she was confident that she would become a martyr. "My thought for some reason turned to the fate of revolutionary movements in general in the West and at home; to the continuity of our ideas and of their dissemination from one country to another. Pictures . . . of people who had died long ago awoke in my memory. My imagination worked as never before."[19]

70

Women did not participate in ancient religious terror groups or American mobs. But they were visible in many early nineteenth-century European crowds and became very prominent in Russia; some became "legends, surrounded by an aura of romance that defies critics."[20] Women constituted 21 percent of the group and one-third of the original executive committee, a pattern repeated in successive Russian terror groups. Over 25 percent of those arrested in the Going to the People movement were women. In the 1860s, Sergei Nechaev was the first to anticipate the importance of women, describing them as the "most priceless assets" a terrorist group could have. The number of women was especially impressive because most recruits came from the university, and women were not admitted to Russian universities. They went instead to Switzerland for university education; most studied engineering or medicine.

The executive committee had thirty people organized into five-person cells, to make police penetration more difficult.[21] Group numbers are unknown; estimates are around five hundred.[22] An effort to create additional cells among workers, students, and military officers was abandoned when the organization became obsessed with idea of assassinating the czar, a goal that forced it to become increasingly centralized.

Zasulich had used a pistol, and the four subsequent Russian assassins employed pistols or swords. Narodnaya Volya did not preclude those weapons but clearly preferred bombs,[23] encouraging members to throw them from a short distance, making it more likely that they would lose their lives in the effort.[24] Without the bomb, "the assassin would not have created the same impression [and not have] . . . expressed a new stage in the revolutionary movement." Criminals did not use bombs, and it was virtually inconceivable that they would; the risk of killing oneself was too high.[25] By insisting on the importance of throwing the bomb, the likelihood a terrorist group would ultimately become a criminal gang was reduced, although some Russian terrorists did become criminals later. Some cells prohibited women from throwing bombs because they could not throw as far as males and were thus more likely to be killed in the process, a decision that seemed to vitiate their status. Women employed other weapons and participated in manufacturing bombs, a dangerous occupation responsible for many fatalities.

71

One could throw a bomb in the excitement of the moment, but if that assailant was captured, the ordeal afterward would tax one's moral determination. Imprisonment could be a prolonged process, giving abused prisoners ample opportunities to save their lives or negotiate a lighter sentence by expressing regret or revealing valuable information. But prisoners could also reaffirm the deed in court and indict the regime. This form of martyrdom harked back to the initial Christian notion, though Christian martyrs did not kill anyone. When the Romans persecuted them, martyrs would affirm their commitment to Christ even though they were likely to be killed if they did. Over 12 percent of the Russian terrorists were children of the clergy, which helped link terrorism to notions of martyrdom. "Those who saw him pass say that he was not only calm and peaceful but that his pleasant smile played upon his lips when he addressed cheering words to his companion. At last, he could satisfy his ardent desire to sacrifice himself for his cause. It was perhaps the happiest moment of his unhappy life. . . . Lysohub was the Saint."[26] Stepniak described the Russian terrorist as "noble, terrible, irresistibly fascinating, uniting the two sublimities of human grandeur, the martyr and the hero."[27] The legend cultivated inspired future terrorists. Fifty years later, the Soviet dictator Josef Stalin said, "If we bring our children up on stories of the People's Will, we [will] make terrorists out of them."[28]

Narodnaya Volya made seven efforts to assassinate Alexander II before succeeding in 1881 in killing the "Greatest Liberator in History," the first czar killed in eighty years. The weapon was a hand-thrown bomb. Six participants were tried and hanged; four refused to ask for mercy, which gave the group a powerful mystique and generated a flood of new recruits. But the negative consequences were much more significant. The expectation that the deed would spark popular support was a total delusion; indeed, the public was outraged. Ironically, two hours before his assassination Alexander II had established a committee to make the constitution more democratic. Narodnaya Volya hoped the government would now negotiate and offered the new czar "immunity" in exchange for a general amnesty and a parliamentary constitutional government.[29] But Alexander

72

III reversed his father's decision. The five assailants were immediately executed, including the first woman in Russian history to die that way.

Mobs abused university students and launched pogroms against the Jewish population, ostensibly because Jews were important in the terrorist movement.[30] Those pogroms were greatly intensified later by the most infamous twentieth-century forgery, *The Protocols of Zion of the Elders of Zion* (1903), which depicted a (fictional) Jewish plot to take over the entire world. Russia at this time had by far the largest Jewish population in the world,[31] and its anti-Semitic policies were inspirational elsewhere. The pogroms stimulated a massive flow of immigration to the West, especially the United States, and inspired the Zionist movement to return to the "Holy Land." *The Protocols* was translated into many different languages and disseminated globally. The American auto manufacturer Henry Ford had five hundred thousand copies translated and distributed throughout the United States in the 1920s. A decade later, Hitler used the *Protocols* as a propaganda tool against Jews, which helped precipitate the Holocaust. Later, as Jews resettled in the "Holy Land," the *Protocols* became significant in the Arab world. The 1988 Covenant of Hamas, a Fourth Wave Palestinian terrorist group, states:

Today it is Palestine, tomorrow it will be one country or another. The Zionist plan is limitless. After Palestine, the Zionists aspire to expand from the Nile to the Euphrates. When they will have digested the region they overtook, they will aspire to further expansion, and so on. Their plan is embodied in the "Protocols of the Elders of Zion," and their present conduct is the best proof of what we are saying.[32]

Russia created the Okhrana, a notorious underground police force, which used agents provocateurs to curb terrorism.[33] Women became crucial to Okhrana and were paid as well or better than their male counterparts, an unusual pattern then and now, too.[34] The Okhrana significantly diminished Narodnaya Volya's reputation and the hope inspiring its members, and the organization collapsed three years later. The immediate precipitating cause was its excessive centralization and a carelessness Morozov had warned

73

against. The police arrested a member who had a list of all its participants—and their addresses. Several hundred were jailed, and the remnants left St. Petersburg, moving largely to rural areas, where they continued to assassinate minor officials.

