1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and*
   *Blake Graham, in their official capacities*
9

10          IN THE UNITED STATES DISTRICT COURT

11        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                    CIVIL DIVISION

13

14  **JAMES MILLER et al.,**          Case No. 3:19-cv-01537-BEN-JLB

15                    Plaintiffs,    **COMPENDIUM OF WORKS**
                                     **CITED IN DECLARATION OF**
16       **v.**                      **RANDOLPH ROTH**

17                                   **VOLUME 31 OF 37**

18  **CALIFORNIA ATTORNEY**          Courtroom:    5A
    **GENERAL ROB BONTA et al.,**    Judge:        Hon. Roger T. Benitez
19
                      Defendants.    Action Filed:  August 15, 2019
20

21

22

23

24

25

26

27

28                              1

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS[i]** | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325-1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

i The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians.  *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

Compendium of Works Cited in Declaration of Randolph Roth
(3:19-cv-01537-BEN-JLB)

British products and replace them with indigenous ones. But after three years, some became convinced mass agitation was insufficient and endorsed terror. The primary organization, Dacca Anushilan Samiti (Self-Culture Association),[118] operated under the guise of suburban fitness clubs, as did its principal offshoot, Jugantar (New Era), tied to the Indian diaspora. Indian students at the University of California–Berkeley supported the uprising and created Ghadar (Revolution). In World War I, it tried to ally with the Irish Sinn Fein, an arrangement Germany tried to aid with money and military supplies, but the United States and United Kingdom thwarted them.[119]

Initially, all Indian terrorists were Hindu; over 80 percent of them were students from the higher castes. A British civil servant described them as "misled idealists" but noted that "one should never forget this, the Bengali boys who became terrorists were the best boys in Bengal."[120] Muslims and the British were principal targets. Funds were gathered through gang robberies, which occasionally made Hindus victims if they were perceived as administration members or "traitors." Recruits were normally integrated into the organizations in a temple of Kali. "There before the image of the Goddess Kali, the members took the vow with a *gita* [a scripture urging them to fight a righteous war] on the head and a sword in the hand."[121] "At the inauguration ceremony a white goat resembling the Englishman was sacrificed before the Goddess."[122] A picture police found in the organization's headquarters shows "Kali dancing, and the several heads which form her garland and the various limbs and heads lying above receiving the attention of crows and jackals are white."[123] The Self-Culture Association adopted the First Wave's weapons, tactics, and strategy. Kali's central place made it difficult for Muslims to sympathize, but as the Self-Culture Association became more anti-British it began to attract Muslims as well.

The special influence of the Russo-Japanese War and the location of Self-Culture Association cells in fitness clubs show that Indians were obsessed with physical culture to demonstrate they could deal with the "martial races." The clubs featured wrestling with daggers and lathes (staves), boxing, jujitsu, and riding. But the uprising failed. The British had no reason to give up their tenure or believe the revolt might be justified. Many

Compendium_Roth
Page 0542

Muslims, suspicious of the terrorists' ultimate intentions, helped the British, and the police infiltrated the group.[124] Little thought was given to the new state's character: "The revolutionaries often acted on impulse and emotion without proper plans or precautions and had only short-term goals. The link between specific acts of violence and the independence of India was at best hazy. Perhaps it is in the nature of revolutionary activity not to have well-formulated conceptions of the past and the future."[125]

Nationalism and anarchism inspired Chinese activities as well. Movements began in Paris and Tokyo; in 1906, Paris had over five hundred Chinese students, and ten thousand studied in Tokyo, where educational costs were considerably less.[126] Ironically, most students were sent overseas because the government thought they would return to help "modernize" the country and strengthen its ability to deal with foreign powers. Britain, Germany, Russia, France, Italy, Portugal, Japan, and other major powers had made considerable inroads into China's independence, forcing significant concessions, including of territory. Those concessions provoked the unsuccessful Boxer Uprising (1898–1900), a massive popular military effort to eliminate all foreign influences and presences. The Boxers used only traditional weapons, swords, lances, and daggers, believing that their "martial arts were magical, and they were invulnerable."[127] The ruling dynasty became convinced that China had to understand the importance of Western technology, but the Russian Terrorist Brigade in Paris taught the Chinese sent there how to use bombs.

The Chinese had an assassination tradition that transformed some assassins into popular heroes, similar to the celebration of Western tyrannicides, but the Chinese tradition granted honor only if the assassin died in the effort. But now Chinese revolutionaries emphasized assassination's relationship to revolution. It made overturning a government "extremely easy. The tactic did not require much money or many people or coordinating groups. There was no risk of foreign intervention. [It did not] implicate or frighten innocent people in the area where it was undertaken [and] was [effective] in terrifying the authorities."[128] Assassination efforts occurred in two short phases, namely, 1903 through 1907 and 1910 through 1912. Anarchists and nationalists cooperated to remove the Manchu

99

THE FIRST WAVE: ANARCHIST, 1879–1920s

dynasty, China's government for centuries. As the dynasty had originated in Manchuria, the rebels denounced it as a foreign imposition. A republic would increase China's unity, strength, and ability to prevent foreign interventions.

The Society for the Education of a Militant People, largely composed of anarchists, generated the initial 1903–1907 phase.[129] Eight separate plots were carried out, but only one victim died, a provincial governor. Individuals organized the attacks but made no effort to coordinate them with popular uprisings. The attack that killed the governor was intended to be linked with an uprising, but the uprising did not get off the ground. A woman was the designated leader of that anticipated uprising, the first time a woman was involved in such a task, an event the Russian terrorists had inspired.

Every assassin died in their attempt. Contemporaries reflecting on the pattern felt that the participants had been transfixed by the ancient Chinese tradition and misunderstood the new meaning of assassination. A Japanese journal at the time said, "Those who committed suicide out of anguish should instead carry out assassination for the revolution." A recent commentator adds, "The appeal of . . . heroic suicide may help to explain the incompetence with weapons that characterized almost all the attempts. . . . Many of these episodes can be interpreted as ritual suicides rather than calculated attempts at assassination."[130]

The next assassination campaign (1910–1912) was more effective. A variety of groups cooperated for the first time. In 1905, the Chinese Revolutionary Alliance under Sun Yat-sen's leadership "promised to overthrow the Manchu empire and thus restore China to the Chinese, establish a republic and distribute land equally among the people."[131] By 1910, the Revolutionary Alliance had many supporters who generated popular uprisings and general strikes in some provinces and had assembled administrative structures, including military elements. The assassination campaign this time frequently succeeded in killing or injuring intended victims (four times in six attempts) and was correctly timed to coincide with popular disturbances.

Clearly, assassins had learned from previous mistakes. The Revolutionary Alliance precluded solo attacks. The most successful operation was the

100

Compendium_Roth
Page 0544

THE FIRST WAVE: ANARCHIST, 1879–1920s

1911 assassination of General Feng-Shan, who had been sent to suppress the rebellion in Kwangtung. None of the twenty assassins involved was hurt, and over twenty members of the general's protection unit died. The event had a dramatic effect. The imperial government sent no one to replace the general, and within two weeks the province declared its independence. The assassination campaign continued in the rest of the country, and a republic was established in the following year. Success did not hinge on the assassination campaign, but it certainly helped.

Sun Yat-sen, China's new leader, was ambivalent about such tactics. He refused to endorse assassination publicly but gave assassins funds and allowed an important journal associated with the Revolutionary Alliance to describe them favorably.[132] Huang Hsing, the uprising's chief figure and recognized as the "Co-Founder of the Republic," struggled with Sun Yat-sen over the matter.[133] Anarchist activity continued until the early 1930s, at which point the Communist Party absorbed the anarchists.

Ironically, though Tokyo's atmosphere provided inspiration and assets to Chinese students, Japanese terrorists never got far. Anarchists organized demonstrations against the outbreak of the Russo-Japanese War in 1904. But later they joined riots against the Treaty of Portsmouth ending the war in 1905, which gave Japan much less than they demanded. The contradiction between agitating against starting the war and then insisting on continuing it perhaps can be explained by the belief that riots against the peace treaty seriously threatened the system.[134]

In 1907 anarchists and socialists created an alliance of around forty people in Denjiro Kotoku, a group deeply influenced by European anarchists. Recruits came from an unusual source, relatively poor families; most had only completed elementary school and were involved in construction and tradesman activities.[135] The first strike planned was the assassination of the emperor, a wholly unprecedented act; the Japanese considered their emperor divine, and no assassination attempt had ever been made. One conspirator explained, "Because there was the myth surrounding the imperial family, there was the desire on my part to talk about the making of a bomb and the utilization of this as an attack on the myth of the emperor to show that the blood of the emperor was no different from that of the common man."[136]

Compendium_Roth
Page 0545

A series of general strikes, assassinations of wealthy capitalists, fires, and attacks on government, especially police, was to follow. But twenty-six were apprehended before any attack was made. No public protests of the trials occurred, and the movement's remnants did not acclaim the convicted as heroes or martyrs. Ira Plotkin's examination of the trial concludes, "Because of . . . the crime for which they were accused, conspiracy to assassinate the divine symbol of the state, Kotoku and his followers did not become martyrs to the socialist or anarchist cause. The socialists feared total loss of support if they identified with such criminals . . . and [the] anarchist movement came to an end."[137] "The next generation of protestors and agitators could not attack the imperial institution as a way to bring about change, but rather they could attack the politicians in the name of the emperor to influence change."[138]

In the Great Treason Conspiracy trial of 1911, every potentiality of Japanese revolutionary terror was destroyed. The trial taught Osugi Sakae, the leading figure, "a lesson he never forgot even though he never articulated it, a radical may do almost anything, but he must never directly oppose a policeman or execute any violent action against the government."[139] But his rejection of violence did not preserve his life. The great Kantu Earthquake of 1923, which destroyed over 60 percent of Tokyo and Yokohama, provided cover to some Japanese to murder Osugi and many other radicals.

## DECLINE OF THE FIRST WAVE

The First Wave began declining before World War I, and by the mid-1920s, four decades after it began, it was basically over. At its high point (1890–1910), terror activity occurred on all six inhabited continents and in at least thirty-eight nation-states. After 1914, only ten states experienced terror; all were in Europe or the Americas: Italy, Spain, France, Russia, Portugal, Bulgaria, the United States, Argentina, Uruguay, and Brazil. Terrorism in Spain remained important in the early 1930s, and a few incidents occurred elsewhere. An anarchist tried to assassinate Franklin D. Roosevelt (1933)

102

THE FIRST WAVE: ANARCHIST, 1879–1920s

when shaking hands with Chicago's mayor, who was killed instead. A year later, an IMRO member trained and sheltered by Italy and Hungary assassinated King Alexander of Yugoslavia together with France's foreign minister, Louis Barthou, in Marseilles.

Ironically, the wave's bloodiest incidents occurred during the wave's decline. The 1920 Wall Street bombing was the First Wave's deadliest incident, killing thirty-eight and injuring 143; it remained the deadliest terrorist attack in American history until the Fourth Wave Oklahoma City bombing in 1995. Antianarchist immigration laws leading to the deportation of some five hundred immigrants, including Luigi Galleani, and the unfair treatment of Sacco and Vanzetti made anarchists argue that bombing Wall Street, the "center of capitalism," was an appropriate "act of revenge." In 1921, the Diana Theatre in Milan, Italy, was bombed; twenty-one were killed and 159 injured. The aim was to kill Milan's police chief, who had abused prisoners. He was unhurt. Not until 1980, during the Third Wave, did Italy experience a more deadly terrorist massacre, namely, the Bologna train station bombing by the neofascist organization Armed Revolutionary Nuclei that killed eighty-five and wounded over two hundred.

There were three major factors contributing to the wave's decline: the inability of organizations to achieve success, the decision of many anarchists to become syndicalists, and changing police practices. Since the hope of success is the stimulant for all terror groups, across all four waves, that hope evaporates when there are no successes, especially when many efforts are attempted. In the First Wave, failures everywhere made it more and more difficult after the first two decades to get new recruits or inspire the formation of new organizations, especially in areas where anarchists dominated. Some anarchist intellectuals who had supported assassination began doubting their views. As early as 1887, Peter Kropotkin wrote, "A structure based on centuries of history cannot be destroyed with a few kilos of dynamite."[140] In 1895, the Italian anarchist Errico Malatesta argued:

> Violence used to another's hurt, which is the most brutal form the struggle between men can assume, is eminently corrupting. It tends, by its very nature, to suffocate the best sentiments of man, and to develop

103

all the antisocial qualities, ferocity, hatred, revenge, the spirit of domi-
nation and tyranny, contempt of the weak, servility towards the strong.
And this harmful tendency arises also when violence is used for a good
end. . . . Anarchists who rebel against every sort of oppression and strug-
gle for the integral liberty of each and who ought thus to shrink instinc-
tively from all acts of violence which cease to be mere resistance to
oppression and become oppressive in their turn are also liable to fall
into the abyss of brutal force. . . . The excitement caused by some recent
explosions and the admiration for the courage with which the bomb-
throwers faced death, suffices to cause many anarchists to forget their
program, and to enter on a path which is the most absolute negation of
all anarchist ideas.[141]

The French anarchist Fernand Pelloutier in 1895 insisted anarchists aban-
don "the individual dynamiter" and get involved again in the labor move-
ment.[142] Soon syndicalism, often called anarchosyndicalism, developed in
France and spread to many countries in the West. In 1922, syndicalism
established a global bond in the International Workers' Association, which
had several million members.[143] A new version of Proudhon's views appeared;
workers living in a confederation of small communes could abolish capi-
talism, eliminate "wage slavery," and destroy the state through "direct
action" by individuals and masses. Acts to take human lives were aban-
doned; instead, individuals sabotaged property, especially machinery. The
most useful act would be a general strike in which all workers would par-
ticipate and reject the intervention of third parties like politicians.

Syndicalist numbers grew rapidly in Europe. By 1920, France had around
130,000; most European states had fifty thousand or fewer. Sabotage and
strikes were common, but ironically workers soon used strikes to increase
their wages and working conditions and hence stay within the system. But
when the Communist Party's hostility to capitalism became a feature of
Western political systems, syndicalists often joined them. But the experi-
ences of Italy, Germany, and Spain were very different. Their governments
used violence to eliminate the syndicalists, though the process was differ-
ent in each case. The Italian Syndicalist Union (USI) had 820,000 members

Compendium_Roth
Page 0548

THE FIRST WAVE: ANARCHIST, 1879–1920s

in 1921, the second-largest syndicalist group in Europe; at the same time, Mussolini's Fascist Party was a major element on the political scene. The deadly Diana Theatre bombing by anarchists that year outraged many Italians and helped Mussolini become prime minister next year. The Fascists blamed it on "red rabble," or the USI, who had nothing to do with the bombing, and street battles became a prominent feature of Italian life for several years.[144] In 1925, Mussolini became a dictator and eliminated the USI.[145] In Germany, the Free Workers Union had over one hundred thousand members in the early 1920s, but it began disintegrating and had only several hundred left when Hitler was appointed chancellor in 1933. He immediately ordered most surviving members killed.[146]

Spain produced the world's largest, strongest, and most durable syndicalist movement, the National Confederation of Labor (CNT), based in Catalonia and Basque areas, both of which demanded more local autonomy. When General Franco revolted against Spain's Second Republic, the CNT supported the Republic. Some members became cabinet ministers, and others managed all the factories in some areas, the most significant attempt ever made to put syndicalist ideas into practice. Nazi Germany and Fascist Italy supported Franco, and the Soviet communists aided the Second Republic. But the communists unexpectedly moved against the CNT, killing and imprisoning many members, inadvertently helping General Franco win the bloody three-year war. Afterward, he killed thousands of syndicalists and put the rest in internment camps.[147]

Remaking the police forces was a third factor in the wave's decline. When police were only concerned with criminals, they responded to illegal actions after they occurred. But preemption or efforts to make it impossible for certain acts to happen became crucial in dealing with terrorists. Some policemen took their uniforms off to observe activities without being identified. The UK Special Branch, U.S. FBI, and Russian Okhrana were all created to deal with terror groups.

Undercover agents joined terrorist groups, a practice Alexsei Lopukhin, the head of the Russian police from 1902 to 1904, described as the very "foundation of police operation." "Political crimes unlike ordinary ones were marked by long-term clandestine planning compelling the police to take

Compendium_Roth
Page 0549

steps . . . to expose them in advance."[148] Many terrorists became police agents because, one police official explained, terrorists "naturally suspect each other and from their ranks the police [could] easily recruit agents. Their suspicion of each other contributes far more to their helplessness than to their safety." By 1912, the Russian government had "26,000 agents provocateurs" and an antiterrorist network of two hundred thousand people. The provocateurs aimed to stimulate internal tensions and mutual suspicions among terrorists, which would help police shape rebel policies. "Provocateurs often carried out actions that [alienated the public] from the revolutionary cause by shaming it and disgracing it."[149] In some cases, provocateurs sought people apparently ready to participate in terror acts. Police provocateurs would then get involved in "sting operations," inducing terrorists to commit actions they might not have done otherwise.

Russian and French police funded anarchist newspapers at home and abroad, hoping to provide "telephone cable[s] from the world in which the conspiracies were being planned, straight to the office of the Chief of Police."[150] Ironically, because the public knew the police were involved in such activities, the police exploited that fact to discredit authentic anarchist pamphlets believed dangerous by describing them as police products. Russian penetration efforts were so successful that a police agent, Yevno Azef, became the leader of the Terrorist Brigade from 1903 to 1908. When the Terrorist Brigade discovered his identity, the exposure demoralized the organization, and it disintegrated.

The double role agents played made it difficult to understand their commitments. The police found themselves confronted by unanticipated issues because in giving agents such enormous freedom they made it possible for the agent's individual interests to become a factor.

In Europe, torturing prisoners to gain information was common in medieval and early modern times.[151] Abolished in the eighteenth century, torture was revived and even appeared in states that had never used it before, for example, the United States. Did torture help or hinder the fight against terror? Officials often disagreed, but revelations about torture practices provoked public anger and stimulated radicals to seek revenge. The 1886 tortures in Montjich, for example, ordered by Spain's Prime Minister Antonio

106

Cánovas del Castillo, induced an Italian anarchist to come to Spain and assassinate him.

It should be noted finally that although new police practices were necessary to deal with terrorism, some practices aided the terrorist cause by stirring imaginary fears among the public, enabling terrorists to have greater destructive impact. A British vice consul declared "much of the violence of the Spanish anarchist movement must be attributed to the cruelty of police repression."[152] In Spain, a Black Hand plot to assassinate all the landowners in Andalusia ended in thousands being arrested, three hundred imprisoned, and eight executed—but the plot's very existence has been doubted.[153] The British Special Branch was the most effective and successful police program because it used the new tactics with great restraint, a program one scholar described "as the wonder of the world for thirty years."[154]

## CONCLUSION

Revolutionary uprisings became international in Europe after the French Revolution, but only after terrorist activity began in the 1880s did the violence become global. The term "global" became part of the twentieth-century vocabulary, linked to the rise of the internet. But it was relevant earlier.

Two principal themes inspired the First Wave, "equality" and "nationalism." These purposes were understood differently in various contexts, which generated conflicts between and within terrorist groups. The egalitarian ethos ranged from anarchism to populism, with democratic and sometimes socialist connotations. Nationalist groups were important, but there were not many. I labeled the First Wave anarchist largely because the public normally described all terrorists as anarchists. All terrorists called their tactics "propaganda of the deed," an anarchist term, and several anarchist theorists played crucial roles in the wave's development. Populist groups like the Russian Narodnaya Volya, for example, acknowledged their debt to Bakunin, a major anarchist theorist.

107

First Wave terrorist groups had short lives. We have no definitive sta-
tistics on this matter. But it does seem that a group surviving five years had
a relatively long life. IMRO existed for forty-one years, the longest in the
wave, but it survived so long partly because nationalist groups tended to sur-
vive longer, and IMRO was willing to become a tool of successive Bulgarian
governments. Clearly, IMRO's transformations would have astonished and
angered its founders. Multiple entities emerged in most states. Some, like
Germany and the United States, experienced a small number of incidents
produced by lone wolves or very small networks, but those two states did
not produce organized groups. No Russian group lasted long, but Russia
experienced an intermittent history of terrorism for forty-one years.

Assassination was the distinctive, most commonly used tactic, for obvi-
ous reasons. The deeply embedded tradition of tyrannicide was important.
Assassinations provided enormous publicity. The strikes were emotionally
satisfying to assailants because their victims were so closely identified with
the system. Assassination provided a good occasion for martyrdom, a key
theme of the First Wave; the assassins often died in the attempt or were
captured and sometimes had opportunities to display their commitment in
court. Finally, extensive organizations with significant assets were not
required; lone individuals could commit assassinations.

Over time, however, the limitations of assassination became clear. The
enormous publicity became counterproductive. As preferred victims became
better protected, people with less symbolic significance were chosen.
The switch enabled groups to survive longer but did not bring success.
IMRO was the group most reluctant to assassinate, a reluctance that con-
tributed to its longevity. Ironically, its last act was assassinating King Alex-
ander and the French foreign minister in 1933. To expand the range of tac-
tics, hostage taking was suggested, but few incidents occurred because the
practice was associated with ordinary criminal activity and had a historic
link to offensive state practices.

Different groups produced different international responses depending
on the conflicting interests and views of states. In the wave's third decade,
the first international "war on terrorism" began with the 1904 St. Petersburg
protocol. But many states, especially democratic ones, did not participate

Compendium_Roth
Page 0552

and often gave refuge to foreign terrorists who belonged to populist and nationalist groups from Russia and the Ottoman Empire, which were seen as despotic systems. States contiguous to those in Eastern Europe and Asia Minor were inclined to help nationalist groups, even socialist ones, as the Bulgarian and Russian experiences demonstrate.

Terrorism helped precipitate at least two international wars. The Balkan War (1913) pitted Balkan Christian states against the Ottoman Empire, a response to IMRO activities. Then, of course, there was World War I. The Versailles Treaty ending World War I established a new international order, dividing the defeated empires on the European continent into nine nation-states: Austria, Hungary, Czechoslovakia, Yugoslavia, Estonia, Latvia, Lithuania, Poland, and Finland. The defeated empires had experienced much separatist terrorist activity, including the act precipitating World War I, but the creation of new states virtually extinguished those efforts.

First wave terrorism was a "youth movement," and most groups originated among university students, largely physical science majors. Japan provided the principal exception to this pattern; there, most participants came from poor families with little education. Women were especially significant in the Russian groups, a fact that inspired similar events elsewhere, even in places where women had no previous role in politics or violence. Surprisingly, India was the home of the first all-female group. But no country produced as many female terrorists as Russia. Students often went abroad for education to democratic states, where physical sciences were better developed and interaction with others was easy. Terrorist exiles provided instruction in foreign cities, especially Paris, and democratic countries made no serious efforts to stop the practices.

No group achieved its stated end or a mutual agreement. The Chinese seem to be an exception, in that assassinations helped overthrow the imperial dynasty, but the Chinese Revolutionary Alliance's military and political efforts were most crucial. Remember, too, that the number of attempted assassinations there was small; approximately fifteen in a seven-year period, and only a few were successful. More terror attacks might have produced more obstacles to success.

Compendium_Roth
Page 0553

RANDOLPH ROTH

# American Homicide

THE BELKNAP PRESS OF
HARVARD UNIVERSITY PRESS
Cambridge, Massachusetts
London, England
2009



Copyright © 2009 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America

*Library of Congress Cataloging-in-Publication Data*

Roth, Randolph, 1951–
    American homicide / Randolph Roth.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 978-0-674-03520-1 (cloth : alk. paper)
    1. Homicide—United States—History.   I. Title.

HV6524.R68 2009
364.1520973—dc22      2009016830

3 1223 08609 1858

To Allison,
the memory of William Slothrop,
and God's second sheep

French, the Dutch, and the Native Americans. Leaders caught up in the struggle for trade and territory used homicide as a tool of public policy: for them, force was a means of achieving political ends, even in times of peace. They recognized that the right to rule depended on military superiority, not on treaty rights or the legitimacy of other colonists' claims. The struggle for trade and territory was also indirectly responsible for many homicides because of its corrosive impact on public morality and social institutions. Whites and Indians, singly or in groups, imitated the behavior of tribes and nations: they took goods, seized land, killed anyone—native or colonist—who stood in their way, and felt justified in doing so. Colonial authorities reported numerous robbery murders, vigilante murders, and revenge murders, which flourished where neither natives nor colonists could gain the upper hand and establish political control. Together such homicides accounted for a third of the known murders of English colonists in the early years of colonization (the other two-thirds were political murders or other kinds of murders among people who knew one another).[25]

Political conflict also weakened institutions that might have re-

strained violence. The lack of a common legal or law-enforcement system and the refusal in most instances of rival tribes and nations to accept the legitimacy of one another's systems meant that criminals were almost certain to get away with murder and that the friends and relatives of murder victims had little hope of obtaining justice. The lack of security on the frontier also discouraged the migration of families from Europe, so European colonies during the frontier period had large contingents of young, unmarried men, who make up the most homicidal group in the majority of human populations.[26] Many of them, like John Smith and Myles Standish, were soldiers or sailors and veterans of foreign wars whose fighting skills were coveted by colony leaders. Their combat experience and readiness to fight made them a threat not only to their enemies but also to their friends and neighbors, especially their fellow soldiers and sailors.

Homicides caused directly by political conflict were responsible for another third of the murders of colonists that occurred on the early



Figure 1.2  Unrelated-adult homicide rates in New England and New Netherlands, 1630–1797 (per 100,000 adults per year).



Figure 1.3  Unrelated-adult homicide rates in Virginia and Maryland, 1607–1800 (per 100,000 adults per year).

over them, and "carried awaye their gunnes & what els they liked." Although Governor Winthrop considered Bagnall "a wicked fellowe" who "had muche wronged the Indians," the English authorities hunted down Squidragset's men and lynched one of his leading warriors. They could not tolerate the murder of Englishmen, no matter how justified.[32]

Both Native American and European leaders were willing to use homicide to intimidate allies, deter undesirable behavior, and preempt attacks by potential adversaries. Although the Powhatans had initially formed an alliance with the settlers at Jamestown and helped feed them, they were irritated by the colonists' incessant demands during the "starving time" of 1609–10 and tried to send them a message by killing every settler who left the colony to beg or steal food. One party was found "slain, with their mouths stopped full of bread, being done, as it seems, in contempt and scorn, that others might expect the like when they should come to seek for bread and relief amongst them."[33]

Plymouth Colony also used homicide to send messages to its neighbors. In the winter of 1623 the colonists were afraid that the Massachusetts were about to "cut off" the survivors of Thomas Weston's failing colony at Wessaugusett (in present-day Weymouth, Massachusetts) and that they would "do the like" to Plymouth, "thinking the people here would revenge their death." Weston's men, who had arrived in the spring of 1622 with too few supplies, were starving, and they had angered the Massachusetts by stealing corn and kidnapping the child of a sachem for training in England. Since Weston's beleaguered men were damaging the aura of European invincibility and giving the Massachusetts just cause for war, Plymouth decided to act, especially after hearing rumors that the Massachusetts were preparing to attack. The colonists sent an armed party north under Captain Myles Standish, who had fought as a mercenary in the Dutch Wars and was well schooled in the techniques of terror and intimidation. Standish invited Massachusetts leaders to a feast at Wessaugusett, where he and his men stabbed six of them to death and hanged another. Only one escaped. Standish cut off the head of the most prominent man and stuck it on a post on top of the blockhouse at Plymouth as a "warning and terror" to the Massachusetts. They got the point. Thereafter they

called the English "Wotoquansawge, which in their language signifieth stabbers or Cutthroats."[34]

Like colonial and tribal leaders, private individuals did not shrink from killing people to defend their interests or get what they wanted. They adopted the same defensive, hostile, or predatory postures toward acquaintances and strangers that governments showed toward each other. Europeans and Native Americans alike committed robbery murders, singly and in groups. Pecksuot, a Massachusett, told a tale about a French ship that came into Massachusetts Bay before 1620 with "much goods to Trucke." He persuaded his friends to take "all for nothing." They paddled out to the ship with beaver skins to trade, each man concealing a knife in his loincloth. They sold their goods "very Cheap," and when the French lowered their guard, they killed everyone except Finch, the master of the ship, who leaped into the hold wounded. "We bidd him com up, but he would not. Then we cutt thayr Cable & the ship went Ashore & lay upon her sid & slept ther. Finch Came up & we killed him. Then our Sachem devided thayr goods & fiered theyr Ship." In 1638 Arthur Peach, who was fleeing prosecution in Massachusetts for having fathered an illegitimate child by a servant woman, murdered Penowanyanquis, a Narragansett whom he met on his way to New Netherlands. When his accomplices, three runaway servants, balked at his plan to kill and rob Penowanyanquis, Peach, a veteran of the Pequot War, was incredulous. What did the life of an Indian matter? He "had killed many of them." Peach murdered the man and took cloth and five fathoms of wampum from him to finance his journey.[35]

People who had lost family, friends, or property to robbers or murderers sometimes turned to robbery and murder to gain satisfaction, since there was no other means of redress on the frontier. When Richard Killingbeck, a Virginia militia captain, led a small party of men to trade with the Chickahominies in 1617, the Chickahominies killed and robbed them, in part to avenge the killing of the twelve tribesmen by the militia earlier that year during the corn levy and in part because of "the greate quantity of trucke" that Killingbeck was carrying. They then stole some sacred objects from their own village and fled. Similarly mixed motives prompted a Wiechquaeskeck to kill and rob Claes Smit, a Dutch wheelwright who lived near the East River in New Neth-

erlands. The man went to Smit's house to trade for cloth, but when Smit stooped over a trunk to unlock it, the man grabbed an ax and hit Smit in the neck, killing him instantly. The Wiechquaeskeck believed himself entitled to Smit's life because as a young boy he had seen his uncle murdered at Fort Amsterdam by three white men who wanted his beaver pelts. The boy promised himself that one day he would repay the Dutch for the murder, and when the opportunity presented itself, he did.[36]

Even simple thefts spurred homicides. Victims struck at targets of convenience and left more vengeful victims in their wake. Dixy Bull, an English trader on the Penobscot River in Maine, turned pirate after the French stole all his goods in a raid in 1632. He raided not only the French but also the English, because they had failed to avenge his losses. His raids wounded dozens of people and cost the life of at least one of his men, shot dead in a raid on the French post at Pemaquid.[37]

Law and order was compromised on the frontier not only by political conflict but also by the profusion of jurisdictions. Sometimes those jurisdictions harbored killers, but even when rival jurisdictions worked together, it was difficult to agree on an appropriate response to homicides. Most Native peoples believed that they could make amends for homicides with goods or with the blood of the perpetrator's kin or countrymen, if the original perpetrator could not be found. Europeans, on the other hand, believed that perpetrators should be held personally accountable for their crimes and that willful murderers deserved death. In 1634 the Wiscomesses acknowledged that they had killed two Englishmen and five Susquehannas on the Isle of Kent on Maryland's Eastern Shore. A Susquehanna had made fun of a Wiscomesse at a peace parley, and the Englishmen and the Susquehannas had laughed. The victims had been killed to avenge an insult, but ultimately the murder was political: the Wiscomesses were anxious about losing the struggle for control of the upper Chesapeake and had to make it clear to their Native and European neighbors that they were not to be taken lightly. The Wiscomesses tried to compensate Maryland and Virginia, both of which claimed the Isle of Kent, but their offer of *roanoke*, the beads used as currency in the fur trade, was rejected. The English demanded the murderers. The Wiscomesses declined to give them up. The conflict led to years of killings and intermittent warfare.[38]

The clash between Native and European cultures was exacerbated by the presence of so many aggressive young men who were accustomed to violence and knew no other way to command respect. Those of the colonists who had seen service in European wars were likely to reach for a weapon whenever they were challenged or insulted. Edward Stallings, master of a ship that had run aground near Newport News, Virginia, argued with William Epps, the commander of the militia company of Smythes Hundred. Stallings' "uncivill and unmanly wordes" so enraged Epps that he struck Stallings on the head and killed him. George Harrison, a planter at Martin's Hundred, quarreled with Richard Stephens, a Jamestown merchant and fellow militia officer, over a shipment of goods. They agreed to a duel, and Harrison died of his wounds.[39] Such homicides were responsible for a third of the murders that occurred during the early years of colonization.

The violence-prone nature of men who had been schooled in the military made discipline difficult to maintain both in the regular army and in the militia. Officers sometimes had to kill their men to maintain order, and militiamen, who were more fractious than ordinary soldiers, sometimes killed officers who they felt had mistreated them. In 1646 Thomas Cromwell, captain of an English man-of-war that had captured "sundry prizes" from the Spanish in the Caribbean, killed a sailor in Plymouth when the man "reviled his captain with base language" and came at him with a rapier still in its scabbard. In November 1643, at the height of Kieft's War, a Dutch militiaman killed an officer, Captain Daniel Patrick, for refusing to lead a militia company against the Indians in the dead of winter. The man accused Patrick of "treachery," and Patrick spat in his face. As Patrick turned to leave, the man shot him in the back of the head with a pistol. That same year, Maryn Adriaensen, a Dutch militia officer and former privateer who had led several campaigns against the Indians, attempted to kill the colonial governor, William Kieft, in his office at Fort Amsterdam. He felt Kieft was trying to blame him for the war against the Indians, which was causing an increasing number of casualties among the Dutch in New Netherlands. He held a pistol to Kieft's head, saying, "What devilish lies art thou reporting of me?" Kieft was saved when another man grabbed Adriaensen's pistol and let the hammer snap on his thumb. One of Adriaensen's men then fired at Kieft and was in turn shot dead.[40]

mer servants to vote and acquire land. It also further increased the penalty for hog theft: second-time offenders would have their ears cut off, and third-time offenders would be hanged. The contest of wills was clear.[70]

Indentured servitude helped make North America a very homicidal place for Europeans by relegating previously free laborers to the status of de facto slaves. Like other murders among unrelated colonists, these homicides were rooted in the violent behavior that seventeenth-century Europeans brought to the New World with them and in the feelings and beliefs about government and society that caused that behavior. Those feelings and beliefs, which arose out of political, religious, and class conflict and the disruption of the European social hierarchy by economic hardship, traveled to the colonies with the settlers and combined with weak and incapacitated colonial governments to produce high homicide rates that persisted even after the frontier period.

CHAPTER 2

# "All Hanging Together"

*The Decline of Homicide in the Colonial Period*

In the final quarter of the seventeenth century the murder rate in the colonies suddenly dropped. The exact timing of the fall in the homicide rate in these years is uncertain because so many court records from the late seventeenth century have been lost, but it appears that between 1675 and 1693 the rate for European adults fell abruptly twice: once after Bacon's Rebellion (1675) and King Philip's War (1675–76) and again in the late 1680s and early 1690s, at the time of the Glorious Revolution in England. The rate remained low by historical and modern standards for nearly eighty years, until the revolutionary crisis of the 1760s and 1770s.

The patterns were very different for African Americans and Native Americans. African Americans were killed by unrelated adults at high rates in the late seventeenth and early eighteenth centuries, when racial slavery replaced indentured servitude as the primary source of bound labor in British North America. Native Americans in New England were killed by unrelated adults at high rates throughout the colonial period, especially between 1720 and 1760.

**European American Homicide**

The decline in homicide rates among European Americans was dramatic. In Maryland the rate at which unrelated European adults killed

Compendium_Roth
Page 0559

each other fell from 29 per 100,000 adults per year to 15 per 100,000 between the mid-1670s and the mid-1690s. In Virginia it fell from 37 per 100,000 to 10 per 100,000, and in New England from 6 per 100,000 to an astonishing 1 per 100,000. By the end of the century, the homicide rate for colonists in the Chesapeake was for the first time within the range of contemporary western European rates—roughly 12 per 100,000 adults per year. The rate in New England may very well have been the lowest in the Western world (Figures 1.2 and 1.3).[1]

Historians have suggested a number of reasons for the sudden drop in homicides among European colonists: the spread of more civilized standards of conduct, a decline in gun ownership, increased prosperity, or improved law enforcement. But none of these suggestions can explain the decline. It was too abrupt to have been caused by an increase in civility, and gun ownership held steady through the eighteenth century. Although the economic circumstances of most free young men and women did improve over the seventeenth and eighteenth centuries, war crippled the New England economy in the late seventeenth century, and in the Chesapeake the economy was decidedly mixed. The General Court improved law enforcement in Massachusetts, but the emphasis was on rooting out "debauchery, irreligion, prophaneness, & atheisme," not on catching murderers.[2]

The character of the colonial population changed during this period, but its growing diversity might have been expected to raise homicide rates rather than lower them. In some places rates did go up, but increases were short-lived and localized. In the late seventeenth and early eighteenth centuries, settlers from Germany, Scotland, and Ireland poured into the colonies. Many were Lutherans, Presbyterians, or Catholics, and their presence was disconcerting to the resident Congregationalists, Baptists, Quakers, and Anglicans. Wherever these new immigrants faced severe discrimination, as Irish Catholics did in New England and the Chesapeake, they were two to four times more homicidal than other colonists. Wherever they were numerous enough to cause a political backlash among the original settlers, as they did in Pennsylvania in the 1720s, the homicide rate tripled. There were few such nativist outbursts, however, and homicide rates for German, Scots, and Irish immigrants moved quickly toward those of other settlers in the colonies where they lived.[3]

The decline of indentured servitude did contribute to the decrease

in homicides among unrelated colonists, especially in the Chesapeake, where there had been so many indentured servants. The revival of the English labor market after 1675 lowered the supply and raised the price of indentured servants, forcing New Englanders to rely almost exclusively on free or family labor. Chesapeake tobacco planters turned to slave labor, which became more affordable with the end of the Royal African Company's monopoly of the slave trade and decreased demand for slaves from Caribbean sugar planters (who had seen prices and profits drop). The proportion of white colonists who were bound servants fell in the Chesapeake from nearly half in the mid-seventeenth century to no more than a tenth by the mid-eighteenth century, and in New England from a tenth to near zero.[4]

But these numbers were not the whole story. The proportion of bound servants among homicide victims fell far faster than their proportion in the population. After 1675 masters were suddenly less likely to subject bound white laborers to lethal abuse. By the 1680s and 1690s, the number of murdered servants included in the colonists' homicide rate had fallen from 18 per 100,000 adults per year in Maryland to 2, and in Virginia from 11 per 100,000 adults per year to 3. By the mid-eighteenth century, that number had fallen in Maryland and Virginia to less than 1 per 100,000 adults per year. In New England, only one servant was reported murdered between 1675 and 1692, and none from 1693 to the Revolution. Indentured servitude was not only less common; it was less lethal.

This sudden drop in lethal abuse paralleled the sudden drop in the murder rate of colonists in general. Every kind of homicide became rarer among unrelated European Americans: rape murders, robbery murders, political murders, property dispute murders. Although it is impossible to measure changes in relationships or the emotions they reflected, it appears that empathy, solidarity, and mutual forbearance increased, except where Catholics were concerned. Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together. The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders.

In 1675, on the eve of the decline in homicide, the lack of solidarity and goodwill among European colonists was evident in a number of ways. With no serious threat to unite against, they could not find common cause in religion, nationality, or even race. African slaves accounted for only 2 percent of the population in New England and 6 percent in the Chesapeake. Racial consciousness was increasing in British North America, as was the fear that slaves and servants might unite and rebel against their masters; but the fundamental dividing line among the colonists, especially in the Chesapeake, was class, which pitted bound white laborers against their white owners. The presence of Africans could not unite European colonists as long as slave labor played such a minor role in society.[5]

Nor were the colonists united at this time in their feelings about Native Americans. While some held Indians in contempt and would gladly have seen them removed or eliminated, most colonists in the Chesapeake realized that they could not defend their borders without Indian allies. In New England, where settlers and Native Americans had lived in peace for nearly forty years, there were obvious advantages to living side by side with Indians, who made up nearly a fourth of the region's population before King Philip's War. Native Americans provided settlers with furs, corn, labor, and wampum, which was the primary currency for Europeans as well as Indians into the 1660s. New England tribes were the region's first line of defense against the dreaded Iroquois. In addition, settlers who were evangelical Christians saw the Indians as souls in need of salvation, and the spiritual lives of the two peoples were deeply intertwined. One in twenty Indians had already moved to a "praying" town by 1675, and evangelical colonists held out hope for a biracial Christian society. This is not to say that Native Americans were equal partners in New England's social, economic, or spiritual life, or that the two groups were never at odds. But in the interval between the Pequot War and King Philip's War relations were generally civil, and neither group indulged in demonizing the other.[6]

Religion and nationality were also poor grounds for unity. Between 1650 and 1680 the colonists found themselves at war three times with the Netherlands, a Protestant nation, while they had cordial and profitable relations with French Catholics in the Canadian Maritimes and the West Indies and were barely touched by the fighting between En-

gland and France in the late 1660s.[7] Quaker and Baptist dissenters in Maryland enjoyed more rights under a Catholic proprietor than they would have in Anglican Virginia or Puritan New England, where they risked being banished or hanged. Certainly, New Englanders were more unified spiritually than colonists in the Chesapeake, because of the dominance of Puritan reformers in Massachusetts, Connecticut, and Plymouth, and of dissenters in Rhode Island. But dominance was not unity, and resentment and alienation were common among the unchurched, who were responsible for most homicides in New England.[8] The wandering poor were denied public charity and warned out of town wherever they went, and the unruly poor—drunks, Sabbath-breakers, fornicators, petty thieves, runaway servants—were fined, whipped, dunked, or pilloried and publicly humiliated. It was hard for many of the poor to see themselves as part of a Christian society.

Governments on both sides of the Atlantic betrayed their insecurity by killing their citizens over political differences. Maryland and Virginia hanged dozens of people for treason. Massachusetts and Connecticut officials showed how precarious they believed social stability to be when they banished scores of colonists for heresy in the seventeenth century and put more than four dozen moral offenders and witches to death. Political conflict and violence were rife, and the colonists were eager to root out internal enemies to ensure the survival of their communities.[9]

Three events changed the way the colonists saw themselves, their fellow colonists, and their governments: King Philip's War, the transformation of the Chesapeake into a slave society, and the Glorious Revolution. These events, which had the potential to destabilize colonial society and divide the colonists in new ways, had the opposite effect. King Philip's War unified colonists who lived on the front line, especially New Englanders. The spread of racial slavery led white property owners, especially in the Chesapeake, to set aside their differences and pull together to defend white supremacy. And an overwhelming majority of colonists came to support the Protestant coup that brought William and Mary to power in 1688, once they were sure of the direction William's reforms would take in the colonies and in the imperial government.[10] Together these events forged a sense of solidarity among colonists that helped them transcend their earlier differences and see one another as allies rather than adversaries. That feeling was

a powerful deterrent to homicide, as was the belief that the governments at home and in Britain were *their* governments and would look after *their* interests.

King Philip's War was the most important factor in the decline of homicide in New England. Relations between the colonists and most Native American peoples began to deteriorate in the 1660s and early 1670s, when their roles in the economy changed. As furbearing animals grew scarce and colonists started to raise surpluses of corn and livestock, Native Americans found themselves pushed to the edge of the economy, with little to trade except their land and labor. English currency began to replace wampum as the medium of exchange. Native Americans in western and central New England were bitter about the colonists' failure to come to their aid when they were attacked repeatedly by the Mohawks in the 1660s and early 1670s. Every year settlers and their livestock encroached farther onto Native hunting grounds. Colonial authorities who made an effort to redress Native grievances showed a growing preference for "praying" Indians, who embraced Christianity.[11]

Philip, the Wampanoag sachem who led the rebellion, had good reason to be angry. When the governors of Plymouth compensated Christian Indians at Natick for land lost to settlers, they gave them Wampanoag land—without consulting the Wampanoags. Philip also came into conflict with the colonists over Native ministers who were undermining traditional culture and traditional leaders. He found one of these ministers, John Sassamon, particularly irksome and probably conspired to have him killed. When Plymouth authorities executed the Indians they believed responsible for Sassamon's killing, Philip was furious. The Wampanoags took up arms. Inspired by their early successes, two-thirds of New England's 18,000 Indians joined the rebellion, determined to force the colonists—all 60,000 of them—off their land.

King Philip's War was the most destructive conflict in New England's history and did more than any other event in the seventeenth century to reshape the way New Englanders saw themselves. For nearly all the colonists the war was a race war, pitting whites against Indians, and they urged one another to set aside their differences and join the battle. As contemporary chronicler William Hubbard put it, since the Indians were "all hanging together, like Serpent's Eggs," it was incum-

bent upon the colonists to do likewise. Benjamin Franklin's grandfather, Peter Folger, who blamed the war itself on the persecution of Baptists, Quakers, and other religious minorities as "Hereticks," called for an end to sectarian hostilities, asking New Englanders:

> Is this a time for you to press,
> To draw the Blood of those
> That are your Neighbours & your Friends;
> As if you had no Foes.

The terrified colonists needed little urging. The specter of Indians lurking in the woods, awaiting the fall of darkness so that they could spring out and bury their hatchets in the skulls of innocents, touched primordial fears. Many colonists abruptly revised their views of Native Americans. They were not primitive souls awaiting the gospel of truth, who might one day evolve into civilized citizens. They were, as Deacon Philip Walker put it, "Incarnat divels sent from the infernall Lake"—the spawn of Satan.[12]

The colonists waged total war. Two thousand Native men, women, and children were killed outright; 3,000 died of exposure or malnutrition after their crops and villages were destroyed. One thousand were sold into slavery in the West Indies, and another 2,000 became permanent refugees in Canada or New York. Captured leaders were hanged. Two were torn to pieces by a mob of women in Marblehead, Massachusetts. By the end of the war, fewer than 4,000 Indians from bands that had supported the rebellion remained in New England.[13]

Although "praying" Indians served in the military campaign against the rebels, they fared little better than their non-Christian brethren. More than 1,000 Indians lived in Christian villages in 1675, but once the war started the colonists viewed them with suspicion. At first they were confined to their villages "on peril of being taken as our enemies, or their abettors." The colonists warned that if they strayed more than a mile from home, "their Blood or other damage . . . will be upon their own heads." But within a few months Massachusetts authorities moved most Christian Indians to a camp in Boston Harbor on Deer Island, where many died of malnutrition or exposure. Those who were not interned on Deer Island ran the risk of being murdered. Two Christian Indians mistaken for rebels in Boston were nearly lynched. White vigilantes suspected Indians from the Christian village of Wamesit of set-

ting fire to barns and haystacks nearby, and they attacked the village, killing a twelve-year-old Indian boy and wounding five women and children. Vigilantes murdered six Christian women and children who were picking berries near Concord.[14]

Missionaries and magistrates who had worked with Christian Indians and dared to stand up for their rights were vilified. An anonymous pamphleteer called them "traytors to their king and Country" and put them on notice: "[S]ome generous spirits have vowed their destruction. [A]s Christian[s] we warne them to prepare for death, for though they will deservedly dye, yet we wish the health of their souls." Richard Scott threatened to kill the Christian Indians' foremost defender, Captain Daniel Gookin, "calling him an Irish Dog that was never faithful to his country, the son of a whore, a bitch, a rogue, God confound him and God rot his soul." Threats and public ostracism took their toll. Gookin was "afraid to go along the Streets," and when he complained to a neighbor about it, he was told "you may thank yourself." Gookin lost his bid for reelection to the Court of Assistants, and Daniel Henchman, another sympathizer, lost his post as a militia officer when his men refused to fight with him. Missionary activity ceased, and most defenders of the Christian Indians were cowed into silence. By the end of the war, only 500 "praying" Indians remained.[15]

Anyone who sought to deal peacefully with non-Christian Indians was suspect, no matter what his status. In a later phase of the war involving the French, Edmund Andros, who was then governor of the Dominion of New England, ran afoul of public opinion when he tried to return Abenaki hostages who had been seized without warrant by militiamen. Andros, a native of the Isle of Jersey, was accused of treachery; since he was "of a French extract, so [he acted] in the French interests." Someone claimed to have heard an Indian say that "the Governor had more love for them the Indians, then for his Majesties Subjects the English" and that he had "hired Indians to kill the English." Captain John Alden, who had been assigned to act as a government envoy to the Abenakis, was also suspected of treason; he was accused at the Salem witchcraft trials of siding with the devil, the Abenakis, and the French.[16]

New England colonists emerged from the war not only with a clear sense of the need for racial unity, but also with a greater regard for one another that bridged religious divides. Baptists won praise from Con-

gregationalists and Presbyterians for their participation in the war. William Turner, who had been imprisoned in 1668 and 1670 for his Baptist views and had been denied a commission on religious grounds at the beginning of the war, was given command of the garrison at Hatfield, Massachusetts, and the massacre he led against Indians encamped at Peskeompscut, which cost him his life, made him a hero. Roger Williams, the founder of Rhode Island and himself a dissenter, won accolades for his efforts to gather intelligence and keep the Narragansetts out of the war. Massachusetts rescinded Williams' banishment because he had "served the English interest." Benjamin Church, a rough-and-ready frontiersman noted for his wry sense of humor and his irregular church attendance, became the war's greatest hero because of his work with Native allies and his successful guerrilla campaign against Philip. Quakers opposed the war, as they did all wars, but by its end they, too, identified with the "English" cause, as did New England's most notorious sectarian, Samuel Gorton, who delighted in the colonists' newfound ability to pull together in the crisis and to form a genuine "body Pollitique of English in these parts."[17]

This inclusive spirit was at work within orthodox churches as well. Congregationalist and Presbyterian churches relaxed requirements for baptism and church membership and welcomed a broader range of colonists into the fold. Most churches adopted the "half-way covenant," which ended the restriction of baptism to the children of members, and they made standards for receiving communion less exacting. The orthodox majority also made a quiet decision to be more forgiving of everyday sinners, particularly young men and women who had premarital sex. King Philip's War marked the end of whippings for fornication in New Haven County, and elsewhere such whippings declined markedly. No cleric championed these changes more ardently than Solomon Stoddard, a minister from Northampton, Massachusetts, and it is unlikely that any minister outdid Stoddard in his zeal to exterminate Native Americans. He counseled the colonial governor to train dogs to hunt Indians as vermin. "They are to be looked upon as theives & murderers, they doe acts of hostility, without proclaiming war. . . . they act like wolves & are to be dealt withall as wolves."[18]

New England's colonists were not yet as unified as they would be at the end of the century. There were a few orthodox preachers who blamed the war and its attendant horrors on sinners, dissenters, and

witches and wanted to persecute those responsible; and the orthodox still discriminated against religious minorities and punished sinners.[19] But when war broke out, the colonists realized that what they had in common as whites, Protestants, and English women and men was more important than sectarian differences or moral failings. Although it stemmed from fear and hatred of Indians, this newfound solidarity lessened the alienation and resentment that had caused so many homicides in the mid-seventeenth century and generated greater tolerance and respect for other colonists and for the social order.

However, Indian wars did not automatically trigger increased solidarity among all the colonists. The war that broke out in the Chesapeake in 1675 galvanized Virginians on the western and southern frontiers, but Virginians who lived far from the frontier did not hate Indians or lust after their land so intensely. Marylanders needed Native allies for protection and resolved to stay out of the war. The conflict in Virginia between the supporters of a total war against all Indians, led by Nathaniel Bacon, and the supporters of a limited, defensive war against hostile Indians, led by Governor Berkeley, led in 1675 to Bacon's Rebellion and to open class warfare. Indentured servants and slaves flocked to Bacon's banner on the promise of freedom in return for military service. Berkeley's assembly debated whether to reenfranchise free, propertyless whites and cut the salaries of wealthy officeholders for the sake of political peace.[20]

The defeat of the rebels did not put an end to political hostility. Berkeley and his supporters were in a vengeful mood. They executed twenty-three rebel leaders and confiscated the estates of many more, and once the rebellion was over, they refused to make more than token reforms in a political system that left most Virginians with no voice in government. They did authorize the county courts to hear the grievances of local citizens, but propertyless freemen were disfranchised again in 1677, and nothing was done to limit public expenditures, the fees of officeholders, or the tax advantages of large landowners. Class hatreds remained fierce, and some colonists still had substantial grounds for resentment and alienation.

What changed the way unrelated adult colonists in the Chesapeake felt about one another was not the Indian war or Bacon's Rebellion, but the rise of racial slavery. Between 1660 and 1700 the proportion of Africans in the population of the Chesapeake rose from 5 percent to

nearly a quarter. The vast majority of English migrants who headed to the New World as indentured servants still came to the Chesapeake, where there were greater opportunities for land ownership than in the West Indies, as well as lower mortality rates. But by 1700 indentured servants were no longer the major source of bound labor in the Chesapeake, and those who came were more often skilled craftsmen, seamstresses, domestic servants, or overseers. By 1700 the Chesapeake had become a slave society in which the divide between whites and blacks overshadowed class divisions among whites.[21] The new society increased racial consciousness among whites and placed new importance on white solidarity, much as King Philip's War did among whites in New England. This solidarity was not as intense or heartfelt in the Chesapeake as it was in New England, given the sharpness of class divisions among whites and the more remote threat of slave rebellion. But its impact was still strong. Led by a decline in murders of indentured servants, homicides among unrelated white adults dropped by two-thirds.[22]

At first racial slavery rested on little more than brute force. Slaveowners whipped refractory slaves, hobbled chronic runaways by severing their toes, and executed those who rebelled or committed crimes. In 1669 the Virginia legislature encouraged the use of force by making it only a misdemeanor to cause the death of a slave by "excessive" punishment, and in 1680 the legislature made it lawful to kill runaway slaves who resisted capture. Despite these measures, slaveowners recognized that the system of racial slavery needed the support of nonslaveholding whites. Their help, whether as patrollers, overseers, or vigilant neighbors, was vital to keeping slaves in their place. If they did not acquiesce, or if white servants joined black slaves in rebellion against their owners, slavery would collapse.[23]

Between 1662 and 1705 slaveowners in Virginia and Maryland campaigned to clarify the line between Africans and Europeans. Their goal was to control blacks and to secure the racial allegiance of nonslaveholding whites by fostering contempt for blacks and by punishing those who formed personal relationships with blacks. They passed legislation declaring that African slaves who converted to Christianity would remain slaves and that any slave freed by an owner would have to be transported out of the colony at the owner's expense. Free blacks who already lived in the Chesapeake would not be allowed to purchase

white indentured servants, and any slave who struck a white for any reason would receive thirty lashes. It became illegal for white women to give birth to mixed-race children, and white servants who dared to run away with slaves had to compensate owners for their time and the time of the slaves who went with them. In the 1680s and 1690s these laws led to a flurry of prosecutions of whites who helped runaway slaves or had sex with blacks. Together with the stigmatization of interracial relationships and the decline in the number of indentured servants who worked side by side with blacks in the fields, these prosecutions weakened social ties between poor whites and blacks. By the turn of the century, the racial divide was clear.[24]

The campaign for white supremacy and solidarity had terrible consequences for African Americans, but positive consequences for many nonslaveholding whites, especially indentured servants. Deadly abuse of white servants declined not only because their skills were prized during the transition to slavery, but also because masters came to see them first and foremost as fellow whites and as Christians. They no longer referred to servants routinely as "rogues" and "whores." They passed laws to protect their rights and dignity. By 1705 it was illegal "to whip a christian white servant naked, without an order from a justice of the peace." Such treatment was reserved for blacks. Indentured servants had the right to keep and accumulate property, but slaves' "horses, hogs, and cattle" were subject to sale by church wardens for the support of the parish. Former indentured servants had their rights guaranteed by law and were incorporated more fully into white society, both economically and militarily. "Freedom dues"—the property that indentured servants received from masters at the end of their contracts—were increased from three bushels of corn to ten bushels, plus 30 shillings in cash and a working musket. Finally, the burden of the poll tax on men with little property was alleviated at the colonial level by the imposition of an export tax on tobacco and duties on imported liquor, servants, and slaves. The annual tax burden for the average white male fell from forty-five pounds of tobacco in the 1670s to only five pounds in the early 1700s.[25]

Politicians in Virginia and in Maryland also stepped up their efforts to court the votes of small property owners. Competition between candidates was so intense that politicians solicited votes with liquor and other gifts on election days. These competitive elections increased cor-

ruption and public drunkenness, but they also heightened cooperation across class lines by rallying all property owners (and prospective owners) to the defense of the tobacco economy, slavery, and white supremacy.[26]

Antagonism toward Indians did play a role in forging white solidarity in the Chesapeake, though not to the degree it did in New England. During Bacon's Rebellion the Virginia assembly overturned a 1670 law that had forbidden the permanent enslavement of Indians. According to that law, captured Indian children could be enslaved only until age thirty and captured adults for twelve years. In 1676, however, the assembly granted Bacon and his men the power to enslave enemy Indians for life, and the postrebellion assemblies of 1677 and 1679 extended that right to all Virginia soldiers. In 1682 the assembly defined slavery on racial grounds. Thereafter all laws that applied to African slaves would apply to Indian and mulatto slaves as well. Like other colonies, Maryland and Virginia also stopped giving new counties Indian names. The proportion of new counties in British North America named for Indian people or places fell from 10 percent in the seventeenth century to zero in the first half of the eighteenth century.[27]

The rise of African slavery had a more limited role in forging white solidarity in New England. Even though the proportion of Africans in New England's population never rose above 3 percent, African slavery was an important institution in New England's ports and on plantations in Rhode Island, and New England merchants and seamen played a major role in the slave trade throughout the colonies. Like their counterparts in the Chesapeake, colonists in New England placed more and more restrictions on Africans and Native Americans and came to view them with similar contempt. In 1686 the Massachusetts assembly forbade the sale of "any strong Beer, Wine, Cyder, Rum or any other strong drink, to any Indian or Negro" without a license from the Governor's Council. In 1693 it banned Indians and Africans from the militia, denied Africans the right to drink in taverns, and imposed harsh penalties on whites who received stolen goods from Africans, Indians, or mulattos. In 1703 it established a curfew for "free blacks, slaves, and Indians" and ordered owners who manumitted African slaves to post £50 in bonds to "indemnify" the colony if their former slaves broke the law or became public charges. And in 1705 it imposed penalties on whites and blacks who had mixed-race children.

Whites and free blacks would be whipped, and slaves would be sold out of the province, as would the mixed-race children of enslaved women. The prohibition on interracial sex did not apply to whites and Indians, but otherwise the legislation treated blacks and Indians the same.[28]

The Glorious Revolution of 1688–89 also had a profound effect on white colonists. By the turn of the century it brought political peace and stability to Britain and British North America, put an end to internecine political violence, and stimulated patriotic feeling among colonists. The great majority found common ground in a commitment to the British constitution, with its putative guarantees of representative government and minority rights, and to the British Empire, which promised to spread British values, British enterprise, and British people throughout the world. They also began to identify with a more tolerant Protestantism that respected the rights of most (but not all) dissenters.

The Glorious Revolution helped restore colonists' faith in the imperial government and in their colonial governments. They had been deeply divided over policies implemented by Charles II and James II. The crown had pressured royal colonies like Virginia and proprietary colonies like Maryland to increase revenues and improve defense, and it had curbed the powers of charter colonies like Massachusetts, Connecticut, and Rhode Island, which had been largely self-governing before the Restoration. James II revoked the charters that had authorized New England's assemblies, forced the colonies to unite as the Dominion of New England, and told the dominion's royal governor, Joseph Dudley, to rule by prerogative. When one New Englander objected, claiming that the colonists' rights had been violated, Dudley told him that he "must not think the laws of England follow us to the ends of the Earth. . . . You have no more prividges left you, than not to be sold for Slaves."[29]

The crown had also disrupted the economy in the colonies by enforcing the Navigation Acts, thus putting an end to direct trade with the Dutch and other foreign powers. The imperial bureaucracy expanded, as did taxes and fees, and the crown gave generous grants of land, quitrents, escheats, and other financial emoluments to officials who were willing to support the new regime. Charles II and James II also tried to strengthen the Church of England. They sent more ministers to the colonies, sought an end to orthodox Puritan rule in

Massachusetts and Connecticut by extending the franchise to propertied non-Puritans, and pressed for formal recognition of the Anglican Church in Maryland.[30]

A growing number of colonists opposed England's plans. In New England, Puritans, Congregationalists, Baptists, and Quakers resisted the pan–New England government that James had created. They were convinced that his goal was to destroy Protestantism and representative government and establish an autocratic, spiritually lax regime. They were particularly appalled to see Restoration culture take hold in New England. Young people were engaging in bawdy games and maypole dancing, and sexually provocative clothing was in fashion. In Maryland, rumors spread that James planned to use the Indians to help the Catholic minority annihilate the Protestant majority. In Virginia, even moderates who tried to meet the crown halfway were disillusioned. It seemed to them that England was determined to loot the colonies and deprive colonists of their rights as English citizens.[31]

The overthrow of James II by William of Orange in the Glorious Revolution of 1688–89 triggered a chain of events that united colonists politically. News of James's flight and William's victory led to bloodless revolutions by militant Protestants who rejoiced at the news that England had a Protestant king again. In Maryland, rebels overthrew the government of the Catholic proprietor and assumed power as the "Protestant Association." In New England, the government installed by James II was overthrown, and charter government was restored to each colony. The first years of William's reign were anxious ones, however. The status of the new colonial regimes was unclear, the war in New England against the French and their Native allies was going badly, and William and his ministers were preoccupied with armed uprisings in Scotland and in Ireland and a war on the Continent. They told the colonists to be patient, but the uncertainty made it difficult to collect taxes, hold courts, or rein in Protestant zealots, who threatened to destabilize the colonies all over again by persecuting Catholics in Maryland and by trying to disfranchise Anglicans and Baptists and prosecuting suspected witches in Massachusetts and Connecticut.[32]

Gradually, however, William's government took hold politically and militarily. William believed in representative government, and he guaranteed the right of colonial assemblies to make laws, levy taxes, and appoint members of the governors' councils (subject to gubernatorial re-

view). At the same time he believed in keeping a firm hand on the tiller, so he retained the power to appoint governors, deputy governors, secretaries, and, through them, judges and sheriffs. He also reserved the right to veto colonial legislation, appoint revenue officers, and establish vice-admiralty courts to enforce trade laws.[33]

William was a confirmed Anglican, but he sponsored the Toleration Act of 1689, which granted freedom of conscience to dissenting Protestants and made property ownership the only qualification for voting. Although he actively supported the Anglican establishments in Virginia and Maryland, he did not let them run roughshod over dissenters. He disallowed acts that would have subverted his religious program, such as laws the Massachusetts assembly passed against blasphemy and idolatry, but he did allow the Congregational establishments in Massachusetts and Connecticut to stand. Catholics, anti-Trinitarians, and non-Christians were still beyond the pale. They could not hold office or worship in public, and with Parliament's support William denied them the right to propagate their views in public through the Blasphemy Act of 1697.

Few colonists were initially satisfied with William's handling of colonial affairs, but his measures proved effective, and the vast majority of Protestants eventually embraced his policies. Conflict with royal officials was inevitable once William and his administrators made it clear that, like James II, they were determined to enforce the Navigation Acts and integrate the colonies more fully into the British economy. But William's conciliatory stance, together with the colonists' growing appreciation of the military and economic benefits of membership in the British Empire, softened the antagonistic tone of colonial politics. By the early 1700s opponents of James II were working in colonial government alongside former proponents, and the power of the Protestant zealots who had sponsored the revolutions in New England and Maryland had waned. Virtually no one questioned the legitimacy of the government anymore or called damnation down upon their political opponents. The fearful, weak governments of the mid-seventeenth century had relied upon executions to put down treason, religious dissent, and rebellion, but under the more secure governments of the early eighteenth century such executions disappeared.[34]

William's handling of religious affairs was just as effective, at least for Protestants. He won the loyalty of Baptists and Quakers when he

guaranteed their basic rights and allowed them to come to England, where there were a number of supportive royal officials and members of Parliament, to plead for an end to the lingering discrimination against dissenters in colonies with established churches. The crown also put an end to executions for witchcraft after learning of the miscarriages of justice in Salem in 1692.[35]

For their part, the orthodox gradually came to terms with the loss of their power to persecute dissenters and suspected witches. Supporters of the Congregational establishments of Massachusetts, Connecticut, and New Hampshire, and of the Anglican establishments of Maryland and Virginia, found new ways to promote Christian piety. They set up ministerial associations and missionary societies. They founded colleges—William and Mary opened in 1694 and Yale in 1701—to educate orthodox ministers, and they sent evangelical preachers to every corner of the colonies to spread the gospel. Religious and political rivalries remained intense, but they became less confrontational and claimed no more lives.[36]

William's political and religious settlement reconciled the colonists with one another, but his status as a Protestant hero was what united them. Royal propaganda portrayed him as the savior of the English people. He had found them "in languishing circumstances; almost quite depriv'd of Liberty and Property; having their Religion, Laws and Lives in utmost hazard; sinking under Arbitrary Power and Tyranny; almost overwhelm'd with Popery and Slavery." Now they were on the offensive throughout the world against Catholicism, corruption, and despotism. Militant Protestants were especially pleased by the progress they saw. "God seems to have begun the Reformation of the whole World, and eminently to appear for the True Reformed Religion," proclaimed one colonist pamphleteer. Another declared that "Earth Quakes" had begun "which shall shake yet until they have shaken the Papal Empire to pieces." William's anti-Catholicism was popular throughout the realm, as was his alliance with the Netherlands and Protestant states in Germany against the French effort to establish a "universal" monarchy; but in the colonies his defense of constitutional government and representative institutions and his commitment to tolerance among Protestants were equally important.[37]

The 1690s marked a turning point in national feeling in the colonies. The proportion of counties named for British heroes rose from

40 percent in the decades before the Glorious Revolution to 80 percent and stayed at that level until the revolutionary crisis of the 1760s and 1770s (Figure 2.1). Celebrations of the king's birthday on 4 November and of Gunpowder Treason Day on 5 November (which marked the date on which the British thwarted a Catholic plot to blow up Parliament) were merged with annual feast days to create a grand patriotic holiday, which became the foremost public event in the colonies. Colonial faith in ecumenical Protestantism and in British values and institutions was at an all-time high.[38]

Of course, anti-Catholicism was poor grounds for unity in Maryland, where a quarter of the population was Catholic. Voters turned the most militant anti-Catholics out of office once the Glorious Revolution was complete, but they did so as much in rejection of Puritan extremism as in a gesture of tolerance to Catholics. The assembly, mindful of the need not to drive Catholics to rebellion, granted Catholics the right to vote—a right they had lost in England under William—but



barred them from holding office or practicing law outside prerogative or chancery courts. Race and a desire for political peace bound Protestant and Catholic colonists together, but it was an uneasy union, and religious antagonism periodically gained the upper hand.[39]

Anti-Catholicism was crucial to the creation of political solidarity in New England. Together with the intense anti-Indian feeling reawakened by King William's War of 1689–1699 and Queen Anne's War of 1702–1713, it helped create the most unified citizenry in the colonies. The struggle against the French and their Indian allies had as powerful an impact on the psychology of New Englanders as any royal propaganda did. It deepened the colonists' sense of religious and racial solidarity and exacerbated their hatred of "savagery" and "popery." People believed that the French and the Indians were conspiring with the devil to destroy them. One of the witches executed at Salem testified that "at their Cheef Witch-meetings, there had been present some French Canadians" and "some Indian Sagamores, to concert the methods of ruining New England." Mercy Lewis, one of the accusers at Salem, reported that French and Indian specters had visited her and shown her the book of Catholic devotions they used. Fears of French encroachment upon New England were not unfounded, of course: in Maine the French fought side by side with the Abenakis, and in 1690 two men from the Isle of Jersey tried to promote the French cause in New Hampshire and Massachusetts by fomenting rebellion among Indian (and African) slaves. They were planning to burn Exeter and Newbury and flee to Canada, where they would free the slaves.[40]

Native Americans, however, remained the primary focus of New Englanders' hostility. After so many years of brutal warfare and so many horrifying atrocities, it could hardly have been otherwise. Mercy Short, who had been taken hostage by a band of Indians, was universally applauded after she killed ten of her captors—six of them children—and brought back their scalps. The Reverend Cotton Mather said of the Indians in 1702 that "the most scrupulous persons in the world must own, that it must be the most unexceptionable piece of justice in the world for to extinguish them." The Glorious Revolution and the war against France confirmed New Englanders in their loyalty to one another, but during this era that loyalty was founded first and foremost on hatred of the Indians.[41]

The impact of the increase in political, religious, and racial solidar-

**Figure 2.1** Trends in county names in the United States, 1634–1919 (percentage of names of new counties). *Source:* Zelinsky (1988: 124–125).

ity on the homicide rate among unrelated colonists was profound, as was the emergence of political stability in the colonies and in the British Empire at large. Nearly every connection between people—servants and masters, neighbors, and strangers—became abruptly less homicidal in New England and the Chesapeake. Several patterns stand out. First, colonists stopped killing one another over political or religious differences. Politics was still contentious, and rioters expressed outrage from time to time against ministers or public officials who crossed them; but except for a few killings related to land disputes and a quarrel between a Protestant and a Catholic in Maryland, political and religious homicides ceased among European Americans after the Glorious Revolution, not only in New England and the Chesapeake but throughout British North America.[42] These homicides reappeared in the late 1760s and early 1770s as the revolutionary crisis unfolded, but between 1693 and 1765 there was virtually no risk of colonists' being killed in disputes over land, taxes, Indian policy, religion, territorial sovereignty, or constitutional rights.

The sudden disappearance of political homicides played a smaller part in the decline in homicides in the late seventeenth century in Virginia, where political homicides had accounted for a very small proportion of homicides among unrelated colonists to begin with: about 8 percent from the time of settlement through Bacon's Rebellion. In New England, however, political homicides had accounted for 29 percent of homicides among unrelated colonists before 1675, and their disappearance accounted for a third of the decline in homicides that occurred there at the end of the seventeenth century. And in Maryland, where political homicides had accounted for 54 percent of homicides among unrelated colonists before 1675, their disappearance accounted for two-thirds of the decline in homicides. The conflict between proprietary and antiproprietary forces in Maryland still claimed a few lives in this era. In 1690, for example, John Payne, who had been appointed a customs collector by the new antiproprietary government, was shot dead on the Pleasant River when he tried to board a ship commanded by Lord Baltimore's stepson, formerly deputy governor under the proprietary regime and a member of Lord Baltimore's Council. However, the Protestants' victory was so complete by the mid-1690s that Catholics never took up arms again in Maryland.[43]

Another sign of the impact of political, racial, and religious unity on

the homicide rate was the disappearance of rape murders and robbery murders among Protestant colonists. From the late 1680s to the revolutionary crisis there are no recorded instances of Protestant colonists in New England or the Chesapeake raping and murdering colonial women, and no Protestant colonist committed a predatory homicide against a fellow colonist. The robbery murders that occurred were committed by outsiders who did not share in the colonists' newfound spirit of solidarity: a free mulatto man, convict servants, Irish Catholic immigrants, or English soldiers and sailors.[44] Protestant colonists now shared too strong an identity to prey on one another as they had done in the early and mid-seventeenth century. Indeed, this sense of identity was so strong that by the late seventeenth century people who were outside the white Protestant mainstream recognized themselves and were recognized by others as outsiders. Irish Catholics, free blacks, and convict servants were not extremely homicidal in the eighteenth century, but their alienation was such that those who were disturbed or desperate could commit acts of violence that Protestant colonists would not.

The decline in robbery homicides and sexual homicides, together with the decline in indentured servitude, had a particularly dramatic effect on homicide rates for women. In Maryland and Virginia these rates fell respectively from 29 and 36 per 100,000 women per year in the mid-seventeenth century to only 1 per 100,000 in the early eighteenth century, and in New England from 4 per 100,000 to 0.4 per 100,000.[45] Those declines—along with the growing proportion of women in the adult population—helped push overall homicide rates to very low levels by the mid-eighteenth century.

As the colonists' homicide rate declined, the contribution of soldiers and especially sailors to the homicide rate became more salient. Together they committed a fifth of all homicides of colonists in New England and in Maryland from the 1690s to the Revolution, even though they accounted for less than a tenth of the population. Sometimes they killed people in the course of carrying out their duties. In New England, press-gangs from the Royal Navy killed at least four "recruits" who were trying to escape, and sentries on the northern frontier shot at least five colonists dead when they mistook them for marauding Indians.[46] But soldiers and sailors were habitual brawlers, and the majority of deaths involving them were the result of fights. English

sailors went on a rampage in Portsmouth, Virginia, when several Spanish ships came into port. They chased the Spanish sailors into their boardinghouses and killed two of them before local authorities could restore order. British sailors in Newport, Rhode Island, turned on a couple of local men in a brothel and ran them through with swords. More often, however, sailors turned on their own shipmates in work disputes or drunken fights. Such homicides were confined to the margins of colonial society, on the frontier or in ports or harbors, and only rarely did they involve colonists.[47]

There was little change in the character of other types of homicide, although these too occurred much less frequently. Men still killed each other in drunken brawls or disputes over eviction notices, stolen livestock, or unpaid loans, but these were spontaneous rather than premeditated murders, and few involved guns. The proportion of homicides among unrelated colonists that were committed with guns fell from 38 percent to 13 percent in New England from the late 1670s through the 1760s and from 40 percent to 11 percent in Maryland. As in the seventeenth century, women almost never killed fellow colonists outside their homes or families. Mistresses, landladies, and female servants committed or assisted in a handful of homicides in their households, but except for a couple of shoving matches that resulted in deaths, women did not kill unrelated colonists.[48]

The influx of immigrants from Scotland and Ireland in the eighteenth century raised the homicide rate, though not as much as historians have assumed. Both Scotland and Ireland had high homicide rates. Political instability was the primary cause. Scotland witnessed terrible violence during the English Civil War and during postwar rebellions against the imposition of an Anglican establishment on Scotland. William III reached out to Presbyterian Scots in an effort to restore order, and his successor, Queen Anne, tried to solve the Scottish problem once and for all by establishing the Presbyterian Church in Scotland and by uniting England and Scotland under one government in 1707. The Presbyterian majority was restive, however, because of the loss of political independence, and disgruntled Highlanders, Anglicans, and Catholics launched Jacobite rebellions in 1715 and 1745. Eventually the British government consolidated its power over the Highlands, but many Scots refused to acknowledge the legitimacy of the government. As a people they did not become as unified as the En-

glish in the eighteenth century, and many of them never felt part of the larger British entity.[49]

The political situation and the homicide problem were even worse in Ireland. The conquest of Ireland was bloody, especially in the southwest, the seat of rebellion against English colonization, and in Ulster, where Irish lands were expropriated and handed to Protestant proprietors, who resettled them primarily with Scots Presbyterians. Immediately after the Glorious Revolution the new Scots-Irish were taxed to support the Anglican Church and were barred from holding office, voting, celebrating the Lord's Supper, or performing marriages and burials. Over time, however, the Anglo-Irish regime softened its stance, and it eventually granted Protestant dissenters the rights to vote and to hold office. The Scots-Irish became less alienated from the government; some even came to see themselves as part of the ruling Protestant minority. The homicide indictment rate fell gradually in Armagh and Tyrone, heavily Scots counties in Ulster, from 10 per 100,000 adults per year in the 1730s and 1740s to 7 per 100,000 by the 1760s and 1770s.[50]

As a whole, Ireland remained more homicidal than England. Agrarian violence was still endemic in the 1760s and 1770s. Vigilantes like the White Boys (Catholics) and the Oakboys (a coalition of Presbyterians, Anglicans, and Catholics) hamstrung cattle, drove sheep over cliffs, tore down houses, and burned barns and haystacks. They attacked landowners, middlemen, and collaborators, branding them, cutting off pieces of their ears, and running wool cards over their flesh. Catholics remained homicidal wherever they had suffered the worst violence at the hands of Protestant settlers and the English government. In the southwest their homicide rate was probably at least 14 per 100,000 adults per year. But Irish Protestants were also homicidal, and outside of Ulster they probably committed homicide at about the same rate that Catholics did. They, too, felt discriminated against, especially by British trade and tariff policies, which damaged the Irish economy. Political alienation, ethnic and religious hatred, and disrespect for the courts and other institutions ran deep in Ireland, and all those factors kept the homicide rate high.[51]

Scots and Irish immigrants brought their homicidal tendencies with them to North America. They were not numerous enough in New England to raise the homicide rate appreciably there in the colonial

era, although the Scots-Irish, who were largely Presbyterians from Ulster, were more than twice as likely to be murdered or to commit murder as other colonists. However, because they accounted for only 12 percent of the population, they raised the region's homicide rate by only 10 percent. They also appear to have assimilated to New England's nonhomicidal culture fairly quickly. They committed homicide in New England at less than half the rate they did in Ulster in the mid-eighteenth century. That rate might have been even lower had they not been concentrated on New England's northern frontier, where homicide rates were higher for everyone.[52]

In Virginia, where the homicide rate was much higher than in New England, the Scots-Irish had a reputation for extraordinary violence. They appear to have brought fighting techniques like biting and eye-gouging to the colonies, but these were meant to show ferocity and humiliate the victim, not to kill, and they were immediately adopted by non-Scots. The Scots-Irish were 26 percent more likely to be murdered or to commit murder than other colonists, but had they not been concentrated on the frontier, they might have had the same homicide rate as English, Welsh, and German colonists, who killed each other in the Chesapeake at roughly the same rate that the Scots-Irish did in Ulster. When political stability came to the Shenandoah Valley in 1765, its homicide rate fell from over 20 per 100,000 adult colonists per year to 8 per 100,000, despite the continuing influx of Scots-Irish settlers. Scots-Irish homicide rates went down along with everyone else's, and by the end of the century they were almost indistinguishable from those of other white Virginians.[53]

Catholic immigrants from Ireland stood out more than Presbyterian immigrants from Ulster. In Virginia, Irish Catholics were 56 percent more likely than other colonists to be murdered or to commit murder; and in New England they were twice as likely to be murdered and four times as likely to commit murder. Irish Catholics were disproportionately homicidal in part because so many of them were single men who came to the New World as sailors or convict servants, and they felt no kinship with Protestant colonists. They also brought violent ways with them from Ireland. It would take time for them to forge a sense of solidarity with the English or Scots-Irish—or with each other. They were less cohesive across class lines than other ethnic groups and more likely to kill one another, particularly if someone questioned their in-

tegrity, their faith, their national honor, or their manhood. Even so, the Irish made up too small a share of the colonial population to raise homicide rates appreciably, and like the Scots-Irish they were less homicidal in New England than they had been in Europe.[54]

The homicide rate among unrelated colonists in the Chesapeake remained much higher than the rate in New England in the early eighteenth century: 9 per 100,000 adults per year compared to only 1 per 100,000. Part of the explanation is that class lines were more significant in the Chesapeake than they were in New England. Although indentured servitude contributed less to the homicide rate in the eighteenth century than it had in the mid-seventeenth, and the decline in murders of bound servants was evidence that planters and overseers had changed how they viewed and treated poor whites, poor whites did not seem to feel any more charitable toward people who were better off than they were, nor were they more resigned to their fate as subordinates in a decidedly hierarchical society. The number of murdered masters, mistresses, and overseers fell by two-thirds after 1675, but that number did not fall faster than the proportion of colonists who owned bound servants. The rate at which masters and overseers were murdered may even have increased: before 1675–76, bound servants in Maryland and Virginia had been three and a half times more likely than masters or overseers to end up as homicide victims, but thereafter masters and overseers were more likely than servants to be homicide victims. The decrease in class feeling associated with the rise of racial slavery and racial solidarity appears to have been one-sided.[55]

The use of transported convicts as bound laborers may have increased the homicide risk for masters and overseers after 1717, when Parliament first gave British courts the power to sentence convicted felons to penal servitude in the colonies instead of hanging them. Between 1718 and 1775, 50,000 convict servants from England, Scotland, and Ireland landed in the Chesapeake. Colonial assemblymen and counselors tried repeatedly to ban the importation of convict servants, but Parliament was eager to shift Britain's crime problem to the colonies. Yet it would be a mistake to blame convict laborers for the continuing violence against masters and overseers. They were almost all property offenders, and they appear to have been only slightly more prone to violence than other colonists, except when they were on the run. The fact that nonconvict servants killed most of the murdered masters

and overseers suggests that this homicide problem stemmed from the servant-master relationship itself and the hostility of poor whites toward planters.[56]

Persistent class tension in the South manifested itself in the number of Virginians and Marylanders who killed one another at public events like elections, militia musters, horse races, shooting contests, boxing matches, or sessions of the county courts. Living in a society in which colonists remained divided by caste and class did not instill a yearning for class warfare in freemen of poor or middling circumstances. Instead they felt a desperate hunger for status and prestige and a fear of losing face and falling to the lowest levels of society. For most men suffering acute anxiety about status, it was impossible to walk away from a challenge or an insult. At Dew's Horse Race Ground in Richmond County, Virginia, John Oldham got into an argument with John Hutchins and claimed he could beat him in a fight. A crowd gathered to watch them, shouting, "Well done Oldham," "Well done Hutchins," whenever one of them landed a crushing blow. Finally Hutchins collapsed. Oldham did not mean to kill him, and was sorry that he did; but neither man was willing to stop until one of them was unconscious. Anxiety about status may have intensified in the 1710s and 1720s, when the rate at which male colonists were murdered in Virginia by unrelated colonists rose once again.[57]

Occasionally the gentry were drawn into such contests. George Wortham, a wealthy planter and captain of the local militia in Middlesex County, Virginia, attended a militia muster with Benjamin Davis, a poor young man. The two men retired with other militia members to a tavern in the county courthouse, and both were soon drunk. Davis' pride was already wounded, for Wortham had asked him earlier if he would come and work for him and by doing so had drawn attention to the difference in their social standing. Davis began to take offense at everything Wortham said. When Wortham finally told him to keep quiet and "not to concern himself with that which did not belong to him," Davis drew his sword. Wortham fended him off repeatedly, but Davis persisted, and eventually Wortham had to kill him. Lethal fights on public occasions, especially elections, could occur anywhere in the colonial world. But New England saw fewer such deaths, because most men there believed that they were as good as anyone else and could advance as far as they wanted. In the Chesapeake there was

less social mobility because the planter elite had a near-stranglehold on the social hierarchy.[58]

Although the Chesapeake had persistently higher homicide rates than New England, and although Irish and Scots-Irish immigrants did have higher rates for a time, there was an abrupt decline in the homicide rate among unrelated people in the colonies as a whole in the last quarter of the seventeenth century. The decline persisted through the 1760s, in part because of ongoing warfare against France and its Native American allies, which renewed and intensified the colonists' sense of religious and racial solidarity, particularly in New England, and kept them tightly bound to one another and to the British Empire. A third of New England's adult males served in the militia during King George's War (1744–1748) and the French and Indian War (1754–1760). Virginia did not find itself on the front lines until the latter conflict, but it committed a large supply of men and matériel to that war, and the homicide rate in the Chesapeake plummeted to its lowest level in history. Frontier violence remained a problem in the Shenandoah Valley, but the rate in the Chesapeake fell from 9 per 100,000 adults per year to less than 5 per 100,000 as loyalty to Britain grew and hatred of the French and Indians reached a fever pitch (Figure 1.3).[59]

Colonial identity, like British identity as a whole, was shaped by war. British Protestants, colonists included, defined themselves by what they were not; there was little place in their society for Catholics who refused to conform or who persisted in supporting a Catholic Stuart dynasty. Their image of themselves as a people was highly positive. The unprecedented economic success that the colonists and the British Empire enjoyed in the mid-eighteenth century fostered pride in Anglo-American culture, with its enterprise, ingenuity, and enlightened approach to science and the arts. The colonists also took pride in their political system, especially as political stability increased in the eighteenth century. Contested elections and party strife were permanent features of the political scene, but constitutional government, representative institutions, and the orderly succession of monarchs were an improvement over what the rest of the world had to offer. And the British public—active, informed, and opinionated—was itself a source of pride. The political and sectarian controversies of the Civil War and Restoration had produced bitter feelings and social conflict,

but they had also laid the foundation at home and in the colonies for national awareness, national feeling, and an empowered citizenry, by producing a profusion of newsletters, pamphlets, and sermons that people from all walks of life could debate at coffeehouses, churches, taverns, and clubs. By the time of the Glorious Revolution, the British public was a force to be reckoned with throughout the empire.[60]

Success bred faith in the system, which bred more success, more trust in political leaders, and greater national solidarity. Eventually British identity encompassed not only the English but also the Scots, the Welsh, and the Scots-Irish. The rise in national feeling may have had an especially strong impact on the way the poor and the middle class saw themselves, by giving them a sense of pride in Britain's accomplishments and a sense of their special destiny. Only Irish Catholics remained wholly beyond the pale, derided, like the French, as a superstitious, indolent, violent people.[61]

Once colonial homicide rates dropped, the culture changed in ways that helped keep rates low. In Virginia, for example, once areas emerged from frontier conditions everyone—even the poor—began to turn to the county courts to resolve personal differences. They filed dozens of civil suits in every county every year for slander, trespass, assault (which included threats and verbal abuse), and assault and battery (which included physical violence). In long-established counties an average of one every fifty white men were involved in any given year as complainants or defendants in a civil suit for assault or slander.[62] Because very few of the files for these civil suits have survived, it is impossible to know what they were about, but if surviving files from Rockbridge County, Virginia, are any indication, they involved the kinds of disputes that at an earlier date might well have led to murder. Major Alexander Stuart, for instance, sued John Thompson for slander. Thompson had claimed

> that a certain Gentleman over heard [Stuart] make an appointment with a negro wench, and that same Gentleman watched sd Stuart until he and the negro wench came to the place appointed or the place of action. Then sd Gentleman returned to a company and asked if they wanted to see Sport and then went back to the place where [Stuart] & the negro wench was, with sundry others with him and found said [Stuart] acting with sd negro wench, that one of the Company took

> sd [Stuart] by the foot and Disengaged him from off the said Negro wench, and notwithstanding so large a Company was present, [Stuart] Scrambeled and indeavored to Replace him self again on the said negro wench.

Stuart also sued Thomas Paxton, like himself a wealthy planter, for repeating this story.[63]

In the mid-seventeenth century a gentleman like Stuart would have horsewhipped Thompson and challenged Paxton, who was his peer, to a duel. In the eighteenth century the desire for revenge was more often satisfied in court, even though half of all slander suits and three-fourths of all assault suits were settled or dropped before trial, and those that ended in guilty verdicts usually resulted in small damage awards. Most suits were intended merely to demonstrate that the plaintiff was a man who would stand up for his rights. They were not meant to bankrupt the defendant. They thus reflected the less homicidal turn in the culture of Virginia and Maryland as much as they helped shape it.[64]

In New England the decline in homicides was likewise followed by a shift in male culture that helped keep rates low. Changes in genteel manners in the late seventeenth and early eighteenth centuries fostered an appreciation of men who used wit rather than force to triumph over adversaries in politics and in personal disputes. Humor, self-deprecation, control of one's temper, and attentiveness to the feelings of others became the hallmarks of the gentleman. Politics became less combative. Good manners, conversational skills, and a sharp pen were vital to success in a political world that centered upon coffeehouses, soirees, contested elections, and newspapers. There was less fighting and more satirical writing and repartee, skills that were valued not only by the gentry but also by farmers, artisans, and laborers.[65]

Instead of fighting, young men in Connecticut started to play a version of the dozens, which in a patriarchal culture meant running down each other's fathers. Two rival gangs of young men ran into each other on a street in Lebanon in the summer of 1701 and immediately went at it. Eleazer Fitch asked Eleazer Mudge "who made him." Thomas Bernard tried to calm the waters by saying that God had made them all, but Fitch turned to Bernard "and said who made you I know not but who ever he was I wished he had his trident off and you were

all Three dam'd together." Bernard asked Fitch "whether his father taught him such Language," to which Fitch replied, "dont tell me of my father. . . . I know who got you my bob Tailed Dog got you and you are all Tail and yet it[']s all ye part of a man y$^t$ belongs to you." As the exchange heated up, the boys' Puritan antecedents came to the fore. One young man called his adversary "the scum of Sodom." Another declared, "I am going to Heaven. . . . You are fire brands of Hell. You are scorched already." This was tame stuff by modern standards, but it still ended up in court. Bernard and his friends brought charges against Fitch for blasphemy, but the court found Mudge guilty of calling Fitch "a Devill Worshiper," and all were found guilty of quarreling.[66]

Using wit against rivals also gave outsiders a nonviolent means of humbling their would-be superiors and had a calming effect on public life generally. The favorite targets of New England satirists were the self-righteous, especially the ministers of orthodox churches. Young Benjamin Franklin, who was too poor to attend Harvard, made fun of Harvard-educated ministers in the early 1720s in the famous "Silence Do-Good" letters written for his freethinking brother's newspaper. The tradition of satire continued through the early 1760s, when a writer for the *New Hampshire Gazette* suggested a remedy for the colony's high taxes and low morals: fire all the ministers and have them open taverns, where they could preach to the individuals who needed their services most. Such satires, which were widely disseminated and repeatedly rehearsed, gave Anglicans, freethinkers, and young journeymen a voice, helped reconcile them to New England's social order, and lessened the chances that alienation would break out into violence.[67]

The continuing low homicide rate among unrelated colonists in New England and the Chesapeake correlated with other changes in colonial society. The fact that a greater proportion of the population was native-born improved prospects for social solidarity. The economy strengthened after 1715, so that poor and middle-income men had a better chance of getting ahead, and their improved prospects helped persuade them that the colonial social hierarchy was legitimate. But like the changes in male culture, these shifts occurred after the homicide rate had fallen. The major changes in homicide rates coincided with the expansion of religious, racial, and political solidarity and the

improved stability and legitimacy of government that had occurred in the late seventeenth century.

The decline in the homicide rate came later in North Carolina than in New England or the Chesapeake, but by the mid-eighteenth century it appears that North Carolina also had a low homicide rate, and for much the same reasons (Figure 2.2). North Carolina was far more homicidal than the Chesapeake in the early eighteenth century, because Indian warfare and political strife (including three rebellions against the colonial government) had periodically reduced the colony to lawlessness. But as racial slavery took hold in North Carolina in the 1720s and 1730s, white solidarity increased, and as the colony's government became more effective, the homicide rate declined and was soon comparable to the Chesapeake's—probably 12 per 100,000 adult



**Figure 2.2** Homicide rates in New France, North Carolina, and Pennsylvania, 1650–1800 (per 100,000 persons per year). Pennsylvania, 1775–1783, is extrapolated from 1764–1774. *Sources:* Lachance (1984: 132, 192); Spindel (1989: 57); Marietta and Rowe (1999: 29).

colonists per year on the eve of the French and Indian War and 6 per 100,000 during the war.[68]

Homicide rates followed a more complex pattern in Pennsylvania, but they, too, ended up low on the eve of the French and Indian War, and they fell to an even lower level during the war (Figure 2.2). The colony, which was settled by Quakers, Moravians, and other pietists in the 1680s and 1690s, initially had a very low homicide rate—around 2 per 100,000 adults per year. That rate was largely due to the stability of the Quaker-dominated government, the pietists' solidarity and commitment to nonviolence, and the absence of a staple crop, which almost eliminated the need for slaves or indentured servants. Most of the inhabitants were also willing to live in peace with Native Americans and to abide by the terms of treaties.[69]

However, the homicide rate surged in Pennsylvania from the late 1710s to the early 1730s, to probably 9 or more per 100,000 adults per year—the rate that had prevailed in New England before King Philip's War. The primary cause was a sudden influx of settlers from northern Ireland, Germany, and elsewhere. The arrival of thousands of non-English and non-Quaker immigrants made Quakers and pietists a minority, and the moral and religious solidarity that had prevailed in the colony was destroyed. Quakers and pietists found this new diversity distressing and felt they had been "invaded." They debated whether newcomers should be granted political rights. Relations between established residents and "foreigners" were tense, as they were among newcomers of different nationalities, and many poor immigrants were profoundly alienated from everyone. Germans killed Irishmen, Scotsmen killed Welshmen, indentured servants killed masters or fellow servants, and criminal gangs committed robbery murders. Quakers and other pietists did not themselves become homicidal, but beyond the bounds of their communities Pennsylvania became more so, repeating the pattern that took hold in New England in the mid-seventeenth century, when the society outside the Puritan community became more homicidal.[70]

Matters were made worse in Pennsylvania by an economic recession caused by an act of Parliament that prescribed a uniform rate of exchange for foreign coins to prevent tampering. Pennsylvania obeyed the new law, thanks to the influence of the Penn family and of Philadelphia's Quaker merchants, who were currying favor with the royal

government; but other colonies did not. They offered better exchange rates, so Pennsylvania was drained of currency and entered a steep deflationary cycle. The governor of the colony, William Keith, took advantage of the hostility engendered by the monetary policy and organized a rebellion against the mercantile-proprietor party. With the support of non-Quaker immigrants, the poor, and rural pietists, Keith approved issues of paper currency by the colonial government and staged rallies and riots against merchants and assemblymen who refused to support his economic agenda. He accused them of gouging the poor. "We all know it is neither the Great, the Rich, nor the Learned, that compose the Body of the People; and that Civil Government ought carefully to protect the poor laborious and industrious Part of Mankind."[71]

Keith's supporters mobbed the Philadelphia house of James Logan, the leader of the mercantile-proprietor party, destroyed stocks and pillories, and burned the stalls of butchers suspected of overcharging customers. Assemblymen who did not yield to Keith's supporters were harassed and beaten in the streets. Isaac Norris, a member of the mercantile-proprietor party and a defender of the status quo, complained that Keith had "fond us an United Peaceable people & left us by his wicked politicks & Artifice Divided & in partys." Keith fled to England in 1728 to avoid prosecution for sedition, and his political movement crumbled soon afterward. But while it was active, law and order broke down in Philadelphia, and hostility intensified throughout the colony, dividing people along class, ethnic, and religious lines. As a result, homicide and other violent crimes increased.[72]

Pennsylvania also experienced a wave of frontier homicides in the 1720s and early 1730s. Many of the new immigrants flocking to the colony were encouraged to settle on Indian land. The sudden invasion of Europeans led to a rash of murders in the backcountry as settlers and unscrupulous traders skirmished with the Delaware, Shawnee, Conestoga, and other Native peoples who had previously lived in peace with the colonists.[73]

When political calm and prosperity returned to Pennsylvania in the mid-1730s, the homicide rate fell to a moderate level of about 4 or 5 per 100,000 adults per year. The government wrung concessions from Native Americans in 1732, 1736, and 1737 that more than doubled the amount of land open to settlement, and the number of frontier kill-

ings decreased as the Indians decamped and moved west. Naturalization laws were liberalized, and the mercantile-proprietary party came to see the wisdom of paper currency. Gradually a new political consensus emerged, and non-Quakers and non-English immigrants began to take part in the political process. Together with the return of prosperity and a flexible monetary policy, the decision to allow immigrants to become citizens helped create a political rapprochement that restored the rudiments of order, although it did not revive the fellow feeling that had prevailed among colonists in the 1680s and 1690s.[74]

During the French and Indian War the homicide rate in Pennsylvania fell to about 2 per 100,000 adults per year as new grounds for solidarity were discovered in a hatred of France and its Indian allies. The colony sent thousands of troops to the front, while Quaker diplomats worked behind the scenes to restore peaceful relations between the colony and its Native neighbors. Pennsylvania's frontiers saw a great many homicides, but away from the frontier, Pennsylvania, unlike Virginia and North Carolina, became less homicidal during the war.[75] By the early 1760s every colony in British North America, not just those in New England, was either moderately homicidal or nonhomicidal.

The British colonies were not unique in becoming less homicidal in the late seventeenth and the eighteenth centuries. Homicide rates declined in French Canada and throughout western Europe as political instability receded as a result of stronger courts, better law enforcement, more powerful central governments, and (at least in Great Britain and British North America) greater religious tolerance and stronger national feeling. England saw its homicide indictment rate drop by half from the late seventeenth to the early eighteenth century (Figure 1.1), and New France saw its rate drop by two-thirds (Figure 2.2). Data from the Netherlands, France, Switzerland, Sweden, Finland, and Ireland show homicide rates falling there too. No nation had lower rates than Britain or its colonies, but both western Europe and North America were moving in the same direction.[76]

## African American Homicide

The homicide rate for African Americans in the Chesapeake and New England was higher than the rate for European colonists in the late seventeenth and early eighteenth centuries—at least 10–15 per 100,000

adults per year (Figures 1.3 and 2.3). The higher rate is not surprising. Slavery and violence were inextricably linked in the years when racial slavery was being established in the colonies. Slaveowners had to use force to persuade newly enslaved people that they no choice but to accept their position at the bottom of a new social hierarchy, and, as with indentured servitude, there was no guarantee that owners or overseers would use force in a rational way or that slaves would submit to it. Whippings and beatings could end in death if the men and women administering them lost control, and slaves could respond violently. It is interesting to note that women of both races were involved in an eighth of the killings of masters, overseers, or male slaves and in nearly a third of the killings of mistresses or female slaves—proportions similar to those that prevailed in murders under indentured servitude.[77]

In the early days of colonial slavery whites who killed slaves often revealed the profound ignorance that lay at the root of racial prejudice. Joseph Lawton, a tenant farmer from Suffield, Massachusetts, seemed to feel that he had been swindled because his young servant, Congo,



Figure 2.3  Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

newly arrived from Africa, could not understand English. Neighbors overheard him raging at the bewildered boy. When they realized that it had been some time since they had seen Congo, they became suspicious and asked Lawton what he had done with him. Lawton replied that he had nothing to answer for. "Why is it any hurt to kill him? Has he got any soul?" The young man's decomposed body was found in a brook the following spring, the skull crushed.[78]

Most white colonists were determined to dominate a people whom they considered inferior. In 1721 a free laborer named London exchanged friendly barbs with William Ripp, a white laborer, as they unloaded a small boat in the harbor at Newbury, Massachusetts. "In jest," Ripp called London a "Black Rogue." London responded by "telling him He was No more [a] black Rogue than himself." Ripp and London took their "Jocose Speeches . . . in good part," but another white crewman, Ralph Wheeler, asked London "how he dar'd to Speak Such words to a White Man?" London told Wheeler "to mind his Own Business," and Wheeler attacked him. London died of his injuries. In another incident that turned deadly, William Hamilton, an apprentice for a merchant in Salem, shot one of his employer's slaves through the head. Hamilton claimed that his pistol had gone off accidentally while he and the slave were roughhousing, but the grand jury concluded that Hamilton, unable to stomach being beaten by a black man, had shot him deliberately. He was indicted for murder.[79]

In dealing with African Americans whites often behaved as if it was their prerogative to take the law into their own hands, and from the very beginning, agents of the law were overenthusiastic in their use of force against black men. In 1741 three white men in Roxbury, Massachusetts, tried to elicit a confession from a slave suspected of stealing. They tied him to a tree and beat him to death. In Boston in 1746, Jonathan Simpson Jr. ran into the street crying for help. He had tried to whip his father's slave, Bristol, and Bristol had drawn a knife on him. Three watchmen came to his aid; in the course of trying to subdue Bristol they strangled him.[80]

Sources on homicides of Africans by European colonists are far less rich for the Chesapeake and the Shenandoah Valley in the eighteenth century than for New England, so it is impossible to know with certainty if cultural antagonism or conceptions of racial superiority and privilege played as important a role in slave homicides there. But the

large number of examinations of owners and overseers who were suspected of beating or whipping slaves to death, and the large number of claims for compensation for rebels, runaways, and felons killed by white posses suggest that colonists in Virginia and Maryland believed they had a harder time than New Englanders did in establishing their authority, maintaining discipline, and curbing resistance. Living in a society that was a quarter black, southern whites also seemed to be more fearful of signs of resistance than northerners were.

And southern whites had good reason to be afraid. If newspaper accounts are any measure, slaves in Virginia and Maryland resisted or rebelled more often than their northern counterparts, perhaps feeling that their chances of success were greater because of their numbers. In Hanover County, Virginia, an aggressive young overseer's assistant who had been hired to get more work out of the field hands on a large plantation got into an argument with a slave who did not get the cooking fire ready before sunrise. The slave took a swing at the assistant with an ax and wrestled him to the ground. Other slaves joined in, and they beat the man badly. Eventually they let him go, but they then tied up the head overseer and an elderly neighbor who came to his aid and beat both of them. The assistant returned with an armed party of twelve men and two boys, and the slaves—forty or fifty in number—rushed them with clubs and staves. The whites opened fire, killing three slaves and wounding five.[81]

In Virginia and Maryland rebellious slaves were routinely killed if they resisted arrest. Such deaths were rare in New England. Virginians and Marylanders also killed a high proportion of runaways and fugitives from justice. Slaves were chased into rivers or ponds, where they drowned, or they were cornered and shot. Jack, a slave of Edmund Scarburgh of Accomack County, had run away after wounding a woman owned by one of Scarburgh's relatives. Scarburgh's overseer found Jack hiding in a cellar, and when Jack rushed him, the overseer shot him in the chest. Scores of fugitives and runaways suffered the same fate. Counting those who killed themselves rather than surrender, and those captured who died in jails from abuse, malnutrition, or exposure, enough fugitive slaves were killed that they alone would have given African Americans a death rate in Virginia of 2 per 100,000 black adults per year—twice as high as the homicide rate for all New England colonists.[82]

Racial slavery was initially less homicidal than indentured servitude had been in the mid-seventeenth century in part because of timing: after 1675 colonial society was probably less homicidal for everyone, including slaves, although the lack of good data on slaves before 1675 makes it impossible to say. The lower initial homicide rate for slaves was also tied to economics. Slaves were more expensive than indentured servants. Crippling or killing a slave ran contrary to a slaveowner's interests: he could earn a return on his investment only if the slave was productive for many years. It was wiser to sell slaves who were troublesome. Even though such slaves sold at a discount, a partial loss was preferable to a total loss.

Murders of blacks by whites began to decline everywhere in the mid-eighteenth century as slavery became more firmly established and whites became more confident of their ability to keep blacks in their place. In New England, the Chesapeake, and the Shenandoah Valley, the homicide rate for blacks fell from roughly 10 to 15 per 100,000 adults per year to 4 per 100,000 between 1730 and 1775 (Figures 1.3 and 2.3). In New England, murders of slaves by owners and overseers simply stopped after 1720. Other kinds of murders of blacks by whites almost disappeared after Bristol's death at the hands of Boston watchmen in 1746, and those that did occur had little to do with racial prejudice or a desire to dominate blacks. The circumstances of the homicides that occurred in the Chesapeake and the Shenandoah Valley are largely unknown, but, as in New England, murders by owners, overseers, and other whites fell sharply.[83]

What would account for the simultaneous decline in the eighteenth century in lethal violence against blacks in New England, the Chesapeake, and the Shenandoah Valley? Similar forces may have been at work in each region. As enslaved Africans adjusted to life in the New World and European colonists accepted the humanity (if not the equality) of Africans, many slaveowners adopted a paternalistic attitude toward their servants. Lethal discipline declined. The routines involved in tobacco production, mixed farming, domestic service, seafaring, and small-scale manufacturing—unlike those in rice or cotton production—required close contact and cooperation between slaves and their masters, mistresses, or overseers. In such circumstances, personal relationships could develop between owners and slaves. However strained, such relationships helped the economic logic of slavery pre-

vail: the destruction of a slave meant the loss of a sizable investment. During the eighteenth century political leaders, newspaper editors, and other influential colonists also changed the face of slavery by emphasizing that abusive owners undermined the institution. Every time they flew into "fits of passion," they sowed the seeds of rebellion in all slaves. Humane treatment and moderate correction were the best ways to ensure loyal service and social peace.[84]

It is more difficult to explain the decline in murders of blacks by other whites. It appears that by midcentury European colonists in New England began to think of Africans as members of their communities—and in most cases as worthy ones, if memorial notices for African neighbors, servants, slaves, and coworkers are any indication. The heedless homicide of blacks became unthinkable. Prejudice, discrimination, and everyday violence persisted, but in ways that did not brutalize most blacks. Efforts got underway during and after the Revolution to abolish slavery and grant blacks basic civil rights. New England colonists did not extend such consideration to Native Americans. They murdered them at an alarming rate through the 1790s.

The reasons for the decline in murders of blacks by whites other than owners and overseers may have been less benign in the Chesapeake and the Shenandoah Valley, although the forces at work in New England may have been at work in Virginia or Maryland too. But in the South whites had to consider the consequences of losing their tempers or taking the law into their own hands when someone else's slave provoked them, because by the mid-eighteenth century slaveowners were more likely to sue whites who injured or killed their slaves. Slaveowners dominated Virginia's and Maryland's courts, and they were quick to hand down judgments against whites who used lethal or disabling violence against other people's slaves without good cause. In addition, because of the decline in slave plots and rebellions, fear had abated in the white community. Whites were less anxious when they encountered black people they did not know on the road or in the woods. In the early eighteenth century, whites who met black men they considered suspicious were more likely to shoot them.

As remarkable as the decline in the rate at which whites murdered blacks was the low rate of black-on-black murder. From the first, African Americans were murdered by other African Americans at only half the rate at which they were murdered by European colonists. Ethnic

antagonism among African-born slaves led frequently to quarrels in the late seventeenth and early eighteenth centuries, but on the whole Africans did not bring western and central Africa's high homicide rate with them to North America. Contemporary Africa's high rate was first and foremost a consequence of the slave trade, which had unleashed lethal conflicts over trade and territory. Every African within reach of the slave trade lived on a contested frontier, where rival African and European powers vied for control. Political murders, robbery murders, and murders to capture slaves were endemic, as were murders of male prisoners of war who could not be sold overseas or incorporated safely into their captors' villages. The slave trade also encouraged ritual homicides of slaves in Africa. Among the Bobangi of the Zaire basin, it was common to kill slaves to mark trade or peace agreements between neighboring chiefs or to accompany honored owners to the afterlife. Governments in Dahomey, Benin, and the western Sahel sacrificed slaves to celebrate royal ancestors. The Mangbetu of northeastern Zaire killed and ate slaves (or pretended to eat them) to show off their wealth. Such homicides did not survive the Atlantic passage.[85]

Like European colonists, Africans carried their belief in witchcraft to the New World, but it is doubtful that such beliefs led to many homicides in the colonies. In western and central Africa people often murdered suspected witches, and it may well be that some Africans accused of poisoning other Africans in the New World were actually practicing witchcraft or testing or punishing suspected witches. It is likely, however, that most suspects were falsely accused or were practicing medicine without the permission of their owners (a crime for slaves under colonial law) rather than trying to do harm. There is no evidence that witchcraft had anything to do with fatal or near-fatal poisonings: poison might simply have been the safest and convenient method of killing another slave. In any event, the knowledge of poisons and the customs associated with their use faded relatively quickly in New England and the Chesapeake. Slaves there found it more difficult to preserve their African heritage than did slaves in the Lower South or the Caribbean because there were so few of them. Although most slaves in the Chesapeake came from Upper Guinea, Lower Guinea, or Angola, they rarely lived close to other slaves who came from the same villages and shared their traditions, and their lives were more closely intertwined with those of whites.[86]

After 1730 the rate at which African Americans murdered one another fell in the Chesapeake and the Shenandoah Valley to only a third of the rate at which European Americans killed one another, and such murders all but disappeared in New England, where blacks murdered other blacks at roughly the same rate at which poor whites killed other poor whites. There is only one homicide in the surviving records, and it was a manslaughter rather than a murder. In 1750, Poro, who was owned by a man in Marshfield, Massachusetts, picked a fight with a fellow slave named Gambo, and Gambo struck him on the head with a stick. Poro died the next day. All other black homicide victims in colonial New England were victims of whites.[87]

The patterns are nearly identical in the Chesapeake and in the Shenandoah Valley. The records are not as complete or diverse are they are for New England, but those that survive show a steady decline in the rate at which black adults were murdered by other blacks. In a few instances slaves went on rampages against their masters or mistresses and attacked fellow slaves as well as whites, for reasons unknown. In 1736 a female slave broke into William Cox's house, stole goods, burned his tobacco shed, nearly murdered his son, and killed her children and three of his other slaves before drowning herself. In 1755 a slave of Stephen Watkins murdered one of Watkins' grown children and a fellow slave before hanging himself, and in 1761 a slave on a plantation in Maryland murdered his mistress, his mistress' son, and a female slave and tried to kill a slave child.[88] Most of these slaves appear to have been mentally ill. The actual homicide rate among blacks was probably no more than 2 per 100,000 adults per year.

The decline in homicides of blacks by blacks in the Chesapeake and the Shenandoah Valley was probably a consequence of social and cultural change. By midcentury the size of plantations had increased, the proportion of native-born blacks in the population had risen, there were extended families and kinship networks, bonds among neighbors had intensified, and ethnic divisions among slaves had diminished. The African American experience of banding together to protect one another against abuse coalesced into a shared identity. All those forces forged a racial solidarity among blacks that militated against lethal violence, even among strangers.[89]

Solidarity among blacks may have been even more intense in New England, because there were so few of them and they were concen-

trated in a handful of towns and counties. In New Hampshire a third of blacks lived in Portsmouth; in Massachusetts a third to a half lived in Boston; in Connecticut nearly half lived in New London or Fairfield County; and in Rhode Island three-fourths lived in Newport or King's County. Cultural prohibitions against homicide may also have been stronger in New England, as they were for working-class whites. Black Yankees adopted the same ironic, self-deprecating humor that white working-class Yankees did. They ridiculed people who put on airs or were holier-than-thou, and they defended themselves or cut others down to size with wit and humor.[90] To this day, African Americans are less likely to commit murder or to be murdered in New England than anywhere else, just as European Americans are.

These cultural adaptations did not mean that slaves in New England accepted their lot. In fact, as soon as masters and mistresses stopped murdering slaves in the 1720s, slaves started murdering their masters, mistresses, and in a few instances white neighbors or strangers. The numbers are small, but they are consistent with those from the Chesapeake and the Shenandoah Valley. Lethal violence against whites, which was almost unheard of during the early decades of slavery, quintupled in the 1730s through the 1750s. Part of that increase stemmed from the increased proportion of blacks in the population, but the rate at which blacks murdered whites increased threefold.[91]

Slaves used clubs, knives, hatchets, and poison to kill whites. In 1731 in Wallingford, Connecticut, Hannah, a slave who belonged to a prominent family, attacked her master's niece and a neighbor with a knife. In 1745, Jeffrey, a slave of a farmer in Mendon, Massachusetts, cut off his mistress' nose and then severed her head with a hatchet. Another slave named Phillis poisoned her master by lacing his gruel with arsenic. There were many similar cases in the Chesapeake and the Shenandoah Valley, but in the South there were also a number of cases that involved two or more slaves who conspired to kill whites. Three slaves beat and kicked their master to death in Strafford County, Virginia, in 1769. In 1753 two slaves struck an overseer with an ax in Accomack County, Virginia, after he beat one of them for being late. They then picked him up and threw him on a pile of burning brush. Still alive, he tried to crawl out of the flames, but they smashed his head with a piece of wood and pushed him back into the fire.[92]

The surge in black-on-white homicides throughout the colonies was in a broad sense political: it represented a decision on the part of a small number of slaves to stage personal rebellions against oppression. In the early days of slavery, many slaves, especially in the Chesapeake, resisted by running away or plotting rebellion with other slaves, but their efforts were so unsuccessful (and so likely to end in death) that by the 1720s and 1730s few blacks were willing to follow that course. Those who were angry, desperate, and willing to risk death had only one option: an individual act of violence against whites. The sentiments that slaves gave voice to when they committed such acts of violence indicated an awareness of their political nature. A black man who beat an apprentice to death in Philadelphia after the apprentice ordered him out of his master's yard expressed feelings that were not often revealed or freely spoken in the nation until the 1960s. A witness had heard him tell the apprentice that where he stood "was no Business of his or any white Dog alive, and that he would not go till he pleased." Another slave who murdered his master in New Jersey hinted at the rebellious feelings stirring in many blacks' hearts. As he was being led to the stake to be burned to death, he told white onlookers that "they had taken the Root, but left the Branches."[93]

These homicides declined as the revolutionary crisis unfolded in the 1760s and early 1770s. The possibilities that the Revolution opened up—rebellion, flight, manumission, or emancipation—may have alleviated the hopelessness and desperation that led some blacks to commit murder. The decline in fatalistic homicides may also have been rooted in increased opportunities for blacks to marry and form families after 1750. Family commitments may have been sufficient to discourage most blacks from killing whites, although the brutal punishments inflicted upon blacks who murdered whites, which included the mutilation and exposure of their corpses, may also have been a deterrent. Whatever the reason, in the early 1760s and 1770s blacks turned to other, milder forms of resistance against whites, such as arson and theft.[94]

### Native American Homicide

As a result of the devastation of the Native populations of New England and the Chesapeake by war, disease, and dispossession, by the

1690s there were too few Native Americans left to have a significant impact on the colonists' homicide rates. At that time colonists outnumbered Native Americans ten to one in New England and twenty to one in the Chesapeake. By 1775 they outnumbered Natives in both places by more than 100 to 1. And after the devastating wars of 1675–76, Native Americans who lived near or among the colonists realized that retaliatory violence was futile. A few murders did occur, but from the 1690s until the Revolution every settled or enslaved Indian known to have murdered a white person was caught and put to death. By the eighteenth century even Native Americans who lived farther away from European settlements were reluctant to kill whites except in times of war. The two main deterrents were desire for trade and fear of retribution. Native Americans defended their rights and settled scores on the frontier, but they preferred to do so during wars, when they could count on the help of Indian allies or the French and move their families to safety across the Blue Ridge Mountains or into Canada.[95]

Unlike African Americans and European Americans, however, Native Americans saw their homicide rate increase sharply in the mid-eighteenth century, at least in New England, where documentation is plentiful. There Native Americans were murdered by nonrelatives at a rate of 23 per 100,000 persons per year—more than ten times the rate for African Americans and twenty times the rate for European Americans (Figure 2.3). Indians were murdered by colonists at a much higher rate than colonists were murdered by Indians, even though colonists killed Native Americans for a very narrow range of reasons. On several occasions, Indians and colonists quarreled while hunting together, and the Indian was left dead. In most other known incidents, however, Native Americans were victims of terror or sheer indifference to the value of Indian lives. For sport, a gang of boys in Middleborough, Massachusetts, pushed Patience Seepat off a bridge into a mill pond, where she drowned. Six settlers in Wiscasset, Maine, took revenge on three Abenaki men shortly after the treaty ending King George's War was signed, and during the French and Indian War, thirty-five bounty hunters killed fourteen friendly Penobscots near Owl's Head Bay. Colonists who murdered Indians had little to fear from the law. Few were convicted, and several were freed from jail by friends before they could be tried.[96]

Native Americans were killed most often, however, by their fellow

Native Americans, especially between 1720 and 1760, when most tribes in southern New England lost their remaining lands and political autonomy, and when most tribes in northern New England suffered devastating losses in the three major wars fought there. A few of the murders, almost all of which involved men killing men, appeared to be traditional killings to avenge the deaths of relatives who had fallen in battle. Sam, who was hunting bear in southern Maine with a party of "Eastern" Indians, bragged about having killed a famous chief during Dummer's War. Unbeknownst to him, that chief was the father of one of his companions, who promptly struck Sam down with a hatchet. But Native culture had been transformed; there were no more political assassinations or deaths from ritual combat between rival leaders.[97] Native leaders sometimes found themselves on opposite sides in the struggle between the French and the English for supremacy in northern New England, and many fought against one another in the French-English wars, but political violence among Native Americans was for the most part confined to those wars. Native leaders were so well integrated into the French or English political systems, or so hamstrung by them, that traditional political violence ceased.

Other kinds of traditional homicides were also rare. There are no accounts from the eighteenth century of murders provoked by the desecration of a burial site or by speaking the name of a deceased sachem. In the mid-seventeenth century these affronts had to be avenged because they disturbed the spirits of the departed.[98] The spread of Christianity and the decline of traditional religious practices and of faith in the power of traditional spirits made such provocations less common and the need to respond less urgent.

What increased were homicides over insults, arguments, or gambling debts. Traditional culture had restrained conflict among Native males. Thomas Morton, a non-Puritan settler in Plymouth Colony who befriended neighboring Natives, remarked upon how little they quarreled with each other. They often ignored insults or challenges, especially from men they considered inferior. One sachem explained this forbearance to Roger Williams, saying that there was no reason for him to be concerned about "the barking of a Dog." William Wood, an early settler in Massachusetts, witnessed similar restraint during sporting events and games of chance.[99]

By the mid-eighteenth century, however, such restraint had all but

disappeared, at least in southern New England. Native men attacked one another with little or no provocation. Sometimes alcohol played a part in unleashing violence, but most of these homicides stemmed from petty quarrels. Samuel Deerskins and Daniel Jones of Plymouth had been talking civilly for about an hour, when the subject changed to "a meething held among't ye Indians Sometime Before." Jones expressed his opinion; Deerskins told him he was a fool. Jones responded with harsh words and turned to the fire to light his pipe. Deerskins jumped up and stabbed him from behind. Joseph Quasson, who was serving in Maine as a provincial soldier during Dummer's War, got into an argument at camp with another Indian soldier and killed him with a shotgun blast to the testicles. Four Native whalers, also friends, quarreled at sea but decided to settle matters after the voyage because their captain forbade fighting on board. As soon as they docked, they had it out with boat hooks and harpoons. Two of them were killed. The other two quarreled later in their jail cell, so of the four friends only one was left alive.[100]

We can only speculate about why Native American men took out their frustrations on other Indians. There is no record of such petty homicides in northern New England, where Natives retained their tribal autonomy and appear to have developed a greater sense of solidarity across tribal and kinship lines than they had had in the early seventeenth century. Native American men in southern New England were responsible for most reported homicides of Indians by unrelated Indians. Cut adrift from their culture and politically powerless, they had left their families and villages to enter the labor market with whites as fishermen, whalers, farm laborers, and military scouts. It is possible that these men became soldiers and sailors not only because more desirable occupations were closed to them, but also because soldiering and fishing attracted alienated, violent men. The surviving sources do not reveal how the murderers felt about their lives, but the lack of proportion between the violence of their assaults and the immediate causes suggests that, like most beleaguered minorities who have little hope of changing the circumstances of their lives, they carried a great deal of anger with them wherever they went. The loss of their land, their freedom, and traditional ways of winning the respect of their peers unleashed the hostile and defensive emotions that led to murder.

By the end of the eighteenth century the homicide rate among unrelated Native American adults had declined in New England. Most Natives regrouped in small settlements after losing their land or intermarried with African Americans to form an inclusive nonwhite caste at the bottom of New England's social hierarchy. Those changes halved the Indians' homicide rate (Figure 2.3), but in 1800 it was still ten times higher than the rates for blacks or whites.

CHAPTER 3

# Family and Intimate Homicide in the First Two Centuries

cides of adult relatives (parents, siblings, adult children, in-laws, step-relatives, and so on), in 80 percent of marital homicides, and in 67 percent of romance homicides among lovers in New England and the Chesapeake.[2]

Generally, in the Anglo-American world marriage, kinship, and romantic relationships were almost never lethally violent, in large part because of the mutual dependence that family ties fostered and because of the support extended by relatives, neighbors, and legal authorities to spouses, lovers, and family members who were wronged or abused. However, local conditions and cultural practices caused variations in lethal violence rates. Family and intimate murders were rare in England, yet they occurred there at probably two or three times the rate they did in New England, where the hardships of frontier life and the need for cooperation to keep small farms and family businesses afloat seem to have encouraged family members to pull together more than they did in the Old World. Rates in the Chesapeake were significantly higher than in England or New England. The high murder rate among unrelated adults in the Chesapeake may have had some effect on family and intimate relations, but the evidence also indicates that people in England and New England were more likely than people in the Chesapeake to intervene in family disputes to try to prevent lethal violence.[3]

## Marital Homicide among European Americans

Marital murders have historically been a serious problem in many societies, and in some societies they still are, but they were rare in early modern England and in the Chesapeake and rarer still in New England from colonial times into the nineteenth century. Why were they uncommon? And why were marital homicide rates so stable compared to homicide rates among unrelated adults? The answer probably lies in the nature of marriage in the Anglo-American world. Relationships between spouses could be very violent, but they were almost never lethally violent. Extreme violence was usually held in check because of the peculiar balance of power between men and women, the ways wives and husbands depended on each other, and the willingness of friends, neighbors, and legal authorities to intervene in the most troubled relationships.

Despite the dramatic surges and declines in the homicide rate among unrelated adults in the first two centuries of settlement, family and intimate homicide rates varied very little from the seventeenth through the early nineteenth centuries. The changing levels of violence among unrelated adults had a modest impact on relations between lovers, spouses, and other relatives, but by and large, family and intimate homicide rates followed a different pattern, because they were driven by forces that had little to do with the feelings and beliefs that correlated so strongly with homicides among unrelated adults.

Family and intimate homicides were extremely rare. In all of New England, for example, only about 35 spouses and 25 adult relatives were murdered before 1800. One or two lovers were killed, and no romantic rivals. The pattern differed only for Native Americans, whose family and intimate murder rate was fifteen to twenty times the rates for African Americans and European Americans. The rate peaked in the mid-eighteenth century, when Native American families came under intense pressure from warfare and the loss of their land to European encroachment.[1]

The character of family and intimate murders remained the same from the colonial period through the Revolution and the early national period. The perpetrators were usually men, and the victims were most often women. Women were killed in roughly 40 percent of homi-

Compendium_Roth
Page 0583

Although there is no way to tell exactly what proportion of marriages were violent, serious spouse abuse appears to have been widespread in both England and America from the sixteenth through the early nineteenth centuries. The violence also appears to have been proportionately the same in both places. Men committed the vast majority of life-threatening assaults, but there were also cases of aggravated husband abuse and mutual violence. According to court testimony, much of the women's violence was provoked, but some women were habitually violent and abused their husbands from the beginning of their marriages.[4]

Husbands and wives fought to change a spouse's behavior, to silence complaints about their own, and to defend themselves against violence. Arguments over adultery provoked a substantial percentage of marital assaults. Oliver Whipple of Hampton, New Hampshire, an attorney and magistrate, had beaten his wife Abigail on a number of occasions because she complained when he tried to seduce their servant girls. He threw a chair at her when she was seven months pregnant and told her he would "split" her brains out. Abigail fought back, but she was no match for him. When she threw a shoe at Oliver and kicked him, he picked her up and threw her against the stove. Robert Holt of St. Mary's County, Maryland, complained that his wife Dorothy and her lover had abused him so violently that he stood "in fear of [his] life."[5]

But the majority of marital violence stemmed from disputes over more commonplace issues like drinking, money, work, or children. The McNeils of Londonderry, New Hampshire, had once owned a substantial farm but had lost almost everything because of Josiah's drinking. His wife Elizabeth, an "industrious" woman who had "educated her Children well," had endured Josiah's drunken assaults for years, but by the time her children were teenagers, she had had enough. One winter day a neighbor called, and Elizabeth asked if he had come to see "the prisoner." There lay Josiah on the floor, bound hand and foot. On another occasion neighbors saw Josiah fleeing into the woods, his wife and son and daughters chasing him "with Clubs or Sticks in their hands." An hour later Josiah appeared at their door seeking protection. "His head and face was bloddy." The records of every county list hundreds of such assaults, many of them severe.[6]

Given the level of marital violence in the Anglo-American world

from the seventeenth through the early nineteenth centuries, it is remarkable that so few spouses were murdered. But most marital violence was not meant to kill; it was meant to punish and to inflict suffering. In this period, most abuse stopped short of murder not only because people were afraid of the consequences if their violence became obvious, but also because at some level they knew that they needed their spouses if they were to survive in a struggling economy. Without them, who would keep the household running? Who would tend the shop and do the chores on the farm?

Marriages in the Anglo-American world were partnerships, but the terms of those partnerships differed from region to region. They were probably most nearly equal in New England. New England's Puritans did not believe that men and women were equal, but they did have a strong sense of the reciprocal obligations of husbands and wives and of the mutuality necessary for a successful marriage. And to succeed in New England's economy, couples needed all the help they could get from each other. Acquiring a shop or farm was a goal that New Englanders achieved to a greater degree than anyone else in the Western world, and to a large extent both the ideal and the reality of independent proprietorship were born from a struggling regional economy. New England was the poorest region in colonial America, but it had the greatest equality of wealth and the highest levels of self-employment. Survival and success depended on family labor and the production of diverse goods that could meet the demands of changing markets, local and international. In short, the regional economy required husbands and wives to work in complementary ways.[7]

As letters and diaries from happier marriages reveal, most husbands and wives derived enormous satisfaction from establishing farms and businesses together. They may still have been unequal partners in the sense that husbands usually controlled finances and investments, yet a few came close, despite the patriarchal character of the society, to living as friends and equals. New Englanders typically married in their mid-twenties and brought some property and skills to their marriages. After the Revolution they made great strides toward lessening the inequality in marriage by committing themselves to the universal education of both men and women. Female literacy rates soon approximated those of men. As a result, New England had the highest literacy rate in the nation, and wives had a stronger hand in business affairs

and in educating their children. American periodicals supported the movement toward greater equality in marriage: after the Revolution the proportion of fiction and nonfiction articles that embraced the idea that men should have power over women fell from 42 percent to 29 percent, and the proportion recommending that men and women should make decisions together rose from 12 percent to 27 percent.[8]

Of course, mutual regard did not always prevail in these domestic partnerships. Yet however angry one or both spouses became, they almost always stopped short of crippling or killing. Although much of the violence recounted in historical documents seems on the surface to stem from unfocused rage, in reality people were often using violence instrumentally, to defend or to change the terms of marital partnerships, or to express frustration over their inability to do so.[9] Mutual dependence could generate violence, but more often it seemed to set limits, especially after the Revolution, when abused spouses had the option of ending marriages that became too violent.

The typical marriage was somewhat different in the Chesapeake and in England. Women who were not indentured servants married earlier in the Chesapeake than in England or New England, so there was a wider gap between husbands and wives in age and experience. Fewer couples were self-employed in England than in the New World, which meant that husbands were more likely to work outside the household and to view their families as a financial burden. The gap in literacy between husbands and wives was also wider in the Chesapeake and in England than in New England. It is important, however, not to overstate the regional differences among marriages in the Anglo-American world. All Anglo-Americans—indeed perhaps all northern and western Europeans—contracted marriage freely, married relatively late, and had some degree of mutual dependence in their marriages. Those who were violent used force primarily to try to make their partners change their ways, and levels of lethal violence were correspondingly low.[10]

Only a handful of the spousal murders that occurred from colonial times into the early nineteenth century appear to have been premeditated—that is, planned rather than committed in an emotional fury. Nearly all the deliberate murders in this era were committed by wives who had fallen in love with other men. There are few records of sane husbands committing premeditated murder in any of the counties studied.[11]

Although nearly all the women who deliberately killed their husbands got help from accomplices, they fell into two distinct groups. One group lived beyond the bounds of respectable society and murdered their husbands just to be rid of them. The other wanted desperately to marry their lovers and retain the advantages of life in society. Martha Newdale, a former indentured servant from Maryland, was one of those women who didn't care what people thought. In 1702 she grew tired of her husband's laziness and drinking and ran off to Richmond County, Virginia, with a lover, Abraham Hannisson. Her husband, missing his meal ticket, tracked them down. Martha told him he could move in with her and Hannisson, and he foolishly agreed. She and Hannisson jumped him when he was drunk and beat him to death with a hammer. In 1778 Bathesheba Spooner of Brookfield, Massachusetts, whose father was a notorious British loyalist, persuaded two paroled British soldiers and her lover, a teenaged Continental soldier she had nursed back to health, to murder her wealthy husband. Her co-conspirators dumped the husband's body into the well in her yard so that she could pass off his death as accidental, but when the body was brought up neighbors saw marks of violence on it. The paroled soldiers were later captured with her husband's clothes, cash, and silver buckles.[12]

Deliberate murders such as these stemmed from the practical difficulties of life in a society that rarely allowed divorce. They stood apart from the overwhelming majority of spousal murders, which were committed either unintentionally, during the course of an assault, or by someone who was mentally ill.

Mentally ill spouses presented a serious danger to family members, especially in the days before asylums. Jeremiah Meacham, a weaver from Newport, Rhode Island, spent his days sitting on the roof of his house or hiding in his room. One evening in 1715 his wife went upstairs to persuade him to come down. Meacham stabbed her with a pen knife and bludgeoned her and her sister to death with an ax. He then barricaded himself in his room and held off neighbors until they broke through the floorboards, whereupon he grabbed a torch from one of them and set fire to the house. He was caught when he jumped from a window.[13]

In New England, where religious fervor was intense, it was not uncommon for mentally ill spouses to translate religious delusions into homicide. Thomas Goss of Barkhamsted, Connecticut, an innkeeper

and a veteran of the French and Indian War, believed that evil spirits were tormenting him, and he stopped sleeping with his wife, convinced that she and the devil were lovers. Afraid that she would cast a spell on him, he split her head open with an ax while she slept, smeared her blood over their children, and then waited quietly for his neighbors to come. Goss's delusions had an apocalyptic cast. He warned his neighbors that if they hanged him for killing his wife, "thirty thousand males above fifteen years of age, would be instantly killed by the shock, in North-America."[14]

In the Chesapeake, where the white population lived in fear of slave rebellion, mentally ill spouses were more often obsessed with the idea that their slaves were about to murder them and their families. Colin Campbell, a planter from Surry County, Virginia, stabbed his wife to death in April 1802. In the days before the murder he had exhibited "every Symptom of Insanity," including a "wildness of look," "no inclination to sleep or eat," and "paroxyms" of fear during which he ran to and fro. What turned Campbell violent, however, was the discovery of a plot among slaves in Surry and adjacent counties to rise against whites on the day after Easter 1802. Authorities in Virginia and North Carolina quashed the rebellion, but Campbell believed that "the insurrection of Negroes" was imminent. He claimed that he "had stab'd his Wife at her own request" so that she could die by his hand rather than a slave's.[15]

In almost every case, friends and relatives knew that the person who suffered from mental illness posed a threat to his or her family, and they tried to take preventive measures. A neighbor took in family members who were threatened. A husband sued for custody of his children because his wife had threatened them. Neighbors agreed to look in on a family every two hours after a family member's mental condition took a turn for the worse. Such measures were often ineffective, however, as the Walpole, New Hampshire, *Farmer's Museum* acknowledged in an editorial in 1803. All the cases cited above ended in murder. Without the help of asylums, family and friends were vulnerable to deadly assaults.[16]

The majority of spousal murders that occurred in early New England and the Chesapeake had nothing to do with mental illness, however. They stemmed from attacks that were committed in anger and were not meant to be lethal. In most cases the victims did not die im-

mediately, an indication that the attackers did not set out to kill and stopped when they realized they had inflicted a serious injury. Abigail Thomson of Farmington, Connecticut, threw a pair of scissors at her husband. They pierced his forehead and lodged in his brain, and he died nineteen days later. John Steadman, a Scots laborer from Annapolis, Maryland, beat his wife so badly that she died a day later. Because she had threatened and abused her husband for years, Abigail Thomson was hanged for her crime. John Steadman was executed because he tried to cover up his assault and did not seek medical help. In this era they were the only people who committed manslaughter but were convicted of murder and hanged.[17]

The majority of people who committed similar manslaughters did not even serve time. Israel Ford of Weymouth, Massachusetts, hit his wife in the small of her back with a pair of tongs, and she died thirteen days later. Moses Duty of Haverhill, New Hampshire, struck his wife Elizabeth with a hoe, and she died two days later. Ford and Duty were indicted but never tried. A Mr. Maxfield of Ryegate, Vermont, died a day after his wife pummeled him during a drunken fight. Local authorities jailed Mrs. Maxfield and several acquaintances who were at her house at the time of the assault, but she was later released. Althea Cook, the wife of a gentleman farmer from Calvert County, Maryland, died a day or two after her husband beat her, and Amelia Lamphier of Windsor, Vermont, took seven days to die after she was injured. An inquest determined that George Lamphier had kicked his wife, even though she denied it, as did her husband and mother-in-law. Both Lamphier and the husband of Althea Cook were tried as murderers but were found not guilty. The community certainly did not sanction this brutal behavior, but it was clear that these spouses were not willful murderers. They did not set out to kill, and they called physicians once they realized their spouses' injuries were serious.[18]

Another sign that these assaults were not meant to be lethal is that few were committed with guns. Only 9 percent of marital murders were committed with firearms in the seventeenth and eighteenth centuries, and none in the Chesapeake, even though guns were used in two-fifths of murders of unrelated adults during the early years of colonization and during the American Revolution.[19] Marital murderers seldom used more than their fists or feet. Sometimes they picked up whatever was at hand—a stick, a stone, a tool. Guns re-

quired preparation and a degree of premeditation. The absence of guns (and of poison) shows that most murderous assaults, like most nonlethal assaults, were committed on the spur of the moment, with no intent to kill.

Yet people who committed manslaughter were not necessarily less serious abusers than willful murderers. George Lamphier, for instance, was clearly a cold, calculating, vicious man. He struck his wife only on parts of her body that would be concealed by her clothes. Bradbury Ferguson of Exeter, New Hampshire, beat his wife Eliza Ann repeatedly but was careful not to leave scars or break bones. When she told him that she was going to swear a complaint against him, he shrugged and said, "Shew your marks." Benjamin Smart of Concord, New Hampshire, lost his temper at his pregnant wife, Nancy, but he waited until their visitor left before he followed her upstairs to the bedroom, threw her to the floor, and kicked her. These people did not want to kill their spouses, but they relished causing pain and exercising power over them, and they meted out their violence judiciously in part to avoid exposure. Some abusers thumbed their noses at the law, though. Moses Duty and Mrs. Maxfield beat their spouses brutally and expected them to be up and about after prolonged assaults, with their injuries on display for anyone to see.[20]

Courts had a high threshold for interfering in abusive marriages: they were reluctant to intervene unless a spouse had been left black and blue or had suffered broken bones. But when disfiguring, disabling, or life-threatening assaults came to the attention of the authorities, they were likely to step in and warn the offender to stop or face prosecution. The penalties for aggravated spousal abuse in early modern England and in colonial New England and the Chesapeake ranged from warnings after first offenses to fines, confinement in the stocks, and whippings. Most whippings were administered in public—a severe humiliation for women in particular, since offenders were stripped to the waist. One woman in Plymouth Colony was allowed to be "punished at home," however; her husband administered a private, legally authorized whipping.[21]

Courts could order abusive spouses to post bond for good behavior as an alternative to punishment. This expedient was satisfactory to almost everyone, including battered spouses, because families did not suffer financially as long as abusive spouses kept the peace. Friends or

relatives would step forward to secure the bond, and the pressure on the abuser was intense: a forfeited bond could mean a loss of £40, which for a poor family could represent several years of income. In contrast, the typical fine of £1 or £2 plus court costs, although it had to be paid immediately, might represent two or three months' pay for a laborer. But courts also handed down multiple punishments. Thomas Wilson of Virginia, a tailor, abused his wife in 1626 while he was drunk. The court put him in the stocks, fined him 20 shillings, and ordered him to post bond for good behavior. More typical was the punishment of Henry Sherburne of Portsmouth, New Hampshire, a wealthy landowner who in 1668 was fined and ordered to post bond for beating his wife several times.[22]

By the early nineteenth century, incarceration had replaced whippings. In the counties studied, the majority of husbands and wives tried for aggravated assault or attempted murder were convicted, and penalties for husbands could be stiff. Once state penitentiaries were opened in New Hampshire and Vermont, two-thirds of the husbands found guilty of attempted murder were sentenced to spend five to ten years in prison. Sentences for aggravated assault could also be severe. One of every seven husbands convicted of a marital assault in New Hampshire and Vermont spent between a month and six months in jail, and those who were fined could also face the loss of two or three months' wages. Threats were harder to prosecute, since there were usually no witnesses other than the victim. Only one in seven of these cases ended in conviction. Prosecutors still had an effective sanction in peace bonds, which by the nineteenth century could cost $100 or more if forfeited. In 1800 that sum represented as much as a third of a poor family's annual income.[23]

It is doubtful, however, that fear of prosecution prompted violent spouses to hide or moderate their attacks. Although the penalties were harsh, the odds of prosecution were slim, because authorities preferred to use moral suasion and threats of prosecution to deter spousal abuse. Even if only 2 to 3 percent of marriages were extremely violent—the average that pertains to the nineteenth century—the numbers would indicate that the state prosecuted no more than a small fraction of spouses who committed life-threatening abuse. Few prosecutions for threat, assault, or attempted murder led to divorce or legal separation,[24] because most cases came at the request of abused wives

who hoped that state intervention would force their husbands to reform. They were de facto civil suits.

Before the mid-eighteenth century, divorce and separation could not have played much of a role in deterring marital violence in the Anglo-American world. England's divorce laws were then more restrictive than those of any other Protestant nation, and the colonies generally followed English precedent. Throughout the colonial period the only permissible grounds for divorce in Virginia and Maryland were adultery, desertion, impotence, or neglect. The courts did not grant divorces on the grounds of cruelty, but they did permit separations in extreme cases. In 1676, for instance, Sarah Gibson was "Left to her Liberty" by the General Court of Virginia "Either to goe for England or Stay with her husband" as she thought "best for her Safety," after her husband beat and maimed her. The same court granted Mrs. Burt "seaprate maintenance" in 1679 because her husband was "a terrible fellow" who "ill treated" her.[25]

The colonial governments of New England were more likely to permit separations on the grounds of cruelty, but they, too, stopped short of granting divorces on those grounds, even when they were afraid that one spouse might kill the other. They viewed marriage, in the tradition of radical or reformed Protestantism, as a civil contract that could be voided by civil authorities if one party failed to live up to the terms of the contract, but the only grounds recognized for voiding the contract were adultery, desertion, and impotence. Marital violence was too commonplace to be considered as grounds for divorce, and, as in England, men were allowed to discipline their wives by beating them, just as they would their children, servants, and slaves. Violence could be prosecuted only as an assault—that is, as a violation of the general civil contract.[26]

By the end of the eighteenth century circumstances had changed. Vermont and New Hampshire were the first states to sanction divorce on the grounds of marital violence. The American Revolution led authorities in northern New England to conclude that spouses had a right to live free from violence and that marriage, like any other civil compact among freeborn citizens, should rest only on consent, not coercion. In 1787 Vermont made "intolerable severity" grounds for divorce, and in 1791 New Hampshire followed suit with a less sweeping but still forceful law against "extreme cruelty." These laws were not

dead letters. Abused spouses used them freely to protect themselves against violence, and the courts used them to punish violent spouses by granting victims property, alimony, and child custody.[27]

The Massachusetts and Connecticut legislatures also recognized the need to protect spouses, especially wives, against abuse. In 1786 Massachusetts passed a law that allowed abused spouses to seek legal separation "from bed and board." The law did not permit divorces on the grounds of cruelty, but it allowed victims to leave troubled marriages, taking their children and property with them, and freed them from debts incurred by their spouses after the separation. Connecticut did not officially amend its divorce law, but in 1790 the state assembly began to rule favorably on petitions for divorce on the grounds of cruelty. Equally important, in the late 1760s every jurisdiction in New England began granting a substantially greater number of divorces on the grounds of adultery, desertion, and neglect. Many of the marriages dissolved on those grounds were violent, and public officials were willing to hear testimony about abuse as long as the bulk of the testimony pertained to legal grounds for divorce.[28]

The changes in divorce proceedings in Massachusetts and Connecticut did not protect as many victims of chronic abuse as the antiabuse statutes in Vermont and New Hampshire, but they were indicative of the broad consensus that began to take hold in New England after the Revolution: in marriage as in government, tyranny was unacceptable. The ability of abused spouses to dissolve violent marriages may well have become a deterrent to violence and may even have been the primary reason that the spouse murder rate fell by half in New England after the Revolution.

Abused women in the colonies had other resources besides the state, however: their neighbors and relatives. Public scorn for abusers and the intervention of neighbors to protect victims—both of which had their roots in the culture of early modern England—did more than criminal prosecution or the threat of divorce to restrain marital violence. Intervention by third parties was common not only in the seventeenth century, when families enjoyed little privacy and when friends and neighbors had few qualms about interfering in other people's affairs, but also in the nineteenth century, when modern notions of privacy were emerging. Neighbors, servants, and relatives even stepped in when marital violence was mutual.[29]

In the seventeenth-century Chesapeake, where tolerance for fighting and brawling was high, relatives and neighbors appear to have been more reluctant than their counterparts in England and New England to intervene in troubled marriages. But they did intercede to stop extreme marital violence. In 1625 Mr. Bransbie, a Virginia tobacco planter, and two of his indentured servants stormed into Joseph Johnson's house to make him stop abusing his wife. Bransbie, an officer in the Virginia militia, told Johnson that if "he did beat and abuse his wiefe any more he wold beate him tyghtlie unless ye Governor comanded ye contrary." Bransbie intervened again at a later date, even though Johnson "presented his peece owt at his window" and yelled "W[ha]t have you to do heere, you were best kepe back or I will make ye stande back." Bransbie walked up to Johnson and grabbed the gun right out of his hands.[30]

Such interventions could be dangerous. Matilda Nash of Sullivan, New Hampshire, a seventy-year-old widow, gave shelter to the wife and children of a mentally ill neighbor, Daniel Corey, and when she tried to reason with him he struck her on the head with a gunstock and killed her. But most interventions ended peacefully. Constables and justices of the peace were sometimes called in when there was violence, but they intervened more often as neighbors than as town officials.[31]

Relatives, neighbors, and domestic employees also supported abused spouses when they decided to prosecute, separate, or divorce. In poor areas of the country it was not uncommon for friends and relatives to support abuse victims who left their spouses and remarried without divorcing. The practice was probably most common in the seventeenth and eighteenth centuries, when divorce was largely unavailable. As long as the couple behaved well, everyone embraced the fiction that they were married and the abusive spouse was dead.[32] Similar tolerance was not extended to spouses who deserted their families merely to take up with a new love.

Aggrieved spouses who turned to the courts could not expect much help, and wives had more difficulty than husbands in making their cases. In most jurisdictions, judges and jurors were lenient toward husbands who had extramarital affairs or claimed they used corporal punishment only to discipline their wives. Still, women could use court proceedings to proclaim to the world that their husbands were abusers

or cheats, and husbands could bring disgrace upon wives who had been abusive or unfaithful. Taking a spouse to court could thus enhance the aggrieved spouse's reputation and expose the abuser or adulterer to the scorn of the community. That was no small matter in an era when churches were a powerful force in community life. Adultery prosecutions may even have helped prevent lethal violence against women, because they enabled husbands to regain control over their wives and to punish their wives' lovers.[33]

Husbands and wives who wanted to shame their spouses could also appeal to the community for support by posting advertisements in local newspapers. The custom became especially popular after the Revolution, when constraints on public and private expression relaxed. Unhappy spouses, most of them women, accused their partners of drunkenness, indolence, abuse, adultery, and theft. These postings sometimes rehearsed the entire history of a troubled marriage. Mercy Griffis told readers of the *Vermont Gazette* about the suffering she had endured over sixteen years of marriage to Benjamin Griffis. Hannah West asked readers of the Windsor *Vermont Journal* to "Hear the Truth" about her husband, who had absconded and left her penniless after nine years of marriage. He took "all my cloth that I had to clothe my family with, and all my yarn I had spinned. . . . He carried away my flax, wood, and all the provisions which we raised on our farm the last year." He left "five children to cry and sob to see the desolation of my family. Since last winter he had been more cruel, and has abused me and his children in a shameful manner, and jamming me till I was black and blue."[34]

Postings usually marked the end of marriages. They were meant to destroy the reputation of spouses who had failed as husbands or wives, but they may also have deterred violence by giving wronged spouses a means of avenging themselves and defending their honor. In addition, they served as a warning to others about the public humiliation that awaited them if they abused their spouses. Postings appeared in Maryland and Virginia and in other areas of the United States, but they were extraordinarily popular in New England, where high levels of literacy and newspaper subscription meant that more spouses could write them and a wider audience could read them.[35]

The literate culture of New England also preserved many stories about spouses who dealt creatively with marital problems that under

other circumstances might have prompted violence. Husbands and wives defied the demands of controlling spouses and flouted convention in minor and major ways. The pressure to meet New England's high housekeeping standards, which was the source of many marital problems, prompted a good deal of defiance. Mary Welch of Two Heroes, Vermont, was clearly unhappy in her marriage. Sometimes she would ride off to stay with friends for several days at a time, leaving her husband Nathaniel alone to care for their three children and tend the farm. She told her brother-in-law that "she would Burn up & Destroy their own House and every thing they had and that she would kill her husband." Mary's in-laws were certain that "it was her real intentions" to murder Nathaniel, but since she tended to become angry only when he asked her to perform some task for him, her "real intentions" may have been to show him how hard it was to keep house, do farm chores, care for young children, and cater to his demands. Disapproving neighbors like Nancy Cade gleefully reported Mary's misdeeds. Cade said that she once heard Nathaniel ask Mary to make a small cake, at which "Mary got up and fetched about a Bushel of good flower and puts it into a Tub about half full of swills which was put by for the Hogs and after swearing an Oath said to her Husband there's a Cake for you." When he asked her to mend his shirts, she took out one of his "Holland shirts nearly as good as new which she cut to pieces." When asked to clean the house, she broke the furniture into kindling and burned it.[36]

Azuba Brooks's husband complained that she "did not manage her household concerns as well as women in general" and that "her manner of cooking and taking care of her household concerns was such that her family could not be decent." She in turn told neighbors he was a "Thumb sucking child" and a "Dirty Mangy Puppy." She answered one of his complaints about her cooking "by taking a cake hot from the Fire and throwing it Spitefully Into his Face," and when he complained about her manners she blew her nose and threw the mucus at him. "God Dam You David Brooks," she would say, "I Know how to torment you and I will Do It."[37]

Men were not exempt from the pressure to adhere to New England's standards, and sometimes they came up with innovative ways of defying it. A man who married a well-to-do widow in Cornish, New Hampshire, was tormented by her constant complaints about the way

he managed the farm. Why didn't he do things the way her first husband had? One day he went to the graveyard, dug up the remains of her first husband, carried the coffin home, and set it down in the kitchen, "declaring that if it would make so much difference he should be on the farm."[38]

Conduct of this sort, though often admired and considered a sign of strong character in New England, was not universally applauded. Respectable society considered it evidence that the defiant partner was at fault in the marriage. Newspapers declared the grave-robbing husband of Cornish a "monster in human shape." Mary Welch's neighbors, in-laws, and even her own sister advised her husband to "whip her severely if ever he thought to live with her."[39] This unusual advocacy of physical punishment shows that people who behaved as Mary Welch did risked putting themselves beyond the protection of society. Still, such people had their sympathizers, and, more to the point, their avoidance of lethal confrontations with their spouses helped create a culture of nonviolence and may have encouraged others to deal with marital problems in nonviolent ways.

A number of factors thus combined to reduce the marital murder rate in New England after the Revolution: greater access to divorce or separation on the grounds of cruelty, higher levels of literacy, and the use of postings to shame abusive spouses. But marital murder rates had been low in the Anglo-American world even before the Revolution because of the mutual dependence of husbands and wives and the willingness of friends, neighbors, and public authorities to protect spouses who were abused or otherwise wronged.

### Marital Homicide among African Americans

Marital homicide figures for African Americans are less certain than the figures for European Americans. Surviving sources from the Chesapeake almost never discuss relationships between enslaved victims and assailants, nor do they record slaves' surnames, so it is difficult to separate marital murders from other murders. Nevertheless, it is clear that marital homicides were rare among African Americans. Only two are known to have occurred in New England in the seventeenth and eighteenth centuries.

The first case involved a free man named Cloyes who murdered his

wife with an ax in Stamford, Connecticut, in 1675. He was probably mentally ill, because his case never came to trial. The second murder was committed in Boston in 1720 by Joseph Hanno, also a free man. He, too, killed his wife with an ax. That murder stemmed from a conflict over the degree to which Hanno's wife Nanny was willing to accommodate herself to white society. Joseph, born in Africa, had been in New England forty-four years, the last fourteen as a free man. His owners had raised him as a Christian, and he was proud of his faith. His wife's rejection of white religion weighed heavily in his decision to kill her. He had never considered murder, he said, "till she told me, that she had as liev talk with the Devil, as talk with any of GODS Ministers." When asked by a minister who visited him in jail if he understood the principles of Christianity, Joseph replied, "Yes, Sir, I have a Great deal of Knowledge. No body of my Colour, in Old England or New, has so much." "I wish you were less Puffed up with it," the minister said. No other marital murders occurred among African Americans in New England over the next eighty years.[40]

Because information on African American marriages in the Chesapeake is sparse, the marital murder rate there must be estimated by proxy. The best proxy is the rate at which African American women were murdered by African American men or by unknown assailants. That rate, which correlates well with all forms of intimate and familial violence, was as low as the rate for European American women: 0.3 or 0.4 per 100,000 women per year from the seventeenth into the early nineteenth century. Records note a murder method but rarely identify victims and assailants by more than a single name. In 1726, for example, Ben, a slave in Richmond County, Virginia, cut the throat of Winney, a slave on the same plantation. In Middlesex County, Virginia, in 1771 Abram beat and kicked Sarah so brutally that she died on the spot, and in 1795 Peter strangled Alice with a linen handkerchief. A number of murders occurred because of marital problems but involved other victims. For instance, in 1768 a slave in Williamsburg, Virginia, quarreled with his wife about her relationship with another man and was "so provoked" that he threw a hatchet, which hit an innocent bystander in the forehead.[41]

We can only speculate about the reasons for the low marital murder rate among African Americans. To begin with, it is unclear how many of them were full and willing participants in Anglo-American marriage

customs. In New England the pressure to marry was strong, and slaves were punished for fornication, adultery, or bearing illegitimate children. Some African Americans probably took part in Anglo-American marriage ceremonies simply to placate their owners or to avoid prosecution, although most who did so appeared to embrace them wholeheartedly. Religious and secular authorities formally recognized marriages among slaves and between slaves and free blacks and granted free blacks full marital rights.[42]

But many African Americans in New England firmly rejected traditional marriage in favor of unsanctioned marriages that could be entered into or dissolved at will. A few of them practiced serial monogamy, taking new partners as circumstances or preferences dictated. Boston Carpenter, a free black man, owned his wife and threatened to sell her if she misbehaved. Some enslaved African Americans had "abroad" marriages in which husbands lived apart from their wives and children. Abroad marriages, whether sanctioned or unsanctioned, had some advantages over cohabiting marriages. Slaves did not have to see their loved ones abused or have their own humiliations witnessed. Unsanctioned abroad marriages could also be dissolved easily if the partners were unhappy. Men simply stopped their conjugal visits. Women could end their marriages without risk to themselves or their children by asking their owners to bar their husbands from the property.[43]

Although abroad marriage had its advantages, there was still potential for discord. Spouses in abroad marriages rarely saw each other during the week, so there was ample time for infidelity, and competition for female companionship among black men was intense because there were far more black men than black women throughout most of the colonial era. Yet before the nineteenth century there is no evidence that an African American in New England ever killed a spouse or a romantic rival because of jealousy. The legal system may have played a role in suppressing violence in marriages among free blacks because of its willingness to punish adulterers. In many instances betrayed spouses had the satisfaction of seeing their spouses or romantic rivals fined or whipped.

Slaves in sanctioned marriages could also petition for divorce. In 1742 a slave named Boston accused his wife of having an illegitimate child by a white soldier, and the Massachusetts legislature granted his request for a divorce. However, it is likely that the fundamental deter-

rent to spousal homicide, at least for enslaved African Americans, was the ease with which they could dissolve unsanctioned marriages without recourse to law, simply by telling their owners, friends, and relatives they were no longer married. When slaves were freed some found it a great shock to learn that they would have to abide by the white community's rules. Chatham Freeman of Wallingford, Connecticut, married his wife legally after they and their child were freed in 1782, but he soured on the law a few weeks later. He was appalled when he found out that he could not set her aside and take another wife. "I never can stand it to be married to that woman!" he protested.[44]

Enslaved spouses probably spent little time together, especially in New England, where most slaveowners had few slaves; so there was less time for murderous violence to ferment. Many free blacks who married slaves did not live with their spouses either, usually because they did not wish to live as quasi-slaves. Free blacks often tried to purchase their spouses and children, and slaves sometimes tried to persuade their owners to buy their spouses and children from other owners. Venture Smith, an enslaved farmhand who lived in Stonington, Connecticut, prevailed upon his owner to purchase his wife and daughter, who lived with Smith's former master in Rhode Island. But Smith's household was shattered one day when his mistress flew into a "violent passion" and beat his wife. Smith took the horsewhip out of his mistress' hand and threw it into the fire. For this offense he was sold. It took him twenty years to purchase himself and his family, and he was fortunate that the owners were willing to sell.[45] Smith's marriage was precious to him, and when slavery made it difficult to sustain, it took on even greater value. Under such circumstances one would expect low spouse murder rates.

Free blacks had a greater chance of realizing the Anglo-American ideal of marriage. Chloe Spear, who was sold into slavery as a child and carried from Africa to Boston in 1762, married her husband Caesar while both were still slaves, but they were freed soon afterward by the abolition of slavery in Massachusetts. They saved enough money to open a boardinghouse for seamen and day laborers. Their marriage had its ups and downs. Chloe was more devout and ambitious than her husband, who took life as it came, but she accepted that her husband was "of a different turn of mind from herself, and not seriously disposed," and they got on well enough. Determined to get ahead, she

joined the Baptist Church, learned to read, took in washing, cleaned houses, and brought home gifts of "cold meat and vegetables" from the families she worked for. Caesar cooked, cleaned the house, and looked after their seven children. Although roles were reversed in their marriage, theirs was an archetypal New England union in every other respect, with both partners working to achieve prosperity and economic independence.[46]

African Americans in the Chesapeake were under less pressure to adopt Anglo-American marital practices. The laws of Maryland and Virginia did not sanction slave marriages, so enslaved spouses were free to abandon unhappy marriages and form new ones. Legal action against wayward spouses was not an option, because, unlike their counterparts in New England, the courts in the Chesapeake refused to defend the sanctity of slave marriages. There were some indications that murderous jealousy was a serious problem within African American marriages and between male romantic rivals. Jealousy may have been especially severe among slaves who lived on small plantations, because it was difficult for them to find mates and to keep their families together when slaves were moved or sold. In Virginia in the mid-eighteenth century, a fifth of all enslaved women on large plantations lived as single parents, but nearly three-fifths of the women on small plantations did so.[47]

By the early nineteenth century there were additional remedies for unhappy marriages available to some slaves and free blacks. Those who belonged to interracial churches could ask that unfaithful spouses be excommunicated, and free blacks could bring charges against adulterous spouses in court.[48] Still, probably the greatest deterrent to marital murders among African Americans was their growing sense of solidarity. By the end of the eighteenth century their awareness of themselves as a people apart, beset by white evil, led to a general decline in the rate at which they murdered one another and an increased reliance on one another for emotional and material support, both inside and outside marriage.

## Marital Homicide among Native Americans

The only people in the Anglo-American world to have very high rates of marital murder were Native Americans. In New England, the only

place where reliable data are available, the rates for Native Americans who lived in or on the fringes of white society were twenty times those of Europeans and African Americans. The problem was worst in the mid-eighteenth century, when murders of unrelated adults also peaked among Native Americans. The pattern is indicative of the strain that the loss of their remaining lands in southern New England and continuous warfare in northern New England put on Native American families and communities. That strain was compounded by discrimination, especially against Indian men. The only jobs open to them in the white economy were in dangerous occupations like whaling, seafaring, and military service, which kept them away from their families and claimed many lives. The ratio of Native women to men stood at four to three in Massachusetts by 1764, and at three to two in Connecticut by 1774. Poverty, depression, and alcoholism were epidemic.[49]

The rates of every kind of homicide went up among Native Americans during the eighteenth century, but spousal murder appears to have been a persistent problem among Native Americans in colonial New England, with high rates even in the late seventeenth century. Sources on Native Americans seldom speak about the motives behind marital murders, and when they do, they usually reflect white views of Native American character or white misunderstanding of Native marriage, which could take diverse forms. Although most Natives had monogamous marriages for which the approval of kin had been sought and dowries paid, tribal leaders sometimes had polygynous marriages, and some Natives had more informal relationships that were contracted and dissolved by mutual consent.[50]

The accounts of early colonists all agree, however, that marriages among Native Americans were prone to violence. Father Pierre Biard, the first Jesuit missionary to Acadia and Maine, complained in 1613 that Abenaki and Micmac husbands were cruel to their wives. "The husbands beat them unmercifully," he wrote, "and often for a very slight cause. One day a certain Frenchman undertook to rebuke a Savage for this; the Savage answered angrily: 'How now, have you nothing to do but to see into my house, every time I strike my dog?'"[51]

Christopher Levett, an English trader on the coast of Maine, found that his Abenaki friends were incredulous when he told them that his wife had refused to cross the Atlantic alone to be with him and that he

would have to fetch her. They "wished me to beate her. I told them no, for then our God would bee angrie. Then they runne out upon her in evil tearmes, and wished me to let her alone and take another, I told them our God would be more angrie for that. Againe they bid me beate her, beate her, repeating it often, and very angerly." William Wood, an early settler at Massachusetts Bay, was appalled by the "customary churlishness and savage inhumanity" of Native husbands in southern New England, but he believed that the arrival of the English only made matters worse, because the Native women, "seeing the kind usage of the English to their wives do as much condemn their husbands for unkindness and commend the English for their love, as their husbands—commending themselves for their wit in keeping their wives industrious—do condemn the English for their folly in spoiling good working creatures." Wood also noted that abused Native American women sometimes fled to English households for protection, and he knew several English women who had threatened to scald Native American men who tried to reclaim their wives.[52]

Although there were probably some differences in marital homicide rates among different groups of Native Americans, no European observer made any attempt to differentiate among peoples or made note of any problems that might have intensified marital violence among particular groups. Yet their testimony about wife abuse is consistent. Marital violence among Native Americans was rampant, and it claimed many lives. Some women were killed with hatchets, but most were beaten to death. Some of the violence was no different from white violence: people attacked their spouses in a moment of anger and killed them without meaning to. In 1786, for example, Sage Combs was beaten to death by her husband as they sold baskets and brooms door to door in Salem, Massachusetts. She stubbed her toe as she stepped over a stone wall and sat down momentarily. Her husband, Isaac, frustrated at having to stop, accused her of "carelessness" and hit her. "I struck her twice on her forehead, with a Walnut Stick with several knots in it. The blood gushed from the wound and I then struck her on her Temple with a Sharp Stone." He tried to staunch the bleeding with grass, dirt, and sugar, but the wound was too deep.[53]

A higher proportion of Native American spousal murders were deliberate, however. One man threw his wife out of a window in 1670, while they were lodging at an Englishman's house in Roxbury, Massa-

chusetts. Josiah, a day laborer in Dartmouth, Rhode Island, beat his wife, Margaret, and then shoved her into the fire and let her burn to death. At least one killing anticipated the kind of brutal violence, some of it sexually charged, that would not appear among whites or blacks in the United States until the mid-nineteenth century, when changing gender roles created deep reservoirs of rage in men who were unable to adapt to the new balance of power between women and men. In 1722 Hannah Ompatawin of Natick, Massachusetts, testified before she died of her injuries that her husband had beaten her so viciously that even as he was hitting her she knew she would not recover from the assault.

> I . . . would do any thing in reason to gratify him which I was able, yet nevertheless he flung me down and rent my thigh open forceably, and held me down & violently punch[t] or Strook me with his knee in my private parts while he beat me almost off the place where I lay then he pulled me on agin and punch[t] with his knee agin in ye Same place While he gave me my deaths Wound, I told him them boards we lay on Would be a witness aginst him yt he had kill'd me & give me my deaths Wound.[54]

White contemporaries claimed that Indians had a moral code that dictated their response to marital problems. If a woman committed adultery, for example, many tribes allowed the husband to throw her out of his home and kill her lover. Yet in many cases husbands killed both wives and lovers, with no apparent sanctions. A Penacook who lived on the Merrimack River near present-day Concord, New Hampshire, pursued his wife upriver after she eloped with a tribal chief named Peorowarrow. He discovered them asleep on Sewall's Island. He would not kill them as they slept, so he lay in wait all night and shot them with a rifle as they boarded their canoe the next morning. In 1793 Tobias Cayes and his wife Sarah were visited by a friend from Providence, George Pinny. The three went to a tavern in East Hartford to celebrate Christmas, and by the time they started for home they were drunk. The next morning, Cayes found his wife and Pinny in the barn, "clasp'd in each other's arms." He stabbed them both with a pitchfork.[55]

The surviving sources are either silent about motives or hopelessly prejudiced against Indians, so it is not clear why Native American men

who were angry at their wives did not simply leave them. Most Native Americans, even those who were Christians, seem to have believed that marriages could be dissolved at will, without any risk of community censure. Yet a man's honor still rested on his being the dominant partner in marriage and on exacting fidelity from his wife, even though the double standard for men and women where extramarital sex was concerned was not as pronounced as it was in the white community.[56]

The conflict between the idea that women should remain subordinate to men and the customs that gave women a great deal of personal and economic freedom set Native American men and women at odds, and as the white culture became dominant, their relationships were increasingly disrupted. They rarely turned to churches or the courts for help in restraining violent partners or to seek punishment for adulterers, as Europeans and African Americans did, and colonial authorities seldom took an interest in cases of adultery, desertion, or domestic violence involving Native Americans. Missionaries and Native judges tried to fill the gap by adjudicating cases that Native men and women brought before them, but their rulings had only a modest effect, because they were often ignored by the offending party. A near-complete division of labor also led to a lack of mutual dependence among married couples and to greater economic independence for wives. For the most part women had to keep households going by themselves. They gathered food, tended crops, earned wages as domestics, and made baskets for sale. Men were often away from home hunting, earning wages, or fighting wars. For men especially, the arrival of the whites had meant devastation: the encroachment of settlements upon hunting land, humiliating defeats in battle, the deaths and enslavement of friends and relatives, the disappearance of traditional ways to earn status. These losses undermined the status hierarchy among Native Americans so severely that they translated not only into an increase in violence among unrelated men, but into jealousy and violence in men's relationships with their wives. As they lost status in society, men began to feel diminished in the eyes of their wives, who were learning ways of making a living on their own. The more diminished men felt, the more abusive they became.[57]

To make matters worse for Native American men, a growing number of Native American women began to marry African Americans. In part this trend resulted from a relative dearth of Native American men

and African American women, but Native American women had also quickly discovered that African American husbands were less likely to abuse them and more likely to live at home and support their families on a daily basis. Of course, not every African American involved with a Native American woman was nonviolent. Samuel Freeman of Ashford, Connecticut, beat his common-law wife to death in 1805. Generally speaking, however, African Americans husbands were substantially less homicidal than their Native American counterparts. The preference of many Indian women for black husbands "created a very bitter feeling among the Indian men against blacks."[58] They also resented African American men because once they became members of the tribe by marriage, they were rival claimants for scarce tribal resources.

## Romance Homicide

Homicides in which suitors killed their lovers or romantic rivals were even rarer than marital murders in America and England from the sixteenth through the early nineteenth centuries. Like the marital murder rate, the romance homicide rate did not rise and fall with the rate of murders among unrelated adults, because these homicides did not stem from the same feelings and beliefs that prompted unrelated adults to kill one another. Romance homicides had their own distinctive causes, but they appear to have been deterred by some of the same forces that prevented marital homicides: legal remedies and the support of family and friends.

Before 1800 there were only two known cases of romance murder in New England. In 1719 Reuben Hull, a young farmer from Westerly, Rhode Island, shot and killed Freelove Doliver. He had courted her for several months, and when she ended their relationship he was furious. His jailers remarked upon his lack of remorse: he was "obdurate" even as he made his way to the gallows. Abigail Dent, a seventeen-year-old boardinghouse servant from Portsmouth, New Hampshire, was probably killed by a former lover. The chief suspect was a sailor named Thomas Paschal. She was last seen in his company, and they were arguing about Dent's relationship with another sailor. Her body was found later that week in a swamp about a mile from town. Paschal was the only suspect, but his messmate swore that he had been in their room asleep at the time of the murder, so no charges were ever filed.[59]

In the Chesapeake, only one romance homicide came to public attention. One Sunday evening in 1792 Daniel Yowell, who lived in a remote, mountainous section of Culpepper County, stabbed sixteen-year-old Nancy Clark to death at her home. Her mother tried to save her, but Yowell turned on her and slashed her face to the bone before he cut Nancy's throat and disemboweled her. Yowell tried to kill himself, but he managed only to cut his windpipe.[60]

Contemporary commentary indicates that people were astonished by these murders. Romance homicide was almost unheard of in the early modern Anglo-American world. Certainly young people who were rejected were hurt as deeply as young people are today, and occasionally they reacted violently to rejection. Young women in England were known to "faint, cry in the street, or weep and beg" when young men spurned them, and in Massachusetts it was said that women often became "either melancholy or mad." Young men may have been even more vulnerable to rejection because they were the ones to take the initiative in most courtships and their disappointments were more public. It was common for them to react "with rage, anxiety, or madness." In seventeenth-century London, Sage Pover's suitor threatened to hang himself if she did not accept the ring he had bought her. Thomas Bedle went on a rampage after Margaret Inman rejected his marriage proposal and "did faine himself madd or distempered for the love of hir. . . . He brake one of his neighbours glasse windows and rann a knife at one of the servants of the said house and beat or strock the master of the said house." After his fiancée broke off their engagement, Samuel Truett proclaimed on a public street that "I have done my endeavour as far forth as any man to get Nan Collins . . . with child, and if she proves with child, I will keep the bastard, but let the whore . . . go and be damned."[61]

A few young men sent friends to intimidate their lovers into taking them back, but very few rejected lovers ever made any attempt to kill the person they loved or the rival who supplanted them. Young people usually recovered rapidly from romantic setbacks, in part because of the emotional support they received from friends and relatives. Most of them did not get serious about marriage before their early twenties, and by that time they also had some experience with the emotional ups and downs of romance, thanks to a youth culture that facilitated relationships. Adolescents were encouraged to pair off at dances,

holiday celebrations, and informal gatherings, and no one thought the worse of them if they moved from one relationship to another. Friends, siblings, and parents helped young men and women get over their disappointments. John Lee of Virginia told his brother Richard in the 1750s that he was fortunate to have escaped the "inferior" girl who turned him down, and he urged Richard to try again with a more suitable person.[62]

The rituals of courtship were also instrumental in deterring romantic violence. Formal exchanges of words, gestures, and gifts enabled young men to declare their interest in young women without investing too much emotion and gave young women graceful ways to encourage or discourage such interest. No one had to risk too much, at least publicly. If the exchanges continued to the point of intimacy—holding hands, sharing food, drinking from the same cup—their behavior alerted parents and friends to the seriousness of the relationship and was a cue for them to offer guidance and support.[63] Such customs lessened the possibility of violence by giving young people a degree of emotional protection.

If a woman allowed herself to become too deeply involved with a man before the relationship failed, she could seek redress by suing for breach of promise. Promises of marriage were binding and could be upheld in court if there were witnesses to the promise or evidence of a serious courtship (particularly exchanges of gifts). However, young women seldom went to court unless they were pregnant and had been abandoned. Sarah Ward of Middlesex County, Massachusetts, testified that Zechariah Maynard "often showed much love to me and promised to marye me. I did not think he would Runawaye and leave me in this condition." Young women who sued often won financial compensation, and they tarnished the reputations of the young men who had wronged them, but also, and perhaps most important, they defended their own reputations in court by proving that they had slept with a man only on the promise of marriage—a widely tolerated if not commended practice. Going to court was not a happy remedy, but it defused potentially violent situations by exposing them to public scrutiny.[64]

The Romantic movement, which swept across the Anglo-American world in the second half of the eighteenth century, raised the emo-

tional stakes in courtships by encouraging a greater investment in intimacy and more open expressions of love. By the early nineteenth century the proportion of fiction and nonfiction articles in American magazines that glorified the expression of feelings in romantic relationships had risen from 18 percent to 57 percent. Yet there is no evidence, at least through the 1820s, of an upswing in possessiveness or jealousy. Young people were not abruptly persuaded that their happiness might depend wholly on the love of a particular person.[65]

The impact of the Romantic movement was tempered by practicality, and its assumptions were initially regarded with a critical eye. Dwight Foster, a young New Englander, noted in 1780 that "there is something heavenly in the Passion of Love—but the Misfortune of it often makes a Man act in a very ridiculous Manner—even a Man of Sense is frequently unable to command himself when his heart is affected by this Passion." Despite its positive associations, romance was associated with immaturity and a loss of reason. Even the young urged caution around it. One woman advised her friend not to be "so symple to send to her sweet hart and woo him." A young man told a friend that it was "not necessary for him to say that he was in love before he knew whether he was beloved." By the early nineteenth century, 58 percent of all articles in American magazines declared that love and happiness were the most important considerations in choosing a partner. However, 42 percent agreed that young people should still take into account practical considerations such as wealth and status.[66]

Although the Romantic movement celebrated complete candor in intimate relationships, women were still encouraged to remain modest and to be wary of male intentions, and men were advised to be guarded and to conduct themselves at all times with unflappable aplomb. Of course, sometimes that behavior achieved the desired end, and sometimes it did not. James Barnard, a young seaman from Massachusetts, was disappointed when the woman he loved turned down his proposal. "She did not know the strength of my feelings, she could not. I had guarded myself with the utmost care—too proud to let anyone know he or she had the power to mar my peace one moment."[67]

There is no record of African Americans in New England committing any romance homicides from the seventeenth through the early nineteenth centuries. The absence of any evidence of such murders is

remarkable, given that more and more African Americans, no longer subject to the arbiters of marital alliance who dictated the terms of courtship in sub-Saharan Africa, adopted the Anglo-American practice of marrying for love and were able to court and marry during that period. Venture Smith proudly proclaimed that he had married his wife Meg "for love." Christopher G., a free man from Newport, Rhode Island, wooed his cousin, Elleanor Eldridge, with walks along the beach and romantic letters. "I have thought of you, almost with one thought, since I left. How strange it is that wherever I look I see nothing but my dear Ellen." He signed his letters "true lover." Such courtships were conducted publicly and with the encouragement of friends and relatives (and, in slave times, owners).[68]

There may have been a wider range of courtship practices among African Americans in the Chesapeake, where a greater number of Africans, enslaved and free, held European culture at arm's length. Whereas most slaves in New England were sold singly and few lived near relatives, slaves in the Chesapeake were sometimes purchased with their families or fellow villagers and were able to sustain a few of their traditions. As a result some young men had to win the blessing of a young woman's mother or a female elder before they could marry. Philip Coleman, a former slave, "took a great fancy" to a young woman, but her mother "put up so strong [an] objection that the wedding was called off." Caroline Johnson Harris said that young couples in her quarters had to get permission to marry from "Aunt Sue," who asked young people to think hard about marrying for a couple of days, because marriage was sacred. The advice and instruction of experienced elders may have helped to moderate violent emotions and deter hasty decisions.[69]

On the whole, however, young African Americans in the Chesapeake, especially those who were enslaved, were not as closely supervised in their courtships as their counterparts in New England, and this lack of oversight may have made romantic relationships more susceptible to violence. The circumstances of homicides among African American adults are largely unknown in the South before the Civil War, so it is impossible to know how many romance homicides occurred, but it is likely that failed suitors committed a number of such murders. In Louisa County, Virginia, for instance, a man named Boat-

swain murdered Rachel and Will, most likely because Rachel had rejected him and he believed that Will had alienated her affections. In Henrico County, Virginia, a slave named Stephen visited a neighboring plantation and asked a young woman to marry him. She refused. A witness testified that Stephen then declared that he was "determined to murder this night." He returned after dark and found Aaron, another slave, in bed with her and beat him to death. Given the rate at which enslaved African Americans began and ended courtships in the Chesapeake, and the absence of strong mechanisms, formal and informal, to keep jealousy, possessiveness, and premarital sexuality in check, romance homicides may well have been more common among Chesapeake slaves than among free blacks or New England slaves.[70]

Among Native Americans in New England, there was only one known instance of romance homicide in the colonial or revolutionary period. Toomalek was a member of a small band of Coos Indians who lived near the Connecticut River near present-day Newbury, Vermont. A short, powerfully built young man, he was in love with a young woman, Lewâ, who eventually married another Coos named Mitchell. Toomalek decided to kill Mitchell, and one evening he surprised the couple as they sat by their campfire. He fired at Mitchell, wounding him seriously but not fatally. A second shot struck Lewâ. She died of her wounds a few hours later.

Mitchell eventually remarried, but matters did not end there. One day Toomalek, in company with a white man named Ebenezer Olmsted, took a bottle of rum and went to visit Mitchell. They drank together for a while, and then Mitchell and Toomalek argued. Mitchell drew his knife and made a feeble pass at Toomalek, and Toomalek stabbed him through the heart.[71]

There is just not enough evidence to be certain about the number of romance murders among Native Americans. But since jealousy was frequently cited as a motive for murder among married Native Americans, and since the motive behind the majority of Native American murders is unknown, it is possible that murders of romantic rivals were more common among Native Americans than among other Americans. The freedom that most Native cultures in New England gave women to take up and discard lovers and the pressure those cultures placed on men to subjugate male rivals may have made romantic fail-

ure both more common and less tolerable for young Native American men, especially as traditional ways to earn status disappeared and all relations among unrelated men became more volatile.

## Homicide of Adult Relatives

The homicide rate among adult relatives other than spouses was low both in England and among European Americans in New England and the Chesapeake from the seventeenth into the early nineteenth centuries.[72] People rarely killed their parents, adult children, siblings (including in-laws and step-relations), aunts, uncles, nieces, nephews, or cousins. Relatives almost never killed one another for money or property, and they never killed one another over issues that often led to murder in many other early modern societies: a sexual transgression that threatened a family's honor, a dispute about the person a family member was to marry, or the failure of a relative to meet his or her customary obligations to kin. Because of the dynamism of the nonfarm economy in England and British North America, the greater availability of land in America, and the expectation that family members should make their own way in the world with only the help that their families could afford, Anglo-American families did not control the economic destiny of family members to the degree that families did in most Western societies. And as we have seen, Anglo-American families used the courts and public opinion, rather than violence, to deal with romantic and marital disputes. The family killings that did occur had much in common with spousal murders. They were usually the unintended consequence of mental illness, quarrels over trivial matters, or abuse.

In New England, where the best data are available, there were only three known cases in which a relative killed another relative over property. One of those cases occurred in 1688. Edward Hill of Boston conspired with his wife and neighbors to murder his wife's uncle, William Penn, and take possession of Penn's estate with a forged will. Penn had persuaded the Hills to migrate to Massachusetts to help him run his business and had promised to make them his heirs. Edward Hill turned out to be a ne'er-do-well, however, so Penn left his property to another relative in England. Unfortunately, Penn became ill and was forced to move in with the Hills. Edward abused him, stole from him,

and finally killed him. Then he offered three neighbors £10 each if they would swear to the authenticity of the will he had prepared. The scheme worked. Eighteen years later the rightful heirs had the fraudulent will overturned, but Hill was never tried for murder because there was no longer any physical evidence against him and because much of the testimony against him came from co-conspirators.[73]

In the Chesapeake, the data gathered so far include only one murder of a relative for property. John Berry, a down-at-the-heels young gentleman from Joppa, Maryland, thought that his prospects were secure after he married a wealthy heiress. She died soon after they wed, however, and he was afraid that his in-laws would disinherit him if he married the woman he loved, a young orphan who had been raised by his late wife. He therefore conspired with the family's servants in 1751 to murder his late wife's father and mother. He promised the servants cash or release from their indentures if they would kill the couple and conceal his role. On the appointed night, two women servants sneaked into their master and mistress' bedroom and attacked them with an ax. They killed their mistress outright, but their master was only stunned, and they could not bring themselves to finish him off. In a panic they called neighbors and claimed that robbers had been in the house, but their story quickly fell apart, and they and their fellow conspirators were arrested and convicted.[74]

A handful of homicides were committed by mentally ill relatives. But most murders of adult relatives were rooted in spontaneous quarrels between brothers or between fathers and sons. Baker Nason got into an argument with his brother Jonathan while they were paddling a canoe on the Piscataqua River near their home in Maine. Jonathan swung his paddle at Baker, and Baker swung back and accidentally killed him. The teenaged Samuel Frost quarreled with his father while they were digging a ditch in Princeton, Massachusetts, and hit him on the head with a pry bar. Since they were not premeditated, such homicides were adjudicated as manslaughters or negligent homicides.[75]

Of course, there was often more to a fatal quarrel than a sudden fit of temper. Men who were angry and depressed because they had fallen on hard times made up a sizable proportion of family murderers. Because they were often forced to turn to families for help, family members sometimes ended up as the targets of their wrath. Benjamin Tuttle, a middle-aged man, lived with his sister and brother-in-law,

John and Sarah Slawson, a prominent couple from Stamford, Connecticut. No one was happy with this arrangement. In November 1676 Benjamin and his sister got into an argument over a trivial matter. Slawson said that she wished her husband had eaten supper before leaving the house to go on watch. Tuttle replied that his brother-in-law could have eaten supper if he had wished. Slawson told Tuttle not to be "short" with her, whereupon Tuttle stormed outside, leaving the door wide open. Slawson asked her daughter to shut the door, but Tuttle reappeared suddenly and said, "I'll shut the door for you." He then struck his sister repeatedly with an ax, threw her into the fireplace, and watched her burn.[76]

Thomas Starr's life was also following a downward trajectory. To make matters worse, his fiancée had broken off their engagement because of some "ungentlemanly and capricious" act on his part. Starr was too overcome with "shame and remorse" to show his face in public. One evening he got drunk and stabbed his cousin, Samuel Cornwell, with a penknife. Cornwell had not done anything to cause Starr's troubles: he just happened to be there when Starr snapped.[77]

The colonies saw very few cases like these. Yet homicides among adult relatives can be common in societies where resources are scarce and where kinship largely determines a person's chances for marriage, property, or status. Under those conditions relationships among adult relatives are often explosive. In rural France, where population pressure was intense in the seventeenth and eighteenth centuries, and land was scarce and nonfarm opportunities limited, fathers who owned land controlled the fate of their children. Under the prevailing custom of primogeniture, they chose one of their sons to inherit everything. Sometimes they also burdened the inheriting son with punishing financial obligations before he got control of the property. The custom led to high rates of fratricide and parricide well into the nineteenth century.[78]

Economic opportunities were greater in the Anglo-American world (especially for those willing to migrate), and most parents and kin played a supportive rather than a determining role in the lives of their relatives. The goal of the Anglo-American kinship system was to help each family member create an independent household. Relatives recognized that everyone might need some help to achieve that goal. To

ensure that an able-bodied relative did not become a burden and endanger the independence of anyone's household, the system set informal limits on help for those who could not help themselves. Adults were free to marry and to earn a living as they saw fit, but they had to succeed largely on their own. These imperatives created a flexible system of kin relations in which there were few formal obligations but many informal ones.[79]

Because parents and adult children, including in-laws, had the strongest bonds and obligations and often lived in close proximity, they were more likely than other relatives to kill one another. Parents were expected to help their children establish their own farms, shops, and households, and children were expected to contribute to the household while they were young and to help parents in their old age. Parents and adult children were also expected to help one another during crises. Other adult relatives seldom provided direct financial support, although they arranged jobs for relatives, extended loans and credit, facilitated migration, and offered support to relatives who moved into their communities. None of these acts were obligatory, but they gave extended families strong emotional bonds and an economic advantage over families with fewer ties.

Still, the fate of adults, especially outside farming, depended less on blood relatives than on spouses, employers, neighbors, and local governments. And because American society was so mobile, people often found themselves living far away from their families and leading very independent lives. As a result of this mobility, troubled relationships among adult relatives were seldom crippling. They could be abandoned or replaced by relationships with nonkin, especially through dissenting churches and other voluntary associations. The ease with which people formed these new connections diminished the likelihood of violence among adult relatives.

The rate at which European Americans murdered adult relatives in New England, Maryland, and Virginia was not constant. It was always low, but it did increase over time. In New England it rose from zero before King Philip's War to 0.1 per 100,000 per year from the late seventeenth through the mid-eighteenth centuries. In the Chesapeake it rose from zero before Bacon's Rebellion to 0.2 per 100,000 per year.[80] However, the differences are so small and the reliability of the

seventeenth-century estimates is so limited that this pattern may not be significant.

Part of the explanation for the absence of homicides of adult relatives in the pre-1675 records is that adults were not as densely interrelated in the early colonial period as they would be later. Most emigrants came to the New World alone or in the company of a few close relatives, rather than as members of extended families, and death rates were initially high. It took several generations to create extensive kin networks. It is also possible that mutual dependence suppressed homicides of adult relatives in the early colonial period. Parents and adult children needed one another if they were to escape the poverty of the initial years of settlement. The same was true of other family relationships on the frontier. A young woman traveling west in 1810 remarked upon how much more important relatives were in the Ohio wilderness. "A cousin in this country is not to be slighted," she wrote. "I would give more, for one in this country, than for 20 in old Connecticut."[81] As interrelatedness increased and as the need for cooperation became less pressing, the possibility of deadly conflict increased, because relatives were treated more like any other adults. In fact, by the mid-eighteenth century the circumstances surrounding murders among adult relatives in southern New England and the Chesapeake made them look much like murders among nonrelatives, and the rates of the two kinds of murder began to go up and down together.

There is no record of African Americans in New England committing murders of other adult relatives in the seventeenth or eighteenth centuries. That fact, too, is remarkable, given the increasing interrelatedness of African Americans by the late eighteenth century. Again, the adoption of Anglo-American kinship practices may have helped prevent violence. Kinship obligations were not as extensive or binding among African Americans as they were among most African peoples. African Americans in New England viewed adult relatives much the way European Americans did: as allies who would help them in times of need. Most African Americans adopted Anglo-American kinship beliefs, especially the idea of bilateral descent (from both the mother and father). Bilateral descent limited the power of kinship. Where descent was patrilineal or matrilineal, as it was in most African societies, many people belonged to each clan or kin group; but where descent was bilateral, only siblings shared a common set of kin, and only par-

ents and children had formal obligations to one another. Initially the transition to bilateral kinship beliefs left many African Americans feeling bereft, but the shift opened the way for them to develop closer relationships with nonrelatives like godparents. By the mid-eighteenth century these ties helped African Americans in New England develop an intense sense of solidarity and fellow feeling that left them unlikely to murder one another whether they were related or not.[82]

It is impossible to know how often African Americans murdered adult relatives in the Chesapeake, because records do not indicate whether victims and assailants were related. Still, murders of adult relatives were probably rare, because lethal violence by men against women—a good proxy for all forms of intimate and familial violence, as noted above—was rare. There were undoubtedly more opportunities to murder relatives, since African Americans, slave and free, built more extensive family networks in the Chesapeake than they did in New England, and family played a larger role in their lives.[83] As in New England, however, there are no signs that family networks determined the fates of individuals as much as they did among many peoples in Africa. Relatives played a supportive role, as they did among European Americans, and so they may not have been the objects of murderous rage. And as in New England, the greatest deterrent to murder among African Americans in the Chesapeake was probably the growing sense of solidarity among them. By the end of the eighteenth century they were no longer an aggregate of disparate tribes cast up on an alien shore, their families dead or dispersed. They had densely interrelated families, and they had an awareness of themselves as a distinct people.

Whether Native Americans in New England were more likely to murder adult relatives during the seventeenth and eighteenth centuries is unclear. Known murders of relatives were rare and do not appear to have been a persistent problem. The five known homicides of adult relatives were confined to the mid-eighteenth century, when marital murders and murders of unrelated adults also peaked. In 1726 an Indian man went on a rampage in Colchester, Connecticut, killing two of his children and his brother before killing himself. In 1728 Jacob Swamp brutally murdered his brother, stabbing him so many times that his own clothes were soaked in blood. In 1769, at a dance in Stockbridge, Massachusetts, two brothers got drunk and beat each other so badly that one died the next day. Suicidal depression, murder-

ous rage, and drunken quarrels were common among Native Americans in the mid-eighteenth century, a further sign that warfare in northern New England and loss of land in southern New England had a disastrous effect on the morale of Native Americans and led to violence both inside and outside families.[84]

# "A Sense of Their Rights"

*Homicide in the Age of Revolution*

Although rates of family and intimate homicide remained low for most people in western Europe and North America well into the nineteenth century, the long decline in homicide among unrelated adults ended amid the revolutionary turmoil of the late eighteenth century. The political stability that had prevailed through most of the Western world since the mid-seventeenth century was shattered by a succession of revolutions, civil wars, and military conquests. National loyalties and faith in government were strained and sometimes destroyed by revolutionary ideas, popular protests, and divisive wars. Some regimes collapsed, and those that survived found it difficult to reestablish their authority and revive patriotic feeling among their citizens. Beset by treasonous plots and rebellions and plagued by threats from abroad, newly emerged governments floundered. Their citizens fell to squabbling among themselves over politics, questioning one another's loyalties and refusing to obey laws or administrations they considered illegitimate. The three most important correlates of homicide were thus in place in much of the Western world during the Age of Revolution: political instability, a loss of government legitimacy, and a decline in fellow feeling among citizens. Together, these conditions created the feelings of anger, alienation, and powerlessness that caused homicide rates to spike.

Nowhere was the rise in homicide greater than in revolutionary

145

France. The collapse of the ancien régime, which had governed with a strong hand since the late seventeenth century, led to a brutal struggle for power that lasted from the fall of the Bastille in 1789 until 1802, when Napoleon ended the French Revolution by establishing a dictatorship. By the mid-1790s the homicide rate probably ranged from 30 to 80 per 100,000 adults per year in eastern, southern, and western France, where the republican government was weak and citizens were divided by the Revolution or openly hostile to it. The homicide problem may have been less severe in and around Paris, where the post-Jacobin government had established its authority. But the actual homicide rate for all of France will probably prove to have been 40 per 100,000 adults per year or more, once government and newspaper accounts of homicides are taken into account.[1]

France was not the only Western nation to experience a dramatic rise in homicide during the Age of Revolution. In England and in Sweden, the two countries for which national statistics are available, homicide rates doubled between the 1780s and the 1830s. According to studies of selected towns, homicide rates also appear to have doubled in Germany, Switzerland, and Italy. The rate rose to 20 per 100,000 adults per year in Geneva after that city-state's elite crushed an uprising in 1782 led by the Représentants, the delegates to the lower house of Geneva's ruling council, who had demanded political equality for lower-ranking citizens. In Leiden the rate rose to 30 per 100,000 adults per year after 1801, when Napoleon imposed an authoritarian government on the Netherlands. Rates fell gradually in Canada, where political calm prevailed until the Patriote uprising of 1837, but they increased everywhere else as political stability, faith in government, and national feeling faltered.[2]

Homicide rates among unrelated adults in the United States did not follow a uniform pattern, but in the states and counties studied intensively the number of homicides soared wherever the Revolution divided people into Tory and rebel camps. In other words, homicide rates were highest where the struggle for power between Tories and rebels—and between the British and Continental armies—was most intense. In the countryside around New York City and Philadelphia, in the Ohio Valley, and in the backcountry from southwestern Virginia to northwestern Georgia, homicide rates reached seventeenth-century levels as governments collapsed, law and order broke down,

and neighbor turned against neighbor. For most white Americans, the Revolution was profoundly disruptive and divisive, but in those areas it was a genuine civil war. The criminal justice system disbanded or became the partisan tool of whoever was in power locally. Vigilante and revenge killings ensued, some motivated by politics, some not. As in revolutionary France, the proliferation of politically charged homicides was matched by an increase in garden-variety homicides as individuals adopted the same hostile and predatory attitudes toward their neighbors that political partisans showed toward their opponents. The extremely high homicide rates persisted until the end of the War of 1812, when they finally returned to the levels that prevailed in the rest of the nation.

Homicide rates doubled even in places where the struggle for power between Tories and rebels was intermittent or short-lived and the criminal justice system remained effective, like New England and the Chesapeake. In colonies that experienced political violence during the imperial crisis of the 1760s and early 1770s, like Pennsylvania, Massachusetts, and North Carolina, the increase in homicide began before the Revolution as the withering of British patriotism and the erosion of loyalty to the governments imposed upon the colonies by the crown undermined the fellow feeling that had kept homicide in check since the late seventeenth century. And in most communities within those colonies, the revolutionary movement was too divisive for solidarity to be reestablished while the outcome of the Revolution remained in doubt. But in places like the Shenandoah Valley of Virginia, where the Revolution won broad support and caused little disruption, the homicide rate among unrelated white adults continued to fall in the late eighteenth century. Homicide rates also continued to fall for African Americans in the South and in New England. Blacks were less likely to be murdered by whites and by one another, in large part because of the vitality of the antislavery movement, which freed many slaves and increased humanitarian regard for blacks. The movement also forged greater solidarity among blacks and gave them hope for a better future.

Wherever government broke down, political, robbery, and revenge homicides proliferated. The political upheaval undermined existing loyalties and institutions and made people from all walks of life more impatient with legal and economic restraints and more sensitive to

personal slights. Ordinary men were suddenly more likely to kill to defend their reputations, property, or rights. Public men—politicians, military officers, attorneys, and newspaper editors—were particularly vulnerable to the Revolution's disruptive effects. In a republic that had yet to develop strong parties or political institutions, they were at the mercy of public opinion, and a surprising number of them died trying to defend their honor in duels.

The American Revolution might have had an even worse effect on the homicide rate if it had created a long-lasting economic crisis or a deep-seated disruption of the social hierarchy. Life was difficult for the poor in America's largest cities—Boston, New York, and Philadelphia—and the urban poor were especially restive and violent in the late eighteenth century.[3] But in small towns and in the countryside, most people were still able to form households and to buy their own shops or farms, thanks to the British victory in the French and Indian War, which had opened vast tracts of land to settlement. African Americans everywhere looked forward to new opportunities because of the decline of slavery. In the slaveholding South, revolutionary ideas would challenge the social hierarchy and lead to a permanent increase in homicides there, but almost everywhere else the Revolution's impact on homicide was confined to the years between 1764 and 1790, when government broke down and fellow feeling withered.

The increase in all kinds of homicides among unrelated adults began the moment conflict between colonists and the government turned violent. Homicide rates rose in Pennsylvania, North Carolina, and South Carolina after revolts broke out in the backcountry in the 1760s over Indian policy, land policy, and the failure to grant newly settled counties adequate representation in colonial assemblies (Figure 2.2). The turning point in New England was 1770, the year of the Boston Massacre (Figure 1.2). In the Chesapeake politics remained nonhomicidal until 1775, when fighting broke out between loyalist and patriot forces (Figure 1.3). Many of the homicides that occurred were political or war-related. In southern New England and the Chesapeake, where the homicide rate for whites doubled, such homicides were probably responsible for a third of the increase in the 1770s and early 1780s. On the Vermont frontier and in the southern and western backcountry, political homicides were responsible for more than half the increase.[4]

The revolutionary conflict had a direct impact on the homicide rate everywhere, but in most parts of the country its indirect impact on the homicide rate was even greater. By eroding British patriotism, undermining the legitimacy of political institutions and political leaders of all stripes, weakening the legal system, and generally vitiating the social contract that kept the peace, the conflict that gave rise to political homicides generated more hostile, defensive, and predatory behavior and spawned other kinds of homicide, such as robbery and revenge murders.

### The Rise in Homicide throughout the Country

British patriotism had been on the wane since the mid-1750s. Colonists who served in the armed forces during the French and Indian War—probably one of every three adult males—saw British soldiers up close for the first time and did not like what they saw. They were stunned by the arrogance of British officers, who considered all colonials their inferiors, and shocked by their brutality toward enlisted men. They found regular British soldiers servile, profane, and impious.[5]

The colonists were further alienated by the Stamp Act, which made it clear that their interests were not safe in British hands. Many of them began referring to themselves explicitly as "American" rather than "British." In colonial newspapers the proportion of references to the colonies as "British" or "royal" fell from 38 percent before the war to only 6 percent by its end; references to the colonies as "American" rose from 20 percent to 43 percent. The share of implicit references to the colonies as American also rose, from 5 percent to 17 percent. The erosion of British patriotism was also evident in the names colonial assemblies gave new counties. The proportion of new counties named for British notables fell from 81 percent in the first half of the eighteenth century to 64 percent in the third quarter of the century as disputes over colonial policies intensified. It then plummeted to 18 percent from 1775 to 1789, and to 2 percent in the last decade of the eighteenth century (Figure 2.1).[6]

In New England anti-British feeling generated political homicides long before the war began, during riots against British officials, soldiers, and sympathizers. Ebenezer Richardson was a Boston customs

collector suspected of informing on merchants who were violating Britain's import and export laws. In February 1770 a mob gathered in front of his house and began to break his windows. He fired on them, wounding one young man and killing another. Less than two weeks later a group of young men began pelting British sentries with rocks and ice to protest the presence of British troops in Boston. The sentries opened fire, killing five protesters in what became known as the Boston Massacre. A mob was responsible for the death of John Taylor, a Tory from Washington, New Hampshire. According to local tradition, Taylor was being ridden out of town on a rail. Hoping to make his departure as painful as possible, a number of men grabbed his legs and began lifting him up off the rail and slamming him down again. His scrotum got caught on a splinter, his testicles were torn off, and he bled to death.[7]

Once the Revolution got underway, it became difficult to distinguish between homicide and acts of war. After the British army withdrew from New England in March 1776, many loyalists fled, and the patriots were left in firm control of Massachusetts, New Hampshire, and most of Connecticut and Rhode Island. They posted sentries to apprehend loyalist spies, and they established prisoner-of-war camps. Occasionally sentries shot travelers who refused to identify themselves, sentries were themselves shot by spies, and prisoners of war were shot while trying to escape. Some of these killings ended up being adjudicated as homicides, although in most cases verdicts of manslaughter were returned.[8]

In Vermont, southern Connecticut, and eastern Maine, where the patriots did not have firm control, the situation was much more chaotic, and it was more difficult to prosecute political killings. The British staged raids from New York, Long Island, and Canada throughout the war, sometimes with the help of loyalists, and loyalists staged raids of their own. Both loyalists and patriots ambushed and killed people they knew to be political enemies. When the struggle for control of western Vermont intensified in 1777 in anticipation of a British invasion from Canada, neighbor turned against neighbor. John Irish, a loyalist farmer from Tinmouth, was ambushed and killed near his home by an unknown patriot. David Mallory, a medical student from Arlington, was killed by a group of loyalists led by Mallory's teacher, Dr. Samuel Adams. A few people took advantage of the political situation

to settle scores. William Prindle, for example, a farm laborer who claimed to be a loyalist, struck a blow for England by killing his patriot employer and cutting off his head.[9]

Internal divisions also claimed lives in New England during the revolutionary period. Conservative patriots were pitted against more radical patriots. Quarrels that might once have been referred to the courts or to colonial assemblies now led to armed confrontation. For instance, some Vermonters wanted independence from New York, while others had reason to be content with the status quo. In 1775 supporters of New York rule fired into a party of protesters who had gathered to prevent the sitting of a county court created by New York. Two men were killed. In turn Vermont's insurgent militia, the Green Mountain Boys, killed at least one supporter of New York rule while suppressing a pro–New Yorker rising in Windham County in 1784. In 1786–87 farmers in western Massachusetts rose against their own county courts to protest foreclosures and the low commodity prices and tight monetary policies that had caused them. The governor of Massachusetts called up militiamen from eastern Massachusetts to subdue the protesters, who were led by Captain Daniel Shays, a Revolutionary War veteran. In Springfield the protesters tried to seize a state armory guarded by the governor's militiamen, and the militia opened fire, killing five rebels and one of their own officers. The show of force persuaded most protesters to abandon the cause, but small bands continued to clash with the militia and with the governor's local supporters over the next four weeks. Those skirmishes claimed at least ten more lives.[10]

In Pennsylvania political discontent spawned a number of homicides in the backcountry in the 1760s, after the French and Indian War. The provincial government had advanced the interests of the Penn family and other land speculators, but it had not protected backcountry settlers against Indian attacks or given them adequate courts or representation in the colonial assembly. Many settlers, hoping that British rule would be more effective and disinterested, supported a campaign by the Pennsylvania assembly in 1764–65 to replace the proprietary government with a royal government. When that campaign failed, a militant minority took Indian policy into its own hands, determined to expel or exterminate the colony's entire Native population.[11]

The killings began in 1763, when soldiers massacred Moravian con-

verts at Lehigh Gap and Conestoga, and settlers burned a settlement of displaced Delawares, Mohicans, and Shawnees in the Wyoming Valley and assassinated their leader, Teedyuscung. After these attacks, murders of Indians almost became casual. Native Americans retaliated for these and other murders, initiating a cycle of murder and revenge that lasted through the Revolution.[12]

Since racial solidarity generally correlates with low homicide rates, the settlers might have been expected to set aside their own differences as they banded together against the Indians. They did not, however, because Pennsylvania settlers were as divided over Indian policy in the 1760s as Virginia settlers had been at the time of Bacon's Rebellion. Most citizens supported the state's attempts to restore peaceful relations with Native Americans. But settlers who lived on the frontier were furious with the proprietary government for refusing to lift a hand to defend them against Indian attacks. Their anger expressed itself in a complete repudiation of government institutions and officials. They would no longer turn to the state for help; instead they would settle disputes themselves. They soon produced prodigious homicide rates, especially in the Wyoming Valley in northeastern Pennsylvania. In the 1770s and early 1780s settlers from Pennsylvania fought for control of the valley with migrants from New England, who were sponsored by the government of Connecticut and its development arm, the Susquehannah Land Company. Dozens of people died. Settlers also attacked traders and government officials who appeared to be siding with Native Americans. The "Black Boys" of Cumberland County in south-central Pennsylvania attacked westbound pack trains that they believed were carrying arms to the Natives, and they fought British soldiers and Pennsylvania officials who tried to arrest them.[13]

As the Revolution got underway, clashes between Tories and rebels made the bloodshed even worse. Tories and their Native allies massacred over 200 settlers in July 1778. Political killings continued in the backcountry during the Whiskey Rebellion of 1794. At least six men died near Pittsburgh during protests against the federal excise tax on liquor.[14]

Southeastern Pennsylvania saw only a few political homicides during the Revolutionary era. Relations among non-Tories were tense, however, because the Constitutionalists, who controlled Pennsylvania's rebel government during the war, governed in a high-handed fashion, persecuting not only Tories but also neutrals, pietists, and lukewarm

patriots. In March 1777 the Constitutionalists passed a Militia Act, which compelled men between the ages of eighteen and fifty-three to serve in the militia or pay heavy fines; and three months later they passed the Test Act, which deprived men of their civil rights if they did not swear allegiance to the state. These acts disfranchised the majority of men in Pennsylvania and threatened to bankrupt Quakers, Moravians, and Mennonites, who could not swear oaths or serve in the military.[15]

Opponents of the Constitutionalists rallied around the Republicans, who favored an inclusive franchise, peaceful relations with neutrals, and waivers from military service for pacifists. They clashed with Constitutionalist militiamen in Philadelphia in October 1779, after the city's Republican leaders put an end to price controls and allowed merchants to charge whatever the market would bear. The militiamen were angry that the wealthy had left the fighting and suffering to the poor, and they attacked a house where Republican leaders had taken refuge. At least six people were killed and seventeen wounded in the showdown between the two factions. Militant neutrals formed neighborhood associations to resist tax collectors and military recruiters. William Boyd, a tax collector in Chester County, was killed on his rounds by such resisters in 1780. Political homicides were less frequent in interior counties than in the southeast or on the frontier, but they occurred everywhere in Pennsylvania during the Revolution.[16]

Unlike New England and Pennsylvania, the Chesapeake did not suffer any political homicides before the Revolution began. The only protests that ended in homicide occurred late in the war, during the British invasion of 1780–81, when Virginia imposed a military draft and requisitioned beef and clothing for its troops. The draft sparked riots in a number of counties. The rioters, most of whom lived on the frontier, the Northern Neck, or the Eastern Shore, had legitimate grievances. They did not want to be paid in Continental currency, which was nearly worthless, and they were afraid their families would be left defenseless against Indians, slaves, and loyalist raiders. County officials did not back down, however, and confrontations between militia and protesters left at least two people dead. The toll could have been much higher, but Governor Thomas Jefferson counseled restraint and told local militia officers to track down individual protesters at night and take them "out of their Beds singly and without Noise."[17]

During the war, however, the Chesapeake saw political homicides

wherever British forces were powerful enough to undermine patriot authority and encourage loyalist resistance. Such homicides occurred in 1775–76 in and around the adjoining towns of Norfolk and Portsmouth, where the royal governor, Lord Dunmore, ordered his forces to make their last stand. They also occurred throughout the war wherever the British navy and local loyalists raided patriot ships and plantations, and they appeared again when the British invaded Virginia in 1779 and 1780–81.

Patriots kept the upper hand on the Eastern Shore, another loyalist stronghold, despite constant raids by British and loyalist privateers on patriot plantations near the bay. Realizing that there was no hope of an immediate British landing, the loyalists kept a low profile, spying for the British and destroying patriot property. The patriots, who controlled the local government, found that mild sanctions like fines and peace bonds could keep the loyalists in check as long as the British army and navy focused their attention elsewhere. But the potential for violence was always there. In July 1781 a patriot planter came upon three loyalists trying to persuade one of his slaves to join a loyalist raiding party. The loyalists murdered the planter and fled, but the slave told neighbors what had happened, and the loyalists were hunted down. The posse gave them time to pray and then hanged them.[18]

The proliferation of politically charged homicides during the Revolution was accompanied by an increase in other kinds of homicides, especially robbery murders. The line between political murder and robbery murder was sometimes hard to define. Josiah Philips was already a convicted criminal when he declared himself a loyalist and was licensed by Lord Dunmore to rob patriots in the Norfolk area. His interracial gang, which at its peak had fifty members, stole livestock, burned buildings, and killed whoever tried to stop them. Most robbery murders, however, were committed by men who had no political affiliation or who had lost faith in the cause they were fighting for. They murdered their victims to prevent them from talking or killed the officers who uncovered their operations. The majority of them were never caught.[19]

Public violence weakened law enforcement and had a corrosive effect on personal morality. During the war, young men in particular were more liable to break with ordinary standards of right and wrong as they witnessed the violence erupting around them. Teenaged broth-

ers Barnett and Nicholas Davenport worked as farm laborers for a wealthy couple. One day they clubbed the couple to death, killed their three young grandchildren, looted their house, and set it on fire. Such cold-blooded murders, which had all but disappeared from New England after King Philip's War and from the Chesapeake after Bacon's Rebellion, reappeared once the revolutionary crisis began. Gun violence, where it can be measured, was also more common. In New England the proportion of political and nonpolitical homicides committed with guns rose from 13 percent before the Revolution to 52 percent.[20] The increase suggests that more of these homicides were premeditated.

Retaliatory and vigilante murders also increased, at least among whites. Occasionally these murders occurred among criminals. In 1779 Younger Hardwick apparently killed fellow gang member Erasmus Whitworth in Amelia County, Virginia, because Whitworth had stolen part of Hardwick's share of the loot. But most perpetrators and victims were law-abiding citizens. In Albemarle County, Virginia, a local man stepped into a tavern and imprudently told a table of "gamesters" that he had just collected a debt. When he left, one of the gamblers sneaked out after him. Several men took note and followed the gambler. They found their neighbor dead, his throat cut and his money gone. They tracked the gambler to a canebrake where he was washing blood from his hands and hanged him on the spot.[21]

Pennsylvania suffered a rash of deadly brawls and robberies from the mid-1760s into the early 1790s, most of which occurred among strangers. Travelers were waylaid, sailors stabbed, and merchants terrorized by a floating population of former soldiers, runaway servants, gang members, and war refugees, who had no qualms about cutting throats to steal whatever they could. But even for law-abiding citizens, the violent ways learned during the Revolution died hard. John Lacey was a fervent patriot from Bucks County who had once ordered his men to shoot on sight any farmer caught trading with the enemy in Philadelphia. After the war he got into a business dispute with a man named Joel Cooke, who he thought was trying to defraud him. Lacey shot Cooke dead behind a Quaker meetinghouse.[22]

Revenge homicides, robbery homicides, political homicides, and vigilante homicides had always been common on contested frontiers, where no government or coalition of governments could gain the up-

per hand; and in effect, the Revolution turned the entire country—even long-settled areas like southern New England, southeastern Pennsylvania, and the Chesapeake—into a contested frontier. The decline in British patriotism, the weakening of white solidarity as the threat from Native Americans diminished, and the rise of democratic, egalitarian protest movements facilitated all types of homicide by eroding civility, mutual forbearance, and fellow feeling among unrelated whites, but the lack of a stable government was what truly opened the floodgates to a torrent of murders. Perhaps no homicides were more indicative of the fear and hostility that government instability engendered among colonists than two senseless killings that occurred during this period in Philadelphia. The first murder was committed in 1776, while the Second Continental Congress was meeting in the State House to debate the future of the colonies. A few people began to taunt a lone woman in the street. Someone called her a witch. Others took up the cry, and within minutes a crowd had stoned her to death. A decade later it happened again. A mob seized an elderly woman, accused her of being a witch, and carried her through the streets, all the while pelting her with stones. She died a few days later.[23]

The homicide rate would probably not have risen as precipitously during the Revolution if revolutionary leaders had been able to set up strong, unified governments in every colony and if allegiance to the new nation had immediately taken the place of allegiance to Great Britain; but every state government had difficulty establishing its authority, and American patriotism grew slowly. Nominal loyalty to the United States was widespread once the Revolution was won, but the depth of that loyalty was questionable. Efforts to create national solidarity in the 1780s and 1790s through patriotic celebrations, oratory, and literature foundered over real differences in values and interests. Most nationalist celebrations were partisan, despite the claims of organizers. Political adversaries—Federalist and anti-Federalist, Hamiltonian and Jeffersonian—used feast days, thanksgiving days, militia musters, Fourth of July celebrations, and tributes to George Washington or the French Revolution to promote their particular visions of the American nation. These celebrations had some success in helping majorities to consolidate their power, nationally and locally. They forged solidarity among party supporters and drew a broad range of men and women into nationalistic partisan movements. That was no small

achievement, but it would take time to recreate the sense of unity that had existed under the British Empire and to establish the legitimacy of the new central government.[24]

Race was no more effective than patriotism in binding whites together in the late eighteenth century. Fear of Native Americans declined after the French and Indian War. Indian peoples no longer posed a military threat to most whites, except on the frontier, so the need for white solidarity was less pressing, and a growing number of whites expressed outrage at massacres of friendly Indians and the seizure of Native lands. The campaign against slavery also divided whites. Launched in the 1750s and 1760s by Quakers, evangelicals, and enlightened thinkers, the antislavery movement blossomed during the Revolution, and more whites, especially in the North and the Upper South, began to condemn slavery as inhumane and as inconsistent with revolutionary ideals and a free, mobile society. The rift between the Deep South and other areas of the nation began to widen, and northerners began to look askance at states whose economies were dependent on slave labor. Few whites were willing to incorporate blacks or Indians as citizens into American society, and race remained an important bond among whites, but in the late eighteenth century it was not as powerful as it had been.[25]

Local loyalties were more important than they had been before the Revolution. In the 1790s the proportion of new counties named for local heroes was higher than the proportion named for national figures: 43 percent versus 38 percent (Figure 2.1). Many of those local notables were heroes of the Revolution, and local loyalties were not necessarily incompatible with national loyalties. But as new divisions arose over slavery, economic policy, and the western territories, local and regional loyalties sometimes conflicted with national or interregional loyalties, especially for New England Federalists, southern Republicans, and westerners of both parties, who articulated their own regional versions of nationalism. Only time would tell if national loyalties or amalgams of local and national loyalties would prove powerful enough to rebuild the fellow feeling that had existed before the Revolution.[26]

In the short run, revolutionary ideology weakened the bonds that had deterred homicide among unrelated whites. The increase in murders over property and reputation in the late eighteenth century sug-

gests that whites became more protective of their rights and their good names once the Revolution began. The concern with reputation manifested itself in the sudden resurgence of dueling, which had all but disappeared in British North America in the late seventeenth and early eighteenth centuries. The only colony where duels had persisted into the 1680s and 1690s was South Carolina, where planter "aristocrats" from the West Indies kept the custom alive. One or two isolated instances of dueling cropped up elsewhere in the early to mid-eighteenth century. In 1728, for instance, Benjamin Woodbridge, the son of an admiralty judge from Barbados, was killed in a duel on Boston Common. He and Henry Phillips, a recent graduate of Harvard, had quarreled after Woodbridge asked Phillips to sign a note for a gambling debt he owed him and Phillips refused. The men called each other thieves and liars and, in accordance with the code of dueling, borrowed swords so that they could settle their differences honorably. Their friends thought they were joking and learned that Woodbridge had been wounded only when Phillips ran to a tavern for help. Phillips fled rather than face prosecution.[27]

Bostonians were shocked by Woodbridge's death. Clearly, they felt that society had moved beyond dueling. The Reverend Joseph Sewall captured their feelings in a sermon endorsed by all of Boston's ministers in which he denounced "the Society of Evil Doers" that encouraged young men to fight "Bloody and Mortal Duels." Colonial gentlemen rarely fought or challenged each other—it simply was not done. Émigrés might resort to dueling, but colonial gentlemen settled their differences peacefully.[28]

That pattern changed abruptly during the Stamp Act crisis of 1765. The trust and mutual regard that had existed among elites were shattered, and men began to attack each other furiously over political differences. One Virginian, who lamented the new incivility in public life, tried to explain the extreme reactions of friends whose letters to the editor drew public criticism. "Our writers are generally such as have been very little used to Contradiction, and know not how to bear it from one another; and when they find their Writings not treated with that Respect they have been accustomed to in their private Characters, they grow angry, and sometimes abuse one another." Gentlemen who took Britain's side or who wavered before taking the patriot side were subjected to all kinds of public abuse, verbal and physical. Those who

accepted stamp distributorships were branded traitors. Many of them were burned in effigy or had their houses vandalized.[29]

Taken aback by this turn of events, gentlemen defended their reputations and proclaimed their superior status (and their disdain for society's legal institutions) by reviving the custom of dueling. They opposed the leveling force of revolutionary ideology by resuming a practice that made it impossible to command the respect of others without resorting to violence. In doing so they helped to create conditions that strongly correlate with higher homicide rates. Yet most challenges came to nothing or were resolved in other ways. Williamsburg attorney James Mercer, whose brother Richard had accepted a stamp distributorship, challenged Arthur Lee, a young physician whose brother Richard Henry had incited the mob that had sent Richard Mercer scurrying back to England. They agreed to a duel with pistols at a race ground, but their shots went wide, and each accused the other of cowardice. The dispute ended in a coffeehouse, where Lee tried to cane Mercer. The crowd took away their canes and pistols, but Mercer would not give up. He pummeled Lee, bloodying his nose and blackening his eyes. The local paper had the last word:

> To fisty-cuffs go the exalted duelists. O sad, sad! the Doctor [Lee], instead of being handsomely run or fired through the body, which would have given him infinite satisfaction, is bled at the nose, and has his eyes closed, as if he had been no better than a clown or peasant. The poor, abus[e]d, unfortunate Doctor, lifts his discomposed, tumefied, bloody, and sightless head; and, notwithstanding the inconvenience of such a situation for the display of oratory, makes a very fine harangue on the most grossly and shamefully violated laws of honour; for which, as a mischief to society, with a truly disinterested spirit, he expresses more concern than for any injury done to his own person. The Coffee-House world manifest their esteem by laughing.

With that peculiarly American scorn for pretension, the editor savaged the duelists for setting themselves above the common man with their silly rituals and pompous speechifying.[30]

Fear of ridicule, however, was no longer enough to deter duelists. Political passions were simply too intense. Colonel James Bayliss died in 1765 in a duel in Dumfries, Virginia, two days after rioters paraded effigies of the colony's new stamp collectors through town with copies

of the Stamp Act wrapped around their necks like halters. The effigies had "receiv'd the Insults of the Congregation, by Caneing, Whipping, (the Mosaic Law) Pillorying, Cropping, Hanging, and Burning." It is not clear which side Bayliss was on.[31]

Dueling resurfaced in the late eighteenth and the nineteenth centuries wherever politics became competitive and democracy reared its uncouth head: in Ireland (where the modern rules of dueling were first codified) during the campaign for home rule in the 1760s and 1770s, in England during the controversy over the Reform Bill, in Belgium after the revolt of 1830, in Italy after the unification of 1860, and in Portugal with the advent of contested parliamentary elections in the 1880s. In these nations, as in the United States, public men who went in for dueling affirmed the democratic revolution by acknowledging the importance of public opinion, but at the same time they were also rejecting the revolution by reviving an aristocratic practice that placed them above the "rabble." Dueling combatants were almost always men in the public eye—politicians, newspaper editors, attorneys, and military officers—who were exposed to harsh criticism as politics became more democratic and more confrontational and the political structures that had kept the peace among political leaders since the Glorious Revolution were dissolved. No longer insulated by the privileges of their class, these men stood before their readers and constituents as individuals, and since their success depended almost solely on the public's perception of them, they could not let slanderous remarks go unchallenged.[32]

Dueling could enhance a man's reputation; a refusal to fight could tarnish his good name and ruin his career. As a Virginian who wrote an "Essay on Honor" said, "the opinion of mankind, which is as forcible as a law, calls upon a man to resent an affront, and fixes the contempt of a coward upon him if he refuses." This attitude was not confined to southern gentlemen. John Farnham, a Harvard student, declared that "it is in vain to expect or presume that . . . [a] man will ever obtain any consequence & respect who suffers himself to be trodden under foot." Ira Allen, a brother of Ethan Allen and the leader of the faction that governed Vermont in the early 1790s, responded immediately when he was insulted by the leader of the opposing faction, Isaac Tichenor, a Princeton graduate referred to by his enemies as "The Jersey Slick." Tichenor claimed to have "slipped General Allen's

nose"—that is, pulled it in an insulting way. Allen went across the Connecticut River to New Hampshire to duel with him. The two faced each other, pistols in hand, and were preparing to fire when spectators rushed in to stop them.[33]

Scores of distinguished men met untimely ends in duels. Button Gwinnett, the leader of the radical patriots in Georgia, and Lachlan McIntosh, a leader of the conservative patriots, were political and personal enemies. When command of the Continental forces in Georgia went to McIntosh, Gwinnett tried to embarrass him by arresting his brother on the charge of being a Tory. The two men quarreled so fiercely during the 1777 military campaign in eastern Florida that they had to cede command to a third man. When they got home, the assembly—which Gwinnett controlled—censured McIntosh and exonerated Gwinnett. McIntosh called Gwinnett "a Scoundrell & lying Rascal" and challenged him to a duel. Both men were seriously wounded, and Gwinnett died three days later. The same fate befell Alexander Hamilton's nineteen-year-old son Philip in 1801. After New York City attorney George Eacker insinuated publicly that Hamilton would not oppose the violent overthrow of President Thomas Jefferson, Philip and his friend Richard Price confronted him, and Eacker called them both "damned rascals." They challenged him to a duel. Price escaped unscathed, but Philip was killed. Hamilton became deeply depressed. Two and a half years later he accepted a challenge from Aaron Burr, even though his friends assured him that he had no need to fight because Burr's reputation was so far beneath his. That so many promising or accomplished men chose to risk death rather than their reputations shows how forceful the homicidal impact of the Revolution was. By undermining the unity and mutual regard of the American people and their willingness to accept the legitimacy of government by their political adversaries, the Revolution had created conditions ripe for homicide, even among elites who shared a commitment to republicanism and revolution.[34]

## Homicide on the Southern and Western Frontiers

Public men were not the only ones to experience increased volatility in their dealings with other people. The Revolution made all relationships more violent, especially in the southern and western back-

country, where it took decades to create strong, stable governments and where men created their own justice by killing people who wronged them. From the Georgia Piedmont to the Ohio River Valley, homicide rates were extremely high from the mid-1760s through the War of 1812. Rates of 25 to 30 per 100,000 per year were common for white adults in areas where county governments had been established (Figures 4.1 and 4.2). In the backcountry, where settlers and Indians (and the Spanish and British) were still fighting for control, rates probably reached 200 or more per 100,000. Those numbers had not been seen since the early seventeenth century.

Like previous frontiers that were politically unstable and lacked strong institutions that could uphold law and order, the revolutionary backcountry was plagued by vigilantism, revenge murders, political murders, systematic violence by criminal gangs, and campaigns against peaceable Native Americans who did not move on after they were defeated militarily. During the Revolution more backcountry whites took the law into their own hands and killed to advance their interests or defend their rights, lives, and property. This pattern would reappear later in Florida, the Southwest Territory, the lower Mississippi Valley, Texas, and California.

The Revolution came at a difficult time for settlers in the southern backcountry. They lacked the means to govern or defend themselves adequately, and they were divided over whether their interests would be better served by the British government or by patriot governments dominated by coastal elites. Virginia's government took steps before the Revolution to maintain law and order by establishing county governments in the southwest, paying for local improvements, and giving settlers adequate representation in the General Assembly. But the planters and merchants of coastal North Carolina, South Carolina, and Georgia did not want to share power with the frontier population; they deliberately delayed the formation of new counties and refused to give settlers adequate representation in state assemblies or funding for public projects. Their actions compounded the homicide problem in the Lower South by depriving settlers of courts, constables, and militia companies. Settlers in that region had no choice but to take the law into their own hands, and their efforts to protect themselves against criminals and Indian attacks were probably responsible



Figure 4.1  Homicide rate in plantation counties in Georgia, 1790–1900 (per 100,000 adults per year). Franklin, Jasper, and Wilkes Counties.



Figure 4.2  Unrelated-adult homicide rates in rural Ohio, 1798–1900 (per 100,000 adults per year).

for as many homicides as political violence was. Jittery farmers gunned down friendly Creeks or Cherokees who wandered near their houses, and residents who tracked down thieves ended up in deadly shootouts. Local vigilantes known as Regulators organized in the 1760s in North and South Carolina to carry out their own brand of justice against criminals. Colonial governments suppressed the Regulators, but fifty lives were lost in a battle between Regulators and state militiamen at Alamance Creek in North Carolina in 1771. Southwestern Virginians fared better, but their county governments were not entirely effective because officials did not have time to establish their legitimacy.[35]

The situation only deteriorated when the British made the southern backcountry a major theater of operations. They invaded the area several times and encouraged loyalists and their Native allies to attack patriots. The battle was joined first in southwestern Virginia. William Campbell, a militia officer in Washington County, stopped a suspicious traveler in 1777 and discovered that the man had been paid by the British to smuggle letters to Cherokee leaders, asking them to attack settlers. Campbell and his friends hanged the man on the spot. Local loyalists, joined by men from North Carolina, attacked patriots and plotted to destroy the lead mines in Montgomery County, which were vital to Virginia's war effort. The outcome of the struggle was in doubt until patriot militia leaders like Campbell, Walter Crockett of Montgomery County, and Charles Lynch of Bedford County (the state superintendent of the lead mines, whose followers allegedly coined the term "Lynch Law" to celebrate his brand of vigilante justice) decided in 1779–80 to fight terror with terror. Tradition has it that during their campaign they shot or hanged a large number of suspected loyalists and forced the British to turn their attentions farther south.[36]

Political violence, including lynchings and murders of prisoners, was most intense in and around Augusta, Georgia, the frontier settlement that held the key to controlling the upper Savannah River watershed. Residents of adjacent areas, including Wilkes County in Georgia and Ninety-Six District in South Carolina, suffered through a six-year reign of terror as British and American forces tried unsuccessfully to establish control over the region. Patriots and loyalists battled back and forth for Augusta and the surrounding countryside. The combatants united briefly in 1779 for a joint expedition against the Cherokees but soon returned to fighting each other.

When the British recaptured Augusta in the spring of 1780, loyalists went on a rampage in the countryside and took revenge on patriots, who had held the upper hand the previous year. A band of loyalists rode up to the farm of Colonel John Dooley, a patriot who had killed a number of loyalists to avenge the murder of his brother, and shot him dead in front of his family. After discovering that the Hart family had once hidden a patriot soldier in their house, loyalists looted the Harts' farm, took Nancy Hart hostage, and ordered her to cook them a meal. As they waited by the hearth, Hart quietly gathered up their muskets and started to push them outside through a chink in the cabin wall. When the Tories saw what she was doing, she took up a musket and threatened to shoot the first man who moved. Two men rushed her, and she shot them both. Meanwhile her daughter had called for help by blowing on a conch shell, and her husband and neighbors came running. They hanged the rest of the group.[37]

Across the Savannah River in Ninety-Six District, South Carolina, loyalists were better organized and more equally matched with patriots, so a greater portion of killings occurred during or shortly after pitched battles. A band of thirty patriots rode out in 1781 in pursuit of a small band of loyalists who had stolen horses. They recovered the horses, but they did not realize that the loyalists were part of a band of 300 under "Bloody Bill" Cunningham, and they made the mistake of camping at Cloud's Creek before completing their journey home. The loyalists surrounded them and refused them terms, because the group included a young man, John Butler Jr., who had killed a loyalist earlier. The young man's father offered to exchange himself for his son, but his son grabbed a rifle and killed a loyalist before he was gunned down. The surviving patriots surrendered, but the loyalists spared only one man, in recognition of the fact that local patriots had spared one of theirs in a recent battle. They hacked the others to death with swords. John Butler Sr. grabbed a pitchfork and defended himself as best he could, but the loyalists chopped off his hands and then killed him.[38]

The next year a band of patriots led by another of John Butler's sons, William, surprised Cunningham's depleted force near Baulknight's Ferry. Cunningham abandoned his men and rode off. Butler gave chase but was unable to catch him. When he returned, he found that one of his men had already killed one of the loyalists. Butler was

exasperated: he was not out to avenge Cloud's Creek; he wanted to round up the loyalists and put an end to the killing, now that the war was all but over. His men would not let him punish the killer, however, because the dead man had once tortured the killer's mother in a futile effort to get her to disclose her son's whereabouts. Butler let that killing pass, but later that day they came upon several of Cunningham's stragglers, and another of his men refused his direct order not to shoot. It was clear that no cease-fire could put an end to the enmity between the two camps: it was too strong and too personal, and it would spill past the verges of the war and seep into the lives of the children and grandchildren of combatants.[39]

Harassment of loyalists continued after the war. In Wilkes County, Georgia, where feelings remained bitter, it was not uncommon for jurors deliberating on the courthouse steps to chase down and beat up a loyalist who happened to pass by. Churchgoers forcibly ejected loyalists who dared to show up for services. "Lynch's Law," which referred not just to hanging but to vigilante justice of any kind, became the preferred method of dealing with disputes both personal and political and was celebrated in song and story. This poem appeared in the *Augusta Chronicle* in 1794:

> Some time ago, Augusta acted right,
> To punish one, and put two more to flight;
> Lynch's law, ought still to be in vogue,
> It will rid the town of every cursed rogue.
>
> . . .
>
> The state is robb'd, and plunder'd of its right,
> It'll not be so, if Lynch be kept in sight.[40]

For the most part, vigilante justice stopped short of murder. Men ganged up on people they didn't like and beat them. Twenty armed men stormed the house of Colonel Henry Kerr in Wilkes County in 1793 and carried off Kerr, a friend, and seven of his slaves because of a property dispute. In Augusta, Major Fields Perdue gathered a gang together and went after a former employee, George Tucker, who had had the effrontery to quit and demand his pay. Perdue and his entourage dragged Tucker from his boardinghouse and marched him at gunpoint to the Carolina side of the Savannah River. Tucker reported that they "stripped me naked, and tied my hands with hickory bark,

and stood round me with pistols cock'd and sticks" while Perdue gave him thirty lashes. He finally broke free and jumped into the river, where he was rescued by a passing boat.[41]

In more than a few instances this kind of vigilantism did end in death. After a Wilkes County grand jury refused to indict Robert Stewart for murder in 1795, his neighbors got together and killed him. In Richmond County in 1797, a party of drunken men seized a man "on suspicion of several crimes" and hanged him from a tree in the woods. In Franklin County in 1800, John and Julius Neal got a gang together and went after Cormack Higgins, who they believed had robbed and murdered their brother. They brought Higgins to the county seat and took him to the gallows, where another murderer had just been hanged. There they sat him on a horse and put a rope around his neck. Higgins refused to confess, however, even after the Neals shooed the horse out from under him and let him hang awhile, so they cut him down and asked friends to help them take him to their house. John Neal went on ahead. As the rest of the party crossed a river, a single shot from the far bank killed Higgins instantly.[42]

Because the violence between patriots and loyalists had legitimized lynchings, beatings, and revenge murder, vigilante justice gained a measure of approval in the backcountry that it did not have elsewhere. Jurors or grand jurors acquitted all these vigilantes of murder, even the ones in Richmond County whose victim turned out to be innocent. In the eyes of the grand jury, the victim's bad reputation justified the killing.

The movement of settlers into the backcountry also increased the homicide rate after the Revolution by setting up a conflict of interest between settlers and federal, state, and territorial governments. The federal government incurred the settlers' wrath during the Confederation period and Washington's presidency when it tried to enforce the terms of Indian treaties in hopes of preventing violence and building a military alliance with western tribes. The government repeatedly sent troops into the Ohio River Valley in the mid-1780s to tear down homes that squatters had built on Shawnee land. In Georgia the federal government repudiated treaties that the state government had coerced some of the Creeks into signing in the mid-1780s. Those treaties had ceded to the state all the land between the Ogeechee and Oconee rivers in central Georgia. By 1790, however, the flood of settlers into

the disputed territory was so overwhelming that Creek leaders accepted the loss of their land east of the Oconee in return for a prohibition of white settlement west of the Oconee, to be enforced by federal troops and by Creek authorities. The Creeks were permitted to arrest or kill any white who set foot west of the Oconee without a pass from Creek or federal authorities.[43]

Washington's administration stationed troops along the Oconee, but the bloodshed continued. Creek warriors who opposed the 1790 cession or were determined to avenge the deaths of friends and relatives defied tribal leaders and raided farms and plantations east of the river. Settlers raided deep into Creek territory, often with the help of the Georgia militia, which the state had garrisoned along the Oconee to protect settlers and to counter federal support for the Creeks. Elijah Clarke, a Revolutionary War hero and a champion of settlers' rights, took matters into his own hands in 1794 and established the "Trans-Oconee Republic" west of the river. He and his supporters declared their independence, set up a government, issued land grants, and built a bustling farm community under the protection of "Fort Defiance" before federal troops forced them back across the Oconee and burned their settlement.

Settlers in Kentucky felt abandoned by the federal government. In the 1780s many considered seceding from the United States and establishing an independent republic. They welcomed federal forces whenever they arrived to fight the Indians, but they railed against the government when it took the Natives' side or tried to mediate the conflict. Like Bacon's Rebels before them, they hated the East Coast elites who had rid themselves of Indians but would not allow settlers in the backcountry to do the same.[44]

Backcountry settlers were also alienated from their state governments, and with good reason. Wherever state governments held title to western lands there was massive fraud, corruption, and claim jumping. The Georgia legislature of 1794 was probably the most corrupt. It gave four land companies—all of which included state legislators as investors—huge land grants for only pennies an acre. Public outrage over the Yazoo land fraud led to the ousting of many of these legislators, but the damage could not be undone, because the courts ruled the grants legally binding.[45]

Virginia's government was less corrupt, but it issued conflicting land

grants in the future state of Kentucky and failed to provide for a comprehensive survey. As a result, settlers had to defend their claims in court against well-financed, well-represented speculators, who won almost every case. Settlers who could not afford legal fees had little choice but to sell their land at a fraction of its value to those who could afford to fight in court. The economic consequences of these policies for settlers were disastrous. By the time Kentucky became a state in 1792, two out of three families there owned no land at all, and the numbers were not much better on the Georgia frontier. For most families in these areas, all the hard work they had done and the hardships they had endured went for naught, and all the loved ones they had lost in battles with the Indians died in vain.[46]

In some cases the rage engendered by government actions led directly to homicide. In 1794, when anger against the federal government was at a fever pitch in Georgia because of the suppression of the Trans-Oconee Republic, a Methodist minister named Beverley Allen, who refused to acknowledge the jurisdiction of federal courts in the state of Georgia, shot and killed a U.S. marshal in Augusta. In 1795, when anger over the Yazoo fraud was most intense, Robert Thomas, a state senator who had profited from the fraud, was assassinated by one of his constituents. But antigovernment feeling also increased homicides indirectly by convincing settlers that their governments were illegitimate. It was generally agreed that the "spirit of speculation which seems to have seized hold on all departments, and orders of people, from the man in office to the tiller of the soil," had corrupted government on all levels, and that the right of states to conduct their own affairs where Native Americans or western lands were concerned had been "trampled under the federal foot." In the eyes of many people on the southern and western frontier, governments existed only to swindle the common man out of the fruits of his labor. If they wanted justice, they would have to create it themselves.[47]

In time the federal government did force the Creeks, Cherokees, Shawnees, and other Native peoples out of Georgia, Kentucky, and Ohio, and it established an orderly system for selling federal lands in the Northwest and Southwest Territories. Legislators in Georgia and Virginia tried belatedly to end corruption and ensure that farm families had a fair chance to buy land, and every new state in the trans-Appalachian West empowered poor white men by ending property re-

strictions on voting. It would take several decades, however, to alleviate the bitter feelings of the 1780s and 1790s, and the hatred of government engendered in the southern backcountry during those decades never truly disappeared.

The frustration of settlers in the postrevolutionary backcountry manifested itself in high homicide rates. Settlers were quick to take the law into their own hands and kill people who appropriated their property or damaged it in any way. Murders occurred over the right to set up fish traps, over attachments for debt, or over hunting dogs that had been shot. Settlers were also quick to kill people who insulted them or failed to show proper respect. Poor people seldom fought duels, but like revolutionary-era public men they felt compelled to defend their reputations and sometimes judged it better to kill or be killed than to tolerate a public affront. Turning the other cheek could be interpreted as a sign of weakness. If a settler did not respond to a challenge, he risked further bullying and intimidation. In taverns and at the saltworks in Ross County, Ohio, for example, men used guns and knives freely and showed no remorse over killing men who had insulted them. After finishing off his victim one murderer declared with satisfaction that "the damned rascal deserved it." Near Augusta, Georgia, a man was stabbed to death in his sleep for having ridiculed another man in front of a crowd, and a man murdered a neighbor for calling him a rogue and a liar at a militia election.[48]

Continuing genocidal violence against Native Americans also boosted the homicide rate in the backcountry after the Revolution. Some men murdered Indians by stealth; others killed them openly and boasted about it to friends. Tom Lion was killed quietly. An elderly Mohican who lived alone in Holmes County, Ohio, Lion made a living by trading game for the supplies he needed, like flour and gunpowder. He enjoyed annoying the settlers, who considered him a harmless nuisance, and he liked to tell stories about all the whites he had killed in his youth. He claimed to have ninety-nine dried human tongues in his cabin. One day he got drunk at a house-raising, and when the conversation turned to the murder of the Hochstetler family on the Pennsylvania border, he bragged that he knew all about the case. A relative of the Hochstetlers overheard him and followed him home that night. Lion was never seen again—murdered, it was believed, his body submerged in a cranberry bog.[49]

Other people killed Natives randomly and without compunction. Three men passing through Lancaster, Ohio, saw an Indian man, woman, and child and decided to kill them on the spot. In 1813 Thomas Griffee of Williamson County, Illinois, was aiming at a bear in a tree when he saw an Indian taking aim at the same bear. He leveled his gun at the man and shot him. Henry Parsons, remembered in Williamson County's history as "a cold, calculating miscreant," shot at least two Native hunters in similar fashion and swore that he would kill any Indian who crossed his path in the woods.[50]

Murders by criminal gangs added to the homicide tally. The cattle and horse thieves who had plagued the southern backcountry before the Revolution were not especially murderous. They had returned fire when cornered but avoided armed conflict whenever possible. They had made money by selling stolen horses and cattle in Chesapeake markets and prospered through speed and stealth, not violence. In the postrevolutionary backcountry many criminal gangs had no qualms about killing hunters, settlers, or travelers for their cash or belongings. When the conflict between settlers and the Creeks was at its height in central Georgia, white gangs took advantage of the situation by murdering and scalping the families they robbed to make it look as if they had been victims of Creek raiders. The practice was so common that by the mid-1780s authorities admitted they could never be sure whether "white or red savages" were at fault.[51]

The most infamous of these criminal gangs were two brothers from a disaffected Tory family. The Harpes terrorized Tennessee and Kentucky in 1798–99, stealing money, clothes, and horses and killing thirty or forty people, some of them children, to eliminate potential witnesses. They were said to have been the sons of a loyalist raider from North Carolina who had fought at Kings Mountain. The family was ostracized after the war, and their neighbors' animosity made a deep impression on the Harpe boys. Before he died, the eldest declared that "he had been badly treated and consequently had become disgusted with all mankind."[52]

Almost as famous as the Harpes, and also a product of the war, was the Cave-in-Rock gang. They robbed and murdered travelers who went down the Ohio River in flatboats in 1797. The leader of the gang, Samuel Mason, came from a prominent Virginia family and had been a captain in the Virginia militia during the Revolution, but his experi-

ences during and after the war had embittered him. As commander of the militia at Fort Henry he had seen more than his share of death. He was the sole survivor when his company of fourteen men was ambushed by Indians in 1777, and the company that rescued him lost all but four men. In 1782 he was trying to carve a farm from the wilderness near Wheeling Creek when Native American raiders stole several of his slaves. Mason and a friend pursued the raiders, but they fell into an ambush, and his friend was shot dead. Within months Mason had turned horse thief, trying to recoup his losses at his neighbors' expense and bitter that, having risked so much for them, he had so much less to show for it. He moved in and out of respectable society for the next few years but turned outlaw for good in the mid-1790s. Like every war in history, the Revolution left behind its share of traumatized or resentful veterans who could no longer function in society. The backcountry afforded these people both a refuge from civilization and nearly unlimited opportunities for criminal activity.[53]

The Revolution left a legacy of violence across the Ohio River Valley and the southern backcountry. It legitimized killing in defense of property, reputation, and rights, but, more important, it transferred authority for life-and-death decisions from the government to ordinary citizens. This legacy fused with the hatred of government across the entire southern frontier. People approached confrontations with the conviction that they had to take full responsibility for safeguarding their rights and reputations. Looking to the despised government for justice was worse than useless: it was shameful. It was up to individuals to see that justice was done.

## Homicide on the Northern Frontier

New England's backcountry did not witness as many homicides after the Revolution as the Ohio River Valley or the South, but wherever the government thwarted dreams of landownership or threatened the livelihood of settlers, New Englanders could also be murderous. After the Revolution squatters settled on land in Maine that had been deeded in colonial times to two syndicates of land speculators, the Pejepscot and Kennebec grantees, because they were sure that the speculators' royal charters would be voided. However, the courts ruled in the proprietors' favor. Years of antiproprietary riots and demonstrations ensued,

and in 1808 a settler murdered a member of a proprietary surveying party.[54]

A dozen political homicides occurred in northern Vermont during the embargo crisis of 1807–1809 and the War of 1812. Seizures of American ships and sailors by France and Britain during the Napoleonic War prompted Jefferson's administration to prohibit foreign trade in the hope that the denial of American naval stores and foodstuff would force European powers to respect America's right as a neutral power to trade with all nations. The Madison administration set aside Jefferson's unpopular no-trade policy and allowed trade with neutral powers, but depredations against American shipping continued. The embargo and the ensuing war with Britain proved divisive in northern Vermont, where people depended on trading grain, lumber, and livestock with Canada. Political adversaries took up arms against one another. Smugglers killed at least five revenue agents and toll collectors, and at least three smugglers were killed. During the war, a Vermont militiaman who refused to support the invasion of Canada was shot for resisting arrest as a deserter, and two suspected spies were shot by American troops.[55]

Violence against Native Americans persisted in a few areas of the northern backcountry. Some settlers were simply unwilling to live with Indians, many of whom declined to leave after they had been defeated militarily. In Vermont, George Sheldon feuded with Abenakis from St. Francis, Canada, who returned to their home on Vermont's Missisquoi River each spring to hunt and fish. Although the details are hazy, Sheldon apparently believed that the Abenakis had burned his barn, and sometime in the early 1790s he shot two of them dead. Such "ethnic cleansing" kept the homicide rate for Native Americans high long after the backcountry had ceased to be a frontier.[56]

## Homicide in the Shenandoah Valley

Homicide was not a problem everywhere during and after the Revolution. In the Shenandoah Valley of Virginia, for instance, where the Revolution had enjoyed broad support, the homicide rate fell, and political homicides were rare (Figure 1.3). Valley patriots never faced an invasion by the British or their Native allies, so their leaders maintained a firm grip on power. They were able to protect residents, pro-

vide basic services, and uphold law and order. The valley's residents embraced the Revolution with near unanimity because it promised to protect that order. As a result, patriot leaders had little trouble putting down draft resisters in Augusta County or defeating a small band of local loyalists who gathered at Massanutten in Rockbridge County.[57]

Per capita, the Shenandoah Valley may have committed more men and supplies to the war effort than any other region in the country, sending over 500 officers and thousands of enlisted men into the Continental army. Augusta County alone raised thirty-eight companies between 1776 and 1781. The valley's residents were most interested, however, in carrying the war to the British and their native allies in the Ohio River Valley. Having experienced a devastating Indian war as recently as 1764–1766, and hoping to profit from the opening of new lands in the West, they were particularly supportive of George Rogers Clark's trans-Appalachian campaigns. Valley soldiers were responsible for some of the greatest victories over Native forces and for some of the most infamous massacres, including the murder of the Shawnee chief Cornstalk and other hostages held by Rockbridge County soldiers garrisoned at Point Pleasant on the Ohio River.[58]

The valley's support for the Revolution extended to the new national government. Delegates to Virginia's ratification convention from the valley and from the trans-Allegheny West voted 27 to 1 in favor of the new federal constitution and provided the margin of victory, since delegates from the rest of Virginia voted 61 to 78 against it.[59] Given the almost complete absence of political conflict in the valley, the depth of its citizens' commitment to the Revolution and to the Indian war, and their solid support for both local and national revolutionary governments, it is not surprising that the rate at which unrelated whites murdered each other fell during the Revolution. The rate at which murder suspects were brought in for questioning—the only measure we have of murder activity in the valley—declined from 5.4 per 100,000 white adults in the decade before the Revolution to only 2.2 per 100,000 from 1775 to 1800 (Figure 1.3). Compared to rates from the rest of the slaveholding South or Pennsylvania, which had a similar mix of German, Scots-Irish, and English settlers, that rate was startlingly low. It was comparable to New England's rate during the Revolution, which was the lowest in the nation. Wherever the transition from the old government to the new government and from old

loyalties to new loyalties went well, homicide rates among unrelated adults remained low or even declined.

### African American Homicide

African Americans also saw their homicide rate decline during the Revolution in New England, the Chesapeake, and the Shenandoah Valley. In New England the rate for blacks dropped to between 1 and 2 per 100,000 adults per year, which was as low as the rate for whites (Figure 2.3). There was only one known case of a black murdering another black, and there were only five known cases of whites murdering blacks. Two enslaved men died of neglect or abuse, but racial hostility played no apparent role in the other three deaths. Crispus Attucks was killed in the Boston Massacre; a suspected thief who attacked his captors with an ax was shot to death; and a man involved in street brawl in Boston was so "disordered in his senses" from a blow to the head that he wandered into the harbor three weeks later and drowned.[60]

In the Chesapeake and the Shenandoah Valley, the rate at which blacks were examined for killing other blacks fell by half, to only 1.2 per 100,000 adults per year, and the rate at which whites were questioned for killing blacks also fell by half, to only 2 per 100,000 adults per year (Figure 1.3). The circumstances of these homicides, where known, were not unusual: a field hand was killed for refusing to be whipped for visiting a woman in the plantation's spinning room; a hired slave was clubbed to death for pocketing wages he had earned by hauling tobacco; and slaves died in fights with other slaves.[61]

Unlike those for most whites, African American homicide rates continued to decline during the Revolution largely because the forces that had depressed the rates in the mid-eighteenth century were still at work. There was growing solidarity among African Americans, and many European Americans had more humane attitudes toward them. It would be a mistake, however, to think that all whites became less violent toward blacks in the late eighteenth century. Where slavery survived, it remained a violent institution. Frustrated or sadistic masters inflicted horrible beatings on slaves. White posses hunted down and killed slaves who took advantage of the lawlessness of the Georgia–South Carolina backcountry to establish maroon communities in swamps along the Savannah River. The same fate awaited slaves who

hid in swamps along the North Carolina coast and raided local planta-
tions. Nervous whites hanged slaves and free blacks suspected of orga-
nizing slave rebellions. Prosecutions for "conspiracy" peaked in Vir-
ginia in 1775–1777, when slaveholders feared that their slaves might
rise up and join the British. Charleston magistrates hanged Thomas
Jeremiah, a free black harbor pilot, because they believed he was help-
ing the British and organizing a slave revolt.[62]

Many blacks caught up in the conflict itself were killed. During the
British campaign to capture Charleston, South Carolina, patriot sol-
diers captured four men outside their lines—two whites, a mulatto,
and a black—who they suspected were deserting to the enemy. Gover-
nor John Rutledge ordered the soldiers to "hang them up" on the
beam above the fort gate as a warning to others. The British captured a
slave named Ned in Redding, Connecticut, who was fighting with a
band of patriots. After executing the whites, a British officer asked
what should be done with "the negro." His superior said, "damn him,
kill him." The officer stabbed Ned and then cut off his head. When
Cornwallis' soldiers ran low on food at Yorktown, they drove blacks out
of their camp. Dozens were stranded in the no-man's-land between the
British and American forces and were killed in crossfire.[63]

Blacks were far less likely than whites to be victims of political homi-
cides or war crimes during the Revolution. Most did not have an op-
portunity to choose sides, and many who did were wary of the inten-
tions of both sides. Some 5,000 blacks enrolled in patriot militias or in
the Continental army, and a lesser number in loyalist or British forces;
but they joined in smaller proportions than did whites, even in patriot
New England, which integrated its forces early and relied on slaves and
free blacks to help meet induction quotas for the Continental army.
Outside New England, blacks who enlisted or were purchased or dra-
gooned by military forces usually worked as cooks, servants, teamsters,
or laborers rather than as soldiers. The custom of assigning them sup-
port duties probably explains why the British officer in Redding asked
what to do with Ned. Blacks were seldom used or perceived as combat-
ants.[64]

The humanitarian spirit that many whites began to embrace dur-
ing the Revolution probably helped keep the black homicide rate
low. It was undoubtedly responsible for the continued decline in le-
thal discipline of slaves and in extralegal violence against all blacks.
Baptist, Methodist, and revolutionary leaders who rejected slavery

did their best in the 1770s and 1780s to increase sympathy for the suf-
ferings of blacks. New Light Calvinists like Samuel Hopkins of New-
port, Rhode Island, along with enlightened thinkers like Benjamin
Rush of Philadelphia and the Methodist ministers of the Virginia Con-
ference, vilified slavery "as contrary to the Golden Law of God on
which hang all the Law and the Prophets, and the unalienable Rights
of Mankind, as well as every Principle of the Revolution." Humane
attitudes led to the gradual abolition of slavery in the northern
United States and the passage of laws in the Upper South that crimi-
nalized the unintentional killing of slaves during discipline and al-
lowed manumission of slaves without government interference. The
latter laws led to the freeing of 20,000 slaves in Maryland and Vir-
ginia.[65]

Among blacks themselves, the decline in homicide was most likely a
consequence of a continuing increase in racial solidarity. The rise in
the proportion of African Americans who were native-born and the in-
creasing cultural and linguistic unity of African Americans helped en-
slaved and free blacks form stronger communities. The rapid spread
of evangelical Christianity and republican ideology, both of which
gained currency among blacks as white Christians and revolutionar-
ies turned against slavery, accelerated the process. Many African Amer-
icans formed Christian fellowships and campaigned openly against
slavery where they could. Had the opportunity presented itself, it is
likely that blacks everywhere would have organized self-help socie-
ties like the Free African Union Society of Newport, Rhode Island,
or churches like the African Church in Boston. But even where free-
dom was not yet a possibility, African Americans banded together to
improve their lives. For instance, slaves in Granville County, North
Carolina, tried to hold an "election" among themselves for justices and
sheriffs. They wanted to "have equal Justice distributed so that a weak
person might collect his debts, as well as a Strong one."[66]

Although the surviving evidence is slim, it is clear that the dream of
freedom and equality that the Revolution created had a profound psy-
chological effect on the black community, making it more unified and
less homicidal. African Americans may have taken different sides dur-
ing the Revolution, or no side at all, but from the beginning they
wholeheartedly embraced the idea of freedom. In Charleston, South
Carolina, in 1765, during a demonstration against the Stamp Act, a
group of slaves started chanting "Liberty." In Maine in 1774 a slave

wrote a letter to a prominent citizen to ask for help to secure his free-dom, saying, "Yu know the Situation of us poor Slaves, you know what a valuable thing Liberty is to all men leave alone the Poor Unhappy Slaves, we are flesh and blood as much as them of another Colour, but that Cruel yoke of Slavery, hard to be born." Jehu Grant, who ran away from his loyalist master in Rhode Island to join the Continental army, said that "when I saw liberty poles and the people all engaged for the support of freedom, I could not but like and be pleased with such thing (God forgive me if I sinned in so feeling). . . . The songs of lib-erty that saluted my ear, thrilled through my heart."[67]

When Governor Dunmore of Virginia offered freedom to any slave who fought for Britain and when law and order collapsed in Georgia, slaves ran by the thousands. There were few happy endings for these people. Most of the slaves who escaped to Dunmore perished in the epidemic that swept through his ships. Some Georgia fugitives starved to death in eastern Florida. When Massachusetts abolished slavery, fu-gitive and free blacks alike were kidnapped and sold.[68] Despite these setbacks, the Revolution raised blacks' hopes that their time was com-ing. It never had the divisive effect among blacks that it did among whites, nor did it lead initially to more hostile attitudes among whites toward blacks.

The rate at which blacks murdered whites also remained low during the revolutionary period. There was only one known homicide of a white by a black in New England. Pomp, an apprentice, killed his em-ployer, Captain Charles Furbush, after Furbush reneged on a promise to free Pomp from his indentures early and make him his heir. In Vir-ginia, beginning in the 1760s, enslaved men and women sometimes banded together to murder their masters or overseers. Eight slaves conspired to kill Lockey Collier in Elizabeth City County, Virginia. They worked for hours to clean up the scene of the crime but were caught anyway. Blacks who joined loyalist and patriot gangs probably committed some murders, and individual blacks committed murder in the course of armed robberies, but the rate at which blacks murdered whites did not rise.[69]

As in the mid-eighteenth century, the fundamental reason for the low black-on-white homicide rate was the futility of homicide as a form of resistance. Killing whites meant almost certain death for the perpe-trator and increased repression for other blacks. Enslaved blacks ran

away in great numbers during the Revolution—a third of all slaves fled plantations in Georgia, for example—and blacks were eager to fight for their freedom alongside whites. But it made little sense for them to murder whites or to launch a revolt against them, especially when the abolition movement was making such progress. The Haitian Revolu-tion in 1791 inspired talk of an uprising in the United States, but most slaves appeared to hope that the abolitionists would succeed in bring-ing a peaceful end to the peculiar institution.[70]

gests that whites became more protective of their rights and their good names once the Revolution began. The concern with reputation manifested itself in the sudden resurgence of dueling, which had all but disappeared in British North America in the late seventeenth and early eighteenth centuries. The only colony where duels had persisted into the 1680s and 1690s was South Carolina, where planter "aristocrats" from the West Indies kept the custom alive. One or two isolated instances of dueling cropped up elsewhere in the early to mid-eighteenth century. In 1728, for instance, Benjamin Woodbridge, the son of an admiralty judge from Barbados, was killed in a duel on Boston Common. He and Henry Phillips, a recent graduate of Harvard, had quarreled after Woodbridge asked Phillips to sign a note for a gambling debt he owed him and Phillips refused. The men called each other thieves and liars and, in accordance with the code of dueling, borrowed swords so that they could settle their differences honorably. Their friends thought they were joking and learned that Woodbridge had been wounded only when Phillips ran to a tavern for help. Phillips fled rather than face prosecution.[27]

Bostonians were shocked by Woodbridge's death. Clearly, they felt that society had moved beyond dueling. The Reverend Joseph Sewall captured their feelings in a sermon endorsed by all of Boston's ministers in which he denounced "the Society of Evil Doers" that encouraged young men to fight "Bloody and Mortal Duels." Colonial gentlemen rarely fought or challenged each other—it simply was not done. Émigrés might resort to dueling, but colonial gentlemen settled their differences peacefully.[28]

That pattern changed abruptly during the Stamp Act crisis of 1765. The trust and mutual regard that had existed among elites were shattered, and men began to attack each other furiously over political differences. One Virginian, who lamented the new incivility in public life, tried to explain the extreme reactions of friends whose letters to the editor drew public criticism. "Our writers are generally such as have been very little used to Contradiction, and know not how to bear it from one another; and when they find their Writings not treated with that Respect they have been accustomed to in their private Characters, they grow angry, and sometimes abuse one another." Gentlemen who took Britain's side or who wavered before taking the patriot side were subjected to all kinds of public abuse, verbal and physical. Those who

accepted stamp distributorships were branded traitors. Many of them were burned in effigy or had their houses vandalized.[29]

Taken aback by this turn of events, gentlemen defended their reputations and proclaimed their superior status (and their disdain for society's legal institutions) by reviving the custom of dueling. They opposed the leveling force of revolutionary ideology by resuming a practice that made it impossible to command the respect of others without resorting to violence. In doing so they helped to create conditions that strongly correlate with higher homicide rates. Yet most challenges came to nothing or were resolved in other ways. Williamsburg attorney James Mercer, whose brother Richard had accepted a stamp distributorship, challenged Arthur Lee, a young physician whose brother Richard Henry had incited the mob that had sent Richard Mercer scurrying back to England. They agreed to a duel with pistols at a race ground, but their shots went wide, and each accused the other of cowardice. The dispute ended in a coffeehouse, where Lee tried to cane Mercer. The crowd took away their canes and pistols, but Mercer would not give up. He pummeled Lee, bloodying his nose and blackening his eyes. The local paper had the last word:

> To fisty-cuffs go the exalted duelists. O sad, sad! the Doctor [Lee], instead of being handsomely run or fired through the body, which would have given him infinite satisfaction, is bled at the nose, and has his eyes closed, as if he had been no better than a clown or peasant. The poor, abus[e]d, unfortunate Doctor, lifts his discomposed, tumefied, bloody, and sightless head; and, notwithstanding the inconvenience of such a situation for the display of oratory, makes a very fine harangue on the most grossly and shamefully violated laws of honour; for which, as a mischief to society, with a truly disinterested spirit, he expresses more concern than for any injury done to his own person. The Coffee-House world manifest their esteem by laughing.

With that peculiarly American scorn for pretension, the editor savaged the duelists for setting themselves above the common man with their silly rituals and pompous speechifying.[30]

Fear of ridicule, however, was no longer enough to deter duelists. Political passions were simply too intense. Colonel James Bayliss died in 1765 in a duel in Dumfries, Virginia, two days after rioters paraded effigies of the colony's new stamp collectors through town with copies

country, where it took decades to create strong, stable governments and where men created their own justice by killing people who wronged them. From the Georgia Piedmont to the Ohio River Valley, homicide rates were extremely high from the mid-1760s through the War of 1812. Rates of 25 to 30 per 100,000 per year were common for white adults in areas where county governments had been established (Figures 4.1 and 4.2). In the backcountry, where settlers and Indians (and the Spanish and British) were still fighting for control, rates probably reached 200 or more per 100,000. Those numbers had not been seen since the early seventeenth century.

Like previous frontiers that were politically unstable and lacked strong institutions that could uphold law and order, the revolutionary backcountry was plagued by vigilantism, revenge murders, political murders, systematic violence by criminal gangs, and campaigns against peaceable Native Americans who did not move on after they were defeated militarily. During the Revolution more backcountry whites took the law into their own hands and killed to advance their interests or defend their rights, lives, and property. This pattern would reappear later in Florida, the Southwest Territory, the lower Mississippi Valley, Texas, and California.

The Revolution came at a difficult time for settlers in the southern backcountry. They lacked the means to govern or defend themselves adequately, and they were divided over whether their interests would be better served by the British government or by patriot governments dominated by coastal elites. Virginia's government took steps before the Revolution to maintain law and order by establishing county governments in the southwest, paying for local improvements, and giving settlers adequate representation in the General Assembly. But the planters and merchants of coastal North Carolina, South Carolina, and Georgia did not want to share power with the frontier population; they deliberately delayed the formation of new counties and refused to give settlers adequate representation in state assemblies or funding for public projects. Their actions compounded the homicide problem in the Lower South by depriving settlers of courts, constables, and militia companies. Settlers in that region had no choice but to take the law into their own hands, and their efforts to protect themselves against criminals and Indian attacks were probably responsible



**Figure 4.1** Homicide rate in plantation counties in Georgia, 1790–1900 (per 100,000 adults per year). Franklin, Jasper, and Wilkes Counties.



**Figure 4.2** Unrelated-adult homicide rates in rural Ohio, 1798–1900 (per 100,000 adults per year).

CHAPTER 5

# The Emergence of Regional Differences

*Homicide in the Postrevolutionary Period*

Homicide rates increased in most American communities during and immediately after the Revolution, but as the long-term consequences of the Revolution became clear, they began to fall in the North and the mountain South. By the 1820s rates in the North were at historic lows that ranged from under 1 to just over 6 per 100,000 adults. They would remain at that level through the early 1840s. Those rates were comparable to rates in Canada, Sweden, and the Low Countries, and lower than rates in the rest of Europe. The United States would never see numbers that low again.[1]

In the Ozark and Appalachian highlands of the South, where there were few slaves, homicide rates were as low as those in the rural Midwest by the 1830s and early 1840s. But the populations there were too small to affect the South's overall homicide rate. In slaveholding areas of the South, the homicide rate after 1800 ranged from 8 to 28 per 100,000 adults per year—at least twice what it had been for whites at its low point in the Chesapeake in the late 1750s and 1760s and three times what it had been for blacks in the 1780s and 1790s. After the Revolution homicide rates were thus most strongly linked to the presence or absence of slavery.[2]

It took time for these distinct patterns to take shape in the North, the mountain South, and the slave South. Backcountry violence was an interregional problem until the end of the War of 1812, when homi-

180

cide rates in Ohio finally fell below those in the Georgia Piedmont (Figures 4.1 and 4.2). Dueling was a national problem until the death of Alexander Hamilton in 1804, after which northerners made it clear that anyone who killed a man in a duel would be drummed out of public life. Homicide rates were high in northern and southern port cities through the War of 1812. Independence opened American ports to ships of all nations, and international tensions created hostility among American and foreign sailors, especially during the Napoleonic era. In Boston, for instance, in the decade after the British occupation, Portuguese, English, American, and French sailors were all involved in murders over women, national honor, or turf. In Savannah, Georgia, thirteen sailors were murdered from 1804 to 1815: a German, a Swede, a Norwegian, two Englishmen, two Frenchmen, two Irishmen, and four Americans. These homicides peaked in 1811–1813, when riots among sailors led to killings in New York, Norfolk, Charleston, Savannah, and New Orleans. The surge in such homicides subsided after the Napoleonic Wars as the maritime economy rebounded.[3]

After the War of 1812 it was clear even to contemporaries that homicide rates in the slave South were diverging from those in the rest of the nation. In the North and the mountain South the homicide rate among unrelated adults fell to its lowest level in American history as loyalist-patriot divisions disappeared and patriotism soared. People in those regions began to boast about America's superiority and to celebrate the unique character of America's political institutions. Edward Tiffin, Ohio's first governor, extolled the transformation of the government from one under which "we [could only] *breathe,* to one under which we may *live.*" The Reverend Samuel Williams of Vermont was confident that Americans had devised the finest government in the world. It was, he said, a government that "reverences the people." He considered the United States "the best poor man's country," a place of opportunity where "the highest perfection and felicity, which man is permitted to hope for in the present life, may rationally be expected."[4]

Widespread self-employment and the removal of many legal and institutional barriers to advancement based on religion, class, or race, including slavery, persuaded the vast majority of northerners and whites in the mountain South that their social hierarchy was becoming more legitimate. A "Citizen of Color" captured the optimism of northern blacks when he wrote in 1814 that "we dwell in safety and pursue our

honest callings" with "none daring to molest us, whatever his complexion or circumstances."[5] Homicide was still a problem in urban neighborhoods where the level of self-employment was low and on frontiers that did not yet have effective governments, and the decline in self-employment that began in the 1820s and 1830s caused widespread anxiety and prompted riots that were responsible for a number of deaths in northern cities. But elsewhere in these regions homicides were rare.

The situation was very different in the slave South. Revolutionary ideas and aspirations wreaked havoc with the status hierarchy of slave society in a number of ways. Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical. Prominent whites were subjected to the rough-and-tumble of democracy and were infuriated by the way they were treated. Blacks despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of black rebellion. As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw more than its share of deadly quarrels, property disputes, duels, and interracial killings.

People in the slaveholding South were also less likely than people in the North or the mountain South to trust the federal government and to identify with the new nation. Distrust blossomed in the 1820s and 1830s as proslavery southerners realized that the federal government had turned against them on a number of vital issues, including the admission of new slave states and territories and the suppression of abolitionist speech. The distrust may not have been strong enough to raise the homicide rate, but it was strong enough to nullify the dampening effect that the patriotism of the post–War of 1812 period should have had on the homicide rate among whites. In those decades, when American nationalism reached its nineteenth-century peak, identification with national heroes was weaker in the South than in the nation as a whole. The difference was so strong that a higher percentage of places were named in the North than in the South for the South's national heroes, including Washington, Jefferson, and Jackson. Regional differences in national loyalty would become even more marked in the 1850s, of course, and again in the 1890s. But they were substantial enough in the postrevolutionary period to help raise the homicide

rate above the levels of the middle and late eighteenth century.[6] The slaveholding South thus became the first region of the United States to deviate from the long-term trend toward lower homicide rates in North America and western Europe.

None of the correlates of lower homicide rates were present in the Southwest. In the Mexican borderlands rates tripled from the 1820s to the 1840s, probably reaching 40 per 100,000 adults per year in the Rio Grande Valley of New Mexico and in slaveholding areas of east Texas, and 100 or more per 100,000 in California and Hispanic areas of Texas. Mexico's war for independence from Spain (1810–1821) unsettled relations among classes and racial castes, just as the American Revolution had done in the slaveholding South, and led to murders that crossed class and racial lines. Government instability and frontier violence compounded the problem; Mexicans, Americans, and Native Americans killed one another over trade and territory. Mexico's counterrevolution of 1834 set off violent rebellions in nine of Mexico's twenty-seven states and territories, including Texas, California, and New Mexico, which led to a cycle of political killings, robbery murders, revenge murders, and vigilantism. Together, political instability, the failure of the federal and territorial governments to establish their legitimacy, the lack of national feeling, and the delegitimation of the social hierarchy made the Southwest one of the most homicidal regions in North America.

### The Decline of Homicide in the North

The turning point in homicide rates in the northern backcountry and in northern ports like New York City was the end of the War of 1812 (Figures 4.2 and 5.1–5.3). Elsewhere in the North, particularly in southern New England and eastern Pennsylvania, the turning point had occurred in the late 1780s (Figures 1.2 and 2.2). Homicide rates declined as soon as political conflict subsided, the Constitution was ratified, and a stronger national government emerged. In Pennsylvania, for example, moderates were determined to build a stronger, more inclusive state government and to lay to rest the divisions of the war years. In 1786 moderate assemblymen altered the Test Act so that pietists could affirm their loyalty without swearing oaths. Two years later they gutted the Militia Act by suspending the fines for refusing



Figure 5.1  Unrelated-adult homicide rate in New Hampshire and Vermont, 1775–1900 (per 100,000 adults per year).



Figure 5.2  Unrelated-adult homicide rates in rural Illinois, 1820–1900 (per 100,000 adults per year).

military service. As their hold on power strengthened in the 1790s, they abolished other unpopular wartime acts and implemented universal male suffrage and a volunteer militia—measures that proved widely popular. The legitimacy of government was rebuilt that way in every state, step by step.[7]

The Revolution had undermined fellow feeling in the North, especially among white Protestants, in ways that would take a generation to repair. Patriotic feeling did not really began to flourish until the 1820s and early 1830s (Figure 2.1), and many northerners still questioned the legitimacy of the central government and the character of the men who ran it. But the Revolution also fostered a belief in the unique promise of the new nation that seemed to help suppress homicide. America would be a country where everyone had a chance to be eco-



Figure 5.3  Urban homicide rates in the northern United States, 1797–1900 (per 100,000 adults per year).

nomically independent. The abolition of slavery, the extension of voting rights, increased toleration for religious dissenters, and high levels of homeownership and self-employment convinced the vast majority of northerners that they were on their way toward putting an end to the oppression and prejudice that had kept people in abject poverty for centuries in aristocratic and monarchical societies. Obviously there was room for improvement in their society, but most people believed that now everyone could get married, set up a household, and own a shop or farm. The sole requisite for success was hard work. Even the poor, Catholics, and former slaves shared that belief, despite the financial obstacles and social prejudices they faced. The social hierarchy that emerged in the North after the Revolution was thus perceived as far more legitimate than any that had preceded it.

The belief that they had created a society in which everyone had a chance to get ahead did not create the kind of solidarity that fear of Indians, anti-Catholicism, or patriotism had among European colonists in the late seventeenth century. But most northerners believed they had a shared interest in sustaining the social and political order that emerged after the Revolution. The hatred they might have harbored for wartime enemies—many of whom had packed up and left for Canada anyway—was displaced by pride in their extraordinary victory over the British. The hostile, defensive, and predatory emotions that lay behind the murders of friends, acquaintances, and strangers—never as strong in the North as in the South or on the frontier—were supplanted by the feeling that everyone in America could participate in this grand social and political experiment.

For most people this faith in the social and political order of the postrevolutionary North was justified. By the end of the War of 1812, 60 percent of all adult men in the North owned their own shops or farms; the proportion was closer to 80 percent for men in their mid-thirties and older. Most of those who did not own shops or farms at least owned homes or headed independent households. Owning a house or shop or farm was the standard by which people were judged. Those who owned property had a sense of accomplishment, greater resilience in the face of disappointments, and a strong bond with other property owners.[8]

It is impossible to prove that the growing legitimacy of the North's social hierarchy and the respect and satisfaction derived from eco-

nomic independence were responsible for the decline in homicide in the postrevolutionary North, but it is clear that high levels of self-employment and homeownership were strongly associated with low homicide rates. Of all the areas studied, northern New England and Holmes County, Ohio, where homeownership and self-employment rates were very high, continued to have the lowest homicide rates. Other factors undoubtedly had an impact on rates in the North. The presence of nonviolent pietists like the Amish and Mennonites kept rates low in parts of Ohio and Pennsylvania, for example, whereas the presence of sailors raised the rates of port cities. Like indentured servants, sailors were deprived of rights and wholly at the mercy of their employers, and the humiliation they endured left them predisposed to violence. But self-employment and home ownership were probably the most important deterrents to homicide, because they were the most important sources of respect in a society that judged people by their work ethic and their investment in the community.

Places with the lowest levels of self-employment and homeownership, such as Boston, New York City, and Philadelphia, had the highest homicide rates. The poor, tenement-ridden neighborhoods of those cities were the most homicidal areas of the North. In the first decades of the nineteenth century, these neighborhoods were packed with Scots and Irish immigrants who eked out a living doing work that most natives rejected. They found it very hard to live in such close quarters with others, especially in a society where homeownership was the norm and adult renters were viewed as failures. Crammed together in flats without water or sanitary facilities, they fought constantly to defend their territory and whatever scraps of dignity they still had. Trivial disputes easily escalated into murder. Peter Kain, for example, was driven to distraction by his noisy neighbors in New York City. One Saturday night he smashed all their doors and windows and stabbed one of them to death. Catherine Burney got into an argument with a fellow Scot, Margaret Dix, in their tenement in Boston. She picked up a flatiron and crushed Dix's skull.[9]

Poor urban laborers had less patience than other northerners when challenged or treated with disrespect, and on occasion they fought to the death over card games, elections, and neighborhood turf. After the War of 1812 some of this desperate hunger for respect was channeled into bare-knuckle fighting, which became popular among

working-class men in northern cities. Many early prizefights in New York, Boston, and Philadelphia grew out of the same sorts of disputes that everyday murders did. Fighting gave men an opportunity to earn prestige and perhaps a little money as well. Gang fighting offered similar opportunities. Among the first gang fighters were volunteer fire companies, which battled one another for the privilege of putting out fires. In 1839 two New York City companies went at each other with brickbats and sticks for more than an hour. The 1820s and 1830s also saw the rise of gangs engaged in gambling, prostitution, theft, and illegal liquor sales. They fought primarily to protect their businesses and to eliminate rivals, but on occasion they also fought for honor, for a political party, or for ethnic pride.[10]

There were some ominous incidents of collective violence in the postrevolutionary North, but they did not claim many lives before the late 1840s and had virtually no impact on the homicide rate. The nation's large cities, where competition for jobs, housing, and political power was most intense, saw riots that pitted Whigs against Democrats, blacks against whites, natives against foreigners, Protestants against Catholics, capital against labor, and proslavery against antislavery activists. In New York City in the 1820s, striking dockworkers beat up men who crossed their picket lines and attacked employers who refused to meet their demands. In Boston in 1819 sixty blacks mobbed city watchmen who were trying to arrest a fugitive slave. In Providence, Rhode Island, in 1824, whites went on a rampage after a group of blacks refused to make way for whites on a sidewalk; they destroyed twenty homes, taverns, and suspected brothels and ran blacks out of the "Hardscrabble" neighborhood. A weeklong riot in Cincinnati in 1829 drove all blacks out of the city. In New York City in 1824, Catholic weavers attacked Protestant weavers who had gathered to celebrate the Battle of the Boyne.[11]

The worst violence occurred in Philadelphia, where, in a portent of what was to come, riots between Protestants and Irish Catholics in 1844 left a score of people dead. But despite its fearsome reputation, urban collective violence was not usually lethal in this era. For the most part rioters and gang members fought to humiliate their opponents, not to kill them. The goal was intimidation: they wanted to exert control in their communities and show they could not be pushed around. Whenever postrevolutionary northerners began to feel that

the government was advocating for a competing group or that they themselves were competing against groups with antagonistic values or interests, lethal violence was possible.[12] But the promise of economic independence for all was still a unifying force. Only in the late 1840s and early 1850s, when the two-party system collapsed and many northerners came to believe that what divided them was far more important than what united them, did lethal violence spin out of control.

Outside cities the failure to achieve or sustain economic independence could have deadly consequences. In small towns and rural communities in the postrevolutionary North, where the majority of people owned shops and homes, almost all intentional homicides were committed by men and women who were socially beyond the pale: bankrupts, alcoholics, convicts, and people who had committed moral crimes. These people were treated with contempt by their neighbors. Otis Cox, for example, was an alcoholic, and when he died, a local man wrote in his diary that "no tears were shed over his remains but [he] was hurried to his grave . . . and in a very few days he will be forgotten."[13]

The effects of such social stigmatization were clear. It is remarkable how often violence erupted when people who had once enjoyed the respect of society suddenly found themselves outcasts. Josiah Burnham of Grafton County, New Hampshire, was well educated, the son of a Congregationalist minister, and a descendant of the Wolcott family of Connecticut. He had done very well as a surveyor and developer, but after a series of questionable property deals he landed in jail. He had been in prison for five years when he was joined by two other respected citizens who had overextended themselves financially: Joseph Starkweather Jr., a militia captain; and Russell Freeman, a former magistrate and town officer. Starkweather and Freeman taunted Burnham for his fecklessness and insinuated that he had cheated on his wife, who had worked tirelessly for years to support their children and pay his debts. Burnham stabbed both men to death.[14]

Like bankrupts, alcoholics were prone to respond violently to perceived injustices and slights, especially in the 1820s and 1830s, when the rural North was becoming increasingly preoccupied with respectability. Ephraim Briggs, a veteran of the Revolutionary War, and Daniel Palmer, once a successful farmer, had lost their good names through public drunkenness. One day at the Red Tavern in Danby,

Vermont, they called simultaneously for a drink. Palmer grabbed the first mug, and Briggs, his elder, ordered him to put it down. Palmer drank anyway, and Briggs slugged him. In the ensuing fight Briggs was killed. Dr. Elias Thomas of Goffstown, New Hampshire, could not abide the humiliation of being escorted home from the tavern every night by Charles Small, a young bartender. One night the drunken Thomas turned on Small and stabbed him. Although alcoholics were primarily a threat to their wives, as homicide rates fell and as they were increasingly marginalized in society they accounted for a growing share of the men who murdered unrelated adults.[15]

People who had flouted society's moral standards also contributed to the homicide rate. Rolon Wheeler, a hardscrabble farmer from Wallingford, Vermont, ran afoul of his neighbors for sleeping with his wife's sister. They came to his house one night to tar and feather him. When they broke into his bedroom, he killed one of them and wounded several others before escaping through a hole concealed under his bed. Jonathan Hall, who worked at a brothel run by the widow Grandy in Vergennes, Vermont, also refused to be run out of town. When a mob of thirty men showed up one night to make good on the community's threat to tear down the brothel, Hall shot the first man to come through the door.[16]

Predatory homicides such as those committed in the course of robberies and sexual assaults nearly disappeared, as did homicides over insults or property disputes. Gun homicides—a good proxy for intentional homicides—declined from 52 percent of homicides among unrelated adults in New England during the Revolution to only 17 percent by the 1820s and 1830s, and from 60 percent in Ross and Holmes Counties in Ohio to zero. Involuntary homicides caused by mental illness or by unlucky blows in ordinary fights accounted for a large portion of homicides among unrelated adults.[17]

By the 1830s and 1840s there were signs that northerners' confidence in their egalitarian social order was waning. Opportunities for self-employment declined after the War of 1812 as the population increased and the economy changed. The creation of integrated regional and national markets made it harder for small or inefficient firms to survive, and more capital was needed to create viable shops and farms. Population pressure further increased costs in the Northeast by raising the price of land in cities and the countryside, and the

capital costs of establishing new businesses in the Midwest were so high, especially for farmers, that they offset much of the advantage of cheaper midwestern land. As a result, self-employment declined in the North from 60 percent of all adult males in 1815 to 40 percent by 1860.[18]

The decline in self-employment did not occur overnight, but by the mid-1830s northerners knew it was under way. Per-capita income rose, even for farm laborers and factory workers, because of rising productivity, but incomes did not keep pace with the rising cost of establishing farms or shops, so fewer families enjoyed the prestige and security of self-employment. Few people referred to the decline as a crisis, because its onset was so slow. Most spoke instead of the "pressure of the times" and actively sought ways to cope with diminishing opportunities.

Both the Whig Party and the Democratic Party offered remedies for the decline in self-employment. The Whigs favored greater access to capital and markets, while the Democrats favored greater access to undeveloped land in the West, lower taxes, and limits on the power of banks, corporations, and other potential monopolies. Unions and workingmen's parties in cities like Boston, Philadelphia, and New York City called for shorter hours, a homestead law, and better pay, so that more apprentices and journeymen could rise from the ranks to become master tailors, shoemakers, and mechanics. Young people dealt with the "pressure of the times" in more immediate ways, by delaying marriage and children and saving the money they earned as laborers. They took a few more years to establish their economic independence. Faith in the republic and in prospects for individual success remained strong into the 1840s; but anxiety increased, because the path to home ownership and self-employment had become longer and more difficult.[19]

The fear of failure was palpable among churchgoing northerners, who tried in various ways to improve their children's chances of success. Discipline became stricter, and parents and ministers pressured young people to join temperance societies and to reject sexual temptation. The age at which young people began to worry about their reputations and their futures dropped precipitously. Northerners increasingly praised industry, restraint, and moral zeal, and they expressed scorn for people who failed to toe the line. But their crusade to ex-

pand church membership, curb drinking, and improve the moral tone of society ended up being divisive, because it alienated many hard-working people, especially those who drank occasionally, attended church irregularly, and had little use for people who told others how to live.[20]

The moral and spiritual crusades that divided northerners in the 1830s and 1840s did not have an immediate effect on the homicide rate among unrelated adults, in part because homeownership and self-employment remained widespread and because many drinkers and nonchurchgoers steadfastly ignored the reformers and crusaders. Abel Rich, a notorious skeptic from Strafford, Vermont, scoffed when a revivalist confronted him in 1835 before a crowd of neighbors and asked if he had got religion. "None to boast of, I tell ye," he said. Rich, whose fellow townsmen had elected him tithingman, later declared that he bore the preacher no grudge, but if the man "should be mobbed and I was the only witness, I would forget it before morning-g-g, that I would-d-d." In another Vermont town a church committee discovered that one of their members who was an alcoholic had backslid, and they posted a notice at the general store announcing his excommunication. "Whereas Mr. Lyon has not kept his promise to reform, we the Church Committee return him to the outside world from whence he came. By the church committee." The next day another notice appeared. "Whereas Mr. Lyon is so much worse than when he joined the church, we of the outside world refuse to accept him back. By the Outside Committee." The church committee never quite regained the status it had once enjoyed.[21]

Wit was a powerful leveler. It enabled the weak to tweak the noses of the strong, and it defused confrontations that might otherwise have turned violent. The seeds of class conflict were evident in the ongoing battle between Ira Hoffman, a poor farm laborer in Sutton, Vermont, and his employer, a well-to-do farmer who demanded moral rectitude in his employees. Hoffman repeatedly thumbed his nose at his boss, whom he characterized as "mean as cat piss," and infuriated him by using foul language, strutting about town in a fancy satin vest, and, in his most effective move, quitting at harvest time. To make matters worse, he used his quick wit and his thorough knowledge of current events to trounce his employer's beloved Whigs in a local debate over Texas.[22]

The conflict between this young outsider and his employer would

have been almost unthinkable in the plantation South. The difference between Hoffman's story and that of George Tucker, the Georgia carpenter who quit his job, asked for his pay, and was stripped naked and whipped by his employer, illustrates how wide the cultural divide was between the North and the slaveholding South. In the North, outsiders like Rich and Hoffman could assert their independence and proclaim their manhood in imaginative, nonviolent ways, whereas southerners were kept in their place by a more rigid class system, and young men who wanted to prove their manhood could do so only by fighting.

In the North, young men who enjoyed tavern life and were not regular churchgoers formed a distinct community in the 1830s and 1840s. They favored the Democratic Party, which appealed to religious dissenters, freethinkers, and antiprohibitionists by supporting the strict separation of church and state and by opposing laws that forced people to quit drinking or observe the Sabbath. The Democrats did not endorse drinking or atheism, as their Whig opponents often charged, but they believed that voluntary support for churches and for reform movements like temperance was the only constitutional way to improve the moral and spiritual tone of society. It may be that the critical turn of mind necessary to resist Christian proselytizing and prohibitionist indoctrination, together with the solidarity that pressure from respectable society created, helped keep the homicide rate low among these men, many of whom were of an age to be predisposed to violence. In the late 1840s and 1850s, however, when it became apparent that the decline in self-employment was not going to reverse itself and that the drinking poor might be fixed permanently at the bottom of the social hierarchy, these factors would not be strong enough to prevent an increase in homicide in this demographic.

Vigilante justice remained popular after the Revolution and was occasionally used against adulterers, brothel keepers, and petty criminals. Though illegal and unpopular with authorities, vigilante justice was not in most instances divisive. It usually reflected the will of the community, and supporters justified it as a direct expression of democracy. Vigilantes typically gathered in groups of fifty to one hundred. Sometimes they tarred and feathered their victims and tore down their houses, but in most cases they simply made noise, broke windows, burned people in effigy, and ordered their victims to change their ways or leave town.[23]

Vigilantes rarely killed people, except on the frontier, where homicide rates were higher and livestock theft endemic, and along major rivers like the Mississippi, Missouri, and lower Ohio, where criminal gangs flourished well into the 1840s, taking advantage of good roads, riverboats, and the proximity of state borders to escape capture. Iowa, for instance, experienced a terrible crime wave after the Black Hawk Purchase was opened to settlement in July 1833. Iowa did not have its own territorial government until 1838, and there were no secure jails, effective courts, or law enforcement until the early 1840s. As a result, Iowans felt they had to take the law into their own hands. They formed vigilance committees and hunted down murderers and horse thieves at considerable risk to themselves. After a mass meeting, citizens in Poweshiek County searched the woods north of Montezuma for members of the "Fox and Long" gang. They caught two, tried them "by a self-constituted jury," and shot them. W. W. Brown's gang plagued communities along the Mississippi River for several years, stealing horses, passing counterfeit money, pirating boats, and murdering witnesses, until residents of Jackson County formed a citizens' army to stop them. The vigilantes cornered the gang at Brown's Hotel in Bellevue. They killed three outlaws and captured all but six of the survivors, but they themselves suffered four dead and seven wounded.[24]

These postrevolutionary northern vigilantes made an effort not to be lawless or vengeful. In Iowa vigilantes executed only seven men in the 1830s and early 1840s, and in each instance they held a trial (a "lynch court") before condemning the accused to death. In every other case, they simply whipped and banished the accused or turned them over to territorial authorities. Their justice was rough—they extracted confessions under threat of death—but it was formal and democratic. At the end of the trial for the thirteen gang members captured after the shootout in Bellevue, the vigilantes voted with beans to decide the men's fate: a white bean for hanging and a red bean for whipping. The red beans prevailed, forty-two to thirty-eight, so the surviving gang members were not hanged, even though they had killed four vigilantes. They were given thirty-nine lashes each, placed on the Mississippi in a boat with three days' provisions, and told not to return on penalty of death.[25]

Despite such violence, homicide rates remained low into the early

1840s, even for African Americans. Blacks were murdered at the same rate as whites in New York City and at only a slightly higher rate in Philadelphia (Figure 5.4)—remarkable statistics given the poverty of most African Americans and the high proportion of African American men who worked as sailors or dockworkers. In Philadelphia several blacks lost their lives in drunken quarrels with other blacks, and a few blacks killed or were killed during robberies or beatings, but on the whole there were few homicides, intentional or unintentional, among blacks. Nor were there many homicides of either type between blacks and whites, except during the "Flying Horse Riot" of 1834, in which two black men died (and another was castrated) after a fight between blacks and whites over who would ride on a carousel.[26]

Homicide rates were also low for blacks in northern New England and in the Midwest. Once the War of 1812 ended, blacks were not in-



Figure 5.4  Homicide rates in New York City and Philadelphia by race, 1797–1900 (per 100,000 adults per year). New York City: all homicides. Philadelphia: homicides among unrelated adults, indictments only.

volved in a single homicide in the rural midwestern counties studied intensively, or in Cuyahoga County, Ohio, even though several of the counties had substantial black populations. In Vermont and New Hampshire only one African American—an ex-convict—committed a homicide between the late 1780s and the late 1840s, and none were murdered. In short, the patterns that were established in the North during and after the Revolution persisted. Whites seldom engaged in homicidal violence against blacks except during riots, when law and order broke down and assailants had a degree of anonymity; and blacks seldom engaged in homicidal violence against anyone.[27]

By contrast, the long-term impact of the Revolution on homicide rates for Irish Catholics in the North was mixed. Their rates were actually very low in small towns and in the countryside in the early nineteenth century, especially by the standards of contemporary Ireland. In the rural Midwest their homicide rate fell to only 4 per 100,000 adults per year, and in northern New England it fell to 1 per 100,000. That was two-thirds higher than the rates for African Americans or for other whites, but it was much lower than it had been in the eighteenth century. Some of the difference can be explained by proximate causes—that is, by the desperate competition for jobs and by the Irish tradition of recreational violence—but at bottom the higher homicide rate stemmed from a craving for respect, which was all the more powerful in a society dominated by Protestants of English descent who regarded the Irish as "white Negroes."[28]

Irish immigrants were seldom involved in the kind of predatory violence that runaway Irish servants had engaged in before the Revolution. Most Irishmen who were recent immigrants worked as unskilled laborers in mining, canal building, and railroad building. The number of workers usually exceeded the number of jobs, so laborers—many of them desperately poor—often had to fight for employment. Irish laborers were probably no more homicidal than their peers, but their concentration in these competitive occupations increased the likelihood that they would engage in fights or riots that could turn deadly.[29]

The Irish did have a penchant for recreational violence. They considered fighting a sport, and they glorified powerful fighters. But all too often, Saturday night brawls at dances, drinking parties, and brothels ended in death. Clearly, Irish immigrants brought this kind of vio-

lence with them to the United States; such killings, usually associated with heavy drinking, made up a large proportion of the homicides that occurred in Ireland in the nineteenth century.[30]

Still, like other rural northerners, rural Irish Catholics saw their homicide rates decline in the early nineteenth century. Optimism about the future probably played a role in moderating violence. Although anti-Irish prejudice and anti-Catholic laws did not die easily, in the late eighteenth and early nineteenth centuries new state laws established religious freedom for Catholics and separated church from state. In addition, America's successful rebellion against Great Britain and its bold stand against British aggression during the Napoleonic Wars fired the imagination of Irish patriots, many of whom came to see the United States as a model and an ally. Immigration to America meant emancipation from British oppression, from Protestant prejudice, from "tyrannous landlords" who worked them like slaves. As laborer John Quinlivan put it, America gave him a chance to be independent and to have "a place to Stop that I can call my own." To many Irish Catholics it was "the land that flows with milk and hon[e]y—the land of work and peace."[31]

But nativism was intensifying even in the rural North in the 1820s and 1830s as Catholics began to outnumber Protestants among Irish immigrants, and many Irish Catholic immigrants had very little hope of bettering themselves. They were simply too poorly paid ever to achieve economic independence, and the only positive recognition they could hope for from the Protestant majority was to be remembered upon their deaths as faithful servants. The newspapers of the period sometimes characterized Irish individuals in passing as "respectable," but such remarks only implied that most Irish men and women did not fit that description. Still, the Irish believed that their achievements in the United States went "far beyont what it was possible for them to have done had the[y] stop[p]ed in Ireland," and they did gain a degree of acceptance in the rural North, at least before the Great Famine.[32] They were a reliable source of cheap labor, and they posed no serious threat to the Protestant majority because they made up less than 5 percent of the population.

In cities like New York and Philadelphia, however, Irish Catholics faced hostility and discrimination from the 1790s through the early

1840s. Wherever they were numerous enough to threaten the jobs and the political power of Protestants, their homicide rate hovered around 12 per 100,000 adults per year—twice the rate for African Americans and three times the rate for non-Irish whites and for contemporary Ireland. They were often killed or implicated in homicides that occurred during riots. They fought and died to defend their neighborhoods, their right to vote, and their right to enter skilled trades. Yet they were far more likely to die in fights with each other.[33] Living in tenements and working for wages had a demoralizing effect on all the urban poor—and Irish Catholics were disproportionately poor. But prejudice and discrimination made matters worse for the urban Irish, some of whom were so angry about their treatment at the hands of the Protestant majority that they turned to gang violence and to predatory crime, which further increased their homicide rate. That pattern would be repeated in the late nineteenth century in cities across the United States: the minority in each city that felt it was losing ground and being pushed to the bottom of the social hierarchy would have the highest homicide rate—the Chinese in San Francisco, for example, or African Americans in Philadelphia, or Hispanics in Los Angeles.

Urban Irish had a powerful ally in their effort to become full and equal members of American society. The Democratic Party courted Irish Catholic voters by opposing anti-immigrant laws and denouncing anti-Irish prejudice. It awarded them patronage jobs, supported their candidacies for state and local offices, and, perhaps most important, gave them a sense of belonging and empowerment. The party also encouraged the Irish to support an antiblack, proslavery agenda and persuaded them to begin thinking of themselves as more deserving than blacks by virtue of their skin color. Given the competition between African Americans and Irish Catholics for jobs and housing in northern cities, the Irish needed little encouragement. As yet they had not clashed with blacks in significant numbers, but clearly there was potential for trouble.[34] Serious violence did not erupt, however, until the late 1840s and 1850s, when the competition between the two groups increased homicide rates both directly—by spawning interracial riots—and indirectly, as disillusionment with politics and frustration with declining economic prospects led to a general increase in homicides of all kinds.

## White Homicide in the South

As in the North, homicide rates in the mountain South were probably at their lowest levels in history by the 1830s and early 1840s. Frontier disputes with Native Americans were at times a problem, especially during the forced removal of the Cherokees and other Native peoples to reservations in the West. In Gilmer County, Georgia, for example, several Cherokees murdered a teenaged farm laborer who had encroached on their land, and another murdered an ill-tempered white trader who was selling liquor to the Natives. But those were the county's only reported homicides, and once the frontier period had passed, homicide rates in northern Georgia, in the Ozarks of southern Missouri, and in the upper Cumberland in Kentucky and Tennessee fell nearly to zero (Figure 5.5).[35]

Southern mountain communities were very similar to rural commu-



Figure 5.5  Homicide rates in mountain counties, 1816–1900 (per 100,000 adults per year).

nities in the North in the early national period. The land was still fertile, and timber was plentiful. People made a decent living raising hogs, sheep, and cattle, and population pressure was low. Slaves made up less than 5 percent of the population in these rugged counties, so white laborers did not have to compete against slave labor, and farmers did not have to compete against planters for land, political power, or social prestige, at least within their own communities. Land titles were less secure in the mountain South than in the North, and many settlers were still renting or squatting on land owned by speculators in the 1820s and 1830s, but by midcentury roughly two-thirds of adult white males owned at least a house and a small acreage. In plantation counties that figure was 50 percent or less.[36]

People in the mountain South did not need much land to make a good living. Their livestock usually ran free on the land of absentee owners, and without competition from slaves or free blacks, a third of all adult white males were able to earn most of their income outside agriculture, as opposed to a quarter or less in counties where slaves made up a tenth or more of the population. Food was plentiful, and the hazards of urban life were far away. As a result, the white inhabitants of the mountain South were among the tallest, healthiest people in the United States. The sense of empowerment and the expectation of economic independence were as strong in these communities as in the small towns and rural areas of the North. So, too, were patriotism and faith in the new nation, which is one reason why so many people in the mountain South were Unionists during the sectional crisis and the Civil War.[37]

In contrast, by the 1820s the homicide rate in the slaveholding South was at least twice what it had been at its low point in the mid-eighteenth century, and much higher than in the rest of the United States. Although the homicide rate varied widely in plantation counties in Georgia and South Carolina, in the North Carolina Piedmont, and in the Chesapeake and the Shenandoah Valley of Virginia, on the whole it was probably 10 to 25 per year for both blacks and whites (Figures 4.1, 5.6, and 5.7). That was double the rate in cities like Philadelphia and New York, which were the most homicidal places in the North. The plantation South was as prosperous as any other region in the United States, so poverty cannot explain the rising homicide rate. Nor can weak criminal justice institutions. The

South built prisons at the same rate as the North, and its cities had the first modern, uniformed police forces in the United States. In rural counties, slave patrols supplemented local sheriffs.[38]

The primary cause of the slaveholding South's higher homicide rate was the Revolution, which had a disruptive effect on slave society and on the relationship between proslavery southerners and the federal government. The Revolution undermined the pretensions of the *soi-disant* aristocracy and increased doubts about the rationale for slavery, but southern society was still firmly controlled by the slaveholding gentry, and many blacks and nonslaveholding whites felt frustrated and aggrieved at not having a share in the fruits of victory. Aware of these feelings, whites were more fearful of blacks, and slaveholders were more wary of nonslaveholding whites. Slaveholders were also distrustful of the federal government. They had been very patriotic during the War of 1812, but their patriotism declined quickly as the national controversy over slavery intensified in the 1820s and 1830s. They had not yet become southern nationalists, but they were rapidly becoming



Figure 5.6  Homicide rates in Virginia by race, 1790–1900 (per 100,000 adults per year). Amelia, Lancaster, Rockbridge, and Surry Counties.

alienated from whites in the North and the mountain South, and they viewed the nonslaveholding whites in their midst as actual or potential abolitionists.[39] Together, the loss of faith in federal government, the decline in fellow feeling among whites, the growing fear of blacks among whites, and frustration among blacks and poor whites with the social hierarchy gave rise to the anger and alienation that caused the increase in homicide.

Fear of the antislavery movement was responsible for the initial jump in the homicide rate. Slaveholders were afraid that the success of the movement in the North would encourage blacks to murder whites in the South. For the most part, slaves and free blacks in the South,



Figure 5.7 Homicide rates in plantation counties, 1815–1863 (per 100,000 adults per year). *Sources:* North Carolina: Bynum (1992: 82); Frederick County, Maryland: Rice (1994: 34, 100); Whitfield and Greene Counties, Georgia: Ayers (1984: 115).

like their counterparts in the North, chose other means to resist slavery and oppression, but whites were increasingly afraid of slaves, especially after the Haitian Revolution in 1791 and the exposure of slave rebellion plots in Virginia and North Carolina in 1800. Determined to do whatever it took to keep the institution alive, white militants used force ruthlessly to suppress abolitionists and to stop the spread of rebellion in the South.

The defeat of the southern antislavery movement was not a foregone conclusion in the 1790s and early 1800s, but southerners knew that their society was at a crossroads. As one anonymous Virginian put it, "The question now is a plain one. Shall we abolish slavery, or shall we continue it? There is no middle course to steer." The abolition of slavery in the North, the disappearance of convict servitude, and the rapid decline of apprenticeship and indentured servitude left southern slavery as the only formal remnant of the hierarchical society of the mid-eighteenth century. There were no longer degrees of servitude in America: only one remained, and African Americans were more impatient than ever to throw off that last form of bondage. George Tucker, a young Virginian from a prominent family, warned in 1801 that slave rebellions were inevitable.

> The love of freedom . . . is an inborn sentiment, which the God of nature has planted deep in the heart: long may it be kept under by the arbitrary institutions of society; but, at the first favourable moment, it springs forth, and flourishes with a vigour that defies all check. This celestial spark . . . is not extinguished in the bosom of the slave. It may be buried in the embers; but it still lives; and the breath of knowledge kindles it into flame. Thus we find . . . there never have been slaves in any country, who have not seized the first favorable opportunity to revolt.

The desire of the slaves for freedom was "an eating sore," rapidly growing worse because of "the very nature of our government, which leads us to recur perpetually to the discussion of natural rights."[40]

John Randolph of Roanoke saw the same dangers: since the Revolution blacks had acquired a "sense of their rights, and contempt of danger, and a thirst for revenge." Whites in the plantation South were divided—and would remain divided—about what course to take. The dangers of slavery, and the moral problems it posed, wore on an increasing number of slaveowners, some of whom manumitted their

slaves or let them hire out their own time so that they could save enough money to purchase their freedom. Others thought that they could make slavery safer by Christianizing the institution. They wanted to minister to the souls of slaves and slaveowners, teach generosity and forbearance to all parties, foster respect for slave families, and encourage everyone—especially slaves—to look to heaven for their ultimate reward. Still others, like Tucker and his friend Thomas Jefferson, rejected both positions, certain that blacks and whites could never live as equals in a free society but doubtful that slavery could be preserved, given its inherent dangers and its ability to corrupt the morals of even the most devout Christians. Where slavery was concerned, Jefferson wrote, "We have the wolf by the ears; and we can neither hold him, nor safely let him go. Justice is on one scale, and self-preservation in the other."[41]

The profitability of slavery, prejudice against African Americans, and fear engendered by the Haitian Revolution and slave plots in the United States gave the upper hand to whites who wanted to preserve white supremacy by force. Defenders of slavery scoffed at the naïveté of colonizers, Christianizers, and abolitionists and reminded southerners of the fate of whites in Haiti. Proslavery activists like Edward Clifford Holland warned that blacks would always be on the lookout for opportunities to rebel: they "should be watched with an eye of steady and unremitted observation. . . . They are the ANARCHISTS and the DOMESTIC ENEMY: the COMMON ENEMY OF CIVILIZED SOCIETY, and the BARBARIANS WHO WOULD, IF THEY COULD, BECOME THE DESTROYERS OF OUR RACE."[42]

Defenders of slavery made a special effort to demonize free blacks, who they claimed were fomenting rebellion among the slaves. They also pointed to their poverty and to the property crimes they committed as proof that blacks were unfit for freedom. Blacks had "no moral sensations," they declared, "no taste but for women; gormandizing, and drinking to excess; no wish but to be idle." Some even claimed that blacks were a different species. Their view of black character (which would become the dominant view among white Americans by the 1850s) not only legitimized slavery and racial inequality; it also fed fear and justified violence against blacks.[43]

Proslavery whites used their influence, particularly through churches and the Jeffersonian Party, to prop up slavery. They forced evangelical

churches to repeal antislavery resolutions, clamped down on manumissions, and strengthened fugitive slave laws and the slave patrol system. They encouraged prejudice and discrimination against free blacks, fought to admit new slave states and protect slavery in the Southwest territories, and rallied voters across the nation to support white supremacy. But the most militant defenders of slavery were not content with political victory. They were determined to crush black resistance and to silence white abolitionists—or anyone else who expressed sympathy for the suffering of slaves.[44]

The emotions roused by slave plots and the tirades of proslavery whites led to an increase in murders of African Americans by whites. Whenever rumors of a slave rebellion surfaced, proslavery whites responded with overwhelming force. Mass arrests followed by hangings of suspected rebels became routine after 1800. These actions had widespread support, for, whatever their opinions of slavery, southern whites were all deathly afraid of becoming victims of slave violence.[45]

Murders of suspected rebels and white sympathizers escalated after the publication in 1829 of an *Appeal to the Coloured Citizens of the World* by David Walker, a free black shopkeeper and civil rights activist in Boston. Walker threatened whites with violent retribution if they did not "throw away" their "fears and prejudices" and emancipate the slaves immediately. "We cannot but hate you, while you are treating us like dogs." North Carolina was abuzz with rumors that local blacks had read Walker's pamphlet, which was circulated in the South by black sailors and preachers. In Duplin County several slaves gave evidence under torture that they had heard about a conspiracy to rebel on Christmas Day 1830, and sixty-five slaves were arrested. In the countryside it was rumored that the uprising had already started, and 600 whites came streaming into the county seat. They stormed the jail and seized two of the conspiracy's alleged "ringleaders," cut off their heads, and strung up their bodies. The North Carolina legislature lent credence to all the rumors by passing fifteen new laws against blacks, including bans on manumissions and teaching blacks to read or write.[46]

The worst violence occurred in 1831 after Nat Turner's rebellion in Southampton County, Virginia, in which at least 58 whites were killed. Authorities in Virginia and North Carolina charged 91 men and women with conspiracy and hanged 35 of them, including Turner,

but militant whites were not satisfied. They went on a rampage, beating, burning, mutilating, and killing suspicious blacks and whites. When a guard unit in Murfreesboro, North Carolina, spied a strange black man walking down a road toward Southampton, they shot him, "cut off his head, stuck it on a pole, and planted the pole at the cross streets." That same day a black carriage driver "behaved imprudently" in the presence of his mistress, and he, too, had his head cut off and stuck on a pole. One militia unit cut off the heads of 15 slaves and put their heads on poles "as a warning to all." In the end, vigilantes killed over 120 men and women, most of whom had nothing to do with Turner's rebellion.[47]

The events of 1830–31 prompted people across the slaveholding South to take preventive measures whenever rumors of insurrection arose, and the nets they cast to capture suspects began to draw in whites as well. In 1835 a woman in Madison County, Mississippi, said she overheard her servants talking about a slave plot on a plantation outside Livingston. Before the scare was over more than two dozen blacks, slave and free, were dead, along with sixteen whites. Two slave preachers were the first victims; they were accused, as slave ministers and conjurors often were, of preaching abolition. Soon afterward a white man was accused of trading with blacks for stolen property. Vigilantes hanged him and his colleague. Then they turned their attention to Angus Donovan, a corn trader from Kentucky, and Ruel Blake, the owner of a slave who had been tortured by the vigilantes. Donovan and Blake had complained of the vigilantes' brutal treatment of blacks. The vigilantes hanged them both. Accusations, forced confessions, and lynchings continued for the next two months.[48]

Proslavery vigilantes were probably responsible for killing between 600 and 700 people in the first half of the nineteenth century. The deaths had a chilling effect on public debate: all but a handful of free blacks and antislavery whites were cowed into silence. But there were not enough of these deaths to affect the overall homicide rate in the plantation South. The rate rose largely because of individual murders of blacks by whites. Whites killed blacks at a rate of 5 per 100,000 adults per year in tobacco- and grain-growing counties in Virginia; 7 per 100,000 in Florida and in Edgefield County, South Carolina, a cotton-growing county; and 23 per 100,000 in Horry County, South Carolina, where the primary crop was rice.[49] These murders might ap-

pear at first glance to differ from vigilante murders, but they were caused by the same fears and discontents. Blacks were increasingly determined to assert themselves. Almost every black person who was murdered had at some point refused to do what was asked of him or made a demand that was considered unacceptable. Whites were increasingly determined to keep blacks in their place and more afraid than ever of what might happen if they failed. The individual whites who murdered slaves and free blacks may not have been directly involved in the militant movement to defend slavery, but they were every bit as determined to keep blacks in their place as the vigilantes, politicians, and racial theorists who spearheaded the movement.

As in the eighteenth century, a high proportion of black homicide victims were killed unintentionally by masters or overseers during discipline. Overzealous whippings and beatings claimed the lives of roughly a third of all blacks killed by whites in the Chesapeake, the Shenandoah Valley, and the Georgia–South Carolina upcountry after 1800. But a growing proportion of slaves were deliberately killed by masters or overseers. A third of all blacks killed by individual whites were shot, and another third were stabbed, clubbed, or kicked.[50] This kind of violence, which went well beyond discipline, had not been seen at such levels since the late seventeenth and early eighteenth centuries, when slavery was first established. Clearly, it was part of an effort to underscore the legitimacy of slavery in the wake of the Revolution.

Slaveowners felt that they had to kill slaves who defied them in order to break the increased resistance they were facing from all their slaves. Like their counterparts in the late seventeenth and early eighteenth centuries, they were willing to accept the property loss and the cost of legal fees. Ann Powell, a slaveowner in Amelia County, Virginia, reported that her slave Tom was "a very bad negro." He had run away many times. When her neighbors caught him yet again, he swore that he would keep running away if they returned him to his mistress. They whipped him on the spot for that remark, but the whipping did not satisfy Powell's overseer. He tied Tom to a fence and beat him to death. Drury Moore, an Amelia County overseer whose master was away, sought permission from a justice of the peace to give a slave named Scott more than the usual twenty lashes because Scott had struck him and bitten him on the hand. The justice advised Moore to wait for his employer, but Moore refused. He ordered Scott whipped,

but Scott would not cooperate. As he walked away, Moore shot him in the back. Moore told the court that "he had always said he would shoot any negroe th[a]t was under his controll that struck him."[51]

White southerners were not of one mind about killing slaves. Masters and overseers who brutalized their victims were indicted for murder, and witnesses who testified in such cases—all of whom, by law, were white—often expressed horror at what they had seen. Yet none of these witnesses ever came to the aid of an enslaved victim other than to ask the assailant to stop once they thought the slave had had enough, and none of these murderers were convicted. Masters or overseers who killed slaves with less brutality were not even charged. The authorities believed that there was good reason not to interfere, especially if a master or overseer felt the need to use a gun or knife. Taking the side of a slave could undermine discipline and threaten the institution of slavery. Whites who had qualms about the brutal treatment of slaves simply learned to give the worst of their neighbors a wide berth.

Slaveowners and overseers were not the only whites guilty of increased violence against African Americans. In the mid-eighteenth century most men would have been reluctant to destroy someone else's valuable property. Certainly poor whites did not often take it upon themselves to kill a wealthier man's slave. But after 1800 even the poorest of whites felt licensed by the greater social mandate to keep slaves in their place. Robert McCutchen, a farmer in Rockbridge County, Virginia, had hired Harry, a neighbor's slave, to do some work for him. Harry asked for his pay several times, but McCutchen always refused. One Saturday night, Harry happened to meet McCutchen while the farmer was drinking with neighbors, and Harry once again tried to get what was owed him. "You damn'd black Sallymander," said McCutchen. "Clear out, [or] I'll take your life." The neighbors testified that Harry replied civilly, "Mr. McCutchen, I have not said any thing improper to you, nor done you any harm, and you would not go to hurt me." McCutchen said that he would "as soon kill him, as . . . a Lizard," and he grabbed an ax and split his head open.[52]

In the context of widespread fear that society was changing and that slaves were challenging white supremacy, a white man who let a slave embarrass him was seen as acknowledging the validity of the slaves' claims. Adding to the problem was the economic competition that poor whites faced from enslaved artisans. Such competition and the

cost of land made it difficult to sustain a small farm or shop and to establish a family, and many whites became mired in poverty. They had no status except that conferred by their skin color, and no way of earning the respect of other whites. As slaves became more aware of the workings of the larger society, they too began to look down upon the white underclass. Poor whites who found themselves competing with slaves for the next-to-lowest rung of the social ladder tried to salvage whatever remnants of pride they could by flaunting their mastery over black men.

Still, men who murdered blacks they did not own did not have the support from the justice system that masters, overseers, and vigilantes did. Slaveowners were not pleased to have their property destroyed for the sake of a poor man's pride. Robert McCutchen was sent to prison. John Hayslet murdered a free black and had to flee the state to avoid prosecution.[53] Proslavery militants confined their antiblack violence largely to their own slaves or to suspected rebels. They viewed murders by nonslaveholders as different from the murders they themselves committed. Yet murders by nonslaveholders were rooted in the same emotions that gave birth to the proslavery movement.

Those emotions also led militant whites to kill people they suspected of favoring abolition. Joseph Samuel confronted James Reynolds in the street in Hamburg, South Carolina, and accused him of having "run negroes to a free State" and "carried them money." Reynolds, who did business with local blacks, replied that "he had never denied earning them money" but that he had never helped a runaway. Samuel beat him to death anyway. Assassins tried several times to kill the South's only noted abolitionist, Cassius Clay. Militants also killed whites from the North who made careless remarks about slavery. An Ohioan standing on a crowded dock on the Mississippi River said in passing that "he would soon be in a free state." Several bystanders jumped him, nailed him up in a pork barrel, and threw him into the river, where he drowned. Governor John Floyd of Virginia applauded such attempts to bring abolitionist "villains" to justice. "The law of nature will not permit men to have their families butchered before their eyes by their slaves and not seek by force to punish those who plan and encourage them to perpetuate these deeds." As sectional conflict intensified, southerners killed northerners more frequently.[54]

In the long run, the Revolution destabilized relations among whites

in the slave South as much as it did relations between whites and blacks. After 1800 the homicide rate among whites in the slave South reached 6 per 100,000 adults per year in Virginia; 13 per 100,000 in Edgefield County, South Carolina; and 27 per 100,000 in Horry County, South Carolina.[55] With the spread of revolutionary ideas about equality, the region's caste and class system lost legitimacy in the eyes of the poor, while the well-to-do clung to their ideas about social class and became more obdurate in their efforts to enforce social distinctions.

Southerners from all walks of life also clung to their conception of honor, which was based in part upon the mastery of other men, black and white. By its very nature slave society conferred the greatest honor on men who dominated others. Georgia humorist Augustus Baldwin Longstreet once observed that the worst fate that could befall a man in the South was to be afraid of another man, because fear made a man a slave. And no white southerner could truly be content until he had "understrappers"—white men who worked for a slaveowner. George Keen, a settler in eastern Florida, recalled how much he had wished as a young man that he could have taken part in the "overseer talk" of the local planters he escorted on hunting trips.

> One would say, I've got the best overseer I ever had; another would say, my overseer is a worthless fellow, a third would say I am pretty well satisfied with my overseer, and so on. I would sit there like a bump on a log. You bet I never wanted anything worse in my life than I wanted a plantation of niggers so I could talk about my overseer. I had some niggers, but not enough to have an overseer; that's what worried me. When hunting time come round I was in but when overseer talk was the topic of the day I was ten feet above high water mark on dry land.

Ironically, it was mastery of white men—not slaves—that was the key to self-esteem in the postrevolutionary slave South.[56]

Whites who owned few or no slaves could still take comfort in their superiority to black men, although even that status was under siege. But it was far more difficult for white men to acquire a sense of mastery over other white men. The struggle for dominance among white men had been held in check in the century before the Revolution by the inherently hierarchical nature of British society, which fostered the belief that inferiors (especially indentured servants, convict servants,

and apprentices) had a duty to defer to their superiors. The Revolution eliminated that check, even as it heightened ambitions and intensified competition. Poor and middle-income whites who wanted to move up the social ladder in the plantation South had no more opportunity to do so after the Revolution than before because of the inherent economic inequality of slaveholding society and its restrictive definition of honor. They could not compete on an equal footing in a society in which wealth, power, and social prestige were concentrated heavily in the hands of the slaveholding elite. In some states, like Virginia and South Carolina, they could not even look to political participation for a sense of empowerment, since through the 1840s more than half of all white males in those states were still disfranchised by property restrictions.

The situation made relations among poor and middle-income whites more adversarial than in the North or the mountain South. Although many poor and middle-income whites in the slaveholding South tried, like their counterparts elsewhere, to empower themselves through churches, schools, and temperance societies, they did not do so to the degree that other white Americans did, and they turned to violence far more often as a way of venting their frustration. They had the example of southern gentlemen before them, but they embraced personal combat on their own terms as a way to protect their honor, property, or rights. Dominating others was as important to poor and middle-income whites as it was to wealthy whites.

The desire for mastery over others set in motion contests of will that no man felt he could afford to lose. At a husking bee in Rockbridge County, Addison Thompson picked up a rock to throw at a dog then accidentally dropped it. George Rowsey put his foot on it and said, "If you put that rock out of the yard I will put you out." Thompson pulled the rock out from under Rowsey's foot and threw it at the dog, and Rowsey stabbed him to death. A similar contest of wills cost Archer Wingo his life on the day of his father's funeral in Amelia County, Virginia. His mother had invited guests to the family home after his father's burial. A number of people demanded more liquor, but young Archer, who had custody of the key to the liquor cabinet, cut them off. Two neighbors ordered him to hand over the key, and when he refused they threw him to the ground and kicked him to death.[57]

Poor and middle-income men were also notoriously touchy around

other people's slaves. Losing face in front of a slave was degrading, and being told by a slaveowner not to touch his slave was a reminder of one's low status. In 1836 in Jasper County, Georgia, Richard Gregory got into an argument in Charles Morgan's store with one of Morgan's slaves and began to beat him. Morgan ordered him to stop, but Gregory ignored him. Another customer, William Nelson, intervened, saying that the slave was too drunk to understand his punishment and that Gregory should at least wait until the slave sobered up. Gregory drew a pistol and shot Nelson. Two years later Jasper County witnessed a similar murder. A slave asked Turner Horton in front of a crowd for a debt he owed. Horton started to beat the slave with a stick, but the slave's owner, Joseph Harrison, ordered Horton to stop. Horton kept beating the slave, so Harrison beat Horton with a stick, compounding his humiliation. That Sunday Horton cornered Harrison at a church service and shot him through the heart.[58]

Even when poor and middle-income whites competed against each other in games of chance or strength, there was potential for serious violence. Men who were eager to prove themselves found losing hard to stomach. Whites killed each other over who was the best at wrestling, who was the best at cards or pitching dollars, who had won more money. The same adversarial psychology led to an increase in homicides over economic disputes. William Johnson, a free black barber from Natchez, Mississippi, wrote a list in his diary of the material causes of murders among whites in that town: "a Barrell of oysters," "Cattle," or "Something about a 20 c[en]t Hat."[59]

Petty disputes had led to homicides in the eighteenth century in the North as well as the South, of course, but the chances of being killed because of a petty squabble were far higher in the slaveholding South in the early nineteenth century because of the changes the Revolution had wrought. It created a struggle for status and preferment that poor and middle-income white men could not win. Petty quarrels took on life-or-death significance. Men became more aggressive and more determined to win respect by dominating others. No one captured this spirit better than Augustus Longstreet. As a judge and a reformer, he was deeply troubled by violence among whites in his native Georgia, but he understood that it grew out of a desperate need for respect. His stories in *Georgia Scenes*, published in 1835, captured the braggadocio of men in the Georgia-Carolina upcountry. They could "knock out the

bull's eye" and take any man in a fight, and they ridiculed men who didn't measure up.[60]

The same antagonistic, belligerent spirit was apparent among public men in the slaveholding South. Unlike their northern counterparts, they continued to duel (or kill in ambush) their social and political rivals long after the two-party system took shape and institutionalized political conflict. They murdered one another over insults, slights, or revelations of embarrassing truths. As would-be seigneurs, they had trouble coping with democratic politics. They were used to dominating people and having others defer to them. Such expectations had not posed a problem in the mid-eighteenth century, when the social and political hierarchy was fairly stable and their place in it secure. Except for attacks during the Revolutionary War they had faced no serious challenge since the late seventeenth century, and they had seldom been subjected to public attacks. After the Revolution, however, challenges both real and imagined came from every corner.[61]

Public men with the loftiest political ambitions were the most likely to fight, since they needed to preserve their standing and protect their reputations. When William Crawford, the future U.S. senator and secretary of the Treasury, was an aspiring young politician in Georgia, he was asked by a group of speculators to join their latest venture. He wanted nothing to do with these men, who had been involved in the *Yazoo* scandal, so he spurned their offer publicly. Peter Van Allen, one of the speculators, challenged Crawford to a duel. Crawford killed Allen and became a political star.[62]

The South produced hundreds of similar stories. John Hampden Pleasants, the former editor of the Richmond *Whig*, became incensed when an essay in the Democratic Richmond *Enquirer* insinuated that he was an abolitionist. The charge stung because Pleasants had in fact supported gradual emancipation briefly in the wake of Nat Turner's rebellion and had published letters from Whigs who thought that slavery hurt Virginia's economy. Yet the *Enquirer*'s editor, Thomas Ritchie, had done much the same by publishing an even-handed account of the legislature's 1832 debate on emancipation. Now Ritchie wanted to claim that he and the Democrats had always been rock-solid in their defense of slavery. Pleasants denied that he was an abolitionist and said that he would like to see "some abolitionist leaders hanged." But with his reputation and his party's standing at stake, he had to chal-

lenge the author of the essay, Thomas Ritchie Jr. (the son of the *Enquirer*'s editor) to a duel. Pleasants was mortally wounded. As he lay dying, he lamented the southern obsession with reputation. "What a damned immolation this is to be for public opinion."[63]

The widely reported duels involving Henry Clay, Andrew Jackson, and John Randolph attest to their popularity among gentlemen with high aspirations. Few men from the backcountry engaged in duels. Duelists were primarily from cities, large towns, or county seats. They followed the rules of the *code duello*, codified for the English-speaking public by Anglo-Irish gentlemen in 1777 and adopted in the United States with some modifications. Usually they claimed to have resorted to violence only after exhausting all other options. Abiding by the rules demonstrated, at least in their own eyes and in the eyes of most fellow southerners, that they were men of restraint as well as passion, of civility as well as courage, tolerant men who nevertheless would not hesitate to cane or kill a man for an affront. Their code of behavior conflated the ideal qualities of statesman and slavemaster in a society that was at once elite-dominated and democratic, and it helped to legitimize slaveowners' mastery of society and politics.[64]

Many gentlemen, however, especially those with less lofty political ambitions, were not interested in following the rules of the challenge and simply went after each other in the street. McQueen McIntosh and Colonel John Hopkins, who were feuding in the local newspapers, ran into each other in Darien, Georgia, pulled out their pistols, and fired away. Hopkins was wounded; McIntosh died. Major John Cooper of Hampton, Virginia, and Thomas Allen, Esq., of York County were parties to a local feud about a school. Allen, who was visiting Hampton for the day with his family, had his two small sons in tow when he ran into Cooper. They exchanged harsh words, and Cooper pulled out his pistol and shot Allen as his children screamed for help.[65]

These killings reflected the persistent difficulty that southern political leaders had in coming to grips with the unruliness of political competition in postrevolutionary America. But the carnage extended well beyond the public realm. Young gentlemen imitated their elders and challenged friends who insulted them or gossiped about them or beat them at card games. They accused them of being "damned liars" or "cheats" or "rogues" and demanded that they fight or be labeled cowards. Some of them even challenged teachers who criticized their work

in class. Since the code dictated that men did not have to respond to inferiors, teachers merely had such students expelled.

Some men enjoyed intimidating people and killing those who refused to do their bidding. A farmer and his family were driving their sheep down a road near Florence, Alabama, when a man rode up and demanded that they make way. The road was too narrow for the farmer to turn his flock aside, so the man rode into the farmer's flock "and caused him some trouble to keep it together." The farmer shouted that he would throw a rock at the man if he did not stop. The man ignored him, so the farmer threw a rock. The man dismounted, went into a nearby store, came out with a gun, and shot the farmer. Then he got out his Bowie knife and stabbed him through the heart.[66]

The South swarmed with men who prided themselves on giving in to such violent impulses. Colonel Alexander McClung killed more than a dozen men during his lifetime. As a young man he fought a number of duels, and while he was in the army he killed a general in a duel. After moving to Vicksburg, Mississippi, he got into a feud and killed seven members of a local family. He also killed people frequently on the streets and in taverns. Even his friends shrank from him when he was angry. Yet southerners admired him for his hair-trigger temper and, in the belief that there was something noble about his willingness to kill people who offended him, gave him the sobriquet "the Black Knight of the South."[67]

Men like McClung were the South's conquering heroes. As Longstreet said, "the bully of the county never wants friends," and the more famous the bully, the more friends he had. A number of men like McClung, who were known to have killed men who crossed them, won seats in Congress or their state legislatures: William Yancey of Alabama, Louis Wigfall of Texas, George Tillman of South Carolina. McClung could have been successful in politics too, but he ran for Congress as a Whig in a Mississippi district where being a Democrat was an essential qualification. Longstreet was philosophical about the southern proclivity for electing violent men. He compared southern politicians to hounds that all "jump on the undermost."[68]

It is no coincidence that the culture that condoned this conduct also condoned vigilantism. Southerners admired men who were a law unto themselves. The citizens of Thomas County, Georgia, were plagued by criminals who crossed the nearby state line from Florida Territory to

burglarize homes and steal horses. They decided to take matters into their own hands. Anyone who was caught sneaking across the state line at night was shot on sight. After yet another body turned up, a circuit court judge instructed the county's grand jurors to indict the vigilantes. Instead the jurors used the occasion to express their appreciation for a job well done: "We have taken under our serious consideration the inquest upon the body of Mack M. Glass and after making diligent inquiry, we are decidedly of the opinion that the killing of him was a praiseworthy action and that the persons concerned therein are entitled to the thanks of the county for their conduct in executing the laws." Similarly, vigilantes in Vicksburg, Mississippi, decided they had had enough of the riverfront gaming industry. They armed themselves and set out to tear up all the gambling establishments. When some of the gamblers resisted and killed one of the attackers, the vigilantes were infuriated. After overpowering the gamblers they hanged five of them, then gave four others 1,000 lashes each and set them adrift on the Mississippi.[69]

This kind of collective violence was not confined to the plantation South, but it was probably two or three times more common there than in the rural North or the mountain South, and far more deadly. Vigilantism was especially pervasive in the lower Mississippi Valley and on the Gulf Coast. The wealth created by the cotton, sugar, rice, and real estate boom of the 1820s and 1830s attracted gamblers, robbers, horse thieves, slave stealers, and confidence men eager to profit from the region's success. These criminals hid out in swamps and woodlands, traveling up and down the Mississippi River, sailing around the Gulf, and crossing state lines. Vigilantes were confident that they could do a better job at catching these people than law-enforcement officials, since they knew the terrain better and could cross state lines at will; they had few qualms about taking over the law's role and lynching suspects who fell into their hands.[70]

Southerners had a tradition of ruthless vigilantism that went back to the Carolina Regulators and the Revolution. They were accustomed to acting on their own and ignoring the constraints imposed by the legal system. This tradition had been reinforced by slavery, since neighbors often had to band together to patrol the roads for runaways. Like patrolling, vigilante action could also be exciting, especially for young men. They got to saddle up and ride out with friends, often at night,

and some of them took pleasure in the suffering and humiliation of victims. Murderers elsewhere in the United States were certainly capable of sadistic violence, like the members of the Philadelphia mob who castrated a black man and raped a black woman during the Flying Horse Riot of 1834.[71] But northern whites rarely tortured other whites. Their peers in the slaveholding South practiced almost every form of sadism on whites, from eye gouging to castration to slow suffocation. The only torment they reserved solely for blacks was burning.

Southern humor in the postrevolutionary period reflected this propensity to cruelty. The plantation South had its share of ironists, like Longstreet, but its humor—of both the published and the everyday variety—more often than not involved physical suffering and humiliation, whereas northern humor specialized in poking fun at pretentious or self-righteous people.

The Tennessee humorist George Washington Harris wrote stories about a young man named Sut Lovingood, who was mean and proud of it. When the family's horse died and his father had to pull the plow himself, Sut thought it "wer pow'ful inturestin, an' sorter funny." He laughed uproariously when his father ran into a hornets' nest "es big es a hoss's head." He also found humor in the death of the kindly Mrs. Yardley. He broke up a quilting bee at her house by tying a line hung with quilts to a skittish horse and setting the horse off with a whack from a fence post. The horse "run plum over Missis Yardley," whose "heart stop't beatin'." Sut thought that was hilarious, but he did help "salt ole Missis Yardley down" afterward so that she could "rotten cumfurtably."[72]

Southern letters from the antebellum period abound with wry comments about victims of murders and brutal assaults. One Virginian described how his friend, John McDermott, had murdered an elderly man: "He sent the poor old fellow to the other country, both drunk and with a pain in his belly, that being the place where John's knife made acquaintance." A South Carolinian spoke of his delight at beating a man and making him beg "like a negro" for mercy. Others recalled with amusement seeing men who had lost an eye or an ear in a fight.[73]

Of course, whites in the slave South were not of one mind when it came to bullying, cruelty, and murder. Many did speak out against the rising tide of murder among whites. Laws against dueling passed

in nearly every southern state, and antidueling societies formed in Charleston, Savannah, Vicksburg, and other hotbeds of murder; but they had no impact on dueling or on the murder rate as a whole. Antidueling laws were never enforced, and antidueling societies had trouble even getting their own members to honor their pledges.[74] Some humorists, like Longstreet, tried to discourage violence by poking fun at men with violent tempers and the bloodthirstiness of those who egged them on, but they were swimming against the tide.

Most southerners wanted to attack the problem of increased violence more directly by outlawing concealed weapons. Few whites had carried pistols or fighting knives in the eighteenth century, but the practice became popular in the plantation South in the nineteenth century as fears of black violence grew and whites became more anxious and belligerent. The proportion of homicides committed with such weapons is uncertain, since most records did not specify the kind of gun or knife used, but guns and knives accounted for a growing share of the known weapons that whites used to kill other whites. After the Revolution, guns or knives were used in 67 percent of homicides among whites in plantation counties in Virginia, Georgia, and South Carolina. According to contemporary observers, a substantial number of those weapons were pistols, dirks, or Bowie knives, manufactured expressly to kill people.[75]

Proponents of concealed weapons claimed that they were necessary for personal defense. Cassius Clay, who carried pistols and knives for protection against antiabolitionist mobs, said that "when society *fails to protect us*, we are authorized by the laws of God and nature to defend ourselves; based upon *the right*, 'the pistol and the Bowie knife' are to us as sacred as the gown and the pulpit." But opponents of concealed weapons believed that men carried concealed weapons for two reasons: to intimidate others and to seize the advantage in spontaneous disputes. In 1834 the grand jurors of Jasper County, Georgia, denounced "the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shoot-

ing & murdering so many of our citizens." The justices of the Louisiana Supreme Court echoed these sentiments. "Unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries. Those who opposed concealed weapons did not blame them for the slaveholding South's homicide problem, but they understood the psychology of white-on-white violence and believed that concealed weapons made the homicide problem worse by giving bullies and cowards the means to kill anyone they disliked.[76]

Opponents of concealed weapons won the public debate in the South. In an effort to stem the tide of backcountry violence, especially among boatmen on the Ohio and Mississippi Rivers, Kentucky and Louisiana passed the nation's first concealed-weapons laws in 1813. They were joined in the late 1830s by Alabama, Arkansas, Tennessee, Georgia, and Virginia. Whigs and Christian reformers lent the movement its most enthusiastic support in the 1830s and 1840s, but it was extremely popular in most states. It had the support of people who condemned violence outright, but it was also supported by people who believed that there would be fewer deaths if combatants were forced to "fight fair."[77]

Despite their popularity, concealed-weapons laws had no clear impact on homicide rates. They may have discouraged the carrying of handguns and fighting knives, but they were hard to enforce, and they did not address the underlying causes of violence. Men in the North and the mountain South had guns and knives, too, but they rarely used them to kill anyone. Only one free state felt the need for a concealed-weapons law in these years: Indiana, which had been settled predominantly by white southerners. The appeal of violence for men in the slaveholding South—its sporting nature, its excitement, and the opportunity it afforded to prove oneself in front of one's peers—was undiminished, as was the antagonistic spirit that prompted the violence in the first place.

As historian Bertram Wyatt-Brown has observed, a society that was at once a slave society and a revolutionary society could not demand "groveling, obsequiousness, and slavishness" from its freeborn white citizens. It had to give them a chance to prove that they were independent men who could command deference and respect from others. But in a slave society, men had to dominate other men to earn respect, and everyone understood that principle. As a young attorney in Ala-

bama told Alexis de Tocqueville in 1830, men who murdered other men were "always acquitted by the jury, unless there are greatly aggravating circumstances. . . . Each juror feels that he might, on leaving the court, find himself in the same position as the accused, and he acquits."[78] Laws that prohibited the carrying of concealed weapons seemed a better solution than stiff sanctions for the homicide problem. Such laws were not meant to do away with the competition for dominance; they were meant only to lessen its deadliness. But the need to dominate others was what led to murder, and after the Revolution unsettled the social hierarchy and undermined the idea that inferiors should defer to their superiors, whites in the slaveholding South were fated to become entangled in an increasing number of lethal disputes over who could master whom.

In most areas of the slaveholding South, there were mitigating factors that kept homicide rates from rising too far after the Revolution. There were stable state governments that advocated strongly for southern interests, for example, and the federal government had fulfilled at least some of its promises: Great Britain and Spain had been expelled from the Gulf Coast and the lower Mississippi River Valley, as had the Native Americans. But in Florida there were no such mitigating factors, and the feelings and beliefs that correlate with low homicide rates were almost wholly absent, so it remained two to four times more homicidal than the rest of the slaveholding South. Most whites in Florida felt that neither federal nor territorial officials were governing honestly or effectively. Public land was not being distributed fairly. The Seminoles had refused to leave. The banks existed solely to feather the nests of corrupt local officials and to fleece the average citizen, and there was little effort to deter crime. Frontier violence and government instability persisted into the 1840s.

These conditions produced anger and disillusionment with Florida's government and widespread disrespect for the law, especially among poor and middle-income whites, who stood little chance of acquiring prime agricultural land or of getting what they considered their fair share of the proceeds from the cotton, citrus, and real estate booms. Many settlers felt disfranchised and powerless, and they turned to robbery, vigilantism, and other forms of violence. As a result the homicide rate for whites rose to 40 per 100,000 adults per year during the ante-

bellum period and to 70 per 100,000 during the Second Seminole War, 1835–1842 (Figure 5.8).

Florida's homicide problem began during the Patriot War (1812–1814), when American filibusterers tried to oust the colony's Spanish governor and annex the territory to the United States. The homicide rate probably rose into the hundreds per 100,000 adults per year. The fighting was as bitter as any that occurred in the southern backcountry during the Revolutionary War, because the insurgents were opposed not only by Spanish loyalists but also by British merchantmen, runaway slaves, and Seminoles, all of whom had reason to fear an American takeover. Families who lost relatives took revenge, killing or burning out their enemies. After the war, defeated patriots like William Williams, disaffected and inured to violence, formed criminal gangs and robbed and murdered people and kidnapped slaves along the Georgia-Florida border.[79]



Figure 5.8 White homicide rates in Florida, 1828–1861 (per 100,000 adults per year). *Source:* Denham and Roth (2007).

The homicide rate declined in the early 1820s, when Florida became a territory of the United States and the chaos caused by the Patriot War, the First Seminole War (1816–1818), and campaigns against fugitive slave communities came to an end. But the new territorial government had very little legitimacy in the eyes of many whites, so their homicide rate stayed unusually high—40 per 100,000 adults per year. Control of the government remained in the hands of small cadres of federal appointees, such as the "Nucleus," a faction associated with Andrew Jackson. These factions, unresponsive and unaccountable to the territory's voters, enriched themselves at public expense. They chartered banks that issued hundreds of thousands of dollars in ill-secured loans to faction leaders and their political cronies, then held Florida taxpayers responsible for paying off the bonds that secured the loans if the banks defaulted. Faction leaders also got rich by controlling the survey and sale of land. Under federal law, people who had settled in Florida by 1825 could register and purchase between 80 and 160 acres of the land they occupied for $1.25 an acre before it came up for public auction. It was difficult enough for the poor to come up with the cash they needed, but the faction leaders who controlled land offices made the registration process next to impossible. They dismissed squatters' claims on technicalities, demanded "proof" of occupancy that illiterate farmers found hard to come by, and closed land offices illegally in the weeks before public auctions so that squatters had nowhere to register their claims. The consequences were stark in middle Florida, where land was most valuable: by 1829 only 19 percent of men with fewer than ten slaves owned land in Leon County and 13 percent in Jackson County.[80]

Florida's territorial officials also failed to establish an effective system of law enforcement. Because of penury, indifference, or the misappropriation of funds, territorial officials hired too few constables and deputies, and their jails (where they bothered to build them) were too rickety to hold criminals. As a result, at least a quarter of all homicide suspects jumped bail or escaped from jail. Three of every 100 white murderers were hanged, but because there was no state prison, murderers could not be sentenced to long prison terms, so the rest got no more than thirty-nine lashes, a year in jail, and a $1,000 fine (which was routinely rescinded for those who could not pay). Knowing that

there was very little risk of being hanged, outlaws thought little of murdering potential witnesses.[81]

Beset by lawlessness on every side, Floridians felt that they had to take the law into their own hands. They formed vigilante groups and dispensed justice as they saw fit. One in every twenty-five murder victims in Florida was hanged by white vigilantes. Poor and middle-income whites defended what property they had with violence. Neighbors killed neighbors over the placement of a fence, crop damage, the ownership of a canoe, or a contract to supply shingles to the government, usually without first seeking legal redress. Citizens who had their property attached killed the justices of the peace who issued the writs and the deputies who served them. Sectional rivalries between east and west Florida compounded the difficulties of creating a responsive government, and politics became a matter of currying favor with the federal government and of defaming opponents. Calumny led to whippings, duels, and assassinations among political leaders.[82]

Another consequence of the government's inability to establish a legitimate system of law and order was that more people carried guns. Fifty-five percent of the victims of white assailants in Florida (excluding those who were lynched) were shot, compared to 38 percent in antebellum Georgia and South Carolina and 36 percent in Virginia. Having to be ready to fight took its toll.[83]

The homicide rate among whites climbed to 70 per 100,000 adults per year during the Second Seminole War and the depression of 1839–1843, when faith in both the territorial and the federal governments reached a new low. Floridians questioned the federal government's commitment to removing the Seminoles. President Andrew Jackson, furious at criticism of his administration, added fuel to the fire in 1837 by blaming Floridians themselves: "Let the damned cowards defend their country. . . . They ought to have crushed [the Seminoles] at once if they had been men of spirit and character." The financial panic of 1837, which led to the depression of 1839–1843, made matters worse. As Florida's banks failed and poor farmers faced foreclosure, anger at Florida's political establishment finally translated itself into constructive action. Dissidents promising bank regulation and an end to land-office corruption stood for election and won control of the government.[84]

The political crisis finally passed in the early 1840s, and the homicide rate among whites fell once again to 40 per 100,000 adults per year. The end of the Second Seminole War, the arrival of statehood in 1845, and the creation of a more responsive two-party system allayed public anger, and Florida leaders began to behave, at least publicly, as if they were working for the good of the people. But cynicism about the government endured for generations, and Florida's homicide rate remained higher than the rate in the rest of the slaveholding South until the Civil War.[85]

## Black Homicide in the South

African Americans in the plantation South were profoundly affected by the Revolution's failure to fulfill its promise of equality and opportunity for all. In the early 1800s it became clear to them that the campaign for emancipation and equal rights had been defeated and that their place in the social hierarchy of the South was fixed. A slave in Southampton County expressed the frustration that all blacks felt when he said, "god damn the white people they have reigned long enough."[86] The end of that reign now seemed further off than ever. Fatalities involving discipline, running away, and insubordination increased, not only because of greater fear and hostility among whites, but also because African Americans resisted the institution on a day-to-day basis with greater fervor than they had in the late eighteenth century, when it appeared that they might gain freedom soon.

There is no sign, however, that black violence against whites had intensified. Blacks murdered whites at a rate of only 1 per 100,000 adults per year in Virginia; 2 per 100,000 in Horry County, South Carolina; and 3 per 100,000 in Edgefield County. With the exception of Nat Turner's rebellion in 1831, African Americans did not stage any organized revolts. Slaves talked about taking up arms, but most recognized the futility of doing so, given the overwhelming force the slave regime could bring to bear on them. Stealth murders of masters or mistresses by small groups of slaves, which had begun in the 1760s and 1770s, were also rare. The chances of escaping detection were poor, and it was almost certain that the innocent would suffer along with the guilty. Even in Florida, where law and order had broken down among whites, blacks murdered whites at a rate of only 3 per 100,000 adults per year,

because the odds of escaping were so poor for black offenders. Those odds improved, however, during the Second Seminole War, when the Seminoles encouraged slaves to run away and join their fight, and in those years the rate at which blacks murdered whites jumped to 8 per 100,000 (Figure 5.9).[87]

In Edgefield County, South Carolina, one unnamed runaway did declare a personal war on slavery. He hunkered down in a swamp and decided to kill anyone who came after him. Mason Mosely, a hunter, tried to capture him, but the runaway surprised Mosely with a knife and stabbed him to death. With Mosely's gun he was able to hold off a posse for some time before he ran out of ammunition and was killed. For the most part, however, blacks killed only whites who had wronged them personally or hurt their loved ones. Daniel of Lancaster County, Virginia, dashed out of his cabin and smashed William Mitchell's head with a hoe after he learned that the overseer had forced his son to whip his wife. Malina of Wilkes County, Georgia, believed that her mis-



Figure 5.9  Black homicide rates in Florida, 1828–1861 (per 100,000 adults per year). *Source:* Denham and Roth (2007).

more likely than marital or romance murders to have been provoked by at least one of the factors that correlate with homicides among unrelated adults. Letitia Blaisdell was an extreme example of someone who was dissatisfied with her position in life and turned to murder because she desperately wanted to be as rich as her relatives were. But many native-born Protestants appeared to feel increasing levels of dissatisfaction with their economic progress, and their frustrated expectations were beginning to produce higher homicide rates not only in the society at large, but within their own families.

CHAPTER 7

# "All Is Confusion, Excitement and Distrust"

*America Becomes a Homicidal Nation*

Between the mid-nineteenth and early twentieth centuries homicide rates fell in nearly every Western nation. Wherever stable, legitimate governments took shape and people developed a strong sense of patriotism and national identity, homicide rates tumbled to historically low levels. The homicide rate in England and Wales fell twice during this period, after 1867 and 1884. Those drops correlate perfectly with two major reforms that changed the nature of the British political system. The 1867 Reform Act gave the vote to all men who were heads of households in incorporated cities and towns, adding just under a million voters to the rolls. The 1884 act enfranchised all male household heads in the countryside, adding six million voters. The homicide rate fell abruptly after each act was passed and then decreased gradually to an astonishing 1 per 100,000 adults per year on the eve of World War I (Figure 5.11).[1] Giving poor and middle-class Britons the vote reduced every kind of murder among unrelated adults, from rape and robbery murders to killings in tavern brawls and in employer-employee disputes.

Homicide rates continued to fall in Canada's core provinces after Canadians won the right to self-government and began to develop strong two-party systems and a clearer sense of identity and nationality. Homicide rates were extremely low in the Confederation provinces that achieved independence from Britain in 1867—Nova Scotia, New

297

Brunswick, Quebec, and Ontario—despite their ethnic and religious divisions. By the 1880s the homicide indictment rate was less than 1 per 100,000 adults per year (Figure 5.10). But in the 1850s and early 1860s the western frontier of Canada was as violent as the northwestern frontier of the United States. Among white settlers the homicide rate was at least 25 per 100,000 adults per year in British Columbia, and it was much higher among Native Americans. Homicide rates were probably also high in Newfoundland, where conflict persisted between English Protestants and Irish Catholics; and in Manitoba, where mixed-blood Métis twice rebelled against the central government to defend their land against encroachment by English and Scots-Irish settlers. Because of the homicide rates in its outlying provinces, Canada as a whole had a higher homicide rate in the late 1920s than England and Wales, but its rate was still low by historic standards: 2.3 per 100,000 adults per year.[2]

National unification and the emergence of a strong central government sent the homicide rate plummeting in Italy. The data from Germany are far from complete, but the rate at which Germans were tried for homicide also fell rapidly after national unification, dropping by a third between the early 1880s and the beginning of World War I. Only France saw its homicide rate rise slightly in the late nineteenth and early twentieth centuries. The French rate was not very high—perhaps a little more than 2 per 100,000 adults per year, or about the same as Canada's—but it was 50 percent higher under the Third Republic than it had been under the Second Empire of Louis Napoleon. Both regimes had representative assemblies and universal suffrage for men, but Louis Napoleon's constitutional monarchy was more widely popular and would probably have survived had it not suffered a disastrous defeat in the Franco-Prussian War. Conservative and moderate republicans governed well after 1870, but they governed from a narrow middle ground, and only by default, because the monarchist majority could not agree on whether to turn to a Bourbon, an Orleans, or a Bonaparte or to choose a strong man like former general and Minister of War Georges Boulanger. The right consolidated its power over the army and the Catholic Church, while the left turned to radical republicanism, socialism, and anarchism, and both the right and left threatened to overthrow the Republic. Politics became so heated that

assassinations and duels among public men reappeared. This constant political turmoil, with ideologues of all stripes warring over what form the government should take, was accompanied by an elevated homicide rate among unrelated adults. By World War I, France's homicide rate was double the rates in more politically stable and unified nations such as England, Wales, Sweden, and Norway.[3]

It was at this time that homicide rates in the United States truly diverged from rates elsewhere in the Western world. In the late 1840s and 1850s they exploded across the nation, not only in the plantation South and the Southwest, where higher rates already prevailed, but also in the mountain South and the North, which had previously had extremely low rates. The least homicidal places in the Western world suddenly became the most homicidal. By the end of the Civil War, homicide rates among unrelated adults were substantially higher in the North than in Canada or western Europe, and higher still by one or two orders of magnitude in the South and Southwest. All kinds of homicide increased: robbery murders, rape murders, and killings over insults, bar tabs, card games, property disputes, and small debts. Ethnically and racially motivated murders increased, as did murders in the workplace and along the nation's roads, railroads, and waterways. Everywhere and under all sorts of circumstances, Americans, especially men, were more willing to kill friends, acquaintances, and strangers.

Immigration, economic hardship, and the conquest of areas populated by Hispanic and Native peoples contributed to the rise in homicide in the late 1840s and 1850s. Irish, French Canadian, German, and Chinese immigrants were well represented both as victims and as perpetrators wherever substantial numbers of them worked as unskilled laborers; and Hispanic and Native peoples in the trans-Mississippi West saw their homicide rates rise because of dispossession, demoralization, and victimization by white settlers. Yet homicide rates also surged among native-born Protestants, and in most areas of the country their rates rose as quickly as those of immigrants or ethnic minorities.[4] Many native-born workers, particularly African Americans, saw their standard of living decline in cities around the nation as masses of immigrants flooded into the country from Ireland, Germany, and French Canada. But native-born murder rates continued to climb even in ru-

ral areas, where there was unprecedented prosperity in the late 1840s and 1850s. Immigration, war, and poverty may have contributed to the rise in homicide, but they did not cause it. The rise was too sudden and too widespread. Besides, Canadians and Europeans faced their own problems with immigration, war, and poverty, yet their homicide rates fell.

Ultimately the increase in homicide in the United States occurred because Americans could not coalesce into a nation. As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and the rise of industrialized cities—the patriotic faith in government that most Americans had felt so strongly after the Revolution was undermined by anger and distrust. Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors. They were losing the sense that they were participating in a great adventure with their fellow Americans. Instead, they were competing in a cutthroat economy and a combative electoral system against millions of strangers whose interests and values were antithetical to their own.

In his inaugural address of 1853, President Franklin Pierce tried to restore faith in America's destiny. He saw "abundant grounds for hopeful confidence." The future was "boundless." It didn't look that way to most Americans. In 1846 the United States had embarked upon a war of conquest to spread slavery into Mexico, a sister republic, and it appeared that slaveholders and proslavery politicians would govern new territory. A flood of immigrants usurped what are now referred to as entry-level jobs, and after three decades of steady decline in self-employment, the promise of opportunity began to ring hollow. Banking monopolies and federal subsidies for special interests fostered economic inequality, and politicians promoted the belief that government corruption was rife (even though the government was no worse than it had ever been). Tenements were overflowing, but more mansions were being built every day. People began to wonder if democracy was a lost cause in the United States. Their fears were exacerbated by the failure of the European revolutions of 1848, which ended in class conflict, socialist uprisings, and military repression. Americans had once hoped, as a writer to the *Southern Literary Messenger* said, that

"the rotten and antiquated foundations of every despotic and exclusive institution of the Old World" would "crumble into ruin." Instead, the United States appeared to be recreating old Europe at its worst.[5]

Politics polarized along ethnic, regional, religious, class, and racial lines, and the national polity disintegrated as people argued about whether immigrants, free blacks, Catholics, Hispanics, Asians, and Native Americans should become full citizens and whether slavery would be allowed in the western territories. The rise in homicide coincided with a nationwide decline in patriotism (especially in identification with national political symbols) and with a loss of faith in government and in moderate, mainstream political parties. The proportion of new counties named after national heroes fell from a high of 45 percent in the 1820s and 1830s to only 17 percent in the 1850s and 1860s (Figure 2.1). The Democrats failed as a national party and the Whigs failed altogether, leaving the two-party system in ruins. Parties that were more aggressive ideologically took their place. The leaders of these parties questioned the legitimacy of national institutions and challenged other Americans' morality, patriotism, and right to citizenship. They used extreme rhetoric to generate partisan enthusiasm, and they encouraged righteous and retributive violence, especially in defense of property or rights.[6]

Aggression and vitriolic language invaded personal as well as political relationships and turned everyday encounters over debts or minor offenses like trespassing into deadly ones. More people chose to protect their rights or interests by force, either because they felt that they could no longer count on the government to protect them or because they despised the government so much that they would not seek justice from it. Some even refused to recognize legal decisions that went against them because the government was no longer "their government." And as more Americans became frustrated by their inability to achieve economic independence or anxious about preserving it, the heightened sensitivity about social status and respect that had characterized male behavior in the plantation South and the Southwest spread to other areas of the country. People responded violently not only to threats to their property or person but also to disrespect. They killed over a word, a gesture, a glance. In every region, the majority of murders were everyday homicides—sexual assault murders, rob-

bery murders, property dispute murders, and so on—with no obvious connection to politics. But across the nation, the areas with the greatest political strife had the highest homicide rates.

## Homicide in the North

Homicide rates among unrelated adults in the northern United States followed the arc of the nation's political history. They rose in the late 1840s and 1850s, during the Mexican War and the Kansas crisis, remained high through the Civil War, and declined in most places in the late 1860s and 1870s as the nation emerged from chaos and the two-party system revived. Across the northern United States, homicide rates that had ranged in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to a high of 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities (Figures 4.2 and 5.1–5.3).[7] As with most previous surges in homicide, the increase affected everyone: blacks and whites, the native-born and immigrants, Protestants and Catholics, the rich and the poor. Murders of unrelated adults remained the near-exclusive province of men, but the rate at which women murdered and were murdered by unrelated adults also rose. Victimization and perpetration rates doubled or more than doubled for everyone.

Thousands of homicides that appeared to arise out of class, ethnic, religious, racial, or partisan hostility had an obvious political dimension. Like the killings of blacks by Irish rioters in New York, for example, or of German immigrants by nativists in Chicago, they were caused by conflicts over slavery and immigration and by the fear that the decline in self-employment generated. But the great majority of homicides seemed to have nothing to do with politics. They were the result of tavern brawls, fights over property, and other everyday disputes. Ultimately, however, they stemmed from the same emotions that political homicides did—anger about the government's failure to protect their interests, a decline in fellow feeling, and frustration over the declining opportunities for self-employment that undermined the legitimacy of the North's social hierarchy.

The decline in self-employment was critical. The key to achieving status in the United States was economic independence, but the pro-

portion of adult men in the North who were self-employed fell steadily from around three-fifths in 1815 to two-fifths by 1860 and a third in 1880. By the mid-nineteenth century many Americans faced the prospect of working their entire lives as "wage slaves." In time, the creation of high-paying jobs for skilled and semiskilled workers on railroads and in factories would make wage work more attractive, and Americans would come to consider it honorable for a man to spend his life working for a corporation. That was not yet the case in the mid-nineteenth century. Many Americans were demoralized by their failure to achieve self-employment and despondent about their children's chances of achieving it. It was all well and good for Abraham Lincoln to say that "there is no such thing as a freeman being fatally fixed for life, in the condition of a hired laborer," and that if a man spent his life working for others it was "not the fault of the system, but because of either a dependent nature which prefers it, or improvidence, folly, or singular misfortune." What had been true in the 1820s was no longer true in the 1850s and 1860s. Critics noted that men who thought like Lincoln lived in frame houses, not log cabins. Labor reformer Ira Stewart wondered if Lincoln wanted to be admired because he had once worked with his hands, or because he no longer had to. The Whigs' vision of boundless opportunity was compelling to many poor and middle-income men, but it did not lessen their anger and anxiety about the difficulty of getting ahead.[8]

Although real wages rose, even for the poor, working people experienced their loss of economic independence as a loss of dignity, and they blamed the rich for trampling on their fellow citizens to get ahead. Strikes and other labor conflicts proliferated in coal mining and railroading as workers realized that they would have to fight to improve their wages and working conditions or live like slaves on what their employers were willing to give them.

Mass violence in coal mining and railroading took nearly 200 lives in the 1860s and 1870s, and as workers in small firms grew increasingly frustrated over their wages, working conditions, and prospects, an increasing number of them murdered their employers in disputes over wages, firings, and arrests for disturbances in the workplace. Workers had become more jealous of their rights, and employers were less respectful of people who worked for wages. The relationships between employers and employees were most volatile when they lived together,

blacks in their place again. "We will have no mercy for them. We will kill them like dogs. I [was] never down on a nigger as I am now." But the effectiveness and inclusiveness of the city's Republican government and the conciliatory gestures made by conservative white elites prevented the violence from becoming worse.[122]

### Homicide in the Southwest

Because its population was so small, the Southwest did not have a great impact on the nation's homicide rate in the mid-nineteenth century. But the region was staggeringly violent. Homicide rates rose in the late 1840s and early 1850s to the highest levels in the United States—probably 250 per 100,000 adults per year or more. In California rates declined gradually after the mid-1850s but remained high through the 1870s. In counties dominated by immigrants from Europe and the eastern United States they stood at roughly 25 per 100,000, and in mining counties and in farming and ranching counties where Hispanics and Indians made up a substantial minority of the population they were 60 per 100,000 or more (Figure 7.2). In Arizona, Colorado, New Mexico, and south and west Texas, where the mining and cattle booms were just under way in the late 1860s and the 1870s, homicide rates did not decline during this period. They ranged at a minimum from 140 per 100,000 adults per year in Colorado and 250 per 100,000 in New Mexico and in south and west Texas to 600 per 100,000 in Arizona.[123]

The increase in homicide in the Southwest can be attributed in part to the feelings and beliefs that settlers from the North and South brought with them. The same sorts of homicides that plagued the North and South appeared in the Southwest as soon as settlers arrived: murders that stemmed from political, ethnic, racial, or religious conflict, from vigilante or predatory violence, or from personal quarrels or property disputes. In San Francisco, for example, from 1849 to 1880, 6 percent of victims were murdered by mobs, vigilantes, or politically or racially motivated killers, 16 percent by disputants over property, and 25 percent by robbers, rapists, or gang members. Fifty-two percent were killed over insults, gambling disputes, or questions of honor, half of them in brothels, dance halls, or taverns.[124]

The rapid influx of so many settlers during the cattle and mining booms also contributed to the Southwest's homicide problem. The

lawlessness of cattle towns and mining camps and the propensity of their largely male population to gamble, drink heavily, and consort with prostitutes made predatory and recreational violence far more common than in the North or South and increased homicide rates for men and women alike. Women seldom became killers themselves, unless they were involved in prostitution or engaged in property disputes alongside their husbands; but they were killed more often by rapists and robbers than women elsewhere in the country, especially if they worked as prostitutes, saloon waitresses, or dance hall girls. In California in the 1850s and early 1860s the rate stood at 9 per 100,000 women per year (the rate for men was 81 per 100,000). The violence was compounded by handguns, which became the weapons of choice for His-



**Figure 7.2** Homicide rates in California, 1849–1900 (per 100,000 adults per year). Farming counties: Sacramento and San Joaquin. Mining counties: Calaveras and Tuolumne. Ranching counties: San Diego, San Luis Obispo, and Santa Barbara.

panics and Anglos after the Texas Rangers popularized their use during the Mexican War. From the late 1840s through the 1870s over half of all homicides in California were committed with guns, and probably two-thirds in south and west Texas.[125]

The same conditions that gave rise to the feelings and beliefs associated with high homicide rates in the North and the South were certainly present in the Southwest. It was obvious that there was no stable, legitimate government or reliable legal system. There was a marked shortage of empathy, especially among people of different ethnic backgrounds, and earning status and respect was a struggle. Workers and small proprietors were frustrated, especially in the mining and cattle industries, over economic inequality and the difficulty of achieving economic independence, and ethnic and racial minorities resented the prejudice and discrimination that consigned them to the bottom of the region's social hierarchy. The American conquest of 1846–47 destroyed the territorial governments that Mexico had established and left the region in a state of near anarchy. The lack of effective government and the uncertainty of land titles in Mexico's former borderlands allowed the struggle among Anglos, Hispanics, and Native Americans for control of the region's resources to spiral out of control and led to so many robbery, revenge, vigilante, and property-dispute murders that the region was in a virtual state of undeclared war. California's state and county governments were able to establish the rudiments of law and order in the late 1850s as the influx of settlers slowed and spending on law enforcement increased. But in the rest of the Southwest, especially in the mountains and on the open range, lawlessness persisted into the 1860s and 1870s. State and territorial governments were too weak and unstable to protect lives and property.

It proved difficult to establish legitimate governments in the Southwest. The majority of Hispanics and Native Americans opposed the American occupation and the governments established in its wake, which they quite rightly perceived as hostile; and Anglos disagreed bitterly among themselves over slavery, race relations, immigration, and the distribution of the spoils of conquest. These divisions ran so deep that it was impossible for any government to represent the values and interests of the majority of citizens or to win their trust. The rapid influx of so many alien cultures did little to help foster harmony. Im-

migrants flooded into the Southwest from Europe, Latin America, and Asia. When Emma H. Adams visited Tucson in 1884, she was astounded to see how many nationalities were represented there: "Americans, Mexicans, Germans, Russians, Italians, Austrians, Frenchmen, Spaniards, Greeks, the Chinese, Japanese, Portuguese, the African, Irishman, and Sandwich Islander."[126] Most of these immigrants were ambitious and aggressive young men who were veterans of the Mexican War or came from violent places like New York City, southeast China, the slaveholding South, or central Mexico. They fought the native-born Hispanic and Indian inhabitants of the Southwest, and they fought among themselves: they were as likely to kill their own kind as to kill across racial or national lines. It would take a generation to create governments that were sufficiently stable and legitimate to end the worst violence, and even then the people of the Southwest were too bitterly divided to forge a sense of kinship strong enough to deter homicide.

The Mexican War set off the initial surge in homicides in the Southwest. The war was inspired by militants from the plantation South who wanted to carry slavery, Protestantism, and white supremacy into the Mexican borderlands, and their conquest of northern Mexico was savage. Soldiers and filibusterers viewed Hispanics and Natives with contempt, and in the absence of effective civil or military government they committed innumerable atrocities. While the regular army did a fair job of deterring assaults on civilians, other units made matters worse. The Texas Rangers, who were sent to northern Mexico by the state government, killed so many unarmed civilians that General Zachary Taylor asked that no more Rangers be attached to his command, since their "atrocities" had intensified Mexican resistance. "The mounted men from Texas have scarcely made one expedition without unwarrantably killing a Mexican," he declared. The Mexicans called the Rangers "los Tejanos sangrientos"—the bloody Texans. As one regular said, "The Mexicans dread the Texians more than they do the devil, and they have good reason for it."[127]

When volunteer units from the South were involved, violence against civilians was the rule rather than the exception. Samuel Chamberlain, a private in a cavalry company that served under General Zachary Taylor, wrote that volunteers from Arkansas and Kentucky believed that "greasers" belonged "to the same social class as their own

Negro slaves." They "plundered and ill-treated them, and outraged the women . . . sometimes in the presence of the fathers and husbands, who were tied up and flogged for daring to interfere in these amusements." They whipped priests, converted cathedrals into stables, and desecrated churches, tearing down crucifixes and dragging them through the streets. They killed innumerable civilians. Men from a Kentucky regiment shot a boy in a field for target practice. Volunteers from another regiment shot an elderly sheepherder "because he objected to the shooting of his sheep." On Christmas Day 1846 several volunteers "insulted" women at Rancho Agua Nueve, and men from the ranch retaliated by killing an Arkansan near his camp. The Arkansan's comrades rode to the ranch, forced sixty men, women, and children into a cave, and started to slaughter them. When General Wool and his regulars heard the gunfire, they rushed to the scene. One Arkansan, holding a bloody scalp, told Wool not to interfere. "We don't a muss with you," he said. Wool ignored him. He and his men were able to rescue forty of the Mexicans.[128]

Mexican guerrillas, who came from areas every bit as violent as the American South, were equally ruthless. Determined to make the American occupation as costly as possible, they routinely picked off soldiers who went to towns or ranches on their days off. They also murdered Mexicans who gave aid and comfort to the enemy. "Yankedoes"—Mexican women who lived with American soldiers—faced the worst violence. One woman in northern Mexico had her ears cut off for fraternizing with an American lieutenant, and another was gang-raped and cut to pieces because she had left her husband for an American soldier. The day that the American army withdrew from the Mexican town of Saltillo, twenty-three "Yankedos" were dragged to the town square. "For hours they were subjected to nameless horrors," including rape by burros. When the guerrillas were done they cut the women's throats.[129]

The politically and racially motivated violence carried into New Mexico and Arizona, where the American occupation had begun peacefully. A new territorial government took shape quickly under Governor Charles Bent, but in January 1847 he and six people traveling with him were murdered under suspicious circumstances near Taos. Over the next few weeks thirteen more Americans were killed in villages north of Santa Fe along the Rio Grande River—the same villages that

had staged the 1837 revolt against the Mexican government. The attacks were credited at first to Indians, but they were instigated by the former lieutenant governor of New Mexico, Diego Archuleta, who was angry because General Stephen Kearney had annexed the entire territory after supposedly promising to let Archuleta govern the western half as an independent state. The anti-American insurgency commanded 1,500 troops at its peak—most of them genízaros and paisanos who were afraid of losing their land. The American army rallied and dispersed the insurgents after intense fighting. More than seventy insurgents died. These killings left a legacy of bitterness in the region.[130]

Bounty hunters—many of them veterans or deserters from the Mexican War—compounded the hostility by killing and scalping nomadic Native Americans. The governor of Sonora, Mexico, wanted to stop Apache raids on Mexican towns and villages along the territorial border and offered a bounty of $50 for each Apache scalp, but he was willing to pay for the scalp of any Indian, man, woman, or child. Dozens of bounty hunters were attracted by his offer, but perhaps the most successful was Joel Glanton, a famous Texas rebel, Ranger, and Indian fighter. Glanton, originally from Edgefield County, South Carolina, thought little of killing men in feuds or barroom brawls, and his work as a "free scout" for the Republic of Texas had prepared him well for "raising the hair" of enemies. After being forced to leave the army for killing a fellow infantryman, he recruited a band of equally unscrupulous men and set off to hunt scalps. Glanton's band murdered scores of Native Americans in southern New Mexico and Arizona, some of them marauders and some not, and they committed rapes and robberies as well. When Indians became too hard to find, they harvested Mexican scalps.[131]

Similar atrocities occurred in California, where the Bear Flag rebels—a motley band of American soldiers, trappers, adventurers, and pioneers—started their own campaign in June 1846 to liberate the territory from Mexico. They loosed a reign of terror against Native Americans and Hispanics from Stockton to San Francisco, looting houses, stealing livestock, and brutalizing the inhabitants. Two of these rebels enslaved a band of Indians at Rancho Nipomo, worked them mercilessly, raped the women, and used the men for target practice. A Bear Flag patrol on the shore of Suisun Bay opened fire on three Hispanic men who were landing in a small boat, not waiting to discover whether

they were Mexican soldiers. Ramón de Haro fell first, and when his twin brother, Francisco, tried to shield him, a Bear Flag officer yelled, "Kill the other son of a bitch." Their uncle, José Berreyesa, pleaded with the patrol. "Is it possible that you kill these young men for no reason at all? It is better that you kill me who am old too!" So they did. Pitched battles between American soldiers and Californios took forty more lives before the arrival of 1,500 New York volunteers in March 1847 ended the military phase of the American conquest.[132]

The political instability and racial conflict that followed the Mexican War played out differently in California, south Texas, and the mining and cattle country that lay between and thus had different impacts on homicide rates in the various regions of the Southwest. In California the homicide rate for non-Indians was over 230 per 100,000 adults per year in 1848 and in 1854–55. Most murders in mid-nineteenth-century California were perpetrated by Anglos, who were determined to relegate native-born Hispanics and Native Americans to the bottom of the social hierarchy and to bar Asians, Latin Americans, and free blacks from entering the Southwest and becoming citizens. In the immediate postwar period California's government was simply too weak to prosecute white supremacists, so in most instances murders of minorities went unpunished. Interracial homicides claimed the lives of only 28 percent of Anglos in the 1850s and early 1860s, but because of the great number of minorities killed by Anglos, such homicides claimed 55 percent of Hispanic victims, 56 percent of Chinese victims, 61 percent of black victims, and 66 percent of Native American victims. Most Anglos had never lived in close proximity to free people of different races and nationalities and felt demeaned by having to compete with them. "Amalgamation" was unthinkable. As the editor of the *Californian* said in 1849, "We desire only a white population."[133]

Hispanics, Native Americans, and Anglos killed one another at very high rates during the Gold Rush of the late 1840s and 1850s. In the bonanza year of 1848, gold was plentiful and labor in short supply, so Hispanic prospectors were tolerated and Indian laborers welcomed. But in 1849 nearly 100,000 immigrants arrived in northern and central California, including 80,000 Anglos, 8,000 Mexicans, and 5,000 South Americans. By 1852, 250,000 immigrants had arrived. The goldfields were crowded, and surface deposits had begun to play out. As a result, Anglo miners tried to drive Hispanics and Indians out of the diggings,

and Anglos who ranched or farmed drove Hispanics and Indians off their land elsewhere in California so that they could monopolize the market for provisioning miners. That is when the killing began in earnest. Charles Daniell, a Forty-niner, did not stray far from the truth when he told his mother that to "see the elephant" in California meant "to shoot three Indians, hang two greasers, kill a grisly bear, and dig a seven pound lump of gold."[134]

The settlers' war against Hispanics and Native Americans cost thousands of lives. General Persifor F. Smith, commander of the U.S. Army in California, set the war in motion by ruling that "everyone who is not a citizen of the United States, who enters upon public land and digs for gold [is] a trespasser." Across the goldfields, the cry went up: "Down with Foreigners!" Vigilantes at Sutter's Mill drove away Mexicans, Chileans, and Peruvians in April 1849. In July expulsions occurred throughout the Sacramento River watershed. Foreigners were killed and their property destroyed, stolen, or sold at auction. Anyone who was not English, Welsh, or Scots was at risk, including Irish, French, German, Italian, and Basque miners. However, Hispanics were the primary targets. The hostility toward them was so intense that even native-born Californios were expelled. Peddlers from Sonora had been welcome in 1849, when they brought in onions, potatoes, and other goods, and sold them at reasonable prices. But in 1850 they were forced out by Anglo merchants who refused to be undersold.[135]

Miners also expelled slaves or servants working claims for their masters. Thomas Jefferson Green, a slaveowner from Texas, was given the boot when he tried to work his claim with slave labor. Hispanic *patróns* who employed *paisano* and *genízaro* servants were also expelled. A California legislator complained that the laborers brought in by Hispanic contractors from Chile, Peru, and Mexico were "as bad as any of the free negroes of the North, or the worst slaves of the South." The fields were to be reserved, declared Henry Tefft, a delegate to the state constitutional convention, for "intelligent and enterprising white men who, from the want of capital, are compelled to do their own work." The miners attacked Hispanic employers who defied the prohibition on servant labor, whipping them, cropping their ears, or killing them outright.[136]

In 1850 the California legislature tried to discourage foreign immigration (while filling the state's coffers) by passing a bill that im-

posed a foreign miners' tax of $20 a month. The bill was authored by Thomas Jefferson Green, who had become a state senator. Although he had been kicked out of the mines himself, he was willing to help Anglo miners by keeping Mexican "peons" out. Like most southerners, he hated Mexicans. He once said that he could "maintain a better stomach at the killing of a Mexican" than of a body louse.[137]

The tax was rarely collected from European miners, but they made common cause with Hispanic miners and staged mass protests against it. In May 1850 a protest near Sonora, about seventy-five miles southeast of Sacramento, drew 4,000 miners. A Mexican miner threatened the county sheriff with a knife and had his head nearly severed by a bystander. When they heard about the threat to the sheriff, a band of 150 Anglo veterans organized themselves into a militia company and imposed martial law. They ordered foreign miners to surrender their weapons, forced them to pay the tax, and required them to apply for "good conduct" permits. All Hispanics except "respectable characters" had fifteen days to leave. Between 5,000 and 15,000 foreigners were expelled from the southern mines between May and August. Fake tax collectors also got in on the act. At one mine an Anglo imposter persuaded a posse to help him eject forty Hispanic miners from their claims, and two of the miners were killed before his deception was discovered.[138]

The foreign miners' tax proved so divisive and unproductive that the legislature repealed it in 1851. The repeal did not end expulsions and killings, however. Anglos and Hispanics squared off against each other repeatedly. In 1852 a Fourth of July parade at Rich Bar turned ugly when Anglos began to chant, "Down with the Spaniards!" "Drive every foreigner off the river!" A drunken English brothel owner opened fire, mortally wounding Señor Pizarro, "a man of high birth and breeding, a *porteño* of Buenos Ayres." The Spaniards, in turn, killed a young Irishman. At a gambling house on the Stanislaus River, a dispute over cards led to the deaths of one Anglo and three Mexicans. One of the Mexicans, shot three times and stabbed with his own knife, urged his compatriots on as he lay dying: "Mata! Mata a los chingados Yanquis! [Kill! Kill the fucking Yankees!]" In Downeyville on the night of 4 July 1851 a man named Cannon insulted a Mexican prostitute named Josefa, and she stabbed him in the chest. The town's Anglos seized Josepha, tried her in a lynch court, and hanged her that after-

noon. One Anglo who had done his fair share of lynching summed up the general attitude of his countrymen when he said, "To shoot these Greasers ain't the best way. Give 'em a fair jury trial, and rope 'em up with all the majesty of the law. That's the cure."[139]

Relations between Anglos and Hispanics were nearly as violent in San Francisco as they were in the mining country. Many interracial killings occurred in brothels, because so many had both Anglo and Hispanic workers and patrons, but most interracial killings were gang-related. An Anglo gang called the Hounds, originally recruited by the city's businessmen to return runaway sailors to their ships, made a living by stealing and extorting protection payments from Hispanics. In June 1849 two Hounds entered a Chilean shop and demanded a payment. The shopkeeper shot one of them, but the other escaped and brought the rest of the gang back with him. They looted every shop in the neighborhood, raped women, and murdered a man who tried to fight back.[140]

In the countryside, where legal institutions were too weak (or too biased) to defend the property rights of Hispanics, Anglos used every means fair and foul to take the land of Californio farmers and ranchers. Convinced that all Californio titles would be declared invalid, they cut wood on Californio land, stole horses, slaughtered cattle, burned crops, destroyed orchards, tore down fences, appropriated streams and ponds, and chased off ranch hands. When those methods did not suffice, they shot Californio farmers and ranchers in their fields. Hispanic sheriffs who tried to defend Californios were murdered. It is true that some Californio titles were fraudulent or excessive, and wealthy Californios monopolized land to a degree that Americans would not have tolerated anywhere, including the eastern United States. But even if that had that not been the case, Anglos would still have killed Californios, whom they considered "half-civilized black men."[141]

Some Hispanics became bandits and fought back. Bernardo García murdered two Bear Flag soldiers in 1846 and became an outlaw. He robbed and killed Americans until he himself was killed by a posse in 1853. Salomón Pico, a Mexican soldier who had owned a rancho north of Santa Barbara, also turned bandit. He told friends that he "had been cheated out of his property by Americans and in consequence . . . would kill every American falling into his hands." His gang attacked

Anglo traders, miners, and cattle drivers along the coast in the early 1850s. Andrés Fontes joined a gang in 1857 in order to get revenge on the Los Angeles County sheriff, who had jailed him for defending an Indian woman whom the sheriff was harassing. Tiburcio Vásquez turned to violence in 1852 after two of his friends were hanged for their role in a fight at a dance in Monterey. Vásquez complained that the Americans had shoved Californio men aside, "monopolizing the dance and the women. A spirit of hatred and revenge took possession of me. I had numerous fights in defense of what I believed to be my rights and those of my countrymen. I believed we were being unjustly deprived of the social rights that belonged to us." He asked for his mother's blessing and began his career as a robber.[142]

Like guerrillas in the Civil War South, most Hispanic bandits lost sight of their original objectives and became predators. They formed alliances with Anglo and Native American bandits when it suited their purpose and attacked non-Anglos, including Hispanics, Indians, and Chinese. They raided mining camps, ranches, stores, taverns, and brothels and killed lone travelers, and they committed rapes as well as robberies and murders.

No incident more clearly shows how murders committed by one alienated group could generate more murders and more brutality than the Ranchería tragedy of August 1855. After robbing Chinese miners camped about forty miles east of Sacramento, a Hispanic gang got drunk and raided Ranchería, a small mining town in Amador County. Screaming "Viva Mexico!," they began shooting at anything that moved. They killed two card players, wounded the hotelkeeper, and killed his wife as she tried to get their children out of harm's way. At the general store, they shot the clerk, severed the head of the owner, and stole $6,000 from the safe. When an Indian came in to see what the commotion was about, they shot him dead.[143]

An Anglo mob accused thirty-six of the town's Hispanic citizens of committing the crime. A motion to hang all of them failed, so they hanged the three who had been identified by a man named James Johnson as the thieves who broke into the store. They were innocent, but Johnson wanted their mining claim. The mob then burned Hispanic homes and businesses and drove the town's Hispanic citizens into Mile Gulch, where eight of them were killed by members of the murdered Indian's tribe. Anglo vigilantes burned the Catholic church

and the Chili Flat neighborhood in nearby Drytown, and they lynched one of the bandits, whom they found hiding under a pile of clothes in Gopher Flat. Sheriff Phoenix was killed a week later when he tried to arrest the bandits, but the posse caught most of them. Two were shot dead, two were lynched, and one committed suicide.

The Anglo-Hispanic conflict in California took a very different shape wherever Hispanics remained the majority. Hispanic ranchers prospered along the coast of southern California because of the demand for beef in San Francisco, Sacramento, and the goldfields, and they faced less competition from Anglos, because the area lacked the minerals and the rainfall that had attracted Anglo farmers and miners to northern and central California. Anglo-Hispanic violence was intense in Monterey and San Luis Obispo Counties by the mid-1850s as Anglo ranchers moved in from the north, but in San Diego County, which was too far south to interest Anglo ranchers, there was not a single known homicide in the 1850s or early 1860s involving an Anglo and a Hispanic. Wherever Hispanic power was entrenched and stable, it deterred Anglo-Hispanic homicides.

In Santa Barbara County there was only one known murder of a Hispanic by an Anglo before 1857 and none of an Anglo by a Hispanic. The village of Santa Barbara was home to a small contingent of Anglo businessmen and former officers and soldiers from Stevenson's New York Volunteers, who had been stationed in Santa Barbara during the war, and the county experienced a gradual influx of Anglo ranchers. But the Hispanic population rose simultaneously because of immigration from Mexico, so Hispanics maintained a four-to-one majority. They controlled local government and the courts. When a band of former Volunteers squatted on land that was owned by the Catholic Church, the Hispanic community appealed to the California Supreme Court. The court, dominated by Democrats sympathetic to the Church, ruled that the squatters would have to leave. When a Hispanic posse arrived with the court's order, the squatters opened fire, killing one man, but they were evicted, and their failure sent a message to other would-be squatters: they could not take land by force in Santa Barbara County.[144]

The Anglo businessmen who had settled in Santa Barbara chafed under Hispanic rule. Most of them were deeply prejudiced. Charles Huse, the editor of Santa Barbara's newspaper, complained that the

"dregs of society are collected in this town. . . . The greatest part of the population is lazy, does not work, does not pay its debts, does not keep its word, is full of envy, of ill will, of cunning, craft and fraud, falsehood and ignorance." Anglos were particularly upset by the use of Spanish in the town's schools and by the reluctance of Hispanic jurors to convict Hispanics suspected of stealing Anglo property (even though Anglo jurors were just as partial toward Anglo suspects). But the Anglo minority found it difficult to act on its prejudice. When Anglo businessmen formed a vigilante committee to round up Hispanic rustlers, they discovered that they did not have enough horses, and Hispanic ranchers refused to provide them. They tried to establish a separate English-language public school but had to give it up because it was too expensive. When Huse made a stand for the English language and discontinued the Spanish-language page in his newspaper, he lost so many readers that he had to sell—to Hispanics, who transformed it into a successful Spanish-language newspaper. The will to bully and kill Hispanics was there, but not the wherewithal.[145]

Santa Barbara's Anglo minority was emboldened, however, by the Know-Nothing movement, which carried the state in 1855. The *Ignorantes*, as Hispanics called them, hated immigrants, including the Irish, the Germans, the French, and the Chinese, but they disliked native-born Hispanics as well. The Democratic Party was powerless to stop the Know-Nothings' anti-Hispanic legislation, which included a prohibition on the use of Spanish in public schools and a vagrancy law that promised, in its own words, to put "greasers" to work.[146]

The political situation became even less favorable for Santa Barbara's Hispanic majority the following year, when California's Democratic Party embraced the white supremacist, proslavery agenda of the national party and sanctioned its call for the annexation of Mexico and Central America. Negrophobia and Hispanophobia fed off each other. Anglo Democrats in Los Angeles abandoned former mayor Antonio Coronel in the mayoral election of 1856, calling him "el negro." A Democratic newspaper declared that "Californios are a degraded race; a part of them are so black that one needs much work to distinguish them from Indians; there is little difference between them and the Negro race; in the event a Territorial government would be established in the south very soon they would establish friendship with the Negro slaves, would be united with one another, until all would be

amalgamated and all would be slaves!" The newly founded Republican Party offered Hispanics little hope. It had close ties to nativists and anti-Catholics, and its presidential nominee was John C. Frémont, the despised leader of the Bear Flag Rebellion.[147]

The changed political climate weakened the Hispanic government in Santa Barbara County and spawned more homicides. The Anglo minority was increasingly resentful of Hispanic rule, especially where the judicial system was concerned. Charles Huse, now the leader of the Know-Nothings, declared that "it would be better to close the doors of the Courthouse. . . . It makes no difference what the testimony is, if the criminal is Spanish or Californian, he is always set free by a jury of 'native sons.'" Spurred by events outside the county, the Anglos decided to dispense justice themselves. In 1857 Anglo vigilantes hanged two Hispanic men on a charge of robbery and murder even though, as one Anglo witness testified, the vigilantes did not know the name of the alleged victim, the place of the alleged crime, or whether there was any evidence against the condemned men. In 1858 an Anglo lawman gunned down a Hispanic suspect, and in 1859 rancher John Nidever and several Anglo neighbors pulled Francisco Badillo and his sixteen-year-old son from their home and hanged them on suspicion of horse theft. Twenty Californios, led by the sheriff, the coroner, and the mayor of Santa Barbara, hurried to the scene. They questioned Badillo's young sons, who had witnessed the murders. When the boys mistakenly identified Nidever's son George as one of the murderers, four Californios went after him and nearly killed him before the other posse members could stop them.[148]

Hispanic authorities jailed the Anglos who had lynched the Badillos and the Californios who had tried to kill George Nidever, but a grand jury comprised of eight Anglos and eight Hispanics deadlocked. The former refused to indict the Anglos, so the latter refused to indict the Californios. With the government hamstrung and incapable of defending life or property, relations between the Anglo and Hispanic communities broke down completely, and the two groups descended into outright war. Troops arrived from Fort Tejon to keep the peace. Major Carleton, their commander, wrote his superiors that "the Americans here will not brook restraint on the part of the Californians, and are exceedingly intolerant of the political as well as official control of any of that people. This sentiment on the part of the Americans seems

to have become so intense as now to be almost a monomania. . . . They do not seem disposed to concede to Californians the same civil rights which they claim for themselves." Charles Fernald, another officer, observed that the Hispanic control of the government and the courts in Santa Barbara had left the Anglo minority "morally insane."[149]

Thanks to the federal army and the forbearance of the Hispanic community, the wave of anti-Hispanic violence in Santa Barbara County eventually came to an end. When Anglos voted at a mass meeting to give George Nidever's attackers four days to leave the county, state senator Pablo de la Guerra persuaded the men to do so for the sake of peace, even though the Badillos' murderers remained in the county. Hispanic officials continued to give Anglos half the seats on the grand jury, even though they were entitled to only a fifth. The Hispanic community established a parochial school in Santa Barbara and left the public school to the Anglos. No Anglo was killed by a Hispanic in Santa Barbara County while Hispanics were in the majority. If George Nidever had died from his wounds, a war might have broken out, but fortunately he lived. And because Hispanics seldom responded violently to Anglo violence, there were few incidents in which deaths could occur. In all likelihood, the Hispanic community rejected anti-Anglo violence in part because they were confident of their numerical superiority, but also because they knew that the Anglos would repay any violence tenfold.

The Chinese who migrated to California to work in the mines did not suffer from interracial violence to the degree that Hispanics and Native Americans did, but they, too, were victimized. Arriving en masse in 1851–52 to work for Chinese labor contractors and Anglo mining entrepreneurs, they were attacked from all sides. Anglo miners and laborers drove them out of seven camps in 1852, and they were robbed and murdered by Hispanic bandits and by Natives who demanded fees for permission to live on their land. As mining became more capital intensive, Anglo entrepreneurs were increasingly determined to keep their Chinese laborers, and they were supported by merchants and by government officials, who recognized that the Chinese provided a steady stream of revenue, since they were more likely than the Europeans or Hispanics to pay the foreign miners' tax. Paying the tax also reduced confrontations with the state's revenue agents, although at least two Chinese were killed in attacks on tax collectors in 1855. In the late

1860s and 1870s, however, when the mines played out and the transcontinental railroad was completed, the Chinese moved to cities and to ranching and farming communities, where they were more vulnerable to attack.[150]

The worst violence occurred in Los Angeles in 1871. Anglos and Hispanics went on a rampage through Chinatown after a policeman was killed while trying to stop a fight between rival Chinese gangs. The rioters looted stores, burned buildings, and killed nineteen Chinese, only one of whom had anything to do with the gang fight. Some were shot, some hanged, and others dragged to death. Gene Tong, an elderly doctor, offered the mob several thousand dollars if it would spare him, but the rioters stripped off his pants to get his money, cut off his finger to get his diamond ring, and killed him. Interracial violence was inevitable wherever the Chinese posed a threat to Anglo labor and did not enjoy the protection of Anglo employers. Chinese workers were attacked one night in 1877 on a ranch near Chico, where they had been hired to clear a pasture. Members of the Laborers' Union (an adjunct of the Order of Caucasians, which wanted to end Chinese immigration to the United States) stole onto the ranch, shot the laborers as they slept, and set their bunkhouse on fire.[151]

As in the South, the incidence of interracial homicide was dependent upon the political climate and the will and ability of government and local elites to protect the rights of racial minorities. Political, racial, and everyday homicides were most common where Anglos were battling Hispanics, Native Americans, or the Chinese for control of trade, territory, or jobs. Interracial homicide rates were lower where Hispanics held power, as they did in Santa Barbara and in the deserts of southern California, and where the Chinese were protected by Anglo employers. Homicide rates were also lower where the Anglos displaced non-Anglos rapidly or forced them into small enclaves, as they did by the 1870s in San Francisco and in Sacramento and San Joaquin Counties. None of these places was nonhomicidal, of course. Anglo domination of non-Anglos was not a recipe for social peace, any more than white domination of blacks was in the South. But homicide rates might have been uniformly high in the 1850s and early 1860s if Anglos had coveted southern ranches or jobs in shaft mining or railroad construction.

Interracial homicides were responsible for more than half of the

murders that occurred after the American conquest of California, but intraracial homicides alone would have given the Southwest the highest murder rates in the nation. There was little solidarity within any racial group. Chinese immigrants, for instance, who came almost exclusively from Canton and the Pearl River Delta, brought homicidal conflicts with them to California. In the mid-nineteenth century, the delta region was plagued by piracy and banditry, by feuds among clans, villages, and rural districts, and by civil war between the delta's two major ethnic groups: the Punti, the native inhabitants of the region, and the Hakka, who had migrated to the delta from the northeastern provinces in the thirteenth century and spoke a dialect closer to Mandarin than Cantonese. Thousands of murders occurred every year, and the central government was too weak, corrupt, and divided in its loyalties to bring peace and stability to the region. For protection, many people banded together in companies *(kongsi),* which were made up of citizens of particular ethnic, district, and dialect groups. Others turned to secret societies *(hui),* which included people of various ethnicities. Some of these organizations were benevolent, some criminal, and some both, but almost all of them were caught up in the fighting and contributed to the delta's homicide problem.[152]

Since people in the delta were desperately poor, many Chinese men signed contracts with the merchants or criminals who ran the local company or secret society, taking on massive debts in exchange for passage to California. Most companies and secret societies were as well organized in California as they were in China. They controlled the market for Chinese laborers and had the means—usually violent—to force recalcitrant debtors to pay. They did offer their members steady work, burial insurance, health care, and legal representation in California courts, but they also drew people deeper into debt at their gambling houses, brothels, saloons, and opium dens, and many Chinese were killed in feuds among rival companies or societies. Some of these feuds ended in spectacular battles. In Weaverville, for example, two company armies of 200 men or more went up against each other in July 1854. They had trained for the battle for three weeks, at first using clubs, knives, spikes, and spears. But Anglo miners got wind of the battle and lent the combatants rifles, revolvers, and Bowie knives. Between 10 and 20 men died before the companies called a truce. That September, 600 men fought a company war on I Street in Sacramento,

and in October 1856, 2,500 men from the Sam Yap and Yan Wo companies battled in Tuolumne County.[153]

Most homicides among the Chinese in California were the result of simple quarrels among rivals. A gunfight broke out in Stockton's Chinatown, for example, after two companies argued over a card game, and three men were killed. But a great many homicides were deliberate assassinations. Companies and secret societies murdered debtors, disobedient prostitutes, or rivals who threatened their interests. Ay Yuen walked into a gambling parlor in Sacramento and shot Ah Cow because he was doing business in another company's territory. Le Chou and three associates killed Lum Sow outside a brothel in Big Oak Flats because Lum Sow had lured away one of Le Chou's prostitutes. Ah Sin, a San Francisco madam, gave one of her prostitutes a fatal dose of opium because she did not turn over her earnings. Prostitutes were frequent victims of homicide, and because a high proportion of the Chinese women who migrated to California worked as prostitutes and were subjected to violence by customers and brothel operators, Chinese women had the highest nondomestic murder rate of any group of women through the 1870s: over 30 per 100,000 adults per year, three times the rate for Hispanic women and ten times the rate for Anglo women.[154]

The Chinese may actually have been less likely to kill each other in California than they had been in the Pearl River Delta. They appear to have had a stronger sense of solidarity overseas than they did at home, and rivalries among companies and secret societies appear to have been less violent because their territories were smaller and more easily defended. But the rate at which the Chinese killed each other in California remained high after the Civil War—at least 33 per 100,000 adults per year—even though the rates at which the Chinese were killed by Hispanics, Native Americans, and Anglos declined. New immigrants from the Pearl River Delta brought homicidal customs with them, making it impossible for California's Chinese to reduce violence within their communities.[155]

Indians living independently or under Anglo jurisdiction killed one another at roughly the same rate as the Chinese—at least 30–40 per 100,000 per year. In the 1850s and early 1860s, 58 percent of the Native homicides in which the circumstances are known involved Indians from different tribes. They fought, as they did before the American

conquest, over women, children, and hunting land, and the violence among them, which included murders and family feuds as well as pitched battles, intensified as they tried to make up for the deaths of tribal members and the loss of land. The forms of intertribal violence were traditional, but the threat to tribal survival exacerbated the situation.[156]

Homicides among Indians were also rampant in the towns and mining camps where Native American men went to drink and gamble. Luseños and Cahuillas from San Bernardino County gathered in Los Angeles to play a well-publicized match of peon, but after several intense games and a good deal of drinking, a fight broke out. "Dead Indians were found in every direction. . . . These all had their heads smashed beyond recognition." By one count, at least fifty lives were lost. Alcohol use was obviously a factor in such killings. It played an even greater role in intratribal violence. Of the homicides with known circumstances that occurred within tribes, 93 percent involved alcohol. As time passed, there were more and more homicides involving friends and acquaintances. By the 1870s such killings had eclipsed intertribal homicides. The Native Americans had given up on the effort to maintain tribal prestige and, in complete demoralization, were turning on themselves.[157]

Homicide rates were much higher, however, among Hispanics than among Indians or the Chinese in the 1850s and early 1860s—at least 72 per 100,000 adults per year.[158] That rate was roughly the same as before the American conquest, and indicates that the Hispanic community was as deeply divided as ever. Little is known about the character of those homicides, because to date, research has focused almost exclusively on violence between Hispanics and Anglos. But it is likely that immigrants from Spain, Mexico, Chile, and Peru brought violent habits with them and contributed to the homicide problem. It also appears that most immigrants felt greater loyalty to their nationality than to a broader Hispanic community, and murders across national lines were probably common. However, it is likely that there were fewer fatal confrontations between native Californio *gente fina* and *paisanos* as the power of the former over the latter declined.

Detailed records are available for some cases, and they show that murders among unrelated Hispanics were usually caused by spontaneous disputes. Killings occurred during drunken brawls in saloons and

brothels, or at dances or friendly get-togethers on *ranchos*. In San Francisco, 86 percent of Hispanic murders in the mid-nineteenth century were the result of quarrels or feuds. A man named San Miguel, who had escaped from the Sacramento jail, found a cold welcome in San Francisco, where he had been involved in an "affair of honor" with several associates. They surprised him in North Beach and stabbed him twenty times. Diego Sandoval, a bully with a record of violence, demanded money from a diminutive tailor named Álvarez every time their paths crossed. One night, when Sandoval tried to shake him down in public for another $3, Álvarez decided that he had been humiliated long enough, and he shot him. The sensitivity of Hispanic men to insults was well known, but the influx of hostile Anglos and the relegation of Hispanics to the lowest rung of California's social hierarchy clearly increased levels of anger and frustration among Hispanic men.[159]

Bandits and vigilantes also took a toll on the Hispanic population. However, in the late 1860s and 1870s the murder rate among Hispanics fell from 72 per 100,000 adults per year to about 37 per 100,000 adults per year. Hispanic banditry and vigilantism declined as the forces of law and order took hold in California and in northern Mexico, where the bandits had found sanctuary. The closing of mining camps, with their attendant recreations, also saved lives. But Hispanic murder rates remained much higher than Anglo rates. Hispanics were only beginning to form bonds within their community across class and national lines, and anger over the loss of land, status, and political power was intense.[160]

Unrelated Anglos in California murdered one another at a rate of at least 37 per 100,000 adults per year in the 1850s and early 1860s. That rate was four or five times the rate at which whites killed one another in the North and most of the South, and because Anglos were in the majority, those homicides accounted for the majority of homicides in Gold Rush California. The absence of strong government and law enforcement in the first years after the American conquest was a factor in the murder rate, which was highest among Anglos during the early years of the Gold Rush. Immigrants came prepared for violence; without any law enforcement, as one miner put it, "you've got to paddle for yourself." Fear of robbers, claim jumpers, Indians, and Mexicans prompted immigrants to lay in stores of rifles and fighting knives.

Handgun ownership was widespread. "That firearms are necessary in a country like this, no one living here can doubt," said the *Sonora Herald*. "It would not be prudent to travel without them, nor should they be thought useless under the pillow at night." And there were plenty of places to use weapons. Because the mines attracted so many single men, saloons, gambling halls, dance halls, and brothels were everywhere. Hinton Helper said during a tour of California in 1855 that "I have seen purer liquors, better segars, finer tobacco, truer guns and pistols, larger dirks and bowie knives, and prettier courtesans here, than in any other place I have ever visited." Quarrels over women, card games, or careless words quickly led to homicides when men were drunk and well armed. The homicide rate among Anglos declined gradually in the late 1850s and 1860s as law enforcement improved, the pace of immigration slowed, and more families and family-oriented businesses appeared.[161]

Still, the homicide rate for Anglos in California was higher in the late 1840s and early 1850s than on previous frontiers, and it remained high well into the 1870s, two decades after the gold boom had ended. Anglos in California were as homicidal in the decade after the Civil War as whites in most plantation counties in the South, and for some of the same reasons. Settlers from Texas and the slaveholding South brought their violent habits with them and committed more than their share of homicides. Lynchings and gang violence were persistent problems, as were duels among public men. In San Francisco, for example, Senator David Broderick, a Free Soil Democrat originally from New York, clashed with David Terry, a proslavery Democrat, former Texas Ranger, and chief justice of the California Supreme Court. Terry killed Broderick in a duel at Lake Merced in 1859.[162] But Anglo settlers who came from the North, the mountain South, and Europe committed homicide at higher rates in California than they would have back home. The antagonistic, multiracial character of California society, the struggles among Anglos and Hispanics for control of local governments, the polarization of state and federal politics, and the increasing monopolization of California's mines and ranches made all Anglos, not just settlers from the South, more hostile and aggressive toward one another, more concerned about losing face, and more willing to use violence when crossed.

The rate at which Anglos murdered one another fell precipitously in

the late 1860s and 1870s, to 15 per 100,000 adults per year, as political and ethnic conflict among them diminished, land titles were sorted out, and they wrested control of California from Hispanics.[163] Even so, California remained one of the most homicidal places in the United States—and one of the most homicidal in all of American history. It had experienced simultaneously a war of conquest against the indigenous inhabitants, a frontier society, and a national political crisis over slavery, immigration, and the decline in self-employment. And the conquest of California was never complete: Anglos never eradicated the indigenous population and continued to rely on immigrant labor from Latin America and China. California remained an embattled, racially divided society, plagued by many of the problems that beset the postbellum South. That is why homicide rates among Anglos in California, like homicide rates among whites in the South, remain elevated to this day.

South Texas was also an embattled society. Despite the American victory in the Mexican War, it remained a contested borderland. In northern Mexico, the struggle between centrists and federalists continued, and local strongmen battled each other for political power and a stake in the booming business of cross-border smuggling. The weak provincial governments were incapable of imposing law and order, since the gangs responsible for the smuggling and raiding that plagued south Texas were protected by the businessmen and politicians who shared in their profits. These gangs, made up of both Anglos and Hispanics, were responsible for hundreds of murders from the end of the war through the 1870s. Apaches, vigilantes, and bounty hunters contributed to the body count. The mayhem did not stop until the late 1870s, when the administrations of Porfirio Díaz and Rutherford B. Hayes secured the border and crushed the Apaches.[164]

Yet ordinary Anglo-Texan citizens perpetrated far more killings than outlaw gangs or Apaches. Many Anglo-Texans—perhaps a majority—were determined to force Hispanics out of south Texas. They did not want to live side by side with "mongrel" and "degenerate" people. "White folks and Mexicans were never made to live together," said one woman from Victoria. Like most other Texans, she believed that "the Mexicans had no business" in Texas, and "the Americans would just have to get together and drive them all out of the country." Gilbert Kingsbury echoed those sentiments when he described his Tejano

neighbors in Brownsville: "These degraded creatures are mere pilfer-ers, scavengers and vagabonds, downright barbarians but a single re-move from Digger Indians, hanging like vermin on the skirts of civili-zation—a complete pest to humanity."[165]

Anglos were also afraid that Tejanos, being of "mixed blood," would ally themselves with African Americans and pose a threat to slavery. When war was declared in 1861, Unionist Hispanics in Zapata County were ridden down by Confederate troops and killed. But most kill-ings occurred because Anglo-Texans wanted the land, jobs, and re-sources of the Tejano community. Hispanic ranchers were forced off their land by foreclosure, legal subterfuge, intimidation, arson, rus-tling, and murder. In the Cart War of 1857, Anglos killed seventy-five Hispanic teamsters in an effort to monopolize trade out of San Anto-nio. In the 1870s Anglo cattlemen organized secret societies to force Hispanic sheepherders out of south Texas. They killed sheepherders and destroyed their flocks. In 1877 Anglo entrepreneurs seized con-trol of the salt lakes near El Paso, which had belonged to the residents of Ysleta and Socorro for generations. Judge Charles Howard, the agent for the entrepreneurs, told the *paisanos* that the salt was no longer theirs to sell. The *paisanos* fought back. Six of them died in the battles with the Anglos; Howard and four of his associates were killed. Then the Texas Rangers arrived. They put down the rebellion in two weeks, plundering the homes of Hispanics, raping the women, and beating the men.[166]

In south Texas, law-enforcement officials reacted to crimes commit-ted by Hispanics in much the same way they would have reacted to crimes committed by slaves. Dead bodies were put on display to dis-courage others from committing similar offenses. In 1875 a company of Texas Rangers shot 15 Hispanic rustlers who were holding 300 cat-tle on a small island in the Rio Grande River, dragged them back to Brownsville, and stacked their bodies like cordwood on the street. Sheriffs and deputies hunting suspects in Hispanic areas sometimes killed dozens of innocent people to avenge the death of one Anglo. Near the Nueces River, for example, a single Anglo posse killed 40 His-panics after a popular rancher was murdered. Anglo vigilantes were more brutal than law enforcement. They hanged, tortured, burned, and mutilated Hispanics for crimes ranging from murder and live-stock theft to overfamiliarity with Anglo women. Vigilantes lynched at

least 160 Hispanics in the Southwest in the 1850s and another 150 in the 1870s. And of course, Anglos murdered Hispanics regularly in ev-eryday disputes. As the adjutant general of Texas reported in 1875, "a considerable element" of the Anglo community considered "the kill-ing of a Mexican no crime."[167]

The legal system rapidly lost all legitimacy in the Hispanic commu-nity. Hispanics armed themselves and attacked Anglo marshals, sher-iffs, and Rangers. They joined insurrections and imposed their own rough justice on Anglos. In 1875 thirty Hispanic men set out to punish Anglos for persecuting their people. They raided ranches and small settlements around Corpus Christi, looting, burning, and killing at least five Anglo men. If they had had more men, they would have at-tacked Corpus Christi itself. Juan Cortina, a young Tejano rancher from Brownsville, led an uprising against Anglos in 1859. Before the Mexican War, he had worked with Anglo rustlers to ship livestock to Mexican ports, and he had been a member of the political establish-ment in Brownsville, delivering Hispanic votes for its candidates. But he and his men were angry about the anti-Hispanic violence that fol-lowed the war, and they wanted to protect the lives and property of Hispanics. "Our personal enemies shall not possess our lands until they have fattened it with their own gore." Cortina got together sixty men and rode into Brownsville. They freed Hispanic prisoners from the jail, looted the stores of Anglo merchants who had mistreated His-panic customers, and executed five Anglos who had killed Hispanics and had not been punished.[168]

The rebels selected their targets carefully and told Anglos that they had nothing to fear if they treated Tejanos fairly, but Anglos did not take the message kindly. They formed a vigilante group—the Browns-ville Tigers—and went after Cortina and his men. The fighting lasted six months and claimed dozens of lives before the rebels were driven into Mexico for good. Such uprisings inspired other Tejanos to resist, individually and collectively, but in the end they probably made mat-ters worse for Hispanics. Militant whites came to believe that Hispanics were preparing to "slaughter the gringo" and that the only way to stop the "gringo hunting expedition" was to strike preemptively.[169]

Because it was mostly interracial, south Texas violence was largely ig-nored by the rest of the country, but the violence that occurred on the grasslands of the West, an area that stretched from west Texas, New

Mexico, and Arizona in the south to Nevada, Utah, Wyoming, and Montana in the north, captured the imagination of Americans and became emblematic of the violence of the West as a whole. The area was as murderous as California or south Texas after the Civil War, but the violence was primarily due to one factor: the absence of effective government during the rise of the open-range cattle industry. As the demand for beef increased in Europe and the eastern United States, and as railroads and stockyards extended access to markets, the West became cattle country. The cattlemen moved in before the land could be surveyed and parceled out, and few areas were under the jurisdiction of any governing body; as a result every cattleman was "on his own hook" when it came to protecting his range and his livestock. Rustling was endemic, as were fights over water holes and prime grazing land. The arrival of federal land agents, courts, and county governments sometimes made the situation worse by disrupting arrangements that cattlemen had worked out among themselves and by giving large operations the legal power to force small ones off the range. There were hundreds of homicides over trespassing, theft, property damage, claim jumping, and even politics as cattlemen vied for control of local governments and tried to use their power against rivals.[170]

Open-range cattlemen seldom came to blows with farmers. The potential for violence was there: cattlemen did not like it when farmers got in their way, and farmers got upset when cattlemen broke their fences, damaged their crops, stole their cattle, or infected their herds with Texas fever, a tick-borne disease that was fatal to blooded cattle but not to the wild longhorns that carried it. Because farmers could generally muster the power to win these fights, open-range cattlemen preferred to move farther west as the farming frontier advanced rather than have their cattle quarantined or be faced with farmer posses or lawsuits.[171]

However, cattlemen waged a lethal war with sheepherders, whose flocks grazed the same open ranges. Cattlemen claimed that sheep ruined the range for cattle by cutting the turf, cropping the grass too low, and leaving a scent so strong that cattle were unwilling to graze. In fact cattle could ruin the range just as easily as sheep by overgrazing it, but cattlemen were not interested in the facts. The resultant conflict was cultural as well as economic. Most sheepherders in the Southwest were Hispanic or Navaho, and most in the Great Basin were Basque or

Mormon. Southern cattlemen despised all those groups. But sheepherders did not go quietly. Seventeen men died in Lincoln County, New Mexico, in the Tularosa Ditch War of 1873 and the Horrell War of 1873–74, which pitted Hispanic sheepherders against Texas cattlemen. The herders forced the cattlemen who had been involved in those conflicts back into Texas, but violence against herders and their flocks continued across the West.[172]

Since there were no clear titles to the grasslands, cattlemen also fought one another. Small-scale cattlemen and cowhands who wanted to start their own herds battled large-scale cattlemen, rustling herds and running cattle onto rivals' claims in efforts to gain the upper hand. When large cattlemen hired gunmen to protect their herds and fenced off pastures and water holes, whether they owned them or not, drovers and small-scale cattlemen responded by cutting fences, encroaching on disputed land, and forming posses to defend themselves. The Fence Cutting War of 1883–84 in west Texas, a general uprising of small-scale against large-scale cattlemen, was one of the most violent range wars. Only six or seven cattlemen were killed, but dozens were wounded. When Texas Rangers entered the fray on the side of the fencers, they became targets themselves. Ranger Ben Warren, a lead investigator, was shot dead through the window of a hotel in Sweetwater, but his fellow Rangers got their revenge a year later, when an undercover Ranger led a band of fence-cutters into a trap and the Rangers shot them down.[173]

The state of Texas tried to end the fighting, lynching, and rustling by dispatching more Rangers to the cattle frontier. The legislature also passed a law that made fence-cutting a felony punishable by one to five years in prison but also mandated that all fences erected on public land or on another individual's property be removed within six months and that gates be maintained on public roads so that cattlemen could pass through with their herds. The law helped, but the killing persisted for many years.

The homicide rates on the western grasslands were ultimately the result of frontier conditions. Rates were high wherever there was no reliable government and wherever a group of speculators took control of a county government and imposed its will on an unwilling majority. The cattle frontier was also homicidal because of the kind of men it attracted. Most cowboys were poor young men who had few prospects at

home, particularly if they came from war-torn parts of the South or Southwest or if they were black or Hispanic. Many hoped to become ranchers, but their wages were usually spent on supplies, clothes, whiskey, guns, prostitutes, and gambling, and the only way they could build a herd was to take up range land without paying for it and stock it with feral or stolen cattle. That was a recipe for violence, especially as wealthy cattlemen and outside investors moved in and used their power to control the land and stock, win supply contracts with the army and Indian agencies, and dictate the terms of trade at railheads.[174]

Many young cowboys had given up (at least for the time being) on self-employment, marriage, and home and land ownership, much as gang members had in the cities of the North, South, and Midwest, or as young Forty-niners did when they signed on for the Gold Rush. They were attracted to the cattle frontier, to its dangers and hardships, because it was an exciting way of life that gave them a chance to prove themselves and command respect. They loved to tell stories about droughts, blizzards, stampedes, Indian wars, and gunfights, all of which involved manly men performing heroic deeds. They admired men who did not retreat in the face of danger or adversity, who had the "grit" or "sand" to stand up for themselves when they were challenged. Oliver Lee, a New Mexico cattleman who had had his share of scrapes, asserted that he never "willingly hurt" anyone "unless they hurt me first. Then I made them pay."[175]

The young cowboy's obsession with proving his manhood and earning respect grew out of the violent culture of the Civil War South, the Mexican borderlands, and American cities, and was reinforced by stories and images from popular culture. Enamored of street fighting, gang fighting, dime novels, and the *Police Gazette,* many young cowboys, like Charlie Siringo and Teddy Blue Abbott, had already knifed or shot people before they became cowboys. Abbott admitted in his later years that he "was really dangerous" when he was young, "itching to shoot somebody in order to prove himself." Young men like Abbott and Siringo were fiercely proud of their macho image and posed for pictures with revolvers, knives, cigars, and whiskey bottles.[176]

Most cowboy violence played out in cattle towns, where young men measured themselves against other cowhands and against the gamblers, saloonkeepers, brothel owners, and bouncers who made a living

off them. Young cowboys shot men for cutting in on a dance, cheating at cards, calling them names, or refusing them a drink. Cattle towns tried to curb violence by hiring policemen and by enforcing local ordinances that prohibited the carrying of pistols and dirk knives. Once those measures were in place, the homicide rate in the five major cattle towns in Kansas fell to 60 per 100,000 adults per year in the 1870s—roughly the same as in the mountain South and in ranching and mining counties in California. Before those measures were in place, Ellsworth had eight homicides in a single year and Wichita fifteen—rates of roughly 1,200 and 1,500 per 100,000.[177]

The cattle country of the West was also violent because so many cattlemen were militant whites from the South. The Civil War and Reconstruction left them bitter and alienated. John Selman was a Texan who turned outlaw after deserting from the Confederate army in 1863. Like many other deserters, he turned to crime to survive, but crime soon became a way of expressing his hatred for racial minorities and for the wealthy men who had misled the South into war. The cattle country gave him ample room in which to operate. When the Lincoln County range war reduced southeastern New Mexico to anarchy in the summer and fall of 1878, Selman and his gang moved in. He and his "Wrestlers" cleaned out ranches in the Bonito, Hondo, and Ruidoso valleys, stealing horses, cattle, and clothes. They robbed stores and other businesses. At Bartlett's Mill they forced the wives of two workers into the brush and "used them at their pleasure." At the farm of José Chavez y Sanchez, they found three young men, including two of Chavez's sons, haying in a field, and shot them. When the Wrestlers asked for watermelons at the farm of Martín Sanchez, "his boy, about twelve or fourteen years old, carried the watermelons up for them and before they left they shot him down." They killed all nine members of a Hispanic family and then amused themselves by posing the body of the family's teenage son against a tree with a cigar in his mouth. A petition from the citizens of Roswell stated matters plainly: "Men are shot down like so many dogs in parties of two or three. Women are outraged, and their children driven from their homes. Entire settlements have been compelled to abandon their Ranches, Crops, and flee from the country for safety."[178]

Many cowboy killers, like the Olive brothers and John Wesley Hardin, began their murderous careers during Reconstruction by killing

blacks and Union soldiers in north and east Texas, and they thought nothing of killing Native Americans, Hispanics, or African Americans who got in their way on cattle drives or on the open range. Most cattlemen were willing to pay a "toll" of a few lame cattle for safe passage through Indian Territory, but not Hardin. When a band of Indians tried to cut several cattle out of his herd, he shot two of them dead. On another occasion, Hispanic wranglers tried to pass Hardin's herd on the trail. Convinced that they were trying to mix the herds and steal cattle, Hardin killed six of them.[179]

There are hundreds of similar stories from this era. When drover Gregorio Balensuela talked back to Ham Mills, a Texan, and called him a "gringo," Mills shot him dead. Colonel John Chisum, the famous Texas cattleman, brought three black hands with him when he moved his operation to New Mexico. At a Christmas party, one of the black cowboys got "out of line" and was shot dead by several white cowboys. Another talked back to a white cowboy while they were branding calves, and he, too, was shot dead. Beaver Smith, the survivor, was in the habit of singing the praises of Abe Lincoln when he was drunk. The white cowboys voted to hang him, but Ike Smith, one of the white hands, suggested that they brand him instead, because he was an excellent cook. "We laid him on his stomach and I put the Chisum brand on his loin, then jingle-bobbed his right ear, as that was the Colonel's mark." As Teddy Blue Abbott observed, cattlemen were "hard on Mexicans and niggers, because being from Texas they was born and raised with that intense hatred of a Mexican, and being Southerners, free niggers was poison to them." Any black or Hispanic who got "above himself" was likely to be killed.[180]

Many of the gun battles that took place in cattle towns after the war were rooted in the hatred that southern cattlemen, gamblers, and saloonkeepers felt for the northern lawmen and businessmen who dominated those towns. Dyed-in-the-wool Confederate Democrats were pitted against equally militant Unionist Republicans. Phil Coe was a rough and ready Texan and a leader among the Democrats in Abilene, Kansas. He hated the town's Republicans, who owned all the banks and cattle companies and dominated the town council, and Abilene's Republicans hated him. They were especially annoyed by the sign over Coe's tavern, which displayed an anatomically correct bull. The council ordered its lawman, Wild Bill Hickok, to get rid of the sign.[181]

Hickok was the right man for the job. In 1855, at age eighteen, he had moved to Kansas to farm, and when his community was attacked by proslavery forces, he joined an antislavery militia and helped make Kansas a free territory. He fought for the Union in the Civil War and distinguished himself as a scout and a fighter. Abilene's Republican elite hired Hickok because he was a loyal Republican, and they needed someone tough, experienced, and politically reliable to tame the lawless elements in their town.[182]

Legend has it that Hickok and Coe were rivals for the affections of a local prostitute. That may have been so, but they hated each other because of their politics: Hickok had no use for Rebels, and Coe detested Yankees. Coe told his friend John Wesley Hardin that Hickok had it in for southerners, especially Texans. The claim may have been true: Hickok killed mostly southerners.

Hickok went after Coe immediately. He shut down the town's crooked gambling operations, a move that cut into Coe's profits; and, worse, he took a paintbrush to Coe's sign and turned his glorious bull into a steer. Coe threatened Hickok, and Hickok let it be known that he was ready for a showdown. Coe and about fifty followers made a disturbance one day and fired into the air, hoping to draw Hickok out so that Coe could kill him. Hickok demanded an explanation. Coe, gun in hand, said he had shot at a dog. Hickok pulled out his pistols, and both men fired, at a distance of eight feet. Coe missed, but Hickok did not.[183]

The shootout at the OK Corral in Tombstone, Arizona, was a similar affair. The bankers, mine owners, and wealthy cattlemen who dominated Cochise County hired the Earp brothers—fellow northerners, Republicans, and real estate investors—to protect their property against cattlemen-rustlers like the Clantons and McLaureys and outlaws like John Ringo, nearly all of whom were southerners and Democrats. The "war" of 1881–82 killed a dozen men, including Morgan Earp, who was ambushed in a pool hall. But it ended in victory for the Earps and their supporters and led to declines in rustling, robbery, and homicide. Cochise County remained violent, but the days when the Clantons and Ringos could ride into Tombstone and shoot up the town were over.[184]

Politically charged murders occurred everywhere in cattle country where Yankees and former Confederates mixed. It is not a coincidence that 40 percent of the assailants and 15 percent of the victims in cattle-

town killings in Kansas were officers of the law—they were mostly Republicans in a hostile, Democratic environment. Teddy Blue Abbott noted that southern cattlemen were always "getting filled up" with talk about killing Yankees.

> Those early day Texans was full of that stuff. Most of them . . . being from Texas and Southerners to start with, was on the side of the South, and oh, but they were bitter. That was how a lot of them got killed, because they were filled full of that old dope about the war and they wouldn't let an abolitionist arrest them. The marshals in those cow towns on the trail were usually Northern men, and the Southerners wouldn't go back to Texas and hear people say: "He's a hell of a fellow. He let a Yankee lock him up." Down home one Texas Ranger could arrest the lot of them but up North you'd have to kill them first.

The problem was that northern lawmen were just as "filled up" about killing them. Politics was deadly business in the mid-nineteenth century, even on the open range.[185]

The political crisis of the mid-nineteenth century did not play out in the same way in the North, the South, and the Southwest. As a result, it had a distinctive impact on homicides in each region. Minorities also experienced the political crisis of the mid-nineteenth century differently, so the homicidal histories of African Americans, Hispanics, Native Americans, and Asian and European immigrants differed from those of native-born whites. America's homicide problem was not caused, however, by regional, ethnic, or racial differences, or by religious or class differences, for that matter. Those differences had not made the United States unusually homicidal in the early national period, and Canada and western Europe had most of the same divisions in the mid-nineteenth century, but they experienced declines in homicide. America became homicidal in the mid-nineteenth century because it was the only major Western country that failed at nation-building. Once the American polity dissolved over slavery, immigration, and the Mexican War, all sorts of disputes, whether political, petty, or personal, were more likely to end in homicide. The homicide problem was made worse by the decline in self-employment, which disrupted the nation's social hierarchy and left many people anxious and

fearful about their standing in society, and by the failure of state and territorial governments to establish their authority in the post–Civil War South and on the mining and ranching frontiers of the West. Ultimately, however, it was the federal government's loss of legitimacy and the weakening of patriotism and fellow feeling in the mid-nineteenth century that set the United States on course to become a more homicidal nation.

# A RIGHT TO BEAR ARMS?

### THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT

Edited by Jennifer Tucker, Barton C. Hacker, and Margaret Vining

A Smithsonian Contribution to Knowledge



Smithsonian
*Scholarly Press*
WASHINGTON, D.C.
2019



Published by
SMITHSONIAN INSTITUTION SCHOLARLY PRESS
P.O. Box 37012, MRC 957
Washington, D.C. 20013-7012
https://scholarlypress.si.edu

Compilation copyright © 2019 by Smithsonian Institution

*All rights reserved.* This publication may not be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior permission of the publisher.

**Library of Congress Cataloging-in-Publication Data**
Names: Tucker, Jennifer, 1965– editor. | Hacker, Barton C., 1935– editor. | Vining, Margaret, editor. | Smithsonian Institution Scholarly Press, publisher.
Title: A right to bear arms? : the contested role of history in contemporary debates on the Second Amendment / edited by Jennifer Tucker, Barton C. Hacker, and Margaret Vining.
Other titles: Contested role of history in contemporary debates on the Second Amendment
Description: Washington, D.C. : Smithsonian Institution Scholarly Press, 2019. | Series: A Smithsonian Contribution to Knowledge | Includes bibliographical references and index. | Smithsonian Institution compilation copyright 2019
Identifiers: LCCN 2018058276 (print) | LCCN 2018058928 (ebook)
    | ISBN 9781944466268 (E-book) | ISBN 9781944466251 | ISBN 9781944466251(hardcover)
    | ISBN 1944466258(hardcover) | ISBN 9781944466268(ebook)
Subjects: LCSH: Firearms—Law and legislation—United States. | United States. Constitution. 2nd Amendment—History. | Gun control—United States—History. | Gun control—Great Britain—History.
Classification: LCC KF3941 (ebook) | LCC KF3941 .R543 2019 (print) |
    DDC 344.730533—dc23 | SUDOC SI 1.60:R 44
    LC record available at https://lccn.loc.gov/2018058276

**ISBN-13:**  978-1-944466-25-1 (print)
**ISBN-13:**  978-1-944466-26-8 (ebook)

Printed in the United States of America

♾ The paper used in this publication meets the minimum requirements of the American National Standard for Permanence of Paper for Printed Library Materials Z39.48–1992.

3 1223 12794 9296

# Contents

List of Figures                                                                                    vii

List of Tables                                                                                      ix

Introduction                                                                                         1
*Jennifer Tucker*

**PART I. GUNS AND FIREARMS OWNERSHIP IN SEVENTEENTH-AND EIGHTEENTH-CENTURY ENGLAND AND AMERICA**

INTRODUCTION TO PART I                                                                              21

1  The Right to Bear Arms in English and Irish Historical Context                                   23
   *Tim Harris*

2  Who Had Guns in Eighteenth-Century Britain?                                                      37
   *Priya Satia*

3  Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century
   England and America                                                                              54
   *Kevin M. Sweeney*

4  Limits on Armed Travel under Anglo-American Law: Change and
   Continuity over the Constitutional *Longue Durée*, 1688–1868                                     72
   *Saul Cornell*

5  "You Never Dreamt of a Poysoned Bullet": "Forbidden" Ammunition
   from the Sixteenth Century to the Present                                                        95
   *Jonathan S. Ferguson*

6  Why Guns Are and Are Not the Problem: The Relationship between Guns
   and Homicide in American History                                                                113
   *Randolph Roth*

v

vi                          *A Right to Bear Arms?*

## PART II. THE RIGHT TO ARMS AND THE ANGLO-AMERICAN TRADITION: HISTORICAL DEBATE

INTRODUCTION TO PART II                                                    137

7  English and American Gun Rights                                         139
   *Lois G. Schwoerer*

8  The Right to Be Armed: The Common Law Legacy in England and America    154
   *Joyce Lee Malcolm*

9  The "Reasonable Regulation" Right to Arms: The Gun-Rights Second
   Amendment before the Standard Model                                    167
   *Patrick J. Charles*

## PART III. HISTORY AND THE SUPREME COURT: OPPOSING LEGAL VIEWPOINTS

INTRODUCTION TO PART III                                                   187

10 Going Armed: How Common Law Distinguishes the Peaceable Bearing
   of Arms from Carrying Weapons to Terrorize Others                       189
   *Stephen P. Halbrook*

11 The Use and Misuse of History in Second Amendment Litigation           202
   *Mark Anthony Frassetto*

Appendix I. District of Columbia et al., *Petitioners*, v. Dick Anthony Heller,
   *Respondent*—Brief of the Cato Institute and History Professor
   Joyce Lee Malcolm as Amici Curiae in Support of Respondent             217

Appendix II. District of Columbia et al., *Petitioners*, v. Dick Anthony Heller,
   *Respondent*—Brief of Amici Curiae Jack N. Rakove, Saul Cornell,
   David T. Konig, William J. Novak, Lois G. Schwoerer et al.
   in Support of Petitioners                                              261

Bibliography                                                              311

Contributors                                                             335

Index                                                                     339



116                                    *A Right to Bear Arms?*

by geologists, paleontologists, and evolutionary biologists. They, like social science historians, study historical phenomena and search for correlations that are so persistent and repetitive—the coappearance of asteroid strikes and mass extinctions is one example—that they are obliged to conclude that the relationship between these phenomena must be causal.[9]

History shows that changes in America's homicide rate have *not* coincided with changes in gun ownership or firearms technology. The great surges in homicide in America's past—in the early and mid-seventeenth century, during the Revolution, during the political crisis of the mid-nineteenth century, and during the 1960s and 1970s—have coincided with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy. Whenever these circumstances prevailed, America's homicide rates soared. Friends, acquaintances, and strangers killed each other much more often.[10]

Rates for homicides among intimate partners, by contrast, spiked whenever the balance of power between women and men shifted toward women in marriage, romance, and society. These shifts, which occurred most prominently in the 1830s and early 1840s, and from the late 1960s into the 1980s, lessened the level of everyday violence in most intimate relationships. Yet paradoxically, the same shifts increased the intensity of violence, and thus the likelihood of homicide, among men who refused to accept changes in gender relations or who could not meet the new, higher standards for male conduct in marriage and courtship.[11]

The implications of these persistent and repetitive patterns are clear. Guns or no guns, America will remain a violent society as long as it continues to wrestle with nation building at home and as long as the struggle for racial and gender equality is contested and incomplete. But the evidence also shows that the availability of guns—especially modern, breech-loading firearms—has pushed the homicide rate in the United States beyond what it would have otherwise been, especially in times when the homicide rate has been extraordinarily high.

In the colonial and revolutionary period, over half of all households owned a working gun. On the eve of the Revolution, the proportion ranged from 41 percent of male wealth holders in the middle colonies to 50 percent in New England and 69 percent in the South. A few households owned pistols, but most owned muskets or fowling pieces, used for hunting, warfare, vermin control, and policing slaves. The poor were less likely to own firearms than the wealthy, but a third of the poorest fifth of wealth holders still owned a gun.[12] Gun ownership has not been studied as thoroughly between the 1820s and the end of World War II, so the regional and demographic distributions of firearms during that period are not known. But domestic production and imports of affordable firearms were sufficient to sustain high rates of gun ownership into the early 1970s, when the level still stood at half of all households.[13]

But before the mid-nineteenth century, when Americans owned muzzle-loading weapons, the impact of guns on the homicide rate was modest, even though household ownership of firearms was widespread. Family and intimate partner homicides were rare, and only 10 to 15 percent were committed with guns. And when the homicide rate among unrelated adults was low, as it was during the early and mid-eighteenth century, and in the North and mountain South after the War of 1812, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 or 15 percent.

However, when the homicide rate rose among unrelated adults during times of political instability, such as in the early and mid-seventeenth century and during the Revolution, the

proportion of nondomestic homicides committed with guns jumped to 30 to 40 percent and rose higher still on contested frontiers, such as in Ohio before the War of 1812 or in the Southwest following its hostile military occupation during the Mexican War. When the fundamental causes of higher homicide rates among unrelated adults were in place, the presence of muzzle-loading guns—and the readiness to use them—appears to have raised the homicide rate beyond what it would have otherwise been, because it was easier to inflict a lethal wound with a loaded gun than with a knife or a club. But when the homicide rate among unrelated adults was low, or if the homicide involved an intimate partner, the impact of early firearms on the homicide rate was small, because guns were rarely used.

Gun use in homicides was rare because muzzle-loading firearms had limitations as murder weapons. They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flints and percussion caps; and with the exception of a few double-barreled pistols, they could not fire multiple shots. They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could be used only as clubs in hand-to-hand combat. And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose. It took at least a minute (and plenty of elbow room) to load a muzzleloader if the weapon was clean and if powder, wadding, and shot or ball were at hand. Users had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge. The firing mechanism also had to be readied, often with fresh flint or a new percussion cap. And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire. The life of a charge could be extended by replacing a flint-lock gun, which used hydroscopic black powder in its priming pan, with a percussion-lock gun, which used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber. The life of a charge could also be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage. That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[14]

The pattern of gun use in homicides in colonial and revolutionary America reflected these limitations. Family and household homicides—most of which were caused by abuse or simple assaults that got out of control—were committed almost exclusively with weapons that were close at hand: whips, sticks, hoes, shovels, axes, knives, feet, or fists. In New England and Maryland, not one known marital homicide among European Americans or African Americans was committed with a gun, and fewer than 10 percent of household homicides. It did not matter that family and intimate homicides were rare or that murders of servants, slaves, or owners were common during the heyday of indentured servitude or the early years of racial slavery. Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[15]

The same was true of homicides of other adult relatives. Fewer than a fifth of such homicides were committed with firearms in New England and Maryland because most occurred the moment tempers flared. The gun homicides of adult relatives that did occur were unusual because they were premeditated. Louis Parronneau of Penobscot, Maine, did not want to wait for his inheritance, so he walked into his uncle's store and shot him with a handgun, hoping that the murder would look like a robbery. William Tate, a merchant in

Falmouth, Maine, devised a plan to kill a burglar who had been pilfering local storehouses. He loaded a handgun with shot, cocked it, and tied one end of a string to its trigger and the other to the door latch of his storehouse. Unfortunately, Mary Tate, a relative who was "unfamiliar with the premises" and had not been told about this plan, opened the door and was shot in the abdomen.[16]

Among Native Americans in colonial and revolutionary New England, there were only two recorded incidents in which a rejected husband or lover used a gun to kill a rival or the woman who had rejected him. A Penacook man who had learned his wife was about to run off with another man lay in wait on the edge of the Merrimack River and shot them dead as they passed in a canoe. An Abenaki man opened fire on his rival and the woman he loved, wounding him and killing her. Apart from these, there were no known gun homicides of spouses, lovers, romantic rivals, or other family members among Native Americans. Murders of spouses and other relatives were more common among Native Americans than among European or African Americans, but they too were committed with everyday implements.[17]

Impulsive homicides did sometimes occur when guns were already loaded, when people were hunting, shooting at targets, or training for the militia. John Keniston and two friends put a keg of rum in their canoe and went duck hunting on the Piscataqua River in New Hampshire. Two Indians paddled up to ask for a drink, and one of them refused to leave. The drunken Keniston fired a charge of duck shot into his head. Walter Hamilton and Cuffee, servants of a merchant in Salem, Massachusetts, were shooting in the yard when they got into an argument and squared off against each other. Cuffee, armed with a club, was no match for Hamilton, who had the musket. Reuben Chamberlain Jr. quarreled over a gun with a fellow militiaman at a training day in Newbury, Vermont, and in the struggle for possession he shot the man to death. Homicides were uncommon on these occasions, but if men were holding guns that were already loaded, they were the weapons of choice.[18]

Gun use in homicides was more common in the muzzle-loading era if violence was feared or anticipated. For instance, white people used guns frequently to kill fugitive slaves. Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot. Most were tracked down by well-armed posses. A slave named Aaron ran away from his master in King George County and survived by stealing hogs. A posse tracked him down, and when he was surrounded, he stabbed a slave who had been ordered to take hold of him, so a member of the posse shot him dead.[19]

Sheriffs and deputies also used guns freely to prevent the escape of black felony suspects. Captain Low of York, Maine, had been deputized to sail a suspect to Newburyport, Massachusetts, where the man was to be jailed for store breaking. Low was the only crew member on the dinghy, so the prisoner grabbed an axe and tried to kill him. Low fended him off with a hatchet and then shot him after a female passenger handed Low his loaded gun. Fugitive slaves occasionally used guns to resist capture. Coffee, who fled after murdering a fellow slave in Durham, Connecticut, shot and killed a Paugusett warrior who was helping colonial authorities track him down; Joe, a runaway, shot his master, Edward Taylor, when Taylor and another man tried to recapture him. In each instance, fugitives and posse members carried loaded weapons and were prepared to use them.[20]

White people also used guns to kill Native Americans. In New England, 57 percent of such homicides were committed with guns between the end of King Philip's War in 1676 and the end of the eighteenth century. Most of these homicides were deliberate acts

of genocide or revenge, like the slaughter in 1755 of fourteen Penobscot men, women, and children by a band of scalp hunters at Owl's Head, Maine, or the killings in 1790 of two Mississiquoi Indians in Sheldon, Vermont, by George Sheldon, a pioneer farmer who suspected that a Mississiquoi had burned his barn. Other gun homicides of Native Americans were committed out of fear. In 1681, Jonathan Ahattawants stopped at the house of Jonathan Dyer in Braintree, Massachusetts, on a cold winter night and asked to be let in so he could get warm. Dyer refused to let him in, and when Ahattawants tried the door, Dyer loaded his gun and shot him.[21]

Among unrelated white people, most gun homicides occurred during political or property disputes, when men had armed themselves deliberately. Their goal was usually to intimidate, not kill; but if neither party backed down, homicide could result. For example, the owners of the fishing station on the Piscataqua River in present-day New Hampshire were at loggerheads with Plymouth Colony over trading and fishing rights on the Kennebec River in Maine. In 1634, the Piscataqua station agent, John Hocking, sailed past Plymouth's trading post on his way to open trade with the Indians. The Plymouth men pursued him and found him at anchor a few miles upstream. They cut one of his anchor cables; before they could cut the other, Hocking shot one of them dead. One of the Plymouth men then fired on Hocking and killed him.[22]

Political homicides and government–sanctioned homicides that occurred outside the bounds of organized warfare were also likely to be committed with guns. Press gangs shot draft resisters, posses shot escaped prisoners, soldiers shot deserters, sentries shot suspected spies, customs agents shot smugglers, and political adversaries shot one another.[23] In 1775, when settlers with conflicting land titles from New York and New Hampshire were both laying claim to what is now Vermont, protesters tried to shut down the county court in Westminster, Vermont, which was to be administered by New Yorkers. Supporters of New York fired into the crowd, killing two protesters.[24] In the 1770s and early 1780s, settlers from Pennsylvania fought for control of the Wyoming Valley with migrants from New England, who were sponsored by the government of Connecticut and its development arm, the Susquehanna Land Company. Dozens of people were shot.[25] And throughout the American Revolution, patriots and Tories from New England to South Carolina and Georgia were assassinated or killed during raids with guns.[26]

Thus, early Americans used muzzle-loading guns as murder weapons if they anticipated violence or if their guns were prepped for some other purpose, but they seldom used them to kill people under other circumstances. That explains why so few family or household murders were committed with guns, why so many Native Americans and fugitive slaves were killed with guns, and why the proportion of unrelated white people murdered with guns went up and down with the homicide rate. When the homicide rate among unrelated white people was high, as it was among European colonists in the early and mid-seventeenth century, and the hostile, defensive, and predatory emotions that caused homicide were more pervasive and intense, the proportion of colonists who murdered one another with firearms was fairly high—38 percent in New England and New Netherlands and probably 40 percent in Maryland. But when the homicide rate among unrelated colonists fell abruptly from the late seventeenth century into the 1760s, and fewer people expected or sought to instigate violence, the proportion of victims murdered with guns fell to only 13 percent in New England and 11 percent in Maryland.[27]

When the homicide rate rebounded among unrelated European Americans during the American Revolution, and white people prepared themselves for potentially violent

*A Right to Bear Arms?*

encounters over property, politics, and personal honor by arming themselves with loaded guns, the proportion of homicides committed with firearms rose again, to 46 percent in New England and 33 percent in Virginia. Yet, the proportion of homicides of unrelated white people committed with firearms never rose above two-fifths, except on contested frontiers. That proportion is far below the 70 percent that prevails in the United States today. But in a number of circumstances, the widespread ownership of muzzle-loading guns facilitated homicide and exacerbated the homicide rate.

This pattern of gun use in homicides persisted through the first half of the nineteenth century, even though the stock of guns changed with the increasing popularity of single-shot pistols and the advent of cap-and-ball revolvers. Pistols were popular among gentlemen, for whom custom-made horse pistols and dueling pistols were items of "conspicuous consumption" and tokens of masculinity. Repeating cap-and-ball revolvers were favored by frontiersmen, Indian fighters, and military officers, but because they were associated in the popular imagination with the romance of the West and with the exploits of Texas Rangers, soldiers in the Seminole War in Florida, and cavalrymen in the Mexican War, they were also coveted by prosperous Americans, who lined up to buy them despite their limited availability and high price.[28]

These new weapons were still difficult to use as murder weapons, which is why they did not change the pattern of gun use in homicides. Even the most expensive handmade pistols were muzzleloaders. Early cap-and-ball revolvers made it possible for a person to fire five or six shots in rapid succession, but they still had the basic limitations of muzzleloaders. The rotating cylinders in early revolvers had to be loaded one chamber at a time. Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever. Thus cap-and-ball revolvers, like muzzleloaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun.[29]

Gun use in homicides of unrelated adults continued to go up and down with the homicide rate, just as it had in the colonial and revolutionary periods. In most jurisdictions in the Northeast and the Midwest, gun use was high through the War of 1812, as was the homicide rate. But gun use fell to very low levels after the war, when the homicide rate in the northern United States was extraordinarily low, because of political stability, patriotic feeling, faith in the government and its leaders, and widespread self-employment. Eighty percent or more of married couples were able by their midthirties to buy their own homes and their own shops or farms. The rate of gun use in homicides dropped to 17 percent in New Hampshire and Vermont, to 5 percent in New York City, and to 0 percent in Cleveland, in rural Cuyahoga, Holmes, Mercer, Meigs, and Ross Counties in Ohio, and in rural Calhoun, Henderson, and Williamson Counties in Illinois.[30]

Gun use in family and intimate homicides remained rare in the Northeast and the Midwest from the Revolution through the first half of the nineteenth century, even though the rate of spouse murder more than doubled in the 1830s and early 1840s, as the balance of power between women and men shifted toward women in society and in marriage. Husbands who could not meet their wives' new expectations for respectability, sobriety, and emotional intimacy or accept their wives' growing economic independence, almost never used guns; they beat, choked, kicked, stabbed, or burned their wives to death.[31] Muzzle-loading firearms and cap-and-ball revolvers simply had too many limitations to be the weapons of choice in spontaneous assaults.

Homicide rates followed a different course in the slave South than in the Northeast or Midwest in the first half of the nineteenth century, but gun use followed the same pattern. Not as much data has been gathered for the South, so it is not yet possible to describe the pattern of gun use in rarer kinds of homicide, like marital murders or romance murders. But for homicides in general, the data show that gun use followed the murder rate among unrelated adults. It was high where the rate was high and low where the rate was low, reflecting the level of intentional violence and the intensity of the emotions that caused violence. Gun use was particularly high in Florida, a contested frontier where the murder rate reached forty per one hundred thousand adults per year or more. It approached modern levels there: 30 percent of murders by black people and 55 percent of murders by white people (excluding lynchings) were committed with guns. Guns were used less often in rural Virginia, South Carolina, and Georgia, where the homicide rate was only ten per one hundred thousand adults per year. In rural Georgia and South Carolina, only 7 percent of homicides by black people and 38 percent of homicides by white people were committed with guns; and in rural Virginia, only 8 percent of homicides by black people and 36 percent by white people. White people were more likely to use muzzle-loading guns or cap-and-ball revolvers than their northern counterparts in the antebellum period because they feared or anticipated violence in a wider range of circumstances. Black people in the South might have used such guns just as frequently, if they had had access to them.[32]

Homicide rates followed yet another course in the West, but gun use there followed the same logic that it did in the Northeast, the Midwest, and the South. The homicide rate spiked to over seventy per one hundred thousand persons per year in California after the Anglo conquest in the Mexican War, as political, racial, and frontier violence proliferated. Accordingly, gun use in homicide, which had been only 13 percent in Los Angeles before California's annexation to the United States, rose to over 50 percent. Of the nine counties for which data are available for the Gold Rush era, only San Francisco, which had the lowest homicide rate among the nine counties studied to date (roughly thirty per one hundred thousand adults per year), had a lower rate of gun use in homicides: 40 percent. Once again, guns were the weapons of choice in the muzzle-loading era when the homicide rate among unrelated adults was high and people frequently prepared their weapons in expectation of trouble.[33]

Once breech-loading revolvers, shotguns, and rifles were introduced in the mid-nineteenth century, however, the impact of guns on the homicide rate burgeoned. Most breech-loading guns could fire multiple rounds, and they could be kept loaded and ready to fire for weeks at a time, thanks to factory-produced ammunition that encased the charge in a waterproof, airtight shell. They could also be fired more reliably because rim-fire and center-pin cartridges were ignited by the strike of the hammer, not by the spark of a flint or percussion cap. Breech-loading guns were thus the ideal weapons for killing in the heat of the moment.

Breech-loading guns, particularly revolvers, were not produced for the consumer market until the mid-1850s and were not available in quantity until after the Civil War. They were not responsible for the surge in homicide among unrelated adults that occurred between the Mexican War and the end of Reconstruction, nor were they responsible for the increase in the murders of spouses and lovers that began in the 1830s and 1840s. But as soon as they became widely available, Americans scrambled to buy them, in large part because the nation was still in the midst of a homicide crisis in the late 1850s through the early 1870s, and they were wanted for self-defense.

Once Americans had the new weapons, they kept them everywhere: in their homes, in their wagons, in saddle bags, purses, and pockets. As a result, the proportion of homicides

of unrelated adults committed with guns increased not only when the homicide rate among unrelated adults increased in the late 1840s and 1850s; it continued to rise in the late 1870s and 1880s, even when and where the homicide rate among unrelated adults declined. The proportion of family and intimate homicides committed with guns also increased steadily in the late nineteenth century until it equaled the proportion of homicides among unrelated adults committed with guns. In short, gun violence invaded marriages, families, and romantic relationships, and the domestic murder rate in the United States quickly surpassed the rates in Canada and western Europe. Gun violence also persisted in relationships among friends, acquaintances, and strangers after the causes of the high midcentury homicide rates dissipated, making it difficult if not impossible for the homicide rate among unrelated adults to return to the low levels of the 1830s and early 1840s. Breech-loading guns did not cause America's homicide problem, but they made it much worse.

The limitations of early firearms as murder weapons were overcome by a burst of innovations in the arms industry between the late 1840s and the end of the Civil War. In 1848, Christian Sharps patented the first successful breech-loading rifle, and Capt. C. E. Minié of France invented a self-expanding bullet that could be loaded easily and would fire accurately because it expanded "into the rifling grooves upon firing." In the same year, Walter Hunt developed the first repeating rifle, which was improved upon by Lewis Jennings. By 1851, Robinson and Lawrence were manufacturing Jennings's and Sharps's rifles, although with little commercial or practical success.

In 1852, however, the Volcanic Repeating Arms Company, founded by Horace Smith and Daniel Wesson, drew upon these achievements to produce the first truly modern rifle: a lever-action repeater that evolved from the Henry rifle, which the New Haven Repeating Arms Company (the predecessor of Winchester Repeating Arms Company) produced successfully in 1861. The Henry was a .44 caliber tube-fed 15-shot rapid-fire breechloader that used metallic cartridges, so it could be kept loaded all the time. Christopher Spencer, a former Colt machinist, founded the Spencer Repeating Rifle Company in 1861 to produce a similar rifle, the Spencer .52 caliber, which could fire 7 shots in 12 seconds and 21 per minute and was more powerful and reliable than competing rifles. The rifled musket remained the principal weapon of the Civil War—a .58 caliber muzzleloader that used paper cartridges and percussion caps. Henry and Spencer rifles were widely used in the Civil War, and by war's end, muzzle-loading rifles were obsolete.[34]

The limitations of early handguns were overcome in the same period. In 1857, Smith and Wesson introduced their .22 caliber 7-shot breech-loading metallic-cartridge revolver. The Model 1 was a stunning innovation, as Smith and Wesson noted in their advertisements:

The cartridge for this arm consists of a copper cap having its closed end enlarged, which . . . forms a receptacle for the percussion priming. The remainder of the cap being filled with powder, the ball is firmly inserted in its open end, thus enclosing the powder and priming in a perfectly water-proof case. Some of the advantages of an arm constructed on this plan are:

The convenience and safety with which both the arm and ammunition may be carried;
The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
Certainty of fire in damp weather;
That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.

Smith and Wesson had created an outstanding firearm. It was also a near-perfect murder weapon—lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time. Its only drawback was its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot.[35]

Colt and other rival manufacturers were unable to produce a comparable handgun until 1873, when the patent on Smith and Wesson's cylinder design expired, but they did improve the design of their percussion cap revolvers, which became lighter and more reliable but could not use metal cartridges. For users who were willing to load, unload, and clean their guns chamber by chamber, day after day, these too were formidable weapons; and Colt had the edge in large-caliber revolvers with real stopping power because Smith and Wesson's "tipping barrel action" could not handle cartridges larger than .32 caliber. Because of improvements in manufacturing equipment and techniques, the price of such guns fell and the supply expanded rapidly. By 1873, Colt had produced more than a million firearms, including 850,000 revolvers; production figures for Smith and Wesson were similar.[36]

The greatest surge in production, however, occurred in the late nineteenth century, as the patents on the first breech-loading rifles, shotguns, and revolvers expired and self-contained ammunition was perfected and mass produced. Rim-fire cartridges, which placed the primer in a rim around the base of the copper casing, were reliable in small-caliber weapons; and center-fire cartridges, which featured a primer with a self-contained anvil or knob in the center of a thick-headed cartridge, were reliable in weapons of all calibers. The new ammunition, which was manufactured to precise specifications, eliminated the dangers of overloading and the liabilities of underloading[37]

The surge in production also depended, however, on a surge in demand. The United States proved a much better market for the new firearms than western Europe, not simply because it was home to the greatest producers and innovators in the firearms industry but because demand was higher. Rural Americans were more likely than their European counterparts to hunt and to control vermin with firearms, so they replaced their muzzleloaders as quickly as they could afford to. American gentlemen, for whom the latest guns were status symbols, continued to purchase high-end models suitable for collecting, sport hunting, and target shooting.

But the firearms industry prospered in the United States above all because it found new markets among the urban middle class, the urban poor, and former slaves. Many poor and middle-class Americans loved guns because they associated them with the adventures of cowboys, miners, Indian fighters, soldiers, police officers, and western lawmen. They purchased them, however, largely because the United States was still in the throes of a homicide crisis in the late 1860s and 1870s—a crisis that the arms industry exploited with great skill by promoting the need for personal protection. Homicide rates were falling across western Europe by the time breech-loading weapons and factory-made ammunition were perfected. But the murder rate in the United States had soared since the late 1840s, when the sectional crisis began, making it the most homicidal society in the Western world. Had the murder rate been falling in the United States, the mass market for breech-loading weapons might never have developed, especially in cities, where guns did not have as many practical uses, or among former slaves, most of whom were desperately poor. But many working-class and middle-class Americans and former slaves were afraid they might become victims of violence, and so armed themselves as fast as they could with the new weapons, especially revolvers.[38]

*A Right to Bear Arms?*

Americans used the new firearms in ways they could never use muzzle-loading guns. Because the new revolver could be loaded indefinitely, it could be used to stalk victims over the course of days or weeks and take them by surprise. It was the perfect weapon for despondent men who wanted to avenge themselves on estranged wives or former lovers. It enabled them to kill quickly without disfiguring their victims and then turn the weapon instantly upon themselves. Americans often kept guns at the ready to protect their daughters, mothers, or sisters from abusive spouses.[39]

The new weapons were also useful for people whose occupations put them in harm's way. Tavern owners, hotelkeepers, and brothel operators had to deal with rowdy customers and even the occasional robber, and they took to keeping revolvers or shotguns behind the bar, the registration desk, or the front door. Franklin Farwell and Sherrod Lawrence of East Arlington, Vermont, used their revolvers to put down a Christmas-day disturbance in their saloon and hold three men for arrest. Upon their release from jail, the three men returned to the saloon with revolvers. Farwell and Lawrence were ready for them, and the five men opened fire. Farwell and Lawrence killed one of their attackers and wounded the other two, but they also killed an innocent patron and Farwell's eight-year-old son.[40]

The new guns were also the weapons of choice for freed people who expected visits from white terrorists. A white neighbor warned the Coe family of Cumberland County, Tennessee, that a band of hostile white people was going to try to run them out of town. They bought out the entire supply of ammunition at the local store. When the attack came, six of the Coes laid down a line of fire so intense that they were able to hold off thirty or more white neighbors for a day and a night, until the white attackers finally slunk away, their losses unknown.[41]

The new guns made struggles for dominance among young men much more lethal. In 1888, at a tent revival next to a church in Jasper County, Georgia, several young men from the Tyler and Malone families wandered into the woods to take a drink together. On the way back to the churchyard, Sam Tyler "rubbed against Clarence [Malone] rudely—said nothing, went on to Walker [Malone], rubbed against him rudely enough to push him half round & remarked there is the dam son of bitch." The pushing, cursing, and threats recurred off and on over the next half hour. Pistols were pulled and then put away when a group of worshippers intervened. But the youths were too riled up just to walk away, and one of them opened fire despite the gathered crowd. By the time the shooting stopped, Sam Malone, his brother Ed, and Jim Malone—the one who tried hardest to keep the peace—lay dead.[42] Shootings such as this often occurred in churchyards, but they also happened at parties, in taverns, in courtrooms, and on public streets—anywhere men gathered.

The new guns became tools of the trade for police officers. By the late nineteenth century, arms were considered necessary for the police, particularly because so many suspects were carrying concealed revolvers. In Chicago, for example, from 1879 to 1885, one of seven homicides among unrelated adults in Chicago involved a police officer: a third of the time the police were victims and two-thirds of the time assailants. These killings were facilitated by revolvers: 88 percent were committed with handguns versus only 44 percent of other homicides among unrelated adults.

Most officers were killed, as might be expected, by people disposed to violence: murderers, burglars, or the mentally ill. But the vast majority of the people officers killed were unarmed, nonviolent offenders: thieves who were fleeing, drunks resisting arrest, a saloon keeper who had violated a zoning ordinance, an innocent bystander who was standing near an unruly crowd. In Chicago, John Shea and two of his friends stole beer kegs from a rail

car and were rolling them down a city street when Officer Walsh happened upon the scene. They abandoned the kegs and ran, but Walsh opened fire, shooting Shea in the back. The pattern was the same in New York City, New Orleans, and Cleveland: the proliferation of handguns increased the likelihood that police officers would be homicide victims, but it also prompted police officers to fear for their lives whenever they faced a disobedient citizen and to use deadly force in situations where it was not warranted.[43]

Unfortunately, the impact of the new firearms on weapons use in homicides cannot be charted from year to year because it is impossible to know in many instances whether a "pistol" or a "rifle" used in a homicide was modern. But as modern firearms replaced muzzle-loading firearms between the 1850s and the end of World War I, the proportion of homicides committed with firearms, especially handguns, soared.[44]

The proportion still varied by region. Guns were used least often, as they are today, in the Northeast and the Midwest. But gun use climbed steadily during the second half of the nineteenth century, both in cities and in rural areas, whether the homicide rate among unrelated adults was going up or down. Gun use in homicides rose to 25 percent in New York City, 30 percent in greater Cleveland, 32 percent in New Hampshire and Vermont, 38 percent in rural Holmes, Meigs, Mercer, and Ross Counties in Ohio, 49 percent in Chicago, and 66 percent in rural Calhoun, Henderson, and Williamson Counties in Illinois.[45] Because breech-loading guns could be used as murder weapons in a wider range of circumstances and without preparation, they were used in a growing proportion of murders even when the homicide rate fell in the late 1870s and 1880s, despite the fact that premeditated violence was less common, as political stability returned and the hatred and distrust inspired by the sectional crisis dissipated.[46] Gun use spiraled upward so fast that it reached modern levels by the end of World War I.

Gun use in family and intimate homicides also increased rapidly in the Northeast and the Midwest in the late nineteenth century, until it neared or exceeded gun use in homicides of unrelated adults. For the first time, spouses and other relatives faced the real possibility of being murdered with guns, as family members picked up breechloaders spontaneously during domestic disputes.[47] The proportion of former lovers killed with guns rose to three-fifths.[48]

Gun use varied by race and ethnicity. In a study of homicide in New York City, Eric Monkkonen discovered that guns were used by 50 percent of native-born white assailants during the Civil War and Reconstruction, by 37 percent of German assailants, by 26 percent of Irish and African Americans, and by 21 percent of Italians. Data from northern New England, Chicago, Cleveland, and five counties in the rural Midwest reveal a similar pattern. From the Mexican War to the end of the century, guns were used in homicides of unrelated adults by 50 percent of assailants of German ancestry and by 46 percent of assailants of probable English, Scots, or Welsh ancestry. But guns were used only a third of the time by assailants of Italian, French, African American, or eastern European ancestry, and just under 30 percent of the time by assailants of Scandinavian or Irish ancestry. But as Monkkonen observed, these differences probably reflected wealth-related differences in gun ownership rather than cultural differences.[49]

Gun use rose in the South as well as in the North in the late nineteenth century, as breech-loading guns replaced muzzleloaders and as black people gained greater access to firearms. Gun use was high not only in Georgia and South Carolina, where the homicide rate soared after the Civil War, but also in Virginia, where it held steady. In Virginia, guns were used in 46 percent of homicides by black people and 61 percent of homicides by white people, and in

126                                    *A Right to Bear Arms?*

Georgia and South Carolina in 57 percent of homicides by black people and in 80 percent of homicides by white people. Perhaps more significant, white and black people were as likely to use their guns in intraracial homicides as they were in interracial killings—and sometimes even more likely. In postbellum Georgia and South Carolina, black assailants used guns to kill 57 percent of their black victims and 56 percent of their white victims, and white assailants used guns to kill 82 percent of their white victims and 77 percent of their black victims. In Virginia in the last two decades of the nineteenth century, black assailants used guns to kill 57 percent of their black victims but only 20 percent of their white victims, and white assailants used guns to kill 71 percent of their white victims and 33 percent of their black victims.[50]

The impact of breech-loading guns in the South was clear. Arms that were purchased by white people to keep black people in their place and by blacks to defend themselves against white violence were employed in intraracial homicides as well, because they were so easy to use when the impulse to hurt someone arose. White southerners may have fantasized about killing black people and black Southerners may have fantasized about killing white people, but once they had breech-loading guns, black and white people were more likely to use them against members of their own race.

Gun use also rose in the West, even though homicide rates fell after the Civil War as the violence spurred by competition on the mining and ranching frontiers and by the conquest of northern Mexico receded into the past. In California, the proportion of homicides committed with guns climbed by the end of the nineteenth century to 58 percent in San Francisco and to 65 percent in all nine counties studied to date—figures comparable to the proportions in the South and in counties elsewhere in the West. In the last two decades of the nineteenth century, gun use stood at 66 percent in Douglas County, Nebraska, 66 percent in Las Animas County, Colorado, and 81 percent in Gila County, Arizona. It did not matter how far removed a western county was from frontier violence: breech-loading guns made it impossible for the homicide rate to fall as far and as fast at the end of the frontier period as it had in the past. And as in the Northeast and the Midwest, gun use was as high in the West in family and intimate homicides (70 percent) as it was in homicides among unrelated adults (58 percent) once breech-loading guns arrived on the scene.[51]

Gun use also differed in the West by race and ethnicity, as it did in the North and the South. In the twelve counties in Arizona, California, Colorado, and Nebraska studied by Clare McKanna Jr., Eric Monkkonen, and Kevin Mullen, the proportion of homicides committed with guns was 62 percent for non-Hispanic white people, 55 percent for Asian Americans, 53 percent for Hispanics, 52 percent for African Americans, and 46 percent for Native Americans.[52] Again, these differences probably reflect differences in wealth-related gun ownership, but it will be impossible to know for certain without more detailed studies.

The pattern of gun use in the second half of the nineteenth century suggests that widespread ownership of modern breech-loading revolvers, rifles, and shotguns made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of lethal violence in a wide variety of circumstances. Had fewer American men owned revolvers, marital and romance homicide rates might have declined in the last decades of the nineteenth century, as they did in Great Britain, or at least leveled off, as more and more American men accepted the necessity (and the desirability) of women's greater earning power and economic independence and learned to meet the higher emotional and behavioral standards that women expected in courtship and marriage.[53] And if ownership of modern guns had been less common, the homicide rate among unrelated adults might have declined further than it did in the North and the West, as the political divisions of the Civil War era faded, as frontiers became

Compendium_Roth
Page 0678

more settled, and as society adjusted to the decline in self-employment and recognized the worth of men who worked their entire lives as employees of others.[54]

But once breech-loading weapons were introduced, no person, place, or time was safe from gun violence: it increased in the home and in intimate relationships, and it rose in periods when the homicide rate among unrelated adults was low. Gun violence was everywhere, and it increased the likelihood that assaults, whether premeditated or spontaneous, would be lethal.

The relationship between modern firearms and the homicide rate will be clearer, of course, when historical data on homicide and weapons use are gathered for a larger number of jurisdictions, when the extent of gun ownership and the kinds of guns Americans used are described more fully, and when the history of gun ownership and gun use are studied comparatively, especially in Canada and western Europe. But it is important to remember that the United States would have become a homicidal society in the mid-nineteenth century even if gun ownership had not been widespread and if modern firearms had not been invented. The political crisis that began in the late 1840s and 1850s was responsible for the increase in the homicide rate among unrelated adults. Changes in America's culture and in the economic balance of power between men and women were responsible for the increase in the rate of intimate partner homicides in the 1830s and early 1840s. Until modern firearms were invented and sold widely, however, those increases overwhelmingly stemmed from kicking, clubbing, or stabbing deaths rather than shooting deaths.

The implications of these persistent and repetitive homicide patterns are clear. Guns or no guns, America will remain a violent society as long as it continues to wrestle with nation building at home and as long as the struggle for racial and gender equality is contested and incomplete. Nevertheless, the invention of modern, breech-loading firearms and their diffusion through society have had a deadly impact, especially on failed romantic relationships and on encounters between civilians and law enforcement.

The impact of modern firearms has been obscured by time. Americans have lived for so long in a sea of modern firearms that they cannot think back to a time when the technology did not exist. Yet history shows that we have been living with the deadly consequences of that technology since the mid-nineteenth century. The Founding Fathers, who guaranteed the right to bear arms in an era of muzzle-loading technology, could not foresee the dangers of breech-loading firearms or of later technologies, such as semiautomatic firearms, machine guns, large capacity magazines, and bump stocks. They doubtless believed they had struck the right balance between rights and responsibilities, given the many legitimate uses of muzzle-loading firearms and their limitations as murder weapons. They expected able-bodied gun owners to defend the nation against foreign aggression and the federal government against domestic rebellion. But they left regulatory matters largely to the states, most of which banned concealed weapons and took steps to keep guns out of the hands of people they feared, especially slaves, free black people, and Native Americans.[55] How the Founding Fathers would strike that balance today is anyone's guess. But surely they would agree, given the new dangers we face, that it is our generation's decision to make, not theirs.

# NOTES

Sources for the data in this essay are described in Randolph Roth, *American Homicide* (Cambridge, Mass.: Belknap Press of Harvard University Press, 2009), 477–487. The data are available from the Historical Violence Database, sponsored by the Criminal Justice Research Center at Ohio State

Act, seeking injunctions to bar the deployment of the new force. This tactic failed because the courts upheld the Metropolitan district.[48]

Withholding taxes proved a more fruitful tactic of resistance. The jurisdictions within the Metropolitan District were annually assessed for their proportionate shares of the total cost of the police. Jefferson, Carrollton, Algiers, St. Bernard, and New Orleans refused to pay on numerous occasions. In fact, New Orleans began to renege on its financial obligations even earlier, when former Union soldiers and black men joined the city police force. The tax delinquencies of the local governments exacerbated the state's burdensome debt problem and entangled the Metropolitan force in lengthy and troublesome court battles, seriously hampered the payment of police salaries, and eventually forced retrenchment of many police efforts.[49]

Paying the policemen became a major problem. Even before the Metropolitan Police Act took effect, impoverished police officers who had gone unpaid for months had staged a protest and threatened more serious action as early as September, 1868. Because the Board of Metropolitan Police Commissioners was often unable to raise the necessary cash through tax levies, it resorted to issuing salary warrants. An alternative to cash payments was necessary to allow the police to operate, but the issuance of warrants in lieu of hard money worked economic hardship on the policemen. Warrants were issued in several different series denoted by colors; they had a market value of at best 80 to 85 percent of face value, and at times they dropped to a mere 50 percent of their nominal worth. Despite a face value of approximately $83 per month, the actual value of a patrolman's warrant was rarely more than $50 per month in the 1850s.[50]

The Board of Police tried to stabilize and secure the funding of police operations by getting the legislature to tinker with the mechanics of collecting taxes, but these efforts met with little success. An act of 1870 made police warrants receivable for taxes and license fees. Legislation in 1870, 1874, and 1875 attempted to enforce tax collection for the payment of Metropolitan Police appropriations. To protect the Metropolitan organi-

48. *Annual Report, 1868/69*, pp. 44–48; *Daily Picayune*, June 16, 1869; *Republican*, June 15, 1869.

49. *Acts of Louisiana*, 1867, pp. 171–73; *Annual Report, 1868/69*, pp. 7–8, 1869/70, pp. 10–16, 1870/71, pp. 7–8, 1872/73, p. 8, 1873/74, pp. 11–12; *Report of the Attorney General, 1869*, p. 7; *Daily Picayune*, May 1, 7, June 19, 20, 1868.

50. *Annual Report, 1868/69*, pp. 8–9, 1869/70, p. 15; *Times*, September 16–18, 1868, May 28, 1870.

zation from its creditors, the legislature passed a bill in 1869 to prohibit justices of the peace in New Orleans from issuing processes of garnishment against the Board of Police. An act of the legislature in 1869 addressed the underpayment of policemen by adding 30 percent to their salary for the year as compensation for the devalued warrants, but this was merely a stopgap. The actions of the legislature failed to put the police on a consistently sound financial footing.[51]

Financial constraints were so severe that in 1874 and 1875 the legislature enacted two laws to reduce the level of taxation, cut back police expenditures, and pare down the payroll by discharging a substantial number of policemen. From a high of about 735 personnel in 1870, the force was reduced to about 450 men in 1874 and to about 350 by 1876. A force smaller than that of 1860 was compelled to patrol a geographically enlarged jurisdiction with a population roughly twice that in 1860.[52]

Resistance through the courts and through tax delinquencies drained the Metropolitan Police purse, but still more damaging was violent opposition to police authority, both from individuals and from organized groups. The custom of carrying deadly weapons continued to plague the peace of the city, for the war had exacerbated an already extreme proclivity for personal violence among New Orleanians. Organized violence reached an extraordinary level; in eight and one-half years the Metropolitan Police fought at least four small battles and quelled several riots. The toll on policemen ran high: they suffered an average of twenty-two gunshot wounds and twenty other wounds each year.[53]

The inauguration of the Metropolitan organization had been ominously violent. When the police first went on duty in October, 1868, riots in New Orleans and St. Bernard and legal resistance by Jefferson City officials had endangered the viability of the force and led to the suspension of all black policemen. An attempt by city officials in New Orleans to form their own police was thwarted when the U.S. military commander threatened to use troops to enforce the law.[54]

51. *Acts of Louisiana*, 1869, pp. 42, 65, 1870, Extra Session, pp. 213–14, 1874, pp. 68–72, 1875, pp. 35–39; *Annual Report, 1869/70*, p. 15.

52. *Acts of Louisiana*, 1874, p. 109, 1875, p. 10; *Annual Report* as cited in note 12; *Daily Picayune*, March 16, 1876.

53. *Daily Picayune*, May 6, 1871, May 15, 1877; *Report of the Attorney General, 1869*, pp. 3–4.

54. *Annual Report, 1868/69*, p. 7.

In May, 1869, the Metropolitan Police fought the local officials and municipal police of Jefferson City in a successful attempt to install Metropolitan officers in that jurisdiction. The mayor and police chief of Jefferson City refused to allow the Metropolitan detachment to go on duty and had the men arrested and charged with carrying concealed weapons and with illegally trying to carry out police functions. The Metropolitan policemen, commanded by Captain Gustave Schreiber, were then released on their own recognizance. Superintendent Cain of the Metropolitans obtained warrants for the Jefferson City mayor and chief of police, which he tried to serve by marching on the Jefferson City city hall with some three hundred Metropolitan policemen. The Jefferson City force fired on the Metropolitans, who returned fire for a short while and then retreated to the Carrollton railroad depot. One Metropolitan was killed and at least eleven wounded. When federal troops with artillery arrived to assist in assaulting the city hall, it had been abandoned by the local forces. The Metropolitans occupied the hall and began operations as the sole police in Jefferson City.[55]

The Metropolitans' next serious confrontation did not take place until after the hotly contested and much disputed election of November, 1872. The race for control of the state legislature and the governor's office that year began with five contending parties but eventually narrowed to two. The Republicans ran William P. Kellogg, a white Vermonter, as their gubernatorial candidate and a black, C. C. Antoine, for lieutenant governor. The opposing Fusion ticket was headed by Democrat John D. McEnery for governor and Liberal Republican D. B. Penn for lieutenant governor and backed by a coalition of Democrats and Republican followers of former governor Henry Clay Warmoth. Both sides resorted to chicanery, and both claimed electoral victory. The U.S. Grant administration in Washington supported Kellogg as the winner, but the Fusionists established their own competing state government in January, 1873. Thus rival state governments contended for power. When Kellogg ordered a change in command of the state militia, a group of white militiamen refused to turn over control of the Carondelet Street armory in New Orleans. Superintendent Badger of the Metropolitan Police, who recognized Kellogg as the lawful governor, led policemen from four precincts, armed with Winchester rifles, to seize the armory. The militiamen were unwilling to surrender to the

55. *Times*, May 18–20, 1869; *Annual Report, 1868/69*, p. 7.

Metropolitans but peacefully turned over the armory to the police when ordered to do so by a delegation of U.S. Army officers. The intervention of federal officers allowed the militiamen to surrender gracefully and averted the possibility of a bloody resolution to the confrontation but did not resolve the struggle between the rival state governments of Kellogg and McEnery.[56]

This attempt reached its climax in March, 1873, when McEnery supporters staged a massive assault on the Metropolitan Police. After ransacking a gun store on the night of March 5, a party of McEnery adherents armed primarily with revolvers joined with rifle-bearing compatriots to attack the police station in the Cabildo on Jackson Square. Following an exchange of shots, the situation on the square stabilized with the McEnery force of at least two hundred men considerably outnumbering the Metropolitans. When the action at Jackson Square reached an impasse, parties of police were stopped and disarmed by McEnery followers around the city, and McEnery's men captured the police station in Jefferson City.[57]

Superintendent Badger tipped the balance by bringing up reinforcements armed with rifles and accompanied by a twelve-pounder Napoleon cannon. They dispersed the opposition at Jackson Square, and shortly thereafter the Metropolitans recaptured the station at Jefferson City. The police took possession of McEnery's office and the chambers of his legislature and other state offices at the Odd Fellows' Building, arresting several legislators in the process. U.S. troops helped the police to patrol the streets after the struggle was over.[58]

Scarcely a month elapsed before the Metropolitan force was deployed again as a military unit. The police were called out of the city in April to the town of Colfax, some two hundred miles from New Orleans, where an intense battle between blacks and whites had resulted in a massacre of the black contingent, leaving as many as one hundred African Americans dead.

56. *Daily Picayune*, December 14, 20, 1872; Taylor, *Louisiana Reconstructed*, 253–55; Rable, *But There Was No Peace*, 122–24.

57. *Daily Picayune*, March 6–8, 1873; *Times*, March 6, 1873; *Republican*, March 6–7, 1873; Taylor, *Louisiana Reconstructed*, 254–55; Rable, *But There Was No Peace*, 125. The mob at Jackson Square may have been considerably larger than two hundred; Rable has placed it at six hundred.

58. *Daily Picayune*, March 6–8, 1873; *Times*, March 6, 1873; *Republican*, March 6–7, 1873; Taylor, *Louisiana Reconstructed*, 254–55; Rable, *But There Was No Peace*, 125.