1    Rob Bonta
     Attorney General of California
2    P. Patty Li
     Supervising Deputy Attorney General
3    Anna Ferrari
     Deputy Attorney General
4    John D. Echeverria
     Deputy Attorney General
5    State Bar No. 268843
       455 Golden Gate Avenue, Suite 11000
6      San Francisco, CA  94102-7004
       Telephone:  (415) 510-3479
7      Fax:  (415) 703-1234
       E-mail:  John.Echeverria@doj.ca.gov
8    *Attorneys for Defendants Rob Bonta and
     Blake Graham, in their official capacities*

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                        CIVIL DIVISION

13

14   | **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
     |---|---|
15   | Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** |
16   | **v.** | |
17   | | **VOLUME 32 OF 37** |
18   | **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:     5A |
19   | | Judge:          Hon. Roger T. Benitez |
     | Defendants. | Action Filed:  August 15, 2019 |
20

21

22

23

24

25

26

27

28                                    1

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS[i]** | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| | | | |
|---|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325-1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

9

The Metropolitans arrived too late to stop the violence, but they did arrest several whites.[59]

Almost immediately the police were pressed into service again in their capacity as the Metropolitan brigade of militia. An expedition to keep the peace in a tense racial confrontation in the town of Amite proved uneventful, perhaps because the appearance of the police was sufficient to prevent any outbreak of violence. Two weeks later, in May, 1873, some 125 Metropolitans encountered more formidable opposition in the town of St. Martinville, which also lay outside the Metropolitan District. There the police faced an organization of whites who were resisting the authority of the state government to collect taxes. For several days the Metropolitan detachment was besieged in the courthouse by the tax resisters, who numbered somewhere between four hundred and six hundred men. The skirmishing resulted in few lives lost, and the arrival of police reinforcements brought the violence to an end about a week after it had begun. Back in New Orleans, the remaining elements of the police were alerted and stationed to guard the legislature against a rumored coup. The Orleans Parish grand jury protested the use of the Metropolitan Police outside the city, asking the district court judge to have the governor and Superintendent Badger indicted for usurpation of powers not properly belonging to their offices. No indictment was forthcoming, but the police were not obliged to do service outside the district again.[60]

The uneasy truce between the police and their conservative antagonists endured for a little more than a year. It ended on September 14, 1874, in the bloodiest struggle of the Metropolitan administration, the battle of Liberty Place. Beginning at Opelousas in April, 1874, Democrats throughout the state formed local groups called White Leagues to assert white supremacy and destroy the Republican government of William Kellogg. In New Orleans an organization that had been known as the Crescent City Democratic Club in the 1868 and 1872 elections served as the nucleus in

59. *Times*, April 7, 13, 16, 1873; *Republican*, April 22, 1873; Taylor, *Louisiana Reconstructed*, 267–73; Rable, *But There Was No Peace*, 126–29. The *Times* alleged that several policemen opposed being mobilized as militia, but the *Republican* denounced that claim as a "fabrication" (*Times*, April 23, 27, 30, May 1, 1873; *Republican*, April 26, 1873).

60. *Times*, May 6–11, 1873; *Republican*, April 22, 1873. The Board of Metropolitan Police contended that the deployment of the police as a militia unit was detrimental to their role in policing the Metropolitan District and asked the legislature to repeal the Metropolitan Brigade law (*Annual Report*, 1873/74, pp. 12–13).

forming the city's White League. John McEnery, regarded by Democrats as the legitimate winner of the 1872 gubernatorial race, became the statewide leader of the loosely affiliated White Leagues. The White League in New Orleans prepared for possible military action against the Kellogg administration by drilling secretly and ordering arms from outside the state. The Metropolitan Police became aware of the arms shipments and began seizing guns, some already in the city and others as they arrived by steamer, on September 8, 9, and 10.[61]

McEnery left the city, probably to protect himself against criminal charges in the likely event of a White League coup against the Kellogg regime, and his lieutenant governor, D. B. Penn, and militia commanders Frederick N. Ogden and John B. Angell prepared to seize the statehouse (the former St. Louis Hotel) and to use force if necessary to ensure that guns aboard a recently arrived steamer were unloaded and used to arm members of the White League. On September 13, the White League called for a mass rally at the Henry Clay statue on Canal Street for the following day. As a crowd of perhaps five thousand whites gathered on Canal Street on September 14, White League military units set up barricades along Poydras Street (roughly parallel to and four blocks upriver from Canal) all the way from Carondelet Street to the river (a distance of about twelve blocks).[62]

Most of the federal troops stationed in New Orleans had been sent out of the city to avoid the seasonal risk of yellow fever (an epidemic of the disease had ravaged New Orleans the previous year). To deal with the White League insurgency, the Kellogg administration could call on a force of black militiamen under the command of General James Longstreet, adjutant general of the state militia, and between five hundred and six hundred Metropolitan policemen under Superintendent Badger. With two Gatling guns and a battery of artillery, Longstreet and Badger led the Metropolitans from the Cabildo station on Jackson Square and the militia from the statehouse to Canal Street, establishing a line along Canal running about four blocks from the Custom House (at Canal and Decatur) to the levee. From the levee end of the line Badger led about half of the policemen toward the White League position, but detachments of White Leaguers

61. *Daily Picayune*, June 24, September 9–13, 1874; Taylor, *Louisiana Reconstructed*, 290–92; Rable, *But There Was No Peace*, 137–38.

62. *Daily Picayune*, September 10–13, 1874.

had sneaked onto the levee and were able to enfilade Badger's force, which received fire from its front and left flank. The Metropolitans did not make good use of their cannon and Gatling guns, and the White League fired effectively enough so that the police soon retreated, leaving Badger lying wounded in Canal Street. As the police retreated, the militia followed their example and fled. Many of the policemen threw down their guns and stripped off their uniform coats and hats. The armed forces of the White League had carried the day, losing sixteen killed and forty-five wounded to the Metropolitans' eleven killed and sixty wounded.[63]

The White League and its supporters celebrated their victory, mourned their dead, occupied the statehouse, and installed a new city police force under Chief Thomas Boylan, whose experience in law enforcement extended back to the 1850s. Their rejoicing was cut short, though, when they learned that on September 15 President Grant ordered the insurgents to lay down their arms within five days. They complied with the order, refraining as usual from direct confrontation with the federal government, and the Republican government was quickly restored. After only four days of forced retirement, the Metropolitan Police returned to duty.[64]

The battle of Liberty Place did not give Democrats control of the state and city governments, but it did vividly demonstrate the vulnerability of the Republicans and the Metropolitan Police. A few months later, in January, 1875, the Democrats attempted a legislative coup in the statehouse, using strongarm tactics but refraining from the sort of overt military action that had led President Grant to intervene on behalf of the Kellogg administration the previous September. A bloodless show of force by federal troops shored up the Republican regime once more, but the incident again showed that if the federal government failed to provide military support for the Republicans in Louisiana the Democrats might prevail. The Metropolitan Police grew weaker because financial problems forced retrench-

63. *Daily Picayune*, September 15–24, 1874; *Republican*, September 15–26, 1874; Taylor, *Louisiana Reconstructed*, 293–94; Rable, *But There Was No Peace*, 138–40; Landry, *Battle of Liberty Place*, 96–132. The number of militia under Longstreet's command is not clear; Taylor suggested three thousand, but the number near the battle certainly had to have been far fewer. Landry has estimated four hundred.

