1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and
   Blake Graham, in their official capacities*
9

10           IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                     CIVIL DIVISION

13

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** |
| **v.** | **VOLUME 33 OF 37** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:   5A |
| | Judge:       Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

                                1

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS[i]** | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, Pistols: An Illustrated History of Their Impact 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, Colonial Maryland: A History 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, The 1838 Mormon War in Missouri 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, American Knives: The First History and Collector's Guide 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, Arms and Armor in Colonial America, 1526-1783, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, Daggers and Fighting Knives in the Western World, from the Stone Age till 1900, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, Waves of Global Terrorism: From 1879 to the Present 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, American Homicide 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

Compendium of Works Cited in Declaration of Randolph Roth
(3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325-1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians.  *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America,*" Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

tives resorted to violence, not so much to prevent blacks from voting, but in order to force them to vote for the Democratic ticket.[58] Several political murders were committed in various parishes, the most notable being the killing of Sheriff Dinkgrave in Ouachita parish. Yet as a rule, conservatives devised a strategy that avoided open confrontation with Republican authorities. As a consequence the only major riot of 1876 occurred on June 20th in the parish of East Baton Rouge when some twenty blacks were killed in what became known as the Mount Pleasant massacre.[59]

In 1878 white conservatives pursued their strategy of influencing the vote of the parishes of north Louisiana, which had a large black population, in order to create a Democratic majority. The situation quickly got out of control as a riot broke out on the night of the election at Caledonia, a village twenty-five miles below Shreveport on the Red River. The riot broke out as a group of whites led by Deputy Sheriff McNeil, following rumors that blacks had gathered arms in the vicinity of the polls, attempted to search a house owned by a black.[60] At first the fight involved seventy-five blacks and about twenty whites, but as only a few blacks were armed, they were rapidly driven into the swamps and other hiding places by the whites.[61]

Then a "negro hunt" began as white reinforcements gathered from diverse places and parishes. The unrest lasted several days. It is difficult to ascertain the exact number of blacks who were killed during the riot and the "hunt" that followed. The whites took no prisoners and did not take care of the wounded. United States District Attorney Leonard fixed the number of blacks killed between fifty to seventy-five, while the Democratic press put at first the number at fifteen. Meanwhile the U.S. Senatorial Committee that investigated the riot fixed the number of blacks killed at twenty. Only two whites were reported wounded. Thus ended radical rule in Caddo parish as the Democratic party carried the election by 1,500 votes.[62]

Riots broke out in Natchitoches and Caddo, while bulldozing and general intimidation became the rule in Madison, Concordia, and Tensas. Whites also organized themselves into paramilitary groups and terrorized blacks in other parts of the state.[63] The level of violence shocked Governor F. T. Nicholls, a moderate Democrat who was opposed to the use of violence. Meanwhile, in many parishes Democrats succeeded in carrying the election by fraud and ballot-stuffing. In Natchitoches, the Democratic party carried the parish by a vote of 2,811 to 0, while in Caddo, Concordia, Madison, and Tensas the large Republican majorities of 1876 simply evaporated.[64]

While politics was not a major factor in individual homicides (11%), it represented the single most important cause in collective killing (67%). Indeed, 85 percent of people killed for political reasons died during major disturbances. As Leon Litwack has asserted, white violence was well-organized.[65] Evidence shows that whites did not assault or kill blacks at random but followed a deliberate and selective policy aimed at intimidating white Republicans, eliminating black leadership, and terrorizing the black population. Congressional committees reported numerous instances in which black males were taken out of their cabins and shot by unknown white parties, while the victims' wives and children remained unmolested. During the St. Landry riot of 1868, which deteriorated into mass-murder, only blacks wearing a red string tied around their arms were exempted from white violence.[66]

White conservative leaders publicly promoted the killing of blacks and scalawags as a solution for Louisiana's political ills. In 1868 local White Camelia leaders selected targets in their respective parishes among prominent or politically active blacks and among white Republicans.[67] Even more effective was the White League, whose strategy was simple and direct. It consisted of intimidating not only blacks and white Republicans, but also any moderate white not afraid of speaking his mind. The White League strategy consisted of a mixture of social ostracism and physical violence. Political murders were only a part of this exercise of intimidation.[68]

Consequently much of the white anger was directed against blacks who began to engage in political activities, join Republican clubs, and assert their right to vote. Blacks who wished to play a political role were systematically singled out. Out of 1,450 blacks who fell victim to white violence during Reconstruction, 24.6 percent were local or state officeholders or held an office within the Republican party.

During the riot that struck the St. Bernard parish in October 1868, all black constables, justices of the peace, and police jury members were killed. Even being a member of the state legislature did not ensure immunity from violence, as several black senators and house members became special targets of the white fury. William R. Meadows, an ex-slave and former member of the 1867 constitutional convention was killed in May 1868 in Claiborne parish. Senator Alexander François from St. Martin parish was beaten to death in May 1869 by Colonel Fournet after the former published a letter on the abuses practiced on blacks in his parish. John Gair and John Wiggins, two members of the House of Representatives, were respectively

poisoned and shot in 1873 and 1875. Joseph Lofficial was killed after being elected to the legislature in November 1870. Joseph Antoine, son of Ceasar C. Antoine, was killed during the presidential campaign of 1868. Finally, Franklin St. Clair, a candidate for the state house in 1868, was killed while returning from a speaking engagement in Morehouse parish.[69]

Many charges of larceny, robbery, and other property offenses against white Republicans were politically motivated. In many instances the charge of stealing chickens was used to justify the killing of white Republicans. Many eminent black politicians also met with the same fate on trumped-up charges of stealing hogs, chickens, and cattle.[70] By regularly accusing white radicals of inciting blacks to murder and robbery, Democratic newspapers all over the state justified attacks against white Republicans and Republican newspapers. Consequently the presses and offices of the following Republican newspapers were destroyed by white mobs: the *St. Landry Progress* on September 28, 1868; the *Attakapas Register* on October 19, 1868; the *Claiborne Republican* on November 17, 1868; the *Marksville Weekly Register* on December 30, 1868; and the *Shreveport Southwestern Telegram* on December 23, 1874.[71]

## Conclusion

The post–Civil War years were without doubt the most tumultuous period in Louisiana history. The numerous incidents of collective violence that struck the Pelican State after the Civil War reveal the brutal character of nineteenth-century Louisiana society. The evidence is devastating; it confirms the frightful stories of murder, intimidation, rowdyism, and lawlessness reported in the correspondence of both the Freedmen's Bureau and Gulf Department, and the numerous testimonies contained in the reports and executive documents submitted to Congress. It shows that in Louisiana, human life was of little value in what became a war of race during Reconstruction.

Several factors were linked in bringing about the general atmosphere of anarchy that prevailed in Louisiana after the war: the demoralization of the white population following a bitter defeat; the racial and political animosity produced by emancipation; the social disorganization generated by the emergence of lawless groups; and the unsteady economic condition brought by depression and the transformation of the plantation economy.

Above all the turmoil of the period may be seen as the expression of the frustration of the white community in general as it found itself unable to cope with the new political situation. With emancipation, Louisiana—along with the rest of the South—saw the emergence of a new political order that introduced blacks into local, state, and national politics. The numerous political riots that struck Louisiana during Reconstruction reflect the white resistance to this major transformation brought about by the integration of blacks into the political process. The development of lynching and vigilantism in post–Civil War Louisiana demonstrate unequivocally the nature of white response to the changes generated by emancipation.

4

# *Toward a Reign of Terror: Vigilantism and Lynch Law*

In August 1877, Baptiste Celestin, a black resident of St. Mary parish, was arrested by thirty armed men and brought before the local justice of the peace on the charge of larceny. Due proceedings were held and witnesses summoned, a majority of whom were members of the local vigilance committee. After a full investigation of the case, the accused man was discharged for lack of evidence. The members of the vigilance committee took charge of the case themselves and sentenced the man to exile beyond the borders of Louisiana for twenty years.[1] Such cases were not unusual in rural Louisiana before and after the war. Celestin was in fact quite lucky since lynching became increasingly the punishment reserved for those caught stealing in post–Civil War Louisiana.

By the late nineteenth century, vigilantism became both the preferred response of Louisiana's established classes when confronted by a threat to their predominance and a method used by these same classes for dealing with social turmoil. They increasingly chose to use violence against other individuals or classes as a way to "preserve status quo at times when the formal system of rule enforcement is viewed as ineffective or irrelevant."[2] In this sense vigilantism and lynching were the products of a rupture in the judicial system. Such practices rested on the belief in the ultimate right of local citizens to enforce order: a belief fostered by a society in which violence had become a regular part of daily life. Believing that they could not obtain justice from the legally constituted authorities, people taking justice into their own hands was the only remedy for an intolerable situation.[3]

The historical study of vigilantism and lynching in North America

has recently received a new impetus.[4] Although historians have for a long time acknowledged that vigilantism and, more particularly, lynching were widespread in the South after the Civil War, most historians have until recently doubted that a "credible history of the phenomenon could be made for lack of sufficient information."[5] As a consequence the only systematic analysis of lynching and vigilantism has come almost exclusively from other social scientists, mainly sociologists who have relied on data collected either by the *Chicago Tribune* or the National Association for the Advancement of Colored People on lynching in the late nineteenth and early twentieth centuries.[6] No systematic quantitative analysis has so far been done for Louisiana on this subject covering the years 1866 to 1884.[7]

Drawing upon but not limiting itself to statistical data, this chapter examines the emergence and the salient patterns of vigilantism and lynching in post–Civil War Louisiana. By paying particular attention to the nature and the causes of vigilantism and lynching, this study seeks to determine to what extent these two phenomena were interconnected and examine how they evolved over the period. In the process, their relation to the contradictions inherent in the white society's fundamental values shall be determined.

## Lynching versus Vigilantism

Before looking at the data, we must first define what is meant by vigilantism and lynching. During the second half of the nineteenth century in Louisiana, vigilantism and lynching became a part of the established pattern of violence used by dominant groups of citizens to ensure the maintenance of public order, the protection of social mores, and as a means of countering social change. Organized secretly or carried out openly, such violence was given different epithets such as mob law, lynch law, or vigilantism. The groups involved were, over the period, called regulators, citizens' protective associations, committees of safety, bulldozers, lynching mobs, vigilantes, vigilance movements, or vigilance committees.[8] All these groups had the following characteristics in common: they operated under what they considered extraordinary emergency conditions, and since they were not ready to wait for the slow and uncertain action of the legal system, they operated outside of the law.[9]

Vigilance committees can be defined as groups of citizens organized

to preserve the community from crimes or to deal "popular justice"[10] in regions where courts and constitutional authorities seemed powerless to enforce the law. Springing from what was seen as inadequacies in protective law, these committees represented a popular response to depredations committed by alleged criminals in a particular region or state. Although they took the law into their own hands and dealt out punishment without any pretense of legality or due process of law, vigilance committees in Louisiana differed from lynch mobs by the fact that they were well organized and better disciplined.[11]

Vigilance committees could operate for weeks and even months before disbanding. The duties and organization of each committee were clearly specified in its statutes. Not only were most committees directed by an executive, many had written constitutions, maintained a list of members, held regular monthly meetings, kept minutes of their proceedings, and received regular reports from surrounding wards and precincts. Membership was conditional on unanimous vote of the regular members and involved payment of a membership fee. Some vigilance committees even published advertisements in local newspapers inviting all people interested in justice to attend their meetings.[12]

Lynching differed from vigilantism by its more spontaneous and less organized nature. Rather than offering society protection against bands of criminals, as vigilance committees did, lynching was a means of punishing particular alleged criminals. Lynching has been defined as a popular and extralegal punishment administered by an excited mob resulting in the death or maiming of one or more victims.[13] Such a definition is too general, however, to be applicable for this study covering the years 1866 to 1884.

It is also important to differentiate lynchings from riots. Lynching is habitually the killing of one or more persons who is/are seized and illegally executed for an alleged crime, while a riot usually involves the haphazard killing of people at random by a mob under strong excitement. Therefore the latter type of violent death is excluded from consideration. Furthermore, all cases of murders committed by bands of outlaws were also rejected. If including in the definition of lynching all cases in which an individual was killed in a riot or was victim of a brutal murder committed by more than one person, the number of people lynched in post–Civil War Louisiana would have run to more than a thousand.[14] For the purposes of the present study, a lynching incident is defined as an act of violence in which one or more victims

were seized and summarily tried before being maimed or put to death for having allegedly committed a crime or violated established social mores.[15]

## The Distribution of Lynching and Vigilantism

With this criteria information was collected on 33 vigilance committees and 239 incidents of lynching[16] that occurred between 1866 and 1884 (figs. 4.1 and 4.2). The statistical breakdown of the data gives an overall panorama of the evolution of lynching and vigilantism in Louisiana. Although the number of lynchings may appear rather high, they are nevertheless similar to the well-documented figures for the 1890s.[17] The collected data represent a significant record of the structure of community control in the context of the important social change affecting Louisiana during the post–Civil War decades. It is particularly significant that the peak year for vigilantism was 1876, a year that preceded important social and political change, and that lynching was also particularly high in 1868 and 1874, two years that saw attempts by conservative white Democrats to overthrow Republicans from power. The data furthermore suggest that it was over a long period of time that public opinion in Louisiana gradually grew



Figure 4.1   Annual Distribution of Vigilance Committees



Figure 4.2   Annual Distribution of Lynchings

Table 4.1
Racial Distribution of Lynching in Louisiana

|  | Whites | Blacks | % of Blacks | Total |
|---|---|---|---|---|
| 1866–76 | 46 (67) | 124 (168) | 73.0 | 170 (235) |
| 1877–84 | 22 (31) | 47 (69) | 68.0 | 69 (100) |
| Total | 68 (98) | 171 (237) | 71.7 | 239 (335) |

*Note:* Numbers in parentheses are the number of people killed.

comfortable with the idea that vigilantism and lynching were acceptable—an attitude we know existed at the end of the century.

Evidence supports James Cutler's assertion that there was a tendency "for vigilance societies organized in the interest of the law and order" to fall under the control of the more vicious and lawless elements of society, in the process losing any restraint they may have had in using violence. Indeed, the data show that vigilantism preceded lynching and set the tone for popular justice in Louisiana. While vigilance committees were an important feature of the late antebellum period, lynching remained exceptional.[18] While both forms of popular justice remained prevalent throughout Reconstruction, their paths diverged with the end of radical rule. Vigilance violence almost disappeared during the early Redemption period, while lynching remained an important feature of the time.[19]

Protected by their market value under slavery, blacks were rarely victims of lynching prior to the Civil War.[20] This was no longer the case after the war. With emancipation, extralegal killing of blacks by whites became a disturbing feature of race relations in Louisiana and in the South in general.[21] Blacks were victims of 73 percent of the lynching incidents occurring during Reconstruction and 68 percent of those occurring during the early Redemption years. These percentages are similar to the ones presented by other historians or social scientists regarding the same period.[22] The average number of

victims per incident, however, is a little higher during Reconstruction (1.38) and early Redemption (1.45) than during the period of 1882 to 1930 (1.24).[23]

The racial nature of lynching is further shown by the direct implication of whites in 238 out of 239 lynching incidents of the period. For their part, black people were rarely influenced by the lawless spirit of the period as far as lynching was concerned. Indeed lynching paradoxically furnished occasions for biracial cooperation, as shown by seven instances of blacks being killed by integrated mobs.[24] For example, George Stubinger, the sheriff of Iberia parish was murdered in December 1869 by a black while attempting to maintain order. A group composed of whites and blacks immediately caught and lynched the black without any form of trial.[25] Moreover, civil authorities in Caddo intervened in 1875 against a group of blacks, preventing them from lynching a member of their own race.[26]

The breakdown of statistics on a regional basis shows that vigilantism and lynching varied greatly in total frequency and in rates among the various regions of the state. Indeed more than 50 percent of the vigilance committees were located in the Sugar Bowl area. Twenty-four out of 33 vigilance committees originated in the 19 Cajun and Creole parishes of southern Louisiana: four of those parishes—Lafayette, Iberia, St. Mary, and Vermilion—had 19 vigilance committees (fig. 4.3). Vigilantism in southern Louisiana seems to have been a local response to a local problem: what to do with the cattle thieves of the region.[27] Meanwhile, a third of Louisiana lynchings were concentrated in the seven parishes of the Red River Delta, a region that had less than 10 percent of the state population (fig. 4.4). Vigilantism and lynching were thus concentrated in two distinct regions of Louisiana.[28]

The data do not support the "power-threat" theory developed by sociologists that argues that whites would be more likely to use collective violence, such as lynching, when they formed a small minority in

Compendium_Roth
Page 0706



Figure 4.3    Regional Percentage of Vigilance Committees, 1866–1884



Figure 4.5    Regional Percentage of Lynching with Black Victims, 1866–1884



Figure 4.4    Regional Percentage of Lynching, 1866–1884

an area.[29] Indeed several areas with a large black population had a comparatively small rate of lynching of blacks, while other districts with a small black population had a much higher rate (figs. 4.5, 4.6, 4.7).[30] However, the data do support Cutler's view that regional subcultural factors played an important role, as we can see from the different ways in which southern and northern Louisiana resorted to lynching.[31]

## The Nature of Lynching and Vigilantism

The way that both vigilance committees and lynching mobs exercised punishment reveals much about the evolution of popular justice in Louisiana. Vigilance committees issued sharp warnings in the local press to all criminals, ordering them to leave the state. The usual punishment of vigilance committees consisted of banishment for a first offence, lashing if resistance was encountered, and hanging for a



**Figure 4.6** Annual Rate of Blacks Lynched per 10,000 Inhabitants, 1866–1884



**Figure 4.7** Annual Rate of Whites Lynched per 10,000 Inhabitants, 1866–1884

second offense. Punishments were pronounced during informal meetings. Although they resorted on a few occasions to summary executions, the practice of banishment remained the main tool of popular justice after the war. For example, in 1868 four blacks in Lafayette parish were given twenty-four hours to leave the state by a committee of thirty men. Similar advice was also given to four blacks in Iberia parish in July 1874.[32]

Vigilance committees became particularly violent on two occasions. The first incident occurred in April 1870, when a vigilance committee put an end to the ravages of the West and Kimball gang, a notorious band of criminals in Winn parish, by killing eight members and capturing several others.[33] The second incident involved the September 1873 lynching of twelve members of a band of cattle thieves in Vermilion parish. They had been previously advised by the local vigilance committee to leave the parish, but instead of doing so, 150 "cattle thieves" armed themselves and threatened to destroy the town of Abbeville. Three hundred members of the local vigilance committee

then seized and lynched twelve members of the band.[34] Still, when compared to lynch mobs, Louisiana vigilance committees showed much greater restraint in the use of violence. Indeed, 82 percent of vigilance committees had no reported victims (table 4.2).

Lynching was completely absent in New Orleans throughout the period, but in the countryside, lynching was regularly used by white conservatives as a policy of terror, representing a dramatic warning to all blacks who dared to challenge white supremacy.[35] Furthermore, vigilance committees never resorted to sadism or torture as was the case with lynch mobs after the Civil War. Although some historians have argued that lynching in its most dreadful forms did not appear until the 1880s,[36] mutilating bodies of victims was already a part of the ritual of lynching in the early Reconstruction years. There were no less than twenty-seven instances (or 16% of the cases of lynching) during that period in which blacks were shot, had body parts amputated, or were slowly tortured, mutilated, or burned at the stake.[37]

### Table 4.2
#### Number of Victims per Incident

| Number | Lynchings | Vigilantism | Total |
|---|---|---|---|
| 0 | 14 (0) | 27 (0) | 41 (0) |
| 1 | 179 (179) | 1 (1) | 180 (180) |
| 2 | 18 (36) | 1 (2) | 19 (38) |
| 3 | 12 (36) | 1 (3) | 13 (39) |
| 4 | 7 (28) | 1 (4) | 8 (32) |
| 5 | 3 (15) | 0 (0) | 3 (15) |
| 6 | 4 (24) | 0 (0) | 4 (24) |
| 8 | 1 (8) | 1 (8) | 2 (16) |
| 9 | 1 (9) | 0 (0) | 1 (9) |
| 12 | 0 (0) | 1 (12) | 1 (12) |
| Total | 239 (335) | 33 (30) | 272 (365) |

*Note:* Numbers in parentheses are the number of people killed. As shown by the data, in 14 lynching incidents, the victims did not die.

There were also several instances of blacks being seized and brought to the woods to be chained together, shot, set on fire and eventually thrown into lakes, bayous, or rivers.[38] Bryant Offort, a black who was killed in De Soto parish on September 6, 1868, was stabbed thirty-seven times.[39] Whites could become brutal and sadistic in lynching blacks: in three particular instances blacks were horribly burned. In one such case in 1868, the hands and feet of Lloyd Shorter were chopped off, coal-oil was poured upon him, and he was set on fire before being thrown into the Red River. Jake McReady, a black who had allegedly killed a white named George Simpson, met the same gruesome fate in 1874 when he was taken during the night from his cabin by a group of armed white men led by the son of the victim. McReady's hands and feet were tied, and turpentine was poured on him. The whites then shot him several times and cut his throat before setting him on fire. Henry Jones was luckier. Having been shot by a group of whites, he feigned death. He was then thrown between two logs. After piling some rotten wood on him, the whites set fire to the pile and left. He was severely burned, but escaped with his life.[40]

Mutilation of victims was not limited to blacks, as shown by the brutal execution of six officials of Red River parish in August 1874, whose bodies were afterward mutilated during the so-called Coushatta affair.[41] As a consequence white moderates became so intimidated that they were afraid to speak their minds, choosing instead to detach themselves from politics.[42]

In a period of political and racial stress such as Reconstruction, sadism and slow torture became an expression of hatred, rage, and anarchy, as well as serving as a dramatic warning to all blacks who dared to challenge white supremacy.[43] By the late 1870s and early 1880s, new modes of increasingly sadistic punishment were devised as part of the ritual of lynching, such as putting the victims in the carcass of a cow and letting them slowly die.[44]

The taking of prisoners forcibly from jail and killing them was another practice that distinguished lynching from vigilantism. While vigilantism was aimed at restoring peace and order by bringing possible criminals to court, lynching was the ultimate expression of community will. Lynch mobs broke into jails on a regular basis, taking out alleged criminals in order to kill them. There were also many instances of prisoners being taken out of the hands of sheriffs during transit and lynched.[45] The failure to protect prisoners from mobs was not limited to white conservative sheriffs. For example, George Essex, a black sheriff of St. John the Baptist, was charged with failing to oppose a mob that had seized and hung Valcour St. Martin and did not attempt afterward to arrest the perpetrators of this unlawful murder. As a consequence, District Attorney F. B. Earhardt asked the judge of the Fourth Judicial District that Essex be suspended from office.[46]

The evidence confirms that vigilantism was essentially related to the protection of society against crimes and disorder. Seventy percent of Louisiana vigilance committees were organized as a means of putting an end to thievery in the countryside. Before any specific crimes had been committed, rumors that bands of robbers were operating in a particular region were often enough to generate the formation of preventive vigilance committees.[47] Even cities did not escape vigilantism. The determination of citizens in New Orleans to put an end to hoodlumism resulted in the formation of three such committees.[48] The citizens of the city of Baton Rouge set up a similar committee in June 1868 as a means of capturing criminals and protecting lives and property.[49] Illegal traffic and contraband activities were problems that persisted after the war and periodically led to the formation of vigilance committees in the parishes of East Baton Rouge, East Feliciana, and West Feliciana in 1874–1876, in the parishes of Richland and St. Tammany in 1878, and in Grant parish in 1880.[50]

In contrast lynching displayed a quite different pattern of justification between Reconstruction and the early Redemption periods (figs. 4.8 and 4.9). Data shows that only 15 percent of lynching incidents



Figure 4.8   Assigned Motives for Lynching, 1866–1876



Figure 4.10   Motives for Lynching by Race of Victims, 1866–1884

originated with a view to protecting property or maintaining law and order, while political motives (23%),[51] murders or attempted murders (22%),[52] and social and personal conflicts (28%) were at the root of more than 70 percent of all lynchings. The comparison between Reconstruction and the early Redemption period yields some interesting differences. While 31 percent of lynchings during Reconstruction were politically motivated, only 3 percent originated from politics during the early Redemption period. Socially motivated lynchings also decreased—although not as markedly—dropping from 32 percent to only 13 percent. Meanwhile, the percentage of lynchings motivated by murder rose from 14 to 37 percent, while those rooted in property crimes increased from 15 to 23 percent.

To be fully understood, the causes surrounding lynching must be analyzed in relation to their racial dimension as shown by fig. 4.10. Although the causes surrounding the lynching of whites and blacks followed similar patterns, they differed somewhat. Indeed, either politics, white racial prejudice, or black insubordination were at the root of more than 50 percent of black lynchings, while two-thirds of the white lynchings originated from murders or antisocial behaviors. Moreover, very few whites were lynched for having personal relations with a black of the opposite gender.[53] However, the high proportion



Figure 4.9   Assigned Motives for Lynching, 1877–1884

Compendium_Roth
Page 0710

of lynchings where blacks were victims set a trend for the future when, by the turn of the century, lynching and lynching of blacks became virtually synonymous.

Evidence shows that alleged murders and other criminal behaviors were the cause of more than a third of the incidents in which blacks were lynched. Still, many more blacks were lynched during Reconstruction for breaking of contract, concealment of arms, boasting, using offensive language, or simply racial prejudice. These offenses seem trivial, but in fact they represented for many whites a serious challenge to white supremacy and to the preservation of social order. Florrind Johnson, a black, was burned to death for being too intimate with a white woman, while William Jones was lynched in April 1872 for simply laughing about a white woman. Black workers were also killed for trying to rent land as happened on January 9, 1869, when three blacks were shot and their throats cut in Caddo parish because they did not want to live under white protection.[54] The black population learned the hard way that the white community would tolerate no break in the established social order.

Nevertheless political motives remained the single most important cause of black lynching, as lynching and threats of lynching represented an important political instrument in insuring that Louisiana remained a "white-man's country."[55] As the political climate worsened in 1868 and again in 1874, the state became deeply divided between Republicans and Democrats. Local Democratic leadership called for white solidarity and was determined to resort to summary means, if necessary, to correct the wrongs brought on by radical policies.[56]

Since black clergymen played a major role in the black community and black churches served as sites for political meetings, they both became special targets of white fury. Black clergymen were regularly assaulted, beaten, and even murdered. The murders of black clergyman were often very brutal. For example, Willis Johnson was savagely murdered while visiting a friend in St. Landry parish in June 1872. The band of white men surrounded the house, breaking in and seizing Johnson, who, while begging for time to say a prayer, was immediately shot and killed by a volley.[57] Another black clergyman named Julius Steward was killed in Bossier parish in October 1874. He was tied up and killed on horseback.[58] The disruption of black church services and the burning of black churches were regular occurrences as well. Two black churches were burned in May and September 1874 in Iberia parish because the local black community refused to endorse the

White League platform. Afterward the White League went so far as to offer to help rebuild the churches conditional on the political support of the black community. The local black community steadfastly refused.[59]

## The Justification for Lynching and Vigilantism

It was fashionable for commentators to blame the state administration and its law enforcement officers for this unfortunate state of affairs. The country newspapers protested that too many criminals, robbers, rapists, and murderers were acquitted and escaped due punishment by resorting to legal technicalities.[60] Local newspapers played a major role in the rationalization of lynching as a justifiable activity. As a consequence vigilantism and lynching came to be seen as a remedy to an intolerable situation.[61]

Although mob law was not officially approved, many whites felt it was the only solution because the law and courts seemed powerless. This apparent mockery of justice and the inability of the public prosecutors to secure convictions alarmed property holders and concerned citizens who then resorted to extreme means to put an end to crime. The problem was aggravated by the fact that white people, as a rule, displayed too much sympathy for fellow whites who were charged with criminal offenses. This made the task of mustering aid in apprehending alleged criminals more difficult and helped to develop the general belief that there was no public sentiment for justice in Louisiana.[62]

The inefficiency of law enforcement can not by itself furnish the explanation of why so many blacks were lynched during Reconstruction. Whites were quick to blame white radicals and black politicians of manipulating black votes and in the process installing "corrupt" government. The majority of whites in Louisiana were opposed to postwar changes and particularly objected to the political implications of such changes. In this context, the rumors of black insurrection that troubled post–Civil War Louisiana provided the rationale for the lynching of many blacks. When blacks did not conform to traditional white racist conceptions, the hidden fear of black revolt and insurrection intensified within the white community. In a society where communication was still primarily verbal, the most trivial incident could give way to the wildest rumors about the organization of black secret

societies whose members were fully armed and plotting to kill every white man, child, and woman and to divide up their property.[63] As a consequence whites repeatedly organized posses, paramilitary groups, and lynch mobs as a means of nipping black insurrection in the bud.

As a black spread the rumor that white people in the Atchafalaya area were getting ready to make a descent on blacks, blacks left their fields, procured arms, and organized themselves as well as possible, throwing out pickets to give the alarm. All blacks deserted their homes for several days, apprehending an eminent attack that never materialized. A committee composed of leaders of the black and white communities was formed to reduce the tension and find the origins of the rumor.[64]

Such forms of lynch mobs did not end with Reconstruction as rumors of black insurrectionary plots were still used to justify violence during the 1878 congressional election in the troubled parishes of Tensas, Madison, Natchitoches, and Caddo. Furthermore, five blacks were lynched in Pointe Coupée parish in 1878 following rumors of a negro plot to kill the leading white men of the region.[65]

Political tension in one parish had often an influence on surrounding parishes. Such was the case following the killing of Captain John Peck who had led the assault on the house of Alfred Fairfax in Tensas parish in October 1878. As whites from surrounding parishes rushed into Tensas to support the local white population, similar troubles broke out in Concordia, Madison, and Ouachita. All over the region tension ran high between blacks and whites. This was particularly obvious in Ouachita parish, which bordered Tensas, where a conflict seemed impending. As a consequence of the spread of racial tension, four blacks were killed in one single day in Monroe by a group of whites on horseback.[66]

While the regular use of violence such as lynching had been justified in the face of extraordinary circumstances under the rule of radicalism, after 1876 many whites thought that there was no longer any necessity for mob law and that no excuse could be offered to justify it.[67] With the end of radical rule, the fear of rape became the new rationale on the part of whites to justify lynching.[68] No black had been lynched for rape during the decade before the war, and alleged sexual assaults of blacks on white women were rare during Reconstruction. The most notorious cases were the lynching of six blacks in Grant parish in November 1873 for the alleged rape and murder of Mrs. Lacour, and that of a black in April 1875 in St. Landry for the

alleged rape and murder of the wife of George Lanthier.[69] Due to the low number of reported cases, the alleged rape of white women by blacks did not excite public opinion during Reconstruction. This situation changed dramatically during the early Redemption era.

Toward the end of radical rule, the Louisiana country press began to report an alarming increase in the number of rapes committed by blacks upon white women since the abolition of slavery. These papers reported that since blacks were no longer under control, or restrained by fear, rape was becoming the single most important cause for the increase of lynchings in Louisiana. Local newspapers even advocated the rule of "Judge Lynch" in all unquestionable cases of rape, and acknowledged that as long as law was not enforced, the "wild justice of revenge" would not be "wholly unjustifiable." This rationalization of lynching as a way of punishing blacks for atrocious crimes played a major role in the transformation of the image of blacks into a subhuman species.[70] Although Professor Joel Williamson asserted that it was not until 1889 that rape became used as a justification for the lynching of blacks, evidence shows that this was already the case in Louisiana during the late 1870s and early 1880s.[71]

Despite the assertion of the Louisiana press that rape committed by blacks upon white women was, by 1880, at the root of most lynching, evidence shows that, in fact, alleged rape formed less than 7 percent of the assigned causes for lynching blacks. Furthermore, the charges of alleged rape were often pitifully fraudulent. They remain an important expression of the manipulation of white racial and sexual fears and beliefs regarding blacks.[72]

Although few whites overtly denounced lynching, many whites were troubled by its evolution. They acknowledged that mob rule was the most hideous, pernicious, and merciless form of disturbance, and they disapproved of the way mobs usurped the function of the law, becoming judge, jury, and executioner.[73] Protests arose in many parishes and regions of Louisiana after 1876. Following the successive lynchings of Charles McLean and John C. Vance, both charged with arson, meetings attended by the most influential citizens and the wealthiest bankers and entrepreneurs of the region were held in Shreveport, Caddo parish, to condemn the high-handed outrages committed by the lawless mobs.[74] Even the lynching of blacks was denounced, as shown by a petition of citizens of Carroll parish in 1877. A similar protest was also issued in 1877 by a committee of citizens in Rayville, Richland parish.[75] Blacks in St. Tammany parish

held a meeting in June 1882 to protest the brutal and summary execution of Mealy Howard who was charged with raping a white woman.[76]

In Louisiana, as elsewhere, the emergence of a strong opposition to vigilantes often took the form of antivigilance committees and reflected deep social and economic conflicts.[77] This opposition was particularly manifest after the lynching of the twelve alleged outlaws who had resisted the vigilance committee in Vermilion parish in September 1873. The proceedings of the committee created a climate of terror in the lower parishes and met with stiff opposition from the press. The committees were described by the press as groups of banditti and outlaws, no better than the ones against whom they acted.[78]

Yet in spite of the fact that many people came to deplore lynching and vigilantism, others continued to consider these practices necessary evils. Even though some law officers occasionally tried to resist a lynch mob, the plain truth was that lynching was usually endorsed by local community leaders and occurred with the connivance of local officers. On several occasions, the "best classes" in Shreveport openly advocated the capture and hanging without trial of men accused of being desperadoes.[79] While moderate whites often condemned lynching, fearful of reprisal, their inaction was mainly motivated by self-preservation. As a consequence they did nothing to stop it, and since officials did not attempt to arrest lynchers, the latter not surprisingly felt they had public support for their actions. In the final analysis lynching was made possible largely because it was for the most part "tolerated" by the local community.[80]

## Conclusion

The point to be emphasized here is that the emergence of popular justice in Louisiana must be put in its historical context. Post–Civil War lynching was particularly influenced by the redefinition of the black status and race relations and the determination of a large majority of whites to maintain their land as a "white man's country." In that process new rationales for lynching were developed reflecting new social and political conditions.

Mid-nineteenth-century America saw a period of tremendous change and upheaval as Southern society had to adjust itself not only to the destruction left by the Civil War and the abolition of slavery, but

also to the "radical" Reconstruction policy of the federal government. Moreover, the traditional mechanisms of social control were disrupted as the South passed from a plantation society, used to solving its tensions and conflicts internally, to a society administered by Republican and black officials who depended more heavily on the federal government. Both vigilantism and lynching were obviously forms of social control used as a response to a dramatic situation. As such they were clear manifestations of the social tension that underlay white attempts to assert their supremacy over the black masses.

Vigilantism and lynching reveal much about the values of the white Louisiana society and what this society considered as acceptable standards of behavior. Not only did whites in Louisiana feel that justice was not adequately administered, the determination of these whites to enforce their own interpretation of social values on all groups that lived within the limits of their parishes and even beyond is apparent. Indeed blacks were lynched because they had aroused the white ire, although they may or may not have committed some criminal or other offense.

Such a siege mentality created the psychological conditions that made lynching generally acceptable, and this had tragic consequences on the future of both white and black communities. Lynching with all its ritual represented not only the response of the white community to imaginary threats, it also reminded blacks that violence could always be used as a policy for enforcing white supremacy. However, lynching was directed not only toward blacks but also against whites who did not conform to social mores. As such, lynching also played an important and powerful role in forging public opinion and in forcing whites to accept and join the ranks of a white supremacist point of view. Thus, the white community found in lynching a way of diminishing its frustration, suppressing dissent, and correcting the course of history. In the process lynching played a fundamental role in making what became known by the late nineteenth and first half of the twentieth centuries as the solid South.



# TOMMY GUN

## How General Thompson's Submachine Gun Wrote History

### BILL YENNE

San Rafael Public Library
1100 E. Street
San Rafael, CA 94901

Thomas Dunne Books

St. Martin's Press ✹ New York

THOMAS DUNNE BOOKS.
An imprint of St. Martin's Press.

TOMMY GUN. Copyright © 2009 by Bill Yenne. All rights reserved. Printed
in the United States of America. For information, address St. Martin's
Press, 175 Fifth Avenue, New York, N.Y. 10010.

www.thomasdunnebooks.com
www.stmartins.com

Design by William Ruoto

Library of Congress Cataloging-in-Publication Data

Yenne, Bill, 1949–
    Tommy gun : how General Thompson's submachine gun wrote
history / Bill Yenne.—1st ed.
        p. cm.
    Includes bibliographical references and index.
    ISBN 978-0-312-38326-8
    1. Thompson  submachine  gun—History.  2. Thompson,  John
Taliaferro, 1860–1940.  I. Title.
UF620.T5Y46 2009
623.4'424—dc22

                                                            2009017591

First Edition: October 2009

10  9  8  7  6  5  4  3  2  1

**CHAPTER 8**

# Valentine's Day

The Bootleg Wars in Chicago, with the feud between Al Capone and Bugs Moran as their centerpiece, reached a crescendo on St. Valentine's Day 1929. It was to be a pivotal moment in the history of the Prohibition-era crime wave that has ever after been linked in popular culture with the Thompson sub-machine gun. If the tommy gun was famous—or infamous—before, it achieved iconic status on that bloody day.

For many months the war had gone on, punctuated occasionally by deadly violence and often by intrigue. At last, Capone decided to resolve the situation with Moran in that singular way that disputes found resolution in the Chicago underworld.

Five members of Moran's North Side gang had arrived at the SMC Cartage Company on North Clark Street in Chicago's Lincoln Park neighborhood just before 10:30 on the cold morning of February 14. Not coincidentally, Capone was out of town, vacationing in Florida.

There are various theories as to exactly why they came to North Clark Street, but one way or the other, they came. As the popular story goes, Capone had arranged for Moran to be invited to a warehouse on the North Side to inspect a recently arrived consignment of whiskey—and then he left Chicago. It has recently been suggested that they would not have arrived in their best suits and ties to receive a routine load of whiskey, but well dressed they were.

The five included Albert "James Clark" Kachellek, Moran's senior lieutenant; Adam Heyer, Moran's accountant; and "Gorilla Al" Weinshank, the manager of a number of Moran's "front" businesses; as well as Pete Gusenberg and his brother Frank. The Gusenbergs were Moran enforcers who had both taken part in the Hawthorne Hotel shoot-out in 1926, and who had been involved in the tommy gun death of Lombardo. With the gangsters

were Reinhart Schwimmer, an optician and petty gambler who was a sort of North Side gang groupie, and John May, who worked part-time as a mechanic in the Moran motor pool.

It is supposed that Moran himself planned to be there as well, but he was running late. As one story goes, he arrived just as two men in police uniforms and two in street clothes entered the warehouse. Thinking that the rest of his gang was about to be busted, Moran and his bodyguards turned tail and left the area.

Moran could be forgiven for thinking that the two men in uniform were the police, although they were not. Unforgivable was the Capone lookout who mistook Moran's employee Al Weinshank for the boss himself.

The whole rendezvous had probably been an ambush engineered by Capone. The men who looked like the police were actually Capone hitmen who had been alerted to enter the building when the lookout told them that Moran was present. The fact that the man who looked like Moran was *not* Moran would be a critical mistake.

Inside, the faux cops lined the seven Moran gangsters—including the faux Moran—up against a brick wall. Two of the men in blue were carrying shotguns. The others carried M1921 Thompson submachine guns, serial numbers 2347 and 7580. Fingers wrapped around the cold steel of the triggers, and the ripping, thudding sound of exploding gunpowder echoed within the building.

When the real police arrived, the floor of SMC Cartage was a sea of red. Only John May's dog and Frank Gusenberg survived, although Gusenberg was dead within hours. When asked who shot him, he famously replied, "Nobody shot me." The only person more hated than the man who shot you was a rat—any rat. Frank Gusenberg was not going to die a rat.

The spectacular slaying garnered national media attention. Almost immediately, the papers dubbed it the "St. Valentine's Day Massacre," and indeed it was. It was the signature slaughter of the decade, and it remains as such in the folklore to this day.

"It's a war to the finish!" cried Chicago's police commissioner, William F. Russell, quoted in the February 25 issue of *Time* magazine. "I've never known a challenge like this. We're going to make this the knell of gangdom in Chicago."

It wasn't. They never even solved the case. Gusenberg was not a rat.

The CSI team who combed the room later calculated that at least seventy .45 ACP rounds had been fired.

**26    TOMMY GUN**



This M1921, serial number 2347, is one of two Thompson submachine guns
that are confirmed to have been used in the St. Valentine's Day Massacre. Both
are now in the possession of the Berrien County, Michigan, Sheriff's Office.
*(Photo by and courtesy of Chuck Schauer)*

Never determined, however, was "whodunit."

There was no shortage of suspects, but these did not include the conveniently vacationing Al Capone.

In the beginning, the police worked under the theory that the hit men had been members of Detroit's "Purple Gang," Capone allies who ran booze into the States from Ontario.

A late-model Cadillac was located a week later in a garage owned by Claude Maddox, a Capone associate late of the Egan's Rats Gang in St. Louis. Having determined the car to have been used by the shooters in the St. Valentine's Day Massacre, the police began looking for various St. Louis gangsters. These included Fred "Killer" Burke, a Detroit hit man thought to have been one of the first—if not *the* first—to have introduced the Thompson submachine gun into Detroit's underworld. The police had now decided that Burke had been one of the faux cops at SMC Cartage.

As they searched for Burke, the police also arrested and charged Capone enforcers John Scalise and Machine Gun Jack McGurn. However, Scalise was killed before the trial, and McGurn never went to trial. He claimed to have been with his underage girlfriend, Louise Rolfe, and she corroborated his story, earning her a tabloid nickname "Blonde Alibi."

To prevent her from testifying at the trial, McGurn married Louise, because a wife cannot be forced to testify against her husband. The murder charges were then dropped, but the authorities countered McGurn's legal maneuver with one of their own. They charged him with "white slavery" under the Mann Act, which mandates criminal penalties for conspiring to transport an underage female across state lines for "immoral purposes." He was convicted, but never did time. The conviction was overturned on appeal because Louise was determined to have been a willing participant.

McGurn was found murdered on February 15, 1936, seven years and a day after the Massacre. Nobody was ever convicted for that crime either.

Killer Burke remained on the lam until March 1931, and might have eluded capture indefinitely had he not gotten drunk and murdered a policeman during a routine traffic stop in St. Joseph, Michigan, in December 1929. When police raided his house there, he was not at home. Though he had managed to stay one short step ahead of the law that time, Burke had left behind a mountain of incriminating evidence from guns and ammunition to the spoils from bank robberies.

Among the guns were the two Thompson submachine guns that ballistics expert Calvin Goddard—and others through the years—have confirmed were the ones used in the St. Valentine's Day Massacre. One of them was also identified as the gun that had been used to kill Frankie Yale in New York in July 1928. Through Auto-Ordnance records, it was determined that at least one of the two submachine guns had once been sold by Peter Von Frantzius Sporting Goods on Diversey Parkway in Chicago, and had been in the possession of a man going by the name of Frank Victor Thompson (no relation to Marcellus).

Both guns remain in the possession of the Berrien County, Michigan, Sheriff's Office to this day. Lieutenant Mike Kline, the department's quartermaster, told me that the guns are still on display, and a popular stop when school tours come to visit.

He explained that they are both fully functional, and that they work as well as ever. They are even fired occasionally. Back in the 1940s, when the department ran a week-long kid's camp, the finale was a demonstration of the guns. It was always a crowd-pleaser.

Kline told me a story about how one of the two St. Valentine's Thompsons was borrowed by the FBI back in the 1960s for a display at Quantico. In the late 1970s, a Berrien County sheriff was at Quantico attending a training session, and he saw the gun. He mentioned to the FBI men that Berrien County actually owned the gun, and a disagreement ensued.

"No, it's ours," the FBI man insisted. "You guys gave it to us."

"Don't think so," said the sheriff. "I don't think we gave that away."

Fortunately the squabble did not end in a shoot-out, but as in the Old West, the sheriff triumphed. The "borrowed" Thompson has been back in Berrien County ever since.

Lieutenant Kline told me that the department has been a little leery about letting them go out, although he welcomes visitors who wish to view them. Various documentary film crews from the History Channel, the Discovery Channel, and others have come to film the guns through the years, often with Lieutenant Kline firing them for the cameras.

Burke himself would eventually die in jail while doing time as a cop killer, but no one was ever convicted in the St. Valentine's Day Massacre. The evidence of the tommy guns suggests that Burke was involved, although it has not been proven conclusively. He may have been there, or he might just have been the "cool-down guy," holding the guns for another triggerman. Numerous other individuals have been implicated. These range from McGurn to the noted Capone enforcer Antonio "Big Tuna" Accardo. Nobody really knows. Frank Gusenberg was not a rat.

The crime will probably *never* be solved.

The topic of speculation and conspiracy theories for decades, the historic significance of the massacre is that it served to reinforce the public distaste for the bootleg gangsters and the failed experiment of Prohibition that had made their reign of terror possible.

The St. Valentine's Day Massacre also underscored the potent capabilities of the Thompson submachine gun. Much to the chagrin of Marcellus Thompson and his father, the massacre forever made it, not the "law and order" gun, but the "gangster gun."



The top-slotted Cutts compensator was added to the muzzle of the M1928
Thompson submachine gun to reduce muzzle climb by expelling gas upward each
time a round was fired. *(Collection of the author)*

production guns. In any case, the Cutts compensator gives the M1928 a dis-
tinctive appearance that has often been described as "cool."

Meanwhile, as the weapon that became the M1928 was under develop-
ment, Auto-Ordnance was working on a parallel development of a gun that
would be designated as the Model of 1927 (M1927). To address the befuddled
bureaucrats in the U.S. Army who remained confused about whether the
Thompson submachine gun was a rifle or a light machine gun, Auto-Ordnance
proposed what was officially described as the "Thompson Semi-Automatic
Carbine."

Like the M1928, the M1927 was not a new production gun, but a retrofit
of the stock M1921 in which specific parts were changed out, making it semi-
automatic, and therefore redefining it as a carbine. Again, as with the M1921
six years earlier, the M1927 failed to win the hearts or minds of General
Thompson's successors at the Ordnance Department, although a few M1927s
were sold to police departments that were leery of the idea of unleashing
fully automatic weapons on city streets.

The M1927 carbine is not to be confused with the distinctly different
Thompson Autorifle. Though it was temporarily shoved aside as Auto-
Ordnance focused its attention on the Persuader and Annihilator, the Auto-
rifle was not abandoned. During the 1920s, later versions of the Autorifle
received a positive reaction from both the U.S. Army and, with a .303 caliber
barrel, from the British army as well.

As reported in the May 14, 1928, issue of *Time*, "the self-loading infantry

rifle perfected by General Thompson was last week awarded the British War Office prize of $15,000 and will now be tried generally throughout the British Army. A rifle for each soldier to carry, to fire aimed shots from the shoulder without pausing to reload, the Thompson self-loader differs from a machine gun in that the trigger is pulled for each shot instead of held down for a continuous stream of lead. Rid of the necessity for bolting a new cartridge into the firing chamber between shots, as in hand-loading rifles, a soldier can aim 25 or 30 shots per minute with the Thompson self-loader."

After all that, however, neither the British War Office nor America's War Department adopted the Thompson Semi-Automatic Carbine and it went back on the shelf. Later, when the British acquired the M1928 during the early days of World War II, their field manual for the submachine gun referred to it as a carbine.

At least two semiautomatic M1927s were later converted to full auto by Auto-Ordnance itself. The New Mexico State Prison acquired a number of M1927s, of which two were returned to the factory to be reconfigured to full automatic as "M1921/M1927/M1928" guns. Chuck Olsen, a collector in Arizona, owns both and has shown me one of them. The gun came to Chuck by way of a dealer who got it from the estate of actor Steve McQueen. A videotape of McQueen firing the gun is said to exist.

During the early days of World War II, as Auto-Ordnance ran through stocks of M1921 parts from which to make M1928s, the Thompson submachine-gun assembly line finally would reopen. Initially, the newly manufactured submachine guns would be the same as the retrofitted M1921s that became M1928s. With minor modifications they would be designated M1928A1, with the suffix standing for "Alteration One."

Like the M1921, the M1928 Navy had been designed to accept the fifty- or hundred-round drum magazine, but the marines found the larger magazines cumbersome to carry and prone to jamming. The smaller, narrower twenty-round box magazines would become standard equipment for the M1928A1, although this weapon could also accommodate a drum magazine.

Aside from the U.S. Navy and Marine Corps contract, sales of the M1928 were sluggish. As firearms advisor Idan Greenberg points out, "This was a gun that sold in the early 1920s for $175. By the 1930s with a Cutts compensator added and a little heavier bolt and actuator, the M1928 was $225. You could buy a brand-new Ford for $440, so Thompsons didn't sell very well."

Meanwhile, Auto-Ordnance was also developing the little known M1929. Marcellus and the general reapproached their old friends in Belgium, this

time with more apparent success than in 1921. They negotiated a license agreement whereby Belgium would manufacture thousands of tommy guns at their government-owned arms factory, Fabrique Nationale d'Armes de Guerre. The actual engineering for these guns was done by George Norman at Birmingham Small Arms (BSA) in England, which prototyped them in several calibers, including .45 ACP, 7.65 mm, and 9 mm. Designated as M1929, the gun had no Cutts compensator, but had a longer barrel and an overall length several inches greater than an M1928.

The Great Depression, however, crippled the global economy after 1929, and the order from the Belgians was canceled after just a handful of prototypes was made. Thus the tommy guns that the Belgian general staff felt might have saved their country from the Germans in 1914 were also *not* on hand when the Germans came knocking again in 1940.

Two things that the outlaws of the 1930s did have in common with their Roaring Twenties counterparts were that they excited the morbid fascination of the tabloid media and its readers, and they had a fascination of their own with the Thompson submachine gun.

As with men such as Al Capone and Bugs Moran, the names of the 1930s bad guys became and remain notorious. Names such as John Dillinger and Charles Arthur "Pretty Boy" Floyd are well known. While nobody may remember Lester Gillis, many of us recognize his nom de crime, "Baby Face Nelson."

Arizona Donnie Clark had four sons with petty criminal George Barker, and became "Ma" Barker. She is best remembered as the mother who turned her boys—and her "adopted" son Alvin "Creepy" Karpis—into thugs. Their 1931–1935 spree of armed robberies and cop killings is an ugly but indelible part of the history of the times, and of many decades of Hollywood treatments.

Though all of these criminals from this period will live on in the corners of pop mythology, the names of Bonnie Parker and Clyde Barrow are immortal, thanks to Hollywood director Arthur Penn. His 1967 film starring Faye Dunaway and Warren Beatty in the title roles still resides at number 27 on the American Film Institute's ranking of the top 100 movies of all time.

If the media could be held responsible for molding and perpetuating the myths of the tommy gun–toting thugs of the 1930s, it was certainly aided and abetted in this caper by the Bureau of Investigation. This agency, which became the Federal Bureau of Investigation (FBI) in 1935, provided not only an energetic foil for the criminals, but a classification system that gave the malefactors an official acknowledgment that added to their mystique. What self-respecting malcontent did not thrill to the notion of being labeled a "public enemy" by the federal government?

The term "public enemy" probably originated with Frank Loesch of the Chicago Crime Commission, who used it in 1930 to condemn crime bosses such as Moran and Capone, as well as enforcers such as Jack McGurn. As Laurence Bergreen quotes Loesch in his book *Capone: The Man and the Era*, the list of public enemies included "the outstanding hoodlums, known murderers, murderers which you and I know but can't prove. . . . I put Al Capone at the head and his brother next. . . . The purpose is to keep the publicity light shining on Chicago's most prominent, well known and notorious gangsters to the end that they may be under constant observation by the law enforcing authorities and law abiding citizens."

Placing Capone at the head of the list gave him the distinction of being



FBI special agents open fire at their targets using tracers in this dramatic nighttime
demonstration at the bureau's range near Quantico, Virginia, circa 1935.
*(Courtesy of the National Archives)*

Public Enemy Number One, a term which itself became part of the pop culture lexicon.

The idea of a public enemy list was so appealing that it was "borrowed" by J. Edgar Hoover, the Bureau of Investigation's hard-boiled director, who, like Eliot Ness, was cultivating his self-image as that of a single-minded crimestopper.

The appellation of Public Enemy served both sides. It gave the criminals an irrefutable cachet, and it also gave the FBI—and Hoover personally—a public relations nudge when these criminals were finally apprehended. Unlike the perpetrators of the well-planned St. Valentine's Day Massacre, the Public Enemies on the FBI's list usually *were* apprehended—either dead or alive.

The men brandishing the Thompson submachine guns in the St. Valentine's Day Massacre were not then, nor will they ever be, identified with certainty. Four years later, the perps responsible for what has come to be known as the Kansas City Massacre were known immediately. That was part

of the difference between the calculating gangsters of the 1920s and the brazen bandits of the post-Prohibition era.

Though faded from the popular memory of a bygone age, the events in Kansas City on the morning of June 17, 1933, caught the attention of the public—and curdled their blood.

Frank Nash was going back to prison. That was how it all started.

Nash had been on the lam since October 1930, having broken out of the federal penitentiary at Leavenworth, Kansas, where he had done six years of a twenty-five-year sentence for assault. The Bureau of Investigation had ended his nearly three years of freedom in Hot Springs, Arkansas, and they were transporting him back to Leavenworth via Kansas City.

The agents saw nothing amiss when they took him off the train in Kansas City—then they saw the not-so-pretty face of Pretty Boy Floyd.

Floyd's career as a criminal began when he was barely out of his teens, and when he was twenty-one, he went away for four years in the Missouri State Penitentiary for highway robbery. In May 1930, just over a year after he got out of prison in Missouri, he was in trouble again, this time sentenced to twelve to fifteen years in the Ohio State Penitentiary for robbing a bank in Toledo. However, he escaped in November 1930 and joined with Adam Richetti, then wanted for jumping bail on a robbery charge.

In June 1933, Missouri mobsters Richard Tallman Galatas, Herbert Farmer, Frank Mulloy, and Louis "Doc" Stacci asked Vernon Miller to free fellow gangster Frank Nash from the feds in Kansas City. Miller decided to import Floyd and Richetti to help him. They agreed, but they almost never made it to Kansas City.

On June 16, as Floyd and Richetti were passing through Bolivar, Missouri, they had car trouble. As they were getting their car fixed, Sheriff Jack Killingsworth passed by. Richetti recognized him from an earlier run-in and decided that the best thing to do was to kidnap the lawman at gunpoint. Brandishing one of the Thompson submachine guns they planned to use in the Kansas City caper the next day, they loaded the sheriff into a stolen car and drove off. Two stolen cars later, Killingsworth was abandoned, amazingly unharmed, in the middle of nowhere.

The two thugs were in Kansas City before midnight, listening to Miller outline his scheme.

The next day, seven armed men, police and federal agents, escorted Frank Nash off the train and through Union Station to a waiting Chevrolet. Nash and three officers were in the car when Floyd and Richetti appeared

from behind a green Plymouth and opened fire with their Thompson sub-machine guns from a distance of about fifteen feet.

Four of the lawmen died, and two were badly wounded.

Frank Nash, the object of the escape attempt, was hit in the hail of .45 ACP rounds and died at the scene.

The bullet holes are still there, visible at eye level to the left of the eastern main entrance to Union Station—if you know where to look. If you don't, just ask at the information desk inside. As I discovered on my own visit, the volunteers there will be glad to show you.

Floyd, Richetti, and Miller escaped, but when the Bureau of Investigation began gathering fingerprints, their anonymity was lost.

The feds never got Miller. Sometime earlier, he had crossed Longie Zwillman, the boss of the New Jersey mob. As Miller was running from the Bureau, he should have been watching his back for Zwillman. Miller's dismembered carcass was found alongside a road near Detroit five months after the Kansas City Massacre.

Adam Richetti and Pretty Boy Floyd would remain at large for more than a year before being nabbed.

Meanwhile, just as the 1920s had an enforcer in the form of Machine Gun Jack McGurn, who took his weapon as a nickname, the 1930s folklore includes George "Machine Gun Kelly" Barnes. Born in Chicago, he did federal time in Leavenworth Penitentiary for his bootlegging activities on an Indian reservation in Oklahoma. Released in 1928, he changed his surname to Kelly and married a woman named Kathryn Thorne.

In retrospect, she should have earned the nickname, rather than bestowing it upon her husband. Although the folklore does not, we should call her "Machine Gun Kate," because, as it is stated officially by the FBI, "she encouraged Kelly to become deeply involved in a life of crime, bought him a machine gun, and gave him the nickname."

Despite the colorful nickname, George and Kathryn earned their bread and butter mainly from petty crimes and illicit booze. While they did the occasional bank job, George had not actually killed anyone with his tommy gun. They probably would have been just one more pair of Depression-era bandits had Kathryn not had the brainstorm that they should kidnap two prominent Oklahoma City businessmen, Charles Urschel and Walter Jarrett, on July 22, 1933.

Jarrett was released the following day, but Urschel was well known as a millionaire, so the Kellys issued a ransom demand for him. The ransom was

Compendium_Roth
Page 0727



Drive-by shooting, 1930s style. An FBI special agent practices firing his Thompson
submachine gun from a moving vehicle at the FBI range near Quantico, Virginia.
In Chicago, they had been firing tommy guns from cars since the 1920s.
*(Courtesy of the FBI)*

paid and Urschel was released after nine days. His recollections of the place
where he had been held led Bureau of Investigations agents to the Kellys,
who were arrested in Memphis on September 26.

If J. Edgar Hoover can be accurately credited for popularizing—if not
inventing—the term "public enemy" for referring to villains, George Kelly
added a now-immortal term for government agents to the lexicon of popular
culture. When surrounded by Bureau of Investigation men on his last day as
a free man, Kelly is reported to have shouted "Don't shoot, G-men!"

From this plea, the term "G-men" became synonymous with federal law
enforcement agents, although the FBI now disavows the "Don't shoot, G-men!"
story, which Hoover's public relations department used to build up its repu-
tation at the time.

Two years later, the term would be adapted as the title of the blockbuster
film starring Jimmy Cagney as a "G-man" on the trail of a "Public Enemy
Number One," played by Edward Pawley.

Meanwhile, George Kelly was getting his justice. Charles Urschel's

# LAW REVIEWS AND JOURNALS

# *ARTICLE: The Second Amendment: Toward an Afro-Americanist Reconsideration.* [*]

December, 1991

**Reporter**
80 Geo. L.J. 309 *

**Length:** 23800 words

**Author:** **ROBERT J**. COTTROL ** AND RAYMOND T. DIAMOND ***

** Associate Professor, Rutgers (Camden) School of Law.  A.B. 1971, Ph.D. 1978, Yale University; J.D. 1984, Georgetown University Law Center.

*** Associate Professor, Tulane University School of Law.  A.B. 1973, Yale University; J.D. 1977, Yale Law School.

# Highlight

It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, . . . and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, *and to keep and carry arms wherever they went.* [1]

# Text

[*310]  INTRODUCTION

---

[*] © Copyright Robert J. Cottrol and Raymond T. Diamond, 1991.  This article was delivered as a paper at the 1990 annual meeting of the American Society for Legal History, at the Harvard Legal History Forum, at a faculty seminar at Northwestern University Law School, at the 1991 joint annual meeting of the Law and Society Association and the International Law and Society Association, and at the 1991 annual meeting of the American Political Science Association.  The authors would like to acknowledge the helpful comments made in those forums.  The authors would like to acknowledge the research assistance of Jan McNitt, Boston College Law School, 1991; Richard J. Fraher, Rutgers (Camden) School of Law, 1993; Roderick C. Sanchez, Rutgers (Camden) School of Law, 1992; Adrienne I. Logan, Tulane University School of Law, 1992; and Willie E. Shepard, Tulane University School of Law, 1992.  This paper has benefitted from the criticism and helpful comments of Akhil R. Amar, Michael Les Benedict, Barbara Black, Maxwell Bloomfield, Ruth Colker, Michael Curtis, Robert Dowlut, Kermit Hall, Natalie Hull, Don B. Kates, Jr., Barbara K. Kopytoff, Sanford Levinson, Joyce Lee Malcolm, John Stick, and Robert F. Williams.  The authors would also like to acknowledge summer research grants from Boston College Law School, Rutgers (Camden) School of Law, and Tulane University School of Law which contributed to the writing of this paper.

[1]  *Dred Scott v. Sanford, 60 U.S. (19 How.) 393, 417 (1857)* (emphasis added).

80 Geo. L.J. 309, *310

The often strident debate over the Second Amendment   [2] is like few others in American constitutional discourse and historiography.  It is a constitutional debate that has taken place largely in the absence of Supreme Court opinion.   [3] It is a historical controversy where the framers' intentions have **[*311]** best gleaned from indirect rather than direct evidence.   [4] It is a scholarly debate that members of the academy have been until recently somewhat reluctant to join,   [5] leaving the field to independent scholars primarily concerned with the modern gun

_____

[2] A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." _U.S. CONST. amend. II._

[3]  The Supreme Court has directly ruled on Second Amendment claims in only four cases.  *See* _United States v. Miller, 307 U.S. 174 (1939); Miller v. Texas, 153 U.S. 535 (1894);  Presser v. Illinois, 116 U.S. 252 (1886);  United States v. Cruikshank, 92 U.S. 542 (1876)._  Proponents of the collective rights theory have frequently cited these cases as supportive of their views.  It is more accurate to describe the first three cases as having recognized the individual right, but also as having construed the Second Amendment as a bar to federal, but not state or private, infringement of the right.  *See infra* Part III.  *United States v. Miller* limited the Second Amendment's protection to weapons useful for militia duty.  *See infra* Part IV.  Since then, a number of lower federal courts have heard Second Amendment claims, often dismissing them on grounds that the Amendment has not been incorporated into the Fourteenth Amendment, which would make it binding on the states.  Other courts have dismissed the claims by employing the collective rights theory.  Almost all of these cases involved persons involved in criminal activity who were also convicted of firearms charges and thus are not really a good test of the extent to which the Second Amendment protects the rights of the public at large.  *See, e.g.,* _United States v. Three Winchester 30-30 Caliber Lever Action Carbines, 504 F.2d 1288 (7th Cir. 1974)_ (statute prohibiting possession of firearms by previously convicted felon does not infringe upon Second Amendment).  In a recent case in which a federal court sustained a general prohibition against handgun ownership, the Supreme Court refused to consider the case on appeal.  *See* _Quilici v. Village of Morton Grove, 695 F.2d 261 (7th Cir. 1982),_ cert. denied,  **464 U.S. 863 (1983).**

If the federal jurisprudence concerning the Second Amendment is somewhat thin, it should be noted that there is extensive case law concerning analogous provisions in state bills of rights.  Indeed it is likely, should the Supreme Court ever seriously consider the question, that it might borrow Second Amendment doctrine from the state courts.  For some recent constructions of state right to keep and bear arms provisions see, *e.g.,* _Hoskins v. State, 449 So.2d 1269 (Ala. Crim. App. 1984)_ (statute prohibiting a person convicted of committing a crime of violence from owning or possessing a pistol does not deny right to keep and bear arms); _Rabbitt v. Leonard, 413 A.2d 489 (Conn. Super. Ct. 1979)_ (statute permitting revocation of pistol permit for cause and providing notice of revocation and opportunity for de novo postrevocation hearing does not violate citizen's right to bear arms); _State v. Friel, 508 A.2d 123 (Me. 1986)_ (statute prohibiting possession of a firearm by a convicted felon does not violate constitutional right to keep and bear arms); _People v. Smelter, 437 N.W.2d 341 (Mich. Ct. App. 1989)_ (statute prohibiting possession of stun guns does not impermissibly infringe upon right to keep and bear arms); _State v. Vlacil, 645 P.2d 677 (Utah 1982)_ (statute making it a Class A misdemeanor for any noncitizen to own or possess a dangerous weapon is not unconstitutional).  For a historical discussion of state right to keep and bear arms provisions, see generally STEPHEN P. HALBROOK, A RIGHT TO BEAR ARMS: STATE AND FEDERAL BILLS OF RIGHTS AND CONSTITUTIONAL GUARANTEES (1989).

[4]  The debates in the House of Representatives over what became the Second Amendment (it was originally proposed as the Fourth Amendment) centered on a clause excepting conscientious objectors from militia duty.  The original text of the Amendment read: "A well regulated militia, composed of the body of the people, being the best security of a free state, the right of the people to keep and bear arms shall not be infringed; but no person religiously scrupulous shall be compelled to bear arms." THE FOUNDERS' CONSTITUTION 210 (Phillip B. Kurland & Ralph Lerner eds., 1987).  The House debate, focusing on the religious exemption, sheds little light on the individual versus collective rights debate, although the phrase "body of the people" used to describe the militia does suggest the idea of a militia of the whole.  Still, the best evidence of the framers' intentions in this matter comes from the surrounding history and the comments of the constitutional framers generally with respect to the composition of the militia.  *See infra* Part I.

[5]   *See* Sanford Levinson, *The Embarrassing Second Amendment,*  _99 YALE L.J. 637, 639-42 (1989)_ (discussing the reluctance of most constitutional scholars to treat the Second Amendment as a subject worthy of serious scholarly or pedagogical consideration).  Recently, however, one scholar has examined the Second Amendment within the context of the Bill of Rights as a whole.  *See* Akhil Amar, *The Bill of Rights as a Constitution,*  _100 YALE L.J. 1131 (1991)._ In Amar's view, the Bill of Rights was designed with both populist and collective concerns in mind.  It was designed to protect both the right of the people and to

80 Geo. L.J. 309, *311

control controversy.  [6] In short, the Second Amendment **[*312]** is an arena of constitutional jurisprudence that still awaits its philosopher.

The debate over the Second Amendment is ultimately part of the larger debate over gun control, a debate about the extent to which the Amendment was either meant to be or should be interpreted as limiting the ability of government to prohibit or limit private ownership of firearms.  Waged in the popular press,  [7] in the halls of Congress,  [8] and

---

prevent potential tyranny from an overreaching federal government.  Amar sees the purpose of the Second Amendment as preventing Congress from disarming freemen, so that the populace could resist tyranny imposed by a standing army.  *Id. at 1162-73.*

[6]  *See, e.g.,* David I. Caplan, *Restoring the Balance: The Second Amendment Revisited,*  5 FORDHAM URB. L.J. 31 (1976) (current efforts to limit firearm possession undermine the Second Amendment's twin goals of individual and collective defense); Robert Dowlut, *Federal and State Constitutional Guarantees to Arms,*  15 U. DAYTON L. REV. 59 (1989) (laws seeking to disarm the people violate the Second Amendment); Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?,*  36 OKLA. L. REV. 65 (1983) (interpretation of the Second Amendment is controlled by the framers' intent to guarantee the individual right to keep and bear arms rather than a more narrow judicial interpretation); Keith A. Ehrman & Dennis A. Henigan, *The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?,*  15 U. DAYTON L. REV. 5 (1989) (Second Amendment's historical origins erect no real barrier to federal or state laws affecting handguns); Richard E. Gardiner, *To Preserve Liberty -- A Look at the Right to Keep and Bear Arms,*  10 N. KY. L. REV. 63 (1982) (advocates of gun control have twisted the original and plain meaning of the Second Amendment); Alan M. Gottlieb, *Gun Ownership: A Constitutional Right,*  10 N. KY. L. REV. 113 (1982) (modern antipathy to firearms has influenced interpretation of the Second Amendment as a collective right); David T. Hardy, *The Second Amendment and the Historiography of the Bill of Rights,*  4 J.L. & POL. 1 (1987) (the Second Amendment has a dual purpose stemming from the merger of the militia and the right to bear arms provisions); Maynard H. Jackson, Jr., *Handgun Control: Constitutional and Critically Needed,*  8 N.C. CENT. L.J. 189 (1977) (Second Amendment is central to any discussion of the legal merits of gun control); Nelson Lund, *The Second Amendment, Political Liberty and the Right to Self-Preservation,*  39 ALA. L. REV. 103 (1987) (suggesting a Second Amendment jurisprudence consistent with modern treatment of the Bill of Rights such that handgun regulation be reasonably tailored to public safety); James A. McClure, *Firearms and Federalism,*  7 IDAHO L. REV. 197 (1970) (Second Amendment precludes federal interference but leaves to debate the issue of state regulation of handguns); Robert J. Riley, *Shooting to Kill the Handgun: Time to Martyr Another American "Hero,"* 51 J. URB. L. 491 (1974) (construing the Second Amendment as a surpassable barrier to handgun control by finding the handgun a weapon of marginal military utility); Jonathan A. Weiss, *A Reply to Advocates of Gun Control Law,* 52 J. URB. L. 577 (1974) (placing the Second Amendment in context of the Bill of Rights, provides an inviolable right to bear arms and an absolute bar to government restriction).

Two advocates of the individual rights theory who are outside the academy, but have nonetheless been quite instrumental in influencing the constitutional debate among law teachers and historians, are Donald B. Kates, Jr. and Stephen P. Halbrook.  *See, e.g.,* Donald B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment,*  82 MICH. L. REV. 204 (1983) (Second Amendment right to bear arms, applicable against both federal and state government, does not foreclose, but limits, gun control options); Donald B. Kates, Jr., *The Second Amendment: A Dialogue,* 49 LAW & CONTEMP. PROBS. 143 (1986) (Second Amendment substantially limits the arbitrariness of granting gun permits); Steven. P. Halbrook, THAT EVERY MAN BE ARMED: THE EVOLUTION OF A CONSTITUTIONAL RIGHT (1984) [hereinafter HALBROOK, THAT EVERY MAN BE ARMED] (the right of citizens to keep and bear arms has deep historical roots and overly restrictive interpretations of the Second Amendment are associated with reactionary concepts including elitism, militarism, and racism); Steven P. Halbrook, *The Jurisprudence of the Second and Fourteenth Amendments,* 4 GEO. MASON U.L. REV. 1 (1981) (the fundamental character of the Second Amendment and the increasingly restrictive forms of gun control legislation necessitate Supreme Court precedent on the status of the Amendment's applicability to the states); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151 (1986) (Second Amendment right to bear arms is incompatible with the suggestion of no right to bear arms without state or federal permission).

[7]  *See, e.g.,* Daniel Abrams, *What 'Right to Bear Arms'?,* N.Y. TIMES, July 20, 1989, at A23; Robert J. Cottrol, *It's Time to Enforce the Second Amendment,* PLAIN DEALER (Cleveland), Feb. 17, 1990, at 5B; Ervin N. Griswold, *Phantom Second Amendment Rights,* WASH. POST, NOV. 4, 1990, at C7; Sue Wimmershoff-Caplan, *The Founders and the AK-47,* WASH. POST, July 6, 1989, at A18.  Even former Chief Justice Warren Burger has used this arena to opine on the subject.  *See* Warren Burger, *The Right to Keep and Bear Arms,* PARADE MAG., Jan. 14, 1990, at 4.

80 Geo. L.J. 309, *312

increasingly in historical and **[*313]** legal journals, [9] two dominant interpretations have emerged. Advocates of stricter gun controls have tended to stress the Amendment's Militia Clause, arguing that the purpose of the Amendment was to ensure that state militias would be maintained against potential federal encroachment. This argument, embodying the collective rights theory, sees the framers' primary, indeed sole, concern as one with the concentration of military power in the hands of the federal government, and the corresponding need to ensure a decentralized military establishment largely under state control. [10]

Opponents of stricter gun controls have tended to stress the Amendment's second clause, arguing that the framers intended a militia of the whole -- or at least the entire able-bodied white male -- population, expected to perform its duties with privately owned weapons. [11] Advocates of this view also frequently urge that the Militia Clause should be read as an amplifying, rather than a qualifying, clause. They argue that, while maintaining a "well-regulated militia" [12] was the predominate reason for including the Second Amendment in the Bill of Rights, it should not be

---

For one interesting example of a writer who (reluctantly) supports the individual rights interpretation of the Second Amendment and who, as a member of the gun control group Handgun Control, Inc., is also a strong advocate of stricter gun control, see columnist Michael Kinsley, *Slicing Up the Second Amendment,* WASH. POST, Feb. 8, 1990, at A25. More recently, conservative columnist George Will, also an advocate of stricter gun control, has stated that "The National Rifle Association is perhaps correct and certainly plausible in its 'strong' reading of the Second Amendment protection for private gun ownership." Will argues for repeal of the Second Amendment on the grounds that the right is not as important as it was 200 years ago.

Will also makes the interesting observation that "The subject of gun control reveals a role reversal between liberals and conservatives that makes both sides seem tendentious. Liberals who usually argue that constitutional rights (of criminal defendants, for example) must be respected regardless of inconvenient social consequences, say that the Second Amendment right is too costly to honor. Conservatives who frequently favor applying cost-benefit analysis to constitutional construction (of defendants' rights, for example) advocate an absolutist construction of the Second Amendment." *See* George Will, *Oh That Annoying Second Amendment: It Shows No Signs of Going Away,* PHILADELPHIA INQUIRER, March 22, 1991.

Although the Second Amendment and gun control debates involve far more than a simple liberal/conservative dichotomy, there are numerous exceptions on both sides; Will's point is well taken. If we accept the conventional view that the National Rifle Association is a predominantly conservative organization and that advocates of gun control tend to be politically liberal, we can see rather interesting role reversals. For example, the NRA has attacked firearms bans in public housing, bans which mainly affect people who are poor and black, while liberal groups have generally remained silent on the issue.

[8] *See* THE RIGHT TO KEEP AND BEAR ARMS: REPORT OF THE SUBCOMM. ON THE CONSTITUTION OF THE COMM. ON THE JUDICIARY, S. REP NO. 522, 97th Cong., 2d Sess. 3 (1982) [hereinafter SUBCOMMITTEE REPORT].

[9] *See id.; see also* Lawrence Delbert Cress & Robert E. Stalhope, *The Second Amendment and the Right to Bear Arms: An Exchange,* 71 J. AM. HIST. 587 (1984) (debate whether correct interpretation of Second Amendment rests on rights to bear arms or communal prerogatives implied in Militia Clause); Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition,* 10 HASTINGS CONST. L.Q. 285 (1983), *reprinted in* FIREARMS AND VIOLENCE: ISSUES OF PUBLIC POLICY 391-95 (Donald B. Kates, Jr. ed. 1984) (proper reading of Second Amendment extends to every citizen right to bear arms for personal defense); Robert E. Shalhope, *The Ideological Origins of the Second Amendment,* 69 J. AM. HIST. 599 (1982) (armed citizen and militia existed as distinct, yet interrelated, elements within American republican thought).

[10] *See, e.g.,* Jackson, *supra* note 6, at 194 (the purpose of the Second Amendment was to maintain the militia, not to provide an individual right to bear arms); Roy G. Weatherup, *Standing Armies and Armed Citizens: An Analysis of the Second Amendment,* 2 HASTINGS CONST. L.Q. 961, 963, 995, 1000 (1975) (Second Amendment was designed solely to protect the states against the federal government, using a historical analysis of the relationship between citizens and their sovereign as evidence).

[11] *See, e.g.,* Halbrook, THAT EVERY MAN BE ARMED, *supra* note 6, at 55-87; Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment, supra* note 6, at 214-18, 273.

[12] U.S. CONST. amend. II.

80 Geo. L.J. 309, *313

viewed as the sole or  **[\*314]**  limiting reason.  They argue that the framers also contemplated a right to individual and community protection.  [13] This view embodies the individual rights theory.

This debate has raised often profound questions, but questions generally treated hastily, if at all, by the community of constitutional scholars.  [14] For example, if one accepts the collective rights view of the Amendment, serious questions arise concerning whether the federal government's integration of the National Guard into the Army and, later, the Air Force have not in all but name destroyed the very institutional independence of the militia that is at the heart of what the collective rights theorists see as the framers' intentions.  [15] Even the gun control debate is not completely resolved by an acceptance of the collective rights theory.  If the Second Amendment was designed to ensure the existence of somewhat independent state militias immune from federal encroachment, then the question arises to what extent states are free to define militia membership.  Could a state include as members of its militia all adult citizens, thus permitting them an exemption from federal firearms restrictions?  If, instead, the federal government has plenary power to define militia membership and chooses to confine such membership to the federally controlled National Guard, does the Second Amendment become a dead letter under the collective rights theory?

If the collective rights theory raises difficult questions, the individual rights theory raises perhaps even more difficult, and perhaps more interesting ones.  Some of these questions are obvious and frequently asked, such as where to draw the line between an individual's right to possess arms and the corollary right to self-defense on the one hand, and the community's interest in public safety and crime control on the other.  Other questions are more elusive, more difficult to pose as well as to answer.  At the heart of the individual rights view is the contention that the framers of the Second Amendment intended to protect the right to bear arms for two related purposes.  The first of these was to ensure popular participation in the security of the community, an outgrowth of the English and early American reliance on posses and militias made up of the general citizenry to provide police and military forces.  [16] The second purpose was to ensure an armed citizenry in order to prevent potential tyranny by a government empowered and perhaps emboldened by a monopoly of force.  [17]

 **[\*315]**  The second argument, that an armed populace might serve as a basis for resistance to tyranny, raises questions of its own.  The framers had firsthand experience with such a phenomenon, but they lived in an age when the weapon likely to be found in private hands, the single shot musket or pistol, did not differ considerably from its military counterpart.  Although the armies of the day possessed heavier weapons rarely found in private hands, battles were fought predominately by infantry or cavalry with weapons not considerably different from those employed by private citizens for personal protection or hunting.  [18] Battles in which privately armed citizens

---

[13]  *See, e.g.,* Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment, supra* note 6.

[14]  *See supra* note 5.

[15]  *See* Perpich v. Department of Defense, 110 S. Ct. 2418, 2422-26 (1990) (discussing the history of legislation governing the militia and the National Guard, and Congress's plenary authority over the National Guard).

[16]  *See* Malcolm, *supra* note 9, at 290-95.

[17]  See Stephen Halbrook's exploration of that idea within the context of classical political philosophy in THAT EVERY MAN BE ARMED, *supra* note 6, at 7-35; *see also* Gardiner, *supra* note 6, at 73-82 (the history of the Second Amendment indicates that one of its purposes was to ensure the indicates that one of its purposes was to ensure the existence of an armed citizenry as a defense against domestic tyranny); Lund, *supra* note 6, at 111-16 (Second Amendment protects an individual's right to bear arms in order to secure his political freedom); Shalhope, *supra* note 9, at 610-13 (framers of the Second Amendment, motivated by their distrust of government, intended to protect the right of individuals to bear arms).

[18]  The American civilian of the mid-18th century was typically armed with the "Pennsylvania" rifle, later to be known as the "Kentucky" rifle.  See Daniel Boorstin's discussion of the relative merits of the Pennsylvania Rifle and the muskets that British soldiers were equipped with in DANIEL J. BOORSTIN, THE AMERICANS: THE COLONIAL EXPERIENCE 350-51 (1958).

80 Geo. L.J. 309, *315

vanquished regular troops, or at least gave "a good account of themselves," were not only conceivable -- they happened. [19]

Modern warfare has, of course, introduced an array of weapons that no government is likely to permit ownership by the public at large [20] and that few advocates of the individual rights view would claim as part of the public domain. [21] The balance of power has shifted considerably and largely to the side of governments and their standing armies. For individual rights theorists, this shift immediately raises the question of whether, given the tremendous changes that have occurred in weapons technology, the framers' presumed intention of enabling the population to resist tyranny remains viable in the modern world. [22] Although partly a question of military tactics, [*316] and thus beyond the scope of this discussion, [23] it is also a constitutional question. [*317] If private ownership of firearms

---

[19] For one account of the battles of Lexington and Concord, see DAVID HAWKE, THE COLONIAL EXPERIENCE 573-78 (1966).

[20] It should not be necessary to detail such obvious examples as stinger missiles and nuclear weapons, but even more ordinary miltiary weapons are also unlikely to be permitted to the public at large. For example, the U.S. Army expects every soldier, regardless of military specialty, to be proficient with the M203 grenade launcher (a shoulder-fired light mortar capable of firing a 40 millimeter high explosive round 400 meters), the M72A2 light antitank weapon (LAW) (a handheld disposable antitank weapon capable of penetrating an armored vehicle at 300 meters), the M67 fragmentation grenade, and the M18AI Claymore antipersonnel mine. See DEPARTMENT OF THE ARMY, SOLDIER'S MANUAL OF COMMON TASKS: SKILL LEVEL 1 (1985).

[21] For one of the better efforts to reconcile modern weaponry with the type of weapons the framers intended to protect, see Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, supra note 6, at 204, 261.

[22] We are putting aside for the moment the question of the utility or potential utility of an armed population as a useful auxiliary to national or local governments in maintaining either national or community security. It should be noted that during the Second World War, when the National Guard had been mobilized into the Army, impromptu home defense forces -- some organized by state governments, some privately organized -- patrolled beach areas and likely sabotage sights. The individuals who performed this service were usually equipped with their own weapons. And while this American version of "Dad's Army" encountered no significant enemy activity -- doubtless to the relief of all concerned, particularly the participants -- the utility of these patrols should be noted. If such patrols were necessary, and some undoubtedly were, from the military point of view, it was probably better to have civilian auxiliaries performing this function, freeing regular military units for more pressing duties. See id. at 272 n.284. It should also be noted that, immediately after the attack on Pearl Harbor, the Hawaiian territorial governor ordered citizens to report with their own firearms for defense of the Islands in anticipation of Japanese invasion. Ironically, given the later treatment of Japanese Americans on the mainland, a good percentage of the men who made up the citizens' home guard in Hawaii were of Japanese descent. See id.

In light of our later discussion of whether or not, given the racial restriction in the Uniform Militia Act of 1792, free Negroes were considered part of the militia, see infra Part I.C.2, it should be noted that many of the individuals who served in these home guard organizations probably did not meet the statutory definition of militia members. By statute, membership in the militia is defined as men from 18-45. Most men in that age group were in the armed forces during the Second World War so that those performing home guard duties were probably older and younger than the statutory age limits. See Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, supra note 6, at 272 n. 284 (research indicates that men between the ages of 16 and 65 served in home guard units). It is also probable that a fair number of women performed those tasks. For our purposes, what is interesting about this history is that it indicates that militia membership is even broader than the statutory definition. Perhaps the best way of viewing the issue is to regard statutory militia provisions as defining those who may be compelled to perform militia service, but to realize that the whole population might be permitted to volunteer for militia service.

[23] Despite modern technological advances, the impotence of privately-armed civilians against organized armies is by no means obvious. Afghan guerrillas, to cite a recent example, were quite successful in resisting the Soviet Army largely with small arms. Harry Summers, retired Army Colonel and Professor at the Army War College, indicated in a recent column that he believed an armed population could resist a tyrannical government or at least do so better than an unarmed one. See Harry Summers, Gun Collecting and Lithuania, WASH. TIMES, Mar. 29, 1990, at F4 (public should protect its right to bear arms as a protection against government).

There are at least three ways to approach the question of an armed population resisting the government. The first is to look at what happens when actual armed conflict breaks out between a nation's military forces and the population or a segment of the

80 Geo. L.J. 309, *317

is constitutionally protected, should this right be protected with the original military and political purposes in mind, or should the protection of firearms now be viewed as protecting only those weapons viewed for personal protection or recreation? [24] Or, given that all firearms are potentially multi-purpose, and that all firearms potentially may be used for military, recreational, or personal defense as well as for criminal purposes, what effect should legislatures and courts give to the framers' original military rationale?  Where should the proper lines be drawn with respect to modern firearms, all of which employ technologies largely unimagined by the framers? [25]

Societal, as well as technological, changes raise questions for advocates of the individual rights view of the Second Amendment.  In the eighteenth century, the chief vehicle for law enforcement was the *posse comitatus,* and the major American military force was the militia of the whole.  While these institutions are still recognized by modern law, [26] they lie dormant in late twentieth-century America.  Professional police forces and a standing military

_____

population.  Although modern technology weights the odds heavily in the government's favor, other considerations, including whether or not military forces are overextended, the skill of the population in general with arms (which might be influenced by the number of military veterans in the population or the number of people who regularly practice with firearms), the terrain, and the morale of military forces called upon to suppress the population, might tend to redress the technological imbalance.

The second way of viewing this question is to look at it as a question of deterrence.  From this perspective, one might argue that, even if a government would ultimately win a confrontation with an armed population, the cost to the government is higher.  It will endure substantially larger casualties and may have to endure large scale destruction of economically valuable infrastructure in order to achieve its objectives.  This higher cost might cause a government to seek compromise, or cause a reluctance on the part of many in the military to participate, even if ultimate victory was assured.  In the Soviet Union, press reports indicated great resistance on the part of citizens to sending reservists to the Azerbaijan region, in part because the population was armed and willing to resist.  *See* Bill Keller, *Gorbachev Issues Emergency Decree Over Azerbaijan,* N.Y. TIMES, Jan. 16, 1990, at A1 (Azerbaijani leader threatens armed resistance against military); Bill Keller, *Moscow Dispatches 11,000 Troops to Azerbaijan,* N.Y. TIMES, Jan. 17, 1990, at A1 (Gorbachev hesitated in sending troops partly from fear of wide-scale popular resistance); Bill Keller, *Troops Seek to Calm Azerbaijan: Soviets Debate Cause of Violence,* N.Y. TIMES, Jan. 18, 1990, at A1 (one reason for hesitation before sending troops was fear of popular disapproval of sending troops to dangerous area); Esther B. Fein, *Gorbachev is Backed on Azerbaijan Combat,* N.Y. TIMES, Jan. 18, 1990, at A8 (Gorbachev criticized in the past for sending troops to control civil unrest); Bill Keller, *Soviet Troops Bogged Down by Azerbaijanis Blockades of Railroads and Airfields,* N.Y. TIMES, Jan. 19, 1990, at A1 (many young Soviets not eager to be mobilized); Frances X. Clines, *Soviet Force Said to Battle With Azerbaijani Militants: Call Up of Reserves Halted,* N.Y. TIMES, Jan. 20, 1990, at A1 (Moscow ends mobilization of reservists after wide protests); Bill Keller, *Cry of Won't Give Up My Son!  And Soviets End the Call-Up,* N.Y. TIMES, Jan. 20, 1990, at A6 (same).

The third consideration is the one most relevant to the Afro-American experience.  Governmental oppression can occur when the state actively oppresses the population or a segment of the population.  It can also occur when the state displays an active indifference to the denial of one segment of the population's rights by another.  This occurred most vividly for blacks during the Jim Crow era.  *See infra* Part IV.

[24] The latter appears to be the view taken by former Chief Justice Burger.  *See* Burger, *supra* note 7, at 4.

[25] In the 18th century, when the Second Amendment was adopted, firearms were single shot devices that were reloaded very slowly.  Firearms were loaded by pouring black gunpowder down the muzzle of the firearm, followed by a separate bullet (usually a lead ball); the load was then rammed down with a ramrod.  By way of contrast, modern firearms are usually loaded with self-contained cartridges -- cartridges where the bullet and the powder are contained in one single capsule.  Almost all modern firearms, with the exception of a few firearms designed almost exclusively for target shooting or training children in the use of firearms, are repeaters: they can fire more than one bullet before the shooter has to reload.  Among the types of repeating firearms that exist today are revolvers (pistols with between five and nine rotating cylinders), manually operated rifles and shotguns, firearms that require the operation of a lever or bolt between pulls of the trigger in order to make a new round of ammunition ready to fire, semiautomatic firearms (pistols, rifles, and shotguns capable of firing a new round with each pull of the trigger), and automatic firearms (weapons that will fire a new round as long as the shooter depresses the trigger).  These new developments make all modern firearms much more rapid fire than those employed in the 18th century.  For books that illustrate the history of firearms technology, see ROBERT HELD, THE AGE OF FIREARMS, A PICTORIAL HISTORY (1957); BASIL P. HUGHES, FIREPOWER: WEAPONS EFFECTIVENESS ON THE BATTLE FIELD, 1630-1850 (1975); HAROLD L. PETERSON, THE TREASURY OF THE GUN (1962).

80 Geo. L.J. 309, *317

[*318] establishment assisted by semi-professional auxiliaries -- the reserves and the National Guard -- have largely assumed the roles of public protection and national security. It is possible that the concept of a militia of the armed citizenry has been largely mooted by social change.

Yet, the effect of social change on the question of the Second Amendment is a two-edged sword. If one of the motivating purposes behind the Second Amendment was to provide a popular check against potential governmental excess, then does the professionalization of national and community security make the right to keep and bear arms even more important in the modern context? Furthermore, the question remains whether the concept of a militia of the whole is worth re-examining: Did the framers, by adopting the Second Amendment, embrace a republican vision of the rights and responsibilities of free citizens that, despite the difficulties, should somehow be made to work today?

Finally, the Second Amendment debate raises important questions concerning constitutional interpretation, questions that need to be more fully addressed by legal historians and constitutional commentators. It poses important questions about notions of the living Constitution, and to what extent that doctrine can be used to limit as well as extend rights. It also poses important questions about social stratification, cultural bias, and constitutional interpretation. Do courts really protect rights explicit or implicit in the Constitution, or is the courts' interpretation of rights largely a dialogue with the elite, articulate sectors of society, with the courts enforcing those rights favored by dominant elites and ignoring those not so favored?

Many of the issues surrounding the Second Amendment debate are raised in particularly sharp relief from the perspective of African-American history. With the exception of Native Americans, no people in American history have been more influenced by violence than blacks. Private and public violence maintained slavery. [27] The nation's most destructive conflict ended the "peculiar institution." [28] That all too brief experiment in racial egalitarianism, Reconstruction, was ended by private violence [29] and abetted by Supreme Court sanction. [30] Jim Crow was sustained by private violence, often with [*319] public assistance. [31]

If today the memories of past interracial violence are beginning to fade, they are being quickly replaced by the frightening phenomenon of black-on-black violence, making life all too precarious for poor blacks in inner city neighborhoods. [32] Questions raised by the Second Amendment, particularly those concerning self-defense, crime, participation in the security of the community, and the wisdom or utility of relying exclusively on the state for protection, thus take on a peculiar urgency in light of the modern Afro-American experience.

---

[26] *See, e.g.,* 10 U.S.C. § 311 (1988) (unorganized militia consists of all men between the ages of 18 and 45, and females who are commissioned National Guard officers); *Williams v. State, 490 S.W.2d 117, 121 (Ark. 1973)* (recognizing the continued validity of the *posse comitatus* power).

[27] *See* KENNETH M. STAMPP, THE PECULIAR INSTITUTION: SLAVERY IN THE ANTEBELLUM SOUTH 141-91 (1956).

[28] The Civil War cost the Union and Confederate armies a combined casualty total of 498,332 deaths. By way of contrast, World War II, the nation's second bloodiest conflict, cost the United States 407,316 fatalities. *See* THE WORLD ALMANAC & BOOK OF FACTS 793 (Mark S. Hoffman ed., 1991).

[29] *See generally* ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION, 1863-1877, at 564-600 (1988); GEORGE C. RABLE, BUT THERE WAS NO PEACE: THE ROLE OF VIOLENCE IN THE POLITICS OF RECONSTRUCTION (1984).

[30] *See, e.g.,* United States v. Harris, 106 U.S. 629 (1882) (holding unconstitutional a federal criminal statute designed to protect equal privileges and immunities for blacks from invasion by private persons); United States v. Cruikshank, 92 U.S. 542 (1876) (holding unconstitutional a federal criminal statute designed to prevent whites from conspiring to prevent blacks from exercising their constitutional rights).

[31] *See infra* Part IV.

[32] *See infra* Part V.

80 Geo. L.J. 309, *319

This article explores Second Amendment issues in light of the Afro-American experience, concluding that the individual rights theory comports better with the history of the right to bear arms in England and Colonial and post-Revolutionary America.  The article also suggests that Second Amendment issues need to be explored, not only with respect to how the right to keep and bear arms has affected American society as a whole, but also with an eye toward subcultures in American society who have been less able to rely on state protection.

The remainder of this article is divided into five parts.  Part I examines the historical tension between the belief in the individual's right to bear arms and the desire to keep weapons out of the hands of "socially undesirable" groups.  The English distrust of the lower classes, and then certain religious groups, was replaced in America by a distrust of two racial minorities: Native Americans and blacks.  Part II examines antebellum regulations restricting black firearms ownership and participation in the militia.  Part III examines the intentions of the framers of the Fourteenth Amendment with respect to the Second Amendment and how nineteenth-century Supreme Court cases limiting the scope of the Second Amendment were part of the general tendency of the courts to limit the scope of the Fourteenth Amendment.  This Part also examines restrictions on firearms ownership aimed at blacks in the postbellum South and the role of private violence in reclaiming white domination in the South.  Part IV examines black resistance to the violence that accompanied Jim Crow.  In Part V, the article suggests directions of further inquiry regarding political access, the current specter of black-on-black crime, and the question of gun control today.

**[*320]**  I.  ARMED CITIZENS, FREEMEN, AND WELL-REGULATED MILITIAS: THE BEGINNINGS OF AN AFRO-AMERICAN EXPERIENCE WITH AN ANGLO-AMERICAN RIGHT

Any discussion of the Second Amendment should begin with the commonplace observation that the framers of the Bill of Rights did not believe they were creating new rights.   [33]  Instead, they believed that they were simply recognizing rights already part of their English constitutional heritage and implicit in natural law.   [34] In fact, many of the framers cautioned against a bill of rights, arguing that the suggested rights were inherent to a free people, and that a specific detailing of rights would suggest that the new constitution empowered the federal government to violate other traditional rights not enumerated.   [35]

Thus, an analysis of the framers' intentions with respect to the Second Amendment should begin with an examination of their perception of the right to bear arms as one of the traditional rights of Englishmen, a right necessary to perform the duty of militia service.  Such an analysis is in part an exercise in examining the history of arms regulation and militia service in English legal history.  But a simple examination of the right to own weapons at English law combined with an analysis of the history of the militia in English society is inadequate to a full understanding of the framers' understanding of what they meant by "the right to keep and bear arms." By the time the Bill of Rights was adopted, nearly two centuries of settlement in North America had given Americans constitutional sensibilities similar to, but nonetheless distinguishable from, those of their English counterparts.   [36] American settlement had created its own history with respect to the right to bear arms, a history based on English

---

[33]  BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 184-89, 193-94 (1967).

[34]  *Id.* Especially pertinent is John Philip Reid's reminder: "There are other dimensions that the standing-army controversy, when studied from the perspective of law, adds to our knowledge of the American Revolution.  *One is the degree to which eighteenth-century Americans thought seventeenth-century English thoughts."* JOHN PHILLIP REID, IN DEFIANCE OF THE LAW: THE STANDING-ARMY CONTROVERSY, THE TWO CONSTITUTIONS, AND THE COMING OF THE AMERICAN REVOLUTION 4 (1981) (emphasis added).

[35]  *See, e.g.,* THE FEDERALIST NO. 84 (Alexander Hamilton).

[36]  This can be seen with reference to the right of trial by jury.  A number of scholars have noted that Americans in the late 18th century regarded the right of trial by jury as including the right to have the jury decide issues of law as well as fact.  This was, of course, a departure from traditional English practice.  *See* MORTON J. HOROWITZ, THE TRANSFORMATION OF AMERICAN LAW, 1780-1860, at 28-29 (1977); WILLIAM EDWARD NELSON, AMERICANIZATION OF THE COMMON LAW: THE IMPACT OF LEGAL CHANGE ON MASSACHUSETTS SOCIETY, 1760-1830, at 3-4, 8, 20-30 (1975).

80 Geo. L.J. 309, *320

tradition, modified by the American experience, and a history that was sharply influenced by the racial climate in the American colonies.

[*321]  A.  ENGLISH LAW AND TRADITION

The English settlers who populated North America in the seventeenth century were heirs to a tradition over five centuries old governing both the right and duty to be armed.  At English law, the idea of an armed citizenry responsible for the security of the community had long coexisted, perhaps somewhat uneasily, with regulation of the ownership of arms, particularly along class lines.  The Assize of Arms of 1181 [37] required the arming of all free men, and required free men to possess armor suitable to their condition. [38] By the thirteenth century, villeins possessing sufficient property were also expected to be armed and contribute to the security of the community. [39] Lacking both professional police forces and a standing army, [40] English law and custom dictated that the citizenry as a whole, privately equipped, assist in both law enforcement and in military matters.  By law, all men between sixteen and sixty were liable to be summoned into the sheriff's *posse comitatus.* All subjects were expected to participate in the hot pursuit of criminal suspects, supplying their own arms for the occasion.  There were legal penalties for failure to participate. [41]

Moreover, able-bodied men were considered part of the militia, although by the sixteenth century the general practice was to rely on select groups intensively trained for militia duty rather than to rely generally on the armed male population.  This move toward a selectively trained militia was an attempt to remedy the often indifferent proficiency and motivation that occurred when relying on the population as a whole. [42]

Although English law recognized a duty to be armed, it was a duty and a right highly circumscribed by English class structure.  The law often regarded the common people as a dangerous class, useful perhaps in defending shire and realm, but also capable of mischief with their weapons, mischief toward each other, toward their betters, and toward their betters' game.  Restrictions on the type of arms deemed suitable for common people had long been part of English law and custom.  A sixteenth-century statute designed as a crime control measure prohibited the carrying of handguns and cross-bows **[*322]** by those with incomes of less than one hundred pounds a year. [43] Catholics were also often subject to being disarmed as potential subversives after the English reformation. [44]

It took the religious and political turmoil of seventeenth-century England to bring about large scale attempts to disarm the English public and to bring the right to keep arms under English constitutional protection.  Post-Restoration attempts by Charles II to disarm large portions of the population known or believed to be political opponents, and James II's efforts to disarm his Protestant opponents led, in 1689, to the adoption of the Seventh

---

[37] SELECT CHARTERS & OTHER ILLUSTRATIONS OF ENGLISH CONSTITUTIONAL HISTORY FROM THE EARLIEST TIMES TO THE REIGN OF EDWARD THE FIRST 181-84 (H.W.C. Davis ed., Fred B. Cothman & Co. 1985) (1921).

[38] 1 FREDERICK POLLOCK & FREDERIC W. MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I 421-42, 565 (1968).

[39]  *Id.*

[40]  Historian Joyce Lee Malcolm notes that England did not have a standing army until the late 17th century and did not have a professional police force until the nineteenth.  *See* Malcolm, *supra* note 9, at 391.

[41]  ALAN HARDING, A SOCIAL HISTORY OF ENGLISH LAW 59 (1966); Malcolm, *supra* note 9, at 391.

[42]  Malcolm, *supra* note 9, at 391-92.

[43]  *Id.* at 393.

[44]  *Id.* at 393-94.

80 Geo. L.J. 309, *322

provision of the English Bill of Rights: "That the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions, and as allowed by Law." [45]

By the eighteenth century, the right to possess arms, both for personal protection and as a counterbalance against state power, had come to be viewed as part of the rights of Englishmen by many on both sides of the Atlantic. Sir William Blackstone listed the right to possess arms as one of the five auxiliary rights of English subjects without which their primary rights could not be maintained. [46] He discussed the right in traditional English **[*323]** terms:

The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence, suitable to their condition and degree, and such as are allowed by law, which is also declared by the same statute 1 W. & M. st. 2 c. 2 and is indeed a public allowance, under due restrictions, of the natural right of resistance

---

[45] *Id.* at 408.

[46] 1 WILLIAM BLACKSTONE, COMMENTARIES *143-45. Blackstone listed three primary rights -- the right of personal security, the right of personal liberty, and the right of private property -- all of which he regarded as natural rights recognized and protected by the common law and statutes of England. He also argued that these would be "dead letters" without the five auxiliary rights which he listed as: (1) the constitution, powers and privileges of Parliament; (2) the limitation of the king's prerogative; (3) the right to apply to the courts of justice for redress of injuries; (4) the right of petitioning the King or either house of Parliament, and for the redress of grievances; and (5) the right of subjects to have arms for their defence. *Id.* at *121-45.

Some commentators have argued that Blackstone's remarks and other evidence of English common-law and statutory rights to possess arms should be viewed in the light of the extensive regulation of firearms that traditionally existed in England and also in light of English strict gun control in the 20th century. *See, e.g.,* SUBCOMMITTEE REPORT, *supra* note 8, at 26; FRANKLIN E. ZIMRING & GORDON HAWKINS, THE CITIZEN'S GUIDE TO GUN CONTROL 142-43 (1987); Ehrman & Henigan, *supra* note 6, at 9-10. Two points should be made in that regard. First, much of English firearms regulation had an explicit class base largely inapplicable in the American context. Second, neither a common law right to keep and bear arms nor a similar statutory right such as existed in the English Bill of Rights of 1689 would, in the light of Parliamentary supremacy, be a bar to subsequent statutes repealing or modifying that right. Blackstone is cited here not as evidence that the English right, in precise form and content, became the American right; instead it is evidence that the idea of an individual right to keep and bear arms existed on both sides of the Atlantic in the 18th century.

Blackstone's importance to this discussion is twofold. His writings on the right to possess arms can be taken as partial evidence of what the framers of the Second Amendment regarded as among the rights of Englishmen that they sought to preserve. Blackstone's views greatly influenced late 18th-century American legal thought. But Blackstone's importance in this regard does not cease with the American Revolution. Blackstone also greatly influenced 19th-century American legal thinking. One influential antebellum American jurist, Justice Joseph Story, was significantly influenced by his readings of Blackstone. *See* R. KENT NEWMYER, SUPREME COURT JUSTICE JOSEPH STORY: STATESMAN OF THE OLD REPUBLIC 40-45, 137, 246 (1985). Story viewed the Second Amendment as vitally important in maintaining a free republic. In his *Commentaries on the Constitution,* he wrote:

The right of the citizens to keep, and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if they are successful in the first instance, enable the people to resist, and triumph over them.

JOSEPH STORY, COMMENTARIES ON THE *CONSTITUTION OF THE UNITED STATES 7*08 (Carolina Academic Press 1987) (1833).

While it would be inaccurate to attribute Story's Second Amendment views solely to his reading of Blackstone, Blackstone doubtless helped influence Story and other early 19th-century lawyers and jurists to regard the right to keep and bear arms as an important prerogative of free citizens. All of this is important for our discussion, not only with regard to antebellum opinion concerning the Second Amendment, but also in considering the cultural and legal climate that informed the framers of the Fourteenth Amendment who intended to extend what were commonly regarded as the rights of free men to the freedmen, and who also intended to extend the Bill of Rights to the states. *See infra* Part III.

and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression. [47]

## B.  ARMS AND RACE IN COLONIAL AMERICA

If the English tradition involved a right and duty to bear arms qualified by class and later religion, both the right and the duty were strengthened in the earliest American settlements.  From the beginning, English settlement in North America had a quasi-military character, an obvious response to harsh frontier conditions.  Governors of settlements often also held the title of militia captain, reflecting both the civil and military nature of their office.  Special effort was made to ensure that white men, capable of bearing arms, were imported into the colonies. [48] Far from the security of Britain, often bordering on the colonies of other frequently hostile European powers, colonial governments viewed the arming of able-bodied white men and the requirement that they perform militia service as essential to a colony's survival.

There was another reason for the renewed emphasis on the right and duty to be armed in America: race.  Britain's American colonies were home to three often antagonistic races: red, white, and black.  For the settlers of British  **[*324]**  North America, an armed and universally deputized white population was necessary not only to ward off dangers from the armies of other European powers, but also to ward off attacks from the indigenous population which feared the encroachment of English settlers on their lands.  An armed white population was also essential to maintain social control over blacks and Indians who toiled unwillingly as slaves and servants in English settlements. [49]

This need for racial control helped transform the traditional English right into a much broader American one.  If English law had qualified the right to possess arms by class and religion, American law was much less concerned with such distinctions. [50] Initially all Englishmen, and later all white men, were expected to possess and bear arms to defend their commonwealths, both from external threats and from the internal ones posed by blacks and Indians. The statutes of many colonies specified that white men be armed at public expense. [51] In most colonies, all white men between the ages of sixteen and sixty, usually with the exception of clergy and religious objectors, were considered part of the militia and required to be armed. [52] Not only were white men required to perform traditional militia and posse duties, they were also required to serve as patrollers, a specialized posse dedicated to keeping order among the slave population, in those colonies with large slave populations. [53] This broadening of the right to keep and bear arms reflected a more general lessening of class, religious, and ethnic distinctions among whites in

---

[47] 1 BLACKSTONE, *supra* note 46, at *143-44.

[48] ABBOTT E. SMITH, COLONISTS IN BONDAGE: WHITE SERVITUDE AND CONVICT LABOR IN AMERICA, 1607-1776, at 30-34 (Norton 1971) (1947).

[49] BOORSTIN, *supra* note 18, at 355-56.

[50] *Id.* at 353.

[51] *See* A. LEON HIGGINBOTHAM, JR., IN THE MATTER OF COLOR: RACE AND THE AMERICAN LEGAL PROCESS: THE COLONIAL PERIOD 32 (1978).

It should also be added that the abundant game found in North America during the colonial period eliminated the need for the kind of game laws that had traditionally disarmed the lower classes in England.  Malcolm, *supra* note 9, at 393-94.

[52] *See, e.g.,* 2 LAWS OF THE ROYAL COLONY OF NEW JERSEY 15-21, 49, 96, 133, 289 (Bernard Bush ed., 1977).

[53] HIGGINBOTHAM, *supra* note 51, at 260-262.

80 Geo. L.J. 309, *324

colonial America.  The right to possess arms was, therefore, extended to classes traditionally viewed with suspicion in England, including the class of indentured servants.  [54]

If there were virtually universal agreement concerning the need to arm the white population,  [55] the law was much more ambivalent with respect to  **[*325]**  blacks.  The progress of slavery in colonial America reflected English lack of familiarity with the institution, in both law and custom.  [56] In some colonies, kidnapped Africans initially were treated like other indentured servants, held for a term of years and then released from forced labor and allowed to live as free people.  [57] In some colonies, the social control of slaves was one of the law's major concerns; in others, the issue was largely of private concern to the slave owner.  [58]

These differences were reflected in statutes concerned with the right to possess arms and the duty to perform militia service.  One colony -- Virginia -- provides a striking example of how social changes were reflected, over time, in restrictions concerning the right to be armed.  A Virginia statute enacted in 1639 required the arming of white men at public expense.  [59] The statute did not specify the arming of black men, but it also did not prohibit black men from arming themselves.  [60] By 1680 a Virginia statute prohibited Negroes, slave and free, from carrying weapons, including clubs.  [61] Yet, by the early eighteenth century, free Negroes who were house owners were permitted to keep one gun in their house, while blacks, slave and free, who lived on frontier plantations were able to keep guns.  [62] Virginia's experience reflected three sets of concerns: the greater need to maintain social control over the black population as caste lines sharpened;  [63] the need to use slaves and free blacks to help defend frontier plantations against attacks by hostile Indians; and the recognition on the part of Virginia authorities of the necessity for gun ownership for those living alone.

---

[54] For a good discussion of the elevation of the rights of white indentured servants as a means of maintaining social control over the black population, see generally EDMUND S. MORGAN, AMERICAN SLAVERY, AMERICAN FREEDOM: THE ORDEAL OF COLONIAL VIRGINIA (1975).

[55] Stephen Halbrook notes that Virginia's royal government in the late 17th century became very concerned that the widespread practice of carrying arms would tend to foment rebellion, and that, as a result, statutes were enacted to prevent groups of men from gathering with arms.  *See* HALBROOK, THAT EVERY MAN BE ARMED, *supra* note 6, at 56-57.  The sharpening of racial distinctions and the need for greater social control over slaves that occurred toward the end of the seventeenth and beginning of the 18th century lessened the concern authorities had over the armed white population.  *See* MORGAN, *supra* note 54, at 354-55.

[56]  *See* Raymond T. Diamond, *No Call to Glory: Thurgood Marshall's Thesis on the Intent of a Pro-Slavery Constitution,*  42 VAND. L. REV. 93, 101-102 (1989) (colonies dealt with slavery in an unsystematic and piecemeal fashion).  *See generally* WINTHROP D. JORDAN, WHITE OVER BLACK: AMERICAN ATTITUDES TOWARDS THE NEGRO, 1550-1812, at 48-52 (1968).

[57] HIGGINBOTHAM, *supra* note 51, at 21-22.

[58]  *See* HERBERT APTHEKER, AMERICAN NEGRO SLAVE REVOLTS (5th ed. 1983); Diamond, *supra* note 56, at 101-102, 104; Robert J. Cottrol & Raymond T. Diamond, Book Review, 56 TUL. L. REV. 1107, 1110-1112 (1982) (reviewing A. LEON HIGGINBOTHAM, JR., IN THE MATTER OF COLOR: RACE AND THE AMERICAN LEGAL PROCESS: THE COLONIAL PERIOD (1978)).

[59] 1 WILLIAM W. HENING, STATUTES AT LARGE OF VIRGINIA 226 (New York, R. & W. & G. Bartow 1823); *see* HIGGINBOTHAM, *supra* note 51, at 32.

[60] 1 HENING, *supra* note 59, at 226; *see* HIGGINBOTHAM, *supra* note 51, at 32.

[61] HIGGINBOTHAM, *supra* note 51, at 39.

[62]  *Id.* at 58.

[63]  *Id.* at 38-40.

80 Geo. L.J. 309, *325

These concerns were mirrored in the legislation of other colonies.  Massachusetts did not have general legislation prohibiting blacks from carrying arms, [64] but free Negroes in that colony were not permitted to participate in [*326] militia drills; instead they were required to perform substitute service on public works projects. [65] New Jersey exempted blacks and Indians from militia service, though the colony permitted free Negroes to possess firearms. [66] Ironically, South Carolina, which had the harshest slave codes of this period, may have been the colony most enthusiastic about extending the right to bear arms to free Negroes.  With its majority black population, that state's need to control the slave population was especially acute. [67] To secure free black assistance in controlling the slave population, South Carolina in the early eighteenth century permitted free blacks the right of suffrage, the right to keep firearms, and the right to undertake militia service.  [68] As the eighteenth century unfolded, those rights were curtailed. [69]

Overall, these laws reflected the desire to maintain white supremacy and control.  With respect to the right to possess arms, the colonial experience had largely eliminated class, religious, and ethnic distinctions among the white population.  Those who had been part of the suspect classes in England -- the poor, religious dissenters, and others who had traditionally only enjoyed a qualified right to possess arms -- found the right to be considerably more robust in the American context.  But blacks had come to occupy the social and legal space of the suspect classes in England.  Their right to posses arms was highly dependent on white opinion of black loyalty and reliability.  Their inclusion in the militia of freemen was frequently confined to times of crisis.  Often, there were significant differences between the way northern and [*327] southern colonies approached this question, a reflection of the very different roles that slavery played in the two regions.  These differences would become sharper after the Revolution, when the northern states began to move toward the abolition of slavery and the southern states, some of which had also considered abolition, [70] began to strengthen the institution.

---

[64] Higginbotham informs us that the Boston selectmen passed such an ordinance after some slaves had allegedly committed arson in 1724.  *See id.* at 76.

[65] *See* LORENZO J. GREENE, THE NEGRO IN COLONIAL NEW ENGLAND 127 (1968).  Greene notes that blacks probably served in New England militias until the latter part of the 17th century.  *Id.* It is interesting to note that, despite this prohibition on militia service, blacks served with New England forces during the French and Indian Wars.  *Id.* at 188-89.  Winthrop Jordan notes that in 1652 the Massachusetts General Court ordered Scotsmen, Indians, and Negroes to train with the Militia, but that, in 1656, Massachusetts and, in 1660, Connecticut excluded blacks from Militia service.  *See* JORDAN, *supra* note 56, at 71.

[66] *See* 2 LAWS OF THE ROYAL COLONY OF NEW JERSEY, *supra* note 52, at 49, 96, 289.

[67] For a good discussion of black life in colonial South Carolina, see generally PETER H. WOOD, BLACK MAJORITY: NEGROES IN COLONIAL SOUTH CAROLINA FROM 1670 THROUGH THE STONO REBELLION (1974).

South Carolina in 1739 was the scene of the Stono Rebellion, one of the largest slave rebellions in North America.  A recent study of the rebellion suggests that the presence of large numbers of African born men from the Kingdom of the Kongo played a critical role.  The Kingdom, including parts of modern Zaire, Congo-Brazzaville, Gabon, and Angola, had been heavily influenced by Portugese traders and missionaries in such areas as language, religion, and contemporary European military tactics including the use of firearms.  The Stono Rebellion illustrated both the internal and external threats faced by many colonies.  First, the presence of large numbers of African slaves, familiar with European military tactics and technology, posed a threat to slave society in South Carolina.  Second, this threat was further enhanced by the fact that South Carolina bordered on the Spanish colony of Florida.  Historical accounts of the rebellion indicate that Portugese-speaking Catholic slaves acted in concert with Spanish agents.  *See generally* John K. Thornton, *African Dimensions of the Stono Rebellion,* 96 AM. HIST. REV. 1101 (1991)

[68] *See* HIGGINBOTHAM, *supra* note 51, at 201-15.

[69] *Id.*

[70] *See* Robert J. Cottrol, *Liberalism and Paternalism: Ideology, Economic Interest and the Business Law of Slavery,* 31 AM. J. LEGAL HIST. 359, 363-64 (1987).

80 Geo. L.J. 309, *327

Ironically, while the black presence in colonial America introduced a new set of restrictions concerning the English law of arms and the militia, it helped strengthen the view that the security of the state was best achieved through the arming of all free citizens. It was this new view that was part of the cultural heritage Americans brought to the framing of the Constitution.

C. THE RIGHT OF *WHICH* PEOPLE?

1. Revolutionary Ideals

The colonial experience helped strengthen the appreciation of early Americans for the merits of an armed citizenry. That appreciation was strengthened yet further by the American Revolution. If necessity forced the early colonists to arm, the Revolution and the friction with Britain's standing army that preceded it -- and in many ways precipitated it -- served to revitalize Whiggish notions that standing armies were dangerous to liberty, and that militias, composed of the whole of the people, best protected both liberty and security. [71]

These notions soon found their way into the debates over the new constitution, debates which help place the language and meaning of the Second Amendment in context. Like other provisions of the proposed constitution, the clause that gave Congress the power to provide for the organizing, arming, and disciplining of the militia [72] excited fears among those who believed that the new constitution could be used to destroy both state power and individual rights. [73]

[*328] Indeed, it was the very universality of the militia that was the source of some of the objections. A number of critics of the proposed constitution feared that the proposed congressional power could subject the whole population to military discipline and a clear threat to individual liberty. [74] Others complained that the Militia Clause provided no exemptions for those with religious scruples against bearing arms. [75]

But others feared that the Militia Clause could be used to disarm the population as well as do away with the states' control of the militia. Some critics expressed fear that Congress would use its power to establish a select militia, a

---

[71] *See generally* REID, *supra* note 34.

[72] That clause is now found in U.S. CONST. art. I, § 8, cl. 15.

[73] Elbridge Gerry of Massachusetts thought a national government which controlled the militia would be potentially despotic. James Madison's Notes on the Constitutional Convention of 1787 (Aug. 21, 1787), *in* 1 1787: DRAFTING THE U.S. CONSTITUTION 916 (Wilbowin E. Benton, ed., 1986). With this power, national government "may enslave the States." *Id.* at 846. Oliver Ellsworth of Connecticut suggested that "[t]he whole authority over the Militia ought by no means to be taken away from the States whose consequence would pine away to nothing after such a sacrifice of power." *Id.* at 909.

It is interesting, in light of the current debate, that both advocates and opponents of this increase in federal power assumed that the militia they were discussing would be one that enrolled almost all of the white male population between the ages of 16 and 60, and that that population would supply their own arms. George Mason of Virginia proposed "the idea of a select militia," but withdrew it. *Id.* at 909.

[74] This was a view argued by Luther Martin before the Maryland House of Representatives. Luther Martin Before the Maryland House of Representatives (1787), *in* 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 157 (Max Farrand ed., 1966) [hereinafter THE RECORDS OF THE FEDERAL CONVENTION]. Samuel Bryan, a Pennsylvania pamphleteer who argued against the proposed constitution, argued that it could subject the whole population to military discipline. Samuel Bryan, *Letter to the People of Pennsylvania,* INDEPENDENT GAZETTEER, Oct. 5, 1787, *reprinted in* THE ANTIFEDERALISTS 22-23, 27 (Cecelia M. Kenyon ed., 1966). A number of critics argued that the provision was a threat to the liberty of every man from 16 to 60. *Id.* at 57. Thus, the language of the Fifth Amendment requiring grand jury proceedings for cases arising in the militia, except when in actual service during time of war or public danger, may have been in response to this fear.

[75] THE ANTIFEDERALISTS, *supra* note 74, at 57. This concern was the reason for the original language of the Second Amendment. *See supra* note 4.

80 Geo. L.J. 309, *328

group of men specially trained and armed for militia duty, similar to the earlier English experience. [76] Richard Henry Lee of Virginia argued that that select militia might be used to disarm the population and that, in any event, it would pose more of a danger to individual liberty than a militia composed of the whole population. He charged that a select militia "commits the many to the mercy and the prudence of the few." [77] A number of critics objected to giving Congress the power to arm the militia, fearing that such power would likewise give Congress the power to withhold arms from the militia. [78] At the constitutional convention, Massachusetts delegate Elbridge Gerry saw such potential danger in giving the new government power over the militia, that he declared:

This power in the United States as explained is making the states drill sergeants. He had as lief let the citizens of Massachusetts be disarmed, as to take the command from the states, and subject them to the General Legislature. It would be regarded as a system of Despotism. [79]

The fear that this new congressional authority could be used to both destroy state power over the militia and to disarm the people led delegates to state ratifying conventions to urge measures that would preserve the traditional [*329] right. The Virginia convention proposed language that would provide protection for the right to keep and bear arms in the federal constitution. [80]

In their efforts to defend the proposed constitution, Alexander Hamilton and James Madison addressed these charges. Hamilton's responses are interesting because he wrote as someone openly skeptical of the value of the militia of the whole. The former Revolutionary War artillery officer [81] expressed the view that, while the militia fought bravely during the Revolution, it had proven to be no match when pitted against regular troops. Hamilton, who Madison claimed initially wanted to forbid the states from controlling any land or naval forces, [82] called for uniformity in organizing and disciplining of the militia under national authority. He also urged the creation of a select militia that would be more amenable to the training and discipline he saw as necessary. [83] In what was perhaps a concession to sentiment favoring the militia of the whole, Hamilton stated: "Little more can be reasonably aimed at, with respect to the people at large, than to have them properly armed and equipped; and in order to see that this not be neglected, it will be necessary to assemble them once or twice in the course of a year." [84]

---

[76] *See supra* text accompanying note 43.

[77] THE ANTIFEDERALISTS, *supra* note 74, at 228.

[78] 2 THE RECORDS OF THE FEDERAL CONVENTION, *supra* note 74, at 385-87; 3 *id.* at 208-09, 272, 295.

[79] 2 THE RECORDS OF THE FEDERAL CONVENTION, *supra* note 74, at 385.

[80] The Virginia convention urged the adoption of the following language:

That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural, and safe defence for a free state; that standing armies, in time of peace, are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the community will admit; and that in all cases, the military should be under strict subordination to, and governed by, the civil power.

3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA, IN 1787 TOGETHER WITH THE JOURNAL OF THE FEDERAL CONVENTION 657-59 (Jonathan Elliot ed., Ayer Co. 1987) (1907) [hereinafter ELLIOT'S DEBATES].

[81] RICHARD B. MORRIS, SEVEN WHO SHAPED OUR DESTINY: THE FOUNDING FATHERS AS REVOLUTIONARIES 228, 237-49 (1973).

[82] 1 THE RECORDS OF THE FEDERAL CONVENTION, supra note 74, at 293.

[83] THE FEDERALIST NO. 25, at 161 (Alexander Hamilton) (The Heritage Press 1945). For a modern study that supports Hamilton's views concerning the military ineffectiveness of the militia, see BOORSTIN, *supra* note 18, at 352-72.

[84] THE FEDERALIST NO. 29, at 183 (Alexander Hamilton) (The Heritage Press 1945). Interestingly enough, Hamilton's views anticipated the state of modern law on this subject; the National Guard has, in effect, become a select militia with a much larger reserve militia existing in the citizenry at large.

80 Geo. L.J. 309, *329

If Hamilton gave only grudging support to the concept of the militia of the whole, Madison, author of the Second Amendment, was a far more vigorous defender of the concept. He answered critics of the Militia Clause provision allowing Congress to arm the militia by stating that the term "arming" meant only that Congress's authority to arm extended only to prescribing the type of arms the militia would use, not to furnishing them. [85] But Madison's [*330] views went further. He envisioned a militia consisting of virtually the entire white male population, writing that a militia of 500,000 citizens [86] could prevent any excesses that might be perpetrated by the national government and its regular army. Madison left little doubt that he envisioned the militia of the whole as a potential counterweight to tyrannical excess on the part of the government:

Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government: still it would not be going too far to say, that the State governments with the people on their side, would be able to repel the danger. The highest number to which, according to the best computation, a standing army can be carried in any country does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million citizens with arms in their hands, officered by men chosen among themselves, fighting for their common liberties and united and conducted by governments possessing their affections and confidence. It may well be doubted whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops. Those who are best acquainted with the last successful resistance of this country against the British arms will be most inclined to deny the possibility of it. Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached, and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of. Notwithstanding the military establishments in the several kingdoms of Europe, which are carried as far as the public resources will bear, the. . . governments are afraid to trust the people with arms . . . . [87]

It is against this background that the meaning of the Second Amendment must be considered. For the revolutionary generation, the idea of the militia and an armed population were related. The principal reason for preferring a militia of the whole over either a standing army or a select militia was rooted in the idea that, whatever the inefficiency of the militia of the whole, the institution would better protect the newly won freedoms than a reliance on security provided by some more select body.

[*331] 2. Racial Limitations

One year after the ratification of the Second Amendment and the Bill of Rights, Congress passed legislation that reaffirmed the notion of the militia of the whole and explicitly introduced a racial component into the national deliberations on the subject of the militia. The Uniform Militia Act [88] called for the enrollment of every free, able-bodied *white* male citizen between the ages of eighteen and forty-five into the militia. The act further specified that every militia member was to provide himself with a musket or firelock, a bayonet, and ammunition.

---

[85] 5 ELLIOT'S DEBATES, *supra* note 80, at 464-65.

[86] THE FEDERALIST NO. 46, at 319 (James Madison) (The Heritage Press 1945). The census of 1790 listed the white male population over age 16 as 813,298. *See* BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL HISTORY OF THE UNITED STATES FROM COLONIAL TIMES TO THE PRESENT 16 (1976). The census did not list the number over 60 that would have been exempt from militia duty.

[87] *Id.*

[88] *1 Stat. 271.*

80 Geo. L.J. 309, *331

This specification of a racial qualification for militia membership was somewhat at odds with general practice in the late eighteenth century. Despite its recognition and sanctioning of slavery, [89] the Constitution had no racial definition of citizenship. [90] Free Negroes voted in a majority of states. [91] A number of states had militia provisions that allowed free Negroes to participate. [92] Particularly in the northern states, many were well aware that free Negroes and former slaves had served with their state forces during the Revolution. [93] Despite the prejudices of the day, lawmakers in late eighteenth-century America were significantly less willing to write racial restrictions into constitutions and other laws guaranteeing fundamental rights than were their counterparts a generation or so later in the nineteenth century. [94] The 1792 statute restricting militia enrollment to white men was one of the earliest federal statutes to make a racial distinction.

The significance of this restriction is not altogether clear. For the South, there was a clear desire to have a militia that was reliable and could be used to suppress potential slave insurrections. But despite the fear that free Negroes might make common cause with slaves, and despite federal law, some southern states in the antebellum period enrolled free blacks as militia members. [95] **[*332]** Northern states at various times also enrolled free Negroes in the militia despite federal law and often strident prejudice. [96] States North and South employed free Negroes in state forces during times of invasion. [97] While southern states often prohibited slaves from carrying weapons and strictly regulated access to firearms by free Negroes, [98] northern states generally made no racial distinction with respect to the right to own firearms, [99] and federal law was silent on the subject.

---

[89]   *See* *U.S. CONST. art. I, § 2, cl. 3* (three-fifths of slave population counted for apportionment purposes); *U.S. CONST. art. I, § 9, cl. 1* (importation of slaves allowed until 1808); *U.S. CONST. art. IV, § 2, cl. 3* (escaped slaves must be "delivered up" to their masters).

[90]   *U.S. CONST. art I, § 2, cl. 3* (specifying congressional representation) is often cited for the proposition that blacks were not citizens because of the three-fifths clause. It should be noted that, under this clause, free Negroes were counted as whole persons for purposes of representation. The original wording of this provision specifically mentioned "white and other citizens," but that language was deleted by the committee on style as redundant. *See* 5 ELLIOT'S DEBATES, *supra* note 78, at 451.

[91]   *See infra* Part II; *see also* Robert J. Cottrol, *A Tale of Two Cultures: Or Making the Proper Connections Between Law, Social History and The Political Economy of Despair,* 25 SAN DIEGO L. REV. 989, 1004 & nn. 86-88 (1988).

[92]   JORDAN, *supra* note 56, at 125-26, 411-12.

[93]   Robert J. Cottrol, *Law, Politics and Race in Urban America: Towards a New Synthesis,* 17 RUTGERS L.J. 483, 503 & n.129 (1986).

[94]   Robert J. Cottrol, *The Thirteenth Amendment and the North's Overlooked Egalitarian Heritage,* 11 NAT'L BLACK L.J. 198, 202-03 (1989) (discussing racism in early 19th-century America).

[95]   *See* JORDAN *supra* note 56, at 125-26, 411-12 (in varying degrees, North Carolina, South Carolina, and Georgia); BERNARD C. NALTY, STRENGTH FOR THE FIGHT: A HISTORY OF BLACK AMERICANS IN THE MILITARY 20 (1986) (same).

[96]   *See* JORDAN, *supra* note 56, at 125-26 ("Although [the exclusion of Negroes from the militia] lay on the statute books of all four New England colonies, Negroes served in New England forces in every colonial war." Additionally, and in varying degrees, New York, New Jersey, Pennsylvania, and Delaware included Negroes.).

[97]   This was particularly true during the War of 1812. *See* ROBERT J. COTTROL, THE AFROYANKEES: PROVIDENCE'S BLACK COMMUNITY IN THE ANTERBELLUM ERA 63 (1982); EUGENE D. GENOVESE, ROLL, JORDON, ROLL: THE WORLD THE SLAVES MADE 155 (1976); NALTY, *supra* note 95, at 24-28.

[98]   *See infra* Part II.A; *see also* STAMPP, *supra* note 27, at 208-28.

[99]   Paul Finkelman, *Prelude to the Fourteenth Amendment: Black Legal Rights in the Antebellum North,* 17 RUTGERS L.J. 415, 476 (1986).

80 Geo. L.J. 309, *332

The racial restriction in the 1792 statute indicates the unrest the revolutionary generation felt toward arming blacks and perhaps the recognition that one of the functions of the militia would indeed be to put down slave revolts. Yet, the widespread use of blacks as soldiers in time of crisis and the absence of restrictions concerning the arming of blacks in the northern states may provide another clue concerning how to read the Second Amendment. The 1792 act specified militia enrollment for white men between the ages of eighteen and forty-five. [100] Yet, while it specifically included only this limited portion of the population, *the statute excluded no one from militia service.*

The authors of the statute had experience, in the Revolution, with a militia and Continental Army considerably broad in membership. Older and younger men had served with the Revolutionary forces. Blacks had served, though their service had been an object of considerable controversy. [101] Even women had served, though, given the attitudes of the day, this was far more controversial than black service. Given this experience and the fact that the constitutional debates over the militia had constantly assumed an enrollment of the male population between sixteen and sixty, it is likely that the framers of the 1792 statute envisioned a militia even broader than the one they specified. This suggests to us how broad the term "people" in the Second Amendment was meant to be.

The 1792 statute also suggests to us also how crucial race has been in our **[*333]** history. If the racial distinction made in that statute was somewhat anomalous in the late eighteenth century, it was the kind of distinction that would become more common in the nineteenth. The story of blacks and arms would continue in the nineteenth century as racial distinctions became sharper and the defense of slavery more militant.

*II*. ARMS AND THE ANTEBELLUM EXPERIENCE

If, as presaged by the Uniform Militia Act of 1792, [102] racial distinctions became sharper in the nineteenth century, that development was at odds with the rhetoric of the Revolution and with developments of the immediate postrevolutionary era. [103] Flush with the precepts of egalitarian democracy, America had entered a time of recognition and expansion of rights. Eleven of the thirteen original states, as well as Vermont, passed new constitutions in the period between 1776 and 1777. [104] Five of these states rewrote their constitutions by the time of the ratification of the Bill of Rights in 1791. [105] A twelfth original state, Massachusetts, passed a new constitution in 1780. [106] Many of the new constitutions recognized the status of citizens as "free and equal" or "free and independent." [107] In Massachusetts and Vermont these clauses were interpreted as outlawing the

---

[100]  *See supra* note 88.

[101]  NALTY, *supra* note 95, at 10-18.  *See generally* BENJAMIN QUARLES, THE NEGRO IN THE AMERICAN REVOLUTION (1961).

[102]  1 Stat. 271;  *see supra* note 88.

[103]  *See* Raymond T. Diamond & Robert J. Cottrol, *Codifying Caste: Louisiana's Racial Classification Scheme and the Fourteenth Amendment,* 29 LOY. L. REV. 255, 260-63 (1983).

[104]  *See* FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE UNITED STATES (Benjamin P. Poore ed., 2d ed., Washington, Government Printing Office 1878) [hereinafter FEDERAL AND STATE CONSTITUTIONS].  Massachusetts passed a new constitution in 1780.  1 *id.* at 956.  Rhode Island would not do so until 1842.  2 *id.* at 1603.

[105]  These states were: Georgia in 1789, *see* 1 *id.* at 384; New Hampshire in 1784, *see* 2 *id.* at 1280; Pennsylvania in 1790, *see* 2 *id.* at 1548; South Carolina in 1778 and 1780, *see* 2 *id.* at 1620, 1628; and Vermont in 1786, *see* 2 *id.* at 1866.

[106]  1 *id.* at 956.

[107]  *See* N.H. CONST. of 1784, pt. I, art. I, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1280; CONN. CONST. of 1776, pmbl., 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 257; MASS. CONST. of 1780, pt. I, art. I, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 957; PA. CONST. of 1776, declaration of rights, art. I, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1541; PA. CONST. of 1790, art. IX, § 1, 2 FEDERAL AND

80 Geo. L.J. 309, *333

institution of slavery. [108] Many of the new constitutions guaranteed the right to vote regardless of race to all men who otherwise qualified, [109] and guaranteed many of the rights that **[\*334]** would later be recognized in the Bill of Rights. [110] In no instance were any of these rights limited only to the white population; several states explicitly extended rights to the entire population irrespective of race. [111]

The right to vote, perhaps the most fundamental of rights, was limited in almost all instances to men who met property restrictions, but in most states was not limited according to race. [112] Ironically, only in the nineteenth-century would black voting rights be curtailed, as Jacksonian democracy expanded voting rights for whites. [113] In

---

STATE CONSTITUTIONS, *supra* note 104, at 1554; VT. CONST. of 1786, ch. 1, art. I, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1867; VT. CONST. of 1776, bill of rights, § 1, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1908.

[108] *See* Diamond, *supra* note 56, at 103 nn.59-61.

[109] *See, e.g.,* GA. CONST. of 1779, art. IV, § 1, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 386; MD. CONST. OF 1776, art. II, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 821; MASS. CONST. of 1776, pt. I, declaration of rights, art. IX, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 958; N.H. CONST. OF 1784, pt. I, bill of rights, art. XI, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1281; N.J. CONST. of 1776, art. IV, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1311; N.C. CONST. of 1776, constitution or frame of government, art. IX, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1411-12; PA. CONST. of 1776, declaration of rights, art. VII, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1541; VT. CONST. of 1777, ch. 1, declaration of rights, art. VIII, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1859.

Only Georgia, under its 1776 constitution, and South Carolina, in its 1790 constitution, provided explicit racial restrictions on the right to vote. *See* GA. CONST. of 1776, art. IX, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 379; S.C. CONST. of 1790, art. I § 4, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1628.

[110] *See, e.g.,* GA. CONST. of 1776, art. LXI, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 283 (freedom of the press); MASS. CONST. of 1780, pt. 1, declaration of rights, art. XVIII, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 959 (freedom of assembly); MD. CONST. of 1776, declaration of rights, art. XXVII, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 819 (prohibiting quartering troops in homes); N.H. CONST. of 1776, declaration of rights, art. XXIII, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 959 (limits on searches and seizures and on general warrants); PA. CONST. of 1776, declaration of rights, art. XII, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1542 (freedom of speech); S.C. CONST. of 1778, art. XLI, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1627 (due process of law); VA. CONST. of 1776, bill of rights, § 16, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1909 (freedom of religion); VT. CONST. of 1786, ch. 1, declaration of rights, art. XVIII, 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1869 (right to bear arms).

[111] *See* GA. CONST. of 1776, art. LVI, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 283; GA. CONST. of 1789, art. IV, § 5, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 386; MD. CONST. of 1776, art. XXXIII, 1 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 819-20 (freedom of religion for "all persons"); N.C. CONST. of 1776, art. VIII (rights in criminal proceedings to be informed of charges, to confront witnesses, and to remain silent for "every man," and freedom of religion for "all men"), 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1409; N.Y. CONST. of 1777, art. XIII (due process to be denied "no member of this state"), art. XXXVIII (freedom of religion "to all mankind"); PA.CONST. of 1776, art. II (freedom of religion for "all men"), art. VIII (due process for "every member of society"), 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1541; PA. CONST. of 1790, art. XI, § 3 (freedom of religion to be denied to "no person"), art. XI, § 7 (freedom of the press for "every person" and freedom of speech for "every citizen"), art. XI, § 10 (due process to be denied to "no person"), 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1554-55; S.C. CONST. of 1778, art. XXXVIII (freedom of religion), 2 FEDERAL AND STATE CONSTITUTIONS, *supra* note 104, at 1626-27; S.C. CONST. of 1790, art. VIII (freedom of religion "to all mankind"), 2 FEDERAL AND STATE CONSTITUTIONS, § supra note 104, at 1632.

[112] *See* COTTROL, *supra* note 97, at 42-43.

[113] *See* Cottrol, *supra* note 93, at 508-09.  This is not to say that voting limitations were the sole measure of the failure of Jacksonian democracy to include blacks. *Id.* at 508-13.

80 Geo. L.J. 309, *334

its constitution of 1821, New York eliminated a one hundred dollar property requirement for white males, and concomitantly increased the requirement to two hundred fifty dollars for **[*335]** blacks. [114] Other states would eliminate black voting rights altogether. [115] Other than Maine, no state admitted to the union in the nineteenth century's antebellum period allowed blacks to vote. [116]

This curtailment of black voting rights was part and parcel of a certain hostility toward free blacks, a hostility that ran throughout the union of states. In northern states, where slavery had been abandoned or was not a serious factor in social or economic relations, such hostility was the result of simple racism. [117] In southern states, where slavery was an integral part of the social and economic framework, this hostility was occasioned by the threat that free blacks posed to the system of Negro slavery. [118]

A.   THE SOUTHERN ANTEBELLUM EXPERIENCE: CONTROL OF ARMS AS A MEANS OF RACIAL OPPRESSION

The threat that free blacks posed to southern slavery was twofold. First, free blacks were a bad example to slaves. For a slave to see free blacks enjoy the trappings of white persons -- freedom of movement, expression, and association, relative freedom from fear for one's person and one's family, and freedom to own the fruits of one's labor -- was to offer hope and raise desire for that which the system could not produce. A slave with horizons limited only to a continued existence in slavery was a slave who did not threaten the system, [119] whereas a slave with visions of freedom threatened rebellion.

This threat of rebellion is intimately related to the second threat that free blacks posed to the system of Negro slavery, the threat that free blacks might instigate or participate in a rebellion by their slave brethren. To forestall this threat of rebellion, southern legislatures undertook to limit the freedom of **[*336]** movement and decision of free blacks. [120] States limited the number of free blacks who might congregate at one time; [121] they curtailed the ability of free blacks to choose their own employment, [122] and to trade and socialize with slaves. [123] Free blacks

---

[114] N.Y. CONST. of 1821, art. II, *superceding* N.Y. CONST. of 1777, art. VII; *see also* Dixon R. Fox, *The Negro Vote in Old New York, in* FREE BLACKS IN AMERICA, 1800-1860, at 95, 97-112 (John H. Bracey, Jr. et. al. eds., 1970).

[115] *See* COTTROL, *supra* note 97, at 42-43.

[116] LEON F. LITWACK, NORTH OF SLAVERY: THE NEGRO IN THE FREE STATES, 1790-1860, at 79 (1961).

[117] It is to be questioned whether racism is ever "simple." Winthrop Jordan has theorized that the English and their cultural descendants were culturally predisposed to racism. JORDAN, *supra* note 56, at 3-43. Carl Jung has suggested that for white Americans the Negro represents the part of the unconscious that requires repression. ALEXANDER THOMAS & SAMUEL SILLEN, RACISM AND PSYCHIATRY 13-14 (1972); *"America Facing its Most Tragic Moment" -- Dr. Carl Jung*, N.Y. TIMES, Sept. 29, 1912, § 5, at *3*. Whatever accounts for racism, it is clear that racism is capable of actuating the lawmaking process. *See generally* HIGGINBOTHAM, *supra* note 51.

[118] *See* STAMPP, *supra* note 27, at 215-17.

[119] Compare "Sambo," the idealized exposition of the slave psyche hypothesized by Stanley Elkins. Elkins viewed slaves as having internalized their circumstances to the point at which they became not only incapable of resisting the white masters but also actively cooperated in maintaining their own degradation. *See* STANLEY M. ELKINS, SLAVERY: A PROBLEM IN AMERICAN INSTITUTIONAL AND INTELLECTUAL LIFE 81-139 (3d ed., 1976).

[120] GENOVESE, *supra* note 97, at 51, 399; STAMPP, *supra* note 27, at 215-217; Eugene D. Genovese, *The Slave States of North America, in* NEITHER SLAVE NOR FREE: THE FREEDMEN OF AFRICAN DESCENT IN THE SLAVE SOCIETIES OF THE NEW WORLD 258, 261-262 (David W. Cohen & Jack P. Greene eds., 1972).

[121] JOHN H. FRANKLIN, FROM SLAVERY TO FREEDOM: A HISTORY OF NEGRO AMERICANS 139-40 (6th ed. 1988).

[122] *Id.* at 140.

80 Geo. L.J. 309, *336

were subject to question, to search, and to summary punishment by patrols established to keep the black population, slave and free, in order.   [124]  To forestall the possibility that free blacks would rebel either on their own or with slaves, the southern states limited not only the right of slaves, but also the right of free blacks, to bear arms. [125]

The idea was to restrict the availability of arms to blacks, both slave and free, to the extent consistent with local conceptions of safety.  At one extreme was Texas, which, between 1842 and 1850, prohibited slaves from using firearms altogether.   [126]  Also at this extreme was Mississippi, which forbade firearms to both free blacks and slaves after 1852.   [127]  At the other extreme was Kentucky, which merely provided that, should slaves or free blacks "wilfully and maliciously" shoot at a white person, or otherwise wound a free white person while attempting to kill another person, the slave or free black would suffer the death penalty.   [128]

More often than not, slave state statutes restricting black access to firearms were aimed primarily at free blacks, as opposed to slaves, perhaps because the vigilant master was presumed capable of denying arms to all but the most trustworthy slaves, and would give proper supervision to the latter.   [129]  Thus, **[*337]** Louisiana provided that a slave was denied the use of firearms and all other offensive weapons,   [130]  unless the slave carried written permission to hunt within the boundaries of the owner's plantation.   [131]  South Carolina prohibited slaves outside the company of whites or without written permission from their master from using or carrying firearms unless they were hunting or guarding the master's plantation.   [132]  Georgia, Maryland, and Virginia did not statutorily address the question of slaves' access to firearms, perhaps because controls inherent to the system made such laws unnecessary in these states' eyes.

---

[123]  *Id.* at 140-41.

[124]  STAMPP, *supra* note 27, at 214-16.

[125]   *See infra* text accompanying notes 126-46.

[126]  An Act Concerning Slaves, § 6, 1840 Laws of Tex. 171, 172.  Chapter 58 of the Texas Acts of 1850, provided penalties for violators of the 1840 statute.  Act of Dec. 3, 1850, ch. 58, § 1, 1850 Laws of Tex. 42-44 (amending § 6 of An Act Concerning Slaves).  Masters, overseers, or employers were to be fined between $ 25 and $ 100, and the slave was to receive not less than 39 nor more than 50 lashes.  But also under the 1850 Act, slaves were allowed to carry firearms on the premises of the master, overseer, or employer, where they presumably would receive proper supervision.

[127]  Act of Mar. 15, 1852, ch. 206, 1852 Laws of Miss. 328 (prohibiting magistrates from issuing licenses for blacks to carry and use firearms).  This act repealed Chapter 73, sections 10 and 12 of the Mississippi Acts of 1822, allowing slaves and free blacks respectively to obtain a license to carry firearms.  *See* Act of June 18, 1822, ch. 73, §§ 10, 12, 1822 Laws of Miss. 179, 181-82.

[128]  Chapter 448, § 1, of the Kentucky Acts of 1818 was limited solely to slave offenders.  Act of Feb. 10, 1819, ch. 448, § 1, 1819 Acts of Ky. 787.  The Kentucky Acts of 1850 extended these provisions to free blacks as well.  Act of Mar. 24, 1851, ch. 617, art. VII, § 7, 1850 Acts of Ky. 291, 300-01.

[129]  This presumption was not dispositive of all regulation on this subject.  Sale or other delivery of firearms to slaves was forbidden by several states, among them Florida, Georgia, Louisiana, and North Carolina.  Act of Feb 25, 1840, no. 20, § 1, 1840 Acts of Fla. 22-23; Act of Dec. 19, 1860, no. 64, § 1, 1860 Acts of Ga. 561; Act of Apr. 8, 1811, ch. 14, 1811 Laws of La. 50, 53-54; Act of Jan. 1, 1845, ch. 87, §§ 1, 2, 1845 Acts of N.C. 124.  Moreover, slave states often provided for patrols manned by local men who would be authorized to search out and confiscate firearms in the possession of free blacks as well as slaves.  *See infra* text accompanying notes 133-46.

[130]  Black Code, ch. 33, § 19, Laws of La. 150, 160 (1806).

[131]   *Id.* § 20.  Moreover, in 1811, Louisiana forbade peddlers from selling arms to slaves, upon a fine of $ 500 or one year in prison.  Act of Apr. 8, 1811, ch. 14, 1811 Laws of La. 50, 53-54 (supplementing act relative to peddlers and hawkers).

[132]  Act of Dec. 18, 1819, 1819 Acts of S.C. 28, 31 (providing more effective performance of patrol duty).

80 Geo. L.J. 309, *337

By contrast, free blacks, not under the close scrutiny of whites, were generally subject to tight regulation with respect to firearms.  The State of Florida, which had in 1824 provided for a weekly renewable license for slaves to use firearms to hunt and for "any other necessary and lawful purpose," [133] turned its attention to the question of free blacks in 1825.  Section 8 of "An Act to Govern Patrols" [134] provided that white citizen patrols "shall enter into all negro houses and suspected places, and search for arms and other offensive or improper weapons, and may lawfully seize and take away all such arms, weapons, and ammunition . . . ." By contrast, the following section of that same statute expanded the conditions under which a slave might carry a firearm, a slave might do so under this statute either by means of the weekly renewable license or if "in the presence of some white person." [135]

Florida went back and forth on the question of licenses for free blacks [136] but, in February 1831 repealed all provision for firearm licenses for free [*338] blacks. [137] This development predated by six months the Nat Turner slave revolt in Virginia, which was responsible for the deaths of at least fifty-seven white people [138] and which caused the legislatures of the Southern states to reinvigorate their repression of free blacks. [139] Among the measures that slave states took was to further restrict the right to carry and use firearms.  In its December 1831 legislative session, Delaware for the first time required free blacks desiring to carry firearms to obtain a license from a justice of the peace. [140] In their December 1831 legislative sessions, both Maryland [141] and Virginia [142] entirely prohibited free blacks from carrying arms; Georgia followed suit in 1833, declaring that "it shall not be lawful for any free person of colour in this state, to own, use, or carry fire arms of any description whatever." [143]

Perhaps as a response to the Nat Turner rebellion, Florida in 1833 enacted another statute authorizing white citizen patrols to seize arms found in the homes of slaves and free blacks, and provided that blacks without a proper explanation for the presence of the firearms be summarily punished, without benefit of a judicial tribunal. [144] In

---

[133] An Act Concerning Slaves, § 11, Acts of Fla. 289, 291 (1824).  In 1825, Florida had provided a penalty for slaves using firelight to hunt at night, but this seems to have been a police measure intended to preserve wooded land, for whites were also penalized for this offense, albeit a lesser penalty.  Act of Dec. 10, 1825, § 5, 1825 Laws of Fla. 78-80.  Penalties for "firehunting" were reenacted in 1827, Act of Jan. 1, 1828, 1828 Laws of Fla. 24-25, and the penalties for a slave firehunting were reenacted in 1828, Act of Nov. 21, 1828, § 46, 1828 Laws of Fla. 174, 185.

[134] 1825 Acts of Fla. 52, 55.

[135] *Id.* § 9.

[136] In 1828, Florida twice enacted provisions providing for free blacks to carry and use firearms upon obtaining a license from a justice of the peace.  Act of Nov. 17, 1828, § 9, 1828 Fla. Laws 174, 177; Act of Jan. 12, 1828, § 9, 1827 Fla. Laws 97, 100.

[137] Act of Jan 31, 1831, 1831 Fla. Laws 30.

[138] APTHEKER, *supra* note 58, at 298.  For a full account of the revolt, the bloodiest in United States history, see *id.* at 293-324. For a compilation of documentary sources on the revolt, see also HENRY I. TRAGLE, THE SOUTHAMPTON SLAVE REVOLT OF EIGHTEEN THIRTY-ONE: A COMPILATION OF SOURCE MATERIAL (1971).  An account of the revolt novelized from Turner's confession can be found in WILLIAM STYRON, THE CONFESSIONS IF NAT TURNER (1967).  Styron's novel has been criticized as failing to capture the power of religion to the 19th century black, and thus failing to tell the truth of the revolt. *See, e.g.,* WILLIAM F. CHEEK, BLACK RESISTANCE BEFORE THE CIVIL WAR 116-17 (1970).

[139] *See* HERBERT APTHEKER, NAT TURNER'S SLAVE REBELLION 74-94 (1966).

[140] *Id.* at 74-75.

[141] *Id.* at 75.

[142] *Id.* at 81.

[143] Act of Dec 23, 1833, § 7, 1833 Ga. Laws 226, 228.

[144] Act of Feb. 17, 1833, ch. 671, §§ 15, 17, 1833 Fla. Laws 26, 29.  The black person offending the statute was to be "severely punished," incongruously enough "by moderate whipping," not to exceed thirty-nine strokes on the bare back.  *Id.* § 17.

80 Geo. L.J. 309, *338

1846 and 1861, the Florida legislature provided once again that white citizen patrols might search the homes of blacks, both free and slave, and confiscate arms held therein. [145] Yet, searching out arms was not the only role of the white citizen patrols: these patrols were intended to enforce pass systems for both slaves and free blacks, to be sure that blacks did not possess liquor and other contraband items, and generally to terrorize blacks into accepting their subordination. [146] The patrols would meet no resistance from those who were simply unable to offer any.

 [*339]  B.   THE NORTHERN ANTEBELLUM EXPERIENCE: USE OF FIREARMS TO COMBAT RACIALLY MOTIVATED DEPRIVATIONS OF LIBERTY

Even as northern racism defined itself in part by the curtailment of black voting rights, [147] it cumulatively amounted to what some have called a widespread "Negrophobia." [148] With notable exceptions, public schooling, if available to blacks at all, was segregated. [149] Statutory and constitutional limitations on the freedom of blacks to emigrate into northern states were a further measure of northern racism. [150] While the level of enforcement and  [*340]  the

---

[145]  Act of Jan. 6, 1847, ch. 87, § 11, 1846 Fla. Laws 42, 44; Act of Dec. 17, 1861, ch. 1291, § 11, 1861 Fla. Laws 38, 40.

[146]  STAMPP, *supra* note 27, at 214-15.

[147]  *See supra* text accompanying notes 112-16.

[148]  *See, e.g.,* RAOUL BERGER, GOVERNMENT BY JUDICIARY: THE TRANSFORMATION OF THE FOURTEENTH AMENDMENT 10 (1977).

[149]  After *Roberts v. Boston, 59 Mass. (5 Cush.) 198 (1849),* upheld the provision of segregated public education in the City of Boston, the Massachusetts legislature outlawed segregated education.  Act of Mar. 24, 1855, ch. 256, 1855 Mass. Acts 256; *see* Finkelman, *supra* note 99, at 465-467.  In Connecticut, most schools were integrated before 1830; only in response to a request from the Hartford black community was a separate system established in that year.  *Id.* at 468.  The Iowa constitution provided for integration in public schools.  *See* *Clark v. Board of Directors, 24 Iowa 266 (1868)* (construing IOWA CONST. of 1857, art. IX, § 12).

In Ohio, blacks were excluded entirely from public schools until 1834 when the state Supreme Court ruled that children of mixed black ancestry who were more than half white might attend; not until 1848 did the legislature provide for public education of any sort for other black children.  Williams v. Directors of Sch. Dist., Ohio 578 (1834); *see also* *Lane v. Baker, 12 Ohio 237 (1843).* In 1848, the state legislature allowed blacks to be serviced by the public schools unless whites in the community were opposed; in the alternative, the legislature provided for segregated education.  Act of Feb. 24, 1848, 1848 Ohio Laws 81.  The following year, the legislature provided that the choice of segregated or integrated public education lie at the option of local school districts.  Act of Feb. 10, 1849, 1849 Ohio Laws 17.  Cincinnati refused to comply with the mandate to educate blacks until forced to do so by a combination of statutory and judicial persuasion.  Act of Mar. 14, 1853, § 31, 1853 Ohio Laws 429; Act of Apr. 18, 1854, 1854 Ohio Laws 48; Act of Apr. 8, 1856, 1856 Ohio Laws 117; State *ex rel. Directors of the E. & W. Sch. Dist. v. City of Cincinnati, 19 Ohio 178 (1850);* *see* Finkelman, *supra* note 99, at 468-470.  *See generally* UNITED STATES OFFICE OF EDUCATION, HISTORY OF SCHOOLS FOR THE COLORED POPULATION (1969).  In Philadelphia, public education was provided for whites in 1818, and separate education was provided for blacks in 1822.  Finkelman, *supra* note 99, at 468.  In Providence, public education was segregated.  COTTROL, *supra* note 111, at 90.  Rural schools in Rhode Island, however, were integrated.  *Id.* In New York, some school districts were segregated, among them that of New York City.  Finkelman, *supra* note 99, at 463, 467-68.

[150]  From 1807 to 1849, Ohio required blacks entering the state to post a bond.  Act of Jan. 25, 1807, ch. VIII, 1807 Ohio Gen. Assem. Laws 53, *repealed by* Act of Feb. 10, 1849, 1849 Ohio Laws 17.  Michigan Territory passed a similar law in 1827, though there was only one recorded attempt to enforce it.  Act of Apr 13, 1827, 1827 Mich. Rev. Laws 1-10 (1st & 2d Councils).  DAVID M. KATZMAN, BEFORE THE GHETTO: BLACK DETROIT IN THE NINETEENTH CENTURY 7 n.6 (1973).  Indiana required a bond from 1831 until 1851, when a new constitution forbade black immigration entirely.  Act of Feb. 10, 1831, 1831 Ind. Rev. Laws 375, *superseded by* IND. CONST. of 1851, art. XIII, § 1 (amended 1881).  Illinois went the same route by coupling the repeal of its 1829 bond provisions with a prohibition on black immigration in its 1848 constitution.  ILL. CONST. of 1848, art. XIV; Act of Jan. 17, 1832-33, Ill. Rev. Laws 463, *amended by* Act of Feb 1, 1831, 1832-33 Ill. Rev. Laws 462, *repealed by* Act of Feb. 12, 1853, 1853 Ill. Laws 57.  Oregon's 1859 constitution forbade blacks to enter the state, OR. CONST. of 1859, art. XVIII

80 Geo. L.J. 309, *340

ultimate effect of these constitutional and statutory provisions may not have been great, [151] the very existence of these laws speaks to the level of hostility northern whites had for blacks during this period. It is against this background -- if not poisonous, racist and hostile -- that the black antebellum experience with the right to bear arms must be measured.

Perhaps nothing makes this point better than the race riots and mob violence against blacks that occurred in many northern cities in the antebellum period. These episodes also illustrate the uses to which firearms might be put in pursuit of self-defense and individual liberty.

A good deal of racial tension was generated by economic competition between whites and blacks during this period, and this tension accounts in part for violent attacks against blacks. [152] Moreover, whites were able to focus their attacks because blacks were segregated into distinct neighborhoods in northern states, rendering it easy for white mobs to find the objects of their hostility. [153]

Quite often, racial violence made for bloody, destructive confrontations. In July 1834, mobs in New York attacked churches, homes, and businesses of white abolitionists and blacks. These mobs were estimated at upwards of twenty thousand people and required the intervention of the militia to suppress. [154] In Boston in August of 1843, after a handful of white sailors verbally and physically assaulted four blacks who defended themselves, a mob of several hundred whites attacked and severely beat every black they could find, dispersed only by the combined efforts of police and fire personnel. [155]

The Providence Snowtown Riot of 1831 was precipitated by a fight between whites and blacks at "some houses of ill fame" [156] located in the black ghetto of Snowtown. After a mob of one hundred or so whites descended on Snowtown, and after warning shots had been fired, a black man fired into the crowd, killing a white. The mob then descended on Snowtown in earnest, destroying no fewer than seventeen black occupied dwellings across a period of four days. The mobs did not disperse until the militia fired into the crowd, killing four men and wounding fourteen others. [157]

**[*341]** Similarly, the militia in Philadelphia put down an October 1849 race riot that resulted in three deaths, injuries, and the destruction of property. [158] By contrast, in the Providence Hardscrabble Riot of October 1824,

---

(repealed 1926), and Iowa provided for a fine of two dollars a day for any black remaining in the state for more than three days. Act of Feb. 5, 1851, 1851 Iowa Laws 172.

[151] From 1833 to 1838, Connecticut prohibited the establishment of schools for nonresident blacks. Act of May 24, 1833, ch. IX, 1833 Conn. Pub. Acts 425, *repealed by* Act of May 31, 1838, ch. XXXIV, 1838 Conn. Pub. Acts 30; *see also* Crandall v. State, 10 Conn. 339 (1834) (attempted prosecution under this statute failed due to an insufficient information). *See* Finkelman, *supra* note 99, at 430-43 (discussing the lack of enforcement of statutes regulating black immigration).

[152] *See* LITWACK, *supra* note 116, at 159, 165 (in fields where blacks were allowed to compete with whites, who were often the new Irish immigrants, violence often erupted).

[153] *Id.* at 153; *see also* LEONARD P. CURRY, THE FREE BLACK IN URBAN AMERICA 1800-1850: THE SHADOW OF THE DREAM 96-111 (1981).

[154] CURRY, *supra* note 153, at 101.

[155] *Id.* at 100.

[156] *Id.* at 102.

[157] *Id.* at 102-03.

[158] *Id.* at 104.

80 Geo. L.J. 309, *341

militia were not called out and the police did nothing to stop a crowd of fifty or so whites from destroying every house in the black Hardscrabble area and looting household goods. [159]

Awareness of racial hostility generally, and of incidents like these, made blacks desirous of forming militia units. The firing of the weapon in Providence in 1831 that sparked the mob to violence illustrated that blacks were willing to take up arms to protect themselves, but also illustrated the potentially counterproductive nature of individual action. The actions of the white militia in Providence and Philadelphia, as well as those of the police and fire units in Boston, proved the strength of collective armed action against mob violence. Moreover, the failure of police to take action in Providence in 1824 illustrated the vulnerability of the black community to mob violence, absent protection.

Though the Uniform Militia Act of 1792 had not specifically barred blacks from participation in the state organized militia, [160] the northern states had treated the act as such, and so the state organized militia was not an option. [161] Blacks could nonetheless form private militia groups that might serve to protect against racial violence, and did so. Free blacks in Providence formed the African Greys in 1821. [162] Oscar Handlin tells of an attempt by black Bostonians in the 1850s to form a private militia company. [163] Black members of the Pittsburgh community had no private militia but nonetheless took action against a mob expected to riot in April 1839. Instead of taking action on their own, they joined an interracial peacekeeping force proposed by the city's mayor, and were able to put a stop to the riot. [164]

It is not clear whether private black militia groups ever marched on a white mob. But that they may never have been called on to do so may be a measure of their success. The story of the July 1835 Philadelphia riot is illustrative. Precipitated when a young black man assaulted a white one, the two day riot ended without resort to military intervention when a rumor reached the streets that "fifty to sixty armed and determined black men had [*342] barricaded themselves in a building beyond the police lines." [165]

Undoubtedly, the most striking examples of the salutary use of firearms by blacks in defense of their liberty, and concurrently the disastrous results from the denial of the right to carry firearms in self-defense, lie in the same incident. In Cincinnati, in September 1841, racial hostility erupted in two nights of assaults by white mobs of up to 1500 people. On the first evening, after destroying property owned by blacks in the business district, mobs descended upon the black residential section, there to be repulsed by blacks who fired into the crowd, forcing it out of the area. The crowd returned, however, bringing with it a six-pound cannon, and the battle ensued. Two whites and two blacks were killed, and more than a dozen of both races were wounded. Eventually, the militia took control, but on the next day the blacks were disarmed at the insistence of whites, and all adult black males were taken into protective custody. On the second evening, white rioters again assaulted the black residential district, resulting in more personal injury and property damage. [166]

---

[159] Id. at 102.

[160] See supra Part I.c.2.

[161] JACK D. FONER, BLACKS AND THE MILITARY IN AMERICAN HISTORY: A NEW PERSPECTIVE 20-21 (1974).

[162] See COTTROL, supra note 97, at 63.

[163] OSCAR HANDLIN, BOSTON'S IMMIGRANTS: A STUDY IN ACCULTURATION 175 & n.110 (1959).

[164] CURRY, supra note 153, at 100; VICTOR ULLMAN, MARTIN R. DELANY: THE BEGINNINGS OF BLACK NATIONALISM 29-31 (1971).

[165] CURRY, supra note 153, at 105-06.

[166] Id. at 107-08; WENDELL P. DABNEY, CINCINNATI'S COLORED CITIZENS: HISTORICAL, SOCIOLOGICAL AND BIOGRAPHICAL 48-55 (Dabney Publishing Co. 1970) (1926); Cincinnati Riot, NILES' NAT'L REG. (Baltimore), Sept. 11, 1841, at 32.

80 Geo. L.J. 309, *342

This history shows that if racism in the antebellum period was not limited to the southern states, neither was racial violence. Competition and hostility toward blacks accounted for this violence in northern states, whereas the need to maintain slavery and maintain security for the white population accounted for racial violence in southern states. Another difference between the two regions is that in the southern states blacks did not have the means to protect themselves, while in northern states, blacks by and large had access to firearms and were willing to use them.

The 1841 Cincinnati riot represents the tragic, misguided irony of the city's authorities who, concerned with the safety of the black population, chose to disarm and imprison them -- chose, in effect, to leave the black population of Cincinnati as southern authorities left the black population in slave states, naked to whatever indignities private parties might heap upon them, and dependent on a government either unable or unwilling to protect their rights. As a symbol for the experience of northern blacks protecting themselves against deprivations of liberty, the 1841 riot holds a vital lesson for those who would shape the content and meaning of the Fourteenth Amendment.

*III*. ARMS AND THE POSTBELLUM SOUHERN ORDER

The end of the Civil War did more than simply bring about the end of  **[*343]**  slavery; it brought about a sharpened conflict between two contrasting constitutional visions. One vision, largely held by northern Republicans, saw the former slaves as citizens   [167] entitled to those rights long deemed as natural rights in Anglo-American society. Their's was a vision of national citizenship and national rights, rights that the federal government had the responsibility to secure for the freedmen and, indeed, for all citizens. This vision, developed during the antislavery struggle and heightened by the Civil War, caused Republicans of the Civil War and postwar generation to view the question of federalism and individual rights in a way that was significantly different from that of the original framers of the Constitution and Bill of Rights. If many who debated the original Constitution feared that the newly created national government could violate long established rights, those who changed the Constitution in the aftermath of war and slavery had firsthand experience with states violating fundamental rights. The history of the right to bear arms is, thus, inextricably linked with the efforts to reconstruct the nation and bring about a new racial order.

If the northern Republican vision was to bring the former slaves into the ranks of citizens, the concern of the defeated white South was to preserve as much of the antebellum social order as could survive northern victory and national law. The Emancipation Proclamation and the Thirteenth Amendment   [168] abolished slavery; chattel slavery as it existed before the war could not survive these developments. Still, in the immediate aftermath of the war, the South was not prepared to accord the general liberties to the newly emancipated black population that northern states had allowed their free black populations.   [169] Instead, while recognizing emancipation, southern

---

[167]  Even during the Civil War, the Lincoln administration and Congress acted on the legal assumption that free blacks were citizens. Despite Chief Justice Taney's opinion in *Dred Scott* that neither free blacks nor slaves could be citizens, ***Dred Scott v. Sanford, 60 U.S. (15 How.) 393, 417 (1856),*** Lincoln's Attorney General Edward Bates issued an opinion in 1862 declaring that free blacks were citizens and entitled to be masters of an American vessel. *See*  10 Op. Atty. Gen. 382, 413 (1862). That same year, Congress amended the 1792 militia statute, striking out the restriction of militia membership to white men. *See* Act of July 17, 1862, ch. 36, § 12, 12 Stat. 597, 599. While it could be argued that these measures were in part motivated by military needs, it should be noted that the United States and various states had previously enlisted black troops during time of crisis despite the restrictions in the 1792 Act. *See supra* Part I.c.2. Thus, these measures reflected long standing Republican and antislavery beliefs concerning the citizenship of free Negroes. *See generally* Cottrol, *supra* note 91. For a good discussion of black citizenship rights in the antebellum North, see generally Finkelman, *supra* note 99.

[168]  Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation.

U.S. CONST. amend. XIII.

[169]  *See generally* Finkelman, *supra* note 99.

80 Geo. L.J. 309, *343

states imposed [*344] on the freedmen the legal disabilities of the antebellum free Negro population.  As one North Carolina statute indicated:

All persons of color who are now inhabitants of this state shall be entitled to the same privileges, and are subject to the same burdens and disabilities, as by the laws of the state were conferred on, or were attached to, free persons of color, prior to the ordinance of emancipation, except as the same may be changed by law. [170]

In 1865 and 1866, southern states passed a series of statutes known as the black codes.  These statutes, which one historian described as "a twilight zone between slavery and freedom," [171] were an expression of the South's determination to maintain control over the former slaves.  Designed in part to ensure that traditional southern labor arrangements would be preserved, these codes were attempts "'to put the state much in the place of the former master.'" [172] The codes often required blacks to sign labor contracts that bound black agricultural workers to their employers for a year. [173] Blacks were forbidden from serving on juries, and could not testify or act as parties against whites. [174] Vagrancy laws were used to force blacks into labor contracts and to limit freedom of movement. [175]

As further indication that the former slaves had not yet joined the ranks of free citizens, southern states passed legislation prohibiting blacks from carrying firearms without licenses, a requirement to which whites were not subjected.  The Louisiana [176] and Mississippi [177] statutes were typical of the [*345] restrictions found in the codes.  Alabama's [178] was even harsher.

---

[170]  North Carolina Black Code, ch. 40, 1866 N.C. Sess. Laws 99, *reprinted in* 1 DOCUMENTARY HISTORY OF RECONSTRUCTION: POLITICAL, MILITARY, SOCIAL, RELIGIOUS, EDUCATIONAL AND INDUSTRIAL, 1865 TO THE PRESENT TIME 291 (Walter L. Fleming, ed., 1960) [hereinafter DOCUMENTARY HISTORY OF RECONSTRUCTION].

[171]  KENNETH STAMPP, THE ERA OF RECONSTRUCTION, 1865-1877, at 80 (1965).

[172]  FONER, *supra* note 29, at 198 (1988) (quoting letter from William H. Trescot to James L. Orr, Dec. 13, 1865, South Carolina's Governor's Papers).  Eugene Genovese has quoted an antebellum observer who described the free Negro as "a sort of inmate on parole." GENOVESE, *supra* note 97, at 399.

[173]  FONER, *supra* note 29, at 200.

[174]  STAMPP, *supra* note 171, at 80.

[175]  *Id.*

[176]  No Negro who is not in the military service shall be allowed to carry fire-arms, or any kind of weapons, within the parish, without the special permission of his employers, approved and indorsed by the nearest and most convenient chief of patrol.  Any one violating the provisions of this section shall forfeit his weapons and pay a fine of five dollars, or in default of the payment of said fine, shall be forced to work five days on the public road, or suffer corporal punishment as hereinafter provided.

Louisiana Statute of 1865, *reprinted in* DOCUMENTARY HISTORY OF RECONSTRUCTION, *supra* note 170, at 280.

[177]  [N]o freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof in the county court shall be punished by fine, not exceeding ten dollars, and pay the cost of such proceedings, and all such arms or ammunition shall be forfeited to the informer; and it shall be the duty of every civil and military officer to arrest any freedman, free negro, or mulatto found with any such arms or ammunition, and cause him or her to be committed to trial in default of bail.

Mississippi Statute of 1865, *reprinted in* DOCUMENTARY HISTORY OF RECONSTRUCTION, *supra* note 170, at 290.

[178]  1.  That it shall not be lawful for any freedman, mulatto, or free person of color in this State, to own fire-arms, or carry about his person a pistol or other deadly weapon.

80 Geo. L.J. 309, *345

The restrictions in the black codes caused strong concerns among northern Republicans. The charge that the South was trying to reinstitute slavery was frequently made, both in and out of Congress. [179] The news that the freedmen were being deprived of the right to bear arms was of particular concern to the champions of Negro citizenship. For them, the right of the black population to possess weapons was not merely of symbolic and theoretical importance; it was vital both as a means of maintaining the recently reunited Union and a means of preventing virtual reenslavement of those formerly held in bondage. Faced with a hostile and recalcitrant white South determined to preserve the antebellum social order by legal and extra-legal means, [180] northern Republicans were particularly alarmed at provisions of the black codes that effectively preserved the right to keep and bear arms for former Confederates while disarming blacks, the one group in the South with clear unionist sympathies. [181] This fed the determination of northern Republicans **[*346]** to provide national enforcement of the Bill of Rights. [182]

---

2. That after the 20th day of January, 1866, any person thus offending may be arrested upon the warrant of any acting justice of the peace, and upon conviction fined any sum not exceeding $ 100 or imprisoned in the county jail, or put to labor on the public works of any county, incorporated town, city, or village, for any term not exceeding three months.

3. That if any gun, pistol or other deadly weapon be found in the possession of any freedman, mulatto or free person of color, the same may by any justice of the peace, sheriff, or constable be taken from such freedman, mulatto, or free person of color; and if such person is proved to be the owner thereof, the same shall, upon an order of any justice of the peace, be sold, and the proceeds thereof paid over to such freedman, mulatto, or person of color owning the same.

4. That it shall not be lawful for any person to sell, give, or lend fire-arms or ammunition of any description whatever, to any freedman, free negro or mulatto; and any person so violating the provisions of this act shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined in the sum of not less than fifty nor more than one hundred dollars, at the discretion of the jury trying the case.

See THE RECONSTRUCTION AMENDMENTS' DEBATES 209 (Alfred Avins ed., 1967).

[179] See FONER, *supra* note 29, at 225-227; STAMPP, *supra* note 171, at 80-81.

[180] The Ku Klux Klan was formed in 1866 and immediately launched its campaign of terror against blacks and southern white unionists. *See* FONER, *supra* note 29, at 342; *infra* text at notes 217-223.

[181] During the debates over the Civil Rights Act of 1866, Republican Representative Sidney Clarke of Kansas expressed the fears of many northern Republicans who saw the clear military implications of allowing the newly formed white militias in Southern states to disarm blacks:

Who, sir, were those men? Not the present militia; but the brave black soldiers of the Union, disarmed and robbed by this wicked and despotic order. Nearly every white man in [Mississippi] that could bear arms was in the rebel ranks. Nearly all of their ablebodied colored men who could reach our lines enlisted under the old flag. Many of these brave defenders of the nation paid for their arms with which they went to battle. And I regret, sir, that justice compels me to say, to the disgrace of the Federal Government, that the "reconstructed" state authorities of Mississippi were allowed to rob and disarm our veteran soldiers and arm the rebels fresh from the field of treasonable strife. Sir, the disarmed loyalists of Alabama, Mississippi, and Louisiana are powerless today, and oppressed by the pardoned and encouraged rebels of those States.

THE RECONSTRUCTION AMENDMENTS' DEBATES, *supra* note 178, at 209.

[182] Representative Roswell Hart, Republican from New York, captured those sentiments during the debates over the Civil Rights Act of 1866:

The Constitution clearly describes that to be a republican form of government for which it was expressly framed. A government which shall "establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare, and secure the blessings of liberty"; a government whose "citizens shall be entitled to all privileges and immunities of other citizens"; where "no law shall be made prohibiting the free exercise of religion"; where "the right of the people to keep and bear arms shall not be infringed"; where "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated," and where "no person shall be deprived of life, liberty, or property without due process of law."

80 Geo. L.J. 309, *346

The efforts to disarm the freedmen were in the background when the 39th Congress debated the Fourteenth Amendment, and played an important part in convincing the 39th Congress that traditional notions concerning federalism and individual rights needed to change.  While a full exploration of the incorporation controversy [183] is beyond the scope of this article, it should be noted that Jonathan Bingham, author of the Fourteenth Amendment's Privileges or Immunities Clause, [184] clearly stated that it applied the Bill of Rights to the states. [185] Others shared that same understanding. [186]

Although the history of the black codes persuaded the 39th Congress that Congress and the federal courts must be given the authority to protect citizens against state deprivations of the Bill of Rights, the Supreme Court in its earliest decisions on the Fourteenth Amendment moved to maintain much of the structure of prewar federalism.  A good deal of the Court's decision-making  [*347]  that weakened the effectiveness of the Second Amendment was part of the Court's overall process of eviscerating the Fourteenth Amendment soon after its enactment.

That process began with the *Slaughterhouse Cases,* [187] which dealt a severe blow to the Fourteenth Amendment's Privileges or Immunities Clause, a blow from which it has yet to recover.  It was also within its early examination of the Fourteenth Amendment that the Court first heard a claim directly based on the Second Amendment.  Ironically, the party first bringing an allegation before the Court concerning a Second Amendment violation was the federal government.  In *United States v. Cruikshank,* [188] federal officials brought charges against William Cruikshank and others under the Enforcement Act of 1870. [189] Cruikshank had been charged with violating the rights of two black men to peaceably assemble and to bear arms.  The Supreme Court held that the federal government had no power to protect citizens against private action that deprived them of their constitutional rights.  The Court held that the First and Second Amendments were limitations on Congress, not on private individuals and that, for protection against private criminal action, the individual was required to look to state governments. [190]

---

Have these rebellious States such a form of government?  If they have not, it is the duty of the United States to guaranty that they have it speedily.

THE RECONSTRUCTION AMENDMENTS' DEBATES, *supra* note 178, at 193.

[183]  For a good general discussion of the incorporation question, see MICHAEL K. CURTIS, NO STATE SHALL ABRIDGE: THE FOURTEENTH AMENDMENT AND THE BILL OF RIGHTS (1986).  For a good discussion of the 39th Congress's views concerning the Second Amendment and its incorporation via the Fourteenth, see HALBROOK, *supra* note 6, at 107-23.

[184] No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . ." U.S. CONST. amend. XIV, § 1.

[185]  THE RECONSTRUCTION AMENDMENTS' DEBATES, *supra* note 178, at 156-60, 217-18.

[186]  *Id.* at 219 (remarks by Republican Sen. Jacob Howard of Michigan on privileges and immunities of citizens).

[187]  *Butchers Benevolent Ass'n v. Crescent City Live-Stock Landing & Slaughter-House Co., 83 U.S. (16 Wall.) 36 (1872).*

[188]  *92 U.S. 542 (1876).*

[189]  *16 Stat. 140 (1870)* (codified as amended at *18 U.S.C. §§ 241*-42 (1988)).  The relevant passage reads:

That if two or more persons shall band or conspire together, or go in disguise upon the public highway, or upon the premises of another, with intent to violate any provision of this act, or to injure, oppress, threaten, or intimidate any citizen with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the Constitution or laws of the United States or because of his having exercised the same, such persons shall be held guilty of a felony . . . .

*Id. at 141*

[190]  *92 U.S. at 548-59.*

80 Geo. L.J. 309, *347

The *Cruikshank* decision, which dealt a serious blow to Congress' ability to enforce the Fourteenth Amendment, was part of a larger campaign of the Court to ignore the original purpose of the Fourteenth Amendment -- to bring about a revolution in federalism, as well as race relations.   [191] While the Court in the late 1870s and 1880s was reasonably willing to strike down instances of state sponsored racial discrimination,   [192] it also showed a strong concern for maintaining state prerogative and a disinclination to carry out   **[*348]**   the intent of the framers of the Fourteenth Amendment to make states respect national rights.

This trend was demonstrated in *Presser v. Illinois,*   [193] the *second* case in which the Court examined the Second Amendment.   *Presser* involved an Illinois statute which prohibited individuals who were not members of the militia from parading with arms.   [194] Although Justice William Woods, author of the majority opinion, noted that the Illinois statute did not infringe upon the right to keep and bear arms,   [195] he nonetheless went on to declare that the Second Amendment was a limitation on the federal and not the state governments.   Curiously enough, Woods's opinion also contended that, despite the nonapplicability of the Second Amendment to state action, states were forbidden from disarming their populations because such action would interfere with the federal government's ability to maintain the sedentary militia.   [196] With its view that the statute restricting armed parading did not interfere with the right to keep and bear arms, and its view that Congress's militia power prevented the states from disarming its citizens, the *Presser* Court had gone out of its way in dicta to reaffirm the old federalism and to reject the framers' view of the Fourteenth Amendment that the Bill of Rights applied to the states.

The rest of the story is all too well known.   The Court's denial of an expanded roll for the federal government in enforcing civil rights played a crucial role in redeeming white rule.   The doctrine in *Cruikshank,* that blacks would have to look to state government for protection against criminal conspiracies, gave the green light to private forces, often with the assistance of state and local governments, that sought to subjugate the former slaves and their descendants.   Private violence was instrumental in driving blacks from the ranks of voters.   [197] It helped force many blacks into peonage, a virtual return to slavery,   [198] and was used to force many blacks into a state of ritualized subservience.   [199] With the protective arm of the federal government withdrawn, protection of black lives and property was left to largely hostile state governments.   In the Jim Crow era that would follow, the right to posses arms would take on critical importance for many blacks.   This right, seen in the eighteenth century as a mechanism

---

[191] This can also be seen in the Court's reaction to the federal government's first public accommodations statute, the Civil Rights Act of 1875.   With much the same reasoning, the Court held that Congress had no power to prohibit discrimination in public accommodations within states.   *See* The Civil Rights Cases, 109 U.S. 3 (1883).

[192] *See, e.g.,* Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886) (declaring the administration of a municipal ordinance discriminatory); Strauder v. West Virginia, 100 U.S. 303, 308 (1879) (striking down a statute prohibiting blacks from serving as jurors).

[193] 116 U.S. 252 (1886).

[194] Id. at 253.

[195] Id. at 265.

[196] Id.

[197] RABLE, *supra* note 29, at 88-90; STAMPP, *supra* note 171, at 199-204.

[198] Benno C. Schmidt, Jr., *Principle and Prejudice: The Supreme Court and Race in the Progressive Era. Part 2: The Peonage Cases,* 82 COLUM. L. REV. 646, 653-55 (1982).

[199] GEORGE M. FREDRICKSON, WHITE SUPREMACY: A COMPARATIVE STUDY IN AMERICAN AND SOUTH AFRICAN HISTORY 251-52 (1981); CHARLES E. SILBERMAN, CRIMINAL VIOLENCE, CRIMINAL JUSTICE 32 (1978); JOEL WILLIAMSON, A RAGE FOR ORDER: BLACK/WHITE RELATIONS IN THE AMERICAN SOUTH SINCE EMANCIPATION 124 (1986).

80 Geo. L.J. 309, *348

that enabled a majority to **[*349]** check the excesses of a potentially tyrannical national government, would for many blacks in the twentieth century become a means of survival in the face of private violence and state indifference.

*IV*. ARMS AND AFRO-AMERICAN SELF-DEFENSE IN THE TWENTIETH CENTURY: A HISTORY IGNORED

For much of the twentieth century, the black experience in this country has been one of repression. This repression has not been limited to the southern part of the country, nor is it a development divorced from the past. Born perhaps of cultural predisposition against blacks, [200] and nurtured by economic competition between blacks and whites, particularly immigrant groups and those whites at the lower rungs of the economic scale, [201] racism in the North continued after the Civil War, abated but not eliminated in its effects. [202] In the South, defeat in the Civil War and the loss of slaves as property confirmed white Southerners in their determination to degrade and dominate their black brethren. [203]

Immediately after the Civil War and the emancipation it brought, white Southerners adopted measures to keep the black population in its place. [204] Southerners saw how Northerners had utilized segregation as a means to avoid the black presence in their lives, [205] and they already had experience with segregation in southern cities before the war. [206] Southerners extended this experience of segregation to the whole of southern life through the mechanism of "Jim Crow." [207] Jim Crow was established both by the operation of **[*350]** law, including the black codes and other legislation, and by an elaborate etiquette of racially restrictive social practices. The *Civil Rights Cases* [208] and *Plessy v. Ferguson* [209] gave the South freedom to pursue the task of separating black from white. The *Civil Rights Cases* went beyond *Cruikshank,* even more severely restricting congressional power to provide for the equality of blacks under Section 5 of the Fourteenth Amendment, [210] and *Plessy v. Ferguson*

---

[200]   *See generally* JORDAN, *supra* note 56, at 3-43.

[201]   LITWACK, *supra* note 116, at 153-86.

[202]   Cottrol, *supra* note 91, at 1007-19.

[203]   C. VANN WOODWARD, THE STRANGE CAREER OF JIM CROW 22-23 (3d ed. 1974).

[204]   *See infra* text accompanying notes 169-178.  *See generally* WOODWARD, *supra* note 203, at 22-29.

[205]   *See id.* at 18-21 (the Jim Crow system was born in the North where systematic segregation, with the backing of legal and extralegal codes, permeated black life in the free states by 1860); *see also* LITWACK, supra note 116, at 97-99 (in addition to statutes and customs that limited the political and judicial rights of blacks, extralegal codes enforced by public opinion perpetuated the North's systematic segregation of blacks from whites).

[206]   *See* RICHARD C. WADE, SLAVERY IN THE CITIES: THE SOUTH 1820-1860, at 180-208 (1964) (although more contact between blacks and whites occurred in urban areas of the South, both social standards and a legal blueprint continued the subjugation of blacks to whites).

[207]   *See generally* WOODWARD, *supra* note 204.  Jim Crow has been said to have established

an etiquette of discrimination.  It was not enough for blacks to be second class citizens, denied the franchise and consigned to inferior schools.  Black subordination was reinforced by a racist punctilio dictating separate seating on public accommodations, separate water fountains and restrooms, separate seats in courthouses, and separate Bibles to swear in black witnesses about to give testimony before the law.  The list of separations was ingenious and endless.  Blacks became like a group of American untouchables, ritually separated from the rest of the population.

Diamond & Cottrol, supra note 103, at 264-65 (footnote omitted).

[208]   *109 U.S. 3 (1883).*

[209]   *163 U.S. 537 (1896).*

80 Geo. L.J. 309, *350

declared separate facilities for blacks and whites to be consonant with the Fourteenth Amendment's mandate of "equal protection of the laws." [211] In effect, states and individuals were given full freedom to effect their "social prejudices" [212] and "racial instincts" [213] to the detriment of blacks throughout the South and elsewhere. [214]

These laws and customs were given support and gruesome effect by violence. In northern cities, violence continued to threaten blacks after Reconstruction and after the turn of the century. For instance, in New York, hostility between blacks and immigrant whites ran high. [215] Negro strikebreakers were often used to break strikes of union workers. [216] Regular clashes occurred between blacks and the Irish throughout the nineteenth century, [217] until finally a major race riot broke in 1900 that lasted four days. [218] **[*351]** And in 1919, after a Chicago race riot, 38 deaths and 537 injuries were reported as a result of attacks on the black population. [219]

In the South, racism found expression, not only through the power of unorganized mobs, but also under the auspices of organized groups like the Ku Klux Klan. The Klan started in 1866 as a social organization of white Civil War veterans in Pulaski, Tennessee, [220] complete with pageantry, ritual, and opportunity for plain and innocent

---

[210] *109 U.S. 3.*

[211] *163 U.S. at 548.*

[212] *Id. at 551.*

[213] *Id.*

[214] Jim Crow was not exclusively a southern experience after the Civil War. For example, at one point or another, antimiscegenation laws have been enacted by forty-one of the fifty states. Harvey M. Applebaum, *Miscegenation Statutes: A Constitutional and Social Problem,* 53 GEO. L.J. 49, 50-51 & 50 n.9 (1964). The *Adams* case, in which the federal government challenged separate university facilities throughout the union, involved the State of Pennsylvania. *See Adams v. Richardson, 356 F. Supp. 92, 100 (D.D.C. 1973); Adams v. Richardson, 351 F. Supp. 636, 637 (D.D.C. 1972). Hansberry v. Lee, 311 U.S. 32 (1940),* involved a covenant restricting the sale of property in Illinois to blacks. The set of consolidated cases that outlawed the separate but equal doctrine would later be known as *Brown v. Board of Educ., 347 U.S. 483 (1954),* the defendant board of education was located in Kansas, a Northern state.

[215] GILBERT OSOFSKY, HARLEM: THE MAKING OF A GHETTO: NEGRO NEW YORK 1890-1930, at 46-52 (1963).

[216] *Id.* at 42.

[217] *Id.* at 45-46.

[218] *Id.* at 46-52.

After the riot ended, the situation nevertheless remained tense. Negroes began to arm. Revolvers and other weapons were easily purchased at local pawnshops and hard ware stores. In a survey made of [the area where the riot took place], just one day after the riot, it was found that 145 revolvers and a substantial amount of ammunition had been sold -- "all had gone to negroes." Lloyd Williams, a Negro bartender, was seen leaving one store with an arsenal of weapons. When asked what he was going to do with them, he replied, "I understand they're knocking down negroes 'round here. The first man tries it on me gets this . . . ." Other Negroes warned that no white men were going to bother them. As policemen patrolled the Negro blocks they were showered with bricks, bottles, and garbage, thrown from rooftops and tenement windows. They fired back with revolvers. It seems miraculous that no one was killed.

*Id.* at 49-50.

[219] CHICAGO COMMISSION OF RACE RELATIONS, THE NEGRO IN CHICAGO: A STUDY OF RACE RELATIONS AND A RACE RIOT (1922) 595-98, 602, 640-49, *reprinted in* THE NEGRO AND THE CITY 126-33 (Richard B. Sherman ed., 1970). After World War I, an outbreak of racial violence against blacks was recorded from 1917 to 1921. Riots occurred in Chicago, Omaha, Washington, D.C., and East St. Louis, Illinois. *Id.* at 126.

[220] WYN CRAIG WADE, THE FIERY CROSS: THE KU KLUX KLAN IN AMERICA 33 (1987).

80 Geo. L.J. 309, *351

amusement. [221] But the group soon expanded and turned its attention to more sinister activities. The Klan's activities, primarily in the South, expanded to playing tricks on blacks and then to terroristic nightriding against them. [222] The Ku Klux Klan in this first incarnation was disbanded, possibly as early as January 1868, and no later than May 1870. [223] By that time, the Klan's activities had come to include assaults, murder, lynchings, and political repression against blacks, [224] and Klan-like activities would continue and contribute to the outcome of the federal election of 1876 that ended Reconstruction. [225] As one author has put it, "The Invisible Empire faded away, not because it had been defeated, but because it had won." [226]

The Ku Klux Klan would be revived in 1915 after the release of D.W. Griffith's film *Birth of a Nation*, [227] but, both pre- and post-dating the Klan's revival, Klan tactics would play a familiar role in the lives of black people in the South; for up to the time of the modern civil rights movement, lynching would be virtually an everyday occurrence. Between 1882 and 1968, 4,743 **[*352]** persons were lynched, the overwhelming number of these in the South; [228] 3,446 of these persons were black, [229] killed for the most part for being accused in one respect or another of not knowing their place. [230] These accusations were as widely disparate as arson, [231] theft, [232] sexual contact or even being too familiar with a white woman, [233] murdering or assaulting a white person, [234] hindering a lynch

---

[221] *Id.* at 33-35.

[222] *Id.* at 37.

[223] STANLEY F. HORN, INVISIBLE EMPIRE: THE STORY OF THE KU KLUX KLAN 1866-1871, at 356-59 (1969).

[224] *See generally* WILLIAM L. KATZ, THE INVISIBLE EMPIRE: THE KU KLUX KLAN IMPACT ON HISTORY 19-59 (1986).

[225] *See* WADE, *supra* note 220, at 57, 110-11. Through the intimidation of black voters, the Democratic party in the South, with which most Klansmen were affiliated, recovered, and Republican strength waned. The Democrats captured the House of Representatives in 1874, and with the controversial compromise between Democrats and Republicans that elevated Rutherford B. Hayes to the Presidency in 1877, the end of Reconstruction was marked. *Id.*

[226] KATZ, *supra* note 224, at 58.

[227] WADE, *supra* note 220, at 120.

[228] STEPHEN J. WHITFIELD, A DEATH IN THE DELTA: THE STORY OF EMMETT TILL 5 (1988).

[229] *Id.*

[230] NATIONAL ASS'N FOR THE ADVANCEMENT OF COLORED PEOPLE, THIRTY YEARS OF LYNCHING IN THE UNITED STATES: 1889-1918 (1919) reported as follows:

Among colored victims [of lynching], 35.8 per cent were accused of murder; 28.4 per cent of rape and "attacks upon women" (19 per cent of rape and 9.4 per cent of "attacks upon women"); 17.8 per cent of crimes against the person (other than those already mentioned) and against property; 12 per cent were charged with miscellaneous crimes and in 5.6 per cent no crime was charged. The 5.6 per cent. [sic] classified under "Absence of Crime" does not include a number of cases in which crime was alleged but in which it was afterwards shown conclusively that no crime had been committed.

*Id.* at 10.

[231] *See, e.g., Negro and Wife Hanged, Suspected of Barn-Burning,* ST. PAUL PIONEER PRESS, Nov. 26, 1914, *reprinted in* RALPH GINZBURG, 100 YEARS OF LYNCHINGS 92 (1988).

[232] *See, e.g., Negro Hanged as Mule Thief,* ATLANTA CONST., July 15, 1914, *reprinted in* GINZBURG, *supra* note 231, at 92; *Would be Chicken Thief,* N.Y. HERALD, Dec. 6, 1914, *reprinted in* GINZBURG, *supra* note 231, at 93 (reporting a black man having been lynched "[f]or the crime of crawling under the house of a white citizen, with the intention of stealing chickens").

[233] *See, e.g.,* WHITFIELD, *supra* note 228 (Emmett Till was killed in 1955 because he was thought to have whistled at a white woman). Other major works describing individual lynchings are JAMES R. McGOVERN, ANATOMY OF A LYNCHING: THE KILLING OF CLAUDE NEAL (1982) (describing a lynching in 1934 occasioned by the rape of a white woman); HOWARD

80 Geo. L.J. 309, *352

mob, [235] protecting one's legal rights, [236] not **[*353]** showing proper respect, [237] or simply being in the wrong place at the wrong time. [238]

This is not to say that blacks went quietly or tearfully to their deaths.  Oftentimes they were able to use firearms to defend themselves, though usually not with success: Jim McIlherron was lynched in Estell Springs, Tennessee, after having exchanged over one thousand rounds with his pursuers. [239] The attitude of individuals such as McIlherron is summed up by Ida B. Wells-Barnett, a black antilynching activist who wrote of her decision to carry a pistol:

*I* had been warned repeatedly by my own people that something would happen if I did not cease harping on the lynching of three months before . . . .  I had bought a pistol the first thing after [the lynching], because I expected some cowardly retaliation from the lynchers.  I felt that one had better die fighting against injustice than to die like a

---

SMEAD, BLOOD JUSTICE: THE LYNCHING OF MACK CHARLES PARKER (1986) (describing another lynching of a black man for the rape of a white woman).  *See also Blacks Lynched for Remark Which May Have Been 'Hello,'* PHILA. INQUIRER, Jan. 3, 1916, *reprinted in* GINZBURG, *supra* note 231, at 98; *Inter-Racial Love Affair Ended by Lynching of Man,* MEMPHIS COM. APPEAL, Jan. 14, 1922, *reprinted in* GINZBURG, *supra* note 231, at 158; *Negro Ambushed, Lynched for Writing White Girl,* MEMPHIS COM. APPEAL, Nov. 26, 1921, *reprinted in Ginzburg, supra* note 231, at 156; *Negro Insults White Women; Is Shot and Strung Up,* MONTGOMERY ADVERTISER, Oct. 10, 1916, *reprinted in* GINZBURG, *supra* note 231, at 111; *Negro Shot Dead for Kissing His White Girlfriend,* CHI. DEFENDER, Feb. 31, 1915, *reprinted in* GINZBURG, *supra* note 231, at 95; *Negro Youth Mutilated for Kissing White Girl,* BOSTON GUARDIAN, Apr. 30, 1914, *reprinted in* GINZBURG, *supra* note 231, at 90; *White Girl Is Jailed, Negro Friend Is Lynched,* GALVESTON TRIB. (Texas), June 21, 1934, *reprinted in* GINZBURG, *supra* note 231, at 217.

[234]   *See, e.g., Hoosiers Hang Negro Killer,* CHI. REC., Feb. 27, 1901, *reprinted in* GINZBURG, *supra* note 231, at 37; *Negro and White Scuffle, Negro Is Jailed, Lynched,* ATLANTA CONST., July 6, 1933, *reprinted in* GINZBURG, *supra* note 231, at 197; *Negro Shot After Striking Merchant Who Dirtied Him,* MONTGOMERY ADVERTISER, Aug. 28, 1913, *reprinted in* GINZBURG, *supra* note 231, at 88; *Negro Suspected of Slaying Bartender Is Hung by Mob,* KANSAS CITY STAR, Oct. 31, 1899, *reprinted in* GINZBURG, *supra* note 231, at 23.

[235]   *See, e.g., Negro Father is Lynched; Aided Son to Escape Mob,* BALT. AFRO-AM., July 6, 1923, *reprinted in* GINZBURG, *supra* note 231, at 170.

[236]   *See, e.g., Miss. Minister Lynched,* N.Y. AMSTERDAM NEWS, Aug. 26, 1944, *reprinted in* GINZBURG, *supra* note 231, at 236 (reporting the lynching of a black man for having hired a lawyer in a property dispute).

[237]   *See, e.g., Impertinent Question,* BIRMINGHAM NEWS, Sept. 23, 1913, *reprinted in* GINZBURG, *supra* note 231, at 88 (relating that a black man was lynched after he asked whether a white woman's husband was home); *Insulting Remark,* MONTGOMERY ADVERTISER, Oct. 23, 1913, *reprinted in* GINZBURG, *supra* note 231, at 89 (relating that a black man was lynched for having made an insulting remark to a white woman); *Negro Half-Wit is Lynched; Threatened to Lynch Whites,* MONTGOMERY ADVERTISER, Aug. 25, 1913, *reprinted in* GINZBURG, *supra* note 231, at 87; *Negro Insults White Women; Is Shot and Strung Up,* MONTGOMERY ADVERTISER, Oct. 10, 1916, *reprinted in* GINZBURG, *supra* note 231, at 111; *Train Porter Lynched After Insult to Woman,* ATLANTA CONST., May 9, 1920, *reprinted in* GINZBURG, *supra* note 231, at 130.

[238]   *See, e.g., An Innocent Man Lynched,* N.Y. TIMES, June 11, 1900, *reprinted in* GINZBURG, *supra* note 231, at 31; *Boy Lynched at McGhee for No Special Cause,* ST. LOUIS ARGUS, May 27, 1921, *reprinted in* GINZBURG, *supra* note 231, at 150; *Negro Suspect Eludes Mob; Sister Lynched Instead,* N.Y. TRIB., Mar. 17, 1901, *reprinted in* GINZBURG, *supra* note 231, at 38; *Posse Lynches Innocent Man When Thwarted in Its Hunt,* WILMINGTON ADVOC., Dec. 16, 1922, *reprinted in* GINZBURG, *supra* note 231, at 166; *Texans Lynch Wrong Negro,* CHI. TRIB., Nov. 22, 1895, *reprinted in* GINZBURG, *supra* note 231, at 9; *Thwarted Mob Lynches Brother of Intended Victim,* MONTGOMERY ADVERTISER, Aug. 5, 1911, *reprinted in* GINZBURG, *supra* note 231, at 73.

[239]   *Blood-Curdling Lynching Witnessed by 2,000 Persons,* CHATTANOOGA TIMES, Feb. 13, 1918, *reprinted in* GINZBURG, *supra* note 231, 114-116.

dog or a rat in a trap.  I had already determined to sell my life as dearly as possible if attacked.  I felt if I could take one lyncher with me, this would even up the score a little bit.  [240]

When blacks used firearms to protect their rights, they were often partially successful but were ultimately doomed. In 1920, two black men in Texas **[*354]** fired on and killed two whites in self-defense.  The black men were arrested and soon lynched.  [241] When the sheriff of Aiken, South Carolina, came with three deputies to a black household to attempt a warrantless search and struck one female family member, three other family members used a hatchet and firearms in self-defense, killing the sheriff.  The three wounded survivors were taken into custody, and after one was acquitted of murdering the sheriff, with indications of a similar verdict for the other two, all three were lynched.  [242]

Although individual efforts of blacks to halt violence to their persons or property were largely unsuccessful, there were times that blacks succeeded through concerted or group activity in halting lynchings.  In her autobiography, Ida Wells-Barnett reported an incident in Memphis in 1891 in which a black militia unit for two or three nights guarded approximately 100 jailed blacks who were deemed at risk of mob violence.  When it seemed the crisis had passed, the militia unit ceased its work.  It was only after the militia unit left that a white mob stormed the jail and lynched three black inmates.  [243]

A.  Philip Randolph, the longtime head of the Brotherhood of Sleeping Car Porters, and Walter White, onetime executive secretary of the National Association for the Advancement of Colored People, vividly recalled incidents in which their fathers had participated in collective efforts to use firearms to successfully forestall lynchings and other mob violence.  As a thirteen-year-old, White participated in his father's experiences,  [244] which, he reported, left him "gripped by the knowledge of my own identity, and in the depths of my soul, I was vaguely aware that I was glad of it."  [245] After his father stood armed at a jail all night to ward off lynchers,  [246] Randolph was left with a vision, not "of powerlessness, but of the 'possibilities of salvation,' which resided in unity and organization."  [247]

The willingness of blacks to use firearms to protect their rights, their lives, and their property, alongside their ability to do so successfully when acting collectively, renders many gun control statutes, particularly of Southern origin, all the more worthy of condemnation.  This is especially so in view of the **[*355]** purpose of these statutes, which, like that of the gun control statutes of the black codes, was to disarm blacks.

---

[240]  IDA B. WELLS-BARNETT, CRUSADE FOR JUSTICE: THE AUTOBIOGRAPHY OF IDA B. WELLS 62 (Alfreda M. Duster ed., 1970).  Wells-Barnett's fears for her safety, fortunately, were never realized.  Born a slave in 1862, she died of natural causes in 1931.  *Id.* at xxx-xxxi, 7.  Eli Cooper of Caldwell, Georgia was not so lucky, however.  Cooper was alleged to have said that the "Negro has been run over for fifty years, but it must stop now, and pistols and shotguns are the only weapons to stop a mob." Cooper was dragged from his home by a mob of 20 men and killed as his wife looked on.  *Church Burnings Follow Negro Agitator's Lynching,* CHI. DEFENDER, Sept. 6, 1919, *reprinted in* GINZBURG, *supra* note 231, at 124.

[241]  *Letter from Texas Reveals Lynching's Ironic Facts,* N.Y. NEGRO WORLD, Aug. 22, 1920, *reprinted in* GINZBURG, *supra* note 231, at 139-40.

[242]  *Lone Survivor of Atrocity Recounts Events of Lynching,* N.Y. AMSTERDAM NEWS, June 1, 1927, *reprinted in* GINZBURG, *supra* note 231, at 175-78.

[243]  WELLS-BARNETT, *supra* note 240, at 50.  To forestall the occurrence of future incidents of the same nature, a Tennessee court ordered the local sheriff to take charge of the arms of the black militia unit.  *Id.*

[244]  WALTER WHITE, A MAN CALLED WHITE 4-12 (1948), *reprinted in* THE NEGRO AND THE CITY, *supra* note 219, at 121-26.

[245]  *Id.* at 126.

[246]  JERVIS ANDERSON, A. PHILLIP RANDOLPH: A BIOGRAPHICAL PORTRAIT 41-42 (1973).

[247]  *Id.* at 42.

80 Geo. L.J. 309, *355

This purpose has been recognized by some state judges.  The Florida Supreme Court in 1941 refused to extend a statute forbidding the carrying of a pistol on one's person to a situation in which the pistol was found in an automobile glove compartment.  [248] In a concurrence, one judge spoke of the purpose of the statute:

*I* know something of the history of this legislation.  The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in the turpentine and lumber camps.  The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security.  The statute was never intended to be applied to the white population and in practice has never been so applied.  [249]

The Ohio Supreme Court in 1920 construed the state's constitutional right of the people "to bear arms for their defense and security" not to forbid a statute outlawing the carrying of a concealed weapon.  [250] In so doing, the court followed the lead of sister courts in Alabama,  [251] Arkansas,  [252] Georgia,  [253] and Kentucky,  [254] over the objections of a dissenting judge who recognized that "the race issue [in Southern states] has intensified a decisive purpose to entirely disarm the negro, and this policy is evident upon reading the opinions."  [255]

That the Southern states did not prohibit firearms ownership outright is fortuitous.  During the 1960s, while many blacks and white civil rights workers were threatened and even murdered by whites with guns, firearms in the hands of blacks served a useful purpose, to protect civil rights workers and blacks from white mob and terrorist activity. [256]

While the rate of lynchings in the South had slowed somewhat,  [257] it was still clear by 1960 that Southerners were capable of murderous violence in  **[*356]**  pursuit of the Southern way of life.  The 1955 murder of Emmett Till, a fourteen-year-old boy killed in Money, Mississippi for wolf-whistling at a white woman, sent shock waves throughout the nation.  [258] Two years later, the nation again would be shocked, this time by a riotous crowd outside Little Rock's Central High School bent on preventing nine black children from integrating the school under federal court

---

[248]  *Watson v. Stone, 4 So. 2d 700 (Fla. 1941).*

[249]  *Id. at 703* (Buford, J., concurring).

[250]  *State v. Nieto, 130 N.E. 663 (Ohio 1920).*

[251]  *Dunston v. State, 27 So. 333 (Ala. 1900).*

[252]  *Carroll v. State, 28 Ark. 99 (1872).*

[253]  **Brown v. State, 39 S.E. 873 (Ga. 1901).**

[254]  *Commonwealth v. Walker, 7 Ky. L. Rptr. 219 (1885)* (abstract).

[255]  *Nieto, 130 N.E. at 669* (Wanamaker, J., dissenting).

[256]  *See, e.g.,* John R. Salter, Jr. & Donald B. Kates, Jr., *The Necessity of Access to Firearms by Dissenters and Minorities Whom Government is Unwilling or Unable to Protect, in* RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT, 185, 189-93 (Donald B. Kates, Jr. ed., 1979).

[257]  According to records kept by the Tuskegee Institute, 4,733 lynchings occurred between 1882 and 1959.  *4,733 Mob Action Victims Since '82, Tuskeegee Reports,* MONTGOMERY ADVERTISER, April 26, 1959, *reprinted in* GINZBURG, *supra* note 231, at 244.  Tuskegee Institute's records show only ten more lynchings to have occurred by 1968.  WHITFIELD, *supra* note 228, at 5.

[258]  *See* WHITFIELD, *supra* note 228, at 23-108; *see also Eyes on the Prize: America's Civil Rights Years, 1954-1965: Awakenings (1954-56)* (PBS television broadcast, Jan. 21, 1986).

order; President Eisenhower ordered federal troops to effectuate the court order. [259] News of yet another prominent lynching in Mississippi reached the public in 1959. [260]

In the early 1960s, Freedom Riders and protesters at sit-ins were attacked, and some suffered permanent damage at the hands of white supremacists. [261] In 1963, Medgar Evers, Mississippi secretary of the NAACP was killed. [262] Three college students were killed in Mississippi during the 1964 "Freedom Summer"; this killing would render their names -- Andrew Goodman, James Chaney, and Michael Schwerner -- and their sacrifice part of the public domain. [263] A church bombing in Birmingham that killed four small black children, [264] the killing of a young white housewife helping with the march from Montgomery to Selma, [265] and the destructive riot in Oxford, Mississippi, [266] that left two dead when James Meredith entered the University of Mississippi helped make clear to the nation what blacks in the South had long known: white Southerners were willing to use weapons of violence, modern equivalents of rope and faggot, to keep blacks in their place.

It struck many, then, as the height of blindness, confidence, courage, or moral certainty for the civil rights movement to adopt nonviolence as its credo, and to thus leave its adherents open to attack by terrorist elements within the white South. Yet, while nonviolence had its adherents among the mainstream civil rights organizations, many ordinary black people in the South believed in resistance and believed in the necessity of maintaining firearms for personal protection, and these people lent their assistance and their [*357] protection to the civil rights movement. [267]

Daisy Bates, the leader of the Little Rock NAACP during the desegregation crisis, wrote in her memoirs that armed volunteers stood guard over her home. [268] Moreover, there are oral histories of such assistance. David Dennis, the black Congress of Racial Equality (CORE) worker who had been targeted for the fate that actually befell

---

[259]  *See* **Cooper v. Aaron, 358 U.S. 1 (1958);** *see also* TONY A. FREYER, THE LITTLE ROCK CRISIS: A CONSTITUTIONAL INTERPRETATION (1984); Raymond T. Diamond, *Confrontation as Rejoinder to Compromise: Reflections on the Little Rock Desegregation Crisis,* 11 NAT'L BLACK L.J. 151, 152-164 (1989); *Eyes on the Prize: America's Civil Rights Years, 1954-1965: Fighting Back (1957-62)* (PBS television Broadcast, Jan. 28, 1986).

[260]  *See generally* SMEAD, *supra* note 233.

[261]  RHONDA BLUMBERG, CIVIL RIGHTS: THE 1960S FREEDOM STRUGGLE 65-81 (1984).

[262]  CIVIL RIGHTS: 1960-66 190-91 (Lester A. Sobel ed., 1967).

[263]  *Id.* at 244-46.

[264]  *Id.* at 187-88.

[265]  *Id.* at 303-05.

[266]  *Id.* at 110-18.

[267]  Donald B. Kates, Jr., recalls that:

As a civil rights worker in a Southern State during the early 1960's, I found that the possession of firearms for self-defense was almost universally endorsed by the black community, for it could not depend on police protection from the KKK. The leading civil rights lawyer in the state (then and now a nationally prominent figure) went nowhere without a revolver on his person or in his briefcase. The black lawyer for whom I worked principally did not carry a gun all the time, but he attributed the relative quiescence of the Klan to the fact that the black community was so heavily armed. Everyone remembered an incident several years before, in which the state's Klansmen attempted to break up a civil rights meeting and were routed by return gunfire. When one of our clients (a school-teacher who had been fired for her leadership in the Movement) was threatened by the Klan, I joined the group that stood armed vigil outside her house nightly. No attack ever came -- though the Klan certainly knew that the police would have done nothing to hinder or punish them.

RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT, *supra* note 256, at 186.

[268]  DAISY BATES, THE LONG SHADOW OF LITTLE ROCK, A MEMOIR 94 (1982).

80 Geo. L.J. 309, *357

Goodman, Schwerner, and Chaney during the Freedom Summer, [269] has told of black Mississippi citizens with firearms who followed civil rights workers in order to keep them safe. [270]

Ad hoc efforts were not the sole means by which black Southern adherents of firearms protected workers in the civil rights movement. The Deacons for Defense and Justice organized first in 1964 in Jonesboro, Louisiana, but received prominence in Bogalousa, Louisiana. [271] The Deacons organized in Jonesboro after their founder saw the Ku Klux Klan marching in the street and realized that the "fight against racial injustice include[d] not one but two foes: White reactionaries and police." [272] Jonesboro's Deacons obtained a charter and weapons, and vowed to shoot back if fired upon. [273] The word spread throughout the South, but most significantly to Bogalousa, where the **[*358]** Klan was rumored to have its largest per capita membership. [274] There, a local chapter of the Deacons would grow to include "about a tenth of the Negro adult male population," or about 900 members, although the organization was deliberately secretive about exact numbers. [275] What is known, however, is that in 1965 there were fifty to sixty chapters across Louisiana, Mississippi, and Alabama. [276] In Bogalousa, as elsewhere, the Deacons' job was to protect black people from violence, and they did so by extending violence to anyone who attacked. [277] This capability and willingness to use force to protect blacks provided a deterrent to white terroristic activity.

A prime example of how the Deacons accomplished their task lies in the experience of James Farmer, then head of (CORE), a frontline, mainstream civil rights group. Before Farmer left on a trip for Bogalousa, the Federal Bureau of Investigation informed him that he had received a death threat from the Klan. The FBI apparently also informed the state police, who met Farmer at the airport. But at the airport also were representatives of the Bogalousa chapter of the Deacons, who escorted Farmer to the town. Farmer stayed with the local head of the Deacons, and the Deacons provided close security throughout the rest of this stay and Farmer's next. Farmer later wrote in his

---

[269] HOWELL RAINES, MY SOUL IS RESTED: MOVEMENT DAYS IN THE DEEP SOUTH REMEMBERED 275-76 (1977).

[270] Telephone interview with David Dennis (Oct. 30, 1991).

[271] Hamilton Bims, *Deacons for Defense,* EBONY, Sept. 1965, at 25, 26; *see also* Roy Reed, *The Deacons, Too, Ride by Night,* N.Y. TIMES, Aug. 15, 1965, Magazine, at 10.

[272] Bims, *supra* note 271, at 25-26.

[273] *Id.* at 26. Like the Deacons for Defense and Justice was the Monroe, North Carolina chapter of the NAACP, which acquired firearms and used them to deal with the Ku Klux Klan. ROBERT F. WILLIAMS, NEGROES WITH GUNS 42-49, 54-57 (1962). The Deacons for Defense and Justice are to be contrasted with the Black Panther Party for Self Defense. The Black Panther Program included the following statement:

We believe we can end police brutality in our black community by organizing black self-defense groups that are dedicated to defending our black community from racist police oppression and brutality. The *Second Amendment to the Constitution of the United States* gives a right to bear arms. We therefore believe that all black people should arm themselves for self-defense.

*Black Panther Party -- Platform and Program, reprinted in* REGINALD MAJOR, A PANTHER IS A BLACK CAT 286 (1971). Yet, the Black Panthers deteriorated into an ineffective group of revolutionaries, at times using arguably criminal means of effectuating their agenda. *See generally* GENE MARINE, THE BLACK PANTHERS (1969); BOBBY SEALE, SEIZE THE TIME: THE STORY OF THE BLACK PANTHER PARTY AND HUEY P. NEWTON (1968).

[274] JAMES FARMER, LAY BARE THE HEART: AN AUTOBIOGRAPHY OF THE CIVIL RIGHTS MOVEMENT 287 (1985).

[275] *See* Bims, *supra* note 271, at 26; *see also* Reed, *supra* note 268, at 10.

[276] *See* Reed, *supra* note 271, at 10; *see also* Bims, *supra* note 268, at 26.

[277] RAINES, *supra* note 269, at 417 (interview with Charles R. Sims, leader of the Bogalousa Deacons); *see* Bims, *supra* note 271, at 26; Reed, *supra* note 271, at 10-11.

80 Geo. L.J. 309, *358

autobiography that he was secure with the Deacons, "in the knowledge that unless a bomb were tossed . . . the Klan could only reach me if they were prepared to swap their lives for mine." [278]

Blacks in the South found the Deacons helpful because they were unable to rely upon police or other legal entities for racial justice.  This provided a practical reason for a right to bear arms: In a world in which the legal system was not to be trusted, perhaps the ability of the system's victims to resist might convince the system to restrain itself.

[*359]  CONCLUSION: SELF-DEFENSE AND THE GUN CONTROL QUESTION TODAY

There are interesting parallels between the history of African-Americans and discussion of the Second Amendment.  For most of this century, the historiography of the black experience was at the periphery of the historical profession's consciousness, an area of scholarly endeavor populated by those who were either ignored or regarded with suspicion by the mainstream of the academy.   [279] Not until after World War II did the insights that could be learned from the history of American race relations begin to have a major influence on the works of constitutional policy makers in courts, legislatures, and administrative bodies.  Moreover, it should be stressed that, for a good portion of the twentieth century, the courts found ways to ignore the constitutional demands imposed by the reconstruction amendments.  [280]

While discussion of the Second Amendment has been relegated to the margin of academic and judicial constitutional discourse, the realization that there is a racial dimension to the question, and that the right may have had greater and different significance for blacks and others less able to rely on the government's protection, has been even further on the periphery.  The history of blacks and the right to bear arms, and the failure of most constitutional scholars and policymakers to seriously examine that history, is in part another instance of the difficulty of integrating the study of the black experience into larger questions of legal and social policy.  [281]

Throughout American history, black and white Americans have had radically different experiences with respect to violence and state protection.  Perhaps another reason the Second Amendment has not been taken very seriously by the courts and the academy is that for many of those who shape or critique constitutional policy, the state's power and inclination to protect them is a given.  But for all too many black Americans, that protection historically has not been available.  Nor, for many, is it readily available today.  If in the past the state refused to protect black people from the horrors of white lynch mobs, today the state seems powerless in the face of the tragic black-on-black violence that plagues the mean streets of our inner cities, and **[*360]** at times seems blind to instances of unnecessary police brutality visited upon minority populations.  [282]

---

[278]  FARMER, *supra* note 274, at 288.

[279]  August Meir & Elliot Rudwick, *J. Franklin Jameson, Carter G. Woodson, and the Foundation of Black Historiography,* 89 AM. HIST. REV. 1005, 1005 (1984).

[280]   *See, e.g.,* Schmidt, *supra* note 198, at 647 (describing the way in which the Supreme Court failed to uphold the Fifteenth Amendment in the late 19th and early 20th centuries); *see also* Randall L. Kennedy, *Racial Critiques of Legal Academia,* 102 HARV. L. REV. 1745, 1753-54 (1989) (discussing the legal academia's willingness to ignore the Reconstruction Amendments in the early 20th century).

[281]  One scholar has criticized the failure of legal scholars with a left perspective "to incorporate the authentic experience of minority communities in America." Jose Bracamonte, *Foreword to Symposium, Minority Critiques of the Critical Legal Studies Movement,* 22 HARV. C.R.-C.L. L. REV. 297, 298 (1982).

[282]  The beating of Rodney King on March 3, 1991, by members of the Los Angeles Police Department, captured on tape by a serendipitous amateur photographer, has focused attention recently on the problem of police brutality, though the problem predates and presumably continues beyond the incident.  *See* Tracey Wood & Faye Fiore, *Beating Victim Says He Obeyed Police,* L.A. TIMES, Mar. 7, 1991, at A1.

80 Geo. L.J. 309, *360

Admittedly, the racial atmosphere in this nation today is better than at any time prior to the passage of the Voting Rights Act of 1965.   283  It must also be stressed, however, that many fear a decline in the quality of that atmosphere.

One cause for concern is the Supreme Court's assault in its 1989 Term on gains of the civil rights movement that had stood for decades.   284  Another is the prominence of former Ku Klux Klan leader David Duke, a member of the Louisiana state legislature and a defeated, but nonetheless major, candidate for the Senate in 1990.   285  In the last several years, two blacks who had entered the "wrong" neighborhood in New York City have been "lynched."   286  Is this a sign of more to come?  The answer is not clear, but the question is.

Twice in this nation's history -- once following the Revolution, and again after the Civil War -- America has held out to blacks the promise of a nation  [*361]  that would live up to its ideology of equality and of freedom.  Twice the nation has reneged on that promise.  The ending of separate but equal under *Brown v. Board* in 1954,   287  -- the civil rights movement of the 1960s, culminating in the Civil Rights Act of 1964,   288  the Voting Rights Act of 1965,   289  and the judicial triumphs of the 1960s and early 70s -- all these have held out to blacks in this century that same promise.  Yet, given this history, it is not unreasonable to fear that law, politics, and societal mores will swing the pendulum of social progress in a different direction, to the potential detriment of blacks and their rights, property, and safety.

The history of blacks, firearms regulations, and the right to bear arms should cause us to ask new questions regarding the Second Amendment.  These questions will pose problems both for advocates of stricter gun controls

---

283  Pub. L. No. 89-110, *79 Stat. 437* (codified as amended at *42 U.S.C. § 1973* (1988)).

284  *See, e.g.,  Patterson v. McLean Credit Union, 491 U.S. 164 (1989)* (urging, sua sponte, not only reconsideration of *Runyon v. McCrary, 427 U.S. 160 (1976),* on the issue of whether the right to contract on a basis equal with whites under Civil Rights Act of 1866 includes the right to be free from discriminatory working conditions, but also overruling Runyon); *Martin v. Wilkes, 490 U.S. 755 (1989)* (conferring on whites claiming reverse discrimination a continuing right to challenge consent decrees involving affirmative action); *Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989)* (essentially shifting the burden of proof in employment discrimination cases, such that an employee must go beyond the showing of a disparate impact on a group protected by the statute; also allowing an employer to establish a legitimate business justification as a defense, replacing the standard established in *Griggs v. Duke Power Co., 401 U.S. 424 (1971),* which required an employer to show that a discriminatory practice was indispensable or essential); *City of Richmond v. J.A. Croson, 488 U.S. 469 (1989)* (subjecting remedial measures involving affirmative action to the same standard of strict scrutiny as in cases of invidious racial discrimination).

285  *See e.g.,* Peter Applebome, *Louisiana Tally is Seen as a Sign of Voter Unrest,* N.Y. TIMES, Oct. 8, 1990, at A1; David Maraniss, *Duke Emerges from Loss Stronger Than Ever,* WASH. POST, Oct. 8, 1990, at A1; James M. Perry, *Duke's Strong Run in Louisiana Sends National Politicians a Shocking Message,* WALL. ST. J., Oct. 9, 1990, at A5.  Moreover, as of the time of final editing, Duke had emerged from a field of four major candidates, including a member of Congress and the incumbent governor, to face a former governor in a runoff election.  *See* Ex Klan Leader in Louisiana Runoff; Primary: David Duke Will Face Former Gov. Edwin Edwards, Who Led In Ballotting, L.A. TIMES, Oct. 20, 1991, at A1.

286  Michael Griffith, "a 23-year-old black man[,] was struck and killed by a car on a Queens highway . . . after being severely beaten twice by 9 to 12 white men who chased him and two other black men through the streets of Howard Beach in what the police called a racial attack." Robert D. McFadden, *Black Man Dies After Beating by Whites in Queens,* N.Y. TIMES, Dec. 21, 1986, § 1, at *1.*  Yusef Hawkins, "[a] 16-year-old black youth[,] was shot to death . . . in an attack by 10 to 30 white teenagers in the Bensonhurst section of Brooklyn. . . ." Ralph Blumenthal, *Black Youth is Killed by Whites; Brooklyn Attack Is Called Racial,* N.Y. TIMES, Aug. 25, 1989, at A1.

287  *347 U.S. 483 (1954).*

288  Pub. L. No. 88-352, *78 Stat. 241* (codified as amended at 42 U.S.C. § 2000 (1988)).

289  Pub. L. No. 89-110, *79 Stat 437* (codified as amended at *42 U.S.C. § 1973* (1988)).

80 Geo. L.J. 309, *361

and for those who argue against them.  Much of the contemporary crime that concerns Americans is in poor black neighborhoods   [290] and a case can be made that greater firearms restrictions might alleviate this tragedy.  But another, perhaps stronger case can be made that a society with a dismal record of protecting a people has a dubious claim on the right to disarm them.  Perhaps a re-examination of this history can lead us to a modern realization of what the framers of the Second Amendment understood: that it is unwise to place the means of protection totally in the hands of the state, and that self-defense is also a civil right.

Georgetown Law Journal
Copyright (c) 1991 Georgetown Law Journal

---

**End of Document**

---

[290]   *E.g.,* SILBERMAN, supra note 199, at 160-61; Randall L. Kennedy, *McClesky v. Kemp: Race, Capital Punishment, and the Supreme Court,*   101 HARV. L. REV. 1388 (1988); Howard A. Palley & Dana A. Robinson, *Black on Black Crime,* SOCIETY, July/Aug. 1988, at 5, 59.

# Colonial Firearm Regulation

Clayton E. Cramer

*Recently published scholarship concerning the regulation of firearms in Colonial America claims that because Colonial governments distrusted the free population with guns, the laws required guns to be stored centrally, and were not generally allowed in private hands. According to this view, even those guns allowed in private hands were always considered the property of the government. This Article examines the laws of the American colonies and demonstrates that at least for the free population, gun control laws were neither laissez-faire nor restrictive. If Colonial governments evinced any distrust of the free population concerning guns, it was a fear that not enough freemen would own and carry guns. Thus, the governments imposed mandatory gun ownership and carriage laws.*

*Clayton E. Cramer is an independent scholar who took the leading role in exposing the Michael Bellesiles hoax. His website is: www.claytoncramer.com.*

## I. THE LEGAL SIGNIFICANCE OF COLONIAL FIREARM REGULATION TODAY

In much the same way that an understanding of the limits of free speech in Colonial America may provide insights into the intent of Congress and the states when they adopted the First Amendment, so an understanding of colonial firearms regulation has the potential to illuminate our understanding of the limits of the right protected by the Second Amendment. What types of firearms laws were common, and might therefore have been considered within the legitimate scope of governmental regulation?

In the last several years, widely publicized scholarship by Michael Bellesiles has asserted that the English colonies strictly regulated the individual possession and use of firearms. While acknowledging that the English government ordered the colonists to own firearms for the public defense as a cost-cutting measure, he asserts:

> At the same time, legislators feared that gun-toting freemen might, under special circumstances, pose a threat to the very polity that they were supposed to defend. Colonial legislatures therefore strictly regulated the storage of firearms, with weapons kept in some central place, to be produced only in emergencies or on muster day, or loaned to individuals living in outlying areas. They were to remain the property of the government. The Duke of York's first laws for New York required that each town have a storehouse for arms and ammunition. Such legislation was on the books of colonies from New Hampshire to South Carolina.[i]

This assertion—that the Colonial governments distrusted their free people with firearms, and closely controlled their possession in governmental hands—has began to appear in court decisions concerning the meaning of the right to keep and bear arms provisions contained in the U.S. Constitution and 46 of the state constitutions.[ii]

Then as now, laws were not always obeyed, and were sometimes indifferently or unequally enforced. The evidence from contemporary accounts, from probate records, or even from archaeological digs (which could suggest something about gun ownership levels by recovered artifacts), might provide us with evidence for evaluating how often those laws were followed. Under the best of conditions, however, analysis of this type is complex, and differing interpretative models may come to differing conclusions as to whether those laws were generally obeyed, generally ignored, or perhaps were somewhere in between. By comparison, evaluating the claim that Colonial governments passed laws that restricted firearms ownership and use (regardless of how they were actually enforced) is fairly easy.

An examination of the Colonial statutes reveals that, contrary to Bellesiles's claim of distrusted and disarmed freemen, almost all colonies *required* white adult men to possess firearms and ammunition. Some of these statutes were explicit that militiamen were to keep their guns at home; others imply the requirement, by specifying fines for failing to bring guns to musters or church. Colonies that did not explicitly require firearms

Electronic copy available at: https://ssrn.com/abstract=2759961

ownership passed laws requiring the carrying of guns under circumstances that implied nearly universal ownership.

None of the Colonial militia statutes even *suggest* a requirement for central storage of all guns. None of the Colonial laws in any way limited the possession of firearms by the white non-Catholic population; quite the opposite. Most colonies did, however, pass laws restricting possession of firearms by blacks and Indians. In a few cases, in a few colonies, whites suspected of disloyalty (including Catholics) were also disarmed.

As the statutes demonstrate, colonial governments did not hold that firearms in private hands, "were to remain the property of the government."[iii] Indeed, the evidence is largely in the other direction—that colonial governments were often reluctant to seize weapons for public use. When driven by necessity to do so, they compensated owners of those guns.

Colonial regulations that limited the use of firearms were usually for reasons of public safety. These regulations were similar in nature, though generally less restrictive in details, than similar laws today.

## II. FIREARMS AND CIVIC DUTY

The laws regulating firearms ownership adopted by the American colonies bear a strong resemblance to each other. This is not surprising, since by 1740, every colony bore allegiance to the English crown, and the laws reflected the shared heritage. The similarity in laws is especially noticeable with respect to the English duty of nearly all adult men to serve in the militia, and to bear arms in defense of the realm.

### A. Connecticut

Among the Colonial militia statutes, Connecticut's 1650 code contains one of the clearest expressions of the duty to own a gun: "That all persons that are above the age of sixteen yeares, except magistrates and church officers, shall beare arms...; and every male person with this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band...." [iv] A less elaborate form of the law appeared in 1636, with reiterations in 1637, 1665, 1673, 1696, and 1741.[v] Fines varied between two and ten shillings for lacking firearms or for failure to appear with firearms "compleat and well fixt upon the days of training...."[vi]

### B. Virginia

Virginia provides another example of a militia statute obligating all free men to own a gun. A 1684 statute required free Virginians to "provide and furnish themselves with a sword, musquet and other furniture fitt for a soldier… two pounds of powder, and eight pounds of shott…."[vii] A similar 1705 statute required every foot soldier to arm himself "with a firelock, muskett, or fusee well fixed" and gave him eighteen months to comply with the law before he would subject to fine.[viii] There are minor modifications to the statute in 1738 that still required all members of the militia to appear at musters with the same list of gun choices, but reduced the ammunition requirement to one pound of powder and four pounds of lead balls.[ix] A 1748 revision is also clear that militiamen were obligated to provide themselves with "arms and ammunition."[x] The 1748 statute, however, did acknowledge that all freemen might not be wealthy enough to arm themselves, and provided for issuance of arms "out of his majesty's magazine."[xi] By 1755, all cavalry officers were obligated to provide themselves with "holsters and pistols well fixed…."[xii]

### C. New York

Another typical colonial militia statute is the Duke of York's law for New York (adopted shortly after the colony's transfer from the Dutch), that provided, "Besides the Generall stock of each Town[,] Every Male within this government from Sixteen to Sixty years of age, or not freed by public Allowance, shall[,] if freeholders[,] at their own, if sons or Servants[,] at their Parents and Masters Charge and Cost, be furnished from time to time and so Continue well furnished with Arms and other Suitable Provition hereafter mentioned: under the penalty of five Shillings for the least default therein[:] Namely a good Serviceable Gun, allowed Sufficient by his Military Officer to be kept in Constant fitness for present Service" along with all the other equipment required in the field.[xiii]

Electronic copy available at: https://ssrn.com/abstract=2759961

D. Maryland

Similar to statutes appearing in other colonies, Maryland's "An Act for Military Discipline" enacted in February or March of 1638/9 (O.S.) required "that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes[,] one Serviceable fixed gunne of bastard muskett boare…" along with a pound of gunpowder, four pounds of pistol or musket shot, "match for matchlocks and of flints for firelocks…."[xiv] A different form of this law, ordering every member of the militia to "appear and bring with him one good serviceable Gun, fixed, with Six Charges of Powder," appears in a 1715 Maryland statute book as well.[xv] Cavalrymen were obligated to "find themselves with Swords, Carbines, Pistols, Holsters and Ammunition" with a fine for failure to appear armed at militia muster.[xvi]

Of course, laws were sometimes passed but not enforced in colonial times, just as happens now. But the provisions for enforcement in Maryland would seem likely to encourage enforcement for purely selfish reasons. The officers of the militia were required to verify compliance with the law by "a Sight or view of the said armes and ammunition" every month. People who failed to possess arms and ammunition were to be fined thirty pounds of tobacco, payable to the militia officer responsible for the inspection. Anyone who lacked arms and ammunition was to be armed by their militia commander, who could force payment at "any price… not extending to above double the value of the said armes and ammunition according to the rate then usual in the Country."[xvii]

To make sure that householders moving to the new land were adequately armed, it appears that one of the conditions of receiving title to land in Maryland beginning in 1641 was bringing "Armes and Ammunition as are intended & required by the Conditions abovesaid to be provided & carried into the said Province of Maryland for every man betweene the ages of sixteene & fifty years w[hi]ch shalbe transported thether." The arms required included "one musket or bastard musket with a snaphance lock," ten pounds of gunpowder, forty pounds of bullets, pistol, and goose shot.[xviii]

The Maryland militia law of 1638/9 was revised in 1642 requiring, "That all housekeepers provide fixed gunn and Sufficient powder and Shott for each person able to bear arms."[xix] A 1658 revision of the law required "every houshoulder provide himselfe speedily with Armes & Ammunition according to a former Act of Assembly viz 2 [pounds] of powder and 5 [pounds] of shott & one good Gun well fixed for every man able to bear Armes in his house." A householder was subject to fines of 100, 200, or 300 pounds of tobacco, for the first, second, and third failures to keep every man in the house armed.[xx]

In 1756, Maryland again made it explicit that " all and every Person and Persons of the Militia of this Province are as aforesaid, not only liable to the Duties and Services required by this Act, but also if able to find, at their own proper Cost and Charge, Suitable Arms…." At the same time, concerned that those exempted from militia duty who were wealthy were getting an unfair advantage, it ordered that exempts were obligated to "each of them find one good and Sufficient Firelock, with a Bayonet, and deliver the Same to the Colonel or Commanding Officer of the County wherein he shall reside, or pay to the Said Colonel or Commanding Officer the Sum of Three Pounds Current Money in lieu thereof…."[xxi]

At the start of the Revolution, Maryland still assumed that the freemen of the colony were armed as required by law. The Maryland Convention in 1775 threatened that: "if any Minute or Militia-man shall not appear at the time and place of Muster with his Firelock and other accoutrements in good order, … he shall forfeit and pay a sum not exceeding five shillings Common money…."[xxii]

E. Massachusetts

Massachusetts adopted a measure March 22, 1630/1 that required all adult men to be armed.[xxiii] Although this measure is not explicit that the arms were *firearms*, it is apparent that guns were not in short supply in Massachusetts, because within 15 years, the Colonial government had made the requirement for guns explicit, and had even become quite demanding as to what type of guns were acceptable for militia duty. An order of October 1, 1645 directed that in the future, the only arms that would be allowed "serviceable, in our trained bands… are ether full musket boare, or basterd musket at the least, & that none should be under three foote 9 inches…."[xxiv] Even those exempt from militia duty were not exempt from the requirement to have a gun in their home. A June 18, 1645 order required "all inhabitants" including those exempt from militia duty, "to have armes in their howses fitt for service, with pouder, bullets, match, as other souldiers…."[xxv]

Electronic copy available at: https://ssrn.com/abstract=2759961

Massachusetts Bay Colony, like many modern governments, expressed its concern about the nexus of guns and children. A May 14, 1645 order directed that "all youth within this jurisdiction, from ten yeares ould to the age of sixteen yeares, shalbe instructed, by some one of the officers of the band, or some other experienced souldier… upon the usuall training dayes, in the exercise of armes, as small guns, halfe pikes, bowes & arrows….."[xxvi] The duty to be armed meant that even children were required to learn to use a gun.

F. New Haven and Plymouth

Other colonies also required their free adult males to own guns. New Haven Colony passed such laws in 1639, 1643, 1644, and 1646.[xxvii] Plymouth Colony did the same in 1632, 1636, and 1671 (although the last statute is less clear than the earlier two as to requiring private ownership).[xxviii]

G. New Hampshire

A statute in New Hampshire's 1716 compilation ordered "That all Male Persons from Sixteen Years of Age to Sixty, (other than such as are herein after excepted) shall bear Arms … allowing Three Months time to every Son after his coming to Sixteen Years of Age, and every Servant so long, after his time is out, to provide themselves with Arms and Ammunition…. That every Listed Souldier and Housholder, (except Troopers) shall be always provided with a well fix'd, Firelock Musket, of Musket or Bastard-Musket bore,… or other good Fire-Arms, to the satisfaction of the Commission Officers of the Company… on penalty of *Six Shillings* for want of Such Arms, as is hereby required…." [emphasis in original] Similar requirements were imposed on cavalrymen.[xxix]

H. New Jersey

New Jersey's 1703 militia statute was similar, requiring all men "between the Age of Sixteen and Fifty years" with the exception of ministers, physicians, school masters, "Civil Officers of the Government," members of the legislature, and slaves, to be members of the militia. "Every one of which is listed shall be sufficiently armed with one good sufficient Musquet or Fusee well fixed, a Sword or [Bayonet], a Cartouch box or Powder-horn, a pound of Powder, and twelve sizeable Bullets, who shall appear in the Field, so armed, twice every year…."[xxx]

I. Delaware

In 1742, Delaware required, "That every Freeholder and taxable Person residing in this Government (except such as are hereafter excepted) shall, on or before the First Day of March next, provide himself with the following Arms and Ammunition, viz. One well fixed Musket or Firelock, one Cartouch-Box, with Twelve Charges of Gun-Powder and Ball therein, and Three good Flints, to be approved of by the Commanding Officer of the respective Company to which he belongs, and shall be obliged to keep such Arms and Ammunition by him, during the Continuance of this Act...." There was a fine of forty shillings for those who failed to do so.

While "every Freeholder and taxable Person" in Delaware was obligated to provide himself with a gun, not all were required to enlist in the militia, only "all Male Persons, above Seventeen and under Fifty Years of Age" with a few exceptions.

The exemptions from militia duty are quite interesting. Quakers were exempted from the requirement to provide themselves with guns, from militia duty, and from nightly watch duty, in exchange for paying two shillings six pence for every day that "others are obliged to attend the said Muster, Exercise, or Watch...."

Others were exempted from militia musters, but not from the requirement to fight, or the requirement to own a gun. "[A]ll Justices of the Peace, Physicians, Lawyers, and Millers, and Persons incapable through Infirmities of Sickness or Lameness, shall be exempted and excused from appearing to muster, except in Case of an Alarm: They being nevertheless obliged, by this Act, to provide and keep by them Arms and Ammunition as aforesaid, as well as others. And if an Alarm happen, then all those, who by this Act are obliged to keep Arms as aforesaid... shall join the General Militia...." Ministers appear to have been exempted from all of these requirements.[xxxi]

J. Rhode Island

Electronic copy available at: https://ssrn.com/abstract=2759961

There seems to be no explicit Rhode Island law that required every man to own a gun. There is, however, a 1639 statute that ordered "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."xxxii While not an explicit order that every man was required to own a gun, widespread gun ownership was clearly assumed. The Rhode Island city of Portsmouth did impose a requirement to own a gun in 1643, and directed militia officers to personally inspect every inhabitant of the town to verify that they had both bullets and powder.xxxiii

### K. South Carolina

Much like Rhode Island, South Carolina's obligation to own a gun is not explicit, but did require "all, and every person and persons now in this Colony" to "appear in armes ready fitted in their severall Companies…."xxxiv "Armes," of course, might include a sword or other non-firearm weapon, but South Carolina's 1743 requirement to bring guns to church (to be discussed later), suggests that "armes" meant guns.

### L. North Carolina

North Carolina passed militia laws in or before 1715 and in 1746 that were similar in form. The earlier statute required every member of the militia (every freeman between 16 and 60) to show up for muster "with a good Gun well-fixed Sword & at least Six Charges of Powder & Ball" or pay a fine.xxxv The 1746 statute obligated "all the Freemen and Servants… between the Age of Sixteen Years, and Sixty" to enlist in the militia, and further, required all such persons "be well provided with a Gun, fit for Service,… and at least Twelve Charges of Powder and Ball, or Swan Shot, and Six spare Flints....." Failure to have those when called to militia muster would subject one to a fine of two shillings, eight pence, "for Want of any of the Arms, Accoutrements, or Ammunition...." Interestingly enough, unlike other colonies, the definition of militia member under both statutes did not exclude free blacks.xxxvi According to John Hope Franklin, "free Negroes served in the militia of North Carolina with no apparent discrimination against them."xxxvii

### M. Georgia

Georgia's long and poorly written militia law of 1773 at first appears to provide for the government to arm the militia, since it declares that the governor or military commander may "assemble and call together all male Persons in this Province from the Age of Sixteen Years to Sixty Years… at such times, and arm and array them in such manner as is hereafter expressed…."xxxviii But later the statute directs that, "every Person liable to appear and bear arms at any Exercise Muster or Training… Shall constantly keep and bring with them… one Gun or Musket fit for Service[,] one Catridge [*sic*] Box with at least Nine Catridges filled with Good Gun Powder and Ball that shall fit his Piece[,] a horn or Flask containing at least a Quarter of a Pound of Gun Powder[,] a shot Pouch with half a pound of Bulletts…." This is followed by a *very* complete list of tools required to use a gun in the field.xxxix

A member of the militia who was an indentured servant, or otherwise subject to "Government or Command" of another, was not obligated to arm himself, but like New York and other colonies, his master was. He "Shall constantly keep such arms amunition [*sic*] and Furniture for every such Indented Servant…."xl The militia statute also provided for enlisting male slaves from 16 to 60 "as [their masters] can Recommend as Capable and faithful Slaves." Masters were also supposed to arm such slaves when in actual militia service "with one Sufficient Gun… powder Horn and shot pouch…."xli

Failure to appear "completely armed and furnished as aforesaid at any General Muster" could result in a fine of twenty shillings. Militia officers were allowed to appear at the residence of any person obligated to militia duty up to six times a year, "and to Demand a Sight of their arms amunition [*sic*] and accoutrements aforesaid…." Failure to possess the arms and ammunition could result in a five shilling fine.xlii Similar provisions applied to those who were cavalry militiamen.xliii

### N. Pennsylvania

Pennsylvania is the only colony that does not appear to have imposed an obligation to own guns on its citizens.xliv It appears that Pennsylvania's exception was because of its Quaker origins and Quaker pacifism.

Electronic copy available at: https://ssrn.com/abstract=2759961

### O. Indentured Servants

As part of requiring the arming of all freemen, several colonies imposed requirements that masters give guns to indentured servants who had completed their term of service. A 1699 Maryland statute (reiterated in 1715) directed what goods the master was to provide a servant completing his term. Along with clothes and a variety of tools, the master was also directed to give a newly freed male servant, "One Gun of Twenty Shillings Price, not above Four Foot by the barrel, nor less than Three and a Half; which said Gun shall, by the Master or Mistress, in the Presence of the next Justice of the Peace, be delivered to such Free-man, under the Penalty of Five Hundred Pounds of Tobacco on such Master or Mistress omitting so to do…." To encourage the newly freed servant to keep his gun, "And the like Penalty on the said Free-man selling or disposing thereof within the Space of Twelve Months…." Starting in 1705, Virginia imposed a similar requirement that freedom dues include a musket worth at least twenty shillings.[xlv] A 1715 North Carolina statute gave masters the choice of fulfilling freedom dues with either a suit or "a good well-fixed Gun…."[xlvi]

### P. Gunpowder

Gunpowder import records also provide some clues about firearms ownership and use. The British Board of Trade recorded quantities of gunpowder imported through American ports for a brief period just before the Revolution. We have surviving records for the years 1769, 1770, and 1771 that show the American colonies imported a total of 1,030,694 pounds.[xlvii] Of course, this shows only gunpowder imported with knowledge of the Crown; Americans smuggled goods quite regularly during those years, and there was some domestic production of gunpowder as well.[xlviii]

Gunpowder was used not only for civilian small arms, but also for cannon, blasting, and (in extremely small quantities), for tattooing. It seems likely that at least some of this million pounds of gunpowder was sold to the British military, colonial governments, or the Indians. Nonetheless, the quantity is enormous. Even if only one-quarter of the million pounds of gunpowder was used in civilian small arms, that is enough for eleven to seventeen million shots over those three years—in a nation where, according to some, few Americans owned guns, most guns were stored in central storehouses because of mistrust of the population, and few Americans hunted with guns.[xlix]

### Q. Summary

Common to nearly every colony was the requirement that members of the militia (nearly all free white men) possess muskets and ammunition; the rest, such as Rhode Island and South Carolina, clearly assume it. Some of these statutes are explicit that militiamen are to keep their guns at home; others imply it, by specifying fines for failure to appear with guns at church or militia musters. If the militiaman's gun was stored in an armory, and was issued "only in emergencies or on muster day," it is strange that the governments fined militiaman for failing to appear with gun and ammunition. None of the Colonial militia statutes even *suggest* a requirement for central storage of all guns. None of these laws in any way regulated the possession of firearms by the white population, except for requiring nearly all white men to own guns.

## III. THE OBLIGATION TO CARRY FIREARMS

Another part of the civic duty to be armed included the duty to bring guns to church and other public meetings, or while traveling.

### A. Guns in Church

The statute that most clearly states the intent of "bring your guns to church" laws is a 1643 Connecticut order, "To prevent or withstand such sudden assaults as may be made by Indeans upon the Sabboth or lecture dayes, It is Ordered, that one person in every several howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, with powder and shott to e[a]ch meeting…." Connecticut found within a month that, "Whereas it is obsearved that the late Order for on[e] in a Family to bring his Arms to the meeting house every Sabboth and lecture day, hath not bine attended by divers persons" there was now a fine for failing to do so.[l]

Massachusetts Bay Colony also imposed a requirement to come to church armed, though it was repealed

Electronic copy available at: https://ssrn.com/abstract=2759961

and reinstated several times as fear of Indian attack rose and fell. A March 9, 1636/7 ordinance required individuals to be armed. (Britain and its colonies changed from Julian to Gregorian calendar in 1752; as part of that change, the beginning of the new year changed from March 25 to January 1. What had been January 3, 1751 on the Julian calendar would be January 3, 1752 on the Gregorian calendar. Dates from before March 25, 1752 are typically recorded in a form that shows what year appears in the records—but also what year our calendar would consider that date to have been.)

Because of the danger of Indian attack, and because much of the population neglected to carry their guns, every person above eighteen years of age (except magistrates and elders of the churches) was ordered to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12d. for every default…."[li]

The requirement to bring guns to church was repealed November 20, 1637[lii] (perhaps because of the Antinomian crisis to be discussed below). A May 10, 1643 order that directed the military officer in each town to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting" suggests that this requirement was again back in force. The motivation for the 1643 law appears to have been preventing theft of arms while the inhabitants were attending church.[liii]

Rhode Island's 1639 law ordered that, "none shall come to any public Meeting without his weapon." There was a fine of five shillings for failing to be armed at public meetings.[liv] Maryland did likewise in 1642: "Noe man able to bear arms to goe to church or Chappell… without fixed gunn and 1 Charge at least of powder and Shott."[lv] The Rhode Island town of Portsmouth passed a similar requirement in 1643,[lvi] as did New Haven Colony in 1644.[lvii]

Plymouth's 1641 law is oddly worded, and might at first be read as referring to a communal obligation of the township: "It is enacted That every Towneship within this Government do carry a competent number of pieeces fixd and compleate with powder shott and swords every Lord's day to the meetings…." The rest of the sentence clarifies that at least one member of each household was obligated to bring weapons to church during that part of the year when Indian attack was most feared: "one of a house from the first of September to the middle of November, except their be some just & lawfull impedyment."[lviii] By 1658, Plymouth had reduced the requirement so that only one fourth of the militia was obligated to come to church armed on any particular Sunday.[lix] In 1675, apparently in response to a current military crisis, all were again required to come to church armed "with att least six charges of powder and shott" during "the time of publicke danger…."[lx]

The earliest mandatory gun carrying law is a 1619 Virginia statute that required everyone to attend church on the Sabbath, "and all suche as beare armes shall bring their pieces, swords, pouder and shotte." Those failing to bring their guns were subject to a three shilling fine.[lxi] This law was restated in 1632 as: "All men that are fittinge to beare arms, shall bring their pieces to the church…."[lxii]

While the original motivation in colonies both North and South for bringing guns to church was fear of Indian attack, by the eighteenth century, the Southern colonies' concerns appear to have shifted to fear of slave rebellion. Virginia's 1619 and 1632 statutes were somewhat vague as whether all white men were required to come armed to church or not, because of the qualification "fittinge to beare arms." The requirement was more clearly restated in a November 1738 statute that required all militiamen to come to church armed, if requested by the county's militia commander. Other language in the statute suggests that protection of the white inhabitants from possible slave uprising was now the principal concern.[lxiii]

South Carolina's 1743 confusingly worded statute required "every white male inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who [are] liable to bear arms in the militia of this Province… shall, on any Sunday or Christmas day in the year, go and resort to any church or any other public place of divine worship within this Province, and shall not carry with him a gun or a pair of horse-pistols… with at least six charges of gun-powder and ball, and shall not carry the same into the church or other place of divine worship as aforesaid" would be fined twenty shillings. Other provisions required church-wardens, deacons, or elders to check each man coming in, to make sure that he was armed. The purpose was "for the better security of this Province against the insurrections and other wicked attempts of Negroes and other Slaves…."[lxiv] A very similar statute appears in Georgia in 1770.[lxv]

B. Guns for Travelers

Along with the duty to be armed at church, several colonies required travelers to be armed. A 1623

Electronic copy available at: https://ssrn.com/abstract=2759961

Virginia law (reissued in similar form in 1632) required, "That no man go or send abroad without a sufficient parte will armed…. That go not to worke in the ground without their arms (and a centinell upon them.)… That the commander of every plantation take care that there be sufficient of powder and am[m]unition within the plantation under his command and their pieces fixt and their arms compleate…."[lxxvi]

Massachusetts imposed a similar requirement in 1631, ordering that no person was to travel singly between Massachusetts Bay and Plymouth, "nor without some armes, though 2 or 3 togeathr." While the law does not specify that "armes" meant firearms, it would seem likely, considering Massachusetts's other laws requiring all militiamen to own a gun.[lxxvii] The measure was strengthened in 1636: "And no person shall travel above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12*d.* for every default…."[lxxviii]

Rhode Island imposed a similar requirement in 1639: "It is ordered, that noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword…." There was a fine of five shillings for failing to be armed.[lxix] Maryland's 1642 law requiring everyone to come to church armed also dictated, "Noe man able to bear arms to goe… any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott."[lxx]

While the requirements varied from colony to colony, and the motivations changed in the South from fear of Indians to fear of slaves, common to many of the colonies was the duty to come to church armed. Somewhat less commonly there was an obligation to be armed (sometimes explicitly with a gun) while traveling away from settled areas.

## IV. RACE, SLAVERY, & REGULATION

Colonial governments imposed a duty to own guns, but otherwise seem to have imposed few restrictions on gun possession—for whites. For Indians and blacks (either free or slave), colonial laws were much more restrictive.

### A. Indians

Colonial concern about Indians acquiring guns is not surprising. Firearms provided a significant advantage to whites because of their novelty, because gunfire created fear and confusion, and because a gun could do damage where an arrow could not.

William Bradford's account of the Pilgrims' first battle with Indians shows the advantage that guns provided the Europeans. A band of Pilgrims who were exploring the new land in December of 1620 found themselves under attack by Indians armed with bow and arrow. When the Pilgrims began firing muskets, most of the attacking Indians retreated. One brave member of the band, perhaps their leader, stood behind a tree, "within half a musket shot of us," and fired arrows repeatedly at the Pilgrims. He was far enough way, and making sufficiently good use of cover, that Myles Standish, the only professional soldier among the Pilgrim settlers, had little opportunity of hitting him. Finally, Standish, after taking "full aim at him… made the bark or splinters of the tree fly about his ears, after which he gave an extraordinary shriek, and away they went, all of them."[lxxi]

When the Pilgrims arrived in 1620, the Indians of Massachusetts had no guns. Only three years later, John Pory's account reported that those Indians unfriendly to the Pilgrims had been "furnished (in exchange of skins) by some unworthy people of our nation with pieces, shot, [and] powder…."[lxxii] By 1627, the Indians of Massachusetts Bay were believed to have at least sixty guns, largely supplied by Thomas Morton, an Englishman whose trading post, Merrymount, was filled with the sort of hedonists whom the Pilgrims had hoped to leave behind in England. Morton bartered guns for furs with the Indians, violating a royal proclamation against supplying firearms, powder, or shot to the Indians.[lxxiii]

Even after Morton's banishment to England, there were problems with other Europeans selling guns to the Indians. Governor Bradford's history of Plymouth details the arrest of an Englishman named Ashley for illegal sales in 1631, and complaines about French traders selling guns and ammunition to the Indians.[lxxiv]

Attempts to regulate gun sales to the Indians appear in many colonies, and the severity of the punishments suggests that not all colonists shared their government's concerns. Much like the modern effort

Electronic copy available at: https://ssrn.com/abstract=2759961

to disarm people who are not trusted, the colonial gun control efforts were a series of very strict bans that could not be enforced, and were sometimes replaced with more realistic laws that sought to control rather than prohibit sales.

The prohibitions vary in the severity of punishments and vigorous of enforcement. In 1640, Springfield, Massachusetts tried a woman accused of selling her late husband's gun to an Indian. Her defense was that she did not sell it, but lent it to the Indian, "for it lay [spoiling] in her [cellar]," and she expected to reclaim it shortly. The judge warned her that she should get it home again speedily, "for no commonwealth would allow of such a misdemeanor."[lxxv] At the other extreme, a 1642 Maryland law prohibited providing gunpowder or shot to the Indians, and made execution one of the possible punishments.[lxxvi]

Massachusetts Bay Colony, to supplement the royal proclamation against providing guns or ammunition to the Indians, passed its own ordinance on May 17, 1637 prohibiting sale of guns, gunpowder, shot, lead, or shot molds to the Indians, or repair of their guns.[lxxvii] In 1642, Massachusetts Bay complained that "some of the English in the eastern parts" who were under no government at all, were supplying gunpowder and ammunition to the Indians. Unsurprisingly, Massachusetts Bay passed laws punishing those sales.[lxxviii]

Other evidence of a mistrust based on race can be seen in a pair of orders concerning militia duty. The first, on May 27, 1652, required all "Scotsmen, Negers, & Indians inhabiting with or servants to the English" between 16 and 60 to train with the militia.[lxxix] In May, 1656, perhaps after the military crisis of the moment had passed, "no Negroes or Indians… shalbe armed or permitted to trayne…."[lxxx]

Connecticut struggled with unlawful sales of guns to Indians. The very first entry in *Public Records of the Colony of Connecticut* concerns a 1636 complaint that "Henry Stiles or some of the ser[vants] had traded a piece with the Indians for corn."[lxxxi] In 1640, Connecticut ordered George Abbott to pay a £5 fine for "selling a pistol & powder to the Indians…."[lxxxii] A few years later, Robert Slye, George Hubberd, John West, and Peter Blatchford were each fined £10 for "exchanging a gun with an Indian…."[lxxxiii]

Connecticut found enforcement of its gun control law prohibiting sales to the Indians[lxxxiv] frustrated by other colonies. Because merchants in the Dutch and French colonies were selling guns to the Indians, Connecticut next prohibited sale of guns outside the colony. Finally, Connecticut prohibited foreigners from doing business with Indians in Connecticut; the ban was retaliation for continued sales of guns to the Indians by Dutch and French traders elsewhere.[lxxxv] Connecticut also repeatedly fined colonists for selling ammunition to the Indians.[lxxxvi]

By the middle of the seventeenth century, either the original fear of the Indians having guns was receding throughout the New England colonies, or the futility of trying to keep them disarmed was becoming apparent. The laws appear to have changed by the 1660s to less restrictive forms. In 1662, a Springfield, Massachusetts court fined two Indians for drunkenness. Not having the money for the fine, one of them, "Left a gun with the County Treasurer till they make payment."[lxxxvii] On April 29, 1668, the Massachusetts General Court decided to license the sale of "powder, shot, lead, guns, i.e., hand guns [small arms]" to Indians "not in hostility with us or any of the English in New England…."[lxxxviii] In 1668-69, an Indian sued Francis West in Plymouth for the theft of a hog and a gun. The court ordered West to pay for the stolen hog and return the gun to the Indian.[lxxxix]

A similar progression is visible in Connecticut in this same period. In 1660, Connecticut ordered that "if any Indians shall bring in guns into any of the towns" that the colonists were to seize them. The Indians could redeem their seized guns for 10s. each, with half paid to the Treasury, and the other half paid to the Englishman who seized the gun. Because the Indians could redeem their guns, it seems that the objection was not to the Indians having guns, but bringing them to town.

By the following year, this ban on Indians bringing guns to town was repealed for the Tunxis Indians that lived nearby, who "have free liberty to carry their guns, through the English towns, provided they are not above 10 men in company."[xc] The Tunxis Indians were apparently trusted enough to come to town (in small numbers) armed.

Virginia provides perhaps the best example of the shifting views of the colonists about the effectiveness of such laws. A March 1658 Virginia statute provided that "what person or persons so ever shall barter or sell with any Indian or Indians for piece, powder or shot, and being lawfully convicted, shall forfeit his whole estate…." Any Virginian who found an Indian with gun, powder, or shot, was legally entitled to confiscate it.[xci]

Electronic copy available at: https://ssrn.com/abstract=2759961

By the following year, "it is manifest that the neighboring plantations both of English and [foreigners] do plentifully furnish the Indians with guns, powder & shot, and do thereby draw from us the trade of beaver to our great loss and their profit, and besides the Indians being furnished with as much of both guns and ammunition as they are able to purchase, *It is enacted,* That every man may freely trade for guns, powder and shot: It derogating nothing from our safety and adding much to our advantage…."xcii [emphasis in original]

In October 1665, Virginia again prohibited the sale of guns and ammunition to the Indians. The statute admitted that New Amsterdam's sales of guns to the Indians had made the March 1658 law unenforceable. The seizure of New Amsterdam by the Duke of York in 1664 had changed the situation. "[T]hose envious neighbors are now by his majesty's justice and providence removed from us," thus the ban was again in force.xciii

The ban on gun sales was not obeyed, however. In March 1676, as tensions between whites and Indians escalated into Bacon's Rebellion, Virginia enacted a new statute, complaining "the traders with Indians by their [avarice] have so armed the Indians with powder, shot and guns, that they have been thereby emboldened…." The new statute made it a capital offense to sell guns or ammunition to the Indians, and also declared that any colonist found "within any Indian town or three miles without the English plantations" with more than one gun and "ten charges of powder and shot for his necessary use" would be considered guilty of selling to the Indians, and punished accordingly.xciv

In times of tension, of course, colonies might again pass restrictions on sale of guns or ammunition to Indians, but Maryland seems to have followed the model of Virginia—severe restrictions followed by more realistic regulations. A 1638/9 Maryland law made it a felony "to sell give or deliver to any Indian or to any other declared or professed enemie of the Province any gunne pistol powder or shott without the knowledge or lycence of the Leiutenant Generall…."xcv A 1649 statute provided that "noe Inhabitant of this Province shall deliver any Gunne or Gunnes or Ammunicon or other kind of martiall Armes, to any Indian borne of Indian Parentage…."xcvi A 1763 Maryland law prohibited "any Person or Persons within this Province to Sell or give to any Indian Woman or Child any Gun Powder Shot or lead Whatsoever[,] nor to any Indian Man within this Province more than the Quantitys of one Pound of Gun Powder and six Pounds of Shot or lead at any one Time[,] and not those or lesser Quantitys of Powder or Lead oftener than once in Six Months…."xcvii

## B. Blacks

Laws disarming blacks were more common in the southern colonies. A 1680 Virginia statute prohibited "any negroe or other slave to carry or arme himselfe with any club, staffe, gunn, sword or any other weapon of defence or offence…"xcviii

By May, 1723, however, there seem to have been enough free blacks and Indians in the militia that the law was changed: "That every free negro, mulatto, or indian, being a house-keeper, or listed in the militia, may be permitted to keep one gun, powder, and shot…." Those blacks and Indians who were "not house-keepers, nor listed in the militia" were required to dispose of their weapons by the end of October, 1723. Blacks and Indians living on frontier plantations were required to obtain a license "to keep and use guns, powder, and shot…."xcix Even the small number of blacks and Indians who were members of the militia were apparently no longer trusted with guns in public by 1738. They were still required to muster, but "shall appear without arms…."c

Other southern colonies showed similar mistrust of blacks with guns. A Maryland statute passed in or before 1715 directed, "That no Negro or other slave, within this Province, shall be permitted to carry any Gun or any other offensive Weapon, from off their Master's Land, without Licence from their said Master…."ci While less clear, Delaware's 1742 militia statute prohibited all indentured servants and slaves from bearing arms, or mustering in any company of the militia. It is unclear from the statute if this ban applied to free blacks as well.cii

A Georgia statute of 1768 "for the Establishing and Regulating Patrols" prohibited slaves possessing or carrying "Fire Arms or any Offensive Weapon whatsoever, unless such Slave shall have a Ticket or License in Writing from his Master Mistress or Overseer to Hunt and Kill Game Cattle or Mischievous Birds or Birds of Prey…." Other provisions allowed a slave to possess a gun while in the company of a white person 16 years or older, or while actually protecting crops from birds. Under no conditions was a slave allowed to carry "any

Electronic copy available at: https://ssrn.com/abstract=2759961

Gun Cutlass Pistol or other Offensive Weapon" from Saturday sunset until sunrise Monday morning. The "Patrols" alluded to in the law's title were for the purpose of "Searching and examining any Negroe house for Offensive Weapons Fire Arms and Ammunition."[ciii]

Unlike the white population, blacks and Indians were not generally trusted with guns, and the laws reflected this. While individual whites might be disarmed as punishment for a crime or suspected disloyalty (as will be discussed next), gun ownership was generally unrestricted, except for blacks or Indians.

## V. DISARMING THE DISLOYAL

Individual whites were sometimes disarmed if they were perceived as disloyal to the polity.

### A. Antinomians

In 1637 Massachusetts, Anne Hutchinson's Antinomian heresy threatened the social order. Hutchinson's beliefs had spread rapidly through Puritan society, and "some persons being so hot headed for maintaining of these sinfull opinions, that they feared breach of peace, even among the Members of the superiour Court… those in place of government caused certain persons to be disarmed in the severall Townes, as in the Towne of Boston, to the number of 58, in the Towne of Salem 6, in the Towne of Newbery 3, in the Towne of Roxbury 5, in the Towne of Ipswitch 2, and Charles Towne 2."[civ]

Today we can look with disfavor on this disarming order for a variety of violations of the Constitution: as a bill of attainder; as a deprivation of due process; for granting favor to one religious point of view. These concerns, of course, are ahistorical. What the disarming order tells us about Colonial Massachusetts strongly indicates that gun regulation was generally *not* restrictive.

While consistent with the claim that Colonial governments disarmed persons who were not trusted, that there was a need to cause "certain persons to be disarmed" suggests that firearms were *not* stored in central storehouses and were not usually under governmental control. Most freemen were armed, as the laws of all the colonies except Pennsylvania required. Only as punishment for a specific crime—heresy—did Massachusetts disarm Hutchinson's partisans. The number disarmed—77 out of a population then in the thousands—is far less than the percentage legally disarmed in America today.

Virginia's statutes provide a positive variant of this notion. A 1676/7 statute directed: "It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony…."[cv] Any loyal subject of the crown was permitted to purchase and own guns.

### B. Catholics

Maryland provides a somewhat different example. Catholics were exempted from militia duty because, like Hutchinson's Antinomians, and blacks almost everywhere in the colonies, they were not completely trusted. In light of the role that Catholics played in the recurring attempts to restore the Stuarts to the throne of England, the distrust is unsurprising.

In exchange for exemption from militia duty, Catholics were doubly taxed on their lands.[cvi] As part of the same statute, members of the militia were required to swear an oath of allegiance to King George II. Catholics who refused the oath—thus refusing their legal obligation as British subjects to defend the realm—were not allowed to possess arms or ammunition.[cvii]

The law of Britain concerning Catholics and arms after the accession of William I to the throne is at first glance quite confusing. A 1689 law prohibited Catholics from possessing "any arms, Weapons, Gunpowder, or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace, at their general Quarter sessions, for the Defence of his House or Person)."[cviii] The law both prohibited Catholics from possessing arms, and yet allowed them, under some restrictions, to have at least defensive arms. Joyce Malcolm argues that, "This exception is especially significant, as it demonstrates that even when there were fears of religious war, Catholic Englishmen were permitted the means to defend themselves and their households; they were merely forbidden to stockpile arms."[cix]

At least in times of crisis, the English law would appear to have been the justification for disarming Catholics both in Britain and America. In Britain, for example, the death of the queen in 1714 caused orders that, "The Lords Leiutents of the severall Countrys were directed to draw out the Militia to take from Papists

Electronic copy available at: https://ssrn.com/abstract=2759961

& other suspected Persons their Arms & Horses & to be watchfull of the Publick Tranquillity."[cx]

Yet there seem to be relatively few incidents that appear in the *Archives of Maryland* that actually involve taking away arms from Catholics, and even these bear careful scrutiny. In 1744, "No Roman Catholick be for the future enrolled or mustered among the Militia of the said County and that if any of the *Publick Arms* be in the Possession of any Roman Catholick, the Colonel of the said County is hereby desired to oblige the Person in whose Custody such Arms are, to deliver the same to him." [emphasis added][cxi] The law apparently did not order confiscation of privately owned arms owned by Catholics.

By contrast, in 1756, "all Arms Gunpowder and Ammunition of what kind soever any Papist or reputed Papist within this Province hath or shall have in his House or Houses" were ordered seized.[cxii] That the order was adopted when it was, however, suggests that while the 1689 law *allowed* complete prohibition of Catholic gun ownership at the discretion of the government, in Maryland they were not *usually* prohibited from possession.

Catholics settled mainly in Maryland. In other colonies, there is no evidence that Catholics in general were disarmed.

Georgia provides an example of selective Catholic disarmament. At the start of the French & Indian War, British forces demanded that the French population of Nova Scotia swear an oath of allegiance to the crown. Persons who refused were forcibly removed to other British colonies. Some of these Acadians (the ancestors of the Cajuns) were bound as indentured servants in Georgia. A 1756 law prohibited indentured Acadians "to have or use any fire Arms or other Offensive Weapons otherwise than in his Masters Plantation or immediately under his Inspection…."[cxiii] There seems to be no general prohibition on Catholic ownership of firearms in Georgia; the Acadians were disarmed because they had refused to be loyal subjects of the British government, and the suspicion of disloyalty followed them to Georgia.

## VI. PRIVATE VS. GOVERNMENT OWNERSHIP

Regarding Bellesiles's claim that guns "were to remain the property of the government,"[cxiv] the evidence suggests quite the opposite.

### A. Guns for the Poor

On any number of occasions, the Colonial governments supplied guns to subjects too poor to purchase them. The laws usually specified that the recipient was to pay for the gun.

For example, a March 22, 1630/1 Massachusetts statute required the entire adult male population to be armed. Every person, including servants, was to own "good & sufficient armes" of a type "allowable by the captain or other officers, those that want & are of abilitie to buy them themselves, others that are unable to have them provided by the town…." Those who were armed by the town under the March 22 statute were to reimburse the town "when they shalbe able."[cxv] On March 6, 1632/3, the law was amended to require that any single person who had not provided himself with acceptable arms would be compelled to work for a master. The work earned him the cost of the arms provided to him by the government.[cxvi]

Connecticut's Code of 1650 provided that a person who was required to arm themselves, or arm a dependent, but "cannot purchase them by such means as he hath, hee shall bring to the clark so much corne or other merchantable goods" as was necessary to pay for them. The value of the arms was to be appraised by the clerk "and two others of the company, (whereof one to bee chosen by the party, and the other by the clarke,) as shall be judged of a greater value by a fifth parte, then such armes or ammunition is of.…"

Thus, the man who would not purchase a gun and ammunition would have one provided by the government, but at a price as much as twenty percent above the market price. The high price created an incentive to purchase a gun privately.

Another part of the law provided for hiring out any unarmed single men to earn the price of a gun and ammunition.[cxvii] Very similar laws appeared in New York[cxviii] and New Hampshire.[cxix]

A 1673 Virginia law, while less explicit about the process for determining the value of the arms, directed militia officers to purchase guns on the public account for distribution to those who could not afford them, "for them to dispose of the same as there shalbe occasion; and that those to whome distribution shalbe made doe pay for the same at a reasonable rate…."[cxx] The law does not directly disprove that guns were "to remain

Electronic copy available at: https://ssrn.com/abstract=2759961

the property of the government." It does, however, seem a bit strange for the government to provide guns to individual militiamen, and then require them to pay for those guns, if the guns were to remain governmental property.

## B. Public Arms

Not every Virginia militiaman apparently succeeded in arming himself; a 1748 statute provided "it may be necessary in time of danger, to arm part of the militia, not otherwise sufficiently provided, out of his majesty's magazine and other stores within this colony…." Contrary to the claim that all guns were considered the property of the government, the same statute criminalized embezzlement of "arms or ammunition" that were issued to those who were too poor to arm themselves, and thus drew a distinction between public arms issued from "his majesty's magazine" and other, presumably privately owned firearms.[cxxi]

Similarly, a Maryland statute of 1733 passed "to prevent the Embezzlement of the Public Arms" directed "That all the Public Arms shall be Marked with such Marks… to denote such Arms to belong to the Public; after which Marks so made, no Person or Persons whatsoever, shall presume to Sell or Purchase such Arms so Marked…."[cxxii] If all guns automatically belonged to the government, it seems a bit odd that there was a need to mark them as "Public Arms."

In 1756, Maryland's militia officers were ordered to make a diligent search for arms and ammunition, demanding that everyone show what guns they had. The reason would appear to be, "Whereas on many Occasions Arms Ammunition and military Accoutrements of different Kinds have been delivered out of the public Magazines of this Province and are now dispersed among the Inhabitants and have been Sold or Sent from one to another and it is represented that the Locks have been taken of from many of the Said Arms and put to private Use…."[cxxiii] If all guns were "automatically government property," the careful search for publicly owned arms, distinguishing them from private property, would make no sense.

Massachusetts at one point directed that, "The surveyar genrall of the armes of the country shall have power to sell any of the country armes for an equall price, either in corne or other country pay, & to p[ro]vide armes againe therew[i]th so soone as may bee, so hee sell them not out of this jurisdiction."[cxxiv] Publicly owned arms were to be sold (not issued or loaned), as long as they were sold in Massachusetts.

A 1765 Virginia statute is also strong evidence that guns were not regarded as automatically government property. It provided for militia commanders in "each of the counties from which the militia has been sent into service in the pay of this colony shall, within the space of three months after the passing this act, sell, for the best price that be had for the same, all arms, ammunition, provisions, and necessaries purchased at the publick expense in the said counties…."[cxxv] Surplus government guns were clearly sold, not loaned out to militiamen.

## C. Private Arms

Other evidence establishes that Colonial governments at least sometimes recognized that guns could be private property, and were *not* regarded as automatically the property of the government. Connecticut's records provide such evidence. In 1639, after the Pequot War, "a musket with 2 letters I W" was found, "conceaved to be Jno. Woods who was killed att the Rivers mouth. It was ordered for the present [that] the musket should be delivered to Jno. Woods friends until other appeare."[cxxvi] If the Connecticut government regarded a dead man's musket as "government property," it is odd that they delivered it to his friends.

We also have examples of colonists fined for selling guns to the Indians—and with no suggestion that these were publicly owned arms. A 1636 complaint in the Connecticut records shows that "Henry Stiles or some of the ser[vants] had traded a peece with the Indians for Corne."[cxxvii] In 1640, George Abbott is ordered to pay a £5 fine for "selling a pystoll & powder to the Indeans…."[cxxviii] Fines are also repeatedly assessed for selling guns to the Indians, with no hint or suggestion that these were government property.[cxxix]

Were guns privately owned or government property? We have evidence such as a Connecticut lawsuit in 1639 by a "Jno. Moody contra Blachford, for a fowling peece he bought and should have payd for it 40s."[cxxx] In 1640, also in Connecticut, a William Hill was fined £4 "for buying a stolen peece of Mr. Plums man."[cxxxi] There is nothing in the reports of these cases that suggests that these guns were considered government property.

Similarly, in New Haven Colony, a civil suit of 1645 concerns a gun purchased by Stephen Medcalfe from

Electronic copy available at: https://ssrn.com/abstract=2759961

a Francis Linley. The gun was defective, and when it exploded, Medcalfe lost an eye. There is nothing in the description of the suit that suggests that the gun was "property of the government" and it was no surprise that one person sold a gun to another.[cxxxii]

Belesiles claims that "the government reserved to itself the right to impress arms on any occasion, either as a defensive measure against possible insurrection or for use by the state. No gun ever belonged unqualifiedly to an individual."[cxxxiii]

Yet there are a number of examples that directly contradict this claim. An October 13, 1675 statute of Massachusetts Bay provided for assessments on persons exempt from militia training of "so many fire armes, muskets, or carbines, with a proportionable stocke of [powder] & am[m]unition, as the said committees respectively shall appoint…." It appears that this was an assessment in kind, not of money. Another part of the statute specified "all such persons as shall be assessed, and shall accordingly provide three fire armes, shall be freed from being sent abroad to the warrs, except in extreame & utmost necessity."[cxxxiv]

Thus, the government believed that there were enough people who owned at least three guns that the government was prepared to exempt them from the onerous duty to fight overseas if they offered those guns to the government. As much as the government needed the guns, it did not believe that it had the authority to confiscate them. Instead, it needed to make a deal with the owners. Apparently the government did not believe that all guns were its property.

More evidence that militiamen possessed their *own* arms, and that the arms were not always issued from government magazines for militia service, is Massachusetts Governor William Shirley's 1755 order to the militia to appear for service. "To such of them as shall be provided with sufficient Arms at their first Muster, they shall be allowed a *Dollar* over and above their Wages, and full Recompence for such of their Arms as shall be inevitably lost or spoiled."[cxxxv]

Clearly, Governor Shirley believed that there were some members of the militia who, contrary to law, did not have firearms appropriate to military service. Just as clearly, Governor Shirley believed that some members would show up appropriately armed, and he was prepared to pay them extra to do so. Most importantly from the standpoint of private vs. public ownership, "full Recompence" shows that militiamen would be compensated for the loss of their privately owned guns; the guns were not "property of the government."

Maryland's Governor Sharpe similarly directed calling up of the militia, offering to provide government arms in 1759, but also "That for Every One of such Arms as any of Your men shall bring with them, and that may be Spoiled or Lost in actual Service, I will pay at the rate of Twenty five Shillings a Firelock."[cxxxvi]

At the start of the Revolution, a number of colonies made arrangements for additional pay for those soldiers who showed up with their own guns. Connecticut, for example, provided "that each inlisted inhabitant that shall provide arms for himself, well fixed with a good bayonet and cartouch box, shall be paid a premium of ten shillings…."[cxxxvii] Later measures also suggest that militia men showing up with their own guns, and being paid extra, were the rule, not the exception.[cxxxviii] Like Governor Shirley's "full Recompense," the Connecticut laws provided for compensation for those whose guns were lost in the war. While Connecticut impressed guns from the population for militiamen who did not have their own, the owners were to be paid four shillings for the use of impressed guns, and "the just value of the such gun" if lost.[cxxxix]

At the start of the Revolution, the Provincial Congress of Massachusetts purchased firearms from private parties,[cxl] and requested private citizens to sell their guns to the government: "[I]t is strongly recommended to such inhabitants…, that they supply the colony with same."[cxli] A request of June 15, 1775 for individuals to sell their arms is also phrased in terms that seem quite voluntary. "*Resolved*, that any person or persons, who may have such to sell, shall receive so much for them, as the selectmen of the town or district in which or they may dwell, shall appraise such arms at…."[cxlii]

Other colonies also purchased guns from private parties—a strange behavior if guns remained "the property of the government." [cxliii] Similarly, in November of 1775, with the war well under way, the Pennsylvania government issued a very odd statement, if guns were automatically "property of the government":

> The Committee of Safety are of opinion, that it is not improper for Mr. James Innes to purchase any second hand Arms which he may find in the hands of Individuals of this Province,

Electronic copy available at: https://ssrn.com/abstract=2759961

and therefore have no objection to his buying them; But as they have employed, and are endeavouring to employ, all the Artificers that can be procured in making new arms for the public, they apprehend any application by Mr. Innes to such Artificers, will be attended with bad consequences to the general Cause by enhancing the Price of arms….[cxliv]

At the start of the Revolution, the Maryland government confiscated guns from Tories and others suspected of disloyalty to the Patriot cause. Yet even then, the owners received compensation for the value of their guns.[cxlv] Even disloyalty was not just cause for confiscation without compensation.

Another piece of evidence that guns were not "property of the government" is a 1776 order of the Continental Congress:

> Whereas in the execution of the resolve of Congress of the 14th of March, respecting the disarming disaffected persons, many fire arms may be taken, which may not be fit for use to arm any of the troops mentioned therein: Therefore, Resolved, That all the fire arms so taken, being appraised according to said resolve, none of them shall be paid for, but those that are fit for the use of such troops, or that may conveniently be so made, and *the remainder shall be safely kept by the said assemblies, conventions, councils or committees of safety, for the owners, to be delivered to them when the Congress shall direct*.[cxlvi] [emphasis added]

The owners were to be paid for guns taken for military use. Government ownership of guns was not assumed. Quite the opposite, private ownership was assumed and respected, even for Tories.

In the days after Lexington and Concord, General Gage was understandably nervous about being attacked from the rear by armed rebels. General Gage consequently ordered the people of Boston to turn in their arms. Many Bostonians were also deeply interested in leaving town, both because of the increasing poverty caused by the Boston Port Act of 1774, and the likelihood that the revolutionary army would attack Boston.

As an incentive, General Gage offered passes to leave Boston to all who turned in their weapons. No weapons or ammunition were allowed to leave Boston. The arms were to be "marked with the names of the respective owners…that the arms aforesaid, at a suitable time, would be returned to the owners." The marking of the arms demonstrates that at least some of these were personally owned, not public arms. On April 27th, "the people delivered to the selectman 1778 fire-arms, 634 pistols, 973 bayonets, and 38 blunderbusses…."[cxlvii]

## VII. Restrictions on Private Use

There are restrictions on the use of firearms in the Colonial law, and most of these are unsurprising. They are safety and hunting regulations of the same general form, though less restrictive, than current laws.

### A. Restrictions on Discharge

The need for such laws strongly suggests that the claim that guns were kept centrally stored is incorrect. A March 1655/6 Virginia statute, for example, prohibited shooting "any guns at drinkeing (marriages and funerals onely excepted)" because gunshots were the common alarm of Indian attack, "of which no certainty can be had in respect of the frequent shooting of gunns in drinking…."[cxlviii] Similarly, a 1642 Maryland statute also ordered that, "No man to discharge 3 guns within the space of ¼ hour… except to give or answer alarm."[cxlix]

There are some regulations that appear to have been temporary measures designed to deal with a particular crisis, and we may only speculate as to the motivations. An example is a 1675 Plymouth statute that prohibited shooting except at an Indian or a wolf. Since this measure immediately followed one requiring everyone to come to church armed "during the time of publicke danger,"[cl] it seems likely that the law was an attempt to prevent unnecessary alarm, for the same reasons as the Virginia and Maryland laws.

Shooting was apparently a common enough pastime in 1638 Massachusetts that when an Emanuell Downing had "brought over, at his great charges, all things fitting for takeing wild foule by way of [decoy],"

Electronic copy available at: https://ssrn.com/abstract=2759961

the General Court felt it necessary to order "that it shall not bee lawfull for any person to shoote in any gun within halfe a mile of the pond where such [decoy] shalbee placed…."[cli] The need for such a law suggests that guns were not kept locked in a central storehouse.

The laws were passed not only for the economic benefit of the community as a whole, but also because negligent misuse of firearms was not unknown. An incident from a history of Plymouth Colony described how:

> On 1 July 1684 Robert Trayes of Scituate, described as a 'negro,' was indicted for firing a gun at the door of Richard Standlake, thereby wounding and shattering the leg of Daniel Standlake, which occasioned his death. The jury found the death of Daniel Standlake by 'misadventure,' and the defendant, now called 'negro, John Trayes,' was cleared with admonition and fine of £5.[clii]

A statute adopted at the Massachusetts 1713-14 legislative session complained, "Whereas by the indiscreet firing of guns laden with shot and ball within the town and harbour of Boston, the lives and limbs of many persons have been lost, and others have been in great danger, as well as other damage has been sustained…" the legislature prohibited firing of any "gun or pistol" in Boston ("the islands thereto belonging excepted").[cliii]

Perhaps for a similar reason—or just to allow the inhabitants to get some sleep—in 1759, Georgia made it unlawful to fire "any great gun or [small] arm in the town or harbour of Savannah after Sun Set without leave or permission from the Governor…."[cliv]

### B. Restrictions on Hunting

Hunting with firearms was also sufficiently common for Colonial governments to adopt restrictions. A 1632 Virginia statute licensed hunting wild pigs, but "any man be permitted to kill deare or other wild beasts or fowle in the common woods, forests, or rivers…. That thereby the inhabitants may be trained in the use of theire armes, the Indians kept from our plantations, and the wolves and other vermine destroyed."[clv] A March 1661/2 statute prohibited "hunting and shooting of diverse men" on land without the owner's permission "whereby many injuryes doe dayly happen to the owners of the said land…." The statute also provided that it was lawful to pursue game shot elsewhere onto private land without permission.[clvi] A 1699 statute, "prohibiting the unseasonable killing of Deer," complained about how the deer population "is very much destroyed and diminished" by killing "Does bigg with young…."[clvii]

Laws regulating hunting appear in at least two colonies by mid-eighteenth century, and the language in both statutes suggests that hunting was common. A 1722 New Jersey "Act to prevent the Killing of Deer out of Season" prohibited deer hunting from January through June. That same law included a provision prohibiting "Persons carrying of Guns, and presuming to Hunt on other Peoples Land" explaining that it was required because "divers Abuses have been committed, and great Damages and Inconveniencies arisen…." The same act prohibited a slave from hunting or carrying a gun without permission of his master.[clviii]

A 1738 North Carolina "Act, to Prevent killing Deer, at Unseasonable Times" made it unlawful "to kill or destroy any Deer… by Gun, or other Ways and Means whatsoever" from February 15 to July 15."[clix]

Virginia temporarily banned deer hunting in 1772, complaining that "many idle people making a practice, in severe frozen weather, and deep snows, to destroy deer, in great numbers, with dogs, so that the whole breed is likely to be destroyed, in the inhabited parts of the colony…." The government's concern was that, "numbers of disorderly persons… almost destroyed the breed, by which the inhabitants will… be deprived of that wholesome and agreeable food…." Therefore, deer hunting was completely prohibited until August 1, 1776.[clx] It is not made explicit that the hunting was with guns, however.

Maryland had a few hunting restrictions as well. A 1648 law complained that because licenses previously issued for "killing of Wild Hoggs [e]mploying Indians to kill deere with Gunnes" both to residents and non-residents of Maryland "hath occasioned some inconvenience & hath given great offence to divers of the Inhabitants of this Province," all existing licenses were repealed. Unfortunately, the statute failed to explain in what manner this hunting had inconvenienced or offended the "Inhabitants."[clxi]

Two years later, another law prohibited foreigners "either English or Indian" from hunting "in any part of this Province or kill any Venison or other Game" without a license from the governor,[clxii] again with no

Electronic copy available at: https://ssrn.com/abstract=2759961

explanation of the problem this law was intended to solve.

A 1654 Maryland law sought to prohibit shooting on Sundays: "Noe work shall be done on the Sabboth day but that which is of Necessity and Charity to be done no Inordinate Recreations as fowling, fishing, hunting or other, no shooting of Gunns be used on that day Except in Case of Necessity[.]" Following immediately upon prohibitions on drunkenness, swearing and gossiping, the statute seems intended to improve morals of the population, and was not specifically directed at guns.[clxiii] In 1678, the law was expanded to prohibit a larger list of amusements, and still prohibited fishing and hunting.[clxiv]

### C. Restrictions on Fire-hunting

One particularly destructive practice of Colonial America was "fire-hunting," well described by a 1760 account explaining why white pines in New York, New England, and New Jersey were protected for the use of the Royal Navy:

> This restriction is absolutely necessary, whether considered as securing a provision for the navy, or as a check upon that very destructive practice, taken from the Indians, of fire-hunting. It used to be the custom for large companies to go into the woods in the winter, and to set fire to the brush and underwood in a circle of several miles. This circle gradually contracting itself, the deer, and other wild animals inclosed, naturally retired from the flames, till at length they got herded together in a very small compass.
>
> Then, blinded and suffocated by the smoke, and scorched by the fire, which every moment came nearer to them, they forced their way, under the greatest trepidation and dismay, through the flames. As soon as they got into the open daylight again, they were shot by the hunters, who stood without and were in readiness to fire upon them.[clxv]

Fire-hunting was not confined to the Northeast colonies; there are a number of statutes of Colonial Virginia and Maryland that either directly prohibit fire-hunting with reference to guns,[clxvi] or that license hunting on the frontier in an attempt to control fire-hunting.[clxvii] Doubtless other restrictions on firearms use existed—but if so, those who argue that Colonial governments severely restricted firearms use have yet to produce them.

### CONCLUSION: COLONIAL FIREARMS REGULATIONS WERE NEITHER *LAISSEZ-FAIRE* NOR RESTRICTIVE

As should be clear from the preceding walk through these laws, the Colonial statutes were not *laissez-faire*; there were many obligations concerning the ownership and carrying of guns adopted for the public good. Neither were they restrictive, at least for whites (with the exception of Catholics in Maryland). There were, it is true, some severe restrictions on firearms ownership in Colonial America, but they applied only to people who were not trusted to be loyal members of the community, particularly Indians and blacks. For the vast majority of people, who were considered loyal members of the community, gun ownership was not only allowed, it was an obligation.

### ENDNOTES

---

[i]. Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A. Knopf, 2000), 73. Similar text, with a subset of the same footnotes, appears at Michael Bellesiles, "Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794," *Law & History Review*. 16:575 (1998).

Bellesiles also asserts government ownership of all guns at *Arming America*, pp. 79-80. Because individuals failed to take adequate care of guns in private hands, "The eventual solution to the lack of care devoted to firearms was to make all guns into the property of the state, subject to storage in central storehouses where they could be cleaned and repaired

Electronic copy available at: https://ssrn.com/abstract=2759961

by paid government gunsmiths." Similarly, Bellesiles asserts that while "the colonies supported and subsidized the private ownership of firearms, the government reserved to itself the right to impress arms on any occasion, either as a defensive measure against possible insurrection or for use by the state. No gun ever belonged unqualifiedly to an individual."

[ii]. *State v. Hirsch*, 177 Or. App. 441, 34 P.3d 1209 (Or. App. 2001).

[iii]. Bellesiles, *Arming America,* 73.

[iv]. *Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford, Conn.: Silas Andrus, 1822), 72-73; J. Hammond Trumbull (vol. 1-3), Charles J. Hoadly (vol. 4-15), *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony* (Hartford, Conn.: Brown & Parsons, 1850) (hereinafter *Public Records of Connecticut*), 1:542-543.

[v]. *Public Records of Connecticut*, 1:3-4, 15-16, 2:19-20, 217-18, 4:177, 8:379-80.

[vi]. *Id.*, 2:217-18, 4:177, 8:379-80.

[vii]. William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (New York: R. & W. & G. Bartow, 1823), 3:13.

[viii]. *Id.*, 3:338.

[ix]. *Id.*, 5:17, 21.

[x]. *Id.*, 6:116.

[xi]. *Id.*, 6:118.

[xii]. *Id.*, 6:537.

[xiii]. *The Colonial Laws of New York from the Year 1664 to the Revolution…* (Albany, New York: James B. Lyon, 1894), 1:49-50.

[xiv]. William Hand Browne, ed., *Archives of Maryland* (Baltimore: Maryland Historical Society, 1885) (hereinafter *Archives of Maryland*), 1:77.

[xv]. *Id.*, 75:258.

[xvi]. *Id.*, 75:259.

[xvii]. *Id.*, 1:77.

[xviii]. *Id.*, 3:100-1.

[xix]. *Id.*, 3:103.

[xx]. *Id.*, 3:345.

[xxi]. *Id.*, 52:469.

[xxii]. *Id.*, 11:21. But see *id.,* 11:90 for a complaint that many had failed to conform to the law, though the complaint alleges that that the problem was "would not," not "could not."

[xxiii]. Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston: William White, 1853), 1:84.

[xxiv]. *Id.*, 2:134. This requirement is reiterated on November 11, 1647. *Id.*,2:222.

[xxv]. *Id.*, 3:84.

[xxvi]. *Id.*, 2:99.

[xxvii]. Charles J. Hoadly, ed., *Records Of The Colony And Plantation Of New Haven, From 1638 To 1649* (Hartford, Conn.: Case, Tiffany, 1857), 25-26, 96-97, 131, 202. Hoadly, 122-3, lists a number of men fined for failure to obey.

[xxviii]. William Brigham, ed., *The Compact with the Charter and Laws of the Colony of New Plymouth…* (Boston: Dutton and Wentworth, 1836), 31, 44-45, 285-6.

[xxix]. *Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England…* (1716), 91-92, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1985.

Electronic copy available at: https://ssrn.com/abstract=2759961

xxx. *The Laws and Acts of the General Assembly of Her Majesties Province of Nova Caesarea or New-Jersey* (W. Bradford, 1709), 12-13, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1412.

xxxi. *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Franklin, 1741), 171-7. While the title page is clearly 1741, this must have been only for the first of annual series, since the law was passed in 1742. See also a 1740 statute, *Id.*, 151, imposing similar requirements on the town of Lewes, which was apparently considered especially exposed to naval attack.

xxxii. John Russell Bartlett, ed., *Records of the Colony of Rhode Island and Providence Plantations, in New England* (Providence, R.I.: A. Crawford Greene and Brother, 1856), 1:94.

xxxiii. *Id.*, 1:79-80.

xxxiv. Alexander S. Salley, *Journal of the Grand Council of South Carolina* (Columbia, S.C.: Historical Commission of South Carolina, 1907), 1:10-11.

xxxv. *Laws of North Carolina–1715*, ch. 25, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 2:29-31.

xxxvi. *A Collection of all the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use...* (Newbern, N.C.: James Davis, 1751), 215-16.

xxxvii. John Hope Franklin, *The Free Negro in North Carolina, 1790-1860* (Chapel Hill, N.C.: University of North Carolina Press, 1995), 101-102.

xxxviii. Allen D. Candler, comp., *The Colonial Records of the State of Georgia* (Atlanta, Ga.: Chas. P. Byrd, 1911), 19(part 1):291. Nearly identical language appears in the 1755 militia statute. *Id.*, 18:7, 11-12.

xxxix. *Id.*, 19(part 1):296.

xl. *Id.*, 19(part 1):303. There are many pages of highly detailed fines and provisions to handle any imaginable contingency in this statute.

xli. *Id.*, 19(part 1):324-25.

xlii. *Id.*, 19(part 1):297-8.

xliii. *Id.*, 19(part 1):299. See the similar obligation imposed in 1757 on members of the militia to keep and carry "one good Gun or Pistol in Order… and a Cartridge Box with at least Six Cartridges" when on patrol duty. *Id.*, 18:231.

xliv. A few scattered scraps that give some idea of the conflict between governor and legislature on passage of a mandatory militia law can be found at *Pennsylvania Archives*, 4th series, 1:706-8; 2:441, 548, 555.

xlv. *Archives of Maryland*, 75:264; Abbot Emerson Smith, *Colonists in Bondage: White Servitude and Convict Labor in America, 1607-1776* (Gloucester, Mass.: Peter Smith, 1965), 239.

xlvi. *Laws of North Carolina—1715*, ch. 46, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 63; Farley Grubb, "The Statutory Regulation of Colonial Servitude: An Incomplete-Contract Approach," *Explorations in Economic History* 37 (January, 2000):69.

xlvii. Public Records Office, Customs 16:85, 109, 171. In 1769: 229,545 pounds; 1770: 410,591; 1771: 390,558 pounds.

xlviii. William J. Novak, "*Salus Populi*: The Roots of Regulation in America, 1787-1873" (Ph.D. diss., Brandeis University, 1992), 188.

xlix. This calculation is necessarily imprecise, but is based on statutes of the time that assumed four pounds of lead for every pound of gunpowder, and a 0.75 caliber Brown Bess: *Archives of Maryland*, 1:77; Matthew Page Andrews, *Tercentenary History of Maryland* (Chicago and Baltimore: S.J. Clarke Publishing Co., 1925), 1:150; Hening, 5:17, 21. Many firearms in Colonial America were smaller caliber, and consequently used less powder, increasing the number of shots that could have been fired. Concerning the claim of gun ownership, storage requirements, and hunting, see generally Bellesiles, *Arming America*.

l. *Public Records of Connecticut,* 1:95, 96.

li. Shurtleff, 1:190.

lii. *Id.*, 1:210.

Electronic copy available at: https://ssrn.com/abstract=2759961

liii. *Id.*, 2:38.

liv. Bartlett, 1:94.

lv. *Archives of Maryland*, 3:103.

lvi. Bartlett, 1:79.

lvii. Hoadly, 131-32. See *id.*, 122-23, for men fined for failure to bring their guns to church, and Hoadly, 500, for William Paine's request that he be exempted from this requirement, "he lives [far off] and hath three small children, and his wife is lame and cannot help to bring the children."

lviii. Brigham, 70.

lix. *Id.*, 115.

lx. *Id.*, 176.

lxi. August 2, 1619, "Proceedings of the Virginia Assembly, 1619," in Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606-1625* (New York: Charles Scribner's Sons, 1907; reprinted New York: Barnes & Noble, 1959), 273.

lxii. Hening, 1:198.

lxiii. *Id.*, 5:19.

lxiv. David J. McCord, *Statutes at Large of South Carolina* (Columbia, S.C.: A. S. Johnson, 1840), 7:417-19.

lxv. Candler, *The Colonial Records of the State of Georgia*, 19(part 1):137-40.

lxvi. Hening, 1:127, 198.

lxvii. Shurtleff, 1:85.

lxviii. *Id.*, 1:190.

lxix. Bartlett, 1:94.

lxx. *Archives of Maryland*, 3:103.

lxxi. William Bradford, Samuel Eliot Morison, ed., *Of Plymouth Plantation, 1620-1647* (New York: Alfred A. Knopf, 2001), 70.

lxxii. Sydney V. James, Jr., *Three Visitors to Early Plymouth* (Bedford, Mass.: Applewood Books, 1997), 16.

lxxiii. Francis Adams, Jr., ed., *New English Canaan of Thomas Morton* (Boston: The Prince Society, 1883; reprinted New York: Burt Franklin, 1967), 21-28.

lxxiv. Bradford, 204, 206-8, 232-3.

lxxv. Joseph H. Smith, ed., *Colonial Justice in Western Massachusetts (1639-1702): The Pynchon Court Record, An Original Judges' Diary of the Administration of Justice in the Springfield Courts in the Massachusetts Bay Colony* (Cambridge: Harvard University Press, 1961), 208.

lxxvi. *Archives of Maryland*, 3:103.

lxxvii. Shurtleff, 1:196.

lxxviii. *Id.*, 2:24.

lxxix. *Id.*, 3:268.

lxxx. *Id.*, 3:397.

lxxxi. *Public Records of Connecticut*, 1:1, 2.

lxxxii. *Id.*, 1:49.

lxxxiii. *Id.*, 1:182.

lxxxiv. *Id.*, 1:79-80.

lxxxv. *Id.*, 1:113-14, 138, 145-6, 197-8.

lxxxvi. *Id.*, 1:146-7, Richard Lord fined £7 and Thomas Stanton, £5. *Id.*, 1:167, Thomas Lord ordered to appear. *Id.*, 1:242, Captain Sebadoe fined £10.

Electronic copy available at: https://ssrn.com/abstract=2759961

lxxxvii. Smith, 263.

lxxxviii. Shurtleff, 4 (part 2):365.

lxxxix. John E. Soule, Milton E. Terry, and Robert S. Wakefield, comp., *George Soule of the Mayflower and His Descendants for Four Generations*, 3rd ed. (Plymouth, Mass.: General Society of Mayflower Descendants, 1999), 6.

xc. *Public Records of Connecticut,* 1:351, 375.

xci. Hening, 1:441.

xcii. *Id.*, 1:525.

xciii. *Id.*, 2:215.

xciv. *Id.*, 2:336-7.

xcv. *Archives of Maryland*, 1:71.

xcvi. *Id.*, 1:250.

xcvii. *Id.*, 58:420.

xcviii. Hening, 2:481.

xcix. *Id.*, 4:131.

c. *Id.*, 5:17. Indians and blacks to appear unarmed for muster reiterated in 1757. *Id.*, 7:95.

ci. *Archives of Maryland*, 75:268.

cii. *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Frankllin, 1741), 178.

ciii. Candler, *The Colonial Records of the State of Georgia*, 19(part 1):76-78. Essentially identical language appears in the 1755 slave law, *Ibid.*, 18-117-18.

civ. J. Franklin Jameson, ed., *Johnson's Wonder-Working Providence: 1628-1651* (New York: Barnes & Noble, Inc., 1959), 175. Shurtleff, 1:211-12, gives the disarming orders.

cv. Hening, 2:403.

cvi. *Archives of Maryland,* 52:450-1 contains a 1756 militia law that exempts "Papists, the Persons commonly called Neutralls, Servants, and Slaves." See instructions at 52:598 ordering that no soldier be enlisted "Roman Catholic or Deserter, knowing them to be such…." Also discussed at 6:419-20, 9:315-6; 28:315

cvii. *Id.*, 52:451-2.

cviii. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (Cambridge, Mass.: Harvard University Press, 1994), 123. Britain and Ireland had different laws concerning the disarming of Catholics, with the Irish law somewhat more restrictive on the possession of arms for self-defense. Compare 1 W. & M., ch. 15 (1689) with the Irish law 7 Will, III ch.5 (1695).

cix. Joyce Lee Malcolm, "The Right of the People to Keep and Bear Arms: The Common Law Tradition," *Hastings Constitutional. Law Quarterly* 10:310 (1983).

cx. *Archives of Maryland*, 25:288-9.

cxi. *Id.*, 28:315.

cxii. *Id.*, 52:454.

cxiii. Candler, *The Colonial Records of the State of Georgia*, 18:190-1.

cxiv. Bellesiles, *Arming America,* 73.

cxv. Shurtleff, 1:84.

cxvi. *Id.*, 1:93.

cxvii. *Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford, Conn.: Silas Andrus, 1822), 72-73.

cxviii. *Colonial Laws of New York*, 1:52.

Electronic copy available at: https://ssrn.com/abstract=2759961

cxix. *Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England…* (1716), 91-92, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1985, 94.

cxx. Hening, 2:304.

cxxi. *Id.*, 6:118.

cxxii. *Archives of Maryland*, 75:425.

cxxiii. *Id.*, 52:452.

cxxiv. Shurtleff, 2:31. Shurtleff, 3:187, includes a May 23, 1650 order that the public arms to be sold not include cannon. An October 14, 1651 order at Shurtleff, 3:248, provides for the gift of five publicly owned muskets to inhabitants of Salem and "our present honored Governor."

cxxv. Hening, 8:125-6.

cxxvi. *Public Records of Connecticut,* 1:29.

cxxvii. *Id.*, 1:1, 2.

cxxviii. *Id.*, 1:49.

cxxix. *Id.*, 1:182, Robert Slye fined £10 for "exchanging a gunn with an Indian," George Hubberd, John West, and Peter Blatchford "for the same" all fined the same amount.

cxxx. *Id.*, 1:33.

cxxxi. *Id.*, 1:50.

cxxxii. Hoadly, *Records Of The Colony And Plantation Of New Haven,* 176-77.

cxxxiii. Bellesiles, *Arming America*, 79.

cxxxiv. Shurtleff, 5:48-49.

cxxxv. Library of Congress, Printed Ephemera Collection; Portfolio 35, Folder 15b.

cxxxvi. *Archives of Maryland*, 9:565. Similar offers appear at 31:404, in 1760, and at 56:404 in 1761.

cxxxvii. *Public Records of Connecticut,* 14:417-18. See *id.*, 15:188, for a similar measure in December 1775.

cxxxviii. *Id.*, 15:97.

cxxxix. *Id.*, 14:418-19.

cxl. Massachusetts Provincial Congress, *The Journals of Each Provincial Congress of Massachusetts in 1774 and 1775* (Boston: Dutton and Wentworth, 1838), 536-37, 584-93. *Id.*, 584 (107 "small arms"); 585 (13 "guns"); 591 (28 "guns, for the use of the colony, collected by order of Congress").

cxli. *Id.*, 210.

cxlii. *Id.*, 336-37.

cxliii. February 7, 1776, *Colonial Records of Pennsylvania* (Chicago: Library Resources, 1970), 10:478;   February 9, 1776, 10:481; April 9, 1776. 10:537; April 10, 1776, 10:537; July 30, 1776, 10:471; July 24, 1776, 10:653; August 23, 1776, 10:698; November 29, 1775, *Minutes of the Supreme Executive Council of Pennsylvania* (Harrisburg, Penn.: Theo. Fenn & Co., 1852), 10:416-67, 10:550-51, 686-67, 700.

cxliv. November 30, 1775, *Min.Sup.Penn.*, 418.

cxlv. See March 8, 1776, *American Archives* 4th series, 5:1509 for Baltimore, Maryland's confiscation and compensation of guns.

cxlvi. Worthington C. Ford, *et al,*. ed., *Journals of the Continental Congress, 1774-1789* (Washington, D.C., 1904-37), 4:220-21.

cxlvii. Richard Frothingham, *History of the Siege of Boston, and of the Battles of Lexington, Concord, and Bunker Hill,* 6th ed. (Boston: 1903), 94-95.

cxlviii. Hening, 1:401-2.

cxlix. *Archives of Maryland,* 3:103.

Electronic copy available at: https://ssrn.com/abstract=2759961

[cl]. Brigham, 176.

[cli]. September 6, 1638, Shurtleff, 1:236.

[clii]. Eugene Aubrey Stratton, *Plymouth Colony: Its History & People, 1620-1691* (Salt Lake City: Ancestry Publishing, 1986), 188.

[cliii]. *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay…* (Boston: Albert J. Wright, 1878), 3:305-6.

[cliv]. Candler, *The State Records of the Colony of Georgia,* 18:294-5.

[clv]. Hening, 1:199.

[clvi]. *Id.*, 2:96-97. *Id.*, 3:328, contains a minor revision of this law in 1705.

[clvii]. *Id.*, 3:180.

[clviii]. *Laws and Acts of the General Assembly Of His Majesties Province of Nova Caesarea or New-Jersey…* (William Bradford, 1722), 143-45.

[clix]. *Laws of North Carolina—1738,* ch. 10, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 2:128.

[clx]. Hening, 8:592-3.

[clxi]. *Archives of Maryland,* 3:255.

[clxii]. *Id.*, 1:295-96. Also reiterated in 1654 at 1:351.

[clxiii]. *Id.*, 1:343-44.

[clxiv]. *Id.*, 7:51-52.

[clxv]. Andrew Burnaby, "In the Woods" in Albert Bushnell Hart and Mabel Hill, *Camps and Firesides of the Revolution* (New York: Macmillan Co., 1937), 51. See also J. Franklin Jameson, ed., *Johnson's Wonder-Working Providence: 1628-1651* (New York: Barnes & Noble, Inc., 1959), 85, for what *may* be a description of Indian fire-hunting of deer in seventeenth century New England.

[clxvi]. Hening, 5:62 is a 1738 statute prohibiting fire-hunting by both colonists and Indians. "And if any Indian be found fire-hunting… it shall and may be lawful, for the owner of such land… to take away the gun of such Indian, and the same to keep to his own use." *Id.*, 5:431 again punishes fire-hunting.

*Archives of Maryland,* 28:348-9 is a 1745 statute that prohibits fire-hunting, although it is not explicit that the "hunters" were using guns. *Id.*, 44:21, 36, 39, 173, 180-1, trace the legislative history from the request earlier that year from the backwoods farmers to prohibit fire-hunting and hunting by non-residents to final passage. For reasons not explained, a similar law is debated in 1753 at 50:211 and 251, where it was "referred to the Consideration of next Assembly."

Connecticut's 1733 statute regulating "Firing the Woods" at *Public Records of Connecticut,* 7:456-7, is not explicitly about hunting, nor does it ever mention firearms, but may have been motivated by the same concerns.

[clxvii]. Hening, 3:69.

Electronic copy available at: https://ssrn.com/abstract=2759961



Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence

Author(s): Rob Harper

Source: *The William and Mary Quarterly*, Jul., 2007, Third Series, Vol. 64, No. 3 (Jul., 2007), pp. 621–644

Published by: Omohundro Institute of Early American History and Culture

Stable URL: https://www.jstor.org/stable/25096733

**REFERENCES**
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/25096733?seq=1&cid=pdf-reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Omohundro Institute of Early American History and Culture* is collaborating with JSTOR to digitize, preserve and extend access to *The William and Mary Quarterly*

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

## Notes and Documents
## Looking the Other Way:
## The Gnadenhutten Massacre and the
## Contextual Interpretation of Violence

### Rob Harper

IN the summer of 1781, Wyandot Indians at war with the United States learned that the Moravian missionaries of eastern Ohio were secretly aiding the Continental army. In retaliation the Wyandot forcibly removed the ministers and their Indian converts from their Muskingum Valley villages to Upper Sandusky, several days' journey to the west. The following winter many of the Moravian Indians returned home to salvage corn they had left unharvested during their involuntary evacuation. Simultaneously, Wyandot and Shawnee warriors renewed their assault on the upper Ohio Valley's white settlements, killing a few colonists and capturing several more. Rumors circulated among settlers that the raiders had launched their attacks from the Muskingum missions. In early March 1782, roughly 160 soldiers of the western Pennsylvania militia, led by David Williamson, set out to investigate. On arriving at the mission town of Gnadenhutten, the militia found the Moravian corn gatherers. The Pennsylvanians initially offered the Indians safe passage to Fort Pitt but then accused them of aiding enemy war parties and condemned them to death. Using a Moravian Indian's cooper's mallet, the militia killed nearly one hundred unarmed captives, including more than thirty children, "while they were praying, singing, and kissing."[1] They

Rob Harper is a Ph.D. candidate in American History at the University of Wisconsin–Madison. He thanks Ned Blackhawk, Jeanne Boydston, Charles Cohen, Gregory Dowd, Gordon and Jill Harper, Michael Kwas, Robert Lewis, Leonard Sadosky, Laura Van Abbema, and the anonymous readers for the *William and Mary Quarterly* for their comments and criticisms. He also thanks the National Society of the Colonial Dames of America in the State of Wisconsin and the 2004 conference of the Committee on Institutional Cooperation American Indian Studies Consortium for the opportunity to present related papers and the Jacob K. Javits Fellowship Program of the U.S. Department of Education for its support during research and writing. Very special thanks to Mandra Walker for everything.

[1] John Heckewelder, *Thirty Thousand Miles with John Heckewelder*, ed. Paul A. W. Wallace (Pittsburgh, Pa., 1958), 261 (quotation). Two visitors to western

*William and Mary Quarterly*, 3d Series, Volume LXIV, Number 3, July 2007

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

WILLIAM AND MARY QUARTERLY

then plundered and burned the town. They never faced any punishment for their actions.

The Gnadenhutten massacre illustrates a common pattern of frontier violence. During the last half of the eighteenth century, white settlers repeatedly retaliated for enemy Indian attacks by killing neutral or allied Indians. This series of murders, among which Gnadenhutten stood out only for the number and religion of the victims, reshaped the trans-Appalachian West, dooming attempts at intercultural accommodation and setting the stage for ongoing war and Indian removal.

Most explanations of these events share a heavy emphasis on motive, usually attributing them to a deep and abiding hatred of Indians that permeated the colonial backcountry. This focus, however, yields at best a partial and often distorted understanding of how such atrocities came about. In particular the prevailing concern with why murderers chose to kill has precluded close study of the circumstances that made this choice possible. Reassessing the Gnadenhutten massacre illustrates the inadequacy of motive-centered interpretations and offers a model for more contextually grounded studies of violence.

The motive-centered approach to anti-Indian atrocities has survived several major historiographical shifts. Through the 1960s most studies treated such violence as "a dark, unhappy, distasteful side" of national expansion that reflected the harshness of frontier existence rather than the nature of colonial society as a whole. In the 1970s and 1980s, revi-

---

Pennsylvania at the time of the massacre reported that 160 men participated in the expedition, and a contemporary newspaper account stated that a larger number set out but only 160 actually reached the mission towns. See Relation of Frederick Lineback, &c., [1782], in Samuel Hazard, ed., *Pennsylvania Archives*, 1st ser. (Philadelphia, 1854), 9: 524; [Philadelphia] *Pennsylvania Packet; Or, The General Advertiser*, Apr. 16, 1782, [3]. Other reports set the number higher: David Zeisberger gave "some 200" and William Irvine gave 300 (see Eugene F. Bliss, ed. and trans., *Diary of David Zeisberger: A Moravian Missionary among the Indians of Ohio* [1885; repr., Saint Clair Shores, Mich., 1972], 1: 79; William Irvine to George Washington, Apr. 20, 1782, in C. W. Butterfield, ed., *Washington-Irvine Correspondence* [Madison, Wis., 1882], 99). Genealogist George C. Williston has identified the names of 196 participants (see Williston, "The 1782 Volunteer Militia from Washington County, Pa and Their Moravian Indian Victims" [2001], http://freepages.genealogy .rootsweb.com/~gwilli824/moravian.html). Leonard Sadosky analyzes the group's economic and geographic composition in Sadosky, "Rethinking the Gnadenhütten Massacre: The Contest for Power in the Public World of the Revolutionary Frontier," in *The Sixty Years' War for the Great Lakes, 1754–1814*, ed. David Curtis Skaggs and Larry L. Nelson (East Lansing, Mich., 2001), 202–3, 212–13. Shortages of gunpowder and shot in the wartime backcountry at least partly explain the militia's choice of weapon. In 1781 militia members reportedly executed captured Indian men with tomahawks and spears. See C. W. Butterfield, "Expedition against Delawares," in Louise Phelps Kellogg, ed., *Frontier Retreat on the Upper Ohio, 1779–1781* (1917; repr., Baltimore, 2003), 378–79.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

sionist scholars argued instead that violence against Indians lay at the heart of Anglo-American identity and culture. Beginning in the 1990s, a new wave of studies sought to explain how earlier patterns of intercultural accommodation gave way to hatred, bloodshed, and dispossession. During the last decade, such postrevisionist historians have explored the development and articulation of anti-Indian ideologies in increasingly nuanced and sophisticated ways.[2] Despite their sharp interpretive differences, these literatures all focus their assessment of anti-Indian violence on the perpetrators' presumed motives, asking what fostered Indian hating, how prevalent it was, and how it fitted into the larger story of American expansion. Each generation has offered new answers, but the conversation has rarely strayed far beyond this common set of questions. Most studies implicitly assume that motive constituted a sufficient

[2] James Patrick McClure, "The Ends of the American Earth: Pittsburgh and the Upper Ohio Valley to 1795" (Ph.D. diss., University of Michigan, 1983), 437 (quotation). Pre-1970 works include Theodore Roosevelt, *The Winning of the West*, 4 vols. (1889–96; repr., Lincoln, Neb., 1995); Nicholas B. Wainwright, *George Croghan: Wilderness Diplomat* (Chapel Hill, N.C., 1959); Jack M. Sosin, *The Revolutionary Frontier: 1763–1783* (New York, 1967). Post-1970 revisionist works include Richard Slotkin, *Regeneration through Violence: The Mythology of the American Frontier, 1600–1860* (Middletown, Conn., 1973); Richard Drinnon, *Facing West: The Metaphysics of Indian-Hating and Empire-Building* (Minneapolis, Minn., 1980); Alden T. Vaughan, "Frontier Banditti and the Indians: The Paxton Boys' Legacy, 1763–1775," *Pennsylvania History* 51, no. 3 (January 1984): 1–29. Postrevisionist works of the 1990s include Richard White, *The Middle Ground: Indians, Empires, and Republics in the Great Lakes Region, 1650–1815* (New York, 1991); Stephen Aron, *How the West Was Lost: The Transformation of Kentucky from Daniel Boone to Henry Clay* (Baltimore, 1996); Andrew R. L. Cayton and Fredrika J. Teute, eds., *Contact Points: American Frontiers from the Mohawk Valley to the Mississippi, 1750–1830* (Chapel Hill, N.C., 1998); Jeremy Adelman and Aron, "From Borderlands to Borders: Empires, Nation-States, and the Peoples in Between in North American History," *American Historical Review* 104, no. 3 (June 1999): 814–41. Exemplary studies of anti-Indian violence include Ronald Dale Karr, "'Why Should You Be So Furious?' The Violence of the Pequot War," *Journal of American History* 85, no. 3 (December 1998): 876–909; Jill Lepore, *The Name of War: King Philip's War and the Origins of American Identity* (New York, 1998); James H. Merrell, *Into the American Woods: Negotiators on the Pennsylvania Frontier* (New York, 1999); Peter Rhoads Silver, "Indian-Hating and the Rise of Whiteness in Provincial Pennsylvania" (Ph.D. diss., Yale University, 2000); Wayne E. Lee, *Crowds and Soldiers in Revolutionary North Carolina: The Culture of Violence in Riot and War* (Gainesville, Fla., 2001); Gregory Evans Dowd, *War under Heaven: Pontiac, the Indian Nations, and the British Empire* (Baltimore, 2002); Jane T. Merritt, *At the Crossroads: Indians and Empires on a Mid-Atlantic Frontier, 1700–1763* (Chapel Hill, N.C., 2003); Krista Camenzind, "Violence, Race, and the Paxton Boys," in *Friends and Enemies in Penn's Woods: Indians, Colonists, and the Racial Construction of Pennsylvania*, ed. William A. Pencak and Daniel K. Richter (University Park, Pa., 2004), 201–20; David L. Preston, "George Klock, the Canajoharie Mohawks, and the Good Ship *Sir William Johnson*: Land, Legitimacy, and Community in the Eighteenth-Century Mohawk Valley," *New York History* 86, no. 4 (Fall 2005): 473–99.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0798

condition for murder, obviating any further study of causation. The scholarly literature on anti-Indian violence, therefore, remains largely a literature on Indian hating, obscuring rather than explaining the social and political context in which these atrocities took place.

In developing a more contextualized approach, early Americanists can learn much from the historiography of violence in other regions and periods. Scholarship on racial violence draws attention to the roles of nonperpetrators and the influence of factors unrelated to racial difference. Studies of white supremacist violence in the American South demonstrate how ambitious or vulnerable white leaders incited atrocities against African Americans for personal and political gain. Simultaneously, anxieties about gender, sexuality, and socioeconomic change shaped the ideologies that inspired and rationalized lynch mobs. Historians of the Holocaust show that factors as varied as state propaganda, corporate greed, petty ambition, and a culture of conformity all contributed significantly to the chain of decisions that culminated in genocide.[3] Such insights suggest a need to consider more closely how nonperpetrators have enabled violence and how a wide range of political and social tensions exacerbated racial antagonisms.

A growing literature also illuminates how changing social and political structures influenced people's choices to commit or tolerate atrocities. Benjamin Lieberman's history of ethnic cleansing in nineteenth- and twentieth-century Europe links outbreaks of ethnic violence and forced migration to the collapses of dynastic, nationalist, and Communist empires. Studies of settler colonies in Australia and Africa examine local political structures and shifts in imperial policies and their contribution to widespread and sometimes genocidal anti-indigenous violence. Jeffrey Ostler's examination of the Wounded Knee massacre describes how patterns of American colonialism on the Great Plains shaped the conflicts and personal agendas that brought about mass murder.[4] All

---

[3] For the American South, see Stewart E. Tolney and E. M. Beck, *A Festival of Violence: An Analysis of Southern Lynchings, 1882–1930* (Urbana, Ill., 1995); Stephen Kantrowitz, *Ben Tillman and the Reconstruction of White Supremacy* (Chapel Hill, N.C., 2000); Nancy MacLean, "The Leo Frank Case Reconsidered: Gender and Sexual Politics in the Making of Reactionary Populism," in *Jumpin' Jim Crow: Southern Politics from Civil War to Civil Rights*, ed. Jane Dailey, Glenda Elizabeth Gilmore, and Bryant Simon (Princeton, N.J., 2000), 183–218. For Holocaust scholarship, see Christopher R. Browning, *Ordinary Men: Reserve Police Battalion 101 and the Final Solution in Poland* (1993; repr., New York, 1998), esp. the new afterword; A. D. Moses, "Structure and Agency in the Holocaust: Daniel J. Goldhagen and His Critics," *History and Theory* 37, no. 2 (May 1998): 194–219; Peter Hayes, *From Cooperation to Complicity: Degussa in the Third Reich* (Cambridge, 2004).

[4] On the political context of mass violence in general, see Charles Tilly, *The Politics of Collective Violence* (Cambridge, 2003). For Europe, see Benjamin Lieberman, *Terrible Fate: Ethnic Cleansing in the Making of Modern Europe* (Chicago,

This content downloaded from
130.ff:ffff:ffff:ffff:ffff on Thu, 01 Jan 1976 12:34:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0799

these works balance their examination of perpetrators' beliefs and motives with an analysis of the structural conditions that fostered and encouraged them.

In these disparate areas, scholars have increasingly looked beyond well-worn, motive-centered explanations and drawn attention to myriad contextual factors. Collectively, their work suggests that studies of early American violence should explore the historical circumstances that enabled proponents of violence to achieve their aims. Topics that warrant closer attention include the weakening of forces that at other times discouraged violence, the relationship between violence and community politics, and the influence of formal and informal hierarchies and institutions on violence. Specifically, early Americanists should explore why nonperpetrators tolerated or condoned perpetrators' brutality and whether communities were more willing to acquiesce to violence at certain times. More broadly, historians should also consider how such shifts reflected the structure of colonial society as a whole.[5]

The Gnadenhutten massacre illustrates how such questions can enhance historians' understanding of anti-Indian violence in early America. Existing interpretations of this event are limited in several respects. Most accounts treat the militia as an undifferentiated mob with a handful of impotent dissenters rather than as a collection of individuals with diverse interests and priorities. Also the persistent emphasis on the murderers' motives has led historians to neglect many of the contextual concerns already outlined. In particular they have not explored the immediate circumstances that brought the militia to Gnadenhutten or

---

2006). On settler colonies, see Alison Palmer, *Colonial Genocide* (Adelaide, Australia, 2000); Elizabeth Elbourne, "The Sin of the Settler: The 1835–36 Select Committee on Aborigines and Debates over Virtue and Conquest in the Early Nineteenth-Century British White Settler Empire," *Journal of Colonialism and Colonial History* 4, no. 3 (Winter 2003), http://muse.jhu.edu/journals/journal_of_colonialism_and_colonial_history/v004/4.3elbourne.html; John C. Weaver, *The Great Land Rush and the Making of the Modern World: 1650–1800* (Montreal, Quebec, 2003); A. Dirk Moses, ed., *Genocide and Settler Society: Frontier Violence and Stolen Indigenous Children in Australian History* (New York, 2004). See also Caroline Elkins, *Imperial Reckoning: The Untold Story of Britain's Gulag in Kenya* (New York, 2005). For Wounded Knee, see Jeffrey Ostler, *The Plains Sioux and U.S. Colonialism from Lewis and Clark to Wounded Knee* (Cambridge, 2004).

[5] Several studies of violence against non-Indians in early America offer models for how to address such questions, including Ian K. Steele, *Betrayals: Fort William Henry and the "Massacre"* (New York, 1990); James Sidbury, *Ploughshares into Swords: Race, Rebellion, and Identity in Gabriel's Virginia, 1730–1810* (New York, 1997); Walter Johnson, *Soul by Soul: Life inside the Antebellum Slave Market* (Cambridge, Mass., 1999); Lee, *Crowds and Soldiers*; Marjoleine Kars, *Breaking Loose Together: The Regulator Rebellion in Pre-Revolutionary North Carolina* (Chapel Hill, N.C., 2002).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0800

how others enabled or overlooked their actions.[6] Previous accounts have not explained why the massacre occurred when it did, how and why the militia resolved on mass murder, and, after the fact, why civil and military authorities chose to look the other way.

White settlers had suspected the Moravian Indians of treachery since the Seven Years' War, when French-allied Indians had launched devastating attacks against colonists in the Pennsylvania backcountry. This settler hostility helped convince the missionaries to move their congregations across the Ohio River to the Muskingum country. The Revolutionary War only amplified colonial suspicions, especially because the new Moravian towns stood directly between the upper Ohio settlements and the British stronghold at Detroit.[7] Under these circumstances it is remarkable that the Ohio missions survived as long as they did.

The Moravians' allies within the backcountry military managed to protect them through most of the Revolutionary War. Groups of settlers repeatedly plotted to attack the missions, but until 1782 these schemes either collapsed on their own or were suppressed by military authorities. In October 1781 army and militia leaders reiterated their friendship by releasing a handful of Moravians that a militia expedition had captured at the abandoned Muskingum towns. This group met with such good treatment that they fatefully encouraged other Moravian Indians at Upper Sandusky to return to the missions, promising that they had "nothing to fear" from the colonists, who "had behaved in every Respect to them as Friends."[8]

[6] The tendency to downplay differences among the militia is exemplified by Richard White's statement that "the Americans, not without division, condemned the captured Moravians" to death (White, *Middle Ground*, 390). Recent reassessments of the massacre by Leonard Sadosky and Gregory T. Knouff have already pushed beyond the standard explanation of ubiquitous Indian hating but retain many of its limitations. See Sadosky, "Rethinking the Gnadenhütten Massacre," 187–214; Knouff, *The Soldiers' Revolution: Pennsylvanians in Arms and the Forging of Early American Identity* (University Park, Pa., 2004), 182–86.

[7] Gregory Evans Dowd, *A Spirited Resistance: The North American Indian Struggle for Unity, 1745–1815* (Baltimore, 1992), 75–78, 83–86; Earl P. Olmstead, *David Zeisberger: A Life among the Indians* (Kent, Ohio, 1997), chaps. 7–10; Merritt, *At the Crossroads*, chaps. 5–8; David L. Preston, "Squatters, Indians, Proprietary Government, and Land in the Susquehanna Valley," in Pencak and Richter, *Friends and Enemies in Penn's Woods*, 180–200.

[8] Bliss, *Diary of David Zeisberger*, 1: 31, 36, 64, 66 (quotations). For pre-1782 anti-Moravian plots, see John Heckewelder, *Narrative of the Mission of the United Brethren among the Delaware and Mohegan Indians, from Its Commencement, in the Year 1740, to the Close of the Year 1808* (1820; repr., New York, 1971), 214–15; William M. Farrar, "The Moravian Massacre," *Ohio Archaeological and Historical Publications* 3 (1891): 292–93; John Gibson to [Thomas Jefferson], May 30, 1781, in Kellogg, *Frontier Retreat on the Upper Ohio*, 399–400. For the October 1781 capture and

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

In early March 1782, James Marshel, the militia commander of Washington County, Pennsylvania, "ordered out the militia to go to Muskingum" and investigate the Moravian towns. By taking this step, Marshel changed anti-Moravian plotting fundamentally. Previously, bands of resentful, frightened, or vengeful settlers had huddled in frontier forts talking about the incessant Indian attacks, the likelihood that raiders were using the missions as a base, and how a determined band of men such as themselves could eliminate the enemy's "half-way towns" once and for all.⁹ Marshel turned this loose talk into a formal plan that promised imminent action. Obstacles that had faced earlier advocates of an attack, such as how to convince a critical mass of comrades to join them and how to organize a large-scale venture without alerting antagonistic military authorities, disappeared. An assault on the missions, previously the project only of especially militant settlers, now acquired the stamp of official policy, attracting individuals not interested in persecuting the Moravians but eager to defend their homes.

Marshel did not act impulsively. A series of Indian attacks in early February had revived settler suspicions of the mission towns, but several weeks passed before the militia's departure. Nor was forming an expedition the only choice available to him. He could have waited and hoped that anti-Moravian murmurs would come to nothing, as had apparently happened in May 1781. If a serious plot against the missions had developed, Marshel could have squashed it, as army and militia officers had done in April 1781. If necessary he could have sought the help of the Continental garrison at Fort Pitt, whose acting commander, John Gibson, was a longtime friend of the Moravians. But Marshel did not even notify Gibson of the expedition, let alone seek army support.¹⁰

release of Moravians, see Heckewelder, *Narrative of the Mission*, 298; Heckewelder, *Thirty Thousand Miles*, 189; Alex. McKee to [Arent De Peyster], Apr. 10, 1782, in *Sir Frederick Haldimand: Unpublished Papers and Correspondence, 1758–1784* (London, 1977), reel 56, Add. MSS 21783, fol. 140; [Daniel Brodhead] to [John Ettwein], Fort Pitt, Oct. 23, 1781, in *Papers of John Ettwein*, Archives of the Moravian Church, Bethlehem, Pa. (New Haven, Conn., n.d.), reel 1, item no. 144; Schebosch [John Bull] to [Ettwein], Nov. 4, 1781, ibid., reel 7, item no. 1636.
   ⁹ William Irvine to William Moore, May 3, 1782, in Butterfield, *Washington-Irvine Correspondence*, 239 ("ordered out"); Farrar, *Ohio Archaeological and Historical Publications* 3: 291–93 ("half-way towns," 292); J. T. Holmes to [John S. Ritenour and William T. Lindsey], n.d., in Joseph Doddridge, *Notes on the Settlement and Indian Wars of the Western Parts of Virginia and Pennsylvania from 1763 to 1783, Inclusive, Together with a Review of the State of Society and Members of the First Settlers of the Western County*, ed. Ritenour and Lindsey (1912; repr., Parsons, W.Va., 1960), 201–3. James Marshel varied the spelling of his name considerably, and historians have followed suit. I have adopted the spelling "Marshel" throughout the text.
   ¹⁰ The Indian attacks took place on or about Feb. 8, 1782, nearly a month prior to the massacre. The expedition Marshel ordered was at most a delayed response to

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Instead of ignoring or suppressing calls for an attack on the mission towns, Marshel used his authority to make them a reality.

Part of the explanation for Marshel's actions lies in the politics of the upper Ohio Valley, where settlers routinely resisted government authority and rival factions of Virginians and Pennsylvanians repeatedly clashed over their states' competing territorial claims. In this turbulent climate, Marshel's position was particularly precarious. In early 1781 Pennsylvania had granted him several important offices in the government of newly created Washington County, most notably that of militia commander. Throughout the year the Virginia faction incessantly challenged Marshel's authority. While their would-be officers bickered over command, many settlers avoided militia duty entirely. Just one month before the massacre, popular resistance sabotaged Marshel's attempt to organize militia companies. Voters, meanwhile, rejected Marshel's leadership by choosing his chief rival, Dorsey Pentecost, to represent the county on Pennsylvania's Supreme Executive Council.[11] With a longstanding antagonist triumphant at the ballot box and the militia beyond his control, Marshel's political prospects were dimming. A report of suspicious activity at the mission towns and subsequent calls for a campaign against them enabled him to show that he could do more than hold unruly musters and send small detachments to guard ineffectual stockades: he would send an expedition into Indian country. By encour-

these raids: the militia surely had scant hope of overtaking the attackers weeks after the fact. See *Pennsylvania Packet; Or, The General Advertiser*, Mar. 30, 1782, [3]; Tho[mas] Scott to William Moore, Feb. 20, 1782, in Hazard, *Pennsylvania Archives*, 9: 496; Mich[ael] Huffnagle to William Moore, Mar. 8, 1782, ibid., 9: 511. For failed 1781 plots, see Heckewelder, *Narrative of the Mission*, 214–15; Doddridge, *Notes on the Settlement*, 224; Gibson to Jefferson, May 30, 1781, in Kellogg, *Frontier Retreat on the Upper Ohio*, 399–400. For John Gibson, see Gibson to Nathaniel Seidel, May 9, 1782, in Butterfield, *Washington-Irvine Correspondence*, 362n. By contrast the October 1781 expedition, which released Moravian Indians unharmed, was authorized by the army. See Brodhead to Ettwein, Oct. 23, 1781, in *Papers of John Ettwein*, reel 1, no. 144.

[11] For antigovernment resistance and border conflict, see Daniel Brodhead to Jos[eph] Reed, Oct. 17, 1780, in Hazard, *Pennsylvania Archives*, 8: 588–89; Brodhead to Reed, Mar. 10, 1781, ibid., 8: 766; McClure, "Ends of the American Earth," 348–66; Daniel P. Barr, "Contested Land: Competition and Conflict along the Upper Ohio Frontier, 1744–1784" (Ph.D. diss., Kent State University, 2001), chap. 8. For Marshel's career, see James Marshall to Joseph Reed, June 5, 27, 1781, in Hazard, *Pennsylvania Archives*, 9: 193–94, 233–34; Isaac Mason to Reed, July 1, 1781, ibid., 9: 238–39; Dorsey Pentecost to Reed, July 27, 1781, ibid., 9: 315–19; James Marshal to [William] Moore, Feb. 4, 1782, ibid., 9: 484–85; Lewis Clark Walkinshaw, *Annals of Southwestern Pennsylvania* (New York, 1939), 2: 153–55; Pentecost to Moore, Mar. 25, 1782, in Executive Correspondence, *Records of Pennsylvania's Revolutionary Governments, 1775–1790 (Record Group 27) in the Pennsylvania State Archives*, ed. Roland M. Baumann ([Harrisburg, Pa.], n.d.), reel 19, frames 601–4.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0803

aging aggression against Indians, Marshel reasserted his authority as commander and diverted settler hostility away from himself and the government he served. In so doing he helped turn familiar anti-Moravian rhetoric into gruesome reality.

By ordering an expedition, James Marshel made the massacre possible but not inevitable. When David Williamson and his men reached the mission towns, they chose how to proceed. Most accounts of the event assume that they slaughtered their captives because they hated Indians, a hatred magnified by recent attacks on their communities. A closer inspection suggests that the decision stemmed not from a collective desire to kill but from widespread deference to the demands of an especially vocal and bloodthirsty faction. In the chain of events that culminated in the massacre, this passive acquiescence mattered as much as the murderers' consuming hatred.

The published histories of Moravians George Henry Loskiel and John Heckewelder attributed the Gnadenhutten massacre to frontier settlers' general contempt for Indians. Though both authors noted that some expedition members opposed the slaughter, they stressed that "the majority remained unmoved, and only differed concerning the mode of execution." The Indians' few defenders could do nothing but wring their hands, "calling God to witness" that they took no part in the atrocity.[12] This explanation of the militia's actions established the model that nearly all subsequent accounts have followed.

Heckewelder had described these events differently in an earlier and more detailed account titled "Captivity and Murder." This manuscript, written within a few years of the massacre but not published until the twentieth century, reported that "the Major part" of the militia "were much against hurting" the captives, who "were not only declared Innocent by many, but recomended to the Protection and Charity of all as good and true Christians." These protests failed to move those intent on bloodshed, who "positively declared that they must Dye."[13] In this

[12] George Henry Loskiel, *History of the Mission of the United Brethren Among the Indians in North America*, trans. Christian Ignatius La Trobe (London, 1794), pt. 3: 175–81 (quotations, 179); Heckewelder, *Narrative of the Mission*, 311–24. Loskiel's work was originally published as *Geschichte der Mission der evangelischen Brüder unter den Indianern* (Leipzig, Germany, 1789).

[13] Heckewelder, *Thirty Thousand Miles*, 194 (quotations). The text of "Captivity and Murder" ("John Heckewelders Narrative of the Indian Mission on Muskingum Captivity and Murder") is divided among several chapters of this collection of Heckewelder's writings, edited by Paul A. W. Wallace. The description of the massacre published in Heckewelder's 1820 *Narrative of the Mission* is a condensed version of this manuscript, revised to accentuate the ingenuous piety of the converts and the barbarity of "backwoods men." This simplification of the earlier account helped

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0804

narrative Heckewelder claimed that members of a relatively small, passionate, promassacre faction overcame the misgivings of their more numerous companions.

Several early sources corroborate Heckewelder's assertion that only a minority of the militia supported or participated in the slaughter. Dorsey Pentecost reported that "there seems to have been some difference amongst themselves" about the massacre and had "heard it Insinuated that about thirty or forty only of the party [at most one in four] gave their Consent or assisted in the Catastrofy." Another contemporary account stated that only "a few of the men" had killed the captives and that "divers persons interceded for the lives, especially of the children." A prisoner taken by an Indian raiding party only weeks after the slaughter told Moravian David Zeisberger "that two men alone had accomplished the whole murder." Significantly, Heckewelder relied principally on reports by two boys who survived the massacre, whereas Pentecost's information originated with expedition members.[14] Victims and perpetrators, therefore, offered similar accounts of the militia's internal divisions.

However many expedition members supported the massacre, they arrived at their decision slowly. In his report on the matter, Fort Pitt commandant William Irvine wrote that the militia slaughtered the Moravians only "after cool deliberation and considering the matter for three days." An account published a few months later similarly stressed that the victims "were kept prisoners for some time." Williamson's men had ample reason to avoid such a delay: British-allied Indians had ambushed and destroyed a similar contingent of Pennsylvania militia on the Ohio River the preceding August.[15] That the expedition members

reinforce Heckewelder's larger argument that the greatest obstacle to the Christianization of Indians was not that their own savagery but that of white settlers (Heckewelder, *Narrative of the Mission*, x–xi [quotation, x]). For the manuscript's provenance and approximate date, ibid., x, 170. Wallace's dating of the manuscript is corroborated by the fact that George Henry Loskiel's history, first published in German in 1789, clearly draws from "Captivity and Murder" (compare Loskiel, *History of the Mission*, pt. 3: 178–82; Heckewelder, *Thirty Thousand Miles*, 191–97).

[14] Dorsey Pentecost to William Moore, May 8, 1782, in Hazard, *Pennsylvania Archives*, 9: 540 ("some difference"); *Pennsylvania Packet; Or, The General Advertiser*, Nov. 7, 1782, [2] ("a few of the men"); Bliss, *Diary of David Zeisberger*, 1: 85 ("two men alone"). For Heckewelder's sources, see Heckewelder, *Thirty Thousand Miles*, 195. By May 8, the date of Pentecost's letter to Moore, no news of the missionaries or the survivors had reached western Pennsylvania (see, for example, Gibson to Seidel, May 9, 1782, in Butterfield, *Washington-Irvine Correspondence*, 362n).

[15] Irvine to Washington, Apr. 20, 1782, in Butterfield, *Washington-Irvine Correspondence*, 99 ("after cool deliberation"); *Pennsylvania Packet; Or, The General Advertiser*, Nov. 7, 1782, [2] ("were kept prisoners"). For the August 1781 ambush, see A. Thompson and Alexander McKee to Arent De Peyster, Aug. 29, 1781, in Butterfield, *Washington-Irvine Correspondence*, 230n.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0805

lingered with their captives for several days suggests their decision was nei-
ther hasty nor preordained. This delay also fits well with Heckewelder's
account of a heated debate.

Other events preceding the massacre suggest that Williamson's men
considered killing some of their captives but sparing the rest. At one
point expedition members reportedly identified about ten non-
Moravian men among their captives. One later source states that these
men, whom the militia presumed to be enemy warriors, were murdered
apart from the mission inhabitants. This distinction between "warriors"
and Moravians indicates that some members of the militia contemplated
killing the former but not the latter. Williamson's men also separated
adult male captives from women and children. During a 1781 foray
against the Coshocton Delaware, participants had divided their prison-
ers in the same way, killing every man but letting the women and chil-
dren live.[16] The segregation of the Moravians at Gnadenhutten suggests
that at least some militia members considered and perhaps favored fol-
lowing this precedent.

The Moravian Indians' remarkable trust in the militia raises further
doubts about the breadth of support for the massacre. When members
of the militia arrived at Gnadenhutten, most of the eventual victims
were at the neighboring mission of Salem, several miles downriver. The
people of Salem first learned of Williamson's arrival from John Martin,
one of the missionaries' Indian helpers, who had seen the people of
Gnadenhutten "up & down the Streets together with the white People,
& as he thought quite merry together." This sight convinced him that
"their Friends (meaning the Americans) were come out of Love &
Friendship, to take them under their Protection & Care." Displaying well-
advised caution, the people of Salem sent three men to Gnadenhutten to
test the waters. These men returned with some of the expedition mem-
bers, who had "desired them to Show them the place & People the[y]
belonged to." The Moravians welcomed and fed their guests, who con-
vinced them to come to Gnadenhutten so that the militia could escort
all the Christian Indians safely to Fort Pitt. On the way back to
Gnadenhutten, three of the missionaries' Indian assistants conversed
extensively with "such of the white People, who appeared to be religious."

---

[16] Doddridge, *Notes on the Settlement*, 192–93 (quotation, 192). For identifica-
tion of non-Moravians among the prisoners, see *Pennsylvania Packet; Or, The
General Advertiser*, Nov. 7, 1782, [2]. David Zeisberger reported there were ten non-
Moravian victims; Dorsey Pentecost heard that the militia identified four warriors
among their captives. See Bliss, *Diary of David Zeisberger*, 1: 85; Pentecost to Moore,
May 8, 1782, in Hazard, *Pennsylvania Archives*, 9: 540. For separation of men from
women and children, see Bliss, *Diary of David Zeisberger*, 1: 79; Butterfield,
"Expedition against Delawares," 377–79; Heckeweller, *Thirty Thousand Miles*, 195.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Their interlocutors acknowledged "that the Indians not only perfectly understood the Scripture, but indeed were without doubt good Christians." Two other Moravians spoke with expedition members "who were inquisitive as to politicks," so that the militia "became fully acquainted with these Christian Indians in every Respect." Meanwhile some of the Moravians' "big Boys . . . were playing all the Way with some of the White Lads."[17] According to Heckewelder, no militia members threatened the inhabitants of Salem at any point during these events. The Moravians had ample opportunities to size up their visitors, and they undoubtedly did so, tragically concluding they could trust them.

Loskiel and Heckewelder argued that these events illustrated the militia's duplicity and the naive, trusting nature of their converts. But this explanation gives the militia too much credit and the Moravian Indians too little. Notwithstanding the missionaries' tendency to portray them as wide-eyed innocents, the men and women who put their lives in Williamson's hands had lived for many years in a hostile, treacherous world. They no doubt remembered previous encounters with settlers hostile toward Christian Indians, including the militia's attempt to attack the missions in 1781.[18] They had ample cause to treat Williamson's party with caution.

Moreover frontier Indian haters rarely displayed the restraint and coordination necessary to accomplish such large-scale deception. One small group of expedition members had killed two unarmed Moravians before even reaching Gnadenhutten. During the previous year's Coshocton campaign, a militia member tomahawked a visiting Indian leader at the very moment he was discussing peace terms with the expedition commander.[19] It is doubtful that more than one hundred expedition members could maintain an elaborate pretense of goodwill long

[17] Heckewelder, *Thirty Thousand Miles*, 191–93 (quotations). For the location of Salem, see Heckewelder, *Narrative of the Mission*, 209. Zeisberger similarly reported that Williamson's men "themselves acknowledged and confessed [that the Moravians] had been good Indians" (Bliss, *Diary of David Zeisberger*, 1: 81).

[18] On the missionaries' depiction of their converts, Gregory T. Knouff observes that for Heckewelder, "Gnadenhütten resembled the staple Anglo-American narratives of Indian barbarity against whites in warfare—with the roles simply inverted. The Revolutionaries appear to be the savages; the Delawares, the stoic Christian victims" (Knouff, *Soldiers' Revolution*, 184). For the Moravians' prior experience of settler hostility, see Heckewelder, *Narrative of the Mission*, 68–92, 214–15.

[19] For the murders committed on the way to Gnadenhutten, see Heckewelder, *Narrative of the Mission*, 313–14; Relation of Frederick Lineback, in Hazard, *Pennsylvania Archives*, 9: 524; Bliss, *Diary of David Zeisberger*, 1: 79; Doddridge, *Notes on the Settlement*, 189; Heckewelder, *Thirty Thousand Miles*, 191. For the 1781 Coshocton campaign, see Butterfield, "Expedition against Delawares," 379–80.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0807

enough to quiet the Moravians' suspicions. More likely, the men Martin saw conversing amicably with Moravians at Gnadenhutten and those who subsequently persuaded the people of Salem to join them did not share the murderers' determination to kill. Such individuals may have proposed taking the Moravians to Fort Pitt in good faith and only subsequently acceded to their companions' demands for blood.

Any explanation of this change of plans must begin with Williamson, the expedition commander. Accounts differ over whether Williamson supported or opposed the slaughter. His personal feelings, however, mattered far less than his decision to dodge the issue. This choice reflected the politics of the upper Ohio militia, the commander's recent experiences, and his concern for his own popularity and reputation. The previous October Williamson had led the expedition that captured a handful of Moravians at the mission towns. He had delivered his prisoners to the Continental commander at Fort Pitt, who promptly freed them. Williamson subsequently found himself subject to "severe animadversions on account of his lenity" to the captives from those who believed they "ought to have been killed." When he returned to Gnadenhutten in March, such criticisms likely gave him pause. Equally important, Williamson's influence over his men was tenuous at best. His wealth and social prestige had secured him a leading position in the local militia, but his actual power extended only as far as his followers' willingness to obey him. A few months after the massacre, a fellow officer criticized Williamson's fondness for popular approval, observing: "His Oratory is suited to the taste of the people his countrymen, and their Bigotted notions stand him in lieu of arguments." This man was not likely to take a controversial stand. Wary of alienating the militia and of injuring his reputation at home, he "told his men that he would leave it to their choice, either to carry the Indians as Prisoners to Fort Pitt, or to kill them."[20]

The political culture of the Pennsylvania backcountry helps explain how massacre proponents prevailed in this vote. The settlers of this

[20] Doddridge, *Notes on the Settlement*, 199 ("severe animadversions"); John Rose, "Journal of a Volunteer Expedition to Sandusky, from May 24 to June 13, 1782," *Pennsylvania Magazine of History and Biography* 18, no. 3 (1894): 294 ("His Oratory"); Relation of Frederick Lineback, in Hazard, *Pennsylvania Archives*, 9: 524 ("told his men"). For Williamson's 1781 expedition and popular criticism, see Alexander Scott Withers, *Chronicles of Border Warfare; Or, A History of the Settlement by the Whites, of North-Western Virginia, and of the Indian Wars and Massacres in That Section of the State . . .* , ed. Reuben Gold Thwaites (1895; repr., Parsons, W.Va., 1975), 322–23. On the limited authority of militia commanders, see Dorsey Pentecost to W[illia]m Moore, June 17, 1782, in Hazard, *Pennsylvania Archives*, 9: 557; William Crawford to William Irvine, May 24, 1782, in Butterfield, *Washington-Irvine Correspondence*, 363–64; McClure, "Ends of the American Earth," 362–63.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0808

region exhibited a brash majoritarian localism that Saul Cornell has called "plebeian populism." In the 1780s and 1790s, plebeian populists fiercely opposed the growing power of state and federal governments. For them "local institutions such as the jury, the militia, or the crowd embodied the true voice of the people." Rejecting the need for "any mediating class of political leaders," they held that only the will of the local majority could adequately protect their communities from corrupting private interests. Because of their high regard for popular opinion, these radical localists had little concern for the rights of those who deviated from it. The trauma of war, together with the chronic insecurity of frontier existence, magnified such suspicious intolerance, yielding hostility and even violence against dissenters.[21]

Fears of corruption and malign influence led to fierce confrontations over the integrity of elections. In August 1781 Washington County inhabitants declared that a failure to publicize elections had placed "men who have ever Lived in obscurity" in office. On another occasion Pittsburgh residents claimed that lack of public notice had allowed "a few designing People" to elect candidates "disaffected to this Government" who "would not have been elected, if the People could have had timely Notice to attend." The citizens of Bethlehem Township challenged another election, insisting that, thanks to "great Irrugalarity" in the voting, "fit persons are not elected." They helpfully named the candidate who, they claimed, would have won a legitimate vote and recommended that the state simply grant him the post in question.[22]

These protests reflected widespread fears that conniving enemies of the people could manipulate the democratic process to circumvent popular desires. Politicians who lived in obscurity could hardly be trusted to protect community interests from the designing people scheming against them. Such calls for transparency and suspicions of the unfamiliar were especially pronounced in militia elections. In May 1782 a militia expedi-

[21] Saul Cornell, *The Other Founders: Anti-Federalism and the Dissenting Tradition in America, 1788–1828* (Chapel Hill, N.C., 1999), 107–14, 208–10 (quotations 107, 109, 111). For western Pennsylvania's political culture, see Thomas P. Slaughter, *The Whiskey Rebellion: Frontier Epilogue to the American Revolution* (New York, 1986); Terry Bouton, "A Road Closed: Rural Insurgency in Post-Independence Pennsylvania," *Journal of American History* 87, no. 3 (December 2000): 855–87.

[22] Inhabitants of Washington [Co.] to [Joseph] Reed, Aug. 15, 1781, in Hazard, *Pennsylvania Archives*, 9: 356 ("Lived in obscurity"); Mich[ael] Huffnagle to William Moore, July 31, 1782, in Executive Correspondence, *Records of Pennsylvania's Revolutionary Governments, 1775–1790*, reel 19, frames 924–26 ("a few designing People," "timely Notice"); [petition of Pittsburgh inhabitants], Aug. 1, 1782, ibid., frame 937 ("disaffected to this Government"); [petition of Bethlehem Township inhabitants], Oct. 26, 1781, ibid., frame 111 ("great Irrugalarity"); [inhabitants of Bethlehem Township] to Dorsey Pentecost, Oct. 27, 1781, ibid., frame 113.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

tion nearly collapsed before it began because of infighting over the elec-
tion of officers. And in early February of the same year, "a Large Mob"
shut down an election of Washington County militia officers, stopping
the use of state-mandated paper ballots and forcing voters to declare
their preferences publicly instead of hiding behind the ballot box.[23]
Forbidding the secret ballot enabled the mob to intimidate voters into
supporting its candidates. This bullying approach to democracy worked
especially well in a society suspicious of difference and hostile toward
dissent. In the upper Ohio settlements, separating oneself from the
crowd could be not merely intimidating but dangerous. Ironically, an
ideology that celebrated majority rule could enable a particularly deter-
mined or outspoken cohort to cow its opponents into silence, thereby
hijacking the much-heralded will of the people. A minority faction
could thus make itself a majority, and a slim majority could become a
virtual consensus.

The only detailed description of the fatal vote at Gnadenhutten
comes from the account of Joseph Doddridge, a dubious source written
decades after the event. According to Doddridge, when the expedition
members met to decide the issue, Williamson asked that all those "in
favor of saving [the Moravians'] lives" step forward to be counted. "On
this sixteen, some say eighteen, stepped out of the rank, and formed
themselves into a second line; but alas! This line of mercy was far too
short for that of vengeance." Most of those opposed to the slaughter
succumbed to "the fear of public indignation" and "had not heroism
enough to express their opinion." Doddridge concluded that "the justice
and humanity of a majority [was] silenced by the clamor and violence of
a lawless minority."[24]

These vivid details may be apocryphal and were probably colored by
the author's desire to uphold "the honor of my country."[25] But
Doddridge's account generally fits with other, more reliable evidence
and illustrates how Williamson's men may have reached their decision.
Regardless of whether most expedition members cherished what
Doddridge called justice and humanity, Heckewelder's manuscript and
other sources indicate that only a few endorsed indiscriminate slaughter.
Though Williamson may not have asked massacre opponents to literally

[23] Marshal to Moore, Feb. 4, 1782, in Hazard, *Pennsylvania Archives*, 9: 484–485
(quotation, 484). For May 1782 infighting, see John Rose to William Irvine, May 24,
1782, in Butterfield, *Washington-Irvine Correspondence*, 364–65.
[24] Doddridge, *Notes on the Settlement*, 191, 201 (quotations). Tellingly, this
account of the militia's decision agrees more closely with Heckewelder's then-
unpublished "Captivity and Murder," which Doddridge almost certainly had not
read, than with the missionary's published history, which he had (ibid., 199n).
[25] Ibid., 201.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0810

step forward, the region's intolerant, bullying political culture surely dis-
couraged them from speaking out. It is not hard to imagine men caving
under the pressure, each persuading himself that his lone voice could do
little to turn the tide. Other considerations may have contributed as
well: unwillingness to challenge men seeking vengeance for the loss of
their families, doubts about the Moravians' innocence, the unpleasant
prospect of escorting nearly one hundred captives to Pittsburgh, the
desire to share in the loot from the missions, or the belief that Indian
lives were less worthy of protection than white ones. All these factors led
expedition members to decline to take a stand.

   In sum the available sources cast doubt on the Moravian historians'
depiction of an imbalanced, two-sided debate between a mass of Indian
haters and a handful of more humane souls. Heckewelder's manuscript
states that the misgivings of most gave way to the murderers' resolve.
Other evidence suggests that different expedition members had widely
varying ideas and expectations about their captives' fate. Williamson's
abdication of leadership and a local political culture intolerant of dissent
help explain how the massacre proponents suppressed opposition. These
considerations all point to an alternative explanation of how the militia
chose mass murder: a relatively small promassacre faction prevailed not
because of the popularity of its proposal but because those who could
have stopped it chose to look the other way.

When news of the massacre reached Philadelphia, Congress and the state
of Pennsylvania called for an investigation.[26] The men who led the
inquiry, Dorsey Pentecost and William Irvine, chose to suppress the
controversy rather than attempt to bring the perpetrators to justice. Like
James Marshel's decision to organize David Williamson's expedition,
Irvine and Pentecost's choice reflected the particular political predica-
ments that confronted them.

   Since 1774 Pentecost had fiercely opposed Pennsylvania's jurisdiction
over the upper Ohio Valley. When Virginia abandoned its claim to the
region, he found himself subject to the government he had long antago-
nized. Pentecost, a political chameleon, took this setback in stride,
quickly winning election to his new state's Supreme Executive
Council.[27] This success put him in an awkward position. Despite his

[26] Cha[rles] Thomson to William Moore, Apr. 9, 1782, in Hazard, *Pennsylvania
Archives*, 9: 523–24; [Supreme Executive] Council to [William Irvine], Apr. 13, 1782,
ibid., 9: 525.
[27] Thomas Scott to [Joseph] Reed, Jan. 24, 1781, ibid., 8: 715; Marshall to Reed,
June 5, 1781, ibid., 9: 193; Minutes of the Supreme Executive Council, Nov. 19, 1781,
in *Colonial Records of Pennsylvania* (Harrisburg, Pa., 1853), 13: 119. James Patrick

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 1976 12:34:56 UTC
All use subject to https://about.jstor.org/terms

9-cv-01537-BEN-JLB   Document 153-32   Filed 10/21/22   PageID.16419   I
of 164

long opposition to Pennsylvania's government, he was now among its leading officeholders. Yet he had attained that status only because of popular support he owed to his well-known defiance of Philadelphia's authority. Should he now ally with the government he had previously denounced, cultivating connections in the East and possibly burning his bridges at home? Or should he continue in his role of political gadfly, appealing to anti-Pennsylvania sentiment west of the Alleghenies but alienating powerful potential allies in Philadelphia?

Pentecost attempted to do both. With his new eastern colleagues, he played the dutiful civil servant, voicing western concerns but never challenging state authority. When he returned home, he advised his neighbors to resist state taxation, questioned Pennsylvania's right to govern them, and suggested that the region secede to form a new state.[28] Pentecost presumably hoped that if such a state came into being, his early support would increase his influence over it. If, on the other hand, the region remained part of Pennsylvania, maintaining good relationships with Philadelphia officials would safeguard his political future there. In the spring of 1782, therefore, he found himself walking a tightrope, seeking to demonstrate his allegiance to both state and settlers. Under such circumstances he understandably wished to dodge a controversy that would force him to declare his loyalties openly.

Irvine found himself in a similarly tenuous position, though for different reasons. An upwardly mobile Scotch-Irish immigrant and physician-turned-soldier, Irvine had grudgingly assumed command of the Continental army's paltry western forces the previous winter. Complaining that Fort Pitt was "nothing but a heap of ruins," he told his superiors that the post was "in no degree adequate for an officer of my rank." These concerns about his military prestige reflected more general anxieties about social standing. In a society in which economic autonomy was central to masculine identity, Irvine was financially dependent on his wife, Ann.[29] Insecurity stemming from this unmanly

McClure describes Pentecost as "probably the region's most striking illustration of the flexibility of allegiance under changing local political conditions" (McClure, "Ends of the American Earth," 276 [quotation], 329, 405–8).

[28] Pentecost to Moore, May 8–9, 18, 1782, in Hazard, *Pennsylvania Archives*, 9: 540–42, 545–46; Deposition of John Robinson, [June 20] 1782, ibid., 9: 572; Deposition of Hugh M. Breckenridge, [July 4] 1782, ibid., 9: 572–73.

[29] William Irvine to George Washington, Dec. 2, 1781, in Butterfield, *Washington-Irvine Correspondence*, 78 ("heap of ruins"); Irvine to the Continental Board of War, Sept. 25, 1781, ibid., 157–58 ("in no degree adequate"). For Irvine's familial and financial concerns, see Judith Ridner, "William Irvine and the Complexities of Manhood and Fatherhood in the Pennsylvania Backcountry," *Pennsylvania Magazine of History and Biography* 125, nos. 1–2 (January–April 2001): 5–34.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

dependence likely contributed to his resentment at being assigned to a remote western outpost. Such worries about his public image significantly influenced his actions during the next few months.

At the time of the Gnadenhutten massacre, Irvine was on leave. When he returned to his post in late March, several major crises confronted him. During his absence his long-unpaid troops had nearly mutinied. Later a group of militia members—probably veterans of Gnadenhutten—had attacked the United States' few remaining Delaware allies and threatened to seize Fort Pitt itself. They also declared that they would scalp acting commander John Gibson, his Native American wife, and their children. For Irvine these events raised ominous possibilities. If the militia attacked the fort, itself in disrepair, his undermanned and rebellious garrison might not be willing to fight it off. Even if violence were averted, antagonizing the local militia would seriously hinder his coordination of regional defenses and dash his hopes of leading an offensive campaign.[30] In short Irvine had good reason to fear that he would fail utterly in a post he had declared to be beneath him. Like Pentecost and Marshel, he found that to become an effective leader in the region, he needed to cultivate the support of local inhabitants.

The Philadelphia officials who ordered an inquiry into Gnadenhutten could hardly have chosen two men more reluctant to lead it. Irvine desperately wished to avoid taking any public position on the massacre, even imploring his wife, more than one hundred miles to the east, to keep her feelings on the matter to herself.[31] Pentecost similarly wished to convince his constituents that he was on their side without alienating his new colleagues in Philadelphia. Whatever credit he earned

[30] For the near mutiny of the Fort Pitt garrison, see John Finley to William Irvine, Feb. 2, 1782, in Butterfield, *Washington-Irvine Correspondence*, 351–53; noncommissioned officers and soldiers of the 7th Virginia Regiment to Irvine, n.d., ibid., 103–4. For the attack on the Delaware allies and threats to Gibson, see William Irvine to Ann Irvine, Apr. 12, 1782, in Lyman C. Draper Manuscripts, subser. AA, 2: 17–21, Wisconsin Historical Society, Madison; Irvine to Washington, Apr. 20, 1782, in Butterfield, *Washington-Irvine Correspondence*, 99–103; John Nevill to George [Rogers] Clark, Apr. 14, 1782, in James Alton James, ed., *George Rogers Clark Papers, 1781–1784*, Collections of the Illinois State Historical Library (Springfield, Ill., 1926), 19: 57–58; McKee to [De Peyster], Apr. 10, 1782, in *Sir Frederick Haldimand*, reel 56, Add. MSS 21783, fols. 140–41. Irvine's fear of a militia attack on the fort was evident in his orders to the garrison on his return. He continued to view the militia as a threat that autumn. See orderly book of the Eighth Pennsylvania Regiment, 1778–1783, Mar. 25, 1782, in Draper Manuscripts, subser. NN, 2: 217–18; Irvine to [Isaac Craig], September 1782, ibid., subser. AA, 1: 316–19. For Irvine's hopes to lead a campaign, see Irvine to George Washington, Feb. 7, 1782, in Butterfield, *Washington-Irvine Correspondence*, 92–93.

[31] W. Irvine to A. Irvine, Apr. 12, 1782, in Draper Manuscripts, subser. AA, 2: 17–21.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0813

by quietly encouraging resistance to state authority might vanish if he became embroiled in a public investigation of the militia.

Upper Ohio settlers' responses to Gnadenhutten were sharply divided. Pentecost noted that the massacre had sparked "great speculation" in the area, with "some condemning, others applauding the measure." Militia officer Edward Cook protested reports that westerners approved of the slaughter, claiming that "the Better Part of the Community" thought that "the Perpetrators of that wicked Deed ought to be Brought to Condein [appropriate] Punishment." Another local officer denounced the "robbing, plundering, murdering scheme" against "our well-known friends." Yet another accused Williamson and his men of cowardice, noting that they had previously refused to join expeditions against actual enemies.[32] Irvine and Pentecost's political vulnerabilities, however, made the existence or extent of such feelings irrelevant. Whatever the balance of public opinion, they had good reason to believe that the murderers' defenders were sufficiently passionate and vocal to create a fierce and potentially violent controversy, an outcome that neither man could afford.

On May 7 the two men met with Gibson to discuss how to proceed. Pentecost and Gibson both reported that expedition members had differed among themselves about carrying out the massacre and that only a minority of the group had supported it. Gibson believed that those who had opposed the murders might be convinced to testify against their companions. Two days later, however, Irvine and Pentecost met again without Gibson and called off the investigation. The political costs of pursuing justice, they concluded, were too great because the inquiry might "produce a Confusion, and Ilwill amongst the people." Rather than stir up further conflict within the region and risk their own careers, they suggested that the state overlook the massacre but attempt to prevent similar atrocities in the future.[33]

Irvine's experience illustrates how political conflict among colonists could induce those who might otherwise have condemned the murderers

[32] Pentecost to Moore, May 8, 1782, in Hazard, *Pennsylvania Archives*, 9: 540 ("great speculation"); Edw[ard] Cook to William Moore, Sept. 2, 1782, ibid., 9: 629 ("Better Part"); W[illiam] Croghan to [William Davies], [July] 6, 1782, in James, *George Rogers Clark Papers*, 19: 71–73 ("robbing, plundering, murdering scheme," 71); Nevill to Clark, Apr. 14, 1782, ibid., 19: 57–58.

[33] Pentecost to Moore, May 9, 1782, in Hazard, *Pennsylvania Archives*, 9: 541–42 (quotation, 541); Pentecost to Moore, May 8, 1782, ibid., 9: 540–41; William Irvine to William Moore, May 9, 1782, in Butterfield, *Washington-Irvine Correspondence*, 241–45; Gibson to Seidel, May 9, 1782, ibid., 362n. The following August the Pennsylvania Assembly called for a new "inquiry, on legal principles" into the massacre, calling it "an act disgraceful to humanity and productive of the most disagreeable and dangerous consequences." No one acted on this resolution. See assembly committee report, [Aug. 15, 1782], in Butterfield, *Washington-Irvine Correspondence*, 246n.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

to tolerate their actions. Early in his tenure at Fort Pitt, Irvine voiced sympathy and admiration for the Moravian congregations. Just two months before the massacre, he sharply rebuked two soldiers accused of "attempting to murder Indian Moses, a Delaware," in Pittsburgh. Though agreeing that the court-martial lacked sufficient evidence to convict, Irvine charged that "the circumstances are strong and pointed" and lamented "that any person who bears the name of a soldier should be so destitute of humanity or the manly virtues necessary to stamp the profession as to do or say anything even to create a suspicion of so base an act." During the following months, Irvine grew increasingly wary of voicing such opinions publicly. His predecessor, Daniel Brodhead, had sought to strengthen diplomatic ties with neutral Indians and repeatedly aided the Moravians. Protests against these policies had weakened Brodhead's authority and ultimately contributed to his removal from command. Anxious to avoid Brodhead's fate, Irvine worried that the "general and common opinion of the people of this country [the upper Ohio settlements] is that all Continental officers are too fond of Indians." To gain "the confidence and esteem of the people," he felt he had to show "no partiality, favor, or affection to any color." In practice this high-minded euphemism meant scrupulously avoiding any hint of criticism of the Gnadenhutten murderers.[34]

Such fears drove Irvine to align himself with the men who helped bring about the massacre. Shortly after the militia's return from Gnadenhutten, Marshel and Williamson hatched a new plan to attack the British-allied Wyandot of the Sandusky Valley. Even before his abortive investigation of the massacre, Irvine endorsed their effort and agreed to supply ammunition, hoping that his leadership would channel the militia's rage in a more constructive direction. "If they behave well on this occasion," he reasoned, "it may also, in some measure, atone for the barbarity they are charged with at Muskingum." He pulled strings to ensure that his friend William Crawford was elected commander instead of Williamson and ordered the militia to "liberate . . . on parole" any prisoners they could not bring back with them. But Irvine's hopes that Crawford's leadership could rein in the militia proved illusory. By scrawling on trees and "exposing Effigies which they left hanging by the heels in every camp," some of Crawford's party declared their intention "to exterminate the whole Wiandott Tribe." These statements openly mocked Irvine's orders

[34] Orderly book of the Eighth Pennsylvania Regiment, Jan. 12, 1782, in Draper Manuscripts, subser. NN, 2: 206 ("attempting to murder"); W. Irvine to A. Irvine, Apr. 12, 1782, ibid., subser. AA, 2: 17–21 ("general and common opinion"). For Irvine's sympathy for Moravians, see W. Irvine to A. Irvine, Dec. 29, 1781, in Butterfield, *Washington-Irvine Correspondence*, 341–42. For Daniel Brodhead, see A[lexander] Fowler to Joseph Reed, Mar. 29, 1781, in Kellogg, *Frontier Retreat on the Upper Ohio*, 356–57; [George Washington] to Brodhead, May 5, 1781, ibid., 395; McClure, "Ends of the American Earth," 375–82; Sadosky, "Rethinking the Gnadenhütten Massacre," 193–96.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

regarding the treatment of prisoners, pledging instead that "*No quarters [were] to be given to an Indian, whether man, woman, or child.*"[35]

To succeed the militia first needed to "effect a *surprise*," but the Wyandot heard about the expedition even before it set out. On learning that the enemy was watching their march, Crawford advised returning home, but his subordinates overruled him. Their slow progress enabled the Indians to assemble a large force that utterly routed the untrained and inexperienced militia. In retaliation for Gnadenhutten, groups of Delaware and Shawnee, many of them friends or relatives of massacre victims, burned Crawford and several of his officers to death.[36]

Demanding vengeance for Crawford, local leaders almost immediately began planning another strike against the Wyandot towns in Upper Sandusky. Irvine agreed to command this expedition personally. Though "doubtful of the consequences," he noted that the "clamorous" settlers "charge continental officers with want of zeal, activity, and inclination of doing the needful for their protection." Failing to participate, he feared, would further jeopardize his own legitimacy and that of the Congress he served. By taking charge, on the other hand, he might still put to good use the militia's desire "to kill and burn all before them." Such enthusiasm for indiscriminate violence jarred with Irvine's high-minded sense of military propriety, but he had already begun to rationalize such tensions. He cautiously endorsed settlers' call for "the total destruction of all the Indian settlements within two hundred miles," explaining that their "dear-bought experience" vindicated this attitude.[37]

[35] Irvine to Moore, May 9, 1782, in Butterfield, *Washington-Irvine Correspondence*, 243–44 ("If they behave well"); Irvine to commander of volunteers, May 14, 1782, ibid., 119 ("liberate"); A[ren]t S. De Peyster to [Frederick] Haldimand, Aug. 18, 1782, in *Collections and Researches Made by the Pioneer Society of the State of Michigan* (Lansing, Mich., 1888), 10: 628–29 ("exposing Effegies," 629); Heckewelder, *Narrative of the Mission*, 341–42 ("*No quarters*," 342). For expedition plans, see Relation of Frederick Lineback, in Hazard, *Pennsylvania Archives*, 9: 524–25; Extract of a Letter from Mr John Etwine, Mar. 31, 1782, ibid., 9: 525; William Irvine to James Marshel, Mar. 29, 1782, in Butterfield, *Washington-Irvine Correspondence*, 282–83; Marshel to Irvine, Apr. 2, 4, May 1, 11, 1782, ibid., 283–89; Irvine to George Washington, May 21, 1782, ibid., 113–19; McKee to [De Peyster], Apr. 10, 1782, in *Sir Frederick Haldimand*, reel 56, Add. MSS 21783, fols. 140–41.

[36] Irvine to commander of volunteers, May 14, 1782, in Butterfield, *Washington-Irvine Correspondence*, 119 (quotation); Heckewelder, *Narrative of the Mission*, 338–42; Dorsey Pentecost to W[illia]m Moore, June 17, 1782, in Hazard, *Pennsylvania Archives*, 9: 556–57; John Turney to Arent De Peyster, June 7, 1782, in Butterfield, *Washington-Irvine Correspondence*, 368n; John Rose to William Irvine, June 13, 1782, ibid., 367–78; Rose, *Pennsylvania Magazine of History and Biography* 18; A[ren]t S. De Peyster to [H. Watson] Powell, May 15, 1782, in *Collections and Researches Made by the Michigan Pioneer and Historical Society* (Lansing, Mich., 1892), 20: 16; Croghan to Davies, July 6, 1782, in James, *George Rogers Clark Papers*, 19: 71–73.

[37] William Irvine to Benjamin Lincoln, July 1, 1782, in Butterfield, *Washington-Irvine Correspondence*, 175 ("doubtful of the consequences," "total destruction");

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Though peace with Britain shelved Irvine's Sandusky campaign, his collaborations with the upper Ohio militia significantly influenced him. In January 1782 Irvine condemned an attack on one Indian; in May, he chose to disregard the slaughter of nearly one hundred. During the ensuing summer, as he witnessed the toll of Indian attacks on the upper Ohio frontier, his letters increasingly defended the attitudes of militant settlers. By the following spring, Irvine embraced their views wholeheartedly, arguing that "nothing short of a total extirpation of all the western tribes of Indians, or at least driving them over the Mississippi and the lakes, will insure peace."[38] Irvine never actually approved of the Gnadenhutten massacre, but that was not necessary. Political expediency, together with growing sympathy for the settlers' plight, convinced him not only to let the slaughter go unpunished but also increasingly to identify with those responsible.

Irvine's experience illuminates an important part of the context that made anti-Indian violence possible: experience, perception, and crisis together created a tolerance for horrific savagery. Whereas historians lack the sources necessary to know whether many of his contemporaries underwent a similar transformation, the circumstances of frontier war— widespread terror, doubts about the loyalty of supposed friends, the weakness of civil and military authorities—likely made such experiences commonplace. Though stopping short of endorsing mass murder themselves, Irvine and others like him acquired a sinister willingness to look the other way.

Historians' questions about anti-Indian violence have often posited an implicit but sharp distinction between those who hated Indians and those who did not. Scholars have asked whether the Gnadenhutten murderers were an unfortunate aberration or if they reflected a generally shared racism. This emphasis on the presence or absence of hatred reflects broader questions about the nature of Anglo-American colonialism: whether colonists were mostly good folks or the perpetrators of an eighteenth-century cleansing; whether the expansion of the United States was heroic or genocidal. These debates over colonists' relative virtue or barbarity are provocative and compelling, but they offer little insight into why certain encounters between Indians and settlers produced mass murder and countless others did not.[39] For purposes of his-

---

[Antoine Chesne] to [Arent] De Peyster, Aug. 16, 1782, in *Collections and Researches Made by the Pioneer Society*, 10: 628 ("kill and burn").

[38] Irvine to Benjamin Lincoln, Apr. 16, 1783, in Butterfield, *Washington-Irvine Correspondence*, 187.

[39] David L. Preston's work offers a valuable perspective on the underrecognized frequency of nonviolent interracial encounters in the eighteenth-century backcountry. See Preston, *New York History* 86; Preston, "Imperial Crisis in the Ohio Valley: Indian, Colonial, and British Military Communities, 1760–1774," paper presented at "Warfare and Society in Colonial North America and the Caribbean," sponsored by

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0817

torical explanation rather than moral evaluation, easy distinctions between haters and nonhaters prove arbitrary and unhelpful.

In this case many individuals with widely varying motives made choices that enabled the killers to commit their crime and escape unpunished: James Marshel, who sent the militia to the mission towns; David Williamson, who put the Moravians' fate to a vote; the other expedition members, who chose to let the massacre proceed; and William Irvine and Dorsey Pentecost, who decided to ignore it after the fact. These findings suggest a need to extend the study of anti-Indian violence beyond the motives of perpetrators and a generalized notion of Indian hating to include a closer assessment of the historical contexts in which such events took place.

More specifically, this case points to at least three different aspects of those contexts that warrant attention. It illustrates the importance of political circumstances: Marshel's and Pentecost's tenuous authority as local leaders, the leadership vacuum fostered by Irvine's recent assumption of command and his absence at the time of the massacre, and the controversy surrounding the release of Moravian prisoners the previous fall. In early 1782 these developments coalesced, seriously weakening the institutions and hierarchies that had formerly protected the Moravians from attack. Additionally, the willingness of so many individuals to look the other way and the shifting attitudes of Irvine in particular show how people who did not sanction the massacre nonetheless helped make it possible. Their ideologies shaped and were shaped by the political circumstances of the moment, as Irvine and others sought out, articulated, and ultimately internalized rationales for morally dubious decisions. The complexity and dynamism of these ideas underscore the inadequacy of the catchall label "hatred" for explaining the causes of violence. Finally, historical circumstances, fluctuating ideologies, and the choices they informed all reflected the larger structural context of settler colonialism in the upper Ohio Valley. Many characteristics of the region were typical of settler frontiers: a colonial population rapidly moving beyond the limits of government power; governments attempting, often unsuccessfully, to achieve effective sovereignty; and indigenous peoples intent on protecting their autonomy and the resources on which they depended. These factors combined to undermine the legitimacy and effectiveness of customary legal, political, and military hierarchies among colonists and Indians, rendering conflict between the two—and between colonists and the governments seeking to rule them—all but inevitable. Officials in London, Philadelphia, and other administrative centers effectively promoted conflict through ongoing attempts to establish state control over key resources

the University of Tennessee's Center for the Study of War and Society and the Omohundro Institute of Early American History and Culture, Oct. 6–8, 2006, Knoxville, Tenn.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0818

(most notably land), tactics that threatened the economic futures of natives and settlers and raised the stakes of struggles between them. These officials typically and sometimes sincerely condemned atrocities such as the Gnadenhutten massacre and cited them as further justification for the expansion of state power, yet that very expansion had created the context that made such crimes possible.[40]

The political predicaments of Marshel, Irvine, and Pentecost reflected this structural context, which placed them in an uncomfortable intermediary position between the governments they represented and the people they were supposed to govern. Their official duties often brought them into direct conflict with settlers' interests and priorities, yet they lacked either the popular legitimacy or the means of coercion necessary to secure popular compliance. Moreover the resulting struggles gave the colonial population a strong suspicion of official authority as well as an inclination to support fellow settlers who clashed with it. Many of the factors that made Gnadenhutten possible thus flowed directly from fundamental attributes of colonial society. Colonial structures did not make the massacre inevitable—it resulted from a series of individual decisions, including the murderers'—but the nature of settler colonialism created circumstances that made such choices more likely. Though this structural context did not dictate people's actions, it curtailed their options, skewed their perceptions, and created strong incentives to choose as they did. Further studies of relationships among ideology, agency, and historical context may shed considerable light on the causes of violence and the willingness of so many to tolerate it.

Attributing events such as the Gnadenhutten massacre to perverse genocidal fantasies can be reassuring. Dwelling on the brutality of perpetrators sets them apart; by contrast, linking mass murder to familiar human frailties such as ambition, insecurity, and cowardice brings the horror ominously close to home. But fully explaining such violence in the past, let alone the present, demands closer attention to how and why individuals look the other way. Widespread willingness to blame atrocities on exotic hatreds only magnifies the need for a more context-sensitive historiography of violence that makes sense of not only the desire to kill but also the circumstances that turn such dark dreams into reality.

[40] Weaver, *Great Land Rush*; Cole Harris, "How Did Colonialism Dispossess? Comments from an Edge of Empire," *Annals of the Association of American Geographers* 94, no. 1 (March 2004): 165–82; Preston, "Squatters, Indians, Proprietary Government"; Patrick Wolfe, "Settler Colonialism and the Elimination of the Native," *Journal of Genocide Research* 8, no. 4 (December 2006): 387–409. On the role of imperial officials in fostering frontier conflict, see Elbourne, *Journal of Colonialism and Colonial History* 4; Moses, *Genocide and Settler Society*.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 17:39:47 UTC
All use subject to https://about.jstor.org/terms

From the Collections of the Library and Archives of the Autry

FOR RESEARCH USE ONLY

**UF 740 L6 1959**

*Cartridges:*

*A pictorial digest of small arms ammunition*

By Herschel C. Logan

Excerpts include the cover page, pages 11-40, and pages 180-183

10/18/2022



*The* CARTRIDGE STORY

PAPER

COMBUSTIBLE

SEPARATE PRIMED

SELF CONTAINED

PATENT IGNITION

CENTER FIRE
MODERN RIMLESS

CENTER FIRE
INSIDE PRIMED

RIM FIRE

From the Collections of the Library and Archives of the Autry

FOR RESEARCH USE ONLY

# CARTRIDGES
*~a pictorial digest of small arms ammunition*



*by*

HERSCHEL C. LOGAN

AUTHOR AND ILLUSTRATOR

HAND CANNON TO AUTOMATIC

THE STACKPOLE COMPANY
HARRISBURG, PENNSYLVANIA

*Originally published by*
STANDARD PUBLICATIONS, INC., HUNTINGTON, W. VA.

| DATE | EVENT |
| --- | --- |

out a balloon primer pocket projecting into the interior of the case.

Peters Cartridge Company organized at Kings Mills, Ohio.

1888 . . .   A process termed "colloiding," in which guncotton was made to burn and not explode, was worked out by the Frenchman Vieille.

Ballistite, a double based powder containing both nitro-cellulose and nitroglycerine was patented by Alfred Nobel.

1892 . . .   The Model 1892, .30 Krag Jorgensen, was the first U. S. rifle to use smokeless powder and a reduced caliber. The bullet had a lead core encased with a cupro-nickeled jacket . . . blunt nose and flat base.

1893 . . .   The Borchardt, first automatic type handgun, was designed and chambered for ammunition which has, more or less, been a model for all automatic ammunition since.

Francis G. du Pont developed a hard grain smokeless powder with a fairly high nitrogen content.

1898 . . .   Development of the "H-48," a non-mercuric fulminate for primer fillers, by the Frankford Arsenal.

1900 . . .   Peters Cartridge Company produced the first crimped .22 long rifle cartridge. It was known at that time as the Smith & Wesson Long.

1902 . . .   Remington Arms Company merged with the Union Metallic Cartridge Company to become familiarly known as Remington-UMC.

1906 . . .   The U. S. service adopted the German type "spitzer" bullet which had a pointed nose and a flat base . . . weight 150 grains.

1924 . . .   The 172-grain gilding metal encased bullet having a nine degree chamfer at the base was adopted by the U. S. It is commonly known as "boattail."

1934 . . .   E. I. du Pont de Nemours & Company bought out Remington-UMC.

Peters Cartridge Company was absorbed by du Pont and Remington.

10

From the Collections of the Library and Archives of the Autry

FOR RESEARCH USE ONLY



paper

BALL

BUCK AND BALL

BUCKSHOT

## PAPER

The first cartridges were very simple . . . a powder charge wrapped in paper and tied with a string. For the most part they were used only in an emergency and to expedite loading while on horseback. The ball was a separate unit to be inserted by itself.

Later, someone conceived the idea of combining both powder and ball into a paper case, a development that was to carry on for nearly three centuries.

Such cartridges were used in matchlock, wheel lock, flintlock and percussion arms of various types. Oftentimes they were greased or oiled, not only to lubricate the barrel, but to protect the powder charge from dampness.

Paper cartridges used both round balls and conical bullets for projectiles. Those with only one large ball or bullet were referred to simply as .69 Ball, .69 Pistol, Musketoon or Musket. Those with one large ball and three smaller ones were called .69 Buck and Ball, while those with twelve small balls were labeled .69 Buckshot, or whatever the caliber happened to be in each case. All were used in smoothbore arms.

The original instructions directed the soldier to tear the cartridge open, pour the powder into the barrel, then unwrap the bullet and ram it down. Contrary to this, they soon developed their own loading technique. This many times merely included the biting off of the end, pouring the powder charge, less a small amount which was used for the priming pan, into the barrel and then ramming down the ball. Paper and string were then rammed down on top to serve as a wad.

12



# PAPER CARTRIDGE
## METHOD OF MANUFACTURE

1. Cartridge paper 4 1/3 inches wide by 5 1/4 inches in overall length, (for .69 caliber) wrapped around a cartridge stick of .65 diameter.
2. The stick slipped back from end allowing paper case to be "choked" or tied.
3. Stick is removed and ball is inserted, followed by stick which holds case in shape while ball is being secured by two half hitches.
4. Fifty grains of black powder is poured into case.
5. End of case is pinched and bent over at right angle.
6. Right side is folded in to center.
7. Left side is folded in after which the "tail" is folded up and over to form . . .
8. The completed cartridge.

13

From the Collections of the Library and Archives of the Autry

FOR RESEARCH USE ONLY

## CALIBER 36



(Sharps 90 bore Paper)
Total length 2⅜ in.
1¹³⁄₁₆ in. buff colored paper
case
Conical lead bullet

These 90 bore (.36 cal.) cartridges were used in the Sharps slanting breech sporting rifles. The slanting breech rifle was patented by Christian Sharps in 1848. Sharps Pat. disc priming magazine is to be found on the early issues of this rifle. Later the Lawrence Pat. priming magazine replaced the earlier Sharps method.

## CALIBER 44



(44 Army)
Total length 1¹³⁄₁₆ in.
Paper case is lemon color
for easy identification.
216 gr. lead, conical bullet

25 grs. black powder
These U. S. (1858) paper cartridges were used in the Army Dragoon revolvers. (See Plate 160 *Hand Cannon to Automatic*)

## CALIBER 52



(32 Bore Sharps Paper)
Total length 2⅝ in.
1¹¹⁄₁₆ in. paper case, tied
with cord
Conical lead bullet

This 32 bore cartridge was later called the .52 caliber. It was used in the Model 1859 Sharps B. L. percussion military rifles and carbines. Later the .52 caliber size was made by cementing the paper tube to the base ring of the bullet. Still later this size developed into the familiarly known Sharps linen type.

## CALIBER 54




(54 Martial Pistol)
Total length 1½ in.
Cream colored paper case
½ oz. spherical lead ball

Paper cartridges such as this were used in both flint and percussion martial arms from 1815 to around 1860. An interesting note on the one illustrated is that it came from an old box, hand labeled . . . ".525 Colt Musket." However, its measurements are identical with the .54 caliber cartridge, whose ball does mike .525. Due to the fouling of the barrels by the old black powder, the balls of most of the early cartridges were made smaller than the actual bore measurement . . . hence a .525 ball for a .54 caliber. Ammunition such as this was used in the Black Hawk, Seminole and Mexican Wars.

## CALIBER



(Unknown)
Total length 2³⁄₃₂ in.
1⅛ in. paper case
Conical lead bullet of .650
diameter

It is said that this large cartridge will fit the chambers of the .56 Colt Revolving Musket. However, it is larger than the combustible cartridge which was made by the Colt Cartridge Works for the revolving musket. It is illustrated here as another type of these early cartridges.

## CALIBER 58



(58 Buckshot)
Total length 2⁵⁄₁₆ in.
Buff colored paper case
12 lead balls weighing 43
grs.
75 grs. black powder
Total weight 625 grs.

Used in the 1855 Musket of .58 caliber, these buckshot cartridges must have been the granddaddy of the present day riot gun charge. This caliber was also made in the "buck and ball" load—one large ball and three buckshot.

## CALIBER 58



14

15

From the Collections of the Library and Archives of the Aud.

FOR RESEARCH USE ONLY

(58 Springfield)
Total length 2½ in.
Buff colored paper case
500 gr. conical lead ball
(Minié Ball) with con-
cave base
60 grs. black powder

Instead of using an iron cup in the base of the Minié ball, as was invented by Capt. Minié, to spread the bullet to fit the rifling upon discharge of the propellant . . . the army found that the powder charge itself was sufficient to expand the deep, hollow-based bullet. This cartridge itself was developed for the 1855 Springfield musket.

## CALIBER 64



(64 Paper)
Total length 1¹¹⁄₁₆ in.
White paper case, tied with white and red striped cord
393 gr. spherical lead ball
74 grs. black powder

This is the type of ammunition the soldiers under Gen. Jackson were using in their .69 caliber Hall carbines and rifles in 1818 during the Seminole Campaign in Florida.

## CALIBER 69

(69 Pistol)
Total length 1¹³⁄₁₆ in.
Buff colored paper case tied with red and white striped cord
1 oz. spherical lead ball
50 grs. black powder

On March 9, 1799, the U. S. Govern-




ment made its first contract with Simon North for 500 horse pistols of .69 caliber. Pistols of this caliber were used in the service until 1815. It was the .69 flintlock pistol that was the hand gun guardian of the then infant United States. (See plates 50, 54, 56 and 59 *Hand Cannon to Automatic*)

## CALIBER 69




(69 Rifle Musketoon)
Total length 2⅛ in.
Buff, coarse grain, paper case
625 gr. conical lead bullet
50 grs. black powder
Made at Frankford Arsenal, 1859

The rifle musketoon was a short musket with a large smooth bore. Musketoons using this ammunition were first brought out in 1842. They were used by both the artillery and cavalry . . . as well as the sappers (engineers).

16

Label . . .
RIFLE MUSKETOON, Cal: .69
50 Grains M. Powder
Weight of Ball 625 Grains

FRANKFORD ARSENAL
1859

## CALIBER 69




(69 Musket)
Total length 2⁵⁄₁₆ in.
Buff colored paper tied with light colored cord

Since the regulation smooth bore musket of .69 caliber gave way to the .58 caliber musket with a rifled barrel using a conical bullet in 1855, the life of this cartridge must have been very brief. It is known that some of the 1842 muskets and musketoons were rifled to take the new conical bullets, as a sort of experimental prelude to the actual reduction of caliber to .58.

## CALIBER 69

(69 Musket)
Total length 2⁵⁄₁₆ in.
Heavy, coarse, buff colored paper case
1 oz. spherical lead ball

Apparently this item is one of the early experimental cartridges. It will be noted that the ball is partially exposed. It was used no doubt in the .69 caliber smoothbore muskets.



## CALIBER 69



(69 Buck and Ball)
Total length 2⅜ in.
Dark buff colored paper case tied with light brown cord
Three 43-gr. lead buckshot
1 433-gr. spherical lead ball
75 grs. black powder
Total weight 662 grs.

Another of the multi-ball loads for the .69 muskets and musketoons is this "Buck and Ball." The cross-section view shows how the three buckshots were placed on top of the large ball within the paper case.

17

From the Collections
of the Library and
Archives of the Autry

FOR RESEARCH
USE ONLY

*The following descriptions of the Paper Cartridges on the opposite page are taken almost verbatim from the book . . .*

A Brief Description
of the
MODERN SYSTEM OF SMALL ARMS
As Adopted in
The Various European Armies
By J. Schön

(Translated from the German by J. Gorgas, Capt. of Ordnance, U. S. Army, Dresden, 1855)

**1** This cartridge, used in the Norwegian Breech-loading Rifle, is commonly of writing paper, and wound twice. One end laps over the groove of the bullet, and is tied with a thick greased woolen thread, and the other end is turned down over the charge . . . which is 70 grains. The bullet is 1.137 inch long, and 0.696 inch diameter. Weight 787 grains.

**2** A Belgian cartridge which is wound double and pasted its whole length. The open end is drawn over the ball to the first groove to which it is tied with a woolen thread. The loose end of the cartridge is twisted and turned down over the end. The bullet is 1.125 inch long . . . .672 inch in diameter and its weight is 731 grains.

**3** The cylinder of this Bavarian cartridge is of paper, unpasted and contains 58 grains of powder . . . from which the bullet is separated by a tie. In loading, the end folded down is not bitten off but opened, the powder poured in, the cartridge turned, and the bullet shoved out of it with the rammer. It is pushed home and rammed three times, which drives the tige from 0.15 inch to 0.09 inch deep into the lead, and fills the grooves. The bullet's length is 0.957 and its weight is 478 grains.

**4** Used in a Prussian fortress wall piece (defensions-gewehr) this cartridge in which the bullet is placed, point inward, is tied between the powder and the ball, and both ends are turned down and not pasted. Powder weight 102 grains. The bullet is 1.23 inch long . . . .694 inch in diameter and weighs 777 grains.

**5** This Belgian cartridge is made of thin cardboard rolled around once, and, for greater security and the preservation of the powder, is wrapped about with an envelope of common writing paper pasted, the end of which is inserted into the cylinder in such a way as to envelope the point of the bullet and separate it from the powder. The whole is then surrounded by a third wrapper unpasted

and folded close over the base of the bullet . . . the other end being left long, is twisted and turned down. The cartridge is dipped in tallow as far as the cylindrical part of the bullet extends. The method of loading is as follows: The cartridge is bitten off above the powder, the powder poured in, the cylindrical part of the bullet inserted, the empty cartridge torn off, and the bullet shoved down without ramming on the charge, which is 85 grains of common musket powder. In loading in this way, without freeing the bullet of the paper, there will be no danger of the bullet moving forward when the gun is carried with its muzzle depressed. The bullet is 1.223 inch in length . . . .673 inch in diameter, and weighs 721 grains.

**6** The cartridge cylinder of this Austrian item is not pasted, but folded down over the base of the bullet. The bullet is turned point inwards, and tied with a thread over the point, which prevents the access of the powder and gives the cylinder the required stiffness. The loose end is folded down and the primer attached to it. The bullet is 1.035 inch in length . . . .692 inch in diameter, and weighs 652 grains.

**7** Hanoverian troops used this cartridge, which was made of fine but strong vegetable paper, not pasted. The loose end was folded twice at right angles and turned down in the Prussian manner. The bullet was 0.8 inch in length . . . .61 inch in diameter, and weighed 444 grains.

**8** The cylinder of this Russian cartridge is double, has its edges pasted and is folded down over the base of the bullet, which has its point turned inward. It is tied in the groove with a woolen thread dipped in tallow. The other end is pinched and folded down. Another tie is made about a third way down the conical part of the ball, the object of which is to prevent the powder from shaking down. The bullet is 1.191 inch in length . . . 0.70 inch in diameter, and weighs 689 grains.

18



A GROUP OF
EUROPEAN PAPER CARTRIDGES
(PRIOR TO 1855)

1   2   3   4
5   6   7   8

*Illustrated from Schön's book....*
MODERN SYSTEM OF SMALL ARMS
DRESDEN 1855

19

From the Collections of the Library and Archives of the Autry
FOR RESEARCH USE ONLY

# combustible

PAPER

LINEN

SKIN

COLLODION

From the Collections of the Library and Archives of the Autry

FOR RESEARCH USE ONLY

COMBUSTIBLE

Two developments came in the first half of the nineteenth century. One was the conical bullet, the other the combustible envelope used in the manufacture of cartridges. Together with the newly invented percussion cap, they produced an advanced step in cartridge evolution.

Various materials, paper, linen, collodion, skin, etc., were used in forming the case for the powder charge. All were highly nitrated making them readily inflammable. It mattered very little whether or not the case broke during the loading since it would ignite anyway from the fire of the percussion cap.

It is regrettable that no record seems to be available as to who produced the first combustible cartridge. They were produced by several firms during the middle of the nineteenth century. Used both in hand guns and long arms they were, for the most part, put up in wooden hollowed containers or blocks. These containers, holding five or six cartridges, were drilled out so that each cartridge was in a separate compartment by itself. The wooden blocks were wrapped in oiled waterproofed paper upon which the label was printed.

The Sharps linen, to mention one outstanding example, was a product of this period of development. It was less fragile than the paper variety and became quite popular, along with the Sharps breech-loading rifle.



## MAKING A COMBUSTIBLE CARTRIDGE

1. Cartridge paper, or linen cloth, cut in a strip of one and three-eighths inches (for the Army size .52 caliber Sharps) and of sufficient length to wrap twice around a cartridge stick.
2. Gluing the edge and securely fastening it forms the paper cylinder.
3. Cut a piece of thin bank-note paper, or gauze, three-fourths of an inch square.
4. Place this square of paper on end of cartridge stick . . . apply glue either to this paper or to the inside rear edge of paper case.
5. Insert stick with paper into case forcing it to the rear . . . and withdraw stick.
6. Allow case to dry after which charge with 60 grains of black powder.
7. Apply an adhesive to ball before seating it in case. Choke paper into grooves of ball to form . . .
8. The complete cartridge.

22

23

From the Collection of the Library and Archives of the Autry

FOR RESEARCH USE ONLY

## CALIBER 28



(28 Combustible)
Total length 1³⁄₁₆ in.
¾ in. paper case
59 gr. conical lead bullet
Total weight of cartridge 67 grs.

The bullet in this cartridge is identical with those cast by the .28 caliber Colt mold . . . used in the early percussion pistols and revolvers.

## CALIBER 31



(31 Paper Combustible)
Total length 1⅛ in.
¾ in. paper case
Conical lead bullet

Made for Colt, Whitney or Remington revolvers of 31-100 caliber. A cartridge of this type was patented by J. H. Ferguson, June 28, 1859, Pat. No. 24,548. The paper case was prepared according to the patent papers as follows: "First, the paper is treated with a compound consisting of eighteen parts by weight of nitrate of potassa, pure, and seventeen parts of sulphuric acid, pure, after which it is washed to free it from the soluble salts and excess of acid, and then dried between sheets of blotting paper. This preparation renders the paper highly inflammable, but not

at all explosive . . . in order to render it perfectly waterproof, a light coat of shellac varnish is applied to one side only." A contemporary ad, in describing these new cartridges, says:

*Combustible Envelope Cartridges*

For Colt's, Remington's, Whitney's, Bacon's and all other revolvers using caps. They are put up in waterproof cases, are more convenient, and surer fire than loose powder and ball, and a revolver can remain loaded much longer, without injury, when charged with these cartridges instead of loose powder and ball.

## CALIBER 36

 

(36 Colt Combustible)
Total length 1¼ in.
¾ in. paper case
Conical lead bullet with two grease grooves

These cartridges were packed in a flat wooden container having a separate hole for each of the six charges. The wood box was wrapped in an oiled paper upon which was printed the following:

6 Combustible Envelope
Cartridges
Made of HAZARD'S Powder
Expressly for
Col. Colt's Patent
REVOLVING BELT PISTOL
address
Colt's Cartridge Works
Hartford, Conn.
U. S. America

24

## CALIBER 36



(36 Skin Cartridge)
Total length 1⁵⁄₁₆ in.
Cylindrical . . . round nose . . . lead bullet

An English cartridge illustrated in its paper carrying case. The strip of paper to the left of the bullet is used to quickly remove the case before the combustible skin cartridge was inserted into the chamber of the gun. On the blue label around the case is the following wording:

Capt. M. Hayes, R. N.
Patent
SKIN CARTRIDGES
Manufactured by
BROUX & MOLL   LONDON

## CALIBER 38

  

(38 Eley Colt)
Total length 1⁵⁄₁₆ in.
⅞ in. skin case, wrapped with small cord
Conical lead bullet

Shown beside the cartridge is its paper carrying case. The black ribbon is used in removing the case from the cartridge before inserting it into the chamber of the gun. Eley Bros.

were one of the most noted of English cartridge manufacturers. The cartridge pictured here was their bid for the ammunition business of owners of .38 caliber Colt and other percussion revolvers.

## CALIBER 44



(44 Bartholow Waterproof)
Total length 1⁵⁄₁₆ in.
½ in. collodion coated case
Conical lead bullet

On May 21, 1861, R. Bartholow secured a patent for a waterproof combustible cartridge which was described as follows in Patent No. 32,345 . . . "Nitrate of potassa, charcoal, sulphur and chlorate of potassa mixed with shellac, pressed into form of cartridge, and coated with collodion." Cartridges for the Army were packaged in containers labeled "for Army Holster Pistol." Those for Navy use were labeled "Navy Pistol Size." (See plate 160 *Hand Cannon to Automatic*)

## CALIBER 44



(44 Colt)
Total length 1⁵⁄₁₆ in.

25

From the Collections of the Library and Archives of the Autry

FOR RESEARCH USE ONLY

---

---

---

¾ in. paper case
Conical lead bullet

One of a series of cartridges used in the famous .44 Colts of Civil War and frontier days. This one is described by its original label as follows:

6 Combustible Envelope
Cartridges
Made of HAZARD'S Powder
Expressly for
Col. Colt's Patent
REVOLVING HOLSTER PISTOL
Address
Colt's Cartridge Works
Hartford, Conn.
U. S. America

## CALIBER 44



(44 Colt Skin)
Total length 1¹¹⁄₁₆ in.
1⅛ in. skin case
Conical lead bullet

While the cleaned and chemically treated pigs' intestines were still wet they were stretched over forms of the same shape as the cartridge case. After the skin cases were dry and the powder and bullet had been put in place the outside of the case was given a coating of gutta-percha varnish. For the lubrication in the grooves around the bullet the following was used: . . . three parts best tallow, two parts wax (vegetable preferred), and one part native gutta-percha, melted together in the order named; and the scum removed while near the boiling point. This cartridge

26

Patent No. 33,611 was patented on October 29, 1861, by Wm. Mont Storm.

## CALIBER 44



(44 Colt, Hazard's Waterproof)
Total length 1¼ in.
Manufactured by the Hazard Powder Co., Hazardville, Conn.

R. O. Doremus and B. L. Budd patented this waterproof cartridge, Patent No. 34,725. The powder is formed into shape upon a pin projecting from the base of the bullet . . . or is pressed into the base of the concave bullet if no pin is used. The powder may be made up of layers of varying combustibility in order to provide greater acceleration. It is interesting to note one paragraph in the patent papers concerning this cartridge. It says: . . . "Among the important features of this ammunition — besides possessing the qualities named in our other application as due to powder in the solidified form—are readiness to use, while in consequence of the absence of paper covering, the men need no longer be condemned for infantry who have lost their side teeth." In other words with this new patent they no longer had to bite off the end of the cartridge. The box label for this cartridge reads as follows:

Pressed Waterproof
CARTRIDGES
For Colt's Army Pistol
Patented March 18, 1862
Manufactured by the
HAZARD POWDER CO.
Hazardville, Conn.

## CALIBER 44



(44 Skin Cartridge)
Total length 1⅛ in.
Round nose, lead bullet

Another of the Capt. M. Hayes patent combustible cartridges, pictured in its paper carrying case.

## CALIBER 46



(46 for Colt)
Total length 1⅝ in.
Conical lead bullet

Algernon K. Johnston of Middletown, Conn., and Lorenzo Dow of Topeka, Kansas, on October 1, 1861, secured a patent (No. 33,393) for a waterproof cartridge. On January 7, 1862, they secured a similar patent (No. 34,061). A paragraph from the first patent reads: "Then, in order to render the cartridge compact and waterproof, or highly impervious to moisture, we coat the cartridge so constructed with collodion, or with a film of any substance obtained by dissolving cotton, flax or other textile matter in the ether of some acid, either alone or in combination with alcohol." The following label would indicate that Johnston & Dow were patentees rather than manufacturers:

Johnston's & Dow's
WATERPROOF & COMBUSTIBLE
CARTRIDGES
Manufactured by
Elam O. Potter, New York, U. S.
for Colt's Army Pistol 46-100
with powder made expressly for
these cartridges by
HAZARD POWDER CO.

It is not unusual to find early cartridges marked as being larger than the usual bore of the arm to which they belong. A ball of larger diameter than the bore was used, so that it would take the rifling. Hence, this .46 caliber would be used in the regular .44 Colt army revolver.

## CALIBER 52



(52 Sharps Linen)
Total length 2³⁄₁₆ in.
1⅜ in. linen case with nitrated paper base
Conical lead bullet

Manufactured by:
Sharp's Rifle Mfg. Co.
Washington Arsenal
A. G. Fay, Potter & Tolman
H. W. Mason and others

This is one of the most famous of all of the combustible types. It was used in the Sharps Sporting and Military Arms before and during the Civil War. Every student of arms history is familiar with the Sharps "Beecher's Bibles." These were the rifles sent into Kansas in 1857 in boxes labeled

27

From the Collections of the Library and Archives of the Autry
FOR RESEARCH USE ONLY

"Beecher's Bibles." When John Brown was captured at Harpers Ferry in 1859, 102 Sharps carbines were taken from him. True it is that the .52 Sharps linen is one of the cartridges which not only saw history in the making, but helped to make it. There were 16,306,508 Sharps cartridges purchased by the government during the Civil War. These cartridges were listed as late as 1897 in the Hartley & Graham catalog.

## CALIBER 54



(54 Starr Linen)
Total length 1¹⁵⁄₁₆ in.
1⅝₁₆ in. linen case with nitrated paper base
Conical lead bullet
80 grs. black powder
Manufactured by Johnston & Dow and others

Similar to the Sharps linen, the .54 Starr was developed for the Starr percussion carbine. A considerable quantity of these arms, (20,601) were delivered to the U. S. War Department during the period between July 30, 1863, and Aug. 20, 1864. A total of 25,603 were used during the Civil War. For these the government purchased 6,860,000 cartridges.

## CALIBER 56

(56 Merrill)
Total length 1⅜ in.
1 in. paper case
Conical bullet
40 grs. black powder

This is the scarce size of the Merrill



combustible cartridge. Neither Satterlee nor Sawyer mention this caliber. The label from the original box reads as follows:

10 cartridges for
MERRILL'S PATENT CARBINE
Cal. 56-100   -   Gr. 40
Address
The Merrill Patent Fire Arm
Manufacturing Company
Baltimore, Md.

## CALIBER 56



(56 Colt Revolving Rifle)
Total length 1⅞ in.
1⅜₁₆ in. paper case
Conical bullet of .583 diameter
Manufactured by Colt Cartridge Works

This cartridge was used in the Model 1855, .56 Colt revolving rifle or carbine. These arms were the 5-shot cylinder models . . . used by the militia in some states. A few came into the Civil War when the militia companies were mustered in. They were not too popular with the troops, however, due to the loud report and flash so close to the face and also to the fact that occasionally several chambers went off at once.

28

*separate primed*

PAPER
CLOTH
RUBBER
METALLIC

From the Collections of the Library and Archives of the Author

FOR RESEARCH USE ONLY

# SEPARATE PRIMED

The invention of the percussion cap precipitated a period of experimentation, which it was hoped would lead to quicker loading and firing.

The paper, linen and other materials of the combustible era gave way to metallic cases, even though there were a number of cases of paper, and paper and foil, in the early part of this separate primed period. These separate primed cartridges were ignited from the fire of an ordinary percussion cap, disk primer or tape primer.

Two cardboard cased cartridges should be mentioned here. One was the Whitworth tube used in the Whitworth rifle. It has a long, round nose bullet, seated flush with the top of the tube. The rear of the tube was torn off exposing the powder charge when loading into the barrel. The other, the Greene, was the more unusual. It had a similar tube but in this case the bullet was behind the powder charge and served as a gas seal.

First of the metallics of this period was the well known Maynard and Burnside brass cartridges. While they were both separate primed, the similarity ceased. In appearance they were as unlike as two cartridges can be. The Maynard was a tubular brass case with a wide flat base soldered to it. In the center was a small pin hole through which the fire from the percussion cap (or tape primer) passed.

The Burnside on the other hand had a tapering case not unlike an ice cream cone. Around the bullet was a heavy bulge which was used as a grease chamber. This cartridge, too, had a small pin hole in its inverted base.

The following pages will picture several other types developed during this period.

30

## CALIBER 35




(35 Maynard Percussion)
Total length 2 in.
1¹⁵⁄₃₂ in. brass case, .400 dia.
Conical, flat nose bullet

Used in the Maynard sporting rifles, these cartridges were among the first, if not the first, reloadable brass cartridges. They were used largely in the Model 1865 arm. The Maynard cartridge was patented by Edward Maynard first on June 17, 1856. This was for a metal shell with the rear aperture closed by waxed paper. On January 11, 1859, he secured another patent (No. 22,565) which provided for, "a perforated steel disk soldered to perforated base of brass shell." This is the type of cartridge illustrated, except the steel disk gave way to brass. The small hole in the head admitted the flame from the percussion tape or cap to ignite the powder within the case. The label from the box containing these interesting cartridges reads thus:

10
METALLIC CARTRIDGES
(loaded)
35-100 Calibre
EDWARD MAYNARD, Patentee
June 17th, 1856    January 11, 1859
Re-issue May 28, 1861
Manufactured by
MASSACHUSETTS ARMS CO.
Chicopee Falls, Mass.

## CALIBER 36




(36 Marston)
Total length ⅞ in.
1¹⁵⁄₃₂ in. light green paper case
.330 dia.
Conical lead bullet .350 dia.

This rare cartridge was patented May 18, 1852, (No. 8,956) by Marston and Goodell. The shell was to be of paper or metal with a leather or paper base. It was used in the Marston single shot pistol. This arm was described in the booklet entitled *Art and Industry at the Crystal Palace in 1853*. This was an important industrial exposition of that day. It is said that the edges of the leather head were greased. When the cartridge was fired, the disk remained, to be pushed out by the bullet of the next cartridge. The disk being greased, this operation kept the barrel in clean condition. A patent, (No. 8,273) was also secured in France in 1852. (See plate 88, *Hand Cannon to Automatic*)

## CALIBER 36



(36 Sharps "Mule Ear, Lop Ear or Flop Ear")
Total length 1½ in.
1¹⁄₁₆ in. brass case with projection on base

31

From the Collections of the Library and Archives of the Auth...

FOR RESEARCH USE ONLY

Dia. at head .414
Dia. at mouth .409
Round nose, lead bullet

These unique cartridges were produced in 1857 for Sharps pistol rifles, produced in Sharps Philadelphia factory. A shallow mortise was milled into the upper side of the breech to accommodate the projection or "ear" of the cartridge. The ear projected up above the breech just high enough to be easily secured for extraction with a finger nail or knife blade, but not high enough to interfere with the line of sight. A glance at the breech would also tell whether or not a cartridge was in the chamber.

The base and projection of the cartridge were stamped out of one piece of sheet brass and soldered to the tube. The projection folded down on itself and was soldered to the rim of the tube, thus forming the complete case. A small hole in the head admitted the flame, from the disk primer to the powder charge.

These rarities were packed in a box with this simple wording:

The Balls and Brass Tubes should be kept well greased to insure accurate shooting, and to prevent the tubes from sticking in the Gun.

Apparently these cartridges were loaded with two different styles of bullets. At least two well authenticated types were encountered in this research. Both types are illustrated.

## CALIBER 45

(45 Whitworth Tube)
Total length 3¾₆ in.
Full length heavy paper case
.535 dia.
530 gr. cylindrical, round nose, lead bullet
70 grs. black powder

Made in England under English Patent No. 1,959 of 1859. The Whit-



worth tube cartridge was used in the Whitworth rifle. These rifles and cartridges, purchased in England, were smuggled into the South on blockade runners during the Civil War. Used primarily by Confederate snipers, they are said to have given a good account of themselves. A very few of them were equipped with a spiral hexagonal type bullet rather than the cylindrical. These were cast then swaged to the shape of the bore. Their box label reads as follows:

10
WHITWORTH
Patent Cartridges
Cylindrical Projectiles, 530 Grain
Charges 70 grains

The same caliber with 85 grs. of powder was also made . . . length 3²⁹₃₂ in.

## CALIBER 46

(46 Maynard, first type)
Total length 1¹¹₁₆ in.
1⅛ in. brass case with cover for base



Dia. at head .497
Dia. at mouth .495
Conical lead bullet of .462 diameter

Patented June 17, 1856, (No. 15,141), the cartridge here illustrated is the first Maynard experimental. The cap shown with it was used only to protect the base, in which the pin hole opening into the powder charge was located. A small disk of waxed or gummed paper was placed in the case between the powder and the perforated base. This served as a protection for the powder against air or moisture.

## CALIBER 50



(50 Maynard Brass & Paper)
Total length 1⅝ in.
1¾₆ in. thin brass, paper wrapped case, .550 dia.
Conical, flat nose, lead bullet

This brass and paper Maynard was used in the early Maynard sporting rifles. It is generally believed that the paper and brass type of case was used previous to the solid brass case.

Be that as it may, this item shows up much less frequent than its near relative, the solid brass case.

## CALIBER 50



(50 Smith, heavy paper)
Total length 2¼₆ in.
1⅞₆ in. heavy paper case
Conical lead bullet

There appears to be a question concerning this and the specimen which follows. It is the opinion of some foremost authorities that these two cartridges are privately made rather than factory issues. Nevertheless, they are encountered by collectors and are pictured along with the others, with only this brief information.

## CALIBER 50



(50 Smith's Carbine)
Total length 2¹³₃₂ in.
1¹³₃₂ in. red paper case with

32

33

From the Collection of the Library and Archives of the Auth'r

FOR RESEARCH USE ONLY

wording "Smith's Carbine .50"
Conical lead bullet

Like the previous cartridge this one is believed to be of private origin and not regular issue.

## CALIBER 50



(50 Smith, rubber case)
Total length $2\frac{1}{32}$ in.
$1\frac{1}{4}$ in. black rubber case, .635 dia.
Conical lead bullet for the Smith B. L. percussion rifled carbine

Gilbert Smith of Buttermilk Falls, N. Y., on June 30, 1857, secured a patent (No. 17,702) for a cartridge case . . . "or at least the cylindrical portion thereof, of some impermeable and elastic substance, such as India rubber or gutta-percha . . . so that it may be expanded laterally by the force of the explosion of the charges, and will contract itself after the explosion by its own inherent property." This black rubber cartridge is very seldom encountered nowadays and is a choice collector's item.

## CALIBER 50

(50 Smith, brass and paper)
Total length $1\frac{13}{16}$ in.
$1\frac{3}{8}$ in. thin brass and paper wrapped case, .630 dia.
Conical lead bullet




Used in the .50 Smith B. L. Percussion Rifled Carbine

On Dec. 15, 1863, Thomas J. Rodman and Silas Crispin secured a patent (No. 40,988) for a "metallic cartridge case formed of thin wrapped sheet metal . . . combined with an internal or external strengthening disk or cup. Whether this disk is made of paper, metal or elastic material." This patent was assigned to Thomas Poultney at Baltimore, Md. Hence from the label it will be seen that these Smith cartridges were produced under this patent.

10
Poultney's Patent Metallic
CARTRIDGES
Patented Dec. 15th, 1863    12 caps
for
SMITH'S BREECH LOADING
CARBINE
No. 1            50-100 Caliber
Address Poultney & Trimble,
Baltimore, Md.

During the Civil War the government purchased 30,062 Smith's carbines and 13,861,500 cartridges.

## CALIBER 50

(50 Maynard with wire extractor)
Total length $2\frac{1}{16}$ in.
$1\frac{7}{16}$ in. straight brass case with wire extractor
Conical, flat nose, lead bullet

One of the rare experimentals, this cartridge with its wire extractor was



(50 Maynard with Cord Extractor)
Total length $2\frac{3}{16}$ in.
$1\frac{5}{16}$ in. brass, straight case with cord extractor
Conical, flat nose, lead bullet

Another of the rare Maynard experi-

patented Sept. 29, 1863, by Edward Maynard. Patent No. 40,112 provided for a metallic or otherwise durable cartridge with a suitable retracting arm, chain, thong, cord or wire attached. These were used to extract the case when fired. Using this method of extraction, Maynard felt that the necessity of a thick base or build up base was eliminated.

## CALIBER 50

mentals, this one was equipped with a cord extractor. The cord is attached to a small wire loop soldered to the case. On some of these cartridges the cord was passed through a small hole in the case, knotted and then sealed over with wax gum or cement which was not affected by the combustion of the powder.

## CALIBER 50



(50 Maynard 1865 issue)
Total length $1\frac{13}{16}$ in.
$1\frac{5}{16}$ in. brass case .545 dia.
Conical, flat top, lead bullet
Used in the Maynard breech-loading carbine

Best known of the Maynard early brass percussion cartridges, this .50 caliber was used both in the sporting rifles and military arms produced by the Massachusetts Arms Co., Chicopee Falls, Mass., under Maynard's patent. These rifles were the first to use the expanding metallic cartridge case as a gas check.

During the Civil War 20,002 of these rifles were purchased by the government. For use with them 2,157,000 cartridges were purchased.

Saterlee in his *Catalog of Firearms* mentions an interesting item in connection with these arms. It seems that Jefferson Davis secured some 400 of these rifles, probably through a previous War Department purchase, and they were used by the Confederates at Ball's Bluff. Since the fac-

34

35

From the Collection of the Library and Archives of the Autr...

FOR RESEARCH USE ONLY

tory had burned down, the manu-
facturers did not get a government
contract until 1864.

These rifles will be found both with
and without the Maynard tape prim-
ing magazine, for which Maynard
held the patent.

Occasionally these cartridges are
found with the bullet seated quite
well down in the case.

## CALIBER 50



(50 Gallager Brass and Paper)
Total length 2³⁄₁₆ in.
1¹¹⁄₁₆ in. brass and paper
    wrapped case
Conical lead bullet

These cartridges were also produced
under the Rodman & Crispin patent
of Dec. 15, 1863, (No. 40,988). They
were used in the Gallager percussion
carbine, patented by Mahlon J. Gal-
lager in 1860. Some 8,294,023 of
these cartridges were purchased by
the U. S. during the Civil War for
use in 22,728 carbines.

## CALIBER 50

(50 Gallager, All Metal Case)
Total length 2 in.
1¹¹⁄₁₆ in. drawn brass, straight
    case, 550 dia. . . . doughnut
    type base
Round nose, lead bullet
Used in the Gallager B. L. per-



cussion carbine

Comparatively few of these cartridges
were made and it is only occasionally
that they are found in collections to-
day. In addition to the brass case,
they are infrequently found in a
tinned metallic case.

## CALIBER 50



(50 Frankford Arsenal Ex-
    perimental)
Total length 1¹⁵⁄₁₆ in.
1⁷⁄₁₆ in. copper, tapering case
Conical lead bullet

One of the early breech-loading,
external primed, experimental car-
tridges. The cross-section shows the
nitrated paper base. Such cartridges
were, of course, fired by the fire from
a percussion cap . . . or tape, if they
were used in arms with the latter
method of priming.

## CALIBER 53



(53 Greene)
Total length 3 in.
Full length paper case
575 gr. cylindrical, round nose,
    lead bullet
88 grs. black powder

Used in the Greene 1857 Un-
derhamber Bolt Action Ri-
fle and the Greene B. L.
Percussion Carbine

The Greene, underhammer bolt action
breech-loading rifle used this paper
cartridge, having the bullet in the
rear, to serve as a gas seal. A bullet
was seated in the chamber ahead of
the cartridge here illustrated. After
acting as a gas seal when the gun was
fired, the rear bullet was then pushed
forward by the bolt, to be discharged
by the powder charge of the next
cartridge. The bore of this unusual
rifle was smooth but slightly oval in
cross section, a feature which is in-
ventor, Lt. Col. J. Darrell Greene
adopted from an earlier oval bore
gun developed by Charles Lancaster
of London, England. The narrow di-
mension of the bore was .53, the
longer dimension .546. The cartridge
was patented by Greene on Sept. 8,

1857, (No. 18,143). War Department
records indicate that 900 of the rifles
were purchased in March of 1863.
A similar cartridge was patented in
1860 in England (No. 1,574).

## CALIBER 54



(54 Hunt or Jennings)
Total length 1 in.
Cylindrical, round nose, hollow
    lead bullet with base plug
    of cork
Stamped on the side, "Patent-
    ed 1848"
Diameter .548

Walter Hunt, on August 10, 1848,
secured a patent (No. 5,701) for . . .
"a ball for firearms, with a cavity
to contain the charge of powder for
propelling said ball, in which cavity
the powder is secured by means of a
cap enclosing the back end." A re-
issue, No. 164, dated Feb. 26, 1850,
further describes this unique car-
tridge . . . "Making metallic balls for
firearms with the rear part thereof
cylindrical and a cavity in the said
cylindrical part of sufficient capacity
to receive the entire charge of gun-
powder, substantially as herein de-
scribed, when the said charge is re-
tained in the ball by a cap or the
equivalent thereof, having a central
hole through which the charge can be
inflamed."

Twenty of these cartridges were car-
ried in a tubular magazine below the
barrel of a rifle patented by Lewis
Jennings in 1849. They were fired
by a Maynard tape-primer held in
the priming magazine on top of the
frame.

Tyler Henry adapted the ideas of this

36                                                                37

From the Collections
of the Library and
Archives of the Auth

FOR RESEARCH
USE ONLY

gun and those found in the Horace Smith patent of 1851 (Volcanic) into the famous Henry Magazine Rifle of 1860.

Due to the short life of the Jennings arms, few of the Hunt cartridges are to be found today.

A similar cartridge was patented in England in 1847 . . . (No. 11, 994). It was described as "Powder in projectile closed in by perforated metal plate."

## CALIBER 54



(54 Burnside)
Total length 2⅜ in.
1¹³⁄₁₆ in. brass tapering case with large grease ridge at mouth
400 gr. conical lead bullet
45 grs. black powder

The Burnside cartridge is one of the earliest of American brass cases. It was used extensively in the Burnside B. L. Carbine during the Civil War and later up until the time of the Custer Massacre.

On March 25, 1856, Ambrose E. Burnside secured a patent (No. 14,-491) on a metallic tapering case with a perforation in the base by means of which the powder could be ignited from the fire of a percussion cap. George P. Foster, on April 10, 1860, secured a patent (No. 27,791) for a grease chamber around the bullet of the Burnside cartridge. It is this later cartridge which is quite common today, and of which the Ordnance Department purchased the large quantity of 21,819,200 during the Civil War. It is understood that this cartridge was also made in a 2⅛ in. case with a .50 caliber bullet, but it is a very rare item indeed. An original label from a box of these unusual cartridges reads:

10 CARTRIDGES
with 12 caps
for the
B U R N S I D E
BREECH LOADING RIFLE
Patented March 25, 1856
Caliber 54/100
Made by
Burnside Rifle Co.
Providence, R. I.

## CALIBER 56



(56 Billinghurst Requa Mitrailleuse)
(Pronounced Me-try-youz)
Total length 2⅝ in.
2 in. brass, straight case .582 dia.
Conical lead bullet

Used in the Billinghurst Requa Volley Gun

Even though this cartridge was used in a wheel mounted gun having twenty-four barrels in a single row, it is included in this digest because of its unusual interest in collections. The cartridges were loaded in the chambers simultaneously, 24 cartridges on a long, hinged, metal feed strip. The gun was one of the first of the quick firing multi-shot arms. A train of priming powder reaching the full length of the breech block was set off by a percussion cap. This in turn ignited the powder, through the small hole in the base of each cartridge, setting off the whole row in short order.

## CALIBER 58



(58 Maynard "Flop Ear")
Total length 2¹⁄₁₆ in.
1⅞₆ in. brass, straight case
Conical lead bullet

A further type of one of the very rare early Maynard experimentals. This type was included under Patent No. 40,112 of Sept. 29, 1863. The flop ear is for extracting the fired case from the chamber.

## CALIBER 69



(69 Maynard with Cord Extractor)
1⅝₆ in. brass, straight case

It will be noted in this Maynard experimental that the cord is attached to the interior of the case by means of a set screw in a small bushing.

## CALIBER 69



(69 Maynard "Flop Ear")
1⅝₆ in. brass straight case

This .69 Flop Ear differs from the .58 Flop Ear in that the flop ear on the .58 cartridge is set in a short way from the edge . . . while on this size the flop ear is tangent with the perimeter of the base.

38

39

From the Collection of the Library and Archives of the Auty

FOR RESEARCH USE ONLY

CALIBER 69



(69 Maynard Capsule Shape)
Total length 2 in.
1⅜ in. brass, tapered base case
Cylindrical, round nose, lead
bullet

A Maynard experimental about which little is known. Since only a few were made for experimental purposes, they are quite rare indeed today and are to be found only in a few very extensive cartridge collections.

40

From the Collections of the Library and Archives of the Autry

FOR RESEARCH USE ONLY

*self-contained*

PAPER

METALLIC

# DETONATING THE POWDER CHARGE

One of the most interesting phases of the whole story of cartridges is to be found in the detonation of the powder charge. The evolution of the modern primer from the burning stick over five centuries filled with romance, history and science. Illustrated here are but a few of the steps in this pageant of progress.



Flame from a burning stick applied to priming powder scattered around the touch hole was the first means of detonation.



A burning cord held in a serpentine was used in the Matchlock period to ignite the powder charge.



Pyrite (fool's gold) brought into contact with a revolving wheel to throw off sparks was used in the early wheel locks.



Flint striking against steel provided sparks for detonating the powder charge in the days of the flintlock.



Tiny pellets made of fulminate of mercury were used in the pill lock arms. When struck by the hammer, the resulting sparks of flame ignited the main powder charge.

## THE PRIMER

One of the finest descriptions of the primer ever written is to be found in an article in the *ARCA Arms Review* (1934) by the late Paul B. Jenkins, entitled "The Story of the Primer." Parts of it are used with the kind permission of F. Theodore Dexter, the Publisher.

"There are more of the combined Romances of History and of Science bottled up in any modern cartridge than in any other thing of its size in all the world . . .

Whatever cartridge you choose, its projectile—bullet, shot-charge or armor-piercing s h e l l—is unfailingly amazing in embodied capabilities of range, accuracy and energy. Its mechanically measured explosive is uniform with all its kind to within a few grains. Its case is as bright and as carefully turned out as a new government coin. Weatherproof against the elements, it is almost equally unaffected by storage through the years. In short, any modern cartridge is one of the most marvelous products of present-day science.

But of all its wonders and perfections, how many of us have ever adequately considered the primer set in the center of its head—in rim-fires its equivalent inside the rim—inconspicuously yet indispensably awaiting its summons to instantaneous efficiency? How innumerably many times life itself in some form hangs upon the instant sureness of response of those tiny cups and their magic contents! Failure there, and the whole weapon, though the finest product of half a dozen sciences combined, is no better than the "skull-cracker" of the Indian or the war-club of the South Seas savage.

How many of us have ever thought of the instantaneous chemical ebullition, the miniature cataclysm of violent action and reaction of molecules and their imprisoned forces, that goes on in that shiny drop of silvery material when the firing-pin wakes its quiescence to a Liliputian Vesuvius of erupting gas and flame? Yet a century and a half of ceaseless study and experiment in the laboratories of some of the world's foremost chemists have been devoted to effecting both the normal safety and harmlessness of that magic bead and its equally normal and certain waking in a tiny flaming fury of transformation at the sharp rap of the trigger-released striker on its thin metal shell.

Made by the millions daily in great factories, handled by all of us with no more thought of danger than if it were a bit of wood or stone, the process of blending its components is so fraught with possibilities of shattering destruction that the laws of empires have stepped in to order that but one man at a time may preside at the fuming witches' brew of the kettle in which its inert materials are united to produce that gray powder of infinitesimal crystals which alike heat or pressure or a spark or even a hard rub of a finger will rouse to an explosion more violent than that to be produced from an equal quantity of dynamite or nitroglycerine. And all this, that hunter or soldier, marksman or police officer, may know that the crook of a finger will give him an instant mastery of time and space and accuracy and energy that only electricity itself can surpass.

And a Scots Presbyterian clergyman of the long ago first thought of it all! Rev. Alexander John Forsyth (1768-1843), 52 years minister of a remote sea-coast parish of burn and brae in old Aberdeenshire. In recognition of the genius of his discovery a magnificent bronze memorial tablet—placed in 1930, 87 years after his death—the joint gift of whole British regiments, arms-guilds, and a host of Scots and English sportsmen, stands today on the walls of the Tower of London, the only memorial in honor of any individual ever erected within the precincts of that eight-and-a-half centuries old structure that has well been called "the heart of the British empire!" Could earthly tribute farther go! Other achievements, fames and names have crowded the walls and aisles of Westminster Abbey with statues, busts and inscriptions; but in "the Tower" his remembrance stands without a rival! His Alma Mater, the University of Aberdeen, installed in 1931 a replica of the Tower tablet, in King's College, where he graduated in 1786.

\* \* \*

To be strictly accurate, however, Forsyth did not at all "invent" the percussion-cap. He only made it possible by discovering that certain explosive compounds already somewhat known could be detonated by a blow and so used to ignite the charge of a gun . . .

The gray powder of his fulminate, which he called "detonating powder" Forsyth applied in half a dozen ingenious mechanisms to the firing of both "long" and "short" arms, military and sporting, and to cannon as well. It was, however, so scantily and unreliably made by chemists from whom he secured it that when summoned to the Tower of London to carry on his experiments for the Government he was compelled to make his own; for which he was ably qualified, having "majored" in chemistry at the University of Aberdeen. The delicacy and danger of the process, the handling of

180

181

From the Collections of the Library and Archives of the Army

FOR RESEARCH USE ONLY

the product and the startling and powerful fumes accompanying its preparation, made the Government workmen flee the Tower as from a volcano, when he was at it in his laboratory!"

*(For clarity of detail, all primers are illustrated twice their actual size)*

 



Two types of percussion caps for both long and short arms. The one at the left is known as the "hat type" due to its resemblance to the old stove pipe hats.



An unusual percussion cap in which the fulminate was contained in concave depression on the outside of the cap. The cap itself fitted on the hammer of the gun instead of on the nipple as was the usual method.



Tube primer in which the fulminate was contained within a copper tube.



Referred to as the umbrella hooded tube primer due to appearance, this is one type of primer seldom encountered.

182



Called the mushroom primer. Another type of the hooded tube primers.



Two strips of paper between which were sealed small fulminate pellets formed a roll of Maynard tape primers.





Disk primers in which the fulminate was contained between thin copper foil disks, were used on some of the early breech-loading percussion arms. These were commonly known as Lawrence primers.



Allen's Patent primer. The fulminate was contained in the rim of the primer—quite like that of an ordinary rim fire cartridge.

 

Pin and tiny percussion cap for reloading pin fire cartridges.

 

Berdan primer—(Hobb's Pat.). Fulminate sealed in a brass cap by a thin sheet of thin silver foil paper.

    



Cross-section view of some early self-contained primers. These types, it will be observed, are different from the Berdan type of primer in that they contain the anvil as well as the fulminate.

   

   

Illustrating four late types of self-contained primers. Top—side view of primers. Middle—cross-section side view of anvils. Lower—under side of primers with anvils in position.

## BULLETS

There seems to be no end to the shape, sizes and styles in which bullets have been produced, or with which experiments have been conducted. In addition to the many types illustrated throughout the digest, the following are included . . . and reproduced actual size . . . for their interest. (weighed on druggist's scales).



.28 cal. ball for Paterson Colt revolvers—weight 36 grs.



.31 cal. triangular for pistol—weight 60 grs.



.31 cal. lead bullet for 10-shot Walch percussion revolver—weight 78 grs. The Walch is the arm in which two charges were loaded in each of the five chambers of the cylinder.



.34 cal. ball for Paterson Colt revolver—weight 54 grs.



.34 cal. hexagonal base lead bullet—weight 144 grs.



.36 cal. for Colt revolving rifle—weight 163 grs.

183

From the Collections of the Library and Archives of the Army

FOR RESEARCH USE ONLY

NATIVISM ON THE OHIO:

THE KNOW NOTHINGS IN CINCINNATI AND LOUISVILLE

1853-1855


A Thesis

Presented in Partial Fulfillment of the Requirements

for the degree of Master of Arts in the

Graduate School of the Ohio State University

by

Mary Alice Mairose, B.A.

* * * * *

The Ohio State University

1993


Master's Examination Committee:          Approved by

Randolph A. Roth

Michael Les Benedict

Eve Levin                                _____
                                              Adviser
                                         Department of History

Compendium_Roth
Page 0840

For My Parents

ii

Compendium_Roth
Page 0841

## ACKNOWLEDGMENTS

I wish to thank Professor Randolph A. Roth for his guidance and support at every stage of this project. Thanks go to the other members of my committee, Professors Michael Les Benedict and Eve Levin, for their suggestions and insights.  I am grateful to the archivists and librarians at the Archdiocese of Cincinnati, the Archdiocese of Louisville, the Cincinnati Historical Society, the Filson Club, the Kentucky Historical Society, the Louisville City Archives, the Ohio Historical Society, and the University of Notre Dame.  I am grateful to Sarah Phillips, and her parents, Dennis and Judy, who opened their home in Louisville to me on many occasions.  I also wish to thank Karlyn and Bob Grise of Elkhart, Indiana for their hospitality.  I am indebted to Bob and Hope Taft, whose contributions to this project defy description, and to Anna Taft, for her patience in teaching me to use the computer.  Finally, I thank my parents for all of their love and support.

iii

VITA

June 30, 1968 . . . . . .  . Born – Covington, Kentucky

1991 . . . . . . . . B. A. Northern Kentucky University

FIELDS OF STUDY

Major Field: History

iv

Compendium_Roth
Page 0843

TABLE OF CONTENTS

ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . . iii

VITA . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF CONTENTS . . . . . . . . . . . . . . . . v

LIST OF FIGURES . . . . . . . . . . . . . . . . . vi

INTRODUCTION . . . . . . . . . . . . . . . . . . .1

CHAPTER                                    PAGE

I.    Louisville and Cincinnati, 1778-1850 . . . . . . 5

II.   A Year of Contrasts . . . . . . . . . . . . . 45

III.  The Rise of Nativist Parties . . . . . . . . . .82

IV.   The Politics of Fear:
      The Election Day Riots of 1855 . . . . . . . . 127

CONCLUSION . . . . . . . . . . . . . . . . . . . 163

BIBLIOGRAPHY . . . . . . . . . . . . . . . . . . 166

.v

Compendium_Roth
Page 0844

## LIST OF FIGURES

**FIGURES**                                                    **PAGE**

**1. Cincinnati divided by wards** . . . . . . . . . . **175**

**2. Louisville divided by wards** . . . . . . . . . . **176**

vi

Compendium_Roth
Page 0845

## Introduction

During the years between 1785 and 1854 the Catholic population of Louisville, Kentucky experienced unusual degrees of toleration and acceptance. But by 1855 the anti-Catholic, anti-foreign Know Nothing Party had come into power and Catholics faced violence and discrimination. In Cincinnati, Ohio, where hostility toward Catholicism had always been strong, a temporary coalition of diverse segments of the population joined together in 1854 under the leadership of the Know Nothing Party to oust an unpopular Democratic administration. In 1855, however, the reform coalition disbanded and the Know Nothings ran candidates on an unsuccessful anti-Catholic and anti-immigrant platform. One purpose of this study is to explain these events and the circumstances that gave rise to them.

Recent historians of nativism in the North have emphasized the importance of the slavery issue in the national success of the Know Nothing movement. In <u>The Origins of the Republican Party</u> (1987) William Gienapp argues that Cincinnati's independent party succeeded because of its dual platform of anti-Catholicism and anti-Nebraskaism.[1]  Tyler Anbinder in <u>Nativism and</u>

1

<u>Slavery</u> describes the Know Nothings as the "junior partner" of the abolitionists in achieving the victories of 1854. [2]  Both of these studies ignore the unique local circumstances which, coupled with Cincinnati's longstanding anti-Catholicism, insured a victory for the coalition.  This study will examine the local issues which played at least an equal role in the success of the independent coalition, and the rapid downfall of the Know Nothings after 1854.

Historians have largely neglected the American Party in the South.  Only one monograph on the subject exists. <u>The Know Nothing Party in the South</u> by W. Darrell Overdyke argues that anti-Catholicism played little role in the nativist movement in the South and that the Know Nothings focused their attacks on immigrants to draw attention away from the sectional issue of slavery. [3]  This thesis suggests that the people of Louisville viewed both Catholics and foreigners as possible threats to the peculiar institution, a perception which significantly contributed to the success of the Know Nothings.

This thesis is divided into four chronological chapters.  The first provides an overview of Cincinnati and Louisville from the late 1700's to the early 1850's.  Chapter Two illustrates Louisville's acceptance of, and Cincinnati's hostility towards

3

Catholics.   The events which contributed to the rise of nativist parties are discussed in the third chapter. The thesis concludes with the elections and riots of 1855 which insured the success of the party in Louisville and brought about its downfall in Cincinnati.

4.

## Notes to Introduction

1. William E. Gienapp, <u>The Origins of the Republican Party</u> (New York: Oxford University Press, 1987).

2. Tyler Anbinder, <u>Nativism and Slavery</u> (New York: Oxford University Press, 1992).

3. W. Darrell Overdyke, <u>The Know Nothing Party in the South</u> (Baton Rouge: Louisiana State University Press, 1950).

Chapter I

Louisville and Cincinnati, 1778-1850


American colonists feared and hated Catholics and foreigners long before Louisville and Cincinnati were established.  The earliest settlers of the American Colonies had come of age during an era of intense hatred of the Catholic Church.  Henry VIII's departure from the Church, the martyrdom of devout Protestants during the reign of Bloody Mary and wars with Catholic France were part of the collective memory of the English people.  Earlier events, such as the Inquisition and the St. Bartholomew's Day Massacre, illustrated the despotic and blood thirsty nature of the Catholic Church.  These old hatreds were brought to the New World. They flourished in that isolated setting.

Dissimilar in many ways, both the Puritans of New England and the Virginia Anglicans shared a fierce abomination of the Roman Catholic Church.  Both groups wanted to keep their fledgling colonies untainted by those with different traditions and values.  The earliest French Huguenots who settled in the colonies

5

6

were regarded with as much suspicion as the French Catholics.  Common ethnicity was as important to the colonists as a common religion. [1]

During the turbulent years of the eighteenth century conflict between Catholics and Protestants heightened.  As the British struggled with the Catholic French for control of North America, old fears of Catholics became stronger.  Popular propaganda charged the colonists to save the "Protestant Lamb" from the triple alliance of "the Devil, the Pope and the king of France."  Prejudice against Catholics heightened in Maryland and Pennsylvania where most of the Colonial Catholics lived.  In Maryland local magistrates were required to keep a close watch on the Catholics in their areas and to report any suspicious activities. Rumors of a Papal takeover ran rampant in Pennsylvania. As a result, Catholics were restricted from joining the local militia, their weapons were confiscated, and they were required to pay extra taxes.

After the French and Indian War ended, Protestant preachers persisted in keeping their congregations on guard against the Catholics.  The colonial government was uneasy about the influence that the Catholic clergy had among some groups of native Americans.  Aggravating the situation was the Quebec Act of 1773.  This legislation expanded Quebec's boundaries into the land

7

south of the Great Lakes, and granted religious toleration and civil rights to the French Catholics. American Protestants were deeply offended by the Quebec Act; many colonists viewed it as a hostile attempt to establish Catholicism on their borders.

Hostility toward Catholics increased following the passage of the Quebec Act.  Settlers in New England and the middle colonies celebrated Pope's Day, known as Guy Fawkes' Day in England, a mock celebration commemorating a failed Catholic plot to blow up Parliament. [2]  Protesters paraded effigies of the pope through the streets which they later burned, in various New England towns.

But the desire for American independence largely overshadowed hostility toward Catholics during the Revolutionary War.  Catholics enjoyed greater toleration during the revolutionary period than they had in colonial days, and the Revolutionaries soundly rejected Tory propaganda that suggested that the alliance with Catholic France was setting the stage for a Papal takeover.

There are two views about whether the war resulted in greater acceptance of Catholics after its conclusion.  Historians of nativism have traditionally argued that aid from a Catholic country and the spirit of toleration espoused by the Founding Fathers were not

8

enough to end prejudice against Catholics.  They point
out that most of the new state constitutions offered
special protection for Protestants and prevented
Catholics from holding office. [3]

A recent historian of American Catholicism takes a
more optimistic view of Protestant-Catholic relations
in light of the Revolution.  The struggle with Britain
did not wipe out all prejudice against Catholics, but
the patriotism of such Catholics as Charles Carroll of
Maryland helped many Americans believe that Catholicism
and republicanism could co-exist.  This new sense of
optimism allowed the Catholics of Pennsylvania and
Maryland to hold office and further gain the trust of
their fellow Americans. [4]

Events in Cincinnati follow the pattern suggested
by historians of nativism.  Anti-Catholic prejudice was
strong enough in that city to prevent Catholics from
establishing a Church during Cincinnati's first three
decades.  In Louisville Catholics established
themselves early, in 1785, and in a period of great
optimism.  Mass migration from Maryland gave them a
sense of community which kept the congregation intact.
Early Catholic clergymen were sensitive to nativists'
fears and attempted to allay them.  In return
Louisville's Catholics enjoyed unusual degrees of
acceptance and toleration.

g

In the spring of 1778, George Rogers Clark selected an island at the Falls of the Ohio to train militia troops and wait for reinforcements before taking offensive action in the Northwest.  Along with the soldiers were a number of civilians and one slave eager to settle on the fertile soil of Kentucky.  They christened their new settlement Corn Island in honor of the first crop planted there.

By late June, Clark and his men began their mission, leaving the settlers behind on Corn Island. By the end of that year the settlers had moved to the Kentucky shore where they built cabins and a stockade. The settlement was named Louisville in honor of Louis XVI of France.  In 1780, the state of Virginia granted Louisville a town charter.[5]

These early settlers realized that Louisville's location would make the town an ideal center for warehousing and distribution, but Louisville developed slowly in the early years of American independence. The most serious problems faced by the new town was a curtailed river trade caused by Spanish control of the lower Mississippi River.  Until the United States gained full control of the waterway,  Louisville had little to offer as a commercial center.  Frequent Indian raids and a lingering fear of British attacks also impeded the city's growth.  Mosquitoes rising from

the area's many ponds caused a malaria like illness, and many people avoided Louisville fearing that the area was unhealthy.[6]

During this sluggish period in Louisville's development Roman Catholics established their religion in the city.  It is believed that French Catholics settled in Louisville in the 1780's, [7] but the earliest major influx of Catholics came from the eastern United States.  Far away in Maryland the soil was no longer fertile due to poor farming practices. Post-Revolutionary depression and the Consolidation act of 1784 which increased taxes and provided for collection of those in arrears caused many to consider a move westward. According to tradition, sixty Catholic families from the Maryland counties of St. Mary, Charles, and Prince George made a compact to move west, establish a church, and protect each other from the dangers of the frontier.  Although they were unable to secure a priest for their journey, between twenty and twenty-five of these families from Saint Mary's County left Maryland in 1785. They traveled overland to Pittsburgh and from there made the trip down the Ohio River to modern day Maysville, Kentucky.  From there, they traveled overland to the interior of the Kentucky territory.  In current day Nelson County these

17

Catholics established the Pottinger's Creek Settlement, approximately thirty miles outside  Louisville.[8]

The Maryland Catholics were able to establish a place for themselves on the Kentucky frontier because their values, behavior, language, and culture were similar to their Protestant neighbors.  The rest of the community did not consider them a threat.  The ancestors of these Catholics settled the Maryland colony primarily as a commercial venture; its status as a haven for Catholics was secondary.  Their descendants repeated the same pattern on the Kentucky frontier. The new settlers were men and women whose religion consisted of quiet piety in the home, rather than ostentatious worship.  They were more interested in establishing farms than they were in conquering the West for Catholicism.  Moderate in means and education, they were described as honest, kind and obliging. These early Catholics lived lives that were decent, but not austere.  They enjoyed dancing and card playing and many were slave owners. [9]

Kentucky's earliest Catholics were quite unlike the stereotypical Protestant conceptions of Catholics. They were British in background and lacked priests. Their devotion to Rome did not appear excessive and many were caught up in the building of a new nation.