1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   JOHN D. ECHEVERRIA
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and
    Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                        CIVIL DIVISION

13

| 14 | **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
|----|---------------------------|--------------------------------|
| 15 | Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF SAUL CORNELL** |
| 16 | **v.** | |
| 17 | | **VOLUME 1 OF 4** |
| 18 | **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:    5A |
| 19 | | Judge:        Hon. Roger T. Benitez |
| 20 | Defendants. | Action Filed:  August 15, 2019 |

21

22

23

24

25

26

27

28

1

## INDEX

| Works | Decl. Page | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Heydon's Case, (1584) 76 Eng.Rep. 637 (KB) | 26 n.88 | 0002-0007 |
| 1 Zephaniah Swift, A Digest Of The Laws Of The State Of Connecticut 11 (New Haven, S. Converse 1822) | 26 n.88 | 0007-0015 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 24 n.81 | 0016-0017 |
| Md. Const. of 1776, Declaration of Rights, art. III, § 1. | 3 n.4 | 0018-0023 |
| Md. Const. of 1776, Declaration of Rights, art. IV. | 5 n.13 | 0018-0023 |
| Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2 | 22 n.73 | 0024-0025 |
| 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, §§ 1-2 | 18 n.55 | 0026-0028 |
| An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, Laws of The State of New-York, Comprising the Constitution, and the Acts of the Legislature, Since the Revolution, from the First to the Fifteenth Session, Inclusive 191-2 (Thomas Greenleaf, ed., 1792) | 22 n.74 | 0029-0031 |
| N.C. Const. of 1776, Declaration of Rights, art. I, § 3 | 5 n.13 | 0032-0035 |
| N.C. Const. of 1776, Declaration of Rights, art. II | 20 n.65 | 0032-0035 |
| 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15 | 18 n.56 | 0036-0073 |

2

| | | |
|---|---|---|
| Francois Xavier Martin, A Collection Of Statutes Of The Parliament Of England In Force In The State Of North-Carolina 60–61 (Newbern, 1792) | 4 n.5 | 0074-0075 |
| 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same | 18 n.56 | 0076-0078 |
| Idaho Const. of 1889, art. I, § 11 | 27 n.91 | 0079 |
| Supplements To The Revised Statutes. Laws Of The Commonwealth Of Massachusetts, Passed Subsequently To The Revised Statutes: 1836 To 1849, Inclusive 413 (Theron Metcalf & Luther S. Cushing, eds. 1849) | 20 n.65 | 0080-0081 |
| Statutes Of The State Of New Jersey 561 (rev. ed. 1847) | 20 n.65 | 0082-0083 |
| An Act Incorporating the residents residing within limits therein mentioned, in 2 NEW YORK LAWS 158 (1785) | 20 n.65 | 0084-0094 |
| An Act to incorporate the Town of Marietta, in Laws Passed In The Territory Northwest Of The River Ohio 29 (1791) | 20 n.65 | 0095-0097 |
| Pa. Const. of 1776, ch. I, art. III | 5 n.13, 20 n.64 | 0098-0102 |
| 9 Statutes At Large Of Pennsylvania 29-30 (Mitchell & Flanders eds. 1903) | 4 n.5 | 0103-0104 |
| Tex. Const. of 1869, art. I, § 13 | 27 n.91 | 0105-0109 |
| Utah Const. of 1896, art. I, § 6 | 27 n.91 | 0110-0112 |
| Vt. Const. of 1777, Declaration Of Rights, art. IV | 20 n.65 | 0113-0122 |
| Vt. Const. of 1777, Declaration Of Rights, art. V | 5 n.13 | 0113-0122 |

3

| | | |
|---|---|---|
| **BOOKS**[1] | | |
| *American Dictionary of the English Language* (1828) | 10 n.28 | 0124-0127 |
| Joseph Backus, *The Justice Of The Peace* 23 (1816). | 4 n.7 | 0128-0132 |
| Joan Burbick, *Gun Show Nation: Gun Culture And American Democracy* (2006), xvi-xxii | 14 n.44 | 0133-0142 |
| Brutus, *Essays of Brutus VII*, reprinted in 2 The Complete Antifederalist 358, 400–05 (Herbert J. Storing ed., 1981) | 21 n.70 | 0143-0155 |
| J.J. Burlamaqui, *The Principles Of Natural Law* (Thomas Nugent Trans., 1753) at 201 | 9 n.22 | 0156 |
| Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation Of The Early Federal System*, In 1 The Cambridge History Of Law In America 518–544 (Christopher Tomlins & Michael Grossberg Eds., 2008) | 2 n.3 | 0157-0211 |
| Saul Cornell, *The Other Founders: Antifederalism And The Dissenting Tradition In America*, 1788-1828 (1999), 139 | 21 n.69 | 0212-0222 |
| Saul Cornell, *The Right To Bear Arms,* In The Oxford Handbook Of The U.S. Constitution 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber Eds., 2015) | 2 n.3, 18 n.57 | 0223-0246 |
| Tench Coxe, *A Freeman, Pa. Gazette, Jan. 23, 1788*, Reprinted In Friends Of The Constitution: Writings Of The "Other" Federalists 82 (Colleen A. Sheehan & Gary L. Mcdowell Eds., 1998) | 21 n.71 | 0247-0251 |

---

[1] The Declaration of Saul Cornell cites two books – Gary Gerstle, Liberty and Coercion: *The Paradox of American Government, From the Founding to the Present* (Princeton Univ. Press, 2015), and William J. Novak, *The People's Welfare: Law And Regulation In Nineteenth-Century America* (1996) --in their entirety and without discussing the books in detail.  *See* Cornell Decl. ¶ 39 n.78 & . ¶ 61 n.127.  These books are not included with this filing.

| | | |
|---|---|---|
| Alexander DeConde, *Gun Violence In America* | 34 n.119 | 0252-0257 |
| *Dictionarium Britannicum* (1730). | 9 n.24 | 0258-0260 |
| *Dictionary of the English Language* (1755) | 10 n.26, 10 n.27 | 0261-0263 |
| Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government* (2005), 82-87 | 5 n.12 | 0264-0275 |
| Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (University Of North Carolina Press, 2009) 105-109,227-238 | 4 n.6 | 0276-0287 |
| 10 Encyclopedia Americana 214 | 20 n.67 | 0288-0293 |
| James E. Fleming & Linda C. Mcclain, *Ordered Liberty: Rights, Responsibilities, and Virtues* (Harvard University Press, 2013), 44-45 | 5 n.10 | 0294-0325 |
| Joanne B. Freeman, *Affairs af Honor: National Politics In The New Republic* (2001) | 15 n.48 | 0326-0333 |
| Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* 2, N.2; 91(1904) | 20 n.66, 23 n.78, 26 n.87 | 0334-0338 |
| Jack P. Greene, *Pursuits Of Happiness: The Social Development of Early Modern British Colonies and the Formation of American Culture* (1988), 170-176 | 14 n.46 | 339-344 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (2016), 198-201 | 13 n.43, 43 n.51, 32 n.109 | 345-353 |
| William N. Hosley, Colt: The Making Of An American Legend (1st Ed. 1996) | 19 n.60 | 354-365 |
| 2 James Kent *Commentaries On American Law* (340) 464 N.2 (Oliver Wendell Holmes, Jr., Ed. 12 Ed. 1873) | 23 n.77 | 366-374 |

5

| | | |
|---|---|---|
| David Thomas Konig, *Regionalism in Early American Law,* In 1 The Cambridge History of Law in America 144 (Michael Grossberg & Christopher Tomlins eds., 2008) | 14 n.46 | 375-380 |
| Gerald Leonard & Saul Cornell, *The Partisan Republic: Democracy, Exclusion, and the Fall of the Founders' Constitution*, 1780s–1830s, At 2 | 10 n.29 | 382-390 |
| New Law Dictionary (1792) | 9 n.23 | 391 |
| New Histories of Gun Rights and Regulation: Essays On The Place of Guns in American Law and Society (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller Eds., Forthcoming 2023). | 7 n.20 | 392 |
| New Universal Dictionary (1763) | 9 n.25 | 393-395 |
| William E. Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine* (1998). | 29 n.97 | 396-399 |
| Kunal M. Parker, *Common Law History, And Democracy In America, 1790-1900: Legal Thought Before Modernism* (2013), 147-148 | 25 n.82 | 400-405 |
| Randolph Roth, *American Homicide* 56, 315 (2009) | 14 n.45 | 406-409 |
| Harry N. Scheiber, *State Police Power*, In 4 Encyclopedia of the American Constitution 1744 (Leonard W. Levy Et Al. Eds., 1986) | 21 n.68 | 410-419 |
| Barry Alan Shain, *The Nature of Rights at the American Founding and Beyond* (Barry Alan Shain Ed., 2007), 125-127,139-143 | 10 n.31 | 420-430 |
| Quentin Skinner, *Liberty Before Liberalism* (1998), 17-36 | 10 n.31 | 431-443 |
| Richard Slotkin, *Gunfighter Nation: The Myth of the Frontier In Twentieth-Century America* (1993), 10-16 | 14 n.44 | 444-450 |

| | | |
|---|---|---|
| Merritt R. Smith, And Leo Marx, *Does Technology Drive History? The Dilemma Of Technological Determinism* (Cambridge, Ma: Mit, 1994) | 34 n.118 | 451-456 |
| Robert Spitzer, *The Politics Of Gun Control* 14 (2012). | 31 n.106 | 457-467 |
| Kevin M. Sweeney, Firearms Ownership And Militias In Seventeenth And Eighteenth Century England And America, In A Right To Bear Arms?: The Contested Role Of History In Contemporary Debates On The Second Amendment (Jennifer Tucker Et Al. Eds., 2019) | 15 n.47, 16 n.50, 17 n.52 | 468-485 |
| H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002). | 12 n.34 | 486-490 |
| Sean Wilentz, Society, Politics, and the Market Revolution, in the New American History (Eric Foner Ed., 1990) | 18 n.59 | 491-503 |
| **LAW REVIEWS AND JOURNALS** | | |
| Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014) | 3 n.4 | 0505-0519 |
| Joseph Blocher, *Has the Constitution Fostered a Pathological Rights Culture? The Right to Bear Arms: Gun Rights Talk*, 94 B.U. L. Rev. 813 (2014) | 33 n.114 | 0520-0535 |
| Joseph Blocher, *Hunting and the Second Amendment,* 91 NOTRE DAME L. REV. 133 (2015). | 33 n.114 | 0536-0574 |
| Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019) | 11 n.33 | 0575-0587 |
| Samuel L. Bray, 'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution, 102 VIRGINIA L. REV. 687 (2016) | 4 n.9 | 0588-0644 |

| Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021) | 26 n.88 | 0645-0688 |
|---|---|---|
| Rachel A. Callcut et al., *Effect Of Mass Shootings on Gun Sales-A 20-Year Perspective*, 87 J. TRAUMA ACUTE CARE SURGERY 531 (2019). | 33 n.116 | 0689-0711 |
| Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017) | 5 n.10, 11 n.33 | 0712-0732 |
| Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020) | n.23 | 0733-0752 |
| Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original) | 9 n.23 | 0753-0799 |
| Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999) | 12 n.35 | 0800-0817 |
| Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) | 12 n.36, 34 n.119 | 0818-0852 |
| Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) | 11 n.32 | 0853-0864 |
| Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1713, 1716 (2012) | 4 n.9, 19 n.61 | 0865-0888 |
| Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017) | 13 n.40 | 0889-0932 |

8

| | | |
|---|---|---|
| Saul Cornell, *The Police Power And The Authority To Regulate Firearms In Early America 1–2* (2021) | 11 n.33, 22 n.72, 24 n.80 | 0933-0949 |
| Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022) | 19 n.63 | 0950-0983 |
| Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022) | 13 n.42 | 0984-1020 |
| Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022) | 27 n.90, 28 n.92, 28 n.93 | 1021-1039 |
| Allan Dafoe, *On Technological Determinism: A Typology, Scope Conditions, and a Mechanism Science*, 40 TECH. & HUM. VALUES 1047 (2015). | 34 n.118 | 1040-1069 |
| John J. Donohue, *The Swerve to "Guns Everywhere": A Legal and Empirical Evaluation*, 83 LAW & CONTEMP. PROBLEMS 117 (2020) | 37 n.124 | 1070-1086 |
| Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016) | 10 n.29 | 1087-1108 |
| Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014) | 17 n.54 | 1109-1120 |
| Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016) | 30 n.102 | 1121-1145 |
| Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 SOUTH. ILL. UNIV. L.J. 61 (2018) | 37 n.123 | 1146-1171 |

9

| | | |
|---|---|---|
| Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015). | 6 n.16 | 1172-1189 |
| Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, 22 APPLIED ECON. LETTERS 281 (2014) | 37 n.124 | 1190-1193 |
| Stephen P. Halbrook, *New York's Not So "SAFE" Act: The Second Amendment in an Alice-In- Wonderland World Where Words Have No Meaning*, 78 ALBANY L. REV. 789 (2015). | 31 n.108 | 1194-1218 |
| Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence*, 14 GEORGETOWN J. OF L. & PUB. POL'Y. 47 (2016). | 34 n.118 | 1219-1247 |
| James Jacobs, *Why Ban 'Assault Weapons'?*, 37 CARDOZO L. REV. 681, 687 (2015). | 32 n.110 | 1248-1275 |
| Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) | 28 n.95, 30 n.103 | 1276-1351 |
| Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) | 10 n.29 | 1352-1367 |
| Aaron T. Knapp, *The Judicialization of Police,* 2 CRITICAL ANALYSIS OF L. 64 (2015) | 5 n.12 | 1368-1387 |
| David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994). | 34 n.118 | 1388-1414 |
| Christopher S. Koper et. al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. URB. HEALTH 313 (2018). | 36 n.122 | 1415-1423 |

10

| | | |
|---|---|---|
| Christopher S. Koper, *Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms*, CRIMINOLOGY & PUBLIC POLICY 147 (2020) | 37 n.124 | 1424-1447 |
| Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022) | 17 n.53 | 1448-1462 |
| Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. 238, 241 (2014); | 30 n.103 | 1463-1466 |
| John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979) | 5 n.10 | 1467-1493 |
| William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008) | 25 n.83 | 1494-1502 |
| William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994) | 5 n.11 | 1503-1527 |
| Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) | 10 n.29 | 1528-1557 |
| Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas*, 1836-1900, 121 SOUTHWESTERN QUARTERLY 284 (2020) | 30 n.102 | 1558-1578 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022) | 28 n.94 | 1579-1593 |
| Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018) | 31 n.104 | 1594-1621 |

Compendium of Works Cited in Declaration of Saul Cornell
(3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| Eric M. Ruben & Darrell A. H. Miller, Preface: *The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017). | 7 n.19, 13 n.39 | 1622-1630 |
| Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015) | 19 n.62 | 1631-1642 |
| Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018) | 18 n.58 | 1643-1669 |
| Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019) | 17 n.54 | 1670-1676 |
| Jaclyn Schildkraut et.al., *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020) | 31 n.104 | 1677-1706 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017) | Passim | 1707-1733 |
| William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968) | 3 n.4 | 1734-1768 |
| David M. Studdert et al., *Testing the Immunity of the Firearm Industry to Tort Litigation*, 177 JAMA INTERNAL MEDICINE 102, 102-05 (2017). | 33 n.113 | 1769-1772 |
| Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public, 55 U.C. DAVIS L. REV. 2495 (2022) | 7 n.20 | 1773-1785 |
| Christopher G. Tiedeman, *A Treatise on the Limitations of the Police Power in the United States* 4–5 (1886) | 30 n.101 | 1786-1790 |

12

| | | |
|---|---|---|
| Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008) | 5 n.11, 5 n.12 | 1791-1809 |
| Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005) | 23 n.78 28 n.95 | 1810-1845 |
| David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment*, 74 TUL. L. REV. 387 (1999) | 33 n.115 | 1846-1923 |
| John J. Zubly, *The Law of Liberty* (1775) | 5 n.10 | 1924-1939 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Vivian S. Chu, *Federal Assault Weapons Ban: Legal Issues Congressional Research Service*, February 14, 2013 | 32 n.110 | 1941-1957 |
| Carolyn Maloney, Supplemental Memorandum: The Committee's Investigation Into Gun Industry Practices And Profits (Jul. 27, 2022) | 35 n.121 | 1958-1980 |
| Report on Books for Congress, [23 January] 1783," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031 | 9 n.22 | 1981-2020 |
| **NEWS ARTICLES** | | |
| Mark Berman & Todd C. Frankel, *Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence*, WASHINGTON POST (July 27, 2022, 7:19 PM) | 35 n.120 | 2022-2024 |

| | | |
|---|---|---|
| John Bingham, *Speech, Cincinnati Daily Gazette* (Sept. 2, 1867), As Quoted In Saul Cornell And Justin Florence, The Right To Bear Arms In The Era of the Fourteenth Amendment: Gun Rights or Gun Regulation, 50 SANTA CLARA L. REV. 1043, 1058 (2010) | 29 n.96 | 2025-2055 |
| Polly Mosendz, *Why Gunmakers Would Rather Sell AR 15s Than Handguns*, BLOOMBERG (June 20, 2018, 3:00 AM), https://www.bloomberg.com/news/articles/2018-06 20/why-gunmakers-wouldrather- sell-ar-15s-than-handguns | 37 n.124 | 2056-2061 |
| Robert J. Spitzer, *Why Assault Rifles are Selling*, CHICAGO TRIBUNE, June 16, 2015. | 34 n.117 | 2062-2064 |
| **OTHER SOURCES** | | |
| 1 William Blackstone, Commentaries, *61 *349 | 4 n.8, 26 n.88 | 2066-2067 |
| John Donohue III & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STANFORD LAW SCHOOL BLOGS (Oct. 15, 2019), https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/ | 36 n.122 | 2068-2072 |
| Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence*, July 4, 1799, at 7 (July 4, 1799) | 10 n.30 | 2073-2084 |
| Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0 | 16 n.49 | 2085-2118 |
| "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-thecourt-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshallcourt-1801-1835/ | 23 n.76 | 2119-2128 |

14

| | | |
|---|---|---|
| "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-thecourts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/ | 23 n.76 | 2129-2135 |

Compendium of Works Cited in Declaration of Saul Cornell
(3:19-cv-01537-BEN-JLB)

# HISTORICAL STATUTES

# HEYDON'S CASE (Full Text) — Lawlane

---

## HEYDON'S CASE

## ON APPEAL BY HEYDON

## [1584] EWHC Exch J36

---

In an information upon an intrusion in the Exchequer[1], against Heydon, for intruding into certain lands, etc. in the county of Devon: upon the general issue, the jurors gave a special verdict to this effect.

First, they found that parcel of the lands in the information was ancient copyholds of the manor of Ottery, whereof the warden and canons regular of the late college of Ottery were seised in the right of the said college; and that the warden and canons of the said college, 22 H. 7. at a court of the said manor, granted the same parcel by copy, to Ware the father and Ware the son, for their lives, at the will of the lord, according to the custom of the said manor; and that the rest of the land in the information was occupied by S. and G. at the will of the warden and canons of the said college for the time being, in the time of H. 8. And further that the said S. and G. so possessed, and the said Ware and Ware so seised as aforesaid, the said warden and canons by their deed indented, dated 12 January anno 30 H. 8. did lease the same to Heydon the defendant for eighty years, rendering certain rents severally for several parcels; and found that the said several rents in Heydon's lease reserved, were the ancient and accustomed rents of the several parcels of the lands, and found, that after the said lease they did surrender their college, and all the possessions thereof to King Hen. 8. And further found the statute of[2] 31 Hen. 8. and the branch of it, scil. by which it is enacted, "That if any abbot, etc. or other religious and ecclesiastical house or place, within one year next before the first day of this present Parliament, hath made, or hereafter shall make any lease or grant for life, or for term of years, of any manors, messuages, lands, etc. and in the which any estate or interest for life, year or years, at the time of the making of such grant or lease, then had his being or continuance, or hereafter shall have his being or continuance, and not determined at the making of such lease, etc. Or if the usual and old rents and farms accustomed to be yielden and reserved by the space of twenty years next before the first day of this present Parliament, is not, or be not, or hereafter shall not be thereupon reserved or yielded, etc. that all and every such lease, etc. shall be utterly void." And further found, that the particular estates aforesaid were determined, and before the intrusion Heydon's lease began; and that Heydon entered, etc. And the great doubt which was often debated at the Bar and Bench, on this verdict, was, whether the copyhold estate of Ware and Ware for their lives, at the will of the Lords, according to the custom of the said manor, should, in judgment of law be called an estate and interest for lives, within the said general words and meaning of the said Act. And after all the Barons openly argued in Court in the same term, scil. Pasch. 26 Eliz. and it was unanimously resolved by Sir Roger Manwood, Chief Baron, and the other Barons of the Exchequer, that the said lease made to Heydon of the said parcels, whereof Ware and Ware were seised for life by copy of court-roll, was void; for it was agreed by them, that the said copyhold estate was an estate for life, within the words and meaning of the said Act. And it was resolved by them, that for the sure and true[3] interpretation of all statutes in general (be they penal[4] or beneficial, restrictive or enlarging of the common law,) four things are to be discerned and considered:

[5]1st. What was the common law before the making of the Act.

[6]2nd. What was the mischief and defect for which the common law did not provide.

3rd. What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth.

And, 4th. The true reason of the remedy; and then the office of all the Judges is always to make such[7] construction as shall suppress the mischief, and advance the remedy, and to suppress subtle inventions and evasions for continuance of the

mischief, and pro privato commodo, and to add force and life to the cure and remedy, according to the true intent of the makers of the Act, pro bono publico. And it was said, that in this case the common law was, that religious and ecclesiastical persons might have made leases for as many years as they pleased, the mischief was that when they perceived their houses would be dissolved, they made long and unreasonable leases: now the stat of 31 H. 8. doth provide the remedy,[8] and principally for such religious and ecclesiastical houses which should be dissolved after the Act (as the said college in our case was) that all leases of any land, whereof any estate or interest for life or years was then in being, should be void; and their reason was, that it was not necessary for them to make a new lease so long as a former had continuance; and therefore the intent of the Act was to avoid doubling of estates, and to have but one single estate in being at a time: for doubling of estates implies in itself deceit, and private respect, to prevent the intention of the Parliament. And if the copyhold estate for two lives, and the lease for eighty years shall stand together, here will be doubling of estates simul & semel which will be against the true meaning of Parliament.

And in this case it was debated at large, in what cases the general words of Acts of Parliament shall extend to copyhold or customary estates, and in what not; and therefore this rule was taken and agreed by the whole Court, that when an Act of Parliament doth [9] alter the service, tenure, interest of the land, or other thing, in prejudice of the lord, or of the custom of the manor, or in prejudice of the tenant, there the general words of such Act of Parliament shall not extend to copyholds: but when an Act of Parliament is generally made for the [10] good of the weal public, and no prejudice can accrue by reason of alteration of any interest, service, tenure, or custom of the manor, there many times copyhold and customary estates are within the general purview of such Acts[11]. And upon these grounds the Chief Baron put many cases, where he held, that the Statute of [12] West. 2. de Donis Conditionalibus did not extend to copyholds; for if the statute alters the estate of the land, it will be also an alteration of the tenure, which would be prejudicial to the lord: for of necessity the donee in tail of land ought to [13] hold of his donor, and do him such services (without special reservation) as his donor doth to his lord[14].

2nd. Littleton saith, lib. 1. cap. 9. That although some tenants by copy of courtroll have an estate of inheritance, yet they have it but at the [15] will of the lord, according to the course of the common law. For it is said, that if the lord put them out, they have no other remedy but to sue to their lord by petition[16]; and so the intent of the Statute De Donis Conditionalibus was not to extend (in prejudice of lords) to such base estates, which as the law was then taken, was but at the will of the lord. And the statute saith, Quod voluntas donatoris in carta doni sui manifeste express. de caetero observetur: so that which shall be entailed, ought to be such an hereditament, which is given, or at least might be given by deed or charter in tail.

3rd. Forasmuch as great part of the land within the realm, is in grant by copy, it will be a thing inconvenient, and occasion great suit and contention, that copyholds should be [17] entailed, and yet neither fine [18] nor common [19] recovery bar them; so as he who hath such estate cannot (without the assent of the lord by committing a forfeiture, and taking a new estate) of himself dispose of it, either for payment of his debts, or advancement of his wife, or his younger children; wherefore he conceived that the Statute De Donis Conditionalibus did not extend to copyholds, quod fuit concessum per totam Curiam. But it was said that the statute, without special custom, doth not extend to copyholds [20]; but if the [21] custom of the manor doth warrant such estates, and a remainder hath been limited over and enjoyed, or plaints in the nature of a formedon in the descender brought in the court of the manor, and land so entailed by copy recovered thereby, then the custom co-operating with the statute makes it an estate-tail; so that neither the statute without the custom, nor the custom without the statute, can create an estate-tail.

And to this purpose is [22] Littleton, lib. 1. c. 8. for he saith, that if a man seised of a manor, within which manor there hath been a custom which hath been used time out of memory, that certain tenants within the same manor have used to have lands and tenements, to hold to them and their heirs in fee-simple or fee-tail, or for term of life, etc. at the will of the lord, according to the custom of the same manor; and a little after, that formedon in descender lies of such tenements, which writ, as it was said, was not at the common law[23].

To which it was answered by the Chief Baron, that if the statute (without custom) shall not extend to copyholds, without question the custom of the manor cannot

make it extend to them[24]; for before the statute, all estates of [25] inheritance, as Littleton saith, lib. i. cap. 2., were fee-simple[26], and after the statute no custom can begin, because the statute being made in 13 E. 1. is made within time of memory[27]; ergo the estate tail cannot be created by custom; and therefore, Littleton is to be intended (inasmuch as he grounds his opinion upon the custom, that copyholds may be granted in fee-simple, or fee-tail) of a fee-simple conditional at the common law: for Littleton well knew, that no custom could commence after the statute of West. 2., as appears in his own book, lib. 2. c. 10. and 34 H. 6. 36. And where he saith, that formedon in [28] descender lies, he also saith, that it lies at the common law. And it appears in our books, that, in special cases[29], a formedon in the descender lay at the common law, before the statute of Westm. 2., which see 4 E. 2. Formedon 50. [30]. 10 E. 2. Formedon 55. 21 E. 3. 47. Plowd. Com. 246. b. etc.

And where it was further objected, that the statute of West. 2. cannot without custom make an estate tail of copyholds, because without custom, such estate cannot be granted by copy; for it was said, if estates had been always granted to one and his heirs by copy, that a grant to one and the heirs of his body, is another estate not warranted by the custom: so that in such manors, where such estates of inheritance have been allowed by custom, the statute doth extend to them, and makes them, which before were fee conditional, now by the statute estates in tail, and that the statute cannot, as hath been agreed before, alter the custom, or create a new estate not warranted by the custom.

To that it was answered by the Chief Baron, that where the custom of the manor is to grant lands by copy in feodo simplici (as the usual pleading is) without question, by the same custom lands may be [31] granted to one and the heirs of his body[32], or upon any other limitation or condition; for these are estates in fee-simple, et eo potius, that they are not so large and ample as the general and absolute fee-simple is, and therefore the generality of the custom doth include them, but not e converso; ad quod non fuit responsum. But it was agreed by the whole Court, that another Act made at the same Parliament, cap. 18. which gave the elegit [33] doth not extend to copyholds, for that would be prejudicial to the lord, and against the custom of the manor, that a stranger should have interest in the land held of him by copy, where by the custom it cannot be transferred to any without a surrender made to him, and by the lord allowed and admitted[34]. But it was agreed by them, that other statutes made at the same Parliament, which are beneficial for the copyholder, and not prejudicial to the lord, may be, by a favourable interpretation, extended to copyholds, as cap. 3. which gives the wife a cui [35] in vita, and receipt, and cap. 4. which gives the particular tenant a quod ei deforceat; and therewith agrees 10 E. 4. 2. b.[36]. And in this case it was also resolved, that although it was not found [37] that the said rents were the usual rents, accustomed to be reserved within 20 years before the Parliament; yet inasmuch as they have found, that the accustomable rent was reserved, and a custom goes at all times before, for this cause it shall be intended, that it was the accustomable rent within the twenty years, and so it should be intended, if the contrary be not shewed of the other side[38]. And judgment was entered for the Queen.

Note 1   As to an information of intrusion, see ante i. p. 16 a. (A). (ED.)   [Back]

Note 2   31 H. 8. c. 13.   [Back]

Note 3   Moor. 128. Say. 66. 6 Co. 37 b. Cro. Car. 45. 83. [Vin. Abr. Statutes E. 6. pl. 137. Bac. Abr. Statutes, I. 4. vi. 333.]   [Back]

Note 4   Penal statutes are in general to be construed strictly, and are not to be enlarged by parity of reason, nor extended by equitable construction, but even in penal laws, the intention of the Legislature is the best method to construe the law, The King v. Gage, 8 Mod. 65; and equity will aid remedial laws though penal, not by making them more penal, but so as to let them have their course. Per Wright, Lord Keeper, Attorney General v. Sadell, Prec. Ch. 215. As to the construing statutes by equity in general, see 1 Inst. 24 b. 54 b. i. 29. Plowd. 9, 10. 17, 18. 36. 46. 53. 57. 59. 82. 88. 109. 124. 177. 204. 244. 363. 364. 366. 371. 464. 466. Hatt. Treat. on Stat. Ash. Exposit. of Stat. by Eq. Vin. Abr. Statutes E. 6. Com. Dig. Parliament R. 10. Bac. Abr. Statutes I. 6. With respect to the different kinds of statutes, see 1 Inst. 98 b. i. 25-27. and a. (16.) (N.).ib. 2 Eun. 80. 1. Bl. Com. 85. (ED.)   [Back]

Note 5   Poph. 74.   [Back]

Note 6   2 Rol. Rep. 99.   [Back]

Note 7   Hard. 27. 2 Rol Rep. 314. Cro. Car. 83. 533. Co. Lit. 381 b. 1 Co. 123 a. 11 Co. 73 b. 2 Siderf. 41. 2 Bulst. 187. Hob. 97. 1 Rol. Rep. 162. 166. Cro. Argument 40. [2 Wils. 193. 6 T. R. 385. Bac. Abr. Statute I. 6. 8, 9. vi. 387. 389, 390.]   [Back]

Note 8   Co. Lit. 44 a. 31 H. 8. c. 13. 3 Bulstr. 152. Moor 60. 1 Leon. 333. [Com. Dig. Copyhold N. – Vin. Abr. Estate, R. a. 9. pl. 7. Bac. Abr. Leases, &c. E. 2. iv. 73.] [Back]

Note 9   Cro. Car. 41. 43, 44. Moor 128. Godb. 369. O. Benl. 163. 3 Bulst. 152. Hard. 433. Cawly 106. [2 Cowp. 707. 6 East, 480. 1 Bro. C, C. 24. Watk. Gilb. Ten. 164. Com. Dig. Copyhold N. O. Bac. Abr. Copyhold B. i. 709, 710.]   [Back]

Note 10   Moor 128. Cro. Car. 42, 43. O. Benl. 163. 1 Rol. Rep. 48. [2 Cowp. 707. 1 Bro. C. C. 24. Watk. Gilb. Ten. 164.]   [Back]

Note 11   As to what statutes extend to copyholds, see post p. 23. n. (P). (ED.) [Back]

Note 12   See 1 Wils. 27. 2 Wils. 400. Moor 188, 189. Say. 67. Cro. Eliz. 391. 307. 149. 1 Leon. 175. Poph. 34. 128. 2 Saund. 422. Hard. 433. 1 Rol. 838. Lit. sect. 76. 9 Co. 105 a. Co. Lit. 60 a. b. 4 Co. 22 a. [2 Bl. Com. 113. 3 Wood. 506. 1 Prest. Cony. 153. Com. Dig. Copyhold C. 8. N. Bac. Abr. Copyhold C. 1.]   [Back]

Note 13   Cr. Car. 43, 44. [Co. Lit. 23 a. 143 a.]   [Back]

Note 14   Before the Statutes Quia Emptores Terrarum, if tenant in fee simple made a feoffment in fee without any reservation of services, the feoffee held by the same services by which the feoffor held over, because the services being an incumbrance upon the land, which the tenant could not discharge without his lord's consent, must follow the land into whose hands soever it comes; but that statute only extended to cases where the fee simple was transferred; and when, after the Statute de Donis, the feudal right of reverter was turned into a reversion, the law obliged the donee to do the same services to the donor which he was bound to do to his superior lord, because this was an estate of inheritance which possibly might have continued for ever, 1 Inst. 43. a. 143. a. i. 445. 527. This construction was not extended to leases for lives or years; for if the lessor made no reservation, the law implied none except fealty, which is due from every tenant having any determinate interest. Ib. (ED.)   [Back]

Note 15   Lit. sect. 77. 2 Co. 17 a. 6 Co. 37 b. Co. Lit. 60 b. Cro. Car. 45. 4 Co. 21 a. Hetl. 6. 9 Co. 105 a. [Vin. Abr. Copyhold (A) pl. 4.]   [Back]

Note 16   But as Lord Coke elsewhere observes, this was not Littleton's own opinion, but his opinion was rather to the contrary, 1 Inst. 60. b. i. 65-67.; and it has been long settled, that, though a copyholder has an estate at the will of the lord, yet it is according to the custom of the manor; and if he be ousted contrary to the custom, he shall not only sue by petition to the lord, but may have trespass against him. Ibid. (ED.)   [Back]

Note 17   Moor 189. Sav. 67. Cro. El. 149. 307. 391. 1 Leon. 175. Poph. 34. 128. 2 Saund. 422. Hard. 433 a. 9 Co. 105 a. 1 Rol. 838. Co. Lit. 60 a. b. 1 Rol. Rep. 48. 4 Co. 22 a. Moor. 188. [Watk. Gilb. Ten. 166, 7.]   [Back]

Note 18   Ace.Rowden v. Malster, Cro. Car. 45. 5 Cru. Dig. 214.; as to the mode of barring entails of copyholds, infra n. (N). (ED.)   [Back]

Note 19   Cro. Car. 43. 45. Godb. 368. O. Benl. 165. Poph. 35. Cro. Eliz. 391. Cart. 238. Cro. Car. 45. [1 Wils. 26. Watk. Gilb. Ten. 166, 7.]   [Back]

Note 20   This point has been the subject of much controversy, see Gilb. Ten. 165. 418 1 Watk. Coph. 155. Vin. Abr. Coph. (F. e); 1 Cru. Dig. 2 edit. 364. Bac. Abr. Copyhold C.; but it has been long settled agreeably to the decision in this case and inRowden v. Malster, Cro. Cha. 42. that the Statute De Donis does not extend to copyholds without a special custom, but that where there has been a custom of entailing copyholds, the statute co-operating with the custom, will give to such an estate all the qualities of an estate tail, Roe d. Crow v. Baldware, 5 T. R. 111. As to what will amount to a proof that a copyhold has been entailed, see infra, 1 Inst. 60. b. i. 671. Where copyholds are intailable, and the custom has not prescribed any particular mode of barring, the intail may be barred, 1st. By forfeiture and regrant, as where the custom is either for the tenant in tail to commit a forfeiture of the

copyhold, and the lord to seize, and after making three proclamations, to regrant it to the old tenant, or to another person; or the tenant in tail, to make a surrender to a purchaser in fee, and then for the purchaser to commit a forfeiture, and the lord to seize, &c. seePilkington v. Stanhope, Sid. 314. Sty. 452.Grantham v. Coply, 2 Saund. 422. and n. (1) ib.; 2nd, By a recovery in the manor court, which, it seems, from several authorities, may be suffered without a particular custom to warrant it, seeBrowne's case, post, 10 Co. 23. a.Dell v. Higden, Moor. 358.Oldcat v. Level, id. 753. Gilb. Ten. 176. Cart. Rep. 23.Carr v. Singer, 2 Yes. 604.; or 3rd, By a surrender, though only to the use of a will, 2 Vez. 596. 2 Stra. 1197. 2 Burr. 979. 3P. Wms. 10. Watk. Copyhold. 162. A custom to bar the entail by surrender may be concurrent with a custom to bar by recovery, Everall v. Smalley, 1 Wils. 26. 2 Stra. 1197. Roe d. Bennettv. Jeffery, 2 Maul. and S. 92. As to equitable entails of copyholds, see n. (N) infra. (ED.)   [Back]

Note 21   1 Rol. 838. Co. Lit. 60 b. [1 Wils. 27. 3 Wood, 506. 2 B1. Com. 143. Watk. Gilb. Ten. 166. 170. 1 Fonbl. Tr. Eq. 300 n. 1 Cru. Dig. 304. 1 Prest. Cony. 111. Con. Dig. Copyhold C. 8. Bac. Abr. Copyhold C. i. 170.]   [Back]

Note 22   Lit. sect. 77, Co. Lit. 60 b. Rep. Q. A. 98. 160. Skin. 269, 297.   [Back]

Note 23   See infra n. 29 ib.   [Back]

Note 24   But see the remarks of Gilb. Ten. 166. upon this opinion of my Lord Ch. Baron. See also the books cited in the last note but one. (ED.)   [Back]

Note 25   Co. Lit. 19 a. Cro. Car. 45. Poph. 34. 1 Co. 103 b. 6 Co. 40 a. (f) Co. Lit. 45. 114 b. 115 a. [Watk. Gilb. Ten. 170, 1.]   [Back]

Note 26   But this position that all estates of inheritance were, before the Statute De Donis, either in fee absolute or conditional, has been questioned by several distinguished writers, see Wright Ten. 189. Watk. Gilb. Ten. 424. 1 Inst. 19 a. i. 508. (A 1). (ED.)   [Back]

Note 27   See 1 Inst. 113 a. 115 b. i. 35, 36. and n. (S). ib. 2 Bl. Com. 31. (ED.)   [Back]

Note 28   Co. Lit. 60 b. 280 b. 19 a. Lit. sect. 481. F. N. B. 217. D. Poph. 34. [Vin. Abr. Formedon B. pl. 1.]   [Back]

Note 29   That where the heir could not have an assise ofmort d'ancestor, he might, according to his special case, have a formedon in descender at common law, but then he was to recover a fee-simple. Per Bendlow, Plowd. 239 b. 1 Inst. 60 b. i. 671. For the nature and different kinds offormedon, see 1 Inst. 326. b. iii. 214. and n. 32 ib. 2 Inst. 336. Plowd. 240. Booth, 139, 140. 3 Bl. Con. 192. Bac. Abr. Formedon, (A). Vin. Abr. Formedon. Com. Dig. Pleader, 3 E. 1,,&c. (ED.)   [Back]

Note 30   O. Benl. 165. 1 Rol. Rep. 4. Co. Lit. 60 b.   [Back]

Note 31   Godb. 20. Poph. 35. 1 Leon. 56. Cro. Eliz. 323. 373. 4 Leon. 64. 1 Rol. 511. 4 Co. 23 a. Co. Lit. 52 b. [1 Prest. Est. 2nd edit. 487.]   [Back]

Note 32   Where the custom of a manor does not admit of an entail of a copyhold, a K. B. v.-21 surrender to the use of a person and the heirs of his body, gives him a conditional fee; and in that case a surrender after issue had, will bar the estate, Hanton v. Barnes, Co. Suppl. s. 12.Pullen v. Middleton, 9 Mod. 483. But all copyholds may be entailed in effect, either by custom at law, or in equity without it; thus, if a surrender be made to a person and his heirs, and a trust be declared of such estate to another and the heirs of his body, a Court of Equity will see it observed; for the custom only binds the tenancy, and has nothing to do with the trust, 2 Yes. 304. 633. 1 Stra. 454. 2 Bl. Com. 357. And such equitable entail may be barred in the same mode as if it were a legal entail, see 9 Mod. 484. 5 Cru. Dig. 611. And if the tenant in tail of the trust of a copyhold accepts a surrender of the legal estate from the trustees, it will bar the entail and remainder over, Grayme v. Grayme, 1 Watk. Copyh. 2nd edit. 277. But an equitable entail of a copyhold is not barred by a devise without a surrender, Rose v. Lowe, 1 H. Bl. 461. (ED.)   [Back]

Note 33   1 Rol. 888. Cro. Car. 44. Hard. 433. O. Benl. 163. Say. 67. [2 Cowp. 709. 4 Bart. Prec. 209. n. Vin. Abr. Copyhold O. 2. pl. 4. Com. Dig. Copyhold N. Bac. Abr. Copyhold C. 2. i. 712. Execution C. 2. ii. 713.]   [Back]

Note 34   S. P. Co. Copyh. 149. Gilb. Ten. 185. 3 Read. Stat. Law. 123. 2 Inst. 396. Yin. Abr. Copyholds (O. d.) pl. 4. Bac. Abr. Copyhold (C. 2). Com. Dig. Copyhold N.; and see the books cited ace. in n. (d). sup. (ED.)    [Back]

Note 35   Cro. Car. 43. 2 Inst. 343. Sav. 67. 4 Co. 23 a. [Vin. Abr. Copyhold O. 2. pl. 2, 3. 46. Corn. Dig. Copyhold N. O.]    [Back]

Note 36   In conformity to the principles laid down in this case, it is held, that the statute 4 H. 7. of Fines, as to their being a bar after five years' non-claim, the Statutes, of Limitations, the Statutes of Bankruptcy, the Statutes of Mortmain, the statutes 7 Ann. relative to conveyances by infant trustees, the 4th section of the Statute of Frauds, 29 Cha. 2. c. 3. concerning the sale of lands, and the 7th section which requires declarations of trusts to be in writing, and many other statutes, extend to copyholds; but they are not within the statute 11 H. 7. respecting alienations by a wife of the lands of her husband, the Statute of Uses and Jointures, the Statute of "Wills, the statute 32 H. 8. as to discontinuances by the husband of the wife's lands, the statute respecting partitions (1 Inst. 187 a. (2). i. 753. (83). Burrell v. Dodd, 3 Bos. & P. 378.), the statute 13 Eliz. for making accountants' lands liable to the debts of the Crown, the statutes 29 Cha. 2. c. 3. s. 12. and 14 Geo. 2. c. 20. s. 9. relating to occupancy (see 1 Inst. i. 626. (16).Zouch d. Forse v. Forse, 7 East. 186), nor those sections of the Statute of Frauds which relate to devises of lands; and they are excepted out of the Register Acts, 2 & 3 Ann. c. 4. 6 Ann. c. 35. 7 Ann. c. 20. 8 Geo. 2. c. 6. See further as to what statutes extend to copyholds, Vin. Abr. Copyhold, O. d. Bac. Abr. Copyhold C. Com. Dig. Copyhold N. O. (ED.)    [Back]

Note 37   4 Co. 65 b. Hob. 55. 262. 1 Leon. 333. 2 Rol. 700. 9 Co. 74 a. Cro. Jac. 413. Post 42 b. [Watk. Gilb. Ten. 184, 5.]    [Back]

Note 38   S. P. Com. Dig. Pleader, S. 31. As to what shall be a sufficient finding by verdict, and when it may be aided by intendment or special conclusion, see Com. Dig. TPleader, S. 26. to S. 43. and the books cited ante, i. p. 4 a. n. (R). (ED.) [Back]

A

PENNS.
**STATE**
LIBRARY.

**DIGEST**

OF THE

# LAWS

## OF THE STATE OF CONNECTICUT.

IN TWO VOLUMES.

VOLUME I.

BY ZEPHANIAH SWIFT, LL. D. C. A. S.
LATE CHIEF JUSTICE OF THE STATE.

LIBERA EST SERVITUS UBI JUS EST VAGUM AUT INCOGNITUM.

NEW-HAVEN:
PRINTED AND PUBLISHED BY
S. CONVERSE.
:::::::
1822.

Digitized by Google



**DISTRICT OF CONNECTICUT, ss.**

BE IT REMEMBERED, That on the sixteenth day of May, in the forty-sixth year of the Independence of the United States of America, SHERMAN CONVERSE, of the said District, hath deposited in this office the title of a Book, the right whereof he claims as Proprietor, in the words following, to wit:

"A Digest of the Laws of the State of Connecticut, in two volumes. Volume I. By "Zephaniah Swift, LL. D. C. A. S. late Chief Justice of the State. Misera est servi-"tus, ubi jus est vagum aut incognitum."

In conformity to the Act of the Congress of the United States, entitled, "An Act for the encouragement of learning, by securing the copies of Maps, Charts and Books, to the authors and proprietors of such copies, during the times therein mentioned."

CHA'S. A. INGERSOLL,
*Clerk of the District of Connecticut.*

A true copy of Record, examined and sealed by me,
CHA'S. A. INGERSOLL,
*Clerk of the District of Connecticut.*

Google

# BOOK FIRST.

## OF THE RIGHTS OF PERSONS.

## CHAPTER I.

### *Of Rights in General.*

To explain rights, a definition of law is necessary. Law, in its most extensive sense, is a rule of action. Municipal law is a rule of conduct established by a nation in a state of society for its government. It is defined to be a rule of civil conduct, prescribed by the supreme power of the state, commanding what is right, and prohibiting what is wrong. It is divided into *Lex non scripta*, unwritten law, which is denominated common law: and *Lex scripta*, written law, or statutes.

1. Common law is founded on immemorial usage and custom, and has the singular advantage of being derived from the wisdom, and sanctioned by the experience of ages, and nations. When our ancestors emigrated from England they brought with them the common law of their country, in the same manner as their language, and by their adoption and consent, it became the common law of this country: and it may be called the common law of America as well as of England. As it, however, is derived from that country, we must necessarily trace the origin and principles of it in their authorities, in the same manner as we ascertain the meaning of English words from English writers. Though it is called the unwritten law, yet it is to be found in the Reports and elementary writings of judges and lawyers. It is a principle adopted by all civilized nations that a decision in one case shall be a rule, and constitute a precedent in all similar cases; and reports of these decisions are the basis of common law. They have been preserved in England from a very remote period, and in that country as well as in this, continue to unfold, explain and illustrate the principles of the common law. The modern decisions of the courts in England are not of binding authority here. As the opinions of eminent jurists they are entitled to high respect, and are of great utility in guiding our researches on similar subjects: but when found unsupported by principle and not logical deductions from the rules of the common law, they are not to be regarded. Few instances occur, however, where the decisions are not correct, and they are generally referred to, and considered as of binding authority. The same remark applies to the decisions of our sister States. But the decisions of our own courts, of dernier resort, have the authority of precedents, binding in similar cases: with this exception; where there has been a decision which is a manifest departure from principle, courts may deny its authority: but where there has been a course of decisions establishing a rule, they are not at liberty to set it aside, because they doubt its correctness or propriety: for *stare decisis* is a fundamental maxim of the common law. When cases

Digitized by Google

occur, that are new, *primæ impressionis*, judges must resort to the principles of analogous cases for their determination.

Though our courts have always recognised the common law as derived from England, yet in some few instances they have deviated from it in their decisions which are now deemed part of our law.

In England there are many local customs, affecting particular parts of the kingdom, which are a part of the common law: we have no such local customs: but where there is a known usage of trade in a particular place, it may be proved to controul and govern a contract made in view of or with reference to such usage.(a)

The science of the law is grounded on certain first principles existing in the nature and fitness of things. These have been introduced by the statutes of the legislature, or have been derived from the dictates of reason—from the considerations of policy—from the excellent maxim of the civil law, to live virtuously, injure nobody and to render to every man his due—and from the sublime precept of christian morality, to do to others as we would they should do to us. On this basis, our courts have erected the noble fabric of jurisprudence: they have adjusted the various parts with the nicest symmetry: and a deviation from any fundamental principle deranges the whole superstructure. A judge, therefore, in forming an opinion with respect to any particular case, must take into view the whole system, and make his decision conformable to the general principles on which it is founded. Nothing can be more improper than the practice of considering every case to stand on its own basis; and of deciding according to what appears to be right in single cases. This will make the law uncertain, introduce contradictory determinations, and render it impracticable to systematize the principles of jurisprudence. But where judges take into view the whole science, and square their decisions to the fundamental principles on which it is established, the consequence will be the introduction of that permanent, uniform rule in the administration of justice, which is the ultimate object of government.

Sir Edward Coke says " that nothing which is against reason is law: for reason is the life of the law, nay, the common law itself is nothing but reason: which is to be understood of an artificial perfection of reason, gotten by long study, observation and experience, and not of every man's natural reason: for *Nemo nascitur artifex*, no man is born an artist. This legal reason is the perfection of reason: and therefore if all the reason in so many several heads were united into one, yet, could he not make such a law as the law of England is, because by many successions of ages, it hath been fined and refined by an infinite number of grave and learned men, and by long experience grown to such a perfection for the government of this realm as the old rule may be justly verified of it; Neminem oportet esse sapientiorem legibus: no man out of his own private reason ought to be wiser than the law, which is the perfection of reason."(b)

2. Statutes are enacted by the legislature, and are either general or special, public or private. General or public statutes have universal authority. They are printed and distributed through the state; and courts are bound officially to take notice of them without being specially pleaded by the party who wishes to take benefit of them. Special or private statutes relate to the concerns of individuals; they are not published with the public statutes, and courts are not bound to regard them unless specially pleaded by the party who wishes to take benefit of their operation and in whose favour

(a) 3 Day, 349. 3 Con. Rep. 9.          (b) Co. Lit. 97. b. Ibid. 394. b.



Case 3:19-cv-01537-BEN-JLB   Document 154   Filed 10/22/22   PageID.17418   Page 27 of 265

they are made.   Statutes are said to be declaratory of the common law, or remedial of some defect.

Statutes take effect from the first day of the session of the legislature in which they are passed, unless when a particular time for the commencement is appointed in the statute : and then it takes effect from that time :(c) but the injustice of giving statutes a retrospective operation has induced the parliament of Great Britain to pass an act that the Clerk of parliament shall indorse on the act the time it receives the royal assent, which shall be the time of its commencement.(d)   But no law should be in force till it has been published so that the people have an opportunity of knowing the provisions of it : and in this state there is a provision that all public statutes shall take effect from the rising of the general assembly by which they are passed, unless otherwise directed by such statutes.(e)

An affirmative statute does not take away the common law, and the party may have his election to proceed upon either :(f) but if it directs a thing to be done in a certain manner, it can be done in no other manner, though there are no negative words.   A negative statute does away the common law.   If a statute command or prohibit a thing for the advantage of a particular person, he shall have an action on the statute for any injury done him contrary thereto.(g)   If a penalty is given and no action for the recovery thereof, action of debt will lie.   Where a statute commands or prohibits a thing of public concern, the person who violates it, is not only liable to the party injured, but may be indicted at the suit of the public.(h)   Whenever the provision of a statute is general, every thing necessary to make that provision effectual is supplied by common law.   Whenever a power is given by statute, every thing necessary to make it effectual is given by implication of law.

As it is impracticable to make statutes so plain and explicit that no doubt can be entertained respecting their meaning, certain rules of construction have been adopted.

1.   The intention of the makers of the statute is to be pursued in the construction of it, and may be collected from the cause or necessity of making it, as well as from other circumstances.(i)

2.   The common law is to be regarded in the construction of statutes, and three things are to be considered.(k)   The old law, the mischief, and the remedy : that is, how the common law stood at the time of the making of the act ; what the mischief was for which the common law did not provide : and what remedy the statute had provided to cure the mischief : and the business of the judges is so to construe the act as to suppress the mischief and advance the remedy.

3.   When a statute makes use of a word, the meaning of which is known to the common law, the word shall be understood in the same sense.(l)

4.   When divers statutes relate to the same thing and are made in *p ar materia*, they are all to be taken together in the construction of any one of them and considered as one statute.(m)

5.   An equitable construction of statutes is sometimes necessary ; so that acts within the letter shall not be considered within the meaning, and acts not within the letter shall be considered within the meaning.   If a law be made, that whoever does a certain act shall suffer death, it will not comprehend a madman.(n)

(c) 1 Ld. Raym. 371.   (d) 33 G. 3. Ch. 13.     (e) Statutes, 258.   (f) Plowd. 204. (g) Poph. 75.  (h) Cro. Eliz. 635.   (i) Plowd. 231. 11. Co. 73.   (k) 6 Mod. 143. 3 Co. 7. (l) 6 Mod. 143.   (m) Plowd. 206. 1 Burr. 447.   (n) 1 Inst. 21. 15 John. 358. Plowd. 465.

Digitized by  Google

OF RIGHTS IN GENERAL.

6. Words that are used in enacting laws are to be taken and considered in their common, customary, and popular use, and no grammatical construction will be admitted to vary or controul their apparent meaning.

7. Terms of art, or technical terms must be considered according to the import and meaning of them in that art, science or trade whence they are taken.

8. Where words are clearly repugnant to each other (in a statute, or in two statutes,) the last will supercede the first. Later laws abrogate prior contrary laws, is a universal rule.(o)

9. The title of a statute is no part of it and is not to be regarded in the construction of it.(p)

10. Where the words are doubtful, equivocal, or intricate, it is proper to consider the preamble of the act which is often a key to open the minds of the makers as to the mischiefs intended to be remedied ; but the general words of an enacting clause cannot be restrained by the particular words of the preamble.(q)

11. Words and phrases, the meaning of which has been ascertained, in a statute, are, when used in a subsequent statute, to be understood in the same sense.(r)

12. One part of a statute must be construed by another, that the whole may, if possible, stand : *ut res magis valeat quam pereat.*(s)

13. We must always take into consideration the subject matter about which the law is concerned, and affix to the words made use of, a meaning correspondent to the subject to which they are applied : for the same words when applied to different subjects have different meanings. That meaning must be taken which is commonly intended, when employed upon that subject about which the law is conversant.(t)

14. Where words have no signification, or a very absurd one, if taken according to their literal common acceptation, there it is necessary to deviate from the common sense of the words and construe them in such manner as will deduce a rational and consistent meaning.

15. The general words in one clause of a statute may be restrained by the particular words in a subsequent clause of the same statute : but if a particular thing be given or limited in the preceding part of a statute, this shall not be taken away or altered by any subsequent general words.(u)

16. Penal statutes are always to be construed strictly for the benefit of the citizen. Nothing more is to be deduced from the words than what they expressly warrant, and they are not to be extended by implication. Where a statute made it felony to steal sheep or *other cattle*, it was held the statute extended only to stealing sheep, and the words *other cattle* were too uncertain to create a capital offence.(v)

17. Statutes against fraud, which are not penal, and which merely concern property are to be expounded liberally so as to answer the design of the legislature.(w)

18. A saving inconsistent with the body of the statute is void.(x)

19. Where the common law and statute differ, the latter supercedes and annuls the former.(y)

20. Later statutes repeal prior contrary statutes. This must be understood where the statutes are expressly contrary or negative words are used: otherwise, if both the statutes can be reconciled, they must stand and have a concurrent operation.(z)

(o) 1 Bl. Com. 89.   (p) 1 Ld. Ray. 77.   (q) Plowd. 369.   (r) Salk. 609.   (s) 1 Inst. 381.
1 Show. 168.   (t) 1 Inst. 381.   (u) 8 Mod. 8.   1 Lev. 80.   (v) Plowd. 17.   (w) 3 Inst. 381.
(x) 1 Co. 47.   (y) 1 Bl. Com. 89.   (z) Ibid.



Compendium_Cornell
Page 0013

21. If a statute repealing another be afterwards repealed, the first statute is revived without any express words by mere implication.(a)

22. Statutes calculated to diminish or restrain the power of a future legislature are of no validity : for it is incident to the power of a legislature to repeal all prior laws.(b)

23. The word *may* in a statute is *imperative* and has the same meaning as the word shall.(c)

24. The contemporaneous exposition of a statute is to be regarded : such as the opinion of the sages of the law who lived at the time it was made.(d)

25. There is a known distinction between circumstances which are the essence of a thing required to be done by a statute, and clauses merely directory.(e)

The depositing of a title of a book in the Clerk's office is the essence, and vests the copy right in the author ; the publication of the Clerk's record in a newspaper and the delivery of a copy of the book to the Secretary of State are directory.

26. Where there is a written constitution declared to be the supreme law of the land, all statutes made repugnant to it are void : and it is competent for courts to decide on their validity on the same principle that they can decide a subsequent statute to be repugnant to a prior and repeals it.

When a law is in its nature a contract, and when absolute rights have vested under that contract, a repeal of the law cannot divest these rights. A party to a contract cannot pronounce its own deed invalid, though that party be a sovereign state. A grant is an executed contract, and a law annulling conveyances is unconstitutional, because it is a law impairing the obligation of contracts within the meaning of the constitution of the United States.(f)

The constitution has given to Congress the power to enact a uniform bankrupt law ; but till they exercise that power the respective states are not forbidden to pass bankrupt laws, provided they do not infringe that article in the constitution which prohibits a state to pass a law impairing the obligation of contracts. No state can pass a law by which a debtor is released from the fulfilment of his contract, for this would not only impair but destroy the obligation of the contract. But there is a distinction between the obligation of a contract and the remedy given by the Legislature to enforce it. Without impairing the obligation of the contract, the remedy may be modified as the wisdom of the nation may direct. Confinement of the debtor may be a punishment for not performing his contract, or may be allowed as a mean of inducing him to perform it. But the state may refuse to inflict the punishment, or may withhold this mean and leave the contract in full force. Imprisonment is no part of the contract, and simply to release the prisoner does not impair its obligation. Of course, an insolvent law that merely discharges the person of the debtor, leaves his obligation to pay in full force, and is not opposed to the constitution : but an act which not only liberates the person of the debtor, but discharges him from all liability for any debt contracted previous to his discharge, on his surrendering his property in the manner it prescribes, is a law impairing the obligation of a contract within the meaning of the constitution, and is void.(g)

There is some question respecting the correctness of all the principles above laid down, though the case was undoubtly decided right. To say

(a) 1 Inst. 315.   (b) 1 Bl. Com. 90.   (c) Salk. 609.   Vern. 154.   (d) 2 Inst. 11.
(e) 1 Burr. 447. 3 Day, 145. 1 Bl. Rep. 330.   (f) 6 Cranch. 87.   (g) 4 Wheaton, 122.

Google

Case 3:19-cv-01537-BEN-JLB   Document 154   Filed 10/22/22   PageID.17421   Page 30 of 265

force till the conquest of Constantinople by the Turks.  The laws of Justinian were lost in the West during the dark ages, but about the year 1137 a complete copy was discovered at Amalphi, in Italy, upon which they revived, and not only greatly contributed to the improvement of society, but became the basis of the jurisprudence of the principal part of Europe.  The civil law was never recognised in England, but many valuable rules and principles have been borrowed from it by their most distinguished jurists, the benefit of which we are now experiencing in this country.

Having explained and defined what is meant by municipal law, we are prepared for the consideration of the Rights of persons.  Persons are public or private.(i)    Public persons are those who sustain public offices as the members of the executive, of the legislature, and the judiciary, by whose instrumentality government is administered.    Private persons are the subjects of government, for whose benefit it was instituted and who derive from it the enjoyment and protection of their civil rights.    Rights are natural and civil. Natural rights are such as appertain to individuals in a state of nature.  Civil rights result from the institutions of society.    Natural rights consist in the enjoyment and exercise of a power to do as we think proper, without any other restraint than what results from the law of nature, or what may be denominated the moral law : but as in a state of nature each individual must be the protector of his rights, and the avenger of his wrongs, without a claim on his fellow creatures for their assistance, mankind have found it necessary to give up this species of liberty, and unite in society for mutual assistance, protection, and defence : hence the origin of civil rights.    Rights are of a twofold nature, absolute and relative.   Absolute rights belong to men in their individual capacity, and are denominated the rights of personal security, personal liberty, and private property.   Relative rights respect mankind in their social connection with each other—and are the relations of husband and wife, parent and child, guardian and ward, master and servant. Rights are also divided into the rights of persons and the rights of things. The rights of persons have been enumerated : the rights of things constitute *what may* be called property—or a right to the exclusive enjoyment of the things of *this* world : remedies for the infringement of these various rights are furnished by the institution of courts of Justice, and are the great objects of civil government.  I shall consider first, the rights of persons ; secondly, the rights of things ; thirdly, actions or remedies for injuries ; and fourthly, the powers of courts of equity which supply the defect of remedies at law.

---

# CHAPTER II.

## *Of the Right of Personal Security.*

PERSONAL security consists in the peaceable enjoyment of life, limbs, body, health, and reputation.

1.  The preservation of life is an object of the first consequence in all governments, and the taking of it away is almost universally punished with death.    To the person injured no reparation can be made, and therefore the public only can prosecute the offender.  In England an appeal is given to the wife or son of the deceased against the murderer ; but here no such

(i) 1 Bl. Com. 124.



Compendium_Cornell
Page 0015



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)



# 1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5

Subject(s):

- Storage (https://firearmslaw.duke.edu/subjects/storage/)

Jurisdiction(s):

- Maine (https://firearmslaw.duke.edu/jurisdictions/maine/)

Year(s):

- 1821 (https://firearmslaw.duke.edu/years/1821/)

Be it further enacted, That it shall, and may be lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.

-  (https://twitter.com/dukefirearmslaw)

Compendium_Cornell
Page 0016

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu
(mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu
(mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).



| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

## Constitution of Maryland - November 11, 1776 (1)

**A Declaration of Rights, and the Constitution and Form of Government agreed to by the Delegates of Maryland, in Free and Full Convention Assembled.**

**A DECLARATION OF RIGHTS, &C.**

THE parliament of Great Britain, by a declaratory act, having assumed a right to make laws to bind the Colonies in all cases whatsoever, and, in pursuance of Rich claim, endeavoured, by force of arms, to subjugate the United Colonies to an unconditional submission to their will and power, and having at length constrained them to declare themselves independent States, and to assume government under the authority of the people; Therefore we, the Delegates of Maryland, in free and full Convention assembled, taking into our most serious consideration the best means of establishing a good Constitution in this State, for the sure foundation and more permanent security thereof, declare,

I. That all government of right originates from the people, is founded in compact only, and instituted solely for the good of the whole.

II. That the people of this State ought to have the sole and exclusive right of regulating the internal government and police thereof.

III. That the inhabitants of Maryland are entitled to the common law of England, and the trial by Jury, according that law, and to the benefit of such of the English statutes, as existed at the time of their first emigration, and which, by experience, have been found applicable to their local and other circumstances, and of such others as have been since made in England, or Great Britain, and have been introduced, used and practiced by the courts of law or equity; and also to acts of Assembly, in force on the first of June seventeen hundred and seventy-four, except such as may have since expired, or have been or may be altered by facts of Convention, or this Declaration of Rights-subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State: and the inhabitants of Maryland are also entitled to all property, derived to them, from or under the Charter, granted by his Majesty Charles I. to Crecilius Calvert, Baron of Baltimore.

IV. That all persons invested with the legislative or executive powers of government are the trustees of the public, and, as such, accountable for their conduct; wherefore, whenever the ends of government are perverted, and public liberty manifestly endangered, and all other means of redress are ineffectual, the people may, and of right ought, to reform the old or establish a new government. The doctrine of non-resistance, against arbitrary power and oppression, is absurd, slavish, and destructive of the good and happiness of mankind.

V. That the right in the people to participate in the Legislature is the best security of liberty, and the foundation of all free government; for this purpose, elections ought to be free and frequent, and every man, having property in, a common interest with, and an attachment to the community, ought to have a right of suffrage.

VI. That the legislative, executive and judicial powers of government, ought to be forever separate and distinct from each other.

VII. That no power of suspending laws, or the execution of laws, unless by or derived from the Legislature, ought to be exercised or allowed.

VIII. That freedom of speech and debates, or proceedings in the Legislature, ought not to be impeached in any other court or judicature.

IX. That a place for the meeting of the Legislature ought to be fixed, the most convenient to the members thereof, and to the depository of public records; and the Legislature ought not to be convened or held at any other place, but from evident necessity.

X. That, for redress of grievances, and for amending, strengthening and preserving the laws, the Legislature ought to be frequently convened.

XI. That every man hath a right to petition the Legislature, for the redress of grievances, in a peaceable and orderly manner.

XII. That no aid, charge, tax, fee, or fees, ought to be set, rated, or levied, under any pretence, without consent of the Legislature.

XIII. That the levying taxes by the poll is grievous and oppressive, and ought to be abolished; that paupers ought not to be assessed for the support of government; but every other person in the State ought to contribute his proportion of public taxes, for the support of government, according to his actual worth, in real or personal property, within the State; yet fines, duties, or taxes, may properly and justly be imposed or laid, with a political view, for the good government and benefit of the community.

XIV. That sanguinary laws ought to be avoided, as far as is Consistent with the safety of the State: and no law, to inflict cruel and unusual pains and penalties, ought to be made in any case, or at any time hereafter.

XV. That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no *ex post facto* law ought to be made.

XVI. That no law, to attains particular persons of treason or felony, ought to be made in any case, or at any time hereafter.

XVII. That every freeman, for any injury done him in his person or property, ought to have remedy, by the course of the law of the land, and ought to have justice and right freely without sale, fully without any denial, and speedily without delay, according to the law of the land.

XVIII. That the trial of facts where they arise, is one of the greatest securities of the lives, liberties and estates of the people.

XIX. That, in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the indictment or charge in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses, for and against him, on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

XX. That no man ought to be compelled to give evidence against himself, in a common court of law, or in any other court, but in such cases as have been usually practiced in this State, or may hereafter be directed by the Legislature.

XXI. That no freeman ought to be taken, or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or by the law of the land.

XXII. That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted, by the courts of law.

XXIII. That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants-to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special-are illegal, and ought not to be granted.

XXIV. That there ought to be no forfeiture of any part of the estate of any person, for any crime except murder, or treason against the State, and then only on conviction and attainder.

XXV. That a well-regulated militia is the proper and natural defence of a free government.

XXVI. That standing armies are dangerous to liberty, and ought not to be raised or kept up, without consent of the Legislature.

XXVII. That in all cases, and at all times, the military ought to be under strict subordination to and control of the civil power.

XXVIII. That no soldier ought to be quartered in any house, in time of peace, without the consent of the owner; and in time of war, in such manner only, as the Legislature shall direct,

XXIX. That no person, except regular soldiers, mariners, and marines in the service of this State, or militia when in actual service, ought in any case to be subject to or punishable by martial law.

XXX. That the independency and uprightness of Judges are essential to the impartial administration of Justice, and a great security to the rights and liberties of the people; wherefore the Chancellor and Judges ought to hold commissions during good behaviour; and the said Chancellor and Judges shall be removed for misbehaviour, on conviction in a court of law, and may be removed by the Governor, upon the address of the General Assembly; *Provided,*That two-thirds of all the members of each House concur in such address. That salaries, liberal, but not profuse, ought to be secured to the Chancellor and the Judges, during the continuance of their Commissions, in such manner, and at such times, as the Legislature shall hereafter direct, upon consideration of the circumstances of this State. No Chancellor or Judge ought to hold any other office, civil or military, or receive fees or perquisites of any kind.

XXXI. That a long continuance in the first executive departments of power or trust, is dangerous to liberty; a rotation, therefore, in those departments, is one of the best securities of permanent freedom.

XXXII. That no person ought to hold, at the same time, more shall one office of profit, nor ought any person. in public trust, to receive any present from any foreign prince or state, or from the United States, or any of them, without the approbation of this State.

XXXIII. That, as it is the duty of every man to worship God in such manner as he thinks most acceptable to him; all persons, professing the Christian religion, are equally entitled to protection in their religious liberty; wherefore no person ought by any law to be molested in his person or estate on account of his religious persuasion or profession, or for his religious practice; unless, under colour of religion, any man shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others, in their natural, civil, or religious rights; nor ought any person to be compelled to frequent or maintain, or contribute, unless on contract, to maintain any particular place of worship, or any particular ministry; yet the Legislature may, in their discretion, lay a general and equal tax for the support of the Christian religion; leaving to each individual the power of appointing the payment over of the money, collected from him, to the support of any particular place of worship or minister, or for the benefit of the poor of his own denomination, or the poor in general of any particular county: but the churches, chapels, globes, and all other property now belonging to the church of England, ought to remain to the church of England forever. And all acts of Assembly, lately passed, for collecting monies for building or repairing particular churches or chapels of ease, shall continue in force, and be executed, unless the Legislature shall, by act, supersede or repeal the same: but no county court shall assess any quantity of tobacco, or sum of money, hereafter, on the application of any vestrymen or church-wardens; and every encumbent of the church of England, who hath remained in his parish, and performed his duty, shall be entitled to receive the provision and support established by the act, entitled "An act for the support of the clergy of the church of England, in this Province," till the November court of this present year to be held for the county in which his parish shall lie, or partly lie, or for such time as he hate remained in his parish, and performed his duty.

XXXIV. That every gift, sale, or devise of lands, to any minister, public teacher, or preacher of the gospel, as such, or to any religious sect, order or denomination, or to or for the support, use or benefit of, or in trust for, any minister, public teacher, or preacher of the gospel, as such, or any religious sect, order or denomination-and every gift or sale of good-e, or chattels, to go in succession, or to take place after the death of the seller or donor, or to or for such support, use or benefit-and also every devise of goods or chattels to or for the support, use or benefit of any minister, public teacher, or preacher of the gospel, as such, or any religious sect, order, or denomination, without the leave of the Legislature, shall be void; except always any sale, gift, lease or devise of any quantity of land, not exceeding two acres, for a church, meeting, or other house of worship, and for a burying-ground, which shall be improved, enjoyed or used only for such purpose-or such sale, gift, lease, or devise, shall be void.

XXXV. That no other test or qualification ought to be required, on admission to any office of trust or profit, than such oath of support and fidelity to this State, and such oath of office, as shall be directed by this Convention or the Legislature of this State, and a declaration of a belief in the Christian religion.

XXXVI. That the manner of administering an oath to any person, ought to be such, as those of the religion persuasion, profession, or denomination, of which such person is one, generally esteem the most effectual confirmation, by the attestation of the Divine Being. And that the people called Quakers, those called Dunkers, and those called Menonists, holding it unlawful to take an oath on any occasion, ought to be allowed to make their solemn affirmation, in the manner that Quakers 1lave been heretofore allowed to affirm; and to be of the same avail as an oath, in all such cases, as the affirmation of Quakers hath been allowed and accepted within this State, instead of an oath. And further, on such affirmation, warrants to search for stolen goods, or for the apprehension or commitment of offenders, ought to be granted, or security for the peace awarded, and Quakers, Dunkers or Menonists ought also, on their solemn affirmation as aforesaid, to be admitted as witnesses, in all criminal cases not capital.

XXXVII. That the city of Annapolis ought to have all its rights, privileges and benefits, agreeable to its Charter, and the acts of Assembly confirming and regulating the same, subject nevertheless to such alteration as may be made by this Convention, or any future legislature.

XXXVIII. That the liberty of the press ought to be inviolably preserved.

XXXIX. That monopolies are odious, contrary to the spirit of a free government, and the principles of commerce; and ought not to be suffered.

XL. That no title of nobility, or hereditary honours, ought to be granted III this State.

XLI. That the subsisting resolves of this and the several Conventions held for this Colony, ought to be in force as laws, unless altered by this Convention, or the Legislature of this State.

XLII. That this Declaration of Rights, or the Form of Government, to be established by this Convention, or any part or either of them, ought not to be altered, changed or abolished, by the Legislature of this State, but in such manner as this Convention shall prescribe and direct.

This Declaration of Rights was assented to, and passed, in Convention of the Delegates of the freemen of Maryland, begun and held at Annapolis, the 14th day of August, A. D. 1776.

By order of the Convention.

MAT. TILGHMAN, President.

Compendium_Cornell
Page 0019

## THE CONSTITUTION, OR FORM OF GOVERNMENT, &C.

I. THAT the Legislature consist of two distinct branches, a Senate and House of Delegates, which shall be styled, *The General Assembly of Maryland.*

II. That the House of Delegates shall be chosen in the following manner: All freemen, above twenty-one years of age, having a freehold of fifty acres of land, in the county in which they offer to vote, and residing therein-and all freemen, having property in this State above the value of thirty pounds current money, and having resided in the county, in which they offer to vote, one whole year next preceding the election, shall have a right of suffrage, in the election of Delegates for such county: and all freemen, so qualified, shall, en the first Monday of October, seventeen hundred and seventy-seven and on the same day in every year thereafter, assemble in the counties, in which they are respectively qualified to vote, at the court-house, in the said counties; or at such other place as the Legislature shall direct; and, when assembled, they shall proceed to elect, viva voce, four Delegates, for their respective counties, of the most wise, sensible, and discreet of the people, residents in the county where they are to be chosen, one whole year next preceding the election, above twenty-one years of age, and having, in the State, real or personal property above the value of five hundred pounds current money; and upon the final casting of the polls, the four persons who shall appear to have the greatest number of legal votes shall be declared and returned duly elected for their respective counties.

III. That the Sheriff of each county, or, in case of sickness, his Deputy (summoning two Justices of the county, who are required to attend, for the preservation of the peace) shall be the judges of the election, and may adjourn from day to day, if necessary, till the same be finished, so that the whole election shall be concluded in four days; and shall make his return thereof, under his hand, to the Chancellor of this State for the time being.

IV. That all persons qualified, by the charter of the city of Annapolis, to vote for Burgesses, shall, on the first Monday of October, seventeen hundred and seventy-seven, and on the same day in every year thereafter, elect, *viva voce*, by a majority of votes, two Delegates, qualified agreeable to the said charter; that the Mayor, Recorder, and Aldermen of the said city, or any three of them, be judges of the election, appoint the place in the said city for holding the same, and may adjourn from day to day, as aforesaid, and shall make return thereof, as aforesaid: but the inhabitants of the said city shall not be entitled to vote for Delegates for Anne-Arundel county, unless they have a freehold of fifty acres of land in the county distinct from the City.

V. That all persons, inhabitants of Baltimore town, and having the same qualifications as electors in the county, shall, on the same first Monday in October, seventeen hundred and seventy-seven, and on the same day in every year forever thereafter, at such place in the said town as the Judges shall appoint, elect, *viva voce*, by a majority of votes, two Delegates, qualified as aforesaid: but if the said inhabitants of the town shall so decrease, as that a number of persons, having a right of suffrage therein, shall have been, for the space of seven years successively, less than one half the number of voters in some one county in this State, such town shall thenceforward cease to send two Delegates or Representatives to the House of Delegates, until the said town shall have one half of the number of voters in some one county in this State.

VI. That the Commissioners of the said town, or any three or more of them, for the time being, shall be judges of the said election, and may adjourn, as aforesaid, and shall mate return thereof, as aforesaid: but the inhabitants of the said town shall not be entitled to vote for, or be elected, Delegates for Baltimore county: neither shall the inhabitants of Baltimore county, out of the limits of Baltimore town, be entitled to vote for, or be elected, Delegates for the said town.

VII. That on refusal, death, disqualification, resignation, or removal out of this State of any Delegate, or on his becoming Governor, or member of the Council, a warrant of election shall issue by the Speaker, for the election of another in his place; of which ten days' notice, at least, (excluding the day of notice, and the day of election) shall be given.

VIII. That not less than a majority of the Delegates, with their Speaker (to be chosen by them, by ballot) constitute a House, for the transaction of any business other than that of adjourning.

IX. That the House of Delegates shall judge of the elections and qualifications of Delegates.

X. That the House of Delegates may originate all money bills, propose bills to the Senate, or receive those offered by that body; and assent, dissent, or propose amendments; that they may inquire on the oath of witnesses, into all complaints, grievances, and offences, as the grand inquest of this State; and may commit any person, for any crime, to the public jail, there to remain till he be discharged by due course of law. They may expel any member, for a great misdemeanor, but not a second time for the same cause. They may examine and pass all accounts of the State, relating either to the collection or expenditure of the revenue, or appoint auditors, to state and adjust the same. They may call for all public or official papers and records, and send for persons, whom they judge necessary in the course of their inquiries, concerning affairs relating to the public interest; and may direct all office bonds (which shall be made payable to the State) to be sued for any breach of duty.

XI. That the Senate may be at full and perfect liberty to exercise their judgment in passing laws-and that they may not be compelled by the House of Delegates, either to reject a money bill, which the emergency of affairs may require, or to assent to some other act of legislation, in their conscience and judgment injurious to the public welfare--the House of Delegates shall not on any occasion, or under any presence annex to, or blend with a money bill, any matter, clause, or thing, not immediately relating to, and necessary for the imposing, assessing, levying, or applying the taxes or supplies, to be raised for the of government, or the current expenses of the State: and to prevent altercation about such bills, it is declared, that no bill, imposing duties or customs for the mere regulation of commerce, or inflicting fines for the reformation of morals, or to enforce the execution of the laws, by which an incidental revenue may arise, shall be accounted a money bill: but every bill, assessing, levying, or applying taxes or supplies, for the support of government, or the current expenses of the State, or appropriating money in the treasury, shall be deemed a money bill.

XII. That the House of Delegates may punish, by imprisonment. any person who shall be guilty of a contempt in their view, by any disorderly or riotous behaviour, or by threats to, or abuse of their members, or by any obstruction to their proceedings. They may also punish, by imprisonment, any person who shall be guilty of a breach of privilege, by arresting on civil process, or by assaulting any of their members, during their sitting, or on their way to, or return from the House of Delegates, or by any assault of, or obstruction to their officers, in the execution of any order or process, or by assaulting or obstructing any witness, or any other person, attending on, or on their way to or from the House, or by rescuing any person committed by the House: and the Senate may exercise the same power, in similar cases.

XIII. That the Treasurers (one for the western, and another for the eastern shore) and the Commissioners of the Loan Office, may be appointed by the House of Delegates, during their pleasure; and in case of refusal, death, resignation, disqualification, or removal out of the State, of any of the said Commissioners or Treasurers, in the recess of the General Assembly, the governor, with the advice of the Council, may appoint and commission a fit and proper person to such vacant office, to hold the same until the meeting of the next General Assembly.

XIV. That the Senate be chosen in the following manner: All persons, qualified as aforesaid to vote for county Delegates, shall, on the first tidy of September, 1781, and on the same day in every fifth year forever thereafter, elect, *viva voce*, by a majority of votes, two persons for their respective counties (qualified as aforesaid to be elected county Delegates) to be electors of the Senate; and the Sheriff of each county, or, in case of sickness, his Deputy (summoning two Justices of the county, who are required to attend, for the preservation of the peace,) shall hold and be judge of the said election, and make return thereof, as aforesaid. And all persons, qualified as aforesaid, to vote for Delegates for the city of Annapolis and Baltimore town, shall, on the same first Monday of September, 1781, and on the same day in every fifth year forever thereafter, elect, viva voce, by a majority of votes, one person for the said city and town respectively, qualified as aforesaid to be elected a Delegate for the said city and town respectively; the said election to be held in the same manner, as the election of Delegates for the said city and town; the right to elect the said elector, with respect to Baltimore town, to continue as long as the right to elect Delegates for the said town.

XV. That the said electors of the Senate meet at the city of Annapolis, or such other place as shall be appointed for convening the Legislature, on the third Monday in September, 1781, and on the same flay in every fifth year forever thereafter, and they, or any twenty-four of them so met, shall proceed to elect, by ballot, either out of their own body, or the people at large, fifteen Senators (nine of whom to be residents on the western, and six to be residents on the eastern shore) men of the most wisdom, experience and virtue, above twenty-five years of age, residents of the State above three whole years next preceding the election, and having real and personal property above the value of one thousand pounds current money.

Compendium_Cornell
Page 0020

XVI That the Senators shall be balloted for, at one and the same time, and out of the gentlemen residents of the western shore, who shall be proposed as Senators, the nine who shall, on striking the ballots, appear to have the greatest numbers in their favour, shall be accordingly declared and returned duly elected: and out of the gentlemen residents of the eastern shore, who shall be proposed as Senators, the six who shall, on striking the ballots, appear to have the greatest number in their favour, shall be accordingly declared and returned duly elected: and if two or more on the same shore shall have an equal number of ballots in their favour, by which the choice shall not be determined on the first ballot, then the electors shall again ballot, before they separate; in which they shall be confined to the persons who on the first ballot shall have an equal number: and they who shall have the greatest number in their favour on the second ballot, shall be accordingly declared and returned duly elected: and if the whole number should not thus be made up, because of an equal number, on the second ballot, still being in favour of two or more persons, then the election shall be determined by lot, between those who have equal numbers; which proceedings of the electors shall be certified under their hands, and returned to the Chancellor for the time being.

XVII. That the electors of Senators shall judge of the qualifications and elections of members of their body; and, on a contested election, shall admit to a seat, as an elector, such qualified person as shall appear to them to have the greatest number of legal votes in his favour.

XVIII. That the electors, immediately on their meeting, and before they proceed to the election of Senators, take such oath of support and fidelity to this State, as this Convention, or the Legislature, shall direct; and also an oath " to elect without favour, affection, partiality, or prejudice, such persons for Senators, as they, in their judgment and conscience, believe best qualified for the office."

XIX. That in case of refusal, death, resignation, disqualification, or removal out of this State, of any Senator, or on his becoming Governor, or a member of the Council, the Senate shall, immediately thereupon, or at their next meeting thereafter, elect by ballot (in the same manner as the electors are above directed to choose Senators) another person in his place, for the residue of the said term of five years.

XX. That not less than a majority of the Senate, with their President (to be chosen by them, by ballot) shall constitute a House, for the transacting any business, other than that of adjourning.

XXI. That the Senate shall judge of the Elections and qualifications of Senators.

XXII. That the Senate may originate any other, except money bills, to which their assent or dissent only shall be given; and may receive any other bills from the House of Delegates, and assent, dissent, or propose amendments.

XXIII. That the General Assembly meet annually, Old the first Monday of November, and if necessary, oftener.

XXIV. That each House shall appoint its own officers, and settle its own rules of proceeding.

XXV. That a person of wisdom, experience, and virtue, shall be chosen Governor, on the second Monday of November, seventeen hundred and seventy-seven, and on the second Monday in every year forever thereafter, by the joint ballot of both Houses (to be taken in each House respectively) deposited in a conference room; the boxes to be examined by a joint committee of both Houses, and the numbers severally reported, that the appointment may be entered; which mode of taking the joint ballot of both Houses shall be adopted in all cases. But if two or more shall have an equal number of ballots in their favour, by which the choice shall not be determined on the first ballot, then a second ballot shall be taken, which shall be confined to the persons who, on the first ballot, shall have had an equal number; and, if the ballots should again be equal between two or more persons, then the election of the Governor shall be determined by lot, between those who have equal numbers: and if the person chosen Governor shall die, resign, move out of the State, or refuse to act, (the-General Assembly sitting) the Senate and House of Delegates shall, immediately thereupon, proceed to a new choice, in manner aforesaid.

XXVI. That the Senators and Delegates, on the second Tuesday of November, 1777, and annually on the second Tuesday of November forever thereafter, elect by Joint ballot (in the same manner as Senators are directed to be chosen) five of the most sensible, discreet, and experienced men, above twenty-five years of age, residents in the State above three years next preceding the election, and having therein a freehold of lands and tenements, above the value of one thousand pounds current money, to be the Council to the Governor, whose proceedings shall be always entered on record, to any part whereof any member may enter his dissent; and their advice, if so required by the Governor, or any member of the Council, shall be given in writing, and signed by the members giving the same respectively: which proceedings of the Council shall be laid before the Senate, or House of Delegates, when called for by them or either of them. The Council may appoint their own Clerk, who shall take such oath of suport and fidelity to this State, as this Convention, or the Legislature, shall direct; and of secrecy, in such matters as he shall be directed by the board to keep secret.

XXVII. That the Delegates to Congress, from this State, shall be chosen annually, or superseded in the mean time by the joint ballot of both Houses of Assembly; and that there be a rotation, in such manner, that at least two of the number be annually changed; and no person shall be capable of being a Delegate to Congress for more than three in any term of six years; and no person, who holds any office of profit in the gift of Congress, shall be eligible to sit in Congress; but if appointed to any such office, his seat shall be thereby vacated. That no person, unless above twenty-one years of age, and a resident in the State more than five years next preceding the election, and having real and personal estate in this State above the value of one thousand pounds current money, shall be eligible to sit in Congress.

XXVIII. That the Senators and Delegates, immediately on their annual meeting, and before they proceed to any business, and every person, hereafter elected a Senator or Delegate, before he acts as such, shall take an oath of support and fidelity to this State, as aforesaid; and before the election of a governor, or members of the Council, shall take an oath, " elect without favour, affection, partiality, or prejudice, such person as Governor, or member of the Council, as they, in their judgment and conscience, believe best qualified for the office."

XXIX. That the Senate and Delegates may adjourn themselves respectively: but if the two Houses should not agree on the same time, but adjourn to different days, then shall the Governor appoint and notify one of those days, or some day between, and the Assembly shall then meet and be held accordingly; and he shall, if necessary, by advice of the Council, call them before the time, to which they shall in any manner be adjourned, on giving not less than ten days' notice thereof; but the Governor shall not adjourn the Assembly, otherwise than as aforesaid, nor prorogue or dissolve it, at any time.

XXX. That no person, unless above twenty-five years of age, a resident in this State above five years next preceding the election- and having in the State real and personal property, above the value of five thousand pounds, current money, (one thousand pounds whereof, at least, to be freehold estate) shall be eligible as governor.

XXXI. That the governor shall not continue in that office longer than three years successively, nor be eligible as Governor, until the expiration of four years after he shall have been out of that office.

XXXII. That upon the death, resignation, or removal out of this State, of the Governor, the first named of the Council, for the time being shall act as Governor, and qualify in the same manner; and shall immediately call a meeting of the General Assembly, giving not less than fourteen days' notice of the meeting, at which meeting. a Governor shall be appointed, in manner aforesaid, for the residue of the year.

XXXIII. That the Governor, by and with the advice and consent of the Council, may embody the militia; and, when embodied, shall alone have the direction thereof; and shall also have the direction of all the regular land and sea forces, under the laws of this State, (but he shall not command in person, unless advised thereto by the Council, and then, only so long as they shall approve thereof); and may alone exercise all other the executive powers of government, where the concurrence of the Council is not required, according to the laws of this State; and grant reprieves or pardons for any crime, except in such cases where the law shall otherwise direct; and may, during the recess of the General Assembly, lay embargoes, to prevent the departure of any shipping, or the exportation of any commodities, for any time not exceeding thirty days in any one year-summoning the General Assembly to meet within the time of the continuance of such embargo; and may also order and compel any vessel to ride quarantine, if such vessel, or the port from which she may have come, shall, on strong grounds, be suspected to be infected with the plague; but the Governor shall not, under any presence, exercise any power or prerogative by virtue of any law, statute, or custom of England or Great Britain.

Compendium_Cornell
Page 0021

XXXIV. That the members of the Council, or any three or more off them, when convened, shall constitute a board for the transacting of business; that the Governor, for the time being, shall preside in the Council, and be entitled to a vote, on all questions in which the Council shall be divided in opinion; and, in the absence of the Governor, the first named of the Council shall preside; and as such, shall also vote, in all cases, where the other members disagree in their opinion.

XXXV. That, in case of refusal, death, resignation, disqualification, or removal out of the State, of any person chosen a member of the council, the members thereof, immediately thereupon, or at their next meeting thereafter, shall elect by ballot another person (qualified as aforesaid) in his place, for the residue of the Year.

XXXVI. That the Council shall have power to make the Great Seal of this State, which shall be kept by the Chancellor for the time being, and affixed to all laws, commissions, grants, and other public testimonials, as has been heretofore practiced in this State.

XXXVII. That no Senator, Delegate of Assembly, or member of the Council, if he shall qualify as such, shall hold or execute any office of profit, or receive the profits of any office exercised by any other person, during the time for which he shall be elected; nor shall any (governor be capable of holding any other office of profit in this State, while he acts as such. And no person, holding a place of profit or receiving any part of the profits thereof, or receiving the profits or any part of the profits arising on any agency, for the supply of clothing or provisions for the Army or Navy, or holding any office under the United States, or any of them-or a minister, or preacher of the gospel, of any denomination-or any person, employed in the regular land service, or marine, of this or the United States-shall have a seat in the General Assembly or the Council of this State.

XXXVIII. That every Governor, Senator, Delegate to Congress or Assembly, and member of the Council, before he acts as such, shall take an oath " that he will not receive, directly or indirectly at any time, any part of the profits of any office, held by any other person during his acting in his office of Governor, Senator, Delegate to Congress or Assembly, or member of the Council, or the profits or any part of the profits arising on any agency for the supply of clothing or provisions for the Army or Navy."

XXXIX. That if any Senator, Delegate to Congress or Assembly, or member of the Council, shall hold or execute any office of profit, or receive, directly or indirectly, at any time, the profits or any part of the profits of any office exercised by any other person, during his acting as Senator, Delegate to Congress or Assembly, or member of the Council-his seat (on conviction, in a Court of law, by the oath of two credible witnesses) shall be void; and he shall suffer the punishment of wilful and corrupt perjury, or be banished this State forever, or disqualified forever from holding any office or place of trust or profit, as the Court may judge.

XL. That the Chancellor, all Judges, the Attorney-General, Clerks of the General Court, the Clerks of the County Courts, the Registers of the Land Office, and the Registers of Wills, shall hold their commissions during good behaviour, removable only for misbehaviour, on conviction in a Court of law.

XLI. That there be a Register of Wills appointed for each county who shall be commissioned by the Governor, on the joint recommendation of the Senate and House of Delegates; anal that, upon the death, resignation, disqualification, or removal out of the county of any Register of Wills, in the recess of the General Assembly the Governor, with the advice of the Council, may appoint and commission a fit and proper person to such vacant office, to hold the same until the meeting of the General Assembly.

XLII. That Sheriffs be elected in each county, by ballot, every third year; that is to say, two persons for the office of Sheriff for each county, the one of whom having the majority of votes, or if both have an equal number, either of them, at the discretion of the Governor, to be commissioned by the Governor for the said office; and having served for three years, such person shall be ineligible for the four years next succeeding; bond with security to be taken every year, as usual; and no Sheriff shall be qualified to act before the same is given. In case of death, refusal, resignation, disqualification, or removal out of the county before the expiration of the three years, the other person, chosen as aforesaid, shall be commissioned by the Governor to execute the said office, for the residue of the said three years, the said person giving bond and security as aforesaid: and in case of his death, refusal, resignation, disqualification, or removal out of the county, before the expiration of the said three years, the Governor, with the advice of the Council, may nominate and commission a fit and proper person to execute the said office for the residue of the said three years, the said person giving bond and security as aforesaid. The election shall be held at the same time and place appointed for the election of Delegates; and the Justices, there summoned to attend for the preservation of the peace, shall be judges thereof, and of the qualification of candidates, who shall appoint a Clerk, to take the ballots. All freemen above the age of twenty-one years, having a freehold of fifty acres of land in the county in which they offer to ballot, and residing therein-and all freemen above the age of twenty-one years, and having property in the State above the value of thirty pounds current money, and having resided in the county in which they offer to ballot one whole year next preceding the election-shall have a right of suffrage. No person to be eligible to the office of Sheriff for a county, but an inhabitant of the said county above the age of twenty-one years, and having real and personal property in the State above the value of one thousand pounds current money. The Justices aforesaid shall examine the ballots; and the two candidates properly qualified, having in each county the majority of legal ballots, shall be declared duly elected for the office of Sheriff, for such county, and returned to the Governor and Council, with a certificate of the number of ballots for each of them.

XLIII. That every person who shall offer to vote for Delegates, or for the election of the Senate, or for the Sheriff, shall (if required by any three persons qualified to vote) before he be permitted to poll, take such oath or affirmation of support and fidelity to this State, as this Convention or the Legislature shall direct.

XLIV. That a Justice of the Peace may be eligible as a Senator, Delegate, or member of the Council, and may continue to act as a Justice of the Peace.

XLV. That no field officer of the militia be eligible as a Senator, Delegate, or member of the Council.

XLVI. That all civil officers, hereafter to be appointed for the several counties of this State, shall have been residents of the county, respectively, for which they shall be appointed, six months next before their appointment; and shall continue residents of their county, respectively, during their continuance in office.

XLVII. That the Judges of the General Court, and Justices of the County Courts, may appoint the Clerks of their respective Courts; and in case of refusal, death, resignation, disqualification,., or removal out of the State, or from their respective shores, of the Clerks of the General Court, or either of them, in the vacation of the said Court- and in case of the refusal, death, resignation, disqualification, or removal out of the county, of any of the said County Clerks, in the vacation of the County Court of which he is Clerk--the Governor, with the advice of the Council, may appoint and commission a fit and proper person to such vacant office respectively, to fold the same until the meeting of the next General Court, or County Court, as the case may be.

XLVIII. That the Governor, for the time being, with the advice and consent of the Council, may appoint the Chancellor, and all Judges and Justices, the Attorney-General, Naval Officers, officers in the regular land and sea service, officers of the militia, Registers of the Land Office, Surveyors, and all other civil officers of government (Assessors, Constables, and Overseers of the roads only excepted) and may also suspend or remove any civil officer who has not a commission, during good behaviour; and may suspend any militia officer, for one month: and may also suspend or remove any regular officer in the land or sea service: and the Governor may remove or suspend any militia officer, in pursuance of the judgment of a Court Martial.

XLIX. That all civil officers of the appointment of the Governor and Council, who do not hold commissions during good behaviour, shall be appointed annually in the third week of November. But if any of them shall be reappointed, they may continue to act, without any new commission or qualification; and every officer, though not reappointed, shall continue to act, until the person who shall be appointed and commissioned in his stead shall be qualified.

L. That the Governor, every member of the Council, and every Judge and Justice, before they act as such, shall respectively take an oath, " That he will not, through favour, affection or partiality vote for any person to office; and that he will vote for such person as, in his judgment and conscience, he believes most fit and best qualified for the office; and that he has not made, nor will make. any promise or engagement to give his vote or interest in favor of any person."

LI. That there be two Registers of the Land Office, one upon the western, and one upon the eastern shore: that short extracts of the grants and certificates of the land, on the western and eastern shores respectively, be made in separate books, at the public expense, and deposited in the offices of the said Registers, in such manner as shall hereafter be provided by the General Assembly.

LII. That every Chancellor, Judge, Register of Wills, Commissioner of the Loan Office, Attorney-General, Sheriff, Treasurer, Naval Officer, Register of the Land Office, Register of the Chancery Court, and every Clerk of the common law courts, Surveyor and Auditor of the public accounts, before he acts as such, shall take an

Compendium_Cornell
Page 0022

oath " That he will not directly or indirectly receive any fee or reward, for doing his office of , but what is or shall be allowed by law; nor will, directly or indirectly, receive the profits or any part of the profits of any office held by any other person, and that he does not hold the same office in trust, or for the benefit of any other person."

LIII. That if any Governor, Chancellor, Judge, Register of Wills, Attorney-General, Register of the Land Office, Register of the Chancery Court, or any Clerk of the common law courts, Treasurer, Naval Officer, Sheriff, Surveyor or Auditor of public accounts, shall receive, directly or indirectly, at any time, the profits, or any part of the profits of any office, held by any other person, during his acting in the office to which he is appointed; his election, appointment and commission (on conviction in a court of law by oath of two credible witnesses) shall be void; and he shall suffer the punishment for wilful and corrupt perjury, or be banished this State forever, or disqualified forever from holding any office or place of trust or profit, as the court may adjudge.

LIV. That if any person shall give any bribe, present, or reward, or any promise, or any security for the payment or delivery of any money, or any other thing, to obtain or procure a vote to be Governor, Senator, Delegate to Congress or Assembly, member of the Council, or Judge, or to be appointed to any of the said offices, or to any office of profit or trust, now created or hereafter to be created in this State-the person giving, and the person receiving the same (on conviction in a court of law) shall be forever disqualified to hold any office of trust or profit in this State.

LV. That every person, appointed to any office of profit or trust, shall, before he enters on the execution thereof, take the following oath; to wit :-" I, A. B., do swear, that I do not hold myself bound in allegiance to the King of Great Britain, and that I will be faithful, and bear true allegiance to the State of Maryland; " and shall also subscribe a declaration of his belief in the Christian religion.

LVI. That there be a Court of Appeals, composed of persons of integrity and sound judgment in the law, whose judgment shall be final and conclusive, in all cases of appeal, from the General Court, Court of Chancery, and Court of Admiralty: that one person of integrity and sound judgment in the law, be appointed Chancellor: that three persons of integrity and sound judgment in the law, be appointed judges of the Court now called the Provincial Court; and that the same Court be hereafter called and known by the name of *The General Court*; which Court shall sit on the western and eastern shores, for transacting and determining the business of the respective shores, at such times and places as the future Legislature of this State shall direct and appoint.

LVII. That the style of all laws run thus; *"Be it enacted by the General Assembly of Maryland:"* that all public commissions and grants run thus; *"The State of Maryland," &c.* and shall be signed by the Governor, and attested by the Chancellor, with the seal of the State annexed-except military commissions, which shall not be attested by the Chancellor or have the seal of the State annexed: that all writs shall run in the same style, and be attested, sealed and signed a usual: that all indictments shall conclude, *"Against the peace, government, and dignity of the State."*

LVIII. That all penalties and forfeitures, heretofore going to the King or proprietary, shall go to the State-save only such, as the General Assembly may abolish or otherwise provide for.

LIX. That this Form of Government, and the Declaration of Rights, and no part thereof, shall be altered, changed, or abolished, unless a bill so to alter, change or abolish the same shall pass the General Assembly, and be published at least three months before a new election, and shall be confirmed by the General Assembly, after a new election of Delegates, in the first session after such new election; provided that nothing in this form of government, which relates to the eastern shore particularly, shall at any time hereafter be altered, unless for the alteration and confirmation thereof at least two-thirds of all the members of each branch of the General Assembly shall concur.

LX. That every bill passed by the General Assembly, when engrossed, shall be presented by the Speaker of the House of Delegates, in the Senate, to the Governor for the time being, who shall sign the same, and thereto affix the Great Seal, in the presence of the members of both Houses: every law shall be recorded in the General Court office of the western shore, and in due time printed, published, and certified under the Great Seal, to the several County Courts, in the same manner as hath been heretofore used in this State.

This Form of Government was assented to, and passed in Convention of the Delegates of the freemen of Maryland, begun and held at the city of Annapolis, the fourteenth of August, A. D. one thousand seven hundred and seventy-six.

By order of the Convention.

M. TILGHMAN, President.

## Notes:

(1) Verified by "A Collection of the Constitutions of The Thirteen United States of North America. Published by Order of Congress, Philadelphia, By John Bryce, 1783."

This constitution was framed by a convention which met at Annapolis August 14, 1776, and completed its labors November 11, 1776. It was not submitted to the people. Back

Source:
The Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America
Compiled and Edited Under the Act of Congress of June 30, 1906 by Francis Newton Thorpe
Washington, DC : Government Printing Office, 1909.

Colonial Charters Page



| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |
|---|---|---|---|---|---|---|---|---|---|---|

© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Avalon Statement of Purpose     Accessibility at Yale     Contact Us     Yale Law Library     University Library     Yale Law School     Search Morris     Search Orbis

Compendium_Cornell
Page 0023



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)



# 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2

## Subject(s):

- Storage (https://firearmslaw.duke.edu/subjects/storage/)

## Jurisdiction(s):

- Massachusetts (https://firearmslaw.duke.edu/jurisdictions/massachusetts/)

## Year(s):

- 1783 (https://firearmslaw.duke.edu/years/1783/)

"That all cannon, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having in them any gun-powder, shall be liable to be seized by either of the Firewards of the said Town: And upon complaint made by the said Firewards to the Court of Common Pleas, of such cannon, swivels, mortar, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon, swivel, mortar, or howitzer, shall be adjudged forfeit, and be sold at public auction.

-  (https://twitter.com/dukefirearmslaw)

- (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu
(mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu
(mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).



DATE DOWNLOADED: Tue Oct 18 16:30:53 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1814 464 .

ALWD 7th ed.
, , 1814 464 .

Chicago 17th ed.
"," Massachusetts - Laws, January Session : 464-465

AGLC 4th ed.
'' Massachusetts - Laws, January Session 464.

OSCOLA 4th ed.
'' 1814 464

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

464      COMMONWEALTH FIRE ARMS.   *Feb.* 28, 1814.

Town incor-   county of Essex, by the name of Lynnfield," be, and the
porated.   same hereby is incorporated into a town, by the name of
Lynnfield, with all the powers, privileges, and immunities,
and liable to all the duties and requisitions of other towns
in this Commonwealth.

[Approved by the Governor, February 28, 1814.]

## CHAP. CXCII.

An Act in addition to an act, entitled "An act to provide
for the proof of Fire Arms, manufactured within this
Commonwealth."

SEC. 1. BE *it enacted by the Senate and House of
Representatives, in General Court assembled, and by the
authority of the same,* That from and after the passing of
this act, all musket barrels and pistol barrels, manufactured
within this Commonwealth, shall, before the same shall be
sold, and before the same shall be stocked, be proved by
the person appointed according to the provisions of an act,
entitled "An act to provide for the proof of Fire Arms,
manufactured within this Commonwealth," to which this
Manner of   is an addition, in manner following, viz : with a charge of
proving.   powder equal in weight to the ball which fits the bore of
the barrel to be proved ; and the powder used in such proof
one ounce thereof in a howitzer of four and a half inch
caliber, at an elevation of forty-five degrees, shall be of
sufficient power to carry a twelve pound shot one hundred
and thirty yards ; or one ounce thereof in a howitzer of
five and a half inch caliber, at an elevation of forty-five de-
grees, shall be sufficient to carry a twenty-four pound shot
eighty yards, and the ball used in such proof shall be suit-
ed to the bore of the barrel to be proved as aforesaid.

SEC. 2. *Be it further enacted,* That if any person or
persons, from and after the passing of this act, shall man-
ufacture, within this Commonwealth, any musket or pis-
Restrictions.   tol, or shall sell and deliver, or shall knowingly purchase
any musket or pistol, without having the barrels first prov-
ed according to the provisions of the first section of this
act, marked and stamped according the provisions of the
first section of the act to which this is an addition ; or if

any person or persons shall sell, stock or finish, or shall knowingly purchase any musket barrel or pistol barrel manufactured within this Commonwealth, which shall not have been first proved, marked and stamped according to the provisions aforesaid, the person or persons who shall so manufacture, sell and deliver, or knowingly purchase any musket or pistol without causing the same to be first proved, marked and stamped as aforesaid, and the person or persons who shall sell, stock or finish, or shall knowingly purchase any musket barrel or pistol barrel, which shall not have been proved, marked and stamped as afore- **Forfeitures.** said, shall severally forfeit the sum of ten dollars, to be recovered by an action of debt before any court proper to try the same, by any person who shall sue for and recover the same, to his own use : *Provided however,* That the **Proviso.** foregoing provisions and penalties shall not extend to any muskets or pistols, or musket or pistol barrels, manufactured in any armoury of the United States, for their use, or in execution of any contract made or to be made with the United States, for the manufacture of fire arms.

SEC. 3. *Be it further enacted,* That the second and third sections of the act to which this is in addition, and **Sections re-** also so much of the first section thereof as prescribes the **pealed.** mode of proving musket barrels and pistol barrels, and the power of the powder to be used in such proof, be, and the same are hereby repealed.

[Approved by the Governor, February 28, 1814.]

---

## CHAP. CXCIII.

An Act to incorporate The President, Directors and Company of the Lynn Mechanicks Bank.

SEC. 1. BE *it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That Daniel Silsbe, Joseph Fuller the third, John D. Atwell, Thomas Rich, Samuel Brimble- **Persons in-** cum, Micajah Burrill, Parker Mudge, Oliver Fuller, Jon- **corporated.** athan Conner, John Alley, jr. Stephen Oliver, John Mudge, and Jonathan Bachellor, their associates, successors, and assigns shall be, and hereby are created a Cor-

# L   A   W   S

OF THE

# STATE OF NEW-YORK,

COMPRISING THE

# CONSTITUTION,

AND THE

# ACTS OF THE LEGISLATURE,

SINCE THE REVOLUTION, FROM THE

FIRST TO THE FIFTEENTH SESSION, INCLUSIVE.



IN   TWO   VOLUMES.

VOLUME I.

Quum Leges aliæ fuper alias accumulatæ, eas de integro retractare, et in Corpus fanum et habile redigere,   ex Ufu fit.
BACON.

Mifera Servitus eft ubi Jus eft vagum aut incognitum.
4 Inft. 246.

N E W · Y O R K—PRINTED BY THOMAS GREENLEAF—M,DCC,XC,II.

Digitized by Google

point, out of the citizens and inhabitants of the said city of Hudson, one fit and discreet person to be mayor of the said city, and one fit and discreet person to be recorder of the said city ; which said mayor and recorder, after such appointments respectively, shall continue in their said respective offices, to do and to execute all things which to their said several offices doth or may severally and respectively belong, or in any manner appertain, until other fit persons be appointed and sworn in their room ; and in like manner, a fit and discreet person shall be appointed out of the said citizens and inhabitants, to be common clerk of the said city, who shall hold and continue in office during the will and pleasure of the governor and council of appointment, and also another fit and discreet person shall be appointed out of the citizens and inhabitants of the said city, to be the chief marshal thereof, whose duty it shall be to execute writs, processes and precepts, to arise and be issued within the said city, from the courts and magistrates thereof, in and about the administration of justice, in the same manner as the sheriffs of other cities and counties are by law authorised to execute such writs, processes and precepts ; and which chief marshal shall be from time to time, appointed, and shall hold and exercise his office for such period as sheriffs of other cities and counties by law are or ought to be appointed, or may or ought by law to hold and exercise their respective offices ; which said mayor, recorder, clerk and marshal, shall be annually nominated and appointed in manner and form aforesaid, until otherwise directed by the legislature.

IV. *And be it further enacted by the authority aforesaid,* That on the second Monday in May next, and on the second Monday in May in every succeeding year forever thereafter, the freemen of the said city, being inhabitants thereof, shall and may assemble themselves, and meet together at such time of the day, and at such public place as the mayor for the time being, or in his absence or sickness, the recorder for the time being, shall appoint, and then and there, by plurality of voices or votes, elect and chuse out of the freemen, inhabitants of the said city, for the ensuing year, four aldermen, four assistants, one supervisor, and such a number of assessors, constables and collectors, as the common council for the said city shall, from time to time, deem necessary, and direct to be chosen.

V. *And be it further enacted by the authority aforesaid,* That the mayor, or recorder of the said city for the time being, and two or more of the aldermen, and two or more of the assistants of the said city, shall and may, on the second Monday in May next, and on the second Monday in May in every succeeding year, forever thereafter, in common council, nominate and appoint one fit person, being a freeman and inhabitant of the said city, to be the treasurer and chamberlain of the said city, for the year ensuing ; every of which said persons as are herein before nominated, or hereafter to be nominated, elected and appointed to any civil office within the said city, shall, within fifteen days next after such appointment or election, respectively take and subscribe the oath of abjuration and allegiance, now or hereafter appointed by law (or if of the people called Quakers, an affirmation) and also an oath or affirmation, as the case may require, for the faithful execution of the office to which he or they shall so be appointed.

VI. *And be it further enacted by the authority aforesaid,* That if any one of the freemen, inhabitants of the said city of Hudson, shall hereafter be elected or chosen to the office of alderman, assistant, supervisor, or assessor, collector or constable, for the said city, and having notice of his said election, shall refuse, deny, delay or neglect, to take upon him or them to execute such

Digitized by Google

**office** to which he or they fhall be fo chofen or clected ; that then, and fo of-
ten as it fhall happen, it fhall and may be lawful for the mayor or recorder,
or any two or more of the aldermen, and any two or more of the affitants
of the faid city for the time being, in common council, to affefs and impofe
upon every fuch perfon or perfons fo refufing, delaying or neglecting, fuch
reafonable and moderate fine and fines, fum and fums of money, as they, in
common council, fhall think fit, fo as fuch fine for each refufal, denial, delay
or neglect, fhall not exceed the fum of ten pounds, current money of New-
York ; all which faid fines fhall and may be levied by diftrefs and fale of the
goods and chattels of fuch delinquent and delinquents, by warrant under the
feal of the faid city, figned by the mayor thereof for the time being, render-
ing the furplufage to the owner or owners thereof (if any there be) neceffary
charges of making and felling fuch diftrefs, being firft deducted ; or by action
of debt in any court of record within the jurifdiction of the faid city, having
cognizance of the fame, to be profecuted, and fhall be recovered and received
by and to the ufe of the faid mayor, aldermen and commonalty of the faid
city, and their fucceffors forever.

VII.  *And be it further enacted by the authority aforefaid*, That in all fuch
cafes forever hereafter, of the abfence, ficknefs, or death of the mayor of the
faid city for the time being, it fhall and may be lawful to and for the recor-
der of the faid city for the time being, to do and execute all and fingular the
duties and trufts to the office of the faid mayor belonging and appertaining,
to all intents, purpofes and conftructions whatfoever, during the abfence or
ficknefs of fuch mayor, or until a fucceffor be duly appointed and fworn.

VIII.  *And be it further enacted by the authority aforefaid*, That if it fhall
happen that any of the aldermen or affitants, fupervifor, affeffors, collectors
or conftables, or any one of them hereafter to be elected, nominated and
fworn in their refpective offices as aforefaid, fhall hap, en to die or remove out
of the faid city, within the time they are or fhall be refpectively named or elected
for, or before other fit perfons be refpectively named or elected, and fworn
in their refpective rooms, it fhall and may be lawful for the freemen, inhabi-
tants within the limits of the faid city, to affemble and meet together, at fuch
time and place as fhall be appointed by the mayor of the faid city for the time
being, and then and there, by plurality of voces, to elect one of the freemen,
an inhabitant within the limits of the faid city, to ferve as alderman, affitant,
fupervifor, affeffor, collector or conftable, in the room of fuch alderman,
affitant, fupervifor, affeffor, collector or conftable, fo dying or removing,
and fo often as fuch cafes fhall happen ; and in cafe of the death or removal
of the treafurer or chamberlain, out of the limits of the faid city, for the com-
mon council to appoint another in his ftead, at any time after fuch death or
removal : And that all and every fuch perfon and perfons fo to be newly
chofen or appointed and fworn, fhall ferve in their refpective offices until
other fit perfons be refpectively chofen or appointed, and fworn in their
refpective rooms.

IX.  *And be it further enacted by the authority aforefaid*, That the chief
marfhal fo to be nominated and appointed, and every marfhal to be there-
after nominated and appointed, fhall, before he fhall be deemed capable of
executing his faid office, become bound, with fuch fureties, in fuch manner
and under fuch penalty for the faithful difcharge of the duties of his office, as
the fheriffs of other cities and counties are or fhall be by law directed and re-
quired to be bound for the faithful execution of their offices.

Digitized by Google

Compendium_Cornell
Page 0031



Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 -

## Constitution of North Carolina : December 18, 1776 (1) (2)

### A DECLARATION OF RIGHTS, &C.

I. That all political power is vested in and derived from the people only.

II. That the people of this State ought to have the sole and exclusive right of regulating the internal government and police thereof.

III. That no man or set of men are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services.

IV. That the legislative, executive, and supreme judicial powers of government, ought to be forever separate and distinct from each other.

V. That all powers of suspending laws, or the execution of laws, by any authority, without consent of the Representatives of the people, is injurious to their rights, and ought not to be exercised.

VI. That elections of members, to serve as Representatives in General Assembly, ought to be free.

VII. That, in all criminal prosecutions, every man has a right to be informed of the accusation against him, and to confront the accusers and witnesses with other testimony, and shall not be compelled to give evidence against himself.

VIII. That no freeman shall be put to answer any criminal charge, but by indictment, presentment, or impeachment.

IX. That no freeman shall be convicted of any crime, but by the unanimous verdict of a jury of good and lawful men, in open court, as heretofore used.

X. That excessive bail should not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted.

XI. That general warrants -- whereby an officer or messenger may he commanded to search suspected places, without evidence of the fact conmlittecl, or to seize any person or persons, not named, whose offences are not particularly described, and supported by evidence -- are dangerous to liberty, and ought not to be granted.

XII. That no freeman ought to be taken, imprisoned, or disseized of his freehold liberties or privileges, or outlawed, or exiled, or in any nlanller destroyed, or deprived of his life, liberty, or property, but by the law of the land.

XIII. That every freeman, restrained of his liberty, is entitled to a remedy, to inquire into the lawfulness thereof, and to remove the same, if unlawful; and that such remedy ought not to be denied or delayed.

XIV. That in all controversies at law, respecting property, the ancient mode of trial, by jury, is one of the best securities of the rights of the people, and ought to remain sacred and inviolable.

XV. That the freedom of the press is one of the great bulwarks of liberty, and therefore ought never to he restrained.

XVI. That the people of this State ought not to be taxed, or made subject to the payment of any impost or duty, without the consent of themselves, or their Representatives in General Assembly, freely given.

XVII. That the people have a right to bear arms, for the defence of the State; and, as standing armies, in time of peace, are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power.

XVIII. That the people have a right to assemble together, to consult for their common good, to instruct their Representatives, and to apply to the Legislature, for redress of grievances.

XIX. That all men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences.

XX. That, for redress of grievances, and for amending and strengthening the laws, elections ought to be often held.

XXI. That a frequent recurrence to fundamental principles is absolutely necessary, to preserve the blessings of liberty.

XXII. That no hereditary emoluments, privileges or honors ought to be granted or conferred in this State.

XXIII. That perpetuities and monopolies are contrary to the genius of a free State, and ought not to be allowed.

XXIV. That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no ex post facto law ought to be made.

XXV. The property of the soil, in a free government, being one of the essential rights of the collective body of the people, it is necessary, in order to avoid future disputes, that the limits of the State should be ascertained with precision; and as the former temporary line between North and South Carolina, was confirmed, and extended by Commissioners, appointed by the Legislatures of the two States, agreeable to the order of the late King George the Second, in Council, that line, and that only, should be esteemed the southern boundary of this State as follows: that is to say, beginning on the sea side, at a cedar stake, at or near the mouth of Little River (being the southern extremity of Brunswick county) and running from thence a northwest course, through the boundary house, which stands in thirty-three degrees fifty-six minutes, to thirty-five degrees north latitude; and from thence a west course so far as is mentioned in the Charter of King Charles the Second, to the late Proprietors of Carolina. Therefore all the territories, seas, waters, and harbours, with their appurtenances, lying between the line above described, and the southern line of the State of Virginia, which begins on the sea shore, in thirty-six degrees thirty minutes, north latitude, and from thence runs west, agreeable to the said Charter of King Charles, are the right and property of the people of this State, to be held by them in sovereignty; any partial line, without the consent of the Legislature of this State, at any time thereafter directed, or laid out, in anywise notwithstanding: -- Provided always, That this Declaration of Rights shall not prejudice any nation or nations of Indians, from enjoying such hunting-grounds as may have been, or hereafter shall be, secured to them by any former or future Legislature of this State: -- And provided also, That it shall not be construed so as to prevent the establishment of one or more governments westward of this State, by consent of the Legislature:

Compendium_Cornell
Page 0032

-- And provided further, That nothing herein contained shall affect the titles or repossessions of individuals holding or claiming under the laws heretofore in force, or grants heretofore made by the late King George the Second, or his predecessors, or the late lords proprietors, or any of them.

## THE CONSTITUTION, OR FORM OF GOVERNMENT, &c

WHEREAS allegiance and protection are, in their nature, reciprocal, and the one should of right be refused when the other is withdrawn:

And whereas George the Third, King of Great Britain, and late Sovereign of the British American Colonies, hath not only withdrawn from them his protection, but, by an act of the British Legislature, declared the inhabitants of these States out of the protection of the British crown, and all their property, found upon the high seas, liable to be seized and confiscated to the uses mentioned in the said act; and the said George the Third has also sent fleets and armies to prosecute a cruel war against them, for the purposed reducing the inhabitants of the said Colonies to a state of abject slavery; in consequence whereof, all government under the said King, within the said Colonies, hath ceased, and a total dissolution of government in many of them hath taken place.

And whereas the Continental Congress, having considered the premises, and other previous violation of the rights of the good people of America, have therefore declared, that the Thirteen United Colonies are, of right, wholly absolved from all allegiance to the British crown or any other foreign jurisdiction whatsoever: and that the said Colonies now are, and forever shall be, free and independent States.

Wherefore, in our present state, in order to prevent anarchy and confusion, it becomes necessary that government should be established in this State; therefore we, the Representatives of the freemen of North-Carolina, chosen and assembled in Congress, for the express purpose of framing a Constitution, under the authority of the people, most conducive to their happiness and prosperity, do declare, that a government for this State shall be established, in manner and form following, to wit:

I.(3) That the legislative authority shall be vested in two distinct branches both dependent on the people, to wit, a *Senate* and *House of Commons*.

II.(3) That the Senate shall be composed of Representatives annually chosen by ballot, one for each county in the State.

III.(3) That the House of Commons shall be composed of Representatives annually chosen by ballot, two for each counts and one for each of the towns of Edentown, Newbern, Wilmington, Salisbury, Hillsborough and Halifax.

IV. That the Senate and House of Commons, assembled for the purpose of legislation, shall be denominated, *The General Assembly*.

V.(3) That each member of the Senate shall have usually resided in the county in which he is chosen for one year immediately preceding his election, and for the same time shall have possessed, and continue to possess in the county which he represents, not less than three hundred acres of land in fee.

VI. That each member of the House of Commons shall have usually resided in the county in which he is chosen for one year immediatelv preceding his election, and for six months shall have possessed, and continue to possess, in the county which he represents, not less than one hundred acres of land in fee, or for the term of his own life.

VII.(3) That all freemen, of the age of twenty-one years, who have been inhabitants of any one county within the State twelve months immediately preceding the day of any election and possessed of a freehold within the same county of fifty acres of land for six months next before, and at the day of election, shall be entitled to vote for a member of the Senate.

VIII.(3) That all freemen of the age of twenty-one Years, who have been inhabitants of any one county within this State twelve months immediately preceding the day of any election, and shall have paid public taxes shall be entitled to vote for members of the House of Commons for the county in which he resides.

IX.(3) That all persons possessed of a freehold in any town in this State, having a right of representation and also all freemen who have been inhabitants of any such town twelve mouths next before and at the day of election, and shall have paid public taxes, shall be entitled to vote for a member to represent such town in the House of Commons: -- Provided always, That this section shall not entitle any inhabitant of such town to vote for members of the House of Commons, for the county in which he may reside, nor any freeholder in such county, who resides without or beyond the limits of such town, to vote for a member for said town.

X. That the Senate and House of Commons, when met, shall each have power to choose a speaker and other officers; be judges of the qualifications and elections of their members; sit upon their own adjournments from day to day, and prepare bills, to be passed into laws. The two Houses shall direct writs of election for supplying intermediate vacancies; and shall also jointly, by ballot, adjourn themselves to any future day and place.

XI. That all bills shall be read three times in each House, before they pass into laws, and be signed by the Speakers of both Houses.

XII. That every person, who shall be chosen a member of the Senate or House of Commons, or appointed to any office or place of trust, before taking his seat, or entering upon the execution of his office, shall take an oath to the State; and all officers shall also take an oath of office.

XIII.(4) That the General Assembly shall, by joint ballot of both houses, appoint Judges of the Supreme Courts of Law and Equity, Judges of Admiralty, and Attorney-General, who shall be commissioned by the Governor, and hold their offices during good behavior.

XIV. That the Senate and House of Commons shall have power to appoint the generals and field-officers of the militia, and all officers of the regular army of this State.

XV.(4) That the Senate and House of Commons, jointly at their first meeting after each annual election, shall by ballot elect a Governor for one year, who shall not be eligible to that office longer than three years, in six successive years. That no person, under thirty years of age, and who has not been a resident in this State above five years, and having, in the State, a freehold in lands and tenements above the value of one thousand pounds, shall be eligible as a Governor.

XIV. That the Senate and House of Commons, jointly, at their first meeting after each annual election, shall by ballot elect seven persons to be a Council of State for one year, who shall advise the Governor in the execution of his office; 2 nd that four members shall be a quorum; their advice and proceedings shall be Altered in a journal, to be kept for that purpose only and signed,by the members present; to any part of which, any member present Nay enter his dissent. And such journal shall he laid before the General Assembly when called for by them.

XVII. That there shall be a seal of this State, which shall be kept by the Governor, and used by him, as occasion may require; and shall be called, *The Great Seal of the State of North Carolina*, and be affixed to all grants and commissions.

XVIII. The Governor. for the time being, shall be captain-general and commander in chief of the militia; and, in the recess of the General Assembly, shall have power, by and with the advice of the Council of State, to embody the militia for the public safety.

XIX.(4) That the Governor, for the tine beings shall have power to draw for and apply such sums of money as shall be voted by the general assembly, for the contingencies of government, and be accountable to them for the same. He may, by and with the advice of the Council of State, lay embargoes, or prohibit the exportation of any commodity, for any term not exceeding thirty days, at any one time in the recess of the General Assmabiy; and shall have the power of granting pardons and reprieves, except where the prosecution shall be carried on by the General Assembly, or the law shall otherwise direct; in which case he may in the recess grant a reprieve until the next sitting of the General Assembly; and may exercise all the other executive powers of government, limited and restrained as by this Constitution is mentioned, and according to the laws of the State. And on his death, inability, or absence from the State, the Speaker of the Senate for the time being -- (and in case of his death, inability, or absence from the State, the Speaker of the House of Commons) shall exercise the powers of government after such death, or during such absence or inability of the Governor (or Speaker of the Senate,) or until a new nomination is made by the General Assembly.

Compendium_Cornell
Page 0033

XX. That in every case where any officer, the right of whose appointment is by this Constitution vested in the General Assembly, shall, during their recess, die, or his office by other means become vacant, the Governor shall have power, with the advice of the Council of State, to fill up such vacancy, by granting a temporary commission, which shall expire at the end of the next session of the General Assembly

XXI. That the Governor, Judges of the Supreme Court of Law and Equity, Judges of Admiralty, and Attorney-General, shall have adequate salaries during their continuance in office.

XXII. That the General Assembly shall, by joint ballot of both Houses, annually appoint a Treasurer or Treasurers for this State.

XXIII. That the Governor, and other officers, offending against the State, by violating any part of this Constitution, mal-administration, or corruption, may be prosecuted, on the impeachment of the General Assembly, or presentment of the Grand Jury of any court of supreme jurisdiction in this State.

XXIV. That the General Assembly shall, by joint ballot of both Houses, triennially appoint a Secretary for this State.

XXV. That no persons, who heretofore have been, or hereafter may be, receivers of public the monies, shall have a seat in either House of General Assembly, or be eligible to any office in this State, until such person shall have fully accounted for and paid into the treasury all sums for which they may he accountable and liable.

XXVI. That no Treasurer shall have a seat, either in the Senate, House of Commons, or Council of State, during his continuance in that office, or before he shall have finally settled his accounts with the public, for all the monies which may be in his hands at the expiration of his office belonging to the State, and hath paid the same into the hands of the succeeding Treasurer.

XXVII. That no officer in the regular army or navy, in the service and pay of the United States, of this or any other State, nor any contractor or agent for supplying such army or navy with clothing or provisions, shall have a seat either in the Senate, House of Commons, or Council of State, or be eligible thereto: and any member of the Senate, House of Commons, or Council of State, being appointed to and accepting of such office, shall thereby vacate his seat.

XXVIII. That no member of the Councilof State shall have a seat, either in the Senate, or House of Commons.

XXIX. That no Judge of the Supreme Court of Law or Equity, or Judge of Admiralty, shall have a seat in the Senate, House of Commons, or Council of State.

XXX. That no Secretary of this State, Attorney-General, or Clerk of any Court of Record, shall have a seat in the Senate, House of Commons, or Council of State.

XXXI. That no clergyman, or preacher of the gospels of any denomination, shall be capable of being a member of either the Senate, House of Commons, or Council of State, while he continues in the exercise of the pastoral function.

XXXII.(5) That no person, who shall deny the being of God or the truth of the Protestant religion, or the divine authority either of the Old or New Testaments, or who shall hold religious principles incompatible with the freedom and safety of the State, shall be capable of holding any office or place of trust or profit in the civil department within this State.

XXXIII. That the Justices of the Peace, within their respective counties in this State, shall in future be recommended to the Governor for the time being, by the Representatives in General Assembly; and the Governor shall commission them accordingly: and the Justices, when so commissioned, shall hold their offices during good behaviour, and shall not be removed from office by the General Assembly, unless for misbehaviour, absence, or inability.

XXXIV. That there shall be no establishment of any one religious church or denomination in this State, in preference to any other; neither shall any person, on any presence whatsoever, be compelled to attend any place of worship contrary to his own faith or judgment, nor be obliged to pay, for the purchase of any glebe, or the building of any house of worship, or for the maintenance of any minister or ministry, contrary to what he believes right, of has voluntarily and personally engaged to perform; but all persons shall be at liberty to exercise their own mode of worship: -- *Provided*, That nothing herein contained shall be construed to exempt preachers of treasonable or seditious discourses, from legal trial and punishment.

XXXV. That no person in the State shall holtl mole than one lucrative office, at any one time: -- *Provided*, That no appointment in the militia, or the office of a Justice of the Peace, shall be considered as a lucrative office.

XXXVI. That all commissions aml grants shall run in the name of the State of North Carolina, and bear test, and be signed by the Governor. All writs shall run in the same manner and bear test, and be signed by the Clerks of the respective Courts. Indictments shall conclude, *Against the peace and dignity of the state*.

XXXVII.(5) That the Delegates for this State, to the Continental Congress while necessary, shall be chosen annually by the General Assembly, by ballot; but may be superseded, in the mean time, in the same manner; and no person shall be electoral, to serve in that capacity, for more than three years successively.

XXXVIII. That there shall be a Sheriff, Coroner or Coroners, and Constables, in each county within this State.

XXXIX. That the person of a debtor, where there is not a strong presumption of fraud, shall not be continued in prison, after delivering up, *bona fide*, all his estate real and personal, for the use of his creditors in such manner as shall be hereafter regulated by law. All prisoners shall be bailable by sufficient sureties, unless for capital offences when the proof is evident or the presumption great.

XL. That every foreigner, who comes to settle in this State having first taken an oath of allegiance to the same, may purchase, or, by other means, acquire, hold, and transfer land, or other real estate; and after one year's residence, shall be deemed a free citizen.

XLI. That a school or schools shall be established by the Legislature, for the convenient instruction of youth, with such salaries to the masters, paid by the public, as may enable them to instruct at low prices; and all useful learning shall be duly encouraged, and promoted, in one or more universities.

XLII. That no purchase of lands shall be made of the Indian natives, but on behalf of the public, by authority of the General Assembly.

XLIII. That the future Legislature of this State shall regulate entails, in such a manner as to prevent perpetuities.

XLIV. That the Declaration of Rights is hereby declared to be part of the Constitution of this State, and ought never to be violated, on any presence whatsoever.

XLV. That any member of either House of General Assembly shall have liberty to dissent from, and protest against any act or resolve, which he may think injurious to the public, or any individual, and have the reasons of his dissent entered on the journals.

XLVI. That neither House of the General Assembly shall proceed upon public business, unless a majority of all the members of such House are actually present: and that, upon a motion made and seconded, the yeas and nays, upon any question, shall be taken and entered on the journals; and that the journals of the proceedings of both Houses of the General Assembly shall be printed, and made public, immediately after their adjournment.

This Constitution is not intended to preclude the present Congress from making a temporary provision, for the well ordering of this State, until the General Assembly shall establish government, agreeable to the mode herein before described.

RICHARD CASWELL, *President*.

December the eighteenth, one thousand seven hundred and seventy-six, read the third time, and ratified in open Congress.

Compendium_Cornell
Page 0034

By order,

JAMES GREEN, *jun. secretary.*


1 Verified from "The Proceedings and Debates of the Convention of North Carolina, called to amend the Constitution of the State, which assembled at Raleigh, June 4, 1835. To which are subjoined the Convention act and the Amendments to the Constitution together with the votes of the People. Raleigh: Printed by Joseph Gales and Son, 1836." Appendix, pp. 409 424. Back

2 This constitution was framed by a " Congress," "elected and chosen for that particular purpose," which assembled at Halifax November 12, 1776, and completed its labors December 18, 1776. It was not submitted to the people for ratification. Back

3 See amendments. Back

4 See amendments. Back

5 See amendments. Back

**Source:**
**The Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America
Compiled and Edited Under the Act of Congress of June 30, 1906 by Francis Newton Thorpe
Washington, DC : Government Printing Office, 1909.**

**Colonial Charters Page**

© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Compendium_Cornell
Page 0035



DATE DOWNLOADED: Tue Oct 18 16:35:49 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1858-1859 28 .

ALWD 7th ed.
, , 1858-1859 28 .

Chicago 17th ed.
"," North Carolina - Public Laws, Regular Session : 28-64

AGLC 4th ed.
'' North Carolina - Public Laws, Regular Session 28

OSCOLA 4th ed.
'' 1858-1859 28

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

and 15th lines the words "first volume of public acts," and insert the words "each of the volumes embracing both the public and private acts." [*Ratified the 16th day of February,* 1859.]

## REVENUE.

**Chap. 25.**

AN ACT ENTITLED REVENUE.

District board of valuation, how appointed.

SECTION 1. *Be it enacted by the General Assembly of the State of North-Carolina, and it is hereby enacted by the authority of the same,* That at the first Court of Pleas and Quarter Sessions for each county, held after the first day of July, 1859, and at the same term every four years thereafter, the court shall appoint one justice of the peace, and two freeholders, men of skill and probity, for each captain's district in the county, who shall be styled the district board of valuation of their respective districts. The clerk shall issue a notice of his appointment to each man, within ten days, and the sheriff shall serve the same within twenty days after adjournment of the court. Should the court fail to make the required appointments, or should, from any . cause, a vacancy occur, any three justices of the peace may make the required appointments, or fill the vacancy.

Board to ascertain value.

2. This district board of valuation shall, as near as practicable, ascertain the cash value of every tract of land, or other real estate, with the improvements thereon, situate in their district, either by viewing the premises or otherwise.

May call and swear witnesses.

3. In estimating the value, the board may call and swear witnesses to testify thereto, and they shall take into the estimate any fishery appurtenant thereto or used with the land ; also all mines of metal, stone or coal, or other material discovered, or supposed to exist, whereby the price of land is enhanced ; also, all machinery and fixtures for manufacturing or mechanical purposes, that have been erected or used on the land. When a tract of land shall be in one or more districts, the board of the district in which the owner resides shall ascertain the value of the whole tract ; and if the owner reside in neither of the districts, the board

of the district in which the larger part may lie, shall ascertain the value of the whole.

4. The owner of the land, or (if he be a non-resident) his agent shall furnish the district board with a list, including land entries, setting forth the separate tracts, and also the several contiguous bodies or tracts of land owned by him in the district, together with the names of the water courses, or other noted places on, or nearest to which they may be situated, and the number of acres in each separate tract or contiguous body of land. *Owner to furnish list.*

5. Town lots shall be listed separately, and each lot be numbered according to the plot of the town. Each separate body or tract of land, and each town lot shall be separately and distinctly valued and returned. *Town lots.*

6. The district boards shall, in each case, administer the following oath to the person furnishing the required list: "You, A. B., do solemnly swear that the list, by you furnished, contains a full statement of every tract of land and town lot in this district, for the taxes of which you are liable, either in your own right or the right of any other person, either as guardian, attorney, agent or trustee, or in any other manner whatsoever, to the best of your knowledge and belief, so help you God." *Oath.*

7. If any person shall refuse to furnish the list required above, or to take the oath prescribed in the preceding section, he shall be deemed guilty of a misdemeanor, and the justices of the peace of said board shall bind him over to appear at the next term of the Superior Court of the county to answer the charge; and, on conviction or submission, he shall be fined at the discretion of the court. *Refusal to take oath.*

8. When the owner of the land, or (if he be a non-resident of the State) his agent, be not a resident of the district where the land is situated, the required list, with affidavits of the same import as the above required oath, subscribed and sworn to before and certified by a justice of the peace, may be transmitted to the district board of valuation, and if received before the board shall be ready to value the land contained in the list, such list shall be received as though tendered and sworn to by the owner or agent in person. *Non-residents.*

9. When the board of valuation are not furnished with a list sworn to as above required, or the owner or agent refuses to answer to the correctness of the statement as to the number of acres contained in any tract of land, they may procure a county or other surveyor, and have the same surveyed.   And the surveyor may recover the amount of his fees and all expenses out of the owner of the land, before a justice of the peace, by warrant or attachment.

*When list is not furnished.*

10. The district boards of valuation shall, as soon as practicable after their appointment, proceed to value all real property in their respective districts, as above directed, complete the lists by the first of January, after their appointment, and annex the following affidavit, subscribed and sworn to before a justice of the peace, who shall certify the same : "We do solemnly swear that we have diligently enquired, and do not believe that there is any real property in the —— district of —— county, subject to taxation, that is not entered and valued in the above list, and the foregoing valuation of real property, with the improvements thereon, and privileges thereto attached, is in our judgment and belief the actual value thereof in cash ; and that in assessing the same, we have endeavored to do equal justice to the public and to the individuals concerned, so help us God."   This list and valuation shall remain in the hands of the justice of the peace of the board, and be open to the inspection of any one who wishes to examine it, until returned as hereinafter directed.

*Boards to value real property.*

11. On the second Monday of January, after the appointment of the district boards of valuation, the persons who were appointed as justices of the peace to be members of the different district boards, shall meet at the court house, and organize themselves into a county board of valuation, by electing, by ballot, one of their number chairman, and another secretary.   In case a justice of the peace of any district board, from any cause cannot attend, the older of the two members of the board shall take his place.

*Justices to meet.*

12. To this county board of valuation shall the district boards of valuation make returns of their lists.   This board shall carefully examine and compare all the lists, and if, in their opinion, the real property throughout the county shall

*Boards to make returns of lists.*

not have been assessed by a uniform standard of value, they may re-assess any district or any separate tract or tracts or lots of land.

13. If any one deem that too high a valuation was put on his land, he may apply to the county board of valuation for redress, and they shall duly consider the case and decide as in their judgment is right. The board may call, swear and examine witnesses, or in person view the land about the value of which they are in doubt. *When valued too high.*

14. Two-thirds of the entire number of the members, composing the county board of valuation, shall form a quorum for the transaction of business, and the decision of a majority of the members present shall stand as the decision of the board. *Two-thirds to be a quorum.*

15. If in the opinion of the county board of valuation, any tract or tracts of land or town lots have been assessed at too low a value, they shall make lists of such tracts or lots, and post them in at least two conspicuous places in the court house, at the time of their adjournment. After they shall have examined and compared the lists, heard the complaints of all who may feel themselves aggrieved by the valuation of their property, the board shall post the lists as above required, and adjourn until the first Monday in April following, when they shall again meet at the court house, hear the complaints of all who may feel themselves aggrieved by their former action, or by the original valuation, and decide each case as to them may appear right; and from this decision there shall be no appeal. *When valued too low.*

16. When the county boards of valuation shall have performed the duty on them imposed, they shall return the lists receive of the district boards of valuation, as by them revised and corrected, to the clerk of the county court, before whom they shall subscribe and swear to the following affidavit annexed to the lists returned: "We solemnly swear that the foregoing lists have been carefully examined and compared, and, in our judgment and belief, they do, as now corrected, exhibit the actual cash value of every tract or lot of land in this county, with the improvements thereon and privileges thereto attached; and in the discharge of our duties we have endeavored to do equal justice to the public *Lists to be returned to clerk.*

and the individuals concerned, so help us God."   The clerk, on receiving the lists from the county board of valuation, shall record them in alphabetical order, keeping the return of each district separate from the other.

**Compensation.**   17. Each member of the county and district boards of valuation shall receive, out of the county treasury, such compensation as the county court may allow, which, however, shall in no case exceed two dollars a day for the time engaged in the discharge of his duties.

**Takers of tax lists—how appointed.**   18. At the first court of pleas and quarter sessions of each county, held after the first day of April in each year, the court shall annually appoint, for each captain's district, a justice of the peace or a freeholder of known skill and probity, to take the lists of taxable subjects, and the names of the appointees and of the districts for which they were appointed, shall, during the term, be advertised at the court house, by the clerk.   Should the court fail to make such appointments, any three justices of the peace of the county may meet at the office of the county court clerk, on or before the first day of July, and appoint the takers of the lists of taxables, and the clerk shall record such appointments.

**Appointments of takers of tax lists.**   19. Notices of all appointments of takers of tax lists, as soon as made, shall be issued by the clerk to the sheriff, who shall serve them within ten days on each appointee, whose duty it shall be to advertise at three several places within the district, at least ten days before the time of listing, the places and times where and when he will attend for the purpose of receiving the lists of taxables; and the days thus determined on shall be between the second Monday in July and first Thursday in August.

**Persons incapable of taking lists.**   20. Should any person appointed to take the list of taxables, from any cause, become incapable to perform the duties, another shall be appointed by any three justices of the peace of the county, to be notified by the sheriff for that purpose, and the person thus appointed shall take the list of taxables.

**Penalty for refusing to serve.**   21. If any person appointed to assess the value of lands, or to take the lists of taxables, shall refuse or wilfully fail to discharge the duties of his appointment, he shall be deemed guilty of misdemeanor.

22. Every person appointed to take the list of taxables, shall, before he enters upon the discharge of his duties, take the following oath, administered by a justice of the peace: "I, A. B., do solemnly swear that I will well and faithfully *Oath.* discharge the duties imposed by law on me as the taker of the list of taxables in ——— district, ——— county, without prejudice or partiality, to the best of my skill and ability, so help me God."

23. Every person appointed to take the list of taxables, *Powers of takers of tax lists.* shall, on taking the above oath, be invested with full power to administer oaths, and with all the other powers of a justice of the peace, so far as the same may be necessary to the proper discharge of his duties. Every person so appointed shall receive such compensation for his services as the county court may in its discretion allow, to be paid out of the county treasury.

24. Every taker of the list of taxables shall be furnished, *Clerk to furnish copy of returns by preceding board.* by the clerk of the county court, with a fair copy of the returns made by the last preceding board of valuation of the assessment of real estate in his district, and with the necessary number of printed forms of tax bills, furnished by the comptroller, under the provisions of this act.

25. All the property and other subjects of taxation shall *To be taxed annually.* be annually taxed, as by this act enacted, unless such property be expressly exempt from taxation by this or some other act; and the property and estate hereby exempted *Exemptions.* from taxation, are all such and their profits as may belong to the United States, or to this State, or may belong to or be set apart and exclusively used for the university and colleges, institutes, academies and schools for the education of youth, or the support of the poor or afflicted, or specially set apart for and appropriated to the exercises of divine worship or the propagation of the gospel, or such as may be set apart and kept for grave yards belonging to churches, religious societies, cities, towns or counties.

26. The taxes shall be annually collected and paid: First, *How collected and paid.* to the sheriffs, on all property and subjects of taxation required to be listed, as per schedule A; secondly, to the sheriffs, on all property and subjects of taxation which are not required to be listed, but an account of which is to be

3

Compendium_Cornell
Page 0042

1858-'59.——Chap. 25.

rendered on oath to the sheriffs, as per schedule B; thirdly, to the clerks of courts, and to the treasurer of the State, as per schedule C.

## Schedule A.

27. The following subjects shall be annually listed, and be taxed the amounts specified:

**Land.**
(1) Real property, with the improvements thereon, (including entries of land,) twenty cents on every hundred dollars of its value.

**Polls.**
(2) Every taxable poll eighty cents; *Provided*, That the county court may exempt from poll tax such poor and infirm persons, and disabled and insane slaves as they may declare and record fit objects of exemption.

**Gates, &c.**
(3) Every toll gate on a turnpike road, and every toll bridge, five per cent. on the gross receipts, and every gate permitted by the county court to be erected across a highway, fifteen dollars.

**Ferries.**
(4) Every ferry one per cent. on the total receipts of tolls during the year.

**Studhorses, &c.**
(5) Every studhorse or jackass, let to mares for a price, belonging to a resident of the State, six dollars, unless the highest price demanded for the season for one mare shall exceed that sum, in which case the amount thus demanded shall be paid as tax. The subject shall be listed, and the tax paid in the county in which the owner resides.

**Interest, &c.**
(6) Every dollar of net interest, not previously listed, received or accrued, (whether demandable or not,) on or before the first day of July of every year, on bonds or certificates of debt of the United States, of this State, (unless exempt by chapter 90 of the Revised Code, entitled "Public Debt,") or of any other State or government, or of any county or corporation, municipal or private, or on any bond, note, contract, account, or other claim or demand against solvent debtors, wherever they may reside, four cents.

**Dividend and profit.**
(7) Every dollar of net dividend or profit, not previously listed, declared, received, or due on or before the first day of July in each year, upon money, or capital invested in steam vessels of twenty tons burden or upwards, or in shares in any bank or other incorporation or trading company, four cents.

(8) Such net interest, dividend and profit shall be ascer- How ascertain-
tained by deducting from the aggregate amount of interest, ed.
dividends and profits accrued in favor of the person listing,
the amount of interest accrued against him during the year
ending on the first day of July.

(9) Every note shaver, or person who buys any note or Note shavers.
notes, bond or bonds made by individuals, shall list the
profits made and received or secured on all such purchases
made by him during the year ending on the first day of
July, whether made for cash or in exchange for other notes
or bonds, and pay a tax of ten per cent. on the aggregate
amount of such profits, in addition to the tax imposed by
this act on the interest he may receive on such notes or
bonds; *Provided*, There shall be no deduction made from
the profits in consequence of any losses sustained.

(10) Every person resident in this State, engaged in the Negro traders.
business of buying and selling slaves, whether the purchases
or sales be made in or out of the State, for cash or on a
credit, one-half of one per cent. on the total amount of all his
purchases, during the twelve months ending on the first day
of July of each year.

(11) Every person resident in this State, not a regular Not regular
trader in slaves, who may buy a slave or slaves to sell again, traders.
whether such purchase or sale be made in or out of the
State, for cash or on credit, one-half of one per cent. on the
total amount of his purchases during the twelve months
ending on the first day of July of each year.

(12) Every carriage, buggy or other vehicle kept for Carriages, &c.
pleasure or for the conveyance of persons, of the value of
fifty dollars or upwards, one per cent. on its value.

(13) All gold and silver plate, and gold and silver plated Plate, &c.
ware, and jewelry worn by males, including watch-chains,
seals and keys, when collectively of greater value than
twenty-five dollars, one per cent on their entire value.

(14) Every watch in use one per cent. on the value; Watches.
*Provided*, That all watches worn by ladies shall be exempt
from taxation.  Every harp in use, $2.50; every piano in
use, $1.50.

(15) Every dirk, bowie-knife, pistol, sword-cane, dirk-cane Dirks, &c.
and rifle cane, used or worn about the person of any one

at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

*Dentists, physicians, &c.* (16) Every resident surgeon-dentist, physician, lawyer, portrait or miniature painter, daguerrian artist, or other person taking likenesses of the human face: every commission merchant, factor, produce broker, and auctioneer; every State and county officer, and every person in the employment of incorporated or private companies, societies, institutions or individuals, and every other person, (except ministers of the gospel and judges of the superior and supreme courts) whose annual total receipts and income, (whether in money or otherwise) in the way of practice, salary, fees, wages, perquisites and emoluments, amount to, or are worth five hundred dollars or upwards, one per cent. on such total receipts and income.

*Liquors, &c.* (17) Every resident of the State that brings into this State, or buys from a non-resident, whether by sample or otherwise, spirituous liquors, wines or cordials for the purpose of sale, ten per cent. on the amount of his purchases. Every person that buys to sell again, spirituous liquors, wines or cordials from the maker in this State, his agent, factor or commission merchant, five per cent. on his purchases.

*Collateral descent.* (18) Upon all real and personal estate, whether legal or equitable, above the value of one hundred dollars, situated within this State, which shall descend, or be devised or bequeathed to any collateral relation, or person, other than a lineal ancestor or descendant, or the husband or wife of the deceased, or husband or wife of such ancestor or descendant, or to which such collateral relation may become entitled under the law for the distribution of intestates' estates, and which real and personal estate may not be required in payment of debts and other liabilities, the following per centum tax upon the value thereof, shall be paid:

(*Class* 1) If such collateral relation be a brother or sister, a tax of one per cent.

(*Class* 2) If such collateral relation be a brother or sister of the father or mother of the deceased, or child of such brother or sister, a tax of two per cent.

(*Class* 3) If such collateral relation be a more remote re-

lation, or the devisee or legatee be a stranger, a tax of three per cent.

(19) The real estate liable to taxation shall be listed by the devisee or heir in a separate column, designating its proper per cent. tax. *Who to list.*

(20) The personal estate shall be liable to the tax, in the hands of the executor or administrator, and shall be paid by him before his administration account is audited, or the estate settled, to the sheriff of the county. *Personal estate liable.*

(21) If the real estate descended or devised, shall not be the entire inheritance, the heir or devisee shall pay a *pro rata* tax corresponding with the relative value of his estate or interest.

(22) If the legacy or distributive share to be received shall not be the entire property, such legatee or distributee shall, in like manner, pay a *pro rata* part of the tax, according to the value of his interest.

(23) Whenever the personal property in the hands of such executor or administrator (the same not being needed to be converted into money in the course of the administration) shall be of uncertain value, he shall apply to the county court, to appoint three impartial men of probity to assess the value thereof; and such assessment being returned to court, and confirmed, shall be conclusive of the value.

28. Every person shall at such time and place as shall be designated by the persons appointed to take the list of taxables, list all the real and personal estate, and other taxable subjects enumerated in Schedule A of this act, which were his property, or in his possession, or were the subjects of taxation on the first day of July, of that year. *Real and personal estate to be listed.*

29. Lists of taxables of testators, intestates, minors, lunatics, insane persons, absentees, and other estates held in trust, shall be rendered by the executor, administrator, guardian, agent, trustee, or *cestui que trust* as the case may be. *Estates held in trust, &c.*

30. Real estate shall be listed in the county where situated, and where a tract of land is divided by a county line, shall be listed in the county in which the larger portion shall be situated; except when the owner resides in one of the counties in which a portion of the tract is situated, in which case he shall list in the county in which he resides. Where *Where to be listed.*

Compendium_Cornell
Page 0046

the Pedee and main Yadkin river shall be the dividing line between counties, in that case the land shall be listed in the county where the same shall be situated.

**Where land has been divided.** 31. Where any tract of land, or town lot, shall have been divided after valuation by the board of valuation, the taker of the tax lists shall return the separate value of each part, making the aggregate value of the parts equal to the board valuation of the entire tract or lot, and the taker of the list may swear and examine witnesses to aid him in making the return correctly.

**Increase of value from mines, &c.** 32. When land or town lots, after valuation, shall increase in value by reason of mines of metal, coal, or other valuable thing being discovered or worked, or by reason of new buildings being erected; or where land or town lots, after valuation, shall decrease in value by reason of fire, or other extraordinary causes, or by reason of failure of mines, the person taking the tax list shall appoint and swear two respectable and disinterested freeholders, who, with him, shall re-value said land or lot, and such value shall be returned on the list.

**Listing of polls, &c.** 33. Every poll that is, or will be of the required age on the first day of July of any year, shall be listed that year. Every owner, if in the State, shall list his slaves in the county in which he resides; and if the owner be a non-resident of the State, the hirer or person who has the slaves in possession, shall list the same and pay taxes. Slaves hired out beyond the limits of the State shall be listed by the owners as well as those employed within the State.

**Where to be listed.** 34. Such slaves and other taxable personal estate as are employed on the land of the owner, shall be listed in the county in which the land is listed.

**Free persons of color.** 35. Every head of a family, or owner of land or town lot, who, on the first day of July shall have a free person of color subject to taxation, as a member of his family, or in his employment, or living on his land, or in his house, shall list such person for taxation, and pay the tax.

36. Personal property, and other subjects of taxation—unless otherwise directed in section 34—shall be listed in the district where the owner or lister resides; but if the owner

reside out of the State, they shall be listed in the district where his agent, or the person liable for the tax may reside.

37. At the time and place appointed by the taker of the tax lists, the inhabitants of the district shall attend, and the taker of the list shall read over to each one giving in his list, all the articles and subjects of taxation, and thereupon he shall render to the taker of the list, his list of taxables, and at the same time take the following oath: "You, A. B., do solemnly swear that you have rendered a true and full statement of all subjects of taxation which you, in your own right, or as agent of, or in trust for any other person, or in any other capacity are by law required to list for taxation, according to your best knowledge, information and belief, so help you God." *Inhabitants to attend to list taxables.*

38. No taker of a tax list shall take the list of any one without administering the foregoing oath, on pain of paying one hundred dollars to any one who will sue for it: *Provided*, That females, aged and infirm persons, and persons not resident in the county, or absent from the county during the days of listing taxables, may transmit their lists to the taker of the tax lists, with the foregoing oath subscribed and sworn to before, and certified by a justice of the peace, which list, if transmitted to the taker of tax lists, on or before the day appointed for taking the lists, shall be entered by him as though sworn to in his presence. *Taker of tax list to administer oath.*

39. If any person shall refuse to take the oath prescribed in section 37 of this act, he shall be deemed guilty of a misdemeanor, and the taker of the tax lists shall forthwith bind him over to appear at the next term of the superior court of the county, to answer the charge, and on conviction or submission, he shall be fined one hundred dollars, at least, more than the amount of his taxes. *Penalty for refusing to take oath.*

40. If any person neglect to list his taxables on the day or days appointed for that purpose, he may list at any time before the lists are returned to the court, under the same rules and regulations as laid down for listing on appointed days, on paying to the person taking the list twenty-five cents, as compensation for his extra trouble. *Neglect to list.*

41. Every taker of the list of taxables shall set down on the blank lists furnished by the clerk, each article or sub- *Duties of list takers.*

ject of taxation in its proper column, against the names of the persons listing, arranged in alphabetical order, and return the same to the clerk of the county court, at the term next after the time prescribed for taking the lists. He shall further make out a list of all the persons that should have listed in his district, and shall have failed to do so, and return the same, together with the copy of the last assessments of real estate in his district, as furnished to him by the clerk, under the provisions of this act, at the same time that he makes the return of the list of taxables.

**Endorsement on returns, &c.** 42. Each return thus made, shall have the following endorsement: "I, A. B., appointed to take the list of taxables in ——— district, do declare on oath I have taken, that the within lists correctly set forth all the property and other subjects of taxation required to be listed, as rendered to me by the persons listing the same; that in each case, the list of each person listing was rendered on oath in the manner prescribed and enjoined by law; and that further, the list of persons who failed to list, as required by law, contains the name of every delinquent in the district for which I was appointed, to the best of my knowledge and belief;" which endorsement shall be signed by the person making the return, in the presence of the clerk of the county court, who shall attest the same; and without such endorsement, signed and attested, as herein required, the return shall not be received unless it can be made to appear to the satisfaction of the court, that the taker of the list of taxables is prevented from attending the court by sickness or other unavoidable cause.

**When county court may take list.** 43. The county court, on the prescribed oath, may take the list of any person applying to list his taxables at any term of such court, before the first day of March, upon his paying to the clerk one dollar for recording the same.

**Relief for overcharge.** 44. If any one shall be charged with more polls or other subjects of taxation than he is liable for, he may apply to the county court for relief, and if the court shall find that he has cause for complaint, it shall direct the clerk to render a true account thereof, and the account thus rendered, certified by the clerk, shall be returned to the comptroller,

who shall credit the sheriff with the overcharge in his settlement of that year.

45. If the application for relief be made to the court after Justices to examine the case. the sheriff shall have settled the accounts with the comptroller, the court (twelve or a majority of the justices being present) shall carefully examine the case, and if, in its opinion, the applicant is entitled to relief, shall direct the clerk to record on the minute docket the cause of complaint and the amount which, in the opinion of the court, should be refunded to the applicant. The clerk shall make out a copy of such record, certify the same under the seal of the court, and deliver it to the applicant, who shall pay to the clerk a fee of fifty cents. Such copy shall then be transmitted to the comptroller of the State, who, on finding the proceedings in conformity with the requirements of this section, shall credit the treasurer of the State with the amount specified, and make an endorsement to that effect on the transcript. The treasurer shall, on presentation of such copy, thus endorsed, pay to the holder of the same the amount to be refunded.

46. The clerk on receiving the returns shall record them Clerk to record the lists. at length, in alphabetical order, keeping the return of each district separate from the other: and at the next county court, after they are directed to be made, shall set up in some conspicuous part in the court house, a copy of the whole, adding to the taxables of each person the amount of tax for which he is liable; and any clerk offending against any of the duties prescribed in this section, shall forfeit and pay one hundred dollars.

47. The clerk on or before the first day of June next af- Clerk to make return to Comptroller. ter the lists are returned, shall return to the comptroller an abstract of the same, showing the number of acres of land, and their value, and the value of town lots, and the number of white, free black, and slave polls, separately, and specify every other subject of taxation, and the amount as State tax paid on each subject, and the amount paid on the whole. At the same time the clerk shall return to the comptroller an abstract of the lists of the poor, county and school taxes, paid in his county, setting forth separately the tax levied on each poll, and on each hundred dollars value of real pro-

perty, for each purpose, and also the gross amount of taxes of every kind levied for county purposes.

**Penalty on clerk.** 48. If any clerk shall offend against any of the duties prescribed in the preceding section, or shall fail to return to the comptroller a copy of the sheriff's returns, made, sworn to and subscribed, as required in section 89 of this act, he shall forfeit and pay to the State one thousand dollars, to be recovered against him and the sureties of his bond, in the superior court of Wake county, at the term next after the default, on motion of the attorney general; and it shall be the duty of the comptroller to inform the attorney general of such default.

**Clerk's duties.** 49. The clerk of the county court shall, on or before the first day of April, in the year ensuing the taking the lists, deliver to the sheriff of the county a fair and accurate copy, in alphabetical order, of the tax lists, which shall contain the public tax, or tax payable to the public treasurer, and the taxes imposed by the justices of the county court; it shall likewise designate the separate amount due from each subject of taxation, and extend the aggregate amount due from each person in columns; and if any clerk shall fail to furnish the sheriff at the time prescribed with a copy of this description, he shall be deemed guilty of a misdemeanor, and the sheriff shall inform the grand jury thereof.

**Pay to clerks.** 50. For services of the clerks in relation to the taxes not in this chapter specially provided for, they shall be paid by the county such sum as the court may allow.

**Tax collectors.** 51. The sheriff shall forthwith proceed to collect said taxes, and when he shall collect, by his deputies or others who are not sworn, such persons shall in open court, or before a justice of the peace of the county, take an oath, faithfully and honestly to account for the same, with the sheriff, or other person authorized to receive them.

**Receipt.** 52. The sheriff shall give to each tax-payer one receipt for the amount of his State taxes, and another separate receipt for the amount of his county taxes.

**When sureties to collect.** 53. If any sheriff shall die during the time appointed for collecting taxes, his sureties may collect them, and for that purpose shall have all the powers and means of collecting the same of the collectors and tax-payers, as the sheriff

would have had; and shall be subject to all the remedies for collection and settlement of the taxes on their bond or otherwise, as might have been had against the sheriff if he had lived.

54. The sheriff, and (in case of his death) his sureties, **To have one year.** shall have one year and no longer, from the day prescribed for his settlement and payment of the State taxes, to finish the collection of all taxes; but this extension of time for collection shall not extend the time of his settlement of the taxes.

55. The sheriff shall collect the taxes as they are set down **Duties of sheriff.** in the list, and, moreover, shall collect of all persons whose taxables are not listed, double the taxes imposed on the same subjects; and as to any land not listed, which may not have been assessed at the last assessment, the same, in estimating the double tax, shall be deemed to be of the value, by the acre, of the highest valued tract adjoining thereto.

56. Immediately on receiving the tax lists, the sheriff **Sheriff to advertise.** shall advertise the fact, and that he holds them ready for inspection. He shall also request therein all persons to inform him of any taxables which may not be listed. For the more efficient collection of the taxes the sheriff at any time from the delivery to him of the lists till the first day of October in the next year, may, and if there be need, shall distrain and sell the property of the tax payer to satisfy the same, selling first his personal, and then his real estate.

57. In each case, in which the sheriff collects by distress, **Extra compensation.** he shall be entitled to extra compensation of forty cents, to be collected with the tax.

58. If any person liable for taxes on other subjects than **Persons removing.** land, shall be about to remove from the county, after listing time and before the period for collection, the sheriff shall make affidavit thereof before the clerk, and obtain from him a certificate of the amount of such person's tax, and forthwith collect the same.

59. If any person be liable for taxes in any county where-**Persons liable for taxes in other counties.** in he shall have no property, but shall be supposed to have property in some other county, and will not pay his tax, the sheriff shall report the fact to the county court, held

Compendium_Cornell
Page 0052

next after the first day of October, and thereupon the court shall direct the clerk to issue a *fieri facias* to the sheriff of that county, returnable to the court whence it issued, for such tax and the cost of process and executing the same, which the sheriff shall execute in the manner of writs of execution in other cases; and the tax collected thereon shall be paid to the clerk of the court, and by him paid to the sheriff, to be accounted for as other taxes.

**Sale under distress.** 60. The sale under distress of personal estate for taxes shall be advertised ten days previous thereto, at three public places in the district wherein the delinquent tax payer shall reside, and if he reside not in the county, then in the district where the taxables were or ought to have been listed; and the amount of tax shall be stated in the advertisement.

**Rules for selling land for taxes.** 61. The sale of land for taxes due thereon, shall be made under the following rules:

(1) The sheriff shall return to the court of pleas and quarter sessions of his county, held next after the first day of January, a list of the tracts of land which he proposes to sell for taxes, therein mentioning the owner or the supposed owner of each tract, and if such owner be unknown, the last known or reputed owner, the situation of the tracts, and the amount of taxes for which they are respectively to be sold, which list shall be read aloud in open court, recorded by the clerk upon the minutes of the court, and a copy thereof shall be put up in some public part of the court house.

(2) The county court shall order the clerk of the court to issue notice to every person whose land is returned as aforesaid; and a copy of the notice shall be served by the sheriff on the owner, or his agent, and returned to the next county court; and if the owner be a non-resident, the clerk shall publish the same in some newspaper printed in the State, in which advertisement shall be mentioned the situation of the land, the streams on or near which it lies, the estimated quantity, the names of the owners, where they are known, and the names of the tenants or occupants of the same.

(3) The sales shall be made within the two terms next succeeding the term when the returns are made of lands to

be sold, and at such place in the county as is directed for the sale of land under execution; and the whole expense attendant on the advertising and sale, shall be chargeable on the lands and raised at the sale.

(4) The whole tract or contiguous body of land belonging to one delinquent person or company, shall be set up for sale at the same time, and the bid shall be struck off to him who will pay the amount of taxes, with the expenses aforesaid, for the smallest part of the land.

(5) At the second term next succeeding for the term when the returns are made of lands to be sold, the sheriff shall return a list of the tracts actually sold for taxes, the quantity of the tract bought and to be laid off, the name of the purchaser, and the sum paid to the sheriff for taxes and charges, which list shall be read aloud by the clerk in open court, shall be recorded in the minutes of the court, and a copy thereof shall be put up by the clerk, during the term, in some public part of the court house.

62. If any sheriff or clerk shall fail to perform any of the duties prescribed in sections 60 and 61 of this act, he shall forfeit and pay to the person aggrieved one hundred dollars and shall moreover be liable, he and his sureties on his bond, for all such damages as any one may sustain by reason of such default. <span style="float:right">Penalty on clerk or sheriff.</span>

63. The land of an infant, lunatic or person *non compos mentis*, shall not be sold for taxes; *Provided, however*, That when land may be owned by such persons in common with another or others, free of such disability, the share or interest of the person so free, shall be subject to be sold for the taxes due on the whole tract; but before setting apart the quantity bid off, the purchaser by petition shall cause the tract to be divided among the tenants in common, and the share or interest of the defaulting taxpayer being set apart, the purchaser may proceed to lay off on such share the quantity by him bid off, and secure the title as before provided; and the time necessarily employed in procuring such division shall not be reckoned against the purchaser. <span style="float:right">Lunatics, &c.</span>

64. The owner of land sold for taxes under section 61 of this act, his heirs, executors or administrators, or any other person for them, may redeem the same from the purchaser, <span style="float:right">Owners of lands sold for taxes.</span>

Compendium_Cornell
Page 0054

at any time within one year after the sale, by paying or tendering in payment to the purchaser or to the county court clerk of the county where the land lies, the full amount of the price paid to the sheriff, and twenty-five per cent. thereon.

*If not redeemed, purchaser to select, &c.*

65. If the land so sold, shall not be redeemed within the period aforesaid, the purchaser may at the end of that time select the quantity of land struck off to him, out of any part of the tract or body of which the same was bid off; the said quantity to be laid off in one compact body, as nearly square as may be, and adjoining to some of the outlines of the whole tract or body of land.

*Quantity to be selected in one year.*

66. Within one year after the time of redemption shall have passed, the purchaser, at his own cost, his heirs, executors or administrators, or any of them, may procure the quantity bid off to be surveyed by the county surveyor, who shall make out and certify, under his hand, a fair plat of the survey with the courses and distances fairly and truly set forth; and if the county surveyor, on request, shall fail to make such survey and plat, then any other surveyor may make and certify the same.

*Sheriff to make title.*

67. The sheriff on being presented with such certified plat, within the year after the time of the redemption is passed, shall convey to the purchaser the land therein contained.

*Court to direct sheriff to make title.*

68. When by any provision of the law, any sheriff or officer, other than the person who sold for the taxes, shall be authorized to execute a conveyance for the land, the purchaser shall apply to the county court, and on showing to the court that such purchase has been made, and the price paid to the sheriff, who sold, and that he has paid the other taxes since accruing thereon, the court shall direct the present sheriff to execute a deed on the purchaser's producing to him a certified plat and survey, as is provided for in sections 65 and 66 of this act.

69. The purchaser of land sold for taxes, under section 61 of this act, shall be considered as taking and holding the same, subject to all the taxes accrued from the first day of April in the year preceding the purchase.

*Penalty on surveyor.*

70. If any county surveyor, being required within two months after the survey may be lawfully made, to survey

the land bid off at sale for taxes, shall wilfully fail to do so within four months after such request, he shall forfeit and pay to the purchaser, or his executor or administrator, one hundred dollars.

71. If no person will bid a less quantity than the whole land, for the taxes, the bid shall be deemed the bid of the State, and the land shall be struck off to the State as the purchaser; and the sheriff shall report in writing to the county court, at the time he returns the list of lands sold for taxes, what and whose lands are thus struck off to the State, describing them particularly, which report shall be recorded on the minutes of the court, and thereupon the title of said lands shall be deemed to have been vested in the State from the time of purchase. <span style="float:right">When to be deemed the bid of the State.</span>

72. The clerk shall, within twenty days after the return of the sheriff's report of the land sold to the State, make and certify two copies thereof; one of which he shall transmit to the comptroller, and the other deliver to the sheriff, (or to his sureties, when they act,) who shall deposit the same with the secretary of state, to be by him recorded; and the secretary shall grant to the sheriff a certificate, setting forth what and whose lands, and the quantity and value thereof, have been sold for the taxes and struck off to the State. <span style="float:right">Clerk to make and certify two copies.</span>

73. If any sheriff or other person authorized thereto, shall sell for taxes and strike off any land to the State, and shall fail duly to report the same to the county court, or to duly obtain and deposit a copy thereof with the secretary of state, the comptroller shall, in his report to the treasurer, charge such sheriff (or other person acting in his stead) with the sum of two thousand dollars, and the treasurer shall recover the same as unpaid tax. <span style="float:right">Penalty for not making return.</span>

74. Lands bid off for the State may be redeemed in like time, and under the same rules and regulations as those purchased by individuals, except the payment (which shall be double in amount of all the taxes for which they were sold) shall be made to the treasurer; and on his certificate thereof, the secretary of state shall, on being paid his fees, issue a grant to the original proprietor, his heirs or assigns, <span style="float:right">How redeemed.</span>

and at the same time shall certify the payment to the comptroller.

**Liable to entry.** 75. Lands bid off for the State shall, as to the person for whose tax the land is sold, his heirs or assigns, be liable to be entered as vacant lands, subject, nevertheless, to the right of redemption within the time prescribed.

**Sureties may report.** 76. When land shall be sold for its tax and the sheriff shall die, or otherwise become unable to report his sales, his sureties may report the same within the time prescribed, and shall proceed as to the land bid off by the State, in the same manner as the sheriff might.

**Real estate bound.** 77. When any person shall sell his real property, and shall have no estate within reach of the sheriff to satisfy the taxes due from him on any subject of taxation, the real property shall be bound for all such taxes.

**Conveyance to avoid taxes, void.** 78. Every conveyance made by any deceased person, with the fraudulent intent to evade the collection of any taxes by this act imposed, shall as against the State be void, and the taxes shall be chargeable at the suit of the State of North-Carolina on the property conveyed, in the hands of vendees and assignees.

**Lands not assessed.** 79. If the sheriff or other person shall discover that any land has not been assessed, he shall make it known to the county court; whereupon a board shall be appointed to assess the same, who shall proceed in the manner herein provided; and the court shall ascertain the amount of tax which within the ten preceding years the land has been liable for, but not paid; and the sheriff shall be ordered forthwith to collect treble the amount with interest, of all such tax, by distress or otherwise.

**Sheriffs to inform Attorney General.** 80. It shall be the duty of the sheriffs to inform the attorney general and solicitors of the State, for the circuits and counties, concerning all omissions by tax-payers, done in their respective counties to defraud the State of its revenue; and the attorney general and solicitors of the State, for circuits and counties, upon information or good cause for suspicion, that any person has omitted to render his tax list, or has failed to render an accurate and fair list of all the property, estate and subjects on and for which he is liable to be taxed, shall file a bill in equity against the person so

Compendium_Cornell
Page 0057

defaulting; and the answer of the defendant shall not be competent evidence against him in any criminal or penal prosecution whatever. And whenever suit is brought or a bill (filed) in behalf of the State, under any of the provisions of this act, it shall be done in the name of the State of North-Carolina, unless otherwise directed.

81. The comptroller, at public cost, shall have prepared and printed forms of tax lists, with all the articles and subjects of taxation to be listed under this act or any future law, mentioned separately over the heads of parallel columns, in which the amount, or quantity, or description of each article or subject to be listed is to be set down; and he shall annually furnish each county court clerk with as many such blank lists, as in the opinion of the clerk may be required to supply the takers of the lists in his county; and further, the comptroller, at public cost, shall have prepared and printed, other blank forms adapted to the returns by this act required to be made by the clerks of county courts, and sheriffs, and he shall supply each clerk and sheriff with as many such blank forms as in his opinion may be needed.

*Comptroller to furnish tax lists.*

## Schedule B.

### *Subjects taxed without being listed.*

82. The sheriff shall annually collect the taxes as set forth in this schedule, and grant to each party paying the tax, a license to carry on his business until the first day of July next ensuing, except in cases where the tax is on non resident traders in slaves, or horses and mule drovers, in which cases no license shall be required:

*Sheriffs to collect.*

(1) Every company of circus riders, or exhibitors of collections of animals, seventy-five dollars for each county in which they shall perform or exhibit for reward. Every separate exhibition (commonly known as side shows) accompanying such performers or exhibitors, which cannot be seen without the payment of a separate charge, fifteen dollars for each county in which it is exhibited for reward.

*Circus riders, &c.*

4

**Stage players, &c.**     (2) Every company of stage or theatrical players, or persons performing feats of strength or agility, or exhibiting natural or artificial objects, except amateur performers, twenty dollars for each county in which they exhibit for reward.

**Itinerant singers, &c.**     (3) Every company of itinerant singers, or performers on musical instruments, or dancers, or itinerant companies, who otherwise exhibit for the public amusement, ten dollars for each county in which they exhibit for reward.

**Insurance companies.**     (4) Every insurance company incorporated by this State, except companies for mutual assurance, who take no policy out of the State, one hundred dollars.

    (5) Every insurance company incorporated out of the State, one hundred dollars for each county in which an agency is established.

**Bank agencies.**     (6) Every agency of a bank incorporated out of the State, five hundred dollars.

**Brokers, &c.**     (7) Every money or exchange, bond or note broker, private banker or agent of a foreign broker or banker, three hundred dollars for each county in which he has an office or place of business.

**Express companies.**     (8) Every express company, ten dollars for each county in which it proposes to deliver packages.

**Billiard tables.**     (9) Every public billiard table, one hundred and twenty-five dollars; every private billiard table, twenty-five dollars.

**Bowling alleys.**     (10) Every public bowling alley, whether called a nine-pin or a ten-pin alley, or by any other name, fifty dollars; every private bowling alley, ten dollars.

**Livery stables.**     (11) Every livery stable, where horses and vehicles are kept for hire, twenty-five dollars.

**Retailers.**     (12) Every licensed retailer of spirituous liquors, wines or cordials, or retailer of malt liquors, thirty dollars. In addition to this, such retailer shall list the amount of liquors, wines and cordials as required in schedule A of this act, and pay the tax there imposed.

**Dentists, painters, &c.**     (13) Every itinerant surgeon-dentist, portrait or miniature painter, daguerreian artist, and other persons taking likenesses of the human face, ten dollars for each county in which he carries on his business: *Provided,* That such person as shall furnish satisfactory evidence to the sheriff of the

Compendium_Cornell
Page 0059

county, in which he proposes to practice, that he is a resident of the State, and has listed the receipts of his profession for the previous year, shall be exempt from the tax imposed in this paragraph.

(14) Every non-resident of the State, who, in person or by agent, shall purchase any slave or slaves in this State, shall, immediately after such purchase, become liable to pay a tax of one-half of one per cent. on the amount of his purchase, and upon his neglect or failure to pay such tax, he shall forfeit and pay the sum of one hundred dollars, which shall be collected by the sheriff, one-half to his own use and the other half to the use of the State. When the purchase was made by an agent, such agent shall be equally liable for the tax and forfeiture with his principal. *Dealers in slaves.*

* (15) Every non-resident of the State, who, either in person or by agent, brings a slave or slaves into the State, and sells, shall pay one-half of one per cent. on the amount of each sale effected. If he fail to pay this tax, the purchaser shall be liable for the same, and the sheriff of the county in which the sale was made, or in which the purchaser reside, shall collect by distress or otherwise out of the seller, if to be found in his county, and if the seller is not to be found, out of the buyer. *Non-resident dealers in slaves.*

(16) Every person that sells playing cards, a sum equal to thirty-five cents per pack on all cards sold by him during the year. *Cards.*

(17) Every person that, for himself, or as agent for another or at his regular place of business, sells riding vehicles, manufactured out of this State, one per cent. on his sales. *Vehicles.*

(18) Every auctioneer, on all goods, wares or merchandize placed in his hands by a merchant resident in the State, (whether owner or not) or by a commission merchant, one per cent. on the gross amount of sales, and if by itinerant traders, or such as are not residents of the State, five per cent. on gross amount of sales, subject to all the regulations and exemptions set forth in the tenth chapter of Revised Code, entitled "*Auctions and Auctioneers.*" *Auctioneers.*

(19) Every merchant, merchant tailor, jeweller, grocer, druggist, apothecary, produce dealer, commission merchant, factor, produce broker, and every other trader, who, as prin- *Merchants, &c.*

cipal, or agent for another, carries on the business of buying or selling goods, wares or merchandize of whatsoever name or description, and who is not taxed on his purchases in some other paragraph of this schedule, one-half of one per cent. on the total amount of his purchases, whether made in or out of the State, for cash, or on credit: *Provided,* That articles the growth or manufacture of this State, if bought in the State, and also articles the growth or manufacture of adjoining States, if brought into this State for sale by the grower or manufacturer, shall not be required to be returned in the amount of purchases, but shall be exempt from taxation.

Clothing.

(20) Every dealer in ready made-clothing (for males) one and one-half per cent. on total amount of purchases.

Patent medicines.

(21) Every person who, for himself, or as agent for another, sells patent medicines or nostrums, ten per cent. on amount of his sales.

Horse drovers, &c.

(22) Every non-resident horse or mule drover, or person who receives horses or mules to sell for a non-resident, one per cent. on the amount of each sale, due as soon as the sale is effected; and upon his neglect or failure to pay such tax in every county in which he sells, he shall forfeit and pay the sum of one hundred dollars, which shall be collected by the sheriff, by distress or otherwise, one-half to his own use, and one-half to the use of the State. Every horse or mule drover shall be considered a non-resident, unless the sheriff has satisfactory evidence that he is a resident of the State; and the sheriff shall have power and authority to examine, on oath, at any time, every horse or mule drover, or person who receives horses or mules to sell for another, as to whether he has made any sale or exchange or not, and as to whether he is a non-resident, or agent of a non-resident; and on his failure to answer, he shall be subject to the same penalty as for failure or neglect to pay such tax.

Studs & Jacks.

(23) Every stud-horse or jackass let to mares for a price, belonging to a non-resident of the State, ten dollars, unless the highest price demanded for the season, for one mare, shall exceed that sum, in which case the amount thus demanded shall be paid for the license. The payment to one sheriff, and the license under his hand, shall protect the sub-

ject in this paragraph taxed, in any county of this State. Every such stud-horse or jackass shall be considered as belonging to a non-residen:, unless the sheriff is furnished with satisfactory evidence that the owner is a resident of the State.

(24) Every person that peddles goods, wares or merchandize, either by land or water, not the growth or manufacture of this State, or any drugs, nostrums or medicine, whether such person travel on foot, or with a conveyance, or otherwise, shall first have proved to the county court that he is a citizen of the United States, and is of good moral character, and shall have obtained from the court, (who may in its discretion, make or refuse) an order to the sheriff to grant him peddler's license, to expire on the 1st of July next ensuing.  And the sheriff on production of a copy of such order, certified by the clerk of said court, shall grant such license for his county, on receipt of forty dollars tax: *Provided*, (1.) That not more than one person shall peddle under one license.  (2.) That any person who temporarily carries on a business as merchant in any public place, and then removes his goods, shall be deemed a peddler.  (3.) That nothing in this act contained, shall prevent any person from freely selling live stock, vegetables, fruits, oysters, fish, books, charts, maps, printed music, or the articles of his own growth or manufacture.  (4.) That nothing herein contained shall release peddlers from paying the tax imposed in this act, on persons who deal in the same species of merchandise, which tax shall be collected or secured in the same manner as in case of other merchants or traders.

(25) Every itinerant who deals in or puts up lightning rods, or who sells spirituous liquors, wines or cordials, in quantities from one quart to one barrel, shall be under the same rules and restrictions, and be liable to the same tax as peddlers, except that no order from court shall be required to entitle him to a license: *Provided*, That any person shall be permitted to sell any spirituous liquors, wines or cordials, made from products of his own farm without paying the tax in this paragraph imposed.

(26) Every company of gypsies or any strolling company of persons who make a support by pretending to tell for-

Compendium_Cornell
Page 0062

tunes, horse trading, tinkering or begging, one hundred dollars in each county in which they offer to practice any of their crafts, recoverable out of any property belonging to any one of the company.   But nothing herein contained shall be so construed as to exempt them from indictment, or any other penalties now imposed by law.

(27) Every freeman that shall arrive at age after the 1st of July of any year, and before an election, may pay his poll tax for that year to the ' heriff, or to his deputy, before the election, without listing.

(28) If any person bound to list taxables in his own right, or the right of another, shall fail to list the same, or any part thereof, the sheriff shall collect from him, and of his own proper estate, double the tax imposed on the property or subject not listed.

County court may release.

83. The county court may release any person from the payment of a double tax, for failing to list his taxables, in cases where it shall appear to the court by satisfactory evidence, that such failure occurred by reason of sickness of the party, at the very time when the list was taken, or when it may appear that he rendered a list, and his name was omitted to be entered, or was omitted in the duplicate prepared by the taker of the list to be returned to the clerk; or for other sufficient cause, to be judged of by the court.

To be paid to sheriffs.

84. On personal property in hands of executors and administrators bequeathed to, or as distributive shares to collateral relations or stangers, as set forth in schedule A, in connection with real estate descended or devised to collateral relations or strangers, the tax shall be paid to the sheriff direct.

To render statement to sheriff.

85. Every person that is intended to be taxed in §16, §17, §18, §19, §20, §21, and §24, of schedule B, and shall have been carrying on his business twelve months before the first day of July of any year, shall render to the sheriff a statement of the amount of his purchases (or sales, as the said paragraphs may require) of taxable articles, during the year ending on such first day of July, and shall sign and swear to an affidavit that his purchases (or sales as may be required) during that period did not exceed the amount stated, and on his paying the taxes imposed and enume

rated in schedule B., shall be entitled to a license to carry
on his business until the first of July, next ensuing.

86. Every person who is intended to be taxed in para- *To enter into bond.*
graphs 16, 17, 18, 19, 20, 21, and 24, of schedule B., com-
mencing to do business, or who shall not have been doing
business for twelve months before the first of July, shall pay
at the end of the year for which his license is issued the
taxes on his purchases or sales, as set forth in said para-
graphs of schedule B; and to secure the same, he shall, be-
fore license is delivered, enter into bond with good sureties,
payable to the State of North-Carolina, in such sum as the
sheriff may deem sufficient, conditioned that he will render
a true statement of the amount of his purchases (or sales, as
this act may require) for the period embraced in his license,
and pay his taxes thereon, on the first day of July when
this license shall expire.

87. Every person that shall carry on any business intend- *Forfeit.*
ed to be taxed, as per schedule B, without having previ-
ously received a license as required, shall, in addition to
the taxes, forfeit and pay one hundred dollars, to be collect-
ed by distress or otherwise, by the sheriff, one-half to his
own use, and the other half to the use of the State.

88. Every person intended to be taxed by sections 1, 2, 3, *Shall show license.*
13, 23, 24, 25 and 26, of schedule B, shall show his license,
to any justice of the peace or constable, who may demand
a view thereof; and it shall be the duty of every constable
to demand such a view.   And if such person fail to exhibit
his license on demand thus made, he shall forfeit and pay
one hundred dollars, recoverable on a warrant before a jus-
tice of the peace, one-half to the person suing out the war-
rant, and one-half to the use of the State, to be paid over
to the sheriff and accounted for as taxes.

89. Every sheriff shall keep a record of the taxes collect- *Sheriff to keep record of taxes collected.*
ed by him from the clerks of courts, and under schedule B
of this act, and of all forfeitures, arrears from insolvents,
double taxes, and taxes on unlisted subjects, and on or
before the second Monday in August, shall deliver to the
clerk of the county court, a statement setting forth all sums
received to that date, not previously accounted for, the date
of each receipt, the person from whom received, the amount

received from each person, the subjects on which received, and the aggregate amount, accompanied by an affidavit, signed and sworn to before the clerk and attested by him, that the statement is correct, and that no receipt has been omitted. And the clerk shall, before the third Monday in August, send a duplicate of said statement and affidavit to the comptroller of the State, register the same in a book kept in his office for that purpose, and keep a copy of the same posted in a conspicuous place in the court house, until the first day of January next ensuing.

Clerk's ab-
stract.

90. The clerk, on application of the sheriff, shall deliver to him a true abstract of such return, which the sheriff shall deliver to the comptroller when he settles his accounts; and if any sheriff shall fail to deliver such abstract to the comptroller, the comptroller shall add to the taxes for which such sheriff is liable, one thousand dollars, and so report his account to the treasurer.

Forfeiture of
Clerk.

91. If any clerk shall fail to perform any of the duties required in the preceding three sections of this act, or shall falsely certify to the abstract of the sheriff's return, he shall be deemed guilty of a misdemeanor, and on conviction, shall be removed from office.

92. If any person taxed in schedule B of this act, refuses or fails to pay the taxes imposed, and leaves the county before the sheriff can collect the forfeiture, the sheriff, in his own name, may recover the tax and forfeiture out of the delinquent, in any superior court of the State. The tax and forfeiture, when collected, shall be paid over by the sheriff, as originally required.

### Schedule C.

93. The following subjects shall be taxed the amounts specified, and the taxes collected and accounted for thus:

Corporations.

(1) Every corporation that might become incorporated by letters patent, under the provisions of chapter 26, Revised Code, entitled "Corporations," but shall fail to do so, and apply to the General Assembly and obtain a special act of incorporation, or shall obtain an act to amend their charter, whether it had been secured by letters patent under  id

law or by a special act, twenty-five dollars for each act to
incorporate or to amend; which tax shall be paid to the
treasurer of the State.

(2) No corporation shall organize under such special act **Corporations.**
of incorporation obtained as set forth in the preceding sec-
tion, or derive any benefit under such act to amend their
charter, until it shall first have obtained a certified copy of
such act from the secretary of State, and the secretary shall,
in no case, furnish such copy, until the company applying
shall have delivered to him the treasurer's receipt for the
tax assessed in the preceding section; which receipt the
secretary shall file in his office.

(3) The president and cashier of each of the banks in this **Bank taxes.**
State, on or before the first day of October, in each year,
shall pay into the public treasury the following tax, to-wit:
It the profits divided among the stockholders of the banks
under their charge, during the year, amounted to not less
than six, and not more than seven per cent., one-half of one
per cent. on the stock owned by individuals or corporations;
if over seven and not more than eight per cent., three-fourths
of one per cent. on the stock thus owned; if more than
eight per cent., one per cent. on the stock thus owned.  In
case the said officers of any bank shall neglect or fail to pay
the tax as herein required, said bank shall pay double the
amount of said tax, and the same shall be sued for and re-
covered by the attorney general in the name of the State,
in the superior court of the county of Wake.

(4) Every license to an attorney to practice law in the **Attorneys**
county or superior courts, fifteen dollars, to be paid at the **license.**
time of obtaining the same, to the clerk of the supreme
court, who shall before the first day of October in each year,
render to the treasurer of the State a list, setting forth the
names of the persons, from whom received, and the amounts
received; and pay into the public treasury the total amount,
less five per cent. commission, for receiving and accounting
for the same.

(5) Every marriage license, one dollar; every mortgage **Marriage**
deed, marriage contract, and deed in trust, made to secure **licenses, &c.**
debts or liabilities, one dollar; and every other deed con-
veying title to real estate where the consideration is three

hundred dollars or upwards, fifty cents, payable to the clerk of the county court. No clerk shall grant such license, or admit to probate such instrument, until the tax shall have been paid, and the receipt shall be endorsed on such license or instrument, and be registered with the same.

(6) Every broker, not a resident of the State, shall pay to the cashier of the bank from which he draws any exchange or specie, one-quarter of one per cent. on all such sums drawn, to be accounted for to the State treasury by the said cashier on oath.

**Clerk to keep record.** 94. Every clerk shall keep a record of the taxes received by him, and to the county court next preceding the first of July of each year, on the first day of the term, shall return a statement setting forth the date of each receipt, the person from whom received, the subject on which received, and the amount received from each person, and the aggregate amount received up to that date, and not previously accounted for; and to this statement the clerk shall attach an affidavit that such statement is correct, and that no receipt by himself or a deputy of his, has been omitted; which affidavit shall be sworn to and subscribed in presence of the chairman of the court, who shall attest the same. And the county court clerk shall record such statement and affidavit in a book kept for that purpose in his office, and keep a copy of the same posted in some conspicuous place in the court house, from the time at which the return shall be made, until the first day of January next ensuing. And on or before the second day of the term, the clerk shall pay the sheriff the amount of the taxes received, as set forth in said return, less three per cent. commissions, for receiving and accounting for said taxes.

**Penalty on clerk.** 95. If any clerk shall fail to perform any duties required in the preceding section, he shall be deemed guilty of a misdemeanor, and on conviction shall be removed from office. And if any clerk shall fail to pay over to the sheriff the amount of the taxes in his hands on the day specified, the sheriff shall inform the county solicitor of the default, and the county solicitor shall bring suit on his bond, and shall recover, in addition to the taxes withheld or not ac-

counted for, one hundred dollars; and the whole recovery shall be paid into the treasury by the sheriff.

96. The sheriffs, and all receivers of public moneys, shall yearly settle their accounts with the comptroller, between the last day of June and the first day of October, (unless where the settlement of such persons may be specially directed to be made in another manner, or at another time,) so that it may be known what sum each one ought to pay into the treasury; and the comptroller shall forthwith report to the public treasurer the amount due from each accountant, setting forth therein (if a sheriff's account) the net amount due from the sheriff to each fund; and therefor the treasurer shall raise an account against such person, and debit him accordingly. *Settlement with Comptroller.*

97. The sheriff in making his settlement as aforesaid shall designate in a list by him rendered at the time, the different sources from which were raised the taxes accounted for by him, and the particular amount of tax received from each source; and the comptroller shall give to each sheriff a certified copy of such list, which the sheriff shall deposit with the clerk of the county court of his county, for public inspection; in such settlement the sheriff shall be charged with the amount of public tax as the same appears by the tax list transmitted to the comptroller; also, with all double taxes, and taxes on unlisted property by him received, and with all other tax which he may have collected, or for which he is chargeable. *Return of sources of taxation.*

98. He shall be credited (1) with the amount of State tax on land bid off by the State, with the cost attendant on the sale and procuring the title, and with commissions on the whole, including the county revenue, on producing the certificate of the secretary of State, as is provided in section 72 of this act. (2) With all insolvent taxables allowed by the court as hereinafter provided; and when the sheriff shall be required to settle before such taxables are allowed, he shall be credited with them in the next year's settlement, or the sheriff may at any time thereafter, on producing certificates of such taxables allowed, procure an order from the comptroller on the treasurer for the amount thereof. And, in like manner, the sheriff shall have credit for any over- *Credits to sheriffs.*

payment made in former settlement, by reason of any error in the clerk's abstract of taxables.

**Insolvents.**

99. No insolvent taxables shall be credited to the sheriff in his settlement with the comptroller, but such as shall be allowed by the county court ; a list whereof, containing the names and amounts, and subscribed by the sheriff, he shall return to the court at some term preceding said settlement, and the same shall be allowed only on his making oath that he has been at the dwelling house or usual place of abode, of each of the tax-payers, and could not there or elsewhere in the county, find property wherewith to discharge his taxes, or such part thereof as is returned unpaid ; and that the persons contained in the list were insolvent, at and during the time, when, by law, he ought to have endeavored to collect their taxes ; such list shall be recorded on the minutes of the court, and a copy thereof, within ten days after its return, shall be set up by the clerk in some public part of the court house ; *Provided*, That when the sheriff may be desirous of obtaining his allowance for insolvent poll tax, that instead of swearing to his list, as the law now directs, the same may be submitted to the county court, a majority of justices being present, who shall consider and examine said sheriff's list, and make him such allowance as they may think just and proper.

**Returns of insolvents, &c.**

100. If any sheriff shall return to court as insolvent the name of a person who is not listed, or has paid his taxes for the year, or shall, by himself or his deputy, collect from any person his tax for the year, for which he has been returned an insolvent, without accounting for the same ; or if any clerk shall fail to record or set up the returns as required in the preceding section, the person so offending shall forfeit and pay to the State one hundred dollars, and the county solicitor shall prosecute a suit for the same.

**Oath of sheriffs or other collectors.**

101. Every sheriff or other person allowed by law to collect and account in his stead, on settling his accounts with the comptroller, shall take the following oath, administered by the comptroller, and subscribe the same in the presence of the comptroller, by whom it shall be attested ; and the comptroller shall make no settlement with the sheriff, or any one in his stead, unless he have sworn to and subscri-

1858-'59.——Chap. 25.

bed the oath as hereby required: I, A. B., sheriff of the county of ——, do on this the —— day of ——, one thousand eight hundred and ——, make oath that the list now given in by me, is to the best of my knowledge and belief, complete, perfect and entire, and doth contain the full amount of all moneys, by me or for me received, or which ought to have been received, on account of the public taxes for the year one thousand eight hundred and ——, on listed and unlisted property; and all double taxes, and all taxes received from clerks of courts, and from insolvents not heretofore accounted for, and all taxes received, or which ought to have been received from any other and all other sources whatsoever. And I do further make oath, that if I, or any person for me, shall hereafter collect any unpaid tax now due, and not rendered in said list, I will render a true account thereof, within one year after collecting the same."

102. If the comptroller at any time shall have just cause to suspect that any sheriff or other person accounting in his stead may have made a false return, or sworn falsely in any matter relative to the collecting or accounting for any tax, he shall thereof inform the officer prosecuting in the superior court of the county wherein the offence was committed, who shall take such steps as public justice may demand. *False returns.*

103. The sheriff for his services in collecting and paying the public taxes into the treasury, shall receive a compensation of two per cent. on the net amount received by him from the clerk, for taxes imposed by Schedule C of this act, and four per cent. on the amount of taxes collected from every other source, to be deducted in the settlement of his account with the comptroller. For collecting and paying county taxes, (for whatever purpose laid,) the sheriff shall receive the same per centum compensation as above allowed on public taxes. *Sheriff's compensation.*

104. And for his settlement with the treasurer, he shall be paid by the treasurer three dollars for each day he may be necessarily engaged therein, and two dollars for every thirty miles of twice the estimated distance from his home to the seat of government, by the most usual common highway.

**In case of failure to settle accounts.**
105. In every case of failure by a sheriff or other accounting officer, to settle his accounts within due time, or to take the oath required on his settlement, the comptroller shall forthwith report to the treasurer the account of such sheriff or officer, deducting therefrom nothing for commissions or insolvents, but adding thereto one thousand dollars, for the amount of taxes supposed not to appear in the list transmitted by the clerk; and if the whole amount be not paid, the treasurer, on motion of the attorney-general in the superior court of Wake county, at the first court after the default shall have occurred, shall recover judgment against such defaulting officer and his sureties, for the amount reported against him, without other notice than is given by the delinquency of the officer.

**Clerk to transmit copy of bond.**
106. And to the end, that their obligation and names may be known, the clerk of the county court, at the same time when he transmits to the comptroller the tax list, shall transmit to him also a copy certified under the seal of the court, of the bond of the sheriff, upon pain for his default, of forfeiting to the State one thousand dollars; which the treasurer shall and is hereby specially charged to collect in like manner and at such time as is provided in the preceding section.

**Duty of register.**
107. The register of every county yearly, on or before the first day of September, shall transmit to the comptroller a certified copy of the bond of the clerk of the county court, as the same is registered, upon pain of forfeiting for his default to the State, one thousand dollars; which the treasurer is hereby specially charged to collect in like manner and time, as is provided in section one hundred and five of this act.

**Suits against sheriffs, clerks, &c.**
108. In all suits directed by any law to be instituted on motion of the attorney general at the instance of the treasurer or comptroller, against any sheriff or clerk, and his sureties, a copy of the bond of such officer, certified as aforesaid, and sent to the comptroller, and by the comptroller certified together with the default under his hand, shall be deemed sufficient evidence of the execution of such bond and the default of the officer, to allow the judgment to be entered.

Compendium_Cornell
Page 0071

109. And in case of the default by the register to duly **Register's default, &c.**
certify and transmit the bond of the clerk in proper time,
the comptroller shall forthwith proceed to procure such cer-
tified copy, and also a copy of the bond of the register cer-
tified by the keeper thereof, and shall proceed in the man-
ner hereinbefore provided against them and their sureties,
at the first superior court in Wake county after copies shall
have been procured.

110. In every case of default by any clerk, sheriff, or ta- **Default of clerks, sheriffs, &c.**
ker of the tax list, or assessor of the value of property in
the discharge of any of the duties of this act, imposed on
any of them, where no penalty is provided, the defaulting
officer shall forfeit and pay to the State, for each default,
one hundred dollars. And all the penalties by this act im-
posed on such officers for the sole use of the State, may,
when there is no special mode provided for recovering the
same, be recovered in the name of the State, at the instance
of the treasurer, or [on] motion of the attorney general, or
any of the solicitors of the State.

111. The certificate of the treasurer or comptroller of any **Certificate to be evidence.**
matter of default in any of said officers, occurring at the
office of the comptroller or treasurer, and copies of any pa-
pers, in said offices duly certified by the proper keeper there-
of, shall be admitted as evidence in any suit or prosecution
whatsoever against them or others, and about any other
matter whatsoever.

112. The treasurer may, on motion, obtain judgment in **Treasurer may obtain judgment.**
any court of record, against any person indebted to the
State, in the same manner, and under the same rules and
regulations which are prescribed in case of delinquent
sheriffs; and the court shall award execution, though the
amount of the claim be within the jurisdiction of a justice
of the peace.

113. If any person shall wilfully and corruptly commit **Penalty for perjury.**
perjury in any oath required to be taken or administered by
any section of this act, such persons shall be deemed guilty
of a misdemeanor, and on conviction, shall be subject to the
same pains and penalties as are imposed in section 29, chap-
ter 34, entitled " Crimes and Punishments," in the Revised
Code, on persons guilty of perjury.

**Other laws repealed.**

114. All laws imposing taxes, the subjects of which are revised in this act, or imposing taxes upon subjects other than those revised in this act, are hereby repealed: *Provided,* That this repeal shall not be construed to extend to the provisions of any law so far as they relate to the taxes listed, or which ought to have been listed, or which may be due for the year 1858, or for any year previous thereto.

115. All other laws of this State coming in conflict with the provisions of this act, be, and the same are hereby repealed.

116. This act shall be in force from and after its ratification. [*Ratified the 16th day of February,* 1859.]

---

## RIVERS AND CREEKS.

**Chap. 26.**  AN ACT TO AMEND CHAPTER ONE HUNDRED OF THE REVISED CODE, ENTITLED RIVERS AND CREEKS.

**Duty of commissioners.**

*Be it enacted by the General Assembly of the State of North-Carolina, and it is hereby enacted by the authority of the same,* That the commissioners appointed by the county courts to examine and lay off the rivers and creeks within the county, or where the stream is a boundary between counties, pursuant to the provisions of chapter one hundred of the Revised Code, entitled "Rivers and Creeks," shall have power to lay off gates, with slopes attached thereto, upon any mill dam built across such stream, of such dimensions and construction as shall be sufficient for the convenient passage of floating logs and other timber, in cases where it may be deemed necessary by the said courts; and they shall return to the courts appointing them a plan of such gates, slopes and dams in writing.

**Report, &c.**

That upon the confirmation of the report made by the commissioners, and notice thereof given to the owner or keeper of said mill, it shall be his duty forthwith to construct, and thereafter to keep and maintain at his expense, such gate and slope, for the use of persons floating logs and other timber as aforesaid, so long as said dam shall be kept up, or until otherwise ordered by the court.

Compendium_Cornell
Page 0073



(https://firearmslaw.duke.edu)

(https://law.duke.edu/)



# Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)

## Subject(s):

- Carrying Weapons (https://firearmslaw.duke.edu/subjects/carrying-weapons/)

## Jurisdiction(s):

- North Carolina (https://firearmslaw.duke.edu/jurisdictions/north-carolina/)

## Year(s):

- 1792 (https://firearmslaw.duke.edu/years/1792/)

Item, it is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, of of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's

Compendium_Cornell
Page 0074

Justices in their presence, Sheriffs and other ministers in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and boroughholders, constables and wardens of the peace within their wards shall have power to execute this etc. [in original] And that the Justices assigned, at thier coming down into the country , shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPlIY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).





DATE DOWNLOADED: Tue Oct 18 16:49:27 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1866 27 .

ALWD 7th ed.
, , 1866 27 .

Chicago 17th ed.
"," Georgia - Annual Session : 27-28


AGLC 4th ed.
'' Georgia - Annual Session 27.

OSCOLA 4th ed.
'' 1866 27

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

PUBLIC LAWS—County Bonds, Taxes, etc.        27

# TITLE VI.

## COUNTY BONDS, TAXES, Etc.

BIBB COUNTY, (No 40.)
Sec. 1. Bonds authorized for building Court House and Jail.
2. Sale and payment of bonds.
CAMDEN, GLYNN AND EFFINGHAM COUNTIES, (No. 41.)
3. Tax on dogs and guns authorized.
4. Owners of plantations to make returns.
DECATUR CO., (Nos. 42, 43.)
5. Payment of Jurors.
6. By extra tax.
7. Issue of bonds for building bridge.
8. Tax for payment.
9. Right of way, damages.
10. Rates of toll.
11. Amount and sale of bonds.
ECHOLS CO., (No. 44.)
12. Extra tax for building bridge legalized.

LOWNDES CO., (No. 45, 46.)
13. Issue of bonds for building Court House and Jail.
14. Signing and registering.
15. Coupons receivable for county dues.
16. Tax for payment of bonds.
17. Issue of scrip legalized.
RANDOLPH CO., (No. 47.)
18. Tax for 1866 legalized.
RICHMOND CO., (No. 48.)
19. Extra tax for county purposes.
THOMAS AND MITCHELL COS., (No. 49.)
20. Issue of bonds for taking railroad stock.
21. Legal voters to consent to subscription.

(No. 40.)

*An Act to authorize the Inferior Court of Bibb county to issue their bonds for the purpose of raising funds to build a new Court House and Jail.*

1. SECTION I. *The General Assembly of the State of Georgia do enact,* That the Inferior Court of Bibb county shall have power and authority to issue their bonds in such sums as they may deem proper, **Amount of bonds.** and having not longer than ten years to run, bearing seven per cent. interest; such bonds to amount, in the aggregate, to not more than fifty thousand dollars, for the purpose of raising funds to build a new Court House and Jail for the county of Bibb.

2. SEC. II. The bonds authorized by this act shall be approved and signed by all the Justices of the Inferior Court in their official **How sold.** capacity, and may be sold in the market or at public outcry, as the Inferior Court may direct; at any rate not less than ninety per cent. of their nominal value, and when so issued and sold shall be valid and binding on the county of Bibb, and for the payment of which **Payment, how provided for.** and the interest thereon, the Inferior Court shall provide by taxation.

SEC. III. Repeals conflicting laws.

Assented to 13th of December, 1866.

(No. 41.)

*An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same.*

3. SECTION I. *The General Assembly of the State of Georgia do enact,* That the Justices of the Inferior Courts of Camden, Glynn and Effingham counties be and they are hereby authorized to levy and **Justices of Infr Court authorized to levy tax.**

28          PUBLIC LAWS—County Bonds, Taxes, etc.

Grand and petit jurors compensated in Decatur county—Decatur county to issue bonds.

collect a tax of two dollars per head on each and every dog over the
number of three, and one dollar a piece on every gun or pistol, mus-
ket or rifle over the number of three kept or owned on any plantation
in the counties aforesaid ; the said tax to be applied to such county
purposes as the said courts shall direct.

**Planters required to render full return upon oath.** 4. Sec. II. That the owner of every plantation in said counties shall
be required to render, upon oath, a full return of every dog, gun,
pistol, musket, or rifle so held or kept as aforesaid, and shall be held
responsible for the tax imposed upon them, which tax the said Infe-
rior Courts are hereby authorized and empowered to enforce, as in
other cases.

Sec. III. Repeals conflicting laws.
Approved 7th of December, 1866.

(No. 42.)

*An Act to compensate Grand and Petit Jurors of the Superior, Inferior
and County Courts in the county of Decatur, in this State, and to
authorize the levy of an extra tax for said purpose.*

**Compensation of Jurors.** 5. Section I. *The General Assembly of the State of Georgia do
enact,* That from and immediately after the passage of this act Grand
and Petit Jurors who may serve in the Superior or County Courts in
the county of Decatur shall be entitled to receive for each and every
day they may serve as such jurors, two dollars ; *provided* he shall
**Proviso.** produce the certificate of the sheriff, countersigned by the presiding
Judge or Justice, of the time he has served, which certificate shall be
a warrant for the sum allowed, and a voucher to the treasurer of the
county for paying the same.

**Inf'r Court may collect Jury tax.** 6. Sec. II. That the Inferior Court of Decatur county is author-
ized and required to levy and have collected an extra tax, to be styled
the "Jury Tax," of sufficient amount to pay all jurors in said county
as provided for in the first section of this act.

**Act shall be of force.** Sec. III. That this act shall be of force immediately after its pass-
age, and all conflicting laws are repealed.
Assented to 12th of December, 1866.

(No. 43.)

*An Act to authorize the Justices of the Inferior Court of Decatur
County to issue Bonds for the payment of erecting a Bridge over
Flint River, within the limits of Bainbridge, or for the payment of
stock in a corporate company for that purpose.*

**Bonds.** 7. Section I. *The General Assembly of the State of Georgia do
enact,* That a majority of the Justices of the Inferior Court of
Decatur county may issue bonds, payable in two, three, four, five, six,
seven, eight, nine and ten years, and if in their judgment it would
be better, up to twenty years, with a rate of interest not greater than
that rate fixed by law ; which bonds, so issued, shall be signed by

 **Idaho Constitution**

## CONSTITUTION OF THE STATE OF IDAHO

### ARTICLE I DECLARATION OF RIGHTS

Section 11.   RIGHT TO KEEP AND BEAR ARMS. The people have the right to keep and bear arms, which right shall not be abridged; but this provision shall not prevent the passage of laws to govern the carrying of weapons concealed on the person nor prevent passage of legislation providing minimum sentences for crimes committed while in possession of a firearm, nor prevent the passage of legislation providing penalties for the possession of firearms by a convicted felon, nor prevent the passage of any legislation punishing the use of a firearm. No law shall impose licensure, registration or special taxation on the ownership or possession of firearms or ammunition. Nor shall any law permit the confiscation of firearms, except those actually used in the commission of a felony.

How current is this law?

**Search the Idaho Statutes and Constitution**

Compendium_Cornell
Page 0079

SUPPLEMENTS TO THE REVISED STATUTES.

# LAWS

OF THE

## Commonwealth of Massachusetts,

PASSED SUBSEQUENTLY TO THE

# REVISED STATUTES:

### 1836 TO 1849 INCLUSIVE.

TO WHICH ARE PREFIXED

A TABLE OF REFERENCES CONNECTING THE SEVERAL CHAPTERS AND SECTIONS OF THE REVISED STATUTES WITH THE LAWS CONTAINED IN THIS VOLUME;

ALSO,

A TABLE OF REFERENCES CONNECTING THE SUPPLEMENTAL STATUTES WITH EACH OTHER; AND

THE CONSTITUTION OF THE COMMONWEALTH AS REVISED BY STRIKING OUT ALL THE ANNULLED OR OBSOLETE PORTIONS, AND INSERTING THE AMENDMENTS IN THE PLACES WHERE THEY BELONG;

AND TO WHICH ARE APPENDED

THE APPORTIONMENT OF SENATORS AND REPRESENTATIVES UNDER THE LAST AMENDMENT OF THE CONSTITUTION;

RESOLVES RELATING TO GRANTS OF LAND OR MONEY TO THE OFFICERS, &c., OF THE REVOLUTION;

RESOLVES RELATING TO DEAF AND DUMB PERSONS;

RESOLVES RELATING TO THE IMPRISONMENT OF CITIZENS OF THIS STATE IN OTHER STATES;

RESOLVES RELATING TO SCHOOL DISTRICT LIBRARIES.

---

THE SUPPLEMENTS, INCLUDING 1843, EDITED

BY THERON METCALF:

AND THE RESIDUE OF THE VOLUME

BY LUTHER S. CUSHING.



## Boston:

PUBLISHED BY DUTTON & WENTWORTH, STATE PRINTERS.

1849.

Digitized by Google

THE

# GENERAL LAWS

OF THE

## Commonwealth of Massachusetts,

PASSED AT THE

## JANUARY SESSION, 1847.

Note. [The omitted chapters are those which contain the Special Statutes.]

## CHAPTER 13.

### AN ACT TO DEFINE THE TIME OF NIGHT-TIME IN CRIMINAL PROSECUTIONS.

| Section | Section |
|---|---|
| 1. What shall be deemed *night-time*, in criminal prosecutions. | 2. When to take effect. |

SECT. 1.  Whenever, in any criminal prosecution, an offence is alleged to have been committed in the night-time, the time called night-time shall be deemed and be considered to be the time which existed between one hour after the sun-setting on one day, and one hour before sun-rising on the next day; and, in all cases, the time of sun-setting and sun-rising shall be ascertained according to mean time, in the place where the offence was committed. *What shall be deemed night-time, in criminal prosecutions.*

SECT. 2.  This act shall take effect from and after its passage.  [February 9, 1847.] *When to take effect.*

## CHAPTER 14.

### AN ACT CONCERNING THE SALE OF POTATOES IN THIS COMMONWEALTH.

#### Standard weight of the bushel of potatoes.

In all purchases and sales of potatoes hereafter made, the standard weight of the bushel shall be sixty pounds. And the provisions of the one hundred and ninety-ninth section of the twenty-eighth chapter of the Revised Statutes, shall hereafter apply to all such purchases and sales. [February 10, 1847.] *Standard weight of the bushel of potatoes.*

57

Digitized by Google

# STATUTES

OF THE

# STATE OF NEW JERSEY.

REVISED AND PUBLISHED

## Under the authority of the Legislature.



TRENTON:

PRINTED BY PHILLIPS & BOSWELL.

1847.

Digitized by Google

# TITLE XXI.
## INTERNAL POLICE.

Chap. 1....ANIMALS, EXHIBITION OF.
  "    2....CONVICTS, IMPORTATION OF.
  "    3....DISORDERLY PERSONS.
  "    4....FAIRS, SUPPRESSION OF.
  "    5....FIRE CRACKERS, ETC.
  "    6....FUGITIVE SLAVES.
  "    7....GAMING, PREVENTION OF.
  "    8....GUNPOWDER MANUFACTORIES, ETC.
  "    9....HORSERACING, PREVENTION OF.
  "   10....INNS AND TAVERNS.
  "   11....LOTTERIES, SUPPRESSION OF.
  "   12....MINORS, ENTERTAINMENT OF.
  "   13....MORRIS CANAL, PROTECTION OF.
  "   14....OFFENDERS, APPREHENSION OF.
  "   15....RAILROAD ENGINES.
  "   16....RELIGIOUS MEETINGS.
  "   17....ROUTS AND RIOTS, ETC.
  "   18....TIMBER, PROTECTION OF.
  "   19....TOLL, UNLAWFUL, PROHIBITED.
  "   20....TRAVELLERS, SAFETY OF.
  "   21....UNINCORPORATED BANKS.
  "   22....VENDUES, SALE OF LIQUOR AT.
  "   23....VICE AND IMMORALITY.
  "   24....WOODS, MARSHES, MEADOWS.
  "   25....WORKHOUSES.
  "   26....WRECKS.

---

## CHAPTER 1.
### ANIMALS, EXHIBITION OF.

1. License required.                    4. Penalty for violation.
2. How, and by whom granted.            "  Duty of collector to prosecute.
3. Sum to be paid.                      5. Money, to whom paid.

---

**An Act to regulate the exhibition of beasts or animals.**          1834-5.
PAMPH. 98.

Revision....Approved April 15, 1846.

1. BE IT ENACTED *by the Senate and General Assembly of the* Menageries, *State of New Jersey,* That it shall not be lawful for any person licensed.

Digitized by Google

Compendium_Cornell
Page 0083

 

DATE DOWNLOADED: Fri Oct 21 09:35:19 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1784-1785 154 .

ALWD 7th ed.
, , 1784-1785 154 .

Chicago 17th ed.
"," New York - 8th Legislative Session, 1st & 2nd Meetings : 154-163

AGLC 4th ed.
'' New York - 8th Legislative Session, 1st & 2nd Meetings 154

OSCOLA 4th ed.
'' 1784-1785 154

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

**154**                 LAWS OF NEW YORK.                    [CHAP. 83.

lands in
the juris-
diction of
this State.
any settlement under the United States in Congress assembled in or
upon any lands within the limits reserved for the jurisdiction of this
State by the act of the cession made by the legislature to the said United
States, altho' such lands may have been or hereafter may be purchased
from the Indians by the commissioners of the United States:  Nor be
construed to bar or prevent the citizens of this State, from settling upon
and cultivating any lands within the said reserved limits under the
authority of the legislature thereof, altho' such lands or any part thereof
may have been or hereafter shall be purchased from the Indians by any
commissioners of the United States: Nor be construed to prejudice the
right which this State hath to raise troops for defending and garrison-
ing their frontiers agreeably to the Articles of Confederation.

---

# CHAP. 83.

AN ACT for incorporating the inhabitants residing within the
limits therein mentioned.

PASSED the 22d of April, 1785.

Preamble;
settlement
at Clavar-
ack Land-
ing; peti-
tion for in-
corpora-
tion.
WHEREAS the inhabitants of that part' of Clavarack district herein
after particularly mentioned and described, with other inhabitants of the
said district, have, by their petition, among other things represented to
the legislature, that a number of the said inhabitants having commercial
objects in view, have emigrated from the neighbouring States; and pur-
chased a tract of land in the said district, adjacent to Clavarack land-
ing, and made, at a great expence, a settlement thereupon — that they
intend carrying on an extensive commerce and that in order to facili-
tate their undertakings, and to enable them to regulate their own con-
cerns and internal police, to adjust such differences as may arise within
their own limits, and give stability and permanent security to their set-
tlement, have prayed, that the district of country contained within the
limits herein after particularly mentioned, might be seperated from the
said district of Clavarack, and that the inhabitants thereof might be
erected into a body politic and corporate, with such powers jurisdic-
tions privileges and immunities, as should be deemed requisite to answer
the beneficial purposes, intended by such incorporation.

*And whereas* the legislature are inclined to give every suitable encour-
agement to the extension of the commerce of this State, and speedy
population thereof

District of
country
named
erected
into a city
by the
name
Hudson
I. *Be it enacted by the People of the State of New York represented in
Senate and Assembly, and it is hereby enacted by the authority of the same,*
That the district of country contained within the following limits to wit,
Beginning at the channel of the Hudsons river in the county of Albany
directly opposite the mouth of the creek commonly called major Abra-
hams creek, thence to and up the middle of said creek to the place
where the Clavarack creek empties into the said major Abrahams creek,
thence up along the middle of said Clavarack creek, until the said Clav-
arack creek strikes the line of the manor of Livingston as now held and
possessed, thence along the line of the said manor of Livingston to the
east side of Hudsons river, thence into the said river one hundred and
eighty feet below high water mark, thence to the place of beginning
keeping the same distance of one hundred and eighty feet all along from
high water mark aforesaid be and is hereby seperated from the said

Compendium_Cornell
Page 0085

Case 3:19-cv-01537-BEN-JLB   Document 154   Filed 10/22/22   PageID.17492   Page 101 of 265

Clavarack district, and that all the freemen of this State inhabitants
within the aforesaid limits, be and hereby are ordained constituted and
declared to be, from time to time and forever hereafter, one body cor-
porate and politic in fact and in name, by the name of ,The mayor
recorder aldermen and commonalty of the city of Hudson, and that by
that name, they and their successors forever, shall and may have perpetual
succession, and shall be persons in law, capable of suing and being sued,
pleading and being impleaded, answering and being answered unto,
defending and being defended in all courts and places whatsoever in all
manner of actions, suits, complaints, matters and causes whatsoever, and
of what kind or nature soever, and that they and their successors may
have a common seal, and may change and alter the same at their pleas-
ure, and also that they and their successors by the same name of The
mayor recorder aldermen and commonalty of the city of Hudson shall
be in law capable of purchasing, holding and conveying any estate real
or personal for the public use of the said corporation *provided neverthe-
less*, that all such real estate shall lie, and be included within the limits
of the said city of Hudson only, and not elsewhere, *provided always*, that it shall and may be lawful to and for all and every the citizens sojourn-
ers and travellers within this State, at all times forever hereafter to have the free use and enjoyment of all and every the high-ways, roads and landing places within the limits of the said city, which have heretofore been used and enjoyed as such, and that without any toll, claim or demand of the said corporation for the same, or any other interruption whatsoever ; or any alteration of such road or high-way without the con-
sent and approbation of the commissioners of the high-ways of the dis-
trict next adjoining to the said city, whose inhabitants shall make use of
such road or high-way (any thing in this act contained to the contrary
hereof in any wise notwithstanding.

<div style="float:right">Proviso, as
to free
enjoyment
of high-
ways by all
sojourners
and travel-
lers.</div>

II. *And be it further enacted by the authority aforesaid,* That there be, and forever hereafter there shall and may be in and for the said city, one mayor, one recorder, four aldermen, four assistants, one common clerk, one chief marshal, one chamberlain, one supervisor, and as many assessors, collectors and constables, as the common council of the said city of Hudson hereinafter constituted and made, shall from time to time deem necessary and direct to be chosen and elected, which supervisor assessors collectors and constables so deemed necessary, and directed to be chosen, shall forever hereafter be chosen and elected in the man-
ner and at the time and place hereinafter directed and appointed for the annual election of officers within the said city.

<div style="float:right">Officers of
the city.</div>

III. *And be it further enacted by the authority aforesaid* That it shall and may be lawful to and for his excellency the governor, or person administering the government of this State for the time being, by, and with the advice and consent of the council of appointment, and he and they are hereby authorised and required, within one month after the passing of this act, and yearly forever thereafter at such time as the said council shall be assembled immediately after the first day of May in every year, to nominate and appoint out of the citizens and inhabit-
ants of the said city of Hudson, one fit and discreet person to be mayor of the said city, and one fit and discreet person to be recorder of the said city, which said mayor and recorder after such appointments respectively shall continue in their said respective offices, to do and to execute all things, which to their said several offices doth, or may sev-
erally and respectively belong or in any manner appertain, until other fit persons be appointed and sworn in their room; and in like manner a fit and discreet person shall be appointed out of the said citizens and

<div style="float:right">Mayor, re-
corder,
clerk and
chief mar-
shal, to be
appointed
by the gov-
ernor:
powers,
duties and
terms of
office.</div>

inhabitants, to be common clerk of the said city, who shall hold and continue in office during the will and pleasure of the governor and council of appointment ; and also another fit and discreet person shall be appointed out of the citizens and inhabitants of the said city, to be the chief marshal thereof, whose duty it shall be, to execute writs processes and precepts to arise and be issued within the said city from the courts and magistrates thereof in and about the administration of justice in the same manner as the sherifs of other cities and counties are by law authorized to execute such writs processes and precepts ; and which chief marshal shall be from time to time appointed, and shall hold and exercise his office for such periods, as sherifs of other cities and counties by law are or ought to be appointed, or may or ought by law to hold and exercise their respective offices, which said mayor, recorder, clerk and marshal shall be annually nominated and appointed in manner and form aforesaid, until otherwise directed by the legislature.

**Annual election, day of; city officers to be elected.** IV. *And be it further enacted by the authority aforesaid,* That on the second Monday in May next and on the second Monday in May in every succeeding year forever thereafter, the freemen of the said city, being inhabitants thereof shall and may assemble themselves, and meet together at such time of the day, and at such public place as the mayor for the time being, or in his absence or sickness the recorder for the time being shall appoint, and then and there by plurality of voices or votes, elect and chuse out of the freemen inhabitants of the said city, for the ensuing year, four aldermen four assistants, one supervisor, and such a number of assessors constables and collectors, as the common council for the said city shall from time to time deem necessary and direct to be chosen.

**Treasurer and chamberlain, appointment of.** V. *And be it further enacted by the authority aforesaid,* That the mayor or recorder of the said city for the time being and two or more of the aldermen and two or more of the assistants of the said city, shall and may on the second Monday in May next, and on the second Monday in May in every succeeding year forever thereafter in common council, nominate and appoint one fit person being a freeman and inhabitant of the said city to be the treasurer and chamberlain of the said city for the year ensuing, every of which said persons, as are herein before nominated or hereafter to be nominated, elected and appointed to any civil **Officers of city to take oaths.** office within the said city, shall within fifteen days next after such appointment or election, respectively take and subscribe the oath of abjuration and allegiance now or hereafter appointed by law (or if of the people called Quakers an affirmation), and also an oath or affirmation as the case may require for the faithful execution of the office to which he or they shall so be appointed.

**Penalty for failure of person elected or appointed to qualify and act.** VI. *And be it further enacted by the authority aforesaid,* That if any one of the freemen inhabitants of the said city of Hudson shall hereafter be elected or chosen to the office of aldermen assistant supervisor or assessor collector or constable for the said city, and having notice of his said election shall refuse, deny, delay or neglect to take upon him or them to execute such office to which he or they shall be so chosen or elected, that then and so often as it shall happen, it shall and may be lawful for the mayor or recorder, or any two or more of the aldermen and any two or more of the assistants of the said city for the time being in common council to assess and impose upon every such person or persons, so refusing delaying or neglecting, such reasonable and moderate fine and fines, sum and sums of money as they in common council shall think fit, so as such fine for each refusal, denyal, delay or neg-

lect, shall not exceed the sum of ten pounds current money of New York, all which said fines shall and may be levied by distress and sale of the goods and chattels of such delinquent and delinquents by warrant under the seal of the said city signed by the mayor thereof for the time being, rendering the surplusage to the owner or owners thereof (if any there be) necessary charges of making, and selling such distress being first deducted, or by action of debt in any court of record within the jurisdiction of the said city having cognizance of the same to be prosecuted, and shall be recovered and received by, and to the use of the said mayor aldermen and commonalty of the said city, and their successors forever.

VII. *And be it further enacted by the authority aforesaid,* That in all such cases, forever hereafter of the absence sickness or death of the mayor of the said city for the time being, it shall and may be lawful to, and for the recorder of the said city for the time being, to do and execute all and singular the duties and trusts to the office of the said mayor belonging and appertaining, to all intents, purposes and constructions whatsoever during the absence or sickness of such mayor or until a successor be duly appointed and sworn. *(margin: Recorder to perform duty of mayor in case of vacancy, absence, etc.)*

VIII. *And be it further enacted by the authority aforesaid,* That if it shall happen that any of the aldermen or assistants supervisor assessors, collectors or constables, or any one of them hereafter to be elected nominated and sworn in their respective offices as aforesaid, shall happen to die or remove out of the said city within the time they are or shall be respectively named or elected for, or before other fit persons be respectively named or elected, and sworn in their respective rooms, it shall and may be lawful for the freemen inhabitants within the limits of the said city, to assemble and meet together at such time and place as shall be appointed by the mayor of the said city for the time being, and then and there by plurality of votes to elect one of the freemen an inhabitants within the limits of the said city to serve as alderman assistant supervisor, assessor collector or constable in the room of such alderman assistant supervisor assessor collector or constable so dying or removing, and so often as such cases shall happen, and in case of the death or removal of the treasurer or chamberlain out of the limits of the said city, for the common council to appoint another in his stead, at any time after such death or removal; and that all and every such person and persons so to be newly chosen or appointed and sworn, shall serve in their respective offices, until other fit persons be respectively chosen or appointed and sworn in their respective rooms. *(margin: Vacancies in office, how filled.)*

IX. *And be it further enacted by the authority aforesaid,* That the chief marshal so to be nominated and appointed, and every marshal to be thereafter nominated and appointed, shall, before he shall be deemed capable of executing his said office become bound with such sureties, in such manner and under such penalty for the faithful discharge of the duties of his office, as the sherifs of other cities and counties are or shall be by law directed and required to be bound for the faithful execution of their offices. *(margin: Chief marshal shall to give same bond as sheriffs)*

X. *And be it further enacted by the authority aforesaid,* That the treasurer collectors and constables to be hereafter chosen and appointed, shall before they enter on the execution of their respective offices, respectively give such security for the faithful discharge of the trusts reposed in them as the mayor recorder and common council of the said city shall deem sufficient. *(margin: Treasurer, collectors and constables to give bonds.)*

XI. *And be it further enacted by the authority aforesaid,* That the mayor recorder aldermen and assistants of the said city for the time *(margin: Common council, how com-)*

158                          LAWS OF NEW YORK.                    [CHAP. 83.

posed; to make by-laws. being (whereof the mayor or recorder always to be one) be and shall be forever hereafter called The common council of the city of Hudson, who, or the major part of them shall have power to make by-laws relative to the public markets within the said city, so as such by-laws shall not extend to the regulating or ascertaining the price of any commodity, or article of provision which may be brought for sale within the said city: relative to the streets and high-ways of the said city: relative to nuisances within the limits of the said city: relative to the cleaning of chimnies and preventing the said city from fire: relative to the manner of warning the meetings of the said city and the common council thereof and the time and place where they shall be holden : relative to a city watch: relative to bonds and secutities to be given by constables collectors treasurers, or any other officers of the said city for the faithful discharge of the duties of such office or offices: relative to the burial of the dead: relative to the public lights or lamps of the said city: relative to the restraining geese and swine going at large within the limits of the said city: relative to the overseeing of the poor; and relative to any thing whatsoever which may concern the good government and police of the said city: *Provided* that such by-laws be not contrary to or inconsistent with the constitution laws and statutes of this State, and that the said common council of the said city for the time being, or the major part of them, as often as they shall make ordain and publish such laws for the purposes aforesaid, may make, ordain, limit and provide such and the like pains punishments and penalties, fines and amerciaments, upon, towards and against all and every person that shall offend against such laws statutes rights and constitutions, or any or either of them as by the said common council or the major part of them shall be thought requisite to make, ordain, limit and provide for the observation and preservation of the same laws statutes rights and constitutions, to be prosecuted and recovered in any court of record within the jurisdiction of the said city having cognizance of the same by action of debt or otherwise to the use of the said mayor aldermen and commonalty of the said city of Hudson and their successors forever: *provided also* that no such by-laws shall continue in force longer than for the term of one year.

Proviso: by-laws not to conflict with any law of the State.

Proviso; bye-laws to be in force but one year.

Common council, meetings of; penalty for non-attendance. XII. *And be it further enacted by the authority aforesaid,* That the common council of the said city, shall be summoned called and held from time to time, so often and at such times and places as the mayor, or in case of his sickness or absence, the recorder of the said city for the time being shall think fit to appoint or direct, and that it shall and may be lawful to and for the said common council of the said city or the major part of them to assess and lay such reasonable fines and amerciaments in and upon every officer and member of the body corporate aforesaid for the time being, who after having had due notice or being duly summoned to appear or attend at any such common council to be held for the said city, shall neglect so to do or make default therein or shall not appear or attend according to such notice or summons in that behalf, or shew a reasonable cause, (by the said common council or a major part of them at their discretion to be allowed), and so as often as such case shall happen, so that no such fines or amerciaments for any one default of appearance or attendance of any such officer or member aforesaid shall exceed the sum of twenty shillings in the manner and form aforesaid to be levied for the use of the said mayor aldermen and commonalty of the said city and their successors to be recovered and received.

XIII. *And be it further enacted by the authority aforesaid,* That the common council of the said city of Hudson for the time being or the major part of them have, and from time to time forever hereafter shall have full power licence and authority, to establish appoint order and direct the making and laying out all other streets lanes ways alleys highways water courses and bridges not already made or laid out, but also the altering amending and repairing all such streets lanes ways alleys highways, water courses and bridges heretofore made or laid out, or hereafter to be made or laid out in and throughout the said city limits and precincts thereof in such manner as the common council for the time being or the major part of them shall think or judge to be necessary and convenient for all inhabitants and travellers there : *Provided always* that in all cases where the property of individuals is affected by the laying out repairing or altering such streets ways lanes alleys highways water courses and bridges as aforesaid, the said common council shall and do proceed according to the mode pointed out to the commissioners of highways for the county of Albany in and by certain acts of the legislature in such cases made or to be made and provided.

*Regulation of highways, common council to provide for.*

*Proviso; proceedings to be in accordance with mode prescribed for Albany county.*

*And whereas* a punctual and well regulated ferry across the river at the said city of Hudson is of the utmost consequence to the good people of this State at large.

XIV. *Be it therefore enacted by the authority aforesaid,* That the common council of the said city for the time being or the major part of them from time to time and at all times forever hereafter shall and may have full power and authority to settle, appoint, establish, order, direct and superintend and shall and may settle appoint establish order direct and superintend, such and so many ferries from the said city, to the opposite or western shore of the Hudsons river for the carrying and transporting people, horses, cattle, goods and chattles across the said river in such manner as the common council of the said city for the time being or the major part of them shall conceive to be most conducive for the public good. *Provided always,* that nothing in this act contained shall extend or be construed to debar or deprive any of the citizens of this State, of the property or possession of the soil on the eastern or western shore of any right which they now may or ought lawfully to enjoy or hereafter may obtain with respect to the priviledge of ferriage; nor shall this act or any thing therein contained, extend to, or be deemed or construed to debar or deprive any of the citizens of this State of any other right or privilege (as to right of soil or ferriage) which any such citizen now has or may lawfully have or enjoy, nor shall be deemed or construed to debar or prevent Coenraedt A. Flaak of or from conveying or carrying across the said river to and from either side of the said river with a ferry boat, any person or persons, horses, cattle, goods or chattles.

*Ferry across the Hudson river, common council to provide for.*

*Proviso; not to affect existing rights of ferriage.*

XV. *And be it further enacted by the authority aforesaid,* That the said mayor recorder aldermen and commonalty of the said city and their successor shall and may from time to time, and at all times forever hereafter have hold and keep a market or markets at such place or places within the limits of the said city, as the said common council for the time being shall appoint and direct on any or every day of the week (Sunday excepted) and that the said mayor for the time being is and for ever hereafter shall be (ex officio) clerk of the said market or markets of the said city, and water bailif for the same and that he shall have full power and authority to do and execute, and shall and may do and execute forever hereafter within the liberties limits and precincts of the said city, all and whatsoever to the said offices of clerk of the market and water bailif doth or may respectively appertain and belong; and also that the

*Public markets, to be provided for by the common council.*

**160**                LAWS OF NEW YORK.                [CHAP. 83.

mayor of the said city for the time being, shall have full power and authority, by and with the advice of the common council, to licence and appoint, by warrant under his hand and seal, or otherwise for the said city, one or more porter or porters carriers cartmen carmen, packers cullers common criers schavengers, inspectors of lumber, and also one or more surveyor or surveyors, measurer or measurers, guager or guagers, beadles, garblers, bellmen, watchmen, bridewell keepers, or keepers of a house or houses of correction and alms houses, and to discharge the same at pleasure; provided that no gauger to be appointed by this act, shall have authority to gauge liquors or molasses for ascertaining any duty to be imposed thereon by act of legislature unless thereunto expressly authorized by law.

Bridewells, houses of correction, and work houses, erection of, etc.  XVI. *And be it further enacted by the authority aforesaid,* That the said mayor, aldermen and commonalty, forever hereafter, have full power and authority to erect and build one or more bridewell or bridwells, house or houses of correction work house or work houses, together with full power and authority to the said mayor recorder and aldermen, or any one of them, to take up and arrest, or order to be taken up or arrested all or any rogues vagabonds straglers and idle and suspicious persons, and as they the said mayor recorder and aldermen or any one of them shall see cause to order any such rogues vagabonds straglers and idle and suspicious persons, either to the said work house, there to remain and work any time not exceeding thirty days, or else to the house of correction, there to receive such corporal punishment as the said mayor recorder and aldermen or any three of them, whereof the mayor or recorder to be one, shall think fit such corporal punishment not to exceed thirty nine stripes for any one offence, and that the said mayor aldermen and commonalty and their successors forever hereafter, may and shall have power to erect and build an alms house for relief of the poor with as full power to order direct and regulate the aforesaid houses, and the persons to be put in and ordered there, as to any city or corporation in any other part of this State and to the officers and ministers thereof doth or may belong.

Gaols for the confinement of prisoners.  XVII. *And be it further enacted by the authority aforesaid,* That the said mayor recorder aldermen and commonalty, and their successors forever hereafter may have one or more public gaol or gaols in such fit place or places with in the said city and limits and jurisdiction thereof as by the common council of the said city or the major part of them for the time being shall be appointed to imprison and safely keep all and every person and persons for any treason or treasons, murders felonies, trespasses, evil doings, and all other matters and causes, to be arrested or attached or to be committed to the gaol or gaols aforesaid in safe custody, there to remain until they be delivered by due course of law, and that the common council of the said city for the time being or the major part of them shall and may have power from time to time to chuse constitute and place one or more fit person or persons in the office or offices of keeper or keepers of the gaol or gaols aforesaid, to hold the same during the pleasure of the common council of the said city for the time being or the major part of them, and it is hereby empowered and commanded the keeper and keepers of the gaol and gaols aforesaid for the time being, that all and singular traitors murderers felons malefactors, disturbers of the peace, and other delinquents, and all others for any crime and offence, or other reasonable causes or matters to the gaol or gaols aforesaid ordered or committed, or to be ordered or committed, to receive, take, keep and cause to be kept in the same gaol or gaols, until they shall be thence delivered by due course of law.

Case 3:19-cv-01537-BEN-JLB   Document 154   Filed 10/22/22   PageID.17498   Page 107 of 265

XVIII. *And be it enacted by the authority aforesaid,* That the mayor recorder aldermen and commonalty of the said city and no other whatsoever, shall have power to give and grant licences annually under the public seal of the said city, to all such persons as they shall think fit to licence to keep a tavern inn ordinary or victualling house, and to sell wine brandy rum strong waters cyder beer ale, or any other sort of exciseable or strong liquors within the said city of Hudson or the liberties and precincts thereof by retail or small measure, and that it shall and may be lawful to and for the mayor recorder aldermen and commonalty of the said city to ask demand and receive for every such licence by them to be given and granted as aforesaid, such sum or sums of money as they, and the person to whom such licence shall be given and granted, shall agree for, not exceeding the sum of sixteen shillings for each licence, all which monies as by the said mayor recorder aldermen and commonalty shall be so received, shall be used and applied to the public use of the said mayor aldermen and commonalty of the said city and their successors forever—and that every and each of which licence shall continue and be in force for one year from the granting thereof but no longer.

*Taverns, etc., licensing of, by the mayor, recorder, aldermen and commonalty.*

XIX. *And be it further enacted by the authority aforesaid,* That it shall and may be lawful to and for the freemen citizens and inhabitants of the said city of Hudson at their annual meetings for election of officers, to vote any sum or sums of money to be raised which they may think proper and necessary for the purchasing any lot or lots of ground within the limits of the said city for the purpose of burying the dead, or for erecting a court house and gaol alms house work house or house of correction, or for the purpose of the support and relief of the poor within the limits of the said city.

*Citizens may vote money for cemetery, etc.*

XX. *And be it further enacted by the authority aforesaid,* That it shall and may be lawful to and for the mayor recorder and aldermen of the said city, or any three of them, whereof the mayor or recorder shall always be one, to hold, on the first Tuesday in every month, one court of common pleas of record, within the said city, to be called the mayors court, which shall and may hold, plea, have cognizance of all and all manner of plaints, suits, causes, trespasses, actions and demands whatsoever, personal and mixed, arising or accruing, within the said city and the jurisdiction thereof, with full power and authority to hear and determine all and every such actions and pleas, and judgment and execution thereon to render and award, and to proceed and act therein in such manner and form, and by such and the like methods, process and proceedings, as fully and amply, as in other courts of common pleas of record, in and for the respective counties in this State, in like cases can or may be acted done adjudged or determined according to the laws and constitution of this State; and it shall be lawful for the said mayor's court in every such term respectively to continue each term to the day succeeding inclusively, or to adjourn the first day of each term to the next term, as the dispatch of the business to be depending before the said court may from time to time render necessary or require.

*Mayor's court, jurisdiction of, etc.*

XXI. *And be it further enacted by the authority aforesaid,* That the common clerk of the said city of Hudson for the time being, shall, and he is hereby forever declared to be, the clerk of the said court of record, to do and perform all manner of acts and things within the city aforesaid, the limits and jurisdictions thereof which to the office of clerk of the said court of record doth appertain and belong, and to receive, demand, have collect and enjoy all fees perquisites and profits, which may to the office of such clerk belong or appertain.

*Clerk of city to be clerk of mayor's court.*

Compendium_Cornell
Page 0092

Certain officers of city to attend on mayor's court; execute process, etc.

XXII. *And be it further enacted by the authority aforesaid*, That the common clerk, chamberlain, marshal, constables, gaol keepers and all other subordinate officers of and in the said city, who hereafter may be nominated, chosen, elected constituted and appointed, and every of them respectively, jointly and severally as cause shall require, shall be, and hereby are commanded to be, obedient to and attend upon the judge and judges of the court of the said city, and every or any of them, at all times hereafter, according to the duty or obligation of their respective offices and places, and to execute all and every the commands precepts, warrants to them respectively directed and issued, and given out, and to be issued and given out by the said court or any one of the judges thereof, and that the said marshal, ministers and officers of the said city for the time being, shall and may, and they and each of them is and are hereby authorized and commanded, to execute and return all and every the process and precepts of the said court to them respectively directed or to be directed, from time to time, and at all times, as fully and effectually as any marshal minister or officer of or in any city or place within this State the precepts or processes of any court of record therein hath used, or can or may execute and return in any manner whatsoever.

Freemen of city, who to be considered.

XXIV. *And be it further enacted by the authority aforesaid*, That all and every freeman, citizen inhabitant of the State of New York or any other of the United States of America, who shall become inhabitants within the limits and jurisdiction of the said city of Hudson, and who shall have therein resided for the space of four months together and shall continue therein to reside, & shall pay any taxes, and not be disqualified by law, shall be entitled to every freedom right privilege and immunity of the said city, and be considered to all intents and purposes a free citizen thereof.

This act declared a public act.

*And be it enacted by the authority aforesaid*, That this act be, and it is hereby declared to be a public act and that the same be and shall forever hereafter be construed in all courts and places benignly and favourably, for every beneficial purpose therein intended.

Preamble; lands under water in front of city.

*And whereas* Thomas Jenkins, Seth Jenkins, David Lawrence, Hezekiah Dayton, Shubael Worth, Joseph Barnard, Ezra Reed, Charles Jenkins, Benjamin Folger, Reuben Folger, William Wall, Nathaniel Green, Samuel Mansfield, Cotton Gelston, John Thurston William Minturn, Peleg Clark and Titus Morgan, have by their humble petition represented to the legislature that they have at a considerable expence purchased the tract of land, formerly called the Clavarack Landing for the purpose of establishing a commercial settlement, and that they have built thereon several wharfs and are about to build others, together with a ship yard, and being apprehensive, that the land under the water, below highwater mark, might at a future day, become the cause of dissentions and disputes, and from a desire to preserve good order and harmony among the citizens and inhabitants of this State, they have prayed the legislature for a grant of the said land from high-water mark to the channel of the said river opposite the land so purchased. *And whereas* the prayer of the said petition appears to be reasonable.

Lands under water in front of lands purchased by persons named, granted to them.

*Be it therefore enacted by the authority aforesaid*, That the said Thomas Jenkins, Seth Jenkins, David Lawrence, Hezekia Dayton Shubael Worth, Joseph Barnard, Ezra Reed, Charles Jenkins, Benjamin Folger, Reuben Folger, William Wall, Nathaniel Green, Samuel Mansfield Cotton Gelston, John Thurston, William Minturn, Peleg Clark and Titus Morgan, and each and every of them, have, hold, use, occupy, possess and enjoy all and all manner of right title interest property claim and demand

whatsoever of in and to all the land lying under the water, and directly opposite to the tract of land so purchased by them as aforesaid from high water mark one hundred and eighty feet to the channel of the said river in a course north fifty-seven degrees west, to the sole use benefit and behoof of them the said Thomas Jenkins, Seth Jenkins, David Lawrence, Hezekiah Dayton, Shubael Worth, Joseph Barnard, Ezra Reed, Charles Jenkins, Benjamin Folger, Reuben Folger, William Wall, Nathaniel Green, Samuel Mansfield, Cotton Gelston John Thurston, William Minthurn, Peleg Clark, and Titus Morgan and to their heirs and assigns forever in severalty. *Provided always*, that nothing in this act contained, shall extend, or be construed to extend, or in any manner to affect impede or interrupt the free navigation of the said river, or any public right or privilege heretofore held and enjoyed, by the good people of this State; or the private right or privilege heretofore lawfully held, and enjoyed by any citizen or citizens of this State.

*Proviso; free navigation of river not to be impeded.*

---

# CHAP. 84.

AN ACT to enable the mayor aldermen and commonalty of the city of New York in common council convened, to order the raising monies by tax for the maintenance of the poor and other contingent expences arising in the said city.

Passed the 22d of April, 1785.

*Be it enacted by the People of the State of New York, represented in Senate and Assembly, and it is hereby enacted by the authority of the same,* That the mayor aldermen and commonalty of the city of New York in common council convened shall be, and hereby are, fully empowered and authorized, as soon as conveniently may be, after the passing of this act, to order the raising a sum not exceeding six thousand pounds, by a tax on the estates, real and personal, of all and every the freeholders and inhabitants within the city and county of New York to be applied to the support and maintence of the poor of the said city and county, the bridewell and the criminals from time to time confined in the prison of the said city and county, and to the repairing and maintaining the public roads, and cleaning and improving the streets within the said city and county; and also a further sum not exceeding four thousand pounds, by a tax on the estates, real and personal of all and every the freeholders and inhabitants within the said city, on the south side of a line, beginning at the out-let of the swamp of Leonard Lispenard Esquire into Hudsons river, thence to and along the north side of the dwelling house of Nicholas Bayard Esquire, thence to and along the north side of the dwelling house late of Thomas Jones Esquire, and thence to and along the north side of the dwelling house of Abraham Cannon to the East river, to be applied to the payment of so many watchmen as the mayor aldermen and commonalty of the said city and county of New York shall think necessary for guarding the said city, and also to the purchasing of oil, providing lamps, and repairing and attending the lamps, which now are or hereafter may be erected within the said city, and for the making, repairing and maintaining the public wells and pumps within the said city, and defraying other contingent expenses within the said city, which said sums abovementioned shall

*New York city, tax levied for public purposes in.*

*Tax for watchmen, on what part of city levied.*

# THE ACT

## OF

# INCORPORATION,

## AND THE

## ORDINANCES AND REGULATIONS

## OF

## The Town of Marietta,

## WASHINGTON COUNTY, OHIO.

———•••———

### MARIETTA.
### PRINTED BY C. EMERSON & CO.

———•••———

### 1837.

Compendium_Cornell
Page 0095

ffff

3

18

as such,) the person so offending may be complained of before any justice of the peace for the town, and upon conviction, shall be fined by such justice not than less one dollar, nor more than five dollars for the first offence, and for the second and all subsequent offences against this ordinance, such person shall be fined not less than five, nor more than than ten dollars, and pay all costs, to be collected as other penalties by law are.

SEC. 2.   Be it further ordained and enacted,  That all fines incurred and collected agreeably to the provisions of the first section of this ordinance, shall be paid as follows:—one half thereof to the complainant, and the other half thereof to the township treasury.

SEC. 3.   Be it further ordained and enacted,  That this ordinance shall take effect and be in full force from and after the first day of June next, and be published forthwith in the American Friend.

SEC. 4.   Be it further ordained and enacted,  That all by-laws and ordinances, heretofore passed on this subject, be, and the same are, hereby repealed.

*Passed into a by-law April* 21, 1823.

*Attest,*                                R. PRENTISS, *Town Clerk.*

---

# An Ordinance
### *Relative to Shows, Plays, and other public exhibitions.*

SEC. 1.   Be it ordained by the Mayor, Recorder, and Trustees of the Town of Marietta, in Town  Council assembled,  That if any person or persons shall exhibit any wax figures, puppet show, wire dancing, or tumbling, juggling or slight of hand, or any other show or exhibition, except such as tend to improve the human understanding, or to disseminate useful information, and shall ask or receive any money or other property for exhibiting the same, every person so offending shall forfeit and pay, for every such offence, any sum not exceeding one hundred dollars nor less than ten dollars.

SEC. 2.   That no person or persons shall show or exhibit for money or other property anything as excepted in the first section of this ordinance, without having first obtained a license from the Mayor, or, in his absence, the Recorder, permitting him or them to show or exhibit the same, for which license he or they shall pay into the town treasury any sum which the Mayor, or in his absence, the Recorder may require; not exceeding one hundred dollars, nor less than five dollars.   And any person offending against the provisions of this section shall forfeit and pay, for every such offence, any sum not less than ten dollars.

SEC. 3.   The Mayor, with the advice and consent of the Recorder or any two of the council, or, in the absence or inability of the Mayor, the Recorder with the advice and consent of any two of the council, may, and they are hereby authorized to grant li-

Compendium_Council
Page 0097

Yale Law School
LILLIAN GOLDMAN LAW LIBRARY
in memory of Sol Goldman

THE AVALON PROJECT *Documents in Law, History and Diplomacy*

Search Avalon

Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 -

## Constitution of Pennsylvania - September 28, 1776 (1)

WHEREAS all government ought to be instituted and supported for the security and protection of the community as such, and to enable the individuals who compose it to enjoy their natural rights, and the other blessings which the Author of existence has bestowed upon man; and whenever these great ends of government are not obtained, the people have a right, by common consent to change it, and take such measures as to them may appear necessary to promote their safety and happiness. AND WHEREAS the inhabitants o f this commonwealth have in consideration of protection only, heretofore acknowledged allegiance to the king of Great Britain; and the said king has not only withdrawn that protection, but commenced, and still continues to carry on, with unabated vengeance, a most cruel and unjust war against them, employing therein, not only the troops of Great Britain, but foreign mercenaries, savages and slaves, for the avowed purpose of reducing them to a total and abject submission to the despotic domination of the British parliament, with many other acts of tyranny, (more fully set forth in the declaration of Congress) whereby all allegiance and fealty to the said king and his successors, are dissolved and at an end, and all power and authority derived from him ceased in these colonies. AND WHEREAS it is absolutely necessary for the welfare and safety of the inhabitants of said colonies, that they be henceforth free and independent States, and that just, permanent, and proper forms of government exist in every part of them, derived from and founded on the authority of the people only, agreeable to the directions of the honourable American Congress. We, the representatives of the freemen of Pennsylvania, in general convention met, for the express purpose of framing such a government, confessing the goodness of the great Governor of the universe (who alone knows to what degree of earthly happiness mankind mav attain, by perfecting the arts of government) in permitting the people of this State, by common consent, and without violence, deliberately to form for themselves such just rules as they shall think best, for governing their future society, and being fully convinced, that itis our indispensable duty to establish such original principles of government, as will best promote the general happiness of the people of this State, and their posterity, and provide for future improvements, without partiality for, or prejudice against any particular class, sect, or denomination of men whatever, do, by virtue of the authority vested in use by our constituents, ordain, declare, and establish, the following Declaration of Rights and Frame of Government, to be the CONSTITUTION of this commonwealth, and to remain in force therein for ever, unaltered, except in such articles as shall hereafter on experience be found to require improvement, and which shall by the same authority of the people, fairly delegated as this frame of government directs, be amended or improved for the more effectual obtaining and securing the great end and design of all government, herein before mentioned.

### A DECLARATION OF THE RIGHTS OF THE INHABITANTS OF THE COMMONWEALTH OR STATE OF PENNSYLVANIA

I. That all men are born equally free and independent, and have certain natural, inherent and inalienable rights, amongst which are, the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety.

II. That all men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences and understanding: And that no man ought or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent: Nor can any man, who acknowledges the being of a God, be justly deprived or abridged of any civil right as a citizen, on account of his religious sentiments or peculiar mode of religious worship: And that no authority can or ought to be vested in, or assumed by any power whatever, that shall in any case interfere with, or in any manner controul, the right of conscience in the free exercise of religious worship.

III. That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same.

IV. That all power being originally inherent in, and consequently derived from, the people; therefore all officers of government, whether legislative or executive, are their trustees and servants, and at all times accountable to them.

V. That government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or soft of men, who are a part only of that community, And that the community hath an indubitable, unalienable and indefeasible right to reform, alter, or abolish government in such manner as shall be by that community judged most conducive to the public weal.

VI. That those who are employed in the legislative and executive business of the State, may be restrained from oppression, the people have a right, at such periods as they may think proper, to reduce their public officers to a private station, and supply the vacancies by certain and regular elections.

VII. That all elections ought to be free; and that all free men having a sufficient evident common interest with, and attachment to the community, have a right to elect officers, or to be elected into office.

VIII. That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore is bound to contribute his proportion towards the expence of that protection, and yield his personal service when necessary, or an equivalent thereto: But no part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives: Nor can any man who is conscientiously scrupulous of bearing arms, be justly compelled thereto, if he will pay such equivalent, nor are the people bound by any laws, but such as they have in like manner assented to, for their common good.

IX. That in all prosecutions for criminal offences, a man hath a right to be heard by himself and his council, to demand the cause and nature of his accusation, to be confronted with the witnesses, to call for evidence in his favour, and a speedy public trial, by an impartial jury of the country, without the unanimous consent of which jury he cannot be found guilty; nor can he be compelled to give evidence against himself; nor can any man be justly deprived of his liberty except by the laws of the land, or the judgment of his peers.

X. That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not particularly described, are contrary to that right, and ought not to be granted.

XI. That in controversies respecting property, and in suits between man and man, the parties have a right to trial by jury, which ought to be held sacred.

XII. That the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained.

XIII. That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power.

XIV. That a frequent recurrence to fundamental principles, and a firm adherence to justice, moderation, temperance, industry, and frugality are absolutely necessary to preserve the blessings of liberty, and keep a government free: The people ought therefore to pay particular attention to these points in the choice of

Compendium_Cornell
Page 0098

officers and representatives, and have a right to exact a due and constant regard to them, from their legislatures and magistrates, in the making and executing such laws as are necessary for the good government of the state.

XV. That all men have a natural inherent right to emigrate from one state to another that will receive them, or to form a new state in vacant countries, or in such countries as they can purchase, whenever they think that thereby they may promote their own happiness.

XVI. That the people have a right to assemble together, to consult for their common good, to instruct their representatives, and to apply to the legislature for redress of grievances, by address, petition, or remonstrance.

## PLAN OR FRAME OF GOVERNMENT FOR THE COMMONWEALTH OR STATE OF PENNSYLVANIA

SECTION 1. The commonwealth or state of Pennsylvania shall be governed hereafter by an assembly of the representatives of the freemen of the same, and a president and council, in manner and form following-

SECT. 2. The supreme legislative power shall be vested in a house of representatives of the freemen of the commonwealth or state of Pennsylvania.

SECT. 3. The supreme executive power shall be vested in a president and council.

SECT. 4. Courts of justice shall be established in the city of Philadelphia, and in every county of this state.

SECT. 5. The freemen of this commonwealth and their sons shall be trained and armed for its defence under such regulations, restrictions, and exceptions as the general assembly shall by law direct, preserving always to the people the right of choosing their colonels and all commissioned officers under that rank, in such manner and as often as by the said laws shall be directed.

SECT. 6. Every freemen of the full age of twenty-one Years, having resided in this state for the space of one whole Year next before the day of election for representatives, and paid public taxes during that time, shall enjoy the right of an elector: Provided always, that sons of freeholders of the age of twenty-one years shall be intitled to vote although they have not paid taxes.

SECT. 7. The house of representatives of the freemen of this commonwealth shall consist of persons most noted for wisdom and virtue, to be chosen by the freemen of every city and county of this commonwealth respectively. And no person shall be elected unless he has resided in the city or county for which he shall be chosen two years immediately before the said election; nor shall any member, while he continues such, hold any other office, except in the militia.

SECT. 8. No person shall be capable of being elected a member to serve in the house of representatives of the freemen of this commonwealth more than four years in seven.

SECT. 9. The members of the house of representatives shall be chosen annually by ballot, by the freemen of the commonwealth, on the second Tuesday in October forever, (except this present year,) and shall meet on the fourth Monday of the same month, and shall be stiled, The general assembly of the representatives of the freemen of Pennsylvania, and shall have power to choose their speaker, the treasurer of the state, and their other officers; sit on their own adjournments; prepare bills and enact them into laws; judge of the elections and qualifications of their own members; they may expel a member, but not a second time for the same cause; they may administer oaths or affirmations on examination of witnesses; redress grievances; impeach state criminals; grant charters of incorporation; constitute towns, boroughs, cities, and counties; and shall have all other powers necessary for the legislature of a free state or commonwealth: But they shall have no power to add to, alter, abolish, or infringe any part of this constitution.

SECT. 10. A quorum of the house of representatives shall consist of two-thirds of the whole number of members elected; and having met and chosen their speaker, shall each of them before they proceed to business take and subscribe, as well the oath or affirmation of fidelity and allegiance hereinafter directed, as the following oath or affirmation, viz:

I do swear (or affirm) that as a member of this assembly, I will not propose or assent to any bill, vote, or resolution, which stall appear to free injurious to the people; nor do or consent to any act or thing whatever, that shall have a tendency to lessen or abridge their rights and privileges, as declared in the constitution of this state; but will in all things conduct myself as a faithful honest representative and guardian of the people, according to the best of only judgment and abilities.

And each member, before he takes his seat, shall make and subscribe the following declaration, viz:

I do believe in one God, the creator and governor of the universe, the rewarder of the good and the punisher of the wicked. And I do acknowledge the Scriptures of the Old and New Testament to be given by Divine inspiration.

And no further or other religious test shall ever hereafter be required of any civil officer or magistrate in this State.

SECT. 11. Delegates to represent this state in congress shall be chosen by ballot by the future general assembly at their first meeting, and annually forever afterwards, as long as such representation shall be necessary. Any delegate may be superseded at any time, by the general assembly appointing another in his stead. No man shall sit in congress longer than two years successively, nor be capable of reelection for three Years afterwards: and no person who holds any office in the gift of the congress shall hereafter be elected to represent this commonwealth in congress.

SECT. 12. If any city or cities, county or counties shall neglect or refuse to elect and send representatives to the general assembly, two-thirds of the members from the cities or counties that do elect and send representatives, provided they be a majority of the cities and counties of the whole state, when met, shall have all the powers of the general assembly, as fully and amply as if the whole were present.

SECT. 13. The doors of the house in which the representatives of the freemen of this state shall sit in general assembly, shall be and remain open for the admission of all persons who behave decently, except only when the welfare of this state may require the doors to be shut.

SECT. 14. The votes and proceedings of the general assembly shall be printed weekly during their sitting, with the yeas and nays, on any question, vote or resolution, where any two members require it except when the vote is taken by ballot; and when the yeas and nays are so taken every member shall have a right to insert the reasons of his vote upon the minutes, if he desires it.

SECT. 15. To the end that laws before they are enacted may be more maturely considered, and the inconvenience of hasty determinations as much as possible prevented, all- bills of public nature shall be printed for the consideration of the people, before they are read in general assembly the last time for debate and amendment; and, except on occasions of sudden necessity, shall not be passed into laws until the next session of assembly; and for the more perfect satisfaction of the public, the reasons and motions for making such laws shall be fully and clearly expressed in the preambles.

SECT. 16. The stile of the laws of this commonwealth shall be, " Be it enacted, and it is hereby enacted by the representatives of the freemen of the commonwealth of Pennsylvania in general assembly met, and by the authority of the same." And the general assembly shall affix their seal to every bill, as soon as it is enacted into a law, which seal shall be kept by the assembly, and shall be called, The seal of the laws of Pennsylvania, and shall not be used for any other purpose.

SECT. 17. The city of Philadelphia and each county of this commonwealth respectively, shall on the first Tuesday of November in this present year, and on the second Tuesday of October annually for the two next succeeding years, viz. the year one thousand seven hundred and seventy-seven, and the year one thousand seven hundred and seventy-eight, choose six persons to represent them in general assembly. But as representation in proportion to the number of taxable inhabitants is the only principle which can at all times secure liberty, and make the voice of a majority of the people the law of the land; therefore the general assembly shall cause

Compendium_Cornell
Page 0099

complete lists of the taxable inhabitants in the city and each county in the commonwealth respectively, to be taken and returned to them, on or before the last meeting of the assembly elected in the year one thousand seven hundred and seventy-eight, who shall appoint a representation to each, in proportion to the number of taxables in such returns; which representation shall continue for the next seven years afterwards at the end of which, a new return of the taxable inhabitants shall be made, and a representation agreeable thereto appointed by the said assembly, and so on septennially forever. The wages of-the-representatives in general assembly, and all other state charges shall be paid out of the state treasury.

SECT. 18. In order that the freemen of this commonwealth may enjoy the benefit of election as equally as may be until the representation shall commences as directed in the foregoing section, each county at its own choice may be divided into districts, hold elections therein, and elect their representatives in the county, and their other elective officers, as shall be hereafter regulated by the general assembly of this state. And no inhabitant of this state shall have more than one annual vote at the general election for representatives in assembly.

SECT. 19. For the present the supreme. executive council of this state shall consist of twelve persons chosen in the follow-in" manner: The freemen of the city of Philadelphia, and of the counties of Philadelphia, Chester, and Bucks, respectively, shall choose by ballot one person for the city, and one for each county aforesaid to serve for three years and no longer, at the time and place for electing representatives in general assembly. The freemen of the counties of Lancaster, York, Cumberland, and Berks, shall, in like manner elect one person for each county respectively, to serve as counsellors for two years and no longer. And the counties of Northampton, Bedford, Northumberland and Westmoreland, respectively, shall, in like manner, elect one person for each county, to serve as counsellors for one year, and no longer. And at the expiration of the time for which each counsellor was chosen to serve, the freemen of the city of Philadelphia, and of the several counties in this state, respectively, shall elect one person to serve as counsellor for three years and no longer; and so on every third year forever. By this mode of election and continual rotation, more men will be trained to public business, there will in every subsequent year be found in the council a number of persons acquainted with the proceedings of the foregoing Years, whereby the business will be more consistently conducted, and moreover the danger of establishing an inconvenient aristocracy will be effectually prevented. All vacancies in the council that may happen by death, resignation, or otherwise, shall be filled at the next general election for representatives in general assembly, unless a particular election for that purpose shall be sooner appointed by the president and council. No member of the general assembly or delegate in congress, shall be chosen a member of the council. The president and vice-president shall be chosen annually by the joint ballot of the general assembly and council, of the members of the council. Any person having served as a counsellor for three successive years, shall be incapable of holding that office for four years afterwards. Every member of the council shall be a justice of the peace for the whole eommon¬vealth, by virtue of his office.

In case new additional counties shall hereafter be erected in this state, such county or counties shall elect a counsellor, and such county or counties shall be annexed to the next neighbouring counties, and shall take rotation with such counties.

The council shall meet annually, at the same time and place with the general assembly.

The treasurer of the state, trustees of the loan office, naval officers, collectors of customs or excise, judge of the admirality, attornies general, sheriffs, and prothonotaries, shall not be capable of a seat in the general assembly, executive council, or continental congress.

SECT. 20. The president, and in his absence the vice-president, with the council, five of whom shall be a quorum, shall have power to appoint and commissionate judges, naval officers, judge of the admirality, attorney general and all other officers, civil and military, except such as are chosen by the general assembly or the people, agreeable to this frame of government, and the laws that may be made hereafter; and shall supply every vacancy in any office, occasioned by death, resignation, removal or disqualification, until the office can be filled in the time and manner directed by law or this constitution. They are to correspond with other states, and transact business with the officers of government, civil and military; and to prepare such business as may appear to them necessary to lay before the general assembly. They shall sit as judges, to hear and determine on impeachments, taking to their assistance for advice only, the justices of the supreme court. And shall have power to grant pardons and remit fines, in all cases whatsoever, except in cases of impeachment; and in cases of treason and murder, shall have power to grant reprieves, but not to pardon, until the end of the next sessions of assembly; but there shall be no remission or mitigation of punishments on impeachments, except by act of the legislature; they are also to take care that the laws be faithfully executed; they are to expedite the execution of such measures as may be resolved upon by the general assembly; and they may draw upon the treasury for such sums as shall be appropriated by the house: They may also lay embargoes, or prohibit the exportation of any commodity, for any time, not exceeding thirty days, in the recess of the house only: They may grant such licences, as shall be directed by law, and shall have power to call together the general assembly when necessary, before the day to which they shall stand adjourned. The president shall be commander in chief of the forces of the state, but shall not command in person, except advised thereto by the council, and then only so long as they shall approve thereof. The president and council shall have a secretary, and keep fair books of their proceedings, wherein any counsellor may enter his dissent, with his reasons in support of it.

SECT. 21. All commissions shall be in the name, and by the authority of the freemen of the commonwealth of Pennsylvania, sealed with the state seal, signed by the president or vice-president, and attested by the secretary; which seal shall be kept by the council.

SECT. 22. Every officer of state, whether judicial or executive, shall be liable to be impeached by the general assembly, either when in office, or after his resignation or removal for mar-administration: All impeachments shall be before the president or vice-president and council, who shall hear and determine the same.

SECT. 23. The judges of the supreme court of judicature shall have fixed salaries, be commissioned for seven years only, though capable of re-appointment at the end of that term, but removable for misbehaviour at any time by the general assembly; they shall not be allowed to sit as members in the continental congress, executive council, or general assembly, nor to hold any other office civil or military, nor to take or receive fees or perquisites of any kind.

SECT. 24. The supreme court, and the several courts of common pleas of this commonwealth, shall, besides the powers usually exercised by such courts, have the powers of a court of chancery, so far as relates to the perpetuating testimony, obtaining evidence from places not within this state, and the care of the persons and estates of those who are non compotes mentis, and such other powers as may be found necessary by future general assemblies, not inconsistent with this constitution.

SECT. 25. Trials shall be by jury as heretofore: And it is recommended to the legislature of this state, to provide by law against every corruption or partiality in the choice, return, or appointment of juries.

SECT. 26. Courts of sessions, common pleas, and orphans courts shall be held quarterly in each city and county; and the legislature shall have power to establish all such other courts as they may judge for the good of the inhabitants of the state. All courts shall be open, and justice shall be impartially administered without corruption or unnecessary delay: All their officers shall be paid an adequate but moderate compensation for their services: And if any officer shall take greater or other fees than the law allows him, either directly or indirectly, it shall ever after disqualify him from holding any office in this state.

SECT. 27. All prosecutions shall commence in the name and by the authority of the freemen of the commonwealth of Pennsylvania; and all indictments shall conclude with these words, "Against the peace and dignity of the same." The style of all process hereafter in this state shall be, The commonwealth of Pennsylvania.

SECT. 28. The person of a debtor, where there is not a strong presumption of fraud, shall not be continued in prison, after delivering Up, bona fide, all his estate real and personal, for the use of his creditors, in such manner as shall be hereafter regulated by law. All prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or presumption great.

SECT. 29. Excessive bail shall not be exacted for bailable offences: And all fines shall be moderate.

SECT. 30. Justices of the peace shall be elected by the freeholders of each city and county respectively, that is to say, two or more persons may be chosen for each ward, township, or district, as the law shall hereafter direct: And their names shall be returned to the president in council, who shall commissionate one or more of them for each ward, township, or district so returning, for seven years, removable for misconduct by the general assembly. But if any city or county, ward, township, or district in this commonwealth, shall hereafter incline to change the manner of appointing their justices of the peace as settled in this article, the general assembly may make laws to regulate the same, agreeable to the desire of a majority of the freeholders of the city or county, ward, township, or district so applying. No justice of the

peace shall sit in the general assembly unless he first resigns his commission; nor shall he be allowed to take any fees, nor any salary or allowance, except such as the future legislature may grant.

SECT. 31. Sheriffs and coroners shall be elected annually in each city and county, by the freemen; that is to say, two persons for each office, one of whom for each, is to be commissioned by the President in council. No person shall continue in the office of sherift more than three successive years, or be capable of being again elected during four years afterwards. The election shall be held at the same time and place appointed for the election of representatives: And the commissioners and assessors, and other officers chosen by the people, shall also be then and there elected, as has been usual heretofore, until altered or otherwise regulated by the future legislature of this state.

SECT. 32. All elections, whether by the people or in general assembly, shall be by ballot, free and voluntary: And any elector, who shall receive any gift or reward for his vote, in meat, drink, monies, or otherwise, shall forfeit his right to elect for that time, and suffer such other penalties as future laws shall direct. And any person who shall directly or indirectly give, promise, or bestow any such rewards to be elected, shall be thereby rendered incapable to serve for the ensuing year.

SECT. 33. All fees, licence money, fines and forfeitures heretofore granted, or paid to the governor, or his deputies for the support of government, shall hereafter be paid into the public treasury, unless altered or abolished by the future legislature.

SECT. 34. A register's office for the probate of wills and granting letters of administration, and an office for the recording of deeds, shall be kept in each city and county: The officers to be appointed by the general assembly, removable at their pleasure, and to be commissioned by the president in council.

SECT. 35. The printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of government.

SECT. 36. As every freeman to preserve his independence, (if without a sufficient estate) ought to have some profession, calling, trade or farm, whereby he may honestly subsist, there can be no necessity for, nor use in establishing offices of profit, the usual effects of which are dependence and servility unbecoming freemen, in the possessors and expectants; faction, contention, corruption, and disorder among the people. But if any man is called into public service; to the prejudice of his-private affairs, he has a right to a reasonable compensation: And whenever an office, through increase of fees or otherwise, becomes so profitable as to occasion many to apply for it, the profits ought to be lessened by the legislature.

SECT. 37. The future legislature of this state, shall regulate intails in such a manner as to prevent perpetuities.

SECT. 38. The penal laws as heretofore used shall be reformed by the legislature of this state, as soon as may be, and punishments made in some cases less sanguinary, and in general more proportionate to the crimes.

SECT. 39. To deter more effectually from the commission of crimes by continued visible punishments of long duration, and to make sanguinary punishments less necessary; houses ought to be provided for punishing by hard labour, those who shall be convicted of crimes not capital; wherein the criminals shall be imployed for the benefit of the public, or for reparation of injuries done to private persons: And all persons at proper times shall be admitted to see the prisoners at their labour.

SECT. 40. Every officer, whether judicial, executive or military, in authority under this commonwealth, shall take the following oath or affirmation of allegiance, and general oath of office before he enters on the execution of his office.

## THE OATH OR AFFIRMATION OF ALLEGIANCE

I do swear (or affirm) that I will be true and faithful to the commonwealth of Pennsylvania: And that I will not directly or indirectly do any act or thing prejudicial or injurious to the constitution or government thereof, as established by the-convention. -

## THE OATH OR AFFIRMATION OF OFFICE

I-do swear (or affirm) that I will faithfully execute the office of for the of-and will do equal right and justice to all men, to the best of my judgment and abilities, according to law.

SECT. 41. NO public tax, custom or contribution shall be imposed upon, or paid by the people of this state, except by a law for that purpose: And before any law be made for raising it, the purpose for which any tax is to be raised ought to appear clearly to the legislature to be of more service to the community than the money would be, if not collected; which being well observed, taxes can never be burthens.

SECT. 42. Every foreigner of good character who comes to settle in this state, having first taken an oath or affirmation of allegiance to the same, may purchase, or by other just means acquire, hold, and transfer land or other real estate; and after one year's residence, shall be deemed a free denizen thereof, and entitled to all the rights of a natural born subject of this state, except that he shall not be capable of being elected a representative until after two years residence.

SECT. 43. The inhabitants of this state shall have liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands therein not inclosed; and in like manner to fish in all boatable waters, and others not private property

SECT. 44. A school or schools shall be established in each county by the legislature, for the convenient instruction of youth, with such salaries to the masters paid by the public, as may enable them to instruct youth at low prices: And all useful learning shall be duly encouraged and promoted In one or more universities.

SECT. 45. Laws for the encouragement of virtue, and prevention of vice and immorality, shall be made and constantly kept in force, and provision shall be made for their due execution: And all religious societies or bodies of men heretofore united or incorporated for the advancement of religion or learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities and estates which they were accustomed to enjoy, or could of right have enjoyed, under the laws and former constitution of this state.

SECT. 46. The declaration of rights is hereby declared to be a part of the constitution of this commonwealth, and ought never to be violated on any presence whatever.

SECT. 47. In order that the freedom of the commonwealth may be preserved inviolate forever, there shall be chosen by ballot by the freemen in each city and county respectively, on the second Tuesday in October, in the Year one thousand seven hundred and eighty-three, and on the second Tuesday in October, in every seventh year thereafter, two persons in each city and county of this state, to be called the COUNCIL OF CENSORS; who shall meet together on the second Monday of November next ensuing their election; the majority of whom shall be a quorum in every case, except as to calling a convention, in which two-thirds of the whole number elected shall agree: And whose duty it shall be to enquire whether the constitution has been preserved inviolate in every part; and whether the legislative and executive branches of government have performed their duty as guardians of the people, or assumed to themselves, or exercised other or greater powers than they are intitled to by the constitution: They are also to enquire whether the public taxes have been justly laid and collected in all parts of this commonwealth, in what manner the public monies have been disposed of, and whether the laws have been duly executed. For these purposes they shall have power to send for persons, papers, and records; they shall have authority to pass public censures, to order impeachments, and to recommend to the legislature the repealing such laws as appear to them to have been enacted contrary to the principles of the constitution. These powers they shall continue to have, for and during the space of one year from the day of their election and no longer: The said council of censors shall also have power to call a convention, to meet within too years after their sitting, if there appear to them an absolute necessity of amending any article of the constitution which may be defective, explaining such as may be thought not clearly expressed, and of adding such as are necessary for the preservation of the rights and happiness of the people: But the articles to be amended, and the amendments proposed, and such articles as are proposed to be added or abolished, shall be promulgated at least six months before the day appointed for the election of such convention, for the previous consideration of the people, that they may have an opportunity of instructing their delegates on the subject.

The Avalon Project : Constitution of Pennsylvania - September 28, 1776

Passed in Convention the 28th day of September, 1776, and signed by their order.

BENJ. FRANKLIN, Prest.

(1) The Proceedings Relative to Calling the Conventions of 1776 and 1790 the Minutes of the Convention that formed the present Constitution of Pennsylvania together with the Charter to William Penn the Constitutions of 1776 and 1790 and a view of the Proceedings of the Convention of 1776 and the Council of Censors. Harrisburg: Printed by John S. Wiestling Market Street, 1825. pp. 3S4. Index.

The Constitution of the Commonwealth of Pennsylvania as established by the General Convention carefully compared with the original to which is added a Report of the Committee appointed to enquire Whether the Constitution has been preserved inviolate in every Part and whether the legislative and executive branches of Government, have performed their duty as Guardians of the People or assumed to themselves or exercised other or greater Powers. than they are entitled to by the Constitution.

As adopted by the Council of Censors Published by their Order. Philadelphia: Printed by Francis Bailey, at Yorick s Head in Market Street. M, DCC.LXXXIV. pp. 64.

This constitution was framed by a convention (called in accordance with the expressed wish of the Continental Congress) which assembled at Philadelphia July 15 1776 and completed its labors September 28 1776. It was not submitted to the people for ratification. Back

Source:
The Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America
Compiled and Edited Under the Act of Congress of June 30, 1906 by Francis Newton Thorpe
Washington, DC : Government Printing Office, 1909.

Colonial Charters Page

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

| Avalon Statement of Purpose | Accessibility at Yale | Contact Us | Yale Law Library | University Library | Yale Law School | Search Morris | Search Orbis |

Compendium_Cornell
Page 0102

[Section II] (Section III, P. L.) And be it further enacted, That if two-thirds parts of the members of such counties respectively that do elect and send members to serve in the general assembly of this state shall neglect or refuse to appear and take their seats in the house within ten days after the time fixed by the constitution of this commonwealth, the majority of such as do appear in order to take their seats are hereby authorized and empowered to issue their writs to the sheriff or coroner of the respective counties where such neglect or refusal shall be, commanding him to cause an election to be held for electing a member or members to supply every such vacancy in such county (which election shall be held as the laws of Pennsylvania direct for filling vacancies in assembly as the same may be altered or revived by this house), which writs shall be as good and available to all intents and purposes as writs for supplying vacancies in the general assembly can or ought to be if they were issued by the speaker by direction of a full house.   And the members which shall be so elected shall meet the other members in assembly on the fourteenth day after every such election, to which time and no longer the members that shall issue such writs may adjourn.

Passed January 21, 1777.  See the Act of Assembly passed October 11, 1777, Chapter 764.

---

## CHAPTER DCCXXXVII.

AN ACT TO REVIVE AND PUT IN FORCE SUCH AND SO MUCH OF THE LATE LAWS OF THE PROVINCE OF PENNSYLVANIA AS IS JUDGED NECESSARY TO BE IN FORCE IN THIS COMMONWEALTH AND [TO] REVIVE AND ESTABLISH THE COURTS OF JUSTICE AND FOR OTHER PURPOSES THEREIN MENTIONED.

(Section I, P. L.) Whereas by the unconstitutional power claimed by the British King and parliament over the American colonies and the cruel and oppressive measures which the said King and parliament have pursued to establish that power it

Digitized by 

Original from
PENN STATE

*The Statutes at Large of Pennsylvania.* [1776-77

became necessary for the colonies to declare themselves free and independent states, which was accordingly done pursuant to a resolve of the Continental Congress.  Whereupon all authority being in any person under the said King consequently ceased, and the laws enacted by his representatives here became of no force or effect, although the same were for the most part suited to the circumstances of the people:

And whereas it is absolutely necessary for the well governing every state that laws properly adapted to the circumstances of the inhabitants be at all times in force:

[Section I] (Section II, P. L.) Be it therefore enacted, and it is hereby enacted by the Representatives of the Freemen of the Commonwealth of Pennsylvania in General Assembly met and by the authority of the same, That each and every one of the laws or acts of general assembly that were in force and binding on the inhabitants of the said province on the fourteenth day of May last shall be in force and binding on the inhabitants of this state from and after the tenth day of February next as fully and effectually to all intents and purposes as if the said laws and each of them had been made or enacted by this general assembly, and all and every person and persons whosoever are hereby enjoined and required to yield obedience to the said laws as the case may require until the said laws or acts of general assembly respectively, shall be repealed or altered or until they expire by their own limitation and the common law and such of the statute laws of England as have heretofore been in force in the said province, except as is hereafter excepted.

[Section II] (Section III, P. L.) Provided always and be it further enacted by the authority aforesaid, That so much of every law or act of general assembly of the province aforesaid as orders the taking or subscribing any oath, affirmation or declaration of allegiance or fidelity to the King of Great Britain or his successors or oath of office and so much of every law or act of general assembly aforesaid as acknowledges any authority in the heirs or devisees of William Penn, Esquire, deceased, the former governor of the said province, or any other person whomsoever as governor, and so much of every law or act of general assembly as ascertains the number of members of

Digitized by Google

Original from
PENN STATE

# TEXAS LAW | Tarlton Law Library
## Jamail Center for Legal Research

Citation:  *Constitution of the State of Texas, Adopted by the Constitutional Convention Convened under the Reconstruction Acts of Congress Passed March 2, 1867, and the Acts Supplementary thereto; to be Submitted for Ratification or Rejection at an Election to Take Place on the First Monday of July, 1869.* Austin, Texas: Printed at the Daily Republican Office. 1869. Winkler-Friend 2121.

Content downloaded from
Tarlton Constitutions 1824-1876 (http://tarlton.law.utexas.edu/constitutions/)

The text of these documents is in the public domain.  That is, the original words and content are freely usable.

The images of the documents are copyrighted material; the copyright is held by the Tarlton Law Library.  The copyrighted images may be used only with permission.   Permission is granted to use the copyrighted materials in the classroom for educational purposes.  Downloading, printing, publication, public display or otherwise using any of the copyrighted images, including on the web or in a forum other than a classroom, requires permission from Tarlton. Requests for permission to use these materials should be submitted online to rarebooks@law.utexas.edu.

If you are uncertain whether you need permission to use these materials, please contact us at rarebooks@law.utexas.edu.

# CONSTITUTION

OF THE

# STATE OF TEXAS,

ADOPTED BY THE

## CONSTITUTIONAL CONVENTION

CONVENED UNDER THE RECONSTRUCTION ACTS OF CONGRESS
PASSED MARCH 2, 1867, AND THE ACTS
SUPPLEMENTARY THERETO;

BE SUBMITTED FOR RATIFICATION OR REJECTION
AT AN ELECTION TO TAKE PLACE ON THE
FIRST MONDAY OF JULY, 1869.

———————

AUSTIN, TEXAS:
PRINTED AT THE DAILY REPUBLICAN OFFICE.
1869.

Property of Tarlton Law Library, Jamail Center for Legal Research, The University of Texas School of Law

THE LIBRARY
THE UNIVERSITY
OF TEXAS

BOUND FEB W 1944
*Nov 42*
Central / Book 3. 00 Law-Special
APR 2 8 1942

# CONSTITUTION

## OF THE

# STATE OF TEXAS.

---

## PREAMBLE.

WE, THE PEOPLE OF TEXAS, acknowledging with gratitude the grace of God, in permitting us to make a choice of our form of government, do hereby ordain and establish this Constitution :  *Preamble.*

## ARTICLE I.

### BILL OF RIGHTS.

That the heresies of nullification and secession, which brought the country to grief, may be eliminated from future political discussion ; that public order may be restored, private property and human life protected ; and the great principles of liberty and equality secured to us and our posterity, We declare that :  *Preface.*

SECTION I.  The Constitution of the United States, and the laws and treaties made, and to be made, in pursuance thereof, are acknowledged to be the supreme law ; that this Constitution is framed in harmony with, and in subordination thereto ; and that the fundamental principles embodied herein can only be changed, subject to the national authority.  *Constitution, laws & treaties of the United States supreme*

49504

Property of Tarlton Law Library, Jamail Center for Legal Research, The University of Texas School of Law

4

**Equal rights asserted--exclusive privileges denied.**

SECTION II.   All freemen, when they form a social compact, have equal rights; and no man, or set of men, is entitled to exclusive separate public emoluments or privileges.

**No religious test required.**

SECTION III.   No religious test shall be required as a qualification to any office of public trust in this State.

**Worship.**

SECTION IV.   All men have a natural and indefeasible right to worship God according to the dictates of their own consciences. No man shall be compelled to attend, erect, or support any place of worship; or to maintain any ministry against his consent.

**Rights of conscience.**

No human authority ought, in any case whatever, to control, or interfere with the rights of conscience in matters of religion;

**Equal laws to religious societies.**

and no preference shall ever be given, by law, to any religious societies or mode of worship.   But it shall be the duty of the Legislature to pass such laws as may be necessary to protect every religious denomination in the peaceable enjoyment of their own mode of public worship.

**Liberty of opinion & the press guaranteed.**

SECTION V.   Every citizen shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

**Truth of publication may be given in evidence.**

SECTION VI.   In prosecutions for the publication of papers, investigating the official conduct of officers, or of men in a public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and in

**Jury to determine law and facts.**

all prosecutions for libels, the jury shall have the right to determine the law and the facts, under the direction of the Court, as in other cases.

**Security from seizures and searches.**

SECTION VII.   The people shall be secured in their persons, houses, papers, and possessions, from all unreasonable seizures or searches; and no warrant to search any place, or to seize any person or thing, shall issue, without describing such place, person or thing, as near as may be, nor without probable cause, supported by oath or affirmation.

**Speedy and public trial.**

SECTION VIII.   In all criminal prosecutions, the accused shall have a speedy public trial, by an impartial jury.   He shall not be compelled to give evidence against himself.   He shall

**Accused to be heard.**

have the right of being heard by himself, or by counsel, or both; shall be confronted with the witnesses against him, and shall

Property of Tarlton Law Library, Jamail Center for Legal Research, The University of Texas School of Law

5

have compulsory process for obtaining witnesses in his favor: *Compulsory process for witnesses awarded. How held. Exceptions.* and no person shall be holden to answer for any criminal charge, but on indictment or information, except in cases arising in the land or naval forces or offenses against the laws regulating the militia.

SECTION IX.   All prisoners shall be bailable upon sufficient *Bailable offenses.* sureties, unless for capital offenses, when the proof is evident; but this provision shall not be so construed as to prohibit bail after indictment found, upon an examination of the evidence by a Judge of the Supreme or District Court, upon the return of the writ of habeas corpus, returnable in the county where the offense is committed.

SECTION X.   The privileges of the writ of habeas corpus shall *Writ of habeas corpus.* not be suspended, except by act of Legislature, in case of rebellion or invasion, when the public safety may require it.

SECTION XI.   Excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted. *Excessive bail and fines. Cruel and unusual punishments.* All courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy *Remedy by law.* by due course of law.

SECTION XII.   No person, for the same offense, shall be *Jeopardy of life.* twice put in jeopardy of life; nor shall a person be again put upon trial for the same offense, after a verdict of not guilty; and *Trial by jury.* the right of trial by jury shall remain inviolate.

SECTION XIII.   Every person shall have the right to keep *Arms.* and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe.

SECTION XIV.   No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, *Bills of attainder, expost fac to and retroactive laws. Private property taken. Laws impairing contracts.* shall be made; and no person's property shall be taken, or applied to public use without just compensation being made, unless by the consent of such person; nor shall any law be passed depriving a party of any remedy for the enforcement of a contract, which existed when the contract was made.

SECTION XV.   No person shall ever be imprisoned for debt. *Imprisonment for debt.*

SECTION XVI.   No citizen of this State shall be deprived of

Property of Tarlton Law Library, Jamail Center for Legal Research, The University of Texas School of Law

 Constitution of the State of Utah PREAMBLE

Grateful to Almighty God for life and liberty, we, the people of Utah, in order to secure and

perpetuate the principles of free government, do ordain and establish this CONSTITUTION.

ARTICLE I

DECLARATION OF RIGHTS

Section 1. [**Inherent and inalienable rights.**] All men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; to worship according to the dictates of their consciences; to assemble peaceably, protest against wrongs, and petition for redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right.

Sec. 2. [**All political power inherent in the people.**] All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require.

Sec. 3. [**Utah inseparable from the Union.**] The State of Utah is an inseparable part of the Federal Union and the Constitution of the United States is the supreme law of the land.

Sec. 4. [**Religious liberty.**] The rights of conscience shall never be infringed. The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment. No property qualification shall be required of any person to vote, or hold office, except as provided in this Constitution.

Sec. 5. [**Habeas corpus.**] The privilege of the writ of *habeas corpus* shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it.

Sec. 6. [**Right to bear arms.**] The people have the right to bear arms for their security and defense, but the Legislature may regulate the exercise of this right by law.

Sec. 7. [**Due process of law.**] No person shall be deprived of life, liberty or property, without due process of law.

Sec. 8. [**Offenses bailable.**] All prisoners shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption strong.

Sec. 9. [**Excessive bail and fines. Cruel punishments.**] Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor.

Sec. 10. [**Trial by jury.**] In capital cases the right of trial by jury shall remain inviolate. In courts of general jurisdiction, except in capital cases, a jury shall consist of eight jurors. In courts of inferior jurisdiction a jury shall consist of four jurors. In criminal cases the verdict shall be unanimous. In civil cases three-fourths of the jurors may find a verdict. A jury in civil cases shall be waived unless demanded.

Sec. 11. [**Courts open. Redress of injuries.**] All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered

without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

Sec. 12. [**Rights of accused persons.**] In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to be confronted by the witnesses against him, to have compulsory process to compel the attendance of witnesses in his own behalf, to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed, and the right to appeal in all cases. In no instance shall any accused person, before final judgment, be compelled to advance money or fees to secure the rights herein guaranteed. The accused shall not be compelled to give evidence against himself; a wife shall not be compelled to testify against her husband, nor a husband against his wife, nor shall any person be twice put in jeopardy for the same offense.

Sec. 13. [**Prosecution by information or indictment. Grand jury.**] Offenses heretofore required to be prosecuted by indictment, shall be prosecuted by information after examination and commitment by a magistrate, unless the examination be waived by the accused with the consent of the State, or by indictment, with or without such examination and commitment. The grand jury shall consist of seven persons, five of whom must concur to find an indictment; but no grand jury shall be drawn or summoned unless in the opinion of the judge of the district, public interest demands it.

Sec. 14. [**Unreasonable searches forbidden. Issuance of warrant.**] The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

Sec. 15. [**Freedom of speech and of the press. Libel.**] No law shall be passed to abridge or restrain the freedom of speech or of the press. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

Sec. 16. [**No imprisonment for debt. Exception.**] There shall be no imprisonment for debt except in cases of absconding debtors.

Sec. 17. [**Elections to be free. Soldiers voting.**] All elections shall be free, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage. Soldiers, in time of war, may vote at their post of duty, in or out of the State, under regulations to be prescribed by law.

Sec. 18. [**Attainder. Ex post facto laws. Impairing contracts.**] No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be passed.

Sec. 19. [**Treason defined. Proof.**] Treason against the State shall consist only in levying war against it, or in adhering to its enemies or in giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act.

Sec. 20. [**Military subordinate to the civil power.**] The military shall be in strict subordination to the civil power, and no soldier in time of peace, shall be quartered in any house without the consent of the owner; nor in time of war except in a manner to be prescribed by law.

Sec. 21. [**Slavery forbidden.**] Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within this State.

Sec. 22. [**Private property for public use.**] Private property shall not be taken or damaged for public use without just compensation.

Sec. 23. [**Irrevocable franchises forbidden.**] No law shall be passed granting irrevocably any franchise, privilege or immunity.

Sec. 24. [**Uniform operation of laws.**] All laws of a general nature shall have uniform operation.

Sec. 25. [**Rights retained by people.**] This enumeration of rights shall not be construed to impair or deny others retained by the people.

Sec. 26. [**Provisions mandatory and prohibitory.**] The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.

Sec. 27. [**Fundamental rights.**] Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government.

ARTICLE II

STATE BOUNDARIES

Section 1. [**State boundaries.**] The boundaries of the State of Utah shall be as follows: Beginning at a point formed by the intersection of the thirty-second degree of longitude west from Washington, with the thirty-seventh degree of north latitude; thence due west along said thirty-seventh degree of north latitude to the intersection of the same with the thirty-seventh degree of longitude west from Washington; thence due north along said thirty-seventh degree of east longitude to the intersection of the same with the forty-second degree of north latitude; thence due east along said forty-second degree of north latitude to the intersection of the same with the thirty-fourth degree of longitude west from Washington; thence due south along said thirty-fourth degree of west longitude to the intersection of the same with the forty-first degree of north latitude; thence due east along said forty-first degree of north latitude to the intersection of the same with the thirty-second degree of longitude west from Washington; thence due south along said thirty-second degree of west longitude to the place of beginning.

ARTICLE III

ORDINANCE

The following ordinance shall be irrevocable without the consent of the United States and the

people of this State:

[**Religious toleration. Polygamy forbidden.**] First:--Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited.

[**Right to public domain disclaimed. Taxation of lands. Exemptions.**] Second:--The people inhabiting this State do affirm and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries hereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States. The lands belonging to citizens of the United States, residing without this State shall never be taxed at a higher rate than the lands belonging to residents of this State; nor shall taxes be imposed by this State on lands or property herein, belonging to or which may hereafter be purchased by the United States or reserved for its use; but nothing in this ordinance shall preclude this state from taxing, as other lands are taxed, any lands owned or held by any Indian who has severed his tribal

## Vermont State Archives & Records Administration

VSARA > Learn > Constitution > 1777 Constitution

# Vermont Constitution - 1777

- Preamble
- Chapter I: A Declaration of the Rights of the Inhabitants of the State of Vermont
- Chapter II: Plan or Frame of Government

## Preamble

Whereas, all government ought to be instituted and supported for the security and protection of the community as such and to enable the individuals who compose it, to enjoy their natural rights, and the other blessings which the Author of existence has bestowed upon man; and whenever those great ends of government are not obtained, the people have a right, by common consent, to change it, and take such measures as to them may appear necessary to promote their safety and happiness.

And whereas, the inhabitants of this State have, (in consideration of protection only) heretofore acknowledged allegiance to the King of Great Britain, and the said King has not only withdrawn that protection, but commenced, and still continues to carry on, with unabated vengeance, a most cruel and unjust war against them; employing therein, not only the troops of Great Britain, but foreign mercenaries, savages and slaves, for the avowed purpose of reducing them to a total and abject submission to the despotic dominion of the British parliament, with many other acts of tyranny (more fully set forth in the declaration of Congress), whereby all allegiance and fealty to the said King and his successors, are dissolved and at an end; and all power and authority derived from him, ceased in the American Colonies.

And whereas, the territory which now comprehends the State of Vermont, did antecedently, of right, belong to the government of New Hampshire; and the former Governor thereof, viz. his excellency Benning Wentworth, Esq., granted many charters of lands and corporations, within this State, to the present inhabitants and others. And whereas, the late Lieutenant Governor Colden, of New York, with others, did, in violation of the tenth command, covet those very lands; and by a false representation made to the court of Great Britain (in the year 1764, that for the convenience of trade and administration of justice, the inhabitants were desirous of being annexed to that government), obtained jurisdiction of those very identical lands, ex-parte; which ever was, and is disagreeable to the inhabitants. And whereas, the legislature of New York, ever have, and still continued to disown the good people of this State, in their landed property, which will appear in the complaints hereafter inserted, and in the 36th section of their present constitution, in which is established the grants of land made by that government.

They have refused to make re-grants of our lands to the original proprietors and occupants, unless at the exorbitant rate of 2300 dollars fees for each township; and did enhance the quitrent, three fold, and demanded an immediate delivery of the title derived before, from New Hampshire.

The judges of their supreme court have made a solemn declaration, that the charters, conveyances, &c., of the lands included in the before described premises, were utterly null and void, on which said title was founded; in consequence of which declaration, writs of possession have been by them issued, and the sheriff of the county of Albany sent, at the head of six or seven hundred men, to enforce the execution thereof.

They have passed an act, annexing a penalty thereto, of thirty pounds fine and six months imprisonment, on any person who should refuse assisting the sheriff, after being requested, for the purpose of executing writs of possession.

The Governors, Dunmore, Tryon and Colden, have made regrants of several tracts of land, included in the premises, to certain favorite land jobbers in the government of New-York, in direct violation of his Britannic majesty's express prohibition, in the year 1767.

They have issued proclamations, wherein they have offered large sums of money, for the purpose of apprehending those very persons who have dared boldly, and publicly, to appear in defence of their just rights.

They did pass twelve acts of outlawry, on the 9th day of March, A.D. 1774, impowering the respective judges of their supreme court, to award execution of death against those inhabitants in said district that they should judge to be offenders, without trial.

They have, and still continue, an unjust claim to those lands, which greatly retards emigration into, and the settlement of, this State.

They have hired foreign troops, emigrants from Scotland, at two different times, and armed them, to drive us out of possession.

They have sent the savages on our frontiers, to distress us.

They have proceeded to erect the counties of Cumberland and Gloucester, and establish courts of justice there, after they were discountenanced by the authority of Great Britain.

The free Convention of the State of New-York, at Harlem, in the year 1776, unanimously voted, "That all quit-rents formerly due to the King of Great Britain, are now due and owing to this convention, or such future government as shall be hereafter established in this State."

In the several stages of the aforesaid oppressions, we have petitioned his Britannic majesty, in the most humble manner, for redress, and have, at very great expense, received several reports in our favor; and in other instances, wherein we have petitioned the late legislative authority of New-York, those petitions have been treated with neglect.

And whereas, the local situation of this State, from New-York, at the extreme part, is upwards of four hundred and fifty miles from the seat of that government, which renders it extreme difficult to continue under the jurisdiction of said State.

Therefore, it is absolutely necessary, for the welfare and safety of the inhabitants of this State, that it should be, henceforth, a free and independent State; and that a just, permanent and proper form of government, should exist in it, derived from, and founded on, the authority of the people only, agreeable to the direction of the honorable American Congress.

We the representatives of the freemen of Vermont, in General Convention met, for the express purpose of forming such a government, confessing the goodness of the Great Governor of the Universe (who alone, knows to what degree of earthly happiness, mankind may attain, by perfecting the arts of government), in permitting the people of this State, by common consent, and without violence, deliberately to form for themselves, such just rules as they shall think best for governing their future society; and being fully convinced that it is our indispensable duty, to establish such original principles of government, as will best promote the general happiness of the people of this State, and their posterity, and provide for future improvements, without partiality for, or prejudice against, any particular class, sect, or denomination of men whatever: Do, by virtue of authority vested in us, by our constituents, ordain, declare, and establish, the following declaration of rights, and frame of government, to be the Constitution of this Commonwealth, and to remain in force therein, forever, unaltered, except in such articles, as, shall, hereafter, on experience, be found to require improvement, and which shall, by the same authority of the people, fairly delegated, as this frame of government directs, be amended or improved, for the more effectual obtaining and securing the great end and design of all government, herein before mentioned.

<back to top>


# Chapter I

### A Declaration of the Rights of the Inhabitants of the State of Vermont

I. **That all men are born equally free and independent, and have certain natural, inherent, and unalienable rights, amongst which are the enjoying and defending life and liberty; acquiring, possessing, and protecting property, and pursuing and obtaining happiness and safety.** Therefore, no male person, born in this country, or brought from over sea, ought to be holden by law, to serve any person, as a servant, slave, or apprentice, after he arrives to the age of twenty-one years; nor female, in like manner, after she arrives to the age of eighteen years, unless they are bound by their own consent, after they arrive to such age, or bound by law for the payment of debts, damages, fines, costs, or the like.

II. That private property ought to be subservient to public uses, when necessity requires it; nevertheless, whenever any particular man's property is taken for the use of the public, the owner ought to receive an equivalent in money.

III. That all men have a natural and unalienable right to worship Almighty God, according to the dictates of their own consciences and understanding, regulated by the word of God; and that no man ought, or of right can be compelled, to attend any religious worship, or erect, or support any place of worship, or maintain any minister, contrary to the dictates of his conscience; nor can any man who professes the protestant religion be justly deprived or abridged of any civil right as a citizen, on account of his religious sentiment, or peculiar mode of religious worship; and that no authority can, or ought to be vested in, or assumed by any power whatsoever, that shall, in any case, interfere with, or in any manner control, the rights of conscience, in the free exercise of religious worship: nevertheless, every sect or denomination of people ought to observe the Sabbath or Lord's day, and keep up and support some sort of religious worship which to them shall seem most agreeable to the revealed will of God.

IV. That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same.

V. That all power being originally inherent in, and consequently, derived from, the people; therefore, all officers of government, whether legislative or executive, are their trustees and servants, and at all times accountable to them.

VI. That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family or set of men, who are a part only of that community; and that the community hath an indubitable, unalienable and indefeasible right, to reform, alter or abolish government, in such manner as shall be, by that community, judged most conducive to the public weal.

VII. That those who are employed in the legislative and executive business of the State, may be restrained from oppression, the people have a right, at such periods as they may think proper, to reduce their public officers to a private station, and to supply the vacancies, by certain and regular elections.

VIII. That all elections ought to free; and that all freemen, having a sufficient evident common interest with, and attachment to, the community, have a right to elect officers, or be elected into office.

IX. That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore is bound to contribute his proportion towards the expense of the protection, and yield his personal service, when necessary, or an equivalent thereto; but no part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives; nor can any man, who is conscientiously scrupulous of bearing arms, be justly compelled thereto, if he will pay such equivalent; nor are the people bound by any law, but such as they have, in like manner, assented to, for their common good.

X. That in all prosecutions for criminal offences, a man hath a right to be heard by himself and his counsel—to demand the cause and nature of his accusation—to be confronted with the witnesses—to call for evidence in his favor, and a speedy public trial by an impartial jury of the country; without the unanimous consent of which jury, he cannot be found guilty; nor can he be compelled to give evidence against himself; nor can he be justly deprived of his liberty, except by the laws of the land or the judgment of his peers.

XI. That the people have a right to hold themselves, their houses, papers and possessions, free from search and seizure; and therefore warrants, without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

XII. That no warrant or writ to attach the person or estate of any freeholder within this state, shall be issued in civil action, without the person or persons, who may request such warrant or attachment, first make oath, or affirm, before the authority who may be requested to issue the same, that he, or they, are in danger of losing his, her or their debts.

XIII. That, in controversies affecting property, and in suits between man and man, the parties have a right to a trial by jury, which ought to be held sacred.

XIV. That the people have a right to freedom of speech, and of writing and publishing their sentiments, therefore, the freedom of the press ought not to be restrained.

XV. That the people have a right to bear arms for the defence of themselves and the State; and, as standing armies, in the time of peace, are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power.

XVI. That frequent recurrence to fundamental principles, and a firm adherence to justice, moderation, temperance, industry and frugality, are absolutely necessary to preserve the blessings of liberty, and keep government free. The people ought therefore to pay particular attention to these points, in the choice of officers and representatives, and have a right to exact a due and constant regard to them from their legislators and magistrates, in the making and executing such laws as are necessary for the good government of the State.

XVII. That all people have a natural and inherent right to emigrate from one State to another that will receive them; or to form a new State in vacant countries, or in such countries as they can purchase, whenever they think that thereby they can promote their own happiness.

XVIII. That the people have a right to assemble together to consult for their common good—to instruct their representatives; and to apply to the Legislature for redress of grievances, by address, petition or remonstrance.

XIX. That no person shall be liable to be transported out of this State, for trial, for any offence committed within this State.

<back to top>

# Chapter II

## Plan or Frame of Government

Compendium_Cornell
Page 0115

## SECTION I.

The Commonwealth or State of Vermont, shall be governed hereafter, by a Governor, Deputy Governor, Council, and an Assembly of the Representatives of the Freemen of the same, in manner and form following.

## SECTION II.

The supreme legislative power shall be vested in a House of Representatives of the Freemen or Commonwealth or State of Vermont.

## SECTION III.

The supreme executive power shall be vested in a Governor and Council.

## SECTION IV.

Courts of justice shall be established in every county in this state.

## SECTION V.

The freemen of this Commonwealth, and their sons, shall be trained and armed for its defence, under such regulations, restrictions and exceptions, as the General Assembly shall, by law, direct; reserving always to the people, the right of choosing their colonels of militia, and all commissioned officers under that rank, in such manner, and as often, as by the said laws shall be directed.

## SECTION VI.

Every man of the full age of twenty-one years, having resided in this State for the space of one whole year, next before the election of representatives, and who is of a quiet and peaceable behavior, and will take the following oath (or affirmation), shall be entitled to all the privileges of a freeman of this State.

"I _____ solemnly swear, by the ever living God (or affirm in the presence of Almighty God that whenever I am called to give my vote or suffrage, touching any matter that concerns the State of Vermont, I will do it so, as in my conscience, I shall judge will most conduce to the best good of the same, as established by the constitution, without fear or favor of any man."

## SECTION VII.

The House of Representatives of the Freeman of this State, shall consist of persons most noted for wisdom and virtue, to be chosen by the freemen of every town in this State, respectively. And no foreigner shall be chosen, unless he has resided in the town for which he shall be elected, one year immediately before said election.

## SECTION VIII.

The members of the House of Representatives shall be chosen annually, by ballot, by the freemen of this State, on the first Tuesday of September, forever (except this present year) and shall meet on the second Thursday of the succeeding October, and shall be stiled, The General Assembly of the State of Vermont; and shall have power to choose their Speaker, Secretary of the State, their Clerk, and other necessary officers of the House—sit on their own adjournments—prepare bills and enact them into laws—judge of the elections and qualifications of their own members—they may expel a member, but not a second time for the same cause—They may administer oaths (or affirmations) on examination of witnesses—redress grievances—impeach State criminals—grant charters of incorporation—constitute towns, boroughs, cities, and counties, and shall have all other powers necessary for the Legislature of a free State, but they shall have no power to add to, alter, abolish, or infringe any part of this constitution. And for this present year the members of the General Assembly shall be chosen on the first Tuesday of March next, and shall meet at the meeting-house, in Windsor, on the second Thursday of March next.

## SECTION IX.

A quorum of the house of representatives shall consist of two thirds of the whole number of members elected; and having met, and chosen their speaker and clerk, shall, each of them, before they proceed to business, take and subscribe, as well the oath of fidelity and allegiance hereinafter directed, as the following oath or affirmation, viz:

I _____ do solemnly swear, by the ever living God (or I do solemnly affirm in the presence of Almighty God), that as a member of this Assembly, I will not propose, or assent to any bill, vote or resolution, which shall appear to me injurious to the people; nor do or consent to any act or thing whatever, that shall have a tendency to lessen or abridge their rights and privileges, as declared in the Constitution of this State; but will in all things, conduct myself as a faithful, honest representative and guardian of the people, according to the best of my judgment and abilities.

And each member, before he takes his seat, shall make and subscribe the following declaration, viz:

I do believe in one God, the Creator and Governor of the universe, the rewarder of the good and punisher of the wicked. And I do acknowledge the scriptures of the old and new testament to be given by divine inspiration, and own and profess the Protestant religion.

Vermont Constitution - 1777

And no further or other religious test shall ever, hereafter, be required of any civil officer or magistrate in this State.

## SECTION X.

Delegates to represent this State in Congress shall be chosen, by ballot, by the future General Assembly, at their first meeting, and annually, forever afterward, as long as such representation shall be necessary. Any Delegate may be superseded, at any time, by the General Assembly appointing another in his stead. No man shall sit in Congress longer than two years successively, nor be capable of re-election for three years afterwards; and no person who holds any office in the gift of the Congress, shall, thereafter, be elected to represent this State in Congress.

## SECTION XI.

If any town or towns shall neglect or refuse to elect and send representatives to the General Assembly, two thirds of the members of the towns that do elect and send representatives (provided they be a majority of the inhabited towns of the whole State), when met, shall have all the powers of the General Assembly, as fully and amply as if the whole were present.

## SECTION XII.

The doors of the house in which the representatives of the freemen of this State shall sit, shall be open for the admission of all persons, who behave decently, except only when the welfare of the State may require the doors to be shut.

## SECTION XIII.

The votes and proceedings of the General Assembly shall be printed, weekly, during their sitting, with the yeas and nays, on any question, vote or resolution, where one third of the members require it; (except when the votes are taken by ballot) and when the yeas and nays are so taken, every member shall have a right to insert the reasons of his vote upon the minutes, if he desire it.

## SECTION XIV.

To the end that laws, before they are enacted, may be more maturely considered, and the inconvenience of hasty determination as much as possible prevented, all bills of public nature shall be first laid before the Governor and Council, for their perusal and proposals of amendment, and shall be printed for the consideration of the people, before they are read in General Assembly for the last time of debate and amendment; except temporary acts, which, after being laid before the Governor and Council, may (in the case of sudden necessity) be passed into laws; and no other shall be passed into laws, until the next session of Assembly. And for the more perfect satisfaction of the public, the reasons and motives for making such laws, shall be fully and clearly expressed and set forth in their preambles.

## SECTION XV.

The stile of the laws of this State shall be,—"Be it enacted, and it is hereby enacted, by the Representatives of the Freemen of the State of Vermont, in General Assembly met, and by the Authority of the same."

## SECTION XVI.

In order that the Freemen of this State might enjoy the benefit of election, as equally as may be, each town within this State, that consists, or may consist, of eighty taxable inhabitants, within one septenary or seven years, next after the establishing this constitution, may hold elections therein, and choose each, two representatives; and each other inhabited town in this State may, in like manner, choose each, one representative, to represent them in General Assembly, during the said septenary or seven years; and after that, each inhabited town may, in like manner, hold such election, and choose each, one representative, forever thereafter.

## SECTION XVII.

The Supreme Executive Council of this State, shall consist of a Governor, Lieutenant-Governor, and twelve persons, chosen in the following manner, viz. The freemen of each town shall, on the day of election for choosing Representatives to attend the General Assembly, bring in their votes for Governor, with his name fairly written, to the constable, who shall seal them up, and write on them, votes for the Governor, and deliver them to the representative chosen to attend the General Assembly; and, at the opening of the General Assembly, there shall be a committee appointed out of the Council, and Assembly, who, after being duly sworn to the faithful discharge of their trust, shall proceed to receive, sort, and count, the votes for the Governor, and declare the person who has the major part of the votes, to be Governor, for the year ensuing. And if there be no choice made, then the Council and General Assembly, by their joint ballot, shall make choice of a Governor.

The Lieutenant Governor and Treasurer, shall be chosen in the manner above directed; and each freeman shall give in twelve votes for twelve councillors, in the same manner; and the twelve highest in nomination shall serve for the ensuing year as Councillors.

The council that shall act in the recess of this Convention, shall supply the place of a council for the next General Assembly, until the new Council be declared chosen. The Council shall meet annually, at the same time and place with the General Assembly; and every member of the Council shall be a Justice of the Peace for the whole State, by virtue of his office.

## SECTION XVIII.

Compendium_Cornell
Page 0117

The Governor, and in his absence the Lieutenant or Deputy Governor, with the Council—seven of whom shall be a quorum—shall have power to commissionate all officers (except those who are appointed by the General Assembly), agreeable to this frame of government, and the laws that may be made hereafter; and shall supply every vacancy in any office, occasioned by death, resignation, removal or disqualification, until the office can be filled in the time and manner directed by law or this constitution. They are to correspond with other States, and transact business with officers of government, civil and military; and to prepare such business as may appear to them necessary to lay before the General Assembly. They shall sit as judges to hear and determine on impeachments, taking to their assistance, for advice only, the judges of the supreme court; and shall have power to grant pardons, and remit fines, in all cases whatsoever, except in treason and murder—shall have power to grant reprieves, but not to pardon, until after the end of the next session of the Assembly; but there shall be no remission or mitigation of punishment, except by act of legislation. They are also, to take care that the laws be faithfully executed. They are to expedite the execution of such measures as may be resolved upon by General Assembly; and they may draw upon the Treasurer for such sums as may be appropriated by the House: they may also lay embargoes, or prohibit the exportation of any commodity for any time, not exceeding thirty days, in the recess of the House only; they may grant such licenses as shall be directed by law, and shall have power to call together the General Assembly, when necessary, before the day to which they shall stand adjourned. The Governor shall be commander in chief of the forces of the State; but shall not command in person, except advised thereto by the Council, and then, only, as long as they shall approve thereof. The Governor and Council shall have a Secretary, and keep fair books of their proceedings, wherein any Councillor may enter his dissent, with his reasons to support it.

## SECTION XIX.

All commissions shall be in the name of the freemen of the State of Vermont, sealed with the State seal, signed by the Governor, or in his absence the Lieutenant-Governor, and attested by the Secretary; which seal shall be kept by the Council.

## SECTION XX.

Every officer of State, whether judicial or executive, shall be liable to be impeached by the General Assembly, either when in office, or after his resignation, or removal for mal-administration. All impeachments shall be before the Governor or Lieutenant-Governor and Council, who shall hear and determine the same.

## SECTION XXI.

The supreme court, and the several courts of common pleas of this State shall, besides the powers usually exercised by such courts, have the powers of a court of chancery, so far as relates to perpetuating testimony, obtaining evidence from places not within this State, and the care of persons and estates of those who are non compotes mentis, and such other powers as may be found necessary by future General Assemblies, not inconsistent with this constitution.

## SECTION XXII.

Trials shall be by jury; and it is recommended to the legislature of this State to provide by law, against every corruption or partiality in the choice, and return, or appointment, of juries.

## SECTION XXIII.

All courts shall be open, and justice shall be impartially administered, without corruption or unnecessary delay; all their officers shall be paid an adequate, but moderate, compensation for their services; and if any officer shall take greater or other fees than the laws allow him, either directly or indirectly, it shall ever after disqualify him from holding any office in this State.

## SECTION XXIV.

All prosecutions shall commence in the name and by the authority of the freemen and the State of Vermont, and all indictments shall conclude with these words, "against the peace and dignity of the State." The style of all process hereafter, in this State, shall be,—The State of Vermont.

## SECTION XXV.

The person of a debtor, where there is not a strong presumption of fraud, shall not be continued in prison after delivering up bona fide, all his estate, real and personal, in possession, reversion or remainder, for the use of his creditors, in such manner as shall be hereafter regulated by law. All prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident or presumption great.

## SECTION XXVI.

Excessive bail shall not be exacted for bailable offences; and all fines shall be moderate.

## SECTION XXVII.

That the General Assembly, when legally formed, shall appoint times and places for county elections, and at such times and places, the freemen in each county respectively, shall have the liberty of choosing the judges of inferior court of common pleas, sheriff, justices of the peace, and judges of probate, commissioned by the Governor and council, during good behavior, removable by the

General Assembly upon proof of mal-administration.

**SECTION XXVIII.**

That no person, shall be capable of holding any civil office, in this State except he has acquired, and maintains a good moral character.

**SECTION XXIX.**

All elections, whether by the people or in General Assembly, shall be by ballot, free and voluntary: and any elector who shall receive any gift or reward for his vote, in meat, drink, monies or otherwise, shall forfeit his right to elect at that time, and suffer such other penalty as future laws shall direct. And any person who shall, directly or indirectly, give, promise or bestow any such rewards to be elected, shall, thereby, be rendered incapable to serve for the ensuing year.

**SECTION XXX.**

All fines, licence money, fees and forfeitures, shall be paid, according to the direction hereafter to be made by the General Assembly.

**SECTION XXXI.**

All deeds and conveyances of land shall be recorded in the town clerk's office, in their respective towns.

**SECTION XXXII.**

The printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of government.

**SECTION XXXIII.**

As every freeman, to preserve his independence (if without a sufficient estate), ought to have some profession, calling, trade, or farm, whereby he may honestly subsist, there can be no necessity for, nor use in, establishing offices of profit, the usual effects of which are dependence and servility, unbecoming freemen, in the possessors or expectants; faction, contention, corruption and disorder, among the people. But if any man is called into public service, to the prejudice of his private affairs, he has a right to a reasonable compensation; and whenever an office, through increase of fees or otherwise, becomes so profitable as to occasion many to apply to it, the profits ought to be lessened by the legislature.

**SECTION XXXIV.**

The future legislature of this State, shall regulate entails, in such manner as to prevent perpetuities.

**SECTION XXXV.**

To deter more effectually from the commission of crimes, by continued visible punishment of long duration, and to make sanguinary punishments less necessary, houses ought to be provided for punishing by hard labor, those who shall be convicted of crimes not capital; whereby the criminal shall be employed for the benefit of the public, or for reparation of injuries done to private persons: and all persons, at proper times, ought to be permitted to see the prisoners at their labor.

**SECTION XXXVI.**

Every officer, whether judicial, executive or military, in authority under this State, shall take the following oath or affirmation of allegiance, and general oath of office, before he enter on the execution of his office.

The oath or affirmation of allegiance.

"I _____ do solemnly swear by the ever living God (or affirm in the presence of Almighty God) that I will be true and faithful to the State of Vermont; and that I will not, directly or indirectly, do any act or thing, prejudicial or injurious to the constitution or government thereof, as established by Convention."

The oath or affirmation of office.

"I _____ do solemnly swear by the ever living God (or affirm in the presence of Almighty God), that I will faithfully execute the office of _____ for the _____ of _____; and will do equal right and justice to all men, to the best of my judgment and abilities, according to law."

**SECTION XXXVII.**

No public tax, custom or contribution shall be imposed upon, or paid by, the people of this State, except by a law for that purpose; and before any law be made for raising it, the purpose for which any tax is to be raised ought to appear clear to the legislature to be of more service to the community than the money would be, if not collected; which being well observed, taxes can never be burthens.

Vermont Constitution - 1777

**SECTION XXXVIII.**

Every foreigner of good character, who comes to settle in this State, having first taken an oath or affirmation of allegiance to the same, may purchase, or by other just means acquire, hold, and transfer, land, or other real estate; and after one years residence, shall be deemed a free denizen thereof and be entitled to all the rights of a natural born subject of this State; except that he shall not be capable of being elected a representative, until after two years residence.

**SECTION XXXIX.**

That the inhabitants of this State shall have liberty to hunt and fowl, in seasonable times, on the lands they hold, and on other lands (not enclosed); and in like manner, to fish in all boatable and other waters, not private property, under proper regulations, to be hereafter made and provided by the General Assembly.

**SECTION XL.**

A school or schools shall be established in each town, by the legislature, for the convenient instruction of youth, with such salaries to the masters, paid by each town, making proper use of school lands in each town, thereby to enable them to instruct youth at low prices. One grammar school in each county, and one university in this State, ought to be established by direction of the General Assembly.

**SECTION XLI.**

Laws for the encouragement of virtue, and prevention of vice and immorality, shall be made and constantly kept in force; and provision shall be made for their due execution; and all religious societies or bodies of men, that have or may be hereafter united and incorporated, for the advancement of religion and learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities and estates which they, in justice, ought to enjoy, under such regulations, as the General Assembly of this State shall direct.

**SECTION XLII.**

All field and staff officers, and commissioned officers of the army, and all general officers of the militia, shall be chosen by the General Assembly.

**SECTION XLIII.**

The declaration of the rights is hereby declared to be a part of the Constitution of this State; and ought never to be violated on any pretence whatsoever.

**SECTION XLIV.**

In order that the freedom of this Commonwealth may be preserved inviolate, forever, there shall be chosen, by ballot, by the freemen of this State, on the last Wednesday in March, in the year one thousand seven hundred and eighty-five, and on the last Wednesday of March, in every seven years thereafter, thirteen persons, who shall be chosen in the same manner the council is chosen—except that they shall not be out of the Council or General Assembly—to be called the Council of Censors; who shall meet together on the first Wednesday of June next ensuing their election; the majority of whom shall be a quorum in every case, except as to calling a Convention, in which two thirds of the whole number elected shall agree, and whose duty it shall be to enquire whether the legislative and executive branches of government have performed their duty as guardians of the people; or assumed to themselves, or exercised, other or greater powers than they are entitled to by the constitution. They are also to enquire whether the public taxes have been justly laid and collected, in all parts of this Commonwealth—in what manner the public monies have been disposed of, and whether the laws have been duly executed. For these purposes they shall have power to pass public censures—to order impeachments, and to recommend to the legislature the repealing such laws, as appear to them to have been enacted contrary to the principles of the constitution. These powers they shall continue to have, for and during the space of one year from the day of their election, and no longer. The said Council of Censors shall also have power to call a Convention, to meet within two years after their sitting, if there appears to them an absolute necessity of amending any article of this constitution which may be defective—explaining such as may be thought not clearly expressed, and of adding such as are necessary for the preservation of the rights and happiness of the people: but the articles to be amended, and the amendments proposed, and such articles as are proposed to be added or abolished, shall be promulgated at least six months before the day appointed for the election of such convention, for the previous consideration of the people, that they may have an opportunity of instructing their delegates on the subject.

<back to top>

## Reference Room

VSARA Reference Archivists
sos.archives@vermont.gov

Compendium_Cornell
Page 0120

Vermont Constitution - 1777

Phone: 802-828-3208

Hours & Directions

Visit the Calendar Page 

## OPR

## Corporations

## Secretary's Desk

## Contact Information

**Vermont State Archives & Records Administration**

Tanya Marshall, State Archivist & Director

1078 Route 2, Middlesex

Montpelier, VT 05633-7701

802-828-3700

**Phone & Hours**

Main Line: 802-828-3700

Fax: 802-828-3710

Office Hours: 7:45 AM to 4:30 PM, M-F

Reference Room: 9 AM to 4 PM, M-F

Closed State Holidays

**Apostilles/Authentications**

802-828-3700

sos.statutoryfilings@vermont.gov

**Reference Room**

802-828-2308

sos.archives@vermont.gov

**Records Management**

802-828-3897

sos.rim@vermont.gov

Visit the Calendar Page:



About Us

Site Policies



A Vermont Government Website © Copyright 2022 Vermont State Archives & Records Administration

Compendium_Cornell
Page 0122

# BOOKS

Compendium_Cornell
Page 0123

🏠 Home   ☰ Menu

# AMERICAN DICTIONARY of the ENGLISH LANGUAGE

## Dictionary Search

🔍

---

## Abridge

---

**ABRIDGE'**, *verb transitive* abridj', [G. short, or its root, from the root of break or a verb of that family.]

**1.** To make shorter; to epitomize; to contract by using fewer words, yet retaining the sense in substance - used of writings.

Justin abridged the history of Trogus Pompeius.

**2.** To lessen; to diminish; as to *abridge* labor; to *abridge* power of rights.

**3.** To deprive; to cut off from; followed by of; as to *abridge* one of his rights, or enjoyments. to *abridge* from, is now obsolete or improper.

**4.** In algebra, to reduce a compound quantity or equation to its more simple expression. The equation thus abridged is called a formula.

---

## Websters Dictionary 1828

---

### SITEMAP

---

🏠 Home (https://webstersdictionary1828.com/)

⭐ Preface (/Preface)

🎓 History (/NoahWebster)

📌 Quotations (/Quotes)

---

### LEGAL

---

About Us (/AboutUs)

Terms of Use (/Terms)

Compendium_Cornell
Page 0124

Privacy Policy (/Privacy)

Copyright Notice (/Copyright)

## OUR WEBSITES

The Kings Bible (https://thekingsbible.com/)

King James Bible 1611 (https://blackletterkingjamesbible.com/)

King James Bible Dictionary (https://kingjamesbibledictionary.com//)

Websters Dictionary 1828 (https://webstersdictionary1828.com/)

Textus Receptus Bibles (https://textusreceptusbibles.com/)

Treasury of Scripture Knowledge (https://tsk-online.com/)

 (http://www.thekingsbible.com)    (https://www.facebook.com /WebstersDictionary1828)

© Copyright 2022 MasonSoft Technology Ltd (/Copyright)

v4 (2022.7.23)

# AMERICAN DICTIONARY of the ENGLISH LANGUAGE

## Dictionary Search

[                                    ] 🔍

---

## Infringe

---

**INFRINGE**, *verb transitive* infrinj'. [Latin infringo; in and frango, to break. See Break.]

**1.** To break, as contracts; to violate, either positively by contravention, or negatively by non-fulfillment or neglect of performance. A prince or a private person infringes an agreement or covenant by neglecting to perform its conditions, as well as by doing what is stipulated not to be done.

**2.** To break; to violate; to transgress; to neglect to fulfill or obey; as, to *infringe* a law.

**3.** To destroy or hinder; as, to *infringe* efficacy. [*Little Used*.]

---

## Websters Dictionary 1828

---

### SITEMAP

---

🏠 Home (https://webstersdictionary1828.com/)

⭐ Preface (/Preface)

🎓 History (/NoahWebster)

✈ Quotations (/Quotes)

---

### LEGAL

---

About Us (/AboutUs)

Terms of Use (/Terms)

Privacy Policy (/Privacy)

Copyright Notice (/Copyright)

**OUR WEBSITES**

The Kings Bible (https://thekingsbible.com/)

King James Bible 1611 (https://blackletterkingjamesbible.com/)

King James Bible Dictionary (https://kingjamesbibledictionary.com//)

Websters Dictionary 1828 (https://webstersdictionary1828.com/)

Textus Receptus Bibles (https://textusreceptusbibles.com/)

Treasury of Scripture Knowledge (https://tsk-online.com/)

 (http://www.thekingsbible.com)    (https://www.facebook.com

/WebstersDictionary1828)

© Copyright 2022 MasonSoft Technology Ltd (/Copyright)

v4 (2022.7.23)



THE

# JUSTICE OF THE PEACE,

BEING

## A GENERAL DIRECTORY,

AND

FORMS PROPER FOR THE DUE EXECUTION OF THE OFFICE,

ACCORDING TO THE

## COMMON AND STATUTE LAWS,

NOW IN FORCE AND USE IN

## THE STATE OF CONNECTICUT.

WITH MANY OTHER FORMS NOT PECULIARLY APPROPRIATE

TO THAT OFFICE.

## BY JOSEPH BACKUS,

COUNSELLOR AT LAW.

HARTFORD:

PRINTED FOR THE AUTHOR.

B. & J. Russell, Printers.

1816.

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA



DISTRICT OF CONNECTICUT, ss.

BE IT REMEMBERED, That on the third day of October, in the forty-first year of the Independence of the United States of America, Joseph Backus, of the said District, hath deposited in this office the title of a book, the right whereof he claims as author, in the words following, to wit:

{ SEAL. }

"The Justice of the Peace, being a general directory, and forms proper for the due execution of the office, according to the common and statute laws, now in force and use in the State of Connecticut. With many other forms not peculiarly appropriate to that office. By Joseph Backus, Counsellor at Law."

In conformity to the Act of the Congress of the United States, entitled, "An act for the encouragement of learning, by securing the copies of Maps, Charts, and Books, to the authors and proprietors of such copies, during the times therein mentioned."

HENRY W. EDWARDS,
*Clerk of the District of Connecticut.*
A true copy of Record examined and sealed by me,
H. W. EDWARDS,
*Clerk of the District of Connecticut*

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

# CHAPTER III.

## BAIL AND COMMITMENT.

**B**AIL, is freeing or setting at liberty, one who is arrested or imprisoned on legal process, by the prisoner's giving security, that he will appear before the court, having jurisdiction of the offence, to answer to the matters for which he is held, and to abide the orders of such court thereon. The security given in common cases, is by the prisoner, jointly with one or more responsible persons, entering into a recognizance to the state, in such sum as in the opinion of the justice, will secure the appearance of the prisoner, either voluntarily, or by compulsion of his sureties, (which compulsion they have a right to use,) to take his trial for the offence with which he is charged.

Commitment is by a warrant directed to a proper officer, setting forth the cause for which the commitment is ordered, him requiring to convey the prisoner to the common gaol in the County, and him there, with such warrant, deliver to the keeper thereof, and requiring such keeper to receive and hold the prisoner in his custody, in such gaol, until he shall be delivered by order of law.

When a delinquent, charged with any criminal offence, is legally brought before a justice of the peace, it is his duty without delay to enquire into the facts with which the prisoner is charged, by an examination of lawful witnesses ; but he cannot compel the prisoner to furnish evidence against himself, by answering interrogatories designed to draw forth a confession of circumstances which may go to prove his guilt. If on enquiry, the justice believes the prisoner guilty, and the crime is not capital, nor within the final jurisdiction of the justice, he must admit him to bail, if he will give it, otherwise, commit him to gaol until delivered by order of law.

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

EN-JLB  Document 154  Filed 10/22/22  PageI 265

JUSTICE OF THE PEACE.  25

Of Surety for keeping the Peace, and being of Good Behaviour.

# CHAPTER IV.

## OF SURETY FOR KEEPING THE PEACE, AND BEING OF GOOD BEHAVIOUR.

THE term, peace, denotes that condition of the body politic, in which no person either suffers, or has just cause to fear any injury to the person or possessions of any one therein, from the violence of another, expressed either in threatening words, furious gestures, force of the body, or any other force used *in terrorem.* (a)

This peace may be violated by tumultuous and offensive carriage, traducing, quarrelling, challenging, assaulting, beating or striking any other person, or by threatening to beat or kill any person, or to burn his house, or otherwise to injure his person or destroy his property.(b)  Every the least wilful violence committed on the person of another, is a breach of the peace. (c)

The first duty enjoined upon justices in their commission is to keep the peace.  In the performance of this duty, each may, *ex-officio,* arrest and bind to keep the peace, offenders who violate it in his presence, and commit to prison such as refuse, until they comply. (d)  He may also commit all who are brought before him by a constable for a breach of the peace in the presence of such constable. (d)  *Vide general duties of constables.*

Every justice, in his discretion, may *ex-officio,* not only bind to keep the peace, all who violate it by either striking or threatening, but also such as contend only in hot words :(e) those who in his presence and hearing, threaten to kill or beat or in any way hurt another, may by him be bound to keep the peace. So he may such as go orride armed offensively, or with unusual number of at-

(a) Jacob Law Dict.      (b) 1 St. 545. 1 H. P. C. 253. Dal. Jus. 10.
(c) Hawk. Pl. C. 251.    (d) 1 Hawk. P. C. 25, Dal. Jus. 36.
(e) Dal. Jus. 37.

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

Of Surety for keeping the Peace, and being of Good Behaviour.

tendants in his presence, to the terror of the people ; for such conduct may be judged an affray and an inchoate breach of the peace. If any person threaten to kill, maim, or beat another, or attempt to do it in the presence of a constable, he may arrest such offender and carry him before a justice of the peace. Or, if a constable perceive any persons in his presence about to violate the peace by drawing weapons, or by striking or assaulting one another, or by assaulting the constable himself, he may take assistance and carry them all before a justice, to find sureties of the peace, and in either case, he may bind them to keep the peace.(*f*)

As a justice may, *ex-officio*, grant a warrant to bring before him one who threatens in his presence, so he may on complaint by one who requires surety of the peace against another for like threats.(*g*)

All persons of sufficient discretion to know the nature of the application, may of right demand surety of the peace : even a wife against her husband who threatens to kill her or beat her outrageously, or, if she have notorious cause to fear he will do either. And also a husband against his wife for the like causes.(*h*) And if a justice be present when any such cause arises, he need not wait for application, but may proceed presently to bind them to keep the peace.(*i*)

Surety of the peace may be demanded by and against infants under fourteen years, which must be granted. But infants and *femes covert* must be bound by sureties only ; and if unable to find sureties, may be committed until they can.(*j*) But it may not be granted at the demand of, or against persons *non compos mentis*. Yet against an impotent person, so weak that he cannot himself break the peace, it may be granted, because he may instigate and procure others to do it. The common form of binding to the peace is adapted to such a case as the person is bound, as well not to procure harm to be done to another as not to do it

(*f*) Dalt. Jus. p. 193.     (*g*) Ibid.     (*h*) 1 Hawk. P. C. 253. Dal. Jus. 198.
(*i*) Dalt. Jus. 198, 199.      (*j*) Ibid.

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA



# GUN SHOW NATION

GUN CULTURE AND AMERICAN DEMOCRACY

JOAN BURBICK

THE NEW PRESS

NEW YORK
LONDON

© 2006 by Joan Burbick
All rights reserved
No part of this book may be reproduced, in any form, without written
permission from the publisher

Requests for permission to reproduce selections from this book should
be mailed to Permissions Department, The New Press, 38 Greene Street,
New York, NY 10013.

Published in the United States by The New Press, New York, 2006
Distributed by W. W. Norton & Company, Inc., New York

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA

Burbick, Joan
   Gun show nation : gun culture and American democracy / Joan Burbick.
     p.   cm.
   Includes bibliographical references and index.
   ISBN-13  978-1-59558-087-0 (hc.)
   ISBN-10  1-59558-087-5 (hc.)
   1. Gun control—United States—History   2. Firearms ownership—
United States—History   3. Firearms—Law and legislation—United
States—History   4. Firearms—Social aspects—United States.   I. Title.
HV7436.B87 2006
363.330973—dc22
                                                                  2006044415

The New Press was established in 1990 as a not-for-profit alternative to the
large, commercial publishing houses currently dominating the book publish-
ing industry. The New Press operates in the public interest rather than for
private gain, and is committed to publishing, in innovative ways, works of
educational, cultural, and community value that are often deemed insuffi-
ciently profitable.

www.thenewpress.com

Composition by NK Graphics
This book was set in Fairfield LH Light

Printed in the United States of America

10  9  8  7  6  5  4  3  2  1

# INTRODUCTION

Political theater thrives on flashy stage props. In April of 2004, as the vice president of the United States, Dick Cheney, held a flintlock rifle in his hands at the National Rifle Association's annual convention in Pittsburgh, the cavernous ballroom shook with deafening applause. A gift from the NRA, the rifle was no bad-ass military weapon from *Rambo* movies. His flintlock was the honored gun of revolutionary patriots, the gun of our founding fathers, red-white-and-blue America. A long-time supporter of gun rights, Cheney, like the 3,000 NRA members in Convention Hall, was a freedom fighter, and they were celebrating a common heritage.

The vice president was there to address the NRA members, who had waited for hours to hear him speak. And he was there to bash his political opponent, John Kerry, the anticipated Dem-

## INTRODUCTION

ocratic presidential candidate, who was in town on the same weekend. I listened to the joyful crowd cheer and shout each time he told them that President George W. Bush would protect their constitutional rights. Like rapt participants in a religious revival, many in the crowd nodded as Cheney reverently quoted from the Second Amendment to the Constitution: "the right of the people to keep and bear arms shall not be infringed." They cheered when told that only one candidate has "shown you respect," President Bush. Front-line patriots lining up to vote, they jeered at Kerry, chanting, "Four more years."

Guns entered our national politics with earnest in the 1960s, when the country was rocked by assassinations, dissent over the Vietnam War, and social change from the civil rights movement. Since then the political language of gun rights has only become louder and has found expression in several Second Amendment organizations, including the Institute for Legislative Action of the NRA. And organized gun owners have even pushed ahead of retired people in bringing their message and clout to Washington, D.C. In 2001, after the election of George W. Bush, the NRA topped the list of powerful Washington lobbies, edging ahead of the American Association of Retired Persons (AARP), according to *Fortune* magazine.[1]

Moreover, the success of this political language of gun rights only makes sense if we look back in time at how and when guns began to send political messages—and precisely who was able to send them and why. Without returning to this past, we are left with only a dim understanding of why since the 1960s our national politics have fostered endless conversations and debates about guns. As a writer and teacher of American culture at a state university and a woman who has lived in the rural West for almost thirty years, I have watched my family, friends, and neighbors buy not only guns but also a political philosophy of

## INTRODUCTION

xvii

gun ownership. Decades before Michael Moore's *Bowling for Columbine* or the 9/11 terrorist attack on the World Trade Center, many in my community, along with millions of gun owners, have embraced a way of thinking about themselves and their country that has affected how they vote and how they think about freedom, crime, and the American way.

Ten years ago, at a gun show in Moscow, Idaho, I began to try to understand how and why guns speak in this national conversation. The men standing behind their folding tables selling an assortment of rifles, handguns, and ammunition lectured me on individual liberty, talking politics while they sold. They preached a brand of rugged individualism and exchanged stories about frontier heroes and combat missions in Vietnam and Korea.

This book follows that gun talk from gun shows, to gun stores, to gun-rights conventions, to the huge annual meetings of the National Rifle Association. I traveled to eight states, talking with gun owners, sellers, lobbyists, grassroots organizers, and policy makers. Some of these people are my neighbors, others I met far from home on the streets of Reno and Pittsburgh, at a county fairgrounds in Kankakee, Illinois, and on an Indian reservation in Worley, Idaho.

The journey I took to listen to this politics of guns made me question how we imagine what it means to be an American, and the often bitter debates that swirl around our identities as a people. Many of the stories I was told were about our revolutionary past and the American frontier. They were foundational beliefs for many Americans about how and why our nation was created, how the West was won, and even how we are a Christian nation and must fulfill a sacred, global destiny. And it was back to some of those tenacious stories about our past that I returned as I wrote this book. To understand gun talk, I had to un-

derstand what America means to millions of ordinary people
and how these beliefs shaped their sense of who they are, were,
and must remain in the future.

After all the miles I traveled and stories I heard, what this
book made me see was how important gun politics were to
white men. They were the main participants at the meetings
and gun shows I attended. Gender and race informed most con-
versations I had. Even if white men promoted gun ownership as
a necessary right of every American, the reasons for gun owner-
ship depended upon an often highly racial and gendered view of
America's history. And our popular culture has only reinforced
this sense of how white men hold the destiny of the nation in
their hands, especially if one hand holds a gun. For almost 150
years, Americans have watched as white men shot their way
across our cinema screens, TV sets, Wild West shows, and the-
atre stages, making the world, and our cities and towns, safe
from the bad guys. Guns often are equated with male action.
And white men get to act more than anyone else in our popular
imaginations, defending our freedoms and making the world
safe for democracy.

I don't mean that women and people of color are not part of
the story of guns in the United States. They were and still are.
Especially today, women are encouraged to become shooters on
screen and off. At gun shows, they are told that they need to
practice self-defense and become armed citizens. In fact, en-
tering the male world of guns is described as liberating, even
empowering.[2] In this respect, the gun culture has not changed
much since the 1880s, when women's shooting clubs were in
vogue and white women who could afford the expense of a
handgun or rifle were encouraged to know how to shoot and de-
fend themselves against real and imagined enemies. Moreover,
the arming and disarming of peoples of color has a long and

traumatic history in the United States that exposes how in-
effective we have been at providing basic security for all our
citizens.

But most of the talk was with white men about white men.[*]
Always the talk was about who had the right to own a gun and
why, how this power was equated with individual freedom in
the United States, and how without gun rights, as a people, we
would slide into either anarchy or despotism. Guns were the
safeguards of democracy.

As a white woman on this journey into gun talk, I did have
two advantages. One, I was white, and two, I knew the funda-
mentals of shooting. I couldn't be labeled quickly as an ignorant
liberal. Even though I am only a casual shooter, plinking at cir-
cular metal plates that spin, many women I know, including my
daughter, will not touch a gun. Guns are bad, period. At gun
shows, I am encouraged to touch guns. And the key word here
is *touch*. The men selling know that women must cross a line to
enter into the world of the gun, a line often equated not only
with male action but also with male violence and the power of
violence itself. And this appeal can be seductive for some women,
even those who have no need for self-defense. But for many
women I know, the widespread ownership of guns by men in
the United States sets off angry red flares, the gun itself stand-
ing for all that is wrong with this country.

At one talk I gave in the Midwest, a young woman came up
to me afterward and said she was no liberal gun-grabber. She
didn't want to get close enough to grab a gun. She wanted men
with guns to mind their own business and stay away from her.
Period. Gun ownership was not an initiation into an American
identity, nor was it a way to understand the rights and responsi-
bilities of citizenship. Gun owners were gun nuts, crazies, and
dangerous predators, particularly dangerous to women. The great

gun divide between men and women is reinforced by sheer sta-
tistics. According to the 1999 National Gun Policy Survey, only
12 percent of women own a gun while 44 percent of men do.[4]

Gun talk feeds and fuels the debates over individual rights
and how these rights rest on owning lethal force for political or
personal protection. In the gun-rights world, our personal liber-
ties are defended by the use of lethal force in the hands of civil-
ians, not in the hands of the state. Gun ownership is part and
parcel of democratic citizenship. In fact, a gauge of freedom is
determined by how much lethal force the government leaves in
the hands of individual citizens. The civil structures of govern-
ment, with its checks and balances, its electoral processes, and
its social, economic, and military policies, only stand if individ-
uals retain their weapons. Guns guarantee democracy.

The aisles of gun shows echo with these debates, and these
conversations can help us to understand why and how guns
hold such imaginative force for many Americans. It is important
to remember that gun shows are also traveling bookstores, gath-
erings for grassroots politics, and memory fairs of American his-
tory. They harbor small-scale and big-business entrepreneurs
across the aisle from mom-and-pop gun sellers who sell dreams
and a vision of the United States. Guns shows create imagined
communities, shaping what it means to be an American citizen.[5]

In the last twenty years, gun shows have also made some
Americans millionaires, and anyone with even the most cursory
knowledge of the arms industry knows what immense monetary
stakes are involved in gun sales to private individuals in the
United States. We have the largest domestic gun market in the
world. Since 1899, United States citizens have bought about
225 million firearms with approximately 192 million guns re-
maining in private possession.[6] Gun politics live and breathe in
the pages of gun magazines whose sole purpose is to sell a prod-

Compendium_Cornell
Page 0140

uct that comes complete with a way of life and a set of political
beliefs. Guns circulate ideas and cash.

The freedom to buy is often equated with the right to keep
and bear arms. At gun shows, the question about how much
lethal power we can entrust to an individual is often answered
with the response: as much as a gun owner wants. If a gun
owner who is a law-abiding citizen wants a particular gun that is
on the market, no questions should be asked. Regulation of in-
dividual buying behavior is a no-no, an infringement of rights
guaranteed by the Constitution. Gun politics bring us into the
world of male consumerism with its need to own the latest, the
newest, and the most lethal gun there is. As a shooter, I have
succumbed to this hype, lingering over ads for a few weeks of a
new model .40 Sig Sauer that was adopted by the Air Marshals
after 9/11. Gun manufacturers keep making new models to en-
tice people to buy. And if the manufacturer can make it more
lethal or look more lethal, so much the better for the ad cam-
paign. In the 1840s, Samuel Colt developed this style of selling
guns by continually making new models, what William Hosley
has described as cannibalizing guns into different models to beat
competitors.[7] Even at the annual meetings of the National Rifle
Association, the big draw is the massive gun show at its heart,
where the latest styles and accessories can be found. Hawking
shiny gun hardware comes with the politics. Guns are cool
things to buy, despite all the talk of rights and responsibility.

The American imagination has been held captive by the gun
since before the Civil War, when gun markets of any conse-
quence started in the United States.[8] Stories and pageants about
the Western frontier became an early political theater for the
staging of national dramas about heroes and their guns. My
journey more than 150 years later into gun politics in the twenty-
first century is inseparable from that early entertaining tale. As

Americans, we buy into and believe stories about our past that
guide our values and our purchases.

The gun does indeed revolve in the American soul. But at
what price? What alternative ways of imagining our democracy
are never heard because the gun sounds so loud and true? Can
we invent our lives without the noise of advertisers, gun-filled
action movies, sound bites, and the constant pumping of anxi-
ety through our national veins, making the gun the only safe
harbor?

I believe we can. But not without first understanding how
and why millions of Americans believe in the way of the gun.

# The Complete Anti-Federalist

*Edited, with Commentary and Notes, by*

## Herbert J. Storing

*With the Assistance of Murray Dry*

## VOLUME 2

Objections of Non-Signers of
the Constitution
*and*
Major Series of Essays
at the Outset

The University of Chicago Press
*Chicago and London*

The University of Chicago Press, Chicago 60637
The University of Chicago Press, Ltd., London

© 1981 by The University of Chicago
All rights reserved. Published 1981
Printed in the United States of America

*Library of Congress Cataloging in Publication Data*
Main entry under title:

The Complete Anti-Federalist

Includes bibliographical references.
Contents: v. 1. What the Anti-Federalists were for—v. 2.
Objections of non-signers of the Constitution and Major series
of essays at the outset—v. 3. Pennsylvania—[etc.]
1. United States—Constitutional law—Collected works.
I. Storing, Herbert J., 1928-77. II. Dry, Murray.
KF4515.C65                    342.73′029    81-10287
ISBN 0-226-77573-9 (set)      347.30229     AACR2

REF
342.73,C738,v.2

The Complete
anti-Federalist

S. F. PUBLIC LIBRARY

83-03

# Contents

VOLUME TWO

Contents of Other Volumes                                                vi
A Note on Cross References                                               x
Works Frequently Cited                                                   xi

### PART 1

### Objections of Non-Signers of the Constitution

Introduction                                                            3
2.1    Elbridge Gerry's Objections to Signing the National Constitu-
       tion (*Massachusetts Centinel* 3 November 1787)                  4
2.2    George Mason's Objections to the Constitution of Government
       Formed by the Convention (1787)                                  9
2.3    Robert Yates and John Lansing, Reasons of Dissent (*New York
       Journal* 14 January 1788)                                       15
2.4    Luther Martin, The Genuine Information Delivered to the
       Legislature of the State of Maryland (1788)                     19
2.5    Letter from Edmund Randolph Giving His Reasons for Refus-
       ing His Signature to the Proposed Federal Constitution (10 Oc-
       tober 1787)                                                     83

### PART 2

### Major Series of Essays at the Outset

2.6    Letters of Cato (*New York Journal* September 1787–January
       1788)                                                          101
2.7    Letters of Centinel (Philadelphia *Independent Gazetteer* and
       Philadelphia *Freeman's Journal* October 1787–April 1788)      130
2.8    Observations Leading to a Fair Examination of the System of
       Government Proposed by the Late Convention, Letters from
       The Federal Farmer (1787 and 1788)                             214
2.9    Essays of Brutus (*New York Journal* October 1787–April 1788)   358

v

# *Essays of Brutus*

NEW YORK JOURNAL
October 1787–April 1788

The essays of Brutus are among the most important Anti-Federalist writings. In clear and forceful argument Brutus takes up in a highly competent way the major Anti-Federalist themes, such as consolidation,[1] the small republic, a bill of rights, and representation.[2] He provides the best Anti-Federalist rebuttal of the powerful Federalist argument, well known in the form given it by Publius, that the federal government must be given unlimited powers to meet the unlimited contingencies implicit in its vast responsibility. He provides an extended and excellent discussion—the best in the Anti-Federalist literature—of the judiciary to be established under the Constitution and its far-reaching implications.[3] In these latter respects and in general, the *Brutus* essays are the most direct Anti-Federal confrontation of the arguments of *The Federalist*.

The essays appeared in the *New York Journal* between October 1787 and April 1788, during which time the first seventy-seven papers of *The Federalist* also appeared. They were widely reprinted and referred to; but despite their importance and high quality, they had never been reprinted in their entirety until 1971.[4]

The essays have generally been attributed to Robert Yates on the authority of Paul Leicester Ford. The attribution is somewhat questionable, Ford himself having first attributed the essays to Thomas Treadwell (as did Samuel B. Harding), then changing his mind.[5] Ford does not give the evidence for concluding that Yates was the author. As Morton Borden correctly observes, the Brutus essays are clearly superior to the essays of Sydney, which have also been attributed to Yates;[6] if, however, the latter were written by Abraham Yates, as DePauw contends,[7] that would leave the field clear for Robert as Brutus. Ford does not give the evidence on which he formed his judgment, and no evidence one way or the other has been unearthed by the present editor.[8] (This Brutus is in any case not to be confused with Brutus [Virginia] 5.15.)

There follows an extended outline of the argument of Brutus.

Introduction—Importance of decision, need for care (I. 2.9.1–3).
  I. Basic question: Is confederated government best for U.S.? (I. 2.9.1–21).

Compendium_Cornell
Page 0146

Essays of Brutus

A. Government proposed is, though not perfect consolidation, so
   close as to terminate in it (I, 2.9.4–9).
   1. It is supreme within its sphere (necessary and proper clause); so
      far as its powers reach, it is a complete government, not a con-
      federation (2.9.5).
   2. Powers are ostensibly limited but extend to everything of im-
      portance (2.9.5–9).
      a. Taxing power is complete and implies or draws with it all
        other powers (2.9.5).
      b. Judicial power is extensive and will eclipse state courts
        (2.9.7).
      c. Necessary and proper clause might be interpreted to give
        Congress complete control over states (2.9.8–9).
(Back then to question, 2.9.10).
B. Can free government be exercised over the whole U.S. reduced to
   one state? No.
   1. Authority denies it (2.9.11).
   2. History denies it (2.9.12).
   3. Reason denies it (2.9.13–20).
      a. Distinction between despotic government, pure democracy,
        free (representative) republic, the last being at issue here
        (2.9.13).
      b. Impossibility of a representation, in a country so large and
        populous as the U.S., that will speak the sentiments of the
        people without becoming too numerous for business
        (2.9.14–15).
      c. Free republic requires a similarity of manners, sentiments,
        interests in contrast to U.S. variety (2.9.16).
      d. Execution of laws in free republic depends on confidence of
        people, which must be lacking in so extensive a country
        (2.9.17–18).
      e. Legislature cannot have necessary knowledge of and time to
        deal with concerns and wants of different parts (2.9.19).
      f. In such an extensive republic officers of government would
        soon rise above control of people and abuse their power
        (2.9.20).
Above argument at least shows necessity, in forming government for this
country, of (1) limiting and defining powers, (discussed in V–XV); (2) ad-
justing parts, (discussed in III, IV, XVI); (3) guarding against abuse of
authority (discussed in II, 2.9.22–23).
  II. Bill of Rights (II, 2.9.22–33).
    A. The origins of civil government—kinds of individual rights. Foun-
      dation should be laid in express reservations by people of such of
      their essential national rights as are not necessary to be parted with
      (2.9.24; see IX, 2.9.102).

359

Compendium_Cornell
Page 0147

Essays of Brutus

says the gentleman, ought to be proportioned to the end: admit the proposition to be true it is then necessary to enquire, what is the end of the government of the United States, in order to draw any just conclusions from it. Is this end simply to preserve the general government, and to provide for the common defence and general welfare of the union only? certainly not: for beside this, the state governments are to be supported, and provision made for the managing such of their internal concerns as are allotted to them. It is admitted, "that the circumstances of our country are such, as to demand a compound, instead of a simple, a confederate, instead of a sole government," that the objects of each ought to be pointed out, and that each ought to possess ample authority to execute the powers committed to them.[56] The government then, being complex in its nature, the end it has in view is so also; and it is as necessary, that the state governments should possess the means to attain the ends expected from them, as for the general government. Neither the general government, nor the state governments, ought to be vested with all the powers proper to be exercised for promoting the ends of government. The powers are divided between them—certain ends are to be attained by the one, and other certain ends by the other; and these, taken together, include all the ends of good government. This being the case, the conclusion follows, that each should be furnished with the means, to attain the ends, to which they are designed.

To apply this reasoning to the case of revenue; the general government is charged with the care of providing for the payment of the debts of the United States; supporting the general government, and providing for the defence of the union. To obtain these ends, they should be furnished with means. But does it thence follow, that they should command all the revenues of the United States? Most certainly it does not. For if so, it will follow, that no means will be left to attain other ends, as necessary to the happiness of the country, as those committed to their care. The individual states have debts to discharge; their legislatures and executives are to be supported, and provision is to be made for the administration of justice in the respective states. For these objects the general government has no authority to provide; nor is it proper it should. It is clear then, that the states should have the command of such revenues, as to answer the ends they have to obtain. To say, "that the circumstances that endanger the safety of nations are infinite,"[57] and from hence to infer, that all the sources of revenue in the states should be yielded to the general government, is not conclusive reasoning: for the Congress are authorized only to controul in general concerns, and not regulate local and internal ones; and these are as essentially requisite to be provided for as those. The peace and happiness of a community is as intimately connected with the prudent direction of their domestic affairs, and the due administration of justice among themselves, as with a competent provision for their defence against foreign invaders, and indeed more so.

2.9.81

399

Major Series of Essays

2.9.82    Upon the whole, I conceive, that there cannot be a clearer position than this, that the state governments ought to have an uncontroulable power to raise a revenue, adequate to the exigencies of their governments; and, I presume, no such power is left them by this constitution.

Brutus.

# VII
3 January 1788

2.9.83    The result of our reasoning in the two preceeding numbers is this, that in a confederated government, where the powers are divided between the general and the state government, it is essential to its existence, that the revenues of the country, without which no government can exist, should be divided between them, and so apportioned to each, as to answer their respective exigencies, as far as human wisdom can effect such a division and apportionment.

2.9.84    It has been shewn, that no such allotment is made in this constitution, but that every source of revenue is under the controul of the Congress; it therefore follows, that if this system is intended to be a complex and not a simple, a confederate and not an entire consolidated government, it contains in it the sure seeds of its own dissolution.—One of two things must happen— Either the new constitution will become a mere *nudum pactum*, and all the authority of the rulers under it be cried down, as has happened to the present confederation—Or the authority of the individual states will be totally supplanted, and they will retain the mere form without any of the powers of government.—To one or the other of these issues, I think, this new government, if it is adopted, will advance with great celerity.

2.9.85    It is said, I know, that such a separation of the sources of revenue, cannot be made without endangering the public safety—"unless (says a writer) it can be shewn that the circumstances which may affect the public safety are reducible within certain determinate limits; unless the contrary of this position can be fairly and rationally disputed; it must be admitted as a necessary consequence, that there can be no limitation of that authority which is to provide for the defence and protection of the community, &c."*

2.9.86    The pretended demonstration of this writer will instantly vanish, when it is considered, that the *protection and defence* of the community is not intended to be entrusted *solely* into the hands of the general government, and by his own confession it ought not to be. It is true this system commits to the general government the protection and defence of the community against foreign force and invasion, against piracies and felonies on the high

*Federalist,* No. 23.

400

Compendium_Cornell
Page 0149

Essays of Brutus

seas, and against insurrections among ourselves. They are also authorised
to provide for the administration of justice in certain matters of a general
concern, and in some that I think are not so. But it ought to be left to the
state governments to provide for the protection and defence of the citizen
against the hand of private violence, and the wrongs done or attempted by
individuals to each other—Protection and defence against the murderer, the
robber, the thief, the cheat, and the unjust person, is to be derived from the
respective state governments.—The just way of reasoning therefore on this
subject is this, the general government is to provide for the protection and
defence of the community against foreign attacks, &c., they therefore ought
to have authority sufficient to effect this, so far as is consistent with the
providing for our internal protection and defence. The state governments
are entrusted with the care of administring justice among its citizens, and
the management of other internal concerns, they ought therefore to retain
power adequate to the end. The preservation of internal peace and good
order, and the due administration of law and justice, ought to be the first
care of every government.—The happiness of a people depends infinitely
more on this than it does upon all that glory and respect which nations
acquire by the most brilliant martial achievements—and I believe history
will furnish but few examples of nations who have duly attended to these,
who have been subdued by foreign invaders. If a proper respect and submis-
sion to the laws prevailed over all orders of men in our country; and if a
spirit of public and private justice, oeconomy and industry influenced the
people, we need not be under any apprehensions but what they would be
ready to repel any invasion that might be made on the country.[58] And more
than this, I would not wish from them—A defensive war is the only one I
think justifiable[59]—I do not make these observations to prove, that a gov-
ernment ought not to be authorised to provide for the protection and de-
fence of a country against external enemies, but to shew that this is not the
most important, much less the only object of their care.[60]

The European governments are almost all of them framed, and adminis-         2.9.87
tered with a view to arms, and war, as that in which their chief glory
consists; they mistake the end of government—it was designed to save
men[']s lives, not to destroy them. We ought to furnish the world with an
example of a great people, who in their civil institutions hold chiefly in view,
the attainment of virtue, and happiness among ourselves. Let the monarchs
in Europe, share among them the glory of depopulating countries, and
butchering thousands of their innocent citizens, to revenge private quarrels,
or to punish an insult offered to a wife, a mistress, or a favorite: I envy them
not the honor, and I pray heaven this country may never be ambitious of
it.[61] The czar Peter the great, acquired great glory by his arms; but all this
was nothing, compared with the true glory which he obtained, by civilizing
his rude and barbarous subjects, diffusing among them knowledge, and
establishing, and cultivating the arts of life: by the former he desolated

401

Major Series of Essays

countries, and drenched the earth with human blood: by the latter he soft-
ened the ferocious nature of his people, and pointed them to the means of
human happiness. The most important end of government then, is the
proper direction of its internal policy, and oeconomy; this is the province of
the state governments, and it is evident, and is indeed admitted, that these
ought to be under their controul. Is it not then preposterous, and in the
highest degree absurd, when the state governments are vested with powers
so essential to the peace and good order of society, to take from them the
means of their own preservation?

2.9.88    The idea, that the powers of congress in respect to revenue ought to be
unlimited, "because the circumstances which may affect the public safety
are not reducible to certain determinate limits," is novel, as it relates to the
government of the united states. The inconveniencies which resulted from
the feebleness of the present confederation was discerned, and felt soon
after its adoption. It was soon discovered, that a power to require money,
without either the authority or means to enforce a collection of it, could not
be relied upon either to provide for the common defence, the discharge of
the national debt, or for support of government. Congress therefore, so
early as February 1781, recommended to the states to invest them with a
power to levy an impost of five per cent ad valorem, on all imported goods,
as a fund to be appropriated to discharge the debts already contracted, or
which should hereafter be contracted for the support of the war, to be
continued until the debts should be fully and finally discharged. There is not
the most distant idea held out in this act, that an unlimited power to collect
taxes, duties and excises was necessary to be vested in the united states,
and yet this was a time of the most pressing danger and distress. The idea
then was, that if certain definite funds were assigned to the union, which
were certain in their natures, productive, and easy of collection, it would
enable them to answer their engagements, and provide for their defence,
and the impost of five per cent was fixed upon for the purpose.

2.9.89    This same subject was revived in the winter and spring of 1783, and after a
long consideration of the subject, and many schemes were proposed; the
result was, a recommendation of the revenue system of April 1783; this
system does not suggest an idea that it was necessary to grant the United
States unlimited authority in matters of revenue. A variety of amendments
were proposed to this system, some of which are upon the journals of
Congress, but it does not appear that any of them proposed to invest the
general government with discretionary power to raise money. On the con-
trary, all of them limit them to certain definite objects, and fix the bounds
over which they could not pass. This recommendation was passed at the
conclusion of the war, and was founded on an estimate of the whole national
debt. It was computed, that one million and an half of dollars, in addition to
the impost, was a sufficient sum to pay the annual interest of the debt, and
gradually to abolish the principal.—Events have proved that their estimate

402

Compendium_Cornell
Page 0151

Essays of Brutus

was sufficiently liberal, as the domestic debt appears upon its being adjusted to be less than it was computed, and since this period a considerable portion of the principal of the domestic debt has been discharged by the sale of the western lands. It has been constantly urged by Congress, and by individuals, ever since, until lately, that had this revenue been appropriated by the states, as it was recommended, it would have been adequate to every exigency of the union. Now indeed it is insisted, that all the treasures of the country are to be under the controul of that body, whom we are to appoint to provide for our protection and defence against foreign enemies. The debts of the several states, and the support of the governments of them are to trust to fortune and accident. If the union should not have occasion for all the money they can raise, they will leave a portion for the state, but this must be a matter of mere grace and favor. Doctrines like these would not have been listened to by any state in the union, at a time when we were pressed on every side by a powerful enemy, and were called upon to make greater exertions than we have any reason to expect we shall ever be again. The ability and character of the convention, who framed the proferred constitution, is sounded forth and reiterated by every declaimer and writer in its favor, as a powerful argument to induce its adoption. But are not the patriots who guided our councils in the perilous times of the war, entitled to equal respect. How has it happened, that none of these perceived a truth, which it is pretended is capable of such clear demonstration, that the power to raise a revenue should be deposited in the general government without limitation? Were the men so dull of apprehension, so incapable of reasoning as not to be able to draw the inference?[62] The truth is, no such necessity exists. It is a thing practicable, and by no means so difficult as is pretended, to limit the powers of the general government in respect to revenue, while yet they may retain reasonable means to provide for the common defence.

It is admitted, that human wisdom cannot foresee all the variety of circumstances that may arise to endanger the safety of nations—and it may with equal truth be added, that the power of a nation, exerted with its utmost vigour, may not be equal to repel a force with which it may be assailed, much less may it be able, with its ordinary resources and power, to oppose an extraordinary and unexpected attack;—but yet every nation may form a rational judgment, what force will be competent to protect and defend it, against any enemy with which it is probable it may have to contend. In extraordinary attacks, every country must rely upon the spirit and special exertions of its inhabitants—and these extraordinary efforts will always very much depend upon the happiness and good order the people experience from a wise and prudent administration of their internal government.[63] The states are as capable of making a just estimate on this head, as perhaps any nation in the world.—We have no powerful nation in our neighbourhood; if we are to go to war, it must either be with the Aboriginal natives, or with European nations. The first are so unequal to a contest with this whole

2.9.90

403

Compendium_Cornell
Page 0152

Major Series of Essays

continent, that they are rather to be dreaded for the depredations they may make on our frontiers, than for any impression they will ever be able to make on the body of the country. Some of the European nations, it is true, have provinces bordering upon us, but from these, unsupported by their European forces, we have nothing to apprehend; if any of them should attack us, they will have to transport their armies across the atlantic, at immense expence, while we should defend ourselves in our own country, which abounds with every necessary of life. For defence against any assault, which there is any probability will be made upon us, we may easily form an estimate.

2.9.91   I may be asked to point out the sources, from which the general government could derive a sufficient revenue, to answer the demands of the union. Many might be suggested, and for my part, I am not disposed to be tenacious of my own opinion on the subject. If the object be defined with precision, and will operate to make the burden fall any thing nearly equal on the different parts of the union, I shall be satisfied.

2.9.92   There is one source of revenue, which it is agreed, the general government ought to have the sole controul of. This is an impost upon all goods imported from foreign countries. This would, of itself, be very productive, and would be collected with ease and certainty.—It will be a fund too, constantly encreasing—for our commerce will grow, with the productions of the country; and these, together with our consumption of foreign goods, will encrease with our population.[64] It is said, that the impost will not produce a sufficient sum to satisfy the demands of the general government; perhaps it would not. Let some other then, equally well defined, be assigned them:— that this is practicable is certain, because such particular objects were proposed by some members of Congress when the revenue system of April 1783, was agitated in that body. It was then moved, that a tax at the rate of ninetieths[65] of a dollar on surveyed land, and a house tax of half a dollar on a house, should be granted to the United States. I do not mention this, because I approve of raising a revenue in this mode. I believe such a tax would be difficult in its collection, and inconvenient in its operation. But it shews, that it has heretofore been the sense of some of those, who now contend, that the general government should have unlimited authority in matters of revenue, that their authority should be definite and limited on that head.—My own opinion is, that the objects from which the general government should have authority to raise a revenue, should be of such a nature, that the tax should be raised by simple laws, with few officers, with certainty and expedition, and with the least interference with the internal police of the states.—Of this nature is the impost on imported goods—and it appears to me that a duty on exports, would also be of this nature—and therefore, for ought I can discover, this would be the best source of revenue to grant the general government. I know neither the Congress nor the state legislatures will have authority under the new constitution to raise a revenue

404

Compendium_Cornell
Page 0153

Essays of Brutus

in this way. But I cannot perceive the reason of the restriction. It appears to
me evident, that a tax on articles exported, would be as nearly equal as any
that we can expect to lay, and it certainly would be collected with more ease
and less expence than any direct tax. I do not however, contend for this
mode, it may be liable to well founded objections that have not occurred to
me. But this I do contend for, that some mode is practicable, and that limits
must be marked between the general government, and the states on this
head, or if they be not, either the Congress in the exercise of this power, will
deprive the state legislatures of the means of their existence, or the states by
resisting the constitutional authority of the general government, will render
it nugatory.

                                                                Brutus.


## VIII
### 10 January 1788

The next powers vested by this constitution in the general government,        2.9.93
which we shall consider, are those, which authorise them to "borrow
money on the credit of the United States, and to raise and support armies."
I take these two together and connect them with the power to lay and collect
taxes, duties, imposts and excises, because their extent, and the danger that
will arise from the exercise of these powers, cannot be fully understood,
unless they are viewed in relation to each other.

The power to borrow money is general and unlimited, and the clause so       2.9.94
often before referred to, authorises the passing any laws proper and neces-
sary to carry this into execution. Under this authority, the Congress may
mortgage any or all the revenues of the union, as a fund to loan money upon,
and it is probably, in this way, they may borrow of foreign nations, a
principal sum, the interest of which will be equal to the annual revenues of
the country.—By this means, they may create a national debt, so large, as to
exceed the ability of the country ever to sink. I can scarcely contemplate a
greater calamity that could befal this country, than to be loaded with a debt
exceeding their ability ever to discharge. If this be a just remark, it is unwise
and improvident to vest in the general government a power to borrow at
discretion, without any limitation or restriction.

It may possibly happen that the safety and welfare of the country may       2.9.95
require, that money be borrowed, and it is proper when such a necessity
arises that the power should be exercised by the general government.—But
it certainly ought never to be exercised, but on the most urgent occasions,
and then we should not borrow of foreigners if we could possibly avoid it.
The constitution should therefore have so restricted, the exercise of this

405

Compendium_Cornell
Page 0154

Major Series of Essays

power as to have rendered it very difficult for the government to practise it.
The present confederation requires the assent of nine states to exercise this,
and a number of the other important powers of the confederacy—and it
would certainly have been a wise provision in this constitution, to have
made it necessary that two thirds of the members should assent to borrow-
ing money—when the necessity was indispensible, this assent would always
be given, and in no other cause ought it to be.

2.9.96    The power to raise armies, is indefinite and unlimited, and authorises the
raising forces, as well in peace as in war. Whether the clause which im-
powers the Congress to pass all laws which are proper and necessary, to
carry this into execution, will not authorise them to impress men for the
army, is a question well worthy consideration? If the general legislature
deem it for the general welfare to raise a body of troops, and they cannot be
procured by voluntary enlistments, it seems evident, that it will be proper
and necessary to effect it, that men be impressed from the militia to make up
the deficiency.

2.9.97    These powers taken in connection, amount to this: that the general gov-
ernment have unlimitted authority and controul over all the wealth and all
the force of the union. The advocates for this scheme, would favor the world
with a new discovery, if they would shew, what kind of freedom or in-
dependency is left to the state governments, when they cannot command
any part of the property or of the force of the country, but at the will of the
Congress. It seems to me as absurd, as it would be to say, that I was free and
independent, when I had conveyed all my property to another, and was
tenant to will to him, and had beside, given an indenture of myself to serve
him during life.—The power to keep up standing armies in time of peace,
has been justly objected, to this system, as dangerous and improvident. The
advocates who have wrote in its favor, have some of them ridiculed the
objection, as though it originated in the distempered brain of its oppo-
nents,[66] and others have taken pains to shew, that it is a power that was
proper to be granted to the rulers in this constitution.[67] That you may be
enabled to form a just opinion on this subject, I shall first make some
remarks, tending to prove, that this power ought to be restricted, and then
animadvert on the arguments which have been adduced to justify it.

2.9.98    I take it for granted, as an axiom in politic, that the people should never
authorise their rulers to do any thing, which if done, would operate to their
injury.

It seems equally clear, that in a case where a power, if given and exer-
cised, will generally produce evil to the community, and seldom good—and
which, experience has proved, has most frequently been exercised to the
great injury, and very often to the total destruction of the government; in
such a case, I say, this power, if given at all, should if possible be so
restricted, as to prevent the ill effect of its operation.

2.9.99    Let us then enquire, whether standing armies in time of peace, would be

406

Compendium_Cornell
Page 0155

from slaughter, from a view of the advantage they reaped from their slaves. Thus historians observe, that civil wars were more cruel than others; the general practice in that case being to put the prisoners to the sword, because they could not make slaves of them.

XXX. But Christian nations have generally agreed among themselves to abolish the custom of making their prisoners yield perpetual service to the conqueror. At present it is thought sufficient to keep those that are taken in war till their ransom is paid, the estimation of which depends on the will of the conqueror, unless there be a cartel, or agreement, by which it is fixed.

## CHAP. VII.

### *Of the rights of war over the goods of an enemy.*

I. As to the goods of an enemy, it is certain that the state of war permits us to carry them off, to ravage, to spoil, or even entirely to destroy them; for, as Cicero very well observes,* *It is not contrary to the law of nature to plunder a person, whom we may lawfully kill.* And all those mischiefs which the law of nations allow us to do to the enemy, by ravaging and wasting his lands and goods, are called spoil or plunder.

II. This right of spoil, or plunder, extends in general, to all things belonging to the enemy; and the law of nations, properly so called, does not exempt even sacred things; that is, things consecrated either to the true God, or to false deities, and designed for the use of religion.

III. It is true, the practices and customs of nations do not agree in this respect; some having permitted the plunder of things sacred and religious, and others having looked upon it as a profanation. But whatever the customs of different people may be, they can never constitute the primitive rule of right. In order therefore to be assured of the right of war in regard to this article, we must have recourse to the law of nature and nations.

***

* Cic. de. Off. lib. iii. cap. vi.
26

THE CAMBRIDGE HISTORY OF LAW IN AMERICA

VOLUME II

*The Long Nineteenth Century (1789–1920)*

Law stands at the center of modern American life. Since the 1950s, American historians have produced an extraordinarily rich and diverse literature that has vastly expanded our knowledge of this familiar and vital yet complex and multifaceted phenomenon. But few attempts have been made to take full account of law's American history. *The Cambridge History of Law in America* has been designed for just this purpose. In three volumes we put on display all the intellectual vitality and variety of contemporary American legal history. We present as comprehensive and authoritative an account as possible of the present understanding and range of interpretation of the history of American law. We suggest where future research may lead.

In the long century after 1789 we see the crystallization and, after the Civil War, the reinvention of a distinctively American state system – federal, regional and local; we see the appearance of systematic legal education, the spread of the legal profession, and the growing density of legal institutions. Overall, we learn that in America law becomes a technique of first resort wherever human activity, in all shapes and sizes, meets up with the desire to organize it: the reception and distribution of migrant populations; the expulsion and transfer of indigenous peoples; the structure of social life; the liberation of slaves and the confinement of freed people; and the great churning engines of continental expansion, urban growth, capitalist innovation, industrialization. We see how law intertwines with religion, how it becomes ingrained in popular culture, and how it intersects with the semi-separate world of American militarism and with the "outside" world of other nations.

*The Cambridge History of Law in America* has been made possible by the generous support of the American Bar Foundation. Volumes I and III cover the history of law in America, respectively, from the first moments of English colonizing through the creation and stabilization of the republic; and from the 1920s until the early twenty-first century.

Michael Grossberg is the Sally M. Reahard Professor of History and a Professor of Law at Indiana University. His research focuses on the relationship between law and social change, particularly the intersection of law and the family.

Christopher Tomlins is Senior Research Fellow at the American Bar Foundation in Chicago. His research encompasses the relationship among labor, colonization, and law in early America; the conceptual history of police in Anglo-American law and politics; and the place of historical materialism in legal theory.

https://doi.org/10.1017/CHOL9780521803069.001 Published online by Cambridge University Press
Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0157

https://doi.org/10.1017/CHOL9780521809603.019 Published online by Cambridge University Press

# THE CAMBRIDGE HISTORY
# OF LAW IN AMERICA

VOLUME II

*The Long Nineteenth Century (1789–1920)*

---

*Edited by*

MICHAEL GROSSBERG

*Indiana University*

CHRISTOPHER TOMLINS

*The American Bar Foundation, Chicago*



Published online by Cambridge University Press Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0159

CAMBRIDGE UNIVERSITY PRESS
Cambridge, New York, Melbourne, Madrid, Cape Town, Singapore, São Paulo, Delhi

Cambridge University Press
32 Avenue of the Americas, New York, NY 10013-2473, USA

www.cambridge.org
Information on this title: www.cambridge.org/9780521803069

© Cambridge University Press 2008

This publication is in copyright. Subject to statutory exception
and to the provisions of relevant collective licensing agreements,
no reproduction of any part may take place without
the written permission of Cambridge University Press.

First published 2008

Printed in the United States of America

*A catalog record for this publication is available from the British Library.*

*Library of Congress Cataloging in Publication Data*

The Cambridge history of law in America / edited by Michael Grossberg,
Christopher Tomlins.
  p.   cm.
Includes bibliographical references and index.
ISBN   978-0-521-80306-9 (hardback)
1. Law – United States – History.   I. Grossberg, Michael, 1950–   II. Tomlins,
Christopher L., 1951–   III. Title.
KF352.C36   2007
349.73–dc22        2007017606

ISBN   978-0-521-80306-9 hardback

Cambridge University Press has no responsibility for
the persistence or accuracy of URLs for external or
third-party Internet Web sites referred to in this publication
and does not guarantee that any content on such
Web sites is, or will remain, accurate or appropriate.

CONTENTS

*Editors' Preface*                                                    *page* vii

1   Law and the American State, from the Revolution to the
    Civil War: Institutional Growth and Structural Change               1
    MARK R. WILSON

2   Legal Education and Legal Thought, 1790–1920                       36
    HUGH C. MACGILL AND R. KENT NEWMYER

3   The Legal Profession: From the Revolution to the Civil War         68
    ALFRED S. KONEFSKY

4   The Courts, 1790–1920                                             106
    KERMIT L. HALL

5   Criminal Justice in the United States, 1790–1920:
    A Government of Laws or Men?                                       133
    ELIZABETH DALE

6   Citizenship and Immigration Law, 1800–1924: Resolutions
    of Membership and Territory                                       168
    KUNAL M. PARKER

7   Federal Policy, Western Movement, and Consequences
    for Indigenous People, 1790–1920                                  204
    DAVID E. WILKINS

8   Marriage and Domestic Relations                                   245
    NORMA BASCH

9   Slavery, Anti-Slavery, and the Coming of the Civil War            280
    ARIELA GROSS

10  The Civil War and Reconstruction                                  313
    LAURA F. EDWARDS

v

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0161

11   Law, Personhood, and Citizenship in the Long Nineteenth
     Century: The Borders of Belonging                          345
     BARBARA YOUNG WELKE

12   Law in Popular Culture, 1790–1920: The People
     and the Law                                                387
     NAN GOODMAN

13   Law and Religion, 1790–1920                                417
     SARAH BARRINGER GORDON

14   Legal Innovation and Market Capitalism, 1790–1920          449
     TONY A. FREYER

15   Innovations in Law and Technology, 1790–1920               483
     B. ZORINA KHAN

16   The Laws of Industrial Organization, 1870–1920             531
     KAREN ORREN

17   The Military in American Legal History                     568
     JONATHAN LURIE

18   The United States and International Affairs, 1789–1919      604
     EILEEN P. SCULLY

19   Politics, State-Building, and the Courts, 1870–1920        643
     WILLIAM E. FORBATH

     *Bibliographic Essays*                                     697
     *Notes on Contributors*                                    821
     *Index*                                                    823

Cambridge Histories Online © Cambridge University Press, 2008

EDITORS' PREFACE

In February 1776, declaiming against the oppressive and absolute rule of "the Royal Brute of Britain," the revolutionary pamphleteer Tom Paine announced to the world that "so far as we approve of monarchy...in America THE LAW IS KING"! Paine's declaration of Americans' "common sense" of the matter turned out to be an accurate forecast of the authority the legal order would amass in the revolutionary republic. Indeed, Paine's own fiery call to action was one of the stimuli that would help his prediction come true. We know ourselves that what he claimed for law then mostly remains true now. Yet, we should note, Paine's claim was not simply prophecy; it made sense in good part because of foundations already laid. Long before 1776, law and legal institutions had gained a place of some prominence in the British American colonies. The power and position of law, in other words, are apparent throughout American history, from its earliest moments. The three volumes of *The Cambridge History of Law in America* explain why Paine's synoptic insight should be understood as both an eloquent foretelling of what would be and an accurate summation of what already was.

*The Cambridge History of Law in America* belongs to a long and proud scholarly tradition. In March 1896, at the instigation of Frederick William Maitland, Downing Professor of the Laws of England at Cambridge University, and of Henry Jackson, tutor in Greek at Trinity College, the syndics of Cambridge University Press invited the University's Regius Professor of Modern History, Lord John Dalberg Acton, to undertake "the general direction of a History of the World." Six months later Acton returned with a plan for a (somewhat) more restrained endeavor, an account of Europe and the United States from *The Renaissance* to *The Latest Age*. Thus was born *The Cambridge Modern History*.

Acton's plan described a collaborative, collectively written multi-volume history. Under general editorial guidance, each volume would be divided among "specially qualified writers" primed to present extensive and

vii

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0163

authoritative accounts of their subjects.[1] They were to imagine themselves writing less for other professional historians than for a more general audience of "students of history" – anyone, that is, who sought an authoritative, thoughtful, and sophisticated assessment of a particular historical subject or issue. Acton envisioned a history largely clean of the professional apparatus of reference and citation – texts that would demonstrate the "highest pitch of knowledge without the display," reliant for their authority on the expertise of the authors chosen to write them. And although it was intended that the *History* be the most complete general statement of historical knowledge available, and to that extent definitive, Acton was not interested in simply reproducing (and thus by implication freezing) what was known. He desired that his authors approach the task critically, strive for originality in their research, and take it on themselves to revise and improve the knowledge they encountered.[2]

Acton did not live to see even the first volume in print, but between 1902 and 1911 *The Cambridge Modern History* appeared in twelve substantial volumes under the editorial direction of Adolphus Ward and Stanley Leathes. The *History* quickly found a broad audience – the first volume, *The Renaissance*, sold out in a month. Other Cambridge histories soon followed: *The Cambridge History of English Literature*, which began to appear under Ward's editorship in 1907; *The Cambridge Medieval History* (1911–36); *The Cambridge History of American Literature* (1917–21); *The Cambridge Ancient History* (1923–39); *The Cambridge History of the British Empire* (1929–67); *The Cambridge History of India* (1922–60), and more. All told, close to a hundred Cambridge histories have been published. More than fifty are currently in print. Cambridge histories have justly become famous. They are to be found in the collections of libraries and individuals throughout the world.

Acton's plan for *The Cambridge Modern History* invoked certain essentials – an ideal of collective authorship and a commitment to make expertise accessible to a wider audience than simply other specialists. To these he added grander, programmatic touches. The *History* would be "an epic," a "great argument" conveying "forward progress . . . upward growth." And it would provide "chart and compass for the coming century." Such ambitions are

[1] When, early on, Acton ran into difficulties in recruiting authors for his intimidating project, Maitland gently suggested that "his omniscient lordship" simply write the whole thing himself. Acton (we note with some relief) demurred. There is humor here, but also principle. Collective authorship is a practice ingrained in the Cambridge histories from the beginning.
[2] Our account of Acton's plan and its realization gratefully relies throughout on Josef L. Altholz, "Lord Acton and the Plan of the *Cambridge Modern History*," *The Historical Journal*, 39, no. 3 (September 1996), 723–36.

characteristic of Acton's moment – the later nineteenth century – when in Britain and Continental Europe history still claimed an educative mantle "of practical utility," the means rather than science (or law) to equip both elites and ordinary citizens "to deal with the problems of their time." It was a moment, also, when history's practitioners could still imagine filling historical time with a consistent, standardized account – the product, to be sure, of many minds, but minds that thought enough alike to agree on an essential common purpose: "men acting together for no other object than the increase of accurate knowledge." Here was history (accurate knowledge) as "the teacher and the guide that regulates public life," the means by which "the recent past" would yield up "the key to present time." Here as well, lest we too quickly dismiss the vision as naïve or worse, was the shouldering of a certain responsibility. "We have to describe the ruling currents, to interpret the sovereign forces, that still govern and divide the world. There are, I suppose, at least a score of them, in politics, economics, philosophy and religion. . . . But if we carry history down to the last syllable of recorded time, and leave the reader at the point where study passes into action, we must explain to him the cause, and the growth, and the power of every great intellectual movement, and equip him for many encounters of life."

Acton's model – a standard general history, a guiding light produced by and for an intellectually confident elite – could not survive the shattering effects of two world wars. It could not survive the democratization of higher education, the proliferation of historical scholarship, the constant emergence of new fields and subdisciplines, the eventual decentering of Europe and "the West." When, amid the rubble and rationing of a hastily de-colonizing post–World War II Britain, Cambridge University Press's syndics decided a revised version was required – a *New Cambridge Modern History* for a new day – their decision acknowledged how much the world had changed. The revised version bore them out. Gone was Acton's deep faith in history's authority and grandeur. The general editor, G. N. Clark, wrote, "Historians in our self-critical age are aware that there will not be general agreement with their conclusions, nor even with some of the premises which they regard as self-evident. They must be content to set out their own thought without reserve and to respect the differences which they cannot eradicate" – including, he might have added (but perhaps there was no need) the many fundamental differences that existed among historians themselves. Cambridge histories no longer aspired to create standardized accounts of the way things had been nor to use the past to pick the lock on the future. The differences in perspective and purpose that a less confident, more self-critical age had spawned were now the larger part of the picture.

Yet the genre Acton helped found has now entered its second century. It still bears, in some fashion, his imprint. The reason it has survived, indeed

Compendium_Cornell
Page 0165

prospered, has less to do with some sense of overall common purpose than the more modest but nevertheless essential precept of continued adherence to certain core principles of design simply because they have worked: individual scholars charged to synthesize the broad sweep of current knowledge of a particular topic, but also free to present an original interpretation aimed at encouraging both reflection and further scholarship, and an overall architecture that encourages new understandings of an entire subject or area of historical scholarship. Neither encyclopedias nor compilations, textbooks nor works of reference, Cambridge histories have become something quite unique – each an avowedly collective endeavor that offers the single best point of entry to the wide range of an historical subject, topic, or field; each in overall conceptual design and substance intent not simply on defining its field's development to date but on pushing it forward with new ideas. Critique and originality, revision and improvement of knowledge – all remain germane.

Readers will find that *The Cambridge History of Law in America* adheres to these core goals. Of course, like other editors we have our own particular ambitions. And so the three volumes of this Cambridge history have been designed to present to full advantage the intellectual vitality and variety of contemporary American legal history. Necessarily then – and inevitably – *The Cambridge History of Law in America* dwells on areas of concern and interpretive debates that preoccupy the current generation of legal historians. We do not ignore our predecessors.[3] Nor, however, do we attempt in the body of the *History* to chart the development of the field over their time and ours in any great detail. Readers will find a more substantial accounting of that development in the bibliographic essays that accompany each chapter, but as editors we have conceived our job to be to facilitate the presentation of as comprehensive and authoritative a rendition of the present understanding of the history of American law as possible and to suggest where future research may lead.

Cambridge histories always define their audiences widely; ours is no exception. One part of our intended audience is scholarly, but hardly confined to other legal historians; they are already the best equipped to know something of what is retailed here. So to an important extent we try to look past legal historians to historians at large. We also look beyond history to scholars across the broad sweep of law, the humanities, and the social sciences – indeed to any scholar who may find a turn to law's history useful (or simply diverting) in answering questions about law and society in America.

---

[3] See, for example, the graceful retrieval and reexamination of themes from the "imperial school" of American colonial historians undertaken by Mary Sarah Bilder in Volume I, Chapter 3.

Compendium_Cornell
Page 0166

A second part of our audience is the legal profession. Lawyers and judges experience in their professional lives something of a practical encounter with the past, although the encounter may not be one they would recognize as "historical." As John Reid has written, "The lawyer and the historian have in common the fact that they go to the past for evidence, but there the similarity largely ends." Here lawyers and judges can discover for themselves what historians do with evidence. In the process, they will also discover that not inconsiderable attention has been paid to their own lives and experiences. Legal historians have always known how important legal thought and legal education are in the formation of the professional world of the law, and both feature prominently in this *History*. Here the profession encounters the history of its activities and of the medium it inhabits from a standpoint outside itself.

The third segment of our intended audience is the general public. Our purposes in this encounter are not Acton's. We do not present this *History* as the means to educate a citizenry to deal with the problems of the moment. (Indeed, it is worth noting that in America law appropriated that role to itself from the earliest days of the republic.) Like G. N. Clark, today's historians live in self-critical times and have lower expectations than Lord Acton of what historical practice might achieve. That said, readers will find that this *History* touches on many past attempts to use law to "deal with" many past problems: in the America where law is king, it has been law's fate to be so employed. And if their accounts leave some of our authors critical in their analysis of outcomes or simply rueful in recounting the hubris (or worse) of the attempts, that in itself can be counted an education of sorts. Moreover, as Volume III's chapters show repeatedly, Americans continue to turn to law as their key medium of private problem solving and public policy formation and implementation, and on an expanding – global – stage. In that light, there is perhaps something for us to learn from Acton's acknowledgment that the scholar-expert should not abandon the reader "at the point where study passes into action." We can at the very least offer some reflection on what an encounter with the past might bring by way of advice to the "many encounters of life" lying ahead.

In reaching all three of our intended audiences, we are greatly assisted by the pronounced tendency to "demystify" and diversify its subject that has characterized American legal history for a half-century. To some, the field's very title – "legal history" – will conjure merely an arcane preoccupation with obscure terminologies and baffling texts, the doctrines and practices of old (hence defunct) law, of no obvious utility to the outsider whether historian or social scientist or practicing lawyer or just plain citizen. No doubt, legal history has at times given grounds to suppose that such a view of the discipline is generally warranted. But what is interesting

Compendium_Cornell
Page 0167

in American legal history as currently practiced is just how inappropriate that characterization seems.

To read the encomia that have accumulated over the years, one might suppose that the demise of legal history's obscurity was the single-handed achievement of one man, James Willard Hurst, who on his death in 1997 was described in the *New York Times* as "the dean of American legal historians." Indeed, Hurst himself occasionally suggested the same thing; it was he who came up with the aphorism "snakes in Ireland" to describe legal history in America at the time he began working in the field in the 1930s. Though not an immodest man, it seems clear whom he cast as St. Patrick. Yet the *Times'* description was merited. Hurst's lifework – the unpacking of the changing roles of American law, market, and state from the early nineteenth to the early twentieth centuries – set the agenda of American legal historians from the 1950s well into the 1980s. That agenda was a liberation from narrower and more formalistic preoccupations, largely with the remote origins of contemporary legal doctrine or with the foundations of American constitutionalism, that had characterized the field, such as it was, earlier in the century. Most important, Hurst's work displayed some recognition of the multidimensionality of law in society – as instrument, the hallmark with which he is most associated, but also as value and as power. Hurst, in short, brought legal history into a continuing dialogue with modernity, capitalism, and the liberal state, a dialogue whose rich dividends are obvious in this *History*.

Lawyers have sometimes asked aggressively anachronistic questions of history, like – to use an apocryphal example of Robert Gordon's – "Did the framers of the Constitution confer on the federal government the power to construct an interstate highway system?" Hurstian legal history did not indulge such questions. But Hurstians did demonstrate a gentler anachronism in their restriction of the scope of the subject and their interpretation of it. Famously, for Hurst, American legal history did not begin until the nineteenth century. And when it did begin it showed a certain consistency in cause and effect. As Kermit Hall summarized the view in 1989, "Our legal history reflects back to us generations of pragmatic decision making rather than a quest for ideological purity and consistency. Personal and group interests have always ordered the course of legal development; instrumentalism has been the way of the law."[4] The Hurstian determination to demystify law occasionally reduced it to transparency – a dependent variable of society and economy (particularly economy) tied functionally to social and economic change.

---

[4] Kermit L. Hall, *The Magic Mirror: Law in American History* (New York, 1989), 335.

Compendium_Cornell
Page 0168

As a paradigm for the field, Hurstian legal history long since surrendered its dominance. What has replaced it? In two words, astonishing variety. Legal historians are aware that one cannot talk or write about economic or social or political or intellectual history, or indeed much of any kind of history, without immediately entering into realms of definition, prohibition, understanding, practice, and behavior that must imply law to have meaning. Try talking about property in any of those contexts, for example, without implying law. Today's legal historians are deeply engaged across the full range of historical investigation in demonstrating the inextricable salience of law in human affairs. As important, the interests of American historians at large have never been more overtly legal in their implications than now. To take just four popular areas of inquiry in American history – citizenship and civic personality, identity, spatiality, and the etiology of social hierarchy and subordination – it is simply impossible to imagine how one could approach any of these areas historically without engaging with law, legal ideology, legal institutions, legal practices, and legal discourse. Legal historians have been and remain deeply engaged with and influenced by social history, and as that field has drifted closer and closer to cultural history and the historical construction of identity so legal history has moved with it. The interpretive salience of race and ethnicity, of gender and class is as strong in contemporary legal historical practice as in any other realm of history. Add to that the growing influence of legal pluralism in legal history – the migration of the field from a focus on "the law" to a focus on the conditions of existence of "legality" and the competition of many alternative "legalities" – and one finds oneself at work in a field of immense opportunity and few dogmas.

"Astonishing variety" demonstrates vitality, but also suggests the benefits of a judicious collective effort at authoritative summation. The field has developed at an extraordinary rate since the early 1970s, but offers no work that could claim to approach the full range of our understanding of the American legal past.[5] *The Cambridge History of Law in America* addresses both

---

[5] The field has two valuable single-author surveys: Lawrence M. Friedman's *A History of American Law* (New York, 1973; 3rd ed. 2005) and Kermit Hall's *The Magic Mirror*. Neither approaches the range of what is on display here. The field also boasts volumes of cases and commentary, prepared according to the law teaching "case book" model, such as Stephen B. Presser and Jamil S. Zainaldin, *Law and Jurisprudence in American History: Cases and Materials* (St. Paul, MN, 1980; 6th ed. 2006) and Kermit Hall, et al., *American Legal History, Cases and Materials* (New York, 3rd ed., 2003). There also exist edited volumes of commentary and materials that focus on broad subject areas within the discipline of legal history; a preponderance deal with constitutional law, such as Lawrence M. Friedman and Harry N. Scheiber, eds., *American Law and the Constitutional Order: Historical Perspectives* (Cambridge, MA, 1978; enlarged ed. 1988). Valuable in

Compendium_Cornell
Page 0169

the vitality of variety and its organizational challenge. Individually, each chapter in each volume is a comprehensive interrogation of a key issue in a particular period of American legal history. Each is intended to extend the substantive and interpretative boundaries of our knowledge of that issue. The topics they broach range widely – from the design of British colonizing to the design of the successor republic and of its successive nineteenth- and twentieth-century reincarnations; from legal communications within empires to communications among nation-states within international law to a sociology of the "legalization" that enwraps contemporary globalism; from changes in legal doctrine to litigation trend assessments; from clashes over law and religion to the intersection of law and popular culture; from the movement of peoples to the production of subalternship among people (the indigenous, slaves, dependents of all kinds); and from the discourse of law to the discourse of rights. Chapters also deal with developments in specific areas of law and of the legal system – crime and criminal justice, economic and commercial regulation, immigration and citizenship, technology and environment, military law, family law, welfare law, public health and medicine, and antitrust.[6]

Individual chapters illustrate the dynamism and immense breadth of American legal history. Collectively, they neither exhaust its substance nor impose a new interpretive regimen on the field. Quite the contrary, *The Cambridge History of Law in America* intentionally calls forth the broad array of methods and arguments that legal historians have developed. The contents of each volume demonstrate not just that expansion of subject and method is common to every period of American legal history but also that as the long-ascendant socio-legal perspective has given way to an increasing diversity of analytical approaches, new interpretive opportunities are rife everywhere. Note the influence of regionalism in Volume I and of institutionalism in Volume II. Note the attention paid in Volume III not only to race and gender but also to sexuality. The *History* shows how legal history

---

their own right, such volumes are intended as specific-purpose teaching tools and do not purport to be comprehensive. Finally, there are, of course, particular monographic works that have proven widely influential for their conceptual acuity, or their capacity to set a completely new tone in the way the field at large is interpreted. The most influential have been such studies as James Willard Hurst, *Law and the Conditions of Freedom in the Nineteenth-Century United States* (Madison, WI, 1956), and Morton J. Horwitz, *The Transformation of American Law, 1780–1860* (Cambridge, MA, 1977).

[6] Following the tradition of Cambridge histories, each chapter includes only such footnotes as the author deems necessary to document essential (largely primary) sources. In place of the dense display of citations beloved of Acton's aesthetic discouraged, each author has written a bibliographic essay that provides a summary of his or her sources and a guide to scholarly work on the subject.

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0170

has entered dialogue with the full array of "histories" pursued within the academy – political, intellectual, social, cultural, economic, business, diplomatic, and military – and with their techniques.

*The Cambridge History of Law in America* is more than the sum of its parts. The *History's* conceptual design challenges existing understandings of the field. We divide the American legal past into three distinct eras and devote a complete volume to each one: first *Early America*, then *The Long Nineteenth Century*, and last *The Twentieth Century and After*. The first volume, *Early America*, examines the era from the late sixteenth century through the early nineteenth – from the beginnings of European settlement through the creation and stabilization of the American republic. The second volume, *The Long Nineteenth Century*, begins with the appearance of the United States in the constituted form of a nation-state in 1789; it ends in 1920, in the immediate aftermath of World War I, with the world poised on the edge of the "American Century." The final volume, *The Twentieth Century and After*, concentrates on that American century both at home and abroad and peers into the murk of the twenty-first century. Within each of these broad chronological divisions occurs a much more detailed subdivision that combines an appreciation of chronology with the necessities of topical specialization.

Where appropriate, topics are revisited in successive volumes (crime and criminal justice, domestic relations law, legal thought, and legal education are all examples). Discussion of economic growth and change is ubiquitous, but we accord it no determinative priority. To facilitate comparisons and contrasts within and between eras, sequences of subjects have been arranged in similar order in each volume. Specific topics have been chosen with an eye to their historical significance and their social, institutional, and cultural coherence. They cannot be walled off from each other, so readers will notice substantive overlaps when more than one author fastens on the same issues, often to create distinct interpretations of them. History long since ceased to speak with one voice. In this *History*, readers are invited into a conversation.

Readers will notice that our chronology creates overlaps at the margins of each era. They will also notice that some chapters focus on only particular decades within a specific era[7] or span more than one era.[8] All this is

---

[7] Chronologically specific topics – the American Revolution and the creation of the republic in Volume I, the Civil War in Volume II, the New Deal era in Volume III – are treated as such. Chapters on the legal profession in Volumes II and III divide its development at the Civil War, as do those, in Volume II, on the state and on industrial organization.

[8] Volume II's chapter on the military deals with both the nineteenth and twentieth centuries, as do Volume III's chapters on agriculture and the state and on law and the environment. The latter chapter, indeed, also gestures toward the colonial period.

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0171

intentional. Historians construct history by placing subjects in relation to
each other within the continuum of historical time. Historians manipulate
time by creating periods to organize the placement of subjects. Thus, when
historians say that a subject has been "historicized," they mean it has been
located in what they consider its appropriate historical-temporal context or
period. Slicing and dicing time in this fashion is crucial to the historian's
objective of rendering past action coherent and comprehensible, but neces-
sarily it has a certain arbitrariness. No matter how familiar – the colonial
period, the Gilded Age, the Progressive period, and so forth – no historical
period is a natural division: all are constructs. Hence we construct three
"eras" in the interests of organizational coherence, but our overlaps and the
distinct chronologies chosen by certain of our authors allow us to recognize
different temporalities at work.

That said, the tripartite division of these volumes is intended to provide
a new overall conceptual schema for American legal history, one that is
broad and accommodating but that locates legal history in the contours of
American history at large. Maitland never forgot that, at bottom, just as
religious history is history not theology, legal history is history not law.
Notwithstanding law's normative and prescriptive authority in "our" cul-
ture, it is a phenomenon for historical inquiry, not the source of an agenda.
And so we take our cue, broadly, from American history. If it is anything,
American history is the history of the colonization and settlement of the
North American mainland, it is the history of the creation and expansion
of an American nation-state, and it is the history of that state's place in
and influence on the world at large. The contents and the organization of
*The Cambridge History of Law in America* speak to how law became king
in this America and of the multitudinous empire of people and possibili-
ties over which that king reigned. Thus we address ourselves to the end-
less ramifications, across more than four centuries, of the meaning of Tom
Paine's exclamation in 1776.

*The Cambridge History of Law in America* could not have been produced
without the support and commitment of the American Bar Foundation,
Cambridge University Press, and our cadre of authors. We thank them all.

The American Bar Foundation housed the project and, together with the
Press, funded it. The Foundation was there at the creation: it helped initiate
the project by sponsoring a two-day meeting of an ad hoc editorial consult-
ing group in January 2000. Members of that group (Laura Edwards, Tony
Freyer, Robert Gordon, Bruce H. Mann, William Novak, Stephen Siegel,
Barbara Young Welke, and Victoria Saker Woeste) patiently debated the
editors' initial thoughts on the conceptual and intellectual direction that the
*History* should follow and helped identify potential contributors. Since then,

Compendium_Cornell
Page 0172

the project has benefited from the support of two ABF directors, Bryant Garth and his successor Robert Nelson, and the sustained and enthusiastic interest of the Foundation's Board of Directors during the tenure of four Board presidents: Jacqueline Allee, M. Peter Moser, the late Robert Hetlage, and David Tang. We owe a particular debt of gratitude to Robert MacCrate for his early support and encouragement. As all this suggests, the American Bar Foundation's role in the production of *The Cambridge History of Law in America* has been of decisive importance. The part the Foundation has played underlines its standing as the preeminent research center for the study of law and society in the United States and its long tradition of support for the development of American legal history.

Cambridge University Press has, of course, been central to the project throughout. We are grateful to the syndics for their encouragement and to Frank Smith and his staff in New York for their assistance and support. Frank first suggested the project in 1996. He continued to suggest it for three years until we finally succumbed. During the years the *History* has been in development, Frank has accumulated one responsibility after another at the Press. Once we rubbed shoulders with the Executive Editor for Social Sciences. Now we address our pleas to the Editorial Director for Academic Books. But Frank will always be a history editor at heart, and he has maintained a strong interest in this *History*, always available with sage advice as the project rolled relentlessly onward. He helped the editors understand the intellectual ambitions of a Cambridge history. Those who have had the privilege of working with Frank Smith will know how important his advice and friendship have been to us throughout.

Finally, the editors want to thank the authors of the chapters in these volumes. A project like this is not to every author's taste – some took to it more easily than others. But together the sixty authors who joined us to write the *History* have done a magnificent job, and we are deeply grateful to every one. From the beginning our goal was not only to recruit as participants those whom all would identify as leading figures of our field but also to include those who, we were confident, would be leading figures of its next generation. We are delighted that so many of each were willing. We acknowledge also those who were unable for one reason or another to see an initial commitment through to the end: their efforts, too, helped us define and establish the project. And obviously, we owe a particular debt to those others who came later to take the places of the fallen.

To oversee a project in which so many people have at one time or another been involved has seemed on occasion like being the mayors of a village. People arrive and (much less frequently, thank goodness) depart. Those who settle in for the duration become a community of friends and neighbors. Over time, one learns much from one's friends and neighbors about the joys

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0173

and vicissitudes of life. One learns who (and whose family) may be ailing, and who is well. One learns of hurts and difficulties; one revels in successes. And one may learn, as we did so sadly in August 2006, of an untimely death. Notwithstanding the demands of his immensely successful career in academic administration, our colleague Kermit Hall never laid down his historian's pen and was an enthusiastic participant in this project. He died suddenly and unexpectedly. His contributions to the field have been great, and he is greatly missed.

Throughout, the many authors in this project have responded courteously to our editorial advice. They have reacted with grace and occasional humor to our endless demands that they meet their deadlines. Sometimes they even sent their manuscripts too. Most important, they have striven to achieve what we asked of them – the general goals of a Cambridge history and the specific goals of *this* history, as we have described them in this preface. Their achievements are evident in the pages of each volume. In an individualistic intellectual culture, the scholarship on display here demonstrates the possibilities inherent in a collective intellectual enterprise. In the end, of course, the editors, not the authors, are responsible for the contents of these volumes. Yet, it is the authors who have given the *History* its meaning and significance.

*Michael Grossberg*
*Christopher Tomlins*

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0174

15

---

## THE CONSOLIDATION OF THE EARLY FEDERAL
## SYSTEM, 1791–1812

### saul cornell and gerald leonard

To celebrate the ratification of the new Federal Constitution, Federalist Francis Hopkinson composed "The Raising: A New Song for Federal Mechanics." In one verse he exhorted America's artisans to rally to the Constitution's standard. In Hopkinson's musical ode, citizens mustered with their tools, not muskets.

> COME muster, my lads, your mechanical tools,
> Your saws and your axes, your hammers and rules;
> Bring your mallets and planes, your level and line,
> And plenty of pins of American pine:
> *For our roof we will raise, and our song still shall be*
> *Our Government firm, and our citizens free.*[1]

Hopkinson also helped stage Philadelphia's elaborate procession in honor of the Constitution. As many as 5,000 marchers representing the city's many trades, professions, and different religious denominations assembled to demonstrate their support. Similar but less elaborate parades and celebrations occurred in other cities and towns. These carefully staged rituals were designed to symbolize harmony and promote consensus in the wake of the sometimes bitter ratification debates. Although these public displays of consensus never managed to obliterate fully the lingering traces of Anti-Federalist antagonism and suspicion, the rapid acceptance of the Constitution was nothing short of remarkable given the rancor of the ratification process. Even in Rhode Island, a strongly Anti-Federalist state that would not ratify the Constitution for almost two years, the new language of American constitutionalism permeated public discourse. Thus,

[1] Francis Hopkinson, "The Raising: A New Song for Federal Mechanics," in *The Miscellaneous Essays and Occasional Writings*. 3 vols. (Philadelphia, 1792), 2: 320; see also "A Grand Procession in Honor of Ratification," *Maryland Journal* (Baltimore) May 6, 1788 in Bernard Bailyn, ed., *The Debate On the Constitution*. 2 vols. (New York, 1993), 2:430–38.

518

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0175

one commentator observed that in Rhode Island "every friend of liberty" was "putting on the appearance of Federalism." He was pleased to report that "the conversation of the inhabitants is carried out in a style of Federal purity, and a man may as well expect to make a tour of Europe without any knowledge of the French, as to be distinguished in company without a smattering of the Federal dialect."[2]

In the view of poet, politician, and essayist Joel Barlow, a properly framed constitution "ought to serve not only as a guide to the legislative body, but as a political grammar to all the citizens. The greatest service to be expected from it is, that it should concentrate the maxims, and form the habits of thinking, for the whole community." Although he too viewed the new Federal Constitution as central to the way Americans understood government and law, William Manning, a tavern keeper from Billerica, Massachusetts, cast a more suspicious eye toward the new frame of government, comparing it to "a Fiddle, with but few Strings, but so that the ruling Majority could play any tune upon it they pleased." Manning's musical metaphor differed from Hopkinson's in stressing discord, not harmony. The tavern keeper's description of the Constitution expressed the fears of many who worried that the Constitution had been designed to favor the interests of the few at the expense of the many. It also captured the contingent and open-ended quality of America's new constitutional text.[3]

Barlow was correct to assert that the new Constitution provided a common language. The existence of a common constitutional language did not establish a consensus on how the new document should be interpreted. The Constitution had sketched the basic outlines of American government, but there was much to be worked out before the shape of the nation's legal and political system could be deemed settled. Battles over how to interpret the Constitution began almost immediately. They would prove to be as divisive as the struggle over ratification itself had been.

To understand the era's battles over the meaning of the new Constitution we must unite the traditional court-centered narrative focused on landmark Supreme Court decisions with a constitutional history from the bottom up that includes the voices of artisans, backcountry farmers, women, and slaves. Until quite recently, constitutional history has been written as if judges and politicians were the only actors on the stage. The result has been an essentially Whig and Federalist narrative that details the rise of the courts as the preeminent force in shaping the process of constitutional interpretation and

---

[2] *United States Chronicle* (Providence), July 17, 1788.

[3] Joel Barlow, "A Letter to the National Convention of France on the Defects in the Constitution of 1791" (New York, 1793), 30; William Manning's "The Key of Libberty," *William and Mary Quarterly* 13 (1956), 234.

https://doi.org/10.1017/CHOL9780521803052.019 Published online by Cambridge University Press

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0176

the creation of an effective national government. But constitutional debate
was not restricted to the new nation's courts or legislative chambers. Amer-
icans debated these issues in taverns, staged elaborate protests in the streets,
and occasionally took up arms to defend their own vision of constitution-
alism. In the case of dramatic events, such as the Whiskey Rebellion, all of
these venues were pressed into service by Americans. Nor was the Whiskey
Rebellion the only occasion in which constitutional ferment spilled out of
doors. Gabriel's Rebellion (1800), a slave uprising in Richmond, Virginia,
revealed how constitutional ideas passed easily from masters to their slaves.
Finally, the struggles of New Jersey women, who exercised the franchise
for a single generation, further complicate efforts to depict constitutional
debate in the Early Republic as simply an argument between Jefferson and
Madison on the one side and Hamilton and the Federalists on the other.

We must also realize how different the substantive concerns of modern
American constitutional law are from those that gripped the Early Republic.
Since the 1950s, American constitutional law has been dominated by the
rights revolution. Certainly the language of rights was important to the men
and women of the Founding generation, but issues of rights were usually
bound up in other matters – notably fights over the meaning of federalism
and popular sovereignty.

Federalism, the structure of power relations among localities, states, and
the new federal government, was not some abstract philosophical principle,
but a palpable reality that shaped virtually every political issue of the day. For
Joel Barlow, the greatest accomplishment of American constitutionalism
lay precisely in linking together the concepts of representative government
and federalism. The development of the federal principle was, in his view,
one of the greatest achievements that "political experience has yet brought
to light." Federalism was "the only resource that nature has offered us at
least in the present state of political science for avoiding at once the two dan-
gerous extremes of having the republic too great for any equitable adminis-
tration within, or too small for security without."[4]

The question of federalism had been hotly contested between Federalists
and Anti-Federalists during ratification. Anti-Federalists complained bit-
terly that their opponents had co-opted the name Federalist. In the view
of Elbridge Gerry, a prominent Massachusetts Anti-Federalist, "those who
were called antifederalists at the time complained that they had injustice
done them by the title, because they were in favor of a Federal Government,

[4] Joel Barlow, "To His Fellow Citizens, of the United States" in Charles S. Hyneman and
Donald S. Lutz, eds., *American Political Writing During the Founding Era, 1760–1805.*
2 vols.

Compendium_Cornell
Page 0177

and the others were in favor of a national one." Anti-Federalists believed
that their opponents, the Federalists, were consolidationists, centralizers
bent on reducing state governments to mere ciphers in a powerful new
nation-state. The most astute Federalists, including Madison, were forced
to admit that the new government was something novel, a system "partly
national; partly federal." Such a concept was difficult for many Americans to
comprehend. Americans had recognized a functional division in authority
between state and federal government since independence, but the issue of
divided sovereignty was more complicated. According to traditional consti-
tutional theory sovereignty was indivisible. The notion that the individual
states and the new federal government were each sovereign within their
own particular sphere of authority was not only difficult to comprehend,
but was destined to create conflicts between the states and the new federal
government. How would these two boundaries be kept distinct, and who
would police disputes in cases where there was a conflict between the states
and the new federal government?[5] Virtually every important conflict in
the first two decades after adoption of the Constitution was shaped by the
struggle to define the nature of the federal system and the battle over whose
interpretation of the Constitution would shape law and policy.

The fate of federalism was closely linked to the fight over popular so-
vereignty. As the staunch Federalist and Massachusetts Supreme Court Chief
Justice Theophilus Parsons noted in *Ainslie v. Martin*, the American Revo-
lution had transformed the nature of sovereignty. "The throne was vacant,"
Parsons declared, "but the people, in their political character, did not look
after another family to reign; nor did they establish a new dynasty; but
assumed to themselves, as a nation, the sovereign power." Americans might
all agree with Parsons in the abstract, but in practice there were serious
divisions within American society over how the will of the people would be
collected and expressed in matters of constitutional interpretation.[6] Would
popular action in the streets retain its status as fully "constitutional" action,
perhaps empowering the constitutional agency even of women and African
Americans? Or would constitutional meaning rest in the hands of a national
elite, only nominally answering to a constricted electorate? In addition
to the rifts dividing members of the nation's elite over questions such as
federalism, a profound division existed between proponents of a popular
constitutionalism and those who sought to restrain the radical potential of
unchecked democracy.

[5] Elbridge Gerry, "Speech" in Joseph Gales, ed., *Debates and Proceedings in the First Congress*
(Washington, DC., 1834), *Annals of Congress*, August 1789, 731.
[6] *Ainslie* v. *Martin*, 9 Mass. 454 (1813).

Compendium_Cornell
Page 0178

*Saul Cornell and Gerald Leonard*

### I. A BILL OF RIGHTS: LIBERTY, REPUBLICANISM, AND FEDERALISM IN EARLY AMERICAN CONSTITUTIONAL THOUGHT

Ratification of the Constitution did not resolve the basic tensions that had divided Federalists from Anti-Federalists during the ratification debates. Many of the issues simply spilled over into the first federal elections. Federalists defeated their former opponents handily and obtained an impressive majority in the First Congress. Nevertheless, divisions continued to widen, framing the initial conflicts over the meaning of the new Constitution.

The First Federal Congress was faced with a host of questions that required its members to flesh out many features of the new government's structure. Among the questions taken up by Congress were symbolic issues, such as the appropriate form of address for the new president, but also structural matters, such as the removal power of the president. The First Congress also had to complete the design of the federal court system. Most crucial of all Congress had to deal with the question of amendments to the Constitution.

Ironically, the task of drafting amendments fell to James Madison, originally an opponent of the idea of a Bill of Rights. Madison pared the lengthy list of amendments recommended by state ratification conventions to a dozen provisions. The first two amendments dealt with congressional salaries and apportionment, but were not ratified by the states in these years (the salaries amendment finally made it through in 1992). The ten that followed were all adopted by the states and later came to be known as the Bill of Rights. They included protections against the national government's violation of basic individual rights, such as freedom of religion, and provided explicit affirmations of other rights that were more civic in nature, such as the right of the people to form juries, to assemble, and to bear arms in a well-regulated militia. The amendments also addressed structural questions, such as federalism and unenumerated rights retained by the people and the states.

The debate over the language of what would become the Second Amendment demonstrates the contested nature of the original Bill of Rights. It also illustrates the degree to which federalism shaped the language of rights and the structure of constitutional discourse in the First Congress. The Constitution gave to Congress the power to organize, arm, and discipline the militia, but reserved to the states the right to appoint officers and train the militia according to standards set by Congress. The former Anti-Federalist Elbridge Gerry expressed some concern that Madison's original language, particularly the clause allowing conscientious objectors to avoid military service, might be used as a pretext to disarm the militia. Gerry reminded

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0179

members of Congress of the indispensable role that a militia played in a republican government: "What, sir, is the use of the militia? It is to prevent the establishment of a standing army, the bane of liberty." The importance of this issue was difficult to overstate. "Whenever government[s] mean to invade the rights and liberties of the people," Gerry commented, "they always attempt to destroy the militia, in order to raise an army upon their ruins." The proposal to exempt individuals with religious scruples from having to serve in the militia struck Gerry as a potentially dangerous grant of authority to the federal government that would create "an opportunity to the people in power to destroy the constitution itself." Giving the federal government the power to "declare who are those religiously scrupulous, and prevent them from bearing arms" would allow it to decide who might be excluded from the militia, effectively giving it the capacity to disarm the militia altogether. With the militia rendered ineffective, it would be an easy matter to create a powerful standing army and crush any resistance to federal power.[7]

Although Gerry was alarmed by the prospect that the original language of the Second Amendment would have allowed the militia to be disarmed, he showed no concern that the same power might be used to disarm individuals or challenge the common law right of self-defense. It was the right to bear arms in a well-regulated militia that was at issue. The threat that the new Federal Constitution posed to the militia had been discussed at great length during ratification, but relatively little attention had been paid to an individual right to own guns outside this context. During ratification there had been a few scattered protests that articulated a more expansive right to own guns for hunting and other non-military purposes. The most influential example of this strain of Anti-Federalist thought was the *Dissent of the Pennsylvania Minority*, which singled out a right to hunt for constitutional protection. The right to hunt was one of many in the *Dissent*'s extensive laundry list of rights requiring explicit protection. Federalist Noah Webster confessed that he could barely contain his laughter when he pondered such Anti-Federalist hyperbole. Webster's dismissal of the logic of the Anti-Federalist position was emblematic of a different Federalist approach to protecting liberty. Indeed, he mocked the Anti-Federalist's over-reliance on written bills of rights. If one adhered to the Anti-Federalist approach, he concluded, one would have needed to affirm the following:

That Congress shall never restrain any inhabitant of America from eating and drinking, at seasonable times, or preventing his lying on his left side, in a long winter's night, or even on his back, when he is fatigued by lying on his right.

[7] Elbridge Gerry, "Speech in Congress," *Annals of Congress*, 17 August 1789, 778.

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0180

*Saul Cornell and Gerald Leonard*

"You may just as well ask for a clause," Webster added, "giving license for every man to till his own land and milk his own cows."[8]

Webster's rejoinder to the *Dissent* reveals an important but often neglected context for understanding the meaning of rights in the Founding era. While modern Americans have come to view the Bill of Rights and the courts as the primary means of protecting liberty, Americans in the Founding era, most importantly Anti-Federalists, looked to other sources to protect their rights. Many rights were not explicitly protected in bills of rights. The New York constitution did not even have a bill of rights. The common law provided one important source for guarding liberty. Americans also counted more on their legislatures to safeguard liberty. Rather than look to judges as sentinels guarding freedom, Americans were more apt to look to local juries as the proper guardians of rights. Finally, there was broad agreement that federalism was central to the preservation of liberty. The division of power within the federal system was an indispensable mechanism for checking power and protecting liberty.

Faith in the ideal of federalism did not, however, mean there was a consensus on how power ought to be split between the states and the federal government to achieve this goal. Anti-Federalists believed that the greatest threat to liberty came from a distant government; in contrast, Federalists believed that the individual states themselves posed the most serious threats to liberty. But each side at least recognized that the survival of liberty required an effective division of power between these two spheres of authority.

While modern Americans look to the first eight Amendments to the Federal Constitution as the core freedoms protected by the Bill of Rights, Anti-Federalists thought that the Tenth Amendment, which focused on federalism, was the most important of all those proposed. When Congress debated the wording of this key provision of the Bill of Rights Anti-Federalists fought to restrict the powers of the new government to those "expressly delegated" by the Constitution. This effort to limit federal power was resoundingly defeated, and the language of the amendment was distinctly Federalist in spirit: "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The failure to limit federal power to those "expressly delegated" prompted some Anti-Federalists to complain that the Bill of Rights was utterly useless. Without structural changes in the nature of federalism, Anti-Federalists feared that any protections for

[8] [Noah Webster,] "America," in Gary McDowell and Colleen Sheenan, eds., *Friends of the Constitution: Writings of the Other Federalists* (Indianapolis, 1998), 175–76.

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0181

liberty embodied in the Bill of Rights would be circumvented easily by the
federal courts and Congress.

## II. HAMILTONIANISM AND THE REPUBLICAN OPPOSITION

Beginning with the First Congress, the Federalists' program for establish-
ing a nationalist Constitution was shaped by economic policies designed
by Alexander Hamilton to place the new national government on a solid
financial basis and to bind the wealthy to the new nation by aligning their
economic interests with those of the new government. Federalist state-
building was not only nationalist in design but self-consciously styled on
the British model. The goal was to emulate Britain's fiscal/military state
apparatus by creating a national bank, a funded national debt, and an effec-
tive military establishment and to surround them with a political culture
in which deference, not democracy, was the cornerstone of political life.
Although attacked as a crypto-monarchist, Hamilton's vision was not anti-
republican. His vision of the power of the federal government was not
unbounded. He believed that the powers of the federal government were
limited, but within its sphere of authority its powers were considerable.

Opposition to Hamilton's program brought elements of the old Anti-
Federalist coalition into league with disaffected Federalists. Together these
disparate groups helped form the Republican movement. Given that Hamil-
ton's economic program was partly inspired by the English "court" model of
Sir Robert Walpole and his successors, it is not surprising that the opposi-
tion to it would draw liberally on the potent oppositional rhetoric of English
radical Whig ("Country") ideology. Opponents attacked financial corrup-
tion and the threat posed by a powerful and unresponsive government. The
critique was not, however, simply a tired rehash of the Old "Country" cri-
tique of political corruption. Opponents of Hamilton recast this language
and translated it into a distinctly American idiom. The key transformation
was the new emphasis on federalism.

One of the most outspoken opponents of Hamilton's program was the
Virginian John Taylor, who described the threat posed by the Federalist sys-
tem in forceful terms: "The funding system was intended to effect, what the
bank was contrived to accelerate. 1. Accumulation of great wealth in a few
hands. 2. A political moneyed engine. 3. A suppression of the republican
state assemblies, by depriving them of political importance, resulting from
the imposition and dispensation of taxes."[9] The ultimate goal, according

[9] John Taylor, *An Enquiry into the Principles and Tendency of Certain Public Measures*, (Philadel-
phia, 1794), 85–87.

Compendium_Cornell
Page 0182

to Taylor, was to reduce the state assemblies to mere ciphers in a consolidated system of government. State legislatures, the only truly representative bodies in the new federal system, would be rendered impotent by the machinations and manipulations of the paper banking interest.

William Manning formulated his own democratic critique of Federalist constitutionalism. The tavern keeper was inspired to author his own attack on Federalist economic policy after "reading the Many Altercations proposals & Disputes in the publick papers about funding & the Manner of paying the Continental & State Debts." Manning believed that Hamilton's policies had doubly injured the people. Not only had the Secretary of the Treasury's policies provided a windfall for speculators but new taxes enacted to pay off the speculators bore down hardest on the common people. "It would," he wrote, "Eventually prove the Destruction of our Dear bought Libertyes & of all the State Governments." Manning shared Taylor's concern that Federalist economic policy would undermine federalism and create a consolidated national government dedicated to the interests of the few.[10] This critique was delivered with a more populist slant: "Those that have got the publick Securityes for a trifel their will be a formadale body of powerfull Men" who would easily "Combine in opposition" and work to undermine "the Rights of Mankind." Manning believed that the Federal Constitution had facilitated this process by establishing a government "at Such a Distance from the Influence of the Common people" that the wealthy "think their Interests & Influence will always be the gratest Sway." It was precisely because the state governments were more responsive to the popular will that the wealthy desired to weaken state power.

For the emerging Republican opposition, the various state legislatures would continue to function as deliberative bodies, collecting, refining, and focusing the voice of the people. True federalism could not rest on a system of coercion. Persuasion, not power, was the key to this approach to constitutionalism. In contrast to Federalists, who looked to a strong military/fiscal state capable of using coercion to maintain order, Republicans championed a state-centered vision of federalism that looked to a public sphere of political debate to cement the new nation together. Republican theorists waxed eloquent about the role of public opinion in a republic. The notion of a public sphere, in which citizens debated ideas openly, was essential to this vision of constitutionalism. The creation of Democratic-Republican societies and of an effective network of newspapers was vital to the integrity of the public sphere. This decentralized vision of power fit well with Republican theories of federalism.

[10] William Manning, "'Measures so Glareingly Unjust': A Response to Hamilton's Funding Plan by William Manning," *William and Mary Quarterly* 46 (1989), 320, 322.

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0183

Still, there was some division within the ranks of Republicans over how much this public sphere ought to be controlled by elites. John Taylor's vision of a state-centered federal system was shaped by a conservative and essentially elitist vision of republicanism in which the state legislatures would comprise a refined version of the popular will mediated by members of the gentry. Manning, by contrast, espoused a more democratic vision of federalism in which representatives would be drawn from the ranks of the "laboring sort" rather than planter or mercantile elites. Manning also hoped that his proposals for a national Laboring Society (open to all free males over the age of twenty-one who labored for a living) and a reinvigorated democratic press would allow the "laboring sort" to shape public opinion.

Leading Federalists, meanwhile, condemned the Democratic-Republican "Societies" altogether. Washington denounced the clubs as "self-created societies" that corrupted, not revitalized, the political process. For Federalists the opposition exemplified the continuing dangers posed by faction and mobocracy. The opposition, they argued, was merely carrying forward a destructive, Anti-Federalist agenda.

### III. THE WHISKEY REBELLION, THE CONSTITUTIONALISM OF THE CROWD, AND THE LIMITS OF RESISTANCE TO FEDERAL POWER

The Hamiltonian economic program included a series of tax increases that prompted protests and armed resistance on the part of farmers in western Pennsylvania and Kentucky. The most violent and sustained popular protest since Independence, the Whiskey Rebellion highlighted the fragility of the new federal system. How could the new nation deal with the powerful and persistent forces of localism? For Federalists the answer was simple: force. Federalists blamed the uprising on the Democratic-Republican societies for fomenting discord. For them, the Whiskey Rebellion demonstrated the dangers of excessive democracy and provided a sobering reminder of the necessity of a strong central government to counteract powerful centripetal forces that threatened to pull the nation apart.

For the most radical voices within the Republican opposition, most notably the Whiskey Rebels themselves, even a state-centered theory of federalism failed to provide adequate local autonomy. For radical localists, the individual state governments were still too far removed from the local-ities to enjoy legitimacy and could never represent their interests effec-tively. The people under the new Federal Constitution were hardly better off than under British rule. In contrast to members of the Republican elite, these radicals rejected the authority of both state and federal governments and asserted the right to resort to extra-legal crowd action to preserve the

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0184

autonomy of localities. Plebeian radicals also continued to embrace the sym-
bols and tactics of the revolutionary tradition, erecting liberty poles, and
tarring and feathering excise men. Nor did radicals limit their opposition
to symbolic protests; they mustered themselves as local militia units and
resisted efforts to collect federal taxes. While the rebels hoped that local
militias could serve as a means of checking federal power, the radical poten-
tial of the militia was undermined when Washington mobilized the "well
regulated" state militias against these local units.

For Republicans, the Washington administration's decision to use force
to put down the Whiskey Rebellion confirmed the nefarious designs of
Hamilton and his allies. But although united in opposition to Federalist
policies, they were divided on what forms of protest were legitimate within
the new federal system. Most Republican leaders sympathized with the
grievances of the rebels, but few were willing to grant constitutional legit-
imacy to extra-legal crowd action; the notion that local militia units might
act outside the authority of the state would have struck leading Republi-
cans as an exercise in mobocracy, not democracy. Mainstream Republican
constitutional theory accepted that public meetings and the press might
be used to rally opposition, but fell short of sanctioning crowd action or
armed rebellion as an appropriate means to challenge unjust government
action.

The militia was only one means by which popular constitutionalism was
invoked during the Whiskey Rebellion. Republicans hoped to use local
juries as a check on federal authority. Federalists bypassed this potential
obstacle by using federal courts to prosecute participants in the western
Pennsylvania disturbances. Republicans strenuously opposed this policy.
Once again, they argued, Federalists were undermining true federalism and
substituting a single national standard dictated by a powerful centralized
authority.

### IV. THE SEDITION ACT AND THE COMPACT THEORY
### OF FEDERALISM

No part of the Federalist agenda did more to inflame political passions than
did the passage of the Alien and Sedition Acts. Hostilities among European
powers during the 1790s threatened to embroil the United States in con-
flict. Consequent fears about the threat of foreign and domestic subversion
led the Federalists to pass legislation making it more difficult to become a
citizen and making seditious libel a federal crime. Federalists defended the
Alien and Sedition Acts as necessary to prevent foreign agents, radical refu-
gees, and their domestic allies from undermining American republicanism.

Compendium_Cornell
Page 0185

They pointed out that the Sedition Act did not limit speech but actually strengthened the protections for speech beyond the common law understanding of seditious libel, which did not allow truth as a defense. Republicans, however, found in these acts – especially the Sedition Act – decisive confirmation of their fears of the Federalists' zeal for centralization and contempt for liberty. Concerned in particular by the Sedition Act's curbs on speech, they objected that it was beyond the national government's limited list of enumerated powers and took a dramatic step toward creating a consolidated government. The most innovative legal thinkers within the ranks of republicanism asserted that the American Revolution had swept away such monarchical notions as seditious libel. At the very minimum, they argued, the limited government created by the Constitution did not incorporate a common law notion of seditious libel.

In their attempts to resist the Federalist offensive, opposition theorists found themselves formulating new meanings for federalism and for the constitutional function of dissent that would irrevocably alter the course of American law. In challenging the constitutionality of the Sedition Act, for example, Republicans inaugurated a new phase of dissenting constitutional theory. Once appeals to the legislature and the courts – the normal political and legal mechanisms for challenging the Alien and Sedition laws – failed, what recourse was left to resist tyranny? Republicans were forced to think of new ways to protect individual liberty and restore the federal government to its proper sphere of authority. They turned to the ideal of federalism. After all, the principles of federalism had been central to opposition thought since ratification. The structure of the federal system had always been seen as the final guarantor of individual liberty.

But although this belief was a cardinal tenet of dissenting constitutionalism, relatively little attention had been devoted to exploring how federalism's checking function would actually operate in practice. Exactly how would the will of the people be collected and invoked? Would the judiciary exercise the final check when a corrupt faction gained control of the federal government and threatened the liberties of the people? The state legislatures? Special conventions of the people of the states? The state militias?

Republican elites favored a states' rights view of federalism. The two most important public expressions of the new approach were Thomas Jefferson's Kentucky Resolutions and James Madison's Virginia Resolutions. Each drew on the anti-consolidationist rhetoric that had defined dissenting constitutional discourse since ratification. In each case, Jefferson and Madison asserted that the protection of individual liberty depended on preserving the balance of power between the states and the federal government. States'

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0186

rights and individual rights continued to be linked together in oppositional constitutional discourse. The two documents also elaborated a compact theory of federalism. The Kentucky Resolutions affirmed "that the several states composing the United States of America are not united on the principle of unlimited submission to their general government." A corollary of this position was the view that "as in all other cases" involving a "compact among parties having no common judge, *each party has an equal right to judge for itself, as well of infractions as of the mode and measure of redress.*" Jefferson's original draft of the Kentucky Resolution had called for state nullification of unconstitutional acts of Congress, but this language was omitted from the final version adopted by the Kentucky legislature. Asserting the right to judge infringements, even without asserting the right to nullify laws, did appear to give individual states a right to determine for themselves the constitutionality of federal laws.[11]

Madison's more temperate response in the Virginia Resolution did not assert an individual state right, but noted that in extraordinary cases, when the Constitution's safeguards had broken down, the states "have a right, and are duty bound to interpose for arresting the progress of the evil." By invoking the right of the states, not individual states, and employing the vague concept of interposition, Madison avoided language that would suggest the right of an individual state to nullify an unconstitutional law. But the Virginia Resolution shared with Jefferson's Kentucky Resolution an emphasis on the compact theory of union. Madison declared that it was the intentions of the states in ratifying the Constitution that controlled the meaning of the text. Madison's theory not only placed a states' rights view of federalism at the heart of Republican constitutional theory, but it gave additional emphasis to the original intent of the ratifiers of the Constitution as the authoritative source of meaning when interpreting it.

The efforts of the Kentucky and Virginia legislatures at redress were rebuffed by the other states' legislatures, which were mostly under Federalist control. A second set of resolutions was drawn up, and in the Kentucky Resolutions of 1799 the term "nullification" was reintroduced. Asserting that the individual states could judge issues of constitutionality, the resolution also affirmed that in extreme circumstances nullification was the rightful remedy. The concept of nullification was tempered by the assertion that Kentucky would "bow to the laws of the Union" while continuing "to oppose, in a constitutional manner," unconstitutional acts." Nevertheless, Jefferson flirted with the notion of secession as the ultimate response to the tyranny of the Alien and Sedition Acts. Once again, Madison counseled

[11] "The Alien and Sedition Laws, and    Virginia and Kentucky Resolutions" (Boston, 1798), 2.

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0187

Jefferson out of this radical position and helped avert a serious constitutional crisis.[12]

What united the Virginia and Kentucky approaches was the belief that individual state legislatures might serve as a means of collecting and organizing opposition. The most likely mechanisms for such action would be petitions to Congress and the amendment process. In 1788, Federalists reminded their opponents that the states would rally against any potential threat from the federal government. Madison himself had been one of the argument's most forceful proponents. More than ten years later he was restating this gloss on federalism in even more assertive terms: "The appeal was emphatically made," at that time "to the intermediate existence of the state governments between the people and the government." The individual states, Madison observed, "would descry the first symptoms of usurpation" and "sound the alarm to the public." In defending the rights of states, Madison was careful to note that in constitutional matters there was an important distinction between the ordinary acts of the legislature and the acts of the conventions that had ratified the Constitution. Madison, that is, was far more circumspect than Jefferson in asserting the rights of state legislatures to judge constitutional matters.[13]

### V. THE NOT SO REVOLUTIONARY REVOLUTION OF 1800: UNDOING THE FEDERALIST LEGACY AND CREATING AN EMPIRE OF LIBERTY

The election of 1800, bitterly contested between Jefferson and Adams, resulted in a tie between Thomas Jefferson and his own running mate, Aaron Burr. Although the Constitution provided a mechanism for handling such disputes, at least two states mobilized their militias as a precautionary measure to guard against the possibility that Federalists might take advantage of the confusion and refuse to turn over the reins of government. After considerable maneuvering by supporters and opponents of Jefferson, a peaceful transfer of power was accomplished. In turn Jefferson's inaugural sounded a conciliatory note, proclaiming that, "We are all Republicans, we are all Federalists." But more than conciliation was at work here. Jefferson's inaugural address stated a set of ideals that would come to define his constitutional politics. He reaffirmed representation and federalism as the twin constitutional pillars of American government, even though the events of

[12] Thomas Jefferson, "The Kentucky Resolutions of 1799," in Jefferson Powell, ed., *Languages of Power: A Sourcebook of Early American Constitutional History* (North Carolina, 1991), 138.

[13] James Madison, "The Report of 1800" in Powell, *Languages of Power*, 146.

https://doi.org/10.1017/CHOL9780521803052.018 Published online by Cambridge University Press, 2008

Compendium_Cornell
Page 0188

the previous decade had revealed profound disagreement over how to implement them and indeed over how to interpret the Constitution to preserve them.

Jefferson's election did not bring the revolutionary transformation that some had hoped for and others feared. Rather than attempt a radical transformation of the state the Federalists had built, Jefferson steered the nation on a path somewhere between Hamilton's federalism and that of the most radical members of his own coalition. Among his own supporters Jefferson was pressed from both sides. Southern conservatives wished to amend the Constitution to stifle federal power. The Old Republicans who dominated the Jeffersonian movement in Virginia wanted a prohibition on the reelection of the president, shorter terms for senators, limits on the government's borrowing power, and Congressional power to remove federal judges. None would occur. For more egalitarian democrats such as William Manning, meanwhile, Jefferson's election brought little of the hoped-for shift in power from the few to the many.

Avoiding both extremes, Jefferson's first Inaugural Address described America as a "chosen country, with room enough for our descendants to the thousandth and thousandth generation." To remain a virtuous yeoman republic and keep alive the ideal of an "empire of liberty," the nation would have to expand westward. Jefferson's yeoman republic had little room for African Americans or Indians. Although Jefferson always viewed Indians in a much more positive light than Africans, he predicted that tribal societies would either assimilate into white culture or face extinction.[14]

At the time Jefferson took office, more than a half-million Americans already lived west of the Appalachian Mountains. For many, access to the Mississippi River had become crucial to their economic prosperity. Pinckney's Treaty (1795) with Spain provided navigation rights to this vital economic corridor, but when the Spanish closed the port of New Orleans to American shipping in 1802, many in Congress were alarmed. In particular, Americans were concerned that Napoleon Bonaparte's effort to regain control of the port was part of a larger plan for reasserting French power in the region. Some Americans even advocated seizing the city. Jefferson preferred a negotiated settlement and sent a delegation to purchase the port from France, only to discover that Napoleon was willing to sell the entire territory of Louisiana to the United States. Jefferson was presented with an opportunity to double the size of the country. His only problem was that the Constitution did not expressly authorize the president to purchase new territory. To fulfill his dream of securing enough land for the

[14] Thomas Jefferson, "First Inaugural Address," in Merrill Peterson, ed., *Thomas Jefferson: Writings* (New York, 1984), 494.

Compendium_Cornell
Page 0189

nation to remain a yeoman republic, Jefferson relaxed some of his vaunted constitutional scruples. The purchase was not comparable to Hamilton's efforts to use latitudinarian constructions to expand the power of the federal government at the expense of states' rights, but Jefferson's action nevertheless forced him into a constitutional gray zone. Jefferson contemplated amending the Constitution to make the purchase possible, but feared Napoleon might withdraw the offer before such an amendment could be ratified.

Jefferson was also forced to confront the limits of his own egalitarian vision of the Constitution in providing for governance of the new territory. In the plan he had drafted for the Northwest Territories two decades earlier, Jefferson had been a model republican who sought to include the inhabitants of new territories as equals, not subjects. With respect to Louisiana, however, Jefferson's approach suggested that liberty was not something all men could be expected to exercise with equal discretion. In this regard, Jefferson's treatment of the non-Anglo population of Louisiana was in keeping with his views about African Americans and Native Americans.

Jefferson's goal on assuming the presidency had been to undo the legacy of a decade of Federalist power. Pursuing this goal meant modifying aspects of his own constitutional theory as he energetically used the power of the executive and the federal government to promote his vision of an empire of liberty. Nor would he change these positions during his second term. The Federalist opposition was far weaker than during Jefferson's first term, yet the political challenges he faced were in many respects even more formidable. In response, Jefferson exercised executive power ever more forcefully.

In 1808 Jefferson was poised to resolve the persistent quarrel over direct federal expenditures for internal improvements by backing a constitutional amendment that would have removed any lingering doubts about the constitutionality of such a program. Events in Europe rudely shunted the issue aside. American trade with both Britain and France had prospered hugely during the early phases of the conflict between the two nations. Each, however, had become desperate to exert economic pressure on their enemies and so set out to blockade each other's ports. The United States argued that neutral nations had a right to carry on non-military trade with both sides in the conflict, but neither Britain nor France honored the claim. By 1807 France had seized five hundred U.S. ships and Britain nearly a thousand. The United States also protested the British practice of boarding American ships in search of British nationals to impress (force) into naval service. The dispute reached a crisis in 1807 when the British ship, the *Leopard*, fired at an American Navy ship, the *Chesapeake*. In the skirmish three Americans were killed and eighteen wounded. The British abducted four American sailors who they charged were deserters from the Royal Navy.

Compendium_Cornell
Page 0190

*Saul Cornell and Gerald Leonard*

Attempting to avoid military conflict with the British and French, Jefferson proposed an economic embargo. By keeping America's ships out of harm's way and depriving Britain and France of the economic benefits of trade, Jefferson hoped to exert pressure on both sides to respect the rights of neutrals. American exports fell from $108 million in 1807 to $22 million in 1808. The constitutionality of Jefferson's "peaceable coercion" was affirmed by a Massachusetts federal judge, the Federalist John Davis, but the embargo was exceedingly unpopular in New England and in seaport cities and was widely flouted by smugglers. To enforce the embargo along the Canadian border Jefferson had to use federal troops, a decision he had decried during the Whiskey Rebellion a decade earlier. Like his Federalist predecessors, Jefferson sought to expand the definition of treason and use it as a means to crush opposition to his administration's policies. The embargo divided Republicans and strengthened the fortunes of the Federalists, who had been in decline in most areas of the nation. In the 1808 presidential election, the Federalist candidate, Charles Pinckney, received three times as many votes as he had in 1804, doing particularly well in New England. Despite the strong showing in the Northeast, however, the Republican candidate James Madison handily defeated Pinckney by 122 to 47 electoral votes.

When war with Britain finally broke out in 1812, some Federalists appeared to outdo their Jeffersonian adversaries in defending the ideal of states' rights. In choosing to invoke the same concept of states' rights that had inspired Jeffersonians less than a decade before, Federalists demonstrated an important reality about the structure of American federalism. During the ratification of the Constitution, Federalists had assured Anti-Federalists that the states would serve as the final check on the power of the federal government. The recycling of these arguments in 1812 did not mean that Federalists had suddenly turned Anti-Federalist. Rather, this strain of states' rights thought was hard-wired into the structure of American federalism. Thus, when faced with the prospect of a draft, Federalist Daniel Webster did not shy away from asserting a right of states to interpose between the federal government and their citizens when individual liberty was threatened. Nor did Webster and other Federalists flinch about asserting the right of states to refuse to muster their militias and march them beyond the borders of their states.

Late in 1814, Federalists in New England met in Hartford to discuss their dissatisfaction with Republican policy. Some flirted with the idea of secession, as they had briefly in 1803, but the Hartford Convention stopped well short of advocating the break-up of the Union. Although New England Federalists had denounced the Virginia and Kentucky Resolutions, they now found themselves echoing many of the same ideas. The convention delegates

proposed a series of constitutional amendments that would strengthen New England's influence in the Union. In particular, they wanted majorities of two-thirds to become mandatory for Congressional adoption of commercial regulations and declarations of war, and for the admission of new states. To weaken the South's influence in Congress, the Hartford Convention also called for a repeal of the three-fifths compromise that allowed Southerners to count a percentage of their slaves for the purposes of determining representation in the House. But the Hartford Convention's proposals were publicized at the same time as news of the Treaty of Ghent ending the war (December 1814) and America's impressive victory at the Battle of New Orleans (January 1815) were fueling a new sense of national pride. The Federalists' narrow sectionalism consequently appeared out of step with the public's new patriotic fervor. As a movement Federalists were irreparably damaged even in their stronghold of New England. Both their old consolidationism and their new secessionism were now equally discredited, opening the way for a new moderate Republicanism reconciled to the wise use of national power to preserve the republic.

## VI. CONSTITUTIONAL OUTSIDERS AND THE LIMITS OF JEFFERSONIANISM

Notwithstanding heady proclamations of a "second American revolution," Thomas Jefferson's presidency is better cast as a story of caution and compromise, tendencies that grew in part out of domestic and international circumstance, in part out of limitations inherent in Jefferson's own political and constitutional vision. In important ways, those limitations had been evidenced well before Jefferson ever assumed the presidency and tell us much about the kind of republic Jefferson envisioned, the kind of citizenry he thought should influence it, and the kind of people who would endanger it. In 1786, for example, Jefferson had greeted news of Shays' Rebellion calmly; a decade later he had reacted just as mildly to the Whiskey Rebellion. But in 1800, when it came to Gabriel's Rebellion, Jefferson evinced little sympathy for the plight of Virginia's slaves nor much openness to their desires for freedom. Gabriel Prosser, a skilled Richmond artisan, had planned to seize the state arsenal and distribute weapons to all who would join to overthrow the system of slavery. He had planned to march under a banner with the words "death or liberty" emblazoned on it, taking Patrick Henry's Revolutionary credo and transforming it into a rallying cry for an uprising against slavery. Prosser had expected not just slaves but "poor white people" and other "democrats" to rally to his cause. All those whites deemed "Friendly to liberty," notably "Quakers, Methodists, and Frenchmen" were to be spared and the rest killed. Had his original plan not been

Cambridge Histories Online © Cambridge University Press, 2008

frustrated by a torrential rain storm, Gabriel's Rebellion might have been
the most successful slave uprising in American history. But the delay caused
some slaves to waver, the plot was discovered, and its supporters hunted
down. Twenty-seven conspirators were executed on the gallows.[15]

The rebellion pushed the Virginia legislature into a confrontation with
the problem of slavery. Several proposals were debated, including outright
abolition of slavery and the creation of colonies of freed slaves in the western
part of the United States. Governor James Monroe broached the idea with
the newly elected president. Jefferson rejected the idea. Elaborating the
theme articulated in his Inaugural Address, Jefferson outlined America's
future expansion in explicitly racist terms. "However our present interests
may restrain us with our own limits," Jefferson wrote, it was necessary "to
look forward to distant times, when our rapid multiplication will expand
itself beyond those limits, & cover the whole northern, if not the southern
continent, with a people speaking the same language, governed in similar
forms, & by similar laws." Americans could not "contemplate with satis-
faction either blot or mixture on that surface." Admittedly, it was not only
a belief in the need to preserve his vision of a white yeoman republic that
fueled Jefferson's hostility to using western lands to deal with the problem
of slavery. Jefferson also shared Madison's view that corruption would be
less likely to damage a large republic. "Had our territory been even a third
only of what is," Jefferson observed to Nathaniel Niles, the outcome of
the Sedition crises might have been radically different. Echoing Madison's
argument in *Federalist 10*, Jefferson noted that "while frenzy and delusion
like an epidemic, gained certain parts, the residue remained sound and
untouched."[16] The West should be saved for virtuous white yeoman and
not become a dumping ground for dangerous freedmen.

Gabriel's Rebellion demonstrated the limits of Republican thought. By
using the language of American constitutionalism – particularly the potent
rights discourse of the revolutionary heritage – as a way to rally support
for their insurrection, Gabriel and his followers exposed a profound contra-
diction in American constitutional thought. The response of the Virginia
legislature to the rebellion evinces its reluctant recognition not only of
the danger posed by slavery, but of the particularly grave danger posed by
slaves living in a society whose political ideology was founded on notions

[15] "Confessions of Ben, Alias Ben Woolfolk, 17 September 1800" in Gordon S. Wood, ed.,
      revised ed., *The Rising Glory of America, 1760–1820* (Boston, 1990), 357–58.
[16] "President Thomas Jefferson to Governor James Monroe, 24 November 1801," in Wood,
      *Rising Glory*, 365. Jefferson to Nathaniel Niles, March 22, 1801, *The Thomas Jefferson
      Papers, Series 1. General Correspondence, 1651–1827*. Available online from the Library of
      Congress at http://memory.loc.gov/ammem/collections/jefferson_papers/index.html.

Compendium_Cornell
Page 0193

3:19-cv-01537-BEN-JLB  Document 154  Filed 10/22/22  PageID.17600  Page :
265

of liberty and equality. Ironically, the more elitist and deferential views of Federalists allowed them to be more inclusive than their Jeffersonian counterparts. Precisely because all men were not created equally as potential political actors, Federalists could accommodate blacks, Indians, and even propertied women in their vision of an expanding federal Republic.

Just as the principles of universal liberty and equality that animated the Revolution and republican constitution-making inspired Gabriel's rebels – as they had African American attempts to gain freedom in the Northern states after the Revolution – some American women also found in them a basis on which to seek more equitable treatment. Much as blacks in colonial America had experienced occasional, if temporary, opportunities to avoid permanent enslavement, some women in colonial America had enjoyed significant independence from male domination. Both in the ruptures of religious life caused by the Great Awakening and in the developing commercial life of the colonies, women had occasionally found meaningful avenues into public life and a public voice. The disruptions of the Revolution, as well, forced or freed many women to make political choices, including whether to follow their husbands into patriotism or loyalism. One might have expected the Revolution and constitution-making to have directed American society toward further freedom and equality for women. Many women indulged exactly that expectation, only to see it dashed.

Abigail Adams had greeted the Revolution in 1776 by calling on its leaders to "remember the ladies." In the 1790s, American women received with open arms and ready minds the egalitarian arguments of England's Mary Wollstonecraft and her French, post-Revolutionary counterparts. Widely read in the United States, Wollstonecraft and others were joined by a number of (mostly female) American feminists: essayist and playwright Judith Sargent Murray (a Federalist); novelist and journalist Charles Brockden Brown; and less prominent supporters in the newspapers or in the occasional public speech or demonstration. Priscilla Mason captured the fervor in 1793, observing in her salutatory oration to the Young Ladies' Academy of Philadelphia how men had "seized the scepter and the sword . . . [given] laws to society . . . denied women the advantage of a liberal education" and "doom'd the sex to servile or frivolous employments, on purpose to degrade their minds, that they themselves might hold unrivall'd, the power and pre-eminence they had usurped." Other women occasionally seized public space, taking to the streets in support of the French Revolution or attending the Philadelphia productions of feminist plays written by Murray and other women.[17]

[17] "The Salutatory Oration, Delivered by Miss Mason," in *The Rise and progress of the Young-Ladies' Academy of Philadelphia* (Philadelphia, 1794), 92.

Compendium_Cornell
Page 0194

*Saul Cornell and Gerald Leonard*

Yet the only formal step that elevated the constitutional standing of women in these years was the temporary enfranchisement of women in one state. New Jersey's enfranchisement of women by constitution in 1776 was confirmed by statute in 1790, but was followed nowhere else. Even then, enfranchisement was taken to extend only to single women, not to *femes coverts* – daughters and wives under the legal protection and control of fathers and husbands – and was eliminated altogether in a general reform of the election laws in 1807 (a reform that also rolled back African-American voting rights).

While some women placed their faith in the promise of equality articulated by the Declaration of Independence and other statements of revolutionary ideology, gender inequality remained embedded in law and social practice. The ideology of republicanism adapted itself to this inequality by its celebration of Republican Motherhood. American men (and many women, for that matter) insisted that natural distinctions between the sexes implied a republican role for women legitimately different from that of men. Women were ill equipped to partake of public liberty and equality, according to this view, but they were ideally suited to preserving revolutionary principles in their capacity as mothers and educators of their children in moral and political virtue. Essential to this model of the republican family was the legal notion of the *feme covert*, which preserved the family by unifying ultimate authority and politico-legal personality – not to mention the property that underlay public power – in the husband and father.

The contest between emerging ideologies of gender equality and the traditional legal notion of *feme covert* emerged starkly in the Massachusetts case, *Martin* v. *Commonwealth* (1805), in which the son of a loyalist father sought to reclaim his mother's land that had been forfeited during the Revolution. James Sullivan, the state's Attorney General, rested his arguments on certain assumptions that demonstrate that ideas of gender equality had gained a tentative foothold in American legal thought. Although hardly widespread, the cultural availability of these arguments at this time is one measure of the change wrought by revolutionary ideology. Sullivan insisted that the mother had chosen freely to follow her husband out of Massachusetts and adhere to the British, rightly depriving her (and her heirs) of her land. She could not escape her membership in and obligations to the state by pointing to the authority of her husband, as the younger Martin now argued. Like all women, she bore the privileges and responsibilities of a constitutional actor in her own right. Her choice to withdraw from Massachusetts during the Revolution was hers alone.[18]

[18] *Martin* v. *Commonwealth*, 1 Mass 347 (1805).

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0195

But Sullivan lost. The court held that Martin's mother had been a *feme covert*. Her withdrawal from the state had been her husband's doing, not her own. Any attempt on her part to resist that withdrawal – to choose patriotism over her husband's treason – would itself have been wrong. The principle of the *feme covert* was more fundamental than principles of treason or even the principle of equality for which Massachusetts had rebelled.

Although ideas of gender equality did not result in radical changes in the law, women continued to exert their agency as constitutional actors outside the world of courts. The political life of the new nation owed much to the actions of women who functioned as managers of the "private" social life that lubricated policymaking in capital cities – and occasionally in more public roles, as in the agitation for abolition of slavery.

## VII. CONSTITUTIONAL POLITICS IN COURT: *MARBURY V. MADISON* AND THE SEPARATION OF POWERS

Judicial review was one of many problems in the nation's early constitutional development, but only one. Traditional constitutional history, however, has misled generations by treating it as *the preeminent* problem. It has done so by putting *Marbury v. Madison* (1803)[19] at center stage in the Early Republic's constitutional growth. Yet as the history of the 1790s attests, constitutionalism was hotly contested by a host of actors in American society who chose to assert themselves outside the world of the courts. American constitutional development in the first decades of the new nation cannot be reduced to Supreme Court cases: neither *Marbury* nor the problem of judicial review, in short, deserves quite the preeminence each has been given.

That said, it would be just as much an error to conclude that *Marbury* has no importance. The case well illustrates the general, political tug of war on questions of federalism and separation of powers that had consumed the Republic and its elite institutions since its creation. Considered as such, *Marbury* allows us to understand the role of the federal judiciary and of the Supreme Court in particular in the era's constitutional development. Rather than function as a grand arbiter, single-handedly settling constitutional conundrums from on high, the Court functioned as a tough and canny player, one of several involved in a tense political-legal game with very high stakes.

In its most immediate sense, the dispute addressed in *Marbury v. Madison* was the product of the Judiciary Act of 1801, itself a major effort to shift power to the center. The Judiciary Act had been passed in the

[19] *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803).

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0196

*Saul Cornell and Gerald Leonard*

immediate wake of the disastrous 1800 election by a lame-duck Federalist Congress. Along with several other statutes, it dramatically expanded the one branch of the federal government – the judiciary – most thoroughly insulated from popular power. President Adams rapidly appointed large numbers of Federalists to the posts created by the new legislation, many of whom were life-tenured. Just weeks before Jefferson's inauguration, Adams also appointed John Marshall to the vacant Chief Justiceship of the United States. And, just hours before the actual ceremony, Adams made a final round of "midnight" appointments. William Marbury, named a justice of the peace for the District of Columbia, was one of them, but never received his commission in the end-of-term bustle. After Jefferson directed his secretary of state, James Madison, not to deliver the appointees' commissions, Marbury sought a writ of mandamus from the Supreme Court compelling delivery. For the Court, Marshall insisted that Marbury had a right to his commission, but held that section 13 of the Judiciary Act of 1789, empowering the Court to issue the necessary writ, violated the Constitution and could not stand.

For generations it has seemed that *Marbury's* importance lay in this allegedly foundational act of judicial review rather than in the dicta that called on Jefferson to do right by one obscure nominee to one minor office. But *Marbury*'s significance did not lie in its exercise of the (already established) power of judicial review to strike down a minor portion of a Federalist statute. It lay in the opinion's intrusion into the general constitutional politics of the day, its judicially gratuitous defense of the lame-duck, consolidationist power grab by the Federalists of 1801.

Few historians would still say that judicial review waited as late as 1803 to be established. During the eighteenth century, under the British regime of Parliamentary sovereignty, significant uncertainty reigned over what tools a court might employ to circumscribe legislative power. In post-Revolutionary America, in contrast, the ascendant notion that only the people were sovereign, never the government, early yielded the implication that courts must implement only that law that was legitimately derived from the people themselves. This was the basic principle of judicial review. In accord with this basic principle, a handful of state courts had already invalidated state laws under their own state constitutions before ratification of the Federal Constitution. James Iredell, a leading North Carolina lawyer and future Justice of the U.S. Supreme Court, clearly articulated the theory behind their action in a newspaper essay of 1786. Precisely anticipating the principles of *Marbury*, Iredell argued for judicial review as a matter of inexorable logic: if all branches of the government, including the judiciary, were bound by a Constitution that represented the sovereign people's will, and if a case presented judges with two ostensible laws, one the

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0197

act of the legislature and the other the act of the sovereign people, the judiciary must apply the Constitution, which was the act of the people, and disregard the statute, which was merely the act of the legislature. The judges were not reaching out to strike down the acts of the legislature. Rather, the judges were applying appropriate law to the adjudication of a case before them.

As Iredell and others were well aware, constitutions and bills of rights were far more than tools of judicial action. They were written to guide every branch of government and to keep constantly before the people the most fundamental principles of popular government. Indeed, the Constitution might have been held interpretable only by the people and their legislatures in the normal course of politics and not by the judiciary at all. But that possibility did not survive the early years of the Republic. Another possible limitation was that a power of judicial review indeed existed, but extended only to the judiciary's protection of its own institutional and jurisdictional "rights." Sometimes intimated, this approach was never consistently put in effect. Rather, from the very beginning, judicial review protected the individual, constitutional rights of the litigants before the court.

The Framers of the Federal Constitution seem generally to have assumed that the judiciary would exercise a power of review, but also thought it unlikely to prevail in any instance where the concerted political will of a legislative or popular majority opposed its exercise. Throughout the Philadelphia Convention, Madison considered a congressional veto the only practical device for defeating the licentious tendencies of the state legislatures, notwithstanding the availability of judicial review of state legislation by way of the Contracts Clause and other substantive provisions of the Constitution. In *Federalist* 78, Hamilton accepted the Anti-Federalist charge that the Constitution would permit judicial review, but denied this meant judicial supremacy. Like Iredell, he insisted that judicial review reflected the supremacy of the people over legislators and judges alike, not the supremacy of any branch over another. And as a practical matter, the judges could never muster the resources necessary to control the political branches of the government, for judges possessed powers neither of purse nor sword to enforce their decisions. Even with the power of judicial review, Hamilton concluded, the judiciary remained "the least dangerous branch" of the federal government.

Just as a handful of state courts had begun to exercise powers of review before 1789, review powers were generally assumed in the new federal courts after ratification. *Marbury* may have been the first case in which the Supreme Court made a point of invalidating a federal statute, but the previous decade had periodically seen decisions informed by the idea of constitutional review. In 1792, for example, a federal circuit court invalidated

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0198

542                                    *Saul Cornell and Gerald Leonard*

a Rhode Island stay law under the Contracts Clause. The same year, federal
circuit courts considered the federal Invalid Pensioners Act, some finding
it unconstitutional and others using a strained construction to render it
valid. In *VanHorne's Lessee v. Dorrance* (1795), Justice Paterson on circuit
overrode a Pennsylvania statute as inconsistent with both the Pennsylvania
constitution's guarantee of the jury right and its guarantee of fundamental
property rights. In *Ware v. Hylton* (1796), the Supreme Court itself invali-
dated a North Carolina sequestration statute under the Supremacy Clause
because the statute conflicted with the Treaty of Paris. The Court also
gave full consideration to the constitutionality of the federal carriage tax in
*Hylton v. U.S.* (1796), ultimately upholding it on the merits. When *Marbury*
invalidated a portion of the Judiciary Act in 1803, then, the Court was exer-
cising a largely uncontroversial power. It was the political context and the
political content of the opinion that made *Marbury* explosive, intruding as
it did into the ongoing battle between Jefferson and the Federalists, and
delivering an extra-judicial lecture to the new ruling party by the new
Federalist chief justice.[20]

Perhaps some of *Marbury*'s traditional status as a landmark in the history
of judicial review can be preserved, though. Arguably, Marshall's opinion
finally rendered the practice routine. Even firm advocates had insisted that,
since the Constitution placed initial responsibility for elaborating the Con-
stitution in the legislature – the body closest to and most readily accountable
to the sovereign people – the judiciary should overrule statutes on constitu-
tional grounds only in the very clearest cases. *Marbury*, in contrast, can be
read to treat judicial review as routine rather than exceptional, opening the
door to decisions like *McCulloch* (1819), in which Marshall would indeed
intimate a kind of judicial supremacy in constitutional interpretation.

Still, before 1803 and for a good few years thereafter, judicial review was
widely embraced as a natural extension of popular, not judicial, supremacy.
Acceptance of the premise of popular sovereignty implied that the judiciary
was nothing very special or very dangerous, as Hamilton had asserted. Pop-
ular sovereignty implied that each branch of government in the American
system had equal, coordinate authority to interpret the Constitution and
all other applicable laws in the course of its duties.

What complicated matters was that, after Adams' defeat in 1800, the
judiciary had become the last redoubt for Federalists at the national level.
Driven perhaps equally by devotion to law and hostility to Jeffersonian
demagogues, Marshall took advantage of judicial review to lay down law
to the Jeffersonian politicians on questions of separation of powers. Seven

---

[20] *VanHorne's Lessee* v. *Dorrance*, 2 U.S. (2 Dall.) 304 (C.C.D.Pa. 1795); *Ware* v. *Hylton*, 3 US
(3 Dall.) 199 (1796); *Hylton* v. *U.S.*, 3 U.S. (3 Dall.) 171 (1796).

https://doi.org/10.1017/CHOL9780521803052.018 Published online by Cambridge University Press
Cambridge Histories Online © Cambridge University Press, 2008

years after *Marbury*, in *Fletcher v. Peck* (1810), he would do the same, this time laying down law to the radical "Old Republican" wing of the Jeffersonian movement, the heirs of the Anti-Federalist tradition, on questions of federalism. Judicial review by itself raised little controversy. It was the questions of separation of powers and federalism, with respect to which Marshall exploited the "legal" character of judicial review, that raised hackles.

Questions of separation of powers under the Constitution already had an important history by *Marbury*'s time. The Constitution, of course, had separated the powers of the national government among three branches and defined the powers and duties of each more or less carefully. In theory, this separation ensured that every exercise of power might be checked by other exercises of power. Different governmental institutions could and would check each other because their functions designedly overlapped: the president might veto legislation, the Senate would deliberate on presidential appointments, the courts would review the acts of the other branches. The extent of this overlap, however, could never be defined with precision. What, for example, were the obligations of judges under Article III? Were they free to accept assignments from the executive branch? Most of the early Supreme Court Justices concluded that they were, and repeatedly accepted such assignments. Chief Justices Jay and Ellsworth both undertook diplomatic missions while on the Court. Several Justices accepted the role of federal pension commissioner during their tenure. What about advisory opinions? Would judges overstep their bounds by offering opinions on legal questions before cases raising those questions reached their courts? Or was it in fact an obligation of the judiciary to offer legal opinions when asked, thus participating in the legislative and executive processes? Some of the Justices publicly delivered advisory opinions in 1792 when the constitutionality of the Invalid Pensioners Act was brought into question. And many Justices offered advisory opinions to executive officers and others both formally and informally in a variety of circumstances during the 1790s, apparently with no more qualms than the many state judges who have written formal advisory opinions from that day to this. In 1793, the Justices famously declined to offer an advisory opinion when requested by President Washington (by way of Jefferson), but this was no admission that federal judges lacked constitutional power to render such opinions. The Justices merely exercised a discretion not to grant Washington's request on that occasion, in part to save the Court from involvement in the particular political controversy that that case might have brought.

*Marbury*'s part in separation of powers controversies arose not because the power of judicial review as such was doubted, but because Marshall used the case to lecture Jefferson on the scope of presidential power, exhibiting the Federalists' readiness to make the least dangerous branch as dangerous

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0200

*Saul Cornell and Gerald Leonard*

as possible to the Jeffersonian branches of the government. In the very case in which Marshall launched his supposed campaign to entrench the separation of law from politics and to defend the Court's right to say what the law is, the "great Chief Justice" indulged in a legally irrelevant, political provocation to the executive branch. For, while adjudging the statutory basis for the Court's jurisdiction in the case invalid, Marshall proceeded to advise Jefferson of his obligation to see to the delivery of the commissions of a collection of Federalist judicial appointees. Though the Court acknowledged its lack of authority actually to hand down such a judgment in the case, Marshall implied that the judiciary could give law to the executive on the executive's own obligations in any case. The Court thus stretched the constitutional principle of separation of powers to intervene in the national, politico-constitutional debate that had arisen out of the election of 1800 – a conflict more about federalism than about separation of powers – all the time insisting, as part of that debate, that it was only applying the law.

For the Jeffersonians, *Marbury*'s trespass on executive authority was no isolated provocation, but was of a piece with the long-term campaign of the Federalists. The opinion recalled for them the equally gratuitous lectures on Federalist constitutionalism that Federalist judges had used to bully grand juries throughout the 1790s, especially in the period of the Alien and Sedition Acts. It confirmed, for anyone in need of convincing, that the Federalists were determined to create a judicial stronghold from which to preserve the consolidationist gains of the 1790s in the wake of their crushing electoral defeat in 1800. Just as *Marbury*'s dicta seemed to replicate the Federalist judicial excesses of the 1790s, so its defense of one of Adams's "midnight" appointees seemed an effort to vindicate the Federalist Judiciary Act of 1801 as a step toward judicial supremacy over the popular branches. To the Jeffersonians, *Marbury* perverted the separation of powers to preserve Federalist power in the aftermath of the Federalists' political defeat in 1800.

The Jeffersonian response was, of course, not only to ignore Marshall's extra-judicial endorsement of Marbury's claim but also to repeal the Judiciary Act itself, a move in which the Court acquiesced (possibly over Marshall's objections) in *Stuart v. Laird* (1803).[21] During the original debate over the Bill of Rights, Jefferson had looked to the judiciary as a potential bulwark against tyranny. By the early 1800s, however, expansive federal – and Federalist – judicial power threatened not only a contraction of the power of other branches but an erosion of states' rights and popular sovereignty. Jefferson attacked Federalists for turning the judiciary to

[21] *Stuart* v. *Laird*, 5 U.S. (1 Cranch) 299 (1803).

Compendium_Cornell
Page 0201

"party purpose," and he applauded Congress for having "lopped off a parasite limb." Another critic posed the issue as one between those "appointed for life" and the "immediate representatives of the people." Efforts to restrict federal judicial power were understood by Federalists, meanwhile, as both an expansion of the power of the Jeffersonian presidency and as part of a larger agenda to promote the chaos of states' rights at the expense of rightful national power.

The more radical Jeffersonians wanted to go beyond mere repeal of the Judiciary Act. Their goal was to cleanse the judiciary and restore the proper separation of powers by impeaching the worst of the Federalist judges. The first target was John Pickering of New Hampshire, a notorious drunk, probably insane, and certainly not a proper man to have on the federal bench. The use of impeachment as a political tool troubled many, however, including a number of Republicans who doubted that Pickering's deplorable behavior belonged among the "high crimes and misdemeanors" that justified removal from office. The radicals won over enough members of the Senate to convict Pickering, but the case against their second target, Samuel Chase, was far more complicated. Chase had used his position as a judge to denounce Republican ideas, and the most ardent Republicans argued that impeachment was the only tool to check the excesses of unelected judges. But more moderate Republicans and Federalists required that an impeachable offense be a criminal act. Impeachment, they insisted, should not be used as a political tool. The Senate failed to convict Chase, and the episode drove a wedge between the radical and moderate wings of Jefferson's coalition. Still, Chase's impeachment and a rumored threat to impeach Marshall himself chastened the Federalists to a significant degree. The close call showed that Congress would hesitate to intrude too aggressively into the judicial sphere. But it equally established that the judiciary could defend its independence only so long as it plausibly explained its actions as distinctively legal, divorced from politics. This settlement on the question of separation of powers did not truly promise a future of apolitical judging, but, like the language of federalism in politics more generally, it established the fundamental language of constitutional politics in the courts.

### VIII. CONSTITUTIONAL POLITICS IN COURT: FEDERALISM

As much as *Marbury* raised separation of powers problems for the Jeffersonians, the chief focus for constitutional conflicts involving the courts was the problem of federalism. The rift that had divided Federalists from Anti-Federalists over the division of authority between the states and the central government only widened in the decade after the Constitution was ratified

Compendium_Cornell
Page 0202

and the Bill of Rights adopted. At one extreme stood the radical states' rights theories advanced by Jefferson in the Kentucky Resolutions. Federalists rejected this theory and continued to affirm their commitment to a powerful central government.

Although committed to the Federalist vision of a strong central government, including a powerful Supreme Court, Marshall was not a Hamiltonian consolidationist, seeking to build a British-style regime with a powerful standing army to enforce its will. Rather Marshall is better understood as an expositor of a distinctly legalistic style of Federalist ideology. Marshall shared with Hamilton a suspicion of localist democracy, which he believed invariably threatened the fundamental rights of property and contract on which civilization rested. In his view the rule of law required rigid adherence to certain basic principles, particularly the principles of contract and property entrenched in the common law and incorporated into the Federal Constitution's Contracts Clause. On these questions it was manifestly the duty of the judiciary to preserve a uniform federal law without obstruction from individual state governments.

Marshall was not, as his enemies charged, a consolidationist bent on destroying all state authority; in his view state governments would have wide latitude to act within their appropriate spheres of authority demarcated by the Constitution. But the principle of popular sovereignty did not mean that the people could do whatever they wanted, particularly with regard to contract and property rights. The Constitution established legal mechanisms and principles that the people could not change at will but only by the mechanisms of Article V. In practice, then, even the political branches and the states must be controlled by law, and the law's integrity must be preserved by the ultimate authority of a single legal tribunal like the national Supreme Court.

In contrast, the Jeffersonian model of federalism deemphasized the production of a coherent national law and posited instead the indispensable autonomy of the several republics that constituted the nation. For Jefferson, the people were sovereign in a quite active sense, and they normally expressed their sovereign will through the medium of the state governments. Jefferson viewed American government as a pyramid. At the foundation was the mass of politically equal, male, white citizens, each yielding only so much power over his own life as necessary for good government and consistent with the continued political equality of the citizenry. As one moved up the structure of the pyramid, power would be delegated in a limited fashion: local, state, and federal governments enjoyed successively less authority and no more power than was absolutely necessary to execute their political functions. The national government was the most limited of all, entitled only to so much power as it absolutely required to secure

Compendium_Cornell
Page 0203

a republican peace among the Union's constituent republics and between the Union and the world. While committed to Union, Jeffersonians were not willing to achieve this goal at the expense of the liberty enjoyed by citizens and the states. Jeffersonians were not enemies of a coherent system of law. They did, however, oppose the creation of a powerful central government, since it would inexorably erode liberty. Consistent with that position, they tended to resist the Marshall Court's accumulation of broad authority, notwithstanding the Court's presence at the only spot in the system from which uniform law might be imparted to the nation.

Each of these opposing visions could be gleaned from the text of the Constitution. Jeffersonians could emphasize that the Constitution granted only limited, enumerated powers to the national government and that the document had been ratified by the people of the states, rather than by the people as a single body. In this vision, the federal courts were not superior to, but parallel with, the state courts. Federalists could point out that, although the national government's sphere of action was limited, within that sphere it was supreme and entitled to all the powers necessary to be effective. Moreover, it was entitled to construe its powers generously in pursuit of its legitimate goals and to enforce its laws without regard to the objections of the state governments. Here, the tendency was to elevate the federal courts as an authority that might discipline the unruly states.

The history of federalism in this period can be seen as a history of political negotiation and compromise between these two basic viewpoints. A word of caution, though: in those days, there was no institutionalized two-party system. As described above, political alliances were fluid, politico-constitutional action took many forms, and the idioms of states' rights and national power might be deployed by anyone at the right strategic moment. Still, these two idioms were indeed fundamental, and to the extent that self-identified Republicans and Federalists increasingly came to dominate the public discourse of constitutionalism, they generally drew on these two basic perspectives to distinguish themselves from each other.

The point of departure in negotiating the roles of the courts was the framing and ratification of the Constitution, itself a process of negotiation and compromise among those advocating consolidation and those favoring state autonomy. Born of frustration with the mere league that was the Articles of Confederation, the Constitution itself was a major step toward consolidation. If the Framers had prudently stopped short of full consolidation and even short of granting the new government certain powers that Madison thought essential, they had nevertheless augmented federal power and placed specific limits on the states, even in their regulation of apparently internal matters like contract. The addition of the Bill of Rights – particularly the all-important Tenth Amendment limit on federal power – and the

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0204

later development of a constitutional theory of strict construction were the two key elements in their continuing struggle against the Federalist vision of a strong national government.

When the original Judiciary Act of 1789 established the federal court system as a national arm intruding into the states, it appeared that another consolidationist step had been taken. The Act, however, fell far short of creating the "imperial" establishment that the Anti-Federalists feared, that the Constitution itself arguably permitted, and that the Judiciary Act of 1801 would more closely approach. It established only a modest number of federal courts, denied federal-question jurisdiction to the federal trial courts except in certain narrow areas, and imposed strict limits on federal diversity jurisdiction and the Supreme Court's appellate jurisdiction. The ability of the federal courts to reach into the lives of most Americans was therefore extremely limited. The Anti-Federalist fear that citizens would be forced to litigate issues in federal courts hostile to liberty and far from the localities in which issues arose would only rarely come to pass.

That said, the Act granted the Supreme Court jurisdiction to review the judgments of the state courts on federal questions and so held out at least some promise of federal judicial control of federal law. The provision caused little controversy at first, but the federal courts did move to bring state law in line with their vision of the Federal Constitution whenever they got hold of the necessary cases. Thus, in *Ware v. Hylton* (1796), the Supreme Court invalidated North Carolina's statutory effort to interfere with the British debt collection that was guaranteed by the Treaty of Paris. Few questioned the Court's power to do so. The federal circuit courts, as well, used the Contracts Clause to invalidate the occasional state law. Two federal courts even granted writs of certiorari to transfer cases involving federal questions from the state courts where they were pending to federal court. The state courts refused to recognize the writs, however, and were sustained by their legislatures. In both cases the federal courts backed off.

A far more violent states' rights reaction to federal court action came when the Supreme Court asserted its jurisdiction over the state of Georgia in another contract case, *Chisholm v. Georgia* (1793). Chisholm was a South Carolina resident and creditor of the state of Georgia suing the state for payment. Georgia claimed immunity as a sovereign state. The Court held that Article III's grant of federal jurisdiction in cases "between a State and Citizens of another State" empowered the federal courts to sit in judgment on the states even when sued by private parties.[22] This claim of judicial power over a sovereign state proved highly controversial. If a mere private person could sue an unwilling state in federal court, some argued, the states

---

[22] *Chisholm* v. *Georgia* 2 U.S., (2 Dall.) 419 (1793).

Compendium_Cornell
Page 0205

would "have relinquished all their Sovereignties, and have become mere corporations." Newspaper essayists predicted that suits against the states would subvert the balance of power within the federal system. The result would be the dreaded consolidation predicted by Anti-Federalists and the destruction of liberty: "the consolidation of the Union for the purpose of arbitrary power . . . the downfall of liberty and the subversion of the rights of the people." Another claimed the grant of federal jurisdiction had been drafted with "craft and subtility" by lawyers and was another example of the conspiratorial designs of "aristocrats to reduce the States to corporations."

The use of Anti-Federalist rhetoric was not surprising. What was more remarkable was the widespread political support for this critique. The Eleventh Amendment, which overturned *Chisholm* and reaffirmed a measure of state sovereign immunity, was adopted by a Congress dominated by Federalists. A full explanation of the Federalist position remains as elusive as the amendment's precise meaning, which the courts have long treated as related only tenuously to its text. But the evidence suggests broad commitment to the idea that the Constitution must have incorporated state sovereign immunity and that *Chisholm*, in other respects a perfectly conventional exposition of Federalist principle, had simply misunderstood that basic commitment. Like the Judiciary Act before it, the Eleventh Amendment suggested a readiness, even among Federalists, to see basic principles of private law go unenforced when the alternative was violation of constitutional (and common law) principles like sovereign immunity. Necessarily, too, the Constitution lived within politics – sometimes politics of the most elevated sort that might vindicate or vitiate sovereign immunity as a matter of principle, sometimes a politics of immediate interest and practical advantage. As it happened, several states at the time faced law suits that the amendment would allow them to avoid.

Following *Chisholm*, the Supreme Court avoided major controversies over federalism until *Fletcher v. Peck* in 1810.[23] Under constant threat from the Jeffersonians after 1801, Marshall and the Court had maintained a fairly low profile. Whether by design or mere circumstance, they afforded the Republicans under Jefferson and Madison the room to drift in a moderately nationalist direction themselves. But in 1810 Marshall seized on a case in which the Court's judgment was not likely to be resisted to establish certain nationalist, legalist, anti-populist principles. *Fletcher v. Peck* in many ways encapsulates the range of possibility open to constitutional actors in the first decades of the Republic. The Federalist viewpoint seemed to win the battle in court and held its own in Congress. But little of Federalism could be salvaged amid the Jacksonian ascendancy of the next generation.

[23] *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87 (1810).

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0206

*Saul Cornell and Gerald Leonard*

*Fletcher v. Peck* had its origins in the "Yazoo" fraud of 1795, in which apparent wholesale bribery of the Georgia legislature resulted in a mammoth land sale to a group of speculators at a bargain price. The new owners busily resold such title as they had (clouded not just by the bribery but also by continuing Indian claims to much of the land) to purchasers in the Northern states. Meanwhile, in Georgia a political movement arose to invalidate the sale, and in 1796, a newly elected legislature passed a "Repeal Act." That act, however, did not actually repeal the sale, but rather declared it "null and void" from the start as a "usurped act." *Fletcher v. Peck* itself was a feigned (arranged) case, brought years later by a third-party purchaser of Yazoo lands against his seller to determine the validity of the purchased title.

Georgia's "Repeal Act" represented not only an assertion of a legislative right to review the constitutionality of legislation but also a possible challenge to the sanctity of contract. As such it was a direct assault on Federalist constitutionalism (and, indeed, on the constitutionalism of some members of the Jeffersonian elite). Chief Justice Marshall's opinion in *Fletcher* addressed both of these concerns. First, legislative exercise of constitutional review usurped judicial power, according to Marshall, and thus violated basic principles of separation of powers. Although here the limitation was arguably a matter only of Georgia constitutional law, Marshall indicated his belief that it was also a matter of the very nature of legislative power. Second, the "Repeal Act" was a clear violation of property rights, one of the bedrock principles of Marshall's constitutionalism, and an affront to the Federal Constitution's Contracts Clause. To staunch Federalists, the legislature appeared to be replicating the excesses of state legislatures during the Confederation period – the very evil that the Constitution had been designed to eliminate.

Many Republicans, on the other hand, believed Georgia's actions were a legitimate exercise of popular sovereignty and states' rights, an act of popular constitutional review clearly superior to any act of mere judicial review. The Repeal Act did not purport to be the action of one legislature disapproving the act of a previous legislature. Rather, it was the product of a legislature acting in a special constitutional capacity in response to peculiar circumstance. Resolutions of a state constitutional convention, the actions of grand juries throughout the state, and public gatherings of the people (some more peaceful than others) had specially "invest[ed] this Legislature with conventional powers"; that is, with the powers not just of a legislature but of the people themselves assembled in convention. Like their colleagues in other episodes in other states during the 1790s, the people of Georgia had resorted to the entire range of purportedly "constitutional" actions to put their sovereignty into practice. Exercising the powers so conferred, the

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0207

new legislature had reviewed the passage of the original act, found it marred by fraud and hence an unconstitutional usurpation, and declared it null and void – without effect from the moment of its supposed enactment.

Here was a Jeffersonian expression of active popular constitutional review, superior to judicial review. The affair was hardly uncontroversial, even among Jeffersonians. Who, after all, was to decide when it really was "the people" speaking? Jefferson, Madison, and much of the moderate wing of the Republican party in fact sought a compromise solution rather than stand fully behind the actions of the Georgia legislature. Still, Georgia's assertion that it must be the people – the sovereigns – not their agents who have ultimate power to say what the law is and to interpret the Constitution drew on and perpetuated the constitutionalism of a large swath of the American public before and after 1789.

For Federalists, popular sovereignty could never be taken so far. The supposedly sovereign people of a state were not competent to change the terms of the Constitution except by Article V, nor alter the transcendent rights of contract and property except by forsaking constitutional government itself. Courts, not the people, interpreted and applied the law. This was not judicial supremacy, although some were prepared to go that far; it was simply an argument for leaving adjudicatory functions to adjudicatory institutions, just as legislative functions must be left to legislatures. The people might amend the Constitution and were, in that sense, sovereign. But the Constitution of the United States (and that of Georgia) placed the judicial power in the courts, not in the people or in the legislatures. Otherwise there would be no reliable general law, only guesses about what a legislature or "the people" might do next with individuals' fundamental rights.

This was the perspective that informed Marshall's opinion. After assuming that the sale was a contract within the meaning of the federal Contracts Clause, Marshall offered an empty nod to state sovereignty by refusing to consider the bribery allegations. The Court, he said, must not presume to tell Georgia that an act bearing all the forms of a Georgia law was no law at all. Of course, Georgia's legislature had already decided that matter itself. But therein lay the problem; that the people of Georgia in their sovereign capacity might legitimately declare their own law void could not be permitted. The forms of law must be respected, and if the forms of law appeared to create private, vested rights, then no court could allow an attempt to "devest" those rights in the name of a state. The rule of law required that private rights be governed not by mere sovereign will but by "certain great principles of justice," such as the rule that good faith purchasers never be molested in their title. To assert power to the contrary, Marshall argued, was likely inconsistent with the very idea of legislative power. Even more

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0208

*Saul Cornell and Gerald Leonard*

to the point, it clearly conflicted with the federal Constitution's "bill of rights for the people of each state," by which Marshall did not, of course, mean *the* Bill of Rights, which then limited only national power. Instead, he pointed to those provisions – the Contracts Clause along with the bans on bills of attainder and ex post facto laws – that guaranteed individual rights against unprincipled state majorities and subjected the states to federal discipline.

*Fletcher* did not settle the rights of the Yazoo claimants in fact, although it certainly strengthened their bargaining position. Nor did it settle the continuing debates about the nature of the Constitution. But the case revealed a series of rifts in the fabric of American constitutionalism. For the most outspoken critics of the Yazoo scandal, heirs of William Manning, the actions of the legislature and the people out of doors vindicated the ideal of popular sovereignty. A more moderate states' rights view, endorsed by many leading Republicans, also persisted. While championing the "principles of '98," which looked to the states as the guardians of popular liberty, it hesitated to endorse the extra-legal authority of the crowd. For moderates, exceptional demonstrations of "popular sovereignty" like the Repeal Act were not the appropriate means of solving constitutional questions.

Among the judiciary, and on the Supreme Court, a decidedly nationalist and Federalist view flourished. The Court was the only practical guarantor of coherence and integrity in national law and of security in those transcendent rights of property and contract that underlay the specific arrangements agreed to by the nation in 1787–88, and civilization in general. In *Fletcher*, Marshall seized a moment when he knew the states' rights versions of the Constitution would not unite in serious opposition (since Jefferson and many other Republicans were looking for a compromise on the Yazoo affair), and he trumpeted Federalist constitutionalism with near impunity. He would expand on this view in later cases, such as *Martin v. Hunter's Lessee* (1816) and *McCulloch v. Maryland* (1819),[24] when the nationalizing trend among Republicans would again clear an opportune space for him to act.

But Marshall, though always a major player in the endless constitutional negotiation, would never manage to vanquish those opposing visions of constitutionalism that looked primarily to the states and even to direct action by the people. In the twilight of his life and career, the resurgence of states' rights in the Nullification Crisis of 1832–3 and the Jacksonian assault on implied-powers constitutionalism and judicial imperialism would leave Marshall despondent.

---

[24] *Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat.) 304 (1816) and *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316 (1819).

Compendium_Cornell
Page 0209

CONCLUSION: MULTIPLE CONSTITUTIONAL TRADITIONS IN
THE FOUNDING ERA – A DISCORDANT NARRATIVE

A viable system of federalism was far from secure when America entered
the War of 1812. At various moments in the two decades since ratification
of the Constitution, powerful centrifugal forces within American constitu-
tional life had threatened to rend the fabric of the new nation asunder. The
Whiskey Rebellion and Gabriel's Rebellion both had demonstrated that
loyalties remained in flux and highly negotiable. On more than one occa-
sion, state militias had been mobilized to protect the states against potential
tyranny of the federal government. The right to bear arms and the well-
regulated militia enshrined in the Second Amendment had not functioned
quite as Anti-Federalists had hoped. Still, in the fluid world of America's
developing constitutional order, the notion that state militias might stand as
the final barrier against federal tyranny had come close to being tested.

It is tempting to view Jefferson and the Republicans in cynical terms,
abandoning their commitment to states' rights when it suited their political
ambitions. Rather than see Jeffersonian constitutional ideology as a thin
veil masking their pursuit of power, it makes more sense to recognize that
Jefferson and his allies shared with the Federalists a complex amalgam
of ideas and goals about constitutional government. When two different
constitutional values came into conflict, liberty and federalism, popular
sovereignty and the rule of law, or strict construction and republicanism,
each side was forced to make difficult choices: which part of its constitutional
philosophy should it preserve and which part should it sacrifice to obtain
the desired objective?

It is also important to recall that all the various discourses of constitu-
tionalism available to Americans during the Early Republic existed within
a set of established structural power relations created by the Constitution.
That the states' rights "principles of '98" were used to great effect at dif-
ferent moments of constitutional crisis by both Jefferson and his Federalist
opponents does not make such uses unprincipled and opportunistic. The
structure of the federal system meant that such arguments were always avail-
able for those who wished to formulate a critique of centralizing tendencies
within American constitutionalism.

In short, the complex history of constitutional development in the Early
Republic does not square easily with the traditional Whiggish narrative of
unfolding liberty or with neo-Federalist accounts of rising nationalism. Nor
does it square with modern anti-Whig declension narratives, in which civic
republicanism simply gives way before the onslaught of liberal capitalism.

The most accurate description of the contested constitutional culture of
the Early Republic may well have been William Manning's suggestion that

Compendium_Cornell
Page 0210

554                         *Saul Cornell and Gerald Leonard*

the Constitution was "a Fiddle, with but few strings." Many actors stepped on the stage of American law hoping to scratch out their own simple tune with this fiddle. Others hoped that this instrument would allow them to create a grand symphonic vision for American law. The contentious history of this period suggests that neither of these visions of law was entirely successful. The early constitutional history of the new nation proved to be more discordant than harmonious.

Cambridge Histories Online © Cambridge University Press, 2008

Compendium_Cornell
Page 0211



The Omohundro Institute of Early American History and Culture is sponsored
jointly by the College of William and Mary and the Colonial Williamsburg
Foundation. On November 15, 1996, the Institute adopted the present name in
honor of a bequest from Malvern H. Omohundro, Jr.

© 1999
The University of North Carolina Press
All rights reserved
Set in Minion type by Keystone Typesetting, Inc.
Manufactured in the United States of America
Library of Congress Cataloging-in-Publication Data
Cornell, Saul.
The other founders : Anti-Federalism and the dissenting
tradition in America, 1788–1828 / Saul Cornell.
    p. cm.
Includes bibliographical references and index.
ISBN 0-8078-2503-4 (alk. paper).—
ISBN 0-8078-4786-0 (pbk.: alk. paper)
1. United States—Politics and government—1783–1865. 2. Constitutional history
—United States. 3. Federal government—United States—History—18th century.
4. Federal government—United States—History—19th century. 5. Dissenters
—United States—History—18th century. 6. Dissenters—United States
—History—19th century. I. Omohundro Institute of Early American History &
Culture. II. Title.
E310.c79 1999
320.473'049—dc21                          99-13685
        CIP

The paper in this book meets the guidelines for permanence and durability of the
Committee on Production Guidelines for Book Longevity of the Council on
Library Resources.

03 02 01 00 99 5 4 3 2 1

# Chapter 4 :
# Courts, Conventions, and Constitutionalism

## The Politics of the Public Sphere

Anti-Federalist writing included an alarming catalog of horrors that would befall the nation if the Constitution were adopted. Although the list of evils conjured up by opponents of the Constitution was quite extensive, the most frequently repeated charges were not framed in hysterical terms but were presented as sober predictions. That specter of a powerful, distant government capable of using its extensive powers of taxation, control of the judiciary, and standing army to enforce its arbitrary decrees did not require readers to engage in a paranoid flight of fancy. Most Americans had only to recall the period of British rule to visualize the dangers Anti-Federalists decried.

Although many of the fears of Anti-Federalists echoed familiar complaints drawn from the tradition of country protest, that catalog of horrors was not simply a tired recitation of political clichés. The most ominous threat detected by Anti-Federalists was all the more insidious because it was essentially covert. Nothing better demonstrated the cunning of their opponents than the effort to undermine freedom of the press. The enormity of this threat was the reason that Anti-Federalists devoted so much energy to exposing the mechanisms by which the destruction of the press could be accomplished under the new government. The Constitution threatened to eviscerate the public sphere and make it impossible for the people to resist the imposition of tyranny.

Anti-Federalists complained bitterly that the Federalist-dominated press refused to provide equal space to opponents of the Constitution. The charge was repeated in both public and private statements. Thus, Aedanus Burke, an influential South Carolina Anti-Federalist, queried Pennsylvania's Samuel Bryan "if any and what arts" were "used by the federalists to mislead or deceive the people to adopt it" or to "suppress the publications or objections of the other party." Burke also inquired about "impediments in the Printing offices" and "the conduct and character of the Printers in general in this business." "Were Printers under any and what fear or restraint to publish against the New-System? Or did the Printers act independently or otherwise?"[1]

Although modern accounts have tended to dismiss Anti-Federalist complaints as either paranoia or propaganda, the surviving evidence about publication tends to support the indictment. Anti-Federalists did have trouble getting their message into print. The perception that few papers would publish Anti-Federalist material was fairly accurate. One-quarter of all papers published no Anti-Federalist material. The median number of essays published by those editors who did open their pages to Anti-Federalist authors was only four. In the view of Centinel the actions of printers were part of a Federalist conspiracy to prevent Anti-Federalists from rallying the people against the Constitution. Centinel claimed that every means of intimidation was used to frustrate the efforts of printers to publish material against the Constitution, including physical harassment and the threat of economic boycott.[2]

Further evidence of a conspiracy was provided by the actions of the postmaster general. His adoption of a new method for distributing the mails infuriated Anti-Federalists and intensified their belief in a Federalist conspiracy. The controversy over the mails seemed to provide concrete proof of Anti-Federalist allegations that Federalists sought to use government power to crush opposition to the Constitution. Both of those controversies help to account for some of the intensity and passion of Anti-Federalist rhetoric about the press. The actions of Federalists seemed to confirm the direst predictions made by any Anti-Federalist writer about the dangers of accepting the Constitution. If this was the situation during ratification, what chance would an opposition have under the new Constitution?

Postmaster General Ebenezer Hazard believed that his decision to switch from stagecoach deliveries to postriders was merely a prudent economy to improve the efficiency of the mail and cut costs. To his Anti-Federalist enemies, however, the decision was a deliberate attempt to interfere with the traditional prerogatives of printers and obstruct the free flow of political information. Rather than improving the efficiency of the mails, Hazard's reforms actually resulted in widespread delays and increased the opportunities for corruption. In many instances papers were simply discarded by postriders or sold by individuals for personal profit.[3]

A Friend to the People believed that the actions of the postmaster general were motivated by the "advocates of despotic power" who had "found their efforts to shackle the press unsuccessful in many of the States." Frustrated in their efforts, the "next step was as much as possible to cut off all communication of sentiment, and to prevent any publications" from circulating to other states. Centinel thus believed that Hazard's actions limited the influence of newspapers "to the places of their publication, whilst falsehood and deception have had universal circulation, without the opportunity of refutation." The actions of the Post Office constituted a "violation of their duty and integrity" and had "prostituted their of—ces to forward the nefarious design of enslaving their countrymen, by thus cutting off all communication by the usual vehicle between the patriots." Another author in the *Freeman's Journal* believed this "stretch of arbitrary power" surpassed that of the British "before the Revolution." Such a policy was disastrous. "By this manoeuvre all communication is cut off between the States, so that the despots may assemble an *army* and subjugate the freemen of one state, before their friends in another hear of it."[4]

The controversy over the Post Office seemed to vindicate the conspiratorial rhetoric of the most polemical Anti-Federalist authors. This point did not go unnoticed by Federalists. George Washington feared that the controversy over the Post Office fueled Anti-Federalist complaints, making "very plausible pretexts for dealing out their scandals, and exciting jealousies, by inducing a belief that the suppression of intelligence at that critical juncture, was a wicked trick of policy, contrived by an Aristocratic Junto." The paranoia often attributed to Anti-Federalists by modern scholars seems less exaggerated when one considers the publishing history of ratification. Anti-Federalists might have been mistaken about the motives of many of their opponents; they were not, however, wrong about their impact on the campaign. The Anti-Federalists did have a much more difficult time finding outlets for their materials.[5]

Compendium_Cornell
Page 0214

The actions of the postmaster general and bias of the Federalist press intensified Anti-Federalist concerns about the dangers posed by the Constitution. If Anti-Federalists faced major obstacles to publication during ratification, the prospects after adoption seemed even more dire. Anti-Federalists believed that, once adopted, the new Constitution would pose a whole range of threats to freedom of the press. In response to the Federalist question—"What controul can proceed from the federal government to shackle or destroy that sacred palladium of national freedom?"—Anti-Federalists were prepared with a detailed set of responses. An Old Whig rattled off a number of measures that might be taken to limit freedom of the press, including licensing of printers and burdensome security bonds to compel good behavior. One of the most common fears expressed by Anti-Federalists was that taxation could be used as a weapon against a free press. Federal Farmer observed, "I am not clear, that congress is restrained from laying any duties whatever on printing, and from laying duties particularly heavy on certain pieces printed."[6]

The likelihood of a new Stamp Act enforced by a powerful standing army was only one of the threats envisioned by Anti-Federalists. A Democratic Federalist believed that, if "the enormous power of the new confederation" were extended directly to *"individuals* as well as to the *States* of America, a thousand means may be devised to destroy effectually the liberty of the press." Implicit in this argument was the belief that the states were more likely to guard the liberties of their citizens than was a distant government—a particularly compelling claim, given the absence of a written bill of rights. The power of the judiciary and the imprecision of the text of the Constitution only amplified that danger. "There is no knowing what corrupt and wicked judges may do," especially "when they are not restrained by express laws."[7]

The most likely and in most respects the most perfidious means of undermining the freedom of the press was the use of libel, especially seditious libel prosecutions. The power to prosecute libels was particularly dangerous because it allowed the government to single out specific individuals for punishment and effectively divide opposition. Since libel law might not immediately be invoked, it was far easier to lull the people into a false sense of security. Philadelphiensis warned citizens, "When Government thinks proper, under the pretence of writing a libel, etc. it may imprison, inflict the most cruel and unusual punishment, seize property, carry on prosecutions, etc. and the unfortunate citizen has no *magna charta,* no *bill of rights,* to protect him."[8]

Although both Federalists and Anti-Federalists agreed that the preservation of republicanism and liberty demanded a responsible free press, there was an important difference between their views of seditious libel. Federalists generally defended a conception of libel based in Blackstone, whereas Anti-Federalists looked to the model established in the case of John Peter Zenger.

The Federalist view of the doctrine of seditious libel was succinctly articulated by James Wilson, who asserted the classic Blackstonian view that "the idea of the liberty of the press is not carried so far as this in any country" as to abandon the notion of seditious libel. He went on to remind his Anti-Federalist opponents, "What is meant by the liberty of the press is, that there should be no antecedent restraint upon it; but that every author is responsible when he attacks the security or welfare of the government." Essentially, Blackstonian doctrine asserted the

continuing validity of the idea of seditious libel and affirmed that freedom of the press only prevented prior restraint and licensing of the press.[9]

Most Anti-Federalists accepted the precedent of the Zenger trial, which legitimated truth as a defense against libel and accepted the role of the jury as an arbiter of both the facts and the law in libel cases. Empowered to determine not only whether the utterance had been made but also whether the utterance was libelous, Zengerian principles provided an appropriate republican safeguard against tyranny. It was up to the community to decide whether an utterance was libelous, not the government. The Anti-Federalist debt to Zengerian principles is evident in Arthur Lee's Cincinnatus essays. In his discussion of the freedom of the press, Cincinnatus wrote: "It was the jury only, that saved Zenger . . . it can only be a jury that will save any future printer from the fangs of power." For Lee, trial by jury in cases of seditious libel served as an important check on arbitrary government. Like many Anti-Federalists, Lee was unwilling to abandon the concept of seditious libel entirely. To do so would remove an important structural check on the possible licentiousness of the press. Even "the sacred palladium of public liberty," freedom of the press, was subject to the limits set by the community. By allowing the jury to determine when a statement was libelous, the people retained the right to police themselves and set restrictions on the exercise of individual liberty when the good of the community demanded such limitations. Trials in state courts would provide the necessary protection for individuals and simultaneously allow the people to police themselves and the press. State libel, unlike federal libel, did not trouble most Anti-Federalists.[10]

Thus, fearful of the potential abuse of seditious libel prosecutions, most Anti-Federalists were not willing to reject the doctrine of seditious libel in toto, nor was there any need to dispense with the concept of libel as long as the right of trial by jury in state courts was preserved. Pennsylvanian John Smilie wondered, "What security would a printer have, tried in one of their courts?" The answer for Smilie was simple: none. The reason that the federal government could not be trusted was equally clear: "An aristocratical government cannot bear the liberty of the press." Only the state governments could form juries that truly represented the opinions of the people. Juries would both reflect the will of the people and deliberate in a rational manner on the nature of the alleged crime.[11]

Although there was little disagreement that federal juries could not be trusted, there was no consensus whether juries had to be drawn from specific localities or merely from the states in which the charges were brought. For some Anti-Federalists it was sufficient safeguard to demand that juries be drawn from the states, but others favored a more localist conception, arguing for the necessity of drawing jurors from the county in which the offense occurred.[12]

Apprehensions about the threat to liberty posed by seditious libel were uttered by many Anti-Federalist authors. The most intense criticism of this aspect of the Constitution, however, was expounded by Pennsylvania Anti-Federalists. Publishers and printers in that state had good reason to fear the danger such prosecutions posed: libel was an especially volatile issue in Pennsylvania. The leading Anti-Federalist printer, Eleazer Oswald, had once before faced a politically motivated libel charge, in 1782. Then, the printer had infuriated Supreme Court Justice Thomas McKean by publishing an account of a trial in which the judge had impugned the character of some

Revolutionary war veterans. The judge hauled Oswald into court and charged him with libel. Oswald responded by publishing an account of his own experiences in McKean's court that excoriated the judge's efforts to use libel to silence political dissent. In effect, Oswald sought to try his case in the court of public opinion. Using the press to rally support for his cause, Oswald bypassed the authority of the court and appealed to the jurors who would decide his fate. Despite the best efforts of the attorney general to persuade a grand jury to bring forward a charge of libel, Oswald escaped prosecution.[13]

The Oswald case of 1782 colored the way Pennsylvania Anti-Federalists interpreted the Constitution's power over the press. McKean's prominent support for the Constitution only lent additional credence to Anti-Federalist fears that the Constitution had been crafted by men who intended to use the law of libel to stifle all political opposition.

Anti-Federalists did not have to wait long to see their worst fears about the Federalist view of libel invoked against them. Even as the news of the ratification of the ninth state reached Pennsylvania, Oswald became embroiled in another libel controversy. Once again, the law of libel appeared to be used as a political weapon, and its primary target was an influential Anti-Federalist publisher.

Until Oswald's prosecution for libel, the constitutional disagreements between Federalists and Anti-Federalists had been largely theoretical. The debate was conducted in the pages of newspapers and on the floor of the individual state ratification conventions. The Oswald case was the first instance in which Federalist and Anti-Federalist constitutional philosophies were put to a test in court. It is not surprising, therefore, that the controversy arising out of the Oswald libel prosecution spilled over into the press and eventually found its way into the halls of the Pennsylvania State Assembly. The public debate over the law of libel conducted in the court, the press, and the State Assembly provided an occasion for Anti-Federalists to distinguish their conception of law from that of their opponents. The case not only was a landmark in the history of the law of libel, but it also allowed the middling democrats who dominated Pennsylvania Anti-Federalism to assert their own distinctly democratic vision of constitutional theory.

### The Oswald Libel Case of 1788

The second Oswald libel case, in 1788, developed out of a personal conflict between Eleazer Oswald, the publisher of the *Independent Gazetteer,* and Andrew Brown, the former editor of the *Federal Gazette.* Oswald had published a number of essays critical of Brown, and the aggrieved Federalist editor demanded that Oswald reveal the names of those authors who had attacked him or face possible libel charges. Oswald defended the principle of anonymous speech against the efforts of his Federalist adversaries to force him to reveal the identity of his authors; he refused to disclose his author's identities and further infuriated Brown with his ridicule, calling the printer a *"hand-maid* of some of my enemies among the federalists." Brown followed through on his threat to bring a charge of libel.[14]

Initially the libel case came before George Bryan, the prominent Anti-Federalist leader, who released Oswald on his own recognizance. Oswald was confident that the jury would once again prove his salvation. In 1782, Oswald had escaped libel prosecution by appealing to the grand jury, which refused to

indict him for libeling his enemies. Were Brown's case against him to go to trial, it was very likely that Oswald would evade prison, as in 1782. Oswald now made a tactical blunder when he challenged his old nemesis Chief Justice Thomas McKean's impartiality in the press. McKean ruled that the attack on the neutrality of the court was an instance of contempt, and he ordered Oswald imprisoned without a jury trial. McKean invoked the doctrine of constructive contempt, which allowed judges to construe statements outside the courtroom as contempt if they interfered with court proceedings. Thus, McKean's use of a contempt citation effectively denied Oswald a jury trial. Oswald was fined ten pounds and sentenced to a month in prison.[15]

One of the leading Anti-Federalist printers in the nation, Oswald believed that the prosecution was politically motivated. His strategy was exactly the same one he had used successfully in 1782: he sought to make the trial proceedings as public as possible. The libel suit against him had been brought "the moment the *federal* intelligence came to hand" that the new Constitution had been ratified by nine states. Emboldened by their political victory, Federalists took this opportunity, Oswald charged, to settle an old score with him. Oswald was confident that the machinations of his opponents would come to nothing and asserted confidently that, "if former prejudices should be found to operate against me on the bench," he would be content to let his fate rest with "a jury of my country, properly elected and empannelled, a jury of freemen and independent citizens." He informed his audience, "I have escaped the jaws of persecution through this channel on certain memorable occasions." The decision to use his paper to rally public support for his cause made perfect sense, for Oswald believed that the role of newspapers was to shape and influence public opinion. In this sense the public sphere of print and the role of the jury were mutually dependent. For Oswald, not only was the jury intended to be a mirror of society; it was itself a quasi-representative body entitled to judge the constitutionality of law. While McKean believed that Oswald had compromised the independence of the judicial process, Oswald felt it was merely another manifestation of the political process. Accordingly, Oswald believed the job of the press was to educate citizens politically so they could exercise their function on the jury. McKean hoped to confine the jury's role and insulate it from the world of print, a forum that could not be controlled by judges trained in the law.[16]

Had Oswald not provided McKean with a pretext for issuing a contempt citation, the case might have been a simple replay of the earlier case. The use of contempt to prosecute Oswald changed things dramatically, and the case became a subject of public debate and considerable controversy. Reactions to the case, however, went beyond discussion of the technical issues in the case: a wide-ranging discussion of the nature of libel, the role of juries, the use of constructive contempt, and the meaning of freedom of the pressensued. In attacking McKean, Anti-Federalists presented a more expansive, libertarian view of the freedom of the press. Anti-Federalists also reasserted an expansive view of the rights of juries and their own distinctive approach to constitutional interpretation.

While a number of writers defended Oswald in traditional Zengerian terms, a few Anti-Federalist writers moved beyond this defense and put forth a new, more liberal theory of freedom of the press. Oswald had himself begun to question whether the use of libel was "Incompatible with law and liberty." One author, A Pennsylvanian, developed Oswald's argument even further. He

began by observing, "An idea has been circulated that too great a latitude is allowed to the press, and that its *licentiousness* ought to be restrained." In practice, this "idea" constrained the freedom of the press, since it was "extremely difficult to draw a line of distinction between what is termed the *liberty* and licentiousness of the press." While most Anti-Federalists accepted the need to draw such a line, this author proclaimed: "There is no middle line—Restrain the *licentiousness*, and you in effect demolish the *liberty* of the press."[17]

The second aspect of the Oswald case that provoked considerable public commentary was the use of constructive contempt judgments against a defendant. This issue touched on a number of Anti-Federalist concerns: the roles of judges and juries and the proper method of interpreting constitutional texts. McKean sought to diminish the role of juries, and he defended the use of constructive contempt as indispensable to his judicial authority. Oswald's public statements, although not made in court before McKean, had effectively undermined that judicial process and authority. Throughout the proceedings McKean defended the authority of his office. "Judges discharge their functions under the solemn obligations of an oath: and, if their virtue entitles them to their station, they can neither be corrupted by favour to swerve from, nor influenced by fear to desert, their duty." Punishing Oswald was thus necessary to preserve the authority of the court. Oswald's public appeal was an instance of contempt because it had the effect of "prejudicing the public" regarding "the merits of a case" and hence interfered with the "administration of justice." McKean asserted the right of the judiciary to determine the law on this matter and denied that Oswald was entitled to a jury trial. "Whether the publication amounts to a contempt, or not, is a point of law, which, after all, is the province of the judges, and not of the jury, to determine." McKean sought to reduce the prerogatives of juries and expand the powers of judges.[18]

Federalists placed far less trust in popular tribunals and preferred to expand the scope of judicial authority. Their worst scenario of all was to drag legal issues into the court of popular opinion. McKean and his allies had correctly interpreted the Anti-Federalist strategy. Oswald's supporters sought to use the press to shape the views of jurors who would then interpret both the facts of the case and the law. Such tactics made perfect sense, given the Anti-Federalists' theory of libel and their more democratic approach to constitutional matters, which was closely tied to a notion of an expansive public sphere. For middling democrats such as Oswald, a vibrant public sphere was essential to educate citizens and alert them to threats to their liberty. Far from undermining the authority of law, Oswald's actions helped the jury serve its proper constitutional function.

The use of constructive contempt was perceived by Anti-Federalists to be an effort by the judiciary to increase its authority. McKean's actions seemed to vindicate their claim that Federalists intended to use the interpretive authority of judges to expand the powers of government. Amicus reminded Pennsylvanians, "There is but one way of being guilty of what is called a contempt of the court, by some act of violence or indecent expression, in the presence and hearing of the court, whilst sitting, or by refusing to obey the process of the court." Federalists appeared to be trying to circumvent the requirements for a jury trial by invoking this unfamiliar legal concept. McKean's actions justified the Anti-Federalist's belief that a powerful judiciary would pervert the plain meaning of constitutional texts. X. Z. attacked the use of "implied power" and was particularly incensed that "the party,

pretending to be offended, is to decide on the offence." Framing the issue in democratic terms, X. Z. noted, "Gentlemen of the robe have too generally lofty ideas on this subject." McKean's actions were typical of the judges who were incapable of sympathizing with the common man. "Amongst the *great*," X. Z. wrote, "the inferior class of mankind are viewed as a lower order of beings." Furthermore, "gentlemen of the bar are very ingenious in producing cases and opinions in Court, to support particular points." Against the legalism and latitudinarian constructions favored by Federalist judges, X. Z. exhorted Pennsylvanians to recall that "no opinion must ever be permitted to overrule the fundamental liberties of our country, or to destroy the express words of our constitution." Anti-Federalists were proponents of a constitutional plain style and committed to a form of constitutional literalism, and they accordingly opposed the sort of broad interpretive latitude that McKean defended. X. Z. complained that, by "this sort of logic, the whole constitution may be converted to a very ductile code." Fortunately, a properly worded constitution, such as framed by Pennsylvanians, did not easily lend itself to interpretive abuse. Affirming the strong textualist stance taken by most Anti-Federalists, X. Z. asserted that the Pennsylvania constitution's "words are too stubborn to bend to every blast of invention."[19]

McKean's behavior led some commentators to champion a more democratic vision of the law. An author who adopted the name One of the Common People warned readers, "It is the fashionable opinion of the times, that the common people cannot understand, and ought not to inquire into the proceedings of those in power." In particular, Federalist judges and lawyers wished to lessen the power of juries and thereby exclude the people from an active role in legal proceedings. McKean's use of a constructive contempt citation and his refusal to allow Oswald a jury suggested that he did not trust the people to fulfill their obligations as jurors. "*Judges* were sworn to act rightly and honestly, and *therefore* could not be biased: But his honor was graciously pleased to express his great doubts, whether *jurymen* paid so sacred regard to *their* oaths." Contrary to the excessive legalism of Federalists, Anti-Federalist supporters of Oswald maintained that the law was a matter of common sense and that men of sound mind and virtuous character could interpret it without formal legal training or education. In a republic, there was no need of a special priestly class to interpret the law.[20]

Many of the issues debated in the press were replayed in the Pennsylvania Assembly, which took up the Oswald case. Federalists asserted the Black-stonian doctrine that "true liberty" was "equally endangered by tyranny on the one hand, and by licentiousness on the other." Indeed, Federalist opponents of Oswald went further: "To censure the licentiousness, is to maintain the *liberty* of the press." The argument against Oswald was peppered with historical evidence about the law of libel in England and America. Supporters of McKean challenged the claims made in the press that Blackstone was a "courtly" writer who stood against true Whig republican principles of the American Revolution. In their view the Pennsylvania constitution embraced a neo-Blackstonian understanding of freedom of the press. McKean accepted that the law protected only "a candid commentary" but did not shield "every endeavour to bias and intimidate," arguing that it was the job of the courts to "enquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to

delude and defame." The Federalists accepted the neo-Blackstonian reading of the Pennsylvania constitution's declaration protecting freedom of the press as a limit on prior restraint, not a rejection of the idea of seditious libel. One of McKean's supporters in the Assembly recognized that Oswald had intended to subvert the judicial process by appealing his case directly to the people. Such a move was "certainly calculated to draw the administration of justice from proper tribunals; and in their place substitute newspaper altercations." Federalists sought to limit popular involvement in judicial proceedings. The jury's role would be to decide on the facts of the case and not pass judgment on technical matters of law that were best left to judges. Above all, Federalists did not wish to see the law politicized. The prospect that legal matters would become the subject of debate in the press and that jurors would be influenced by those debates horrified them. This was precisely the sort of democratic excess that the federal Constitution was intended to check.[21]

McKean's actions shocked and outraged Oswald's Anti-Federalist allies in the Assembly. William Findley, a leading Anti-Federalist spokesman, challenged McKean's supporters, lambasted McKean, and reiterated themes that Anti-Federalists had repeated throughout ratification. Against McKean's neo-Blackstonian emphasis on the common law, which elevated the role of the judiciary, Findley championed "the rights and immunities which formed the great object of the revolution." Findley dismissed the common law as a relic of British monarchism. The Revolution represented a distinct break with this tradition, which belonged to "the dark and distant period of juridical history."[22]

Findley did more than simply restate the familiar Zengerian principles that defined the Anti-Federalist view of libel. He also pressed many of the themes that had been presented in response to the Oswald case in the press. His critique of the common law went beyond exposing its contamination by outdated antirepublican ideas. Invoking the common law was a familiar tactic of those judges who were eager to manipulate the plain sense of the Constitution through speculative constructions of legal principle. In opposition to the legalistic cast of Federalist arguments, Findley affirmed a constitutional plain style, championing the belief that legal principles were "capable of an easy and equivocal definition." "Every man," Findley alleged, "who possessed a competent share of common sense, and understood the rules of grammar" could determine the meaning of the Constitution. He denounced "the sophistry of the schools and the jargon of the law" and warned that many legal techniques were designed to "pervert or corrupt the explicit language" of the text. Pennsylvania's constitution had been drafted by middling democrats like Findley. The language of that document, unlike the ambiguity of the federal Constitution, was set down in a plain style and included a bill of rights explicitly limiting the scope of government powers. For Findley, "there was nothing ambiguous or uncertain" about the rights guaranteed by the state constitution. It would be "fatal to the cause of liberty," he declared, "if it was once established, that the technical learning of a lawyer is necessary to comprehend the principles" sown in "this great compact between the people and their rulers." The text of the Constitution and the principles of natural rights evident to anyone who possessed common sense were the foundations of law, not the accumulated wisdom of the common law. The Federalists' use of the common law was part of a larger effort to reduce popular involvement in judicial proceedings.[23]

Reducing the powers of jury and strengthening those of the judiciary were part of the Federalist goal of creating a more aristocratic style of government. Findley even went so far as to affirm that "the law of the land was not, in fact, contradistinguished from the judgement of his peers, but merely a diversity in the mode of expressing the same thing." The jury, like the legislature, was an authentic voice of the people. Findley shared the view of other Anti-Federalists that the jury could function like a sitting constitutional convention, an authoritative interpreter of the meaning of constitutional documents.[24]

The Oswald libel case seemed to vindicate Anti-Federalists' worst fears about their opponents. The chasm between the Federalists' Blackstonian views and the Anti-Federalists' Zengerian principles could hardly be wider. A few of Oswald's Anti-Federalist supporters even broke with Zengerian ideals and challenged the very idea of political libel. This new, more liberal conception of freedom of the press not only represented an important step in the transformation of an alternative to Federalist constitutionalism; it was an important step in the growth of a new theory of the public sphere.

During ratification Eleazer Oswald had framed his ideals in republican terms. He defended printers whose "true dignity consists in looking after and supporting the general good, in which every citizen in a greater or lesser degree is equally interested." Although his paper became one of the most important vehicles for Anti-Federalist ideas, Oswald prided himself on publishing both Federalist and Anti-Federalist materials. After ratification, that republican conception of the press would give way to a more partisan one. So in the aftermath of the libel suit, Oswald's paper too became a far more partisan platform. Rather than each printer striving to embody the ideal of disinterestedness, individual printers would champion particular ideas, and the public will would emerge out of this conflict.[25]

Anti-Federalists had not devoted much attention to analyzing the function of the press, but during ratification most Anti-Federalists bitterly complained about its partiality. In nearly every instance, they attacked the antirepublican bias of Federalist printers. Writing shortly after ratification, Samuel Bryan (the author of the Centinel essays) suggested a different way of understanding the dynamics of the public sphere.

The Printers were certainly most of them more willing to publish for, then against the new Constitution. They depended more upon the People in the Towns than in the Country. The Towns people withdrew their Subscriptions from those who printed Papers against, and violent Threats were thrown out against the Antis and Attempts were made to injure them in their Business.[26]

Federalists controlled access to newspapers because of their economic clout. Appeals to republican virtue were of little consequence; only by recognizing the role of economic interests could Anti-Federalists effectively combat Federalists. With the benefit of hindsight, Bryan had clearly come to recognize that the press and the public sphere would not regulate themselves and that republican injunctions were insufficient to challenge the power of the marketplace. The lesson of ratification was clear: in the future, control of the diffusion of knowledge would become essential for politicians. The old republican conception of the press would have to yield to a new, more modern and liberal conception of the press as an agent of particular interests seeking

to manage public opinion in a marketplace of ideas. The notion of a public sphere, a site of rational dialogue on matters of common concern, would come more closely to resemble a marketplace of ideas in which partisan interests vied for the sympathies of the public. The transformation from public sphere to marketplace of ideas would not be accomplished for some time, but the politics of ratification were indispensable in leading some influential figures to begin to rethink the nature of the public sphere.

## *The Aborted Second Convention Movement*

Just as the Oswald libel case was concluding in September 1788, Pennsylvania Anti-Federalists faced a new, more pressing problem: what to do about the adoption of the Constitution. During ratification, a number of Anti-Federalists actively agitated for a second convention to revise the Constitution. Other Anti-Federalists concentrated their attention on the prospect of amendments and looked to the First Congress as the appropriate battleground. Ratification had entered a new phase after February 1789, when the Massachusetts state convention decided to ratify with an implicit understanding that a set of recommended amendments would be taken up by the First Congress. Although that decision did not quash the movement for a second convention, it shifted energy and attention away from it. Not until the New York convention met in July did a second convention garner renewed interest. Initially, New York Anti-Federalists had proposed recommendatory, explanatory, and conditional amendments. When that proposal seemed unlikely to pass, Melancton Smith suggested that ratification be conditional and that a second constitutional convention consider amendments. The proposal also called for the temporary suspension of congressional power over the militia, elections, and taxation until the question of amendments was settled. Federalists responded with a call for ratification "in full confidence" that amendments would be taken up by the Congress. Smith next called for a conditional ratification, including a right to secede if two-thirds of the states did not petition Congress to call a second convention to take up amendments. The right of secession was defeated, as was the conditional adoption. Ultimately, New York followed the Massachusetts model of recommending amendments. The New York convention, however, did publish a circular letter calling for a second constitutional convention to consider the subject of amendments, which would then be taken up by Congress. Efforts to organize a national second convention movement were coordinated by New York Anti-Federalist John Lamb, who corresponded with Anti-Federalist leaders from South Carolina, North Carolina, Virginia, Maryland, Pennsylvania, and New Hampshire.[27]

The first and only state to convene such a convention was Pennsylvania, where delegates from all over the state convened at Harrisburg in September 1788 to take up the subject of amendments. The outcome of the Harrisburg convention was crucial to the future of Anti-Federalism. If Harrisburg should succeed, it would be a model for a broad national movement for a second convention and create the nucleus of an anticonstitutional movement.

The dynamics of the Harrisburg convention also illustrate the continuing importance of the tension between elite and popular opposition to the Constitution and the vital role that middling democrats played in mediating between those two poles of Anti-Federalism.

Plebeian populists looked forward to Harrisburg as an opportunity to further their own radical agenda. Carlisle Anti-Federalists, encouraged by the news of a convention in nearby Harrisburg, offered up a toast calling for amendments that might "render the proposed Constitution of the United States truly democratical." Leading Anti-Federalists throughout Pennsylvania and several newcomers to Pennsylvania politics attended. One of the newcomers was a feisty representative from Carlisle, the leader of the Carlisle riot, William Petrikin. Like other plebeian populists, Petrikin was eager to persuade the delegates to adopt a radical program to unite Anti-Federalists throughout the country and scrap the system of government so recently adopted.[28]

At Harrisburg, Petrikin felt betrayed by the moderate forces, who "did more injury to our cause than all the strategems of our advrsaries." His disappointment was hard to contain: "Our friends throughout the state expected something decisive from us and we spent our whole time Canvassing for places in Congress." While moderates directed their energies to working through the system, Petrikin confessed that he had "expected the intention of our meeting was to unite the opposition in the different parts of the state that they might act in concert—to form committees and associations and open a Chanel of communication through-out the united states if posible." In contrast to the other delegates, who "courted preferment," Petrikin proudly recommended that Anti-Federalists continue to organize into committees of correspondence and militia units. His radical localist agenda was not compatible with the state-centered view of politics championed by more experienced politicians. Echoing the spirit of Anti-Federalists in Carlisle who took their political grievances into the streets, Petrikin declared, "If a party of Feds and anties happens to meet upon any convival or public occasion the feds is sure to get a compleat dressing befor they dissmiss."[29]

The moderate forces at Harrisburg were led by Charles Pettit, an established politician and close ally of the middling democrats who dominated Pennsylvania politics. Pettit sought to distance himself from events like the Carlisle riot and avert any actions that might possibly promote anarchy. Middling politicians like Pettit were alarmed by the depth of hostility in the backcountry and feared anarchy. Writing to one of the leading spokesmen for Pennsylvania's middling democrats, Robert Whitehill, to express his grave reservations about continued resistance to the new Constitution, Pettit stressed his own belief that to "reject the New Plan and attempt again to resort to the old" would be disastrous and would "throw us into a State of Nature, filled with internal Discord." Pettit underscored the fact that "a Politician will readily imagine the Danger of such a Situation." He captured the view of many leading Anti-Federalists when he later confided to George Washington, "Even after the vote of adoption by the State Convention, a large proportion of the people, especially in the western counties, shewed a disposition to resist the operation of it, in a manner which I thought indicated danger to the peace of the State." For Pettit, the willingness of plebeian populists to take their grievances into the streets was an example of mobocracy, not republicanism, and had to be prevented at all costs. The memory of the Carlisle riot, a scant six months earlier, loomed large in the minds of Petitt and Whitehill. Middling democrats appreciated that latent radicalism unleashed by the riot could undermine their more moderate democratic agenda.[30]

The Harrisburg convention recommended a set of amendments to be submitted to the state legislature, which would then be transmitted to Congress. Mild in tone and conciliatory, the content

of those amendments would have satisfied all but the most radical voices within the Anti-Federalist coalition. Although disappointing to William Petrikin, they were true to the spirit of more mainstream critics of the Constitution: the amendments would tip the balance of power within the federal system in favor of the states. Their goals were to limit the new government to powers expressly delegated and explicitly prohibit the expansion of federal power "under color or pretense of construction or fiction." All the rights protected under the state constitutions were explicitly affirmed. The power to regulate the election of senators and representatives was returned to the states. Poll taxes were prohibited, and direct taxation was restricted to cases in which states failed to meet congressional requisitions. A prohibition of standing armies in times of peace and state control over the militia were also recommended. Control over the federal district was restricted to those regulations pertaining to "police and good order." Inferior federal courts were restricted to admiralty jurisdiction, and appeals restricted to matters of law. Full congressional approval of treaties was mandated, extending the existing provision for Senate approval. Thus, the pattern of amendments suggested by the Harrisburg convention conformed to the general model that emerged from the individual state ratification conventions: protection for individual liberty, restrictions on the elastic clauses within the Constitution, and a shift in the balance of power between the states and the federal government.[31]

For plebeian populists, the decision of the Harrisburg convention was a betrayal. They continued to organize themselves into committees of correspondence and local militia units—they had not accepted the effective transfer of sovereignty to a government they believed would not be truly representative. They continued to affirm a belief in the legitimacy of the people to resist unjust exercises of arbitrary authority. Their radical localist vision of democracy did not easily integrate into the Anti-Federalist agenda to work as a loyal opposition to amend the Constitution.

Pettit and middling democrats hoped that the struggle for amendments might actually revitalize an alternative politics, to combat the politics that inspired Federalists to create a stronger central government. The struggle between Federalists and Anti-Federalists was merely another expression of a more basic tension: those who believed that the stability of government depended upon force versus those who thought that government could rest on the confidence and affections of the people. Pettit was not naive. He conceded that the Confederation was faulty and that its framers had relied too heavily on a degree of "Virtue, Public Spirit and other Attributes of Patriotism" that the people had been unable to supply. Pettit accepted that "those Ties are so far dissolved as to have lost their Force." Still, the Federalist solution was a cure worse than the disease.[32]

Rather than depend on stronger coercive authority, Pettit placed his faith in a revitalized public sphere, one that would unite individual communities. The amendment process was a means of reestablishing the social ties necessary to bring the nation together on a more solid and permanent basis. Pettit hoped to create a network of local organizations to work together for a common end. The goals of such an organization, however, were radically different from what William Petrikin envisioned. Pettit looked to the states and the federal system as the best means to assure that localism would not disrupt the Union. Pettit hoped that the individual counties would convene meetings to discuss the

amendments and then send delegations to convene at the state level to make appropriate recommendations. Pettit showed a remarkable faith in the ability of reasoned debate to produce a consensus. In place of the republican reliance on virtue, the flaw that had crippled the Confederation government, Pettit and other middling democrats hoped to substitute an invigorated public sphere. The meetings within local communities working through the state structure, Pettit hoped, would energize the political process and unite the nation. The public sphere in this vision was grounded in locality, even as it created ties among different localities. In contrast to the plebiscite envisioned by plebeian populists, Pettit favored a deliberative democracy. With such a system, there would be no need for a strong central government: the public sphere, not virtue, would be the new foundation for American republicanism.

Although fearful of anarchy, Pettit remained sanguine and committed to democracy. Federalists in Pennsylvania were less optimistic, and their experience with backcountry unrest led them to an even more negative view of democracy. Before the Harrisburg convention, there was considerable concern among Federalists that continued Anti-Federalist agitation might lead to anarchy. One contemporary observer conjectured, "Blood and slaughter seem unavoidable unless speedily counteracted by sufficient authority." Given such fears, it is easy to appreciate why Pennsylvania Federalist John Armstrong might concede in private, "The philosophy that teaches the equality of mankind and the dignity of human nature is founded in vanity." In Armstrong's view, the recent events had demonstrated that "there is infinitely more truth in the opposite doctrine, that the many were made for the few, and that we are better governed by rods than by reason." Armstrong was not unaware that many of his views were too dangerous to broach in public. "These ideas" were kept private, and he advised Horatio Gates that he would express such sentiments only to "a tried and bosom friend."[33]

Federalist attitudes toward plebeian radicalism diverged from those of more moderate Anti-Federalists in one important respect. While each side might have breathed easier once the threat of civil war and anarchy had been averted, Federalists perceived recent events in ironic terms, particularly plebeian radicalism. In the view of Federalist John Montgomery, the violence at Carlisle had prompted a number of Anti-Federalists of "respectable characters, whose minds were for some time greatly adverse to that Constitution," to seek a moderate position: violence had made these men as "anxious to preserve peace and good order, as any others." Public disorder strengthened, not weakened, the desire to create political stability. "Upon the whole, seeming evil has often since the Revolution been productive of real good in our public affairs." The local success of plebeian radicals in Carlisle thus weakened their position in the broader political arena.[34]

Ironically, the very success of the plebeian radicalism of the Carlisle rioters ultimately proved their own undoing. The fear of anarchy led the middling democrats who dominated the proceedings at Harrisburg to turn their energies to creating an effective loyal opposition, contributing to the demise of the drive for a second convention: opposition would not take the form of an anti-Constitution movement. Rather than encourage extralegal action by backcountry populists, leading Anti-Federalists opted to compromise and take up their role as a loyal opposition party.

The publication of the Harrisburg convention's resolves eased political tensions considerably. Federalist Richard Peters wrote to George Washington to express his happiness: "Our Anti-

Federalists have changed their battery. They are now very Federal. They want amendments and they must get into the seats of government to bring them about." Anti-Federalists resolved to work through the electoral system to achieve the amendments they desired. Middling democrats were optimistic after Harrisburg, and the moderate tone adopted by the delegates to Harrisburg did not blunt their desire to assert their own political and constitutional visions. Rejecting the radicalism of plebeian populism actually enabled middling Anti-Federalists to carry forward with their own distinctive agenda.[35]

It is possible to find among the vast writings of Anti-Federalists numerous hysterical and outlandish claims about the dire consequences that would follow ratification of the Constitution. When those exaggerated claims are accorded equal weight with the more typical Anti-Federalist arguments, it is easy to construct an image of the opponents of the Constitution as exemplars of the paranoid style of politics or as men of little faith. Both of those views, however, obscure the fact that most Anti-Federalists raised a far more sober and specific set of concerns. When Anti-Federalists worried about the absence of a bill of rights, they focused on such threats as the absence of a guarantee for trial by jury and the failure to protect freedom of the press. Nothing seemed more likely to imperil liberty than the prospect that the new government might use the law of libel as a political weapon to suppress dissent. Anti-Federalists did not have to wait long to see it used exactly so by their enemies. The prosecution of Eleazer Oswald was concrete evidence that Federalists would use the law of libel as a political tool.

Before the Oswald libel case, the argument between Federalists and Anti-Federalists had been largely speculative. The prosecution of Oswald brought Federalists and Anti-Federalists face to face in court, pitting Federalist adherence to Blackstonian ideals against Anti-Federalist Zengerian precedents. Anti-Federalists formulated a more trenchant critique of Federalist jurisprudence, and they moved beyond Zengerian ideals to frame a more liberal theory of freedom of the press and assert a more democratic vision of constitutional law.

As the furor over the Oswald case was abating, Pennsylvania Anti-Federalists turned once more to national politics. The Harrisburg convention was a turning point in the evolution of Anti-Federalism. Before Harrisburg, many within the Anti-Federalist coalition were dedicated to calling a second convention to frame substantive amendments to the Constitution. Some even recommended scrapping the Constitution and beginning anew. At the very least, before Harrisburg, an anti-Constitution party was plausible.

But those radical alternatives were decisively rejected. The middling democrats who dominated that meeting recognized that such a party would only encourage plebeian populists to push their more radical goals, and they feared the destabilizing impact. Middling Anti-Federalists also recognized that continued agitation for a second convention would only distract them from the important political battles ahead and inflame popular passions, ultimately weakening their ability to mount an effective opposition. The prospect of extralegal action by plebeian populists worried middling democrats, and their chosen path would minimize that danger. Instead of an anti-Constitution party, a loyal opposition emerged from Harrisburg.

As in their response to the Oswald case, middling democrats in the Harrisburg convention demonstrated their willingness to

pursue their own agenda. Anti-Federalists continued to defend a more democratic vision of politics and law and employed a variety of tactics to fulfill it. They sought to rally popular support by championing their cause in the press, defending their views in the courts, and pursuing an aggressive democratic program in the legislature. What they refused to countenance was extralegal crowd action. Their politics embraced several related goals: amending the federal Constitution, defending the prerogatives of the jury, and asserting the superiority of the legislature over the judiciary. All were compatible with their stance as a loyal opposition. Crucial thereto was their emphasis on the centrality of the public sphere to American constitutionalism. Protecting the public sphere against Federalists and creating institutions to knit localities and states together became a major focus of their loyal opposition. The public sphere would provide a means of unifying the nation without a strong central government. Faith in the public sphere had come to replace an earlier faith in republican virtue.

The transformation of Anti-Federalism into a loyal opposition was gradual. Ratification of the Constitution did not eliminate the underlying tensions between Federalists and Anti-Federalists. Plebeian populists were discouraged by the moderation of middling democrats. The strategy adopted by middling democrats did not, however, mark the demise of plebeian populism; their radical egalitarian and localist agenda did not disappear. Popular unrest, temporarily muted, would remain dormant until the Whiskey Rebellion sparked another, wider popular upheaval.

## Notes

[1]. Saul Cornell, "Reflections on 'The Late Remarkable Revolution in Government': Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," *Pennsylvania Magazine of History and Biography*, CXII (1988), 122–123, 129.

[2]. Centinel [Samuel Bryan?], no. 12, "To the People of Pennsylvania," *IG*, Jan. 23, 1788 (*CA-F*, II, 187–190). Data on republication were obtained from the *DHRC* volumes and files of the DHRC project. It is true that some papers published few, if any, political materials. Anti-Federalists would have taken little solace from this fact, since they believed that it was the duty of all printers to provide open access to essays on important public subjects.

[3]. On the controversy over the Post Office, see *DHRC*, XVI, 540–541.

[4]. A Friend to the People, *FJ*, Apr. 16, 1788 (*DHRC*, XVI, 586); Centinel [Samuel Bryan?], no. 11, "To the People of Pennsylvania," *FJ*, Jan. 16, 1788 (*CA-F*, II, 187); Centinel, no. 15, "To the People of Pennsylvania," *IG*, Feb. 22, 1788 (II, 196).

[5]. George Washington to John Jay, July 18, 1788 (*DHRC*, XVI, 595). On the paranoia and exaggerated quality of Anti-Federalist rhetoric, see Cecelia M. Kenyon, "Men of Little Faith: The Anti-Federalists on the Nature of Representative Government," *WMQ*, 3d Ser., XII (1955), 3–43. This also informs the interpretation of Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York, 1996). For a fascinating effort to locate conspiracy theory in the context of eighteenth-century theories of causation, see Gordon S. Wood, "Conspiracy and the Paranoid Style: Causality and Deceit in the Eighteenth Century," *WMQ*, 3d Ser., XXXIX (1982), 401–441.

[6]. Old Whig [George Bryan, John Smilie, and James Hutchinson?], no. 3, *IG*, Oct. 20, 1787 (*CA-F*, III, 27); Federal Farmer [Melancton Smith?], *Observations Leading to a Fair Examination of the System of Government Proposed by the Late Convention . . . Letters from the Federal Farmer to the Republican* (New York, 1787), no. 4 (II, 250). See also Robert Whitehill, Speech in the Pennsylvania State Ratification Convention (*DHRC*, II, 454); Deliberator, *FJ*, Feb. 20, 1788 (*CA-F*, III, 179).

[7]. A Democratic Federalist, *Pennsylvania Herald, and General Advertiser* (Philadelphia), Oct. 17, 1787 (*CA-F*, III, 59).

[8]. Philadelphiensis [Benjamin Workman?], no. 9, *IG*, Feb. 7, 1788 (*CA-F*, III, 129).

pursue their own agenda. Anti-Federalists continued to defend a more democratic vision of politics and law and employed a variety of tactics to fulfill it. They sought to rally popular support by championing their cause in the press, defending their views in the courts, and pursuing an aggressive democratic program in the legislature. What they refused to countenance was extralegal crowd action. Their politics embraced several related goals: amending the federal Constitution, defending the prerogatives of the jury, and asserting the superiority of the legislature over the judiciary. All were compatible with their stance as a loyal opposition. Crucial thereto was their emphasis on the centrality of the public sphere to American constitutionalism. Protecting the public sphere against Federalists and creating institutions to knit localities and states together became a major focus of their loyal opposition. The public sphere would provide a means of unifying the nation without a strong central government. Faith in the public sphere had come to replace an earlier faith in republican virtue.

The transformation of Anti-Federalism into a loyal opposition was gradual. Ratification of the Constitution did not eliminate the underlying tensions between Federalists and Anti-Federalists. Plebeian populists were discouraged by the moderation of middling democrats. The strategy adopted by middling democrats did not, however, mark the demise of plebeian populism; their radical egalitarian and localist agenda did not disappear. Popular unrest, temporarily muted, would remain dormant until the Whiskey Rebellion sparked another, wider popular upheaval.

## Notes

1. Saul Cornell, "Reflections on 'The Late Remarkable Revolution in Government': Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," *Pennsylvania Magazine of History and Biography,* CXII (1988), 122–123, 129.

2. Centinel [Samuel Bryan?], no. 12, "To the People of Pennsylvania," *IG,* Jan. 23, 1788 (*CA-F,* II, 187–190). Data on republication were obtained from the *DHRC* volumes and files of the DHRC project. It is true that some papers published few, if any, political materials. Anti-Federalists would have taken little solace from this fact, since they believed that it was the duty of all printers to provide open access to essays on important public subjects.

3. On the controversy over the Post Office, see *DHRC,* XVI, 540–541.

4. A Friend to the People, *FJ,* Apr. 16, 1788 (*DHRC,* XVI, 586); Centinel [Samuel Bryan?], no. 11, "To the People of Pennsylvania," *FJ,* Jan. 16, 1788 (*CA-F,* II, 187); Centinel, no. 15, "To the People of Pennsylvania," *IG,* Feb. 22, 1788 (II, 196).

5. George Washington to John Jay, July 18, 1788 (*DHRC,* XVI, 595). On the paranoia and exaggerated quality of Anti-Federalist rhetoric, see Cecelia M. Kenyon, "Men of Little Faith: The Anti-Federalists on the Nature of Representative Government," *WMQ,* 3d Ser., XII (1955), 3–43. This also informs the interpretation of Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York, 1996). For a fascinating effort to locate conspiracy theory in the context of eighteenth-century theories of causation, see Gordon S. Wood, "Conspiracy and the Paranoid Style: Causality and Deceit in the Eighteenth Century," *WMQ,* 3d Ser., XXXIX (1982), 401–441.

6. Old Whig [George Bryan, John Smilie, and James Hutchinson?], no. 3, *IG,* Oct. 20, 1787 (*CA-F,* III, 27); Federal Farmer [Melancton Smith?], *Observations Leading to a Fair Examination of the System of Government Proposed by the Late Convention . . . Letters from the Federal Farmer to the Republican* (New York, 1787), no. 4 (II, 250). See also Robert Whitehill, Speech in the Pennsylvania State Ratification Convention (*DHRC,* II, 454); Deliberator, *FJ,* Feb. 20, 1788 (*CA-F,* III, 179).

7. A Democratic Federalist, *Pennsylvania Herald, and General Advertiser* (Philadelphia), Oct. 17, 1787 (*CA-F,* III, 59).

8. Philadelphiensis [Benjamin Workman?], no. 9, *IG,* Feb. 7, 1788 (*CA-F,* III, 129).

9. James Wilson, Speech in the Pennsylvania State Convention (*DHRC,* II, 455). By the time he published his lectures on law, Wilson had clearly moved to embrace Zengerian ideals; on this point, see Norman L. Rosenberg, *Protecting the Best Men: An Interpretive History of the Law of Libel* (Chapel Hill, N.C., 1986), 65–69.

10. Cincinnatus [Arthur Lee], no. 1, "To James Wilson, Esq.," *New-York Journal,* Nov. 1, 1787 (*CA-F,* VI, 9). For a useful overview of the Zenger case and the relationship between libertarian thought and civic republican ideals in America, see Rosenberg, *Protecting the Best Men,* 35–40.

11. John Smilie, Speech in the Pennsylvania State Convention (*DHRC,* II, 441, 453).

12. For discussion of threats to jury trial by the Constitution, and as a form of judicial control, see above, Chapters 2 and 3.

13. A Friend to the People, *IG,* Oct. 1, 1782, The Printer, Jan. 4, 11, 1783. The events of the 1782 Oswald libel case are discussed briefly in Robert L. Brunhouse, *The Counter-Revolution in Pennsylvania, 1776–1790* (Harrisburg, Pa., 1942), 126.

14. A Gentleman of the Law, *The Case of the Commonwealth against Oswald . . .* (Philadelphia, 1788), 3.

15. Ibid., 9.

16. Ibid., 3.

17. Ibid., 4; *Republica versus Oswald,* in Alexander J. Dallas, *Reports of Cases Ruled and Adjudged in the Several Courts of the United States, and of Pennsylvania . . . ,* I (Philadelphia, 1788), 319; *IG,* July 1, 1788; A Pennsylvanian, *IG,* Sept. 27, 1788. The response to the Oswald case casts doubt on Leonard W. Levy's claim that "in the entire body of Anti-Federalist publications no one had come to grips with any real problems connected with freedom of the press" (*Emergence of a Free Press* [New York, 1985], 244). For a critique of Levy, see David M. Rabban, "The Ahistorical Historian: Leonard Levy on Freedom of Expression in Early American History," *Stanford Law Review,* XXXVII (1985), 795–856.

18. *Republica versus Oswald,* in Dallas, *Reports,* 326.

19. Amicus, *IG,* Sept 23, 1788; X. Z., *IG,* July 28, 1788.

20. One of the Common People, *IG,* Aug. 7, 1788.

21. *Republica versus Oswald,* in Dallas, *Reports,* 325, 326.

22. Rosenberg, *Protecting the Best Men,* 62–65.

23. Ibid.

24. *Republica versus Oswald,* in Dallas, *Reports,* 319; *IG,* July 1, 1788.

25. Eleazer Oswald's Statement, *IG,* Mar. 12, 1788 (*DHRC,* XVI, 557–559).

26. Cornell, "Reflections on 'The Late Remarkable Revolution in Government,' " *PMHB,* CXII (1988) 122–123, 129.

27. For the text of the New York circular letter, see *DHFFE,* I, 44–45. For a general discussion of the dynamics of this process, see Steven R. Boyd, *The Politics of Opposition: Antifederalists and the Acceptance of the Constitution* (Millwood, N.Y., 1979), 131–133.

28. *Carlisle Gazette* (Pennsylvania), July 9, 1788. A number of documents relating to the Harrisburg Convention have been reproduced in *DHFFE,* I, 257–281. Other accounts of Harrisburg include Paul Leicester Ford, *The Origins, Purpose, and Result of the Harrisburg Convention of 1788: A Study in Popular Government* (Brooklyn, N.Y., 1890); Linda Grant DePauw, "The Anticlimax of Antifederalism: The Abortive Second Convention Movement, 1788–89," *Prologue,* II (1970), 98–114; Boyd, *The Politics of Opposition,* 142–144.

29. William Petrikin to John Nicholson, Mar. 23, 1789 (*DHFFE,* I, 406–407).

30. Charles Pettit to Robert Whitehill, June 5, 1788 (*DHRC,* XVIII, 154–155); Pettit to George Washington, Mar. 19, 1791 (II [microfiche], 706).

31. On the Harrisburg convention, see the documents in *DHFFE,* I, 257–281.

32. Pettit to Whitehill, June 5, 1788 (*DHRC,* XVIII, 154).

33. ——— to Francis Hopkinson, Aug. 17, 1788 (*DHFFE,* I, 252); John Armstrong, Jr., to Horatio Gates, New York, May 30 1788 (I, 238).

34. John Montgomery to James Wilson, Mar. 2, 1788 (*DHRC,* II, 704).

35. Richard Peters to George Washington, Sept. 17, 1788 (*DHFFE,* I, 275).

THE OXFORD HANDBOOK OF

# THE U.S. CONSTITUTION

*Edited by*

MARK TUSHNET

MARK A. GRABER

*and*

SANFORD LEVINSON



OXFORD
UNIVERSITY PRESS

Compendium_Cornell
Page 0223

## OXFORD
### UNIVERSITY PRESS

*Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide.*

Oxford    New York

Auckland    Cape Town    Dar es Salaam    Hong Kong    Karachi    Kuala Lumpur    Madrid
Melbourne    Mexico City    Nairobi    New Delhi    Shanghai    Taipei    Toronto

With offices in

Argentina    Austria    Brazil    Chile    Czech Republic    France    Greece    Guatemala    Hungary
Italy    Japan    Poland    Portugal    Singapore    South Korea    Switzerland    Thailand
Turkey    Ukraine    Vietnam

Oxford is a registered trademark of Oxford University Press in the UK and certain other countries.

Published in the United States of America by
Oxford University Press
198 Madison Avenue, New York, NY 10016

© Oxford University Press 2015

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system,
or transmitted, in any form or by any means, without the prior permission in writing of
Oxford University Press, or as expressly permitted by law, by license, or under terms agreed with the
appropriate reproduction rights organization. Inquiries concerning reproduction outside the scope of
the above should be sent to the Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form
and you must impose this same condition on any acquirer.

Library of Congress Cataloging-in-Publication Data

The Oxford handbook of the U.S. Constitution / Edited by Mark Tushnet, Mark A. Graber, and
Sanford Levinson.
    pages cm
Includes bibliographical references and index.
ISBN 978-0-19-024575-7 ((hardback) : alk. paper)
1. Constitutional law—United States. I. Tushnet, Mark V., 1945- editor. II. Graber, Mark A., editor.
III. Levinson, Sanford, 1941- editor. IV. Title: Oxford handbook of the United States Constitution.
KF4548.5.O973 2015
342.73—dc23

2014048046

1  3  5  7  9  8  6  4  2

Printed in the United States of America on acid-free paper

Note to Readers

This publication is designed to provide accurate and authoritative information in regard to
the subject matter covered. It is based upon sources believed to be accurate and reliable and is
intended to be current as of the time it was written. It is sold with the understanding that the
publisher is not engaged in rendering legal, accounting, or other professional services. If legal
advice or other expert assistance is required, the services of a competent professional person
should be sought. Also, to confirm that the information has not been affected or changed by
recent developments, traditional legal research techniques should be used, including checking
primary sources where appropriate.

*(Based on the Declaration of Principles jointly adopted by a Committee of the
American Bar Association and a Committee of Publishers and Associations.)*

You may order this or any other Oxford University Press publication
by visiting the Oxford University Press website at www.oup.com

3 1223 11430 5700

*Contributors*

1. Introduction: Th

2. The Constitutio
   DAVID BRIAN RO

3. Constitutional D
   MICHAEL LES BI

4. The Gilded Age t
   KEN I. KERSCH

5. From the New D
   LUCAS A. POWE,

6. The Reagan Revo
   THOMAS M. KEC

PAR

7. Constitutions as
   NEIL KOMESAR

8. The Constitution
   NEAL DEVINS

9. The Constitution
   MARIAH ZEISBE

10. The Constitution
    JUSTIN CROWE

11. The Uneasy Place
    RUSSELL MUIRHI



Compendium_Cornell
Page 0224

738   RIGHTS

Pope, J, 'Contract, Race, and Freedom of Labor in the Constitutional Law of "Involuntary Servitude"' (2010) 119 *Yale Law Journal* 1474.

———, 'What's Different about the Thirteenth Amendment, and Why Does It Matter?' (2011) 71 *Maryland Law Review* 189.

Reed, D, *On Equal Terms: The Constitutional Politics of Educational Opportunity* (2001).

Reich, C, 'The New Property' (1964) 73 *Yale Law Journal* 733.

———, 'Individual Rights and Social Welfare: The Emerging Legal Issues' (1965) 74 *Yale Law Journal* 1245.

Sager, L, *Justice in Plainclothes: A Theory of American Constitutional Practice* (2004).

Scott, R, 'Public Rights, Social Equality, and the Conceptual Roots of the *Plessy* Challenge' (2008) 106 *Michigan Law Review* 777.

Seidman, L and Tushnet, M, *Remnants of Belief: Contemporary Constitutional Issues* (1996).

Shue, H, *Basic Rights: Subsistence, Affluence, and U.S. Foreign Policy* (1980).

Sklansky, D, 'Quasi-Affirmative Rights in Constitutional Criminal Procedure' (2002) 88 *Virginia Law Review* 1229.

Sparer, E, 'The Legal Right to Health Care: Public Policy and Equal Access' (1976) 6 *The Hastings Center Report* 39.

Steiner, H, 'Moral Rights' in Copp, D (ed), *The Oxford Handbook of Ethical Theory* (2005) 459.

Sunstein, C, 'Against Positive Rights' (1993) 2 *East European Constitutional Review* 35.

———, 'On Property and Constitutionalism' in Michel Rosenfeld (ed), *Constitutionalism, Identity, Difference, and Legitimacy: Theoretical Perspectives* (1994) 396.

———, *The Second Bill of Rights: FDR's Unfinished Revolution and Why We Need It More than Ever* (2004).

———, 'Why Does the American Constitution Lack Social and Economic Guarantees?' (2005) 56 *Syracuse Law Review* 1.

Tani, K, 'Welfare and Rights before the Movement: Rights as a Language of the State' (2012) 122 *Yale Law Journal* 314.

Tarr, G, *Understanding State Constitutions* (1998).

Tribe, L, 'Unraveling National League of Cities: The New Federalism and Affirmative Rights to Essential Government Services' (1977) 90 *Harvard Law Review* 1065.

———, 'The Abortion Funding Conundrum: Inalienable Rights, Affirmative Duties, and the Dilemma of Dependence' (1985) 99 *Harvard Law Review* 330.

Tushnet, M, 'Critique of Rights' (1993) 47 *Southern Methodist University Law Review* 23.

———, 'The Issue of State Action/Horizontal Effect in Comparative Constitutional Law' (2003) 1 *International Journal of Constitutional Law* 79.

———, *Weak Courts, Strong Rights: Judicial Review and Social Welfare Rights in Comparative Constitutional Law* (2008).

Walzer, M, 'Philosophy and Democracy' (1981) 9 *Political Theory* 379.

Weinrib, L, 'Civil Liberties outside the Courts." (forthcoming 2015) 2015 *Supreme Court Review* ___.

Williams, R, *The Law of American State Constitutions* (2009).

Young, K, *Constituting Economic and Social Rights* (2012).

Zackin, E, *Looking for Rights in All the Wrong Places: Why State Constitutions Contain America's Positive Rights* (2013).

..............................

# THE RIG

..............................

## I. THE CHAN
## TO BEAR A

..............................

MODERN American society is
place the number of firearms ir
American politics is dominate
and the other pro-regulation.
ing were not seen as antithetic
zens capable of bearing arms, a
required to outfit themselves w
the burden and the cost of pub
history, rhetoric and reality of
might enroll as few as 50 perce
both in the colonial era and th
militia, even if such a reality
both a right and an obligation.
munities serving to help incul
republicanism.[1]

American constitutionalis
about an expanding heritage
a set of static individual righ
sighted group of "Founding
the right to bear arms in Ame

---

\*   I would like to thank Sanford l
insightful editorial advice. Nathali
assistance for this chapter.

[1]   Cook, P, and Goss, K, *The Gun*
and Colonial Militias," in Cornell,
*Essays on District of Columbia v. H*



e Constitutional Law of "Involuntary

ment, and Why Does It Matter?' (2011)

f *Educational Opportunity* (2001).
*il* 733.
erging Legal Issues' (1965) 74 *Yale Law*

Constitutional Practice (2004).
ceptual Roots of the *Plessy* Challenge'

*mporary Constitutional Issues* (1996).
*Foreign Policy* (1980).
tional Criminal Procedure' (2002) 88

Policy and Equal Access' (1976) 6 *The*

*Handbook of Ethical Theory* (2005) 459.
*opean Constitutional Review* 35.
hel Rosenfeld (ed), *Constitutionalism,*
*spectives* (1994) 396.
*olution and Why We Need It More than*

cial and Economic Guarantees?' (2005)

ights as a Language of the State' (2012)

lew Federalism and Affirmative Rights
*d Law Review* 1065.
ble Rights, Affirmative Duties, and the
*view* 330.

*thodist University Law Review* 23.
in Comparative Constitutional Law'
'79.
*d Social Welfare Rights in Comparative*

*cal Theory* 379.
*rthcoming* 2015) 2015 *Supreme Court*

(2009).
12).
*ces: Why State Constitutions Contain*

# CHAPTER 35

...................................................................

# THE RIGHT TO BEAR ARMS

...................................................................

SAUL CORNELL*
New York, New York

## I. THE CHANGING MEANING OF THE RIGHT TO BEAR ARMS IN AMERICAN HISTORY

MODERN American society is awash in a sea of guns. Estimates vary, but some scholars place the number of firearms in private hands at over three hundred million. Contemporary American politics is dominated by two opposing and antagonistic positions: one pro-gun and the other pro-regulation. Ironically, in the Founding era regulation and arms bearing were not seen as antithetical, but were inextricably linked together. In theory, all citizens capable of bearing arms, a substantial subset of the adult white male population, were required to outfit themselves with a military quality musket and were expected to bear both the burden and the cost of public defense. Of course as was often the case in early American history, rhetoric and reality often diverged from one another. In some colonies the militia might enroll as few as 50 percent of those men able to bear arms. Still, government policy, both in the colonial era and the early republic, was driven by the ideal of a well-regulated militia, even if such a reality proved difficult to achieve. Bearing arms in the militia was both a right and an obligation. The militia was an important local institution in many communities serving to help inculcate the ideals of civic virtue so central to eighteenth-century republicanism.[1]

American constitutionalism is often cast in terms of a simple progressive narrative about an expanding heritage of liberty or alternatively, as a foundational myth in which a set of static individual rights have been handed down to modern Americans by a far-sighted group of "Founding Fathers." Neither of these accounts explains the history of the right to bear arms in America. Among all the rights esteemed by Americans, the right

---

* I would like to thank Sanford Levinson and Mark Tushnet for their thoughtful suggestions and insightful editorial advice. Nathalie Verhaegen, Fordham Law School, provided invaluable research assistance for this chapter.
[1] Cook, P, and Goss, K, *The Gun Debate: What Everyone Needs to Know* (2014). Sweeney, K, "Firearms and Colonial Militias," in Cornell, S and Kozuskanich, N (eds), *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (2013).

to bear arms seems uniquely able to focus constitutional anxieties and aspirations at key moments in American history. In the eighteenth century the dominant fear was collective self-defense and the dangers posed by a powerful British-style standing army controlled by the new federal government. Antebellum Americans grappled with the nation's first gun violence problem, a moment when the market revolution supplied cheap and reliable handguns for the first time. During Reconstruction, Republicans sought to protect the recently emancipated freedmen and later grappled with ways to respond to the armed terror campaign of paramilitary groups such as the Ku Klux Klan. In modern America champions of gun rights are likely to fear the risk of home invasion or the specter of "Black Helicopters," while gun control advocates are more apt to fear the threat of mass public shootings. Each generation of Americans has debated the meaning of the right to bear arms in terms that reflect the fears, preoccupations, and hopes of their own time.[2]

## II.  THE ENGLISH ORIGINS OF
## THE RIGHT TO BEAR ARMS

In 1688 Parliament ousted the Catholic king, James II, and established the Protestant William of Orange as king. Parliament finally achieved its longtime goal of asserting legal superiority over the monarchy. The Declaration of Rights (1688) drafted by Parliament during the Glorious Revolution affirmed a number of basic liberties and asserted such Whig principles as an opposition to professional standing armies in peacetime. The Declaration of Rights also asserted: "That the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law." This right was limited to Protestants, and the type of armament was further restricted by an individual's social class. Finally, the right was constrained in scope: Parliament retained the power to further regulate or restrict the right as it saw fit, to promote public safety and the general welfare of the nation.[3] As the English jurist William Blackstone wrote:

> Having arms for their defence, suitable to their condition and degree, and such as are allowed by law … is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression.[4]

Blackstone described the right of self-preservation as the first law of nature, but the learned jurist accepted the orthodox view embodied in the English common law: individuals ceded this unfettered right in exchange for the protections of the rule of law.

English common law recognized the need to preserve social harmony. ground: individuals were required to re for the use of deadly force to defend hearth mate self-defense was limited.[5]

Many English legal ideas, including realities of colonial life. In the Amer enmeshed with the idea of a well-regu militias served many vital roles. The mi tant in the South where the threat of sla necessary to guard colonial communi were not keen to cede additional land t colonial borders were far from secure, a tions from Spanish settlers to the South

As political tensions mounted durin and America deteriorated in the late 17 papers. By the eve of American Indepe in June 1776, confidently asserted the ne of liberty and republican government. C century, the text reminded Virginians posed by "Standing Armies, in time of affirmed another tenet of Whig belief th to, and governed by, the civil power."[7]

Although Virginia did not single out Declaration of Rights, Pennsylvania be much of the colonial era Pennsylvania necessitated by the ruling Quaker Part French and Indian War, political pressu This compromise meant Quakers and o colony could finally organize a militia to over the volunteer militia gradually fel of pacifism, eventually refusing to mak the American Revolution many Pennsy position. The framers of Pennsylvania's radical pacifism and demanded some ty Pennsylvania Constitution accommoda arms bearing did not extend to armed s

---

[2]  For a good example of the ahistorical model see Halbrook, S, *The Founders Second Amendment* (2012) For an elegant, but somewhat, Whiggish narrative, see Winkler, A, *Gun Fight: The Battle over the Right to Bear Arms in America* (2013). On the fear of disarmament and "Black Helicopters," see Waldman, M, *The Second Amendment: A Biography* (2014).

[3]  Schwoerer, L., 'To Hold and Bear Arms: The English Perspective' in Bogus, C (ed), *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (2000) 207–221.

[4]  Blackstone, W, 1 *Commentaries* 139 (1765).

[5]  Miller, D, 'Guns as Smut: Defending the F *Law Review* 1278, 1317. For the opposing view, : *Anglo-American Right* (1996).

[6]  Cornell, S, *A Well-Regulated Militia: The* *America* (2006).

[7]  Virginia Constitution of 1776, Declaratio *States of America* (1782).

nal anxieties and aspirations at key
ury the dominant fear was collective
tish-style standing army controlled
ans grappled with the nation's first
volution supplied cheap and reliable
, Republicans sought to protect the
with ways to respond to the armed
Ku Klux Klan. In modern America
ome invasion or the specter of "Black
apt to fear the threat of mass public
ted the meaning of the right to bear
and hopes of their own time.[2]

## RIGINS OF
## AR ARMS

les II, and established the Protestant
ved its longtime goal of asserting legal
ights (1688) drafted by Parliament dur-
basic liberties and asserted such Whig
armies in peacetime. The Declaration
e Protestants may have arms for their
ed by law." This right was limited to
estricted by an individual's social class.
ent retained the power to further regu-
lic safety and the general welfare of the
rote:

ndition and degree, and such as are
r due restrictions, of the natural right
ns of society and laws are found insuf-

tion as the first law of nature, but the
died in the English common law: indi-
e for the protections of the rule of law.

---

English common law recognized the need to balance the necessity of self-preservation and the need to preserve social harmony. Under common law there was no right to stand your ground: individuals were required to retreat from attack. A slightly different standard existed for the use of deadly force to defend hearth and home, but even in this case the scope of legitimate self-defense was limited.[5]

Many English legal ideas, including the right to "have arms," were transformed by the realities of colonial life. In the American context the right to have arms became closely enmeshed with the idea of a well-regulated militia. In an era before police forces, colonial militias served many vital roles. The militias put down rebellions and were especially important in the South where the threat of slave insurrection was omnipresent. Militias were also necessary to guard colonial communities from potentially hostile Indian neighbors who were not keen to cede additional land to Englishman. Prior to the French and Indian Wars, colonial borders were far from secure, and militias helped protect against the threat of incursions from Spanish settlers to the South and French settlers to the North.[6]

As political tensions mounted during the imperial crisis and relations between Britain and America deteriorated in the late 1760s, this ancient right was debated in colonial newspapers. By the eve of American Independence, The Virginia Declaration of Rights, drafted in June 1776, confidently asserted the necessity of a well-regulated militia to the preservation of liberty and republican government. Carrying forward the Whig ideals of late seventeenth century, the text reminded Virginians that the militia was a counterweight to the threat posed by "Standing Armies, in time of peace." Finally, The Virginia Declaration of Rights affirmed another tenet of Whig belief that "the military should be under strict subordination to, and governed by, the civil power."[7]

Although Virginia did not single out the right to bear arms for express protection in its Declaration of Rights, Pennsylvania became the first state to do so several months later. For much of the colonial era Pennsylvania was the only colony without a militia, a situation necessitated by the ruling Quaker Party's commitment to pacifism. During the era of the French and Indian War, political pressure forced the Quakers to accept a volunteer militia. This compromise meant Quakers and other pacifists would not have to bear arms, and the colony could finally organize a militia to defend itself against Indian attack. The compromise over the volunteer militia gradually fell apart when Quakers adopted a more radical form of pacifism, eventually refusing to make any contribution to public defense. By the era of the American Revolution many Pennsylvanians had grown deeply resentful of the Quaker position. The framers of Pennsylvania's Constitution refused to accommodate the Quakers' radical pacifism and demanded some type of contribution to public defense. Ultimately, the Pennsylvania Constitution accommodated more moderate pacifists, whose opposition to arms bearing did not extend to armed self-defense or financial support for public defense.

---

rook, S, *The Founders Second Amendment*
, see Winkler, A, *Gun Fight: The Battle over the*
rmament and "Black Helicopters," see Waldm...

Perspective' in Bogus, C (ed), *The Second*
tional Scholars on the Right to Bear Arms* (2000...

Miller, D, 'Guns as Smut: Defending the Home-Bound Second Amendment' (2009) 109 *Columbia Law Review* 1278, 1317. For the opposing view, see Malcolm, J, *To Keep and Bear Arms: The Origins of an Anglo American Right* (1996).

Cornell, S, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006).

Virginia Constitution of 1776, Declaration of Rights' in *The Constitutions of the Several Independent States of America* (1782).

742    RIGHTS

Pennsylvania provided an exemption for those scrupulous about bearing arms, but required payment of a fee or fine in place of service in the militia. [8]

Massachusetts was the first state to explicitly protect a right to "keep and bear arms." This formulation acknowledged the right to keep those arms needed to meet the obligation to bear arms in the militia. The purpose of bearing arms was clearly delineated in the text of the provision that linked such actions with common defense. Two towns in Western Massachusetts expressed reservations about the limited nature of this right, demanding broader protections, including an express recognition of the right to keep arms in the home for reasons of self-defense. Despite these isolated protests no revisions to the constitution were made. [9]

Only four of the original thirteen state constitutions singled out the right to bear arms for explicit protection. New Hampshire's 1784 revised constitution did not expressly protect the right to bear arms, but it did affirm a right of revolution, an implicit endorsement for one particular conception of right to have arms for public defense of liberty. [11]

## III. The Origins of the Second Amendment

The new federal Constitution gave the president and Congress broad powers over the militia, prompting considerable alarm among the Anti-Federalist opponents of the Constitution. Federalists argued that a bill of rights was not only unnecessary, but might even be dangerous to liberty. Many Americans were unpersuaded by such legalistic arguments, clamoring for a written declaration of rights similar to the ones found in some states. The most astute and politically savvy Federalists recognized that some modest concessions to Anti-Federalists would do little harm, and might win over moderate opponents of the Constitution. Several state ratification conventions, including Virginia, Massachusetts, New York, and New Hampshire made official proposals for amendments. Virginia's list included a demand for explicit protection for the right to bear arms. Virginia also recommended express protection for religious pacifists by not requiring them to bear arms. New Hampshire's convention recommended a more broad-based right. Its proposal would have prohibited Congress from disarming citizens, except for those who had been in actual rebellion against the government. New Hampshire's provision did not limit state authority to disarm citizens, a policy many states, including New Hampshire, had exercised during the American Revolution. [12]

[8] Blocher, J, 'The Right Not to Keep or Bear Arms' (2012) 64 Stanford Law Review 1; 'Pennsylvania Constitution of 1776, Declaration of Rights' paragraph 13 in The Constitutions of the Several Independent States of America (1782). On the difference between Quaker and Moravian pacifism, see Marietta, J, 'Conscience, the Quaker Community, and the French and Indian War' (1971) 95 The Pennsylvania Magazine of History and Biography 3; Burkholder, J, 'Neither "Kriegerisch" nor "Quäkerisch": Moravians and the Question of Violence in Eighteenth-Century Pennsylvania' (2012) 12 Journal of Moravian History 149.
[9] 'Massachusetts Constitution' in The Constitutions of the Several Independent States of America (1782).
[10] Cornell, n 6 above, 18–30.
[11] Lutz, D, 'The State Constitutional Pedigree of the U.S. Bill of Rights' (1992) 22 Publius 19. New Hampshire added an express provision protecting the right to bear arms in 1982; see https://www.nh.gov/constitution/billofrights.html.
[12] Rakove, J, 'The Second Amendment: The Highest Stage of Originalism' (2000) 76 Chicago-Kent Law Review 103.

During ratification, Anti-Federalists posed by the Constitution. One issue tect a private right of self-defense. The tinuing importance of common law the eighteenth century. Federalists ratification, but there was broad agree nary matters of criminal law, includ Anti-Federalist essayist, who took th when he wrote: "[I]t ought to be left tion and defence of the citizen again or attempted by individuals to each Coxe echoed this understanding: "[ nal law, exclusively of Congress." The under the new Constitution; the indiv "such as unlicensed public houses, nu The future viability of the state militia the Constitution gave unprecedented Concerns about federal control of the and drew a predictable response fro unfounded. [13]

The job of digesting the official pro ing to the right to bear arms and the spoken opponents of amendments d Madison recognized that a properly fr might assuage the fears of misguided, hope that fervent Anti-Federalists wou designed to weaken the new federal gov and Senate, Madison's original list was religiously scrupulous of bearing arms man expressed alarm that the new fed for deciding who was scrupulous and t Congress also dropped references to the a suggestion that the militia be limited t the power to define the composition of t tinue to be the first line of defense for th not be limited to common defense of the

The Senate edited the House list of s which were then submitted to the states first two amendments, which dealt with sional salaries, the original Fourth Artic

'Brutus' in Storing, H (ed), The Complete A fiensia, Pennsylvania Gazette, Jan. 23, 1788' in Constitution: Writings of the "Other" Federalists
[13] See Rakove, J, n 12 above.

about bearing arms, but required

a right to "keep and bear arms."
arms needed to meet the obliga-
rms was clearly delineated in the
on defense. Two towns in Western
l nature of this right, demanding
the right to keep arms in the home
ts no revisions to the constitution

singled out the right to bear arms
onstitution did not expressly pro-
volution, an implicit endorsement
blic defense of liberty.[11]

## OND AMENDMENT

Congress broad powers over the
Anti-Federalist opponents of the
is not only unnecessary, but might
apersuaded by such legalistic argu-
lar to the ones found in some states.
ized that some modest concessions
in over moderate opponents of the
including Virginia, Massachusetts,
als for amendments. Virginia's list
to bear arms. Virginia also recom-
requiring them to bear arms. New
ased right. Its proposal would have
for those who had been in actual
ovision did not limit state authority
r Hampshire, had exercised during

---

During ratification, Anti-Federalists had raised the alarm over many potential dangers posed by the Constitution. One issue that did not attract much notice was the need to protect a private right of self-defense. This omission makes sense if one understands the continuing importance of common law conceptions of rights to American legal thought in the eighteenth century. Federalists and Anti-Federalists disagreed on many things during ratification, but there was broad agreement that each state would continue to address ordinary matters of criminal law, including the legal definition and limits of self-defense. The Anti-Federalist essayist, who took the Roman pen name Brutus, made this point expressly when he wrote: "[I]t ought to be left to the state governments to provide for the protection and defence of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other. . . ." Writing as a "Freeman," Federalist Tench Coxe echoed this understanding: "[t]he states will regulate and administer the criminal law, *exclusively of Congress.*" The police power of the states would not be diminished under the new Constitution; the individual states would continue to legislate on all matters "such as unlicensed public houses, nuisances, and many other things of the like nature." The future viability of the state militias was a different matter. The government created by the Constitution gave unprecedented power over the militia to the federal government. Concerns about federal control of the militia were frequently voiced by Anti-Federalists and drew a predictable response from Federalists who insisted that these fears were unfounded.[13]

The job of digesting the official proposals for amendments, including those pertaining to the right to bear arms and the militia, fell to James Madison, one of the most outspoken opponents of amendments during ratification. A pragmatist by temperament, Madison recognized that a properly framed list of amendments would be harmless and might assuage the fears of misguided, but earnest Anti-Federalists. (Madison had little hope that fervent Anti-Federalists would settle for anything less than substantial changes designed to weaken the new federal government.) In the course of the debates in the House and Senate, Madison's original list was edited and rearranged. A clause dealing with those religiously scrupulous of bearing arms was dropped when an Anti-Federalist congressman expressed alarm that the new federal government might use this clause as a pretext for deciding who was scrupulous and then using this power to disarm the state militias. Congress also dropped references to the militia as composed of the body of the people and a suggestion that the militia be limited to matters of common defense. Congress was given the power to define the composition of the militia any way it saw fit. The militia would continue to be the first line of defense for the individual states against insurrection, and would not be limited to common defense of the nation.[14]

The Senate edited the House list of seventeen amendments, paring it down to twelve, which were then submitted to the states for ratification. When the states failed to ratify the first two amendments, which dealt with apportionment of representatives and congressional salaries, the original Fourth Article became the Constitution's Second Amendment.

---

nford Law Review 1; 'Pennsylvania
onstitutions of the Several Independent
oravian pacifism, see Marietta, J,
War' (1971) 95 The Pennsylvania
gerisch" nor "Quäkerisch": Moravians
(2012) 12 Journal of Moravian History 143
eral Independent States of America (1781).

f Rights' (1992) 22 Publius 19. New
ar arms in 1982; see https://www.nh.gov/

riginalism' (2000) 76 Chicago-Kent Law

[13] 'Brutus' in Storing, H (ed), The Complete Antifederalist (1981) Vol 2: 358, 400–405; Coxe, T, 'A Freeman, Pennsylvania Gazette, Jan. 23, 1788' in Sheehan, C and McDowell, G (eds), Friends of the Constitution: Writings of the "Other" Federalists (1998) 82.
[14] See Rakove, J, n 12 above.

The final text read: "a well regulated militia, being necessary to the security of a Free State, the right of the people to keep and bear arms, shall not be infringed."[15]

In contrast to the lively press debate over the Constitution, newspapers devoted relatively little space to congressional debate over amendments. "Centinel," one of the most influential Anti-Federalist essayists, expressed his frustration with the language of the amendments, using an early draft of the provision on the right to bear arms as an example.

A well regulated militia, composed of the body of the people, being the best security of a free state, the right of the people to keep and bear arms, shall not be infringed, &c." It is remarkable that this article only makes the observation, "that a well regulated militia, composed of the *body* of the people is the best security of a free state;" it does not ordain, or constitutionally provide for, the establishment of such a one.[14]

Without effective structural changes, Centinel believed that merely declaring such a right was useless as it might lull the people into a false sense of security. Despite some lingering Anti-Federalist protests, the right to bear arms took its place as the Constitution's Second Amendment.[16]

# IV. WELL REGULATED: THE ANTEBELLUM
# RIGHT TO BEAR ARMS

As was the case for all of the new amendments to the Constitution, the Second Amendment did not limit the state's traditional authority under the police powers to regulate firearms or other weapons. Such regulations had existed since the colonial era. Laws regulated the storage of firearms and gunpowder, restricted the discharge of weapons at certain times and in certain places, and limited possession to citizens judged virtuous and loyal. Some states conducted gun censuses to determine the levels of private gun ownership[17]

The most common type of gun laws dealt with arming the militia. Laws from the Founding era specified the types of weapons eligible men needed to bring to muster (muskets for soldiers, horsemen's pistols for dragoons and other mounted units). Militia weapons were subject to inspection by the government, and failure to maintain one's weapon or report to muster properly armed resulted in fines. States also exempted militia weapons from seizure during debt proceedings. The law treated all other arms as ordinary property liable to seizure and subject to the full range of state police power authority. Although one might travel with a musket to muster, the state could prohibit

[15] Cogan, N, *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* (1997) 169–205.
[16] Bowling, K, '"A Tub to the Whale": The Founding Fathers and Adoption of the Federal Bill of Rights' (1988) 8(3) *Journal of the Early Republic* 235–236. Tench Coxe did comment on an early draft of the Second Amendment by noting that citizens "are confirmed by the next article in their right to keep and bear their private arms." See Cornell, n 6 above.
[17] Cornell, S and DeDino, N, 'A Well-Regulated Right: The Early American Origins of Gun Control' (2004) 73 *Fordham Law Review* 487, 491–505.

traveling with a loaded weapon or permission.[18]

Compared to England, America wa reflected the needs of an agrarian soci small percentage of the population opt muskets with bayonet mounts, the typ ta, were not what most citizens wante were far more useful to the average fa lence among those of European descer Regulation was not aimed at reducing the Founding era. Public policy toward of life in a relatively peaceful and prosp

The period between the drafting of tl of state constitution writing in the 1820 The revolutionary world of the Concord such as Davy Crockett and Jim Bowie, and Samuel Colt. The eponymous Bow octs that the burgeoning market revolu and furniture, gun manufacturing ben neered by Eli Whitney. By the time San to the sale of pistols during the Mexicar him to create a mythic image of the ind ity and democracy. The strong link betw equality, and masculinity has been an i since the marketing of Colt's pioneering

The calculus of individual self-defe the nineteenth century with the introd able pocket pistols. Pistols became a r of self-defense. As pistols became chea places, the expanding practice of carry first epidemic of gun violence. For the fi forced to deal with a weapons violence p

The vast majority of the early state ca arms were Southern.[22] By the 1820s, the the new nation.[23] Indeed, the South's l North's most populous cities: New Yor

[18] Cornell, S, 'The Right to Carry Firearms c Historical Realities' (2012) 39 *Fordham Urban*
[19] Sweeney, n 1 above.    [20] Hosely, W,
[21] Cornell, n 6 above, 140–149.
[22] The most important counterexamples are (h); *Walls v. State*, 7 Blackf. 572 (Ind. 1845); *St* largely peopled by migrants from the South; se Old Northwest, 1790-1860' (1995) 15 *Journal of t*
[23] *See* Roth, R, *American Homicide* (2009).

Compendium_Cornell
Page 0231

ry to the security of a Free State,
nfringed."[15]

ution, newspapers devoted rela-
ents. "Centinel," one of the most
ustration with the language of
on the right to bear arms as an

e, being the best security of a free
ot be infringed, &c." It is remark-
ell regulated militia, composed of
does not ordain, or constitution-

that merely declaring such a right
of security. Despite some lingering
place as the Constitution's Second

# E ANTEBELLUM

## ARMS

nstitution, the Second Amendment
e police powers to regulate firearms
he colonial era. Laws regulated the
charge of weapons at certain times
ns judged virtuous and loyal. Some
of private gun ownership[17]

rming the militia. Laws from the
ble men needed to bring to mus-
goons and other mounted units).
vernment, and failure to maintain
ulted in fines. States also exempted
ngs. The law treated all other arms
the full range of state police power
to muster, the state could prohibit

---

traveling with a loaded weapon or discharging a weapon on a muster day without permission.[18]

Compared to England, America was a well-armed society. Patterns of gun ownership reflected the needs of an agrarian society. Pistols were generally a luxury good, and only a small percentage of the population opted to acquire them. Heavy, large-bore military style muskets with bayonet mounts, the type of weapons most essential to a well-regulated militia, were not what most citizens wanted for private use. Guns for hunting and pest control were far more useful to the average farmer. It is also important to note that levels of violence among those of European descent were relatively low in the post-revolutionary era. Regulation was not aimed at reducing gun violence, which was not a significant problem in the Founding era. Public policy toward firearms reflected the social and economic realities of life in a relatively peaceful and prosperous rural society.[19]

The period between the drafting of the first state constitutions and the second great wave of state constitution writing in the 1820s was marked by profound changes in American life. The revolutionary world of the Concord Minuteman gave way to the world of frontiersmen such as Davy Crockett and Jim Bowie, and eventually to the world of the market revolution and Samuel Colt. The eponymous Bowie knife was only one of many new consumer products that the burgeoning market revolution supplied in abundance. In addition to clocks, and furniture, gun manufacturing benefited from the techniques of mass production pioneered by Eli Whitney. By the time Samuel Colt applied his unparalleled marketing genius to the sale of pistols during the Mexican-American War (1848), the conditions were ripe for him to create a mythic image of the individual armed citizen as an icon of American equality and democracy. The strong link between handguns and American ideas about freedom, equality, and masculinity has been an important component of American popular culture since the marketing of Colt's pioneering revolver.[20]

The calculus of individual self-defense changed dramatically in the early decades of the nineteenth century with the introduction of muzzle pistols, including easily concealable pocket pistols. Pistols became a reliable alternative to edged weapons as a method of self-defense. As pistols became cheaper, more reliable, and nearly ubiquitous in some places, the expanding practice of carrying concealable weapons contributed to America's first epidemic of gun violence. For the first time in American history legislatures were now forced to deal with a weapons violence problem.[21]

The vast majority of the early state cases testing the limits and scope of the right to bear arms were Southern.[22] By the 1820s, the Antebellum South was the most violent region in the new nation.[23] Indeed, the South's homicide rates were more than double that of the North's most populous cities: New York and Philadelphia.[24] The South enacted the first

---

, Sources, and Origins (1997) 169–205.
and Adoption of the Federal Bill of Rights'
d comment on an early draft of the Second
article in their right to keep and bear their

arly American Origins of Gun Control'

[18] Cornell, S, 'The Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities' (2012) 39 Fordham Urban Law Journal 1695.
[19] Sweeney, n 1 above.      [20] Hosely, W, Colt: The Making of an American Legend (1996).
[21] Cornell, n 6 above, 140–149.
[22] The most important counterexamples are a trio of Indiana cases: State v. Mitchell, 3 Blackf. 229 (Ind. 1833; Walls v. State, 7 Blackf. 572 (Ind. 1845); State v. Duzan, 6 Blackf. 31 (Ind. 1841). Early Indiana was largely peopled by migrants from the South; see Etcheson, N, 'Manliness and the Political Culture of the Old Northwest, 1790-1860' (1995) 15 Journal of the Early Republic 59, 60 n.2.
[23] See Roth, R, American Homicide (2009).      [24] ibid.

modern-style gun control laws. Opposition to these laws triggered the first legal challenges to gun laws and the earliest state case law on the right to bear arms.[25]

Two radically different models of the right to bear arms emerged in these early Southern cases. In *Bliss v. Commonwealth* (1822), the Kentucky Supreme Court reversed a lower court decision upholding a concealed weapons law.[26] The state's highest court interpreted the right to bear arms as an expansive individual right of self-defense. Yet even in this case, there was pushback from the legislature. In contrast to the state's Supreme Court, the legislature concluded that the suggestion that bearing arms had anything to do with self-defense was "perfectly ridiculous." Ultimately the state amended its constitution to permit the regulation of concealed weapons.[27] In *State v. Buzzard* (1842), the Arkansas Supreme Court ruled that the right to bear arms was inextricably linked to participation in a well-regulated militia. The meaning of the right had to be interpreted with that purpose in mind.[28]

The permissive attitude toward armed self-defense and the right to carry arms in public articulated in *Bliss* was a primarily Southern phenomenon. A very different attitude toward public carry took hold in other parts of America. In the 1830s Massachusetts passed a sweeping law that effectively prohibited the right to travel armed. The distinguished jurist Peter Oxenbridge Thacher summarized the meaning of the law in a grand jury charge that was published and drew praise in the popular press: "In our own Commonwealth no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property." The language of the Massachusetts law was widely emulated in the North, Midwest, Far West, and eventually even in the South. The right to travel armed was limited to cases where individuals had a reasonable fear of imminent threat.[29]

The divergent paths of the South and other parts of the nation on the question of the right to carry arms casts Justice Roger Taney's opinion in *Dred Scott* in a new light. Viewing the right to keep and carry arms as a basic attribute of national citizenship, Taney's rhetoric in *Dred Scott* played on the fears of armed blacks to try and make the idea of black citizenship seem preposterous. If blacks were citizens, Taney wrote they would have "the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak, to hold public meetings upon political affairs, and to keep and carry arms wherever they went."[30] Taney's claim that the right to travel armed was one of the privileges and immunities of citizens may have been true in some parts of the South, but it was demonstrably not

the norm outside of this region
and immunity of national citiz

Ironically, Taney's distinctio
forceful champions in the No
ists. Although early abolitionis
their goal, the growing severity
ment led some to embrace arm
all. By the 1840s militant abolit
mary tool of furthering their g
als such as Lysander Spooner, a
about the right to bear arms in r
Second Amendment right to tak

The passage of the Kansas-Ne
eignty to the center of America
poured into Kansas hoping to in
came heavily armed and showed
Some abolitionists and proslave
of terror against their political
Kansas was plunged into a mini
violence in Kansas through disar
Massachusetts, Charles Sumner, r
"The Crime against Kansas." Sun
the companion of the pioneer, a
man and the beast of the forest." I
gun-in-hand, conquering the West
needed in just self-defense, than n
Constitution must be blotted out
impeached."[34] Sumner's speech cap
the Second Amendment.

Focusing on the decisions of pro
ists in the North tends to produce
meaning and scope of the right to b
bellum constitutional thought cont
This militia-based reading was far
champions including Harvard Law
his influential *Commentaries on the*

---

[25] Homicide rates in upcountry regions of the South were significantly lower than in slave-owning regions, which suggests that Southern slavery encouraged a culture of violence, ibid 202.

[26] *Bliss v. Commonwealth*, 12 Ky. 90 (1822). The other case advancing an expansive individual right was *Nunn v. State*, 1 Ga. (1 Kel.) 243 (1846).

[27] Kentucky House of Representatives, *Journal of the House of Representatives of the Commonwealth of Kentucky* (1837) 73.

[28] For examples of post–Civil War commentators who viewed *Buzzard*, not *Bliss*, as the orthodox view, see Dillon, J, 'The Right to Keep and Bear Arms for Public and Private Defense' (1874) 1 *Central Law Journal* 259; and Bishop, J, *Commentaries on the Criminal Law* (7 edn, 1882).

[29] 1835 Mass. Acts 750; see Thacher, P, *Two Charges to the Grand Jury of the County of Suffolk for the Commonwealth of Massachusetts . . .* (1837). For additional discussion of the Massachusetts model, see Hammond, E, *A Practical Treatise; or an Abridgement of the Law Appertaining to the Office of Justice of the Peace . . .* (1841) 184–186. For the republication of Thacher's grand jury charge and the popularity of this law, see Cornell, n 18 above, 1720.

[30] *Scott v. Sandford*, 60 U.S. 393 (1857).

[?] Charles, P, 'The Faces of the Second A
Standards of Review.' (2012) 60 *Cleveland S*

[?] For a general history of abolitionism,
Slavery (1996); Perry, L, *Radical Abolitionis*
Thought (1973) 237–238.

[?] McPherson, J, *Battle Cry of Freedom:*

[34] Sumner, C, '"The Crime against Kans
States Senate 19-20 May 1856' in *The Liberat*
history, see Aron S, 'Lessons in Conquest: T
Historical Review 125–147.

Compendium_Cornell
Page 0233

gered the first legal challenges
rms.[25]

erged in these early Southern
e Court reversed a lower court
highest court interpreted the
iefense. Yet even in this case,
ite's Supreme Court, the legis-
ything to do with self-defense
:onstitution to permit the reg-
the Arkansas Supreme Court
irticipation in a well-regulated
hat purpose in mind.[28]

he right to carry arms in pub-
non. A very different attitude
the 1830s Massachusetts passed
armed. The distinguished jurist
he law in a grand jury charge
n our own Commonwealth no
other offensive and dangerous
or violence to his person, fam-
s widely emulated in the North,
ght to travel armed was limited
it threat.[29]

tion on the question of the right
cott in a new light. Viewing the
citizenship, Taney's rhetoric in
ake the idea of black citizenship
y would have "the full liberty of
ch its own citizens might speak;
and carry arms wherever they
e of the privileges and immuni-
1th, but it was demonstrably not

antly lower than in slave-owning
of violence, ibid 202.

ing an expansive individual right was

*presentatives of the Commonwealth of*

*zzard*, not *Bliss*, as the orthodox
Private Defense' (1874) 1 *Central Law*
n, 1882).

*ury of the County of Suffolk for the*
on of the Massachusetts model; see
*pertaining to the Office of Justice of*
d jury charge and the popularity of

the norm outside of this region, and hence was not generally understood to be a privilege and immunity of national citizenship.[31]

Ironically, Taney's distinctively Southern view of arms bearing would find its most forceful champions in the North among an increasingly radicalized group of abolition-ists. Although early abolitionists embraced nonviolence as the preferred method to achieve their goal, the growing severity of anti-abolitionist violence and changes within the move-ment led some to embrace armed resistance as the only means to end slavery once and for all. By the 1840s militant abolitionists abandoned the Bible in favor of the rifle as the pri-mary tool of furthering their goal. This practice was theoretically justified by individu-als such as Lysander Spooner, an abolitionist with strong libertarian leanings, who wrote about the right to bear arms in radically individualistic terms and argued that slaves had a Second Amendment right to take up arms against their masters.[32]

The passage of the Kansas-Nebraska Act in 1854 moved the doctrine of popular sover-eignty to the center of American politics. Proslavery forces and abolitionist supporters poured into Kansas hoping to influence the outcome of the slavery question. Both sides came heavily armed and showed little hesitation in using violence to defend themselves. Some abolitionists and proslavery settlers went even further, engaging in a campaign of terror against their political opponents. As a result of this escalation of bloodshed, Kansas was plunged into a miniature civil war in the mid-1850s.[33] Proposals to reduce violence in Kansas through disarmament prompted the ardent abolitionist senator from Massachusetts, Charles Sumner, to deliver his impassioned and widely reprinted speech, "The Crime against Kansas." Sumner reminded the Senate that "[t]he rifle has ever been the companion of the pioneer, and, under God, his tutelary protector against the red man and the beast of the forest." Having conjured up the mythic image of a lone pioneer, gun-in-hand, conquering the West, Sumner added: "[n]ever was this efficient weapon more needed in just self-defense, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached."[34] Sumner's speech captured the essence of the radical abolitionists' vision of the Second Amendment.

Focusing on the decisions of proslavery judges in the South and radicalized abolition-ists in the North tends to produce a distorted view of pre–Civil War thought about the meaning and scope of the right to bear arms. The orthodox view of arms bearing in ante-bellum constitutional thought continued to read the Amendment's language holistically. This militia-based reading was far from hegemonic, but it continued to have prominent champions including Harvard Law professor and Supreme Court justice Joseph Story. In his influential *Commentaries on the Constitution* Story developed his view of the Second

[31] Charles, P, 'The Faces of the Second Amendment outside the Home: History versus Ahistorical Standards of Review,' (2012) 60 *Cleveland State Law Review* 1, 8.

[32] For a general history of abolitionism, *see* Stewart, B, *Holy Warriors: The Abolitionists and American Slavery* (1996); Perry, L, *Radical Abolitionism: Anarchy and the Government of God in Antislavery Thought* (1973) 237–238.

[33] McPherson, J, *Battle Cry of Freedom: The Civil War Era* (1988).

[34] Sumner, C, '"The Crime against Kansas: The Apologies for the Crime; The True Remedy" United States Senate 19-20 May 1856' in *The Liberator XXVI* (1856); on the myth of the lone pioneer in western history, see Aron S, 'Lessons in Conquest: Towards a Greater Western History' (1994) 63(2) *The Pacific Historical Review* 125–147.

Amendment at considerable length. He also produced a condensed and simplified version of his theory in a popular text designed for use in the common schools of his home state of Massachusetts. Casting his discussion of bearing arms as a classic New England jeremiad, Story lamented the rise of excessive individualism in American culture, a development that had corroded the nation's sense of civic obligation and threatened the purpose and function of the Second Amendment. Echoing Founding era conceptions, Story's vision of arms bearing was inclusive; the militia encompassed the vast majority of white male citizens able to bear arms. He also accepted that the scope of the right was defined by the Amendment's preamble: constitutional protection for arms bearing made it possible to maintain a well-regulated militia that was a bulwark against tyrannical government and the dangers of a powerful standing army.[35]

# V. The Civil War, Reconstruction, and the Emergence of A Federal Second Amendment Jurisprudence

The Civil War proved to be a watershed moment in the contentious history of the Second Amendment. The idea that a state might use its militia against the federal government, an idea invoked, but not fully theorized during the original debate over the Constitution in 1788, had been elaborated by a variety of constitutional thinkers in the decades after ratification. Although this theory was most fully developed by Southern constitutional theorists, it was hardly unique to the South. The Union's triumph over the South in the Civil War effectively discredited this insurrectionary theory of states' rights, much as John Brown's prewar raid on Harpers Ferry had discredited the radical abolitionist idea that individuals, including slaves, might take up arms against their masters or their government.

The defeat of the South and the problem of postwar reconstruction began a new era in the constitutional debate over the meaning of the right to bear arms. In addition to demanding an end to slavery, Northern Republicans insisted that basic rights be extended to the African-American population. Many Southerners resisted this effort to provide freed persons with basic liberties. In late 1865, Mississippi and South Carolina became the first states in the postwar South to adopt "black codes," laws designed to severely limit freedmen's rights, including ownership and use of firearms.[36]

The effort to disarm blacks prompted a swift response from American military forces charged with keeping order in the Reconstruction South. General Daniel E. Sickles was so outraged by South Carolina's exclusion of blacks from the militia and general disarmament that he issued a military order suspending the statute. Sickles decreed "all laws shall be applicable alike to all the inhabitants," and proclaimed "the constitutional rights

of all loyal and well-disposed ... Sickles's order prohibited race ... legitimately exclude certain ... racially neutral restrictions o... the large number of conceale... ried over from the antebellum ... influenced by antebellum abol... a well-regulated state. The idea ... during Reconstruction, but cor...

The most important legal de... Fourteenth Amendment. Repul... congressmen John A. Bingha... Amendment in terms that clea... bear arms. Scholars continue to ... Bingham and Howard's vision ... latures and the vast majority of ... Amendment presents even more ... the halls of Congress to the natio... unitary meaning of the clause be...

The continuing problem of Sou... dominated by former Confederate ... temporarily disbanding all militi... the proposal to disband Southern ... efforts to find a middle ground on ... the situation in the South, Republ... passed.[40]

Eliminating the neo-Confeder... lence in the South. Indeed, the situ... to regret their decision to disband ... to restore order in the South.[41] The ... Americans, became a high prior... blacks to serve alongside whites ... militia. Dubbed the "Negro Militia ... which were outfitted with the late... tias within the African-American ... function. Drilling and parading s...

---

[35]   Story's republican vision fits neither the modern gun rights nor gun control visions of the Amendment; see Story, J, 1 *Commentaries on the Constitution* (1833) 275 and Story, *The Constitutional Class Book* (1834) 149.
[36]   Foner, E, *Reconstruction: America's Unfinished Revolution: 1863-1877* (1988).

[37]   'Order of General Sickles, Disregard ... *History of the United States of America du* ... 1870] (1875) 36–37.
[38]   On the centrality of the idea of well-... W, *The People's Welfare: Law and Regulati* ...
[39]   For a summary of the major interpret... of 'Original Meaning': Recent Approache...
[40]   Bogus, C, 'What Does the Second Ar... *Constitutional Commentary* 485–516.
[41]   *Congressional Globe*, 40th Congress, ...

densed and simplified version
on schools of his home state of
classic New England jeremiad,
an culture, a development that
atened the purpose and func-
ceptions, Story's vision of arms
ority of white male citizens able
as defined by the Amendment's
ade it possible to maintain a
al government and the dangers

## STRUCTION,
## DERAL SECOND
## UDENCE

contentious history of the Second
. against the federal government,
inal debate over the Constitution
onal thinkers in the decades after
loped by Southern constitutional
n's triumph over the South in the
theory of states' rights, much as
dited the radical abolitionist idea
ns against their masters or their

construction began a new era in the
bear arms. In addition to demand-
hat basic rights be extended to the
sted this effort to provide freed per-
uth Carolina became the first states
signed to severely limit freedmen's

nse from American military forces
outh. General Daniel E. Sickles was
from the militia and general disar-
he statute. Sickles decreed "all laws
roclaimed "the constitutional rights

its nor gun control visions of the
(1833) 275 and Story, *The Constitutional*

n: 1863–1877 (1988).

of all loyal and well-disposed inhabitants to bear arms will not be infringed." Although Sickles's order prohibited race-based disarmament, he acknowledged that the state might legitimately exclude certain categories of persons from owning guns, and might enact racially neutral restrictions on the use of firearms. Sickles was particularly alarmed by the large number of concealed weapons carried by whites in the South, a practice carried over from the antebellum period.[37] Republican ideas about liberty were not only influenced by antebellum abolitionist thought, but were also shaped by Whig notions of a well-regulated state. The idea of regulation was not antithetical the Second Amendment during Reconstruction, but continued to be essential to promoting its aims.[38]

The most important legal development in this era was the drafting and adoption of the Fourteenth Amendment. Republican senator Jacob Howard of Michigan, and Republican congressmen John A. Bingham of Ohio, defended section one of the Fourteenth Amendment in terms that clearly referenced basic liberties that included the right to bear arms. Scholars continue to argue over how many other members of Congress shared Bingham and Howard's vision of section one. Sorting out what the individual state legislatures and the vast majority of Americans thought about the meaning of the Fourteenth Amendment presents even more intractable historical problems. Once debate shifted from the halls of Congress to the nation's state houses and town squares, the evidence of a single unitary meaning of the clause becomes more problematic.[39]

The continuing problem of Southern violence, particularly the activities of state militias dominated by former Confederate soldiers, prompted congressional Republicans to propose temporarily disbanding all militias in the South. Congressional Democrats protested that the proposal to disband Southern militias clearly violated the Second Amendment. Despite efforts to find a middle ground on the issue and craft a more narrowly tailored response to the situation in the South, Republican voices prevailed and the bill disbanding the militia passed.[40]

Eliminating the neo-Confederate state militias did little to lessen the chaos and violence in the South. Indeed, the situation in parts of the South prompted some Republicans to regret their decision to disband the militia. Some type of military force was necessary to restore order in the South.[41] The formation of a new militia, one that included African Americans, became a high priority for Southern Republicans. The decision to allow blacks to serve alongside whites meant that most Southerners refused to join the new militia. Dubbed the "Negro Militia" by contemporaries, blacks eagerly joined these units, which were outfitted with the latest weaponry. The political and social role of the militias within the African-American community was at least as important as its military function. Drilling and parading served an important symbolic function, inspiring and

[37] 'Order of General Sickles, Disregarding the Code, January 17, 1866' in McPherson, E, *The Political History of the United States of America during the Period of Reconstruction* (from April 15, 1865, to July 15, 1870) (1875) 36–37.

[38] On the centrality of the idea of well-regulated liberty to Whig and Republican thought, see Novak, W, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (1996).

[39] For a summary of the major interpretive positions on incorporation, see Brett B, 'The Magic Mirror of "Original Meaning": Recent Approaches to the Fourteenth Amendment' (2013) 66 *Maine Law Review* 29.

[40] Bogus, C, 'What Does the Second Amendment Restrict? A Collective Rights Analysis' (2002) 18 *Constitutional Commentary* 485–516.

[41] *Congressional Globe*, 40th Congress, 3rd Session, 84.

rallying members of the African-American community. For Republicans, participation in the new militia became one of the most important privileges and immunities of citizenship, a foundation for the exercise of other rights such as voting or serving on juries.[42]

The arming of the Negro militias was met with especially fierce resistance in South Carolina. Violent clashes between the Ku Klux Klan and the Negro Militia in 1869 prompted a congressional investigation. Democrats denounced the militia as a tool of Republican tyranny. Republicans argued that the militia was the only means to protect the black population from Klan terror.[43] In response to heightened violence in the South, Congress enacted a series of Enforcement Acts, beginning in 1870. The third act, dubbed the Ku Klux Klan Act, criminalized conspiracies against the civil rights of citizens, and empowered the president to use military force to suppress violence. Under the Act, the federal government was given broad new powers to arrest and detain suspects. The newly organized Department of Justice developed a theory of Second Amendment incorporation using the recently ratified Fourteenth Amendment. The first case to test the theory, *United States. v. Mitchell*, was based on a grim set of facts. A "Negro militia" captain Jim Williams was brutally murdered by the Klan. The government charged that the Klan had been engaged in a conspiracy to deprive Williams of his constitutional right to bear arms and to intimidate him and thereby prevent his exercise of his constitutional right to vote.[44]

> Imagine, if you like—but we have not to draw upon the imagination for the facts—a militia company, organized in York County, and a combination and conspiracy to rob the people of their arms, and to prevent them from keeping and bearing arms furnished to them by the State Government. Is not that a conspiracy to defeat the right of the citizens, secured by the Constitution of the United States, and guaranteed by the Fourteenth Amendment?[45]

The incorporation argument advanced by the government in the KKK trials did not treat the Second Amendment as a private right of self-defense, but rather as a militia-based right. The Klan had disarmed an officer of the militia and confiscated weapons provided to him by the State of South Carolina. In a cruel irony, it was the Klan's lawyers, Reverdy Johnson and Henry Stanbery, prominent Democrats and respected constitutional lawyers, who asserted an individual right of self-defense. This private right was set against the incorporated right to bear arms in the militia, defended by the government. Johnson and Stanberry justified disarming the Negro militia as a matter of self-preservation. As far as the Second Amendment was concerned, they argued that it was best understood in states

[42] Singletary, O, *Negro Militia and Reconstruction* (1957); and Kantrowitz, S, 'One Man's Mob Is Another Man's Militia: Violence, Manhood, and Authority in Reconstruction South Carolina' in Daley, J, Gilmore, G and Simon, B (eds), *Jumpin' Jim Crow: Southern Politics from Civil War to Civil Rights* (2000) 67–87. For the individual rights reading of arms bearing during Reconstruction, see Amar, A, *The Bill of Rights Creation and Reconstruction* (2000).

[43] *Report of the Joint Select Committee to Inquire into the Condition of Affairs in the Late Insurrectionary States, 42 Congress*, 2nd Session, Report, No. 22 (1872).

[44] Hall, K, 'Political Power and Constitutional Legitimacy: The South Carolina Ku Klux Klan Trials, 1871-1872' (1984) 33 *Emory Law Journal* 921, 926–927.

[45] Corbin, D, 'Opening Statement in The Case of Robert Hays Mitchell et al.' in Pitman, B and Post, I. (reporters), *Proceedings in the Ku Klux Trials at Columbia, S.C. In the United States Circuit Court, November Term, 1871* (repr ed 1969) 147–148.

rights terms: "a restriction upon Con... the two-judge panel hearing the ca... ment's theory of Second Amendment... voting issue, not the Second Amendm...

The issue of Second Amendment i... in *United States v. Cruikshank* (1875... most brutal episodes in the Reconst... South Carolina KKK trials, where th... ally resolved by the courts, *Cruiksha...* full weight behind the more narrow s... had defended the Klan in the South... in unambiguous terms that "bearing... right protected by the Second Amend... well-regulated militia. In essence, the... carry arms for purposes of self-defen... by the Second Amendment. *Cruiksha...* al vision of Reconstruction embodied...

Although the issue of Second Ame... rejected by the courts, the regulation o... ing Reconstruction. Republicans, incl... tion one of the Fourteenth Amendm... regulate firearms for reasons of public... neutral manner. Reconstruction was a... States, cities, and towns enacted even... antebellum era. Prohibitions on the sal... the iconic frontier town of the Wild We...

## VI.  GANGSTER V...
## AND FALL OF THE C...

At the dawn of the new century, Cong... Act of 1903 and the National Defense... militia. In place of the traditional civi...

[46] *Proceedings in the Ku Klux Trials*, stateme... *Ku Klux Trials*, statement of Johnson, R, n 47 al... 1871)

[47] *United States v. Cruikshank*, 92 U.S. 568 (1... Massacre, The Supreme Court, and the Betrayal...

[48] *Presser v. Illinois*, 116 U.S. 264 (1886), a cas... Illinois statute that prohibited citizens from pa...

[49] Cornell, S and Florence, J, 'The Right to B... Rights or Gun Regulation' (2010) 50 *Santa Clar...* regulation in Dodge City and other cattle towns...

y. For Republicans, participation
privileges and immunities of citi-
h as voting or serving on juries.[42]
ecially fierce resistance in South
and the Negro Militia in 1869
enounced the militia as a tool of
tia was the only means to protect
heightened violence in the South,
ing in 1870. The third act, dubbed
st the civil rights of citizens, and
ress violence. Under the Act, the
est and conspiracy to rob the people of
f Second Amendment incorpora-
t. The first case to test the theory,
cts. A "Negro militia" captain Jim
vernment charged that the Klan
of his constitutional right to bear
ercise of his constitutional right to

nagination for the facts—a militia
nd conspiracy to rob the people of
ng arms furnished to them by the
ight of the citizens, secured by the
Fourteenth Amendment?[45]

nment in the KKK trials did not
:fense, but rather as a militia-based
and confiscated weapons provided
it was the Klan's lawyers, Reverdy
and respected constitutional law-
his private right was set against the
d by the government. Johnson and
atter of self-preservation. As far as
at it was best understood in states'

Kantrowitz, S, 'One Man's Mob Is
construction South Carolina' in Dailey,
itics from Civil War to Civil Rights
uring Reconstruction, see Amar A, The

lition of Affairs in the Late
1872).
e South Carolina Ku Klux Klan Trials,

Mitchell et al.,' in Pitman, B and Post,
In the United States Circuit Court,

rights terms: "a restriction upon Congress" and "one of the rights of the State."[46] Ultimately, the two-judge panel hearing the case refused to rule on the constitutionality of government's theory of Second Amendment incorporation. In the end the government won on the voting issue, not the Second Amendment.

The issue of Second Amendment incorporation finally came before the Supreme Court in *United States v. Cruikshank* (1875). The case was triggered by one of the bloodiest and most brutal episodes in the Reconstruction era, the Colfax Massacre. In contrast to the South Carolina KKK trials, where the Second Amendment issue was raised but never actually resolved by the courts, *Cruikshank* considered this issue directly. The Court placed its full weight behind the more narrow states' rights view championed by the Democrats who had defended the Klan in the South Carolina case.[47] Indeed, the Court went on to assert in unambiguous terms that "bearing arms for lawful purposes" was not identical to the right protected by the Second Amendment that linked bearing arms to participation in a well-regulated militia. In essence, the Court argued that the common law right to keep and carry arms for purposes of self-defense was distinct from the right to bear arms protected by the Second Amendment. *Cruikshank* completed the high Court's retreat from the radical vision of Reconstruction embodied in the Fourteenth Amendment.[48]

Although the issue of Second Amendment incorporation was debated and eventually rejected by the courts, the regulation of firearms by individual states remained robust during Reconstruction. Republicans, including John Bingham, the primary architect of section one of the Fourteenth Amendment, believed that the individual states were free to regulate firearms for reasons of public safety, as long as such policies were done in a racially neutral manner. Reconstruction was an era of enhanced, not diminished, gun regulation. States, cities, and towns enacted even more stringent regulations than those in place in the antebellum era. Prohibitions on the sale of pistols were enacted in some states. Dodge City, the iconic frontier town of the Wild West, banned all public carry.[49]

# VI. GANGSTER WEAPONS AND THE RISE AND FALL OF THE COLLECTIVE RIGHTS THEORY

At the dawn of the new century, Congress took up the task of militia reform. The Dick Act of 1903 and the National Defense Act of 1916 transformed the organization of the militia. In place of the traditional civic republican model of the militia favored by the

[46] *Proceedings in the Ku Klux Trials*, statement of Stanberry, H, n 47 above, 147–148; *Proceedings in the Ku Klux Trials*, statement of Johnson, R, n 47 above, 146–147; *United States v. Avery*, 80 U.S. 253 (13 Wall.) (1871).

[47] *United States v. Cruikshank*, 92 U.S. 568 (1875); Lane, C, *The Day Freedom Died: The Colfax Massacre, The Supreme Court, and the Betrayal of Reconstruction* (2008).

[48] *Presser v. Illinois*, 116 U.S. 264 (1886), a case that built on the legacy of *Cruikshank* and upheld an Illinois statute that prohibited citizens from parading with arms.

[49] Cornell, S and Florence, J, 'The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation' (2010) 50 *Santa Clara Law Review* 1043; on violence in the West and gun regulation in Dodge City and other cattle towns, see. Dykstra, R, *The Cattle Towns* (1968) 121–122.

Case 3:19-cv-01537-BEN-JLB  Document 154  Filed 10/22/22  PageID.17645  Page 254 of 265

Founding generation, a new National Guard system was created. The new militia would be professionalized and most important, controlled by the federal government. By wresting control of the militia from the states these acts had the practical effect of draining the original conception of the Second Amendment of much of its function as a guardian of federalism.[50]

The reorganization of militia into the modern National Guard prompted a more wide-ranging debate over the value of military training for civilians. Critics not only proclaimed opposition to "making military training compulsory," but went on to argue that "it is entirely adverse to the spirit and principles of the Constitution." This view seemed to turn the traditional early American conception of the militia on its head. The idea of the citizen-solider was no longer the Minuteman, but the modern National Guardsman. As one contemporary legal scholar noted, "the day is past when a group of hardy pioneer citizens could defend their rights by a few muskets or homemade pikes."[51]

Changing ideas about the militia and fears about crime facilitated a major interpretive shift in thinking about the Second Amendment. This change was crystalized in a short but influential article in the *Harvard Law Review* (1914). Lucillus A. Emery, chief justice of the Maine Supreme Court, articulated a new theory of the Second Amendment that would set the terms of debate around this constitutional idea for decades to come. Emery's vision of the Second Amendment reflected the profound transformation of American society in the modern age, changes that included the "greater deadliness of small arms," the "alarming frequency of homicides," and the rise of a distinctive criminal class "known as 'gunmen.'" These developments led Emery to ponder the "scope, and limitation of the constitutional guaranty of a right to keep and bear arms,—of the extent of its restraint upon the legislative power." He concluded that the Second Amendment posed minimal restraints on the power to regulate firearms.[52]

Perhaps the most significant aspect of Emery's argument was his explicit characterization of the Second Amendment as a collective right. "The right guaranteed is not so much to the individual for his private quarrels or feuds as to the people collectively for the common defense." After the publication of Emery's article the debate over the meaning of the Second Amendment was cast in terms of a simple dichotomy: collective versus individual right.[53] This new framework was well suited to the needs of those seeking to promote more comprehensive gun regulation.

Demand for more effective gun control was closely tied to public perception of crime. The growth of organized crime during the Prohibition Era made gangster weapons, such as the machine gun, a powerful symbol of the danger posed by firearms. The demands for some type of federal involvement finally bore fruit in 1934, when Congress enacted the first comprehensive federal firearms law. The National Firearms Act of 1934 regulated

firearms dealers and imposed
machine guns. The law took a
this power to target the types
National Firearms Act of 1934
guns, machine guns, and silen
which was closely identified wi

The constitutionality of thi
*United States v. Miller* (1939). Th
allegedly transported an unreg
Court in Arkansas quashed the
ernment appealed directly to t
than defend their Second Amen
ecution and imprisonment. Wh
of the case was briefed.[35]

Justice James C. McReynolds
gloss on the case in the introduc
in court. The *New York Times*
drawled from the bench: 'We co
service and we are unable to say
The Court concluded that "in th
session or use of 'a shotgun havi
time has some reasonable relatio
militia, we cannot say that the Se
such an instrument." Miller's wea
the militia, nor did the occasion o
decisively rejected the notion of a
firearms for purposes unconnecte

Although the Court had not em
language of Emery's collective righ
history, drawing on the civic conc
advanced in several antebellum ca
rights theory the reaction was diffe
establishment that contemporary
*Miller* the collective rights view. Ir
this consensus when it averred tha
collective body."[58]

---

[50]  Uviller R, and Merkel, W, *The Militia and the Right to Arms; Or, How the Second Amendment Fell Silent* (2002). The militia was divided into the organized militia, the National Guard, and a more amorphous unorganized Militia.

[51]  Ansell, S, 'Legal and Historical Aspects of the Militia' (1916-1917) *Yale Law Journal* 26, 471-480; 'Dr. Cadman on Military Training in the Schools' in Beman, L (ed), *Military Training Compulsory in Schools and College* (1926) 132.

[52]  Emery, L, 'The Constitutional Right to Keep and Bear Arms' (1914-1915) 28 *Harvard Law Review* 473-477.

[53]  ibid 473, 476-77; see also *Salina v. Blaksley*, 72 Kan. 230 (1905).

[54]  DeConde, A, *Gun Violence in Amer
Gun Control* (5 edn 2012).
[55]  *See* 'Brief of the United States' in *Un.
The Peculiar Story of US. v. Miller' (2008
'Supreme Court bars sawed-off shot
*New York Times*, 16 May 1939.
[57]  *Miller*, n 55 above.
[58]  *Aymette v. State*, 21 Tenn. (2 Hump.)

firearms dealers and imposed a series of taxes on particular classes of weapons, including machine guns. The law took advantage of congressional authority to levy taxes and used this power to target the types of weapons associated with gangsters and bootleggers. The National Firearms Act of 1934 taxed the manufacture, sale, and transfer of sawed-off shotguns, machine guns, and silencers. The Act sought to limit access to this class of weapons, which was closely identified with criminal behavior.[54]

The constitutionality of this law was challenged on Second Amendment grounds in *United States v. Miller* (1939). The defendants in the case, Jack Miller and Frank Layton, had allegedly transported an unregistered, sawed-off shotgun across state lines. The District Court in Arkansas quashed the indictment on Second Amendment grounds and the government appealed directly to the Supreme Court, which agreed to hear the case. Rather than defend their Second Amendment rights, Miller and Layton fled to avoid further prosecution and imprisonment. When the high court heard the case only the government side of the case was briefed.[55]

Justice James C. McReynolds wrote the majority opinion in *Miller* and offered his own gloss on the case in the introductory remarks he made before the decision was announced in court. The *New York Times* reporter covering the case wrote "Justice McReynolds drawled from the bench: 'We construe the amendment as having relation to the military service and we are unable to say that a sawed-off shotgun has relation to the militia.'"[56] The Court concluded that "in the absence of any evidence tending to show that the possession or use of 'a shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." Miller's weapon was not "part of the ordinary military equipment" of the militia, nor did the occasion of its use "contribute to the common defense." The Court decisively rejected the notion of an individual right under the Second Amendment to own firearms for purposes unconnected with militia activity.[57]

Although the Court had not embraced an individual rights view, it had also rejected the language of Emery's collective rights theory. The Court appeared to reach back further into history, drawing on the civic conception of arms bearing as a militia- based right, a view advanced in several antebellum cases. Among legal scholars steeped in Emery's collective rights theory the reaction was different. Emery's interpretation was so pervasive in the legal establishment that contemporary accounts of the case in law journals simply imputed to *Miller* the collective rights view. In its "Case Notes," the *California Law Review* captured this consensus when it averred that the Court "held that the right refers to the people as a collective body."[58]

[54] DeConde, A, *Gun Violence in America: The Struggle for Control* (2001); Spitzer, R, *The Politics of Gun Control* (5 edn 2012).

[55] *See* 'Brief of the United States' in *United States v. Miller*, 307 U.S. 174 (1939) (No. 696) at 4–5; Frye, B, 'The Peculiar Story of US. v. Miller' (2008) 3 *New York University Journal of Law and Liberty* 48.

[56] 'Supreme Court bars sawed-off shotgun: Denies Constitution gives right to carry this weapon' *New York Times*, 16 May 1939.

[57] *Miller*, n 55 above.

[58] *Aymette v. State*, 21 Tenn. (2 Hump.) 154 (1840); Case Notes (1939–1940) 13 *California Law Review* 130.

---

*(partial text visible in left margin from facing page)*

ted. The new militia would
eral government. By wrest-
ctical effect of draining the
s function as a guardian of

l Guard prompted a more
vilians. Critics not only pro-
*k*," but went on to argue that
tution." This view seemed to
n on its head. The idea of the
rn National Guardsman. As
a group of hardy pioneer citi-
pikes."[51]

cilitated a major interpretive
was crystalized in a short but
A. Emery, chief justice of the
d Amendment that would set
les to come. Emery's vision of
on of American society in the
of small arms," the "alarming
al class "known as 'gunmen.'"
mitation of the constitutional
s restraint upon the legislative
inimal restraints on the power

t was his explicit characteriza-
ght guaranteed is not so much
people collectively for the com-
debate over the meaning of the
ny: collective versus individual
those seeking to promote more

l to public perception of crime.
a made gangster weapons, such
osed by firearms. The demands
n 1934, when Congress enacted
l Firearms Act of 1934 regulated

*r, How the Second Amendment
, the National Guard, and a more*

7) *Yale Law Journal* 26, 471–480;
*Military Training Compulsory in*

1914-1915) 28 *Harvard Law Review*

754    RIGHTS

# VII.  Gun Rights Versus Gun Control: The Contours of the Modern Debate Over the Right to Bear Arms

The founding of the National Rifle Association (NRA) in 1871 had little to do with the Second Amendment. Originally the organization, founded by two Civil War veterans, was focused on marksmanship, a concern that was itself driven by the recognition that Southerners were generally more familiar with firearms and better marksman on the whole than their Northern counterparts. For most of the twentieth century, the NRA was a sportsman's organization that dabbled in politics on occasion when issues of firearms regulation were at issue. Even after the Second World War, one could easily peruse the NRA's showcase publication, the *American Rifleman,* for months and not stumble upon any reference to the Second Amendment. The NRA's membership and its focus would shift as America entered the turbulent era of the 1960s as the debate over the role of guns in American society changed once again.[59]

Attitudes toward guns in American history have always been profoundly shaped by cultural fears, particularly during times of social unrest. The tumultuous era of the 1960s was no exception. The assassinations of President Kennedy and his brother Bobby Kennedy, and increasing levels of urban violence and crime galvanized support for new, more sweeping gun control laws. As was often true at key moments in American history, the politics of race also shaped gun policy. The rise of the Black Panther movement and its radical vision of the Second Amendment and armed self-defense frightened conservatives as well as liberals and prompted passage of new restrictions on firearms in California and other places.[60]

The first major piece of federal legislation to emerge in response to the turbulence of the 1960s was the Gun Control Act of 1968. This new law expanded license and record-keeping requirements for dealers and restricted handgun sales over state lines. Mail order sales of rifles and shotguns were prohibited. The Act also defined a number of categories of persons who were banned from possessing firearms.[61]

The vast majority of gun violence in America was accomplished with handguns, which accounted for 75 percent of gun homicides. In response to this fact, a number of localities, including the crime-ridden city of Washington, DC, enacted stringent handgun bans. The DC law (1976) made it virtually impossible to legally obtain and register a handgun in the city. It also imposed stringent safe storage requirements. For a brief moment it seemed that gun control had not yet hardened into a partisan issue, as elements of both the Democratic and Republican parties supported strong gun control laws.[62]

At the same time the gun control groups were organizing to ban handguns, an even more ardent, better organized and funded gun rights movement was also emerging. A key

---

[59] Spitzer, n 54 above.    [60] Winkler, n 2 above.

[61] On fear and the perception of risk in the gun debate see, Kahan D and Braham, D, 'More Statistics, Less Persuasion: A Culture Theory of Gun-Risk Perceptions' (2003) 151 *University of Pennsylvania Law Review* 1291.

[62] Rostron, A, 'Protecting Gun Rights and Improving Gun Control after *District of Columbia v. Heller*' (2009) 13 *Lewis and Clark Law Review* 383.

---

development in this process o〈
A group of radical gun rights
organization's leadership. The
formed, and committed itsel
Amendment at its core.[63]

Public debate over guns wa
tures this division than a hilar
which Homer joins the NRA. Re
precocious daughter Lisa infor
risk of gun violence, prompting
Amendment:

HOMER: "But I have to have a gun
LISA: "Dad! The Second Amendr
meaning today!"
HOMER: "You couldn't be more w
could just walk in here anytim

The episode underscores the 
lic discourse by the end of the tw
rights supporters had effectively
forming it into an expansive indi
well-regulated militia. Gun contr〈
arguments, viewing the right to be
guage of rights, gun control advoca
health terms. Gun violence was a p
cies to those used to reduce automo
uct design, education, cultural chan
Evidence of Emery's lingering in
still be seen when the conservative
of the Second Amendment as a fr
this essay could hardly have been w
by the NRA and a host of libertaria
on the Second Amendment in the e
paper trail for a new revisionist acc〈
the view of the academic establishm
the accumulated weight of this ne
of any strong alternative scholarly
debate over the meaning of the rigl
guished constitutional scholar with

[63] Winkler, n 2 above.
[64] The Simpsons: The Cartridge Family'
[65] of the Second Amendment rhetoric of
*Scheme to the Destroy the Second Amendmei
Private Guns and Public Health* (2004).

## ν CONTROL:
## DEBATE OVER
## RMS

....................................................

1871 had little to do with the
l by two Civil War veterans,
riven by the recognition that
ind better marksman on the
entieth century, the NRA was
asion when issues of firearms
r, one could easily peruse the
nonths and not stumble upon
ership and its focus would shift
lebate over the role of guns in

een profoundly shaped by cul-
umultuous era of the 1960s was
d his brother Bobby Kennedy,
d support for new, more sweep-
American history, the politics of
novement and its radical vision
ned conservatives as well as lib-
n California and other places,[60]
esponse to the turbulence of the
ided license and record-keeping
r state lines. Mail order sales of
number of categories of persons

nplished with handguns, which
this fact, a number of localities,
ed stringent handgun bans. The
n and register a handgun in the
or a brief moment it seemed that
elements of both the Democratic
[62]

izing to ban handguns, an even
rement was also emerging. A key

development in this process occurred in 1977 at the NRA's annual meeting in Cincinnati.
A group of radical gun rights activists within the organization took over control of the
organization's leadership. The NRA that emerged from this meeting was radically trans-
formed, and committed itself to an expansive gun rights ideology with the Second
Amendment at its core.[63]

Public debate over guns was becoming increasingly polarized. Nothing better cap-
tures this division than a hilarious episode of the popular TV comedy *The Simpsons*, in
which Homer joins the NRA. Returning home with a recently purchased firearm, Homer's
precocious daughter Lisa informs him that bringing a gun into the home increased the
risk of gun violence, prompting Homer and Lisa to debate the meaning of the Second
Amendment:

HOMER: "But I have to have a gun! It's in the Constitution!"
LISA: "Dad! The Second Amendment is just a remnant from revolutionary days. It has no
    meaning today!"
HOMER: "You couldn't be more wrong, Lisa. If I didn't have this gun, the king of England
    could just walk in here anytime he wants and start shoving you around."[64]

The episode underscores the sharp dichotomy that had emerged in American pub-
lic discourse by the end of the twentieth century regarding the right to bear arms. Gun
rights supporters had effectively claimed ownership of the Second Amendment, trans-
forming it into an expansive individual right not conditioned on any connection with a
well-regulated militia. Gun control advocates had largely abandoned Second Amendment
arguments, viewing the right to bear arms as an anachronism. Rather than invoke the lan-
guage of rights, gun control advocates preferred to frame firearms policy and law in public
health terms. Gun violence was a public health problem that required a similar set of poli-
cies to those used to reduce automobile fatalities: sophisticated data collection, better prod-
uct design, education, cultural change, and stronger regulations.[65]

Evidence of Emery's lingering influence over academic debate and jurisprudence could
still be seen when the conservative chief justice Warren Burger described the NRA's view
of the Second Amendment as a fraud in the popular magazine *Parade*. The timing for
this essay could hardly have been worse. A dedicated group of activist lawyers supported
by the NRA and a host of libertarian think tanks began churning out law review articles
on the Second Amendment in the early 1980s at a dizzying pace. The goal was to create a
paper trail for a new revisionist account of the right to bear arms, one that would change
the view of the academic establishment and possibly the courts. By the end of the decade,
the accumulated weight of this new body of revisionist scholarship and the absence
of any strong alternative scholarly voices on this issue had largely shifted the terms of
debate over the meaning of the right to bear arms. In 1989 Sanford Levinson, a distin-
guished constitutional scholar with unimpeachable liberal credentials, concluded that

n D and Braham, D, 'More Statistics,
1151 *University of Pennsylvania Law*

:rol after *District of Columbia*

[63] Winkler, n 2 above.
[64] 'The Simpsons: The Cartridge Family' (Fox television broadcast, Nov. 2, 1997).
[65] cf the Second Amendment rhetoric of LaPierre, W, *America Disarmed: Inside the UN and Obama's Scheme to the Destroy the Second Amendment* (2011) with the public health approach of Hemenway, D, *Private Guns and Public Health* (2004).

756   RIGHTS

the Second Amendment had become an embarrassment to liberal scholars who read the First Amendment's text in a capacious manner, while construing the words of the Second Amendment in an uncharacteristically narrow fashion. By the 1990s, it appeared that a new individual rights model had supplanted Emery's earlier collective rights interpretation. In reality, the paradigm shift was far less decisive than its advocates claimed. If one applied a one-author, one-vote model, and looked closely at the law review literature, it turned out that the scholarship was actually closely divided, with supporters of the revisionist individual rights theory edging out supporters of Emery's older collective rights model by a small margin.[66]

Noticeably absent from the scholarly debate over the historical meaning of the Second Amendment were historians of the Founding era. As the gun issue heated up in law reviews, constitutional history had waned as a field in the historical profession, having been largely supplanted by social and cultural history. When historians belatedly entered the Second Amendment debate, it was already too late to change the perception that the scholarly pendulum had swung decisively in favor of the revisionist individual rights model. Gun rights advocates not only had a plausible theory, they had successfully created the impression that their theory was the new orthodoxy. The revisionist model finally gained judicial notice in *United States v. Emerson* (1999), a case that interpreted the Second Amendment as an individual right, but nonetheless upheld the federal law being challenged.[67]

The convergence of a popular movement for gun rights, a group of dedicated activist lawyers, powerful libertarian think tanks such as the CATO Institute, and shifts within the Republican party set the stage for the most important development in Second Amendment jurisprudence in over seventy years—*District of Columbia v. Heller.*[68] A wide assortment of politicians, academics, lawyers, and activists on both sides of the issue filed sixty-six amicus briefs and flooded the Court with over two thousand pages of reading. In addition to longtime combatants in the great American gun debate, such as the NRA and the Brady Center to Prevent Gun Violence, smaller organizations such as Jews for the Preservation of Firearms and the gay/gun rights group the Pink Pistols also filed briefs. They were joined by contributions from professional linguists, historians, criminologists, medical doctors, lawyers, politicians, police, military personnel, and a variety of special interest groups. The scene outside the Court building on the day of the oral argument looked more like a rock concert than a typical day at the highest court in the land, with hundreds camping out in

front of the Court to get a seat t[...]
sharply divided Supreme Court.[...]

Justice Antonin Scalia's ma[...]
ist methodology. Focusing on th[...]
eighteenth-century English dict[...]
referred to ordinary weapons in [...]
lic meaning in this manner, Scal[...]
to have a handgun in the home [...]
sent relied on a more traditional [...]
Emery's collective rights model a[...]
viduals, but he insisted that the so[...]
the necessity of a well-regulated r[...]
ing that the court should have en[...]
authority.[70]

Scholarly reactions to the decis[...]
of critiques by eminent conserva[...]
J. Harvie Wilkinson, Charles Frie[...]
odology as results-oriented. The c[...]
deserved greater constitutional pr[...]
reconcile with the history or text o[...]
for the implementation of the decis[...]
decision.[71]

*The Heller* decision unleashed a[...]
laws were filed across America, in[...]
restrictive gun laws. Less than two [...]
Court once again affirmed that the [...]
Justices extended the reach of the ri[...]
rating the right to bear arms. Despit[...]
advocates after *McDonald*, most gu[...]
violations of *Heller's* somewhat amb[...]
late courts is that some type of inter[...]
gun laws have survived challenge un[...]

---

[66]   For a discussion of Burger's *Parade* article and the emergence of liberal defenders of the Second Amendment, *see* Biskupic, J, 'Guns: A Second (Amendment) Look' *Washington Post*, 10 May 1995, A20. On Lawrence Tribe's Second Amendment conversion, see Mauro, T, 'Scholar's Shift in Thinking Angers Liberals' *USA Today*, 27 August 1999; Levinson, S, 'The Embarrassing Second Amendment (1989) 99 *Yale Law Journal* 637. On the rise of the so-called "Standard Model," an alleged consensus built around the concept of an individual right, see Reynolds, G, 'A Critical Guide to the Second Amendment' (1995) 62 *Tennessee Law Review* 461, 475. For an effective debunking of Reynolds's claim, *see* Spitzer, R, 'Lost and Found Researching the Second Amendment' in Bogus, C, n 3 above.

[67]   Konig, D, 'The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of the Right of the People to Keep and Bear Arms' (2004) 22 *Law and History Review* 119, 154 n.96; Uviller and Merkel, n 50 above; and Cornell, n 6 above.

[68]   *District of Columbia v. Heller*, 554 U.S. 570 (2008). For a sampling of different interpretations of the case, see Cornell and Kozuskanich, n 1 above.

[69]   See Meyes, S, 'Gun fanciers, foes ge[...]
*Washington Times*, 19 March 2008, B01. C[...]
own gun' *New York Times*, 27 June 2008.

[70]   *Heller*, n 68 above.

[71]   Wilkinson J, 'Of Guns, Abortions, a[...]
253; Fried, C, 'The Second Annual Kenne[...]
1025; Epstein, R, 'A Structural Interpretat[...]
on Originalist Grounds' (2008) 59 *Syracu[...]

[72]   *McDonald v. City of Chicago*, 561 U.S[...]
method of incorporation. The Court used [...]
from Justice Thomas who argued for reviv[...]
clause as a basis for incorporation. On the [...]
regulation, see Tushnet, M, 'Permissible G[...]
Outcomes' (2009) 56 *University of Califor[...]
*United States v. Marzzarella*, 614 F.3d 85, 9[...]

iberal scholars who read the
uing the words of the Second
the 1990s, it appeared that a
r collective rights interpreta-
its advocates claimed. If one
it the law review literature, it
l, with supporters of the revi-
mery's older collective rights

torical meaning of the Second
e gun issue heated up in law
he historical profession, hav-
y. When historians belatedly
late to change the perception
or of the revisionist individual
e theory, they had successfully
hodoxy. The revisionist model
999), a case that interpreted the
ss upheld the federal law being

s, a group of dedicated activist
) Institute, and shifts within the
lopment in Second Amendment
*a v. Heller.*[68] A wide assortment
sides of the issue filed sixty-six
nd pages of reading. In addition
, such as the NRA and the Brady
ch as Jews for the Preservation of
lso filed briefs. They were joined
criminologists, medical doctors,
ety of special interest groups. The
rgument looked more like a rock
d, with hundreds camping out in

: of liberal defenders of the Second
' *Washington Post,* 10 May 1995, A20.
T, 'Scholar's Shift in Thinking Angers
ing Second Amendment (1989) 99 *Yale*
alleged consensus built around the
to the Second Amendment' (1995) 62
nolds's claim, *see* Spitzer, R, 'Lost and
ve.
c Context for the Historical Meaning
ind History Review 119, 154 n.96; Uviller
pling of different interpretations of the

front of the Court to get a seat to watch the drama unfold. On the final day of its 2008 term, a sharply divided Supreme Court struck down the DC handgun ban by a five-four vote.[69]

Justice Antonin Scalia's majority opinion in *Heller* employed a textualist original-ist methodology. Focusing on the public meaning of the text, Scalia began his inquiry with eighteenth-century English dictionaries. In his view "bear" simply meant carry, and "arms" referred to ordinary weapons in common use. Having parsed the Second Amendment's pub-lic meaning in this manner, Scalia concluded that the core right protected included the right to have a handgun in the home for purposes of self-defense. Justice John Paul Stevens's dis-sent relied on a more traditional intentionalist variant of originalism. Stevens clearly rejected Emery's collective rights model and argued that the Amendment protected the right of indi-viduals, but he insisted that the scope of the right was defined by the preamble's discussion of the necessity of a well-regulated militia. Justice Stephen Breyer filed a separate dissent, argu-ing that the court should have employed a balancing methodology more deferential to local authority.[70]

Scholarly reactions to the decision were mixed. Among the most interesting were a series of critiques by eminent conservatives, including jurists and scholars, most notably Judge J. Harvie Wilkinson, Charles Fried, and Richard Epstein. Conservatives saw Scalia's meth-odology as results-oriented. The decision seemed to suggest that Hamilton's dueling pistols deserved greater constitutional protection than the militia's muskets, a conclusion hard to reconcile with the history or text of the Amendment. Finally, the absence of clear guidelines for the implementation of the decision left lower courts scrambling to decide how to apply the decision.[71]

The *Heller* decision unleashed a wave of litigation. Within hours, challenges to local gun laws were filed across America, including one from Heller's attorneys, targeting Chicago's restrictive gun laws. Less than two years later, in *McDonald v. City of Chicago,* a similarly split Court once again affirmed that the Second Amendment was an individual right. This time the justices extended the reach of the right beyond DC to states and localities, effectively incorpo-rating the right to bear arms. Despite the significant number of new suits brought by gun rights advocates after *McDonald,* most gun laws have been upheld. Although handgun bans are clear violations of *Heller's* somewhat ambiguous standard, the emerging consensus among appel-late courts is that some type of intermediate scrutiny test ought to be employed. In most cases gun laws have survived challenge under this test.[72]

---

[69] See Meyes, S, 'Gun fanciers, foes get day in court; Hundreds line up to see history being made' *Washington Times,* 19 March 2008, B01. Greenhouse, L, 'Justices, ruling 5-4, endorse personal right to own gun' *New York Times,* 27 June 2008.

[70] *Heller,* n 68 above.

[71] Wilkinson J, 'Of Guns, Abortions, and the Unraveling Rule of Law' (2009) 95 *Virginia Law Review* 253; Fried, C, 'The Second Annual Kennedy Lecture: On Judgment' (2011) 15 *Lewis and Clark Law Review* 1025; Epstein, R, 'A Structural Interpretation of the Second Amendment: Why *Heller* Is (Probably) Wrong on Originalist Grounds' (2008) 59 *Syracuse Law Review* 174.

[72] *McDonald v. City of Chicago,* 561 U.S. 3025 (2010). The only legal issue of note in *McDonald* was the method of incorporation. The Court used the doctrine of substantive due process, prompting a dissent from Justice Thomas who argued for reviving the Fourteenth Amendment's privileges and immunities clause as a basis for incorporation. On the confusion over standards of review appropriate to gun regulation, see Tushnet, M, 'Permissible Gun Regulations after *Heller:* Speculations about Method and Outcomes' (2009) 56 *University of California-Los Angeles Law Review* 1425. On intermediate scrutiny, see *United States v. Marzzarella,* 614 F.3d 85, 97 (3d Cir. 2010).

758    RIGHTS

## VIII. Sandy Hook, The Second Amendment, and the Future of Gun Regulation

The dynamics of the gun debate changed in December 2012 after the massacre of twenty small children and six adults at Sandy Hook Elementary School in Newtown, Connecticut. For the first time in well over a decade polling data suggested that the majority of Americans believed stronger laws were necessary to deal with the problem of gun violence. Newtown energized many voters, particularly mothers, who were new to the gun control debate. Vigils and protests across the nation demanded swift and decisive action to implement stronger gun regulations. The pushback from gun rights advocates was also intense. As was true after earlier shootings, gun sales skyrocketed as gun owners rushed to purchase new weapons before any legislation could be enacted banning their sale and possession. *Heller* figured in the debate over the constitutionality of new, more strict, gun regulations. Liberal senator Charles Schumer advised gun control advocates to embrace *Heller*, and to work within its framework. In Schumer's view, *Heller* posed no serious obstacles to effective gun regulations.[73] Gun rights advocates rejected this view, arguing that *Heller* severely constrained the range of new regulations permissible. Although there was little change at the national level, at the state level legislation moved in opposing directions. States with lax gun control regimes in place loosened them further, and states with relatively strong gun control regulations, at least by American standards, strengthened them. As far as the politics of the gun issue was concerned, America was a nation deeply divided into two different cultures, one pro-gun rights, the other pro-regulation.[74] If recent history is any guide, the legal battle over the scope of the right to bear arms and gun regulation seems unlikely to move beyond this current impasse any time soon.

### Bibliography

Amar A, *The Bill of Rights Creation and Reconstruction* (2000).

Cook, P and Goss, K, *The Gun Debate: What Everyone Needs to Know* (2014).

Cornell, S, *A Well-Regulated Militia and the Origins of Gun Control in America* (2006).

Emery, L, 'The Constitutional Right to Keep and Bear Arms' (1914-1915) 28 *Harvard Law Review* 473–477.

Kahan D and Braham, D, 'More Statistics, Less Persuasion: A Culture Theory of Gun-Risk Perceptions' (2003) 151 *University of Pennsylvania Law Review* 1291.

Lund, N, 'The Second Amendment, Heller, and Originalist Jurisprudence' 56 *University of California- Los Angeles Law* Review (2009), 1345.

Malcolm, J, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1996).

[73] Schumer, C, 'Gun rights with limits' *The Washington Post*, 20 December 2012.

[74] In 1990 78 percent of Americans favored strengthening gun laws. On the eve of *McDonald* those numbers had plunged to 44 percent. After the Newton massacre the number shot up to 58 percent. A year later the figure settled at 49 percent. The data is available at http://www.gallup.com/poll/1645/guns.aspx. Despite the divisive nature of public discourse over guns, most Americans appear to fall somewhere between the more polarized views of gun rights and gun control advocates.

Posner, R, 'In Defense of Loosene...
August 27, 2008. Available onli...
Reynolds, G, 'A Critical Guide to...
461, 475.
Spitzer, R, *The Politics of Gun Con...*
Sunstein, C, 'Second Amendment...
Review 248.
Waldman, M, *The Second Amend...*
Winkler, A, *Gun Fight: The Battle...*

Compendium_Cornell
Page 0245

## AMENDMENT,
## GULATION

fter the massacre of twenty
l in Newtown, Connecticut.
ested that the majority of
he problem of gun violence.
vere new to the gun control
nd decisive action to imple-
advocates was also intense.
1 owners rushed to purchase
g their sale and possession.
nore strict, gun regulations.
es to embrace *Heller*, and to
o serious obstacles to effec-
arguing that *Heller* severely
gh there was little change at
ig directions. States with lax
s with relatively strong gun
ned them. As far as the poli-
ly divided into two different
ent history is any guide, the
egulation seems unlikely to

*now* (2014).
*rol in America* (2006).
(1914-1915) 28 *Harvard Law*

Culture Theory of Gun-Risk
1291.
isprudence' 56 *University of*

*erican Right* (1996).

aber 2012.
a the eve of *McDonald* those
ber shot up to 58 percent. A year
illup.com/poll/1645/guns.aspx.
s appear to fall somewhere
:s.

Posner, R, 'In Defense of Looseness: The Supreme Court and Gun Control' *The New Republic*, August 27, 2008. Available online at http://www.tnr.com/article/books/defense-looseness
Reynolds, G, 'A Critical Guide to the Second Amendment' (1995) 62 *Tennessee Law Review* 461, 475.
Spitzer, R, *The Politics of Gun Control* (5 edn, 2012).
Sunstein, C, 'Second Amendment Minimalism: *Heller* as *Griswold*' (2008) 122 *Harvard Law Review* 248.
Waldman, M, *The Second Amendment: A Biography* (2014).
Winkler, A, *Gun Fight: The Battle over the Right to Bear Arms in America* (2013).

*Friends of the*

# CONSTITUTION

Writings of the "Other" Federalists
1787–1788

*Edited by*

Colleen A. Sheehan and Gary L. McDowell

LIBERTY FUND

*Indianapolis*

This book is published by Liberty Fund, Inc., a foundation established to encourage study of the ideal of a society of free and responsible individuals.



The cuneiform inscription that serves as our logo and as the design motif for our endpapers is the earliest-known written appearance of the word "freedom" (*amagi*), or "liberty." It is taken from a clay document written about 2300 B.C. in the Sumerian city-state of Lagash.

© 1998 by Liberty Fund, Inc.
All rights reserved
Printed in the United States of America

*Library of Congress Cataloging-in-Publication Data*
Friends of the Constitution : writings of the "other" Federalists,
1787–1788 / edited by Colleen A. Sheehan and Gary L. McDowell.
p.   cm.
Includes bibliographical references and index.
ISBN 0-86597-154-4 (cloth.) — ISBN 0-86597-155-2 (pbk.)
1. Constitutional history—United States—Sources.
2. United States—Politics and government—1783–1789—Sources.
I. Sheehan, Colleen A.   II. McDowell, Gary L., 1949–   .
KF4515.F75   1998
342.73'029—dc21                     97-3497

2  4  6  8  10  C  9  7  5  3  1
3  5  7  9  11  P  10  8  6  4  2

LIBERTY FUND, INC.
8335 Allison Pointe Trail, Suite 300
Indianapolis, IN 46250-1684

3 1223 09440 2840

servations, and many others that might be made on the subject, will be sufficient to evince, that a division of the United States into a number of separate confederacies would probably be an unsatisfactory and an unsuccessful experiment. The remaining system which the American states may adopt is a union of them under one confederate republic. It will not be necessary to employ much time or many arguments to show, that this is the most eligible system that can be proposed. By adopting this system, the vigor and decision of a wide-spreading monarchy may be joined to the freedom and beneficence of a contracted republic. The extent of territory, the diversity of climate and soil, the number, and greatness, and connection of lakes and rivers, with which the United States are intersected and almost surrounded, all indicate an enlarged government to be fit and advantageous for them. The principles and dispositions of their citizens indicate that in this government, liberty shall reign triumphant. Such indeed have been the general opinions and wishes entertained since the era of independence. If those opinions and wishes are as well-founded as they have been general, the late Convention were justified in proposing to their constituents, *one* confederate republic as the best system of a national government for the United States.

In forming this system, it was proper to give minute attention to the interest of all the parts; but there was a duty of still higher import—to feel and to show a predominating regard to the superior interests of the whole. If this great principle had not prevailed, the plan before us would never have made its appearance. The same principle that was so necessary in forming it is equally necessary in our deliberations, whether we should reject or ratify it.

I make these observations with a design to prove and illustrate this great and important truth—that in our decisions on the work of the late Convention, we should not limit our views and regards to the State of Pennsylvania. The aim of the Convention was to form a system of good and efficient government on the more extensive scale of the United States. In

81

## SPEECH, 24 NOVEMBER 1787

this, and in every other instance, the work should be judged with the same spirit with which it was performed. A principle of duty as well as candor demands this.

We have remarked, that civil government is necessary to the perfection of society. We now remark that civil liberty is necessary to the perfection of civil government. Civil liberty is natural liberty itself, divested only of that part, which, placed in the government, produces more good and happiness to the community than if it had remained in the individual. Hence it follows, that civil liberty, while it resigns a part of natural liberty, retains the free and generous exercise of all the human faculties, so far as it is compatible with the public welfare.

In considering and developing the nature and end of the system before us, it is necessary to mention another kind of liberty, which has not yet, as far as I know, received a name. I shall distinguish it by the appellation of "*federal liberty*." When a single government is instituted, the individuals, of which it is composed, surrender to it a part of their natural independence, which they before enjoyed as men. When a confederate republic is instituted, the communities, of which it is composed, surrender to it a part of their political independence, which they before enjoyed as states. The principles, which directed, in the former case, what part of the natural liberty of the man ought to be given up and what part ought to be retained, will give similar directions in the latter case. The states should resign, to the national government, that part, and that part only, of their political liberty, which placed in that government will produce more good to the whole than if it had remained in the several states. While they resign this part of their political liberty, they retain the free and generous exercise of all their other faculties as states, so far as it is compatible with the welfare of the general and superintending confederacy.

Since *states* as well as *citizens* are represented in the Constitution before us, and form the objects on which that Constitution is proposed to operate, it was necessary to notice and define *federal* as well as *civil* liberty.

These general reflections have been made in order to introduce, with more propriety and advantage, a practical illustration of the end proposed to be accomplished by the late Convention.

82