1  Rob Bonta
   Attorney General of California
2  P. Patty Li
   Supervising Deputy Attorney General
3  Anna Ferrari
   Deputy Attorney General
4  John D. Echeverria
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and*
   *Blake Graham, in their official capacities*
9

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                       CIVIL DIVISION

13

14  **JAMES MILLER et al.,**              Case No. 3:19-cv-01537-BEN-JLB

15                      Plaintiffs,        **COMPENDIUM OF WORKS
                                           CITED IN DECLARATION OF
16      **v.**                             SAUL CORNELL**

17                                         **VOLUME 2 OF 4**

18  **CALIFORNIA ATTORNEY**                Courtroom:    5A
    **GENERAL ROB BONTA et al.,**          Judge:        Hon. Roger T. Benitez
19
                        Defendants.        Action Filed:  August 15, 2019
20

21

22

23

24

25

26

27

28
                                    1

# INDEX

| Works | Decl. Page | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Heydon's Case, (1584) 76 Eng.Rep. 637 (KB) | 26 n.88 | 0002-0007 |
| 1 Zephaniah Swift, A Digest Of The Laws Of The State Of Connecticut 11 (New Haven, S. Converse 1822) | 26 n.88 | 0007-0015 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 24 n.81 | 0016-0017 |
| Md. Const. of 1776, Declaration of Rights, art. III, § 1. | 3 n.4 | 0018-0023 |
| Md. Const. of 1776, Declaration of Rights, art. IV. | 5 n.13 | 0018-0023 |
| Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2 | 22 n.73 | 0024-0025 |
| 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, §§ 1-2 | 18 n.55 | 0026-0028 |
| An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, Laws of The State of New-York, Comprising the Constitution, and the Acts of the Legislature, Since the Revolution, from the First to the Fifteenth Session, Inclusive 191-2 (Thomas Greenleaf, ed., 1792) | 22 n.74 | 0029-0031 |
| N.C. Const. of 1776, Declaration of Rights, art. I, § 3 | 5 n.13 | 0032-0035 |
| N.C. Const. of 1776, Declaration of Rights, art. II | 20 n.65 | 0032-0035 |
| 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15 | 18 n.56 | 0036-0073 |

2

| | | |
|---|---|---|
| Francois Xavier Martin, A Collection Of Statutes Of The Parliament Of England In Force In The State Of North-Carolina 60–61 (Newbern, 1792) | 4 n.5 | 0074-0075 |
| 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same | 18 n.56 | 0076-0078 |
| Idaho Const. of 1889, art. I, § 11 | 27 n.91 | 0079 |
| Supplements To The Revised Statutes. Laws Of The Commonwealth Of Massachusetts, Passed Subsequently To The Revised Statutes: 1836 To 1849, Inclusive 413 (Theron Metcalf & Luther S. Cushing, eds. 1849) | 20 n.65 | 0080-0081 |
| Statutes Of The State Of New Jersey 561 (rev. ed. 1847) | 20 n.65 | 0082-0083 |
| An Act Incorporating the residents residing within limits therein mentioned, in 2 NEW YORK LAWS 158 (1785) | 20 n.65 | 0084-0094 |
| An Act to incorporate the Town of Marietta, in Laws Passed In The Territory Northwest Of The River Ohio 29 (1791) | 20 n.65 | 0095-0097 |
| Pa. Const. of 1776, ch. I, art. III | 5 n.13, 20 n.64 | 0098-0102 |
| 9 Statutes At Large Of Pennsylvania 29-30 (Mitchell & Flanders eds. 1903) | 4 n.5 | 0103-0104 |
| Tex. Const. of 1869, art. I, § 13 | 27 n.91 | 0105-0109 |
| Utah Const. of 1896, art. I, § 6 | 27 n.91 | 0110-0112 |
| Vt. Const. of 1777, Declaration Of Rights, art. IV | 20 n.65 | 0113-0122 |
| Vt. Const. of 1777, Declaration Of Rights, art. V | 5 n.13 | 0113-0122 |

3

| **BOOKS**[1] | | |
|---|---|---|
| *American Dictionary of the English Language* (1828) | 10 n.28 | 0124-0127 |
| Joseph Backus, *The Justice Of The Peace* 23 (1816). | 4 n.7 | 0128-0132 |
| Joan Burbick, *Gun Show Nation: Gun Culture And American Democracy* (2006), xvi-xxii | 14 n.44 | 0133-0142 |
| Brutus, *Essays of Brutus VII*, reprinted in 2 The Complete Antifederalist 358, 400–05 (Herbert J. Storing ed., 1981) | 21 n.70 | 0143-0155 |
| J.J. Burlamaqui, *The Principles Of Natural Law* (Thomas Nugent Trans., 1753) at 201 | 9 n.22 | 0156 |
| Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation Of The Early Federal System*, In 1 The Cambridge History Of Law In America 518–544 (Christopher Tomlins & Michael Grossberg Eds., 2008) | 2 n.3 | 0157-0211 |
| Saul Cornell, *The Other Founders: Antifederalism And The Dissenting Tradition In America*, 1788-1828 (1999), 139 | 21 n.69 | 0212-0222 |
| Saul Cornell, *The Right To Bear Arms,* In The Oxford Handbook Of The U.S. Constitution 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber Eds., 2015) | 2 n.3, 18 n.57 | 0223-0246 |
| Tench Coxe, *A Freeman, Pa. Gazette, Jan. 23, 1788*, Reprinted In Friends Of The Constitution: Writings Of The "Other" Federalists 82 (Colleen A. Sheehan & Gary L. Mcdowell Eds., 1998) | 21 n.71 | 0247-0251 |

---

[1] The Declaration of Saul Cornell cites two books – Gary Gerstle, Liberty and Coercion: *The Paradox of American Government, From the Founding to the Present* (Princeton Univ. Press, 2015), and William J. Novak, *The People's Welfare: Law And Regulation In Nineteenth-Century America* (1996) --in their entirety and without discussing the books in detail. *See* Cornell Decl. ¶ 39 n.78 & . ¶ 61 n.127. These books are not included with this filing.

| | | |
|---|---|---|
| Alexander DeConde, *Gun Violence In America* | 34 n.119 | 0252-0257 |
| *Dictionarium Britannicum* (1730). | 9 n.24 | 0258-0260 |
| *Dictionary of the English Language* (1755) | 10 n.26, 10 n.27 | 0261-0263 |
| Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government* (2005), 82-87 | 5 n.12 | 0264-0275 |
| Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (University Of North Carolina Press, 2009) 105-109,227-238 | 4 n.6 | 0276-0287 |
| 10 Encyclopedia Americana 214 | 20 n.67 | 0288-0293 |
| James E. Fleming & Linda C. Mcclain, *Ordered Liberty: Rights, Responsibilities, and Virtues* (Harvard University Press, 2013), 44-45 | 5 n.10 | 0294-0325 |
| Joanne B. Freeman, *Affairs af Honor: National Politics In The New Republic* (2001) | 15 n.48 | 0326-0333 |
| Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* 2, N.2; 91(1904) | 20 n.66, 23 n.78, 26 n.87 | 0334-0338 |
| Jack P. Greene, *Pursuits Of Happiness: The Social Development of Early Modern British Colonies and the Formation of American Culture* (1988), 170-176 | 14 n.46 | 339-344 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (2016), 198-201 | 13 n.43, 43 n.51, 32 n.109 | 345-353 |
| William N. Hosley, Colt: The Making Of An American Legend (1st Ed. 1996) | 19 n.60 | 354-365 |
| 2 James Kent *Commentaries On American Law* (340) 464 N.2 (Oliver Wendell Holmes, Jr., Ed. 12 Ed. 1873) | 23 n.77 | 366-374 |

5

| | | |
|---|---|---|
| David Thomas Konig, *Regionalism in Early American Law,* In 1 The Cambridge History of Law in America 144 (Michael Grossberg & Christopher Tomlins eds., 2008) | 14 n.46 | 375-380 |
| Gerald Leonard & Saul Cornell, *The Partisan Republic: Democracy, Exclusion, and the Fall of the Founders' Constitution*, 1780s–1830s, At 2 | 10 n.29 | 382-390 |
| New Law Dictionary (1792) | 9 n.23 | 391 |
| New Histories of Gun Rights and Regulation: Essays On The Place of Guns in American Law and Society (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller Eds., Forthcoming 2023). | 7 n.20 | 392 |
| New Universal Dictionary (1763) | 9 n.25 | 393-395 |
| William E. Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine* (1998). | 29 n.97 | 396-399 |
| Kunal M. Parker, *Common Law History, And Democracy In America, 1790-1900: Legal Thought Before Modernism* (2013), 147-148 | 25 n.82 | 400-405 |
| Randolph Roth, *American Homicide* 56, 315 (2009) | 14 n.45 | 406-409 |
| Harry N. Scheiber, *State Police Power*, In 4 Encyclopedia of the American Constitution 1744 (Leonard W. Levy Et Al. Eds., 1986) | 21 n.68 | 410-419 |
| Barry Alan Shain, *The Nature of Rights at the American Founding and Beyond* (Barry Alan Shain Ed., 2007), 125-127,139-143 | 10 n.31 | 420-430 |
| Quentin Skinner, *Liberty Before Liberalism* (1998), 17-36 | 10 n.31 | 431-443 |
| Richard Slotkin, *Gunfighter Nation: The Myth of the Frontier In Twentieth-Century America* (1993), 10-16 | 14 n.44 | 444-450 |

6

| | | |
|---|---|---|
| Merritt R. Smith, And Leo Marx, *Does Technology Drive History? The Dilemma Of Technological Determinism* (Cambridge, Ma: Mit, 1994) | 34 n.118 | 451-456 |
| Robert Spitzer, *The Politics Of Gun Control* 14 (2012). | 31 n.106 | 457-467 |
| Kevin M. Sweeney, Firearms Ownership And Militias In Seventeenth And Eighteenth Century England And America, In A Right To Bear Arms?: The Contested Role Of History In Contemporary Debates On The Second Amendment (Jennifer Tucker Et Al. Eds., 2019) | 15 n.47, 16 n.50, 17 n.52 | 468-485 |
| H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002). | 12 n.34 | 486-490 |
| Sean Wilentz, Society, Politics, and the Market Revolution, in the New American History (Eric Foner Ed., 1990) | 18 n.59 | 491-503 |
| **LAW REVIEWS AND JOURNALS** | | |
| Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014) | 3 n.4 | 0505-0519 |
| Joseph Blocher, *Has the Constitution Fostered a Pathological Rights Culture? The Right to Bear Arms: Gun Rights Talk*, 94 B.U. L. Rev. 813 (2014) | 33 n.114 | 0520-0535 |
| Joseph Blocher, *Hunting and the Second Amendment,* 91 NOTRE DAME L. REV. 133 (2015). | 33 n.114 | 0536-0574 |
| Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019) | 11 n.33 | 0575-0587 |
| Samuel L. Bray, 'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution, 102 VIRGINIA L. REV. 687 (2016) | 4 n.9 | 0588-0644 |

7

| | | |
|---|---|---|
| Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021) | 26 n.88 | 0645-0688 |
| Rachel A. Callcut et al., *Effect Of Mass Shootings on Gun Sales-A 20-Year Perspective*, 87 J. TRAUMA ACUTE CARE SURGERY 531 (2019). | 33 n.116 | 0689-0711 |
| Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017) | 5 n.10, 11 n.33 | 0712-0732 |
| Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020) | n.23 | 0733-0752 |
| Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original) | 9 n.23 | 0753-0799 |
| Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999) | 12 n.35 | 0800-0817 |
| Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) | 12 n.36, 34 n.119 | 0818-0852 |
| Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) | 11 n.32 | 0853-0864 |
| Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1713, 1716 (2012) | 4 n.9, 19 n.61 | 0865-0888 |
| Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017) | 13 n.40 | 0889-0932 |

8

| | | |
|---|---|---|
| Saul Cornell, *The Police Power And The Authority To Regulate Firearms In Early America 1–2* (2021) | 11 n.33, 22 n.72, 24 n.80 | 0933-0949 |
| Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022) | 19 n.63 | 0950-0983 |
| Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022) | 13 n.42 | 0984-1020 |
| Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022) | 27 n.90, 28 n.92, 28 n.93 | 1021-1039 |
| Allan Dafoe, *On Technological Determinism: A Typology, Scope Conditions, and a Mechanism Science*, 40 TECH. & HUM. VALUES 1047 (2015). | 34 n.118 | 1040-1069 |
| John J. Donohue, *The Swerve to "Guns Everywhere": A Legal and Empirical Evaluation*, 83 LAW & CONTEMP. PROBLEMS 117 (2020) | 37 n.124 | 1070-1086 |
| Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016) | 10 n.29 | 1087-1108 |
| Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014) | 17 n.54 | 1109-1120 |
| Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016) | 30 n.102 | 1121-1145 |
| Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 SOUTH. ILL. UNIV. L.J. 61 (2018) | 37 n.123 | 1146-1171 |

9

| | | |
|---|---|---|
| Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015). | 6 n.16 | 1172-1189 |
| Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, 22 APPLIED ECON. LETTERS 281 (2014) | 37 n.124 | 1190-1193 |
| Stephen P. Halbrook, *New York's Not So "SAFE" Act: The Second Amendment in an Alice-In- Wonderland World Where Words Have No Meaning*, 78 ALBANY L. REV. 789 (2015). | 31 n.108 | 1194-1218 |
| Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence*, 14 GEORGETOWN J. OF L. & PUB. POL'Y. 47 (2016). | 34 n.118 | 1219-1247 |
| James Jacobs, *Why Ban 'Assault Weapons'?*, 37 CARDOZO L. REV. 681, 687 (2015). | 32 n.110 | 1248-1275 |
| Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) | 28 n.95, 30 n.103 | 1276-1351 |
| Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) | 10 n.29 | 1352-1367 |
| Aaron T. Knapp, *The Judicialization of Police,* 2 CRITICAL ANALYSIS OF L. 64 (2015) | 5 n.12 | 1368-1387 |
| David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994). | 34 n.118 | 1388-1414 |
| Christopher S. Koper et. al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. URB. HEALTH 313 (2018). | 36 n.122 | 1415-1423 |

10

| | | |
|---|---|---|
| Christopher S. Koper, *Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms*, CRIMINOLOGY & PUBLIC POLICY 147 (2020) | 37 n.124 | 1424-1447 |
| Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022) | 17 n.53 | 1448-1462 |
| Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. 238, 241 (2014); | 30 n.103 | 1463-1466 |
| John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979) | 5 n.10 | 1467-1493 |
| William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008) | 25 n.83 | 1494-1502 |
| William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994) | 5 n.11 | 1503-1527 |
| Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) | 10 n.29 | 1528-1557 |
| Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas*, 1836-1900, 121 SOUTHWESTERN QUARTERLY 284 (2020) | 30 n.102 | 1558-1578 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022) | 28 n.94 | 1579-1593 |
| Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018) | 31 n.104 | 1594-1621 |

Compendium of Works Cited in Declaration of Saul Cornell
(3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| Eric M. Ruben & Darrell A. H. Miller, Preface: *The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017). | 7 n.19, 13 n.39 | 1622-1630 |
| Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015) | 19 n.62 | 1631-1642 |
| Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018) | 18 n.58 | 1643-1669 |
| Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019) | 17 n.54 | 1670-1676 |
| Jaclyn Schildkraut et.al., *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020) | 31 n.104 | 1677-1706 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017) | Passim | 1707-1733 |
| William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968) | 3 n.4 | 1734-1768 |
| David M. Studdert et al., *Testing the Immunity of the Firearm Industry to Tort Litigation*, 177 JAMA INTERNAL MEDICINE 102, 102-05 (2017). | 33 n.113 | 1769-1772 |
| Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public, 55 U.C. DAVIS L. REV. 2495 (2022) | 7 n.20 | 1773-1785 |
| Christopher G. Tiedeman, *A Treatise on the Limitations of the Police Power in the United States* 4–5 (1886) | 30 n.101 | 1786-1790 |

12

| | | |
|---|---|---|
| Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008) | 5 n.11, 5 n.12 | 1791-1809 |
| Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005) | 23 n.78 28 n.95 | 1810-1845 |
| David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment*, 74 TUL. L. REV. 387 (1999) | 33 n.115 | 1846-1923 |
| John J. Zubly, *The Law of Liberty* (1775) | 5 n.10 | 1924-1939 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Vivian S. Chu, *Federal Assault Weapons Ban: Legal Issues Congressional Research Service*, February 14, 2013 | 32 n.110 | 1941-1957 |
| Carolyn Maloney, Supplemental Memorandum: The Committee's Investigation Into Gun Industry Practices And Profits (Jul. 27, 2022) | 35 n.121 | 1958-1980 |
| Report on Books for Congress, [23 January] 1783," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031 | 9 n.22 | 1981-2020 |
| **NEWS ARTICLES** | | |
| Mark Berman & Todd C. Frankel, *Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence*, WASHINGTON POST (July 27, 2022, 7:19 PM) | 35 n.120 | 2022-2024 |

13

| | | |
|---|---|---|
| John Bingham, *Speech, Cincinnati Daily Gazette* (Sept. 2, 1867), As Quoted In Saul Cornell And Justin Florence, The Right To Bear Arms In The Era of the Fourteenth Amendment: Gun Rights or Gun Regulation, 50 SANTA CLARA L. REV. 1043, 1058 (2010) | 29 n.96 | 2025-2055 |
| Polly Mosendz, *Why Gunmakers Would Rather Sell AR 15s Than Handguns*, BLOOMBERG (June 20, 2018, 3:00 AM), https://www.bloomberg.com/news/articles/2018-06 20/why-gunmakers-wouldrather- sell-ar-15s-than-handguns | 37 n.124 | 2056-2061 |
| Robert J. Spitzer, *Why Assault Rifles are Selling*, CHICAGO TRIBUNE, June 16, 2015. | 34 n.117 | 2062-2064 |
| **OTHER SOURCES** | | |
| 1 William Blackstone, Commentaries, *61 *349 | 4 n.8, 26 n.88 | 2066-2067 |
| John Donohue III & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STANFORD LAW SCHOOL BLOGS (Oct. 15, 2019), https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/ | 36 n.122 | 2068-2072 |
| Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence*, July 4, 1799, at 7 (July 4, 1799) | 10 n.30 | 2073-2084 |
| Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0 | 16 n.49 | 2085-2118 |
| "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-thecourt-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshallcourt-1801-1835/ | 23 n.76 | 2119-2128 |

14

| | | |
|---|---|---|
| "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-thecourts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/ | 23 n.76 | 2129-2135 |

15

existence and prosperity, in any part of the globe. And it must be confessed, that this struggle has, in some of the stages of its progress, been attended with symptoms, that foreboded no fortunate issue. To the iron hand of tyranny, which was lifted up against her, she manifested, indeed, an intrepid superiority. She broke in pieces the fetters, which were forged for her, and showed that she was unassailable by force. But she was environed with dangers of another kind, and springing from a very different source. While she kept her eye steadily fixed on the efforts of oppression, licentiousness was secretly undermining the rock on which she stood.

Need I call to your remembrance the *contrasted* scenes of which we have been witnesses? On the glorious conclusion of our conflict with Britain, what high expectations were formed concerning us by others! What high expectations did we form concerning ourselves! Have those expectations been realized? No. What has been the cause? Did our citizens lose their perseverance and magnanimity? Did they become insensible of resentment and indignation at any high-handed attempt that might have been made to injure or enslave them? No. What then has been the cause? The truth is, we dreaded danger only on one side. This we manfully repelled. But on another side, danger not less formidable, but more insidious, stole in upon us; and our unsuspicious tempers were not sufficiently attentive either to its approach or to its operations. Those, whom foreign strength could not overpower, have well-nigh become the victims of internal anarchy.

If we become a little more particular, we shall find that the foregoing representation is by no means exaggerated. When we had baffled all the menaces of foreign power, we neglected to establish among ourselves a government, that would insure domestic vigor and stability. What was the consequence? The commencement of peace was the commencement of every disgrace and distress, that could befall a people in a peaceful state. Devoid of national power, we could not prohibit the extravagance of our importations, nor could we derive a revenue from their excess. Devoid of national

83

Compendium_Cornell
Page 0251

# GUN VIOLENCE IN AMERICA
The Struggle for Control

Alexander DeConde

Northeastern University Press
Boston

HASTINGS COLLEGE OF THE LAW LIBRARY

*HV*
*7436*
*D43*
*2001*

Northeastern University Press

Copyright 2001 by Alexander DeConde

All rights reserved. Except for the quotation of short passages for the purposes of criticism and review, no part of this book may be reproduced in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system now known or to be invented, without written permission of the publisher.

*Library of Congress Cataloging-in-Publication Data*

DeConde, Alexander
    Gun violence in America : the struggle for control / Alexander DeConde.
       p.  cm.
    Includes bibliographical references and index.
    ISBN 1–55553–486–4 (cloth : alk. paper)
    1. Gun control—United States. 2. Violent crimes—United States. 3. Firearms ownership—United States. 4. United States—Politics and government. I. Title.

    HV7436.D43 2001
    363.3'3'0973—dc21          00–054821

Designed by Janis Owens

Composed in Electra by Coghill Composition Company in Richmond, Virginia. Printed and bound by The Maple Press Company in York, Pennsylvania. The paper is Sebago Antique, an acid-free sheet.

Manufactured in the United States of America
05  04  03  02  01    5  4  3  2  1

# Contents

*Introduction*                                                         3

 1  Origins and Precedents                                             7
 2  The Colonial Record                                               17
 3  To the Second Amendment                                           27
 4  Militias, Duels, and Gun Keeping                                  39
 5  A Gun Culture Emerges                                             53
 6  Reconstruction, Cheap Guns, and the Wild West                     71
 7  The National Rifle Association                                    89
 8  Urban Control Movements                                          105
 9  Gun-Roaring Twenties                                             119
10  Direct Federal Controls                                          137
11  Guns Flourish, Opposition Rises                                  155
12  Control Act of 1968                                              171
13  Control Groups on the Rise                                       189
14  Gun Lobby Glory Years                                            203
15  A Wholly Owned NRA Subsidiary?                                   219
16  The Struggle Nationalized                                        235
17  The Brady Act                                                    249
18  School Shootings and Gun Shows                                   265
19  Clinton v. the NRA                                               281
20  Summing Up                                                       299

*Notes*                                                              311
*Bibliography*                                                       341
*Index*                                                              379

Compendium_Cornell
Page 0253

They never tired of repeating arguments, such as the outlawing of pistols would not diminish crime but might increase it because thugs would no longer fear that their victims might be armed with a gun. But criminologists maintained that "it is almost suicidal for the average householder to attempt to use a firearm against a professional burglar or robber."[30] Regardless, the reasoning of the gun keepers figured in the repeal of firearms registration laws in Arkansas, Michigan, and Virginia, as well as in the American Bar Association's reversal of its opposition to pistol manufacture.

These setbacks for gun-control advocates, the shortcomings of the Miller law, and the failure of efforts to expand it typified the feebleness in the twenties of the movement to obtain significant federal or state gun regulation. Wherever advocates carried their message, they did so against heavy odds. They failed to circumvent the entrenched congressmen from the New England munitions belt who strangled proposed gun measures as they arose while also exerting enough clout to obtain high tariff protection for local small-arms manufacturers. In addition, control-minded legislators could not overcome the opposition from gun enthusiasts representing Western and Southern constituencies or the indifference in the White House and Congress.

The chief executive and the legislators had a number of precedents for the exercise of a federal police power but they did not use them because they understood the political reality of their time. Americans concerned about states' rights and individual rights remained convinced that the central government should not exercise regulatory authority in domestic matters, as in the liquor traffic. This belief worked against most efforts to establish federal controls over gun keeping. States' rights devotees usually coalesced with gun owners and others against attempts to create such a power. The federal record in the enforcement of Prohibition contributed to the distrust of centering firearms control in Washington. If the federal government could not block the landing and distribution of shiploads of rum, journalists and others asked, how could it prevent criminals from obtaining guns, the most easily concealed and vital tools of their trade?

To those committed to the cause of regulatory measures, the distrust of centralized policing and the indifference to cutting down gun violence seemed shameful. Even though nationally, violent crime had been declining, they perceived small firearms and those who used them in crime as having become more formidable than in the past. They assumed further that this new breed of gun wielders had become too powerful or elusive for local police to control. With ready access to telephones, automobiles, gun silencers, sawed-off shotguns, and

submachine guns, desperadoes now roamed larger areas faster than in the past, sped across state lines, robbed and killed, and at times outgunned police.

This mayhem persuaded at least one vocal advocate of government action to argue that "the prevention and detection of crime are national rather than local problems" and could be handled more efficiently on a national scale. He pointed out that among the great powers, only the United States "had not realized the necessity for national supervision of the national problem of crime prevention."[31]

Fourteen months later one of the nation's most notorious submachine-gun slaughters, engineered by Al Capone and his ally Jack Guzik, appeared to give a boost to those who desired federal action on crime and guns. On St. Valentine's Day, February 14, 1929, four of Capone's gunmen, two of them dressed as police, lined up seven men of rival George "Bugs" Moran's gang against a wall in a garage on North Clark Street in Chicago and mowed them down. The murderers escaped punishment. The next April the angered crime commission listed twenty-eight mobsters as the city's most dangerous public enemies. Capone emerged as the nation's public enemy number one. Despite public outrage, the city's infamous crime spree, which added to a surge in homicides, continued for several more years, or until the end of Prohibition.[32]

During this binge of gun violence, newspaper editors, activists in the struggling control movement, and federal legislators alarmed by the perceived rise in crime and some by fear of armed communists demanded a countrywide revolution against what they termed hoodlum depredation. In response, in April 1930 a House of Representatives subcommittee held hearings on six bills aimed at restricting interstate commerce in pistols, revolvers, and machine guns. They included one proposal modeled on the prohibition law and another that would have allowed states to prohibit the weapons from crossing state lines.

Hamilton Fish Jr., a New York Republican, introduced a bill "to prevent organized groups that control crime in the larger cities" from securing "machine guns and automatic rifles and [using] them against the public, against the police and even against themselves in their contests for the control of crime." An opponent of the measure, George Huddleston, a Democrat from Alabama, dismissed it because "the Federal Government has nothing to do with the preservation of public order," a power reserved to the states. The bill, he claimed, would serve an "unconstitutional purpose" under the guise of regulating commerce.[33]

Nonetheless, Joe Crail of California introduced the redraft of a bill he had proposed three years earlier. Like many similar proposals, it aimed to ban pis-

tols, revolvers, short-barreled rifles, and machine guns from interstate commerce. He perceived the measure as "absolutely within all legal and constitutional restrictions." He preferred a ban on the importation of firearms but pushed his milder bill because he thought Congress might accept it.

Crail cited his experience with gun control in a Cuba "infested with bandits" during the Spanish-American War as a reason for advancing the bill. Federal authorities who supervised the occupation of Cuba, he said, forbade "the use of rifles and deadly weapons" and offered a bounty in gold to anyone who gave up a firearm. Cubans surrendered their guns "by the thousands and thousands, old flintlocks, of Revolutionary days, muzzle-loading Remingtons of the Civil War period, and new pieces right up to the minute." The government dumped them in the ocean. Placing firearms "out of the reach of the people" and restricting their possession to law-enforcement officers, he maintained, made peace possible on the island.[34]

Despite this argument as an example of an effective exercise of federal power in regulating firearms, control opponents and devotees of states' rights blocked all the gun bills before Congress. They could not, however, stop the debate in the press, in Congress, or even in the executive branch over whether or not the federal government should take action on regulating guns.

This agitation had an impact on President Herbert C. Hoover. Shortly after taking office he announced that he considered law enforcement the "dominant issue before the American people."[35] So on May 20, 1929, he established the eleven-member National Commission on Law Observance and Enforcement, headed by George W. Wickersham, a former attorney general, to study the problem. After eighteen months of investigation, the commission came up with nothing significant for coping with crime and gun violence.

Since crime remained a foremost public concern, Hoover came under pressure to do more than investigate. Perhaps, some citizens thought, he might address the problem directly with federal authority. He resisted, making a point of defending his attachment to the states'-rights philosophy prominent in the thinking of many Americans and especially among gun defenders in Congress. He opposed any plan to cope with gun violence that resembled a blueprint for a national police force. "Every state has ample laws that cover such criminality," he stated. "What is needed is the enforcement of those laws, and not new laws. Any suggestion of increasing Federal criminal laws in general is a reflection on the sovereignty and the standing of state government."[36] Although true that by this time most states and cities imposed special regulations on firearms sales, to call them adequate required broad imagination.

Within six months of Hoover's words, a fresh crime wave struck New York City and other parts of the nation. One notable tragedy in that city involving the submachine gun—the "Baby Massacre"—created a national furor. On July 28, 1931, racketeer Vincent "Mad Dog" Coll tried to rub out a gangland rival by spraying bullets randomly. He killed one child and wounded five others. Despite the public outrage over this and other bloodletting, mobsters continued to take up the Tommy gun.

Finally, numerous citizens, law officers, and legislators condemned it as a firearm so deadly that no reputable person should want or need it. Above all, they wished to keep it out of the hands of criminals. An assistant federal attorney, for instance, asserted that "the next Congress should take immediate steps to pass a law prohibiting both the transportation of firearms in interstate commerce and the importation of guns from abroad except under Federal supervision."[37]

Such sentiment persuaded control advocates that despite the apprehension over federal policing authority, the assumed crime crisis had converted many Americans to their cause. Even with this optimism, with new followers, and with the aggressiveness of its most dedicated members, the gun-control movement remained weak. Nonetheless, its growing visibility along with its few local accomplishments alarmed shooters.

In particular, the control agitation had long disturbed Karl T. Frederick, a onetime Olympic pistol champion and vice president of the National Rifle Association. He detested New York's Sullivan law and other local gun ordinances. So, right after the World War, he and several other members of a competitive handgun shooting club, the United States Revolver Association, formulated a proposal for a modest pistol statute weaker than the Sullivan law. They hoped it would serve as a model for firearms legislation that all states would adopt. This activity for preemptive legislation coincided with the rifle association's continuing expansion, as in its taking on as affiliates two thousand local sportsmen's clubs.

The federal government contributed to the association's continuing growth, primarily through perpetuating its civilian marksmanship program. Its members continued to benefit from the government's requirement that the War Department sell surplus firearms to them at cost. As in the past, thousands of gun devotees joined the association and affiliated clubs to buy these guns at the bargain rate. In total, shooters purchased some two hundred thousand rifles and other weapons released from government arsenals. When the association took over the youth marksmanship program that the Winchester firearms com-

pany had sponsored, membership received another boost, particularly among the young. In tandem with its expansion throughout the twenties, the organization beefed up its political clout.

Meanwhile, Frederick and friends completed the framing of their model for a gun law but only three states adopted it. The sponsors then revised their tactics, producing in August 1926 a tentative draft and, in the following July, a revision of what they called the Uniform Firearms Act or at times the Uniform Revolver Act. It dealt only with pistols and revolvers, requiring a buyer to register with a licensed gun dealer and wait forty-eight hours before receiving the weapon. During that time police could examine the application to determine if the purchaser was a drunkard, a convicted criminal, a drug addict, or a minor—all of whom the measure forbade to own handguns. In addition, the act would have directed police to issue permits to assumed respectable citizens who had good reason to carry a gun. Police and other critics objected to the model act as too soft.

The following year the National Crime Commission, an organization of distinguished citizens, wrote its own tougher archetype for a gun law and submitted it to the states. Opposition from gun enthusiasts, notably from the NRA, killed it. Other groups concerned with doing something about firearms regulation while preserving shooting rights then returned their attention to the uniform act. After undergoing further study and slight change, the act in 1930 went back to the states for consideration. In the next few years, only five states and the District of Columbia adopted it, usually with modifications to meet their special needs.

For a time, beginning late in 1931, lobbyists for the NRA and other gun owners appeared to have pulled a coup for the uniform act in New York State. They pressured the legislature to pass the Hanley-Fake firearms bill aimed at replacing the Sullivan law with the act's weaker regulations. Only the governor's veto prevented the bill from becoming law.

The dissatisfaction with the Uniform Firearms Act persuaded the interstate commission on crime to adopt a new, tougher model designated the Uniform Pistol Act. It included stiffer penalties for designated crimes than did the earlier measure, banned possession of a pistol by anyone convicted of a serious crime, not just one of violence, and required a license for anyone purchasing a pistol. Largely because of this last provision, the rifle association opposed this measure. No state adopted it. In all, the uniform idea, even where accepted, failed to produce meaningful control. Furthermore, the states did not or would not enact gun laws within a standard pattern.

During the gun proponents' experiment with possible model legislation, the control promoters won another small victory. Arthur Capper, a former Progressive newspaperman and now a senator from Kansas, introduced a bill, modeled on the uniform act, to regulate firearms in the District of Columbia. It attracted nationwide attention because a gun battle in downtown Washington between police and bootleggers had caught a senator in the crossfire, seriously wounding him. Even so, before becoming law in 1932, the Capper bill had to survive years of extensive hearings.

Rarely before this time had the gun problem attracted broad attention other than in a context of crime. In January it engaged public interest as a social issue. At a White House conference on child health and protection Capper spoke for the National Anti-Weapons Society, on whose advisory board he served. He linked the plight of disadvantaged children with firearms, pointing to "a growing spirit of lawlessness" in the cities with its "ghastly succession of shootings and murders in which children and young people were principal participants." Then he focused on guns. "To sober minds," he said, it had become evident "that the laws of this country . . . made it too easy to get a gun. Firearms dealers were passing weapons and cartridges over the counter to persons who could not be trusted with any deadly weapon. There was practically no regulation of sales."[18]

Shortly after, on March 1, another tragedy that stunned the nation struck the family of Charles A. Lindbergh, the aviation hero, and his wife, the writer Anne Morrow Lindbergh. An unknown individual snatched their twenty-month-old son out of his crib in their home near Hopewell, New Jersey. Either deliberately or accidentally he killed the child and demanded ransom. Initially this crime had little to do with the gun regulation issue but when state authorities asked the president for help in tracking down the kidnapper, the case came to touch on the control issue through the fundamental question of federal police power.

Hoover offered assistance from national agencies but pointed out that the "federal government does not have police authority in such crimes."[19] This stance, similar to his position on national gun management, failed to stem the public outcry for making kidnapping a federal crime. On June 17 Congress enacted legislation, known as the Lindbergh law, that made the transporting of a kidnapped person from one state to another a federal offense with a maximum penalty of life imprisonment. Five days after its passage, the president reluctantly signed it into law. He also approved a companion bill that made the send-

ing of a demand for ransom, or a threat to kidnap, a federal crime. These laws built up more precedent for possible federal legislation to control gun violence.

Seven months later as Hoover campaigned for reelection, he condemned "the gangster life" in the cities and states as a danger "to the whole of our civilization." He also indicated he had not abandoned his opposition to the expansion of federal power in enforcing domestic security, as with gun regulation. He repeated that "the responsibility for the control of crime rests emphatically upon the States and local communities." Shortly thereafter, his attorney general, William D. Mitchell, echoed this sentiment, stating that prosecution for criminal offenses "primarily belong[s] under State law." He told Congress he had striven to discourage any tendency in his office "to grab cases away from the State criminal authorities."[40]

By this time, the large number of Americans disturbed by what they viewed as rampant crime thought that in this matter the federal government should do what the administration disapproved. The contrasting perspectives on the federal role in dealing with crime clashed in the presidential campaign.

The Democratic candidate, Franklin D. Roosevelt, knew guns from personal use, from having served as assistant secretary of the navy on the board for the promotion of rifle practice, and from working closely with the rifle association. For years, he had served also on the executive committee of the National Crime Commission, which studied means of combating crime nationally. As New York's governor, he had supported restrictive state and federal handgun controls, tangled personally with Karl Frederick on gun-control legislation, and defied the NRA.[41]

When Roosevelt vetoed legislation such as the Hanley-Fake bill, he spoke out forcefully. "A great many sportsmen have urged me to approve this legislation," he declared. "It is hard to understand the interest of sportsmen in pistols. I have myself fished and hunted a great deal. I have a deep interest in outdoor sports and in the various associations which foster them, but it is common knowledge, of course, that fishermen never use a pistol and that hunters practically never use a pistol." Even for "theoretical self-protection," he added, "the value of a revolver is very problematical." A New York *Times* editorial concurred under the headline "Another Wise Veto."[42]

Unlike Hoover, Roosevelt considered aspects of gun violence and crime, along with unemployment, national problems that required federal action. He announced that if elected he would back centralized regulation of interstate commerce in handguns that control proponents had been pushing for years.

After winning the election in a landslide, Roosevelt personally experienced

gun violence. When he visited Miami on February 14, 1933, to address a political rally, Giuseppe Zangara, an unemployed bricklayer and anarchist, standing thirty-five feet from Roosevelt with a .32-caliber revolver he had purchased in a local pawnshop for eight dollars, fired five shots. He narrowly missed Roosevelt but struck five bystanders, including Chicago's mayor, Anton J. Cermak, who died a few weeks later from his wound. "I do not hate Mr. Roosevelt personally," Zangara explained while jailed, "I hate all Presidents, no matter from what country they come, and I hate all officials and everybody who is rich."[43] Again, an unbalanced individual's shooting spree shocked the nation. It also strengthened the determination of control groups to move ahead in pursuit of federal gun legislation.

Judge Uly O. Thompson, who presided over Zangara's trial and sentenced him to death, summed up much of the controllers' attitude. He pointed out that the assassinations of presidents "have either been perfected or undertaken by a man armed with a pistol." Yet, he added, "the people of this country steadfastly permit the manufacture, sale and possession of such deadly and useless weapons. I say 'useless' for this reason: A pistol in the hands of an assassin is sure death and murder, while a pistol in the hands of . . . the good people of this country is about the most useless weapon of defense with which you can arm yourself." He believed Congress should enact legislation for the "confiscation of all firearms that may be carried or concealed about the person."[44]

Although earlier control activists had often expressed similar sentiment, they had made no tangible impact on either Congress or the public. Now, along with Roosevelt's own views and the assassination attempt, the agitation of control advocates helped pave the way for the first serious exertion for federal legislation to regulate directly an aspect of gun keeping.

Generated for Dennis E Baron (University of Illinois at Urbana-Champaign) on 2013-07-30 21:01 GMT / http://hdl.handle.net/2027/nyp.33433002977704
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

# DICTIONARIUM BRITANNICUM:

### Or a more COMPLEAT

# UNIVERSAL ETYMOLOGICAL

# ENGLISH DICTIONARY

### Than any EXTANT.

#### CONTAINING

Not only the Words, and their Explication; but their Etymologies from the *Antient British, Teutonick, Low* and *High Dutch, Saxon, Danish, Norman* and *Modern French, Italian, Spanish, Latin, Greek, Hebrew, Chaldee,* &c. each in its proper Character.

#### ALSO

Explaining hard and technical Words, or Terms of Art, in all the *ARTS, SCIENCES,* and *MYSTERIES* following. Together with *ACCENTS* directing to their proper Pronunciation, shewing both the *Orthography* and *Orthoepia* of the *English Tongue,*

#### VIZ. IN

AGRICULTURE, ALGEBRA, ANATOMY, ARCHITECTURE, ARITHMETICK, ASTROLOGY, ASTRONOMY, BOTANICKS, CATOPTRICKS, CHYMISTRY, CHYROMANCY, CHIRURGERY, CONFECTIONARY, COOKERY, COSMOGRAPHY, DIALLING, DIOPTRICKS, ETHICKS, FISHING, FORTIFICATION, GARDENING, GAUGING, GEOGRAPHY, GEOMETRY, GRAMMAR, GUNNERY, HANDICRAFTS, HAWKING, HERALDRY, HORSEMANSHIP, HUSBANDRY, HYDRAULICKS, HYDROGRAPHY, HYDROSTATICKS, LAW, LOGICK, MARITIME and MILITARY AFFAIRS, MATHEMATICKS, MECHANICKS, MERCHANDIZE, METAPHYSICKS, METEOROLOGY, NAVIGATION, OPTICKS, OTACOUSTICKS, PAINTING, PERSPECTIVE, PHARMACY, PHILOSOPHY, PHYSICK, PHYSIOGNOMY, PYROTECHNY, RHETORICK, SCULPTURE, STATICKS, STATUARY, SURVEYING, THEOLOGY, and TRIGONOMETRY.

Illustrated with near Five Hundred CUTS, for Giving a clearer Idea of those Figures, not so well apprehended by verbal Description.

#### LIKEWISE

**A** Collection and Explanation of WORDS and PHRASES us'd in our antient Charters, Statutes, Writs, Old Records and Processes at Law.

#### ALSO

The Theogony, Theology, and Mythology of the *Egyptians, Greeks, Romans,* &c. being an Account of their Deities, Solemnities, either Religious or Civil, their Divinations, Auguries, Oracles, Hieroglyphicks, and many other curious Matters, necessary to be understood, especially by the Readers of *English* POETRY.

To which is added,
A Collection of Proper Names of Persons and Places in *Great-Britain,* with their Etymologies and Explications.

The Whole digested into an Alphabetical Order, not only for the Information of the Ignorant, but the Entertainment of the Curious ; and also the Benefit of Artificers, Tradesmen, Young Students and Foreigners.

*A WORK useful for such as would* UNDERSTAND *what they* READ *and* HEAR, SPEAK *what they* MEAN, *and* WRITE *true* ENGLISH.

Collected by several Hands,
The *Mathematical Part* by *G. GORDON,* the *Botanical* by *P. MILLER.*
The Whole Revis'd and Improv'd, with many thousand Additions,
By *N. BAILEY,* φιλόλογος.

### LONDON:

Printed for T. COX at the *Lamb* under the *Royal-Exchange.*
M,DCC,XXX.



Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

Case 3:19-cv-01537-BEN-JLB   Document 154-1   Filed 10/22/22   PageID.17680   Page 24 of 247

A B

ABO´MASUM [with *Anatomists*] One of the four Stomachs of ruminant Animals, *i.e.* such as chew the Cud; the other three are called *Venter*, *Reticulum*, and *Omasum*.

ABO´MINARE [*abominari*, according to the native Senſe of the Word, from *ab* and *omen*, L. ſignifies to account a Thing for an ill Omen, or an unlucky Sign, and therefore to pray againſt it by certain Forms of Speech] to be abhorred, loathed or hated.

To ABO´MINATE [*abominari*, of *ab* and *omen*] properly ſignifies to take a thing for an ill Sign or unlucky Omen; to pray againſt it, or with the contrary, by certain Forms and Speecies, we uſe it for to abhor, hate or loath.

ABOMINA´TION, a thing to be abhorr´d or loathed, a deteſtable thing. L.

ABOMINO´US [*abominoſus*, L.] full of Abomination.

ABORI´GINES [of *ab* and *origo*] the People of Italy by *Saturn*, or ſuch Nations as the *Italians*, who pretend to have been anciently without Original or Derivation from any other Nation or People.

ABON [with the ancient *Britains*] ſignified a River, and was a general Name for all Rivers.
AVON

To ABO´RT [*abortir*, F. *ab* and *orior*, L.] to miſcarry, or bring forth the Foetus, before it is arrived at its Maturity for Birth.

ABO´RTION [of *aborior*, L. to riſe or ſpring up untimely] the untimely Exclusion of the Foetus, commonly called a Miſcarriage in Women.

ABO´RTION [with *Gardeners*] a Term uſed of Fruits that are produced too early before their Time, as when Trees happening to be blaſted by noxious Winds, are ſubject to this Malady, never bringing their Fruit to Maturity.

ABO´RTION [of *aborter*, F.] Miſcarriage in Women, or the bringing forth a Child before its Time, that is not in a Capacity to live.

ABO´RTIVE [*abortivus*, L.] pertaining to ſuch a Birth, ſtill-born, untimely, alſo that comes to nothing, as an abortive Deſign.

An ABO´RTIVE, a ſort of fine Vellum made of the Skin of a Caſt-calf or Lamb.

ABO´RTIVENESS, Miſcarriage; alſo Unſucceſsfulneſs.

ABO´VE [of *abuftan*, *Sax.*] aloft, higher; alſo more than, as over and above.

ABOU´T [of *abutan*, *Sax.*] round about, alſo near in Time and Place; alſo ready, as *about to go*.

ABOU´TED [with *Gardeners*] a Term uſed to denote that Trees are budded. It properly ſignifies a Swelling formed in the human Body, which has come to a Head or Abſceſs, and is applied to Trees, in that the Buds of them do in like manner ariſe like ſmall Heads.

ABRACADA´BRA, this Word is a Spell or Charm, which is ſtill in Uſe and Eſteem with ſome ſuperſtitious Perſons, who pretend to do Wonders by it in the Cure of Agues and Fevers, which is to be written in the Form of a Triangle, decreaſing one Letter every Line till it comes to a Point; and the Illiterate write the Letters in *Engliſh* Characters in the ſame Form.



A´BRACAR, a Name which *Baſilides*, an Heretick of the ſecond Century, gave to God, who he ſaid was the Author of 365, *i.e.* the 365 Days in the Year, to which the Letters אברהאסהאכסא *Abracadabra*, are ſaid to amount according to this Superſtition is ſaid to have lived in the Time of *Adrian*, and had its Name after *Abraſon*, or *Abraxas* [Αβϱεξας, Gr.] a Deity that the Author adored, this he made his ſupreme Deity, and aſcribed to him ſeveral petty ſubordinate Divinities, as 7 Angels, who preſided over the Heavens, and alſo according to the Number of Days in the Year, he held 365 Virtues or Powers, or dependent Intelligences, the Value of the Letters in the Word, according to the *Greek* Numbers made 365 thus,

Α Β Ρ Α Ξ Α Σ
1  2  100  1  60  1  200

ABRA´HAM'S BALM [in *Botany*] the Hemp-tree.

To ABRA´DE [*abrado*, L.] to ſhave off.

ABRA´SION, a ſhaving off; alſo a razing or blotting out.

A B

ABRA´SION [with *Surgeons*] a ſuperficial raiſing of the Skin.

ABRASION [in a *Medicinal Senſe*] the wearing away the natural Mucus, which covers the Membranes, particularly thoſe of the Stomach and Guts, by corroſive or ſharp Humours.

ABRASION [with *Philoſophers*] that Matter which is worn off by Attrition of Bodies one againſt another.

ABRENUNCIA´TION, a renouncing or forſaking any thing entirely. F. of L.

A´BRIC [with *Chymiſts*] Sulphur.

To ABRI´DGE [*abreger*, F.] to make ſhorter in Words, to contract, ſtill retaining the Senſe and Subſtance.

To ABRIDGE [in *Law*] to make a Declaration, or count ſhort, by leaving out Part of the Plaint or Demand, and praying that the Defendant may anſwer to the other.

ABRI´DGMENT [*abregement*, F.] an abridging, &c. wherein the leſs material Things are inſiſted on but briefly, and ſo the whole brought into a leſſer Compaſs; an Epitome or ſhort Account of a Matter; a Summary or ſhort Account of the Matter of a Book.

ABRIDGMENT [of *account*, &c. in *Law*] is the making it ſhorter by abſtracting ſome of its Circumſtances.

ABROCAME´NTUM See *Abrochment*.

To A´BROGATE [*abrogatum*, Sup. of *abrogare*, L.] to diſannul or aboliſh, eſpecially to repeal or make a Law void, which was before in Force.

ABROGA´TION, a diſannulling, &c. L.

ABROO´D [of *broedan*, *Sax.*] as to ſit abrood as an Hen on Eggs, to cheriſh.

ABROTANI´TES [Αβϱοτανίτης, Gr.] Wine made of Southernwood.

ABRO´TANUM [Αβϱότανον, Gr.] the Herb Southernwood.
ABROTONI´TES [Αϛϱοτονίτης, Gr.] Wormwood Wine.

ABRU´PT [*abruptus*, L.] Breaking off ſuddenly; unſeaſonable; alſo rough, haſty.

The ABRU´PT [*abruptum*, L.] the uneven, rough, broken, or craggy, Part of the Abyſs. *Milton*.

ABRU´PTNESS, the breaking or being broken off on a ſudden; alſo Craggineſs of a Rock, Mountain, &c.

A´BSCESS [*abſceſſus*, L. of *abs* and *cedo*, L. to retire; becauſe the Parts are diſunited by the Matter] a groſs Tumor, Ulcer, or Swelling in any Part of the Body, which may either be diſſolved, or be brought to run with Matter.

To ABSCI´ND [*abſcindere*, L.] to cut off.

ABSCI´SSÆ [in *Conick Sections*, or other *Curvilineal Figures*] are the Parts of the Axis cut off by the Ordinates, and accounted downwards from the Vertex of the Section, thus V b or V B are the *Abſciſſæ* in this Figure. Some Writers call theſe the *Intercepted Axes* or intercepted Diameters.

ABSCI´SSION [of *ab* and *ſcindo*, to cut] a cutting off. L.

ABSCISSION [with *Aſtrologers*] a Term uſed, when three Planets being within the Bounds of their Orbs, and in different Degrees of the Sign; the third comes to a Conjunction with the middle Planet, and cuts off the Light of the firſt.

To ABSCO´ND [*abſcondere*, L.] to hide one's ſelf.

A´BSENT [*abſens*, L.] that is out of the Way, miſſing or wanting.

To A´BSENT *one's ſelf*, to be voluntarily abſent, not to appear, to keep out of the Way.

ABSENTA´NEOUS [*abſentaneus*, L.] pertaining to Abſence, done in Abſence.

ABSENTEE's, a Parliament held in *Dublin* the 28th of *Henry* VIII.

ABSI´NTHIATED [*abſinthiatus*, L.] mingled with Wormwood.

ABSINTHIO´MENON [Αψινθιόμενον, Gr.] Southernwood, or Wormwood gentle.

ABSI´NTHITES [Αψινθίτης, Gr.] Wine made of Wormwood.

ABSI´NTHIUM [Αψίνθιον, Gr.] Wormwood.

A´BSIS 2 [¨Αψις, Gr.] the bowed or arched Roof of a Room, Houſe, Oven, &c. alſo the Ring or Compaſs of a Wheel.
A´PSIS

ABSIS 2 [in *Aſtronomy*] is when the Planets moving to their higheſt or loweſt Places are at a Stay; the high *Abſis* being called the *Apogæum*, and the low *Abſis* the *Perigæum*.
APSIS

To ABSI´ST [*abſiſtere*, L.] to ceaſe or leave off.

ABSOLE´TE [*abſoletus*, L.] out of Uſe, neglected.

ABSO´LVATORY [of *abſolutorius*, L.] pertaining to a Diſcharge or Acquittal.

ABSO-

## IN  IN

INFIRM, [*Infirmus*, L.] weak, feeble, crazy, fickly.
INFIRMARY [*Infirmarium*, L. *Infirmarie*, F.] an Apartment, or Lodgings, for fick People.
INFIRMNESS [*Infirmitas*, L.] Weakness, feebleness of
INFIRMITY [Body, Sickness.
INFISTULATED [in and *fistulofus*, L.] turned to or become fiftulous; alfo full of Fiftula's.
To INFIX, [*infixum*, fup. of *infigere*, L.] to fix or faften into.
To INFLAME, [*Inflammare*, L.] to fet ones Heart on fire, to heat, to inrage or incenfe; alfo to provoke, to put into a Paffion.
INFLAMMABLENESS [of *inflammable*, F; *inflammare*, L.] capableneſs of being inflamed or fet on fire.
INFLAMMATION [in *Medicine*] a bliftering heat, a Tumor occafioned by an obftruction, by means whereof the Blood in the Flefh and Muſcles, flowing into fome part faſter than it can run off again, fwells up and caufes a Tenfion with an unufual foreneſs, redneſs and heat.
INFLAMMATIVE, of an inflaming Nature or Quality.
INFLA'TE *Expreſſion*, an Expreffion fwelling with big Words; but to no great purpofe.
To INFLATE [*inflatus*, L.] to blow, fwell, or puff up with Wind.
INFLATION [in *Medicine*] a puffing up, a windy Swelling, the extenfion of a part occafioned by windy Humours.
To INFLECT [*inflectere*, L.] to bend or bow.
INFLECTION ⎫ a bending or bowing.
INFLEXION ⎭
INFLECTION [with *Grammar.*] is the variation of Nouns and Verbs in their feveral Cafes, Tenfes and Declenfions.
INFLE'CTION [in *Optick*] a multiplex Refraction of the Rays of Light, caufed by the unequal thickneſs of any Medium; fo that the Motion or Progreſs of the Ray is hindred from going on in a right Line, and is *inflected* or bent back on the infide by a Curve.

INFLECTION *Point of any Curve* [*Geometry*] is that Point or Place, where the Curve begins to bend back again a contrary way.   As for inftance, when a Curve Line as A, F, K, is partly concave and partly convex towards any right Line, as A, B, or towards a fixt point, as then the Point F, which divides the concave from the convex part, and confequently is at the beginning of the one, and the end of the other, is called the Point of Inflection, as long as the Curve being continued its towards F, keeps its courfe the fame; but the Point K is called the Point of Retrogreffion, where it begins to reflect back again towards that part or fide where it took its original.



INFLEXIBLENESS [*inflexibilitas*, L. *inflexibilité*, F.]
INFLEXIBILITY ⎭ that which cannot be bowed or bended; alfo an inflexible Temper, obftinateneſs, ſtiffneſs.
To INFLICT [*inflictum*, fup.] to lay a Punifhment upon.
INFLI'CTION, a fmiting, a laying a Punifhment upon. *L.*
INFLUENCE [*influentia*, L.] an Emiffion of a Power or Virtue; alfo the working or prevailing upon a power over, &c.
INFLUENCE [in *Aftrology*] a quality fuppofed to flow from the Bodies of the Stars, or the Effect of their Heat and Light, to which, the pretenders to that Art, attribute all the Events that happen on the Earth.
INFLUENCED [of *influentia*, L.] fwayed, biaffed, inclined towards, wrought upon.
To INFLUENCE [of *influentia*, of *influere*, L.] to flow into, to have an influence upon, to produce or caufe; to fway or have power over.
INFLUENT [*influens*, L.] flowing into.
INFLUENT *Juices* [in *Medicine*] fuch juices of a human Body, that by the contrivance of Nature and laws of Circulation, fall into another Current or Receptacle; as the *Bile* into the Gall-Bladder, &c.
INFLUENTIAL, influencing or bearing fway.
INFLUX [*influxus*, L.] a flowing or running into, efpecially of one River into another.
To INFOLD [of *in* and *g*eolban, *Sax.*] to fold or wrap up.
To INFORCE [*inforcer*, F.] to prevail upon by force of Argument, to conftrain or oblige.
INFO'RCEMENT, fuch a compulfion or reftraint.
To INFO'RM [*informare*, L.] to give notice, to tell, to inftruct, to teach, to make acquainted with.
INFORM [*informis*, L.] unfhapen, without form; alfo ugly.
IN FORMA *Pauperis* [*i. e.* under the form of a poor Perfon] is when a Perfon having made Oath before a Judge, that he is not worth 5 Pound, his Debts paid, is admitted to fue, ha-

ving Council or an Attorney affigned to manage his Bufineſs without any Fees.  *L.*
INFORMATION, an informing relation, advice; alfo inftruction, a making known; alfo an accufation brought againſt one before a Magiftrate.  *F.* of *L.*
INFORMATUS *non fum* [*i. e.* I am not informed] a formal anfwer made in Court, by an Attorney who has no more to fay in the defence of his Client.
INFORMED *Stars* [with *Aftrologers*] are fuch fixed Stars as are not ranged under any form or particular conftellation.
INFO'RMER, one who in any Court of Judicature informs againſt, or profecutes any Perfons who tranſgreſs any Law or penal Statute.
INFO'RMOUS [*informis*, L.] that is without form, faſhion or ſhape.
INFO'RTUNATE [*infortunatus*, L.] unfortunate, unlucky, unhappy.
INFO'RTUNATENESS, unhappineſs, unluckineſs.
INFO'RTUNES [with *Aftrologers*] the Planets *Saturn* and *Mars*, fo called by reafon of their ill-difpofed Natures and unfortunate Influences.
INFRA *Scapularis Muſculus* [with *Anatomiſts*] a broad or fleſhy Muſcle of the Arm, arifing from the lower fide of the *Scapula*, and ending in the third Ligament of the Shoulder.  *L.*
INFRA *Spinatus Muſculus* [with *Anat.*] a Muſcle of the Arm, fo termed from the being placed below the Spine, under which it arifes from the *Scapula*, and is inferted to the Shoulder Bone.   This Muſcle moves the Arm directly backwards.
INFRA'CTION, a breaking in, a rupture or violation of a Treaty, a Law, Ordinance, &c.
To INFRA'NCHISE [of *affranchir*, F.] to fet free, to give one his Liberty; to make a Freeman or Denizon; to incorporate into a Society or Body politick.
INFRA'NCHISEMENT [*affranchiſement*, F.] a making free, &c. alfo delivery, difcharge, releafe.
INFRALAPSA'RIANS, a Sect who hold that God has created a certain number of Men, before the fall of *Adam*, only to be damned, without allowing them the means neceffary for their Salvation, if they would labour never fo much after it.
INFRANGIBLE [of *infrangibilis*, L.] not to be broken; durable, ſtrong.
INFRA'NGIBLENESS, uncapableneſs of being broken.
INFRE'QUENCY [of *infrequentia*, L.] feldomneſs.
INFRE'QUENT [of *infrequens*, L.] feldom happening, rare, uncommon.
INFRICA'TION ⎫ a rubbing or chafing.  *L.*
INFRICTION ⎭
To INFRI'NGE [*infringere*, L.] to break a Law, Cuftom or Privilege.
INFRI'NGEMENT, fuch violation or breach.
INFRUCTUO'US [*infructuoſus*, L.] unfruitful.
INFRUGI'FEROUS [*infrugiferus*, L.] bearing no Fruit.
INFU'CATED [*infucatus*, L.] painted over.
INFUCA'TION, a painting of the Face, a colouring or difguifing.  *L.*
INFULA, a Name antiently given to fome of the pontifical Ornaments, which are faid to be Filaments or Fringes of Wool, with which Prieſts, Victims and even Temples were adorned.
To INFU'MATE [*infumare*, L.] to Smoke or dry in the Smoke.
INFUMA'TION, a drying in the Smoke.  *L.*
INFUNDI'BULIFO'RMES [with *Botaniſts*] a term applied to fuch Flowers, as are fhaped like a Funnel.
INFUNDI'BULUM, a Tunnel or Funnel for the pouring of Liquors into a Veffel.  *L.*
INFUNDIBULUM *Cerebri* [*Anatomy*] the Brain Tunnel, a hollow place in the Root of the Brain, through which ferous Humours are difcharged.  *L.*
INFUNDIBULUM *Renum* [*Anatomy*] the *Pelvis* or Bafin of the Reins, thro' which the Urine paffes to the Ureters and Bladder.  *L.*
INFU'RIATE [of *in* and *furiatus*, L.] ſtark Mad; alfo recovered from Madneſs.
INFUSCA'TION, a making dark or dusky.  *L.*
To INFU'SE [*Infuſum*, fup. of *infundere*, L.] to pour in, or into; to fteep or foak; alfo to infpire or endue with.
INFUSI'ON, a pouring in, &c.  *L.*
INFUSION [in *Pharmacy*] is a fteeping of any kinds of Drugs, Roots, Leaves, &c. in fome Liquor proper to draw out their Virtues.
To INGA'GE.  See *To Engage*.
To INGE'MINATE [*ingeminare*, L.] to double or repeat often.
INGE'MINATED *Flowers* [with *Botaniſts*] are fuch when one Flower ſtands on, or grows out, of another.

Ise

Generated for Dennis E Baron (University of Illinois at Urbana-Champaign) on 2013-07-30 21:05 GMT  /  http://hdl.handle.net/2027/nyp.33433002977704
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

A

# DICTIONARY

OF THE

# ENGLISH LANGUAGE:

IN WHICH

The WORDS are deduced from their ORIGINALS,

AND

ILLUSTRATED in their DIFFERENT SIGNIFICATIONS

BY

EXAMPLES from the best WRITERS.

TO WHICH ARE PREFIXED,

A HISTORY of the LANGUAGE,

AND

AN ENGLISH GRAMMAR.

BY SAMUEL JOHNSON, A.M.

IN TWO VOLUMES.

VOL. I.

Cum tabulis animum cenſoris ſumet honeſti ;
Audebit quæcunque parum ſplendoris habebunt,
Et ſine pondere erunt, et honore indigna ferentur.
Verba movere loco ; quamvis invita recedant,
Et verſentur adhuc intra penetralia Veſtæ :
Obſcurata diu populo bonus eruet, atque
Proferet in lucem ſpecioſa vocabula rerum,
Quæ priſcis memorata Catonibus atque Cethegis,
Nunc ſitus informis premit et deſerta vetuſtas.

HOR.



LONDON,

Printed by W. STRAHAN,

For J. and P. KNAPTON ; T. and T. LONGMAN ; C. HITCH and L. HAWES ;
A. MILLAR ; and R. and J. DODSLEY.

MDCCLV.

Generated for Dennis E Baron (University of Illinois at Urbana-Champaign) on 2013-07-30 20:24 GMT / http://hdl.handle.net/2027/ucm.5326809190
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSIDAD COMPLUTENSE
DE MADRID

Case 3:19-cv-01537-BEN-JLB   Document 154-1   Filed 10/22/22   PageID.17683   Page 27 of 247

Generated for Dennis E Baron (University of Illinois at Urbana-Champaign) on 2013-07-30 20:25 GMT  /  http://hdl.handle.net/2027/ucm.532680919O
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

# A B R

6. Relating to the person, as a servant.
  Liking very well the young gentleman, such I took him to
  be, admitted this Diniparmo *as* met *me*, who well shewed, there
  is no service like his that serves because he loves.   *Sidney, b. ii.*
  Good master, corporal, captain, for my old dame's fake,
  stand my friend : she hath no body to do any thing *about* her
  when I am gone, and she is old and cannot help herself.
                                      *Shakespeare's Henry IV. p. ii.*

A'BOUT. *adv.*
1. Circularly.
  The weyward sisters, hand in hand,
  Posters of the sea and land,
  Thus do go *about, about,*
  Thrice to thine, and thrice to mine,
  And thrice again to make up nine.   *Shakesp. Macbeth.*
2. In circuit.
  My honest lads, I'll tell you what I am *about.*—Two yards
  and more,—No quips now, Pistol : indeed I am in the waste
  two yards *about* ; but I am about no waste, I am about thrift.
                             *Shakespeare's Merry Wives of Windsor.*
  A turn *about* was ev'ry pillar there,
  A polish'd mirrour shone not half so clear.   *Dryd. Fables.*
3. Nearly.
  When the boats were come within *about* sixty yards of the
  pillar, they found themselves all bound, and could go no far-
  ther ; yet so as they might move to go about, but might not
  approach nearer.   *Bacon's New Atalantis.*
4. Here and there ; every way.
  Up rose the gentle virgin from her place,
  And looked all *about,* if she might spy
  Her lovely knight to move his manly pace.
                           *Fairy Queen, b. i. cant. ii. stanz. 33.*
  A wolf that was past labour, had the wit in his old age, yet
  to make the best of a bad game ; he borrows a habit, and so
  *about* he goes, begging charity from door to door, under the
  disguise of a pilgrim.   *L'Estrange.*
5. With a before a verb ; as, *about* to fly ; upon the point, with-
  in a small distance of.
  These dying lovers, and their floating sons,
  Suspend the fight, and silence all our guns :
  Beauty and youth, *about* to perish, finds
  Such noble pity in brave English minds.   *Waller.*
6. The longest way, in opposition to the short straight way.
  Gold hath these natures ; greatness of weight ; closeness of
  parts ; fixation ; pliantness, or softness ; immunity from rust ;
  colour, or tincture of yellow : Therefore the sure way (though
  most *about*) to make gold, is to know the causes of the several
  natures before rehearsed.   *Bacon's Natural Hist. N° 328.*
         Spies of the Volscians
  Held me in chase, that I was forc'd to wheel
  Three or four miles *about* ; else had I, Sir,
  Half an hour since brought my report.   *Shakesp. Coriolanus.*
7. To bring about ; to bring to the point or state desired ; as, *he
  brought about his purposes.*
  Whether this will be brought *about,* by breaking his head, I
  very much question.   *Spectator.*
8. To come about ; to come to some certain state or point.
  Wherefore it came to pass, when the time was come *about,*
  after Hannah had conceived, that she bare a son.   *i Sam. i. 20.*
  One evening it befel, that looking out,
  The wind they long had wish'd was come *about* ;
  Well pleas'd they went to rest ; and if the gale
  'Till morn continu'd, both refolv'd to fail.   *Dryd. Fables.*
9. To go about a thing ; to prepare to do it.
  Did not Moses give you the law, and yet none of you
  keepeth the law?  Why go ye *about* to kill me?   *John vii. 19.*
  In common language, they say, to *come about* a man, to cir-
  cumvent him.
  Some of these phrases seem to derive their original from the
  French *à bout ; venir à bout d'une chose ; venir à bout de quel-
  qu'un.*
A. Bp. for Archbishop ; which fee.
ABRACADA'BRA.  A superstitious charm against agues.
To ABRA'DE. *v. a.*  [*Lat. abrado.*]  To rub off ; to wear a-
  way from the other parts ; to waste by degrees.
  By this means there may be a continued supply of what is
  successively *abraded* from them by decoction of waters.
                                         *Hale's Origin of Mankind.*
A'BRAHAM's BALM.  The name of an herb.
ABRA'SION.  [See ABRADE.]
1. The act of abrading ; a rubbing off.
2. [In medicine.]  The wearing away of the natural mucus,
  which covers the membranes, particularly those of the stomach
  and guts, by corrosive or sharp medicines, or humours.  *Quincy.*
3. The matter worn off by the attrition of bodies.
ABRE'AST. *adv.*  [See BREAST.]  Side by side ; in such a po-
  sition that the breasts may bear against the same line.
               My equals first in Suffolk,
  My soul shall shine keep company to heav'n :
  Tarry, sweet soul, for mine, then fly *abreast.*  *Shak. Henry V.*
  For honour travels in a streight so narrow,
  Where one but goes *abreast.*  *Shakesp. Troilus and Cressida.*
VOL. I.

# A B R

The riders rode *abreast,* and one his shield,
His lance of cornel-wood another held ;
The third his bow, and, glorious to behold !
The costly quiver, all of burnish'd gold.   *Dryden's Fables.*
ABRI'COT.   See APRICOT.
To ABRI'DGE. *v. a.*  [*abreger,* Fr. *abbrevio,* Lat.]
1. To make shorter in words, keeping still the same substance.
  All these sayings, being declared by Jason of Cyrene in five
  books, we will essay to *abridge* in one volume.   *2 Macc. ii. 23.*
2. To contract, to diminish, to cut short.
  The determination of the will, upon enquiry, is following
  the direction of that guide ; and he, that has a power to act or
  not to act, according as such determination directs, is free.
  Such determination *abridges* not that power wherein liberty
  consists.   *Locke.*
3. To deprive of ; in which sense it is followed by the particle
  *from,* or *of,* preceding the thing taken away.
              I have disabled mine estate,
  By shewing something a more swelling port,
  Than my faint means would grant continuance ;
  Nor do I now make moan to be *abridg'd*
  From such a noble rate.   *Shakespeare's Merchant of Venice.*
  They were formerly, by the common law, discharged from
  pontage and murage ; but this privilege has been *abridged* them
  since by several statutes.   *Ayliffe's Parergon Juris Canonici.*
ABRI'DGED OF. *part.*  Deprived of, debarred from, cut short.
            See ABRIDGER.
ABRI'DGER. *n. f.*
1. He that abridges ; a shortener.
2. A writer of compendiums or abridgments.
ABRI'DGMENT. *n. f.*  [*abregement,* French.]
1. The contraction of a larger work into a small compass.
  Surely this commandment containeth the law and the pro-
  phets ; and, in this one word, is the *abridgment* of all volumes
  of scripture.   *Hooker, b. ii. § 5.*
              Myself have play'd
  The int'rim, by remembring you his pall ;
  Then brook *abridgment,* and your eyes advance
  After your thoughts, straight back again to France?
                                      *Shakespeare's Henry V.*
  Idolatry is certainly the first-born of folly, the great and
  leading paradox ; nay, the very *abridgment* and sum total of
  all absurdities.   *South's Sermons.*
2. A diminution in general.
  All trying, by a love of littleness,
  To make *abridgment,* and to draw to less,
  Even that nothing, which at first we were.   *Donne.*
3. Restraint, or abridgment of liberty.
  The constant desire of happiness, and the constraint it puts
  upon us, no body, I think, accounts an *abridgment* of liberty,
  or at least an *abridgment* of liberty, to be complained of.
                                                        *Locke.*
ABRO'ACH. *adv.*  [See To BROACH.]
1. In a posture to run out ; to yield the liquor contained ; pro-
  perly spoken of vessels.
  The Templer spruce, while ev'ry liquor's *abroach,*
  Stays 'till 'tis late, yet seems to call a coach.   *Swift's Miscel.*
  The jars of gen'rous wine, (Acestes' gift,
  When his Trinacrian shores the navy left)
  He set *abroach,* and for the feast prepar'd,
  In equal portions with the ven'son sha'rd.
                             *Dryden's Virgil's Æneid, vol. ii.*
2. In a figurative sense ; in a state to be diffused or advanced ; in
  a state of such beginning as promises a progress.
  That man, that sits within a monarch's heart,
  And ripens in the sunshine of his favour,
  Would he abuse the countenance of the king,
  Alack ! what mischiefs might be set *abroach,*
  In shadow of such greatness?  *Shakespeare's Henry IV. p. ii.*
           In another sense.  See BROAD.]
ABRO'AD. *adv.*  [compounded of *a* and *broad.*  See BROAD.]
1. Without confinement ; widely ; at large.
                Intermit no watch
  Against a wakeful foe, while I *abroad,*
  Thro' all the coasts of dark destruction seek
  Deliverance.   *Milton's Paradise Lost, b. ii. l. 463.*
  Again, the lonely fox roams far *abroad,*
  On secret rapine bent, and beaghtful fraud ;
  Now haunts the cliff, now traverses the lawn,
  And flies the hated neighbourhood of man.   *Prior.*
2. Out of the house.
                 Welcome, Sir,
  This cell's my court ; here have I few attendants,
  And subjects none *abroad.*   *Shakespeare's Tempest.*
  Lady —— walked a whole hour *abroad,* without dying after
  it ; at least in the time I staid : though she seemed to be
  fainting, and had convulsive motions several times in her head.
                                                    *Pope's Letters.*
3. In another country.
  They thought it better to be somewhat hardly yoked at home,
  than for ever *abroad,* and discredited.   *Hooker, Pref.*
  Whosoever offers at verbal translation, shall have the mis-
  fortune of that young traveller, who lost his own language
  *abroad,* and brought home no other instead of it.  *Sir J. Denham.*
                                                        D                What

Digitized by Google        Original from
UNIVERSIDAD COMPLUTENSE
DE MADRID

Generated for Dennis E Baron (University of Illinois at Urbana-Champaign) on 2013-07-30 20:35 GMT / http://hdl.handle.net/2027/ucm.5326809190
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

# INF

He should regard the propriety of his words, and get some *information* in the subject he intends to handle.          *Swift.*

Then men have had longer opportunities of *information*, and are equally concerned with ourselves.          *Rogers.*

2. Charge or accusation exhibited.

3. The act of informing or actuating.

INFO′RMER. *n. f.* [from *informo*.]

1. One who gives intelligence.

This writer is either by affed by an inclination to believe the worst, or a want of judgment to choose his *informers*.          *Swift.*

2. One who discovers offenders to the magistrate.

There were spies and *informers* set at work to watch the company.          *L'Estrange.*

Let no court sycophant pervert my sense,
Nor fly *informer* watch these words to draw
Within the reach of treason.          *Pope.*

*Informers* are a detestable race of people, although sometimes neceffary.          *Swift.*

INFO′RMIDABLE. *adj.* [*in* and *formidabilis*, Lat.] Not to be feared ; not to be dreaded.

Of strength, of courage haughty, and of limb
Heroick built, though of terreftrial mold ;
Foe not *informidable*, exempt from wound.          *Milton.*

INFO′RMITY. *n. f.* [from *informis*, Lat.] Shapeleffness.

From this narrow time of geftation may ensue a smalnefs in the exclusion ; but this inferrth no *informity*.          *Brown.*

INFO′RMOUS. *adj.* [*informe*, Fr. *informis*, Latin.] Shapeless ; of no regular figure.

That a bear brings forth her young *informous* and unshapen, which she fashioneth after by licking them over, is an opinion not only common with us at present, but hath been delivered by ancient writers.          *Brown's Vulgar Errours.*

INFO′RTUNATE. *adj.* [*infortuné*, Fr. *infortunatus*, Latin.] Unhappy.   See INFORTUNATE, which is commonly used.

Perkin, feeing himself prifoner, and deftitute of all hopes, having found all either false, faint, or *infortunate*, did gladly accept of the condition.          *Bacon's Henry VII.*

To INFRA′CT. *v. a.* [*infractus*, Lat.]   To break.

Falling fast, from gradual flope to flope,
With wild *infracted* courfe and leffen'd roar,
It gains a safer bed.          *Thomson's Summer.*

INFRA′CTION. *n. f.* [*infraction*, Fr. *infractio*, Lat.]   The act of breaking ; breach ; violation.

By the same gods, the juftice of whole wrath
Punish'd the *infraction* of my former faith.          *Waller.*

The wolves, pretending an *infraction* in the abuse of their hoftages, fell upon the sheep immediately without their dogs.          *L'Estrange's Fables.*

INFRA′NGIBLE. *adj.* [*in* and *frangible*]   Not to be broken.

These atoms are fuppofed *infrangible*, extremely compacted and hard, which compactednefs and hardnefs is a demonstration that nothing could be produced by them, fince they could never cohere.          *Cheyne's Phil. Princ.*

INFRE′QUENCY. *n. f.* [*infrequentia*, Latin.]   Uncommonnefs ; rarity.

The absence of the gods, and the *infrequency* of objects, made her yield.          *Broome's Notes on Pope's Odyssey.*

INFRE′QUENT. *adj.* [*infrequens*, Lat.]   Rare ; uncommon.

To INFRI′GIDATE. *v. a.* [*in* and *frigidus*, Lat.]   To chill ; to make cold.

The drops reached little further than the furface of the liquor, whofe coldnefs did not *infrigidate* those upper parts of the glafs.          *Boyle.*

To INFRINGE. *v. a.* [*infringo*, Latin.]

1. To violate ; to break laws or contracts.

Thofe many had not dar'd to do that evil,
If the firft man that did th' edict *infringe*,
Had anfwer'd for his deed.          *Shakesp. Meaf. for Meaf.*

Having *infring'd* the law, I wave my right
As king, and thus fubmit myfelf to fight.          *Waller.*

2. To deftroy ; to hinder.

Homilies, being plain and popular inftructions, do not *infringe* the efficacy, although but read.          *Hooker.*

Bright as the deathlefs gods and happy, fhe
From all that may *infringe* delight is free.          *Waller.*

INFRINGEMENT. *n. f.* [from *infringe*.]   Breach ; violation.

The punifhing of this *infringement* is proper to that jurifdiction againft which the contempt is.          *Clarendon.*

INFRINGER. *n. f.* [from *infringe*.]   A breaker ; a violator.

A clergyman's habit ought to be without any lace, under a fevere penalty to be inflicted on the *infringers* of the provincial constitution.          *Ayliffe's Parergon.*

INFUNDIBULIFORM. *n. f.* [*infundibulum* and *forma*, Lat.]   Of the fhape of a funnel or tundifh.

INFU′RIATE. *adj.* [*in* and *furia*, Lat.]   Enraged ; raging.

As th' other boys, with touch of fire
Dilated and *infuriate*.          *Milton.*

If by the torch of noon to tenfold rage,
Th' *infuriate* hill forth fhoots the pillar'd flame.          *Thomson.*

INFUSCA′TION. *n. f.* [*infuscatus*, Lat.]   The act of darkening or blackening.

To INFU′SE. *v. a.* [*infuse*, Fr. *infusus*, Latin.]

# ING

1. To pour in ; to inftil.

Thou almoft mak'ft me waver in my faith,
To hold opinion with Pythagoras,
That fouls of animals *infuse* themfelves
Into the trunks of men.          *Shakesp. Merchant of Venice.*

My early miftrefs, now my ancient mufe,
That ftrong Circean liquor ceafe t' *infuse*,
Wherewith thou didft intoxicate my youth.          *Denham.*

Why fhould he defire to have qualities *infufed* into his fon, which himfelf never poffeffed ?          *Swift.*

Meat muft be with money bought ;
She therefore, upon fecond thought,
Infus'd, yet as it were by ftealth,
Some fmall regard for ftate and wealth.          *Swift.*

2. To pour into the mind ; to inftire into.

For when God's hand had written in the hearts
Of our firft parents all the rules of good,
So that their fkill *infus'd* furpafs'd all arts
That ever were before, or fince the flood.          *Davies.*

Sublime ideas, and apt words *infuse* ;
The muse inftruct my voice, and thou infpire the mufe. *Rofc.*

He *infus'd*
Bad inference into th' unwary breaft.          *Milton.*

*Infuse* into their young breafts fuch a noble ardour as will make them renowned.          *Milton.*

3. To fteep in any liquor with a gentle heat ; to macerate fo as to extract the virtues of any thing.

Take violets, and *infuse* a good pugil of them in a quart of vinegar.          *Bacon's Natural Hiftory.*

4. To make an infusion with any ingredient ; to fupply, to tincture, to faturate with any thing infufed.

Drink, *infus'd* with flefh, will nourifh fafter and eafier than meat and drink together.          *Bacon's Natural Hiftory.*

5. To infpire with.

Thou didft fmile,
*Infus'd* with a fortitude from heav'n.          *Shakesp. Tempeft.*

*Infuse* his breaft with magnanimity,
And make him, naked, foil a man at arms.          *Shakesp. H. VI.*

INFU′SIBLE. *adj.* [from *infuse*.]

1. Poffible to be infufed.

From whom the doctrines being *infusible* into all, it will be more neceffary to forewarn all of the danger of them. *Hamm.*

2. Incapable of diffolution ; not fufible.

Vitrification is the laft work of fire, and a fufion of the falt and earth, whereon the fufible falt draws the earth and *infusible* part into one continuum.          *Brown's Vulgar Errours.*

INFU′SION. *n. f.* [*infusion*, Fr. *infusio*, Latin.]

1. The act of pouring in ; inftillation.

Our language has received innumerable elegancies and improvements from that *infusion* of Hebraifms, which are derived to it out of the poetical paffages in holy writ.          *Addifon's Spect.*

2. The act of pouring into the mind ; infpiration.

We participate Chrift partly by imputation, as when thofe things which he did and fuffered for us are imputed to us for righteoufnefs ; partly by habitual and real *infusion*, as when grace is inwardly beftowed on earth, and afterwards more fully both our fouls and bodies in glory.          *Hooker.*

They found it would be matter of great debate, and fpend much time ; during which they did not defire their company, nor to be troubled with their *infusions*.          *Clarendon.*

Here his folly and his wifdom are of his own growth, nor the echo or *infusion* of other men.          *Swift.*

3. The act of fteeping any thing in moifture without boiling.

Repeat the *infusion* of the body oftener.          *Bacon.*

4. The liquor made by infusion.

To have the *infusion* ftrong, in thofe bodies which have finer fpirits, repeat the infusion of the body oftener.          *Bacon.*

INFU′SIVE. *adj.* [from *infuse*.]   Having the power of infusion, or being infufed.   A word not authorifed.

Still let my fong a nobler note affume,
And fing th' *infusive* force of Spring on man.          *Thomson.*

INGA′TE. *n. f.* [*in* and *gate*.]   Entrance ; paffage in.
One noble perfon ftoppeth the *ingate* of all that evil which is looked for, and holdeth in all thofe which are at his back.
          *Spenser on Ireland.*

INGANNA′TION. *n. f.* [*ingannare*, Italian.]   Cheat ; fraud ; deception ; juggle ; delufion ; impofture ; trick ; flight.   A word neither ufed nor neceffary.

Whoever fhall refign their reafons, either from the root of deceit in themfelves, or inability to refift fuch trivial *ingannations* from others, are within the line of vulgarity.          *Brown.*

INGA′THERING. *n. f.* [*in* and *gathering*.]   The act of getting in the harveft.

Thou fhalt keep the feaft of *ingathering*, when thou haft gathered in thy labours out of the field.          *Exo. xxiii. 16.*

INGE, in the names of places, fignifies a meadow, from the Saxon *inʒ*, of the fame import.          *Gibfon's Camden.*

To INGE′MINATE. *v. a.* [*ingemino*, Latin.]   To double ; to repeat.

He would often *ingeminate* the word peace, peace. *Clarendon.*

INGEMINA′TION. *n. f.* [*in* and *geminatio*, Latin.]   Repetition ; reduplication.

                                        INGE′NDERER.

Digitized by Google                Original from
                                  UNIVERSIDAD COMPLUTENSE
                                  DE MADRID

# THE POLICE POWER

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:32:40 UTC
All use subject to https://about.jstor.org/terms

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:32:40 UTC
All use subject to https://about.jstor.org/terms

# THE **POLICE**
# POWER

**PATRIARCHY**
**AND THE FOUNDATIONS**
**OF AMERICAN GOVERNMENT**

## **MARKUS DIRK DUBBER**

COLUMBIA UNIVERSITY PRESS

*New York*

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:32:40 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0266



Columbia University Press
Publishers Since 1893
New York, Chichester, West Sussex
Copyright © 2005 Columbia University Press
All rights Reserved

Library of Congress Cataloging-in-Publication Data
    Dubber, Markus Dirk
    The police power : patriarchy and the foundations of American government / Markus
Dirk Dubber.
      p. cm.
    Includes bibliographical references and index.
    ISBN : 0–231–13206–9 (cloth : alk. paper)
    Police power—United States—History.
    I. Title
    KF4695 .D82    2005
    342.73/0418  22                                          2004043140

Columbia University Press books are printed on permanent and durable acid-free paper
Printed in the United States of America

c 10 9 8 7 6 5 4 3 2 1

References to Internet Web Sites (URLs) were accurate at the time of writing. Neither the
author nor Columbia University Press is responsible for Web sites that may have expired or
changed since the book was prepared.

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:32:40 UTC
All use subject to https://about.jstor.org/terms

**4**

# Policing the New Republic

I t's not entirely clear, of course, exactly whom and what the American political and legal thinkers and doers who first spoke of a power to police read and when they read it. It's also unclear, therefore, to what extent these Americans were directly influenced by any, or all, of the various facets of the concept of police in early modern Europe or in the police science of the seventeenth and eighteenth centuries, or if, perhaps, they got their police entirely from Blackstone's *Commentaries*, the source of so much institutional inspiration in the new republic.

Luckily, however, we learned it doesn't much matter whether the Founding Fathers picked up the police concept from Blackstone or Beccaria or Bentham, or Adam Smith or any of the other eighteenth-century police scientists. It doesn't matter because the core idea of police was the same on both sides of the Channel, for the simple reason that its roots reached back far beyond the divide between continental and English politics and law, to the very origins of Western political thought and practice. Already the Greeks had differentiated between politics, the self-government of householders by householders, and the other-government of households by their householders. Police marked the point of convergence between politics and economics, when one mode of governance merged into the other, and created the oxymoronic science of political economy. The police power was born when the governmentality of the private (micro) household was expanded, and transferred, onto that of the public (macro) household. Equipped with the power to police, the sovereign ruled "the individuals of the state, like mem-

**81**

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:33:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0268

bers of a well-governed family," in Blackstone's words,[1] or "of that great family, the State," in Rousseau's.[2]

It's no surprise that the Founding Fathers took easily to this theory of government as patriarchy, and of politics as economics, as they had been practicing it for quite some time. In their corporations, their camps, their towns, their churches, their families, and on their plantations, they had been doing police long before they had a name for it, that modern, enlightened, scientific concept of police.

The problem, of course, was that this mode of governance stood in deep tension with the principle upon which the American Republic was built, and that gave legitimacy to it, *self-government*. It was one thing for the Kings of England and of Prussia to think of themselves as policing their respective realms, as a more or less benevolent father might his family. It was quite another for the governors of a democratic republic built upon the equality of all, governors and governed alike, to adopt this patriarchal posture.

But adopt it they did, as they applied themselves to the task of policing the new state with a vengeance, developing a distinctly American version of police along the way, turning *police science* into *police power*. Recognized as the very foundation of government, and even as synonymous with government itself, American police power remained true to the common core of all varieties of police, from France to Germany to Scotland to England: its foundation in the householder's governance of the household. All of the components of American police power can be traced back to that model. Its undefinability derives from the father's virtually unlimited discretion not merely to discipline, but to do what was required for the welfare of the household. The ahumanity of its object derives from the essential sameness of all components of the household, animate and inanimate, as tools in the householder's hands. That essential sameness, however, also implies the essential difference between the householder and his household, and therefore the hierarchical aspect of American police power, along with its fundamental amorality. The power to police seeks efficiency, not legitimacy. Patriarchy's concern for the welfare of the household is the police power's concern for the welfare of the state, a concern that expresses itself positively and negatively, in the correction of inferior members of the state household as well as in its protection against threats.[3]

As we've already noted, the Americans, when they revealed the sources of their view of police, were quite explicit about its patriarchal essence. The one definition of police they quoted again and again was, after all, Blackstone's and Blackstone could not have been clearer on this point. It bears repeating that he viewed the police power as that power which the king, as "*pater-familias* of the nation,"[4] possessed vis-à-vis his kingdom, as *familia*.

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:33:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0269

This persistent reliance on Blackstone is truly remarkable. For what relevance could a theory that rooted state power in the king's obligations toward, and authority over, his kingdom retain in a republic? Wasn't the American revolution all about independence, independence also from the king's arbitrary prerogative, which he exercised over his American subjects like a householder over his household? In short, wasn't the revolution meant precisely to rid the Americans of the patriarchal police power of the King of England?

Ending the king's police power, it turns out, did not mean ending police power altogether. Nor did it mean depriving oneself of that power. We have already seen that policing in fact if not by name already had shaped American government since long before the revolution, and it continued to do so long thereafter. Americans had no objections to the notion of one person policing another, or rather a community of others. American society was deeply hierarchical, organized into households of various sizes and types. The kingdom-household under the authority of the king-father was only one of these households, and in many ways the least significant in everyday life. The English king, with "his" law, was very far away. Government occurred at the local level, in the family, the church, the town, perhaps the colony, and of course the plantation.

Americans didn't appreciate being policed, but they had no qualms about policing. The revolution thus can be seen as the removal of a higher layer of household governance. Americans extracted themselves from the kingdom-household so that they could go about policing their respective households without interference from the macro householder, the king.[5] After the revolution, for example, now-state officials no longer would have to deal with royal missives reminding them that slave owners should be held to account for killing their slaves, because slaves were members not only of a plantation household, and the then-colonial household, but also of the grand household of the king. These decrees had been annoying during the colonial era because they interfered with the proper policing of the then-colony, while they reminded the officials of their inferior status vis-à-vis the royal paterfamilias. Under the loose supervision of the king-father, Americans had been free to enslave, in Jonathan Bush's phrase. After the revolution they were truly free to police.

They were free because they were free from someone else's police power. They were also free because they were free to police others. Their autonomy consisted in not being under heteronomy *and* in exercising heteronomy over others. This is the model of republican government familiar from Greek politics, which the American revolutionaries studied with great interest. The new American state was to be a republic, but a republic of householders. It was the householders who were to participate in government, indirectly and

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:33:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0270

directly, by voting and being voted for, and resolving disputes among them-
selves. But the business of government did not end there. Government also
meant, as it always had, policing others. And so everyone, and everything,
else incapable of self-government was to be policed by those who were so ca-
pable.

It's not clear exactly what the drafters of the early state constitutions meant
when they spoke of "governing and regulating the internal police" of the
state. Judging by what governing and regulating American state legislatures
actually did under the heading of "internal police of the state" when they got
around to revising their statutes in the early republic, the objects of their po-
lice included, among other things (and people), taverns, brothels, bawdy
houses, lost goods, and gunpowder, paupers, vagrants, disorderly persons,
prostitutes, drunkards, tipplers, gamesters, the unemployed, jugglers, com-
mon showmen, as well as illegitimate children, and stray animals.[6]

Suffrage limitations didn't just discriminate against the propertyless,
women, slaves, children, animals, and inanimate objects.[7] They eliminated
those who were under the police of *another* person, or—in the case of those
who were denied the status of personhood, including slaves, children, ani-
mals, and inanimate objects—under the police of *some* person. In the house-
holder's republic, the household had no right to govern, only to be governed,
or rather policed.

A fully matured capacity for self-government was required for participa-
tion in the self-government of the political community. That capacity was
thought to be lacking in those who were mere objects of another's police,
whether their householder was the family patriarch, as in the case of wives,
children, servants, animals, and other household property, or the state as
macro householder, in the case of those receiving public poor relief. Even if
the capacity for autonomy wasn't lacking entirely under these conditions, its
actual exercise was surely thought to be impossible. Even if objects of police
could be free in the abstract, they were not, and could not be, free in fact.

As "persons of indigent fortunes, or such as are under the immediate do-
minion of others," objects of police were "suspected to have no will of their
own," and therefore incapable of exercising whatever capacity for self-
government they might possess.[8] That "suspicion" in fact manifested itself as
an irrebuttable presumption in the form of categorical property qualifications,
which persisted in some states until the 1930s.[9]

Now given that there remained so many objects of police, animate and
inanimate, even after the revolution and the ejection of the royal house-
holder and his overseers, there was never any question *whether* there was to
be continued policing in the new republic but merely *who* was to do the
policing. So obvious was the continued need for police that Americans never

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:33:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0271

managed, or bothered, to develop an indigenous account of the nature of police. In fact, early American treatments of police devoted themselves largely to the task of explaining, and repeating, the very obviousness of police. Take for example the concluding passage of Judge Redfield's opinion in *Thorpe v. Rutland & Burlington Railroad* Company,[10] an 1854 case from Vermont that came to be cited as one of the classic discussions of the police power:

> One in any degree familiar with this subject would never question the right depending upon invincible necessity, in order to the maintenance of any show of administrative authority among the class of persons with which the city police have to do. To such men any doubt of the right to subject persons and property to such regulations as the public security and health may require, regardless of merely private convenience, looks like mere badinage. They can scarcely regard the objector as altogether serious. And generally, these doubts in regard to the extent of governmental authority come from those who have had small experience.[11]

The answer to the question of who would get to do the policing in the new republic was just as obvious: we. "We" originally meant "the people," in the sense of the collection of householders entitled to participate in government. So some of the early state constitutions feature declarations such as this one, taken from the Pennsylvania Constitution of 1776: "the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." Here the householder-citizens of Pennsylvania are defiantly throwing off the police power once held over them by their erstwhile macro householder, the king.

But the people of Pennsylvania not only announced that they no longer would be policed by the King of England. They also made clear that the departure of the ultimate policer didn't mean the departure of police. That the power of police was intimately connected to the king's prerogative didn't cause much of a problem, and certainly no more of a problem than the transfer of any other aspect of the royal prerogative, i.e., the authority enjoyed by the king as father of the kingdom family. Now that the king was gone, his prerogative was simply transferred onto the new sovereign: "the people of this State." In the context of police, Thomas Paine's famous answer to the question "where . . . is the King of America?", that "in America THE LAW IS KING,"[12] meant that the prerogative police power of one man, the king, now belonged to a group of men, the people, who had assumed the power to police.

Once the people of the various states had freed themselves from the king's policing of their police, they were understandably wary of subjecting themselves to the police power of another master. To many the creation of an

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:33:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0272

American nation meant being reintegrated within a larger household under another superior householder. And it is in the context of the debates about the federal constitution that one finds the most extended discussions of the obviousness of police power. So we learn that the power to police is an inherent attribute of all government, or least of any free government, where "free" here meant free from a superior police power.

This point about the inevitability of policing in any government was so universally conceded that it helped forge the very consensus upon which the American federalist system of government was built. By leaving "the people of this State" the "sole, exclusive and inherent right of . . . regulating the internal police of the same," the United States preserved the States' status as independent households, or units of police. They, in other words, remained free to police. But they gave up that other aspect of government, namely that of "governing" in the narrow sense. Government *by law* now became a matter not only of the states, but also of the national government. The state-householders could still police their household, but they were now subject to the *laws* of the nation. Those laws, however, were not to be measures of police, issued by a higher power. They were to be laws made with their participation, as always had been appropriate for a government of autonomous householders.

In fact, American constitutional discourse went one step farther. It left the states' power of "internal police" untouched, while it denied the federal government any police power of its own. In other words, it retained the household status of the states by denying the household status of the union.

This arrangement was self-contradictory; nonetheless, it has remained in place to this day. The problem with the compromise upon which the union was built was that it insisted that the power to police was inherent in the very concept of government, while at the same time ostensibly erecting a government without that very power. But this inconsistency has not interfered with the rhetorical usefulness of the police concept over the past two hundred years. The clear assignment of police power to the states, and only to the states, dramatically simplified constitutional analysis. If it was police, it was the states' business.

As a matter of political fact, if not of rhetoric, the inconsistency did manage to resolve itself. As Ernst Freund remarked in 1904, after only the first century of federal legislation, it had become "impossible to deny that the federal government exercises a considerable police power of its own."[13] Despite all the rhetoric about the policeless federal government, already the Federalist Papers claimed a federal police power, even if not in so many words. So Hamilton spoke of the need of government to hand out "a penalty or punishment for disobedience,"[14] and in particular "the disorderly conduct

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:33:34 UTC
All use subject to https://about.jstor.org/terms

of refractory or seditious individuals."[15] Here a "vigorous"[16] government was
needed to dispose of those "seditions and insurrections . . . that are, unhap-
pily, maladies as inseparable from the body politic as tumors and eruptions
from the natural body."[17]

And this became the general modus operandi of the federal government:
use your police power, but call it anything but that. One of the most obvious,
and extreme, uses of the federal police power took the form of federal control
over Native Americans and their "Indian affairs," under the auspices of that
most police scientific institutions of princely government, a "Bureau." This
clear and prolonged exercise of comprehensive householder authority over a
household composed of inferior objects who could have no say in their gov-
ernment, this textbook example of police, was in fact carried out mostly un-
der the commerce clause, which authorized the national government not to
regulate the "police" of the nation, but instead to regulate "commerce"
among the micro households (i.e., the states) within the nation, as well as be-
tween the nation and other macro households (i.e., other nations).[18]

The commerce clause early on emerged as the favorite cover for the exer-
cise of federal police power. The most recent example is the creation of a
comprehensive federal code of drug criminal law, all under the guise of pre-
venting interference with interstate commerce.[19] In fact, almost the entire
edifice of federal criminal law, which has reached proportions that would
have surprised even a police realist like Freund, derives from the commerce
clause. Only recently has the U.S. Supreme Court begun to review the fed-
eral government's use of the commerce clause to generate police measures.
In *United States v. Lopez*,[20] the Court even went so far as to strike down a fed-
eral criminal statute ostensibly based on the federal commerce power. On
what ground? Because to uphold the statute would "bid fair to convert con-
gressional authority under the Commerce Clause to a general police power
of the sort retained by the States."[21] In other words, the fiction of exclusive
*state* police power is alive and well, even after *Lopez*.

Having secured "the sole, exclusive and inherent right of governing and
regulating the internal police of the same" twice over, once against the king
and then against the union, "the people" of the states turned their attention
to the task at hand. With the revolutionary work complete, the time had
come to govern. As Benjamin Rush gushed in the summer of 1787: "the same
enthusiasm *now* pervades all classes in favor of *government* that actuated us in
favor of *liberty* in the years 1774 and 1775, with this difference, that we are
more *united* in the former than we were in the latter pursuit."[22]

And to govern also, and especially, meant to police. For there was much
policing to be done. As Benjamin Franklin cautioned in 1789: "We have been
guarding against an evil that old States are most liable to, *excess of power* in the

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:33:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0274

rulers, but our present danger seems to be *defect of obedience* in the subjects."[23] Others warned that "[t]he principal fault seems to be, a want of energy in the administration of government." What was needed was "an increase of magisterial power in order to provide for the 'execution of the laws that is necessary for the preservation of justice, peace, and internal tranquility.' "[24]

It was high time that order be restored in the American state household. Household members had to be put—back—in their proper place, lest they mistake themselves for householders capable of government. There were plenty of people in need of policing. The recently liberated householders saw post-revolutionary America teeming with men "*whose fathers they would have disdained to have sat with the dogs of their flocks*, raised to immense wealth, or at least the appearance of a haughty, supercilious and luxurious spendthrift."[25]

The comprehensive pursuit of police permeated every branch, and every level, of government. We've already heard about the police commissioners and peace officers who began to appear in American cities in the 1770s and 80s. And these agents were not long confined to executing the statutes on Blackstone's list of police offenses.

Soon the legislative bodies of the states began issuing their very own police regulations, from the state on down to cities, towns, and villages. As an illustration, the New York state legislature passed police regulations in these areas between 1781 and 1801. The list is compiled by William Novak:[26]

- lotteries
- hawkers and peddlers
- the firing of guns
- usury
- frauds
- the buying and selling of offices
- beggars and disorderly persons
- rents and leases
- firing woods
- the destruction of deer
- stray cattle and sheep
- mines
- ferries
- apprentices and servants
- bastards
- idiots and lunatics
- counsellors, attorneys and solicitors
- travel, labor, or play on Sunday
- cursing and swearing

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 09:33:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0275

# The People and Their Peace

Legal Culture and the Transformation of
Inequality in the Post-Revolutionary South

LAURA F. EDWARDS



THE UNIVERSITY OF NORTH CAROLINA PRESS    CHAPEL HILL

Compendium_Cornell
Page 0276

© 2009 THE UNIVERSITY OF NORTH CAROLINA PRESS
All rights reserved

Designed by Kimberly Bryant
Set in Arno Pro by Tseng Information Systems, Inc.
Manufactured in the United States of America

The University of North Carolina Press has been a member
of the Green Press Initiative since 2003.

Library of Congress Cataloging-in-Publication Data
Edwards, Laura F.
The people and their peace : legal culture and the
transformation of inequality in the post-revolutionary
south / Laura F. Edwards.
p. cm.
Includes bibliographical references and index.
ISBN 978-0-8078-3263-9 (cloth : alk. paper)
1. Law—Social aspects—Southern States—History.
2. Women—Legal status, laws, etc.—Southern States—
History—19th century. 3. Slaves—Legal status, laws, etc.—
Southern States—History—19th century. 4. Free African
Americans—Legal status, laws, etc.—Southern States—
History—19th century. 5. People with social disabilities—
Legal status, laws, etc.—Southern States—History—19th
century. I. Title.
KF366.E329 2009
340′.1150975—dc22

2008041343

13  12  11  10  09    5  4  3  2  1

Compendium_Cornell
Page 0277

or established by statute. Appellate judges and legislators in both states wrestled constantly with the issue in the decades following the Revolution, leaving such a convoluted jumble of statutes and decisions that even the most determined historians have found it difficult to impose a coherent analytical framework on them.[5]

Dependents' legal disabilities also played a leading role in Blackstone's *Commentaries*, a favored legal authority of professionally trained lawyers and historians. In fact, historians' reliance on Blackstone in matters relating to domestic authority rivals their faith in statutes and appellate decisions—with equally misleading results. The most frequently cited passage posits the wife's legal death at marriage: "By marriage the husband and wife are one person in law; that is, the very being or legal existence of the woman is suspended during the marriage; or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and cover, she performs every thing."[6] Recent scholarship has extended this framework to explain other relations of domestic dependency, applying it at the level of analogy to reveal similarities in logic: just as a wife's legal existence was consolidated into her husband's, so was a slave's legal being incorporated into the master's. By exposing the nexus of race, class, and gender, this work has illuminated connections as well as parallels in the operation of inequality.[7] The emphasis on Blackstone that informs this scholarship does have a basis in history. His version of husbands' authority over their wives acquired force in legal practice after the Revolution, especially in civil matters relating to property. Ultimately, it spilled over into other areas, limiting the civil and political rights of wives, slaves, and other subordinates as well.

Yet statutes, appellate decisions, and the favored texts of professionally trained lawyers provide only a partial view of the legal landscape during the period between 1787 and 1830. The failure of statutes and appellate law to address offenses against domestic dependents is revealing, but not determinative; although these gaps reveal a great deal about the system's inequalities, they represent only one section of the available legal corpus at this time. The omissions and inconsistencies point to vast areas of law left to local initiative. When facing one of those gaps, local officials did not necessarily reach for Blackstone. In fact, southerners in the late eighteenth and early nineteenth centuries were decidedly less enthusiastic about Blackstone's version of domestic authority than later generations—and later historians. They looked to other constructions of domestic authority, common in both early modern England and the Anglo-colonial legal tradition as it

developed in the British imperial context. Some historians have returned to the various elements in this broader legal tradition, exploring how they allowed dependents more leeway. Equity—a distinct body of law, which was still practiced in the early nineteenth century, but was later dropped in favor of common law—is the best known example in U.S. history, thanks to Mary Beard's classic *Women as a Force in History*. Indeed, the term "law," a shortened form of common law used frequently in the late eighteenth and early nineteenth centuries, tends to confuse modern readers, erasing the presence of equity and other bodies of law. At the time, it was assumed that "law," as practiced in a "court of law," indicated a particular body of law; today "law" refers to the entire corpus of laws. Other bodies of Anglo-American law constrained household heads' authority and recognized dependents' status as legal subjects. Interpretations of common law sometimes accomplished that end as well. Judge Elihu Hall Bay's declaration on wife beating, which opens the first chapter, provides an excellent example. Bay argued from solid legal grounding, either Blackstone's own admonition against wife beating or an interpretation of Sir Edward Coke, when he ruled that common law did not allow a husband to use force against his wife. Variant readings were very much in evidence in the late eighteenth and early nineteenth centuries.[8]

The point is not that competing legal principles negated the importance of statutes, case law, or a Blackstonian version of domestic authority. All these legal traditions coexisted as options and alternatives, rather than contradictions in need of resolution. In the decentralized legal system of the post-Revolutionary South, it was possible for legal officials to support a patriarch's domestic authority in one breath and undercut it in the next, without pause or concern. The one decision was as legally valid as the other; which interpretation to apply to any situation depended on the particular circumstances.

The legal concept of the peace made those determinations possible. In theory, the peace was both hierarchical and inclusive. While the term was common in post-Revolutionary southern legal culture, it was based in a long-standing, highly gendered construction of governmental authority that subordinated everyone to a sovereign body, just as all individual dependents were subordinated to specific male heads of household. The metaphorical public body was represented first through the king and then, after the Revolution, through "the people," via the agency of the state—although "state" authority was located at the local level between 1787 and the 1830s. The sovereign body was always a patriarch, whatever its location or physi-

104

105

cal embodiment. Its gendered authority remained the same, whether sovereignty resided in local jurisdictions or centralized institutions or whether it took the form of a male king, a female queen, or a combination of men and women from different social ranks who constituted "the people."[9]

The peace made offenses against any subject visible, not as crimes against that particular individual but as crimes against the collective public body. Although the physical injury was to the victim, the legal offense lay in the theoretical damage to the metaphorical public body. That was true even in cases involving injuries to wives, children, or slaves, where husbands, fathers, or masters were named as victims as well. Unless a local official recognized a disruption to the peace, the offense remained a private, civil matter. Local officials could invoke the patriarchal interests of the peace to trump either the authority of individual patriarchs or the inferior legal status of subordinates. Slaves, free blacks, and white wives and children who could not testify regularly gave information that initiated cases and shaped their outcomes. Even when they could not prosecute cases in their own names, they made complaints that resulted in prosecutions and convictions for their injuries. In these instances, subordinates did not use the law in their own right. Nor did their use of the legal system alter their status. Legal officials acted in the name of keeping the peace. If the peace was threatened, the source of the information and the legal status of the victim were irrelevant. Those dynamics were particularly evident in cases involving injured subordinates, whose legal status made it difficult for them to move from the passive position of victim to the active role of "prosecutor"—that is, a legally recognized individual who could act in law for themselves, who today we would call a complainant or plaintiff. For that reason, legal officials often required a domestic dependent to obtain a legal representative to assume the active role of prosecuting the case. Usually, that sponsor would be the dependent's household head, who exercised legal authority over him or her. A legal system that filtered dependents' grievances through their household heads posed difficulties. The process ran aground completely when the master, husband, or father either refused to prosecute on behalf of his dependents or used his position to evade prosecution himself. Local officials bypassed those difficulties by designating the "state"—the metaphorical public body and its "peace"—as the legal representative. The "injured" public, represented through the actions of local officials, could replace the actual victim and prosecute the case.[10]

This legal form erased injured wives, children, and slaves only in theory. In practice, dependents remained central, because the damage to the public

106

body was done through their flesh and blood. Always present, yet unacknowledged, it was a convenient legal fiction, one of those twists for which formal law was so well known and, usually, so much despised, particularly when it came to matters involving property. In this instance, though, the law's arcane and labyrinthine logic served practical purposes, instead of confounding them.

Local officials in the Carolinas routinely invoked the peace when they confronted offenses against dependents. Or, at least, that is the best explanation for what they did, a conclusion based in the distillation of ideas from action, since magistrates, sheriffs, and circuit court judges did not stop to record what they thought. The practice of turning offenses against subordinates into offenses against the peace accounts for the mystifying array of cases that could not otherwise have been prosecuted as crimes. The logic that transformed transgressions into crimes was readily available in any number of sources: common law; legal treatises, including Blackstone; religious texts; political theory; and, most important, magistrates' guides, the legal texts local officials were most likely to use. District judges sanctioned the transformation when they tried cases. Applied to wives, the protection of the peace provided for the criminal prosecution of husbands for domestic violence. In South Carolina, the same principle filled in the gaps left by statutes in slave law, allowing for the prosecution of whites for the assault and murder of slaves. In North Carolina, where common law governed slavery, local courts went directly to the notion of slaves' connection to the peace when prosecuting violence against them. While local jurisdictions sometimes stretched the peace in unexpected directions, no one found it problematic. The South's localized legal systems were designed to accommodate just that kind of extemporization.[11]

A liberal application of the peace explains the case against Joseph Hodge for raping his daughter, Nancy. To be sure, the Kershaw District magistrate engaged in some creative legal maneuvering. In 1802, when he heard Nancy Hodge's complaint, there were no statutes or appellate decisions in South Carolina to prevent the prosecution of a father for the rape of his daughter, but there were none to authorize it either. The charge was a stretch, given that incest was a crime neither by statute nor in common law and that property law recognized a father's rights in his daughter's labor and body. Obviously aware of those hazards, the magistrate took pains to map out a clear legal course. The biggest problem was that neither the victim nor her mother could prosecute the case, because of the legal disabilities that resulted from their domestic attachments to the perpetrator. So the magis-

107

trate named them as informants, who brought a crime to his attention. Then he designated the "public" as the prosecutor, based on the fact that its peace had been disturbed. In effect, he separated the injury from Nancy Hodge, who was a precarious victim in law, and made it an offense against the social order. Nancy Hodge could not find a place in the formal mechanisms of law; but the offense against her could, because of her connections to the public peace. Joseph Hodge's case never went to trial, although that was not particularly unusual. Few criminal cases reached trial at the local level, usually for reasons that had nothing to do with the strength of the charges. Nevertheless, in Davidson County, North Carolina, a man was convicted of assault with intent to commit rape "on his own daughter" and sentenced to six months' imprisonment, a punishment that was comparable to sentences doled out to other convicted rapists.[12]

The interests of the peace rescued a host of other cases that might otherwise have fallen through the legal cracks, such as the Chowan County rape cases of the enslaved women, Annis and Juno. In the mid-1820s, when charges were filed, North Carolina statutes and case law remained silent as to the criminal status of the rape of an enslaved woman by an enslaved man, although existing elements of slave law not only militated against prosecutions but also risked recognizing slaves' rights in their own bodies. If the offense was to the public order, though, it was legally possible to prosecute rapes when enslaved women were the victims, just as it was with other criminal offenses. In this legal logic, neither Annis's and Juno's injuries nor those of their owners constituted the crime. That was why criminal prosecutions never involved compensation for the victims—with the exception of assault cases where the criminal and civil components had been explicitly joined. The criminal offenses consisted of the virtual violence to the metaphorical public body through these two women's bodies. That framework assumed these enslaved women's place within the peace and made sexual assaults on them public even as it left unaltered their legal status as slaves.[13]

No definitive statements, written or oral, tie the adjudication of specific local cases to the principle that all subjects held a place within the peace. Like most matters in the realm of common sense, this no longer needed articulation. At the local level, legal officials concerned themselves with concrete circumstances of crimes, not abstract points of law, as later appellate judges did. Their preoccupation with the particulars was apparent in the local legal records, which rarely refer to laws or legal principles

108

but faithfully and carefully document details about the contested events. Magistrates did not record all the necessary details that we would need today to reconstruct these legal matters, but many did take extensive notes about each offense, including a description of the initial complaint as well as voluminous, sometimes verbatim summaries of the evidence offered. Then they simply noted the resulting charge, without explaining how they arrived at that conclusion. There is no way to know what a district court judge was thinking when he tried cases, because the records usually consist only of the indictment, the testimony, and the verdict. In the event of an appeal, the documents occasionally supply the judge's instructions to the jury. But the records seldom shed light on how local justices approached offenses against domestic dependents. Exceptional in this regard are the ruminations of Elihu Hall Bay, the South Carolina district judge who announced in open court that the common law allowed a husband to be convicted of assaulting his wife. That anecdote also illustrates the larger evidentiary problem. It was saved by chance, through an oral tradition that was later recorded, not in the records attached to the case. It offers no insight into how Judge Bay construed common law so as to allow this charge.[14] Yet, whatever legal officials' thinking may have been, their decisions conformed to a general pattern: local officials routinely bypassed the authority of household heads and positioned their dependents within the larger, patriarchal household of the peace.

Despite its positive connotations, the peace expressed a profoundly hierarchical order. Within the logic of the peace, which subordinated some white men to others, the concerns of individual white men were not the same as the interests of the peace, although the two could coincide. In practice, individual patriarchs wielded public authority and protected the peace, sometimes by asserting authority over other white men. But even the wealthiest, most powerful community leaders held their positions at the behest of the public order; their authority was contingent on accepting and fulfilling their own obligations within the social order. When they failed in their duties, others could invoke the interests of the peace to discipline them, just as they did with James Woodruff and James Hodge. As the operation of localized law indicates, the peace never could be defined solely in terms of individual patriarchs' interests, whatever they might be. James Woodruff might want to lie around instead of working his land. Joseph Hodge might want to have sex with his daughter. But the peace, as it was defined in Woodruff's and Hodge's communities, censured these men in

109

rights in law or access to political institutions.[10] White men without property faced a combination of old and new constraints. Many states resisted proposals to eliminate property requirements for voting and officeholding and to make state government more responsive and accessible. Poor white men endured numerous legal restrictions at the local and state levels, including vagrancy laws that forced them into low-wage employment, labor laws that denied them the right to organize and subordinated them to their employers' control, and a host of other measures that kept them from exercising civil and political rights to their full extent.[11]

Similar limitations on the extension of democratic rights are visible in the South as well. State lawmakers clamped down on slavery, piling up acts that not only restricted slaves but also aimed to regulate and stabilize the institution by limiting customary privileges (such as trading, education, and mobility) that some masters allowed some slaves and by mobilizing propertyless white men to police slaves. The status of free blacks deteriorated, as legislators and appellate justices took away rights they had once exercised as free people and even questioned their place as citizens. Perhaps the most dramatic example is North Carolina's 1835 constitution, which instituted a more equitable apportionment scheme, established free white manhood suffrage, and denied free blacks the vote. State lawmakers refused to extend individual rights to white women. Instead, they insisted on women's status as dependents represented by rights-bearing male household heads, just as slaves were represented by masters. Having forged that legal link between marriage and slavery, political leaders in North and South Carolina became increasingly outspoken in their denunciations of women's rights during the second quarter of the nineteenth century.[12] Neither state led the democratic charge when it came to free white men, either. Both were known for their hierarchical governments, often referred to as oligarchies, which limited the power of poor white men and kept government in the hands of the wealthy.[13]

The proverbial glass is either half full or half empty. In fact, there is no way beyond this interpretive impasse as long as the debate is framed in terms of the distribution of rights rather than their development, definitions, and uses. When did rights begin to govern the legal issues that mattered most in ordinary people's lives? What were the implications? This chapter shifts the analytical framework by focusing on the protection of individual *life* rather than individual *rights*. To be vulnerable to physical violence without any possibility for redress—whether through individual rights or appeals to the peaceable order of the community—is to be pro-

foundly marginalized, legally and politically. Any society's legal treatment of violence involves political decisions about the structure of the public order. Identifying which acts to censure and whom to protect determines the government's relationship to ordinary people. Analytical frameworks based in individual rights cannot adequately address this issue because they erroneously presume either that every person holds rights or that what counts as a violation of rights and which persons are protected have been mysteriously predetermined.

Between the late eighteenth and the mid-nineteenth centuries, changes in the legal treatment of violence reflected and reinforced broader changes in the political culture of the Carolinas. To understand the scope of those changes, it is necessary to pick up the threads of the analysis introduced in chapter 3, which traced the process by which assaults became public, criminal matters instead of private, civil matters. Within localized law, legal officials began treating complaints of violence as crimes against the peace rather than private matters that could be resolved through compensation to the injured party. That transformation, which was directed by the actions of ordinary southerners, exemplified people's direct relationship to the localized legal system, a political connection forged in the upheaval of the Revolution.

In the colonial South, the laws of violence underscored the relative political marginalization of all subjects. In theory, no subject's physical injuries became a "public wrong"—a criminal matter that threatened the public order—unless they also affected the king's metaphorical body by breaking the peace of his realm. Those concepts carried broader import, enabling colonial officials to control the political repercussions of violence. In most cases, violence did not pose a direct challenge either to the colonial government or to the social order it protected. Common brawlers, for instance, did not fight with the specific intent of defying their social betters, let alone challenging the political structure. For colonial officials, the problem lay in the way such acts symbolically bypassed established lines of authority. Physically defending themselves and their interests, ordinary southerners acted as sovereign individuals instead of subjects who depended on the king and his officers to represent and protect their interests. Carolina colonists—a diverse, irreverent, contentious lot—stepped over this line often, if the bellyaching of colonial officials and elite commentators is any indication. The categorization of violence as private rather than public neutralized the potential political threat, although not in the literal sense of stopping violence or even rectifying the pain and damage it caused. These

226                                                                                                                                                                227

classifications operated more as institutional safety valves, releasing the pressure that cases of violence generated within the legal system. Labeling violent acts as private personalized them, stripping them of broader meanings so that they could not affect existing power arrangements. Men fought to maintain their reputations, neighbors came to blows over property, husbands hit their wives, masters beat their slaves, and parents whipped their children. Construed as private wrongs, none of those acts could be connected to structural problems that required sustained public attention. The dynamics affirmed the king's authority by giving his officers discretionary control in identifying which conflicts constituted public threats.

Containing the political implications of violence required constant supervision. In this period, as they did later, officials used the concepts of private and public as legal means to political ends, not as fixed categories with normative meanings. Officials shuffled different kinds of violent acts back and forth between the two designations as conditions warranted. Colonial legislatures in the Carolinas, for instance, redefined maiming—or mayhem—to include the destruction of ears and noses. Traditionally, this legal category covered only those limbs necessary for a man to fulfill his military duties to the king. The change addressed a specific problem in the colonies: ritualized fighting that involved biting off noses and ears as well as gouging eyes, which could be construed to fit within established definitions of maiming. When the lower orders used violence too freely, they not only broke the king's peace but also moved into his political territory. If unchecked, personal violence could acquire legitimacy and lead to the problematic, even subversive notion that individuals had the right to act for themselves and represent their own interests. By criminalizing these acts, lawmakers acknowledged that challenge, magnified in a colonial context where government authority was so fragile. Given the pervasiveness and predictability of ritualized fighting, it was no longer possible to defuse the political threat simply by making these offensive acts private. Colonial authorities labeled them public so as to regulate them directly.[14]

The post-Revolutionary elevation of "the people" as the metaphorical sovereign produced a seismic shift in the legal handling and political implications of physical injuries. In theory, the elimination of the king made violence to individuals—and damage to individuals' interests generally—more directly public and more obviously political. But in practice, between 1790 and 1820, those changes appeared within a notion of the peace that took what otherwise might have been egalitarian, individualistic concepts in decidedly different directions. In localized law, individuals became

228

legally visible as differently subordinated subjects, not rights-bearing individuals who stood in positions of abstract legal equality. The legal importance attached to individuals did establish direct connections between these subjects and their government. But those connections preserved the hierarchies that defined southern society, including those that subordinated all white men to the peace and made some white men subordinate to other white men. State law tended to treat individuals as rights-holders instead. When applied to criminal violence in the 1820s, the framework of rights placed adult white men on theoretically equal footing, legally privileging their interests and consolidating their authority over those without rights.[15]

### INDIVIDUAL VIOLENCE AS AN OFFENSE TO THE PEACE, FROM 1790 TO THE 1820S

Between 1790 and 1820, localized law turned injuries to individuals into criminal matters. With their attention firmly fixed on property law, state lawmakers left governance over most acts of violence to local jurisdictions and their idiosyncratic interpretations of common law. Statutes and appellate decisions mirrored changes at the local level when they dealt with violence at all. State law did address more serious offenses, such as murder, manslaughter, rape, and maiming. But misdemeanor violence did not figure in revised codes or appear as a topic of legislation until the late nineteenth century. The appellate courts dealt with such matters infrequently, primarily to sort out procedural or jurisdictional matters only tangentially related to the crime itself. When state law made forays into criminal violence, it was usually one step behind local jurisdictions.[16] Between 1790 and the 1820s, state law adopted the same stance as localized law, affirming the political emphasis on individuals but positioning them as subjects within the peace. Only later, when state lawmakers headed more powerful institutions and turned their attention to criminal law, would they reconceptualize those subjects as rights-bearing individuals.

The pattern of state institutions following local practice is evident in the published reports of appellate decisions. In these volumes, cases involving violence regularly appeared as civil matters—private wrongs—between 1790 and 1820. Increasingly, though, appellate courts reflected changing practices in local jurisdictions, where violence was being treated as a criminal offense—a public wrong—by definition. The shift is evident in two South Carolina appellate cases. In *State v. Wood*, heard in 1794, the

229

court approached violence as an act that could be a crime, but only under certain circumstances. Local authorities had charged the defendant with the criminal offense of assault, rather than treating it only as a civil matter. He took issue with the charge, arguing that he was acting in self-defense: the victim "brought this injury on herself by . . . striking the defendant first, and therefore ought to abide by the consequence." But the court agreed with the prosecutor, who maintained that the "assault was an outrageous one, committed on a woman, and out of all proportion to the nature of the injury he had received from her." Therefore, the defendant should "be considered as the aggressor" and the charges were justified. The specifics of the case, including the fact that the victim was a woman, turned this particular act of violence into a violation of the peace. Other acts of violence would not have been crimes, as the defense's arguments suggest.[17]

By 1802, in *Chanellor v. Vaughn*, the appellate court assumed that violent acts had public effects. The question was how best to deal with their disruptive implications. The presumption was particularly striking in this case because it was tried as a civil matter—still a common occurrence, even when local jurisdictions were more likely to treat a wider array of violent acts as criminal offenses. Although the case was a civil matter, the South Carolina appellate court treated the violence in question as if it were a public wrong. That presumption emerged in the court's response to the defendant's appeal, which maintained that the damages granted by the jury were excessive and should be set aside. The justices refused, arguing that high fines in cases involving violence were in the public's best interests. It was the province of the jury, the justices explained, "to assess such damages as they thought would be commensurate with the nature of the injury." The jury's responsibility in this regard extended to the community, not just the victim: "The peace and good order of the community depended very much on making proper examples of such disorderly and turbulent men as the defendant appeared to be." Given the violent nature of the offense, this private wrong contained elements of a public wrong as well. From there, it was a small leap to treating most acts of violence as public wrongs, by definition.[18]

By the 1820s, the link between violence and crime permeated appellate rulings in both North Carolina and South Carolina. Cases of violence routinely passed through these courts as crimes without the kind of discussion that marked *State v. Wood* in 1794. Occasionally questions about the legal status of violence rose as points of discussion, as they did in the North Carolina court's 1821 ruling in *Stout v. Rutherford*. The victim in this civil case was surprised to find that the public implications of violence meant

230

he could not be awarded damages. He had appealed in order to obtain a settlement. Although the jurors decided in his favor, they had denied him damages for his injuries because he had consented to the fight. The majority opinion in the appellate court arrived at the same conclusion from a different direction: the victim could not recover damages because the primary injury was to the peace, which lifted the matter out of the hands of the two parties involved. Not all the justices were comfortable with the implications of this ruling. Justice Hall concurred with the jury: "I doubt how far a person is entitled to recover damages after having agreed to take his chance in a combat" and "after the event had proved the miscalculation he made upon his own strength." But, in testy comments that fell just short of dissent, he expressed reservations about classifying all acts of interpersonal violence as public wrongs. He was inclined to see such incidents as "merely . . . violations of . . . private rights," minimizing the legal and political importance of this kind of violence. Yet Hall agreed to abide by the new rule, which clearly marked assault as a criminal matter first and a civil matter only secondarily.[19]

The appellate courts magnified the legal importance of injuries to individuals as well. In 1794, for instance, the North Carolina court ruled in *State v. Irwin* that intent could be inferred from the context in which injuries were inflicted. In criminal matters, intent determined the severity of the charges. Malice turned an accidental death into manslaughter, and malice aforethought turned manslaughter into murder. Proving intent could be difficult, particularly if there were no witnesses to the event. Did the defendant mean to kill the victim? Or was it an accident? Those questions usually required a careful reconstruction of the entire context surrounding the incident, with testimony of witnesses who knew both parties and the nature of their relationship. In *State v. Irwin*, the North Carolina appellate court eliminated the need for evidence of intent in the criminal charge of maiming. The wording suggested a broader application to other forms of violence as well. "Malice aforethought is express or to be implied from circumstances," the court posited. Therefore "intent to maim or disfigure, may likewise be implied from circumstances; and it is not necessary to prove antecedent grudges, threatenings or an express design." The justices upheld that ruling in 1796 in *State v. Evans*: "Where an outrageous act, as a maim, is proved, the law presumes that it was done with that disposition of mind, which the law requires to constitute guilt, until the contrary is shewn." The injury to the individual, by itself, constituted proof of the crime; further evidence was unnecessary.[20]

231

That logic made its way into other legal categories of violence, such as affray, assault and assault and battery. The effect was to blur traditional legal distinctions between various forms of violent offenses. Appellate courts tended to define all these crimes in terms of the individuals' injuries. In 1824 the North Carolina appellate court stretched the definition of criminal violence to cover acts that did not result in physical injury to the victim. The case involved two Granville County men convicted of affray for firing guns at a neighbor woman's house and killing her dog. Their lawyers appealed, arguing that it was a civil matter because it was carried out against a private individual in what might be construed as a private space and no public threat was implied in either the actions or the indictment. Writing for the court, Justice Taylor dismissed that argument, claiming that the acts fell under the criminal offense of affray: "It seems certain there may be an affray when there is no actual violence," but enough commotion to "cause a terror to the people." To lay that charge, though, the court substituted the offense against the individual for that done to the public: the post-Revolutionary incarnation of the king's symbolic body resided in a dead dog and a terrified woman.[21]

Another 1824 North Carolina civil suit, *White v. Fort*, underscored the legal importance of individuals' physical injuries. On appeal, the state court ruled that victims of violent felonies or their survivors could prosecute civil cases concurrently with the public prosecution of criminal charges in order to obtain compensation for their losses. In British common law the victims of such crimes could not seek redress for damages because the injury done to the king took precedence. The theoretical subordination of the individual to the king was so complete that it negated the practical possibility of a separate civil suit. The king, as prosecutor, received the convicted felon's forfeited property as compensation, leaving nothing for individual victims to claim. Although forfeiture no longer applied in North Carolina or anywhere else in the United States, the logic by which states prosecuted felonies was the same: the state's interest in controlling violence took precedence over the interest of the victim. The unresolved question, then, was the legal status of injured individuals. Did the injury to the public order trump the significance of victims' injuries to the point where they could not sue for damages? The appellate court decided to define the individual's interest as separate from that of the state and to allow concurrent civil suits in felonies. Bypassing the theoretical subordination of private to public injuries that could have prohibited concurrent civil suits, the court justified individuals' rights to bring civil suits on the more practical

grounds of forfeiture. Although the justices disagreed about the details, they acknowledged that civil suits had been disallowed only because forfeiture left no property to compensate the individual and, since forfeiture had been abandoned, no basis for the prohibition remained. In fact, the justices' arguments presumed that individuals had as much right to redress as the public, granting them independent legal status that they did not previously have.[22]

The changes that linked individuals' injuries to the peace extended even to slaves, although unevenly, since slaves never shared equal or even equivalent status with other subjects. State lawmakers buttressed local practice, turning the most egregious acts of physical violence against slaves into crimes. In 1791 the North Carolina legislature made the willful killing of a slave murder unless it resulted from "moderate correction," legal discretion that was allowed household heads over all their dependents. The statute's preamble drew heavily on Revolutionary language, declaring that the previous "distinction of criminality between the murder of a white person and one who is equally a human creature, but merely of a different complexion, is disgraceful to humanity and degrading in the highest degree to the laws and principles of a free, Christian, and enlightened country." In 1817 the legislature extended the peace further, making the crime of manslaughter applicable to instances in which the victim was a slave. These statutes, however, affirmed rather than modified local practice, which already applied common law precepts—which were not always officially recognized as part of state law—to cases involving slaves. Even acts that granted slaves procedural rights tended to buttress local practice by easing the difficulties of trying slaves and cases involving slaves in a system where process was so important.[23]

In key respects the appellate court also followed local practice. The central issue in *State v. Boon*—an 1801 appellate ruling that criticized the 1791 North Carolina statute criminalizing the killing of slaves as too ambiguous to enforce—was not *whether* slaves were included in the peace, but *how* that was accomplished in the theoretical terms of law. Justice Hall argued that common law protections that applied to other subjects did not automatically extend to slaves. Drawing a connection between common law and the peace, he reasoned that slaves lived under the dominion of their masters, not under that of the peace, because slavery did not exist within common law. For slaves to be brought into the peace, common law protections had to be enacted through statute. As Hall saw it, the problem in this case was that the 1791 statute was too vague to accomplish that goal. While

agreeing with Hall on the inadequacy of the statute, Justice John Louis Taylor took the opportunity to advocate the criminalization of violence against slaves in broader, more general terms. "What is the definition of murder?" he wrote, but "the unlawful killing of a reasonable creature within the peace of the State, with malice aforethought." "A slave," he continued, "is a reasonable creature, may be within the peace, and is under the protection of the State, and may become the victim of preconceived malice." Justice Samuel Johnston went further, arguing that the murder of a slave was more "atrocious and barbarous . . . than killing a person who is free, and on an equal footing." "It is an evidence of a most depraved and cruel disposition to murder one so much in your power that he is incapable of making resistance, even in his own defense." In such incidents, the legal system needed to step in, discipline the offender, and restore order. Significantly, the justices who were most outspoken in their defense of slaves' interests couched their arguments in terms of slaves' place within the peace, not their rights as individuals.[24]

The sway of the peace within localized law explains many apparent legal anomalies at the state level. Consider the 1798 case of *State v. Weaver*, which appears in John Haywood's compilation of early North Carolina appellate decisions. *Weaver* granted masters exactly the kind of latitude that judges questioned in *Boon*, although none of the opinions in *Boon* mentioned this case, even to dismiss it. The decision in *Weaver* began with an analogy between free servants and slaves: "If a free servant refuses to obey and the master endeavor[s] to exact obedience by force, and the servant offers to resist by force . . . and the master kills, it is not murder, nor even manslaughter, but justifiable." A master's use of force was "much more . . . justifiable" when directed against slaves, who were more completely subordinated than free servants.[25] The legal context of the 1790s, however, shaped the meaning and limited the applicability of this opinion. At this time the North Carolina appellate court was still a court of conference, which advised judges in local jurisdictions on especially difficult cases; it did not lay down rules that justices elsewhere were supposed to follow in other cases. Moreover, the published opinion in *Weaver* was not really a decision at all, even though it later passed as precedent. Rather, the text seems to have been the instructions given to the jury by district judge John Haywood, who later included this case in his compilation of early appellate decisions. It did not involve the rights of all masters and all slaves, as Haywood's presentation of the case implied, but the use of force by a specific master, Mr. Scott, against a specific slave, Lewis. Following Judge Haywood's advice, the jury acquitted

234

Scott. At the time, given the discretionary power of localized law, Scott's use of force was contingent, based on local context and exercised on behalf of the peace.[26]

South Carolina state lawmakers affirmed the power of the peace by leaving the criminal prosecution of violence against slaves to local jurisdictions, which used a combination of colonial statutes and the maxims of the peace as defined in common law. The laws passed in the wake of the Stono slave rebellion in 1740 were intended primarily to bring the institution of slavery within the bounds of the law so as to stabilize it. They codified the traditional legal practices of the peace, including its affirmation of existing social hierarchies. Predictably, the statutory burdens of legal discipline fell most heavily on slaves. But the 1740 statutes also brought white southerners under the law's control, establishing punishments for their extreme brutality against slaves as well. Local authorities in the post-Revolutionary period used the rubric of the peace to apply customary interpretations of common law—or not—as they saw fit. When such cases made it to the appellate level, the court tended to affirm local practice. In 1794, for instance, the court supported a local court's decision to include slaves among those who could commit the common law offense of riot. As late as 1825, appellate justices upheld the conviction of a white man for the murder of a slave on the basis that the charge conformed to the common law charge of manslaughter.[27]

Even when the South Carolina appellate court ruled on these matters, its decisions carried different meanings than they would later. In South Carolina, as in North Carolina, the appellate court functioned more in an advisory capacity, particularly between 1790 and the 1820s. District judges came together after completing their circuits to settle disputed or difficult cases. Not all of the cases cited in state compilations were appeals. These volumes also contain decisions that the authors thought were instructive as guides for the legal profession. Matters of interest included the facts of the case, the arguments, the instructions, and the people involved, not just the points of law addressed in the decision. The decisions that make up this early body of "appellate law" recognized local jurisdictions' creative use of the common law concept of the peace, in conjunction with statutes, to provide wider latitude in punishing whites for violence against slaves.

Historians who have searched for systematic legal patterns in these early appellate records have found them frustratingly incoherent. Some have thrown up their hands, accepting contemporary legal reformers' charges of incompetence and chaos. The most generous interpretations character-

235

ize these early appellate decisions as rendering broad interpretations of the statutes. Actually, the records say more about localized law than they do about the statutes or the direction of legal developments at the state level. These advisory opinions resulted from a system that not only allowed local jurisdictions considerable legal discretion but also subordinated the individual outcomes to the collective interests of the peace. Consider the curious arguments of Thomas Pinckney and Timothy Ford in the 1791 case of *State v. Gee*. A local jury had convicted a white man for murdering a slave and sentenced him to seven years' imprisonment, in keeping with the statutes. In their capacity as state prosecutors, Pinckney and Ford questioned the leniency of the sentence with a logic that seems bizarre for two low country Federalist luminaries who were known for their support of a centralized legal system. Applying the principles of the peace to the offense, they argued that the "atrocity" was such that it "deserved death" in this instance. The judge denied their motion. Their argument is nonetheless telling. In particular cases the common law principles of the peace regularly modified and even suspended statutes without threatening their integrity. Both bodies of law had the same goal: to maintain the peace of the state.[28]

Appellate courts did exert more authority over legal issues involving property. Professionally trained lawyers, who read appellate decisions, oversaw this area of law, and property law's close connections with economic development placed a premium on clarification and innovation so as to facilitate the exchange of goods and the accumulation of capital. Right after the Revolution, South Carolina was the wealthiest state in the union, with an economy rooted in slave labor and commodity production for an export market. The protection of property interests, which had preoccupied colonial legislators and jurists, continued to absorb lawmakers, lawyers, and compilers. South Carolina appellate judges, in particular, tended to spend their time in this area of the law. Property concerns could be heard in both law and equity courts, and judges in those two types of courts competed for personal recognition and institutional authority, making this area especially fraught with differences of opinion.[29]

State-level records of legal matters involving slaves were defined by the same preoccupation with matters of property and differences of opinion that defied systematization. Helen Tunnicliff Catterall's 1929 collection, *Judicial Cases Concerning American Slavery and the Negro*, exemplifies the problem. Catterall collected all the cases that dealt with slavery or included slaves from all the available legal compilations in both law and equity. For

South Carolina between 1784 and 1819, she lists 153 property cases and only 21 criminal cases involving slaves.[30] This source and others based on the appellate court records leave the impression that state law treated slaves primarily as property. But that was an artifact of this particular institutional arena. Not only did appellate courts deal primarily with civil matters, but those compiling appellate records were especially interested in property law. The disparity between civil and criminal cases thus tells us a great deal about appellate courts and their supporters, but not much about the full range of legal matters tried within the state. The logic of these cases, even more than their relative quantities, distinguishes localized law from law at the state level. The local counterpart to state law does not lie in a voluminous stash of cases moldering away in the far reaches of the archives, a misplaced testament to the superior morals of a localized legal system, the homespun humanity of white southerners, or—even more problematically—the benevolence of slavery. The logic of the peace allowed local jurisdictions to address offenses against slaves on a case-by-case basis. While more incidents were dropped than were prosecuted, slaves occupied a place as subjects of the peace in local jurisdictions. By contrast, they appeared primarily as property—the subjects of rights-holders—in the developing body of law at the state level.[31]

Many legal reformers sought to extend the rubric of rights beyond property matters into other areas of law, including criminal cases. Their handiwork is evident in compilations like those of North Carolina's John Haywood. In North Carolina the same sentiments resulted in statutes that extended procedural rights to slaves, including the right to trial by jury and to counsel in 1793 and the right of appeal in 1807. The rhetoric of rights figured prominently in appellate decisions. In *State v. Boon*, Judge Hall referred to the common law protections of subjects as "rights," a term that neither Judge Taylor nor Judge Johnston used.[32] But when legal reformers invoked rights between 1790 and 1820, they got only so far. In localized law, assertions of slaves' humanity established their place as subordinate subjects within the peace, a legal framework in which rights-bearing white men were subordinated as well. Affirmation of a master's authority did not extend to all masters, constituting a right that the state was bound to protect. Similarly, slaves' procedural rights recognized their place within a localized system that emphasized process over outcome. Bringing slaves into the process was necessary to maintain the peace; it did not entail recognition of their individual rights.[33]

Attempting to navigate the legal terrain of the peace with the map of

236    237

individual rights has led historians to dead ends and puzzling contradictions. Taking the ascendancy of the individualist legal paradigm for granted and focusing on statutes and appellate decisions, they have struggled to identify consistent patterns in the application of rights to marginalized members of the population.[34] But those institutions and that legal framework had yet to be fully elaborated, particularly in criminal law. By the 1820s the steady drizzle of rights rhetoric began to erode localized conceptions of the peace at the state level, as state law expanded and spilled over onto the terrain of localized law. But the extension of individual rights into the legal process — the trends that scholars have observed in the development of state law — was not the same thing as the extension of individual rights to those individuals who made up the population as a whole.

### SLAVERY AND VIOLENCE AS AN INDIVIDUAL RIGHT, 1820–1860

By the 1820s state institutions and state law — the body of state law made up of statutes and appellate decisions — took on new authority. At the same time, lawmakers began importing the logic of property law into matters involving violence and other public issues. In so doing, they moved the legal focus away from individual lives to individual rights, replacing subjects of the peace, with their distinctive personalities and entangling relationships, with the theoretically uniform bodies of rights-bearing individuals. Using the rights of these abstract individuals as a reference point, they began to redefine the peace. When reformers and state-level jurists invoked the peace, they meant not the inclusive domain occupied by the idiosyncratic and interconnected subjects of previous generations and localized law but a collectivity composed of theoretically autonomous rights-bearing individuals who owned property. Property ownership was, simultaneously, the basis for claiming rights, the model for them, and the means for mobilizing the peace. The possession of rights, construed as a form of property, became the primary route to the legal protections of the peace. For interpersonal violence, the results were twofold. Lawmakers treated the legal protections traditionally granted to all subjects under the peace as rights. Once these protections were cast as rights, judges began refusing them to domestic dependents on the basis that they would endanger husbands' and masters' domestic authority. The legal effect was to privatize domestic relations, including slavery, by uprooting household heads' authority from its place within the more expansive, localized notion of the peace and

planting it on the private property of rights-bearing individuals. All domestic dependents were repositioned as the subjects of their household heads instead of subjects of the peace. The implications were most dramatic for slaves, the most marginalized of subjects and the least able to summon the protections of the peace.

In the 1820s, when appellate courts in the Carolinas began handling more criminal matters than they had before, their decisions transformed the nature of the peace. When the peace was the guiding concept in localized law, its substance always remained plastic — and purposefully so, defined as it was in specific areas, at distinct moments in time, and through the particular relationships of the people there. Appellate courts fixed the substance of the peace by defining it primarily in terms of individual property rights. The 1823 North Carolina case of *State v. Reed*, which involved a white man convicted of manslaughter for killing a slave, captures the essence of this transition. *Reed* recapitulated the major questions in the 1801 case of *State v. Boon*: whether slaves were part of the peace and whether fatal violence against them could be tried under common law. Two of the three judges in *Reed*, John Louis Taylor and John Hall, had also issued opinions in *Boon*. In 1823, though, they sat on the newly constituted North Carolina Supreme Court, composed of three judges who only heard appeals, instead of the North Carolina Court of Conference, which had included all the judges who tried cases in district courts. Both Taylor and Hall wrote short opinions reaffirming their decisions in *Boon*, which took different positions on how to include slaves within the peace. Hall placed slaves outside the bounds of the peace and common law unless the legislature specified otherwise. Taylor, who assumed slaves' position within the peace, thought common law was applicable to them.[35]

Although Justice Leonard Henderson sided with Taylor in *Reed*, his opinion cast the issue differently by raising the question of whether slaves' position as property severed their ties to the peace and their access to the protections of the state, be it through common law or statute. "That a slave is a reasonable, or more properly a human being, is not, I suppose, denied," wrote Henderson. "But it is said that being property, he is not within the protection of the law." After stating the hypothetical that slaves' position as property excluded them from all legal protections, Henderson rejected it, but only in regard to fatal violence. No one, not even masters, had power over slaves' lives. There is no law in North Carolina, wrote Henderson, "by which the life of a slave is placed at the disposal of his master." Even so, Henderson conceded that masters' property rights shielded them from

238

239

# ENCYCLOPÆDIA AMERICANA.

## A

## POPULAR DICTIONARY

#### OF

### ARTS, SCIENCES LITERATURE, HISTORY POLITICS AND BIOGRAPHY,

#### BROUGHT DOWN TO THE PRESENT TIME;

##### INCLUDING

### A COPIOUS COLLECTION OF ORIGINAL ARTICLES

##### IN

## AMERICAN BIOGRAPHY;

##### ON

### THE BASIS OF THE SEVENTH EDITION OF THE GERMAN

## CONVERSATIONS-LEXICON.

##### EDITED BY

## FRANCIS LIEBER,

##### ASSISTED BY

## E. WIGGLESWORTH AND T. G. BRADFORD.

### VOL. X.

**Philadelphia:**

CAREY AND LEA.

SOLD IN PHILADELPHIA BY E. L. CAREY AND A. HART—IN NEW YORK
BY G. & C. & H. CARVILL—IN BOSTON BY
CARTER & HENDEE.

1832.

Digitized by Google

Entered, according to the Act of Congress, in the year 1832, by
CAREY AND LEA,
In the Clerk's office of the District Court of the Eastern District of Pennsylvania.

Digitized by Google

stances which possess double refraction, in general, alter the polarization of light, and apparently in a sudden manner, communicating to the polarized ray a new polarization of the same nature, but in another direction. Among the most interesting phenomena connected with this subject, are the colors produced by the action of crystallized bodies upon polarized light. When thin plates of glass, selenite, mica, agate, quartz-crystal, tourmaline, &c., are exposed in a beam of polarized light, the most beautiful and vivid colors, resembling those observed by Newton in thin films of air or liquids, only infinitely more striking, make their appearance. The attentive examination of these colors has led to a theory both of polarization and double refraction, which, says Herschel, in his Discourse on the Study of Natural Philosophy, is so happy in its adaptation to facts, and in the coincidence with experience of results deduced from it by the most intricate analysis, that it is difficult to conceive it unfounded. Our limits do not permit us to go farther into this interesting subject; for a more complete elucidation of which, we must refer the reader to the article *Polarization of Light*, in the *Library of Useful Knowledge.*

POLE, Reginald, cardinal, an eminent statesman and ecclesiastic, born in 1500, was the son of sir Richard Pole, lord Montacute, cousin to Henry VII, by Margaret, daughter of the duke of Clarence, brother to Edward IV. He entered into deacon's orders at an early age, and had several benefices conferred on him by Henry VIII, with whom he was a great favorite. In 1519, he visited Italy, and returned to England in 1525, but, in consequence of the affair of the divorce from Catharine of Arragon, withdrew to Paris. Henry desired to obtain the concurrence of his kinsman in that measure; but Pole, imbued with the maxims of the church of Rome, drew up a treatise *De Unitate Ecclesiastica*, in which he excited the emperor Charles V to revenge the injury of his aunt. The consequence of this conduct was the loss of all his preferment in England, in return for which, he endeavored to form a party against Henry, which design terminated in the destruction of his brother, lord Montacute, and of his aged mother, then countess of Salisbury, whom the vindictive Henry sent to the scaffold. But the countenance of the court of Rome was extended to Pole, and, besides being raised to the dignity of cardinal, he

was employed in various negotiations. He was also appointed one of the three papal legates to the council of Trent. On the accession of Mary I, his attainder was reversed, and he was invited to England, where he endeavored to moderate the rigor of Gardiner and others against the reformers, and was an advocate for lenient measures, and such a correction of clerical abuses as would conciliate them. On the death of Cranmer, Pole, then, for the first time, ordained priest, became archbishop of Canterbury, and was, at the same time, elected chancellor of both the universities; and, while he acted with much severity in the extirpation of heresy, he made several salutary regulations for the advancement of learning. He died in 1558. Cardinal Pole seems not to have been a man of commanding talents, either political or literary; but he merited great esteem for his mildness, generosity, and comparative moderation, in an age when persecution was deemed lawful on all sides.

POLE, in magnetism. Two points of a loadstone, corresponding to the poles of the equator, the one pointing to the north, the other to the south, are called *poles.* (See *Magnetism.*)

POLE or POLAR STAR is a star of the second magnitude, the last in the tail of Ursa Minor.

POLE, PERCH, or ROD, in surveying, is a measure containing sixteen feet and a half.

POLE-AXE; a sort of hatchet nearly resembling a battle-axe, having a handle about fifteen inches long, and being furnished with a sharp point, bending downwards from the back of its head. It is principally used on board of ships, to cut away the rigging of an adversary who endeavors to board. They have also been sometimes employed in boarding an enemy whose hull was more lofty than that of the boarders, by driving the points into her side, one above another, and thereby forming a kind of scaling-ladder; whence they are sometimes called *boarding-axes.*

POLES OF THE ECLIPTIC; two points on the surface of the sphere, 23° 30′ distant from the poles of the equator, and 90° distant from every part of the ecliptic.

POLEMBURG. (See *Poelemburg.*)

POLENDA, or POLENTA; a national dish in Italy, particularly in the northern part of the country, but very common in all the Mediterranean seaports. It is a kind of soft pudding made of the flour of chestnuts or maize, generally with small pieces of meat in it.

Digitized by Google

POLICE.

POLICE, in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness, &c.; but in all the great countries of the European continent, there is, besides this police, a military police extending over the whole state, and what is called the *high police*, which is occupied in watching the political tendency of the people, and every thing connected with it. It is evident that a police of this sort, as a regular instrument of the government, is incompatible with English or American liberty. This high police generally forms a department under a minister; several branches of the lower police are generally connected with it, sometimes all except the lowest street police. The end of the high police is obtained chiefly by means of the secret police—that cancer which eats into the vitals of society, and the pollution of which Great Britain may be proud of having escaped, notwithstanding the violent political changes which she has undergone. The secret police consists of a body of people of all classes, needy men and women of rank, mistresses, &c., down to the waiters of coffee-houses, and the lowest visitors of taverns and houses of ill-fame, who report whatever they hear against the government. How often do they not invent stories to render themselves important! The deplorable consequences of an institution so destructive to all confidence and sense of security, are obvious, especially when it is considered that its instruments are the most worthless part of the community. On the reports of such miscreants men's lives and liberties depend; and the charges being kept secret, no means are afforded of refuting them. These agents are not unlike the familiars of the inquisition. This institution originated in France, if we do not consider the informers, whom every tyrant probably has had, as a secret police. The marquis d'Argenson, under Louis XIV, was the inventor of it. He was *lieutenant-général de la police* from 1697 to 1718 (since 1667 this had been a separate office). The prevailing licentiousness had occasioned innumerable outrages, and D'Argenson, called by his contemporaries *Rhadamanthus*, hunted out crime in its deepest recesses, and brought it to light, whatever was the rank of the offender. Sartines, director of the police of Paris, with the same power, but not the same rank, conducted the secret po-

lice from 1762 to 1774, and extended it very much; he was equally active with D'Argenson, but not so honest. He had agents in all the countries of Europe. Many stories are told of his skill in detecting crime, while others exist of a less creditable character, such as his sending a pheasant dressed with diamonds to his mistress; and when another refused to take a costly brilliant ring, he had the stone pounded to dust, and strewed the powder on the ink of a note addressed to her. Louis XVI took the charge of the police from him, and made him minister of the marine, in which office his total inexperience made him ridiculous. (Mad. de Staël, *Considérations sur la Révolution Franç.* i. chap. 8.) Lenoire followed (1774–1784), an honest man, who improved many departments of the police in Paris. The empress Maria Theresa requested him to write a work for her on the subject of police regulations, and the *Détail sur quelques Établissemens de la Ville de Paris, demandé par S. M. I. la Reine de Hongrie* (Paris, 1780), was the result. He died poor, in 1807. Le Crosna followed him. He was unimportant. Never was the department of the police in the hands of a more active and sagacious politician than Fouché; never was a secret police so thoroughly organized over, we might almost say, all Europe; and when the charge of the public police was taken from him, he had a police of his own, to watch the movements of Savary, as Napoleon had had his *contrepolice* against Fouché, in which the emperor, however, was always inferior to the minister. The most glaring instance of the abuse to which the secret police is always liable, is the death of the duke d'Enghien, who perished in consequence of the reports of the secret police. Perhaps, however, there are cases in which its employment is justifiable. When a fundamental change has taken place in the government of a country (like the late one in France), and a numerous party exists, not constituting what is called, in free governments, an *opposition*, but actually striving to overthrow the established order,—as, for instance, the Carlists, who exist at present in France,—under such circumstances, a secret police may, perhaps, be admissible, as poisons are prescribed in some dreadful diseases, producing bad effects undoubtedly, but preventing worse. Such a department should never be intrusted but to a man of unquestionable honor and integrity. After the war of 1815,

Digitized by Google

Prussia declared that the secret police—a necessary evil in times such as had just terminated—was abolished for the future. Whether it actually was abolished for a moment, we do not know; but we know that it existed not long after, and flourishes at present in that country, as in all other important governments on the European continent. One duty of the secret police always is to open suspected letters; and this was done even under Louis XIV. The more absolute a government is, and the more it strives to be the sole moving and regulating principle of the society, to the destruction of individual freedom, the more will the police be developed; whilst, on the other hand, the freer a country is, and the more it follows the principle, that every thing which can be possibly left to take care of itself, should be so left, the more strictly is the police confined to mere matters of municipal regulation. The scientific spirit of the Germans, connected with the character of their governments, has given rise, in that country, to the *police sciences*, so called, which are systematically developed and thoroughly cultivated. It is true, that, from the arbitrary nature of the governments, this branch of administration is extended to many subjects which, in freer states, would be left to general law or individual discretion; but, as it is obviously much easier to perfect some branches of the police in absolute governments than in free countries, particularly the medical police, valuable hints may be derived from the German system. In no country has the medical police been so much developed (frequently, it is true, to the annoyance of the people) as in Prussia, because no country ever combined more scientific men with an absolute government. Without, then, taking the Prussian medical police as a model in every particular, it has many points which it would be wise in other nations to imitate. In free countries, the place of a secret police is, in a great measure, supplied by public opinion and the liberty of the press; and it is curious to observe how the most secret transactions, or correspondence, will by degrees come to light; in fact, in some free countries, a politician needs to be quite as much on his guard against making statements in writing, as in absolute governments, since the danger of their reaching the press is as great as that of their detection by a secret police. The first police regulations are met with in Egypt. (q. v.) The Mosaic code, partly founded on the Egyptian, contains many rules of this sort. The police of the

Greeks was excellent. With them, as with their imitators the Romans, the police formed a separate branch of the administration. The capitularies of the Frankish kings contain the next police regulations. In 1548 and 1577, the German empire became subject to such regulations. Some account of the police of London is contained in the article *London*. The king of England, in his speech from the throne in the winter of 1831, recommends an improvement of the police of the kingdom. (See *Politics*.)

POLICINELLO. (See *Punchinello*.)

POLICY OF INSURANCE. (See *Insurance*.)

POLIGNAC, Melchior de, abbé, and subsequently cardinal, a French diplomatist, born 1661, died 1741, was descended from a distinguished family of Languedoc. In 1689, he rendered himself conspicuous by his address in the negotiations with pope Alexander VIII, relative to the articles adopted by the French clergy in 1682. In 1693, the abbé de Polignac was named ambassador extraordinary to Poland, for the purpose of detaching John Sobieski from the league with Austria, and drawing him over to an alliance with France. On the death of Sobieski (1696), he was employed in endeavoring to effect the election of the prince of Conti to the Polish throne. His intrigues, though seconded by large bribes, were, however, unsuccessful. On his return to France, in 1698, he was banished the court on account of the failure of this mission. In 1710, he was sent to take part in the negotiations at Gertruydenberg, and, in 1712, was appointed plenipotentiary to the congress of Utrecht, and was afterwards minister to the court of Rome. As a writer, Polignac is known by his didactic poem, in eight books, against the Epicurean system, entitled *Anti-Lucretius, seu de Deo et Natura* (Paris, 1747), which has been translated into English, French and German. He died in 1741. (See the *Histoire du Cardinal de Polignac*.)

POLIGNAC, Auguste Jules Armand Marie, prince de, ex-minister of France, was born in 1780. His mother, the favorite of Marie Antoinette, and governess in the royal family, was married, in 1767, to the count de Polignac, who was descended from the same illustrious family as the cardinal. (*See the preceding article*.) In 1780, her husband was created duke, and, soon after, the duchess became governess to the young dauphin. In 1789, in consequence of some manifestations of popular hatred, she and her husband left France, with the count d'Artois (since Charles X),

Digitized by Google

# CONTENTS.

**P**en .................... 3
Penal Law (see Criminal Law) ............... "
Penance ................. "
Penates ................. 4
Pencil ................... "
   Lead Pencils (see Plumbago) ............... "
   Pencil of Rays ........ "
Pendant ................. "
————, or Pennant ..... "
Pendulum ............... "
Penelope (see Ulysses) ... 5
Penguin (see Pinguin) ..... "
Penitentiaries (see Prisons) . "
Penn (William) .......... 8
Pennalism .............. "
Pennant (Thomas) ....... "
Pennsylvania (state) ...... "
————— University (see Philadelphia) 11
Penn Township .......... "
Penny (see Sterling Money) . "
——- Post (see Posts) .... "
Pennyroyal ............. "
Penobscot (river) ........ "
——— Bay ............ "
Pensacola ............. "
Pensioner ............. 12
Pentaglot (see Pentapla) ... "
Pentapla, Pentaglot ...... "
Pentateuch (see Hebrew Language, and Moses) ...... "
Pentecost ............. "
Pentelic Marble (see Marble) ................. "
Penthesilea (see Amazons) .. "
Pentheus ............. "
Penumbra (see Eclipse) .... "
Peon ................. "
Peony (see Pæony) ....... "
Pepe (see Naples and Sicily, Revolution of) ........ 13
Peplum (see Panathenæum) . "
Pepper ............... "
Pepperell (sir William) .... "
Peppermint (see Mint) ..... "
Pepys (Samuel) ......... "
Pera ................ 14
Perceval (Spencer) ....... "
      51 *

Percussion Locks ........ 14
Percy (Thomas) ......... 15
Perdiccas.............. "
Père Lachaise (see Lachaise) "
Peregrinus Proteus ..... "
Perennial .............. "
Perfectibility ........... "
Peri .................. 16
Pericardium ........... "
Pericarpium ........... "
Pericles .............. "
Périer (Casimir) ......... 18
Perigee (see Apogee) ..... 19
Perihelion ............ "
Perillus (see Phalaris) ..... "
Perimeter ............ "
Period ............... "
Periodicals ............ "
Periosteum (see Bone)..... 21
Peripatetic Philosophy ..... "
Peripetia ............. 23
Periphery (see Circle) ..... "
Peripneumony (see Pneumony) ............... "
Peripteral Temple (see Architecture, p. 341) ........ "
Peristyle (see Architecture, p. 341) ................ "
Perizonius (James) ....... "
Perjury ............... "
Perkin Warbeck (see Warbeck) ............... 24
Perkins (doctor Elisha) .... "
Permutations (see Combinations) ............... "
Pernambuco ........... "
Péron (François) ........ 25
Pérouse, La (see Lapérouse) "
Perpendicular ........... "
Perpetual Motion ........ "
Perpetuity ............ "
Perpignan ............. "
Perrault (family of) ...... "
Perron, Anquetil du (see Anquetil du Perron, and Zendavesta) ............. 26
Perry, Oliver (see Appendix to this vol.) ....... "
—— (see Pear) ........ "
Persecution of Christians ... "
Persephone (see Proserpine) . 28
Persepolis ............. "

Perseus .............. 29
Persia ................. 30
   History of Persia ....... 31
   Persian Language, Literature, and Ancient Religion .............. 35
Persian Æra (see Epoch) .. 39
—— Gulf ............ "
—— Wheel (see Hydraulics, vol. vi. p. 506) "
Persimon ............. "
Persius .............. "
Personification .......... 40
Perspective ........... "
Perspiration ........... 42
Perth ............... 43
Perturbations .......... "
Peru ................. "
Perugia (province) ....... 46
———— (city) .......... "
————, Lake (see Thrasymene) ........ "
Perugino ............. "
Peruke (see Wig) ....... "
Peruvian Bark (see Bark, Peruvian) ............. "
Pervigilia ............. "
Pestalozzi (John Henry) ... "
Pesth, or Pest ......... 48
Pestilence (see Plague, and Spasmodic Cholera) ..... "
Pestum, or Pesto (see Pæstum) ............... "
Petal ................. "
Petalite .............. "
Petard ............... "
Petechiæ (see Plague) .... "
Peter I (emperor of Russia) . 49
—— II (emperor of Russia) . 55
—— III (emperor of Russia) ............. "
——, St., Church of (see Rome) ............ "
—— (the apostle) ........ "
—— the Hermit ........ 56
Peterborough (the earl of) . "
————, Bishop of (see Marsh, Herbert) ..... "
Peterero ............. "
Peters (Hugh) .......... "
—— (Richard) ......... "

Digitized by Google

# Rights and Irresponsibility

I t is a common refrain: Americans focus excessively on rights, to the detriment of responsibilities. Reflection on the relationship between rights and responsibilities goes deeper than diagnosis of current moral, legal, and social problems. It extends to analysis of the very design of our constitutional system. For example, during the 1991 bicentennial of the ratification of the Bill of Rights, *Harper's* asked a group of scholars and political figures to "carry on the founders' conversation." They pondered whether a "Bill of Duties" should complement the Bill of Rights, taking as their point of departure the claim that although "the vocabulary of rights is nearly exhausted . . . the vocabulary of responsibilities has yet to emerge."[1] Most of the respondents declined to endorse a bill of enforceable duties, but some called for bringing a new communitarian perspective balancing rights and responsibilities to bear on the moral, legal, and social issues of our time.[2]

Proponents of "rights *and* responsibilities" trace the responsibility deficit not only to the silence of our governing documents about responsibility but also to the structure and rhetoric of American "rights talk" and the "morally incomplete" language of rights. One alleged consequence of the imbalance between rights and responsibilities is the erosion of personal responsibility and the institutions of civil society, such as families and religious, civic, and other voluntary associations. These "seedbeds of virtue" are necessary to inculcate the traits of character on which the preservation of ordered liberty depends but which rights talk neglects. The new communitarians seek "[t]o rebuild America's moral foundations [and] to bring our regard for individuals and their rights

Compendium_Cornell
Page 0294

into a better relationship with our sense of personal and collective responsibility."[3]

Political leaders, both Democrats and Republicans, have sympathized with this new communitarianism and its focus on responsibility. As a candidate, Bill Clinton ran on a Democratic Party platform charging the Republican Party with a twelve-year "nightmare" of "irresponsibility and neglect." As President, he called for a "new ethic of personal and family and community responsibility," through which Americans would "demand more responsibility from all" and "take more responsibility" for themselves.[4] The Republican Party countered with its own call to "restore the American dream" and "restore a proper balance between government and personal responsibility."[5] The Third Way politics pioneered by Clinton, the Democratic Leadership Council, and the Progressive Policy Institute proposes a "new social compact based on individual rights and responsibilities."[6]

As a candidate, Barack Obama wrote of how Americans' "individualism has always been bound by a set of communal values, the glue upon which every healthy society depends," and by obligations to family and nation. These appeals to community, along with Obama's declaration that we are "not from red states, not from blue states, but from the United States," led sociologist Amitai Etzioni, founder of the "responsive communitarian" movement, and prominent journalists to label Obama a communitarian.[7] In his inaugural address, President Obama called for a "new era of responsibility—a recognition on the part of every American that we have duties to ourselves, our nation and the world"—and contended that such duties give meaning to "our liberty."[8] Obama, like his Democratic and Republican predecessors, also voices communitarian and Third Way themes that there are many social problems that government alone cannot solve and supports governmental partnerships with community- and faith-based groups.

The refrain of "too many rights, too few responsibilities" and the appeal to "rights *and* responsibilities" in themselves do not explain how rights undermine responsibility.[9] To assess the irresponsibility critique, we must get a clearer picture of what sorts of responsibilities the communitarians believe are in need of restoration (e.g., moral, social, or legal) and to whom such responsibilities are owed (e.g., to self, family, community, country, or the world). This chapter examines a cluster of questions about the relationship between rights and responsibility. What is it about rights that triggers the irresponsibility critique? Do legal rights include a right to be irresponsible and, if so, why defend them? Does the structure of legal rights discourage or preclude individual, community,

or societal reflection on right conduct and efforts to foster responsible behavior? Have liberal justifications of legal rights invited discontent by neglecting the relationship between rights and responsibility? How much of what is at issue in charges of irresponsibility is really about rights, as distinguished from legally prohibited behavior?

Because the irresponsibility critique encompasses a complex cluster of charges about rights, we need to focus on specific proponents to sharpen our analysis and to do the critique justice. We shall focus on two comprehensive, articulate, and influential formulations: those of Harvard Law School Professor Mary Ann Glendon, especially in her book *Rights Talk: The Impoverishment of Political Discourse,* and those expressed in "The Responsive Communitarian Platform: Rights and Responsibilities," whose primary authors are communitarian sociologist Amitai Etzioni, civic liberal political theorist William Galston, and Glendon (and whose signatories include prominent communitarians, civic republicans, and progressives). We acknowledge that these new communitarians have many precursors and contemporaries. They represent the best foils here because of their application of the irresponsibility critique to constitutional rights.

First, we explicate the irresponsibility critique of rights and the calls for responsibility. Second, we argue that a significant component of the irresponsibility critique is a social critique: that a flight from individual responsibility coupled with an increased demand for rights have led to a dearth of civic virtue and a growth of social pathology. We question the connection posited between legal rights and those phenomena. Finally, we put forward a jurisprudential analysis of the irresponsibility critique. We distinguish two strands of the critique: legal rights permit rightholders to act with legal *immunity,* and legal rights allow people to act without regard to moral *rightness*. We grant that legal rights do not equate with moral rightness, but we reject the claims that legal rights send a message about moral rightness, moral insulation, or the absence of responsibility. In support, we point to the employment of moral suasion and the language of responsibility in contemporary debates about a number of constitutional rights.

We also challenge the dichotomous treatment of rights and responsibility by showing that presuppositions about moral capacities and moral responsibility undergird liberal justifications of constitutional rights like those we advance. Liberals believe that the possibility of irresponsible conduct is a cost of recognizing and protecting rights, a cost that is generally preferable to shifting the locus of moral responsibility from individuals to the community or the government. Yet, liberals need not hold

Compendium_Cornell
Page 0296

that the costs of rights never justify restricting or regulating individual freedom. Thus, the irresponsibility critique misunderstands the notion of "rights as trumps" as being more "absolutist" than it actually is. We return to these matters in Chapters 6 and 9. Our constitutional liberalism pursues ordered liberty, not absolute rights without responsibilities.

We argue that the freedom that rights provide makes possible the exercise of responsibility and that leading liberal justifications for rights are not silent about this relationship between rights and responsibility. As a schematic device, we argue that communitarian and liberal talk about responsibility emphasize two different, although related, meanings of responsibility: *responsibility as accountability* to community versus *responsibility as autonomy* or self-government, respectively. As we use the terms, "responsibility as accountability" connotes being answerable to others for the manner and consequences of the exercise of one's rights, whereas "responsibility as autonomy" connotes self-governance, that is, entrusting the right-holder to exercise moral responsibility in making decisions guided by conscience and deliberation. If liberal rights talk seems silent about responsibility, as the communitarians claim, it may be due in part to these very different conceptions of responsibility. The irresponsibility critique highlights the tension between pursuing the goal of responsibility as accountability (emphasized by communitarians) and protecting the principle of responsibility as autonomy (stressed by liberals). In Chapter 3, we illustrate that tension with the example of the right to procreative autonomy.

## In Search of "Rights and Responsibilities"

In *Rights Talk,* Glendon argues that rights talk impoverishes political discourse and civic life because it drives out or obscures the language of responsibility. Diagnosing a lack of fit between, on the one hand, a rights talk that is silent about a rights-bearer's correlative responsibilities and, on the other, a deep American belief that persons should be personally responsible for their actions, Glendon argues that the law's silence about responsibility may even appear to send a message that it condones irresponsibility.[10]

What is wrong with rights talk? Glendon submits:

Our rights talk, in its absoluteness, promotes unrealistic expectations, heightens social conflict, and inhibits dialogue that might lead toward consensus, accommodation, or at least the discovery of common ground. In its

silence concerning responsibilities, it seems to condone acceptance of the benefits of living in a democratic social welfare state, without accepting the corresponding personal and civic obligations. In its relentless individualism, it fosters a climate that is inhospitable to society's losers, and that systematically disadvantages caretakers and dependents, young and old. In its neglect of civil society, it undermines the principal seedbeds of civic and personal virtue. In its insularity, it shuts out potentially important aids to the process of self-correcting learning. All of these traits promote mere assertion over reason-giving.[11]

Glendon illustrates these lamentable features of American rights talk with examples from constitutional, family, and tort law.

Glendon casts her critique of the inattention to responsibilities in American rights talk in the form of a comparative legal anthropology of "libertarian" versus "dignitarian" conceptions of the person and of rights.[12] She argues that the United States, influenced by the Anglo-American tradition, reflects the first. Her primary illustration is Justice Brandeis's proclamation that the "most comprehensive of rights and the right most valued by civilized men" is the "right to be let alone."[13] This lone "rights-bearer," she claims, is "imagined as an independent, highly autonomous, self-determining being." In "the American rights tradition," the "highest priority" is "on individual freedom from governmental constraints. Rights tend to be formulated *without explicit mention of their limits* or of their relation to *responsibilities* or *to other rights*."[14]

By contrast, the conception of the person in "dignitarian systems," influenced by the Romano-Germanic tradition, makes explicit that "each person is constituted in important ways by and through his relations with others." Glendon contrasts Brandeis's formulation with the German Constitutional Court's declaration that "The image of man in the Basic Law is not that of an isolated, sovereign individual." In many other post–World War II constitutions, as well as in the United Nations Universal Declaration of Human Rights (UDHR) and in Catholic social teaching, she argues, rights are grounded in a normative framework of human dignity and "specific rights are typically formulated so as to make clear that they are related to one another, that certain groups as well as individuals have rights, and that political entities, as well as citizens, have responsibilities."[15]

Gauging the scope of Glendon's critique is difficult. At its narrowest, it is a meditation on the comparative silence in American governing documents, such as the Bill of Rights, concerning responsibilities. This silence contrasts strikingly with European constitutions and rights proc-

Compendium_Cornell
Page 0298

lamations such as the French Declaration of Rights and Duties and with
Article 29 of the UDHR, which states that "[e]veryone has duties to the
community" and that everyone's rights and freedoms are subject to limi-
tations "for the purposes of securing due recognition and respect for the
rights and freedoms of others and of meeting the just requirements of
morality, public order and the general welfare in a democratic society."[16]
As an exercise in comparative legal anthropology, Glendon's critique is a
reflection on how differences in such founding texts shape different con-
ceptions of the person. (As we respond to various critiques of rights and
liberal conceptions of the person, we will encounter again Glendon's
"lone rights-bearer" (Chapter 3) and meet such near-kin as the supposed
radically autonomous, "sovereign" self characteristic of "expressive indi-
vidualism" (Chapter 4) and the "unencumbered self" able to stand apart
from all relationships (Chapter 7).)

At its broadest, Glendon's critique is a social critique of American
society and American attitudes about freedom untempered by a sense of
personal responsibility and civic duties. Her leading example is a survey
of teenagers reporting their perception that what makes America special
is that they are free to do whatever they want, without limit. As a juris-
prudential analysis, her critique attacks the characterization of rights as
trumps and absolutist formulations of rights that are silent about respon-
sibility and that appear to preclude deliberation about the common good.
Our public documents and our rights talk encourage a careless and exag-
gerated way of speaking and thinking about rights, as if liberty meant
license. Yet she points out that the interpretations of rights by judges,
lawyers, contracting parties, and others reveals that rights are not
without limits.[17]

Why is our rights talk silent about responsibilities? Does the silence
matter? On the one hand, Glendon locates the undeniable differences
between the American Bill of Rights and the French Declaration of
Rights and Duties in the different intellectual pedigrees of the Amer-
ican and French Revolutions (Lockean individual rights and self-interest
versus classical and Rousseauean civic virtue and duty). On the other
hand, she downplays the American and European textual differences by
arguing that the American Founders did not need to adopt a bill of legal
duties because they relied on the institutions of civil society to restrain
and temper individual self-interest and the exercise of rights. Invoking
speeches by the Founders, Glendon and other proponents of an unwritten
"constitution of responsibility" stress the role of morality and religion as
the ultimate supports for maintaining a republican form of government,

for respecting rights, and for making "our experiment in ordered lib-
erty" possible. Relying particularly on Alexis de Tocqueville's nineteenth-
century observations of Americans, Glendon argues that the "seedbeds
of civic virtue"—such as families, associations, and the constraints of
morality and religion—once played a vital role in educating Americans
about rights and responsibilities.[18]

In Glendon's view, the silence of our governing documents concerning
responsibility would not matter so much if these institutions were still
germinating virtuous citizens with the requisite character traits for
"ordered liberty." However, that traditional, richly textured social fabric
is wearing thin, and Americans increasingly view law as the primary, if
not only, source of teaching about morality. She traces the rise of rights
talk to a significant shift in constitutional law in the 1950s and 1960s to
a focus on individual rights and an eschewal of ordinary politics in favor
of judicial vindication of rights. This "rights revolution" brought with it
an equally significant social phenomenon, a change in "habits of thought
and speech."[19] The result is a rights-laden discourse that makes public
dialogue and deliberation about responsibilities and the common good
difficult and fosters attitudes that the Founders would have criticized as
"liberty as license."

Clearly, Glendon's tale contains an important then/now contrast. She
contends: "[T]he liberal principles enshrined in the United States'
founding documents were political principles that were never meant to
serve as moral guides for all of social and private life." Moreover, their
silence about responsibility reflected an expectation that the institutions
of civil society and individual states would address "the responsibilities
that are correlative with rights." But when legal images of personhood
"migrate into other contexts" of social and private life, and when these
institutions atrophy, so that the law becomes the primary carrier of
values, these images can become "mischievous." In today's more "legal-
istic and heterogeneous society," citizens "tend to regard the Supreme
Court's pronouncements not merely as legal rulings but also as moral
teachings grounded in the country's most sacred civic document." This
reinforces the "excessive individualism in American law."[20]

Glendon maintains nonetheless that the social fabric is not threadbare
and that rights talk obscures a still-intact civil society, with its "com-
munities of memory and mutual aid." She marshals "evidence" that
America has "indigenous languages of relationship and responsibility"
available to refine rights talk.[21] (In Chapter 4, we assess Glendon's argu-
ments concerning the institutions of civil society as "seedbeds of civic
virtue.")

Compendium_Cornell
Page 0300

As with her critique of rights talk, judging the scope of Glendon's proposed corrective is difficult. On the one hand, she claims that her goal is a refined rhetoric of rights that would keep "competing rights and responsibilities in view." She urges that we address such matters as: whether a particular issue is best conceptualized as involving a right; the relation a given right should have to other rights and interests; the responsibilities that should be correlative with a given right; the social costs of rights; and the effects a right may have on the durable protection of freedom and human dignity.[22]

On the other hand, matters such as how to link rights with responsibilities and how to factor in social costs of rights appear to raise questions about the content of and limitations on rights. Glendon appears to consider, as refining rights rhetoric, not only greater judicial attention to the publicity effects of judicial opinions but also greater judicial willingness—even when a fundamental right is asserted—to countenance "moral fabric" arguments and to consider whether they justify the use of the criminal law to express and maintain a "widely shared moral view" (e.g., through sodomy laws).[23] Moreover, although she rejects importing European declarations codifying limitations on rights and correlative duties to communities, she finds them instructive and proposes that the former West Germany's restrictive abortion law would better serve American women than the right of privacy has (an argument we assess in Chapter 3).[24] All this suggests a substantive critique of the content of rights.

### Assessing the Irresponsibility Critique as a Social Critique

Situating the irresponsibility critique in the context of a number of contemporary critiques of American society suggests that certain components of it are a social critique aimed less at legal rights as such than at American society and "rights culture." Those components include the claims that: Americans want rights without the responsibilities of citizenship; the legacy of the 1960s includes not only the civil rights movement but also a challenge to authority that led to the crumbling of moral authority and tradition and an explosion of self-indulgent and socially harmful behaviors; and Americans today debase the value of genuine legal rights by making frivolous claims to rights while fleeing personal responsibility and shifting blame to others. The new communitarians tie all these social phenomena together with the thread of a decline of responsibility. We do not assess fully their accounts of the problems of American

Compendium_Cornell
Page 0301

society. Rather, we question whether legal rights, liberalism, and an "excess" of liberal virtues are to blame for these social phenomena.

### The Quest for a Responsible Citizenry

The irresponsibility critique of rights explores the indispensable relationship between freedom and responsibility. The American experiment in ordered liberty, the communitarians argue, depends on such traits of character as self-control, self-restraint, and respect for the rights of others, as well as a willingness to assume responsibility for oneself, one's family, and the health of America's institutions.[25] Freedom, in other words, depends on both responsibility as autonomy and as accountability.

The communitarians argue that, to a disturbing degree, Americans manifest "a strong sense of entitlement—that is, a demand that the community provide more services and strongly uphold rights—coupled with a rather weak sense of obligation to the local and national community."[26] To the extent that the irresponsibility critique targets such attitudes, it does not directly implicate rights as much as lapses in civic responsibility. Indeed, the prominent example offered as a symbol of contemporary attitudes is young people's reported expectation of being tried by a jury coupled with a reluctance to serve on juries.[27] There is no legal right to evade jury service; indeed, it is a civic duty, nonperformance of which the state may legally punish.[28]

This component of the irresponsibility critique is a helpful civics lesson about the role that responsible citizens must play in sustaining a constitutional democracy. In the communitarian view, however, civic education and national or community service cannot fully redress the decline of a responsible citizenry because the roots of the American malaise go deeper. Indeed, the moral or social fabric, the "ecosystems" of society, result significantly from the effects of the choices and conduct of millions of individuals.[29] Echoing Glendon, the "Responsive Communitarian Platform" warns that the most basic institution of civil society—the family—which should be a moral educator schooling the next generation of citizens in the interplay of rights and responsibilities, is in peril and that "the second line of defense"—schools—cannot alone prevent the decline of a responsible citizenry.[30] Moreover, communitarians charge that schools are reluctant to engage in moral education and character formation but must do so to combat the "moral deficit" among young people.[31] (We return to these matters in Chapters 4 and 5.)

Communitarian inventories of the "moral state of the union" indicate that the responsibility deficit in America encompasses not only some

Compendium_Cornell
Page 0302

conduct protected by legal rights but also lawless behavior that is unprotected by rights and violates the rights of others.[32] Consider, for example, violent crime. What the irresponsibility critique seems to overlook is that although constitutional rights attend persons accused of crimes and limit methods to prevent crime—and communitarians challenge "absolutist" interpretations of such rights—rights do not protect the criminal activity itself.[33] Moreover, notwithstanding the communitarian charge that libertarian interpretations of rights prevent government from addressing violent crime, many liberals argue that providing for the physical security of citizens is the most basic obligation of government.[34]

Communitarians are not alone in focusing on an absence of responsibility as an explanation for many self-destructive and socially costly behaviors. Yet the underlying culprit for a substantial amount of the irresponsible behavior that communitarians target is not rights, but the erosion of qualities like self-control, self-restraint, and respect for others and the law.[35] The communitarians believe, though, that rights have contributed to that erosion, stressing as pivotal the civil rights movement and the broad challenges to authority and tradition during the 1960s.

### The Legacy of the 1960s and the Civil Rights Movement: Progress or Pandora's Box?

Out of the new communitarianism emerges a tale of the legacy of the 1960s explaining both the explosion of rights talk and the erosion of morality and civic virtue. We shall attempt a composite, if oversimplified, account.[36] In the 1950s, the moral authority of leaders and community norms were respected; it was possible to talk about what was right and what was wrong. Families were stronger, violent crime rarer, and habits of self-reliance and self-restraint more abundant. This society had some notable failings: racial inequality and segregation, gender inequality (including a male-governed family structure and the exclusion of women from the commercial work world), and the marginal status of certain ethnic and religious groups (like Jews and Catholics). Moreover, the values themselves were somewhat authoritarian. Nonetheless, there was a cultural consensus in America, a traditional morality that was "dominant and effective."[37]

The civil rights movement, the communitarians grant, appropriately criticized injustice and exclusion and rightly sought to realize the ideal of equality for all citizens.[38] But the 1960s proved to be a Pandora's Box: that decade unleashed a dangerous explosion of claims of entitlement, an ideology of personal fulfillment and liberation, and a pervasive challenge

to traditional morality and authority.[39] Such a challenge undermined the strong family values that held sway in the 1950s and repudiated a traditional morality that emphasized self-control, self-restraint, and self-discipline. In its place, the challenge of the 1960s left us with eroding moral foundations and institutions, moral relativism, an ideology of liberty as license, and a profound absence of moral consensus on new shared values and new forms of social institutions.[40] Alongside this cultural challenge, the 1980s saw the ascent of economic libertarianism and depiction of the "unbridled pursuit of self-interest" as virtuous.[41] As Etzioni elaborates the contrast, "[i]f the hallmark of the 1950s was a strong sense of obligation, from 1960 to 1990 there was a rising sense of entitlement and a growing tendency to shirk social responsibilities."[42] Today, these developments continue unabated, and we continue to live with their consequences.

The communitarian account is overstated. The assertion of civil rights has no obvious or plausible link to the rise of irresponsible and unlawful behavior, because civil rights do not include "rights," for example, to commit violent crimes or drug offenses.[43] Moreover, many civil rights (such as voting, housing, and education) secure preconditions for responsible citizenship. Communitarians respond that this very expansion of opportunities, benign in itself, inadvertently brought about harmful social changes.[44] But Cass Sunstein put it well when he argued that the posited link between rights talk and a responsibility deficit is exactly backward: rights talk arose because of a deficit of responsibility on the part of society and government.[45] And Michael Schudson is right to argue in *The Good Citizen* that the "rights-bearing citizen," such as Rosa Parks, often sought to redefine rather than reject community, illuminating the inequality and exclusion of existing communities; such citizens appealed to "common American traditions of liberty and equality," often "from the point of view of the people who had been left out of the founders' compact."[46]

Nonetheless, the attempt to link the civil rights movement to a growing social "pathology" and shrinking moral consensus is part of a larger debate over American values that centers on whether society is "defining deviancy down" and becoming too tolerant of behaviors once condemned socially, if not legally.[47] An examination of some of those behaviors traced to the legacy of the 1960s—changes in mores concerning sexuality, greater diversity in family forms, increases in divorce, greater acceptance of pregnancy and parenting outside of marriage, and availability of abortion—suggests that the real targets of the irresponsibility critique are such social changes. Developments in family law and the

Supreme Court's recognition of constitutional rights to liberty and autonomy in the areas of sexuality, reproduction, and marriage also are implicated.[48] Thus, the increasing "constitutionalization" and liberalization of family law, some communitarians argue, impede family law's traditional role in conveying moral messages about the responsibilities of spouses and parents and exalt adult liberty and fulfillment at the expense of children and other dependent persons (including mothers). Pointing to changes in the law of family dissolution, Glendon contends that "the legal system inadvertently fosters irresponsible behavior."[49] In assessing the irresponsibility critique, the critical questions are what messages to draw from these legal developments and whether certain legally protected choices are proxies for irresponsibility.

### The Rights Explosion and the Flight from Responsibility

Finally, Glendon and the new communitarians lament the increasing tendency of Americans to express needs and wants in terms of rights, a tendency social critics and popular media describe as "rights inflation" or a "rights explosion." This "vast expansion in the number and scope of rights to which Americans believe they are entitled, and the 'rights culture' this produces," argues Francis Fukuyama (a "Platform" signatory), fosters an "individualism" that seriously threatens community.[50] The attack on "rights culture" seems to target the evidently frivolous or irresponsible assertion of rights. For example, people are said to call for new rights without regard to the obligations that a right creates (e.g., asserting affirmative rights to health care without considering the implications for the fisc). Rather than creating more rights talk—which supposedly makes compromise difficult and devalues rights—communitarians argue for a "return to a language of social virtues, interests, and, above all, social responsibilities [that] will reduce contentiousness and enhance social cooperation."[51]

The rights explosion frequently is said to be accompanied by a corresponding plunge in Americans' sense of personal responsibility, manifested in the tendency to assume the mantle of the victim.[52] To be sure, those who elaborate the victimhood critique offer some absurd examples of rights assertion coupled with denial of personal responsibility. Consider, for example, the lawsuit brought against a refrigerator manufacturer by people injured from running races carrying refrigerators on their backs![53] It is unclear, however, how such refusal to accept responsibility is a legacy of the 1960s or is due to the recognition and enforcement of legal rights.

Compendium_Cornell
Page 0305

30   ORDERED LIBERTY

In sum, all of the components of the irresponsibility critique previ-ously mentioned, understood as a social critique, provide an opportunity for reflecting on the current state of American society. But for the most part they are unpersuasive as critiques of legal rights.

## Assessing the Irresponsibility Critique as a Jurisprudential Critique

In this section, we argue that the jurisprudential underpinnings of the irresponsibility critique of rights are flawed. On one reading, the critique merely seeks to correct some erroneous inferences drawn from certain features of legal rights, immunity and wrongness. On another reading, the new communitarians' discontent with these two features and their impulse to link rights to responsibilities reaches deeper to attack rights themselves. We need to consider how the new communitarians under-stand rights and what sorts of rights they would defend.

### The Immunity Critique

Rights, Immunity, and Harm   The new communitarians understand legal rights to protect against legal coercion, preserving a zone of noninterfer-ence or immunity: "Rights give reasons to others not to coercively inter-fere with the [right-holder] in the performance of protected acts." A consequence is that legal rights may include the freedom to engage in "morally inappropriate," irresponsible, or even socially harmful conduct without legal accountability.[54] The social message that people are said to infer from immunity is that they have a right to be insulated from the moral claims or scrutiny of others.

Although immunity creates social costs, the irresponsibility critique appears to accept immunity as a feature of legal rights. Yet its call for a rhetoric of rights attentive to their social costs suggests ambivalence. And the critique vigorously rejects any leap from legal immunity to social unaccountability. In assessing the immunity critique, we should ask whether legal rights in fact immunize right-holders from liability for imposing social costs or harms on others.

Wesley Hohfeld's classic account of rights provides a helpful point of departure. Hohfeld explained legal rights in terms of several possible pairs of jural relationships.[55] Two are particularly pertinent to the immu-nity critique. Individual rights against governmental interference—the

constitutional rights often used as examples in the irresponsibility critique—might be understood as taking the form of Hohfeld's first pair, *right/duty:* an individual right to do or not do *X* correlates with a governmental duty not to interfere with that right (or to provide *X*). One could also regard constitutional rights as captured by his second pair, *privilege/no right:* an individual privilege or liberty to do or not do *X* correlates with no right or authority for government to require that an individual do otherwise.[56] In either account, there is a realm of activity or inactivity that is immune from legal interference or sanction.

Jack Balkin argues that on Hohfeld's account "a legal right is a privilege to inflict harm that is either not legally cognizable or is . . . without legal remedy."[57] Similarly, Joseph Singer contends that Hohfeld's analysis demonstrated the limits of the then-prevailing justification for legal rights: John Stuart Mill's harm principle and the distinction between self-regarding and other-regarding acts.[58] It made clear that legal rights protect not merely self-regarding acts but also conduct that harms others. Thus, a consequence of the immunity that legal rights afford may be the imposition of noncompensable harms or costs on others.

The new communitarians do not propose to expand the definition of harm to justify interfering coercively with all activities that impose costs, yet harm does serve as a justification for constraining certain rights. Freedom of speech is the paradigm example of a right that warrants legal protection although it imposes social costs and individual harms.[59] In contrast, in areas of public health and safety, including national security, communitarians reject "absolutist" assertions of rights and emphasize harms and costs.[60] With its imagery of social environments and ecosystems, the irresponsibility critique assumes that a wide range of individual choices have social costs, both for the fisc and the social fabric. When should society use law as a tool to address these costs and when should it rely solely on the community's moral voice? Families and family law are an instructive example. On the one hand, the "Platform" advises that responsibility is "not primarily a legal matter," and that communitarians seek "to affirm the moral commitments of parents" to attend to the moral education of their children. On the other hand, communitarians urge that "the law does play a significant role not only in regulating society, but also in indicating which values it holds dear." Because of the "serious" social costs of divorce, divorce law should "signal society's concern."[61] In other areas, communitarians advance a mix of facilitative, persuasive, and coercive measures to encourage or impose parental, institutional, and governmental responsibility. Thus, although the communitarians accept legal immunity as a feature of some legal rights, they

urge a general principle of social accountability for the exercise of rights and argue that legal immunity should not insulate right-holders from such measures.[62]

A comparison with Mill's delineation of the respective spheres of individual freedom and legitimate governmental interference is instructive. Mill argued that an individual is not accountable to society for self-regarding actions (when there is no harm to others), but "for such actions as are prejudicial to the interests of others, the individual is accountable, and may be subjected either to social or to legal punishment, if society [deems] that the one or the other is requisite for its protection." Yet even within the realm of unaccountability, Mill granted that society could use a range of measures, such as "[a]dvice, instruction, persuasion, and avoidance," to signal disapproval of individual action or to attempt to influence such action.[63]

The communitarians seem to reject Mill's nomenclature of a realm of unaccountability because it might send the social message of insulation. In any event, they argue for a narrower understanding of such a realm because the interdependency of contemporary society increases the instances in which the exercise of freedom imposes costs or harms on others.[64] Nevertheless, they might find in Mill support for their argument that a right bestowing legal immunity does not immunize persons from the moral scrutiny or moral claims of others. At the same time, the communitarian quest to link rights and responsibilities poses important questions concerning when persuasive measures rise to the level of social tyranny, coercion, or punishment of the sort that Mill feared and criticized as threatening liberty.[65] We argue that legal immunity does not immunize people from governmental moralizing and the moral scrutiny of others.

Rights as Trumps  In the context of constitutional rights, Ronald Dworkin's conception of rights as trumps has provoked the ire of the new communitarians. They charge that thinking of rights as trumps leads to disregarding any responsibilities to society and any social costs of conduct and shuts down debate about the common good.[66] At bottom, the objection seems to be that this notion has spread from an account of certain fundamental constitutional rights to a conception of legal rights generally, eviscerating moderation of claims by exalting individual desires over social ends.[67] However, the communitarian attack on rights as trumps ignores important limitations on that notion already developed in liberal theory. It reflects a deep discontent with immunity, yet does

not offer a clear alternative conception of rights or how social costs should affect their protection.

Many years before Glendon wrote *Rights Talk,* Dworkin observed that "[t]he language of rights now dominates political debate in the United States." In *Taking Rights Seriously,* he defended a "strong sense" of the "old idea of individual human rights." He argued: "Individual rights are political trumps held by individuals. Individuals have rights when, for some reason, a collective goal is not a sufficient justification for denying them what they wish, as individuals, to have or to do, or not a sufficient justification for imposing some loss or injury upon them."[68] Fundamental rights, he argued, trumped the utilitarian calculus of the greatest happiness of the greatest number.

Dworkin contended: "A right against the Government must be a right to do something even when the majority thinks it would be wrong to do it, and even when the majority would be worse off for having it done." To assert that the government has the right to do whatever advances the general welfare or "the right to preserve whatever sort of environment the majority wishes to live in," would "annihilate[ ]" individual rights against the government. It would reduce them to mere interests to be balanced away at the majority's discretion. Dworkin argued that this strong sense of rights marked the "distinctive concept of an individual right against the State which is the heart . . . of constitutional theory in the United States."[69]

Glendon uses Dworkin's idea of "taking rights seriously," even at the expense of the general interest, to illustrate the "illusion of absoluteness" of American rights talk. She states: "[I]t is difficult to imagine any serious contemporary European legal philosopher" asserting, as Dworkin did, that "if someone has a right to something, then it is wrong for government to deny it to him even though it would be in the general interest to do so."[70] Dworkin's account of taking rights seriously clearly conflicts with what Glendon thinks taking the social costs of rights seriously requires.

But an examination of the limits of Dworkin's conception of rights suggests that the illusion of absoluteness may be Glendon's. The first important limit is that the strong rights that Dworkin defended were fundamental constitutional rights, not every constitutional right, much less every right, and certainly not every imaginable "liberty interest." He granted that, with respect to the vast bulk of laws not implicating those strong rights, promoting the general welfare was a sufficient justification for restricting liberty. Even when a strong right against the government was in play, it would overstate the point to say that "the State is never

justified in overriding that right." For example, Dworkin acknowledged that the government would be justified in overriding a right of free speech to "protect the rights of others, or to prevent a catastrophe, or even to obtain a clear and major public benefit."[71] Thus, he did not claim that societal welfare never restrains rights or overrides them, merely that fundamental rights are not simply individual "interests" to be balanced against such welfare. Furthermore, a significant ground for limiting rights that Dworkin recognized is the conflicting rights of others, especially conflicts between rights to the state's protection and rights to be free from the state's interference. In such situations, the more important right should prevail over the less important. (In Chapter 6, we address how to resolve such conflicts.) Government could also limit the extension of a right if the values protected by the original right were not at stake or if the costs to society went far beyond "the cost paid to grant the original right."[72]

Finally, Dworkin's account did not presume to answer all questions as to how the moral responsibilities of citizens should guide their lives and exercise of their rights or how government and citizens might attempt in noncoercive ways to shape others' exercise of rights. He addresses such questions in subsequent works in ways that clarify the distinction between responsibility as autonomy and responsibility as accountability. Thus, in elaborating the "principle of personal responsibility" for making the ultimate decisions about our own lives, he distinguishes between permissible—and inevitable—forms of *influence* (such as friends, religion, and culture) and impermissible *subordination* through manipulation or coercion.[73] Government, on his view, may seek to influence or persuade to encourage *responsibility* in making a decision, but it may not insist on *conformity* with its view of the responsible decision[74] (a distinction to which we return in Chapter 3).

Dworkin recognized that a government's taking rights seriously would incur costs: "[T]he majority cannot travel as fast or as far as it would like if it recognizes the rights of individuals to do what, in the majority's terms, is the wrong thing to do." Why take rights seriously if doing so makes it more difficult or costly for a polity to pursue the general benefit? Dworkin argued that, although the "bulk of the law . . . must state, in its greatest part, the majority's view of the common good," the institution of rights is the promise of the majority to the minority "that [its] dignity and equality will be respected." Indeed, ideas of dignity (particularly, the supposition of what it means to treat individuals as full members of the human community) and equality (particularly, the requirement that government treat individuals with equal concern and respect) are

Compendium_Cornell
Page 0310

typical grounds for protecting strong rights.[75] As Dworkin elaborates in *Justice for Hedgehogs,* principles of dignity feature as the foundation for this governmental obligation as well as the basis for our special responsibility for our own lives and for what we owe each other.[76]

In sum, the communitarians overlook that Dworkin acknowledged many limits on the idea of rights as trumps. If they reject his underlying conception of what a right is, they may reject legal immunity as a feature of legal rights. If so, we need to know what alternative conception of rights they would embrace and how they would wed legal, as well as social, accountability to rights.

The irresponsibility critique appears to grant that a legal right held by one person generally involves a correlative duty on the part of another, the Constitution provides a reason for government not to interfere coercively with the exercise of rights guaranteed therein, and the exercise of legal rights may result in irresponsible or socially harmful conduct. If the communitarians accept these features of legal rights, it is not clear why they object to the key component of rights as trumps—that it would be wrong for government to act coercively to prevent people from exercising rights in order to pursue the general welfare. Glendon, for example, objects to this claim. Is it therefore right for government to prevent people from exercising rights in such situations?

Although the new communitarians ask that we talk about rights in a different way, they offer no coherent alternative to the strong sense of constitutional rights that Dworkin advances. Perhaps the communitarians object to the peremptory image of a trump, which may send the social message that a right automatically trumps any consideration of the impact of rights on the common good, rather than to Dworkin's particular conceptions. Thus, communitarians may fear that talking about rights as trumps sends the (mistaken) message that the assertion of rights cuts off debate. Similarly, Sunstein suggests that too often rights "masquerad[e] as reasons" and are not conducive to deliberation. In contrast, a more deliberative approach, even if it led to the same protection of a right, would acknowledge that there are other issues to consider.[77] But we should observe that the image of rights as trumps itself suggests that other cards are on the table.

Furthermore, there is reason to doubt that rights operate as trumps in contemporary constitutional law. It is ironic that the notion features so centrally in the irresponsibility critique as emblematic of the failings of contemporary rights talk, given developments in constitutional law since the publication of Dworkin's initial call to take rights seriously. The conservative Burger, Rehnquist, and Roberts Courts often have been

Compendium_Cornell
Page 0311

criticized for not taking rights seriously. Indeed, James Boyd White has suggested that Glendon's critique of rights tells only part of the story since the "characteristic vice" of the Supreme Court cases of the last few decades is not the assertion of absolute rights of the sort that Glendon decries but "the claim to judge every case by a process of 'balancing' one cluster of interests off against another."[78]

Likewise, other commentators suggest that the metaphor of balancing best describes the identification, valuation, and comparison of competing interests pervasive in adjudication of individual constitutional rights.[79] This metaphor, while consistent with communitarian language of restoring balance and equilibrium, is quite at odds with that of trumps. The defining features of such an age are more likely to be mutual adjustment of conflicting rights or indeed balancing rights away, rather than protecting them absolutely though the heavens fall. We return to such matters in Chapters 6 and 9.

Weighing the Social Costs of Rights   Whether the greater individual accountability that communitarians seek with respect to rights is compatible with a strong conception of rights is not clear. For example, Glendon urges a refined rights rhetoric that is attentive to the social costs of rights and to the question of "the responsibilities, if any, that should be correlative with a given right."[80] The irresponsibility critique warns that strong defenses of individual rights undermine communities and the support on which rights themselves depend.[81]

Glendon unfavorably compares Dworkin's supposedly absolute conception of rights to European declarations explicitly linking rights to duties to serve "the public weal." She offers the Canadian Charter of Rights and Freedoms as a good example of a "strong," though not "absolute," form of rights. It guarantees rights "subject only to such reasonable limits prescribed by law as can be demonstrably justified in a free and democratic society" and subjects a "wide range" of constitutional rights to either a national or local "legislative override procedure."[82] Such comparative models suggest a critique of the immunity that a right affords. And they suggest correctives not merely of social accountability, but also of legal accountability. In Chapter 9, we question whether what American courts do in adjudicating claims of "fundamental" constitutional rights is "absolutist." In Chapter 3, we examine Glendon's analysis of abortion law, one clear example of her rejection of legal immunity in favor of the accountability she finds in European models.

Glendon's appeal to craft a refined rights rhetoric from "indigenous resources"—such as household table talk, models of compromise, atti-

tudes of tolerance and forbearance, and even political deliberation—
raises questions as to what sorts of rights she would support and the
respective roles of courts and legislatures in enforcing them. First, is
Glendon's point that individuals should voluntarily moderate their exer-
cise of rights or that government should restrict such exercise in the gen-
eral interest of society? Vindication of rights often assumes that there are
clear winners and losers, people in the right and people in the wrong.
Does government do no wrong when it does not protect people's rights?
Moreover, although the mutual forbearance and compromise that go on
between family members, neighbors, and business partners may be
useful models in certain legal contexts, they are poor models for con-
ceiving the relationship between the rights of individuals and the powers
and interests of the government. Thus, we might wonder whether liber-
alism's commitment to individual freedom could survive the weaker
form of rights that Glendon appears to advocate, particularly in the case
of vulnerable individuals being asked to moderate their claims against
the state.[83]

Second, the communitarian eschewal of rights talk in favor of appeals
to social virtues and responsibilities seems to forget the extent to which
prior victories in securing civil rights involved challenging the status quo
and the ways in which the language of social virtues and the common
good (as well as the costs of social change) are typically deployed to
reject such challenges. Finally, if a communitarian model of rights would
shift responsibility for enforcing rights from courts to legislatures, that
move might suggest a less central role for rights and more attention to
the costs of rights to the community.

In conclusion, it is not clear how communitarians would factor social
costs, virtues, and responsibilities into defining, justifying, and enforcing
rights. Is the message of the irresponsibility critique that rights are privi-
leges, to be protected only as long as they are exercised responsibly?[84] A
similar concern attends conditioning enforcement of rights on a determi-
nation of community approval or interests. One of liberalism's core
values is individual liberty, including "the right to be different, the right
to pursue ideals one's neighbor thinks wrong. . . ."[85] If responsive com-
munities hold people accountable to some collective notion of responsi-
bility, is there any longer such a right? If recognition of a right is
conditioned on whether it imposes costs on others, it may no longer be a
right in any meaningful sense.

Which Costs Count?   Let us assume, with the communitarians, that the
social costs of rights should factor into the recognition and enforcement

of rights in a manner different than they do in liberal accounts. Still, such a communitarian project must determine how to measure social costs relative to the value of rights, as well as when to use legal (versus moral or social) measures for linking rights and responsibility. How would communitarians weigh the costs of protecting rights against the costs of not doing so? What is the cost to individuals of coercion? What is the cost of the risk of governmental error in weeding out costly exercises of rights? An inquiry into which costs count and how much they count will likely yield considerable conscientious disagreement.

One clear example of a near-absolute right that the communitarians defend strongly, and even use to illustrate how rights may license irresponsible and socially harmful conduct, is the First Amendment.[86] (Contrast *Whitney v. California,* where the Supreme Court stated that freedom of speech does not confer a right to speak "without responsibility," for such a right would be an "unbridled license" or "abuse" of freedom.[87]) Communitarians balance the values of the First Amendment and the risks of censorship against the harms of hateful, racist speech quite differently than do critical race theorists and others who argue that the costs of such speech warrant regulating it to pursue equal citizenship for minorities.[88] Communitarians acknowledge that such speech is hurtful but insist on nonlegal remedies, such as raising the moral voice of community against it. Similarly, despite the harms of pornography, it is doubtful whether most communitarians would support civil rights measures advocated by some (though certainly not all) feminists who argue that pornography is not "only words" and contributes centrally to the inequality of women and to violence against them.[89] The very comparative law enterprise that Glendon favors, however, lends support to limits on rights of racist and pornographic expression in view of individual and social harms inflicted by such expression.[90] It is not clear why such a stance is not more communitarian than a strong defense of the First Amendment.[91]

Our point here is that, even though current Supreme Court jurisprudence rejects an "ad hoc balancing of relative social costs and benefits" in particular cases, on the theory that the First Amendment itself "reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs,"[92] one might expect communitarians to urge such balancing. To take a current example of "words that wound,"[93] consider the gulf between the majority and dissent in *Snyder v. Phelps,* in which the Court held that the First Amendment shielded the Westboro Baptist Church from tort liability for intentional infliction of emotional distress on the father of a deceased soldier (Matthew Snyder).

The distress stemmed from Westboro's picketing near the son's funeral with signs like "Thank God for Dead Soldiers," "God Hates Fags," "You're Going to Hell," and "Priests Rape Boys" (reflecting Westboro's "view that the United States is overly tolerant of sin and that God kills American soldiers as punishment").[94] Neither Westboro nor the majority disputed that the deceased soldier's father "suffered 'wounds that are truly severe and incapable of healing themselves.'"[95] Even though the expression of Westboro's views was "particularly hurtful" to Matthew's father, adding to his "already incalculable grief," the majority held that "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." That, Chief Justice Roberts loftily intoned, is the course the United States has chosen "as a Nation," rather than punishing speech that inflicts "great pain."[96]

Justice Alito, the sole dissenter, viewed the costs of rights differently. He concluded (we believe correctly, as does retired Justice Stevens[97]) that the First Amendment does not require that Matthew's father bear such costs: "Our profound national commitment to free and open debate is not a license for the vicious verbal assault that occurred in this case."[98] Matthew was "not a public figure," and all his father wanted was "surely the right of any parent who experiences such an incalculable loss: to bury his son in peace." The First Amendment's commitment to "public debate" would not be undermined by "allowing family members to have a few hours of peace without harassment."[99] Thus, while the majority in *Snyder* concluded that free expression rights "trump," we would think that communitarians (and certainly Glendon) would favor an approach, more akin to that of European jurists, that *would* balance "relative social costs and benefits" and look at the impact of such speech both on Matthew's father and on the community as a whole.[100]

One could foresee similar disagreements over which costs count, and how much, with respect to a wide array of individual rights. Such disagreements raise questions of the relative costs of protecting responsibility as autonomy and promoting responsibility as accountability. To evaluate such costs, we need to consider the justifications for rights. Those justifications implicate the wrongness critique.

### The Wrongness Critique

The wrongness strand of the irresponsibility critique of rights involves a feature of legal rights captured by the communitarian slogan, the "gap between rights and rightness": one may have a "right" to do "wrong"

Compendium_Cornell
Page 0315

acts. As the "Responsive Communitarian Platform" explains, "To say that 'I have a right to do *X*' is not to conclude that '*X* is the right thing for me to do.' . . . [Rights] do not in themselves give a person a sufficient reason to perform [protected] acts."[101] In explaining this gap, Galston states, "Between rights and rightness lies a vast terrain where moral argumentation and (in some cases) forms of public persuasion have a legitimate role."[102] Because the language of rights is morally incomplete, people fail to appreciate the distinction between, and tend to equate, rights and rightness. Moreover, Etzioni asserts, "Many Radical Individualists confuse the right to be free from government intrusion with a nonexistent 'right' to be exempt from the moral scrutiny of one's peers and community."[103]

Positing such a gap, the wrongness critique challenges defenders of legal rights to justify them. We challenge communitarian arguments that rights send the message that rights equal rightness, drawing not only on liberal defenses of rights but also on contemporary debates concerning a number of constitutional rights. Liberal justifications of rights argue that rights protect and call for the exercise of responsibility, although one must differentiate responsibility as accountability from responsibility as autonomy. Liberal responsibility talk emphasizes that rights protect autonomy: they locate in individuals the responsibility to make important decisions in accordance with, or accountable to, conscience. Communitarian responsibility talk, by contrast, stresses that rights require accountability: individuals exercising rights should not be guided primarily by untutored conscience but by the responsibilities, duties, and moral claims laid on them by the moral voice of the community. The deployment of responsibility talk in Dworkin's work offers an opportunity to assess a liberal vocabulary of rights that addresses the issue of responsibility in the senses of both autonomy and accountability. Pressing questions include how that liberal account of rights and responsibilities compares with the proposed communitarian correctives and what role government may properly play in encouraging responsibility.

The Morally Incomplete Language of Rights   The observation of a distinction between rights and rightness is neither a new nor a controversial assertion about the relationship between legal rights and what is morally right. As Dworkin observed in *Taking Rights Seriously,* "[t]here is a clear difference between saying that someone has a right to do something and saying that it is the 'right' thing for him to do, or that he does no 'wrong' in doing it."[104]

What is the significance of this difference? To charge that the language

of legal rights is morally incomplete implies that legal rights fail us as a guide to what we ought to do because they do not talk about moral rightness or moral responsibility. Indeed, according to Glendon, this failure matters immensely as legal language migrates beyond its proper sphere and people come to regard law as the primary "carrier" of values.[105] Contemporary liberal rights theorists, however, do not claim that the purpose of declaring individual rights is to signal the requirements for "a fully human and morally satisfactory life" or that the menu of one's legally permissible choices is a full account of one's moral duties and responsibilities.[106]

There may be constraints on rights that are legal, moral, or social and that take the form of responsibilities owed to self, other persons, community, or humanity. Independent of the community's raising its moral voice or laying moral claims, people might consider themselves under moral duties, for example, to engage in benevolence. The communitarians do not typically emphasize such internal convictions of responsibility because they view it as "unrealistic to rely on individuals' inner voices" and to expect them to do the right thing without the moral voice of the community.[107] This suspicion of conscience alone stems in part from communitarianism's diagnosis of a problematic "radical" or "libertarian" American "individualism" that views individuals as self-sufficient, "free-standing agents," rights-bearers with "no inherent duties or obligations unless they choose to embrace them."[108] By contrast, the "Platform" asserts: "While the ultimate foundation of morality may be commitments of individual conscience, it is communities that help introduce and sustain these commitments"; communities should "articulate the responsibilities they expect their members to discharge."[109] Conscience alone may leave us rudderless; "the social pressures community brings to bear are a mainstay of our moral values."[110]

Yet communitarians charge that rights talk so exalts individual autonomy that right-holders view themselves as exempt both from responsibilities and from moral scrutiny or disapproval. Worse still, people shrink from expressing such disapproval or making moral claims on others. We now turn to those charges.

The new communitarians contend that people generally hesitate to use moral suasion because they think that legal rights insulate people from the moral scrutiny of their neighbors and peers.[111] "Liberal virtues" of tolerance, they argue, make people hesitant to judge the choices (and characters) of others.[112] People may refrain out of an attitude of "live and let live," that the choices of others are not our business. Such an attitude might reflect the atomism of contemporary life, the threadbare

social fabric that the communitarians lament. Alternatively, not making moral claims on one's neighbor might reflect respect for human moral agency.[113] Do such attitudes stem from an inference of a right to insulation from moral voices and indifference toward the choices of others? Do liberal justifications of rights foster such indifference?

Leading liberal defenses of rights, such as those of Mill and Dworkin, do not advocate indifference by members of society concerning each other's choices and exercise of rights. Mill urged that the harm principle does not entail that people have no interest in each other's actions and well-being.[114] In the realm in which society may not act coercively, he recognized a wide range of acceptable means by which society could attempt to influence individuals in their exercises of liberty and signal disapproval. At the same time, Mill recognized that social disapproval could amount to compulsion or tyranny and praised variation, change, and diversity in lifestyle.

Dworkin envisions liberal citizens who care passionately about what they think is good and argue with and persuade each other concerning the good life. For example, in defending the right to procreative autonomy, he urges that he not be interpreted to counsel indifference toward the decisions of friends, neighbors, and other citizens, because people's choices do have an impact on the moral environment. Citizens must respect others' liberty of conscience, however, and are denied "one weapon": the use of majoritarian power to prohibit individuals from, or punish them for, acting on their view of what life is best for them.[115] Dworkin uses responsibility talk to fortify this argument for restraint: if we accept basic principles of dignity, we must respect the special responsibility of every person to make decisions about ethical values for themselves.[116]

The communitarian concern about indifference appears to stem from worry about liberal "neutrality," or the idea that government should refrain from making substantive moral judgments about the worth of citizens' ways of life.[117] The evident leap from a requirement of governmental neutrality to an inference of citizen neutrality (and indifference) is unwarranted. Communitarians themselves claim to reject the use of public coercion to make citizens embrace a communal vision of the good life.[118] As we discuss in Chapter 3, an important question that the irresponsibility critique raises is what government may do within the realm between coercion and noninterference.

Communitarians contend that the gap between rights and rightness cannot be closed without a richer moral vocabulary invoking principles such as decency, responsibility, and the common good. Notwithstanding recurring images in the irresponsibility critique—picturing rights as

knives, guns, porcupine quills, or the like[119]—recognizing and protecting legal rights does not preclude citizens from having views about the right, or responsible, thing to do or communicating those views.[120] Indeed, the launching of various "responsibility" projects and campaigns by civil society and governmental actors[121] challenges Glendon's charge that the "migration" of American rights talk leaves no room for or weakens talk of responsibility and values. There is considerable evidence available in contemporary society that people recognize the distinction between rights and rightness and engage in the sort of moral suasion that the communitarians urge. There is nothing wrong with this behavior in principle, nor anything about it that is necessarily inconsistent with liberalism.[122]

Vigorous debates over a number of constitutional rights, prominently freedom of expression, the right to bear arms, and rights of procreative autonomy, illustrate that citizens often perceive a gap between having a right and doing the right thing and raise their voices to close that gap. Thus, commentary on *Snyder,* the funeral protest case, observed that even though Mr. Snyder lost in court, because "[t]he law says free speech trumps all," he won in the "court of public opinion," because "more people are exercising their free speech to counter [Westboro's] hate" by engaging in "counter-protests."[123] In all these areas, charges of irresponsible use of rights abound, as do campaigns to urge people to behave responsibly and do the right thing. Such campaigns often state the point exactly as the "Platform" does: right-holders confuse a right to do something with doing what is right.[124] They grant that the right-holder has a right to do *X,* but urge that the right-holder has a responsibility not to do *X.*[125]

People engaging in such efforts may invoke the social and moral responsibility of a community to create a climate in which exercising rights in certain ways that are harmful to others becomes unthinkable. For example, after the Oklahoma City bombing, President Clinton urged right-wing hate-mongers opposing the federal government to exercise their rights to free expression responsibly.[126] Similarly, after the shooting of Representative Gabrielle Giffords and others at a political rally in Tucson, amidst the decrying of the escalating vitriol in political speech in the United States, President Obama called for "more civility in our public discourse."[127] Former presidents George H. W. Bush and Clinton were named honorary chairmen of a new National Institute for Civil Discourse, which is to address such questions as "How do we nurture robustness on one hand and not in any way chill speech, and keep it in bounds that are not destructive to democracy?"[128] Moreover, right-holders themselves refer to taking responsibility and avoiding social irresponsibility to explain why they

have voluntarily refrained—perhaps after the suasion of others—from arguably protected conduct.[129] Tellingly, many conservative proponents of taking responsibility seriously in the area of abortion do not call for responsibility with respect to freedom of speech. Instead, they decry these calls for responsibility as impositions of "politically correct speech," "thought control," and the like.

Of course, when people say that a person ought not to do something, they sometimes mean not simply that it is the wrong thing to do but also that there is not, or should not be, a legal right to do it.[130] (Outside the context of constitutional rights, for example, campaigns against harmful but not-yet-unlawful conduct, such as texting or speaking on cellphones while driving—"distracted driving"—often culminate in laws against such practices.[131]) People may conclude that there is too great a gap between rights and rightness to rely on suasion alone to secure accountability. Most state constitutions, for example, explicitly link free speech rights to responsibility, declaring (in these or similar words): "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right."[132] Thus, discontent with the irresponsibility that certain constitutional rights are said to permit sometimes leads to calls for restricting or regulating those rights, as is evident in the areas of gun control and television violence. With gun control, the issue is sometimes framed in terms of competing rights: pitted against the Second Amendment right to bear arms are people's rights to safety and security, said to be threatened by the proliferation of guns and gun-related violence. At the same time, attempts to regulate the sale of firearms draw charges that regulations would punish citizens who use their rights responsibly and would threaten their safety.

Consider also a pregnant woman's right to decide whether to terminate a pregnancy. Opponents of a legal right to choose abortion not only seek to abolish such a right but also engage in speech or actions designed to persuade individual women not to choose abortion, and physicians not to perform it. The Supreme Court's many rulings about protests by abortion opponents at health care facilities speak of balancing, on one side of the scale, the "right to persuade" exercised by protestors who believe abortion is morally wrong, and, on the other, the right of women seeking medical counseling and treatment to be "let alone" and to avoid "unwanted communication."[133] A recent billboard campaign aimed at persuading African-American women that abortion is a form of racial genocide is another controversial example. Exhortations by political leaders who support reproductive rights that abortion should be "safe, legal, and rare," and calls by both proponents and opponents of abor-

tion rights to pursue common ground on the goal of reducing unwanted pregnancy, are additional examples of efforts to encourage personal and public responsibility.[134] Some acts go beyond suasion and literally prevent women from exercising their rights in the name of serving higher law. The steady attempts by abortion protestors to use various forms of pressure to stop pregnant women from getting abortions and to cut off the availability of legal abortion makes it difficult to accept any claim that abortion rights insulate people from the moral claims or scrutiny of others. Such acts, particularly those directed against physicians, appeal to public shaming by "exposing" physicians within their communities, places of worship, and children's schools as "murderers" and "abortionists." Controversy often ensues, in the aftermath of the killing of doctors who perform abortions, over whether speech condemning such doctors was "irresponsible."[135] Although these illustrations are hardly exhaustive, they suggest that responsibility talk and the use of social suasion concerning the exercise of rights are widespread.

The Messages that Rights Send    The silence of rights talk about responsibility is said to send the message that the existence of a legal right implies the nonexistence of a responsibility or even societal approval of the conduct that the right protects. Justice Scalia states: "There is a perhaps inevitable but nonetheless distressing tendency to equate the existence of a right with the *non*existence of a responsibility," that is, to assume that, if one has a legal right to do something, it is "*proper* and perhaps even *good*" to do it.[136] With respect to abortion, he describes as a "natural," although not "accurate[,] line of thought" the idea that, "[i]f the Constitution *guarantees* abortion, how can it be bad?"[137]

This inference is neither "natural" nor "inevitable." We question the premise that the message is a simple equation of rights with rightness ("how can it be bad?"). Any assumption, like Scalia's, that rights signal rightness stems from an authoritarian view of law: what the law prescribes is right, what it permits is good, and what it forbids is bad. But if a citizen does not believe that law is coterminous with morality, she might conscientiously believe that the acts a law prohibits are morally justified and should be protected by a legal right, or, conversely, that the acts the law permits are unjustified and should be prohibited.[138]

Thus, the existence of a legal right might be read in a number of ways. To take Scalia's example, abortion, a shift from criminalizing it to recognizing a constitutional right to choose it might reflect a changing consensus about what is moral.[139] Of course, there are vexing causal questions about whether changes in law *cause* changes in mores or *reflect* such

changes, or some combination of the two. Or, recognizing a right might simply reflect acknowledgment that society will not disintegrate if the protected conduct is not criminally punished or that the social costs of criminal prohibition outweigh the costs of freedom.[140]

Our view is that the existence of a constitutional right signals that this decision and a range of possible choices are protected out of respect for human dignity and autonomy. Allocating decision making responsibility to the individual suggests a societal judgment that it is legally permissible to make such choices and not prudent or appropriate to use law to prohibit them. That there is a range of legally permissible choices, however, does not signal that all choices are equally responsible or equally moral, or even morally permissible. The wrongness critique invites the question whether communitarians hold that certain choices protected by rights are never morally appropriate and always irresponsible.

Is There a Right to Make "Incorrect" or "Irresponsible" Choices?   The wrongness critique also raises the issue whether there is a right to make "incorrect" or "irresponsible" choices. Leading liberal justifications of rights derive basic liberties from a conception of persons as having certain moral powers or capacities, for example, the capacity for a conception of justice and the capacity for a conception of the good life.[141] To promote the development and exercise of such capacities, a constitutional liberal regime (we argue in Chapters 4 and 5) properly carries out a formative project, in which both the institutions of civil society and government share responsibility. However, this does not guarantee full development of such capacities or their wisest use.

The wrongness critique implicitly charges that persons are failing to exercise their moral capacities in a responsible way and to appreciate the moral dimensions of rights. A critical question is whether a communitarian corrective would insist on not only social accountability but also legal accountability. In either case, the critique manifests a lack of trust in people as moral agents exercising autonomy and freedom of conscience, capable of acting on their own conceptions of the good life. The communitarians evidently fear that individual conscience is too weak without the reinforcement of the moral voices of others. In that sense, they resemble those critics who charge that people are not good enough for liberalism and fault it for its apparent "fatally flawed assumption . . . that autonomous individuals can freely choose, or will, their moral life."[142]

A common liberal formulation is that rights protect individuals who act in ways thought wrong by society or by others but that reflect their own views of the good. Dworkin uses such a formulation.[143] Similarly,

Compendium_Cornell
Page 0322

libertarian Roger Pilon argues, "The mere 'irresponsible' exercise of rights, short of violating the rights of others, is itself a right. What else could it mean to be responsible for oneself?" A right to exercise rights irresponsibly, he argues, stems from the acceptance of the notion of individual responsibility to pursue happiness as one sees fit, consistent with the rights of others.[144] Likewise, Stephen Holmes argues that one of liberalism's "core norms or values" is "individual liberty," understood as "a broad sphere of freedom from collective or governmental supervision, including freedom of conscience, the right to be different, the right to pursue ideals one's neighbor thinks wrong, . . . and so forth."[145] In support of that kind of right to be different, Mill argued that individuals have their own well-being most at heart and know best, or better than the majority, what is right for them.[146]

Such liberal themes resonate in our constitutional jurisprudence, which, in justifying rights to liberty and autonomy, observes that there are competing conceptions of the good life (particularly as to matters about which "[m]en and women of good conscience" disagree).[147] That diversity may extend to interpretations of the right and responsible thing to do. Communitarians, liberals, and others may disagree over substantive moral questions such as whether abortion, single parenthood, homosexual sexual conduct, and same-sex marriage are immoral. Liberals who embrace responsibility as autonomy respond that it is the individual's right and responsibility to decide these questions.

Linking protection of rights to the diversity of human moral choices need not stem from moral relativism or skepticism, or denial that there are better and worse, or moral and immoral, choices. It instead appeals to what Rawls calls the "fact of reasonable pluralism"[148]: that it is an inevitable fact (not to be regretted) that, in a society that protects basic liberties such as liberty of conscience and freedom of association, people exercising their moral powers will form and act on divergent conceptions of the good. Moreover, this approach assumes that a stable political order does not require a unitary conception of the good life, a unity that would be possible, if at all, only through the exercise of oppressive state power. (Some communitarians, notably Galston, embrace "value pluralism" (following Isaiah Berlin) and argue for a robust principle of toleration as a restraint on coercive state power.[149]) In Dworkin's account, a liberal society rejects the use of coercive power to compel an individual's adherence to the life others think best for him or her (even if they may be correct) out of the requirements of equal concern and respect and the view that a life lived "against the grain" of one's own conviction is not a good one and has not been improved.[150]

Compendium_Cornell
Page 0323

Such defenses of individual freedom, echoed in our constitutional jurisprudence, treat the risk that some people may make incorrect or irresponsible, though legally protected, decisions as a lesser evil than the outright denial to everyone of the right to make decisions profoundly affecting their individual destiny. Allowing people freedom to make decisions with serious consequences for themselves, and to make mistakes in doing so, respects their dignity and autonomy. Developing and exercising personal and moral responsibility require freedom to make judgments. Dworkin argues that the fact that, despite accepting the responsibilities of judgment and of living life well, we may make mistakes is "at the very foundation of our ethical lives."[151] Thus, a legal right securing the opportunity to exercise moral responsibility may protect mistaken, bad, or irresponsible choices.[152] Such a possibility is an implication of securing rights and a cost of preserving freedom.

Rights and Responsibilities in Liberal Justifications of Constitutional Rights    In contrast to the communitarians' wrongness critique, we would argue that the existence of a legal right, far from obscuring the issue of responsibility, calls for the exercise of moral responsibility. Liberal justifications of constitutional rights seek to protect responsibility as autonomy by locating responsibility for making certain important decisions in the right-holder, rather than in the state or other persons. Moreover, in exercising rights, a person may reflect on his or her responsibility to him- or herself and to others, and on the responsible decision to make in those circumstances.

In explaining the tenet that rights do not equate with rightness, Etzioni (invoking Justice Scalia) says that rights protect the freedom to be irresponsible and even socially harmful because "the alternative would sweep away too much good . . . along with the bad."[153] That argument appeals to the risk of governmental error and indiscriminate use of governmental power. But prominent liberal justifications for constitutional rights more directly implicate the individual responsibility of the right-holder. Constitutional rights protect people against governmental coercion within certain zones of thought and conduct out of respect for human personhood, dignity, or autonomy. Such conceptions locate moral responsibility in the right-holder. All these ideas suggest a defense of rights that is rooted in respect for human moral capacity and agency.[154] And all reflect a conception of responsibility as autonomy. Appeals to personhood, dignity, and autonomy are prominent in Supreme Court justifications of constitutional rights to liberty. In Chapter 3, we consider how those justifications and Dworkin's liberal approach attempt to meld

Compendium_Cornell
Page 0324

responsibility as autonomy with responsibility as accountability in the context of abortion, comparing those efforts with Glendon's communitarian approach.

## Conclusion

On close examination, the irresponsibility critique does not establish a strong case against rights as conceived within our constitutional liberalism. The critique reflects ambivalence about core features of rights, immunity and wrongness. There is a corresponding ambivalence about when communitarian correctives to link rights and responsibilities would embody the moral voice of the community through legal coercion and when they would engage solely in moral suasion. We have argued that although the language of legal rights does not offer a full account of moral responsibility, the protection of rights reflects respect for the exercise of individual responsibility as autonomy. That the protection of rights yields some irresponsible conduct is undeniable, yet it is better to bear that cost than to incur the sacrifices of freedom that a communitarian model based primarily on responsibility as accountability would require. In Chapter 3, we examine further the irresponsibility critique, and the tension between responsibility as autonomy and as accountability, in the context of a woman's constitutional right to decide whether to terminate her pregnancy.

Compendium_Cornell
Page 0325



"A landmark book."—Pauline Maier, *Washington Post Book World*

# Affairs
*of*
# Honor

*J o a n n e   B .   F r e e m a n*

National Politics in the New Republic

NB

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 05:33:12 UTC
All use subject to https://about.jstor.org/terms



# Affairs *of* Honor

## National Politics in the New Republic

## Joanne B. Freeman

*Yale University Press    New Haven and London*

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 05:27:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0327

Published with assistance from the Annie Burr Lewis Fund and
with the assistance of the Frederick W. Hilles Publication Fund
of Yale University. Copyright ©2001 by Joanne B. Freeman. All
rights reserved. This book may not be reproduced, in whole
or in part, including illustrations, in any form (beyond that
copying permitted by Sections 107 and 108 of the U.S. Copy-
right Law and except by reviewers for the public press), with-
out written permission from the publishers.

Designed by Sonia Shannon and set in Galliard type by Achorn
Graphic Services. Printed in the United States of America by
R. R. Donnelley & Sons.

**Library of Congress Cataloging-in-Publication Data**

Freeman, Joanne B., 1962–
    Affairs of honor : national politics in the New Republic / Joanne B. Freeman.
        p.   cm.
Includes bibliographical references and index.
    ISBN 0–300–08877–9 (alk. paper)
    1. United States—Politics and government—1789–1815.   2. Political culture—
United States—History—18th century.   3. Politics and culture—United States—
History—18th century.   4. United States—Social conditions—to 1865.   5. Elite
(Social sciences)—United States—Political activity—History—18th century.
6. Honor—Political aspects—United States—History—18th century.   I. Title.
    E310.F85 2001
    306.2′0973′09034—dc21      2001000915

A catalogue record for this book is available from the
British Library.

The paper in this book meets the guidelines for permanence and
durability of the Committee on Production Guidelines for
Book Longevity of the Council on Library Resources.

10 9 8 7 6 5 4 3 2 1

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 05:27:34 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0328

3:19-cv-01537-BEN-JLB Document 154-1 Filed 10/22/22 PageID.17750 Page 247

### *"What Men of the World Denominate Honor"*

Perhaps the most common misunderstanding about the American political duel concerns its purpose. For twentieth-century onlookers far removed from the culture of honor, the duel was a ritual of violence whose purpose was to maim or kill an adversary. But to early national politicians, duels were demonstrations of manner, not marksmanship; they were intricate games of dare and counterdare, ritualized displays of bravery, military prowess, and—above all—willingness to sacrifice one's life for one's honor. A man's response to the *threat* of gunplay bore far more meaning than the exchange of fire itself. Politicians considered themselves engaged in an affair of honor from the first "notice" of an insult to the final acknowledgment of "satisfaction," a process that sometimes took weeks or even months. Regardless of whether shots were fired, these ritualized negotiations constituted an integral part of a duel.[12]

This more precise understanding of the duel reveals that there were more honor disputes in the early republic than previously recognized; for example, Hamilton was involved in ten such affairs before his duel with Burr.[13] As a partisan leader (and a particularly controversial one at that), Hamilton doubtless attracted more than his share of abuse. Yet his level of involvement in honor disputes was not unique. In New York City, Hamilton's adopted home, there were at least sixteen affairs of honor between 1795 and 1807, most of them heretofore unrecognized because they did not result in a challenge or the exchange of fire. Most of these duels did not result from a sudden flare of temper; politicians timed them strategically, sometimes provoked them deliberately. Often, the two seconds published conflicting newspaper accounts of a duel, each man boasting of his principal's bravery and mocking his opponent's cowardice. Fought to influence a broad public, synchronized with the events of the political timetable, political duels conveyed carefully scripted political messages.[14]

Politicians manipulated the affair of honor to serve their immediate political needs, but they also shared a profound respect for its personal dimension, its impact on their sense of self. The duel was a subtle

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 05:28:40 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0329

168   DUELING AS POLITICS

blend of the strategic and the sincere, the self-interested and the self-less, the political and the personal, the public and the private. Political duelists were not rapacious predators deliberately masking their evil intentions under the guise of honor. They were men of public duty and private ambition who identified so closely with their public roles that they often could not distinguish between their identity as gentlemen and their status as political leaders. Longtime political opponents almost expected duels, for there was no way that constant opposition to a man's political career could leave his personal identity unaffected. As Hamilton confessed on his deathbed, "I have found, for some time past, that my life *must* be exposed to that man."[15] By opposing Burr's political career, Hamilton had wounded him as a gentleman, making himself vulnerable to a challenge. Nowhere do we witness this ambiguity more affectingly than in Hamilton's apologia, his testament to the complexities of political leadership among men of honor.

Personal honor was a concern of politicians throughout the nation. North and South, they recognized the need to remain alert to tone, intent, and implications to preserve their status. Dependent on the community at large for both personal honor and public career, they had to be acutely sensitive to public opinion, the prevailing tone of a community's conversation. The character of politics in the early republic—the prevailing distrust of political parties, the small-scale, localized political realm—magnified this obsession with reputation. Political combat readily degenerated into battles of "asperities and personalities."[16] Many of these skirmishes were settled in ritualistic affairs of honor.

Northerners were as well versed in this code as southerners; it was in their utilization of violence that they differed most noticeably. A northerner might cane a man or post him as a liar in a newspaper or on a broadside rather than challenge him to a duel, but in densely populated, print-saturated New England, a print attack on a man's honor inflicted a severe wound. It was dueling that proved problematic for New Englanders. A duelist took revenge "in cool blood." Willing to kill or be killed, he calmly and deliberately violated the laws of God and man.[17] In a sense northerners and southerners spoke different dia-

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 05:28:40 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0330

3:19-cv-01537-BEN-JLB   Document 154-1   Filed 10/22/22   PageID.17752   Page 247

lects of the language of honor, balancing the conflicting value systems of honor, religion, and the law in regionally distinct ways.

Yet even New Englanders who disapproved of dueling often found it difficult to turn their backs on an affair of honor. It was one thing to condemn dueling generally and quite another to ignore a personal insult or challenge, driving many northerners to condemn dueling in one breath and justify it in the next. Massachusetts Federalist Christopher Gore was typical of many when he declared that he could not duel without feeling "disgraced & debased," even as he agreed to accept a challenge. Harvard student John Farnham drew a similar conclusion in 1810 after hearing about a friend's duel. He was "heartily sorry & grieved" at the news, for it would hurt the reputation of any "young man who depends on the estimation of the publick for a living." Yet, he continued, "I must confess that considering . . . the greatness of the insult . . . that he is not guilty of a great moral sin. . . . [T]hough perhaps the opinion of the most respectable part of the community in N. England is abhorrent to the practice of duelling—it is in vain to expect or presume that . . . the decisions of a court will wipe off the stain on a mans reputation—or that [a] man will ever obtain any consequence & respect who suffers himself to be trodden under foot."[18] Hamilton would struggle with this same ambivalence during his negotiations with Burr.

Northerners found insults to their honor even more difficult to ignore on the elevated national stage, particularly when offered by a southerner. Because of the ambiguous link between regional ties and partisan loyalties, battles between Federalists and Republicans were largely battles between northerners and southerners, placing new demands on New Englanders accustomed to a less belligerent dialect of honor culture. Protective of their comparative status as northerners and Federalists and worried about southern domination of the Union, New England congressmen were thus quick to note insults and often urged personal vindication. They had good reason to feel belligerent, for southern congressmen often "crowded" New Englanders—bullied and taunted them—because they knew that northerners would resist gunplay. So notorious was southern crowding that one newspaper edi-

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 05:28:40 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0331

tor satirically branded it a plot by southerners to "thin off the northern members [of Congress] so as to secure to themselves a decided majority."[19] In essence, the nationalization of politics led to a backlash of defensive regionalism, played out most dramatically in honor disputes on the floor of Congress.

Charges against rivals, ranging from accusations of official misconduct to character slurs, usually shared one underlying theme: politicians accused one another of behaving like politicians. They charged one another with the sins of self-interest and private ambition.[20] They cried out against corrupt dependencies grounded on the distribution of favors. All around them they saw what they most feared, the selfish motives and hidden intrigues of faction. Yet in struggling against these enemies of the republic, these same politicians created factions of their own. When a politician defended his honor, he was defending his ability to claim power, promoting himself and his "particular friends" in public-minded contests with political opponents. In essence, he was conducting partisan politics.

For politicians of the early republic, honor was thus much more than a vague sense of self-worth; it represented the ability to prove oneself a deserving political leader.[21] Hamilton was trying to do as much in his final statement. Burr was compelled by the same logic when he challenged Hamilton. Politicians were simultaneously asserting their concern for the common good and their partisan biases, their selflessness and their private ambitions. These conflicting urges joined to produce an ambiguous form of politics, fueled by public-minded personal disputes couched in the language of honor.

The strictures of honor controlled, channeled, and masked political combat by providing a shared code of conduct that enforced gentlemanly standards of behavior. Men who did not abide by these rules were neither gentlemen nor leaders. As Burr warned Hamilton during their negotiations, "Political opposition can never absolve Gentlemen from the necessity of a rigid adherence to the laws of honor and the rules of decorum." A true gentleman avoided crossing lines but knew how to behave if lines were crossed. As a congressional onlooker to a 1798 honor dispute commented, "In well-bred Society, when a man receives an affront, does he knock down the person giving it? No.

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 05:28:40 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0332

DUELING AS POLITICS   171

He represses his feelings; and takes another time and place to obtain justice."[22]

The laws of honor also indicated when insults could not be ig-nored, branding a man a coward if he let a serious affront go unan-swered. Hamilton experienced this during the 1795 Jay Treaty melée, when James Nicholson dismissed him as a man of no importance be-cause he had once shirked a duel. In 1803, Postmaster General Gideon Granger of Connecticut went into hiding when confronted with simi-lar charges, condemned by even his allies as "a base coward." And in 1804, when the eccentric John Randolph of Roanoke threw a glass of wine in the face of Willis Alston, Jr., broke the glass over his head and threw the bottle at him, "Men of honor of both Federalists & Democrats" had but "one opinion on this subject—& say that they must fight—That Alston will be disgraced if he do not." Hoping to avoid such an outcome, President Jefferson was "anxious for a compro-mise"; even the president himself abided by the strictures of the honor code.[23]

For all these men, the "laws of honor" constituted a standard of conduct by which a man could gauge himself and his rivals. They en-abled him, his peers, and the public at large to "judge of the correctness of the conduct of their representatives" and so distinguish those who were worthy of leadership from those who were not.[24] A means of empowering oneself while deposing one's foes, of asserting one's merit while remaining self-righteously defensive, the code of honor was a powerful political tool. But it was a curiously indirect form of combat, functionally adapted for a society that feared and condemned open ambition and factional politics.

### *"If Our Interview Is Conducted in the Usual Manner"*

In planning his course of action on the dueling ground, Hamilton relied on the universal recognition of the language of honor. Like other politicians, he had a keen understanding of the honor code, enabling him to pick and choose strategies from a clearly defined spectrum of options, in response to a corresponding spectrum of insults. Duels represented one extreme in this grammar of combat. Most political

This content downloaded from
132.174.251.110 on Fri, 21 Oct 2022 05:28:40 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 0333

# THE

# POLICE POWER

## PUBLIC POLICY AND
## CONSTITUTIONAL RIGHTS

———

BY

### ERNST FREUND

PROFESSOR OF JURISPRUDENCE AND PUBLIC LAW IN THE
UNIVERSITY OF CHICAGO.

———

CHICAGO
CALLAGHAN & COMPANY
1904

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA



COPYRIGHT 1904

BY

ERNST FREUND

T
F 8966 p
1904
Copy 1

CENTRAL TYPESETTING CO.,
CHICAGO.

Generated on 2022-10-18 20:22 GMT / https://hdl.handle.net/2027/uc2.ark:/13960/t1kh0nt61
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

01537-BEN-JLB  Document 154-1  Filed 10/22/22  PageID.17757
247

if there appears to be danger of his committing the crime, he is required to enter into a recognizance, with sufficient surety, to keep the peace either generally or towards the person threatened, for a time specified in the recognizance; and upon his violating the stipulation the undertaking may be enforced. While the proceeding for this purpose is had before a judge or justice of the peace, it is not in the nature of a criminal prosecution, the machinery of the courts being here used for the purpose of police restraint; therefore the rule against double jeopardy does not apply.[18]

§ 90. **Concealed weapons.**—Of the conditions tending to facilitate the commission of crime, the carrying of weapons should first be mentioned. As it is not customary in civilised communities to carry weapons about the person, the habit of doing so may be regarded to some extent as an indication of lawlessness.[19] The police power is here however confronted by a constitutional right. The Second Amendment of the Federal Constitution says: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." Provisions of the same import are found in most state constitutions, the purpose of self-defence being in some cases added to that of the common defence. This constitutional guaranty has not prevented the very general enactment of statutes forbidding the carrying of concealed weapons, and the possession or use of certain deadly weapons not generally used for legitimate purposes, such as metallic knuckles or dynamite bombs,[20] or

[18] State v. Vankirk, 27 Ind. 121.

[19] See North v. People, 139 Ill. 81. It has, however, been held in Florida that carrying concealed weapons in a "quiet and peaceable manner" does not tend toward a breach of the peace so as to justify an arrest without warrant, and this although the weapon had just been used for an assault. It was therefore held that the act of the person arrested in killing the officer did not constitute murder (Roberson v. State, 42 Fla. 233, 28 Sou. 424, 52 L. R. A. 751). In Massachusetts, on the other hand, the power to prevent breaches

of the peace is held to justify the prohibition of parades with arms, although the arms are so fixed that they cannot discharge a missile. "The men who carried these weapons could not actually fire them, but it would be generally supposed that they could. With the exception of being actually shot down, all the evils which the statute intended to remedy still exist in the parade in which the defendant took part." Commonwealth v. Murphy, 166 Mass. 171.

[20] Illinois Crim. Code, §§ 54a, 54d; N. Y. Penal Code, § 410.

Generated on 2022-10-10 20:25 GMT / https://hdl.handle.net/2027/uc2.ark:/13960/t1k06m61
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

Compendium_Cornell
Page 0336

the carrying of arms in a threatening manner.[21] The constitutionality of this legislation has been upheld from an early date in the states in which it has been questioned.[22] In Kentucky it was declared unconstitutional,[23] but expressly authorised by subsequent constitutional amendment.[24] We find here an application of the general principle that constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security, and that regulations manifestly demanded by these requirements are valid, provided they do not nullify the constitutional right or materially embarrass its exercise.

§ 91. Military organisations.—In a number of states the law forbids any body of men, other than the regularly organised militia and the United States troops, to associate themselves together as a military company or organisation, or to drill or parade with arms, without the license of the governor.[25] This provision has been upheld in Illinois[26] and in Massachusetts,[27] while the Supreme Court of the United States has held that the federal constitution applies in this matter only to federal legislation and therefore does not control the action of the states.[28] The existence of uncontrolled military organisations, while perhaps not an encouragement to the commission of crime, may yet constitute a serious menace to the public peace and an obstacle to the orderly anl effectual enforcement of the law. As such it would afford a very legitimate ground for

[21] State v. Hogan, 63 Ohio St. 202, 58 N. E. 572.

[22] State v. Mitchell, 3 Blackf. Ind. 229; State v. Reid, 1 Ala. 612, 1840; Nunes v. State, 1 Ga. 243, 1846; State v. Chandler, 5 La. Ann. 489, 1860; Haile v. State, 38 Ark. 564, 1882.

[23] Bliss v. Commonwealth, 2 Littell (Ky.) 90.

[24] Const. 1891, § 1, No. 7, enumerating among the inalienable rights: the right to bear arms in defense of themselves and of the state, subject to the power of the general assembly to enact laws to prevent persons from carrying concealed weapons.

[25] Illinois Military and Naval Code 1899, XI, § 2. ''It shall not be lawful for any body of men whatever other than the regular organised militia * * * to associate themselves together as a military company or organisation or to drill or parade with arms in this state except that permission may be granted by the governor, etc.'' Mass. Rev. Laws, ch. 16, § 147; N. Y. Military Code, § 177.

[26] Dunne v. People, 94 Ill. 120, 1879.

[27] Commonwealth v. Murphy, 166 Mass. 171, 32 L. R. A. 606.

[28] Presser v. Illinois, 116 U. S. 252, 1886.

Generated on 2022-10-18 20:25 GMT / https://hdl.handle.net/2027/uc2.ark:/13960/t1b00n61t
Public Domain / http://www.hathitrust.org/access_usepd

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

restrictive police regulation, in the absence of any positive con-
stitutional right, and since in Illinois the constitution is silent
as to the right to bear arms, the decision rendered in that state
can be questioned only on the ground that contrary to the doc-
trine prevailing in the same jurisdiction, it sanctions the delega-
tion of a discretion unregulated by law to an executive officer,
and thus violates the principle of equality.[29]  The Supreme
Court of Illinois has however also expressed the opinion that the
right to bear arms is not even remotely involved in the question
of the validity of police regulations regarding military com-
panies,[30] and the United States Supreme Court has expressed
itself to the same effect.[31]  And the same view was necessary
to support the decision in Massachusetts, where the right to
bear arms is recognised by the constitution.  The court says
that the right to keep and bear arms for the common defence
does not include the right to associate together as a military
organisation or to drill and parade in cities and towns.  This
may be conceded to be true as far as parading on the streets
is concerned; but the principle is stated in a broader form, as
applying to military organisation in general.  The constitu-
tional right is thus recognised merely as an individual right.

The prevailing doctrine seems to be that the constitutional
recognition of the militia implies a limitation upon the right
of military association in other and more irregular forms.  It
is clear that if the state pays in whole or in part the expense
of arming and drilling the militia, and of erecting armories,
it must have power to control its size, and this again implies
some power of selection.  There cannot in other words be an
indiscriminate right to join the militia.  As a matter of fact
the statutory maximum number of the state militias will gen-
erally be found to accommodate only a small fraction of the
male adult population.  But this necessary power of selection
may still be controlled by law and should be so exercised as

[29] § 643 infra.

[30] "This section [forbidding or-
ganisation and drilling without li-
cense] has no bearing whatever on
that right, whatever it may be, and
we will enter upon no discussion of
that question.   Whether bodies of
men with military organisation or
otherwise under no discipline or

command by the United States or
state shall be permitted to parade
with arms in populous communities
is a matter within the regulation
and subject to the police power of
the state." Dunne v. People, 94 Ill.
120.

[31] Presser v. Illinois, 116 U. S.
252.

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

Generated on 2022-10-18 20:25 GMT  /  https://hdl.handle.net/2027/uc2.ark:/13960/t1b00m61
Public Domain  /  http://www.hathitrust.org/access_use#pd

# *Pursuits of Happiness*

## THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE

JACK P. GREENE

THE UNIVERSITY OF NORTH CAROLINA PRESS

CHAPEL HILL & LONDON

HN50 . G74 1988

© 1988 The University of North Carolina Press

All rights reserved

Manufactured in the United States of America

The paper in this book meets the guidelines for permanence
and durability of the Committee on Production Guidelines for
Book Longevity of the Council on Library Resources.

92 91 90 89 88  5 4 3 2 1

Library of Congress Cataloging-in-Publication Data
Greene, Jack P.
Pursuits of happiness: the social development of early modern
British colonies and the formation of American culture / by Jack P. Greene.
p. cm.
Includes bibliographical references and index.
ISBN 0-8078-1804-6 (alk. paper).  ISBN 0-8078-4227-5 (pbk: alk. paper)
1. Great Britain—Colonies—America—Social conditions. 2. United
States—Social conditions—To 1865. 3. United States—Civilization—
To 1783. 4. Great Britain—Colonies—Social conditions.
I. Title.
HN50.G74 1988        88-1908
306'.0973—dc19        CIP

*For the members of the*

*continuing Research Seminar on the*

*Sociology of Early Modern British Colonization*

*at The Johns Hopkins University,*

*1966–1988*

## Chapter Eight

### 🦋🦋🦋🦋🦋🦋🦋🦋🦋🦋🦋🦋🦋🦋🦋🦋

### CONVERGENCE: DEVELOPMENT
### OF AN AMERICAN SOCIETY,
### 1720–1780

Down to the very eve of the American Revolution, contemporaries were far more impressed by the diversities than by the similarities among the several regions and colonies of British America. Benjamin Franklin expressed the predominant opinion in 1760, just sixteen years before the Declaration of Independence. Without counting any of the island colonies, Franklin informed British readers in a well-known pamphlet, Britain had by that date fourteen separate colonies on the North American continent, no two of which seemed to be much alike. Rather, Franklin emphasized, the colonies were "not only under different governors, but have different forms of government, different laws, different interests, and some of them different religious persuasions and different manners." This perception was not inaccurate. As previous chapters have emphasized, each of the major regions of the early modern colonial British American world quickly developed its own distinctive socioeconomic and cultural configurations. Yet, notwithstanding this fact and the observations of Franklin and most other contemporary commentators, there are strong reasons to suggest that the diversity among the several regions of colonial British America has been greatly overemphasized.[1]

Indeed, this chapter argues that at least on the continent these regions were becoming increasingly alike during the generations immediately preceding the American Revolution. Building on the material presented in previous chapters, it offers two principal contentions. The first is that the common developmental process described at the conclusion of Chapter 7 produced a slow but powerful cultural and social

convergence that mitigated the sharp variations that had distinguished the several regions of colonial British America from one another during their early generations of settlement. The second is that out of this steady process of convergence emerged the beginnings of an American cultural order that was waiting to be defined during and immediately after the era of the American Revolution. An examination of these contentions will provide the materials for the evaluation of the last of the four underlying historiographical assumptions elaborated in Chapter 2, the assumption that American culture was in large part a derivative of puritan culture.

I f one underlying argument of the previous chapters has been that the several regions of overseas settlement in Britain's early modern empire exhibited a similar pattern of social development, a second has been that during the century after 1660 they also participated in a powerful process of social and cultural convergence that rendered the differences among them less and less pronounced. This process can be seen most dramatically in the contrasting histories of New England and the Chesapeake as they were elaborated in Chapters 3 and 4. On the surface at least, these two oldest groups of British continental colonies seemed to be moving further and further apart, as the Chesapeake acquired a strong biracial character with the proliferation of black slavery between 1680 and 1730. But closer examination reveals that in most areas during the century following 1660 the two regions became not less but more alike as a consequence of a congeries of developments that together gradually eroded the striking differences that had distinguished them during their early decades.

In New England, the deterioration of health conditions raised mortality to levels by the mid-eighteenth century not too much lower than those in the contemporary Chesapeake, and a variety of other developments pushed the region closer to patterns of behavior and values toward which people in the Chesapeake were moving. Thus, impressive population growth, the consequent scattering of people out from the original town centers to individual farms, an increasing differentiation of society and complexity of kinship networks, a growing diversity in many aspects of local life, the acceleration of the economy as a result of rapid internal population growth and the increasing integration of the New England economy into the larger Atlantic economy, the slow attenuation of the social and religious synthesis of the founders, a

Compendium_Cornell
Page 0341

growing demand for and exhibition of autonomy among the sons of
each successive generation, more individualism and more conflict in
public life in the localities, and a marked rise in geographical mo-
bility—all of these changes weakened the bonds of community and
pushed New England in the direction of greater individualism, per-
sonal autonomy, and social fluidity.

Simultaneously, in the Chesapeake, the slow improvement of health
conditions during the late seventeenth century had led by the first
decades of the eighteenth century to a balance of sex ratios and a more
typically European family structure. In addition, as tobacco profits
settled down to less spectacular if somewhat steadier levels, few people
continued to entertain much hope of being able to return to England,
the commitment to the Chesapeake became stronger, settlement be-
came more compact and expansion more measured, and the devotion
to staple production was less exclusive. Concomitantly, as Chesapeake
society cohered around an emergent and authoritative socioeconomic
elite, members of which had all of the traditional attributes of social
leadership as they strove successfully to emulate the powerful cultural
model of the English country gentry, social, religious, and political
institutions acquired more vigor, society became far more settled and
cohesive, and the communal impulse was much more evident. The
new sense of coherence and community that was so strikingly manifest
in the Chesapeake after 1725 was, perhaps ironically, probably intensi-
fied among the free white population by the pressures toward racial
solidarity created by the shift to a heavily African slave labor force.

Not just the Chesapeake and New England colonies but most of the
other colonies as well were moving closer together in the configura-
tions of their socioeconomic life. Like the Chesapeake, Ireland, the
Middle Colonies, the Lower South, the Atlantic island colonies of
Bermuda and the Bahamas, and even the Caribbean colonies of Barba-
dos and Jamaica were all moving, like Britain itself during the same
period, toward greater order, coherence, differentiation, and com-
plexity. The reader will recall the hypothetical continuum employed as
a heuristic device in Chapter 2. That continuum depicted a line run-
ning between two ideal types of society, one centrifugal and highly
individualistic in its orientation and the other centripetal and strongly
communal. A similar continuum for the years 1713 and 1763 would
reveal, I submit, a steady convergence toward the center with all of the
colonies south of New England moving from individualism toward

FIGURE 8.1
*Graphic Representation of the Process of Social Convergence
among Early Modern British Colonies*



KEY: Atlantic Islands: Bermuda, Bahamas
Chesapeake: Virginia, Maryland, upper North Carolina
Lower Middle Colonies: Pennsylvania, Delaware, western New Jersey
Lower South: South Carolina, Georgia, lower North Carolina
Orthodox New England: Massachusetts, Connecticut
Upper New England: New Hampshire, Maine, Nova Scotia
Upper Middle Colonies: eastern New Jersey, New York

communalism and New England moving from communalism toward
individualism. This process is illustrated in Figure 8.1.

Only the four small Leeward Island colonies may have deviated
from this process. By the mid-eighteenth century, they may already
have begun to move toward a situation in which white society was
little more than a handful of loosely organized managers and other
people whose sole function was to preside over the extraction of tropi-
cal agricultural profits, who had no long-term commitment to those
societies, and whose impulse toward material gain was so predominant
as to stifle the urge to recreate British social forms in a colonial setting.
As a result, those colonies may already have been in the early stages of
a move away from the center in the direction of the pole of pure

Compendium_Cornell
Page 0342

individualism. But the experience of the Leeward Islands serves as the exception that underlines all the more pointedly the growing social and cultural convergence that between 1660 and 1760 had created, among all the British colonies in America, a common Anglophone cultural order in the western Atlantic. By the last half of the eighteenth century, that convergence had so blurred the differences among the colonies that they were more alike than they had ever been before. If, as was contended in Chapter 2, a broad cultural fault line separated orthodox puritan New England from all the rest of the English colonies in 1660, that line had been all but obliterated a century later. At least in terms of the general thrust of colonial social development, the Leeward Island colonies were by that time the exceptions.

The explanation for this growing convergence is to be found, I would argue, in the dialectical interplay between the same two sets of conditions—experience and inheritance—that provided the context for the common process of colonial social development discussed in the concluding section of Chapter 7. Several conditions—distance from the metropolis, the laxity of British controls, the relative breadth of economic opportunity not just in land but in occupations catering to the needs of an increasingly complex economy, and incorporation into the larger Atlantic economy—combined to produce levels of prosperity sufficient to support societies that were everywhere becoming more and more differentiated, pluralistic, and improved. They also operated to promote the high levels of individual activity and expansiveness that underlay the remarkable economic and demographic growth that characterized all of the continental colonies between 1710 and 1770.

If, as observed Samuel Williams, whose *History of Vermont*, published in 1794, was one of the first systematic attempts to analyze the main features of the emerging American society, a "similarity of situation and conditions" had gradually pushed the colonies toward a similitude of society and values, more specifically, toward "that natural, easy, independent situation, and spirit, in which the body of the [free] people were found, when the American war came on," still a second major influence—inheritance operating in the form of growing metropolitanization or anglicization—was important in helping to erode differences among the colonies. If this development was partly the result of efforts by metropolitan authorities to bring the colonies under closer political and economic control, it was also attributable to an

ever more intense involvement between metropolis and colonies in virtually all spheres of life. Together with an increasing volume of contacts among individuals and the improved communications that accompanied them, this growing involvement drew the colonies more and more into the ambit of British life as the eighteenth century advanced and thereby tied them ever more closely to metropolitan culture.[2]

As the ties with the metropolis thus tightened and became more robust, the pull of metropolitan culture grew, and the standards of the metropolis increasingly came to be the primary model for colonial behavior, the one certain measure of cultural achievement for these provincial societies at the outermost peripheries of the British world. Throughout the colonies, and especially among the emergent elites, there was a self-conscious effort to anglicize colonial life through the deliberate imitation of metropolitan institutions, values, and culture. Thus, before the mid-1770s, British-Americans thought of themselves primarily as Britons, albeit Britons overseas. Contrary to the dominant opinion among earlier historians, colonial comparisons of the colonies with Britain rarely came out in favor of the colonies. The central cultural impulse among the colonists was not to identify and find ways to express and to celebrate what was distinctively American about themselves and their societies but, insofar as possible, to eliminate those distinctions so that they might—with more credibility—think of themselves and their societies—and be thought of by people in Britain itself—as demonstrably British.[3]

Among the several colonial regions, of course, there remained significant differences. In particular, the finite amount of land in the island colonies limited their growth and expansion to a degree unknown on the continent. Together with their comparatively heavier concentration on extractive agriculture, these limits were the early harbingers of a major divergence between the island and continental colonies. Similarly, the relatively greater affluence derived by the southern and West Indian colonies from staple agriculture had enabled them to purchase many more black slaves, to devote more time both to the pursuit of the good life and to politics and the law, to cultivate metropolitan cultural models more assiduously, to rely more heavily upon metropolitan cultural institutions rather than to develop their own, and to be more self-indulgent and less industrious. By contrast, New England still was considerably more religious, had much lower levels

of wealth concentration, and, along with the Middle Colonies, was more heavily urbanized. The Middle Colonies were perhaps the least settled socially, were certainly more heterogeneous in the religious and ethnic composition of their free populations, and may have had the most highly developed social and commercial infrastructures. During the late eighteenth century, however, these differences were largely ones of degree.

Not even the presence of so many slaves in the southern and island colonies, certainly the most conspicuous difference between them and New England, was yet a crucial distinguishing feature among the colonies. In general, there was a steady diminution in the ratio of black slaves to the free population from the most southern to the most northern colonies. As late as 1770, however, slavery was still an expanding, not a contracting, institution in every one of the island and continental colonies except New Hampshire and Nova Scotia. New York, Rhode Island, New Jersey, and Pennsylvania all had populations with a higher proportion of slaves than did the Chesapeake as late as 1700 to 1710 during the early stages of that region's large-scale transition to a slave labor system, and no colony had acted to try to ban slavery, which would be legal in Britain itself for another sixty years. Slavery was everywhere an integral and accepted component of British American culture, and limitations of space were almost certainly more important than ratios of slaves to free people in contributing to the beginnings of a cultural rift between the island and continental colonies after 1750. Given the strong convergence of cultural development in colonial British America by the 1740s and 1750s, it is by no means preposterous to suggest that all of the colonies, including Massachusetts and Connecticut, would have used slavery as extensively as did the southern and West Indian colonies had they had the resources and the incentives to do so.[4]

As between 1660 and 1760 each of the regions of colonial British America became both more creole and more metropolitan, as they increasingly assimilated to a common American social and behavioral pattern and to British cultural models, they became more and more alike, and this powerful social convergence resulted in the emergence and articulation of a common cultural pattern that, though present to some degree throughout the British American world, was especially evident among the continental colonies. If the central features of this

pattern were most powerfully manifest at the center of British North America, in the Chesapeake and Middle Colonies, they were also present to a conspicuous degree in the peripheries, in the Lower South and New England. This pattern can be discussed under three rubrics: growth, differentiation, and values.

As previous chapters have made clear, the growth of the colonies was genuinely impressive, and in each colonial region demographic growth was particularly dramatic. Table 8.1 provides population figures, broken down by whites, blacks, and total population for both individual colonies and regions for 1660, 1710, and 1760. Table 8.2 contains figures for percentage increases for each region and for all the colonies during each of these fifty-year intervals and over the entire century from 1660 to 1760. A sharp distinction can be drawn between the continental colonies and the islands. Once a solid base had been established in the former, as occurred in the Chesapeake and New England during the last half of the seventeenth century, population grew at a rapid rate, ranging between 200 and 300 percent every half-century. But in the latter, where the land supply was limited, the disease environment more virulent for newcomers, and the work regime much harsher for slaves, population grew at only around 40 percent of that on the continent. Nevertheless, every region, even the island colonies, showed a sustained increase in population during the century beginning in 1660, the continental colonies growing at about 2.6 percent per annum and the island colonies at about 1.5 percent.

This growth resulted from both immigration and natural increase. Perhaps as many as one out of five new whites were immigrants; a much higher proportion of new blacks, especially in the islands, derived from slave imports. By far the largest source of this vigorous demographic rise on the continent, however, was natural increase. This increase was primarily the result of three factors: declining mortality, younger ages at marriage of from four to five years for women than in Europe, and a bountiful food supply and high nutrition that already by the 1750s had operated to make male residents of the continental colonies three to three and one-half inches taller than their British counterparts.

Natural growth was, however, lower in cities and in coastal areas of the Chesapeake and Lower South, where, as in the West Indies, mortality was significantly higher. Nevertheless, in overall population trends, the mortality differential between northern and southern colo-

# THE
# GUNNING
# OF AMERICA

Business and the
Making of American Gun Culture

## PAMELA HAAG

BASIC BOOKS

A Member of the Perseus Books Group

New York

Compendium_Cornell
Page 0345

Copyright © 2016 by Pamela Haag.

Published by Basic Books,
A Member of the Perseus Books Group

All rights reserved. Printed in the United States of America. No part of this book may be reproduced in any manner whatsoever without written permission except in the case of brief quotations embodied in critical articles and reviews. For information, contact Basic Books, 250 West 57th Street, New York, NY 10107.

Books published by Basic Books are available at special discounts for bulk purchases in the United States by corporations, institutions, and other organizations. For more information, please contact the Special Markets Department at the Perseus Books Group, 2300 Chestnut Street, Suite 200, Philadelphia, PA 19103, or call (800) 810-4145, ext. 5000, or e-mail special.markets@perseusbooks.com.

Designed by Trish Wilkinson
Set in 11.5-point Goudy Oldstyle Std

Library of Congress Cataloging-in-Publication Data
Names: Haag, Pamela.
Title: The gunning of America : business and the making of American gun culture / Pamela Haag.
Description: New York : Basic Books, a member of the Perseus Books Group, 2016. | Includes bibliographical references and index.
Identifiers: LCCN 2015036679| ISBN 9780465048953 (hardcover) | ISBN 9780465098569 (electronic)
Subjects: LCSH: Firearms—Social aspects—United States—History. | Firearms industry and trade—United States—History. | Capitalism—United States—History. | United States—Social conditions. | United States—Economic conditions. | BISAC: HISTORY / United States / 19th Century. | HISTORY / United States / General. | HISTORY / Military / Weapons. | BIOGRAPHY & AUTOBIOGRAPHY / Women.
Classification: LCC TS533.2 .H33 2016 | DDC 338.4/768340973—dc23
LC record available at http://lccn.loc.gov/2015036679

10 9 8 7 6 5 4 3 2 1          3 1223 11475 0491

*In memory of my brother, Stephen L. Haag*

achieved through the gun. For Wells and other African Americans, the Winchester was an extemporized steel bridge to get from the reality of racial subjugation to the ideal of equality.[37]

A popular inscription on the Winchester 73 read: "Be not afraid of any man, no matter what his size. When danger threatens, call on me. And I will equalize." Colt's first biographer believed that the firearm was a "blessing to mankind" because it gave protection to "the weak against the strong," the "dwarf some superiorities over the giant." Echoing Samuel Colt's promotional copy of the 1850s down to the 1870s, the *New Orleans Republican* predicted that the shotgun would become a "famous peacemaker" when juries and justice failed the black man. This idea became prominent again in the late 1960s, when a young black man in Chicago, for example, claimed the gun as "status," adding, "That's why they call it an equalizer. What's happening today is everybody's getting more and more equal because everybody's got one."[38]

"God made man, and Colt made them equal," one adage held. Of course, making men equal is presumably what the institutions of American law and democracy were supposed to do. For African Americans, Native Americans, and other groups, including women, who were disenfranchised or vulnerable, the Winchester promised a self-sovereignty and individual power that had not been achieved by institutions or law. If war is diplomacy by other means, then the Winchester was equality by other means: the gun, rather than being interpreted as the apotheosis of American individualism, could be seen as the individual's tool of last resort when the social contract has torn and the work of equalizing has fallen short: the dream that has deferred to the gun.[39]

It must be the American gun's most enduring and satisfying seduction: the notion that a gun can equalize—that the abused spouse, for example, can arm herself and be powerful and safe, her finger on the trigger razing years of degradation. Who can dispute that in the face of the institutional failures of injustice and indifference, the brandishing of a gun, even if it is never shot, would feel like, and *be*, a form of empowerment?

But it still matters who is at which end of the barrel. As dominant as constitutional debates are to gun politics today, the Supreme Court's first Second Amendment case, *United States v. Cruikshank*, was only heard in 1876, the same year the federal government restricted the gun trade to Native Americans. It emerged out of the single bloodiest day of violence during Reconstruction, and it tested the South's black codes—state legislation that, among other things, prohibited African American gun ownership in the most heavily armed region of the country. Colfax was the county seat of Grant Parish in Louisiana. The massacre that happened there on Easter Sunday in 1873 did not resemble the heroic narration of Robert Charles's last stand. The Radical Republican sheriff of Colfax had deputized 150 African Americans to defend the town against white Democrats who were outraged over a community of freedmen's efforts to assert and use their new political rights. For three weeks, the hastily drilled and armed men managed to hold off more heavily armed whites who surrounded the brick stable that served as the town's courthouse. On Easter Sunday, whites shot most of the town's black defenders dead as they tried to surrender.[40]

The defendant in *Cruikshank* was a member of the Colfax mob. Among other things, he'd been charged with restricting blacks' rights to bear arms. In this ruling, the Court upheld the right of states to pass civilian firearms controls and legislation. In other words, the justices found that the federal government did not have the power to restrict or limit state gun legislation, which meant that the racist agenda of effectively disarming African Americans through state gun laws would be permitted. (Subsequent laws in the early 1900s in the South were blatant in their intention to selectively limit gun ownership according to race.) In what seems like a negative image of twenty-first-century gun politics, the ruling supported state legislation—gun control—to limit African American citizens' access to the gun market as against the northern liberal campaign to protect emancipated slaves' unrestricted right to bear arms for their own protection and the protection of their families.[41]

As for the gun violence itself, it is more often intraracial than heroically deployed against inequalities or the oppressor. Renowned

sociologist Gunnar Myrdal observed in the early 1940s what more conservative black leaders, such as Booker T. Washington, had already feared, that the "custom of going armed" in the South, which was "taken over by negroes during Reconstruction days," and the "dangerous pattern" of having guns around "undoubtedly contributes to the high record of violent actions, most of the time directed against other negroes." The African American homicide rate in US cities by the mid-1920s was between seven and eight times that of whites. In practice, the philosophy of the gun deferred to the stupidity and impulsivity of its use. A gun imagined against a white mob gets used against a lover or neighbor, instead, or by the mob against the oppressed. We might love the gun for the lure of last-ditch individualism and equality, but that doesn't mean the gun loves us back.[42]

IF THIS GERMINAL GUN MYSTIQUE EXAGGERATED THE "QUALITY" of gun violence—tying it to values of individual agency, justice, and equality—it also exaggerated the quantity of gun violence. Tales of gunmen imagine America as more gun-violent than it was, when it would seem that bias should lean in the other, exculpatory direction. This gun overkill was evident early on in Daniel Boone's legend, and it persisted up to and beyond the Hickok story. We wrote, staged, advertised, filmed, debated, and televised our way into a gun culture more than we shot our way in.

Billy the Kid's story did not fade from fact into legend, but from legend into fact. Two years before the Kid's death at age twenty-three, the wife of the territorial governor of New Mexico wrote to her husband the false legend that he had killed a man for every year of his life, when it is doubtful that he killed more than eight. According to historian Gary Roberts, many old-timers spoke of how they knew Billy the Kid, and recounted stories of him as if they were their own eyewitness memories—but these stories were so similar to a *National Police Gazette* story that there could be no doubt as to their provenance. The Kid's overkill, like that of other famous gunmen, began immediately after his death with the publication of dime novels, including John Woodruff Lewis's *The True Life of Billy the Kid* (1881) and a serial account in

*Las Vegas Optic*. Subsequent accounts exaggerated the number of people he killed and injured, although he was portrayed as more sociopathic than other gunmen. Works concluded that he killed "just for the sport of it," "went about shooting folks just for the fun of it," and had "more individual killings to his credit" than any other. A very rare book prepared for each member of the Livestock Association in 1905 repeated the story that had been told by the New Mexico governor's wife, describing the Kid as an "infamous cutthroat" who had killed one man for each year of his "horrible life."[43]

Other narratives of the western gun followed the same pattern: The Johnson County "War of Wyoming" involved nothing more than "two inconspicuous ranchmen . . . over a line fence quarrel." Sam Bass had "not a few murders" to his name, it was said, when in fact he had none, and so on.[44]

These legends were to become a gun culture archive in the 1900s, but the forgotten archives of the gun culture, including the dispassionate figures of Marcellus Hartley's business ledger books, tell a different story about the quantity of gun violence. What American gun critics and lovers alike tend to take as a given, whether as a tool of condemnation or praise—that the United States is a "nation of cowboys"— gun devotees who know the most about the material world of nineteenth-century gun production cast into doubt. Herbert Houze's study of the Schuyler, Hartley & Graham ledger book, for example, reveals that SHG's earliest shipments to Missouri, the hub of the gun trade, consisted of large-bore hunting rifles and carbines suitable for self-defense. But "consumer demand for such arms rapidly decreased" from 1868 onward, replaced by demand for arms suitable for small game and bird hunting. Likewise, in Nebraska, the transformation from "a frontier state to a settled society," said Houze, is charted in SHG's arms shipments from Lower Manhattan, which shifted from personal defense weapons in the late 1860s to farmers' guns by 1879 and a substantially decreased volume in guns overall. The absence of carbine shipments, he argued, "indicates that settlers no longer perceived the native population as a threat." The gun depot A. D. McAusland, in Miles City, Montana, had been a major transit point

for gun commerce to buffalo hunters. By 1882, however, the area "had been tamed to such an extent" that SHG was shipping plain amber glass target balls for recreational trap-shooting instead of guns. Even in Texas, the dealer Comminge & Geisler ordered 3,040 Lagousky Patent Clay Pigeons in 1885 as gun orders decreased.[45]

In her groundbreaking work on western history, Patricia Limerick brilliantly revised the idea of an 1870s and 1880s frontier of adventuresome gun violence in a place of "free" land to be taken. "The events of western history represent not a simple process of territorial expansion," she argued, "but an array of efforts to wrap the concept of property around unwieldy objects." The battles in this jagged, complex process of conquest happened in the more quiet ellipses of the dime-novel plots. They happened in offices, over deeds, and through barbed wire and agriculture.[46]

A body of scholarship about gun violence on the "frontier" has found that gun violence and its historical consequences have been overestimated, not underestimated. Some of the scholarship on gun violence in the West, although not all of it, has questioned its assumed ubiquity while recognizing a core of truth. The West was more gun-violent than other places—but not as violent as we think. Law professor Adam Winkler noted that gun violence wasn't common on the frontier. We remember the Gunfight at the O.K. Corral in Arizona because it was an infrequent event. Historians Robert Dykstra and Eugene Hollon revisited frontier violence and couldn't find evidence that there had ever been shootouts in the five most important Kansas cattle towns. There were only 45 homicides overall in the 15-year span from 1870 to 1885, for an average of 1.5 homicides per cattle-trading season. Even when cowboys and range riders used guns, they almost never used them in Hollywood-style gunfights. "Getting the drop on"—that is, eluding and avoiding—rivals and enemies was more conducive to survival than shooting.[47]

As for guns and interpersonal violence, Roger Lane, a crime historian, found the mining country mountains far more murderous in the 1870s and 1880s than the plains. Bodie, California, which experienced a mining boom in the late 1870s, recorded 29 murders in a town of

only 5,000. When we talk about gun violence in America, we are often talking about booze, bachelorhood, and racial-ethnic strife. Shootings happened impulsively because of lethally obstinate notions of offense and honor among intoxicated, socially unattached men living in close quarters. The incidents often lacked the narrative intricacy or moral gravitas common to legends of gun violence.[48]

But the mystique would transform—or inflect—an older and larger tradition of American violence as it evolved from the late 1800s to the 1900s. The extraordinary violence of the gunman, American studies scholar Richard Slotkin brilliantly argued, masked the ordinary violence of the ages. That ordinary violence might include deadly clashes between capital and labor in the age of the robber barons, and the nonphysical brutality of conquest—the systematic unraveling of indigenous cultures to hew survivors, in the language of the 1800s, to the ways of "civilization" as opposed to "savagery."[49]

The cowboy's actual life embodied this ordinary violence as vividly as his mythic life embodied the extraordinary violence of the gunslinger. Cowboys, historian David Cartwright observed, "were lower-class bachelor laborers in a risky and unhealthful line of work" who lived in a disreputable "subculture" ravaged by whiskey. Novelist and historian Wallace Stegner depicted the true cowboy as almost entirely opposite of his mythic avatar—not the autonomous, armed hero of his own life in the wide open West, but an "overworked, underpaid hireling, almost as homeless and dispossessed as a modern crop worker." Through "moral surgery," Cartwright noted, the cowboy became an American icon of rugged individualism and risk taking, but dismounted from horse and myth, he was a "drunk sleeping it off on the manure behind the saloon."[50]

The cowboy was no more the product of American individualism than the Winchester rifle itself, although both were becoming its icons. The legends that would become "facts" about the American gun culture made gun violence both more common and more coolly righteous than it was. The violence of the lone gunman was not the violence we most had, but it was, apparently, the violence we most preferred.



CHAPTER 10

# BALANCING THE LEDGER

ON DECEMBER 11, 1880, OLIVER WINCHESTER DIED AT HIS Prospect Street estate. He was sixty-nine, and he had been ill and infirm for a few years before he finally succumbed to an unspecified affliction, perhaps heart failure. "Winchester's career was in the best American tradition," obituaries said, of the self-made man.[1]

Eulogies praised Winchester's imagination, for he had been able "to see the red and golden streaks of sunshine where to others it was cloudy and overcast." He had had the unique ability to see "future possibilities." It was true that much of Winchester's genius as a gun capitalist was creative, not mechanical, and rooted in his skills as a salesman and entrepreneur—to "vision" a gun market. His "fearfully destructive inventions and fabrications," noted a nineteenth-century biographical entry, might have done more good than anything else by "circumscrib[ing] the ravages of war, . . . reducing it to the absurdities of comparative suicide." It was an exculpatory idea, although there is no evidence that the repeater rifle stimulated a pacifism of mutually assured destruction. Instead, people and animals were shot faster, at greater distances, with a more mechanically volitional weapon.[2]

Oliver Winchester's motives for his life's work are elusive and conjectural. There were as few stories or legends about Winchester the man as there was a surfeit of them about Winchester the rifle. But from

Compendium_Cornell
Page 0350

murky and even bland motives, Oliver and the other Winchester men created a deeply consequential legacy.[3]

His accounting was deeply in the black. Winchester had emerged the preeminent name for semiautomatic rifles. He had helped mold a commercial market and a civilian-armed society. He and a handful of others had made the mass-production of arms plausible and profitable. Winchester's corporate value went from the red to the black of $3 million in 1880 (the economic status equivalent of $783 million today).[4]

Winchester's keenest—or at least clearest—ambitions were in the private realm. His business machinations unwaveringly revealed his family devotion and pride. His business was a family dynasty, an uncommon accomplishment, and he took steps to ensure it stayed that way. Before Winchester's death, his son Will was in management, although hobbled by his health, and his son-in-law TG Bennett was secretary. Winchester had further tightened family control in 1878 by appointing W. W. Converse, who was married to Sarah Winchester's sister, Mary, as treasurer.[5]

Before his death, Oliver Winchester chose Converse as president. When Converse died in 1889, TG Bennett finally became president. John Browning, a gun *savant*—known as the Thomas Edison of guns—and the inventor of most of the company's patented designs in the 1880s and 1890s, recalled that Bennett presided over the WRAC like a "high priest." Others saw him as the "god" in the Winchester temple. Browning recalled, "He looked so solid in his chair that I had the feeling I could come back year after year, find him there, make a deal without any wasted words, and get back to work. It was a comfortable feeling." Winchester had also kept his family in financial control. Wives were useful for that task. The majority control of the 10,000 shares of stock outstanding was held by his wife, Jane (4,400 shares); his son's wife, Sarah (777 shares); and his daughter, Hannah Jane (400 shares).[6]

Oliver Winchester felt this was a good decision. When he died, the fate of the family, the fortune, and the gun was annealed—just as he had always wanted. For Sarah, in the calamitous early 1880s, the fate of the family, the gun, and the fortune was just as strongly tied, as we will see.

WILL WINCHESTER WAS FORTY-THREE YEARS OLD WHEN HIS FATHER died, and he rapidly failed in health in the months that followed. He had suffered gruesomely, and when he died four months after his father, he did not have a gentle passing. In the midst of "terrible exhaustion and debility" from a deeply seated case of tuberculosis, Will had taken up residence at the Windsor Hotel in New York City, hoping to benefit from cutting-edge tuberculosis treatments. He returned home to New Haven by train on March 5. He graciously but bluntly informed his train conductor that he was taking his last trip, and returning to New Haven to die. He died on March 7, and just two months later, Sarah's mother also died in New Haven.[7]

Sarah's story pulls us back to a much smaller space but within the same saga—a brooding, grief-shrouded world in a mansion on Prospect Street. Even by nineteenth-century standards, death had stalked her remorselessly. Another spiritualist, Richard Frothington, wrote in *The Galaxy* of his relentless pursuit of his wife through spirit land. "Do not tell the world-weary wretch who has caught a glimpse of the 'summer land' to turn away his gaze and look again . . . on this cold and wintry earth," he pleaded. Summer Land was too beautiful to relinquish. Grief is a peculiar kind of luxury. Others would have been prodded out of it, and away from spiritualism's consuming ecstasies, through work, exigency, or others to care for. Sarah had no such impediments; her wealth permitted, perhaps invited, her obsession.[8]

We do not know whether Sarah and the medium Ada Coombs ever met, and if they did, we can only imagine what might have transpired. Perhaps Sarah was in one of the one thousand carriages that brought curious but discreet day sojourners to the charming two-month Niantic, Connecticut, spiritualist camp, forty miles from New Haven by the sea, a place known as a city in the pines. Or she might have "made a sneak," like other women of wealthy families, who left their carriages around the corner and arrived heavily veiled, coming in disguise to hear ghostly messages.[9]

The first time Ada met Sarah for a sitting, if it was unscheduled, she wouldn't have had time to prepare, and couldn't have drawn from her book. Doubtless, Sarah conveyed a "good condition," with an electric

intellect and keen credulousness. Under these circumstances, clairvoyants usually confined themselves to anodyne, breezy imprecisions about fields of flowers in Summer Land—but in this case Ada might have made more effort. An impressive technique that only a few mediums mastered was to have the sitter write the spirit she wanted to reach just one question, a simple one, and seal it in an envelope. When Sarah finished, Ada would take the envelope in her lap, quickly go to the thick folds of her dress (female mediums had an advantage because their clothing and long hair provided more hiding spaces for accessories), and retrieve a small sponge saturated with alcohol, which she rubbed over the envelope. The alcohol dried almost instantly, left no trace, and made the question visible. Nothing else worked like this, especially not water, which wrinkled the paper. Before answering the question, she would stare fixedly into vacant space for a minute or so, and then appear to be seized by a mysterious power—shuddering, lifting her eyes, closing them, and snapping back to attention with a bewildered look. Whatever the mode of ghostly communication, Sarah certainly would have wanted to see Will, and to hear a message of what he'd learned in the afterlife.[10]

Clairvoyants like Ada usually claimed to see a "beautiful spirit light" above the sitter's head, and would reassure the curious and grieving that the "spirit comes to you."

For a first visit, that might have been miracle enough.

On Sarah's next visit, Coombs would have been ready. The name "Winchester" is simple as far as research goes. Ada could have easily excavated Sarah's common but profound sorrows, and been able to conjure up an image of Will. An infant daughter, dead, no other children, a husband lost to the agony of tuberculosis, and a rifle fortune. Skeptics imagine that the intellectually feeble make the best marks for the medium, but it isn't so. The heartbroken and rich are the best sitters, the ones who have prolific, receptive minds capable of understanding and the leisure to pursue it, and are arrogant enough to read coincidences of the universe as personal inscriptions. That hubris requires power, not gullibility.

Slate-writing was a popular technique. With enough time, and her notecards on Sarah's bad fortune, Ada could have prepared slates. The best result came from muriatic acid, mixed with half an ounce of pure zinc shavings. Ada would have dipped her quill pen into the mixture and pondered a good long while on what Will should say, something marvelously specific but not refutable. Working on intuition, Ada would have made much out of a detail, perhaps the fact that Will and Sarah had been building their own mansion, at 194 Prospect Street, when Will died. The house was never completed.[11]

When Sarah arrived, Ada would have made a flourish, before Sarah's eyes, of wiping the slate clean with a damp rag. It is easy to imagine that a medium would revel in this trick, which enlists the skeptic's undeluded request to *see* the slate being cleaned as part of her deception: the zinc-mixture writing would not show up on a wet slate, so the skeptic's skepticism itself facilitated deceit. Sarah would have seen with her own eyes that the slate was perfectly clean, free of writing.[12]

Ada would have then contrived the beginning of a trance. She would have massaged her eyes, then snapped her fingers to throw off distracting earthly conditions from her inner sight. She might have thrown her head back and rolled her eyes until only the whites were visible—to have a better view of the ghost. Then she might have spread one hand across her forehead and raised the other high as if grasping for an object or spirit. She could have fallen silent for a few pregnant seconds, and then begun to speak.[13]

She may have described the gentleman standing by Sarah as a "very near relative," with gray eyes and a beard, and asked Sarah if she recognized him. Of course, Sarah would have recognized the ghost as Will.[14]

Most likely, Ada would have conveyed a dispatch that Will was watching over Sarah, and was *right there*. She would have mixed fantasy with factual detail to authenticate her vision. "From the influences that come over me," she may have said, she perceived that Will died in pain, strangling with consumption. This she would have known from newspapers.

By this time the slate would have been ready, and dry, revealing its message from Will. The slate would convey in beautifully legible pen just one statement: Will wished that, before he passed, he had finished their house on Prospect Street.[15]

After Sarah left, astonished, Ada would have had to smash the slate before her next sitting. Once the zinc writing was on the slate, there was no such thing as getting it off.

AFTER SEVERAL SITTINGS, ADA MAY WELL HAVE BECOME THE VICTIM of her own ingenuity and persuasive skill. There are only so many fragments of information one can glean from notecards. The miracle, a medium's product, was finite. At the last sitting, Ada would have to claim that Will's spirit had "disintegrated." Mediums would say that a spirit was no longer in a favorable condition for communication. Then they moved on.

If legend is true, what Ada did next might have had a few motivations. Fulfilling a grieving person's deepest yearning and resurrecting the spirit of a loved one would tend to build intimacy, even if it was humbug, and who is to say that it entirely was, or that the creation of this illusion, and this ghostly hand, was any more grievously counterfeit than other inventive illusions of the age in Will and Oliver's world.

Maybe Ada felt a peculiar alliance with Sarah. They were more like conspirators than predator and prey, colluding to create the world that Sarah wanted to have, and could afford to contrive, where there was no death and Will and Annie existed, overlaid invisibly with her world but not apart from it. Many got paid to help wealthy people like Sarah enjoy the world that they wanted, whether as domestics or gardeners, and that tangible world, too, was a tissue-thin illusion, spun out of beautiful, audacious incongruities and improbabilities—like Will's prize hothouse orchids in the middle of cold, flinty New Haven. When Ada had to dig deeper to contemplate something for Will to say, it might have felt closer to a gift than deceit, and perhaps what she eventually devised to say was correct. An aura of private anguish hung around Sarah, who was haunted before she had ever arrived at Ada's tent. At séances, novelist Nathaniel Hawthorne wrote, "the whole

material is . . . in the dreamer's mind, though concealed at various depths below the surface."[16]

A full materialization would have been challenging and would have required too many assistants, but let's say that Ada wanted Sarah to see Will. To perform a materialization, she would have placed a large table near the spirit cabinet, ostensibly to lay a candle and instrument upon, but really so that if Sarah made a rush or a "grab" at the materialized form, the table would slow her progress. It is hard to imagine the enthralled Sarah making a grab out of skepticism, but perhaps she would have out of yearning. Before they began, Ada would have had Sarah make a thorough inspection of the cabinet. The ceiling panels always looked unremarkable to the amateur eye, or even to the scientist-investigator who had never himself built a corner cabinet. As the trap door, practically silent, opened in the darkened room, Ada would have had a music box play lightly, to mask any slight sound of her assistant descending down the ladder. He would likely have worn a suit of black tights, except for his right arm, which would have been bare up to his shoulder: his hand needed to be made visible.[17]

The most essential thing was to find the right paint for the ghostly hand. One medium swore that he never found it anywhere except at Devoe and Company of New York. You bought it in six-ounce jelly glasses and pulverized it to powder by thinning it with a pint of turpentine. Then you soaked strips of muslin in the mixture. When they were dry, you shook the powder from the cloth and used it as a powder puff on the accomplice's bare arm and face. He would earn a few dollars for his work. The only drawback was the odor of the turpentine, which always lingered to some extent, but could be masked.[18]

In this dark, heavily draped room, a luminous arm and the glimpse of a hand and face would appear, and then quickly disappear. Sarah's belief was underwritten by a tremendous force of longing, guilt, grief, and obsession. When Will's ghost disappeared and evaporated, she would have known, again, what it meant to say that your heart had broken.

What Ada told her, and that the legend tells us, Sarah might already have feared and intuited. But supernatural terror, like tragedy,



COLT

*The Making of an American Legend*

*In memory of Eileen (Tony) Learned (1908-1995). She embodied the qualities of self-sovereignty.*

*To Christine Ermenc, whose companionship, wisdom, and love are my constant inspiration.*

*To Hartford, Connecticut—the inner mounting flame of cantankerous old New England.*
*Its light is inextinguishable so long as memory endures.*

THE ROAD LESS TAKEN IS PAVED WITH LOVE.

---

REF B C72h

Hosley, William N.

Colt : the making of an
American legend /
c1996.

Copyright © 1996 by The University of Massachusetts Press
All rights reserved
Printed in Canada

LC 96-24139
ISBN 1-55849-042-6 (cloth); 043-4 (pbk.)

Design and composition by *Group C* Inc New Haven/Boston
(BC,CC,MJ,JS,CW,ED)
Set in Adobe Linotype Centennial
Printed and bound by Friesens Corporation

Library of Congress Cataloging-in-Publication Data
Hosley, William N.
Colt : the making of an American legend / William Hosley.
p.  cm.
Includes bibliographical references (p.  ).
ISBN 1-55849-042-6 (cloth : alk. paper). — ISBN 1-55849-043-4 (pbk. : alk. paper)
1. Colt, Samuel, 1814-1862.
2. Gunsmiths—Connecticut—Hartford—Biography.
3. Colt revolver—History.
4. Hartford (Connecticut)—History.
I. Title.
TS533.62.C65H67  1996
683.4'0092'2—dc20
[B]  96-24139
British Library Cataloguing in Publication Data are available.

*Page three:* Illustration from *Armsmear* depicting a variety of Colt firearms. Engraving by Nathaniel Orr.
Unless otherwise credited, all illustrated items belong to the Wadsworth Atheneum.

3  1223  04459  4910

# CONTENTS

*Preface*
6

*Meet Sam and Elizabeth*
10

*Practically Perfect:*
*Sam Colt and the Revolution in Machine-Based Manufacturing*
34

*Guns, Gun Culture, and the Peddling of Dreams*
66

*Coltsville: The Body of Empire*
98

*Sam Colt and the Charter Oak: The Heart of Empire*
126

*Armsmear: The Head of Empire*
138

*Frontiers of Civic Culture:*
*Sam and Elizabeth, Art Patrons*
166

*Building Memorials*
192

*First Lady of Connecticut*
210

*Notes*
228

# GUNS, GUN CULTURE, AND THE PEDDLING OF DREAMS

*God created men; Colonel Colt made them equal.*
FRONTIER SAYING

*A musket is an old established thing; it is a thing that has been the rule for ages; but this pistol is newly created*
SAM COLT, 1854

*Economy and necessity made Texas vigilant to choose the most efficient arms, and she had chosen Colt's.*
REPORT FROM THE SECRETARY OF THE NAVY, 1840

*I am proud of the results of my exertions, and can paddle my own canoe.*
SAM COLT, 1854

Gun-making is a heck of way to make a living. For as long as there have been people willing to sell arms, there have been critics ready to condemn them. More than a century ago, even in a city made rich through the sale of armaments, critics described the "gun lobby" as "always inventing trouble" and being anxious to "keep the public mind on war, not because they fear war, but because they have cannons to sell."[1] Epitomizing the qualities that have made social pariahs of arms merchants for generations, the character of armorer Andrew Undershaft in George Bernard Shaw's play *Major Barbara* explains his philosophy of good government:

*You will make war when it suits us, and keep peace when it doesn't. You will find out that trade requires certain measures when we have decided on those measures. When I want anything to keep my dividends up, you will discover that my want is a national need. When other people want something to keep my dividends down, you will call out the police and military. And in return you shall have the support and applause of my newspapers, and the delight of imagining that you are a great statesman.*[2]

Repeatedly accused of bribery, of fomenting war scares, and of conspiring with each other to raise prices, arms manufacturers accept as an occupational hazard that few will ever be grateful for their contributions to national defense. More often they will be vilified.[3] Why would anyone bother? Progress and morality, the twin peaks of Victorian culture. Sam Colt personified the evangelical strain of thought often apparent among gunmakers certain they are making the world safer and more

secure by arming the weak and just agains and predatory. As Sam Colt put it, "The go this wirld *[sic]* are very far from being satisf other & my arms are the best peacemakers."

The middle third of the nineteenth cen the most rapid period of technological inno history of armaments and warfare. Much lik ter revolution of today, the pace of change wa "innovation... appeared almost endless" as brought forth new, lighter, faster, less expensi powerful weapons. Whether in the scientif ports from the War Department (a branch of we now call Defense), or the Hartford new concurred that "in no branch of scientific in there been greater strides in improvem branches of manufacture have received so m as... weapons of destruction." As witnesses de what "five years ago... had been scarcely already we have grown to consider... obsolet increasingly apparent that "weapons of destr at the center of a revolution not only in the technology but in the pace of technological ch generation wrestling with the tension betwe rationalism and religion, the idea that "pr servable in *everything*" helped reconcile see thetical tendencies, propelling the notion of ever forward. The concept of evolution, a w science and biology even before Charles Dar tionary *On the Origin of Species* (1859), was sorts of things, no less to firearms, where the

66

"match-lock, the wheel-lock and the flint-lock," giving "way to the percussion lock," giving way "to the copper cartridge" validated the progressive impulse and in its steadily increasing pace of change hinted that the biblically charged idea of endtime known as the millennium was imminent.[6] "The end," such as it was, passed without notice as science and secular rationalism chipped away at the euphoria of religious expectation, demolishing hope of an impending moment when society, politics, and technology would complete the progressive march to the promised land of a perfect world. But during the middle third of the century, as the two great ships of religion and science passed in the night, *anything* seemed possible.

For those who imagine science operating in a vacuum, history furnishes few better examples of the enormous multiplier effect that occurs when science and technology are in open dialogue with the forces of religion and culture. As religion and science danced to the rhythm of "progress," the nation worked itself into a millennial frenzy, fueling tremendous economic growth, while mowing down incompatible peoples and ideologies in its path. It was not a very pretty picture, and it is almost impossible now to imagine our society, or any society less single-minded than theirs, tackling problems as big and divisive as, to name one of many, slavery. Americans used to be intense. Indeed, if they could see us, they'd likely make it their duty to conquer us. But they'd fail. We now have better weapons.

The United States in the age of Colt was preachy, judgmental, inflexibly moralizing, aggressive, and young.

The missionary zeal evident among the machine builders and city-makers of the age was fueled not only by a belief in the miracle of the nation's successful War for Independence against Britain but also by the evidence, interpreted as God's favor, of the unparalleled growth and expansion that followed. Guns, technology, and the campaign of western expansion were overlapping layers of the same progressive tendency. Each fed and enabled the other, amplifying the perception that Americans were a chosen people.

Issues of race, guns, and violence had special meaning in the 1840s and 1850s, one of the most violent and adventuresome eras in the nation's history. Although nostalgia for the Civil War era would be misplaced, in an odd and sadly heroic way, it is, or was, our Golden Age. It was our youthful adolescence, and there is hardly a feature of national character that did not come into focus at that time. Americans have never grappled with the meaning of nationhood more passionately. Violent, idealistic, and proud, never before or since has American society embraced guns with such a vengeance, nor sanctioned violence on so grand a scale. Die for your country? They signed up in unprecedented numbers. The age of Colt was the age of the gun, an age when a youthful nation first dreamed of glory and empire.

Manifest Destiny—the phrase defines an era. The author was John Lewis O'Sullivan. The year was 1845. The place was the *United States Magazine and Democratic Review*, the house organ of the empire builders and western expansionists. If Emmanuel





*37. Westward the Course of Empire Takes Its Way, 1862. Emmanuel Leutze (American, 1816–68); painted for the rotunda of the U.S. capitol, this is the defining mural of the age of Manifest Destiny. (Photograph courtesy of the Architect of the Capitol.)*

Leutze's *Westward the Course of Empire Takes Its Way* (1862; fig. 37) was its image, and Horace Greeley's "go west, young man, and grow up with the country" its slogan, O'Sullivan's *United States Magazine and Democratic Review* was the intellectual vortex of the age of empire. As a journalist, diplomat, and expansionist, O'Sullivan epitomized the political sentiments that brought forth the Mexican War, made Sam Colt's achievements possible, and set the stage for the war of values that was our Civil War.[7]

What came first, the zeal for guns and glory or the campaign of Manifest Destiny and western expansion? Both were symptomatic of the age. The *Hartford Daily Times* opened the decade of the 1850s by announcing how our "young Republic has advanced steadily in the bright pathway of glory and renown" toward a "future" in which the "progress of the race" is "assured.... Despotism will die.... Liberty and order will become the common blessings of mankind.... Our own beloved country... will advance... to National glory.... Onward! then, brethren, in the campaign of 1850!"[8]

The cult of progress and the mantra of Manifest Destiny guided national life in what historians have dubbed the Young America Movement. Combining the qualities of rampant Anglo-Saxonism and exp one of the central ambitions of the intensely r Young America Movement was the vision empire stretching west to the Pacific and s Caribbean, including Central America, M California.[9] Why not? Progress, in the mi 1850, consisted of pressing onward to c empires of trade and wealth... in regions... s the world for ages by the iron door of heathe and custom."[10] Rarely has the rhetoric of n been more florid and melodramatic than period nor, in retrospect, more embarrassin uneasy about the way the United States a wealth and power.

To varying degrees, many got into it. S War Jefferson Davis believed that the acquisit was "essential to our prosperity and security.' up with pride after a lopsided victory in a wa sion against Mexico, even more sober voices Webster's assumed a bombastic and moral sure that the events of the nation's past a proved the superiority of republican institutic first time, the United States adopted an agg eign policy, based on the perception of moral

Compendium_Cornell
Page 0359

and a willingness to judge the virtue of foreign governments.[12] Sounding the part of a nation unaccustomed to respect, the *Hartford Daily Times* boasted in 1851 of how "every encroachment and every insult of any foreign power would be speedily met and punished," a policy described as the "practical Monroe Doctrine."[13]

Gun lust and western expansion were symptoms of a young nation stretching to define its identity as it climbed onto the stage of world affairs. Issues of race, cultural and political sovereignty, and national destiny churned the waters made muddy by the burden of expectations of a generation eager to experience the martial glory of their Revolutionary ancestors. Science, by providing a veneer of respectability to the racist notion of genetic hierarchy, helped validate the disposition to read America's success as a triumph of the Anglo-Saxon race as well as its republican institutions.[14] By assuming its superiority, the partisans of Manifest Destiny lay the foundation for a campaign of expansion that, peppered with a sense of religious mission, transformed alien peoples—blacks, Native Americans, and Mexicans, primarily, but also other Europeans, notably the Irish—into "barbarians" and "savages" whose only options were annihilation or conquest.

The culture, particularly its newspapers, was brimming with testy proclamations of racial destiny. Indeed, the Civil War was the last phase of an intense and divisive national debate that perplexed Americans during the twenty years leading up to it. Perplexity and confusion are what make this unsettling episode in the nation's history so intriguing. The United States was pumped up with a sense of destiny; slavery was the stain on an otherwise "perfect picture" of a nation rightfully proud of its political institutions and anxious to "spread the principles of Americanism" throughout the West and beyond.[15] So long as slavery blighted the nation's reputation, a full-throttle assault on the West—with all that entailed—was impossible.

In a work deeply emblematic of the progressive impulse, Neil Arnott's *Survey of Human Progress* explained how "the human race, unlike the lower animals... has gradually but greatly advanced from... savage to various degrees of civilization," a "fact of progressive civilization... little suspected... until... advances in general science," disproved the "Greeks' and Romans'... opinion, that mankind had degenerated from... a golden age."[16] Or if you prefer C. Chauncey Burr's take on the matter, the "Caucasian race were never barbarian or savage.... All races who ever were savages, are so still.... Is it better to exterminate the Indian, or to civilize him?"[17] These were the straight-faced questions of the day. For those committed to, as the expansionists saw it, spreading good government, commercial prosperity, and Christianity throughout the American continent, there was abundant, widely published, public testimony that foretold "the period when the extinction of the Indian races must be consummated."[18]

Consider the image of Sioux Indians "taking an infant from its mother's arms... drawing a bolt from the wagon, driving it through the body and pinning it to the fence," leaving it "to writhe and die in agony," while she watched in "speechless misery," until the "gloating" Indians "[chopped] off her arms and legs leaving her to bleed to death"; or of the "womb of a pregnant mother ripped open, the palpitating infant torn forth, cut into bits and thrown into the face of the mother."[19] Before long, this combination of anecdote and ethnology had so totally dehumanized the opposition that the destructive march of progress could not only proceed but also claim a moral victory over the forces of barbarism and evil.

While the progressive impulse was as evident among northern industrialists as southern conquistadors, the way West was guided by the South's martial spirit. Curiously, the only Northerners to occupy the White House during the campaign of Manifest Destiny (1845–60) were Democrats with decidedly pro-Southern sympathies, who appointed Southerners to their cabinets. It was New Hampshire's Franklin Pierce who appointed the future president of the Confederacy, Jefferson Davis, as secretary of war. From John Tyler to James Buchanan, the South dominated electoral politics

and was primarily responsible for restoring the government's role as an aggressive agent of expansion when, in 1846, President James Polk provoked the attack that led to the Mexican War.

The Mexican War, although as controversial in the nineteenth century as Vietnam was in the twentieth, restored the nation's martial spirit, tipped the scales away from the peace policy that followed the War of 1812, and provided new impetus for arming the nation. This was nothing new in the South, where violence was much more readily accepted as a part of life. With its duels, chivalry, and martial tournaments, its unbroken history of Indian warfare, and the constant fear of slave uprisings, the South had a long tradition of military preparedness and was well suited to lead the campaign of western expansion.[20]

As the nation armed itself in the years leading up to the Civil War, the reputation of improved gunnery as a deterrent to war took hold. The concept of weapons as "peacemakers," revitalized in the rhetoric of the Strategic Defense Initiative and arms buildup of the 1980s, played an important role in antebellum America in the debates about arming a nation with a deep aversion to standing armies and a limited capacity for self-defense.[21] As a concept, it offered hope for reconciling the conflicting ambitions of the expansionist South and the antimilitarist "peace movement" advocates in the North, still vigilant in recalling the costly and seemingly pointless War of 1812 and still convinced that a "chosen people" of virtuous citizens did not need expansive armaments.[22]

An 1841 description of Cochran's repeating gun, Colt's first significant competitor, as "an American peacemaker" is one of the earliest American references to the peacemaking attributes of improved gunnery.[23] The USS *Princeton*, the nation's first propeller-driven warship, was mounted with a twelve-inch iron cannon known as the Peacemaker, made infamous when it exploded in testing before a military commission in 1844, killing the secretaries of state and navy.[24] But it was Sam Colt and his revolvers that brought the peacemaker mythology to the

fore, introducing a line of argument that rer versial and no less effective a century and a

As early as 1852, the *Hartford* described Colt's invention as "not witho importance." Citing the argument about the gunpowder diminishing "the frequency, d destructiveness of wars," the *Times* conclud of science can do no greater service to hum adding to the efficiency of warlike implem the people and nations may find stronger than naked moral suasion to lead th peace."[25] Jabbing at the resistance of pac language and institutions it nonetheless peacemaker lobby soon grafted the rhetori and millennialism onto their cause, descri- as a "humane improvement" and arguing man can invent a process by which a whol be killed... the Millennium will arrive, and the lamb will lie down together."[26] "If a re invented and could be readily used, by whic could instantly... destroy a thousand lives, civilized nations would cease forever.... Th such a machine would prove a greater bene race, than he who should endow a thousand And finally, the most famous line from t evangelist and antislavery crusader Henry W whose description of the Hartford-made Sh loading rifle as containing "more moral pow the slave-holders were concerned than i Bibles," earned them the nickname Beech the bloody Kansas war of 1856.[28]

The 1850s was the decade when issu protection and defense triumphed over the n seated resistance to anything like a standir Revolution and the Constitution valorized th citizen-army. Then as now, amid the stri about gun-control and the Second Amendme of the "right of the people to keep and bea image of a citizen-army achieved the statu icon (fig. 38). Steeped in the literature of poli

Compendium_Cornell
Page 0361





phy and history, and fundamentally distrustful of central government, the founding fathers believed that the greatness of the Roman republic was based upon its citizen army and that its decline coincided with the creation of a standing army of professionals. From Machiavelli they learned that a government of armed citizens was the most effective defense against foreign enemies and the most likely to be united, virtuous, and patriotic.[29] Civilian militias were covered with glory at the Battle of Bunker Hill in the Revolution and in the Battle of New Orleans in the War of 1812, when Andrew Jackson's backwoods riflemen, armed with Kentucky rifles, annihilated a much larger army of British professional soldiers.[30]

Throughout the country, private, civic, and state militias proliferated during the 1850s. In Hartford, the most famous was the Putnam Phalanx (fig. 39), formed in 1858 and named after the hero of Bunker Hill, Connecticut general Israel Putnam.[31] More gentlemen's club than military unit, the Putnam Phalanx was part of a larger cam-

paign by Hartford's upstart Democrats to wrap themselves in the mantle of patriotism. Nevertheless, its formation reflected the growing martial fervor of the period. Sam Colt—a man who loved the glory of a good parade no less than the smell of gunpowder—was a member of the Phalanx. In addition, he successfully lobbied for an appointment as lieutenant colonel in the state militia, rehabilitating and then leading the First Company Governor's Horse Guard in 1853 and five years later sponsoring a private militia company, the Colt Armory Guard.

At the same time, cities across the country campaigned to transform the archaic constable-watch system into a modern uniformed police force that, increasingly and with great controversy, became armed with guns.[32] Initially the police were resistant to the use of firearms, it being contrary to a macho culture that relied on brawn and fists. However, beginning in New York (1845), then in Chicago (1851), New Orleans and Cincinnati (1852),

38. The Minuteman, 1875. Daniel Chester French (American, 1850–1931), sculptor. Ames Manufacturing Co., Chicopee, Mass. The Minute Man is the most poignant symbol of the civilian militia companies that play an important role in national defense. (Courtesy of the Minute Man National Historical Park, Concord, Mass.)

39. Staff and Officers of the Putnam Phalanx, 1861. Lithograph; this detail of the print features D.P. Francis and I.W. Stuart. (Courtesy of the Museum of Connecticut History.)



and in numerous cities across the country, especially following the urban riots and an epidemic of crime that erupted during the economic panic of 1857, uniformed police were for the first time allowed, albeit not authorized, to carry concealed firearms.[33] One of the last products introduced by Colt's firearms before its founder's death in 1862 was dubbed the New Model Police Revolver (fig. 40), a lightweight and powerful .36-caliber, six-shooter with a short, three-and-a-half-inch barrel, easily concealed and relatively inexpensive (today about $660), designed and marketed to appeal to the first generation of police professionals forced to acquire arms at their own expense.[34] From the New York draft riots of 1863, when policemen used revolvers against armed mobs for the first time, to the increasingly horrifying labor riots of the later nineteenth century, the gentle age of the night watchman had clearly passed.[35] Gatling guns were perched on Wall Street during the Great Strike of 1877.[36]

By midcentury, firearms ownership was rapidly losing whatever moral stigma had previously been attached to it as the gun came to be seen not only as a means of ensuring security but as a status symbol a entertainment. In New York City, in 1844, that "the gunshops and hardware stores w. are to be found, have had a most extraordi in business," and it was noted the followin a high society party in New York "four-fift were armed with pistols for protection ag and, no doubt, for flaunting their ownership ment typically costing the equivalent of t dollars and more.[37] In 1851 Newport, P was already famous for its "shooting-pis and, in what sounds like a scene out of th its "pistols... popping at all hours" as an "fashionable season."[38] Throughout the 1 ports of Hartford's annual Fourth of July reveal gun-toting revelers and pistol fire as a uncontrolled nuisance. In 1866 the Hartfore the "hundreds of explosions of pistols... reported, matter of factly, a "4th of Jul mishap," in which "Harriet Beecher Stow Eliza" was "accidentally shot."[39]

40. *New Model Police*
*Revolver, 1861,*
*.36 caliber, 6-shot,*
*serial #4160*
*(WA #05.993).*

72

Compendium_Cornell
Page 0363



41. The Turkey S.
1857. Oil on c
Tompkins Hai
Matteson, 18.
(Courtesy of t
New York Sta
Historical As:
Cooperstown,

Not surprisingly, shooting sports and recreational marksmanship became increasingly popular. Imported at first by immigrants pouring into the United States from Germany after the failed Revolution of 1848, the sport of marksmanship emerged as an entertainment in firearms manufacturing communities like Springfield, Hartford, and Ilion, New York, where Remington's workers participated in an American marksmen shooting match in nearby Fort Plain in 1853, one of the earliest American shooting contests outside the German American community.[40] The German Schutzenbunde, featuring uniformed marksmen, became a popular component of New York social life almost from the moment large concentrations of Germans arrived, while turkey shoots (fig. 41) emerged as a social custom in smaller towns around New York and New England.[41] Untrained at marksmanship, the American soldier often proved inept at handling the more accurate rifled muskets and breechloaders that came into use during the Civil War. In 1871 the National Rifle Association was founded, not to argue about Second Amendment rights but "to turn the [National] Guard into

sharpshooters," which they accomplished by sponsoring target shooting competitions (fig. 42).[42] Later in the century, celebrated hunters, marksmen, and western heroes such as Frank Butler, Annie Oakley, and Buffalo Bill became national celebrities whose touring displays of fancy gunwork provided crowd-gathering entertainment.[43]

As the demand for guns intensified and the moral argument against them lost force, Sam Colt was well positioned to make the most of the opportunities at hand. Indeed, Colt's greatest invention was not repeating firearms—he had plenty of competition—but the system he built to manufacture them and the apparatus of sales, image management, and marketing that made his gun—and not the equally viable products of his competitors—the most popular, prolific, and storied handgun in American history. Colt was the Lee Iaccoca of his generation, a man whose name and personality became so widely associated with the product that ownership provided access to the celebrity, glamour, and dreams of its namesake. What Colt *invented* was a system of myths,

symbols, stagecraft, and distribution that has been mimicked by generations of industrial mass-marketeers and has rarely been improved upon. If we are today drowning in the muck of overhyped, oversold merchandise, thank Sam Colt for lighting the way. Even now, the French word for a handgun is *le Colt*, in the same way that one might describe a photocopy as a "xerox" or a cola as a "coke." This is the stuff Madison Avenue dreams are made of. When one of Colt's congressional allies defended his petition for a patent extension by describing Colt's central ambition as "not so much to amass wealth as to build up for himself fame," he unveiled the central impulse behind Colt's relentless drive.[44] "Colt's idea," it was later said, was "making the world aware that he was in it."[45]

To advance his reputation and the reputation of his invention, Colt drew from an extraordinary grab bag of tactics. First, he drew a bold line between "mere capitalists" and inventors, and carefully crafted his reputation as the latter, even though his legacy at amassing, investing, and deploying capital was more impressive. Colt helped pioneer the theory and practice of American patent law by surrounding himself with attorneys and threatening to sue and outflank his many competitors. Colt used direct advertising as skillfully as any manufacturer of his generation, expanding both the character of the message and the means of delivering it. Colt sought, bought, and gained the recognition of "expert" authorities in the military and scientific communities, and never blinked (or asked permission) before exploiting a testimonial once provided. Colt was a sensationalist who cultivated controversy, virtually coining the practice that led to the cliché "there is no such thing as bad publicity."

Colt adopted the policy, today cal destruction, of cannibalizing his own produc ahead of the competition by always offerin "new." Aware of the complexity of his pro pioneered the use of users' manuals. And, w ing similarity to the personal computer mar he was relentless in his drive to lower pri scare off or bankrupt potential competito commission sales agents, lobbyists, consig quantity discounts skillfully and, while tame son with what passes for influence peddlin not averse to bribery and blackmail to ac goals. Finally, and to the enduring affectio collectors then and now, Colt used art to bo tige and soften the associations of a produ after all, designed to kill people. Colt transla glamour and celebrity into sales. When one ers wrote that "Col. Colt is himself a 'Patent always loaded, and ready for action!" he d image in the mirror for generations of (pr eager to be like Sam Colt, a man "ready for a man and the gun converged toward a sir Colonel Colt, as he liked to be called, had bec eration's Marlboro Man.

Colt lived and worked at the begir American industrial era, and one of his gr was inventing a persona that reconciled between the conflicting ideals of the agraria the freeman farmer—the symbol of Ameri with the promise of technology and mass How, in a system that required stifling con regimentation, could one preserve the trad

42. *The Schutzenfest at Jones's Wood, 1868. From Harper's Weekly: A Journal of Civilization, July 18, 1868; detail of a woodblock engraving. (Courtesy of Watkinson Library, Trinity College.)*



Compendium_Cornell
Page 0365

# COMMENTARIES

ON

# AMERICAN LAW.

BY JAMES KENT.

VOL. II.

TWELFTH EDITION,

EDITED BY

O. W. HOLMES, JR.

BOSTON:

LITTLE, BROWN, AND COMPANY.

1873.

Digitized by Google

Southern District of New York, ss.

BE IT REMEMBERED, That on the twenty-fifth day of November, A. D. 1826, in the fifty-first year of the Independence of the United States of America, JAMES KENT, of the said district, has deposited in this office the title of a Book, the right whereof he claims as author, in the words following, to wit:

[L. S.]

"Commentaries on American Law.  By JAMES KENT.  Vol. I."

In conformity to the Act of the Congress of the United States, entitled "An Act for the encouragement of learning, by securing the copies of Maps, Charts, and Books to the authors and proprietors of such copies, during the times therein mentioned." And also to an Act, entitled An Act, supplementary to an Act entitled An Act for the encouragement of learning, by securing the copies of Maps, Charts, and Books to the authors and proprietors of such copies, during the times therein mentioned, and extending the benefits thereof to the arts of designing, engraving, and etching historical and other prints.

JAMES DILL,
Clerk of the Southern District of New York.

Entered according to the Act of Congress, in the year one thousand eight hundred and thirty-two, by JAMES KENT, in the Clerk's Office of the District Court of the United States, for the Southern District of New York.

Entered according to the Act of Congress, in the year one thousand eight hundred and forty, by JAMES KENT, in the Clerk's Office of the District Court of the United States, for the Southern District of New York.

Entered according to the Act of Congress, in the year one thousand eight hundred and forty-eight, by WILLIAM KENT, in the Clerk's Office of the District Court of the United States, for the Southern District of New York.

Entered according to the Act of Congress, in the year one thousand eight hundred and fifty-one, by WILLIAM KENT, in the Clerk's Office of the District Court of the United States, for the Southern District of New York.

Entered according to the Act of Congress, in the year one thousand eight hundred and fifty-four, by WILLIAM KENT, in the Clerk's Office of the District Court of the United States, for the Southern District of New York.

Entered according to the Act of Congress, in the year one thousand eight hundred and fifty-eight, by WILLIAM KENT, in the Clerk's Office of the District Court of the United States, for the Southern District of New York.

Entered according to the Act of Congress, in the year one thousand eight hundred and sixty, by WILLIAM KENT, in the Clerk's Office of the District Court of the United States, for the Southern District of New York.

Entered according to the Act of Congress, in the year one thousand eight hundred and sixty-six, by MRS. WILLIAM KENT, in the Clerk's Office of the District Court of the United States, for the Southern District of New York.

Entered according to Act of Congress in the year 1873, by JAMES KENT, in the Office of the Librarian of Congress, at Washington.

CAMBRIDGE:
PRESS OF JOHN WILSON AND SON.

Digitized by Google

Compendium_Cornell
Page 0367

**\* 340**      \* It undoubtedly must rest, as a general rule, in the wis-
dom of the legislature, to determine when public uses re-

Chancellor Walworth, of New York, in Lyon v. Jerome, 26 Wend. 497.  But it is not
to be understood that a statute assuming private property for public purposes, without
compensation, is absolutely void, so as to render all persons acting in execution of it
trespassers.  Some of the judicial *dicta* seem to go that length, but others do not.
12 Serg. & R. 366, 372; 20 Johns. 745.  In Case v. Thompson, 6 Wend. 634, it was
held that neither the payment nor the assessment need precede the opening of a road
over the land of an individual.  The compensation may have been provided for with-
out constituting part and parcel of the act itself, and I think the more reasonable and
practicable construction to be, that the statute would be *prima facie* good and binding,
and sufficient to justify acts done under it, until a party was restrained by judicial
process, founded on the paramount authority of the constitution.

In Bonaparte v. C. & A. Railroad Co., 1 Bald. C. C. U. S. 205, it was held that a
law taking private property for public use, without providing for compensation, was
not void, for it may be done by a subsequent law.  But the execution of the law will
be enjoined until the provision be made, and the payment ought to be simultaneous
with the actual appropriation of the property.  It is admitted that even a statute fran-
chise, as a toll bridge or road, must yield to the sovereign right of eminent domain,
and may be impaired or taken away, and appropriated to public uses whenever the
public exigencies require it, for a franchise is fixed and determinate property; but it
must be on the condition of making just compensation to the proprietors.  Even if
the damage be merely *consequential* or *indirect*, as by the creation of a new and rival
franchise in a case required by public necessities, the same compensation is due, and
the cases of Thurston v. Hancock, 12 Mass. 220, and Callender v. Marsh, 1 Pick. 418,
are erroneous, so far as they contravene such a palpably clear and just doctrine.  If
A. be the owner of a mill, and the legislature authorize a diversion of the watercourse
which supplies it, whereby the mill is injured or ruined, is not that a consequential
damage to be paid for?  The solid principle is too deeply rooted in law and justice to
be shaken.  Gardner v. Village of Newburgh, 2 Johns. Ch. 162; Story, J., in Charles
River Bridge v. Warren Bridge, 11 Peters, 638, 641.  The *just compensation* to the
owner for taking his property for public uses, without his consent, means the actual
value of the property in money, without any deduction for estimated profit or
advantages accruing to the owner from the public use of his property.  Specula-
tive advantages or disadvantages, independent of the intrinsic value of the prop-
erty from the improvement, are a matter of set-off against each other, and do not
affect the dry claim for the intrinsic value of the property taken.  Jacob v. City
of Louisville, 9 Dana, 114.  In Symonds v. City of Cincinnati, 14 Ohio, 147, it
was adjudged that it was a competent matter of defence in a suit for compensa-
tion for the value of private property taken for public use, to show the increased
benefit conferred on the owner by the appropriation, as a set-off against the value
of the property taken.  The case was ably discussed, and Mr. Justice Read, who
dissented from the decision, contended that the owner was entitled to the value of
his property taken without the deduction of any reflecting advantage.  In Railroad
Company v. Davis, 2 Dev. & Batt. (N. C.) 451, it was held that payment of the com-
pensation and the assessment of the *quantum* might be made subsequently, and need
not necessarily precede the entry and possession under the statute authority; and
that the legislature was not restricted to a mere easement in the property, but might
take the entire interest of the individual, if it deemed the public exigency to require
it; and that though a railroad company be a private corporation, and its outlays and

[ 436 ]

Digitized by Google

quire the assumption of private property ; but if they should take
it for a purpose not of a public nature, as if the legislature should

emoluments private property, yet the road is a public highway and for public uses,
and the absolute property may be vested in the company.  The questions in that case
were ably discussed in the opinion delivered by C. J. Ruffin ; and if the doctrine of
the court should be deemed rather latitudinary in respect to the legislative right of
eminent domain, it is to be observed that the constitution of North Carolina has no
express provision declaring that "private property shall not be taken for public uses
without just compensation."  But though it be not a constitutional principle, yet the
principle exists with stringent force, independent of any positive provision.

There is no such provision in the constitution of South Carolina ; and it was
accordingly held, after an able discussion, that the legislature had a right to cause
roads to be opened, and materials taken for keeping them in repair, without the con-
sent of the owner of the private property, and without making compensation.
Several of the judges were not satisfied with the decision, as respected the absence
of compensation, and especially in the delegation of such power to the commission-
ers of roads.  The opinion of Mr. Justice Richardson, in support of the duty of
making compensation, was very elaborate and powerful.  The State v. Dawson,
8 Hill, 100.

In ancient Rome, such respect was paid to the rights of private property, that a
scheme of the censors, B. C. 179, to supply the city with water by means of an
aqueduct, was defeated by the refusal of a proprietor to let it be carried through his
lands ; and, at a subsequent period, the senate decreed that it should be lawful to
take from the adjoining lands of individuals the materials requisite for the repairs of
aqueducts, upon an *estimate of the value or damages to be made by good men*, and doing,
at the same time, the least possible injury to the owners.  When a private house was
injured by a public road or aqueduct, the Emperor Tiberius paid the damage, on
petition by the party to the senate.  Tacit. Ann. b. 1, § 75.  So, in London, by an
act of Parliament, as early as 1544, the corporation of the city was invested with the
power to enter upon and appropriate private property requisite for the purpose of
supplying the city with water ; but the ground needed was to be appraised by three
or four different persons appointed by the lord chancellor, and to be paid for within
one month after possession taken.  See King's Memoir on the Croton Aqueduct,
with a learned and very interesting Preliminary Essay, 25, 27, 51.

The exercise of the legislative power of eminent domain was learnedly discussed
in the case of Bloodgood v. M. & H. Railroad Company, 14 Wend. 51 ; s. c. 18 id.
1, 59 ; and it was held by the court, in the last resort on error, that the legislature
might authorize railroad companies to enter upon and appropriate private property
in land for the use of the road, so far as it became indispensably necessary for the
purpose of the road ; *provided*, provision be made in the act for the assessment and
payment to the owner of the damages incurred.  If the provision was made, it was
held to be sufficient, and that the damages need not be actually ascertained and paid
previous to the entry and appropriation of the property.  See, also, Fletcher v. The
Auburn & Sy. R.R., 25 Wend. 462, 464.  This is the construction given to English
statutes in like cases, and frequently, as Lord Denman observed, the amount of com-
pensation cannot be ascertained until the work is done.  Lister v. Lobley, 7 Ad. &
El. 124.  But in Doe v. Georgia R.R. & B. Com., 1 Kelly, 524, it was held, that the
*title* to the property assumed for the road did not pass from the original owner until
the prescribed compensation was actually made.  And in some of the railway acts in
England, the company is prohibited from entering on the land without consent, until

[ 437 ]

Digitized by Google

Compendium_Cornell
Page 0369

take the property of A. and give it to B., or if they should vacate a grant of property, or of a franchise, under the pretext of some public use or service, such cases would be gross abuses of their discretion, and fraudulent attacks on private right, and the law

the ascertained compensation is paid or tendered. So in Mississippi, the damages for land taken for a railroad must first be paid, before the right to the use of it becomes vested. Stewart *v.* R.R. Company, 7 Sm. & M. 568. It rests with the legislature to judge of the cases which require the operation of the right of eminent domain, and it may be applied to the case of roads, turnpikes, railways, canals, ferries, bridges, &c., provided there be, in the assumption of the property, evident utility and reasonable accommodation as respects the public. Cottrill *v.* Myrick, 8 Fairf. 222; Dyer *v.* The Tuscaloosa Bridge Company, 2 Porter, 296; Harding *v.* Goodlett, 8 Yerg. 41; Chancellor Walworth, in 18 Wend. 14, 15. The Supreme Court of Massachusetts, in Boston Water Power Co. *v.* Boston and Worcester Railroad Co., January, 1840, 23 Pick. 360, held, that the right of eminent domain might be exercised in the cases of franchise as well as of personal property, in proper cases, and on making due compensation. There is no doubt of it. Property in a franchise is not more sacred than private property in land under a patent, and the principle was declared in the case of Bonaparte, above mentioned. The doctrine of the cases in 14 and 18 Wendell appears to settle the principle of constitutional law upon a reasonable and practicable foundation. See, also, the strong and clear case of The Louisville C. & C. Railroad Co. *v.* Chappell, Rice (S. C.), 383, and of Backus *v.* Lebanon, 11 N. H. 19, to the same point. But a statute incorporating a company to take private property without consent of the owner, for the construction of a bridge, *and making no provision for his indemnity,* is unconstitutional and void. Thatcher *v.* Dartmouth Bridge Co., 18 Pick. 501, and in the case of Sinnickson *v.* Johnsons, 2 Har. (N. J.) 129, the erection of a dam across a navigable water by an individual, under the authority of a statute providing no remedy to the owner of a meadow overflowed by means of the dam, was held to be an injury for which the owner had his remedy by action for damages. And in Taylor *v.* Porter, 4 Hill, 140, it was held, that the private property could not be taken, nor a private road established for private use, not even by a legislative act, without the consent of the owner, and that any statute doing it was unconstitutional. It can only be taken by statute for *public* uses, and not even then without just compensation to the owner. Art. 1, § 7. C. J. Nelson dissented, on the ground that the laying out private roads over the lands of others, to accommodate one or more individuals, and without the consent of the owner, was within the right of eminent domain, and justified by that principle and by immemorial usage. I apprehend that the decision of the court was founded on just principles, and that taking private property for *private* uses, without the consent of the owner, is an abuse of the right of eminent domain, and contrary to fundamental and constitutional doctrine in the English and American law. See *ante*, 13, and note *b*, ib , and the cases *supra* in this note, and see the subsequent note *a*. The revised constitution of New York, of 1846, has settled this question differently, for it declares that *private roads* may be opened in the manner to be prescribed by law, but the person to be benefited must first pay the damages to be assessed. Art. 1, § 7.

The principle of not taking private property for public uses, without due compensation to the owner, has become an acknowledged one in the Scotch law, and is to be found in the British statute of 1 & 2 Wm. IV. c. 48, relative to roads and highways. Bell's Principles of the Law of Scotland, 173, 174.

[ 438 ]

Digitized by Google

would be clearly unconstitutional and void. (a) [1]  Real property,
and the rights and privileges of private corporate bodies, are all

(a) Wilkinson v. Leland, 2 Peters, 658; Harding v. Goodlett, 3 Yerg. 41; Case of
Albany Street, 11 Wend. 149; In the matter of John and Cherry Streets, in New

[1] *Public Uses* — (a) It has been said that
whether the object for which property is
taken or a tax imposed is a public use
must be determined by the judiciary,
making, of course, all reasonable pre-
sumptions in favor of legislative acts.
Talbot v. Hudson, 16 Gray, 417; Opinion
of Cooley, J., People v. Salem, 20 Mich.
452; Sadler v. Langham, 34 Ala. 811,
821; Horton v. Squankum, &c., Co., 8
Am. Law Reg. N. s. 179; Bankhead v.
Brown, 25 Iowa, 540. But it has also
been laid down, and it would seem to be
the better doctrine, that on such questions
the discretion of the legislature cannot be
controlled by the courts, except, perhaps,
where its action is clearly evasive, or
where there is a palpable usurpation of au-
thority. Cooley, Const. Lim. ch. v. 1st ed.
129; note to People v. Salem, 5 Am. Law
Rev. 148 *et seq.*; Speer v. Blairsville, 50
Penn. St. 150; Olmstead v. Camp, 33
Conn. 532, 552; Comm. v. Breed, 4 Pick.
460, 463; Tidewater Co. v. Coster, 3 C. E.
Green (N. J.), 518, 521, 522; *cf.* 67, 68.
Judge Cooley, in ch. xv. (Eminent Do-
main), 533, refers to the settled practice
of free governments as the test. Perhaps
it is on this ground that the mill acts have
been sustained in so many states. Olm-
stead v. Camp, 33 Conn. 532, 552. See
Ash v. Cummings, 50 N. H. 591; Dorgan
v. Boston, 12 Allen, 223, 238. But see
Sadler v. Langham, 34 Ala. 811; Tyler
v. Beacher, 44 Vt. 648. One or two
other examples are given of purposes
for which the courts have supported the
exercise of the power of eminent domain.
— The use of the government of the
United States. Reddall v. Bryan, 14
Md. 444; Burt v. Merchants' Ins. Co.,
106 Mass. 356; *contra,* Trombley v.
Humphrey, 23 Mich. 471. — The benefit of
a navigable canal outside the state, and
belonging to a foreign corporation. Mat-
ter of Townsend, 39 N. Y. 171. — The
partial taking down of a dam to relieve
certain meadows from flowage. Talbot
v. Hudson, *sup.* — Supplying a village with
pure water. Lumbard v. Stearns, 4 Cush.
60. — Sewers for cities. Hildreth v. Low-
ell, 11 Gray, 345. — Draining swamps.
Anderson v. Kerns Draining Co., 14 Ind.
199. — Abating a nuisance. Dingley v.
City of Boston, 100 Mass. 544. — Levees.
Mithoff v. Carrollton, 12 La. An. 185. —
Schoolhouses. Williams v. School Dist-
rict 6, in Newfane, 33 Vt. 271. So, a
betterment act was held constitutional
which assessed part of the cost of a
street in a city on the abutters, and gave
the owners of estates of which parts
were taken the option to surrender the
whole to the city, and to receive the value
estimated by the mayor and aldermen.
Dorgan v. Boston, 12 Allen, 223, 242. See
the cases cited in the arguments. *Cf.*
Coster v. Tide Water Co., 3 C. E. Green
(N. J.), 54, 518; Embury v. Conner, 3
N. Y. 511.

On the other hand, a private way for
private purposes only cannot constitu-
tionally be established over the land of
another against his consent. *Sup.* 839,
n. (*f*); Nesbitt v. Trumbo, 39 Ill. 110;
Crear v. Crossly, 40 Ill. 175; Dickey v.
Tennison, 27 Mo. 373; Sadler v. Lang-
ham, 34 Ala. 811; Bankhead v. Brown,
25 Iowa, 540; *contra,* Pocopson Road, 16
Penn. St. 15. Nor can and be taken for
private drains; Reeves v. Wood County,
8 Ohio St. 333; nor for the manufacture
of cars by a railroad company; Eldridge
v. Smith, 34 Vt. 484; *cf.* Lance's Appeal,
55 Penn. St. 16; nor for a freight com-
pany for loading and unloading freight,

[ 439 ]

Digitized by Google

held by grant or charter from government, and it would be a
violation of contract, and repugnant to the Constitution of the

York, 19 id. 659; C. J. Parker, in Rice *v.* Parkman, 16 Mass. 830; Norman *v.* Heist,
5 Watts & S. 171; Varick *v.* Smith. 5 Paige, 146, 147, 159, 160, s. P. The opinion
of the vice chancellor in the last case contained a spirited vindication of the constitu-
tional sanctity of private property, against the abuses of the right of *eminent domain*.
See, also, the able and elaborate opinion of Chancellor Bibb, of the Louisville Chancery
Court in Kentucky, in the case of Applegate and Others *v.* Lexington and Ohio Rail-
road Company, decided in November, 1838, in which case an injunction was granted,
after argument, enjoining the defendants from running cars and carriages, by steam
or otherwise, upon their railroad along the main street in the city of Louisville.  It
was adjudged to be a common nuisance, with special damage, a purpresture amounting
to a nuisance, and a disturbance of easements annexed by grant to private estates, and
of privileges secured by statute; and that the right of eminent domain did not author-
ize the legislature to delegate to any private person  or company the lawful power of
disturbing private right and property for their own use and emolument.  But this
decree was afterwards reviewed in the Kentucky Court of Appeals, and modified, and
the injunction against the running of cars on the railway on Main Street, in the city
of Louisville, by the Lexington and Ohio Railroad Company, dissolved.  The Court
of Appeals, in the strong opinion delivered by Chief Justice Robertson, declared, that
upon the facts in the case, the running of railroad cars, by horses or steam, through
the street, was not a nuisance, but conducive to the public interest and prosperity of
Louisville — that the legislature could constitutionally exert her eminent domain, in
taking private property for public use, through the instrumentality of a railroad com-
pany — that private corporations, establishing turnpikes and railroads, may, in this
respect, be deemed public agents, and may take private property for public uses, on
making just compensation — that no compensation was requisite in this case, as the
street was dedicated to public uses, and the railroad, with locomotive steam cars, was
no nuisance or purpresture, not inconsistent with the object of the street, which was
otherwise in full use as a public highway — that though the grant from the corpora-
tion, of the privilege of making a railway through the street, might be productive of
some inconvenience, it was greatly overbalanced by the public benefit resulting from
the use of the rail cars.  Lexington and Ohio Railroad Co. *v.* Applegate, 8 Dana, 289;
Case of Philadelphia and Trenton Railroad Company, 6 Wharton, 25, s. P.  But in
Cooper *v.* Alden, Harr. Ch. (Mich.) 72, an injunction to stop a railroad through a
street in the city of Detroit was granted.  The rule for or against such a right may
be governed by the circumstances and sound discretion of the case.  In the case of
The Hudson and Delaware Canal Co. *v.* N. Y. and Erie R.R. Co., 9 Paige, 823, the
remedy in chancery by injunction was admitted, if the construction of a railroad
would work imminent danger to the works of a canal company previously and law-
fully constructed, and to the use of them.

&c.  Memphis Freight Co. *v.* Memphis,
4 Coldw. 419.

(*b*) On the question of what amounts to
taking a man's property, a serious inter-
ruption to its common and necessary use
has been held to be so in many instances.
See Pumpelly *v.* Green Bay Co., 13 Wall.
166; Eaton *v.* B., C. & M. R.R., 51 N. H.

604.  In the latter case all the authorities
are elaborately reviewed by Smith, J.
But compare .West Branch & S. Canal
Co. *v.* Mulliner, 68 Penn. 857; Bellinger
*v.* N. Y. C. RR., 23 N. Y. 42.  See,
further, two articles, 19 La*w* Rep. 241,
801.

[ 440 ]

Digitized by Google

United States, to interfere with private property, except under
the limitations which have been mentioned.

But though property be thus protected, it is still to be under-
stood that the lawgiver has a right to prescribe the mode and
manner of using it, so far as may be necessary to prevent the
abuse of the right, to the injury or annoyance of others, or of the
public.  The government may, by general regulations, interdict
such uses of property as would create nuisances, and become
dangerous to the lives, or health, or peace, or comfort of the citi-
zens.  Unwholesome trades, slaughter-houses, operations offensive
to the senses, the deposit of powder, the application of steam-
power to propel cars, the building with combustible materials, and
the burial of the dead, may all be interdicted by law, in the midst of
dense masses of population, on the general and rational principle,
that every person ought so to use his property as not to injure his
neighbors, and that private interests must be made subservient to
the general interests of the community. (b) [2]

(b) Puff. b. 8, c. 5, sec. 3; Vattel, b. 1, c. 20, secs. 246, 255; Cowp. 269; Com.
Dig. tit. By-Laws [B.]; Willes, 388; Coates v. The Corporation of New York, 7
Cowen, 585; The State v. Tupper, Dudley Law and Eq. (S. C.) 185.  In the case
of Tanner v. The Trustees of the Village of Albion, 5 Hill (N. Y.), 121, it was held,
that a bowling alley kept for gain or hire in the village was a nuisance at common

[2] *Police Power.* — This power of the
government is now called the police
power, and is discussed at length in ch. xvi.
of Cooley's Constitutional Limitations.
See Thorpe v. Rutland & Burlington
R.R., 27 Vt. 140.  But acts which can
only be justified on the ground that they
are police regulations, must be so clearly
necessary to the safety, comfort, or well-
being of society, or so imperatively re-
quired by the public necessity, that they
must be taken to be impliedly excepted
from the words of the constitutional pro-
hibition.  People v. Jackson & M. Plank
R. Co., 9 Mich. 285, 307; State v. Noyes,
47 Me. 189.  To this extent new duties
or liabilities may be imposed on corpora-
tions, although not mentioned in their
charters; such as to fence a railroad; 27
Vt. 140; New Albany & Salem R.R. v.
Tilton, 12 Ind. 3; Ohio & Miss. R.R. v.
McClelland, 25 Ill. 140; or a liability for

fire communicated by an engine.  Lyman
v. Boston & Worcester R.R., 4 Cush. 288;
or a liability for negligently causing
death.  S. W. R.R. v. Paulk, 24 Ga. 356;
Boston, Concord, & M. R.R. v. State, 32
N. H. 215.  The most remarkable cases
as to the exercise of this power are those
arising out of the liquor laws.  Such laws
do not interfere with the power of Con-
gress to regulate commerce, if they pro-
hibit the sale of imported liquor only,
when it has passed out of the hands of
the importer, or when the original pack-
ages have been broken up by him; see
i. 489, n. 1; nor will they be held invalid
so far as they tend to prevent the perform-
ance of existing contracts; People a
Hawley, 3 Mich. 330; Reynolds v. Geary,
26 Conn. 179; nor as depriving persons
of liberty or property.  Metropolitan
Board of Excise v. Barrie, 34 N. Y. 657
Blair v. Forehand, 100 Mass. 136.

[ 441 ]

Digitized by Google

law, and erections of every kind, adapted to sports or amusements, having no useful end, and notoriously fitted np and continued in order to make a profit for the owner, were nuisances.  They were temptations to idleness and dissipation, and apt to draw together great numbers of disorderly persons.  The observations of the court were exceedingly stringent, but wholesome, and the doctrine and cases of 1 Hawk. P. C. c. 32, § 6 ;  Hall's Case, 1 Mod. 76 ;  2 Keb. 846 ;  Rex *v.* Dixon, 10 Mod. 835 ;  Rex *v.* Higginson, 2 Burr. 1282 ;  Rex *v.* Moore, 3 B. & Ad. 184 ;  Nolin *v.* M. and Ald. of Franklin, 4 Yerg. 163, were referred to with approbation.  So if a milldam be a nuisance, it may be restrained by injunction.  3 Ired. Eq. (N. C.) 301. But a person may not enter upon another's land to abate a nuisance, without a previous notice or request to the owner of the land, except under special circumstances. Jones *v.* Williams, 11 M. & W. 176.  As the Constitution of the United States, and the constitutions of several of the states, in terms more or less comprehensive, declare the right of the people to keep and bear arms, it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons, when not on a journey, or as travellers, from *wearing or carrying concealed weapons*, be constitutional. There has been a great difference of opinion on the question.  In Kentucky, Tennessee, and Mississippi, the decisions are understood to be against the validity of the prohibition, whereas in Indiana, Alabama, and Arkansas, they are in favor of it. (Bliss *v.* The Commonwealth, 2 Littell, 90 ;  The State *v.* Reid, 1 Ala. (N. s.) 612; The State *v.* Mitchell, 3 Blackf. 229 ;  The State *v.* Buzzard, 4 Ark. 18.)  In Tennessee there is a statute law of a penal character against wearing the bowie-knife, but none against carrying firearms.  The statute in Georgia is broader and more extensive.  Hotchkiss's Code of Laws, 739.  But in Georgia the statute prohibition has been adjudged to be valid so far as it goes to suppress the wearing of arms *secretly*, but unconstitutional so far as it prohibits the bearing or carrying arms *openly*.  Nunn *v.* State of Georgia, 1 Kelly, 248.  As the practice of carrying concealed weapons has been often so atrociously abused, it would be very desirable, on principles of public policy, that the respective legislatures should have the competent power to secure the public peace, and guard against personal violence by such a precautionary provision.

[ 442 ]

Digitized by Google



*The Cambridge*
*History of*
# LAW IN
# AMERICA

VOLUME I

EARLY AMERICA

(1580–1815)

*Edited by*
MICHAEL GROSSBERG
CHRISTOPHER TOMLINS

# THE CAMBRIDGE HISTORY
# OF LAW IN AMERICA

## VOLUME I

*Early America (1580 – 1815)*

*Edited by*

MICHAEL GROSSBERG
*Indiana University*

CHRISTOPHER TOMLINS
*The American Bar Foundation, Chicago*



CAMBRIDGE
UNIVERSITY PRESS

Compendium_Cornell
Page 0376

CAMBRIDGE UNIVERSITY PRESS
Cambridge, New York, Melbourne, Madrid, Cape Town, Singapore, São Paulo, Delhi

Cambridge University Press
32 Avenue of the Americas, New York, NY 10013-2473, USA

www.cambridge.org
Information on this title: www.cambridge.org/9780521803052

© Cambridge University Press 2008

This publication is in copyright. Subject to statutory exception
and to the provisions of relevant collective licensing agreements,
no reproduction of any part may take place without
the written permission of Cambridge University Press.

First published 2008

Printed in the United States of America

A catalog record for this publication is available from the British Library.

Library of Congress Cataloging in Publication Data

The Cambridge history of law in America / edited by Michael Grossberg,
Christopher Tomlins.
p.   cm.
Includes bibliographical references and index.
ISBN 978-0-521-80305-2 (hardback)
1. Law – United States – History.   I. Grossberg, Michael, 1950–   II. Tomlins,
Christopher L., 1951–   III. Title.
KF352.C36 · 2007
349.73 – dc22        2007017606

ISBN   978-0-521-80305-2 hardback

Cambridge University Press has no responsibility for
the persistence or accuracy of URLs for external or
third-party Internet Web sites referred to in this publication
and does not guarantee that any content on such
Web sites is, or will remain, accurate or appropriate.

3 1223 08570 3016

Compendium_Cornell
Page 0377

# CONTENTS

*Editors' Preface*                                                                 *page* vii

1   Law, Colonization, Legitimation, and the European
    Background                                                                              1
    ANTHONY PAGDEN

2   The Law of Native Americans, to 1815                                         32
    KATHERINE A. HERMES

3   English Settlement and Local Governance                                    63
    MARY SARAH BILDER

4   Legal Communications and Imperial Governance: British
    North America and Spanish America Compared                          104
    RICHARD J. ROSS

5   Regionalism in Early American Law                                          144
    DAVID THOMAS KONIG

6   Penality and the Colonial Project: Crime, Punishment, and
    the Regulation of Morals in Early America                               178
    MICHAEL MERANZE

7   Law, Population, Labor                                                             211
    CHRISTOPHER TOMLINS

8   The Fragmented Laws of Slavery in the Colonial and
    Revolutionary Eras                                                                253
    SALLY E. HADDEN

9   The Transformation of Domestic Law                                        288
    HOLLY BREWER

10  Law and Religion in Colonial America                                      324
    MARK McGARVIE AND ELIZABETH MENSCH

11  The Transformation of Law and Economy in Early America     365
    BRUCE H. MANN

v

# 5

# REGIONALISM IN EARLY AMERICAN LAW

## DAVID THOMAS KONIG

Early Americans created regionally particular legal systems. Two centuries of nationhood have since brought a great measure of uniformity in certain areas of American law – the adoption of federal rules of procedure, the growth of a federal judiciary, a uniform commercial code, and a national system of legal education are just a few. Yet in certain respects American law remains regionally specific. The nation's ninety-four federal district courts, for example, are grouped into regional circuits whose decisions occasionally conflict and are not resolved. Perhaps in our own time regional distinctiveness is stronger in American culture and political discourse than in actual legal reality. Nevertheless, both its factual existence and its cultural potency are clear.

American regionalism has its roots in early America. In the case of law, the particular goals and variant experiences of unrelated colonization ventures led to the reanimation and recombination of English legal practices in different ways in the new environments. Colonists emphasized some English practices while rejecting others, resulting ultimately in the emergence of three new and distinct regional configurations – the Chesapeake and its Southern neighbors, New England, and the Middle Colonies.

The peoples of early America were – as those of modern America remain – as various as their land, and the regionally diverse legal systems they created gave meaning and order to their experiences. Their legal regionalism originated in a long tradition of diverse English practices and in the contingent exigencies of the unique historical "moments" of social change and legal crisis in which colonization efforts took place. These moments would produce the three distinct regions of legal culture on which we focus in this chapter. We examine and explain the creation and entrenchment of these plural legal orders not through an exhaustive catalog of their legal differences, but through an interpretive inquiry into particular areas of the law that demonstrate how the theory and reality of regionalism first created – and now continues to animate – law in America.

144

Compendium_Cornell
Page 0379

The first two great cultural hearths of American law – the Chesapeake and New England – emerged at a critical moment in English history when a "vexed and troubled" people turned to the institutions of law to reconstitute a body politic collapsing in disarray. Law at this moment stood as the bulwark both of identity and, indeed, survival. To those English who first settled North America, in particular, law would distinguish them from the peoples they encountered; it was a distinctive mark of the superiority of their free and Protestant civilization. They turned to it with enthusiasm as an instrument to settle North America – that is, to claim dominion and control over the land and the peoples they encountered there, whether "lawless" Indians, "heathen" Africans, or "Popish" Roman Catholic colonial rivals. The law provided different models for national recovery, and the two colonization ventures that began England's overseas empire – Virginia and Massachusetts Bay – took skillful advantage of the opportunities it offered; they self-consciously departed in many particulars from the law of the central courts at Westminster in their efforts to use law as an instrument to define their rights and secure their interests according to their particular goals.

This process had proceeded for two generations before war and political and economic revolution produced another, third, colonial moment – the creation and expansion of a seaborne commercial empire sustained in part by massive migration from diverse European origins into the new colonial ventures of the mid-Atlantic. There, English law had to accommodate the vestiges of prior colonial efforts, as well as a burgeoning population who accepted the authority of that law only with reluctance and who often greeted it with defiance.

Once underway in the seventeenth century, the process of regional differentiation continued apace in the next, shaped not only by the contingencies of the historical moments that had launched them but also by succeeding self-definitions – as settler societies developing in a hostile environment, as colonists joining together in collective separation from England, and finally as members of politically and culturally distinct entities in a federal republic attempting to balance the sovereignties of state and union.

## I. THE DISCOVERY OF REGIONALISM IN EARLY AMERICAN LAW

Anyone traveling in Britain's North American colonies would have been struck by the diversity of its peoples, who distinguished themselves from each other in so many ways, whether by religion or race or by place of birth or of residence. Those same colonial populations, however, gave comparatively little thought to what distinguished their own governmental institutions

Compendium_Cornell
Page 0380

# LECTURE XXXV.

### OF THE NATURE AND VARIOUS KINDS OF PERSONAL PROPERTY.

PERSONAL property usually consists of things temporary and movable, but includes all subjects of property not of a freehold nature, nor descendible to the heirs at law.(*a*)

The division of property into real and personal, or movable and immovable, is too obvious not to have existed in every system of municipal law. Except, however, in the term of prescription, the civil law scarcely made any difference in the regulation of real and personal property. But the jurisprudence of the middle ages was almost entirely occupied with the government of real estates,

---

(*a*) It includes not only every thing movable and tangible which can be the subject of property, but may include things quasi-movable, as tenants' fixtures, and quasi-tangible, as choses in action. Spontaneous productions and fruits of the earth while ungathered, are considered as belonging to the freehold, and descend to the heir. Com. Dig. tit. Biens, H. 3; but they are liable to distress for rent and on execution as chattels. See *infra*, iii. 477, 479. The products of annual planting and cultivation, or the *fructus industriæ*, as, for instance, a growing crop, are also so far deemed personal property that they may be distrained or sold by the owner, or taken on execution as such. Craddock *v.* Riddlesbarger, 2 Dana (Ky.), 206, 207. *Vide infra*, iv. 467, 468, as to the rule on that subject between vendor and vendee. Shares in bank and other corporations, with a capital apportioned in shares assignable for public accommodation, but holding real estate, are, nevertheless, personal property, and this is the general doctrine of American law. Hilliard's Abr. c. 1, sec. 18, and cases in Massachusetts, Rhode Island, North Carolina, and Ohio, are cited to show it. They were so made by statute in Connecticut, in 1818, though in Kentucky they have been adjudged to be real estate, as, see *infra*, iii. 459, n. And so they were in Connecticut, prior to the statute of that state, as, see Welles *v.* Cowles, 2 Conn. 567. In England, shares in companies acting on land exclusively, as railroad, canal, and turnpike companies, are held to be real estate. Drybutter *v.* Bartholomew, 2 P. Wms. 127. Buckeridge *v.* Ingram, 2 Ves. Jr. 652. In this last case the vexed question was elaborately discussed, whether such an interest was real or personal estate. Shares in canals and railroads are said to be generally, though not always, personal property, and they are in England made personal by several acts of Parliament. Williams on the Principles of Real Property, int. ch. The American doctrine is the most convenient; and corporations of the nature alluded to are generally created with a declaration, in the charter, that the shares are to be regarded as personal estate.

[ 443 ]

Digitized by Google

# The Partisan Republic

*Democracy, Exclusion, and the Fall of the Founders'
Constitution, 1780s–1830s*

**GERALD LEONARD**

*Boston University*

**SAUL CORNELL**

*Fordham University*



Published online by Cambridge University Press

# CAMBRIDGE
## UNIVERSITY PRESS

University Printing House, Cambridge CB2 8BS, United Kingdom

One Liberty Plaza, 20th Floor, New York, NY 10006, USA

477 Williamstown Road, Port Melbourne, VIC 3207, Australia

314–321, 3rd Floor, Plot 3, Splendor Forum, Jasola District Centre, New Delhi – 110025, India

79 Anson Road, #06–04/06, Singapore 079906

Cambridge University Press is part of the University of Cambridge.

It furthers the University's mission by disseminating knowledge in the pursuit of
education, learning, and research at the highest international levels of excellence.

www.cambridge.org
Information on this title: www.cambridge.org/9781107024168
DOI: 10.1017/9781139161930

© Gerald Leonard and Saul Cornell 2019

This publication is in copyright. Subject to statutory exception
and to the provisions of relevant collective licensing agreements,
no reproduction of any part may take place without the written
permission of Cambridge University Press.

First published 2019

Printed and bound in Great Britain by Clays Ltd, Elcograf S.p.A.

*A catalogue record for this publication is available from the British Library.*

ISBN 978-1-107-02416-8 Hardback
ISBN 978-1-107-66389-3 Paperback

Cambridge University Press has no responsibility for the persistence or accuracy
of URLs for external or third-party internet websites referred to in this publication
and does not guarantee that any content on such websites is, or will remain,
accurate or appropriate.

Compendium_Cornell
Page 0383

# Introduction

In the more than 200 years since the ratification of the U.S. Constitution, it has become conventional wisdom that the Supreme Court has the last word on the meaning of that document. At the same time, the American people widely take for granted that the Constitution is a charter of democracy, liberty, and equality. Those who wrote and adopted the Constitution, however, actually took a dim view of democracy, and their notions of liberty and equality embraced overt racial and gender discrimination. Moreover, few of them anticipated that their new Supreme Court would assume the role of final arbiter of the Constitution's meaning. They did believe that the courts were essential to the preservation of law and justice, as against the lawless whims of popular majorities. But they doubted that the courts could preserve or give meaning to the Constitution independent of other political institutions.

The most farsighted among the founding generation, particularly James Madison, expected the meaning of the Constitution to develop through a political process that included the Supreme Court but would typically be led by the political branches of the federal government, the state governments, and the electorate. At its core, this political process was to be republican, not democratic. Madison and the Framers designed the Constitution deliberately to limit the operational influence of the people – "the democracy" – and instead sought to empower a national, political elite to give force and energy to a new central government. They created new governmental structures that would modify and refine the raw democratic will of the people, inhibit democratic control of office-holders, and prevent the emergence of durable political parties, perhaps

1

https://doi.org/10.1017/9781139161930.001 Published online by Cambridge University Press

Compendium_Cornell
Page 0384

the most essential institutions of American democracy as it later developed but anathema to the republican founders.

The founding generation's republican vision – that is, the vision of the propertied white males who monopolized political power and promulgated the Constitution – can be reduced without too much distortion to a handful of fundamental ideas. The founders meant to create a republic, not a democracy. That is, the people would be recognized as formally sovereign, but real governing power would lie in the hands of the educated, the affluent, those of wide reputation – in short, a "virtuous" elite who might be expected to put justice, law, and the good of their country ahead of their own interests, forbearing the temptations of faction and party. The founders further meant to preserve a well-regulated liberty, not only by relying on the virtue of officeholders, but also by balancing enhanced power at the center against a substantial measure of reserved power for the states. Moreover, the preservation of liberty in a confederated republic depended on limiting full political participation and legal personhood to propertied white men. The majority of the population – women, black Americans, the indigenous nations, the poor – would take positions decisively subordinate to that of propertied white men in the new constitutional structure.

No part of this vision, however, went uncontested. Subsequent decades brought challenges to the Framers' vision, especially in the name of democracy and states' rights. Proponents of democracy never accepted the Framers' republican vision, before or after ratification. Rather, democrats gradually reimagined party organization as an essential feature of the now-democratic Constitution, notwithstanding the antiparty intentions of the Framers. Indeed, the triumphant radicals of the Jackson era deemed democratic party organization superior to courts and the elitist traditions of the law in determining constitutional meaning. Champions of states' rights also launched a persistent struggle over the meaning of federalism, the balance of power between the federal government and the states. Advocates of consolidated, national power and of radical state autonomy defined the ends of a continuum, along which battles raged constantly in the name of establishing the true route to liberty. Finally, proponents of the rights of women, black Americans, and the so-called Indian[1] nations challenged aspects of the Framers' plan but especially the

---

[1] Although "Indian" is an obviously problematic label for the diverse nations that inhabited the land that was to become the United States, it was the common label used by Euro-Americans in this period and remains a widely used label today, even among many of the

https://doi.org/10.1017/9781139161930.001 Published online by Cambridge University Press

Compendium_Cornell
Page 0385

stark racism and chauvinism of the later democrats and states'-rights men. Periodically, they turned to the Constitution itself to advance their causes and principles, but the established authorities consistently found in that Constitution a charter of freedom for the white man alone.

Struggles along all of these dimensions played out over decades. Indeed, the story of what the Constitution became after ratification has no endpoint, although our narrative must: By the late 1830s, the republican vision of the founders had, in important ways, been turned on its head. The new Democratic Party had gained ascendancy by reading the Constitution as a fundamentally democratic, not republican, document, which belonged to the people rather than the courts. Joined with the party's notion of democracy was a commitment to strict construction of federal powers and fierce defense of states' rights. Yet this party of "the democracy" – so understood because its avowed purpose was to defend a populist constitutional order against a reinvented "aristocracy" of special interests – explicitly excluded all but white men from civic participation. If the white males of the founding generation had varied and fluid views of exactly how women, blacks, and Indians might fit into a republican hierarchy, the white male "democrats" of the 1830s starkly excluded all of these groups from their otherwise antihierarchical Constitution.

This book explains the Constitution's evolution from the putatively republican document of 1787 to a charter of democracy (of a sort) by the 1830s. It preserves courts and especially the Supreme Court as important shapers of that story, addressing the usual run of great cases in the constitutional history of the period. But it integrates judicial action into a much larger history of constitutional politics – in Congress, in presidential action, in the states, and in elections, political parties, newspapers, and the streets and fields. As the narrative seeks to demonstrate, this larger constitutional politics gave judicial action much of its meaning, as judicial action simultaneously informed that larger constitutional politics.

This book thus joins the important, traditional story of top-down constitutional development, centered on the Supreme Court, with a more modern, often bottom-up story. It draws on our own primary research and also synthesizes a generation of recent scholarship on the origins of judicial review, party formation, the plight of constitutional outsiders, and more. The result is a modern explanation of how diverse groups combined to supplant the founders' vision with a more "democratic"

descendants of those nations. So, while we often use "indigenous nations" or the like to describe these peoples, we also use "Indians."

Compendium_Cornell
Page 0386

understanding of the Constitution. This new democratic vision of constitutionalism, one bolstered by an expanded public sphere and an emerging
practice and theory of party politics, was premised on an exclusionary
understanding of citizenship that limited political access and legal personhood to white men. In short, this book suggests that a full understanding
of early American constitutional development requires a narrative that
places such figures as the Whiskey Rebels, the proto-feminist Judith
Sargent Murray, the African-American activist James Forten, and the
democratic party organizer Martin Van Buren in the same cast of characters as James Madison, Alexander Hamilton, and John Marshall.

The story's roots lie in the American Revolution and its challenge to
monarchy, aristocracy, and the legal omnipotence of Parliament. The
Revolution forced the American people to invent a government and
constitutional order that could preserve the people's sovereignty and
liberty without the familiar guideposts of hierarchical authority. Both
the facts on the ground and certain widely shared convictions dictated
that the new government would take the form of a confederation of states.
Only a confederation, it seemed, could protect the constituent republics
from aggression, foreign and domestic, while staying out of the internal
affairs of each member state. Each state would preserve its citizens'
liberties, as only modest-sized states could do, but would also be protected from the external threats that brought war, exaggerated military
authority, oppressive taxation, and consequent threats to liberty.

The Revolution seemed to vindicate the claim that confederation
would be an effective tool for the preservation of republican liberty. The
newly confederated United States won its war of independence without a
real national government but only an alliance among the states. The
Articles of Confederation thus persisted into the 1780s as the nation's
first constitution. But, as Chapter 1 of our story explains, its radically
decentralized structure came to seem a failure to many in the nation's
elite. These men bemoaned the excesses of democracy, the disregard for
law, and the anxious localism that crippled the nation in both foreign and
domestic affairs. The remedy was the new Constitution of 1787, which
was designed to deliver substantial power to the center, where it would
be wielded by an elite class putatively devoted to law rather than raw
democratic will. Yet, the framers of the Constitution also sought to retain
federalism and a limited sort of popular sovereignty. While trying to
maintain this delicate balance, the new Constitution made clear that
propertied white men were not yet prepared to grant civic equality to

https://doi.org/10.1017/9781139161930.001 Published online by Cambridge University Press

Compendium_Cornell
Page 0387

women, black Americans, Indians, and the poor. These other Americans,
constituting most of the population, would have distinctly subordinate
roles, if any roles at all, in the constitutional hierarchy of the new federal
republic. At the same time, the Founding and its immediate aftermath saw
just enough agitation for the rights of each of these groups to suggest the
possibility of a progressive expansion of rights under the Constitution
over time.

The Constitution was ratified soon enough, but not without strong
opposition from Anti-Federalists. There was little doubt that George
Washington would be the nation's first president, but many Anti-
Federalists stood ready to scrutinize the new administration's every step,
even as they acquiesced in the new Constitution. Thus, Washington and
his cabinet took the leading role in shaping the new government while
facing criticism and skepticism at nearly every turn. As Chapter 2
explains, President Washington's ambitious Secretary of the Treasury,
Alexander Hamilton, launched an energetic program for centralization
of power in the national government. Although Hamilton believed that
this Federalist program implemented the goals of the framers of the
Constitution, opposition soon formed among elites and middling
politicians, as well as democrats and populists. Representatives of mar-
ginalized groups also sought to carve out roles for themselves under the
Constitution but with little success. Gradually the opposition to the
Federalists coalesced under the Republican label and in 1800 delivered
Jefferson to the presidency in the name of states' rights and popular
sovereignty.

During the years of Federalist hegemony across the 1790s, the federal
courts played an auxiliary role in legitimating the Federalist reading of the
Constitution. After Thomas Jefferson's election in 1800, however, the
cause of Federalist constitutionalism fell chiefly to the Supreme Court
under Chief Justice John Marshall. Chapter 3 shows that Marshall's
Court not only defended capacious federal power, but, as important, used
the Court's opinions to promote a distinctively legalist understanding of
the Constitution. That is, in the face of rising movements for states' rights
and democratic control, the Court insisted that the judiciary was supreme
over the other branches and even over the sovereign people in interpreting
the Constitution. Moreover, according to Marshall, that document con-
stitutionalized judge-made, common law principles of contract and prop-
erty at the expense of the states' and the people's own understandings of
the public good. At every step, Marshall's legalist campaign provoked

Compendium_Cornell
Page 0388

resistance from the more-radical Republicans, who believed that the people – not the judges and not the common law – held the final and sovereign word on the meaning of the Constitution.

The Republicans, however, were never fully united. Although Jefferson's election in 1800 stood as important precedent for future efforts to organize a democratic party, the Republicans remained a loose movement comprising everything from radical democrats to "moderates" who were sometimes indistinguishable from Federalists. Chapter 4 shows how the Republicans in power after 1800 struggled to establish an alternative to Federalist constitutionalism. Under pressure from international crises, the Federalist judiciary, and a Federalist remnant in Congress and the states, the Jefferson Administration and subsequent Republican administrations actually expanded federal power in important respects. In so doing, they exacerbated the frustrations of the democrats and the firmest states'-rights men.

Chapter 5 begins the story of the democrats' breakthrough. After the War of 1812, the ascent of democratic culture did not mean the advent of universal equality but, instead, triumphant claims to the hegemony of the white man. The constitutionalism of the radical democrats came to dominate the Republican movement, gradually converting the movement into the Democratic Party and purging its more legalist and centralizing elements. As it did so, the democrats made clear that they read the Constitution not only as democratic but as white and, of course, male. The possibilities that many had seen in the Constitution for some measure of rights for black Americans, for women, and for the Indian nations virtually disappeared in the "democratic" reinvention of the Constitution.

Chapter 6 tells the story of Indian status under the Constitution, an important test case of the Marshall Court's resistance in the 1820s to the democratic, states'-rights reading of the Constitution. The climactic defeat of the Marshall Court occurred in 1832 when the Court tried to defend the residue of rights claimed by the Cherokee Nation against the aggressions of Georgia's people and government. In the teeth of a holding of the Supreme Court, President Andrew Jackson and the State of Georgia made clear that the Constitution and the laws would mean what the (white, male) people, not the Court, said they meant.

The story concludes with the creation and entrenchment of the Democratic Party by Martin Van Buren and other leaders of the democratic movement. This party would have been anathema to the framers of the Constitution and to nearly all of the ratifiers, both because of the simple fact that it was a permanently organized party and because it stood for a

https://doi.org/10.1017/9781139161930.001 Published online by Cambridge University Press

Compendium_Cornell
Page 0389

kind of radical democratic control and devolved federalism that seemed dangerously similar to the structure that had failed so miserably in the 1780s. For some of the founding generation, but certainly not for all, the horror of Van Buren's Democratic Party would also have included the starkness of its racism and its comprehensive exclusion of women, blacks, and Indians from any meaningful place in the constitutional order.

https://doi.org/10.1017/9781139161930.001 Published online by Cambridge University Press

Compendium_Cornell
Page 0390

436                                L I B

charge be true, the plaintiff has received no private injury, and hath no ground to demand a compensation for himself, whatever offence it may be againſt the public peace ; and therefore, upon a civil proſecution, the truth of the accuſation may be pleaded in bar of the action.  ſ Co. 125.  4 Black. 150.

LIBEL IN THE ECCLESIASTICAL COURT, is the declaration or charge drawn up in writing, on the part of the plaintiff ; unto which the defendant is obliged to anſwer.

LIBERAM LEGEM.  In the ancient trial by battel, if either party became recreant, or yielded and ſubmitted, he was condemned to loſe his *liberam legem* ; that is, to become infamous, and not be accounted *liber et legalis homo*, and never after to be put upon a jury, or admitted as a witneſs in any cauſe. 3 *Black.* 340.

LIBERTIES AND FRANCHISES : Theſe are ſynonymous terms, and their definition is a royal privilege, or branch of the king's prerogative, ſubſiſting in the hands of a ſubject.  The kinds of them are various, and almoſt infinite.  2 *Black.* 37.

LIBERTY, is a privilege held by grant or preſcription, by which men enjoy ſome benefit beyond the ordinary ſubject. But in a more general ſignification, it is ſaid to be " a power of doing whatever the laws permit."  In a ſtate of nature, liberty conſiſts in a power of acting as one thinks fit, without any reſtraint or controul, unleſs by the law of nature.  But man, when he enters into ſociety, finds it neceſſary to ſubmit to divers reſtrictions and regulations of his natural liberty, for the ſake of mutual aſſiſtance and defence.  And theſe reſtrictions and regulations are called human laws ; the obedience whereunto is infinitely more deſirable than that wild and ſavage liberty which is ſacrificed to obtain them.  Political or civil liberty, therefore, is no other than natural liberty, ſo far reſtrained by human laws (and no farther) as is neceſſary and expedient for the general advantage of the public.  Hence we may collect, that the law, which reſtrains a man from doing miſchief to his fellow-citizens, though it diminiſhes the natural, increaſes the civil liberty of mankind.  But every wanton and cauſeleſs reſtraint of the will of the ſubject, whether practiſed by a monarch, a nobility, or a popular aſſembly, are a degree of tyranny, and deſtructive of liberty.  In this kingdom, the idea and practice of political liberty hath been carried to very high perfection, and can only be loſt or deſtroyed by the folly or demerits of thoſe who are in poſſeſſion of it ; the legiſlature, and of courſe the laws of *England*, being peculiarly adapted to the preſervation of this ineſtimable bleſſing, even in the meaneſt ſubject.  Very different from the modern conſtitutions of other ſtates on the continent of *Europe* ; and from the general genius of the imperial law, which in general are calculated to veſt an arbitrary and deſpotic

L I B                                437

deſpotic power of controlling the actions of the ſubject, in the prince, or in a few grandees.  And this ſpirit of liberty is ſo deeply implanted in our conſtitution, and rooted even in our very ſoil, that a ſlave, or a negro, the very moment he lands in *England*, falls under the protection of the laws, and ſo far becomes a freeman ; though the maſter's right to his ſervice may poſſibly ſtill continue.

The abſolute rights of every Engliſhman (which, taken in a political and extenſive ſenſe, are uſually called their liberties), as they are founded on nature and reaſon, ſo they are co-eval with our form of government, though ſubject at times to fluctuate and change, their eſtabliſhment (excellent as it is) being ſtill human.  At ſome times, we have ſeen them depreſſed by overbearing and tyrannical princes ; at others, ſo luxuriant as to tend even to anarchy, which is a worſe ſtate than tyranny itſelf.  But the vigour of our free conſtitution hath always delivered the nation from theſe embarraſſments : and, as ſoon as the convulſions conſequent on the ſtruggle have been over, the balance of our rights and liberties hath ſettled to its proper level ; and their fundamental articles have been from time to time aſſerted in parliament, as often as they were thought to be in danger.

Firſt, by the great charter of liberties, which was obtained, ſword in hand, from king *John*, and afterwards, with ſome alterations, confirmed in parliament by his ſon king *Henry* the third ; which charter contained very few new grants ; but, as *Sir Edward Coke* obſerves, was for the moſt part declaratory of the principal grounds of the fundamental laws of *England*. Afterwards, by the ſtatute called *confirmatio chartarum*, whereby the great charter is directed to be allowed as the common law ; all judgments contrary to it are declared void ; and ſentence of excommunication to be denounced againſt all that by word, deed, or counſel, act contrary thereto, or in any degree infringe it.  Next, by a multitude of ſubſequent corroboratory ſtatutes *(Sir Edward Coke* reckons 32) from *Ed.* 1. to *Hen.* 4.  Then, after a long interval, by the *petition of right*, which was a parliamentary declaration of the liberties of the people, aſſented to by king *Charles* the firſt in the beginning of his reign ; which was cloſely followed by the ſtill more ample conceſſions made by that unhappy prince to his parliament, before the fatal rupture between them ; and by the many ſalutary laws, particularly the *habeas corpus* act, paſſed under *Charles* the ſecond. To theſe ſucceeded the *bill of rights*, or declaration delivered by the lords and commons to the prince and princeſs of *Orange*, *Feb.* 13, 1688, and afterwards enacted in parliament, when they became king and queen ; which declaration concludes in theſe remarkable words ; " and they do claim, demand, and " inſiſt upon all and ſingular the premiſes, as their undoubted " rights.

F f 3

438                                L I E

" rights and liberties."  And the act of parliament itſelf recognizes them to be the true, ancient, and indubitable rights of the people of this kingdom.  Laſtly, theſe liberties were again aſſerted at the commencement of the preſent century in the *act of ſettlement*, whereby the crown was limited to his preſent majeſty's illuſtrious houſe, and ſome new proviſions added for the better ſecuring our religion, laws, and liberties ; which the ſtatute declares to be " the birth-right of the people of *England*, " according to the ancient doctrine of the common law."  1 *Block.* 127.

LIBRATE, a quantity of land, containing four bovates of eſgangs ; which eſgangs were as much as one yoke of oxen could reaſonably cultivate in one year.

LICENCE, is a power or authority given to a man to do ſome lawful act ; and is a perſonal liberty to the party to whom given, which cannot be transferred over, unleſs it be made to a man and his aſſigns.  12 *Hen.* 7. 25.

There may be a parol licence, as well as by deed in writing ; but if it be not for a certain time, it paſſes no intereſt.  2 *Nelſ. Abr.* 1122.  And if there be no certain time in the licence, as if a man licenſe another to dig clay in his land, but doth not ſay for how long, the licence may be countermanded ; though if it be until ſuch a time, it cannot.  *Poph.* 151.

LICENTIA CONCORDANDI, is that licence for which the king's ſilver is paid on paſſing a fine.

LICENTIA SURGENDI, is a liberty or ſpace of time given by the court to a *tenant*, to *ariſe* out of his bed who is eſſoined upon account of ſickneſs *(de mala reſti)* in a real action ; and it is alſo the writ whereby the tenant obtaineth this liberty.  And the law in this caſe is, that the tenant may not ariſe or go out of his chamber, until he hath been viewed by knights thereto appointed, and hath a day aſſigned him to appear : the reaſon whereof is, that it may be known whether he cauſed himſelf to be eſſoined deceitfully or not ; and if the demandant can prove that he was ſeen abroad before the view or licence of the court, he ſhall be taken to be deceitfully eſſoined, and to have made default *Breſt. b.* 5.  *Flat*a. *b. 6. c.* 10.

LIEN, (a French word uſed in our law, and ſignifies *binding*. A *perſonal* lien is a bond or covenant which affects the *perſon* : a *real* lien binds the lands ; as a judgment, ſtatute, or recognizance.

LIEU, *locus*, place ; as where one thing is done in lieu, or in the place or ſtead of another.  So *lieu conuſt (cognitus)* is a place known and certain.  *Lieutenant*, *(locum tenens,)* a deputy, or one that ſupplies the place of another.

LIFE ESTATES :
1. Eſtates for life are of two kinds ; either ſuch as are created by the act of the parties, as by deed or grant ; or ſuch as

*New Histories of Gun Rights and Regulation:  Essays on the Place of Guns in American Law and Society* (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023) has not been provided on account of the book not having yet been published.

An Universal Etymological

# *E N G L I S H*

# DICTIONARY;

## COMPREHENDING

The Derivations of the Generality of Words in the *English* Tongue, either Ancient or Modern, from the Ancient *British*, *Saxon*, *Danish*, *Norman*, and Modern *French*, *Teutonick*, *Dutch*, *Spanish*, *Italian*; as also from the *Latin*, *Greek*, and *Hebrew* Languages, each in their proper Characters.

### AND ALSO

A brief and clear Explication of all difficult Words, derived from any of the aforesaid Languages, and Terms of Art, relating to ANATOMY, BOTANY, PHYSICK, PHARMACY, SURGERY, CHYMISTRY, PHILOSOPHY, DIVINITY, MATHEMATICKS, GRAMMAR, LOGICK, RHETORICK, MUSICK, HERALDRY, MARITIME AFFAIRS, MILITARY DISCIPLINE, HORSEMANSHIP, HUNTING, HAWKING, FOWLING, FISHING, GARDENING, HUSBANDRY, HANDICRAFTS, CONFECTIONARY, CARVING, COOKERY, &c.

### TOGETHER WITH

A large Collection and Explication of Words and Phrases used in our Ancient STATUTES, CHARTERS, WRITS, OLD RECORDS, and PROCESSES in Law; and the Etymology, and Interpretation of the Proper Names of MEN, WOMEN, and remarkable *Places* in *Great-Britain*: Also the DIALECTS of our different Countries.

Containing many Thousand Words more than either *Harris*, *Philips*, *Kersey*, or any *English* Dictionary before extant.

To which is added,

A Collection of our most common PROVERBS, with their Explication and Illustration.

The whole WORK compiled and methodically digested, as well for the Entertainment of the Curious, as the Information of the Ignorant; and for the Benefit of young Students, Artificers, Tradesmen, and Foreigners, who are desirous thoroughly to understand what they Speak, Read, or Write.

Twentieth Edition, with confiderable Improvements. 1763

By N. BAILEY, Φιλόλογος.

## *L O N D O N:*

Printed for T. Osborne, H. Woodfall, J. Beecroft, B. Dodd, W. Strahan, J. Hinton, John Rivington, R. Baldwin, W. Johnston, L. Hawes, W. Clarke, and R. Collins, J. Richardson, T. Longman, G. Keith, T. Caslon, S. Crowder, B. Law and Co. W. Fenner, P. Stevens, R. Withy, C. Henderson, A. and C. Corbett, R. and C. Ware, J. Coote, Z. Stuart, C. Rivington, and J. Hinxman. 1763.

[Price SIX SHILLINGS.]

## A B

Company, at first called *Abram*, High Father] the great Patriarch of the Nation of the *Jews*.

ABRAHAM's *Balm*, the Hemp-tree, a kind of Willow so called.

ABRAID [of Abɲeɓɪaɳ, or Abɲoƀeɳ, *Sax.*] awaked, raised up. *Chauc.*

A'BRAM [ אברם‎ *H. i. e.* High Father; of אב‎ a Father, and רום‎ High] the original Name of the Patriarch *Abraham*.

ABRAM *Cove*, naked or poor man. *Cant.*

ABRA'SION, a shaving off, a raising or crossing out.

ABRE'DE, abroad. *Chauc.*

To ABRE'DGE ⎱ to abridge, to shorten,
To ABREGGE ⎰ *Abbreger*, F. *Chauc.*

To ABRE'IDE ⎱ to start up, to awake,
To ABREYD ⎰ arise. *Chauc.*

ABRE'DING, upbraiding. *Chauc.*

ABRENUNCIATION, a renouncing or forsaking a Thing entirely. *L.*

ABRIG ⎱ [among *Chymists*] Sulphur.
ABRI'CK ⎰

To ABRIDG'E [ *abreger*, F.] to make shorter in Words, still retaining the Sense and Substance; also to restrain a Person from some Liberty, &c. before enjoyed.

To ABRIDGE [in *Common Law*] to make a Declaration or Count shorter, by leaving out Part of the Plaint or Demand, and praying the Defendant may answer to the other only.

AN ABRIDG'EMENT [*Abridgement*, F.] an Epitome, a short Account of a Book Writing, or Matter.

To AB'ROGATE [*abroger*, F. *abrogatum*, L.] to disannul, to abolish, to take away; to repeal or make void a Law which was before in Force.

ABROGA'TION, the Act of Repealing, &c. F. of L.

ABRUPT' [*abruptus*, L.] broken off, on a sudden, hasty, rough, unseasonable.

AB'SALOM [ אבשלום‎ *H. i. e.* the Father's Peace, of שלום‎ a Father, and שלום‎ Peace] King *David*'s rebellious Son.

AB'SALONISM, the Practice of Rebellion against a Father.

AB'SCESS ⎱ [*Abscès*, F. *Abscessus*, L.] an
AB'SCESSE ⎰ Ulceration arising in any Part of the Body, and tending to Suppuration; the same with Imposthume.

ABCES'SION, a going away. *L.*

ABCIS'SÆ [ in *Conic Sections* ] are the Parts of the Axis cut off by the Ordinates.

ABSCIS'SION, a cutting off. *L.*

ABSCISSION [ in *Astrology* ] is when three Planets being within the Bounds of their Orbs, and in different Degrees of the Sign, the third comes to a Conjunction with the middle Planet, and cuts off the Light of the first.

To ABSCOND' [*abscondere*, L.] to conceal or hide one's self.

## A B

ABSCON'SION, an hiding. *L.*

AB'SENT [*absens*, L.] not present, out of the Way, missing. *F.*

ABSENTA'NEOUS [*absentaneus*, L.] done in Absence, pertaining to Absence.

AB'SIS ⎱ [of *A, B, C,*] Alphabets of Let-
AP'SIS ⎰ ters to be learned; Horn-Books, Primers, &c.

AB'SIS ⎱ ['Aψɩς, Gr.] the bowed or arched
AP'SIS ⎰ Roof of an Oven, Room, House, &c. the Ring or Compass of a Wheel : Also a Term used by *Astronomers*, when the Planets moving to their Apogæum or Perigæum are at a stay.

ABSOLU', absolved. *F.*

ABSOL'VATORY [*absolutoire*, F. of *absolutorius*, L.] belonging to a Pardon or Acquittal.

To ABSOLV'E [*absolvere*, L.] to acquit or discharge of an Accusation or Crime laid against one. *L.*

ABSOLUTE [*absolu*, F. of *absolutus*, L.] free from the Power of another; that has Perfection in itself, arbitrary, unlimited.

ABSOLUTE *Equation* [in *Astronomy*] are the Sums of the Eccentrick and Optic Equations.

ABSOLUTE *Estate* [*Law Term*] is one free of all manner of Incumbrances and Conditions.

ABSOLUTE *Gravity* [among *Philosophers*] is that Property in Bodies by which they are said to weigh so much, without any regard to any Circumstances of Modification, and is always as the Quantity of Matter therein contained.

An ABSOLUTE *Number* [in an *Algebraick Equation*] is that which possesseth one entire Part or Side of the Equation, and is always a known Quantity.

ABSOLUTE *Space* is that which, considered in its own Nature, without regard to any outward Thing, always continues the same, and is immoveable.

AB'SOLUTELY [ *absolument*, F. of *absolute*, L.] after an absolute Manner, as the Terms of a Proposition are said to be taken absolutely, *i. e.* without relation to any thing else. Sometimes it is used in opposition to Terms and Conditions ; as, *God does not forgive Men absolutely, but upon Condition of Repentance and Amendment.*

ABSOLU'TION, a Pardoning, Remission or Forgiveness of Sins pronounced by a Priest. F. of L.

AB'SONANT [ *absonans*, L. ] properly sounding harsh, disagreeing from the Purpose, absurd.

AB'SONOUS [*absonus*, L.] the same as *Absonant*.

ABSONIA'RE [ *Old Record* ] to shun, avoid, detest.

To ABSORB' [ *absorber*, F. *absorbere*, L.] to swallow up, to waste or consume.

ABSORB'-

# IN

**INFLEX'IBLENESS,** ⸜ Obſtinacy, Stiff-
**INFLEXIBIL'ITY,** ⸝ neſs, an inflexi-
ble Humour. *F.* of *L.*

**INFLEXI'BLE** [*inflexibilis,* I.. i. e. *non flexibilis*] which cannot be bended or bowed ; nor to be prevailed upon or perſuaded.

**INFLEX'ION,** a Bending, Turning, Winding. *L.*

To **INFLICT'** [*infligor,* F. *inflictum,* L. q. d. *fligere in*] to daſh or ſtrike againſt, to lay a Puniſhment upon.

**INFLIC'TION,** a laying a Puniſhment upon, a Smiting. *L.*

**IN FLUENCE** [*influentia,* L.] a flowing into, a ſending forth Power or Virtue; the Power of a Superior over an Inferior.

To **IN FLUENCE** [*influer,* F.] to ſway, or have Power over.

**IN'FLUENT** [*influens,* L.] flowing into.

**IN'FLUENT** *Juices* [among *Phyſicians*] Juices of a human Body, that by the Contrivance of Nature, and Laws of Circulation, fall into another Current or Receptacle ; as the *Bile* to the *Gall-Bladder,* &c.

**INFLUEN'TIAL,** influencing, or bearing Sway.

**IN'FLUX** [*influxus,* L.] a flowing, or running into.

To **INFOLD'** [of *in* and ꝼealoan, *Sax.* einꝼalten, Teut.] to fold or wrap up.

To **INFORC'E** [*enforcer,* F.] to prevail upon by Force of Argument, to ſtrengthen.

**INFORCEMENT,** a Compulſion, or Conſtraint. *F.*

To **INFORM'** [*informer,* F. *informare,* L. q. d. *in formam ducere*] to give notice, to tell, to teach, inſtruct, or make acquainted with.

**INFORM'** [ *informis,* L. ] miſ-ſhapen, without Form.

*In* **FORMA** *Pauperis* [*Law Phraſe*] is having Clerks and Counſel aſſigned without Fees, upon Affidavit made, that, the Suitor's Debts being paid, he is not worth five Pounds. *L.*

**INFORMA'TION,** a making known, Telling, Advice, Inſtruction ; an Accuſation or Charge brought againſt one. *L.*

**INFORMA'TUS** *non ſum* [ i. e. I am not informed] a formal Anſwer made in Court by an Attorney, when he has no more to ſay in defence of his Client. *L. T.*

**INFORM'ED** *Stars* [in *Aſtronomy*] are ſuch of the fixed Stars as are caſt into, or ranged under, any Form.

**INFORM'ER,** one who informs in a Court of Judicature, or before a Magiſtrate, againſt ſuch as tranſgreſs the Law.

**INFORM'OUS** [*informe,* F. *informis,* L.] without Form, Shape, or Faſhion.

**INFOR'TUNATE** [*infortuné,* F. of *infortunatus,* L. i. e. *non fortunatus*] unhappy, unlucky.

**INFOR'TUNE,** Misfortune. *Chauc.*

**INFOR'TUNES** [in *Aſtrology*] Saturn

and *Mars,* ſo called, becauſe of their unfortunate Influences.

**INFORTUNID** [*infortunatus,* L.] unfortunate. *Chauc.*

To **INFRAN'CHISE** [ of *franc,* F. *france,* Ital. free] to make a Freeman or Denizen ; to incorporate into a Society or Body Politick.

**INFRANCHISE'MENT,** infranchiſing, ſetting free, Diſcharge, Releaſe.

**INFRA** *Scopularis Muſculus* [in *Anatomy*] a Muſcle of the Arm, which ariſes from the lower Part of the *Scopula.* L.

**INFRA** *Spinatus Muſculus* [in *Anatomy*] a Muſcle of the Arm placed below the *Spina.* L.

**INFRAC'TION,** a breaking in. *L.*

**INFRAN'GIBLE** [*infrangibilis,* L.] not to be broken, durable, ſtrong.

**INFRE'QUENT** [*infrequens,* L.] that ſeldom happens, rare, uncommon, *F.*

**INFRICA'TION,** ⸜ a rubbing or cha-
**INFRIC'TION,** ⸝ fing. *L.*

To **INFRING'E** [*infringere,* L. q. d. *to break in upon*] to break a Law, Cuſtom, or Privilege.

**INFRING'MENT,** ſuch Violation, Breach, &c.

**INFRUGIF'EROUS** [*infrugiferus,* L.] not bearing Fruit.

**INFUCA'TION,** a painting of the Face, a colouring or diſguiſing. *L.*

**INFUMA'TION,** a drying in Smoak. *L.*

**INFUNDIBULIFOR'MES** [among *Botaniſts*] any Flowers ſhaued like a Funnel.

**INFUNDIBULUM** *Cerebri* [in *Anatomy*] the Brain Tunnel, a hollow Place in the Root of the Brain, through which ſerous Humours are diſcharged. *L.*

**INFUNDIB'ULUM** *Renum* [in *Anatomy*] the Baſon through which the Urine paſſes to the Ureters and Bladder. *L.*

**INFU'RIATE** [of *in* and *furiatus,* L.] ſtark mad or recovered from Madneſs.

To **INFUS'CATE** [*infuſcatum,* L.] to make dark or duſky.

**INFUSCA'TION,** a making dark or duſky. *L.*

To **INFUSE** [*infuſer* F. of *infuſum, Sup.* L. i. e. *fundere in*] to pour in or into, to ſoak or ſteep, to endue with, or inſpire.

**INFU'SION,** a pouring in. *F.* of *L.*

**INFU'SION** [in *Pharmacy*] a ſteeping of Drugs, Leaves, Roots, &c. in ſome Liquor, in order to get out their Virtue.

*An* **ING** [Ing, *Dan.*] a Meadow or low Ground, a Common. *Lincolnſhire.*

To **INGEMI'NATE** [*ingeminatum,* L.] to double or repeat often.

**INGEM'INATED** *Flowers* [among *Floriſts*] is when one Flower grows out of another.

**INGEMINA'TION,** a Doubling or Repeating.

L l l                                             To

LIBRARY
HASTINGS COLLEGE OF LAW

# The Fourteenth Amendment

*From Political Principle to Judicial Doctrine*

William E. Nelson

Harvard University Press
Cambridge, Massachusetts
London, England
1988

Compendium_Cornell
Page 0396

*KF4757*
*N45*
*1988*

Copyright © 1988 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America
10  9  8  7  6  5  4  3  2  1

This book is printed on acid-free paper, and its binding materials have been chosen for strength and durability.

*Library of Congress Cataloging-in-Publication Data*

Nelson, William E., 1940–
  The Fourteenth Amendment: from political principle to judicial doctrine / William E. Nelson.
    p. cm.
  Bibliography: p.
  Includes index.
    1. United States—Constitutional law—Amendments—14th—History.
2. Civil rights—United States—History.   3. Equality before the
law—United States—History.   I. Title.
KF4757.N45 1988
342.73'085—dc19
[347.30285]                                   87–35226
    ISBN 0–674–31625–8 (alk. paper)          CIP

*To Greg*

> legislative, and the judicial branches of these governments are all
> of limited and defined powers.
>     There are limitations on such power which grow out of the
> essential nature of all free governments. Implied reservations of
> individual rights, without which the social compact could not
> exist, and which are respected by all governments entitled to the
> name. No court, for instance, would hesitate to declare void a
> statute which enacted that A. and B. who were husband and wife
> to each other should be so no longer, but that A. should
> thereafter be the husband of C., and B. the wife of D. Or which
> should enact that the homestead now owned by A. should no
> longer be his, but should henceforth be the property of B.[98]

How can Justice Miller's opinion in *Loan Association* be squared
with *Slaughter-House?* Why would the justice strike down a state
legislative act on such broad grounds after refusing, merely two years
earlier, to read any significant content into section one of the
Fourteenth Amendment? Miller gave his answer in the 1878 case of
*Davidson* v. *New Orleans*,[99] where he complained about the "strange
misconception" held by many lawyers about "the scope" of section
one. "[I]t would seem," he continued, "from the character of many of
the cases before us, and the arguments made in them, that the clause
under consideration is looked upon as a means of bringing to the test
of the decision of this court the abstract opinions of every unsuccessful
litigant in a State court." Litigants, according to Miller, were urging
the Supreme Court to apply "principles of general constitutional
law." According to Miller, the Court "could take jurisdiction" of
those general principles only when "sitting in review of a Circuit
Court of the United States, as we were in *Loan Association* v.
*Topeka*," but not when it was sitting in review of a state court
judgment.[100] In the latter sort of case, the Court was limited to what
he believed to be the narrow grounds of review spelled out in the
Fourteenth Amendment.

It is not clear whether a majority of the Court agreed with Miller's
distinction in *Davidson* between diversity cases, where under the rule
of *Swift* v. *Tyson*[101] the Court could apply expansive constitutional
rules, and federal question cases, where it was bound to read the
Fourteenth Amendment narrowly. Nor is it clear that such a distinc-
tion makes sense. It is by no means a prescription for minimizing
federal intervention in state affairs: the diversity clause has been and
can be productive of extensive litigation and, if a rule like *Swift* is

applied, of extensive lawmaking on the part of the federal courts. The
question raised by the *Davidson* distinction is on whose behalf federal
lawmaking will take place. If the Fourteenth Amendment is read
broadly and the diversity power construed narrowly, citizens within a
state who lack power to influence legislative proceedings will be able
to turn to the federal courts and to federal law for relief. If, on the
other hand, the diversity power is read broadly and the amendment
narrowly, those residing outside the state will be able to obtain
federal relief. While Miller's approach was quite consistent with
antebellum patterns of federalism, it diverged sharply from the values
of Reconstruction political leaders. Miller's approach was also not
what the future would find attractive: in the century since *Slaughter-
House*, *Loan Association*, and *Davidson*, the federal courts have
placed increased emphasis on protection of rights derived from
federal law, especially from the Fourteenth Amendment, and have
deemphasized the diversity jurisdiction. Although Miller's colleagues
were, on the whole, prepared to concur in his broad reading of federal
lawmaking authority in diversity cases, they would soon prove
unwilling to read the Fourteenth Amendment as narrowly as he
would have done.

Two years after it had decided *Loan Association* v. *Topeka*, the
Court adopted the essence of Justice Field's *Slaughter-House* dissent in
*Munn* v. *Illinois*,[102] which upheld the constitutionality of Illinois leg-
islation fixing maximum rates for storage of grain. In an opinion for a
seven-man majority, the Chief Justice began with the obvious point,
one frequently made during the Reconstruction debates, that when a
person "becomes a member of society, he necessarily parts with some
rights or privileges." In particular, an individual entering society sur-
rendered to government power to regulate "the conduct of its citizens
one towards another, and the manner in which each shall use his own
property, when such regulation becomes necessary for the public
good." When a person devoted his property to a use that "affect[ed] the
community at large," he had to "submit to be controlled by the public
for the common good, to the extent of the interest he has thus
created."[103] Chief Justice Waite reasoned that the price charged for
storage of grain in Chicago's grain elevators affected the community
and could therefore be regulated for the common good.

The central assumption of the Chief Justice, which he derived from
Justice Field's *Slaughter-House* opinion rather than from Justice

Compendium_Cornell
Page 0398

Miller's, was that the Court had jurisdiction under the Fourteenth Amendment to protect property rights. The Chief Justice also agreed with Field that the right to property was limited by the police power— the power, as Justice Bradley had defined it, to preserve "the public health" and "the public order."[104] The thrust of the Chief Justice's opinion in *Munn* was that property could not be regulated in the interest of a few individuals, but only in the interest of the general public. Although Waite did not explicitly so state, his view appeared to agree with the one Justice Field had taken in *Slaughter-House*: that unequal legislation granting special privileges to a few was unconstitutional; on the other hand, legislation which drew distinctions between people in order to accomplish some vision of the common good would be constitutional.

The Chief Justice's opinion in *Munn*, adopting the reasoning of the *Slaughter-House* dissent, was joined by four members of the *Slaughter-House* majority, including the author of the majority opinion, Justice Samuel Miller. Although Miller retained his view that "[t]he Fourteenth Amendment did not radically change the whole theory of the relations of the State and Federal Governments to each other"[105] and "was not designed to interfere with the power of a State to protect the lives, liberty, and property of its citizens,"[106] he abandoned his *Slaughter-House* dicta that the amendment protected only rights created by federal law or was of benefit only to blacks. Miller ultimately accepted the position of the *Slaughter-House* dissenters that section one requires that state "laws operate on all alike, and . . . not subject the individual to an arbitrary exercise of the powers of government."[107] While Miller claimed that " [t]he duty of protecting all its citizens in the enjoyment of an equality of rights" remained with the states, he came around to the dissenters' view that the Fourteenth Amendment created an "obligation resting upon the United States . . . to see that the States do not deny the right."[108] This was precisely what the Court had declared the term before *Munn* in *United States* v. *Cruikshank*.[109]

Two dissenters in *Slaughter-House*—Justices Bradley and Swayne —also joined the *Munn* majority, which had accepted their core views about the scope and meaning of section one. But Justice Field did not. Although the Court in *Munn* had accepted his basic analysis of the Fourteenth Amendment's first section, it was applying the analysis differently, and he refused to join in the application.

Field dissented particularly from the portion of the Chief Justice's opinion that permitted regulation of any property devoted to a use that affected the public interest. Field observed:

> If this be sound law. . . , all property and all business in the State are held at the mercy of a majority of its legislature. The public has no greater interest in the use of buildings for the storage of grain than it has in the use of buildings for the residences of families, nor, indeed, anything like so great an interest; and, according to the doctrine announced, the legislature may fix the rent of all tenements used for residences. . . . The public is interested in the manufacture of cotton, woollen, and silken fabrics, in the construction of machinery, in the printing and publication of books and periodicals, and in the making of utensils of every variety, useful and ornamental; indeed, there is hardly an enterprise or business engaging the attention and labor of any considerable portion of the community, in which the public has not an interest in the sense in which that term is used by the court in its opinion. . . .
>
> [T]he doctrine of this court, that, whenever one's property is used in such a manner as to affect the community at large, it becomes by that fact clothed with a public interest, and ceases to be *juris privati* only, appear[s] to me to destroy, for all useful purposes, the efficacy of the constitutional guaranty. . . .
>
> No reason can be assigned to justify legislation interfering with the legitimate profits of that business (i.e., storage of grain), that would not equally justify an intermeddling with the business of every man in the community, so soon, at least, as his business became generally useful.[110]

Field was not as far apart from the majority of the Court, however, as his language may to some suggest. The only issue that divided Field from Waite was whether grain elevators constituted a special industry that could be subjected to burdensome regulations to which other industries were not subjected. Field's point, which seems well taken, was that the majority's test was insufficient to differentiate the grain elevator business from any other business. But, like the majority, Field was prepared to recognize that states possessed a broad police power to "control the use and possession of . . . property, so far as may be necessary for the protection of the rights of others, and to secure them the equal use and enjoyment of their property." As he further explained:

> It is true that the legislation which secures to all protection in their rights, and the equal use and enjoyment of their property, embraces an almost infinite variety of subjects. Whatever affects

# Common Law, History, and Democracy in America, 1790–1900

## Legal Thought before Modernism

**KUNAL M. PARKER**

*University of Miami School of Law*





CAMBRIDGE UNIVERSITY PRESS
Cambridge, New York, Melbourne, Madrid, Cape Town,
Singapore, São Paulo, Delhi, Tokyo, Mexico City

Cambridge University Press
32 Avenue of the Americas, New York, NY 10013-2473, USA

www.cambridge.org
Information on this title: www.cambridge.org/9780521519953

© Kunal M. Parker 2011

This publication is in copyright. Subject to statutory exception
and to the provisions of relevant collective licensing agreements,
no reproduction of any part may take place without the written
permission of Cambridge University Press.

First published 2011

Printed in the United States of America

*A catalog record for this publication is available from the British Library*

*Library of Congress Cataloging in Publication data*
Parker, Kunal Madhukar, 1968–
Common law, history, and democracy in America, 1790–1900 :
legal thought before modernism/Kunal M. Parker.
p.   cm.
(Cambridge historical studies in American law and society)
Includes bibliographical references and index.
ISBN 978-0-521-51995-3 (hardback)
1. Common law–United States–History.   2. Justice, Administration of–History.
3. Progressivism (United States politics)–History.   4. United States–Politics and
government–19th century.   I. Title.   II. Series.
KF395.P37   2011
340.5'70973–dc22      2010037104

ISBN 978-0-521-51995-3 Hardback

Cambridge University Press has no responsibility for the persistence or accuracy of URLS
for external or third-party Internet Web sites referred to in this publication and does not
guarantee that any content on such Web sites is, or will remain, accurate or appropriate.

Compendium_Cornell
Page 0401

strand of Augustan historical thought often seen as a simple extension of
seventeenth-century common law thinking on the subject of England's
"ancient constitution." I focus on the writings of the Tory polemicist
Henry St. John, Viscount Bolingbroke (1678–1751). Even though he
was a Tory, Bolingbroke would be claimed by writers in the Whig tradi-
tion. As Isaac Kramnick has observed, what is unique about the conflict
between the Tory Bolingbroke and the Whig Walpole is that "the cham-
pion of the Tory opposition … wrapped himself in the noble flag of
Whiggery and covered the Whig Walpole with the ignominious standard
of Toryism." "In their attitudes to English history," Kramnick argues,
"Bolingbroke was the true disciple of Coke and Sydney while Walpole
was the follower of the Royalist Tory Dr. Robert Brady."[35]

In the political and economic restructuring that followed 1688, fears
and threats that virtue would be overwhelmed by corruption seemed
greater than ever. While the formal post-1688 constitutional structure
remained in place, the rise of commerce, the extreme corruption of the
Walpole ministry, and what was perceived as the *sub rosa* increase in the
power of the Crown made it important to delve *beneath* the surface of
laws to get to the truth of things. For Bolingbroke, this was done through
the idea of "spirit." Accordingly, he distinguished sharply between actu-
ally existing law and the "spirit" underlying law. The actually existing
formal legal structure could not give itself its own meaning. That mean-
ing must come from "spirit" alone. "Spirit" would serve, in other words,
as the basis for judging existing politicolegal arrangements, including
Britain's eighteenth-century common law constitution.

The long sweep of history, for Bolingbroke, was a dance between
the antagonistic "spirits" of liberty and faction. This was a Manichaean
struggle. As Bolingbroke put it in his "Remarks on the History of
England" (1730), "[I]t will remain eternally true, that the spirit of liberty
and the spirit of faction are not only different, but repugnant and incom-
patible: so that the life of either is the death of the other."[36] Accordingly,
Bolingbroke marches through the reigns of various monarchs, endorsing
one and condemning the other, depending on how favorably disposed

[35] Isaac Kramnick, "Augustan Politics and English Historiography: The Debate on the
English Past, 1730–35," *History and Theory* 6, No. 1 (1967): 33–56, at 33–34. The
secondary literature on Bolingbroke is vast. The reader is referred to David Armitage's
excellent bibliographic essay in Bolingbroke, *Political Writings* (David Armitage, ed.)
(Cambridge: Cambridge University Press, 1997).

[36] Bolingbroke, *Remarks on the History of England*, Letter 2, in *Historical Writings* (Isaac
Kramnick, ed.) (Chicago: University of Chicago Press, 1972), p. 167.

Compendium_Cornell
Page 0402

they were to the "spirit" of liberty.[37] The "spirit" of liberty had won in 1688: "[O]ur ancestors, by keeping this spirit alive and warm, regained [by 1688] all the advantages of a free government, though a foreign invasion had destroyed them, in great measure, and had imposed a very tyrannical yoke on the nation."[38] But the dangers attending the rise of commerce had reinvigorated the "spirit" of faction all over again.

Even though it was possible to thematize history as a struggle between the antagonistic "spirits" of liberty and faction, the difficulty was that it was not easy, especially in Bolingbroke's own day, when the constitutional structure of 1688 remained intact, to distinguish between them. Thus Bolingbroke could write, "[V]irtue and vice are too often confounded, and what belongs to one is ascribed to the other."[39] This was because faction too often treacherously assumed the garb of liberty.[40] The *sub rosa* increase in the power of the Crown and the rise of corruption following the Glorious Revolution, even though it left the formal constitutional structure intact, "bring[s] our liberties, by a natural and necessary progression, into *more real, though less apparent danger*, than they were in before the revolution."[41]

Scholars have long noted a contradiction in Bolingbroke's thought.[42] And it is to this contradiction that I turn. On the one hand, Bolingbroke participated actively in a debate with the Walpole press over England's "ancient constitution." This debate, Isaac Kramnick has suggested, was a reprise of the late-seventeenth-century debate about the origins of Parliament. The debate was played out actively, with Bolingbroke's *Craftsman* adopting the Whig interpretation and the Walpole press advancing the Tory one.[43] At times, in his writings on the "ancient constitution," Bolingbroke strikes a distinctly common lawyerly note. England's

---

[37] For example, in *Remarks on the History of England*, we are told of the reign of Henry IV: "A spirit of liberty breathes in the laws of this glorious king; and the power and duty of parliaments are set forth, in some of them, with such terms as would never have been passed by a prince who had put the least pedantry, or the least foppery, into his notions of kingship" (Letter 5, p. 183).

[38] Ibid.," Letter 4, p. 181.

[39] Bolingbroke, *Letters on the Study and Use of History*, Letter 2, in *Historical Writings*, p. 16.

[40] Bolingbroke, *Remarks on the History of England*, Letter 2, p. 169. Elsewhere, Bolingbroke writes, "These men insinuate themselves as friends to liberty … and yet they are almost wholly employed in promoting that which is destructive of liberty, and inconsistent with it, corruption and dependency." Ibid., Letter 7, p. 200.

[41] Bolingbroke, *Letters on the Study and Use of History*, Letter 2, p. 20 (emphasis added).

[42] For a discussion of this contradiction and of Bolingbroke's historical skepticism, see Isaac Kramnick, "Editor's Introduction," in *Historical Writings*.

[43] For an account of this debate, see Kramnick, "Augustan Politics and English Historiography," pp. 40–46.

"ancient constitution" appears "immemorial," seems to be possessed of identity over time. Thus, Bolingbroke states that the Saxon heterotoges, or "public generals," who conquered Britain became kings, "but the supreme power centered in the micklemote, or wittagenmote, composed of the king, the lords, and the Saxon freemen, that original sketch of a British parliament."[44] He continues, "The rights of the people in those days, must have been carried to a very great height…. The principles of the Saxon commonwealth were therefore very democratical; and these principles prevailed through all subsequent changes."[45] At other points, sounding rather more like Sir Matthew Hale, he describes the "ancient constitution" as one built up by slow accretions over time, in the manner of the common law generally: "Thus was the present constitution of our government forming itself for about two centuries and a half; a rough building raised out of the demolitions which the Normans had made, and upon the solid foundations laid by the Saxons."[46]

On the other hand, Bolingbroke also operates with a sharp sense of historical period, one that is utterly at odds with seventeenth-century understandings of the "ancient constitution" and its identity over time. In the *Letters on the Study and Use of History*, Bolingbroke devotes considerable attention to describing what we might recognize as a historical period:

A new situation, different from the former, begets new interests in the same proportion of difference; not in this or that particular state alone, but in all those that are concerned by vicinity or other relations, as I said just now, in one general system of policy. New interests beget new maxims of government, and new methods of conduct. These, in their turns, beget new manners, new habits, new customs. The longer this new constitution of affairs continues, the more will this difference increase: and although some analogy may remain long between what preceded and what succeeds such a period, yet will this analogy soon become an object of mere curiosity, not of profitable inquiry. Such a period therefore is, in the true sense of the words, an epocha or an era, a point of time at which you stop, or from which you reckon forward.[47]

A "new situation," "new interests," "new maxims of government," "new methods of conduct," "new manners," "new habits," and "new customs": all of these produce an unbridgeable break with the past, mark the point at which one stops or from which one goes forward. For his own European contemporaries, Bolingbroke argues, striking a neo-Harringtonian note,

44 Bolingbroke, *Remarks on the History of England*, Letter 4, p. 178.
45 Ibid.
46 Ibid., p. 180.
47 Bolingbroke, *Letters on the Study and Use of History*, Letter 6, p. 82.

this new period begins with the end of feudalism at the close of the fifteenth
century:

> The end of the fifteenth century seems to be just such a period as I have been
> describing, for those who live in the eighteenth, and who inhabit the western
> parts of Europe. A little before, or a little after this point of time, all those events
> happened, and all those revolutions began, that have produced so vast a change in
> the manners, customs, and interests of particular nations, and in the whole policy,
> ecclesiastical and civil, of these parts of the world.[48]

In England, this period begins with the reigns of Henry VII and
Henry VIII and the loss of power, prestige, and property by the nobility
and the church: "It is from this time that we ought to study the history
of our country, … with the utmost application. *We are not much con-
cerned to know with critical accuracy what were the ancient forms of
our parliaments*, concerning which, however, there is little room for dis-
pute from the reign of Henry the Third at least; nor in short the whole
system of our civil constitution before Henry the Seventh, and of our
ecclesiastical constitution before Henry the Eighth."[49] England's long
feudal past has ended; a commercial era has begun. This is an odd asser-
tion, to be sure, by a proponent of the "ancient constitution." It is safe
to say that neither Coke nor Hale would have written quite this way.

How do we account for this seeming contradiction, an insistence on
a species of continuity (in the form of the temporality of "immemori-
ality" associated with the "ancient constitution") and an insistence on
a species of temporal difference (the sense of a new period that makes
everything before 1500 more or less irrelevant for eighteenth-century
Europeans living in the age of commerce)? I want to suggest that it is
precisely Bolingbroke's distinction between actually existing law and
"spirit" that matters here. It is the "spirit" of the "ancient constitution,"
abstracted from the actual details of early English constitutional struc-
tures, that remains constant even as Bolingbroke recognizes that histori-
cal periods differ radically from one another, that the feudal has ended
and the commercial has begun. Only insofar as it is rendered "spirit" can
the "ancient constitution" survive the transformations of history, which
Bolingbroke recognizes.

[48] Ibid., p. 83.
[49] Ibid., p. 90 (emphasis added). The same is true of France: "In a word, the constitution is
so altered, that any knowledge we can acquire about it, in the history that precedes this
period, will serve to little purpose in our study of the history that follows it, and to less
purpose still in assisting us to judge of what passes in the present age" (p. 88).



RANDOLPH ROTH

# American Homicide

THE BELKNAP PRESS OF
HARVARD UNIVERSITY PRESS
Cambridge, Massachusetts
London, England
2009

Compendium_Cornell
Page 0406



Copyright © 2009 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America

*Library of Congress Cataloging-in-Publication Data*

Roth, Randolph, 1951–
  American homicide / Randolph Roth.
    p.   cm.
  Includes bibliographical references and index.
  ISBN 978-0-674-03520-1 (cloth : alk. paper)
  1. Homicide—United States—History.   I. Title.

HV6524.R68 2009
364.1520973—dc22      2009016830

To Allison,
the memory of William Slothrop,
and God's second sheep

3 1223 08609 1858

from property disputes, quarrels, ethnic and religious hatreds, and sexual assaults except the rate at which they occurred. In most cases, the murderers believed their fellow colonists were out to steal their property or had it in for them because of their class, nationality, or faith. The sense that other colonists were adversaries—that society was a war of all against all—put people on their guard and made them reluctant to show weakness under any circumstances. The sense that fellow colonists were adversaries had an even more dangerous impact on men who were deeply alienated or disturbed, like William Schooler and John Stoddard. It gave them license to prey on their neighbors: to take sex, money, or whatever else they wanted from those weaker than they were. Only when colonists came to see one another in a different light—as allies rather than antagonists—would these homicide rates decline.

One of the most telling signs of the wariness and hostility with which men approached one another was the rate at which they killed each other with guns. Colonists were well armed, but, unlike their counterparts in most of Europe, most chose guns over swords or daggers. Probably 60 percent of all households had at least one working gun. Guns were essential tools in the colonies. Men used them to hunt, to control vermin, and to defend themselves against Indians or people of other nationalities. Few men owned handguns; they needed the range and firepower that muskets afforded and the flexibility to fire shot or slugs, depending on the target. Muskets had their limits as murder weapons. They were inaccurate with slugs, impossible to conceal, and difficult to load. But if the would-be murderer had time to prepare his attack or had already loaded his gun for some other purpose, muskets were usually deadly, in no small part because there was no good medical care for the wounds they inflicted. They were the preferred weapons for killing not only Indians but also political rivals, trespassers, and old enemies. Through 1675, 38 percent of homicides among unrelated colonists in New England and New Netherlands were committed with guns; the figure was probably 40 percent in Maryland. Guns were not responsible for violence, which was rife among Europeans everywhere, but their availability may have made that violence more deadly in colonial America.[61]

The homicide problem among colonists was also exacerbated by indentured servitude, which disrupted the social hierarchy more than

any other institution in the seventeenth century. It forced formerly free women and men to the bottom of the hierarchy and kept them there for years as near-slaves. In most instances, indentured servants and their owners got along well enough to see their contracts through, but indentured servitude gave mistresses and masters extraordinary power and deprived servants of basic rights. Some owners found ways to lengthen their servants' contracts through fraud or subterfuge. Some deliberately kept servants hungry and then lengthened their terms of service when they caught them stealing food. Some forced themselves upon indentured women and lengthened the terms of women who got pregnant.[62]

The injustices fostered by indentured servitude led servants to try to get back at their owners in many ways: by stealing, burning buildings, and assaulting their children sexually. But all too often the conflicts of interest and expectation that the institution created turned lethal. In the mid-seventeenth century, indentured servitude was responsible for 29 percent of all nonfamily, nonpolitical homicides among colonists in New England, 50 percent in Virginia, and 67 percent in Maryland. Masters and mistresses expected high returns from their investments in servants, tried to wring those returns from servants as quickly as possible, and had no long-term interest in their health or welfare. Testimony from homicide cases also shows that a high proportion of masters and mistresses distanced themselves from their servants psychologically, habitually referring to them as whores or rogues and scoffing at their pretensions to Christianity. Clearly, some masters felt it necessary to dehumanize their servants, to put them beyond the bounds of moral consideration and to deny them the status of civilized human beings. The servants' poverty was another strike against them. As John Smyth, an early immigrant to Virginia, observed, "temporal possessions are the life of a man, and . . . by poverty they grow contemptible." This deliberate distancing of master from servant may have contributed as much to the deadliness of the institution as the conflicts of interest and expectation inherent in it.[63]

Some masters, like John Grammar, a tobacco planter in Maryland, chose to balance their accounts by giving their servants too little to eat. Other masters and mistresses killed servants unintentionally by working them to death. Some servants were singled out for abuse primarily because they were chronically ill—not an infrequent occurrence in

more men, some of them friends, some strangers, joined brawls that ended in the deaths of one or more people.[31]

During this period the North also witnessed another phenomenon previously confined to the slaveholding South: murders committed by bullies. Changing circumstances in the North produced a crop of men who cultivated a reputation for toughness. They challenged people for no reason at all, even women and strangers who had given no offense, and attacked their victims if they did anything other than cower in fear. These dominance displays usually happened in mixed company. Drunken bullies tried to humiliate men in front of women or humiliated women as a way of humiliating the men accompanying them. In Philadelphia Horatio Maloney walked up to a woman in a store and insulted her in front of her companion, Samuel Mangan. Mangan punched Maloney, and Maloney stabbed him to death. William Foster insulted two female passengers sitting near him on a streetcar in New York City. Avery Putnam told him to watch his mouth. Foster killed him. James Rodgers and his friends, spilling out of a Manhattan tavern at closing time, ran into a well-dressed couple, the Swansons, who were on their way home from a social engagement. They insulted Mrs. Swanson repeatedly, and when her husband tried to protect her, Rodgers knifed him.[32]

Gang members turned menacing behavior into an art form. They tattooed their bodies like sailors, adopted nicknames like the "Butcher," "Satan," and "Snake" (Snake was a Vermonter whose real name was Cyrus Putnam). One bare-knuckle fighter named Snatchem, who was a member of New York's Slaughter House Gang, won notoriety as the epitome of the northern bully. He was "a beastly, obscene ruffian" who dressed like a pirate, carried two pistols in his belt and a knife in his boot, and sucked blood from his victims' wounds. He described himself as a "kicking-in-the-head-knife-in-a-dark-room fellow," and he had a friend called Jack the Rat who would bite the head off a mouse for a dime and a rat for a quarter.[33]

This new masculine style had been taking shape in the North since the 1820s, but it was no longer confined to a few large cities, and the new toughs did not stop at fighting. Like their southern counterparts, they fought for the fun of it as well as for bragging rights, but from the late 1840s through the Civil War they killed people frequently and de-

liberately. Before this period fighting had resulted in only a few deaths in the North, and those were inadvertent.

As nativism gained strength in the 1850s and gangs and volunteer fire companies became ethnically less diverse, more fights pitted the native-born against immigrants and Protestants against Catholics. This was especially true in Philadelphia, where fighting between native-born and immigrant fire companies claimed at least nine lives between the Mexican War and the Civil War. Yet much of the deadly violence of this era had little to do with American-born or immigrant status. Like other northerners, members of gangs and fire companies killed each other to defend their standing among their peers. Bill "The Butcher" Poole was the toughest fighter in New York City and the undisputed champion of its nativist gangs. He became a prime target for anyone who wanted to advance in the ranks of nativist toughs. He was eventually brought down by two native Tammany fighters.[34]

These homicides proliferated as the feelings and beliefs that had restrained lethal violence in the 1830s and early 1840s dissipated. They were not an explicit response to the nation's political crisis or the disruption of the North's social hierarchy, as homicides motivated by racial, ethnic, class, and political hatred were. Men who engaged in such violence left no evidence that they saw beyond the immediate causes of their violent behavior, and although law-enforcement and other government officials were well aware that everyday quarrels caused most northern homicides, they cited nativist-immigrant hostility, drunkenness, and the proliferation of small weapons as the causes of the increase in violence. But alcohol consumption was actually one-half to two-thirds lower in the 1850s and 1860s than it had been in the 1820s, thanks to the temperance movement; and although handguns and knives made quarrels more deadly, together they were responsible for only half of all fatalities, and they were as much a response to the rise in homicide rates as a cause.[35]

Property-related and vigilante murders were also on the rise. By midcentury, strong county and township governments existed everywhere in the North except in Kansas and the Pacific Northwest. Law enforcement and criminal courts were well established. Yet more men —especially farmers—were taking the law into their own hands. Increasingly hostile to governments that did not promote their interests,

# *Encyclopedia*

## *of the*

# *American Constitution*



LEONARD W. LEVY, Editor-in-Chief
Claremont Graduate School, Claremont, California

KENNETH L. KARST, Associate Editor
University of California, Los Angeles

DENNIS J. MAHONEY, Assistant Editor
Claremont Graduate School, Claremont, California

MACMILLAN PUBLISHING COMPANY
*A Division of Macmillan, Inc.*
NEW YORK

Collier Macmillan Publishers
LONDON

Compendium_Cornell
Page 0410

HUMANITIES
GRADUATE
SERVICE

03405771

Copyright © 1986 by Macmillan Publishing Company
A Division of Macmillan, Inc.

All rights reserved. No part of this book may be reproduced or
transmitted in any form or by any means, electronic or
mechanical, including photocopying, recording, or by any information
storage and retrieval system, without permission in writing from the
Publisher.

Macmillan Publishing Company
A Division of Macmillan, Inc.
866 Third Avenue, New York, NY 10022

Collier Macmillan Canada, Inc.

Printed in the United States of America

printing number
2   3   4   5   6   7   8   9   10

Library of Congress Catalog in Publication Data

Encyclopedia of the American Constitution.

Includes index.
1. United States—Constitutional Law—Dictionaries.
I. Levy, Leonard Williams, 1923–       II. Karst,
Kenneth L.   III. Mahoney, Dennis J.
KF4548.E53   1986        342.73'023'03        86–3038
ISBN 0–02–918610–2     347.3022303

STAFF:

Charles E. Smith, *Publisher*

Elly Dickason, *Project Editor*

Morton I. Rosenberg, *Production Manager*

Joan Greenfield, *Designer*

1744                          STATE POLICE POWER

neutral vessels running the Union blockade of Confederate ports could lawfully be captured and sold as prizes. (See PRIZE CASES, 1863). American forces sent to China to help suppress the Boxer Uprising of 1900 were engaged in war under Article of War 58, which permitted courts-martial to try charges of murder only "in time of war" (*Hamilton v. McClaughry*, 1905). But although on June 10, 1949, a declared war still existed between the United States and Germany and Japan, the Supreme Court held that, since there were no hostilities, that date was "time of peace" under a similar Article of War (*Lee v. Madigan*, 1959; the decision effectively overruled *Kahn v. Anderson*, 1921). The COURT OF MILITARY APPEALS and at least one civilian court held that the Korean and Vietnam conflicts, though not declared wars, were nonetheless "war" under provisions of the Uniform Code of Military Justice, which suspended the statute of limitations and increased penalties for certain military offenses in wartime (*Broussard v. Patton*, 1972; *United States v. Bancroft*, 1953; *United States v. Anderson*, 1968). But the Court of Military Appeals and the COURT OF CLAIMS also held that only a declared war could trigger a provision of the Code which gives courts-martial JURISDICTION "in time of war [over] persons serving with or accompanying an armed force in the field." The principle that emerges from examination of these and many similar cases is that the existence of a "state of war" depends principally on the amount of violence, unless a holding that "war" existed would raise serious constitutional questions, as by giving courts-martial jurisdiction over civilians.

The question can, of course, be of profound importance, for war is chief among the great emergencies that may be held to justify actions of the executive and the legislature which would in normal times be plainly unconstitutional. The most extreme example is the Supreme Court's refusal to strike down the 1942 exclusion of American citizens of Japanese descent from the West Coast and their confinement in "relocation centers," under an EXECUTIVE ORDER of President FRANKLIN D. ROOSEVELT, which had been ratified by an act of Congress. (See EXECUTIVE ORDER 9066; JAPANESE AMERICAN CASES.) As a general proposition it may be said that the Supreme Court's unwillingness to hold unconstitutional the actions of the President and Congress in such emergencies varies in inverse ratio to the size of the emergency and the decision's chronological closeness to it. It has been the practice of the Court to scrutinize emergency measures much more closely and to give the executive and legislature much less leeway if the case reaches

the Court after the war is over. (See EX PARTE MILLIGAN, 1866; DUNCAN V. KAHANAMOKU, 1946.)

JOSEPH W. BISHOP, JR.

Bibliography

BISHOP, JOSEPH W., JR.  1974  *Justice under Fire: A Study of Military Law.* Pages 178–180, 192–201. New York: Charterhouse.

RATNER, LEONARD G.  1971  The Coordinated Warmaking Power—Legislative, Executive and Judicial Roles. *Southern California Law Review* 44:461–489.

# STATE POLICE POWER

The POLICE POWER of the states is one of the most important concepts in American constitutional history; yet, like PRIVACY or FREEDOM OF CONTRACT, its historic significance derives from usage and application, not from the language of the Constitution itself. Nowhere in the Constitution does the term appear.

In his *Commentaries on the Laws of England* (1769) WILLIAM BLACKSTONE provided a definition of public police as "the due regulation and domestic order of the kingdom, whereby the inhabitants of the State, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations." Some of the early American treatises quoted this definition, but in fact it serves badly as a guide to constitutional doctrine and governmental realities in the United States in the 1790s or the early nineteenth century. Nor was the Supreme Court much more effective in providing guidance as to the substance and limits of the police power. Chief Justice JOHN MARSHALL verged perilously near outright tautology in GIBBONS V. OGDEN (1824), when he referred to the police power of the states as "that immense mass of legislation, which embraces every thing within the territory of a State, not surrendered to the general [national] government," and as the "acknowledged power of a State to regulate its police, its domestic trade, and to govern its own citizens." Left entirely open, of course, was the matter of what indeed had not been "surrendered" in the way of state powers as well as the matter of what was "acknowledged" as a legitimate part of residual state SOVEREIGNTY in light of the Constitution. The Court itself, clearly, would acknowledge positive powers and define the terms of "surrender." As late as 1847, in his opinion

STATE POLICE POWER                                                    1745

in the LICENSE CASES, Chief Justice ROGER B. TANEY was referring to the state police power in terms that hardly improved upon Marshall's, so far as specificity was concerned, but that at least had a more positive (if not to say sweeping) rhetorical thrust: that power was, Taney declared, "nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions." Not until the post-Civil War years, when FOURTEENTH AMENDMENT litigation paraded state regulatory laws before the Supreme Court for review, did the Court begin to grapple more tellingly with the problem of definition. Even in contemporary times, however, fitting the police power into the constellation of constitutional ideas has remained one of the Court's most perplexing concerns. There was as much critical acumen as despair in Justice WILLIAM O. DOUGLAS's plaint, in *Berman v. Parker* (1954), that "an attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts." In the last analysis, Douglas contended, "the definition is essentially the product of legislative determinations. . . ."

The Marshall and Taney approach to definition of the police power was sufficient, in a sense, because it sought only to place some sort of label on the powers that remained with the states once the Court had determined the legitimate reach of the CONTRACT CLAUSE and of the COMMERCE CLAUSE; the police power was what the states had left when such determinations had been made. From the standpoint of state lawmakers, however, the approach of the two great Chief Justices was not at all sufficient. First, it did not make even the most basic conceptual distinctions among the fundamental types of governmental power; and so defining the police power as coextensive with sovereignty meant that police subsumed the powers of taxation and EMINENT DOMAIN. Second, the Marshall-Taney approach did not come to grips with power and its legitimate reach in a positive sense. What were the sources of state authority in its exercise of sovereign power? On what basis could a state court, for example, weigh the legitimacy of a regulatory law (even if clearly not beyond the bounds set by federal contract clause and commerce clause rules) against state constitutional limitations such as those prohibiting TAKINGS without JUST COMPENSATION?

It fell to one of the nation's greatest state judges, Chief Justice LEMUEL SHAW of Massachusetts, to produce a doctrinal exposition on the police power that would establish the framework for subsequent adjudication and debate. Shaw's formulation was set forth in *Commonwealth v. Alger* (1851), in which the Massa-

chusetts high court upheld as a proper exercise of "the police power" (so explicitly called) a statute that forbade construction of any wharf in specified areas of Boston harbor. Shaw's great achievement was twofold. He broke out of the *cul de sac* to which Marshall and Taney had driven, addressing the legitimacy of the police power in terms liberated from boundaries set by commerce and contract clause doctrine; and he offered a jurisprudential foundation for positive governmental action.

Shaw conceded at the outset that the police power challenged head-on any efforts to tame it and bring it within bounds. Yet, while it was "not easy to mark its boundaries, or prescribe limits to its exercise," the police power must be acknowledged as superior in some reasoned way to private rights and claims. It was so, Shaw contended, as "a settled principle, growing out of the nature of well-ordered civil society." And so he turned to the task of giving substance to what the Supreme Court had lately termed "the police power belonging to the states, in virtue of their general sovereignty" (Justice JOSEPH STORY in PRIGG V. PENNSYLVANIA, 1842). One of the foundations of that power was the COMMON LAW rule *sic utere tuo ut alienum non laedas* (use your own property in such manner as not to injure that of another). Historically, the rule had been invoked to justify private nuisance and PUBLIC NUISANCE actions alike; in either way, however, it had been used in essentially defensive modes. Shaw linked the *sic utere* concept with a positive obligation of government to impose a system of reasonable restraints on private property uses. "Rights of property," he contended, are properly subject "to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient." As Leonard W. Levy, the biographer of Shaw, has shown, Shaw thus advanced doctrine well beyond the old common law framework; although Shaw held out the possibility of judicial overturning of laws that were not "reasonable" and violated private VESTED RIGHTS, he stressed the propriety of the legislature's acting when necessary and expedient to impose restraints for the public good.

But Shaw also undertook to define a related, yet in some measure conceptually distinct, foundation for the police power: the concept of "rights of the public." Thus Shaw insisted on the "expediency and necessity of defining and securing the rights of the public," and elsewhere on "the acknowledged public right." Even acts not necessarily punishable by common law might

Compendium_Cornell
Page 0413

1746 STATE POLICE POWER

properly be declared illegal by regulatory legislation, Shaw wrote, "for the sake of having a definitive, known and authoritative rule which all can understand and obey." Thus, from the Shaw court in 1851, American police power doctrine emerged in its essentials. As in an earlier decision in 1837 (*Commonwealth v. Blackington*), Shaw asserted the legislature's power to act for the public good to be "the general rule," whereas restraint of the legislature should be the "specific exception."

The next step in elaboration of police power doctrine was the specification of positive purposes, more detailed than the public good or "rights of the public" broadly stated, for which the power would justify regulatory legislation. Early efforts at specification along these lines, before Shaw reformulated the whole issue, had tended simply to codify the common law categories of behavior and property uses constituting nuisance. (Such, for example, is what one finds in Chancellor JAMES KENT's *Commentaries.*) Here again, the arsenal of the common law held an instrument potentially powerful—the principle *salus populi suprema lex* (the welfare of the people is the supreme law), which in the seventeenth and eighteenth centuries in England had often been invoked to assert the plenary powers of Parliament restricted only by accumulated constitutional liberties. In an influential Vermont decision, handed down three years after Shaw's great effort, Chief Justice Isaac Redfield declared that "the general comfort, health, and prosperity of the State" warranted state regulatory powers on the same basis of power as "resides in the British parliament, except where they are restrained by written constitutions" (*Thorpe v. Rutland Railroad*, 1855).

In some other state courts, judges proved reluctant to endorse wholly such broad definitions of legitimate intervention; yet even these more conservative jurists, while looking for principles on which to support JUDICIAL REVIEW, contributed to specification of the bases of positive authority. Thus one of the Michigan judges in *People v. Jackson & Co.* (1861) contended that powers "which can only be justified on [the] specific ground" of the police power or general legislative power must be "clearly necessary to the safety, comfort and well being of society." This line of reasoning was reflected in the 1877 decision of the Supreme Court in BOSTON BEER CO. V. MASSACHUSETTS, in which Justice JOSEPH P. BRADLEY stated for the Court that a PROHIBITION statute against sale of alcoholic beverages did not violate the rights of a brewery company, for clearly such legislation was warranted under the police power: "However difficult it may be to render a satisfactory definition of it," Bradley wrote,

"there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals."

Two other doctrinal arguments found their way into antebellum state jurisprudence on the police power. The first, which was rooted in the notion that the power was part of the residuary sovereignty and of legislative authority comparable to that of Parliament, was that the police power was inalienable. That is, states could not bargain away their power—and obligation—to look after the public interest. (See IN-ALIENABLE POLICE POWER.) The second, a pragmatic strain that would doubtless frighten those who believed that vested rights in property deserved more rigid protection, was the view that the police power needed to be consonant with the changing character and needs of the society. This latter, expansive view of the police power found vivid expression in decisions of the 1850s upholding new regulations which permitted railroads to use the public streets to gain access to urban centers. How the imperatives of material progress inspired this expansive doctrine was illustrated in the language of an Illinois decision in 1859 (*Moses v. Railroad*) declaring that to deny a railroad the use of public streets, "no matter how much the general good may require it, simply because streets were not so used in the days of Blackstone, would hardly comport with the advancement and enlightenment of the present age."

Although the antebellum state courts had provided them with a doctrinal foundation for expanded regulatory initiatives, the state legislatures in fact were slow to extend the range or increase the intensity of regulation. Still, grist for judicial mills was provided by laws that were challenged in the long-established areas of state intervention—that is, in such matters as the regulation of streams to protect navigation and fisheries, marketing regulations and standards, laws requiring the fencing-in of livestock, rudimentary safety legislation (especially against fire dangers), and the control of operations on public works such as bridges, highways, and canals. In the late 1840s and the 1850s, police-power measures proliferated as both the regulation of railroad operations and prohibition of alcoholic beverages became common. Astute lawyers were quick to resist expansive claims for the police power, especially when they limited the freedom that powerful economic interests enjoyed in the use of their property. Prior to 1833, challenges to the police power were often based on the Fifth Amendment as well as on comparable provisions of the state constitutions; but the decision of BARRON V. BALTIMORE

cut off that line of defense for propertied interests. Still, lawyers continued to rely on the DUE PROCESS provisions of state constitutions; and they contended regularly that regulations took away the value of private property without just compensation—in other words, that the regulations effectively were "takings" and amounted to INVERSE CONDEMNATION. Despite the doctrinal contribution of Chief Justice Shaw and others in the 1850s, moreover, lawyers resorted commonly to the view that only uses of property that were actionable under the common law (as noxious uses, nuisances, or trespasses) could be reached by state regulations. In few cases did courts respond favorably to such arguments. Still, the intellectual and to some degree political groundwork was thereby laid for future attacks on the police power.

Adoption of the Fourteenth Amendment gave new impetus and hope to defenders of private property, who presented arguments in the courts that the PRIVILEGES AND IMMUNITIES clause and the due process clause alike afforded new protections against interventions under the police power. Simultaneously with adoption of the amendment, in 1868, came publication of THOMAS M. COOLEY's treatise, *Constitutional Limitations*, in its first edition. Of basic importance to Cooley's view of the limitations that ought to confine the power of state legislatures was his premise that the "due bounds of legislative power" were not set alone by "express constitutional provisions." The implied limitations that he believed ought to apply all hinged on a generalized "due process" concept. Due process, he contended, forbade enactment of what he termed "class legislation" (laws imposing burdens or granting privileges to specific groups or interests that were arbitrarily singled out instead of being "reasonably" classified). Moreover, his generous definition of due process would forbid laws that were "arbitrary and unusual [in] nature," and as such "unknown to the law of the land." The champions of laissez-faire, if given reason for optimism by the Fourteenth Amendment and the views in Cooley's treatise, were provided with a source of unbounded joy by publication in 1886 of CHRISTOPHER G. TIEDEMAN's *Limitations of the Police Power in the United States*. Tiedeman's great contribution was his attempt to turn the clock back altogether, to negate the principal contribution the Shaw Court had made in *Alger*, by resurrecting wholesale the doctrine that the old common law limits also constituted the proper limits of the positive police power. In effect, Tiedeman attempted to fuse the concept of due process, in the Constitution, with the traditional common law limits of *sic utere.* By the late 1870s, the Supreme Court itself had become divided on the crucial question: how far could state regulation go in limiting the actions of private persons and corporations in the marketplace?

The subsequent battle was not confined to the courts; it extended to the legislatures and the political hustings. Indeed, the question of regulatory power was at the very vortex of the storm in both national and state politics for three-quarters of a century. Three issues were involved in the debates. The first was whether specific types of regulatory actions by government abridged, unconstitutionally, what came to be called FREEDOM OF CONTRACT. The second was whether the courts or, instead, the legislatures were supreme in determining whether specific regulations were constitutionally permissible. Finally, there was the issue of what standards the courts should apply generally—if indeed the judicial branch had the power to review specific regulatory measures—to distinguish constitutional measures from those that were unconstitutional. All these issues centered on the rights of property.

Supreme Court doctrine continued to echo pre-Civil War formulations, even expanding them (rhetorically, at least) at the height of conservative, property-minded influence on the Court. Thus in *Barbier v. Connolly* (1884) Justice STEPHEN J. FIELD declared that neither the Fourteenth Amendment nor any other "was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and to add to its wealth and prosperity." Going as far, but in terms perhaps even more open-ended and expansive, Justice JOHN MARSHALL HARLAN asserted in *Chicago, Burlington & Quincy Railway v. Commissioners* (1906) that the legitimate police power of the state "embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety." Despite such assertions of legitimacy for regulatory power, virtually every new or proposed regulation threatening to impose costs or restraints on private interests met with resistance in the state legislatures and the courts. Regulation varied in scope and effectiveness, from one state to another. The latitude and potential for diversity within the legal system offered by FEDERALISM was never more apparent. Nonetheless, the emergent industrial order, the rapid growth of population and absorption of millions of immigrants, urbanization, and the social dislocations that attended the acceleration of technological

Compendium_Cornell
Page 0415

1748                                    STATE POLICE POWER

change and the growth of large-scale firms with enormous leverage over their employees and markets all served to focus political and legislative attention on expansion of the states' regulatory activities. Soon the courts were crowded with cases challenging regulative innovations.

The threshold question, of course, was whether legislative discretion should be permitted or whether the courts should impose constitutional standards that went to questions of substance such as "reasonableness." Before the Civil War, "due process" had been understood as referring to procedural requirements (right to a FAIR HEARING, specification of procedural steps and forms, NOTICE, and the like). In the 1870s, counsel in both the SLAUGHTERHOUSE CASES of 1873 and *Munn v. Illinois* and the other GRANGER CASES of 1877 argued that state regulatory legislation should be overturned on grounds of "due process" deprivation now defined as deprivation of substantive rights in violation of the Fourteenth Amendment. However, the right to regulate private interests, the Court declared in *Munn*, is one "which may be abused," to be sure; but "for protection against abuses by legislatures the people must resort to the polls, not to the courts."

Within a short time, though, the Court reversed itself and began to review state legislation under the police power with a view toward deciding whether "abuse" had occurred. Expansion of the concepts of SUBSTANTIVE DUE PROCESS and freedom of contract, in the hands of a Court whose personnel and social philosophy had changed radically by the 1890s, brought the Court into the business of acting regularly as censor of legislation on substantive grounds. Despite the continued ascendancy in national politics of Republican and conservative-Democratic regimes that resisted pressures for sweeping social-reform legislation, still a flood of new state legislation came forth in such areas as municipal public health, franchise law affecting public utilities, factory and mining safety, maximum hours, child labor, building codes, and railroad safety and operating practices. Neither the state courts nor the Supreme Court lacked for opportunities to play the role of censor and apply the new substantive due process reading of the Fourteenth Amendment.

Thus the courts turned to the last of the great questions regarding constitutional definition of the police power and its limits in the post-Civil War era: the question of standards or formulae for determining constitutionality. One of those standards emerged early in the period—ironically, in *Munn v. Illinois*, in which the new Fourteenth Amendment claims

were decisively rejected by the Court. In deciding the case, however, the Court set forth the new principle of AFFECTATION WITH A PUBLIC INTEREST, asserting that warehouses and railroad companies were subject to regulation because they were virtual monopolies. They were comparable to bridges and ferries, long held by the common law to be a special category of business dedicated to service to the public, standing athwart essential lines of commerce and travel. Citizens were compelled, in effect, to resort to them; hence they were classified by the Court as being in the regulable category. The "affectation" doctrine was a Trojan horse. If there was a line to be drawn between businesses regulable because of their essential character—that is, because the public was compelled to use them for vital activities—then on the other side of that line were types of business immune from regulation. Such was the logic of *Munn*. In later years, the Court struck down a great variety of state regulatory laws on the grounds they were aimed at businesses not affected with a public interest. Indeed, not until 1934 in NEBBIA V. NEW YORK did the Court finally abandon the affectation distinction, ruling that a state could properly regulate any economic interest. "It is clear," the Court declared, "that there is no closed class or category of businesses affected with a public interest."

"Freedom of contract" similarly served as a standard for the Court to strike down regulatory legislation. Thus in LOCHNER V. NEW YORK (1905) and ADKINS V. CHILDREN'S HOSPITAL (1923), as well as in other decisions, the Court invalidated various state laws that regulated the terms of industrial employment. Like the "affectation" standard, however, the freedom of contract formulation as a restriction on the police power was destined to be discarded in the course of the New Deal period of the Court's history.

Other limitations on state exercise of the police power proved to be more enduring. They are, in part, the limitations rooted in the older, antebellum concept of due process as a procedural concept, reinforced by the terms of the EQUAL PROTECTION clause of the Fourteenth Amendment. Not only the Supreme Court but also the state courts—both in periods when many courts were inclined to invalidate social-reform legislation on the grounds of freedom of contract and in periods when they were more inclined to be deferential to legislatures—have contributed to the formulation of continuing restraints on the police power. Thoroughly accepted in American constitutional law, in recent decades, is Justice OLIVER WENDELL HOLMES's warning, in *Noble State Bank v. Haskell* (1911), that regulatory legislation by its definition will

STATE POLICE POWER                                                    1749

"more or less limit the liberty of the individual or . . . diminish property to a certain extent"—but government would be paralyzed if such limitations should regularly fall afoul of constitutional objections. Yet Holmes himself conceded in his opinion in the controversial case of *Pennsylvania Coal Company v. Mahon* (1922) when the Court invalidated a Pennsylvania law curbing mining companies' property rights in an effort to save urban structures from collapsing, that there must be some definable "limits" to the police power: "While property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Thus a line must be drawn between the police power, which permits diminution of property or liberty, and the power of eminent domain, which authorizes a taking only for a public purpose and on payment of adequate compensation.

To this specific consideration of when regulation encroaches on the realm of eminent domain taking, the Supreme Court and state courts have welded the more traditional procedural concerns. Exemplary of the latter was the doctrine of the Tennessee high court in *Vanzant v. Waddel* (1829) to the effect that to be valid a regulation must be "a general public law, equally binding upon every member of the community . . . under similar circumstances." Chief Justice Shaw of Massachusetts elaborated the theme in decisions upholding forfeiture of property deemed unwholesome or a PUBLIC NUISANCE, but requiring TRIAL BY JURY and judicial process. So long as the legislature established a precise statutory rule, applied it evenhandedly, and provided traditional procedural safeguards, the Shaw court would uphold police power regulation. Later, from the Supreme Court opinion in MUGLER V. KANSAS (1887), came the formulation that to be valid a police power regulation must have a "real or substantial relation" to public health, morals, safety, and welfare; and in 1936 (*Treigle v. Homestead Association*) the Court also declared that a regulation must be enacted "for an end which is in fact public and the means adopted must be reasonably adapted to the accomplishment of that end." These considerations of due process, too, have survived even though the restraining concepts to which they were once wedded—the "affectation" idea, and substantive due process concepts such as judicial determination of reasonableness—have largely been stripped from them.

In recent times, and particularly since the expansion of the positive state in the New Deal era, constitutional challenges to the police power have come to a focus on the question of how much administrative discretion ought to be allowed to state regulatory agencies. Agricultural marketing commissions, fish and game control agencies, mining-safety authorities, factory inspection boards, fire- and building-code enforcement agencies, air and water pollution control boards, and other regulatory agencies of government have been held to standards of administrative due process. Their substantive powers of regulation, however, have been generally upheld broadly by state and federal courts.

Emblematic of modern police power issues in the law is the history of land-use ZONING. Even prior to the decision in 1926 of EUCLID V. AMBLER REALTY, in which the Supreme Court upheld zoning that excluded industrial use, several of the states' appellate courts had validated such legislation. In each instance, they rejected claims that property owners had suffered from an effective "taking," hence ought to be compensated. As the Supreme Court itself noted in *Euclid*, such regulations a half century earlier "probably would have been rejected as arbitrary and oppressive"; now they were found necessary and valid because they were consonant with the magnitude of emergent industrial and urban problems. As the California Supreme Court declared in *Miller v. Board of Public Works* (1925), widely cited in other cases involving expansion of administrative discretion: "The police power, as such, is not confined within the narrow circumspection of precedents, resting upon past conditions which do not cover and control present-day conditions. . . . [It] is elastic and, in keeping with the growth of knowledge and the belief in the popular mind in the need for its application, capable of expansion. . . ."

The presumption of constitutionality against claims based on due process was explicitly stated in opinions of the Supreme Court again in the 1930s, echoing the majority's views in *Munn*. In *Nebbia,* for example, the Court not only laid to rest "affectation with a public interest" as a limitation on the police power; it also held that a regulation should be accorded "every possible presumption . . . in favor of its validity . . . unless palpably in excess of legislative power." When the Court upheld a statute regulating prices charged by employment agencies, in OLSEN V. NEBRASKA (1941), it couched its holding in terms that made its new posture unmistakable: "We are not concerned," wrote Justice William O. Douglas, "with the wisdom, need, or appropriateness of the legislation. . . . There is no necessity for the state to demonstrate here us that evils persist." In FERGUSON V. SKRUPA (1963) the Court refused to strike down a state law that prohibited anyone from engaging in the business of debt-adjusting except as incidental to the practice of law.

Compendium_Cornell
Page 0417

# STATE POLICE POWER

1750

Justice HUGO L. BLACK, writing for the Court, acknowledged that good arguments doubtless could be made for the social utility of the activity thus restricted. But he concluded that though the regulation might be "wise or unwise," this substantive issue was not the Court's concern; it belonged to the state legislature. In *Agins v. Tiburon* (1980) a municipal zoning ordinance severely limited development of open-space lands; the Court again upheld a sweeping use of the police power and turned away due process arguments against the ordinance. So long as even a greatly reduced use of the land was permitted, the Court ruled, claims that "justice and fairness" had been denied would not be upheld. Although the Court still imposed commerce power limitations on the states' regulatory activities, by the 1980s it seemed that the presumption of constitutionality against due process, contract clause, and inverse condemnation claims was firmly entrenched.

A decision ostensibly on a narrow technical point yet vitally important for expansion of discretionary power's real-life effectiveness was *Morrissette v. United States* (1951). In this decision the Court reaffirmed state court rulings dating back to pre-Civil War years that when criminal penalties are used to enforce police power regulations regarding "public health, safety and welfare," the state is not constitutionally required to prove criminal intent, as in ordinary criminal cases.

In response to the emergence of the modern state police power, there has been abundant scholarly debate and legal controversy regarding its impact on private economic rights. Some have welcomed the enlarged regulatory power and administrative discretion, declaring them to be indispensable in the complex world of modern economic and social change. These same features of the modern police power have been condemned heatedly by others, however, as unfair in their application. That eminent domain takings, which do require compensation, and actions under the police power, which do not, are on a continuous spectrum of state power has long been recognized. Numerous scholarly formulations have been offered to distinguish the two powers. The classic distinction was given in ERNST FREUND's great treatise, *The Police Power: Public Policy and Constitutional Rights,* published in 1904. Freund contended that "the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful." Modern critics of the expanded police power and the positive state deplore restrictions upon uses of property that impose costs upon a private owner in order to benefit the public, rather than to prevent harm to the public; thus, the person prevented from building on his or her land where it stands in the flight path of an airport's runway is said by these critics to be harmed unfairly, forced in effect to bear alone the cost of a public benefit.

There are some, indeed, who take a hard-line position on the police power by arguing that virtually all restraints—but certainly those that deprive private property owners of what previously had been "reasonable expectations" of use and profit from regulated property—ought to be accompanied by reasonable compensation. Only the narrowest sort of regulation, based on common law nuisance and *sic utere* doctrine, would be exempt as these property-minded conservatives formulate their theory. The possibility that paralysis of the regulatory process might be caused by the sheer volume of government compensation payments required by this theory is a source of satisfaction rather than dismay to the most doctrinaire proponents of this view. Posed against it, and in favor of a definition of police power broad in its terms and consonant with recent decisions, is a theory that when government undertakes the role of "enterpriser" (creating parks, building highways, sponsoring urban renewal projects) it ought to compensate owners whose property is taken or damaged; but in its role as "arbiter" of contending social interests, as Joseph Sax has written, its actions for regulation of private uses of property should require no compensation. Other commentators, taking a middle position, urge that courts should give fresh recognition to considerations of "fairness" in these matters—for example, guarding against the possibility of a property owner's becoming the victim of more or less systematic deprivation, and also distinguishing degrees of harm and damage to the private owners affected by a STATE ACTION. These commentators also urge that administrators and legislators should be aware of "demoralization costs" when no effort is made to ameliorate the suffering of those hit hardest by regulatory activities.

The conflict between claims of the public under the police power and the claims of private property thus constitutes one major area of constitutional adjudication and current debate. Another area, no less turbulent and controversial, is the conflict between the police power and personal freedoms. Virtually all confrontations between persons and the state on matters of FREEDOM OF SPEECH, FREEDOM OF THE PRESS, FREEDOM OF ASSEMBLY, SEPARATION OF CHURCH AND STATE, or discrimination based on sex or religion or race are confrontations involving the police power. The whole corpus of constitutional doctrine based on the BILL OF RIGHTS and on the Fourteenth Amend-

Compendium_Cornell
Page 0418

ment, in this area, together with such federal statutes as the various CIVIL RIGHTS acts, serve as a comprehensive set of limitations upon exercise of the state police power. The states remain free, however, to impose a higher standard in regard to constitutional liberties than is required by prevailing Supreme Court doctrine based on the federal Constitution.

As the uses of the federal regulatory powers have expanded, especially since 1933, there has been increasing need for the courts to examine the question of PREEMPTION—that is, the supersession of state laws when federal regulation has occupied a given policy area. In cases such as PARKER V. BROWN in 1943, and *Florida Avocado Growers v. Paul* twenty years later, the Supreme Court has upheld state marketing regulations affecting agricultural products even though both federal antitrust regulation and federal farm policies presented serious preemption questions. In the fields of labor law and transportation regulation, however, the Court has been more inclined to curb the scope of state activity in fields regulated by federal statutes and administrative regulations. Since the mid-1960s, a wave of consumer-oriented, industrial safety, and environmental legislation enacted by Congress has brought national power into regulatory areas previously occupied largely by state law. These initiatives have occasioned considerable litigation centering on preemption and congressional intent. In a few instances, the new federal statutes specifically authorize imposition of higher regulatory standards by individual states; other statutes have provided for federal preemption after a specified period, in states that do not meet certain minimum standards of regulation and enforcement.

The complexities of the preemption issue in modern constitutional law concerning the state police power are emblematic of the differences between government intervention in the present day and intervention on the modest scale of the eighteenth and nineteenth centuries. In 1836 Justice Joseph Story summarized the limited functions of the state in his day: to protect the persons and property of citizens from harm, to guard personal rights; to establish courts of justice and enforce laws against crimes, to enforce contracts, and to encourage moral behavior. These functions, together with state promotion of economic development, were justified because they were "conducive to the strength and the happiness of the people." What Story could not anticipate—and what is at the core of the modern constitutional history of the state police power—is the enormous expansion of regulatory activity and the accompanying shift toward enlarged administrative discretion in the mod-

ern state. Recent decisions and treatises are no longer much concerned with issues concerning the legitimacy of the police power as such issues were defined in Field's and Cooley's day, or even in the early years of the New Deal. Nonetheless, changing values as to equality, fairness, and rights of the public—and, to an increasing degree in the 1980s, a revival of issues concerning efficiency criteria and the wisdom of regulatory policies—continue to be expressed both in policy debates and in scholarly dialogue on the place of the state police power in the constitutional system.

HARRY N. SCHEIBER

Bibliography

FREUND, ERNST 1904 *The Police Power: Public Policy and Constitutional Rights.* Chicago: Callaghan.

HASTINGS, W. A. 1900 The Development of the Law as Illustrated by the Decisions Relating to the Police Power of the State. *Proceedings of the American Philosophical Society* 39:359–554.

LEVY, LEONARD W. 1957 *The Law of the Commonwealth and Chief Justice Shaw.* Cambridge, Mass.: Harvard University Press.

REZNICK, SCOTT M. 1978 Empiricism and the Principle of Conditions in the Evolution of the Police Power: A Model for Definitional Scrutiny. *Washington University Law Quarterly* 1978:1–92.

SCHEIBER, HARRY N. 1982 Law and the Imperatives of Progress: Private Rights and Public Values in American Legal History, *Nomos: Yearbook of the American Society for Political and Legal Philosophy* 24:303–320.

SCHWARTZ, BERNARD 1965 *A Commentary on the Constitution of the United States, Part II: The Rights of Property.* New York and London: Macmillan.

STOEBUCK, WILLIAM V. 1980 Police Power, Takings, and Due Process. *Washington and Lee Law Review* 37:1057–1099.

# STATE REGULATION OF COMMERCE

When the Framers of the Constitution granted Congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," they did not specify what regulatory powers were to be left to the states. Did they intend simply to grant a power to Congress which left the states free to regulate until such time as Congress acted? Were states restrained only from enacting statutes inconsistent with federal statutes? Or was the grant of power to Congress intended to be exclusive, forbidding the states to regulate commerce among the states even though Congress had not acted?

These questions troubled the Court several times

Constitutionalism
And Democracy

GREGG IVERS AND
KEVIN T. MCGUIRE,
EDITORS

# The Nature of Rights at the American Founding and Beyond

EDITED BY Barry Alan Shain

UNIVERSITY OF VIRGINIA PRESS CHARLOTTESVILLE AND LONDON

Compendium_Cornell
Page 0420

KF
4541
N38
2007

University of Virginia Press
© 2007 by the Rector and Visitors of the University of Virginia
"The History of Rights in Early America" © 2007 by Gordon S. Wood
All rights reserved
Printed in the United States of America on acid-free paper

First published 2007

9 8 7 6 5 4 3 2 1

Library of Congress Cataloging-in-Publication Data

The nature of rights at the American founding and beyond / edited by Barry Alan Shain.
    p.   cm. — (Constitutionalism and democracy)
  Includes bibliographical references and index.
  ISBN 978-0-8139-2666-7 (alk. paper)
  1. Constitutional history—United States. 2. Liberty—Political aspects—United
States—History. I. Shain, Barry Alan, 1950–
  KF4541.N38 2007
  342.7302'9—DC22

                                                    2007017839

Compendium_Cornell
Page 0421

actions to the world and facilitate the forging of necessary commercial, diplomatic, and military relations with European bankers and nations.[37] The soon-to-be-famous English radical, Thomas Paine, had urged as much in arguing that "were a manifesto to be published and dispatched to foreign Courts, setting forth the miseries we have endured, and . . . declaring at the same time, that not being able any longer to live happily or safely, under the cruel disposition of the British Court," such that we are forced to declare our independence, it "would produce more good effects to this Continent, than if a ship were freighted with petitions to Britain."[38] And a few months later, in mid-May 1776, a Virginia resolution directed Richard Henry Lee to propose that the Congress declare independence (as it did on July 2, 1776). More particularly, Lee was instructed to give "the assent of this Colony to such declarations, and to whatever measures may be thought proper and necessary by the Congress for forming foreign alliances."[39] Thus, one recent commentator feels confident in concluding that the Declaration, when issued, was above all else a "foreign-policy statement."[40] The Declaration did serve important domestic functions, in particular raising the stakes in negotiating a return to British sovereignty with a high-level British delegation on its way to New York.[41] But it was more a document in foreign affairs than one that addressed the domestic political situation or novel philosophical matters.[42]

In the best record we have of the congressional debate, Jefferson recalled that it centered on the need to facilitate foreign contacts and aid, and on selecting the most propitious time for declaring independence in order to meet this need. He wrote "that a declaration of Independence" was necessary because it "alone could render it consistent with European delicacy for European powers to treat with us, or even to receive an Ambassador from us."[43] The two most essential architects of American independence, Richard Henry Lee and Samuel Adams, agreed with Jefferson, the Revolution's most valued penman (once that role was ceded by its first possessor, John Dickinson).[44] Writing to Joseph Hawley on April 15, 1776, Adams argued that "no foreign Power can consistently yield Comfort to Rebels, or enter into any kind of Treaty with these Colonies till they declare themselves free and independent." As Stephen Lucas has pointed out, Adams thus stated his realization that "the crucial factor in opening the way for foreign aid was the act of declaring independence. . . . The Declaration reinforced the perception that the conflict was not a civil war." Similarly, Lee too knew the rules of international relations, in writing on June 2, 1776, that "it is not choice then but necessity that calls for independence as the only means by which foreign alliance can be obtained."[45]

Again, with these ends in mind, we must expect that the central rights claims of the Declaration would be couched in the rights language of international relations and (extra-conventional) law, that is, natural law and rights, rather than that of British common law and constitutionalism—the realm of municipal law and civil rights to which Americans had forcefully clung for over ten years.[46]

In the Declaration, the American perspective was to be described for its primary international and secondary domestic audiences in the "proper tone and spirit called for by the occasion."[47] But, as Perry Miller explained, with politically influential Europeans as its principal audience, it was "necessary for the official statement to be released in primarily 'political' terms—the social compact, inalienable rights, [and] the right of revolution," rather than in the Reformed Protestant language of sin, contrition, and sacrifice that the Congress regularly used in addressing "the ranks of militia and citizens."[48] The delegates wished to convince those in Britain still well disposed to them (who included some Whigs and most radicals) of the propriety and necessity of their separation,[49] and bankers, diplomats, and the political powers in France, Holland, and Spain of their resolve and sovereignty. It was necessary, therefore, that the language, using natural rather than civil rights, highlight the British violation of internationally accepted political norms and long-held contractual arrangements. And it is in the light of such intentions that the Declaration's rights discourse must be read if it is not to be anachronistically misunderstood.

Nevertheless, it is also true that Americans believed that if a government abused or failed to protect the civil rights legitimately held by a people, the rights for which men had theoretically sacrificed their natural liberty, a "majority of the community hath an indubitable, inalienable, and indefeasible right to reform, alter, or abolish it."[50] And Americans claimed that, as a people, they were in just such a revolutionary situation vis-à-vis the British government. British North Americans under their "original colonial contract" had exchanged natural rights to equality and absolute independence for the protected and limited civil rights of life, liberty, and the pursuit of happiness. The British monarch had failed to protect these rights, as outlined in the Declaration's remarkably traditional set of twenty-eight indictments issued against the king. Thus, according to an internationally accepted logic that began with natural equality between the peoples of the British Empire, the British monarchy had abrogated its explicit contract with the American people to provide protection in exchange for loyalty. This was the same act that many on both sides of the Atlantic believed the English king had committed previously in the seventeenth

century during the English Civil War and then later in the Glorious Revolution.[51] Americans collectively could therefore justify to themselves and, more importantly, before the court of world opinion, their decision to withdraw their allegiance from the British king, both on historical English constitutional grounds and according to an emerging body of Vattelian international law that legitimated their separatist aspirations.[52]

## Natural and Civil Rights

Still, a focus on the preeminently international aims of the Declaration leaves unclear the exact meaning and nature of the Preamble's rights claims. Does, for example, the Preamble assert that Americans possess individual rights that are morally preeminent before a legitimately constituted democratic majority, as our contemporary understanding would suggest? Or was it the case, instead, that the natural rights of life, liberty, and the pursuit of happiness were fully inalienable only under a limited number of circumstances that did little to determine the extent and power of matching civil rights?[53] Such questions can be answered with reasonable confidence, but only when the Declaration is read as part of an extended text.[54] Such an examination indicates that for most, though likely not all, delegates, the focus of the Preamble was on natural rather than civil rights, that the rights of life, liberty, and the pursuit of happiness were limited in their range of application, and that civil rights were by almost all accounts alienable and subordinate to the public's corporate needs and the people's fully inalienable rights.[55]

Such a reading is in keeping with the most common eighteenth-century understanding of natural and civil rights, in which men, upon entering society, surrendered their equality and almost all of their capacious natural rights for more limited, but more secure alienable civil rights. According to Vattel, civil rights result from each member yielding "certain of his rights to the general body," with the agreement "that there should be some authority capable of giving commands." Thus, for the natural-law theorist Burlamaqui, unlike natural rights, civil rights "are founded on the express or tacit permission, received from the sovereign or the law."[56] James Wilson, following Burlamaqui, described the related concepts of natural and civil liberty: "Civil liberty is nothing else but natural liberty, divested of that part which constituted the independence of individuals, by the authority, which it confers on sovereigns, attended with a right of insisting upon their making a good use of their authority."[57] The Reverend Moses Hemmenway similarly lectured in a 1784 election ser-

mon that "though the *natural rights* of men may, in general, seem much alike, they being, in this respect, 'all FREE and EQUAL;' yet it is in different degrees that they are permitted to use them. According to the different civil constitutions which men are under, their *civil liberty* is larger, or more restricted."[58]

Civil rights (and closely related but distinct and less powerful privileges, liberties, and immunities), unlike natural rights, were protected by a polity within the limits set by historical precedent and public need, not the absolute, though inexact and unenforceable, standards of natural law. Even Jefferson accepted that "every man, and every body of men on earth, possesses the righ[t] of self-government: they receive it with their being from the hand of nature. Individuals exercise it by their single will: collections of men, by that of the majority; for the law of the *majority* is the natural law of every society of men . . . [and] natural rights, may be abridged or modified in its exercise, by their own consent, or by the law of those who depute them."[59] Zephaniah Swift of Connecticut was even more emphatic in lecturing that "natural and civil rights cannot be enjoyed at the same time. We must give up the one to attain the other."[60]

Understanding that the individual rights advanced as inalienable in the Preamble were natural allows the reader to recognize that for most of the delegates these rights were not inalienable when viewed from within civil society.[61] Gouverneur Morris, later the Constitution's draftsman, explained that "Natural Liberty absolutely excludes the Idea of political [civil] Liberty since it implies in every man the Right to do what he pleases. So long, therefore, as it exists Society cannot be established. And when Society is established natural Liberty must cease. . . . He who wishes to enjoy natural Rights must establish himself where natural Rights are admitted. He must live alone."[62]

As with Morris, individual natural liberty and rights were understood by most at the time as fully inalienable only under a limited number of conditions—most importantly: (1) as Morris described, when an individual lives outside of society, in what was most frequently understood to be a presocial setting; (2) as the Declaration characterized, the relation between Americans and Parliament, that is, when one people or nation attempts to legislate for another, thus depriving it of the right to govern itself; (3) as the Virginia Bill of Rights counseled, when one generation tries to "deprive or divest their posterity" of them; or (4) as Vattel noticed, when an individual wishes to depart (emigrate) from an environment in which the morally or religiously intrusive vision of the majority is at odds with

his own.[63] Individual natural rights, in sum, were important conceptual "trumps," but only in a restricted number of circumstances outside of ordinary legal ones.[64]

Jefferson not only endorsed the natural right of emigration (number 4 above),[65] but emphatically emphasized two others (numbers 2 and 3), writing that natural rights are dominant "between society and society, or generation and generation [in situations where] there is no municipal obligation, no umpire but the law of nature. We seem not to have perceived that, by the law of nature, one generation is to another as one independent nation to another."[66] In a manner still often overlooked, but one that Jefferson was especially keen to highlight,[67] the inalienable character of intergenerational natural rights, which dictated that one generation must not surrender the rights of a future one, was of central importance to the logic of colonial resistance. This is captured in the assertion of the Virginia Declaration of Rights that "all men are by nature equally free and independent, and have certain inherent rights, of which, when they enter society they cannot by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." American Revolutionary-era pamphleteers, in opposition to those who would come to defend written constitutions, emphasized that the current generation was not free to surrender the natural rights of their descendants; it was their duty to protect their children's rights to life, liberty, and property and to pass on to them these rights undiminished.[68]

Given their circumstances, not surprisingly, American essayists rarely emphasized so-called Lockean individual rights that men possessed presocially. Edmund Randolph pointedly found such claims misplaced, in that "a preamble [in this case to the Constitution] seems proper not for the purpose of designating the ends of government and human polities— This business, if not fitter for the schools . . . *is* unfit here; since we are not working on the natural rights of men not yet gathered into society, but upon those rights, modified by society, and . . . [interwoven with] the rights of states."[69] The international nature of America's dispute with Britain made presocial rights of interest only to those locked in internal disputes within particular states where some hoped that with independence from Britain, the people had returned to a state of nature with presocial natural rights. Such truly revolutionary claims, often resting on an effort to radicalize natural rights and to undermine the distinction between them and civil ones, were little countenanced by responsible political actors.[70]

Compendium_Cornell
Page 0424

## On Individual and Corporate Natural Equality and Individual Civil Inequality

In the Declaration's Preamble Jefferson wrote for his colleagues that "we hold these truths to be self-evident, that all men are created equal," and that, accordingly, they were "endowed by their Creator with certain inalienable rights; that among these, are life, liberty, and the pursuit of happiness."[71] Moreover, "to secure these rights, governments are instituted among men." Jefferson thus began the Preamble stipulating that he and his fellow Americans held all men to be created equal. Here—despite the argument of those who find something remarkable in the Congress defending natural equality for all men (quite possibly, they assert, *pace* Douglas, Jefferson and many of his colleagues meant to include women and non-Europeans, including Africans)—Jefferson was advancing a standard eighteenth-century commonplace that had been frequently advanced in earlier legal, political, and religious thought.[72]

In so doing, he provided an important ground for the implied contract between a people and their government, or, less obvious today, between distinct nations or peoples, or between connected generations of one people. This description of equality in human creation, by the canons of accepted eighteenth-century thought and practice and in the more expansive language of Virginia's Declaration of Rights, was one in which all men are "by nature equally free and independent."[73] There should be little doubt that the Preamble's "assertion that 'all men are created equal,' which became a central part of the document's moral message, had originally referred to men in a state of nature, that is, before government existed."[74] As controversial and radical as this claim would become in the future, when written, it was utterly conventional in holding that human beings are all equally free in discrete situations governed by natural-law dictates rather than statutory, common, or constitutional law and civil rights.

But, similarly evident, it is difficult to envision any number of Americans sent as delegates to Congress—be they slaveholding Southern planters, slave-importing Northern merchants, or avaricious and ambitious lawyers from the middle colonies—who would have defended, in contrast to an indeterminate natural equality, an equality of talents; an equality of group political or civil standing; or an equality of individual civil rights, be they political, social, economic, racial, or sexual.[75] For, as Alexander Hamilton pointed out, although "men are naturally equal," as soon as they enter society, they "agree to depart from the natural Equality of man—this is done in every Society."[76] Here, Hamilton followed standard eighteenth-

century authorities, such as Pufendorf, who consistently held that "in becoming a citizen, a man loses his natural liberty and subjects himself to an authority whose power includes the right of life and death," or, put differently, the state necessarily determines "what remains of each man's natural liberty, or how each must reconcile the enjoyment of his own rights with the tranquility of the state."[77] Metaphysical natural equality was not understood by most men in the eighteenth-century English-speaking world to carry over to civil society.[78]

Of special interest, as Douglas would argue, was the claim—implicit in the Preamble and explicit in the body of the Declaration, in almost every previous congressional state document, and in very numerous pamphlets—of Americans' corporate equality with their British brethren. This equality was claimed to exist between North American British and those living in the United Kingdom, all of whom, according to many, possessed the same rights.[79] Americans thus began pressing their case against the British ministry by arguing "that all individuals who belong to a single community . . . ought to be considered as equals within it."[80] Well before a handful of radicals in Massachusetts and Virginia had begun to entertain the idea of independence, most Americans were confident that they were a part of the British state and nation and, as subjects in good standing, had done nothing to warrant losing their British civil and constitutional rights. They should be able to enjoy their inherited corporate and individual civil rights equally with their British brethren. According to many in Britain and America, "No man will deny that the provincial Americans have an inherent, *unalienable Right* to all the Privileges of British Subjects."[81] Unfortunately, this position was not accepted by William Blackstone, the Crown, or by the majority in Parliament, who viewed America, along with Ireland (which at least could not be directly taxed by Parliament), as a conquered dominion of the Crown (rather than of the king) and thus subject to parliamentary control.[82]

The ministry's and Parliament's refusal even to consider their closely argued petitions challenging Parliament's sovereignty forced American spokesmen, still holding tight to their membership in the British state and nation, to conceive of themselves as a separate British people living apart, but under the umbrella of a still to be fully worked out British imperial constitution. It was this vision that gave form to much of American political writing during the ten years of the imperial crisis, 1765–75.[83] Either way, though, it was the right to equality with the king's subjects in England, to possess "equal rights with those in Britain," that Americans adamantly claimed as their own.[84]

accompanying a turn to natural rather than constitutional law in America's defense of its corporate political rights in the evolving imperial conflict. The Continental Congress made a calculated gamble when it declared that in accord with "the immutable laws of nature, the principles of the English constitution, and the several charters or compacts . . . the inhabitants of the English colonies in North-America . . . have the following RIGHTS . . . they are entitled to life, liberty and property." At this still relatively early juncture, in 1774, it was well understood that the modest inclusion of natural grounds along with copious civil ones in defense of American corporate rights was a risky maneuver that was sure to embolden domestic and overseas radicals and offend many suspicious members of Parliament with its extra-constitutional and thus necessarily separatist innuendos. Not surprisingly, the mere mention of natural law (to say nothing of rights) in this document deeply divided Congress.[119]

It did so principally because the delegates were formally committed by their instructions to seek a reconciliation with the king and his ministers (under the colonists' admittedly atavistic and monarchical understanding of the British imperial constitution).[120] Any use of the language of natural law or rights—the words closely linked in the eighteenth century with international claims of national sovereignty—they knew could only lessen that possibility. As Adams reported, on September 22, the grand committee considering America's rights, unable to decide whether to include any mention of natural rights, asked the Congress as a whole for its opinion. And "two days afterwards it was determined, against the views of Mr. Adams, that nothing should be said, at that time, of natural rights. This is said to have been caused by the influence of the conservative Virginia members, still anxious to avoid stumbling-blocks in the way of a possible return of good feeling between sovereign and people."[121] In a debate still circumscribed by British constitutional claims on both sides, with Americans seeking in fact to resurrect a monarchical form of constitutionalism that placed them in opposition to British Whigs,[122] making use of natural law or rights seemed to a majority of delegates dangerously premature, even in late 1774, likely to alienate the king and ultimately to lead to separation, and thus unwarranted and undesirable.

The sober New Yorker James Duane, for instance, greatly preferred "grounding our Rights on the Laws and Constitution of the Country from whence We sprung and Charters, without recurring to the Law of Nature—because this will be a feeble support. . . . Privileges of Englishmen were inherent, their Birthright and Inheritance, and cannot be deprived of them." The independence-seeking Virginian with close ties to British

radicalism, Richard Henry Lee, with different goals and a much more ambitious agenda in mind, took the still precocious position that "Life and Liberty, which is necessary for the Security of Life, cannot be given up when We enter into Society." In effect, he was radicalizing natural rights in a manner more common in Britain than America and denying the still widely accepted distinction between natural and civil rights.[123]

To this, the future Loyalist Joseph Galloway, a longtime ally of Benjamin Franklin, responded: "I have looked for our Rights in the Laws of Nature—but could not find them in a State of Nature, but always in a State of political Society. I have looked for them in the Constitution of the English Government, and there found them. We may draw them from this Source securely." Splitting the difference between radical and conservative positions, John Adams remembered that he "was very strenuous for retaining and insisting on it [natural law], as a Resource to which We might be driven by Parliament much sooner than We were aware."[124] His position, neither a bold claim like Lee's endorsement of inviolable individual rights incapable of being civilly limited, nor a wholesale reliance like that of Duane or Galloway on British constitutionalism, was initially rejected. Then, after Congress changed the proposed language from that of natural rights to that of natural law, it came to embody the moderate position eventually adopted by a majority of the delegates. The inclusion of a grounding of rights in natural law, though, was inflammatory to those in Parliament who opposed colonial claims to extra-constitutional rights. Still, in the end, Adams proved prescient in forecasting that Americans, on the march toward independence, soon would have need of such intellectual ammunition, even if this result was in large part because of the efforts expended by John and his cousin.

In the summer of 1776, a majority of congressional delegates decided they were unable to depend any longer on the promise of protected political rights under British constitutional law and came to believe that only with independence would the American right to self-governance be protected. They reluctantly abandoned the safety of the still highly regarded British constitution, its attendant civil rights, and the comfort it provided as they moved into unexplored territory. Only when constitutional institutions were no longer available or binding and the constitutional substructure of civil society had collapsed were Americans' duly limited British civil rights to life, liberty, and happiness recast, in international forms, as natural and inalienable ones. Indeed, even Locke had claimed as much in recognizing that "those who are united into one Body, and have a common establish'd Law and Judicature to appeal to, with Authority to decide

Controversies between them, and punish Offenders, *are in Civil Society* one with another."[125] But, still, for most of the ten years of the conflict, American authors and the politically active had fought as Britons to enjoy equal civil rights with the king's subjects at home or elsewhere in the British Empire.

Ultimately, but reluctantly and with fear on the part of many, and enthusiasm and excitement on the part of only a few, America as a newly minted nation did defend its rights as natural in international law before the court of world opinion. As a separate and equal people, they believed themselves legally justified, under an already dated understanding of international law,[126] in breaking off their relations with Britain, repulsing its aggression, and declaring themselves a fully sovereign and independent nation. The powerful effects of having exploited natural rights in separating from Britain would only slowly come to be understood.[127] For, as John Phillip Reid reminds us, the eighteenth century's original "theory of rights was confining when compared to the theory that would emerge in both British and American constitutional law during the nineteenth century. Rights in the eighteenth century were thought of as restraining arbitrary government rather than as liberating the individual."[128]

## Two Fully Inalienable Rights—One Individual, One Corporate

In the minds of most eighteenth-century Americans who left a record of such, it seems that the traditionally restrictive range of natural rights comes close to capturing their understanding of them, rather than an emerging radical one in which natural rights remained fully inalienable and inviolable in and out of civil society. With the exception of the right of religious conscience,[129] most authors understood that natural individual rights lost their inalienable status when individuals moved into civil society. Recall that natural rights were fully inalienable only in a limited number of cases: in a presocial state of nature, or, more apposite here, vis-à-vis another people, following the logic of Vatellian international law; between an intrusive and often intolerant majority and a dissatisfied emigrating individual; or, too often forgotten, between generations (this understanding would, in a world of written constitutions, prove particularly inconvenient).[130] In keeping with such standards, the "Federal Farmer" declared that only a few rights "are natural and unalienable, of which even the people cannot deprive individuals"—most particularly the individual right of religious conscience and the corporate right of popular self-governance. Most others were constitutional and could be altered or

abolished by the people in express legislative acts. Among these were such important legal rights as "the trial by jury, the benefits of the writ of habeas corpus, etc.," while still other laws "are common or mere legal rights, that is, such as individuals claim under law."[131]

The New Hampshire bill of rights views matters in much the same way. It explains that upon entering society, people surrender their natural liberty and equality and certain rights, "to insure the protection of others." Only a few rights are "unalienable, because no equivalent can be given or received for them. Of this kind are the rights of conscience."[132] According to the legal historian Philip Hamburger, the 1782 New Hampshire constitutional convention, when introducing that state's bill of rights to their constituents, explained that they had "endeavor'd therein to ascertain and define the most important and essential natural rights of men. We have distinguished betwixt the alienable and unalienable rights: For the former of which, men may receive an equivalent; for the latter, or the RIGHTS OF CONSCIENCE, they can receive none."[133] Similarly, Samuel Stillman, one of the few Baptist ministers to be well regarded in Massachusetts, noted that "some of the natural rights of mankind are unalienable, and subject to no control but that of the Deity. Such are the SACRED RIGHTS OF CONSCIENCE. Which in a state of nature, and of civil society are exactly the same. They can neither be parted with nor controled, by any human authority whatever."[134] Other than the right of religious conscience, no other natural right regularly followed the individual into society and could inviolably protect him from legislative restriction of civil rights.

Hamburger has described the well-known Presbyterian minister, William Tennent, as acknowledging "that individuals could give government the power to regulate the rights often described as inalienable—the only exception being in matters of religion." Thus, "I can communicate to my representative, a power to dispose of part of my property . . . but, cannot . . . communicate to any man on earth, a right to dispose of my conscience, and to lay down for me what I shall believe and practice in religious matters."[135] Among individual civil rights only the liberty of religious conscience was tied, in correlative fashion, to an inalienable duty and guiding moral end particular to human beings. For this reason, unlike all other natural individual rights, it could not be transferred, not even to one's legitimate representatives. Only the right of conscience claimed "an entire Exemption from all human Jurisdiction: because its Ends, Offices, and Interests, are superior to all the Ends of Civil Association; and subjecting it to the Power of Man, is inconsistent with the very Being of Religion."[136] No other individual civil right, excepting possibly that of pa-

rental control over children,[137] was comparably tied to inalienable duties that could never be legitimately surrendered, not even to one's political sovereign. By the middle of the eighteenth century, then, only one natural right was viewed as fully inalienable: the right of religious conscience was the first and, at the end of the century, still the only individual right consistently viewed as such.[138]

The dominant eighteenth-century American understanding of the differences separating natural and civil rights was especially well described in 1778 during the ratification struggle over the Massachusetts constitution. In their returns, the citizens of the villages of western Massachusetts ardently defended the inalienability only of an individual's right to religious conscience and of a people's corporate right to form or abolish its government. The then and future radical citizens of Berkshire County affirmed that "the people at large are endowed with alienable and unalienable Rights. . . . Those which are unalienable, are those which belong to Conscience respecting the worship of God and the practice of the Christian Religion, and that of being determined or governed by the Majority in the Institution or formation of Government." Only these two were fully inalienable. "The alienable are those which may be delegated for the Common good, or those which are for the Common good to be parted with."[139] From this established American perspective, the individual was fully free in serving God and family, and in joining himself to the common will of his community, but in little else.[140] And in western Massachusetts, this view of the limited character of inalienable rights was advanced by one of the most radical populations in America.

One might object for this very reason that such an understanding of the limitations imposed on natural rights was not a common sentiment, except among rural, and still largely religious, radicals in western Massachusetts. Yet the historical record indicates that such a view was not unique to them. Throughout the colonies respectable public voices defended comparable opinions regarding the elevated standing of the individual's singularly inalienable right to worship God as he or she believed pleasing to Him. Even progressive thinkers such as Jefferson and Madison adhered to similar views. Jefferson wrote that "Our rulers can have authority over such natural rights only as we have submitted to them. The rights of conscience we never submitted, we could not submit. We are answerable for them to our God."[141] Madison, in keeping with dominant attitudes, described the inexorable relationship that then still existed between rights and duties, most especially concerning those that were inalienable, and claimed that the right of religious conscience was uniquely inalienable, for

it was "the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him. This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society." Therefore, "in matters of Religion, no man's right is abridged by the institution of Civil Society, and that of Religion is wholly exempt from its cognizance."[142] Even for the remarkably progressive Madison, inalienable rights were viewed as much as a restraint on individual freedom as an individual liberty that must be corporately protected from the intrusive pressures of others.

Almost as often lauded in America was the complementary inalienable corporate right and correlative duty of a people to govern itself. Here too, it was not only Berkshire radicals who claimed this right as inalienable. Respected men like the Reverend Jonas Clark held that the right of political self-determination resides "in the people, whether emerging from a state of nature, or the yoke of oppression, [and] is *an unalienable right*."[143] Nathaniel Whitaker similarly concluded, in a manner that recalls any number of congressional declarations, that "no power on earth" was free to intervene against the people. "The freedom of a society or State consists in acting according to their own choice, within the bounds of the law of nature, in governing themselves, independent of all other States. This is the Liberty wherewith God hath made every State free, and which no power on earth may lawfully abridge, but by their own consent."[144] In Rhode Island, the lawyer and activist, Silas Downer, concurred that the "essence of the *British* constitution [is] that the people shall not be governed by laws, in the making of which they had no hand, or have their monies taken away without their own consent." This, he claimed, is both an inherited right and one that is also "a natural right which no creature can *give* [thus, inalienable], or hath a right to take away [inviolable]."[145]

Radicals of western Massachusetts, progressives like Jefferson and Madison, and even relatively conservative pastors were typical in holding that the natural rights of religious conscience and corporate self-determination were unusual in being equally inalienable both in and out of society. No other paired duties and rights matched the existential centrality and imposing responsibilities tied to individual religious conscience and corporate self-governance as divine "gifts of God" demanding unequaled inalienable status.[146] The divinely grounded rights of individual religious conscience and corporate governance would, in the most Godly obsessed part of America,[147] become the first inalienable rights with equal status in and outside of society.[148] Not surprisingly, the divine foundations of each shared little with the secular outlooks of those in Europe most readily as-

sociated with enlightened political aspirations.[149] Yet future secular authors nonetheless would exploit the moral standing of these epoch-changing claims, stripping them of their divine foundation and linkage to metaphysical and extra-personally defined duties and ends.[150]

## Conclusion

America's Declaration of Independence defends the corporate right of a people to self-government and of individuals to important natural rights that they cannot deny to their descendants and that, as inalienable natural rights, could not be surrendered to another people or legislature that sought to legislate for them illegitimately. Indeed, this principle is at the very heart of the imperial struggle that led to America's separation from Britain.[151] No extant evidence suggests that the Preamble can be properly understood as describing a radical philosophy holding that natural rights "*cannot* be given up by individuals in the name of some transcendent public good or in the name of anything else."[152] Although it is impossible to know what was inside the mind of each individual delegate when he agreed to the language of the Preamble, nothing supports a common reading of the Declaration that implies or asserts that the majority of endorsing delegates were radicals committed to tearing down traditional British North American social and political practices by reading inalienability into rights civilly awarded in lieu of surrendered natural ones.[153] Most particularly, the views of the middle and southern state moderates who refused on July 1 to support R. H. Lee's independence proclamation—the majority of delegates from South Carolina, Delaware, Pennsylvania, and New York—should not be in doubt.

As Jefferson claimed fifty years after drafting the Declaration, its central goal was to explain to the world America's reasons for declaring independence. He wrote that Americans had believed that "when forced . . . to resort to arms for redress, an appeal to the tribunal of the world was deemed proper for our justification. This was the object of the Declaration of Independence."[154] He emphasized that it had not been their goal to proclaim to a skeptical world of bankers and diplomats a bold new understanding of individual rights. It was, he recalled, "not to find out new principles, or new arguments never before thought of, not merely to say things that had never been said before; but to place before mankind the common sense of the subject, in terms so plain and firm as to command their assent, and to justify ourselves in the independent stand we are compelled to take." Thus, the individual natural rights of the Preamble are

best understood in view of the Declaration's explanatory role as a listing of grievances, rather than as an original philosophical treatise laying out a novel theory of individual rights.[155] It had been the delegates' intention in 1776, Jefferson continued, "to give expression of the American mind," without "aiming at originality of principle or sentiment."[156]

The intention of the Declaration's authors was not to claim for Americans anything theoretically new. Rather, it was to set forth in an internationally acceptable language their standing as a free and sovereign people. It is not surprising, therefore, that in the late eighteenth century, the Declaration was not taken by American and European audiences as advancing a revolutionary theory of individual rights.[157] In fact, the Preamble's rights statement was viewed as so pedestrian that it was hardly attended to at all.[158] There may have been some, radicals like Samuel Adams and Richard Henry Lee, who did understand the rights language of the Preamble as advancing a new liberal philosophy of individual rights in which the distinction between the inalienability of natural rights and the alienability of civil ones collapsed and the dependence of rights on antecedent duties was rejected. All evidence from the words and even more from the delegates' deeds, suggests that such men were few. Still, the Preamble's artfully chosen language permitted different men to comprehend in it different things. Men of moderate political sympathies, almost certainly the majority of the congressional delegates, could read it as a traditional declaration of natural rights with appropriately deferential references to the Divine, while men of more progressive sympathies might see in its language something closer to their liking.[159] Either way, such studied ambiguity was part of its genius.

In defending the corporate rather than individualistic intentions of the Declaration and its differentiation between the inalienable but circumscribed role of natural rights, and the alienable but more pervasive one for civil rights, Stephen Douglas was closer to getting the 1776 Declaration historically right. It was Lincoln, though, who, in defending an expansive view of the inalienable individual rights of all human beings, captured the future in his noble but creative act of mythmaking at Gettysburg. As the popular historian Gary Wills has noted, by altering the Declaration and appealing to what he believed to be its spirit rather than what its substantive content described, Lincoln "performed one of the most daring acts of open-air sleight-of-hand ever witnessed by the unsuspecting. Everyone in that vast throng of thousands was having his or her intellectual pocket picked. . . . Lincoln had revolutionized the Revolution, given people a new past to live with that would change their future indef-

initely."[160] But now, we must ask, "Should we continue to look the other way, or should the quest for truth impel us, in opposition to compelling reasons counseling silence, to report this theft?"

## Notes

1. See Calhoun, "Speech on the Oregon Bill," 27 June 1848, 565–67; Hazelton, *Declaration of Independence;* and more recently and among the most polemical, Breen, "Lockean Moment."

2. In spirit, I follow Friedenwald, *Declaration of Independence,* 152–53: "The Declaration of Independence . . . is the least comprehended of all the great documents produced as a result of our political development . . . [because its authors left] no precise interpretation of the commonplaces which they comprehended so clearly as to lead them to believe that all who came after must understand with like readiness. . . . My task will be, therefore, to endeavor to put before the reader of these pages something of the aspect that the Declaration had in 1776."

3. Jefferson, *Adams–Jefferson Letters,* 452.

4. For other examples of the two sharply contrasting accounts of rights offered by Lincoln and Douglas, see Adams, *Selected Writings,* 398–99, and Winthrop, *Centennial of Independence* (4 July 1876), 302–5.

5. Cited by Wright, *American Interpretations of Natural Law,* 231–32. See also Burlamaqui, *Principles of Natural Law* (1763), 1:52; White, *Philosophy of the American Revolution,* 196–97: "Let me say at once, therefore, that the term 'unalienable' does not refer to what cannot be *taken away* but rather to what cannot be *transferred* to another."

6. Lincoln, *Life and Writings,* 422–23.

7. McIlwain, *American Revolution,* 191. See also Black, "Ethics of the Declaration," 81; Friedenwald, *Declaration of Independence,* 78–79; Lucas, "Stylistic Artistry of the Declaration," 30; Armitage, "Declaration of Independence and International Law."

8. Lincoln, *Life and Writings,* 423 (citing Douglas).

9. See Dana, "Political Principles of the Declaration," 110; Malone, *Jefferson and His Time,* 1:221; Chinard, *Apostle of Americanism,* 74: "It is no longer a question of analogy, or similarity of thought—the very words [in the Declaration of Independence] are identical . . . [indeed] it was clearly Jefferson's role and duty as a delegate from Virginia to incorporate in the Declaration as much as he could of the 'Bill of Rights.'"

10. Randolph, "Edmund Randolph's Essay," 45.

11. See Bryce, "Law of Nature," 508–9; Maine, "Modern History of the Law of Nature," 88, 92.

12. Lincoln, *Life and Writings,* 423 (citing Douglas).

13. See Maine, "Modern History of the Law of Nature," 107: "The theory of International Law assumes that commonwealths are, relatively to each other, in a state of nature . . . [and] if there be a higher power connecting them, however slightly and occasionally . . . the notion of positive law is [reintroduced and] the idea of a law natural [is excluded]."

14. See Reid, "Irrelevance of the Declaration," 83, asking that the central points of Wills, *Inventing America,* be heeded: "Three lessons are taught [by Wills]. One is that the Declaration's purpose was to lay the legal foundation for an alliance with France. A sec-

S.S.F. Public Library
West Orange
840 West Orange Ave.
South San Francisco, CA 94080

South San Francisco Public Library

3 9048 08758416 9

MAY 1

# LIBERTY
# BEFORE
# LIBERALISM

—

QUENTIN SKINNER

CAMBRIDGE
UNIVERSITY PRESS

CAMBRIDGE UNIVERSITY PRESS
Cambridge, New York, Melbourne, Madrid, Cape Town, Singapore, São Paulo,
Delhi, Mexico City

Cambridge University Press
The Edinburgh Building, Cambridge CB2 8RU, UK

Published in the United States of America by Cambridge University Press, New York

www.cambridge.org
Information on this title: www.cambridge.org/9781107689534

© Q. R. D. Skinner 1998

This publication is in copyright. Subject to statutory exception
and to the provisions of relevant collective licensing agreements,
no reproduction of any part may take place without
the written permission of Cambridge University Press.

First published 1998
Thirteenth printing 2010
Canto Classics edition 2012

Printed and bound by CPI Group (UK) Ltd, Croydon, CR0 4YY

A catalogue record for this publication is available from the British Library

ISBN 978-1-107-68953-4 Paperback

Cambridge University Press has no responsibility for the persistence or accuracy
of URLs for external or third-party internet websites referred to in this publication,
and does not guarantee that any content on such websites is, or will remain,
accurate or appropriate.

'Until I was thirty years old and upwards I rarely looked at a history – except histories of philosophy, which don't count' (F. W. Maitland to Lord Acton, 20 Nov. 1896, Cambridge University Library, Add. MS 6443/197, fo. 1v).

Liberty before liberalism

The cause of the English republic was not to prevail. As the political chaos deepened after the death of Oliver Cromwell in 1658, the restoration of the monarchy came to seem only a matter of time. The immediate hopes of the English republicans expired in a final burst of eloquence when John Milton published *The Readie and Easie Way to Establish a Free Commonwealth*, the second edition of which appeared in April 1660 when preparations were already underway to welcome the returning Charles II.[50] Nevertheless, the period of the Interregnum left behind it the richest legacy of neo-roman and republican writings of the seventeenth century, in addition to nurturing the political sensibilities of such writers as Henry Neville and Algernon Sidney, both of whom sat as young members of the Long Parliament from the mid-1640s until it was forcibly dissolved by Cromwell in 1653.[51]

Pocock's interpretation, including the suggestion that Harrington is more a follower of Hobbes, see Rahe 1992, pp. 409–26 and Scott 1993, pp. 139–63.

[50] On the consistency of Milton's republicanism at the end of the 1650s see Dzelzainis 1995.

[51] Robbins 1959, p. 32; Scott 1988, pp. 86, 100–1.

The neo-roman theory of free states

II

When the neo-roman theorists discuss the meaning of civil liberty, they generally make it clear that they are thinking of the concept in a strictly political sense. They are innocent of the modern notion of civil society as a moral space between rulers and ruled,[52] and have little to say about the dimensions of freedom and oppression inherent in such institutions as the family or the labour market. They concern themselves almost exclusively with the relationship between the freedom of subjects and the powers of the state. For them the central question is always about the nature of the conditions that need to be fulfilled if the contrasting requirements of civil liberty and political obligation are to be met as harmoniously as possible.[53]

[52] They frequently use the term 'civil society', but only to distinguish the state of nature from the state in which we live as members of a commonwealth. See, for example, Harrington 1992, pp. 8, 23. As a result, they sometimes contrast civil society with the family. See, for example, Sidney 1990, II. 5, p. 96.

[53] I have deliberately used the terms freedom and liberty interchangeably here *et passim*. Pitkin 1988 rightly insists that the terms are not synonymous. But the fact remains that, among the writers I am considering, nothing of philosophical importance is felt to hang on the differences. See, for example, Hobbes 1996, p. 145, opening his

Compendium_Cornell
Page 0433

## Liberty before liberalism

When considering this question, these writers generally assume that the freedom or liberty they are describing can be equated with – or, more precisely, spelled out as – the unconstrained enjoyment of a number of specific civil rights.[54] It is true that this way of expressing the argument is not to be found in any of their ancient authorities, nor in any of the neo-roman writers on the *vivere libero* from the Italian Renaissance. Machiavelli, for example, never employs the language of rights; he always limits himself to describing the enjoyment of individual freedom as one of the *profits* or *benefits* to be derived from living under a well-ordered government.[55] By contrast, most

chapter on the liberty of subjects by speaking of 'LIBERTY, or
FREEDOM'.

[54] Although the writers I am considering generally speak of absence of restraint (rather than constraint), they assume that your liberty is undermined when you are coerced into acting as well as when you are coercively prevented. Since 'constraint' covers both eventualities (while 'restraint' only covers the latter) it seems the better word to use. Harrington is self-conscious about the matter, and prefers to speak of constraint. See Harrington 1992, p. 22. (Neville adopts the same usage: see Neville 1969, e.g., p. 111.) For a discussion of the terminological issue in precisely these terms, see the account of the correspondence between Jeremy Bentham and John Lind in Long 1977, pp. 54–61, and cf. Miller 1994, pp. 393–5, and Pettit 1997, p. 42.

[55] See Machiavelli 1960, I. 16, p. 174 and II. 2, p. 284, where he speaks of *comune utilità* and *profitti*; he never speaks of *diritti*.

18

## The neo-roman theory of free states

of the English writers I am considering (Harrington is the major exception) reveal a strong admixture of the radical political theory of the Reformation, according to which the state of liberty is the natural condition of mankind.[56] Milton summarises the conventional wisdom with magnificent assurance at the start of *The Tenure of Kings and Magistrates* in 1649 when he announces that no one 'can be so stupid to deny that all men naturally were borne free, being the image and resemblance of God himself'.[57]

The notion of a state of nature, and the claim that this condition is one of perfect freedom, were assumptions wholly foreign to the Roman and Renaissance texts. Among the seventeenth-century writers, however, they gave rise to the contention that these primitive liberties must be recognised as a God-given birthright, and hence as a set of natural rights which, in Milton's phrase, it becomes 'one main end' of government to protect and uphold.[58]

[56] On this background see Salmon 1959, esp. pp. 80–8, 101–8.

[57] Milton 1991, p. 8; cf. Neville 1969, p. 85; Sidney 1990, I. 2, pp. 8–9.

[58] Milton 1980, p. 455; cf. Neville 1969, p. 130. One cannot therefore distinguish neo-roman from contractarian accounts of civil liberty by reference to their supposedly contrasting treatment of rights. I formerly argued otherwise in consequence of focusing too exclusively on the Renaissance texts. See Skinner 1983, 1984, 1986, but cf.

19

Liberty before liberalism

Nedham makes the point even more emphatically. Not only are we endowed by God with a number of 'natural rights and liberties', but 'the end of all government is (or ought to be) the good and ease of the people, in a secure enjoyment of their rights, without pressure and oppression' from rulers or fellow-citizens.[59]

It is no part of the purpose of these writers to list these natural rights in any detail. But they generally take them to include freedom of speech, freedom of movement and freedom of contract, and they often summarise them in the form of the claim that all citizens have an equal right to the lawful enjoyment of their lives, liberties and estates.[60] John Hall makes an interesting addition to this familiar litany when he speaks of our 'pristine Liberty, and its daughter Happiness', adding that a further duty of government is to enable us to enjoy 'the positive Happiness of a civil Life'.[61] But most of the neo-roman writers

the justified criticisms in Houston 1991, esp. p. 137, and in Charvet 1993, esp. pp. 11–14.

[59] Nedham 1767, pp. 87, 11.

[60] For the acceptance of this contention by all parties in later seventeenth-century England see Harris 1990.

[61] [Hall] 1700, pp. 10, 15. Given that Thomas Jefferson read Harrington, and given that Jefferson subsequently yoked together 'life, liberty and the pursuit of happiness', it is suggestive that John Hall's

20

The neo-roman theory of free states

content themselves with enjoining our rulers, in Nedham's words, to uphold 'security of life and estate, liberty and property'.[62] Sidney, for example, speaks of 'the laws that enjoin the preservation of the lands, liberties, goods and lives of the people',[63] while Neville repeatedly speaks of 'lives, liberties and estates', invoking the phrase that John Locke was later to make canonical in his *Two Treatises of Government*.[64]

When these writers turn to consider these freedoms and how they can best be preserved, they invariably bring to bear two basic assumptions about the idea of civil liberty.[65] It is on these assumptions

tract was reprinted (under the initials 'J. H.') in John Toland's edition of Harrington's works in 1700. This is the edition I use.

[62] Nedham 1767, pp. 72–3.

[63] Sidney 1990, III. 16, p. 403; cf. III. 21, p. 444 and III. 25, pp. 464–5.

[64] Neville 1969, pp. 122, 125, 131, 185; cf. Locke 1988, esp. II. 123, p. 350. On Locke's account of these rights see Tully 1980, pp. 163–74.

[65] Up to this point, the assumptions of the writers I am considering were shared by those who defended the parliament at the outbreak of the civil war by reference to the 'monarchomach' claim (put forward, as we have seen, by Henry Parker among others) that the people, naturally free and originally sovereign, merely delegate their sovereign powers to be exercised for their benefit, while retaining ultimate rights of sovereignty and in consequence the right to remove any ruler acting to their detriment rather than benefit. On this 'monarchomach' theory see Skinner 1978, vol. II, pp. 302–48. For Parker's articulation of the theory in 1642 see [Parker] 1934, esp.

21

Compendium_Cornell
Page 0435

Liberty before liberalism

that I now wish to concentrate. One reason for
adopting this focus is that their views about the
meaning of liberty have seldom been subjected to
detailed analysis.[66] But my principal reason is that the
theory of liberty they espouse appears to me to
constitute the core of what is distinctive about their
thought. More than their sometimes ambiguous
republicanism,[67] more even than their undoubted

pp. 168, 170–1, 186. Some commentators have called this line of
thought 'republican'. See, for example, Tuck 1993, pp. 221–53. But
while Parker is clearly opposed to tyranny, and while his line of
argument was capable of being deployed (as it was by Milton) to
defend the regicide, it is not inherently republican in the sense of
embodying a repudiation of the institution of monarchy. Parker
himself insists that he is 'zealously addicted to Monarchy'. See
[Parker] 1934, p. 207. A fully fledged republicanism only emerges
once the two distinctive premises of the writers I am considering
are added to the argument.

[66] This is not in the least to say, however, that I have lacked for
guidance. For the Roman background see Wirszubski 1960 and
Brunt 1988; for Machiavelli's views on liberty see Colish 1971; for
Machiavelli's and Harrington's views see the classic discussion in
Pocock 1975, esp. pp. 186–8, 196–9, 392–3; for Sidney see Scott 1988,
esp. pp. 35–42; Houston 1991, esp. pp. 108–22; Scott 1991, esp. pp.
201–28. For a general discussion, to which I am especially indebted,
see Pettit 1997, esp. pp. 17–78.

[67] Pettit 1997, p. 15 characterises the writers I am discussing as
exponents of 'republican freedom'. As I have noted, however, this
usage is liable to mislead. Some were republicans in the strict sense
of repudiating the institution of monarchy, but others stressed the

The neo-roman theory of free states

commitment to a politics of virtue,[68] their analysis of
civil liberty marks them out as the protagonists of a
particular ideology, even as the members of a single
school of thought.

The first of their shared assumptions is that any
understanding of what it means for an individual
citizen to possess or lose their liberty must be
embedded within an account of what it means for a
civil association to be free.[69] They accordingly begin
by focusing not on the freedom of individuals but
rather on what Milton calls 'common liberty' or 'free
government',[70] what Harrington calls 'the liberty of a
commonwealth',[71] and what Sidney later calls 'the
Liberties of Nations'.[72] As Nedham's title resound-
ingly reminds us, the leading aspiration of all these

compatibility of their theory of liberty with regulated forms of
monarchical government. See below, notes 174 and 176.

[68] Worden 1994a, p. 46 argues by contrast that 'it is as a politics of
virtue that republicanism most clearly defines itself'.

[69] For the same emphasis in the Roman sources see Wirszubski 1960,
pp. 4–5. Note by contrast that, in 'monarchomach' texts such as
Henry Parker's *Observations* of 1642, there is no discussion of free
states; the question of whether England can or ought to become a
free state is never raised.

[70] Milton 1962, pp. 343, 472, 561; Milton 1980, pp. 420, 424, 432.

[71] Harrington 1992, p. 19. Cf. the repeated references to 'free common-
wealths' in Milton 1980, pp. 407, 409, 421, 424, 429, 456, 458.

[72] Sidney 1990, II. 31, p. 303; cf. III. 34, p. 514.

22

23

Compendium_Cornell
Page 0436

Liberty before liberalism

writers is to vindicate 'the excellency of a free state'.[73]

The clue to understanding what these writers mean by predicating freedom of entire communities lies in recognising that they treat as seriously as possible the ancient metaphor of the body politic. Nedham opens *The Excellency of a Free State* by comparing 'motions in bodies natural' with those in bodies civil, and repeatedly speaks of 'the body of the people' and 'the whole body of a commonweal'.[74] Harrington similarly refers in *Oceana* to 'the whole body of the people' and later informs us in his *System of Politics* that 'the form of a government is the image of man'.[75] But it is Neville who makes the most systematic use of the traditional imagery, employing it to provide the framework of the three dialogues that go to make up his *Plato Redivivus*. He begins by introducing us to three characters, one of whom is a Noble Venetian, a member of the body politic currently enjoying the best state of political health.[76] We learn, however, that he himself has lately been

[73] Nedham 1767, title page.
[74] Nedham 1767, pp. 4, 62, 69, 173. Sidney prefers to speak of the body of the nation. See Sidney 1990, II. 19, p. 190; III. 44, p. 565.
[75] Harrington 1992, pp. 24, 273.
[76] Neville 1969, p. 82.

24

The neo-roman theory of free states

distempered in body, and has come to England in search of medical advice.[77] This serves to introduce us to the second participant in the dialogues, the figure of the Doctor by whom he has been cured. We then learn that both these characters wish to enquire of the third participant, an English Gentleman, about the comparable distempers afflicting the body politic of his native land. The Gentleman duly assures them that the English state has lately collapsed in so much agony that it has almost expired.[78] The rest of the dialogues are then given over to outlining the Gentleman's plans for restoring the body politic of England to health.[79]

The principal way in which these writers pursue this metaphor is by examining the sense in which natural and political bodies are alike capable of possessing and forfeiting their liberty. Just as individual human bodies are free, they argue, if and only if they are able to act or forbear from acting at will, so the bodies of nations and states are likewise free if and only if they are similarly unconstrained from using their powers according to their own wills in

[77] Neville 1969, pp. 73–4.
[78] Neville 1969, p. 81.
[79] Neville 1969, p. 76.

25

Compendium_Cornell
Page 0437

Liberty before liberalism

pursuit of their desired ends. Free states, like free persons, are thus defined by their capacity for self-government.[80] A free state is a community in which the actions of the body politic are determined by the will of the members as a whole.

An obvious inspiration for this commitment is provided by Machiavelli's *Discorsi*, the opening of which defines free cities as 'those which are governed by their own will'.[81] Nedham picks up the idea at the start of his *Excellency of a Free State*, declaring that in speaking of free peoples we are speaking of those who act as 'keepers of their own liberties'.[82] Sidney in his *Discourses* later refers yet more directly to the underlying analogy with the freedom of individuals. ''Tis ordinarily said in France, *il faut que chacun soit servi a sa mode;* Every man's business must be done according to his own mind: and if this be true in particular persons, 'tis more plainly true in whole nations.'[83]

These assumptions carry with them a number of

---

[80] While this analogy is present in all the seventeenth-century writers I discuss, it is even more plainly stated by some of the eighteenth-century commonwealthmen. See, for example, Price 1991, pp. 22, 79, 84.

[81] Machiavelli 1960, I, 2, p. 129 speaks of *cittadi* free from *servitii* as those 'governate per loro arbitrio'.

[82] Nedham 1767, p. 2 *et passim.*

[83] Sidney 1990, III, 16, p. 403.

26

---

The neo-roman theory of free states

constitutional implications to which the neo-roman theorists almost invariably subscribe. One is that, if a state or commonwealth is to count as free, the laws that govern it – the rules that regulate its bodily movements – must be enacted with the consent of all its citizens, the members of the body politic as a whole.[84] For to the extent that this does not happen, the body politic will be moved to act by a will other than its own, and will to that degree be deprived of its liberty.

Nedham develops this argument in the course of explaining what made the ancient Romans a free people. They were 'free indeed' because 'no laws could be imposed upon them without a consent first had in the people's assemblies'. He infers that 'the only way to prevent arbitrariness, is, that no laws or dominations whatsoever should be made, but by the people's consent'.[85] Harrington enlarges on the same

---

[84] Note the contrast with John Locke's understanding of consent in his *Two Treatises of Government*. As Dunn 1969, pp. 141–7 shows, Locke employs the concept only to talk about the origins of legitimate government. Cf. Locke 1988, esp. II, 95–122, pp. 330–49. The writers I am considering add the more radical demand that each law must be enacted with the consent of those who will be subject to it. On the associated question of Locke's understanding of political liberty see Tully 1993, pp. 281–323.

[85] Nedham 1767, pp. xxii, 32–3; cf. pp. 28–9, 114–15.

27

---

Compendium_Cornell
Page 0438

Liberty before liberalism

point in his quirkiest style when he maintains that the fundamental secret of free government is known to any girl who has ever been asked to cut a cake. Take two girls, he says, who 'have a cake yet undivided, which was given between them. That each of them therefore may have that which is due, "Divide", says one unto the other, "and I will choose; or let me divide, and you shall choose." If this be but once agreed upon, it is enough.'[86] More ponderously, but in the same spirit, Sidney defines a free state as 'a compleat body, having all power in themselves over themselves', in which everyone is 'equally free to enter into it or not', so that no one can 'have any prerogative above others, unless it were granted by the whole'.[87]

Critics have sometimes complained that to speak of a body politic as the possessor of a will is a confused and potentially dangerous piece of metaphysics.[88] But the neo-roman theorists are at pains to insist that they have nothing at all mysterious in mind. When they speak about the will of the people, they mean nothing more than the sum of the wills of

[86] Harrington 1992, p. 22.
[87] Sidney 1990, II. 5, p. 99.
[88] See, for example, the cautionary remarks in Berlin 1958, esp. pp. 17, 19, 43.

28

The neo-roman theory of free states

each individual citizen. As Harrington puts it, 'the people, taken apart, are but so many private interests, but if you take them together they are the public interest'.[89] Nor are they so naive as to assume that we can always – or even very frequently – expect these wills and interests to converge on any one outcome. Rather they assume that, when we speak about the will of the people, we must in effect be referring to the will of the majority. Osborne sardonically assures us that the people are 'so modest as to confess themselves and their judgments implicitly contain'd in the suffrages of the major part, though the law pass'd be never so contrary to their sense'.[90] Nor do they ever declare this to be a wholly satisfactory solution to the problem of minority rights. They merely insist (as we do) that it is hard to think of a better procedural rule for enabling bodies of people to act. As Sidney explains, the reason why we are bound to regard the will of the majority as conclusive is that government becomes impossible if everyone retains 'a right, by their dissent, to hinder the resolutions of the whole body'.[91]

[89] Harrington 1992, p. 166.
[90] [Osborne] 1811, p. 164.
[91] Sidney 1990, II. 5, p. 104.

29

Compendium_Cornell
Page 0439

Liberty before liberalism

A further constitutional implication suggested by the metaphor of the body politic is that the government of a free state should ideally be such as to enable each individual citizen to exercise an equal right of participation in the making of laws. For this alone will ensure that all acts of legislation duly reflect the explicit consent of every member of the body politic as a whole. As Nedham affirms, if the people are to have 'any real liberty', they must be 'possessed of the power' of 'enacting and repealing laws' and 'duly qualified with the supreme authority'.[92] Milton agrees that, if we are to count as a free people, we must submit only to 'such Laws as our selves shall choose'.[93] Sidney later adds that, when we speak of nations that have enjoyed liberty, we mean those nations that 'were, and would be, governed only by laws of their own making'.[94]

It is acknowledged, however, that self-government in this literal sense poses some almost insurmountable difficulties. Of these the most obvious, as Harrington observes, is that 'the whole body of the people' is 'too unwieldy a body to be assembled'.[95]

---

[92] Nedham 1767, pp. xv, 23.
[93] Milton 1962, p. 519.
[94] Sidney 1990, I. 5, p. 17; cf. II. 5, p. 99; III. 31, p. 502.
[95] Harrington 1992, p. 24; cf. Sidney 1990, II. 5, pp. 102–3.

30

---

The neo-roman theory of free states

Sir Thomas More had put forward one possible solution in his *Utopia* of 1516, at the time when the ideal of the *civitas libera* was first being seriously canvassed in England. A genuine *res publica*, More suggests, must take the constitutional form of a federated republic. One of the first things we learn about the newly discovered island of Utopia is that its citizens live in fifty-four self-governing cities that manage their own affairs by means of annually elected magistrates chosen from among themselves.[96] Milton enthusiastically takes up the idea in his *Ready and Easie Way to Establish a Free Commonwealth*, in which he ends by proposing that 'every countie in the land' should become 'a kinde of subordinate Commonaltie'.[97] The effect will be to enable the body of the people 'in all things of civil government' to have 'justice in thir own hands', so that they will have 'none then to blame but themselves, if it be not well administerd'.[98]

Among the writers I am considering, however, few exhibit any enthusiasm for giving what Nedham calls 'the confused promiscuous body of the people'

---

[96] More 1965, pp. 112, 122.
[97] Milton 1980, p. 458.
[98] Milton 1980, p. 459.

31

Compendium_Cornell
Page 0440

Liberty before liberalism

any direct share in government.[99] Even Milton complains that the masses tend to be 'exorbitant and excessive',[100] while Neville thinks it obvious that they are 'less sober, less considering, and less careful of the public concerns' than is necessary for strict self-government.[101] Sidney summarises the general attitude in his usual tones of aristocratic fastidiousness. 'As to popular government in the strictest sense (that is pure democracy, where the people in themselves, and by themselves, perform all that belongs to government), I know of no such thing; and if it be in the world, I have nothing to say for it.'[102]

The right solution, they generally agree, is for the mass of the people to be represented by a national assembly of the more virtuous and considering, an assembly chosen by the people to legislate on their behalf.[103] There is sharp disagreement, however,

[99] Nedham 1767, p. 38.
[100] Milton 1962, p. 343.
[101] Neville 1969, p. 102.
[102] Sidney 1990, II. 19, p. 189.
[103] Some further constitutional implications come into view at this point. We are being told that, if the freedom of the commonwealth is to be upheld, there must be a willingness on the part of the people (or their representatives) to devote their time and energy to acting for the common good. To state the assumption in the terminology of the Renaissance texts, the people must possess *virtù*.

32

The neo-roman theory of free states

over the type of legislative body best adapted to this purpose in the case of the English commonwealth. Some contend that the House of Commons is adequately representative in itself. This is the emphatic view of such writers as Osborne, Nedham and Milton in the opening years of the commonwealth. Hired propagandists of the Rump Parliament, whose ordinances had abolished the monarchy and the House of Lords, they dutifully insist that, as Osborne puts it, 'the house of commons' is now 'the fairest, most naturall, and least partiall representative of the whole nation'.[104] Nedham agrees that 'the people's representatives in parliament' now constitute 'the

But the problem is that *virtù* is rarely encountered as a natural quality: most people prefer to follow their own interests rather than the common good. To put the point again in Renaissance terminology, the people incline to *corruzione*, not *virtù*. The main constitutional implication is that, if civic virtue is to be encouraged (and public liberty thereby upheld), there will have to be laws designed to coerce the people out of their natural but self-defeating tendency to undermine the conditions necessary for sustaining their own liberty. I have attempted to pursue this aspect of the argument in Skinner 1981, esp. pp. 56–73, and in Skinner 1983 and 1984. On the place of civic virtue in republican theories of citizenship see also Oldfield 1990, esp. pp. 31–77, and Spitz 1995, esp. pp. 341–427. For the clearest statement among the writers I am considering of the idea that the people may have to be *forcé d'être libre*, see Milton 1980, esp. p. 455.

[104] [Osborne] 1811, p. 163.

33

supreme power of the nation',[105] while Milton never ceased to thunder out the same message. We still find him proclaiming as late as 1660 that 'a free Commonwealth without single person or house of lords, is by far the best government', and thus that in England the House of Commons constitutes 'the only true representatives of the people, and thir libertie'.[106]

Harrington makes it plain in *Oceana* that he is appalled by this view of parliament,[107] if only because it ignores the moral of the story about the girls and the cake. To govern with only one council is to place the right to deliberate and the right to enact policies in the same hands. As the girls well know, however, if the same councillors divide and choose, there will be nothing to stop them from keeping the whole cake for themselves. This makes it essential to govern with two separate councils, one of which deliberates while the other carries out what has been agreed. Harrington further believes that the deliberative council ought to take the form of an elected senate drawn from the nobility, his rather

[105] Nedham 1767, pp. ix–x.
[106] Milton 1980, pp. 429, 447.
[107] Harrington 1992, esp. pp. 64–6.

## The neo-roman theory of free states

optimistic reason being that 'the wisdom of the commonwealth is in the aristocracy'.[108] By contrast, the executive council should remain in the hands of the populace – or rather, their elected representatives – on the grounds that 'the interest of the commonwealth is in the whole body of the people'.[109]

It is hardly surprising that, after the restoration of the British monarchy and House of Lords in 1660, it was Harrington's view that prevailed, even among the most radical of the neo-roman writers on free commonwealths. Neville follows Harrington, as he so often does, by speaking in favour of a senate and a house of representatives, adding that the senate should be elected by parliament as a whole.[110] As doubtless befitted the son of an earl,[111] Sidney speaks even more fervently of the need for 'a great and brave nobility' to temper the absolutism of monarchs and the excesses of the multitude.[112] Thereafter the ideal of a mixed and balanced constitution remained at the heart of the proposals put forward by the so-called commonwealthmen in the eighteenth century,

[108] Harrington 1992, pp. 21–2.
[109] Harrington 1992, pp. 22, 64–6.
[110] Neville 1969, pp. 103, 192.
[111] On Sidney's family background see Scott 1988, pp. 43–58.
[112] Sidney 1990, I. 10, p. 31; II. 16, pp. 166–70; III. 37, pp. 526–7.

Compendium_Cornell
Page 0442

Liberty before liberalism

and eventually came to be enshrined (with the monarchical element converted into a presidential one) in the constitution of the United States.

### III

I now want to consider the other distinctive argument put forward by the neo-roman theorists about the idea of civil liberty. This further claim emerges as soon as they turn to discuss those states which are governed not by the will of their own citizens, but rather by the will of someone other than the community as a whole. Speaking of such states, they again disclose how seriously they take the analogy between natural bodies and political ones. They assume that what it means to speak of a loss of liberty in the case of a body politic must be the same as in the case of an individual person. And they go on to argue – in the clearest proclamation of their classical allegiances[113] – that what it means for an individual person to suffer a loss of liberty is for that person to be made a slave. The question of what it means for a nation or state to

---

[113] It seems important to underline this point, if only because a number of recent commentators (notably Rahe 1992) have argued for a sharp distinction between ancient and modern republicanism.

36

---

The neo-roman theory of free states

possess or lose its freedom is accordingly analysed entirely in terms of what it means to fall into a condition of enslavement or servitude.[114]

Once again, Machiavelli's *Discorsi* provides an obvious inspiration for this line of thought. Machiavelli's opening chapters largely hinge on a distinction between cities which 'began their lives in freedom'[115] and cities 'which in origin were not free',[116] the latter being described in turn as living in servitude.[117] John Hall closely follows this analysis in comparing the achievements of ancient Rome, which 'brought forth good Laws and Augmentations of Freedom', with the predicament of so many modern monarchies, which 'languish in a brutish Servitude' and live 'like Slaves'.[118] Milton mounts the same comparison at

---

[114] The contrast between freedom and slavery is noted in Wirszubski 1960, pp. 1–3; Pocock 1977, p. 57; Worden 1994b, pp. 100–1. See also Houston 1991, pp. 102, 108–22 on the distinction between freedom and slavery as Sidney's starting-point. But it is Pettit who has done most of all to bring out the significance of the contrast. See Pettit 1997, esp. pp. 22, 31–2, an analysis to which I am deeply indebted.

[115] See Machiavelli 1960, I. 1, p. 129 for the claim that Rome enjoyed a 'principio libero'.

[116] See Machiavelli 1960, I. 1, p. 126 on Florence's lack of an 'origine libera'.

[117] Machiavelli 1960, I. 2, p. 129 on cities living in 'servitù'.

[118] [Hall] 1700, p. 15.

37

*Books by Richard Slotkin*

FICTION

*The Return of Henry Starr* (1988)

*The Crater* (1980)

NONFICTION

*Gunfighter Nation: The Myth of the Frontier
   in 20th-Century America* (1992)

*The Fatal Environment: The Myth of the Frontier
   in the Age of Industrialization, 1800–1890* (1985)

*So Dreadfull a Judgment: Puritan Responses to
   King Philip's War, 1675–1677*
   (with James K. Folsom; 1978)

*Regeneration Through Violence:
   The Mythology of the American Frontier
   1600–1860* (1973)

# GUNFIGHTER NATION

## The Myth of
## the Frontier in
## Twentieth-Century
## America

# RICHARD SLOTKIN

UNIVERSITY OF OKLAHOMA PRESS

NORMAN

Compendium_Cornell
Page 0444

tivity in which a linguistic or psychological program of some sort—a "collective unconscious" or a "grammar" of tropes or archetypes—determines the essential structure of all myth/ideological expression.[12] But such approaches tend to obscure the importance of historical experience and change in the shaping of specific myth/ideological systems and in the social life of the communities the systems serve. We will therefore be considering both myth and genre as phenomena shaped by historical contingency, rather than as archetypes generated either by "the nature of things" or "the nature of language."

### The Politics of Myth

Among the many historical contingencies that shape mythic expression, the one that will concern us most is the state of social politics. The work of myth-making exists "for the culture" that it serves, and we therefore speak of it as if it were somehow the property or production of the culture as a whole. But the actual work of making and transmitting myths is done by particular classes of persons; myth-making processes are therefore responsive to the politics of class difference.

In modern society the mass media provide the broadest-based and most pervasive means for canvassing the world of events and the spectrum of public concerns, for recalling historical precedents, and for translating them into the various story-genres that constitute a public mythology. Since the concern of commercial media is to exploit as wide an audience as possible, their repertoire of genres in any period tends to be broad and various, covering a wide (though not all-inclusive) range of themes, subjects, and public concerns. Within the structured marketplace of myths, the continuity and persistence of particular genres may be seen as keys to identifying the culture's deepest and most persistent concerns. Likewise, major breaks in the development of important genres may signal the presence of a significant crisis of cultural values and organization. The development of new genres, or the substantial modification of existing ones, can be read as a signal of active ideological concern in which both the producers and consumers of mass media participate—producers as exploitative promulgators and "proprietors" of their mythic formulations, consumers as respondents capable of dismissing a given mythic formulation or of affiliating with it.[13]

But we should not assume that the mythologies of mass media are

a kind of modern "folklore," or that they constitute the totality of "American culture." The productions of the cultural industries are indeed varied and ubiquitous—from the newspapers and mass entertainment to the textbooks that teach our children the authorized versions of American history and literature—but the authority of these "mass culture" productions has been and is offset by the influence of other forms of culture and expression that are genuinely "popular": produced by and for specific cultural communities like the ethnic group, the family-clan, a town, neighborhood, or region, the workplace, or the street corner. Although few of these subcultural entities are now isolated from the influence of mass media, they are still capable of generating their own myths and their own unique ways of interpreting the productions of the media. A Harlem or a Little Italy, an Appalachian or Mississippi Delta county, a Hasidic or Mennonite community, a rust-belt milltown or a mining town, have been and in many cases continue to be centers of exception or resistance to the formulations of the commercial culture industries, and their productions (particularly in music) affect the development of mass culture. Nonetheless, the symbols and values generated by mass culture have steadily infiltrated, transformed, and compromised the autonomy of "local" cultures. For that reason, I think it is useful to speak not only of "mass culture" but of the development of an "industrial popular culture," whose artifacts are produced primarily by a commercial culture industry but whose symbols become active constituents of a *popular* culture—that is, the belief and value structures of a national audience or public.[14]

The mythology produced by mass or commercial media has a particular role and function in a cultural system that remains complex and heterodox. It is the form of cultural production that addresses most directly the concerns of Americans as citizens of a nation-state.[15] The history of the development of the forms and institutions of commercial or mass popular culture is directly related to the development of a political ideology of American nationality and to the creation of nationwide networks of production and distribution. The basic structure of this commercialized national culture were developed between the Revolution and the Civil War with the emergence of national parties and the development of a nationwide trade in books, magazines, and newspapers utilizing an ever-expanding transportation network. Between the Civil War and the Great War the nascent "culture industries" took advantage of new technologies to meet the demands of an ever-growing and increasingly polyglot cul-

Compendium_Cornell
Page 0445

ture with varied and complex needs and tastes. By the 1920s this form of cultural production was fully industrialized and had become so ubiquitous that it is fair to characterize it as the clearest expression of our "national culture": when we look beyond the family, ethnic community, or workplace for symbols expressive of our "American" identity, we find the mythologies of the popular culture industry.[16]

Since I am concerned with tracing the historical development of a *national* myth/ideology, I will approach the producer/audience dialectic from the producers' side. This approach has the disadvantage of underemphasizing the complex and various ways in which different audiences receive the production of the culture industries. Audience response can be inferred from the modifications producers make in response to shifts in circulation or box-office receipts; but these readings of audience response are always distorted by the traditional biases and institutional biases of the industry. Nonetheless, by focusing on the producers we can study more closely the dynamics of myth-production in the particular cultural site that has acquired the power to address us *as if* it spoke for an "American" national culture.

### Regeneration Through Violence: The Language of the Myth

The Myth of the Frontier is our oldest and most characteristic myth, expressed in a body of literature, folklore, ritual, historiography, and polemics produced over a period of three centuries. According to this myth-historiography, the conquest of the wilderness and the subjugation or displacement of the Native Americans who originally inhabited it have been the means to our achievement of a national identity, a democratic polity, an ever-expanding economy, and a phenomenally dynamic and "progressive" civilization. The original ideological task of the Myth was to explain and justify the establishment of the American colonies; but as the colonies expanded and developed, the Myth was called on to account for our rapid economic growth, our emergence as a powerful nation-state, and our distinctively American approach to the socially and culturally disruptive processes of modernization.

The peculiarities of the American version of this myth/ideology derived from our original condition as a settler-state, a colonial outpost of the European "metropolis." In America, all the political, social, and economic transformations attendant on modernization began

with outward movement, physical separation from the originating "metropolis." The achievement of "progress" was therefore inevitably associated with territorial expansion and colored by the experience, the politics, and the peculiar psychology of emigration.[17]

Euro-American history begins with the self-selection and abstraction of particular European communities from their metropolitan culture, and their transplantation to a wilderness on the other side of the ocean where conditions were generally more primitive than those at home.[18] These colonies in turn would expand by reproducing themselves in subcolonial settlements, projected at some distance from the colonial metropolis into a further and more primitive wilderness. Thus the processes of American development in the colonies were linked from the beginning to a historical narrative in which repeated cycles of *separation* and *regression* were necessary preludes to an improvement in life and fortune.

*Conflict* was also a central and peculiar feature of the process. To establish a colony or settlement, the Europeans had to struggle against an unfamiliar natural environment and against the non-European, non-White natives for whom the wilderness was home. Violence is central to both the historical development of the Frontier and its mythic representation. The Anglo-American colonies grew by displacing Amerindian societies and enslaving Africans to advance the fortunes of White colonists. As a result, the "savage war" became a characteristic episode of each phase of westward expansion.

Conflict with the Indians defined one boundary of American identity: though we were a people of "the wilderness," we were *not* savages. The other boundary was defined by the emergence of conflicts between the colonies and the "mother country," and (later) between the regional concerns of the "borderers" and those of American metropolitan regimes. The compleat "American" of the Myth was one who had defeated and freed himself from both the "savage" of the western wilderness and the metropolitan regime of authoritarian politics and class privilege.[19]

In each stage of its development, the Myth of the Frontier relates the achievement of "progress" to a particular form or scenario of violent action. "Progress" itself was defined in different ways: the Puritan colonists emphasized the achievement of spiritual regeneration through frontier adventure; Jeffersonians (and later, the disciples of Turner's "Frontier Thesis") saw the frontier settlement as a re-enactment and democratic renewal of the original "social contract"; while Jacksonian Americans saw the conquest of the Fron-

tier as a means to the regeneration of personal fortunes and/or of patriotic vigor and virtue. But in each case, the Myth represented the redemption of American spirit or fortune as something to be achieved by playing through a scenario of separation, temporary regression to a more primitive or "natural" state, and *regeneration through violence.*

At the core of that scenario is the symbol of "savage war," which was both a mythic trope and an operative category of military doctrine. The premise of "savage war" is that ineluctable political and social differences—rooted in some combination of "blood" and culture—make coexistence between primitive natives and civilized Europeans impossible on any basis other than that of subjugation. Native resistance to European settlement therefore takes the form of a fight for survival; and because of the "savage" and bloodthirsty propensity of the natives, such struggles inevitably become "wars of extermination" in which one side or the other attempts to destroy its enemy root and branch. The seventeenth-century Puritans envisioned this struggle in biblical terms—"Two Nations [are in] the Womb and will be striving"—and urged their soldiers to exterminate the Wampanoags as God commanded Israel to wipe out the Amalekites. But similar ideas informed the military thinking of soldiers in the Age of Reason, like Colonel Henry Bouquet, who described an "American war" as "a rigid contest where all is at stake and mutual destruction the object . . . [where] everything is terrible; the face of the country, the climate, the enemy . . . [where] victories are not decisive but defeats are ruinous; and simple death is the least misfortune that can happen." Military folklore from King Philip's War to Braddock's Defeat to Custer's Last Stand held that in battle against a savage enemy you always saved the last bullet for yourself; for in savage war one side or the other must perish, whether by limitless murder or by the degrading experience of subjugation and torture.[20]

In its most typical formulations, the myth of "savage war" blames Native Americans as instigators of a war of extermination. Indians were certainly aggressors in particular cases, and they often asserted the right to exclude settlers from particular regions. But with the possible exception of Tecumseh's abortive attempt at a confederacy of western tribes, after 1700 no tribe or group of tribes pursued (or was capable of pursuing) a general "policy" of exterminating or removing White settlements on a large-scale basis. The accusation is better understood as an act of psychological projection that made the Indians scapegoats for the morally troubling side of American ex-

pansion: the myth of "savage war" became a basic ideological convention of a culture that was itself increasingly devoted to the extermination or expropriation of the Indians and the kidnaping and enslavement of black Africans.[21]

In American mythology, the Indian war also provides a symbolic surrogate for a range of domestic social and political conflicts. By projecting the "fury" of class resentment outward against the Indian, the American expands his nation's resources and thereby renders class struggle unnecessary. All the antipathies that make for Revolutionary Terror and/or dictatorial oppression in Europe are projected onto the American savage, who becomes the only obstacle to the creation of a perfect republic. But this historical myth and its hopeful political scenario can only be realized so long as a frontier exists: a reservoir of natural resources sufficient to requite the ambitions of all classes without prejudice to the interests of any.[22]

In analyzing the structure and meaning of this mythology of violence, it is vital that we not confuse mythic representation with political reality. The mythic tales and polemics we will be examining are rife with visions of border wars that turn overnight into preludes to Armageddon and with proposals for genocide and wars of extermination. And there has been enough actual violence along these lines—the Indian wars, the slave trade, "lynch law" and race riots, the labor/management violence of 1880–1920, and our currently high levels of domestic and criminal violence—to support the belief that America has been a peculiarly violent nation. However, most of these apparently distinctive forms of political and social violence have also figured with comparable prominence in the histories of other settler-states, and of Europe. Neither the slave trade nor the subjugation/extermination of natives by colonists was an exclusively Anglo-American enterprise. The mass genocides of modern times belong not to the history of the Americas, but to Europe, Asia, and Africa.[23] What is distinctively "American" is not necessarily the amount or kind of violence that characterizes our history but the mythic significance we have assigned to the kinds of violence we have actually experienced, the forms of symbolic violence we imagine or invent, and the political uses to which we put that symbolism.

When history is translated into myth, the complexities of social and historical experiences are simplified and compressed into the action of representative individuals or "heroes." The narrative of the hero's action exemplifies and tests the political and/or moral validity of a particular approach to the use of human powers in the material

world. The hero's inner life—his or her code of values, moral or psychic ambivalence, mixtures of motive—reduces to personal motive the complex and contradictory mixture of ideological imperatives that shape a society's response to a crucial event. But complexity and contradiction are focused rather than merely elided in the symbolizing process. The heroes of myth embody something like the full range of ideological contradictions around which the life of the culture revolves, and their adventures suggest the range of possible resolutions that the culture's lore provides.

The moral landscape of the Frontier Myth is divided by significant borders, of which the wilderness/civilization, Indian/White border is the most basic. The American must cross the border into "Indian country" and experience a "regression" to a more primitive and natural condition of life so that the false values of the "metropolis" can be purged and a new, purified social contract enacted. Although the Indian and the Wilderness are the settler's enemy, they also provide him with the new consciousness through which he will transform the world. The heroes of this myth-historical quest must therefore be "men (or women) who know Indians"—characters whose experiences, sympathies, and even allegiances fall on both sides of the Frontier. Because the border between savagery and civilization runs through their moral center, the Indian wars are, for these heroes, a spiritual or psychological struggle which they win by learning to discipline or suppress the savage or "dark" side of their own human nature. Thus they are mediators of a double kind who can teach civilized men how to defeat savagery on its native grounds—the natural wilderness, and the wilderness of the human soul.

The myths of regeneration through violence were developed during the initial stages of colonial experience, in two genres of personal narrative, which first appeared in New England in the aftermath of King Philip's War (1675–77). The first was the "captivity narrative," modeled on the popular personal account of Mary Rowlandson (1682). Through the captivity-myth, the structures of Protestant-Christian mythology which the settlers had brought from Europe were applied to the secular experiences of colonization. Captivity narratives (both historical and fictional) were among the most popular and prevalent form of American adventure story for most of the eighteenth century. The hero of the captivity narrative is a White woman (or minister) captured by Indians during a "savage war." The captive symbolizes the values of Christianity and civilization that are imperiled in the wilderness war. Her captivity is figuratively a descent

into Hell and a spiritual darkness which is akin to "madness." By resisting the physical threats and spiritual temptations of the Indians, the captive vindicates both her own moral character and the power of the values she symbolizes. But the scenario of historical action developed by the captivity narrative is a passive one that emphasizes the weakness of colonial power and ends not with a victorious conquest but with a grateful and somewhat chastened return home.[24]

In the early decades of the eighteenth century a second type of narrative was developed which celebrated the deeds of Indian fighters and (later) wilderness hunters. The earliest exemplar of the type was a contemporary of Mrs. Rowlandson named Benjamin Church, a man whose intimate knowledge of Indians and skill in adapting their tactics enabled him to defeat and kill King Philip. Church is the prototype for a version of the American hero-as-Indian-fighter that reached full historical expression in the career (and public celebrity) of Daniel Boone (1784 and after), and in the literary mythology of the nineteenth century. In the various historical narratives associated with Boone, the narrative formulas and ideological themes of the captivity tale (redemption through suffering) are integrated with the triumphalist scenario of the Indian-war story to make a single unified Myth of the Frontier in which the triumph of civilization over savagery is symbolized by the hunter/warrior's rescue of the White woman held captive by savages.[25]

The frontier romances of James Fenimore Cooper, published between 1823 and 1850, codified and systematized the representations of the Frontier that had developed haphazardly since 1700 in such diverse genres as the personal narrative, the history, the sermon, the newspaper item, the street ballad, and the "penny-dreadful." Cooper's palpable intention is to create a genetic myth that "accounts for" the fundamental ideological and social oppositions dividing the society of Jacksonian America by projecting them backward into a fictionalized past.[26]

Cooper recognizes that the racial opposition of Whites and Indians is (for an American) the most basic and definitive of historical tropes, that the ideological justification of American history hinges somehow on the Indian question. His Leatherstocking novels amplify this basic imagery systematically, using White/Indian opposition as the key to interpreting other fundamental oppositions: the opposition between "hard" and "soft" understandings of social and class questions embodied in the gendered contrast of Masculine and Feminine ways of thinking about Indian wars, and the class opposition between landed

gentry and social-climbing yeomen, masters and slaves, or commanders and subordinates.

In each novel Cooper creates a spectrum of possible racial/cultural compromises, ranging from embodiments of racial purity at both the White and the Indian extremes, and gender purity at the Masculine and Feminine extremes, through characters who mix various elements of gender and race—Indians who acquire White sensibilities, White men raised as Indians, and one woman (Cora Munro in *Last of the Mohicans*) who is both a racial hybrid (Negro and White) and a gender hybrid (female sex, "masculine" courage and rationality). Cooper's characters provided generations of imitators and dime-novelists with a lexicon of social and racial stereotypes which they adapted to changing fashions and audiences.

The hero of the Cooper novel is Hawkeye, a White man who knows Indians so well that he can almost pass for one. Based on the historical Daniel Boone, Hawkeye became the model for future versions of the frontier hero in the writings of antebellum historians, journalists, and politicians interested in the important questions of Indian policy, emigration, and westward expansion. As the "man who knows Indians," the frontier hero stands between the opposed worlds of savagery and civilization, acting sometimes as mediator or interpreter between races and cultures but more often as civilization's most effective instrument against savagery—a man who knows how to think and fight like an Indian, to turn their own methods against them. In its most extreme development, the frontier hero takes the form of the "Indian-hater," whose suffering at savage hands has made him correspondingly savage, an avenger determined at all costs to "exterminate the brutes."[27]

### The Frontier Myth as a Theory of Development

Between 1815 and 1870 the United States experienced a period of relatively steady and rapid economic expansion. During that period the country grew from an agrarian adjunct of the European economic system to a leading industrial and financial world power, leading the industrial nations in railroad mileage and approaching leadership in key areas of heavy industrial production. The underlying strength of the economy was such that even the massive destruction of the Civil War did not alter the economic growth curve of the nation as a whole (although it ruined the South for several generations). This cycle of economic expansion coincided

with a period of dramatic geographic expansion. The American government acquired land (by conquest and purchase) sufficient to double the size of the nation; and successive waves of settlers, drawn from the burgeoning populations of the States as well as from Europe, colonized the undeveloped land. It was perhaps inevitable that these two dramatic expansions be linked in American historical mythology and that the westward movement of population be read as a cause—even as *the* cause—of American economic development.[28]

In the period of agrarian expansion, the Christian-eschatological substructure of the original Frontier Myth was overlaid with a more secular ideology, whose terms were formulated most powerfully by Jefferson (and the republican ideologists who followed him). They saw the achievement and safety of republican institutions as dependent on the availability of vast reserves of land capable of sustaining many future generations of self-supporting freeholders. The settlement of the Old Northwest and the Old Southwest between 1795 and 1830 for the most part fulfilled the agrarian program, since the character of soil and climate and the state of technology made feasible the exploitation of western resources by individuals (or small families) of settlers, artisans, and entrepreneurs.

But in fact the growth of the American economy owed at least as much to developments occurring within the "metropolis" itself—entrepreneurial and technological innovation, industrialization, changes in public education and growth of the work force, high rates of productivity—as to the acquisition of new resources beyond the borders. The acquisition of the Far West from Mexico, the bringing of new lands into cultivation, and the search for new mineral and natural resources were given a new kind of economic importance after 1820, because they were integrated with a developing industrial economy driven on an expansive course by the reciprocal influences of increasing productivity and expanded trade.[29]

These developments accelerated between 1855 and 1873. The development of the Great Plains and the Far Western frontiers was increasingly dominated by large capital concerns (particularly railroads) rather than by the individualistic settlement patterns of the agrarian frontier. The change was partly a function of the distance of these new frontiers from the centers of population; but more significant was the changing character of the American economy, particularly the increased levels and importance of trade and capital accumulation.[30]

Beginning with the California Gold Rush of 1849, the "bonanza"

became the characteristic theme of each new frontier enthusiasm. The bonanza frontier offers the prospect of immediate and impressive economic benefit for a relatively low capital outlay; in effect, such a frontier condenses into a brief term the expectation of profit that the agrarian frontiers of 1795–1830 would require a generation or more to achieve. Where agrarian profit depends on the steady rise of population and land values, bonanza profits derive from the opportunity to acquire or produce at low cost some commodity that has a high commercial value. Gold and other precious metals are the most obviously valuable of such commodities, and the discovery of new lodes of gold and silver produced a succession of bonanza frontiers throughout the Mountain West from 1849 to the 1880s. There were also highly touted bonanzas in agricultural commodities like cotton (1830s and 1850s), cattle (1870–85), wheat (1880s), and dry-land products (1900–20), and in energy resources, like the southwestern oil boom of the early twentieth century.[31]

But despite the social and economic differences that distinguished new frontiers from old, throughout the nineteenth century the essential structures of the Frontier Myth remained apt as a way of symbolizing current history and linking it to the traditions of a sanctified past. The Iron Horse could be seen as merely the latest form of the settlers' technological superiority—the scion of the axe, long-rifle, and mold-board plow. Although the new bonanza frontiers were profitable only because of their integration into an industrial economy, the bonanzas themselves still occurred in those regions originally identified as the frontier of the farmer-pioneer and the Indian savage.

In 1873 the long cycle of American economic expansion ended in a catastrophic bank panic followed by the worst depression in American history and twenty years of chronic economic difficulty.[32] Moreover, the vast landed reserve, twice as large as that which Jefferson thought sufficient for a thousand generations, was seemingly approaching exhaustion after only three or four.

The economic crisis of the 1870s produced a major transformation in American mythology, which I have described in some detail in *The Fatal Environment*.[33] The most important agents of that transformation were the proprietors, editors, and journalists of the great urban newspapers and journals, which had developed (since 1850) into a medium for the nationwide circulation of information and opinion. They addressed themselves to three simultaneous crises, which they saw as organically related, the urban "class warfare" that began with

the Tompkins Square "riot" of 1874; the breakdown of Reconstruction in the South and the threat of a "race war" in that region; and the failure of federal policy in regard to the development of western lands—specifically, the failure to police the opening of the territory to exploitation by the railroads and the failure to solve the "Indian question." All three crises would reach a violent climax in 1876–77. Reconstruction would collapse in a last wave of race riots and Ku Klux Klan outbreaks; labor unrest would culminate in the Great Strike of 1877, which seemed a foretaste of proletarian revolution; and the failure of western development would culminate in the outbreak of the Sioux War of 1876 and the catastrophe of Custer's Last Stand.

In addition to their temporal coincidence, these three crises were seen to have a structural kinship. In each, a conflict had arisen between the will and desires of a "lower" human order or class (Indians, Black and immigrant laborers, urban wage-workers) and the imperative requirements of the new industrial system as defined by its owners and managers. Workers, Indians, and freed slaves had asserted in their different ways their desire to control the conditions and terms of their labor and/or the land from which they gained subsistence. The Republican administration was identified with a "philanthropic" (in our terms, "liberal") ideology, which followed the prewar doctrines of "free labor": political authority was to be vested in "the people" rather than in an elite, and the acquisition of both economic competence and political self-control was to be made universally available. But such a wide diffusion of political and economic power seemed incompatible with the requirements of a modern industrial order whose prosperity depended on the expert management of large and complexly interlocking systems of capitalization, production, and distribution. The health of the new corporate order required the willing subordination of worker to manager, and of private ambition to corporate necessity. But this was an ideology logically at odds with the traditional values of self-government and freedom of opportunity and with the political ideology of "free labor" for whose vindication the Civil War had been fought and which the newspapermen shared (or were afraid to openly contradict).[34]

The contradiction was evaded by an act of ideological sleight of hand: the use of race-war symbolism, drawn from the Myth of the Frontier, to interpret the class warfare of workers and managers. The Indian war was at once a current event and a symbol of the primal and genetic strife from which the nation was born. The events

# *Does Technology Drive History?*
*The Dilemma of Technological Determinism*

edited by
Merritt Roe Smith
and
Leo Marx

The MIT Press
Cambridge, Massachusetts
London, England

₀6485649
UNDE

*T14*
*.5*
*D64*
*1994*
*Unde*

© 1994 Massachusetts Institute of Technology

All rights reserved. No part of this book may be reproduced in any form by any electronic or mechanical means (including photocopying, recording, or information storage and retrieval) without permission in writing from the publisher.

Set in Baskerville by DEKR Corporation.
Printed and bound in the United States of America.

Library of Congress Cataloging-in-Publication Data

Does technology drive history? : the dilemma of technological
   determinism / edited by Merritt Roe Smith and Leo Marx.
   p.  cm.
   Includes bibliographical references and index.
   ISBN 0-262-19347-7.—ISBN 0-262-69167-1 (pbk.)
   1. Technology—Social aspects.  I. Smith, Merritt Roe, 1940–.
II. Marx, Leo, 1919–.
   T14.5.D64   1994
   303.48'3—dc20                                      93-21422
                                                      CIP

To the memory of Dr. Bern Dibner and with thanks to David and Frances Dibner for all they have done to encourage and support the study of the history of science and technology.

pill, organ transplants, and biogenetic engineering—whose transformative power has been experienced by millions alive today. For some three centuries, direct firsthand experience of that power has been a well-nigh universal feature of life in developed and developing countries.

The collective memory of Western culture is well stocked with lore on this theme. The role of the mechanic arts as the initiating agent of change pervades the received popular version of modern history. It is embodied in a series of exemplary episodes, or mini-fables, with a simple yet highly plausible before-and-after narrative structure. Before the fifteenth century, for example, Europeans are said to have known little or nothing about the western hemisphere; after the compass and other navigational instruments became available, however, Columbus and his fellow explorers were able to cross the Atlantic, and the colonization of the New World quickly followed. Newly invented navigational equipment is thus made to seem a necessary precondition, or "cause," of—as if it had made possible—Europe's colonization of much of the world.

Similarly, the printing press is depicted as a virtual cause of the Reformation. Before it was invented, few people other than the clergy owned copies of the Bible; after Gutenberg, however, many individual communicants were able to gain direct, personal access to the word of God, on which the Reformation thrived. As a final example, take the story, favored by writers of American history textbooks, about the alleged link between the cotton gin and the Civil War. In the late eighteenth century, slavery was becoming unprofitable in the American states; but after Eli Whitney's clever invention, the use of African slaves to harvest cotton became lucrative, the reinvigorated slavery system expanded, and the eventual result was a bloody civil war.

The structure of such popular narratives conveys a vivid sense of the efficacy of technology as a driving force of history: a technical innovation suddenly appears and causes important things to happen. It is noteworthy that these mini-fables direct attention to the consequences rather than the genesis of inventions. Whether the new device seems to come out of nowhere, like some *deus ex machina*, or from the brain of a genius like Gutenberg or Whitney, the usual emphasis is on the material artifact and the changes it presumably effects. In these episodes, indeed, technology is conceived in almost exclusively artifactual terms, and its materiality serves to reinforce a

tangible sense of its decisive role in history. Unlike other, more abstract forces to which historians often assign determinative power (for example, socio-economic, political, cultural, and ideological formations), the thingness or tangibility of mechanical devices—their accessibility via sense perception—helps to create a sense of causal efficacy made visible. Taken together, these before-and-after narratives give credence to the idea of "technology" as an independent entity, a virtually autonomous agent of change.

Today a similar idea informs the popular discourse of technological determinism. It is typified by sentences in which "technology," or a surrogate like "the machine," is made the subject of an active predicate: "The automobile created suburbia." "The atomic bomb divested Congress of its power to declare war." "The mechanical cotton-picker set off the migration of southern black farm workers to northern cities." "The robots put the riveters out of work." "The Pill produced a sexual revolution." In each case, a complex event is made to seem the inescapable yet strikingly plausible result of a technological innovation. Many of these statements carry the further implication that the social consequences of our technical ingenuity are far-reaching, cumulative, mutually reinforcing, and irreversible.

An invention, once introduced into society, is thus depicted as taking on a life of its own. For example, the continuing improvement of the computer has followed a kind of internal logic (a logic embedded in its constituent material components and its design), so that each "generation" of enhanced computational sophistication has led, in a seemingly predetermined sequence, to the next. As the use of the computer spreads, more and more institutions have to reconfigure their operations to comport with the new capacities and constraints it creates. In the process, society as a whole becomes increasingly dependent on large, intricately interrelated technical systems. The whole network—a system of systems, or a megasystem—becomes the indispensable technological armature of the economy. Its continued functioning is a precondition for the reproduction of the entire social order.

Such a deterministic view of technology is a pervasive theme of the mass media nowadays. Take, for example, "The Machine That Changed the World," a 1993 documentary television series about the coming of the computer. The narrative structure is based on the stock before-and-after model, and the title neatly captures the idea—evidently appealing to large audiences—that advancing technology

pill, organ transplants, and biogenetic engineering—whose transformative power has been experienced by millions alive today. For some three centuries, direct firsthand experience of that power has been a well-nigh universal feature of life in developed and developing countries.

The collective memory of Western culture is well stocked with lore on this theme. The role of the mechanic arts as the initiating agent of change pervades the received popular version of modern history. It is embodied in a series of exemplary episodes, or mini-fables, with a simple yet highly plausible before-and-after narrative structure. Before the fifteenth century, for example, Europeans are said to have known little or nothing about the western hemisphere; after the compass and other navigational instruments became available, however, Columbus and his fellow explorers were able to cross the Atlantic, and the colonization of the New World quickly followed. Newly invented navigational equipment is thus made to seem a necessary precondition, or "cause," of—as if it had made possible—Europe's colonization of much of the world.

Similarly, the printing press is depicted as a virtual cause of the Reformation. Before it was invented, few people other than the clergy owned copies of the Bible; after Gutenberg, however, many individual communicants were able to gain direct, personal access to the word of God, on which the Reformation thrived. As a final example, take the story, favored by writers of American history textbooks, about the alleged link between the cotton gin and the Civil War. In the late eighteenth century, slavery was becoming unprofitable in the American states; but after Eli Whitney's clever invention, the use of African slaves to harvest cotton became lucrative, the reinvigorated slavery system expanded, and the eventual result was a bloody civil war.

The structure of such popular narratives conveys a vivid sense of the efficacy of technology as a driving force of history: a technical innovation suddenly appears and causes important things to happen. It is noteworthy that these mini-fables direct attention to the consequences rather than the genesis of inventions. Whether the new device seems to come out of nowhere, like some *deus ex machina*, or from the brain of a genius like Gutenberg or Whitney, the usual emphasis is on the material artifact and the changes it presumably effects. In these episodes, indeed, technology is conceived in almost exclusively artifactual terms, and its materiality serves to reinforce a

tangible sense of its decisive role in history. Unlike other, more abstract forces to which historians often assign determinative power (for example, socio-economic, political, cultural, and ideological formations), the thingness or tangibility of mechanical devices—their accessibility via sense perception—helps to create a sense of causal efficacy made visible. Taken together, these before-and-after narratives give credence to the idea of "technology" as an independent entity, a virtually autonomous agent of change.

Today a similar idea informs the popular discourse of technological determinism. It is typified by sentences in which "technology," or a surrogate like "the machine," is made the subject of an active predicate: "The automobile created suburbia." "The atomic bomb divested Congress of its power to declare war." "The mechanical cotton-picker set off the migration of southern black farm workers to northern cities." "The robots put the riveters out of work." "The Pill produced a sexual revolution." In each case, a complex event is made to seem the inescapable yet strikingly plausible result of a technological innovation. Many of these statements carry the further implication that the social consequences of our technical ingenuity are far-reaching, cumulative, mutually reinforcing, and irreversible.

An invention, once introduced into society, is thus depicted as taking on a life of its own. For example, the continuing improvement of the computer has followed a kind of internal logic (a logic embedded in its constituent material components and its design), so that each "generation" of enhanced computational sophistication has led, in a seemingly predetermined sequence, to the next. As the use of the computer spreads, more and more institutions have to reconfigure their operations to comport with the new capacities and constraints it creates. In the process, society as a whole becomes increasingly dependent on large, intricately interrelated technical systems. The whole network—a system of systems, or a megasystem—becomes the indispensable technological armature of the economy. Its continued functioning is a precondition for the reproduction of the entire social order.

Such a deterministic view of technology is a pervasive theme of the mass media nowadays. Take, for example, "The Machine That Changed the World," a 1993 documentary television series about the coming of the computer. The narrative structure is based on the stock before-and-after model, and the title neatly captures the idea—evidently appealing to large audiences—that advancing technology

has a steadily growing, well-nigh irresistible power to determine the course of events. This version of the idea is what James calls "hard determinism."[2]

As the essays in this volume suggest, the idea of technological determinism takes several forms, which can be described as occupying places along a spectrum between "hard" and "soft" extremes. At the "hard" end of the spectrum, agency (the power to effect change) is imputed to technology itself, or to some of its intrinsic attributes; thus the advance of technology leads to a situation of inescapable necessity. In the hard determinists' vision of the future, we will have technologized our ways to the point where, for better or worse, our technologies permit few alternatives to their inherent dictates. To optimists, such a future is the outcome of many free choices and the realization of the dream of progress; to pessimists, it is a product of necessity's iron hand, and it points to a totalitarian nightmare.

Critics of "hard" determinism question the plausibility of imputing agency to "technology." After all, they argue, the word is merely a modern abstract noun for a certain category of the arts—what used to be called "the mechanic arts." There are hundreds of technologies, and few assertions about "technology" apply with equal validity to all of them. In spite of the existence of an engineering profession, technology is not an organized institution; it has no members or stated policies, nor does it initiate actions. How can we reasonably think of this abstract, disembodied, quasi-metaphysical entity, or of one of its artifactual stand-ins (e.g., the computer), as the initiator of actions capable of controlling human destiny? To note the reified character of this presumed agent is to recall that—until now, at least— no technology, no matter how ingenious and powerful, ever has initiated an action not preprogrammed by human beings.[3]

2. Ibid.

3. The proviso "until now" is included in deference to the claims often made nowadays on behalf of the imminent capacity of scientists and engineers, with the help of artificial intelligence, robotics, biogenetic technology, and artificial-life theory (or some combination thereof), to create a suprahumanly intelligent, self-directing, self-replicating agent, or "mind child," whose existence will in effect render obsolete the traditional boundaries between the mechanical and the organic, between art and nature. This claim may be seen, in fact, as the current terminus of one popular tradition of technological determinism.

At the other end of the spectrum, the "soft" determinists begin by reminding us that the history of technology is a history of human actions. To understand the origin of a particular kind of technological power, we must first learn about the actors. Who were they? What were their circumstances? This approach leads willy-nilly to the more exacting and productive questions in the historian's tool kit. Why was the innovation made by these people and not others? Why was it possible at this time and this place rather than another time or place? Who benefited, and who suffered? In lieu of a "hard" monocausal explanation for the genesis of the presumed determinative power of a technical innovation, these questions suggest the greater plausibility of a "soft," less specific, multivalent explanation. Instead of treating "technology" per se as the locus of historical agency, the soft determinists locate it in a far more various and complex social, economic, political, and cultural matrix.

The soft determinists' viewpoint may be illustrated by the way they might explain the growing credence given to the idea of technological determinism itself. An obvious historical starting point for this tendency is the marked acceleration in the rate of technical innovation that occurred, according to a broad current consensus of knowledgeable historians, in the West in the seventeenth and eighteenth centuries. But why did a propensity to innovate come to the fore at that time in the British Isles, in the North American colonies, and in Western Europe? Historians have proposed a great variety of well-documented, well-reasoned answers. Some focus on the particular efficacy of certain material, geographic, demographic, and socioeconomic preconditions: access to raw materials or markets; the existence of a mercantile capitalist economy; the operation of the profit motive; the accumulation of capital; the availability of a needy, teachable, exploitable labor force. Others attribute causal primacy to intellectual, cultural, or ideological factors: the extent of secular learning; the existence of a reservoir of entrepreneurial or financial skills; the presence of scientific rationalism, Christianity, the Protestant work ethic, or an artisanal ethos. Indeed, almost every identifiable attribute of early modern Western societies has been proposed as the putatively critical factor. Although it seems probable that the answer is to be found in some distinctive combination of these factors, the truth is that no one can say exactly what accounts for the special propensity to innovate that initially developed in the West in the early modern

era.[4] Thus agency, as conceived by "soft" technological determinists, is deeply embedded in the larger social structure and culture—so deeply, indeed, as to divest technology of its presumed power as an independent agent initiating change.

And yet we need only look at the world of the 1990s to revivify the intuitively compelling idea that technological innovation is a major driving force of contemporary history, if not the primary driving force. Even if the critique of hard determinism is valid, it may only lead us to alter the status of technology to that of a second-order agent of history. Its power to effect change may be derived from certain specific socio-economic and cultural situations, but to say that is only to relocate the *origin* of that power. Once it has been developed, its determinative efficacy may then become sufficient to direct the course of events. In that case "technological determinism" has been redefined; it now refers to the human tendency to create the kind of society that invests technologies with enough power to drive history. If any particular form of human power now has an outstanding claim to that distinction, it probably is technological power. Indeed, one of our chief reasons for collecting these essays is our sense of the increasingly strong hold of that claim on the public imagination. People seem all too willing to believe that innovations in technology embody humanity's choice of its future. Whether that choice is an expression of freedom or an expression of necessity is the dilemma these essays are intended to elucidate.

Many of these essays were first delivered at a two-day workshop held at MIT in December 1989. In addition to the contributors to this volume, the participants included James Bartholomew, Nicholas Bloembergen, Alfred D. Chandler, Jr., I. Bernard Cohen, Jill K. Conway, Colleen Dunlavy, Gerald Holton, Robert Howard, Carl Kaysen, Kenneth Keniston, Philip Khoury, Bruce Mazlish, and William H. McNeill. Their contributions and interventions proved essential in helping us establish the topical and thematic outlines of the book.

4. The word "initially" requires special emphasis here because the recent development of technological sophistication in Japan, South Korea, Taiwan, and Singapore undermines any notion of an inherently or permanently distinctive affinity between the West and technological innovation.

As the project moved from the workshop to the compositional stage, we received advice and assistance from a number of people. Kenneth Keniston and Bronwyn Mellquist offered valuable commentary on several drafts of the introduction and the first essay. Pamela Laird, James H. Nottage, George O'Har, and Paul Vermouth provided much needed assistance with the selection and preparation of illustrations. An anonymous referee offered many helpful recommendations. We also wish to acknowledge the expert editorial assistance of Laurence Cohen and Paul Bethge of The MIT Press, whose close readings of the manuscript helped to improve our prose and clarify our ideas at many points. Finally, we wish to thank the Dibner Institute for the History of Science and Technology, particularly Executive Director Evelyn Simha and her staff, for sponsoring the workshop and helping to organize it. Our debt to the Dibner Institute is considerable, and the dedication on page v is meant to thank those who made it possible.

# THE POLITICS OF GUN CONTROL

Compendium_Cornell
Page 0457

HASTINGS COLLEGE OF LAW LIBRARY



# The Politics of Gun Control

**Robert J. Spitzer**
*SUNY, College at Cortland*

Chatham House Publishers, Inc.
Chatham, New Jersey 07928

Compendium_Cornell
Page 0458

HV7436
S68
1995

*To Ted Lowi,*
*Mentor, Friend, Bon Vivant*

THE POLITICS OF GUN CONTROL

Chatham House Publishers, Inc.
Box One, Chatham, New Jersey 07928

Copyright © 1995 by Chatham House Publishers, Inc.

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior permission of the publisher.

*Publisher:* Edward Artinian
*Editor:* Christopher J. Kelaher
*Production supervisor:* Katharine F. Miller
*Jacket and cover design:* Lawrence Ratzkin
*Composition:* Chatham Composer
*Printing and binding:* R.R. Donnelley and Sons Company

*Library of Congress Cataloging-in-Publication Data*

Spitzer, Robert J. 1953-
    The politics of gun control / Robert J. Spitzer.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 1-56643-022-4. -- ISBN 1-56643-021-6 (pbk.)
    1. Gun control--United States.    I. Title
HV7436.S68    1995
363.3′3′0973--dc20                                 94-46138
                                                        CIP

Manufactured in the United States of America
        10   9   8   7   6   5   4   3   2   1

## About the Author

Robert J. Spitzer is professor of political science at the State University of New York, College at Cortland. He received his Ph.D. from Cornell University in 1980. His books include *The Presidency and Public Policy* (1983), *The Right to Life Movement and Third Party Politics* (1987), *The Presidential Veto* (1988), *The Bicentennial of the U.S. Constitution* (1990), *Media and Public Policy* (1993), and *President and Congress* (1993).

Professor Spitzer has also contributed over fifty articles to a variety of journals and books. From 1986 to 1990, he served as a member of the New York State Commission on the Bicentennial of the U.S. Constitution, and served as chair of the political science department at Cortland from 1983 to 1989. Spitzer has also testified before Congress on several occasions; most recently, he testified in 1994 before the U.S. Senate Judiciary Committee on presidential power.

Compendium_Cornell
Page 0459



*A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.*

—Second Amendment,
U.S. Constitution

## 2. The Second Amendment: Meaning, Intent, Interpretation, and Consequences

Any consideration of the gun control debate inevitably turns to questions of the Constitution and the law. That the two are inextricably linked is illustrated by this quotation from the constitutional scholar Lucilius Emery: "The greater deadliness of small firearms easily carried upon the person, the alarming frequency of homicides and felonious assaults with such arms, the evolution of a distinct class of criminals known as 'gunmen'. . . are now pressing home the question of the reason, scope, and limitation on the constitutional guaranty of a right to keep and bear arms."[1] That Emery raised this issue in 1915 underscores the long and important connection between the gun debate and the Second Amendment.

In the more public debate surrounding gun control, the Second Amendment is constantly invoked, especially by gun control opponents.[2] To pick a simple example from publications of the National Rifle Association (NRA), its October 1993 issue of *American Hunter* contained thirty-four references to the Second Amendment or the ownership of guns as a constitutionally protected right. Its November 1993 issue of the *American Rifleman* contained fourteen such references. Various polls have reported that most Americans believe that the Second Amendment protects an individual's right to own weapons. A 1978 poll commissioned by the NRA reported that 89 percent of Americans believe they have a right to own a gun.[3]

25

Compendium_Cornell
Page 0460

THE POLITICS OF GUN CONTROL

The Second Amendment warrants detailed treatment for two reasons. First, it is essential as a matter of public policy to know what the law does and does not allow, because public policy springs from and is defined by law. Specifically, does the Second Amendment pose any obstacles to gun controls? If so, what are they? If not, why is the Second Amendment so often cited as a barrier to gun control?

Second, an understanding of the Second Amendment and its consequences is essential precisely because it is a touchstone of the gun debate. In American political discourse, claims to rights abound. Some rights, like free speech and religious freedom, are indeed cornerstones of American life and spring directly from the Bill of Rights. Yet Americans claim a bevy of other rights as well. Some, such as the right to privacy, are deemed to arise from the Bill of Rights, even though privacy is not actually mentioned there. Other rights claims are far less well supported, among them the right to smoke, the right to drive, the right to drink (but not drink and drive), and the right to burn leaves in one's yard. The constitutional scholar Mary Ann Glendon has labeled this phenomenon "rights talk," a reference to "our increasing tendency to speak of what is most important to us in terms of rights, and to frame nearly every social controversy as a clash of rights."[4] This singularly American habit is founded in our historical tendency to view law as the preeminent vehicle for the articulation of American values, the enshrinement of political legitimacy, and our ever increasing emphasis on individual rights. Rights language is "universal, inalienable, inviolable." Rights claims tend to be absolutist; thus, this kind of debate "heightens social conflict, and inhibits dialogue"; it erodes mutual respect, and elevates the individual at the expense of social responsibility.[5] As Glendon notes, these attributes describe the gun control debate as well.

The purpose of this chapter is to assess the meaning and consequences of the Second Amendment. (Because this book is principally concerned with federal gun issues, the chapter does not deal with state court rulings or Second Amendment-like provisions found in many state constitutions.) Only after this assessment can we judge the abundant "rights talk" surrounding the gun control debate. Following up on the social regulatory policy analysis introduced in chapter 1, we would expect the courts to provide a key avenue for definition and change of the issue.

In order to clarify the meaning and consequences of the Second Amendment, we examine (1) the circumstances and thinking that led

26

to its insertion in the Bill of Rights, (2) its interpretation by the courts, and (3) its connection to the modern gun control debate. In order to accomplish this, we examine political and constitutional history leading up to and including the federal period, incorporating the thinking of the authors of the Bill of Rights; pertinent court cases; and the writings of Bill of Rights and Second Amendment specialists, including standard legal reference works. We then discuss the theories of those who take issue with the verdict of history and law. Above all, the reader should remember that claims to constitutional legitimacy hold special importance in American politics. Sometimes, the claim is even more important than the fact.

## Historic Roots

As discussed in chapter 1, firearms possession was a common and essential part of colonial and frontier life. Settlers found it necessary to band together to provide for mutual defense from foreign armies and hostile Indians. This reliance on volunteer militias, instead of on a regular, standing army was based on two facts of life. First, the emerging American nation did not possess the manpower or resources to raise, finance, supply, or maintain a professional army. Second, Americans shared a profound mistrust of standing armies. This suspicion stemmed from their knowledge of and experiences with standing armies in European history, where with depressing regularity professional armies had subverted or overthrown civilian governments and deprived people of basic rights.

### THE BRITISH HERITAGE

Great Britain had recently experienced such turmoil. For thirteen years in the middle of the seventeenth century, professional military forces under the control of Oliver Cromwell ruled England. The country was, in the words of the great British historian Thomas Babington Macaulay, "governed by the sword" in that "the civil power" was "subjected to military dictation." Under Cromwell's standing army, "the King had been murdered, the nobility degraded, the landed gentry plundered, the Church persecuted."[6]

Only a few years after Cromwell, King James II, a devout Catholic, attempted to promote the cause of "papism" by filling the leading ranks of the army with Catholics, to the exclusion of Protestants. James's oppressive practices in the cause of advancing Catholi-

27

force against intruders and thieves during nighttime hours. On 25 February 1994, an automobile repossessor was shot and killed by and in front of the home of the man whose vehicle he was repossessing for failure to keep up with his car payments. The shooter, Jerry Casey, admitted that he was not acting in self-defense when he killed the repossessor with a .30–30 telescopic rifle, and there seemed little doubt that Casey knew why his Ford truck was being towed away. Even though the repossessor was acting legally, no charges were brought against Casey by the local district attorney of rural Harris County, who argued that state law did and should protect such a use of deadly force by citizens because of its general deterrent value to crime.[34]

A similar circumstance has arisen in Colorado, which enacted a "make-my-day" law in 1985, allowing citizens to use deadly force against anyone who unlawfully enters a dwelling if the occupant believes a crime is being or might be committed. A year after the law's passage, state residents were horrified when a man who shot and killed a young couple and a third person in a neighborhood dispute was held immune from prosecution under the law.[35]

These examples hint at the broader consequences of a population armed with recognized discretion for the purpose of deterring crime. To return to the good guy-bad guy myth, the Texas instance in particular involved two "good guys"—one, a repo man simply doing his job; the other, a citizen without a past criminal record who committed a murder that the state would not prosecute under a law sanctioning wide citizen discretion to use deadly force as a means of deterring and thwarting crime. That more such cases have not arisen in Texas probably reflects a tougher line taken by prosecutors in other, less rural parts of the state.

Even if one accepts the good guy-bad guy myth, the security dilemma underscores the simple lesson, extracted from countless wars over many centuries, that people (and nations) with the best of intentions still find themselves inevitably drawn into escalating arms races and conflicts when they have no overarching government or authority in which to vest the responsibility for public order. The Texas law just described, enacted at a time when the existing government could provide little help to ward off horse thieves, enmeshes American citizens a little more deeply into the security dilemma.

The self-defense question begs the most important issue distinguishing international politics from domestic politics: Americans have a government that possesses the legitimacy, power, resources, and

above all obligation to address the crime and related defense problem. Admittedly, a government of limited powers that places great store in individual rights and liberties is also limited in the solutions it can pursue. Such is the price of living in a free society. Yet living under a government means also that the individual accedes to the authority and legitimacy of the state.

As the French philosopher Jean-Jacques Rousseau observed, "Man loses, through the social contract, his natural liberty, along with an unlimited right to anything that he is tempted by and can get. He gains civil liberty . . . which is limited by the general will." A policy that surrenders a significant degree of state police power to individuals pushes society toward, rather than away from, the state of nature.

## Nonproliferation and Arms Control

A rejection of the armed-citizen argument returns us to the original question of this chapter and book, state regulation of guns. Just as some visualize an idyllic world without armies or nuclear weapons, some envision a nation without guns. While some argue on behalf of citizen disarmament, it is clear that a host of practical and other problems all but eliminates the citizen disarmament option, just as world nuclear disarmament can only be considered a "fantasy." The most obvious of these problems is the sheer number of weapons in America, along with the difficulty of tracking and retrieving them. Moreover, the current state of armament among the general population is the product of a long and deeply rooted social tradition that cannot simply be legislated out of existence.

A logical policy framework that balances competing values and preferences between hostile opponents is, to borrow again from international relations theory, *nonproliferation* of new weapons and technologies, combined with *arms control* for existing weapons. Nonproliferation is designed to fend off the proliferation of new, more destructive weapons, based on the assumption that it is far easier and more practical to block the distribution of new types of weapons *before* they flood the market than after.

Such a strategy is justifiable for limiting the criminological use of guns because of the inherent desirability of applying brakes to the domestic arms race, and because the active life of guns used in crime may actually be substantially less than for guns not used in crime.[36]

194

195

The effort to regulate assault weapons (especially assault-style pistols) falls loosely into this category. Although such weapons have been available, the purpose of regulation would be to stem their distribution before they become more widespread.

Critics of those seeking such regulations have argued that since assault weapons represent only a small percentage of weapons used in crimes, there is no reason to regulate or restrict their acquisition. Yet their destructive capabilities, offensive nature, and superfluousness to hunting and sporting purposes undercut this argument, even if they are never used in crime. The fact that many such weapons are being adopted for criminal purposes simply emphasizes the desirability of applying the nonproliferation principle to assault weapons before they spread further.

The effort in the 1980s to ban armor-piercing bullets (see chapter 5) represents another, more successful effort along these lines. More recently, Senator Daniel Patrick Moynihan (D-N.Y.) has spearheaded an effort to ban hollow-point pistol bullets (except to the police and the military), designed to expand on impact into a sharp-edged, starlike pattern that causes considerable damage to the victim. These bullets were designed for police use because they provided greater stopping power, yet were less likely to pass through the body of the intended target and hit a bystander. Like armor-piercing ammunition, these bullets were designed solely to increase the damage to individuals or targets being shot.[37]

Arms control has played a vital role in limiting the international nuclear arms race. At the same time, it has offered no panacea and has been most important as a means "to avoid the most provocative actions and limit the most provocative weapons."[38]

Applied to gun regulation, the arms-control principle similarly attempts to impose a greater degree of security by controlling guns' deployment, characteristics, uses, safety, and the like. Most recent gun regulation efforts, including those discussed in chapter 5, fall into this category. That is, they are relatively modest measures generally designed to create a greater degree of stability. Even though these measures are, in policy terms, marginal, they make more sense in an arms-control framework, just as international arms agreements may call for only marginal substantive changes yet are still important for their contribution to international security.

Recent efforts to impose more stringent regulations and fees on gun dealers is an obvious and previously overlooked means to im-

196

pose greater control over the general flow of guns into the national market.[39] While gun control opponents view these and other efforts as simply a prelude to disarmament—and indeed this is certainly the intent of some proponents of gun control—disarmament is a separate and distinct purpose. *The only way to reconcile the fears of control opponents with the efforts of control proponents is to recognize the fundamental distinction between arms control and disarmament.*

To deprive citizens of assault weapons and to make handgun acquisition extremely difficult, to cite two control objectives, are justifiable from a security dilemma perspective. Yet the achievement of these objectives could and should occur only with a concomitant guarantee of ownership protection of traditional hunting and sporting weapons for hunters, target shooters, collectors, and sports enthusiasts. It would mean, for example, that a hunter could use a standard semiautomatic hunting rifle, but not an AK-47. Those inordinately concerned with home protection and seeking a gun for this purpose would need to turn to a shotgun, for example, plus an array of home security devices and techniques, rather than a handgun.

It is obvious that control opponents, and especially the NRA, would recoil from any such agreement, although the NRA would be shrewd to press for, say, exclusive control over mandatory national gun-training programs for all gun owners in exchange for its support of a limited menu of gun regulations. Given the drift of events and changing national demography, the time may come when the NRA and its allies face the prospect of accepting either such an agreement or a more draconian (from their perspective) alternative. One can indeed argue that the hunting/sporting tradition legitimately warrants protection, but no such protective agreement can ignore the multiplicity of gun issues and problems that beset the American consciousness in the late twentieth century.

The theoretical elegance of an arms-control approach to this security dilemma problem is that it provides a structure through which bargaining and accommodation can take place between opposing, hostile interests. It offers no magic solution, but an ongoing process with which both sides can learn to live. That is, it offers a key to the social regulatory paradox.

Notes

1. See, for example, Martin S. Geisel, Richard Roll, and R. Stanton Wettick, "The Effectiveness of State and Local Regulation of Hand-

197

# Index

ABM Treaty (1972), 200n. 19
Abramson, Paul R., 134n. 67
Accidents, gun, 74–75, 82
*Adams v. Williams*, 42, 54–55n. 54
Aldrich, John H., 134n. 67
Alexander, Andrew, 175n. 30
Allman, Christopher J., 89nn. 44, 49
Amar, Akhil Reed, 58n. 71
*American Hunter*, 25, 76, 179n. 62
*American Rifleman*, 25, 76, 100, 111, 177n. 45, 179n. 62
Anarchy, 187, 188, 199–200n. 14
Anderson, Elijah, 200n. 14
Anderson, James LaVerne, 20n. 28, 21nn. 33, 35, 50–51n. 13, 128nn. 8, 14, 171n. 2, 172n. 6, 198n. 3
Anderson, Jervis, 132n. 52
Applebome, Peter, 84n. 7
Armies, mistrust of standing, 27, 28
Armor-piercing bullets, 112, 114, 122, 124, 132n. 50, 196
Arms control, 195–97
Arms race, 189, 201n. 29
Arnett, G. Ray, 174n. 24
Asher, Herbert, 135n. 70
Assault weapons, 119, 152–57, 175n. 30, 191, 196

Atherton, Lewis, 21n. 38
AuCoin, Les, 177n. 42
Ayres, B. Drummond, Jr., 129nn. 24, 27, 177n. 50, 203n. 39

Bakal, Carl, 19n. 22
Baker, James, 112
Barone, Michael, 129n. 28
Barringer, Felicity, 137n. 76
Bartolucci, Alfred A., 88n. 38
Beckford, Charlene Bangs, 52–53nn. 32, 34
Behan, Neil, 133n. 59
Bellah, Robert N., 5on. 5
Bennett, Wallace, 173n. 18
Bennett, William, 114
Bentsen, Lloyd, 153, 167
Berelson, Bernard R., 18n. 16
Berke, Richard L., 85n. 10, 137n. 79
Berkowitz, Leonard, 87–88n. 9
Berry, Jeffrey, 109, 131n. 43, 132n. 46
Best, Judith V., 58n. 72
Biersack, Robert, 131n. 41
Billington, Ray A., 11, 22nn. 41, 43, 44
Bill of Rights, 26–27, 35–36, 42–49, 58n. 71
Bikuspic, Joan, 129n. 33

Black, Henry C., 43n. 6
Black, Hugo, 54n. 50
Blackmun, Harry, 55n. 54, 60n. 84
Blair, Claude, 18n. 17
Bliven, Luther E., 86n. 16
Blood, Michael, 129n. 34
Boor, Myron, 89n. 39
Boorstin, Daniel J., 20n. 26, 21n. 33, 50n. 12, 51n. 18
Bordua, David J., 90n. 57
Bowers, William J., 198n. 1
Bowling, Kenneth, 52–55nn. 32, 33, 34
Boyd, Gerald M., 175n. 31
Brady, James, 14, 116, 157
Brady, Sarah, 109, 114, 115, 151, 157, 176n. 41
Brady bill, 1, 14, 23n. 51, 116, 119, 122, 157–63
Branch Davidian cult, 167, 178nn. 60, 62, 190
Brant, Irving, 43, 56n. 61
Brennan, Pauline Gasdow, 137n. 78
Brent, David, 89nn. 44, 48, 49
Brody, Jane E., 89n. 44, 45, 46
Brooks, Jack, 153, 154, 159–60
Brown, Tommy L., 20n. 30, 21n. 32
Bruce-Briggs, B., 77–78, 93n. 68
Bruns, Roger, 53n. 8
Buckley, William F., 162
Bureau of Alcohol, Tobacco, and Firearms (ATF), 6–7, 140, 163–68, 182
Burger, Warren, 42, 52n. 32, 55n. 56
Burrows, William E., 20n. 24
Bush, George, 106, 110, 114, 117, 124, 134n. 67, 152
Butterfield, Fox, 84n. 6
Butterfield, Herbert, 199n. 13

Caplan, David I., 56n. 57, 57n. 67, 59n. 74
Card, J.J., 88–89nn. 33, 39
Carter, Jimmy, 124, 162, 168
Center to Prevent Handgun Violence, 116
Chafee, John, 156
Choate, Julian E., 11, 22n. 42
Church, William C., 99
Citizens Committee for the Right to Keep and Bear Arms, 148, 172n. 5
Clark, Joseph, 105, 129n. 28
Clarke, Ronald V., 88n. 36, 89nn. 39, 40
Clines, Francis X., 85n. 10

Clinton, Bill, 1, 109, 114, 125, 153, 160, 162, 168
Clinton, Hillary, 109, 177n. 45
Clymer, Adam, 176n. 41, 202n. 37
Coalition to Stop Gun Violence (CSGV), 115, 133n. 62
Cohen, Richard E., 136
Constitution, U.S., 30–33
Constitutional Convention of 1787, 31–32
Consumer Product Safety Commission (CPSC), 18n. 18, 104–5, 110
Cook, Philip, 71, 76–77, 85–86n. 16, 86nn. 19, 20, 87nn. 23, 28, 88nn. 30, 34, 35, 89nn. 43, 50, 90nn. 56, 92n. 61, 93n. 68, 94n. 77
Cooley, Thomas, 43, 56n. 60
Corbin, Robert K., 179n. 62
Corrigan, Richard, 175n. 27
Cortner, Richard C., 57n. 65
Cottrol, Robert J., 57n. 67, 59n. 73, 60nn. 80, 81
Crane, Philip, 57n. 67
Cress, Lawrence D., 59n. 74
Culture, concept of, 19n. 21
Cummings, Homer, 171n. 4
Curvin, Robert, 134n. 64

Daly, Kathleen, 19n. 22, 22n. 48, 85n. 16, 87n. 22, 88n. 32, 89–90nn. 50, 51, 94n. 79, 199n. 9
Dao, James, 198n. 4
Davidson, Osha Gray, 23nn. 50, 51, 83n. 3, 94n. 73, 105, 113, 128nn. 9, 14, 129nn. 29, 31, 32, 132nn. 53, 56, 133nn. 58, 59, 61, 174n. 21, 175n. 26, 178n. 56, 199n. 9
Davis, James W., 128n. 18
Daynes, Byron, 5, 18n. 15, 23n. 54, 98, 127n. 4
Decker, Daniel J., 20n. 30, 21n. 32
Deering, Christopher J., 173n. 13
Defense, 76–79; alternative means of, 81, 83
DeWitt, Karen, 176n. 41
Diamond, Raymond T., 60nn. 80, 81
Dingell, John, 110, 111, 166
Disarmament, arms control and, 196–97
Discharge petition, 146, 149, 174n. 20
Dole, Robert, 148, 156, 160
Douglas, William O., 54–55n. 54
Dowlut, Robert, 59n. 74

*Dred Scott v. Sandford*, 47, 48
Drinan, Robert F., 92n. 64, 94n. 73
Dukakis, Michael, 117, 124, 134n. 67
Duke, Paul, 173–74n. 19
Dye, Thomas R., 15, 17n. 5, 23n. 52

Eastland, James, 145
Eckholm, Erik, 19n. 23, 85n. 11, 86n. 18, 129n. 26
Edelman, Murray, 65, 84n. 5
Ehrman, Keith, 50n. 11, 59n. 78
Elders, Joycelyn, 65
Emery, Lucilius, 25, 49n. 1
Enck, Jody W., 20n. 30, 21n. 32
Epstein, Richard A., 60n. 80
Erikson, Robert S., 136n. 71
Erskine, Hazel, 134n. 68, 135n. 70
Escalation, pattern of mutual, 192–95
Eskridge, William N., Jr., 54n. 50
Everson, David H., 136n. 71

Farber, Daniel A., 54n. 50
Farrand, Max, 31, 51–52nn. 21–27, 53n. 37
Federal court of appeals, cases of, 55n. 55
Federal Firearms Act of 1938, 141
Federalism, 35–36, 181–83
*Federalist Papers*, 32–33
Federation of the NRA, and Cincinnati Revolt, 113
Feighan, Edward F., 157, 158
Feller, Peter Buck, 50n. 9
Fenno, Richard F., 173n. 13
Filibuster, 146, 148, 151, 159, 160
Firearms, 6, 27, 50n. 11. *See also* Gun(s)
Firearms Owners Protection Act, 107, 112, 123, 130–31n. 40, 131n. 41, 147–52. *See also* McClure-Volkmer Act
Fleeman, Michael, 131n. 61
Flexner, James, 51nn. 16, 19
Force Act of 1870, 54n. 48
Ford, Gerald, 123, 162
Foster, Carol D., 136n. 73, 199n. 10, 201n. 27
Fox, James D., 84n. 6
Fox, William T.R., 200n. 16
Fraleigh, Cynthia, 17n. 8, 18nn. 13, 14
Franklin, Grace A., 18nn. 11, 12
Frantz, Joe B., 11, 22n. 42
Frickey, Philip, 54n. 50
Fulbright, J. William, 122

Gaddis, John L., 184, 199n. 8
Gailey, Phil, 178n. 55
Gallup, Alec, 136n. 72
Gallup, George, Jr., 136n. 72
Gallup poll(s), 118–21, 134–35nn. 69–70
Gamarekian, Barbara, 134n. 66
Gates, Daryl, 133n. 59
Geisel, Martin S., 197n. 1
Gephardt, Richard, 153
Gerston, Larry N., 17n. 8, 18nn. 13, 14
Gibbs, Nancy, 86n. 17
Ginsberg, Benjamin, 17nn. 3, 7, 9, 52n. 21
Glendon, Mary Ann, 26, 50nn. 4, 5
Goetz, Bernhard, 129n. 32
Goldman, Peter, 134n. 67
Gotting, Karl L., 50n. 9
Gottlieb, Alan M., 49n. 2
Government: purpose of, 1–2; role of, 3
Government coercion, 3–4
Graham, Hugh Davis, 20n. 24
Grassroots activism, 98
Green, Gary, 90–91nn. 55, 57, 91n. 58
Greenhouse, Linda, 174nn. 22, 23, 24, 174–75n. 25
Gross, Jane, 84n. 4
Gun(s): availability of, 79–80, 83; controversy over, 6–7; debate cycle of, 13–15; influence of, upon Indians, 21n. 37; injuries, 68–69; lifespan of, 202n. 36; as mark of maturity, 8–9; possession of, as offensive, 190–92; sources of, 79; state regulation of, 182–83; thefts of, 79; use of, as public health issue, 65. *See also* Assault weapons; Firearms; Handguns
Gun control: barriers to, 185–87; opponents of, 127n. 5; public opinion, 118
Gun Control Act of 1968, 13, 111, 116, 142–47
Gun culture, 7–13
Gun dealers, regulation of, 202–3n. 39
Gun ownership, demographics of, 120
Gun Owners of America, 127n. 5, 148
Gun policy, alternatives to, 183–85
Gurr, Ted Robert, 20n. 24

Halbrook, Stephen, 50n. 12, 56n. 57, 57nn. 67, 68, 58n. 71
Hall, Richard L., 131n. 41
Hammer, Marion, 63–64
Handgun(s), 69–70, 82, 140–41, 191. *See also* Firearms; Guns
Handgun Control, Inc. (HCI), 14, 97, 110, 115–16, 126, 150–51, 157
Hanley, Charles J., 178n. 53
Hardy, David T., 50n. 9
Harrington, Michael J., 129n. 23, 132n. 49
Hatch, Alden, 20nn. 27, 29
Hatch, Orrin, 47, 148
Hattori, Yoshihiro, 66–67
Hawkins, Gordon, 19n. 22, 20n. 24
Hays, Stuart R., 57n. 67, 59n. 79
Henigan, Dennis A., 50n. 11, 56n. 57, 59n. 78
Hennard, George J., 152, 175n. 29
Hennessy, Bernard C., 136n. 71
Herbers, John, 174n. 25
Herbert, Bob, 19n. 23, 85n. 11
Herndon, Nancy, 175n. 30
Herrnson, Paul S., 131n. 41
Herz, John H., 181, 188, 200nn. 17, 20
Higgins, Robert L., 59n. 79, 198n. 4
Hilts, Philip J., 85n. 14
Hollerman, Jeremy J., 86n. 21
Hollon, W. Eugene, 22n. 44
Holmes, Steven A., 174n. 21, 177n. 42, 178n. 61
Homicide(s), 68–71, 88n. 31, 186
Horn, Steve, 176n. 35
Houk, Vernon N., 89nn. 47, 48
House Judiciary Committee, 144, 146, 153, 159
Howell, John, 94n. 76
Hrebenar, Ronald J., 132n. 45
Hughes, William J., 149, 156–57
Hunt, Leigh, 74
Huntington, Samuel, 2, 17n. 4
Hyde, Henry, 153

Ifill, Gwen, 176nn. 37, 39, 177n. 42
Incorporation, 43, 54n. 50
Inouye, Daniel K., 148
Institute for Legislative Action (ILA), 105–6. *See also* National Rifle Association (NRA)
Interest groups, 151, 169–71
Interstate Commerce Commission, 5
Ippolito, Dennis S., 137n. 83

Jackson, Robert, 172n. 4
Jacobs, Andrew, 154
Jacobs, Nancy R., 136n. 73, 199n. 10,

Japan, and U.S. gun habits, 84n. 8
Jehl, Douglas, 176n. 32
Jensen, Merrill, 30, 51n. 17
Jervis, Robert, 188, 193, 200nn. 18, 24, 26, 202n. 33
Johnson, Dirk, 198n. 5
Johnson, Lyndon, 143, 146–47
Jones, Charles O., 173n. 13
Jones, Walter S., 200n. 21

Kassebaum, Nancy L., 156
Kates, Don B., 57n. 66, 59n. 74
Keller, Bill, 128n. 16, 131n. 42, 177n. 50
Kellerman, Arthur, 88n. 37, 89nn. 39, 41, 92–93nn. 65, 66
Kellert, Stephen, 9
Kennedy, Edward, 145, 148
Kennedy, John F., 78, 110, 111, 142
Kennedy, Robert F., 13, 111, 144
Kennett, Lee, 20n. 28, 21nn. 33, 35, 50–51n. 13, 128nn. 8, 14, 171n. 2, 172n. 6, 198n. 3
Kerasote, Ted, 20–21n. 31
Kessler, Ronald, 178n. 60
Ketchum, Ralph, 61n. 85
Key, V.O., 135n. 71
King, Martin Luther, Jr., 13, 111, 144
King, Wayne, 134n. 65, 177n. 47, 178n. 59
Kirby, Andrew, 199n. 7
Kleck, Gary, 76, 86n. 20, 87n. 26, 88nn. 30, 32–34, 89n. 39, 90nn. 51, 54, 57, 91–92nn. 57, 59, 60, 65, 94–95 n. 80, 135–36nn. 70–71, 201–2n. 31
Kleege, Stephen, 132–52
Knutson, Lawrence L., 136nn. 72, 74
Koop, C. Everett, 65
Kopel, David B., 19n. 22, 134–35n. 69
Koresh, David, 178n. 60
Kraus, Jess F., 85n. 13
Krauss, Clifford, 175n. 29, 176nn. 33, 41
Kruschke, Earl R., 55n. 55

Labaton, Stephen, 178n. 60
Lacayo, Richard, 134n. 68
Lane, Gordon, 63
Langbein, Laura I., 130–31nn. 40–41, 131n. 27
LaPierre, Wayne, 107
Larson, Erik, 178n. 51
Layton, Frank, 40–41

Compendium_Cornell
Page 0465

THE POLITICS OF GUN CONTROL

*Index*

Leddy, Edward F., 128n. 10
Lederman, Susan S., 137n. 82
Leff, Carol Skalnik, 127–28n. 8, 171n. 2, 172nn 4, 5, 6
Leff, Mark H., 127–28n. 8, 171n. 2, 172nn. 4, 5, 6
Lennon, John, 115
Le Page, Anthony, 87–88n. 29
Lester, David, 88nn. 36, 38, 89nn. 39, 40
Levin, Jack, 84n. 6
Levin, John, 56n. 57
Levinson, Sanford, 58n. 71
Lewis, John, 155
Lewis, Neil A., 128n. 11
Light, Paul C., 172n. 9
Lilley, William, III, 18n. 13
Lindgren, James, 94n. 75
Lizotte, Alan J., 137n. 78
Loftin, Colin, 90n. 53, 198n. 1, 201n. 30
Lotwis, Mark A., 130–31n. 40, 175n. 27
Lowi, Theodore J., 3, 15, 17nn. 3, 7, 9, 11, 18n. 12, 23n. 53, 52n. 21
Lund, Nelson, 54n. 52, 56n. 63
Luttbeg, Norman, 136n. 71

McAndrew, Mike, 202n. 39
McAneny, Leslie, 137n. 75
McClure, James, 147
McClure-Volkmer Act, 150–52. *See also* Firearms Owners Protection Act
McClurg, Andrew Jay, 126n. 1
McDowall, David, 90n. 53, 94n. 75, 137n. 78, 201n. 30
McElrath, Karen, 87n. 26, 88n. 30
McFarland, Andrew S., 130n. 37
McGrory, Mary, 177n. 50
McGuigan, Patrick B., 133n. 61
McIver, Mary, 199n. 7
McPhee, William N., 18n. 16
McPherson, James, 54n. 47
Magaddino, Joseph, 94n. 76
Mahon, John K., 21n. 34, 35nn. 15, 19, 52n. 31, 53nn. 38, 39, 40
Maisel, L. Sandy, 127n. 6
Malbin, Michael J., 131n. 41
Malcolm, John R. 1990, 11, 202n. 32
Mann, Thomas E., 135n. 70
Markush, Robert E., 88n. 38
Marshall, Thurgood, 55n. 54
Martin, Luther, 33, 52n. 31
Masters, Brooke A., 128n. 18
Mathews, Tom, 134n. 67

Matlack, Carol, 129n. 35, 132n. 54, 133 n. 59
Matthews, Douglas, 129n. 28
Mauser, Gary A., 134–35n. 69
Mearsheimer, John, 200n. 25
Medoff, Marshall H., 94n. 76
Meier, Kenneth J., 171n. 1
Mercy, James A., 89nn. 47, 48
Metzenbaum, Howard, 111, 148, 157
Militia(s), citizen, 10, 30, 35, 37
Militia Act of 1903, 37–38, 99
Miller, Jack, 40–41
Miller, James C., III, 18n. 13
Mitchell, George, 159, 160
Mohr, Charles, 175n. 31
Molinari, Susan, 177n. 42
Moore, Mark H., 94nn. 72, 74
Moore, W. John, 133n. 62
Moriarty, Michael, 83n. 1
Moynihan, Daniel Patrick, 196
Mydans, Seth, 176n. 35

National Board for the Promotion of Rifle Practice, 99, 101
National Coalition to Ban Handguns (NCBH), 102, 115
National Council to Control Handguns, 134n. 63
National Crime Survey, 76, 91–92n. 60
National Defense Act of 1916, 38, 101
National Firearms Act of 1934, 40–41, 141
National Guard, 37–38, 53n. 45, 54n. 46
National Rifle Association (NRA), 14; antiregulation movement of, 142; background of, 99–100; on Brady bill, 157; campaign costs of, 150; and government subsidies, 100–103; and gun industry, 103–5; influence of, 169–71; Institute for Legislative Action of, 97, 105–6; Legislative Division of, 141; member incentives of, 107–10; and police organizations, 133n. 59, 151; and political invincibility myth, 116–17; preemption efforts of, 183; purpose of, 131–32n. 44; and Second Amendment, 25; and self-defense issue, 76; as single-issue group, 99–100; strategy of, 170–71; tax-exempt entities of, 103
Naval militia, 54n. 46

Newport, Dr. Frank, 136n. 72
Newton, George D., 94n. 76
*New York Times*/CBS News poll, 69, 119, 137n. 80
Nixon, Richard, 67, 104, 110, 123, 162
Nonproliferation, and arms control, 195–97
Nossiter, Adam, 84n. 8
NRA-PAC, 106–7

O'Brien, John, 83n. 1
Omnibus Crime Control and Safe Streets Act of 1968, 55n. 54, 143–44
Order, as governmental purpose, 1–3, 190
Orren, Gary R., 135n. 69
Orth, Franklin, 113
Oswald, Lee Harvey, 78, 93n. 69, 111

Parker, Robert N., 88n. 31
Peairs, Rodney, 66–67
Perper, Joshua A., 89nn. 44, 49
Perry, Richard L., 51n. 14
Pfeffer, Cynthia, 89n. 44
Phillips, Llad, 94n. 76
Pierce, Glenn L., 198n. 1
Political parties, 98–99, 122–25
Polsby, Daniel D., 87n. 24
Pomper, Gerald M., 122, 134n. 67, 137n. 82
Powers, Richard Gid, 179n. 63
Pratt, Larry, 93n. 70
President, 140, 143, 169, 172n. 8
*Presser v. Illinois*, 39–40, 47, 56n. 60, 58n. 71
Public Citizen's Congress Watch, 130n. 39
Public opinion, 98; on gun control, 118; issues in, 18n. 16
Public policies, kinds of, 4

Rauber, Paul, 128n. 19
Reagan, Michael D., 198n. 2
Reagan, Ronald, 14, 110, 123, 147, 150, 162, 166, 168, 174n. 21
Reay, Donald T., 92–93n. 65
Rebhun, Linda-Ann, 88n. 31
Reckord, M.A., 139
Reinhold, Robert, 83n. 3, 175n. 28
Reiss, Albert J., Jr., 84n. 6, 92nn. 62, 63
Reno, Janet, 109
Richardson, James D., 53n. 42
Riker, William, 53n. 39, 198n. 2
Ripley, Randall, 18nn. 11, 12, 174n. 20

Roberts, Steven V., 131n. 42, 173n. 19
Robin, Gerald D., 88n. 31, 92n. 60
Rodgers, Raymond S., 126n. 1
Rodino, Peter, 148–49
Rohan, Jack, 21n. 36
Rohde, David W., 134n. 67
Rohter, Larry, 198nn. 4, 6, 201n. 28
Roll, Richard, 197n. 1
Rosenberg, Mark L., 87nn. 47, 48
Rossi, Peter, 19n. 22, 22n. 48, 76, 85–86 n. 16, 87nn. 22, 24, 25, 88n. 32, 89–90nn. 50, 51, 90n. 53, 93n. 71, 94n. 79, 199n. 9
Roth, Jeffrey A., 84n. 6, 92nn. 62, 63
Rourke, Francis E., 171n. 1
Rourke, John T., 200nn. 21, 22
Rushforth, N.B., 92n. 65
Russell, Carl, 21n. 37
Russett, Bruce, 188, 200nn. 15, 21, 202n. 38
Rutland, Robert A., 43, 56n. 62

Sabato, Larry J., 126n. 2, 131n. 41
Salamon, Lester M., 18n. 13
Salant, Jonathan D., 130n. 39, 202n. 39
Samaha, Joel, 53n. 35
Sanger, David E., 84n. 8
Sanzone, John L., 198n. 2
Schapsmeier, Edward L., 127n. 7
Schapsmeier, Frederick H., 127n. 7
Schlozman, Kay Lehman, 127n. 3, 130 n. 38, 135n. 70
Schumer, Charles E., 115, 162
Schwab, Robert, 17n. 8, 18nn. 13, 14
Schwartz, Bernard, 51nn. 28, 30
Scott, Ruth K., 132n. 45
Second Amendment, 26–61; and Bill of Rights, 26–27; colonial heritage of, 28–30; individualist approach to, 44–45, 57n. 67; Supreme Court rulings on, 38–42
Second Amendment Foundation, 127n. 5
Security dilemma, 188–97
Seelye, Katharine Q., 176n. 34
Seiden, Richard, 88–89n. 39
Self-defense, 45–46, 75–76, 82–83, 190, 192
Serven, James E., 128n. 13
Shalala, Donna, 85n. 12
Shalhope, Robert E., 57n. 67, 59n. 77, 60–61n. 84
Sheffield, Christopher, 202n. 40

Compendium_Cornell
Page 0466

THE POLITICS OF GUN CONTROL

Shenkman, Richard, 11, 22n. 39
Shenon, Philip, 134n. 66, 174n. 25
Sherrill, Robert, 19n. 22, 128n. 16
Shields, Pete, 63, 115, 134n. 63
Siegel, Mark A., 136n. 73, 199n. 10, 201n. 27
Silverman, Jeff, 22n. 46
Single-issue groups, 98, 132–33n. 57
Skowronek, Stephen, 37, 53n. 41
Sloan, John Henry, 88n. 32, 89n. 42, 93n. 67, 198n. 1
Slotkin, Richard, 12, 20n. 25, 22n. 45
Smelser, Neil J., 127n. 3
Smith, Douglas A., 90n. 55
Smith, Steven S., 173n. 13
Smith, Tom W., 22n. 47
Smothers, Ronald, 202n. 37
Social regulation policy, 15–16, 98–99, 140, 143, 169, 184–85
Sorauf, Frank, 131n. 41
Spitzer, Robert J., 17–18nn. 11, 12, 127 nn. 3, 5, 172n. 10, 173nn. 11, 14, 15
Sprecher, Robert A., 93n. 69
Stark, Pete, 128n. 18
Steber, Michael J., 63
Stewart, Jim, 175n. 30
Stone, Jeffrey R., 60n. 80
Stone, Peter H., 129n. 30, 130nn. 36, 37
Sugarmann, Josh, 22n. 49, 103, 128nn. 15, 17, 129nn. 21, 25, 27, 177nn. 47, 49, 178n. 54
Suicide, 71–74, 82
Sunstein, Cass R., 60n. 80

Tatalovich, Raymond, 5, 18n. 15, 23n. 54, 98, 127n. 4
Taubes, Gary, 84n. 4
Tedin, Kent L., 136n. 71
Teret, Stephen, 85n. 13
Tierney, John T., 127n. 31, 130n. 38, 135n. 7
Tonso, William R., 19n. 22
Trefethen, James, 128n. 13

Uchida, Craig D., 90n. 55
Ujifusa, Grant, 129n. 28
Uniform Crime Reports (FBI), 84n. 9, 186
Uniform Militia Act of 1792, 36–37
U.S. v. Cruikshank, 38–39, 47, 60–61 n. 84
U.S. v. Miller, 40, 47, 48, 55n. 54, 60n. 84
U.S. v. Nelson, 55n. 55
Useem, Michael, 127n. 3

Vancouver, Canada, 73
Veit, Helen E., 52–53nn. 32, 33, 34
VerHovek, Sam Howe, 202n. 34
Virginia, 33–35; Bill of Rights of, 29
Volkmer, Howard, 147
Votey, Harold L., Jr., 94n. 76

Walker, Jack L., Jr., 101, 128n. 12
Walker, Thomas G., 137n. 83
Waltz, Kenneth, 187, 199n. 14, 200n. 23
War Revenue Act of 1919, 140
Washington, George, 29, 30, 51n. 19
Wayman, Frank W., 131n. 41
"Weapon instrumentality effect," 70–71, 82
Weapons, 69–70, 82, 102. See also Firearms; Gun(s)
Weatherup, Roy G., 50nn. 7, 8, 51n. 19
Weaver, Randy, 178–79n. 62
Weinraub, Bernard, 175n. 31
Weisman, Steven R., 174n. 21
Weissberg, Robert, 93n. 68, 135n. 70
Werner, Leslie Maitland, 177n. 47
Wettick, R. Stanton, 197n. 1
Wiersema, Brian, 201n. 30
Wilcox, Clyde, 131n. 41
Will, George, 128n. 18
Williams, David C., 58n. 71
Wilson, James Q., 18n. 13, 108, 109, 131–32nn. 43, 44
Wintemute, Garen J., 85n. 13, 90nn. 51, 52
Wolfers, Arnold, 199n. 13
Wolff, Craig, 198n. 4
Woll, Peter, 171n. 1
Wootton, Graham, 122, 130n. 38, 135 n. 70, 138n. 81
Wright, James D., 19n. 22, 22n. 48, 49n. 3, 76, 80, 85–86n. 16, 87nn. 22, 24, 25, 88n. 32, 89n. 50, 89–90n. 51, 90n. 57, 93n. 71, 94n. 79, 199n. 9
Wycoff, James, 21n. 37

Yates, Douglas, 171n. 1

Zimring, Franklin E., 19n. 22, 20n. 24, 80, 86n. 19, 87nn. 21, 27, 89n. 51, 94nn. 76, 78, 171n. 2, 173n. 17

Compendium_Cornell
Page 0467

# 3

# Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America

*Kevin M. Sweeney*

Central to a consideration of firearms and the common law tradition is a historically informed understanding of the relationship between the ownership of firearms and the militias of early modern England and colonial America. Existing legal and constitutional studies of these relationships are often not well informed about the composition and arming of early modern English and American militias. As a result, they often make unsupported claims about the universality of the private ownership of firearms and assume that English and American militias were armed by such weapons carried by their owners. In reality, the story is more complicated because not all of the era's militias were "composed of the body of the people, trained in arms," and even in those places where a population was widely armed, it was not necessarily well armed from a military standpoint.[1]

This essay examines geographical, social, economic, and chronological patterns of firearm possession in England from 1540 to 1750 and in the mainland English colonies and American states from 1630 to 1800 to better understand the military and private uses of firearms.[2] A database containing information gleaned from 3,198 English probate inventories of the estates of male decedents and 4,777 American probate inventories of male decedents is at the core of this chapter's analysis.[3] At the same time, sources such as militia returns, censuses, laws, and public and private correspondence are used to aid in the understanding of data derived from the inventories.

All of these sources have their uses and shortcomings, and unfortunately, Michael Bellesiles's claims for and pretended use of probate inventories to study gun culture in the colonies in *Arming America* has raised questions in the minds of some about these sources.[4] Probate records do have inherent biases: they do not exist for every male decedent but disproportionately record the possessions of older and wealthier men, and because of these biases, using probated estate inventories tends to overestimate instead of underrepresent the presence of particular possessions in the population at large.[5] Still, for decades, historians who are aware of these records' usefulness and their limitations have used estate inventories to write about agricultural change in England, wealth and social structure in England and its colonies, and household possessions in America, England, and France. Probate inventories' great utility lies in the fact that they survive in large numbers in England and its

54

American colonies, making possible *relative* comparisons between regions and over time that can suggest patterns of firearms ownership.[6]

Firearms appeared in England in some number during the later 1500s. Englishmen used them to hunt and control vermin, carried them for personal protection, displayed them as fashion accessories, and gave them as gifts.[7] Surviving muster certificates from twenty-nine English counties reveal that of the approximately eighty thousand weapons carried by men in their trained bands in April 1588—the year of the Spanish Armada—about 42 percent were firearms and 26 percent were pikes. Fewer men carried older types of weapons such as bows (only 18%) and bills (only 14%).[8] At the same time, only 4.8 percent to 6.1 percent of probate inventories of male decedents contained a firearm during the late 1500s, suggesting that relatively few of the estimated one million Englishmen aged sixteen to sixty living in 1588 owned a firearm (Table 3.1).[9]

Overall, the seventeenth- and early eighteenth-century probate inventories of male decedents suggest that the private ownership of firearms did not become widespread in early modern England. During the first four decades of the 1600s, the percentage of male probate inventories with a firearm increases to 13.9 percent (Table 3.2). The percentage of inventories with firearms actually declined to 7.2 percent during the years of the civil wars and the interregnum as private arms were bought, impressed, and stolen. Still, most of the firearms carried on civil war battlefields did not come from the homes of common people but were drawn from public arsenals and aristocrats' private armories or were purchased directly from gunmakers in England and on the continent.[10] The proportion of inventories with guns grew to 12 percent during the Restoration Era and only reached 15.5 percent during the second quarter of the eighteenth century (Table 3.1). Although the percentage

TABLE 3.1. Percentages of probate inventories of English male decedents with firearm and types of firearm found in inventories, 1561–1750.[a]

| Time period | Number of inventories | % With firearm[b] | % With pistol | Total firearms | Gun | Caliver | Musket | Fowlers and birding guns | Pistol | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| 1561–1580 | 326 | 1.2 | 0.6 | 24 | 5 | 1 | 0 | 0 | 5 | 13[c] |
| 1581–1600 | 545 | 4.8[d] | 0.4 | 38[d] | 4 | 19 | 6 | 2 | 5 | 0 |
| 1601–1620 | 243 | 14.0 | 2.1 | 50[e] | 4 | 17 | 12 | 6 | 10 | 1 |
| 1621–1640 | 332 | 13.8 | 0.9 | 70 | 6 | 4 | 32 | 23 | 3 | 2 |
| 1641–1660 | 221 | 7.2 | 0.9 | 28.5[f] | 2 | 0 | 13.5 | 11 | 2 | 0 |
| 1661–1680 | 602 | 12.0 | 2.3 | 149 | 22 | 0 | 32 | 47 | 44 | 4 |
| 1681–1700 | 451 | 13.7 | 2.7 | 124[g] | 42 | 0 | 27 | 31 | 23 | 1 |
| 1701–1720 | 276 | 12.0 | 1.4 | 69[h] | 18 | 0 | 13 | 22 | 13 | 2 |
| 1721–1750 | 200 | 15.5 | 2.0 | 59 | 30 | 0 | 6 | 10 | 11 | 2 |
| Totals | 3,198 | 10.1 | 1.5 | 606.5 | 133 | 41 | 141.5 | 152 | 116 | 25 |

[a] See Note 61 for list of sources.
[b] Includes all types of firearms including pistols.
[c] There were 13 "harguebushes" (i.e., Arquebuses).
[d] There were seven inventories with references to "artillery and furniture" or "his armour" that may have included firearms, which would increase the percentage with a firearm to 6.1% and the total of firearms to 43.
[e] Does not include 13 firearms listed in the inventory of a Marlborough armorer.
[f] One decedent owned "halfe share of a musket and furniture ther belonginge."
[g] Does not include 52 firearms listed in the inventory of a Bristol gunsmith.
[h] Does not include 108 firearms listed in the inventory of a Bristol gunsmith.

56  *A Right to Bear Arms?*

TABLE 3.2. Percentages of probate inventories of English male decedents of differing economic status containing firearms in selected periods, 1601–1750.[a]

| Wealth level and value of personal property in pounds sterling | 1601–1640 | | 1661–1680 | | 1701–1750 | | Over time period | |
|---|---|---|---|---|---|---|---|---|
| | Number | % With firearm | Number | % With firearm | Number | % With firearm | Number | % With firearm |
| Wealthy £250+ | 53 | 39.6 | 133 | 36.1 | 82 | 24.4 | 268 | 33.2 |
| Middling sorts £100–£249 | 86 | 26.7 | 253 | 15.8 | 86 | 29.6 | 427 | 20.6 |
| £50–£99 | 90 | 17.6 | 203 | 13.3 | 80 | 8.8 | 373 | 13.4 |
| Lower classes £25–£49 | 108 | 10.2 | 221 | 5.9 | 95 | 9.2 | 394 | 7.1 |
| £10–£24 | 145 | 5.5 | 169 | 3.0 | 112 | 8.3 | 426 | 5.0 |
| Poor £0–£9 | 93 | 1.1 | 74 | 1.6 | 49 | 0.0 | 216 | 0.9 |
| Totals | 575 | 13.9 | 1,053 | 12.7 | 476 | 13.4 | 2,104 | 13.2 |

[a] Values of total personal wealth in pounds sterling are not adjusted for inflation. Wealth categories are from James Horn, *Adapting to a New World: English Society in the Seventeenth-Century Chesapeake* (Chapel Hill: University of North Carolina Press, 1994), 99–101. See Note 61 for list of other sources.

of inventories of male decedents containing guns should not be interpreted as equivalent to the actual percentage of English males owning a firearm in a given period, the evidence does raise serious questions about sweeping assertions that "by the middle of the sixteenth century they [guns] were commonplace" and that "many, if not most, common people had arms throughout the Civil War."[11]

The relatively small percentage of these inventories with firearms was not because the cost of firearms was prohibitive. New muskets sold for ten shillings to one pound (twenty shillings) and a pair of pistols for around two pounds. Used pistols, birding guns, or muskets found in inventories were usually valued at five to ten shillings. Guns were therefore comparatively affordable given that daily wages for builders and laborers were around a shilling in the later 1500s and early 1600s, a shilling and a half in the mid- and late 1600s, and a bit higher in the early 1700s.[12] Still, arming more than a fraction of the estimated 1.5 million men between the ages of sixteen and sixty in mid-seventeenth-century England was beyond the productive capacity of its gunmakers.[13] London gunsmiths, who were at the center of England's arms industry in the mid-1600s, were turning out only 300 to 1,000 guns a month in peace time and 1,500 to 2,400 a month in war time; and Bristol—the other major gun-producing center—eventually turned out about 300 a week during wartime. These production figures suggest that, at most, England could have produced around 40,000 firearms annually.[14]

In large measure, the modest levels of gun ownership found in the inventories resulted from the limited opportunities to use firearms. English laws and the English government discouraged the private possession and use of firearms. As Louis Schwoerer argued, "a striking feature of England's early modern gun culture was its restrictive nature: English subjects whose socio-economic standing was below a certain level (usually an annual income of £100) were legally disallowed to possess or use a firearm."[15] The Game Act of 1609 limited hunting to those with an annual income of more than £40 from land at a time when the total personal wealth of a majority of men was probably less than £50. The 1662

Militia Act authorized two deputy lieutenants who oversaw the county militia to search for and seize any arms of a person judged to be "dangerous to the Peace of the Kingdom."[16] In 1671, Parliament passed a new Game Act that raised the qualification for hunting to £100 of annual income from land or £150 from leases and, in effect, made it illegal for the great majority of the population to possess a firearm not just to use one to hunt.[17]

The patterns in gun ownership revealed by the probate data correlate strongly with wealth and social status. Whereas about a third of the inventories belonging to the wealthiest male decedents contained a firearm, only one-sixth of the inventories of those of middling status contained a firearm. The inventories of those decedents with estates of less than fifty pounds in personal wealth, who made up about half of the population, rarely contained a gun (Table 3.2).[18] Gentlemen who could hunt legally were much more likely than laborers to own a gun, and members of the gentry often owned several guns (Table 3.3). Yeomen were more likely to own firearms than humbler (and usually less well-off) husbandmen and artisans. There was the occasional hard-up hatter or felt maker whose probate inventory contained a firearm or a laborer who appeared before a judge for possessing such a gun in violation of a law, but they appear to have been atypical.[19]

Despite examples of disobedience and expressions of outrage, the overall pattern of gun ownership suggests the relative success of statutory restrictions on firearms, which reduced opportunities to use them legally, and the absence of a real need to possess firearms.[20] If this had not been the case, England lacked a force capable of policing widespread violations of these laws; as a rule, criminal courts appear to have been rather lax in enforcing such statues.[21] Probate matters were handled by church courts (until 1858), which had no interest in or legal authority to enforce laws that restricted gun ownership. In the end, most Englishmen simply did not have a reason to own a firearm. Ownership of all types of weapons was not widespread in England, violent personal attacks with or without firearms

**TABLE 3.3. Percentages of probate inventories of English male decedents of differing social status and occupations containing firearms in selected periods, 1601–1750.**[a]

| Status/Occupation | 1601–1640 | | 1661–1680 | | 1701–1750 | | Over time period | |
|---|---|---|---|---|---|---|---|---|
| | Number | % With firearm | Number | % With firearm | Number | % With firearm | Number | % With firearm |
| Gentry | 31 | 38.7 | 62 | 27.4 | 20 | 55.5 | 113 | 35.4 |
| Clergy | 18 | 27.8 | 18 | 11.1 | 4 | 0.0 | 40 | 12.5 |
| Merchants | 8 | 50.0 | 11 | 36.4 | 0 | 0.0 | 19 | 42.1 |
| Yeoman farmers | 81 | 19.8 | 209 | 18.2 | 88 | 19.3 | 378 | 18.9 |
| Other farmers | 116 | 8.6 | 161 | 7.1 | 86 | 10.6 | 363 | 8.3 |
| Laborers | 27 | 0.0 | 16 | 0.0 | 8 | 0.0 | 51 | 0.0 |
| Food and beverage trades | 28 | 10.7 | 86 | 11.6 | 47 | 10.6 | 161 | 11.2 |
| Construction trades | 12 | 25.0 | 44 | 6.8 | 27 | 18.5 | 83 | 13.3 |
| Cloth and clothing production | 57 | 14.0 | 98 | 11.2 | 51 | 5.9 | 206 | 10.6 |
| Leather working trades | 25 | 16.0 | 72 | 6.9 | 26 | 3.9 | 123 | 8.1 |
| Metal working trades | 21 | 38.1 | 45 | 17.8 | 23 | 21.7 | 89 | 23.4 |
| Other artisans | 13 | 15.4 | 68 | 11.8 | 19 | 15.8 | 100 | 13.0 |
| Maritime and fishing | 9 | 11.1 | 6 | 50.0 | 10 | 0.0 | 25 | 16.0 |
| Other occupations | 36 | 2.8 | 52 | 15.4 | 52 | 13.5 | 140 | 11.4 |
| Unknown | 93 | 3.2 | 85 | 4.7 | 35 | 0.0 | 213 | 3.3 |
| **Totals** | 575 | 13.9 | 1,053 | 12.7 | 476 | 13.4 | 2,104 | 13.2 |

See Note 61 for list of sources.

were not very common, and the firearms carried by the militia were usually not provided by those who actually served in the ranks.[22]

Instead of loosening legal restrictions on owning firearms and encouraging growth in the private ownership of firearms, the 1689 English Bill of Rights ratified the existing situation. Article VII affirmed that "subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law."[23] This article clearly did not affirm an absolute right to gun ownership, but one that remained limited by religion, class, and parliamentary statute, leading historian Tim Harris to suggest that the article "if anything, should more accurately be seen as a gun control measure."[24] Evidence drawn from probate inventories suggests that gun ownership continued to reflect differences in wealth and status during the first half of the eighteenth century (Tables 3.2, 3.3), and the percentage of inventories containing firearms actually declined to 12 percent during the first two decades of the eighteenth century but then increased to 15.5 percent during the period from 1721 to 1750 (Table 3.1).

Throughout this period, militia service did not do a great deal to expand individuals' private ownership of firearms in England, and the "by-product" of such service was not—as some have claimed—"the universal armament of the commoners."[25] Some English and American historians erroneously portray the Elizabethan trained bands and their colonial offspring as direct descendants of the Anglo-Saxon *fyrd,* which was supposedly based on universal service.[26] As an informed observer made clear in 1605: "By this prerogative royall onely, without healpe or assistance eyther of the common lawe or any statute, or custome, your Highnes' [James I's] noble predecessor of most happy memory, Queen Elizabeth, in the year 1586 first erected the trained bands of horse and foote."[27] These trained bands were selective cavalry and infantry companies with limited membership that for the first time created permanent units and emphasized the importance of unit training.[28] Direction came from the central government, but it took persuasion and negotiation to produce compliance locally, and the result, as several historians have noted, was not a uniform, universal national militia but instead a distinct force of trained bands in each county.[29] Only about a quarter or, in some instances, even fewer men potentially available for service were organized into these units and armed and trained (Table 3.4).[30] Ideally, urban householders, yeoman farmers, or their sons filled the ranks of the trained bands, creating in historian Lindsay Boynton's characterization a "bourgeois militia."[31] Historian Stuart Reid observed that "whilst it was in theory possible to call up every able-bodied man, the terms Militia and Trained Bands were to all intents and purposes synonymous."[32]

The foot soldiers of the trained bands received their arms from two main sources. Some firearms were publicly provided weapons usually referred to as parish, town, or common arms that local or county governments purchased with funds raised by local taxes assessed on individuals appearing on subsidy lists or those assessed for parish rates under the poor law. It was an ad hoc system without a statutory basis that could give rise to individual disputes or occasionally more widespread resistance, but by and large, it worked. It even continued in place after the repeal in 1604 of what are often seen as the nation's basic militia laws. An alternative way of obtaining arms was to designate better-off individuals to provide a firearm or a portion of the cost of purchasing such a weapon. These individuals were known as finders of private arms or joint finders of private arms. Local gentry provided some of these private arms; substantial farmers, tradesmen, and widows usually provided the rest. In certain instances, a man serving in a trained band might provide an entire weapon or part of a weapon, though this practice decreased over time as fewer well-off men actually served in the militia.[33]

Compendium_Cornell
Page 0472

**TABLE 3.4. Militia training and arming in Gloucester, 1608.[a]**

| Gloucester City | Number of individuals | Pikemen | Musketeers | Calivermen |
|---|---|---|---|---|
| Trained men | 108 (24.2%) | 44 | 34 | 30 |
| Untrained men | 339 (75.8%) | 0 | 0 | 0 |
| Total | 447 (100%) | 44 | 34 | 30 |

| Arms | Number of individuals | Corslets[b] | Muskets | Calivers |
|---|---|---|---|---|
| Arms or portions of them supplied by trained men | 49 | 4.75 | 12.0 | 14.33 |
| Arms or portions of them supplied by others[c] | 96 | 35.25 | 27.40 | 9.00 |
| Totals | 145 | 40.00 | 39.40 | 23.33 |

| Rural Gloucester[d] | Number of individuals | Pikemen | Musketeers | Calivermen |
|---|---|---|---|---|
| Trained men | 41 (12.9%) | 20 | 16 | 5 |
| Untrained men | 277 (87.1%) | 0 | 0 | 0 |
| Total | 318 (100%) | 20 | 16 | 5 |

| Arms | Number of individuals | Corslets | Muskets | Calivers |
|---|---|---|---|---|
| Arms or portions of them supplied by trained men | 14 | 2.25 | 7.25 | 1 |
| Arms or portions of them supplied by others[e] | 15 | 5.25 | 7 | 3 |
| Parish arms—tything | 0 | 5 | 2 | 0 |
| Total | 29 | 12.5 | 16.25 | 4 |

[a] Sources: Smyth, *Men and Armour*, 2–10, 198–199, 200, 209–212, 218, 231–232.
[b] Corslets were the armor worn by pikemen and supplied by various private and public sources as indicated. As a rule, the actual pikes were publicly supplied weapons.
[c] Includes arms supplied in whole or part by three women.
[d] Rural Gloucester includes Winterborne, Frampton Cottrell, Pucklechurch, Stoke Gifford, and Iron Acton.
[e] Includes one woman.

A snapshot of the organization, training, and arming of the trained bands can be produced with information drawn from John Smyth, *Men and Armour for Gloucestershire in 1608*, a detailed work intended to assess the state of one county's militia.[34] In the city of Gloucester, only about a quarter of the available men were rated as trained (and thus members of the band) (Table 3.4), and almost two-thirds of these trained men were established tradesmen in their forties. None of a half dozen laborers on the list and none of the 61 servants were rated as trained, and presumably, none were armed. There was enough equipment for 40 of the 44 trained pikemen, all of the 34 trained musketeers, and 23 of the 30 trained calivermen, though most of this equipment was provided by 96 individuals who were not in the trained band, including forty esquires and gentlemen and three women. Overall, only 15 of the 108 trained men—3 pikemen, 3 musketeers, and 9 calivermen—provided on their own all of the equipment that they needed. It was much the same in rural areas of Gloucester, where a smaller proportion of men, just 12.9 percent, were trained, and only 8 of the 41 trained men provided their own equipment in its entirety, while another 6 provided portions of their equipment.

Most trained band members do not appear to have been in a position to embody the armed agrarian freeholder, who was "autonomous in his own defense" and capable of resisting a tyrannical government that mid-seventeenth-century republican theorist James

*A Right to Bear Arms?*

Harrington idealized.[35] The probate inventories suggest that only a small proportion of yeomen and other farmers owned a firearm (Table 3.3). As a rule, the early modern English militiaman depended on actions by the government to put a firearm in his hands, and this undercut his ability to serve as a check on the government. In fact, the English record is "replete with cases where the government did use militia successfully to suppress popular dissent."[36] Yet, the power of Harrington's idealized portrait of the independent, armed, landed proprietor often influenced subsequent discussions of the militia in early modern England and America.[37] Its power still leads today's scholars to privilege the perspectives of the era's political theorists and to slight better-informed contemporaries, who wrote about and grappled with the actual composition, capabilities, and actions of the era's militias.

Many individuals did have the opportunity to achieve Harrington's ideal of an independent, armed freeholder in England's colonies. The earliest colonizing ventures often supplied their settlers with firearms, and this produced a male population that resembled more closely an army than the inhabitants of an English village. A muster or census taken in Virginia in 1625 contained 1,010 long arms and 61 pistols for 814 males over the age of fifteen.[38] In the mid-1600s, over two-thirds of the inventories of males probated in the Chesapeake region and in New England listed a firearm (Table 3.5). Only about a third of the inventories contained muskets, which were likely matchlocks, and this, combined with many references to types of firearms that were not matchlocks, provides further evidence that the embrace of firearms with flint ignition systems was relatively quicker in the colonies than in England.[39]

The proportion of inventories of colonial decedents with a gun during the 1600s was dramatically higher than the proportions found in contemporary English inventories, and it remained so during the first half of the eighteenth century (Tables 3.1, 3.5). At all economic levels, the probated estates of male colonists were much more likely to contain a firearm than were those of their English counterparts (Tables 3.3, 3.6). Wealthy colonists appear to have been twice as likely to possess a firearm, and the inventories of middling freeholders (£50 to £249 in personal property)—the idealized backbone of a militia—were three times as likely to have a firearm as were their English counterparts. Inventories of male colonists with less than £50 sterling in personal property but with more than £9 were about nine times more likely to have a firearm than were their English counterparts. Most strikingly, the inventories of the poorest colonists—mariners, servants, and poor planters—were over eighteen times more likely to possess a gun than were poor decedents in England.

Concerned with threats from native peoples and foreign powers, early seventeenth-century colonial governments initially created trained bands that were more inclusive military units of largely self-armed men. These governments even expanded the militia beyond the selective "bourgeois militia" of seventeenth-century England and even beyond Harrington's ideal of the armed, independent farmers. In some cases, colonies required that masters arm their servants. But in later seventeenth-century Virginia and Maryland, where colonists had spent more energy fighting one another than external foes, governments limited membership in the militia.[40] In Virginia, this pulling back from an inclusive militia resulted in what historian William Shea termed "an English-style 'bourgeois militia.'"[41] Still, two-thirds of probate inventories of male decedents in the Chesapeake region had a firearm in the late 1600s.

The initial role of colonial militias in encouraging widespread possession of firearms in the seventeenth-century Chesapeake and New England can be seen by the contrast with the levels of gun possession found in the inventories of the English colonies of New York, West

TABLE 3.5. Percentages of probate inventories of colonial male decedents containing firearms by region and over time, 1633–1800.[a]

| Place and time | Number of inventories | % of Inventories with firearms[b] | % of Inventories with muskets | % of Inventories with pistols |
|---|---|---|---|---|
| New England | | | | |
| 1633–1664 | 446 | 69.0 | 34.5 | 6.9 |
| 1677–1699 | 498 | 68.7 | 7.8 | 3.6 |
| 1740–1750 | 247 | 55.8 | 0.4 | 3.2 |
| 1770–1775 | 342 | 51.0 | 0.9 | 5.0 |
| 1783–1786 | 198 | 46.0 | 0.5 | 2.5 |
| 1795–1798 | 270 | 32.2 | 1.5 | 1.5 |
| New York | | | | |
| 1677–1699 | 175 | 53.1 | 4.0 | 13.0 |
| 1740–1750 | 90 | 36.7 | 1.1 | 2.2 |
| 1770–1775 | 51 | 49.0 | 0.0 | 15.1 |
| 1783–1786 | 132 | 41.0 | 5.3 | 7.6 |
| 1795–1798 | 50 | 18.0 | 2.0 | 4.0 |
| Penn. and N.J. | | | | |
| 1692–1699 | 154 | 44.8 | 3.9 | 5.2 |
| 1740–1750 | 104 | 32.3 | 0.6 | 2.4 |
| 1770–1775 | 231 | 37.6 | 1.7 | 5.2 |
| 1783–1786 | 173 | 24.3 | 1.7 | 2.3 |
| 1795–1797 | 162 | 26.6 | 2.5 | 6.2 |
| Chesapeake[c] | | | | |
| 1634–1666 | 184 | 66.7 | 4.9 | 12.5 |
| 1677–1699 | 120 | 70.0 | 4.2 | 26.0 |
| 1740–1750 | 229 | 61.6 | 0.4 | 14.8 |
| 1770–1775 | 166 | 62.8 | 1.3 | 10.9 |
| 1783–1786 | 133 | 56.4 | 1.5 | 2.3 |
| 1794–1800 | 114 | 46.5 | 2.6 | 2.6 |
| South Carolina | | | | |
| 1692–1699 | 20 | 70.0 | 5.0 | 30.0 |
| 1740–1750 | 118 | 77.1 | 0.0 | 39.0 |
| 1770–1775[d] | 137 | 71.0 | 0.0 | 19.7 |
| 1784–1785 | 77 | 44.2 | 13.0 | 9.0 |
| 1786–1787 | 103 | 51.5 | 2.9 | 6.8 |
| Total | 4,777 | 52.6 | 5.7 | 7.8 |

[a] See Note 62 for list of sources.

[b] This includes all types of firearms, including muskets and pistols.

[c] Chesapeake refers to Virginia and Maryland.

[d] Data for these years are for both North and South Carolina.

Jersey, and Pennsylvania, which were established in the later 1600s. Although the Dutch colony of New Netherland had had a burger militia, the burden of defending this colony had been borne primarily by professional soldiers and native allies, particularly the Iroquois, and this pattern continued under the English regime established in 1664. Due in part to this situation, the proportion of inventories of male decedents with firearms was much lower in New York than the levels found in the older English colonies (Table 3.5). The difference was even more marked in the colonies established by Quaker proprietors along the Delaware River in West Jersey (today the southern part of the state of New Jersey) and Pennsylvania. Neither of these colonies created militias at their founding, though one was set up in West Jersey when it merged with East Jersey to create the colony of New Jersey

62                              *A Right to Bear Arms?*

**TABLE 3.6. Percentages of probate inventories of colonial male decedents of differing economic status containing firearms in selected periods, 1635–1750.**[a]

| Wealth level and value of personal property in pounds sterling | 1635–1650 | | 1678–1700 | | 1740–1750 | | Over time period | |
|---|---|---|---|---|---|---|---|---|
| | Number | % With firearm | Number | % With firearm | Number | % With firearm | Number | % With firearm |
| Wealthy £250+ | 23 | 70.0 | 93 | 72.3 | 151 | 66.9 | 267 | 68.9 |
| Middling £100–£249 | 48 | 80.0 | 154 | 70.1 | 170 | 57.6 | 372 | 66.9 |
| £50–£99 | 47 | 78.6 | 167 | 70.7 | 132 | 53.8 | 346 | 65.0 |
| Lower £25–£49 | 62 | 69.4 | 175 | 57.6 | 139 | 48.0 | 374 | 55.3 |
| £10–£24 | 43 | 46.5 | 116 | 45.7 | 100 | 41.0 | 259 | 44.0 |
| Poor £0–£9 | 28 | 39.3 | 51 | 23.5 | 39 | 25.6 | 118 | 28.0 |
| Totals | 251 | 67.3 | 744 | 60.6 | 731 | 52.7 | 1,726 | 59.2 |

[a] Values of total personal wealth in pounds sterling unadjusted for inflation. All totals in colonial currencies have been converted to pounds sterling using tables in John J. McCusker, *Money and Exchange in Europe and America 1600–1775: A Handbook* (Chapel Hill: University of North Carolina Press, 1978). See Note 62 for list of other sources.

in 1702. Largely as a result of Quaker opposition to militias—but not to gun ownership per se—the probate inventories for the entire colonial era of male decedents in both areas were less likely to contain firearms. Because of the pattern found in these colonies, one can speculate that, without the legacy of the colonial trained bands in New England and the Chesapeake region, only about one-third of the probate inventories of male decedents in the colonies might have contained a firearm."[42]

As a result of the variety of actual uses that colonists had for firearms—primarily long arms—they rather quickly moved away from muskets, which were relatively heavy, large caliber military weapons ignited by either a matchlock mechanism or later a flintlock mechanism. The percentage of inventories listing muskets declined steadily from the mid-1600s to the mid-1750s (Table 3.5). Part of this decline was due to a loosening of terminology that led to the categorization of almost any long arm as a "gun." At the same time, other sources suggest the move away from muskets was real and evident by the late 1600s: in 1682, the governor of New Hampshire complained about a lack of muskets—"the most valuable weapons"—even though almost three-quarters of the estates of male decedents inventoried in New Hampshire between 1681 and 1693 contained a firearm.[43] The hold of the *Elizabeth and Mary*, which sank during the 1690 New England expedition to capture Quebec, contained loaded carbines and fowlers, not muskets; and the 1701 muster of Capt. J. Lightfoot's militia company in Virginia listed 121 "guns" but only seven muskets.[44] By the mid-1740s, Benjamin Franklin had to explain to readers that a "Musket was "the Name of a particular Kind of Gun."[45] In 1758, Col. Henry Bouquet, an officer in the British army, discovered that among new recruits and provincials "a great number had never seen a musket."[46]

Colonists had come to prefer lighter, smaller-caliber guns because these firearms were more useful as weapons for hunting and controlling vermin but usually could still be used at militia musters. New Englanders came to favor .60 to .65 caliber smoothbore fowlers and fusils that weighed six to seven pounds and were made in New England or imported from

England or France. Elsewhere, colonists came to favor firearms produced for the Indian trade that often weighed as little as five and a half pounds and had bores of .57 to .62 caliber and barrels only thirty-six to forty inches long. And in the back regions of Pennsylvania and colonies further south, a growing number of men preferred the slender-stocked, long-barreled American rifle, which usually weighed between seven and eight pounds and had bores of .58 to .62 caliber or smaller. Even though they were more accurate than smooth-bore muskets, these long rifles were not designed to be military weapons.[47]

The relative scarcity of muskets by the mid-eighteenth century created problems in arming provincial forces, which were expeditionary regiments raised outside of militia organizations to undertake offensive operations during King George's War (1744–1748) and the Seven Years' War (1754–1763). The ideal for arming the provincials was a weapon like the British Long or Short Pattern Land Musket—the famed Brown Bess—which weighted approximately ten pounds, was .75 caliber in bore, could accept a bayonet, and had a sling for ease of carrying. When armed with such a weapon, a provincial soldier could—theoretically—fire devastating volleys and deliver a bayonet charge. Arming men in the field with muskets of the same caliber also reduced problems resulting from supplying troops with ammunition of varying sizes.[48]

At the same time that colonial governments struggled to arm provincial regiments, evidence drawn from probate inventories and other documentary sources indicates that a decreasing proportion of male colonists owned any kind of a firearm, and in some colonies, even some militiamen lacked arms (Tables 3.5, 3.7). Ownership of firearms and participation in the militia in New England—outside of Rhode Island—remained fairly widespread, even though the quality of arms in New Hampshire and Connecticut left something to be desired. A 1755 Rhode Island census counted 9,177 white males over age sixteen, 5,276 of whom were in the militia, but the census listed only 5,052 privately owned small arms—exclusive of pistols, which were of limited use militarily. Some white men owned more than one gun, and some of these small arms were owned by women and free blacks, suggesting that only about half of the white males over sixteen in the colony may have owned a long arm.[49]

The quality of firearms in New York also left something to be desired, and some militiamen were too poor to acquire arms. Outside of South Carolina, the militias in the southern colonies were in even worse shape despite the fact that evidence from probate inventories suggests that the ownership of firearms generally remained higher than in New England and the Middle Atlantic region. A third of the militia in Maryland were unarmed, and fewer than half of the militiamen in North Carolina and Georgia had guns. The quality and quantity of the firearms of Virginia's militiamen were also found to be wanting. In sum, most colonies did not have well-armed militias in the mid-1750s.[50]

To obtain the firearms needed to equip provincial regiments and to arm militias on the frontier, colonial governments bought and impressed weapons from their colonists and bought muskets from English suppliers. During the Seven Years' War, they also obtained the loan of twenty-two thousand muskets from the British government to arm provincial soldiers. Additionally, the British government gave three thousand muskets to the North Carolina militia and five hundred to Georgia's militia. On its own, South Carolina bought a total of two thousand muskets to arm its militiamen, all of whom were supposedly "already furnished with a good gun" (Table 3.7).[51] Even so, there was a critical shortage of muskets needed to arm provincial troops in 1758. Firearms historian De Witt Bailey concluded that the Great Arms 'Crisis' of 1758" was "the result of decades of private purchases of cheap

*A Right to Bear Arms?*

**TABLE 3.7. Condition of colonial militias in 1754–1756.[a] A long dash (—) indicates data unknown; n/a = not applicable.**

| Colony | White males aged 16 years and older | Enrolled militiamen | Percent in militia | Proportion of militia armed | Quality of their arms | Number of public small arms |
|---|---|---|---|---|---|---|
| New Hampshire | 7,000 | 6,000 | 85.7 | "most armed" | "in general of the meanest Sort" | 2,500 |
| Massachusetts | 45,764 | 37,446 | 81.2 | 5,052 small arms and 624 pistols in private hands | — | 300–400 |
| Rhode Island | 9,177 | 5,265 | 57.4 | | — | — |
| Connecticut | 28,500 | 20,000 | 71.4 | | "poor and undersize" | — |
| New York | 19,825 | 12,000 | 60.5 | "some are . . . so indigent" "they cannot purchase their proper arms" | "chiefly for the Indian trade" | 1,000 belonging to NYC |
| New Jersey | 16,000 | 13,000 | 81.3 | n/a | n/a | — |
| Pennsylvania | 25,000 | 0 | 0 | n/a | n/a | — |
| Delaware | 4,000–5,000 | — | 0 | "Two-thirds" | "very bad and scarcely fit for use" | 600 |
| Maryland | 26,000 | 16,500 | 63.5 | | | — |
| Virginia | 45,000 | 28,000 | 62.2 | "Not above one-half" | "are of different bores" | 2,500 |
| North Carolina | 17,900 | 15,400 | 86 | "Not half of the militia are armed" | "very bad" | 1,000 |
| South Carolina | 6,600 | 5,500 | 83.3 | "every person in the province capable of bearing arms" | "already furnished with a good gun" | 2,000 |
| Georgia | — | 768 | | "many being unable to purchase arms" | "very badly armed" | — |

[a] Source: See Sweeney, "Firearms, Militias and the Second Amendment," 332–333, with a change and correction in the number of militiamen enrolled in North Carolina taken from Matthew Rowan to My Lords [of Trade], Cape Fear, June 3, 1754 in *Colonial Records of North Carolina*, ed. William L. Saunders, [10 vols.] (Raleigh: State of North Carolina, 1886–1890), vol. 5: 124–125.

arms, and the general unfamiliarity of the population with a regulation musket."[52] After the war, most provincial soldiers returned their muskets to the British, colonial governments recalled some, and others went home with discharged colonial soldiers.[53]

The problems associated with arming soldiers in the field and mobilized militiamen returned during the American war for independence. Outside of the Middle Atlantic region, a majority of males' probate inventories still contained a firearm during the early 1770s, but the problem remained of obtaining muskets that were now needed to equip the Continental Army and to arm militiamen in the field.[54] The most recent history of arming and equipping American forces during the war of independence concludes that "military stores procurement efforts in the year after the Battle of Bunker Hill in 1775 demonstrates loudly that America was ill equipped for war."[55] To address this situation, Congress created the Department of the Commissary General of Military Stores to transform production by organizing labor, establishing factories, and introducing new techniques. Congress and individual states also imported over one hundred thousand muskets.[56] Despite these efforts, the percentages of probate inventories of male decedents with firearms declined during the mid-1780s (Table 3.5). So when most political leaders addressed questions about

organizing, arming, and disciplining the militia during the 1780s and 1790s, they were more concerned with the arming or rearming of the existing state militias than with the possible disarming of some imaginary "citizens' militia" or "people's militia."[57] Leaders were grappling with real problems evident in the thirteen state militias, some of which no longer appeared to be capable of ensuring the "security of a free State" without improved organization, better training, and thousands of muskets with bayonets.

Arguments over how to achieve these goals had begun in the mid-1780s and continued into the early 1800s. The 1792 Uniform Militia Act passed by Congress did not solve the problem nor settle the question of who would arm the militia. The act specified that all white males between eighteen and forty-five were to serve in the militia and had to arm themselves with a musket or a rifle within six months and within five years all muskets were to be of a standard bore. Achieving this goal proved impossible, and data derived from probate inventories suggest that the private ownership of firearms continued to decline during the later 1700s. The percentages of firearms in the probate inventories of men who died in the 1790s decreased in New England, New York, Maryland, and Virginia and only increased slightly in South Carolina, New Jersey, and Pennsylvania, where the latter state government had finally passed a law in 1777 establishing a militia on a permanent basis.

Reports on the manpower and arms of the individual state militias that were sent to the federal government in 1802 and 1803 indicate the varying degrees to which provisions of the 1792 militia act were and were not being complied with (Table 3.8). A significant minority of white males in the eighteen to forty-five age group were not in the state militias. At the same time, fewer than half of the foot soldiers, who formed the backbone of the state militias, were armed. Outside of New England and New York, a majority of infantrymen in the militias did not have the required firearms. The situation was particularly dire in Virginia and Georgia. It was also probably bad in Delaware, which did not even send in a return, and one historian has concluded that in the early 1800s the state, "in effect, did not have a militia system."[58] Ironically, the overall pattern in 1802 and 1803 bears a striking resemblance to the situation in the colonies in the mid-eighteenth century (Table 3.7). Since that time Pennsylvania had acquired a poorly armed militia, but fewer militiamen in South Carolina were able to arm themselves than in 1754. With these exceptions, not much appears to have changed over the course of a half century, despite much debate and action by state and federal governments. Relatively widespread private ownership of firearms still did not translate into well-armed militias in most states. In a study of the militias during the War of 1812, historian Edward Skeen concluded that "the lack of arms among militias, particularly in the South and West, was a national disgrace," and "it was a good estimate that perhaps fewer than one-third of the militiamen were armed" in accordance with the requirements of the 1792 Uniform Militia Act.[59]

There are in these findings some insights that may be of interest to legal and constitutional scholars and those engaged in contemporary debates over firearms. First, because they appear not to have been common, privately owned firearms had a very different place in English society and culture and in law than they did in the English colonies. Second, as a result of these differences, seemingly similar institutions such as the English militia and its colonial offspring differed in membership and arming, and American militias also differed from colony to colony and state to state. Third, conditions in both England and its colonies changed over time, and one should particularly guard against assumptions about the role of firearms rooted in the image of an unchanging, ahistorical "Early America." Fourth, changes in time and place are critically important when considering how militias were

66      *A Right to Bear Arms?*

TABLE 3.8. State militia returns in 1802 and 1803.

| State | White males over 16 in 1800[a] | White males 16–45 in 1800[b] | Total number of militiamen in 1803[b] | % White men over 16 in militia[b,c] | % White men 16–45 in militia[b,c] | Foot soldiers in militia in 1803[b,d] | Guns for foot soldiers in 1803[b,e] | % Foot soldiers armed[b] |
|---|---|---|---|---|---|---|---|---|
| New Hampshire | 45,683 | 33,968 | 20,551 | 45.0 | 60.5 | 17,423 | 11,170 | 64.1 |
| Massachusetts | 114,191 | 106,862 | 62,450 | 54.6 | 60.1 | 52,654 | 44,278 | 84.1 |
| Connecticut | 63,839 | 44,663 | 20,740 | 32.5 | 46.2 | 15,811 | 13,920 | 88.0 |
| Vermont | 37,872 | 29,786 | 18,422 | 48.6 | 61.8 | 15,045 | 8,153 | 54.2 |
| Rhode Island | 16,561 | 11,874 | 5,467 | 33.0 | 46.6 | 4,731 | 3,052 | 64.5 |
| New York | 142,724 | 110,669 | 71,554 | 50.1 | 64.6 | 64,355 | 39,239 | 61.0 |
| New Jersey | 48,866 | 36,257 | 27,424 | 56.1 | 75.6 | 23,683 | 9,510 | 39.9 |
| Pennsylvania | 152,180 | 113,595 | 90,242 | 59.3 | 79.4 | 86,701 | 29,604 | 34.1 |
| Virginia | 128,191 | 98,970 | 67,577 | 52.3 | 66.3 | 60,220 | 12,404 | 20.6 |
| North Carolina | 81,457 | 62,769 | 42,014 | 51.6 | 67.0 | 39,751 | 17,821 | 44.8 |
| South Carolina | 47,349 | 37,105 | 35,490 | 75.0 | 95.6 | 30,354 | 12,876 | 42.4 |
| Georgia | 25,658 | 20,701 | 18,726 | 73.0 | 90.5 | 16,720 | 2,388 | 14.3 |
| Kentucky | 42,642 | 33,404 | 26,576 | 62.6 | 79.9 | 24,606 | 14,080 | 57.2 |
| **Totals** | 946,253 | 738,813 | 507,335 | 53.5 | 68.9 | 452,473 | 218,486 | 48.3 |

a Source of population data from the U.S. Census of 1900: en.wikipedia.org/wiki/1800_United_States_Census.

b Source: "Militia, Communicated to Congress, March 22, 1804," in *American State Papers, Documents Legislative and Executive of the Congress of the United States, Military Affairs*, vol. 1, 1789–1819 (Washington, D.C.: Gales and Seaton, 1832), publication no. 52, 168–172.

c Percentages were calculated by dividing the numbers of militia men from the 1802 to 1803 returns by the numbers of white males aged 16 years and over and aged 16–45 years from the 1800 federal census. Assuming that the numbers of men in the population in these categories increased between 1800 and the period spanning 1802 to 1803, the percentages in these columns slightly overestimate the percentages of each population group in the militias in 1802 and 1803.

d Foot soldiers include sergeants, corporals, and privates in the infantry and riflemen but exclude commissioned officers and musicians.

e Guns include muskets, rifles, and fusees. Delaware and Maryland did not provide militia returns.

armed. In both England and its colonies, not all militia arms were private arms and not all private arms were militia arms and never had been. Fifth, when considering both militias and the private use of firearms, one needs to consider, as contemporaries did, differences in the types of firearms and their capabilities. Not all muzzle-loading, smoothbore long arms were muskets, and, at various times, military and political leaders in the colonies believed that insufficient numbers of muskets was a problem. Finally, the availability of privately owned firearms in England and their presence in much greater quantities in its colonies did not automatically create armed populaces inherently capable of resisting and defeating an established government. Ironically, this was the case, in part, because of the existence of militias. Militias that depended on governments to provide organization, discipline, and, in some cases, arms were more likely to uphold governments than resist them. This was a hard lesson learned by the Duke of Monmouth's followers in 1685, mariners resisting impressment in New York City in 1758, the Regulators in North Carolina in 1771, and the Shaysites in Massachusetts in 1787, all of whom were rebels or armed protesters confronted by militiamen, who fired on them and helped suppress them.[60] Early modern political theorists such as James Harrington and some of today's legal and constitutional scholars who idealize the era's militias as armed embodiments of the people that existed primarily to restrain or overthrow governments have an incomplete understanding of how seventeenth- and eighteenth-century populations and militias were armed and acted.

## NOTES

1. "Virginia Declaration of Rights," June 12, 1776, on the Avalon Project, Documents in Law, History and Diplomacy, at http://avalon.law.yale.edu/18th_century/virginia.asp (accessed October 27, 2017).

2. Because of the decline in the number of surviving English probate inventories over the course of the eighteenth century and the increasing lack of the necessary detail in the inventories that do survive, it is not possible to extend the English analysis beyond 1750.

3. The databases include the probate inventories of males who owned some personal property other than just livestock and/or money and excludes males whose estates consisted of only real estate. Also excluded are inventories where lumping goods in such categories as "household goods" made it difficult to uncover the presence of a firearm.

4. Michael Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Knopf, 2002), 109.

5. Anna L. Hawley, "The Meaning of Absence: Household Inventories of Surry County, Virginia, 1690–1715," *Dublin Seminar for New England Folklife Annual Proceedings* 12 (1987): 23–31; Gloria L. Main, "The Correction of Biases in Colonial Probate Records," *Historical Methods Newsletter* 8, no.1 (1974): 10–28; Margaret Spufford, "The Limitations of the Probate Inventory," *English Rural Society, 1500–1800: Essays in Honor of Joan Thirsk*, ed. John Cartres and David Hey (Cambridge, UK: Cambridge University Press, 1990), 139–174; Kevin M. Sweeney, "Using Tax Lists to Detect Biases in Probate Inventories," *Dublin Seminar for New England Folklife Annual Proceedings* 12 (1987): 32–40. Some book-length scholarly works using probate inventories that contain informed observations on their use, their biases, and how to deal with the biases include: Gloria L. Main, *Tobacco Colony: Life in Early Maryland, 1650–1720* (Princeton, N.J.: Princeton University Press, 1982), esp. 49, 171–174, 282–286; Carole Shammas, *The Pre-Industrial Consumer in England and America* (Oxford: Oxford University Press, 1990). esp. 19–20; Lorna Weatherill, *Consumer Behaviour and Material Culture in Britain 1660–1760*, 2nd ed. (London: Routledge, 1996), esp. 201–207.

6. In addition to the books cited in note 5 of this chapter, see also Alice Hanson Jones, *American Colonial Wealth: Documents and Methods* (New York: Arno Press, 1977); Jackson Turner Main, *The Social Structure of Revolutionary America* (Princeton, N.J.: Princeton University Press, 1966); Mark Overton, *Agricultural Revolution in England: The Transformation of the Agrarian Economy*, Cambridge Studies in Historical Geography (Cambridge: Cambridge University Press, 1996); Daniel Roche, *The People of Paris: An Essay on Popular Culture in the 18th Century*, trans. Marie Evans in association with Gwyne Lewis (Berkeley: University of California Press, 1987).

7. Lois G. Schwoerer, *Gun Culture in Early Modern England* (Charlottesville: University of Virginia Press, 2016), 106–124.

8. John Tincey, *The Armada Campaign 1588* (London: Osprey Publishing Company, 1988), 46. Based on returns from twenty-nine English counties for 156,500 men with 79,798 weapons of various types, the bulk of the firearms were calivers.

9. The estimate of approximately one million was derived by the following formula: estimated English population in 1586: (3.8 million ÷ 2) × 0.5726 (estimated percentage of the 1586 population to be aged fifteen to fifty-nine, 57.26%) = 1,087,940 . Data from E. A. Wrigley and R. S. Schofield, *The Population History of England, 1541–1871* (Cambridge, Mass.: Harvard University Press, 1981), table A3.1, page 528.

10. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (Cambridge, Mass.: Harvard University Press, 1994), 19–21; Peter Edwards, *Dealing in Death: The Arms Trade and the British Civil Wars, 1638–52* (Thrupp Stroud, UK: Sutton Publishing, 2000), 26–34, 39–40, 175–181, 210–211.

11. Joyce Lee Malcolm, *Guns and Violence: The English Experience* (Cambridge, Mass.: Harvard University Press, 2002), 35; Malcolm, *To Keep and Bear Arms*, 21.

12. Wrigley and Schofield, *Population History of England*, 638–641.

*A Right to Bear Arms?*

13. The estimate of 1.5 million was derived by the following formula: Estimated English population in 1641: (5.1 million ÷ 2) × 0.5942 (estimated percentage of the population in 1641 aged fifteen to fifty-nine, 59.42%) = 1,515,210 Data from Wrigley and Schofield, *Population History of England*, Table A3.1, page 528.

14. For gun production in London, see Walter M. Stern, "Gunmaking in Seventeenth-Century London," *Journal of the Arms and Armour Society* 1, no. 5 (March 1954): 82–83, 97; for Bristol, see Stuart Reid, *All the King's Armies: A Military History of the English Civil War 1642–1651* (Staplehurst, Kent, UK: Spellmount, 1998), 59.

15. Schwoerer, *Gun Culture*, 171.

16. 14 Charles II c.3 (1662).

17. Malcolm, *To Keep and Bear Arms*, 54–76.

18. James Horn estimated that one-half of the population were among those with personal wealth less than £50, in James Horn, *Adapting to a New World: English Society in the Seventeenth-Century Chesapeake* (Chapel Hill: University of North Carolina Press, 1994), 100–101, 309.

19. Malcolm, *To Keep and Bear Arms*, 79–80.

20. Schwoerer, *Gun Culture*, 51–54, 11–13, 173–175.

21. Ibid., 79–81, 86–88, 127–128.

22. On ownership, see Alan Macfarlane, *The Justice and the Mare's Ale: Law and Disorder in Seventeenth-Century England* (New York: Cambridge University Press, 1981), 190–193. On violent attacks, see Malcolm, *Guns and Violence*, 36–45; J. A. Sharpe, *Crime in Early Modern England 1550–1750*, 2nd ed. (London: Longman, 1999), 77–90. On military firearms, see Neil Younger, *War and Politics in the Elizabethan Counties* (Manchester, UK: University of Manchester Press, 2012), 139.

23. English Bill of Rights 1689, http://avalon.law.yale.edu/17th_century/england.asp (accessed October 27, 2017).

24. Schwoerer, *Gun Culture*, 159–164. Joyce Malcolm acknowledged that "with both the Game Act [of 1671] and the Militia Act [of 1662] still unchanged, the assertion of a guaranteed right for Protestants to have arms seems empty rhetoric." Malcolm, *To Keep and Bear Arms*, 120. Tim Harris, *Revolution: The Great Crisis of the British Monarchy 1685–1720* (New York: Penguin Books, 2006), 343.

25. William S. Fields and David T. Hardy, "The Militia and the Constitution: A Legal History," *Military Law Review* 136 (Spring 1992): 19.

26. Ibid., 2–3; Louis Morton, "Origins of American Military Policy," *Military Affairs* 22, no. 2 (1958): 76; John K. Mahan, *History of the Militia and the National Guard* (New York: Macmillan, 1983), 6. But historian Richard P. Abels concludes that the "arguments advanced for a general military obligation of all freemen in early England are not persuasive" and a "'nation in arms,' like the Anglo-Saxon peasant commonwealth so dear to Victorian scholars is a historical myth." See Abels, *Lordship and Military Obligation in Anglo-Saxon England* (Berkeley: University of California Press, 1988), 175, 179.

27. "A petition from the Earl of Hertford to the King," undated, but apparently 1605, in *The Earl of Hertford's Lieutenancy Papers, 1603–1612*, ed. W. P. D. Murphy (Devizes, UK: Whiltshire Record Society, 1969), 102.

28. Lindsay Boynton, *The Elizabethan Militia, 1558–1638* (London: Routledge and Kegan Paul, 1967), 90–96, 113–121; Mark Charles Fissel, *The Bishops' Wars: Charles I's Campaigns against Scotland 1638–1640* (Cambridge, UK: Cambridge University Press, 1994), 174–214; Younger, *War and Politics*, 104–159.

29. Younger, *War and Politics*, 102.

30. Boynton, *Elizabethan Militia*, 45–47.

31. Ibid., 108.

32. Reid, *All the King's Armies*, 1.

33. A. Hassell Smith, "Militia Rates and Militia Statutes 1558–1663," in Peter Clark, Alan G. R. Smith, and Nicholas Tyacke, eds., *The English Commonwealth, 1547–1640: Essays in Politics and Society*

Compendium_Cornell
Page 0482