In 1887, the Terrorist Faction of the People's Will was born, determined to assassinate the new czar, Alexander III. All of its members were apprehended in their first attempt. The incident over time became well known partly because of the identity of three conspirators, Alexander Ulanov and Branislaw and Josef Pilsudski. Ulanov was the older brother of Vladimir Lenin, the leader of the communist revolution in 1917. Branislaw and Josef Pilsudski organized the first major Polish terrorist party, and Josef became Poland's dictator after the Versailles Treaty ending World War I established Poland's independence.

The attempted assassination of Alexander III made the government even more determined to reduce publicity opportunities for terrorists. It eliminated jury trials and made executions private. Terrorism revived in 1902. The Socialist Revolutionaries Party, a populist group Bakunin influenced, established the Terrorist Brigade, which modified its tactics and strategy, hoping to avoid its predecessors' fate. As the public remained hostile to assassinating the czar, the Terrorist Brigade concluded that major officials would be much better victims; they were not well guarded and often seen as very abusive.

The city was abandoned as the principal focus of operations, as it was believed that a serious recent famine would make peasants more receptive, proving Bakunin right after all. But the peasants remained indifferent. The city kept supplying recruits, and university students once again produced the dominant leaders. Successful attacks on major officials increased greatly.

There was some dissatisfaction with the movement's new limits on possible activities. In 1903 Burtsev, the Terrorist Brigade's counterespionage director and labeled the "Sherlock Holmes of the Revolution" for his success in finding "double agents," recommended that hostages be taken from the "favorites of the bourgeoisie and authorities to redeem [as] prisoners. [It] is the only way we have of making the enemy treat the people as a belligerent party."[35] But the recommendation was rejected for several reasons. States

74

originally had employed the practice,[36] and during the Franco-Prussian War Prussians placed hostages on train engines so that "it was understood [that] in every accident caused by the hostility of the inhabitants, their compatriots [would] be the first to suffer."[37] Paris Commune leaders condemned the action as a violation of the Geneva Convention and passed a "Law of Hostages" enabling the Commune to seize French government supporters.[38] But that did not change the Prussian policy. Angry Commune supporters took hostages in response and were ultimately massacred.[39] Another important reason for rejecting hostage taking was that it might obscure the distinction between criminal and terrorist activity, a distinction terrorists insisted on making clear. No noticeable hostage-taking incident occurred in Russia.[40]

Pressures to modify assassination tactics increased. In October 1905, the ongoing Russo-Japanese War and a serious peasant insurrection made the government believe that establishing a Duma (Parliament) would rally popular support. Narodnaya Volya had said it would cease operations if a Duma was established, and the Socialist Revolutionaries felt obliged to accept the czar's proposal. But the Terrorist Brigade disagreed, feeling that more crucial concessions were needed; it withdrew from the Socialist Revolutionary Party to continue terrorism.

The Terrorist Brigade was also deeply divided on whether to use assassination in new ways. Some left the Terrorist Brigade to develop a new group, the Maximalists (1905–1907), which felt that the policy of restricting activity solely to assassinating politically significant persons was inadequate; assassinating *all* government personnel would be more useful and disintegrate the state. By this time, it had become clear that Morozov's argument that separate groups would ultimately merge was not going to happen. Groups kept splitting and only in a few cases did they reunite.

As anarchists, the Maximalists refused to have a central directing body. Autonomous groups joined for operations and then disbanded until the next operation. It had some five thousand members.[41] Two other anarchist groups, Black Flag and the Absence of Authority, operated mainly in the Ukraine, Crimea, and the Caucasus, killing thousands of lower-level civil and military personnel in 1906 and 1907. The remainder lived in fear for

75

their lives and their families, which adversely affected the way they performed their duties.[42] The Maximalists sought martyrdom in a different way, too. "If young rebels had to die, they were determined to go in their own way. . . . Thus, when cornered by the police, it was not unusual for the terrorists to turn the pistols on themselves or if captured to resort to the grim gesture of Russian fanatics since the Old Believers of the seventeenth century—self-immolation."[43]

The Terrorist Brigade and the Maximalists were destroyed in 1907. The first collapsed when it discovered, to its enormous shame, that its leader Azev for years was an agent provocateur, a member of the police force. The Maximalists were too amorphous for penetration, but ferocious government responses ultimately ended the attacks.

The authorities developed counter-terror, employing the death-penalty on a scale never before imposed. . . . At the height of the troubles, terrorists were also made subject to trial by Field Courts Martial. . . . [It] functioned for less than a year but the number sentenced to death—often hanged or shot with twenty-four hours of sentence—may have been over a thousand.[44]

The terrorist problem seemed solved. A commission was established to investigate how agents provocateurs were used, and a British police historian summarized the startling details:

For many years . . . Okhrana agents had organized assassinations, fomented strikes and printed stirring calls to bloody revolution. . . . A bonus was paid to Okhranniks who unearthed illegal secret printing presses, and it was not uncommon for a police official to found such a press himself—and on police money—as a preliminary to "detecting" it and claiming customary money from police funds. . . . The Okhrana had systematically undermined the legality it was charged to uphold—as the Commissioners lost no opportunity to point out. Some former Okhrana chiefs asked in reply what [other] effective means were available. No convincing answer could be given . . . a measure of the impasse in which the late Okhrana found itself.[45]

76

Compendium_Roth
Page 0520

Despite their 1907 demise, the groups succeeded in "breaking the spine of Russian bureaucracy, wounding it both physically and in spirit, contributing to the general paralysis in the final crisis of the imperial regime in March of 1917."[46] Events in February 1917 during World War I set the stage for both the revival and final collapse of every terror group. When his army refused to put down a massive demonstration in the capital protesting food shortages and the war, Nicholas II abdicated, ending nearly four centuries of czarist rule. The transitional parliamentary government, led by the Socialist Revolutionary Alexander Kerensky, granted amnesty to all anarchist and Bolshevik prisoners, which convinced many anarchist émigrés to return.

The "honeymoon" was very short. Because the state had not been eliminated, one anarchist journal described the new situation as "Nothing special. In place of Nicholas the Bloody, Kerenskii [*sic*] the Bloody has ascended the throne."[47] Anarchists demanded the state be dismantled and private property eliminated, which the Bolsheviks proclaimed as one of their ultimate goals, too. They mounted a successful coup in October 1917, one many anarchists supported.