64. *Daily Picayune*, September 15–24, 1874; *Republican*, September 15–26, 1874; Taylor, *Louisiana Reconstructed*, 293–94; Rable, *But There Was No Peace*, 138–40; Landry, *Battle of Liberty Place*, 96–132.

ment and reduced the number of policemen still further, by some one hundred between 1874 and 1876.[65]

Louisiana Republicans entered the 1876 election with serious handicaps. Under Kellogg, the Republicans had relied largely on black voters, but many Louisiana African Americans believed he had appointed too many whites to political office and resented his failure to provide schools for their children. The Democratic candidate for governor, Francis T. Nicholls, had not been active in politics long enough to make many enemies, and he repeatedly assured blacks that he would protect their rights and interests. The Democrats succeeded in persuading some blacks to support Nicholls and intimidating many black and white Republicans into not voting. Both Nicholls and the Republican gubernatorial candidate, Stephen B. Packard, claimed victory, and they established rival state governments in New Orleans in January, 1877. Nicholls kept his supporters from resorting to violence, and both the lame duck president Grant and the incoming president Rutherford B. Hayes declined to intervene to support Packard. The Nicholls government gathered strength and money and spread its influence over the state, while the Packard government, barricaded in the statehouse, shrank away to nothing.[66]

The commander of the Democratic city police, Thomas Boylan, took possession of the Metropolitan Police stations and put his own force on duty on January 9, 1877. By February 1, only seventy-five Metropolitans remained at the statehouse to support the Republicans. On April 6, Packard received official word from a commission sent by Hayes to New Orleans that his administration would not be sustained by the federal government, and on April 24 the last of the U.S. troops boarded a steamer and left the city.[67]

Meanwhile, the Nicholls legislature considered a bill to return the police in New Orleans to the control of the municipal government and adopted it on March 31, 1877, after some debate. Restored to its former preeminence in law enforcement matters, the Common Council enacted an

65. Taylor, *Louisiana Reconstructed*, 304–305.

66. *Daily Picayune*, January 10, 11, 1877; *Republican*, January 10, 11, 1877; Rable, *But There Was No Peace*, 180–83; Taylor, *Louisiana Reconstructed*, 487–99.

67. *Daily Picayune*, February 1, April 25, 26, 1877.

ordinance on April 26 to restructure the police. Thus ended a period of

158 / POLICING THE SOUTHERN CITY

fifteen years almost to the day since the U.S. Navy had appeared before the city in 1862 and initiated an era of unusual federal influence over policing. The city commanded its own police once again, and conservatives controlled the city.[68]

68. *Acts of Louisiana*, 1877, pp. 57–58; *Daily Picayune*, March 3, 7, 20, April 27, 1877; Ordinances and Resolutions of the Common Council (Administrative Series), No. 3914, April 26, 1877, and No. 3964, May 31, 1877.

Compendium_Roth
Page 0682

capitalism it guaranteed. Consumption of any good depends on social and cultural constructs (e.g., sugar consumption depends on social rituals centered on tea and coffee). Gun consumption was tied to the rise of property as *the* social and cultural form of the period. It was an artifact that bound diverse communities and enabled them to build a particular political-economic regime based on property and conquest abroad.

The first European firearms were late-fourteenth-century "hand cannons," essentially tubes mounted on a pole. Shoulder arms, such as muskets, rifles, and shotguns, followed. Pistols could be fired with one hand. The people who made such handheld firearms were called gunmakers or gunsmiths, though *gun* itself might refer to cannons or long guns. *Firearm* usually meant musket. In this book, I use *gun* generically to refer to handheld machines capable of firing missiles that can bore through flesh. But even as weapons, eighteenth-century firearms were radically different from today's—more unreliable, slower, unwieldy, and perishable; the enormous volume of the trade was driven partly by the need for frequent replacement. But the eighteenth-century gun was not merely a cruder version of today's gun; it also functioned differently. The question of its use came up often enough in parliamentary discussion to suggest that it was no settled matter. As a weapon, the eighteenth-century gun commanded obedience not by the threat of a precise mark but by the threat of unpredictable explosion. When a threat was not enough, it removed violence to a clean and comfortable distance; it was (ironically) part of the sanitization of violence that we call the "civilizing process." For the British, the gun's mechanical power, inert among otherwise innocuous springs and locks, made it the weapon of the property holder and the property thief but not of the enraged—such as rioters, who, even within gun factories, preferred rocks and torches, or angry lovers who preferred the sanguinary release of the knife, the former more anonymous and the latter more intimate than the violence permitted by pistol. Guns were for contests over property. In an increasingly mobile society of strangers, guns were the instrument of impersonal, even polite intimidation in the hands of smugglers, highwaymen, poachers, and the property owners and soldiers who defended against such trespassers. Abroad, too, to British

explorers, traders, settlers, and conquerors who came to extend the reign of property in the South Pacific or North America, guns were not only a currency but a symbol of civilization. They justified their violent use of these "symbols" with accounts of the abject savagery of the tomahawks and daggers they opposed.

Guns were never simply instruments of mechanical death in the eighteenth century; their multiple uses—their rich social life—made it possible for Quakers to participate in their manufacture without experiencing a contradiction with Quaker principles—until the 1790s. The wars that began in 1793 entailed mass violence on an unprecedented scale, reshaping gun use in civilian life, too. New kinds of impersonal gun violence unrelated to property emerged. Guns did not replace other weapons, like knives, in familiar forms of violence committed in bouts of passion or drunkenness; they made possible new kinds of violence that were neither passionate nor property related. For the first time, we find a discharged teenaged soldier walking on Bristol Bridge waving his musket around until, without notice, he "wantonly drew the trigger" and killed a young man. Abroad, too, guns figured in new kinds of casually exterminative violence just then. Quakers could no longer presume that guns were civilizing objects promoting the protection and acquisition of property the world over. Galton became a scandal.

The great moral question of this time was how the private self, with all its desires, fantasies, and limitless wants, could be made to articulate with the world outside itself, how it could be mobilized for the public good. This was the problem Adam Smith struggled to answer. In 1795, the Society of Friends perceived a scandalous clash between private gain and public good in Galton's business, but Galton saw evidence of wider societal complicity. He argued that by finding particular fault in his activities, the Society avoided facing the reality of wider Quaker and societal participation in an economic system based on war. He lost the debate. My exhumation of his perspective makes a mountain out of this Quaker molehill. I read Galton's failure to persuade his fellow Quakers as a key moment in which war-driven industrial capitalism was normalized by a critical focus on particularly scandalous forms of trade, like the slave trade and the arms

# A RIGHT TO BEAR ARMS?

## THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT

Edited by Jennifer Tucker, Barton C. Hacker, and Margaret Vining

A Smithsonian Contribution to Knowledge



**Smithsonian**
*Scholarly Press*
WASHINGTON, D.C.
2019

Published by
SMITHSONIAN INSTITUTION SCHOLARLY PRESS
P.O. Box 37012, MRC 957
Washington, D.C. 20013-7012
https://scholarlypress.si.edu

Compilation copyright © 2019 by Smithsonian Institution

*All rights reserved.* This publication may not be reproduced, stored in a retrieval system, or
transmitted in any form or by any means, electronic, mechanical, photocopying, recording,
or otherwise, without the prior permission of the publisher.