But the Brest-Litvosk Treaty (March 1918), requiring Russia to surrender much territory to Germany, induced many anarchists and the Terrorist Brigade to strike the new communist government.[48] Anarchists assassinated policemen, district attorneys, Cossacks, army officers, factory owners, watchmen, and more. The Terrorist Brigade struck major Bolshevik leaders. Fanya Kaplan tried to assassinate Lenin, giving him a serious permanent lung injury. Kaplan, whom the czar had jailed, said Lenin's decision to close the Duma had provoked the strike. The Bolsheviks responded more brutally than the czars ever had. Over eight hundred Terrorist Brigade members and anarchists were executed without trials in 1918, and some 6,300 others met the same fate over the next two years.

The decision to return to terror divided anarchists. Gregori Maksimov, a leading figure, condemned terror as outmoded and as dissipating "revolutionary energy while doing nothing to eliminate social injustice."[49] Many supported the Bolsheviks, especially when White Russian armies launched a civil war, recruiting many Socialist Revolutionaries in the process. But

77

anarchist supporters of the Bolsheviks retained serious suspicions and worked hard to maintain their independence. The case of Nestor Makhno is particularly striking. He organized a military division in the Ukraine; all officers had peasant or factory-worker backgrounds. Incorporated into the Red Army, it kept its internal structure and black banner, the symbol of anarchism. Its independent military exploits were significant, but eventually Red Army leaders tried to assassinate Makhno, inducing him to wage an unsuccessful guerrilla campaign against Bolshevik military targets.

What role did dynamite play? Heinzen and Nechaev wrote before the bomb emerged, suggesting that revolutionary terrorism in any case could have moved in that direction. Also, the ancient Zealots and Sicarrii were able with primitive weapons to be profoundly indiscriminate in their killing. The example of the Islamic Assassins shows that limits could be maintained, one reason perhaps that Russian terrorists at the beginning of their struggle referred to the Assassins as models. Still, the bomb created enormous pressures to expand the field of terrorist operations. In one unsuccessful attempt to assassinate Alexander II, eleven were killed and fifty-six injured. Most Russian terrorists considered the unintended casualties as "collateral damage," that is, an inevitable result of the decision to use explosives, a tool no one suggested abandoning.

Ivan Kalieyev, a Terrorist Brigade member, provided a different model, one that gained international respect. He refused to kill Grand Duke Sergius when accompanied by his children. He waited for another opportunity and assassinated the grand duke when he traveled alone. (Kalieyev's concern for the innocent induced Albert Camus to make him the hero in his remarkable play *The Just Assassins*.)[50] That example was not followed much. Bombs were used whenever possible; the risk of waiting always seemed too great, and no one was demanding that they wait. Indeed, Kalieyev did not criticize those who acted differently. He made his decision and believed they were entitled to make theirs.

The Russians remained committed to assassination though there was never consensus over who should be assassinated. Narodnaya Volya began

78

by killing major officials and then concluded it would be more appropriate to focus on the czar. The Terrorist Brigade abandoned that position and returned to the original policy, while anarchists decided to assassinate any person associated with political institutions.

The problem was exacerbated because Russian terror groups (unlike some religious and mob predecessors) were wracked with factional quarrels and divisions over appropriate tactics and ultimate purposes. Terrorist groups could lose members to other radical elements that did not use terror or even violence. Disagreements between older and newer members were significant, and police infiltration increased internal tensions.

No wonder groups had short lives. The Terrorist Brigade, the most durable organization, survived only seven years. Anarchist groups lasted two years and revived themselves a decade later for two more. The Terrorist Faction of the People's Will disappeared after one attempt.[51] Another cause of fragmentation and of the dissipation of moral limits related to the way groups raised money, that is, by robbery. The two populist groups and the Socialist Revolutionaries limited this activity, but anarchists expanded their number of robberies immensely. In a single year (1905–1906), they carried out "1,951 robberies,"[52] taking "money and valuables from banks, post offices, factories, stores, and the private residences of the nobility. Middle class businessmen, doctors, and lawyers were forced to 'contribute' money to the anarchist cause under the penalty of death."[53] Robbery attracted criminal elements to terrorist groups, making Vera Zasulich's insistence in her notorious trial on the crucial distinction between criminals and terrorists hard to maintain. Indeed, criminals were hired as "mercenaries" for special tasks, and sometimes terrorists sold weapons to criminals and worked with them on joint operations. Increasingly, money seized was used for personal amenities. Many "later lived luxurious lives and spent money without restraint," finally "retiring" to Switzerland to enjoy their new wealth. Leaders tried to control the practice, but Grigori Gershuni, the Terrorist Brigade's last leader, admitted that "nine-tenths of all expropriations were acts of common banditry."[54]

79

## **ANARCHISTS AND THE WEST**

Alexander II's assassination aroused enormous interest abroad, creating opportunities Narodnaya Volya was determined to exploit. Vera Figner organized

> the propaganda of its actual aims . . . and enlist[ed] the sympathies of European society by acquainting it with the domestic policy of our government. Thus, while shaking the throne by the explosion of our bombs within the Empire, we might discredit it from without and contribute . . . to the diplomatic interference of a few countries which had been enlightened as to the international affairs of our dark tsardom. For this purpose, we had at our disposal those revolutionary forces which had been lost to the movement in Russia . . . the emigrants.[55]

The government had to present its case abroad too, where Russia was seen as despotic. To counter government efforts, Figner sent agents.

> [We] had attracted general attention, the journalistic world seized eagerly upon news concerning Russia, and the events listed in the Russian revolutionary chronicle formed the most absorbing news. In order to check the streams of false rumors and canards of every kind furnished to the European public through the daily press it was necessary systematically to supply foreign agents with correspondence from Russia covering all events in the Russian revolutionary world. I sent Hartman [the international propaganda head] . . . copies of letters, biographies of those . . . revolutionary publications, pictures of . . . condemned revolutionists in Russian magazines and newspapers. After the assassination of Alexander II . . . I sent him a report of the event including the letter of the Executive Committee to the new Czar Alexander III.[56]

The Russian diaspora provided printed materials, lectures, and funds.

80

Beyond seeking support from public opinion abroad, foreign revolutionaries were an essential audience. The Internationale meeting in London held after Alexander II's assassination enthusiastically approved "all illegal tactics including the use of chemistry to construct bombs for offensive and defensive purposes."[57] Western European anarchists welcomed the Russian uprising, but they were also a potential liability, because Marxists and anarchists hated each other. Nonetheless, efforts to gain support from both were successful, Vera Figner emphasizes.