**Library of Congress Cataloging-in-Publication Data**
Names: Tucker, Jennifer, 1965– editor. | Hacker, Barton C., 1935– editor. | Vining, Margaret,
    editor. | Smithsonian Institution Scholarly Press, publisher.
Title: A right to bear arms? : the contested role of history in contemporary debates on the Second
    Amendment / edited by Jennifer Tucker, Barton C. Hacker, and Margaret Vining.
Other titles: Contested role of history in contemporary debates on the Second Amendment
Description: Washington, D.C. : Smithsonian Institution Scholarly Press, 2019. |
    Series: A Smithsonian Contribution to Knowledge | Includes bibliographical references
    and index. | Smithsonian Institution compilation copyright 2019
Identifiers: LCCN 2018058276 (print) | LCCN 2018058928 (ebook)
    | ISBN 9781944466268 (E-book) | ISBN 9781944466251 | ISBN 9781944466251(hardcover)
    | ISBN 1944466258(hardcover) | ISBN 9781944466268(ebook)
Subjects: LCSH: Firearms—Law and legislation—United States. | United States. Constitution.
    2nd Amendment—History. | Gun control—United States—History. | Gun control—Great
    Britain—History.
Classification: LCC KF3941 (ebook) | LCC KF3941 .R543 2019 (print) |
    DDC 344.730533—dc23 | SUDOC SI 1.60:R 44
    LC record available at https://lccn.loc.gov/2018058276

**ISBN-13:**   978-1-944466-25-1 (print)
**ISBN-13:**   978-1-944466-26-8 (ebook)

Printed in the United States of America

♾ The paper used in this publication meets the minimum requirements of the American National
Standard for Permanence of Paper for Printed Library Materials Z39.48–1992.

3 1223 12794 9296

capital crimes for property offenses was supposed to deter crime.[43] Legal terror enabled the state to address property violations without expending many resources. Privately owned guns were integral to that cheap solution, part of the partnership between public and private power that characterized the British state in this period. The state did not have a monopoly on violence because it was not yet institutionally coherent enough to have one. It existed in tension and continuity with semiautonomous sources of legitimate authority at the regional level.[44] Moreover, a regular police force was anathema to a Francophobic gentry traumatized by memories of the Stuarts; legal terror and the gun at the property holder's bedside were acceptable substitutes. Gun possession among the propertied classes within a wider context of general disarmament was the result. This *was* state monopoly of violence, given a corporate definition of the state. Thus, the Riot Act of 1715 indemnified civilians for shooting rioters in aid of troops.[45] Homeowners waved their guns through windows at robbers, drunken passersby, and other undesirable elements.[46] Justice Christian Ely insisted on the effectiveness of increasing "the terror of house-breakers," counting on the death sentence *and* a brace of double-barreled pistols at his bedside to deter those who would steal his plate.[47] In an influential pamphlet of shooting advice for sportsmen and gamekeepers, Colonel George Hanger likewise insisted that there was "no better defence for a house, than a double-gun, nor against robbers on the road."[48] He always kept a loaded duck gun by his bed. As a popular contemporary historian of Birmingham observed, guns were essential to every man who had something to lose or gain; "No property will protect itself."[49] *Aris's Gazette* in Birmingham hoped, after an intrusion into the home of Dissenting philosopher Joseph Priestley in 1790, "that persons living in the country, will . . . provide themselves with a sufficient quantity of fire arms."[50] From the 1770s, private citizens also formed associations for nightly policing of their towns to preserve property and peace.[51] The farming out of property protection to volunteers sits awkwardly against the assumption that secure property rights are the foundation of a sophisticated economy. But economic development depended more on the ability to "*signal credibly* that property rights would be protected than to enact them into formal law."[52] The gun was that signal, as theoretically impersonal in its dispensation of justice as the "rule of law," though both enabled class exploitation by securing property.

The gun was paradigmatically the weapon of the landholder, whose exclusive right to his land encompassed an exclusive right to shoot animals within it and ward off trespass with the same fowling piece. The poachers he defended against carried the stigma of Jacobitism, their offenses against property being, sometimes rightly, presumed as offenses against the regime that had ushered in the freedom not of men but of men of property.[53] Smugglers and highwaymen (many of whom were demobilized soldiers) likewise shared the stigma of political rebellion.[54] Like pirates and bandits, they contested the state's exclusive right to exercise coercive power. Their use of firearms to that end symbolized their political challenge to the state's claim of singular legitimacy.[55] The law fully sanctioned civilian use of guns to defend property against such threats. Gamekeepers were licensed to kill poachers. Gun fatalities transpiring in the course of theft were judged willful murders, but those resulting from the defense of property typically ended in acquittal.[56]

The small role guns found in eighteenth-century English homicide emerged from contests over property; they were not used by rioters or in crimes of passion before the 1790s.[57] Indeed, guns are virtually absent in the annals of homicide unrelated to property. Even when gun possession increased in the second half of the century, there was no corresponding increase in their use in homicide before the 1790s. Instances in which a gun figured prominently in a crime of passion were sensational because they were rare: In 1779, James

*A Right to Bear Arms?*

Hackman, a clergyman and, notably, former army officer, shot and killed Martha Ray, long-time mistress of the Earl of Sandwich, as she got into her coach outside the Covent Garden Theatre. She had refused Hackman's heart and hand. Hackman was hanged.[58] This was an exception in a trend of property-related gun violence before the 1790s. Likewise, regardless of shifting gun availability, rioters wielded rocks and farm implements (while faced down by property owners and troops wielding guns). Even Birmingham's rioting gunsmiths of 1772 to 1773 took up stones.[59] I have found but two instances in which rioters used guns before 1795: In Machynlleth around 1739, a participant in a stone-flinging mob fired a pistol to force the Welsh Methodist Howell Harris to cease preaching in the street,[60] and in Birmingham in 1789, Quaker homes that remained aloof from the illuminations celebrating the king's recovery from illness were shot at.[61] These, again, are exceptions.

That ordinary people continued to take up pitchforks and rocks when angry, regardless of the increased availability of guns, says something profound about the place of the gun in eighteenth-century life. "Mobs" did not use guns, even when possession was less strictly policed, because guns were not relevant to the particular kind of violence they were perpetrating.[62] They were not trying to be polite but to assert social and moral claims; the crowd's (usually) drunken fury helped its participants overcome inhibitions against wielding stones, knives, and torches in intimately violent ways as they insisted on the legitimacy of the *personal* paternalistic social relations eroded by the impersonal relations of the emerging market economy. Crowd action was about preservation of community, an affirmation of personal and social bonds, even if the state saw rioters through the lens of rebellion.[63] Certainly, some riots were more political than others, but even during the Gordon Riots, which the state saw as either a conspiracy against the American war or a general attack on the regime, the crowd relied on arson and ransacking; some who attacked the Old Bailey used bludgeons, crowbars, and chisels.[64] Crowd violence was authored by a community rather than an individual but was nevertheless personal in its claims on a moral economy and paternalistic relations. Likewise, most homicides took place during heated arguments or brawls; those involved took recourse to whatever was at hand. Hence, the prevalence of knives, sticks, stones, pitchforks, and axes or simply hands and feet in most homicide reports. Guns simply did not have much to do with emotionally motivated violence *in this period*. (This says nothing about their role in homicide in other periods.)

The sheer inefficiency of eighteenth-century guns may have made them less appealing instruments of violent emotional gratification.[65] But they also simply had different connotations—like bows, which were understood as a weapon of ambush and were not used in murder either.[66] When anger raged, an intimate form of violence was threatened and demanded; the gun removed violence to too impersonal a distance, in this time and place. The very nature of the mechanical, slow process for loading and triggering made it a weapon of cool threat rather than hot-blooded violence. It was seen to possess a deterrent power different from the power embodied in a sword: mechanical, latent in a series of springs, gears, locks, and inert charge—and, crucially, dangerously unpredictable in impact (unlike today's gun). This relative unpredictability made it a poor recourse for the determined murderer but paradoxically more effective as an instrument of intimidation.