All the eminent figures in the socialist world of Western Europe promised Hartman their cooperation in one form or another. With some of them, for instance Karl Marx and Rochefort, the Committee communicated by letter asking them to help their agent Hartman in the work of organizing propaganda against Russian despotism. . . . Marx sent the Committee his autographed portrait together with his expressed agreement to serve.[58]

Marx's response was especially surprising; he had said revolutionaries should not employ terror.[59]

Other political elements, especially Western liberals, had to be reconciled with radicals; the difficulties of this issue compelled Vera Figner to spend a week writing a letter to Alexander III explaining why his father had to be assassinated, a letter that tried to mask the organization's radical aspirations. Understanding her dilemma, Karl Marx praised the letter as displaying "cunning, moderation and tact, [which] won the sympathetic approval of all Russian society."[60] Figner described the letter's impact. "Upon its publication in the West, it produced a sensation throughout all the European press. The most moderate and conservative periodicals expressed their approval of the demands of the Russian Nihilists finding them reasonable, just and such as had in large measure been long ago realized in the daily life of Western Europe."[61] This dilemma of appealing to nonradical elements in the West continued to inspire Russian terrorists. In 1881, when U.S. president James Garfield was assassinated, Narodnaya Volya felt

81

compelled to distinguish that act from the ones it committed. Figner wrote an eloquent letter of condolence to the United States, stating that her group aimed to establish parliamentary government and that terror was abhorrent in free societies. As she anticipated, the letter disturbed many Second Internationale members.

In 1904, the Central Committee of the Socialist Revolutionary Party, which maintained the Terrorist Brigade, was faced with a more painful situation. In the 1890s, anarchists crossed international borders to assassinate prominent figures, including leaders in democratic governments. The Central Committee, to retain sympathies, wrote a proclamation to all citizens.

> The compulsory severity of our methods . . . must not becloud the situation. More than any others, we condemn publicly as did our heroic predecessors the use of terror as a measure of systematic warfare in free countries. But in Russia where despotism precludes any open political struggle and knows only lawlessness, where there is no protection against irresponsible authority, absolutist in all spheres of its bureaucratic structure, we are compelled to interpose the law of revolution against the law of tyranny.[62]

As expected, the statement provoked intense opposition from radicals, and when anarchists in the West began exploding bombs in crowded places, the tension grew more intense. Then France's Francois-Claudius Ravachol, who had been involved earlier in criminal acts, proclaimed himself an anarchist during his 1892 trial. These tactics and attitudes were alien to the tradition the Russians hoped to develop. But the revolutionary bond was so sacred that Kalieyev, whose concern for the innocent had induced him to forgo his first opportunity to assassinate Grand Duke Sergius, said,

> I do not know what I would do had I been born a Frenchman, Englishman or German. In all probability I would not manufacture bombs, and most probably I would not be interested in politics at all. But why should the Party of Socialist Revolutionists [i.e., the party of terror] throw stones

82

at French and Italian terrorists? Why this hurry? Why this fear of European public opinion? It is not for us to fear. . . . We must be feared and respected. Terror is power. It is not for us to proclaim our lack of respect for it. I believe more in terror than in all the parliaments of the world. I will not throw a bomb into a crowded café, but it is not for me to judge Ravachol, [who] justified his act by saying there are "no innocents." He is more of a comrade to me than those to whom this proclamation is addressed.[63]

As Vera Figner foresaw, foreign states that accepted political refugees did so knowing they would severely provoke Russia's government. In the last phase of her life, roughly half of the executive committee lived abroad in safety; the others, except Figner, were in Russian prisons. The Russian government used its secret police force to shape the foreign scene, penetrating Russian groups and inducing them to commit self-destructive acts. "The most notorious provocation occurred in Paris in 1890, when Arkadiy Harting . . . organized a well-armed team of bomb throwers and then betrayed them to the Paris police. These heavily publicized arrests helped persuade the French public of the dangers posed by Russian revolutionaries in France."[64] Okhrana also subsidized journalists to write favorable articles for Russia's government in sympathetic periodicals and created societies in France to promote its views.

Nevertheless, Russian revolutionaries found foreign states useful. In the second phase of Russian terrorism, Terrorist Brigade members often moved over international borders to seek temporary refuge; except for Russia, no passports were needed at that time. When they entered Russia, they could secure new passports from the Russian government to move more freely in Russia itself.[65] The organization created major foreign bases. Its headquarters were in Switzerland, the safest state for foreign terrorists. Geneva and St. Petersburg were situated on different ends of the European continent, but three days after Count von Plehve was assassinated in St. Petersburg (1904), every surviving participant reconvened in Geneva to plan their next move. The Central Committee also moved frequently to Brussels, Paris, and other capitals of democratic states.[66]

83

THE FIRST WAVE: ANARCHIST, 1879–1920s

The organization had a laboratory in Paris teaching people to make and use bombs, and this laboratory welcomed potential terrorists from different countries. Indian and Chinese students learned techniques they used in their own lands.[67] Paris also hosted the Terrorist Brigade's extended trial of Azev (1907), Okhrana's notorious agent provocateur who had become the Terrorist Brigade leader.[68]

European sympathizers helped establish foreign sanctuaries and strengthen their governments' resolve to refuse extradition. The Second Internationale waged a prolonged campaign of demonstrations that contributed to the Italian government's refusal to extradite Michael Gotz, the Terrorist Brigade leader. German Social Democrats provided "legal assistance when Russian radicals were tried in German courts for subversive and criminal activities."[69]

In 1907, the Terrorist Brigade organized attacks from Finland, a nation linked to Russia but with considerable legal autonomy.

> We chose Finland as the base of operations. . . . There could be no question at that time of our being extradited to the Russian government from Finland and should the question have been raised it would have been immediately delayed and the persons wanted would be given an opportunity to disappear. Members of the sympathetic Finnish Party of Active Resistance were present in all Finnish government institutions and even . . . the police. The Finns . . . gave us refuge, supplied us with arms and dynamite, transported supplies to Russia, provided . . . Finnish passports, etc. . . . It may be said without exaggeration that it was only due to the conditions prevailing in Finland that the re-establishment of the Terrorist Brigade was made possible with a minimum of sacrifices.[70]

The Internationalist's London Conference of 1881 electrified anarchists by "authorizing propaganda of the deed" and provoking newspapers and governments to speak of a "gigantic" international conspiracy. Abortive assassination attempts occurred in Germany and Austria-Hungary. Most incidents were isolated, individual-initiated episodes involving local issues and assailants. Many concerned labor disputes and robberies. Black Band

84

and Black Hand groups were active among French and Spanish miners, respectively.