In short, the particular nature of the eighteenth-century gun shaped its use and meaning. The unpredictable result of its gunfire made clear the impersonality of the action of shooting, justifying it before the law as reasonable defense of property—and the risk of death as something of which every trespasser must be aware. Sociologists explain that the tension and fear of physical conflict is almost entirely debilitating at close range without



intense emotional motivation[67]—the emotional motivation needed to violently wield swords, knives, clubs, or the hands. The firearm, however, could be wielded from afar; it required no intimacy, making less emotionally motivated violence possible. The greater the distance, the more depersonalized the target and the greater the ease of firing at it. (Archery required too much skill and strength for everyday violence.)[68] The eighteenth-century gun communicated a particular threat: *I am at enough of a distance that I can overcome my revulsion against physical violence to protect my property, which I might not have had the courage to do if I were armed only with a knife. That type of violence—up close, with a knife—I would only engage in if your attack was upon my life rather than upon my property.* The unpredictability of the eighteenth-century gun ensured the impersonal nature of this threat. The hand pulled the trigger without knowing what the result would be, making the result the impersonal product of chance: *I pull a trigger that unleashes a multistep mechanical process that may or may not result in harm to you. The multiple steps produce a distance between intention (protecting my property) and the result (anything from terrifying you to wounding you to killing you). I am not responsible for the result; it is the product of an impersonal mechanical process.* The bow and arrow, on the other hand, produced a reliably predictable result and lacked the distancing steps of mechanical power; a sword threatened but without the cover of impersonality. The eighteenth-century gun allowed a dispassionate kind of violence partly *because* it could not promise precision. Its theoretical purpose was that of a stern deterrent, the greater ease of perpetrating violence and aloofness from its impact serving to inhibit defiance. This was the source of its power as an instrument of terror in England. In 1796, a prosecutor explained to a jury in a lethal property dispute that if the shooter had desired simply to "terrify" the alleged trespasser, as was within his rights, he might have used an empty pistol or might have let the trespasser know the pistol was loaded. But he had kept his gun "out of sight," in which case its presence had no legitimate purpose.[69] Those who wielded pistols explicitly did so "to intimidate" another.[70] Adam Smith recognized that firearms worked through their terrorizing effect: the "noise . . . smoke, and . . . invisible death to which every man feels himself ever moment exposed."[71] The law against going armed in terror of the people did not apply to property holders defending their property; it applied to those threatening to violate that property. *In this moment,* firearms were not the weapon of the angry and passionate or the weapon of the mob; they were the weapon a man of property might (legally) use to fend off an angry mob and the weapon a practiced highwayman might (illegally) wield to snatch that property.

This was the age of the "polite and commercial people," and guns helped propertied people build that reputation of politeness even while they were antagonistically engaged against the propertyless.[72] Emotion was invested in the property they defended but actively denied in the relationship to the person threatening it. The gun's threat was impersonal, like the new mode of social discipline embodied by Smith's "invisible hand." If property is the power to exclude others from taking or using certain things, the gun was the handheld instrument that made it effective (along with the law). The sword expressed the personal, aristocratic quality of chivalry; the gun, the impersonal, bourgeois quality of private property. Indeed, it is no coincidence that by the 1780s pistols were adapted to the aristocratic custom of dueling. Pistols made it easier for those unskilled at swordplay to participate but also made this eminently choreographed form of violence more polite. Rules of engagement required duelers to raise their weapons and fire in a single movement without pausing to aim.[73] Parties took to firing into the air as a pragmatic and honorable way of terminating the conflict. Some fought with only powder and no ball. Pistols did not make duels less

*A Right to Bear Arms?*

deadly but allowed the custom to evolve with notions of gentlemanly honor. A man killed in a pistol duel fell "victim to modern honour."[74]

## WHAT HAPPENED TO GUN REGULATION AFTER 1800?

Government attitudes toward mass armament changed after Amiens. When war restarted, even the great enemy of radicalism William Pitt conceded, "there was a time . . . when it would have been dangerous to entrust arms with a great portion of the people of this country[,] . . . *but that time is now past.*"[75] Men joined the war effort for different reasons— out of military ardor, love of country, novelty, but also impoverishment and the effort to avoid "being drawn in the militia."[76] The British citizen fought for the regime of property whether or not he had any of his own. After 1803, enlisted men made up 11 to 14 percent of the adult male population, three times the ratio in France.[77] Half a million civilians, mostly working men, were drawn into civil defense and given arms.[78] The result of mass arming, according to Henry Addington, prime minister from 1801 to 1804, was a renewed contract between the government and the governed:

> A determination on the part of the government to put arms into the hands of a whole people, and a resolution on the part of the people to accept them . . . proved a double security, a double pledge. It was a pledge on the part of the government, that they should never attempt anything hostile to the constitution. It was a pledge on the part of the people that they valued as well as understood its excellence; that they were steadily attached to it, and determined to preserve it.[79]

Average enrollment during the Nine Years' War was 76,400; it had been 108,400 in the American war but 300,000 in 1809.[80] The hundreds of thousands of volunteers incorporated from 1808 into local militia under commissioned gentry officers and military discipline withdrew an enormous population of men from the ranks of potential food rioters. Thousands guarded the six naval dockyards. A home guard furnished with uniforms, officers, arms, and weekly drill pay faced down food rioters.[81]

Guns now became pervasive. Training in arms for the state became "the most common collective working class experience."[82] New kinds of people, well beyond gentlemanly sportsmen, now became intimate with guns. Village artisans became well-traveled soldiers; ex-soldiers become artisans.[83] In the end, the volunteer army proved trustworthy—it did not use its weapons to revolt or extort political concessions, proving that its members preferred their own unreformed state to French invasion. But this military experience on an unprecedented, seemingly apocalyptic, scale of magnitude and duration did produce a major cultural shift in understandings about and uses of guns. The availability of guns and the mass experience of using them together produced this shift. Mass arming exposed an entire generation to the business of impersonal killing to an entirely new degree. The experience of bureaucratically rationalized violence taught an entire generation to suppress personal inclinations to accomplish a collective purpose.[84] Guns began to be used in new ways.

State violence was mirrored throughout society. Guns began to appear with startling frequency in reports of untimely death. They were also implicated in new kinds of deliberate homicides unrelated to property or passion. In the Birmingham area in 1794, a man was sentenced to death for shooting a woman "without even knowing her person."[85] In Liverpool, a man stopped a woman, took her calash, and fired a pistol in her face. When the gun misfired, he tried again and wounded her. When caught, he appeared "quite collected"

# RETHINKING SOUTHERN VIOLENCE:

*Homicides in Post–Civil War Louisiana, 1866–1884*

**Gilles Vandal**



Ohio State University Press
*Columbus*

Compendium_Roth
Page 0690

To my wife, Diane, and my two children, Roxane and Jérémie, for their support and love

Copyright © 2000 by The Ohio State University.
All rights reserved.

Library of Congress Cataloging-in-Publication Data

Vandal, Gilles.
    Rethinking Southern violence : homicides in post–Civil War Louisiana, 1866–1884 / Gilles Vandal.
        p. cm. — (The history of crime and criminal justice series)
    Includes bibliographical references and index.
    ISBN 0-8142-0838-X (cloth : alk. paper).—ISBN 0-8142-5041-6 (pbk. : alk. paper)
    1. Homicide—Louisiana—History—19th century.   2. Violence—Louisiana—History—19th century.   3. Whites—Louisiana—Mortality.
4. Blacks—Louisiana—Mortality.   5. Louisiana—History—19th century.
6. Louisiana—Race relations.   7. Louisiana—Social conditions.   I. Title.
II. Series.

HV6533.L8 V35 2000
364.15′23′0976309034—dc21                          99-054309

Text design by Nighthawk Design.
Type set in Sabon by Graphic Composition, Inc.
Printed by Thomson-Shore, Inc.