The 1890s created a new situation, one making an international conspiracy idea more credible. Most assassins were foreigners who used daggers and pistols. The years 1892 to 1901 became the Decade of Regicide, during which more monarchs, presidents, and prime ministers of major world powers were assassinated than any other time in recorded history: President Sadi Carnot of France (1894); Prime Minister Antonio Canovas of Spain (1897); Austria's Empress Elizabeth, reputedly Europe's most beautiful woman (1898); Italy's King Humbert I (1900); and the president of the United States, William McKinley (1901). Aside from McKinley, Italian assassins were responsible for the other four deaths.[71]

Dynamite was used against crowds, too. "The 1893 bombing of the Barcelona Opera House . . . killed as many people [thirty or more] . . . as many as in all the incidents of the 1880s combined." Threats were made to use chemical and biological weapons; a British newspaper reported falsely that biological weapons were being used.[72] The assassinations, crowd attacks, and claims of weapons of mass destruction made anarchists seem like a bizarre breed unable to live in peace anywhere. The working classes, especially in Europe's Latin countries, favored anarchists initially, but that support waned as the campaign developed.

Bismarck called a conference of Western governments to create "an alliance against the Internationale."[73] While only the Austrians and Germans developed a common policy, some European states concluded bilateral agreements. As the number of attacks kept increasing, more states wanted to create international arrangements to cope with the problem. The Rome Conference (1898) aimed at comprehensive international police cooperation and much better border control. International concerns grew even more intense after a devastating international assassination occurred, one organized in the United States in 1900 by an Italian anarchist who returned to Italy to assassinate King Humbert I.[74] The United Kingdom, United States, and Switzerland refused to participate. Why were the Americans unwilling to attend? For one thing, Europeans had experienced much more anarchist terror. Only two major incidents had occurred in the

85

United States, the Chicago Haymarket bombing (1886) and Alexander Berkman's unsuccessful attempt in Pittsburgh to assassinate Henry Clay Frick (1892), the Carnegie Steel Corporation's general manager and a ruthless strikebreaker.

But the American atmosphere was transformed when an immigrant's son assassinated President William McKinley in 1901. His successor, Theodore Roosevelt, immediately made the first American call for an international effort to eliminate terrorism.

> Anarchy is a crime against the whole human race; and all mankind should band together against the Anarchist. His crime should be made an offense against the law of nations like piracy and . . . the slave trade, for it is of far blacker infamy than either. It should be so declared by treaties among all civilized powers. Such treaties would give to the federal government the power of dealing with the crime.[75]

Despite Roosevelt's vigorous proclamation, his commitment to international efforts did not last long.[76] In 1902, the German and Russian governments invited states to accept an agreement for "rigorous surveillance of the anarchists by the creation of central bureaus in the various countries," which would exchange information and create rules to expel foreign "anarchists from all countries." Thirteen states, mostly Central European, signed a secret protocol in 1904 in St. Petersburg. Most democratic Western states refused to sign,[77] an irony when we consider how often democratic states became terrorist targets during the Third Wave and Fourth Wave. Democracies refused for three reasons: they normally granted asylum to political refugees, especially Switzerland and the United Kingdom; had experienced less violence than states signing the treaty; and believed that terror could encourage more states to adopt parliamentary institutions.

Even though the assassination of Italy's King Humbert I precipitated the St. Petersburg meeting, Italy refused to sign the protocol. It mistrusted Russia, Germany, and Austria-Hungary (the major powers involved) and feared that thousands of Italian anarchists abroad might be extradited, making Italy's domestic troubles worse than its international ones. Italians

86

were particularly active as international assassins, crossing borders to kill heads of state or principal political officeholders in different countries.

Beyond democratic ambivalence, the United States had special reasons for not signing the protocol. Secret treaties were unconstitutional. It did not want to get involved in European politics, especially since Germany and Russia had instigated international clashes with the United States. A German fleet during the Spanish-American War (1898) had sailed into the Philippines, an act Americans saw as hostile. In 1902–1903, the Germans bombarded Venezuela to collect debts owed, making Americans feel that Germany might trample on the Monroe Doctrine. Russia's pogroms against the Jews angered Americans, and its expansion in Asia led President Roosevelt to support Japan in the Russo-Japanese War. The federal government also had only one police force, the Secret Service, with just fifty agents very much consumed with other tasks, namely, dealing with counterfeiters and protecting the president. It was not easy to persuade Congress that the federal government needed more extensive police powers. Then there was the "Miss Stone Affair," in which American missionaries were allowed to supply funds to the Internal Macedonian Revolutionary Organization (IMRO), a terrorist group in the Ottoman Empire, making it clear Americans could not treat all terrorist groups alike.

The Russian Terrorist Brigade's experience abroad also illustrates international ambivalence. Support was strongest in states refusing to sign the protocol. When the Russo-Japanese War broke out, the Japanese offered the Terrorist Brigade funds laundered by American millionaires.[78] Japan did not sign the 1904 protocol, but the Ottoman Empire did, even though it supplied the Terrorist Brigade with money and weapons. Signing the protocol meant different things for the signatories; for one thing, the protocol suggested that terrorism and anarchism were synonymous, but many states distinguished between anarchists and other groups.

How effective was the 1904 protocol? It did not remain in force for long enough for a clear picture to emerge. The number of heads of state assassinated declined dramatically in the decade after 1904, but it is not clear the protocol was responsible. Russia was the only major state where a prominent political figure was assassinated: Prime Minister Stolypin was killed

87

in 1911, but the assassin was a Russian and therefore not covered by the protocol.[79] The decline also was related to the fact that prominent persons in major states were now much better guarded than before, but it is not clear how much significance that fact has. Oddly, Stolypin refused to have bodyguards or wear a bulletproof vest the day he was killed by a double agent. Beyond the striking decline of prominent assassinations by foreigners, terrorist activity in general was dropping in Central Europe, where the protocol was most strongly supported.[80]

In 1914, the protocol was destroyed in the aftermath of "the shot heard round the world," when a Serbian nationalist assassinated Archduke Franz Ferdinand, the heir to the Austro-Hungarian Empire, and his wife. The act provoked World War I, the most devastating conflict the world had ever experienced, ending in the destruction of Europe's international structure established by the Congress of Vienna a century before.