The paper used in this publication meets the minimum requirements of the American National Standard for Information Sciences—Permanence of Paper for Printed Library Materials. ANSI Z39.48–1992.

9 8 7 6 5 4 3 2 1

3

## *A Most Troubled State: Lawlessness and Popular Disturbance*

In late September 1868 an intoxicated trader from Arkansas stopped at the Shady Grove plantation in Bossier parish and asked if there were any radical Republicans. When a young boy pointed out an old black man, the trader pulled out his pistol and fired twice at the aged freedman, missing him both times. This event was followed by the organization of a black posse that proceeded to arrest the trader. A skirmish later took place between the black posse and a group of whites who tried to free the trader. After a bloody fight, the white man was finally released. Whites became so enraged over this matter that they launched a general "negro hunt." In the process, some 185 blacks were killed in Bossier and Caddo parishes.[1]

Political and racial riots, street and tavern brawls, labor and ethnic disturbances, and the actions of criminal bands and lynch mobs, are all forms of collective violence that, taken together, constitute a rough barometer of social and political unrest. These various forms of popular disturbance are important to study not only because they show the willingness of people to act outside the law, but also because they reveal much about the radical social disorganization that affected Louisiana after the Civil War.[2]

The South achieved notoriety during the nineteenth century for its frequent outbursts of violence. In post–Civil War Louisiana violence had become so common, particularly during election periods, that the state legislature was forced to vote no less than three election laws and a riot act in order to cope with the problem.[3] The numerous riots and

67

Compendium_Roth
Page 0692

acts of violence committed during the weeks preceding the presidential election of 1868 and during the summer and fall of 1874, show the readiness of Louisiana whites to resort to extreme violence in order to restore their social and political dominance over the black masses.[4]

The goal of the present chapter is threefold: first, to analyze the various patterns of collective violence and to examine the social and political context that brought people to get involved in riots, disturbances, and other acts of lawlessness; second, to investigate the roots of collective violence and to determine the proportion originating in labor disputes, criminal bands, political and racial antagonisms, or personal and social conflicts; and third, to examine the role of paramilitary organizations such as the Knights of the White Camelia and the White League and to determine how collective acts of violence, particularly political violence, originated from concerted action by whites. In the process we shall be able to determine how paramilitary violence represented a desperate attempt by whites to regain the rights they had once enjoyed over the land and the black population. Finally, in order to get a better understanding of the issue of collective violence, we will compare individual and collective patterns of homicide.[5]

## Patterns of Collective Violence

Social scientists and historians have long noted the important distinction between individual and collective forms of violence. While individual or personal violence is commonly considered simply as a crime, collective violence evokes more complex connotations, being often perceived as a form of community protest or popular resistance to intolerable pressure. Students of the phenomenon have nevertheless generally distinguished between violence committed by criminal bands on the one hand and violence committed by people resisting state or local authorities on the other hand. The nature and composition of the violent crowd, their strategies, targets, and grievances are all essential ingredients in analyzing collective violence with a view to understanding its significance.[6]

While collective violence can be generally defined as a radical interruption of social order within a community, it remains a particularly difficult phenomenon to understand when one attempts to become more specific. As Charles Tilly has asserted, collective violence often grows out of actions "which are not intrinsically violent, and which

are basically similar to a much larger number of collective actions occurring without violence in the same period and setting."[7] Not surprisingly, the definition of collective violence largely depends on the way the observer looks at it.

One can apply the legal definition of a riot as any disturbance involving the participation of three or more people. Contemporaries generally see popular disturbances differently depending on classes or races involved. In recent years, social scientists have contributed to refine the perception we may have of crowd behavior. They have shown first of all that collective violence or "popular disturbance" differs from individual violence due to its mass character. Their analysis further shows that people involved in collective violence do not necessarily share the same values, and their participation is not always based on the same motivations. Social scientists tend to limit the definition of collective violence to disturbances resulting from a rudimentary and temporarily organized crowd or group. This definition excludes all forms of institutionalized actions.[8] Certain historians such as Hobsbawm, Rudé, and Thompson have enlarged the definition of collective violence to include all forms of popular disturbances whether or not they are institutionally related.[9] It is this last approach that this present study adopts.

Among the many obstacles that face the student of popular disturbance, the first is methodological and arises from the paucity of firsthand accounts by people involved in such events. Too often information is limited to press accounts reflecting the prevalent prejudices and values of reporters. As a consequence it is difficult to get a clear view not only of the motives and feelings of the people involved, but also of the nature of the crowd, its composition, and its way of acting. It is important to keep in mind that the social or political importance of a popular disturbance is not always related to the type of information generally included in press reports such as the number of participants or the number of people killed or arrested. For example, the slaughter of six white Republican officials in the parish of Red River in August 1874 did more to demoralize both white Republicans and blacks than the massacre of more than 100 blacks during the Opelousas riot of 1868. Despite such limitations most social scientists and historians believe that information of this type provides a good basis for analyzing popular disturbances.[10]

For this study, information has been collected from various sources regarding all major incidents of collective violence perpetrated in



**Figure 3.1**  Annual Distribution of Major Incidents of Collective Violence

Louisiana during the post–Civil War period. For the purpose of this analysis, a major incident of collective violence is defined as any reported political, labor, social, or racial disturbance or any act of lawlessness that involved ten or more people. Furthermore, different acts of collective violence that occurred during a single riot were not included separately in the data as they had already been counted as part of the said riot.[11] Finally, an incident did not need to be deadly to be included in the present data. While political riots that ended with many deaths were counted, so were cases of destruction of property by white mobs and labor disturbances that caused no violent deaths. Based on these criteria, no less than 565 major incidents of collective violence occurred in Louisiana after the Civil War (fig. 3.1).

These data confirm the accepted view that post–Civil War Louisiana was a very troubled region, particularly during the Reconstruction years. With 402 reported cases, the Reconstruction era suffered 71 percent of the major incidents of collective violence and lawlessness during the entire period. The years 1868 and 1874 were particularly troubled with 83 and 66 incidents respectively, reflecting the political climate of the period. The early Redemption era, in contrast, was comparatively quiet with only 163 incidents, or 29 percent of the total for the period. The annual average shows a substantial drop from 33 violent episodes a year for the first period, to only 20 per year for the latter period as political riots, disturbances, and skirmishes fell dramatically.



**Figure 3.2**  Annual Percentage of Homicides Resulting from Collective Violence

One can establish a close correlation between the number of incidents of collective violence and the annual variation in the number of people who died from such violence. Indeed, collective violence had a direct impact on the percentage of people killed. Almost half of the homicides that occurred during Reconstruction were committed by more than one person. The years 1868, 1873, and 1874, which saw major political disturbances, were the only three years with a percentage above 40 percent. These statistics are even more striking when one compares them with the less than 20 percent of homicides committed during the early Redemption period that involved more than one person (fig. 3.2).

The regional distribution of major incidents of collective violence and lawlessness is most revealing. These incidents were largely concentrated in two regions, the Red River area and the Sugar Bowl parishes, which accounted for 22 percent and 19 percent respectively (fig. 3.3). As we have seen, the Red River area was particularly troubled, suffering some of the worst political riots of the period: the Bossier and Caddo riots of 1868, the Colfax massacre of 1873, the Coushatta affair of 1874, the Caledonia riot and the Natchitoches trouble of 1878. On the other hand, the Sugar Bowl area was more the prey of bands of outlaws and robbers. For its part, New Orleans, which was



**Figure 3.3** Regional Percentage of Major Incidents of Collective Violence



**Figure 3.4** Regional Percentage of Homicides Resulting from Collective Violence

better policed and benefitted from the constant presence of Federal troops, had in proportion to its population the smallest ratio of disturbances. Although New Orleans did suffer a few major riots, such as the riots of 1866 and 1868 and the battle of Liberty Place in 1874, more than 60 percent of the Crescent City's disturbances were not political but labor related.