The new status of Bosnia-Herzegovina provoked the assassination. Previously a part of the Ottoman Empire, Austro-Hungarian troops occupied it after the Russian-Ottoman War (1877–1878), and in 1908 the Austro-Hungarian government decided to incorporate it, a decision Serbia and Russia opposed. Several assassination plots materialized, organized largely by the Black Hand, which had been founded by Serbian military officers encouraged by Russia and was composed of Serbian, Bosnian, and Croatian students.[81] The Serbian government suppressed the Black Hand. Gavrilo Princip, a Black Hand member, assassinated the archduke and his wife, who had come to Bosnia to reduce the population's antagonism toward its new status.

The Austro-Hungarians insisted the Black Hand, which had organized an abortive attempt several years before, was responsible. A strong ultimatum, intended to be unacceptable, was delivered to Serbia, which acceded to all demands except one authorizing Austro-Hungarian police to operate on Serbian territory to apprehend suspects. Vienna refused to compromise or wait for the investigation to be completed, Germany gave Vienna a "blank check," Russia backed Serbia, and World War I began.[82] This pattern of a state being unwilling to wait in the wake of a terrorist atrocity until all facts

88

emerge, thereby producing a much worse situation, appears again both in the Third Wave and Fourth Wave.

The trial of Princip and his associates later demonstrated that Serbia had not been involved. Princip testified, "I am a Yugoslav nationalist, aiming for the unification of all Yugoslavs, and I do not care what form of state, but it must be freed from Austria." When asked how he intended to realize his goal he responded, "By means of terror."[83] When World War I was over, Princip and his associates were buried beneath a chapel "built to commemorate for eternity our Serb Heroes."[84]

## NATIONALIST EXPANSION IN EUROPE AND ASIA

Our principal concern has been on the areas where two major distinct objectives, radical reform and anarchism, often intertwined. But the First Wave had a more extensive geography and other objectives as well. Nationalism was important in shaping the wave's geography. Eastern Europe was the initial home for nationalist terrorists, but nationalist aspirations soon spread to Asia and the Middle East as well. In virtually all these cases, a radical dimension was quite evident. Only the Irish produced a separatist terror movement in Western Europe or the Americas without a radical dimension. Separatism had a strong base in Russia's experience; recruits came from different national elements (for example, Armenians and Poles) inside the Russian Empire and soon founded their own national groups, which former Russian comrades helped train and arm. Two separatist efforts in Scandinavia succeeded without violence. Norway gained independence from Sweden (1905); both states had a common monarch but separate legislatures. The Norwegian parliament unanimously voted for secession, and a Norwegian referendum showed that over 95 percent of the Norwegians favored separation, convincing Sweden that it was not worth resisting. Iceland decided to separate from Denmark in 1918, establishing a legislature but retaining the Danish monarch.[85]

89

Compendium_Roth
Page 0533

But nationalist terror did not produce successes in the First Wave, because the Congress of Vienna prevented the dismantling of empires. The most serious nationalist terrorist efforts were filed the Austro-Hungarian, Russian, and Ottoman empires, where territories were contiguous, creating obstacles to separation. Separatist terrorist groups then were often dependent on neighboring states for sanctuaries and material aid, but those states found it difficult to continue the process.

Armenian activities were particularly interesting. Most targets were in Ottoman Empire territories near Europe, aiming to induce major European powers to intervene and establish Armenia as an independent state.[86] This hope was inspired largely by Russia's invasion of the Ottoman Empire in 1877 and 1878, provoked by massacres of Bulgarian Christians after the Bulgarian uprising against the Ottomans. The Treaty of Berlin (1881) ended that war, establishing new Balkan states and strengthening existing ones. The treaty charged six major European states with protecting Armenians against government-encouraged atrocities.[87] But those states were reluctant to pursue their obligations. Armenian groups consequently decided to provoke incidents to illustrate the horrors of the Ottoman Empire and arouse Europe's conscience. The pattern reflected a very significant theme in Armenia's cultural tradition, beginning with St. Vartan's military effort in the fifth century against overwhelming odds to reclaim the right to be Christian.

> The depiction of suffering, daring, rare partial success, and heroic death constitute cultural narratives which serve to establish the willingness to act against very high odds and to accept violent deaths. [They] are essential element[s] of those who would honorably live out their lives that are socially approved because their paradigm is represented in projective narratives.[88]

Armenian terror persisted intermittently for several decades, and the groups frequently splintered, much like the Russian ones. Every member of the first group, Protectors of the Fatherland (1881), was a Russian Armenian initially trained and supported by Russian terrorists. The group

Compendium_Roth
Page 0534

functioned largely in the Anatolia area of the Ottoman Empire. An upris-
ing that provoked foreign intervention there would disintegrate the Otto-
man Empire, an outcome the Russian government wanted to promote; it
therefore gave the organization valuable logistic and financial support
despite its well-known ties with Russian revolutionaries.[89] But efforts to
inflame the Armenian population were difficult. "Constituting six to eight
per cent of the total population, Armenians were not a majority in any prov-
ince of the empire. Of the six provinces of eastern Anatolia where, apart
from Istanbul, most Ottoman Armenians lived, in only one . . . they
comprise[d] more than a quarter of the population, according to Ottoman
census figures."[90]

The Protectors only lasted two years, but other groups soon emerged.
The most important were the Social Democrat Party (Hentchak), created
by Russian Armenian students in Switzerland (1887), and the Armenian
Revolutionary Federation (ARF; 1890). Hentchak, the smaller group, was
more public about its radicalism, aiming to establish "a socialist Armenia
as a beacon for world socialist revolution" based on "workers and peasants."
In 1907, Hentchak joined the Second Internationale;[91] it was much more
global than ARF. Its headquarters were in Switzerland, with units in the
Ottoman Empire, France, the United Kingdom, the United States, and
Russia, raising considerable funds from the Armenian diaspora. ARF pub-
licly emphasized nationalism more than socialism as the best way to get
Armenian support. Over time, ARF developed ties with a sympathetic Per-
sia and its large Armenian community. But the Armenian clergy and
wealthier Armenians, especially in the Ottoman Empire, resisted both
groups and became ARF terror victims.