The correlation between the number of major disturbances and the number of people killed in a particular region yielded further interesting results (fig. 3.4). The data show that three regions, the Red River area, the Northern area, and the Northern Central Hill country, had more than 50 percent of their homicides committed by more than one person. In addition, almost half of the state homicides committed by more than one person occurred in the Red River area alone, which was also the most disturbed region in Louisiana. In contrast, the Sugar Bowl area, despite its high number of disturbances, had a rather low percentage of homicides committed by more than one person. The absence of major political disturbances and riots in that region ex-

plains this particular situation. In all other regions, most people killed died in one-to-one encounters.

## The Racial Nature of Collective Violence

A significant tendency revealed by the data is the high incidence of collective violence originating from whites. While whites were responsible for 85 percent of cases of collective violence, blacks were responsible for only 15 percent of such cases. Although the number of cases decreased significantly between the Reconstruction and the early Redemption periods, the racial proportional shares remained almost the same. Whites were largely responsible for lynch mobs and were also the instigators of the great majority of the riots and acts of lawlessness. Black involvement in such disturbances was mainly limited to labor conflicts, attempts at rescuing blacks arrested for alleged crimes, and participation in outlaw and robber bands.

**Table 3.1**
Collective Nature of Homicidal Behavior, 1866–1884

| | Individual | | Collective | | % Collective |
|---|---|---|---|---|---|
| | N | % | N | % | |
| Unknown by unknown | 451 | 16.4 | 33 | 1.9 | 6.8 |
| Unknown by whites | 218 | 7.9 | 59 | 3.5 | 21.3 |
| Unknown by blacks | 118 | 4.3 | 11 | 0.6 | 8.5 |
| Blacks by unknown | 81 | 2.9 | 29 | 1.7 | 26.4 |
| Whites by unknown | 69 | 2.5 | 19 | 1.1 | 21.6 |
| Whites by whites | 612 | 22.5 | 257 | 15.3 | 29.6 |
| Blacks by whites | 514 | 18.7 | 1,126 | 67.0 | 68.7 |
| Whites by blacks | 125 | 4.5 | 58 | 3.4 | 31.7 |
| Blacks by blacks | 564 | 20.5 | 88 | 5.2 | 13.5 |
| Total | 2,752 | 100.0 | 1,680 | 99.7 | 37.9 |

The fact that most incidents of collective violence and lawlessness were committed by whites emphasizes the racial nature of collective homicide in post–Civil War Louisiana (table 3.1). In 69 percent of cases where whites killed blacks, the incident involved more than one person, while only 30 percent of the cases when the victim was white, involved more than one white. The statistics are even more striking when one considers black homicidal behavior. No matter the race of the victim, when blacks killed other people, they usually acted alone. Yet the tendency of blacks being involved in mortal personal encounters was higher when the victim was black (86%) than when he was white (68%). This aggregate data clearly shows that blacks were more in danger of falling victim of collective killing than whites; 52 percent of blacks killed were murdered by more than one person, compared to 30 percent in the case of whites. Meanwhile, 52 percent of the times when whites committed a murder they acted in groups, compared to only 16 percent for blacks. Furthermore, blacks were victims in 81 percent of instances of white collective killings. Overall the evidence clearly points to the conclusion that white violence was of an organized nature while this was not the case with black violence.

The nature of collective violence is better understood when one examines the occupations of the perpetrators. The data show that violence against blacks, both individual (50%) and collective (65%), was largely committed by two particular groups: planters and farmers. The need felt by these particular groups to control blacks emerges as a paramount factor leading to collective violence (fig. 3.5). This is made even more obvious when one looks at occupation variables in white



**Figure 3.5** Occupations of Whites Committing Collective Homicide: Percentages

violence against whites. Here, only 18 percent of individual violence and 24 percent of the collective violence originated from planters and farmers, both forms of white violence being well spread among the different occupational categories. Local planters and farmers thus assumed the leadership of the Redemption campaign that was nevertheless supported by white conservatives of differing social and economic groups.

While whites who worked small farms had no love for the large planters, they had even less love for blacks. They were fiercely opposed to universal suffrage and to equal rights before the law for blacks. The opposition between poor whites and blacks became sharper after the war, as economic depression accentuated the effect of black competition, increasing racial antagonism.[12] Meanwhile, planters faced with economic ruin were anxious to maintain their control over black labor. Consequently both small farmers and large planters, particularly those who were concentrated in large cotton areas, became advocates of white supremacy, although their motives differed.[13]

But lawlessness and acts of collective violence were not the sole

prerogative of whites. In March 1866, Lieutenant M. F. Daugherty, an agent of the Freedmen's Bureau in Gretna, Jefferson parish, reported that street fights and other disturbances between blacks and poor whites were frequent. Daugherty blamed this racial animosity on the inability of "the negroes to conduct themselves in a polite manner and in keeping with their true condition." He particularly criticized blacks for their habit of coming into town heavily armed and for using their weapons without provocation.[14] Disturbances of this sort were reported regularly all over the state by local newspapers.[15]

## A Favorable Atmosphere for Collective Violence

Although street brawls, disturbances, riots, and various acts of lawlessness are social phenomena common to all traditional societies, they were particularly characteristic of the South during the second half of the nineteenth century. The war not only emancipated the slaves and produced social dislocation, it also helped to develop within the white community a greater tolerance for violence. One of the bloodiest wars in history had contributed to making bloodshed more acceptable. To the extent that fighting men had come to learn that killing fellow citizens was not so grave a matter, the war weakened moral principles and encouraged men to take justice into their own hands, creating an atmosphere of lawlessness.

The war had an influence on both blacks and whites. Blacks ran away from the plantations; white deserters hid in the countryside; and returning soldiers encountered difficulties in readapting to civilian life. Bands of guerrillas, known as jayhawkers, who had roamed the region in the later stages of the war transformed themselves during Reconstruction into gangs of marauders and robbers. The Lawson Kimball and John West band was typical of Louisiana post–Civil War gangs of outlaws and robbers. These two notorious criminals had led separate guerrilla bands during and after the war and later joined forces. They operated during the late 1860s in Winn parish and made incursions into the adjoining parishes. They were involved in the 1866 murder of Lieutenant Butts of the U.S. Army. They rode and robbed throughout the countryside, killing blacks and stealing horses. The band was finally dismantled in April 1870 when its members were either killed or arrested by a vigilance committee.[16] The Kimball and West gang,

the Beaver, the Black Horse Cavalry, the Fontenot, and the Guillory gangs were indeed the most notorious of such bands plundering rural Louisiana with total impunity for a number of years.[17]

The presence of criminal bands was not limited to the years immediately after the war. During the middle and late 1870s and early 1880s, many bands of outlaws continued to prey on several regions of Louisiana. The Cicero gang emerged as one of the worst bands of outlaws. In 1874 and 1875, in a locality commonly called "Hog Thief Point" about 12 miles south of Shreveport, that gang committed a number of atrocious murders, several of them extremely brutal. A similar well-organized gang operated during the early 1880s in the lower part of St. Landry in the neighborhood of Grand Coteau, killing blacks during the night and creating a reign of terror.[18]

As Federal authorities did not have enough troops in Louisiana to maintain law and order in rural areas, these gangs contributed to the general atmosphere of anarchy that prevailed in the Pelican State after the war. Gangs rode around the countryside, whipping and robbing freedmen, and defying the military and civil authorities before retreating to the swamps that offered secure hiding places.[19]