In 1893, Hentchak masqueraded as a Turkish group in the countryside
calling Muslims to revolt against the sultan and establish constitutional
government. The disguise was quickly revealed, infuriating Muslims; its
object, the British ambassador said, was "to create a 'semblance of revolt'
by cutting telegraph wires, bombing the odd government building, etc." The
sultan would then panic and order local authorities to "act in a stupid or
overzealous manner . . . arouse Turkish and Kurdish masses with religious
fanaticism and a massacre would occur."[92]

Compendium_Roth
Page 0535

Allegations of arbitrary arrest, torture, and punishment without trial infuriated Europeans and Armenians, and a series of massacres occurred in Armenian villages. Assassination attempts precipitated even more indiscriminate responses; entire populations were eliminated and women and children deliberately mutilated. Thousands died, and the "statistics" were circulated widely.[93]

The most sensational Armenian effort occurred in 1896, timed to occur when Gladstone and the Liberal Party (strong Armenian supporters) returned to power in the United Kingdom.[94] A team of twenty-six, led by a seventeen-year-old, seized the European Ottoman Bank and held European bank workers hostage. ARF made fourteen demands to the six European states the Berlin Treaty had made responsible for monitoring the Ottoman situation. If the demands were not met within two days, the bank, with the captors and captives inside, would be blown up. When Europeans agreed to talk, the terrorists surrendered their hostages.[95] Over the next four days, nearly six thousand Armenians were killed, apparently at the sultan's command, and around 75,000 Armenians fled Constantinople.[96] Because the city contained European diplomats and tourists, the sultan's reactions were much more visible to the outside world than they would have been in the countryside, where so many previous incidents occurred. Spectators "literally waded in blood . . . and saw with their own eyes some of the Sultan's elegant aides-de-camp stamping with their heels on the bodies of dying Armenians."[97] Despite enormous European outrage, conflicting interests divided European powers from doing anything beyond demanding the massacres cease immediately.

A few years later, Russia became reluctant to help, fearing that a decimated Ottoman Empire would entice European powers to incorporate Ottoman territories on Russia's borders. Separatist sentiments in Russia were a concern too, and the government made efforts to transform ethnic groups into "Russians." Armenian Church properties used to subsidize Armenian schools were seized in 1903, inducing ARF to extend its struggle and fight for Armenian independence from Russia as well.[98] "In a bloody reign of violence lasting two years, hundreds of Russian bureaucrats fell before the bullets, knives and bombs of 'Armenian terrorists.'"[99] But the

92

warm bond between Russian and Armenian revolutionaries continued. It may have even strengthened, because in 1905 when the Terrorist Brigade was established, some Armenians left ARF to join the Terrorist Brigade, and ARF gave it arms.

A desperate ARF changed its policy of avoiding assassinating heads of state, and in 1905, with the assistance of IMRO, planned to assassinate Sultan Abdulhamid II.[100] ARF stated its purpose in a letter addressed to the six major European powers. It "hoped the outrage might force the [Ottoman] Government to adopt measures against the Armenian people so as to induce the European Powers to intervene on their behalf."[101] Three assassination attempts occurred; none were successful, but the last effort killed twenty-six Turks and injured fifty-eight. The Ottomans interned many of the Armenians said to be involved; this time, conspicuous atrocities did not occur, which helped European powers avoid serious involvement again.

In the "Young Turk" revolution (1908), military officers eliminated the sultan and his dynasty, establishing a constitutional government. Armenian groups helped and pledged allegiance to the new order, but a year later the Adana Massacre materialized, killing over 15,000 Armenians.[102] Armenian groups withdrew; ARF retreated to a sympathetic Persia. During World War I, ARF abandoned terrorist activity to organize a sizeable military force, which created the Republic of Armenia (1919). In its first parliamentary election ARF got eighty-two of eighty-six seats, but Bolsheviks and Muslim dissidents quickly incorporated the republic into the new Soviet Union.

Polish terrorists emerged to continue earlier nationalist and ideological struggles. But the division of the Polish community across three different states, Prussia, Austria-Hungary, and Russia, continued to doom terrorist efforts, just as the Armenian dispersion had.[103] The two cases had other parallels, as well. Participants initially were members of Russian terrorist groups, and when Poles and Armenians created their own organizations they remained in useful contact with subsequent Russian ones. Polish students in Russian universities were attracted to Narodnaya Volya, and one, Ignacy Hryniewiecki, helped assassinate Czar Alexander II in 1881. As discussed earlier, the Terrorist Faction, which had organized an abortive

93

plot to assassinate Alexander III in 1887, contained two Poles, Bronislaw and Jozef Pilsudski, who were imprisoned for their roles. When released, they returned home, where they helped found the Polish Socialist Revolutionary Party (BPP) during the 1905 Russian Revolution, when Russia was aflame with domestic violence and an international war. It was modeled after the Russian Duma's Socialist Revolutionary Party, which had created the Terrorist Brigade. The BPP had a terrorist wing, too, which sprung into action when demonstrations were brutally repressed in Russian territories. Austria-Hungary and Japan subsidized the terrorists. Like the Armenians, the Poles now aimed to create a socialist community.[104] But the Poles struck only Russians in Russia "to destabilize Russian authority in Poland and to frighten all figures of the Czar's administration. Polish terrorists attacked, killing 790 military and police officers [and] exploding 120 bombs in a short time of two years from 1905 to 1906. The victims were mostly Russian . . . staff of the Czar's administration."[105]

All Polish terrorists remained publicly committed to promoting socialism in Russia until November 1906, when the party split, and one element of the Revolutionary Faction, led by Józef Pilsudski, insisted that an independent Polish state was the primary aim. But he soon discovered that Polish support for terror, no matter what the ultimate cause, was tepid, and in 1910 he organized a new group in Austria-Hungary, the Union of Active Combat, a paramilitary group that ultimately served in the Austro-Hungarian army during World War I. Poland eventually achieved independence after the Versailles Peace Treaty went into effect, because unlike the Armenians, most Poles, though scattered across states, were in a large, contiguous area.