Nevertheless criminal activity was not limited to former guerrillas and jayhawkers. Blacks were also involved in acts of lawlessness as they regularly attempted to rescue other blacks who had been arrested for robberies or other crimes. In December 1867, blacks in Franklin, St. Mary parish, attempted to rescue a band of black horse thieves from St. Landry who had been put in jail.[20] In the same month intense excitement prevailed at St. Martinville after a mulatto who had shot at O. Delahousaye Jr., a white constable, was arrested. When blacks tried to rescue the prisoner from the hands of a sheriff, the latter was promptly reinforced by whites, and only the swift intervention of the Freedmen's Bureau agent prevented a riot from breaking out.[21] In 1868 a group of black outlaws committed a series of assassinations close to the town of Tigerville. Parties lay in ambush along the Opelousas railroad and fired on passing trains. In the ordeal, four railroad employees were murdered. The band was acting without any ostensible motive or reason. Robbery could hardly be the supposed motive, since the band took no measures to throw the car off the road.[22] In 1872, William Smith, a black arraigned on a charge of hog stealing, was rescued from the guard of a constable by a band of thirteen armed blacks while on his way to Monroe to appear before the district judge.[23] In



**Figure 3.6** Motives Underlying Major Incidents of Collective Violence (percentages)

June 1874 some fifty blacks attempted to rescue the supposed murderer of "Old Eastin" from jail in Napoléonville, but they were stopped by some four or five whites who had been posted there to prevent a rescue.[24]

Criminal activities were the underlying causes of 32 percent of the incidents of collective violence during the entire period: 29 percent during Reconstruction and 39 percent for the early Redemption era (fig. 3.6). Data on the more primary reasons for which people were killed yields further interesting information (fig. 3.7). While depredations committed by criminal bands represent, in terms of numbers, the major cause of collective violence, they remain a rather secondary factor in explaining homicides. Contrary to the assertion made by contemporaries, criminal bands usually only resorted to homicide as a last recourse. As shown in figure 3.7, the number of homicides committed by outlaw bands in the process of committing a crime were quite limited.



**Figure 3.7** Motives Underlying Collective Homicide (percentages)

## Popular Disturbances as a Means of Social Control

It is an unquestionable fact that the general atmosphere of violence and anarchy that prevailed in the South after the Civil War influenced all aspects of social interaction during that troubled period as political riots, social and labor disturbances, murders and other personal disputes reached unprecedented levels. In many parishes after the war, no one had the authority or was willing to bring criminals to justice.[25]

Consequently sheriffs increasingly resorted the posse and other forms of citizen police to maintain law and order. It was such a posse, composed of 150 whites and led by Sheriff Hill, that arrested 48 blacks in August 1868 in Bossier parish when rumors of a black insurrection began to circulate. The whole affair began when the sheriff attempted to arrest several blacks on the charge of stealing cattle.[26] It eventually led to a riot that struck the parish in late September of the same year.

Often whites did not wait for the official formation of a posse before getting together to regulate the countryside. Bands of masked men regularly took to the road, committing various atrocities and not hesitating to stain their hands with blood upon the slightest provocation. In 1867 eight freedmen who had been arrested on the charge of having killed a planter, were met, while being taken to prison, by a

Compendium_Roth
Page 0698

party of masked men. Two of the prisoners were shot dead, and the six others were also probably murdered since no trace of them was ever found.[27] Incidents of this sort were not uncommon in post–Civil War Louisiana.

The simple rumor of a black insurrection was enough to generate an upheaval of all whites of the surrounding areas. For example, a rumor was spread in the parish of West Feliciana in September 1874 that blacks were gathering to attack the town of Bayou Sara. The rumor created a wild excitement among the town population. As a black crowd was coming to town, the black sheriff of the parish called a posse of thirteen whites and chose to stop the black crowd at the entry of the town. After a few shots were fired, the black crowd ran in all directions. Meanwhile fifty whites from the surrounding country gathered in Bayou Sara to give assistance to the posse. The incident ended only after 400 blacks, who had gathered at Kellertown to define an appropriate course, chose to disperse in order to avoid a riot.[28]

This periodic and exaggerated fear of black insurrections brought frightful and bloody retribution on the black community. With each new rumor of an impending black uprising, the parishes were then transformed into a hunting ground, as whites all over the region rallied, feeling it their duty to crush the insurrection at its beginning. Posses were organized and whites scouted the rural areas in paramilitary groups in search of rebellious freedmen. During these "negro hunts," countless numbers of freedmen were taken from their homes and either killed or forced to leave their homes, crops, and all they possessed.[29]

Whenever a black man had a dispute with a white man, the fact that he should be sustained by another black would instantly rally the entire white community, convinced that it was facing a riot.[30] In July 1874 a black man named Sam Wallis had a quarrel in Shreveport with a white merchant named Demetz. When Demetz wounded Wallis, a row involving some 40 blacks versus a group of whites developed. The blacks retired only after a swift intervention on the part of the city police prevented the conflict from reaching tragic proportions.[31]

A similar incident occurred in Ascension parish in June 1881. An old white man named William J. Dowling was travelling along the coast peddling fishing lines and was going from Uncle Sam plantation to Jacobs's sawmill, when he was arrested by a gang of fifteen black men from Uncle Sam's place, who charged Dowling with robbing Alexis Lagroue, a black man, of his money. As the crowd was going back to the plantation with their prisoner, proclaiming their intention

of punishing him in their own way, their noise attracted the notice of a party of young white men in L. N. Landry's store, who went out and rescued the old man from the blacks. After many threats the blacks agreed to surrender their prisoner in order to avoid an open confrontation.[32]

White interference in black quarrels often deteriorated into racial violence, as if it was the duty of whites to regulate black behavior. In Pointe Coupée in March 1880, a white attempted to suppress a row between a black man and his wife. As the black man resisted the interference, the white shot and killed the black.[33] A similar incident occurred in the same parish in August 1881 when a black dance degenerated into a row on a Saturday night. Lieutenant Chenevert, a planter and former Confederate officer but not a member of the U.S. army, was killed while he tried, with the assistance of a few other whites, to reestablish order. Furthermore, another white and a few blacks were wounded during the brawls. As the news spread, a large crowd of whites gathered on Sunday morning at the site of the incident and proceeded to arrest fifteen blacks. Both black and white communities were extremely agitated. As a consequence the stores of the town remained closed and business was suspended for a few days.[34]

All in all, family feuds, parties, and social conflicts of various types rarely worsened into collective violence. Social causes represent only 21 percent of all collective incidents of violence. These causes did not vary much between Reconstruction and the early Redemption period. Moreover, in comparative terms, relatively few people died in such disturbances. This shows a willingness among people to solve their personal disputes on a one-to-one basis rather than through mobilizing community action.