The Balkan world, a seedbed of persistent hostilities, stimulated many groups beyond those that had provoked World War I. A major Balkan terrorist organization, IMRO, was established in 1892 by Macedonian students in Russian, German, and Swiss universities working with Russian and German anarchists.[106] It used the cellular structures the Russians had developed.[107] Like the Armenians, the radical leftist elements founding IMRO dissipated over time; what emerged was a more popular nationalism. The Treaty of Berlin obliged the Ottomans to give Macedonia an autonomous

94

THE FIRST WAVE: ANARCHIST, 1879–1920s

status. The problem was further complicated because three Balkan states (Serbia, Greece, and Bulgaria) had Macedonian populations, and they competed with one another to gain the community's loyalties. IMRO aimed to induce major foreign powers to intervene. It waged several different campaigns, employing strategies and tactics with unusual features. Muslim elements (Turks and Albanians) were the principal victims. Areas attracting European tourists were bombed, hoping to evoke political attention and disrupt trade between the Ottoman Empire and Christian states. But few assassinations occurred, and European states distinguished IMRO from other terrorist groups.

The Miss Stone Affair (1901) is one of the few hostage incidents to take place during this period and the only important one that was successful. IMRO kidnapped an American Protestant missionary, Ellen Stone, and her pregnant companion, demanding the United States pay $110,000 for their release. Negotiations dragged on for six months.[108] Stone's gender and her companion's pregnancy multiplied American concern. Roosevelt's response reflected the conventional view of gender.

> It is impossible not to feel differently about [women] than men. If a man goes out as a missionary, he has no . . . business to venture to wild lands with the expectation the government will protect him as well as when he stayed at home. If he is fit for his work he has no more right to complain of what may befall him than a soldier has in getting shot. But it is impossible to adopt this standard [for] women.[109]

First Wave terrorists were reluctant to take hostages, a practice associated with criminal activity. But IMRO made its decision to kidnap for two reasons. It was virtually bankrupt and knew the missionary community was sympathetic to its purpose of ending Turkish Muslim rule in Europe. Twenty students at the Collegiate Seminary in Bulgaria were IMRO members, and the seminary's head confessed, "I respected them, and my heart was with them."[110] IMRO believed missionaries would persuade the U.S. government the Turks were responsible and intervene with military force if a ransom had to be paid. When Stone's companion gave birth to her child,

95

IMRO provided the necessary medical help. Although the United States refused to negotiate, it endorsed the money-raising efforts of the Foreign Missions Board, which had sent Stone to the area. Major newspapers, Protestant churches, and the Macedonian diaspora helped raised funds. IMRO eventually accepted $66,000, much less than it originally demanded, but the money financed a 1903 uprising. When released, Stone became an IMRO supporter and began a strenuous campaign to raise additional money for IMRO from Christian congregations, dismaying the U.S. government greatly. Stone's activities might be seen as the first example of Stockholm Syndrome in the history of global terrorism, but she had been sympathetic to IMRO's cause before becoming a hostage.[111]

Clearly, the Macedonian struggle did not provoke the same hostility among Americans that the anarchists did. The 1904 protocol developed in St. Petersburg was concerned with anarchists and other groups using "anarchist methods." IMRO activity aroused attention, sympathy, and international support, but the organization was unable to stimulate serious intervention because the major powers were apprehensive a war with the Turks might transform the European balance of power and enhance possibilities of a major war between European states.

When major powers refused to intervene, some Balkan states acted on their own. Bulgaria, Greece, and Serbia went to war with the Turks (the Balkan War of 1913), forcing them to cede Macedonian territories to Serbia and Greece, an unexpected and infuriating result for Bulgaria and IMRO. Bulgaria decided to enter World War I on the Central Powers' side because Serbia and Greece were linked to the Allies, and if the Allies were defeated, Bulgaria believed it could incorporate Macedonia. But Bulgaria chose the losing side, and Macedonia remained divided. Bulgaria kept IMRO alive for fifteen more years, and IMRO struck other Balkan states, particularly Greece. But Bulgaria and IMRO had conflicting aims and drifted apart. This development intensified existing divisions within IMRO, resulting in an abandonment of its left-wing origins, so much so that Italy's fascist government later subsidized the group. Ultimately, IMRO became a criminal organization accepting "contracts" for various schemes. After a Bulgarian

Compendium_Roth
Page 0540

military coup in 1934, the First Wave's most durable terrorist organization collapsed; it had lasted forty-one years.[112]

Unlike other separatist uprisings, Indian terror occurred in an overseas and not a contiguous empire. Russian terrorists influenced two major uprisings in India, namely, those of 1907–1912 and 1914–1918.[113] Indian students in Paris in 1906 attended the Russian bomb-making school and returned home to teach others those techniques. In 1909, a British police raid on a cell found two Hindu documents assessing the utility of the Russian experience for India.

> The system of the Bengali revolutionaries does not of course fit exactly with the Russian scheme [because of] adaptation of differences of country and race, national customs and tendencies. . . . [Also] the dominant religious element is entirely absent from the Russian propaganda, but the underlying principles are the same.[114]

Indian terrorist groups sought aid from Japan, but as Britain had helped Japan in its victory over Russia, Japan refused to repeat the offer it had made to Russian and Polish terrorists. Nevertheless, the dramatic and quick Japanese victory in the Russo-Japanese War reverberated throughout the Asian world, demolishing a widespread view that the West's great military strength signified racial superiority.[115] "If the rice-eating Jap is capable of throwing the meat-eating Russian into utter rout, cannot the rice-eating Indian do the same to the British?" a Calcutta paper asked.[116] Indian newspapers followed the war's progress in detail, and pro-Japanese demonstrations took place. Mahatma Gandhi wrote: "The people of the East seemed to be waking up from their lethargy," and the teenaged Jawaharlal Nehru (destined to be India's first prime minister) wrote: "Japanese victories stirred up my enthusiasm and I waited eagerly for fresh news daily. . . . Nationalist ideas filled my mind. I dreamed of Indian freedom."[117]

A second catalyst was the British decision in 1905 to divide Bengal, India's largest and most populated province, into two, hoping to blunt the nationalist sentiment there. The Hindu minority in one portion, deeply worried about Muslim domination, launched demonstrations to boycott

97