## Labor Disturbances as a Cause of Collective Violence

Labor represented the fundamental issue for Southern planters after the war due to the abolition of slavery. The survival of the plantation system necessitated a bitter and prolonged process involving major changes in farming methods and in the credit system. Partly ruined by the war and threatened with foreclosure and bankruptcy during Reconstruction because of crop failures and overtaxation, planters were also faced with pressures on the part of freedmen for better

wages and long contracts. Planters gradually found in the annual contract system, developed by the Freedmen's Bureau, the best method for preserving the old plantation organization. But freedmen were often reluctant to work under the wage system, since it implied gang labor reminiscent of the old servile system. Since planters refused to sell or even to rent lands to freedmen, sharecropping emerged as the system most acceptable to both sides.[35]

The transformation of farming methods did not prevent blacks from striking or protesting against their labor condition. There were rare instances of black laborers assaulting and even killing their employers. Labor disturbances in rural Louisiana were often described by whites as a black uprising, riot, or insurrection, raising the worst white pre-antebellum fears.[36] In fact disturbances on plantations were not limited to blacks, as they also originated from Chinese laborers discontented with their conditions.[37] For example, Chinese working on the plantation of William Shaffer and M. J. Williams in Terrebonne parish made an uprising in September 1871 and seized the overseer of the plantation.[38] Fights between planters that competed for labor were also an important cause of labor disturbances. As James Payne hired laborers from Virginia, some whites tried to entice the laborers away from him. The fight that ensued took a tragic turn, as one night a group of whites came to Payne's plantation and set fire to the gin-house. Payne was killed while trying to defend his property.[39]

Furthermore, labor disturbances in rural Louisiana originated also from fields of economic activities other than agricultural: out of fifty major labor disturbances that occurred in the Louisiana countryside, eight were of this type. The most notable strikes involved the hod carriers in Shreveport in 1869, black coal heavers in Brashear city in 1875, lumbermen in 1877 and 1879 in Calcasieu, draymen in Shreveport in 1880, and finally railroad workers on the Vicksburg, Shreveport, and Pacific Railroad in April 1882 and March 1883.[40]

The Brashear strike is a good example of the nature of labor disturbance in a small town. In late August 1875, a large gang of black coal heavers employed by Charles Morgan began to protest for higher wages. Rumors spread that the blacks were threatening to burn the town and kill all those who opposed them. Apprehending a riot, Mayor St. Claire, Town Attorney Winchester, and Councilman MacCready took decisive steps to control the so-called black strike.[41] But in fact, the crisis had been blown out of proportion. No strike had

**Table 3.2**
**Labor Disturbances in Louisiana, 1866–1884**

| Regions | 1866–1876 | | 1877–1884 | | Total | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| Rural parishes | 30 | 56.7 | 20 | 39.2 | 50 | 48.1 |
| New Orleans | 23 | 43.3 | 31 | 60.8 | 54 | 51.9 |
| Total | 53 | 100.0 | 51 | 100.0 | 104 | 100.0 |

taken place; blacks had only demanded to be paid in money rather than in goods at the Ehrman's store, because they felt cheated by Ehrman. During the fight that followed a dozen shots were fired, all by whites. The only wounded person was black. The whole disturbance, which ended with the arrest of several black workers, showed that the control of black labor remained paramount even for white Republican officials.[42]

Labor disturbances in particular were not limited to rural areas as more than half occurred in New Orleans (table 3.2). Both white and black workers of the Crescent City developed a class consciousness after the war, not hesitating to strike together in order to maintain or improve their wages and working conditions. On many occasions they opted for class solidarity that went beyond racial division.[43]

While strikes and other forms of labor disturbances had already been part of the social features of antebellum New Orleans, the economic depression that struck the city during Reconstruction led to an increase of such disturbances. Indeed labor disturbances emerged after the war as the most significant form of popular conflict, most incidents of collective violence being labor related. While strikes in New Orleans affected almost every trade, they were still mainly concentrated at the port: longshoremen on the levees were responsible for 27 strikes, a proportion of 50 percent of all city strikes between 1865 and 1884.[44] Strikes by longshoremen predominated during Reconstruction,[45] while strikes in other trades were more frequent during the early Redemption period.[46]

Labor disturbances, described regularly as labor riots, work stoppages, disputes over crop settlements, and other forms of labor disruptions, represented 18 percent of all incidents of collective violence in Louisiana, but only 10 percent of homicides and only 5 percent of collective homicides. Labor conflict was not directly a major cause of violence in Louisiana.

## The Political Motives for Collective Violence

Post–Civil War violence in Louisiana has to be considered in relation to Southern thought and values at the time. Whites in Louisiana, as elsewhere in the South, were afraid of losing their sense of identity, and they were not ready to accept the changes that threatened the images they had of themselves and of blacks. Consequently white violence has to be understood from a racist and white supremacist perspective, as a reactionary fear by a large segment of the white population and as a desperate attempt to regain the rights they had once enjoyed over the lands and the black population.[47]

In 1866 and 1867, but more particularly during the spring and summer of 1868, activities of bands of whites working as paramilitary organizations, such as the Knights of the White Camelia, were reported in various parishes. These bands roamed the countryside in the night, terrorizing blacks and preventing them from joining Republican clubs.[48] State government reports demonstrate that violence in 1868 resulted from a concerted action aimed at forcing blacks to abstain from voting and at driving white Republican leaders out of the state.[49] By the summer and fall of 1868, violence in Louisiana clearly took a political overtone and started with rumors that a victory for Horatio Seymour and Frank Blair at the presidential election would mean the overthrow of Reconstruction. Blacks could avoid intimidation and violence by joining Democratic clubs that gave them "protection papers."[50] As white passions reached a paroxysm of rage, violence degenerated into mass murder during the 1868 presidential election when Louisiana was struck by numerous major riots.[51]

A second wave of violence began in 1873 on the part of white conservatives, fiercely opposed to the new Republican administration led by Governor W. P. Kellogg, attempting to prevent the installation of local Republican officials in several parishes. The state authorities were compelled to send detachments of the New Orleans Metropolitan Police into several rural areas to reestablish order. The crisis culminated on Easter day, April 13, 1873, when hundreds of whites from Grant, Rapides, and Catahoula parishes rallied at Colfax where they slaughtered more than one hundred blacks in cold blood. Blacks with their throats cut were left in the field for later burial by the military authorities.[52]

The year 1874 was marked by an uprising of the White League, a loosely structured, paramilitary and antiradical organization, which took temporary control of the whole state. The strategy of the White

League was aimed not only at intimidating blacks but also at expelling white Republicans from local parishes.[53] During the summer and fall of 1874, the *Shreveport Times* and other rural papers repeatedly called on whites to rally for concerted action, and if necessary to resort to political assassination of the radical white leaders throughout northwest Louisiana. The *Times*'s "extreme and blood-thirsty utterances" were so widely quoted that they attracted national attention to the dangerous conditions prevailing in Louisiana.[54]

Blacks in rural Louisiana were made to feel the wrath of the white community as whites began roaming rural areas in paramilitary groups. Frightful stories began to circulate about the violent conditions prevailing in many parishes. The *Shreveport Times* acknowledged that blacks in Caddo and throughout the adjoining parishes were uneasy, "in doubt as to the intention of the white people," frightened, and in a "frame of mind to be led by bad men into action that will bring upon them a fearful retribution." Blacks became terrorized and apprehensive for their lives. As they suffered numerous acts of violence from the White Leaguers, many chose to sleep out in the woods to escape the white fury. Numerous bodies of unknown blacks were later found.[55]

Calls for violence issued by the *Shreveport Times* prompted large numbers of whites to leave Shreveport in Caddo parish on August 30, 1874, for Coushatta in Red River parish to participate in the murder of six white Republican officials. The brutal slaughter of these white officials had a devastating effect on the Republican leadership. The *Times* asserted that it was the duty of the white community to kill the members of the returning board and proposed to dispose of all radical legislators by lynching them. Not surprisingly, all Republican officials in northern Louisiana felt forced to resign in order to avoid a reenactment of the Coushatta tragedy.[56] The White League uprising culminated with the victory of the battle of Liberty Place in New Orleans in September 1874.

The victory was short-lived, however, as the Federal army quickly reestablished Republican officials in New Orleans and other parts of the state. Among ways subsequently employed to compel blacks to abstain from voting or to vote for the White League ticket, calls were issued to planters to discharge all workers who would vote Republican.[57] This campaign of intimidation continued in 1875 and 1876 as white conservatives bulldozed Republicans officials and compelled them to resign.

The election of 1876 marked a shift in strategy as white conserva-