1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and*
   *Blake Graham, in their official capacities*
9

10          IN THE UNITED STATES DISTRICT COURT

11       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                  CIVIL DIVISION

13

14  | **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
15  | Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF SAUL CORNELL** |
16  | **v.** | |
17  | | **VOLUME 4 OF 4** |
18  | **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:     5A |
19  | | Judge:        Hon. Roger T. Benitez |
20  | Defendants. | Action Filed:  August 15, 2019 |

21

22

23

24

25

26

27

28

# INDEX

| Works | Decl. Page | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Heydon's Case, (1584) 76 Eng.Rep. 637 (KB) | 26 n.88 | 0002-0007 |
| 1 Zephaniah Swift, A Digest Of The Laws Of The State Of Connecticut 11 (New Haven, S. Converse 1822) | 26 n.88 | 0007-0015 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 24 n.81 | 0016-0017 |
| Md. Const. of 1776, Declaration of Rights, art. III, § 1. | 3 n.4 | 0018-0023 |
| Md. Const. of 1776, Declaration of Rights, art. IV. | 5 n.13 | 0018-0023 |
| Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2 | 22 n.73 | 0024-0025 |
| 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, §§ 1-2 | 18 n.55 | 0026-0028 |
| An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, Laws of The State of New-York, Comprising the Constitution, and the Acts of the Legislature, Since the Revolution, from the First to the Fifteenth Session, Inclusive 191-2 (Thomas Greenleaf, ed., 1792) | 22 n.74 | 0029-0031 |
| N.C. Const. of 1776, Declaration of Rights, art. I, § 3 | 5 n.13 | 0032-0035 |
| N.C. Const. of 1776, Declaration of Rights, art. II | 20 n.65 | 0032-0035 |
| 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15 | 18 n.56 | 0036-0073 |

2

| | | |
|---|---|---|
| Francois Xavier Martin, A Collection Of Statutes Of The Parliament Of England In Force In The State Of North-Carolina 60–61 (Newbern, 1792) | 4 n.5 | 0074-0075 |
| 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same | 18 n.56 | 0076-0078 |
| Idaho Const. of 1889, art. I, § 11 | 27 n.91 | 0079 |
| Supplements To The Revised Statutes. Laws Of The Commonwealth Of Massachusetts, Passed Subsequently To The Revised Statutes: 1836 To 1849, Inclusive 413 (Theron Metcalf & Luther S. Cushing, eds. 1849) | 20 n.65 | 0080-0081 |
| Statutes Of The State Of New Jersey 561 (rev. ed. 1847) | 20 n.65 | 0082-0083 |
| An Act Incorporating the residents residing within limits therein mentioned, in 2 NEW YORK LAWS 158 (1785) | 20 n.65 | 0084-0094 |
| An Act to incorporate the Town of Marietta, in Laws Passed In The Territory Northwest Of The River Ohio 29 (1791) | 20 n.65 | 0095-0097 |
| Pa. Const. of 1776, ch. I, art. III | 5 n.13, 20 n.64 | 0098-0102 |
| 9 Statutes At Large Of Pennsylvania 29-30 (Mitchell & Flanders eds. 1903) | 4 n.5 | 0103-0104 |
| Tex. Const. of 1869, art. I, § 13 | 27 n.91 | 0105-0109 |
| Utah Const. of 1896, art. I, § 6 | 27 n.91 | 0110-0112 |
| Vt. Const. of 1777, Declaration Of Rights, art. IV | 20 n.65 | 0113-0122 |
| Vt. Const. of 1777, Declaration Of Rights, art. V | 5 n.13 | 0113-0122 |

3

| | | |
|---|---|---|
| **BOOKS**[1] | | |
| *American Dictionary of the English Language* (1828) | 10 n.28 | 0124-0127 |
| Joseph Backus, *The Justice Of The Peace* 23 (1816). | 4 n.7 | 0128-0132 |
| Joan Burbick, *Gun Show Nation: Gun Culture And American Democracy* (2006), xvi-xxii | 14 n.44 | 0133-0142 |
| Brutus, *Essays of Brutus VII*, reprinted in 2 The Complete Antifederalist 358, 400–05 (Herbert J. Storing ed., 1981) | 21 n.70 | 0143-0155 |
| J.J. Burlamaqui, *The Principles Of Natural Law* (Thomas Nugent Trans., 1753) at 201 | 9 n.22 | 0156 |
| Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation Of The Early Federal System*, In 1 The Cambridge History Of Law In America 518–544 (Christopher Tomlins & Michael Grossberg Eds., 2008) | 2 n.3 | 0157-0211 |
| Saul Cornell, *The Other Founders: Antifederalism And The Dissenting Tradition In America*, 1788-1828 (1999), 139 | 21 n.69 | 0212-0222 |
| Saul Cornell, *The Right To Bear Arms,* In The Oxford Handbook Of The U.S. Constitution 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber Eds., 2015) | 2 n.3, 18 n.57 | 0223-0246 |
| Tench Coxe, *A Freeman, Pa. Gazette, Jan. 23, 1788*, Reprinted In Friends Of The Constitution: Writings Of The "Other" Federalists 82 (Colleen A. Sheehan & Gary L. Mcdowell Eds., 1998) | 21 n.71 | 0247-0251 |

---

[1] The Declaration of Saul Cornell cites two books – Gary Gerstle, Liberty and Coercion: *The Paradox of American Government, From the Founding to the Present* (Princeton Univ. Press, 2015), and William J. Novak, *The People's Welfare: Law And Regulation In Nineteenth-Century America* (1996) --in their entirety and without discussing the books in detail. *See* Cornell Decl. ¶ 39 n.78 & . ¶ 61 n.127. These books are not included with this filing.

| | | |
|---|---|---|
| Alexander DeConde, *Gun Violence In America* | 34 n.119 | 0252-0257 |
| *Dictionarium Britannicum* (1730). | 9 n.24 | 0258-0260 |
| *Dictionary of the English Language* (1755) | 10 n.26, 10 n.27 | 0261-0263 |
| Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government* (2005), 82-87 | 5 n.12 | 0264-0275 |
| Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (University Of North Carolina Press, 2009) 105-109,227-238 | 4 n.6 | 0276-0287 |
| 10 Encyclopedia Americana 214 | 20 n.67 | 0288-0293 |
| James E. Fleming & Linda C. Mcclain, *Ordered Liberty: Rights, Responsibilities, and Virtues* (Harvard University Press, 2013), 44-45 | 5 n.10 | 0294-0325 |
| Joanne B. Freeman, *Affairs af Honor: National Politics In The New Republic* (2001) | 15 n.48 | 0326-0333 |
| Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* 2, N.2; 91(1904) | 20 n.66, 23 n.78, 26 n.87 | 0334-0338 |
| Jack P. Greene, *Pursuits Of Happiness: The Social Development of Early Modern British Colonies and the Formation of American Culture* (1988), 170-176 | 14 n.46 | 339-344 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (2016), 198-201 | 13 n.43, 43 n.51, 32 n.109 | 345-353 |
| William N. Hosley, Colt: The Making Of An American Legend (1st Ed. 1996) | 19 n.60 | 354-365 |
| 2 James Kent *Commentaries On American Law* (340) 464 N.2 (Oliver Wendell Holmes, Jr., Ed. 12 Ed. 1873) | 23 n.77 | 366-374 |

5

| | | |
|---|---|---|
| David Thomas Konig, *Regionalism in Early American Law,* In 1 The Cambridge History of Law in America 144 (Michael Grossberg & Christopher Tomlins eds., 2008) | 14 n.46 | 375-380 |
| Gerald Leonard & Saul Cornell, *The Partisan Republic: Democracy, Exclusion, and the Fall of the Founders' Constitution*, 1780s–1830s, At 2 | 10 n.29 | 382-390 |
| New Law Dictionary (1792) | 9 n.23 | 391 |
| New Histories of Gun Rights and Regulation: Essays On The Place of Guns in American Law and Society (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller Eds., Forthcoming 2023). | 7 n.20 | 392 |
| New Universal Dictionary (1763) | 9 n.25 | 393-395 |
| William E. Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine* (1998). | 29 n.97 | 396-399 |
| Kunal M. Parker, *Common Law History, And Democracy In America, 1790-1900: Legal Thought Before Modernism* (2013), 147-148 | 25 n.82 | 400-405 |
| Randolph Roth, *American Homicide* 56, 315 (2009) | 14 n.45 | 406-409 |
| Harry N. Scheiber, *State Police Power*, In 4 Encyclopedia of the American Constitution 1744 (Leonard W. Levy Et Al. Eds., 1986) | 21 n.68 | 410-419 |
| Barry Alan Shain, *The Nature of Rights at the American Founding and Beyond* (Barry Alan Shain Ed., 2007), 125-127,139-143 | 10 n.31 | 420-430 |
| Quentin Skinner, *Liberty Before Liberalism* (1998), 17-36 | 10 n.31 | 431-443 |
| Richard Slotkin, *Gunfighter Nation: The Myth of the Frontier In Twentieth-Century America* (1993), 10-16 | 14 n.44 | 444-450 |

Compendium of Works Cited in Declaration of Saul Cornell
(3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| Merritt R. Smith, And Leo Marx, *Does Technology Drive History? The Dilemma Of Technological Determinism* (Cambridge, Ma: Mit, 1994) | 34 n.118 | 451-456 |
| Robert Spitzer, *The Politics Of Gun Control* 14 (2012). | 31 n.106 | 457-467 |
| Kevin M. Sweeney, Firearms Ownership And Militias In Seventeenth And Eighteenth Century England And America, In A Right To Bear Arms?: The Contested Role Of History In Contemporary Debates On The Second Amendment (Jennifer Tucker Et Al. Eds., 2019) | 15 n.47, 16 n.50, 17 n.52 | 468-485 |
| H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002). | 12 n.34 | 486-490 |
| Sean Wilentz, Society, Politics, and the Market Revolution, in the New American History (Eric Foner Ed., 1990) | 18 n.59 | 491-503 |
| **LAW REVIEWS AND JOURNALS** | | |
| Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014) | 3 n.4 | 0505-0519 |
| Joseph Blocher, *Has the Constitution Fostered a Pathological Rights Culture? The Right to Bear Arms: Gun Rights Talk*, 94 B.U. L. Rev. 813 (2014) | 33 n.114 | 0520-0535 |
| Joseph Blocher, *Hunting and the Second Amendment,* 91 NOTRE DAME L. REV. 133 (2015). | 33 n.114 | 0536-0574 |
| Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019) | 11 n.33 | 0575-0587 |
| Samuel L. Bray, 'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution, 102 VIRGINIA L. REV. 687 (2016) | 4 n.9 | 0588-0644 |

| | | |
|---|---|---|
| Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021) | 26 n.88 | 0645-0688 |
| Rachel A. Callcut et al., *Effect Of Mass Shootings on Gun Sales-A 20-Year Perspective*, 87 J. TRAUMA ACUTE CARE SURGERY 531 (2019). | 33 n.116 | 0689-0711 |
| Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017) | 5 n.10, 11 n.33 | 0712-0732 |
| Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020) | n.23 | 0733-0752 |
| Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original) | 9 n.23 | 0753-0799 |
| Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999) | 12 n.35 | 0800-0817 |
| Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) | 12 n.36, 34 n.119 | 0818-0852 |
| Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) | 11 n.32 | 0853-0864 |
| Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1713, 1716 (2012) | 4 n.9, 19 n.61 | 0865-0888 |
| Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017) | 13 n.40 | 0889-0932 |

8

| | | |
|---|---|---|
| Saul Cornell, *The Police Power And The Authority To Regulate Firearms In Early America 1–2* (2021) | 11 n.33, 22 n.72, 24 n.80 | 0933-0949 |
| Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022) | 19 n.63 | 0950-0983 |
| Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022) | 13 n.42 | 0984-1020 |
| Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022) | 27 n.90, 28 n.92, 28 n.93 | 1021-1039 |
| Allan Dafoe, *On Technological Determinism: A Typology, Scope Conditions, and a Mechanism Science*, 40 TECH. & HUM. VALUES 1047 (2015). | 34 n.118 | 1040-1069 |
| John J. Donohue, *The Swerve to "Guns Everywhere": A Legal and Empirical Evaluation*, 83 LAW & CONTEMP. PROBLEMS 117 (2020) | 37 n.124 | 1070-1086 |
| Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016) | 10 n.29 | 1087-1108 |
| Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014) | 17 n.54 | 1109-1120 |
| Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016) | 30 n.102 | 1121-1145 |
| Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 SOUTH. ILL. UNIV. L.J. 61 (2018) | 37 n.123 | 1146-1171 |

9

| | | |
|---|---|---|
| Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015). | 6 n.16 | 1172-1189 |
| Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, 22 APPLIED ECON. LETTERS 281 (2014) | 37 n.124 | 1190-1193 |
| Stephen P. Halbrook, *New York's Not So "SAFE" Act: The Second Amendment in an Alice-In- Wonderland World Where Words Have No Meaning*, 78 ALBANY L. REV. 789 (2015). | 31 n.108 | 1194-1218 |
| Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence*, 14 GEORGETOWN J. OF L. & PUB. POL'Y. 47 (2016). | 34 n.118 | 1219-1247 |
| James Jacobs, *Why Ban 'Assault Weapons'?*, 37 CARDOZO L. REV. 681, 687 (2015). | 32 n.110 | 1248-1275 |
| Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) | 28 n.95, 30 n.103 | 1276-1351 |
| Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) | 10 n.29 | 1352-1367 |
| Aaron T. Knapp, *The Judicialization of Police,* 2 CRITICAL ANALYSIS OF L. 64 (2015) | 5 n.12 | 1368-1387 |
| David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994). | 34 n.118 | 1388-1414 |
| Christopher S. Koper et. al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. URB. HEALTH 313 (2018). | 36 n.122 | 1415-1423 |

10

| | | |
|---|---|---|
| Christopher S. Koper, *Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms*, CRIMINOLOGY & PUBLIC POLICY 147 (2020) | 37 n.124 | 1424-1447 |
| Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022) | 17 n.53 | 1448-1462 |
| Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. 238, 241 (2014); | 30 n.103 | 1463-1466 |
| John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979) | 5 n.10 | 1467-1493 |
| William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008) | 25 n.83 | 1494-1502 |
| William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994) | 5 n.11 | 1503-1527 |
| Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) | 10 n.29 | 1528-1557 |
| Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas*, 1836-1900, 121 SOUTHWESTERN QUARTERLY 284 (2020) | 30 n.102 | 1558-1578 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022) | 28 n.94 | 1579-1593 |
| Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018) | 31 n.104 | 1594-1621 |

11

| | | |
|---|---|---|
| Eric M. Ruben & Darrell A. H. Miller, Preface: *The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017). | 7 n.19, 13 n.39 | 1622-1630 |
| Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015) | 19 n.62 | 1631-1642 |
| Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018) | 18 n.58 | 1643-1669 |
| Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019) | 17 n.54 | 1670-1676 |
| Jaclyn Schildkraut et.al., *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020) | 31 n.104 | 1677-1706 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017) | Passim | 1707-1733 |
| William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968) | 3 n.4 | 1734-1768 |
| David M. Studdert et al., *Testing the Immunity of the Firearm Industry to Tort Litigation*, 177 JAMA INTERNAL MEDICINE 102, 102-05 (2017). | 33 n.113 | 1769-1772 |
| Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public, 55 U.C. DAVIS L. REV. 2495 (2022) | 7 n.20 | 1773-1785 |
| Christopher G. Tiedeman, *A Treatise on the Limitations of the Police Power in the United States* 4–5 (1886) | 30 n.101 | 1786-1790 |

12

| | | |
|---|---|---|
| Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008) | 5 n.11, 5 n.12 | 1791-1809 |
| Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005) | 23 n.78 28 n.95 | 1810-1845 |
| David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment*, 74 TUL. L. REV. 387 (1999) | 33 n.115 | 1846-1923 |
| John J. Zubly, *The Law of Liberty* (1775) | 5 n.10 | 1924-1939 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Vivian S. Chu, *Federal Assault Weapons Ban: Legal Issues Congressional Research Service*, February 14, 2013 | 32 n.110 | 1941-1957 |
| Carolyn Maloney, Supplemental Memorandum: The Committee's Investigation Into Gun Industry Practices And Profits (Jul. 27, 2022) | 35 n.121 | 1958-1980 |
| Report on Books for Congress, [23 January] 1783," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031 | 9 n.22 | 1981-2020 |
| **NEWS ARTICLES** | | |
| Mark Berman & Todd C. Frankel, *Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence*, WASHINGTON POST (July 27, 2022, 7:19 PM) | 35 n.120 | 2022-2024 |

| | | |
|---|---|---|
| John Bingham, *Speech, Cincinnati Daily Gazette* (Sept. 2, 1867), As Quoted In Saul Cornell And Justin Florence, The Right To Bear Arms In The Era of the Fourteenth Amendment: Gun Rights or Gun Regulation, 50 SANTA CLARA L. REV. 1043, 1058 (2010) | 29 n.96 | 2025-2055 |
| Polly Mosendz, *Why Gunmakers Would Rather Sell AR 15s Than Handguns*, BLOOMBERG (June 20, 2018, 3:00 AM), https://www.bloomberg.com/news/articles/2018-06 20/why-gunmakers-wouldrather- sell-ar-15s-than-handguns | 37 n.124 | 2056-2061 |
| Robert J. Spitzer, *Why Assault Rifles are Selling*, CHICAGO TRIBUNE, June 16, 2015. | 34 n.117 | 2062-2064 |
| **OTHER SOURCES** | | |
| 1 William Blackstone, Commentaries, *61 *349 | 4 n.8, 26 n.88 | 2066-2067 |
| John Donohue III & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STANFORD LAW SCHOOL BLOGS (Oct. 15, 2019), https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/ | 36 n.122 | 2068-2072 |
| Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence*, July 4, 1799, at 7 (July 4, 1799) | 10 n.30 | 2073-2084 |
| Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0 | 16 n.49 | 2085-2118 |
| "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-thecourt-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshallcourt-1801-1835/ | 23 n.76 | 2119-2128 |

14

| | | |
|---|---|---|
| "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-thecourts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/ | 23 n.76 | 2129-2135 |

15

**TABLE 3**   State restrictions on large-capacity magazines

| State and Year of Initial Implementation | Magazine Capacity Limit | Grandfathering of Pre-Law LCMs | Assault Weapon Restrictions |
| --- | --- | --- | --- |
| California (2000) | 10 | Yes | Yes (1989) |
| Colorado (2013) | 15 | Yes | No |
| Connecticut (2013) | 10 | Yes (with registration) | Yes (1993) |
| Hawaii (1992) | 10 (handgun magazines) | No | Yes (1992) |
| Maryland (1994) | 20 (1994), 10 (2013) | Yes | Yes (1994) |
| Massachusetts (1998) | 10 | Yes | Yes (1998) |
| New Jersey (1990) | 15 (1990), 10 (2018) | No (some exceptions for 11–15 rounds with registration) | Yes (1990) |
| New York (2000) | 10 | No (2013) | Yes (2000) |
| Vermont (2018) | 10 (long guns), 15 (handguns) | Yes | No |

*Notes.* The dates for assault weapons restrictions represent the first year when any such restriction was implemented. Note that Washington, D.C., has also had LCM restrictions since 2009.
*Sources.* Law Center to Prevent Gun Violence (https://lawcenter.giffords.org/), Vernick and Hepburn (2003), and Klarevas et al. (2019).

(Fleegler, Lee, Monuteaux, Hemenway, & Mannix, 2013; Gius, 2014; Koper & Roth, 2001; also see Moody & Marvell, 2018). Nonetheless, it is difficult to draw definitive conclusions from these studies given the lack of evidence on the implementation and market effects of these laws and the fact that studies have not accounted for important differences in the laws across states and over time—most critically, where and when they included LCM bans and grandfathering provisions.

A growing number of studies have also examined the effects of state LCM laws on mass shootings more specifically. Most notably, Webster et al. (2020), in their state-level panel analysis of mass murders from 1984 through 2017, suggested that state LCM bans reduce mass murder incidents (4+ killed) and fatalities whereas AW-specific restrictions do not. Controlling for several types of gun laws, gun availability, socioeconomic variables, time trends, and other state-level differences, Webster et al. estimated that states with LCM restrictions had ~50% fewer mass murder incidents during their study period.[30] Effects on fatal victim counts appeared greater but more variable in statistical significance, and the laws seem to have had their clearest effects on mass murders involving a domestic relationship between the perpetrator and one or more of the victims. LCM laws also appeared to reduce more deadly mass shootings (those with more than four or five fatal victims) in some model specifications.

Along similar lines, Klarevas et al. (2019) studied the effects of LCM-specific restrictions on mass shootings resulting in six or more deaths from 1990 through 2017, distinguishing between incidents committed with and without LCM firearms. Controlling for the years of the federal ban, time trends, and state-level differences in gun availability and other social factors, they found that mass murders committed with LCM firearms were significantly less likely and produced significantly fewer total fatalities in LCM ban states. States with LCM laws also had substantially lower levels of firearm mass murders overall (for example, total deaths from these incidents were 95% lower in

LCM ban states after controlling for other covariates), although these differences were not statistically significant.

The Webster et al. (2020) and Klarevas et al. (2019) studies provide the strongest evidence to date for the efficacy of state LCM bans in reducing mass shootings. Both studies are particularly noteworthy for distinguishing between state AW and LCM restrictions. Taking the results of these studies at face value, nonetheless, it remains unclear whether effects from LCM laws vary based on differences in their provisions (such as whether they grandfather pre-law LCMs), the strength of their implementation, or how long they have been in effect.

Other aspects of the studies also leave ambiguities. The Webster et al. (2020) analysis, for instance, does not establish a direct link between LCM laws and use of LCM firearms in mass murders. Furthermore, the fact that LCM laws appear more consistently linked to domestic-related mass murders in their analysis is somewhat surprising (and perhaps indicative of some misspecification in their models) considering that LCM weapons are used more frequently in public mass shootings and seem to have their greatest potential for enhancing the lethality of public incidents (see earlier discussion and Table 2).[31] The Klarevas et al. (2019) study makes a more direct connection between LCM restrictions and lower use of LCM firearms for a smaller subset of more severe mass murders. The rarity of these particular events (there were 69 across the 28-year period studied by Klarevas et al.), however, makes it difficult to determine conclusively whether LCM laws reduce their overall occurrence and death tolls.[32] The effects of LCM laws on mass murder deaths may also be overestimated in these studies as they seem much larger than would be expected based on the extrapolations from incident-level analyses discussed previously (see Table 2). Finally, neither study examined the effects of LCM bans on nonfatal gunshot injuries from mass shootings.

Other state-level studies have yielded mixed evidence on how state AW–LCM laws affect mass shootings. Luca, Malhotra, and Poliquin (2019) reported that these laws are unrelated to the incidence of nondomestic mass murders, which they approximated using incidents in which at least three fatal victims were unrelated to and not romantically involved with the shooter. In contrast, the Gius (2015) study of public mass shootings (referenced above) suggests that state AW–LCM laws reduce deaths from public mass shootings by 45% while having no effect on mass shooting injuries. In a similar vein, Blau et al. (2016) found that public shooting incidents of various sorts (see Footnote 20) are lower in states with AW–LCM bans, even though it is not clear from their analysis whether this is true for public mass shootings specifically (hence, the results could reflect differences across states in the propensity of people to engage in public shootings). They also did not find evidence of AW—LCM laws reducing the use of AWs in these incidents.

Inferences from these additional studies, however, are unclear as a result of multiple problems. Besides lacking specific measurement of LCM firearm use, these studies fail to differentiate between AW and LCM laws, lumping them together into one category. Consequently, the studies do not account for which of these states had LCM restrictions and when.[33] Other idiosyncrasies in the samples, measures, methods, and findings also complicate interpretations.[34,35]

To provide some additional but tentative insight into this issue, Table 4 examines the occurrence of mass shootings with LCM weapons in states with and without LCM restrictions in the years since the expiration of the federal ban. The tabulations are based on the Koper et al. (2018) sample of firearm mass murders with four or more killed from 2009 to 2015, the *Mother Jones* data (as of February 2019) on public mass murders with four or more killed from 2005 to January 2019, and the Klarevas et al. (2019) data on firearm mass murders with six or more killed from 2005 through 2017. Each incident in these sources was coded according to whether it occurred in a state and year in which any type of LCM restriction was in effect, regardless of grandfathering, magazine capacity limit, or AW provisions. Table 4 shows the percentages of firearm mass murder cases that involved an LCM firearm,

**CRIMINOLOGY**
*& Public Policy* | **161**

**TABLE 4**   Use of high-capacity semiautomatics in firearm mass murders in states with and without restrictions on large-capacity magazines

| Data Source and Sample | State-Years with LCM Bans: Total Cases and % With LCMs (min. estimates) | State-Years Without LCM Bans: Total Cases and % With LCMs (min. estimates) |
|---|---|---|
| Koper et al. (2018): all firearm mass murders with 4+ killed, 2009–2015 (*N* = 145) | *n* = 22 incidents 18% – 27% involving LCM | *n* = 123 incidents 12% – 17% involving LCM |
| *Mother Jones* (Follman et al., 2019): public firearm mass murders with 4+ killed that did not involve other crimes, 2005–Jan. 2019 (*N* = 56) | *n* = 14 incidents 36% – 50% involving LCM | *n* = 42 incidents 50% – 64% involving LCM |
| Klarevas et al. (2019): all firearm mass murders with 6+ killed, 2005–2017 (*N* = 47) | *n* = 8 incidents 50% involving LCM | *n* = 39 incidents 72% involving LCM |

*Notes*. Minimum estimated ranges of LCM use from Koper et al. (2018) and *Mother Jones* (Follman et al., 2019) sources are based on cases in which LCMs were explicitly reported (lower bound) or in which gun models were identified that are sold with LCMs (upper bound).

contrasted for LCM ban state-years and state-years without LCM restrictions. The figures from Koper et al. and *Mother Jones* are minimum estimated ranges of LCM use based on cases in which LCMs were explicitly reported (lower bound) or gun models were identified that are sold with LCMs (upper bound). No further adjustments were made for missing gun data. The Klarevas et al. numbers are based on cases in which LCM use was clearly identified by the authors. Irrespective of differences in the level of mass shootings across states (which could be affected by numerous factors), these figures provide some indication as to whether mass shootings in LCM ban states are less likely to involve firearms equipped with LCMs when they do occur.

With the caveat that the samples are small, the estimates reveal an inconsistent pattern. In the Koper et al. (2018) and *Mother Jones* samples, the estimated range of cases involving an LCM overlaps between the states with and without LCM restrictions. Using the broadest sample of firearm mass murders (Koper et al.), the estimated range for LCM cases seems somewhat higher in the LCM restriction states. In contrast, LCM use appears lower in the LCM ban states when focusing on public mass shootings (*Mother Jones*) or mass shootings with the highest fatality counts (Klarevas et al., 2019).[36] Hence, inferences about the effectiveness of LCM restrictions could be conditional on the types of incidents under examination.

In summary, growing evidence suggests LCM restrictions reduce mass shootings and are more potent than AW-only restrictions. Nonetheless, the evidence is not yet sufficient to draw definitive conclusions. Further research is needed on the implementation and outcomes of these laws more generally, with particular attention to how variations in their provisions and implementation affect the magnitude and timing of their impacts on criminal LCM use and gun violence. Another important consideration may be how AW-LCM laws are used in tandem with other state gun laws (e.g., gun registration laws) that could enhance their effectiveness. Such studies could inform state-level policymaking by illuminating the types of AW and LCM regulations that are most optimal for reducing deaths and injuries from the use of high-capacity semiautomatics.

Compendium_Cornell
Page 1438

## 3.3 | Similar weapon bans outside the United States

Outside the United States, a few other nations have also passed regulations on semiautomatic weapons and/or LCMs (Masters, 2017). Scholarly inquiry on these laws has focused primarily on Australia's semiautomatic rifle ban and buyback program that was implemented after a highly tragic and infamous mass shooting in that nation in 1996 (the Port Arthur massacre). As shown by Chapman, Alpers, and Jones (2016), Australia had 13 mass shootings (defined in their study as incidents resulting in five or more deaths) in the 18 years prior to that law and zero for at least 19 years after its passage (notwithstanding more recent incidents). This provides provocative evidence that tight restrictions on AW-type and other high-capacity semiautomatics can prevent mass shootings. Setting aside the political and practical feasibility of implementing AW and/or LCM bans with buybacks in the United States, however, conclusions about the impacts of the semiautomatic rifle ban in Australia—and its applicability to the United States—should be qualified by a few considerations. The 1996 Australian gun reforms included several additional provisions relevant to firearms licensing, registration, training, storage, and sales (Peters, 2013), all of which may have conceivably contributed to the reduction in mass shootings. Furthermore, some evidence suggests that other social factors reducing violence more generally may have also played a role in reducing mass shootings and gun violence in Australia in the years since the gun reforms (Chapman et al., 2016). The fact that Australia had strict regulation of handguns even before 1996 (Peters, 2013) also suggests that regulations focused on semiautomatic rifles, while potentially efficacious, would not likely have the same level of impact on gun violence and mass shootings in the United States.

## 4 | DISCUSSION AND CONCLUSION

In conclusion, despite numerous challenges to studying the issues addressed herein, this article highlights a few key points about the use, impacts, and regulation of high-capacity semiautomatic weapons as they pertain to the problem of mass shootings in the United States. LCM firearms are used in between 20% and 58% of all firearm mass murders, and they are used in a particularly high share of public mass shootings. Mass shootings perpetrated with LCM firearms result in substantially more fatalities and injuries than do attacks with other firearms, and these differences are particularly pronounced for nonfatal gunshot injuries. Quantifying the unique contribution of LCM firearms to these outcomes with greater precision, independently of or in interaction with offender and situational characteristics, will require further and more sophisticated study. Notwithstanding, extrapolations from available data imply that tighter regulation of high-capacity firearms could potentially reduce mass shooting fatalities by 11% to 15% and total fatal and nonfatal injuries from these attacks by one quarter, with larger impacts for public mass shootings. For reasons discussed, actual impacts from LCM regulation seem likely to be lower, although some aggregate-level studies raise the possibility of larger effects. Nonetheless, these figures are high enough to suggest that tighter regulation of high-capacity semiautomatic weaponry—and restriction of LCMs in particular—is one policy measure that can contribute meaningfully to reducing deaths and injuries from mass shootings. Effects may be modest and gradual, however, depending on the form of those regulations.

The federal AW–LCM ban of 1994 had important exemptions and loopholes that limited its impacts in the short run. Its expiration in 2004, however, was followed by an upswing in mass shootings with high-capacity semiautomatics that has contributed to more severe incidents with higher fatalities and injuries. Policy makers who wish to reinstate a new version of the federal ban should give careful consideration to any grandfathering provisions in future legislation. Assessing the political and practical

difficulties of registering all AWs and LCMs or establishing turn-in or buyback programs for them is beyond the scope of this article.[37] Policy makers should note, however, that it may take many years to attain substantial reductions in crimes committed with banned guns and/or magazines if a new law exempts the existing stock, which has likely grown considerably since the time of the original ban. Policies regarding exemptions must also explicitly address the status of imported guns and magazines.

In the meantime, further research is needed on the implementation and effects of state restrictions on AWs and LCMs (and perhaps those at the local level as well). Although some studies indicate that mass shootings are lower in states with these laws (and LCM bans in particular), more evidence is needed to show definitively that these laws reduce crimes with LCM firearms and, in turn, reduce mass shootings and other gunshot victimizations. Further research is also needed to determine whether the effectiveness of these laws varies based on their specific provisions.

The conclusions offered here are also subject to various caveats regarding the current state of data and research on mass shootings. Better data collection systems are needed to track mass shootings and document the features of these incidents, including the type of weaponry used.[38] There is also a need for more studies that analyze the dynamics and outcomes of attacks with different types of guns and magazines. Such studies would help to refine our understanding of how changes in the use of high-capacity semiautomatics affect the incidence and severity of mass shootings. This essay has also focused on firearm mass murders resulting in four or more deaths. As data become more widely available for tracking multiple victim shootings, studies using different definitions of mass shootings (e.g., based on total injury counts) could provide a wider perspective on how the use and regulation of LCM firearms affect mass violence. Finally, future studies will also need to further assess whether firearm restrictions, including those on AWs and LCMs, lead to substitution of other methods in attempts to inflict mass casualty events (and with what results).

In closing, restrictions on AWs and LCMs are not a complete solution for the problem of mass shootings or public mass shootings more specifically. Nonetheless, they are modest policy measures that can likely help to reduce the incidence and severity of mass shootings over time. Given the high social costs of murders and shootings,[39] these laws could produce substantial savings for society even if their effects on mass shootings are modest.

## ENDNOTES

[1] A semiautomatic weapon fires one bullet for each squeeze of the trigger. After each shot, the gun automatically loads the next round and cocks itself for the next shot, thereby permitting a faster rate of fire relative to nonautomatic firearms. Semiautomatics differ from fully automatic weapons (i.e., machine guns), which fire continuously as long as the trigger is held down. Fully automatic weapons have been illegal to own in the United States without a federal permit since 1934.

[2] The federal government's 1994 AW ban defined AWs based on having two or more of such features, as do some current state laws. In contrast, several current state laws and a new federal ban proposed (unsuccessfully) in 2013 define AWs based on a one-feature criterion.

[3] Gun manufacturers report data on total handgun, rifle, and shotgun production to federal authorities, with handgun figures further differentiated by caliber. They are not, however, required to report any further detail on production by model, firing mechanism (semiautomatic vs. other), or magazine capacity.

[4] Estimates of their use tend to be higher for different types of shootings, including mass shootings (discussed below) and gun murders of police.

[5] Consistent with other research and reporting, this definition is also generally limited to cases in which the victims were killed in the course of one event that occurred in one or more locations in close proximity.

[6] Researchers commonly use the FBI's Supplemental Homicide Reports (SHR) to identify homicide incidents with multiple fatalities in the United States, although some have noted substantial numbers of mass murders that do not

appear in the SHR. Furthermore, the SHR does not provide counts of additional wounded victims, nor does it provide detail on firearms used beyond basic handgun, rifle, and shotgun designations.

[7] In a study of firearm mass murders from 1999 to 2013, the Congressional Research Service reported that public mass shootings produced 49% to 58% more fatalities and 8 to 17 times as many wounded victims per incident than did family and other felony-related cases (Krouse & Richardson, 2015).

[8] For example, a firearm identified simply as a "semiautomatic handgun" or as a "semiautomatic rifle" might or might not be an LCM firearm or an AW depending on the particular model. Even when models are identified, there may be ambiguity about LCM use in the absence of specific magazine information. Some firearm models can be sold with LCMs or smaller magazines, whereas some firearms not sold with LCMs at retail can be equipped with aftermarket LCMs.

[9] In some cases involving reported AW use, the firearm may only be identified generically in public accounts as an "assault rifle" or as an "assault weapon."

[10] Additional sources on public mass shootings have also yielded figures similar to those in Table 2. Cannon (2018) reported that AWs and other high-capacity semiautomatics were used in 65% of 79 public firearm mass murders documented by the Citizens Crime Commission of New York City from June 1984 through February 2018. This database mainly overlaps with the *Mother Jones* collection, although with some notable differences. Similarly, Lemieux (2014) found that AWs were used in 26% of 73 public mass murder incidents he studied from 1983 to 2013, and Capellan and Gomez (2018) estimated that "rifles or assault rifles" were used in approximately 23% of 206 mass murders or attempted mass murders they documented from 2000 to 2015. Both of these AW estimates are similar to that of Krouse and Richardson (2015).

[11] In other words, forcing the substitution of low-capacity weapons in these cases would likely reduce the number of victims killed in some cases, thereby reducing the number of incidents that would qualify as a mass murder.

[12] The FBI's active shooter data does not include details about the types of weapons used other than basic handgun, rifle, and shotgun designations. To identify cases involving semiautomatic rifles, Jager et al. (2018) supplemented the FBI data with information from court and police records as well as from news sources.

[13] For older studies showing higher victim counts for mass shootings with LCM firearms or AWs more specifically, see Duwe (2007) and Koper (2004). On a related note, Anisin (2018) reported that mass shooting incidents (3+ shot) are more likely to result in mass murders (4+ killed) when offenders use AWs or multiple firearms, although it is not possible to determine the unique effect of AWs from the analysis.

[14] Note that Table 2 includes two sources on mass public shootings that mainly overlap but not completely. I have used the study of the Citizens Crime Commission of New York City (CCCNYC; Cannon, 2018) as a complement to studies of the well-known *Mother Jones* news organization's database (Follman et al., 2019) because the CCCNYC appears to have made definitive determinations as to the use of AWs and LCM firearms for the 79 cases reported. (The cases that CCCNYC has identified as AW–LCM cases are currently listed on the organization's website for the years 1984–2012 but not for more recent years.) I have taken these designations at face value for the purposes of this review. In contrast, Dillon's (2013) analysis of the *Mother Jones* data for 1982–2012 compared 31 cases that clearly involved LCM weapons with 31 cases that either did not involve LCM use or (much more commonly) did not provide sufficient information for a clear determination about LCM use. More generally, examining public mass shootings as reported in multiple data sources to search for common patterns helps to compensate for some of the differences in event coverage and details across these sources. On a related note, Lemieux (2014) reported that use of AW-type rifles was not associated with victim counts in his examination of 73 public mass murder incidents from 1983 to 2013. He did not report specific figures and did not address use of other LCM firearms, however.

[15] As one illustration, the Koper et al. (2018) database includes 27 cases that involved LCM firearms. Assuming these were the only LCM cases—or the only ones in which LCM use substantially affected the outcomes—we can estimate the number of deaths and injuries that could have potentially been prevented if the attackers had used non-LCM firearms. Focusing on total victims, there were 978 people killed or wounded across the sample. The LCM cases produced 13.67 killed and wounded victims on average, accounting for a total of 369 of these victims. If the LCM attacks had been conducted with non-LCM firearms, we can estimate that they may have only resulted in 5.16 victims on average (based on the observed average for non-LCM/unknown cases) producing a total of 139 victims. This would have reduced gunshot victims by 230 (i.e., 369–139), amounting to an overall reduction of 24% across the full sample (230/978 × 100).

[16] In the Everytown (2018) sample, the potential reduction in deaths rises to 19% if the Las Vegas shooting is included and the potential reduction in total victims rises to 45%.

[17] The calculations for both databases count multiple gun non-LCM cases as those in which the firearms used were clearly not LCM firearms or were not known to be such. The LCM firearm cases include instances of both single and multiple gun use in which offenders clearly used an LCM(s) or LCM compatible firearm(s). Note that some multiple gun cases also involve multiple shooters, although these are rare.

[18] The non-LCM multiple gun cases involved two to four firearms, whereas the LCM cases ranged from one to four. Even after excluding LCM cases with more than two firearms, the average number of shots fired for LCM cases (54) was roughly double that in the non-LCM multiple gun cases.

[19] More extended discussion of some of the issues surrounding the use of multiple guns and/or magazines in mass shootings are provided by Kleck (2016) and Klarevas (2016). Kleck (2016) argued that LCM restrictions would have no appreciable impact on the outcomes of mass shootings because shooters with multiple non-LCM firearms or magazines can quickly and easily switch guns or change magazines, particularly during the course of attacks that take place over the course of several minutes or longer periods. The counter argument, noted above, is that firearm and magazine changes create pauses in shooting that give potential victims and bystanders additional seconds to escape, take cover, or possibly overtake and incapacitate the shooter. Besides the data presented above in reference to cases with multiple guns, some have also offered more detailed arguments surrounding the use of multiple non-LCM magazines. Drawing on tests and reports from shooting experts, for example, Klarevas (2016, pp. 211–212) estimated that using a semiautomatic with a 30-round LCM doubles an average shooter's firing rate and shooting time per minute relative to using a semiautomatic with multiple 10-round magazines (LCM effects are much greater when compared with using a 6-shot revolver). In this scenario, a shooter trying to fire continuously with 10-round magazines would have to spend 40 seconds reloading every minute in contrast to only 20 seconds for a shooter with 30-round magazines. We can expect that these differences would be less pronounced for offenders using smaller LCMs (e.g., in the 11–20-round range), but these estimates also assume that attackers have the time, skill, and poise to reload without problems (like fumbling for or dropping a gun or magazine). Besides giving shooters the ability to wound more people more rapidly, Klarevas also emphasized that LCM use makes them more invulnerable to counterattack as people at the scene must flee or take cover when faced with a sustained barrage of gunfire. This perhaps explains why mass shooters with LCMs have had time to make magazine changes when needed in several prominently reported cases and have only rarely been subdued by bystanders (facts highlighted by Kleck). A more insightful analysis in this regard might be to examine these issues in the context of mass shootings and near mass shootings perpetrated by offenders with non-LCM firearms and magazines (e.g., looking at issues such as the number of shots they fired, the number of gun/magazine changes they made, how often they were subdued by bystanders, and the like). Finally, this debate also highlights the need for more in-depth studies of the dynamics of mass shootings that take into account how gunfire unfolds over the course of these incidents. Kleck noted that mass shootings often occur over many minutes and argued that the average rates of gunfire in LCM cases could readily be achieved with non-LCM weapons. The average rate of gunfire as calculated from the total length of an incident, however, will not always be indicative of how the event unfolded or the peak rate of gunfire that occurred. Some events involve spurts of gunfire followed by pauses as offenders move through a location, search for additional victims, and/or reload (e.g., see the detailed descriptions of selected cases provided by Klarevas). As one example, the Virginia Tech massacre perpetrated by Seung-Hui Cho in April 2007 involved approximately 174 shots that were fired over the course of 156 minutes (Kleck, 2016, pp. 34, 43). This suggests an average firing rate of one round every 54 seconds, which is a misleading characterization of how the gunfire occurred (e.g., see Klarevas, 2016, pp. 94–95). Analyzing the details and dynamics of mass shootings in more systematic depth (e.g., numbers of shots fired continuously or in spurts and with what guns and magazines) would be useful in more precisely understanding how LCM firearms affect the outcomes of these events.

[20] The Blau et al. (2016) findings should be interpreted cautiously given certain aspects of the data. Drawing from a few public sources, the sample appears to have consisted of public mass shootings resulting in four or more deaths from 1982 to 2015, public spree shootings resulting in two or more fatalities from 1982 to 2015, and active shooter incidents as identified by the FBI, which have no victim count criteria, from 2000 to 2013. This mixing of data sources introduces inconsistent measurement across the timeframe of the study. In addition, identification of LCM firearms and AWs is not discussed in any detail, which is potentially problematic, especially considering that the FBI active shooter data do not identify firearm models or even which guns were semiautomatics.

[21] This conclusion is also supported indirectly by the wider body of research that has attempted to determine the impacts of weaponry on the outcomes of violent events (i.e., weapon "instrumentality") while controlling in different ways (albeit, imperfectly) for characteristics of the situations and actors involved. Most of this research has focused on the effects of guns relative to the use of other or no weapons (e.g., Alba & Messner, 1995; Felson & Messner, 1996; Wells & Horney, 2002; Zimring, 1968), although a few studies (besides those noted in text) have used such methods to contrast attacks involving different types of firearms (Libby & Corzine, 2007; Libby & Wright, 2009; Zimring, 1972). Collectively, these studies affirm the notion that attacks with more lethal weapons are more likely to result in deaths and serious injuries. Hence, even if more lethally minded offenders choose more dangerous weaponry, the evidence suggests overall that the chosen weaponry has an independent effect in facilitating the realization of the offender's intentions.

[22] Trends in criminal use of AWs and LCMs were measured using several national and local data sources on guns recovered by police, with a focus on changes in AWs and LCM weapons as a share of gun recoveries. Assessing trends in LCM use was more difficult because there is no national data source on crimes with LCMs, and local police agencies do not typically record magazine capacity in their gun recovery databases. It was possible, nonetheless, to examine LCM use in a small number of geographically diverse jurisdictions, which revealed some common trends.

[23] There were at least seven LCM incidents from 1982 through 1994 and at least eight from 1995 through 2004 (including other cases that likely involved LCMs would magnify this increase). Conclusions about these trends are contingent on the completeness and reliability of the data over time, which some researchers have criticized (e.g., see Duwe, 2020). The point here, nonetheless, is to illuminate the patterns in these data as analyzed by Gius (2015).

[24] Similar patterns can be discerned from the CCCNYC's listing of public mass shootings with 4+ killed (Cannon, 2018). Their collection shows 10 AW–LCM incidents in the decade before the ban and 11 during the decade of the ban (cases without AWs or LCMs declined during this time). After the ban (September 2004–February 2018), both LCM and non-LCM cases increased in rate and victim counts (the latter increase was most pronounced for LCM cases). Finally, Blau et al. (2016) also reported that public shootings of various sorts (see Footnote 20) were lower during the federal ban, but they did not find lower levels of AW use in these incidents.

[25] Interestingly, deaths per incident in LCM cases also declined during the ban in Klarevas's (2016, p. 350) data (from 9.1 before the ban, to 7.7 during the ban, to 9.2 after), a pattern that is also apparent in the CCCNYC report on public mass murders with LCM firearms (see Cannon, 2018). These changes also seem more likely to reflect a general secular trend than an effect from the federal law, unless perhaps they were caused by a decline in the use of specific LCM models, like AWs, that have particularly large magazines. Klarevas reported a decline in AW cases during this time, but there is not sufficient detail presented in either source to examine this carefully.

[26] For further discussion of the ban's potential to reduce shootings more generally, see Koper (2013) and Koper et al. (2019).

[27] The constitutionality of this requirement is currently being litigated in a federal court challenge to a new California law that would end the state's prior LCM grandfathering exemption. This type of restriction, however, has been upheld in prior federal court cases involving other state and local LCM laws.

[28] States with more restrictive gun laws, however, have lower levels of gun availability and gun homicide in general (e.g., Fleegler, Lee, Monuteaux, Hemenway, & Mannix, 2013; Miller, Azrael, & Hemenway, 2002; Siegel, Ross, & King, 2013). Some studies also suggest that state-level restrictions can be effective in reducing crimes with particular categories of firearms (Vernick, Webster, & Hepburn, 1999; also see Loftin, McDowall, Wiersema, & Cottey, 1991).

[29] A few fragmentary accounts include a media report that crimes with LCM firearms continued rising in Baltimore for at least the first few years after Maryland's reduction of its LCM capacity limit from 20 to 10 rounds in 2013 (Freskos, 2017). In contrast, a study of guns recovered by police in multiple jurisdictions around the country found some indications that LCM firearms are less common in jurisdictions with LCM laws (Koper et al., 2018).

[30] This discussion is based on a pre-publication draft of the Webster et al. (2020) study.

[31] It is not clear from their data, however, how often the domestic and nondomestic incidents occurred in public or the types of venues in which they occurred.

[32] The Klarevas et al. (2019) results may have also been affected by the omission of other gun laws that might affect mass shootings (see Webster et al., 2020; also see Reeping et al., 2019).

[33] On a related note, it is not clear whether Luca et al. (2019) and Blau et al. (2016) included Colorado as a ban state after it enacted LCM-only restrictions in 2013.

[34] Besides issues noted in text, Luca et al. (2019) may not have used an appropriate functional form for their cited models (see discussion in Webster et al., 2020). Gius's (2015) finding that AW–LCM laws reduce mass shooting deaths but not injuries is at odds with data showing that LCM use is more strongly associated with injuries when examining incident-level outcomes (see Table 2). In addition, with the exception of concealed carry laws, Gius did not account for other state gun laws that appear related to the level of mass shootings more generally (Reeping et al., 2019; Towers, Gomez-Lievano, Khan, Mubayi, & Castillo-Chavez, 2015; Webster et al., 2020; but also see Lin, Fei, Barzman, & Hossain, 2018 with regard to public shootings). See Footnote 20 for additional caveats regarding Blau et al. (2016). Finally, these studies did not include measures of overall gun availability, which has been linked to mass shootings in some studies (Reaping et al., 2019; Towers et al., 2015; but see Klarevas et al., 2019; Webster et al., 2020) and is generally lower in LCM ban states (which tend to have higher numbers of other gun restrictions as well).

[35] A CNN news story (Petula, 2017) referenced another analysis reportedly showing that state LCM regulations reduce mass shootings, but this study has not been published or publicly disseminated to my knowledge.

[36] Given the limits of these data, I have not undertaken extensive comparisons across LCM ban states or examined changes over time. One notable aspect of the data, however, is that most of the mass murders in the LCM ban states (and many of the cases involving LCM use) occurred in California. Accordingly, future studies of state LCM bans might give careful consideration to how patterns in California compare with those of other LCM ban states. It is also noteworthy that there were no confirmed LCM cases in these sources in states that had LCM restrictions with conditional or no grandfathering of pre-ban LCMs. There was one case that involved an LCM-compatible firearm (with no further information on the magazine type) in Washington, DC, shortly after the city passed its own LCM ban without grandfathering.

[37] See Klarevas (2016, pp. 257–258) for a discussion of implementation and cost considerations surrounding a national LCM ban and turn-in program.

[38] More generally, there is a need for better data on crimes with guns having LCMs. Policymakers should thus encourage police agencies to record information about magazines recovered with crime guns. Likewise, ATF should consider integrating ammunition magazine data into its national gun tracing system and encourage reporting of magazine data by police agencies that trace firearms.

[39] Cost of crime estimates suggest the full societal costs of each homicide in the United States (including medical, criminal justice, and other government and private costs, both tangible and intangible) may be as high as $5 billion to $11.6 billion as measured in 2007 dollars (Heaton, 2010). The full social costs of gunshot victimizations were estimated to be as high as $1 million in 2000 (Cook & Ludwig, 2000). Also see Webster (2017) for further discussion of the consequences and costs associated with mass shootings in particular.

## ORCID

*Christopher S. Koper*  https://orcid.org/0000-0003-4793-3628

## REFERENCES

Alba, R. D., & Messner, S. F. (1995). "Point blank" against itself: Evidence and inference about guns, crime, and gun control. *Journal of Quantitative Criminology*, *11*(4), 391–410.

Anisin, A. (2018). A configurational analysis of 44 US mass shootings: 1975–2015. *International Journal of Comparative and Applied Criminal Justice*, *42*(1), 55–73.

Blau, B. M., Gorry, D. H., & Wade, C. (2016). Guns, laws, and public shootings in the United States. *Applied Economics*, *48*(49), 4732–4746.

Cannon, A. (2018). *Mayhem multiplied: Mass shooters and assault weapons*. New York: Citizens Crime Commission of New York City.

Capellan, J. A., & Gomez, S. P. (2018). Change and stability in offenders, behaviors, and incident-level characteristics of mass public shootings in the United States, 1984–2015. *Journal of Investigative Psychology and Offender Profiling*, *15*(1), 51–72.

Chapman, S., Alpers, P., & Jones, M. (2016). Association between gun law reforms and intentional deaths in Australia, 1979–2013. *JAMA*, *316*(3), 291–299.

Cook, P. J., & Ludwig, J. (1996). *Guns in America: Results of a comprehensive national survey on firearms ownership and use*. Washington: Police Foundation.

Cook, P. J., & Ludwig, J. (2000). *Gun violence: The real costs*. New York: Oxford University Press.

Dillon, L. (2013). *Mass shootings in the United States: An exploratory study of the trends from 1982–2012* (Master's thesis). Fairfax: Department of Criminology, Law and Society, George Mason University.

DiMaggio, C., Avraham, J., Berry, C., Bukur, M., Feldman, J., Klein, M., … Frangos, S. (2018). Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data. *Journal of Trauma and Acute Care Surgery*, *86*(1), 11–17.

Duwe, G. (2007). *Mass murder in the United States: A history*. Jefferson: McFarland.

Duwe, G. (2020). Patterns and prevalence of lethal mass violence. *Criminology & Public Policy*, *19*(1), 17–35.

Everytown for Gun Safety. (2018). *Mass shootings in the United States, 2009–2017*. New York: Author.

Felson, R. B., & Messner, S. F. (1996). To kill or not to kill? Lethal outcomes in injurious attacks. *Criminology*, *34*, 519–545.

Fleegler, E. W., Lee, L. K., Monuteaux, M. C., Hemenway, D., & Mannix, R. (2013). Firearm legislation and firearm-related fatalities in the United States. *JAMA Internal Medicine*, *173*(9), 732–740.

Follman, M., Aronsen, G., & Pan, D. (2019). *U.S. mass shootings, 1982–2019: Data from Mother Jones' investigation*. Retrieved from https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/

Fowler, K. A., Dahlberg, L. L., Haileyesus, T., & Annest, J. L. (2015). Firearm injuries in the United States. *Preventive Medicine*, *79*, 5–14.

Fox, J. A., & DeLateur, M. J. (2014). Weapons of mass (murder) destruction. *New England Journal on Criminal and Civil Confinement*, *40*, 313–343.

Freskos, B. (2017, April 1). Baltimore police are recovering more guns loaded with high-capacity magazines, despite ban on sales. The Trace.org.

Gius, M. (2014). An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. *Applied Economics Letters*, *21*(4), 265–267.

Gius, M. (2015). The impact of state and federal assault weapons bans on public mass shootings. *Applied Economics Letters*, *22*(4), 281–284.

Heaton, P. (2010). *Hidden in plain sight: What cost-of-crime research can tell us about investing in police*. Santa Monica: RAND Corporation.

Jager, E., Goralnick, E., McCarty, J. C., Hashmi, Z. G., Jarman, M. P., & Haider, A. H. (2018). Lethality of civilian active shooter incidents with and without semiautomatic rifles in the United States. *JAMA*, *320*(10), 1034–1035.

Klarevas, L. (2016). *Rampage nation: Securing America from mass shootings*. Amherst: Prometheus Books.

Klarevas, L., Conner, A., & Hemenway, D. (2019). The effect of large-capacity magazine bans on high-fatality mass shootings, 1990–2017. *American Journal of Public Health*, Advance online publication. https://doi.org/10.2105/AJPH.2019.305311

Kleck, G. (2016). Large-capacity magazines and the casualty counts in mass shootings: The plausibility of linkages. *Justice Research and Policy*, *17*(1), 28–47.

Koper, C. S. (2004). *An updated assessment of the Federal Assault Weapons Ban: Impacts on gun markets and gun violence, 1994–2003* (Report to the National Institute of Justice). Philadelphia: Jerry Lee Center of Criminology, University of Pennsylvania.

Koper, C. S. (2013). America's experience with the federal assault weapons ban, 1994–2004: Key findings and implications. In D. W. Webster & J. S. Vernick (Eds.), *Reducing gun violence in America: Informing policy with evidence and analysis* (pp. 157–171). Baltimore: Johns Hopkins University Press.

Koper, C. S., Johnson, W. D., Nichols, J. L., Ayers, A., & Mullins, N. (2018). Criminal use of assault weapons and high capacity semiautomatic firearms: An updated examination of local and national sources. *Journal of Urban Health*, *95*(3), 313–321.

Koper, C. S., Johnson, W. D., Stesin, K., & Egge, J. (2019). Gunshot victimisations resulting from high volume gunfire incidents in Minneapolis: Findings and policy implications. *Injury Prevention*, *25*, i9–i11.

Koper, C. S., & Roth, J. A. (2001). The impact of the 1994 Federal Assault Weapon Ban on gun violence outcomes: An assessment of multiple outcome measures and some lessons for policy evaluation. *Journal of Quantitative Criminology*, *17*, 33–74.

Koper, C. S., & Roth, J. A. (2002). The impact of the 1994 Federal Assault Weapon Ban on gun markets: An assessment of the short-term primary and secondary market effects. *Journal of Quantitative Criminology*, *18*, 239–266.

Krouse, W. J., & Richardson, D. J. (2015). *Mass murder with firearms: Incidents and victims, 1999–2013*. Washington: Congressional Research Service, Library of Congress. https://digital.library.unt.edu/ark:/67531/metadc743624/

Lankford, A., & Silver, J. (2020). Why have public mass shootings become more deadly? Assessing how perpetrators' motives and methods have changed over time. *Criminology & Public Policy*, *19*(1), 37–60.

Lee, J. (Ed.). (2014). *Gun digest 2015*. Iola: Krause.

Lemieux, F. (2014). Effect of gun culture and firearm laws on gun violence and mass shootings in the United States: A multi-level quantitative analysis. *International Journal of Criminal Justice Sciences*, *9*(1), 74–93.

Libby, N. E., & Corzine, J. (2007). Lethal weapons: Effects of firearm types on the outcome of violent encounters. *Justice Research and Policy*, *9*(2), 113–137.

Libby, N. E., & Wright, J. D. (2009). Influence of automatic firearms on the presence of multiple victims of violence. *Journal of Contemporary Criminal Justice*, *25*(1), 89–105.

Lin, P., Fei, L., Barzman, D., & Hossain, M. (2018). What have we learned from the time trend of mass shootings in the U.S.? *PLoS ONE*, *13*(10), e0204722. https://doi.org/10.1371/journal.pone.0204722

Loftin, C., McDowall, D., Wiersema, B., & Cottey, T. J. (1991). Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *The New England Journal of Medicine*, *325*(23), 1615–1620.

Luca, M., Malhotra, D., & Poliquin, C. (2019). *The impact of mass shootings on gun policy*. Working paper 16–126. Cambridge: Harvard Business School, Harvard University.

Masters, J. (2017). *U.S. gun policy: Global comparisons*. New York: Council on Foreign Relations. https://www.cfr.org/backgrounder/us-gun-policy-global-comparisons

McGonigal, M. D., Cole, J., Schwab, C. W., Kauder, D. R., Rotondo, M. F., & Angood, P. B. (1993). Urban firearm deaths: A five-year perspective. *The Journal of Trauma*, *35*, 532–537.

Miller, M., Azrael, D., & Hemenway, D. (2002). Rates of household firearm ownership and homicide across U.S. regions and states, 1988–1997. *American Journal of Public Health*, *92*(12), 1988–1993.

Moody, C. E., & Marvell, T. B. (2018). Clustering and standard error bias in fixed effects panel data regressions. *Journal of Quantitative Criminology*, Advance online publication. https://doi.org/10.1007/s10940-018-9383-z

Peters, R. (2013). Rational firearm regulation: Evidence-based gun laws in Australia. In D. W. Webster & J. S. Vernick (Eds.), *Reducing gun violence in America: Informing policy with evidence and analysis* (pp. 195–204). Baltimore: Johns Hopkins University Press.

Petula, S. (2017, October 1). Here is 1 correlation between state gun laws and mass shootings. Retrieved from CNN.com

Phillips, B. (2017, November 7). Did banning assault weapons affect mass shootings? *Political Violence @ a Glance, Denver Dialogues*. Retrieved from http://politicalviolenceataglance.org/2017/11/07/did-banning-assault-weapons-affect-mass-shootings/

Reeping, P. M., Cerda, M., Kalesan, B., Wiebe, D. J., Galeo, S., & Branas, C. C. (2019). State gun laws, gun ownership, and mass shootings in the US: Cross sectional time series. *BMJ*, *364*, 1542. https://doi.org/10.1136/bmj.1542

Reedy, D. C., & Koper, C. S. (2003). Impact of handgun types on gun assault outcomes: A comparison of gun assaults involving semiautomatic pistols and revolvers. *Injury Prevention*, *9*, 151–155.

Richmond, T. S., Branas, C. C., Cheney, R. A., & Schwab, C. W. (2004). The case for enhanced data collection of gun type. *Journal of Trauma*, *57*, 1356–1360.

Roth, J. A., & Koper, C. S. (1997). *Impact evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994* (Report to the National Institute of Justice). Washington: The Urban Institute.

Roth, J. A., & Koper, C. S. (1999). *Impacts of the 1994 Assault Weapons Ban: 1994–1996* (Research-in-Brief). Washington: U.S. Department of Justice.

Siegel, M., Ross, C. S., & King, C. III (2013). The relationship between gun ownership and firearm homicide rates in the United States, 1981–2010. *American Journal of Public Health*, *103*(11), 2098–2105.

Towers, S., Gomez-Lievano, A., Khan, M., Mubayi, A., & Castillo-Chavez, C. (2015). Contagion in mass killings and school shootings. *PLoS ONE*, *10*(7), e0117259. https://doi.org/10.1371/journal.pone.0117259

Violence Policy Center. (2011). *The militarization of the U.S. civilian firearms market*. Washington: Author.

Vernick, J. S., Webster, D. W., & Hepburn, L. M. (1999). Effects of Maryland's law banning Saturday night special handguns on crime guns. *Injury Prevention*, *5*, 259–263.

Webster, D. W. (2017). The true effect of mass shootings on Americans. *Annals of Internal Medicine*, *17*(166), 749–750.

Webster, D. W., McCourt, A. D., Crifasi, C. K., Booty, M. D., & Stuart, E. A. (2020). Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. *Criminology & Public Policy*, *19*(1), 171–212.

Wells, W., & Horney, J. (2002). Weapon effects and individual intent to do harm: Influences on the escalation of violence. *Criminology*, *40*(2), 265–296. https://doi.org/10.1111/j.1745-9125.2002.tb00957.x

Zimring, F. E. (1968). Is gun control likely to reduce violent killings? *University of Chicago Law Review*, *35*, 721–737.

Zimring, F. E. (1972). The medium is the message: Firearm caliber as a determinant of death from assault. *The Journal of Legal Studies*, *1*, 97–123.

## AUTHOR BIOGRAPHY

**Christopher S. Koper** is an associate professor in the Department of Criminology, Law and Society at George Mason University and the principal fellow of Mason's Center for Evidence-Based Crime Policy. He specializes in issues related to policing, firearms policy, program evaluation, and evidence-based crime policy. His work on gun crime and gun policy includes multiple studies of the 1994 federal assault weapons ban conducted for the U.S. Department of Justice and Congress.

**How to cite this article:** Koper CS. Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms. *Criminol Public Policy*. 2020;19:147–170. https://doi.org/10.1111/1745-9133.12485

**55 U.C. Davis L. Rev. 2495**

**U.C. Davis Law Review**
June, 2022

**Symposium**

**The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public**

Darrell A. H. Miller [d1] [a1]   Jennifer Tucker [aa1]

Copyright © 2022 by Darrell A. H. Miller & Jennifer Tucker

# COMMON USE, LINEAGE, AND LETHALITY

## TABLE OF CONTENTS

| | |
|---|---|
| I. LACK OF A COMMON METRIC FOR ARMS | 2498 |
| II. TREVOR DUPUY AND THE THEORETICAL LETHALITY INDEX | 2502 |
| *A. Brief Biography of Dupuy* | 2502 |
| *B. The Theoretical Lethality Index* | 2506 |
| III. LETHALITY AS A COMMON METRIC FOR ARMS | 2509 |
| CONCLUSION | 2513 |

Political and legal debates over assault rifles, large-capacity magazines, and other lethal technology are characterized by increasing rancor and hostility. Lack of a common vocabulary to describe the topics of debate, much less facilitate a constructive dialogue, only aggravates this trend. For example, gun rights advocates often disparage the term "assault rifle" as reflecting a practical illiteracy about firearms or treat it as some kind of "hoplophobic" smear. [1] Regulators sometimes **\*2496** class weapons based on features that gun-rights advocates say are purely cosmetic, leading to charges that these regulations are grotesquely over- or under-inclusive. [2]

The doctrine defining constitutionally protected arms is advancing without a clear sense of the object of Second Amendment protections. *District of Columbia v. Heller*--the first Supreme Court case to hold that the Second Amendment protects an individual right to keep firearms for personal purposes like self-defense-- uses various terminology for arms in its opinion. At its most general, the Court states that the constitution protects weapons in "common use" for "lawful purposes," as distinct from "arms" that are "dangerous and unusual." [3] But it doesn't take long for those broad categories to become muddled. *Heller* says that handguns capable of concealment are protected, but that short-barreled shotguns (which are modified specifically to be carried in one hand and concealed) are "dangerous and unusual" weapons that may be prohibited. [4] It suggests that "M-16s and the like" may be banned; but also that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms"-- which would include not only M-16s, but "weapons useful in warfare" such as rocket launchers, hand grenades, and more exotic and deadly weaponry. [5] Some lower court judges, those who eschew conventional tailoring and are receptive to a "text-history-and-tradition-only" approach to Second Amendment questions, have begun to suggest that weapons that are "lineal descendants" of Founding Era arms are protected by the Second **\*2497** Amendment, [6] despite the fact that such familial metaphors more often obscure than illuminate historical relationships between technologies of different periods. [7]

Sorely missing from the current debate is a shared vocabulary for what the public policy and the constitutional doctrine is aiming to achieve. Terms like "common use," "dangerous and unusual," "lineal descendants" or "employed in civilized warfare" [8] cannot adequately discipline doctrine or debate without some common denominator for the task. This Article suggests that focusing on lethality is one way to converge on a shared metric for the discussion. [9]

The late Trevor N. Dupuy, a senior U.S. Army officer during World War II who later became a respected and prolific military historian, developed one such metric in the middle of the twentieth century--the Theoretical Lethality Index ("TLI"). In 1964, the United States Army contracted with Dupuy to analyze how the killing power of weapons had increased over time--he created the TLI to measure how many people a particular weapon could kill in one hour. [10] Dupuy **\*2498** worked on this project for a non-partisan entity which had an interest in the accuracy and utility of his formula--the United States military. As such, Dupuy's Theoretical Lethality Index offers a useful metric for quantifying the lethality of firearms in historical terms. His index can provide at least a starting point to construct a common scale to assess the functionality of weapons both within and across various time periods.

Part I of this Article outlines the state of Second Amendment doctrine with respect to which and what type of arms are protected, and the confused language and goals of that doctrine. Part II provides a short biography of Dupuy and his development of the TLI. Part III demonstrates how Dupuy's TLI can help guide policy makers and judges as they engage with the right to keep and bear arms in a post-*Heller* world.

## I. LACK OF A COMMON METRIC FOR ARMS

In *District of Columbia v. Heller*, the Supreme Court held for the first time that individuals have a right to keep arms in their home for lawful purposes such as self-defense, without regard to participation in any organized military unit such as the National Guard. [11] Key to that case was how to define the word "arms" in the Second Amendment. [12] It is indisputable that a strict dictionary-definition of the word "arms" in 1791 is radically over-inclusive. Justice Antonin Scalia states in *Heller* that "[t]he 18th-century meaning [of arms] is no different from the meaning today" and that "arms" simply means "weapons." [13] Indeed, he continues, it "borders on the frivolous" to suggest that only those arms that existed in 1791 are protected now: "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." [14] But no one really believes that. Not even Justice Scalia believes that.

There are numerous modern weapons that "constitute bearable arms" that are categorically outside the Second Amendment's coverage--no matter what "bearable arms" literally means. Let's start with bearable arms of catastrophic lethality--vials of weaponized smallpox or VX nerve agent, for example. These are indubitably weapons; they also are **\*2499** capable of being carried, but no one treats these weapons of mass destruction as raising any prima facie Second Amendment question. [15] Moving down the spectrum of lethality, *Heller* itself categorically excludes from Second Amendment coverage machine guns, "M-16 rifles and the like," and short-barreled shotguns, notwithstanding Justice Scalia's assertion that the Second Amendment extends prima facie to these types of weapons. [16] Lower courts have followed suit, excepting weapons like hand grenades from Second Amendment coverage, despite their falling within a literal class of "bearable arms." [17]

Instead of a radically over-inclusive textual definition of "weapons," Justice Scalia concedes the Second Amendment really doesn't protect all "bearable arms," but only those arms in "common use," and in particular, those weapons "typically possessed by law-abiding citizens for lawful purposes." [18] Handguns, according to the majority, are a popular form of self-defense technology, commonly owned by individuals for self-defense, and therefore are protected by the Second Amendment. But this common use test sets up a vicious circularity, one that Justice Stephen Breyer in his *Heller* dissent exposed. *Heller*'s common use test means that "if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress ... had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so." [19] It can't be, according to Justice Breyer, that the only permissible regulations are those regulations that currently exist. [20]

For a decade now, lower courts and scholars have struggled to break out of this circularity. Some try to identify a reference group from which to assess "common use." [21] At its most crude, this can reduce to comparing the inventory of a certain weapon to that of another **\*2500** commercial product-- like a pickup truck. [22] The presumption here is that a weapon as widely possessed as this other product must be in "common use." [23] Other, more sophisticated approaches attempt to identify a more relevant reference set. For example, scholars such as Michael O'Shea and Nelson Lund have suggested the measure for common use should be the weapons possessed by ordinary law enforcement. [24] Others have argued that civilians should be capable of owning even *more* firepower than the police. [25] Still others believe the reference group for common use should be some kind of military body, such as the National Guard, or at the most extreme, the standing army. [26]

Compendium_Cornell
Page 1449

A recent development in Second Amendment doctrine is to analogize modern weapons to historical ones. This move first appeared in the District of Columbia Circuit Court opinion that eventually became *Heller*. In that case, *Parker v. District of Columbia*, the court suggested that "[t]he modern handgun-- and for that matter the rifle and long-barreled shotgun--is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era **\*2501** weapon." [27] Chief Justice John Roberts echoed this "lineal descendant" line during *Heller* oral argument when he speculated: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well." [28] Some lower courts and advocates have picked up on this strain of reasoning. Occasionally, this search for "lineal descendants" of modern weapons can become arcane. For example, in 1718, an Englishman named James Puckle patented a multi-round "Puckle gun." The weapon was never widely produced and contemporaries ridiculed it for its impracticality. [29] Nevertheless, some argue that today's 100 round magazines must be constitutionally protected, because someone patented this curio in England in the eighteenth century. [30]

None of these attempts to break out of *Heller*'s definitional morass is satisfactory, and that's partially because these tests tend to focus on epiphenomenal rather than functional factors. Searching for answers in analogs from automotive sales or eighteenth-century patent applications fails to consider what rule of relevance makes the analogy analytically sound. [31] What makes weapons relevantly similar is their lethality. [32] Comparing the sales of AR-15s to pickup trucks or asking what features of an AR-15 resemble those of a Founding era flintlock is far less useful for assessing utility or dangerousness than focusing on how lethal an AR-15 is compared to some other kind of weapon. Lethality may not resolve all the definitional problems of what an "arm" **\*2502** is under the Second Amendment, [33] but it has the advantage of being relevant, functional, and unitary. [34]

## II. TREVOR DUPUY AND THE THEORETICAL LETHALITY INDEX

### A. Brief Biography of Dupuy

In the middle of the twentieth century, a retired colonel named Trevor Nevitt Dupuy developed a metric to measure a weapon's lethality. Dupuy was one of the most respected and prolific American military thinkers of the last century. [35] Combat during World War II gave him a practical bent, which combined with his analytical approach to military history provided a new outlook on the study of weapons and warfare. He developed sophisticated combat models that drew on his extensive archival research as well as his personal experience as a World War II commander. [36] His derivation of a theory of combat and **\*2503** philosophy of war from these materials was unusual and widely praised inside the military. By the time of his death, he had published scores of books and articles in military and professional journals across the globe. [37]

Dupuy was born in New York, the son of Richard Ernest Dupuy, who was himself a military historian and veteran. After graduating from the U.S. Military Academy at West Point in 1938, the younger Dupuy fought in Burma during the war and by age twenty-seven had been promoted to lieutenant colonel. [38] He commanded artillery units across several military theaters for the United States, the United Kingdom, and the Chinese military, [39] and received honors for service and valor from all three governments. [40]

Following the war, after a stint working for the military in Europe and Washington, Dupuy began his academic career, first at Harvard and then at the Ohio State University. His writing began in earnest while teaching at Harvard. Seeing no text on military science that he could use to teach his students, he approached the elder Dupuy to assist in writing a textbook. What began as a mimeographed set of class materials [41] eventually turned into a two-volume publication, *Military Heritage of America*, one of many projects father and son would complete together. [42]

Dupuy focused on understanding the complexities of modern warfare through the review of massive amounts of historical data. [43] Roughly contemporaneously, major military institutions began to invest heavily in a discipline called "operations research" that sought to bring quantitative tools to bear on military strategy. Analytical centers and think tanks, [44] like RAND (for "research and development"), as well as other "civilian defense planners" became an "integral part" of United **\*2504** States security planning at this time. [45] However, "even after 3,300 years of recorded military history" reliable data was hard

to come by. [46]  This lack of hard data led Dupuy to reach for new techniques on which to base operational analysis and combat modeling. His research attempted to link combat modelers who needed reliable data on combat operations with the existing information present in the unit records of actual historical engagements. [47]

Intense, professional, and tenacious, Dupuy believed that the study of historical combat could and should be used to prepare for future conflicts. [48]  In more than two dozen works, he analyzed the patterns of warfare from ancient times to the present. He summarized his historical approach in his book, *The Evolution of Weapons and Warfare*. [49]  While Dupuy was a great believer in quantifying the dynamics of warfare, he thought that the data should be drawn from the history of past wars. [50]  He was skeptical about the value of war-gaming and simulation exercises divorced from what Carl von Clausewitz described as the "fog" and "friction" of war. [51]

From 1960 to 1962, Dupuy worked for the Institute of Defense Analysis, where he was frequently consulted for advice and expertise. For the next thirty years, he published books and gave lectures to military audiences about the role of technology in war. He documented a historical cycle for weapons technology: stagnant for long periods, followed by bursts of intense change. He understood that it could take decades--even centuries--for new technologies to be incorporated into the tactics and organizational structure of armies. [52]  His research documented technological change (from the stirrup to the gun)--and showed that the pace of that change accelerated exponentially with the nineteenth-century industrial revolution and then again with the intense state-led innovations of the two world wars. [53]

In part to study these technological and military dynamics, in 1962 Dupuy formed the Historical Evaluation and Research Organization  **\*2505**  (HERO) and would serve as its President and Executive Director for the next two decades. At HERO, he conducted many studies for the U.S. Army, for which he accumulated detailed, recorded data from actual battlefield experience. As he often remarked, military history was the true "laboratory of the soldier." [54]

In the process Dupuy developed an analytic procedure for comparing, quantitatively, the lethality of individual weapons (the Theoretical Lethality Index), described below. [55]  He also continued his work as an author, lecturer, and military analyst until the end of his life. American diplomats and military leaders consulted with him during the first Gulf War, and he testified before Congress several times. He kept up a steady media schedule, appearing on over thirty television and radio programs, including spots on all of the major networks, C-Span, and CNN. [56]

Dupuy died at the age of seventy-nine on June 5, 1995, of a self-inflicted gunshot wound, three weeks after being diagnosed with terminal pancreatic cancer. [57]  At the time of his death he was considered "one of the world's leading military historians." [58]  He left behind several unfinished projects, including his own autobiography, which he planned to call "A Footnote to History." [59]

The metrics on lethality that Dupuy pioneered are still being used in policy papers and military history projects as well as in analysis of modern military operations and combat. [60]  Dupuy's work showed that even military planners--whose profession is the study of weapons--have repeatedly struggled to fully understand the impact of new, improved weaponry on combat and society. Despite his prominence as a military commander and military historian, little has been written  **\*2506**  about him, leaving a gap in our historical understanding of this important figure.

### *B. The Theoretical Lethality Index*

A significant and underappreciated contribution of Dupuy is his creation of a single metric, the Theoretical Lethality Index ("TLI") that provides apples-to-apples comparisons of the lethality of weaponry across time. As he wrote in his *Evolution of Weapons and Warfare*, "All weapons have at least one common characteristic: lethality--the ability to injure and if possible to kill people." [61]  The TLI reduced to a single value how many persons a particular weapon could theoretically kill in one hour, considering a spectrum of different technological factors, including range, rate of fire, accuracy, reliability, mobility, "radius of action" and vulnerability. [62]

Dupuy constructed the TLI by exhaustively examining the historical record of real battles across time, where the lethal capacity of the weapon was one among a host of other factors, including weather, terrain, and the defensive and offensive capabilities of opposing forces. His TLI represented an attempt to isolate, in one number, the lethality of technology alone, based primarily on the characteristics of that technology. Hence, the TLI number is not influenced by a military or civilian context; it does not take into account factors like combat tactics, how dispersed or bunched the targets may be or what defensive positions they occupy. Nor does it account for the social or psychological state of the individual using the weapon.[63] The TLI is solely about the lethality of the weapon as a technology designed to kill.

In contrast to those who analyzed warfare with abstract calculations based on combat modelling and wargaming, Dupuy based his analysis on scrupulous investigation of actual historical military engagements. As he put it, "The history of warfare is a review of the manner in which groups of men have ... [used] their weapons more effectively than the opponents, or in other words, by realizing, or at least approaching, the ultimate degree of lethality of their weapons."[64] He explained: "Lethality **\*2507** is necessarily a comparative thing."[65] A sword wielded by a trained combatant is lethal, "[b]ut its comparative lethality is limited by the factors of time, range, and the physical limitations of the man who wields it."[66] Dupuy recognized that "[b]y assigning values to these factors it is feasible to compare the lethality of the sword with the lethality of the hydrogen bomb, or the tank, or whatever other weapon one pleases."[67]

Dupuy divided world history into three primary eras of weapons technology. The "Age of Muscle" (c. 350 BC to 13th century) was the era of the short sword and longbow. The "Age of Gunpowder" (14th century to middle of the 19th century) introduced the bayonet, the flintlock and the first cannons. But it was the "Age of Technological Change" (middle of 19th century to middle of 20th century), he thought, that ushered in major advances in weaponry. "The weapons of this period constitute a quantum jump in lethality over their predecessors of the age of gunpowder."[68] This era saw the development of the conoidal rifle bullet (Minie ball) (1841); the breech-loading rifle (c. 1848); the Maxim machine gun (1883); the bolt-operated magazine rifle (1895); the tank (1916); the fighter-bomber (1917); the ballistic missile (1944); and the atomic bomb (1945).[69] Dupuy identified one of the most profound changes in combat occurred between 1850 and 1860, when firearms became both more common and more deadly.[70]

Under contract with the U.S. Army, Dupuy and HERO analyzed the relationship between weapons and military doctrine from the fourth century BC to the end of the Korean War.[71] The four-volume report that he and his team produced included the TLI as a unitary metric for lethality.

The report demonstrated that the TLI of weapons increased exponentially in the past 200 years. While an eighteenth century soldier with a flintlock musket could kill 43 people an hour, a soldier in the Civil War era using the Minie ball could kill 102 people per hour: a **\*2508** more than twofold increase.[72] Breech-loading rifles, metal cartridges, and magazines boosted the TLI of infantry rifles even higher, to 495 by the end of the nineteenth century: a ten-fold increase over the flintlock musket. The introduction of automatic fire machine guns at the end of the nineteenth century again vastly increased the kill rate. The TLI of a World War I machine gun was 3,463, and that of World War II, 4,973.[73]

**Dupuy's Theoretical Lethality Index[74]**

| WEAPON | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |

| | |
|---|---|
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |
| 16th century 12-pdr cannon | 43 |
| 17th century 12-pdr cannon | 224 |
| Gribeauval 18th century 12-pdr cannon | 940 |
| World War I tank | 6,926 |
| World War II medium tank | 575,000 |
| One-megaton nuclear airburst | 695,385,000 |

Dupuy was convinced that there was a "relatively small" number of major advances in weapons throughout history. He defined a "major advance" as a "new development that changes the nature of warfare." [75] A major advance was "a revolutionary" change, which might be followed by "a series of evolutionary changes." [76] One such  **\*2509**  "revolutionary weapon" was the Maxim recoil-operated, belt-fed machine gun which later became the model for other machine guns. [77] He constructed the TLI using a standard formula. As he pointed out, "Obviously the weapons that kill more people in shorter periods of time have greater lethality." The TLI showed that "there have been few major advances in weapons lethality through the ages, and most of them have occurred since about 1850." [78]

## III. LETHALITY AS A COMMON METRIC FOR ARMS

Currently, the analysis to determine whether any given "arm" is constitutionally protected fails to display much analytical rigor. The very features of large-capacity magazines that one judge thinks are essential for self-defense [79] are the very same features other judges consider unreasonably dangerous. [80] Trying to avoid the impasse by searching for "lineal descendants" of muskets in the Sig Sauer catalog, or by comparing the sales of rifles to pickup trucks [81] threaten to make Second Amendment analysis even more unmoored from anything rational or functional.

At the very least, the TLI offers proof of concept that one can construct a single metric for lethality that may provide a basis for systematic comparisons of arms within and between time periods. [82] Moreover, to the extent any question about gun rights and regulation turns partially or wholly on historical analogs, [83] the TLI supplies vital historical context using a common denominator.

First, the TLI shows that weapons have increased sharply in lethality from the mid-nineteenth century to the present day. Speaking of the period between the 1850s and 1860s, Dupuy described weapon advancement over prior ages during this time as a "quantum jump in  **\*2510**  lethality." [84] Another period of steady acceleration in lethality followed in the early to mid-twentieth century. Using apples-to-apples comparisons, based on this index, one can see that in 1903 it would only take two people with five-round Springfield rifles to kill as many as an eighteenth-century cannon. [85] By World War II it would require a battery of *five* eighteenth century cannon to be as lethal as a single machine gun. [86]

Contrary to the implausible proposition that "[n]othing in the Second Amendment makes lethality a factor" in Second Amendment analysis, [87] it is apparent that the people's representatives have considered lethality a relevant factor in the costs versus benefits of weapon technology from the beginning. [88] To the extent judges follow Justice Scalia's proposition that "traditional restrictions go to show the scope of the [Second Amendment] right," [89] the TLI can help courts ask the right questions. It is fruitless to ask counter-factuals like: "How would the founding generation have regulated widespread private ownership of AR-15s?" That's akin to basing a First Amendment decision about home console entertainment on "what James Madison thought about video games." [90] It's a more useful question to ask: "What is the lethality threshold of the word 'arms' in the Second Amendment?" Using a single metric-- lethality--can help translate regulatory justifications to new technological environments as well as recognize the fact and pace of **2511** change in lethality between different eras. [91] The TLI or similar tools can also help give content to distinctions between weapons suitable for personal self-defense and those "weapons of war" not covered by the Second Amendment. [92] By using lethality as a metric, rather than less functional traits like the shape of a weapon, its materials, or its popularity, researchers can make inferences across different times along a margin that is of practical relevance.

The Founders lived in a period when they could perhaps be forgiven for thinking that "a gun is a gun is a gun," because the basic flintlock hadn't really become significantly more lethal in the previous 150 or so years. If the Constitution had been written in the middle of the nineteenth century, instead of the 1780s, the Founders would have been much more aware of the pace of innovation. [93] But we don't have to speculate about how lawmakers may have reacted to knowledge of technological change. As Saul Cornell has noted, the nineteenth century, especially during and after Reconstruction, witnessed a flurry of regulation and constitution-drafting just as technological change was making firearms more common, concealable, and deadly.

The massive battlefield casualties of the American Civil War vividly revealed the lethality of new firearms technologies-- especially the Minie ball. Cornell has argued that "Reconstruction ushered in one of the most intense periods of gun regulation in American history." [94] He has documented how--in a significant act of constitution drafting during Reconstruction--many states both guaranteed a right to arms in their state constitutions, but were "equally committed to enacting strong racially neutral gun regulations, aimed at reducing interpersonal violence and preserving the peace." [95] For example, Georgia's Reconstruction constitution of 1877 stated: "[T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be **2512** borne." [96] The 1869 Constitution of Texas stated "Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe." [97] Indeed, a brief examination of many of these Reconstruction and Gilded Age constitutions show both a statement about the right to keep and bear arms and a right to reasonably regulate such a practice. The TLI shows that these lawmakers were not operating in a technological vacuum; they were securing an express ability to regulate weapons at precisely the time that firearms were becoming dramatically more lethal. [98]

Finally, whether you adhere to a theory that the Second Amendment is for self-defense against common criminals or against rogue governments, the TLI provides a tool to assess the weapon technology along a single dimension. For example, if one believes that right metric for self-defense weaponry is that kind of defensive armament most effective at countering a typical criminal threat, the TLI offers a number. How many people per hour is it necessary to kill in order to supply an adequate deterrent to common criminal perpetrators? Alternatively, although we are highly skeptical that the anti-tyranny purpose the Second Amendment contains much legally enforceable content, if one truly believes that weapons must be in the hands of private parties to counter the capacity of the United States military, [99] this metric provides some common denominator for that argument as well. [100]

 **2513**  Granted, the TLI cannot provide answers to all interpretive challenges of the Second Amendment. The TLI itself does not provide metrics for a host of twenty-first century weapons. (Military experts must extrapolate from Dupuy's methods to say what the theoretical lethality index of a modern 9mm pistol would be, for example). Non-experts, or those without access to the proprietary methods of the Dupuy Institute, can only provide estimates about where modern technology fit (a modern AR-15 is almost certainly more lethal than an eighteenth century musket and less lethal than a World War II medium tank, for instance). However, even with these limitations the TLI does provides a reliable benchmark from which to generate judgments about comparative lethality. The TLI, and derivative indices, offer a useful metric for understanding the lethality of different weapons, across time, and can therefore make an important contribution to the debate over the right to keep and bear arms.

## CONCLUSION

After a decade of slumber, it is clear the Supreme Court, with its new conservative super-majority, is now awakening to decide Second Amendment matters left undecided after *Heller*. In the next few years, the Court is almost certain to address what counts as a constitutionally protected "arm." In doing so, it is also likely to rely on history and tradition to a greater degree than most other rights. Lethality, and the Theoretical Lethality Index constructed by Dupuy and his team, offers one way for the justices to anchor their analysis to historically-driven metrics that are functional, intelligible, and relevant; rather than those that are rhetorical and trivial.

## Footnotes

<u>d1</u>      Copyright © 2022 Darrell A. H. Miller & Jennifer Tucker.

<u>a1</u>      Melvin G. Shimm Professor of Law, Duke University School of Law.

<u>aa1</u>     Associate Professor of History, Wesleyan University. Thanks to Joseph Blocher and Jake Charles for discussing or reviewing previous versions of this essay. Thanks especially to Peter Rutland, who is working on a broader study on Trevor Dupuy, for bringing Dupuy's Theoretical Lethality Index to our attention.

<u>1</u>       Stephen P. Halbrook, *Banning America's Rifle: An Assault on the Second Amendment?*, 22 FEDERALIST SOC'Y REV. 152, 152 (2021) ("The term 'assault weapon,' while usually applied to some kind of rifle, is actually a pejorative term without a definite meaning."). Gun violence prevention advocates respond that the term is an accurate reflection of gun manufacturers' own marketing materials, which emphasized "the military pedigree of its products." VIOLENCE POL'Y CTR., THE MILITARIZED MARKETING OF BUSHMASTER ASSAULT RIFLES 5 (2018), https://vpc.org/wp-content/uploads/2018/04/Bushmaster2018.pdf [https://perma.cc/U8N8-G6E5]. "Hoplophobia" is a neologism that roughly translates to "fear of weapons." For more on the idea of anti-gun animus, see Jacob D. Charles, *Second Amendment Animus*, 116 NW. U. L. REV. 1, 14-32 (2021).

<u>2</u>       *See* Erica Goode, *Even Defining 'Assault Rifles' Is Complicated*, N.Y. TIMES (Jan. 16, 2013), https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html [https://perma.cc/A3M8-GDEW]; *see also* Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301, 303 (2018) ("Critics of assault weapon bans complain that these laws irrationally draw distinctions among firearms based on cosmetic features ...."). *But see* E. Gregory Wallace, *''Assault Weapon'' Lethality*, 88 TENN. L. REV. 1, 14 & n.64 (2020) (arguing for functionality of certain features).

<u>3</u>       *District of Columbia v. Heller, 554 U.S. 570, 627 (2008)*. Elsewhere, the Court uses the phrase "dangerous *or* unusual." *Id.* at 623 (emphasis added).

<u>4</u>       *Id.*

<u>5</u>       *See id.* at 624.

<u>6</u>       *See, e.g.*, Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J., 974 F.3d 237, 257 (3d Cir. 2020) (Matey, J., dissenting) (stating that "I believe the proper interpretive approach is to reason by analogy from history and tradition" and citing the "lineal descendant" language from *Heller* oral argument (internal quotation marks omitted and citations omitted)); Parker v. District of Columbia, 478 F.3d 370, 398 (D.C. Cir. 2007) ("The modern handgun--and for that matter the rifle

and long-barreled shotgun--is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era weapon ....").

[7]  *See* Joseph Blocher, *Bans*, 129 YALE L.J. 308, 363 (2019) ("Is the modern AR-15 a 'lineal descendant' of the colonial-era musket? Guns have no progeny, so one cannot trace their lineage directly through some kind of family tree."); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1478 (2009) (describing this analytical technique as "largely indeterminate").

[8]  *Aymette v. State*, 21 Tenn. 154, 158 (1840).

[9]  *See* Jennifer Tucker, *Now That Guns Can Kill Hundreds in Minutes, Supreme Court Should Rethink the Rights Question*, CNN (Oct. 20, 2021, 7:31 AM EDT) https://www.cnn.com/2021/10/20/opinions/supreme-court-gun-rights-case-lethality-tucker/index.html [https://perma.cc/8JMV-XR48]. We are not the first to identify lethality as a potential metric. *See* Wallace, *supra* note 2, at 17. We have a number of disagreements with Professor Wallace's assessment of lethality in his piece, as well his estimation of comparative lethality. For purposes of this Article, however, we differ in particular with his belief that lethality of a technology cannot be reduced to a single number--the TLI is proof of concept that it can--and his skepticism of the utility of such a metric within and between time periods.

[10]  HIST. EVALUATION & RSCH. ORG., FINAL REPORT ON HISTORICAL TRENDS RELATED TO WEAPON LETHALITY (1964), https://apps.dtic.mil/sti/pdfs/AD0458760.pdf [https://perma.cc/K48C-FKDD]; *see also* TREVOR N. DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE 92 (1980) [hereinafter EVOLUTION] (reprinting Theoretical Lethality Index table).

[11]  *See* District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

[12]  The Second Amendment states in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

[13]  *Heller*, 554 U.S. at 581.

[14]  *Id.* at 582.

[15]  *See* Nordyke v. King, 644 F.3d 776, 797 n.6 (9th Cir. 2011) (Gould, J., concurring in part) ("[T]o me it is obvious that the Second Amendment does not protect the right to keep a nuclear weapon in one's basement, or a chemical or biological weapons in one's attic, or a tank in one's backyard."), *reh'g en banc*, 681 F.3d 1041 (9th Cir. 2012).

[16]  *See Heller*, 554 U.S. at 572.

[17]  *See* Hollis v. Lynch, 827 F.3d 436, 448 (5th Cir. 2016) (acknowledging that hand grenades and machine guns are unprotected "dangerous and unusual weapons for the purposes of the Second Amendment").

[18]  District of Columbia v. Heller, 554 U.S. 570, 625 (2008).

[19]  *Id.* at 721 (Breyer, J., dissenting).

[20]  *Id.*

21    For a discussion of this effort, see Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 TENN. L. REV. 231, 278-83 (2015).

22    *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) ("[W]e note that in 2012, the number of AR- and AK-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States."), *reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

23    Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue:* Stenberg *Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1293 (2009) ("A gun might be common because it is widely owned ....").

24    Michael P. O'Shea, *The Right to Defensive Arms After* District of Columbia v. Heller, 111 W. VA. L. REV. 349, 392 (2009); *see also* Craig S. Lerner & Nelson Lund, Heller *and Nonlethal Weapons*, 60 HASTINGS L.J. 1387, 1411 (2009) (arguing for a rebuttable presumption "that civilians have a right to use weapons commonly used by the police").

25    Brief of Pink Pistols in Support of Plaintiff-Appellants at 16, *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2014) (No. 14-15408)) ("If police need standard-issue magazines holding 15 to 17 rounds, a fortiori law-abiding citizens need the same firepower, if not more.").

26    Andrew P. Napolitano, *The Right to Shoot Tyrants, Not Deer*, WASH. TIMES (Jan. 10, 2013), http://www.washingtontimes.com/news/2013/jan/10/the-right-to-shoot-tyrants-not-deer [https://perma.cc/WW48-S9WP] ("[The Second Amendment] protects the right to shoot tyrants, and it protects the right to shoot at them effectively, with the same instruments they would use upon us."). Part of the reason for this confusion is *Heller*'s unwillingness to expressly overrule *United States v. Miller*. In *Miller*, the Court held that short-barreled shotguns were not Second Amendment weapons because they were not suitable for military use. *United States v. Miller*, 307 U.S. 174, 178 (1939). However, in *Heller* the Court held that military application of a weapon was not required, and indeed, if a weapon was suitable only for military use that's a reason why it is *not* protected. *District of Columbia v. Heller*, 554 U.S. 570, 589, 624-25 (2008).

27    *Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007).

28    Transcript of Oral Argument at 77, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (No. 07-290).

29    David B. Kopel, Clayton E. Cramer & Scott G. Hattrup, *A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts*, 68 TEMP. L. REV. 1177, 1195 (1995). Other arcana common in briefing has to do with a multi round weapon taken by Meriwether Lewis and William Clark on the Corps of Discovery. *See* Halbrook, *supra* note 1, at 165.

30    *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020) ("Semi-automatic and multi-shot firearms were not novel or unforeseen inventions to the Founders, as the first firearm that could fire more than ten rounds without reloading was invented around 1580. Rapid fire guns, like the famous Puckle Gun, were patented as early as 1718 in London."), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *reh'g en banc sub nom.* Duncan v. Bonta, No. 19-55376, 2021 WL 5577267 (9th Cir. Nov. 30, 2021).

31    *See* Cass R. Sunstein, *Analogical Reasoning* 10 (Harvard Pub. L., Working Paper No. 21-39, 2021), https://ssrn.com/abstract=3938546 [https://perma.cc/C9V8-FYHY] ("For analogical reasoning to operate properly, we have to know that cases A and B are 'relevantly' similar, and that there are not 'relevant' differences between them.").

32     DUPUY, EVOLUTION, *supra* note 10, at 286.

33     A more rational test for a protected weapon would be not whether the weapon is in "common use" but whether the weapon is "unreasonably dangerous"-- that is, whether its utility for something like self-defense is outweighed by its risks on other margins. The notion of "dangerous and unusual" seems to contemplate such a cost-benefit analysis. Joseph Blocher & Darrell A. H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 HARV. J. ON LEGIS. 279, 297 (2016).

34     In this sense, our argument takes issue with a lower court judge who has suggested that "[n]othing in the Second Amendment makes lethality a factor to consider because a gun's lethality, or dangerousness, is assumed." Duncan v. Becerra, 366 F. Supp. 3d 1131, 1145-46 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *reh'g en banc sub nom.* Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021), *rev'd and remanded sub nom.* Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021). This is patently false, as the increased lethality of any arm (such as a hand grenade or landmine) is *certainly* relevant to whether it may be prohibited.

35     Robert Mcg. Thomas, Jr., *Trevor N. Dupuy, 79, Prolific Military Historian*, N.Y. TIMES, June 9, 1995, at B11, https://www.nytimes.com/1995/06/09/obituaries/trevor-n-dupuy-79-prolific-military-historian.html [https://perma.cc/DAE6-93J9]; Jack Walker, *Trevor N. Dupuy Dead at 79*, PHALANX, Sept. 1995, at 33; Susan Rich, *Trevor N. Dupuy*, DUPUY INST., http://www.dupuyinstitute.org/tndupuy.htm (last visited Feb. 10, 2022) [https://perma.cc/YNF7-R4N5]. On Dupuy's contributions to military history, see CHRISTOPHER A. LAWRENCE, WAR BY NUMBERS: UNDERSTANDING CONVENTIONAL COMBAT, at ix-17 (2017).

36     *See* Rich, *supra* note 35; Thomas, *supra* note 35, at B11. Dupuy regarded his chief contribution as integrating military theory with historical experience. *See* LAWRENCE, *supra* note 35, at ix-xii. *See generally* T.N. DUPUY, NUMBERS, PREDICTIONS AND WAR: USING HISTORY TO EVALUATE COMBAT FACTORS AND PREDICT THE OUTCOME OF BATTLES (1979) [hereinafter NUMBERS] (exemplifying Dupuy's commitment to integrating military theory and history); T.N. DUPUY, UNDERSTANDING WAR: HISTORY AND THEORY OF COMBAT (1987) [hereinafter UNDERSTANDING] (same).

37     Walker, *supra* note 35, at 33.

38     Thomas, *supra* note 35, at B11.

39     Rich, *supra* note 35.

40     *Id.*

41     Rich, *supra* note 35. On Dupuy's contributions to military history, see LAWRENCE, *supra* note 35, at ix-17.

42     Rich, *supra* note 35. *See* DUPUY, UNDERSTANDING, *supra* note 36, at X; *see also* DUPUY, NUMBERS, *supra* note 36, at xv; LAWRENCE, *supra* note 35, at ix-xii.

43     LAWRENCE, *supra* note 35, at x. For more information about the research on tactical weapons in the 1950s and 1960s, see, for example, James Fallows, *M-16: A Bureaucratic Horror Story Why the Rifles Jammed*, ATLANTIC (June 1981), https://www.theatlantic.com/magazine/archive/1981/06/m-16-a-bureaucratic-horror-story/545153 [https://perma.cc/QHN5-LE7E].

Compendium_Cornell
Page 1458

44    *See* CHARLES R. SHRADER, HISTORY OF OPERATIONS RESEARCH IN THE U.S. ARMY VOLUME 1: 1942-1962, at iii (2006).

45    LAWRENCE, *supra* note 35, at ix.

46    *Id.*

47    LAWRENCE, *supra* note 35, at ix; DUPUY, EVOLUTION, *supra* note 10, at vii.

48    Rich, *supra* note 35; Walker, *supra* note 35, at 33.

49    DUPUY, EVOLUTION, *supra* note 10, at vii.

50    *Id.*

51    1 CARL VON CLAUSEWITZ, ON WAR 39-40, 106 (J.J. Graham trans. 1873) On the Pentagon's reliance on wargaming, see JOHN PRADOS, PENTAGON GAMES: WARGAMING AND THE AMERICAN MILITARY 4 (1987).

52    DUPUY, EVOLUTION, *supra* note 10, at 300-05; *see also* LAWRENCE, *supra* note 35, at 6-7.

53    DUPUY, EVOLUTION, *supra* note 10, at 287-94.

54    Shawn   Woodford,   "*Human   Factors   in   Warfare:   Fear   in   a   Lethal   Environment,*"   THE DUPUY   INST.:   MYSTICS   &   STATISTICS   BLOG   (Nov.   2,   2018),   https://urldefense.com/ v3/___   http://www.dupuyinstitute.org/blog/2018/11/02/human-factors-in-warfare-fear-in-a-lethal-environment/;!! OToaGQ!-mUY72ZfkYxHD9d0dFNBpg31R_LGM5aZ8X6i7U0SGha2GUuyOLcaw_FlFfJmj7Hk2yg   $   [https:// perma.cc/Z7YJ-2K6L] (quoting Dupuy).

55    HIST. EVALUATION & RSCH. ORG., *supra* note 10.

56    Rich, *supra* note 35.

57    Walker, *supra* note 35, at 79.

58    Rich, *supra* note 35.

59    *Id.*; *see also* Thomas, *supra* note 35, at B11.

60    *See, e.g.*, N.K. JAISWAL, MILITARY OPERATIONS RESEARCH: QUANTITATIVE DECISION MAKING 317-18 (1997); CARL MOSK, NATIONALISM AND ECONOMIC DEVELOPMENT IN MODERN EURASIA 91 (2013); James J. Schneider, *The Theory of the Empty Battlefield*, 132 J. ROYAL UNITED SERV. INST. 37, 37 (1987). The most recent validations of combat models are described in Volume I, Nos 4, 5, and 6 and Volume III, Nos 1 and 2 of The Dupuy Institute's International Tactical, Numerical, Deterministic Model ("TNDM") Newsletter. *International TNDM*

Compendium_Cornell
Page 1459

*Newsletter*, TDI: PUBLICATIONS (last visited Feb. 21, 2022) http://www.dupuyinstitute.org/tdipub4.htm [https://perma.cc/36PD-Z4NW].

61   DUPUY, EVOLUTION, *supra* note 10, at 286.

62   *Id.* at 92, 309-10.

63   To account for these other factors, along with the TLI, Dupuy calculated an Operational Lethality Index ("OLI"). *Id.* at 309-10. A fruitful research question would be to construct a civilian version of the OLI with respect to different weapons. But that project is outside the scope of this paper.

64   *Id.* at 286.

65   *Id.* at 286.

66   *Id.* at 286.

67   *Id.* at 286.

68   *Id.* at 292.

69   *See id.* at 292-94. In the age of technological change, there were many other ancillary developments, including: the percussion cap, electronic communication, barbed wire (first adapted to military purposes in 1874), smokeless powder (1885), recoil mechanism, quick-firing artillery (1890-1910); radar (1938), and earth satellites in space. *See id.* at 296-98.

70   DUPUY, NUMBERS *supra* note 36, at 6.

71   The process of introduction and assimilation of these new weapons is described in a report that he produced, consisting of four volumes (342 pages).

72   *See* DUPUY, EVOLUTION, *supra* note 10, at 92.

73   Situating the modern AR-15 (a successor to the German StG 44, the first "assault rifle," that was used in World War 2) anywhere near the Maxim machine gun makes it exponentially more lethal than the flintlock musket of the Founder's era. The term "AR-15" is now most-commonly used to refer only to the civilian variants of the rifle which lack the fully automatic function. There are a variety of ways to convert an AR-15 to a fully automatic weapon, as explained by Mike Searson, *Turning Your AR-15 into an M-16*, RECOIL (June 5, 2019), https://www.recoilweb.com/turning-your-ar-15-into-an-m-16-150631.html [https://perma.cc/XGT9-4WBZ].

74   This table is constructed from Dupuy's data. DUPUY, EVOLUTION, *supra* note 10, at 92.

75   *Id.* at 287.

76   *Id.*

Compendium_Cornell
Page 1460

77    *Id.* at 287-90.

78    *Id.* at 287.

79    *See* Kolbe v. Hogan, 849 F.3d 114, 162 (4th Cir. 2017) (Traxler, J., dissenting) (indicating that untrained civilians need more rounds because they are likely to miss the target).

80    *See* id. at 127 ("[W]hen inadequately trained civilians fire weapons equipped with large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more bystanders.").

81    *See* id. at 153.

82    *But see* Wallace, *supra* note 2, at 16-17 (arguing that lethality as a stable metric is difficult to determine).

83    Currently history and historical analogs are part of the conventional two-step framework for Second Amendment adjudication. The question in *Bruen* is whether this historical test is the only step of the analysis.

84    DUPUY, EVOLUTION, *supra* note 10, at 292.

85    *See id.* at 92.

86    *See id.*

87    Duncan v. Becerra, 366 F. Supp. 3d 1131, 1145-46 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *reh'g en banc sub nom.* Duncan v. Bonta, No. 19-55376, 2021 WL 5577267 at *119 (9th Cir. Nov. 30, 2021), *rev'd and remanded sub nom.*

88    *See* Cincinnati, Ohio, Ordinance to Prevent Accidents from the Firing of Cannon or Other Guns on Boats, in Front of the City of Cincinnati (Mar. 9, 1825) ("[I]t shall not be lawful for any person or persons having charge or being on board of any boat upon the Ohio river, when passing by, stopping at, or leaving the city of Cincinnati, to cause any cannon, gun or other fire-arms to be so fired as to discharge its contents towards the city ...."); Phila., Pa., Gun-Cotton Act of Assembly (Mar. 16, 1847) ("Whereas, an article called gun cotton, with properties of ignition and explosion similar to those of gunpowder, and equally if not more dangerous in towns and cities, has been introduced. Therefore ... no gun-cotton shall be introduced in Philadelphia, nor placed in storage therein, in greater bulk or quantity in any one place, than is permitted by existing laws, with regard to gunpowder ....").

89    McDonald v. City of Chicago, 561 U.S. 742, 802 (2010) (Scalia, J., concurring).

90    The quote is a sardonic remark by Justice Samuel Alito during oral argument over First Amendment protection of violent video games. Transcript of Oral Argument at 17, Brown v. Ent. Merchs. Ass'n, 564 U.S. 786 (2011) ( No. 08-1448).

91    For more on this move of "translation," see Lawrence Lessig, *Fidelity in Translation*, 71 TEX. L. REV. 1165, 1211 (1993) ("[T]he practice of translation moves in two stages: first, understanding the contexts between which the translator must move; and second, locating something called an equivalence between the two contexts.").

92    *Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) ("[W]e have no power to extend Second Amendment protection to the weapons of war that the *Heller* decision explicitly excluded from ... coverage.").

93    *See* Tucker, *supra* note 9.

94    Saul Cornell, Symposium, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 UC DAVIS L. REV. ONLINE 65, 67 (2021).

95    *Id*.

96    GA. CONST. of 1877, art. I, § 1, pt. XXII (emphasis added).

97    TEX. CONST. of 1869, art. I, § 13 (emphasis added).

98    For more on this point, see Darrell Miller, *New Research from the UC Davis Symposium: The Theoretical Lethality Index, Reconstruction Regulation and Enforcement*, DUKE CTR. FOR FIREARMS L.: SECOND THOUGHTS BLOG (Oct. 22, 2021), https://firearmslaw.duke.edu/2021/10/new-research-from-the-uc-davis-symposium-the-theoretical-lethality-index-reconstruction-regulation-and-enforcement/ [https://perma.cc/G7BC-QUNR].

99    James B. Astrachan, *The Bumpy Road to the Supreme Court: Does the Second Amendment Prevent States from Prohibiting Ownership of Assault-Style Rifles and High-Capacity Magazines?*, 47 U. BALT. L. REV. 337, 375 (2018) ("[I]t is not the role of the courts to take away from the citizens the means to most effectively oppose such a [tyrannical] government.").

100   *See* JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT 169 (2018) ("The keeping and bearing of lethal arms to deter government officials may be connected to the Second Amendment, but it is likely that the value is primarily moral or political, rather than a judicially administrable constitutional entitlement."). But to the extent such an argument requires something other than speculation, the TLI offers some metric from which to assess what kind of weaponry in private hands would be necessary to counter a military armed with machine guns, artillery, and nuclear weapons. *See* Darrell A. H. Miller, *Second Amendment Equilibria*, 116 NW. U. L. REV. 239, 256-57 (2021).

55 UCDLR 2495

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:19-cv-01537-BEN-JLB    Document 154-3    Filed 10/22/22    PageID.18914    Page 43 of 715

PERUTA, THE HOME-BOUND SECOND AMENDMENT,..., 127 Harv. L. Rev. F. 238

**127 Harv. L. Rev. F. 238**

**Harvard Law Review Forum**
April 11, 2014

Commentary

Second Amendment
Darrell A.H. Miller [a1]

Copyright © 2014 Harvard Law Review Association, Darrell A.H. Miller

# PERUTA, THE HOME-BOUND SECOND AMENDMENT, AND FRACTAL ORIGINALISM

Second Amendment disputes used to cleave along one dimension: collective versus individual rights. No more. Ever since a majority of the Justices of the United States Supreme Court broke in favor of individual rights in *District of Columbia v. Heller* [1] and *McDonald v. City of Chicago*, [2] tremendous litigation pressure has fragmented Second Amendment theory and doctrine. The pressure is unlikely to ease soon. Motivated parties, well-financed advocacy organizations, and the prospect of attorneys' fees guarantee that every question of who, what, where, when, and why concerning the right to keep and bear arms is going to be asked, and will demand an answer.

Currently, the most pressing doctrinal question splitting the circuits, at the broadest level of generality, is whether the Second Amendment right to keep and bear arms extends beyond the home. The Ninth Circuit recently has entered that debate. In *Peruta v. County of San Diego*, [3] a divided three-judge panel of the Ninth Circuit held that the Second Amendment is not home-bound. Judge O'Scannlain, writing for the majority, held that the Second Amendment scope includes a right to carry firearms for confrontation in the streets. The state of California has sought en banc review. Petitions for certiorari are pending in similar cases. It is likely we will see a Supreme Court resolution to this issue in the next few years.

At that point, the Supreme Court must mend not only doctrinal splits--does the Second Amendment extend beyond the home?--but also methodological ones--how is a court even to answer that question? To date, most judges have been methodologically pluralist: relying on some combination of history, precedent, empirical data, pragmatism, and judicial deference to reach their conclusions. These judges typically use history only for evaluating the threshold issue of whether the Second Amendment is implicated at all. Tailoring the right is the place for tiers of scrutiny, for empirical data, for weighing of interests, for pragmatics.

 **\*239**  But a few judges, untroubled by stare decisis and emboldened by errant passages in *Heller* and *McDonald*, have rejected such eclectic methods. To them, tiers of scrutiny are suspect; empirics are irrelevant. Instead, these judges have attempted to produce what no judge has yet achieved: the perfectly originalist opinion, one in which the judge applies originalism to every facet of decisionmaking--fractal originalism, as it were.

*Peruta* is just such an attempt at fractal originalism. Judge O'Scannlain's opinion is a sixty-plus page tour-de-force, a lower court example of what Professor Lawrence Rosenthal has described as "Originalism in Practice." [4] Nevertheless, *Peruta* is just as likely to be seen as confirming how difficult fractal originalism is to achieve at the lower court level, and how many other judicial values--among them neutrality, restraint, and administrability--must be sacrificed in the pursuit.

*Peruta* concerned a challenge to San Diego County's "good cause" requirement for concealed carry. [5] Because California state law generally forbids persons to openly carry firearms, this meant that the only way a person could publicly carry a firearm in San Diego County was to comply with the good cause permitting system. Peruta sued the County, arguing that the good cause requirement, when evaluated in light of California's restrictions, violated the Second Amendment.

Compendium_Cornell
Page 1463

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.18915   Page 44 of
715

PERUTA, THE HOME-BOUND SECOND AMENDMENT,..., 127 Harv. L. Rev. F. 238

Judge O'Scannlain reframed the question before the court as whether the Second Amendment's word "bear" encompasses bearing arms for confrontation beyond the home, and whether California's regulation, in combination with San Diego County's, violated that right. (As Judge Thomas noted in dissent, this is a tendentious move, certainly not one that adherents of judicial restraint would countenance.) To construe the word "bear," Judge O'Scannlain mined, in a way not typically seen in lower-court opinions, the extensive eighteenth and nineteenth century historical materials on public carry.

What the court did with this history was revealing. The court recognized that some of this precedent did not fit with *Heller's* conclusion that the Second Amendment had codified a pre-existing right to self-defense. [6] Trimming was therefore in order. With a nod toward George Orwell, the majority candidly judged that while all historical **\*240** cases are "equally relevant" to determine meaning, "some cases are more equal than others." [7] And so the majority proceeded to chop historical authority into categories: In the first category were "authorities that understand bearing arms for self-defense to be an individual right." In the second category were "authorities that understand bearing arms for a purpose *other than* self-defense to be an individual right." In the third category were "authorities that understand bearing arms not to be an individual right at all." [8]

Those cases in the third category--those that centered upon a collective or militia-rights interpretation of the Second Amendment--were entitled to no weight, those in the second were given marginal weight, and those in first category were fully valued. Having weighted the history in this fashion, the majority then concluded that "bear," when combined with the strict lexical meaning, clearly meant a right to bear arms for confrontation out of doors. San Diego County's regulation, combined with California's restrictions, had all but destroyed this right, and the law could not stand.

Professor Lawrence Solum has argued that what distinguishes originalism from non-originalism is originalism's premise that, at a minimum, one may objectively ascertain the semantic meaning of the Constitution's words, fixed at the time of their ratification. [9] You produce dictionaries; you produce pamphlets; you produce cases. This is a factual investigation, and it is falsifiable. If Solum's description of originalism is true, then *Peruta's* discounting large swaths of historical evidence based on a decision (*Heller*) that post-dates ratification by over two centuries is a strange way to do originalism. No linguist would stack the deck this way.

*Peruta's* treatment of the militia-centered precedent seems capricious in light of the way other judges and advocates with originalist credentials have used the same precedent. For example, Second Amendment litigants, and some judges, have pointed to the militia to argue that restrictions on firearms for eighteen-year-olds are unconstitutional today, because eighteen-year-olds would have been able to bear weapons as militia members in 1791. (Recent litigation in the Fifth Circuit considered this point. [10] ) Furthermore, some Second **\*241** Amendment advocates point to militia-centered precedent as evidence that private access to extremely powerful firearms is constitutionally protected because of their similarity to weapons that would have been employed in militia service. [11] Either the historical precedent focused on a militia-centered right is evidence of original understanding for all purposes, or it is irrelevant. It cannot be selectively probative; or at least, it cannot be selectively probative and still be considered a neutral criterion for decisionmaking. *Peruta's* engagement with the Reconstruction evidence for the right to public carry is also problematic. *Peruta* cites Reconstruction lawmakers and executive officials for the proposition that the right to bear arms meant the right to bear them outdoors. *Peruta* does not cite Sickles's Order No. 1, issued just a few months later, which prohibited "[o]rganizations of white or colored persons bearing arms, or intend[ing] to be armed" unless they were members of the military or militia. [13] (One wonders if Order No. 1 did not necessitate Order No. 7.)

But so has the *lack* of gun regulation. Conspicuously absent from *Peruta's* citations are the numerous regulations on public carry that were intended to *prevent* confrontations by armed citizens. Authorities passed these laws to preserve the peace in general, and to prevent slaughter of freedmen and their supporters in particular. For example, *Peruta* cites Union General Daniel Sickles's Order No. 1 as supporting the right of freedmen to carry arms openly. *Peruta* does not cite Sickles's Order No. 7, issued just a few months later, which prohibited "[o]rganizations of white or colored persons bearing arms, or intend[ing] to be armed" unless they were members of the military or militia. [13] (One wonders if Order No. 1 did not necessitate Order No. 7.)

When law enforcement arrested Klan members for carrying firearms to terrorize their fellow citizens, Klan members responded that they were simply exercising a superior, *traditional*, God-given right to **\*242** arm for self-defense. [14] Little in *Peruta* addresses what Professors Saul Cornell and Carole Emberton have documented as the complex and divided attitudes of

Compendium_Cornell
Page 1464

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.18916   Page 45 of
715

PERUTA, THE HOME-BOUND SECOND AMENDMENT,..., 127 Harv. L. Rev. F. 238

Reconstruction America toward the public carrying of firearms [15] --an ambivalence that can be traced back to the founding era and before. [16] Instead, there is a distressingly familiar manner in which blacks are exhibited to make a point, and then hurried out of sight. Yes, the history of gun control is besmirched by racism. So too is the history of gun bearing. This sullied history demands a more nuanced treatment than any court has offered so far.

In Judge O'Scannlain's defense, he is a circuit court judge. He has to decide something. Reconciling the indeterminate history and the contextual ambiguities of "bear" with the reasoning of *Heller* and *McDonald* is one way to discharge his duty. In fact, to the extent that *Peruta* disregards conflicting historical authorities on the basis of what the Supreme Court *says* that precedent means, *Peruta* at least is employing *some* theory of precedent--an issue that continues to stymie originalist theorists. (Whether this theory is in fact an originalist theory of precedent, I leave to others.)

But in its effort to achieve fractal originalism, *Peruta* exposes the fissures between the demands of the method and the operation of a hierarchical judiciary. If you can't credit linguistic or historical data when that data conflicts with the implications of Supreme Court reasoning, then lower court opinions will tend to replicate any error in the Supreme Court reasoning. This may be perfectly acceptable in a hierarchical system of judging, but it stands as a serious institutional constraint on originalism as a methodology for anyone other than the nine Justices at the top of the pyramid. Why work to make a historical record, if any history that conflicts with a prior Supreme Court ruling is not probative? As Professor Thomas Merrill has noted, originalism must be practiced by judges and lawyers with resource constraints and human limitations. [17] This does not mean that historical methods are a vanity, but it does counsel care in crafting rules of decision--even historically indicated ones--at a level of abstraction that permits judges to judge, litigants to litigate, and governments to govern.

## Footnotes

a1    Professor of Law, Duke Law School. Thanks to Joseph Blocher and Lawrence Rosenthal for comments.

1    554 U.S. 570 (2008).

2    130 S. Ct. 3020 (2010).

3    742 F.3d 1144 (9th Cir. 2014).

4    Lawrence Rosenthal, *Originalism in Practice*, 87 IND. L.J. 1183, 1244 (2012) (quipping that "authentically originalist adjudication is something like the Loch Ness Monster--much discussed, but rarely encountered").

5    As reported in *Peruta*, San Diego County's good cause requirement was an individualized determination, looking for factors that distinguished the applicant's risk of confrontation from the risk of the general populace. A bare assertion of concern for one's personal safety did not alone constitute good cause. *Peruta, 742 F.3d at 1148.*

6    *Id.* at 1155 ("[T]he right is, *and has always been,* oriented to the end of self-defense. Any contrary interpretation of the right, whether propounded in 1791 or just last week, is error.") (citation omitted).

7    *Id.* (citing GEORGE ORWELL, ANIMAL FARM 118 (2009) (1945)).

8    *Id.* at 1156.

9    Lawrence B. Solum, *Originalism and Constitutional Construction,* 82 FORDHAM L. REV. 453, 456-57, 467 (2013).

Compendium_Cornell
Page 1465

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.18917   Page 46 of 715

PERUTA, THE HOME-BOUND SECOND AMENDMENT,..., 127 Harv. L. Rev. F. 238

[10]   *See* Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 339 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc) ("History and tradition yield proof that 18- to 20-year olds had full Second Amendment rights. Eighteen year olds were required by the 1792 Militia Act to be available for service, and militia members were required to furnish their own weapons; therefore, eighteen year olds must have been allowed to 'keep' firearms for personal use.").

[11]   *See* Brief Amicus Curiae of Gun Owners of America, Inc. et al. in Support of Appellants and Reversal at 24-26, Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) (No. 10-7036) (arguing that "assault rifles" and "high-capacity magazines" are protected because they are "reasonably related" to weapons employed in the militia).

[12]   *E.g.* Clayton E. Cramer, *The Racist Roots of Gun Control*, 42 KAN. J.L. & PUB. POL'Y 17 (1995); NICHOLAS J. JOHNSON, NEGROES AND THE GUN (2014); Robert J. Cottrol & Raymond T. Diamond, *"%7FNever Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity--The Redeemed South's Legacy to a National Jurisprudence*, 70 CHI-KENT L. REV. 1307 (1995); STEPHEN P. HALBROOK, SECURING CIVIL RIGHTS (2010).

[13]   1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 211 (1906) (reprinting sections I and III of General Order No. 7).

[14]   *See* Proceedings in the Ku Klux Trials at Columbia, S.C. in the United States Circuit Court, November Term, 1871, at 425-26 (Benn Pitman & Louis Freeland Post eds., 1872).

[15]   *See, e.g.*, Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1724 & n.146 (2012); Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 615, 621-22 (2006).

[16]   *See, e.g.*, Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 107-14 (2013); Cornell, *supra* note 15, at 1707-14.

[17]   Thomas W. Merrill, *Originalism, Stare Decisis and the Promotion of Judicial Restraint*, 22 CONST. COMMENT. 271, 281 (2005) ("Originalism ... if it is to be done well, requires a skill set that is beyond the ken of most lawyers and judges.")

127 HVLRF 238

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.





DATE DOWNLOADED: Mon Oct 17 20:47:53 2022
SOURCE: Content Downloaded from *HeinOnline*


Citations:

Bluebook 21st ed.
John T. Noonan Jr., Ordered Liberty: Cardozo and the Constitution, 1 CARDOZO L. REV.
257 (1979).

ALWD 7th ed.
John T. Noonan Jr., Ordered Liberty: Cardozo and the Constitution, 1 Cardozo L. Rev.
257 (1979).

APA 7th ed.
Noonan, J. (1979). Ordered liberty: cardozo and the constitution. Cardozo Law Review,
1(1), 257-282.

Chicago 17th ed.
John T. Noonan Jr., "Ordered Liberty: Cardozo and the Constitution," Cardozo Law
Review 1, no. 1 (Spring 1979): 257-282

McGill Guide 9th ed.
John T. Noonan Jr., "Ordered Liberty: Cardozo and the Constitution" (1979) 1:1
Cardozo L Rev 257.


AGLC 4th ed.
John T. Noonan Jr., 'Ordered Liberty: Cardozo and the Constitution' (1979) 1(1)
Cardozo Law Review 257

MLA 9th ed.
Noonan, John T. Jr. "Ordered Liberty: Cardozo and the Constitution." Cardozo Law
Review, vol. 1, no. 1, Spring 1979, pp. 257-282. HeinOnline.

OSCOLA 4th ed.
John T. Noonan Jr., 'Ordered Liberty: Cardozo and the Constitution' (1979) 1 Cardozo
L Rev 257

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
   *Copyright Information*

# ORDERED LIBERTY:
# CARDOZO AND THE CONSTITUTION

JOHN T. NOONAN, JR.*

> *Once turn into the fields and you will hardly*
> *stir a step . . . without finding yourself*
> *face to face with questions that are*
> *ultimate.*
>
> Benjamin Cardozo

> *The author no longer says to you what*
> *he meant to say.*
>
> O.W. Holmes, Jr.

## I.

At midnight in Bridgeport one restless fall night in 1935 two young men stood in front of a shop window full of cheap portable radios. The men were several blocks from their apartment on the same street. Two blocks from the store, between them and their apartment on the same street, was a police station. The street was well-lit. One smashed the glass with a gun, and each took a radio. They began to walk in different directions, using side streets to get back to the apartment. A block from the police station a police cruiser drew up by one of them, two officers got out, and putting a hand on the young man's shoulder, one officer asked where he was going with the radio. The youth was carrying the gun in the sleeve of his coat. He let it drop into his hand and fired twice. With unlucky accuracy his first shot struck Officer Wilfred Walker in the abdomen, the second Sergeant Thomas Kearney in the chest. Walker died a few hours later, Kearney the next day. The young man escaped.[1]

A month later Frank Palka was arrested for robbery in his home town, Buffalo. He was already suspected of the Bridgeport crime. The Bridgeport police were notified and eventually arrived in Buffalo. An officer from Bridgeport interrogated Palka in a Buffalo police station, telling him falsely that Jack Burke, his roommate's brother, had given the Bridgeport police the whole story. He was not told of any right to remain silent or consult counsel. He confessed that he was

---

*Professor of Law, University of California. I am indebted to Jesse Choper and Andrew L. Kaufman for their comments on this article.

[1] *See* State v. Palko, 121 Conn. 669, 671-72, 186 A. 657, 658 (1936) and State v. Palko, 122 Conn. 529, 532-33, 191 A. 320, 322-23 (1937) [hereinafter cited respectively as *Palko One* and *Palko Two*]. (The distance from the store to the police station and the officers' full names are given in N.Y. Times, Sept. 30, 1935, at 3, col. 5).

257

the burglar who had fired the shots. He confessed again to a second Bridgeport police officer who interviewed him at the Buffalo police station. He was brought back to Connecticut, and in Fairfield County Superior Court, before Judge John Cornell and a jury, in January 1936 he went on trial for his life.[2]

He was a young man, twenty-four or twenty-five of Polish descent. He was also a handsome man. Observers thought he was a "dead ringer" for Clint Frank, a recent captain of the Yale football team. He was not unintelligent—he read the briefs written in his behalf with interest. He had no wife or woman to stand by him, but his mother still had hope for him and sat through the trial and heard what it was said he had done.[3]

The Palkas were too poor to have a lawyer; Judge Cornell appointed, and the state paid, his counsel. He was David Goldstein, designated by Judge Cornell to help out an overburdened public defender. Goldstein had his office on Main Street, Bridgeport; he had been a state senator for six years and was currently the city's Tax Attorney; he was also considered by many to be the best trial lawyer in the state. A sole practitioner, he had recently taken as an associate George Saden, a Yale Phi Beta Kappa and a 1934 graduate of Harvard Law School. Saden sat in the courtroom during the trial, feeling sorry for Mrs. Palka. It was to be his task to compose the long and scholarly brief later filed in the Supreme Court of the United States on Palka's behalf.[4]

Frank Palka did not deny that he was one of the two burglars. His defense was that on the day of the crime he had been drinking rye whiskey and beer beginning at three in the afternoon and continuing into the evening. By late evening he was befuddled. He woke up in his apartment next morning with no memory of anything that had happened; while drunk he could not have had the intention of killing anyone.

The jury could believe or disbelieve the story of his drinking to the point of befuddlement. Goldstein argued that it was inconceivable that he had set out to steal a ten dollar radio from a store two blocks

---

[2] For the correct spelling of the defendant's name, *see* Brief for Appellant at 3, Palko v. Connecticut, 302 U.S. 319 (1937) (holding overruled by Benton v. Maryland, 395 U.S. 724 (1969)). The facts that Palka's home town was Buffalo and that the Bridgeport police were sent for were obtained from Interview with George A. Saden, Superior Court Judge, Connecticut, on telephone (Nov. 15, 1978) [hereinafter cited as Saden Interview]. The other facts are derived from *Palko One*, 121 Conn. at 678-81, 186 A. at 661-62, and *Palko Two*, 122 Conn. at 536-37, 191 A. at 724-25.

[3] All facts from Saden Interview, *supra* note 2.

[4] *See* MARTINDALE-HUBBELL LAW DIRECTORY 157 (1936) (Biographical Section) for Goldstein and Saden biographical data. Other facts from Saden Interview, *supra* note 2.

from a police station with the deliberate intention of killing if apprehended, and incredible that he should have gone to sleep in his apartment a few blocks from the scene if he had realized that he had just shot two policemen. He had a gun with him because he liked to carry a gun, and it had been a handy tool for burglary; this was no proof that he had carried it with the intent to kill.[5]

Palka was tried only for Thomas Kearney's murder, no doubt on the belief that it was easier to prove premeditation as to the second shot. The prosecution had to prove that he had fired the gun and that he had done so with premeditation. Apart from his confessions, the evidence against him was this: The grips of the gun which had smashed the shop window had fallen off in the window, and there was testimony that the markings on the grips were the same as those seen on a revolver Palka had possessed. Returning to his apartment in the early morning after the shootings he had told Thomas Iwanicki that he had been prepared to shoot a policeman; Iwanicki thought he was sober. His roommate's brother, Jack Burke, and his other roommate, Tom Evans, testified that he had admitted to them what he had done.[6]

Judge Cornell would not let the prosecutor present the two confessions to the jury. They had been made, Goldstein argued, to shield the other burglar, Palka's roommate Frank Burke. They had been made in custody and obtained by trick, the judge observed, and they were excludable as evidence on these grounds and because of "all the other surrounding circumstances."[7]   By this vague phrase Judge Cornell perhaps referred to the emotions in a station house when a suspected cop-killer is interviewed by brother officers of his victims and the emotions Palka may have experienced as he waited for the Bridgeport police to make the twelve-hour trip to Buffalo. The judge would not let in evidence of the robbery committed by Palka in Buffalo, nor would he let the state cross-examine Frank Palka on another burglary, said to have been committed before the one leading to the killings, although the prosecutor said the robbery and the burglary bore on Palka's credibility. Finally, Judge Cornell instructed the jury that to convict Frank Palka of murder in the first degree there must have been "an interval of time during which he gave thought to and reflected upon his purpose sufficiently to know what he was doing." "It will occur to you," Judge Cornell said, "that where a man sud-

[5] The argument for Palka is inferred from *Palko One* and *Palko Two*.

[6] *Palko One*, 121 Conn. at 671-73, 186 A. at 658-59.

[7] *Id.* at 682, 186 A. at 662.

denly makes up his mind to kill another and instantly shoots or otherwise fatally injures him, there is no opportunity for such consideration . . ."[8]

The jury did not convict Frank Palka of murder in the first degree, as the prosecutor requested, but of murder in the second degree. Judge Cornell sentenced him to imprisonment at hard labor for life, with a recommendation that he never be pardoned.[9] From this judgment the prosecutor appealed.

The Supreme Court of Errors of Connecticut ordered a new trial.[10] The confessions should have been admitted; the trial judge had discretion to exclude confessions, but Judge Cornell was wrong in believing that confessions made in custody and obtained by deceit were not good evidence. Cross-examination on the other burglary should have been allowed, and evidence of the Buffalo robbery should have been let in, to test the defendant's credibility. Climactically, Judge Cornell's instructions on the premeditation required for first degree murder had been mistaken. They focused on "the incalculable moment between his realization of the threat of arrest and the pulling of the trigger." But here was a burglar who had gone armed with a loaded gun which could aid his theft and his escape. His premeditation was to be measured not by what he did at the instant of arrest but by his being ready to shoot. As he had admitted in his confessions, he shot because he was on parole; he was in fact on parole from the Elmira Reformatory as a convicted rapist.[11]

At the second trial, with the confessions admitted, the excluded evidence admitted, the instructions clarified, and a different judge presiding, Frank Palka was found guilty of first degree murder and sentenced to die. The death warrant for his execution provided that he be electrocuted before sunrise within five days after February 15, 1937.[12] As his case was appealed, a reprieve stayed his execution. On March 4, 1937, the Supreme Court of Errors upheld his conviction.[13] In November of the same year his case was argued by Goldstein and Saden before the Supreme Court of the United States.

Three and one half weeks after the argument, on Monday morning December 6, 1937, Benjamin Cardozo was ready to deliver the

---

[8] *Id.* at 674, 679-82, 186 A. at 659, 661-62.

[9] Brief for Appellant, *supra* note 2, at 3.

[10] 302 U.S. at 321.

[11] *Palko One*, 121 Conn. at 674, 679-82, 186 A. at 661-62. The information on Elmira is in *Palko Two*, 121 Conn. at 671, 188 A. at 658.

[12] Death Warrant, *reprinted in* Record at 31, Palko v. Connecticut, 302 U.S. 319 (1937).

[13] *Palko Two*, 122 Conn. at 530, 191 A. at 531.

decision. It was to be the last time he spoke in person from the bench. Except for Pierce Butler, who dissented silently,[14] the Court was unanimous. In this mature microcosm of his thought, Cardozo put his reading of the Constitution. His opinion had the concentration, energy, and assurance of a judge of rich experience, who has spent "years of crowded thoughts"[15] reflecting on his role and on his society and on the values of communal life.

## II.

Goldstein and Saden focused on a single issue: their client had been put on trial twice, twice compelled to defend himself, twice placed in jeopardy of his life; trying him twice, Connecticut had violated the Constitution of the United States. English precedent, state law, and the holding of the Supreme Court itself applying the fifth amendment to a federal trial were marshalled to demonstrate that freedom from double jeopardy was a fundamental guarantee of Anglo-American law. As such, they argued, it was a privilege and immunity of every citizen of the United States. By the fourteenth amendment every state was forbidden to encroach on the immunities accompanying national citizenship.[16] Their brief presented to the Court the 1905 doctoral thesis of Horace Flack that the privileges and immunities clause of the fourteenth amendment incorporated the entire Bill of Rights, but Goldstein and Saden did not ask the Court to accept this thesis. Recognizing the precedents which stood in the way, they urged the Court to follow a middle course—an expansive reading of "privileges and immunities," incorporating those parts of the Bill of Rights which were fundamental.[17] The fifth amendment's guarantee against double jeopardy, they contended, was fundamental. The due process clause, they added, required the same conclusion.[18]

In rebuttal, the prosecutors, Lorin Willis and William Comley, relied on the line of Supreme Court rulings that the due process

---

[14] 302 U.S. at 329 (dissenting opinion).

[15] Address by Benjamin N. Cardozo, New York State Bar Association (Jan. 22, 1932) [hereinafter cited as Cardozo State Bar Address], *reprinted in* SELECTED WRITINGS OF BENJAMIN NATHAN CARDOZO at 7, 25 (M. Hall ed. 1947) [hereinafter cited as SELECTED WRITINGS].

[16] *See* Brief for Appellant, *supra* note 2, at 29-40, 48-56. The federal government is also prohibited from infringing on immunities accompanying national citizenship. *See* Kepner v. United States, 195 U.S. 100 (1904).

[17] *See* Brief for Appellant, *supra* note 2, at 34-35. For the thesis, *see* H. FLACK, THE ADOPTION OF THE FOURTEENTH AMENDMENT (1908).

[18] *See* Brief for Appellant, *supra* note 2, at 40-41.

clause did not incorporate the Bill of Rights.[19]  As for a guarantee
against a retrial being fundamental, there was the telling observation
of Justice Holmes dissenting in the federal fifth amendment double
jeopardy case: a prisoner "would no more be in jeopardy for a second
time when retried because of a mistake of law in his favor than he
would be when retried for a mistake that did him harm."[20]
Goldstein and Saden had ended their brief with a reminder of the
dangers of tyranny. Willis and Comley thought their language ap-
propriate to protestors against the Stuart monarchy. This was a new
age where "a very pressing problem is how better to secure decent,
law-abiding citizens against the growing threat of daring and defiant
crime." To adapt criminal practice to meet modern realities was "no
disparagement of the spirit of ordered liberty."[21]

    With these arguments before him, Cardozo began his exegesis of
the Constitution. Not for a moment did he pause to look at the view
only recently articulated by Justice Roberts for the Court, that the
proper mode of exegesis was to lay the statute by the Constitution
and tell, by visual inspection as it were, whether the statute con-
formed to the sacred text.[22]  Fundamentalism of this sort needed
neither refutation nor commentary. Nor, despite the focus of
Goldstein and Saden, did he dwell on the privileges and immunities
clause of the fourteenth amendment. Invoking a case decided in
1900, he dismissed in a sentence the claim that Palka's immunities as
a citizen of the United States had been violated.[23]  When he spoke of
immunities or privileges in the principal part of his opinion it was to
use them as terms interchangeable with what was protected by due
process.[24]  His exegesis was an exposition of the due process clause
but an exposition neither dependent on the literal text of the
amendment nor confined to the argument of counsel.

    Cardozo took notice of three broad paths of interpretation. The
first was that which Goldstein and Saden had pointed to without ad-

---

[19] *See* Brief for State of Connecticut at 8-18, Palko v. Connecticut, 302 U.S. 319 (1937)
[hereinafter cited as Brief for State].

[20] Kepner v. United States, 195 U.S. 100, 135 (1904) (dissenting opinion), *quoted in* Brief
for State, *supra* note 19, at 6.

[21] Brief for State, *supra* note 19, at 35. The phrase, "ordered liberty," so Cardozo-like in its
cadence, does not appear to be a quotation from Cardozo; it moves from the brief to his opin-
ion.

[22] United States v. Butler, 297 U.S. 1, 62 (1936).

[23] Palko v. Connecticut, 302 U.S. 319, 329 (1937) (citing Maxwell v. Dow, 176 U.S. 581,
584 (1900)).

[24] For use of "immunity," see 302 U.S. at 322, 325. For use of "privileges and immunities,"
see *id.* at 326 (three times).

vocating, but which was now attributed to them by Cardozo as their "thesis": the fourteenth amendment incorporated the Bill of Rights; whatever restraints the first eight amendments laid upon the federal government were now binding on the states. This route was firmly blocked by precedent. Despite the Bill of Rights, the Court had already said that the states were not bound to use grand juries for criminal indictments;[25] that the states could modify or abolish civil jury trial;[26] that the states could modify or abolish the privilege against self-incrimination,[27] and Cardozo read the decisions he cited expansively, making it clear that in his view the corresponding provisions of the Bill of Rights were no part of fourteenth amendment due process.[28]  It was not Cardozo's habit to attack a settled line of decisions. He spent little time in turning from this path and no time in considering Goldstein and Saden's actual argument that the Bill of Rights be the starting point for identifying "fundamental" immunities.

A second path he barely glanced at, although it is evident from a sentence in the opinion that it had passed before his mind. This would have been to hold that "due process of law" in the fourteenth amendment meant only "procedural fairness." Every law, it may be observed, takes the life, liberty or property of someone. The fourteenth amendment, it may be argued, was not meant to constitute a Court which would review each law to see if the taking was too severe; all that the Court had power to do was to see that the taking occurred in a fair way. Much later, Raoul Berger was to show how strong an historical case could be made that this was what the framers of the amendment meant.[29]  But for Cardozo that course was also blocked by precedent. "Long ago," the Court had decided, "that even in the field of substantive rights and duties the legislative judgment, if oppressive and arbitrary," might "be overridden by the courts."[30] The "even" recognized that the reading of due process as substantive was debatable; but for Cardozo the practice of the Court had ended the debate. Even if he had been ready to reject the bulk of precedents which enforced the Court's view of due process in economic regulation, he was not prepared to give up a concept which permitted the Court to protect free speech. Comprehensively, he as-

---

[25] Hurtado v. California, 110 U.S. 516 (1883).

[26] Walker v. Sauvinet, 92 U.S. 90 (1875).

[27] Twining v. New Jersey, 211 U.S. 78 (1908).

[28] 302 U.S. at 323-24. *See* W. LOCKHART, Y. KAMISAR & J. CHOPER, CONSTITUTIONAL LAW 570 (1975) for a criticism of this reading.

[29] *See* R. BERGER, GOVERNMENT BY JUDICIARY 193-220 (1977).

[30] 302 U.S. at 327.

serted the Court's power to override all "oppressive and arbitrary" legislation.

If the two paths barred by precedent were quickly dismissed, there were more profound reasons than precedent for Cardozo's rejection of them. The thinking of a lifetime was behind his summary rejection. Each represented a mechanical formula, each impeded the true work of the judge. Champions of the first approach were to insist that it substituted objectivity for subjectivity, the single standard of the Bill of Rights for each judge's preferences.[31] But they put upon modern state procedure the constraints of eighteenth century practice, and they overlooked the willful subjectivity required for any judge to say the Bill of Rights and due process were the same. Defenders of the second approach were to claim that they alone were true to the Constitution: if the "original meaning" of the fourteenth amendment could be disregarded, the judges were free to amend the Constitution by a process different from the amendment process authorized by Article V.[32] But this contention made the judges adhere to the Constitution as it stood in 1868; it took from them the responsibility of judging in a different era by evoking the intentions of the dead who could have known nothing of the new era's challenges. Both approaches ran against Cardozo's strongest and most settled convictions.

"A *constitution* states or ought to state not rules for the passing hour, but principles for an expanding future . . . . While it is true to its function, it maintains its power of adaptation, its suppleness, its play." Cardozo had written these lines sixteen years earlier in *The Nature of the Judicial Process*.[33] The "broad precepts and immunities in state and national constitutions," he intimated, had no single "true meaning," good from their origin to the end of their days. They must, he suggested, be read in an evolutionary sense.[34] In a nutshell, "the content of constitutional immunities is not constant but varies from age to age."[35] A man holding this faith could not let the Constitution be tied to eighteenth century procedures or to a nineteenth century conception of due process.

In the work of modernization, the judge played a crucial, even sacred role. It was his task to interpret "signs and symbols given from

---

[31] *See, e.g.,* Adamson v. California, 332 U.S. 46, 89 (1947) (Black, J., dissenting).

[32] *See* R. BERGER, *supra* note 29, at 367-72.

[33] B. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 83-84 (1921) (emphasis in original) [hereinafter cited as JUDICIAL PROCESS].

[34] *Id.* at 85.

[35] *Id.* at 82-83.

without."[36]   He was the hierophant of "the aspirations and convictions and philosophies of the men and women of [his] time."[37]   He was the authorized interpreter who made the Constitution correspond to the values of contemporary society. Upon him fell the heavy burden of deciphering both the document and the dreams of his day.

That this task must inevitably partake of the judge's personal perspective did not escape Cardozo, although he did not welcome the responsibility as personal: "The odium is visited on the cruel judges. We never hear of the cruel legislature that imposed a rigid rule."[38] When a young judge sitting by designation of the governor on the Court of Appeals, he upheld against due process challenge a statute requiring contractors on state projects not to employ aliens, he could obliquely criticize the legislators for requiring discrimination which was both "ungenerous and unwise."[39]   It was not he who had decided to put the immigrants out of jobs on the subway. When a justice of the Supreme Court, he upheld against due process challenge a California statute requiring all University of California students, conscientious objectors or not, to attend classes in military science, he could observe that some might condemn the law as "unwise or illiberal or unfair."[40]   It was not he who had determined the curriculum. Cooperating in the system, he experienced no personal guilt for the system's faults or cruelties.

Chafe as he might at criticism that belonged in his view elsewhere, he was self-conscious of his own part in the work of interpretation whether it was of "a village ordinance or a nation's charter." There was, he wrote, "in each of us a stream or tendency whether you choose to call it philosophy or not, which gives coherence and direction to thought and action. Judges cannot escape that current any more than other mortals. We may try to see things as objectively as we please. None the less, we can never see them with any eyes except our own."[41]

How was this acute sense of personal vision reconciled with the rejection of responsibility when he collaborated in the unwise and the ungenerous? In part the answer must be that he lived with the sys-

---

[36] *Id.* at 174.

[37] *Id.* at 173.

[38] Cardozo State Bar Address, *supra* note 15, in SELECTED WRITINGS, *supra* note 15, at 42.

[39] People v. Crane, 214 N.Y. 154, 161, 108 N.E. 427, 429 (1915).

[40] Hamilton v. Regents of the Univ. of Cal., 293 U.S. 245, 266 (1934) (Cardozo, J., concurring).

[41] B. CARDOZO, JUDICIAL PROCESS, *supra* note 33, at 12, 13 (footnote omitted); "stream of tendency" in the original, here corrected to "stream or tendency."

tem as most do; if you are not Don Quixote, if you are not bent on righting all the injustices in the world, you are bound to collaborate in systems which in some degree are ungenerous and unjust. In part the answer must be that he had the sense which Spinoza also had of the rightness of what is.[42]  He was doing what he must, in the system as it stood. Further, he acted with a consciousness, a conviction, that the system as a whole worked to the good.

This conviction most markedly distinguished his spirit from that of Holmes, who, accepting a role of judicial deference to the legislature, could speak of the folly of "the crowd" or "the herd" and could speak of himself as "the supple tool of power."[43]  Law, Cardozo recognized in a remarkable passage of reflective self-criticism, was "the instrument by which society represses conduct which awakens fear of such intensity as to make tolerance impossible."[44]  Law also dealt, he added, with "our wishes, the counterpart of our fears."[45]  The repression of fear-inducing conduct, the realization of wishes—these goals could seem the playthings of changing crowd emotions. But Cardozo did not despair of "rationalizing" fears and wishes.[46]  He used "rationalizing" in a good sense. He meant understanding the principles that governed them.[47]

In this ultimately Spinozistic ambition, he never faltered. It was in this spirit that he helped the Restatements which would "bring certainty and order out of the wilderness of precedent."[48]  In this spirit he spoke on "Values" to the graduating class of the Jewish Institute of Religion, assuring them that, though not orthodox, he believed in "certain values transcending the physical and temporal."[49]

The analogy which formed the heart of "Values" was the astronomy of Tycho Brahe, the Dane who came after Copernicus and

[42] See L.S. FEUER, SPINOZA AND THE RISE OF LIBERALISM 84-85 (1958) for a discussion of Spinoza's "intellectual love of God" as the acceptance of determinism.

[43] Letter from Oliver W. Holmes to Charles E. Hughes, noted in M.J. PUSEY, CHARLES EVANS HUGHES 287 (1951). See also Rogat, The Judge as Spectator, 31 U. CHI. L. REV. 231, 236 (1964) for some penetrating remarks on Holmes.

[44] Address by Benjamin N. Cardozo, St. John's University School of Law (1928), reprinted in 13 ST. JOHN'S L. REV. at 231, 239-40 (1939).

[45] Id.

[46] Id. at 240.

[47] Spinoza discusses "the strong man" who "strives before all things to conceive things as they really are and to remove the hindrances to true knowledge, such as are hatred, anger, envy. . . ." B. SPINOZA, ETHICS, IV, PROPOSITION 73, Scholion in THE CHIEF WORKS OF BENEDICT DE SPINOZA 2, 236 (G. Bell & Sons edition 1883, reprinted in R.H.M. Elwes trans. 1955).

[48] B. CARDOZO, THE GROWTH OF THE LAW 1 (1924).

[49] Address by Benjamin N. Cardozo, Jewish Institute of Religion, Commencement (May 24, 1931), reprinted in SELECTED WRITINGS, supra note 15, at 1, 1.

instructed Kepler and who sought to set in their place a thousand stars. Although Cardozo read Brahe's story as "the submergence of self in the pursuit of an ideal,"[50] his choice of a scientist as exemplar was not casual. His faith, the faith that has to underlie conscientious devotion to the pursuit of principle, was voiced by Brahe in the poem which Cardozo used as the vehicle for his reflections:

> You and I
> Have watched too many constant stars to
> dream
> That heaven or earth, the destinies of men
> Or nations, are the sport of chance.[51]

To find principle in judicial decisions may seem the work of Sisyphus to some, but Cardozo undertook the work with faith that principle could be found.

Why did principle so often indicate deference to the legislature? It is misleading, I think, to say it was Cardozo's modesty. No more than Holmes did he convey a sense of underestimating his own intellectual abilities. It is perhaps not so misleading to say that deference to the legislature represented an economical solution to the question where the judicial hierophant was to find "the aspirations and convictions and philosophies" of the people of his day.[52]  If a judge was not to embark on survey research—Cardozo implicitly rejected the possibility[53]—where else could these ideas be more democratically ascertained? If a judge was not merely to project his own convictions—Cardozo firmly rejected this course: "in such matters, the thing that counts is not what I believe to be right"[54]—what more objective standard could he find? In judging the limits of the legislature's power, "the personal element," he wrote, "should have little, if any, sway."[55]  The legislature was "chosen from the body of the people."[56]  It could be inferred to express the people's values.

This distribution of authority presented an analogy with the distribution of authority between judge and jury. In formulating the test which Cardozo was to employ, Holmes had written:

---

[50] Id. at 4.

[51] ALFRED NOYES, WATCHERS OF THE SKY 88-89 (1922).

[52] B. CARDOZO, JUDICIAL PROCESS, supra note 33, at 173.

[53] "[T]he thought to be appraised and heeded is not the hasty or unconsidered impression of the crowd. . . . We do not strike an average between the thoughts of ability and folly." B. CARDOZO, THE PARADOXES OF LEGAL SCIENCE 50-51 (1928) (footnotes omitted) [hereinafter cited as PARADOXES].

[54] B. CARDOZO, JUDICIAL PROCESS, supra note 33, at 89.

[55] Id. at 90.

[56] B. CARDOZO, PARADOXES, supra note 53, at 121.

Compendium_Cornell
Page 1478

> I think that the word liberty in the Fourteenth Amendment is perverted when it is held to prevent the natural outcome of a dominant opinion unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law.[57]

As negligence could be determined by a prudent man, so could constitutionality. The common law standard of the reasonable man was transplanted to constitutional law. While remaining an analogy not an equation, this transposition was attractive to a common law judge. In *The Nature of the Judicial Process* Cardozo adopted the same kind of language. In "marking the limits of the individual's immunities," a judge was to use an "objective standard." What was to count for the judge was what he "may reasonably believe that some other man of normal intellect and conscience might reasonably look upon as right."[58]

Holmes and Cardozo prescinded from investigating how the legislative result was reached. Neither would have been surprised to be told that legislation was often the outcome of the conflict of interest groups, with the dominant group imposing its will or consenting to a compromise. The outcome was to be respected by the judge unless it went beyond reason.

Such a test appears, at first sight, to be heavily weighted in favor of any challenged legislation. If a judge approaches his task with empathy, he should be able to see 99.9 percent of the time that the legislators might reasonably have thought their legislation right. Unless one assumes a priori that legislators are numbskulls or rascals, one would expect to find them regularly as rational as the judges reviewing them. True, Cardozo did find one California statute so irrational that it was invalid under the due process clause. But this statute had implemented a referendum passed in the heat of anti-Japanese emotion. The underlying assumption was that the state would only prosecute persons of oriental physiognomy. Accordingly, where California merely alleged criminal ownership of land by an alien and proved the defendant was a landowner, the burden fell on the defendant to prove his citizenship.[59] Analytically, the statute said that, in such cases, ownership of land equaled proof of alienage. Few statutes presented such arbitrary equivalences between one fact and another fact and could be so readily pronounced irrational.

---

[57] Lochner v. New York, 198 U.S. 45, 75 (1905) (dissenting opinion).
[58] B. CARDOZO, JUDICIAL PROCESS, *supra* note 33, at 88.
[59] Morrison v. California, 291 U.S. 82 (1934).

Most of the time in constitutional law cases, "reasonableness" was not a matter of sanity or logic; it was a matter of values. The question was whether the value preferences of the legislature passed muster. Holmes' formula had captured this dimension by referring explicitly to "a rational and fair man." Cardozo made the same point explicit by referring to a "normal conscience" and to what some other person would think "right." Rightness here, as in the analogous common law negligence cases, was a mix of rationality and moral values.

Putting the reviewing court in a position not far different from that of a judge vis-a-vis a jury, with the extra latitude given by specific reference to conscience, Cardozo gave ample scope for finding legislation invalid. He enlarged the judge's scope in *The Paradoxes of Legal Science* by acknowledging the existence of a "higher" or "natural" law in a secular, evolutionary sense. The goal of that higher law was "the free development of personality." It could be used as a "test" of the validity of legislative changes.[60] Pursued in its implications, this analysis seemed to invest the judge with full power to nullify all law which failed to conform to an evolving ideal of the human person.

Cardozo cut off these implications in several ways. He acknowledged that there were many times when there were "no legislative pronouncements to give direction to the judge's reading of the book of life and manners." The judge must then try empathetically to estimate the values of others and, if confused, to "look within himself."[61] But such introspection was to occur only rarely. Judicial review was an extraordinary power. It was not to be "cheapened and made odious." It was to be exercised only in "true emergencies."[62] Second, the higher law was not normally to be discovered by the judge's abstract reasoning or personal introspection. As Holmes' formula had tied notions of fairness to "the traditions of our people and our law," so Cardozo spoke of natural law "within the limits of national tradition."[63] If fidelity to the Constitution did not demand exegesis of the Founders' intentions, it did necessitate attention to the practices always accepted as American. In the California conscientious objectors' case, Cardozo emphasized the custom, found from colonial days forward, of requiring even from conscientious objectors

---

[60] B. CARDOZO, PARADOXES, *supra* note 53, at 121-22.
[61] *Id.* at 55.
[62] *Id.* at 121-24.
[63] *Id.* at 122, 122-23.

the performance of acts "indirectly related to service in the camp or field"; the practice was his warrant for upholding the value system which required military science to be studied at the university.[64] Third, he looked on judicial review as it was employed in the America of his day—a response to legislation and usually to legislation embodying economic regulation. Judicial review was not thought of as itself the initiator of social change, still less as its mighty engine. Change came from the lawmakers. The courts decided whether the change met the constitutional test. The judges looked to see whether the legislators had brought about "a cataclysmic rupture of the existing legal order." The judges' perception of values overrode the law "to forbid change, change revolutionary in the suddenness of its onset and the extent of its upheaval."[65] Cardozo did not contemplate the case where the judge himself might be taxed as a revolutionary.[66]

Above all, he resolutely refused to accept what may be called "the libertarian gambit." The gambit invites the judge to focus on the plight of the poor unfortunate before him opposed by the might of the state, to take into account his environment and his heredity, his age, his experience of prison, his lack of love, his susceptibility to impulse, his subjection to habit, his inability to act other than he has. "To understand all is to pardon all." The communal values protected by the criminal law are forgotten in absorbed attention to the prisoner. Once the gambit is accepted, a judge can always find reasons to reverse a conviction.

Cardozo's clearest refusal to follow such a course, presaging his opinion in *Palko v. Connecticut*, came in *Snyder v. Massachusetts*.[67] Three men robbed a gas station in Somerville, shooting the attendant dead. One turned state's evidence and named Herman Snyder as the man who had pulled the trigger. Snyder denied that he had been the executioner; his counsel tried to show he was mentally unbalanced; he was convicted of murder in the first degree.[68] The case was appealed to the Supreme Court on the ground that he had been denied due process of law at his trial: the jury had been taken to view the gas station with counsel present but not the defendant himself. Affirming the sentence that sent Snyder to death, Cardozo explicitly

---

[64] Hamilton v. Regents of the Univ. of Cal., 293 U.S. 245, 267 (1934) (Cardozo, J., concurring).

[65] B. CARDOZO, PARADOXES, *supra* note 53, at 121; "upheaval" in original, here corrected to "upheaval."

[66] *See* Noonan, *The Supreme Court and the Family*, 23 CATH. U.L. REV. 255 (1973) for an analysis of such cases in one area of law.

[67] 291 U.S. 97 (1934).

[68] Commonwealth v. Snyder, 282 Mass. 401, 420-21, 185 N.E. 376, 382-83 (1933).

reminded his readers that justice required a balance: "We are to keep the balance true." In a single lapidary sentence he stated his commitment to the community: "But justice, though due to the accused, is due to the accuser also."[69]

The libertarian, however, could press, "Is there justice without authority? By what authority does the state take the life of any individual? Is it because 'the state' is many and the individual one? Does multitude give authority? Is power authority? Is the might of an organized mass more virtuous than the gunman's hand on the trigger? Does that organized mass' fear give it authority? Is its fear different from the parolee's instinctive dread of the police? Or will the state allege its necessity? Does necessity confer authority? Does not the fleeing burglar also kill because he must? By what warrant does the state use its power, still its fears, meet its necessities by taking life?" Cardozo did not address these questions directly. He was aware that they were there: "Once turn into the fields and you will hardly stir a step in the solution of a novel problem, in particular a problem in the domain of public law, without finding yourself face to face with questions that are ultimate."[70]   Whenever in the name of law one is compelled to follow another's will, the ultimate question is, "By what authority?" The question looms largest when the law gives one person the right to take another's life. The question disturbs the foundations of secular liberalism, and the disturbance is reduced, not removed, when the death penalty is eliminated so that one's dominion over another is not so absolutely asserted.

Matthew Arnold, Cardozo wrote as a college student, proposed a system of morals which failed "to supply any adequate ground for obligation." He added, "Perhaps the weakness is an organic one to any scientific theory of morality."[71]  The correlative of an inadequate ground for obligation is an inadequate basis for authority. Cardozo himself subscribed to a "scientific theory of morality." He was prepared to act without more authority than the commission of the state.[72]  Admiring Arnold in his youthful essay, he preferred Newman[73]—not for his faith, but for his character. Unlike Arnold,

---

[69] Snyder v. Massachusetts, 291 U.S. 97, 122 (1934).

[70] Cardozo, *Mr. Justice Holmes*, 44 HARV. L. REV. 682, 684-85 (1931).

[71] B. Cardozo, *The Moral Element in Matthew Arnold* 1, 12 (unpublished paper in Cardozo Collection, Butler Library, Columbia University) [hereinafter cited as *Arnold*], a copy of which appears in a slightly different form in SELECTED WRITINGS, *supra* note 15, at 61, 66. To assist the reader, parallel citations to the Hall edition have been provided.

[72] "The state in commissioning its judges has commanded them to judge . . . ." B. CARDOZO, PARADOXES, *supra* note 53, at 17.

[73] John Henry Newman, the leader of the Oxford Movement, and later cardinal.

Newman could not be accused of "a lack of . . . the vigorous, the manly, a lack of sympathy with energy as energy."[74]   Cardozo knew the throbbing of the veins for action, for leaving an imprint on events; he wanted to play his part. If he were to do so, he could not stop to doubt. Sticking to the path, he knew what questions lay in the fields. His commitment to his communal task reflected an answer he never completely articulated.

"The author no longer says to you what he meant to say." These were Holmes' words, quoted by Cardozo in his essay on Holmes as "the great overlord" of the legal universe.[75]   But where for Holmes the epigram expressed an absolute, the impossibility of recapturing the structure in which an ancestor had thought, for Cardozo they acted more as admonition or reminder that words spoken in the past are not to be mechanically reiterated without attention to the circumstances of their utterance. He himself drew with great catholicity on the teachers of the past, from Plato to Mill.

With no one did he show more affinity intellectually—and, it may be surmised, temperamentally—than Benedict Spinoza, whose goal of "laboring to understand the actions of man," he found natural to quote as the highest form of praise.[76]   "We begin with Spinoza . . . ," he wrote explaining "liberty." Modern sociology and modern ethics had done little but elaborate Spinoza's "triumphant declaration of the power of mind."[77]   Which Spinoza, one might ask—the metaphysician and mystic whose intellectual love of God meant acceptance of necessity, or the active reformer and participant in the political life of Holland?[78]   The answer would be, both. To the extent that one free spirit can find comfort in the complex, not wholly reconcilable, not wholly consistent ideas of another, he found support in Spinoza. He responded to him, he did not copy him or swallow him whole. Twentieth century New York was not seventeenth century Amsterdam. Yet Spinoza was more than a source for apt quotations or literary gilding of his own ideas. Somewhere in the past he needed to find a spirit who, *mutatis mutandis*, had a vision of the

---

[74] B. Cardozo, *Arnold*, *supra* note 71, at 23-24, in SELECTED WRITINGS, *supra* note 15, at 73.

[75] Cardozo, *Mr. Justice Holmes*, *supra* note 70, at 691. *Compare* "One of the proofs that a word contains living thoughts is that it kills itself. So, I know, a priori that no one who wrote in the 16th, 17th, or 18th century will say the poignant thing I want." Letter from Oliver W. Holmes to Patrick Sheehan (July 17, 1909), *reprinted in* HOLMES-SHEEHAN CORRESPONDENCE at 27 (D. H. Burton ed. 1976).

[76] Cardozo, *Mr. Justice Holmes*, *supra* note 70, at 687.

[77] B. CARDOZO, PARADOXES, *supra* note 53, at 106-07.

[78] *See* Kolakowski, *The Two Eyes of Spinoza*, in SPINOZA 279, 293-94 (M. Greene ed. 1973).

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.18935   Page 64 of
715

universe he could share. More than anyone else Spinoza met that
need.

Not only did he share with Spinoza a Sephardic inheritance, a
religious independence, and a certain willingness to submit to the
way things are, he also shared with Spinoza a desire to make things
better through understanding them. The course he adopted in inter-
preting the Constitution had its parallel in Spinoza's approach to the
sacred texts which Spinoza had inherited. Just as Spinoza took the
hallowed concepts of theological tradition like "God," used them and
gave them new content, appropriate as he thought to a modern
mentality,[79] so Cardozo took the hallowed concepts of legal tradition,
used them, and gave them new content. Spinoza's evolving theologi-
cal categories became Cardozo's evolving constitutional immunities.
The central concept he used and remade in this way was "liberty,"
and the very choice of the concept as central was owed to Spinoza.

Men "have never contended with such acrimony; never yielded
to such fell passion and perpetrated such cold-blooded deeds of
cruelty as when they have succeeded in making governments their
patrons in matters of faith and doctrine and, with the approval of the
insensate multitude, have triumphed over their opponents."[80]  One
does not need to read Spinoza to reach this conclusion, but it is
Spinoza's passionate recognition of this human experience, coupled
with the philosophically calm claim that thought can never be cur-
tailed, that gives power to the *Tractatus Theologico-Politicus*. In
Spinoza's account: "[E]veryone by a supreme law of nature is master
of his own thoughts."[81] This ultimate reality must be reckoned with
by all governments. The "most disastrous consequences" follow to the
commonwealth which attempts to control thought or to control
speech; for speech, in Spinoza's view, is intimately joined to thought.
Indeed the aim of the state is liberty, but liberty of action must be
surrendered for the common good. What cannot be surrendered is
the single indivisible liberty "of thought and judging and speaking
civilly."[82]  A tyranny will encroach on this domain. In a free state,
"everyone is at liberty to think as he pleases and to say what he
thinks."[83]

---

[79] H. WOLFSON, 2 THE PHILOSOPHY OF SPINOZA 331-32, 345 (1st Schoken paperback ed.
1969). Wolfson expresses Spinoza's "work of rationalization" as saying to his opponents, "I see
no reason why I should not use your own formulae, but I must give them an interpretation of
my own." *Id.* vol. 1, at 22.

[80] B. SPINOZA, *TRACTATUS THEOLOGICO-POLITICUS* 349 (R. Willis trans. London 1862).

[81] *Id.* at 343.

[82] *Id.* at 345.

[83] *Id.* at 342. (The caption of chapter 20—capitals omitted).

Compendium_Cornell
Page 1484

Spinoza's philosophy can "be construed as a metaphysical justification of individualism in ethics and politics."[84] That reading seems forced, given Spinoza's submissiveness to the state in the order of action. At any rate unrestricted individualism is not what Cardozo found congenial in him: "The individual person," Cardozo wrote, "is the atom in the social structure. The atom does not exist in isolation. It combines with other atoms in response to a persistent instinct."[85] The social structure, specifically the state, had ends, in terms of which a judge struck balances. These balances were not compromises: "[T]here will be many situations in which one of the extremes will mark the course to be selected." The balance might "more accurately be described as a concordance"—Cardozo employed the medieval legal term derived from music to indicate a form determined by a purpose.[86] Where Spinoza put liberty as the state's ultimate purpose, Cardozo put "the development of the free personality." Where Spinoza made free thought and free speech central to liberty, so did Cardozo. Where Spinoza sought to put free thought and free speech beyond governmental control by invoking a metaphysic of nature, Cardozo invoked the Constitution.

### III.

Each case is unique. Each case is a type. In *The Paradoxes of Legal Science,* Cardozo accepted this conundrum as central to the administration of justice. A "wise eclecticism," he observed, takes both features of a case into account.[87] In *Palko v. Connecticut* the individual aspects of the case were dwarfed by the constitutional considerations. A captious critic might contend that very little of what Cardozo wrote had anything to do with Frank Palka's predicament.

In part this was because of the way Goldstein and Saden presented the case. They did not dwell on the crime or on Palka's personality. They did not allude to the testimony admitted on the retrial or to how Palka's two confessions were obtained; the day of *Miranda* warnings was distant;[88] what had shocked the Court in 1936 and led it to overturn murder convictions in Mississippi had been the suspension of one prisoner on a tree and the brutal whipping of several

---

[84] Hampshire, *Spinoza and the Idea of Freedom,* in SPINOZA, *supra* note 78, at 297, 316.
[85] B. CARDOZO, PARADOXES, *supra* note 53, at 86-87.
[86] *Id.* at 56. *Cf.* the classic work of Gratian, circa 1150, on the canon law, CONCORDIA DISCORDANTIUM CANONUM, in 1 CORPUS JURIS CANONICI (E. Friedberg ed. 1879).
[87] *Id.* at 8.
[88] Miranda v. Arizona, 384 U.S. 436 (1966).

defendants.[89]   Counsel did not attempt to weave into their argument against double jeopardy the evidence which the retrial let in. They pitched their case on a single principle, and although the facts of the crime were visible in the two opinions of the Supreme Court of Errors, and although the circumstances of Palka's confessions could be glimpsed through them, Cardozo followed counsel. The single small, irrelevant and poignant detail that Goldstein and Saden pointed out was that in the official reporting of the case Palka's name had been misspelled "Palko"; it was how the prosecution had believed his name was spelled and how he had been indicted. His true name was now called to the attention of the Court.[90]   Goldstein and Saden did not, however, pursue the point; the incorrect caption of the case in the Supreme Court was unchanged; and Cardozo found no need to acknowledge the correction because he wrote his entire opinion without a single reference to Frank Palka by name.

This supreme indifference to the identity of the defendant or "appellant," as he became in the opinion, reflected Cardozo's attention to the more general aspect of the case. The "sordid controversies of litigants," he believed, were "the stuff from which great and shining truths will ultimately be shaped."[91]   The sordid murder in Bridgeport became an opportunity to articulate his deepest convictions about constitutional adjudication.

If law were only a matter of imposing sanctions, if all courts did was to apply force in support of a rule, if results alone counted, Cardozo's keen and subtle disquisition would have been unnecessary. He could have been as laconic as Pierce Butler and written "Affirmed" as answer enough to "I dissent." The application of power, however, as Cardozo knew, was not the whole task of an American appellate judge. Thousands and thousands of written opinions, reasoning the law, were the overwhelming evidence to the contrary. He mocked the law review editors who judged only results with the ancient story of Apollo and Pan's contest on the lyre before Midas: when Midas awarded the palm to Pan, Apollo turned the judge's ears into those of an ass.[92]   Cardozo did not think his ears grew longer when such result-oriented critics wrote. He focused on showing the reasons by which the result was reached.

---

[89] *See* Brown v. Mississippi, 297 U.S. 278 (1936).

[90] Brief for Appellant, *supra* note 2, at 3.

[91] B. CARDOZO, JUDICIAL PROCESS, *supra* note 33, at 35.

[92] Address by Benjamin N. Cardozo, New York County Lawyers Association Annual Dinner (Dec. 17, 1931), *reprinted in* SELECTED WRITINGS, *supra* note 15, at 99, 100.

In doing this of course Cardozo was teaching, teaching as much or more than judging. He was explaining first to himself, then to his colleagues, then to the bench and the lawyers and the law professors and the law students, then to the public at large what the principles were which made law something different from the application of force by those with the power to use it.[93]

I have before me a copy of 22 *Pacific Reporter Second* (22 P.2d). It has in its front matter the names of a hundred judges of the courts of Arizona, California, Colorado, Idaho, Kansas, Montana, Nevada, New Mexico, Oklahoma, Oregon, Utah, Washington, and Wyoming, who were contemporaries of Cardozo and who were teachers too, for they wrote opinions. Not one of their names is remembered, not one is recognizable. I have before me Friedman and Israel's five volume *The Justices of the United States Supreme Court 1789-1969.*[94] It has the names of ninety-nine men who have been members of the Court. There, more names are known, though the majority have been as easily forgotten as those who labored and were reported in 22 P.2d. I have before me Paul Freund's casebook on constitutional law. In its biographical discussion of twenty-eight Justices, Cardozo is not mentioned; the implication is that he did not leave a sufficient imprint on constitutional law to warrant discussion.[95] Yet as a judge Cardozo is in the small company of those who shine for us with great brightness. He is in the company of Marshall, Holmes, Brandeis. Are the qualities which make him remarkable, which lift him beyond the forgotten names of 22 P.2d and most of the remembered names in Freund, qualities which appear in his work only as the expositor of statutes and as the creator of rules of common law? Has he no standing as a teacher of the Constitution?

By general agreement, Cardozo's opinion sustaining the constitutionality of sections of the Social Security Act in *Steward Machine Company v. Davis*[96] is still of importance. Historically, com-

---

[93] *See* Kaufman, *Benjamin Cardozo,* in THE JUSTICES OF THE UNITED STATES SUPREME COURT 1789-1969, 2287, 2294-96 (L. Friedman & F. Israel eds. 1969), where Andrew Kaufman contrasts Cardozo's teaching with Brandeis' because Cardozo refrained from the exposition of economics in which Brandeis engaged. No doubt Cardozo taught differently from Brandeis, but he taught nonetheless. Perhaps it is best said that they taught different subjects, and that Brandeis sometimes preached.

[94] THE JUSTICES OF THE UNITED STATES SUPREME COURT, 1789-1969 (L. Friedman & F. Israel eds. 1969).

[95] *See* P. FREUND, A. SUTHERLAND, M. HOWE, & E. BROWN, CONSTITUTIONAL LAW at XXXV-L (4th ed. 1977) [hereinafter cited as P. FREUND].

[96] 301 U.S. 548 (1937). The case is discussed in P. FREUND, *supra* note 95, at 262; G. GUNTHER, CONSTITUTIONAL LAW 251 (9th ed. 1975); W. LOCKHART, Y. KAMISAR & J. CHOPER, *supra* note 28, at 227.

Compendium_Cornell
Page 1487

ing in May 1937, after the series of decisions invalidating New Deal legislation, the Court-packing plan, and the enactment of the Judiciary Act of 1937, the opinion was one of several marking the end of the battle between Court and Administration.[97]  Socially, the scope given the federal government to influence and induce state action was the beginning of a massive expansion of federal power. Doctrinally, the case was without precedent as to the federal interest recognized and was contrary to recent precedent as to the inducement by which Congress could influence the states.[98]  The federal spending power became the basis of an expanding national government. *Steward Machine Company* began a new era in the life of the Court and the country.

Beneath the densely reasoned argument of the opinion in favor of the law's validity lay Cardozo's cherished principle on judicial deference to legislation. If this principle were all that he had established, applying it to federal legislation, his mark on constitutional development would be significant. The principle was Holmesian in origin: that does not detract from Cardozo's vindication of it. Wisdom, not novelty, is the test of judicial strength.[99]

That the principle is now so commonly accepted obscures, no doubt, the achievement; and that judicial deference is now limited and invoked only on behalf of economic, not social, regulation has given it the appearance of liberal prejudice rather than settled principle.[100]  Other opinions of Cardozo have suffered, equally or more, from the march of events past the problem he addressed. As to the power of the federal government under the commerce clause, Cardozo drew a line between interstate and intrastate business, which later developments were to obliterate. Read in retrospect, his words seem to be a fragile effort to preserve an ancient distinction.[101]  His similar line-drawing between permissible and impermissible state laws affecting imports in interstate commerce still stands as far as the

---

[97] *See* P. FREUND, *supra* note 95, at 260-62 for a discussion of the background to this case.

[98] In Steward Mach. Co. v. Davis, 301 U.S. 548, 592-93 (1937), Cardozo distinguished rather than overruled the precedent, United States v. Butler, 297 U.S. 1 (1936).

[99] *Compare* Cardozo on Arnold: "I for one, am impatient when I hear it urged against him that his message was not new. It is a shallow estimate that would gauge the greatness of men solely by the novelty of the truths they may proclaim." B. Cardozo, *Arnold, supra* note 71, at 26, in SELECTED WRITINGS, *supra* note 15, at 75.

[100] *Compare* Dandridge v. Williams, 397 U.S. 471, 477 (1970) (upholding state legislation establishing a ceiling on welfare benefits) *with* Planned Parenthood v. Danforth, 428 U.S. 52 (1976) (invalidating state legislation regulating the method of abortion and requiring parental consent for abortions on minor children).

[101] *Compare* Schechter Poultry Corp. v. United States, 295 U.S. 495, 551 (1935) (Cardozo, J., concurring) *with* Maryland v. Wirtz, 392 U.S. 183 (1968).

importation of milk is concerned;[102] yet the general economic sense of the line he drew has been persuasively criticized and it is not clear how the state use tax he upheld differed economically from the price legislation he invalidated.[103]

But it is in the field of civil rights that Cardozo seems to have been not merely bypassed by events, but rejected. Applying the fourteenth amendment to racial discrimination, he thought it unconstitutional for Texas to empower the Democratic Party's state executive committee to exclude whom it chose from the primaries, when the committee excluded Blacks;[104] but he joined a unanimous Court in finding no unconstitutionality when, taking up a distinction he himself had offered, the Texas Democratic Party in convention excluded Blacks.[105]  Here, as with the commerce clause power and the immunity of interstate commerce from local discrimination, Cardozo had set up a distinction which required almost case by case analysis by the Court. The impatient dynamisms the Court was asked to modulate would not submit to this close monitoring. Must we conclude that, a common law judge par excellence, Cardozo applied common law technique to political issues unfitted for such careful measurement?

Voting with the majority to find due process lacking when the accused lacked counsel[106] and when the accused was subjected to police torture to obtain a confession,[107] Cardozo was ordinarily cautious in letting the constitutional rights of the individual prevail over the interests of the community. As a state judge interpreting a state immunity statute as co-extensive with the privilege against self-incrimination, he found no objection to compelling a lawyer to incriminate himself under a grant of immunity from criminal penalty and then disbarring him on the basis of his testimony.[108]  As a Justice of the Supreme Court he observed—gratuitously it might be said, since the case being decided was *Palko*—that there were students of the law who thought the privilege itself "a mischief rather than a benefit."[109]  For a quarter of a century the Supreme Court had kept evidence illegally obtained from being offered in a federal

---

[102] Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935), *followed in* Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361 (1964).

[103] *Compare* Henneford v. Silas Mason Co., 300 U.S. 577 (1937) *with* Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935). *See* Kaufman, *supra* note 93.

[104] *See* Nixon v. Condon, 286 U.S. 73, 88 (1932).

[105] *See* Grovey v. Townsend, 295 U.S. 45 (1935).

[106] *See* Powell v. Alabama, 287 U.S. 45 (1932).

[107] *See* Brown v. Mississippi, 297 U.S. 278 (1936).

[108] *See In re* Rouss, 221 N.Y. 81, 116 N.E. 782 (1917), *cert. denied*, 246 U.S. 661 (1918).

[109] 302 U.S. at 325.

Compendium_Cornell
Page 1489

trial.[110]  When he came to consider the same issue in 1926 in New
York, he observed that the fourth amendment did not bind the states;
he reasoned that protection for the individual had to be balanced
against "the social need that crime be repressed"; he held that the
state could use a blackjack, seized by police in an illegal search, to
prove the defendant had possessed a criminal weapon.[111]  To free
speech he showed more tenderness; he concurred in Cuthbert
Pound's dissenting opinion in *People v. Gitlow*[112] where the defend-
ant was convicted of criminal anarchy for distributing a manifesto
calling for political strikes to bring about militant revolution; and he
wrote the dissent on procedural grounds when Georgia convicted a
defendant of insurrection for using revolutionary language.[113]  But
even the vindication of free speech he confined to limited channels.
When Arthur Garfield Hayes sought habeas corpus for a Socialist
jailed in New York for speaking without a municipal permit, Cardozo
wrote a concurrence in the judgment denying the petition.[114]  The
mayor had declared "he would grant no further permits for Socialist
meetings while he was mayor" before the petitioner had gone ahead
and spoken.[115]  The ordinance, Cardozo wrote, was not unconstitu-
tional on its face; a trial must test whether it was abusively
applied.[116]

After the New Deal Court, after the Warren Court, how few of
these decisions are vital precedent! The fate which overtook his views
on state action in party primaries and the constitutional status of the
privilege against self-incrimination and the governing law in illegally
obtained evidence was to overtake, twenty-two years later, his actual
holding in *Palko*. Overruling him, Thurgood Marshall quoted William
Brennan's description of the approach favored by Cardozo as "a
watered down subjective version of the individual guarantees of the
Bill of Rights," and drew only John Harlan's protest at this injustice
to one of "this Court's truly great decisions."[117]

---

[110] *See* Weeks v. United States, 232 U.S. 383 (1914).

[111] People v. Defore, 242 N.Y. 13, 150 N.E. 585, *cert. denied*, 270 U.S. 657 (1926). *Contra*,
Mapp v. Ohio, 367 U.S. 643 (1961).

[112] People v. Gitlow, 234 N.Y. 132, 154, 136 N.E. 317, 326 (1922), *aff'd*, 268 U.S. 652 (1925)
(dissenting opinion).

[113] Herndon v. Georgia, 295 U.S. 441 (1935) (Cardozo, J., dissenting).

[114] People *ex rel.* Doyle v. Atwell, 232 N.Y. 96, 103, 133 N.E. 364, 366 (1921), *appeal
dismissed*, 261 U.S. 570 (1923) (concurring opinion).

[115] People *ex rel.* Doyle v. Atwell, 197 A.D. 225, 227, 188 N.Y.S. 803, 804, *aff'd*, 232 N.Y.
96, 133 N.E. 364 (1921), *appeal dismissed*, 261 U.S. 570 (1923).

[116] 232 N.Y. at 103-04, 133 N.E. at 366-67.

[117] *See* Benton v. Maryland, 395 U.S. 784, 794 (1968), for Marshall's quotation. For Harlan's
reply, see *id.* at 808 (dissenting opinion).

Discriminating between different civil liberties, discriminating between different pressures upon them, Cardozo was a member of the Court as it began to develop a consciousness of responsibility as guardian of personal freedom. Beginnings must be more tentative than mature positions. Advance would not have been made at all if not made molecularly. Inheritors, indebted to the beginnings and the advances, cannot afford to sneer at those who made them. Ironically, the Justices who spoke slightingly of a "subjective" reading of the fourteenth amendment were the very ones to create their own content for due process, unrelated to the Bill of Rights, and far more the product of subjective wishes than anything Cardozo's closely controlled interpretation of American tradition would have countenanced.[118]

Cardozo would scarcely have been surprised at Marshall's or Brennan's scorn, or thought that his educational enterprise had been a failure. As a young man, full of the grave candor and shrewd insight of the precocious, he had written of Matthew Arnold, "I cannot doubt that criticism *will* show, if it has not already shown, much of his philosophy to be false and much of his theology fantastic." He had continued, "I am sure that it will be many a day before we shall cease to need his lesson of a clear vision and a lofty soul, and many will be the day before we shall find a teacher so just and wise and truthful to instill it."[119]  Was reference to the intangible realm of the spirit a kind of anticipatory defeatism, a concession that the spirit could accomplish nothing lasting in the earthly world? When Cardozo wrote on Arnold was he, like Spinoza, preparing "a reliable anodyne for the defeat of political and personal hopes which was always on the horizon?"[120]  Materialists may think so. But those who respond to the spirit of another will think that no more permanent and no more valuable legacy could be left than a voice which still speaks "heart to heart."[121]  Cardozo would have been content with a judgment on his own work such as he made on Arnold's. It was not to cry "sour grapes" to hope for it. It is now his due. What he taught was not precisely himself—the idiosyncrasies of personality are ironed out of his opinions—but neither was it specific doctrine. The lesson given

---

G. GUNTHER, *supra* note 96, at 509-12, sets out much of the *Palko* opinion. Having used it in the main introductory case in the first three editions of the book, Lockhart, Kamisar and Choper now merely note it. *See* W. LOCKHART, Y. KAMISAR & J. CHOPER, *supra* note 28, at 569; Freund drops the case altogether. *See* P. FREUND, *supra* note 95.

[118] *See, e.g.,* Roe v. Wade, 410 U.S. 113 (1973); Eisenstadt v. Baird, 405 U.S. 438 (1972).

[119] B. Cardozo, *Arnold, supra* note 71, at 26-27, in SELECTED WRITINGS, *supra* note 15, at 75. I correct "install" to "instill" and "day" to "days."

[120] L.S. FEUER, *supra* note 42, at 85.

[121] *Cor ad cor loquitur,* the motto adopted by John Henry Newman.

was how a human spirit addresses great problems with resolution, with ideals, without much self-deception intersecting with the occasion offered.

## IV.

Writing for the Court in *Palko v. Connecticut*, Cardozo brought together his devotion to "a rationalizing principle which gives to discrete instances a proper order and coherence"[122] and his commitment to communal values. The principle which should govern fourteenth amendment cases, stated already in *The Paradoxes of Legal Science*,[123] was evident to him. It was the principle of the *Tractatus Theologico-Politicus*. It was "the meaning, the essential implication of liberty itself," or, equivalently phrased, what was "implicit in the concept of ordered liberty."[124]

At the center of the concept of liberty he put "freedom of thought, and speech."[125]  The comma must be a misprint. The idea is Spinoza's. The freedom of thought and speech is unitary. Cardozo introduced this freedom with the phrase "for illustration." But it was fundamental for him. A sentence later he was declaring, "Of this freedom one may say that it is the matrix, the indispensable condition of nearly every other form of liberty." He then set out two instances where the Court had given a substantive meaning to due process. Each was a case where free speech had been protected.[126]  "Due process" also comprehended fair procedure—he invoked the leading cases—but due process itself he understood in subordination to liberty. "Fundamental too in the concept of due process, and so in that of liberty," he wrote, "is the thought that condemnation shall be rendered only after trial."[127]  He put it as though it was through the concept of liberty that due process acquired vitality as a constitutional norm.

Even where death was the penalty Cardozo put the defect of due process under the rubric of deprivation of liberty.[128]  "Is not life the

---

[122] 302 U.S. at 325.
[123] B. Cardozo, Paradoxes, *supra* note 53, at 96-107.
[124] 302 U.S. at 326.
[125] *Id.*
[126] DeJonge v. Oregon, 299 U.S. 353 (1937); Near v. Minnesota *ex rel.* Olson, 283 U.S. 697 (1931).
[127] 302 U.S. at 327.
[128] *Id.*

indispensable matrix of my liberty?" a man about to be electrocuted might be heard to mutter. "Free speech, a free press, peaceable assembly, the aid of counsel and just compensation for property are of little value to a dead man" was how Frank Palka's lawyers actually put it.[129]   Cardozo, however, understood values in communal terms. Communally, the liberty of free speech stood above the right to individual life. His unfolding of this hierarchy of values as the Constitution's was emphasized by his doing it in a capital case.

In the climactic paragraph of *Palko v. Connecticut* Cardozo faced at last whether the state statute permitting Frank Palka's retrial violated the fourteenth amendment. His criterion was ordered liberty. He asked if the statute had subjected the appellant to "a hardship so acute and shocking that our polity will not endure it." He asked if the statute offended those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." He observed that the statute had made "no seismic innovation."[130]   He had already observed that "right-minded men"—and the principal right-minded man referred to was Holmes—had found retrial to correct error constitutional.[131]   He had already remarked that right thinking men did not believe they were favoring "a practice repugnant to the conscience of mankind."[132]   He held the statute valid. Mindful always of the justice due to the accuser in order that the balance be kept true, he ended: "The edifice of justice stands, its symmetry, to many, greater than before."[133]

In April of the following year, as Cardozo himself was dying, Frank Palka sought again a stay of execution. His petition reached the Supreme Court and was denied.[134]   He was left to undergo, some spring morning before dawn, the fate he had inflicted at midnight on Thomas Kearney and Wilfred Walker. Acting his part in the constitutional distribution of authority, Cardozo had let the community vindicate its officers.

---

[129] Brief for Appellant, *supra* note 2, at 46.

[130] 302 U.S. at 328.

[131] *Id.* at 323.

[132] *Id.* Cardozo was referring to the dissents in Kepner v. United States, 195 U.S. 100 (1904).

[133] 302 U.S. at 328.

[134] N.Y. Times, April 12, 1938, at 15, col. 1.



A State of Legislatures

Author(s): William J. Novak

Source: *Polity*, Jul., 2008, Vol. 40, No. 3 (Jul., 2008), pp. 340–347

Published by: The University of Chicago Press on behalf of the Northeastern Political Science Association

Stable URL: https://www.jstor.org/stable/40213482

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Northeastern Political Science Association* and *The University of Chicago Press* are collaborating with JSTOR to digitize, preserve and extend access to *Polity*

This content downloaded from
130.182.4ff:ffff:ffff:ffff on Thu, 01 Jan 1976 12:34:56 UTC
All use subject to https://about.jstor.org/terms

Polity • Volume 40, Number 3 • July 2008

© 2008 Northeastern Political Science Association 0032-3497/08 $30.00
www.palgrave-journals.com/polity

# A State of Legislatures

**William J. Novak**
University of Chicago

*Polity* (2008) **40**, 340–347. doi:10.1057/pol.2008.6; published online 5 May 2008

Keywords   *state; legislature; legislation; politics; law; regulation*

The history of the early American state has long been dominated by two overarching assumptions. The first is that prior to the revolution in governance precipitated by the Civil War, the early American state was exceptionally "weak," politically immature, institutionally fragmented, and organizationally diffuse. The second assumption is that precisely because of this comparative state under-development, courts and judges emerged as uniquely important and active policymakers in the United States.

The historiographical roots of these two assumptions are as deep as they are diverse, from the overt anti-statism of Cold War-era American historiography to the rapid growth of the field of American legal history.[1] But, perhaps unintentionally, it was Stephen Skowronek's influential and oft-repeated description of the early American polity as a "state of courts and parties" that firmly cemented the two assumptions together in a powerful paradigm of early American political development. Although Skowronek's primary research in *Building a New American State* focused on post-1877 developments and he tried to distinguish his notion of a "*sense* of statelessness" from *actual* statelessness or anti-statism, Skowronek's vocabulary of "exceptionalism," "incoherence," "limitation," "patchwork," "weak springs," and a "hapless giant" helped create a rather crimped chronicle of an early American state ultimately hobbled by "an outmoded judicial discipline."[2]

---

1. On Cold War historiography, see Arthur M. Schlesinger, Sr., *Paths to the Present* (Boston: Houghton Mifflin Company, 1964); Louis Hartz, *The Liberal Tradition in America: An Interpretation of American Political Thought since the Revolution* (New York: Harcourt Brace Jovanovich, 1955); Daniel J. Boorstin, *The Genius of American Politics* (Chicago: Chicago University Press, 1958); John Higham, "Changing Paradigms: The Collapse of Consensus History," *Journal of American History* 76 (1989): 460–66. On the new legal history, see James Willard Hurst, *Law and the Conditions of Freedom in the Nineteenth-Century United States* (Madison: University of Wisconsin Press, 1956); Morton J. Horwitz, *The Transformation of American Law, 1780–1860* (Cambridge: Harvard University Press, 1977); and Christopher L. Tomlins, "Law: The Modality of Rule," in *Law, Labor, and Ideology in the Early American Republic*, ed. Tomlins (New York: Cambridge University Press, 1993), 19–13.

2. Stephen Skowronek, *Building a New American State: The Expansion of National Administrative Capacities, 1877–1920* (New York: Cambridge University Press, 1982), 5, 19, 287.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:44:15 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1495

Recent developments in several fields, however, pose some serious problems for both of these key assumptions. In history, political science, and law, scholars have begun to take a new look at the early American state, and have found it to be anything but "weak."[3] The work of Max Edling on the founding of a fiscal-military state, Jerry Mashaw on the early roots of American administration, Richard John on the Post Office and communications regulation, Richard White on Indian removal and westward expansion, Michele Landis Dauber on federal emergency relief, Colleen Dunlavy on American railroad regulation, Mark Wilson on governmental procurement, along with many other revisionist investigations, portray an early American state far more centralized, organized, interventionist, active, and expansive than accounted for in earlier historiography.[4] Almost simultaneously, a new wave of scholarship in law and jurisprudence has begun to seriously question the court-, case-, and judge-centered nature of most treatments of American law. The work of Jeremy Waldron, Bill Eskridge, and Larry Kramer, among others, argues that previous scholarship on law has fetishized courts and judges and radically understated the role of other creative lawmakers in the American tradition, particularly legislatures, administrative agencies, and the people themselves.[5] In search of early American law and the state, such scholarship recommends that we look past courts and parties to the elaborate machinery of legal governance embedded in statutes, ordinances, by-laws, administrative rules and regulations, and constitutional conventions.

Taking cues from these two recent revisions, I would like to suggest that the history of the early American state would benefit enormously from a reconsideration of the pivotal governmental role of early American legislatures.

---

3. I pursue this theme in more detail in a forthcoming article, "The Myth of the 'Weak' American State." Also see, Richard R. John, "Governmental Institutions as Agents of Change: Rethinking American Political Development in the Early Republic," *Studies in American Political Development*, 11 (1997): 347–80.

4. Max M. Edling, *A Revolution in Favor of Government: Origins of the U.S. Constitution and the Making of the American State* (New York: Oxford University Press, 2003); Jerry L. Mashaw, "Recovering American Administrative Law: Federalist Foundations, 1787–1801," *Yale Law Journal* 115 (2006): 1256–1344; Richard R. John, *Spreading the News: The American Postal System from Franklin to Morse* (Cambridge: Harvard University Press, 1995); Richard White, *"It's Your Misfortune and None of My Own": A New History of the American West* (Norman: University of Oklahoma Press, 1991); Michele Landis Dauber, *The Sympathetic State: Disaster Relief and the Origins of the American Welfare State* (Chicago: University of Chicago Press, forthcoming); Colleen A. Dunlavy, *Politics and Industrialization: Early Railroads in the United States and Prussia* (Princeton: Princeton University Press, 1994); Mark R. Wilson, *The Business of Civil War: Military Mobilization and the State, 1861–1865* (Baltimore: Johns Hopkins University Press, 2006); William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (Chapel Hill: North Carolina University Press, 1996).

5. See for example, Jeremy Waldron, *The Dignity of Legislation* (Cambridge: Cambridge University Press, 1999); William N. Eskridge, Jr., Philip P. Frickey, and Elizabeth Garrett, eds., *Cases and Materials on Legislation: Statutes and the Creation of Public Policy* (St. Paul: West Publishing Co., 2001); Larry Kramer, *The People Themselves: Popular Constitutionalism and Judicial Review* (New York: Oxford University Press, 2004).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:44:15 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1496

Just as, until recently, the study of legislation and legislatures has been neglected in legal scholarship, American history has been remarkably inattentive to the legislature.[6] This is particularly puzzling and troubling given the centrality of representative government, the people's house, popular assemblies, and local councils and conventions to the history of American democracy. The first and longest Article of the U.S. Constitution, after all, concerns the legislative power.

The neglect of the legislature and legislation in the history of the American state is not hard to explain. Studying the messy, diverse, and complicated inputs and outputs of sprawling American legislative processes is less attractive than studying the clean lines of the American presidential synthesis with captivating political and intellectual figures like Washington, Jefferson, Madison, and Jackson. Just as such towering subjects produce diaries, letters, and speeches, American courts also yield wonderfully accessible literary opinions that allow historians to smoothly synthesize the influence of the Marshall Court or the Taney Court on the development of public policy. Moreover, as Jeremy Waldron has suggested, there seems to be something more dignified, more unitary, and more rational about judicial and presidential decision making when compared to the noisy and combative interest-peddling, horse-trading, and log-rolling of legislative processes.[7]

This bias against and neglect of the legislature in the history of the American state is unfortunate for two reasons. First, the long struggle to extract truly popular and representative legislative power from the long shadow of monarchical executive authority is one of the great stories of Anglo-American history.[8] Second, legislatures were absolutely central to the growth and development of the American state, arguably more central than either courts or parties.

Once one begins to actively look for them, legislatures, legislation, and legislative-like organizations and processes quickly start to dominate early American history. Indeed, the coming together of people in representative assemblies of almost every sort to produce petitions, declarations, constitutions, amendments, statutes, rules, ordinances, and by-laws seems to be the very essence of early American governance and statecraft. A great chain of legislation, ordinary as well as extraordinary, stretches from colonial town meetings to revolutionary committees of correspondence to the Continental Congress to the first Congress of the United States to active state legislatures and municipal

---

6. Two important recent exceptions are the work of Julian E. Zelizer, *On Capitol Hill: The Struggle to Reform Congress and Its Consequences, 1948–2000* (New York: Cambridge University Press, 2004) and David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801* (Chicago: University of Chicago Press, 1997).

7. Waldron, *Dignity of Legislation.*

8. Edmund S. Morgan, *Inventing the People: The Rise of Popular Sovereignty in England and America* (New York: W.W. Norton & Co., 1988).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:44:15 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1497

councils to the Southern state secession conventions that preceded the formation of the Congress of the Confederate States. Writing a history of early American law and statecraft that leaves out legislatures and legislation is something like writing a history of the Civil War that leaves out slavery. Legislation was at the very center of early American governance.

While a full reconsideration of the role of the legislature in early American history is beyond the scope of this short essay, the quick survey that follows attempts to highlight three key features of the early American legislative state: (a) the extraordinary breadth and variety of early legislation; (b) the links between substantive legislation, a robust police power, and a strong regulatory tradition in early American statecraft; and (c) the interconnections between formal legislatures and other lesser legislating bodies that allowed for a high degree of coordination, standardization, and integration in the early American state irrespective of court action or party politics.

A penchant for legislating grew up cheek by jowl with early American habits of local and popular self-government. A key provision in the twenty-eight major colonial territorial grants, patents, and charters that directed the colonial settlement of British North America involved the formal delegation of a modicum of self-governing authority to various councils or assemblies.[9] The Mayflower Compact, the Fundamental Orders of Connecticut, and the Massachusetts Body of Liberties inaugurated a distinguished and persistent American tradition of governance centered around the power of assemblies of people "to enact, constitute and frame such just and equal Laws, Ordinances, Acts, Constitutions and Offices, from time to time, as shall be thought most meet and convenient for the general good."[10] The road to the First Continental Congress was well prepared by long practice and familiarity with diverse legislative processes from the expansive substantive legislation of local town meetings to the revolutionary petitions of committees of correspondence to the formal declarations of right of the Stamp Act Congress. It was no accident that one of the first priorities of the Continental Congress in drawing up the 1774 Declaration of Rights and Grievances was to assert that "the foundation of English liberty, and of all free government, is a right in the people to participate in their legislative council."[11] Although it has become all too common in a certain style of legal-constitutional

---

9. Charles M. Andrews, *The Colonial Period of American History,* 2nd edn., 3 vols. (New Haven: Yale University Press, 1964); Francis Newton Thorpe, *The Federal and State Constitutions, Colonial Charters, and other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America* (Washington, DC: Government Printing Office, 1909); Christopher L. Tomlins, "The Legal Cartography of Colonization, the Legal Polyphony of Settlement: English Intrusions on the American Mainland in the Seventeenth Century," *Law and Social Inquiry* 26 (2001): 315–74, 333.

10. The Mayflower Compact.

11. Declaration of Rights and Grievances (1774); Jack N. Rakove, *The Beginnings of National Politics: An Interpretive History of the Continental Congress* (New York: Knopf, 1979).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:44:15 UTC
All use subject to https://about.jstor.org/terms

344   **POLITY FORUM: STATE OF LEGISLATURES**

writing to insist (rather anti-democratically) upon the preeminence of courts and judges in the protection of rights and liberties, the historical record suggests alternatively that almost all of the great declarations of rights (old as well as new) have been the product of assemblies, councils, legislatures, and conventions.

But while legislation and legislatures were central to both colonial and revolutionary era governance, the great era of legislative activism and invention lay in the early republic and antebellum period. The precedent was set with the extraordinary output of the First Congress of the United States, 1789–1791. Something of a "continuing constitutional convention" in action, the first Congress exemplified the power of legislation to shape the nation. In addition to setting up the major executive departments as well as the federal judiciary, establishing its own rules and procedures, and proposing new amendments to the U.S. Constitution itself, the first Congress passed a slew of important statutes that set up the conditions for two centuries of future governmental policymaking. Among other things, these statutes established a regular system of taxation and a national census, provided for the common defense and the conduct of foreign affairs, created a national bank and post office, governed relations between the states and with native Americans, administered territorial governance and the permanent seat of government, and regulated naturalization, patents, copyrights, pensions, lighthouses, the coasting trade, merchant seamen, public lands, and federal crimes.[12] Although courts, parties, and administrative agencies and offices were important in the development of the early American state, it is important to remember the original legislative power that preceded and frequently invented them. The first Congress created the Department of Foreign Affairs, The Department of War, the Treasury Department, and the Judicial Courts of the United States. The first federal case in the U.S. was heard by a special committee of the Continental Congress.[13]

Early American state legislatures were not slow to follow Congress's national example. Indeed, in terms of substantive policymaking, state legislators were even more active, expansive, and detailed than their congressional counterparts. One area of particular legislative energy and statutory activity concerned the states' police power, "the inherent plenary power of a State . . . to prescribe regulations to preserve and promote the public safety, health, and morals, and to prohibit all things hurtful to the comfort and welfare of society."[14] As a number of

---

12. For an excellent overview, see David Currie, *The Constitution in Congress: Federalist Period* (Chicago: University of Chicago Press, 1997), 3–4.

13. "Case of the Schooner Thistle", 5 *Journals of the Continental Congress* 631 (1776); Sidney Teiser, "The Genesis of the Supreme Court," *Virginia Law Review* 25 (1939): 398–421.

14. Lewis Hockheimer, "Police Power," *Central Law Journal* 44 (1897): 158. Or as Ernst Freund defined the power in the most authoritative treatise on the topic: "The power of promoting the public welfare by restraining and regulating the use of liberty and property." Freund, *The Police Power: Public Policy and Constitutional Rights* (Chicago, Callaghan & Co., 1904), iii.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:44:15 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1499

historians have now established, the range and reach of early American state police power regulation was far more extensive than previously acknowledged.[15] The early statute books of nearly every state legislature swelled with a proliferation of remarkably similar police power regulations governing almost all aspects of social and economic life, from laws regulating public morals (e.g., blasphemy laws, Sunday laws, liquor regulations) to laws regulating public economy (e.g., inspection laws, licensing laws, public market regulations) to laws regulating in the interest of public health (e.g., noxious trades, cemetery regulations, quarantine laws) to laws regulating in the interest of public safety (fire codes, gunpowder regulations, and firearms regulations). Such statutes were essential building blocks of the early American state.

One aspect of legislative police power that made it such an important part of early American statecraft was the degree to which it was capable of being delegated downwards to cities, towns, villages, and a host of other subsidiary civil associations. One of the major activities of early American legislatures, after all, was the establishment of literally thousands of subordinate law-making bodies and associations, from formal municipal corporations to special governmental districts to charitable and benevolent associations.[16] Such delegations of power allowed for a simultaneous distribution and integration of governmental authority frequently overlooked in histories of the American state. Indeed, in some cases, the formal governmental linkages extended all the way from top to bottom, from the national legislature to local municipal council.

In 1802, for example, President Thomas Jefferson, Speaker of the House Nathaniel Macon, and President of the Senate Abraham Baldwin signed the charter of incorporation of the city of Washington. There the United States Congress delegated to local city officials a broad spectrum of regulatory police powers just like those delegated by state legislatures to a myriad of other cities, towns, and villages across the country:

To establish a Board of Health, with competent authority to enforce its regulations, and
to establish such other regulations as may be necessary to prevent the introduction of contagious diseases, and for the preservation of the health of the city;

---

15. See for example, Leonard W. Levy, *The Law of the Commonwealth and Chief Justice Shaw: The Evolution of American Law, 1830–1860* (Cambridge: Harvard University Press, 1957); Harry N. Scheiber, "Public Rights and the Rule of Law in American Legal History," *California Law Review* 72 (1984): 217; and Novak, *The People's Welfare*.

16. Between 1789 and 1865, for example, Connecticut passed over 3,000 so-called "special" acts incorporating and policing associations ranging from academies and churches to railroad and highway companies to towns and villages. For a more detailed discussion, see William J. Novak, "The American Law of Association: The Legal-Political Construction of Civil Society," *Studies in American Political Development* 15 (2001): 163–88.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:44:15 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1500

to prevent and remove nuisances;

to establish the navigation of the Potomac and Anacostia rivers adjoining the city;

to erect, repair, and regulate public wharves, and to deepen creeks, docks, and basins;

to regulate the manner of erecting, and the rates of wharfage at private wharves;

to regulate the stationing, anchorage, and mooring of vessels;

to provide for licensing, taxing, and regulating auctions, retailers, ordinaries, and taverns, hackney carriages, wagons, carts, and drays, pawn-brokers, venders of lottery tickets, money-changers, and hawkers and peddlers;

to provide for licensing, taxing, regulating, or restraining theatrical or public shows and amusements;

to restrain or prohibit tippling-houses, lotteries, and all kinds of gaming;

to regulate and establish markets;

to erect and repair bridges;

to open and keep in repair streets, avenues, lanes, alleys, drains, and sewers, agreeably to the plan of the city;

to supply the city with water;

to provide for the safekeeping of the standard weights and measures as fixed by Congress, and for the regulation of all weights and measures used in the city;

to regulate the sweeping of chimneys, and thus to fix the rates and fees

to provide for the prevention and extinguishment of fires;

to regulate the size of bricks to be made or used and provide for the inspection of lumber and other building materials to be sold in the city;

to regulate, with the approbation of the President of the United States, the manner of erecting, and the materials to be used in the erection of houses;

to regulate the inspection of tobacco, flour, butter, and lard, in casks or boxes, and salted provisions;

the storage of gunpowder, and all naval and military stores not the property of the United States;

and the weight and the quality of bread;

to impose and appropriate fines, penalties, and forfeitures, for the breach of their laws or ordinances; and

to provide for the appointment of inspectors, constables, and other officers as may be necessary to execute the laws of the Corporation.[17]

Like other nineteenth-century municipalities, the City of Washington did not hesitate to use such broad grants of regulatory authority. Washington's first four Councils (1803–1806) immediately enacted a host of ordinances regulating

---

17. *Charter of the City of Washington, Being the Act of Incorporation, and the Acts Supplementary to and Amendatory of, and in Continuation of the Same, Passed by the Congress of the United States* (Washington, DC: 1859), 8–9.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:44:15 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1501

markets; the size of bricks; the weighing of hay, straw, and fodder; hackney carriages, theatrical and other public amusements; poor, infirm, and diseased persons; the cording of fire-wood; the repairing of pumps; weights and measures; fire buckets; peddlers and ordinary keepers; the keeping of carriages and billiard tables; the measuring of coal; nuisances; the inspection and measurement of lumber; fairs; the inspection of flour; auctions; the weight and quality of bread; and ferries.[18] The sweeping compass and careful detail of these regulations were duplicated a thousand-fold across the many jurisdictions of early nineteenth-century America, legal testament to the extensive power of legislative action in the early American state.

Of course, the congressional charter of the city of Washington and the ordinances of its first councils are but a single, simple example of the way in which legislation linked the disparate institutions that constituted the early American state. Yet already in this legislative charter and in these by-laws, one gets a glimpse of an early American state that was not exceptionally weak or especially dependent on courts or parties to implement or integrate policy. The enormous output of early American legislatures, from the United States Congress to state assemblies to municipal councils and beyond, stands instead as an impressive and unrivaled record of governmental activism and coordination. Although political histories of early America are dominated by presidents, chief justices, and national elections, it is the institution of the legislature in all its guises that demands more scholarly attention. In this democratic nation, it would be strange indeed, for the legislature, the people's house and the popular assembly, to not come first in our histories of law, politics, and the American state.

---

18. *Acts of the Corporation of the City of Washington Passed by the First Council* (Washington, DC, 1803); *Acts of the Corporation of the City of Washington Passed by the Second Council* (Washington, DC, 1804); *Acts of the Corporation of the City of Washington Passed by the Third Council* (Washington, DC, 1805); *Acts of the Corporation of the City of Washington Passed by the Fourth Council* (Washington, DC, 1806).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:44:15 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1502

**45 Hastings L.J. 1061**

**Hastings Law Journal**
April 1994
William J. Novak [a]

Copyright (c) 1994 Hastings College of the Law; William J. Novak

# COMMON REGULATION: LEGAL ORIGINS OF STATE POWER IN AMERICA

## Introduction

As the lone historian participating in this Symposium, I am obliged to turn attention to historical antecedents and the broader context of modern constitutional adjudication. At an earlier point in our jurisprudential history, such a move would have been superfluous, not anomalous. In the early twentieth century, American constitutional commentary was dominated by historically-minded social thinkers like James Bradley Thayer, Edward S. Corwin, and Thomas Reed Powell. A thorough grounding in constitutional history was a prerequisite to almost all discussions of constitutional law and theory.

Since World War II, however, the role of historical knowledge and method in constitutional thought has deteriorated, replaced by a steady string of distinctly antihistorical perspectives: the legal process of Henry Hart and Albert Sacks, the neutral principles of Herbert Wechsler, the judicial craftsmanship of Alexander Bickel, the original understanding of Robert Bork, the law and economics of Richard Posner, the neo-Kantian rights theories of John Rawls and Ronald Dworkin, and ultimately the 'law of rules' of Antonin Scalia, which serves as a backdrop to this Symposium. [1] Given some of the disturbing conclusions **\*1062** and policies generated by these 'time-less' constitutionalisms (from Bickel's defense of federalism and critique of Brown in an era of civil rights crisis [2] to Posner's similarly ill-timed attack on federal AIDS spending [3]), it is a propitious moment to reconsider the virtues of a historical approach to American constitutional law. [4]

**\*1063** The two pillars of the historical craft are sequence and context. Historians study change over time, and embrace the complex interconnectedness of social developments. As a rule, historians challenge timeless universalisms, ideologies that deny or disguise their contingent and human origins ( e.g., the doctrine of natural law). By paying close attention to sequence -- by giving ideas, individuals, institutions, and events worldly histories -- historians battle reification and transcendence, the tendency of every established order to produce 'the naturalization of its own arbitrariness.' [5] Similarly, historians tend to eschew reductionist and overly determined models for divining essences and filtering out least common denominators ( e.g., notions like political or economic man), in favor of a methodology that emphasizes the interrelatedness of economic, political, social, and legal phenomena. As Willard Hurst noted, 'The content and energy which patterns of behavior and ideas, feelings, and events impart to men's lives are conditioned by the fact that these elements do not exist as isolated entities. They coexist and interact.' [6] For historians, nothing human is timeless or autonomous. Such a perspective is especially useful when approaching something as embedded in history, politics, and social life as American constitutional law.

These anti-foundational and anti-essentialist premises have led some historians to talk about modern historical practice as an inherently destabilizing and subversive enterprise, a counter to the universalism of rationalist forms of apologetics. [7] The classic example of such a critical use of history is C. Vann Woodward's The Strange Career of Jim Crow. Through his historical recovery of a relatively flexible moment in post-Reconstruction race relations, Woodward challenged the then-universal tenet that the roots of segregation lay in deep, unalterable Southern mores. [8] Applied to law, Robert Gordon has argued **\*1064** that historicism, defined as 'the recognition of the historical and cultural contingency of law, ' is a 'perpetual threat' to mainstream legal scholarship and its on-going effort to rationalize, justify, and institutionalize current legal doctrine and practice. [9]

Other philosophers, social scientists, and legal scholars have taken 'the historical turn' less for its intrinsic critical bite than as an alternative to the excessive empiricism, positivism, and scientism of current academic discussions of society and policy. James Kloppenberg has refined the notion of a pragmatic 'historical sensibility' that incorporates a more interpretive and hermeneutic approach to knowledge. The patron saint of that perspective is Wilhem Dilthey who argued, 'The development of historical consciousness destroys faith in the universal validity of any philosophy which attempts to express world order cogently through a system of concepts.' [10]  In place of universal and apodictic philosophies, Dilthey advocated a more skeptical, humanistic, and open-ended approach to the cultural sciences that recognized 'meaning and significance arise only in man and his history.' [11] Though the focus of an enormous body of theoretical  **\*1065**  literature and an intellectual debate as old as the separation of nomos and physis, the gist of the historical sensibility is captured in a distinction Sheldon Wolin drew between political science and political wisdom:

The antithesis between political wisdom and political science basically concerns two different forms of knowledge. The scientific form represents the search for rigorous formulations which are logically consistent and empirically testable. As a form, it has the qualities of compactness, manipulability, and relative independence of context. Political wisdom . . . presents a contrast with the scientific type. Its mode of activity is not so much the style of the search as of reflection. It is mindful of logic, but more so of the incoherence and contradictoriness of experience. For the same reason, it is distrustful of rigor. Political life does not yield its significance to terse hypotheses, but is elusive, and hence meaningful statements about it often have to be allusive and intimative. Context becomes supremely important, for actions and events occur in no other setting. Knowledge of this type tends, therefore, to be suggestive and illuminative rather than explicit and determinate. [12]

Fittingly, Wolin recommends the study of history, institutions, law, and past political theories as central to political wisdom. In this Article, I would like to take up Wolin's recommendation and urge a historical re-turn in American constitutional thought on the premise that the late twentieth century might be in need of less constitutional science and more constitutional wisdom.

## I. Liberal Constitutionalism

A fitting place to begin such an enterprise is with a historical critique of the reigning paradigm of modern constitutional law -- liberal constitutionalism. That paradigm is the source of the current obsession  **\*1066**  with the public-private distinction and the judicial balancing test that spawned this Symposium. While self-evident to the modern lawyer, Justice Scalia's constitutional proposition that private right and public value might be as incommensurable as the length of a line and the weight of a rock [13] strikes a historian as novel, problematic, and in need of a healthy dose of historicism.

Scalia's Carrollian metaphor constitutionally enshrines one particular way of breaking up and looking at the world -- a way that has come to represent the essence of modern liberal [14] constitutionalism. That perspective interprets the world in terms of a harsh, overarching separation of the private and the public, the individual and the state. [15]  The dichotomy is total and the two are often conceived of as intrinsically antagonistic, as in Herbert Spencer's The Man Versus the State. [16]  Public powers, when confined to their legitimate and proper sphere, are absolute and plenary. Private rights when correctly delineated are inviolate and determinative. Judges obtain their distinctive political authority in the American regime precisely because they are the ultimate arbiters of these fundamental constitutional boundaries. The balancing test -- the careful drawing and re-drawing of the line between public values and individual rights -- has become the sine qua non of the judicial role. [17]  Duncan Kennedy has described it as the  **\*1067**  fundamental legitimating ideology behind the liberal rule of law. [18]  To legal scholars these observations have the status of cant. They are taken for granted as matter-of-factly representing the way that constitutional jurisprudence is, should be, and always has been practiced. For those who have passed through the looking-glass of modern legal education, the public-private distinction and judicial balancing are as natural, neutral, and necessary as 'We The People . . .' itself. [19]

 **\*1068**  The historian's job is to challenge this misconception. Far from being either natural, necessary, or the way things have been from time out of mind, the public-private antinomy and judicial balancing are surprisingly recent and contingent human creations, social constructions of a particular historical moment. Liberal constitutionalism is a modern legal invention, the culmination of a complex and important set of social and political struggles. How we conceptualize the historical emergence of liberal constitutionalism -- how we frame its original sequence and context -- has enormous consequences for the way we think about judicial power, constitutional interpretation, and the supposed irreconcilability of public values and private rights.

Compendium_Cornell
Page 1504

As expected, the dominant, assumed version of American constitutional history is remarkably conducive to the liberal bifurcation of public and private, powers and rights. It offers comfort and legitimacy to the liberal legal order by providing it with deep, consensual roots in the American past. Though examples are legion, the father of this perspective is Edward S. Corwin. [20] In a series of authoritative articles in the early twentieth century, Corwin reduced the essence of American constitutionalism to a triumvirate of sacred doctrines: vested rights, judicial review, and due process. Those doctrines were rooted in a higher law tradition as old as western civilization that happily realized its telos in the hands of the Founders, John Marshall, and Joseph Story. [21] From that tradition flowed the principledness and rightness of American constitutionalism's 'basic doctrine' of shielding private rights from legislative attack via a powerful, independent judiciary. Of course, definitions of private right and legislative power changed significantly from the nineteenth to the twentieth century. Private right grew from a narrow, propertied conception to modern notions of personal liberty and civil rights. The locus of public power **1069** shifted from the states to the federal government. But for Corwin and his progeny, constitutionalism remained consistently dedicated to drawing and re-drawing the line between public and private, power and right, political sovereignty and fundamental law, protecting the latter from the former. That was the tradition, Carl Swisher noted, 'from Demosthenes to Calvin Coolidge and beyond. ' Justice Scalia is only too clearly implicated in that 'beyond.'

In the following pages, I argue that this legitimationist view of constitutional history is flawed. [22] In contrast to its linear portrayal of an American constitutionalism, continuously devoted to the judicial delimitation and protection of a vital private sphere, I make the case for discontinuity and diversity. Despite some recent arguments to the contrary, American constitutional history from 1787 to 1937 is not reducible to the elaboration of a single doctrine or principle ( e.g., Jennifer Nedelsky's protection of property, Herbert Hovenkamp's advancement of classical economic theory, or Morton Horwitz's aggrandizement of legal and judicial power). [23] There have been several competing constitutionalisms in the American past. [24] The modern, liberal version is only the most recently ascendant. It did not evolve naturally out of eighteenth- and nineteenth-century ideas and practices, but overthrew and displaced them.

In a larger work-in-progress, I argue that the early nineteenth century was anything but the formative era of modern constitutionalism. Instead, it was home to understandings of public law, individual responsibility, and judicial role decidedly different from our own. A **1070** classic example of that foreignness is Massachusetts Chief Justice Lemuel Shaw's defense of legislative power in Commonwealth v. Alger:

We think it is a settled principle, growing out of the nature of well ordered civil society, that every holder of property . . . holds it under the implied liability that his use of it may be so regulated, that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this commonwealth . . . is derived directly or indirectly from the government, and held subject to those regulations, which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient. [25]

Shaw's references to 'the nature of well ordered civil society,' 'the rights of the community,' and 'social and conventional rights' of property clash sharply with common assumptions about the liberal, higher-law core of early American constitutionalism. They suggest instead the outlines of a different vision of law and society that governed public legal discourse and controversy well into the late nineteenth century; a vision that distinctly refused to separate public powers and private rights in favor of an over-arching notion of 'well-ordered' and 'well-regulated' community, in which liberties and powers, rights and duties were mutually interwoven. [26] Such ideas were dislodged by modern liberal ones only after a veritable constitutional and legal revolution.

A complete contextual and sequential refutation of the supposedly deep roots of liberal constitutionalism is beyond the scope of this Article. Let me narrow the task at hand in three ways. First, the analysis that follows is primarily synchronic. Before one can argue about the reasons for the rise of one regime (liberalism) and the demise of another (the well-regulated society), one must establish the distinctiveness of those regimes in the first place. Thus, my priority here is to illuminate 'the well-regulated society' as a coherent, alternative nineteenth-century constitutionalism, not to chart the transition to liberalism.

**1071** Secondly, I narrow the relevant context by paying particular attention to legal doctrine. Legal doctrine is important, and historians have staunchly defended a focus on treatise writers and appellate judges as an appropriate, relatively autonomous unit for legal-historical study. [27] Nonetheless, it is impossible to fully grasp the import of a common-law doctrine like overruling

Compendium_Cornell
Page 1505

necessity without taking into account the larger social context of early American urban life ( e.g., a propensity for catastrophic epidemics and fires). For the sake of brevity, however, such contexts will have to remain implicit.

Finally, and most importantly, the rest of this Article will focus solely on the nature of state power in nineteenth-century America (ignoring for the time-being the equally compelling question of nineteenth-century conceptions of rights). [28] In contrast to liberal assumptions about laissez-faire and the 'night-watchman,' or negative state, public power was alive and well in the nineteenth century. And it existed in public law as something more than a pragmatic, judicial counterbalance to individual rights. The phrase 'common regulation' is meant to capture both its presence and its distinctiveness. Let me unpack the meaning of this phrase by treating its two halves individually.

## II. Regulation

Despite a vast academic literature and constant public usage, 'regulation' defies close circumscription. Indeed, it is rarely dealt with as an independent concept. In its most general form -- controlling, directing, or governing by rules -- 'regulation' is almost useless as an analytical tool for deciphering and distinguishing forms of governmental action. It becomes synonymous with anything and everything **\*1072** government does. From that perspective, the Constitution, Northwest Ordinance, Sherman Antitrust Act, and NIRA are equal examples of public regulation. Yet more specific renderings of 'regulation' run the risk of anachronistically imposing modern constructions on an unsuspecting and diverse past. [29] Nevertheless, there are at least two models of regulation that serve as useful guides (or foils) in illuminating the character and historiographical significance of nineteenth-century public policymaking.

The first and most unsophisticated model of regulation -- the 'classical' model -- equates regulation with the state and counterposes the state to a free and private market (economic or social). More a general tendency in some scholarship than a clearly expressed position, this model thrives on the juxtaposition of ideal types: laissez-faire and the general welfare state, public and private, and the state and individual. Regulation is the artificial intervention of the state or the public realm in the autonomous happenings of private life ( i.e., interference with private property, the free market, or individual rights). [30] The sources of this approach to regulation are diverse, rooted in the dominant paradigms of American politics and economics: self-interested liberalism and the free market. Its fit with liberal constitutionalism should be apparent.

For our purposes, the most important aspect of the classical model is its historical dynamic. It is usually embedded in a narrative wherein the United States moves to regulation only after a nineteenth century characterized by laissez-faire, free enterprise, and a lack of governmental initiatives. [31] Examples of this perspective abound in some of the best recent work on the American state. Stephen Skowronek's much heralded study of public administration posits a 'sense of statelessness' that permeated early American political development. [32] **\*1073** A renaissance of work on the American state focuses almost exclusively on national authority, administrative agencies, and post-1887 development. [33] The implication is that public activity in the states, outside the 'fourth branch of government,' or before the Civil War, was insignificant.

Of course, this is not the only model of regulation in America, and its assumptions (historical and conceptual) have not gone uncontested. First, a vast historical literature, from the 'commonwealth studies' of Oscar and Mary Handlin and Louis Hartz to the legal histories of Willard Hurst, Leonard Levy, and Harry Scheiber, has subverted the conception of a nineteenth century devoid of state action. [34] Through detailed investigations of the policies of state legislatures, **\*1074** courts, and judges, these studies uncover a beehive of public activity before the Civil War, from state promotion of canals and railroads to public lands and eminent domain policies to experiments in mixed and public enterprises. Together, these studies thoroughly demolish the myth of laissez-faire and make it very difficult to insist on the 'statelessness' of early America.

The conceptual challenge to the classical model comes from a recognition that not all 'state interventions' are equal. A fundamental difference in kind separates the governmental activities of levying property taxes, distributing public lands, and prohibiting the sale of liquor or dangerous materials. Though perhaps always noticed, it took Ernst Freund's pioneering studies of law and legislation to clearly demarcate these distinctions for American lawyers and scholars. [35] Freund divided governmental power into four 'manifestations': justice, police, taxation, and management of public property and personnel. [36] Though all four contained residues of 'regulation' as rules and controls, Freund identified police as the power chiefly associated with the idea

Compendium_Cornell
Page 1506

of 'regulation.'[37] He defined police as the state's power to promote the public welfare through statutes and rules restraining and restricting 'the use of liberty and property.'[38] Freund labelled this regulatory authority the 'police power.'[39]

Freund's typology and definition of regulation are much more useful than the intervention-nonintervention model in evaluating public powers. And numerous historians and political scientists have been quick to borrow and elaborate his separation of governmental powers.  **\*1075**  Theodore Lowi is perhaps the most influential of Freund's embellishers.[40] Like Freund, Lowi advocated a stricter definition of regulation (or police power) as a particular kind of governmental activity involving restraints and restrictions on private conduct. Lowi used this notion to differentiate regulation from distributive and redistributive policies. In contrast to regulation, 'distributive' policies entailed the promotion of development by granting or giving away resources and privileges to individuals and groups. Public land policies as well as the fevered grants of corporate charters and franchises, tax exemptions, eminent domain privileges, and other immunities or subsidies in the early nineteenth century were perfect examples of distributive government.[41] Lowi used 'redistribution' to stand for the welfare policies of the post-New Deal years whereby resources were transferred on a grand scale from one social group to another.

Unfortunately, despite this closer scrutiny of kinds of governmental policies, the categories and definitions devised by Freund and Lowi did not challenge the periodization or basic story-line of the classical model and the laissez-faire historians. In place of the evolution from laissez-faire to state intervention and regulation, Freund and Lowi simply presented a nineteenth-century policy-making shift from distribution to regulation. Regulation remained a distinct product of the late nineteenth century. Lowi argued for the historical as well as functional distinction between distribution and regulation, distribution 'being almost the exclusive type of national domestic policy from 1789 until virtually 1890.'[42] In 1904, Freund similarly concluded, 'The law of the police power the essence of his concept of regulation is practically a growth of the last thirty or forty years.'[43]

The Freund-Lowi model of regulation remains the dominant interpretive paradigm of American political and constitutional history. The commonwealth studies, together with some of the new initiatives of legal historians, portray an early nineteenth century bustling with government activity but devoid of truly 'regulatory' state action. Rather, the emphasis of policy after the Revolution is on the 'opening up' of opportunities and the releasing of creative economic energies  **\*1076**  through policies best understood as 'distributive.'[44] Though these studies ably critique the laissez-faire theory of nineteenth-century government, they cling to the notion that regulation was rare before the Gilded Age. Richard L. McCormick has summed up a consensus about public power in the nineteenth century: 'Forever giving things away, governments were laggard in regulating the economic activities they subsidized. . . . 'Policy' was little more than the accumulation of isolated, individual choices, usually of a distributive nature.'[45]

The concept of 'common regulation' challenges this notion of a young America, free of serious regulatory effort. In contrast to liberal mythology, the early American Constitution was devoted to much more than the protection and distribution of natural rights and private privileges. Despite the gradual loosening of some feudal vestiges, like primogeniture and imprisonment for debt, public regulatory power remained an omnipresent factor in early nineteenth-century economic, political, and social life. Indeed, the portrait of a stateless America, characterized by patronage, bargain basement giveaways of natural and man-made ( i.e., charters, monopoly privileges, limited liability, etc.) resources, a 'paucity of planning,' and little restrictive regulation or oversight, is seriously challenged by a deluge of state and local legislation regulating economic and social life. Between 1781 and 1801, for example, the New York legislature passed special laws regulating lotteries; hawkers and peddlers; the firing of guns; usury; frauds; the buying and selling of offices; beggars and disorderly persons; rents and leases; firing woods; the destruction of deer; stray cattle and sheep; mines; ferries; apprentices and servants; bastards; idiots and lunatics; counsellors, attorneys and solicitors; travel, labor, or play on Sunday; cursing and swearing; drunkenness; the exportation of flaxseed; gaming; the inspection of lumber; dogs; the culling of staves and heading; debtors and creditors; the quarantining of ships; sales by public auction; stock jobbing; fisheries; the inspection of flour and meal; the practice of physic and surgery; the packing and inspection of beef and pork; sole leather; strong liquors, inns, and taverns; pot and pearl ashes; poor relief; highways; and quit rents.[46] Most of these regulations were passed while the legislature was also busy re-formulating the basic institutions and infrastructure of state government: elections, legislative sessions, courts, towns, sheriffs, the militia, basic  **\*1077**  criminal laws, weights and measures, land laws, banks, turnpikes, and bridges.

This regulatory pattern continued well into the nineteenth century. Like many states, Michigan revised its statutes in the late 1830s.[47] Under familiar titles and headings, the state organized its regulations of (a) highways, bridges, and ferries; (b) trade (including the inspection and regulation of beef, pork, butter, fish, flour and meal, leather, pot and pearl ashes, beer and ale,

and staves and heading; [48] the licensing and regulation of auctions; and weights and measures); (c) public health (including regulations for quarantines, the removal of nuisances, offensive trades, contaminated vessels, homes or buildings, the burial of the dead, travellers, boards of health, medical **\*1078** societies, physic, and surgery); (d) the internal police of the state (including regulations for paupers and the poor, disorderly persons, [49] taverns and other licensed houses, illegitimate children, Sunday observance, the law of the road and public carriages, the firing of woods and prairies, timber on water and land, lost goods and stray beasts, theatrical exhibitions and public shows, gunpowder, and unauthorized banking); and (e) corporations. In addition, separate criminal provisions helped restrain such conduct as obstructing highways, railroads or rivers; duelling, defrauding or cheating at common law; unlawfully assembling or rioting; the importing and selling of obscene books or prints; exciting disturbance at public meetings or elections; and selling corrupt or unwholesome provisions. [50]

In addition to these state regulations, municipalities were usually incorporated with ample powers to pass regulations of their own. A perfect example are the extensive 'police' powers granted to the city of Albany by the New York legislature. An 1826 statute haphazardly lumps together some of the regulatory powers of the common council for the 'more effectual suppression of vice and immorality' and 'for preserving peace and good order.' [51] Included are hundreds of regulatable offenses, actions, professions, and economic interests: forestalling; regrating; disorderly and gaming houses; billiard tables; combustible and dangerous materials; the use of lights and candles in livery or other stables; the construction of fireplaces, hearths, chimneys, stoves, and any other apparatus capable of causing fires; the gauging of all casks of liquids and liquors; the place and manner of selling hay, pickled and other fish; the forestalling of poultry, butter, **\*1079** and eggs; the purchase of wheat, corn, every kind of grain, and other articles of country produce, by 'runners'; the running of dogs; weights and measures; buildings; chimneys and chimney sweeps; roads; wharves and docks; the weighing and measuring of hay, fish, iron, cord wood, coal, grain, lime, and salt; markets; cartmen and porters; fires; highways and bridges; roof guards and railings; the selling of cakes and fruit; the paving or flagging of sidewalks; the assize and quality of bread; the running-at-large of horses, cows, or cattle; and vagrants, common mendicants, or street beggars. In addition, the legislature authorized Albany's common council 'to make all rules, by-laws, and regulations for the good order and government of the said city.' [52]

Lists such as these could be multiplied a hundredfold across the various jurisdictions of nineteenth-century America. Moreover, each item listed is more than likely the focus of scores of more particular regulations and specifications. [53] I have risked tiring the reader with **\*1080** extensive excerpts and inventories to physically confront regulation's absence in our historiography with the sheer weight of its presence in nineteenth-century law. My first theme is simple and unoriginal, but nonetheless important: Regulation was certainly there in the early nineteenth century.

### III. Common

If the 'regulation' in 'common regulation' draws us to the familiar in early nineteenth-century public policy, 'common' represents my attempt to emphasize its distinctive, foreign, and perhaps unrepresentable features. It is part of an effort to tell the tale of nineteenth-century constitutionalism from the inside out, from the past forward, emphasizing the concerns, ambitions, and technologies of public action central to nineteenth- rather than twentieth-century Americans. [54] This would seem to be an obvious historicist point, were not histories of public regulation in America plagued with an overwhelming tendency to read history backwards, with one eye ever cast on the forthcoming New Deal and welfare state. [55] Such a presentist **\*1081** orientation results in the neglect of the unfamiliar and the forcing of the familiar into anachronistic categories and frameworks. [56] Indeed, a prime reason why historians have had trouble recognizing or dealing with public power in the early republic is that it refuses to conform to modern expectations or understandings.

My second theme, then, is no more complex than the first: Though certainly there, early nineteenth-century regulation was different. It did not carry with it the same assumptions and intellectual baggage that energize contemporary regulatory policy. To get at this difference, we must hold our own conceptions of regulation, rights, and law at bay while sympathetically searching for the period's endemic definitions and orderings. By 'common regulation,' I hope to capture some of the special meanings and glosses that lay beneath early American efforts to regulate economy and society, and identify the peculiar vision that sets those efforts apart from modern liberal renderings. [57]

The modern law of regulation revolves around a distinctly constitutional construction of the state police power. The police power is envisioned as a judicially constructed balancing or 'reasonableness' test for determining when a regulatory statute passed by

Compendium_Cornell
Page 1508

an otherwise sovereign legislature conflicts with the specific requirements of the Constitution. The exercise becomes a mixture of logomachy, logic, statutory construction, comparative institutional choice, and modern constitutional 'science.' The modern approach is positivist (regulation is viewed simply as the will of a sovereign state) and instrumental **\*1082** (the police power is viewed as a tool for promoting and reconciling the external goals of politics, power, and policy). [58] The modern state police power is not seen as containing in and of itself any compelling aspirational, cultural, historical, or moral imperatives.

Common regulation is the product of a much different view of law and society. Traces of this larger perspective are evident in the very word 'common.' 'Common' was a constant ingredient in nineteenth-century political and legal discourse. Though still a rich word today, it was especially layered with meanings then. It was a synonym for 'public,' used to identify objects, goals, and traits of a general nature, belonging to the whole. It stressed those things shared rather than individually possessed, binding society and mankind together rather than pulling it apart. 'Common' rippled with larger notions of 'community,' 'ordinariness' (as in the Third Estate), 'intercourse' (as in 'communication' or 'communion'), and 'public goods' (as in 'the commons '). Even alone it resonated with hints of the ideas associated with some of its more famous couplings: 'common good,' 'common rights,' 'common people,' and 'common weal.' It was the central component of the English translation ('commonwealth') of the Latin res publica -- the source of our own 'republic.' [59] By 'common regulation' I hope not only to draw upon those potent sentiments swirling about the word 'common,' but to call particular attention to two distinct features of early American regulatory policy: its roots in the common-law and its vision of a commonwealth.

Common regulation was a product of the common-law vision of a well-regulated society. [60] The regulations listed above were not simply **\*1083** expressions of a plenary state power limited by and played off against written constitutional provisions. They were part and parcel of an older social vision that took seriously the historical sensibility of the common law and the aspirations of an ordered commonwealth. Regulation, like law, in the early republic was more than a reflection or instrument of power and interests (economic, political, social, or technological). A crucial element of common regulation was an intellectual persuasion that envisioned regulation (like law) as a moral exercise for the promotion of public happiness in the good society. Central to this perspective were (1) an adherence to the common law as an experiential yet flexible source of value and guidance; (2) an overriding concern with common, rather than private goods and interests; and (3) a commitment to the commonwealth as the guarantor of public happiness and the general welfare. Unlike the modern police power, the essence of common regulation lay in common-law obligations rather than constitutional limitations.

But common regulation is distinguished from modern regulation as much by its physical as its metaphysical characteristics. Whereas modern regulation can more or less succinctly point to the constitutional definition of the state police power as a source of legitimacy and authority, the roots of common regulation were more diverse. Far from flowing from one doctrine or some primitive equivalent of the police power, common regulation was really an amalgam of several different and sometimes competing traditions, doctrines, and practices.

### A. Colonial Experience

One of the more important of these traditions was perhaps tradition itself. Though this Article concerns itself with public policy after the Constitution was adopted, one of its goals is to dilute the customary historian's watershed marked by the years 1776-1787. Without question, early modern habits, customs, and rules influenced public policy well into the nineteenth century. And by all accounts, colonial American society was a well-regulated one. [61] Market regulations **\*1084** against forestalling, engrossing, and regrating passed undisturbed by Adam Smith, the Constitution, the Federalist Papers, and John Marshall from colonial statute books to the commentaries of Nathan Dane to the incorporation of Albany in the early nineteenth century. [62] Other patterns and practices of colonial regulation from sumptuary laws to mercantilist restrictions on commerce continued to find a place in nineteenth-century policymaking. One need only reflect on the long and varied history of 'Sabbath,' 'Sunday,' or 'blue' laws to make the case for the influence of tradition on regulatory policy. [63]

### B. Police

Other influences are less obvious and more specific. Not to be underestimated was the broad European conception of 'police' that began to emerge in the seventeenth and eighteenth centuries. Marc Raeff has recently probed the links between this notion and the rise of absolutism and the interventionist and regulatory Polizeistaat in Western and Central Europe. [64] 'Police' in this sense stood for something much grander than a municipal security force. It referred to the growing sense that the state had an

Compendium_Cornell
Page 1509

obligation not merely to maintain order and administer justice, but to aggressively foster 'the productive energies of society and provide the appropriate institutional framework for it.' [65] Other historians have found this strong notion of police animating public regulatory policy in Scotland and France. [66]

  **\*1085**  In America, 'police' stood for new efforts on behalf of a dynamic state to marshal resources and promote a well-ordered community devoted to the public happiness and public good. As Christopher Tomlins has definitively demonstrated, American lawyers and theorists were well-acquainted with Continental developments in the science of government. When Thomas Jefferson established the first law chair in North America at William and Mary, he dubbed it a chair of 'Law and Police.' [67] The whole concept of a well-regulated society articulated by a host of early American legal scholars meshed wonderfully with the larger goals and objectives underlying Continental understandings of 'police.' The 'police power' itself owes its etymology, if not its substantive applications, to notions of Polizei. But regulation in America also had more direct sources and vital traditions to draw on, not least of these the peculiar practices associated with regulatory law in England.

### C. Sovereign Prerogative

Closely linked to 'police' on the continent was the notion of the sovereign prerogative in England. The ' lex prerogativa' stood for that complex and varied set of rights, powers, and privileges belonging to the Crown as sovereign. Included in this bundle of prerogatives were powers (and obligations) to regulate and promote the domestic life of the kingdom. [68] Ernst Freund characterized this plenary sovereign power as the 'royal police power' -- the power lodged in the King (with council in Star Chamber) to control the internal police of **\*1086** the realm. [69] Even after 1688 and the rise of Parliamentary sovereignty, Blackstone could still envision a royal prerogative whereby the King was charged with an overarching, flexible responsibility for administering justice, conserving the peace, erecting corporations, and 'arbitrating' commerce. [70] Behind this prerogative lurked not only specific powers to regulate public markets or set up courts, but a residual sovereign power to do what was necessary to ensure the advantage of the public. Part of this is captured in Blackstone's conception of the kingdom as a 'well-governed family' with the King as master. [71] But as Joseph Chitty stressed in his 1820 treatise on the subject, 'The splendour, rights, and powers of the Crown were attached to it for the benefit of the people and not for the private gratification of the sovereign. ' [72] In theory at least, the royal prerogative stemmed from a public philosophy in which the object of government and law was the welfare of the people. [73] In Chitty's words, 'The prerogative is not the iron tie of unbridled power: it holds the subject in the silken chain of mild subjection, for the general and permanent welfare of society.' [74]

The sovereign prerogative in England has a long, complicated career that is essentially the story of English constitutional and parliamentary history. I can only suggest here the degree to which the notion of the sovereign as the locus of inherent and open-ended 'police powers' guaranteeing the common welfare remained a theme of American regulatory law well into the nineteenth century. On the constitutional level especially, conceptions of state sovereignty and state regulatory power moved hand-in-hand. In The License Cases, [75] Chief Justice Roger Taney defined the states' police power as 'nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions.' [76] New York Justice Andrews **\*1087** echoed in 1889 that the police power 'is but another name for that authority which resides in every sovereignty to pass all laws, for the internal regulation and government of the state, necessary for the public welfare.' [77]

But the English tradition of royal prerogative had a much greater effect than merely influencing American discussions of 'sovereignty.' Over and over again, the very entities controlled by royal prerogative became the focus of early American regulation. Matthew Hale's and Joseph Chitty's digests of seventeenth-century kingly powers look like compendiums of the major public policies of the early nineteenth century. These included public lands, franchises (corporations), game and forests, parks, fisheries, mines, fairs and markets), ports, monopolies, patents, marts and fairs, weights and measures, money, parens patriae, taxation, staples, prices, and highways. [78] Well into the late nineteenth century, American regulation in these areas continued to be directly influenced by the rationales and explanations supporting the notion of prerogative. [79]

### D. Legislative Authority

Compendium_Cornell
Page 1510

Just as crucial, yet ultimately as obscure as the relationship between sovereignty and regulation in the nineteenth century, is the complex link between regulation and changing conceptions of legislation. Sovereignty and legislation, of course, are closely related in American law. As Justice Andrews pointed out, the 'governmental powers vested in the sovereign in England have since our Revolution  **1088**  devolved on the legislatures of the states.' [80]  Roger Taney's discussion of sovereignty and police in The License Cases revolved exclusively around his conception of legislative authority. [81]  But though the 'police power' refers to a distinctly legislative power, the cross-fertilization between legislation and regulation is anything but straightforward. 'What is legislation?' remains the great underlying, unresolved problem of nineteenth-century jurisprudence. Though some historians have argued that post-Revolutionary state legislatures simply operated as modern, positivist and plenary law-making authorities (limited only by express constitutional limitations), I would like to make the case for a more problematic, ambiguous approach to legislation in early America. [82]  In particular, I would contend that the years before the Civil War marked a pre-positivist legislative moment where most jurists and political thinkers continued to resist a notion of law as simply the command or will of a sovereign legislature. Instead, they remained wedded to a more organic, fundamental legal tradition wherein even legislative power was conceived of and interpreted within a common-law framework.

Like its more famous anti-positivist neighbors constitutionalism and natural law, the common-law approach to legislation is to some extent rooted in the ancient English notion of 'fundamental law.' [83]  **1089**  In the fundamental law tradition, Parliament (like the early Massachusetts legislature) was viewed as a 'high' or 'general' court, not so much enacting its will as pronouncing judgments 'declaratory of the moral principles of the law.' [84]  Law and politics were suffused with ethics and religion. Public authority was not legitimate unless it conformed to principles of right and justice removed from simple questions of utility, power, or expediency. As Saint Augustine suggested, 'Without justice, what were kingdoms but great robberies.' [85]

Though this might sound like natural law (especially if one had to decipher divine rules or reify a Lockean social contract), the nineteenth-century American version was more historical and naturalistic. It fit roughly with the 'third way' charted between the extremes of positivism and natural law by theorists of a dynamic ancient constitutionalism in seventeenth-century England and the historical jurisprudence of nineteenth-century Germany. [86]  American commentators perceived legislation as derivative of, and secondary to, the higher objects of society; it had no meaning or authority outside of the 'plan by which the nation resolved to endeavor to obtain happiness.' [87]  That plan and object could not be captured once and for all in a written  **1090**  constitution, or a hypothesized state of nature, or an absolute entity like private property. Guidance on the many dimensions of this fundamental law was available only in the open-ended, living, experiential lessons of the common law. Though constitutions provided concrete limitations and express grants of authority, the common law remained the overarching interpretive schema through which jurists and legislators decided what, how, and why things could be done via statute.

Though this relationship between statute and common law may seem rather fuzzy, two things suggest that a common-law conception of legislation continued to predominate in the nineteenth century. First, a host of non-constitutional theoretical equivocations about legislative power suffused discussions of regulation, codification, judicial review, and statutory interpretation. Well into the late nineteenth century, commentators and theorists refused to accept a simple and closed definition of 'statutory law' as the command of the supreme power of the state. They continuously cited 'the will of the people,' 'constitutional conformity,' and subsequent interpretations by 'courts of justice' as definitional attributes of 'statute law.' Rather than seeing legislation as positivist, presentist 'will,' Joel Bishop argued in 1873, 'Every statute operates to modify something in the law which existed before. No statute is written, so to speak, upon a blank in the institutions of society. No such blank exists or can exist.' Consequently, 'no statute can be understood except by him who understands the prior law.' [88]  In other words, legislating was not unlike the traditional job of common-law courts -- adjusting, changing, and interpreting older law to meet changing conditions.

Secondly, the whole story of legislative regulation well into the late nineteenth century is replete with common-law methods, forms, strategies, and traditions. Had legislation simply been a matter of legislative will and constitutional limitations, there would have been no  **1091**  need for all this talk about sovereign prerogative, overruling necessity, salus populi, sic utere tuo, and the common law of nuisance. But legislation and regulation were not simply matters of will in the nineteenth century. They were pieces of a lingering common-law mind-set that pursued the public good and happiness not as a function of utility, expedience, gain, interest, or power, but in accordance with an organic fundamental law and morality embedded in common experience, reflected however imperfectly in the maxims, principles, and practices of the common law.

**E. Salus Populi, Overruling Necessity, Parens Patriae, and Sic Utere Tuo**

Besides being the general source for early American notions of police, sovereignty, legislation, and law, the common law contained specific doctrines that greatly influenced judicial constructions of common regulation. The most important of these was the maxim salus populi suprema lex est (the welfare of the people is the supreme law). [89] If one were forced to reduce the idea of a fundamental common law to a single doctrine, most likely it would be salus populi. [90] Whereas the Lockean social contract yielded fundamental natural private rights, the common-law notion of salus populi held that those rights were 'conventional,' subject to the 'higher law' of the common welfare.

Salus populi had many sources and expressions. The most abstract forms emanated from civil-law writers like Emmerich de Vattel, who based the legitimacy of all society and government on its ability to promote the general happiness of mankind. [91] American versions most often took the shape of Chancellor Kent's declaration that 'private interest must be made subservient to the general interest of the community.' Kent used this rationale to uphold governmental regulations of unwholesome trades, slaughter houses, gunpowder, cemeteries, and the like. As Justice Holmes accurately noted later, this **\*1092** doctrine was the foundation for the state police power. [92] Indeed, the salus populi maxim is most often encountered in appellate cases justifying state regulations that restrict private rights in the common interest.

The doctrine of overruling necessity flowed directly from the assumptions of salus populi and sovereign prerogative. If the common welfare and safety of society were the highest law, it followed that when the preservation of that society was at stake lesser rules and conventions gave way. In its most basic form, the law of overruling necessity was a social version of the law of self-defense. [93] American courts and commentators consistently referred to a line of English cases making it 'well settled at common law' that in cases of calamity ( e.g., fire, pestilence, or war) individual interests, rights, or injuries would not inhibit the preservation of the common weal. [94] Thus, private houses could be pulled down or bulwarks raised on private property without compensation when the safety and security of the many depended upon it. [95] As Thomas Cooley later reasoned, 'Here the individual **\*1093** is in no degree at fault, but his interest must yield to that 'necessity' which 'knows no law.'' The injury to the individual was damnum absque injuria (an injury without a remedy) under the reasoning that 'a private mischief shall be endured, rather than a public inconvenience.' [96]

But overruling necessity was more than a social self-defense mechanism. Early on, natural-law writers suggested the wider potential of the law of necessity. Thomas Rutherford argued that 'necessity sets property aside' -- things necessary 'continue in common.' [97] Like Grotius and Pufendorf, Rutherford contended that an extreme want of food or clothing justified theft. Property was relational, dependent on the common consent of all. No one could be assumed to have consented away the right to use another's property when self-preservation or social preservation were in jeopardy. Necessity revived a 'community of goods,' where all things were available to common use for common benefit. Though, as Blackstone made clear, civil-law ideas on theft never made their way into English common law, the broader conceptions of consent, conventional and relational property rights, the community of goods, and public necessity trumping private interest did. [98] These notions provided a more open-ended backdrop for defending legislative and sovereign prerogatives in cases of public need, beyond extreme cases of calamity. At least two commentators rooted the entire police power in 'the law of overruling necessity.' [99]

Though perhaps best known for its role in state regulation of the family and child custody, the parens patriae doctrine also affected American regulatory law across the spectrum. [100] Parens patriae was rooted in the sovereign prerogative. As Chitty put it:

 **\*1094** The king is in legal contemplation the guardian of his people, and in that amiable capacity is entitled . . . to take care of his subjects as are legally unable, on account of mental incapacity, whether it proceed from first nonage: second, idiocy: or third, lunacy: to take proper care of themselves and their property. [101]

Essentially, parens patriae conceived of the king or sovereign as parent. [102] But in addition to equipping the sovereign with specific powers to regulate and protect special classes of persons and institutions ( e.g., children, incompetents, charities), parens patriae operated metaphorically on common regulation in general.

Compendium_Cornell
Page 1512

The classic statement on the links between state and family is, of course, Robert Filmer's Patriarcha. [103] Despite John Locke's famous critique, [104] paternalism remained a compelling framework for jurists to elaborate theories of kingly or state power. Matthew Hale recognized only two types of government: natural and civil. Natural government entailed the relationship between parent and child from which civil (political and economic) government drew its model. [105] Blackstone was just as fond of the analogy. He defined 'public police and economy' as 'the due regulation and domestic order of the kingdom: whereby the individuals of the state, like members of a well-governed family, are bound in their general behaviour to conform to the rules of propriety, good neighbourhood, and good manners.' The king or sovereign was the head of this political family, with discretionary power to 'dispose,' 'order,' and regulate it. [106] This metaphorical equation of sovereignty and parenthood (or fatherhood, in this distinctly patriarchal society), rooted in the common law, was a pervasive factor in early nineteenth-century attempts to assess the boundaries of public power.

Finally, one of the most powerful doctrines shaping early American conceptions of public authority was the maxim sic utere tuo ut **1095** alienum non laedas (use your own so as not to injure another) of the common-law of nuisance. Ernst Freund captured the strong public potential of nuisance law when he dubbed it 'the common law of the police power, striking at all gross violations of health, safety, order, and morals.' [107] Public nuisance law provided the common-law foundation for common regulation. And 'nuisance' was hardly the timid regulatory instrument implied by some legal historians. [108] Declaring an activity or establishment a nuisance in the early nineteenth century unleashed the full power and authority of the early American state. Perhaps under no other circumstances could private property and liberty be as quickly and completely restrained or destroyed without a hint of compensation.

More importantly, by nineteenth-century standards, nuisance was not primarily a matter of technical, private law at all. Rather, the underlying sic utere tuo rationale of nuisance was a fundamental, public ordering principle of society. Horace Wood declared as late as 1875 that sic utere tuo was a 'well-established, and exceedingly comprehensive rule of the common law . . . which is the legal application of the gospel rule of doing unto others as we would that they should do unto us.' [109] Wood elaborated in terms echoing those of Chief Justice Shaw in Commonwealth v. Alger:

No man is at liberty to use his own without any reference to the health, comfort or reasonable enjoyment of like public or private rights by others. Every man gives up something of this absolute right of dominion and use of his own, to be regulated or restrained by law, so that others may not be hurt or hindered in the use or enjoyment of their property. This is the fundamental principle of all regulated civil communities, and without it society could hardly exist, except by the law of the strongest. [110]

Clearly there is more to nineteenth-century conceptions of public power than implied by liberal constitutionalism and its theorists and historians.


**1096  Conclusion**

These are just some of the traditions and doctrines that informed nineteenth-century conceptions of state regulatory power. Many more can be unearthed. But even this preliminary sketch suggests how different nineteenth-century assumptions about state power, public values, and private rights were from the taken-for-granted definitions and sequences of twentieth-century constitutionalism.

On the simplest level, the presence of extensive regulatory statutes and rationales like salus populi call into question the received historical wisdom bolstering liberal constitutionalism. In contrast to the classical, Corwin thesis, American constitutionalism has not been uniformly wedded to a single founding doctrine solicitous of private rights over public goods. The early republic, far from being the formative era of an on-going tradition of vested rights, due process, and judicial review, gave rise to potent constitutional renderings of the public powers of the state. When public welfare, happiness, and values were threatened, nineteenth-century jurists could summon powerful public legal doctrines and technologies to their defense. The nineteenth century was anything but the 'golden age' of individual right and laissez-faire celebrated by conservative jurists from the Progressive era to the present.

Compendium_Cornell
Page 1513

But the idea of common regulation implies more than the need to merely adjust our constitutional timeline, 'bringing the state back into' nineteenth-century public law. For such a revision could be easily tamed and absorbed into the master narrative of American constitutionalism, the emergence of liberalism and capitalism. Indeed, such a revision could be used to argue that full-blown judicial balancing of plenary public powers and absolute individual rights was coincident with the birth of the republic. Such a conclusion would be erroneous. For common regulation was predicated precisely on an unwillingness to separate out private from public interests, individual rights from larger social obligations. The notion of common regulation was based on a vision of a 'well-regulated' society, overtly hostile to the nominalistic conceptions of self-interest, possessive individualism, and competition at the heart of the liberal-capitalist version of our constitutional heritage. It represents a genuine historical alternative -- 'a world we have lost.'

The retrieval and reconstruction of this other American constitutionalism provides a contextual and critical perspective from which to assess contemporary constitutional doctrine. For one troubled by modern jurists' musings on the irreconcilability of public values and  **1097**  private rights in American constitutional law, it is helpful to know that theirs has not been the only way of breaking up, categorizing, and understanding American law and society. The legal-intellectual constructs of modern liberal constitutionalism are neither timeless nor autonomous. They are contingent and historical creations.

Similarly, the attempt to historicize and situate (sequentially and contextually) American constitutional law poses a sharp challenge to the presentist and teleological enterprise of tracing (or assuming) the roots of liberal jurisprudence through the deep recesses of the past to the wellsprings of Western civilization. For what this quick survey of nineteenth-century evidence suggests is that liberal legalism is primarily a twentieth-century convention not a pre-determined end of history. Consequently, it is perhaps time for constitutional scholars to abandon the endless post-war quest for a trans-historical Archimedean point (economic law or original position) on which to build a final, apolitical jurisprudentia liberalis and revive instead Justice Holmes's often-quoted (and more often ignored) legal-historical insight, 'The life of the law has not been logic: it has been experience.' [111]  In place of hubristic attempts to devise and implement a more perfect, scientific jurisprudence, we should look anew at the potential for constitutional wisdom attending historical perspectives on the relationship of American law, economy, and society. For despite the intricate constitutional logic, science, and theory that overflows this Symposium and other law reviews, we still have a remarkably 'thin' understanding of the basic social and political struggles that led to the ascendancy of liberal constitutionalism and the decline of competitors like common regulation. Ideally, such understanding would be the first step in any reasonable assessment of the significance and persistence of the public-private distinction, the balancing test, and 'rights talk' in late twentieth-century American jurisprudence.

## Footnotes

[a]   Assistant Professor of History, University of Chicago. Ph.D. 1991, Brandeis University. The author thanks Jay Blount, Stephen Gottlieb, Hendrik Hartog, Morton Keller, James Kloppenberg, Margaret Novak, Richard Ross, Suzanna Sherry, David Tannenhaus, Christopher Tomlins, and Michael Willrich for their suggestions, criticisms, and advice.

[1]   The principal texts in these traditions are Henry M. Hart, Jr. & Albert M. Sacks, The Legal Process: Basic Problems in the Making and Application of Law (1958); Herbert Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L. Rev. 1 (1959); Alexander M. Bickel, The Least Dangerous Branch: The Supreme Court at the Bar of Politics (1962); Alexander M. Bickel, The Unpublished Opinions of Mr. Justice Brandeis: The Supreme Court at Work (1957); Alexander M. Bickel, Foreword: The Passive Virtues, 75 Harv. L. Rev. 40 (1961); Robert H. Bork, The Tempting of America: The Political Seduction of the Law (1990); Richard A. Posner, Economic Analysis of Law (1973); John Rawls, A Theory of Justice (1971); Ronald Dworkin, Taking Rights Seriously (1977); Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175 (1989).

[2]   For the most judicious analysis of Bickel's positions on these matters, see Clyde Spillenger, Reading the Judicial Canon: Alexander Bickel and the Book of Brandeis, 79 J. Am. Hist. 125 (1992).

[3]   Tomas J. Philipson & Richard A. Posner, Private Choices and Public Health: The AIDS Epidemic in Economic Perspective (1993).

[4]
The much-debated 'republican revival' and the recent treatises of Cass Sunstein and Bruce Ackerman seem to signal a pending historical turn in constitutional jurisprudence. But both literatures remain problematic from a historian's perspective. As Terry Fisher and Linda Kerber have argued, the 'neo-republican' effort to reach back across two hundred years of American history and extract from the Founding a single, coherent ideological template to guide contemporary decision making is reductionist, 'anachronistic,' and doomed to failure. See William W. Fisher III, Making Sense of Madison: Nedelsky on Private Property, 18 Law & Soc. Inquiry 547 (1993); Linda K. Kerber, Making Republicanism Useful, 97 Yale L.J. 1663 (1988); Frank Michelman, Law's Republic, 97 Yale L.J. 1493 (1988); Cass R. Sunstein, Beyond the Republican Revival, 97 Yale L.J. 1539 (1988). The best historical overviews and assessments of the republicanism literature can be found in James T. Kloppenberg, The Virtues of Liberalism: Christianity, Republicanism, and Ethics in Early American Political Discourse, 74 J. Am. Hist. 9 (1987); Isaac Kramnick, The 'Great National Discussion': The Discourse of Politics in 1787, 45 Wm. & Mary Q. 3 (1988); Daniel T. Rodgers, Republicanism: The Career of a Concept, 79 J. Am. Hist. 11 (1992); Robert E. Shalhope, Republicanism in American Historiography, 39 Wm. & Mary Q. 334 (1982); Robert E. Shalhope, Toward a Republican Synthesis: The Emergence of an Understanding of Republicanism and Early American Historiography, 29 Wm. & Mary Q. 49 (1972).

In The Partial Constitution and We The People respectively, Sunstein and Ackerman make a more concerted effort to deal with the sweep of the American constitutional past, but their histories remain decidedly episodic, focussing on four key moments of constitutional contest and change: 1787, Reconstruction, Lochner, and 1937. See Cass R. Sunstein, The Partial Constitution (1993); Bruce Ackerman, We The People: Foundations 37 (1991). Ackerman's principled defense of episodism ('Very few Americans feel the need to recall what happened in 1887, although it is a century closer to us in chronological time than 1787. People constantly refer to the Reconstruction amendments, while nobody talks much about the constitutional significance of the Spanish-American War.') is also fraught with the dangers of presentism and anachronism, obscuring the larger contexts and continuities of constitutional debate and struggle. See Ackerman , supra, at 37.

Robert W. Gordon's brilliant historiographical trilogy is the definitive discussion of the relevance of history for law and legal theory. See Robert W. Gordon, Critical Legal Histories, 36 Stan. L. Rev. 57 (1984); Robert W. Gordon, Historicism in Legal Scholarship, 90 Yale L.J. 1017 (1981) hereinafter Gordon, Historicism; Robert W. Gordon, Introduction: J. Willard Hurst and the Common Law Tradition in American Legal Historiography, 10 Law & Soc'y Rev. 9 (1975).

[5]
Pierre Bourdieu , Outline of a Theory of Practice 164 (Richard Nice trans., 1977).

[6]
James Willard Hurst , Justice Holmes on Legal History 55 (1964).

[7]
See, e.g., Morton J. Horwitz, The Historical Contingency of the Role of History, 90 Yale L.J. 1057 (1981).

[8]
C. Vann Woodward , The Strange Career of Jim Crow (1955). As Woodward elegantly put it:

My only purpose has been to indicate that things have not always been the same in the South.... The policies of proscription, segregation, and disfranchisement that are often described as the immutable 'folkways' of the South, impervious alike to legislative reform and armed intervention, are of a more recent origin. The effort to justify them as a consequence of Reconstruction and a necessity of the times is embarrassed by the fact that they did not originate in those times. And the belief that they are immutable and unchangeable is not supported by history.

Woodward , supra, at 47.

More recently, George Chauncey has demonstrated the critical power of revising 'taken-for-granted' sequences by deconstructing the received wisdom that the history of homosexuality in America before 1969 was basically a story of isolation and invisibility ( i.e., the history of 'the closet '). George Chauncey , Gay New York: Gender, Urban Culture, and the Making of the Gay Male World, 1890-1940 (1994).

[9]
Gordon, Historicism, supra note 4, at 1017. These historians put to good use a central insight of Hegel: 'Philosophy aims at knowing what is imperishable, eternal, and absolute. Its aim is truth. But history relates the sort of thing which

Compendium_Cornell
Page 1515

has existed at one time but at another has perished. ' John Patrick Diggins, The Promise of Pragmatism: Modernism and the Crisis of Knowledge and Authority 10 (1994) (quoting Hegel).

[10]    James T. Kloppenberg, Uncertain Victory: Social Democracy and Progressivism in European and American Thought, 1870-1920 , at 107-14 (1986) (quoting Wilhelm Dilthey).

[11]    Wilhelm Dilthey, Pattern and Meaning in History: Thoughts on History and Society 168 (H.P. Rickman ed., 1961). Dilthey concluded this treatise:

The historical consciousness of the finitude of every historical phenomenon, of every human or social condition and of the relativity of every kind of faith, is the last step towards the liberation of man. With it man achieves the sovereignty to enjoy every experience to the full and surrender himself to it unencumbered, as if there were no system of philosophy to tie him down. Life is freed from knowledge through concepts; the mind becomes sovereign over the cobwebs of dogmatic thought.... The attempt used to be made to grasp life through the world. But there is only the one road from the interpretation of life to the world and life is only there in experience, understanding and historical apprehension. We do not carry the meaning of the world into life. We are open to the possibility that meaning and significance arise only in man and his history, not in the isolated individual but in man as a historical being. For man is something historical.

Id. at 167-68. For a classic discussion, see H. Stuart Hughes, Consciousness and Society: The Reorientation of European Social Thought, 1890-1930 , at 183-248 (1958).

[12]    Sheldon Wolin, Political Theory as a Vocation, in Machiavelli and the Nature of Political Thought 23, 23-75 (Martin Fleisher ed., 1972). Some leading surveys of the historical and interpretive turns are Richard J. Bernstein, Beyond Objectivism and Relativism: Science, Hermeneutics, and Praxis (1985); Interpretive Social Science: A Second Look (Paul Rabinow & William M. Sullivan eds., 1987); Understanding and Social Inquiry (Fred R. Dallmayr & Thomas A. McCarthy eds., 1977); Donald R. Kelley, The Human Measure: Social Thought in the Western Legal Tradition (1990). On the implications of this perspective for legal thought, the best source is Joan Williams's trilogy of theoretical-historiographical articles. See Joan C. Williams, Rorty, Radicalism, Romanticism: The Politics of the Gaze, 1992 Wis. L. Rev. 131; Joan C. Williams, Culture and Certainty: Legal History and the Reconstructive Project, 76 Va. L. Rev. 713 (1990); Joan C. Williams, Critical Legal Studies: The Death of Transcendence and the Rise of the New Langdells, 62 N.Y.U. L. Rev. 429 (1987).

[13]    See Bendix Autolite Corp. v. Midwesco Enters., 486 U.S. 888, 897 (1988) (Scalia, J., concurring). Scalia's musing about rocks and lines is the source of this Symposium's title, 'When Is a Line as Long as a Rock Is Heavy?: Reconciling Public Values and Individual Rights in Constitutional Adjudication. ' The Symposium brochure speculates, 'In Wonderland, Alice would not have been at all surprised if she were asked to compare the length of a line with the weight of a rock. Yet, the Constitution may invite just such a comparison if it calls upon the Court to balance public values and individual liberties.'

[14]    As will become clear below, I am using the word 'liberal' here in its historical, classical, and 'negative' sense, as in John Stuart Mill's statement, 'The sole end for which mankind are warranted, individually or collectively, in interfering with the liberty of action of any of their number is self-protection. ' John Stuart Mill, On Liberty 9 (Elizabeth Rapaport ed., 1978) (1859). Thus Scalia, while politically conservative, is a classic liberal. See Isaiah Berlin, Two Concepts of Liberty, in Four Essays on Liberty (Oxford Univ. Press 1969) (1958); Louis Hartz, The Liberal Tradition in America (1955). On liberal legalism, see Roberto Mangabeira Unger, The Critical Legal Studies Movement (1983).

[15]    See Morton J. Horwitz, The Public/Private Distinction, 130 U. Pa. L. Rev. 1423 (1982) (discussing the origins of the public-private distinction in modern political and legal thought).

[16]    Herbert Spencer , The Man Versus The State (Truxton Beale ed., 1916).

Compendium_Cornell
Page 1516

17    For the best recent discussions of balancing pro and con, see Frank M. Coffin, Judicial Balancing: The Protean Scales of Justice, 63 N.Y.U. L. Rev. 16 (1988); T. Alexander Aleinikoff, Constitutional Law in the Age of Balancing, 96 Yale L.J. 943 (1987). For a timely, if banal, example of just how far public and private balancing tests control modern legal thinking and problem-solving, consult some of the arm-chair legal analysis resulting from the recent assault on figure skater Nancy Kerrigan. In speculating on whether or not rival Tonya Harding would be dropped from the Olympic team, lawyer after lawyer employed the public-private template, suggesting subsequent litigation would turn on balancing the public's expectation and value of a fair, unblemished athletic competition against Harding's private investment in her training and career with the expectation of a financial payoff. Channel 2 News (television broadcast, Jan. 20, 1994).

18    Duncan Kennedy, The Structure of Blackstone's Commentaries, 28 Buff. L. Rev. 209, 382 (1979). Kennedy introduces a wonderful diagram to illustrate the conceptual power of a 'rule of law' as mediator between the individual and state (public law), and between clashing individual rights (private law):

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

    In positing a pre-social, highly individualistic concept of the self and a rigid separation of public and private, the liberal world view empowers law (when it can successfully legitimate itself as something other than power or politics) as the ultimate umpire of social relations and an all-powerful border police. In the liberal schema, the 'rule of law' becomes the only thing protecting an individual from the violence of others as well as the state. Thus, even a staunch critic of liberalism like E.P. Thompson could conclude that 'the notion of the rule of law is itself an unqualified human good.' E.P. Thompson, Whigs and Hunters: The Origin of the Black Act 267 (1975). But see Morton Horwitz, The Rule of Law: An Unqualified Human Good?, 86 Yale L.J. 561 (1977) (criticizing the rule of law). The central problem with Kennedy's analysis is his assertion that Blackstone marks the ascendancy of a liberal legalism that by the nineteenth century structured all of Anglo-American law. As suggested below, one could argue that Kennedy's diagram and liberal legalism failed to capture American jurisprudence until the early twentieth century (Kennedy's date for liberalism's 'final disintegration'). Kennedy, supra, at 217.

19    Morton Horwitz is the original source of the alliterative 'natural, neutral, and necessary' which he uses to stand for the hegemonic and naturalizing tendencies of all mainstream legal thought. See Morton J. Horwitz, The Transformation of American Law, 1870-1960: The Crisis of Legal Orthodoxy 6 (1992) hereinafter Horwitz, Crisis of Legal Orthodoxy . Cass Sunstein has recently domesticated and harnessed this central Legal Realist and Critical Legal Studies insight for peaceful, liberal purposes in The Partial Constitution, supra note 4.

20    For the most recent statement in the Corwinian tradition, see Jennifer Nedelsky, Private Property and the Limits of American Constitutionalism: The Madisonian Framework and Its Legacy (1990). For an excellent review essay, see also Fisher, supra note 4.

21    See Edward S. Corwin, The 'Higher Law' Background of American Constitutional Law (1955); Edward S. Corwin, The Doctrine of Due Process of Law Before the Civil War, 24 Harv. L. Rev. 366, 460 (1911); Edward S. Corwin, Marbury v. Madison and the Doctrine of Judicial Review, 12 Mich. L. Rev. 538 (1914); Edward S. Corwin, The Basic Doctrine of American Constitutional Law, 12 Mich. L. Rev. 247 (1914). An overview of Corwin's basic position can be found in Edward S. Corwin, Liberty Against Government: The Rise, Flowering and Decline of a Famous Juridical Concept (1948).

22    Of course, I am not the first to make such an argument. American legal historians have been wrestling with various aspects of the Corwin thesis since Willard Hurst's famous distinction between static and dynamic property rights. James Willard Hurst, Law and the Conditions of Freedom in the Nineteenth-Century United States (1956) hereinafter Hurst, Conditions of Freedom . I discuss some of these historiographical moves in my Public Economy and the Well-Ordered Market: Law and Economic Regulation in 19th-Century America, 18 Law & Soc. Inquiry 1, 3-7 (1993). For a more

complete survey, see Harry N. Scheiber, American Constitutional History and the New Legal History: Complementary Themes in Two Modes, 68 J. Am. Hist. 337 (1981).

23   See Nedelsky , supra note 20; Herbert Hovenkamp, Enterprise and American Law, 1836-1937 (1991); Morton J. Horwitz, The Transformation of American Law, 1780-1860 (1977) hereinafter Horwitz, Transformation ; Horwitz, Crisis of Legal Orthodoxy , supra note 19. More convincing is the recent effort of Chris Tomlins to build a synthesis around the more substantively flexible notion of law as 'a modality of rule.' See Christopher L. Tomlins, Law, Labor, and Ideology in the Early American Republic (1993) (especially pp. 19-97).

24   See Hendrik Hartog, The Constitution of Aspiration and 'The Rights That Belong to Us All', 74 J. Am. Hist. 1013 (1987); Michael Grossberg, Social History Update: 'Fighting Faiths' and the Challenges of Legal History, 28 J. Soc. Hist. 191 (1991).

25   Commonwealth v. Alger, 62 Mass. (7 Cush.) 53, 84-85 (1851).

26   William J. Novak, Intellectual Origins of the State Police Power: The Common Law Vision of a Well-Regulated Society (University of Wisconsin Legal History Working Paper No. 3-2, 1989).

27   See, e.g., Michael Grossberg, Governing the Hearth: Law and the Family in Nineteenth-Century America (1985); Robert W. Gordon, Critical Legal Histories, supra note 4 (discussing Critical Legal Studies and history).

28   Early American conceptions of rights, like powers, differed markedly from modern liberal notions as well as from traditional ideas about 'natural law.' As Nathaniel Chipman put it in 1833, 'The rights of man are all relative to his social nature, and ... exist, in a coincidence only with the rights of the whole, in a well ordered state of society and civil government.' Nathaniel Chipman, Principles of Government: A Treatise on Free Institutions Including the Constitution of the United States 66 (1833). The legal-historical sources of nineteenth-century rights language are distinctive and diverse. Citizenship is central. For some hints see Linda K. Kerber, The Paradox of Women's Citizenship in the Early Republic: The Case of Martin v. Massachusetts , 1805, 97 Am. Hist. Rev. 349 (1992); Margaret R. Somers, Rights, Relationality, and Membership: Rethinking the Making and Meaning of Citizenship, 19 Law & Soc. Inquiry 63 (1994); Suzanna Sherry, Public Values and Private Virtue, 45 Hastings L.J. 1099 (1994).

29   For an example of this, see Barry M. Mitnick , The Political Economy of Regulation: Creating, Designing, and Removing Regulatory Forms (1980). While Mitnick deserves credit for taking the problem of conceptualization seriously, his understanding of regulation as 'interference' is so bound up with modern political and philosophical debates about the state and the market that it may be harmful to historians.

30   For inklings of this approach, see id. at 2-7; James W. McKie, Regulation and the Free Market: The Problem of Boundaries, 1 Bell J. Econ. & Mgmt. Sci. 6 (1970).

31   See, e.g., Sidney Fine , Laissez Faire and the General-Welfare State: A Study of Conflict in American Thought, 1865-1901 (1956); Arthur Selwyn Miller , The Supreme Court and American Capitalism (1968); Wallace D. Farnham, 'The Weakened Spring of Government': A Study in Nineteenth-Century American History, 68 Am. Hist. Rev. 662 (1963). Though he draws more on English than American sources, see also Calvin Woodard, Reality and Social Reform: The Transition from Laissez-Faire to the Welfare State, 72 Yale L.J. 286 (1962).

32   Stephen Skowronek , Building a New American State: The Expansion of National Administrative Capacities, 1877-1920 , at 5 (1982). Skowronek labels institutional development as late as 1900 'patchwork.'

Compendium_Cornell
Page 1518

33   See Thomas K. McCraw, Regulation in America: A Review Article, 49 Bus. Hist. Rev. 159 (1975); Thomas K. McCraw , Prophets of Regulation (1984); see also Barry D. Karl, The Uneasy State: The United States from 1915 to 1945 (1983); Morton Keller, Regulating a New Economy (1990); Morton Keller, Affairs of State: Public Life in Late Nineteenth Century America (1977) (especially chs. 9-11); Charles C. Bright, The State in the United States During the Nineteenth Century, in Statemaking and Social Movements 121 (Charles Bright & Susan Harding eds., 1984); Morton Keller, The Pluralist State: American Economic Regulation in Comparative Perspective, 1900-1930, in Regulation in Perspective 56 (Thomas K. McCraw ed., 1981); Theda Skocpol and John Ikenberry, The Political Formation of the American Welfare State in Historical and Comparative Perspective, 6 Comp. Soc. Res. 87 (1983). On the 'renaissance' generally, see Theda Skocpol, Bringing the State Back In: Strategies of Analysis in Current Research, in Bringing the State Back In 3 (Peter B. Evans et al. eds., 1985); William E. Leuchtenberg, The Pertinence of Political History: Reflections on the Significance of the State in America, 73 J. Am. Hist. 585 (1986).

34   The best of the commonwealth studies are Carter Goodrich , Government Promotion of American Canals and Railroads, 1800-1890 (1960); Oscar & Mary Flug Handlin , Commonwealth: A Study of the Role of Government in the American Economy: Massachusetts, 1774-1861 (1947); Louis Hartz , Economic Policy and Democratic Thought: Pennsylvania, 1776-1860 (1948); Gerald D. Nash , State Government and Economic Development: A History of Administrative Policies in California, 1849-1933 (1964). It is hard to get an idea of the full import of this school without also including the work of Harry Scheiber on the Ohio canal era, Milton Heath, Bray Hammond, James Neal Primm, George Miller, Paul Gates, and Edwin M. Dodd. For fuller bibliographical summaries and analyses, see Robert A. Lively, The American System: A Review Article, 29 Bus. Hist. Rev. 91 (1955); Harry N. Scheiber, Government and the Economy: Studies of the 'Commonwealth' Policy in Nineteenth-Century America, 3 J. Interdisciplinary Hist. 135 (1972). The legal histories most concerned with the commonwealth theme are Hurst, Conditions of Freedom , supra note 22; Leonard W. Levy , The Law of the Commonwealth and Chief Justice Shaw (1957); and the voluminous articles of Harry N. Scheiber, including Harry N. Scheiber, Property Law, Expropriation, and Resource Allocation by Government: the United States, 1789-1910, 33 J. Econ. Hist. 232 (1973); Harry N. Scheiber, Public Rights and the Rule of Law in American Legal History, 72 Cal. L. Rev. 217 (1984); Scheiber, The Road to Munn: Eminent Domain and the Concept of Public Purpose in the State Courts, 5 Persp. Am. Hist. 327 (1971).

35   Ernst Freund , Legislative Regulation: A Study of the Ways and Means of Written Law (1932) hereinafter Freund, Legislative Regulation ; Ernst Freund , Standards of American Legislation (1917) hereinafter Freund, Standards ; Ernst Freund , The Police Power: Public Policy and Constitutional Rights (1904) hereinafter Freund, Police Power .

36   Freund , Legislative Regulation , supra note 35, at 53.

37   Id.

38   Freund , Police Power , supra note 35, at iii.

39   Id. at 21. The police power entailed the imposition of direct and explicit limitations on private behavior not found in taxation or land policies. Furthermore, police restraints and compulsions operated on conventional and legitimate behavior rather than the 'intrinsically vicious' or evil acts regulated by criminal justice. As Freund admits, this is perhaps the trickiest distinction in that most police legislation is enforced through criminal penalties and thus is technically a part of the criminal law. Nevertheless, Freund's typology addresses the need to distinguish the criminal sanction against murder from that attending a violation of anti-trust laws. His notion of 'intrinsic' criminality versus the more 'conventional' restraints of regulatory law is perhaps overdrawn, yet it usefully highlights the more contentious, policy-oriented nature of police legislation.

40   See, e.g., Theodore J. Lowi, American Business, Public Policy, Case-Studies, and Political Theory, 16 World Pol. 677 (1964).

[41] See Richard L. McCormick, The Party Period and Public Policy: An Exploratory Hypothesis, 66 J. Am. Hist. 279, 283-84 (1979).

[42] Lowi, supra note 40, at 689.

[43] Freund, Police Power , supra note 35, at v.

[44] Robert H. Wiebe, The Opening of American Society: From the Adoption of the Constitution to the Eve of Disunion (1984); Bright, supra note 33, at 121-23.

[45] McCormick, supra note 41, at 284-85.

[46] See Laws of New York, 1781-1801 (1802).

[47] See Revised Statutes of Michigan (1838). Similar provisions can be found in The Revised Statutes of the Commonwealth of Massachusetts (1836).

[48] The requirements for each of these products mirror the detail of the regulation of beef (though the antebellum buyer of beef should still beware, this hardly looks like caveat emptor to me):

All barrels in which beef or pork shall be packed, shall be made of good seasoned white oak or white ash staves and heading, free from every defect; and each barrel shall contain two hundred pounds of beef or pork. Such barrels shall measure seventeen and a half inches between the chimes, and be twenty-nine inches long, and hooped with twelve good hickory, white oak, or other substantial hoops; if the barrel be made of ash staves, it shall be hooped with at least fourteen hoops; the staves and heads shall be made a proper thickness, and the hoops shall be well set and driven together; and the barrels shall be branded on the bilge with at least the initial letters of the cooper's name.... No beef shall be packed in barrels or half barrels, for sale or exportation, unless it be of fat cattle not under three years old; and all such beef shall be cut into pieces, as nearly square as may be, and of not more than twelve, nor less than four pounds in weight. All beef which an inspector shall find on examination to have been killed at a proper age, and to be fat and merchantable, shall be sorted and divided for packing or repacking, in barrels and half barrels, into three different sorts, to be denominated 'mess,' 'prime,' and 'cargo' beef. Mess beef shall consist of the choice pieces of such beef as are large and well fatted, without hocks, shanks, clods or necks, and may or may not contain two choice rounds out of the same cattle, not exceeding ten pounds each: and each barrel or half barrel containing beef of this description, shall be branded on one of the heads with the words 'mess beef.' Similar descriptions for prime and cargo beef follow. Every barrel of beef shall be well salted with seventy-five pounds of good Turks Island salt, or a sufficient quantity of other salt to be equal thereto, exclusive of a strong new pickle; and to each barrel shall be added four ounces of saltpetre. On the head of every barrel and half barrel of merchantable beef and pork, inspected and packed, shall be distinctly branded the weight it contains, with the first letter of the christian name, and the surname at full length, of the inspector or deputy who shall have inspected the same, the word 'MICHIGAN,' and the name of the county and the year in which the same was inspected and branded.

Revised Statutes of Michigan , supra note 47, at 136-38. Extensive penalties are then listed for fraud, neglect, unlawful brands, intermixing, or offering for sale beef contrary to the provisions of this law. See id.

[49] Again, the detail of these regulations is crucial. Regulated under the heading of 'disorderly persons' are:

All persons who threaten to run away and leave their wives and children a burden on the public; all persons pretending to tell fortunes, or where lost or stolen goods may be found; all common prostitutes, all keepers of bawdy houses, or houses for the resort of prostitutes; all drunkards, tipplers, gamesters or other disorderly persons; all persons who have no visible profession or calling to maintain themselves by, but who do for the most part support themselves by gaming; all jugglers, common showmen and mountebanks, who exhibit or perform for profit and puppet-show, wire

Compendium_Cornell
Page 1520

or rope dancing, or other idle shows, arts or feats; all persons who keep in any public highway, or in any place where spirituous liquors are sold, any keno table, wheel of fortune, thimblers, or other table, box, machine or device for the purpose of gaming; all persons who go about with such table, wheel, or other machine or device, exhibiting tricks or gaming therewith; all persons who play in the public streets or highways, with cards, dice, or any instrument or device for gaming; shall be deemed disorderly persons.

Id. at 199.

50    See id. at 619-51.

51    Laws of the State of New York chs. 185 & 191 (1826).

52    Id. at 193.

53    A telling example is the regulation of ferriage rates. An 1810 New York statute regulation the New York City-Nassau Island ferry is typical:

For every fat ox, steer or bull, twenty-five cents, for all other neat cattle eighteen cents, the ferry-master to find the necessary head ropes to fasten and secure the cattle in the boats; for every dead calf, hog or sheep, two cents; for every lamb, pig or shote, one cent; for every quarter of beef, three cents; for every firkin of butter, lard or tallow, two cents; for every other package of butter, lard or tallow, per cwt. three cents; for every ham, an half cent; for every bale of cotton or wool, ten cents; for every crate of earthen ware, twelve cents and an half; for every bear skin, dry hide or horse skin, an half cent; for every cask of flax seed, dry beans or pease of seven bushels, seven cents; for every hundred oysters or clams, one cent; for every sheaf of straw, an half cent; for every one horse chaise with standing top, thirty-one cents; for every hundred bricks, six cents; for every full trunk or chest four feet long, six cents; three feet long four cents; for every full trunk or chest two feet long, two cents, all under, one cent; for every empty trunk or chest of the above sizes, half the above rates; for every bookcase or cupboard, twenty-five cents; for every secretary, bookcase or chest of drawers, twenty cents; for every mahogany dining table, eights cents; for every tea or card table, four cents; of other kind of wood, half of the above rates; for every piano forte, twenty cents; for every mahogany bedstead, four cents; of other wood, two cents; for every clock and case, twenty-five cents; for every sideboard, thirty-seven cents and an half; for every mahogany settee, twenty cents; of other wood, six cents; for every feather bed, three cents; for every cat-tail or straw bed, one cent; for every matrass of hair or wool, two cents; for every looking glass the plate six feet long, fifty cents; five feet long or upwards, eight cents; three feet, six cents; two feet, two cents; all under, one cent; for every chaldron of coals, fifty cents; for every cord of nutwood, eighty cents; for every cord of oak or other wood, seventy cents; for every kettle of mild of eight gallons or upwards, two cents; for every empty milk kettle, one cent; for every musket or fowling piece, one cent; for every large or horse boat of household furniture where a single boat is required, one hundred and fifty cents; for every ton of hemp or flax, sixty-two cents and an half; for every ton of cordage, sixty-two cents and an half; for every ream of paper one cent; for every fruit or other tree more than six or less than ten feet long, an half cent; all under, one quarter cent; flowers or shrubs in pots or boxes, an half cent; for every corpse of an adult, twenty-five cents; of children, twelve cents and an half; for every cheese, one quarter cent; for every dog, four cents; for every hundred of pipe staves or heading, fifteen cents; for every hundred of hogshead staves or heading, twelve cents and an half; for every hundred of barrel staves or heading, eight cents; for every hundred weight of hay, ten cents.

Public Laws of the State of New York chs. 119 & 37 (1810).

54    I owe the concept of 'technologies of public action' to Hendrik Hartog, Public Property and Private Power: The Corporation of the City of New York in American Law, 1730-1870 , at 66 (1983).

55    The New Deal has plagued especially one of the most remarkable efforts in American public history, the 'commonwealth studies.' Without question the work of the Committee on Research in Economic History was directly influenced by the New Deal (as noted by Oscar and Mary Flug Handlin in the 1968 revised edition of Commonwealth: A Study of the Role of Government in the American Economy: Massachusetts, 1774-1861 viii-xii (rev. ed. 1969)). This perspective led them to privilege highly visible examples of government-business cooperation, TVA-like efforts at

public ownership and development, and the state's orientation towards general economic management and direction. Those efforts that resonated most with New Deal initiatives received greatest attention, while more subtle (but perhaps more historically lucrative) examples of state power ( e.g., the common law of nuisance, the police power, municipal regulatory ordinances) were neglected. The result is a conception of state government in the early nineteenth century that FDR's 'Brain Trust' would not find completely alien. Accusations of presentism, in other words, were not altogether undeserved. On the other hand, dismissive attitudes have resulted in the neglect of some of the greatest substantive discoveries of this body of work. For a listing of the commonwealth literature and commentary, see supra note 34.

56    The best representation of this historiographical problem is John Gough's discussion of how modern English historians, long-tutored in Parliamentary sovereignty, have had considerable difficulty coming to terms with Sir Edward Coke and the idea that at some point in history Parliament could be conceived of as limited. J.W. Gough, Fundamental Law in English Constitutional History (1955).

57    The phrase 'common regulation' itself was rarely used in the antebellum era. I have found it only twice in the nineteenth-century federal courts. See Wight v. Curtis, 29 F. Cas. 1170, 1172 (C.C.S.D.N.Y. 1845) (No. 17,628); Sparf v. United States, 156 U.S. 51, 143 (1895). Indeed, the word 'regulation' was rarely qualified in this period. A Westlaw search of federal cases between the years 1813-1845 reveals that 'regulation' was used by itself nearly 80% of the time. When qualified, 'regulation' was usually combined with a relatively innocuous adjective like 'municipal,' 'internal,' or 'general.' Usages of 'police regulation' and 'public regulation' were also extremely rare, appearing in only 60 of 2027 federal cases using the term 'regulation' before 1870. Thus, in naming antebellum regulation, I am forced to rely on a designation not really natural to the period. 'Police regulation' or 'republican regulation' would have been useful tags if 'police' and 'republican' were not mired in such deep historiographical and definitional quagmires. Even with long clarifications as to what I would mean by 'police' and 'republican' these words would drag along more baggage and confusion than enlightenment.

58    Though there are many modern formulations of the police power, the rendition in the first edition of the Encyclopedia of the Social Sciences best captures the 'empty,' ex post facto quality of contemporary constitutional discourse:

Police power is an idiom of apologetics which belongs to the vocabulary of constitutional law. In American government the validity of any regulatory statute may, in 'a genuine case in controversy,' be tested by judicial review. If the act is sustained, the police power is usually invoked as the sanction; if it is declared null and void, some such phrase as 'lack of jurisdiction' or 'want of due process' lies at the base of rationalization.

Walton H. Hamilton & Carlton C. Rodee, Police Power, in 12 Encyclopedia of the Social Sciences 190 (1933) (emphasis added).

59    An excellent source for the many uses and versions of 'common' available in the late eighteenth and early nineteenth centuries is 3 Oxford English Dictionary 564-65 (2d ed. 1989). See also Arthur F. McEvoy, The Fisherman's Problem: Ecology and Law in the California Fisheries, 1850-1980 , at 10-15 (1986); Carol Rose, The Comedy of the Commons: Custom, Commerce, and Inherently Public Property, 53 U. Chi. L. Rev. 711 (1986).

60    Novak , supra note 26.

61    George L. Haskins, Law and Authority in Early Massachusetts 66-84 (1960); William E. Nelson, Americanization of the Common Law: The Impact of Legal Change on Massachusetts Society, 1760-1830 chs. 3 & 4 (1975). For a quick gauge of continuity, compare Nelson's and Haskins's lists of regulated activities with the statutes excerpted in Part II above. For excellent, concise treatments, see Forrest McDonald, Novus Ordo Seclorum: The Intellectual Origins of the Constitution 14-21 (1985); Milton Sydney Heath, Constructive Liberalism: The Role of the State in Economic Development in Georgia to 1860 , at 55-57 (1954); Clarence L. Ver Steeg, The Formative Years, 1607-1763 , at 195 (1964). The continuity of regulation problemitizes but does not undermine the issues at stake in that staple (or red herring) of colonial historiography -- the 'community-society' debate. David Konig and Bruce Mann are the best representatives

of this perspective in colonial legal history. David Thomas Konig, Law and Society in Puritan Massachusetts: Essex County, 1629-1692 (1979); Bruce H. Mann, Neighbors and Strangers: Law and Community in Early Connecticut (1987).

62   See Michael G. Kammen, Colonial New York: A History 56-57 (1975); Sydney V. James, Colonial Rhode Island: A History 157 (Milton M. Klein & Jacob E. Cooke eds., 1975); 4 William Blackstone, Commentaries *158; 7 Nathan Dane, A General Abridgment and Digest of American Law, with Occasional Notes and Comments 33-40 (1824); Laws of the State of New York chs. 185 & 191 (1826).

63   See William Addison Blakely, American State Papers Bearing on Sunday Legislation (1911).

64   See Marc Raeff, The Well-Ordered Police State: Social and Institutional Change Through Law in the Germanies and Russia, 1600-1800 (1983); Marc Raeff, The Well-Ordered Police State and the Development of Modernity in Seventeenth- and Eighteenth-Century Europe: An Attempt at a Comparative Approach, 80 Am. Hist. Rev. 1221 (1975) hereinafter Raeff, Well-Ordered Police State.

65   Raeff, Well-Ordered Police State, supra note 64, at 1226.

66   See W.G. Carson, Policing the Periphery: The Development of Scottish Policing 1795-1900, Part I, 17 Austl. & N.Z. J. Criminology 207 (1984); 1 Steven L. Kaplan, Bread, Politics and Political Economy in the Reign of Louis XV (1976); Thomas Brennan, Police and Public Power in Ancient Regime France (paper delivered at American Society for Legal History Conference, Atlanta, Feb. 1990) (on file with author). The most representative contemporary 'police' treatise is Nicolas Delamare, Traite de Police (1722).

67   I am indebted to Christopher Tomlins both for pointing me to these sources and for generally educating me on the evolution of a European conception of 'police.' Those seeking a more extensive genealogy, as well as an intriguing interpretation contrasting 'police' with the American 'rule of law,' should go first to Tomlins , supra note 23 (especially ch. 2). Tomlins and I disagree, however, over the common law's ingrained hostility to the broader notions of public responsibility contained in the Continental versions of 'police.'

68   Matthew Hale describes the prerogative as

that which asserts, maintains, and with all imaginable Care provides for the Safety of the King's Royal Person, his Crown and Dignity, and all his just Rights, Revenues, Powers, Prerogatives, and Government, as the great Foundation (under God) of the Peace, Happiness, Honour and Justice, of this Kingdom; and this Law is also, that which declares and asserts the Rights and Liberties, and the Properties of the Subject; and is the just, known, and common Rule of Justice and Right between Man and Man, within this Kingdom.

Matthew Hale, The Prerogatives of the King xxxviii (D.E.C. Yale ed., 1976).

69   Freund, Standards , supra note 35, at 38-39.

70   See 1 Blackstone , supra note 62, at ch. VII (commentary entitled Of the King's Prerogative); Daniel J. Boorstin, The Mysterious Science of the Law 101 (1941).

71   1 Blackstone , supra note 62, at *274; 4 id. at *162.

72   Joseph Chitty, A Treatise on the Law of the Prerogatives of the Crown 4 (1820).

[73]     W.P. Prentice, Police Powers Arising Under the Law of Overruling Necessity 7 (1894).

[74]     Chitty , supra note 72, at iii.

[75]     46 U.S. (5 How.) 540 (1847).

[76]     Id. at 583 (opinion of Taney, C.J.). The best discussion of the police power's relationship to conceptions of state sovereignty is W.G. Hastings, The Development of Law as Illustrated by the Decisions Relating to the Police Power of the State, 39 Proc. Am. Phil. Soc'y 359 (1900). See also Prentice , supra note 73, at 4-10.

[77]     People v. Budd, 22 N.E. 670, 674 (N.Y. 1889). The continued hold of notions of sovereignty over the definition of the state police power is indicated by Thomas J. Pitts's definition in 1937:

It is not a power reserved but a right inherent in the State as sovereign and while the power may be regulated and limited by the Constitution, it exists independently of it, as a necessary attribute of sovereignty.... The sovereign State has no existence apart from and independent of the police power.

Thomas J. Pitts, The Nature and Implications of the Police Power, 6 Kan. City L. Rev. 128, 128 (1937).

[78]     See Chitty , supra note 72, at 107-242; Hale , supra note 68, at 201-321. Especially intriguing is the extensive attention each give to prerogatives regarding trade and commerce.

[79]     See Munn v. Illinois, 94 U.S. 113 (1876); Budd, 22 N.E. at 670; O'Connor v. Pittsburgh, 18 Pa. 187 (1851). Julius Goebel suggested that judicial doctrines surrounding the king's prerogative are almost the exclusive source of public law and political theory in medieval England. Thus, its continued hold over early American public law should not be surprising. See Julius Goebel, Jr., Constitutional History and Constitutional Law, 38 Colum. L. Rev. 555, 561 (1938).

[80]     Budd, 22 N.E. at 678.

[81]     The License Cases, 46 U.S. (5 How.) 504, 573-86 (1847) (opinion of Taney, C.J.).

[82]     For the most famous proponents of this widely shared perspective, see Horwitz, Transformation , supra note 23 (especially ch. 1); Hurst, Conditions of Freedom , supra note 22, at 10; James Willard Hurst, The Growth of American Law: The Law Makers 30-33 (1950); Nelson , supra note 61, at 90-92. Nelson takes the Massachusetts Constitution of 1780 at face value in asserting that the legislature possessed 'full power and authority ... to make, ordain, and establish, all manner of ... laws, statutes, and ordinances ... as they shall judge to be for the good and welfare of this Commonwealth.' Id. at 90 (quoting Mass. Const. pt. II, ch. 1, s 1, art. 4 (1780)). Though the 'positivism' of this proclamation may seem transparent to twentieth-century observers, nineteenth-century commentators were not so sure of themselves. They usually followed up constitutional assertions of legislative 'law-making' power with provocative questions like 'But, what is a law?' or 'What is a statute?' Such questions opened up whole new levels of jurisprudential commentary as to what the exact nature and extent of legislative authority was and should be. For examples of this argument, see E. Fitch Smith, Commentaries on Statute and Constitutional Law 290-91 (1848); G.A. Endlich, A Commentary on the Interpretation of Statutes 2 n.1 (1888).

[83]     The perspective that follows is put together from hints and suggestions in the following works (none of which really gets at the exact relationship between fundamental and common law that I think is operating in the regulatory cases): 1 Julius Goebel, Jr., The Oliver Wendell Holmes Devise, History of the Supreme Court of the United States: Antecedents and Beginnings to 1801 (1971) (especially ch. 1); Gough , supra note 56; Charles Howard McIlwain, Constitutionalism: Ancient and Modern (1947); C.H. McIlwain, Constitutionalism & the Changing World (1939); Charles Howard McIlwain, The High Court of Parliament and its Supremacy (1910); J.G.A. Pocock, The Ancient

Compendium_Cornell
Page 1524

Constitution and the Feudal Law (1957); John Phillip Reid, Constitutional History of the American Revolution: The Authority of Rights (1986); Joseph H. Smith, Appeals to the Privy Council from the American Plantations (1950) (especially pp. 523-53); Gordon S. Wood, The Creation of the American Republic, 1776-1787 , at 259-305 (1969); Goebel, Constitutional History, supra note 79; Thomas C. Grey, Origins of the Unwritten Constitution: Fundamental Law in American Revolutionary Thought, 30 Stan. L. Rev. 843 (1978); Samuel P. Huntington, Political Modernization: America vs. Europe, in Political Order in Changing Societies 93-139 (Samuel P. Huntington ed., 1968); Stanley N. Katz, The American Constitution: A Revolutionary Interpretation, in Beyond Confederation: Origins of Constitution and American National Identity 23 (Richard Beeman et al. eds., 1987). The standard source on fundamental law and constitutionalism is Edward S. Corwin, The 'Higher Law' Background of American Constitutional Law, 42 Harv. L. Rev. 149 & 365 (1928-29). On natural law, see Charles Grove Haines, The Revival of Natural Law Concepts (1930); Benjamin Fletcher Wright, Jr., American Interpretations of Natural Law: A Study in the History of Political Thought (1931).

84 Wood , supra note 83, at 263.

85 As quoted in Gough , supra note 56, at 22.

86 See Pocock , supra note 83; Peter Stein, Legal Evolution: The Story of an Idea (1980); James Q. Whitman, The Legacy of Roman Law in the German Romantic Era: Historical Vision and Legal Change (1990); Steve Pincus, Shadwell's Dramatic Trimming (forthcoming 1995).

87 Smith , supra note 82, at 246. Indeed, if read closely, the 'natural-law' theorists most cited by early Americans (Grotius, Vattel, and Rutherford) are far more historicist, realistic, and public-minded in their thinking than the caricature of 'natural law' bequeathed to us by Corwin, Haines, and Wright.

88 Joel Prentiss Bishop, Commentaries on the Written Laws and Their Interpretation 4 (1882); see also Endlich , supra note 82, at 2. Such themes are the basis for almost every treatise on statutory construction in the nineteenth century. See John Norton Pomeroy, An Introduction to Municipal Law 28-56 (1883); Smith , supra note 82 (especially ch. 7). Perhaps the most famous nineteenth-century text on statutory construction is Theodore Sedgwick, A Treatise on the Rules Which Govern the Interpretation and Application of Statutory and Constitutional Law (1857). The entire treatise is devoted not to arguing in a plenary, positivist mode that legislatures can do anything not explicitly constitutional, but that legislatures 'can do no act which is not law.' Id. at 676. The notion reverberates with John Adams's 'a government of laws, and not of men,' as well as Bishop's conception of legislation as part of a continuous process of applying law. Mass. Const. art. 30 (1780); see Bishop , supra.

89 Salus populi (translated as 'regard for the public welfare is the highest law') is the first maxim discussed in Herbert Broom, A Selection of Legal Maxims 1 (9th ed. 1924). For a more instrumentalist interpretation of salus populi role in seventeenth-century English political debate, see J.A.W. Gunn, Politics and the Public Interest in the Seventeenth Century (1969).

90 Indeed, in some ways the common-law renditions of police, sovereignty, legislation, and law discussed above flow directly out of the general notion that common law must conform to the common welfare. Salus populi is the 'natural law' of the common law. For a suggestive discussion, see Gough , supra note 56, at 99-102.

91 Emmerich de Vattel, The Law of Nations lix-lx (Joseph Chitty ed., 1849) (1797)); 2 Hugo Grotius, De Jure Belli Ac Pacis Libri Tres bk. I, at 9-45 (Francis W. Kelsey trans., 1964) (1624).

92 2 James Kent, Commentaries on American Law 340 (O.W. Holmes, Jr. ed., 12th ed. 1873). Holmes's comments appear in id. at 441 n.2.

93     Prentice , supra note 73, at 4; see also Thomas M. Cooley, A Treatise on the Constitutional Limitations 594-95 (1868); 2 Kent , supra note 92, at 338-40; Platt Potter, Dwarris on Statutes 444-45 (1871); Harrison H. Brace, To What Extent May Government in the Exercise of its Police Power, Take, Destroy or Damage Private Property Without Giving Compensation Therefor?, Chi. L. News , June 19, 1886, at 340; Pitts, supra note 77, at 132; Scott M. Reznick, Empiricism and the Principle of Conditions in the Evolution of the Police Power: A Model for Definitional Scrutiny, 1978 Wash. U. L.Q. 1, 19-20 (1978).

94     See, e.g., Maleverer v. Spinke, 73 Eng. Rep. 79, 81 (K.B. 1538); Case of the King's Prerogative in Saltpetre, 77 Eng. Rep. 1294, 1294 (K.B. 1607); Mouse's Case, 77 Eng. Rep. 1341, 1342 (K.B. 1609); British Cast Plate Mfrs. v. Meredith, 100 Eng. Rep. 1306, 1307 (K.B. 1792). In Saltpetre, Coke argues that

    for the commonwealth, a man shall suffer damage; as, for saving of a city or town, a house shall be plucked down if the next be on fire: and the suburbs of a city in time of war for the common safety shall be plucked down; and a thing for the commonwealth every man may do without being liable to an action.

    Saltpetre, 77 Eng. Rep. at 1295. Justice Buller in Meredith echoes,

    There are many cases in which individuals sustain an injury, for which the law gives no action; for instance, pulling down houses, or raising bulwarks, for the preservation and defence of the Kingdom against the King's enemies.... This is one of those cases to which the maxim applies, ' Salus populi suprema est lex.'

    100 Eng. Rep. at 1307-08 (emphasis added).

95     The doctrine first appears in American case law in 1788 in Respublica v. Sparhawk, 1 U.S. (1 Dall.) 357 (1788). For examples of the continued use of the concept of necessity in American law, see Block v. Hirsch, 256 U.S. 135 (1921) (discussing rent controls to abate emergency housing conditions); American Land Co. v. Zeiss, 219 U.S. 47 (1911) (discussing the San Francisco earthquake); Jacobson v. Massachusetts, 197 U.S. 11 (1905) (discussing compulsory smallpox vaccines); Bowditch v. Boston, 101 U.S. 16 (1879) (discussing fire). For more on these later necessity cases, see generally Rodney L. Mott, Due Process of Law 344-60 (1926); Reznick, supra note 93, at 51-54.

96     Cooley , supra note 93, at 594-95; see also 2 Kent , supra note 92, at 338. Damnum absque injuria is itself a key common-law maxim in nineteenth-century regulatory law. The common law was not presumed to provide a remedy for every actual injury. The higher prerogatives of the common law often made it necessary for individual injuries to go unredressed in the common interest. See Joseph William Singer, The Legal Rights Debate in Analytical Jurisprudence from Bentham to Hohfeld, 1982 Wis. L. Rev. 975.

97     1 Thomas Rutherford, Institutes of Natural Law 93-96 (1799).

98     4 Blackstone , supra note 62, at *31-32.

99     Prentice , supra note 73; Potter , supra note 93, at 444-67.

100     See Grossberg , supra note 27, at 236-37; George B. Curtis, The Checkered Career of Parens Patriae: The State as Parent or Tyrant?, 25 DePaul L. Rev. 895 (1976) (discussing the development and use of the parens patriae doctrine from its early English origins to its modern American employment in cases involving juveniles, mental incompetents, and the protection of interests held by the general populace); Douglas R. Rendleman, Parens Patriae: From Chancery to the Juvenile Court, 23 S.C. L. Rev. 205 (1971) (tracing the evolution of parens patriae and the juvenile court through the nineteenth century). For a discussion of parens patriae's role in the regulation of public nuisances, see John C. Bagwell, The Criminal Jurisdiction of Equity -- Purprestures and Other Public Nuisances Affecting Health and Safety, 20 Ky. L.J. 163 (1932).

[101]   Chitty , supra note 72, at 155 (footnote omitted).

[102]   For the implications of such a conception well into the twentieth century, see David J. Rothman, The State as Parent: Social Policy in the Progressive Era, in Willard Gaylin et al., Doing Good: The Limits of Benevolence (1978).

[103]   Sir Robert Filmer, Patriarcha and Other Writings (Johann P. Somerville ed., 1991) (1679).

[104]   John Locke, Two Treatises of Government (Peter Laslett ed., 1960) (6th ed. 1764).

[105]   Hale , supra note 68, at 1.

[106]   4 Blackstone , supra note 62, at *161-62; 1 id. at *264.

[107]   Freund, Standards , supra note 35, at 66.

[108]   Edward S. Corwin, The Twilight of the Supreme Court: A History of Our Constitutional Theory 68 (1934); Freund , Police Power , supra note 35, at 25-26, 425; Horwitz, Transformation , supra note 23, at 74-78; Levy , supra note 34, at 252-54 (1957); Martin V. Melosi, Pollution and Reform in American Cities, 1870-1930 , at 18 (1980); Joel Franklin Brenner, Nuisance Law and the Industrial Revolution, 3 J. Legal Stud. 403 (1974); Paul M. Kurtz, Nineteenth Century Anti-Entrepreneurial Nuisance Injunctions -- Avoiding the Chancellor, 17 Wm. & Mary L. Rev. 621 (1976).

[109]   1 Horace G. Wood, A Practical Treatise on the Law of Nuisances 30 (3d ed., Bancroft-Whitney 1893).

[110]   Id.

[111]   Oliver Wendell Holmes, Jr., The Common Law 1 (1881).

45 HSTLJ 1061

**End of Document**                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Compendium_Cornell
Page 1527



Regulation during the American Founding

Author(s): JOSEPH POSTELL

Source: *American Political Thought*, Winter 2016, Vol. 5, No. 1 (Winter 2016), pp. 80–108

Published by: The University of Chicago Press in association with the Notre Dame Program in Constitutional Studies and the The Jack Miller Center

Stable URL: https://www.jstor.org/stable/10.2307/26543224

**REFERENCES**
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/10.2307/26543224?seq=1&cid=pdf-reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*The University of Chicago Press* and *The Jack Miller Center* are collaborating with JSTOR to digitize, preserve and extend access to *American Political Thought*

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

# Regulation during the American Founding: Achieving Liberalism and Republicanism

JOSEPH POSTELL

**ABSTRACT**

Previous scholarship on the political thought of the American founding has concluded that the founders amalgamated liberalism and republicanism but has not yet identified the precise contours of this combination. The first section of this article lays out the debate between liberalism and republicanism. The second section reveals that the founders, far from promoting laissez-faire, supported and enacted a wide array of regulations at the local, state, and national levels. The third and fourth sections discuss the justification for regulation and demonstrate that the founders' approach to liberalism harmonized the exercise of individual rights and the common good, foundations that have been considered exclusively liberal and republican, respectively. The article concludes by suggesting that regulation provokes questions for the liberal/republican categories, since neither approach adequately explains the founders' rationale in favor of both liberalism and regulation.

The American founders continue to occupy a prominent place in American political discourse and thought. In recent years the influence of the founding has not receded but increased. Furthermore, both sides of the political spectrum have appealed to various elements in the American founding. President Obama opened his second inaugural address by claiming the principles of the founding. "What makes us exceptional—what makes us American," he maintained, "is our allegiance to an idea articulated in a declaration made more than two hundred years ago: 'We hold these truths to be self-evident, that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happi-

Joseph Postell is assistant professor of political science at the University of Colorado Colorado Springs, 1460 Austin Bluffs Parkway, Colorado Springs, CO 80918 (jpostell@uccs.edu).

The author thanks David Azerrad, Josh Dunn, Philip Hamburger, Peter Myers, Johnathan O'Neill, Steven Pittz, and reviewers of *American Political Thought* for very helpful comments on earlier versions of this article.

American Political Thought: A Journal of Ideas, Institutions, and Culture, vol. 5 (Winter 2016).
2161-1580/2016/0501-0004$10.00. © 2016 by The Jack Miller Center. All rights reserved.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

ness" (Obama 2013). At the same time, many of President Obama's political opponents trace their opposition back to the very same ideas and documents.

Debate over the status of the American founding is informed by a tension that has emerged in academic scholarship on the founding. For decades scholars engaged in a debate over whether the founding was rooted in Lockean liberalism or classical republicanism. Much of this argument revolved around whether the founders promoted individual rights and self-interest or dedication to the common good at the expense of rights. While the debate has recently receded and scholars have generally accepted that the founders practiced elements of both, important questions remain unanswered, in part because scholars have not sufficiently examined how the founding generation confronted and addressed the practical problems they faced.

This article seeks to address one of the significant gaps in our understanding of the founding by examining the scope of and justification for regulation during the founding era. After surveying the history and current state of the dispute between the liberal and republican interpretations of the founding, it examines the scope of regulation during the founding period, demonstrating that the founders never defended or practiced laissez-faire in the economic sphere. Then it discusses in detail the justification that founding-era figures offered in defense of the legitimacy of regulation. In their view regulation harmonized the exercise of individual rights and the promotion of the common good by establishing a truly free market, ordering the use of property to protect the rights of all, and limiting the use of property to enhance the freedom of every individual. Liberalism was not understood as incompatible with regulations that achieved these ends, and contrary to the republican interpretation of the founding, regulation was not designed to place the common good over and against individual rights. Thus, in enacting and defending regulations the founding generation acted in a manner not adequately explained by either of the prevailing liberal or republican interpretations.

## THE REPUBLICAN AND LIBERAL INTERPRETATIONS OF THE FOUNDING

Although the liberal interpretation of the American founding can be found in writing prior to World War II (Becker 1922; Dewey 1935), the origin of the liberal interpretation is typically associated with Louis Hartz's *The Liberal Tradition in America* (Hartz 1955).[1] More recently, this interpretation has

---

1. Oddly enough, as discussed later, Hartz's other work shows very clearly the existence of a powerful regulatory power in American politics from the early republic, a fact that is often viewed as a challenge to the liberal thesis.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1530

been advanced by scholars such as Joyce Appleby (1984), John Henry Diggins (1984), Isaac Kramnick (1990), Thomas Pangle (1990), and Michael Zuckert (1996).[2] The basic thesis of this school of thought is that the founders were primarily motivated by ideas embedded in early modern political theory and particularly indebted to the philosophy of John Locke (Gibson 2009).[3] This interpretation stresses the centrality of individual natural rights to the thought of Locke and the founders. The protection of these individual rights, according to this interpretation, is the primary purpose of government, not the subordination of them to the collective good.

Thus, rather than promoting communitarian ideals and a dedication to virtue and the common good, the liberal interpretation emphasizes the centrality of individual rights and freedoms to the founders' political project. Although some accounts emphasize that the founders' liberalism was based on a sophisticated understanding of natural law that limited selfishness, acquisitiveness, and other qualities associated with individualism (Tarcov 1983; Wolfe 2009), according to the liberal interpretation the founders "embraced only a demotic virtue that was necessary for the modern state" (Gibson 2009, 21). While some scholars who advance the liberal interpretation do not dismiss the role of the common good in the founding, this element of the founders' thought is often de-emphasized in liberal accounts, or its role in the practical policies they enacted is not explored.

The republican interpretation, by contrast, finds the meaning of the American founding not in assertions of individual natural rights found in statements of first principles, but in the practice of local self-government and in the continuation of classical republican traditions (Reid 1981; Gibson 2009, 23).[4] Scholars such as Bernard Bailyn (1967), Gordon Wood (1969), and J. G. A. Pocock (1975), among others, have advanced this interpretation. The republican interpretation emphasizes the importance the founding generation placed on civic virtue, on participation in local government and affairs, and on the public good as opposed to the protection of individual rights.

---

2. Although Zuckert is frequently understood as advancing the liberal interpretation of the founding, he argues that the founding is not wholly liberal. Rather, it "was able to incorporate versions" of competing traditions such as republicanism. Thus, while Zuckert understands the founding as fundamentally liberal, it is a "unique amalgam" of other traditions built around a liberal core (Zuckert 1996, 7).

3. As Alan Gibson explains, the liberal interpretation of the founding "suggests that the core of the Founders' political thought is encapsulated in the Lockean variation of the principles of classical liberalism" (Gibson 2009, 13). I rely extensively on Gibson's treatment of the scholarship on the founding in this section.

4. Gibson argues that according to the republican interpretation of the founding, "ideas and behavior, word and deed, cannot be radically separated" (Gibson 2009, 23). Thus, to see the ideas of the founders most clearly, we must look both at the founders' writings and at their actions, not simply the former.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1531

Scholars who have advanced the republican thesis have led many "to direct attention away from the influence of the political thought of John Locke" on the founders, seeking to "raise doubts about whether a Lockean consensus was ever established in the United States" (Gibson 2009, 35–36). The Whigs during the revolutionary period and the Jeffersonians during the 1790s, they argue, were skeptical of capitalism and placed the public or common good ahead of the claims and rights of individuals. As Wood asserts in now-famous passages, "for the republican patriots of 1776 the commonweal was all-encompassing," and it "made partial considerations fade into insignificance." Republicanism in its ideal form for these Whigs, Wood continues, "obliterated the individual." It "was essentially anti-capitalistic, a final attempt to come to terms with the emergent individualistic society that threatened to destroy once and for all the communication and benevolence that civilized men had always considered to be the ideal of human behavior" (Wood 1969, 418–19). Thus, the republican interpretation stresses the founders' elevation of the community over the individual and concern about the effects of capitalism on civic virtue and participation in public life. Various scholars associated with the republican interpretation have argued that these themes of classical republicanism were prevalent both before and after the establishment of the Constitution (Banning 1978; McCoy 1980; Elkins and McKitrick 1993).

This contrast between republicanism and liberalism has dominated scholarly interpretations of the founding for decades, working its way into influential texts on the history of American political development and even into practical political debates. In 1996 Michael Zuckert identified "a more or less raging scholarly Battle of the Books over the initial character of the American regime" (Zuckert 1996, 6). Around the same time, Barry Alan Shain described the "most contentious" of the "heated scholarly debates surrounding the era of the American Founding" as this question of "which of two political philosophies, liberalism or republicanism, best describes the political thinking, moral precepts, political institutions, and long-term aspirations" of the founding (Shain 1994, xiii). These historical controversies spilled over into political controversies, as legal and political thinkers cited the liberal or republican traditions in defense of their favored causes. Prominent legal theorists such as Cass Sunstein began to use the republican tradition to argue that the framers would have endorsed the modern administrative state, and popular writers such as E. J. Dionne seized on the republican interpretation as justification for a public philosophy that stressed the common good (Sunstein 1988; Dionne 2012).

## THE MULTIPLE-TRADITIONS SYNTHESIS

Both sides of the liberal/republican debate can point to a substantial body of evidence in favor of their respective positions. Thus, both interpretations

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1532

clearly identify something central to the founders' project. As a result, this long-standing debate between the liberal and republican interpretations of the founding has "faded from center stage in the academy" (Gibson 2007, 130). The liberal/republican dichotomy has largely been replaced by an "amalgam" interpretation that sees the founding as combining republican and liberal elements (Gibson 2007, 2009).

However, the precise contours of this amalgam have not yet been adequately identified or explained. The challenge is explaining how these different elements coexisted. Were they incompatible elements, each vying for supremacy in American political practice? Or were they overlapping, such that the dichotomy between liberalism and republicanism has largely been invented by scholars who have missed the compatibility between these elements?

Scholarship has thus been more recently directed at answering these questions. David Ericson (1993) argues that the founders were able to amalgamate republicanism and liberalism because republicanism is actually a species of liberalism. In this view, republicanism is a type of liberalism as opposed to an altogether distinct philosophy. Zuckert's *Natural Rights Republic* (1996) also advocates this interpretation, which still places liberalism at the center of the founding but concedes that it is a republican brand of liberalism that the founders embraced. Joshua Dienstag (1996) has also reasserted the liberal interpretation of the founding by demonstrating the Lockean foundations of the founders' emphasis on certain ascetic moral virtues. Thus, in Dienstag's view the founders' concern for virtue is entirely compatible with Lockean liberalism.

As these arguments indicate, one way to explain the synthesis of republicanism and liberalism is to situate one of these two philosophies within the other (Ericson 1993).[5] Another approach is to concede that republicanism and liberalism are distinct public philosophies, but to argue that they are compatible with each other. This is the approach taken by other scholars who argue that classical republicanism remained a part of the founding, in spite of their embrace of liberalism. As Gibson explains, "These scholars view the American Founding as a period of transition in which distinguishable—*though not rival*—idioms of political thought converged and were coherently combined" (Gibson 2009, 57; emphasis in the original). This approach emphasizes the distinctness of the two traditions but insists that they were combined in a coherent fashion. Many advocates of the republican thesis have come to adopt this position (Banning 1986; Kloppenberg 1987; Pocock 1987).

---

5. Ericson represents what Alan Gibson calls the "Neo-Lockean synthesis" school of thought on the founding. This approach grants that both liberal and republican elements were present in the founding, but that liberalism is the core of the founders' approach and republicanism is a variation of liberalism. See Gibson (2009, 54–57).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1533

Therefore, while the liberalism/republicanism debate has receded and the multiple-traditions synthesis has replaced it, it is still unclear how the founders combined liberalism and republicanism. Alan Gibson has written that "the synthetic quality of the political thought of the Founders" has been fully settled, but, as mentioned above, their synthesis "raises as many questions as it answers" (Gibson 2007, 132). The task now is for scholars to "begin with the particular set of problems they identified and addressed," including examining how "the Founding generation confronted concrete daily problems and practices" (Gibson 2007, 159, 139).[6] The following sections of this article use a specific set of issues—issues surrounding economic regulation—to advance our understanding of the founders' practice of liberalism. The founders' practical task of economic regulation sheds light on how the founders understood liberalism as compatible with regulation of a modern economy.

## REGULATION DURING THE FOUNDING PERIOD

The conventional view of American history assumes that prior to the Civil War government regulation was largely absent in America. This view connects purportedly individualist themes in the founders' writings to their dramatic reduction of the degree of government intervention in the antebellum economy. In this view, regulatory programs and the agencies that administer them did not appear until the end of the nineteenth century. Therefore, laissez-faire must have predominated during the antebellum period, which enshrined the founders' liberal philosophy by prohibiting economic regulation. In this way scholars have connected Lockean liberalism to laissez-faire and characterized the founding generation as influenced by both.

This conventional view persists in spite of a significant body of evidence to the contrary. Economic and legal historians have debunked the view that America practiced laissez-faire prior to the Civil War—though these studies are infrequently cited in political science scholarship (Morris 1946; Handlin and Handlin 1947; Hartz 1948; Heath 1954). Lawrence Friedman writes that

6. More specifically, in *Understanding the Founding* Gibson identifies "four specific areas that scholars should now turn their attention to, based on what we have learned" (2007, 156). First, scholars should "examine more intensely the Founders' conception of civil society" (156). Second, scholars should avoid imposing constructs such as the "great antithesis of ancients and moderns" and simply "begin with the particular set of problems they identified and addressed" (158, 159). Third, they should "identify the inegalitarian ideologies that were present in the Founders' political thought" (161). Fourth, they should "explore more fully how the structure of American political institutions, the path of American political development, and even contemporary discourse in American politics have been and continue to be structured by the interactions of multiple traditions of political thought" (162–63). This article takes on one aspect of the second task, namely, examining very significant problems of regulation the founders addressed in the early republic.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1534

"by reputation, the 19th century was the high noon of *laissez-faire*. . . . But when we actually burrow into the past, we unearth a much more complex reality" (1985, 177).[7] This section provides a brief overview of pre–Civil War regulation at the local, state, and national levels. By focusing on the period between ratification of the Constitution and the Civil War, we will see how the founders and the citizens who ratified the Constitution put their new system of government into practice, and how regulation fit into that system.[8] While not exhaustive, this overview will allow us to explore the manner in which the founders reconciled liberalism with economic regulation in the final section of this article.

## FEDERAL REGULATIONS

Because so many of the leading founders, including Madison, Hamilton, and Washington, played a significant role in crafting public policy in early American history, it is useful to begin with federal regulation during the early republic as a means of illustrating the founders' acceptance of regulatory activity. Since the federal government was a government of enumerated powers, rather than plenary power, regulation at the federal level occurred in a limited number of areas. Nevertheless, some of these regulatory endeavors are significant and illustrative. During the 1790s, the federal government both forbade the use of liquor in the fur trade and also required all fur traders to be licensed and bonded (Fine 1964, 19). It also distributed funds for disaster relief, despite a failed attempt to do so when the city of Savannah was destroyed by fire in 1796 (Balogh 2009, 145). It administered an extensive pension system for war veterans and an elaborate program for selling public lands to citizens (Jensen 2003; Mashaw 2012). In addition, the federal government subsidized internal improvements such as roads and canals in order to connect the various parts of the nation and stimulate economic activity (Balogh 2009).[9]

Perhaps the most fascinating example of federal government intervention in the economy during this period involves Congress establishing federal hospi-

---

7. See also Mashaw (2012, 14).

8. Of course, any attempt to define the period in which the founders established regulation must to some extent be arbitrary. Yet the period between ratification and 1860 provides us with insights from political and legal thinkers such as Hamilton, Madison, Kent, and Shaw who broadly subscribed to the natural law political and legal thought that undergirded the founding. This allows us to examine the theorists who helped to craft and justify the Constitution, as well as the legal thinkers who were educated within and who defended the philosophical school that informed the making of the Constitution.

9. Balogh discusses some of the more obscure subsidies, such as Congress's grant to Zane's Trace, "a trail running from western Virginia to Ohio." He also notes that these activities were supported by a number of prominent founders, such as Washington and Madison.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

tals for sick and disabled seamen in 1798. The program levied a tax of 20 cents per month to be deducted from the wages of all seamen engaged in coastal trade and fishing, and the funds were used to establish the US Marine Hospital Service. This program was administered in addition to an act requiring all US vessels engaged in coastal trade and fishing to enroll with and be granted a license by the federal government, which also entailed compliance with federal regulations (Mashaw 2012, 34–35).

## STATE AND LOCAL REGULATIONS

While the federal government was active in certain areas of regulation during the early republic, the majority of regulation occurred at the state and local levels. Here the regulatory power of government was widespread and spanned all areas of economic life, from common carriers to banks and labor. Seen as a whole, the activities of states and localities during the antebellum period demonstrate the founding generation's commitment to regulation.

Many of these regulations restricted the use of property so that others were capable of enjoying their property without injury or interference. For example, in the half century after the Revolution "plaintiffs could recover damages for a nuisance" for a variety of injuries, from factories emitting foul smells to draining a pond that causes another's well to dry up (Nelson 1975, 121–22). Regulations were often codified rather than left to the common law. In the 1830s, the state of Michigan authorized local officials to assign specific places for the practicing of trades that were offensive to other citizens or dangerous to the public health (Friedman 1985, 184–85; Novak 1996, 15). Activities such as the burying of the dead and the storage of gunpowder were extensively regulated in such statutes (Novak 1996).

Another area of state and local regulation involved inspections and licensing. States established these programs widely during the founding period. In Massachusetts and Pennsylvania, for example, inspections were required for a variety of commodities before they could be sold, including lumber, beef, tobacco, butter, bar iron, and salt (Handlin and Handlin 1947, 64–68; Hartz 1948, 204–5). These inspection laws were implemented in states as diverse as Connecticut, New York, Georgia, and Michigan (Friedman 1985, 183; Novak 1996, 15). The inspections covered packing and dimensions of containers, markings and stampings, and, of course, the quality of goods. States and localities also used licensing to regulate entry into various occupations, including lawyers, doctors, innkeepers, tavern owners, and auctioneers (Handlin and Handlin 1947, 69–74; Hartz 1948, 206–7; Nelson 1975, 123–24; Friedman 1985, 185). The licensing of liquor merchants enabled temperance advocates to stamp out perceived moral illnesses in society. In many states licensing programs were used essentially to forbid liquor sales altogether (Handlin and

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Handlin 1947, 252–54; Hartz 1948, 208; Nelson 1975, 130; Novak 1996, 155–56).

Finally, state and local regulation governed common carriers and charters of incorporation to economic entities. In early America states granted specific charters of incorporation to specific entities by special (rather than general) incorporation. Since the states crafted special incorporation laws to apply to specific actors, they could use the chartering process to impose regulatory duties. Banks were often partially owned by the states that incorporated them, and some states set the maximum interest rates that banks could charge for loans in their charters (Friedman 1985, 179–80).[10] Transportation companies were also regulated through special incorporation. Illinois required every chartered ferry keeper receiving a charter to display the "rates of ferriage . . . by law allowed" (Friedman 1985, 187). The doctrine of "duty to serve" was concomitant with a special charter of incorporation; the law assumed that if the government granted permission to set up and operate a common carrier, the owners could be required "to grant equality of access to members of the community seeking to use them" and to comply with regulatory requirements (Scheiber 1997, 845).

This brief overview illustrates the extent of regulation that the founding generation accepted as legitimate. Hardly dedicated to the idea of laissez-faire, the founding generation saw no philosophical objection to these kinds of regulations. What remains to be seen is why certain regulations were defensible. As the following sections discuss, for the founders regulation was defended on liberal grounds, as compatible with their understanding of liberalism. Regulation was not seen as the assertion of republican principles over the liberal foundations of the nation. Rather, regulation was seen as the means of achieving a true liberalism, one in which regulation harmonized the protection of rights and the common good.

## LIBERALISM, REGULATION, AND THE COMMON GOOD

Regulation during the American founding period was so pervasive and thoroughgoing that it is impossible to conclude that the founders believed in the idea of laissez-faire. Nor did prominent founders defend laissez-faire in their public pronouncements (Dorfman 1961, 1315).[11] In his *Report on Manufac-*

10. As Friedman explains, "Pennsylvania owned one-third of the capital of the Bank of Pennsylvania, chartered in 1793. The Bank of the State of South Carolina, chartered in 1812, acted as the state's depository and fiscal agent; it was in effect the banking arm of the state itself." In Vermont one charter limited interest on loans to 6% (Friedman 1985, 179–80).

11. As Dorfman summarizes, during the time of the founding "laissez-faire meant, as a general principle, little more than its advocates opposed, in most cases, any direct interference

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1537

*turers*, for instance, Alexander Hamilton rejected the idea that "To leave industry to itself [is] . . . the soundest as well as the simplest policy." While he granted that "this mode of reasoning is founded upon facts and principles, which have certainly respectable pretensions," such ideas "blend a considerable portion of error with the truths they inculcate" (Hamilton 1791/1904, 4:71–73).[12] James Madison voiced the same opinion, stating that the best policy of government "will be found to lie between the extremes of doing nothing and prescribing everything; between admitting no exceptions to the rule of '*laissez faire*,' and converting the exceptions to the rule" (Madison 1829/1865, 4:12). As we have just seen, the founders practiced what they believed. They did not subscribe to the theory of laissez-faire, nor did they establish a laissez-faire policy at any level of government.

What does this entail for the liberal and republican interpretations of the theory of the founding? It might seem that regulation favors the republican interpretation, since classical republicanism emphasizes the common good over and above individual rights. However, the goal of regulation was not to promote the common good over the rights of individuals. Rather, regulation properly understood was established for the purpose of harmonizing the rights of individuals with the common good. Thus, for the founding generation, regulation was seen as compatible with both liberalism and republicanism.

## REGULATION: PROVING THE REPUBLICAN THESIS?

Some treatments of regulation in early America view the existence of regulation as a clear sign of the founders' preference for republicanism over liberalism. In one recent book, Brian Balogh (2009) chronicles the largely unnoticed but profound role the national government played in ordering the nineteenth-century economy. Balogh suggests that the expansive role of the national government in the nineteenth century demonstrates that the founders were classical republicans. He argues, "The commonwealth tradition stressed that the public good derived from placing the polity's interests ahead of the rights of individual citizens. Service to the republic disciplined self-interest in the cause of the commonwealth of all citizens" (Balogh 2009, 24). In this view, founders such as Washington "conceived of liberty as a corporate privilege to be enjoyed collectively by all of the republic's citizens. It was a blessing bestowed

---

by government with the market determination of the prices of goods or of the factors of production," rather than a blanket condemnation of all government intervention (1961, 1315).

12. Elsewhere Hamilton wrote of laissez-faire, "This favorite dogma, when taken as a general rule, is true; but as an exclusive one, it is false, and leads to error in the administration of public affairs" (Hamilton 1801/1904, 8:262–63).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1538

on the entire community rather than a privately held benefit distributed to rights-bearing individuals" (24).[13] In their classical republican philosophy "the obligation to serve trumped private interests. . . . There was little room for private interest in republics. Indeed, private interest represented one of the greatest threats to republican government" (28). Finally, "The rights of citizens were not contracted for in a universal state of nature, as enlightenment thinkers had begun to argue. Rather, they were derived specifically from loyalty to the republic. The republic's safety and welfare, in turn, trumped individual rights when the two were in conflict" (30). In summary, the evidence of a tradition of regulation for the sake of the common good, in this interpretation, undermines the liberal view of the founding, with its emphasis on individual natural rights and private interests.

The story that emerges from this understanding of the early republic is not one of amalgamating liberalism and republicanism. In this narrative the founding's essentially classical republican character is illustrated by the role of regulation in placing the common good over the rights of individuals. In the same vein, William Novak argues that "nineteenth-century America . . . was predicated on the elemental assumption that public interest was superior to private interest. . . . Historians of civic republicanism have alerted us to the prominence in early American thought of an autonomous conception of the public good" that is associated with the republican interpretation of the founding (Novak 1996, 9).

According to many students of the early republic, then, regulation cannot be reconciled with the liberal interpretation of the founding. Rather, it demonstrates the predominance of republicanism over liberalism. This view emphasizes the incompatibility of liberalism and republicanism, such that a government that protects individual rights is incompatible with the promotion of the common good. If the public good and private rights are in conflict, then regulation shows that when this conflict arose, restraints on private rights were adopted in order to advance the public good. Hence, when the founders' came to making practical choices of economic policy, in this view, they opted for republicanism over liberalism.

## INDIVIDUAL RIGHTS AND THE COMMON GOOD: A FALSE TENSION?

This argument in favor of the republican character of the founding, however, does not square with the founders' own rationale in favor of regulation, which

---

13. See also Balogh (2009, 26): "Revolution-era Americans conceived of rights inhering in the corporate associations to which they belonged."

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1539

was based on their interpretation of liberalism rather than classical republican arguments. The founders did not justify regulation as placing the common good over individual rights. They argued that the right kinds of regulations promoted both individual rights and the common good. The liberal/republican dichotomy implies that these two concepts are at odds, but for the founders the protection of individual rights was a necessary condition for the promotion of the common good. In their approach to public policy, the public welfare consisted primarily of a community in which every individual citizen enjoyed the greatest sphere of liberty (equal to that of others) to live, prosper, and pursue his own reasonable understanding of happiness. Regulations were not government commands issued for any purpose but were rules intended to secure, order, and enlarge freedom. Such an approach, in their estimation, would advance both the private interests of all and the public welfare as a whole. Thus, in enacting and defending regulations, the founders acted in a way that was compatible with both liberalism's attachment to individual rights and classical republicanism's emphasis on the public welfare. This approach can be seen both in the founders' theoretical writings on regulation (discussed in this section) and in their practical, legal defenses of regulation (discussed in the next section).

### LIMITS TO LIBERTY AND PROPERTY RIGHTS IN LOCKE

As scholars have long understood, including those who have connected the founding to the liberal tradition, the founders' view of individual rights is heavily influenced by Locke. To understand their view of the relationship between individual rights and the common good, therefore, a brief examination of Locke's view of this relationship will be helpful. The first thing to note is that Locke himself accepts limits to the scope of natural rights to life, liberty, and property in the *Second Treatise*. There, he argues that "the first and fundamental natural law . . . is the preservation of the society, and (as far as will consist with the publick good) of every person in it" (Locke 1967, sec. 134). The preservation of society itself, and of every person in it, is the most fundamental principle of natural law. Liberty and property rights are secondary to this first and fundamental natural law. Thus, Locke defines political power as "a right of making laws . . . for the regulating and preserving of property, and of employing the force of the community, in the execution of such laws, and in the defense of the common-wealth from foreign injury, and all this only for the publick good" (sec. 3).

This provides an opening, from within Locke's liberal framework itself, for the regulation of liberty and property rights—but only insofar as is necessary for the preservation of society and those in it. For Locke the preservation of

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1540

every person in society requires the preservation of the liberty and property rights of every person. For if one's rights to liberty and property are not protected by law, then one's very life is at risk, since liberty and property rights are necessary to give effect to the right to life. As Locke explains, "reason bids me look on him, as an enemy to my preservation, who would take away that freedom, which is the fence to it. . . . This makes it lawful for a man to kill a thief . . . let his pretense be what it will, I have no reason to suppose, that he, who would take away my liberty, would not when he had me in his power, take away every thing else" (Locke 1967, secs. 17–18). And under the natural law no person has the right to forfeit his right to life: "No body can give more power than he has himself; and he that cannot take away his own life, cannot give another power over it" (sec. 23). Therefore, regulation of liberty and property rights is necessary to preserve the liberty and property rights of all, which are necessary to secure the preservation of all, which is the fundamental law of nature.

In short, the law of nature, which itself gives rise to natural rights, also binds the use of those rights so that the rights of all are preserved. The rights of individuals are not unbound, but are conditioned on the preservation of the rights of everyone else. As a result, Locke could write without contradiction that "the Prince or Senate" has "the power to make laws for the regulating of property between the subjects one amongst another" (Locke 1967, sec. 139) and that "in Governments the Laws regulate the right of property, and the possession of land is determined by positive constitutions" (sec. 50). For Locke, liberty may be regulated by law, which ought to reflect the duties imposed by the natural law. Such regulations do not conflict with freedom but enhance it. "For Law, in its true notion," Locke explains, "is not so much the limitation as the direction of a free and intelligent agent to his proper interest. . . . So that, however it be mistaken, the end of law is not to abolish or restrain, but to preserve and enlarge freedom: For in all the states of created beings capable of laws, where there is no law, there is no freedom" (sec. 57). Freedom, for Locke, is not the absence of law but the existence of proper laws that preserve and enlarge the freedom we have a right to by nature.

As scholars such as Michael Zuckert have demonstrated, Locke—like John Rawls and prominent Catholic natural law theorists—conceives of rights as independent of purely consequentialist considerations and therefore as not limited by such considerations (Zuckert 2005, 263–64).[14] However, while

---

14. Both Rawls and John Finnis, a prominent Catholic natural law theorist, emphasize that rights are independent of consequentialist considerations. See Rawls (1971, 22–33) and Finnis (2011, 146–56).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1541

rights are not limited by consequentialist considerations, they are limited by the very conception of rights as grounded in a law of nature that sets limits on the exercise of those rights. In other words, as Zuckert has stated, "it is in terms of rights securing that the political good is chiefly to be understood," but securing rights requires restraints on the use of rights (264). These restraints necessary for the fuller enjoyment of rights are the basis for and purpose of regulation. The common good is promoted chiefly by the protection of rights, but the protection of the rights of all requires reasonable regulation.

## INDIVIDUAL RIGHTS AND THE COMMON GOOD IN THE THOUGHT OF THE FOUNDERS

As explained earlier, contemporary definitions of Lockean liberalism and classical republicanism problematically place the protection of natural rights and the pursuit of the common good at odds with each other. As a result, the existence of regulation during the founding period, to the extent that it is recognized and discussed by scholars, is taken as evidence that the founders followed classical republicanism rather than liberalism when theory met practice. However, this is not the manner in which the founders themselves viewed issues surrounding regulation. In their view, as well as Locke's, the protection of individual rights was not incompatible with securing the common good. Furthermore, rights were governed by the natural law, and therefore limits were attached to their exercise; these limits did not subordinate rights to the common good but rather secured rights in the proper sense. In the arena of economic regulation, these principles meant that regulation could serve both ends, fulfilling the protection of natural rights and providing for the common good.

Many letters and treatises of the founding period emphasized that the protection of individual rights and the pursuit of the common good were compatible and overlapping enterprises. Nathaniel Chipman, whose *Principles of Government* stands as one of the few comprehensive treatises of the period, wrote that "the laws of nature, rightly understood, are found to aim, as well at the promotion of the individual as the general interests—or rather the promotion of the general interests of the community, *through* the private interests of the individual members" (Chipman 1793/1833, 36–37, emphasis in the original). Chipman quoted approvingly Burlamaqui's definition of natural liberty: "the right which nature gives to all mankind disposing of their persons, and property, after the manner they shall judge most consonant to their happiness; on condition of their acting within the limits of the laws of nature, and that they do not in any way abuse it to the prejudice of other men" (59). This definition of natural liberty includes the duty to ensure that one's exercise of

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

rights does not transgress the limits established by the law of nature, and that liberty is not abused to the detriment of others.

James Wilson's expression of natural rights in his famous *Lectures on Law* followed the same line of reasoning. Wilson affirmed that "every citizen is, of right, entitled to liberty, personal as well as mental, in this highest possible degree, which can consist with the safety and welfare of the state" (Wilson 1791/2007, 2:1132). These natural rights, though affirmed, were therefore not contradicted when they were limited for the sake of the preservation of society or the rights of others. As a result, Wilson concluded, "our municipal regulations concerning [mental liberty] are not less hostile to the true principles of utility, than they are to the superior law of liberty" (2:1132). These regulations did not restrict freedom; they increased it: "every citizen will gain more liberty than he will lose by those prohibitions" (2:1132). Thus, he concluded that "by the municipal law, some things may be prohibited, which are not prohibited by the law of nature" (2:1056). The protection of natural rights is not, for Wilson, opposed to the "true principles of utility." The general interests of the community are promoted by municipal regulations that both increase the liberty of the individuals regulated and ensure the safety and security of others.

Regulations were therefore legitimate if they achieved both objectives—increasing the liberty of the regulated and establishing the safety and security of others. As Zephaniah Swift, an early American judge and author, explained, "that property may be upon a certain, permanent foundation, there have been positive rules adopted by mankind, which govern the acquisition, the use, and the disposition of it. These are calculated to give the possessors a more perfect enjoyment, than can be derived from natural law" (Swift 1795, 1:182). Regulation was understood not to be in conflict with natural rights, but to be necessary for the "more perfect enjoyment" of these rights, in a manner compatible with the natural rights of all.

## TO SECURE THESE RIGHTS: LEGAL DEFENSES OF REGULATION DURING THE FOUNDING

In their theoretical defense of regulation, therefore, the founding generation argued that both individual rights and the common good were compatible ends of public policy and that the common good would be pursued in part by protecting and regulating the exercise of rights. Their practical justification for regulation similarly followed this analysis. By examining some examples of early American regulations and how they were defended, this section will demonstrate that the founders' approach to reconciling individual rights and the common good, as described in this article, squares with their justification of regulation better than contemporary approaches that bifurcate individual

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1543

se 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.18995   Page 124
715
Regulation during the American Founding • 95

rights and the common good under the banners of liberalism and classical republicanism.

## QUARANTINES AND HEALTH REGULATIONS

It will be helpful to begin with easy cases where regulations are clearly necessary to protect public health. In such cases regulation is clearly compatible with natural rights as understood through natural law, since no person has the right to use his liberty to infringe the rights of others by threatening their health or lives. Quarantine regulations in the early republic demonstrate this reasoning in practice. In the cases of *Coates v. City of New York* (7 Cow., N.Y. Supreme Court [1827]) and *Brick Presbyterian Church v. City of New York* (5 Cow., N.Y. Supreme Court [1826]) two churches challenged an 1823 New York City bylaw forbidding the burial of the dead in a designated portion of the city. The burial of the dead was a matter that affected the public health, and most municipalities enacted quarantine regulations to ensure that burial did not threaten the life or health of others. As Justice Lemuel Shaw later stated in the case of *Commonwealth v. Alger* (7 Cush., Mass. Supreme Judicial Court [1853]), regulations that prohibit certain uses of property, by (for instance) prohibiting the storage of gunpowder in a populous neighborhood, requiring wooden buildings to be covered with incombustible material to prevent the spread of fire, or prohibiting the raising of dams that cause unhealthy stagnant waters to form, are not injurious to property rights. In Shaw's words, "this is a police power, to prohibit a particular use, and not every use of which the land is capable; a power to regulate, not a power to destroy" (*Commonwealth v. Alger*, 62). This distinction between the power to regulate and the power to destroy is revealed in judicial opinions that tested the legitimacy of burial regulations.

The New York City bylaw preventing burial of the dead, the churches argued in court, violated their property rights by depriving them of their ability to establish cemeteries. The question for the New York Supreme Court was whether the bylaw was a valid regulation. In upholding the bylaw, the court declared that "no property has, in this instance, been entered upon or taken" (*Brick Presbyterian Church v. City of New York*, 542). The regulation did not infringe the right to property because, as Eric Claeys explains, "the cemetery law stopped them from doing something they had no right to do" (Claeys 2003, 1578). The right to property did not grant property owners the right to injure others or to threaten public health or safety. Thus, the bylaw merely reflected, in the court's words, the "power so to order the use of private property . . . to prevent its proving pernicious to the citizens generally" (*Coates v. City of New York*, 606). As with the abatement of nuisances, the court claimed, a regulation that orders the use of property "to prevent its proving pernicious" does

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1544

not violate property rights in the name of the public interest, because the right to property does not entitle someone to take property in a way that injures the rights of others.

The reasoning employed by the New York Supreme Court in upholding quarantine regulations is further illustrated by an 1834 Massachusetts case that produced the opposite result, *Austin v. Murray*, 16 Pick. 121, Mass. Supreme Judicial Court (1834). In that case, the state passed a statute that gave town selectmen the power to establish burial regulations. The selectmen were also empowered to establish penalties for the violation of their rules, orders, and regulations. The selectmen of Charlestown made a bylaw declaring that no person could bring a dead body into the town without the written permission of a majority of the selectmen. A further provision in the bylaw prohibited burial in the town without a license granted by the selectmen.

Thomas Murray, the undertaker of the Catholic church in nearby Boston, was charged with bringing dead bodies into the city without permission for internment in the church's local cemetery. When the bylaw was challenged, the Massachusetts Supreme Judicial Court invalidated it as "an unreasonable infringement on private rights" (*Austin v. Murray*, 127). The parties conceded that the bylaw's provision requiring written permission to bring a body into the town was an unconstitutional delegation of power. However, the selectmen argued that the licensing provision was valid, and that Murray had still acted unlawfully in burying the dead without a license. Justice Samuel Wilde opined that "a by-law to be valid, must be reasonable. . . . Now if this regulation or prohibition had been limited to the populous part of the town, and were made in good faith for the purpose of preserving the health of the inhabitants . . . it would have been a very reasonable regulation." But this regulation extended several miles into the country, "to the utmost limits of the town. Now such unnecessary restraint upon the right of interring the dead, we think essentially unreasonable" (*Austin v. Murray*, 125). This "is a clear and direct infringement of the right of property, without any compensating advantages, and not a police regulation, made in good faith, for the preservation of health" (*Austin v. Murray*, 126). In short, according to the Massachusetts Supreme Judicial Court, a regulation that actually sought to protect the public health would not be a violation of natural rights. But there was a distinction between such a regulation, which merely restricted something from being done that was never permitted under the law of nature to begin with, and a regulation that was not necessary to preserve public health. Those kinds of regulations, the court argued, were unnecessary and violated individual rights.

In these cases, the courts' underlying logic was neither that of a selfish individualism nor that of subordinating individual rights to some amorphous common good, as the customary liberal and republican interpretations posit.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1545

Rather, the logic undergirding regulation is best explained by the understanding of liberalism as articulated in this article. Restrictions such as those governing the burial of the dead were not infringements of property rights but rules to ensure that one firm's use of property (in Madison's words) "leaves to every one else the like advantage" (Madison 1792/1983, 266). As Chancellor James Kent wrote in his *Commentaries*, "every individual has as much freedom in the acquisition, use, and disposition of his property, as is consistent with good order, and the reciprocal rights of others" (Kent 1836, 2:328). Put simply, liberty under natural law does not encompass the right to infringe the rights of others, and many regulations were designed simply to ensure that the reciprocal natural rights of all would be preserved.

### SECURING AND INCREASING THE LIBERTY OF ALL: TRAFFIC REGULATIONS

In addition to regulations that restrain injurious exercises of rights, the founders' understanding of liberalism permitted regulations that increase the rights and liberties of all without taking the rights of any person. As Wilson and others stated when speaking of municipal regulation, "every citizen will gain more freedom than he can lose by such prohibitions" (Wilson 1791/2007, 2:1132). Some regulations, in other words, actually increased the liberty of all by adjudicating in areas where common pools required reinterpreting and reallocating property rights. When property is appropriated out of the commons, it is still necessary to regulate the use of commodities such as water and land so that communication and transportation networks can be constructed. These networks increase the freedom of all as long as individuals do not use their property to interfere with their development. Infrastructure must be developed to increase the freedom of all, and this will require some reallocation of property rights of the people affected to facilitate development.

Though prevailing liberal interpretations suggest that traffic laws interfere impermissibly with individual rights, and the classical republican interpretation examines these regulations and sees evidence of the founders' communitarianism, the understanding of liberalism advanced in this article can explain and justify these regulations as harmonizing individual rights and the common good. Traffic regulations ordered the exercise of liberty and property to facilitate others' exercise of the same rights.

Many early American regulations promoted development of infrastructure and transportation networks, and legal opinions defending the validity of these regulations during the early nineteenth century demonstrate the application of this principle. One case, *Vanderbilt v. Adams*, 7 Cow. 349, N.Y. Supreme Court (1827), addressed traffic regulations in New York Harbor. The state

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1546

of New York empowered harbormasters to regulate harbor traffic within the limits of New York City, including the power to move vessels not unloading cargo in order to make space for the unloading of cargo by a newly arriving vessel. Vanderbilt, the lessee of a private wharf on which his boat was docked, refused to obey an order by the harbormaster and was fined. He challenged the legitimacy of the regulation, and the New York Supreme Court upheld the ordinance.

In upholding the power of the harbormaster to move ships in the harbor, the court explained that "the power exercised in this case is essentially necessary for the purpose of protecting the rights of all concerned." The rights of all, including the rights of Vanderbilt himself, were protected by traffic regulations on common space such as harbors and wharfs. Thus, the court argued that the ordinance was "not, in the legitimate sense of the term, a violation of any right" and that the regulation "would not be upheld, if exerted beyond what may be considered a necessary police regulation." But in this case the regulation "is not considered an injury. So far from it, the individual, as well as others, is supposed to be benefited. . . . It is for the better protection and enjoyment of that absolute dominion which the individual claims" (*Vanderbilt v. Adams*, 351–52). Here the court explained that no person has a property right effectively to exclude others from use of the harbor. Furthermore, the regulation in question expanded not only the right of others to use the harbor to unload cargo but also Vanderbilt's right to use the harbor, since the regulation ordered the rules by which the harbor would be used by all. In this case, then, the court affirmed that no right was taken, and that the regulation actually expanded liberty and property rights for each possessor.

In another case dealing with infrastructure, *Commonwealth v. Alger*, the Massachusetts Supreme Judicial Court upheld a series of Massachusetts laws that redrew the harbor lines of Boston Harbor. The boundary laws were challenged by a wharf owner (Alger) whose wharf was bifurcated by the new lines. Alger's wharf was considered a nuisance in violation of a legitimate regulation, and he was not compensated, since no taking of property was deemed to have occurred.

Lemuel Shaw, the chief judge, upheld the action as a regulation of property under the police power rather than a taking of property for public use. The object of the regulation was "to prevent injurious obstructions in the harbor of Boston, and to secure the free, common, and unobstructed use thereof, for the citizens of the commonwealth . . . as a common and public right" (*Commonwealth v. Alger*, 84). The goal was common to all of the citizens in the society, and the regulation was a means of advancing that goal by facilitating the development of infrastructure that all could use. No single person, claiming an absolute right to property, could obstruct the development of this kind

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

of transportation network; that would be a claim to an injurious use of property, tantamount to blackmailing the public. Therefore, Shaw concluded, "every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated, that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community" (*Commonwealth v. Alger*, 84–85). Moreover, "in the exercise of the more general power of government, so to restrain the injurious use of property, it seems to apply more significantly and more directly to real estate thus situated on the sea-shore . . . to which the public have a common and acknowledged right" (*Commonwealth v. Alger*, 96). Thus, because this property was situated particularly in an area held in common by all, uses of it are more likely to become injurious by thwarting the development of infrastructure that expands the rights of every person in the society.

Consequently, the redrawing of the harbor lines did not subordinate Alger's right to the interests of the whole society. Rather, it benefited all, including Alger himself, by preventing an injurious use of property. After all, Shaw argued, "the tradesman needs to know, before incurring expense," where the lines separating private and public waters will be drawn. "This requisite certainty and precision can only be obtained by a positive enactment." Such an enactment, he continued, would allow everyone to "more certainly know their own and the public rights, and govern themselves accordingly" (*Commonwealth v. Alger*, 96–97, 103). Thus, while the regulation in one sense limited Alger's use of his property, on the whole it expanded the stability and certainty of Alger's property rights by setting a clear rule separating private and public waters. This regulation, then, like the regulation in *Vanderbilt v. Adams*, did not subordinate Alger's rights to the common good. It actually expanded both Alger's rights and the rights of others by preventing an injurious use of property from restricting the development of infrastructure in which all have a common interest and on property in which there is a common right. Examining the principles developed in these cases helps illustrate, where the prevailing liberal and republican interpretations cannot, how certain regulations harmonize individual rights and the common good rather than prioritizing the latter over the former.

## PROPERTY AFFECTED WITH A PUBLIC INTEREST: MILLDAMS

Milldams served as another type of infrastructure that the founding generation developed in part through regulation. These dams were constructed along waterways for purposes such as grinding wheat into flour (gristmills). In the process the lands of upstream property owners were often flooded because the

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

operation of the mill required the creation of a head of water, a process that diverted the flow of water from its natural channels. Without some protection against damage lawsuits from other property owners, milldam builders would face compelling disincentives to undertake these beneficial projects. The difference between the development of milldams and other infrastructure was that gristmills were operated privately on private land but were used by the public as a common carrier under rates set by municipal regulation. Though they were privately held, gristmills were common carriers with a duty to provide access to the public. As such, they were considered by judges to satisfy the "public use" requirement for takings of property with compensation (Claeys 2004, 902–3).

To deal with the spillover effects of milldams, many states passed statutes establishing a framework for adjusting the rights of those affected. "An Act for the Support and Regulation of Milldams," passed in Massachusetts in 1795, is typical. These statutes typically contained several elements. First, affected property owners could complain to the local Court of Common Pleas, which would convene a jury to render an appraisal of the amount of damage done. Second, a court would assess the damage amount to be paid annually to the injured property owner.[15] Once undertaken, this process barred private lawsuits for damages resulting from the normal operation of the mill.[16] Finally, in exchange for the franchise to establish a public service, the millers assumed regulatory obligations to keep weights and measures, to allow the passage of fish through the stream at certain periods, and to charge a set sum for others' use of the mill. While many statutes specified that gristmills specifically served a public purpose, others were more broadly worded so that they extended the same protections to mills established for private manufacturing purposes.

In many states these acts were challenged by landowners whose lands were flowed by the milldams. The courts therefore were forced to consider whether the milldam statutes violated property owners' rights. When the cases involved gristmills, the courts' task was straightforward: the property was taken for public use, so compensation was due to the affected owners. However, since

15. In some states, unlike Massachusetts, the owner of the flooded lands simply relinquished title to the land itself and was paid damages when the permission to establish the mill was granted. But otherwise, most states had statutes that were essentially identical to that of Massachusetts, including Virginia, Indiana, Kentucky, Maine, Rhode Island, North Carolina, and Wisconsin.

16. This point was often disputed by litigants in nineteenth-century Massachusetts, many of whom argued that the statutory remedy was only additional and did not displace the traditional common-law remedy for damages. See Nelson (1975, 159). Maine's statute expressly prohibited common-law damage actions.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1549

the owners benefited from the development of a public facility where they could take their grain to be ground into flour, compensation was only given for the market value of the property taken. In other cases, however, where the mill was used to generate power for private manufacturing, it was not considered a public use and therefore could not be justified under the power of eminent domain. Nevertheless, the statutes were upheld as regulations of property in order to promote the reciprocal advantage of all.

Although not every statute, judge, and lawyer in the nineteenth century formulated and applied these distinctions consistently, they were understood by the most perspicacious legislators, lawyers, and judges, who established precedents to guide others. One of these judges, Lemuel Shaw (author of the *Commonwealth v. Alger* decision), acknowledged in upholding the Massachusetts milldam statute that it was "somewhat at variance with that absolute right of dominion and enjoyment which every proprietor is supposed by law to have in his own soil"; therefore, "it will be useful to inquire into the principle upon which they are founded. We think they will be found to rest for their justification, partly upon the interest which the community at large has in the use and employment of mills, and partly upon the nature of the property, which is often so situated that it could not be beneficially used without the aid of this power" (*Fiske v. Framingham Manufacturing Co.*, 12 Pick. 68, Mass. Supreme Judicial Court [1832]). In Shaw's formulation, the peculiar nature of the property involved justified the mill acts. Without a set of rules for ordering the property, it could not be "beneficially used" to the reciprocal advantage and enhanced freedom of all.

Shaw's inquiry into the principle grounding the mill acts informed the Supreme Court's famous 1885 milldam decision in *Head v. Amoskeag Manufacturing Co.*, 113 U.S. 9 (1885). Amoskeag created a mill that flooded the lands of a nearby property owner (Head). Head was compensated for the flooding, but he alleged that the New Hampshire statute was unconstitutional because the mill—a power mill—was not for public use. Amoskeag countered that the mill satisfied the public use requirement. Thus, both sides focused on the public use question.

However, in deciding the case the Supreme Court argued that the statute did not take property at all, rendering the public use question irrelevant. Rather, borrowing a phrase from Shaw, the court argued that the statute is "valid as a just and reasonable exercise of the power of the legislature . . . to regulate the use of the water-power of running streams, which without some such regulation could not be beneficially used" (*Head v. Amoskeag Manufacturing Co.*, 26). The court relied extensively on Shaw's analysis of the Massachusetts milldam act. The flooding of another's lands, Shaw reasoned, stems from a milldam owner's noninjurious use of his property. The milldam

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1550

owner is not using his property in a manner that is injurious. The property is simply situated such that his action affects the property right of the owner whose land is flooded. In this instance the mill owner "cannot use his own property without flowing the water back more or less on the lands of some other proprietor." This means that "the mill-owner and the owner of lands to be flowed cannot both enjoy their full rights" (*Fiske v. Framingham Manufacturing Co.*, 70–72).

Because neither party is using his property injuriously, the conflict stems merely from the peculiar circumstances that prevent the property from being used. Both parties have "an equal right to the use of [the stream], for all reasonable and beneficial purposes, including the power of such stream for driving mills." "Consequently no one can deprive another of his equal right and beneficial use by corrupting the stream" (*Bates v. Weymouth Iron Co.*, 8 Cush. 548, Mass. Supreme Judicial Court [1851]). The only way to resolve this conflict in a way that benefits everyone is to afford one owner the right to use his property and compensate the other. If the owner whose property is flowed is afforded the right to block the milldam project, then the public loses the benefit of the mill. To avoid this outcome, which both reduces the freedom of everyone and harms the public interest, the law works in the opposite direction. But Shaw and the judges in *Head v. Amoskeag Manufacturing Co.* argued that this is not an infringement of a right or a taking of property for public use. It merely affords the milldam owner his legitimate right to use his property: "It is not a right to take and use the land of the proprietor above against his will, but it is an authority to use his own land and water privilege to his own advantage and for the benefit of the community . . . in a manner best calculated, on the whole, to promote and secure their common rights in it" (*Bates v. Weymouth Iron Co.*, 552–53). This reallocation of rights is justified only because the property cannot be used to anyone's advantage without the regulation, and only if everyone is made better off as a consequence of the regulation.[17]

The defense of regulation is addressed by Richard Epstein in his classic work *Takings*. Epstein explains that (while he adequately addressed the fundamentals of his theory) Locke does not adequately address the fact that "there are transaction costs, holdout, and free-rider problems that are almost insuperable when the conduct of a large number of individuals must be organized" (Epstein 1985, 5). The purpose of establishing the state is to ensure that the

---

17. As Eric Claeys explains, "In the proper circumstances, reciprocity-of-advantage regulations can coerce a property owner to sacrifice some of his rights, without any showing that the owner's use of his property harmed his neighbor. But to justify a reciprocity-of-advantage regulation, the government must show that the regulation makes the ousted owner better off" (Claeys 2004, 919).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1551

natural rights of citizens are more secure under the social compact than they would be in the absence of government. The establishment of government therefore produces a gain in the security of rights and in the fruits of labor. Thus, in forming a government the goal is to ensure that "everyone is made better off and no one is made worse off by the move from the state of nature to civil society" (8). This surplus gain must be divided up appropriately among all the citizens in accordance with their contributions, so that all are better off and none are worse off (10).

In keeping with this objective, the milldam regulations guaranteed compensation to aggrieved property owners at a rate higher than market value. Since forced transactions must occur owing to the collective action problems inherent in organizing the conduct of many individuals, they must be arranged to distribute the surplus produced by milldam development properly, making everyone better off.[18] The milldam acts acknowledged this tension and resolved it, Epstein argues, in accordance with the distribution principle: "The key to understanding these cases follows from . . . necessity and distribution of the surplus. . . . In forced exchanges the surplus must be evenly divided. That requirement can be carried over from national defense to mines and mills if some provision is made to divide between the two parties the surplus created by the movement of resources from one private owner to another" (Epstein 1985, 174).

The milldam statutes' approach reflects this concept of ensuring reciprocity of advantage when a forced transaction is necessary to develop public goods such as infrastructure. The goal was the greater enjoyment of individual rights and the expansion of the freedom of every person in the society. The way in which the milldam acts were written and applied demonstrates this. The New Hampshire Mill Act at issue in *Head v. Amoskeag Manufacturing Co.* compensated the owner of the flooded land at 50% over the market value of his land, "thereby ensuring a division of the surplus brought about by the forced exchange" (Epstein 1985, 174). In setting up the division of the gain this way, the statute used a forced exchange of land use to expand the property rights of both parties by splitting up the gain and giving some to both.

Therefore, the milldam acts, like the other cases of regulation examined here, did not assume that the rights of the individual property holder were

---

18. This idea was acknowledged by the Massachusetts Supreme Judicial Court in *Boston and Roxbury Mill Corporation v. Newman*, 12 Pick. 467, Mass. Supreme Judicial Court (1832): "It is not taking the property of one man and giving it to another. At most, it is a forced sale, to satisfy the pressing want of the public. Now this is as it should be. The will or caprice of an individual would often defeat the most useful and extensive enterprises, if it were otherwise."

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1552

annihilated through regulation. The milldam acts protected the right of private property through compensation of the property owner whose lands were flooded in excess of the value of the land that was affected. This ensured, as James Willard Hurst has written, "that a particular individual should not be made to bear out of his own resources the cost of a community benefit" (Hurst 1956, 25). The milldam statutes prevented injurious uses of property, by preventing a single property owner from blackmailing the public to gain greater compensation for his land than he would receive absent the development of transportation networks altogether.[19]

As these examples show, contrary to the argument that regulation proves the predominance of the republican interpretation over the liberal interpretation of the founding, regulation was not used to place the public interest above individual rights. Nor was it merely a mechanism to expand self-interest and individualism. Rather, regulation was used to harmonize individual rights with the public interest.[20] In the founders' view, then, liberty was not incompatible or necessarily in tension with the public good. Liberty and property rights could be regulated to expand rights and to promote the common good.

During the founding, regulation was understood to vindicate, not to vitiate, property rights. At the same time, the common good was not overlooked. The founding generation's arguments for regulation do not fit either the prevailing liberal or classical republican interpretations of the founding. They do not demonstrate the predominance of one tradition or the other, but help scholars to see how the founders' unique approach enacted policies that were consistent with both traditions.

19. As the Wisconsin Supreme Court argued in upholding the constitutionality of the state's milldam statute, "No tyranny has been found more odious in the older states than is sometimes exhibited in the pertinacious obstinacy of one man, who pursues his common-law right of resisting the occupation of his land . . . for the purpose of a mill. . . . The statute which cuts off the common-law privilege of such a man to engage in litigious malice, and which secures him ample compensation . . . is surely benign in its effects, and harmonious with the spirit if not the letter of the constitution. Such a law . . . by encouraging enterprise and diffusing the conveniences of social life, enhances the value of land, advances its settlement, and promotes general civilization" (*Newcomb v. Smith*, 3 Pinney 131, 140, Wis. Supreme Court [1849]).

20. As Paul Kens (2011) argues, courts in the nineteenth century treated economic regulation as balancing liberty against the rights of the community. The analysis in this article would agree with this formulation insofar as it asserts that regulation was not used to place the rights of the community above the liberty of individual economic actors. However, this article goes further and suggests that harmonizing the rights of individuals with the common good avoids the need to balance liberty and community altogether, since the tension can itself be overcome through regulation.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1553

## CONCLUSION

Scholarship on the American founding has correctly moved toward a consensus in favor of a "liberal/republican amalgam" theory. Yet questions remain regarding how that amalgam was forged and how it worked in practice. The justification for regulation by founding-era figures demonstrates that there is no tension between liberalism and regulation in the first place. Regulation, as illustrated by the cases and examples analyzed in this article, harmonized individual rights and the common good. Once liberalism is properly understood as the protection of individual rights under a law of nature that accepts certain limits on liberty and property and encourages devotion to the common good, a stark dichotomy between liberalism and republicanism appears to obscure rather than illuminate the founders' thought. Neither approach adequately accounts for the founders' rationale for regulation.

While it is not possible in this article to provide a treatment of the classical republican interpretation of the founding, a few conclusions can be drawn from the evidence provided by regulation. First, the founders' reasons in favor of regulation do not entail that they were not classical republicans. Simply because regulation was justifiable under liberalism does not entail that it was incompatible with other principles. Second, and relatedly, by demonstrating that liberalism properly understood is compatible with classical republicanism's dedication to the common good, regulation indicates that the liberal/republican dichotomy is itself problematic. The distinctions on which the dichotomy rests, including the stark distinction between individual rights and the common good, fail to explain adequately the founders' own reasoning and practice. In the spirit of Jefferson's first inaugural address, perhaps they were all liberals and they were all republicans.

## REFERENCES

Appleby, Joyce. 1984. *Capitalism and the New Social Order: The Republican Vision of the 1790s*. New York: New York University Press.

Bailyn, Bernard. 1967. *The Ideological Origins of the American Revolution*. Cambridge, MA: Belknap.

Balogh, Brian. 2009. *A Government out of Sight: The Mystery of National Authority in Nineteenth-Century America*. New York: Cambridge University Press.

Banning, Lance. 1978. *The Jeffersonian Persuasion: Evolution of a Party Ideology*. Ithaca, NY: Cornell University Press.

———. 1986. "Jeffersonian Ideology Revisited: Liberal and Classical Ideas in the New American Republic." *William and Mary Quarterly* 43 (1): 3–19.

Becker, Carl. 1922. *The Declaration of Independence*. New York: Harcourt Brace.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19006   Page 135 of 715

Chipman, Nathaniel. 1793/1833. *Principles of Government: A Treatise on Free Institutions*. Repr. Burlington: Edward Smith.

Claeys, Eric R. 2003. "Takings, Regulations, and Natural Property Rights." *Cornell Law Review* 88 (6): 1549–671.

———. 2004. "Public-Use Limitations and Natural Property Rights." *Michigan State Law Review* 2004 (4): 877–928.

Dewey, John. 1935. *Liberalism and Social Action*. New York: Capricorn Books.

Dienstag, Joshua. 1996. "Serving God and Mammon: The Lockean Sympathy in Early American Thought." *American Political Science Review* 90 (3): 497–511.

Diggins, John Henry. 1984. *The Lost Soul of American Politics: Virtue, Self-Interest, and the Foundations of Liberalism*. New York: Basic Books.

Dionne, E. J. 2012. *Our Divided Political Heart: The Battle for the American Idea in an Age of Discontent*. New York: Bloomsbury.

Dorfman, Joseph. 1961. "Chancellor Kent and the Developing American Economy." *Columbia Law Review* 61 (7): 1290–317.

Elkins, Stanley, and Eric McKitrick. 1993. *The Age of Federalism: The Early American Republic, 1788–1800*. New York: Oxford University Press.

Epstein, Richard. 1985. *Takings: Private Property and the Power of Eminent Domain*. Cambridge, MA: Harvard University Press.

Ericson, David F. 1993. *The Shaping of American Liberalism: The Debates over Ratification, Nullification, and Slavery*. Chicago: University of Chicago Press.

Fine, Sidney. 1964. *Laissez-Faire and the General Welfare State: A Study of Conflict in American Thought, 1865–1901*. Paperback ed. Ann Arbor: University of Michigan Press.

Finnis, John. 2011. *Natural Law and Natural Rights*. 2nd ed. Oxford: Oxford University Press.

Friedman, Lawrence. 1985. *A History of American Law*. 2nd ed. New York: Simon & Schuster.

Gibson, Alan. 2007. *Understanding the Founding: The Crucial Questions*. Lawrence: University Press of Kansas.

———. 2009. *Interpreting the Founding*. 2nd ed. Lawrence: University Press of Kansas.

Hamilton, Alexander. 1791/1904. "Report on Manufactures." In *Works of Alexander Hamilton*, vol. 4, ed. Henry Cabot Lodge. Repr. New York: Putnam.

———. 1801/1904. "The Examination, No. III." In *Works of Alexander Hamilton*, vol. 8, ed. Henry Cabot Lodge. Repr. New York: Putnam.

Handlin, Oscar, and Mary Flug Handlin. 1947. *Commonwealth: A Study of the Role of Government in the American Economy: Massachusetts, 1774–1861*. Cambridge, MA: Harvard University Press.

Hartz, Louis. 1948. *Economic Policy and Democratic Thought: Pennsylvania, 1776–1860*. Cambridge, MA: Harvard University Press.

———. 1955. *The Liberal Tradition in America*. New York: Harcourt Brace.

Heath, Milton Sydney. 1954. *Constructive Liberalism: The Role of the State in Economic Development in Georgia to 1860*. Cambridge, MA: Harvard University Press.

Hurst, J. Willard. 1956. *Law and the Conditions of Freedom in the Nineteenth-Century United States*. Madison: University of Wisconsin Press.

Jensen, Laura. 2003. *Patriots, Settlers, and the Origins of American Social Policy*. New York: Cambridge University Press.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1555

Kens, Paul. 2011. "Property Liberty and the Rights of the Community: Lessons from *Munn v. Illinois*." *Buffalo Public Interest Law Journal* 30:157–96.

Kent, James. 1836. *Commentaries on American Law*. 2nd ed. New York: O. Halsted.

Kloppenberg, James. 1987. "The Virtues of Liberalism: Christianity, Republicanism, and Ethics in Early American Political Discourse." *Journal of American History* 74 (1): 9–33.

Kramnick, Isaac. 1990. *Republicanism and Bourgeois Radicalism: Political Ideology in Late Eighteenth-Century England and America*. Ithaca, NY: Cornell University Press.

Locke, John. 1967. *Second Treatise of Government*. Ed. Peter Laslett. New York: Cambridge University Press.

Madison, James. 1792/1983. "Property." *National Gazette*. In *The Papers of James Madison*, vol. 14, ed. Robert A. Rutland et al. Repr. Charlottesville: University of Virginia Press.

———. 1829/1865. "Letter to Friedrich List." In *Letters and Other Writings of James Madison*. Repr. Philadelphia: Lippincott, 1865.

Mashaw, Jerry. 2012. *Creating the Administrative Constitution: The Lost One Hundred Years of American Administrative Law*. New Haven, CT: Yale University Press.

McCoy, Drew. 1980. *The Elusive Republic: Political Economy in Jeffersonian America*. Chapel Hill: University of North Carolina Press.

Morris, Richard. 1946. *Government and Labor in Early America*. New York: Columbia University Press.

Nelson, William E. 1975. *Americanization of the Common Law: The Impact of Legal Change on Massachusetts Society, 1760–1830*. Cambridge, MA: Harvard University Press.

Novak, William. 1996. *The People's Welfare: Law and Regulation in Nineteenth-Century America*. Chapel Hill: University of North Carolina Press.

Obama, Barack. 2013. "Second Inaugural Address." http://www.whitehouse.gov/the-press-office/2013/01/21/inaugural-address-president-barack-obama.

Pangle, Thomas. 1990. *The Spirit of Modern Republicanism: The Moral Vision of the American Founders and the Philosophy of Locke*. Chicago: University of Chicago Press.

Pocock, J. G. A. 1975. *The Machiavellian Moment: Florentine Political Thought and the Atlantic Republican Tradition*. Princeton, NJ: Princeton University Press.

———. 1987. "Between Gog and Magog: The Republican Thesis and *Ideologica Americana*." *Journal of the History of Ideas* 48 (2): 325–46.

Rawls, John. 1971. *A Theory of Justice*. Cambridge, MA: Harvard University Press.

Reid, John Phillip. 1981. "The Irrelevance of the Declaration." In *Law in the American Revolution and the Revolution in the Law*, ed. Hendrik Hartog, 46–89. New York: New York University Press.

Scheiber, Harry N. 1997. "Private Rights and Public Power: American Law, Capitalism, and the Republican Polity in Nineteenth-Century America." *Yale Law Journal* 107:823–61.

Shain, Barry Alan. 1994. *The Myth of American Individualism: The Protestant Origins of American Political Thought*. Princeton, NJ: Princeton University Press.

Sunstein, Cass. 1988. "Beyond the Republican Revival." *Yale Law Journal* 97 (8): 1539–90.

Swift, Zephaniah. 1795. *A System of Laws of the State of Connecticut*. Vol. 1. Windham, CT: John Byrne.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

108 • American Political Thought • Winter 2016

Tarcov, Nathan. 1983. "A 'Non-Lockean' Locke and the Character of Liberalism." In *Liberalism Reconsidered*, ed. Douglas MacLean and Claudia Mills. Totowa, NJ: Rowman & Allenheld.

Wilson, James. 1791/2007. "Lectures on Law." In *The Collected Works of James Wilson*, vol. 2, ed. Kermit L. Hall and Mark David Hall. Repr. Indianapolis: Liberty Fund.

Wolfe, Christopher. 2009. *Natural Law Liberalism*. Paperback ed. New York: Cambridge University Press.

Wood, Gordon. 1969. *The Creation of the American Republic, 1776–1787*. Chapel Hill: University of North Carolina Press.

Zuckert, Michael. 1996. *The Natural Rights Republic: Studies in the Foundation of the American Political Tradition*. Notre Dame, IN: Notre Dame University Press.

———. 2005. "Reconsidering Lockean Rights Theory: A Reply to My Critics." *Interpretation* 32 (3): 257–68.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 04:42:56 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1557



An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836—1900
Author(s): Brennan Gardner Rivas
Source: *The Southwestern Historical Quarterly*, Vol. 121, No. 3 (January, 2018), pp. 284–303
Published by: Texas State Historical Association
Stable URL: https://www.jstor.org/stable/44648385
Accessed: 18-10-2022 04:45 UTC

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Texas State Historical Association* is collaborating with JSTOR to digitize, preserve and extend access to *The Southwestern Historical Quarterly*

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms



Andrew Jackson Sowell, Texas Ranger, photographed by D. P. Barr
in 1871. Sowell is sporting three weapons, two of which would have
been illegal for most men to carry in public by the end of 1871.
*Photo AR-X-016-J274, Austin History Center, Austin Public Library.*

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

# An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836–1900

### By Brennan Gardner Rivas*

An association between Texas and guns runs deep. From the famous "Come and Take It" flag raised at the Battle of Gonzales and Davy Crockett wielding "Old Betsy" at the Alamo to the pistol-toting cowboy and the storied Texas Ranger, firearms have long been an integral part of Texas history and the Texas mystique. In the modern era, when guns and the rights of gun owners have become hot-button issues nationally, the Lone Star State has occupied a prominent place in the debate. Texans have been particularly adamant about protecting their Second Amendment rights, legalizing licensed concealed carry in 1995 and open carry in 2015. Modern gun-rights advocates have not been shy about invoking Texas's history as a gun-friendly state; indeed, the "Come and Take It" flag, often with its original cannon image changed to a modern military-style assault rifle, has become a ubiquitous symbol at pro-gun events. The clear suggestion from such imagery is that any state effort to restrict the ownership or bearing of arms is a recent phenomenon foisted upon the citizenry by an overreaching government.

History tells a more complicated story. As this article demonstrates, although guns have certainly played a prominent role in defining Texas culture, for much of its history the Lone Star State has had relatively stringent gun regulations. Indeed, the state's first gun-control measures date back to the Republic of Texas, and in 1871 Texas became a pioneer in the field of arms-control when lawmakers banned the carrying of deadly weapons outside the home. Perhaps most surprisingly, this legislation, for reasons that are explored below, garnered support from both Republicans

---

* Brennan Gardner Rivas is a doctoral candidate in history at Texas Christian University. The author wishes to express her gratitude to Gregg Cantrell for his vital role in the development of this project. She also thanks Randolph B. Campbell and Ryan Schumacher for their editorial expertise.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1560

and Democrats and remained on the books into the modern era. The stereotype of nineteenth-century Texas as a gun-lover's paradise, then, clearly mistakes the past for the present.

Since the founding of the Republic of Texas in 1836, Texans have endorsed the Second Amendment by enshrining the right to bear arms within every version of the state constitution. Each one contains a clause in its bill of rights guaranteeing the citizen's "right to bear arms in defense of himself and the state."[1] Invoking the term "citizen" meant that, until the passage of the Fourteenth Amendment, this protection excluded significant portions of the population.[2] In antebellum Texas, citizenship was a white male prerogative and citizens bore arms to defend themselves, their dependents (an extension of self), or the state.[3] And they did just that in the Texas Revolution, the U.S. war with Mexico, and countless wars and skirmishes against the region's many Indian tribes. Their sense of civic duty demanded this organized and politically justifiable bearing of arms, but the construction of masculinity in the antebellum South embraced both the controlled violence of war and the disorderly violence of the duel and the brawl.[4] The white men of Texas enjoyed a virtually unrestricted right to use all manner of weapons, including guns, to exercise their masculinity.[5]

Although antebellum Texans did not accept infringements upon the citizen's right to bear arms, they did assent to the state's right to legislate on the subject of weapons. Unsurprisingly, in the first three decades following independence regulations targeted the non-white persons of Texas, particularly the male slaves and Indians who posed a threat to the

---

[1] In later constitutions, notably 1869 and 1876, this language changed slightly to assure the right to "keep and bear arms" subject to some level of legislative regulation. See "Declaration of Rights" in Texas Constitution of 1836, Texas Constitution of 1845, Texas Constitution of 1861, Texas Constitution of 1866, Texas Constitution of 1869, and Texas Constitution of 1876.

[2] For an opposing perspective, see Stephen P. Halbrook, "The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights," *Baylor Law Review* 629 (1989): 645.

[3] The racial parameters of citizenship changed over time throughout Texas history. Following independence, anyone within the new category of "free black" lost citizenship enjoyed under Mexican rule but residents of both European and African ancestry became "white" and remained citizens. See Harold R. Schoen, "Legal Status," in Bruce A. Glasrud and Milton S. Jordan (eds.), *Free Blacks in Antebellum Texas* (Denton: University of North Texas Press, 2015), 98.

[4] Significant works on this subject include but are not limited to, Edward L. Ayers, *Vengeance and Justice: Crime and Punishment in the 19th-Century American South* (New York: Oxford University Press, 1984); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982); and Dickson D. Bruce Jr., *Violence and Culture in the Antebellum South* (Austin: University of Texas Press, 1979).

[5] The only gun restrictions that mostly affected white Texans were prohibitions against dueling, which often went unenforced. Clayton Cramer has made a persuasive case that the rigid enforcement of anti-dueling laws in the 1830s and 1840s actually created higher rates of violence in frontier areas and ultimately prompted several states to outlaw the wearing of concealed weapons in public. See Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Conn.: Praeger, 1999). Texas lawmakers moved in this direction during the 1850s but did not pass a prohibition against concealed weapons.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1561

safety and social order of white communities. Thus, antebellum gun laws were primarily about race, and the state legislature had the power to make laws limiting the wearing, bearing, and carrying of weapons as long as they did not undermine the absolute right of white men to own and use them.[6]

From the first legislative session of the Republic of Texas, lawmakers tried to keep weapons out of the hands of nearby Indian tribes. They feared not only the scalping knife, but also the high-quality firearms wielded by well-trained raiding parties. The powerful Comanches obtained British-made rifles and ammunition through direct and indirect trade with Americans along the Red River.[7] In addition, the westward migration of Americans created a new and lucrative market for horses that the Comanches and others sought to fill by stealing horses from Texas residents and trading them in exchange for guns and ammunition.[8] This raiding and trading led Texas lawmakers to prohibit the trading of guns and other weapons to Indians and focus on breaking up the illegal trading posts along the Red River.[9] Texans supplemented this strategy by raising and even arming mounted cavalry units, like the Texas Rangers, to make war upon hostile Indian tribes.[10]

As they did with Indians, Texans also tried to keep weapons away from slaves unless absolutely necessary. Fear of slave rebellion plagued slave owners across the South, and Texans were no exception. Many of them had migrated from the Lower South and harbored deep fears of a slave revolt akin to Nat Turner's rebellion in Virginia in 1831.[11] The Texas Slave Code, created in 1840, included a provision forbidding slaves from carrying weapons without "written consent of his master, mistress or overseer." A weapon carried illegally by a slave was subject to confiscation by any white person and the slave owner would have to pay a bounty of ten dollars to the neighbor who caught his mistake.[12] As the slave population of Texas grew throughout the 1840s and 1850s, state representatives from the plantation areas of East and Central Texas tried to ban the arming of

---

[6] The phrase "absolute right to bear arms" originated from an 1859 Texas Supreme Court decision, but aptly expresses the spirit of all antebellum weapons laws insofar as they pertained to white men. See *Cockrum v. State of Texas*, 24 Tex. 394, 401 (1859).

[7] Pekka Hämäläinen, *The Comanche Empire* (New Haven: Yale University Press, 2008), 151–152, 162, 167.

[8] In addition to Hämäläinen, *Comanche Empire*, see Brian DeLay, *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War* (New Haven: Yale University Press, 2008), 86–105.

[9] *Journal of the House of Representatives of the Republic of Texas*, 1st Leg., Reg. sess. (1836), 242.

[10] See Joseph Milton Nance, *After San Jacinto: The Texas-Mexican Frontier, 1836–1841* (Austin: University of Texas Press, 1963), 87–88.

[11] Alwyn Barr, *Black Texans: A History of African Americans in Texas, 1528–1995* (2nd ed.; Norman: University of Oklahoma Press, 1996), 32–33.

[12] H. P. N. Gammel (comp.), *Gammel's Laws of Texas, 1822–1897* (10 vols.; Austin: Gammel Book Company, 1898), II, 345–346.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1562

slaves altogether.[13] They were unsuccessful in this attempt, but they were able to amend the Slave Code to require armed slaves to be in the presence of a master or overseer.[14] Representatives from the western counties opposed a total ban on slaves carrying weapons because West Texans who owned slaves depended upon them to assist in protecting their crops, livestock, and homes from Indian raids. Texans might have been enamored with the idea of a slave-holder's republic, but they could not avoid the fact that their state was also a frontier area subject to threats that had long since passed for most of the South.[15]

State policies toward slaves and Indians became more difficult to enforce during the Civil War, when tens of thousands of Texan men took up arms to defend their state and their new nation. State legislators from the western counties, in the name of frontier security, continued to block efforts to ban the arming of slaves.[16] When the few U.S. military troops guarding the Texan frontier in 1861 left after passage of the state secession ordinance, state lawmakers tried to fill the gap by raising new mounted volunteer units under the authority of the governor. These rangers became a source of tension between state officials and a Confederate government desperate for more soldiers; ultimately, the Confederate government was no more attentive to Texans' Indian problem than the Union had been. To make matters worse, the Confederate government's draft policies prompted a flood of deserters and draft dodgers into the frontier counties of North and West Texas. The result was an explosion of violence and depredations by these brigands and Indians, which frontier units could not control.[17] Confederate policies toward slaves also generated conflict in Texas. Military authorities had the right to impress slave labor for fortifications and other wartime needs, and the Confederate government famously considered drafting slaves into full military service in exchange for freedom.

---

[13] The bills can be found *Journal of the House of Representatives of the Republic of Texas*, 8th Leg., Reg. sess. (1843), 113; *Journal of the House of Representatives of the State of Texas*, 1st Leg., Reg. sess. (1846), 396; *Journal of the House of Representatives of the State of Texas*, 2nd Leg., Reg. sess. (1847–1848), 149. One bill did not call for unequivocal disarming of slaves, instead requiring authorization for the arming of all non-white persons, including free blacks. See *Journal of the House of Representatives of the State of Texas*, 3rd Leg., Reg. sess., (1849–1850), 371. (Hereafter, all subsequent citations of this and other editions of *Journal of the House of Representatives of the State of Texas* will be cited as "*House Journal*" with the year following in parentheses.)

[14] This new law was passed in 1856. See, Gammel (comp.), *Gammel's Laws of Texas*, IV, 499–500.

[15] There are some important exceptions to the state's policy of trying to keep weapons in white hands. The small free-black population of Texas was entitled to own weapons, though they were generally prohibited from serving in militias. Also, urban areas housed "nominal slaves" who operated fairly independently of their masters and outside the oversight of local law enforcement. Many of them were likely able to carry weapons, gamble, and otherwise behave similarly to single white men. See Barr, *Black Texans*, 25; Nicholas Johnson, *Negroes and the Gun: The Black Tradition of Arms* (Amherst, N.Y.: Prometheus Books, 2014), 41.

[16] *House Journal*, 2nd Called sess. (1864), 30.

[17] David Paul Smith, *Frontier Defense in the Civil War: Texas Rangers and Rebels* (College Station: Texas A&M University Press, 1992), 74–75, 171. For more detailed accounts of lawlessness in northern frontier counties, see Donaly E. Brice and Barry A. Crouch, *Cullen Montgomery Baker: Reconstruction Desperado*

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1563

Both policies threatened masters' control over their slaves, something all the more precious in Texas, where invading Union armies had not yet begun to enforce the Emancipation Proclamation.

The Civil War ended in the spring of 1865 with surrender ceremonies that entailed Confederate soldiers laying their arms at the feet of the Union victors.[18] But the close of the war came late to Texas, and by June disillusioned Texas soldiers had taken matters into their own hands rather than submit to the humiliation of ceremonial surrender. After abandoning Galveston to Union forces, the bulk of General Edmund Kirby Smith's troops retreated to Houston, where they disobeyed their orders, emptied government storehouses, and headed for home or the Rio Grande. Groups of soldiers and disaffected Confederates raided armories and munitions factories across the state, intimidating local residents along the way. This "break up" of Confederate power left communities in chaos as the war drew to a close and created an environment in which violence and vigilantism could be perpetrated with impunity.[19]

Violence characterized the early years of Reconstruction throughout Texas. The kind of lawlessness that had afflicted the northern and western frontier during the war invaded the remainder of the state following the "break up." The power vacuum created by soldiers and officials fleeing from Union occupation combined with economic uncertainty, white racial animosity toward the newly emancipated freedmen, and bitter feelings over losing the war. An early reaction to the rise in crime in the larger towns was to disarm the citizenry by prohibiting concealed weapons or outlawing weapons altogether within the city limits.[20]

In 1866, Texas lawmakers had an opportunity to address the rampant lawlessness when delegates convened to write a new constitution and organize a new civil government. Some officials, like James W. Throckmorton, also reacted favorably to disarmament. Throckmorton had opposed secession, but he demonstrated his loyalty to Texas by taking a commission in

---

(Baton Rouge: Louisiana State University Press, 1997); Barry A. Crouch, Larry Peacock, and James M. Smallwood, *Murder and Mayhem: The War of Reconstruction in Texas* (College Station: Texas A&M University Press, 2003).

[18] The terms of surrender offered by Ulysses S. Grant permitted officers to keep their sidearms, but no such provision was made for enlisted soldiers. See General Ulysses S. Grant to General Robert E. Lee, in U.S. War Department, *The War of the Rebellion: Official Records of Union and Confederate Armies* (128 vols.; Washington, D.C.: U.S. Government Printing Office, 1880–91), Series 1, Vol. 46, 57–58.

[19] On the "break up" see Charles W. Ramsdell, *Reconstruction in Texas* (New York: Columbia University Press, 1910), 27–51; William L. Richter, *The Army in Texas during Reconstruction, 1865–1870* (College Station: Texas A&M University Press, 1987), 13; Crouch, Peacock, and Smallwood, *Murder and Mayhem*, 10–11; and Brad R. Clampitt, "The Breakup: the Collapse of the Confederate Trans-Mississippi Army in Texas, 1865," *Southwestern Historical Quarterly* 108 (April 2005): 498–534.

[20] "Proceedings of the City Council," *Flake's Bulletin* (Galveston), Dec. 28, 1865; "The Deadly Weapon Order," *San Antonio Daily Express*, Nov. 21, 1867. See also Donald Curtis Brown, "The Great Gun-Toting Controversy, 1865–1910: The Old West Gun Culture and Public Shootings" (Ph.D. diss., Tulane University, 1983), 21.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

the Confederate army. His moderate background made him an appealing candidate for the governorship, which he handily won in 1866. Having spent most of his time in the Confederate armed forces fighting Comanches and deserters along Texas's Indian frontier, Throckmorton returned to politics with firsthand knowledge of the rampant lawlessness plaguing the state.[21]

In his address to the state legislature, which had convened under the newly written state constitution, Throckmorton recommended passage of a law taxing weapons carried in public in order to discourage "thoughtless youths and others who bear them for show or other purposes." He conceded that an outright prohibition against the public carrying of weapons was unconstitutional but that the right to bear arms was "wretchedly abused" and ought to be subject to a tax.[22] Such a law most certainly would have disarmed the vast majority of black Texans (and even many whites) in possession of weapons because few of them had sufficient cash to pay even the lowest of taxes. Only elite white men would be able to carry guns. Like many of Throckmorton's other policies during his brief gubernatorial tenure, he assumed the best of local elites and discounted the potential threat posed to Texas Unionists and freedmen.[23] The Texas House of Representatives responded to Throckmorton's recommendation by considering a tax on carrying weapons, but disagreements arose over the amount of the tax and whether it should vary in accordance with the particular type of weapon carried.[24] Unable to agree, lawmakers settled instead for a law that prohibited discharging firearms in urban areas.[25]

Part and parcel of Texas lawmakers' efforts to curb lawlessness was the restoration of proper authority throughout the state. Much of the violence in the countryside arose from racial animosity and wounded pride, two problems that white Texans chose to resolve by imposing control over the former slaves. Texans sought to keep a powerless labor force for the cotton economy and maintain a social order based on white supremacy. In order to achieve this control, Texas lawmakers followed the example of other states within the former Confederacy by drafting a black code. They ran into a problem, though, because the black codes passed in 1865 by states like Mississippi had inspired a strong reaction from Republicans in Congress. The result was the federal Civil Rights Act of 1866, which guaranteed equal protection of the law to all citizens, regardless of race;

---

[21] Smith, *Frontier Defense in the Civil War*, 75–77. See also Kenneth Wayne Howell, *Texas Confederate, Reconstruction Governor: James Webb Throckmorton* (College Station: Texas A&M University Press, 2008).

[22] *House Journal*, 11th Leg., Reg. sess. (1866), 199–200.

[23] Carl H. Moneyhon, *Texas after the Civil War: The Struggle of Reconstruction* (College Station: Texas A&M University Press, 2004), 63.

[24] *House Journal* (1866), 879–881.

[25] Gammel (comp.), *Gammel's Laws of Texas*, V, 1128.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1565

Conservatives in the Texas legislature had to tiptoe around this law by using race-neutral language in the construction of their state's black code. Laws regulating labor contracts, apprenticeships, and penalizing vagrancy formed the core of this code, but several other measures passed by the Eleventh Legislature in 1866 were designed to supplement it.[26] One such accompanying law was an "act to prohibit the carrying of fire-arms upon the premises of any citizen without consent."[27] Because virtually no black Texans owned their own land in 1866 and thus had to live and work on land owned by whites, the law effectively prevented freedmen from carrying—or even owning—a gun without their landlords' or employers' permission. This solution, which enabled Texas to avoid Mississippi's mistake of explicitly targeting African Americans, essentially re-inscribed the antebellum statute that had given whites strict control over blacks bearing arms, and thus it constituted a point of continuity between antebellum and early Reconstruction Texas rather than the opening of a new era of gun regulation.[28]

The first postbellum Texas legislature did more than try to reduce the newly liberated freedmen to second-class status; its members also found ways of elevating white Texans, especially white men. They refused to adopt the Fourteenth Amendment, rejecting the idea that black men fit the standards of citizenship. In their statements against the Fourteenth Amendment, members of the House asserted that capitulation to federal demands would demonstrate a "poverty of manly spirit."[29] They also sought ways to keep the weapons of war in trustworthy white hands. Responding to the sack of state weapons caches in the chaos following surrender, the Eleventh Legislature commissioned the governor to appoint someone "to collect all the arms and munitions . . . belonging to the State of Texas, which may be in the hands of individuals, without authority to retain the

―――――

[26] For discussion of the Mississippi Black Code and its overt disarming of freedmen, see Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866–1876* (Westport, Conn.: Praeger, 1998), 2–3; On the Texas Black Code, Barry A. Crouch, "'All the Vile Passions': The Texas Black Code of 1866," *Southwestern Historical Quarterly* 97 (July 1993): 12–34; Moneyhon, *Texas after the Civil War,* 60–61; Ramsdell, *Reconstruction in Texas,* 122–125.

[27] Crouch, "'All the Vile Passions,'" 22–23, 28–29. See also Carl H. Moneyhon, "Black Codes," *Handbook of Texas Online,* <http://www.tshaonline.org/handbook/online/articles/jsb01>[Accessed Mar. 10, 2016]; Richter, *The Army in Texas during Reconstruction,* 61. Violators of the new law could be fined up to ten dollars and imprisoned for up to thirty days for carrying a fire-arm unless they had written consent from the property owner. Gammel (comp.), *Gammel's Laws of Texas,* V, 1008.

[28] Stephen Halbrook has written that "on November 26, 1866, the Texas legislature passed its first gun control measure, which was also the closest Texas came to adopting a black code provision to disarm freedmen" in Halbrook, "The Right to Bear Arms in Texas," 653–654. This was the first measure that, on its face, looks like modern gun regulation, but only a narrow reading of legislative history could allow it to be considered the state's first gun control law. As Halbrook recognizes, the law targeted freedmen and thus applied to a segment of the population whose access to firearms had long been regulated by the state legislature.

[29] *House Journal* (1866), 582.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1566

same."[30] This measure, not carried out until the following decade, had the potential to dramatically reshape the gun-owning population of Texas by confiscating weapons in the name of the state and redistributing them to white militia units or selling them to the highest bidder.

The half year following the meeting of the Eleventh Legislature revealed just how wrong that body's members were to presume that they could be readmitted to statehood in spite of their clear unwillingness to recognize the legal rights of freedmen. Intransigence from the former Confederacy prompted Republicans in Congress to take over the Reconstruction process, declare all southern state governments to be provisional, and divide the South into military districts. Major General Philip Sheridan became commander of the Fifth Military District (Texas and Louisiana) in 1867, a fitting task for the man who had been in command of Union troops in those states for two years. Ever since his arrival he recognized that "Texas has not yet suffered from the war and will require some intimidation."[31] Two years of occupation did little to alter his impression of Texas and its political leaders. During that time he and his staff repeatedly butted heads with Throckmorton and lost confidence in the governor's capability to lead Texas back into the Union. When he finally received permission to do so, Sheridan removed Throckmorton from office in July 1867. The path for Congressional Reconstruction in Texas stood clear.

Military intervention angered many white Texans and intensified their frustration throughout 1867 and 1868. The looming threat of a poor cotton crop led planters to blame the predominantly black agricultural labor force. Freedmens' efforts to create stable nuclear families, obtain schooling for their children, and mothers' desire to stay out of the fields contributed to a severe labor shortage. Finally, the formation of the Union League to strengthen the Republican Party in Texas offended white Texans who could not stomach the idea of black political organization. These factors turned Texas, already noted for its reputation as an unruly place, into one of the most violent states in the country in the latter 1860s. Voter registration added blacks to the rolls throughout the state, while loyalty tests administered by registrars removed many, though by no means all, former Confederates. Sheridan's overseers of Texas, General Charles Griffin and his successor, General Joseph J. Reynolds, pursued a policy of removing local- and state-level officeholders of dubious loyalty, and insisted that all jurors take an oath that barred former Confederates from service.[32]

[30] Gammel (comp.), *Gammel's Laws of Texas*, V, 1106–1107.

[31] Gen. Philip Sheridan to Gen. Ulysses S. Grant, quoted in Richter, *The Army in Texas during Reconstruction*, 13.

[32] Moneyhon, *Texas after the Civil War*, 70–82; Donaly Brice, "Finding a Solution to Reconstruction Violence: The Texas State Police," in *Still in the Arena of the Civil War: Violence and Turmoil in Reconstruction Texas, 1865–1874*, ed. Kenneth W. Howell (Denton: University of North Texas Press, 2012), 187–189; James M. Smallwood, "When the Klan Rode: Terrorism in Reconstruction Texas," in Howell, *Still in the Arena of the Civil War: Violence and Turmoil in Reconstruction Texas, 1865–1874*, 215.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Congressional Reconstruction played out differently in the many counties of Texas, but at the state level the policies of Sheridan and the Republican Party resulted in former Confederates' worst nightmare: a Republican government committed to black political participation. Local offices left vacant by Griffin's and Reynolds's removals tended to be filled by Republicans, some of whom were black. Elections in 1868 and 1869 significantly overrepresented black Texans and gave Union League chapters the opportunity to demonstrate their power to protect black voters from white intimidation.[33] Conservatives responded by resuscitating the Democratic Party in the state, appealing to the moderate wing of the Republican Party to join them, and initiating a campaign of racial violence. Sporadic local violence became better organized and carried stronger political overtones when groups like the Ku Klux Klan and the Knights of the White Camellia appeared in 1867 and 1868 and formed the paramilitary arm of the Democratic Party. These organizations engaged in guerrilla warfare against Republican lawmen as well as the black militia companies that formed after emancipation. Their emergence in areas with low black populations reinforces the claim that the goal of their members was the formation of a unified white Democratic front against the reigning Republican government.[34] This environment of lawlessness, intimidation, and fear likely prompted Texans, white and black, to seek personal security and power by carrying weapons.

With Klan violence on the rise in Texas and throughout the South, Radical Republican officials took action to protect freedmen and enforce the racial equality at the heart of their Reconstruction policies. In 1870, the federal government convened a committee to investigate the Klan and tried to eliminate Klan-type organizations. That same year, Texas Republican governor Edmund J. Davis, leader of the state party's radical faction, said that the subject "of primary importance in the minds of the great mass of our people" was crime; it also happened that ending lawlessness was the only subject upon which the dueling Republican factions could agree.[35]

---

[33] Though black Texans comprised approximately 30 percent of the state's population according to 1867 rolls, they accounted for 45 percent of all Texas voters. This disparity indicates that many white Texans eligible to vote declined to register; the causes of this trend are still unclear. See Randolph B. Campbell, *Gone to Texas* (2nd ed., New York: Oxford University Press, 2012), 274. For an example of Union League protection in the election of 1869, see Randolph B. Campbell, *Grass-roots Reconstruction in Texas* (Baton Rouge: Louisiana State University Press), 121–122.

[34] Gregg Cantrell, "Racial Violence and Reconstruction Politics in Texas, 1867–1868," *Southwestern Historical Quarterly* 93 (January 1990): 350; Barry A. Crouch, "A Spirit of Lawlessness: White Violence; Texas Blacks, 1865–1868," *Journal of Social History* 18 (Winter 1984): 217–232; Dale Baum, "Chicanery and Intimidation in the 1869 Texas Gubernatorial Race," *Southwestern Historical Quarterly* 97 (July 1993): 37–54; Carl Moneyhon, "The Democratic Party, the Ku Klux Klan, and the Politics of Fear," in Howell, *Still in the Arena of the Civil War*, 252–253, 260–261; Moneyhon, *Texas after the Civil War*, 110.

[35] Campbell, *Gone to Texas*, 276.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1568

Davis proposed three controversial measures to restore peace: reorganization of the state militia, creation of a state police force, and a weapons-control law. The state's latest constitution, ratified in 1869, continued the tradition of including an arms guarantee in the bill of rights, but for the first time gave the legislature the authority to regulate that right.[36] Davis asked lawmakers to take advantage of this new power and restrict the carrying of weapons. He drew a connection between an armed populace and "the frequency of homicides in this State."[37] Davis supplemented this proposal with a recommendation for "a police system . . . embracing the whole State under one head . . . and to be subject to the orders of the chief."[38]

When the Texas legislature met in 1870, it was the first time that the body had convened in four years. Though they faced a backlog of state business, legislators immediately began implementing the Republican program. Throughout the four legislative sessions that met during 1870 and 1871, lawmakers responded to Davis's anti-crime proposals. In the summer of 1870, the House introduced four separate weapons-control bills and sent one to the Senate for approval, but the Texas Senate had already passed "An Act Regulating the Right to Keep and Bear Arms." The senate bill, probably a milder version of a bill introduced by Cherokee County's Radical Republican Mijamin Priest, sat on the table in the House for about a month before hurriedly passing the chamber just a few days before the close of the session.[39] The law did not entirely prohibit carrying weapons outside the home, instead banning them only at certain locations and functions. For instance, weapons could not be carried to polling places on election days, inside churches, or at any "social gathering composed of ladies and gentlemen."[40] The summer session also established a State Police force under the control of the governor's administration. The State Police answered to the executive-appointed adjutant general and could be called upon when local officials either could not or would not enforce the law. State policemen also had the mobility and authority

---

[36] The 1869 guarantee states "Every person shall have the right to keep and bear arms, in the lawful defence [sic] of himself or the State, under such regulations as the Legislature may prescribe." Texas Constitution of 1869 (superseded 1876).

[37] *House Journal*, 1st called sess. (1870), 19.

[38] *House Journal* 1st called sess. (1870), 17–18. The office of the chief of state police would be filled by the adjutant general, a position filled by gubernatorial appointment.

[39] I suggest this theory of a milder version for three reasons: first, the legislature passed a much more strict law in its next session in 1871, suggesting Radical displeasure with the original; second, Dallas Democrat John W. Lane moved to suspend the rules so that the bill could progress to its third reading and get through the House quickly, suggesting that Democrats preferred it to the alternative; third, Radical George H. Slaughter fought doggedly to return to an earlier version of H. B. No. 257. He was conveniently absent from the House during the afternoon session of August 10, 1870. See *House Journal* (1870), 482–483, 960, 964.

[40] Gammel (comp.), *Gammel's Laws of Texas*, VI, 237.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

to capture criminals who had escaped prison, fled arrest, or skipped bail. Local judges could call upon this force in times of emergency, but the governor had the power to declare martial law and use the State Police as an occupying force in areas overcome by lawlessness.[41]

When the next session met in the winter and spring of 1871, lawmakers amended the weapons-control and State Police force acts. The State Police law received minimal changes, mostly adjustments of funding and approval for county Special Police to be called into service during events like elections.[42] But lawmakers completely overhauled the "Act Regulating the Right to Keep and Bear Arms." The new law prohibited carrying weapons in public with few exceptions. Travelers could carry arms while on the road, officers could carry weapons "while engaged in the discharge of their official duties," and residents of counties designated "frontier counties" by gubernatorial proclamation could carry arms at all times. Because legal theory of the day considered arms necessary and legitimate for self-defense, the Radical-dominated Twelfth Legislature allowed an exemption for anyone "fearing an unlawful attack on his person" that was both "immediate and pressing" enough "to alarm a person of ordinary courage."[43] This 1871 weapons-ban dramatically and tremendously altered Texans' relationships to their weapons. They could no longer openly carry or conceal "any pistol, dirk, dagger, slung-shot [*sic*], sword-cane, spear, brass knuckles, bowie knife, or any other kind of knife" beyond the confines of their property. These weapons have several important characteristics and commonalities: all are small, hand-held, portable, concealable, and were used frequently in the commission of homicides, assaults, and other crimes. The ban was particularly striking given white Texans' long history of freely bearing arms, a history that had made even the moderate proposal of Throckmorton unacceptable. As we have seen, however, larger towns had already passed ordinances against concealed weapons and pistols, so perhaps the Republicans thought that this urban measure simply made sense for the entire state. Officers who neglected their duty to enforce the arms ban were themselves subject to dismissal, indictment, and a hefty fine—a savvy way to continue replacing Democratic officials with Republicans loyal to Davis.[44]

Texas Republicans reveled in their victory over Democrats in 1871. A

---

[41] Gammel (comp.), *Gammel's Laws of Texas*, VI, 193–195.

[42] On the subtle difference between Special Police and State Police, see Donaly E. Brice and Barry A. Crouch, *The Governor's Hounds: The Texas State Police, 1870–1873* (Austin: University of Texas Press, 2011), 3.

[43] Significantly, the language of the law did not consider threats against one's property to be substantial enough to warrant an exemption. See debates over proposed amendments *House Journal* (1871), 523–524; *House Journal* (1871), 434.

[44] The law can be found in Gammel (comp.), *Gammel's Laws of Texas*, VI, 927–929.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1570

writer for the *Houston Daily Union* urged Republican leaders to stay the course and refuse to capitulate to their Democratic enemies:

> The Democrats are furiously opposed to the State Police, and all the measures necessary to put down violence and crime, and to assure peace and quiet to each community; let us still arrest and drive out thieves and murderers, and continue to oppose Democracy. The Democrats are sullen and angry because the firearm bill has robbed rowdies of their six-shooters, their bowie knives and their sword canes; let us continue to disarm rowdies and murderers, to stop bloody affrays, and to thus oppose the Democracy."[45]

Supporters of the new weapons law touted it as a beneficial measure that would curb violence and eliminate dueling. In San Antonio two well-respected men attempted to settle a quarrel "at the muzzle of a six-shooter," and a reporter opined that "no commentary is needed, to convince good men, not only of the wisdom of the law prohibiting the carrying of firearms, and other deadly weapons, but also of the necessity of its rigid enforcement."[46] In 1873, Governor Davis praised the weapons law for its "most happy effect" throughout the state over the past two years.[47] Detractors focused on the law's difficulty for travelers, who had no trouble outside of town, but could be dragged to court upon arrival in a city.[48] But such editorializing by both Republicans and Democrats masked the widespread disregard for the weapons law and the authorities who enforced it (particularly the State Police).

The rate at which Texans violated the weapons ban is unknown and indeed unknowable. However, Davis and his Republican allies saw a connection between the proliferation of crime (especially homicide) and a citizenry armed with small, portable weapons. Of course, there were additional factors contributing to the rampant lawlessness in Texas, like endemic racism, distrust of local government, and a lack of communal ties binding Texans together.[49] But all of these animosities and differences that inspired crime relied upon some physical tool in order to be carried out. While homicides in Texas ran the gamut of weapons, from hands and ropes to shotguns, anecdotal evidence suggests that firearms were the preferred weapons of Texan killers and criminals. The catalog of murders laid out by Texas Republicans in 1868 tells of freedmen being "fired upon," "shot," and "armed whites . . . forcibly robbing freedmen of their

---

[45] "A Good Lesson," *Houston Daily Union*, June 30, 1871.

[46] "The District Court," *San Antonio Daily Express*, Apr. 2, 1871.

[47] *House Journal* (1873), 33–34.

[48] See "The Weapon Law," *San Antonio Daily Express*, June 21, 1871.

[49] Randolph Roth, *American Homicide* (Cambridge, Mass.: Belknap Press of Harvard University Press, 2010), 341.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

arms."[50] A nineteenth-century commentator discussed homicides committed a decade later, many of which involved victims being "shot and killed," "shot dead," or having "shots put into him."[51] Though it is unclear what type of firearm was more likely to be used in the commission of a murder, Republican concern over small arms suggests that they considered pistols to be the primary threat to the peace and security of Texas communities. Pistols were involved in crimes other than murder, too; lesser offenses like assault, theft, disrupting the peace, gambling, illegal shooting, and unlawfully carrying weapons composed the majority of all crimes in Texas and often entailed the use of pistols. Thus the weapons ban was likely broken in association with thousands of crimes committed in the years after its passage.

Widespread violation of the weapons ban demonstrates not so much a lack of resolve among Texan law enforcement officials but rather the impossibility of disarming the entire state. Enforcing the ban would have been difficult for Republican sheriffs in Democratic-majority counties, lacking as they did the acceptance and respect of the local white population. In spite of this handicap, sheriffs went toe-to-toe with criminals, outlaws, and desperadoes and risked their lives in the process. The situation was no better for the State Police, a favorite target among Democrats in their condemnations of the Davis administration. Critics accused the State Police of being "the vanguard of a black insurrection," the portent of an impending race war. Recent scholarship has shown that by far most state policemen were white, and the force was more effective at bringing criminals to justice than its detractors were willing to admit. In fact, members of the State Police arrested thousands of criminals between 1870 and 1873, including violators of the weapons ban. But they faced a distinct difficulty in carrying out their duties as a result of Texans associating them with freedmen and Reconstruction. One black state policeman's attempt to enforce the weapons ban highlights the convergence of racism, political violence, and gun-toting in the "redemption" of Texas.[52]

Throughout the spring and summer of 1871, Republicans and Democrats vied for the vacant seat for Texas's third congressional district. Winning this election represented a significant milestone for Texas Democrats, who hoped to return the state's presidential electors to the Dem-

---

[50] *Report of Special Committee on Lawlessness and Violence in Texas* (Austin: Printed at the Office of the Daily Republican, 1868), 7–9. The only weapons specifically mentioned in the report are pistol, revolver, and whip.

[51] Horace V. Redfield, *Homicide North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Philadelphia: J. B. Lippincott and Co., 1880), 64–65, 68. Redfield describes some murders by pistol and others by rifle or shotgun, but he makes sure to tell the story of a pistol-toter getting the better of a rifleman on page 67.

[52] Quotation from Crouch and Brice, *The Governor's Hounds*, 2. On the success of the State Police, see Crouch and Brice, *The Governor's Hounds*, 170; Moneyhon, *Texas After the Civil War*, 140.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1572

ocratic fold in the upcoming election of 1872. Three days prior to the
election black state policemen in Groesbeck (Limestone County, east of
Waco) encountered a white man named D. C. Applewhite, who was drunk
and armed with a pistol. When black officer Mitch Cotton and his fellow
policemen tried to enforce the weapons ban, Applewhite became con-
frontational and headed for a saloon. The officers followed him and the
ensuing gunfight left Applewhite dead in the street. Affidavits from wit-
nesses told radically different stories depending upon the political affili-
ation of the person testifying. Republicans claimed that Applewhite shot
first while Democrats claimed the opposite. Black residents took up arms
and fled with Mitch Cotton and his fellows in an effort to avoid retribu-
tion from whites. But the white townspeople of Groesbeck also armed
themselves, claiming that "the colored people were under arms and had
threatened to attack and burn the town." Descriptions of the movements
of both white and black men indicate that the parties involved were para-
military, militia, or rifle companies that had drilled in anticipation of such
an event. Black residents of Limestone County "barricaded" themselves in
the Groesbeck mayor's office before "retreating" to the woods; a unit of
State Guards (part of the reorganized militia) "went on duty at once" to
"keep the peace and order at the election." The State Guards acted in the
interests of local Democrats by apprehending the black policemen and
controlling the town through election day. Law and order broke down
in the aftermath of Applewhite's death, and white residents refused to
respect black officers. Republican officials of Groesbeck determined that
"the people will not permit negro police to enforce the laws, and that the
mere sight of the negro police would surely lead to bloodshed." Though
the Limestone County conflict began over the weapons ban, it escalated
to become a battle over polling places and political power that the former
Confederates won.[53]

Radical Republicans in Texas struggled to hold on to power against the
wishes of a majority willing to accept and perpetrate the kind of violence
that took place in Groesbeck. Democrats and many moderate Republi-
cans joined forces to oppose Davis's administration, calling him a tyrant
and criticizing new taxes for improvements and education. Images of a
brutal, freedman-infested police force loyal to a corrupt governor did not
help Davis's cause. Whites who had declined to register or vote in previous
elections began turning out in much higher numbers following 1870, and
the state witnessed an influx of immigrants from other parts of the South.

---

[53] See affidavits, statements, and testimony concerning Limestone and Freestone Counties in *House
Journal,* adj. sess. (1871), 191–240. Quotations from *House Journal,* adj. sess. (1871), 220, 219, 225, 198.
Several historians have addressed the Groesbeck rebellion with varying degrees of specificity; for detailed
accounts, see Crouch, *Governor's Hounds,* 93–116; and Reginald G. Jayne, "Martial Law in Reconstruction
Texas" (M.A. thesis, Sam Houston State University, 2005), 59–82. For high-level analysis and contextu-
alization of the riot, see Moneyhon, *Texas after the Civil War,* 142–143; and Campbell, *Gone to Texas,* 281.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

The Democratic Party drew strength from both of these developments and ate away at the Republican Party's power over state government. In 1872 Democrats succeeded in casting the state's electoral votes for Horace Greeley, and by that time even the national Republican Party had abandoned the Texas Radicals to their fate.[54] Though the Davis-appointed state supreme court invalidated the election of 1873, in which Democrat Richard Coke defeated Davis for the governorship, the anti-Davis coalition had the popular mandate and the arms to remove him from the statehouse by force.[55] In the previous gubernatorial election (1869), armed Republicans guarded the polls, protecting black voters and preventing Democratic shenanigans at polling places. By 1873, Democrats had the strength of numbers and control of enough polling places to win the election by a two-to-one margin. Many local special elections in the years leading up to 1873 overwhelmingly favored Democrats because armed, white, paramilitary groups took over polling places and intimidated black Republican voters, as had happened in Limestone County.

Once Democrats had control of the state legislature and the governor's office in 1874, legislators began dismantling the Radical Republican program that had been implemented in Texas. They focused their ire on the State Police, education programs, new taxes, and a number of other Republican measures, but they left the weapons ban untouched until 1887. In fact, the Texas Supreme Court upheld the law on two separate occasions in the 1870s. In *English v. State*, a Radical Republican court sustained the constitutionality of the law, and in *State v. Duke* a Democratic court headed by former secessionist leader Oran M. Roberts agreed that legislative regulation was acceptable.[56] The Democrats at the next state constitutional convention (in 1875) knew about the *English* decision and still decided to retain legislative regulation of the right to keep and bear arms. The provision in the final constitution affirmed the right to bear arms, but allowed the legislature to "regulate the wearing of arms with a view to prevent crime."[57] This about-face on the subject of the weapons

---

[54] Moneyhon, *Texas after the Civil War*, 183–186.

[55] Carl H. Moneyhon, *Edmund J. Davis of Texas: Civil War General, Republican Leader, and Reconstruction Governor* (Fort Worth: TCU Press, 2010), 221–223.

[56] See *English v. State of Texas*, 35 Tex. 473, 478 (1871); *State of Texas v. Duke*, 42 Tex. 455 (1875). Though both courts sustained the 1871 weapons ban, they differed tremendously in other respects. Most significantly, *English* introduced a precedent that declared constitutional protection only for weapons associated with militia service, excluding pistols, sword-canes, and several other popular weapons used at the time. Though *Duke*, decided prior to the ratification of the Texas Constitution of 1876, concurred on the subject of legislative regulation, the Roberts-led court overturned the narrow interpretation of protected weapons defined by *English*. For more information on these cases, see Halbrook, "The Right to Bear Arms in Texas," 659–665; and Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Conn.: Praeger, 1994), 113–119.

[57] Texas Constitution of 1876. For an insightful and informative discussion of the differences between owning and wearing arms, see Halbrook, "The Right to Bear Arms in Texas," 667–668.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1574

law suggests that Texas Democrats did not oppose regulation per se, just
regulation by the "Black Republican" party. Moreover, Texans who had
felt oppressed by the State Police's enforcement of the weapons ban no
longer had to fear gubernatorial power behind local black or Republi-
can officials. A few Republicans continued to hold elective office into the
1890s, but the power of the state government stood behind their oppo-
nents, giving Democrats the opportunity to push these men out of office
by means fair or foul whenever the opportune moment arrived.

Evidence suggests that "redemption" in Texas and throughout the
South involved the physical disarming of freedmen, and white Democrats
gloried in the symbolic significance of this disarmament. For instance, the
Democratic legislature, beginning in 1874, allocated money for the state
adjutant general to "recover state arms" in the possession of those without
proper authority to have them.[58] This was certainly a continuation of the
1866 Eleventh Legislature's failed attempt to reclaim arms that Confeder-
ate soldiers and brigands had stolen from local arsenals in the chaos fol-
lowing surrender. The Republicans who controlled local and state offices
between 1867 and 1873 confiscated the arms belonging to criminals, and
Davis's adjutant general distributed state arms to Texas militiamen—a
group that, for the first time, included black Texans. The recovery of state
arms after 1874 likely served as a cover for taking weapons away from
freedmen and putting them in the hands of the Democratic militia com-
panies that sprang up during this time.[59] Rearming white Democrats and
reinvesting them with state authority signified their recovery of political
power from blacks and Republicans, and their "redemption" of the state
in the name of white supremacy.

Literature about the fall of Reconstruction in the South glorified this
disarmament of freedmen. Manly white Democrats intimidating black
Southerners into surrendering their weapons played an important role in
the memory of "redemption" that became the dominant narrative. This
view, enshrined in Lost Cause literature, was clearly articulated by Thomas
Dixon Jr. in *The Clansman*. In the novel, the Ku Klux Klan of fictional
Ulster County restores true men to power and protected white women by
disarming a black militia company loyal to the Republican government.
The political resurgence of the antebellum white elite took place when
"the negroes laid down their arms and surrendered," and "in quick succes-
sion every county followed the example of Ulster, and the arms furnished
the negroes by the State and National governments were in the hands of
the Klan."[60] Dixon quickly adapted the story for the stage, and produc-

---

[58] Gammel (comp.), *Gammel's Laws of Texas*, VIII, 142, 222.

[59] Gammel (comp.), *Gammel's Laws of Texas*, VIII, 717.

[60] Thomas Dixon, *The Clansman: An Historical Romance of the Ku Klux Klan* (New York: Grosset & Dun-
lap, 1905), 340–341.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1575

Case 3:19-cv-01537-BEN-JLB Document 154-3 Filed 10/22/22 PageID.19027 Page 156 of 715

Mexia Opera House Friday November 8th
The Clansman's Farewell Tour!
Last Chance to See This Wonderful Play Until 1911

AT the conclusion this Season The Clansman will start on a European and Australian Tour to last Three Years.

THE CLANSMAN

TWO Companies consolidated into one for this extraordinary Engagement of the most popular Drama in America.

By THOMAS DIXON, Jr.
Direction of GEORGE H. BRENNAN
The most notable Cast and Production yet Presented--Seventy-five People on the Stage --Troop of Calvery Horses--New Scenic and Electrical Effects.
PRICES: Entire lower floor $1.50, all chairs reserved. Gallery $1.00. Seats on Sale at opera house Saturday November 2nd from 9 a. m. to 12 m., 1:30 p. m. to 5:30 p. m.

An advertisement for a production of Thomas Dixon Jr.'s *The Clansman*. From the *State Herald* (Mexia, Tex.), Oct. 31, 1907, <https://texashistory.unt.edu/ark:/67531/metapth302285/m1/8/> [Accessed Oct. 10, 2017].

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

tions toured across the country. *The Clansman* resonated with Texans, who flocked by the thousands to performances across the state between 1906 and 1908.[61] The romanticized memory of black disarmament suggests not only its literal truth (to some degree), but its force as a symbol of "redemption" and the restoration of white supremacy in the South.

Although Southerners reinterpreted the rise and fall of Reconstruction to fit an emerging Lost Cause ideology that denigrated blacks and Republicans, Democrats in power throughout the South quietly retained some Radical measures. One such law in Texas was the 1871 weapons ban, which remained on the books in the state until the 1990s. The provision of the law that underwent substantial change during the late nineteenth century was the penalty for violation. Lawmakers adjusted the fine, experimented with requiring jail time, and finally allowed jailed offenders to be sentenced to labor on county projects or even leased as laborers to county residents. Late-century Democrats walked a line between disliking the weapons ban and repeatedly amending it rather than repealing it. Governor John Ireland, voicing a common opinion among Texas Democrats, claimed that the light penalty for carrying deadly weapons only disarmed law-abiding residents. Opponents of gun regulation today echo this refrain, but where they now see deregulation as the solution, Ireland in 1887 called for stiffer penalties. Only a firm conviction of the ban's importance and effectiveness could have convinced Ireland to keep it when his own argument would otherwise have concluded in a call for repeal.[62]

Texas Democrats likely kept the weapons ban because they knew firsthand just how effective it could be; enforcement of the law by State Police and local sheriffs successfully reduced crime in Texas, giving Democrats a model to follow when they returned to power.[63] If state policemen and sheriffs could use the ban to curb the white-on-black racial violence that Republican lawmakers and U.S. Army officers cataloged during Reconstruction, then Democratic sheriffs, marshals, and constables could use it to recreate the antebellum order and impose white supremacy throughout Texas by enforcing it selectively at the local level. Though clear-cut evidence of selective enforcement is largely absent from legislative and newspaper records, an argument can be made that late-century white

---

[61] For example, see *Orange Daily Tribune*, Dec. 22, 1908; *Abilene Daily Reporter*, Nov. 9, 1907; *El Paso Daily Times*, Dec. 8, 1908; *Cuero Daily Record*, Dec. 22, 1908.

[62] See John Ireland's message *House Journal* (1889), 21. At the 1875 constitutional convention, former Confederate officer Jacob Waelder expressed a similar opinion. See Seth Shepard McKay, *Debates in the Texas Constitutional Convention of 1875* (Austin: University of Texas Press, 1930), 294. Prior to 1887, the penalty for violation entailed a fine ranging from twenty-five to one hundred dollars, forfeiture of the weapon, and no more than sixty days in county jail. After 1887, the penalty entailed a fine ranging from twenty-five to two hundred dollars and jail time between twenty and sixty days. See Gammel (comp.), *Gammel's Laws of Texas*, VI, 927–929; Gammel (comp.), *Gammel's Laws of Texas*, IX, 804–805.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Compendium_Cornell
Page 1577

Texans recognized the power of the weapons ban to affect local socioeconomic conditions throughout the state. For instance, in 1889, an El Paso writer commented that lackadaisical enforcement of the arms ban limited the appeal of West Texas to prospective settlers and cost the region much-needed financial investment.[64] If West Texans identified the power of the 1871 law to indirectly promote settlement, there is reason to believe that white Texans in counties with a substantial black population could and would use the very same law to achieve their own local goals—one of which was the restoration and protection of Democratic rule and white supremacy.

By the end of the nineteenth century, Texas had changed from a rough and rowdy frontier that gave white men an absolute right to carry weapons into a state that theoretically prohibited all ordinary citizens from carrying weapons in public. Examination of the state's weapons laws indicates that issues of race were inextricably intertwined with arms policies in Texas from the time of the Republic of Texas through the Jim Crow era. Though Indian men owned weapons and used them to harass Texan settlements, state lawmakers consistently tried to cut off neighboring Indian tribes' access to arms and ammunition and frequently funded armed volunteers to make war upon them. Black men, the vast majority of whom were enslaved prior to 1865, had limited access to weapons prior to emancipation and faced disarmament and intimidation both when Democrats controlled the legislature in 1866 and after "redemption" in 1874. The passage and retention of the weapons ban of 1871 demonstrates the centrality of bearing arms to the process of Reconstruction in Texas. Without disarming the population, Republicans could not hope to protect their voters and their minority rule in Texas; only by using their weapons could Democrats create an environment of fear sufficient to restore white supremacy after years of black political participation. Rethinking state weapons-control laws in light of the racial violence that characterized Reconstruction in Texas and throughout the South moves the historiographical conversation about the legality and effectiveness of arms regulation out of the late eighteenth century and into the late nineteenth—the era when the modern gun control measures currently being dismantled across the South first took shape.

---

[63] The law also proved to be popular in some areas, like the crime-ridden frontier counties of North and West Texas. See Brown, "The Great Gun-toting Controversy," 36–40.

[64] "An Unwanted Assault," *Sunday Herald* (El Paso, Tex.), May 18, 1889.

This content downloaded from 130.182.4.15 on Tue, 18 Oct 2022 04:45:59 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19030   Page 159 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

**55 U.C. Davis L. Rev. 2603**

**U.C. Davis Law Review**
June, 2022

**Symposium**

**The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public**
Brennan Gardner Rivas [a1]

Copyright © 2022 by Brennan Gardner Rivas

# ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS: TEXAS AS A CASE STUDY

*In ongoing conversations about public carry laws, many scholars make references to enforcement of public carry laws. These references tend to claim that such laws were enforced in a discriminatory way, or even not at all. This Article presents data-driven conclusions about the enforcement of the 1871 deadly weapon law of Texas, the state's primary public carry law which prohibited the open and concealed carrying of pistols, knives, and some other small weapons. The author collected this data from the extant criminal misdemeanor records of four sample counties, relying upon archival research rather than digital repositories to identify cases.*

## TABLE OF CONTENTS

| | |
|---|---|
| I. LACK OF ARCHIVAL RESEARCH ON PUBLIC CARRY ENFORCEMENT HAS PRODUCED FALSE ASSUMPTIONS | 2603 |
| II. TEXAS AS A CASE STUDY OF ARCHIVAL-BASED ENFORCEMENT HISTORY | 2609 |
| *A. Statutory Context in Texas* | 2609 |
| *B. Sample Counties* | 2612 |
| *C. Jurisdictional Flexibility and Changes* | 2614 |
| *D. Conviction Rates* | 2615 |
| *E. Racially Discriminatory Enforcement* | 2616 |
| CONCLUSIONS | 2620 |
| APPENDIX: BIBLIOGRAPHY OF ARCHIVAL SOURCES | 2623 |

## I. LACK OF ARCHIVAL RESEARCH ON PUBLIC CARRY ENFORCEMENT HAS PRODUCED FALSE ASSUMPTIONS

Since *Heller* there has been substantial discussion of public carry laws in the United States, and in particular the nineteenth-century jurisprudence arising from the southern states. But there has not been **\*2604** much talk of enforcement. In 1983, Raymond G. Kessler theorized that during times of political crises, firearm regulations "can be selectively enforced against those perceived to be a threat to government." [1] He rested his assertions on a 1979 article whose authors inferred that, since handgun permit laws display "prejudice" toward drug users, "former mental patients," and felons, "enforcement practices are likely to be worse." [2] Stephen P. Halbrook in 1989 speculated that Texas Democrats retained a public carry law enacted by their Republican enemies simply because "those in power could selectively enforce this act against political opponents or selected ethnic groups." [3] But it did not take long for writers to make the leap from theorizing about potentialities to pulling up supposed instances of such discriminatory enforcement. In 1990, a sociologist named Brendan F. J. Furnish claimed that the pages of the *New York Times* from 1911 to 1913 show that seventy percent of those arrested under the Sullivan Act were Italian. [4] Just a few years later, Clayton Cramer--in an article so riddled with falsehoods that it ought not be cited by a federal circuit judge--argued that the entire secret purpose behind postbellum, race-neutral public carry laws was the systematic and racially motivated disarming of African Americans. [5] Such claims have been repeated, republished, and assumed to be true. [6] **\*2605** Taking these works at face value, critical race theorists and ethnic studies scholars have marshalled the idea of selective enforcement

Compendium_Cornell
Page 1579

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19031   Page 160 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

against minorities into a growing historiography on the contours of racism and gun policy across American history--much of it predicated upon the false assumption that gun laws were enacted with racist ends in mind, and enforced in a racially discriminatory way as a matter of consistent-yet-unspoken policy by law enforcement officials. [7] The only substantive rebuttal to these arguments that I have seen so far (aside from my own research) has come from Patrick Charles, who found the anti-immigrant accusations surrounding the Sullivan Act's enforcement to be wildly inaccurate. [8]

There is another false assumption regarding the enforcement of public carry laws--incompatible with the one I just described--which holds that these statutes went largely unenforced. This is an amusing claim because the state appellate cases cited by *Heller* and addressed in *Young* came from somewhere; each one began with an arrest, and it stands to reason that for each case appealed there were far more that were not. Sadly, an over-reliance upon digitized newspaper collections, which only represent a small fraction of the publications that circulated in the nineteenth century, gives the impression that public carry laws were not enforced simply because few cases were reported in the news. In fact, the only place where a researcher might hope to find evidence of misdemeanor law enforcement is in county archival records--a place where it seems few people have looked.

If these common assumptions drive some researchers to examine and rebut them, new roadblocks emerge. In his dissent in *Young*, Judge O'Scannlain asserts that, even if these public carry laws were enforced, **\*2606** they evaded constitutional scrutiny under the Second Amendment. [9] Beyond that, he argues, misdemeanors and sureties were inconsequential and akin to traffic violations in terms of their constitutional significance. [10] This line of argument would have us ignore enforcement history altogether as irrelevant to the constitutional issue at hand.

I will rebut these mutually incompatible claims of selective enforcement, non-enforcement, and enforcement irrelevancy, and discuss the results of my data-driven, archival exploration into the enforcement of the public carry laws of Texas.

The least compelling of these claims are the ones concerning irrelevancy which Judge O'Scannlain raised. To the first challenge, regarding constitutional scrutiny, of course this is an impossible request of nineteenth-century jurists whose education and professional consensus instructed them that the Second Amendment was irrelevant to police-based public carry laws enacted at the state level; we should not hold it against them that they did not foresee *Heller*, particularly when that decision claims to speak for a "consensus" from the past. [11] To Judge O'Scannlain's second point, that misdemeanors and sureties are constitutionally inconsequential, I will acquiesce that inferior courts today are consigned to traffic violations; but the kinds of criminal cases which they used to handle have been relocated to higher, constitutionally consequential courts. Rather than focus on the jurisdiction in which a crime is prosecuted, we should focus on the law in question. The fact that historic public carry laws are the subject of such great controversy before the court today only underscores their constitutional significance, misdemeanors though they may have been.

 **\*2607** Even more fundamental than the relevancy of enforcement history is the fact that it does indeed exist. Robert Leider has argued that the "Massachusetts Model" legislation involving sureties went unenforced, in large measure because digitized newspaper repositories do not carry many stories about the law's enforcement. While I agree with him that the Massachusetts Model was not technically a "ban," and that the drift away from common law led other states to pursue criminal statutes rather than sureties to keep the peace, the key phrase from his paper remains, "until someone does archival research on this issue." [12]

Another attempt, similarly without the aid of archival research, has been made by Justin Aimonetti and Christian Talley, who purport to prove that post-Civil War [13] concealed weapons laws were enacted with racist intent, and were consistently enforced in a discriminatory way against African Americans. [14] Their evidence contains zero archival sources and instead relies upon a small assemblage of Southern newspaper articles. [15] A large portion of these articles are reform-minded editorials calling for better enforcement of concealed weapon statutes, regardless of race. But Aimonetti and Talley misconstrue these voices of Southern progressivism and argue quite weakly that they show a lack of vigorous enforcement against whites. One revealing example comes from the pages of the *Savannah Morning News*, wherein the editor laments the common practice of carrying weapons and the inadequacy of prior legislation to curtail it; far from evidence of racial animus, the article clearly demonstrates that mainstream Americans (even those in **\*2608** the South) supported public carry laws and lamented the unnecessary deaths that resulted from indiscriminate weapons-carrying. [16]

The Aimonetti and Talley article further claims that public carry laws were enacted for racist purposes, though they do not address any specific legislation. The closest their article comes is a newspaper report of debates in the South Carolina legislature

surrounding a bill that would have amended the state's concealed weapon law in 1901. A state senator promoted mandatory licensing for concealed-carry as a way to dissuade Black citizens from carrying weapons; however, the man withdrew his own proposed amendment in favor of one "which he thought would suit better." [17] That amendment was proposed by a different state senator, "the effect of which is that no person shall carry a pistol, concealed or unconcealed, except on his own premises, the length of which is less than twenty inches and the weight of which is less than three pounds." [18] This amendment, which would have prohibited even the *open* carrying of pistols in South Carolina, was adopted, though the bill in question did not become law. [19] So much for evidence of "impermissible motives" for legislative enactments. [20]

But what about racially discriminatory enforcement of Southern public carry statutes? The authors make this claim, but it rests primarily upon reports that African Americans had been arrested for carrying **\*2609** concealed weapons, often amid a larger local riot or violent episode. The connections to enforcement more broadly are scant, and consist of a few passing references and one small city's list of "doings" by the Police Court for the years 1902 and 1904. [21] So much for evidence of "disparate enforcement" of public carry laws. [22]

## II. TEXAS AS A CASE STUDY OF ARCHIVAL-BASED ENFORCEMENT HISTORY

Where the previous authors have theorized, conjectured, and attempted to present evidence of public carry law enforcement, I will now present data-driven conclusions drawn from archival records. I have put together a dataset of more than three thousand cases from four sample counties in Texas covering the years 1870 to 1950.

### A. Statutory Context in Texas

Public carry restrictions in Texas included several statutory parts. The first was a time-place-manner ("TPM") restriction enacted in 1870 which prohibited a broad array of weapons, including long guns, at **\*2610** specific social gatherings; its penalty ranged from $50 to $500. [23] The second was what I have called in my own research the 1871 deadly weapon ban or deadly weapon law; [24] it has also been referred to as "The Six-Shooter Law" by Gov. Greg Abbot [25] or "the pistol law" [26] by other scholars and commentators. It was a sweeping prohibition against the open or concealed carrying of deadly weapons (all of which were small, not considered militia or hunting weapons, and deemed to be weapons of interpersonal conflict rather than arms that may be borne in proper defense or service). [27] There were exemptions, so it was not a total ban **\*2611** --but it came fairly close. [28] That law, confusingly, superseded the 1870 TPM restriction with a similar one; therefore, the revised TPM law as well as the deadly weapon law both became absorbed in the state's penal code of 1879. [29] Texans also had statutes which prohibited the unlawful discharge of a firearm as well as the "rude display" of a pistol. [30] Judges treated the latter of these as a minor offense, and it was common for unlawful carry defendants to plead down to rude display as a lesser offense. [31] A fourth and more obscure law was another time-place- **\*2612** manner restriction which specifically and solely concerned carrying arms to a polling place. It also made its way into the penal code, but under the title and chapter involving elections rather than the one pertaining to deadly weapons. [32]

A brief aside which I would like to make here pertains to the time-place-manner restrictions which remained in place alongside the deadly weapon law. The *Young* dissent made the case that such restrictions do nothing more than demonstrate "that carry was presumptively lawful everywhere else." [33] Not so. In Texas, these separate TPM statutes provided opportunities for legal flexibility. What I mean by that is: the list of prohibited weapons was slightly different, and in the case of the broad 1870 TPM statute, included long guns which were untouched by the 1871 deadly weapon law. Furthermore, the two TPM statutes in Texas had much higher fine thresholds, meaning that they could more forcefully punish a violator and, *importantly*, be prosecuted in District court rather than Justice or County courts. [34] I want to reiterate that all three of these mechanisms remained within the state penal code through multiple revisions reaching across the late nineteenth and early twentieth centuries. Beyond that, in my own archival research I have seen each one be enforced.

### B. Sample Counties

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19033   Page 162 of
715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

With 254 separate counties, a comprehensive survey of county-level misdemeanor records in Texas is an impossible task. I relied upon a strategic and historically informed sampling process to draw conclusions about the enforcement of public carry provisions. About 150 counties have compiled inventories of the surviving records. Only a fraction of these have been microfilmed, but some of them have been **\*2613** transferred to university libraries and archives for safekeeping. The majority of Texas county records, though, can only be seen by traveling to the small county seats and asking clerks for a chance to poke around their storage areas to look for them. I limited my sample to only those counties that had been inventoried and still held criminal misdemeanor records *other than* just case files (which are time-consuming to sort through as compared to scanning pages of a ledger).

I chose four sample counties spanning the more heavily populated portion of the state--east of the so-called "frontier line" which demarcated Comanche lands that were (prior to irrigation) inconducive to large-scale farming. [35] The surviving, accessible records vary for each county, so the type of information varies as well. [36]

Jefferson County is along the Gulf coast, near the Louisiana border. The seat, Beaumont, has long been a thriving coastal city bustling with economic activity. Jefferson County yielded 784 cases spanning the years 1874 to 1953; this is a fairly low number due in large measure to the fact that entire collections of records listed in the inventory were missing. The most useful records there were Criminal Index books from the early to mid-twentieth century, which included names, crimes, dates, and case numbers but did not reveal any information about the outcome of the case itself.

Parker County is along the old "frontier line" and remained a home of Comanche bands well into the 1860s. After the Comanches were pushed off the land, Anglo-white ranchers and farmers moved into the area. Parker County records were hit-and-miss, yielding 301 total cases from 1877 to 1920. There are several gaps in the chronological record, particularly for the period prior to the late 1890s.

McLennan County is about one hundred miles south of the Dallas-Fort Worth metro area and near the turn of the twentieth century it was a bustling, thriving market town. Cotton farming and slavery had long been present in this northern part of the "blackland prairie" but the area **\*2614** really grew on the back of the railroads that came through in the 1870s and 1880s. Waco became a hub featuring the kinds of transfer points and railway infrastructure that most cities lacked. I found 825 cases spanning 1871 to 1930. The records from McLennan District and County courts is extensive, and the Criminal Fee books from 1897 to 1930 provided insights into the average cost of prosecution and whether convicted violators had to work off their fines on the county farm.

The single best documented county, insofar as criminal misdemeanors are concerned, is Fayette County. This historic area was part of the original empresario grant given to Stephen F. Austin by the newly independent Mexican empire. Fayette County attracted many Bohemian and Czech immigrants, which made it fertile ground for the development of a Republican Party apparatus during Reconstruction. Fayette County farmers had plantations and slaves, but they were not mono-agricultural in favor of cotton and voted against secession in 1861. Fayette County records yielded 1,346 cases, 560 of which derived from Justice Court Docket books.

In total, I found 3,256 separate cases from these four counties. The final outcome of many of the cases is known, which means that the dataset can tell us not only who was being arrested, but what ended up happening to him or her within the justice system. In this Article, I will focus on three issues which the dataset support, the first being jurisdictional flexibility in enforcing the deadly weapon law.

### C. Jurisdictional Flexibility and Changes

In the early and mid-1870s, these cases usually originated in District court via a grand jury indictment. This was a new law with a hefty fine (minimum $25) that addressed a cause of serious concern among Texan people, all of which encouraged prosecutors to proceed via indictment. Furthermore, the Texas constitution in force from 1869 to 1876 did not include a judicial role for County courts; the Republicans who authored the Constitution of 1869 believed the County court system to be intransigently racist in its dealings with freedmen and deliberately unfair in its dealings with white Republicans, so they vested judicial powers within the District Court system and the Justices of the Peace. [37] **\*2615** Since JPs were not professional jurists, many misdemeanor charges were vetted through the indictment process before being transferred back to the inferior court for adjudication. After the Constitution of 1876 took effect, and particularly after the 1879 legal reforms set forth a new Code of

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19034   Page 163 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

Criminal Procedure, the cases typically began via information or complaint in Justice courts with appeals receiving a trial de novo in the resuscitated County courts. That being said, there were plenty of Fayette County cases in the County court records that do not have a corresponding match in the Justice court docket books; some docket books may be lost, or some cases may have indeed originated in County court, which shared original jurisdiction with Justice courts. [38] This pattern came to an abrupt halt in 1905, when the legislature raised the minimum fine to $100, placing cases beyond the jurisdiction of Justice courts and squarely within County courts. Prosecutions skyrocketed after 1905, indicating that local officials prioritized its enforcement when it became exceedingly profitable for the county-- fines went to the road fund, and violators jailed for failure to pay typically had to work on the road crew or a county farm. A deep understanding of the state's larger legal and legislative context was crucial to my making sense of these jurisdictional changes--a word of advice I give to anyone interested in conducting a similar archival research project.

### D. Conviction Rates

So far, we have seen evidence that people in Texas were being arrested for unlawfully carrying deadly weapons, but were they being convicted? Of the 3,256 cases, 1,885 left a record of the final adjudication. Among those, 1,684 resulted in guilty judgments or appeals (89% of those with known outcomes; 52% of the total); 200 resulted in not guilty judgments (11% of those with known outcomes; 6% of the total). There was one recorded mistrial, which accounts for a negligible percentage of both. There was also a total of 406 cases that were dismissed or had indictments quashed, which accounts for 12% of the total. [39] This is a  *2616  high conviction rate, particularly in relation to average misdemeanor conviction rates today in Texas, which hover at around 73%. [40] And among the 62 known Black deadly weapon violators, the conviction rate was 87% among those adjudicated (13% acquitted), with 21% receiving dismissals. These numbers correspond, more or less, to the larger sample. [41] We can conclude from this data that public carry arrests were likely to result in convictions for both White and Black defendants.

### E. Racially Discriminatory Enforcement

A third issue which I would like to address is racially discriminatory enforcement, and what the dataset can tell us on that score. Scholarship on Texas points toward counties with a substantial Black minority--most of which had sizeable cotton production either before or after the Civil War--as the ones most affected by lynching, electoral fraud, and vicious behavior toward Black citizens during the half-century following the Civil War and Reconstruction. [42] It stands to reason that the counties most likely to engage in *prima facie* racially discriminatory enforcement--the ones most likely to use public carry laws for the racist ends that some scholars have proposed [43] --are the ones with a White majority but substantial Black minority, and a history of cotton production. Fayette County fits this description quite well, and the cultural influence of its European immigrants in fostering and maintaining a Republican Party presence through the end of the 1880s  *2617  makes it a revealing case study. McLennan County, on the other hand, only briefly fell under the leadership of Republicans and has a long, well-documented history of severe racial violence across the long Progressive Era.

To assess the prevalence of racially biased enforcement patterns, I used statistical sampling to take a closer look at these two counties. I found compelling evidence that racially discriminatory enforcement of the deadly weapon law developed over time and emerged during the decade of the 1890s. [44] The sample consisted of 177 named defendants from the two counties, which is about 10% of the total number. [45] These names became a starting point for research within census and other genealogical records to determine the race, ethnicity, age, hometown, and occupation of each person. There were only seven names (3.9% of the sample) for which I could not ascertain race or ethnicity with reasonable certainty, and for this reason I declined to include them in these results. My findings show that from 1870 to about 1890, the race of public carry defendants reflected the larger demographics of the county in question, with Black defendants accounting for anywhere from 25-40% during those two decades when their share of the population ranged from 27-34%. Evidence from Fayette County is particularly compelling because I undertook an additional step to confirm this hypothesis; I investigated the racial background of *all* 82 of the county's defendants from the years 1870 to 1879 and found that they mirrored local demographics almost perfectly. In 1870, the Black population of Fayette County was 33% of the total, and during that decade, 32% of those arrested for unlawful carry were Black (see Fig. C).

*2618  Fig. A

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19035   Page 164 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

**Fig. B**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

 **\*2619  Fig. C**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The graphs of long-term enforcement within my sample show that racially biased enforcement of the deadly weapon law evolved over time and manifested itself during the 1890s. I believe this turning point is directly related to the collapse of Black voting rights in Texas during that decade, and the resulting erosion of Black political power locally. The best way to explain this phenomenon is by way of describing the economic and demographic growth that occurred in the market towns of Texas between 1870 and 1920. In both McLennan and Fayette counties, White people from elsewhere in Texas and the former Confederacy arrived by the thousands between 1870 and 1920.[46] They slowly upended the local balance of political power that had taken root following the enfranchisement of Black men in Texas in late-1860s. In these counties with substantial African American minorities (33% and 34%), Black men represented a crucial segment of the local voting population. Particularly in Fayette County, where immigrants from Central Europe engaged in less extreme forms of racism, county-level politics made room for Black voters and their political goals. When the state legislature convened every other year from 1875 to 1895, Fayette County's three- or four-member delegation almost always included a Republican, but the practice came to a swift stop amid the political turmoil of the 1890s. By that time, waves of newcomers meant that the White population outnumbered its Black counterpart to such an extent  **\*2620**  that African Americans became irrelevant to the maintenance of local political power. When Black disfranchisement occurred in Texas, during the 1890s, whatever residual fairness was left in the administration of local justice evaporated; politics is about power, and a population robbed of its political voice can neither claim nor exercise it.

**Fig. D**

| FAYETTE COUNTY CENSUS DATA, 1870-1920 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1870 | | 1880 | | 1890 | | 1900 | | 1910 | | 1920 | |
| White | 10,953 | 67% | 19,167 | 69% | 23,031 | 73% | 26,148 | 72% | 22,434 | 75% | 23,201 | 77% |
| Negro | 5,473 | 33% | 8,763 | 31% | 8,446 | 27% | 10,394 | 28% | 7,351 | 25% | 6,755 | 23% |

**Fig. E**

| MCLENNAN COUNTY CENSUS DATA, 1870-1920 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1870 | | 1880 | | 1890 | | 1900 | | 1910 | | 1920 | |
| White | 8,861 | 66% | 19,276 | 72% | 28,811 | 74% | 45,345 | 76% | 55,991 | 73% | 65,280 | 79% |

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19036   Page 165 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Negro** | 4,627 | 34% | 7,643 | 28% | 10,381 | 26% | 14,405 | 24% | 17,234 | 22% | 17,575 | 21% |

## CONCLUSIONS

This local political history may seem insignificant in comparison to the great gun control debate that occupies the attention of the federal courts today--and indeed it is. If we are going to have a Second Amendment jurisprudence driven by history, then we need to prioritize the accuracy of that history; and to do that, we must venture into the proverbial weeds of historical context-- almost universally driven by local imperatives, and therefore *complicated*. Context matters, from this political history of central Texas to the regional context in which it unfolded. For reasons which historians still discuss and debate today, the decade of the 1890s proved to be a momentous turning point in race relations across the American South. The number and severity of segregation laws increased, and all Southern states replaced or amended their constitutions to eliminate Black voting rights; the epidemic of heinous, ritualized race-killings hit its high point, as the writings of anti-lynching crusader Ida B. Wells-Barnett have demonstrated. Historians have long been aware of and intrigued by this seemingly inexplicable turning point. The eminent Southern historian C. Vann Woodward even went so far as to claim that post-emancipation race relations in the South did not really coalesce around segregation until that time. [47] His thesis has been disputed, but even his critics feel the need to explain why such dramatic changes took place *then*. [48] Was it a **\*2621** reaction against Black activism, a response to perceived electoral corruption, or possibly a result of the U.S. Supreme Court abandoning the Reconstruction Amendments? No matter its origin, the swift and merciless reassertion of white supremacy was carried out through a local political process that White Democrats ultimately rigged to disempower Black voters and oppress Black communities. Interpreted within this larger regional context, the development of racially discriminatory enforcement in the 1890s is predictable, and it tells us far more about the failure of democracy in the American South than it does about public carry laws. Were we to look this closely at the enforcement of other misdemeanor crimes across the same time span, I believe we would see nearly identical results-- during the closing years of the nineteenth century, discrimination emerged where it had been largely absent before or sharpened dramatically in places where it already existed. Indeed, the scholarship emerging from within critical race theory has demonstrated quite clearly the systemic failure of our nation's justice system to protect the civil rights of racial and ethnic minorities, particularly African Americans. [49]

Another persistent problem with historically driven jurisprudence is the "when" question. We have seen enforcement patterns change over time, influenced by the larger socio-political environment that necessarily shaped local policing and justice. Unlawful carry prosecutions moved from one jurisdiction to another, were treated by some officials as high-priority crimes while being set aside by others--a hallmark of the justice system as true today as it was then. Should we make legal judgments based on legislative intent? Or the initial application of the law? Or the racist practices that developed over time? Which "when" matters most? The fundamental shortcoming of history-in-law centers on this very issue of chronology, and how to accurately characterize a complex, convoluted story with the brevity needed to **\*2622** keep the judicial process moving. Sadly, the method most used by gun rights advocates is that of freezing the story at its most convenient time, or flattening the complexities to suit their argument. In the end, History as a jurisprudential lodestar poses as many problems as it resolves; it can show us how laws and customs came to be, but it cannot shine a light on where we are headed--we have to look to the future, not the past, to do that.

I will conclude with my own humble opinion, and my most significant takeaway from years spent studying the history of gun and weapon regulation. The nineteenth-century Americans whose jurisprudential mentality *Heller* claims to safeguard did not see the Second Amendment as a roadblock to sweeping state regulation of the weapons most likely to be used in the commission of crimes. These ambitious, risk-taking, forward-thinking Americans looked to their governments for bold and creative solutions to the new problems posed by life in an industrial age. They funded the construction of railways, bridges, and sanitation systems that we still use today, and in Texas they built and expanded commercial centers that still define exurban life in the Lone Star State. Yes, nineteenth-century Americans (and southern ones in particular) disagreed at times about the meaning and scope of the Second Amendment; and yes, they carefully phrased their statutes so as not to deny the right of self-defense during what they dubbed "a difficulty." But they did not see themselves as powerless to act, nor did they see the law or the constitution as frozen in time. If we want a history-focused jurisprudence, maybe we should listen to them a little more closely.

**\*2623  APPENDIX: BIBLIOGRAPHY OF ARCHIVAL SOURCES**

**County Records Consulted for Enforcement Dataset**

Compendium_Cornell
Page 1585

*Fayette County Records, LaGrange, Texas.*

Office of the District Clerk of Fayette County.

Office of the District Clerk of Fayette County.

District Court Minutes, vols. K-M (1867-1877).

Office of the County Clerk of Fayette County.

Judge's State Docket, vols. 1-6 (1872-1933).

Bar State Docket (1872-1879).

Bar Criminal Docket (1888-1894).

Office of the County Judge of Fayette County.

Justice Court Criminal Docket, Precinct 1 (1877-1880, 1883-1893, 1899-1901).

Justice Court Criminal Docket, Precinct 6 (1899-1902).

Justice Court Criminal Docket, Precinct 7 (1881-1890, 1893-1904).

Justice Court Criminal Docket, Precinct 8 (1890).

Justice Court Criminal Docket, Precinct Unlisted (1889-1897, 1893-1895, 1895-1897, 1897-1899).

*Jefferson County Records, Beaumont, Texas.*

Office of the County Clerk of Jefferson County.

County Court Criminal Minutes, vol. 1 (1897-1915).

Criminal Judgment Book (1910-1915).

County Court Criminal Index, (1914-1953).

*Jefferson County Records, Sam Houston Regional Library and Research Center, Liberty, Texas.*

Justice Court Criminal Docket, Precinct 6 (1908-1915).

Justice Court Civil and Criminal Docket, Precinct 1 (1874-1876).

Justice Court Criminal Docket, Examining Trials, Precinct 1 (1895-1902).

Justice Court Criminal Docket, Examining Trials, Precinct 1 (1921-1925).

*Liberty County Records, Sam Houston Regional Library and Research Center, Liberty, Texas.*

Justice Court Criminal Docket, Precinct 1 (1870-1875).

Justice Court Criminal Docket, Precinct 8 (1912).

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19038   Page 167 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

*McLennan County Records, McLennan County Archives, Waco, Texas.*

Justice Court Criminal Docket, Precinct 1 (1901-1903).

Justice Court Criminal Docket, Precinct 3 (1894-1904).

Justice Court Criminal Docket, Precinct 5 (1896-1900).

County Court Criminal Fee Book, vols. K-W (1897-1930).

**\*2624** County Court Criminal Minutes, vols. A, H, L (1876-1881, 1896-1922).

County Court Criminal Case Files, Boxes 1-7 (1886-1887).

County Jail Register of Prisoners (1895-1900).

Texas, District Court Criminal Docket (1873-1874).

City of Waco Criminal District Court, Docket (1874-1876).

*Parker County Records, University of Texas at Arlington Central Library, Special Collections, Arlington, Texas.*

County Court Minutes, vols. 5-9 (1896-1937).

Justice Court Criminal Docket, Precinct 1, 9 vols. (1884-1923).

### Footnotes

[a1] Copyright © 2022 Brennan Gardner Rivas.

[1] Raymond G. Kessler, *Gun Control and Political Power*, 5 LAW & POL'Y Q. 381, 381 (1983).

[2] DAVID T. HARDY & KENNETH L. CHOTINER, RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT 209-11 (Don B. Kates, Jr. ed., 1979). Hardy and Chotiner cite as evidence for this assertion the racially disproportionate arrests in Massachusetts (statewide) and Chicago near the time of their writing. Recent scholarship from critical race studies calls into question this kind of facile analysis, which mistakes correlation for causation and underplays the extent of structural racism within the American justice system. *See infra* note 40.

[3] *See* Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629, 662 (1989).

[4] Brendan F. J. Furnish, *The New Class and the California Handgun Initiative: Elitist Developed Law as Gun Control*, *in* THE GUN CULTURE AND ITS ENEMIES 133 (William R. Tonso ed., Second Amend. Found. 1990).

[5] Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17, 20-21 (1995).

Compendium_Cornell
Page 1587

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19039   Page 168 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

6   *See, e.g.*, Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity - The Redeemed South's Legacy to a National Jurisprudence?, 70 CHI.-KENT L. REV. 1307 (1995)* [hereinafter *Never Intended to Be Applied to the White Population*] ("The model of gun control that emerged from the redeemed South is a model of distrust for the South's untrustworthy and unredeemed class, a class deemed both different and inferior, the class of Americans of African descent."); Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 GEO. L.J. 309 (1991)* [hereinafter *Afro-Americanist Reconsideration*] ("[T]he purpose of [twentieth century gun control statutes in the South] ... like that of the gun control statutes of the black codes, was to disarm blacks.").

7   Brennan Gardner Rivas, *Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship, in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher & Jake Charles eds., Oxford Univ. Press) (forthcoming 2022) (manuscript at 1-2) (on file with authors); Patrick J. Charles, *Racist History and the Second Amendment: A Critical Commentary, 43 Cardozo L. Rev. 1343, (April, 2022)* (manuscript at 1-2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3897310 [https://perma.cc/DCT4-XFM4].

8   Where Furnish claimed 70% of defendant surnames listed in the pages of the *New York Times* were Italian, Charles found only 27-30%. Nearly a third (43 of 132) of the defendants had no name listed at all. Patrick J. Charles, *A Historian's Assessment of the Anti-immigrant Narrative in* NYSRPA v. Bruen, DUKE CTR. FOR FIREARMS L.: SECOND THOUGHTS BLOG (Aug. 4, 2021) https://firearmslaw.duke.edu/2021/08/a-historians-assessment-of-the-anti-immigrant-narrative-in-nysrpa-v-bruen/ [https://perma.cc/N8GU-24MV].

9   Young v. Hawaii, 992 F.3d 765, 857 (9th Cir. 2021) (en banc) (O'Scannlain, J., dissenting).

10   *Id.* at 845 (O'Scannlain, J., dissenting).

11   The *Duke* decision from Texas indeed engaged in constitutional scrutiny, even going so far as to explain quite clearly that the entire matter was "settled law" that the Bill of Rights was "intended to be limitations on the power of the government of the thirteen States, and not on the powers of the State governments," and "has been long regarded as the settled construction in the Supreme Court of the United States." State v. Duke, 42 Tex. 455, 457 (1875). The statute in question, one which I will talk in more detail about, is as close to a ban on public carry of pistols and knives as any state dared venture during the Gilded Age; in fact, it was so sweeping in its effect that I called it a ban in my own dissertation. But the court at that time saw it, not as a ban on weapons in public, but as "nothing more than a legitimate and highly proper regulation of their use." *Id.* at 459. Two decades later, in another case arising from this Texas law, the U.S. Supreme Court held that "it is well settled that the restrictions of these [Second and Fourth] amendments operate only upon the federal power, and have no reference whatever to proceedings in state courts." Miller v. Texas, 153 U.S. 535, 538 (1894).

12   Robert Leider, Constitutional Liquidation, Surety Laws, and the Right to Bear Arms 15 (Mar. 2021) (unpublished manuscript) (on file with George Mason University School of Law).

13   This is a chronologically nebulous period for the authors as they decline to define it. The states they refer to enacted concealed weapons restrictions throughout the nineteenth century and early twentieth century, ranging from 1801 to 1917. *See Search the Repository*, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/repository/search-the-repository/ (last visited Feb. 1, 2022) [https://perma.cc/T6KY-CK5U].

14   Justin Aimonetti & Christian Talley, *Race,* Ramos, *and the Second Amendment Standard of Review, 107 VA. L. REV. ONLINE 193, 197 (2021).*

15   *Id.* The authors cite forty-one separate newspaper articles, from thirty-three newspapers. The plurality is from South Carolina papers--eighteen of the citations (44%) are drawn from seven of that state's newspapers. Each title (save

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19040   Page 169 of
715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

one, which I could not find and believe to be a mistyped citation, *id.* at 216 n.172) are available through the Library of Congress: Chronicling America. Presumably, the authors looked no further than a keyword search of Chronicling America without looking to any other newspaper databases, let alone archival resources.

16    The *Savannah Morning News* editor said, "No man who thinks very much of himself, cares to be going around with the butt of a pistol sticking out of his pocket,"--a statement which calls into question the assumption that white Southerners engaged in near-constant weapon-carrying and considered it an appropriate behavior for men. *The Concealed Weapon Evil*, MORNING NEWS, Sept. 8, 1893, at 6. On manliness and weapon-carrying, see Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 114-23 (May 2019) (Ph.D. dissertation, Texas Christian University) (on file with author) [hereinafter The Deadly Weapon Laws of Texas]. The editor's brief remark regarding armed Black Georgians was: "Almost every negro that one meets is armed. Some of them carry two pistols and a Winchester rifle." This statement should cause readers to ponder whether Black Southerners chose to arm themselves to spite the law, or to defend themselves from a hostile white majority whom they encountered in the public square. Speaking eloquently against all weapon-carrying, the editor concluded with this statement, worth quoting in full: "The very act of carrying these concealed weapons in a time of peace is an offense. The man that does it has murder in his heart. It has grown to be a very common thing where men get into a little dispute that could be settled very easily, as soon as their passion was over, for one or both to draw pistols and one or both get killed or seriously wounded. This is a free country, of course, but is it not possible that there is too much freedom in some things?" *The Concealed Weapon Evil*, *supra*, at 6.

17    *The General Assembly*, YORKVILLE ENQUIRER, Feb. 16, 1901, at 2.

18    *Id.*

19    *Id.*

20    Aimonetti & Talley, *supra* note 14, at 223.

21    Emblematic of the authors' approach is a discussion of concealed-weapons arrests as a way for white Virginians to prevent feared uprisings by local African American residents. *See id.* at 215. This method has previously been used by Cottrol and Diamond, which also failed to draw any concrete connection between arrest of Black weapon-carriers and systematic law enforcement policy. *See* Cottrol & Diamond, *Afro-Americanist Reconsideration*, *supra* note 6, at 349-358. Isolated episodes to do not prove a consistent policy across time and place. More weight must be given to the two articles from the *Watchman and Southron* of Sumter, SC, which gave annual reports of proceedings of the Police Courts. The two articles cited by Aimonetti and Talley present figures for 1902 and 1904. The first of those reports included only three arrests for concealed weapons, two Black and one white, of a total of more than four hundred criminal misdemeanors. *See Doings of the Police Force for 1902*, WATCHMAN AND SOUTHRON (Sumter, SC), Feb. 25, 1903, at 2. The second year featured a much more stark racial disparity of thirty Black persons arrested for concealed-carry and only four white. This certainly shows us inconsistent enforcement patterns, and a tremendous racial disparity in that local area for the year 1904, but it decidedly does not present compelling evidence of consistent discriminatory enforcement across the long Progressive Era or across the entire South. These articles instead show us the extent to which local law enforcement as an entire enterprise became a tool for the oppression of Black Southerners. The *Watchman and Southron* editor even addressed racial disparities regarding the misdemeanors reported for 1904, saying "As usual the negroes are in the great majority, but an inspection of the summary will show that the percentage of convictions was much higher in the cases against white prisoners than in those where negroes were the defendants." *The Sinner's Record*, WATCHMAN AND SOUTHRON (Sumter, SC), Feb. 1, 1905, at 6.

22    Aimonetti & Talley, *supra* note 14, at 223.

23    "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a

Compendium_Cornell
Page 1589

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19041   Page 170 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63.

[24]   Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SW. HIST. Q. 284, 284-303 (2018); Rivas, The Deadly Weapon Laws of Texas, *supra* note 16, at 124.

[25]   Brief for the Governor of Texas as Amicus Curiae in Support of Petitioners, New York State Rifle & Pistol Association, Inc. v. Bruen, No. 20-843 (U.S. July 20, 2021).

[26]   Donald Curtis Brown, who wrote a dissertation on the subject in the 1980s, tended to refer to it as "the pistol law" in emulation of many newspaper editors of the day who used that phrase. The fact that pistols were only one of several weapons included under its purview has discouraged more recent scholars (myself included) from using this phrase as a primary identifier for the law in question. *See* Donald Curtis Brown, The Great Gun-toting Controversy, 1865-1910: The Old West Gun Culture and Public Shootings (1983) (Ph.D. dissertation, Tulane University) (on file with author).

[27]   No amendments were made to this law between its enactment in 1871 and the completion of the 1879 penal code, but subsequent changes were made and are reflected in later penal code revisions. The first section stated, "That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term 'civil officers' as used in this act." An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25. The third section of the act reads, "If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days." *Id*. § 3.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19042   Page 171 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

28    The law did not apply to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces. Also, the deadly weapon law did not apply to all guns or firearms but just pistols. The time-place-manner restrictions, however, applied to any "fire-arms ... gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol ...." *See supra* notes 23, 27; *see infra* notes 29, 32.

29    *See* TEX. PENAL CODE ANN. § 9.318 (1879); *id*. § 9.320.

30    TEX. PENAL CODE ANN. § 9.314 (1879); *id*. § 9.316.

31    This is a fascinating trend, and the dataset shows a total of 211 cases, which is 11% of the 1,885 cases with known outcomes, reduced to rude display. The law treated the simple act of carrying as a much more serious offense than using it in a rude or menacing way. I tracked rude display cases within the sample counties, though there were far fewer of them than there were "unlawful carry" cases. In some ways rude display seems to have become a replacement charge for affrays that did not result in injuries, as well as unlawful weapon carriers who were willing to plead guilty to a lesser charge.

32    "If any person, other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of this Code." TEX. PENAL CODE ANN. § 6.163 (1879). The prescribed penalty from section 161 was a fine of $100 to $500 in addition to imprisonment in the county jail not exceeding one month. *Id*. § 161.

33    Young v. Hawaii, 992 F.3d 765, 846 (9th Cir. 2021) (en banc) (O'Scannlain, J., dissenting).

34    *See supra* notes 23, 27, 28, 30.

35    Historians of West Texas will surely be disappointed that I did not include a western county within my sample. My only response is that I hope to survey Presidio County and include it within my database. It is also worth noting that a very few cases (a total of three) came from two Liberty County Justice court criminal docket books. I reviewed these materials simply as a matter of convenience because they were close at hand, and two were found in a volume from the mid-1870s, making them rare and worth recording. But the Liberty County cases are far too few in number to represent an accurate view of law enforcement there. Where possible, I have deliberately tried to exclude them, though there are so few that they nonetheless have little bearing upon the overall totals.

36    Sometimes, records that should be there are missing; other times, records are available but unusable, as happened to me in Jefferson County.

37    *See* TEX. CONST. art. V (1869). Compare the constitutional statements vesting judiciary power within court systems for the constitutions of 1866, 1869, and 1876. Unlike the 1866 and 1876 constitutions, the republican-authored document does not mandate the creation of county courts. When the legislature created county courts in 1870, it required that justices of the peace serve as members of the court and vested them with administrative powers "as were heretofore discharged by the county commissioners and County Courts of this State." *See* An Act to Organize the Courts of Justice of the Peace and County Courts, and to Define Their Jurisdiction and Duties, 12th Leg., 1st Called Sess., ch. LXV, § 32-38, 1870 Tex. Gen. Laws 87.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19043   Page 172 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

38    There were 105 cases from justice court in Fayette County that were marked as transferred to county court. All but six of those stated a bail amount (usually $100, but occasionally only $50). By contrast, there are a total of 731 cases from the county court system.

39    If we were to look at cases with known judgments, including those quashed or dismissed, the total number would be 2,291. Guilty and Appealed judgments would then account for 74%, Not Guilty judgments would account for 9%, and Quashed/Dismissed would account for 18%. Dismissals were common enough, however, that I decided to consider them within their own separate category rather than allow them to dilute statistics for those cases that actually went to an adjudication.

40    STATE OF TEX.: JUD. BRANCH, ANNUAL STATISTICAL REPORT FOR THE TEXAS JUDICIARY 67 (2014), https://www.txcourts.gov/media/885306/Annual-Statistical-Report-FY-2014.pdf [https://perma.cc/X3J7-JZXR]. The numbers in question apply to Statutory County Courts, which "aid the constitutional county court with its judicial function." STATE OF TEX.: JUD. BRANCH, TEXAS COURTS: A DESCRIPTIVE SUMMARY 2 (2014), https://www.txcourts.gov/media/994672/Court-Overview.pdf [https://perma.cc/RB8Y-3YYW].

41    For additional information regarding this sampling process, see Rivas, The Deadly Weapon Laws of Texas, *supra* note 16, at 164-95. For a full list of county records reviewed for the purposes of this dataset, see *infra* Bibliography.

42    *See* WILLIAM D. CARRIGAN, THE MAKING OF A LYNCHING CULTURE: VIOLENCE AND VIGILANTISM IN CENTRAL TEXAS, 1836-1916, at 3 (Univ. Ill. Press 2004).

43    Aimonetti & Talley, *supra* note 14, at 203-10, 214-18; Cottrol & Diamond, *Afro-Americanist Reconsideration*, *supra* note 6, at 318-19, 354-55, 361; Cottrol & Diamond, *Never Intended to Be Applied to the White Population*, *supra* note 6, at 1329, 1331-35; Cramer, *supra* note 5, at 20-21, 23-24; David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359, 1418; Stefan B. Tahmassebi, *Gun Control and Racism*, 2 GEO. MASON U. C.R.L.J. 67, 67-85 (1991).

44    *Infra* Figures A and B.

45    There were 2,171 total cases from McLennan and Fayette counties combined, but 1,778 individual violators (repeat offenders, transferred cases, and appeals) account for the difference. The sample included 102 violators from a total of 1,021 in Fayette County, and 75 from a total of 757 in McLennan County. This sample size yields of confidence interval of ±7 when using the worst-case-scenario of 50% accuracy, which is the standard for polling statistics. Since my figures are based upon the reading of straightforward census data rather than subjective poll questions, and I have disregarded defendants whose race could not be determined with reasonable certainty, it is fair to consider the accuracy of this sample at 95% or higher.

46    Supra Figures D and E.

47    C. VANN WOODWARD, THE STRANGE CAREER OF JIM CROW 7 (Oxford Univ. Press 1955).

48    See, e.g., JOEL WILLIAMSON, THE CRUCIBLE OF RACE: BLACK-WHITE RELATIONS IN THE AMERICAN SOUTH SINCE EMANCIPATION (Oxford Univ. Press 1984) (discussing changing perceptions of African Americans by Southern whites); Kenneth W. Mack, *Law, Society, Identity, and the Making of the Jim Crow South: Travel and Segregation on Tennessee Railroads, 1875-1905*, 24 LAW & SOC. INQUIRY 377 (1999) (examining the advent of de jure segregation in the American South); Howard N. Rabinowitz, *More than the Woodward Thesis: Assessing*

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19044   Page 173 of 715

ENFORCEMENT OF PUBLIC CARRY RESTRICTIONS:..., 55 U.C. Davis L. Rev....

The Strange Career of Jim Crow, 75 J. AM. HIST. 842 (1988) (book review) (examining the origins and nature of segregation).

49  *See, e.g.*, MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS (New Press 2010) (examining how the U.S. criminal justice system operates as system of racial control); ELIZABETH HINTON, FROM THE WAR ON POVERTY TO THE WAR ON CRIME: THE MAKING OF MASS INCARCERATION IN AMERICA (Harvard Univ. Press 2016) (discussing the creation of the system of mass incarceration in the U.S.); KHALIL GIBRAN MUHAMMAD, THE CONDEMNATION OF BLACKNESS: RACE, CRIME, AND THE MAKING OF MODERN URBAN AMERICA (Harvard Univ. Press 2010) (describing how America has characterized African Americans as criminal).

55 UCDLR 2603

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**40 Campbell L. Rev. 301**

**Campbell Law Review**
Spring, 2018

**Symposium**
Allen Rostron [a1]

Copyright © 2018 by Campbell Law Review; Allen Rostron

# STYLE, SUBSTANCE, AND THE RIGHT TO KEEP AND BEAR ASSAULT WEAPONS

## ABSTRACT

*Assault weapons have long been a subject of intense controversy. The debate has intensified in recent years after a series of mass shootings in which perpetrators used AR-15 rifles or other military-style weapons, such as the shootings in Newtown, Aurora, San Bernardino, Orlando, Las Vegas, Sutherland Springs, and Parkland. While the federal assault weapon ban has expired, some state legislatures have enacted bans. Critics complain that these laws irrationally condemn certain types of firearms simply because they have a military appearance. Gun control advocates argue that these laws are not just about superficial appearances and that the banned weapons are more dangerous than other firearms. This Article contends that even if the controversy over assault weapons ultimately stems from concerns about the look or style of certain firearms, those are not irrelevant considerations. If the military style of assault weapons increases their appeal to disturbed individuals committing the most horrific crimes, and if the intimidating look of these weapons increases the public's perception of the risk of mass shootings, those are legitimate concerns that legislators and judges may take into account.*

INTRODUCTION                                                    302
I. ASSAULTWEAPONS                                              304
A. Types of Firearms                                           304
1. Automatic Firearms                                          305
2. Semi-Automatic Firearms                                     307
B. Assault Weapons                                             307
II. LEGISLATION                                                308
III. CASES                                                     312
A. Before *Heller*                                            313
B. After *Heller*                                             314
1. The Scope of the Right to Keep and Bear Arms               315
2. Intermediate Scrutiny                                       318
a. Selecting a Standard                                        318
b. Application of the Standard                                 321
c. Judicial Restraint                                          324
IV. THE SIGNIFICANCE OF APPEARANCES                           326
CONCLUSION                                                     332

**\*302  INTRODUCTION**

In early 2016, a satirical news website reported that President Barack Obama had found an ingenious way to resolve America's problems with guns. [1] A new law would require all firearms to be a bright shade of pink. "Not only will all newly produced guns be forced to be sold only in pink, but registered guns will also have to be sent in to a special gun control bureau where they will be painted the mandatory shade of pink." [2] According to the satirical story, the National Rifle Association planned

to challenge the new law as a violation of constitutional rights, but President Obama insisted that "the [C]onstitution does not state that Americans have the right [to] choose the color of their gun." [3]

The story was a joke, of course; a joke based on the idea that firearms would lose their macho appeal for many gun enthusiasts if they were a color that made them look less manly and intimidating. [4] While the notion of actually enacting a pink gun law is outlandish, it is not silly to consider what impact the aesthetic or stylistic characteristics of firearms have on **\*303** how they are used and perceived, as well as how they should be treated by law. Does it matter what a gun looks like? Is the style or appearance of a gun ever a legitimate consideration in determining what legal regulations or restrictions should be imposed on it? Does the Second Amendment give people a right to have guns that look a certain way?

These questions are particularly acute for assault weapons, a category of firearms that has been a subject of intense cultural, political, and legal controversy over the past several decades. Critics of assault weapon bans complain that these laws irrationally draw distinctions among firearms based on cosmetic features, prohibiting guns that have a frighteningly militaristic appearance but not other guns that function the same but look less alarming. [5] Gun control advocates have responded by arguing that these laws are not just about appearances and that the banned weapons do in fact have substantive characteristics that make them more dangerous or more likely to be misused than other firearms. [6]

In this Article, I will take an unconventional approach to this debate and argue that even if the controversy over assault weapons ultimately does boil down to concerns about how certain guns look, those concerns are not meaningless. Appearances matter, at least in some ways and in some contexts. If the military style of assault weapons emboldens some disturbed individuals and increases the likelihood that they will commit crimes, especially the sort of public mass shootings that have horrified the nation time and time again in recent years, that is a legitimate and reasonable concern. If the widespread presence of these guns and the increasingly common practice of carrying them openly in public settings causes real and significant distress for a lot of people, that is a phenomenon worthy of at least some consideration in thinking about how these weapons should be treated by legislators and by courts. Appearances are not everything, but they also are not nothing.

**\*304** Part I of this Article provides some basic information about different types of firearms and what constitutes an assault weapon. Part II discusses legal restrictions that have been put on assault weapons by legislatures, including the now-expired federal assault weapon ban and the assault weapon bans that remain in effect in some states. Part III looks at how courts have dealt with the issue, particularly the string of decisions by federal appellate courts in recent years that have upheld state or local assault weapon bans. Part IV considers whether the military look of assault weapons has any relevance to legislative or judicial decision-making about them, and it challenges the notion that the intimidating appearance of these weapons should be a wholly irrelevant consideration.

## I. ASSAULT WEAPONS

The debate over assault weapons often degenerates into sparring over terminology. Some gun rights proponents contend that there is really no such thing as an "assault weapon" because the term is a political buzzword invented by gun control advocates. [7] Others say that gun manufacturers and dealers invented the term in an effort to hype their products and boost sales. [8] While it may be impossible to come to a consensus on the proper way to talk about the issue, it is helpful to begin with a basic understanding of some distinctions among different types of firearms and their characteristics.

### A. Types of Firearms

Handguns and long guns are two categories of firearms. [9] Handguns (such as pistols and revolvers) are designed to be fired with one hand, [10] while long guns (such as rifles and shotguns) are relatively longer and require the use of both hands. [11]

Firearms can be categorized in other ways, such as by the type of action that the firearm utilizes. The action is the mechanism within the **\*305** firearm that handles the ammunition. [12] In some firearms, the action requires some manual force supplied by the shooter. For example, the user of a bolt action rifle must manipulate a small lever to eject an empty cartridge from the rifle's firing chamber and put the next round of ammunition in position to be fired. [13]

Compendium_Cornell
Page 1595

STYLE, SUBSTANCE, AND THE RIGHT TO KEEP AND..., 40 Campbell L. Rev. 301

Other firearms are self-loading. [14] This simply means they do not rely on manual force supplied by the shooter to dispose of an empty cartridge and to prepare the next cartridge to be fired. Instead, self-loading firearms use the explosive force created by each round, as it is fired, to eject the spent cartridge and move the next round into the gun's firing chamber. Self-loading firearms were first developed in the late 1800s, and they entered into widespread use in the early 1900s. [15] By eliminating the need for the shooter to do anything other than pull the trigger, self-loading firearms could achieve significantly faster rates of fire than what was possible with previous types of firearms. [16]

### 1. Automatic Firearms

This new technology was soon put to use on the battlefields of World War I. [17] Commonly referred to as machine guns, the self-loading firearms used in the war were capable of firing several hundred rounds per minute. [18] Early on, these machine guns were large, heavy weapons. They were not easily transportable, and each gun required a crew of several soldiers to operate it. By the end of the war, the development of lighter and somewhat more portable machine guns was well underway. [19]

The machine guns used in the war were automatic weapons, meaning they were capable of firing more than one bullet per pull of the trigger. [20] Once the trigger is pulled, a fully automatic weapon will continue firing **306** rapidly until either the shooter releases the trigger or the gun runs out of ammunition. [21]

After the war, automatic rifles that were smaller and lighter, like the Thompson submachine gun, [22] soon became available, and they became popular with civilians as well as soldiers. [23] With the rise of organized crime during the Prohibition era, automatic rifles became notorious weapons for gangsters. [24] Congress eventually cracked down, passing the National Firearms Act of 1934 (NFA). [25] While that law did not ban any weapons, it created a new regime of special legal restrictions for all firearms capable of automatic fire. [26]

Those restrictions remain in effect today. Any person who wants to legally obtain an automatic weapon must pay a $200 transfer tax and go through an application process that includes being investigated and approved by the FBI. [27] The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) maintains a "registry of information about the ownership of every NFA weapon." [28]

Automatic weapons thus have been subject to special restrictions under federal law since the 1930s. In 1986, Congress took the additional step of prohibiting the introduction of new automatic weapons into the civilian market. [29] Automatic weapons manufactured and registered under the NFA prior to May 19, 1986, remain legal, and ownership of them can be transferred to another person (provided the transferee complies with the NFA's requirements and restrictions), but automatic weapons produced on **307** or after that date can be legally acquired only by the military and law enforcement agencies. [30]

As a result of the 1986 law, there are a limited number of automatic firearms that can be lawfully possessed by civilians in the United States, and that number does not increase over time. A recent release of data by the ATF indicates that there are about 176,000 guns in the pool of registered "pre 86" automatic weapons. [31] Given the limited number available, these firearms have become relatively expensive and much sought after by gun enthusiasts and collectors. [32]

### 2. Semi-Automatic Firearms

While automatic weapons are relatively rare, semi-automatic firearms are very common. [33] Semi-automatic weapons are self-loading, so they automatically load themselves with another round of ammunition after each shot is fired. [34] But, unlike an automatic weapon that can fire multiple rounds with one trigger pull, a semi-automatic weapon fires only one bullet "each time the shooter pulls the trigger." [35] Millions of new semi-automatic pistols and rifles are sold in the United States every year, [36] and they are not subject to the special legal restrictions that apply to automatic weapons under the NFA. [37]

Compendium_Cornell
Page 1596

### B. Assault Weapons

The controversy over "assault weapons" essentially arises because gun manufacturers make firearms for the civilian market that imitate military **\*308** weaponry. Assault weapons are firearms, principally rifles, that are semiautomatic versions of the automatic weapons used by military forces. [38]

The use of the term "assault" in connection with these weapons seems to trace back to the Sturmgewehr 44, a rifle developed by Germany during World War II. [39] The Sturmgewehr, translated as "storm rifle" or "assault rifle," could be set to fire in semi-automatic or fully automatic mode. [40] It combined the best features of an infantry rifle (which has a long range and high accuracy) and a submachine gun (which is compact, lightweight, and fires a relatively low-powered cartridge, so it is easier to control during automatic fire). [41]

After World War II, other nations developed similar weapons for their militaries. The Soviet Union produced the AK-47 rifle, and the United States adopted the M-16 rifle. [42] Both proved to be effective for military use and became the basic weapons of modern combat. [43] Manufacturers eventually began to produce and market versions of these military weapons that could fire only semi-automatically. [44] These firearms, such as the AR-15 rifle, which is a semi-automatic version of the M-16, became popular for uses beyond military contexts. [45] The semi-automatic civilian versions of military rifles are what has become known as assault weapons. [46]

## II. LEGISLATION

Over the past several decades, laws that ban assault weapons have been enacted at the federal level and in several states. [47] The definition of **\*309** an assault weapon has varied under these laws, but they generally employ the same basic two-part approach to identifying the firearms to which they apply. The laws list certain specific firearms, by brand and model name, and then provide a test, based on a weapon's parts or features, for determining which other firearms will also be considered assault weapons. [48] This approach, using a specific list and a features test, strikes a balance between clarity and flexibility. The list provides some degree of certainty about which firearms are covered, while the features test enables the law to be applied to new models introduced after the law's enactment and prevents the statute from being evaded by merely giving a new name to one of the listed weapons.

California pioneered this approach. A shooting at an elementary school in 1989 prompted it to become the first state to enact an assault weapon ban. [49] A young drifter, wearing military combat fatigues and a flak jacket, used a semi-automatic AK-47 type rifle to fire more than 100 rounds at children on a playground. [50] Five children died, and thirty others were wounded. [51] Public officials and law enforcement leaders throughout the state called for a ban on military-style firearms. [52] Within a few months, California's legislature passed the Roberti-Roos Assault Weapons Control Act. [53] The law applied to a list of weapons identified by name, including all rifles in the AK and AR-15 series. [54] In addition, it covered other firearms with certain specified features. For example, it covered any semiautomatic centerfire rifle with a detachable ammunition magazine and any one of six other features: (1) a pistol grip protruding conspicuously beneath the action of the weapon, (2) a thumbhole stock, (3) a folding or telescoping stock, (4) a grenade or flare launcher, (5) a flash suppressor, or (6) a forward pistol grip. [55] The law prohibited the sale of these weapons in California, [56] and it also prohibited possession of them. [57] It did, however, **\*310** include a "grandfathering" exception that allowed those already possessing assault weapons to keep them, provided they complied with registration requirements. [58] New Jersey enacted similar legislation in 1990, and Connecticut followed suit in 1993. [59]

Similar legislation soon followed at the national level. [60] The federal assault weapon ban, enacted in 1994, was bitterly controversial. [61] Even with Democrats holding majorities in both houses of Congress, President Bill Clinton had to press hard to pull together the votes needed to pass it. He put the provision in a major crime bill that included measures favored by many conservatives, such as expanding the federal death penalty, hiring more police officers, and building more prisons. [62] At every

Compendium_Cornell
Page 1597

event relating to the bill, Clinton surrounded himself with dozens of police officers. [63] Portraying the assault weapon ban as a way to protect police endangered by too much firepower in criminal hands, Clinton managed to eke out enough votes to pass it. [64]

The law covered a list of weapons identified by name, including AK or Kalashnikov type rifles and the Colt AR-15. [65] In addition to the firearms on that list, it also covered firearms deemed to be assault weapons based on their features. [66] For example, a semi-automatic rifle was covered if it had the "ability to accept a detachable" ammunition magazine and possessed any two of the following five features: "(i) a folding or telescoping stock; (ii) a pistol grip that protrudes conspicuously beneath the action of the  **\*311**  weapon; (iii) a bayonet mount; (iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; [or] (v) a grenade launcher." [67] The federal statute, applying only to firearms with two or more of the specified features, thus did not go as far as California's stricter one-feature test. The federal law also contained a list of approximately 650 firearms that would be exempt from the ban, even if they otherwise fell within the law's definition of an assault weapon. [68] The exemption list comprised guns that were primarily used for hunting, target practice, and shooting sports. [69]

While the federal law prohibited the manufacture and sale of the banned weapons, it contained a grandfather clause protecting weapons already sold and lawfully possessed before the date of the statute's enactment. [70] As a result, sales of assault weapons surged in the months before the bill passed, as gun owners stocked up on firearms that would no longer be available after implementation of the ban. [71]

The effect of the federal assault weapon ban was limited in another important respect. As a compromise to help ensure that it would pass, the measure came with an expiration date. [72] A sunset clause in the bill provided that the assault weapon ban would remain in effect for only ten years unless Congress opted to renew it. [73] As the expiration of the ban approached in 2004, President George W. Bush declared that he would sign a renewal bill, but it was an empty gesture because it was clear that Congress would not vote to renew the ban. [74] In September 2004, the ten-year clock ran out, and the federal ban evaporated. [75]

Violent crime in the United States decreased significantly while the federal assault weapon ban was in effect, but analysts reached different conclusions about whether the law contributed to that decrease. [76] Even the  **\*312**  law's supporters acknowledged that it was an imperfect measure, [77] particularly because of what some dubbed the 'copycat' problem." [78] Manufacturers were able to evade the ban by renaming firearms and making minor modifications to their designs, such as removing a bayonet mount, that put them outside the law's definition of an assault weapon. [79] For example, one manufacturer began selling an AR-15 type rifle that was modified slightly to avoid the ban and then renamed it the PCR, short for "Politically Correct Rifle." [80]

Since the demise of the federal assault weapon ban in 2004, pushes to enact a new ban have been made in Congress from time to time, but each has fallen short. [81] For example, in April 2013, a bill that would have created a new federal assault weapon ban was defeated in the United States Senate by a vote of 40 to 60. [82] In the absence of federal action on the issue, states maintain the option to implement their own policies. Seven states (California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York) currently have assault weapon bans in effect. [83]

## III. CASES

The debate over assault weapon bans has been waged in courts as well as in legislative arenas. They have been challenged on an array of constitutional grounds, and for the most part they have withstood these legal attacks.

### \*313  A. *Before* Heller

Prior to the Supreme Court's decision in *District of Columbia v. Heller* in 2008, [84] the Second Amendment right to keep and bear arms did not seem to be a potent basis for challenging assault weapon laws. [85] Lower courts consistently interpreted the

Second Amendment as narrowly applying only to the organized, public activities of state militia forces like the National Guard, and not to individual, private uses of guns. [86]

As a result, critics of assault weapon bans challenged them on a variety of other legal grounds. For example, after California became the first state to ban assault weapons, gun rights advocates claimed the statute violated separation of powers and due process rights. [87] Challenges brought against the federal assault weapon ban included claims that it was unconstitutionally vague, [88] it was an impermissible Bill of Attainder, [89] and it exceeded Congress's authority under the Commerce Clause. [90]

The core argument, however, was that the assault weapon bans violated equal protection rights by arbitrarily and unjustifiably prohibiting certain firearms that are ultimately no more dangerous than many other firearms that were not banned. [91] In short, the challengers claimed that it was irrational to ban a firearm merely for having a military look or style.

Courts generally rejected these challenges; their reasoning essentially boiled down to judicial deference to legislative decisions. [92] The Supreme **314** Court of California, for example, acknowledged that the definition of assault weapons under the state's law might be roughly and imperfectly drawn, but the court was not inclined to override the legislature's choices about how to "make California a safer place, even if only marginally and incrementally." [93] Likewise, courts found that the federal assault weapon ban rationally served legitimate government interests. [94] Congress tried to draw a line between firearms relatively more likely to be used for criminal purposes while exempting those relatively less likely to be used that way. [95] "[W]hile perhaps not flawless in its execution," the law was not utterly irrational. [96]

### B. *After* Heller

In 2008, the legal landscape changed significantly with the Supreme Court's decision in *District of Columbia v. Heller*. [97] The Supreme Court held that the Second Amendment protects a broad range of individual, private uses of guns, not just the activities of organized militia forces. [98] The decision led to waves of constitutional challenges to a wide range of gun laws, including assault weapon bans. [99]

In the decade since *Heller*, federal appellate courts have decided four cases about the Second Amendment and assault weapons. These cases will be discussed in detail in the remainder of this Part. All four cases have reached the same conclusion: assault weapon bans are constitutional. The D.C. Circuit upheld the District of Columbia's ban in 2011, [100] the Second Circuit upheld New York and Connecticut laws in 2015, [101] the Seventh Circuit upheld a local ordinance (enacted by the City of Highland Park, Illinois) in 2015, [102] and the Fourth Circuit upheld Maryland's ban in 2017. [103] The results have been unanimously in one direction, and the courts' reasoning has been fairly consistent across all of the cases, with one significant exception. While reaching the same result as the other courts, **315** the Fourth Circuit was the lone court to decide that the Second Amendment does not even apply to assault weapons. [104]

### 1. The Scope of the Right to Keep and Bear Arms

At the outset of their analysis, courts have struggled with a threshold question of whether assault weapons are even within the scope of the Second Amendment's protection. The Supreme Court's decision in *Heller* construed the Second Amendment as applying only to weapons "typically possessed by law-abiding citizens for lawful purposes." [105] In other words, a firearm must be "in common use" among civilians for lawful purposes to receive any constitutional protection. [106] The Supreme Court added that this limitation is consistent with the historical tradition of prohibiting possession of "dangerous and unusual weapons." [107]

The Supreme Court did not hesitate to find that handguns are a type of weapon commonly used by American civilians for lawful purposes, as they "are the most popular weapon chosen by Americans for self-defense in the home." [108] In contrast, the Court implied that a military weapon like an M-16 rifle would not qualify for Second Amendment protection. [109] The Court's decision suggested it would be "startling" to think that the federal laws imposing strict regulations on machine guns might violate the

Second Amendment. [110]  At oral argument, Justice Scalia was even more explicit in stating his belief that even though there are more than 100,000 automatic weapons lawfully possessed by American civilians, these weapons are nevertheless "quite unusual" and therefore not protected by the Second Amendment. [111]

Putting these limits on the types of weapons covered by the Second Amendment was a clever way for the Supreme Court to avoid opening the door to claims that people have a constitutional right to military weaponry like Stinger missiles and bazookas. It enabled the Supreme Court to say that the Second Amendment broadly protects private possession and use of guns "while avoiding the scary and politically unpalatable prospect that it  **316**  gives private individuals a right to arm themselves" with the most potent sorts of military weaponry. [112]

At the same time, limiting the Second Amendment's reach in these ways also raised a host of difficult questions that the Supreme Court did not answer. [113]  In particular, the Supreme Court gave no clear guidelines or standards for determining what it means for a weapon to be in common use. [114]  No one knows how many guns, or how many people using the guns, is enough to qualify as common or typical. For example, if a particular type of gun is lawfully used by one million Americans, is that sufficiently common because one million is a large number, or is it insufficient because one million is a very small fraction of the total number of guns and people in America? [115]

On top of that uncertainty about what they are supposed to be deciding, courts lack clear information about how many people have assault weapons. The challengers in several of the assault weapon ban cases relied on data about the number of AR-15 rifles sold each year since 1986. [116]  For a thorough analysis of the lawful use of assault weapons, one obviously would need information about more than just recent sales of that one type of rifle. In a later case, the challengers attempted to present a more comprehensive count of assault weapons, estimating that there were at least eight million AR-15 and AK-47 type semi-automatic rifles in private hands nationwide by 2013. [117]

Even with more precise data about the number of assault weapons and the total number of firearms in America, courts would face a difficult task in deciding whether assault weapon use is sufficiently common to merit constitutional protection. The Supreme Court thought handguns are common enough to be protected by the Second Amendment but automatic  **317**  weapons are not. [118]  Those guideposts leave an enormous amount of gray area. Semi-automatic assault weapons fall somewhere in that debatable zone, as they are certainly less common than handguns but more common than machine guns. Most courts have therefore essentially given challengers the benefit of the doubt and assumed that assault weapons are sufficiently common to merit Second Amendment protection. [119]

As noted above, the Fourth Circuit boldly departed from that consensus and held that the Second Amendment does not apply to assault weapons. [120]  It based that ruling on a bit of text in the *Heller* majority opinion that had not previously received much attention. [121]  Justice Scalia remarked in his opinion that a government could ban "M-16 rifles and the like" while explaining that the Second Amendment does not guarantee a right to possess military weapons. [122]  M-16s are automatic weapons, so one might interpret this narrowly to mean the government can ban M-16 rifles and other machine guns.

Instead, the Fourth Circuit concluded that "and the like" simply refers to firearms that have qualities and characteristics similar to those of M-16 rifles and other military weapons. [123]  For example, an AR-15 rifle is obviously very much like an M-16 rifle in all ways except one--the AR-15 is the semi-automatic version of the automatic M-16. In other respects, the weapons essentially share the same design, appearance, and features. [124]  Semi-automatic fire versus automatic fire is, of course, a substantial distinction, but the Fourth Circuit was not convinced that it should prevent courts from finding that one weapon is "like" the other. [125]  A skilled shooter, the court found, can achieve rates of fire with a semi-automatic firearm that nearly match those of an automatic weapon. [126]  In the Fourth Circuit's view, the Supreme Court in *Heller* was not trying to draw a bright line between semi-automatic and automatic weapons; instead, the Court made clear that military weaponry is not protected by the Second  **318**  Amendment and can be banned regardless of whether the mode of fire is semi-automatic or automatic. [127]

The Fourth Circuit thus concluded that the Second Amendment does not apply to assault weapons, and the court characterized this as an easy case based on *Heller*'s plain language. [128]  While it is a clever and intriguing argument, it is by no means the

Compendium_Cornell
Page 1600

only plausible reading of *Heller*. Given that Justice Scalia clearly wanted to head off any claims that his opinion gives people a constitutional right to use machine guns, [129] his opinion's reference to "M-16 rifles and the like" [130] may have been just an imprecise way of talking about automatic weapons. But the uncertainty just underscores once again the extent to which *Heller* left a muddle of ambiguity and important questions unresolved.

### 2. Intermediate Scrutiny

Moving beyond the threshold question of what type of firearms the Second Amendment covers, the ultimate question in every case is how strong the right to keep and bear arms should be. Even the Fourth Circuit, after making its categorical assertion that the Second Amendment does not apply to assault weapons, went on to analyze what should happen assuming that assault weapons are not entirely outside the scope of the right. [131] In this Section, I will look at the intermediate scrutiny standard that the courts have selected and examine how they have applied it to assault weapon bans. The courts' decisions have essentially boiled down to two key propositions: judges should be deferential to legislative determinations about guns, and no great injustice occurs if people cannot have assault weapons because they can simply use other guns.

### a. Selecting a Standard

In *Heller*, the Supreme Court declined to specify what level of scrutiny should apply in Second Amendment cases, saying only that it must be something more demanding than mere rational basis scrutiny. [132] Since  **\*319**  *Heller*, the lower courts thus have wrestled with the issue of what level of scrutiny to apply, and most have opted for intermediate scrutiny. [133] The assault weapon cases are no exception, with intermediate scrutiny being used by the federal appellate courts in every one of these cases decided so far. [134]

Intermediate scrutiny generally requires courts to decide if the government's action is "substantially related to an important governmental objective" [135] or "reasonably adapted to a substantial governmental interest." [136] Determining that intermediate scrutiny should apply leaves courts a tremendous amount of discretion and flexibility in deciding cases because intermediate scrutiny can mean many different things. [137] It is more of an array or spectrum of possible approaches than a single test or standard. [138] Applying intermediate scrutiny in the assault weapon cases, a court might require substantial, detailed proof demonstrating that an assault weapon statute will reduce gun violence. Or a court instead might merely require the government to articulate a plausible theory as to how an assault weapon ban might have beneficial effects.

If courts applied a highly demanding form of intermediate scrutiny, requiring concrete, detailed proof that a gun law will have a specified effect, then virtually every gun law might fail the test. It is difficult to conclusively prove what effect any legal measure will have on a phenomenon as complex as crime. This is true for pro-gun legislation as well as gun control measures. For example, despite an enormous amount of study, no consensus exists on whether legislatures can reduce crime by  **\*320**  passing laws that make it easier for people to carry concealed guns. [139] And the same difficulty in reaching firm conclusions about complex, politically tinged issues can be found in a host of other settings, from disagreements about the likely economic effects of tax cuts [140] to uncertainties about whether climate change is increasing the frequency or intensity of hurricanes. [141] Complex problems rarely have incontrovertible solutions.

In the assault weapon cases, courts have avoided these difficulties by employing a relatively mild form of intermediate scrutiny. They emphasize that an assault weapon ban does not impose a substantial burden on anyone's rights because a person unable to have a banned assault weapon can simply use any one of the many types of firearms that are legal. [142] As the D.C. Circuit reasoned, this is akin to giving governments room to regulate speech in ways that impose modest burdens because they leave open ample alternative channels for communication. [143]

To some extent, this is a matter of gun rights advocates' own arguments coming back to haunt them. In *Heller*, the Supreme Court found that the District of Columbia's handgun ban violated the Second Amendment because it prohibited "an entire class of 'arms'" frequently used for lawful self-defense. [144] Gun rights advocates would like to say that assault weapon bans similarly outlaw a significant, popular category of  **\*321**  firearms. But at the same time, gun rights advocates insist that "assault weapons" is actually not a real category or class of firearms at all, but just a term invented for political purposes to demonize an

Compendium_Cornell
Page 1601

arbitrary set of firearms with certain superficial, aesthetic similarities. [145] They cannot have it both ways. If "assault weapons" is not a meaningful category of firearms, then obviously laws banning them do not deprive people of access to any meaningful category of firearms.

### b. Application of the Standard

Turning to the application of the intermediate scrutiny standard, courts indicate that the government must show that the assault weapon bans have some substantial relationship to the goal of protecting police officers and the public from gun violence. [146] In each case, the courts have found evidence sufficient to satisfy this requirement. [147] In doing so, they have essentially accepted the government's evidence at face value. In other words, they treat the evidence as establishing what the evidence purports to show, and they have not seemed interested in trying to assess the strength, credibility, or persuasiveness of the evidence.

For example, several of the courts relied on an academic study, led by criminologist Christopher Koper, that examined the effects of the 1994 federal assault weapon ban. [148] The study is a detailed, careful, and impressive piece of work. Given its complexity and seemingly fair-minded approach, the study contains plenty of grist for arguments coming from both the gun rights and gun control perspectives. And indeed, fact checkers claim both sides of the gun debate have cherry-picked select portions of the study and used them out of context. [149]

In the assault weapon cases, courts have accurately cited the Koper study for several assertions that favor the governments' positions and support the courts' decisions to uphold the assault weapon laws. [150] For **\*322** instance, the study found that criminal use of assault weapons declined during the period when the federal assault weapon ban was in effect. [151] That is a helpful and significant fact. But the court opinions in the assault weapon cases do not mention other findings in the Koper study that are arguably equally important to a complete picture. In particular, the Koper study found that while the federal assault weapon ban led to a decrease in crimes with assault weapons, that benefit was offset by increased criminal use of non-banned firearms. [152] As a result, the study found that it could not "clearly credit the ban with any of the nation's recent drop in gun violence." [153] Koper believes that while there was little or no evidence that the federal ban caused a decrease in gun crime during the ten years it was in effect, the ban could have produced at least some small reduction in shootings if the ban had remained in effect for a longer period of time. [154] While assault weapon bans "would certainly not be a panacea for gun crime," Koper feels they "may help to prevent further spread of particularly dangerous weaponry and eventually bring small reductions in some of the most serious and costly gun crimes." [155] The courts upholding assault weapon bans against constitutional attacks therefore certainly are not wrong to cite Koper's study, but it is fair to say they have relied on it in ways that do not delve deeply into its complexity. The courts have not appreciated that the study could easily be spun to support either side of the gun policy debate.

Likewise, courts have relied on data indicating that assault weapons tend to be overrepresented among the firearms traced by law enforcement. [156] For example, assault weapons accounted for over eight percent of guns traced in 1993, even though assault weapons constitute only about one percent of all the firearms in the United States. [157] The Second Circuit relied on this fact as part of the evidence for its conclusion **\*323** that assault weapons "are disproportionately used in crime." [158] The disproportionate representation of assault weapons in the trace data is strong evidence that assault weapons are more likely to be associated with criminal activity than most other firearms. [159] But some researchers are very skeptical of the notion that trace data has any value in studying criminal use of guns. [160] One critic colorfully "compared analyzing trace data to practicing phrenology or examining the entrails of sacrificial animals to forecast the future." [161] Courts have wisely avoided being dragged into a swamp of technical arguments about the merits of trace data use, and instead they have simply acknowledged that the trace data provides evidence on which a government might reasonably choose to rely.

In applying their mild version of intermediate scrutiny, the courts have tended to say little about the particular military-style features, such as folding stocks and flash suppressors, listed in assault weapon legislation. They have asserted that the danger posed by some of the features, such as a firearm's compatibility with the use of a grenade launcher or silencer, are "manifest and incontrovertible." [162]

Other features, such as folding stocks, pistol grips, and barrel shrouds, are not dangerous in and of themselves, but courts suggest that their combined effect is to make assault weapons particularly well-suited for being used in a spray-firing mode. [163] In other words, they make it easier for the shooter to hold the gun at hip level and fire as quickly as possible in the general direction of the shooter's targets, rather than raising the gun to shoulder level and methodically taking more precise aim. That supports the view that the assault weapon laws are a plausible way to pursue the government's interest in reducing the dangers of gun violence, but it is not something that is conclusively proven or explored in great detail in the decisions.

In assessing the effects of various firearm features, the courts at times could be more careful about distinguishing the role of each particular feature. For example, the Second Circuit's decision asserted that features **\*324** like flash suppressors, protruding grips, and barrel shrouds cause assault weapons to be more lethal, resulting in "more wounds, more serious, in more victims," per shooting incident. [164] The evidence underlying that assertion is a 1994 congressional report, which discussed the enhanced lethality of assault weapons equipped with large-capacity magazines. [165] The increased danger resulting from use of large-capacity magazines is obvious: a firearm with greater ammunition capacity can be used to shoot more bullets at more people. But that is true whether or not the firearm is an assault weapon and has features like a flash suppressor, a pistol grip, or a barrel shroud.

To be sure, a strong case can be made for banning assault weapons, but the issue is obviously complicated and highly debatable, with respectable arguments to be made on both sides. Faced with that situation, courts ruling on the validity of assault weapon legislation have assumed their job is simply to determine whether the government has a plausible theory and substantial evidence about how the legislation might have important positive effects, not to weigh the government's evidence against the challenger's evidence and decide which is stronger.

### c. Judicial Restraint

One might say that the courts are setting a rather low bar for the government to overcome. The assault weapon bans will be upheld as long as governments have a plausible contention that the bans enhance public safety, even if the challengers present equal or even greater evidence to the contrary.

The courts' approach, however, has the admirable virtue of giving considerable deference to legislative decision-making. Every one of the decisions has emphasized this point, stressing that courts should exercise restraint and leave to legislators the task of assessing and weighing the complex, conflicting information about assault weapons and the hotly contested policy issues surrounding them. [166] The cautious form of **\*325** intermediate scrutiny employed by the courts in the assault weapon cases ensures that legislatures maintain their proper central role in making policy with respect to firearms.

Judge J. Harvie Wilkinson's concurrence in the Fourth Circuit case made the case for judicial restraint in the most affecting terms:

> Disenfranchising the American people on this life and death subject would be the gravest and most serious of steps. It is their community, not ours. It is their safety, not ours. It is their lives, not ours. To say in the wake of so many mass shootings in so many localities across this country that the people themselves are now to be rendered newly powerless, that all they can do is stand by and watch as federal courts design their destiny--this would deliver a body blow to democracy as we have known it since the very founding of this nation. [167]

Judge Wilkinson astutely noted that *Heller* was "a cautiously written opinion," not meant to sweep away legislative authority over firearms, and "had it been written more ambitiously, it is not clear that it could have garnered the critical five votes." [168]

Indeed, the highly deferential approach taken in the assault weapon cases is arguably just what the Supreme Court prescribed in *Heller*. The Supreme Court majority in *Heller* went out of its way to emphasize that the Second Amendment does not provide an absolute right and that many types of firearm regulations are permissible. [169] Moreover, the majority's opinion in *Heller* emphatically warned against allowing Second Amendment analysis to turn into "a judge-empowering 'interest-balancing inquiry'" that requires courts to assess the policy merits of challenged legislation. [170] In other words, Justice Scalia did not want courts to wade into social science and public policy debates and make constitutional decisions based on whether they thought

Compendium_Cornell
Page 1603

the expert witnesses, empirical studies, or other evidence presented by a government proved that a particular gun law was a good idea with a positive impact on public safety. In *Heller*, this meant striking down the District of Columbia's handgun ban because the ban significantly infringed on the right to use guns in defense against crime, and the ban could not be saved by the District's policy arguments about **\*326** how the ban had vital positive effects. [171] The Supreme Court thus made clear that its task in Second Amendment cases is not to evaluate the public policy merits of gun laws.

The lower courts have done a similar maneuver in the assault weapon cases, but in the opposite direction. They have found that the bans do not significantly infringe on the right to keep and bear arms because people prohibited from having a banned assault weapon can simply use guns that are not banned. [172] They have upheld the bans, despite the challengers' policy arguments about how the bans are misguided and ineffectual, because those arguments should be directed at legislatures rather than courts. [173] The judges in these cases thus have heeded Justice Scalia's admonition to refrain from balancing interests and weighing public policy arguments, although perhaps not with results he would have applauded.

Judicial restraint is ultimately at the heart of the appellate court decisions about assault weapon bans. As Judge Easterbrook explained in the Seventh Circuit case, "The central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process." [174] The courts have respected this principle by applying intermediate scrutiny to the assault weapon bans in a way that reserves to legislatures the task of making policy decisions about the wisdom and effectiveness of such laws.

## IV. THE SIGNIFICANCE OF APPEARANCES

The debate over assault weapons will continue in the courts as well as in legislatures. The arguments often essentially boil down to a question of whether assault weapons are materially different and more dangerous than other semi-automatic firearms not classified as assault weapons. Gun enthusiasts insist that the differences between assault weapons and other firearms are purely cosmetic. [175] They contend that it is absurd to ban certain weapons merely because they have a military look that may be more frightening or intimidating to some people. [176] A gun's appearance, **\*327** according to gun proponents, is a superficial consideration that should have no impact on its legal status or treatment. [177]

Gun control advocates generally respond by arguing that their concerns about assault weapons are not based merely on appearances. [178] They contend that the features listed in statutory definitions of assault weapons are meaningful. [179] It is fairly obvious how the ability to mount a grenade launcher or bayonet on a firearm could have an effect that is not purely cosmetic. While pistol grips, forward grips, barrel shrouds, thumbhole stocks, and muzzle brakes do not change the basic functioning of a firearm, they can make it easier to maintain control of the weapon during sustained, rapid firing of a large number of rounds. [180] Folding or telescopic stocks can make a rifle shorter and easier to conceal. [181] Flash suppressors reduce the extent to which a shooter's vision will be impaired by muzzle flash at night but also can help conceal a shooter's location. [182] These features are not on military firearms just because they look nice. They can enhance the effectiveness of a firearm, whether it is being used by a soldier, a police officer, a criminal, or a law-abiding citizen.

Setting aside the debate about substantive differences between assault weapons and other firearms, there can be no doubt that appearances also play a significant role in the issue. For many people who have strong negative feelings about assault weapons, their attitudes are undoubtedly not based on extensive study of crime data or on impassive evaluations of the utility of thumbhole stocks or protruding grips. Many people have a strongly negative visceral reaction to firearms that look like weapons of war. The immediate, gut-level reaction to a glimpse of a more traditional rifle may be warm thoughts and images, such as a father and son hunting, that would be suitable for a Norman Rockwell painting. Assault weapons, on the other hand, may have much darker associations. Personally, the first thing that flashes into my mind when I see an AR-15 type rifle is the Vietnam War; Osama bin Laden is in the first image that comes to mind at the sight of an AK-47 type rifle. While this is the most anecdotal sort of **\*328** evidence, it seems obvious that various types of firearms have different emotional connotations because of the way they look. If so, is the appearance of a firearm nevertheless a superficial consideration with no proper role in legislative or judicial decision-making about the regulation of firearms?

While regulating firearms based solely on how they look would be a highly questionable approach, the appearance of firearms is by no means an entirely irrelevant consideration. In short, looks matter. In a wide range of contexts, aesthetics affect what

people feel, think, and do. For example, students learn more from educational materials that are aesthetically pleasing. [183] The visual appeal of a website is the top factor driving judgments of the website's credibility. [184] If a product has a visually appealing design, consumers will perceive it as being easier to use than a product that is substantively identical but does not look as nice. [185] Moreover, that perception will become reality because a product that people perceive to be more usable will in fact be a more useable product for them. [186] Airport screenings and other security measures that do not increase security in any real sense may nevertheless have beneficial effects if they reassure the public, minimize irrationally exaggerated fears, and even deter potential terrorists by creating a credible illusion of enhanced security. [187] If human beings were coldly rational calculators, superficial appearances might be dismissed as irrelevant. But cognition is invariably intertwined with emotion.

In the court opinions about assault weapon bans, only Judge Easterbrook touched on the emotional and psychological aspects of the issue in a significant way. [188] He noted that if assault weapon bans do nothing else, they may at least enhance public perceptions of safety. [189] People tend to overestimate the likelihood of horrific events like mass **329** shootings. [190] Judge Easterbrook candidly observed that if an assault weapon ban "reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." [191]

While the military look of assault weapons may alarm many people, the weapon's menacing appearance may appeal to the worst instincts and urges of some others. Nearly two decades ago, I was among the lawyers for the plaintiffs in the case of *Merrill v. Navegar, Inc.* [192] The case arose from a shooting rampage at an office in San Francisco. [193] The shooter had three firearms, two of which were TEC-9 semi-automatic pistols. [194] California's assault weapon law banned the sale of these weapons, but the shooter went to the neighboring state of Nevada to obtain them. [195] In seeking to establish that the manufacturer of these guns could be held liable for negligently marketing a weapon with special appeal to criminals, one of the major challenges was proving causation. Even assuming the manufacturer acted negligently, did it make a difference? In other words, the issue was whether the shooter would have used other firearms and the tragic results would have been the same even if TEC-9s and other assault weapons did not exist.

One of the plaintiffs' arguments on this point was based on the expert testimony of J. Reid Meloy, a forensic psychologist. [196] He characterized the shooter as the sort of purposeful and emotionless predator who would meticulously plan his attack and who would have violent fantasies fueled by the military style of his weaponry. [197] In Meloy's view, the TEC-9's fearsome appearance was not merely cosmetic or a coincidence. [198] The weapon's look, and the ways in which it was marketed to appeal to those fantasizing about extreme violence, may well have emboldened the shooter to undertake a mass shooting spree he otherwise might not have attempted. [199]

**330** This is the sort of argument that is difficult to prove conclusively for any one particular incident but that has some undeniable overall truth. There certainly have been horrific mass shootings that did not involve assault weapons. [200] But it is hard to believe it is a mere coincidence that AR-15 rifles and other military-style assault weapons have been used in so many of the worst mass shootings in recent years--the Newtown school shooting and Aurora movie theater shooting in 2012, the San Bernardino holiday party shooting in 2015, the Orlando nightclub shooting in 2016, the Las Vegas concert shooting and Sutherland Springs church shooting in 2017, and the Parkland high school shooting in 2018. [201] People who carry out these sorts of mass assaults seem inclined to use firearms patterned after military weapons, whether the reasons for doing so are psychological or practical.

The possibility that criminals may be influenced by the look of assault weapons has not been a major topic in legislative debates. Proponents of assault weapon bans understandably might worry about acknowledging that their concerns are based in any way on the appearance of the weapons rather than their functional capabilities. No one wants to be accused of ignorantly trying to ban a gun merely because it looks scary.

But legislators have not entirely ignored the issue of whether assault weapons may be problematic in part because of how they look. In 1994, when the federal assault weapon ban was working its way through Congress, a House subcommittee conducted a hearing and issued a report on the proposed legislation. [202] The report discussed the military features, such as folding stocks and pistol grips, that distinguish assault weapons from other firearms. [203] It noted that gun enthusiasts "often dismiss these

combat-designed features as merely 'cosmetic.'" [204] But witnesses at the subcommittee hearing testified "that, even if these characteristics were merely 'cosmetic' in effect, it is precisely those cosmetics that contribute to their usefulness as tools of intimidation by criminals." [205]

**\*331**  Henry Cisneros, the Secretary of the Department of Housing and Urban Development, testified that part of the problem with assault weapons is that "[t]hey are intimidating in appearance." [206] Senator Charles Schumer followed up on the point later, asking Cisneros if "the look" of the weapons is important for intimidation purposes. [207] Cisneros said "[a]bsolutely" and described how criminal gang members in Chicago housing projects rely on the look of their assault weapons to intimidate security guards and project residents. [208]

John Magaw, the director of the Bureau of Alcohol, Tobacco, and Firearms, echoed that idea, saying, "These weapons were intentionally designed to mirror military weapons and are used to intimidate their victims." [209]

Likewise, John Pitta, executive vice president of the Federal Law Enforcement Officers Association, testified that while the impact of assault weapons could be measured statistically in some respects, he was not familiar with any statistics that could quantify the extent to which assault weapons served the purpose of intimidation. [210]

Opponents of the federal assault weapon legislation effectively conceded that there was some merit to the notion that assault weapons are more intimidating than other firearms. One of the witnesses presented by the legislators opposed to the legislation was Phillip Murphy, from Tucson, Arizona, who testified about using his AR-15 rifle to guard his parents' home after a burglary, as he was afraid the perpetrators would return to rob the home again. [211] He explained why that firearm's appearance was an important consideration, saying that he "brought a weapon so intimidating that I might preclude any aggressive action taken against me by its appearance alone." [212] The menacing appearance of an assault weapon thus becomes a force for good when the gun is in the right hands.

This is a dilemma at the heart of any attempt to ban or restrict particular types of firearms. Guns can be used to do good things or bad **\*332** things, and anything that makes a gun a better instrument for criminal use may make it a better tool for some legitimate uses, as well. A gun that is well-designed for firing a large number of rounds as quickly as possible may be ideal for a disturbed individual who wants to kill strangers in a crowded public place, but one can at least imagine a scenario where the same qualities of the firearm will come in handy for a heroic person using the gun to defend against a large number of attackers. And just as there are many responsible, law-abiding people who like firearms that look like military weapons, there are people with evil intentions who are drawn to them, as well.

What to do about this is the difficult question. We entrust legislators with the task of determining, within constitutional boundaries, whether there are regulatory measures that can reduce the risks posed by firearms without unduly interfering with their legitimate uses. In doing that calculus, it is not absurd for legislators to take into account how the military appearance of firearms affects perceptions of them and for courts to do the same in deciding whether to uphold laws that restrict access to these weapons. Aesthetics are certainly not everything, but they also are not nothing.


**CONCLUSION**

Assault weapons certainly generate passionate feelings on all sides of the gun debate. I have found this in conversations with people who favor stricter gun control and people who strongly believe any restrictions on firearms are a serious threat to freedom. I have also found it in talking with people who generally favor gun rights but would make an exception for assault weapons.

Over the past twenty years, I've talked about gun issues at many different sorts of events. Often, I have been approached afterward by audience members who will graciously thank me for speaking but respectfully explain that they disagree with much of what I said. In about a dozen of these conversations, I have heard some version of this line: "I think people should have a right to have guns, but I don't know why anyone should be able to have an assault weapon."

My sense is that people say this sort of thing because they want to make it clear that they realize the issues are difficult and they do not approach them in an entirely one-sided way. They are being nice and seeking to show that we share some common

ground even though they largely disagree with me. But what is striking to me is that when people who generally favor gun rights try to think of some point on which they might agree with a gun control speaker, assault weapons are the subject that **\*333** consistently comes to their minds. For example, I have never had anyone say, "I believe in gun rights, but I don't know why we can't expand background checks to cover private sales" or, "I believe in gun rights, but it seems reasonable to have a waiting period for firearm purchases." There is something about assault weapons and the feelings they engender that resonates even with some people who otherwise are not sympathetic to the gun control perspective.

Yet, even those who favor a ban or special restrictions on assault weapons must concede that drafting statutes that draw clear, durable lines between assault weapons and other firearms is a challenge. Rigid definitions can be easily circumvented by slight changes to gun designs, and more flexible definitions will be condemned as too vague and uncertain. It is also difficult to measure how effective these laws are. And surveys of public opinion indicate that support for these laws has declined substantially, even in an era when there have been so many high-profile shootings involving assault weapons. [213]

For all of these reasons, pushing for the enactment of laws banning assault weapons would not be my focus if I were crafting strategy for gun control efforts. I would focus on measures to expand and strengthen the background check system. [214] Trying to keep guns out of the hands of those with serious criminal records or significant mental problems should be an objective on which everyone can agree. Beyond that, putting restrictions on specific items that can be defined with relative ease, like large-capacity magazines [215] and bump stocks or other mechanisms that increase firing rates, [216] might be a better goal than seeking to ban a more amorphous category of items like assault weapons.

To the extent that assault weapon bans have already been enacted in some states and may be enacted by additional states in the future, there should be no room for doubt that these laws are constitutional. Courts have consistently and properly held that Second Amendment rights are not absolute and that substantial deference must be given to legislative **\*334** determinations about how to reduce risks of firearm misuse without unduly infringing on legitimate use. In evaluating Second Amendment challenges to assault weapon bans, courts should respect legislative determinations that the military adequacy of assault weapons may enhance their potential for causing harm. And if the differences between assault weapons and other firearms really are purely cosmetic, as gun rights enthusiasts insist, then there will be no great harm in banning them because people can simply use other weapons that work just as well. If that means some people will be unable to use firearms with the aesthetic style that they prefer, so be it. The Constitution guarantees a right to keep and bear arms, not a right to keep and bear weapons that have a certain look.

## Footnotes

[a1]   Associate Dean for Students and the William R. Jacques Constitutional Law Scholar and Professor of Law, University of Missouri-Kansas City School of Law. B.A. 1991, University of Virginia; J.D. 1994, Yale Law School. Before becoming a law school teacher, Professor Rostron worked as a senior staff attorney for the Brady Center to Prevent Gun Violence. The views expressed in this Article are strictly his own and do not represent the positions of any other person or entity.

[1]   David Marrs, *America Solves Gun Control Problem by Making All Guns Pink*, DAILY SQUAT (Feb. 1, 2016), https://perma.cc/9M53-HVZD.

[2]   *Id.*

[3]   *Id.* This was not the first time someone suggested that all guns should be pink. *See, e.g.*, XemaSab, *Maybe All Guns Should Be Pink*, DEMOCRATIC UNDERGROUND (May 2, 2013, 10:05 PM), https://perma.cc/LL53-KK33. I also recall being a judge for a gun control essay contest about fifteen years ago, and one of the entries was a tongue-in-cheek call for requiring all guns to be pink.

Compendium_Cornell
Page 1607

[4]   Pink guns, marketed to women, are a small-but-growing segment of the firearms market. *See* Adam Weinstein, *Take a Stand for Women: Ban Pink Guns*, TASK & PURPOSE (Mar. 8, 2017), https://perma.cc/SGJ4-94PZ (criticizing the marketing of pink firearms for reinforcing social gender norms).

[5]   *See, e.g.*, Stephen P. Halbrook, *Reality Check: The "Assault Weapon" Fantasy and Second Amendment Jurisprudence*, 14 GEO. J.L. & PUB. POL'Y 47, 49 (2016) (arguing that "assault weapons" is a propaganda term used to promote bans on firearms "that have cosmetic outward features that look like military rifles"); James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 CARDOZO L. REV. 681, 687 (2015) (arguing that banning guns that look like military weapons is "like asking how many features make an automobile look too futuristic or too much like a race car for private citizens to own").

[6]   *See, e.g.*, BRIAN J. SIEBEL, BRADY CTR. TO PREVENT GUN VIOLENCE, ASSAULT WEAPONS: "MASS PRODUCED MAYHEM" 1 (2008) ("Far from being simply 'cosmetic,' these features all contribute to the unique function of any assault weapon to deliver extraordinary firepower. They are uniquely military features, with no sporting purpose whatsoever."); VIOLENCE POLICY CTR., BULLET HOSES: SEMIAUTOMATIC ASSAULT WEAPONS-- WHAT ARE THEY? WHAT'S SO BAD ABOUT THEM? (2003).

[7]   *See* Halbrook, *supra* note 5; Peter Ferrara, Opinion, *'Assault Weapon' Is Just a PR Stunt Meant to Fool the Gullible*, FORBES (Dec. 28, 2012, 9:23 AM), https://perma.cc/5FTR-G8S4.

[8]   PHILLIP PETERSON, GUN DIGEST, BUYER'S GUIDE TO ASSAULT WEAPONS 11 (Dan Shideler ed., 2008).

[9]   Allen Rostron, *High-Powered Controversy: Gun Control, Terrorism, and the Fight over .50 Caliber Rifles*, 73 U. CIN. L. REV. 1415, 1419 (2005).

[10]   18 U.S.C. § 921(a)(29)(A) (2012) (defining handgun as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand").

[11]   *Id.* § 921(a)(5), (7) (defining rifles and shotguns as firearms meant to be fired from the shoulder).

[12]   *See* Rostron, *supra* note 9, at 1419-20.

[13]   *Id.* at 1420.

[14]   *Id.*

[15]   *See* JIM SUPICA, GUNS 21-24 (2005).

[16]   For example, when Hiram Maxim built his first fully automatic firearm, he found it could fire over 600 rounds per minute. Adrienne LaFrance, *People Thought Machine Guns Might Prevent Wars*, ATLANTIC (Jan. 26, 2016), https://perma.cc/AAH2-QQJX.

[17]   For a detailed account of the machine guns used in World War I, see Tom Laemlein, *"Grim Reapers": The Machine Guns of World War I*, AM. RIFLEMAN (Oct. 20, 2017), https://perma.cc/Z4C6-RJ42.

[18]   *Id.*

19    *Id.*

20    *See* 26 U.S.C. § 5845(b) (2012) (defining "machinegun"); *see also* Rostron, *supra* note 9, at 1420.

21    Rostron, *supra* note 9, at 1420 n.13.

22    Retired U.S. Army Brigadier General John Thompson designed a small automatic rifle "that will fire 50 to 100 rounds, so light that [a soldier] can drag it with him as he crawls on his belly from trench to trench, and wipe out a whole company single-handed." Matthew Moss, *The Tale of the Tommy Gun*, POPULAR MECHANICS (Feb. 27, 2017), https://perma.cc/2D75-DAXQ.

23    *See* SUPICA, *supra* note 15, at 25-30.

24    *Prohibition-Era Gang Violence Spurred Congress to Pass First Gun Law*, NAT'L PUB. RADIO (June 30, 2016, 4:25 PM), https://perma.cc/S9S6-7HQC.

25    National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (codified at 26 U.S.C. §§ 5801-5872 (2012)); *see* Rostron, *supra* note 9, at 1428.

26    Rostron, *supra* note 9, at 1430-34. In addition to automatic firearms, the NFA restrictions apply to silencers, destructive devices such as bombs and grenades, and certain types of weapons such as rifles and shotguns with short barrels. *See* 26 U.S.C. § 5845(a)-(f).

27    Rostron, *supra* note 9, at 1430.

28    *Id.* at 1432.

29    *See* Firearm Owners' Protection Act, Pub. L. No. 99-308, sec. 102, § 9, 100 Stat. 449, 452-53 (1986) (codified at 18 U.S.C. § 922(o) (2012)).

30    *See* Rostron, *supra* note 9, at 1434.

31    Letter from Stephanie M. Boucher, Disclosure Div. Chief, Bureau of Alcohol, Tobacco, Firearms & Explosives, to Jeffrey E. Folloder, Exec. Dir., Nat'l Firearms Act Trade & Collectors Ass'n (Feb. 24, 2016), https://perma.cc/8RGC-KVTF.

32    Philip Wegmann, Opinion, *It's Still Legal to Own a Machine Gun (It's Also Extremely Difficult and Especially Expensive)*, WASH. EXAMINER (Oct. 2, 2017, 3:53 PM), https://perma.cc/2UWH-9XLP.

33    *Semi-Automatic Firearms and the "Assault Weapon" Issue Overview*, NAT'L RIFLE ASS'N-INST. FOR LEGISLATIVE ACTION (Feb. 15, 2013), https://perma.cc/KMH9-W5XR ("Semi-automatics account for about 20 percent of the 300 million privately-owned firearms in the United States and the percentage is quickly rising, because semi-automatics now account for about 50 percent of all new firearms bought annually.").

34    *See* Rostron, *supra* note 9, at 1420.

35    *Id.*

36    *Semi-Automatic Firearms and the "Assault Weapon" Issue Overview, supra* note 33 ("Americans bought about five million new semi-automatics in 2012.").

37    *See* Rostron, *supra* note 9, at 1430.

38    H.R. REP. NO. 103-489, at 17 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1820, 1825 (explaining that an ATF working group during the George H.W. Bush administration chose the term "assault weapons" to refer to semi-automatic versions of fully automatic military assault rifles).

39    *See* Aaron Smith, *The Nazis' Assault Rifle Now Made in America*, CNNMONEY (June 29, 2016, 11:57 AM), https://perma.cc/F9RS-2GRV.

40    *Id.*

41    *Id.*; SUPICA, *supra* note 15, at 26.

42    SUPICA, *supra* note 15, at 28.

43    *Id.* at 30.

44    *Id.*

45    *Id.*

46    *See supra* note 38.

47    *Semi-Automatic Firearms and the "Assault Weapon" Issue Overview, supra* note 33; *e.g.*, Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1996 (codified in scattered sections of 18 U.S.C.) (repealed 2004); CAL. PENAL CODE §§ 30500-31115 (West 2012); CONN. GEN. STAT. ANN. §§ 53-202a, -202b (West 2012); D.C. CODE §§ 7-2501.01(3)(A), -2502.02(a)(6) (2001 & Supp. 2017); HAW. REV. STAT. §§ 134-1 to -4(e) (2011); MD. CODE ANN., CRIM. LAW §§ 4-301 to -304, -306 (LexisNexis 2012 & Supp. 2017); MASS. GEN. LAWS ch. 140, §§ 121, 131(m) (2014); N.J. STAT. ANN. §§ 2C:39-1(w), :39-5(f) (West 2016); N.Y. PENAL LAW §§ 265.00(22), .02(7), .10 (McKinney 2017).

48    *See infra* notes 49-52, 61-64 and accompanying text.

49    Jacobs, *supra* note 5, at 687-88.

50    *Stockton's Open Wounds*, NEWSDAY, Mar. 5, 1989, at 15.

51    *Id.*

52    *See* Carl Ingram, *Normal Political Patterns Melt in Heat of Gun Control Conflict*, L.A. TIMES, Mar. 27, 1989, at 3.

53    Roberti-Roos Assault Weapons Control Act of 1989, 1989 Cal. Stat. 64 (codified at CAL. PENAL CODE §§ 30500-31115 (West 2012)).

54    The current version of the list is at CAL. PENAL CODE § 30510.

55    *Id.* § 30515.

56    *Id.* § 30600.

57    *Id.* § 30605.

58    *Id.* §§ 30900-30965.

59    *Semi-Automatic Firearms and the "Assault Weapon" Issue Overview, supra* note 33. For example, the New Jersey statute covers a list of several dozen firearms identified by name, plus any other firearm "substantially identical" to any of the listed firearms. N.J. STAT. ANN. §§ 2C:39-1(w)(1)-(2) (West 2016). It also covers semi-automatic shotguns that have a pistol grip, a folding stock, or a magazine capacity of more than six rounds. *Id.* § 2C:39-1(w)(3).

60    Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1996 (codified in scattered sections of 18 U.S.C.) (repealed 2004).

61    *Id.* For a sense of the bitter division over the issue, see Ronald Brownstein, *No Cease-Fire in Fight over Gun Ban: Narrow House Victory Not End as NRA Promises Retaliation*, CHI. SUN-TIMES, May 8, 1994, at 25. President Clinton's push for the assault weapon ban put him at odds with congressional leaders even within his own party. *See* Russell Riley, *Bill Clinton's Costly Assault Weapons Ban*, ATLANTIC (June 25, 2016), https://perma.cc/2YAG-X75F.

62    *See* David Corn, *What the Fight over Clinton's 1994 Assault Weapons Ban Can Teach Obama*, MOTHER JONES (Dec. 21, 2012, 11:01 AM), https://perma.cc/LFJ3-54KU.

63    *Id.*

64    *Id.*

65    Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. § 921(a)(30)(A) (2003) (repealed 2004).

66    *Id.* § 921(a)(30)(B).

67    *Id.*

68    *Id.* §§ 922(v)(2)-(3); *id.* app. a; *see also* VIVIAN S. CHU, CONG. RESEARCH SERV., R42957, FEDERAL ASSAULT WEAPONS BAN: LEGAL ISSUES 5 (2013).

69    CHU, *supra* note 68.

70    18 U.S.C. § 922(v)(2).

71    Corn, *supra* note 62.

72    *See* 18 U.S.C. § 921.

73    *Id.*

74    *See* Wayne Slater, *Kerry Lays into Bush as Assault-Weapons Ban Expires*, DALL. MORNING NEWS, Sept. 14, 2004, at 7A (describing accusations that President George W. Bush had a secret deal with the NRA to announce support for renewal of the assault weapon ban but not urge Congress to act).

75    Rostron, *supra* note 9, at 1435.

76    *Compare Ban on Assault Weapons Didn't Reduce Violence*, WASH. TIMES (Aug. 16, 2004), https://perma.cc/J7QP-TG69 (claiming National Institute of Justice study found that assault weapons are rarely used in crimes and the federal assault weapon ban had no discernible impact on rates of gun violence), *with* BRADY CTR. TO PREVENT GUN VIOLENCE, ON TARGET: THE IMPACT OF THE 1994 FEDERAL ASSAULT WEAPON ACT 2 (2004), https://perma.cc/8PG2-B2MZ (claiming that the federal assault weapon ban significantly reduced the number of assault weapons used in crimes).

77    Corn, *supra* note 62 (quoting a former Department of Justice official from the Clinton administration as saying, "It was better to get what we got than nothing").

78    BRADY CTR. TO PREVENT GUN VIOLENCE, *supra* note 76, at 4-5.

79    *Id.*

80    *Id.* at 5.

81    Bills that would reinstitute a federal assault weapon ban have been introduced repeatedly. *E.g.*, Assault Weapons Ban of 2017, S. 2095, 115th Cong. (2017); Assault Weapons Ban of 2015, H.R. 4269, 114th Cong. (2015); Assault Weapons Ban of 2013, S. 150, 113th Cong. (2013); Assault Weapons Ban and Law Enforcement Protection Act of 2007, H.R. 1022, 110th Cong. (2007); Assault Weapons Ban and Law Enforcement Protection Act of 2005, H.R. 1312, 109th Cong. (2005).

82    Jonathan Weisman, *Gun Control Drive Blocked in Senate; Obama, in Defeat, Sees "Shameful Day,"* N.Y. TIMES, Apr. 18, 2013, at A1.

83    *Supreme Court Leaves State Assault Weapons Bans in Place*, BALT. SUN (June 20, 2016, 4:35 PM), https://perma.cc/U7JQ-HPRM.

84    District of Columbia v. Heller, 554 U.S. 570 (2008).



Compendium_Cornell
Page 1612

85  U.S. CONST. amend. II.

86  *E.g.,* Silveira v. Lockyer, 312 F.3d 1052, 1075 (9th Cir. 2002); Gillespie v. City of Indianapolis, 185 F.3d 693, 710 (7th Cir. 1999); United States v. Wright, 117 F.3d 1265, 1273-74 (11th Cir. 1997); United States v. Rybar, 103 F.3d 273, 286 (3d Cir. 1996); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995); United States v. Hale, 978 F.2d 1016, 1019-20 (8th Cir. 1992); United States v. Toner, 728 F.2d 115, 128 (2d Cir. 1984); United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977); United States v. Warin, 530 F.2d 103, 106 (6th Cir. 1976); Cases v. United States, 131 F.2d 916, 921-23 (1st Cir. 1942). The lone exception, prior to *Heller*, was *United States v. Emerson*, 270 F.3d 203, 264-65 (5th Cir. 2001), which found that the Second Amendment protects an individual's right to keep and bear arms for purposes unrelated to militia service.

87  *See* Kasler v. Lockyer, 2 P.3d 581, 584 (Cal. 2000).

88  *E.g.,* United States v. Starr, 945 F. Supp. 257, 259 (M.D. Ga. 1996), *aff'd sub nom.* United States v. McCranie, 144 F.3d 56, 56 (11th Cir. 1998) (unpublished table decision).

89  *E.g.,* Navegar, Inc. v. United States, 192 F.3d 1050, 1066-68 (D.C. Cir. 1999).

90  *E.g., id.* at 1052; CHU, *supra* note 68, at 7-9.

91  *Kasler,* 2 P.3d at 584-92; CHU, *supra* note 68, at 9-11.

92  While the federal and state bans were upheld, local ordinances adopted by an Ohio city were struck down because they defined assault weapons in ways that were too vague. *See* Peoples Rights Org. v. City of Columbus, 152 F.3d 522, 538 (6th Cir. 1998); Springfield Armory, Inc. v. City of Columbus, 29 F.3d 250, 254 (6th Cir. 1994).

93  *Kasler,* 2 P.3d at 592.

94  Olympic Arms v. Buckles, 301 F.3d 384, 389-90 (6th Cir. 2002).

95  *Id.*

96  *Id.* at 390.

97  District of Columbia v. Heller, 554 U.S. 570 (2008).

98  *Id.* at 577-625.

99  *See* Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 725-56 (2012) (discussing the various litigation that followed the *Heller* decision).

100  Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011).

101  N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242 (2d Cir. 2015).

102    Friedman v. City of Highland Park, 784 F.3d 406 (7th Cir. 2015).

103    Kolbe v. Hogan, 849 F.3d 114 (4th Cir. 2017).

104    *See infra* notes 120-27 and accompanying text.

105    District of Columbia v. Heller, 554 U.S. 570, 625 (2008).

106    *Id.* at 624 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)).

107    *Id.* at 627 (citations omitted).

108    *Id.* at 629.

109    *Id.* at 627.

110    *Id.* at 624.

111    Transcript of Oral Argument at 22, *Heller*, 554 U.S. 570 (No. 07-290).

112    Allen Rostron, *Protecting Gun Rights and Improving Gun Control After District of Columbia v. Heller*, 13 LEWIS & CLARK L. REV. 383, 390 (2009).

113    *See* Kolbe v. Hogan, 849 F.3d 114, 135-36 (4th Cir. 2017) (listing questions about the scope of the Second Amendment raised by *Heller*).

114    Friedman v. City of Highland Park, 784 F.3d 406, 409 (7th Cir. 2015) (stating that the Court did not identify "what line separates 'common' from 'uncommon' ownership").

115    At the oral argument in *Heller*, Justice Scalia suggested that the relevant measure might be the percentage of Americans who use the gun, as he pointed out that 100,000 machine guns was a small number relative to the population of the United States. Transcript of Oral Argument, *supra* note 111.

116    *See* N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 255 (2d Cir. 2015); *see also* Heller v. District of Columbia, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

117    *See Kolbe*, 849 F.3d at 128; Brief for Plaintiffs-Appellants at 8, *Kolbe*, 849 F.3d 114 (No. 14-1945); *see also Friedman*, 784 F.3d at 409 (citing evidence in the record showing "that perhaps 9% of the nation's firearms owners have assault weapons").

118    *See supra* notes 108-11 and accompanying text.

119    *See* *N.Y. State Rifle & Pistol Ass'n,* 804 F.3d at 255; *Heller,* 670 F.3d at 1261; *cf. Friedman,* 784 F.3d at 408-09 (suggesting that Second Amendment analysis should not turn on how common a weapon is at the time of the litigation).

120    *Kolbe,* 849 F.3d at 137.

121    *Id.* at 136-37.

122    District of Columbia v. Heller, 554 U.S. 570, 627 (2007).

123    *Kolbe,* 849 F.3d at 136-37.

124    *Id.* at 136.

125    *Id.*

126    *Id.*

127    *Id.* at 136-37.

128    *Id.* at 136 (describing the issue as a "relatively easy inquiry" with an answer that is "plainly" in the government's favor).

129    *See supra* notes 105, 114 and accompanying text.

130    District of Columbia v. Heller, 554 U.S. 570, 627 (2007).

131    *See Kolbe,* 849 F.3d at 138.

132    *Heller,* 554 U.S. at 628-29. "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.* at 628 n.27.

133    Allen Rostron, *The Continuing Battle over the Second Amendment,* 78 ALB. L. REV. 819, 824-25 (2014).

134    *Kolbe,* 849 F.3d at 138; N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 257-61 (2d Cir. 2015); Heller v. District of Columbia, 670 F.3d 1244, 1261-62 (D.C. Cir. 2011). In the Seventh Circuit case, *Friedman v. City of Highland Park,* 784 F.3d 406, 410 (7th Cir. 2015), Judge Easterbrook sidestepped the question of what level of scrutiny should apply, but he noted that other circuits have applied intermediate scrutiny to assault weapon bans. *Id.* The approach he used can fairly be described as an intermediate scrutiny approach. *See id.* If anything, it may be less demanding than the version of intermediate scrutiny applied by the other circuits. *Id.* at 410-11 (holding that gun laws should be upheld if they leave people with adequate means to exercise the right of self-defense); Rostron, *supra* note 99, at 744-47 (describing the exceptionally lenient version of intermediate scrutiny used by Judge Easterbrook in a prior Second Amendment case).

135    *Heller,* 670 F.3d at 1258 (quoting Clark v. Jeter, 486 U.S. 456, 461 (1988)).

136    *Kolbe*, 849 F.3d at 139 (quoting United States v. Masciandaro, 638 F.3d 548, 471 (4th Cir. 2011)).

137    Rostron, *supra* note 99, 746-47.

138    *Id.*

139    COMM. TO IMPROVE RESEARCH INFO. & DATA ON FIREARMS, NAT'L ACAD. OF SCIS., FIREARMS AND VIOLENCE: A CRITICAL REVIEW 2 (Charles F. Wellford et. al. eds., 2005) (finding "no credible evidence that the passage of right-to-carry laws decreases or increases violent crime" and concluding that "the data available on these questions are too weak to support unambiguous conclusions or strong policy statements").

140    *See, e.g.*, Patricia Cohen, *Who Would Win Under the Plan? Economists Face Off*, N.Y. TIMES, Dec. 2, 2017, at A11.

141    *See, e.g., Global Warming and Hurricanes*, GEOPHYSICAL FLUID DYNAMICS LAB., (Jan. 24, 2018), https://perma.cc/YW36-GN37 (finding it is premature to conclude that global warming resulting from greenhouse gas emissions has "had a detectable impact on Atlantic hurricane or global tropical cyclone activity" (emphasis omitted)).

142    *See* Kolbe v. Hogan, 849 F.3d 114, 138 (4th Cir. 2017) (stating that the challenged law "bans only certain military-style weapons and detachable magazines, leaving citizens free to protect themselves with a plethora of other firearms and ammunition"); N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 260 (2d Cir. 2015) ("[C]itizens may continue to arm themselves with non-semiautomatic weapons *or* with any semiautomatic gun that does not contain any of the enumerated military-style features."); Friedman v. City of Highland Park, 784 F.3d 406, 410-11 (7th Cir. 2015) ("If criminals can find substitutes for banned assault weapons, then so can law-abiding homeowners."); Heller v. District of Columbia, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("[T]he prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves.").

143    *See Heller*, 670 F.3d at 1262.

144    District of Columbia v. Heller, 554 U.S. 570, 628 (2008).

145    *See supra* note 7 and accompanying text.

146    *Kolbe*, 849 F.3d at 139; *N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 261; *Heller*, 670 F.3d at 1262.

147    *Kolbe*, 849 F.3d at 140-41; *N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 262-63; *Friedman*, 784 F.3d at 412; *Heller*, 670 F.3d at 1262-63.

148    CHRISTOPHER S. KOPER ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994-2003 (2004), *cited in N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 263 n.122, *Friedman*, 784 F.3d at 411, and *Heller*, 670 F.3d at 1263.

149    *See* Robert Farley, *Did the 1994 Assault Weapons Ban Work?*, FACTCHECK.ORG (Feb. 1, 2013), https://perma.cc/852W-8TYX.

Compendium_Cornell
Page 1616

---

150    *E.g., Friedman, 784 F.3d at 411* (citing Koper study as showing that assault weapon bans "reduce the share of gun crimes involving assault weapons"); *Heller, 670 F.3d at 1263* (citing Koper study as showing that criminal use of assault weapons decreased after the federal assault weapons ban was enacted).

151    KOPER, *supra* note 148, at 51, *cited in Heller, 670 F.3d at 1263.*

152    KOPER, *supra* note 148, at 96.

153    *Id.*

154    *See* Farley, *supra* note 149.

155    *Id.*

156    *E.g., N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 262 (2d Cir. 2015)* (citing Brief for the State Defendants as Appellees and as Cross-Appellants at 49, *id.* (No. 14-0036(L)); *see* H.R. REP. NO. 103-489, at 13 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1820, 1821; *see also* Allen Rostron, *Beyond Market Share Liability: A Theory of Proportional Share Liability for Nonfungible Products, 52 UCLA L. REV. 151, 191 (2004)* (explaining how firearm traces are conducted).

157    H.R. REP. NO. 103-489, at 13 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1820, 1821.

158    *N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 262.*

159    *See* Rostron, *supra* note 156, at 190-96 (arguing that trace data should be used in tort cases as a way to estimate the relative likelihood of different types of guns being used in crimes).

160    *Id.* at 193-95.

161    *Id.* at 193 (citing David B. Kopel, *Clueless: The Misuse of BATF Firearms Tracing Data, 1999 L. REV. MICH. ST. U. DET. C.L. 171, 185 (1999)*).

162    *N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 262.*

163    *See e.g., Kolbe v. Hogan, 849 F.3d 114, 125 (4th Cir. 2017); Friedman v. City of Highland Park, 784 F.3d 406, 409 (7th Cir. 2015); Heller v. District of Columbia, 670 F.3d 1244, 1262-63 (D.C. Cir. 2011).*

164    *N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 262.*

165    H.R. REP. NO. 103-489, at 19 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1820, 1827.

166    *See N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 261, 263* (stating that the court must show substantial deference to the legislature's weighing of evidence and policy judgments about assault weapons); *Friedman, 784 F.3d at 412* ("The best way to evaluate the relation among assault weapons, crime, and self-defense is through the political process and scholarly debate."); *Heller, 670 F.3d at 1269* (Appendix: Regarding the Dissent) (stating that it is not the court's job

---

to decide whether assault weapons should be banned and instead judges have the narrower task of merely determining whether the government has presented the sort of evidence sufficient to survive intermediate scrutiny).

167   *Kolbe*, 849 F.3d at 150 (Wilkinson, J., concurring).

168   *Id.* at 150-51.

169   *See* District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008) (clarifying that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms").

170   *Id.* at 634 (quoting *id.* at 689 (Breyer, J., dissenting)).

171   *Id.* at 634-35.

172   *See supra* note 142 and accompanying text.

173   *See supra* note 166 and accompanying text.

174   Friedman v. City of Highland Park, 784 F.3d 406, 412 (7th Cir. 2015) (citing McCulloch v. Maryland, 17 U.S. 316, 407 (1819)).

175   *See supra* notes 5-7 and accompanying text.

176   *See supra* notes 5-7 and accompanying text.

177   *See supra* notes 5-7 and accompanying text.

178   *See* SIEBEL, *supra* note 6 (noting that "[f]ar from being simply 'cosmetic,' these features all contribute to the unique function of any assault weapon to deliver extraordinary firepower").

179   *See* EDUC. FUND TO STOP GUN VIOLENCE, KILLING MACHINES: THE CASE FOR BANNING ASSAULT WEAPONS 8-10 (2003); Terence Cullen, *Assault Weapons Have Sinister Accessories Beyond Bump Stocks*, N.Y. DAILY NEWS (Oct. 5, 2017, 12:37 PM), https://perma.cc/CSG9-TX83.

180   *See* EDUC. FUND TO STOP GUN VIOLENCE, *supra* note 179.

181   *Id.* at 3.

182   *Id.* at 6.

183   *See, e.g.*, Jan L. Plass et al., *Emotional Design in Multimedia Learning: Effects of Shape and Color on Affect and Learning*, 29 LEARNING & INSTRUCTION 128, 128-40 (2014).

184    *See* B.J. Fogg et al., *How Do Users Evaluate the Credibility of Web Sites? A Study with over 2,500 Participants, in* PROCEEDINGS OF THE 2003 CONFERENCE ON DESIGNING FOR USER EXPERIENCES 1, 5 (2003).

185    *See* Masaaki Kurosu & Kaori Kashimura, *Apparent Usability vs. Inherent Usability: Experimental Analysis on the Determinants of the Apparent Usability, in* HUMAN FACTORS IN COMPUTING SYSTEMS: CHI '95 CONFERENCE COMPANION 292, 293 (Irvin R. Katz et al. eds., 1995).

186    *See id.*

187    *See* Peter Glaskowsky, *Bruce Schneier's New View on Security Theater*, CNET (Apr. 10, 2008, 8:45 AM), https:// perma.cc/VK4N-SYP5; Bruce Schneier, *In Praise of Security Theater*, WIRED (Jan. 25, 2007, 12:00 PM), https:// perma.cc/G29M-NLVR.

188    Friedman v. City of Highland Park, 784 F.3d 406, 412 (7th Cir. 2015).

189    *Id.*

190    *Id.*

191    *Id.*

192    Merrill v. Navegar, Inc., 89 Cal. Rptr. 2d 146 (Cal. Ct. App. 1999), *rev'd*, 28 P.3d 116 (Cal. 2001).

193    *Id.* at 152.

194    *Id.* at 153-54. To be precise, they were TEC-DC9s, but TEC-DC9s and TEC-9s are materially indistinguishable, so I will refer to them here as TEC-9s because that is the more familiar term for them. *Id.* at 152 n.3.

195    *Id.* at 152-53.

196    *Id.* at 158.

197    *Id.*

198    *Id.*

199    *Id.*

200    For example, the shooter who killed thirty-two people at Virginia Tech in 2007 used two conventional semi-automatic pistols, although he utilized some large-capacity ammunition magazines. *See* VIOLENCE POLICY CTR., BACKGROUNDER ON PISTOLS USED IN VIRGINIA TECH SHOOTING 2 (2007).

201    Christopher Ingraham, *Assault Rifles Are Becoming Mass Shooters' Weapon of Choice*, WASH. POST: WONKBLOG (June 12, 2016), https://perma.cc/4EUE-Q7PC; M.L. Nestel, *How Assault Rifles Have Played a Prominent Role in US Mass Shootings*, ABC NEWS (Nov. 7, 2017, 9:19 AM), https://perma.cc/5KN8-C3YM.

202    H.R. REP. NO. 103-489 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1820.

203    *Id.* at 18, 1994 U.S.C.C.A.N. at 1826.

204    *Id.*

205    *Id.*

206    *Public Safety and Recreational Firearms Use Protection Act: Hearing on H.R. 3527 Before the Subcomm. on Crime & Criminal Justice of the H. Comm. on the Judiciary*, 103d Cong. 88 (1994) (statement of Henry Cisneros, Secretary, Department of Housing and Urban Development).

207    *Id.* at 107.

208    *Id.*

209    *Id.* at 97 (statement of John W. Magaw, Director, Bureau of Alcohol, Tobacco, and Firearms, U.S. Department of the Treasury).

210    *Id.* at 175 (statement of John Pitta, Executive Vice President, Federal Law Enforcement Officers Association).

211    *Id.* at 145-46 (statement of Phillip W. Murphy).

212    *Id.* at 146.

213    *See* Art Swift, *In U.S., Support for Assault Weapons Ban at Record Low*, GALLUP NEWS (Oct. 26, 2016), https://perma.cc/AF38-GHCH.

214    Allen Rostron, *Cease Fire: A "Win-Win" Strategy on Gun Policy for the Obama Administration*, 3 HARV. L. & POL'Y REV. 347, 360-61 (2009); Allen Rostron, *Incrementalism, Comprehensive Rationality, and the Future of Gun Control*, 67 MD. L. REV. 511, 565 (2008).

215    Richard Aborn, Opinion, *A Commonsense Gun Restriction*, NEWSDAY (June 1, 2014, 5:07 PM), https://perma.cc/GR8F-D9G9 (calling on Congress to reinstate the federal ban on large-capacity ammunition magazines).

216    Larry Buchanan et al., *What Is a Bump Stock and How Does It Work?*, N.Y. TIMES (Feb. 20, 2018), https://nyti.ms/2yInaRa.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**80 Law & Contemp. Probs. 1**

Law and Contemporary Problems
2017

The Second Generation of Second Amendment Law and Policy

Eric M. Ruben and Darrell A. H. Miller

Special Editors

Eric M. Ruben, Darrell A. H. Miller [a1]

Copyright © 2017 by Eric M. Ruben and Darrell A. H. Miller

# PREFACE: THE SECOND GENERATION OF SECOND AMENDMENT LAW & POLICY

The cacophonous and charged public debate over gun policy reflects a nation deeply divided about the appropriate balance between gun rights and gun regulation. [1] The Second Amendment often dominates that debate--as both a symbol and a right enforceable in the courts. On April 8, 2016, scholars from diverse disciplinary backgrounds met at New York University School of Law to present new scholarship, a second generation of research, about this important constitutional provision. [2] This issue is the product of that dialogue.

Of course, a second generation implies that there was a first generation. The first generation of scholarship ended in 2008, when the Supreme Court issued the most important Second Amendment decision in the Court's history--*District of Columbia v. Heller*. [3] That first generation focused on a single question: Does the Second Amendment protect an individual right to keep and bear arms for self-defense, or a collective right connected to the maintenance of a well-regulated militia?

This question garnered relatively little attention before the early twentieth century. Before then, federal gun control, as we understand it today, did not exist, and Second Amendment issues rarely arose. As Judge Thomas Cooley wrote in 1868: "How far it is in the power of the legislature to regulate [the Second Amendment] right, we shall not undertake to say, as happily there has been very little occasion to discuss that subject by the courts." [4] To be sure, many states and localities regulated weapons and some of these regulations were challenged on state constitutional law grounds. [5] But generally these laws did not generate sustained Second Amendment analysis in light of the understanding, set forth  **\*2**  most famously in *Barron v. Baltimore*, [6] that the Bill of Rights limited only the federal government. [7]

By the early 1900s, however, urbanization, crime, and the increased lethality of concealable weapons prompted calls for reform. [8] State and local governments were the first to heed the calls, passing broad restrictions on the possession and carrying of handguns, [9] but federal regulation was on the horizon. The opportunity to address the meaning of the Second Amendment right had arrived.

Legal commentators in the first half of the twentieth century came to a fairly uniform conclusion: the Second Amendment protected a collective, not individual, right. [10] The right was primarily concerned with the maintenance of a "well regulated Militia." [11] Thus, the Second Amendment would not prevent the federal government from passing laws targeting the possession and use of guns in crime. A 1915 essay by Maine Supreme Court Justice Lucilius A. Emery in the *Harvard Law Review* summarized the basis for this position, noting that "the right guaranteed is not so much to the individual for his private quarrels or feuds as to the people collectively for the common defense against the common enemy, foreign or domestic." [12]

Compendium_Cornell
Page 1622

Later, in 1934, the very first volume of *Law and Contemporary Problems* included an article mirroring this understanding, opining that "no regulation or restriction of firearms or weapons is in conflict with [the Second] Amendment unless it substantially impedes the maintenance of a militia sufficiently well-equipped to assure the safety of the state."[13] That same year, Congress enacted the first federal law that could reasonably be called national gun control, the **\*3** National Firearms Act.[14] More than ever before, the National Firearms Act provided the occasion for the Supreme Court to consider the scope of the Second Amendment.

In 1939, in *United States v. Miller*, a unanimous Supreme Court upheld the National Firearms Act's prohibition on interstate transport of short-barreled shotguns.[15] In so doing, the Court confirmed the growing consensus in legal scholarship about the meaning of the Second Amendment. "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia," the Court explained, "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."[16]

*Miller* appeared to settle many Second Amendment questions, and for over seventy years courts used it to turn away almost every Second Amendment challenge to a gun regulation. But the scholarly investigation continued, and gained momentum and financing with the rise of the modern gun rights movement in the 1970s.[17] Researchers mining historical sources found support for a different understanding of the Second Amendment: one grounded in individual self-defense, not militia service. At first, this scholarship was considered an outlier. But with time, prominent legal scholars acknowledged the potential merit of the individual-right view, including leading liberal law professors such as Sanford Levinson and Laurence Tribe.[18]

Once the individual-right scholarship was in place, advocates began challenging the militia-centric interpretation of the Second Amendment in court. In *District of Columbia v. Heller*, seventy years after *Miller*, the Supreme Court again considered the meaning and scope of the constitutional right to keep and bear arms.[19] This time, a bare majority of the Court emphatically adopted the individual-right view, striking down a law banning the possession of operable handguns in the home.[20]

Scholarship played a key role in *Heller*. There was almost no federal case law precedent to guide the Court. The most proximate Supreme Court case, *Miller*, was over half a century old and applied a vastly different interpretation of the **\*4** right.[21] The Court in *Heller* could not rely solely, or even predominantly, on common law reasoning from incremental changes typical to the development of other constitutional rights. There was no slow buildup of favorable precedent, in the way that desegregation cases ultimately led to *Brown v. Board of Education*. The litigants and the Court had to draw on other sources from a relatively modern generation of research by litigants, activists, and academics. The various opinions in *Heller* cited close to twenty law review articles and at least a dozen other scholarly publications.[22]

Two years after *Heller*, in *McDonald v. City of Chicago*, the Supreme Court invoked its incorporation doctrine and applied the Second Amendment as a restraint on state and local governments.[23] In so doing, the Court struck down a handgun ban in Chicago that was similar to the law struck down in the District of Columbia.[24] With *McDonald*, the Second Amendment became an issue not only for Congress and the federal government, but also for every state legislature, county commissioner, and township trustee.

*Heller* and *McDonald* represent a significant shift in the constitutional landscape for the right to keep and bear arms, but in one of the most cited passages in both opinions the Court also emphasized that the right is not unlimited, and that governments maintain broad regulatory authority.[25] The right announced in *Heller* and *McDonald*, the Court instructed, "[should not be taken to] cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'"[26] The Court also noted historical consensus about the constitutionality of bans on carrying concealed weapons.[27] In a nod to other lawful regulations, the Court cautioned that this short list of "presumptively lawful regulatory measures" is not "exhaustive."[28]

*Heller* and *McDonald* opened the floodgates to hundreds of lawsuits raising a host of novel questions about the Second Amendment.[29] A ban on handguns in **\*5** the home may be unconstitutional, but what about bans on other types of weapons?

Compendium_Cornell
Page 1623

For restrictions less severe than handgun bans, what standard of review should courts apply? What historical firearm measures not already identified by the Supreme Court should be considered presumptively lawful? The list of unanswered questions goes on and on.

We characterize the scholarship addressing this new wave of questions as the second generation of Second Amendment scholarship. With this symposium and this publication we seek to avoid rehashing old debates; instead, we aim to push forward in new directions that can deepen our understanding of the Second Amendment in the post-*Heller* world. The authors featured in the coming pages are not of one discipline or mind. Analyzing gun rights and regulation through myriad lenses--history, political science, philosophy, sociology, public health, and law--furthers our understanding and broadens our perspective.

While this compilation is interdisciplinary by design, historical considerations permeate the articles. The historical component in almost all of the contributions reflects, in large part, the profound influence of Justice Antonin Scalia's jurisprudential legacy. *Heller*, by some accounts, was Scalia's crowning doctrinal achievement, "the finest example of what is now called 'original public meaning' jurisprudence ever adopted by the Supreme Court."[30] The opinion looked to history not only to support the Court's interpretation of the meaning of the Second Amendment's words, but also to support the validity of exceptions to Second Amendment coverage. Restrictions that are sufficiently "longstanding," *Heller* instructs, are "presumptively lawful."[31]

Thus, under *Heller*, a long regulatory lineage creates a strong presumption that a given weapon regulation is constitutional. In *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, historian Saul Cornell explores the lineage of one common category of regulation: public carry restrictions.[32] Examining an oft-overlooked resource, Justice of the Peace manuals, Cornell describes a historically broad ability to regulate public carry when and where it could disturb the peace. His provocative (and ironic) conclusion is that the historical treatment of public carry rights and regulations bears a close resemblance to the balancing view conveyed in Justice Stephen Breyer's *Heller* dissent, which itself is not inconsistent with the originalist view in Justice Scalia's majority opinion. Cornell finds that "[s]omething analogous to a balancing exercise was fundamental to the way Anglo-American law dealt with arms .... The liberty interest associated with the right to arms was always balanced against the concept of the peace."[33]

  **\*6**   Whereas Cornell's contribution is a deep historical dive into one restriction, public carry laws, in *Gun Law History in the United States and Second Amendment Rights*, political scientist Robert Spitzer provides a broad empirical exposition of various gun regulations throughout American history. Spitzer shows how gun laws were "ubiquitous" in American history and have "spanned every conceivable category of regulation, from gun acquisition, sale, possession, transport, and use, including deprivation of use through outright confiscation, to hunting and recreational regulations, to registration and express gun bans."[34] Spitzer's description demonstrates how regulation has tracked changes in technology and public safety needs. One of the most interesting examples is precedent dating to the 1920s for bans on weapons now known as assault rifles. Such regulatory precedent begs a jurisprudential question that warrants further attention: If the "arms" protected by the Second Amendment can evolve (as *Heller* says they can[35]), then should the benchmark for what regulations are "longstanding" and "presumptively lawful" also evolve? More generally, Spitzer shows that gun rights and regulations need not be all or nothing. Indeed, "for the first 300 years of America's existence, gun laws and gun rights went hand-in-hand."[36]

History can buttress or undercut claims of permissible regulation under the *Heller* paradigm, but it can also elucidate other contours of the right. In *Self-Defense, Defense of Others, and the State*,[37] Darrell A. H. Miller describes the historical interplay between the state and lawful self-defense, which *Heller* instructs is "central to the Second Amendment right."[38] Miller shows that self-defense always has "been heavily conditioned and constructed by the state."[39] Indeed, for much of English legal history, self-defense was not thought of as a right at all, but rather an argument in favor of a pardon from the sovereign.[40] The fact that self-defense did not historically operate as a purely natural law right, unconnected to public power, has legal and policy implications. Significantly, "[i]t suggests that the state has a power, and perhaps an obligation, to ensure that private capacity to render lethal force conforms to minimum standards of safety, training, and discipline."[41]

In *Gendering the Second Amendment*, sociologist Jennifer Carlson and political scientist Kristin Goss analyze historical conceptions of the state and how they are linked to gun rights. To assist in that endeavor, they consider the state and gun rights through the lens of gender--an underdeveloped theoretical framework in the Second Amendment debate. "[T]he exercise of gun rights and  **\*7**  responsibilities," they note, "is and always has been gendered" just as the "the state is and always has

Compendium_Cornell
Page 1624

been gendered." [42]  By tracing broad trends in American governance vis-à-vis gender, and relating those trends back to gun policy and practices, they offer an important perspective on the evolution of American gun policy and culture. *Gendering the Second Amendment* is a positive development in the scholarship dealing with the Second Amendment, especially because the intersection of the Second Amendment and gender has been woefully underexplored. Hopefully Carlson and Goss's article will inspire additional research on this topic.

Theoretical concepts like self-defense and gun rights have evolved over time and, of course, technology has too. In *3D-Printed Firearms, Do-It-Yourself Guns, & the Second Amendment*, James Jacobs and Alex Haberman highlight regulatory challenges presented by modern gunsmithing technology. *Heller* suggested rules for what arms are protected by the Second Amendment--for example, those "'in common use at the time' for lawful purposes like self-defense" [43] --but it failed to establish clear guidance for dealing with new weapons and weapon-making technology. In the years since *Heller*, 3D printers have made increasingly sophisticated firearms, prompting widespread enforcement concerns. If anyone can manufacture a gun at home, what good are mandatory background checks? If guns can be constructed completely from plastic, might they evade metal detectors? Jacobs and Haberman address these novel issues, which will only become more relevant as technology advances. Though the authors conclude that restricting the publication of weapon-making software does not violate the Second Amendment, they also argue that 3D-printed guns are "a modest technological development rather than a game changer" in light of "how common gunsmithing has been, and is." [44]  That said, with gun-making technology rapidly evolving, it is "none too soon to bring 3D gunsmithing into the debate about gun control." [45]

As the articles in this issue reflect, history has played a significant role in Second Amendment jurisprudence and scholarship since *Heller*. Nonetheless, most lower courts have not applied a purely originalist methodology in deciding Second Amendment challenges, and have relied instead on a mix of historical analysis and tiered scrutiny. [46]  Many challenged laws are pronounced neither categorically constitutional nor unconstitutional on historical grounds, but rather are scrutinized under means-end scrutiny common in other doctrinal settings. It is therefore often necessary to evaluate whether a governmental interest is sufficiently important to justify an impingement, and also whether an **\*8** impingement is sufficiently necessary to achieve that interest. Several articles in this issue address questions within this emerging paradigm.

In *Justifying Perceptions in First and Second Amendment Doctrine*, Eric M. Ruben considers when the government's interest in preserving the perception of safety can justify a firearm restriction. [47]  That rationale was invoked to uphold a ban on assault weapons in a recent Seventh Circuit case, [48]  sparking controversy and raising a difficult doctrinal question: How can this justification be accepted for a gun restriction if it would be unacceptable for a speech restriction? Ruben concludes that the issue should be treated differently in the distinct context of the right to keep and bear arms, though courts should only accept public safety perceptions as a legitimate justification after they solve some doctrinal difficulties, such as ensuring that public perceptions do not belie illicit animus.

Beyond historical and constitutional questions, critical policy issues remain concerning the right to keep and bear arms, especially where different groups of people have different capacities and authority to use deadly weapons and pose different risks to themselves and others. In *Implementation and Effectiveness of Connecticut's Risk-Based Gun Removal Law: Does It Prevent Suicides?*, Jeffrey W. Swanson and his co-authors provide empirical evidence that could both motivate the adoption and justify the constitutionality of a particular gun policy: risk-based gun removals. [49]  Risk-based gun removal procedures, which authorize police to seize firearms in limited circumstances, have the potential to prevent gun violence (to self or others) without creating a criminal record. Do they work? According to Swanson et al., this mechanism, which has been adopted in Connecticut, Indiana, and California, has proven effective for preventing the most common type of gun death in America--suicide. Indeed, based on the results of an ambitious mixed-methods empirical study, the authors estimate that for every ten to twenty gun seizures, one suicide was prevented. [50]

In *Lawful Gun Carriers (Police and Armed Citizens): License, Escalation, and Race*, Nicholas J. Johnson compares the formal and informal licenses and behavior of two groups of lawful gun carriers: police and lawful private gun carriers. According to one recent analysis, police in Florida are sanctioned for firearms crimes at a higher rate than lawful private gun carriers, and other studies show that such lawful private gun carriers commit far fewer crimes than do members of the general public. [51]  Thus, criminal behavior cannot be explained by the mere carrying of a gun. Rather, Johnson argues, it is best explained by the **\*9** scope of the two groups' respective firearm licenses: narrow for civilians and broad for police. Among other things, this conclusion about the role of a license "cuts against the argument that private gun carriers are a hazard because they are not

trained like police."[52] More provocatively, this conclusion frames a normative question raised at the end of Johnson's article: "why should [lawful private gun carriers] be less welcome in the community than police?"[53]

Finally, the last two pieces in the issue provide commentary by two featured speakers at the April 8, 2016 symposium: Senator Chris Murphy (D-Conn.) and Sanford Levinson. Murphy's keynote assesses the dysfunctional politics of gun rights and regulation. Murphy describes how the political left and right occupy "different planets" when it comes to firearm policies: the left is primarily concerned with "concrete details of gun laws" and the right is primarily concerned with "abstract concepts of liberty and freedom and revolution."[54] To reach "a common road to common ground," Murphy suggests some ways leaders can "fix the bugs in the system that cause us to talk past each other."[55]

Sanford Levinson has been a leading thinker about the Second Amendment since he published *The Embarrassing Second Amendment* over twenty-five years ago. [56] In his postscript to this issue, Levinson provides insightful observations about how notions of sovereignty have informed understandings of gun rights, regulation, and self-defense. [57] Building on the contributions of Saul Cornell and Darrell A. H. Miller, Levinson offers an erudite and fascinating postscript to close the symposium. His final line highlights the urgency of continuing to grapple with what counts as legitimate violence in America: "[E]ven those of us who are onlookers, so to speak, neither directly inflicting the violence nor bearing its brunt, have reason to be concerned about the circumstances of its occurrence given both the moral questions surrounding them and the sheer political and social consequences for the societies we live in."[58]

The second generation of Second Amendment scholarship is still in its early years, and the articles presented in this issue raise as many questions as they answer. This publication will hopefully be an incubator, leading to other efforts to build on and respond to the arguments contained in this symposium. Forward-thinking scholarship, after all, will continue to play a uniquely significant role in Second Amendment law and policy for years to come. Our hope is that this symposium, if nothing else, will motivate further research to advance the understanding of this polarizing and fascinating Amendment.

## Footnotes

a1   Eric M. Ruben is a Fellow at the Brennan Center for Justice at New York University School of Law. Darrell A. H. Miller is a Professor at Duke University School of Law.

1   *See generally* Chris Murphy, *Keynote: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS., no. 2, 2017 at 233-34.

2   The symposium was sponsored by the Brennan Center for Justice at New York University School of Law and Law and Contemporary Problems at Duke University School of Law.

3   District of Columbia v. Heller, 554 U.S. 570 (2008) (holding for the first time that the Second Amendment protects an individual right to keep and bear arms).

4   THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 350 (1868).

5   *See generally* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS., no. 2, 2017 (surveying gun laws throughout American history).

6   *See* Barron v. Baltimore, 32 U.S. (7 Pet.) 243 (1833).

Compendium_Cornell
Page 1626

7    While some scattered contrarian state court decisions disagreed about the reach of the Bill of Rights, they were the exception, not the rule. *See* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 153-56 (1998) (describing Nunn v. State, 1 Ga. 243 (1846) and similar opinions as "contrarian" and in conflict with *Barron*).

8    *See* Lucilius A. Emery, *The Constitutional Right to Keep and Bear Arms*, 28 HARV. L. REV. 473, 473 (1915) ("The greater deadliness of small firearms easily carried upon the person, the alarming frequency of homicides and felonious assaults with such arms, the evolution of a distinct class of criminals known as 'gunmen' from their ready use of such weapons for criminal purposes, are now pressing home the question of the reason, scope, and limitation of the constitutional guaranty of a right to keep and bear arms,--of the extent of its restraint upon the legislative power and duty to prohibit acts endangering the public peace or the safety of the individual.").

9    *See* ADAM WINKLER, GUN FIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 204-10 (2011) (describing the Sullivan Law, an early New York permitting requirement for the purchase and possession of handguns; the Revolver Act, which was adopted by multiple states shortly afterward to mandate permits for concealed weapons; and the Uniform Firearms Act, which similarly regulated handguns).

10   *See* Robert J. Spitzer, *Lost and Found: Researching the Second Amendment*, *in* THE SECOND AMENDMENT IN LAW AND HISTORY: HISTORIANS AND CONSTITUTIONAL SCHOLARS ON THE RIGHT TO BEAR ARMS 16, 24-25, 36-37 (Carl T. Bogus ed., 2000) (counting eleven law review articles discussing the Second Amendment between 1912 and 1959, each of which espoused the militia-related interpretation).

11   U.S. CONST. amend. II.

12   Emery, *supra* note 8, at 477.

13   John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400, 412 (1934).

14   National Firearms Act, ch. 757, 48 Stat. 1236 (1934) (codified as amended at 26 U.S.C. §§ 5801-5872 (2012)) (imposing a tax, registration requirement, and transfer restriction on certain machine guns and short-barreled shotguns).

15   United States v. Miller, 307 U.S. 174 (1939).

16   *Id.* at 178.

17   For discussions of the arc of modern Second Amendment scholarship before *Heller*, see generally MICHAEL WALDMAN, THE SECOND AMENDMENT: A BIOGRAPHY (2014); WINKLER, *supra* note 9; Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller, 122 HARV. L. REV. 191 (2008).

18   *See* LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 897 n.211 (3d ed. 2000); Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L. J. 637, 645-46 (1989).

19   *See* District of Columbia v. Heller, 554 U.S. 570 (2008).

20   *Id.*

21   *See supra* notes 15-17 and accompanying text. There was more recent state court precedent that analyzed state constitutional provisions analogous to the Second Amendment. But the Court did not use those modern cases as a resource. It certainly did not use this precedent to craft a reasonable regulation model of the right. *See* Adam Winkler, *The Reasonable Right to Bear Arms*, 17 STAN. L. & POL'Y REV. 593, 594 (2006) (discussing state court decisions on state constitutional rights to keep and bear arms).

22   *See Heller,* 554 U.S. 570 (2008).

23   *See* McDonald v. City of Chicago, 561 U.S. 742 (2010).

24   *Id.* at 749-50.

25   *Id.* at 786; *Heller,* 554 U.S. at 626-27.

26   *McDonald,* 561 U.S. at 786 (quoting *Heller,* 554 U.S. at 626-27).

27   *Heller,* 554 U.S. at 626.

28   *Id.* at 627 n.26.

29   *See* LAW CTR. TO PREVENT GUN VIOLENCE, POST-*HELLER* LITIGATION SUMMARY 1-2 (Mar. 31, 2015), http://smartgunlaws.org/wp-content/uploads/2014/11/Post-Heller-Litigation-Summary-March-2015-Final-Version.pdf [https://perma.cc/WW5T-AD2D] (noting that after *Heller* courts have been "inundated" with Second Amendment challenges, leading to over 900 decisions).

30   Randy E. Barnett, *News Flash: The Constitution Means What it Says*, WALL ST. J. (June 27, 2008, 12:01 AM), http://www.wsj.com/articles/SB121452412614009067 [https://perma.cc/Y8SP-L62S].

31   *Heller,* 554 U.S. at 626-27, 627 n.26.

32   *See generally* Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS., no. 2, 2017.

33   *Id.* at 14.

34   Spitzer, *supra* note 5, at 56.

35   *Heller,* 554 U.S. at 582.

36   Spitzer, *supra* note 5, at 56.

37   Darrell A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 LAW & CONTEMP. PROBS., no. 2, 2017.



38    *Heller,* 554 U.S. at 628.

39    Miller, *supra* note 37, at 86.

40    *Id*. at 89.

41    *Id*. at 87.

42    Jennifer Carlson & Kristin A. Goss, *Gendering the Second Amendment,* 80 LAW & CONTEMP. PROBS., no. 2, 2017 at 103.

43    *Heller,* 554 U.S. at 624.

44    James B. Jacobs & Alex Haberman, *3D-Printed Firearms, Do-It-Yourself Guns & the Second Amendment*, 80 LAW & CONTEMP. PROBS., no. 2, 2017 at 139-40.

45    *Id*. at 141.

46    *See* Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment,* 80 GEO. WASH. L. REV. 703 (2012).

47    Eric M. Ruben, *Justifying Perceptions in First and Second Amendment Doctrine*, 80 LAW & CONTEMP. PROBS., no. 2, 2017.

48    Friedman v. City of Highland Park, 784 F.3d 406, 412 (7th Cir. 2015), *cert. denied,* 136 S. Ct. 447 (2015).

49    Jeffrey W. Swanson et al., *Implementation and Effectiveness of Connecticut's Risk-Based Gun Removal Law: Does It Prevent Suicides?*, 80 LAW & CONTEMP. PROBS., no. 2, 2017.

50    *See id*.

51    Nicholas J. Johnson*, Lawful Gun Carriers (Police and Armed Citizens): License, Escalation, and Race*, 80 LAW & CONTEMP. PROBS., no. 2, 2017 at 220 n.52 (citing CRIME PREVENTION RES. CTR., CONCEALED CARRY PERMIT HOLDERS ACROSS THE UNITED STATES 7-8 (2014)).

52    *Id*. at 210.

53    *Id*. at 230.

54    Murphy, *supra* note 1, at 233-34.

55    *Id*. at 238.

Compendium_Cornell
Page 1629

56      *See* Levinson, *supra* note 18.

57      Sanford Levinson, *Postscript: Some Observations About Guns and Sovereignty*, 80 LAW & CONTEMP. PROBS., no. 2, 2017.

58      *Id.* at 251.

80 LCPR 1

---

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Compendium_Cornell
Page 1630

**125 Yale L.J. Forum 121**

Yale Law Journal Forum
September 25, 2015

Eric M. Ruben, Saul Cornell [a1]

Copyright © 2015 The Yale Law Journal, Eric M. Ruben, Saul Cornell

# FIREARM REGIONALISM AND PUBLIC CARRY: PLACING SOUTHERN ANTEBELLUM CASE LAW IN CONTEXT

## INTRODUCTION

During recent oral arguments in *Peruta v. County of San Diego*, a case being reconsidered en banc in the U.S. Court of Appeals for the Ninth Circuit, former Solicitor General Paul Clement turned to what may appear an unusual guide for interpreting the scope of the Second Amendment in the twenty-first century. His clients had been denied permits to carry concealed handguns in San Diego because they could not demonstrate a heightened need for selfdefense, and Clement was trying to convince the Ninth Circuit that the Second Amendment precluded those denials. Two of the strongest sources of authority--decisions by other federal appellate courts and evidence from the period of the Second Amendment's adoption--provided scant support for his position. In fact, several courts recently upheld "good cause" policies similar to San Diego's,[1] and firearm regulations, including those prohibiting discharge in populated areas, were common in the Founding era.[2] Instead, Clement looked to antebellum state court case law, and referred the Ninth Circuit to the interpretation of the Second Amendment from an 1846 opinion by the Georgia Supreme Court, *Nunn v. State*.[3] The Georgia high court held that the Second  **\*122**  Amendment protected the right "to keep and bear arms of every description" and was violated by a law prohibiting the open carrying of certain weapons.[4] Clement argued that the Ninth Circuit should adopt *Nunn's* view of the Second Amendment to strike down San Diego's "good cause" policy.[5]

*Nunn*, of course, is not binding precedent in the Ninth Circuit. But ever since the Supreme Court's landmark decision in *District of Columbia v. Heller* used an originalist approach to establish the individual right to keep and bear arms,[6] courts have incorporated historical evidence into their Second Amendment jurisprudence.[7] This historical evidence includes *Nunn* and other antebellum state court opinions.[8] As Justice Scalia put it in his majority opinion in *Heller*, "interpret[ations] of the Second Amendment in the century after its enactment," including in state court opinions, are "a critical tool of constitutional interpretation," since they can point to "the scope [constitutional rights] were understood to have when the people adopted them."[9] Indeed, as  **\*123**  Clement noted, the *Heller* majority itself favorably cited *Nunn's* interpretation of the Second Amendment.[10]

But when courts invoke *Nunn* and other antebellum opinions about the right to carry guns in public, they glance over a striking fact about the case law: it is drawn almost exclusively from the slaveholding South. This regional link raises two related questions. First, why did this case law arise in the antebellum South, but not in other areas of the country? And second, did this regional jurisprudence really reflect a national understanding of the Second Amendment's scope? If *Nunn* and similar cases were the product of a unique regional culture during a unique period in the nation's development, quite removed from the Founding era (and the Reconstruction era),[11] they do not provide a solid foundation for a contemporary interpretation of the Second Amendment.[12]

This Essay begins to address these questions.[13] First, it draws on the broad body of historical research into the distinctive culture of slavery and honor in  **\*124**  the antebellum South that contributed to both arms carrying and violence.[14] This culture also influenced jurisprudence throughout the region, including the opinions of Chief Justice Joseph Henry Lumpkin, the author of *Nunn*. Second, we contrast *Nunn's* view of the right to bear arms outside the home with a separate historical tradition, dominant

Compendium_Cornell
Page 1631

outside the South, which was less enthusiastic about public carry and more tolerant of broad regulation of the public bearing of arms. [15]  In fact, the vast majority of Americans lived under this alternative tradition, rather than under the *Nunn* regime. This analysis suggests that *Nunn* and similar cases did not represent a national consensus about the meaning of the right to bear arms, and should not be relied upon to strike down public carry regulations today.

## I. THE ANTEBELLUM SOUTH AND THE ORIGINS OF PERMISSIVE CARRY JURISPRUDENCE

Last year, when a split panel in *Peruta* declared San Diego's concealed carry policy unconstitutional--prompting the Ninth Circuit to rehear the case en banc--the majority rested its conclusion on an analysis of nineteenth-century cases, including *Nunn*, from courts in nine states, all but one of them Southern: Alabama, Arkansas, Georgia, Indiana, Kentucky, Louisiana, North Carolina, Tennessee, and Texas. [16]  After reviewing these cases, the opinion for  **\*125**  the divided court concluded that "the majority of nineteenth century courts agreed that the Second Amendment right extended outside the home and included, at minimum, the right to carry an operable weapon in public for the purpose of lawful self-defense." [17]

But the majority's presumption that this regional selection of case law reflected a national jurisprudential consensus in the nineteenth century is deeply problematic. The selective use of Southern case law in *Peruta* represents just the type of analysis that Justice Scalia has warned against, in which courts "look over the heads of the crowd and pick out [their] friends." [18] Understanding this jurisprudence, to borrow again from Justice Scalia, "requires immersing oneself in the political and intellectual atmosphere of the time ... and putting on beliefs, attitudes, philosophies, prejudices and loyalties that are not those of our day." [19]  These cases did not emerge in a vacuum and do not reflect the full range of American legal history. Rather, they come from a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined. [20]

Violence was a central element of slave and honor culture in the South. Richard Hildreth, an antebellum lawyer, journalist, and historian, wrote in 1840 that violence was frequently employed both to subordinate slaves and to intimidate abolitionists. [21] That violence, in turn, resulted in "a complete paroxism [sic] of fear" and "extreme degree of terror ... of slave vengeance" amongst the slaveholding class. [22]  Meanwhile, violence between white men "to preserve white manhood and personal status" was encouraged in Southern honor culture. [23]  According to Hildreth, duels "appear but once an age" in the  **\*126**  North, but "are of frequent and almost daily occurrence at the [S]outh." [24]  As a result of the distinct cultural phenomena of slavery and honor, Southern men carried weapons both "as a protection against the slaves" and also to be prepared for "quarrels between freemen." [25]

Hildreth was not the only contemporary commentator to observe the prevalence of public carry in Southern society or to compare it with the norm in other parts of the country. In 1845, one year before *Nunn*, New York jurist William Jay contrasted "those portions of our country where it is supposed essential to personal safety to go armed with pistols and bowie-knives" with the "north and east, where we are unprovided with such facilities for taking life." [26]  Frederick Law Olmstead, writing in 1857, observed that "among young men a bowie-knife was a universal, and a pistol a not at all unusual, companion in Kentucky." [27] Similarly, an 1874 *New York Times* editorial commented that "[i]n most of the Southern States, the keeping and bearing of arms is considered an indispensable adjunct to the freedom of an American citizen." [28]  The editorial continued: "When a mob assembles in a Southern State, it is certain to be an 'armed mob.' The gun stores are among the largest and most prosperous establishments in small Southern towns." [29]  In 1880, journalist H.V. Redfield published one of the earliest studies exploring Southern violence and concluded that the South's murder rate was connected to the prevalence of public carrying of weapons, particularly concealable ones. [30]  In much of the South, "[s]o fixedly has this deadly custom been engrafted upon society ... that a very earnest and prolonged effort will be required to efface it." [31]  He noted that in New England, however, carrying concealed weapons was uncommon because "[t]he laws forbid it, and public sentiment condemns it so  **\*127**  strongly that were the laws silent the habit could not be engrafted upon society." [32]

Public carry thus was popular in Southern society, but cultural norms were not silent regarding what *manner* of carrying was honorable. In particular, concealed carry was perceived to give men "secret advantages" and lead to "unmanly assassinations," while open carry "place[d] men upon an equality" and "incite[d] men to a manly and noble defence of themselves." [33]  Some

Compendium_Cornell
Page 1632

Southern legislatures, accordingly, passed laws penalizing concealed carry, while permitting open carry. Kentucky and Louisiana passed the first such laws in 1813, and other states followed suit. [34]

The challenges to these laws gave rise to the *Nunn* family of case law. Following the norms of the time, Southern judges wrote opinions supporting open carry as constitutionally protected, while criticizing concealed carry and noting that it was constitutionally unprotected. [35]  No similar judicial record exists in the North, meanwhile, where public carry was much less prevalent and public carry restrictions appear to have gone unchallenged. [36]

 **\*128**  The judges deciding the Southern right-to-carry cases were thus immersed in a social and legal atmosphere unique to the South. [37]  The distinctive nature of Southern society, including its embrace of slavery and honor, contributed to an aggressive gun culture. [38]  That culture, in turn, influenced jurists such as Chief Justice Lumpkin, who had considerable success "translating his personal views into law." [39]  At minimum, the historical origins of *Nunn* and similar cases ought to give modern judges serious pause as they consider public carry cases, like *Peruta*, in the post-*Heller* era.

## II. AN ALTERNATIVE REGULATORY TRADITION

*Nunn's* permissive view of public carry was not universally held in the United States--indeed, it was not universally held in the South. [40]  Another prevalent view accepted robust regulation of the right to carry. The roots of this alternative framework can be traced to the regulatory regime of medieval England. In 1328, the English Statute of Northampton began a tradition of prohibiting armed travel through fairs, markets, and other populated areas. [41]   **\*129**  Others have explored the evolution of this prohibition in England. [42]  What is important for this Essay is that several early American states expressly incorporated versions of the Statute of Northampton into their laws. [43]  In those states, constables, magistrates, or justices of the peace had the authority to arrest anyone who traveled armed contrary to prohibitions derived from the Statute of Northampton. As a North Carolina jurist, James Davis, put it in 1774:

> Justices of the Peace, upon their own View, or upon Complaint, may apprehend any Person who shall go or ride armed with unusual and offensive weapons, in an Affray, or among any great Concourse of the People, or who shall appear, so armed, before the King's Justices sitting in Court. [44]

These types of restrictions on the right to bear arms were widely considered permissible at the Founding. [45]

Modern proponents of an expansive right to public carry downplay this early regulation, insisting, for example, that it only covered "arms carrying with the specific intent of terrorizing the public." [46]  This reading is partially due to the fact that some early American versions of the Statute of Northampton, exemplified by a 1790s Massachusetts law, gave justices of the peace the authority to arrest "such as shall ride or go armed offensively, *to the fear or terror* of the good citizens." [47]  But as William Blackstone suggested in his *Commentaries on the Laws of England*, terrorizing the public was the  **\*130**  consequence of going armed. [48]  Blackstone wrote that "by the laws of Solon, every Athenian was finable who walked about the city in armour," and similarly, in England *"riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, *by* terrifying the good people of the land." [49]  In other words, the act of traveling armed in a populated place was sufficient under common law to constitute the offense. Accordingly, an 1805 treatise written for justices of the peace in New Jersey made clear that peace officers could, on their own initiative, apply this restriction to a man traveling armed "though he may not have threatened any person in particular, or committed any particular act of violence." [50]  Similarly, other early American versions of the Statute of Northampton omitted any mention of "terror." North Carolina's statute, for example, stated that "no man great nor small [shall] go nor ride armed by night nor day, in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere." [51]  By its plain terms the North Carolina prohibition applied categorically, regardless of any "intent to terrorize."

Compendium_Cornell
Page 1633

In 1836, Massachusetts revised its public carry restriction, omitting any reference to "fear or terror" and adding a new exception for public carry in the limited circumstances where a person had a "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property."[52] Under the statute, any person publicly carrying a weapon could be arrested upon the complaint of any other person "having reasonable cause to fear an injury, or breach of the peace."[53] Defendants were permitted the opportunity to provide a **\*131** defense, such as proving that they reasonably had armed themselves in response to a threat. If, after a hearing, the justice of the peace determined that the defendant violated the statute, the defendant would be required to provide "sureties for his keeping the Peace,"[54] a common enforcement tool in early America. At common law, sureties were similar to present-day guarantors in the bail context: members of the community who would pledge responsibility for the defendant and risk losing their bond if the defendant failed to "keep the peace."[55] In a rural society before the age of police forces or an administrative state, this citizen-complaint process was an efficient way to deal with the danger posed by public carrying, especially where that danger was limited because public carry was not "engrafted" on the regional culture.[56]

The same year Massachusetts revised its law, the respected jurist Peter Oxenbridge Thacher, whose judicial decisions and other writings "had made him known throughout the country,"[57] issued a grand jury charge explaining the restrictions on public carry in Massachusetts. He instructed that in the Commonwealth, "no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property."[58] Judge Thacher's charge was praised in the contemporary press as "sensible," **\*132** "practical," and "sage."[59] It lies of course in stark contrast to Chief Justice Lumpkin's later pronouncements on the unconstitutionality of open carry regulations.[60]

Massachusetts was not alone in its broad regulation of public carry. Over the next several decades, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, and Pennsylvania passed laws modeled on the 1836 Massachusetts statute.[61] While modern regulatory schemes, such as the "good cause" **\*133** permitting policy at issue in *Peruta*, do not operate in exactly the same manner as these regulations passed primarily outside the South in the nineteenth century, they are a logical analogue given present-day circumstances. Significantly, both regimes presume that the state's police power justifies limiting the right to carry arms in public to circumstances in which there is a clear justification, such as a heightened need for self-defense.[62]

After the Civil War, the Massachusetts model--generally restricting public carry with limited exceptions for people with reasonable cause to fear attack--gained traction in parts of the South. One of the fullest judicial expositions of the scope of this regulatory model occurred after Texas enacted a statute that reflected the Massachusetts one, titled, "Act to regulate the keeping and bearing of deadly weapons."[63] The Texas law prohibited "[a]ny person [from] carrying on or about his person" pistols, knives, and other specified weapons.[64] The Act provided an affirmative defense if a defendant could show that he or she faced an "immediate and pressing" danger that would "alarm a person of ordinary courage."[65] In *State v. Duke*, the Texas Supreme Court upheld this statute as "a legitimate and highly proper regulation" that "appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business."[66]

**\*134** Meanwhile, outside both the South and North, frontier towns adopted public carry regulations by the era of the Fourteenth Amendment that were far stricter than even those in Massachusetts and Texas.[67] Desiring to reduce violence and attract businessmen who might not invest in places where they felt endangered, many frontier towns prohibited public carry altogether.[68] Even famed "wild west" places like Tombstone and Dodge City banned carrying firearms within town limits.[69]

Thus, it appears that much of the country did not share *Nunn's* view that broad regulation of public carry ran afoul of the right to bear arms. Most regions, and parts of the South itself, were amenable to substantial restrictions on public carry rights in the interest of public safety, restrictions that were reflected in statutes, the press, grand jury charges, and Reconstruction-era opinions such as *Duke*.

## CONCLUSION

In recent years, courts have been asked to strike down public carry restrictions on the basis of the original understanding of the Second Amendment. If the judges deciding those cases choose to look to history, they should keep in mind that diverse regional understandings of the right to carry firearms have persisted throughout our nation's history. While *Nunn* represents one

Compendium_Cornell
Page 1634

perspective on the constitutionality of public carry restrictions, it falls woefully short of reflecting a national consensus. Indeed, the value of cases like *Nunn* is greatly diminished by the fact that a great many Americans in the antebellum years lived outside the South, in places less enthusiastic **\*135** about public carry and more accepting of public carry restrictions. Rather than relying on regional case law derived from the antebellum South, whose gun culture and jurisprudence were influenced by the culture of slavery and honor, judges seeking historical guidance in public carry cases today can and should seek guidance from the alternative tradition that presumed the constitutional soundness of broad public carry restrictions. At a minimum, persuasive historical precedent exists for a view of the Second Amendment that accommodates modern "good cause" permitting schemes requiring applicants to show a heightened need for self-defense in order to carry handguns in public.

## Footnotes

a1   *Eric M. Ruben is a Jurisprudence Fellow at the Brennan Center for Justice at New York University School of Law. Saul Cornell is the Paul and Diane Guenther Chair in American History at Fordham University. The authors would like to thank Joseph Blocher for helpful comments on an early draft, and Graham White, Joseph Masterman, and other members of the* Yale Law Journal *for outstanding editorial assistance.*

1   *See* Drake v. Filko, 724 F.3d 426, 434 (3d Cir. 2013); Woollard v. Gallagher, 712 F.3d 865, 881 (4th Cir. 2013); Kachalsky v. Cty. of Westchester, 701 F.3d 81, 101 (2d Cir. 2012). *But see* Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012) (striking down a total ban on public carry without ruling on the constitutionality of less restrictive "good cause" policies like San Diego's).

2   Among other things, laws restricted the way gunpowder could be stored, and several cities--including Boston, Philadelphia, New York City, and Newport--restricted the use of firearms in public. *See* District of Columbia v. Heller, 554 U.S. 570, 683-84 (2008) (Breyer, J., dissenting) (compiling laws).

3   *See* Oral Argument at 11:50, Peruta v. Cty. of San Diego, No. 10-56971 (June 16, 2015), http://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000007886 [http://perma.cc/DMK2-JDQA] (invoking Nunn v. State, 1 Ga. 243 (1846)). By interpreting the Second yale law journal forum September 25, 2015 Amendment as applicable to a Georgia state law, *Nunn* rejected the United States Supreme Court's prior conclusion that the Bill of Rights did *not* constrain state governments. *See* Barron v. Baltimore, 32 U.S. 243 (1833). This was an early signal that *Nunn* was out of sync with the national consensus at the time about an elemental aspect of constitutional law. *See* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 153-56 (1998) (describing *Nunn* as one of several "contrarian" opinions in conflict with *Barron*).

4   *Nunn*, 1 Ga. at 251 (emphasis omitted). In particular, *Nunn* held that Georgia was precluded from prohibiting the *open* carrying of weapons, but could prohibit the *concealed* carrying of weapons. *Id.* The argument advanced by the plaintiff in *Peruta* is similar: that San Diego cannot prohibit the concealed carrying of firearms, given that the open carrying of firearms is prohibited in much of the county.

5   *See* CAL. PENAL CODE §§ 26150(a)(2), 26155(a)(2) (2012) (requiring concealed carry applicants to prove "good cause"); *id.* § 26160 (maintaining that licensing authorities shall publish written policies regarding "good cause" and other requirements); Peruta v. Cty. of San Diego, 758 F. Supp. 2d 1106, 1110 (S.D. Cal. 2010) (describing the defendant's argument that in San Diego "good cause" is a "set of circumstances that distinguishes the applicant from other members of the general public and causes him or her to be placed in harm's way").

6   554 U.S. 570 (2008).

7   *See, e.g.*, Peterson v. Martinez, 707 F.3d 1197, 1211 (10th Cir. 2013) (holding that to determine whether a law impinges on the Second Amendment the court must ask "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee"); Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,

700 F.3d 185, 194 (5th Cir. 2012) (same); United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) ("[H]istorical meaning enjoys a privileged interpretative role in the Second Amendment context.").

8     *See, e.g.*, Peruta v. Cty. of San Diego, 742 F.3d 1144, 1155-60 (9th Cir. 2014), *reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015); *id.* at 1185-89 (Thomas, J., dissenting); *Drake*, 724 F.3d at 449-50 (Hardiman, J., dissenting); Kachalsky v. Cty. of Westchester, 701 F.3d 81, 90-91 (2d Cir. 2012).

9     *Heller*, 554 U.S. at 605, 634-35.

10    *See Heller*, 554 U.S. at 612 (quoting *Nunn*, 1 Ga. at 251); Oral Argument, *supra* note 3, at 11:50. The holding in *Heller* was limited to the scope of the Second Amendment right *within* the home, which is why *Heller's* invocation of *Nunn* is not dispositive in cases like *Peruta*, concerning the scope of the right *outside* the home.

11    Some scholars, most prominently Akhil Reed Amar, argue that the understanding of the Second Amendment at the time of the adoption of the Fourteenth Amendment should inform today's interpretation of the right to bear arms. *See* AMAR, *supra* note 3, at 257-66. More recently, Amar has pointed to the existence of distinctive regional constitutional subcultures. *See* AKHIL REED AMAR, THE LAW OF THE LAND: A GRAND TOUR OF OUR CONSTITUTIONAL REPUBLIC at xii (2015) ("[O]ur common Constitution looks slightly different from state to state and across the various regions of this great land."). Our analysis builds on Amar's important observation regarding regionalism, as well as the exposition of differing urban and rural firearm regulatory regimes in Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82 (2013). Several other notable papers addressing historical firearms regulations that have been published recently by the *Yale Law Journal* include Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852 (2013); Michael P. O'Shea, *Why Firearm Federalism Beats Firearm Localism*, 123 YALE L.J. ONLINE 359 (2014), http://yalelawjournal.org/forum/why-firearm-federalism-beats-firearm-localism [http://perma.cc/XFX6-2B9R]; and Jonathan Meltzer, Note, *Open Carry for All:* Heller *and Our Nineteenth-Century Second Amendment*, 123 YALE L.J. 1486 (2014).

12    *Cf.* McDonald v. City of Chicago, 561 U.S. 742, 871 (2010) (Stevens, J., dissenting) ("Liberty claims that are inseparable from the customs that prevail in a certain region, the idiosyncratic expectations of a certain group, or the personal preferences of their champions, may be valid claims in some sense; but they are not of constitutional stature.").

13    We take no position in this Essay regarding whether courts *should* use originalism as the sole means of constitutional interpretation, or which of several competing theories of originalism ought to be the preferred method. On the current state of the debate regarding originalism, see Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013).

14    For two notable studies relating to honor culture, slavery, and violence in the antebellum South, see RANDOLPH ROTH, AMERICAN HOMICIDE 180-249 (2009), which discusses how slavery, honor, and other regional differences contributed to higher homicide rates in the slave South than the North; and BERTRAM WYATT-BROWN, SOUTHERN HONOR: ETHICS AND BEHAVIOR IN THE OLD SOUTH 362-401 (2007), which describes how violence was used to preserve personal status in Southern honor culture.

15    In the era of Reconstruction, moreover, this alternative model grew stronger and included large sections of the South. *See infra* notes 63-69 and accompanying text.

16    In particular, the *Peruta* majority relied upon State v. Reid, 1 Ala. 612, 616-17 (1840); Wilson v. State, 33 Ark. 557, 560 (1878); Stockdale v. State, 32 Ga. 225, 227 (1861); *Nunn v. State*, 1 Ga. 243 (1846); Walls v. State, 7 Blackf. 572, 573 (Ind. 1845); *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822); *State v. Jumel*, 13 La. Ann. 399, 400 (1858); *State v. Chandler*, 5 La. Ann. 489 (1850); *State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843); *Andrews v. State*, 50 Tenn. 165, 187 (1871); *Aymette v. State*, 21 Tenn. 154 (1840); *Simpson v. State*, 13 Tenn. (5

Compendium_Cornell
Page 1636

Yer.) 356 (1833); and *Cockrum v. State*, 24 Tex. 394, 403 (1859). *See* Peruta v. Cty. of San Diego, 742 F.3d 1144, 1156-60 (9th Cir. 2014). The one non-Southern state in this list is Indiana, whose early history was largely shaped by migrants from the South. As historian Nicole Etcheson observes, "forty-four percent of Hoosiers" in 1850 were immigrants from the South. Nicole Etcheson, *Manliness and the Political Culture of the Old Northwest, 1790-1860*, 15 J. EARLY REP. 59, 60 & n.2 (Spring 1995). The *Peruta* majority acknowledged, but rejected, the following nineteenth century cases that did not support its conclusion: *Haile v. State*, 38 Ark. 564 (1882); *Fife v. State*, 31 Ark. 455 (1876); *Carroll v. State*, 28 Ark. 99 (1872); *State v. Buzzard*, 4 Ark. 18 (1842); *Hill v. State*, 53 Ga. 472 (1874); *State v. Duke*, 42 Tex. 455, 459 (1875); *English v. State*, 35 Tex. 473 (1872). *See Peruta*, 742 F.3d at 1156-60.

17    *Peruta*, 742 F.3d at 1160.

18    ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 36 (1997) (paraphrasing Judge Harold Leventhal's criticism of the use of legislative history); *see also* Roper v. Simmons, 543 U.S. 551, 617 (2005) (Scalia, J., dissenting).

19    Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. CIN. L. REV. 849, 856-57 (1989).

20    *See* Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity--The Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT. L. REV. 1307, 1314 (1995) (observing that, unlike in the North, "the South's large population of slaves constituted a potential danger to the free white population, a danger that had to be controlled"); *id.* at 1318-19 ("Almost from the beginning, the unique need to maintain white domination in the nation's first truly multiracial society led the South to a greater vigor [than other regions] with respect to the private possession of arms and to the universal depu[t]ization of the white population as a means of insuring racial control.") (footnote omitted).

21    RICHARD HILDRETH, DESPOTISM IN AMERICA: AN INQUIRY INTO THE NATURE, RESULTS, AND LEGAL BASIS OF THE SLAVE-HOLDING SYSTEM 88 (1854).

22    *Id.* at 89-90.

23    *See* WYATT-BROWN, *supra* note 14, at 368-69.

24    *See* HILDRETH, *supra* note 21, at 145.

25    *Id.* at 90; *see also* ROTH, *supra* note 14, at 218 ("Few whites had carried pistols or fighting knives in the eighteenth century, but the practice became popular in the plantation South in the nineteenth century as fears of black violence grew and whites became more anxious and belligerent.").

26    WILLIAM JAY, ADDRESS BEFORE THE AMERICAN PEACE SOCIETY AT ITS ANNUAL MEETING 23-24 (1845).

27    FREDERICK LAW OLMSTEAD, A JOURNEY THROUGH TEXAS, OR, A SADDLE-TRIP ON THE SOUTHWESTERN FRONTIER 20 (1857).

28    Editorial, *A Question for Arkansas*, N.Y. TIMES, May 11, 1874, at 4.

29    *Id.*

30   H.V. REDFIELD, HOMICIDE, NORTH AND SOUTH: BEING A COMPARATIVE VIEW OF CRIME AGAINST THE PERSON IN SEVERAL PARTS OF THE UNITED STATES 197-98 (1880) ("If the habit of carrying deadly weapons could be suppressed in the Southern States it would diminish the number of homicides very largely."). By the time of Redfield's study, the Southern homicide rates had been significantly higher than the Northern rates for at least sixty years. By the 1820s, Southern homicide rates were at least double that of the two "most homicidal" Northern cities--New York and Philadelphia. *See* ROTH, *supra* note 14, at 200.

31   REDFIELD, *supra* note 30, at 195.

32   *Id.* at 194.

33   *See* State v. Chandler, 5 La. Ann. 489, 490 (1850) (stating that open carry "is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country," but concealed carry tends "to secret advantages and unmanly assassinations").

34   *See* Act of Feb. 3, 1813, ch. 89, 1812 Ky. Acts 100; Act of Mar. 25, 1813, 1812 La. Acts 172; Act of Feb. 1, 1839, No. 77, 1838 Ala. Laws 67; Act of Dec. 25, 1837, 1837 Ga. Laws 90; Act of Feb. 10, 1831, ch. 26, § 58, 1831 Ind. Acts 180, 192; Act of Jan. 14, 1820, ch. 23, 1819 Ind. Acts 39; Act of Feb. 2, 1838, ch. 101, 1838 Va. Acts 76; REVISED STATUTES OF THE STATE OF ARKANSAS, ADOPTED AT THE OCTOBER SESSION OF THE GENERAL ASSEMBLY OF SAID STATE, A.D. 1837, at 280 (William MoK. Ball & Sam C. Roane eds., 1838) (including "[w]earing concealed weapons" in its list of "offences against the public peace, and affecting the security of persons and property" in ch. 44, div. VIII, art. I, § 13).

35   *See, e.g.,* Chandler, 5 La. Ann. at 489-90. *Nunn* based its holding on the Second Amendment, while other Southern courts relied upon provisions in their state constitutions. To be sure, the broad view of the right to bear arms was not universally held in the South. But supporters of expansive public carry rights generally reject any contrary cases as not surviving *Heller. See, e.g.,* Peruta v. Cty. of San Diego, 742 F.3d 1144, 1159 (rejecting analysis in State v. Buzzard, 4 Ark. 18 (1842)); *id.* at 1160 (rejecting analysis in State v. Duke, 42 Tex. 455 (1874)); *see also* Darrell A.H. Miller, Peruta, the Home-Bound Second Amendment, and Fractal Originalism, 127 HARV. L. REV. F. 238, 239 (2014) (describing how "some ... precedent did not fit" with *Heller's* view of the right to bear arms and "[t]rimming was therefore in order"). Today, concealed carrying is more popular than open carrying, and accordingly gun rights advocates do not limit their arguments about the scope of the Second Amendment to one preferred form of carrying.

36   *See infra* Part II. We do not intend to suggest that violence or firearms carrying did not exist in the north. They did exist, but to a much lesser extent. *See* SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 139 (2006) (discussing northern concerns about concealed carry).

37   Some gun rights advocates have acknowledged as much. *See, e.g.,* Cottrol & Diamond, *supra* note 20, at 1318-23.

38   *See supra* notes 20-33 and accompanying text.

39   Mason W. Stephenson & D. Grier Stephenson, Jr., *"To Protect and Defend": Joseph Henry Lumpkin, the Supreme Court of Georgia, and Slavery,* 25 EMORY L.J. 579, 579-80 (1976). Indeed, one of Chief Justice Lumpkin's primary objectives was to preserve the hegemony of the planter class and maintain the hierarchy that defined slave society. In an opinion just two years after *Nunn,* he expressed his fear that freed slaves would endanger slaveholders: "Neither humanity, nor religion, nor common justice, requires us to sanction or favor domestic emancipation; to give our slaves their liberty at the risk of losing our own." Vance v. Crawford, 4 Ga. 445, 459 (1848). In another, he upheld the use of trained dogs to pursue a runaway slave. Before quoting extensively from the New Testament regarding the coming apocalypse, Chief Justice Lumpkin opined that such measures were necessary "to tighten the chords that bind the negro to his condition of

servitude--a condition which is to last ... until the end of time." Moran v. Davis, 18 Ga. 722, 724 (1855). *Nunn*, which struck down a Georgia law that prohibited white citizens from openly carrying guns, is an especially weak foundation for our modern, national jurisprudence, given Chief Justice Lumpkin's professed interest in preserving the "peculiar institution," even if through the use of violence and intimidation.

40    *See, e.g., infra* note 44 and accompanying text (discussing the ability of justices of the peace to arrest those who "shall go or ride armed with unusual and offensive weapons ... among any great Concourse of the People" in North Carolina (quoting J. DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (Newbern, James Davis 1774))).

41    2 Edw. 3, c. 3 (1328), *reprinted in* 1 THE STATUTES OF THE REALM 258 (mandating that individuals "bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in [f]airs, [m]arkets, nor in the presence of the [j]ustices or other [m]inisters, nor in no part elsewhere, upon pain to forfeit their [a]rmour to the King, and their [b]odies to prison at the King's pleasure").

42    For a helpful exposition of how the Statute of Northampton evolved through the centuries, see Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 7-36 (2012).

43    *See* 1852 Del. Laws 330-33; 1795 Mass. Acts 436; 1821 Me. Laws 285; 1792 N.C. Sess. Laws 60-61; 1801 Tenn. Pub. Acts 710; 1786 Va. Acts 33.

44    *See* J. DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (Newbern, James Davis 1774) (citing Michael Dalton, THE COUNTRY JUSTICE CONTAINING THE PRACTICE, DUTY AND POWER OF THE JUSTICES OF THE PEACE AS WELL IN AS OUT OF THEIR SESSIONS 37 (London 1705)).

45    *See* Charles, *supra* note 42, at 31-36 (describing the express adoption of similar prohibitions in many parts of early America and the common understanding that these prohibitions barred public carry to preserve the public peace).

46    David B. Kopel & Clayton Cramer, *State Standards of Review for the Right to Keep and Bear Arms*, 50 SANTA CLARA L. REV. 1113, 1127, 1133-34 (2010); *see also* Peru v. Cty. of San Diego, 742 F.3d 1144, 1154-55 (9th Cir. 2014), *reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015); Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. R. SIDEBAR 97, 101-02 (2009).

47    1795 Mass. Acts 436 (emphasis added). For a contemporary analysis of the statute, see 1 WILLIAM CHARLES WHITE, A COMPENDIUM AND DIGEST OF THE LAWS OF MASSACHUSETTS 116 (1809).

48    *See* 4 WILLIAM BLACKSTONE, COMMENTARIES *148-49.

49    *Id.* (emphasis added).

50    JAMES EWING, A TREATISE ON THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE, SHERIFF, CORONER, CONSTABLE, AND OF EXECUTORS, ADMINISTRATORS, AND GUARDIANS 546 (1805). Similarly, as early as 1682, New Jersey constables pledged "to arrest all such persons, as in [their] presence, shall ride or go arm'd offensively." *See* A Bill for the Office of Coroner and Constable, ch. 18 (Mar. 1, 1682), *reprinted in* AARON LEAMING & JACOB SPICER, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 250, 251 (1881).

51    FRANCOIS-XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA, 60-61 (New Bern, Editor's Press 1792).

52    1836 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace ....").

53    1795 Mass. Acts 436, ch. 2; *see also* Arrest Warrant of Benjamin Bullock (August 13, 1853) (on file with author). In Bullock's case, after he was arrested, a justice of the peace heard evidence and determined that Bullock was not guilty of the offense. Record, Grover v. Bullock (Worcester Cty. August 16, 1853) (No. 185) (on file with author). One might infer that the lack of Westlaw-searchable case law relating to the Massachusetts-type restrictions is evidence that these restrictions were not enforced. But traditional case law research is not especially probative of the application of these restrictions; *Bullock*, for example, did not result in any published opinions and was only discovered after uncovering paper records created by the local justices of peace. And in many cases those records did not survive the passage of time, and those that did are not well indexed or digitally searchable. In light of the fact that restrictions on public carry were well accepted in places like Massachusetts, *see, e.g., infra* note 59 and accompanying text, and were included in the relevant manuals for justices of the peace, *see, e.g., supra* notes 44, 50 and accompanying text, the better inference is that violations were enforced at the justice of peace level, but did not result in expensive appeals that would have produced searchable case law.

54    *See* 1795 Mass. Acts 436, ch. 2.

55    *See* 5 WILLIAM BLACKSTONE, COMMENTARIES *251-53 (discussing the common law practice of providing sureties for keeping the peace). *See generally* RICHARD BURN, BURN'S ABRIDGMENT, OR THE AMERICAN JUSTICE; CONTAINING THE WHOLE PRACTICE, AUTHORITY AND DUTY OF JUSTICES OF THE PEACE; WITH CORRECT FORMS OF PRECEDENTS RELATING THERETO, AND ADAPTED TO THE PRESENT SITUATION OF THE UNITED STATES 386-400 (1792) (explaining the mechanics of sureties of the peace in early American law).

56    *See supra* notes 30-32 and accompanying text.

57    3 THE AMERICAN REVIEW: A WHIG JOURNAL OF POLITICS, LITERATURE, ART AND SCIENCE 222, 223 (1846) (reviewing REPORTS OF CRIMINAL CASES TRIED IN THE MUNICIPAL COURT OF THE CITY OF BOSTON, BEFORE PETER OXENBRIDGE THACHER, JUDGE OF THAT COURT, FROM 1823 TO 1843 (Horatio Woodman ed., 1845)).

58    PETER OXENBRIDGE THACHER, TWO CHARGES TO THE GRAND JURY OF THE COUNTY OF SUFFOLK, FOR THE COMMONWEALTH OF MASSACHUSETTS, AT THE OPENING OF THE TERMS OF THE MUNICIPAL COURT OF THE CITY OF BOSTON, ON MONDAY, DECEMBER 5TH, A. D. 1836, AND ON MONDAY, MARCH 13TH, A. D. 1837, 27 (1837); *see also* Charles, *supra* note 42, at 39 & n.209; Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1720 & n.134 (2012).

59    *See Judge Thacher's Charges*, CHRISTIAN REG. & BOS. OBSERVER, June 10, 1837, at 91.

60    *See supra* notes 3-4 and accompanying text.

61    *See* An Act to Prevent the Commission of Crimes, § 16, *reprinted in* STATUTES OF THE TERRITORY OF WISCONSIN 379, 381 (1839) ("If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family, or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided."); ME. REV. STAT. ch. 169, § 16 (1840), *reprinted in* THE REVISED STATUTES OF THE STATE OF MAINE 707, 709 (1841) ("Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.");

MICH. REV. STAT. ch. 162, § 16, *reprinted in* THE REVISED STATUTES OF THE STATE OF MICHIGAN 690, 692 (1846) ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided."); Of Proceedings to Prevent the Commission of Crimes, ch. 14, § 16, 1847 Va. Acts 127, 129 ("If any person shall go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided");

Of Proceedings to Prevent the Commission of Crimes, ch. 112, § 18, *reprinted in* THE REVISED STATES OF THE TERRITORY OF MINNESOTA 526, 528 (1851) ("If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family, or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided."); Proceedings to Prevent Commission of Crimes, ch. 16, § 17 (1853), *reprinted in* THE STATUTES OF OREGON 218, 220 (1854) ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault, injury, or other violence to his person, or to his family or property, he may, on complaint of any other person, having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided."); Proceedings to Detect the Commission of Crimes, § 6 (1861), *reprinted in* A DIGEST OF THE LAWS OF PENNSYLVANIA 248, 250 (John Purdon comp., 1862) ("If any person, not being an officer on duty in the military or naval service of the state or of the United States shall go armed with a dirk, dagger, sword or pistol, or other offensive or dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his family, person or property, he may, on complaint of any person having reasonable cause to fear a breach of the peace therefrom, be required to find surety of the peace as aforesaid.").

62    Research into public carry restrictions contrary to the *Nunn* regime only recently received attention in academic literature. *See* Cornell, *supra* note 58, at 1720 & n.134. Moreover, the substance of this research was not referenced in briefs submitted to the Ninth Circuit before the original *Peruta* decision was filed. Only after the Court voted to rehear the case en banc and called for additional briefs, over a year after the initial *Peruta* decision, did an amicus brief discuss this new historical research. *See* Brief for Everytown for Gun Safety as Amicus Curiae Supporting Appellees at 15-17, Peruta v. Cty. of San Diego, No. 10-56971 (9th Cir. Apr. 30, 2015), ECF No. 257.

63    Law of April 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25, *reprinted in* 6 H. GAMMEL, LAWS OF TEXAS 927 (1898). For a compilation of other state statutes restricting carrying weapons in public, see Mark Frassetto, *Firearms and Weapons Legislation up to the Early Twentieth Century* (Jan. 15, 2013), http://ssrn.com/abstract=2200991 [http://perma.cc/QB43-SFLU].

64    Law of April 12, 1871, *in* GAMMEL, *supra* note 63, at 927.

65      *Id.*

66      State v. Duke, 42 Tex. 455, 459 (1874). The *Peruta* majority rejected *Duke* because the Texas constitution made express what has always been implicit in the state police power: that the right to bear arms could be limited by "such regulations as the legislature may prescribe." *Peruta*, 742 F.3d at 1160 (quoting Texas Constitution of 1869) (alteration omitted). Regulation of firearms and gunpowder has been at the heart of the police power throughout our nation's history. *See* WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA 53-54 (1996) (describing the scope of police power in early America and how "it was never doubted in this well-regulated society that something as potentially injurious to the public as gun powder ... was decidedly regulatable"); *id.* at 57 (noting exercise of police power in 1813 to prohibit the discharge of firearms in New York City); *see also* District of Columbia v. Heller, 554 U.S. 570, 683-84 (2008) (Breyer, J., dissenting) (compiling early gunpowder and firearm laws). Moreover, the textual distinction between the Texas Constitution as it was interpreted in *Duke* and the Second Amendment is not as clear as *Peruta* makes it out to be. *See* Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 WASH. U. L. REV. (forthcoming 2015) (arguing that, in light of *Heller's* definition of "militia" as including "the body of all citizens capable of military service," the reference to a "well regulated Militia" in the Second Amendment's preamble is a textual authorization of firearms regulation).

67      *See* Blocher, *supra* note 11, at 117-18 (describing severe firearms restrictions in Western towns within the broader American tradition of more restrictive firearms regulations in American population centers).

68      ADAM WINKLER, GUN FIGHT 171-73 (2011).

69      *See* ROBERT R. DYKSTRA, THE CATTLE TOWNS (1983); WINKLER, *supra* note 68, at 13, 163-65 (summarizing historical research such as Dykstra's showing that carrying dangerous weapons was "nearly always proscribed" in frontier towns).

125 YALELJF 121

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Lindsay Schakenbach Regele*

---

# Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion

The years surrounding the origins of the term "Manifest Destiny" were a transitional period in the history of industrialization. Historians have done much to analyze the impact of major technological shifts on business structure and management, and to connect eastern markets and westward expansion. They have paid less attention, however, to the relationship among continental geopolitics, industrial development, and frontier warfare. This article uses War Department papers, congressional reports, and manufacturers' records to examine how the arms industry developed in response to military conflict on the frontier. As public and private manufacturers altered production methods, product features, and their relationships to one another, they contributed to the industrial developments of the mid-nineteenth century.

**Keywords:** firearms industry, nineteenth-century United States, territorial expansion, innovation, federal government, Samuel Colt, military, private sector, public sector

At the Crystal Palace Exhibition in London in 1851, the United States won a greater share of prizes than any other nation. Of particular note were its firearms. Three years after the Exhibition, Britain's Board of Ordnance decided to stock its new national armory with

---

I would like to thank Merritt Roe Smith, Kate Viens, Kara Swanson, William Childs, Emilie Connolly, Andrew Fagal, and Andrew Offenberger, as well as the anonymous reviewers at *Business History Review* for their feedback on various versions of this article. I am also grateful to the staffs at the American Antiquarian Society, the Historical Society of Pennsylvania, the Library Company of Philadelphia, the Middlesex County Historical Society, the Huntington Library, and the National Archives for their help locating materials.

*Business History Review* 92 (Spring 2018): 57–83. doi:10.1017/S000768051800034X
© 2018 The President and Fellows of Harvard College. ISSN 0007-6805; 2044-768X (Web).

Compendium_Cornell
Page 1643

*Lindsay Schakenbach Regele / 58*

American-made machinery.[1] The story of American success at this international display has been well told in studies of the American system of manufactures. But the question of how the United States developed technology that its former colonizer coveted has not yet been answered fully.

Part of the answer lies in the firearms industry and the ideology of "Manifest Destiny," a phrase coined by magazine editor John L. O'Sullivan in 1845 to advocate the United States' annexation of new territory.[2] The years surrounding the phrase's origins were a transitional period in the history of industrialization, and historians have done much to analyze the impact of major technological shifts on firms, regional markets, business management, and workers and communities.[3] They have done less, however, to explore these shifts in relation to the frontier violence that was endemic to antebellum territorial expansion. The frontier has long occupied American historians as a site of violence, opportunity, and exceptionalism. Frontier warfare did not make the United States "exceptional," but the realities of military conflict in the pursuit of territorial expansion in North America had particular effects on its manufacturing. Americans' ability to acquire land depended on an implicit commitment among settlers, manufacturers, and federal officials to improve firearms.

When O'Sullivan gave a name to Americans' territorial ambitions, he described a phenomenon—already underway—that would contribute to arms innovation. Warfare in Florida against the Seminole Indians in the late 1830s and early 1840s provided the first major experience for

[1] Carolyn Cooper, "A Connecticut Yankee Courts the World," in Herbert G. Houze, Carolyn C. Cooper, and Elizabeth Mankin Kornhauser, *Samuel Colt: Arms, Art, and Invention* (New Haven, 2006), 8.

[2] John L. O'Sullivan, "Annexation," *The United States Magazine and Democratic Review*, July/Aug. 1845.

[3] Alfred D. Chandler, *The Visible Hand: The Managerial Revolution in American Business* (Cambridge, Mass., 1977). For business and technology, see also, Naomi R. Lamoreaux, "Entrepreneurship, Business Organization, and Economic Concentration," in Stanley L. Engerman and Robert E. Gallman, eds., *The Cambridge Economic History of the United States II* (Cambridge, U.K., 2000), 403–34. Two of the most compelling studies of expansion and industrial capitalism are, William Cronon, *Nature's Metropolis: Chicago and the Great West* (New York, 1992); Richard White, *Railroaded: The Transcontinentals and the Making of Modern America* (New York, 2011). For the frontier and economic growth, see also Thomas C. Cochran, "The Paradox of American Economic Growth," *The Journal of American History* 61, no. 4 (1975): 925–42. Works on the social and cultural changes that accompanied a rise in the factory system include Barbara M. Tucker, *Samuel Slater and the Origins of the American Textile Industry, 1790–1860* (Ithaca, 1984); Mary H. Blewett, *Men, Women, and Work: Class, Gender, and Protest in the New England Shoe Industry, 1780–1910* (Urbana, 1988); Alan Dawley, *Class and Community: The Industrial Revolution in Lynn* (Cambridge, Mass., 1976); Thomas Dublin, *Transforming Women's Work: New England Lives in the Industrial Revolution* (Ithaca, 1994); David A. Zonderman, *Aspirations and Anxieties: New England Workers and the Mechanized Factory System, 1815–1850* (New York, 1992); and David Hounshell, *From the American System to Mass Production, 1800–1932: The Development of Manufacturing Technology in the United States*, vol. 4 (Baltimore, 1985).

Compendium_Cornell
Page 1644

*Industrial Manifest Destiny / 59*

weapon adaptation and a military market for the private sector. Soon after, the United States declared war on Mexico, which became a testing ground and marketing platform for the firearms industry. Beyond their cultural contexts and ideological underpinnings, Manifest Destiny and the "frontier" matter for business historians because they provided the impetus for innovation in the arms industry, which laid the groundwork for developments in other industries.[4]

Merritt Roe Smith's now forty-year old work on technological change at the federal armory at Harpers Ferry, Virginia, is still the standard-bearer of scholarship on the development of the arms and machine tool industry. But while Smith focused on how local customs shaped industrial change, this article connects eastern firearms manufacturing with the conflict and violence that accompanied the ideology of Manifest Destiny.[5] The experiences of soldiers and citizens on the southern frontier prompted ordnance officials to undertake new experiments in weapon production, and arms makers to develop repeating firearms. These technological innovations helped contribute to the "American

[4] As Patricia Limerick reminds us, the settlement of the North American continent was about more than individual adventurism and violent bravery; it had everything to do with the brutal realities of capitalism. Patricia Nelson Limerick, *The Legacy of Conquest: The Unbroken Past of the American West* (New York, 1987). For the original "frontier thesis," which argued that the existence of a frontier provided opportunities for white Americans that were unavailable in Europe, see Frederick Jackson Turner, "The Significance of the Frontier in American History," *Annual Report of the American Historical Association* (1893): 197–227. Although Turner associated this frontier with violence, Patricia Nelson Limerick, Richard White, and others have done more to reveal the violence and economic exploitation involved in territorial expansion. James R. Grossman, *The Frontier in American Culture: Essays by Richard White and Patricia Nelson Limerick* (Berkeley, 1994). Historians disagree over the usage of "frontier" versus "borderlands." The term "frontier" has more commonly been associated with Anglo-American dominance and colonial binaries, while "borderlands" often signifies more fluid zones of interaction. Andrew R. L. Cayton and Fredrika J. Teute, eds., *Contact Points: American Frontiers from the Mohawk Valley to the Mississippi, 1750–1830* (Chapel Hill, 1998); Pekka Hämäläinen and Samuel Truett, "On Borderlands," *The Journal of American History* 98, no. 2 (2011): 343–44; and Jeremy Adelman and Stephen Aron, "From Borderlands to Borders: Empires, Nation States, and the Peoples in Between in North American History," *The American Historical Review* 104, no. 3 (1999): 815–16. David Silverman has recently and compellingly defined "frontier" as a "zone of contact in which indigenous people exercised significant and sometimes even disproportionate power and the outcome was uncertain and contested." David Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America* (Cambridge, Mass., 2016), 19. In general, all of these terms reflect larger epistemological shortcomings. Andrew Cayton, "Not the Fragments but the Whole," *The William and Mary Quarterly* 69, no. 3 (2012): 514. It is not my intention to enter into the theoretical debates surrounding these terms, but for the purposes of linking contested territory and Anglo-American-Native conflict to manufacturing, I consider "frontier" in the rather limited sense of a sparsely settled backcountry characterized by episodes of violent conflict, which required military and material support.

[5] Merritt Roe Smith, *Harper's Ferry Armory and the New Technology: The Challenge of Change* (Ithaca, 1977); Merritt Roe Smith, "Army Ordnance and the 'American System' of Manufacturing, 1815–1861," in Merritt Roe Smith, ed., *Military Enterprise and Technological Change: Perspectives on the American Experience* (Cambridge, Mass., 1985), 39–86.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

*Lindsay Schakenbach Regele / 60*

system of manufactures," a term that likely originated in 1850s England to describe the interchangeability and mechanization that characterized American manufacturing.[6] This article does not enter into the debate about when, where, and if, true interchangeability developed. Instead, it shows how what became known as the "American system of manufactures" owed its development to manufacturers' willingness to improve weapons in accordance with the demands of an expanding populace on the frontier.[7]

The arms industry, in the United States and elsewhere, has always influenced civilian industries through technology spin-off. Some of America's major industries, such as the machine tool, sewing, and eventually automobile industries incorporated innovations from the arms industry's interchangeable production.[8] There were long-existing networks of machine workers, investors, and wholesalers that linked firms in firearms, textile, and metalworking.[9] Individual mechanical engineers

[6] Nathan Rosenberg, *Technology and American Economic Growth* (New York, 1972), 87–88. David Hounshell notes that while Rosenberg and others attribute the expression to a variety of British reports on American manufacturing in the mid-1850s, it was not really used except by historians, and not until the early twentieth century. David Hounshell, *From the American System to Mass Production, 1800–1932: The Development of Manufacturing Technology in the United States*, vol. 4 (Baltimore, 1985), 16–17.

[7] While Merritt Roe Smith and David Hounshell argue that armory practices led to the achievement of interchangeability by the 1840s, historian Donald Hoke asserts that interchangeability was far from an absolute concept for manufacturers and was not solely a product of federal arms-making. Hoke maintains that interchangeability varied not only across industries, but also from factory to factory, and developed slowly throughout the nineteenth century, largely in the private sector. Smith, *Military Enterprise and Technological Change*; Hounshell, *From the American System to Mass Production*; Donald R. Hoke, *Ingenious Yankees: The Rise of the American System of Manufactures in the Private Sector* (New York, 1989), 3–4. The first conventional musket made entirely of interchangeable parts was manufactured in 1844, but historians disagree about exactly when and by whom interchangeability was achieved. Merritt Roe Smith, "John H. Hall, Simeon North, and the Milling Machine: The Nature of Innovation among Antebellum Arms Makers," *Technology and Culture* 14, no. 4 (1973): 589. Not all historians of technology agree. Robert B. Gordon emphasized the importance of improvements in artificers' handwork over the influence of ordnance officers and superintendents. Robert B. Gordon, "Simeon North, John Hall, and Mechanized Manufacturing," *Technology and Culture,* 30, no. 1 (1989): 179–88, and "Who Turned the Mechanical Ideal into Mechanical Reality?" *Technology and Culture* 29, no. 4 (1988): 744–78. James Farley, on the other hand, argues for the persistent importance of the Ordnance Department in driving innovation. Farley, *Making Arms in the Machine Age: Philadelphia's Frankford Arsenal, 1816–1870* (University Park, Pa., 1994), xv, 64. Decius Wadsworth to Roswell Lee, 15 Dec. 1818, Letters Received from Officials and Officers of the War and Treasury Departments, Records of the Springfield Armory, Mass., box 1, target #2, RG 156, National Archives, Waltham, Mass. (hereafter, NAW).

[8] Clive Trebilcock, "'Spin-Off' in British Economic History: Armaments and Industry, 1760–1914," *The Economic History Review* 22, no. 3 (1969): 474–90; Nathan Rosenberg, "Technological Change in the Machine Tool Industry, 1840–1910," *The Journal of Economic History* 23, no. 4 (1963): 442.

[9] David R. Meyer, *Networked Machinists: High Technology Industries in Antebellum America* (Baltimore, 2006); and David R. Meyer, "Formation of Advanced Technology

Compendium_Cornell
Page 1646

moved between and among different industries and nations, often parlaying the technical skills acquired at an armory into employment and machine development elsewhere.[10] Nathan Rosenberg has shown how independent machinery-producing firms took off after 1840 because of technical convergence in metal-using industries, which faced similar problems related to power transmission, feed mechanisms, friction reduction, and metal properties. Specialized, high-speed machine tools such as milling machines and precision grinders grew out of the production requirements of arms makers. For example, a government contractor developed the turret lathe for the production of percussion locks for an army horse pistol in 1845. The lathe was later adapted and modified for the production of components for sewing machines, watches, typewriters, and locomotives. In particular, machining requirements of sewing machines were very similar to those of firearms production. One repeating rifle inventor also developed a machine for turning sewing machine spools, which spawned an automatic screw machine that was subsequently used in shoe machinery, hardware, rifles, and ammunition.[11]

These sorts of inventions contributed to mass production, which had its start during the era of Manifest Destiny as a result of changes in the firearms market. Although comparisons between firearms production in England and the United States tend to associate American arms manufacturing with much more robust domestic demand than in England, a major civilian market did not exist prior to the 1840s.[12] Debates about

---

Districts: New England Textile Machinery and Firearms, 1790–1820," *Economic Geography* 74, no. s1 (1998): 42–43.

[10] Henry Burden, for example, specialized in hot-working techniques in metal and moved from Scotland to the United States where he worked at the Springfield Armory before inventing machines for producing bar iron. Paul J. Uselding, "Henry Burden and the Question of Anglo-American Technological Transfer in the Nineteenth Century," *The Journal of Economic History* 30, no. 2 (1970): 312–37; Rosenberg, "Technological Change in the Machine Tool Industry," 421.

[11] Rosenberg, "Technological Change in the Machine Tool Industry," 418–31.

[12] Joshua L. Rosenbloom, "Anglo-American Technological Differences in Small Arms Manufacturing," *The Journal of Interdisciplinary History* 23, no. 4 (1993): 684–85; H. J. Habakkuk, *American and British Technology in the Nineteenth Century* (Cambridge, U.K., 1962). Probate inventories reveal greater percentages of gun ownership in the first half of the nineteenth century than Michael Bellesiles's discredited study of gun ownership in early America showed, but dealers in eastern cities repeatedly told arms manufacturers that their customer base did not warrant an expansion of sales. Michael A. Bellesiles, "The Origins of Gun Culture in the United States, 1760–1865," *The Journal of American History* 83, no. 2 (1996): 425–55; Mark D. Groover, "The Gibbs Farmstead: Household Archaeology in an Internal Periphery," *International Journal of Historical Archaeology* 9, no. 4 (2005): 229–89; W. H. Isely, "The Sharps Rifle Episode in Kansas History," *The American Historical Review* 12, no. 3 (1907): 553. U.S. Circuit Court, *The Trial of Samuel Colt: Complete Report of the Trial of Samuel Colt vs. The Mass. Arms Company, Tried June 30, 1851, in U.S. Circuit Court, Boston, Mass., before Hon. Levi Woodbury, Associate Justice, U.S. Supreme Court*

*Lindsay Schakenbach Regele / 62*

gun ownership in early America miss the ways in which this market changed as a result of Manifest Destiny. If, as Pamela Haag argues, civilian consumption of firearms was limited until arms makers employed strategic sales and marketing to create a market for guns in the second half of the nineteenth century, this was only possible because of frontier experience.[13] Settlers in newly acquired territory demanded firearms, and private arms makers pioneered nationwide advertising techniques that linked revolvers and rifles with frontier warfare. At the same time that the civilian market was expanding, the federal government was subsidizing weapon improvements that brought national arms production to international preeminence. It then transitioned away from the regular contractors, who it had spent decades patronizing, to private firearms companies because of more flexible supply policies that included short-term contracts with new suppliers. Government purchases further bolstered mass production.

During the mid-nineteenth century, American firearms production caught up to and surpassed its British and French counterparts because the United States had military ambitions akin to Europe's in the preceding century. The way military conflicts influenced manufacturing decisions, however, differed.[14] Russia's outmoded weaponry during the Crimean War (1853–1856), for example, prompted its military to develop a first-line battle rifle, but by the 1860s, it slowed manufacturing initiatives and turned to the United States for arms purchases.[15] Impressed by the machinery and production of U.S. firearms manufacturers, Russian armorers adopted many of their techniques in the following decades. On the other hand, many British arms makers rejected aspects of the American System because mass

---

(Harriman, Tenn., 1953), 8. None of this is to say that Americans did not buy guns. From the earliest days of colonization, European-Americans and Native Americans purchased and traded for guns to hunt and fight with. Rather, there was not enough "natural" demand to entice the expansion of production. Carl P. Russell, *Guns on the Early Frontiers: A History of Firearms from Colonial Times through the Years of the Western Fur Trade* (Berkeley, 1957); Merwyn Carey, *American Firearms Makers* (New York, 1953). For the "gun frontier," see Silverman, *Thundersticks,* 18.

[13] Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York, 2016), 58–59.

[14] Priya Satia, *Empire of Guns: The British State, the Industrial Revolution, and the Conscience of a Quaker Gun-Manufacturer* (New York, 2018); Ken Alder, *Engineering the Revolution: Arms and Enlightenment in France, 1763–1815* (Chicago, 2010). The United States remained more self-sufficient in firearms supply than most European nations in the second half of the nineteenth century. Andrew Moravcsik, "Arms and Autarky in Modern European History," *Daedalus* 120, no. 4 (1991): 31.

[15] Peter B. Brown, "The Problematics of Armory Modernization in Late Imperial Russia," *Russian History* 21, no. 1 (1994): 65–81, 65.1; Joseph Bradley, *Guns for the Tsar: American Technology and the Small Arms Industry in Nineteenth-Century Russia* (Dekalb, Ill., 1990).

Compendium_Cornell
Page 1648

production technologies did not fit the market they served.[16] To understand how and why industry changes, and in the American case the rise of the civilian arms market and the American system of manufactures, we have to look beyond the factory to the particularities of geopolitical ambitions and the battlefield.

### Arms Production in the 1830s

For the first half of the nineteenth century, the majority of small arms manufacturing occurred at two federal armories in Harpers Ferry, Virginia, and Springfield, Massachusetts, and at the private factories of federal contractors, mostly in New England. Although there were more than three hundred small shops that manufactured guns nationwide, most of these employed only a few workers. In 1840, the federal armories produced more than one-third of the nation's firearms and employed over five hundred workers.[17] The federal armories each received about $200,000 every year, plus additional monies as needed. An 1808 law stipulated that private manufactories, rather than the federal armories, supply state militia. This law, which provided $2,000 annually for contracts, was a compromise between congressmen who wished to expand the national armories and those who wished to allow states to outfit their own militia.

Despite ambivalence over the federal control of arms supplies, the federal government dictated the terms of arms production because the private sector lacked capital and markets. In the decades following the nation's founding, gunsmithing was still a small-scale, specialized trade. Gunsmiths spent about a month of labor on each weapon and often forged the barrel, assembled the gunstock, and completed grinding and filing tasks themselves.[18] Labor was expensive, and consumer demand did not warrant capital investment in the enlargement of gun factories.[19] Most families only purchased one gun for their households, if that. General stores and wholesalers' inventories illustrate this: they were filled with foodstuffs, candles, and clothing items, not muskets and rifles.[20] The private merchant ships and occasional privateering

[16] Russell I. Fries, "British Response to American System," *Technology and Culture* 16, no. 3 (1973): 403.
[17] Rosenbloom, "Anglo-American Technological Differences in Small Arms Manufacturing," 688.
[18] *The Boston Directory* (Boston, 1800).
[19] Maine-born arms manufacturer John Hancock Hall, for example, went into debt financing his business in the 1810s and subsequently turned to government contracting. R. T. Huntington, *Hall's Breechloaders* (York, Pa., 1972), 9.
[20] See for example, Danvers, Mass., General Store Daybook, 1789–1791, Account Books (unidentified) Collection, 1703–1852, folio vol. 6; and Worcester or Boston, Mass., Wholesale

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

Compendium_Cornell
Page 1649

*Lindsay Schakenbach Regele / 64*

expeditions that needed weapons on board did not provide reliable demand, either. Even manufacturers who had gotten some of the first federal contracts in the 1790s turned to other pursuits once their contracts ended. As Purveyor of Public Supplies Tench Coxe had recognized in 1807, only advance-sum contracts could "excite and promote the small arms manufacturing and bring the business to settled form."[21] From the 1810s onward, manufacturers like Nathan Starr understood that the operation of a "large and expensive factory" depended on "steady encouragement from the government."[22]

Federal support of small arms manufacturing has been well documented; so, too, has the relationship between the arms industry and interchangeable production, which meant that all armories machine produced identical gun parts.[23] In the 1810s, the federal government, for example, paid for the expansion of Simeon North's Middletown, Connecticut, factory; North subsequently developed a milling machine that, according to Merritt Roe Smith represented "the first glimmerings of interchangeable production."[24] The device achieved a high degree of precision by mechanically feeding a table holding the work piece (or part to be cut, shaped, and smoothed) into a rotary multiple-toothed cutter. Historians of technology have demonstrated that a factory needed to produce at least one thousand guns to make interchangeable parts production worthwhile.[25] In the early nineteenth century, only

---

and Imports Account Book, Account Books (unidentified) Collection, 1703–1852, folio vol. 11 both in American Antiquarian Society, Worcester, Mass. (hereafter, AAS).

[21] [Tench Coxe?], Rough Draft of Letter to Secretary of War, 5 Nov. 1807, Coxe Irvine Papers - Philadelphia Supply Agencies: Correspondence, Reports, Returns, Bill Accounts, Receipts, Vouchers and Contracts 1794–1842, Records of the Office of the Quartermaster General, Record Group 92, Entry 2118, box 136, National Archives and Records Administration, Washington, D.C. (hereafter NARA).

[22] Nathan Starr to John Rodgers, President of the Board of Navy Commissioners, 23 Mar. 1816, vol. 3, Records Collection of the Office of Naval Records and Library, Record Group 25, Entry 328, NARA.

[23] Older studies of small arms manufacturing offer exhaustive details about private and public gun production in early America. In addition to Smith, *Harper's Ferry Armory*, see Felicia Johnson Deyrup, *Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798–1870* (Northampton, Mass., 1948); James B. Whisker, *The United States Armory at Springfield, 1795–1865* (Lewiston, N.Y., 1997); James B. Whisker and Kevin Spiker, *The Arms Makers of Massachusetts, 1610–1900* (Palo Alto, Calif., 2012).

[24] Simeon North, Dec. 1826, Firearms Makers Collection, box 1, folder 1, Middlesex County Historical Society, Middletown, Conn.; Simon Newton Dexter North and Ralph H. North, *Simeon North, First Official Pistol Maker of the United States: A Memoir* (Concord, N.H., 1913), 78–79, 86; Merritt Roe Smith, "John H. Hall, Simeon North, and the Milling Machine: The Nature of Innovation among Antebellum Arms Makers," *Technology and Culture* 14, no. 4 (1973): 574–76.

[25] Rosenbloom, "Anglo-American Technological Differences in Small Arms Manufacturing," 691. Also, U.S. troops used rifles and muskets, which were less precise and so could more easily be made by interchangeable manufacture. Robert A. Howard, "Interchangeable

Compendium_Cornell
Page 1650

*Industrial Manifest Destiny / 65*

the federal government was willing and able to devote the resources to this. Private makers frequently modified the models they made, which made interchangeability impractical.[26] Their civilian consumers had little desire for interchangeable guns because they were unlikely to have multiple identical guns from which to scavenge parts. Soldiers, on the other hand, needed to be able to change and repair defective parts quickly in the field.

Despite all the advances in supply levels and manufacturing processes by the 1830s, there still existed a fair degree of insecurity surrounding the quality of American arms at the War Department, especially in comparison to Europe. Americans had long admired French arms making; following the Revolutionary War, the War Department ordered two volumes of a French guide to manufacturing weapons, complete with tables on standardized measurements. The French Charleville musket served as the U.S. standard up through the 1790s.[27] Even after the United States developed its own weapons standards and achieved self-sufficiency in arms production, it continued to look overseas. In the late 1830s, U.S. minister Richard Rush cautioned the War Department that, "we live in an age when the world is moving forward . . . the French have made improvements in guns."[28] This was made worse by the fact that the French opposed U.S. expansionist policies and threatened to interfere with its presence in the southwest.[29] Americans were less envious of the technicalities of British arms making, but more concerned about the threat Britain posed to their consolidation of the North American continent. The U.S. government still had to import from Britain some of the firearms used as gifts for Indians, and those it contracted for domestically had to match the British northwest rifle, which treaty recipients preferred over American models.[30] This was especially irksome as the United States and Britain competed for control of the Pacific Northwest.

---

Parts Reexamined: The Private Sector of the American Arms Industry on the Eve of the Civil War," *Technology and Culture* 19, no. 4 (1978): 649.

[26] Howard, "Interchangeable Parts Reexamined," 645.

[27] Drawings and Tables of Foreign Ordnance, vols 1 and 2, 1787, Records of the Office of the Chief of Ordnance, Record Group 156, Entry 69, NARA; Neil L. York, "Pennsylvania Rifle: Revolutionary Weapon in a Conventional War?" *The Pennsylvania Magazine of History and Biography* 103, no. 3 (1979): 308, 314; Samuel Hodgson to John Harris, 3 Sept. 1798, Post Revolutionary War Papers, Record Group 45, NARA.

[28] Richard Rush to Joel Roberts Poinsett, 18 Feb. 1838, box 10, folder 5, Joel Roberts Poinsett Papers (Collection 0512), The Historical Society of Pennsylvania, Philadelphia, Pa. (hereafter, JRPP).

[29] R. A. McLemore, "The Influence of French Diplomatic Policy on the Annexation of Texas," *The Southwestern Historical Quarterly* 43, no. 3 (1940): 342–47.

[30] "Report from the Secretary of War," *American State Papers* (hereafter *ASP*), 28 Feb. 1839, 25th Congress, 3rd Session, no. 273, at 2, 554.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

Compendium_Cornell
Page 1651

*Lindsay Schakenbach Regele / 66*

When conducting tests on a new breechloader in 1837, a board of U.S. army officers noted its susceptibility to explosion by writing that, "these objections may be overcome by those in Europe who are devoting great attention and consideration to this [style of gun]; if so, we should place ourselves on a footing with those nations who may adopt it, and to whom hereafter we may be opposed."[31] A year later, Secretary of War Joel Roberts Poinsett received a letter warning him that, "we do not value mechanical and manufacturing industry enough."[32] These warnings were not unfounded. There was a new sense of urgency from Americans on the ground in frontier areas who begged the War Department to push for more troops and arms because of "the increase of our population and fortifications, the extension of our boundaries, and the constant irritating disturbance on the frontiers."[33]

### Firearms in Florida

The site of many of these "irritating disturbances"—violent skirmishes with Native American societies—was Florida.[34] The United States had acquired the peninsula in the 1819 Transcontinental Treaty with Spain, which extended the United States' southern boundary to the Pacific coast. Florida's extensive coastline offered coveted commercial access to Caribbean and Atlantic markets; it was also a particularly violent battleground. Before the treaty with Spain, U.S. troops fought Seminoles in Spanish territory, which Secretary of War John C. Calhoun and President James Monroe advocated for the "safety of our fellow-citizens."[35] Throughout the 1820s and 1830s, white settlers in Florida petitioned the federal government for protection from the native peoples living there.[36] Beginning in 1835, the second round of Florida Seminole Wars absorbed a tremendous amount of resources (between $30 million and $40 million—50 percent of annual

---

[31] "Report of the President of a Board of Officers on Improvements in Fire-Arms by Hall, Colt, Cochran, Leavitt, and Baron Hackett, as Compared with the United States Musket," *ASP*, 3 Oct. 1837, 25th Congress, 1st Session, Military Affairs, vol. 7, no. 743, at 528.

[32] James Renelden to Poinsett, 2 Mar. 1838, box 10, folder 7, JRPP.

[33] James Gadsden to Poinsett, 15 Dec. 1837, box 9, folder 14, JRPP.

[34] For a recent analysis of the importance of Florida for Manifest Destiny, see Laurel Clark Shire, *The Threshold of Manifest Destiny: Gender and National Expansion in Florida* (Philadelphia, 2016).

[35] William Weeks, *John Quincy Adams and American Global Empire* (Lexington, Mass., 1992), 107–10; "War with the Seminole Indians," *ASP*, 25 Mar. 1818, 15th Congress, 1st Session, Military Affairs, vol. 1, no. 163, at 680.

[36] "Seminole Hostilities," *ASP*, 3 June 1836, 24th Congress, 1st Session, no. 271, at 19.

Compendium_Cornell
Page 1652

expenditures—and forty thousand troops) with little at first to show for it.[37] Florida became a testing ground for American arms.

An inequitable treaty signed in 1832 required Seminoles to move west of the Mississippi over the ensuing three years.[38] Not surprisingly, they did not want to leave their land, a fact made brutally apparent by the murder of the officer appointed to superintend their removal, several days after Christmas in 1835. One night after dinner, General Wiley Thompson and another officer walked outside their garrison's perimeters, where a party of Indians ambushed them. Thompson was shot fourteen times and stabbed in the chest. The other officer died on the spot.[39]

Following Thompson's death, the War Department requested federal appropriations to carry out a military campaign in Florida. Secretary of War Lewis Cass told the Committee of Ways and Means that, "the means of making anything like a detailed estimate of the expenses, are not within the reach of the Department," but settled on $80,000.[40] (All told, the United States would spend $1,588,848.) The Ordnance Department scrambled to redirect supplies from the nation's arsenals to Florida.[41] Each year, the War Department distributed arms, usually muskets, to state militia in proportion to the number of men in service. The amount stayed constant at $200,000 up through the Civil War (as did the amount appropriated for the two federal armories) and was distributed according to the number of militia in service. Florida had about thirteen hundred of its own militia, plus about twenty-two hundred volunteers and militia from Washington, D.C., Pennsylvania, Louisiana, New York, Alabama, Tennessee, Georgia, Missouri, South Carolina, and "friendly Indians," and between two thousand

[37] "Estimates and Appropriations for Suppressing Hostilities of the Seminole Indians in Florida," *ASP*, 15 Sept. 1837, 25th Congress, 1st Session, no. 739, at 466; "Expenditures in Suppressing Indian Hostilities in Florida," *ASP*, 15 Dec. 1840, 26th Congress, 2nd Session, no. 8, at 10. Annual federal expenditures, exclusive of public debt, were $17.5 million in 1835, $30.9 million in 1836, and $39.2 million in 1837. "Statement Showing the Amount of Annual Estimates Submitted by the Secretary of Treasury, and Annual Expenditures," *ASP*, 29 June 1838, 25th Congress, 2nd Session, no. 497, at 16–20.

[38] Andrew Welch, *A Narrative of the Early Days and Remembrances of Oceola Nikkanochee, Prince of Econchatti* (London, 1841), 212–15. For the coercion and negotiation involved in the removal of Creek Indians from the Southeast before the infamous Trail of Tears, see Christopher D. Haveman, *Rivers of Sand: Creek Indians Emigrations, Relocation, and Ethnic Cleansing in the American South* (Lincoln, 2016).

[39] "Seminole Hostilities," *ASP*, 3 June 1836, 24th Congress, 1st Session, no. 271, at 246–47.

[40] "Hostile Indians in Florida," *ASP*, 5 Jan. 1836, 24th Congress, 1st Session, no. 38; "Estimates and Appropriations for Suppressing Hostilities of the Seminole Indians in Florida," *ASP*, 5 Sept. 1837, 25th Congress, 1st Session, no. 739, at 466.

[41] William Maynadier, Circular, 1 Oct. 1838, Records of the Chief of the Ordnance Department, Record Group 156, Entry 3, NARA.

*Lindsay Schakenbach Regele / 68*

and four thousand regular troops.[42] Regular troops received supplies from the federal armories.[43]

In 1837, former President Andrew Jackson, who sought the removal of Seminoles from their homeland, wrote to the War Department that, "A well-chosen brigade with such officers as I could select, numbering 1,000 bayonets and rifles, in addition to the regulars now in Florida would destroy the Seminole Indians in 30 days from the time of their reaching Tampa Bay."[44] Jackson was wrong, for the Seminole engaged in effective guerilla warfare. Former Adjutant General and Florida politician James Gadsden complained about their use of hiding places. The war, in his consideration, was "shamefully prolonged."[45]

### The Arms Industry Changes

In part, as a response to the events in Florida, the War Department placed increased importance on the improvement and experimentation of arms during the late 1830s. It capitalized on decades of direct invest-ment in private armories and on the network of artificers, ordnance chiefs, armory superintendents, and individual contractors. Labor trans-fer between and among the private and public sectors paid off as workers and officers shared technical knowledge and exchanged machine tools.[46] The War Department used federal resources to consolidate control over production by dispatching armory employees to contractors' factories to observe machinists at work.[47] The Springfield Armory began to absorb much of the mechanical talent in the region, and by the 1840s, the quality of its employees was unparalleled.[48]

Talent was not enough. The Ordnance Department had to learn to supply weapons for the type of fighting occurring in Florida.[49] Based on conversations with officers on the ground there, Ordnance officers decided to, for example, use buck and ball cartridges because they dis-persed more widely than traditional ones and were best for camouflaged

[42] "Documents Accompanying the Report of the Secretary of War," *ASP*, 5 Dec. 1840, 26th Congress, 2nd Session, at 50; "Expenditures in Suppressing Indian Hostilities in Florida," *ASP*, at 6.

[43] "Bond of the Officers of the Tallahassee Volunteers," 10 Feb. 1840, vol. 2, Contracts for Ordnance and Ordnance Supplies, Records of the Chief of the Ordnance Department, Record Group 156, Entry 78, NARA.

[44] Andrew Jackson to Poinsett, 27 Aug.1837, box 9, folder 3, JRPP.

[45] Ibid.

[46] Meyer, *Networked Machinists,* 231.

[47] Smith, "John H. Hall, Simeon North, and the Milling Machine," 588.

[48] Uselding, "Henry Burden and the Question of Anglo-American Technological Transfer," 327; Smith, "John H. Hall, Simeon North, and the Milling Machine," 589.

[49] For a description of the nature of warfare in Florida, see John T. Sprague, *The Origin, Progress, and Conclusions of the Florida War* (New York, 1848).

Compendium_Cornell
Page 1654

*Industrial Manifest Destiny / 69*

fighting among swampy forests.[50] In 1837, a board of officers conducted a series of experiments on guns produced at private and public armories, which involved target firing to determine celerity and penetration. The trials also involved physical examination for such qualities as "simplicity," "utility," and "durability." The board's qualitative comments on the trials reveal a preoccupation with combat in Florida. The board noted that one particular rifle was superior because it could transition between infantry and cavalry seamlessly and hence would be useful in a place where many operations relied on dragoons (soldiers who fought as cavalry when mounted, as infantry when dismounted).[51]

At the same time as the fears and realities of warfare in Florida informed officers' experiments and conclusions, the federal government subsidized ordnance officials' inspections of cannon foundries, small arms manufactures, and arsenals in Europe. The officials toured England, Scotland, Sweden, Russia, Prussia, Belgium, and France to determine what they needed to do to improve production in the United States. The U.S. officers returned satisfied that once all flintlocks were replaced with percussion locks, U.S. muskets would be superior to any made elsewhere.[52] It was increasingly becoming the case, in fact, that the United States, not Europe, was the hub of arms making. Europeans had begun taking notice of American guns and sending their own officials to visit U.S. armories.

These visitors were interested primarily in the national armories and the factories of government contractors, where the majority of improvements in gun production had occurred since the 1790s. Commercial production in the private sector, however, began to take off in the 1830s, albeit it in fits and starts. New weapon inventions were starting to appeal to investors, a marked change from earlier attitudes toward arms manufacturing and the time when, according to one patent attorney, "it was not so common to be looking for new things."[53] Lowell, Massachusetts, textile capitalists, for example, were interested in investing in the production of John W. Cochran's "celebrated rifle."[54] Cochran was an inventor from Lowell who manufactured rifles at a private factory in Springfield.

[50] Jackson to Poinsett, 14 Oct. 1837, box 9, folder 8, JRPP; Brown, "Notes on U.S. Arsenals," 450.
[51] "Report of the President of a Board of Officers on Improvements in Fire-Arms," *ASP*, at 526.
[52] "Documents Accompanying the Report of the Secretary of War," *ASP*, 5 Dec. 1840, 26th Congress, 2nd Session, no. 1, at 58.
[53] U.S. Circuit Court, *The Trial of Samuel Colt*, 39.
[54] Jonathan Amory to Francis C. Lowell, 10 July 1836, box 6, folder 5.6, Francis Cabot Lowell II Papers, Massachusetts Historical Society, Boston, Mass.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

Compendium_Cornell
Page 1655

*Lindsay Schakenbach Regele / 70*

Another New England inventor helped establish the patent arms industry when he applied revolving techniques to rifles and pistols in the 1830s. Samuel Colt was the son of a Massachusetts textile manufacturer, who funded his first business ventures. Colt claimed to have conceived of the revolver while apprenticed on a voyage to India, but in all likelihood, he saw or learned about revolving guns from the Englishmen with whom he traveled. When Colt returned to the United States, he hired a mechanic in Hartford, Connecticut, to make his first "rotating gun."[55] Because the early U.S. patent system was notoriously unprofitable, Colt traveled to England for his first patent. When he returned to the United States in 1836, the patent system was undergoing reforms that made patents more lucrative ventures.[56] Although Colt's first U.S. patent coincided with these reforms, he struggled to profit in the absence of a robust market for revolvers. Colt's manufacturing costs were high, which made his arms too expensive for the average consumer, who did not necessarily want a gun that could fire multiple times without reloading.[57] Additionally, the government was reluctant to purchase new inventions.

The military, however, was beginning to experiment with weapons developed in the private sector. Amidst a general climate of government reform and cost-effectiveness in the 1830s, the Senate required the War Department to conduct an examination of the improvements in firearms made by noncontractors.[58] Colt's and Cochran's firearms, along with those of John H. Hall, Daniel Leavitt, and Baron Hackett, were included in the government tests of 1837. These tests signaled the very beginning of changes in the relationship between private and public manufacture, even though the board ultimately selected arms made by a government contractor. The winning firearms were the breechloaders (which allow for quick reloading) developed by John Hall in conjunction with the federal armories.[59] The officers praised them specifically for their

[55] Jack Rohan, *Yankee Arms Maker: The Incredible Career of Samuel Colt* (New York, 1935), 23; U.S. Circuit Court, *The Trial of Samuel Colt*, 39.

[56] For the nineteenth-century patent system, see Zorina B. Khan, *The Democratization of Invention: Patents and Copyrights in American Economic Development, 1790–1920* (New York, 2005); Zorina B. Khan, "Premium Inventions: Patents and Prizes as Incentive Mechanisms in Britain and the United States, 1750–1930," in Dora L. Costa and Naomi R. Lamoreaux, eds., *Understanding Long-Run Economic Growth: Geography, Institutions, and the Knowledge Economy* (Chicago, 2008); Naomi R. Lamoreaux, Kenneth L. Sokoloff, and Dhanoos Sutthiphisal, "Patent Alchemy: The Market for Technology in U.S. History," *Business History Review* 87, no. 1 (2013): 3–38.

[57] Haag, *The Gunning of America*, 25–26; Henry Barnard, *Armsmear: The Home, the Arm, and the Armory of Samuel Colt: A Memorial* (New York, 1860), 197.

[58] Steven Lubar, "The Transformation of Antebellum Patent Law," *Technology and Culture* 32, no. 4 (1991): 932–59.

[59] The board reported: "However ingenious therefore may be the invention however credible the skill of the manufacturer, the board is of the opinion that the arm of Cochran is

Compendium_Cornell
Page 1656

*Industrial Manifest Destiny / 71*

simplicity, "in order that those who use them may readily comprehend their principles and utility."[60] Hall's guns were single-shot and did not have the "various appendages" that Colt's and Cochran's did. Again, the final decisions reflected a preoccupation with frontier warfare and the particularities of combat in Florida. The board recognized the advantage of Colt's continuous fire, but determined that Hall's and Hackett's arms could be loaded more easily on horseback than Colt's and Cochran's, whose parts had to be disconnected to charge them. Officers worried that the multichambered firearms were too complicated for the average soldier. Although Hall's flintlock breech-loading rifles were praised, they would not see much use in Florida, partly because of ignition difficulties in damp conditions. His percussion-ignition carbines (shorter-barreled rifles), however, were given to dragoons in Florida.[61]

The War Department valued military applicability over novelty and in general erred on the side of safety and reliability. Officials were wary of inventors like Colt, who were motivated by profit rather than battlefield realities. It is not that War Department officials did not value innovation. Ordnance Chief George Bomford, for example, often ordered experiments for such inventions as improved iron for gun barrels.[62] For them, however, innovation mattered if it improved battle outcomes, while for Colt and other private arms makers, innovation meant potentially profitable patents. The Ordnance Department, for example, prized interchangeability because it made weapon repairs easier. Private arms makers, on the other hand, did not fully subscribe to interchangeable production methods because they were not yet cost-effective. David Meyer has shown how for all the attention paid to Colt's production of revolvers, their parts did not interchange. Instead, he and others made the parts as uniform as possible, but focused most attention on the final fitting process.[63]

Colt, however, knew the government was a potentially lucrative customer and made adjustments accordingly. He spoke with a field officer in Florida who wanted a weapon that would overcome the Seminole strategy of making a feigned attack, followed by an intense onslaught, during which many soldiers died while reloading their

an unsafe weapon . . . the arm of Colt may be usefully applied in special cases . . . naval service . . . but not adapted to the general purposes of the service." "Report of the President of a Board of Officers on Improvements in Fire-Arms," *ASP*, at 528.

[60] "Report of the President of a Board of Officers on Improvements in Fire-Arms," *ASP*, at 526.

[61] Brown, "Notes on U.S. Arsenals," 454.

[62] See for example, George Bomford to Superintendent, Springfield Armory, 5 Oct. 5, 1833, Letterbook, vol.1, Letters Received from Officials and Officers of War and Treasury Departments, Records of the Springfield Armory, Mass., RG 156, NAW.

[63] Meyer, *Networked Machinists,* 278.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

*Lindsay Schakenbach Regele / 72*

single-shot muskets.[64] Although Colt's first revolvers were impractical for field use, they had the potential to permit U.S. troops to fend off a Seminole offensive. They fired more than ten rounds in a minute, and their ramrods, which many men dropped in the loading process, were attached to the body of the weapon.[65] Colt sold five hundred rifles to Quartermaster General Thomas Sidney Jesup in Florida in 1838, but continued to experiment with ways to improve the revolver.[66] Colt implemented a loading lever so that the hammer rested on a safety pin situated between two caps, rather than on the cap itself, to prevent the weapon from firing unintentionally.[67]

The government tested Colt's repeating firearms again. On November 18, 1840, a board of officers of the first dragoons met in Pennsylvania to compare Colt's new repeating carbines with Hall's standard carbines. Military officers' concerns with battle line applicability made them hesitant to adapt new inventions, and they were reluctant to relinquish control of the production process.[68] The board conducted ten experiments, an example of which involved the carbines "slung to a man mounted, who galloped rapidly for a mile, the piece swinging against the side of the horse." Colt's carbines held up well to rough use by the experimenters and were faster than Hall's—firing eighteen rounds in two minutes forty-five seconds to Hall's eight minutes; they were less accurate, however. Hall's carbines hit the target eighty seven times, Colt's sixty nine.[69] Ultimately, the board reported that, "foregoing experiments were very successfully made, and have impressed us with the belief of the utility of these repeating fire-arms for military purposes." Even so, they recommended a six-month trial period in the field.[70]

As the government slowly embraced private arms makers, it changed its relationship with its regular contractors. By the 1830s, the federal armories produced about 80 percent of the nation's serviceable arms, which meant that the government no longer needed to sustain long-term relationships with manufacturers. Contracting in general did not

---

[64] Rohan, *Yankee Arms Maker,* 93–94; Jacob Neff, *The Army and Navy of America: From the Period of the French and Indian Wars to the Close of the Florida War* (Philadelphia, 1845), 610.

[65] Barnard, *Armsmear,* 166–68, 198.

[66] Haag, *The Gunning of America*, 28.

[67] Barnard, *Armsmear,* 166–68.

[68] Secretary of War Joel Poinsett, for example, said he didn't want to waste any more government resources on trying to increase the rapidity of firing "without long-tried experiments in the field." "Report of the Secretary of War," *ASP*, 5 Dec. 1840, 26th Congress, 2nd Session, at 21.

[69] "Report from the Secretary of War, transmitting the report of a board of dragoon officers appointed to witness an exhibition of the repeating fire-arms and water-proof ammunition invented by Samuel Colt," *ASP*, 16 Dec. 1840, 26th Congress, 2nd Session, no. 14, at 2.

[70] Ibid., at 3.

Compendium_Cornell
Page 1658

end, but it issued the last round of advance-sum contracts in 1834.[71] Instead of investing in the factories of private arms makers, the government began altering contract terms to reap maximum military benefit at minimum public cost. In its 1839 contract with Simeon North for ten thousand carbines, for example, the Ordnance Department expected "perfect uniformity," and to be able to "exchange parts without impairing efficiency," but reserved "the right to annul any part of the contract."[72] This was a stark change from the 1810s and 1820s, when Ordnance officials had negotiated extra funding for North's manufacturing pursuits. The Ordnance Department now reserved the right to nullify entire contracts if more than three-quarters were not filled, or if, in some cases, like Lemuel Pomeroy's 1840 contract for six thousand muskets, 100 percent of the annual amount was not met.[73] This new approach to contracts caused anxiety among regular contractors, who, unlike Colt, had dedicated their entire careers to government manufacture. Asa Waters, who had spent over a quarter century making contract muskets in Millbury, Massachusetts, begged Ordnance Chief Bomford for additional work in 1841, promising to produce pistols at 10 percent cheaper than could be done at the national armories. He even offered to forego payment for over a year if that would be more amenable to the ordnance budget.[74] Waters spent the next few years looking elsewhere for business, but never stopped applying for government work, even though, as he said to another contractor, "they keep applying the screws closer and closer to grinding harder upon the contractors."[75]

Another way the War Department consolidated its control over military production during the Seminole Wars, even as it started to purchase from the private sector, was to replace the civilian superintendents of the federal armories with ordnance officers. For New Englanders, far removed from war in Florida, this was an odious change. Springfield employees and town denizens petitioned Congress to avoid changes in the law. Changes, they argued, "may be proper in the organization of the army and navy, but are degrading, oppressive, and tyrannical when

[71] "Documents from War Department," *ASP*, 1 Nov. 1836, 24th Congress, 2nd Session, no. 2, at 328; M. W. Edwards to Asa Waters, 15 Dec. 1834, box W 3, Waters Family Papers, 1749–1873, AAS.

[72] Contract with Simeon North, 2 May 1839, vol. 2, Records of the Chief of the Ordnance Department, Record Group 156, Entry 78, NARA.

[73] Contract with Lemuel Pomeroy, 24 Feb. 1840, vol. 2, Contracts for Ordnance and Ordnance Supplies, Records of the Chief of the Ordnance Department, Record Group 156, Entry 78, NARA.

[74] Waters to George Talcott, 14 Nov. 1840, and Waters to Bomford, 28 Aug. 1841, folio vol. 1, Waters Family Papers, AAS.

[75] Waters to Eli Whitney Jr., 8 Dec. 1845, Octavo vol. 7, Letterbook 1837–65, Waters Family Papers, AAS.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

Compendium_Cornell
Page 1659

applied to intelligent and high-minded citizen mechanics."[76] Civilian arguments were no match for War Department goals to appoint men with military experience to oversee weapon production.[77] Civilian James Robb was replaced by James Ripley, a major of ordnance who had fought in the First Seminole War. Some historians have described Ripley as averse to innovation due to his suspicion of weapons makers like Colt and his slowness to adopt new technologies, but earlier in his career, Ripley was responsible for improvements to artillery. Ripley's stance likely reflected his military experience and the fact that innovation was not necessarily compatible with security.[78] Either way, his appointment so infuriated workers in Springfield that they brought a lawsuit against him, accusing him of unfair layoffs, resource mismanagement, and the deterioration of the quality of arms.[79] Just as their petitions against changes in superintendence failed, so too did this lawsuit. The War Department, which sought to defeat the Seminoles in Florida, perceived military administration as a good thing.[80] The government kept Ripley on, and regardless of his management style, the Ordnance Department was able to meet requests for additional supplies and arm most of the troops with new guns. During Ripley's tenure, the M1816 (flintlock firearm, infantry musket) was replaced with the first conventional musket of interchangeable parts: the Springfield Model 1842.[81]

The same year as adoption of the new Springfield model, Congress passed a law for the armed occupation of Florida by settlers who would receive federal subsidies for their own defense. Instead of negotiating a peace, the commander of U.S. troops offered the remaining Seminoles money and a rifle to move to a reservation in southwest Florida.[82]

### Proving Ground in Mexico

While U.S. troops battled Seminoles in Florida, Mexico and Texas loomed large on the national agenda. Once Texas became an independent republic in 1836, Americans debated admitting it to the union, along with other Mexican territory to which they had dubious claims.

[76] Charles Stearns, *The National Armories: A Review of the Systems of Superintendency, Civil and Military, Particularly with Reference to Economy and General Management at the Springfield Armory* (Springfield, Mass., 1853), 13, 74.

[77] Brown, "Notes on U.S. Arsenals," 453.

[78] Haag, *The Gunning of America*, 28.

[79] "Report of the Secretary of War," *ASP*, 13 May 1846, 29th Congress, 1st Session, no. 344, at 2.

[80] "Documents from War Department," *ASP*, 14 Nov. 1842, 27th Congress, 3rd Session, no. 2, at 208.

[81] Brown, "Notes on U.S. Arsenals," 449–51; "Expenditures in Suppressing Indian Hostilities in Florida," *ASP*, at 9.

[82] U.S. Circuit Court, *The Trial of Samuel Colt*, 8.

Compendium_Cornell
Page 1660

Insecurities about Britain, which urged Texas to maintain its sovereignty rather than join the United States, drove much of the discussion.[83] France also opposed annexation. Although the United States had supported France in a minor war against the British-backed Mexican government in the 1830s, the French government wanted unfettered access to Texan markets and feared the geopolitical consequences of an expansive United States.[84]

Despite foreign opposition, the U.S. Congress made Texas a state in December, 1845, and declared war on Mexico less than six months later.[85] It was not a popular war, but it was one that the nation was prepared to wage. Indeed, a Mexican officer had visited the United States in the early 1840s to observe its first-rate artillery, even as Mexico had access to British arms.[86] Americans no longer worried about their weapon supply or anxiously compared their guns to foreign ones. As one Philadelphia area newspaper noted, the government had plenty of "muskets ready for shipment at a moment's notice."[87] Two months after fighting commenced, the War Department reported that the number of arms produced at Springfield greatly exceeded that of the previous year.[88] By June the following year, the United States had over $8.4 million worth of small arms in its inventory.[89] Many of these arms represented the latest in firearm technology, including the first conventional musket made entirely of interchangeable parts.[90]

Because of achievements in federal arms production and the rise of patent arms manufacturing, the Ordnance Department lessened its reliance on its regular private contractors. By 1846, only a handful of the Springfield Model 1842, for example, were manufactured outside of the federal armories. Ordnance adopted Simeon North's and John Hall's development of percussion lock technology and milling machines that made possible the manufacture of interchangeable parts, and then turned away from them. It spent the almost $1 million it received during the war to improve infrastructure at the federal armories and arsenals and to update its machine tool inventory, which included

[83] Paul E. Sturdevant, "Robert John Walker and Texas Annexation: A Lost Champion," *The Southwestern Historical Quarterly* 109, no. 2 (2005): 196.

[84] McLemore, "The Influence of French Diplomatic Policy on the Annexation of Texas," 342–47.

[85] Greenberg, *Manifest Destiny,* 103–8.

[86] Gouverneur Kemble to Poinsett, 21 Oct. 1847, box 16, folder 18, JRPP.

[87] *The North American* (Philadelphia), 23 May 1846, 1.

[88] "List of Papers Accompanying the Report of the Secretary of War," *ASP*, 5 Dec. 1846, no. 1, at 165.

[89] "List of Papers Accompanying the Report of the Secretary of War," *ASP*, 30 Nov. 1847, no. 8, at 686.

[90] Brown, "Notes on U.S. Arsenals, 449–51; "Expenditures in Suppressing Indian Hostilities in Florida," *ASP*, at 9.

Compendium_Cornell
Page 1661

*Lindsay Schakenbach Regele / 76*

machines for introducing percussion cap technology to flintlock muskets and rifles.[91] At the same time, however, Ordnance alerted long-term contractors that they "must be prepared to reduce their quantity of work for the future."[92] If they wanted to continue work, they could examine the new model musket at Springfield, but they "must expect increased vigilance in inspection of these arms, and also that, on account of the large stock of muskets on hand and the increasing demand of the states for other arms . . . orders for muskets will be diminished considerably."[93]

If the Ordnance Department did need more arms, it solicited them through advertisements, even as it recognized that the "system of advertising would result in the final ruin" of some of its regular contractors.[94] New government business helped private upstarts like Colt, whose Patent Arms Manufacturing Company had shut down in the early 1840s when it was unable to pay its debts after the markets for armed conflict in Florida and Texas dried up.[95] Colt no longer owned manufacturing equipment, or even a revolver on which to model new ones, but he anticipated profits from arming soldiers with repeating firearms. Samuel H. Walker, former captain of the Texas Rangers, advised him on dimensions and various mechanical issues, and Colt made improvements specifically for frontier service.[96] Walker negotiated Colt's first government contract during the Mexican-American War for one thousand revolvers in January 1847. Colt subcontracted the work to Eli Whitney Jr., whose armory had received decades of federal financial support. Colt then opened his own factory later that year, after entering into a second government contract in July.[97] From the government's standpoint, this arrangement worked particularly well. Colt bore the majority of manufacturing costs, while U.S. troops had success with his revolvers, which received glowing reports from the battlefront. D. E. Twiggs, Seminole War veteran and commander under both General Zachary Taylor

[91] "List of Papers Accompanying the Report of the Secretary of War," *ASP*, 5 Dec. 1846, at 162.

[92] Bomford to G. N. Briggs, 20 Feb. 1839, Records of the Chief of the Ordnance Department, Record Group 156, Entry 3, NARA.

[93] Bomford to Edwards and Goodrich, 9 Mar. 1839, Records of the Chief of the Ordnance Department, Record Group 156, Entry 3, NARA.

[94] Waters to Whitney Jr., 8 Dec. 1845, Octavo vol. 7, Letterbook 1837–65, Waters Family Papers, AAS.

[95] Houze, Cooper, and Kornhauser, *Samuel Colt: Arms, Art, and Invention*, 65.

[96] Henry Barton, "The United States Cavalry and the Texas Rangers," *The Southwestern Historical Quarterly* 63, no. 4 (1960): 510; Samuel Colt to Samuel Walker, 10 Dec. 1846, in Colt, *Samuel Colt's Own Record of Transactions with Captain Walker and Eli Whitney, Jr., in 1847* (Hartford, 1949), 16–17; Colt to S. R. Hamilton, 16 July 1846, in James L. Mitchell, *Colt: A Collection of Letters and Photographs about the Man, the Arms, the Company* (Harrisburg, 1959), 3.

[97] Carl P. Russell, *Guns on the Early Frontiers: A History of Firearms from Colonial Times through the Years of the Western Fur Trade* (Berkeley, 1957), 217–18.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

*Industrial Manifest Destiny / 77*

and General Winfield Scott, endorsed them to Congress, which made the Ordnance Department's decision-making look good.[98]

American officers credited the superiority of their arms for their ability to overcome enemy numbers. The Battle of Buena Vista in February 1847, was a U.S. victory that has largely been attributed to the superiority of American artillery over Mexican troop numbers, but it was not just howitzers that enabled the American success. Colonel Humphrey Marshall of the Kentucky cavalry reported that his regiment of four hundred, "armed with rifles, or with carbine, pistol and sabre," was victorious against almost fifteen hundred men. Another commander noted that, "notwithstanding the great superiority of their numbers, [our] riflemen kept up a deliberate and well-directed fire upon them," and General Zachary Taylor boasted that Americans "maintained their ground handsomely against a greatly superior force, holding themselves under cover and using their weapons with deadly effect."[99] Civilians on the home front, too, took pride in the nation's ability to supply troops readily with guns and ammunition. One newspaper reported several days after the declaration of war that "we learn that over 2,000 muskets and over 700 kegs of ball and buck shot cartridges . . . are destined for the Rio Grande."[100] The cartridges were the same kind used in Florida; their success in Mexico was a testament to the efficacy of weapon experiments in the 1840s.

Experimentation started to pay off for Colt, as well, as military officials became more amenable to his alterations. Toward the end of the war, an arms inspector had reported Colt to Ordnance Chief George Talcott for departing from the pistol pattern of his first delivery, but after only a mild scolding, Talcott allowed Colt to "serve as a guide" for the inspection process.[101] The Secretary of War approved Colt's modifications and Colt received payment shortly thereafter.[102] If, as Donald Hoke maintains, the private sector outpaced the public in innovation, especially in the 1850s, this was the result of battle experience.[103] An ordnance officer commented that the greatest improvements to Colt's arms were made in the years following the Mexican-American War, when their weight was significantly reduced.[104] One report stated that, "in the

[98] David E. Twiggs to Thomas Jefferson Rusk, 21 Apr. 1848, in Colt, *Samuel Colt's Own Record*, 84–85.

[99] "List of Papers Accompanying the Report of the Secretary of War," *ASP*, 30 Nov. 1847, no. 8, at 133–34, 166–67, 190.

[100] *The North American*, 19 May 1846, 1.

[101] Talcott to Colt, 14 Feb. 1848, Records of the Chief of the Ordnance Department, Record Group 156, Entry 3, NARA.

[102] Talcott to Colt, 8 Apr. and 14 June 1848, Records of the Chief of the Ordnance Department, Record Group 156, Entry 3, NARA.

[103] Hoke, *Ingenious Yankees*, 3–4.

[104] U.S. Circuit Court, *The Trial of Samuel Colt,* 20.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

Compendium_Cornell
Page 1663

progress of improvement, complexity has yielded to simplicity, and del-
icacy to strength." They had also become a lot safer than during the gov-
ernment experiments of the late 1830s. In a series of Ordnance tests in
1848 and 1849, the burst rate decreased from 5.6 to 1 percent. Although
Colt was $2,000 in debt after completing his second government order
during the war, these improvements would increase the marketability
of his revolvers in the years following.

### The New Market for Firearms

The war with Mexico changed the arms industry. Scholars have
located the origins of mass production and mass marketing in the
years preceding the Civil War, but while they have focused on the
machinery and the sales and marketing techniques that accompanied
and engendered these changes, they have neglected the influence of ante-
bellum military conflict.[105] In addition to the fact that Mexico turned to
U.S. arms makers to restock its arsenals after the military destroyed
thousands of weapons at the close of the war, the Treaty of Guadalupe
Hidalgo and the subsequent Gadsden Purchase added over 550,000
square miles to U.S. territory, which increased private and public
demand for arms. In addition to the boost in population and security
needs, the war also provided marketing testimony as Americans increas-
ingly associated firearms with victory in Mexico. The experience of the
Mexican-American War, combined with frontier defense in its after-
math, helped transform this market.

The War Department estimated that the United States needed at
least a million arms in its arsenals to be available at a moment's notice
because new territory required that U.S. troops be "almost constantly
in the field."[106] One colonel of ordnance said that, "although the
supply of arms on hand may appear large, I am of opinion that it
should be kept up and increased by manufacturing more annually than

[105] Paul Uselding, for example, focuses on the changes in machinery that enabled mass
commercialization. He argues that Elisha King Root, factory foreman and general superinten-
dent of Colt Armory in Hartford, Connecticut, was largely responsible for the "commercializa-
tion" of the revolver because of his role in developing die-forging, one of the most important
processes in modern mass-production industries. Paul Uselding, "Elisha K. Root, Forging,
and the 'American System,'" *Technology and Culture* 15, no. 4 (1974): 567; Haag, *The
Gunning of America*; Harold C. Livesay, "Marketing Patterns in the Antebellum American
Iron Industry," *Business History Review* 45, no. 3 (1971): 269–95.

[106] Some Americans sold arms to Mexico before the war, but these sales increased after.
See, for example, Asa H. Waters and Co. to Richard M. Jones, 13 Oct. 1842, Octavo vol. 7, Let-
terbook 1837–65, Waters Family Papers, AAS; Brian DeLay, "How Not to Arm a State: Amer-
ican Guns and the Crisis of Governance in Mexico, Nineteenth and Twenty-First Centuries,"
*Southern California Quarterly* 95, no. 1 (2013): 11.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

Compendium_Cornell
Page 1664

*Industrial Manifest Destiny / 79*

is requisite for ordinary consumption."[107] The federal government had to "protect the lines of emigration to New Mexico and Oregon . . . with mounted riflemen."[108] Settlers, too, wanted guns. Samuel Colt himself claimed that prior to the Mexican-American War, there did not exist a civilian market for revolvers.[109]

By 1860, however, the number of guns produced for the civilian market was several times larger than that produced for or by the military.[110] Part of the reason for this change had to do with marketing. Colt, in particular, became known for his nationwide marketing and successful branding.[111] This success depended on the association of his arms with frontier conquest. Testimony from American soldiers who used Colt's revolvers in Mexico, for example, became a major selling point. Before the war had even ended, a Hartford, Connecticut, newspaper published an article—reprinted in other papers—announcing that Colt would be opening a new armory in the city to make guns for the government and for private sale. The article cited the use of Colt's arms, which fired at the rate of six thousand charges per minute, by the Regiment of U.S. Rifles in Mexico. It also quoted General Zachary Taylor's endorsement of Colt's revolvers as weapons that "may be relied upon under *all* circumstances," and noted that Taylor's opinion had been formed by men who "have performed feats of almost romantic daring and gallantry with them, during the war with Mexico."[112] After the war, newspaper stories credited Colt's revolvers for U.S. victory.[113] One of Colt's first print advertisements from the early 1850s depicted a scene from the Mexican-American war, and an advertisement from 1858 harkened

[107] "List of Documents Accompanying the Report of the Secretary of War," *ASP*, 28 Oct. 1851, 26th Congress, 2nd Session, no. 2, at 448; "Report of the Secretary of the Treasury, Showing the Receipts and Expenditures, &c., for the Fiscal Year Ending June 30, 1850," *ASP*, 16 Dec. 1850, 31st Congress, 2nd Session, no. 11, at 65. The federal government's ability to protect settlers had long mattered for its relationship with frontier settlers. American military and commercial benefits encouraged residents of New Mexico to acquiesce to the United States during the Mexican-American War. Max L. Moorhead, *New Mexico's Royal Road: Trade and Travel on the Chihuahua Trail* (Norman, Okla., 1954), 193.

[108] "List of Documents Accompanying the Report of the Secretary of War," *ASP*, 21 Nov., and 23 June 1851, 26th Congress, 2nd Session, no. 2, at 61, 328–29.

[109] U.S. Circuit Court, *The Trial of Samuel Colt*, 8.

[110] Howard supports his argument about civilian markets by citing the 400,000 firearms produced by Colt and Sharps between 1851 and 1860, versus the 218,493 produced by the federal armories. This evidence obscures the fact that both manufacturers also sold their arms to federal troops on the frontier, but indeed, the civilian market for firearms grew in the decade following the Mexican-American War. Robert A. Howard, "Interchangeable Parts Reexamined: The Private Sector of the American Arms Industry on the Eve of the Civil War," *Technology and Culture* 19, no. 4 (1978): 634.

[111] Livesay, "Marketing Patterns in the Antebellum American Iron Industry," 286.

[112] *Salem Register*, 4 Oct. 1847, 2.

[113] *Connecticut Courant*, 20 Jan. 1849, 10.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

back to their being "the first rifle fired" in Florida in 1837.[114] Frontier scenes were powerful marketing tools in the United States, and to some extent overseas.[115]

Although Colt dedicated significant energies to overseas markets in the 1850s—opening a factory in London in 1852, and entering contracts with the British and Russian governments during the Crimean Wars—he increasingly focused on U.S. markets. He closed the London factory in 1857.[116] The U.S. government had rejected Colt's terms for a new contract immediately following the war, but soon recognized the superiority of his revolvers for "mounted and frontier troops."[117] Officers linked Colt's revolvers with Manifest Destiny ideology in their endorsements: Colonel Charles A. May, captain of the 2nd Regiment Dragoons used Colt's revolvers in Florida, Mexico, and New Mexico, and said, "I should not hesitate, with ten men, armed with these pistols, to go anywhere across the plains."[118]

At the same time, federal officials told their regular contractors that demand did not warrant additional contracts.[119] At the start of the Mexican-American war, Eli Whitney Jr. had more than enough work for the military and was reluctant to take on work for Colt.[120] After the war, the government further minimized its use of regular contractors and relied on settlers to test new weapons out for them. Settlers and local soldiers in Oregon, for example, used Sharps rifles—an improved version of Hall's breechloader patented by Christian Sharps in 1848—well in advance of federal troops.[121]

---

[114] Richard A. Dillio, "Samuel Colt's Peacemaker: The Advertising that Scared the West," *History of Media Technology*, 9 Dec. 2017.

[115] Herbert C. Houze, "Samuel Colt and the World," and Elizabeth Mankin Kornhauser, "George Catlin and the Colt Firearms Series," both in Houze, Cooper, and Kornhauser, *Samuel Colt: Arms, Art, and Invention*, 185 and 203–24 respectively.

[116] A. Merwyn Carey, *American Firearms Makers* (New York, 1953), 22. According to William N. Hosley, Colt cared even more about courting favor with European monarchs such as Czar Nicholas than he did with making sales. Hosley, *Colt: The Making of an American Legend* (Amherst, 1996), 94.

[117] Haag, *The Gunning of America,* 34; "Petition of Samuel Colt," Referred to the Committee of Military Affairs, *ASP*, 12 Dec. 1848, 30th Congress, 2nd Session, *U.S. Congressional Serial Set,* Miscellaneous, no. 3, at 2.

[118] U.S. Circuit Court, *The Trial of Samuel Colt,* 22.

[119] Talcott to Whitney Jr., 27 Mar. 1848, Records of the Chief of the Ordnance Department, Record Group 156, Entry 3, NARA.

[120] Whitney Jr. to Colt, 8 Dec. 1846, in Colt, *Samuel Colt's Own Record*, 14.

[121] Jack Hornback, "A Brief Historical Introduction to Oregon Firearms," *Oregon Historical Quarterly* 50, no. 1 (1949): 47; Winston Oliver Smith, *The Sharps Rifle: Its History, Development and Operation* (New York, 1943), 8.

https://doi.org/10.1017/S000768051800034X Published online by Cambridge University Press

*Industrial Manifest Destiny / 81*

Oregon had fewer than 1,000 settlers in 1840; this population increased from 12,093 in 1850 to 52,465 in 1860 and was likely to purchase firearms.[122] Sharps's trip down South to drum up business had been unproductive, but he found the majority of his first sales in the West.[123] Emigration guides advised each party of wagon travelers to spend almost 20 percent of the total cost of the voyage on arms—purchasing one rifle and one pistol per person.[124] Cautionary tales from the frontier warned emigrants of the dire consequences of not being properly armed.[125]

Colt's revolvers had "grown into general favor with the army and country" and now Sharps's were catching up, as Americans rapidly settled territory west of the Mississippi River.[126] The Mexican-American War had made Colt's arms famous; Sharps received press from the use of his rifles by antislavery emigrants and activists in Kansas Territory, a battleground over the fate of slavery between 1854 and the Civil War. Settlers in the territory owned firearms, but their squirrel rifles, buffalo guns, and old army muskets were not nearly as effective as the Sharps breech-loading rifles that wealthy New Englanders and emigrant societies funneled into the territory to combat proslavery inhabitants.[127] All told, antislavery groups spent over $40,000 on Sharps firearms and ultimately succeeded in making the territory a free state.[128] On the eve of the Civil War, Colt's and Sharps's factories in Hartford, Connecticut, the two largest private manufactories in the nation, pulled in over $1 million and $325,000 per year, respectively.[129] While production at the two federal armories remained steady at around twenty thousand guns per year, Colt and Sharps produced about twice that number.[130]

Other major private arms makers got their start during this period. Windsor, Vermont, arms maker Nicanor Kendall partnered with Samuel

---

[122] The population was 17,069,453 in 1840, 23,191,876 in 1850, and 31,443,321 in 1860. United States Census, 1840, 1850, 1860, NARA microfilm publications M432, M653, and M704, NARA; FamilySearch, http://FamilySearch.org.

[123] Smith, "Army Ordnance and the 'American System' of Manufacturing," 78; Haag, *The Gunning of America,* 113.

[124] John Disturnell, *The Emigrant's Guide to New Mexico, California, and Oregon: Giving the Different Overland and Sea Routes Compiled from Reliable Authorities with a Map of North America* (New York, 1850), 6

[125] Riley Root, *Journal of Travels from St. Josephs to Oregon with Observations of that Country, Together with Some Description of California, Its Agricultural Interests, and a Full Description of Its Gold Mines* (Oakland, 1955), 9.

[126] "In Senate of the United States," *ASP,* 30 Jan. 1851, 31st Congress, 2nd Session, no. 257, at 1–2

[127] Isely, "The Sharps Rifle Episode in Kansas History," 553.

[128] Ibid., 565.

[129] Howard, "Interchangeable Parts Reexamined," 638.

[130] Ibid., 635; "Expenses National Armories," *ASP,* 12 Jan. 1848, 30th Congress, 1st Session, Ex. Doc. no. 22, at 2.

Compendium_Cornell
Page 1667

E. Robbins and Richard S. Lawrence in 1844. They performed some government contract work, but were informed, like Whitney and others, not to expect much business after 1848.[131] Robbins and Lawrence turned to building machinery for other armories, and for the British Government in 1854, and contracted to make Sharps rifles in 1850. They overextended themselves, however, and declared bankruptcy in 1855. Their creditors turned their armory into a sewing machine factory, but during the Civil War, returned to making firearms. Worcester, Massachusetts, rifle maker Edwin Wesson patented a revolver in 1848 and two years later, his younger brother Daniel formed the Massachusetts Arms Manufacturing Company with Horace Smith and Joshua Stevens.[132] Horace Smith and Daniel Wesson then founded Smith and Wesson, which Oliver Winchester purchased in 1855 and renamed Volcanic Repeating Arms in 1855. The company later became New Haven Arms Company, and sold rifles to the Union Army during the Civil War. In 1866, Winchester renamed the company yet again; the Winchester Repeating Arms Company emerged as one of the preeminent American arms manufacturers.[133]

## Conclusion

Acting on the belief that the United States had the right to expand across the continent, Americans unintentionally contributed to the industrial developments of the mid-nineteenth century. The relationships among military demands, markets, and innovation were not unique to the nineteenth-century United States, but the Manifest Destiny context points to the importance of understanding the particularities of military conflict and the changes it engenders.[134] As the federal government sponsored military action along its frontiers and in Mexico, manufacturers adapted the arms they produced to better suit combat experience. Although U.S. officials envied European arms manufacturing during the nation's first decades, in 1853, the British government sponsored an industrial reconnaissance mission to the United States,

---

[131] Talcott to Robbins and Lawrence, 10 Feb. 1848, Records of the Chief of the Ordnance Department, Record Group 156, Entry 3, NARA.

[132] U.S. Circuit Court, *The Trial of Samuel Colt,* 86.

[133] Haag, *The Gunning of America*, 60.

[134] Nor should we view its wars as exceptional. See Michael Geyer, and Charles Bright, "Global Violence and Nationalizing Wars in Eurasia and America: The Geopolitics of War in the Mid-Nineteenth Century," *Comparative Studies in Society and History* 38, no. 4 (1996): 652. For the comparison of the U.S. Civil War and German Wars for Unification, see Satia, *Empire of Guns*; and Alder, *Engineering the Revolution*.

Compendium_Cornell
Page 1668

and several years later established an armory that used American methods and machines.[135]

By the Mexican-American War, federal armories were capable of providing arms for troops within and beyond U.S. borders. The government lessened its dependence on contractors, but still did business with the private sector that it had helped develop. The private arms industry, meanwhile, thrived on frontier experience and demand. It came to be dominated by men like Samuel Colt, whose later business ventures, along with those of Oliver Winchester, grew to be the most iconic private arms suppliers of the American West. They benefitted from private and public sales in a way that earlier manufacturers had not and gained a national and international following.

.  .  .

LINDSAY SCHAKENBACH REGELE is assistant professor of history at Miami University, Ohio. She recently published the article "'The World's Best Carpets': Erastus Bigelow and the Financing of Antebellum Innovation" in *Technology and Culture* and is finishing a book manuscript, "Manufacturing Advantage: War, the State, and the Origins of American Industry, 1776–1848," under contract with Johns Hopkins University Press.

---

[135] Rosenbloom, "Anglo-American Technological Differences in Small Arms Manufacturing," 683–84.

Compendium_Cornell
Page 1669

**46 Hastings Const. L.Q. 523**

**Hastings Constitutional Law Quarterly**
Spring, 2019

**Symposium:** *Heller* at Ten

**Essay**
Lindsay Schakenbach Regele [a1]

Copyright © 2019 by University of California, Hastings College of the Law; Lindsay Schakenbach Regele

# A DIFFERENT CONSTITUTIONALITY FOR GUN REGULATION

*District of Columbia v. Heller* hinged on the Second Amendment, defining for the first time an individual's right to own a firearm unconnected with militia use, so long as the firearm is in "common use." [1] In announcing this right, Justice Scalia applied the precedent set by *United States v. Miller*, which suggested that the Second Amendment protects firearms that are regularly used for "common defense." [2] This essay argues that because the government determined which firearms were in "common use" throughout the nation's early history, the Second Amendment allows regulating the types of weapons available to civilians and their usage. A better understanding of the historical regulations that shaped "common use" could help guide legislators who wish to enact gun violence prevention measures that are consistent with the Second Amendment.

Jurisdictional and scholarly contentiousness around the Second Amendment dates to the 1960s, when an increase in gun violence, compounded by the assassinations of President John F. Kennedy, Martin Luther King, Jr., and Robert Kennedy, provided impetus for the passage of the Gun Control Act of 1968. [3] Following the original proposal of this legislation in 1963, the National Rifle Association lobbied for its defeat [4] and the *American Bar Association Journal* published an essay on "The Lost Amendment," which advocated an expanded interpretation of the Second Amendment as an individual right. [5] Since then, legal scholars, historians, **\*524** and political commentators have debated whether the Amendment confers an individual, collective or civic right. [6]

The Amendment, which states that, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed," was rarely invoked in the century after its passage. The first court case to address the "right to bear arms" was the 1822 case of *Bliss v. Commonwealth of Kentucky*, when a Kentucky court ruled that a state law, which fined individuals for carrying concealed arms, violated the state constitution. [7] Not until 1846 did a court overturn a gun regulation based on the Second Amendment to the U.S. Constitution, and not until 1857 did the Amendment undergo debate in the Supreme Court, when the Court observed that if black men were citizens they would have the constitutional right to bear arms. [8]

Until then, Americans' use of arms for common defense owed less to the Second Amendment than it did to Article 1, Section 8 of the Constitution, which gave Congress the power to support armies and provide arms for the militia. [9] In accordance with its constitutional obligation, the federal government subsidized and improved arms manufacturing and expanded the market for guns. [10] The Militia Act of 1792 required militia members to provide themselves with a musket, but many struggled to arms themselves in the face of post-war shortages. [11] To redress the shortages, Congress prohibited the export of arms, and made their import mostly duty-free during the early 1790s. [12] It also constructed two federal armories, and began to invest in private gun factories to supplement the armories' output. [13]

**\*525** An Act of Congress in 1792 gave the president power to select two sites for the nation's federal armories. [14] George Washington chose Springfield, Massachusetts, and Harpers Ferry, Virginia. [15] In 1795, the Springfield Armory manufactured

the nation's first public musket, known as the Model 1795 musket. [16] This .69 caliber flintlock was modeled after the French Charleville, which many American soldiers fought with during the Revolution, and which U.S. officials considered superior to other European guns. [17] It became the standard U.S. musket until the War of 1812. [18] Production was slow at first. Although the Springfield Armory produced about 10,000 muskets a year in 1810, in the late 1790s, it manufactured fewer than one thousand annually. [19] The federal government's solution was to subsidize production in private armories. [20]

The first step was actually creating a small arms industry. During the American Revolution, the Continental Army had relied on imported arms, many of which were in disrepair, and following the war, private producers had little incentive to increase output for a limited civilian market. [21] What gun manufacturing did exist was mostly small-scale craftwork. Throughout the eighteenth and early nineteenth centuries, the most established of these gunsmiths worked in Pennsylvania. [22] Government intervention, however, shifted the loci to the Connecticut River Valley in New England for its proximity to the federal armory at Springfield, Massachusetts. [23] Additionally, the fact that the region had fewer experienced arms manufacturers appealed to government officials, who complained about established gunsmiths' unwillingness to conform to government standards. [24]

 *526  Beginning in the 1790s, the government contracted with new manufacturers seeking to enter the industry. Eli Whitney, for example, the Massachusetts-born inventor and manufacturer, most famous for patenting the cotton gin, pivoted to firearms manufacturing when he learned about government subsidies. [25] He convinced several acquaintances in the executive branch that he could successfully manufacture arms if given the opportunity. [26] Before he even constructed an armory, Whitney received a contract for 10,000 muskets, which included a cash advance, and funding for several storehouses on his property in New Haven, Connecticut. [27] Several years later, the Militia Act of 1808 standardized these sorts of contracts, which ultimately shaped the development of the arms industry. [28] Congress appropriated $200,000 annually to arm the state militias, and stipulated that these funds go to private manufacturers (the choice of private armories reflected many congressmen's apprehensions about centralizing all national arms production at the federal armories). [29]

For the next three decades, the War Department issued five-year renewable contracts that came with ten to twenty percent cash advances, as well as a slate of requirements. [30] All gun parts had to conform to federal standards and pass regular inspections. Following the war, ordnance officials asked the superintendent at the Springfield Armory to figure out the "best means to be devised and adopted for bringing the manufacture of arms to a uniform standard and pattern in all of their parts." [31] They requested that, "muskets given out as patterns from the armories are strictly alike ... in order that the conditions of the contracts now entered into by this department be made conformably thereto." [32] The Ordnance Department mandated that all contract arms be examined by a government proof-master, who would verify  *527 that all "contractors' arms be equal to those produced at the national armories." [33] Contractors had little choice but to conform because, according to arms contractor Asa Waters, "if the patronage of the government is not continued, our factories will be worth but little." [34]

Government patronage required significant management and oversight. The first head of the Ordnance Department, Decius Wadsworth, established a coordinated set of standards for the federal armories and its arms contractors. [35] He designed a timeline for achieving weapon uniformity, requiring the national armories to produce pattern muskets by 1815 and begin full-scale production of the "Model 1816" the following year. [36] Eventually, all armories machine-produced identical gun parts, a manufacturing characteristic known as "interchangeability," but this was a slow and uneven process. [37] Historians of technology have demonstrated that a factory needed to produce at least 1,000 guns to make interchangeable parts production worthwhile. [38] In the early nineteenth century, only the federal government was willing and able to devote the resources to this. Private makers frequently modified the models they made, which made interchangeability impractical. [39] Their civilian consumers had little desire for interchangeable guns because they were unlikely to have multiple identical guns from which to scavenge parts. Soldiers, on the other hand, needed to be able to change and repair defective parts quickly in the field. [40] Members of Congress recognized their obligation to contribute to this  *528 objective. In his argument for the reestablishment of the Ordnance Department as an independent bureau, Representative Wiley Thompson of Georgia noted that, "unparalleled gallantry would become an easy prey to a well equipped and well disciplined foe," if using weapons of "a variety of calibres." [41] Thompson's statement suggests that firearms management was a cooperative, rather than oppositional, undertaking between government officials and private producers, such as Whitney's armory, in the nineteenth century.

The federal government not only subsidized and standardized the construction of firearms, it also regulated their safety. In the 1830s, as Congress reevaluated the balance between private and public production for the military, lawmakers asked military officers to conduct a series of experiments to compare the safety and effectiveness of firearms manufactured at both the federal armories and those of private contractors. [42]  During the first round of tests in 1837, the officers preferred the standard U.S. musket and decided there was "risk to the national safety by adopting new inventions without being convinced of their superiority." [43]  The government would not agree to purchase weapons from new contractors without testing them first. This had ramifications for the origins of gun companies that supply arms in "common use" today. Samuel Colt, for example, solicited government patronage in the 1830s, and had to adapt to safety standards when a board of ordnance officers expressed concern that several features of new revolvers caused safety risks, namely "the possibility of two or more chambers going off at the same time" and the "deafening sharpness ... which must injure the hearing of those who use them." [44]  Once Colt improved the revolvers, the U.S. military purchased them for use on the frontier and in the Mexican American War (1846-1848). [45]

The sum total of this government regulation and subsidization determined what was in the market, and thus what firearms were in "common  **529**  use." In *Gunning America,* Pamela Haag argues that civilian consumption of firearms was limited until arms makers employed strategic sales and marketing to create a civilian market for guns in the second half of the nineteenth century. [46]  Samuel Colt, who became one of the most iconic patent arms makers of the mid nineteenth century, claimed that prior to the Mexican American War, there did not exist a civilian market for revolvers. [47]  Once the civilian market expanded, the guns that were produced and purchased reflected the influence of government intervention. In the 1850s Colt included battlefield testimony in advertisements, which helped him reach a larger civilian market. [48]  One of Colt's first print advertisements from the early 1850s depicted scenes from the Mexican American war, and an advertisement from 1858 advertisements harkened back to their being "the first rifle fired" in Florida in 1837. [49]  His success selling to civilians increased throughout the 1850s: in 1851, he employed 300 workers and produced 40,000 revolvers a year and by 1854, 500 workers, and 50,000 revolvers. [50]  During the 1850s firearms produced for the civilian market by private arms makers began to exceed those produced by the government for the first time. [51]  Arms makers owed their newfound profitability, however, to early federal patronage.

Today, supporters of an absolute individual right to bear arms cite *Heller's* reference to arms in "common use" as an argument against government interference with the firearms market. They look to gun company sales to determine what arms consumers commonly purchase, and argue that such arms are in "common use" and cannot be restricted. [52]  For the nation's first one hundred years, however, the guns that were in "common  **530**  use" were determined by federal subsidization and regulation. We must consider these historical origins of "common-use," as well as the fact that some of the biggest gun companies today-- Colt's Manufacturing Company LLC (Hartford, Conn.), Smith and Wesson (Springfield, Mass.), and Sturm, Ruger & Co., Inc., (Southport, Conn.)--have their roots in armories where the government played an essential role in shaping arms development. [53]

As lawmakers face opposition when they attempt to regulate guns favored by the industry, we need to reevaluate policy aims based on true historical precedent. It is not historically sound for policymakers to allow gun manufacturers and marketers to determine what arms are in common use. By fully understanding the historical relationship between the firearms industry and the government, lawmakers could assert their prerogative to intervene with gun safety regulations. Armed with historical knowledge, sensible gun control might be seen as both constitutionally and politically sound.

### Footnotes

[a1]    Assistant Professor of History, Miami University.

[1]    554 U.S. 570 (2008).

[2]    *Id.* at 621-22 (citing United States v. Miller, 307 U.S. 174 (1939)).

Compendium_Cornell
Page 1672

[3]   Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968).

[4]   Carl T. Bogus, Symposium on the Second Amendment, *Fresh Looks: The Politics of Second Amendment Scholarship: A Primer*, 76 CHI-KENT L. REV. 3, 6 (2000).

[5]   Robert A. Sprecher, *The Lost Amendment*, 51. A.B.A. J. 554 (1965).

[6]   For most of the Amendment's history, the right to bear arms was considered as a collective militia right, rather than an individual one. *See* Stuart R. Hays, The Right to Bear Arms, *A Study in Judicial Misinterpretation*, 2 WILL. & MARY L. REV. 1959, at 381-406; Sprecher, *supra* note 6, at 665-69 (this essay won the 1964 Samuel Pool Weaver Constitutional Law Essay Competition). For an overview of the Second Amendment and constitutional law, see Bogus, *supra* note 4; Don Higginbotham, *The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship*, 55 WILL. AND MARY Q. 39, 40 (1998). *See also*, SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2008); MICHAEL WALDMAN, THE SECOND AMENDMENT: A BIOGRAPHY (2015).

[7]   12 Ky. 90, 94 (1822).

[8]   *See* Nunn v. State, 1 Ga. 243 (1846); Dred Scott v. Sandford, 60 U.S. 393 (1857).

[9]   U.S. CONST. art. I, § 8.

[10]   LINDSAY SCHAKENBACH REGELE, MANUFACTURING ADVANTAGE: WAR, THE STATE, AND THE ORIGINS OF AMERICAN INDUSTRY, 1776-1848 (2019).

[11]   Militia Act of 1792, ch. 28, 1 Stat. (1792).

[12]   Andrew Fagal, The Political Economy of War in the Early American Republic, 1774-1821 (October 14, 2013) (unpublished Ph.D. dissertation, Binghamton University) (on file with author).

[13]   REGELE, *supra* note 10 at 15.

[14]   Derwent Stainthorpe Whittlesey, "The Springfield Armory: A Study in Institutional Development," (1920) (unpublished Ph.D. dissertation, University of Chicago).

[15]   *Id*.

[16]   S. REP. NO. 25, 4TH CONG., MILITARY FORCE, ARSENAL, AND STORES COMMUNICATED TO THE SENATE, DECEMBER 15, 1795 (1ST SESS. DEC. 12, 1795); JAMES B. WHISKER, THE UNITED STATES ARMORY AT SPRINGFIELD, 1795-1865 19 (1997).

[17]   John W. Wright, *The Rifle in the American Revolution*, 29 AM. HIST. REV. 293, (1924).

[18]   WHISKER, *supra* note 16 at 19.

[19]   S. REP. NO. 37, 6TH CONG., ARMORY AT SPRINGFIELD, COMMUNICATED TO THE SENATE JANUARY 7, 1800 (1st Sess. Jan. 6, 1800).

[20]   REGELE, *supra* note 10 at 53.

[21]   Fagal, *supra* note 12.

[22]   *See* Stephen V. Gramscay, *The Craft of the Early American Gunsmith*, 6 MET. MUSEUM ART BULL. 54 (1947).

[23]   FELICIA JOHNSON DEYRUP, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 (Smith College Studies 1948).

[24]   Letter from Oliver Wolcott to Daniel Gilbert (Sept. 8, 1798) (on file with National Archives and Record Administration: Post-Revolutionary War Papers, Record Group 45).

[25]   *See generally* James V. Joy, Jr., *Eli Whitney's Contracts for Muskets,* 8 PUB. CONTRACT L.J. 140 (1976).

[26]   Oliver Wolcott to Eli Whitney, October 9, and October 17, 1798, Box 1, Folder 13, Eli Whitney Papers, Yale University Manuscripts and Archives.

[27]   Letter from Henry Dearborn to Eli Whitney (Feb. 25, 1803) (on file with National Archives and Record Administration, Records Group 7); Letter from Oliver Wolcott to Daniel Gilbert, *supra* note 26.

[28]   Eli Whitney to Samuel Dexter January 8, 1801, Box 1, Folder 17, Eli Whitney Papers, Yale University Manuscripts and Archives.

[29]   Militia Act of 1808, ch. 55, 1 Stat. 490 (1808).

[30]   Fagal, *supra* note 12.

[31]   John Morton to Roswell Lee, November 14, 1817, Box 1, Target #2, Letters Received from Officials and Officers of the War and Treasury Departments, Box 1, Target #3, Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, Mass.

[32]   Letter from John Morton to Roswell Lee (Nov. 14, 1817) (on file with the Springfield Armory, Mass, Record Group 156, Entry 1362, NM-59, 94-066);

[33]   Letter from John Morton to Roswell Lee (March 4, 1818), Box 1, Target #2; Letter from George Bomford to Roswell Lee, June 1, 1823, Box 2, SA-LRO.

[34]   Memorial of Private Contractors to U.S. Congress, 1835?, Waters Family, Papers, 1749-1873, BoxW1, Folder 4 1835, AAS.

35      Merritt Roe Smith, *Army Ordnance and the 'American System' of Manufacturing, 1815-1861*, *in* MILITARY ENTERPRISE AND TECHNOLOGICAL CHANGE: PERSPECTIVES ON THE AMERICAN EXPERIENCE 53 (Merritt Roe Smith, ed. 1985).

36      The Springfield Armory complied successfully with this order, Harper's Ferry did not. *See*, Smith, *supra* note 35.

37      Older studies of small arms manufacturing offer exhaustive details about private and public gun production in early America, MERRITT ROE SMITH, HARPERS FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE (1977). *See also* DEYRUP, *supra* note 23; WHISKER, *supra* note 16; JAMES B. WHISKER & KEVIN SPIKER, THE ARMS MAKERS OF MASSACHUSETTS, 1610-1900 (2012).

38      Joshua L. Rosenbloom, *Anglo-American Technological Differences in Small Arms Manufacturing*, 23 J. OF INTERDISCIPLINARY HISTORY 683, 691 (1993). Also, U.S. troops used rifles and muskets, which were less precise and so could more easily be made by interchangeable manufacture. Robert A. Howard, *Interchangeable Parts Reexamined: The Private Sector of the American Arms Industry on the Eve of the Civil War,* 19 TECH. AND CULTURE 633, 649 (1978).

39      Howard, *supra* note 39, at 645.

40      Howard, *supra* note 39, at 634, 646-48 (arguing that private arms makers were more responsible for innovation in interchangeable production than the federal armories).

41      UNITED STATES CONGRESS, REPORTS OF COMMITTEES OF THE HOUSE OF REPRESENTATIVES FOR THE THIRD SESSION OF THE FORTY-SECOND CONGRESS 125 (1873).

42      S. REP. NO. 743, 25TH CONG., REP. OF THE PRESIDENT OF A BOARD OF OFFICERS ON IMPROVEMENTS IN FIRE-ARMS BY HALL, COLT, COCHRAN, LEAVITT, AND BARON HACKETT, AS COMPARED WITH THE UNITED STATES MUSKET AND THEIR RELATIVE QUALITIES AND EFFICIENCY (1st Sess. Oct. 3, 1837).

43      *Id*.

44      S. REP., 26TH CONG., REP. FROM THE SECRETARY OF WAR, TRANSMITTING, THE REPORT OF A BOARD OF DRAGOON OFFICERS APPOINTED TO WITNESS AN EXHIBITION OF THE REPEATING FIRE-ARMS AND WATER-PROOF AMMUNITION INVENTED BY SAMUEL COLT (2d Sess. Dec. 16, 1840).

45      S. MISC. DOC. NO. 3, 30TH CONG., PETITION OF SAMUEL COLT, PRAYING A CONTRACT FOR SUPPLYING THE GOVERNMENT WITH AN ADDITIONAL NUMBER OF HIS REPEATING FIRE-ARMS, (2d Sess. Dec. 12, 1848).

46      PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 58-59 (2016).

47      *See generally* Colt v. Massachusetts Arms Co., 6 F. Cas. 161 (1851).

48      HARTFORD COURANT, Jan. 20, 1849, at 10.

49    Richard A. Dillio, Samuel Colt's Peacemaker: The Advertising that Scared the West, (Dec. 9, 2017) (unpublished manuscript), https://www.scribd.com/document/126270948/Samuel-Colt-s-Peacemaker-The-Advertising-that-Scared-the-West.

50    BARBARA M. TUCKER & KENNETH H. TUCKER, JR., INDUSTRIALIZING ANTEBELLUM AMERICA: THE RISE OF MANUFACTURING ENTREPRENEURS IN THE EARLY REPUBLIC 70 (2008).

51    Howard supports his argument about civilian markets by citing the 400,000 firearms produced by Colt and Sharps between 1851 and 1860, versus the 218,493 produced by the federal armories. This evidence obscures the fact that both manufacturers also sold their arms to federal troops on the frontier, but indeed, the civilian market for firearms grew in the decade following the Mexican American War. Howard, *supra* note 39, at 634.

52    *See, e.g.*, Brief of Appellant at 24, 44, Peña v. Lindley, 898 F.3d 969 (9th Cir. 2018) (No. 15-15449) (arguing that California's handgun design safety regulations violate the Second Amendment by prohibiting handguns in "common use," and claiming that "it is the regulatory environment that must accommodate itself to the choices made by the lawful, constitutionally protected market for arms, and not the other way around").

53    Kari Huus, The Biggest Gun Companies in the Market, MONEY TALKS NEWS (Feb. 27, 2018), https://www.moneytalksnews.com/slideshows/the-biggest-gun-companies-in-the-u-s-market/?all.

46 HSTCLQ 523

**End of Document**        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**69 Emory L.J. 1043**

Emory Law Journal

2020

Article

Jaclyn Schildkraut [a1] Collin M. Carr [aa1]

Copyright © 2020 by Emory Law Journal; Jaclyn Schildkraut, Collin M. Carr

# MASS SHOOTINGS, LEGISLATIVE RESPONSES, AND PUBLIC POLICY: AN ENDLESS CYCLE OF INACTION

## ABSTRACT

*Although mass shootings give rise to particularly visceral reactions and demands for action within the public sector, the corresponding response from legislators has failed to produce any meaningful change. With much of the discourse in the aftermath of these events centering on the polarized gun control-gun rights debate, two proposed solutions--assault weapons bans and universal background checks--often are at the forefront. Although varying by group and often higher immediately following a shooting, public support for these two proposals has yet to translate into legislative action. In this Article, we explore previous attempts by the federal government to regulate assault weapons and implement background checks for all firearm purchases, particularly in response to high-profile (and highly lethal) mass shootings. We situate these efforts in the context of corresponding public support as well as examples of how such regulations may have been effective at creating impediments for the perpetrators. We also explore state legislative efforts, which have been far more successful in enacting legislation related to assault weapons and background checks. Finally, we consider the role of lobbying and interest groups in overshadowing bipartisan support for these proposals, as well as what may be needed to break the perpetual stalemate in Congress and end the cycle of legislative inaction stemming from mass shootings.*

| | |
|---|---|
| INTRODUCTION | 1045 |
| I. ASSAULT WEAPONS | 1047 |
| A. The Federal Assault Weapons Ban | 1048 |
| B. Public Opinion About an Assault Weapons Ban | 1050 |
| C. Arguments Surrounding an Assault Weapons Ban | 1052 |
| D. Effectiveness of Assault Weapons Bans | 1055 |
| II. BACKGROUND CHECKS | 1056 |
| A. National Instant Criminal Background Check System (NICS) | 1058 |
| B. Shortfalls of Background Check Systems | 1059 |
| III. EXPANDING BACKGROUND CHECKS | 1066 |
| IV. STATE LEGISLATION | 1069 |
| V. DISCUSSION | 1071 |

**\*1045 INTRODUCTION**

Though within the context of the national crime picture, mass shootings are statistically rare events, their frequency of occurrence has been found to be on the rise in recent years.[1] The disproportional amount of attention they receive, particularly from the media, however, makes it appear as though mass shootings are reaching an epidemic-like proportion [2] with many accepting these events as a fixed part of American culture.[3] Consequently, mass shootings have become, and continue to be, a cause for concern for politicians, pundits, and the public alike.[4] Some events are viewed as reflecting broader problems within society.[5] Conversely, others have been perceived as isolated incidents.[6] Still, all events elicit some type of collective response that something needs to be done.

Compendium_Cornell
Page 1677

Despite such perceptions, however, the response to mass shootings has become almost scripted and therefore predictable. When word of a shooting breaks, politicians and the public alike immediately rush to offer their "thoughts and prayers" to those who have been impacted. [7] Debates ensue across both the  **\*1046**  public (often via social media) and political arenas about the root causes of mass shootings, [8] a conversation that routinely falls to the "usual suspects" of guns, mental health, and violent media. [9] Yet despite such outrage, the conversation often is short-lived, [10] and Congress fails to take any meaningful steps to address the issues surrounding these events--in some cases even noting that the immediate aftermath, when support for change often is at its highest, is not the time to politicize the tragedy. [11] That time, however, seems to never come, and the conversation fades as quickly as it began, only to be reignited with the next mass shooting, causing the cycle of inaction to restart.

This is not to say, however, that no legislative efforts have been offered in responses to mass shootings. [12] Numerous proposals have been put to the floors of both the Senate and House of Representatives, though the majority never make it past introduction. [13] At the same time, laws that already exist on the books that could potentially play a role in helping to prevent mass shootings (or at least make it more difficult for them to occur) are not utilized to their fullest capacities. The occurrence of such attacks also may highlight gaping loopholes in the existing legislation that need addressing to help prevent future attacks.

In short, the federal government has failed to respond adequately to mass shootings in a meaningful way. In this Article, we explore several of the key debates that arise after mass shootings--namely, whether assault weapons should be banned and if universal background check policies should be implemented. Specifically, we examine the key arguments from both supporters and those who are against such policies and related congressional action (or lack thereof) from each side. We also consider how such policies correlate with mass shootings and what impact, if any, the implementation of such legislation could have on the occurrence of these events. Finally, we explore what action has been  **\*1047**  taken at the state level and whether addressing mass shootings at the federal level can be achieved or if the partisan divide will continue to perpetuate this endless cycle of inaction.

## I. ASSAULT WEAPONS

A common response in the aftermath of mass shootings is to call for the banning of assault-style weapons, such as AR-15s, AK-47s, and similar firearms. This call to action stems from the perception that these types of guns are the weapon of choice among mass shooters, despite the fact that handguns are three times more likely to be used by such perpetrators. [14] Proponents of banning assault-style firearms also routinely claim that the usage of these by mass shooters has been significantly increasing. [15] In reality, however, despite a small uptick in the proportion of events where these weapons were present, their use in mass shooting events has remained largely stable over the past three decades. [16]

Part of the reason that these claims have gained traction is that such weapons have been used in high-profile shootings including (but not limited to) an Aurora, CO movie theater (2012); Sandy Hook Elementary School in Newtown, CT (2012); a municipal government office in San Bernardino, CA (2015); a nightclub in Orlando, FL (2016); [17] a concert in Las Vegas, NV (2017); a church in Sutherland Springs, TX (2017); and Marjory Stoneman Douglas High School in Parkland, FL (2018). [18] These shootings also are among the more lethal events  **\*1048**  that have been carried out. Collectively, they account for 202 fatalities and 597 injuries. [19] It bears noting, however, that not all highly lethal mass shootings are carried out using an assault-style rifle. The 2007 shooting at Virginia Tech, which claimed the lives of thirty-two individuals (excluding the gunman) and left seventeen injured, was carried out with two semiautomatic handguns. [20] Variations of the handguns used at Virginia Tech also were present in other particularly lethal attacks including a Killeen, TX restaurant in 1991 (twenty-three killed, twenty injured); a Tucson, AZ supermarket in 2011 (six killed, thirteen injured--including Congresswoman Gabrielle Giffords); and a Charleston, SC church in 2015 (nine killed).

Still, the presence of an assault-style rifle has been found to increase the number of casualties--both fatalities and injuries-- in a mass shooting event. In one analysis of 340 mass shootings occurring between 1966 and 2016, it was found that in mass shootings carried out using at least one assault-style rifle, an average of 5.2 people were killed and 7.6 others were injured. [22] Comparatively, an average of 2.9 fatalities and 3.2 people injured per event was found in cases where no such weapon was present. [23] With these statistics in mind, it is not surprising then that there regularly is a call to ban assault-style rifles following such tragedies.

Compendium_Cornell
Page 1678

### A. The Federal Assault Weapons Ban

On September 13, 1994, the Violent Crime Control and Law Enforcement Act was signed into law by President Bill Clinton. [24] Among the provisions included in the Act was the Public Safety and Recreational Firearms Use Protection Act, more commonly known as the Federal Assault Weapons Ban **\*1049** (AWB). [25] The legislation prohibited "the manufacture, transfer, or possession of a semiautomatic assault weapon." [26] Specific criteria for what designated a firearm (either a rifle, pistol, or shotgun) as an "assault weapon" was among the language crafted in the AWB. Semiautomatic rifles in particular were categorized as such if they were able to accept detachable magazines and had two or more of the following features: (1) a folding or telescopic stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a bayonet mount; (4) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; or (5) a grenade launcher. [27] The AWB further banned possession of large-capacity magazines--those capable of holding more than ten rounds of ammunition--as well as the production of nineteen specific semiautomatic firearms classified as assault weapons, including the AR-15, all models of the AK, and Uzis. [28]

From its enactment, the AWB was met with both criticism and pushback. Within three months of it going into effect, Maryland Representative Roscoe Bartlett introduced legislation to repeal the AWB; [29] two weeks later, he filed a second bill aimed at removing restrictions on semiautomatic weapons and large-capacity magazines. [30] The legislature failed to enact either bill into law. In 1998, Alaska Representative Don Young introduced the Second Amendment Restoration and Protection Act, designed not only to repeal the AWB, but also to nullify the Brady Handgun Violence Prevention Act that had, among other things, established the National Instant Criminal Background Check System (NICS) following an assassination attempt on President Ronald Reagan in 1981. [31] Like the earlier legislation, it failed to make it past its introduction.

One of the features of the AWB that worked in the favor of its critics was that it had been crafted to include a sunset provision, meaning that the ban was only good for ten years. [32] Prior to its expiration, individual legislators made **\*1050** several attempts to overcome it. Senator Dianne Feinstein of California [33] and Representative Michael Castle of Delaware [34] each introduced legislation in their respective chambers of Congress to extend the AWB for an additional ten years. Senator Feinstein also introduced legislation to completely eliminate the sunset provision, [35] as did New Jersey Senator Frank Lautenberg [36] and New York Representative Carolyn McCarthy. [37] Each attempt failed, and Congress subsequently allowed the AWB to lapse on September 13, 2004. [38] Some lawmakers made subsequent efforts to reinstate the ban after its lapse, but to no avail. [39] Similarly, attempts to enact a new assault weapons ban have been equally unsuccessful. [40]

### B. Public Opinion About an Assault Weapons Ban

As divisive as the issue of banning assault weapons has been among members of Congress, similar discord has also been found among the populace. Though one poll found that in the month prior to the enactment of the AWB, support for such a policy outweighed its opposition more than three to one, that differential has waned over the years, [41] though findings vary based on the poll. For instance, an October 2004 Gallup poll found that respondents were nearly evenly split (50% favor, 46% oppose) in their opinions about an assault weapons ban just one month after the lapse of similar legislation. [42] A 2012 poll from **\*1051** YouGov conducted five days after the Aurora movie theater shooting found that just half of respondents supported banning assault weapons. [43] Yet even as mass shootings, particularly those involving semiautomatic assault-style rifles that were more lethal in nature, persisted in capturing national attention, public support for banning such weapons continued to diminish. [44] In fact, following the Pulse nightclub and Las Vegas shootings, [45] support for banning assault rifles lingered at 36% and 48%, respectively, despite that the two attacks left 107 people dead. [46]

Nonetheless, some mass shooting events have been successful in garnering added support for an assault weapons ban. In the weeks following the Parkland shooting in 2018, various polls placed the proportion of respondents favoring such legislation between 60% and 63%. [47] After the mass shootings in El Paso and Dayton left thirty-one people dead in less than twenty-four hours, support for restricting assault-style weapons like those used in the attacks again increased, reaching as high as 70% in

one poll.[48] Notably, however, such backing often is largely limited to the immediate aftermath of the attack, and it may be that such support wanes the further out the nation is from these shootings. Still, the shift in support for a ban also is observable across party **\*1052** divide. Democrats historically have always been considerably more likely to support such legislation,[49] though the El Paso and Dayton shootings may have served as a tipping point as backing among Republicans increased from 35% support two months after Parkland[50] to 55% after the pair of attacks nearly eighteen months later.[51] Yet even those pieces of legislation that have been introduced in response to these attacks still fail to garner the necessary support to become law.[52]

### C. Arguments Surrounding an Assault Weapons Ban

Examining the arguments both for and against banning assault weapons may provide necessary insight to the lack of movement in the political arena in spite of public opinion. One of the key arguments for not prohibiting semiautomatic rifles specifically hinges on self-defense. As Andrew Infantino summarized in an op-ed:

> Handguns and shotguns usually become significantly less effective at 100 yards, which is problematic for defending large properties such as farms .... Rifles make up for this disadvantage and, with the right ammunition, are also effective in shorter ranges. Defensive use, however, requires the ability to fire again--quickly and accurately--if one misses. Manually-loaded firearms are impractical for that purpose, especially without significant practice. As other weapons may not be suitable, law-abiding citizens should be allowed semi-automatic rifles to defend themselves from realistic threats.[53]

Similarly, the National Rifle Association (NRA) has taken the position that "[t]he only thing that stops a bad guy with a gun is a good guy with a gun" without qualifying what type of gun is required to achieve such an end.[54] As a result, the conversation to ban assault-style weapons often is portrayed as an attack on the Second Amendment or an attempt to curb gun rights completely,[55] **\*1053** despite that even conservative Justice Antonin Scalia noted in the majority opinion of District of Columbia v. Heller, a landmark Supreme Court case that resulted in a victory for gun advocates, that "the right secured by the Second Amendment is not unlimited."[56]

Conversely, those in favor of banning these firearms argue that "easy access to assault weapons makes it unconscionably simple" to kill people.[57] People routinely argue that assault-style firearms marketed to civilians closely resemble that of their military counterparts that were designed to be used in combat.[58] The main difference, however, is that military variants of the weaponry are fully automatic (though they also can fire one round at a time).[59] The civilian version of semiautomatic firearms, on the other hand, do not have fully automatic capabilities but instead have a mechanism that autoloads a new round into the chamber after one is discharged, meaning that the user only needs to pull the trigger to fire the gun.[60] This eliminates the need to eject spent cartridges, such as with a bolt-action mechanism, thereby eliminating steps between rounds and speeding up the rapidness of the shooting.[61] It bears noting, however, that semiautomatic firing mechanisms are not unique to rifles; instead, they also are available on handguns (including the two used in Virginia Tech) and shotguns.[62]

Still, the increased lethality of mass shootings in which the perpetrators used semiautomatic assault-style rifles raises concerns that the perpetrators arm themselves in a manner akin to the military.[63] The box magazines typically used with these rifles hold thirty rounds of ammunition, meaning that perpetrators can **\*1054** shoot longer without having to reload.[64] Larger magazines can hold between 60 and 100 rounds.[65] In fact, 100-round "drums," as they are called, were used in both the Aurora and Dayton shootings; the perpetrator of the latter attack was able to fire more than forty rounds in just thirty-two seconds.[66] Similarly, several shooting events also have highlighted that police officers responding to the scene may be outgunned by the perpetrators.[67] Further supporting this argument is the fact that the family of the creator of the AR-15--the civilian version of the military's M16 and "America's rifle," as it has been dubbed by the NRA[68]--has spoken out in the wake of mass shootings, saying that the firearm never was intended for civilian use.[69]

Such discord aside, an important consideration that must be factored into the discussion of whether to implement an assault weapons ban is if it will achieve its intended goal. Certainly, basing responses on evidence rather than emotion is vital to any policy's sustainability, and responses to the phenomenon of mass shootings are no exception to this. As such, the now-lapsed AWB provides an important opportunity to assess what impact similar future legislation may have. Research, however, has been scarce in this area due to a lack of federal funding of studies on gun violence stemming from the introduction of the Dickey Amendment in 1996. [70]

**\*1055 D. Effectiveness of Assault Weapons Bans**

Still, the few studies that are available provide important findings for consideration about the efficacy of assault weapons bans. First, though the ban did not completely eliminate the use of assault-style weapons in mass shootings while it was in effect, [71] the relative frequency of the use of such firearms decreased by approximately 25%. [72] One study, examining gun massacre deaths when the AWB was in effect and comparing it to the first decades both prior and after, found that the number of fatalities decreased 43% during the prohibition period. [73] A separate study that examined mass shootings occurring between 1981 and 2017 showed an even more impressive reduction--70% fewer fatalities associated with these events were less likely to occur during the ban period than before or after its occurrence. [74] This translated into nine fewer mass shooting-related fatalities per 10,000 firearm homicides when the ban was in effect. [75]

Given such evidence, it certainly could be argued that a federal assault weapons ban should be considered with renewed focus. Yet despite bipartisan support for gun control more broadly, [76] this issue continues to fail to gain any traction due to the ongoing polarity surrounding it, and it remains to be seen if **\*1056** any of the pending bills at the time of this writing will be enacted into law. [77] As one journalist noted, it takes time to move the political dial, [78] and perhaps the finding of common ground on other firearms legislative issues such as red flag laws--those policies that enable law enforcement or family members to petition a state for the removal of firearms from individuals who are a danger to themselves or others--is an indicator that progress is coming in the seemingly locked gun control-gun rights debate. [79] Still, it is insufficient to put all of the proverbial eggs in the assault weapons basket; instead, consideration should be given to how to keep firearms out of the hands of individuals who should not have them in their possession.

## II. BACKGROUND CHECKS

While assault weapons bans may be one of the most divisive issues related to mass shootings and gun control, background checks are arguably among the least contentious. In fact, of all the regulatory provisions related to guns offered in the aftermath of mass shootings, background checks garner the greatest support. Regularly, public opinion polls find support for such a procedure to be greater than 90% among respondents, [80] even reaching as high as 97%--nearly unanimous support--following the Parkland shooting. [81] Support for background checks legislation even bridges party lines, with around eight out of every ten Republicans expressing backing for the policy, [82] despite that Democrats typically are more likely to support gun control measures on the whole. **\*1057** Similarly, individuals identifying as firearms owners also are likely to support such a measure, [83] as are registered members of the NRA. [84]

The goal of background checks is to keep people who should not be in possession of firearms from being able to legally acquire them, and legislation has sought to clarify who would fall within such categories. The first group of prohibited persons came courtesy of the Federal Firearms Act of 1938 (FFA), which, though focused on regulating interstate firearms commerce, [85] expressly barred some convicted felons, a fugitive from justice, or a person under indictment from purchasing, possessing, or owning a gun. [86] The FFA did not, however, require individuals transferring the firearms to verify the identification of customers. [87] Thirty years later and following the high-profile assassinations of President John F. Kennedy, Martin Luther King, Jr., and Robert F. Kennedy, the Gun Control Act of 1968 (GCA) was enacted into law. [88] In addition to placing additional restrictions on interstate firearms commerce, the GCA also expanded the categories of prohibited persons to include individuals who were deemed mentally defective, those who used drugs, minors, persons who are in the United States illegally or on a nonimmigrant visa, those who have been dishonorably discharged from the military, persons who have renounced

their citizenship, and domestic abusers. [89] A glaring flaw of the GCA's limitations on prohibited persons, however, was the fact that while the Federal Firearms Licensee (FFL) was required to have the purchaser complete a questionnaire, there was no verification of the information provided. [90] Thus, even if a purchaser **\*1058** provided false information, such as misrepresenting that they were not a member of a prohibited category when they actually were, they would still be able to legally purchase a firearm. [91] Moreover, verification of the information provided, when conducted, was even more challenging due to the decentralized nature of the recordkeeping associated with firearms purchases. [92]

### A. National Instant Criminal Background Check System (NICS)

The Brady Handgun Violence Prevention Act of 1993, named for Ronald Reagan's press secretary who was wounded in the assassination attempt on the President in 1981, sought to overcome the limitations of the GCA by mandating, among other things, that for every sale or transfer of a firearm by a licensed firearms dealer, the purchaser must undergo a background check designed to ensure that they are not part of one or more of the prohibited categories. [93] In order to facilitate this process, the Brady Act, as it is more commonly known, also required that a centralized database of disqualifying records be established within five years of the law's enactment. [94] The National Instant Criminal Background Check System (NICS) launched in November 1998 under the administrative control of the Federal Bureau of Investigation. [95] When a person seeks to purchase a firearm from a FFL, they must complete a Firearms Transaction Record form (ATF Form 4473), which requires the applicant to provide their name, address, and identifying information; they also must indicate whether they are members of a prohibited category. [96] Once the form is complete, they present it to the FFL along with government-issued photo identification, at which time, provided that they are not self-identified members of a prohibited category or have given the transferee reasonable cause to believe they are prohibited, a NICS check will be conducted either by phone or electronically. [97] Depending on the outcome of the check, the transaction may either proceed (meaning that no prohibitive criteria was found), be delayed (potentially   **\*1059** prohibitive criteria was found and further information is needed), or be denied (prohibitive criteria was found and the purchaser is disqualified). [98]

Between 1998 when the system was first introduced and 2018 (the year of the most recent operations report), the NICS system has been used to process 304,634,316 background checks. [99] These include both federal and state level, with the latter (comprised of both purchasing- and permitting-related checks) accounting for approximately 58% of transactions. [100] On average, approximately 1.5% of transactions result in a denial, with a felony conviction being the most common reason for disqualification. [101] Audits of the system have found that even with the volume of checks conducted annually, it has a nearly perfect (99.8%) accuracy rate for transactions processed. [102]

### B. Shortfalls of Background Check Systems

One specific mass shooting, however, highlighted a significant issue with background check systems--the fact that they are only as good as the records within them. On April 16, 2007, a twenty-three-year-old senior at Virginia Tech entered the West Ambler Johnston (WAJ) dormitory around 7:15 a.m. [103] He made his way to the fourth floor, where he shot and killed freshman Emily Hilscher and her resident advisor, senior Ryan Clark. [104] The perpetrator then left the building and, two hours later, entered Norris Hall, which housed the campus's engineering program, and opened fire. [105] Over approximately ten minutes, he killed thirty additional students and faculty members and injured seventeen others before committing suicide as law enforcement entered the building. [106]

  **\*1060**  As the shooting was investigated, the mental health and behavioral issues of the perpetrator became a considerable focus. From a young age, when his family immigrated to the United States from South Korea, he struggled with social isolation, eventually being diagnosed with selective mutism and major depression, issues that continued to plague him through high school. [107] He was discouraged from going to college away from home but ignored such advice, eventually enrolling at Virginia Tech for the Fall 2003 semester. [108] During his time at the university, his mental health continued to deteriorate. He remained withdrawn but his writings became increasingly violent and hostile. [109] His behavior also grew increasingly erratic and threatening to the point of where he was removed from a class due to creating fear among the other students and was taught

Compendium_Cornell
Page 1682

one-on-one by the department chairperson. [110] Though she attempted to help him seek out resources and counseling to address the issues, he refused. [111]

On November 27, 2005, the perpetrator had his first run-in with the university's police department when a female student who lived on the fourth floor of WAJ reported that, after the pair had been texting, he appeared at her dorm room wearing sunglasses and a pulled-down hat and introduced himself as "Question Mark," his imaginary twin brother. [112] The officer who responded to the complaint advised him not to contact the female student again, but no further action was taken. [113] Three days later, he contacted the county's counseling center for a telephone triage and set an appointment for an in-person visit, though he never attended. [114]

Nearly two weeks later, on December 12, 2005, a complaint from a second female student was received by the campus police. [115] The perpetrator, whom the student knew through his suitemates, had been sending her instant messages and posting on her Facebook wall throughout the semester; writings also were also left on her dorm room whiteboard that she believed to be from him. [116] Though she reported the incident to the police, the student declined to press charges and  **1061**  the perpetrator was advised the next day by law enforcement to cease communication with her. [117] After the meeting with police, the perpetrator made suicidal threats through instant messages that prompted one of his suitemates to report them. [118] The authorities returned that evening and took him to the police department for a pre-screening for mental illness. [119] Based on the findings of the community service board (CSB) member who conducted the evaluation, a temporary detention order was issued and he was transferred to a local hospital. [120] Over the next twelve hours, the perpetrator underwent a series of evaluations to assess his mental state ahead of a commitment hearing. [121] At the hearing, he was classified as an imminent danger to himself and others, but only was ordered to undergo outpatient treatment. [122] He subsequently was discharged from the hospital and no further follow-up with counseling services, beyond the immediate appointment that day, was conducted. [123]

As it relates to firearms transfers, Virginia is (and also was at the time) a full point-of-contact state, meaning that it conducts its own background checks. [124] Virginia State code, amended in 2005, required that any person who was admitted to any facility (either voluntarily or involuntarily), had been subjected to a temporary detention order, or who had been prohibited by a judge from possessing a firearm be reported to the Central Criminal Records Exchange (CCRE), used to house information vital to background checks. [125] Any person who met one or more of these criteria was unable to legally purchase, possess, or transport a firearm, [126] and only information relevant to making such a  **1062**  determination was required to be submitted by state police to the NICS system. [127]

Since the perpetrator's temporary detention in 2005 was never reported to the CCRE, he was not flagged when he went to purchase his firearms that were subsequently used in the shootings. The first gun, a Walther P22 semiautomatic handgun, was purchased in February 2007; the second, a Glock 19 semiautomatic pistol, was purchased just over a month later as Virginia law at the time required individuals to wait a mandated thirty days between firearms purchases. [128] For each purchase, the perpetrator presented the required identification (proof of residency and a government-issued identification card) and passed the instant background checks, despite that he should have been deemed ineligible under both state and federal law. [129]

In the aftermath of the shooting, Virginia Governor Tim Kaine signed an executive order aimed at closing the loopholes in the state reporting system that allowed the perpetrator to acquire the guns used in the attack legally. [130] Other states also passed legislation to address gaps in their own respective systems or to require reporting of mental health records. [131] At the federal level, Congress approved and President George W. Bush signed into law the NICS Improvements Amendments Act (NIAA), which required faster reporting to the system, more frequent updates of records, and improved coordination between state and federal agencies. [132] The NIAA also clarified what types of records should be reported to NICS and created federal funding opportunities to  **1063**  establish new or update existing reporting systems for firearms eligibility verification. [133] Federal funding totaling $1.3 billion was made available to address these loopholes through grants and other programs; [134] however, between Virginia Tech and the shooting at Sandy Hook Elementary School in December 2012, only about $50 million had been appropriated by the states. [135]

In the thirteen years since the Virginia Tech shooting, improvements have been made regarding the number of records submitted to NICS. In the year after the shooting, just over 500,000 disqualifying mental health records had been submitted to the system, with thirty-five states and Washington, D.C. each providing less than 100 records. [136] Ten years later, that number had increased to 4.97 million records, with just two states submitting fewer than 100 files each. [137] Despite such improvements, however, it is probable that millions of records are still missing from NICS that would otherwise lead to prohibited persons being denied firearms purchases. [138]

In fact, two other mass shootings highlight this continued reporting gap. The perpetrator of the January 8, 2011 attack in Tucson, AZ that killed six and left thirteen others injured--including Congresswoman Gabrielle Giffords-- should have been disqualified from legally purchasing the firearm used in the attack. [139] In 2007, he had been arrested on a drug charge for paraphernalia, though it was dismissed after he completed a diversion program and thus was never reported to NICS. [140] In 2008, he was rejected by the Army, with whom he sought to enlist, for self-reported regular marijuana use. [141] The Army, however, never reported **1064** this to NICS as required, [142] and within a year, he had passed a background check and purchased a shotgun. [143] In the year prior to the attack, he had five separate contacts with campus police at Pima Community College, where he was a student. [144] His violent behavior in class had been so concerning that, in 2010, he was asked to leave; he subsequently decided to withdraw and the college advised he would have to be cleared by a mental health professional that he was not a danger to himself and others before he could return. [145] A month after leaving the school, he passed a background check at a local retailer and lawfully secured the Glock firearm used in the shooting less than two months later, [146] despite the fact that he fell into multiple categories of prohibited persons.

Ten years after the Virginia Tech shooting, the gaps in the reporting system were highlighted again after a gunman killed twenty-six and wounded twenty others at the First Baptist Church in Sutherland Springs, TX on November 5, 2017. [147] The perpetrator, a former member of the U.S. Air Force, had a history of domestic violence. [148] In 2012, he had been court-martialed for assaulting his wife and infant stepson, even fracturing the baby's skull. [149] As part of a plea deal, he served twelve months in confinement before being discharged from the Air Force for bad conduct. [150] His domestic violence conviction, however, was never reported to NICS by the Air Force, and he subsequently was able to pass background checks on four separate occasions beginning in 2014 to purchase firearms after his release. [151] While the discharge alone would not have **1065** disqualified him as a prohibited person (as it was not a dishonorable discharge), the domestic violence arrest and conviction would have if reported, as would the length of time he served in incarceration. [152]

In response to the numerous gaps in the NICS system identified not only by these events but other crimes, attempts were made to address the continued issues that allowed firearms to continue to fall into the wrong hands. In March 2018, less than a month and a half after the Parkland shooting, President Donald Trump signed into law [153] the Consolidated Appropriations Act. [154] Among the many provisions included in the Act was the Fix NICS Act, which includes amendments to both the Brady Act (federal) and the NIAA (states). [155] At the federal level, the Fix NICS Act requires each agency and department to certify whether it has provided disqualifying records to NICS as required, to establish a plan to maximize record submission and related accuracy verification, and to comply with the procedures created. [156] The amendments to the NIAA under the provision require states also to establish an implementation plan, in conjunction with the Department of Justice, to maximize the submission of criminal and mental health records to NICS; it also authorized the creation of new and extension of existing funding streams to achieve this end. [157] It remains to be seen, however, how effective the Fix NICS Act will be. [158]

**1066 III. EXPANDING BACKGROUND CHECKS**

While the Brady Act was successful in creating the foundation for NICS, it also contained a very important loophole, something that was identified by one of the Columbine shooters in a class paper months before the attack: "The biggest gaping hole is that the background checks are only required for licensed dealers ... not private dealers .... Private dealers can sell shotguns and rifles to anyone who is 18 or older ...." [159] When their friend--who purchased three firearms, later used in the shooting, at a local gun show on their behalf--did not want her name tied to the transactions, the pair specifically sought out private individuals

who were not required to run a background check. [160] More than twenty years after this issue was identified, the perpetrator of the August 2019 rampage in Midland-Odessa, TX, who previously had failed a background check due to a disqualifying mental health issue, was able to secure a firearm from a **1067** private seller. [161] He used it to kill seven people and injured more than twenty others. [162]

Beyond these two examples, however, researchers have found that approximately 22% of gun owners acquire their weapons without submitting to a background check. [163] When considering just those firearms purchased in private transactions, the proportion reaches 50%. [164] Other estimates suggest that approximately 80% of guns used in criminal activity also have been acquired through transactions that did not involve a background check. [165] Such findings have led to calls for an expansion of the background check requirements to include all firearms transactions (sales and transfers), including those by private sellers and at gun shows.

Public support for "universal background checks" has been found to be particularly high. Across various polls, 86% of all respondents, on average, support such a measure. [166] Regularly, more than nine out of every ten individuals identifying as Democrat say they support background checks for both gun shows and private sales, while nearly 80% of Republicans express similar attitudes. [167] **1068** Even the majority of gun owners who are not NRA members, as well as those who are NRA members, have been found to support universal background checks, with 78% and 69%, respectively. [168]

As with the assault weapons ban discussed earlier, legislative attempts to address the Brady Act loophole have been largely unsuccessful. Early efforts focused specifically on closing the gun show loophole that allowed buyers to purchase firearms from private dealers without background checks at such events. The first attempt came in 1998, when Illinois Representative Rod Blagojevich introduced a bill to require more detailed records of transactions occurring at gun shows, including the name, address, and age of the purchaser; the make, model, and serial number of the firearm; and the date and location of transfer. [169] The legislation died shortly after introduction, only to be reintroduced--and fail--several times in both the House and Senate. [170] Two additional bills were introduced in early 1999 that sought to require organizations operating gun shows to ensure that background checks were being conducted and that requisite sales were being reported, among other provisions. [171] The legislation failed to garner any support and died on the floor. Following the Columbine shooting, renewed attempts to regulate private transactions at gun shows flooded the legislature. [172] Each attempt, however, was as unsuccessful as those introduced prior to the attack.

**1069** With attempts to close the gun show loophole failing to gain traction, some legislators shifted gears to focus on expanding background checks to all transactions, which thereby would extend to private sellers and gun shows indirectly. The Fix Gun Checks Act of 2011, in addition to expanding NICS records, proposed to conduct background checks on all firearms sales, not only those conducted by FFLs. [173] Similar legislation was introduced by Connecticut Senator Chris Murphy, who was the representative in office when the Sandy Hook shooting occurred, as the Background Check Expansion Act. [174] Both sets of legislation failed to garner the necessary support to become law. Most recently, the Bipartisan Background Checks Act was introduced to expand the requirement to all firearms sales. [175] Though the bill passed the House, it has yet to clear the Senate. [176]

## IV. STATE LEGISLATION

While assault weapons bans and expanded background check provisions have yet to gain the necessary support of Congress to become law, legislative efforts at the state level to address these identified issues have been more successful. Regarding assault weapons, for instance, seven states and the District of Columbia presently have some form of a ban in place. California was the first to pass such a law following a mass shooting at an elementary school in Stockton in 1989, [177] prohibiting nearly seventy-five specific types, models, and series, as well as identifying additional characteristics of semiautomatic handguns, shotguns, and centerfire rifles that qualified as assault weapons. [178] Connecticut, [179] the District of Columbia, [180] and New Jersey [181] each offer similar **1070** guidelines as California, though their lists of specifically prohibited weapons by model, series, or type are slightly shorter. Maryland [182] and Massachusetts [183] provide limited lists of firearm type and series that are specifically

Compendium_Cornell
Page 1685

banned, instead emphasizing general features that qualify as an assault weapon; New York [184] solely emphasizes the general features in its definition. Hawaii's ban covers only handguns classified as assault pistols; rifles and shotguns are not included in its prohibition on assault weapons. [185]

In addition to successful legislation related to assault weapons, a number of states also have enacted laws related to background checks, both at the point of transfer and related to private purchases. For firearms transfers involving a private seller, California, [186] Colorado, [187] Delaware, [188] Nevada, [189] New Jersey, [190] New Mexico, [191] New York, [192] Oregon, [193] Vermont, [194] and Washington [195] each require the background checks to be conducted by or processed through dealers who possess federal firearms licenses. Rhode Island requires purchasers to complete a background check form, which is then submitted to a local law enforcement agency for processing. [196] Connecticut, [197] Maryland, [198] and Pennsylvania [199] have provisions to allow for background checks to be processed by either FFLs or law enforcement.

 *1071  Additionally, a number of states require that purchasers have a license or permit in place after the completion of the background check but prior to the transfer of the firearm. Connecticut, [200] the District of Columbia, [201] Hawaii, [202] Illinois, [203] Massachusetts, [204] and New Jersey [205] require that permits be in place for the purchase of any firearm prior to transfer. Conversely, such licenses are only required on transfers of handguns in Iowa, [206] Maryland, [207] Michigan, [208] Nebraska, [209] New York, [210] North Carolina, [211] and Rhode Island. [212] Finally, a number of states also require background checks on private sellers transferring firearms at gun shows. [213] In short, many of the provisions that have garnered public support but failed to gain traction at the federal level have found success in various states.

## V. DISCUSSION

Despite the reactions and demands for change elicited in the wake of mass shootings, little in the way of responding to these events legislatively has occurred at the federal level. Oftentimes, this comes as the result of the "perpetual stalemate" between the Democrats and Republicans on issues related to gun control. [214] Given the fact that a firearm is a prerequisite for a mass shooting (as opposed to a bomb, knife, or car, for example), it is not entirely  *1072  surprising that much of the focus in the discourse surrounding these events is on the weapons themselves. In essence, however, the gun debate drives all debates and, as a result, other responses can (and do) fall by the wayside, leaving missed opportunities to implement prevention or response strategies.

This is not to say, of course, that lawmakers have done nothing. The federal government banned bump stocks, like those used in the 2017 shooting in Las Vegas that left fifty-eight people dead and more than 400 others injured, [215] on March 26, 2019. [216] The devices are stocks that enable a semiautomatic firearm to continuously fire the weapon with a single pull of the trigger, thereby mimicking a fully automatic gun. [217] Accordingly, people on both sides of the gun debate--including even the NRA [218] -- called for them to be reviewed to determine compliance with federal law or banned completely. Three days after the shooting, Senator Dianne Feinstein and Florida Representative Carlos Curbelo introduced the Automatic Gunfire Prevention Act aimed at banning bump stocks; [219] several weeks later, Pennsylvania Representative Brian Fitzpatrick introduced similar legislation. [220] Both pieces of legislation failed, despite the visceral reactions and demand for action after the shooting. Following the Parkland shooting in February 2018, however, President Trump issued an executive action for the Bureau of Alcohol, Tobacco, Firearms, and Explosives to regulate any devices that turn legal firearms into machine guns, [221] and ten months later, the Department of Justice issued the final regulation. [222] In  *1073  addition to the federal ban, eleven states also have passed similar legislation making possession of bump stocks illegal. [223]

Other measures that also could facilitate keeping firearms out of the hands of prohibited individuals, including potential mass shooters, however, have been met with less legislative success. Since the Parkland shooting, red flag laws, also known as extreme risk protection orders--designed to help remove firearms from the possession of prohibited persons--have been gaining support, even broaching both sides of the congressional aisle. [224] As of September 2019, twelve states and the District of Columbia permit a family or household member to petition for removal, and three of those states and the District of Columbia also allow individuals other than family to petition. Three states allow only law enforcement to seek a removal order. [225] Yet despite such consensus, they have failed to gain traction at the federal level--two bills introduced immediately after Parkland

failed at introduction,[226] and four additional bills proposed in the following legislative session each have just a 4% chance of being enacted.[227]

Still, a lingering question remains as to whether addressing mass shootings legislatively can ever be a nonpartisan issue or, at the very least, if the stalemate can be broken. Given that bipartisan support for measures like assault weapons bans and universal background checks exists in the populace, it calls for consideration then as to whether elected officials' decisions are reflecting that of their constituents. One impediment to this, however, is the money that is received from lobbyists in the gun industry including (but certainly not limited **1074** to) the NRA. Between 1998 and February 2018, the NRA alone donated more than $4 million to members of Congress,[228] the majority being Republicans.[229] When factoring in contributions beyond just individual candidates, including those made to political parties more broadly and political action committees (PACs), this figure increases to more than $13 million.[230] Even more money, however, has been spent by the NRA to further gun rights, including $45.9 million spent on federal lobbying against gun control bills and $144.3 million on outside spending and independent expenditures, such as advertising for or against a particular candidate (between 1998 and 2016).[231]

Collectively, gun rights organizations (including the NRA) outspend gun control advocacy groups more than forty to one.[232] Such contributions also greatly overshadow those made from the constituents themselves.[233] This is likely why it has been all but impossible to pass meaningful legislation related to firearms regulations, even when broadly supported by the public. Until corporate money is no longer as heavily embedded within politics as it has been in past years, it is likely that the problem of elected officials not supporting constituent interests related to firearms legislation will persist.[234]

Where the federal government has failed to make progress on addressing mass shootings legislatively, some states have managed to overcome this stalemate. Seven states plus the District of Columbia currently have an assault weapons ban in place. Each of these jurisdictions is heavily blue, meaning that their government representatives and constituents primarily identify as **1075** Democrats.[235] Similarly, Democrats control all but one of the fourteen states with background check requirements prior to transfer, with Pennsylvania being the sole exception.[236] That Democrats typically support gun control measures more than Republicans likely explains why legislative efforts have been successful in places led by officials from the Democratic party.[237] In this era of single party dominance of state legislatures, both red and blue states have effectively enacted a flood of legislation without successful resistance from the opposing party.[238] The unhindered ability of single party legislatures to effectively enact legislation answers why predominately blue states have made significant progress in enacting assault weapons bans and background checks, while a divided Congress has proven unable to keep pace.[239]

Certainly, a question on everyone's mind is whether federal legislation on measures such as an assault weapons ban or universal background checks could have an impact on reducing the occurrence of mass shootings. As noted earlier, deaths associated with firearm-related massacres decreased during the ten years that the AWB was in place.[240] During that same period, the use of assault-style rifles, particularly the AK-47, by mass shooters also dropped in relative frequency.[241] Though the ban did not completely eliminate the use of assault weapons by mass shooters, the reduction in deaths associated with such weapons is certainly a worthwhile consideration when deciding whether to pass similar legislation. The loss of one life to a mass shooting is one too many, and every life that can be saved should be.

With mass shootings continuing to occur, it is imperative that changes are made that work to prevent these attacks from happening or, when they do, to **1076** mitigate the loss of life. While a common argument against the measures proposed here is that "criminals do not follow the law," the reality is that the gaping loopholes in our systems have made it easier for them to commit their acts with weapons obtained through lawful means. Thus, measures like assault weapons bans and universal background checks--measures that are supported by gun owners, among others--can make it more difficult to acquire the weapons needed to carry out mass violence. Still, it bears noting that mass shootings are a complex issue in need of equally multidimensional responses. Concerned Americans have identified such opportunities for meaningful change that could potentially save countless lives (not only in mass shootings but also related to homicide more broadly). It is time for the federal government to act now to break the cycle of inaction.

Compendium_Cornell
Page 1687

## Footnotes

a1    Jaclyn Schildkraut is an Associate Professor of Criminal Justice at the State University of New York (SUNY) at Oswego. Her research interests include mass/school shootings, homicide trends, mediatization effects, moral panics, and crime theories. She is the co-author of *Mass Shootings: Media, Myths, and Realities* and has published in a number of journals including *Homicide Studies, American Journal of Criminal Justice, Journal of Qualitative Criminal Justice & Criminology, Crime, Law and Social Change*, and *Security Journal*, as well as several edited volumes. State University of New York at Oswego, 458 Mahar Hall, Oswego, NY 13126, USA; Email: Jaclyn.Schildkraut @oswego.edu.

aa1   Collin M. Carr is a 2020 graduate of Syracuse University College of Law. His research focuses on civil liberties and public policy, and covers topics ranging from felon disenfranchisement laws, perceptions of concealed carry on campus policies, and the development of free speech jurisprudence under the First Amendment.

1     *See, e.g.*, Jaclyn Schildkraut, Margaret K. Formica & Jim Malatras, Can Mass Shootings Be Stopped? To Address the Problem, We Must Better Understand the Phenomenon (2018); Bruce Drake, *Mass Shootings Rivet National Attention, but Are a Small Share of Gun Violence*, PEW RES. CTR. (Sept. 17, 2013), https://www.pewresearch.org/fact-tank/2013/09/17/mass-shootings-rivet-national-attention-but-are-a-small-share-of-gun-violence/.

2     Jaclyn Schildkraut, *Mass Murder and the Mass Media: Understanding the Construction of the Social Problem of Mass Shootings in the US*, 4 J. QUALITATIVE CRIM. JUST.& CRIMINALITY 1, 1 (2016). *See generally* JACLYN SCHILDKRAUT & H. JAYMI ELSASS, MASS SHOOTINGS: MEDIA, MYTHS, AND REALITIES (2016); Ronald Burns & Charles Crawford, *School Shootings, the Media, and Public Fear: Ingredients for a Moral Panic*, 32 CRIME L. & SOC. CHANGE 147 (1999).

3     *See* Peter Moore, *Over a Third of Americans Think Mass Shootings Are Just 'a Fact of Life'*, YOUGOV (Oct. 7, 2015, 12:32 PM), https://today.yougov.com/topics/politics/articles-reports/2015/10/07/third-americans-mass-shootings-fact-life; *see also* Maria Caspani, *Most Americans Expect Next Mass Shooting to Happen in Next Three Months: Reuters/Ipsos Poll*, REUTERS (Aug. 9, 2019, 10:46 AM), https://www.reuters.com/article/us-usa-shooting-poll/most-americans-expect-next-mass-shooting-to-happen-in-next-three-months-reuters-ipsos-poll-idUSKCN1UZ1OZ.

4     *See, e.g.*, Sophie Bethune & Elizabeth Lewan, *One-Third of US Adults Say Fear of Mass Shootings Prevents Them from Going to Certain Places or Events*, AM. PSYCHOL. ASS'N (Aug. 15, 2019), https:// www.apa.org/news/press/releases/2019/08/fear-mass-shooting; Nikki Graf, *A Majority of U.S. Teens Fear a Shooting Could Happen at Their School, and Most Parents Share Their Concern*, PEW RES. CTR. (Apr. 18, 2018), https://www.pewresearch.org/fact-tank/2018/04/18/a-majority-of-u-s-teens-fear-a-shooting-could-happen-at-their-school-and-most-parents-share-their-concern/.

5     Bruce Drake, *Public Divided over the Root Causes of Mass Shootings*, PEW RES. CTR. (Apr. 11, 2013), https://www.pewresearch.org/fact-tank/2013/04/11/public-divided-over-the-root-causes-of-mass-shootings/; *Washington Post-ABC News Poll*, WASH. POST (Dec. 2012), http://www.washingtonpost.com/wp-srv/politics/polls/postabcpoll_20121216.html.

6     Drake, *supra* note 5.

7     AJ Willingham, *How 'Thoughts and Prayers' Went from Common Condolence to Cynical Meme*, CNN (Feb. 21, 2018), https://www.cnn.com/ampstories/us/how-thoughts-and-prayers-went-from-common-condolence-to-cynical-meme.

8    JACLYN SCHILDKRAUT, MASS SHOOTINGS IN AMERICA: UNDERSTANDING THE DEBATES, CAUSES, AND RESPONSES, at xxvii (2018); Richard K. Yu, *The Debate on School Shootings in the United States*, MEDIUM (Mar. 6, 2018), https://medium.com/age-of-awareness/the-debate-on-school-shootings-in-the-united-states-1ca8254535.

9    Jaclyn Schildkraut & Glenn W. Muschert, *Violent Media, Guns, and Mental Illness: The Three Ring Circus of Causal Factors for School Massacres, as Related in Media Discourse*, FAST CAPITALISM, 2013, at 159, 159.

10    Laura Ratliff, *With Every Mass Shooting, the US Makes the Same Fundamental & Routine Mistake*, BUSTLE (Oct. 2, 2017), https://www.bustle.com/p/with-every-mass-shooting-the-us-makes-the-same-fundamental-routine-mistake-2756740.

11    *The Grim Political Routine of Responding to a Mass Shooting*, PBS NEWSHOUR (Oct. 2, 2017, 7:17 PM), https://www.pbs.org/newshour/show/grim-political-routine-responding-mass-shooting.

12    *See generally* Jaclyn Schildkraut & Tiffany Cox Hernandez, *Laws that Bit the Bullet: A Review of Legislative Responses to School Shootings*, 39 AM. J. CRIM. JUST. 358 (2014).

13    *Id.*

14    Schildkraut, Formica & Malatras, *supra* note 1; *see also* JACLYN SCHILDKRAUT, ASSAULT WEAPONS, MASS SHOOTERS, AND OPTIONS FOR LAWMAKERS 4 (2019).

15    *See, e.g.*, *Assault Weapons and High-Capacity Magazines*, EVERYTOWN FOR GUN SAFETY SUPPORT FUND (Mar. 22, 2019), https://everytownresearch.org/assault-weapons-high-capacity-magazines/.

16    SCHILDKRAUT, *supra* note 14, at 5.

17    Gregor Aisch et al., *What Happened Inside the Orlando Nightclub*, N.Y. TIMES (June 12, 2016) https://www.nytimes.com/interactive/2016/06/12/us/what-happened-at-the-orlando-nightclub-shooting.html.

18    C. J. Chivers et al., *With AR-15s, Mass Shooters Attack with the Rifle Firepower Typically Used by Infantry Troops*, N.Y. TIMES (Feb. 28, 2018), https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html?auth=login-smartlock. More recently, variants of the AR-15 were used in attacks at a Pittsburgh, PA synagogue in 2018 (11 killed, 6 injured); a Thousand Oaks, CA bar and grill in 2018 (12 killed, 18 injured); a Walmart in El Paso, TX in 2019 (22 killed, 24 injured); a Dayton, OH bar (9 killed, 27 injured); and in Midland and Odessa, TX in 2019 (7 killed, 22 injured). WHYY Staff, *11 Killed, 6 Injured in Pittsburgh Synagogue Shooting; FBI Investigating as Hate Crime*, WHYY (Oct. 27, 2018), https://whyy.org/articles/multiple-casualties-after-shooting-near-pittsburgh-synagogue/; Sean Greene et al., *Thousand Oaks Shooting Leaves 12 People Dead and 18 Injured*, L.A. TIMES (Nov. 7, 2018, 11:58 PM), https://www.latimes.com/local/lanow/la-me-ln-thousand-oaks-20181107-story.html; Chas Danner, *Everything We Know About the El Paso Walmart Massacre*, N.Y. INTELLIGENCER, https://nymag.com/intelligencer/2019/08/everything-we-know-about-the-el-paso-walmart-shooting.html (last updated Aug. 7, 2019); Timothy Williams & Farah Stockman, *Gunman Kills 9 in Dayton Entertainment District*, N.Y. TIMES (Aug. 4, 2019), https://www.nytimes.com/2019/08/04/us/dayton-ohio-shooting.html; Tara Law et al., *7 People Killed, 22 Injured in Odessa Mass Shooting. Here's What We Know So Far*, TIME, https://time.com/5666249/mass-shooting-midland-odessa-texas-police/ (last updated Sept. 1, 2019, 3:24 PM). It bears noting, however, that in this context, the Las Vegas shooting is an outlier event. While the perpetrators of nearly all (Sandy Hook is the notable exception with four, though only two were used in the shooting) these attacks mentioned used a single weapon, the gunman in Las Vegas had twenty-three separate assault-style rifles that were recovered at the scene, many of which had been fired during the course of the attack. *See* JOSEPH LOMBARDO,

Compendium_Cornell
Page 1689

LAS VEGAS METRO. POLICE DEP'T, LVMPD CRIMINAL INVESTIGATIVE REPORT OF THE 1 OCTOBER MASS CASUALTY SHOOTING (2018).

19 *See* Aisch, *supra* note 17; Chivers et al., *supra* note 18.

20 VA. TECH REVIEW PANEL, MASS SHOOTINGS AT VIRGINIA TECH APRIL 16, 2007, at 1, 71 (2007). The seventeen students noted here were injured by gunfire. *Id.* at 92. An additional six students sustained injuries when trying to escape through the windows at Norris Hall. *Id.*

21 SCHILDKRAUT, *supra* note 14, at 7.

22 *Id.* at 6.

23 *Id.*

24 Schildkraut & Hernandez, *supra* note 12, at 361.

25 H.R. 3355, 103d Cong. (1994); *see also* Robert J. Spitzer, *Assault Weapons, in* GUNS IN AMERICAN SOCIETY: AN ENCYCLOPEDIA OF HISTORY, POLITICS, CULTURE, AND THE LAW 53 (Gregg Lee Carter ed., 2d ed. 2012).

26 H.R. 3355.

27 *Id.*; *see also* 18 U.S.C. § 921(a)(30)(B) (repealed 2004); Schildkraut, *supra* note 5, at 7.

28 18 U.S.C. §§ 921-922 (2012); *see also* Robert Singh, *Gun Politics in America: Continuity and Change*, 52 PARLIAMENTARY AFF. 1 (1999).

29 H.R. 464, 104th Cong. (1995).

30 H.R. 698, 104th Cong. (1995).

31 H.R. 4137, 105th Cong. (1998); Jaime Fuller, *It's Been 20 Years Since the Brady Bill Passed. Here Are 11 Ways Gun Politics Have Changed.*, WASH. POST, https://www.washingtonpost.com/news/the-fix/wp/2014/02/28/its-been-20-years-since-the-brady-law-passed-how-have-gun-politics-changed/ (last updated Feb. 28, 2014, 12:30 PM).

32 Singh, *supra* note 28, at 2.

33 S. 2498, 108th Cong. (2004); S. 2109, 108th Cong. (2004).

34 H.R. 3831, 108th Cong. (2004).

35 S. 1034, 108th Cong. (2003).

36     S. 1431, 108th Cong. (2003).

37     H.R. 2038, 108th Cong. (2003). Carolyn McCarthy's husband, Dennis, was among the six people killed in the December 7, 1993 mass shooting on the Long Island Rail Road. *See* Michael Gormley, *Carolyn McCarthy Reflects on 1993 LIRR Shooting, Gun Violence, Activism,* NEWSDAY, https://www.newsday.com/long-island/carolyn-mccarthy-lirr-shooting-1.24081714 (last updated Dec. 3, 2018, 6:00 AM). Her son, Kevin, was also severely wounded in the attack, along with eighteen others. *Id.* Four years after the shooting, she was elected to a seat in the House of Representatives for New York's Fourth Congressional District, where she served until 2015. *Id.*

38     JACLYN SCHILDKRAUT & GLENN W. MUSCHERT, COLUMBINE, 20 YEARS LATER AND BEYOND: LESSONS FROM TRAGEDY 115 (2019).

39     H.R. 6257, 110th Cong. (2008); H.R. 1022, 110th Cong. (2007); S. 645, 109th Cong. (2005); H.R. 1312, 109th Cong. (2005); S. 620, 109th Cong. (2005); H.R. 5099, 108th Cong. (2004); H.R. 5100, 108th Cong. (2004).

40     H.R. 2959, 116th Cong. (2019); H.R. 1296, 116th Cong. (2019); S. 66, 116th Cong. (2019); H.R. 282, 116th Cong. (2019); H.R. 5087, 115th Cong. (2018); H.R. 5077, 115th Cong. (2018); S. 2095, 115th Cong. (2017); H.R. 4269, 114th Cong. (2015); H.R. 437, 113th Cong. (2013); S. 150, 113th Cong. (2013).

41     *See, e.g.*, *The Economy, the Budget Deficit and Gun Control*, CBS NEWS/N.Y. TIMES (Jan. 20, 2011, 6:30 PM), https://www.cbsnews.com/htdocs/pdf/Jan11_Econ.pdf; *Guns*, GALLUP, https://news.gallup.com/poll/1645/guns.aspx (last visited Sept. 12, 2019) [hereinafter *Gallup Poll*].

42     Darren K. Carlson, *Americans Softening on Tougher Gun Laws?*, GALLUP (Nov. 30, 2004), https://news.gallup.com/poll/14185/Americans-Softening-Tougher-Gun-Laws.aspx.

43     YouGov Staff, *After Aurora: Little Change in Opinions About Gun Control Measures*, YOUGOV (July 25, 2012, 8:00 AM), https://today.yougov.com/topics/politics/articles-reports/2012/07/25/after-aurora-little-change-opinions-about-gun-cont; *see also* CNN/ORC POLL (Aug. 9, 2012, 1:00 PM), http://i2.cdn.turner.com/cnn/2012/images/08/09/rel7a.pdf (stating that 57% support the ban).

44     *Gallup Poll*, *supra* note 41.

45     Megan Brenan, *Support for Stricter Gun Laws Edges up in U.S.*, GALLUP (Oct. 16, 2017), http://news.gallup.com/poll/220595/support-stricter-gun-laws-edges.aspx.

46     Aisch et al., *supra* note 17; Alan Gomez & Kaila White, *Here Are All the Victims of the Las Vegas Shooting*, USA TODAY, https://www.usatoday.com/story/news/nation/2017/10/06/here-all-victims-las-vegas-shooting/733236001/ (last updated Oct. 8, 2017, 7:39 PM).

47     *See* Christine Filer, *Six in 10 Say Ban Assault Weapons, Up Sharply in Parkland's Aftermath*, ABC NEWS/WASH. POST (Apr. 20, 2018), https://www.langerresearch.com/wp-content/uploads/1196a5GunPolicy.pdf; *Fox News Poll*, FOX NEWS (Aug. 14, 2019, 6:00 PM), https://www.foxnews.com/politics/fox-news-poll-august-14; *Monthly Harvard-Harris Poll*, HARV. CAPS/HARRIS POLL (Feb. 2018), http://harvardharrispoll.com/wp-content/uploads/2018/02/Final_HHP_20Feb2018_RegisteredVoters_Topline_Memo.pdf; *Large Partisan Gaps in Views on Banning Assault-Style Weapons and Allowing Teachers to Carry Guns*, PEW RES. CTR. (Apr. 17, 2018), https://www.pewresearch.org/fact-tank/2018/04/a-majority-of-u-s-teens-fear-a-shooting-could-happen-at-their-school-and-most-parents-share-their-concern/ft_18-04-16_teensguns/ [hereinafter *Large Partisan Gaps*]; *U.S. Voter Support for Abortion Is High, Quinnipiac University National Poll Finds; 94 Percent Back Universal*

*Gun Background Checks*, QUINNIPIAC U. POLL (May 22, 2019), https://poll.qu.edu/national/release-detail?ReleaseID=2623 [hereinafter *U.S. Voter Support*].

48   Steven Shepard, *Poll: Most Republicans Support Assault Weapons Ban, Despite Trump Saying 'No Appetite'*, POLITICO, https://www.politico.com/story/2019/08/07/poll-most-voters-support-assault-weapons-ban-1452586 (last updated Aug. 7, 2019, 6:24 PM); *see also Fox News Poll*, *supra* note 50; *Mass Shootings*, HUFFPOST/YOUGOV (Aug. 2019), https://big.assets.huffingtonpost.com/athena/files/2019/08/08/5d4c8406e4b0066eb70ee689.pdf.

49   YouGov Staff, *supra* note 43.

50   *Large Partisan Gaps*, *supra* note 47.

51   Shepard, *supra* note 48.

52   *See supra* note 43 and accompanying text.

53   Andrew Infantino, *In Defense of the AR-15*, STATESMAN (Aug. 31, 2019), https://www.sbstatesman.com/2019/08/31/in-defense-of-the-ar-15/.

54   *Remarks from the NRA Press Conference on Sandy Hook School Shooting, Delivered on Dec. 21, 2012 (Transcript)*, WASH. POST, https://www.washingtonpost.com/politics/remarks-from-the-nra-press-conference-on-sandy-hook-school-shooting-delivered-on-dec-21-2012-transcript/2012/12/21/bd1841fe-4b88-11e2-a6a6-aabac85e8036_story.html?utm (last visited Feb. 19, 2020); *see also* Nadia E. Nedzel, *Concealed Carry: The Only Way to Discourage Mass School Shootings*, 27 ACAD. QUESTIONS 429, 433 (2014).

55   Marion P. Hammer, *Florida Alert! "Assault Weapons" Ban Amendment Bans ALL SEMIAUTOMATIC RIFLES AND SHOTGUNS*, NRA-ILA (Aug. 19, 2019), https://www.nraila.org/articles/20190819/florida-alert-assault-weapons-ban-amendment-bans-all-semiautomatic-rifles-and-shotguns.

56   554 U.S. 570, 626 (2008). While the *Heller* case did not address ownership or possession of semiautomatic assault-style weapons, federal appellate courts have, on occasion, upheld the constitutionality of bans on such firearms. *See, e.g.*, Wilson v. Cook Cty., 937 F.3d 1028, 1029 (7th Cir. 2019); Worman v. Healey, 922 F.3d 26, 30 (1st Cir. 2019); Kolbe v. Hogan, 849 F.3d 114, 144, 149 (4th Cir. 2017); N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 269 (2d Cir. 2015); Friedman v. City of Highland Park, 784 F.3d 406, 407-08 (7th Cir. 2015).

57   Daniel Abrams, *Ending the Other Arms Race: An Argument for a Ban on Assault Weapons*, 10 YALE L. & POL'Y REV. 488, 489 (1992).

58   Chivers et al., *supra* note 18; *see also Assault Weapons*, VIOLENCE POL'Y CTR., http://vpc.org/regulating-the-gun-industry/assault-weapons/ (last visited Jan. 28, 2020).

59   Tom Kertscher, *Bernie Sanders Says Private Citizens Have up to 10 Million Assault Weapons, More Than US Military*, POLITIFACT (Aug. 8, 2019), https://www.politifact.com/truth-o-meter/statements/2019/aug/08/bernie-sanders/do-private-citizens-have-5-10-million-assault-weap/.

60   Gary Kleck, *Mass Shootings in Schools: The Worst Possible Case for Gun Control*, 52 AM. BEHAV. SCIENTIST 1447, 1457 (2009).

61      *Id.*

62      SCHILDKRAUT & ELSASS, *supra* note 2.

63      Chivers et al., *supra* note 18.

64      *Id.* A companion argument for gun control advocates, both among legislators and the public, is to limit the capacity of magazines to no more than ten rounds. *See* Griff Witte, *As Mass Shootings Rise, Experts Say High-Capacity Magazines Should Be the Focus*, WASH. POST (Aug. 18, 2019, 6:23 PM), https://www.washingtonpost.com/national/as-mass-shootings-rise-experts-say-high-capacity-magazines-should-be-the-focus/2019/08/18/d016fa66-bfa3-11e9-a5c6-1e74f7ec4a93_story.html. By limiting the available clip size, it would force shooters to have to reload more often, thereby giving people more opportunities to escape. *Id.*

65      Chivers et al., *supra* note 18.

66      Witte, *supra* note 64.

67      *See, e.g.*, Nick Wing, *Houston Shooter Fired 212 Rounds, Outgunned Police with America's Favorite Rifle*, HUFFPOST (June 1, 2016, 3:55 PM), https://www.huffpost.com/entry/houston-shooting-ar15_n_574efd52e4b0c3752dcc134c.

68      Watkins et al., *Once Banned, Now Loved and Loathed: How the AR-15 Became 'America's Rifle'*, N.Y. TIMES (Mar. 3, 2018), https://www.nytimes.com/2018/03/03/us/politics/ar-15-americas-rifle.html.

69      Tony Dokoupil, *Family of AR-15 Inventor Eugene Stoner: He Didn't Intend It for Civilians*, NBC NEWS, https://www.nbcnews.com/news/us-news/family-ar-15-inventor-speaks-out-n593356 (last updated June 16, 2016, 2:24 PM); *see also* James Fallows, *Why the AR-15 Was Never Meant To Be in Civilians' Hands*, ATLANTIC (Nov. 10, 2017, 6:00 AM), https://www.theatlantic.com/notes/2017/11/why-the-ar-15-was-never-meant-to-be-in-civilians-hands/545438/. A common misconception about the AR-15 is that the "AR" stands for assault rifle or automatic rifle. In actuality, the AR represents ArmaLite, the original creator of the weapon. *See* John Haltiwanger, *A Breakdown of Gun Terminology to Help You in Discussions on Mass Shootings and Debates over Gun Control*, BUS. INSIDER (Aug. 12, 2019, 10:06 AM), https://www.businessinsider.com/terms-to-know-about-guns-when-discussing-mass-shootings-2019-8.

70      Christine Jamieson, *Gun Violence Research: History of the Federal Funding Freeze*, AM. PSYCHOL. ASS'N (Feb. 2013), https://www.apa.org/science/about/psa/2013/02/gun-violence. The Dickey Amendment was an addition to a congressional spending bill that mandated that no federal funding could be used to promote or advocate for gun control. *See* Allen Rostron, *The Dickey Amendment on Federal Funding for Research on Gun Violence: A Legal Dissection*, 108 AM. J. PUB. HEALTH 865, 865 (2018). The result of lobbying efforts by the NRA, the Dickey Amendment, named for Arkansas Representative Jay Dickey, was a response to a study by Arthur Kellerman and colleagues published in 1993 that found that the presence of a firearm in the home increased the risk of homicide. *Id.* at 866. Despite that the legislation did not expressly state that funds could not be used for research on gun violence, only that it could not be used for lobbying efforts related to gun control, Congress did require that the same amount of funding within the Center for Disease Control's (CDC) budget typically earmarked for firearm injury research be reallocated. *Id.* Further, the Dickey Amendment has been applied each year that the CDC has been provided funding by Congress. *Id.*

71      Notably, one of the firearms used in the April 20, 1999 shooting at Columbine High School--the IntraTec TEC-DC9-- was one of the nineteen guns expressly outlawed under the AWB, which was in effect at the time of the attack. *See* COLUMBINE REVIEW COMM'N, THE REPORT OF GOVERNOR BILL OWENS' COLUMBINE REVIEW

COMMISSION 23 n.59 (2001). The firearm was purchased by a friend (via a straw purchase) at a local gun show six months prior to the attack from a private citizen. *Id*.

72   SCHILDKRAUT, *supra* note 14, at 8.

73   LOUIS KLAREVAS, RAMPAGE NATION: SECURING AMERICA FROM MASS SHOOTINGS 47-48 (2016). In this particular study, gun massacres were defined as those events in which six or more people died as the result of gunshots. *Id*.

74   C. DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 NAT'L CTR. FOR BIOTECHNOLOGY INFO. 11 (2019).

75   *Id*.

76   *See generally* Alison Durkee, *Are Republicans Really Turning the Corner on Guns?*, VANITY FAIR (Aug. 15, 2019), https://www.vanityfair.com/news/2019/08/republican-response-mass-shootings-background-checks-red-flag-laws; Deirdre Walsh, *Signs of Republican Movement to Support Gun Bills with New Restrictions*, NPR (Aug. 7, 2019, 5:00 AM), https://www.npr.org/2019/08/07/748827083/signs-of-republican-movement-to-support-gun-bills-with-new-restrictions.

77   As of September 2, 2019, there are four active assault weapons bills in Congress. H.R. 2959, 116th Cong. (2019); H.R. 1296, 116th Cong. (2019); S. 66, 116th Cong. (2019); H.R. 282, 116th Cong. (2019). Each bill had a 4% prognosis for successful passage according to GovTrack.us predictions as of April 28, 2020.

78   Amber Phillips, *Why Doesn't Support for Gun-Control Laws Translate to Gun-Control Laws?*, WASH. POST (Aug. 30, 2019, 11:18 AM), https://www.washingtonpost.com/politics/2019/08/30/why-doesnt-support-gun-control-laws-translate-gun-control-laws/.

79   Walsh, *supra* note 76.

80   *Gallup Poll*, *supra* note 44; Tom Kertscher, *Do 90% of Americans Support Background Checks for all Gun Sales?*, POLITIFACT (Oct. 3, 2017), https://www.politifact.com/wisconsin/statements/2017/oct/03/chris-abele/do-90-americans-support-background-checks-all-gun-/; Shephard, *supra* note 51; *U.S. Voter Support*, *supra* note 50.

81   *U.S. Support for Gun Control Tops 2-1, Highest Ever, Quinnipiac University National Poll Finds; Let Dreamers Stay, 80 Percent of Voters Say*, QUINNIPIAC U. POLL (Feb. 20, 2018), https://poll.qu.edu/search-releases/search-results/release-detail?ReleaseID=2521 [hereinafter U.S. Support for Gun Control].

82   Pub. Policy Polling, *National Survey Results*, CTR. FOR AM. PROGRESS (Nov. 2015), https://cdn.americanprogress.org/wp-content/uploads/2015/11/17054452/PPP-GunOwnersPollResults-11.17.15.pdf; Shephard, *supra* note 48.

83   *U.S. Support for Gun Control*, supra note 84; see also Colleen L. Barry et al., *After Newtown--Public Opinion on Gun Policy and Mental Illness*, 368 NEW ENG. J. MED. 1077, 1078 tbl.1 (2013); Gun Policy: Universal Background Checks and Armed Guards, CBS NEWS/N.Y. TIMES (Jan. 17, 2013, 7:00 AM), https://www.scribd.com/document/120711121/CBS-News-New-York-Times-Poll.

84    Pub. Policy Polling, *supra* note 85; *see also* Barry et al., *supra* note 86; *Gun Policy: Universal Background Checks and Armed Guards*, *supra* note 86; W. Gardner Selby, *Lee Leffingwell Says Polls Show 90 Percent of Americans and 74 Percent of NRA Members Support Criminal Background Checks Before All Gun Buys*, POLITIFACT (Apr. 4, 2013), https://www.politifact.com/texas/statements/2013/apr/04/lee-leffingwell/lee-leffingwell-says-polls-show-90-percent-america/.

85    Alfred M. Ascione, *The Federal Firearms Act*, 13 ST. JOHN'S L. REV. 437, 437-38 (1939); Franklin E. Zimring, *Continuity and Change in the American Gun Debate* 2-3 (UC Berkeley Pub. Law & Legal Theory Working Paper Series, Paper No. 50, 2001), http://papers.ssrn.com/paper.taf?abstract_id=266680.

86    Federal Firearms Act of 1938, Pub. L. No. 75-785, ch. 850, §§ 2(c)-(d), 52 Stat. 1250, 1251, *repealed by* Gun Control Act of 1968, Pub. L. No. 90-618, ch. 44, § 921, 82 Stat. 1213, 1214.

87    Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. LEGAL STUD. 133, 140 (1975).

88    Gun Control Act § 101. The Gun Control Act of 1968 amended 18 U.S.C. § 44. *See* David T. Hardy, *The Firearm Owners' Protection Act: A Historical and Legal Perspective*, 17 CUMB. L. REV. 585, 585 & n.2 (1986); Singh, *supra* note 31; Zimring, *supra* note 90.

89    18 U.S.C. § 922(b)(1), (d) (2012).

90    Zimring, *supra* note 87, at 152-53.

91    *Id*.

92    *Id*. at 151.

93    § 922(s).

94    *Id*.

95    *National Instant Criminal Background Check System (NICS)*, FBI, https://www.fbi.gov/services/cjis/nics (last visited Feb. 9, 2020).

96    *NICS & Reporting Procedures*, GIFFORDS L. CTR., https://lawcenter.giffords.org/gun-laws/policy-areas/background-checks/nics-reporting-procedures/ (last visited Feb. 19, 2020).

97    *Id.*; *see also About NICS*, FBI, https://www.fbi.gov/services/cjis/nics/about-nics (last visited Feb. 19, 2020). As of December 31, 2018, thirty-six states submit their NICS checks directly to the FBI. *See* U.S. DEP'T OF JUSTICE, NATIONAL INSTANT CRIMINAL BACKGROUND CHECK SYSTEM (NICS) SECTION: 2018 OPERATIONS REPORT 4 (2018). Thirteen states use fully conducted state level Point of Contact (POC) accesses, while seven states use a combination of FBI and POC accesses based on the type of firearm (handguns vs. long guns like shotguns or rifles) being purchased or transferred. *Id*.

98    About *NICS*, *supra* note 97.

99     U.S. DEP'T OF JUSTICE, *supra* note 97, at 13.

100     *Id.*

101     JENNIFER C. KARBERG ET AL., BACKGROUND CHECKS FOR FIREARM TRANSFERS, 2015--STATISTICAL TABLES 5 (2017); *see also* U.S. DEP'T OF JUSTICE, *supra* note 100, at ii.

102     OFFICE OF THE INSPECTOR GEN., AUDIT OF THE HANDLING OF FIREARMS PURCHASE DENIALS THROUGH THE NATIONAL INSTANT CRIMINAL BACKGROUND CHECK SYSTEM ii (2016).

103     VA. TECH REVIEW PANEL, *supra* note 20, at 77.

104     *Id.* at 25.

105     During the two-hour break between attacks, the shooter returned to his dormitory, changed clothes, disposed of evidence including the hard drive to his computer (which was never recovered), and mailed a package to NBC News that contained his multimedia manifesto, including an 1,800-word diatribe, video clips, and numerous photos. *See Timeline of the April 16 Shootings*, WE REMEMBER 32, http://weremember32.com/timeline/ (last visited Feb. 19, 2020). He also mailed a letter to the English Department, within which he was a major, attacking one of the professors he had previously had issues with. *Id.*

106     VA. TECH REVIEW PANEL, *supra* note 20, at 28.

107     *Id.* at 35-37.

108     *Id.* at 37, 40.

109     *Id.* at 41.

110     *Id.* at 43-44.

111     *See generally* LUCINDA ROY, NO RIGHT TO REMAIN SILENT: WHAT WE'VE LEARNED FROM THE TRAGEDY AT VIRGINIA TECH (2009).

112     VA. TECH REVIEW PANEL, *supra* note 20, at 45.

113     The officer stated that the case would be referred to the university's Judicial Affairs office, but it is unclear if this happened or what action, if any, was taken. *See id.*

114     *Id.* at 45-46.

115     *Id.* at 46.

116    *Id.*

117    *Id.*

118    *Id.* at 47.

119    *Id.*

120    *Id.*; *see also* Richard J. Bonnie et al., *Mental Health System Transformation After the Virginia Tech Tragedy*, 28 HEALTH AFF. 793, 800 (2009). The findings of the CSB screener indicated that the perpetrator was mentally ill, posed an imminent danger to himself or others, and that he refused to seek treatment voluntarily. VA. TECH REVIEW PANEL, *supra* note 20, at 47. These concerns formed the basis of the affidavit for the detention order that was subsequently granted by a local magistrate. *Id.*

121    During the hospital admission process, the perpetrator was diagnosed with a mood disorder (non-specific). *See* VA. TECH REVIEW PANEL, *supra* note 20, at 47. The independent evaluator who met with him the following morning found that he was mentally ill but did not pose a specific imminent danger to himself or others, a finding supported by a second evaluation by the hospital's attending psychiatrist, who recommended outpatient treatment without giving a formal diagnosis. *Id.*

122    *Id.* at 48.

123    *Id.* at 49.

124    U.S. DEP'T OF JUSTICE, *supra* note 97, at 4.

125    VA. CODE ANN. § 37.2-819 (West 2015). Only forms related to the person's admission to the facility or their temporary detention order were required to be submitted to the CCRE. *Id.* Medical records more broadly were excluded from the reporting requirement. *Id.*

126    VA. CODE ANN. § 18.2-308.1:3 (West 2018).

127    VA. CODE ANN. § 37.2-819 (West 2015).

128    Joel Roberts, *Guns Used in Rampage Traced to Va. Shops*, CBS NEWS (Apr. 17, 2007, 1:54 PM), https://www.cbsnews.com/news/guns-used-in-rampage-traced-to-va-shops/; *see also* VA. CODE ANN. § 18.2-308.2:2 (repealed 2012). The law that created the mandated waiting period between firearms purchases was subsequently repealed. *See* David Sherfinski, *Va. Senate Votes to Repeal One-Gun-a-Month Law*, WASH. TIMES (Feb. 6, 2012), https://www.washingtontimes.com/news/2012/feb/6/va-senate-votes-repeal-gun-month-law/.

129    Roberts, *supra* note 128.

130    Va. Exec. Order No. 50 (2007).

131    AMS. FOR RESPONSIBLE SOLS. & LAW CTR. TO PREVENT GUN VIOLENCE, FOR THE RECORD: NICS AND PUBLIC SAFETY 21 (2016). By the end of 2017, forty-three states had laws requiring reporting of mental health records

to NICS in place. Those states without mandatory reporting laws are Arkansas, Michigan, Montana, New Hampshire, Ohio, Utah, and Wyoming; Washington, D.C. also does not have a reporting law in place. While increases in mental health records increased in states both with and without mandatory reporting laws, those states with such policies increased their submissions by eleven times between 2008 and 2017, whereas those without only increased two-fold. The increase between 2008 and 2017 in annual denials for persons prohibited due to a mental defective adjudication also is higher among those states with reporting laws compared to those without (thirteen times compared to five times). *See* EVERYTOWN FOR GUN SAFETY SUPPORT FUND, FATAL GAPS: HOW THE VIRGINIA TECH SHOOTING PROMPTED CHANGE IN STATE MENTAL HEALTH RECORDS REPORTING (2018).

132   NICS Improvement Amendment Act of 2007, Pub. L. No. 110-180, 121 Stat. 2559.

133   *Id.*

134   *Id.*

135   Gordon Witkin, *On Anniversary of Virginia Tech Shooting, Law to Close Loophole Hasn't Accomplished Much*, CTR. FOR PUB. INTEGRITY, https://publicintegrity.org/accountability/on-anniversary-of-virginia-tech-shooting-law-to-close-loophole-hasnt-accomplished-much/ (last updated May 19, 2014, 12:19 PM). More recent estimates suggest that nearly $119 million has been appropriated by states since 2009 to address the reporting system gaps. *See* EVERYTOWN FOR GUN SAFETY SUPPORT FUND, *supra* note 131.

136   EVERYTOWN FOR GUN SAFETY SUPPORT FUND, *supra* note 131.

137   *Id.* The number of total active records in the NICS Indices as of December 31, 2019 was 20,929,713. *See Active Records in the NICS Indices*, FBI (Dec. 31, 2019), https://www.fbi.gov/file-repository/active_records_in_the_nics-indices.pdf/view. Of these, 6,032,035 (28.8%) were adjudicated mental health records. *Id.*

138   EVERYTOWN FOR GUN SAFETY SUPPORT FUND, *supra* note 131; *see also* JIM KESSLER, THIRD WAY, MISSING RECORDS: HOLES IN BACKGROUND CHECK SYSTEM ALLOW ILLEGAL BUYERS TO GET GUNS 3, 5 (2017); Mayors Against Illegal Guns, *After Arizona Shootings, Background Checks Examined: Congress Refuses to Fund All Changes Made After Virginia Tech*, PR NEWSWIRE (Jan. 14, 2011), https://www.prnewswire.com/news-releases/after-arizona-shootings-background-checks-examined-congress-refuses-to-fund-all-changes-made-after-virginia-tech-113615164.html.

139   SCHILDKRAUT, *supra* note 14, at 7.

140   Joshua Norman, *Sheriff Releases Loughner's Arrest Records*, CBS NEWS (Jan. 12, 2011), https://www.cbsnews.com/news/sheriff-releases-loughners-arrest-records/.

141   Mark Thompson, *How Marijuana Use Aborted Jared Loughner's Military Career*, TIME (Jan. 10, 2011), http://content.time.com/time/nation/article/0,8599,2041634,00.html.

142   According to the GCA and the Brady Act, all federal agencies must report information about drug use to NICS.

143   Mayors Against Illegal Guns, *supra* note 138.

Compendium_Cornell
Page 1698

144    *Jared Loughner Had 5 Run-ins with College Police*, CBS NEWS (Jan. 10, 2011, 2:53 PM), https://www.cbsnews.com/news/jared-loughner-had-5-run-ins-with-college-police/.

145    *Id.*

146    Linda Feldmann, *Why Jared Loughner Was Allowed to Buy a Gun*, CHRISTIAN SCI. MONITOR (Jan. 10, 2011), https://www.csmonitor.com/USA/Politics/2011/0110/Why-Jared-Loughner-was-allowed-to-buy-a-gun.

147    Jason Hanna & Holly Yan, *Sutherland Springs Church Shooting: What We Know*, CNN, https://www.cnn.com/2017/11/05/us/texas-church-shooting-what-we-know/index.html (last updated Nov. 7, 2017, 6:52 AM).

148    Pete Williams, *Texas Shooting Exposes Gaps in Gun Background Checks*, NBC NEWS, https://www.nbcnews.com/news/us-news/texas-shooting-exposes-gaps-gun-background-checks-n820066 (last updated Nov. 12, 2017, 7:40 PM).

149    Camila Domonoske & Richard Gonzales, *The Texas Church Shooter Should Have Been Legally Barred from Owning Guns*, NPR (Nov. 6, 2017, 3:50 PM), https://www.npr.org/sections/thetwo-way/2017/11/06/562320017/the-texas-church-shooter-should-have-been-legally-barred-from-owning-guns; *see also* Kevin Johnson, *Texas Church Shooting: Background Check Breakdown Highlights Federal Gun Record Problems*, USA TODAY (Nov. 9, 2017, 3:38 PM), https://www.usatoday.com/story/news/politics/2017/11/09/texas-church-shooting-background-check-breakdown-highlights-federal-gun-record-problems/847947001/.

150    Domonoske & Gonzales, *supra* note 149.

151    *Id.*; *see also* REPORT OF INVESTIGATION INTO THE UNITED STATES AIR FORCE'S FAILURE TO SUBMIT DEVIN KELLEY'S CRIMINAL HISTORY INFORMATION TO THE FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF DEFENSE (2019); Katie Mettler & Alex Horton, Air Force Failed 6 Times to Keep Guns from Texas Church Shooter Before He Killed 26, Report Finds, WASH. POST (Dec. 7, 2018, 7:38 PM), https://www.washingtonpost.com/national-security/2018/12/08/air-force-failed-six-times-keep-guns-texas-church-shooter-before-he-killed-report-finds/.

152    Domonoske & Gonzales, *supra* note 149; Mettler & Horton, *supra* note 151.

153    *President Donald J. Trump Signs H.R. 1625 into Law*, WHITE HOUSE (Mar. 23, 2018), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-signs-h-r-1625-law/.

154    Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348. Within the Consolidated Appropriations Act, two specific bills related to remedying the gaps in the NICS system were introduced and subsequently incorporated into the final law. Fix NICS Act of 2017, H.R. 4477, 115th Cong. (2017); Fix NICS Act of 2017, H.R. 4434, 115th Cong. (2017). Previous attempts to ensure that all prohibited individuals were entered into the NICS database, however, were unsuccessful in becoming law. *See* Fix Gun Checks Act of 2011, H.R. 1781, 112th Cong. (2011); Fix Gun Checks Act of 2011, S. 436, 112th Cong. (2011). A separate bill introduced also aimed to encourage reporting to NICS by the states, but it failed to make it past introduction. Strengthening Background Checks Act of 2013, H.R. 329, 113th Cong. (2013).

155    Consolidated Appropriations Act, 2018, 132 Stat. at 1132, 1135.

156    *Id.* at 1132-33.

157  *Id.* at 1135-36.

158  Given the estimated number of records missing out of NICS, one consideration must be the way in which states are held accountable for their reporting (or lack thereof). The NIAA included noncompliance penalties for states that failed to report the adequate number of records. NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 104, 121 Stat. 2559, 2568-69. Each state, through the Edward Byrne Memorial Justice Assistance Program, established by the Omnibus Crime Control and Safe Streets Act of 1968, is eligible to receive funding for (among other things) personnel, equipment or supplies, training, and programming for behavioral or crisis intervention teams, crime victims, witnesses, prevention, and education. 34 U.S.C. §§ 10151-10152 (2012). Under the NIAA, however, states that are noncompliant with their record submissions could be subjected to a withholding of up to five percent of this funding based upon the proportion missing. *See* NICS Improvement Amendments Act of 2007, 121 Stat. at 2569. The question becomes whether this minimal deduction is significant enough to encourage better reporting. The Supreme Court's acknowledgment that the Tenth Amendment may limit Congress's ability to use its federal spending power as an incentive for the states to comply with federal standards, however, poses a constitutional obstacle in the path of guaranteed state compliance. *See* South Dakota v. Dole, 483 U.S. 203, 211 (1987) (explaining that Congress's act of withholding substantial federal funds may unconstitutionally coerce the states into enacting unwanted policies, but concluding that withholding only five percent of highway funds did not amount to such coercion); *see also* Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 581, 588 (2012) (holding that the Affordable Care Act of 2010's provision that would withhold all federal Medicaid funding from states that failed to comply with the act served as a symbolic "gun to the head" of the states and therefore violated the Constitution). In sum, if reporting is seemingly voluntary due to a minimal penalty for noncompliance, it begs the question as to what can be done (aside from continuing to offer additional funding avenues specifically aimed at increasing record submission) to improve reporting by the states.

159  Jefferson County Sheriff's Office, *Columbine Documents: JC-001-025923 through JC-001-026859*, SCHOOLSHOOTERS.INFO, https://schoolshooters.info/sites/default/files/JCSO%2025%2C2C923%20-%2026%2C859.pdf (last visited Mar. 13, 2020); *see also* 18 U.S.C. § 922(s) (2012). Daniel Mauser, a Columbine student who was killed in the attack, also had identified the same loophole as part of research for the school's debate team, of which he was a member. Mike Soraghan, *Colorado After Columbine: The Gun Debate*, 26 ST. LEGISLATURES 14 (2000).

160  Soraghan, *supra* note 159. At the time the firearms were purchased, both perpetrators were juveniles and therefore ineligible to acquire the weapons. *Where'd They Get Their Guns?--Columbine High School, Littleton, Colorado*, VIOLENCE POL'Y CTR., www.vpc.org/studies/wgun990420.htm (last visited Feb. 19, 2020); *see also* COLUMBINE REVIEW COMM'N, *supra* note 71, at 24 n.60. At the time, federal law prohibited "straw purchases"--the acquisition of a firearm on behalf of someone who was a prohibited person--but this was applicable only to FFLs and not private sellers. *See id.* at 23 n.59; Schildkraut & Hernandez, *supra* note 12, at 363.

161  Andrew Blankstein & Pete Williams, *Texas Gunman Purchased Weapon in Private Sale, Which Doesn't Require Background Check*, NBC NEWS (Sept. 3, 2019, 4:16 PM), https://www.nbcnews.com/news/us-news/texas-gunman-purchased-weapon-private-sale-which-doesn-t-require-n1049351; Tara Law, *A Background Check Loophole Let the Odessa Shooter Get a Weapon. Millions of Guns Change Hands that Way*, TIME (Sept. 4, 2019), https://time.com/5668471/gun-violence-background-checks-odess-mass-shooting/.

162  Blankstein & Williams, *supra* note 161.

163  Matthew Miller, Lisa Hepburn & Deborah Azrael, *Firearm Acquisition Without Background Checks: The Result of a National Survey*, 166 ANNALS INTERNAL MED. 233, 236 (2017).

164  *Id.* at 237.

165  Katherine A. Vittes, Jon S. Vernick & Daniel W. Webster, *Legal Status and Source of Offenders' Firearms in States with Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26, 29-30 (2013). Interestingly, in a separate study, Siegel and colleagues found that universal background checks correlated with a nearly 15% decrease in overall homicide rates when they are in place. *See* Michael Siegel et al., *The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991-2016: A Panel Study*, 34 J. GEN. INTERNAL MED. 2021, 2024 (2019).

166  Garen J. Wintemute, Anthony A. Braga & David M. Kennedy, Private-Party Gun Sales, Regulation, and Public Safety, 363 *NEW ENG. J. MED.* 508, 511 (2010); *Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support*, PEW RES. CTR. (Oct. 18, 2018), https://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/#in-views-of-gun-policies-partisanship-and-gun-ownership-are-factors [hereinafter Gun Policy Remains Divisive]; Monmouth Univ. Polling Inst., National: Gun Owners Divided on Gun Policy; Parkland Students Having an Impact, MONMOUTH U. (Mar. 8, 2018), https://www.monmouth.edu/polling-institute/reports/MonmouthPoll_US_030818/; Domenico Montanaro, Poll: Americans Not Sold on Trump--Or Democrats, NPR, https://www.npr.org/2019/07/22/743516166/npr-newshour-marist-poll-americans-not-sold-on-trump-or-democrats (last updated July 22, 2019, 12:20 PM).

167  *Gun Policy Remains Divisive*, *supra* note 169; Monmouth Univ. Polling Inst., *supra* note 169; Montanaro, *supra* note 169; J. Baxter Oliphant, *Bipartisan Support for Some Gun Proposals, Stark Partisan Divisions on Many Others*, PEW RES. CTR. (June 23, 2017), https://www.pewresearch.org/fact-tank/2017/06/23/bipartisan-support-for-some-gun-proposals-stark-partisan-divisions-on-many-others/.

168  Monmouth Univ. Polling Inst., *supra* note 166.

169  H.R. 3833, 105th Cong. (1998).

170  H.R. 109, 106th Cong. § 1 (1999); S. 2527, 105th Cong. § 1 (1998); H.R. 4442, 105th Cong. § 1 (1998).

171  H.R. 902, 106th Cong. §2 (1999); S. 443, 106th Cong. § 3 (1999). In addition to the background checks and sales reporting requirements, the Gun Show Accountability Act also required operating organizations to register with and pay a fee to the Secretary of the Treasury, notify them of the date and location of the event, and verify the identity and credentials of vendors. *See* H.R. 902, 106th Cong. § 2 (1999); S. 443, 106th Cong. § 3 (1999).

172  The Youth Gun Crime Enforcement Act, introduced three weeks after the shooting, sought to regulate gun shows more strictly, require background checks at the events, and establish mandated waiting periods for more thorough background checks by law enforcement. *See* H.R. 1768, 106th Cong. tit. I (1999); S. 995, 106th Cong. tit. I (1999). The Gun Show Accountability Act was reintroduced as H.R. 1903. *See* H.R. 1903, 106th Cong. (1999). A separate bill requiring background checks at gun shows and banning associated fees was introduced less than two months after the shooting. *See* Mandatory Gun Show Background Check Act, H.R. 2122, 106th Cong. § 2 (1999). The Gun Show Loophole Closing and Gun Law Enforcement Act also sought to mandate background checks on all firearms transfers taking place at gun shows. H.R. 2377, 107th Cong. tit. I (2001); S. 890, 107th Cong. (2001). So did the Gun Show Background Check Act. *See* S. 22, 113th Cong. (2013); S. 35, 112th Cong. (2011); S. 843, 111th Cong. (2009); S. 2577, 100th Cong. (2008); H.R. 260, 108th Cong. § 3 (2003); H.R. 4034, 107th Cong. § 3 (2002); S. 767, 107th Cong. § 3 (2001). The Gun Show Loophole Closing Act called for similar mandates as well. *See* H.R. 820, 116th Cong. (2019); H.R. 1612, 115th Cong. (2017); H.R. 2380, 114th. Cong. (2015); H.R. 141, 113th Cong. (2013); H.R. 591, 112th Cong. (2011); H.R. 2324, 111th Cong. (2009); H.R. 96, 110th Cong. § 3 (2007); H.R. 3540, 109th Cong. § 3 (2005); H.R. 3832, 108th Cong. § 3 (2004); S. 1807, 108th Cong. § 3 (2003).

173  Fix Gun Checks Act of 2011, H.R. 1781, 112th Cong. (2011); Fix Gun Checks Act of 2011, S. 436, 112th Cong. (2011).

Compendium_Cornell
Page 1701

174    Background Check Expansion Act, S. 42, 116th Cong. (2019); Background Check Expansion Act, S. 2009, 115th Cong. (2017). As of the time of this writing, the 2019 bill has a 4% passage projection.

175    Bipartisan Background Checks Act of 2019, H.R. 8, 116th Cong. (2019).

176    Sheryl Gay Stolberg & Catie Edmondson, *Keeping Focus on Gun Bills, Democrats Urge McConnell and Senate to Act*, N.Y. TIMES (Aug. 13, 2019), https://www.nytimes.com/2019/08/13/us/politics/democrats-mcconnell-guns.html.

177    Eric Escalante, *Need to Know: The 1989 Cleveland School Shooting*, ABC10, https://www.abc10.com/article/news/local/stockton/need-to-know-the-1989-cleveland-school-shooting/103-bf6463b2-ce78-4ba1-9216-fc2c79907f82   (last updated Jan. 17, 2019, 5:31 PM). The initial law, the Roberti-Roos Assault Weapons Control Act of 1989, was amended in 1999, *see*CAL. ATTORNEY GEN., ASSAULT WEAPONS IDENTIFICATION GUIDE (2001); *see also* S.B. 23, S. Comm. Public Safety (Cal. 1999), and again with the passage of the .50 Caliber BMG Regulation Act of 2004, *see* A.B. 50, Gen. Assemb. (Cal. 2002).

178    CAL. PENAL CODE §§ 16350, 16790, 16890, 30500-31115 (West 2019).

179    CONN. GEN. STAT. §§ 53-202a-o (2019); *see also* Veronica Rose, *Weapons Banned as Assault Weapons*, OLR RES. REP. (May 29, 2013), https://www.cga.ct.gov/2013/rpt/2013-R-0241.htm.

180    D.C. Code Ann. §§ 7-2501.01(3A)(A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c) (West 2019).

181    N.J. STAT. ANN. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13 (West 2019).

182    MD. CODE ANN., CRIM. LAW §§ 4-301-4-306 (LexisNexis 2019); *see also*MD. CODE ANN., PUB. SAFETY § 5-101(r) (LexisNexis 2019).

183    MASS. GEN. LAWS ch. 140, §§ 121-123, 131M (2019).

184    N.Y. PENAL LAW §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a) (McKinney 2019).

185    HAW. REV. STAT. ANN. §§ 134-1, 134-4, 134-8 (West 2019).

186    CAL. PENAL CODE §§ 27545, 27850-28070 (West 2019).

187    COLO. REV. STAT. § 18-12-112 (2019); H.B. 1229 (Colo. 2013).

188    DEL. CODE ANN. tit. 11, § 1448B, tit. 24, § 904A (2019). Interestingly, one study found that after the enactment of the comprehensive background check legislation in Delaware, the number of background checks increased between 22% and 34%, depending on the type of firearm (handgun, shotgun, or rifle). *See* Alvaro Castillo-Carniglia et al., *Comprehensive Background Check Policy and Firearm Background Checks in Three US States*, 24 INJ. PREVENTION 454, 457 (2017).

189    S. 143 (Nev. 2019). The law went into effect on January 2, 2020.

190   N.J. STAT. ANN. § 2C:58-3 (West 2019).

191   S.B. 8 (N.M. 2019).

192   N.Y. GEN. BUS. LAW § 898 (McKinney 2019); 2013 NY ALS 1; *see also* N.Y. GEN. BUS. LAW §§ 895-897 (McKinney 2019).

193   OR. REV. STAT. § 166.435 (2019).

194   VT. STAT. ANN. tit. 13, § 4019 (2019), enacted by 2017 SB 55, Sec. 6.

195   WASH. REV. CODE § 9.41.113 (2019).

196   R.I. GEN. LAWS §§ 11-47-35-11-47-35.2 (2019).

197   *See* CONN. GEN. STAT. §§ 29-33(c), 29-36*l*(f), 29-37a(e)-(j) (2019).

198   *See* MD. CODE ANN., PUB. SAFETY § 5-124(a)(2) (West 2019). Maryland's background check requirement applies only to handguns and assault weapons. *Id.*

199   *See* 18 PA. CONS. STAT. § 6111(b), (c), (f)(2) (2019). The requirement on background checks at point of transfer in Pennsylvania, however, only applies to handguns. 18 PA. CONS. STAT. § 6111(f)(2) (2019).

200   *See* CONN. GEN. STAT. §§ 29-33, 29-36f-29-36i, 29-37a (2019). One study found that the implementation of Connecticut's permit-to-purchase law correlated with a forty percent reduction in firearm-related homicide. *See* Kara E. Rudolph et al., *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 AM. J. PUB. HEALTH e49 (2015).

201   *See* D.C. Code Ann. §§ 7-2502.01-7-2502.10 (West 2019); D.C. Mun. Regs. tit. 24, §§ 2311-2320 (2019).

202   *See* HAW. REV. STAT. ANN. §§ 134-2, 134-13 (West 2019).

203   *See* 430 ILL. COMP. STAT. 65/1-65/15a (2019); 720 ILL. COMP. STAT. 5/24-3(k) (2019).

204   *See* MASS. GEN. LAWS ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P (2019).

205   *See* N.J. STAT. ANN. § 2C:58-3 (West 2019).

206   *See* IOWA CODE §§ 724.15-724.20 (2019).

207   *See* MD. CODE ANN., PUB. SAFETY § 5-117.1 (West 2019).

208   *See* MICH. COMP. LAWS §§ 28.422-28.422a (2019).

Compendium_Cornell
Page 1703

209    *See* NEB. REV. STAT. ANN. §§ 69-2404, 69-2407, 69-2409 (West 2019).

210    *See* N.Y. PENAL LAW §§ 400.00-400.01 (McKinney 2019).

211    *See* N.C. GEN. STAT. §§ 14-402-14-404 (2019).

212    *See* R.I. GEN. LAWS §§ 11-47-35-11-47-35.1 (2019).

213    The specific states are California (A.B. 295, Gen. Assemb. (Cal. 1999)), Colorado (COLO. REV. STAT. § 18-12-501),
       Connecticut (CONN. GEN. STAT. § 29-37g(c)), Delaware (DEL. CODE ANN. tit. 11, § 1448B(a)), Illinois (430 ILL.
       COMP. STAT. 65/3(a-5)), Maryland (MD. CODE ANN., PUB. SAFETY § 5-124(a)), New York (N.Y. PENAL LAW §
       400.00), Oregon (OR. REV. STAT. §§ 166.434(1), 166.438), and Pennsylvania (18 PA. CONS. STAT. ANN. § 6111(c);
       37 PA. CODE § 33.111(g)). Depending on the state, the background checks may be performed on behalf of the seller
       by a FFL or local law enforcement agency.

214    Austin Sarat & Jonathan Obert, *What Both Sides Don't Get About American Gun Culture,* POLITICO (Aug. 4, 2019),
       https://www.politico.com/magazine/story/2019/08/04/mass-shooting-gun-culture-227502.

215    Gomez & White, *supra* note 46.

216    27 C.F.R. §§ 447.11, 478.11, 479.11 (2019).

217    *Bump Stocks*, ATF, https://www.atf.gov/rules-and-regulations/bump-stocks (last updated Feb. 21, 2019).

218    *Las Vegas Shooting: NRA Urges New Rules for Gun 'Bump-Stocks'*, BBC NEWS (Oct. 5, 2017), https://www.bbc.com/
       news/world-us-canada-41519815.

219    H.R. 3999, 115th Cong. (2017); Automatic Gunfire Prevention Act, S. 1916, 115th Cong. (2017).

220    Closing the Bump-Stock Loophole Act, H.R. 4168, 115th Cong. (2017).

221    Gregory Korte, Nicole Gaudiano & David Jackson, *Trump Takes Executive Action to Ban Bump Stocks that Increase
       Weapons' Firepower*, USA TODAY, https://www.usatoday.com/story/news/politics/2018/02/20/trump-takes-executive-
       action-ban-bump-stocks-rifles-into-automatic-weapons/354536002/ (last updated Feb. 20, 2018, 5:48 PM). It bears
       noting, however, that bump stocks were only used in the Las Vegas shooting; the perpetrator in Parkland used a
       semiautomatic rifle with no additional enhancements to speed up the firing. *US Bans 'Bump Stock' Gun Device Used
       in Las Vegas Mass Shooting*, BBC NEWS (Dec. 19, 2018), https://www.bbc.com/news/world-us-canada-46614001.

222    Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. TIMES (Dec. 18, 2018), https://
       www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html. At the time of this writing, attempts to block
       the bump stock ban from taking effect were unsuccessful in the D.C. Court of Appeals, while the U.S. Supreme Court
       refused to hear the matter. *See* Debra Cassens Weiss, *DC Circuit Refuses to Block Ban on Bump Stocks' SCOTUS Also
       Had Refused to Intervene*, ABA J. (Apr. 2, 2019, 9:25 AM), http://www.abajournal.com/news/article/dc-circuit-refuses-
       to-block-ban-on-bump-stocks-scotus-had-also-refused-to-intervene; *see also* Guedes v. Bureau of Alcohol, Tobacco,
       Firearms, & Explosives, 920 F.3d 1 (D.C. Cir. 2019).

Compendium_Cornell
Page 1704

223    As of September 12, 2019, the following states have bump stock bans in effect: California (CAL. PENAL CODE § 3290), Delaware (DEL. CODE tit. 11, § 1444(a)(6) (2020)), Florida (FLA. STAT. § 790.222 (2018)), Hawaii (HAW. REV. STAT. § 134-8.5 (2018)), Maryland (MD. CODE ANN., COM. LAW § 4-305.1 (2018)), Massachusetts (MASS. GEN. LAWS ch. 140, §121, 131 (2017)), Nevada (2019 Nev. AB 291), New Jersey (N.J. STAT. ANN. § 2C:39-3), New York (N.Y. PENAL LAW § 265.01-c (2019)), Vermont (VT. STAT. ANN. tit. 13, § 4022 (2018)), and Washington (WASH. REV. CODE §§ 9.41.220, 9.41.225 (2019)). Washington, D.C. also has an active bump stock ban. *See* D.C. Code Ann. § 22-4514(a). California's ban was instituted in 1990, while New York's ban went into effect with the passage of the SAFE Act in 2013. All other states' bans were enacted after the Las Vegas shooting.

224    Jon Schuppe, *Red Flag Laws Often Have Bipartisan Support. But Do They Stop Mass Shootings?*, NBC NEWS, https://www.nbcnews.com/news/us-news/gun-seizure-laws-often-have-bipartisan-support-do-they-stop-n1039761 (last updated Aug. 7, 2019, 7:50 AM).

225    *Extreme Risk Protection Orders*, GIFFORDS L. CTR., https://lawcenter.giffords.org/gun-laws/policy-areas/who-can-have-a-gun/extreme-risk-protection-orders/ (last visited Feb. 19, 2020).

226    Extreme Risk Protection Order and Violence Prevention Act of 2018, S. 2607, 115th Cong. (2018); Federal Extreme Risk Protection Order Act of 2018, S. 2521, 115th Cong. (2018).

227    Federal Extreme Risk Protection Order Act of 2019, H.R. 3076, 116th Cong. (2019); Extreme Risk Protection Order Act of 2019, H.R. 1236, 116th Cong. (2019); Extreme Risk Protection Order Act of 2019, S. 506, 116th Cong. (2019); Extreme Risk Protection Order and Violence Prevention Act of 2019, S. 7, 116th Cong. (2019). Passage projection statistics are as of February 9, 2020.

228    Aaron Williams, *Have Your Representatives in Congress Received Donations from the NRA?*, WASH. POST, https://www.washingtonpost.com/graphics/national/nra-donations/ (last updated Feb. 15, 2018).

229    Aaron Kessler, *Why the NRA Is So Powerful on Capitol Hill, by the Numbers*, CNN POL., https://www.cnn.com/2018/02/23/politics/nra-political-money-clout/index.html (last updated Feb. 23, 2018, 2:12 PM). Of the 307 members of Congress receiving financial support, either directly (e.g., campaign contributions) or indirectly (e.g., campaign support through advertisements) from the NRA, just twenty-four Democrats received such assistance while only six Republicans did not receive such contributions. *Id.*

230    Louis Jacobson, *Counting Up How Much the NRA Spends on Campaigns and Lobbying*, POLITIFACT (Oct. 11, 2017), https://www.politifact.com/truth-o-meter/article/2017/oct/11/counting-up-how-much-nra-spends/.

231    *Id.* In addition to money spent on federal lobbying by the NRA, gun manufacturers also engage in such activity, expending $1.4 million in 2017 alone to lobby against restrictions. *See* Kessler, *supra* note 232.

232    Kessler, *supra* note 229.

233    *National Rifle Assn*, OPENSECRETS.ORG, https://www.opensecrets.org/orgs/summary.php?id=D000000082&cycle=2018 (last visited Feb. 19, 2020).

234    *See* Sam Musa, *The Impact of the NRA on the American Policy*, 4 J. Pol. Sci. & Pub. Aff. 1, 2 (2016). *See generally* Lee Drutman, The Business of America Is Lobbying: How Corporations Became Politicized and Politics Became More

Corporate (2015) (explaining how the introduction of corporate money into the well-established lobbying practice in Washington has created a more complex legislative process and led to an increase in corporate power).

235   *2016 Presidential Election Results*, 270TOWIN, https://www.270towin.com/maps/2016-actual-electoral-map (last visited Feb. 19, 2020). Here, the 2016 presidential election results are used as a proxy for political party leaning of constituents. *Id.*

236   *Id.*; *see supra* notes 186-199 and accompanying text. It bears noting that prior to the 2016 election, where Pennsylvania's electoral votes went to the Republican candidate, Donald Trump, the state had voted blue (Democrat) for the prior seven elections (twenty-eight years). *See* Brian Taff, *Pa. for Trump: How Pennsylvania Went Red for 1st Time in 28 Years*, WPVI (Nov. 10, 2016), https://6abc.com/politics/how-pa-went-red-for-trump-for-1st-time-in-28-years/1598897/.

237   See, e.g., JoEllen Pederson et al., *Gun Ownership and Attitudes Toward Gun Control in Older Adults: Re-examining Self Interest Theory*, 1 AM. J. SOC. SCI. RES. 273, 275 (2015).

238   *See* Timothy Williams, *With Most States Under One Party's Control, America Grows More Divided*, N.Y. TIMES (June 11, 2019), https://www.nytimes.com/2019/06/11/us/state-legislatures-partisan-polarized.html ("It is the first time in more than a century that all but one state legislature is dominated by a single party. Most legislative sessions have ended ... and Republican-held states have rushed forward with conservative agendas as those controlled by Democrats have pushed through liberal ones.").

239   *See id.*

240   *See supra* notes 76-77 and accompanying text.

241   SCHILDKRAUT, *supra* note 14, at 7-8.

69 EMORYLJ 1043

Compendium_Cornell
Page 1706

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19158   Page 287 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

**80 Law & Contemp. Probs. 55**

Law and Contemporary Problems
2017

The Second Generation of Second Amendment Law and Policy

Eric M. Ruben and Darrell A. H. Miller

Special Editors
Robert J. Spitzer [a1]

Copyright © 2017 by Robert J. Spitzer

# GUN LAW HISTORY IN THE UNITED STATES AND SECOND AMENDMENT RIGHTS

## I INTRODUCTION

In its important and controversial 2008 decision on the meaning of the Second Amendment, *District of Columbia v. Heller*, [1] the Supreme Court ruled that average citizens have a constitutional right to possess handguns for personal self-protection in the home. [2] Yet in establishing this right, the Court also made clear that the right was by no means unlimited, and that it was subject to an array of legal restrictions, including: "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." [3] The Court also said that certain types of especially powerful weapons might be subject to regulation, [4] along with allowing laws regarding the safe storage of firearms. [5] Further, the Court referred repeatedly to gun laws that had existed earlier in American history as a justification for allowing similar contemporary laws, [6] even though the court, by its own admission, did not undertake its own "exhaustive historical analysis" of past laws. [7]

In so ruling, the Court brought to the fore and attached legal import to the history of gun laws. This development, when added to the desire to know our own history better, underscores the value of the study of gun laws in America. In recent years, new and important research and writing has chipped away at old **\*56** myths to present a more accurate and pertinent sense of our gun past. [8] Researchers and authors including Saul Cornell, Alexander DeConde, Craig Whitney, and Adam Winkler have all published important work making clear that gun laws are by no means a contemporary phenomenon. [9] Yet even now, far too few understand or appreciate the fact that though gun possession is as old as America, so too are gun laws. But there's more: gun laws were not only ubiquitous, numbering in the thousands, but also spanned every conceivable category of regulation, from gun acquisition, sale, possession, transport, and use, including deprivation of use through outright confiscation, to hunting and recreational regulations, to registration and express gun bans. For example, the contemporary raging dispute over the regulation of some semi-automatic weapons that began in late 1980s was actually presaged seven decades earlier, when at least seven states banned such weapons entirely--a fact that seems to have been unknown to modern analysts until now. A vast newly compiled dataset of historical gun laws reveals that the first gun grabbers (as contemporary gun rights advocates like to label gun control proponents) were not Chablis-drinking liberals of the 1960s, but rum-guzzling pioneers dating to the 1600s.

This historical examination is especially relevant to the modern gun debate because, at its core, that debate is typically framed as a fierce, zero-sum struggle between supporters of stronger gun laws versus supporters of gun rights (who, of course, largely oppose stronger gun laws--or so it is said). The zero-sum quality of this struggle posits that a victory for one side is a loss for the other, and vice versa. Yet history tells a very different story-- that, for the first 300 years of America's existence, gun laws and gun rights went hand-in-hand. It is only in recent decades, as the gun debate has become more politicized and more ideological that this relationship has been reframed as a zero-sum struggle.

Compendium_Cornell
Page 1707

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19159   Page 288 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

The plethora of early gun laws herein described establish their prolific existence, but also validate the argument that gun rules and gun rights are by no means at odds. If the Supreme Court was indeed serious in saying that the provenance of gun regulations is relevant to the evaluation of contemporary laws, then this examination advances the Court's stated objective. The common **\*57** notions that gun laws are largely a function of modern, industrial (or post-industrial) America, that gun laws are incompatible with American history and its practices or values, and that gun laws fundamentally collide with American legal traditions or individual rights, are all patently false. Following this introduction in part I, part II establishes that gun laws are as old as the nation. Part III summarizes the different categories into which early gun laws are categorized, and the frequency distributions within each category divided into time periods from 1607 to 1934. Part IV examines illustrative laws within each category and considers their nature and consequences. Part V offers a brief conclusion.

Above and beyond the general ubiquity of gun regulations early in the country's history, the range of those regulations is punctuated by the most dramatic of those laws discussed in parts III and IV: measures that called for gun confiscation for myriad reasons including military necessity, failure to swear allegiance to the government, improper firearms storage, ownership of proscribed weapons, hunting law violations, and failure to pay taxes on guns. One may argue for or against the propriety of such measures, but one may no longer argue that they are the sole province of modern gun control advocates. Further, in the seventeenth century no less than in the twenty-first, an abiding concern underlying many, if not most, of these regulations is the protection of public safety by the government.

## II GUN LAWS ARE AS OLD AS THE NATION

The first formal legislative body created by European settlers in North America was convened in the Virginia colony on July 30, 1619, twelve years after the colony's establishment. [10] The first General Assembly of Virginia met in Jamestown where it deliberated for five days and enacted a series of measures to govern the fledgling colony. [11] Among its more than thirty enactments in those few days was a gun control law, which said "[t]hat no man do sell or give any Indians any piece, shot, or powder, or any other arms offensive or defensive, upon pain of being held a traitor to the colony and of being hanged as soon as the fact is proved, without all redemption." [12]

If a death sentence for providing Native Americans with firearms and ammunition seems a little draconian even by the standards of the day, it punctuated the degree of tension, suspicion, and confrontation that existed **\*58** between the settlers and the indigenous population. [13] Other colonies adopted similar measures, although they were of limited effectiveness--not only because of the difficulty of monitoring arms trading in early America, but because such trading was highly profitable, was fed by traders from other nations, including the French and the Dutch, and because many Native Americans allied themselves with settlers against various foes. [14] Far from being an anomaly, this early gun law was just the beginning of gun regulations in early America.

## III THE ARC OF AMERICAN GUN LAWS

America's early governmental preoccupation with gun possession, storage, and regulation was tied to the overarching concern for public safety, even as it intruded into citizens' private gun ownership and habits. Symptomatic of this is the fact that colonial and state governments enacted over 600 laws pertaining specifically to militia regulation and related militia activities alone. [15] Yet militia-related laws hardly constituted the extent of gun regulation in America.

A recently researched and compiled listing of colonial and state gun laws spanning from America's founding up to 1934 (the year the first significant national gun law, the National Firearms Act, was enacted [16] ), has recently become available. [17] It is by far the most comprehensive compilation to date. This far-reaching compilation process, conducted by lawyer and researcher Mark Anthony Frassetto, has become possible thanks to the ever-growing digitization of state law archives and other electronic sources of historical information about law, including HeinOnline Session Laws Library and the Yale Law School's Avalon Project, and also some digitized state session law archives. Aside from key-word electronic searches of these sources, Frassetto also consulted secondary sources to produce this prodigious list. [18]

The result is a compilation of nearly one thousand gun laws of every variety-- with some exceptions, this list does not include militia laws, hunting regulations, laws pertaining to gunpowder storage, and laws against weapons firing. [19] Following

Compendium_Cornell
Page 1708

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19160   Page 289 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

Frassetto's method of organization, these laws are organized by category and summarized in Table 1. Within those categories, they are arrayed **\*59** by state alphabetically within four historical periods: 1607-1789 (the colonial and pre-modern-Constitution period); 1790-1867 (the pre-Fourteenth Amendment period); 1868-1899 (the post-Fourteenth Amendment period); and 1900-1934 (the twentieth century). Despite the admirable thoroughness of Frassetto's electronic database searches, he notes that his list cannot be considered definitive, owing to multiple spellings of common words and other glitches inherent in the nature of such searches. [20] Thus, his total list of laws is an underestimate of the actual universe of gun statutes--indeed, this article discusses a few early laws from Massachusetts in the 1600s that were not a part of Frassetto's list. [21]

**Table 1**

**NUMBERS OF GUN LAWS IN THE STATES, AND NUMBERS OF STATE GUN LAWS, BY CATEGORIES, 1607-1934**[22]

| LAW TYPE | 1607-1790 | 1791-1867 | 1868-1899 | 1900-1934 |
| --- | --- | --- | --- | --- |
| Ban | 0 | 0 | 7 | 0 |
| Number of states | 0 | 0 | 5 | 0 |
| Brandishing | 2 | 4 | 14 | 7 |
| Number of states | 2 | 3 | 13 | 7 |
| Carry restriction | 5 | 31 | 48 | 21 |
| Number of states | 4 | 19 | 28 | 18 |
| Dangerous weapons | 1 | 4 | 9 | 53 |
| Number of states | 1 | 4 | 8 | 35 |
| Dueling | 3 | 7 | 3 | 0 |
| Number of states | 2 | 7 | 3 | 0 |
| Felons, foreigners, etc. | 11 | 2 | 1 | 26 |
| Number of states | 5 | 2 | 1 | 19 |
| Firing weapons | 19 | 17 | 19 | 22 |
| Number of states | 9 | 14 | 17 | 20 |
| Hunting | 11 | 8 | 24 | 58 |
| Number of states | 8 | 5 | 21 | 43 |
| Manufacturing, inspection | 2 | 11 | 11 | 22 |
| Number of states | 2 | 10 | 9 | 17 |
| Militias | 23 | 15 | 2 | 0 |
| Number of states | 11 | 15 | 2 | 0 |
| Minors, etc. | 0 | 2 | 15 | 21 |
| Number of states | 0 | 2 | 15 | 19 |

Compendium_Cornell
Page 1709

| Registration, taxation | 3 | 8 | 12 | 18 |
|---|---|---|---|---|
| Number of states | 2 | 6 | 11 | 15 |
| Race/slavery [23] | 5 | 18 | 0 | 0 |
| Number of states | 5 | 11 | 0 | 0 |
| Sensitive areas, etc. | 11 | 23 | 30 | 35 |
| Number of states | 7 | 17 | 20 | 26 |
| Sentencing enhancement | 3 | 3 | 5 | 12 |
| Number of states | 3 | 3 | 5 | 10 |
| Storage | 2 | 7 | 2 | 0 |
| Number of states | 1 | 6 | 2 | 0 |

**\*61**  The types of gun laws span about every conceivable category. The two most common and prolific types of laws regulated hunting and militias--in fact, Frassetto noted in his compilation that he excluded from his list most hunting and militia laws, gunpowder storage laws, and laws against the firing of weapons, because there were simply too many of them. Those categories and some of those laws, however, are represented in the list provided here. Thousands of gun laws existed from the country's founding up to 1934. [24] The data presented here represents a subset of these thousands of laws. Notwithstanding Frassetto's exclusions, his full list includes over 800 laws. [25]  The version of his list presented here is somewhat shorter, as it excludes state constitutional provisions, weapons laws that did not specifically mention firearms, and British laws from the early colonial period that Frassetto included. Thus, the list presented here includes about 760 laws. [26]  These include colonial laws, laws of territories that later became states, and of course state laws. Generally speaking, most laws established jurisdiction-wide regulations, although some of the laws were more narrowly drawn to include only densely populated areas, such as cities and towns, or on occasion specifically named cities or counties. Each type of law warrants detailed attention.

Before examining these laws, one other question presents itself: were any of these laws challenged in court? If so, were these challenges based on claims of federal or state right to bear arms-type provisions? If so, what were the outcomes?

A perusal of nineteenth century litigation in state courts reveals that at least one type of gun law was subject to court challenge: those restricting concealed or open gun carrying. The outcomes of such challenges were summarized by a 1905 Kansas state court decision this way: "It has ... been generally held that the Legislatures can regulate the mode of carrying deadly weapons, provided they are not such as are ordinarily used in civilized warfare [i.e. in a military context]. To this view," the court continued, "there is a notable exception in the early case of *Bliss v. Commonwealth*, 2 Litt. (Ky.) 90, 13 Am. Dec. 251 .... While this decision has frequently been referred to by the courts of other states, it has never been followed." [27]  A Washington State court from 1907 offered the same verdict:

> Nearly all the states have enacted laws prohibiting the carrying of concealed weapons, and the validity of such laws has often been assailed, because denying to the citizen the right to bear arms; but we are not aware that such a contention has ever prevailed, except in the courts of the state of Kentucky [a reference to *Bliss*]. [28]

**\*62**  The *Bliss* case was the outlier in this state case law, although in one other case, *Nunn v. State*, the Georgia state court struck down a provision of a state gun carrying law that included restrictions on both concealed carry and open carry. [29]  The court struck down only the open carry provision--the man convicted of violating this provision was apparently carrying a handgun openly, yet the law failed to list handguns among those weapons not to be openly carried, while it did list them among those not to be sold or carried concealed. [30]

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19162   Page 291 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

The conclusions offered by state courts that restrictions on gun carrying were invariably upheld when challenged is punctuated by the fact that, as late as 1981, only two states of the union had loose, "shall issue" carry laws (meaning that the government is obligated to issue a carry license upon completion of proper paperwork, unless the applicant is a felon, mentally unbalanced, or a part of some other category of person prohibited from owning a gun), and one state had no system of permitting for gun carrying. [31] Nineteen states barred concealed gun carrying entirely, and twenty-eight states had "may issue" laws, where states have great discretion as to whether to issue carry permits. [32]

## IV CATEGORIES OF EARLY GUN LAWS

### A. Gun Bans

A handful of laws established outright, categorical bans that criminalized the sale or exchange of firearms. [33] All were enacted in the post-Civil War era. Six of the seven state bans--in Arkansas, [34] Kansas, [35] Texas, [36] and three in Tennessee [37] --were of pistols. The seventh, from Wyoming, banned all firearms--both handguns and long guns--from "any city, town, or village." [38] Arkansas also banned any sale or transfer of pistols, except for those in military use. [39] **63** Subsequent categories of gun laws also include specific bans on particular types of weapons, like automatic weapons, and on weapons accessories, like silencers. These laws, and a few to come, make clear that gun banning--while not common--was not the sole province of 1960s anti-gun liberals.

### B. Brandishing Laws

States also enacted brandishing laws, designed to criminalize the threatening use of the weapons named in these laws. [40] The prohibited behaviors were typically described as "exhibit[ing] any of said deadly weapons in a rude, angry or threatening manner," [41] or with similar language. Some laws in the later 1800s also identified the prohibited behavior as "draw[ing] or threaten[ing] to use" such weapons. [42] These laws also generally included exemptions for the use of such weapons in personal self-defense or for military purposes.

### C. Gun Carry Restrictions

Carry restriction laws were widely enacted, spanning the entire historical period under examination. As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels." [43] Massachusetts followed in 1750. [44] In the late 1700s, North Carolina [45] and Virginia [46] passed similar laws. [47] In the 1800s, as interpersonal violence and gun carrying spread, thirty-eight states joined the list; [48] five more did so in the early **64** 1900s. [49] Laws in the eighteenth century did not typically identify weapons concealment as criminal per se, but did restrict more general carrying of firearms, usually if done in crowded places, or groups of armed people. Among the earliest laws criminalizing the carrying of concealed weapons was that of Kentucky in 1813. [50] As with the brandishing laws, concealed carry laws normally targeted pistols as well as various knives, the chief feature of which was that they had long, thin blades that were favorites in interpersonal fights. Louisiana enacted a similar law that same year. [51] A particularly sharp comment on the intent behind such laws was expressed in Tennessee's 1837 law, which referred to "[e]ach and every person so degrading himself" by carrying pistols or other named weapons. [52] The preamble of Georgia's 1837 law began: "AN ACT to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons." [53] Alabama's 1839 concealed carry law reflected similar antipathy to the practice it was prohibiting: "AN ACT To suppress the evil practice of carrying weapons secretly." [54] Concealed carry laws generally made exceptions for travelers passing through an area while armed.

These laws were enacted in most states of the union and all across the country, including territories. In nineteenth-century laws, the main emphasis was on prohibiting concealed carry, whereas early twentieth century laws generally **65** applied to all carrying, whether concealed or open. Aside from hunting and militia laws, they were among the most common and widely accepted gun regulations to be found in our post-1789 history. These laws therefore pose an especially stark contrast with the contemporary American political movement--dating to the early 1980s--spreading the legality of concealed carry. [55]

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19163   Page 292 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

Many southern states were among those seeking to curtail gun carrying, as well as the enactment of other laws pertaining to criminal uses of guns, which is attributable to the fact that "the Antebellum South was the most violent region in the new nation." [56] After the Civil War, the ravaged South again witnessed violence at rates greater than the rest of the country. [57] Thus, states with greater violence, in the form of greater gun violence, turned in part to stronger gun laws as a remedy.

These historical concealed carry laws also recognized what modern gun control advocates stress: that, among all firearms, handguns pose a unique danger to public safety. Even though there are twice as many long guns as handguns in America, and long guns are generally easier to obtain, about eighty percent of all gun crimes are committed with handguns because of their ease of use, concealability, and lethality. [58] Little stretch of the imagination is required to infer that the same trend existed in the nineteenth century as well.

Before considering other types of gun laws, it should be noted that concealed and open carry restrictions were common in the American western frontier during the nineteenth century in the so-called "Wild West." The truth of life in the Old West, and the actual role of guns in it, is known, but not well known. Axiomatic expressions such as "the guns that won the West" [59] and "arm [s] that opened the West and tamed the wild land" [60] still too often typify what in actuality is a romanticized and wildly exaggerated assessment of the importance of guns in the settling of the West. [61] Indeed, some have gone so far as to claim that "the American experiment was made possible by the gun." [62] But these characterizations ignore the central role of homesteaders, ranchers, miners, **66** tradesmen, businessmen, and other settlers across the western plains. The "taming" of the West was in fact an agricultural and commercial movement, attributable primarily to ranchers and farmers, not gun-slinging cowboys. [63] In fact, the six-shooter and rifle played relatively minor roles in the activities of all these groups--even the cowboys. [64] According to historian Richard Shenkman:

> The truth is many more people have died in Hollywood westerns than ever died on the real frontier .... In the real Dodge City, for instance, there were just five killings in 1878, the most homicidal year .... In the most violent year in Deadwood, South Dakota, only four people were killed. In the worst year in Tombstone, home of the shoot-out at the OK Corral, only five people were killed. The only reason the OK Corral shoot-out even became famous was that town boosters deliberately overplayed the drama to attract new settlers. [65]

Even in the most violence-prone western towns, vigilantism and lawlessness were only briefly tolerated. In his sweeping history of the West, historian Ray Allen Billington noted that local businesspeople and other leaders quickly pushed for town incorporation in order to establish local police forces, which were supported by taxes levied against local bars, gambling establishments, and houses of prostitution. [66] The prohibitions against carrying guns analyzed here were enforced, and there were few homicides. [67] The western-style shoot-outs glorified in countless books and movies were literally "unheard of." [68] In the most violent cow towns of the old West--Abilene, Caldwell, Dodge City, Ellsworth, and Wichita--a total of forty-five killings were recorded between 1870 and 1885, and only six of these killings were from six-shooters; sixteen killings were by police. [69] As cowboy experts Joe B. Frantz and Julian E. Choate observed, "the six-shooter has been credited with use entirely disproportionate with the facts." [70]

Even western outlaws illustrate the extent to which myth replaced fact with respect to guns and lawlessness. Many studies of the famed western outlaws demonstrate that "they were few, inconspicuous, and largely the invention of newspaper correspondents and fiction writers." [71] Moreover, "the western marshall [was] an unglamorous character who spent his time arresting drunks or rounding up stray dogs and almost never engaging in gun battles." [72] Most of the killing that took place on the frontier involved the wars between the U.S. Cavalry **67** and those Native Americans who rebelled against harsh and duplicitous treatment at the hands of whites. [73]

### D. Restrictions On Dangerous Or Unusual Weapons

Compendium_Cornell
Page 1712

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19164   Page 293 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

States moved to enact laws restricting or barring certain dangerous or unusual weapons--also a subject that has contemporary reverberations. Such laws in the country's early decades were aimed in part at pistols and offensive knives, like most concealed carry laws, but also at the practice of rigging firearms to be fired with a string or similar method to discharge a weapon without an actual finger on the firearm trigger. Referred to as "gun traps," the earliest such law was enacted by New Jersey in 1771. [74] Some laws later referred to such weapons as "spring guns," [75] "trap guns," [76] and "infernal machines." [77]

The bulk of the laws that identified certain weapons as dangerous or unusual, however, appeared in the early 1900s, when most states moved aggressively to outlaw machine guns (usually meaning fully automatic weapons), sawed-off shotguns, pistols, weapons and mechanisms that allowed firearms to be fired a certain number of times rapidly without reloading, silencers, and air guns (which propels projectiles with compressed air rather than gun powder). The first state to enact an anti-machine gun law was West Virginia in 1925. [78] A number of states enacted anti-machine gun laws in 1927 alone--a year in which a concerted national push unfolded to regulate these and other gangster-type weapons. In all, at least twenty-eight states enacted anti-machine gun laws during this period. [79] **68** Texas, for example, defined machine guns in 1933 as those from which more than five bullets were automatically discharged "from a magazine by a single functioning of the firing device." [80]

The lesson here is significant both for its historical context and for the contemporary debate over the regulation of new or exotic gun technologies. In these instances, new laws were enacted not when these weapons were invented, but when they began to circulate widely in society. So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. [81] But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted.

### E. Semi-Automatic Gun Restrictions

Of particular relevance to the modern gun debate is the fact that at least seven, and as many as ten, state laws specifically restricted semi-automatic weapons--weapons that fire a round with each pull of the trigger without manual reloading [82] -- anticipating by seven decades the semi-automatic assault weapons ban debates, and related efforts to restrict large capacity bullet magazines, from the 1990s to the present.

States with laws in this category typically combined fully automatic and semi-automatic weapons under a single definitional category. [83] A 1927 Rhode Island measure defined the prohibited "machine gun" to include "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading." [84] To compare, a 1927 Massachusetts law said: "Any gun or small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired ... shall be deemed a machine gun ...." [85] Michigan's 1927 law prohibited machine guns or any other firearm if they fired more than sixteen times without reloading. [86] Minnesota's 1933 law outlawed "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure." [87] It went on to penalize the modification of weapons that were altered to accommodate such extra firing capacity. [88] Fully automatic .22 caliber "light sporting rifles" were **69** also considered machine guns under the law, but .22 caliber semi-automatic "light sporting rifles" were exempted. [89] Ohio also barred both fully automatic and semi-automatic weapons in a 1933 law, incorporating under the banned category any gun that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading." [90] The law defined semi-automatic weapons as those that fired one shot with each pull of the trigger. [91] South Dakota barred machine guns by defining them as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine ...." [92] Like several other states, Virginia outlawed weapons

> of any description ... from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semiautomatically, or otherwise discharged without reloading. [93]

Compendium_Cornell
Page 1713

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19165   Page 294 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

Aside from these seven states, another three included language that was ambiguous as to whether they extended prohibitions to semi-automatic as well as fully automatic weapons. Illinois enacted a 1931 law that prohibited "machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices." [94] Louisiana's 1932 anti-machine gun law, [95] and South Carolina's 1934 law, [96] both defined machine guns in the same way using identical language, including the eight cartridge standard. In the case of these three laws, the word "automatically" would seem to refer to fully automatic firing, but when that wording is married with "discharging more than eight cartridges successively without reloading," it would seem to encompass semi-automatic firing as well.

Table 2 summarizes the key portions of the laws from these ten states. The lesson of the previous part also applies here: new technologies bred new restrictions. And who would have guessed that the fierce controversy over regulating semi-automatic assault weapons in the 1990s and 2000s was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s.

*70  Table 2

STATE LAWS BARRING SEMI-AUTOMATIC WEAPONS, 1927-1934 [97]

| STATE AND YEAR | PROVISION OF LAW |
| --- | --- |
| Massachusetts 1927 | "rapid fire and operated by a mechanism" |
| Michigan 1927 | "any machine gun or firearm which can be fired more than sixteen times without reloading" |
| Minnesota 1933 | "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure." |
| Ohio 1933 | "any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading." |
| Rhode Island 1927 | "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading." |
| South Dakota 1933 | "a weapon of any description from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine." |
| Virginia 1933 | "a weapon of any description from which more than seven shots or bullets may be rapidly, automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading." |

Compendium_Cornell
Page 1714

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19166   Page 295 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

| AMBIGUOUS STATE LAWS | |
| --- | --- |
| Illinois 1931 | "machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices." |
| Louisiana 1932 | "machine rifles, machine guns and sub machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device." |
| South Carolina 1934 | "machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device." |

**\*71  F. Dueling Prohibitions**

A well-known category of gun laws with ties to American history is the prohibition against dueling. Prominent public figures from early American history, including Alexander Hamilton and Andrew Jackson, found themselves in highly publicized duels. [98] Hamilton's longstanding political feud with fellow New York politician Aaron Burr ended when the two men dueled in New Jersey in 1804. [99] Hamilton died from his wounds, and Burr's political career never recovered. [100] Jackson engaged in several duels, and was even injured during one **\*72** in 1806. [101] Though not barred in every state, the practice declined in the North after the Hamilton-Burr duel, but persisted in the South until the mid-nineteenth century. [102]

**G. Felons, Foreigners, Others Considered Dangerous**

Early gun laws aimed at preventing felons, foreigners, or others deemed dangerous from owning firearms focused on Native Americans, with at least five colonies enacting such laws [103] --including the 1619 Virginia law cited earlier. [104] The Massachusetts colony enacted a law in 1637 that required named individuals who expressed "opinions & revelations" that "seduced & led into dangerous errors many of the people" of New England to turn in all "guns, pistols, swords, powder, shot, & match," and it further barred them from "buy[ing] or borrow[ing]" any of the same until such time as the local court said otherwise. [105] If those disarmed admitted to their "seditious libel," they could have their weapons restored. [106] In the 1770s, Pennsylvania enacted a law to bar or strip guns from those who refused to swear loyalty to the new American government. [107] In fact, ten of the thirteen states had laws allowing the impressment--that is, taking--of privately held firearms during the Revolutionary War. [108] Massachusetts also enacted such a law in 1776, although it does not appear in Frassetto's list. [109] By the early 1900s, as anti-immigrant sentiment spread, many states enacted laws aimed at keeping guns from non-citizens, as well as the young, those who were inebriated, felons and other criminals, and non-state residents.

**H. Firing Location Restrictions**

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19167   Page 296 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

Concerns over the inherent harm and risk attendant to the firing of weapons near others spawned a steady stream of laws prohibiting such acts from the 1600s **\*73** through the early 1900s. Early such laws prohibited not only the firing of firearms in or near towns, but firing after dark, on Sundays, or near roads. [110] Early laws also punished firing that wasted gunpowder, or that occurred while under the influence of alcohol. [111] A North Carolina law from 1774 barred hunting by firelight at night, citing this concern in its preamble: "WHEREAS many Persons under Pretence of Hunting for Deer in the Night, by Fire Light, kill Horses and Cattle, to the Prejudice of the Owners thereof." [112] In the 1800s and 1900s, such laws were focused almost exclusively on firing in, around, or near towns or other populated areas or events.

## I. Hunting Restrictions

Hunting laws are significant for the extent to which early ones reflect contemporary concerns. Though one imagines the America of the seventeenth to the nineteenth centuries as a nation little concerned--or not needing to be concerned--about matters related to wildlife management, safe hunting practices, or the like, these concerns are expressed early in American legislative histories, for example in the legislative history for the North Carolina night-time hunting law just quoted. Early hunting laws were aimed at those who hunted on private lands or in preserves, those who hunted certain types of game, most notably water fowl--often tied to prohibitions against hunting of such game from canoes, skiffs, or other water craft--and even the common deer. [113] For example, it comes as something of a revelation to note that Pennsylvania established a deer hunting season, penalizing out-of-season hunting, as early as 1721, [114] and North Carolina as early as 1768. [115] The penalty for violation of the North Carolina law was a fine of five pounds and "forfeiture of his gun." [116] Hunting even in this early period also sometimes required a license. [117] Similarly, laws in the 1800s also restricted what was by then termed "fire-hunting," hunting by firelight at night, poaching on private lands, and the use of certain restricted weapons, such as a "punt gun" or "swivel gun," defined as a smooth bored gun mounted on a swivel that fires a charge of shot to bring down water fowl, or any weapon not fired from the shoulder. [118] Measures were also enacted to protect certain game, to require **\*74** licensing, and bar fishing "with any kind of gun." [119] In the twentieth century, in addition to the types of laws already mentioned, states barred hunting with silencers, from aircraft, by under-age persons, or with certain kinds of weapons--still including swivel guns, but now including automatic weapons. [120]

## J. Gun Manufacture, Inspection, Sale Restrictions

Gun laws also dealt broadly with manufacturing, inspection, and sale of weapons. Many of the laws in this category pertained to the manufacture, sale, transport, and storage of gunpowder. Gunpowder matters were of great concern because early firearms operated with the addition of loose gunpowder to serve as the igniting or explosive force to propel a projectile, so the two were inextricably linked. [121] But beyond the safety concerns about explosions or fires resulting from the mishandling of gunpowder, safety issues also led to other early regulations. In 1814, for example, Massachusetts required that all musket and pistol barrels manufactured in the state be first tested or "proved" to insure that they could withstand the firing process without rupturing. [122] Moreover, the law provided for a "person appointed according to the provisions of this act"--in other words, a state inspector--to oversee or conduct the testing. [123] This continued a long tradition in Massachusetts of giving local officials the power to survey, inspect, and even confiscate arms as needed. As early as 1642, "surveyors of arms" were empowered in colonial law to demand the delivery of gun powder and firearms from individuals in order for these items to be used in "times of danger." [124] New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site. [125] Twentieth century laws extended safety regulations pertaining to gunpowder and other explosives; one state, South Carolina, prohibited the use of explosives to kill fish (hardly a sporting enterprise). [126]

## **\*75** K. Firearms Sales

At least eight states regulated, barred, or licensed firearms sales. For example, Florida (1927), [127] Georgia (1902), [128] and North Carolina (1905) [129] gave localities the power to license, regulate, or even bar the commercial sale of firearms. In a 1917 law, New Hampshire required the licensing of gun dealers, requiring them to record the name, address, date of sale, amount paid, and date of the purchaser's permit for all who made gun purchases. [130] In turn, this information was passed to the local city or town clerk or county office, and "[t]he records thus filed shall at all times be open to the inspection of the police departments, or other

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19168   Page 297 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

public authorities." [131]  New Jersey prohibited pawn brokers from selling or in any manner transferring any firearms. [132]  New York established a registration system for all handgun sales--part of the 1911 law known as the Sullivan Law--which required gun owners to obtain a permit for ownership. [133]  In a 1925 law, West Virginia barred the "public display" of any firearms for sale or rent, or ammunition. Gun dealers were also to be licensed, and were required to record the name, address, age "and general appearance of the purchaser," as well as all identifying information about the gun, which was then to be immediately reported to the superintendent of the local department of public safety. [134]

## L. Militia Laws

The militia laws that appear on this list represent one category of early gun laws that have been carefully studied elsewhere. [135]  Not surprisingly, the laws here replicate what is now well known about the early-American militia system. Early laws confirmed the power of state governments to impress or take the firearms of citizens if needed. Militia-eligible men were typically required to obtain and maintain in working order the necessary combat-worthy firearm, at their own expense, along with the necessary accoutrements of powder, shot, and the like. [136]  In Virginia in the early 1600s, men were required to bring their firearms to church for fear of Indian attacks. [137]  In some states, laws stipulated when, where, and under what circumstances guns were to be loaded or unloaded. [138]  In Maryland,  **76**  privates or non-commissioned officers who used their muskets for hunting were fined, according to a 1799 law. [139]  These laws disappeared with the end of the old militia system in the mid-1800s.

## M. Gun Access By Minors And Irresponsible Others

Numerous laws restricting gun access by minors--minimum ownership ages ranged from twelve to twenty-one--or others deemed irresponsible arose in the late 1800s, becoming more common in the early 1900s. Some states added other barred categories, including convicts or those of poor moral character, those inebriated, and people of unsound mind. [140]  In 1907, the then-territory of Arizona barred

> any constable or other peace officer ... while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm, or while so intoxicated to strike any person, or to strike any person with a pistol, gun or other firearm .... [141]

## N. Arms And Ammunition Trafficking

Arms and ammunition trafficking was also a concern as early as the seventeenth century, just as it is today. Various registration or taxation schemes sought to address this concern. For example, a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals. [142]  A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also "of arms and munitions." [143]  Twenty years later, Virginia required that "all ammunition, powder and arms, other than for private use shall be delivered up" to the government. [144]  In the 1800s, three southern states imposed taxes on personally held firearms. Georgia in 1866 levied a tax of "one dollar a piece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation ...." [145]  In 1867, Mississippi levied a tax of between $5 and $15

> upon every gun and pistol which may be in the possession of any person ... which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain [to seize property for money owed] and seize such gun or pistol, and sell the same for cash .... [146]

**77**  In 1856 and 1858, North Carolina enacted taxes on pistols and other weapons "used or worn about the person." [147]  An 1851 Rhode Island law taxed anyone who owned or kept a pistol or rifle shooting gallery in certain locations; [148]  Louisiana and

Compendium_Cornell
Page 1717

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19169   Page 298 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

Mississippi did the same in 1870 [149] and 1886, respectively. [150] Alabama imposed a tax on firearms dealers in 1898. [151] That same year, Florida required a license for anyone owning "a Winchester or repeating rifle," and further required the licensee to "give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the county commissioners." [152] Hawaii licensed firearms for sporting purposes in 1870, [153] as did Wyoming in 1899, [154] and Georgia imposed a pistol dealers' tax in 1894. [155] Nebraska granted to city mayors the power to issue licenses to carry concealed weapons, adding mayoral discretion to "revoke any and all such licenses at his pleasure." [156]

## O. Registration And Taxation

Registration and taxation laws were enacted with greater frequency beginning in the twentieth century. At least twelve states imposed various gun sales or dealer registration, regulation, taxation, or gun registration schemes. [157] The earliest applicable to purchasers of all firearms, was enacted in Michigan in 1913; [158] New York's 1911 Sullivan law applied to handguns only. [159] Michigan also mandated in 1927 that all pistols be presented by their owners "for safety inspection" to local officials, if they lived in an incorporated city or village. [160] Perhaps most remarkable was this sweeping law, enacted by Montana in 1918, titled "An Act providing for the registration of all fire arms and weapons and regulating the sale thereof":

> **\*78**  Within thirty days from the passage and approval of this Act, every person within the State of Montana, who owns or has in his possession any fire arms or weapons, shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered.

> .... For the purpose of this Act a fire arm or weapon shall be deemed to be any revolver, pistol, shot gun, rifle, dirk, dagger, or sword. [161]

The remarkable sweep of this statewide gun registration scheme is exceeded only by its early provenance.

## P. Right To Bear Arms

In all of the nearly one thousand statutes examined in this analysis, only one referred to the right to bear arms--and it managed to misquote the Second Amendment; it is "the right *of* the people" not "the right *to* the people." In 1868, Oregon enacted "An Act To Protect The Owners Of Firearms":

> Whereas, the constitution of the United States, in article second of amendments to the constitution, declares that "the right to the people to keep and bear arms shall not be infringed;" and the constitution for the state of Oregon, in article first, section twenty-seven, declares that "the people shall have the right to bear arms for the defense of themselves and the state;" therefore, ....

> Section 1. Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defense, the following firearms, to wit: Either or any one of the following named guns and one revolving pistol: a rifle, shotgun (double or single barrel), yager [a heavy, muzzle-loading hunting rifle], or musket ....

Compendium_Cornell
Page 1718

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19170   Page 299 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

Section 2. No officer, civil or military, or other person, shall take from or demand of the owner any fire-arms mentioned in this act, except where the services of the owner are also required to keep the peace or defend the state. [162]

Even in this articulation of a specified right to guns, the law extends that right to "any one of the following," [163] limiting citizens' gun rights both as to numbers of guns to be owned, and to the specified types. Here, indeed, is a "well-regulated right." [164]

## Q. Race And Slavery

The history of firearms regulations pertaining to race and slavery is surprising only in the relatively small number of written state restrictions. Yet that is not to suggest that the antebellum slavery regime was somehow less than uniformly oppressive. Two competing values shaped the relationship between slavery and guns. First, many sought to maintain some discretion regarding the arming of slaves. Early in the country's history, slave owners found it not only useful, but **79** necessary, to arm slaves in early conflicts with Native Americans. For example, during the bloody Yamasee War (1715-1717) in South Carolina, nearly half of the colonist militia forces deployed were slaves. [165] Later on, the practice of enrolling slaves or indentured servants in local militias was largely abandoned, especially as such forces were used to monitor the slave population. [166] In addition, individual slave owners also often wished to arm their slaves when hunting or traveling. [167] The second, opposing value was the overriding fear of slave rebellions. With so much of the population of the South composed of people in bondage, whites lived in constant fear of violent uprisings. [168] Part of the pathology of control extended to deterring and catching runaway slaves. [169] Finally, gun prohibitions often extended to free blacks as well, although some laws distinguished between those in bondage versus those who were free. For example, Virginia enacted a law in 1806 that permitted "every negro or mulatto" to own guns, as long as they were not slaves. [170] Most of the laws listed here either penalize slaves for gun hunting or gun carrying without their owners' authorization or presence. Others barred slave gun carrying entirely, or barred guns to free blacks or those of mixed race.

## R. Time And Place Restrictions

Probably the most common type of gun law in America today is that which restricts the use of firearms in sensitive areas and times. One would be hard-pressed to find a city, town, or village in the contemporary United States that does not have a law against the discharge of firearms within its jurisdiction. Indeed, such laws existed early in our history, some of which fell into previous categories. Early such laws barred firearms carrying and discharges in named or generic public places, communal gatherings, schools, entertainments, on Sundays, or election day, as well as laws enacted in the late 1700s and 1800s to bar firearms discharges in cemeteries (clearly a source of significant mischief), on or at trains or other public conveyances, near roads, churches, bridges, homes or other buildings, or state parks. [171]

## *80  S. Crime And Guns

The idea that those who commit crimes with guns should suffer a greater punishment is an old idea, but not one widely found during the period under study here. In 1783, Connecticut enacted a law that called for the death penalty for those who committed a burglary or robbery with a gun because it was seen to "clearly indicate their violent intentions." [172] By comparison, commission of the same crimes without a gun resulted in a whipping and jail time. [173] A 1788 Ohio (Northwest Territory) law increased the penalty and jail time for anyone convicted of breaking and entering with a dangerous weapon, including firearms. [174] Several states provided for enhanced sentences for crimes committed with firearms in the 1800s. [175] In the 1900s, extended sentences were meted out to those who used explosives or guns while committing crimes--sometimes machine guns or pistols were stipulated. [176]

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19171   Page 300 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

**T. Storage Regulations**

The final category of gun regulation pertains to storage regulations. Many early laws imposed storage restrictions on gunpowder, but similar rules sometimes extended to firearms as well. For example, Massachusetts enacted a 1782 law specifying that any loaded firearms "found in any Dwelling House, Out House, Stable, Barn, Store, Ware House, Shop, or other Building ... shall be liable to be seized" by the "Firewards" of the town. If the storage was found to be improper by a court, the firearms were to "be adjudged forfeit, and be sold at public Auction." [177] Armories and gun houses were subject to regular inspection by the terms of an 1859 Connecticut law. [178] In 1919, Massachusetts passed a law to authorize the issuance of warrants for any complaint alleging that someone was keeping "an unreasonable number of rifles, shot guns, pistols, revolvers or other dangerous weapons, or that an unnecessary quantity of ammunition, is kept **\*81** or concealed for any unlawful purpose in a particular house or place ...." [179] If a court concluded that the possession was not justified, it could order the weapons and ammunition forfeited. [180]


**V CONCLUSION: FIREARMS LAWS ARE AS AMERICAN AS GUN OWNERSHIP**

Early gun laws were comprehensive, ubiquitous, and extensive. Taken together, they covered every conceivable dimension of gun acquisition, sale, possession, transport, and use, including deprivation of use through outright confiscation--not merely for the commission of serious crimes, but even for violation of hunting regulations. Given that the dark fear of contemporary gun rights enthusiasts is government confiscation of firearms, it bears noting that this survey of early gun laws included measures that invoked gun confiscation for a wide range of reasons or offenses including: military necessity; failure to swear a loyalty oath to the government; improper storage of firearms; improper possession of weapons legal to own under certain circumstances, including, but not limited to, possession of specific, named types of prohibited firearms--especially handguns and machine guns; violations of certain hunting laws; and failure to pay a gun tax.

Another category of gun regulation, remarkable in its own right, is the prohibition of semi-automatic weapons in up to ten states, summarized in Table 2. This important statutory prohibition, unknown until now, also has contemporary reverberations as precedent for the assault weapons ban debates in the 1990s and 2000s. [181]

In all of this lawmaking, there is, with the rarest exceptions, no suggestion that these laws infringed on anything related to any "right to bear arms"-- remembering that the Second Amendment did not apply to the states until the Supreme Court so extended it in 2010 [182] --be it the U.S. Constitution's Second Amendment or the various state constitutions' right-to-bear-arms-type provisions. Many state laws predated the modern state and federal constitutions, but there is no indication that subsequent state laws were somehow inhibited or stymied after the adoption of right to bear arms provisions, aside from facing occasional court challenges. [183] Many of these laws did, however, include two types of exemptions: those related to militia or military activities; and instances when individuals used firearms for justifiable personal self-defense. As Saul Cornell has noted, "the common-law right of individual self-defense" [184] was not only well **\*82** established long before codification of the right to bear arms in American constitutions; it existed independent of that right. [185]

Taken together, these sixteen--sometimes overlapping--categories of gun laws span a wide range. Some encompass anachronistic practices--like slavery, dueling, and old-style militias--that nevertheless reflect the scope of government power over the kinds of persons who could carry guns, the circumstances of gun carrying, criminal gun behavior, and military or defense exigencies. Others reflect the most basic efforts to improve safety, including laws that criminalized menacing behavior with guns (such as brandishing), the firing of weapons in populated areas, hunting laws, some of the laws related to manufacturing and inspection pertaining to firearms, laws restricting firearms access to minors, criminals, and those mentally incompetent, laws restricting firearms in sensitive areas or places, sentence enhancement laws, and storage laws.

Finally, some of the gun law categories represented more sophisticated, ambitious, or seemingly modern approaches to gun regulation. Dangerous weapons barred outright by laws enacted in the 1920s and early 1930s included automatic weapons like submachine guns. Congress moved to restrict access to such weapons nationwide in 1934. [186] Yet state laws also barred silencers, air guns, trap guns, and even semi-automatic weapons and the early equivalent of large capacity bullet magazines. While standards varied, some states barred weapons or mechanisms that could fire more than five, seven, eight, sixteen, or eighteen bullets without reloading. The concerns then were akin to those that motivated Congress to enact the Assault Weapons ban of 1994: [187] excessive firepower in the hands of civilians, and the related question of public safety. Beyond these laws

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19172   Page 301 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

are those that are essentially off the agenda in the contemporary political environment: registration and licensing laws, and significant, categorical gun bans.

Taking most of these gun law categories together, one overarching concern straddles them: the conviction that handguns represented a uniquely dangerous threat to societal interpersonal safety. Even though these laws were enacted long before the government or private researchers began to collect systematic data on gun violence, the carrying of pistols was seen as an activity largely confined to those who contemplated or committed crimes or other forms of interpersonal violence, and that therefore pistol carrying should be subject to stricter rules and standards, including in many instances prohibition. While gun control proponents continue to make the same arguments in modern America, those arguments carried more weight in the America of the 1600s through the early 1900s than they do today. The relationship between citizens and their governments with  **\*83** respect to guns contemplates a regulatory regime that bears little resemblance to the modern gun rights narrative of the past. Yes, there was lawlessness, rebellion, and rugged individualism. But the context was that of a governing framework where the state confined and defined lawful use of force by individuals.

Gun laws are as old as the country; more to the point, the *idea* of gun laws and regulation is as old as the country. The prevailing gun law movement in America in the last three decades toward the relaxing of gun restrictions--for example, the reduction of gun sale inspections, the shielding of manufacturers and dealers from criminal and civil liability, the rise of unregulated internet gun and ammunition sales--as well as the spread of concealed carry laws, the open carry movement, and most recently of "stand your ground" laws are not a return to the past. They are a refutation of America's past, and a determined march away from America's gun regulation tradition. And these changes have nothing to do with improving safety or security in society, but everything to do with politics.

### Footnotes

a1     Robert J. Spitzer (Ph.D., Cornell University, 1980) is Distinguished Service Professor and Chair of the Political Science Department at SUNY Cortland. He is the author of fifteen books, including five on gun policy, most recently GUNS ACROSS AMERICA (Oxford University Press 2015).

1      District of Columbia v. Heller, 554 U.S. 570 (2008).

2      *Id.* at 628-30, 635-36.

3      *Id.* at 626-27.

4      *See id.* at 623, 627 (citing United States v. Miller, 307 U.S. 174, 178 (1939)) (distinguishing validity of ban on short-barreled shotguns and noting that weapons protected were those used at time of ratification).

5      *See id.* at 632 (excluding gun-storage laws from scope of decision).

6      *See id.* at 626-27, 629 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever and for whatever purpose.") (citation omitted).

7      *Id.* at 626.

8      SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006); THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON DISTRICT OF COLUMBIA V. HELLER (Saul Cornell & Nathan Kozuskanich eds., 2013); CRAIG R. WHITNEY, LIVING WITH

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19173   Page 302 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

GUNS: A LIBERAL'S CASE FOR THE SECOND AMENDMENT (2012); ADAM WINKLER, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (2011).

9       CORNELL, *supra* note 8; ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA: THE STRUGGLE FOR CONTROL (2001); WHITNEY, *supra* note 8; WINKLER, *supra* note 8. More than any other single scholar or writer, historian Saul Cornell has been most responsible for excavating the legal and social realities of the laws and practices related to guns in early America. In addition to many articles, Cornell has published a number of books on the subject including, WHOSE RIGHT TO BEAR ARMS DID THE SECOND AMENDMENT PROTECT? (2000), A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006), and THE SECOND AMENDMENT ON TRIAL, *supra* note 8. The first important serious treatment of early gun laws and history is LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF A NATIONAL DILEMMA (1975).

10      *First Legislative Assembly in America*, HISTORY.COM (2010), http://www.history.com/this-day-in-history/first-legislative-assembly-in-america [https://perma.cc/3T2G-W3DH] (last visited Dec. 21, 2016).

11      *Laws Enacted By The First General Assembly of Virginia*, *in* COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION 283 (Donald S. Lutz ed., 1998) (quoting 1 JOURNALS OF THE HOUSE OF BURGESSES OF VIRGINIA, 9-14 (H.R. McIlwaine & John P. Kennedy eds., 1905)).

12      *Id.* at 287.

13      This precarious dynamic is well chronicled in NATHANIEL PHILBRICK, MAYFLOWER: A STORY OF COURAGE, COMMUNITY AND WAR (2006).

14      KENNETT & ANDERSON, *supra* note 9, at 51-56.

15      Kevin M. Sweeney, *Firearms, Militias, and the Second Amendment*, *in* THE SECOND AMENDMENT ON TRIAL, *supra* note 8, at 310-11.

16      National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801-5872 (2012)).

17      Mark Anthony Frassetto, Firearms and Weapons Legislation Up To The Early Twentieth Century (Jan. 15, 2013) (unpublished manuscript), https://ssrn.com/abstract=2200991 [https://perma.cc/YEY9-KEN8]. Unless otherwise noted, the citations to colonial and state gun laws found here are taken from this compilation.

18      *Id.*

19      *Id.*

20      *Id.* at 2.

21      I also conducted my own spot check of a few of the laws on Frassetto's list that are not included in this article, and found them to be, taken on the whole, accurate and correct.

22      Source: Frassetto, *supra* note 17. Though the table is labeled "State" gun laws, it also includes laws enacted when the states were colonies, and some local/municipal laws. The full category titles of gun laws from Frassetto's paper are:

Compendium_Cornell
Page 1722

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19174   Page 303 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

Bans on Handguns/Total Bans on Firearms; Brandishing; Carrying Weapons; Dangerous or Unusual Weapons; Dueling; Felons, Foreigners and Others Deemed Dangerous By the State; Firing Weapons; Hunting; Manufacturing, Inspection and Sale of Gunpowder and Firearms; Militia Regulation; Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible; Registration and Taxation; Race and Slavery Based Firearms Restrictions; Sensitive Areas and Sensitive Times; Sentence Enhancement for Use of Weapons; Storage.

23    The small number of laws pertaining to slaves or race-based restrictions pertaining to guns is not meant to suggest that the legal regime in the pre-Civil War South was somehow not uniformly harsh, but rather reflects the fact that express statutory restrictions were not necessary in all places, given the South's uniformly oppressive system of slavery.

24    *See* Frassetto, *supra* note 17 (compiling over 800 gun laws excluding the majority of the most common gun laws including hunting and militia laws, gunpowder storage laws, and laws against the firing of weapons).

25    *See id.*

26    A full summary list of the laws is available at ROBERT J. SPITZER, GUNS ACROSS AMERICA: RECONCILING GUN RULES AND RIGHTS 185-208 (2015).

27    City of Salina v. Blaksley, 83 P. 619, 620 (Kan. 1905) (citing Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822)).

28    State v. Gohl, 90 P. 259, 260 (Wash. 1907); *see also* District of Columbia v. Heller, 554 U.S. 570 (2008) (explaining that nineteenth-century courts typically upheld prohibitions on carrying a concealed weapon).

29    Nunn v. State, 1 Ga. 243 (1846).

30    *Id.* at 246-47.

31    *Concealed Weapons Laws in America from 1981 to Today*, LAW CENTER TO PREVENT GUN VIOLENCE, at http://smartgunlaws.org/wp-content/uploads/2012/05/ccw-factsheet.pdf [https://perma.cc/5ZYV-HYSS].

32    SPITZER, *supra* note 26, at 113.

33    In some subsequent categories to be discussed, gun confiscation was sometimes the penalty for violations of law.

34    Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at ARK. CODE ANN. ch. 48 § 1498 (1894)).

35    Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at KAN. GEN. STAT. § 1003 (1901)).

36    Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24).

37    Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231; Act of June 11, 1870, ch. XIII, § 1, 1870 Tenn. Pub. Acts 28, 28; Act of Dec. 1, 1869, ch. XXII, § 2, 1870 Tenn. Pub. Acts 23, 23-24.

38    Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19175   Page 304 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

39     Act of Apr. 1, 1881, ch. XCVI, 1881 Ark. Acts 191 (codified at ARK. CODE ANN. ch. 48 § 1498 (1894)).

40     Generally, these laws covered pistols along with specific, named knives used for interpersonal violence, such as dirks, sword canes, stilettos, and Bowie knives, and weapons like a "slung shot," which was a hand weapon made up of a piece of metal or other weight attached to a strap or flexible handle.

41     Act of Sept. 30, 1867, § 1, 1867 Ariz. Sess. Laws 21, 21.

42     Act of Mar. 13, 1875, ch. XVII, § 1, 1875 Ind. Acts 62, 62 (Spec. Sess.).

43     Robert J. Spitzer, *Stand Your Ground Makes No Sense*, N.Y. TIMES (May 4, 2015), http://www.nytimes.com/2015/05/04/opinion/stand-your-ground-makes-no-sense.html [https://perma.cc/Z7NY-84UL] (quoting *An Act Against Wearing Swords, (1686)*, *in* THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY, 289 (1758)).

44     Act of Feb. 14, 1750, ch. 17, § 1, 1750 Mass. Acts 544, 545.

45     FRANCOIS XAVIER MARTIN, A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60-61 (1792).

46     A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 33 (Richmond, Augustine Davis 1794).

47     *See* Spitzer, *supra* note 43 (discussing these early laws).

48     Laws from 1800-1867: Alabama: An Act of Feb. 1, 1839, no. 77, § 1, 1838 Ala. Laws 67; Arkansas: ARK. REV. STAT. div. VIII, ch. XLIV, art. I, § 13 (1837); California: Act of Apr. 16, 1850, ch. 99, div. Eleventh, § 127, 1850 Cal. Stat. 229, 245; Colorado: Act of Aug. 14, 1862, 1862 Colo. Sess. Laws 56; Delaware: DEL. REV. CODE tit. fifteenth, § 13 (1852); District of Columbia: D.C. CODE REV. § 141-16 (1857); Georgia: Act of Dec. 25, 1837, 1837 Ga. Laws 90; Indiana: Act of Jan. 14, 1820, ch. XXIII, 1820 Ind. Acts 39; Kentucky: Act of Feb. 3, 1813, ch. 89, §1, 1812 Ky. Acts 100, 100-01; Louisiana: Act of Mar. 25, 1813, 1813 La. Acts 172, 172-73; Maine: ME. STAT. REV. tit. twelfth, ch. 169, § 16 (1840); Montana: Act of Jan. 11, 1865, 1864 Mont. Laws 355; New Mexico: Act of Jan. 14, 1853, 1852 N.M. Laws 67; Ohio: Act of Mar. 18, 1859, 1859 Ohio Laws 56; Oregon: OR. REV. STAT. ch. XVI, § 17 (1853); Pennsylvania: Act of Apr. 8, 1851, no. 239, § 4, 1851 Pa. Laws 381, 382; Tennessee: Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15, 15-16; Wisconsin: WIS. STAT. REV. tit. XXVII, ch. 176, §18 (1858). Laws from 1868-1899: Alaska: FRED F. BARKER, COMPILATION OF THE ACTS OF CONGRESS AND TREATIES RELATING TO ALASKA FROM MARCH 30, 1867 TO MARCH 3, 1905, S. DOC. NO. 59-142 (1906); Arizona: Act of Mar. 18, 1889, no. 13, 1889 Ariz. Sess. Laws 16; Florida: Act of May 31, 1887, ch. 3777, no. 97, § 16 1887 Fla. Laws 181, 186; Illinois: Act of Apr. 16, 1881, 1881 Ill. Laws 73 (codified in 38 ILL. COMP. STAT. §54(d) (1882)); Kansas: KAN. STAT. ANN. ch. 19, art. 3, § 68 (1901); Maryland: Act of Feb. 26, 1872, ch. 42, 1872 Md. Laws 56; Michigan: Act of May 31, 1887, no. 129, 1887 Mich. Pub. Acts 144; Minnesota: MINN. STAT. ch. CIV, § 17 (1881) (as amended through 1878); Mississippi: Act of Feb. 28, 1878, ch. XLVI, § 1, 1878 Miss. Laws 175, 175; Missouri: Act of Mar. 3, 1873, art. III, § 15, 1873 Mo. Laws 322, 328; NEB. STAT. REV. pt. III, ch. V, § 25 (1881); New York: Act of Mar. 27, 1891, chap. 105, § 209, 1891 N.Y. Laws 127, 177; North Dakota: N.D. REV. CODE § 7313, N.D. PENAL CODE § 457 (1895); Oklahoma: Penal Code of the Territory of Oklahoma, ch. 25, art. 38, § 20, 1890 Okla. Sess. Laws 412, 476; Rhode Island: Act of May 3, 1893, ch. 1180, 1893 R.I. Pub. Laws 231; South Carolina: Act of Dec. 24, 1880, no. 362, § 1, 1880 S.C. Acts 448; South Dakota: S.D. REV. CODE, PENAL, ch. XXXVIII, § 457 (1883); Texas: Act of Aug. 12, 1870, ch. XLVI, 1870 Tex. Gen. Laws 63; Washington: WASH. REV. CODE ch. LXXIII, § 929 (1881); West Virginia: W. VA. CODE ch. CXLVIII, § 7 (1870); Wyoming: WYO. STAT. ch. LII, § 1 (1876).

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19176   Page 305 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

49   Connecticut: Act of June 2, 1923, ch. 252, 1923 Conn. Pub. Acts 3707 (codified in II CONN. GEN. STAT. tit. 59, § 6219 (1930)); Hawaii: Act of Mar. 19, 1913, no. 22, 1913 Haw. Sess. Laws 25; Idaho: Act of Feb. 17, 1909, H.R. 62, 1909 Idaho Sess. Laws 6; Iowa: Act of Apr. 16, 1929, ch. 57, § 30, 1929 Iowa Acts 81, 90; Nebraska: Act of Mar. 27, 1901, ch. 16, § 129-LV, 1901 Neb. Laws 71, 141 (codified at NEB. REV. STAT. part I, ch. 14, art. I, § XXV (1901)).

50   This Kentucky law was struck down as a violation of the Kentucky state constitution in *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822). The court's decision did not involve or touch on the federal Constitution's Second Amendment, but instead was based on Kentucky's more expansive right-to-bear-arms-type provision. *See id.* at 90-92. In addition, this ruling was an anomaly in that concealed carry laws were widely held as constitutional when challenged in other states. *See* ROBERT J. SPITZER, GUN CONTROL, 96-99 (2009) (noting that the *Bliss* case was an exception to the prevailing trend of upholding state gun carry restrictions).

51   Act of Mar. 25th, 1813, 1812 La. Acts 172.

52   Tennessee: Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15.

53   Act of Dec. 25, 1837, 1837 Ga. Laws 90. This was the law that was challenged in *Nunn v. State*, discussed *supra* in part III.

54   An Act of Feb. 1, 1839, no. 77, 1838 Ala. Laws 67.

55   ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL, 68-70 (6th ed., Paradigm Publishers 2015) (1995).

56   Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1716 (2012) (citing RANDOLPH ROTH, AMERICAN HOMICIDE (2009); ERIC H. MONKKONEN, MURDER IN NEW YORK CITY (2001); Joshua Stein, *Privatizing Violence: A Transformation in the Jurisprudence of Assault*, 30 LAW & HIST. REV. 423, 445 (2012)); *see generally* DICKSON D. BRUCE, JR., VIOLENCE AND CULTURE IN THE ANTEBELLUM SOUTH (1979).

57   ROTH, *supra* note 56, at 180-249.

58   SPITZER, *supra* note 55, at 54-55.

59   JAMES WYCOFF, FAMOUS GUNS THAT WON THE WEST (1968).

60   MARTIN RYWELL, THE GUN THAT SHAPED AMERICAN DESTINY (1957).

61   RICHARD SHENKMAN, LEGENDS, LIES, AND CHERISHED MYTHS OF AMERICAN HISTORY 112 (1988).

62   WYCOFF, *supra* note 59, at 5-6; *see also* RYWELL, *supra* note 60, at 4 (1957); JAMES B. TREFETHEN, AMERICANS AND THEIR GUNS: THE NATIONAL RIFLE ASSOCIATION STORY THROUGH NEARLY A CENTURY OF SERVICE TO THE NATION (James E. Serven ed., 1967); HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 3 (1952).

63   LEWIS ATHERTON, THE CATTLE KINGS, xi, 31-42, 241-62 (1961).

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19177   Page 306 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

64    PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 353-55 (2016).

65    RICHARD SHENKMAN, LEGENDS, LIES, AND CHERISHED MYTHS OF AMERICAN HISTORY 112 (1988); *see also* ROBERT R. DYKSTRA, THE CATTLE TOWNS 112-48 (1968) (detailing the exaggerated nature of frontier West violence).

66    RAY ALLEN BILLINGTON, WESTWARD EXPANSION 587 (6th ed. abr. 1974).

67    JOE B. FRANTZ & JULIAN ERNEST CHOATE JR., THE AMERICAN COWBOY: THE MYTH AND THE REALITY 78 and *passim* (1955).

68    BILLINGTON, *supra* note 66, at 587.

69    *Id.*

70    FRANTZ & CHOATE JR., *supra* note 67, at 78.

71    BILLINGTON, *supra* note 66, at 587.

72    *Id.*; *see also* FRANK RICHARD PRASSAL, THE WESTERN PEACE OFFICER: A LEGACY OF LAW AND ORDER 22 (1972), and the numerous works cited by BILLINGTON, *supra* note 66.

73    RICHARD W. STEWART, AMERICAN MILITARY HISTORY VOL. 1: THE UNITED STATES ARMY AND THE FORGING OF A NATION 321-40 (2005); W. EUGENE HOLLON, FRONTIER VIOLENCE: ANOTHER LOOK 124-45 (1974). Hollon notes that "of all the myths that refuse to die, the hardiest concerns the extent of the unmitigated bloodletting that occurred in the Western frontier during the closing decades of the nineteenth century." *Id.* at x.

74    Act of Dec. 21, 1771, ch. DXL, § 10, 1771 N.J. Laws 343, 346.

75    Act of Apr. 21, 1915, ch. 133, part II, §§17(c), 18, 1915 N.H. Laws 173, 180-81.

76    Act of Feb. 25, 1931, no. 58, 1931 S.C. Acts 78, 78.

77    *E.g.*, Act of Mar. 14, 1901, ch. 96, 1901 Utah Laws 97, 97.

78    Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24.

79    Act effective July 29, 1927, ch. 552, 1927 Cal. Stat. 938; Act of Feb. 25, 1931, ch. 249, 37 Del. Laws 813; Act of Apr. 27, 1933, no. 120, 1933 Haw. Sess. Laws 117; Act of July 2, 1931, 1931 Ill. Laws 452; Act of Mar. 27, 1927, ch. 156, 1927 Ind. Acts 469; Act of Apr. 19, ch. 234, 1927 Iowa Acts 201; Act of Nov. 28, 1933, ch. 62, 1933 Kan. Sess. Laws 76 (Spec. Sess.); Act of July 7, 1932, no. 80, 1932 La. Acts 336; Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231; Act of June 1, 1929, H.R. no. 498, 1929 Mo. Laws 170; Act of Apr. 29, 1929, ch. 190, 1929 Neb. Laws 673; Act of Mar. 19, 1927, ch. 95, 1927 N.J. Laws 180; Act of Apr. 15, 1931, ch. 435, 1931 N.Y. Laws 1033; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or.

Compendium_Cornell
Page 1726

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19178   Page 307 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

Laws 488, 489; Act of Apr. 25, 1929, no. 329, 1929 Pa. Laws 777; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206 §§ 1-5, 1933 S.D. Sess. Laws 245; Act of Oct. 25, 1933, ch. 82, 1933 Tex. Gen. & Spec. Laws 219; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137; Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335; Act of June 5, 1925, 1925 W. Va. Acts 24 (Extraordinary Sess.); Act of May 28, 1929, ch. 132, 1929 Wis. Sess. Laws 157.

80    1933 Tex. Gen. & Spec. Laws 219, 219.

81    NRA-ILA, *Fully-Automatic Firearms*, NRAILA.ORG, (July 29, 1999), https://www.nraila.org/articles/19990729/fully-automatic-firearms [https://perma.cc/NT68-ZEF6].

82    *See* Table 2.

83    *See* Table 2, laws of Mass., Mich., S.D., and Va.

84    1927 R.I. Pub. Laws 256, 256.

85    1927 Mass. Acts 413, 413-14.

86    Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888.

87    Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232.

88    *Id*.

89    *Id*.

90    Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189.

91    *Id*.

92    Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245.

93    Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.

94    Act of July 2, 1931, 1931 Ill. Laws 452, 452.

95    Act of July 7, 1932, no. 80, 1932 La. Acts 336.

96    Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288.

97    Source: Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413, 413; Act of June 2, 1927, No. 372, 1927 Mich. Pub. Acts 887, 888; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, § 1, 1933

Compendium_Cornell
Page 1727

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19179   Page 308 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, § 1, 1934 Va. Acts 137, 137; Act of July 2, 1931, § 1, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, § 1, 1932 La. Acts 336, 337; Act of Mar. 2, 1934, no. 731, § 1, 1934 S.C. Acts 1288, 1288.

98    DON C. SEITZ, FAMOUS AMERICAN DUELS (1929).

99    Burr was vice president at the time; New York barred dueling, so they traveled to the neighboring state. LIN-MANUEL MIRANDA, *"Blow Us All Away," "Your Obedient Servant," "The World Was Wide Enough,"* on HAMILTON: AN AMERICAN MUSICAL, ACT II, (Atlantic Records 2015).

100   RON CHERNOW, ALEXANDER HAMILTON 704-05, 717-22 (2004).

101   SPITZER, *supra* note 26.

102   ROTH, *supra* note 56, at 181.

103   Act of May 9, 1723, 1723 Conn. Pub. Acts 292; Act of Mar. 31, 1639, 1639 N.J. Laws 18 *reprinted in* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638-1674 (Edmund Bailey O'Callaghan, ed., 1868); Act of Feb. 23, 1645, 1645 N.Y. Laws 47 *reprinted in* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638-1674 (Edmund Bailey O'Callaghan ed., 1868); Pennsylvania Act of Oct. 22, 1763 *reprinted in* VI THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 319 (James T. Mitchell & Henry Flanders eds., 1899); Virginia Act of Feb. 24, 1631, Act. XLVI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (William Waller Henning ed., 1823).

104   *The Laws Enacted by the First General Assembly of Virginia*, *supra* note 11.

105   I RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 211-12 (Nathaniel B. Shurtleff ed., 1853). This law was not among those appearing in Frassetto's list. *See* Frassetto, *supra* note 17.

106   RECORDS OF THE GOVERNOR, *supra* note 105, at 212.

107   Act of July 19, 1776, ch. DCCXXIX, IX THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 11 (1903).

108   WINKLER, *supra* note 8, at 113.

109   Saul Cornell & Nathan DeDino, *A Well Regulated Right*, 73 FORDHAM L. REV. 487, 507 (2004). The Massachusetts law is Act of March 14, 1776, ch. VII, 1776 Mass. Acts 31-36. *See* Frassetto, *supra* note 17.

110   Act of Oct. 1672, 1672 Conn. Pub. Acts 3; Act of Aug. 27, 1746, 1746 Mass. Acts 208; Act of Oct. 14, 1713, 1713 Mass. Acts 291; Act of Mar. 3, 1642, Act XXXV, 1642 Va. Acts 261.

111   Though a 1655 Virginia law specifically exempted drunken firing at weddings and funerals! Act of March 10, 1655, Act XII, 1655 Va. Acts 401.

112  This quote is from North Carolina's 1777 version of this law, Act of May 8, 1777, ch. XXI, 1777 N.C. Sess. Laws, 33, 33.

113  9 Del. Laws 263; Act of Jan. 8, 1857, 1856 N.C. Sess. Laws 22; Act of April 1, 1853, ch 161, 1852 Va. Acts 133.

114  Act of Aug. 26, 1721, ch. 3, 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI.

115  Act of Dec. 5, 1768, ch. 13, 1768 N.C. Sess. Laws 168.

116  *Id.* § 2, at 168-69.

117  Act of Mar. 30, 1882, 1882 Md. Laws 257; Act of Aug. 26, 1721, ch. 3, 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI *reprinted in* III Mitchell & Flanders, *supra* note 103 at 254.

118  14 Del. Laws 401; Act of Nov. 14, 1828, 1828 Fla. Laws 48, 75; Act of Sept. 21, 1882, 1880 Ga. Laws 142, 142; Act of Jan. 8, 1856, 1856 N.C. Sess. Laws 22, 22; Act of Apr. 20, 1874, 1874 Ohio Laws 147, 148; 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI *reprinted in* III Mitchell & Flanders, *supra* note 103 at 254; Virginia Act of Mar. 2, 1642, Act. XI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 248, 248 (William Waller Henning, ed., 1823).

119  Act of Dec. 23, 1878, no. 602, 1878 S.C. Acts 724, 724.

120  Act of Apr. 4, 1931, ch. 97, 1931 Colo. Sess. Laws 399, 399-400; Act of Mar. 29, 1927, 1927 Del. Laws 516, 516; Act of Apr. 27, 1911, ch. 165, 1911 Del. Laws 322, 324; Act of May 10, 1901, 1901 Ill. Laws 212, 213; Act of Mar. 5, 1883, ch. CV, 1883 Kan. Sess. Laws 159, 159; Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359, 386.

121  Act of May 29, 1771, 1771 Mass. Acts 597; Act of Nov. 23, 1715, no. 234, 1715 Mass. Acts 311; Act of Feb. 28, 1786, 1786 N.H. Laws 383.

122  Act of Feb. 28, 1814, ch. CXCII, 1814 Mass. Acts 464, 464-65.

123  *Id.*

124  RECORDS OF THE GOVERNOR, *supra* note 105, at 26. *See also* RECORDS OF THE GOVERNOR, *supra* note 105, at 31, 73-74, 84 for similar references. This law was not among those appearing in Frassetto's list. *See* Frassetto, *supra* note 17.

125  Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274, 274-76.

126  Act of Feb. 16, 1903, no. 82, 1903 S.C. Acts 124, 124-25.

127  Act of June 6, 1927, ch. 12548, § 19(13), 1927 Fla. Laws 206, 212.

128  Act of Dec. 18, 1902, part III, tit. I, no. 192, § 16, 1902 Ga. Laws 427, 434-35.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19181   Page 310 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

129 Act of Mar. 6, 1905, ch. 188, § 6, 1905 N.C. Sess. Laws 545, 547.

130 Act of Apr. 19, 1917, ch. 185, 1917 N.H. Laws 727, 727-30.

131 *Id*. § 3, at 728.

132 Act of Mar. 30, 1927, ch. 321, § 1, 1927 N.J. Laws 742, 742.

133 Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 442, 444-45.

134 Act of June 5, 1925, ch. 3, § 7(b), 1925 W. Va. Acts 24, 32 (Extraordinary Sess.).

135 CORNELL, *supra* note 8; JOHN K. MAHON, THE AMERICAN MILITIA: DECADE OF DECISION 1789-1800 (1960); JOHN K. MAHON, HISTORY OF THE MILITIA AND THE NATIONAL GUARD (1983); H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS: HOW THE SECOND AMENDMENT FELL SILENT (2002).

136 The Uniform Militia Act of 1792, 1 U.S. Stat. 271.

137 Virginia Act of Feb. 24, 1631, Act LI, *reprinted in* I Henning, *supra* note 103, at 174.

138 Act of Mar. 16, 1877, 1877 Mo. Laws 298, 306; Act of Mar. 21, 1835, ch. 423, art. XI, 1835 Mo. Laws 512, 537; Act to Regulate the Militia, 1844 R.I. Pub. Laws 1, 16.

139 A Supplement to the Act, Entitled, An Act to Regulate and Discipline the Militia of this State, ch. 100, § 30, 1798 Md. Laws 69, 75.

140 Act of Mar. 5, 1907, ch. 16, 1907 Ariz. Sess. Laws 15; Act of Feb. 4, 1881, ch. 3285, 1881 Fla. Laws 87; Cook County Ordinance chap. 53 of Chicago (Ill.) Code of 1911.

141 Act of Mar. 5, 1907, ch. 16, § 1, 1907 Ariz. Sess. Laws 15, 15-16.

142 Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Gunds in New Netherland by Private Persons, 1652 N.Y. Laws 128.

143 Virginia Act of Feb. 27, 1631, Act LVI, *reprinted in* I Henning, *supra* note 103, at 174-75.

144 Articles at the Surrender of the Countrie of Virginia, Mar. 22, 1651, *reprinted in* I Henning, *supra*, note 103 at 365.

145 Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27, 27-28.

146 Act of Feb. 7, 1867, ch. CCXLIX, § 1, 1867 Miss. Laws 327, 327.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19182   Page 311 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

147    Act of Feb. 16, 1859, ch. 25, sched. A, § 27(15), 1858 N.C. Sess. Laws 28, 35-36; Act of Feb. 2, 1857, ch. 34, § 23(4), 1856 N.C. Sess. Laws 28, 34.

148    Act of Jan. 20, 1851, § 2, 1851 R.I. Pub. Laws 9, 9.

149    Act of Mar. 16, 1870, no. 68, § 3, sixth, 1870 La. Acts 126, 127.

150    Act of Mar. 18, 1886, ch. II, § 1, 1886 Miss. Laws 12, 19.

151    Act of Feb, 23, 1899, no. 903, § 16, sixty-seventh, 1898 Ala. Acts 164, 190.

152    Act of June 2, 1893, ch. 4147, 1898 Fla. Laws 71, 71-72.

153    Act of July 18, 1870, ch. XX, 1870 Haw. Sess. Laws 26, 26.

154    Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32-33.

155    1893-1894 Treasurer's Report, 1894 Ga. Laws 325, 326.

156    LINCOLN REV. ORD. ch. XIV, art. XVI, § 6 (Neb. 1895).

157    Act of June 19, 1931, ch. 1098, § 1, § 9, 1931 Cal. Stat. 2316, 2316-19; Act of June 2, 1923, ch. 252, 1923 Conn. Pub. Acts 3707; Act of Apr. 7, 1909, ch. 271, 25 Del. Laws 577; Ga. General Tax Act, no. 260, § 2, ninety-third, 1921 Ga. Laws 38, 65; Act of Jan. 9, 1934, act 26, 1933 Haw. Sess. Laws 35 (Spec. Sess.); Act of July 2, 1931, 1931 Ill. Laws 452; Act of May 7, 1913, ch. 250, 1913 Mich. Pub. Acts 472; MISS. CODE ch. 114, § 3887 (1906) (published in 1906 Miss. Laws 346, 367 (Spec. Sess.)); Act of Feb. 20, 1918, ch. 2, 1918 Mont. Laws 6 (Extraordinary Sess.); Act of Mar. 10, 1919, ch. 197, 1919 N.C. Sess. Laws 397; Act of Mar. 26, 1923, no. 11, § 11, 1923 S.C. Acts 12, 19-20; Act of Feb. 18, 1933, ch. 101, 1933 Wyo. Sess. Laws 117.

158    Act of May 7, 1913, No. 250, 1913 Mich. Pub. Acts 472.

159    Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 442.

160    Act of June 2, 1927, no. 372, § 9, 1927 Mich. Pub. Acts 887, 891.

161    Ch. 2, 1918 Mont. Laws 6-9.

162    Act of Oct. 24, 1868, 1868 Or. Laws 18, 18-19.

163    *Id.* at 18.

164    Cornell & DeDino, *supra* note 109.

Compendium_Cornell
Page 1731

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19183   Page 312 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

165  JERRY COOPER, THE RISE OF THE NATIONAL GUARD 3 (1997); John Shy, *A New Look at the Colonial Militia*, 20 WM. & MARY Q. 175, 175-85 (1963) *reprinted in* A PEOPLE NUMEROUS AND ARMED: REFLECTIONS ON THE MILITARY STRUGGLE FOR AMERICAN INDEPENDENCE 31-38 (rev. ed. 1990).

166  Paul Finkelman, *The Living Constitution and the Second Amendment*, 37 CARDOZO L. REV. 623, 644 (2015).

167  1 Del. Laws 104; 9 Del. Laws 552 (1843); Act of Oct. 1, 1804, 1804 Ind. Acts 107, 108; Act of Feb. 8, 1798, ch. LIV, 1798 Ky. Acts 105, 106; Act of Nov. 27, 1729, 1715-1755 N.C. Sess. Laws 35, 36.

168  Finkelman, *supra* note 166, at 644-45.

169  For more on early laws and practices regarding free blacks, slaves, and guns, see CORNELL, *supra* note 8, at 28-29; KENNETT & ANDERSON, *supra* note 9, at 49-51; WINKLER, *supra* note 8, at 115-16.

170  WINKLER, *supra* note 8, at 116.

171  Act of Sept. 30, 1867, 1867 Ariz. Sess. Laws 21, 21-22; Act of Oct. 1672, 1672-1714 Conn. Pub. Acts; 3 Del. Laws 326; 10 Del. Laws 9; Act of May 24, 1895, no. 436, 1895 Mich. Local Acts 591, 596; Act of Oct. 14, 1713, 1713 Mass. Acts 291; Act of June 28, 1823, ch. XXXIV, 1823 N.H. Laws 72, 73 Act of Dec. 31, 1665, 1665 N.Y. Laws 205; Act of Feb. 9, 1750, ch. CCCLXXXVIII, 1745-1759 Pa. Laws 208; Act of Dec. 24, 1774, ch. DCCCIII, 1759-1776 Pa. Laws 421; Act of Feb. 28, 1740, no. 692, 1731-43 S.C. Acts 162[i], 174; Act of Mar. 13, 1871, ch. VI, 1871 Tex. Spec. Laws 11, 14; Act of Aug. 12, 1870, ch. XLVI, 1870 Tex. Gen. Laws 63; Virginia Act of Mar. 10, 1655, Act XII, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 401, 401-02 (William Waller Henning ed., 1823); Virginia Act of Mar. 2, 1642, Act. XI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 248, 248 (William Waller Henning, ed., 1823); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 33 (Augustine Davis ed., 1794).

172  Act of Oct. 9, 1783, 1783 Conn. Pub. Acts 633, 633.

173  *Id.*

174  Act of Sept. 6, 1788, ch. 2, 1788 Ohio Laws 6, 8.

175  Act of Oct. 9, 1783, 1783 Conn. Acts 633; Florida Act of Aug. 6, 1888, chap. 1637; Act of Sept. 6, 1788, ch. II, 1788-1801 Ohio Laws 8; Act of Dec. 2, 1869, 1869 Wash. Sess. Laws 198, 203.

176  Act of Apr. 3, 1907, ch. 151, 1907 Colo. Sess. Laws 334; Act of June 22, 1911, ch. 98, 1911 Conn. Pub. Acts 1357; Act of May 15, 1905, ch. 5411, 1905 Fla. Laws 87; Act of July 2, 1931, 1931 Ill. Laws 452; Act of Mar. 8, 1929, ch. 55, 1929 Ind. Acts 139.

177  1782 Mass. Acts 119, ch. 46, § 1.

178  Act of June 24, 1859, ch. LXXXII, § 7, 1859 Conn. Pub. Acts 61, 62.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19184   Page 313 of 715

GUN LAW HISTORY IN THE UNITED STATES AND..., 80 Law & Contemp....

179    Act of May 22, 1919, ch. 179, § 1, 1919 Mass. Acts 139, 139.

180    *Id.*

181    *See* SPITZER, *supra* note 26, at ch. 3 (analyzing the contemporary dispute over regulating semi-automatic assault weapons).

182    McDonald v. City of Chicago, 561 U.S. 742 (2010).

183    SPITZER, *supra* note 55, at 91, 91-136.

184    CORNELL, *supra* note 8, at 21.

185    Cornell, *supra* note 56, at 1703, 1707; *see also* SPITZER, *supra* note 26, at ch. 4; Nathan Kozuskanich, *Originalism in a Digital Age, in* THE SECOND AMENDMENT ON TRIAL, *supra* note 8, at 289-309.

186    National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801-5872 (2012)).

187    SPITZER, *supra* note 55, at 149-55.

80 LCPR 55

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Compendium_Cornell
Page 1733

# William & Mary Law Review

Volume 10 (1968-1969)
Issue 2

Article 7

December 1968

# Reception of English Common Law in the American Colonies

William B. Stoebuck

Follow this and additional works at: https://scholarship.law.wm.edu/wmlr

 Part of the Comparative and Foreign Law Commons

Repository Citation

William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 Wm. & Mary L. Rev. 393 (1968), https://scholarship.law.wm.edu/wmlr/vol10/iss2/7

Copyright c 1968 by the authors. This article is brought to you by the William & Mary Law School Scholarship Repository.
https://scholarship.law.wm.edu/wmlr

# RECEPTION OF ENGLISH COMMON LAW IN THE AMERICAN COLONIES

## William B. Stoebuck*

So that we may start in cadence, some definitions are due. "Common law" refers to that body of governing principles, mainly substantive, expounded by the common-law courts of England in deciding cases before them. "Reception" means adoption of the common law as the basis for colonial judicial decisions. We are not concerned, as an end in itself, with colonial court systems or with the mechanics of decision making, though inquiries into these subjects, by inference, will advance the quest.[1] Similarly we are not concerned with the workaday study of the colonial lawyer, his education, books, and role in society or with the larger question of the contributions the common law made to the emerging nation. The aim is simply to discover the extent to which the common law as defined above, was received in the American colonies.

### Standard Theories

There are more theories than facts on the influence of English common law in the colonies. Three of these might be referred to as the "standard" ones, and they in turn have spawned comments and variations upon themselves.

The most venerable standard theory is that the common law of England was substantially in force in the colonies from the time of their settlement. Justice Joseph Story stated it most succinctly in 1829 in the famous passage in *Van Ness v. Pacard:*

> The common law of England is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted only that portion which was applicable to their situation.[2]

Story's view was the generally accepted one through the nineteenth

---

* Associate Professor of Law, University of Washington.
1. For a lengthy study of courts as a branch of colonial government, *see* Surrency, *The Courts in the American Colonies*, 11 Am. J. Legal Hist. 253, 347 (1967).
2. Van Ness v. Pacard, 27 U.S. (2 Pet.) 137, 143-44 (1829).

[393]

century. Chief Justice Lemuel Shaw of Massachusetts took a similar position in 1847 in *Commonwealth v. Chapman*.[3] Kent in his *Commentaries* also agrees, saying: "It [the common law] was imported by our colonial ancestors, as far as it was applicable, and was sanctioned by royal charters and colonial statutes." [4]

With the new interest in American legal history that arose early in the twentieth century, Justice Story's theory was challenged. Professor Paul S. Reinsch began the attack by asserting what we may refer to as the second standard theory of reception of the common law. He denied that, at least in the colonial beginnings in the seventeenth century and perhaps along into the eighteenth as well, English jurisprudence was even a subsidiary force in the American legal system. Though conceding the colonists expressed adhesion to the common law, Reinsch says the actual administration of justice was "of a rude, popular, summary kind. . . ." [5] Again, he asserted that the colonies underwent "a period of rude, untechnical popular law, followed, as lawyers became numerous and the study of law prominent, by the gradual reception of most of the rules of the English common law." [6] Dean Charles J. Hilkey soon offered support for this view with what may be considered as a variant of the Reinsch theory. Basing his study upon early Massachusetts Bay materials, Hilkey admitted some influence from the common law but emphasized two other sources of law, first the Bible, especially the Mosaic code, and second an indigenous local element. He considered the combination of these elements as forming what was in effect a new legal system.[7] Another writer whose ideas seem to augment the theory advanced by Reinsch and Hilkey is Max Radin. He first made the point that, since the common law was the king's law and since, except for the writ of error, the king's writs did not run across the seas, it was impossible to say the common law was obligatory on the colonies.[8] Radin felt the common law never amounted to more than a supplemental, subsidiary system during the whole colonial period, and he

---

3. 54 Mass. (13 Met.) 69 (1847).

4. 1 KENT, COMMENTARIES ON AMERICAN LAW * 473.

5. Reinsch, *The English Common Law in the Early American Colonies*, in 1 SELECT ESSAYS IN ANGLO-AMERICAN LEGAL HISTORY 367, 369 (1907).

6. *Id.* at 370.

7. Hilkey, *Legal Development in Colonial Massachusetts, 1630-1686*, in 37 COLUMBIA UNIVERSITY STUDIES IN HISTORY, ECONOMICS AND PUBLIC LAW 160 (1910).

8. Radin, *The Rivalry of Common-Law and Civil Law Ideas in the American Colonies*, in 2 LAW: A CENTURY OF PROGRESS 404, 407-11 (1937).

Compendium_Cornell
Page 1736

emphasized the importance of natural law, equating it with Roman law.[9]

For the third standard theory of colonial common-law reception, we are indebted to Professor Julius Goebel. Although agreeing in general with Reinsch that the common law did not play a significant role in the early colonies, Goebel found an English source for their law. In his study, based upon Plymouth Colony from 1620 to 1650, he presented evidence that the law practiced was that of the customary law of the local courts the colonists had known in England. He theorized that the early settlers, having little knowledge of the common law, *i.e.*, the law of the king's courts at Westminster, naturally had recourse to the law and procedure of the borough and manor courts with which they were familiar.[10]

There are some rather obvious inadequacies with the several theories. First, of course, they are so disparate. Then they speak largely of New England and largely of New England in the seventeenth century at that. These comments should not be made critically, for the expectable sources of information scarcely exist. Appellate court decisions are the preferred source, but there are next to none; the only colonial reporter of consequence is volume one of Harris & McHenry's Maryland Reports, covering the period 1658-1774. If we look to the colonists for contemporary accounts, we find they were singularly indifferent to the common law's progress; moreover, when they did make glancing, often unreliable, remarks on the subject, it is not clear what they meant by "common law." Perhaps, in time, intensive local research may produce direct materials, but for now the sources are mostly indirect and fragmentary: clauses in colonial charters, public attitudes toward English law, court systems, conditions of law practice, and the like. From a knowledge of these matters, it is possible to make the inference that common-law reception was feasible, and likely had occurred, within broad limits.

We are aided by having two fixed pillars between which to suspend the historical bridge. The first—and it should not be minimized simply because it is obvious—is that there was no common law in America on 12 May 1607. At the other end of the colonial period, by dint of examining every case reported in New York, Pennsylvania, and South

---

9. *Id.* at 427-28.
10. Goebel, *King's Law and Local Custom in Seventeenth Century New England*, 31 COLUM. L. REV. 416 (1931).

Carolina from the Revolution to 1810, we are able to make some precise observations on common-law reception as it must have stood on Independence Day. The beginning and end are clear, even if the middle is hazy.

<div align="center">SEVENTEENTH CENTURY</div>

*The Colonial Charters*

Within each colony the framework of government, and so of the system of law as a part of that government, began with a royal charter. No charter stated expressly that the system of courts was to be patterned after that in England nor that the rules of law of the common-law courts or of any named courts were to be the rules of decision. Most colonial charters simply contained a proviso that the laws should not be " 'contrary to the Laws and Statutes of this our Realm of *England*' " or were to be " 'agreeable to the laws of this our realme of England.' " [11] There is no evidence that it made any difference in the development of law within a colony whether its charter said "not contrary" or "agreeable."

The third charter of the Virginia Company, dated 12 March 1612, chartered what amounted to a trading corporation and granted it land by patent. After creating the governing bodies within the company, including a quarterly court (used in the sense of "council"), it was provided that the quarterly court

> shall likewise have full power and authority to ordain and make such laws and ordinances for the good and welfare of the said plantation, as to them, from time to time, shall be thought requisite and meet: so always, as the same be not contrary to the laws and statutes of this our realm of England. . . .[12]

In Massachusetts Bay the charter of 4 March 1629, after making the grant of land, set up governing bodies, including a council known as the General Court. It was empowered to "make laws and ordinances . . . so as such laws and ordinances be not contrary or repugnant to the laws and statutes of this our realm of England." [13]

Maryland was created 20 June 1632 as a proprietary colony with

---

11. Brown, British Statutes in American Law, 1776-1836, at 4-6 (1964).
12. 9 English Historical Documents 65 (Jensen ed. 1955).
13. *Id.* at 72.

Cecilius Calvert, Baron of Baltimore, "the true lord and proprietary." Moreso than any other colony, Maryland was in form a feudal barony. Calvert was to rule and make laws but only with the "advice, assent, and approbation" of a majority of the freemen of the colony, or their delegates, who were to be called together as a council to legislate. The charter required the laws to be "consonant to reason, and be not repugnant or contrary, but (so far as conveniently may be) agreeable to the laws, statutes, customs and rights of this our kingdom of England." [14]

Pennsylvania, like Maryland, was a proprietary colony, which was granted to William Penn by a charter of 4 March 1681. Like Calvert, Penn was to enact laws through an assembly of freemen or their delegates. And again the laws they enacted were to be "consonant to reason, and be not repugnant or contrary, but as near as conveniently may be agreeable to the laws and statutes, and rights of this our kingdom of England. . . ." [15] Unlike the other charters, the Pennsylvania charter specifically reserved to the crown appeals "touching any judgment to be there made or given."

Other colonial charters could be referred to, but the ones quoted from are typical enough to serve our purposes. If the question before us is the extent to which the rules and procedures of the English courts of common law were in force in the colonies, we must ask what the charters provided in this respect. One problem that has been commented upon is what the charters referred to when they spoke of the "laws" of England.[16] Coke, writing of the period around 1630, says: "There be divers lawes within the realme of England." He then lists fourteen "laws," such as the law of the crown, law of parliament, law of nature, statute law, customs, ecclesiastical law, etc., of which the "common law of England" was only one.[17] To which of these "laws" were the colonists to conform?

There is another problem so obvious that it is remarkable it seems not to have been raised by legal historians. In requiring colonial law to be not contrary to, or repugnant to, English laws, the charters were imposing requirements upon colonial *legislative bodies*. The requirement related to the kinds of statutes or ordinances that might be adopted,

14. *Id.* at 84. Also found in Smith, *The Foundations of Law in Maryland: 1634-1715*, in LAW AND AUTHORITY IN COLONIAL AMERICA 92, 93-95 (Billias ed. 1965).
15. 9 ENGLISH HISTORICAL DOCUMENTS 93 (Jensen ed. 1955).
16. Howe, *The Sources and Nature of Law in Colonial Massachusetts*, in LAW AND AUTHORITY IN COLONIAL AMERICA 1 (Billias ed. 1965).
17. COKE ON LITTLETON *11b.

Compendium_Cornell
Page 1739

but nothing was said about what *courts* might or might not do. The
one possible, and perhaps significant, exception was the Pennsylvania
charter's reservation to the crown of appeals from court judgments.
This suggests that the colonial charters, except possibly Pennsylvania's,
made no attempt to govern the rules of decision or procedures in the
courts unless, of course, a colonial statute was involved. An inference
is possible that this was thought unnecessary because it was assumed
that colonial courts would be more or less duplicates of those in England.
The fact that the reservation-of-appeal provision was inserted in the
Pennsylvania charter, written at the comparatively late date of 1681,
suggests the earlier assumptions had proved disappointing to the English
government.

### Beginnings of the Colonies

One who reads historical materials on the colonial legal systems soon
becomes aware of some disturbing phenomena. In the first place, the
vast bulk of scholarship has been devoted to early Massachusetts and
very little to the other colonies. For instance, the studies done by
Reinsch and Hilkey were based upon Massachusetts Bay materials, and
Goebel's well known theory was based upon a study of Plymouth
Colony from 1620 to 1650.[18] Furthermore, while considerable interest
has been shown in the seventeenth century beginnings, little indeed has
been written about the law of the more mature eigtheenth century
colonies. For these reasons, the approach used in this section of the
article will be to outline in some detail the legal system of seventeenth
century Massachusetts, then to make brief references to the systems in
the other colonies as compared with that in Massachusetts.

It is reasonably apparent that the early Massachusetts leaders did not
feel they were obligated to follow the common-law system or any
particular existing system except to the extent they freely chose.[19] In
the 1630's, attempts to appeal Massachusetts judicial decisions to Eng-
land were quashed or frustrated.[20] William Pynchon of Springfield, in
a letter of 9 March 1646 to John Winthrop, stated that he believed
Massachusetts Bay had liberty by her patent to make such laws as the
colony considered good.[21] This view was probably held by most of the
colony's leading men.

18. *See* notes 5, 6, 7, and 10 *supra* for references to these studies.
19. HASKINS, LAW AND AUTHORITY IN EARLY MASSACHUSETTS 114-15 (1960).
20. *Id.* at 64-65.
21. J. SMITH, COLONIAL JUSTICE IN WESTERN MASSACHUSETTS 19 (1961).

:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19192   Page 715

On the other hand, the leaders were interested in a functioning legal system, and the colony developed one that quickly became relatively sophisticated. The first meeting of the Court of Assistants, held in August 1630, conferred upon six of its members the powers of English justices of the peace.[22] In 1636, the system was expanded with inferior courts established at Ipswich, Salem, Newtowne (Cambridge), and Boston. When Massachusetts was divided into counties in 1643, the Inferior Courts became known as County Courts. Above them, having appellate jurisdiction and some original jurisdiction, was the Court of Assistants which held quarterly sessions. The highest court was the General Court, which eventually was to become the Supreme Court of Judicature.[23] Of course the legal system of 1640 was nothing as complex as that comprising all the specialized courts in England. However, later, around 1700, under pressure from the British government, some new, specialized courts were created.[24]

Little is known of Massachusetts's substantive law prior to the adoption of the Body of Liberties of 1641. The magistrates and those in authority resisted written law, having a paternalistic approach toward the governing of the colony.[25] However, there must have been some common-law influence, for technical English terms such as *capias* and *in forma pauperis* were used. Juries were used from the beginning, and forms of action denominated debt, replevin, trespass, and trespass on the case were employed.[26] In 1641, at the insistence of the General Court, the comprehensive code known as the Body of Liberties was adopted. By examining its provisions we get some idea of the various elements—English, Biblical, indigenous, or other—from which early Massachusetts law was formed. The code finally adopted was drafted by Nathaniel Ward, a minister who had English legal training. It is interesting, perhaps significant, to observe that an earlier draft prepared by John Cotton and rejected by the General Court was based on the Scriptures more than was Ward's draft.

Much has been said of the influence of the Bible. Reinsch particularly takes a strong position on this point: "Everywhere, the divine law, interpreted by the best discretion of the magistrates, is looked upon as the binding subsidiary law; while the common law is at most referred

22. HASKINS, *supra* note 19, at 27.
23. *Id.* at 32-34.
24. Howe, *supra* note 5, at 372.
25. Reinsch, *supra* note 5, at 372.
26. HASKINS, *supra* note 19, at 117-18.

Compendium_Cornell
Page 1741

to for the sake of illustration." Perhaps it would be safer to say that
the early Massachusetts leaders, at least in attitude, felt their laws were
opposed neither to Biblical law nor common law, for, as a communica-
tion of the General Court said in 1646, the common law was founded
on the law of God.[27]

The Biblical influence was strongest in criminal law; here was the
greatest divergence from English law.[28]  In the Massachusetts code of
1648, the descriptions of certain crimes were lifted nearly verbatim from
the Bible, especially from Leviticus and Deuteronomy.  Examples are:
idolatry, witchcraft, blasphemy, bestiality, sodomy, adultery, man steal-
ing, treason, false witness with intent to take a life, cursing or striking
a parent, rebelliousness against parents, and malicious killing.  All of
these were capital offenses.  However, not all the capital offenses named
in the Bible were made such by the code of 1648, and some non-capital
punishments were made less severe.  Yet, even in criminal law there
were some common-law influences.  The rape statute was copied after
the common law.  And, though the capital offense of sodomy was Bib-
lical, boys under the common-law age of consent, fourteen years, were
not to receive capital punishment.[29]

Massachusetts land law was based upon the common-law system,
with important modifications.  Feudal tenures or incidents never were
recognized, but the method of land division bore a striking resemblance
to that of English villages.[30]  Conveyances could be made by written
deed.  By an order of 1651, grants in fee simple had to run " 'to the
Party or Grantee his Heires and Assignes forever.' "  Life estates and
terms for years were recognized by those names.[31]  In 1647, the General
Court enacted a statute, obviously taken directly from the common law
of dower, giving a wife a one-third "dower" interest in all lands her
husband held during marriage.[32]

The law of succession, while basically English, had important modi-
fications imposed upon it.  From the beginning the courts enforced the
right to pass land and personalty by will; furthermore, after 1641, this
was expressly provided for by the Body of Liberties.  In cases of in-

---

27. Reinsch, *supra* note 5, at 373-81.
28. Hilkey, *supra* note 7, at 249-67.
29. HASKINS, *supra* note 19, at 142-62.
30. Andrews, *The Influence of Colonial Conditions as Illustrated in the Connecticut
Intestacy Law,* in 1 SELECT ESSAYS IN ANGLO-AMERICAN LEGAL HISTORY 431-32 (1907).
31. Hilkey, *supra* note 7, at 279-83.
32. Haskins, *Reception of the Common Law in Seventeenth-Century Massachusetts: A
Case Study,* in LAW AND AUTHORITY IN COLONIAL AMERICA 17 (Billias ed. 1965).

testacy all children, male and female, shared equally, but, perhaps in grudging recognition of primogeniture or perhaps inspired by some English local custom, the eldest son got a double portion. The widow, of course, was protected by the previously mentioned dower system.[33]

Goebel and Haskins give convincing evidence of influence from English local customary law. Both feel the local Massachusetts courts in particular copied many of their practices and rules of law from a recollected synthesis of such customary law, though probably not outright from the printed custumals used in the English local courts.[34] Haskins notes that systems of inheritance similar to that in Massachusetts existed by custom in many English localities. He also points out that the Massachusetts Act of 1840, providing for the recording of deeds and mortgages in town records, established a system similar to that used in many English boroughs since the Middle Ages.[35]

Having sketched some of the salient features of the components of early Massachusetts law, we will now make brief, comparative reference to the other colonies. It should be kept emphatically in mind that the law did not grow by common design in the colonies; each colony developed its own legal system. The assumption that colonial law was essentially the same in all colonies is wholly without foundation.[36] Moreover, it is unfortunate that we must use Massachusetts as a standard of comparison, because, with respect to its legal development, that colony was not at all typical. From its beginning as a haven for Puritan dissenters until the Minutemen faced the British regulars on the Lexington Green, Massachusetts was always the sulky child, rebellious against things English. We would expect the English common law to have less influence there and in the other similarly situated New England colonies than in the colonies to the south.

In New York the common law was given more recognition than in most colonies. While the common-law cases were not held binding until 1761, the English influence was strong from the time the British took New York from the Dutch in 1664. In 1665, Governor Nichols wrote that legal affairs were conducted in a more regular manner than in the other colonies. He reported to the Board of Trade in 1669 that juries were used in all cases and that there were no laws contrary to those of England. A report by Governor Dongan in 1687 described a

---

33. Hilkey, *supra* note 7, at 293-96.
34. Goebel, *supra* note 10; HASKINS, *supra* note 19, at 163-82.
35. HASKINS, *supra* note 19, at 163-82.
36. *Id*. at 6-7.

system of six kinds of courts, including one of chancery that consisted of the governor and council.[37]

In Pennsylvania, it appears that legal procedures were very irregular before Penn received his charter in 1681. Thereafter, Pennsylvania developed the most complete system of codes of any colony, and the courts exercised both law and equity jurisdiction.[38] The tradition, stated by the Supreme Court of Pennsylvania in 1810, was that the charter had extended the common law.[39] However, it seems the courts felt they had the power to depart from specific common-law rules when they concluded that some overriding situation in the colony required it. For instance, in Pennsylvania married women were empowered to convey land simply by signing a deed before witnesses, though it was well known that the English rule permitted this only by a fine.[40] Reception and development of the common law in Pennsylvania must have been inhibited by the fact that, while the Pennsylvania bar had become distinguished by the time of the Revolution, it was comparatively late in getting a body of trained lawyers.[41]

The court system in Maryland was unique, at least in theory. Because of the form of the grant to Lord Baltimore, he could create manors and boroughs which might have had local courts like their ancient counterparts in England. In fact, such local courts seem not to have been significant factors, since there probably were only two manorial courts and two borough courts that actually operated.[42] Maryland's Assembly probably played the dominant role in developing the colony's legal system, enacting about one thousand general laws between 1638 and 1715. Some acts of Parliament were regarded as binding and some were not, but the basis for choice is not clear. Where statutes did not control, English common law seems to have been regarded as the basis for decision as much of the common-law civil and criminal procedure was used.[43]

The fragments of information we have, point to the conclusion that the common law was more revered in Virginia than in Massachusetts.

37. Reinsch, *supra* note 5, at 390-95.

38. *Id.* at 396.

39. Kirk v. Dean, 2 Binn. (Pa.) 341 (1810).

40. Kirk v. Dean, 2 Binn. (Pa.) 341 (1810); Davey v. Turner, 1 U.S. (1 Dall). 11 (1764).

41. WARREN, HISTORY OF THE AMERICAN BAR 102 (1913).

42. Smith, *The Foundations of Law in Maryland: 1634-1715*, in LAW AND AUTHORITY IN COLONIAL AMERICA 92, 94, 102, 109 n.7 (Billias ed. 1965).

43. *Id.* at 95-98, 100-102.

In Virginia, the purposes of settlement were less to pull away from England and more to preserve the principle of loyalty to the crown in the face of trying conditions.[44] Instructions from the company in London to the colonial government, dated 24 July 1621, were " 'to imitate and follow the policy of the form of government, laws, customs, and manner of trial, and other administration of justice used in the realm of England, as near as may be . . . .' "[45] When the company's charter was vacated in 1624 and Virginia thus became the first royal colony, the change was not very marked in the colony.[46] After Bacon's Rebellion in 1676, however, there was a break in the unity between king and subject in Virginia, and this may have manifested itself in a lessened regard for the king's law.[47]

New Jersey has been regarded as following English precedents to a high degree.[48] During the period when the colony was divided into East Jersey and West Jersey, it seems the common law was more influential in West Jersey. East Jersey's legal system has been likened to that of early Massachusetts, with a heavy Biblical cast to the laws. From 1693, West Jersey had a three-tiered court system and a more regular administration of justice than in East Jersey.[49]

The situation in early Rhode Island, Connecticut, and, perhaps to a lesser extent in New Hampshire, seems to have been roughly comparable to that in Massachusetts. Rhode Island adopted a rudimentary civil and criminal code in 1647, most of whose provisions were lifted verbatim from Dalton's *Country Justice*, a handbook for English justices of the peace.[50] In 1699, Governor Bellomont, transmitting the Rhode Island laws to the Privy Council, wrote that court proceedings were in no wise agreeable to English practice. Yet, in 1708, Governor Cranston wrote the Lords of Trade that the laws of England were generally in force. Developments in the Connecticut and New Haven colonies seem to have closely mirrored those in Massachusetts in the seventeenth century, with the English influence being, if anything, slightly less. In New Hampshire, the story was similar to that in Massachusetts, though

---

44. Washburn, *Law and Authority in Colonial Virginia*, in LAW AND AUTHORITY IN COLONIAL AMERICA 116 (Billias ed. 1965).

45. 9 ENGLISH HISTORICAL DOCUMENTS 185 (Jensen ed. 1955).

46. KEITH, THE FIRST BRITISH EMPIRE 25 (1930).

47. Washburn, *supra* note 44.

48. WARREN, *supra* note 41, at 113.

49. Reinsch, *supra* note 5, at 395-96.

50. Howe, *supra* note 16, at 13-14.

there may have been more reliance on English law and less on Biblical doctrines.[51]

### The Seventeenth Century Lawyer

To a certain degree we should be able to know something of the kind of law practiced by knowing the qualities of the lawyers who practiced it. If, for instance, we were told that all the lawyers in one colony were part-time farmers and largely uneducated, whereas most of the lawyers in another colony were educated in the English inns of court, it would be a fair inference that the common law had the greater influence in the latter colony.

Little is known of the training of colonial lawyers in the seventeenth century. There were no lawyers on the Mayflower, but Massachusetts Bay had a few English-trained lawyers, most of whom did not practice. Governor John Winthrop and Emanuel Downing had studied at the Inner Temple but did not practice. Likewise, Nathaniel Ward, who drafted the 1641 Body of Liberties, had been a barrister of Lincoln's Inn; however, he served as a minister in Massachusetts. Thomas Morton, a member of either Furnewell's Inn or Clifford's Inn (equity inns) came to Massachusetts in 1624 or 1625 and practiced for a while until he was expelled for what the colony's leaders considered personal misconduct. Thomas Lechford, of Clement's Inn (another equity inn) practiced a little in Massachusetts for a year or two until he was disbarred for some sort of professional misconduct. No other English-trained lawyers are known to have lived in Massachusetts during the seventeenth century. Legal matters seem to have been cared for by a class of part-time practitioners who were informally, and most likely often indifferently, trained.[52]

When Connecticut was settled in 1636-1637, three of its leaders had English legal educations. Roger Ludlow and Governor John Winthrop the younger were of the Inner Temple, and Governor John Haynes was "very learned in the laws of England." However, they apparently practiced little, if at all, and Connecticut had no other known lawyers with formal training in the seventeenth century. The handling of legal matters seems to have been by a group less skilled than in Massachusetts.

In Maine one "English barrister," Thomas Gorges, head of the colonial

---

51. Reinsch, *supra* note 5, at 386-90.

52. WARREN, *supra* note 41, at 59-73; Hilkey, *Legal Development in Colonial Massachusetts, 1630-1686*, in 37 COLUMBIA UNIVERSITY STUDIES IN HISTORY, ECONOMICS AND PUBLIC LAW 216-21 (1910).

government, practiced in the seventeenth century. Virginia had two English-educated lawyers present in that century. Henry Justice, of the Middle Temple, was transported to Virginia for theft in 1636, and we know of the later presence of William Fitzhugh, born in 1651 and "educated as a lawyer in England." Reportedly there were thirty-three persons practicing law in Virginia in 1680.

While Maryland was noted for having a trained bar earlier than any other colony, its seventeenth century bar seems to have included only two English-trained lawyers, and these late in the century. Charles Carroll, a member of the Inner Temple, came to Maryland in 1688, and Henry Jowles, "a barrister," became Chancellor in 1697.

Research discloses no other English-trained lawyers who may have practiced in the colonies before 1700. Warren says the practice in New Jersey was "evidently engaged in chiefly by pettifoggers and by the court officers. . . ." For seventy years after its settlement, Pennsylvania, though its bar later flourished, had practically no lawyers with any kind of training.[53] The clear inference is that English-trained lawyers were so few and so scattered in the colonies in the seventeenth century as to have, by themselves, a negligible effect upon the practice of law.

### Legal Materials in the Seventeenth Century

A common-law lawyer must have his law books. To a considerable extent, then, if we know what books on the common law are present at a given time and place, we can infer the extent to which that law is followed. While much more information on colonial law libraries is needed, what is available will advance our investigation in some degree.

The colonists were almost totally dependent upon importation from England for common-law materials. Before the Revolution only thirty-three law books, including eight editions of one, were published in America. Most of these were manuals for justices of the peace, sheriffs, and other local officers or tracts on the rights of Englishmen, especially the right of trial by jury. No English case reports were reproduced, nor was the treatise of any standard English law writer, except for Blackstone's *Commentaries,* but the first American edition of this did not appear until 1771-1772.[54]

---

53. The information on Connecticut, Maine, Virginia, Maryland, New Jersey, and Pennsylvania is drawn from WARREN, *supra* note 41, at 44-45, 54-55, 102, 112, 128-34, and 139. Warren does not closely document his sources, so, it is difficult to go behind his statements.

54. WARREN, *supra* note 41, at 157-60.

Of the few English law books known to have been in the colonies
before 1700, almost all were treatises. *Coke on Littleton* was the pre-
dominant treatise for lawyers during the entire colonial period.[55] A
partial set of *Coke's Reports* travelled over on the Mayflower,[56] though
its utility must have been marginal, since no lawyer was aboard. In
1647, the Massachusetts General Court voted to import two copies each
of *Coke's Reports, Coke on Littleton, Coke on Magna Carta, Book of
Entries, New Terms of the Law,* and Dalton's *Justice of the Peace.*
Examination of the Suffolk County (Boston) court records from 1671
to 1680 disclosed citation of only *Coke on Littleton* and a volume on
the law merchant.[57]

The most complete record available of a colonial justice of the peace
court is the so-called Pynchon Court Record, covering the proceedings
of the local court at Springfield, Massachusetts, from 1639 to 1702. It
does not contain any reference to an English text or to a case of any
English or American court. However, the three successive judges who
kept the record had some familiarity with a limited number of English
treatises. William Pynchon, in a letter dated 9 March 1646, makes pass-
ing reference to Fortescue's *Laws of England* and Dalton's *Country
Justice.* The inventory filed in the estate of his grandson, John Pynchon,
Jr., in 1721 listed the following law books: " 'Fortaques [Fortescue]
on the Laws, law Dictionary, A New England Law Book, Cook upon
Littleton, Finches laws, Magna Charta, Dalton's Statutes, Dalton on the
Laws of England.' " Some of these may have belonged to John, his
father, or even to William.[58]

None of the foregoing establishes that the common law of England
was not applied in the colonies in the seventeenth century. The fact
that a lawyer is not trained in England does not prove he cannot under-
stand and use English precedents. The countless American lawyers
who have been trained since the Revolution by law schools, office
clerkship, and even self-study demonstrates this. However, when, in
seventeenth century America, we find no appreciable number of Eng-
lish-educated lawyers, when we find no evidence of an organized native
system of legal education, and especially when the courts were staffed

55. Thorne, SIR EDWARD COKE 1552-1952, 3 (published in pamphlet form by the
Selden Society 1957).
56. *Id.*
57. Chafee, *Colonial Courts and the Common Law,* in 68 PROCEEDINGS OF MASSACHUSETTS
HISTORICAL SOCIETY 132, 157-58 (1952).
58. J. SMITH, COLONIAL JUSTICE IN WESTERN MASSACHUSETTS 19-20, 157-58 (1961).

by lay judges, it is difficult to imagine any sophisticated or highly technical use of common-law cases and authorities. The probability is that, at least on the appellate level, the basic principles of the common law were known and considered, perhaps from reference to a limited supply of English secondary authorities, such as Coke.

## A Generation of Change

A sailor would know how to express it. He has been sailing a reach with sails luffing, making way but not as he might. This would be the course of the common law in the 17th century. When our sailor realizes the situation, he tightens the sheets, snubs off, and proceeds anew, not on a different tack but with a taut boat and quickened pace. There is reason enough to theorize that something like this happened to the colonial ship of state, in historical perspective quite dramatically, during about a generation beginning almost precisely with the year 1700. Probably it was the Council of Trade and Plantations and the Board of Trade that tightened the lines, and the colonies responded.

### Directions from England

The British probably had a desire for more control over the colonies about forty or fifty years before the turn of the century. But the political convulsions that rocked England between the Grand Remonstrance of 1641 and the Glorious Revolution of 1688 seem to have delayed a sustained effort in this direction. The first real parliamentary legislation for the colonies was an act of 19 May 1649, which declared England and its colonies a commonwealth, to be governed by the "supreme authority," Parliament; however, upon the Restoration that act was repealed.[59]

The year 1664 saw two events that evinced increased English interest in the American colonies. A British fleet captured New Amsterdam from the Dutch, and Charles II granted it to his brother, the Duke of York, renaming it New York. The following year the Duke promulgated the code of law known as the "Duke's Laws" and installed as the English governor Richard Nichols (or "Nicolls").[60] Also in 1664 a four-man royal commission visited Boston, apparently for the intended purpose of acting as a royal court to override the colony's courts. But

59. Keith, *supra* note 46 at 3-9.
60. Johnson, *The Advent of Common Law in Colonial New York*, in Law and Authority in Colonial America 74 (Billias ed. 1965).

after meeting stubborn resistance from the local freemen, the com-
missioners abandoned their mission and left Massachusetts.[61]

England again tried to tighten its grasp on recalcitrant New England
in 1685 by combining the New England colonies, New York, and the
Jerseys into one viceroyalty called the Dominion of New England. Sir
Edmund Andros was appointed governor, who, with a council, was to
try civil and criminal cases according to the laws and the statutes of
England. This move produced remonstrances in the colonies involved,
notably the revolt led in New York by Jacob Leisler, and the Dominion
collapsed in 1688.[62]

By the 1680's and 1690's, the British government began taking steps
that produced a real and lasting tightening of control. In 1684, the
Massachusetts Bay charter was annulled. By a new charter of 1692 the
colony became a royal colony with an appointed governor, who, with
his council, appointed judges and justices of the peace. Thereafter, the
practice of law in Massachusetts became more regular and technical.[63]
In 1692, Maryland's proprietary charter was annulled, a royal governor
was appointed, and the province became a royal colony. While local
practice in law may have been little affected, a new court of appeals and
new admiralty courts were set up.[64] In New York, the Supreme Court
of Judicature was established in 1691, and one author believes there was
at this time a rather sudden increase in reliance on the common law
in that colony.[65]

The great Navigation Act of 1696 must be noted. By this Act Par-
liament created a system of six colonial vice-admiralty districts and
courts, with the judges and other officers commissioned by the English
lords of admiralty. The first vice-admiralty court began to sit in Massa-
chusetts in 1699. Although its procedures were more informal than in
the English High Court of Admiralty, the Massachusetts court seems to
have taken jurisdiction over more matters than the High Court. In the
eighteenth century, at least in Massachusetts, the vice-admiralty court
became a symbol of oppressive British control. After 1760, it was in this
court that all the hated Acts of Trade were enforced.[66]

---

61. Hilkey, *supra* note 52, at 160.
62. 1 MORISON AND COMMAGER, GROWTH OF THE AMERICAN REPUBLIC 84 (5th ed.
1962); JOHNSON, *supra* note 60.
63. Reinsch, *supra* note 5, at 383-85.
64. SMITH, *supra* note 42, at 94-95.
65. Johnson, *supra* note 60.
66. Wroth, *The Massachusetts Vice-Admiralty Court*, in LAW AND AUTHORITY IN

Statutory revision and codification is another area in which evidence of change can be seen. There were a few isolated examples of statute revision in the colonies during the seventeenth century but no real impetus for change until almost precisely 1700, when the Council of Trade and Plantations exerted pressure. In response, for the next fifteen or twenty years there was quite a rash of revisions and codifications. Whereas the colonial laws had previously been gathered together in cumbersome bundles of manuscripts, now they were put in a form more usable, not only by the Privy Council, but by the colonial bench and bar. After approximately 1720, the laws were generally printed by colonial printers such as Benjamin Franklin.[67]

In 1700, the Privy Council wrote to the colonial governors in Barbados and America, requesting reports on their court procedures. Replies are extant from Barbados, Massachusetts, New York, Rhode Island, Maryland, and Virginia.[68] These replies show court systems that varied among themselves rather more than do American state courts today and which clearly were products of the English court system, mainly of the common-law and equity courts. In varying degrees they were abbreviations of the English system, and the procedures are clearly derivatives of English ones. We find direct statements that the common law was applied as the rule of decision[69] or at least that the common-law forms of action were used.[70]

More important than what the colonial governors reported are questions having to do with what they and their subjects thought about the act of reporting. The inferences are fairly strong that during most of the seventeenth century the colonists were too busy with the mundane, often grim, aspects of securing a beachhead on a hostile shore to reflect much upon the law as a science. A modicum of law and order was a utilitarian necessity, and that was about it. Now, nudged by the home government, the colonists were asked to examine them-

---

COLONIAL AMERICA 32 (Billias ed. 1965); Surrency, *The Courts in the American Colonies*, 11 AM. J. LEGAL HIST. 253, 355-56 (1967).

67. Surrency, *Revision of Colonial Laws*, 9 AM. J. LEGAL HIST. 189 (1965).

68. Surrency, *Report on Court Procedures in the Colonies—1700*, 9 AM. J. LEGAL HIST. 69-72 (1965).

69. *Id.* at 177 (New York), 238 (Rhode Island), and 239 (Virginia). The reply from Virginia was quite explicit: "[T]he proceedings are in English and Judgmts: grounded & passed according (or as near) to ye Com[m]on & statute Laws of England & ye Circumstances of ye Country will admitt & to such peculiar Laws as are made suitable to ye present state of ye Country."

70. *Id.* at 169 (Maryland) and 173 (Massachusetts).

selves and say what was their Law in a more speculative sense. This
kind of introspection would normally be expected to produce change
and refinement and, in the context of 1700, to make the colonies imi-
tate more closely the refinements of the common law.

### Colonial Response

On the basis of the evidence, one may infer that English control
over colonial legal systems, and by further inference, the influence of
the common law, increased perceptibly very near the year 1700. There
is also evidence that the colonists themselves became more receptive
to the common law shortly after that date.

When we say the colonists had certain attitudes toward the common
law, we must be careful to define what we mean by "common law."
The object of this article has been to determine the extent to which
the procedures and rules of the king's courts of common law governed
or influenced the resolution of legal disputes in American courts. How-
ever, the colonists did not always think of the "common law" in this
way, and it might be possible to build up a case that did not exist by
citing certain contemporary colonial references to the "common law."

Often in times of pressure from the English government or from
their own colonial governments, the colonists would raise a popular
clamor for "the common law of England" as a shield against their
oppressors. But in this context they meant almost exclusively the pub-
lic aspects they felt guaranteed political freedom, *i.e.,* constitutional
principles, such as trial by jury.[71] A popular outcry of this kind was
raised against the autocratic leaders of Massachusetts in the 1640's.[72]
In Maryland for a century after its founding in 1634, the colonists
claimed the benefits of the common law in opposition to the proprietor's
contention that by the terms of his grant he had the absolute right to
govern.[73] Daniel Dulany's pungent pamphlet of 1728 even went so far
as to urge his fellow Marylanders to adopt both the common law and
all English statutes.[74]

---

71. Howe, *supra* note 16; KEITH, *supra* note 46, at 184-86; Reinsch, *supra* note 5, at
383-84.

72. Howe, *supra* note 16.

73. WARREN, *supra* note 41, at 49-50.

74. DULANY, THE RIGHT OF THE INHABITANTS OF MARYLAND TO THE BENEFIT OF THE
ENGLISH LAWS (1728). This pamphlet is reprinted in an appendix to Sioussat, *The English
Statutes in Maryland,* in ser. 21, Nos. 11-12, JOHNS HOPKINS UNIVERSITY STUDIES IN
HISTORICAL AND POLITICAL SCIENCE (1903).

Another kind of evidence can be found and this points toward an increasing use of English common law in the sense this article defines the term. Obviously such a development would not occur at a certain instant, but the indications are that impetus in this direction was considerably felt in the generation beginning about 1700. In 1712, the South Carolina legislature enacted a statute formally adopting the English common law as the rule of judicature and also adopting 126 named English statutes that had been selected by Chief Justice Nicholas Trott.[75] North Carolina, in 1715, enacted a statute adopting the common law "so far as shall be compatible with our way of living and trade." [76] Pennsylvania's Assembly passed an act expressly extending several English penal statutes in 1718. The preamble to this act recited that the common law was the birthright of English subjects and so ought to be the rule in British dominions.[77]

The citation of English cases as authority can be traced to the early 1700's. Reinsch reports the citation and following of an English case in North Carolina in 1729.[78] A scanning of all cases in Volume 1 of Harris & McHenry's Reports for Maryland covering the years 1658 to 1774, showed the earliest citation of English cases to have been in 1718 in *Tanner v. Freeland*.[79] Earlier cases were so sketchily reported that it seems quite possible that common-law cases were relied upon before then but simply not noted by the reporters. After 1718, English cases were cited to and by the Maryland court in gradually increasing numbers. Even in this later period, much depended upon the style of the several reporters, with varying degrees of attention being given to the citation and discussion of English cases.

Consider another important factor reflecting upon the reception of common law, the quality of the judiciary. Not only were there practically no English-trained judges on the colonial bench during the seventeenth century, but it seems to have been made up in large part of men who were not lawyers at all. Again, signs of an abrupt change can be seen beginning at the turn of the century. The first professional lawyer to become judge of an appellate court may have been Henry Jowles, an English barrister who became chancellor of Maryland in

---

75. Reinsch, *supra* note 5, at 407-10.
76. WARREN, *supra* note 41, at 122-23.
77. Sioussat, *The Theory of the Extension of English Statutes to the Plantations*, in 1 SELECT ESSAYS IN ANGLO-AMERICAN LEGAL HISTORY 416, 426-27 (1907).
78. Reinsch, *supra* note 5, at 409.
79. 1 Md. 34 (1718).

Compendium_Cornell
Page 1753

1697.[80] The first lawyer to become chief justice of New York was William Attwood, an English lawyer who arrived in 1701.[81] In Pennsylvania, the first lawyer to become chief justice was John Guest, an English barrister, in 1706. William Penn, anxious to obtain trained lawyers, had given Roger Mompesson, a good English lawyer, a commission as chief justice, but Mompesson declined the office and went to New York where he was chief justice from 1706 to 1715.[82] New Hampshire, however, had no practicing attorney on the bench until 1754.[83]

The evidence indicates two significant kinds of activity and change traceable almost to the year 1700. First, the British government resolved to regularize colonial legal systems and took effective action to carry out this resolve. This development is consistent with the larger historical background of an England that, after the disturbances of the latter half of the seventeenth century, had put its house in order and now attended to some overdue business in the plantations. Second, in roughly the generation following 1700, the colonies themselves evinced a quickening interest in the refinement of their legal systems, part of which was demonstrably in response to orders from the home government. All this suggests most strongly that the condition of the colonies became, in a short span of time, more receptive to the common law, from which we may infer the common law must have become more understood and followed at this time.

### EIGHTEENTH CENTURY

It is curious that legal historians have dealt little with eighteenth century common-law reception, less in fact than they have with seventeenth century developments. The subject did not interest the colonials either, quite possibly because they preferred not to disclose the results of such a study to his majesty's government. However, we do have comparatively good information on some institutions that established perimeters within which the common law probably was applied. By depicting the eighteenth century colonial lawyer, with his training and legal materials, we can judge with some degree of certainty the extent to which the common law could have been received. And by examina-

---

80. WARREN, *supra* note 41, at 54-55.
81. 2 CHESTER, COURTS AND LAWYERS OF NEW YORK; A HISTORY 1609-1925, 494 (1925).
82. *Id.* at 519-20; Reinsch, *supra* note 5, at 396-400.
83. WARREN, *supra* note 41, at 134-38.

tion of thousands of state-court decisions handed down immediately after the Revolution, some detailed, categorical statements can be made about affairs at the end of the colonial period.

## The Eighteenth Century Lawyer

Almost from the beginning of the eighteenth century a growth in numbers and improvement in training of the colonial bar can be found. Warren estimates that between twenty-five and fifty American-born lawyers were educated in England before 1760 and that about one hundred and fifteen Americans were admitted to the inns of court between 1760 and the close of the Revolution. Of this latter group, he concludes forty-seven were from South Carolina, twenty-one from Virginia, sixteen from Maryland, eleven from Pennsylvania, five from New York, and one or two from each of the other colonies.[84]

Massachusetts seems to have depended little upon the English inns for the education of its eighteenth century lawyers. Most of the handful present held official positions in the colony's legal system. However, it appears a rather efficient system of educating lawyers by "reading law" in the offices of established lawyers was in operation. The students thus trained often were graduates of Harvard, Brown, or some other college and entered upon their law studies with a good general education. As an outstanding example, the office of the leading lawyer Jeremiah Gridley produced James Otis, Jr., the famous opponent of the writs of assistance, and William Cushing, who became a Justice of the United States Supreme Court. Other offices trained President John Adams, Robert Treat Paine, David Sewall, who became a federal judge, and James Sullivan, a judge and attorney general of Massachusetts. The term "barrister" was used to describe those lawyers admitted, under rules adopted by the Superior Court of Judicature, to practice in court. A total of fifty-six men are believed to have been made barristers, of whom twenty-five were practicing in 1768.[85]

In the other New England colonies the local benches and bars were at a low ebb in the eighteenth century. In Rhode Island, the judges were elected annually until fifty years after the Revolution and were mostly laymen uneducated in the law.[86] Warren lists no Rhode Island lawyer trained in England, and he says there were only a few with

---

84. *Id.* at 188.
85. Davis, History of the Judiciary of Massachusetts 76-223, 295-97 (1900).
86. Durfee, Gleanings from the Judicial History of Rhode Island 14-17 (1883).

American legal training. The state of the bars in Connecticut and New Hampshire seems to have been much like that in Rhode Island. Warren names one English barrister who came to New Hampshire in 1758. In Maine, there were only six "educated lawyers" in 1770, none of whom was English-trained.

The middle and southern colonies depended upon the English inns of court in the eighteenth century far more than did New England. From a slow start, Pennsylvania flowered in producing outstanding lawyers in the period of approximately twenty years before the Revolution. Only South Carolina finally possessed more men than Pennsylvania who were trained at the inns of court. Some of the more outstanding of these in Pennsylvania were Andrew Hamilton, famous for his defense of John Peter Zenger, Pennsylvania chief justices Thomas Mckean and Edward Shippen, and the eminent lawyers John Dickinson and George Read. Maryland seems to have drawn upon the English inns to about the same extent as Pennsylvania. The Maryland bar had the reputation of being better trained from an earlier period than any other and was always highly regarded.

Virginia may well have had the best overall system of legal education of any colony. Although Warren says Pennsylvania had more lawyers from the inns of court than any colony except South Carolina, he lists by name more of them for Virginia than for Pennsylvania. At any rate, the number of English-trained lawyers must have been large in Virginia. In addition, Virginia, like Massachusetts, seems to have developed a successful system of education by office apprenticeship. The great George Wythe, who himself apparently received his legal education in Virginia, provided in his single office the legal educations of Jefferson, Marshall, Madison, and Monroe.

South Carolina became a royal province in 1720. Thereafter most of its chief justices were educated lawyers, though most associate justices were laymen. Because the colony, in adopting a list of specified English statutes in 1712, had adopted the one governing the examination and admission of lawyers, the requirements for practice were strict. As a result, the bar was never large (no more than fifty-eight members were admitted before the Revolution) but it was the highest educated bar in the colonies and contained the largest proportion of English-trained lawyers.

Not much is known of the North Carolina and Georgia bars, and neither colony had large numbers of lawyers. While there were several

English-trained lawyers in North Carolina, most, including James Ire-dell, who became a Justice of the United States Supreme Court, studied in law offices in North Carolina and other colonies. Georgia had no courts until 1733. After it became a crown colony in 1752, the chief justice was required to be an "English barrister," but the three assistant judges were usually laymen. The eighteenth century bar was small, though it contained a few English-trained lawyers practicing in Savan-nah.[87]

Perhaps a few words should be said about the lawyer's public image in colonial times. Through most of the period he was an unpopular figure. In the middle part of the 1600's several colonies maintained statutes prohibiting charging fees for legal services.[88] Of course, the class of persons holding themselves out as legal counsel may have justi-fied such stringencies. In 1729, the Rhode Island assembly passed an act forbidding lawyers to sit as members,[89] and there was widespread popular opposition to lawyers being in the assembly in New York.[90] Later in the eighteenth century, as the general level of professional training and competence rose, lawyers must have received increased respect, if not personal esteem. The lawyers who became prominent as leaders in the growing struggle for liberty no doubt enjoyed much popularity. However, this was offset by the popular feeling against the many who were loyalists, a feeling that persisted even after the Revolution.[91] It is doubtful that the legal system itself gained popularity as the Revolution approached. For instance, in Massachusetts, due to the handling of the trials of the British soldiers involved in the Boston Mas-sacre of 1770, the entire court system lost public confidence, which it did not regain until the revolutionary government reorganized the courts during the Revolution.[92]

*Legal Materials*

Traditionally, legal scholars have taken the position that eighteenth

---

87. The statements concerning Rhode Island, Connecticut, New Hampshire, Maine, Pennsylvania, Maryland, Virginia, South Carolina, North Carolina, and Georgia are supported by WARREN, *supra* note 41, at 44-49, 54-56, 104-10, 119-43.

88. HILKEY, *supra* note 52, at 216 (Massachusetts); Reinsch, *supra* note 5, at 395, 406 (New Jersey, Virginia).

89. DURFEE, *supra* note 86, at 37-38.

90. Reinsch, *supra* note 5, at 394.

91. AUMANN, THE CHANGING AMERICAN LEGAL SYSTEM 80-81 (1940).

92. Cushing, *The Judiciary and Public Opinion in Revolutionary Massachusetts*, in LAW AND AUTHORITY IN COLONIAL AMERICA 168-73 (Billias ed. 1965).

century colonial law libraries were small and that they contained in-
complete selections of English authorities. Warren says fifty to a hun-
dred books would have been a large number for a lawyer and that
Judge Edmund Trowbridge of Massachusetts was probably the only
lawyer whose library contained all the valuable English law books then
existing.[93]

An examination of the first volume of Harris & McHenry's Reports
for Maryland (1658-1774) raises the question of whether there were
far more English law books in eighteenth century America than has
been generally supposed. All cases in that volume were scanned and
notations made of the English case reporters and secondary authorities
cited. For the most part, the citations were shown as having been given
as authority by counsel arguing before the Supreme Court of Maryland.
The earliest citation was noted in the 1718 case of *Tanner v. Freeland*.[94]
There was much irregularity in the form of citations, and in some in-
stances it has not been possible to reconcile them with known English
publications.[95]

In all, eighty-four English case reporters were cited in 1 Harris &
McHenry, most of them having been referred to repeatedly. Coke's
Reports, Time of Elizabeth, was the first to be cited. The citations
tended to be mainly to King's Bench reports, such as Coke's Reports,
with the fewest citations to equity reporters and with the proportion
of Common Pleas citations increasing slightly with time. Fifty-five
English treatises were cited, *Coke on Littleton* being the first and fa-
vorite. Abridgments, such as Rolle's, Bacon's, and Viner's, were used
quite a bit, though perhaps not so much as to indicate a great lack of
case materials. As a matter of curiosity, Blackstone's *Commentaries*
were first cited in 1768 and seemed to have had a slight effect on the
course of colonial law.

The citation of cases in 1 Harris & McHenry was generally without
comment, except in some later decisions, where the reporters occasionally
gave details of the English cases. However, the English references were
cited as authority in support of arguments and propositions advanced
by counsel. They obviously were regarded as having some force.
Throughout, English cases were cited far more times than were sec-

93. WARREN, *supra* note 41, at 160-66.
94. 1 Md. 34 (1718).
95. For the purpose of identifying publications the writer has referred to the table
of abbreviations supplied by Professor Cooley on p. ixv of the first volume of his
third edition of BLACKSTONE'S COMMENTARIES (1884).

ondary authorities. In this connection, it is interesting to note that the citation of treatises and abridgments picked up considerably after 1760, which is contrary to what we might have expected. There is no way of knowing how many cases were lifted from secondary authorities without the cases themselves having been read. Therefore, it cannot be concluded that all the English reporters cited existed in Maryland. However, since treatises and abridgments were cited mainly in the later years covered by 1 Harris & McHenry, perhaps it may be inferred that lawyers' libraries tended to contain reporters at an earlier time than they contained secondary authorities and that cases were not lifted in large numbers.

Despite unanswered questions and doubts, the list of English authorities relied upon in 1 Harris & McHenry is impressive. If nothing else, it shows a regular use of English common-law rules as authority from early in the eighteenth century. And the inference is strong that many or most of the reports and treatises cited were present in the colony, though scattered in various law libraries. All this casts some doubt upon the commonly accepted belief that English legal materials were scarce or little relied upon in the colonies until just before the Revolution. From the previous discussion it can be seen that, with respect to reception of the common law, Maryland was fairly typical of the colonies from New York south. The New England colonies, of course, were less disposed to pattern their affairs upon things English, from which it may be conjectured that the existence and citation of English common-law authorities was less in New England than in Maryland and other southern colonies.

*Role of the British Government*

One would suppose the theory and practice of the British government regarding the American colonies would have a great deal to do with implementation of the common law there. This seems not to have been the case, but the evidence on either theory or practice is sketchy. In the first place, no complete or consistent theory seems to have been worked out as to the effect of the common law, though one was as to the effect of statutes. In the second place, as to practice, there were few appeals from the colonies, and they seemed generally to involve questions of the validity of colonial statutes. The English government was too preoccupied with more important matters—making the colonies profitable elements in a mercantile system—to give much attention to inter-

nal legal affairs. There appears to have been more interest in statute law than in common law; questions on statutes will be discussed only as they shed light on the status of the common law in the colonies.

The English courts themselves never settled the theoretical question of the common law in the American colonies.[96] English lawyers and writers had little interest in colonial legal affairs. For instance, when George Chalmers wrote his *Political Annals of the Present United Colonies* in London in 1780, he could find no published legal opinion of appeals taken to England from the colonies and had to consult archives.[97]

Some propositions of colonial law were settled. Since 1609, it was accepted that if the English king conquered a Christian land, that land's laws remained in effect until the king changed them.[98] If the conquered land were not Christian, its laws being contrary to the laws of God, the prior laws were automatically revoked, and the king was to rule by "natural equity" until he could enact new laws.[99] Finally, "if there be a new and uninhabited country found out by *English* subjects, as the law is the birthright of every subject, so, wherever they go, they carry their laws with them, and therefore such new found country is to be governed by the laws of England. . . ."[100]

When it came to applying the rules to America, some confusion resulted. In 1707, it was held in *Smith v. Brown & Cooper*[101] that Virginia had been conquered from infidels and that the common law did not automatically extend to the colony. Blackstone similarly states that the American colonies were "principally" so acquired and that "the common law of England, as such, has no allowance or authority there."[102] One serious doubt is at once apparent about the premises upon which the *Smith* case and Blackstone's view are predicated. Were the colonies really lands conquered from foreign princes, or were they more like previously uninhabited lands? Would it not be nearer the truth

96. Radin, *The Rivalry of Common-Law and Civil Law Ideas in the American Colonies*, in 2 LAW: A CENTURY OF PROGRESS 404, 411 (1937).

97. Washburn, *supra* note 44, at 118-19.

98. Calvin's Case, 77 Eng. Rep. 398 (K.B. 1609) (dictum); Blankard v. Galdy, 91 Eng. Rep. 356 (K.B. 1693).

99. Calvin's Case, 77 Eng. Rep. 398 (K.B. 1609) (dictum).

100. Anonymous, 24 Eng. Rep. 646 (1722) (determination by Privy Council upon appeal from the foreign Plantations); Blankard v. Galdy, 91 Eng. Rep. 356 (K.B. 1693) (dictum).

101. 91 Eng. Rep. 566 (K.B. 1707).

102. 1 BLACKSTONE, COMMENTARIES *107-08.

to say that some parts of the new land were conquered and some parts previously uninhabited? Since the Indians did not live in geographically fixed nations in the European sense, could the lines between conquered and uninhabited parts be determined? What about lands acquired peacefully from the Indians by treaty or purchase? In 1756, Britain's attorney general Charles Platt and solicitor general Charles Yorke rendered an opinion that the common law was in force in such places.[103]

To complicate the situation further, in 1720, after the date of *Smith v. Brown & Cooper*, Attorney General Richard West was of the opinion that the common law of England was the common law of "the Plantations."[104] Then, in 1727, in the celebrated case of *Winthrop v. Lechmere*,[105] the Privy Council held that the Connecticut intestacy statute, which divided realty equally among the decedent's children, was void. This was on the ground that it was "contrary to the laws of England," the reference being of course to the common-law rule of primogeniture.

The Privy Council heard appeals from the colonies and also passed upon the validity of colonial statutes. It seems the Council's main concern was that decisions and statutes should not be contrary to those parts of the statutory law of England that were binding upon the colonies. Even within this limited sphere the Council showed an inconsistency and leniency that was probably due to a practical, realistic approach to colonial conditions.

Except for Carolina, Maryland, Connecticut, and Rhode Island during the time they were proprietary colonies, the governors of all colonies had to submit legislative acts to the Privy Council for approval. In many cases the acts expired by their own terms before they could be passed upon. Sometimes it seems the Council was willing to delay action for years to avoid annulling a statute.[106] There must have been many colonial statutes that, though in clear violation of English statutes, never were challenged. For instance, a 1705 act of the Pennsylvania assembly allowed holographic wills, and they were widely used during the remainder of the colonial period, obviously contrarily to the English

---

103. CHALMERS, OPINIONS OF EMINENT LAWYERS ON VARIOUS POINTS OF ENGLISH JURISPRUDENCE 207 (1st Amer. ed. 1858).

104. *Id.* at 206.

105. GOEBEL, CASES AND MATERIALS ON THE DEVELOPMENT OF LEGAL INSTITUTIONS 398-401 (1937); Andrews, *The Influence of Colonial Conditions as Illustrated in the Connecticut Intestacy Law,* in 1 SELECT ESSAYS IN ANGLO-AMERICAN LEGAL HISTORY 431, 445 (1907).

106. KEITH, THE FIRST BRITISH EMPIRE 287-88 (1930).

Statute of Frauds and Perjuries.[107]  Yet, the Privy Council did disallow many colonial legislative acts, some of them seemingly less obnoxious than others which stood.[108]

The aftermath of *Winthrop v. Lechmere* is another illustration of the unevenness of English control over the colonial administration of justice.  In 1738, in *Phillips v. Savage* the Privy Council was asked to annul the Massachusetts intestacy statute, which was in all essentials like the Connecticut statute annulled in the *Winthrop* case, yet the Massachusetts statute was upheld because it had previously been confirmed by the Council.  Meantime Connecticut had continued to use its intestacy statute despite the decision in *Winthrop*.  Its act was again challenged before the Privy Council in 1745 in *Clark v. Tousey*, but the appeal was dismissed as not having been timely taken.  For practical purposes this was the end of the matter, for Connecticut continued to use its "annulled" intestacy act, and no one again had the temerity to make another appeal.[109]

The evidence indicates that the British government, in practice, did not play a strong role in enforcing the common law in the colonies.  Added to this, we have seen that English legal authorities never decided for themselves in theory the extent to which the common law should be enforced.  It seems justifiable to conclude that direct influence from the home government was not a major factor in colonial reception of the common law.

*A Backward Glance*

This final section is postulated on the proposition that the common law was applied in substantially the same fashion when the Revolution began as it was in the first days of the Republic.  To some extent this proposition is demonstrable.  The early judges and lawyers had practiced before the Revolution.  They must have had susbtantially the same libraries before as after, for presumably no law books came in during the war.  Indeed, one reading the post-Revolutionary cases perceives that the bench and bar were using long-accustomed processes, mental and judicial, for deciding cases.  The whole tenor of the opinions is quite convincing that except for some statutes, the judges were applying the same body of law they had long known.

---

107. *See* discussion in Havard v. Davis, 2 Binn. (Pa.) 406, 417-18 (1810).
108. KEITH, *supra* note 106, at 247-51, lists a number of acts that were annulled.
109. *Id*. at 248-49; Andrews, *supra* note 105 at 445-63.

A few words about methods. All appellate decisions reported for New York, Pennsylvania, and South Carolina from the end of the Revolution through 1810 have been examined. These states were chosen principally because they were the first to publish continuous series of post-Revolutionary reports. Secondarily, their use of common-law precedents is judged reasonably typical, at least of those colonies outside New England. For New York the reports examined were volumes 1-3 of Johnson's Cases, volumes 1-3 of Caines's Reports, and volumes 1-6 of Johnson's Reports, covering in all the period 1798 to 1810. Pennsylvania materials were volume 4 of Dallas's Reports, volumes 1 and 2 of Binney's Reports, and volumes 3 and 4 of Yeates's Reports, extending, with some overlapping among the reporters, from 1790 to 1810. For South Carolina volumes 1 and 2 of Bay's Reports and volumes 1 and 2 of Brevard's Reports, running from 1783 to 1811 with some overlapping, were used.

The evidence sought and recorded consisted of remarks by the judges as to their own understanding of how they were to apply English common-law precedents. What is summarized here is a contemporary judicial commentary on that subject. No attempt was made to determine if the holdings, case by case, matched English rules, for this would entail the virtual compilation of an encyclopedia of English common law *circa* 1800. In the end, it may be doubtful that the product of such monumental labor would produce a general view much different from what shall be seen.

With all three states involved, there was either a statute or a constitutional clause in some wise speaking to common-law reception. In New York, it was the constitution of 20 April 1777, in effect until 1821, that contained this clause:

> [S]uch parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on the 19th day of April, in the year of our Lord one thousand seven hundred and seventy-five, shall be and continue the law of this State, subject to such alterations and provisions as the legislature of this State shall, from time to time, make concerning the same. . . . That all such parts of the said common law, and all such of the said statutes and acts aforesaid, or parts thereof, as may be construed to establish or maintain any particular denomination of Christians or their ministers, or concern the al-

legiance heretofore yielded to, and the supremacy, sovereignty,
government, or prerogatives claimed or exercised by, the King of
Great Britain and his predecessors, over the colony of New York
and its inhabitants, or are repugnant to this constitution, be, and
they hereby are, abrogated and rejected.[110]

Unlike New York, Pennsylvania did not mention reception of the
common law in its constitution. Rather a statute of 28 January 1777
provided:

> [E]ach and every one of the laws or acts of general assembly that
> were in force and binding on the inhabitants of the said province
> on the fourteenth day of May last shall be in force and binding on
> the inhabitants of this state from and after the tenth day of Febru-
> ary next . . . and the common law and such of the statute laws
> of England as have heretofore been in force in the said province,
> except as is hereafter excepted.[111]

In South Carolina, the matter was handled differently. The Colonial
Act of 12 December 1712, after specifically adopting the 126 English
statutes enumerated by Chief Justice Trott, also provided:

> All and every part of the common law of England, where the same
> is not altered by the above enumerated acts, or inconsistent with
> the particular constitutions, customs and laws of this Province
> [except for certain matters of feudal land law and ecclesiastical
> law] . . . is hereby made and declared to be in as full force and
> virtue within this Province, as the same is or ought to be within
> the said kingdom of England. . . .[112]

This Colonial Act of Assembly was adopted and carried forward into
statehood sucessively by the constitutions of 26 March 1776, 19 March
1778, and 3 June 1790.[113] So, there is special reason to suppose that
reception matters in South Carolina would be handled after the Revo-
lution as they were before.

---

110. N. Y. CONST. art. XXXV (1777), reproduced in 5 THORPE, FEDERAL AND STATE
CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS, 2623, 2635-36 (1909).

111. 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903).

112. Reproduced in J. GRIMKE, PUBLIC LAWS OF SOUTH CAROLINA 99 (1790), and also
in 1 J. BREVARD, ALPHABETICAL DIGEST OF THE PUBLIC STATUTE LAW OF SOUTH CAROLINA
136-37 (1814).

113. 6 F. THORPE, FEDERAL AND STATE CONSTITUTIONS 3247, 3255, 3264 (1909).

Perhaps the most remarkable general observation that can be made is as to what was *not* done and said in the courts. None of the reception clauses or acts were ever explained or interpreted, but their purpose was quite faithfully followed. The courts in the three states cited English cases and secondary authorities regularly, easily, and without any feeling they had to explain their doing so.[114] In any extended or difficult case, requiring doctrinal discussion, English authorities would generally be relied upon. Hardly any hostility to English courts is to be found; in fact, deference was often shown for the learning of English judges. Although in their separate or dissenting opinions the various judges might reach contrary results and might disagree as to the state of the common law, there seems to have been underlying agreement that the English Common law as they saw it was usually binding.

Though the judges, by their actions, evinced a practice of following common-law decisions, they wrote little on the process. Not once do we find anything like a full-dress review of the reception doctrine; the courts were far less aware of the question than we are. About as extended a statement as can be found is this one by Chief Justice Kent: "But whatever may be our opinions on the point, as an abstract question, or whatever may be the decisions of the civil law, or the feudal and municipal law of other countries, we must decide this question by the common law of England." [115] Perhaps the most complete exposition was the remark by the South Carolina Constitutional Court "that the common law was of force in South Carolina, and formed by far the greatest and most important part of her system of jurisprudence." [116] Ten or twelve other cases contain remarks of like vein, but are less sweeping.[117]

---

114. For instance, the earliest volume of New York reports, 1 Johnson's Cases (1798-1800), contains 184 decisions of the Supreme Court and three for the Court for the Correction of Errors. Of the Supreme Court decisions, 130 were *per curiam* ones containing no citations of authority, 24 were full opinions without English citations, and 30 cited English authorities. Of the three decisions for the Court for the Correction of Errors, two cited English cases. Fifty-three English reports were relied upon 218 times and 13 secondary authorities 29 times. This included nine references to COKE ON LITTLETON but none to Blackstone. In general, later reporters in all three states contain a considerably larger frequency of English citations; volume 1 Johnson's Cases tends to the minimum instead of maximum intensity of citations for the period 1783-1810.

115. Frost v. Raymond, 2 Cai. R. (N.Y.) 188, 191 (1804).

116. Wells v. Martin, 2 Bay (S.C.) 20, 21 (1796).

117. Post v. Neafie, 3 Cai. R. (N.Y.) 22, 36 (1805); Lansing v. Fleet, 2 Johns. Cas. (N.Y.) 3 (1800); Conroe v. Birdsall, 1 Johns. Cas. (N.Y.) 127, 128 (1799); Jackson *ex dem.* Cooder v. Woods, 1 Johns. Cas. (N.Y.) 163, 167 (1799); Bender v. Fromberger,

Tempering what has just been said, the early state courts did not feel bound to slavish attendance upon English precedents. Under certain circumstances they would refuse to follow them, somewhat more freely, it appears, than a present-day state court will overrule its own prior decisions. The English rule was on occasion departed from if judged not compatible with conditions in America[118] or "unreasonable," [119] or, quite possibly, for no stated reason.[120] A British rule that turned on some statute not in force in a state might be disregarded, the cause for it having disappeared.[121] There was, especially in South Carolina, a fairly evident feeling that procedural, as contrasted with substantive, rules were peculiarly within the local court's domain; hence, the judges were more willing to abandon English rules of practice and procedure.[122]

Certain classes of English decisions were apt to be accorded little

---

4 U.S. (4 Dall.) 441, 444-45 (1806); Respublica v. Cleaver, 5 Yeates (Pa.) 69, 73 (1804); Cooper v. Cooper, 2 Brev. (S.C.) 355, 358 (1810); Fleming v. M'Clure, 1 Brev. (S.C.) 428, 432-33 (1804) (gratuitous statement about English law merchant); Comm'rs of the Treasury v. Brevard, 1 Brev. (S.C.) 11, 13 (1794); Jenkins v. Putnam, 1 Bay (S.C.) 8, 10 (1784).

118. People v. Croswell, 3 Johns. Cas. (N.Y.) 336, 337 (1804) (celebrated case where court split 2-2 on whether truth was defense to libel); Walker v. Chichester, 2 Brev. (S.C.) 67 (1806); Snee v. Trice, 2 Bay (S.C.) 345 (1802); White v. Chambers, 2 Bay (S.C.) 70 (1796); Hall v. Smith, 1 Bay (S.C.) 330 (1793).

119. Bayard v. Malcolm, 2 Johns. (N.Y.) 550, 554-58 (1807); Leatherwood v. Woodroof, 2 Brev. (S.C.) 380, 385 (1810); Clark v. Minton, 2 Brev. (S.C.) 185, 188 (1807).

120. People v. Howell, 4 Johns. (N.Y.) 296, 302 (1809) (dictum); Johnson v. Stagg, 2 Johns. (N.Y.) 510, 522-23 (1807); People v. Barrett, 1 Johns. (N.Y.) 66 (1806) (2-2 decision in which Judges Tompkins and Thompson seem willing to depart from the English rule); Ludlow v. Bowne, 1 Johns. (N.Y.) 1 (1806); Jackson ex dem. Van Denberg v. Bradt, 2 Cai. R. (N.Y.) 169 (1804); Kane v. Ingraham, 2 Johns. Cas. (N.Y.) 403 (1801); White v. M'Neily, 1 Bay (S.C.) 11 (1784). See also the hotly contested group of New York cases involving validity of English prize-court decisions, in which English rules were dealt with in cavalier fashion if not dispensed with. Rhinelander v. Juhel, 2 Johns. Cas. (N.Y.) 487 (1802); Laing v. United Ins. Co., 2 Johns. Cas. (N.Y.) 487 (1802); Johnston v. Ludlow, 2 Johns. Cas. (N.Y.) 481 (1802); Goix v. Low, 2 Johns. Cas. (N.Y.) 480 (1802); Vandenheuvel v. United Ins. Co., 2 Johns. Cas. (N.Y.) 451 (1802).

121. Jackson ex dem. Trowbridge v. Dunsbaugh, 1 Johns. Cas. (N.Y.) 91 (1799); Warnock v. Wightman, 1 Brev. (S.C.) 331, 354, 367-68 (1804); Munro v. Holmes, 1 Brev. (S.C.) 319 (1804); Murrell v. Mathews, 2 Bay (S.C.) 397 (1802). Warnock and Murrell hold that, because the Statute De Donis had never been adopted in South Carolina, a limitation to "A and the heirs of his body" created the ancient conditional fee instead of a fee tail. Particularly in Warnock the court displays considerable knowledge of common-law development in reaching its historically defensible result.

122. Bayard v. Malcolm, 2 Johns. (N.Y.) 550 (1807); Douglass v. Wight, 2 Brev. (S.C.) 218, 219 (1807); Bevin v. Linguard, 1 Brev. (S.C.) 503 (1805); Hane v. Goodwyn, 2 Bay (S.C.) 521 (1804); Perkins v. McIntosh, 1 Brev. (S.C.) 18, 22 (1797).

Compendium_Cornell
Page 1766

force, such as nisi prius ones or cases thought to have been unreliably reported.[123]  Of course, British cases handed down after 1776 were not considered binding, though they might be persuasive, much as a sister state's decision would be today.[124]  On questions on which the English authorities were in conflict or where none was in point, the state courts had to devise their own rules, drawing upon their own sense of reasonableness and perhaps having recourse to civil-law analogies.[125]

Once a state court, by a prior decision, had established a rule on a given issue, that rule was treated with great reverence thereafter.  The decisions contain some categorical assertions that prior cases had to be followed, even if they were shown to conflict with settled English rules.[126]  In other words, by 1800, New York, Pennsylvania, and South Carolina understood a thoroughgoing doctrine of stare decisis, at least as strong as that applied today, contrary to what had been thought by some contemporary writers.[127]

Legal historians have exhibited interest in the treatment of English precedents in maritime matters.  Did the early state courts show a preference for Continental authorities?  When there were English maritime cases in point, the judges seemed to feel as bound to follow them as to follow English cases in other areas, though Continental writers might be cited also.[128]  If English cases were lacking or were conflicting, then civil-law commentators were quite persuasive.[129]

---

123. Hartness v. Thompson, 5 Johns. (N.Y.) 160, 161 (1809); Walden v. Le Roy, 2 Cai. R. (N.Y.) 263, 264 (1805); Jackson *ex dem.* Lewis v. Larroway, 2 Johns. Cas. (N.Y.) 114, 115 (1800).

124. Upton v. Vail, 6 Johns. (N.Y.) 181 (1810); Penny v. New York Ins. Co., 3 Cai. R. (N.Y.) 155, 159 (1805) (dictum); Vandenheuvel v. United Ins. Co., 2 Johns. Cas. (N.Y.) 127, 137, 147 (1801); Bogert v. Hildreth, 1 Cai. R. (N.Y.) 1, 3 (1803); Johnson v. Bloodgood, 1 Johns. Cas. (N.Y.) 51, 56 (1799).

125. Coit v. Houston, 3 Johns. Cas. (N.Y.) 243 (1802); Winton v. Saidler, 3 Johns. Cas. (N.Y.) 185, 190 (1802) (minority opinion by Judge Kent); Holmes v. Lansing, 1 Johns. Cas. (N.Y.) 248 (1800).

126. Colden v. Dopkin, 3 Cai. R. (N.Y.) 171, 172 (1805); Van Raugh v. Van Arsdaln, 3 Cai. R. (N.Y.) 154, 155 (1805); Champneys v. Johnson, 2 Brev. (S.C.) 268 (1809); Eveleigh v. Sylvester, 2 Brev. (S.C.) 178 (1807); Bevin v. Linguard, 1 Brev. (S.C.) 503 (1805); State v. Creight, 1 Brev. (S.C.) 169 (1802); Nelson v. Emerson, 1 Brev. (S.C.) 48 (1802).

127. E.g., *see* Kempin, *Precedent and Stare Decisis: The Critical Years, 1800 to 1850,* 3 Am. J. Legal Hist. 28 (1959).

128. United Ins. Co. v. Lenox, 1 Johns. Cas. (N.Y.) 377 (1800) (*semble*); Le Roy, Bayard & M'Evers v. Gouverneur, 1 Johns. Cas. (N.Y.) 226, 227 (1800); Seton, Maitland & Co. v. Low, 1 Johns. Cas. (N.Y.) 1 (1799); Forbes v. Rice, 2 Brev. (S.C.) 363, 368 (1810); Sasportas v. Jennings, 1 Bay (S.C.) 470 (1795).

129. Morgan v. Insurance Co. of North America, 4 Pa. (4 Dall.) 455, 458 (1806);

Compendium_Cornell
Page 1767

During the eighteenth century there was a maturation of colonial legal systems. With much unevenness from colony to colony, the bench and bar became better trained and better regulated. English-educated lawyers probably exerted appreciable influence in the middle and southern colonies, particularly South Carolina and Virginia, but elsewhere their numbers and impact must have been small. It seems that adequate common-law books were present in at least some of the colonies, though doubtless in scattered libraries. Certainly it can be said that in the fairly typical colonies of New York, Pennsylvania, and South Carolina, the common law was knowable and for the most part followed by the time of the Revolution. The reception process had been very much an indigenous affair, for the English home government had acted only haltingly to impose adoption of the common law.

In the beginning we used the simile of a temporal bridge, suspended between a pillar set in 1607 and another in 1776. At the 1607 end there was no common law in the colonies. In 1776? The post-Revolutionary evidence makes it nigh conclusive that Chief Justice Daniel Horsmanden spoke not only for New York but of colonial America when he said in 1765 that the courts applied the common law "in the main." [130] The ends of the bridge are secure, even if the floor has some missing planks.

---

M'Bride v. Marine Ins. Co., 5 Johns. (N.Y.) 299, 307 (1810); Mumford v. Commercial Ins. Co., 5 Johns. (N.Y.) 262, 267 (1810); Watson v. Duykinck, 3 Johns. (N.Y.) 335, 339 (1808); Griswold v. New York Ins. Co., 3 Johns. (N.Y.) 321, 325 (1808); Scott v. Libby, 2 Johns. (N.Y.) 336, 340 (1807); Schmidt v. United Ins. Co., 1 Johns. (N.Y.) 249, 265 (1806); Walden v. Le Roy, 2 Cai. R. (N.Y.) 263, 265 (1805); Leavenworth v. Delafield, 1 Cai. R. (N.Y.) 573, 575 (1804); Arnold v. United Ins. Co., 1 Johns. Cas. (N.Y.) 363 (1800).

130. WARREN, HISTORY OF THE AMERICAN BAR 91 (1912).

Clinical Review & Education

JAMA Internal Medicine | Special Communication | **FIREARM VIOLENCE**

# Testing the Immunity of the Firearm Industry to Tort Litigation

David M. Studdert, LLB, ScD; John J. Donohue, JD, PhD; Michelle M. Mello, JD, PhD

In the absence of congressional action to reinstate the federal ban on assault weapons, tort litigation offers an alternative strategy for regulating what have become the weapons of choice in mass shootings. However, opportunities to bring successful claims are limited. To prevail, plaintiffs must show that their suit fits within exceptions to the broad immunity from tort actions that Congress gave the firearm industry in the 2005 Protection of Lawful Commerce in Arms Act. In one particularly high-profile lawsuit, families of victims of the school shooting in Newtown, Connecticut, in 2012 sued the makers and sellers of the military-style rifle used in the attack, alleging negligence and deceptive marketing. The trial court dismissed the case on October 14, 2016, but the plaintiffs plan to appeal. We review the history of tort litigation against the firearm industry, outline the Newtown families' claims, and describe the decision.

*JAMA Intern Med.* doi:10.1001/jamainternmed.2016.7043
Published online November 14, 2016.

+ Author Audio Interview

**Author Affiliations:** Stanford Law School, Stanford, California (Studdert, Donohue, Mello); Stanford University School of Medicine, Stanford, California (Studdert, Mello).

**Corresponding Author:** Michelle M. Mello, JD, PhD, MPhil, Stanford Law School & Stanford University School of Medicine, 559 Nathan Abbott Way, Stanford, CA 94305 (mmello@law.stanford.edu).

On a Friday morning in December 2012, Adam Lanza entered Sandy Hook Elementary School in Newtown, Connecticut, and fired 156 bullets in less than 5 minutes, killing 20 children and 6 adults. All but 2 of the shots came from a Bushmaster XM-15 rifle (Bushmaster Firearms International), a civilian version of a combat weapon used by modern armies. Lanza carried more than 400 rounds of ammunition, many housed in 30-round magazines that were emptied quickly and replaced.

Assault weapons, like the XM-15, and high-capacity magazines have become the mass killer's armaments of choice; they have been used in most mass shootings over the past 3 decades.[1] The term *assault weapon* is contested. Although firearm merchants originally coined the label to promote sales,[2] gun rights advocates now spurn it and prefer less-aggressive names, such as *tactical rifle* or *modern sporting rifle*. The term refers generally to semiautomatic rifles that incorporate military-style features, such as pistol grips, folding stocks, and high-capacity detachable magazines. A federal ban on sales of assault weapons and high-capacity magazines expired in 2004, although 7 states and the District of Columbia have enacted their own bans.[3]

Gun control advocates decry the availability of assault weapons. Calls to renew the federal ban rank alongside universal background checks as their top priority for reform. Gun rights advocates counter that weapons like the one Lanza used are valuable in self-defense and deterring crime, popular among target shooters, and protected by the Second Amendment[4] (although to date the constitutional argument has largely been rejected by federal appellate courts).[5,6]

Tort litigation offers a potential alternative route for regulating assault weapons. With this goal in mind, parents of 9 children killed in Newtown and 1 survivor have sued the manufacturers and sellers of Lanza's XM-15 rifle for wrongful death and personal injury.[7] The case has attracted substantial media attention. The defendants tried unsuccessfully to have it removed to federal court from the state court (near Newtown) where it was filed. Then, in another pretrial legal maneuver, the defendants filed a motion asking the court to dismiss the case on the basis that the defendants were immune from suit. On October 14, 2016, the Superior Court of Connecticut issued a ruling granting this motion.[8]

We provide historical context for the case, describe the plaintiffs' claims, and explain the court's reasons for rejecting them.

## The Rise and Fall of Tort Litigation Against the Firearm Industry

Nearly all producers and sellers of consumer goods can be held liable for injuries arising from defects in product design and manufacture. But the mid-1980s saw the advent of a variety of new kinds of lawsuits over firearm injuries.[9,10] Retailers were sued for selling guns that were subsequently used in crimes. These claims were based on a form of tort liability called "negligent entrustment," which involves provision of an item to someone whom the provider knows (or should know) will be used in a manner that poses high risks of injury to others. Other claims targeted wholesalers and manufacturers, alleging that injuries arose from the failure to include feasible safety features, such as loaded chamber indicators or personalization technology. These claims differed from conventional product liability claims in that the plaintiffs' injury arose from a product that functioned just as it was intended to. Still other claims focused on allegedly negligent advertising and selling practices.

In the mid-1990s, local governments joined the fray. Emboldened by novel theories of liability being deployed in tobacco

**Copyright 2016 American Medical Association. All rights reserved.**

Downloaded From: http://jamanetwork.com/ by a STANFORD Univ Med Center User on 11/18/2016

Compendium_Cornell
Page 1769

litigation, cities and counties began suing to recover the costs of police and emergency services needed to address gun violence. By the end of the 1990s, the firearm industry faced lawsuits from many individual plaintiffs, dozens of municipalities, and the State of New York.[10]

Few of those lawsuits succeeded. A recurring stumbling block—particularly for claims relating to marketing practices or intervening criminal acts—was the tenuous link between the manufacturers' behavior and the plaintiffs' injury. Nonetheless, the onslaught roiled the firearm industry. For the gun control advocates who helped orchestrate many of the cases, such destabilization was a central goal.[10]

Under heavy lobbying pressure from the National Rifle Association, more than 30 states enacted laws limiting firearm manufacturers' exposure to tort litigation. In 2005, Congress doubled down and enacted the Protection of Lawful Commerce in Arms Act.[11]

## The Scope of Federal Immunity

The Protection of Lawful Commerce in Arms Act[11] gave firearm and ammunition manufacturers, dealers, and trade associations broad immunity from claims alleging harms due to the "criminal or unlawful misuse" of their products. The preamble to the act characterizes such claims as an "abuse of the legal system" and a threat to "a basic constitutional right." The protections covered both pending and future claims.

It was an extraordinary legislative move. When Congress gives an industry tort immunity it usually provides injury victims an alternative source of compensation, but not so here. The National Rifle Association has called the Protection of Lawful Commerce in Arms Act "the most significant piece of pro-gun legislation in 20 years."[12] Robert Morgenthau, who served as District Attorney of Manhattan for 35 years, has written that the "legislation encourages arms dealers to turn a blind eye to the lethal consequences of what they peddle, and rewards their breathtaking irresponsibility."[13]

Despite its broad reach, the immunity law contains 6 exceptions. The federal government may bring actions to enforce its gun control laws. Design and manufacturing defect claims are preserved in instances in which the gun was used as intended or in a reasonably foreseeable manner and not unlawfully. Also preserved are breach of contract and warranty claims, negligent entrustment claims, and suits against retailers who have been convicted under federal law of selling a gun knowing it will be used in a violent crime. In addition, no immunity exists when the defendant knowingly violated a state or federal statute "applicable to the sale or marketing" of firearms and ammunition and that violation proximately caused the plaintiff's harm.

In the act's first decade, the last exception—commonly called the "predicate exception"—has been its most litigated provision. A series of cases have tested what counts as an "applicable" statute. Two federal appellate courts have ruled that the statute the defendant violates must expressly regulate the sale or marketing of firearms or have a clear nexus to firearms,[14,15] but 2 decisions from state appellate courts[16,17] have allowed plaintiffs to invoke more general statutes.

## Soto et al v Bushmaster Firearms International

The Newtown families sued the manufacturer (Bushmaster), distributor, and retailer of Lanza's rifle, and the salesperson who sold it. In the legal complaint, the plaintiffs characterize the XM-15 as a weapon of war designed to inflict mass casualties that has no legitimate civilian use.[7] They point to aggressive marketing campaigns that emphasize the weapon's lethal features and are aimed at civilian buyers. The **Figure** shows several Bushmaster advertisements; the one shown in Figure, A is discussed in the complaint.

The lawsuit rests on 2 main legal claims, both framed to fit within the exceptions provided in the federal immunity statute. The first claim is negligent entrustment: the defendants knew or ought to have known that selling the XM-15 to civilians posed an unreasonable risk of harm to others. The second claim asserts that by "unethically, oppressively, immorally, and unscrupulously" marketing "the assaultive qualities and military uses" of the weapon to civilians, the defendants violated Connecticut's Unfair Trade Practices Act,[18] thereby extinguishing their immunity.

With respect to the negligent entrustment claim, the court in Connecticut in dismissing the case noted that under state law the provider of the dangerous object must know, or reasonably be expected to know based on the circumstances, that the recipient will use it in a manner involving unreasonable risk to himself or others. The plaintiffs faced an uphill battle on this point: the XM-15 that Adam Lanza used was sold lawfully, approximately 2 years earlier, to his mother. Hence, proving that the gun shop, much less the distributor or the manufacturer, should have foreseen its use in a mass killing was always going to be a stretch. Anticipating this, the plaintiffs tried to focus on the larger picture, emphasizing the weapon's extreme potential for lethality when circulating in the civilian population and the likelihood that it would eventually fall into the hands of a mass killer. But this was a step too far for the court. It was not prepared to label as negligent entrustment "the sale of a legal product to a population that is lawfully entitled to purchase such a product."[8] To extend the negligent entrustment doctrine in this way "would imply that the general public lacks the ordinary prudence necessary to handle an object the Congress regards as appropriate for sale to the public."[8]

The court went on to say that the plaintiffs also had not shown negligent entrustment as that term is defined in the PCLAA. After reviewing the Congressional debates that preceded enactment of the statute, the court found that only "direct entrustments to a shooter"[8] qualified as negligent entrustment, "regardless of what an entrustor knew or should have known."[8] In other words, unless Adam Lanza himself had been the purchaser there was no possibility of fitting within the PCLAA's exception for negligent entrustment claims.

To evaluate the plaintiffs' illegal marketing claim, the court had to address the same threshold question that has divided other courts—namely, whether violating a sales or marketing statute that is generally applicable to firearms is sufficient to trigger the predicate exception in the immunity statute, or whether the violation must be of a statute that specifically regulates firearms. The plaintiffs won this crucial point. Applying a test set down in an earlier appellate court decision,[14] the court held that even though the Connecticut consumer protection statute did not

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://jamanetwork.com/ by a STANFORD Univ Med Center User  on 11/18/2016

Testing the Immunity of the Firearm Industry to Tort Litigation

Figure. Advertisements for Bushmaster's Military-Style Rifles

A  Bushmaster product catalog, 2010

B  Bushmaster product catalog, 2014





C  Bushmaster 2010 advertisement



regulate firearms expressly, it was enough that the state's courts had enforced the statute in previous litigation involving the sale or marketing of firearms.

Although this key hurdle was cleared, the illegal marketing claim ran into another problem. The court pointed to prior Connecticut appellate court decisions[19,20] holding that in order to qualify to bring a claim under the consumer protection statute, a plaintiff must have "some business relationship with the defendant,"[8] such as consumer or competitor. Because there was no such relationship between the victims of the Newtown shooting and the defendants, the judge dismissed the illegal marketing claim. Although the statute itself makes no mention of a business relationship requirement, the trial court felt bound to follow the prior decisions rejecting claims by plaintiffs who lacked such relationships.

## Conclusions

The *Soto* decision is a major setback for the plaintiffs but does not necessarily spell the end of the case. The plaintiffs' lawyer has already vowed to appeal. The prospects for overturning the denial of the negligent entrustment claim seem dim; this was not the strongest part of the plaintiffs' case, and its rejection was carefully reasoned and resounding. The illegal marketing claim, on the other hand, foundered on a single point. The restriction the court imposed on eligible plaintiffs is not in the consumer protection statute itself; it has been read in by the Connecticut courts over time, and the Connecticut Supreme Court may be willing to revise it.

More generally, the court's holding that violation of a general statute such as a consumer protection law can satisfy the predicate exception will be welcomed by gun control advocates. In Connecticut, it suggests that a different plaintiff—for example, an assault weapon purchaser who accidentally harmed himself or others—may be successful. In other states with consumer protection statutes that don't require a business relationship, it suggests that mass shooting victims may yet find a path through PCLAA immunity. Thus, although the *Soto* decision is unwelcome news for the Newtown plaintiffs, it illuminates a potentially important chink in the legal armor that shields the firearm industry from tort liability.

### ARTICLE INFORMATION

**Accepted for Publication:** September 21, 2016.

**Published Online:** November 14, 2016.
doi:10.1001/jamainternmed.2016.7043

**Author Contributions:** Dr Studdert had full access to all the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

*Concept and design:* All authors.
*Acquisition, analysis, or interpretation of data:* Mello.
*Drafting of the manuscript:* Studdert.

*Critical revision of the manuscript for important intellectual content:* Donohue, Mello.
*Administrative, technical, or material support:* Studdert.
*No additional contributions:* All authors.

**Conflict of Interest Disclosures:** Dr Donohue has sat on a grant review panel for the "Fund for a Safer Future," a philanthropy that supports research into gun violence. No other disclosures are reported.

### REFERENCES

1. Follman M, Aronsen G, Lee J. More than half of mass shooters used assault weapons and high-capacity magazines. http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein. Accessed August 26, 2016.

2. Petersen P. *Buyers Guide to Assault Weapons*. Iola, WI: Gun Digest Books; 2008.

3. Law Center to Prevent Gun Violence. Assault weapons. http://smartgunlaws.org/gun-laws/policy-areas/classes-of-weapons/assault-weapons/. Accessed September 14, 2016.

4. National Rifle Association. "Assault weapons" and "large magazine." August 8, 2016, https://www

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://jamanetwork.com/ by a STANFORD Univ Med Center User on 11/18/2016

Compendium_Cornell
Page 1771

.nraila.org/issues/assault-weapons-and-semi
-automatic-firearms/. Accessed August 26, 2016.

**5**.  *Heller v District of Columbia*. 670 F3d 1244 (2011).

**6**.  *New York State Rifle and Pistol Association v Cuomo*. 804 F3d 242 (2nd Cir 2015).

**7**.  *Soto et al v Bushmaster Firearms et al*, FBT CV 15 6048103 Superior Court, Judicial District of Bridgeport, First amended complaint (October 29, 2015).

**8**.  *Soto et al v Bushmaster Firearms et al*, FBT-CV-15-6048103-S. Superior Court, Judicial District of Bridgeport (October 14, 2016).

**9**.  Vernick JS, Teret SP. New courtroom strategies regarding firearms: tort litigation against firearm manufacturers and constitutional challenges to gun laws. *Houst Law Rev*. 1999;36:1713-1753.

**10**.  Lytton TD, ed. *Suing the Gun Industry: A Battle at the Crossroads of Gun Control and Mass Torts*. Ann Arbor: University of Michigan Press; 2006.

**11**.  Protection of Lawful Commerce in Arms Act. 15 USC §§7901-7903 (2012).

**12**.  Harburger T, Wallsten P, Horwitz S. NRA-backed federal limits on gun lawsuits frustrate victims, their attorneys. *Washington Post*. January 31, 2013. https://www.washingtonpost.com/politics/nra-backed-federal-limits-on-gun-lawsuits-frustrate-victims-their-attorneys/2013/01/31/. Accessed September 14 2016.

**13**.  Morgenthau RM. Let shooting victims sue. *New York Times*. June 24, 2013. http://www.nytimes.com/2013/06/24/opinion/let-shooting-victims-sue.html?_r=0. Accessed September 14, 2016.

**14**.  *City of New York v Beretta USA Corp*, 542 F3d 384 (2nd Cir 2008).

**15**.  *Ileto v Glock Inc*, 565 F3d 1126 (9th Cir 2009).

**16**.  *Smith & Wesson Corp v City of Gary*, 875 NE 422 (Ind App 2007).

**17**.  *Williams v Beemiller Inc*, 952 NYS 2d 333 (NY App Div 4th Department 2012 amended by 103 AD 3d 1191 NY App Div 4th Department 2013).

**18**.  Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a-q (2015).

**19**.  *Ventres v Goodspeed Airport LLC*, 881 A 2d 937 (Conn 2005).

**20**.  *Pinette v McLaughlin*, 901 A 2d 1269 (Conn App 2006).

Copyright 2016 American Medical Association. All rights reserved.

Downloaded From: http://jamanetwork.com/ by a STANFORD Univ Med Center User  on 11/18/2016

Compendium_Cornell
Page 1772

### SYMPOSIUM:
### THE 2ND AMENDMENT AT THE SUPREME COURT: "700 YEARS OF HISTORY" AND THE MODERN EFFECTS OF GUNS IN PUBLIC  Common Use, Lineage, and Lethality

June, 2022

**Reporter**
55 U.C. Davis L. Rev. 2495 *

**Length:** 8294 words

**Author:** Darrell A. H. Miller**   *& Jennifer Tucker***

+ Copyright © 2022 Darrell A. H. Miller & Jennifer Tucker.

  * Melvin G. Shimm Professor of Law, Duke University School of Law.

  ** Associate Professor of History, Wesleyan University. Thanks to Joseph Blocher and Jake Charles for discussing or reviewing previous versions of this essay. Thanks especially to Peter Rutland, who is working on a broader study on Trevor Dupuy, for bringing Dupuy's Theoretical Lethality Index to our attention.

## Text

**[\*2495]**

Political and legal debates over assault rifles, large-capacity magazines, and other lethal technology are characterized by increasing rancor and hostility. Lack of a common vocabulary to describe the topics of debate, much less facilitate a constructive dialogue, only aggravates this trend. For example, gun rights advocates often disparage the term "assault rifle" as reflecting a practical illiteracy about firearms or treat it as some kind of "hoplophobic" smear. [1] Regulators sometimes **[\*2496]** class weapons based on features that gun-rights advocates say are purely cosmetic, leading to charges that these regulations are grotesquely over-or under-inclusive. [2]

---

[1] Stephen P. Halbrook, *Banning America's Rifle: An Assault on the Second Amendment?*, 22 FEDERALIST SOC'Y REV. 152, 152 (2021) ("The term "assault weapon,' while usually applied to some kind of rifle, is actually a pejorative term without a definite meaning."). Gun violence prevention advocates respond that the term is an accurate reflection of gun manufacturers' own marketing materials, which emphasized "the military pedigree of its products." VIOLENCE POL'Y CTR., THE MILITARIZED MARKETING OF BUSHMASTER ASSAULT RIFLES 5 (2018), *https://vpc.org/wp-content/uploads/2018/04/Bushmaster2018.pdf* [*https://perma.cc/U8N8-G6E5*]. "Hoplophobia" is a neologism that roughly translates to "fear of weapons." For more on the idea of anti-gun animus, see Jacob D. Charles, *Second Amendment Animus*, *116 NW. U. L. REV. 1, 14-32 (2021)*.

[2] *See* Erica Goode, *Even Defining "Assault Rifles' Is Complicated*, N.Y. TIMES (Jan. 16, 2013), *https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html* [*https://perma.cc/A3M8-GDEW*]; *see also* Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, *40 CAMPBELL L. REV. 301, 303 (2018)* ("Critics of assault weapon bans complain that these laws irrationally draw distinctions among firearms based on cosmetic features ... ."). *But see* E. Gregory Wallace, *"Assault Weapon" Lethality*, *88 TENN. L. REV. 1, 14* & n.64 (2020) (arguing for functionality of certain features).

55 U.C. Davis L. Rev. 2495, *2496

The doctrine defining constitutionally protected arms is advancing without a clear sense of the object of Second Amendment protections. *District of Columbia v. Heller* - the first Supreme Court case to hold that the Second Amendment protects an individual right to keep firearms for personal purposes like self-defense - uses various terminology for arms in its opinion. At its most general, the Court states that the constitution protects weapons in "common use" for "lawful purposes," as distinct from "arms" that are "dangerous and unusual." [3]But it doesn't take long for those broad categories to become muddled. *Heller* says that handguns capable of concealment are protected, but that short-barreled shotguns (which are modified specifically to be carried in one hand and concealed) are "dangerous and unusual" weapons that may be prohibited. [4]It suggests that "M-16s and the like" may be banned; but also that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms" - which would include not only M-16s, but "weapons useful in warfare" such as rocket launchers, hand grenades, and more exotic and deadly weaponry. [5]Some lower court judges, those who eschew conventional tailoring and are receptive to a "text-history-and-tradition-only" approach to Second Amendment questions, have begun to suggest that weapons that are "lineal descendants" of Founding Era arms are protected by the Second **[*2497]** Amendment, [6]despite the fact that such familial metaphors more often obscure than illuminate historical relationships between technologies of different periods. [7]

Sorely missing from the current debate is a shared vocabulary for what the public policy and the constitutional doctrine is aiming to achieve. Terms like "common use," "dangerous and unusual," "lineal descendants" or "employed in civilized warfare" [8]cannot adequately discipline doctrine or debate without some common denominator for the task. This Article suggests that focusing on lethality is one way to converge on a shared metric for the discussion. [9]

The late Trevor N. Dupuy, a senior U.S. Army officer during World War II who later became a respected and prolific military historian, developed one such metric in the middle of the twentieth century - the Theoretical Lethality Index ("TLI"). In 1964, the United States Army contracted with Dupuy to analyze how the killing power of weapons had

---

[3] *District of Columbia v. Heller, 554 U.S. 570, 627 (2008)*. Elsewhere, the Court uses the phrase "dangerous *or* unusual." *Id. at 623* (emphasis added).

[4] *Id.*

[5] *See id. at 624*.

[6] *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J., 974 F.3d 237, 257 (3d Cir. 2020)* (Matey, J., dissenting) (stating that "I believe the proper interpretive approach is to reason by analogy from history and tradition" and citing the "lineal descendant" language from *Heller* oral argument (internal quotation marks omitted and citations omitted)); *Parker v. District of Columbia, 478 F.3d 370, 398 (D.C. Cir. 2007)* ("The modern handgun - and for that matter the rifle and long-barreled shotgun - is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era weapon ... .").

[7] *See* Joseph Blocher, *Bans*, *129 YALE L.J. 308, 363 (2019)* ("Is the modern AR-15 a 'lineal descendant' of the colonial-era musket? Guns have no progeny, so one cannot trace their lineage directly through some kind of family tree."); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, *56 UCLA L. REV. 1443, 1478 (2009)* (describing this analytical technique as "largely indeterminate").

[8] *Aymette v. State, 21 Tenn. 154, 158 (1840)*.

[9] *See* Jennifer Tucker, *Now That Guns Can Kill Hundreds in Minutes, Supreme Court Should Rethink the Rights Question*, CNN (Oct. 20, 2021, 7:31 AM EDT) *https://www.cnn.com/2021/10/20/opinions/supreme-court-gun-rights-case-lethality-tucker/index.html* [*https://perma.cc/8JMV-XR48*]. We are not the first to identify lethality as a potential metric. *See* Wallace, *supra* note 2, at 17 . We have a number of disagreements with Professor Wallace's assessment of lethality in his piece, as well his estimation of comparative lethality. For purposes of this Article, however, we differ in particular with his belief that lethality of a technology cannot be reduced to a single number - the TLI is proof of concept that it can - and his skepticism of the utility of such a metric within and between time periods.

55 U.C. Davis L. Rev. 2495, *2497

increased over time - he created the TLI to measure how many people a particular weapon could kill in one hour. [10]Dupuy **[*2498]** worked on this project for a non-partisan entity which had an interest in the accuracy and utility of his formula - the United States military. As such, Dupuy's Theoretical Lethality Index offers a useful metric for quantifying the lethality of firearms in historical terms. His index can provide at least a starting point to construct a common scale to assess the functionality of weapons both within and across various time periods.

Part I of this Article outlines the state of Second Amendment doctrine with respect to which and what type of arms are protected, and the confused language and goals of that doctrine. Part II provides a short biography of Dupuy and his development of the TLI. Part III demonstrates how Dupuy's TLI can help guide policy makers and judges as they engage with the right to keep and bear arms in a post- *Heller* world.

## I. LACK OF A COMMON METRIC FOR ARMS

In *District of Columbia v. Heller*, the Supreme Court held for the first time that individuals have a right to keep arms in their home for lawful purposes such as self-defense, without regard to participation in any organized military unit such as the National Guard. [11]Key to that case was how to define the word "arms" in the Second Amendment. [12]It is indisputable that a strict dictionary-definition of the word "arms" in 1791 is radically over-inclusive. Justice Antonin Scalia states in *Heller* that "the 18th-century meaning [of arms] is no different from the meaning today" and that "arms" simply means "weapons." [13]Indeed, he continues, it "borders on the frivolous to suggest that only those arms that existed in 1791 are protected now: "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." [14]But no one really believes that. Not even Justice Scalia believes that.

There are numerous modern weapons that "constitute bearable arms" that are categorically outside the Second Amendment's coverage - no matter what "bearable arms" literally means. Let's start with bearable arms of catastrophic lethality - vials of weaponized smallpox or VX nerve agent, for example. These are indubitably weapons; they also are **[*2499]** capable of being carried, but no one treats these weapons of mass destruction as raising any prima facie Second Amendment question. [15]Moving down the spectrum of lethality, *Heller* itself categorically excludes from Second Amendment coverage machine guns, "M-16 rifles and the like," and short-barreled shotguns, notwithstanding Justice Scalia's assertion that the Second Amendment extends prima facie to these types of weapons. [16]Lower courts have followed suit, excepting weapons like hand grenades from Second Amendment coverage, despite their falling within a literal class of "bearable arms." [17]

---

[10]HIST. EVALUATION & RSCH. ORG., FINAL REPORT ON HISTORICAL TRENDS RELATED TO WEAPON LETHALITY (1964), *https://apps.dtic.mil/sti/pdfs/AD0458760.pdf* [https://perma.cc/K48C-FKDD];      *see also* TREVOR N. DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE 92 (1980) [hereinafter EVOLUTION] (reprinting Theoretical Lethality Index table).

[11] *See District of Columbia v. Heller, 554 U.S. 570, 635 (2008)*.

[12] The Second Amendment states in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *U.S. CONST. amend. II*.

[13] *Heller, 554 U.S. at 581*.

[14] *Id. at 582*.

[15] *See Nordyke v. King, 644 F.3d 776, 797 n.6 (9th Cir. 2011)* (Gould, J., concurring in part) ("To me it is obvious that the Second Amendment does not protect the right to keep a nuclear weapon in one's basement, or a chemical or biological weapons in one's attic, or a tank in one's backyard."), *reh'g en banc, 681 F.3d 1041 (9th Cir. 2012)*.

[16] *See Heller, 554 U.S. at 572*.

[17] *See Hollis v. Lynch, 827 F.3d 436, 448 (5th Cir. 2016)* (acknowledging that hand grenades and machine guns are unprotected "dangerous and unusual weapons for the purposes of the Second Amendment").

55 U.C. Davis L. Rev. 2495, *2499

Instead of a radically over-inclusive textual definition of "weapons," Justice Scalia concedes the Second Amendment really doesn't protect all "bearable arms," but only those arms in "common use," and in particular, those weapons "typically possessed by law-abiding citizens for lawful purposes." [18]Handguns, according to the majority, are a popular form of self-defense technology, commonly owned by individuals for self-defense, and therefore are protected by the Second Amendment. But this common use test sets up a vicious circularity, one that Justice Stephen Breyer in his *Heller* dissent exposed. *Heller*'s common use test means that "if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress ... had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so." [19]It can't be, according to Justice Breyer, that the only permissible regulations are those regulations that currently exist. [20]

For a decade now, lower courts and scholars have struggled to break out of this circularity. Some try to identify a reference group from which to assess "common use." [21]At its most crude, this can reduce to comparing the inventory of a certain weapon to that of another **[*2500]** commercial product - like a pickup truck. [22]The presumption here is that a weapon as widely possessed as this other product must be in "common use." [23]Other, more sophisticated approaches attempt to identify a more relevant reference set. For example, scholars such as Michael O'Shea and Nelson Lund have suggested the measure for common use should be the weapons possessed by ordinary law enforcement. [24]Others have argued that civilians should be capable of owning even *more* firepower than the police. [25]Still others believe the reference group for common use should be some kind of military body, such as the National Guard, or at the most extreme, the standing army. [26]

---

[18] *District of Columbia v. Heller, 554 U.S. 570, 625 (2008).*

[19] *Id.* at 721 (Breyer, J., dissenting).

[20] *Id.*

[21] For a discussion of this effort, see Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis,* *83 TENN. L. REV. 231, 278-83 (2015).*

[22] *Kolbe v. Hogan, 813 F.3d 160, 174 (4th Cir. 2016)* ("We note that in 2012, the number of AR-and AK-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States."), *reh'g en banc, 849 F.3d 114 (4th Cir. 2017).*

[23] Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue:* Stenberg *Principles, Assault Weapons, and the Attitudinalist Critique, 60 HASTINGS L.J. 1285, 1293 (2009)* ("A gun might be common because it is widely owned ... .").

[24] Michael P. O'Shea, *The Right to Defensive Arms After* District of Columbia v. Heller, *111 W. VA. L. REV. 349, 392 (2009)*; *see also* Craig S. Lerner & Nelson Lund, Heller *and Nonlethal Weapons, 60 HASTINGS L.J. 1387, 1411 (2009)* (arguing for a rebuttable presumption "that civilians have a right to use weapons commonly used by the police").

[25] *Brief of Pink Pistols in Support of Plaintiff-Appellants at 16, Fyock v. City of Sunnyvale, 779 F.3d 991 (9th Cir. 2014)* (No. 14-15408)) ("If police need standard-issue magazines holding 15 to 17 rounds, a fortiori law-abiding citizens need the same firepower, if not more.").

[26] Andrew P. Napolitano, *The Right to Shoot Tyrants, Not Deer,* WASH. TIMES (Jan. 10, 2013), *http://www.washingtontimes.com/news/2013/jan/10/the-right-to-shoot-tyrants-not-deer* [*https://perma.cc/WW48-S9WP*] ("[The Second Amendment] protects the right to shoot tyrants, and it protects the right to shoot at them effectively, with the same instruments they would use upon us."). Part of the reason for this confusion is *Heller*'s unwillingness to expressly overrule *United States v. Miller.* In *Miller,* the Court held that short-barreled shotguns were not Second Amendment weapons because they were not suitable for military use. *United States v. Miller, 307 U.S. 174, 178 (1939).* However, in *Heller* the Court held that military application of a weapon was not required, and indeed, if a weapon was suitable only for military use that's a reason why it is *not* protected. *District of Columbia v. Heller, 554 U.S. 570, 589, 624-25 (2008).*

55 U.C. Davis L. Rev. 2495, *2500

A recent development in Second Amendment doctrine is to analogize modern weapons to historical ones. This move first appeared in the District of Columbia Circuit Court opinion that eventually became *Heller*. In that case, *Parker v. District of Columbia*, the court suggested that "the modern handgun - and for that matter the rifle and long-barreled shotgun - is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era **[*2501]** weapon." [27]Chief Justice John Roberts echoed this "lineal descendant" line during *Heller* oral argument when he speculated: "We are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well." [28]Some lower courts and advocates have picked up on this strain of reasoning. Occasionally, this search for "lineal descendants" of modern weapons can become arcane. For example, in 1718, an Englishman named James Puckle patented a multi-round "Puckle gun." The weapon was never widely produced and contemporaries ridiculed it for its impracticality. [29]Nevertheless, some argue that today's 100 round magazines must be constitutionally protected, because someone patented this curio in England in the eighteenth century. [30]

None of these attempts to break out of *Heller*'s definitional morass is satisfactory, and that's partially because these tests tend to focus on epiphenomenal rather than functional factors. Searching for answers in analogs from automotive sales or eighteenth-century patent applications fails to consider what rule of relevance makes the analogy analytically sound. [31]What makes weapons relevantly similar is their lethality. [32]Comparing the sales of AR-15s to pickup trucks or asking what features of an AR-15 resemble those of a Founding era flintlock is far less useful for assessing utility or dangerousness than focusing on how lethal an AR-15 is compared to some other kind of weapon. Lethality may not resolve all the definitional problems of what an "arm" **[*2502]** is under the Second Amendment, [33]but it has the advantage of being relevant, functional, and unitary. [34]

II. TREVOR DUPUY AND THE THEORETICAL LETHALITY INDEX

---

[27] *Parker v. District of Columbia, 478 F.3d 370, 398 (D.C. Cir. 2007)*.

[28] Transcript of Oral Argument at 77, *District of Columbia v. Heller, 554 U.S. 570 (2008)* (No. 07-290).

[29] David B. Kopel, Clayton E. Cramer & Scott G. Hattrup, *A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts*, *68 TEMP. L. REV. 1177, 1195 (1995)*. Other arcana common in briefing has to do with a multi round weapon taken by Meriwether Lewis and William Clark on the Corps of Discovery. *See* Halbrook , *supra* note 1, at 165 .

[30] *Duncan v. Becerra, 970 F.3d 1133, 1147 (9th Cir. 2020)* ("Semi-automatic and multi-shot firearms were not novel or unforeseen inventions to the Founders, as the first firearm that could fire more than ten rounds without reloading was invented around 1580. Rapid fire guns, like the famous Puckle Gun, were patented as early as 1718 in London."), *reh'g en banc granted*, *opinion vacated*, *988 F.3d 1209 (9th Cir. 2021)*, *reh'g en banc sub nom*. Duncan v. Bonta, No. 19-55376, 2021 WL 5577267 (9th Cir. Nov. 30, 2021).

[31] *See* Cass R. Sunstein, *Analogical Reasoning* 10 (Harvard Pub. L., Working Paper No. 21-39, 2021), *https://ssrn.com/abstract=3938546* [*https://perma.cc/C9V8-FYHY*] ("For analogical reasoning to operate properly, we have to know that cases A and B are "relevantly" similar, and that there are not "relevant' differences between them.").

[32] DUPUY, EVOLUTION, *supra* note 10, at 286.

[33] A more rational test for a protected weapon would be not whether the weapon is in "common use" but whether the weapon is "unreasonably dangerous" - that is, whether its utility for something like self-defense is outweighed by its risks on other margins. The notion of "dangerous and unusual" seems to contemplate such a cost-benefit analysis. Joseph Blocher & Darrell A. H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, *53 HARV. J. ON LEGIS. 279, 297 (2016)*.

[34] In this sense, our argument takes issue with a lower court judge who has suggested that "nothing in the Second Amendment makes lethality a factor to consider because a gun's lethality, or dangerousness, is assumed." *Duncan v. Becerra, 366 F. Supp. 3d 1131, 1145-46 (S.D. Cal. 2019)*, *aff'd*, *970 F.3d 1133 (9th Cir. 2020)*, *reh'g en banc granted, opinion vacated*, *988 F.3d 1209 (9th Cir. 2021)*, *reh'g en banc sub nom. Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021)*, *rev'd and remanded sub nom. Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021)*. This is patently false, as the increased lethality of any arm (such as a hand grenade or landmine) is *certainly* relevant to whether it may be prohibited.

55 U.C. Davis L. Rev. 2495, *2502

*A. Brief Biography of Dupuy*

In the middle of the twentieth century, a retired colonel named Trevor Nevitt Dupuy developed a metric to measure a weapon's lethality. Dupuy was one of the most respected and prolific American military thinkers of the last century. [35]Combat during World War II gave him a practical bent, which, combined with his analytical approach to military history provided a new outlook on the study of weapons and warfare. He developed sophisticated combat models that drew on his extensive archival research as well as his personal experience as a World War II commander. [36]His derivation of a theory of combat and **[*2503]** philosophy of war from these materials was unusual and widely praised inside the military. By the time of his death, he had published scores of books and articles in military and professional journals across the globe. [37]

Dupuy was born in New York, the son of Richard Ernest Dupuy, who was himself a military historian and veteran. After graduating from the U.S. Military Academy at West Point in 1938, the younger Dupuy fought in Burma during the war and by age twenty-seven had been promoted to lieutenant colonel. [38]He commanded artillery units across several military theaters for the United States, the United Kingdom, and the Chinese military, [39]and received honors for service and valor from all three governments. [40]

Following the war, after a stint working for the military in Europe and Washington, Dupuy began his academic career, first at Harvard and then at the Ohio State University. His writing began in earnest while teaching at Harvard. Seeing no text on military science that he could use to teach his students, he approached the elder Dupuy to assist in writing a textbook. What began as a mimeographed set of class materials [41]eventually turned into a two-volume publication, *Military Heritage of America*, one of many projects father and son would complete together. [42]

Dupuy focused on understanding the complexities of modern warfare through the review of massive amounts of historical data. [43]Roughly contemporaneously, major military institutions began to invest heavily in a discipline

---

[35] Robert Mcg. Thomas, Jr., *Trevor N. Dupuy, 79, Prolific Military Historian*, N.Y. TIMES, June 9, 1995, at B11, https://www.nytimes.com/1995/06/09/obituaries/trevor-n-dupuy-79-prolific-military-historian.html [https://perma.cc/DAE6-93J9]; Jack Walker, *Trevor N. Dupuy Dead at 79*, DUPUY INST., http://www.dupuyinstitute.org/tndupuy.htm (last visited Feb. 10, 2022) [https://perma.cc/YNF7-R4N5]. On Dupuy's contributions to military history, see CHRISTOPHER A. LAWRENCE, WAR BY NUMBERS: UNDERSTANDING CONVENTIONAL COMBAT, at ix-17 (2017).

[36] See Rich, *supra* note 35; Thomas, *supra* note 35, at B11. Dupuy regarded his chief contribution as integrating military theory with historical experience. *See* LAWRENCE, *supra* note 35, at ix-xii. *See generally* T.N. DUPUY, NUMBERS, PREDICTIONS AND WAR: USING HISTORY TO EVALUATE COMBAT FACTORS AND PREDICT THE OUTCOME OF BATTLES (1979) [hereinafter Numbers] (exemplifying Dupuy's commitment to integrating military theory and history); T.N. DUPUY, UNDERSTANDING WAR: HISTORY AND THEORY OF COMBAT (1987) [hereinafter Understanding] (same).

[37] Walker, *supra* note 35, at 33.

[38] Thomas, *supra* note 35, at B11.

[39] Rich, *supra* note 35.

[40] *Id.*

[41] Rich, *supra* note 35. On Dupuy's contributions to military history, see LAWRENCE, *supra* note 35, at ix-17.

[42] Rich, *supra* note 35. *See* DUPUY, UNDERSTANDING, *supra* note 36, at X; *see also* DUPUY, NUMBERS, *supra* note 36, at xv; LAWRENCE, *supra* note 35, at ix-xii.

[43] LAWRENCE, *supra* note 35, at x. For more information about the research on tactical weapons in the 1950s and 1960s, see, for example, James Fallows, *M-16: A Bureaucratic Horror Story Why the Rifles Jammed*, ATLANTIC (June 1981), https://www.theatlantic.com/magazine/archive/1981/06/m-16-a-bureaucratic-horror-story/545153 [https://perma.cc/QHN5-LE7E].

called "operations research" that sought to bring quantitative tools to bear on military strategy. Analytical centers and think tanks, [44]like RAND (for "research and development"), as well as other "civilian defense planners" became an "integral part" of United **[*2504]** States security planning at this time. [45]However, "even after 3,300 years of recorded military history" reliable data was hard to come by. [46]This lack of hard data led Dupuy to reach for new techniques on which to base operational analysis and combat modeling. His research attempted to link combat modelers who needed reliable data on combat operations with the existing information present in the unit records of actual historical engagements. [47]

Intense, professional, and tenacious, Dupuy believed that the study of historical combat could and should be used to prepare for future conflicts. [48]In more than two dozen works, he analyzed the patterns of warfare from ancient times to the present. He summarized his historical approach in his book, *The Evolution of Weapons and Warfare*. [49]While Dupuy was a great believer in quantifying the dynamics of warfare, he thought that the data should be drawn from the history of past wars. [50]He was skeptical about the value of war-gaming and simulation exercises divorced from what Carl von Clausewitz described as the "fog" and "friction" of war. [51]

From 1960 to 1962, Dupuy worked for the Institute of Defense Analysis, where he was frequently consulted for advice and expertise. For the next thirty years, he published books and gave lectures to military audiences about the role of technology in war. He documented a historical cycle for weapons technology: stagnant for long periods, followed by bursts of intense change. He understood that it could take decades - even centuries - for new technologies to be incorporated into the tactics and organizational structure of armies. [52]His research documented technological change (from the stirrup to the gun) - and showed that the pace of that change accelerated exponentially with the nineteenth-century industrial revolution and then again with the intense state-led innovations of the two world wars. [53]

In part to study these technological and military dynamics, in 1962 Dupuy formed the Historical Evaluation and Research Organization **[*2505]** (HERO) and would serve as its President and Executive Director for the next two decades. At HERO, he conducted many studies for the U.S. Army, for which he accumulated detailed, recorded data from actual battlefield experience. As he often remarked, military history was the true "laboratory of the soldier." [54]

---

[44] *See* CHARLES R. SHRADER, HISTORY OF OPERATIONS RESEARCH IN THE U.S. ARMY VOLUME 1: 1942-1962, at iii (2006).

[45] LAWRENCE, *supra* note 35, at ix.

[46] *Id.*

[47] LAWRENCE, *supra* note 35, at ix; DUPUY, EVOLUTION, *supra* note 10, at vii.

[48] Rich, *supra* note 35; Walker, *supra* note 35, at 33.

[49] DUPUY, EVOLUTION, *supra* note 10, at vii.

[50] *Id.*

[51] 1 CARL VON CLAUSEWITZ, ON WAR 39-40, 106 (J.J. Graham trans. 1873) On the Pentagon's reliance on wargaming, see JOHN PRADOS, PENTAGON GAMES: WARGAMING AND THE AMERICAN MILITARY 4 (1987).

[52] DUPUY, EVOLUTION, *supra* note 10, at 300-05; *see also* LAWRENCE, *supra* note 35, at 6-7.

[53] DUPUY, EVOLUTION, *supra* note 10, at 287-94.

[54] Shawn Woodford, " *Human Factors in Warfare: Fear in a Lethal Environment*," THE DUPUY INST.: MYSTICS & STATISTICS BLOG (Nov. 2, 2018), *https://urldefense.com/v3__http://www.dupuyinstitute.org/blog/2018/11/02/human-factors-in-warfare-fear-*

55 U.C. Davis L. Rev. 2495, *2505

In the process Dupuy developed an analytic procedure for comparing, quantitatively, the lethality of individual weapons (the Theoretical Lethality Index), described below. [55]He also continued his work as an author, lecturer, and military analyst until the end of his life. American diplomats and military leaders consulted with him during the first Gulf War, and he testified before Congress several times. He kept up a steady media schedule, appearing on over thirty television and radio programs, including spots on all of the major networks, C-Span, and CNN. [56]

Dupuy died at the age of seventy-nine on June 5, 1995, of a self-inflicted gunshot wound, three weeks after being diagnosed with terminal pancreatic cancer. [57]At the time of his death he was considered "one of the world's leading military historians." [58]He left behind several unfinished projects, including his own autobiography, which he planned to call "A Footnote to History." [59]

The metrics on lethality that Dupuy pioneered are still being used in policy papers and military history projects as well as in analysis of modern military operations and combat. [60]Dupuy's work showed that even military planners - whose profession is the study of weapons - have repeatedly struggled to fully understand the impact of new, improved weaponry on combat and society. Despite his prominence as a military commander and military historian, little has been written **[*2506]** about him, leaving a gap in our historical understanding of this important figure.

*B. The Theoretical Lethality Index*

A significant and underappreciated contribution of Dupuy is his creation of a single metric, the Theoretical Lethality Index ("TLI") that provides apples-to-apples comparisons of the lethality of weaponry across time. As he wrote in his *Evolution of Weapons and Warfare*, "All weapons have at least one common characteristic: lethality - the ability to injure and if possible to kill people." [61]The TLI reduced to a single value how many persons a particular weapon could theoretically kill in one hour, considering a spectrum of different technological factors, including range, rate of fire, accuracy, reliability, mobility, "radius of action" and vulnerability. [62]

Dupuy constructed the TLI by exhaustively examining the historical record of real battles across time, where the lethal capacity of the weapon was one among a host of other factors, including weather, terrain, and the defensive and offensive capabilities of opposing forces. His TLI represented an attempt to isolate, in one number, the lethality of technology alone, based primarily on the characteristics of that technology. Hence, the TLI number is not influenced by a military or civilian context; it does not take into account factors like combat tactics, how dispersed or bunched the targets may be or what defensive positions they occupy. Nor does it account for the social or

---

*in-a-lethal-environment/__;!!OToaGQ!-mUYY72ZfkYxHD9d0dFNBpg31R_LGM5aZ8X6i7U0SGha2GUuyOLcaw_FlFfJmj7Hk2yg$* [*https://perma.cc/Z7YJ-2K6L*] (quoting Dupuy).

55 HIST. EVALUATION & RSCH. ORG., *supra* note 10.

56 Rich, *supra* note 35.

57 Walker, *supra* note 35, at 79.

58 Rich, *supra* note 35.

59 *Id.*; *see also* Thomas, *supra* note 35, at B11.

60 *See, e.g.*, N.K. JAISWAL, MILITARY OPERATIONS RESEARCH: QUANTITATIVE DECISION MAKING 317-18 (1997); CARL MOSK, NATIONALISM AND ECONOMIC DEVELOPMENT IN MODERN EURASIA 91 (2013); James J. Schneider, *The Theory of the Empty Battlefield*, 132 J. ROYAL UNITED SERV. INST. 37, 37 (1987). The most recent validations of combat models are described in Volume I, Nos 4, 5, and 6 and Volume III, Nos 1 and 2 of The Dupuy Institute's International Tactical, Numerical, Deterministic Model ("TNDM") Newsletter. *International TNDM Newsletter*, TDI: PUBLICATIONS (last visited Feb. 21, 2022) *http://www.dupuyinstitute.org/tdipub4.htm* [*https://perma.cc/36PD-Z4NW*].

61 DUPUY, EVOLUTION, *supra* note 10, at 286.

62 *Id.* at 92, 309-10.

psychological state of the individual using the weapon. [63]The TLI is solely about the lethality of the weapon as a technology designed to kill.

In contrast to those who analyzed warfare with abstract calculations based on combat modelling and wargaming, Dupuy based his analysis on scrupulous investigation of actual historical military engagements. As he put it, "The history of warfare is a review of the manner in which groups of men have ... [used] their weapons more effectively than the opponents, or in other words, by realizing, or at least approaching, the ultimate degree of lethality of their weapons." [64]He explained: "Lethality **[\*2507]** is necessarily a comparative thing." [65]A sword wielded by a trained combatant is lethal, "but its comparative lethality is limited by the factors of time, range, and the physical limitations of the man who wields it." [66]Dupuy recognized that "by assigning values to these factors it is feasible to compare the lethality of the sword with the lethality of the hydrogen bomb, or the tank, or whatever other weapon one pleases." [67]

Dupuy divided world history into three primary eras of weapons technology. The "Age of Muscle" (c. 350 BC to 13th century) was the era of the short sword and longbow. The "Age of Gunpowder" (14th century to middle of the 19th century) introduced the bayonet, the flintlock and the first cannons. But it was the "Age of Technological Change" (middle of 19th century to middle of 20th century), he thought, that ushered in major advances in weaponry. "The weapons of this period constitute a quantum jump in lethality over their predecessors of the age of gunpowder." [68]This era saw the development of the conoidal rifle bullet (Minie ball) (1841); the breech-loading rifle (c. 1848); the Maxim machine gun (1883); the bolt-operated magazine rifle (1895); the tank (1916); the fighter-bomber (1917); the ballistic missile (1944); and the atomic bomb (1945). [69]Dupuy identified one of the most profound changes in combat occurred between 1850 and 1860, when firearms became both more common and more deadly. [70]

Under contract with the U.S. Army, Dupuy and HERO analyzed the relationship between weapons and military doctrine from the fourth century BC to the end of the Korean War. [71]The four-volume report that he and his team produced included the TLI as a unitary metric for lethality.

The report demonstrated that the TLI of weapons increased exponentially in the past 200 years. While an eighteenth century soldier with a flintlock musket could kill 43 people an hour, a soldier in the Civil War era using the Minie ball could kill 102 people per hour: a **[\*2508]** more than twofold increase. [72]Breech-loading rifles, metal cartridges, and magazines boosted the TLI of infantry rifles even higher, to 495 by the end of the nineteenth

---

[63] To account for these other factors, along with the TLI, Dupuy calculated an Operational Lethality Index ("OLI"). *Id.* at 309-10. A fruitful research question would be to construct a civilian version of the OLI with respect to different weapons. But that project is outside the scope of this paper.

[64] *Id.* at 286.

[65] *Id.* at 286.

[66] *Id.* at 286.

[67] *Id.* at 286.

[68] *Id.* at 292.

[69] *See id.* at 292-94. In the age of technological change, there were many other ancillary developments, including: the percussion cap, electronic communication, barbed wire (first adapted to military purposes in 1874), smokeless powder (1885), recoil mechanism, quick-firing artillery (1890-1910); radar (1938), and earth satellites in space. *See id.* at 296-98.

[70] DUPUY, NUMBERS *supra* note 36, at 6.

[71] The process of introduction and assimilation of these new weapons is described in a report that he produced, consisting of four volumes (342 pages).

[72] *See* DUPUY, EVOLUTION, *supra* note 10, at 92.

century: a ten-fold increase over the flintlock musket. The introduction of automatic fire machine guns at the end of the nineteenth century again vastly increased the kill rate. The TLI of a World War I machine gun was 3,463, and that of World War II, 4,973. [73]

### Dupuy's Theoretical Lethality Index [74]

| Weapon | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |
| 16th century 12-pdr cannon | 43 |
| 17th century 12-pdr cannon | 224 |
| Gribeauval 18th century 12-pdr cannon | 940 |
| World War I tank | 6,926 |
| World War II medium tank | 575,000 |
| One-megaton nuclear airburst | 695,385,000 |

Dupuy was convinced that there was a "relatively small" number of major advances in weapons throughout history. He defined a "major advance" as a "new development that changes the nature of warfare." [75] A major advance was "a revolutionary" change, which might be followed by "a series of evolutionary changes." [76] One such **[*2509]** "revolutionary weapon" was the Maxim recoil-operated, belt-fed machine gun which later became the model for other machine guns. [77] He constructed the TLI using a standard formula. As he pointed out, "Obviously the weapons that kill more people in shorter periods of time have greater lethality." The TLI showed that "there have been few major advances in weapons lethality through the ages, and most of them have occurred since about 1850." [78]

### III. LETHALITY AS A COMMON METRIC FOR ARMS

Currently, the analysis to determine whether any given "arm" is constitutionally protected fails to display much analytical rigor. The very features of large-capacity magazines that one judge thinks are essential for self-defense [79] are the very same features other judges consider unreasonably dangerous. [80] Trying to avoid the impasse by

---

[73] Situating the modern AR-15 (a successor to the German StG 44, the first "assault rifle," that was used in World War 2) anywhere near the Maxim machine gun makes it exponentially more lethal than the flintlock musket of the Founder's era. The term "AR-15" is now most-commonly used to refer only to the civilian variants of the rifle which lack the fully automatic function. There are a variety of ways to convert an AR-15 to a fully automatic weapon, as explained by Mike Searson, *Turning Your AR-15 into an M-16*, RECOIL (June 5, 2019), *https://www.recoilweb.com/turning-your-ar-15-into-an-m-16-150631.html* [*https://perma.cc/XGT9-4WBZ*].

[74] This table is constructed from Dupuy's data. DUPUY, EVOLUTION, *supra* note 10, at 92.

[75] *Id.* at 287.

[76] *Id.*

[77] *Id.* at 287-90.

[78] *Id.* at 287.

55 U.C. Davis L. Rev. 2495, *2509

searching for "lineal descendants" of muskets in the Sig Sauer catalog, or by comparing the sales of rifles to pickup trucks [81] threaten to make Second Amendment analysis even more unmoored from anything rational or functional.

At the very least, the TLI offers proof of concept that one can construct a single metric for lethality that may provide a basis for systematic comparisons of arms within and between time periods. [82] Moreover, to the extent any question about gun rights and regulation turns partially or wholly on historical analogs, [83] the TLI supplies vital historical context using a common denominator.

First, the TLI shows that weapons have increased sharply in lethality from the mid-nineteenth century to the present day. Speaking of the period between the 1850s and 1860s, Dupuy described weapon advancement over prior ages during this time as a "quantum jump in **[*2510]** lethality." [84] Another period of steady acceleration in lethality followed in the early to mid-twentieth century. Using apples-to-apples comparisons, based on this index, one can see that in 1903 it would only take two people with five-round Springfield rifles to kill as many as an eighteenth-century cannon. [85] By World War II it would require a battery of *five* eighteenth century cannon to be as lethal as a single machine gun. [86]

Contrary to the implausible proposition that "nothing in the Second Amendment makes lethality a factor" in Second Amendment analysis, [87] it is apparent that the people's representatives have considered lethality a relevant factor in the costs versus benefits of weapon technology from the beginning. [88] To the extent judges follow Justice Scalia's proposition that "traditional restrictions go to show the scope of the [Second Amendment] right," [89] the TLI can help courts ask the right questions. It is fruitless to ask counter-factuals like: "How would the founding generation have regulated widespread private ownership of AR-15s?" That's akin to basing a First Amendment decision about home

---

[79] *See* Kolbe v. Hogan, 849 F.3d 114, 162 (4th Cir. 2017) (Traxler, J., dissenting) (indicating that untrained civilians need more rounds because they are likely to miss the target).

[80] *See* id. at 127 ("When inadequately trained civilians fire weapons equipped with large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more bystanders.").

[81] *See* id. at 153.

[82] *But see* Wallace, *supra* note 2, at 16-17 (arguing that lethality as a stable metric is difficult to determine).

[83] Currently history and historical analogs are part of the conventional two-step framework for Second Amendment adjudication. The question in *Bruen* is whether this historical test is the only step of the analysis.

[84] DUPUY, EVOLUTION, *supra* note 10, at 292.

[85] *See* id. at 92.

[86] *See* id.

[87] Duncan v. Becerra, 366 F. Supp. 3d 1131, 1145-46 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted*, *opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *reh'g en banc sub nom.* Duncan v. Bonta, No. 19-55376, 2021 WL 5577267 at 119 (9th Cir. Nov. 30, 2021), *rev'd and remanded sub nom.*

[88] *See* Cincinnati, Ohio, Ordinance to Prevent Accidents from the Firing of Cannon or Other Guns on Boats, in Front of the City of Cincinnati (Mar. 9, 1825) ("It shall not be lawful for any person or persons having charge or being on board of any boat upon the Ohio river, when passing by, stopping at, or leaving the city of Cincinnati, to cause any cannon, gun or other fire-arms to be so fired as to discharge its contents towards the city ... ."); Phila., Pa., Gun-Cotton Act of Assembly (Mar. 16, 1847) ("Whereas, an article called gun cotton, with properties of ignition and explosion similar to those of gunpowder, and equally if not more dangerous in towns and cities, has been introduced. Therefore ... no gun-cotton shall be introduced in Philadelphia, nor placed in storage therein, in greater bulk or quantity in any one place, than is permitted by existing laws, with regard to gunpowder ... .").

[89] McDonald v. City of Chicago, 561 U.S. 742, 802 (2010) (Scalia, J., concurring).

55 U.C. Davis L. Rev. 2495, *2510

console entertainment on "what James Madison thought about video games." [90]It's a more useful question to ask: "What is the lethality threshold of the word "arms' in the Second Amendment?" Using a single metric - lethality - can also help translate regulatory justifications to new technological environments as well as recognize the fact and pace of **[*2511]** change in lethality between different eras. [91]The TLI or similar tools can also help give content to distinctions between weapons suitable for personal self-defense and those "weapons of war" not covered by the Second Amendment. [92]By using lethality as a metric, rather than less functional traits like the shape of a weapon, its materials, or its popularity, researchers can make inferences across different times along a margin that is of practical relevance.

The Founders lived in a period when they could perhaps be forgiven for thinking that "a gun is a gun is a gun," because the basic flintlock hadn't really become significantly more lethal in the previous 150 or so years. If the Constitution had been written in the middle of the nineteenth century, instead of the 1780s, the Founders would have been much more aware of the pace of innovation. [93]But we don't have to speculate about how lawmakers may have reacted to knowledge of technological change. As Saul Cornell has noted, the nineteenth century, especially during and after Reconstruction, witnessed a flurry of regulation and constitution-drafting just as technological change was making firearms more common, concealable, and deadly.

The massive battlefield casualties of the American Civil War vividly revealed the lethality of new firearms technologies - especially the Minie ball. Cornell has argued that "Reconstruction ushered in one of the most intense periods of gun regulation in American history." [94]He has documented how - in a significant act of constitution drafting during Reconstruction - many states both guaranteed a right to arms in their state constitutions, but were "equally committed to enacting strong racially neutral gun regulations, aimed at reducing interpersonal violence and preserving the peace." [95]For example, Georgia's Reconstruction constitution of 1877 stated: "The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be **[*2512]** borne." [96]The 1869 Constitution of Texas stated "Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe." [97]Indeed, a brief examination of many of these Reconstruction and Gilded Age constitutions show both a statement about the right to keep and bear arms and a right to reasonably regulate such a practice. The TLI shows that these lawmakers were not operating in a technological vacuum; they were securing an express ability to regulate weapons at precisely the time that firearms were becoming dramatically more lethal.
[98]

---

[90] The quote is a sardonic remark by Justice Samuel Alito during oral argument over First Amendment protection of violent video games. Transcript of Oral Argument at 17, *Brown v. Ent. Merchs. Ass'n, 564 U.S. 786 (2011)* (No. 08-1448).

[91] For more on this move of "translation," see Lawrence Lessig, *Fidelity in Translation*, *71 TEX. L. REV. 1165, 1211 (1993)* ("The practice of translation moves in two stages: first, understanding the contexts between which the translator must move; and second, locating something called an equivalence between the two contexts.").

[92] *Kolbe v. Hogan, 849 F.3d 114, 121 (4th Cir. 2017)* ("We have no power to extend Second Amendment protection to the weapons of war that the *Heller* decision explicitly excluded from ... coverage.").

[93] *See* Tucker, *supra* note 9.

[94] Saul Cornell, Symposium, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 UC DAVIS L. REV. ONLINE 65, 67 (2021).

[95] *Id.*

[96] GA. CONST. of 1877, art. I, § 1, pt. XXII (emphasis added).

[97] TEX. CONST. of 1869, art. I, § 13 (emphasis added).

[98] For more on this point, see Darrell Miller, *New Research from the UC Davis Symposium: The Theoretical Lethality Index, Reconstruction Regulation and Enforcement*, DUKE CTR. FOR FIREARMS L.: SECOND THOUGHTS BLOG (Oct. 22, 2021),

55 U.C. Davis L. Rev. 2495, *2512

Finally, whether you adhere to a theory that the Second Amendment is for self-defense against common criminals or against rogue governments, the TLI provides a tool to assess the weapon technology along a single dimension. For example, if one believes that right metric for self-defense weaponry is that kind of defensive armament most effective at countering a typical criminal threat, the TLI offers a number. How many people per hour is it necessary to kill in order to supply an adequate deterrent to common criminal perpetrators? Alternatively, although we are highly skeptical that the anti-tyranny purpose the Second Amendment contains much legally enforceable content, if one truly believes that weapons must be in the hands of private parties to counter the capacity of the United States military, [99]this metric provides some common denominator for that argument as well. [100]

**[*2513]** Granted, the TLI cannot provide answers to all interpretive challenges of the Second Amendment. The TLI itself does not provide metrics for a host of twenty-first century weapons. (Military experts must extrapolate from Dupuy's methods to say what the theoretical lethality index of a modern 9mm pistol would be, for example). Non-experts, or those without access to the proprietary methods of the Dupuy Institute, can only provide estimates about where modern technology fit (a modern AR-15 is almost certainly more lethal than an eighteenth century musket and less lethal than a World War II medium tank, for instance). However, even with these limitations the TLI does provides a reliable benchmark from which to generate judgments about comparative lethality. The TLI, and derivative indices, offer a useful metric for understanding the lethality of different weapons, across time, and can therefore make an important contribution to the debate over the right to keep and bear arms.

CONCLUSION

After a decade of slumber, it is clear the Supreme Court, with its new conservative super-majority, is now awakening to decide Second Amendment matters left undecided after *Heller*. In the next few years, the Court is almost certain to address what counts as a constitutionally protected "arm." In doing so, it is also likely to rely on history and tradition to a greater degree than most other rights. Lethality, and the Theoretical Lethality Index constructed by Dupuy and his team, offers one way for the justices to anchor their analysis to historically-driven metrics that are functional, intelligible, and relevant; rather than those that are rhetorical and trivial.

UC Davis Law Review
Copyright (c) 2022 Regents of the University of California. All Rights Reserved

---

**End of Document**

---

*https://firearmslaw.duke.edu/2021/10/new-research-from-the-uc-davis-symposium-the-theoretical-lethality-index-reconstruction-regulation-and-enforcement/* [*https://perma.cc/G7BC-QUNR*].

[99] James B. Astrachan, *The Bumpy Road to the Supreme Court: Does the Second Amendment Prevent States from Prohibiting Ownership of Assault-Style Rifles and High-Capacity Magazines?*, *47 U. BALT. L. REV. 337, 375 (2018)* ("It is not the role of the courts to take away from the citizens the means to most effectively oppose such a [tyrannical] government.").

[100] *See* JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT 169 (2018) ("The keeping and bearing of lethal arms to deter government officials may be connected to the Second Amendment, but it is likely that the value is primarily moral or political, rather than a judicially administrable constitutional entitlement."). But to the extent such an argument requires something other than speculation, the TLI offers some metric from which to assess what kind of weaponry in private hands would be necessary to counter a military armed with machine guns, artillery, and nuclear weapons. *See* Darrell A. H. Miller, *Second Amendment Equilibria*, *116 NW. U. L. REV. 239, 256-57 (2021).*

# A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED STATES

By Christopher G. Tiedeman

DA CAPO PRESS • NEW YORK • 1971

Digitized by Google

A Da Capo Press Reprint Edition

This Da Capo Press edition of
*A Treatise on the Limitations of*
*Police Power in the United States*
is an unabridged republication of the
first edition published in St. Louis,
Missouri, in 1886.

Library of Congress Catalog Card Number 73-150421

SBN 306-70104-9

Published by Da Capo Press
A Division of Plenum Publishing Corporation
227 West 17th Street, New York, N.Y. 10011
All Rights Reserved

Manufactured in the United States of America

A Da Capo Press Reprint Edition

This Da Capo Press edition of
*A Treatise on the Limitations of*
*Police Power in the United States*
is an unabridged republication of the
first edition published in St. Louis,
Missouri, in 1886.

Library of Congress Catalog Card Number 73-150421

SBN 306-70104-9

Published by Da Capo Press
A Division of Plenum Publishing Corporation
227 West 17th Street, New York, N.Y. 10011
All Rights Reserved

Manufactured in the United States of America

Compendium_Cornell
Page 1788

**4**     LIMITATIONS UPON THE POLICE POWER.

provision for the public security and welfare in its daily necessities, that provision which establishes the needful and necessary, and therefore appears as a bidding and forbidding power of the State, is the scope and character of the police."[1]  But in the present connection, as may be gathered from the American definitions heretofore given, the term must be confined to the imposition of restraints and burdens upon persons and property.  The power of the government to embark in enterprises of public charity and benefit can only be limited by the restrictions upon the power of taxation, and to that extent alone can these subjects in American law be said to fall within the police power of the State.

It is to be observed, therefore, that the police power of the government, as understood in the constitutional law of the United States, is simply the power of the government to establish provisions for the enforcement of the common as well as civil-law maxim, *sic utere tuo, ut alienum non lædas.*  " This police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State. According to the maxim, *sic utere tuo, ut alienum non lædas,* it being of universal application, it must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others."[2]  Any law which goes beyond that principle, which undertakes to abolish rights, the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the public welfare and the general security, cannot be included in the police power of the government. It is a governmental usurpation, and violates the principles

[1] Bluntschli, Mod. Stat., vol. II., p. 276.  See *v.* Mohl's comprehensive discussion of the scope of Police Power in the introductory chapter to his Polizeiwissenschaft.

[2] Thorpe *v.* Rutland, etc., R. R., 27 Vt. 150.

§ 1

of abstract justice, as they have been developed under our
republican institutions.

§ 2. The legal limitations upon police power. —
This is the subject of the present work, viz.: The legal
limitations upon the police power of American governments,
national and State.   Where can these limitations be found,
and in what do they consist?   The legislature is clearly the
department of the government which can and does exercise
the police power, and consequently in the limitations upon
the legislative power, are to be found the limitations of the
police power.   Whether there be other limitations or not,
the most important and the most clearly defined are to be
found in the national and State constitutions.   Whenever
an act of the legislature contravenes a constitutional pro-
vision, it is void, and it is the duty of the courts so to de-
clare it, and refuse to enforce it.   But is it in the power of
the judiciary to declare an act of the legislature void,
because it violates some abstract rule of justice, when there
is no constitutional prohibition?   Several eminent judges
have more or less strongly insisted upon the doctrine that
the authority of the legislature is not absolute in those
cases in which the constitution fails to impose a restriction;
that in no case can a law be valid, which violates the funda-
mental principles of free government, and infringes upon
the original rights of men, and some of these judges claim
for the judiciary, the power to annul such an enactment,
and to forbid its enforcement.[1]   Judge Chase expresses
himself as follows :  " I cannot subscribe to the omnipotence
of a State legislature, or that it is absolute and without
control, although its authority should not be expressly re-

[1] Judge Chase in Calder *v.* Bull, 3 Dall. 386; Judge Story in Wilkinson
*v.* Leland, 2 Pet 657; Judge Bronson in Taylor *v.* Porter, 4 Hill, 145;
Judge Strong in People *v.* Toynbee, 20 Barb. 218; Judge Hosmer in
Goshen *v.* Storlington, 4 Conn. 259; Chancellor Walworth in Varick *v.*
Smith, 5 Paige, 137; Judge Spaulding in Griffith *v.* Commissioners, 20
Ohio, 609; Ch. J. Parker, in Ross' Case, 2 Pick. 169.

§ 2

Compendium_Cornell
Page 1790



*Legal Studies Research Paper Series No. 2012-27*

# Necessities of State: Police, Sovereignty, and the Constitution

*Christopher Tomlins*

ctomlins@law.uci.edu

*University of California, Irvine ~ School of Law*

The paper can be downloaded free of charge from SSRN at:

Electronic copy available at: http://ssrn.com/abstract=2034578

CHRISTOPHER TOMLINS

# Necessities of State:
# Police, Sovereignty, and the Constitution

Over the last fifteen years, legal historians have been exploring conceptualizations of the state and state capacity as phenomena of *police*.[1] In this essay, I offer a genealogy of police in nineteenth-century American constitutional law. I examine relationships among several distinct strands of development: domestic regulatory law, notably the commerce power; the law of indigenous peoples and immigrants; and the law of territorial acquisition.[2] I show that in state and federal juridical discourse, police expresses unrestricted and undefined powers of governance rooted in a discourse of sovereign inheritance and state necessity, culminating in the increasingly pointed claim that as a nation-state the United States possesses limitless capacity "to do all acts and things which independent states may of right do."

## At the Founding: Police and Popular Sovereignty

Akhil Amar recently noted that "a general commitment to Enligh tenment values . . . pulsated through the Constitution."[3] Amar explicates neither those values nor where, precisely, they pulsated, but if such values pulsate anywhere in the Constitution it is in the Preamble, "the foundation for all that followed." The Preamble announces at the most foundational level possible a precise register of the people's commitments: to replace the imperfect union among the states with a more perfect Union deriving from a self-governing "continental people"; to remedy injustice, disorder, and inequality by establishing justice, ensuring tranquillity, and pledging protection, commonality, and commonwealth for all and for

THE JOURNAL OF POLICY HISTORY, Vol. 20, No. 1, 2008.
Copyright © 2008 The Pennsylvania State University, University Park, PA.

Compendium_Cornell
Page 1792

posterity.[4] So conceived, the Preamble proclaims human possibility—without limit.

Discourses of governance as perfection, protection, and welfare—of improvement and security, happiness, and safety—are quintessentially discourses of police.[5] Elsewhere I have argued that one may detect in the genealogy of police discourse an implication of democratized state capacity, "grounded in the older communitarian idiom of 'peace and unitie' or safety and happiness, but shaped by a developing consciousness of popular right."[6] This indeed is what Amar finds in the Preamble: the foundational embrace of *popular* sovereignty.[7]

Peel away the impulse to radical democratization, however, and police discourse becomes in its American incarnation a rather more conventional instantiation of successor state capacities. For in certain important regards, as in "domestic tranquility," the words of the Preamble simply echo the imperial predecessor.[8] In fact, continuity in discursive expression of police is a commonplace of postcolonial Anglophone governmentalities. The residual "peace, order and good government" powers of Canada's federal government are symptomatic.[9] Mariana Valverde eloquently describes Canadian state formation as colonial governmentality "infolded" into a postcolonial successor state, which has used the POGG powers (so-called) "to promote what eighteenth century police science called 'the general welfare.'"[10] The Canadian example is in no sense unique. "Peace, order and good government" discourse turns up throughout the British imperium in the founding documents of colonies, in legislation bestowing "responsible" government upon colonies, in successor state constitutions, and in the discourse of postcolonial judiciaries. In Anglophone states of succession, "infolding" is pervasive.

## Police and Sovereignty: The States

"Infolding" was decidedly a feature of American state succession. Ambition for "settled and quiet Government" was embedded in the discourse of Anglo-American colonizing from the moment of its first formal-legal expression in the first Virginia charter (1606).[11] Ideologies of security and improvement are pervasive in European colonizing discourse.[12] After independence, the same governmentalities were reinscribed in successor state constitutions as authority over the state's internal police and echoed in the federal Preamble.

Compendium_Cornell
Page 1793

    In *Commonwealth v. Alger* (1851), Massachusetts Chief Justice Lemuel Shaw explained the state's authority over its internal police through successive documentary conveyances of *sovereignty* from prior regimes of governance: the Charter of New England (1620), which had clothed colonial government with so much of the royal prerogative as was necessary to maintain and regulate the common law rights of subjects in the colony; the Provincial Charter (1691), which had reconfirmed those powers; and the Declaration of Independence (1776), which, acknowledged by the Treaty of Paris (1783), had vacated such powers of dominion and regulation that remained in the Crown after 1691.[13] In Shaw's genealogy, sovereignty was not created by constitutions but was reinvested. It already existed and in juridical contemplation could not fall out of existence: "When relinquished by the parent country [sovereignty] must vest somewhere." What had vested, moreover, was not just the prerogative exercised by the Crown to the extent allowed at common law, but "all the powers of dominion and sovereignty" of the British parliament, unlimited by common law, "all the power which exists anywhere." This *dual* inheritance rendered all "social and conventional rights . . . subject to such reasonable limitations . . . as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient."[14]

    Shaw undertook no exploration of police as an expression of *popular* sovereignty beyond reference to the reinvestment of dominion and controlling power in the legislature by the Massachusetts Constitution. If only implicitly, reference to the constitution acknowledged the sovereign people: in instituting government, the Massachusetts Constitution placed its exercise under "the people's" supervision.[15] Other early state constitutions made pithier statements of the relationship.[16] As each state re-created itself as a self-governing successor to a colony, it located sovereignty in its people and in their name vested its inherited jurisdiction over internal affairs and arrangements (its internal police) in its legislature.[17] Like other mid-nineteenth-century state court decisions, however, *Alger* underscored the practical irrelevance of the sovereign popular claim to a *constitutional* point of origin when it came to the power to police. State decisions instead emphasized the virtually unlimited extent of police powers, their roots in a long history of *state* necessity, and the actual absence of restraint on their exercise.

    Thus, according to Vermont chief justice Isaac Redfield, "Control over the police of the country" resided "perpetually and inalienably" in the legislature. Legislative authority extended first to "the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all

property within the state"; and second, to such measures as would "secure the general comfort, health, and prosperity of the state." The former secured persons and property from the interferences of *others;* the latter rendered "persons and property" *in general* subject "to all kinds of restraints and burdens" for the good of the state. Redfield made no attempt to define the substance of the state's police powers, insisting simply that the legislature's "perfect right" to undertake a general police of population and resources in the interests of the common or general security and welfare was incontrovertible. Objections to the state's "invincible necessity" were dismissed as irrational and unserious.[18] Treatise writers delivered the same message. The state's capacity to police was unlimited; the power itself, indefinable.[19]

So far, what we have observed is substantive continuity in the routines and discourse of governance, restated to a (small) degree in light of revolutionary constitutionalism's appropriation of sovereignty to "the people" but not in practice deflected thereby. This notwithstanding, something was changing in the middle decades of the century: the mode of articulation of police as a power of the state adopted by state supreme courts explicitly renders police the signal instance of governance as an autonomous rationality.[20] Police becomes the expression of the fullness of state sovereignty, inside and outside constitutions. And over the next half century the last remaining restraint—that police was a domestic or internal phenomenon of the states—falls away.

## Police and the Nation-State

The U.S. Constitution's seven articles specify no federal police power as such. Nor, because they enumerate specific federal powers, do the articles recognize any unallocated residuum equivalent to Canada's "peace, order and good government" powers. Particular enumerated powers, notably the commerce clause, have, however, become proxies for federal police powers. Arguably, moreover, the Preamble declares that *all* federal power is directed to "police" ends—improvement and security for all.

Ernst Freund found many bases for a federal police power in the articles—notably in the commerce clause, but also in federal powers over coinage, weights and measures, patents and copyrights, taxation, post offices and post roads, territories, and in the general assertion and projection of sovereignty.[21] The last two were central to the most elaborated nineteenth-century expressions of federal police power, which occurred in the arenas of Indian affairs and in immigration regulation. Here the Supreme

Court consistently showed extreme deference to the broad exercise of federal power through its "plenary powers" doctrine, which recognized in Congress an exclusive and determinative authority to act unchecked by any other department of government in certain realms—"protection and security"—adjudged essential to the maintenance of sovereign statehood,[22]

The idea of plenary federal powers echoes the Preamble in identifying the fundamental purpose of governance as improvement and security. Over the course of the nineteenth century, however, the concept completely departed from the Preamble in locating the origins of those powers to a very considerable extent not in "We the People's" Constitution but in the very idea of sovereign "stateness."[23] In the U.S. case, powers expedient to preserving the existence and achieving the purposes of a sovereign nation-state came to be found independently from those powers delegated by the sovereign people in their act of "constituting" the state.[24]

## Indians, Immigrants, and Islands

The "infolding" of sovereign powers is essential to the transmission of police. "Infolding" as succession made a direct appearance in the Marshall Court's Indian lands jurisprudence.[25] European sovereigns claiming title by discovery and conquest had ceded title to postcolonial successor states, which had in turn ceded their unincorporated territories to the United States. Such Indian title as gained recognition consisted in occupancy for use on sufferance of the successor state. Just below the surface of the discussion lurked the concepts of improvement and security and of plenary powers vested in the sovereign successor as the means to their realization. "To leave them in possession of their country, was to leave the country a wilderness; to govern them as a distinct people, was impossible . . . they were ready to repel by arms every attempt on their independence."[26] The original claim of title by conquest, Marshall observed, was an extravagant pretension, yet in "the Courts of the conqueror" it was "the law of the land."[27] The Taney Court restated Marshall's jurisprudence far more bluntly. Colonizing powers had divided and granted the continent "as if it had been vacant," holding the Indians "subject to their dominion and control." The United States—postcolonial successor—"insisted upon the same powers and dominion."[28]

The apogee of the sovereignty trajectory at the federal level was reached in the later nineteenth and early twentieth centuries, finding

Compendium_Cornell
Page 1796

full expression in Supreme Court decisions on congressional regulation of Indian tribes, of immigration, and of transoceanic territories. Court decisions discovered that the requisite (and exclusive) powers and capacities of legislative and administrative regulation were inherent in the assumption and exercise of sovereignty. In the matter of Indian tribes, the Court in *United States v. Kagama* (1886) found Congress had perfect authority to legislate unilaterally to control tribes rather than treat with them, as previously, and to use legislation to abrogate treaty terms formerly negotiated and recognized. Within the geographical limits of the United States, "the soil and the people . . . are under the political control of the government of the United States, or of the States of the Union. There exist within the broad domain of sovereignty but these two."[29] This purposeful wiping out of anomalous pockets of tribal autonomy internal to the territory of the United States was confirmed in *Lone Wolf v. Hitchcock* (1903).[30]

Immigration cases, decided concurrently, asserted the same plenary capacity in Congress to exercise absolute control over territory, in this case legislative police over entry to the United States. In *Chae Chan Ping v. The United States* (1889), the Court considered whether Congress could exclude Chinese laborers entitled to residence under the express terms of previously negotiated treaties upon reentry. The appellant contended that "the United States, while a sovereign government, is yet one which can exercise only those powers of sovereignty which are enumerated in and delegated by the instrument which created it" and that the power to exclude as exercised in this instance was not among them.[31] Justice Stephen Field, for the Court, held otherwise. "Jurisdiction over its own territory . . . is an incident of every independent nation," an attribute of sovereignty, here exhibited in the state's power to police population— "control all individuals or governments within the American territory."[32]

Field's conception of Congress's power was far broader than the appellant's, but *Chae Chan Ping* at least found that sovereign authority was ultimately derived from the Constitution and the people. His colleagues were less solicitous. *Nishimura Ekiu v. United States* (1892) found the power to police the entry of foreigners was "an accepted maxim of international law . . . inherent in sovereignty." In the U.S. case it was exercised by the political department of the national government because that was where the Constitution happened to place the control of international relations.[33] In *Fong Yue Ting v. United States* (1893), founding its opinion on "leading commentators on the law of nations," the Court affirmed that the power to exclude was but one element of a general

national state power to "control . . . the people within its limits, and . . . expel from its territory persons who are dangerous to the peace of the State." These were "inherent and inalienable rights of every sovereign and independent nation, essential to its safety, its independence and its welfare."[34] Dissenting, Justice Brewer denounced the "indefinite and dangerous" notion that the national government enjoyed powers "inherent in sovereignty" derived somehow from the law of nations. Other national governments might enjoy "elastic powers," but "ours is fixed and bounded by a written constitution."[35]

The argument emerged full-blown in the insular cases. In the Treaty of Paris (1899) concluding the Spanish-American War, Spain ceded the islands of Cuba, Puerto Rico, the Philippines, and Guam to the United States. The insular cases debated the relationship between these newly acquired territories and the prevailing system of U.S. national governance. The decisive cases came in the first half of 1901. Turning on the specificities of congressional regulation of interstate and foreign commerce, the Court addressed at length the bases of national governmental power.

First, in *De Lima v. Bidwell* (1901), the Court held (5–4) that directly consequent upon the Treaty of Paris, Puerto Rico had ceased to be a foreign country for purposes of U.S. tariff laws. Hence no tariff could be collected on goods imported. The majority further argued that the treaty by itself had made Puerto Rico domestic territory. No act of Congress was required to determine the matter, for no status was available under the Constitution other than foreign or domestic territory. And as domestic territory, Puerto Rico was brought within the protections and proscriptions of the Constitution. The minority vehemently denied that the Constitution impaired the national government's discretion to determine the status of ceded territory. To decide otherwise was fatally to compromise the sovereign capacities ("great and necessary powers") of the United States.[36]

The minority was unavailing in *De Lima,* but prevailed in the companion case *Downes v. Bidwell* (1901). The Court held (5–4)[37] that although the Treaty of Paris had made Puerto Rico territory within U.S. jurisdiction, a further positive act of Congress was required to bring it within the customs union created by the Constitution's Article I (§8). In the meantime, Congress might impose duties on Puerto Rican goods exported to the United States, and otherwise legislate its status, as it had in the Foraker Act (1900).[38]

*Downes* replayed the *De Lima* minority's enthusiastic embrace of the United States as a great imperial power, and added an extraordinarily

broad reading of congressional capacity to make it so. Justice Brown held that Congress's powers to acquire and govern new territories were without constitutional limitation.[39] Were Congress precluded from implementing whatever relationship with newly acquired territory it desired, said Justice White in concurrence, the United States would be rendered "hapless in the family of nations."[40]

To the *Downes* majority, the United States as a nation-state enjoyed powers in no way distinct from those of comparable sovereign states; insofar as the Constitution was even relevant to those powers, it facilitated their exercise by staying out of the way. The minority took precisely the opposite tack. The powers of the national government, wrote Chief Justice Fuller, were not derived from international law but wholly from the Constitution. Harlan warned against the idea, prevailing in some circles that "we have in this country substantially or practically two national governments; one, to be maintained under the Constitution, with all its restrictions; the other to be maintained by Congress outside and independently of that instrument, by exercising such powers as other nations of the earth are accustomed to exercise."[41]

*De Lima* and *Downes* created the trajectory for the remainder of the early insular cases. In tariff questions, half the Court—Fuller, Brewer, Harlan, and Peckham, plus Brown—followed *De Lima* in holding that acquired territories ceased to be foreign at the moment of acquisition and therefore that tariff laws ceased to apply to them.[42] In questions of congressional authority over acquired territories, the other half—White, Shiras, McKenna, and Gray, plus Brown—held that Congress had virtually complete discretion.[43] Changes on the bench—the replacement of Horace Gray by Oliver Wendell Holmes, of George Shiras by William Day—made no difference; both joined the *Downes* majority.

*Downes*'s broad invocation of state capacity, particularly the majority's determination to avoid constitutional limitations that might be "fatal to the development of . . . the American Empire," was of a piece with the "preventive, ordering, and safekeeping technology of government" marshaled contemporaneously in the international sphere, notably in Theodore Roosevelt's corollary to the Monroe Doctrine.[44] Both exalted the state's power to create regimes of stewardship, the one directly through colonial governance, the other less directly through invocation of an overall "duty of civilized nations to secure the welfare of foreign states by ensuring that they are orderly and well administered in their domestic affairs."[45]

But governance as a "preventive, ordering, and safekeeping technology" was as much a characteristic of contemporaneous state action in the

domestic sphere. In the police of the domestic, we encounter during the years from 1900 through the New Deal a pronounced discursive convergence—and, in opposition, blowback—from the disputes that characterized the insular cases.

## Commerce as a Proxy

Increasingly aggressive U.S. expansionism, transcontinental and ultimately transoceanic, underlay the confrontation in the *Insular Cases* between the "popular" sovereignty of the Constitution and the conventional sovereignty of the nation-state. When it came to domestic governance, the question whether the federal state had police powers to exercise was complicated by the jurisdictional borders of the nation and the states, and by the availability of the commerce clause as a federal proxy. Throughout the nineteenth century, and beyond, the question was not whether police powers might be exercised, but rather by whom.

In its early commerce cases, the Marshall Court took an expansive view of federal power. *Gibbons v. Ogden* (1819) found Congressional authority under the commerce clause was exercisable "to its utmost extent," acknowledging "no limitations, other than are prescribed in the constitution." Like all powers granted to Congress, it was exclusive, which is to say no other body had any right to exercise that power. The Court made no claim "of a direct power to regulate the purely internal commerce of a State, or to act directly on its system of police." Its purpose was to emphasize that states had no concurrent *commerce* jurisdiction, even in service of "the acknowledged power of a State to regulate its police, its domestic trade, and to govern its own citizens." [46]

In *New York v. Miln* (1837), the Taney Court began to redraw the frontier between the federal commerce power and state police powers by allowing that within its borders a state might act within the realm given over to Congress, even though the effect might appear to be a regulation of commerce, if its actions did not "collide" with federal legislation and could be shown to be an exercise of its "acknowledged" police powers. [47] But *Miln* sidestepped *Gibbons,* preferring instead to advance three "impregnable" claims. First, "a state has the same undeniable and unlimited jurisdiction over all persons and things, within its territorial limits, as any foreign nation; where that jurisdiction is not surrendered or restrained by the constitution of the United States." Second, within that jurisdiction it was a state's right and duty "to advance the safety,

happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, which it may deem to be conducive to these ends." Third, that all such "municipal" powers of "internal police" were retained by the states, "and that, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive." [48]

## The Fourteenth Amendment

*Miln* provided the running room for the broad sovereignty-based state police power discourse developed in *Alger* and *Thorpe.* The Waite Court would maintain the broad regulatory capacity of the states in matters of internal police and commerce over new claims of limitation based on Fourteenth Amendment due process protections.[49] Change came only in the 1880s, when, as we have seen, the Court was fully engaged in a rapid sovereignty-based expansion of federal plenary powers. That expansion was replicated in matters of commerce in the form of a substantial reasser- tion of "the exclusive domain of Congress."[50] Then, in *Chicago, Milwaukee and St. Paul Railway Co. v. Minnesota* (1890), the Court adopted the minority's due process arguments, creating a second and distinct federal restraint upon state police regulation.[51] In *Allgeyer v. Louisiana* (1897), it suggested that due process would trump state police powers wherever the latter encroached upon "the privilege of pursuing an ordinary calling or trade, and of acquiring, holding and selling property." Whether police powers had been legitimately exercised would be "left for determination to each case as it arises." [52]

   *Allgeyer* set the terms for the next cycle of police power jurisprudence, which—federal exclusivity in matters of commerce having finally been established—turned on the extent to which state police powers in matters of safety, health, morals, and the common welfare were vulnerable to the Fourteenth Amendment. Following closely on *Allgeyer*'s defense of con- tractual liberty, *Holden v. Hardy* examined the question to what extent police regulation might permissibly intrude.[53] *Holden* did not argue with *Allgeyer*'s claim that the general right to contract was part of the liberty of the individual protected by the Fourteenth Amendment. Nevertheless, over the objections of Rufus Peckham, the Court found that in its exercise of the police powers "necessarily inherent in *every* form of government" a state might regulate terms of contracts to be performed within its limits without transgressing the Fourteenth Amendment where it could show

that the regulations adopted were for the protection and improvement of the lives, health, and morals of its citizens.[54] Again, in *Jacobson v. Massachusetts* (1905), Peckham once more dissenting, the Court endorsed—once more without defining—state police powers exercised to secure "the general comfort, health, and prosperity of the State," in this case by legislating compulsory vaccination.[55] The federal Constitution did not limit compulsions warranted by the general good. Nor did the Fourteenth Amendment. A person might "live and work where he will" and yet "he may be compelled, by force if need be . . . to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense." It was quite in order, then, to compel public obedience of "reasonable regulations established by the constituted authorities, under the sanction of the State for the purpose of protecting the public collectively."[56] The example Justice Harlan used to make the point (compulsory military service) underlined that the federal state as well as the state of Massachusetts claimed authority to dispose of population in the collective interest.[57]

## The *Lochner* "Era"

Peckham's retort came two months later. In *Lochner v. New York* (1905), the Court held that the New York state legislature could not justify regulatory intervention in the contractual relationship between bakery workers and their employers as an exercise of the state's police powers. Long considered the acme of judicial overstretch, Peckham's majority opinion is remarkable for its attempt, albeit clumsy, to change the trajectory of police powers jurisprudence.[58] Although vague and indistinct, police powers had been found over time to underwrite legislation safeguarding the "safety, health, morals and general welfare" of the public. The Court had upheld their exercise in many cases properly considered borderline by this criterion, but there were, necessarily, limits—for if not, "the Fourteenth Amendment would have no efficacy . . . it would be enough to say that any piece of legislation was enacted to conserve the morals, the health or the safety of the people," and the police power would be "the supreme sovereignty of the State . . . free from constitutional restraint." Any measure invoking police powers must therefore be scrutinized to ensure that it was "fair, reasonable and appropriate" in its impact upon individual rights and liberties, not "unreasonable, unnecessary and arbitrary."[59]

Peckham, it appears, was attempting both to "enumerate" the states' police powers ("safety, health, morals, and general welfare") and

also—because the courts had never defined what these categories encompassed except by grab-bag inventories—to set a standard ("fair, reasonable and appropriate") that measures invoking them had to meet. The New York statute was wanting on both fronts, neither "within the police power of the State" as enumerated, because it could not stand scrutiny as the health measure it purported to be, nor (in its full extent) "proper, reasonable and fair."[60]

Peckham's opinion also responded to the *Jacobson* majority's apparent willingness to contemplate a national government with broad powers to compel. Peckham made his opinion of *Jacobson* quite clear by debating whether the state might declare a supervening interest in a "strong and robust" population, and accordingly demand "any legislation which may be said to tend to make people healthy" be held valid "as health laws." Were this so, went Peckham's rejoinder, everyone might be subjected to state compulsion, "forbidden to fatigue their brains and bodies by prolonged hours of exercise, lest the fighting strength of the State be impaired."[61] Peckham's language condemning police as "the supreme sovereignty of the State . . . exercised free from constitutional restraint" also revived the fears of the minority in *Downes. Lochner* suggested a convergence of police discourses, both pro and con, heard in domestic and international spheres of state action.

*Lochner* bred two dissents. Justice Harlan reiterated the status quo ante. States might not interfere in the lives of their citizens to the extent of actually violating their liberty of contract, but "within certain limits" they might subject citizens to "regulation designed and calculated to promote the general welfare or to guard the public health, the public morals or the public safety." To be voided, a statute had to be "plainly and palpably in excess of legislative power." Harlan suggested no criteria by which "limits" might be charted or "excesses" recognized.[62]

The other (famous) dissent, from Oliver Wendell Holmes, purported to redirect the Court's police power jurisprudence no less then Peckham, but in a different direction. Peckham saw the police power as the state on the loose—sovereign and supreme. He wanted the Fourteenth Amendment to contain it domestically, just as the *Downes* minority wanted the Constitution to contain it internationally. Holmes agreed that the police power expressed the state's supreme sovereignty. But Holmes saw no problem. Police was synonymous with governance, and governance was the business of the legislative and executive arms of the state. Judges had no business forestalling "the natural outcome of a dominant opinion."[63] In *Lochner*, as in *Jacobson*, as, years later, in *Buck v. Bell* (1927), Holmes

thought the police of bakers, no less than the police of bodies, quite appropriately a matter for a legislative majority.[64]

## Writing with an Eye on the New Deal

Peckham's attempt to establish standards for scrutiny of the police power led nowhere.[65] *Lochner* had no "era." Ignored in substance and argument by the Court in *Muller v. Oregon* (1908), *McLean v. State of Arkansas* (1909), and *Bunting v. Oregon* (1917),[66] Lochner was revived briefly in *Adkins v. Children's Hospital* (1923), where the protagonists replayed, more or less, the roles of 1905. Justice Sutherland played Peckham, seeking a general rule to contain legislative interference with freedom of contract. Chief Justice Taft played Harlan, mapping police powers case by case. Holmes played himself, affirming once more that legislatures had the power to do, more or less, whatever they wanted.[67] Thereafter *Lochner* did not pass the Court's lips except to be vacated, alongside *Adkins,* in *West Coast Hotel v. Parrish* (1937).[68]

In the debate over *Lochner,* most have preferred Holmes's side. Over time, constitutional lawyers and historians have tended to agree on *Lochner*'s errors more than they have disagreed.[69] Consider, though, that police means state segregation statutes, state eugenics statutes, state criminalization of interracial marriage, state sodomy laws, and state action to confront a host of other threats to the moral health and welfare of the people. Police, more broadly, means the management of population as a resource. Police and the administrative state that New Deal liberals taught generations to revere exist in intimate regard for one another. State action subjected to principled scrutiny?[70] The New Deal needed a demonizing history of the *Lochner* "era."

The New Deal received the first installment of that history from none other than the young Roscoe Pound. None at the time was more effective in assailing judicial interference with state authority to manage population. Pound decried exaggeratedly individualistic juridical ideologies that denigrated "public right"; conceptualist or "mechanical" juridical reasoning that disregarded practicalities and ignored the societal role of state power; and the general preference for legal principle over facts.[71] His ideal was a "sociological" jurisprudence that would "adjust[ ] . . . principles and doctrines to the human conditions they are to govern."[72] Pound was so successful that any promise of meaningful scrutiny of assumed authority that *Lochner* might have initiated would remain unrealized.

## To Conclude

During the nineteenth century, the states' execution of their "internal police" established networks of local and provincial governance the extent of which scholars have begun fully to appreciate only in the last fifteen years. Simultaneously, the federal state adopted the same broad discourse of sovereign capacity to create additional regimes of police alongside the enumerated powers it had been explicitly granted by the Constitution. Both tendencies comported with the reality of the United States as postcolonial successor to a colonizing metropolitan state's management of population and territory.

The state of sovereign police strained against the constitutional state of popular sovereignty. The founding "enactment" of popular self-government at the end of the eighteenth century had become, by the end of the nineteenth, merely one source of state capacity—one to be passively avoided, or moved out of the way, or put in its proper place. One might argue, and indeed it has been argued, that an important correlation exists between the ascendancy of the state of sovereign police and the decline of the state of popular sovereignty. Take as one manifestation the rapid erosion of mass political participation that occurred after the turn of the twentieth century. Elite progressivism's clear preference was not for democracy per se, but for disinterested administrative expertise as the solvent of problems that could not be managed by the politics of rambunctious and unpredictable partisanship.[73]

At a time when the state of sovereign police was expanding, the contracting capacity of political parties to serve as vehicles for popular constitutionalism created a void filled by personality-based insurgencies that spoke *for* "We, the People," but in their own language of police. Theodore Roosevelt, the "Bull Moose" insurgent, typified the new domestic state of "police" undertaken in the name of the people. Roosevelt thus stands at the point of convergence of domestic with international police discourse—displayed in the *Insular Cases,* in *Jacobson,* in *Lochner,* and in the Roosevelt corollary to the Monroe Doctrine—and embodies police's ultimate seamlessness. In Anglo-American law, Blackstone's description of police as "the due regulation and *domestic* order of the kingdom" has long been treated as the "classic" statement. But the foundations, the flow, and the extensibility of police make a distinction between domestic and international analytically meaningless. Rather, this essay suggests that the powers claimed for the sovereign state *as such,* whether to order internally or externally, are the place to start.

*American Bar Foundation, Chicago*

Compendium_Cornell
Page 1805

## Notes

1. Christopher L. Tomlins, *Law, Labor, and Ideology in the Early American Republic* (New York, 1993), 35–97; William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (Chapel Hill, 1996); Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government* (New York, 2005); Markus Dirk Dubber and Mariana Valverde, eds., *The New Police Science: The Police Power in Domestic and International Governance* (Stanford, 2006).

2. For a comparable attempt, see T. Alexander Aleinikoff, *Semblances of Sovereignty: The Constitution, the State, and American Citizenship* (Cambridge, Mass., 2002).

3. Akhil Reed Amar, *America's Constitution: A Biography* (New York, 2005), 243.

4. Ibid., 5, 33.

5. See, generally, Christopher Tomlins, "Framing the Fragments. Police: Genealogies, Discourses, Locales, Principles," in *The New Police Science,* ed. Dubber and Valverde.

6. Tomlins, *Law, Labor and Ideology,* 35–59.

7. Amar, *America's Constitution,* 5, 8–13, 29.

8. William Blackstone, *Commentaries on the Laws of England* (Chicago, 1979), 4:162 ("due regulation and domestic order").

9. See §91, the British North America Act (1867), patriated in 1982 as the Constitution Act (1867), at http://www.solon.org/Constitutions/Canada/English/ca_1867.html (last visited 27 January 2006).

10. Mariana Valverde, "'Peace, Order, and Good Government': Police-Like Powers in Postcolonial Perspective," in *The New Police Science,* ed. Dubber and Valverde.

11. *First Charter of Virginia* (1606), in Francis Newton Thorpe, *The Federal and State Constitutions* (Washington, D.C., 1909), 3784. See also the charters of Delaware ("Well-being and good Government"), Maryland and Pennsylvania ("good and happy government"), and Rhode Island ("peaceable and orderly Government"), at 558, 1669, 3035, 3217.

12. See Tomlins, "Framing the Fragments."

13. 61 Mass. 53, at 65–83.

14. Ibid., 82, 83, 85. See also Novak, *The People's Welfare,* 20–21.

15. Massachusetts Constitution, Preamble and Part I Articles V and VII.

16. See, generally, Willi-Paul Adams, *The First American Constitutions: Republican Ideology and the Making of the State Constitutions in the Revolutionary Era* (Lanham, Md., 2001), 133–34.

17. See 61 Mass. 53, at 78.

18. *Thorpe v. Rutland and Burlington Railroad Company,* 27 Vt. 140, 149, 150, 154, 155 (1854).

19. Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* (Chicago, 1904), 2.

20. Colin Gordon, "Governmmental Rationality: An Introduction," in *The Foucault Effect: Studies in Governmentality,* ed. Graham Burchell, Colin Gordon, and Peter Miller (Chicago, 1991), 8–9

21. Freund, *The Police Power,* 62–65.

22. See, e.g., *Chae Chan Ping v. United States* [the *Chinese Exclusion Case*] 130 U.S. 581, 603–11 (1889); *Fong Yue Ting v. United States,* 149 U.S. 698, at 712, 731 (1893). The "plenary powers" doctrine was first articulated as such in *United States v. William Rogers,* 45 U.S. 567 (1846), affirming successor-state sovereignty over territory occupied by indigenous peoples.

23. See, e.g., *Nishimura Ekiu v. United States* 142 U.S. 651, 658 (1892).

24. See, e.g., *Fong Yue Ting,* at 704–11 (as a sovereign and independent nation, the United States exercised certain "inherent and inalienable" rights essential to its safety, its independence, and its welfare, as asserted in international law and discovered by examination of the usages and actions of other sovereign and independent nations). For an

early hint of the same, see *The Schooner Exchange v. M'Faddon,* 11 U.S. 116, at 136, 146, and generally 135–47 (1812).

25.  *Johnson v. M'Intosh,* 21 U.S. 543 (1823); *Cherokee Nation v. Georgia,* 30 U.S. 1 (1830); *Worcester v. Georgia,* 31 U.S. 515 (1832). *Johnson v. M'Intosh* is the modal case; *Cherokee Nation v. Georgia* and *Worcester v. Georgia* expand upon aspects of that decision.

26.  21 U.S. 543, at 590.

27.  Ibid., 588, 591, and generally 587–91.

28.  *United States v. William Rogers,* 45 U.S. 567, at 572 (1846).

29.  118 U.S. 375, at 379. For the background to *Kagama,* see *Ex Parte Crow Dog,* 109 U.S. 556 (1883).

30.  187 U.S. 553, at 565 (1903).

31.  *Chae Chan Ping v. United States,* 1889 U.S. Lexis 1778 (1889), Supplementary Brief for Plaintiff (filed by James Coolidge Carter), §III, ¶1.

32.  130 U.S. 581, at 603, 605.

33.  *Nishimura Ekiu v. United States,* 142 U.S. 651, 659 (1892).

34.  149 U.S. 698, 707, 711 (1893).

35.  149 U.S. 698, 707, 737. Chief Justice Fuller and Justice Field entered separate dissents.

36.  182 U.S. 1, 218.

37.  The Court was divided into two blocs: Brewer, Fuller, Harlan, and Peckham took the "Constitution" position; Gray, McKenna, Shiras, and White took the "sovereignty" position. Brown took the sovereignty position but voted with the majority in each case, by dint of which he wrote the lead opinions in both *De Lima* and *Downes.*

38.  182 U.S. 244, 279–80 (Brown): "The power to acquire territory by treaty implies not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be in what Chief Justice Marshall termed the 'American Empire.'"

39.  182 U.S. 244, at 284–87.

40.  Ibid., 306.

41.  Ibid., 359, 369 (Fuller in dissent, joined by Peckham and Brewer); 380 (Harlan in dissent).

42.  *Dooley v. United States,* 182 U.S. 222 (1901); *Armstrong v. United States,* 182 U.S. 243 (1901); *Fourteen Diamond Rings, Emil J. Pepke, Claimant v. United States,* 183 U.S. 176 (1901).

43.  *Dooley v. United States,* 183 U.S. 151 (1901); *Hawaii v. Mankichi,* 190 U.S. 197 (1903); *Dorr v. United States,* 195 U.S. 138 (1904).

44.  Ron Levi and John Hagan, "International Police," in *The New Police Science* ed. Dubber and Valverde, 207–47, esp. 207–22.

45.  Ibid.

46.  *Gibbons v. Ogden,* 22 U.S. 1, at 196, 197, 204, 208 (1824). See also *Brown v. Maryland,* 25 U.S. 419 (1827).

47.  *Miln* was the Supreme Court's first real attempt to summarize what it knew of state police powers (see generally 36 U.S. 102, 139–43).

48.  Ibid., 139. See also *Cooley v. Board of Wardens,* 53 U.S. 299 (1852).

49.  See, e.g., *Slaughter-House Cases,* 83 U.S. 36 (1873); *Henderson v. Mayor of the City of New York,* 92 U.S. 259 (1876); *Munn v. Illinois,* 94 U.S. 113 (1877); *Railroad Company v. Husen,* 95 U.S. 465 (1878).

50.  *Wabash, St. Louis and Pacific Railway Company v. Illinois,* 118 U.S. 557 (1886).

51.  134 U.S. 418, 456–58 (1890).

52.  165 U.S. 578, 590 (1897).

53.  169 U.S. 366 (1898).

54.  Ibid., 392 (emphasis added).

55.  197 U.S. 11, 26.

56. Ibid., 29.

57. Harlan wrote the majority opinion, but this particular passage has a noticeably Holmesian ring.

58. On which, see Dubber, *The Police Power,* 190–202.

59. 198 U.S. 45, at 53, 54, 56.

60. Ibid., 57, 62.

61. Ibid., 60–61. This language is clearly aimed at Harlan, but also at Holmes, for whom the health of the state was sacrosanct.

62. 198 U.S. 45, at 65, 67, 68.

63. Ibid., 76.

64. For Holmes's opinion in *Buck,* see 274 U.S. 200, 208.

65. Note and Comment (J.F.K.), "The Police Power and Liberty of Contract," *Michigan Law Review* 7 (1909).

66. 208 U.S. 412; 211 U.S. 539; 243 U.S. 426.

67. 261 U.S. 525 (1923).

68. Upholding Washington State's minimum wage statute in *West Coast Hotel,* the Supreme Court unleashed all the classic tropes of police: prevention, discretion, and even peace, order, and good government. "[T]he legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted." 300 U.S. 379, 391, 393.

69. See, e.g., Jack M. Balkin, "'Wrong the Day It Was Decided': Lochner and Constitutional Historicism," *Boston University Law Review* 85, no. 3 (June 2005): 677–726.

70. On which, see Dubber, *The Police Power,* at 195.

71. Roscoe Pound, "Liberty of Contract," *Yale Law Journal* 18 (1909): 454, 457–58.

72. Ibid., 464.

73. Mark Kornbluh, *Why America Stopped Voting: The Decline of Participatory Democracy and the Emergence of Modern American Politics* (New York, 2000)

Copyright of Journal of Policy History is the property of Pennsylvania State University Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

Electronic copy available at: https://ssrn.com/abstract=2034578

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19261   Page 390 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

**53 Buff. L. Rev. 1215**

**Buffalo Law Review**
Fall 2005

Book Review
Christopher Tomlins [d1]

Copyright (c) 2005 Buffalo Law Review; Christopher Tomlins

**\*1215  TO IMPROVE THE STATE AND CONDITION OF MAN: THE POWER TO POLICE AND THE HISTORY OF AMERICAN GOVERNANCE**
**The Police Power: Patriarchy and the the Foundations of American Government. By Markus Dirk Dubber. Columbia University Press, Pp.228. $50.00.**

. . . in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare . . . .

Preamble, United States Constitution (1788) [1]

The universal Law of Right may then be expressed, thus: 'Act externally in such a manner that the free exercise of thy Will may be able to coexist with the Freedom of all others, according to a universal Law.'

Immanuel Kant, The Philosophy of Law (1796) [2]

 **\*1216**  Rule of law and rule of police are two different ways to which history points, two methods of development between which peoples must choose and have chosen.

Eduard Lasker, Zur verfassungsgerichte Preussens (1874) [3]

The 'law' of the police really marks the point at which the state, whether from impotence or because of the immanent connections within any legal system, can no longer guarantee through the legal system the empirical ends that it desires at any price to attain. Therefore the police intervene 'for security reasons' in countless cases where no clear legal situation exists, when they are not merely, without the slightest relation to legal ends, accompanying the citizen as a brutal encumbrance through a life regulated by ordinances, or simply supervising him. Unlike law, which acknowledges in the 'decision' determined by place and time a metaphysical category that gives it a claim to critical evaluation, a consideration of the police institution encounters nothing essential at all. Its power is formless, like its nowhere tangible, all-pervasive, ghostly presence in the life of civilized states.

Compendium_Cornell
Page 1810

Walter Benjamin, "Critique of Violence" (1921) [4]

The further in time we depart from the Enlightenment, the greater our apprehension at its prescriptions for human perfectibility becomes; the keener the questions we ask of their details; and the more skeptical our responses to their performance. In the American case, for example, we notice that We the People's prescription for a state of perfection, justice, tranquility, and universal well-being lives cheek by jowl with the purposeful textual sedimentation of enslavement: precisely 143 words separate the United States Constitution's soaring self-justification from its paydirt, the three-fifths compromise. [5] And of course there is more to come. Before the Founders exit Article I, a **\*1217** guarantee of twenty more years of international slave trading is tacked onto the blessings of liberty. [6] A few clauses after that, the Founders agree that restraint of movement shall be part of the fundamental law that ushers in the new state--not just the movement of the "fugitive slave" but of any and every person "held to Service or Labour." [7] Seemingly, the texts that secure "Liberty to ourselves and our Posterity" must, to that precise end, be riddled through with the violence of necessity--civic hierarchy and the means to its enforcement. The primal American statement of enlightened autonomy lies alongside the political and legal economy of alterity and subjection. [8]

Markus Dubber's passionate and provocative book on the police power intends at once to expose and to sever the link, to rescue human autonomy from the necessity of hierarchy. [9] His history of the police power is philosophically committed to a strict demarcation between rule of law and rule of police as modalities of human development, the same demarcation made explicit by the nineteenth-century German liberal, Eduard Lasker. [10] The position Dubber **\*1218** advocates is essentially Kantian. [11] By rule of law, Dubber means principled commitment to the realization of personal autonomy for all, to the rights of persons, as the only means to just resolution of conflict among autonomous equals. Law is the power to protect rights and remedy wrongs. "[L]aw concerns itself with, and only with, the harm one person inflicts upon another." [12] By rule of police, Dubber means the management of men and things, and of men as things. [13] In Blackstone's classic statement, which echoes throughout the book, police is the maintenance of "due regulation and domestic order" in the state, whereby "the individuals of the state, like members of a well-governed family, are bound to conform their general behaviour to the rules of propriety, good neighborhood, and good manners; and to be decent, industrious and inoffensive in their respective stations." [14] The rule of law, hence, is autonomy; of police, it is **\*1219** heteronomy. [15] Law is ex post; its criterion is remedy. [16] Police is ex ante; its criterion is efficiency--prevention, manipulation, improvement. [17] Law reacts; police anticipates. [18] Law is modern, forward-looking, hopeful. [19] Police is ancient, suspicious, authoritarian. [20] It comes to us encrusted with the blood of generations of subjects. [21]

The categorical distinction with which Dubber confronts us is defensible, as we shall see. But we shall also see that it is a philosophical rather than a strictly historical--that is to say, an empirical--distinction. Historically, law and police manifest an almost irresistible propensity to seep into each other, as the United States Constitution demonstrates, so that in the end, their separation may be less significant for its expression of distinctions specifiable in history than for its expression of normative desire for what law might and should be (autonomy), to distinguish law from what police has been and is (heteronomy).

To the extent that law is less than absolutely distinct from police, might law and police not, in fact, be considered heteronymous? [22] In effect, Walter Benjamin suggests such an understanding in the course of his 1921 essay, Critique of Violence. [23] Benjamin's essay, also a philosophy of law rather than an empirical account of it, eschews Kant's categorical imperative as a point of departure for law's authority in human affairs, for a more basic authorization--violence, **\*1220** or force. [24] Law is made by violence; law is also preserved by violence.

> [T]he function of violence in lawmaking is two-fold, in the sense that lawmaking pursues as its end, with violence as the means, what is to be established as law, but at the moment of instatement does not dismiss violence; rather, at this very moment of lawmaking, it specifically establishes as law not an end unalloyed by violence, but one necessarily and intimately bound to it, under the title of power. [25] Law uses that violence to which it is 'intimately bound' to preserve itself as a modality of rule, a "juridical order," [26] from threats--specifically the threat constituted by violence lying outside itself. "[T]he law's interest in a monopoly of violence vis-à-vis individuals is not explained by the intention of preserving legal ends [for then violence as such would not be

Compendium_Cornell
Page 1811

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19263   Page 392 of
715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

condemned, but only that directed to illegal ends] but, rather, by that of preserving the law itself. . . ."[27] Law and police, then, are each a manifestation of authorized violence, police "taking over," as it were, at the moment of law's insufficiency in the achievement of ends. When the **\*1221** state for whatever reason can no longer act through law, police, which is unlike law, steps in.[28]

Benjamin, however, did not argue that law and police were the same phenomenon. Police was "violence for legal ends"--the power of disposition.[29] But police was in addition "the simultaneous authority to decide these ends itself within wide limits"--the power to decree.[30] In police, law-making violence and law-preserving violence become the same. Police simultaneously asserts legal claims for any decree and acts to enforce what it asserts. There are no decisions, no limits--nothing need ever be decided. Hence the formless, all-pervasive, spectral presence of police, the absence of essence, what Dubber calls its "defining undefinability."[31]

We will have occasion to revisit Benjamin before we are done. Meanwhile (and as a final preliminary), if we wish to suggest the possibility of a lesser degree of distinction between law and police than Dubber would have us accept, we should acknowledge that we do so not only as a matter of historical-empirical observation, but also as a matter of present concern. We muddy law, to some extent, not to cleanse police, but to register cautious resistance to the confidence, implicit in Dubber's dichotomization of these phenomena, that law can be trusted to "overcome" the heteronomy of police. For while, as Lasker insisted, rule of law and rule of police may well imply utterly distinct **\*1222** philosophies of human development, it is not so clear, particularly in the current conjuncture, that in fact they follow different strategies.

Dubber's purpose in this book is to change our understanding of the police power by subjecting the police concept to critical historical analysis.[32] On the success of his critique turns the bite of Lasker's sense of absolute difference, and the persuasiveness of his own turn to law-figured-as-autonomy. To Dubber's critique, then, we should turn without further delay. In Part I, I will offer an account of The Police Power, sticking reasonably closely to Dubber's text, confining commentary to instances of disagreement (not particularly extensive) in historical interpretation. Then, in Part II, I will attempt to situate his text in legal-historical discourse, by asking of it, crudely, why this subject; why now? I will examine the most important contours of Dubber's analysis, attempting a critique of the critique. And I will address the central relationship--the relationship between law and police.

Considered as a work of scholarship, The Police Power is a deeply penetrating appraisal of the historical expression and significance of the concept of police. But because the book extends its purview beyond history, one must also ask whether Dubber's considerable insights provide a basis for critique of the present. Of this I am less convinced.

## I. Describing The Police Power

Western political theory and practice has been organized by a contrast between two modalities of governance--autonomy, or self-government, and heteronomy, or government of the self by others. Governance as such rarely exists in any polity in one or the other pure form, but this does not preclude an idealization of these modalities as distinct in essence. Hence, people may govern themselves by making law, but they and their affairs are also governed, administered, and managed, which is police. **\*1223** Law and police, Dubber tells us, have distinct histories and distinct genealogies, and conceive of the state in very different ways:

> From the perspective of law, the state is the institutional manifestation of a political community of free and equal persons. The function of the law state is to manifest and protect the autonomy of its constituents in all of its aspects, private and public. From the perspective of police, the state is the manifestation of a household. The police state, as paterfamilias, seeks to maximize the welfare of his--or rather its--household.[33]

Seen in Aristotelian terms, the law state can exist only on the basis of the police state. The "political community of free and equal persons" was precisely the community of household masters, or (in Roman law) paterfamiliae, each rendered free from the necessities and obligations of self-support by a household of subordinates, servile persons organized in a rank-ordered hierarchy--"wife, servant, slave"--to perform the "necessitous struggle for livelihood" that sustained the master in his enjoyment

Compendium_Cornell
Page 1812

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19264   Page 393 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

of a life of noble and free action and virtuous civic participation. [34] Autonomy, then, was produced for the master from the activities of the oikos (household) community, or familia, over which he presided. It was the master's responsibility, in turn, to manage the welfare of the familia through his direction of the use of the household's resources--human and material, men and things.

The fundamental legal-political distinction that emerged from the household polity was, inevitably, between householder and household. Whether as members of the ancient Graeco-Roman household or of its medieval successor, the Germanic Mund, it was the fate of the vast majority of people to be subjects governed by household masters. The exterior of the household-- the polity itself, and politics--became identified with the condition of the tiny minority of household masters, such that when later nineteenth-century romantic legal historians fastened on the Teutonic "germ" theory of Anglo-Saxon democracy, masters became the prototype of free men. For those who **1224 lived on the interior of the household and participated in its economy, however, household governance "defined daily life." [35] The facts of household governance were relatively straightforward: a leveling down of distinctions among subjects in the face of the fundamental distinction between subject and master, from which emerged the classic exchange that defined the household model of rule-- loyalty (ligeance) in exchange for protection. [36] The same pattern was repeated on the grand scale of the king's household, which became effectively coequal with the realm and point of origin of the state, and into which all microhouseholders were incorporated as subjects of the king's authority as macrohouseholder. "Whatever distinctions might exist among the member of the kingly household, before the king everyone was equal . . . in their inferiority as constituents of the king's familia." All households manifested variety in contents--persons of different status, animals, material goods. But all differences "paled in comparison to the one defining distinction, that between every constituent of the household and the householder." [37]

Thus developed the patriarchal household as the model for governance of the vast majority of the population of Europe. From it came the foundational components of early modern legality, particularly criminal law, and of political theory. The peace of the household (its legality) was constructed by allegiance. Breach of allegiance was felonia (felony)--the "uroffense," as Dubber puts it, that generated the "urpenalty" of outlawry. [38] From the poenalization of felony, originating in the concept of amercement (fine in mitigation) grew eventually modernity's complex hierarchy **1225 of offenses and punishments. [39] The ultimate breach of allegiance was to kill the king, the macrohouseholder, or to "compass or imagine" [40] the king's death. This was high treason. Treason was also the ultimate breach in all microhouseholds, as "[w]hen a Servant slayeth his Master, or a Wife her Husband, or when a Man secular or Religious slayeth his Prelate, to whom he oweth Faith and Obedience." [41] But this became petty treason only, a distinction that underlined the differentiation of the king from other householders as the king's household grew to encompass all. Discipline within all households was the creature of punishment, which by its long lasting corporal form (for example, whipping) signified the abasement of the offender before the household master, the reinforcement of the felon's meanness. [42]

Thus, in the police of the household--the enforcement of obedience--we find the origins of modern criminal justice's key components, offense and punishment. Indeed, to Dubber, the law of crime and punishment has always been and continues to be "the most awesome" and "the most patriarchal" manifestation of the police power. [43] In Dubber's analysis, the object of criminal law is to act as an agency of protection of the welfare of the state "considered as a family." [44] The power to punish remains "rooted in the notion of police." [45] Relations between householders, in contrast, were not amenable to household discipline. As in Aristotelian republican theory, householders in European monarchic polities constituted the community of free and equal persons. The monarch's responsibility lay in providing means for the resolution of disputes amongst these equals, "not to enforce obedience, but to do justice." [46] Here we encounter the realm of law for the first time in Dubber's analysis, a realm of civic adjustments among **1226 equals, [47] a realm that the Enlightenment's radical ideals of equality and political autonomy would greatly elevate and that would become embodied in notions of substantive right. [48] But householders also remained members of the macrohousehold of the monarch. So, to the extent that their actions, or conflicts amongst themselves, might become threats to the macrohousehold's peace, they remained fully subject to its police.

So too, in early-modern liberal political theory, we find the realms of equality and police distinct but entwined. For Locke, the power to make law, to legislate, could come only from the consent of those for whom law was made. [49] But the power to execute law once made against threats within the polity, or to protect the polity from threats from without, were powers of police, nonconsensual. "In this realm of administration, or housekeeping, the model of household governance survives intact,

Compendium_Cornell
Page 1813

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19265   Page 394 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

undisturbed by political theory and its elaborate apparatus for scrutinizing the legitimacy of state action. After Locke, governing through law must be legitimate--and for him that meant consensual. Governing through police, by contrast, came to be held to a lower standard, of minimum competence." [50] Consigning the test of legitimacy to law making and to the mandarin science of politics allows police unchallenged occupancy of the humdrum--"management of the societal household." [51] Indeed, the new sciences of politics and of police, of the **\*1227** state as consent and of the state as an apparatus of administration, emerge more or less at the same moment. [52]

The expansion and elaboration during the eighteenth century of enlightened sciences of politics and police (and, of course, of law [53]) marks the consolidation of the state as such, and the relative eclipse of the microhousehold as a meaningful unit of governance. "As the entire state transforms itself into a single family, Rousseau's 'great family of the state,' the urfamily becomes one social group among others within the überfamily of the entire realm, under the authority of the überfather, the king." [54] For England and its North American colonies, Blackstone's list of offenses against "the Public Health, and the Public Police or Oeconomy" offers a summary guide to the state's growing capacities to prevent disturbances to domestic order, marshal the resources of the household-kingdom, and generally intrude itself into the detail of life in the microhouseholds of the realm and the social order of the whole. [55] Preventive police, for example, exists in Blackstone's sanitary references to the enforcement of quarantines and regulation of the sale of provisions: it is worth noting that these, like the sumptuary regulations, gaming statutes, and game laws that he also listed enforced social station and punished people who were found out of their assigned place. [56] Blackstone's "rules of propriety" and decency, such **\*1228** as those preventing clandestine marriage and polygamy, had the same effect. [57] The state's vital interest in preventing disturbances and promoting popular industriousness is similarly expressed in the proliferation of regulations "against the good order and oeconomy of the kingdom"--idle soldiers and mariners wandering the realm, gypsies, idle and disorderly persons, rogues and vagabonds. All mobility without engagement was a species of vagrancy, purposeless uncontrolled wandering beyond the scope of household government, a waste of resources and as such, inherently offensive to the state. Idleness was (and remains) a particular object of state suspicion. "Idleness in any person whatsoever is . . . a high offense against the public oeconomy." [58] Like all of Blackstone's police offenses, the power to mobilize labor expressed the king's desire and obligation "to maximize the welfare of his household, the realm." [59]

In England and its colonies, as a theory of consent begins to dominate the political foreground, setting conditions on authority's use, police proliferates in the background, forming the character of authority in operation. Proliferation, though, bred no transformation of the concept in Anglophone discourse: in Blackstone's conception, police remained rooted in a conception of household management, part "of his general theory of the royal prerogative, which is nothing but a modernization and radicalization of the age-old power of the householder over his household." [60] It was in continental Europe that police more completely transcended its household origins to be reborn as a science of governance and economy, "the science of administering a 'population' with the aim of maximizing its welfare," an academicized knowledge "complete with treatises, university faculties and training academies" [61] concentrating on the development of the tools necessary to that end: statistics, to keep an inventory of the population; **\*1229** documents (passports, passes, permissions, tickets of leave, timetables) to trace and control its movements; constant reporting to improve the state's knowledge of its objects and of the effects of its administration; manuals to direct its operations. [62] Nor was the science of police confined to population. All the state's resources fell within its purview-- men and things. Police became a science of immense precision, "of endless lists and classifications," [63] and of immense discretion: it "applied to everyone and everything and everywhere" but with "an essential vagueness . . . guidelines but no firm principles" that left the policer absolute discretion "to do whatever needed to be done." [64] Thus, there was "a police of religion, of customs, of health, of foods, of highways, of public order, of sciences, commerce, manufactures, servants, poverty. . . ." Police science "aspire[d] to constitute a kind of omnivorous espousal of governed reality, the sensorium of a Leviathan." [65] Much more than merely a mechanics of control, police science was an aesthetics of good order, of self- and other-improvement. Police produced "the well policed person . . . 'polite', considerate, even beautiful." [66]

One can find some reflection on the sophistication and ambition of continental police science in Adam Smith's 1762-1763 Glasgow University lectures on moral philosophy, gathered in a manuscript entitled "Juris Prudence or Notes from the Lectures on Justice, Police, Revenue and Arms. . . ." [67] What is interesting about Smith's discourse on police was how critical and, essentially, dismissive it was. First, contrary to Blackstone, who, as we have seen, would supply police with a domestic genealogy, Smith treated police as an alien phenomenon, "French." [68] **\*1230** Second, Smith made police a residual category of governance, distanced from the realization of justice, devoted instead to the expedient--cleanliness (sanitation), public security,

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19266   Page 395 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

and above all the "the proper means of introducing plenty and abundance into the country," that is, the means of improvement of the wealth of the state.[69] Smith considered matters of cleanliness and public security "of too mean a nature" to be included in a University of Glasgow lecture, though noting with fine condescension that they were "no doubt matters of considerable importance."[70] The improvement of the wealth of the state, of course, was a different matter. It would become Smith's most famous concern, his lectures on police eventually transmorphing into his Inquiry into the Nature and Causes of the Wealth of Nations.[71] But what is of particular interest is the extent to which The Wealth of Nations was written as a refutation of police as a modality of wealth maximization. Smith's lectures, in short, decisively distinguished the jural (law) from the prudential (police); identified "the first and chief design of all civil governments" as "to preserve justice amongst the members of the state and prevent all encroachments on the individualls in it, from others of the same society," or, stated differently, "to maintain each individual in his perfect rights;"[72] confined the prudential to very specific functions, most of which were too "mean" to warrant much attention;[73] and finally, began the development of an account of political economy that in its fullest statement would answer continental police's cameralist theories of wealth maximization through state manipulation of its resources (men and things) with a politics of markets, individual self-interest and freedom of movement.[74] Or in other words, autonomy.

 **\*1231**  Thus, in Smith we encounter an extended theorization of autonomy that elevates it to a matter of determinative behavioral significance in law and economy. Well and good. But it is precisely police's meanness that, at this point, becomes its cloak. As we have seen, liberalism's mandarin discourses--of consent as the test of law making (Locke), of autonomy as the object of law and justice (Smith) and the road from economic serfdom (Anglophone economics) concentrate on the high ground of governance. Police, by the very lowliness attributed to its objects, flies under the radar.[75] In Anglophone discourse, its conceptual head was raised infrequently, and only by those, such as Patrick Colquhoun and Jeremy Bentham, interested in building upward from quotidien policing to theories of the production of happiness through strategies of prevention and discipline.[76]

To this point, The Police Power has concentrated on establishing the historical character of police and law. Hereafter, Dubber moves to his subtitle, "the foundations of American government." Or perhaps, more accurately, the foundations of government in the United States; for, Dubber properly contends, it was not until the late eighteenth century that "the concept of police entered American political and legal discourse."[77] One may of course detect many prior manifestations of police as a modality of governance throughout the North American colonies: regulation of the poor, of indentured servitude, and of vagrancy; plantation management of enslaved Africans; slave patrolling; church and household discipline; petit treason and corporal punishment. "Americans were policing long before they imported the concept of policing . . . combining long-standing governmental techniques from English law . . . with innovations and adaptations of their own."[78] When the revolutionary generation discovered the  **\*1232**  concept of police for the first time, they drew upon a long-standing practical familiarity with "a wide array of governmental practices" that the concept "named, and apparently systematized."[79]

Though Dubber's object of attention as a historian of the police power is its genealogy, surprisingly he expresses little interest in establishing with any precision the genealogy of its conceptual transportation to, and adoption in, post-revolutionary America. "[I]t doesn't much matter whether the Founding Fathers picked up the police concept from Blackstone or Beccaria or Bentham, or Adam Smith or any of the eighteenth-century police scientists."[80] The reason it doesn't matter is that, as we have seen, Dubber argues "the core idea"[81] was invariant across the Anglo-European spectrum, deeply expressive of the ordered oeconomy of the ancient patriarchal household, unaffected by its continental restatement as a science. Politics was the self-government of autonomous householders; police was their government of their household economies. What had occurred in the eighteenth century was a convergence of these two levels of governance, autonomy and heteronomy, politics and economy, creating the "oxymoronic"[82] science of political economy. But in fact it does matter, to some extent at least, how the founding fathers understood police. For the convergence that Dubber describes was mediated differently in Anglophone and continental discourse, in the one case by liberal political science (consent),[83] and in the other by administrative science (police). The result was distinct approaches to politics, to economic theory, and to the objects of governance that situated the points of convergence of autonomy and heteronomy at different points along the spectrum of possibility. Compare continental Europe, particularly Germany (the home of police science) and England, for example, and one will discover wholly distinct sciences of economics--the one emphasizing historical and contextual circumstance, the other postulating the operation of invariant a priori  **\*1233** principles. Far from an oxymoron, "political economy" stands for the relative "conditions of freedom" that shall pertain in an economy and for the basis upon which outcomes shall be justified.[84]

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19267   Page 396 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

Whatever its genealogy, Dubber does establish beyond doubt the presence of the core patriarchal idea in the Republic's theory of goverance. That presence created, of itself, an inherent contradiction.[85] The founding theory of the republic was supposedly self-government--enlightened autonomy. Its founding statements stressed the equality of all. A patriarchal police was, hence, far more explicitly in tension with theories of governance in the new United States than old Europe. Revealing some consciousness of this, early state constitutions, even as they acknowledged and embraced the state's governing role vis-à-vis its "internal Police," defined that role as one under the supervision of "the people." The Delaware Declaration of Rights (September 1776) is typical: "the people of this state have the sole exclusive and inherent Right of governing and regulating the internal Police of the same."[86] State constitutions established exclusivity of right in two directions--first that it lay in the people of the state, directly represented in democratic legislatures, rather than any other agency; second, and subsequently, that it lay in the people of the state as against any other layer of governance. As each state re-created itself as a political-jurisdictional successor to a colony--an autonomous self-governing entity with known borders and an interior--it located sovereignty in its people and established exclusive jurisdiction in their name over its internal affairs and arrangements (its internal police). The concept of police became, piecemeal, virtually synonymous with the power to govern itself, and police became the police power, a power identified in each of the several states, exercised in and by   *1234   the states, that only the states had.[87] The police power had become the power to govern, transferred by revolutionary succession from the king.[88]

Majoritarian legislative democracy--the course followed by many of the states during the confederation period--bred police legislation that, Dubber argues, was remarkably (for supposedly revolutionary polities) continuous with Blackstone's English model of police, which as we have seen was built on the king-householder's standing as paterfamilias to the entire nation.[89] Dubber is thus deeply skeptical of claims made by scholars (such as me) that the discourse of police emerging in the new post-revolutionary states "gave political voice to a conception of republican government . . . as a means, informed by constitutional declarations of communal as well as individual rights, of maximizing opportunities for the sovereign people to participate in the framing of the collective good."[90] Continuities in the practice of heteronomy are simply too marked, he argues, its genealogy too compelling to allow for any kind of epistemological break in the concept.[91]

One must be careful here to take note of the sources of opposition to the democratization of police. Opposition came from "those who spoke in the more conventional idiom of elite dominion," such as Peter Oxenbridge Thacher, Boston attorney and future judge of the Boston Municipal Court, who identified "excellence" in the city's police precisely with a shifting of governance from the town meeting to "a simple, united and energetic government under the gravest and wisest of citizens."[92] The goal was "a well-regulated city . . . where each knows and preserves his own place," where "regular gradation" and the "orderly distribution of duties" would result in a "correct arrangement and subordination of   *1235   the parts which constitute a magnificent whole."[93] In fact, much of the half century after the Revolution was spent emptying popular sovereignty of any real substantive content. "Suffrage limitations . . . discriminate[d] against the propertyless, women, slaves, children . . . [and anyone] under the police of some person."[94] Membership in the sovereign people, for purposes of political action, became limited to those who could demonstrate a sufficiency of autonomy.

Independently, during the 1780s, culminating in the writing of the federal constitution, state governance capacities came under attack from national elites anxious that the states still remained excessively democratic--in behavior, if not in franchise--and uncontrollable, that their exercise of police powers materially threatened elite property rights. "The internal police as it would be called & understood ought to be infringed," Gouverneur Morris told the Philadelphia convention.[95] Morris cared little about the states' use of their powers in pursuit of a Blackstonian agenda. His concern was "paper money and other tricks [of finance] by which citizens of other States may be affected."[96] The convention agreed that the authority of the new national government it was designing should extend to the enactment of legislation "in all cases for the general interests of the Union, and also to those in which the States are separately incompetent, or in which the harmony of the United States may be interrupted by the exercise of individual legislation."[97]

Dubber represents the creation of the Union as a consensus that left the police power both untouched and associated exclusively with the states. In the patriarchal logic of household government, the states remained independent households, free to police within their borders, and subject to no superior federal police power but only to   *1236   federal law made with their own participation.[98] In broad terms, this is indeed the case. There is no federal police power as such. On the other hand, the Constitution's preamble, as we have seen, embraces a concept of the Union as the perfected outcome of an enlightened police

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19268   Page 397 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

effected by the Constitution itself. And the substance of the Constitution actually limits the states' capacities to police not only beyond what was strictly "internal" but also within the internal in certain crucial respects. Article I, Sections 8-10 describe wide-ranging federal powers that simultaneously removed "a broad range of legislative powers in the economic domain from the state legislatures." [99] Here, the Commerce Clause became the decisive arbiter of which government got to exercise a de facto police. Simultaneously, Dubber agrees, the Constitution constructed a de facto police power for the Union in areas that it declared outside state jurisdiction: for example, management ("government and regulation") of land and naval forces, of immigration and naturalization, and of relations with indigenous peoples. [100] Given that the United States was the reincarnation and continuation of an imperial process of continental expansion, these were crucial and strategic realms for federal power.

The effect of the Constitution, then, was to leave the states' police powers unimpaired within the domain of "internal police" left to the states by the federal constitution. "The clear assignment of police power to the states, and only to the states, dramatically simplified constitutional analysis. If it was police, it was the states' business." [101] But this was only to remove the qualifier--"if"-- to the terrain of the now constitutionalized argument over what police was.

Constitutionalization added the further wild card of judicial determination of outcomes to the mix. The prominence of the judiciary in American police processes, **\*1237** however, long predated the constitutionalization of American law and politics. In England and its colonies, the magistracy had long been the first line of local administration and enforcement of police regulations--its own institutional history as "justices of the peace" was founded on the creation of an office to enforce the regulation of labor mobility. [102] In early nineteenth-century American cities, "police" and municipal courts were established as institutional successors of local magistrates, administering local police regulations and common law offenses-- the Blackstonian core of the Anglophone police regime. [103] But the constitutionalization of the police power had, as we have seen, rendered the police power open to inquiry into its potential limits. The evolution of judicial review, itself controversial, identified the courts as the locale of inquiry. "And so it is in judicial opinions, specifically in judicial opinions on the constitutional limits of the power to police, that we find the most extensive, and certainly the most influential, treatments of the nature and sources of the police power." [104] Constitutionalization, the emergence of judicial review, and the Kantian identification of law as the idealized expression of a general autonomy all come together at the same post-Enlightenment, post-Revolutionary moment when the otherness of law to police emerges and is debated.

Perhaps most interesting in Dubber's account of this debate is his contention that its default setting holds police as a mode of governance in essence limitless until shown otherwise. Rather than contained by the discourse of law, Dubber would have us think of police as a largely unexplored terrain. To the extent that law contains police, it does so only in specific realms of contention. [105] Judges--at least state court judges--appear quite complacent in sustaining the default: Dubber offers copious examples of judicial discourse emphasizing police's protean nature, its **\*1238** obviousness and inevitability, in fact the impossibility of imagining appropriately-ordered human existence without police. As Isaac Redfield of Vermont put it in Thorpe v. Rutland & Burlington Railroad Company (1854):

> One in any degree familiar with [the police of the large cities] would never question the right depending upon invincible necessity, in order to the maintenance of any show of administrative authority among the class of persons with which the city police have to do. To such men any doubt of the right to subject persons and property to such regulations as the public security and health may require, regardless of merely private convenience, looks like mere badinage. They can scarcely regard the objector as altogether serious. And generally those doubts in regard to the extent of governmental authority come from those who have had small experience. [106]

Defending the proposition that American legislatures had "the same unlimited power in regard to legislation which resides in the British parliament, except where they are restrained by written constitutions," Redfield took illustrations of police in action from the never-contested Blackstonian core and used them to find against a railroad corporation that had not fenced its track, contrary to statute, in an action for damages for loss of sheep struck by a locomotive. [107] Lemuel Shaw had done something not dissimilar three years earlier in the iconic nineteenth-century police power case Commonwealth v. Alger (1851), in finding that it was a perfectly appropriate exercise of the police power to specify the dimensions of wharves in Boston Harbor, so that one built in violation of statutory specification and found liable to abatement could legitimately be destroyed and the owner fined. [108] Though its boundaries were difficult to mark or limits to it easily found, the police power was nevertheless "a settled

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19269   Page 398 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

principle, growing out of the nature of well-ordered civil society."[109] The fitness of its exercise by "well-ordered governments" was "so obvious, that all well-regulated **\*1239** minds will regard it as reasonable."[110] Both judgments illustrate the difficulty state courts had in finding how there could ever fail to be a police power. Shaw's opinion, for example, built the police power on a string of conveyances of sovereignty (his term) dating to the earliest moment of English colonizing: the colonial charter that clothed government with so much of the royal prerogative as was necessary to maintain and regulate public right in the colony; the Declaration of Independence and the Treaty of Paris (1783) that dispelled whatever royal prerogative capacity remained; and the Massachusetts Constitution that secured the entirety of sovereign power--dominion and regulation of the public right-- to the new post-colonial government. Successive conveyances had created the means to establish Alger's well-ordered society rather than any explicit act of sovereign popular consent or active involvement.[111]

In the federal realm, in contrast, police power discourse acquired spatial referents. The "if" question--whether something was police--depended on where and to whom and to what it was applied. We have seen that the federal constitution established a de facto police power in the national state (a power, one might say, "that durst not speak its name") by allocating to the federal state police of the nation's outsides--Indians, immigrants, international commerce and so forth. Here, constitutional discourse very deliberately excised significant realms of action from juridical purview without much argument. Developed early in the Marshall Court's Indian cases, the notion that Congress and its agents could assert "plenary" (exclusive) powers of governance beyond courts' capacity to review was enriched and extended during the course of the later nineteenth century in a series of Supreme Court cases addressing the government, transfer and dispersal of Indian tribes, the regulation and restriction of immigration, and the administration of new territories (continental and transoceanic).[112] The combination of the Court's **\*1240** acknowledgment of the ascendancy of plenary over juridical authority with its development of "political question" doctrine--in which it refused to exercise the jurisdiction it did possess in matters considered "inherently political" and hence the business of the executive and legislative branches of government--erects a constitutional law that constrains not police but rather the effectivity of liberalism's legalist panacea itself.[113]

The nation's interior presented a more difficult problem. The states enjoyed "internal police," but this could clash with federal jurisdiction over the nation's outsides when states framed regulatory measures that competed with federal authority. Dubber uses the Supreme Court's decision in Mayor of New York v. Miln[114] as an illustration. New York law required that masters of incoming ships file a report with state authorities of all passengers brought into the state.[115] Miln, a shipmaster, had been fined $15,000 for failing to file.[116] He argued that the state statute was invalid under the Commerce Clause.[117] Under Chief Justice Marshall, the Supreme Court had used the Commerce Clause quite aggressively to establish an exclusive federal jurisdiction over commerce. Under Roger Taney, matters changed. State law that affected interstate and international commerce was valid and would remain so as long as Congress chose to abstain from actively asserting its jurisdiction. The state's statute was justified as a "regulation . . . of police," hence well within state capacities.[118]

> It is apparent, from the whole scope of the law, that the object of the legislature was, to prevent New York from being burdened by an influx of persons brought thither in ships, either from foreign **\*1241** countries, or from any other of the states; and for that purpose a report was required of the names, places of birth, &c. of all passengers, that the necessary steps might be taken by the city authorities, to prevent them from becoming chargeable as paupers.[119] Interestingly, while Justice Story, in dissent,[120] held out for the Marshall Court's position that federal jurisdiction was exclusively whether Congress had acted or not, he did so in terms that acknowledged the formidable extent of the police power that underlay the state's claim:

> I admit, in the most unhesitating manner, that the states have a right to pass health laws and quarantine laws, and other police laws, not contravening the laws of congress rightfully passed under their constitutional authority. I admit, that they have a right to pass poor laws, and laws to prevent the introduction of paupers into the state, under the like qualifications. I go further, and admit, that in the exercise of their legitimate authority over any particular subject, the states may generally use the same means which are used by congress, if these means are suitable to the end. But I cannot admit that the states have authority to enact laws, which act upon subjects beyond their territorial limits, or within those limits, and which trench upon the authority of congress in its power to regulate commerce. It was said by this Court in the case of Brown v. The State of Maryland, 12 Wheat 419, that even the

Compendium_Cornell
Page 1818

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19270   Page 399 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

acknowledged power of taxation by a state, **\*1242** cannot be so exercised as to interfere with any regulation of commerce by congress. [121]

As Dubber notes, addressing "the distinction between state and federal power" quite clearly "captured the breadth of police, external and internal, personal and apersonal" and simultaneously illustrated police's conceptual role in American constitutional jurisprudence "as the boundary of state power vis-à-vis the power of the national government." [122] But this, we must acknowledge, has been a shifting boundary, accompanied, furthermore, by considerable debate over the substance of power asserted on each side of the line. Never was this more the case than in the century following the Civil War, when both line drawing and substance were greatly complicated by alterations in both the character and the balance of power in the American state brought about by accelerating social and economic change, and by the evolution of Fourteenth Amendment jurisprudence. From the Slaughter-House Cases through West Coast Hotel, as a consequence, one encounters a sequence of Supreme Court cases that attempt to define and redefine the practical realms of police and law in both state and federal spheres. [123]

**\*1243** Among all of these, The Police Power isolates Lochner v. New York [124] for attention. Though Dubber makes this notorious case the subject of a fascinating analysis that serves to throw into high relief the law/police distinction that is key to his book, it seems to me an error to address Lochner in comparative historical isolation, for the case has an argumentative context that deserves at least some attention.

Why does Dubber invest such significance in Lochner? The case, which set aside a New York State law limiting the hours of bakery workers as "an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty," [125] was in his estimation nothing less than a historically isolated, magnificently futile stand "for the proposition that the state's police power is not unlimited." [126] In Lochner, the Supreme Court fumbled for both "an understanding of the nature of police . . . [and] an understanding of its legitimate limits" [127] that would subordinate the police power to law and establish constitutional limits on its use. That the State of New York possessed a power to police was not in question. Nor did the Court question the state's capacity to use its police powers to protect "the safety, health, morals and general welfare of the public." [128] But the Court found that the Hours Statute did nothing to protect the public as a whole, merely a particular segment of the public (bakery workers), and that it did so by depriving them of the opportunity to exercise full freedom of contract, thus denying them substantive autonomy. However careless or sloppy the majority may have been in their formulation of the issue, Dubber argues the Court's stance was entirely appropriate. "Lochner did what courts, and the public, should do in the American view of law and government: it subjected state action to principled scrutiny. More specifically, it scrutinized the state's exercise of its police power, a power that traditionally had been defined by its undefinability." [129] In **\*1244** form and execution, the Court's scrutiny might have been wanting, but not "the larger enterprise of exploring the limits of state police power." [130]

Dubber notes, as have others, that the Court was not showing itself hostile to the use of state police powers to enact hours legislation as such. In Holden v. Hardy (1898), it had upheld Utah legislation limiting hours of work in the state's mining industry on the grounds that protection against hazard was in the public interest. [131] In Muller v. Oregon (1908) it would again uphold state limitation of hours of work, this time in the case of female laundry workers, accepting the state's contention that women's reproductive capacities were put at risk by unpoliced hours of work, constituting an "emergency" that threatened the natal well-being of the race. [132] The approach taken in Lochner did not, that is, ordain "the unconstitutionality of the sort of economic and social regulation so dear to progressives of the time." [133] Curiously, however, Dubber does not much investigate precursors of Lochner--other explorations of the bases upon which limits to the police power might be erected. Yet such had been a characteristic of Supreme Court constitutional debate for the previous thirty years. The Slaughter-House Cases (1873), for example, are famous for Justice Stephen J. Field's dissent from the majority's decision to uphold Louisiana's creation, for public health reasons, of a slaughterhouse monopoly in New Orleans. The dissent was woven from two strands--one an attempt to distinguish legitimate from illegitimate resort to the state's police powers, the other the statute's interference with the rights of butchers to follow their trade. As to the first, the State had argued that the act "was adopted in the interest of the city, to promote its cleanliness and protect its health," and hence "was the legitimate exercise of what is termed the police power of the State." [134] Such a power, Field noted:

Compendium_Cornell
Page 1819

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19271   Page 400 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

**\*1245** undoubtedly extends to all regulations affecting the health, good order, morals, peace, and safety of society, and is exercised on a great variety of subjects, and in almost numberless ways. All sorts of restrictions and burdens are imposed under it, and, when these are not in conflict with any constitutional prohibitions or fundamental principles, they cannot be successfully assailed in a judicial tribunal. With this power of the State and its legitimate exercise, I shall not differ from the majority of the court. [135]

But only two provisions of the statute could properly be called police provisions, those that confined the landing and slaughtering of animals to a particular district outside the city, and those that required the inspection of the animals before they are slaughtered. "When these requirements are complied with, the sanitary purposes of the act are accomplished. In all other particulars, the act is a mere grant to a corporation created by it of special and exclusive privileges by which the health of the city is in no way promoted." [136] As to the second, Field argued that the state could not be allowed, "under the pretence of prescribing a police regulation . . . to encroach upon any of the just rights of the citizen, which the Constitution intended to secure against abridgment." [137] It was:

one of the privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit, without unreasonable regulation or molestation and without being restricted by any of those unjust, oppressive, and odious monopolies or exclusive privileges which have been condemned by all free governments. [138]

. . . .

[Such] equality of right, with exemption from all disparaging and partial enactments, in the lawful pursuits of life, throughout the whole country, is the distinguishing privilege of citizens of the United States. To them, everywhere, all pursuits, all professions, all avocations are open without other restrictions than such as are imposed equally upon all others of the same age, sex, and condition. The State may prescribe such regulations for every **\*1246** pursuit and calling of life as will promote the public health, secure the good order and advance the general prosperity of society, but, when once prescribed, the pursuit or calling must be free to be followed by every citizen who is within the conditions designated, and will conform to the regulations. [139] This, Field concluded, was "the fundamental idea upon which our institutions rest." [140] Citing both Adam Smith and the Fourteenth Amendment, he held it "essential to the validity of the legislation of every State that this equality of right should be respected." [141] It was a matter of profound regret that the majority had permitted Louisiana's legislation to "reject[ ] and trample[ ] upon" citizens' equality of right, "for by it the right of free labor, one of the most sacred and imprescriptible rights of man, is violated." [142]

Over the following thirty years, Slaughter-House's minority became Lochner's majority. Field reiterated his demands that the Court develop a new police power jurisprudence in Munn v. Illinois (1877), which upheld state regulation of property--grain elevators--devoted to a use in which the public had an interest. [143] In dissent, Field once more condemned indiscriminate state resort to its police power, "which, from the language often used respecting it, one would suppose to be an undefined and irresponsible element in government," [144] and repeated his contention that the Fourteenth Amendment substantively protected citizens from state regulations that threatened their enjoyment of life, liberty and property.

The legislation in question is nothing less than a bold assertion of absolute power by the State to control at its discretion the property and business of the citizen, and fix the compensation he shall receive. The will of the legislature is made the condition **\*1247** upon which the owner shall receive the fruits of his property and the just reward of his labor, industry, and enterprise. [145] In Wabash, St. Louis, and Pacific Railway Co. v. Illinois

Compendium_Cornell
Page 1820

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19272   Page 401 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

(1886), the Court changed course, severely curtailing state resort to police powers in matters of commerce by affirming federal exclusivity, silently vacating Miln. [146] Defenders of state police powers, now in the minority, were reduced to using some of Field's language recognizing state capacities to regulate in an attempt to embarrass him. [147] In Chicago, Milwaukee and St. Paul Railway Co. v. Minnesota (1890), the Court majority adopted the Slaughter-House and Munn minorities' due process arguments, [148] and in Allgeyer v. Louisiana (1897) it affirmed unanimously that due process would trump state police powers where the latter might be found to have infringed upon "the privilege of pursuing an ordinary calling or trade, and of acquiring, holding and selling property," for these were "an essential part of [a citizen's] rights of liberty and property, as guaranteed by **\*1248** the Fourteenth Amendment." [149] The Court added that its judgment did not mean that a state could no longer exercise its police power in any such case. Rather, it meant that the substance of any exercise was subject to the Supreme Court's scrutiny, case by case. "When and how far such power may be legitimately exercised with regard to these subjects must be left for determination to each case as it arises." [150] Thinking again now of Lochner and its companions, Holden v. Hardy and Muller v. Oregon, we can see that case by case consideration is precisely what the Court undertook. As Dubber notes, scrutiny of such state police power measures continued into and beyond the 1930s. [151]

Given this history and context, why, then, does Dubber make so much of Lochner? The answer lies less in the decision per se than in the potential of the decision and the reaction to the decision. On its face Lochner, like its predecessors, addressed only social and economic regulation--just one tiny fragment of police power usage. "[P]olice power measures included all manner of . . . laws designed to control the dangerous classes." [152] The police power provided the basis for the "entirety of the criminal law." [153] The police power was the basis for state segregation statutes, state eugenics statutes, state criminalization of interracial marriage, state sodomy laws and "a host of other threats to the moral police of the public," [154] all matter-of-factly accepted. The Court's trajectory toward Lochner was confined within a very narrow path of inquiry--Field's initiating Slaughter-House dissent, for example, eschews critique of the state's powers of moral and criminal police, concentrating, as we have seen, on the citizen's economic liberties. [155] Lochner, to Dubber, represents a majority's modest move toward meaningful and principled judicial review of police power legislation with the potential for **\*1249** eventual extension to that vast mélange of laws and powers that is the police power, a move nevertheless significant in its apparent confirmation of a shift in juridical discourse (first intimated in Allgeyer) from a jurisprudence of charting limits to one of actual scrutiny, and the quite radical implications of such a shift:

> The narrow issue in Lochner was the propriety of a particular piece of social legislation. The broad issue was the legitimacy of state police power, and the need to justify exercises of that power in every instance, and in reference to specific criteria subject to meaningful scrutiny, not only by the courts, and not only under the constitution, but by the political community at large and on the basis of whatever principles of legitimacy that define it. [156]

It is, one must confess, difficult to find in Lochner any hint at all of quite so expansive an agenda. But the urgency of the question that underlies Dubber's seizure of Lochner, indeed underlies his entire book--that is, whether heteronomy or autonomy shall rule [157] --and is not weakened by that absence. As we shall see, the question is less historical than philosophical, but the effects of failing to answer it, or even ask, lie littered all about us today, in the vast regime of restraints and powers, matter-of-factly accepted, that constitute the state in contemporary life.

The responsibility for that litter does not escape those "progressive critics" who vilified the Court for its Lochner decision. [158] But their concerns--with perhaps the exception of Oliver Wendell Holmes (for whom, as Dubber shows, the whole exercise of trying to specify something called the police power of the state and scrutinize its use was simply an absurdity, "for the simple reason that all governmental power was police power") [159] -- were for the preservation of progressive social and economic legislation. In this they were not unsuccessful. But responsibility lies more with those who, from the outset, were desirous of ensuring the inviolability of the state's capacity to police "men and things" as it chose, and who, hence, criticized Lochner as an **\*1250** instance of judicial overreach that imperiled state power--and did so with such success that Lochner's promise of meaningful scrutiny of assumed authority remained unrealized.

Compendium_Cornell
Page 1821

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19273   Page 402 of
715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

Among them, we find Roscoe Pound, whose 1909 critique, Liberty of Contract, provides a fitting point upon which to terminate the first part of this excursion into Dubber's Police Power. [160]

In Liberty of Contract, Pound attributed the jurisprudential tendencies that informed the majority in Lochner to the influence of an exaggeratedly individualistic juridical ideology that denigrated "public right"; to an excessively "mechanical" or conceptualist mode of juridical reasoning that ignored practicalities; to an absence of regard for the societal role of state power; and to the general prevalence of legal principles over "situations of fact." [161] His ideal was a "sociological" jurisprudence that would "adjust[ ] . . . principles and doctrines to the human conditions they are to govern." [162] Just what this meant in practice is best illustrated by the approach Pound advocated in the realm of criminal and municipal justice. As Michael Willrich has established in some detail, Pound was a key figure in the turn-of-the-century reconstruction of urban court systems as managers of urban populations through the discretionary application of "socialized law." [163] In the cities, socialized law meant "centralized judicial bureaucracies with specialized branches" [164] such as (in Chicago's case) branch courts addressing discrete populations and problems--domestic relations, morals, and juveniles. [165] More important, it meant giving law a new therapeutic role. As Willrich describes it, the socialization of law brought the installation of "staffs of disciplinary personnel" or "social experts" as strategic players in the *1251 court bureaucracies. "Psychologists, psychiatrists, physicians, social workers, and probation officers . . . examined offenders and advised judges on the best 'individual treatment' given the offenders' mental makeup, family background, and social history." [166] As Progressive Era innovations spread, 'treatments' proliferated:

> To the conventional punitive measures of fines and incarceration, state legislatures added the far more discretionary techniques of indeterminate sentences, probation, parole, compulsory medical treatment, routine commitment to state institutions for the insane or feebleminded, and eugenical sterilization. In socialized criminal justice, the case was only the starting point for a much broader set of investigations and interventions that aimed not so much to punish crime but to reform criminals and the larger social world that had produced them. [167]

As we have seen, Dubber argues throughout The Police Power that criminal law is "the most patriarchal manifestation" of this most patriarchal power. In the early twentieth century, cheered on by Roscoe Pound, we see that patriarchal manifestation acquiring the fully elaborated form that would become the modern twentieth-century criminal justice system. Pound was fully aware of the patriarchal origins of the authority of the state to criminalize and punish. [168] Rather than scrutinize that authority, Pound desired its refinement and extension to "secur[e] social interests regarded directly as such, that is, disassociated from any immediate individual interests with which they may be identified." [169] What were those social interests? "The general security, the security of social institutions, the general morals, the conservation of social resources, the general progress" and, trailing last, "the individual life." [170] Preemptive interventions "to prevent disobedience" would be the new order of things--social *1252 control, "preventive justice." [171] This was the police power with the bit between its teeth.

## II. Considering The Police Power

Ambitions to preempt and prevent are no strangers to the early twenty-first century. This alone provides one immediate and potent answer to the question that I posed at the outset: "Why this subject; why now?" And indeed, the police of the international sphere no less than of the nation has attracted growing attention from contemporary politicians, scholars, and advocates of all stripes. For example, the contemporary Anglo-American project to allow only a conditional or probationary sovereignty for states that, in its estimation, ignore their obligations to what one might term "the natural society of the human race" is a classic instance of the intervention of Dubber's macrohouseholder in the affairs of the microhousehold, of heteronomy on a world scale. [172] Leading Canadian intellectual Michael Ignatieff's neo-liberal agenda for breeding "peace, order and good government" throughout the world through the export of Canadian expertise in administrative technocracy--he calls it, without obvious irony, a Canadian kind of imperialism--represents another, "softer" mobilization of the discourse of police in response to the widespread assumption of threat posed by "failed" states. [173] So also, one finds in the attempts of contemporary social theorists to analyze the "state of exception" or "necessity" or "emergency" or "siege" implied in contemporary governments'

Compendium_Cornell
Page 1822

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19274   Page 403 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

responses to that same widespread assumption, revelation of a conceptual **1253** apparatus and a history that closely tracks the police idea and its dichotomous relationship to law. [174] Giorgio Agamben asks:

> If exceptional measures are the results of periods of political crisis and, as such, must be understood on political and not juridico-constitutional grounds, then they find themselves in the paradoxical position of being juridical measures that cannot be understood in legal terms, and the state of exception appears as the legal form of what cannot have legal form. [175]

Describing the state of exception as "the original structure in which law encompasses living beings by means of its own suspension," [176] Agamben uses as his immediate point of reference President George W. Bush's military order of November 13, 2001 authorizing indefinite detention and trial by military commission of suspected terrorists, an order that "radically erases any legal status of the individual," whether under the Geneva Convention or U.S. law. Detainees become "the object of a pure de facto rule, of a detention that is indefinite not only in the temporal sense but in its very nature as well, since it is entirely removed from the law and from judicial oversight." [177] The definition of the true sovereign, says Agamben, following Carl Schmitt, becomes "he who decides on the state of exception." [178]

Discourses of necessity, emergency, self-preservation--"the preventive, even anticipatory aspect of police" [179] --are prominent in Dubber's account of the police concept. Prevention, anticipation, preemption, and intervention all "reflect[ ] the foundation of police in the unquestionable right of self-preservation under conditions of necessity." [180] Necessity and emergency, indeed, have always been central to police as a mode of governance (or, in Agamben's words, a **1254** "paradigm of government"). [181] Necessity is the rule of the household in performance of its oeconomic role; coercion ensures the continuance of necessity in the face of threat. The condition is one of exception, or emergency, made routine. Yet, fruitful conjunction with contemporary discourses of necessity notwithstanding, the "why" of The Police Power is not to be attributed to the onset of the "Global War on Terrorism" and its tactics. Dubber's purposes, rather, lie in exposure and critique of police as a mode of governance deeply implicated in American practice yet more or less ignored, until recently, in mainstream American political-legal history. The Police Power is both the latest product of a trend in Anglophone and European scholarship that has been busy constructing a broad history of police to replace a prior historiography that concentrated on the organizational development of uniformed police forces, and also a critic of directions followed by elements of that trend.

It is unnecessary to rehearse the trajectory followed by the "new police history" here. Suffice to say, it has tended to concentrate on the eighteenth and nineteenth centuries, and that we can find in it various but related points of origin--Michel Foucault's transformative investigations of power and of the techniques and effects of governmentality; the "new criminology" of the 1970s; and the pioneering institutionalist and intellectual-historical research on the state and political economy, both European and, more recently, American, on-going for some twenty-five years. [182] It is the latter, American, work, however, that catches Dubber's critical eye, for he finds it insufficiently sensitive to the "deep tension" between police and democratic **1255** governance, and police and law, that his book details. [183] The essence of police is hierarchy and heteronomy, deriving from its household origins. Scholars who have found in it potential or actual realizations of popular self-government, an energetic citizenry, and active and engaged political communities, ignore this at their peril. For the same reasons, scholars are equally mistaken who imagine rule of police as a democratic alternative to rule by remote juridical elites wielding an undemocratic common law. [184] Law, Dubber insists, in fact furnishes the only system of rule that can protect the citizen against police. He reinstitutes the principled distinction, eroded in much contemporary history, between a sphere of autonomy and individual rights and the demands, absolutist or majoritarian, made in the name of the public good or common-weal. [185] The common law maxim sic utere tuo ut alienum non laedas is a principle of justice symbolic of the first. [186] The maxim salis populi primus lex est is symbolic of the second. [187]

Dubber gives his critique of trends in American scholarship particular point by underlining the intricate relationship between the genealogies of police and hierarchical governance across a millennium of European history, and in particular "[t]he inherent connection between police science and the police state of absolute continental monarchies" that developed during the Enlightenment. [188] This inherent connection supposedly undercuts any prospect that police could be given any form of democratic reading. The force of the critique is diluted by Dubber's indifference to any need to specify the modes of discursive

Compendium_Cornell
Page 1823

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19275   Page 404 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

transmission, which leaves him dependent upon analogy. As we have seen, he tells us "it doesn't much matter" where the Founding Fathers picked up their ideas about the police concept, because whether expressed in continental European or Anglo-American discourse, the "core ideas" associated with police were invariant, rooted in **\*1256** the household. In fact, it is indisputable that while police was being perfected as an agency of absolutism in continental discourse, Anglo-American political theory, under the influence of Locke, was recentering itself on a departure from household-derived emphases on heteronomy and status by exploring the conceptual bases of "consent" and contract. [189] Dubber does not ignore this development, associated in particular with Locke, but does rather minimize it, by distinguishing between Locke's emphasis on consent in matters of law making and the "entirely different matter" of law's execution--the maintenance of order. [190] Still, the existence of alternative theorizations of politics, and, arising from those, of the bases of welfare, persisted. By the later eighteenth century, as we have seen, one may find in the work of Adam Smith a radical critique of police models of political economy that posited the decisive importance to wealth maximization of markets and individual freedom. [191] But this was not the only course that variation took, for it is also clear that an ideal of the common welfare remained potent in post-Revolutionary American thought. Whether one probes the writings of obscure autodidacts like William Manning or elite theorists like Thomas Jefferson, it is apparent that a great deal of intellectual energy was devoted during the early years of the Republic precisely (as Dubber acknowledges) to "bring the legitimate functions of police in line with a system of government that could not bear the distinction between policer and policed," or in other words to render police compatible with autonomy. [192]

Dubber's approach throughout The Police Power is that to achieve this outcome police must be placed within the limits of law. [193] This relies on a conceptual distinction between police and law, for, examined empirically and institutionally, police and law in the Anglophone tradition are far from distinct. [194] Consider, as Dubber notes, that **\*1257** Thomas Paine's famous dictum, "in America THE LAW IS KING," endorsed law rule only so far as law was recognized to be subject to popular authority. [195] Consider that the history of the rule of law in the United States is precisely the history of a process locating law in the hands of juridical elites distanced from popular authority. [196] Consider finally, as Dubber notes, that police in America, to an extent unparalleled elsewhere, was a juridically-administered discourse. "American courts, while helping to exercise the police power, in their applicatory function as inferior state officials, did more than anyone else to define and justify it." [197] Empirically and institutionally, that is, one may argue that in the United States, police indeed was placed within the limits of the law. The problem was that law did not conform itself conceptually to the provision of an ideal of autonomy.

Dubber realizes that, to be plausible, his history of the police concept thus requires that we rewrite, or write anew, the history of law so as to establish it as "an account of law, or right, as such, based on the basic legal right of autonomy." [198] In other words, Dubber's history of the police concept requires a companion history of the law concept that conforms it to the distinction he draws, if the distinction upon which so much of his analysis depends can in fact be maintained. [199] One has to wonder whether such distinct histories can in fact be written at any other level than the conceptual/intellectual. We have already noted, at the beginning of this essay, the ease with which the apparently enlightened autonomy embraced in the preamble to the U.S. Constitution is succeeded by a text devoted in good measure to the rules and practices of **\*1258** heteronomy. Empirically, we might claim, autonomy for some, no matter how inclusive its sphere, always turns out to be built on the police of others, whether men or things--of a race, a class, a gender, a people, a nation, a species, an environment. [200]

In fact, it is not at all clear that, even conceptually, law is an expression of autonomy, or that law and police may be treated as distinct. To develop these points, let us now, at last, return to Walter Benjamin's Critique of Violence.

The task of a Critique of Violence, Benjamin says, is to "expound[ ] its relation to law and justice. For a cause, however effective, becomes violent, in the precise sense of the word, only when it bears on moral issues. The sphere of these issues is defined by the concepts of law and justice." [201] Studying law and justice entails studying the relationship of means to ends. Violence is means, but to critique violence **\*1259** as such requires that one isolate it from ends, otherwise the critique is simply absorbed by the justness of the end. Thus, where (as in natural law theories) ends are paramount and violence is a phenomenon of nature, only violent means to an end antithetical to natural law may be termed unjustified. Positive law on the other hand scrutinizes not ends but means. It treats violence not as a phenomenon of nature but of history. Positive law thus distinguishes sanctioned ("historically acknowledged") from unsanctioned violence independent of any assessment of ends. But positive law still assures us that ends reached by legal means are justified--"positive law . . . 'guarantee[s]' the justness of the ends through the justification of the means." [202] Obviously, the question becomes whether the distinction between different kinds of violence is meaningful.

Compendium_Cornell
Page 1824

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19276   Page 405 of
715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

Positive law checks resort to violence by the individual as legal subject by ignoring the criterion of naturally just ends. Instead, it erects legal ends (one of which is the subordination of citizens to law)--that is, ends pursued by legalized power. Resort to violence outside legality undermines the system of legalization and must therefore be suppressed, not because it threatens legal ends (for then not violence per se but only violence directed to an illegal end would be controversial) but because violence when not sanctioned, "when not in the hands of the law, threatens it . . . by its mere existence outside the law." [203]

The concrete threat of unsanctioned violence is that in contesting "the order of existing law" it has the effect of creating new law. That is, violence is law-making. Indeed, Benjamin may be seen as arguing that violence is foundational to law in that no act of creation of a legal order can have an anterior legitimation to which it can turn. [204] Rather, law-making--acts of creation or acts against existing laws to transform them--can only begin from the point of absence of legitimation, or against what exists. Once law is made, violence preserves law, in that law uses **\*1260** the threat and actuality of its monopoly of legal violence as the means to its own safe-keeping. [205]

These two forms of violence combine most fully in the realm of punishment. Law's declared power over life, especially the power to end life, is the ultimate law-preserving violence. But law-making violence is also present, for "it may be readily supposed that where the highest violence, that over life and death, occurs in the legal system, the origins of law jut manifestly and fearsomely into existence." [206] Punishment, as Dubber has shown us, is supremely creative--it proliferates endlessly. "Its purpose is not to punish the infringement of law but to establish new law. For in the exercise of violence over life and death more than in any other legal act, law reaffirms itself." [207] From here we move quickly to a trenchant discovery. "[I]n this very violence" (the violence over life and death), he says, "something rotten in law is revealed." [208]

At this point, Benjamin seems to me to hesitate. He has been insisting on a distinction between different forms of violence, and the distinction has now collapsed under the weight of capital punishment. Benjamin will acknowledge this, but only indirectly, only after moving away from law to "another institution of the modern state"--police. [209] Here also, he states, both law-making and law-preserving violence exist alongside each other. But here their separation is entirely suspended. "Police violence is emancipated" from the restraints that distinct orders of violence imply. [210] "It is lawmaking, for its characteristic function is not the promulgation of laws but the assertion of legal claims for any decree, and law-preserving, because it is at the disposal of those ends." [211] But if this suspension of the distinction is what enables police, it is also what distinguishes police from law. They are different phenomena.

> **\*1261** The assertion that the ends of police violence are always identical or even connected to those of general law is entirely untrue. Rather, the 'law' of the police really marks the point at which the state . . . can no longer guarantee through the legal system the empirical ends that it desires at any price to attain. [212] What is "rotten" in the state of law is, it would appear, the corruption that spreads from police, for it is police that instantiates the collapse of the law-making/law-preserving distinction. But police is nevertheless kept conceptually distinct from law.

Can this conceptual distinction be maintained? I think not, which perhaps explains Benjamin's hesitation over the significance of law's "reaffirmation" of itself. For reaffirmation is both creation and preservation--production anew and reproduction. That is law's praxis. Derrida calls it the law of iterability, meaning that iteration and reiteration cannot be distinguished. "[T]he very violence of the foundation or positing of law (Rechtsetzende Gewalt) must envelop the violence of the preservation of law (Rechserhaltende Gewalt) and cannot break with it. It belongs to the structure of fundamental violence in that it calls for the repetition of itself and founds what ought to be preserved. . . . [T]here is no more pure foundation or pure position of law, and so a pure founding violence, than there is a purely preserving violence. Positing is already iterability, a call for self-preserving repetition. Preservation in its turn refounds, so that it can preserve what it claims to found. Thus there can be no rigorous opposition between positing and preserving." [213]

Benjamin argues that law-making and law-preserving violence are different species of violence. But in this, Derrida has shown, he is unsuccessful. [214] Benjamin argues that the suspension of the distinction occurs in police. But the suspension cannot be cabined. "He never gives up trying to contain in a pair of concepts and to bring back down to distinctions the very thing

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19277   Page 406 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

that incessantly exceeds them **\*1262** and overflows them." [215] Law and police may be strategically differentiated--hence heteronymous--but in their common conceptual relation to a common violence they are of a piece. [216]

Now, we should be the first to say that Dubber's law, figured as autonomy, is not Benjamin's (or Derrida's) law, figured as violence/force. But here we are not traversing an empirical argument about what law is, but rather a philosophical argument about how we conceptualize law. And in doing so, perhaps, we uncover the nub on which The Police Power turns, in that although this is a book cast as a history, and to a large extent written as one, in its central characteristic--the proposition that an essential opposition exists between concepts of police and law--it is making a philosophical and not a historical argument. For while the heteronomy of police is indeed historically indubitable, the autonomy of law is not--it is asserted, it cannot be proven. No history of it, we have seen, is available. [217] So, if Dubber argues that the essence of law is autonomy, which distinguishes it from police, it seems at this point sufficient as a retort, or at least demurral, to show that one can read law differently. [218]

 **\*1263**   That one can read differently is indeed evident in the most dramatic moment of the book itself, in which, we have seen, Dubber rescues the Lochner decision from "the enormous condescension of [in this case liberal-legal] posterity." [219] For Dubber acknowledges, there are several different ways of reading the case, only one of which is his. First, we may read Lochner as a narrowly-conceived display of laissez-faire jurisprudence negating a state's legitimate resort to its police powers; or, second, as an exercise in laissez-faire jurisprudence negating legislative regulation of the conditions of labor on the grounds that this was an attempt by the state to claim a commerce power not within its jurisdiction, camouflaged as a use of the state's police powers; or, third, as a principled scrutiny of a police regulation to determine whether it was "fair, reasonable and appropriate" as opposed to "unreasonable, unnecessary and arbitrary." [220]   The orthodox liberal critiques concentrate on the first and second readings: Lochner was a "judicial usurpation of the legislative prerogative" that smuggled "conservative anti-labor laissez-faire views into constitutional doctrine." [221]   Dubber finds these readings understandable, given progressive concerns for the enhancement of regulatory capacity, but dogmatically indifferent to the absence of accountability of state power. He concentrates on the third--scrutiny of resort to "a particular aspect of the police power in a specific context"-- arguing that this is exactly what the American view of law **\*1264**   and government should lead one to expect courts to do. [222]   Admitting the Court's execution might have left something to be desired in the particular instance, "the larger enterprise of exploring the limits of state police power" in the interests of protecting the autonomy of citizens vis-à-vis the state was appropriate. [223]   But opposition both on the Court and beyond it eroded the initiative, [224]   and while the Court continued to examine police power cases, it returned to an older default assumption that police powers per se were unreviewable, beyond its ken: the only question was whether the end sought was appropriate to the police (good **\*1265**   order) of the community as a whole and the means employed "reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." [225]   The basic issue--whether the state indeed had, or should have, the capacity to coerce citizens in the name of the "police . . . of the political community"-- became a non-question. [226]

The police/autonomy dichotomy breaks down, however, in a fourth reading of the case that Dubber offers, namely that the New York legislature's statute did not restrain the autonomy of bakery workers, as the Court argued, but rather enhanced it. Exchange relationships between employers and employees are invariably asymmetrical--invocations of mythically equal citizens engaged in exercising their freedom of contract simply camouflage protection of sustained inequalities of resources and status. [227]   Dubber argues that this reading is consistent with an account of law that confirms its foundation on "the basic legal right to autonomy" asserted throughout:

> In this reading, Lochner wasn't a police power case at all but a justice power case. The New York statute . . . protected the status of bakery employees as autonomous persons under law, by allowing them to manifest their capacity for autonomy in their contractual relationship with their employers, rather than falling prey to the employers' superior power. [228]   Why, then, did the Court strike down the autonomy-enhancing statute, choosing instead to protect and sanction the existing asymmetry of the employment relationship **\*1266** against an attempt at legislative melioration? Does this reading not render the heteronomy/autonomy dichotomy that has sustained the police/law dichotomy throughout the book murky? It would be absurd to read one case to produce so over-determined a conclusion, yet one must also allow that in the multiple readings of Lochner one sees precisely the seepage of law and police into one another, a merger of agents that produces outcomes more ambiguous than the clarity of Dubber's dichotomy allows. One sees clear traces of Benjamin's law-preserving violence--the violence done, for example, in the preservation of sanctioned asymmetries. And one sees that as an instance of reiteration,

Compendium_Cornell
Page 1826

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19278   Page 407 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

the sanction of asymmetry--from whatever motive or principle--has reproduced asymmetry in law, and thereby produces it afresh.


### III. To Conclude: Fort-Dasein [229]

In an immediate sense, the police power evaded principled scrutiny both of its bases and its effects because the moment of its emergence in American political-legal consciousness--the later nineteenth and early twentieth centuries--was simultaneously the moment of its defense. **\*1267** Associated in the liberal mind with benevolent resort to the state's capacities to elevate its citizenry, the police power became the principle means to elevate "public right," address the social (rather than merely individual) interests with which public right was purportedly identified, and thereby, ultimately, improve the human condition. The purpose of The Police Power is to establish a basis upon which we can think very differently--critically--about the police power. It locates the concept of police historically in patriarchy and heteronomy, uses that locale to define it as a mode of governance, and counterposes to it the concept of law, labeled justice power and expressive of autonomy, as the essential standpoint outside police from which the critique can be mounted.

In thus summarizing the project of The Police Power, and to a degree throughout this essay, I have been engaging in a professional academic exercise of "review." Here is one more scholarly book addressing one more scholarly subject. The routine of review categorizes its author's "contribution" to some specific or general pool of knowledge, and moves on. But is that all that should be said? I think not.

Dubber, like Benjamin, is telling a ghost story, [230] one full of warning for our time. For our time is one in which a past--the past of police--has "flashe[d] up at the instant when it can be recognized," a supreme "moment of danger." [231] Throughout The Police Power, police haunts law, indeed haunts life itself. Its spirit is ubiquitous but formless, de-centered, dispersed and distributed, unlimited and indefinable, always beyond law's grasp. For Benjamin, police was particularly threatening to the life of democracies--"the[ ] spirit [of police] is less devastating where they represent, in absolute monarchy, the power of a ruler in which legislative and executive supremacy are united, than in democracies where their existence . . . bears witness to the greatest conceivable degeneration of violence." [232] Derrida comments "[i]n absolute monarchy, police violence, terrible as it may be, shows itself as what it is and what it ought to be in its spirit, whereas the police **\*1268** violence of democracies denies its own principle, making laws surreptitiously, clandestinely." [233] The point is, we know the truth of this so much more now than Benjamin in 1921, or even than Derrida in 1989, even after he added to Benjamin's his own words on "modern technologies of communication, of surveillance and interception . . . [that] ensure the police absolute ubiquity, saturating public and private space, pushing to its limit the coextensivity of the political and the police domain," even after he asks, "[i]s this the contradiction of which Benjamin thought? The internal degeneration of the democratic principle inevitably corrupted by the principle of police power, intended, in principle, to protect the former but uncontrollable in its essence, in the process of its becoming technologically autonomous?" [234] For we now live in a new age, an improved state of exception, our own absolute state of police. [235]

For Benjamin, the only answer, the final answer, was revolutionary violence, "a justice of ends that is no longer tied to the possibility of law." [236] Thus at the end of the **\*1269** Critique of Violence, Benjamin writes, "on the suspension of law with all the forces on which it depends as they depend upon it, finally therefore on the abolition of state power, a new historical epoch is founded." [237] Dubber, we have seen, believes that police may be made controllable, subjected to law. [238] This is his answer--like Benjamin's, no less, no more than an "act of hope." [239]

Deep layers of ironic coincidence here cloud the possibility that Dubber's answer is viable. Dubber begins and ends The Police Power identifying his goal--principled scrutiny of the police power from the standpoint of autonomy (law)--with a project begun by Thomas Jefferson in 1778 to interrogate governance in the new United States from the standpoint of the "unalienable rights" declared in the act of revolutionary violence known as American independence, and continued in 1779 when Jefferson established the new Republic's first chair "of law and police" **\*1270** at the College of William & Mary. [240] Jefferson is well known for his throwaway endorsement of revolutionary violence, [241] but his interrogation of governance from the standpoint of the unalienable rights it had brought forth was not at all productive, perhaps because as both a private and a public governor,

Compendium_Cornell
Page 1827

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19279   Page 408 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

Jefferson knew only too well the benefits of police. Jefferson the governor of slaves was patriarch nonpareil, the classic Aristotelian beneficiary of classic household governance. Jefferson the governor of Virginia, in pursuit of "worthy" ends, was spectral police incarnate. "It is very much the Interest of the good to force the unworthy into their due Share of Contributions to the Public Support, otherwise the burthen on them will become oppressive indeed" he wrote to Garret Van Meter on the occasion of Claypool's Rebellion, an obscure protest that erupted in April 1781, centered on Hardy and Hampshire Counties in western Virginia, against statutes passed by the Virginia Assembly to levy taxes to subsidize the recruitment of troops for the Continental Army, and to requisition supplies. [242]

> [M]en on horseback have been found the most certain Instrument of public punishment. Their best way too perhaps is not to go against the mutineers when embodied which would bring on perhaps an open Rebellion or Bloodshed most certainly, but when they shall have dispersed to go and take them out of their Beds, singly and without Noise, or if they be not found the first time to go again and again so that they may never be able to remain in quiet at home. [243]

The governor of slaves knows firsthand that his noble unalienable autonomy (law) has been enabled by the **\*1271** meanness of slavery (police). The governor of Virginia thinks it perfectly appropriate to use agents of public punishment clandestinely, to disappear rebellious rights-holders from their beds, or harass them until they singly flee, to serve "the Interest of the good." [244] Is this not all too drearily familiar? Can such men as these "revolutionaries-turned-rulers" seriously be treated as the initiators of a critique of the "something rotten" embedded at the heart of this particular "state of exception" (by which, of course, I mean "exceptional" America [245]) at the time of its beginning, as authors of first principles to which we should now return? [246] Dubber's faith in law-as-autonomy is not naïve. But to turn to a law-that-has-never-been, a law that has no history, as a means to resolve the degeneration of democracy that police so pervasively has been and is, cannot be counted as anything but an act of hope, and, I fear, a vain one at that.

## Footnotes

d1   Senior Research Fellow, American Bar Foundation, Chicago. I wish to thank Roy Kreitner, Kunal Parker, and Mariana Valverde for all their wise and helpful advice.

1   U.S. Const. pmbl.

2   Immanuel Kant, Introduction to The Science of Right, in The Philosophy of Law: An Exposition of the Fundamental Principles of Jurisprudence as the Science of Right 47 (W. Hastie trans., The Lawbook Exch., Ltd. 2002) (1887).

3   Eduard Lasker, Zur verfassungsgeschichte Preussens 208 (1874), translated in Leonard Krieger, The German Idea of Freedom: History of a Political Tradition 353 (1957).

4   Walter Benjamin, Critique of Violence, in Reflections: Essays, Aphorisms, Autobiographical Writings 287 (Peter Demetz ed., Edmund Jephcott trans., 1986).

5   See U.S. Const. pmbl., art. I, § 2, cl. 3.

6   See id. at art. I, § 9, cl. 1.

7   Id. at art. IV, § 2, cl. 3.

Compendium_Cornell
Page 1828

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19280   Page 409 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

8    Hence William Lloyd Garrison's denunciation of the U.S. Constitution as "a covenant with death." See Randy E. Barnett, Was Slavery Constitutional Before the Thirteenth Amendment?: Lysander Spooner's Theory of Interpretation n.1, www.lysanderspooner.org/PLJINT.htm (last visited Nov. 9, 2005) (citing Resolution Adopted by the Antislavery Society (Jan. 27, 1843)). The figure of speech is taken from Isaiah 28:15 (King James): "We have made a covenant with death, and with hell are we at agreement; when the overflowing scourge shall pass through, it shall not come unto us: for we have made lies our refuge, and under falsehood have we hid ourselves."

9    Markus Dirk Dubber, The Police Power: Patriarchy and the foundations of American government (2005).

10   See Krieger, supra note 3, at 352-53 (1957). Lasker (1829-1884) had an American following, so much so that on his death the U.S. House of Representatives resolved (in a gesture of provocation against Chancellor Otto von Bismark):

     That his loss is not alone to be mourned by the people of his native land, where his firm and constant exposition of, and devotion to, free and liberal ideas have materially advanced the social, political and economic conditions of these people, but by the lovers of liberty throughout the world.

     Edward Lasker, http://38.1911encyclopedia.org/L/LA/LASKER_EDUARD.htm (last visited June 26, 2005).

11   Dubber, supra note 9, at 111, 112-13, 160; see also Immanuel Kant, Division of the Science of Right, in The Philosophy of Law, supra note 2, at 54-58.

12   Dubber, supra note 9, at 111.

13   Id. at xiv, 160. Chief Justice Taney put it thus in Thurlow v. Massachusetts (License Cases):

     [W]hat are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within itsown limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States. And when thevalidity of a State law making regulations of commerce is drawn into question in a judicial tribunal, the authority to pass it cannot be made to depend upon the motives that may be supposed to have influenced the legislature, nor can the court inquire whether it was intended to guard the citizens of the State from pestilence and disease, or to make regulations of commerce for the interests and convenience of trade.

     Thurlow v. Massachusetts, 46 U.S. (5 How.) 504, 583 (1847). On people as articles of commerce, see Edwards v. California, 314 U.S. 160, 172 (1941) and generally Mary S. Bilder, The Struggle over Immigration: Indentured Servants, Slaves, and Articles of Commerce, 61 Mo. L. Rev.743 (1996).

14   4 William Blackstone, Commentaries on the Laws of England 162 (1769). Dubber, supra note 9, at xii.

15   Dubber, supra note 9, at 3.

16   Id. at 68-69.

17   See id. at 68-69, 73, 82.

18   Id. at 128.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19281   Page 410 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

[19]  See id. at 3, 159-60, 211-17.

[20]  Id. at 3, 10-11.

[21]  See, e.g., id. at 27-36.

[22]  That is, not polarities but correlatives, or distinct ways of expressing the same relationship. We should note that in developing his Science of Right, Kant grants recognition to rights expressive of relations of heteronomy, as in conjugal, parental and household relations, albeit very carefully defined. See Immanuel Kant, Principles of Personal Right that is Real in Kind, in The Philosophy of Law, supra note 2, at 108-09; The Rights of the Family as a Domestic Society, in id. at 109-20.

[23]  See generally Benjamin, supra note 4.

[24]  Id. at 285. It is important to note that the title of Benjamin's essay, in its original German publication was Zur Kritik der Gewalt. See Walter Benjamin, Zur Kritik der Gewalt, 47 Archiv für Sozialwissenschaft und Sozialpolitik 809 (1920-21). The original title may be interpreted as differing from the implications of the subsequent English translation in two respects: First, and less important, Zur Kritik der Gewalt might better be rendered as "On the Matter of the Critique of ..." or "Toward the Critique of ...." This reinforces the correct sense of Kritik/Critique, which is evaluative rather than condemnatory. Benjamin is undertaking a critique and simultaneously exploring how the critique may be undertaken. His text is perhaps more experimental that the flatly assertive English title implies. Second, and more important, Gewalt can also be translated as "legitimate power" or "authority" or "public force." What is translated as "violence" thus can mean state action to exert pressure, threaten or coerce in the name of authority, rather than physical onslaught and destruction from any source. See Jacques Derrida, Force of Law: The Mystical Foundation of Authority, in Acts of Religion 234 (Gil Anidjar ed., 2002) (Force of Law is in large part an extended commentary on Benjamin's Critique of Violence, supra note 4.)

[25]  Id. at 295; see also id. at 283-86.

[26]  Derrida, supra note 24, at 267.

[27]  Benjamin, supra note 4, at 280-81.

[28]  See id. at 287.

[29]  Id. at 286.

[30]  Id. at 287. As Benjamin puts it, there is the police that "accompany[ies] the citizen as a brutal encumbrance through a life regulated by ordinances, or simply supervise[es] him,' and then there is the police that is intervention ' 'for security reasons' in countless cases where no clear legal situation exists.' See id.

[31]  Dubber, supra note 9, at xv, 120; see also id. at 120; Benjamin, supra note 4, at 287. Benjamin states that "[u]nlike law, which acknowledges in the 'decision' determined by place and time a metaphysical category that gives it a claim to critical evaluation, a consideration of the police institution encounters nothing essential at all." Id. What does this mean? As Derrida puts it, a decision "cuts and divides." Derrida, supra note 24, at 252. It is finite. But "if the act simply consists of applying a rule, of enacting a program or effecting a calculation," there is no decision. Id. at 251. Police, that is, is not a decision but an absence, embodied in the suspension of differentiation between law-making and law-preserving

Compendium_Cornell
Page 1830

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19282   Page 411 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

violence. Therein lies its spectrality, its lack of definition or limit. "One never knows who one is dealing with, and that is the definition of the police ... unlocatable." Id. at 276.

32    One must know the history of the idea of police, Dubber argues, or one will fail to understand the nature and scope of the police power. "And that is precisely what has happened in modern American law." In law's failure lies considerable danger. "A power obscured cannot be checked." Dubber, supra note 9, at 159.

33    Id. at 3.

34    William James Booth, Households: On the Moral Architecture of the Economy 4-8, 27 (1993).

35    Dubber, supra note 9, at 10; see also id. at 8-11.

36    Id. at 11-14, 49-50.

37    Id. at 16-18. Dubber's succinct but necessarily condensed summary of a long and complex historical process leaves him acknowledging but not investigating the contours of potent jurisdictional conflicts between the claims of the king and of "inferior" householders outside the arena of criminal law. On the structures and ideologies of governance that claimed and distributed jurisdiction to rule in early-modern England, see, for example, Holly Brewer, By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority (2005) and Richard Lachmann, From Manor to Market: Structural Change in England, 1536-1640 (1987).

38    Dubber, supra note 9, at 15, 24; see also id. at 14-21.

39    Id. at 20.

40    Id. at 22-23 (quoting 25 Edw. III stat. 5 cl.2 (1351)).

41    Id.

42    See id. at 23-36.

43    Id. at xi, xv.

44    Id. at 48; see also id. at 48-62.

45    Id. at 37.

46    Id.

47    Criminal law could be law, Dubber emphasizes, only if envisaged or reinvented as a system of "right, structuring relationships and conflicts among persons, rather than controlling threats to the household." Id. at 181.

48    For Dubber the elevation of law (as he defines it) to the point of generating tension with governance as police is a comparatively recent occurrence. "It didn't arise until what J.B. Schneewind has termed 'the invention of autonomy' in

Compendium_Cornell
Page 1831

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19283   Page 412 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

enlightenment political and moral philosophy, and particularly in the work of Rousseau and Kant. Only at that time was autonomy identified as a characteristic of personhood, rather than as an attribute of status, and of householder status in particular." Id. at 160 (quoting J.B. Schneewind, The Invention of Autonomy: A History of Modern Moral Philosophy (1998)).

49    Id. at 46-47; see also Brewer, supra note 37, at 90-98.

50    Dubber, supra note 9, at 47 (emphasis added).

51    Id. at 47; see also id. at 47-49.

52    That is, during the century beginning 1650.

53    On the development of police science, see Dubber, supra note 9, at 63-77. See also Christopher L. Tomlins, Law, Labor, and Ideology in the Early American Republic 39-43 (1993); supra notes 15-39. On law as science, see 4 Blackstone, supra note 14, at 2-33. Kant's great work on law was, as Kant indicated in its title, intended to restate the fundamental principles of jurisprudence--the philosophy of law--as "the science of right." See Kant, supra note 2.

54    Dubber, supra note 9, at 50 (quoting Jean Jacques Rousseau, A Discourse on Political Economy (1755)).

55    4 Blackstone, supra note 14, at 161-75. Dubber discusses Blackstone in some detail in both the English and colonial contexts. See Dubber, supra note 9, at 48-62.

56    Thus "if any person infected with the plague, or dwelling in any infected house, be commanded by the mayor or constable, or other head officer of his town or vill, to keep his house, and shall venture to disobey it; he may be inforced, by the watchmen appointed on such melancholy occasions, to obey such necessary command." 4 Blackstone, supra note 14, at 161; see also id. at 161-62, 170-75. On the police of quarantine, see Michel Foucault, Discipline and Punish: The Birth of the Prison 195-97 (Alan Sheridan trans., Vintage Books 1979).

57    4 Blackstone, supra note 14, at 163-64.

58    Id. at 165-70.

59    Dubber, supra note 9, at 58; see also id. at 58-59.

60    Id. at 65.

61    Id. at xiii.

62    See Dubber, supra note 9, at 71-72. On the "swarming" of disciplinary mechanisms, see Foucault, supra note 56, at 211-27.

63    Colin Gordon, Governmental Rationality: An Introduction, in The Foucault Effect: Studies in Governmentality 10 (Graham Burchell et al. eds., 1991).

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19284   Page 413 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

64      Dubber, supra note 9, at 72.

65      Gordon, supra note 63, at 10.

66      Dubber, supra note 9, at 73.

67      Adam Smith: Lectures on Jurisprudence 5 (R.L. Meek et al. eds., 1978). Dubber, supra note 9, at 63-64.

68      Smith, supra note 67, at 331.

69      Id. at 333.

70      Id. at 331. Smith explained: "The neteté of a country regards the regulations made in order to preserv[e] cleanlyness of the roads, streets etc. and prevent the bad effects of corrupting and putrifying substances. This could never be treated of in this place." Id.

71      Dubber, supra note 9, at 64. See generally Donald Winch, Adam Smith's Politics: An Essay in Historiographic Revision (1978).

72      Smith, supra note 67, at 7.

73      See supra text accompanying note 70.

74      See generally Winch, supra note 71. See also Tomlins, supra note 53, at 75-78.

75      As Benjamin has told us, police is "formless ... nowhere tangible, all-pervasive, ghostly." Benjamin, supra note 4, at 287.

76      On Colquhoun, see Tomlins, supra note 53, at 79-80; Mark Neocleous, Theoretical Foundations of the "New Police Science," in The New Police Science: Police Powers in Comparative Perspective (Markus Dubber & Marianna Valverde, eds., forthcoming 2006). On Bentham, see Dubber, supra note 9, at 68-70; Tomlins, supra note 53, at 46.

77      Dubber, supra note 9, at xi.

78      Id. at xiii; see also id. at 28-36, 51-53, 59-62.

79      Id. at xiii.

80      Id. at 81.

81      Id.

82      Id.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19285   Page 414 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

83      See generally Brewer, supra note 37.

84      Thus the French Société d'Économique Politique met in 1855 to debate whether "the right of property [is] better founded on the principle of social utility than on the principle of justice and individual right." See Heath Pearson, Origins of Law and Economics: The Economists' New Science of Law, 1830-1930, at 25 (1997). See generally id. at 5-42.

85      See Dubber, supra note 9, at 82.

86      Willi Paul Adams, The First American Constitutions: Republican Ideology and the Making of the State Constitutions in the Revolutionary Era 136 (1980) (quoting Delaware Declaration of Rights § 4 (1776)).

87      See Dubber, supra note 9, at 86.

88      See Commonwealth v. Alger, 61 Mass. (7 Cush.) 53, 78 (1851).

89      See Dubber, supra note 9, at 83.

90      Tomlins, supra note 53, at 58-59; see also id. at 35-106.

91      See Dubber, supra note 9, at 220-21 n. 19.

92      See Peter Oxenbridge Thacher, An Address to the Members of Massachusetts Charitable Fire Society, at Their Annual Meeting, In Boston, May 31, 1805, at 5-21 (1805).

93      Id., quoted in Tomlins, supra note 53, at 95-96; see also id. at 133-37.

94      Dubber, supra note 9, at 84.

95      2 The Records of the Federal Convention of 1787, at 26 (Max Farrand ed., 1937).

96      Id.

97      Tomlins, supra note 53, at 62-63 n.8.

98      See Dubber, supra note 9, at 86.

99      Joyce Appleby, The American Heritage: The Heirs and the Disinherited, 74 J. Am. Hist. 798, 811 (1987).

100     See Dubber, supra note 9, at 86-87. For conferral of rule-making powers of government and regulation on the federal government in various spheres of activity, see U.S. Const. art. I, § 8, cl. 3-5, 14, 16.

101     Dubber, supra note 9, at 86.

102    See Robert C. Palmer, English Law in the Age of the Black Death, 1348-1381: A Transformation of Governance and Law 23-24, 50-51 (1993).

103    For commentary on the Boston Police Court, created in 1822, see Tomlins, supra note 53, at 271. On New York, see id. at 132. On the role of the judiciary in the police regime, see generally Dubber, supra note 9, at 93-119.

104    Dubber, supra note 9, at 94.

105    Id. at 94; see also id. at 94-138.

106    27 Vt. 140, 156 n.† (1854).

107    Id. at 142-43, 149-50.

108    See 61 Mass. (7 Cush.) 53.

109    Id. at 84-85.

110    Id. at 85 (1851). Dubber discusses both Thorpe and Alger, and related cases, at some length. See Dubber, supra note 9, at 85, 104-19.

111    See 61 Mass. (7 Cush.) at 64-93.

112    See, e.g., Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543 (1823); Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831); United States v. Rogers, 45 U.S. (4 How.) 467 (1846); United States v. Kagama, 118 U.S. 375 (1886); Chae Chan Ping v. United States, 130 U.S. 581 (1889); Nishimura Ekiu v. United States, 142 U.S. 651 (1892); United States v. Hing Quong Chow, 53 F. 233 (E.D. La. 1892) (discussed in Dubber, supra note 9, at 141-42); Fong Yue Ting v. United States, 149 U.S. 698 (1893); DeLima v. Bidwell, 182 U.S. 1 (1901); Downes v. Bidwell, 182 U.S. 244 (1901); Dorr v. United States, 195 U.S. 138 (1904).

113    "Political question" doctrine originated in Rogers, 45 U.S. (4 How.) 467.

114    Miln, 36 U.S. (11 Pet.) 102 (1837).

115    Id. at 130.

116    Miln, 1837 U.S. LEXIS 169, 1 (discussed in the "prior history" section).

117    Miln, 36 U.S. (11 Pet.) at 131.

118    Id. at 132.

119    Id. at 132-33.; see also Paul Finkelman, The Taney Court, 1836-1864: The Jurisprudence of Slavery and the Crisis of the Union, in The United States Supreme Court: The Pursuit of Justice 80 (Christopher Tomlins ed., 2005). Finkelman adds:

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19287   Page 416 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

The police powers doctrine would remain a permanent part of American federalism and constitutional law. In Cooley v. Board of Wardens of Port of Philadelphia (1851), the Taney court would reaffirm the doctrine in allowing the port of Philadelphia to require that ships involved in interstate commerce hire a local pilot to guide the ship to a dock. Ultimately, Miln and Cooley set the stage for local regulation of interstate and international commerce in the absence of federal regulation. This was one of Taney's most lasting contributions (or alterations) to constitutional law and illustrates a significant break with the Marshall Court tradition.

Id. Miln is discussed in Dubber, supra note 9, at 143-45.

120    Miln, 36 U.S. (11 Pet.) at 153 (Story, J., dissenting).

121    Id. at 156.

122    Dubber, supra note 9, at 143.

123    See Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1873); West Coast Hotel v. Parrish, 300 U.S. 379 (1937). On the transformation of the state by Civil War and Reconstruction, see Richard Franklin Bensel, Yankee Leviathan: The Origins of Central State Authority in America, 1859-1877 (1990). On the impact of social and economic change, see Martin J. Sklar, The Corporate Reconstruction of American Capitalism, 1890-1916: The Market, The Law, and Politics (1988). On the evolution of Fourteenth Amendment jurisprudence, see Charles W. McCurdy, Justice Field and the Jurisprudence of Government-Business Relations: Some Parameters of Laissez-Faire Constitutionalism, 1863-1897, 61 J. Am. Hist. 970 (1975). See also Howard Gillman, The Waite Court, 1874-1888: The Collapse of Reconstruction and the Transition to Conservative Constitutionalism, in The United States Supreme Court: The Pursuit of Justice 124 (Christopher Tomlins ed., 2005); Linda Przybyszewski, The Fuller Court, 1888-1910: Property and Liberty, in id. at 147; William E. Forbath, The White Court, 1910-1921: A Progressive Court?, in id. at 172; Melvin I. Urofsky, The Taft Court, 1921-1930: Groping for Modernity, in id. at 199; William G. Ross, The Hughes Court, 1930-1941: Evolution and Revolution, in id. at 223.

124    198 U.S. 45 (1905).

125    Id. at 56.

126    Dubber, supra note 9, at 191.

127    Id.

128    Lochner, 198 U.S. at 53.

129    Dubber, supra note 9, at 195.

130    Id.

131    See 169 U.S. 366 (1898); see also Dubber, supra note 9, at 193-95.

132    208 U.S. 412 (1908); see also Dubber, supra note 9, at 195-96.

133    Dubber, supra note 9, at 196.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19288   Page 417 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

134   Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 86 (Field, J., dissenting).

135   Id.

136   Id.

137   Id.

138   Id. at 106 (quoting Live-Stock Dealers' Ass'n v. Crescent City Live Stock Landing, 15 F. Cas. 649, 652 (C.C.D. La. 1870) (No. 6972)).

139   Id. at 109-10.

140   Id. at 110.

141   Id.

142   Id. On due process, see also id. at 115-18, 122 (Bradley, J., dissenting); id. at 125-28 (Swayne, J., dissenting).

143   See 94 U.S. 113 (1877).

144   Munn, 94 U.S. at 145 (Field, J., dissenting).

145   Id. at 148.

146   118 U.S. 557, 577 (1886). The majority stated:

Of the justice or propriety of the principle which lies at the foundation of the Illinois statute it is not the province of this court to speak. As restricted to a transportation which begins and ends within the limits of the State it may be very just and equitable, and it certainly is the province of the State legislature to determine that question. But when it is attempted to apply to transportation an entire series of States a principle of this kind, and each one of the States shall attempt to establish its own rates of transportation, its own methods to prevent discrimination in rates, or to permit it, the deleterious influence upon the freedom of commerce among the States and upon the transit of goods through those States cannot be overestimated. That this species of regulation is one which must be, if established at all, of a general and national character, and cannot be safely and wisely remitted to local rules and local regulations, we think is clear from what has already been said. And if it be a regulation of commerce, as we think we have demonstrated it is, and as the Illinois court concedes it to be, it must be of that national character, and the regulation can only appropriately exist by general rules and principles, which demand that it should be done by the Congress of the United States under the commerce clause of the Constitution.

Id.

147   See id. at 589.

148   134 U.S. 418, 456-58 (1890).

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19289   Page 418 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

149     165 U.S. 578, 590 (1897).

150     Id.

151     See Dubber, supra note 9, at 195-98.

152     Id. at 197.

153     Id.

154     Id.

155     See supra text accompanying note 135.

156     Dubber, supra note 9, at 196.

157     See id. at 211.

158     Id. at xiv, 194, 196.

159     Id. at 201.

160     Roscoe Pound, Liberty of Contract, 18 Yale L.J. 454 (1909). See also Note and Comment, The Police Power and Liberty of Contract, 7 Mich. L. Rev. 507 (1909) [hereinafter J.F.K.].

161     Pound, supra note 160, at 457-58.

162     Id. at 464.

163     Michael Willrich, City of Courts: Socializing Justice in Progressive Era Chicago 98 (2003); see also id. at xxxi-xxxii, 96-115.

164     Id. at xxxii.

165     Id. at 114-15.

166     Id. at xxxii.

167     Id. at xxxii-xxxiii.

168     Dubber, supra note 9, at 126-27.

169     Roscoe Pound, Introduction to Francis Bowes Sayre, A Selection of Cases on Criminal Law xxxii (1927), quoted in Dubber, supra note 9, at 169.

170     Pound, supra note 169, at xxx, quoted in Dubber, supra note 9, at 169.

171     Pound, supra note 169, at xxxv, xxxvi, quoted in Dubber, supra note 9, at 168,127.

172     See e.g., Andy McSmith and Jo Dillon, Blair Seeks New Powers to Attack Rogue States, The Independent, July 13, 2003, at 1. Richard Tuck, The Rights of War and Peace: Political Thought and the International Order From Grotius to Kant, 34-47 (1999).

173     Michael Ignatieff, Director, Carr Ctr. for Human Rights Policy, John F. Kennedy School of Gvt., O.D. Skelton Memorial Lecture, Peace, Order and Good Government: A Foreign Policy Agenda for Canada (Mar. 12, 2004), http://www.ksg.harvard.edu/cchrp/pdf/Skelton.pdf; see also Ron Levi and John Hagan, International Police, in The New Police Science, supra note 76; Mariana Valverde, 'Peace, Order, And Good Government': Police-Like Powers In Postcolonial Perspective, in The New Police Science, supra note 76.

174     Giorgio Agamben, State of Exception 1-31 (Kevin Attell trans., 2003).

175     Id. at 1 (citations omitted).

176     Id. at 3.

177     Id. at 3-4.

178     Id. at 1 (citing Carl Schmitt, Politische Theologie (1922)).

179     Dubber, supra note 9, at 114.

180     Id.

181     Agamben, supra note 174, at 1; see also id. at 1-31.

182     See generally Foucault, supra note 56; The Foucault Effect, supra note 63; Gianfranco Poggi, Development of the Modern State: A Sociological Introduction (1978); Ian Taylor, Paul Walton and Jock Young, The New Criminology: For a Social Theory of Deviance (1973); Capitalism and the Rule of Law: From Deviancy Theory to Marxism (Bob Fine et al. eds., 1979); Wealth and Virtue: The Shaping of Political Economy in the Scottish Enlightenment (Istvan Hont & Michael Ignatieff eds., 1983); Tomlins, supra note 53; William J. Novak, The People's Welfare: Law and Regulation in Nineteenth-Century America (1996); Pasquale Pasquino, Theatrum Politicum: The Genealogy of Capital--Police and the State of Prosperity, in The Foucault Effect, supra note 63, at 105.

183     Dubber, supra note 9, at 220, n.19.

184     Id.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19291   Page 420 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

185    See id. at 110-11.

186    Id.

187    Id.

188    Id. at 220, n.19.

189    See Brewer, supra note 37.

190    Dubber, supra note 9, at 46-47.

191    See supra text accompanying notes 67-74.

192    Dubber, supra note 9, at 91. On Manning and Jefferson, see Tomlins, supra note 53, at 1-8, 36, 81-89.

193    See, e.g., Dubber, supra note 9, at 181, 211.

194    See, e.g., Novak, supra note 182.

195    Christopher Tomlins, History in the American Juridical Field: Narrative, Justification and Explanation, 16 Yale J.L. & Human. 323, 327-28 (2004).

196    See id. at 330-32.

197    Dubber, supra note 9, at 93.

198    Currently, Dubber observes, such an account is missing. Id. at 214.

199    Law-as-autonomy is empirically elusive in The Police Power. See generally Dubber, supra note 9. Indeed, it is worth observing that the absence of a history of law as autonomy can leave the reader not a little perplexed at the confidence with which Dubber invokes the autonomy standard to judge the history--and histories--of police, for this renders the exercise essentially normative. Dubber uses the conceptual to critique the empirical.

200    This is a large assertion that I cannot develop more than briefly. Essentially, the claim is that autonomy always requires the exploitation of resources, both men and things, and that all forms of exploitation are unjust, not simply human but also animal and environmental. I will assume that the assertion that race, class and gender exploitation is subject to moral constraint is relatively uncontroversial. Animal exploitation has been the subject of rights campaigning for more than 150 years. See Keith Tester, Animals and Society: The Humanity of Animal Rights (1991). As Dubber notes, the question of animal exploitation has been given prominence by the work of such individuals as Tom Regan. See Tom Regan, The Case for Animal Rights (1983); Dubber, supra note 9, at 159, 249 (text accompanying note 7). In addition to Regan, one should of course note the work of Peter Singer. See Peter Singer, Animal Liberation: Towards an End to Man's Inhumanity to Animals (1975). As to environmental exploitation, the assertion that "[t]he police of things that belong to no particular person, such as 'public lands,' or rivers or forests or mountains or wild animals ... doesn't require a justification for the interference with personal rights" and "simply doesn't touch upon the realm of law, or justice," Dubber, supra note 9, at 159, ignores moral notions of stewardship and in some circumstances will

Compendium_Cornell
Page 1840

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19292   Page 421 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

prove simply ethnocentric. See Wendy Nelson Espeland, The Struggle for Water: Politics, Rationality, and Identity in the American Southwest (1998). Also see Christopher D. Stone, Should Trees Have Standing? Toward Legal Rights for Natural Objects. 45 S. Cal. L. Rev. 450 (1972) and Gary E. Varner, Do Species Have Standing? 9 Envtl. Ethics 57 (1987), which support the proposition that recognition as a rights-bearer is a matter of convention not essence, as is, therefore, refusal of recognition. Nonhuman legal entities do in fact occasionally gain standing 'for themselves,' through, for example, endangered species legislation or world heritage listing. To be fair to Dubber, one should note his acknowledgement that it is "no longer a foregone conclusion" that animal and environmental exploitation fall outside the category of meaningful heteronomy. Dubber, supra note 9, at 249.

201    Benjamin, supra note 4, at 277.

202    Id. at 278; see also id. at 277-78.

203    Id. at 281.

204    See Derrida, supra note 24, at 269; see also id. at 267-72. The origins of law lie in a violence that Benjamin calls "mythic" or imposed by fate. See Benjamin, supra note 4, at 293-97.

205    Benjamin, supra note 4, at 281; Derrida, supra note 24, at 267.

206    Benjamin, supra note 4, at 286.

207    Id.

208    Id.

209    Id.

210    Id. at 286.

211    Id. at 286-87.

212    Id. at 287.

213    Derrida, supra note 24, at 272.

214    See id. at 279.

215    Id.

216    Id.

217    See supra text accompanying notes 198-99.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19293   Page 422 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

218    It is important to note that at one point in Benjamin's text, he moves toward a reading of relational possibility that coincides to some extent with the autonomy Dubber adduces for law. Just as it takes a "refined sensibility" to detect the rottenness in law, Benjamin, supra note 4, at 286:

[n]onviolent agreement is possible wherever a civilized outlook allows the use of unalloyed means of agreement. Legal and illegal means of every kind that are all the same violent may be confronted with nonviolent ones as unalloyed means. Courtesy, sympathy, peaceableness, trust, and whatever else might here be mentioned are their subjective preconditions.

Id. at 289. But he continues, "Their objective manifestation, however, is determined by the law ... that unalloyed means are never those of direct, but always those of indirect solutions. They therefore never apply directly to the resolution of conflict between man and man, but only to matters concerning objects." Id. That is, autonomy cannot characterize direct relations between men but only indirect relations mediated by "objects"--goods, commodities. This presents Dubber with the considerable irony that law-as-autonomy is possible only where things are the immediate concern, not people. Recall that, for Dubber, "law concerns itself with, and only with, the harm one person inflicts upon another.... A person who suffers harm from something other than another person is not the law's concern." Dubber, supra note 9, at 111. Benjamin points to one instance of unalloyed means as "the conference, considered as a technique of civil agreement," where "the exclusion of violence in principle is quite explicitly demonstrable by one significant factor: there is no sanction for lying." Id. Even here, however, unalloyed means--"peaceful intercourse between private persons"--are constantly under pressure from legal violence. Id. at 290-91. They decay (rot) through, for example, its criminalization of lying, i.e. fraud or deception. Id. See also Derrida, supra note 24, at 284-85.

219    The phrase is E.P. Thompson's; the interpolation mine. See E.P. Thompson, The Making of the English Working Class 12 (Vintage Books 1966) (1963).

220    Dubber, supra note 9, at 192-93 (quoting Lochner, 198 U.S. at 56); see also id. at 190-93.

221    Id. at 193.

222    Id. at 195.

223    Id.

224    In McLean v. State of Arkansas, decided less than a year after Muller, at a time when the Court appears still to have been in the phase of case by case scrutiny (see supra text accompanying notes 150-51), the Court upheld the constitutionality of an Arkansas statute establishing standards for payment of wages in the state's coal mines, arguing as follows:

[T]he police power of the State is not unlimited, and is subject to judicial review, and when exerted in an arbitrary or oppressive manner such laws may be annulled as violative of rights protected by the Constitution. While the courts can set aside legislative enactments upon this ground, the principles upon which such interference is warranted are as well settled as is the right of judicial interference itself.

McLean v. Arkansas, 211 U.S. 539, 547 (1909). The Court proceeded to summarize those principles, thereby creating a basis to guide scrutiny:

If the law in controversy has a reasonable relation to the protection of the public health, safety or welfare it is not to be set aside because the judiciary may be of opinion that the act will fail of its purpose, or because it is thought to be an unwise exertion of the authority vested in the legislative branch of the Government.

Id. at 547-48. It continued:

If there existed a condition of affairs concerning which the legislature of the State, exercising its conceded right to enact laws for the protection of the health, safety or welfare of the people, might pass the law, it must be sustained; if

Compendium_Cornell
Page 1842

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19294   Page 423 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

such action was arbitrary interference with the right to contract or carry on business, and having no just relation to the protection of the public within the scope of legislative power, the act must fail.

Id. at 548. Lochner was not mentioned, except by counsel for the unsuccessful plaintiff in error. Justice Rufus Peckham, the author of the Lochner decision, dissented. See id. at 551. And one commentator concluded that in sustaining the statute as a valid exercise of the police power, the Court "seems to have extended that doctrine to a much greater length than it has in some of its later decisions." See J.F.K., supra note 160, at 507.

225     Lawton v. Steele, 152 U.S. 133 (1894), quoted in Dubber, supra note 9, at 200. It is worth noting the statement that occurs in Justice Stevens' opinion for the Court in the recent and controversial takings (eminent domain) case Kelo v. City of New London that "[f]or more than a century, our public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." See Kelo v. City of New London, 125 S. Ct. 2655 (2005), available at http:// straylight.law.cornell.edu/ supct/html/04-108.ZO.html.

226     Dubber, supra note 9, at 199. Dubber notes a revival of interest in state courts beginning in the 1980s. Id. at 203-08.

227     See, e.g., Robert Hale, Coercion and Distribution in a Supposedly Non-Coercive State, 38 Pol. Sci. Q. 470 (1923).

228     Dubber, supra note 9, at 215.

229     "The police become hallucinatory and spectral because they haunt everything; they are everywhere, even there where they are not, in their Fort-Dasein, upon which one can always call." Derrida, supra note 24, at 280. "Dasein," literally "being-there," is a term from Heideggerian philosophy describing the form of existence unique to self-conscious human beings, that is, an existence "in" the world and inseparable from it. One cannot be without a world to be in. See Martin Heidegger, Being and Time (John Macquarrie & Edward Robinson trans., 1962). Derrida's point is that there is nowhere in existence that police is not present, including of course that place (Fort-Dasein, perhaps an allusion to the anomic dystopian 1981 "cop" movie, Fort Apache--The Bronx) where we expect police definitively to be. Derrida, supra note 24, at 278. But police is not present anywhere particular, because it is present everywhere. Id. The police, he says:

are not simply the police. They do not simply consist of policemen in uniform, occasionally helmeted, armed and organized in a civil structure on a military model to whom the right to strike is refused, and so forth. By definition, the police are present, or represented, everywhere there is force of law [loi]. They are present, sometimes invisible but always effective, wherever there is preservation of the social order. The police are not only the police (today more or less than ever), they are there (elle est là), the figure without face or figure of a Dasein coextensive with the Dasein of the polis.

Id.

230     Derrida, supra note 24, at 278.

231     Walter Benjamin, Theses on the Philosophy of History, in Illuminations 255 (Hannah Arendt ed., Harry Zohn trans., 1969).

232     Benjamin, supra note 4, at 287.

233     Derrida, supra note 24, at 281.

234     Id. at 279-80.

Compendium_Cornell
Page 1843

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19295   Page 424 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

235    As suggested by the Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operational Considerations (Mar. 6, 2003), http://antiwar.com/rep/military_ 0604.pdf. The report, presents what Giorgio Agamben describes as "the state of necessity ... interpreted as a lacuna in public law, which the executive power is obligated to remedy. In this way a principle that concerns the judiciary power is extended to the executive power." Agamben, supra note 174, at 31. But, continues Agamben:

[I]n what does the lacuna in question actually consist? Here the lacuna does not concern a deficiency in the text of the legislation that must be completed by the judge; it concerns, rather, a suspension of the order that is in force in order to guarantee its existence. Far from being a response to a normative lacuna, the state of exception appears as the opening of a fictitious lacuna in the order for the purpose of safeguarding the existence of the norm and its applicability to the normal situation. The lacuna is not within the law [la legge], but concerns its relation to reality, the very possibility of its application. It is as if the juridical order [il diritto] contained an essential fracture between the position of the norm and its application, which, in extreme situations can be filled only by means of the state of exception, that is, by creating a zone in which application is suspended, but the law [la legge], as such, remains in force.

Id.

236    Derrida, supra note 24, at 286.

237    Benjamin, supra note 4, at 300.Writing, in the spirit of Walter Benjamin, of the "spectral figure of the law in the state of exception," Giorgio Agamben concludes:

One day humanity will play with law just as children play with disused objects, not in order to restore them to their canonical use but to free them from it for good. What is found after the law is not a more proper and original use value that precedes the law, but a new use that is born only after it. And use, which has been contaminated by law, must also be freed from its own value. This liberation is the task of study, or of play. And this studious play is the passage that allows us to arrive at that justice that ... [Benjamin] defines as a state of the world in which the world appears as a good that absolutely cannot be appropriated or made juridical.

Agamben, supra note 174, at 64.

238    It must be said that elsewhere Dubber has seemed less sure, noting in the course of a searing disquisition upon the quotidien realities of American criminal law and procedure (police's most developed expression) that "traditional rules of criminal law ... survive mainly as the object of theoretical investigation and the subject of university instruction, in a parallel universe largely untouched by the reality of the criminal process." See Markus Dirk Dubber, The New Police Science and the Police Model of the Criminal Process, in The New Police Science, supra note 76.

239    James Boyd White describes finding "a way of living in an unjust world by imagining an ideal into partial reality" as an act of hope. See James Boyd White, Acts of Hope: Creating Authority in Literature, Law, and Politics 307 (1994).

240    Dubber, supra note 9, at xii, 216 (describing Jefferson's project to revise Virginia's laws of crime and punishment to conform to the principles advanced in the Declaration of Independence).

241    "I hold it that a little rebellion now and then is a good thing, and as necessary in the political world as storms in the physical." Letter from Thomas Jefferson to James Madison para. 4 (Jan. 30, 1787), available at http:// earlyamerica.com/ review/summer/letter.html.

242    Letter from Thomas Jefferson to Garret Van Meter para. 1, (Apr. 27, 1781), available at http://press-pubs.uchicago.edu/ founders/documents/v1ch3s6.html; see also Letter from Garret Van Meter to Thomas Jefferson, (Apr. 11, 1781), available at http:// www.wvculture.org/history/revwar/claypool01.html.

Case 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19296   Page 425 of 715

TO IMPROVE THE STATE AND CONDITION OF MAN: THE..., 53 Buff. L. Rev. 1215

243      Letter from Jefferson, supra note 242.

244      Id.

245      See generally Dorothy Ross, The Origins of American Social Science (1991) and Cultures of United States Imperialism (Amy Kaplan and Donald Pease eds., 1993) for a general discussion on the "national ideology of American exceptionalism," Ross, supra at 22, and the nineteenth and twentieth discourses of exception that its realization would require.

246      Dubber argues that inspiration to resolve the problem of the American police power can be found in the Republic's moment of origin, when "[t]he revolutionaries-turned-rulers of the new republic ... were revolutionaries first, and rulers second" with interests in "erecting a novel system of government under law." Dubber, supra note 9, at xv-xvi.

53 BFLR 1215

---

**End of Document**                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**74 Tul. L. Rev. 387**

Tulane Law Review

December, 1999

Articles

David C. Williams [a1]

Copyright (c) 1999 Tulane Law Review Association; David C. Williams

# CONSTITUTIONAL TALES OF VIOLENCE: POPULISTS, OUTGROUPS, AND THE MULTICULTURAL LANDSCAPE OF THE SECOND AMENDMENT

Traditionally, populists have claimed the Second Amendment as their particular cultural property; by contrast, outgroups and elites have found the Amendment somewhat culturally alien. Recently, some outgroup members have argued that their groups ought to embrace the Amendment because the right to keep and bear arms can be a valuable way of resisting populist oppression. This Article explores this changing multicultural landscape of the Second Amendment. It recognizes that in particular instances and in the short term, outgroups might need to arm themselves against hate violence. It argues, however, that only a consensus culture on the use of violence will provide any real protection to outgroups in the long run. The new outgroup theories of the Amendment frustrate the creation of such a culture because they rest on a constitutional vision of decentralized violence, premised on the inevitability of mutual suspicion and the fundamentality of relating through arms. Such a regime will ultimately benefit populists more than outgroups. In other words, in the long run, these constitutional tales of violence will actually be counterproductive to the goal of outgroup safety that they seek to secure.

I. The Traditional Landscape of the Second Amendment ........... 392
A. The Formal Second Amendment ........... 392
B. The Cultural Landscape of the Second Amendment ........... 395
1. The Gun Culture ........... 395
2. The Gun Culture's Enemies: The Liberal Elite ........... 397
3. The Gun Culture's Enemies: Outgroups ........... 399
4. Outgroup Attitudes Toward the Gun Culture ........... 406
II. The New Landscape of the Second Amendment ........... 412
A. Jews for the Preservation of Firearms Ownership ........... 413
1. Gun Control and Genocide ........... 415
2. JPFO's Interpretation of the Second Amendment ........... 421
a. Assimilation to the Gun Culture ........... 423
b. Ethnic Particularism ........... 425
B. Women and Guns ........... 427
1. Power Feminism and Guns ........... 432
a. Empowering Women ........... 432
b. Gendering the Subject ........... 436
c. The Personal Is Political ........... 438
2. The Second Amendment as an Equal Rights Amendment ........... 441
C. An Afro-Americanist Reconsideration ........... 445
1. Before Cottrol and Diamond ........... 446
2. Cottrol and Diamond ........... 448
III. Outgroups, Populists, and Constitutional Violence ........... 458
A. Decentralized Violence ........... 458
1. Outgroups' Relative Lack of Power ........... 463
2. The Link Between Hate Violence and Revolutionary Conditions ........... 464
3. The Failure of Decentralized Violence to Secure Progressive Ends ........... 468

Compendium_Cornell
Page 1846

4. The Link Between Populism and the Revolutionary Second Amendment      469

B. State Monopoly of Violence      472

C. Constitutional Tales of Violence      475

1. Prudence and Policy Versus Constitutional Storytelling      475

2. Hopeless Tales of Constitutional Violence      477

a. Perspective-Based Interpretations of the Second Amendment      478

b. The Necessity of Hatred and Suspicion      481

c. The Functional Equivalence of All Constitutional Visions      483

d. The Erasure of Political Structures      485

e. The Fundamentality of Relating Through Arms      487

f. The Constitutional Mandate of These Conditions      488

3. The Futility of Constitutionalizing Outgroup Rights of Violence      489

IV. Conclusion: Populism and the Second Amendment      491

**\*389**  For some time, the Second Amendment has led a dual life. On one hand, commentators have approached it as a formal rule of law. In this guise, some have interpreted it as protecting arms bearing only within a state militia; others have interpreted it as protecting an individual right to keep and bear arms, for self-defense, hunting, or even resistance to government. Both schools of thought, however, share one conviction: the right to arms does not peculiarly belong to any subculture, any identity group, any race, religion, or gender. On the other hand, commentators have also approached the Amendment as a cultural document. In this guise, the Amendment does have a particular constituency. The "gun culture" has embraced the provision as its special property, interpreting it as a personal right to arms, while other groups have been notably cooler toward the provision.

The gun culture is generally described as masculine, rural, conservative, and nativist--in other words, the general population out of which American populist movements have traditionally grown. Like other populisms, the gun culture has defined itself in opposition to two enemies. First, the culture has overtly opposed liberal, urban, educated, and cosmopolitan elites who would take away its guns; second, the culture has also opposed--overtly in the past, less overtly in the present--various outgroups, including Jews, feminists, and African-Americans. For their part, these various outgroups have generally agreed that they find the Second Amendment, with its implicit threat of private violence, alien to their cultures. Indeed, the Second Amendment has been the site of a conflict that approaches a culture war.

In recent years, however, the cultural landscape of the Second Amendment has become more complicated. Certain Jews, feminists, and African-Americans have begun to argue that outgroups should embrace the Second Amendment, and that the experience of outgroups as oppressed minorities provides a reason to interpret the Amendment as a personal right to arms. In brief, these theorists argue that "if you can't join 'em, then fight 'em." Because part of America will always be armed and hostile toward outgroups, outgroups should become armed and hostile themselves, using the masters' tools to dismantle the **\*390**  masters' houses. In short, the Second Amendment has become multicultural: populists claim it for themselves, but so do some outgroup members.

Although relatively few in number, these new outgroup theorists of the Second Amendment pose a question that is of enormous, perhaps ultimate, significance to a constitutional republic. In theory, the Constitution promises a scheme of law that is tolerant toward outgroups, protective of individual rights, and resting on the consent of the governed. In practice, however, whether America delivers on those promises depends on the constitutional organization of force. If the means of violence resides in the wrong hands, then the promises will amount to nothing. These outgroup theories of the Second Amendment maintain that America will most likely fulfill its constitutional promises if the means of violence is broadly diffused through the population-- and so we should read the Amendment to protect an individual right to keep and bear arms.

This Article considers how we might best interpret the constitutional organization of violence so as to protect outgroups. To do this, the Article analyzes the relationship between outgroups and populists in the new multicultural landscape of the Second Amendment. After surveying the terrain, it argues that culturally, the Second Amendment lends itself most effectively to populist interpretations, because conditions of decentralized violence generally favor armed, violent, and exclusionary populist movements. Outgroup self-arming may in the short term provide a measure of safety, but in the long run, interpreting the Constitution to require decentralized violence will impede the formation of a consensus culture that extends protection to all.

Part I describes the traditional landscape of the Second Amendment. Some commentators have approached the Amendment as an acultural formal rule, as a protection either for state militias or for abstract individuals connected to no particular identity group. In practice, however, the Second Amendment has worn very distinctive cultural clothing. Claiming to be the legatees of

Compendium_Cornell
Page 1847

the Founders and therefore the true American people, members of the gun culture have adopted the Amendment as the central icon of their vision of America. By contrast, both urban elites and outgroups have rejected the Amendment as alien to their respective cultures.

Part II describes the recent adoption of the Amendment by members of three outgroups--Jews, feminists, and African **\*391** Americans. [1] These outgroup theories share two features. First, they argue that, from the perspective of their respective groups with their history of victimization, the Second Amendment should best be interpreted as protecting a personal right to arms, so that group members can arm themselves against private and public hate violence. Second, they argue that the Second Amendment projects a social world that is fragmented into hostile identity groups; for that reason, outgroup members need a personal right to arms. As a result, although these theories seek to guarantee an individual right to arms, they contemplate that individuals will use their arms in highly political ways. As members of identity groups, they will--severally and collectively-- resist attacks by members of other identity groups. In the long run, such self-defense efforts will not only protect individuals; they will also help break the power of anti-Semitism, misogyny, and racism.

Part III analyzes these outgroup theories on their own terms. By way of internal critique, it considers whether interpreting the Second Amendment as an individual right will help to protect outgroups. All of the outgroup theories argue for a scheme of decentralized violence--because the state is incompetent or oppressive, outgroups will flourish best when everyone is armed, allowing outgroups to defend themselves. In fact, however, under conditions of decentralized violence, outgroups typically suffer because such conditions generally encourage and benefit angry populist movements. Outgroup theorists may respond that although decentralized violence may be bad for outgroups, centralized control of violence would be even worse, because the state would fail to protect, or would actively oppress, them. And indeed, these theorists make a persuasive case that outgroups would be unwise to repose perfect trust in the state. For that reason, it might be prudent for outgroup members to arm themselves against the present threat of hate violence, and it might be good policy for the state to permit them to arm themselves.

Because much of this Article is a critique of these outgroup theories, let me reemphasize this point: I am not arguing that as a matter of prudence and policy, outgroup members should go without **\*392** guns. Instead, I offer a critique of these outgroup theories, not as counsels of prudence, but as constitutional prescriptions--as constitutional tales of violence. The outgroup theorists ultimately leave outgroups in a hopeless situation--they must choose between decentralized violence, with its threat of private oppression, or centralized violence, with its threat of public neglect or oppression. Outgroups need to strive for a more hopeful third option--a consensus culture that is not filled with hatred. In the absence of such a culture, outgroups will inevitably suffer, no matter who controls the means of violence. These outgroup theories of the Second Amendment, however, frustrate the development of such a culture. The theories do not merely urge outgroups to take up arms against a world presently filled with hatred; they also argue that the Constitution itself assumes that the world will always be filled with hatred. For that reason, according to outgroup theorists, the Second Amendment guarantees to outgroups a permanent right to arms--their ultimate hope for safety in an unsafe world.

We define our hopes and dreams, in part, through the constitutional tales that we tell. The constitutional tales of violence told by these outgroups offer no possibility of redemption; they tell us that we can realistically hope for no more than the present. In so doing, they deny to the Constitution one of its most important roles--that of an ideal of social justice which we may never realize but toward which we are commanded to aspire. Outgroups have always needed the Constitution to fill that role, and they still do, precisely because of the rising tide of hate violence. Angry and exclusive populists may rest content with a fragmented and violent social world because such conditions favor their dominance. Outgroups, by contrast, may prudentially arm themselves in recognition of the present threat, but if they wish for safety, they can never stop dreaming of a better day.

## I. The Traditional Landscape of the Second Amendment

### A. The Formal Second Amendment

Traditionally, theorists of the Second Amendment have held two different positions on the provision's formal meaning. [2] First, the states' rights view [3] places primary emphasis on the introductory clause of the Amendment, "A well regulated Militia, being necessary to the **\*393** security of a free State, the right of the people to keep and bear Arms, shall not be infringed." [4] In this view, that introductory clause explains the purpose of the Amendment--to protect state militias so that they may resist federal tyranny. [5] Importantly, for those of this position, the Amendment does not convey an individual right to arms for self-defense, hunting, or any other purpose. [6]

Compendium_Cornell
Page 1848

By contrast, the individual rights position places primary emphasis on the latter part of the Amendment. They point out that the provision protects a right of "the people," not the state governments, and they further maintain that in the late eighteenth century, the unorganized militia included every male of arms-bearing age.[7] Proponents of this view acknowledge that the Amendment specifies a "well regulated Militia," but they argue that "well regulated" means "well trained," rather than "government-controlled."[8] The Framers of the Amendment believed in the right to arms both because an unorganized militia might need to resist tyrannical government and because individuals possess a right to personal self-defense.[9] Thus, the Amendment conveys the right to bear arms upon all individuals, not a state body like the militia.[10]

Elsewhere, I have offered a third interpretation that combines elements of both positions.[11] In my view, the purpose of the Amendment was to allow the body of the people to make a revolution against tyrannical government.[12] In the Framers' minds, any such revolution would have to be made by the people as a whole, rather than a faction, so that the revolution would be dedicated to the common good, rather than the partial good of a few.[13] For that reason, **\*394** the Amendment contemplated that the right to arms would belong to the whole of the citizenry--just as the individual rights view maintains.[14] For the Framers, however, the citizenry must be civic republican in nature; it must exhibit a high degree of consensus and civic virtue.[15] Importantly, it must not be a collection of atomistic individuals with radically different ends, desires, and values.[16] Otherwise, any revolution will turn into vicious civil war, rather than a united campaign against erring government. For that reason, for the Amendment to make sense on its own terms, the right to arms may be possessed only by a civic republican citizenry.[17] In other words, the right to arms does belong to every individual citizen, but only if they are united into a coherent revolutionary people. As I do not believe that Americans presently comprise such a citizenry, I do not believe that the Amendment applies to modern conditions, by its own frame of reference.[18]

These formal views thus all disagree on important substantive matters, and the disagreement is often quite rancorous.[19] All of these views, however, share important features. They rest on purportedly universal and objective natural rights of self-defense and revolution, and they assign those rights to abstract individuals, not to groups or individuals defined by their religion, gender, or race. For example, the individual rights view offers a basically liberal/Lockean analysis. All individuals possess a natural right to self-defense, against private parties and tyrannical governments. That right is not a matter of conventional values, particular discourses, or cultural traditions; rather, it is objectively true. In this sense, the Second Amendment did not create a right to arms; it merely recognized a preexisting natural right. For the same reason, the right belongs to all individuals qua individuals, regardless of their backgrounds.[20] In discussing the right to revolution in particular, the individual rights view assumes that Americans constitute a homogeneous, united people capable of making a unified revolution, rather than a severely divided **\*395** population.[21] The states' rights view is somewhat less universal in that the right to arms belongs only to members of state militias, not to all individuals.[22] It assigns the right to militia members, however, in their status as abstract citizens, not as concrete human beings with specific religious, gender, and racial identities.[23] It traces the Amendment, moreover, to a general right to resist tyranny, rather than to anything less universal.[24] My own view is similar in that it bases the right to bear arms on a natural right to resist revolution, and it assigns the right to a united, homogeneous citizenry, not to one riven by religious, gender, and racial wars.[25]

Considered thus as a set of formal propositions, the Second Amendment should be seen not only for what it is, but also for what it is not. First, it is not the cultural property of a particular group in American society. Second, it envisions the social world as composed of deracialized, degendered citizens or individuals, not as a highly fractured collection of particular cultural identities.

## B. The Cultural Landscape of the Second Amendment

### 1. The Gun Culture

If the formal Second Amendment exhibits all of these characteristics, there is nonetheless a very different way to approach the Second Amendment--as a primary cultural text in an ongoing Kulturkampf. So considered, the Amendment is not a culturally neutral rule but the central constitutional provision for a special constituency--the so-called gun culture.[26] Thus, arguments about gun control and the Second Amendment are not just arguments about guns; rather, they are arguments about a whole

Compendium_Cornell
Page 1849

collection of values, for which guns serve as a symbol. The national discussion on the Amendment and gun control is hence marked by uncommon rancor, because the participants are arguing about the value of different ways of life.

**\*396**  Some years ago, B. Bruce-Briggs offered what has become the classic exposition of this cultural battlefield. [27] Because of its influence and accuracy, it is worth quoting at some length:

[U]nderlying the gun control struggle is a fundamental division in our nation. The intensity of passion on this issue suggests to me that we are experiencing a sort of low-grade war going on between two alternative views of what America is and ought to be. On the one side are those who take bourgeois Europe as a model of a civilized society: a society just, equitable, and democratic; but well ordered, with the lines of responsibility and authority clearly drawn, and with decisions made rationally and correctly by intelligent men for the entire nation. To such people, hunting is atavistic, personal violence is shameful, and uncontrolled gun ownership is a blot upon civilization. On the other side is a group of people who do not tend to be especially articulate or literate, and whose worldview is rarely expressed in print. Their model is that of the independent frontiersman who takes care of himself and his family with no interference from the state. They are "conservative" in the sense that they cling to America's unique pre-modern tradition--a nonfeudal society with a sort of medieval liberty writ large for every man. To these people, "sociological" is an epithet. Life is tough and competitive. Manhood means responsibility and caring for your own. This hard-core group is probably very small, not more than a few million people, but it is a dangerous group to cross. From the point of view of a right-wing threat to internal security, there are perhaps the people who should be disarmed first, but in practice they will be the last. . . . They consider themselves no threat to anyone; they are not criminals, not revolutionaries. But, slowly, as they become politicized, they find an analysis that fits the phenomenon they experience: Someone fears their having guns, someone is afraid of their defending their families, property, and liberty. Nasty things may happen if these people begin to feel that they are cornered. [28]

Historians Lee Kennett and James LaVerne Anderson offered a similar analysis:

The gun, then, is part of a whole series of traditional attitudes about government, society, and the individual. They run, like so many threads, through the whole tapestry of the national past. In its essence, the gun controversy is a struggle between these attitudes and new ones. The city has spawned the new and negative view of the gun; rural and  **\*397**  small town America tends to hold to the older, more positive view. There is also evidence of cleavage along class lines. . . . . . . [T]he gun controversy [is] a skirmish in the larger battle over the nation's cultural values, a battle in which "cosmopolitan America" is pitted against "bedrock America." . . . Cosmopolitan America foresees a new age when guns and the need for them will disappear; bedrock America conceives of it as 1984. Cosmopolitan America has always been concerned about its international image; bedrock America has always been nativist. [29]

After examining the writings of the gun press at length, another analyst summarizes the themes of the gun culture thusly: (1) "The gun owner is a patriot"; (2) "The gun owner is social"; (3) "The gun owner appreciates nature"; (4) "The gun owner is able to survive through his weapons"; and (5) "The gun owner respects tradition and the teachings of his elders." [30]

Finally, sociologists James D. Wright, Peter H. Rossi, and Kathleen Daly offer a similar characterization:

The values of this [gun] culture are best typified as rural rather than urban: they emphasize independence, self-sufficiency, mastery over nature, closeness to the land, and so on. Within this culture, the ownership and use of firearms are both normal and normatively prescribed, and training in the operation and use of small arms is very much a part of what fathers are expected to provide to their sons--in short, this training is part and parcel of coming of age. [31]

## 2. The Gun Culture's Enemies: The Liberal Elite

Both partisans [32] and enemies [33] of the gun culture in America thus agree on one point: a distinctive gun culture does exist, and it is at the center of intense cultural division. There are, however, multiple ways to describe the enemies of the gun culture. One way characterizes the enemy as the liberal power-elite that would take away the gun  **\*398**  culture's guns. This characterization emphasizes several fault lines. The first is geographic. The gun culture is predominantly rural and small-town, and its enemies are predominantly urban. [34] Moreover, the South would appear to be a special center of the gun culture. [35] The second fault line is ideological. Cosmopolitan America believes in bureaucratic rationality and state authority, and bedrock

America believes in armed self-reliance. [36] The third fault line is class. The gun culture is predominantly working class, its enemies predominantly professional and upper-middle class. [37] The fourth fault line involves internationalization. The gun culture tends toward nativism, suspecting foreign ideas, while its enemies welcome them. [38] The fifth fault line involves control of the production of knowledge. The gun culture believes that its enemies in the media and the academy have created a stereotyped image of gun owners. [39] The sixth fault line is chronological. The gun culture sees itself as the preserver of traditional American values, its enemies as the proponents of liberal new ideas, especially collectivism. [40]

In short, in this description, the cultural landscape of the Second Amendment is divided between bedrock and cosmopolitan America.  **\*399**  In describing the landscape this way, many commentators emphasize the relative powerlessness of the gun culture. [41] Today, the culture feels embattled, distant from the centers of power, and disdained by an urban elite. [42] Thus, Sanford Levinson writes:

For too long, most members of the legal academy have treated the Second Amendment as the equivalent of an embarrassing relative . . . . Those of us who agree with [an] emphasis on the desirability of encouraging different "voices" in the legal conversation should be especially aware of the importance of recognizing the attempts of [gun culture members] to join the conversation. . . . [S]urely the call for sensitivity to different or excluded voices cannot extend only to those groups "we" already, perhaps "complacent [[ly]]," believe have a lot to tell "us." [43]

Wright, Rossi, and Daly hit the same note:

To members of the gun subculture . . ., the indictments of gun control advocates must appear to be incomprehensible, if not simply demeaning. We should not be surprised to learn that they may resent being depicted as irresponsible, nervous, [and] potentially dangerous . . . . Indeed, one can only begin to understand the virulence with which gun control initiative[s] are opposed in these quarters when one realizes that what may be at stake is a way of life. . . . . A critical issue in modern America is whether the doctrine of cultural pluralism should or should not be extended to cover the members of the gun subculture. [44]

### 3. The Gun Culture's Enemies: Outgroups

In this map of the Second Amendment's cultural landscape, outgroups as such do not overtly make an appearance. The gun culture's enemy is an urban elite that, on its face, is not associated with  **\*400**  a particular religion, gender, or race. Indeed, to the extent that any bloc appears as an outgroup, it is the gun culture itself, powerless and reviled by those in power.

It is possible, however, to observe a different division in the cultural landscape. The gun culture--as part of bedrock America--has always proudly proclaimed itself to be the voice of the true American people. In this self-image, the culture is not an embattled outgroup, but rather the very definition of 100% Americanism. Correlatively, the enemies of the gun culture include not merely urban elites, but everyone who would contest that self-image. This definition embraces outgroups like Jews, feminists, and African-Americans, who would challenge or complicate traditional notions of American identity.

If members of the gun culture today feel embattled, they have not always felt so. Indeed, traditionally, these Americans have seen themselves as the populist defenders of the establishment, the forces of law, order, and authority. [45] As such, members of the gun culture were responsible for policing "deviant" elements within American society. [46] Tracing the origin of the modern gun culture, Kennett and Anderson explain:

[I]n the development of American society the enemy became internal. Society felt threatened by criminals, ethnic groups, racial groups, rioters, and malcontents. . . . Violence became more closely associated with the use of firearms. . . . [T]he Americans of the nineteenth century became armed individuals as a reaction to the increasing diversity and complexity of their society. [47] In that environment,

pervasive was the idea that the gun helped preserve the social fabric of the nation, "the establishment." Those who were not in that establishment, notably slaves and Indians were the only people who had no business being armed. Even if they were, their cause was hopeless, for they would be outgunned. . . . Perhaps this was not the best solution, but it was a distinctly American

one, incorporating the idea that the gun is its own antidote. . . . Elsewhere the armed masses remained a vision of revolutionaries. In America, by a curious inversion, they became a symbol of order and a conservative totem. [48]   *401  Richard Hofstadter similarly writes, "[I]n the historic system of the South, having a gun was a white prerogative . . . . [and] an important symbol of white male status." [49]

In his massive three-volume study of the myth of the frontier, Richard Slotkin exhaustively examines the way that myths of violence have supported dominant groups and subordinated outgroups. [50]  In particular, he argues that the myth of the frontier-- that America takes its special character from its frontier origins--has been one of the central organizing stories of American popular culture. [51]  Primary components of the myth of the frontier are "regeneration through violence" and "savage war." [52]  According to this mythology, Americans have achieved progress by separation from civilization on the frontier, regression to a more primitive state, and then redemption by means of violence. [53]  The most common form of such regeneration is the "savage war": "[I]neluctable political and social differences--rooted in some combination of 'blood' and culture--make coexistence between primitive natives and civilized Europeans impossible on any basis other than that of subjugation. . . . [B]ecause of the 'savage' and bloodthirsty propensity of the natives, such struggles inevitably become 'wars of extermination.' ' [54]  These myths thus originated in the European experience with Indians, [55]  but later Americans used them as a favorite framework to explain the need to deal violently with resistance of any kind-- labor unrest, class warfare, [56]  African-American unrest, [57]  the Vietnam War, [58]  and the drug war. [59]  In every case, this national mythology provided a rationale for white male  *402  supremacy: "Even in its liberal form, the traditional Myth of the Frontier was exclusionist in its premises, idealizing the White male adventurer as the hero of national history." [60]

To this day, the gun culture often portrays itself not as one culture among many but as the true, authentic, and exclusive American culture. This self-portrait is most vicious among members of the militia movement. As I have argued elsewhere, militia writers interpret the Second Amendment as conferring a right to revolution on a unified American people composed of people like themselves and excluding a variety of others--blacks, Jews, secularists, internationalists, non-libertarians, etc. [61]  That self-portrait, moreover, is not limited to the militia fringe; even moderates in the gun culture describe it as the quintessence of the American experience. Thus, Eugene Balof writes: "Bearing arms is thus seen as not only a defense of the nation, but more importantly, the possession, use, and interest in arms is seen as a uniquely American . . . trait. The gun owner is an American just as the American is a gun owner." [62]

Even law review writers identify the gun culture with a truer or more fundamental American culture. Most often, these writers argue that the gun culture is the legitimate descendant of the Framers' worldview, and gun culture opponents are therefore cultural auslanders. [63]  In arguing that the right to arms should be protected through the Ninth Amendment, Nicholas Johnson states: "By many accounts the framers envisioned a rural agrarian based America. . . . [W]e can usefully ask whether disarmament advocacy is driven by an urban vision that exalts luxury at the expense of individual liberty. To the degree it is, it may be in conflict with our core constitutional values." [64]  Then, after quoting Bruce-Briggs' description of the culture war reproduced above, Johnson opines:

An individual right to arms fits very comfortably within the vision of rural Americans. Because rural life is not glorified in our society, the rural vision may not be popular. Nonetheless, it remains reasonable to believe that vision of America is more in accordance with that of the Framers than is the urban based view that may be the predominant influence on our popular culture. [65]  *403  Similarly, Don Kates quotes the Bruce-Briggs passage and then observes:

If we assume that most modern scholars fall into the first of the modern value categories described, it becomes understandable why they might find the views of the Founders so foreign, indeed repugnant . . . . For the second of the value categories described accords perfectly with the views of the Founders, except that, as intellectuals themselves, its aura of anti-intellectualism would have struck no responsive chord in them. [66]

Even as sophisticated, careful, and culturally sensitive an analyst as David Kopel portrays the gun culture in the same general way. In his prize-winning work The Samurai, the Mountie, and the Cowboy: Should America Adopt the Gun Controls of Other Democracies?, Kopel argues that different gun control schemes are appropriate for different countries because they have different cultures. [67]  Thus, countries like Japan [68]  and Great Britain [69]  can tolerate a fairly invasive gun control scheme because

Compendium_Cornell
Page 1852

their citizens trust the government, especially the police, and they may have good reasons for that trust. By contrast, such a scheme would not work in this country, because guns and distrust of government are too central to the American cultural experience. [70] Thus, Kopel emphasizes the importance of careful attention to cultural differences when considering the role of guns and gun control in different countries. [71]

Unfortunately, Kopel's nuanced appreciation of cultural difference falters when he considers America's gun culture, because he tends to portray it as the fundamental, enduring American culture, rather than merely one among many: [72]

Whether the framers chose wisely or not, their choice cannot be undone. Indeed, the Second Amendment simply reflected the social reality that Americans were already extremely well armed. Gun culture is too deeply embedded in the American soul to change now. . . . . . . . Foreign gun control . . . postulates an authoritarian philosophy of government and society fundamentally at odds with the individualist and egalitarian American ethos. . . . Even if some Americans want their nation to be more like other countries, America cannot be more like **404** them. There are too many guns in America, and too much of an individualist gun culture in the American psyche . . . . Instead of transplanting foreign gun control and culture to America, a realistic American gun policy must accept the permanence of guns in American life. [73] In other words, for Kopel, guns reflect a permanent, central, and ineradicable part of American culture; gun control, by contrast, represents a recent and hopeless attempt to graft elements of foreign culture onto America. For that reason, guns cannot be abandoned, but gun control can. Gun culture is the root of America, gun control culture a feeble and alien transplant.

In short, many in the gun culture see no genuine cultural division among real Americans on the subject of guns; instead, they see America (represented by the gun culture) arrayed in battle against its enemies. In this map of the cultural landscape, the essential fault line lies not between bedrock and cosmopolitan America but between a "true" America and everyone else. In this alternative vision, gun owners are not an outgroup despised by an elite but the ultimate ingroup, responsible for controlling cultural outgroups. And they have a story to tell about themselves. Once upon a time, they were America, justly glorified and dominant. In recent decades, their position has changed, as urban elites have come to control America, but the gun culture is still the true American way. Everyone else--not only the urban elite but everyone, including outgroups--should rightly be seen as less central to the American experience.

In this vision, Jews, feminists, and blacks fall outside the gun culture. Individual Jews, feminists, and blacks may own guns; some may even view themselves as part of the gun culture. As a group, however, they fall outside the traditional gun-owning heartland; their status as members of outgroups makes their membership in the gun culture problematical, a hurdle to be overcome. As observed above, the gun culture is heavily masculine, and is centered on the father-son relationship and the male responsibility of protection. [74] Feminists who would complicate gender roles would not be welcome in this highly patriarchal milieu. Similarly, per capita, Protestants are much more likely than other groups to own arms. [75] Revealing his own non-Protestant frame of reference, Bruce-Briggs explains, "The first gun at **405** puberty is the bar mitzvah of the rural WASP." [76] Given the soil in which the gun culture has grown, this religious identification is not surprising. Rural, conservative, nativist Americans have always been overwhelmingly Protestant, and they have identified Protestantism with the national character. [77] Indeed, when the gun culture describes its enemies as the urban, educated, professional, media-oriented liberal elite, it is difficult not to catch at least a whiff of anti-Semitism. Although I cannot document the assertion, I am quite confident, based on considerable exposure to the gun culture, that when many gun-owners imagine the hated "gun-grabbers," they have Jews in mind. [78]

Similarly, the gun culture originated in the concerns of white citizens to control those of other races, especially blacks and Native Americans. [79] Today, the composition of the culture reveals its racial identification. Rural, conservative, nativist Americans have always been white. [80] Although blacks own guns in roughly the same percentages as whites [81] and arms bearing has been symbolically important to many blacks, [82] still African-Americans are not part of the gun culture's "bedrock" America. As I elaborate below, the gun culture has typically posed a threat, not a promise, to black America. [83] Racial hierarchy and violence formed an important part of the gun culture in the South in the nineteenth and early twentieth centuries. [84] Even today, Southerners own guns in much larger percentages than non-Southerners, and white Southern gun owners display greater racial animus than white Southern non-gun-owners. [85] Moreover, racism has always blemished the tradition of rural radicalism that marks one extreme of the gun culture. [86]

Compendium_Cornell
Page 1853

Because stereotyping of opponents is so common in this culture war, I wish to be very clear about this claim. I am not arguing that all or most gun owners are hostile to outgroups. I am not arguing that all **\*406** members of the gun culture are hostile to outgroups. And I am not arguing that proponents of the right to arms are hostile to outgroups; indeed, in my experience, most such proponents are libertarians implacably hostile to bigotry as a restriction on liberty. I am arguing that the gun culture, by and large, has imagined itself as the true American people, has excluded outgroups, and has thereby regarded outgroups as less central to the American citizenry.

I am certain that some members of the gun culture would resist this characterization. They would claim that perhaps once the culture excluded outgroups, but no longer. Such a claim, however, bears a heavy burden of persuasion. Populist movements of the common man have always grown from the rich soil of "bedrock America." As detailed in Part III, those movements have always imagined not one but two enemies--urban elites and outgroups. Moreover, populist violence has typically been directed not at elites but at despised outgroups. [87] Even today, the paradigmatic member of the gun culture is a white, Protestant, rural, conservative, nativist male. [88] Perhaps that man has undergone a conversion experience, welcoming Jews, blacks, and feminists as equal members in his culture, but it seems unlikely.

## 4. Outgroup Attitudes Toward the Gun Culture

If the gun culture has exiled outgroups from its embrace, outgroups have typically been voluntary exiles; the suspicion has always been mutual. Generally, outgroup members have maintained that to be a Jew, feminist, or African-American entails opposition to the gun culture. Sometimes these arguments verge on the essentialist claim that outgroups are inherently antigun, but more often they simply claim that outgroups have historically found the gun culture alien and perhaps threatening.

Thus, traditionally, guns have been culturally coded as male and anti-female. The status of guns as phallic symbols is virtually a cliché in these post-Freudian days. [89] Many women first learning to shoot guns find it difficult to overcome their socialization as women--their fear of guns, their aversion to violence, and their sense that guns are a **\*407** part of male culture off-limits to them. Many feminists, especially cultural and radical feminists, agree that women are either inherently or culturally nurturant and pacifistic, not militarist and violent. Thus, Ann Scales argues that the force inherent in militarism [90] provides the grounding for the silencing of women:

[M]ilitarism normalizes the oppression of women. It supplies the moral authority for relations of dominance and submission. . . . [T]he militaristic individual has been drilled in the necessity and legitimacy of the use of force. . . . This kind of force, hanging over our heads at every moment, has "the ability to turn a human being into a thing while he is still alive." . . . And that is a definition of woman's otherness. Women have been imitating nothingness for a long time. [91] Sara Ruddick further argues that "maternal thinking" lends itself to a politics of peace. [92] Ruddick notes the typical, cultural belief that men make wars and women make peace, [93] but she rejects this absolutist distinction, observing that mothers have warlike impulses to support soldiers and to fight for parochial interests. [94] Instead, she offers a more limited and culturally contingent argument. Maternal thinking can, under the right circumstances, act as a basis for a peace politics, because it is rooted in caring labor, especially the care of bodies. [95] By contrast, she argues, militarist thinking abstracts away real human physicality and suffering and so makes violence and cruelty easy. [96]

Wendy Brown offers a feminist analysis of the Second Amendment that rests on this perceived antinomy between women and guns. [97] First, she attacks the formal Second Amendment, particularly "[Sanford] Levinson's vision of an armed citizenry, collectively resisting the excesses of state power on behalf of itself as a community." [98] Brown argues that this superficially universalist vision **\*408** in fact ignores the lived experience of outgroups. [99] She contends that Americans do not presently constitute a unified community and instead live in "an era of thoroughly disintegrated public life and disintegrating social order, and an era of rampant violence within and against the urban poor and against women of all socio-economic classes." [100] Under those conditions, a right to arms will generally hurt the "most routine victims of this 'right' ": "[U]rban Black men between the ages of sixteen and thirty-four, for whom homicide is the leading cause of death, and women, one of whom is raped every six minutes, one out of three times at gunpoint or knifepoint." [101] She asks rhetorically, seeking to expose the bias of a purportedly universalist interpretation of the Amendment: "Might there be something a bit 'gendered' about a formulation of freedom that depicts man, collectively or individually, securing his autonomy, his woman, and his territory with a gun[?]" [102]

Compendium_Cornell
Page 1854

Having exposed the Amendment as culturally specific, rather than universal, Brown then argues that women, feminists in particular, fall outside of this culture. [103] She makes this argument by means of a personal story. Returning from a long trek in the wilderness, she and some friends discovered that her car would not start. [104] Luckily, two men from a nearby Winnebago were able to help them start the car. [105] Despite this cooperation, however, Brown found herself reflecting that she and the men were at "opposite ends of the political and cultural universe" and did not "share [[] much of anything." [106] When she first met the chief rescuer, he was "making his way through a case of beer, flipping through the pages of a porn magazine, and preparing to survey the area for his hunting club." [107] Their reasons for being in the wilderness were thus utterly different--"he preparing to shoot the wildlife that I came to revere, he living out of his satellite-dished Winnebago and me out of my dusty backpack, he sustained by his guns and beer, me by my Nietzche and trail mix." [108] If she had met him alone, she would have feared rape; "his gun could well have made the difference between an assault that my hard-won skills in selfdefense **409** could have fended off and one against which they were useless." [109] In other words, because of the "social positioning and experiences of men and women in our culture," the right to arms primarily benefits men, as Brown observes by closing with rhetorical questions:

Who is the gun-carrying citizen-warrior whose power is tempered by a limit on the right to bear arms? Is he most importantly a republican citizen, or more significantly, a socially male one? Is his right my violation, and might his be precisely the illegitimate authority I am out to resist? [110]

Similarly, many Jews have traditionally defined themselves as fundamentally nonviolent--gentle, powerless, and rational. [111] In the face of long-term and implacable persecution, these Jews resolved to oppose violence only with reason; some have argued that "speaking truth to power" is a central Jewish activity. [112] Rationality and nonviolence thus became central pillars of Jewish ethics. Perhaps the foremost scholarly exponent of this view is the anti-Zionist writer Michael Selzer, who maintains: "Jewish ethics and purpose derive from the rejection of power, from the actual contempt of power, which pervades the Jewish ethos." [113] Some attribute theological significance to this ethical norm. God has commanded the Jews to adhere to the covenant, even in the face of persecution, by "representing God's ways in the world and by serving as God's spiritual agents in society." [114]

The identification of Judaism with nonviolence has also permeated popular Jewish culture. In their classic study of shtetl culture, Mark Zborowski and Elizabeth Herzog explain that the culture was "at one in regarding physical violence as 'un-Jewish." ' [115] In this view of the world, Jews emphasized "intellect, a sense of moderation, [and the] cherishing of . . . rational, goal-directed activities," and they **410** rejected an un-Jewish "emphasis on the body, excess, blind instinct, sexual instinct and ruthless force." [116] In the 1940s, Jean-Paul Sartre famously celebrated this view of Judaism:

The Jews are the mildest of men, passionately hostile to violence. That obstinate sweetness which they conserve in the midst of the most atrocious persecution, that sense of justice and of reason which they put up as their sole defense against a hostile, brutal, and unjust society, is perhaps the best part of the message they bring to us and the true mark of their greatness." [117] Finally, Paul Breines describes the continuation of this stereotype in the "Woody Allen figure, that is, the schlemiel: the pale, bespectacled, diminutive vessel of Jewish anxieties who cannot, indeed, must not, hurt a flea and whose European forebears fell by the millions to Jew-hating savagery." [118]

Given this tradition, it is not surprising that Jews as Jews have generally located themselves outside the gun culture. Jews own guns in very low percentages compared to other groups. [119] All of the leading mainstream Jewish organizations have taken strong positions in favor of gun control, [120] and it may not be a coincidence that the leading advocate of gun control on Capitol Hill, Charles Schumer, is himself Jewish. [121] Indeed, the central elements of the gun culture--violent self-reliance, toughness, a willingness to meet blow with blow--comprise a virtual definition of "un-Jewish" behavior in this view of Jewishness.

Similarly, African-Americans have traditionally fallen outside the parameters of the gun culture. In fact, the relationship of blacks to guns themselves has been complicated and sometimes conflicted. On one hand, there is no tradition of viewing guns as "un-black" in the way that there is for viewing guns as "un-Jewish" or "un-female." Many Southern blacks participated in the outdoors culture from which the gun culture grew. [122] In addition, as a result of the long tradition of **411** disarming blacks, many African-Americans have seen self-arming as an important form of empowerment. [123] Today, blacks own guns in roughly

the same percentages as others, [124] and owning a handgun is a badge of manhood for many inner-city youths. [125] Indeed, many young urban black men romanticize revolutionary violence, especially as they perceive it in the figure of Malcolm X. [126] On the other hand, pacifism also has been a significant part of black culture as well, perhaps most significantly in the work of Martin Luther King and the Southern Christian Leadership Council. [127] Moreover, most blacks are neither revolutionaries nor gang members; rather, most blacks view the presence of guns in the hands of inner-city youth as a pestilence that is destroying their community. [128] Not surprisingly, prominent African-American intellectuals have generally condemned widespread gun ownership among blacks and have called for tighter gun control. [129] Furthermore, as a group, African-Americans are more in favor of gun control, especially handgun prohibition, than whites. [130]

However complicated the relationship of African-Americans to guns, their relationship to the gun culture is much simpler. As suggested above, they have experienced its hostility. Even some of the African-Americans fondest of the gun do not love the gun culture. Black revolutionaries have generally sought to break the white power structure. [131] The first objects of a black revolution would probably be urban, such as the police, [132] but rural, conservative, bedrock America would surely not be far behind. [133] Indeed, Carl Rowan predicts that the next race war will come--and come soon-- when blacks take up arms to defend themselves from attack by the white racist members of the militia movement. [134] In fine, black revolutionaries typically have shown no inclination to make common cause with the gun culture, to **412** join with them in celebration of their shared devotion to self-arming; instead, they have seen them as likely opponents.

Recently, Carl Bogus has argued that not only the gun culture in general but the Second Amendment in particular has not benefited African-Americans. [135] He joins the collective rights theory in maintaining that the point of the Amendment was to ensure that the federal government would have no power to disarm state militias. [136] The concern to safeguard the militia system, however, may have derived from a desire to protect its traditional function as slave patrol:

[T]he Second Amendment may have been inspired as much by a desire to maintain a form of tyranny as to provide a means of resisting tyranny. . . . Why the fear about Congress disarming the militia? . . . Northern states would control Congress, and the North was finding slavery increasingly obnoxious. Intentionally or unintentionally, Congress might subvert the slave system by allowing the militia to decay. . . . [S]trong evidence suggests that the Southern states' concerns about maintaining the militia for slave control, and the Northern states' desires to relieve the Southern states' anxiety on the matter, were significant forces behind the Second Amendment. [137]

In summary, then, until relatively recently, the cultural landscape of the Second Amendment seemed fairly simple. The gun culture on one side, and urban elites and outgroups on the other. In recent decades, however, a loud and dissenting chorus has arisen among outgroups to complicate this simple division. Eloquent and emphatic Jews, feminists, and African-Americans have come to embrace the Amendment. In their view, just as the gun culture has used firearms in the past to control outgroups, those same outgroups can now use firearms to seek and find liberation.

## II. The New Landscape of the Second Amendment

The essence of the outgroups' case is fairly straightforward. Because outgroups cannot rely on the anti-Semitic/patriarchal/ racist state to protect them, they have no choice but to rely on themselves, by self-arming against anti-Semitic/patriarchal/racist oppression by public or private parties. The following subparts present an overview of these arguments. Subpart A examines the analysis of Jews for the Preservation of Handgun Ownership, subpart B examines the Women **413** and Guns movement, and subpart C examines the writing of Professors Robert Cottrol and Raymond Diamond, prominent African-American exponents of the right to arms.

In presenting these arguments, I will emphasize two points. First, the outgroups make two kinds of arguments. One argument is a prudential and political claim: individual members of outgroups should exercise the right to arms, and legislatures should respect it, because of the present reality of religious, gender, and racial oppression. The other argument is a constitutional claim: we should interpret the Second Amendment to protect a personal right to arms because, in light of the permanence of government untrustworthiness and private oppression, outgroups badly need such a right. Indeed, for representatives of these outgroups, if the Second Amendment has a special constituency, it is their respective groups, not the gun culture. In short, then, these

Compendium_Cornell
Page 1856

theorists use a perspective-based mode of constitutional interpretation. They approach the Amendment from the perspective of their membership in outgroups, and they offer reasons for interpreting the Amendment in a particular way drawn from their experience in those groups.

Second, the social world of the Second Amendment, as construed by these theorists, is permanently fragmented into hostile identity groups. The permanence of hate violence is precisely the reason that these theorists believe that a right to arms is so important. As a result, these theories seek to recognize an individual right to arms, but these individuals exist in a world of dissentient collectivities. The very rationale for the right to arms considers individuals as members of collectivities. We should recognize a right to arms precisely because people are not abstract individuals; rather, they have religious, gender, and racial identities and act on malign motives rooted in those identities. Moreover, the individual arms bearer acts for reasons rooted in his or her membership in a collectivity and to effectuate change that will make the world safer for other members of that collectivity. The Jew who resists a genocidal government helps to stop another Holocaust, the woman who foils a would-be rapist helps to break the power of the patriarchy, and the African-American who shoots back at the Klan helps to rid the world of racism.

### A. Jews for the Preservation of Firearms Ownership

The tradition of Jewish meekness is only one strand in a rich historical experience. Collectively and individually, Jews have always **\*414** exercised power, from Biblical days to the present.[138] There have been Jewish soldiers,[139] gangsters,[140] and even shtetl thugs, the ba'al-guf,[141] though Jewish elites have sometimes tried to suppress the memory of these "deviant" Jews.[142] Through the ages of persecution, many Jews armed themselves to resist, in defiance of the stereotype of Jewish resignation.[143]

During the nineteenth century, Zionism arose as an alternative ideology to assimilation; it sought to replace gentle accommodation with militant nationalism.[144] After World War II and the Holocaust, many Jewish emigrants began to celebrate the martial virtues as they struggled for a homeland in Palestine; Jews, in their view, should fight rather than suffer.[145] Some of these even became terrorists, adopting a vision of warlike unity that had parallels with the fascism from which they had fled.[146]

With Zionism's efflorescence in the State of Israel, then, armed strength again became a culturally respectable Jewish option.[147] In America, however, most Jews did not come quickly to that point of view. Indeed, American Jews may have first come to feel great pride in a powerful Israel only with the Six Days War, and with this pride came a new appreciation for the uses of violence.[148] For many, the image of the enfeebled shtetl Jew rapidly took a back seat to the image of the bronzed, virile sabra warrior or the merciless Mossad agent.[149] Indeed, some have argued that American Jews have a special attachment to images of Jewish might. Enjoying a safe life in America, endangered only by assimilation, they feel guilty that they are not in Israel, facing hardship and the Arab threat.[150] To compensate, some argue, they become highly devoted to the cause of Israeli security, resenting all criticism of Israeli imperialism.[151] For such Jews, the Holocaust has become a testament to the folly of **\*415** Jewish passivity,[152] the Warsaw uprising[153] and Masada[154] have become central stories, and the fundamental pledge has become "Never again."

Jews for the Preservation of Firearms Ownership (JPFO) appears to be a fringe by-product of this large-scale cultural movement. JPFO is a Milwaukee-based organization, headed by Aaron Zelman, Jay Simkin, and Alan Rice, and claims 4000 members.[155] Its mission is to alert the public to what it believes are the dangers of gun control.[156] Its major works are Lethal Laws[157] and "Gun Control": Gateway to Tyranny.[158] These works have received generally favorable reviews by mainstream Second Amendment theorists of the individual right school.[159] Moreover, despite its relatively small numbers, JPFO has received a great deal of media attention,[160] presumably because of the virulence of its views and its incendiary way of expressing them.

### 1. Gun Control and Genocide

According to JPFO, gun control "has a down-side. A very nasty one. . . . The down-side of 'gun control' is genocide. There have been at least seven major genocides in this century, involving 50-60 million **\*416** victims . . . . In every case, a 'gun control'

law was in force before the genocide began." [161] Gun control and genocide thus have a close relationship, although JPFO equivocates on just how close. At a minimum, gun control is a necessity for genocide: "In the [twentieth century] 'gun control' is an essential pre-condition for genocide. Until and unless a hate-driven group gets control of the government mechanism and disarms its intended targets, genocide simply cannot and does not occur." [162] Even this minimum claim is quite extraordinary: no gun control, no genocide. If armed, the potential victims will always be able successfully to resist. [163] JPFO, however, sometimes goes even further. It argues that gun control actually tends to precipitate genocide. [164] Exhibiting the bad manners for which they have become notorious, Simkin, Zelman, and Rice assert: "[T]hose seeking more 'gun control'--or who accept existing 'gun control' laws--need to consider whether or not they still can support a policy that promotes genocide; . . . those who back 'gun control'--after reading the lethal laws presented within-- must be recognized as supporting genocide." [165]

This claim that gun control leads to genocide grows directly out of JPFO's basic political philosophy. In its view, the "formula for genocide has three parts: Hatred; Government . . .; [and] Gun control." [166] Without all three, "genocide does not occur," because genocide occurs only when a hate-driven group seizes control of the government and disarms the people. [167] Unfortunately, because it is a "basic human emotion," hatred "cannot be banned." [168] Similarly, although government has an "inherent capacity to do great evil," it "in some form, is a necessity for civilization." [169] Therefore, "[g]un control is the only part of this formula that need not be present." [170] Given **417** these premises, JPFO's conclusions are ineluctable. Because hatred is always lurking and government is always a threat, the only way to prevent genocide is to ensure that the "people are on guard and armed;" if gun control laws disarm the people, it is only a matter of time before genocide occurs. [171]

JPFO offers many examples of modern genocides made possible by gun control, but the central example--indeed, the experience that drives the analysis--is the Holocaust in Germany. [172] Not surprisingly, gun control turns out to be the key to understanding how the Nazi atrocities could have happened. In 1928, the Weimar Republic enacted a permit and registration system, [173] and then in 1931 prohibited the public carrying of arms as a hedge against political violence. [174] With the passage of these laws, "the fate of Jews in Europe was sealed." [175] In 1933, Hitler came to power and "loosed his militia" to terrorize the population. [176] The Nazis inherited the Weimar gun control scheme, and it allowed them to achieve "an iron grip on Germany." [177] By 1933, the law had discouraged arms ownership, and the registration lists gave the Nazis necessary information to revoke the permits of "anyone they deemed unreliable," especially Jews. [178] In 1938, the Nazis authored their own gun control law that forbade Jews to own any weapons and exempted the Nazis themselves from the gun control laws. [179] Shortly thereafter followed the stages of the Holocaust: the Kristallnacht pogrom, "Mass Murder by Shooting" in Russia, and ultimately "Mass Murder by Gassing." [180]

This slaughter was possible only because the Jews had already been disarmed. In Russia,

[t]hat so few could murder so many, so quickly can only be explained in one way: the victims were unarmed. The same "gun control" laws that made it possible for Stalin to murder millions of his real or **418** imagined opponents, also made it possible for the Nazis to murder millions of Soviet Jews. [181] Only the Warsaw ghetto resisted by force of arms, and it ultimately lost because it was "woefully under-equipped." [182]

According to JPFO, the risk that gun control will lead to genocide exists everywhere, even in America. The federal government came close to genocide when it interned hundreds of thousands of Japanese-Americans during World War II. [183] If Japan had been more successful in the war in the Pacific, "Japanese-American internees might then have met with the same fate as Jews in Hitler's Europe: extermination." [184] Today, the infrastructure exists for a massive genocide. That infrastructure has three elements: gun control, especially the Gun Control Act of 1968; databases of information about Americans, which "greatly enhance[] the potential for 'genocide' because centralization of information promotes the speedy identification of potential victims"; and a mass media that might "fan the flames of hatred." [185]

Indeed, much of JPFO's language suggests that it believes a Nazi-like genocidal conspiracy is already afoot in America. It argues quite seriously that the 1968 Gun Control Act was "likely based on the Nazi Weapons Law of 18 March 1938." [186] Sometimes, JPFO makes the claim even stronger: "[The 1968 Gun Control Act] is identical, word for word, in tone and in content, as that

passed by Adolf Hitler in 1938." [187] The Library of Congress allegedly translated the Nazi law for Senator Christopher Dodd four months before the American law was passed. [188] Thus, for JPFO, gun control is a "Nazi cancer" "implanted" in America [189] in order to "soften the underbelly of the USA for the slice of the Global Government knife." [190] JPFO has repeatedly used an image of Hitler with his arm raised in stiff-arm salute next to the words "All in favor of gun control raise your right **\*419** hand" on billboards, posters, bumper stickers, and advertisements. [191] They have distributed pamphlets bearing a swastika and the slogan "Stop Hitlerism in America" in order to oppose pro-gun-control candidates in various states. [192] They compare Sarah Brady to Hitler: "Hitler knew that a lie-- endlessly repeated--can win acceptance. So does Sarah Brady." [193] "Brady's use of Hitler's tactics leads to a Final Solution for law-abiding gun-owners." [194] They also compare Waco to Warsaw: "We saw the government go into Waco, Texas, pretty much as the Nazis went into Warsaw. As it was in Warsaw, so it was at Waco." [195] One member of JPFO summarized: "Vote only for politicians who trust the people to own all types of firearms and who have a strong pro-Second Amendment voting record. . . . I see creeping fascism in America, just as in Germany, a drip at a time; a law here, a law there . . . soon you have total enslavement." [196]

Arguing that the risk of another Holocaust is alive and real in America today, JPFO viciously criticizes Jewish organizations, leaders, and politicians that support gun control. [197] Indeed, a central purpose of JPFO is "to expose the propaganda and myths used by all anti-gunners, but particularly by some Jewish anti-gunners." [198] Such Jews have failed utterly to learn from history: "[T]he hardest lesson of the Holocaust . . . is that 'gun control' is a lethal policy. Jews have been a major victim of this policy. Yet 'leaders' of several Jewish communal groups--e.g., the American Jewish Congress, the B'nai Brith among others--still support 'gun control.' " [199] In their blindness, **\*420** these Jews promote victimhood and subservience as a survival strategy. Aaron Zelman maintains, "Jews who support gun control have learned nothing from history. . . . Jews have always tried to ingratiate themselves to government, but let's face it. When there's too much government it's not good for Jews. It's just not in the best interests of Jews to be disarmed." [200] Sympathetic columnist Charley Reese explains: "Zelman faults many Jewish organizations that support gun control for either having the passive attitude of the ghetto Jew or, in some cases, for promoting victimization as a means of promoting Jewish unity." [201] According to JPFO, these pro-gun-control Jews are stirring anti-Semitism by their pernicious behavior:

[Pro-gun-control Congressman Charles] Schumer and his collaborators are promoting anti-Semitism and tyranny. Schumer and other Jewish gun-grabbers-- notably the B'nai Brith and its Anti-Defamation League . . . cannot see that their gun control activities fuel the fires of real anti-Semitism, as . . . gun owners of all races and creeds increasingly find their civil right to own guns reduced by these pro-criminal Jews. [202] In short, pro-gun-control Jews, like all "those who back 'gun control' . . . must be recognized as supporting genocide"--perhaps the worst charge that one Jew can hurl against another in the late twentieth century. [203]

From this analysis, JPFO derives two conclusions--one prudential and one constitutional. Prudentially, JPFO contends that Americans should arm themselves: "The best way sharply to reduce the likelihood of genocide is for individual citizens, everywhere, to **\*421** own and to be skilled in the use of firearms, especially military-type rifles." [204] Such self-arming, in JPFO's view, will be effective, even against modern armies: "It seems sound to conclude that civilians armed with military-type rifles by weight of numbers-- if by nothing else--can at least cripple almost any attacking military force." [205] Correlatively, government should allow citizens to arm themselves. To that end, "[n]o government entity should have any kinds of records concerning firearms ownership." [206] More fundamentally, Americans should not accept any kind of gun control, no matter how superficially reasonable it may appear: "That American 'gun control' proponents constantly push for tighter restrictions on private ownership of firearms by the law-abiding suggests that reasonable 'gun control' is a contradiction in terms. . . . The futile effort to bring it about will be lethal. To save millions of lives, we must destroy 'gun control.' " [207]

## 2. JPFO's Interpretation of the Second Amendment

Second, as a constitutional matter, JPFO argues that the connection between gun control and genocide provides a basis for interpreting the Second Amendment. According to JPFO, "government can do good only slowly, but can do great harm [such as genocide] quickly." [208] For that reason, the Framers "designed a system based on limiting government's power; . . . created a

Compendium_Cornell
Page 1859

civil right of the law-abiding to be armed; [and] . . . did not impose on the government the duty to protect the average person." [209] In other words, according to JPFO--and they make this claim without citing to any historical support--the Framers of the Second Amendment shared JPFO's basic political philosophy. Because they anticipated that gun control leads to genocide, the Framers banned gun control. [210]

At another point, JPFO maintains that "the way in which the private ownership of firearms is discussed" obscures the fact that "'gun control' is the key to genocide." [211] Discussants tend to focus on unimportant short-term issues (like the abuse of firearms by criminals) or long-term side issues (like the sporting use of firearms), but those issues are not constitutionally significant:

**\*422**  Use of firearms for self-defence against criminals, or for hunting, is time-honored, lawful, and praiseworthy. But such uses cannot be the main reasons that . . . the private ownership of firearms was mentioned in the U.S. Constitution. . . . . . . . The Framers of the Constitution did not waste words. They did not state the obvious. They did not deal with trivial matters. If the Second Amendment had been written only . . . to create a civil right to use firearms for "sporting purposes," the Framers would have said so, . . . [and] to enable individuals to defend themselves against criminals, that, too, that would have been stated, in plain English. The Second Amendment plainly was written--as all other parts of the Bill of Rights--to protect individual freedoms from encroachment by government. [212]  The point of the Second Amendment, then, is not hunting or self-defense; otherwise, the Framers would have said so "in plain English." JPFO never actually quotes the language of the Amendment, so it never clearly informs readers what the Amendment says "in plain English." But in the context of its analysis, it is plain that JPFO thinks the underlying purpose was to "protect individual freedoms from encroachment by government"--meaning, to prevent gun control, so as to prevent genocide. [213]  In short, JPFO urges us not to "miss[] the point--that 'gun control' is the key to genocide." [214]

JPFO's interpretive approach to the Second Amendment is thus perspectival, derived from their perspective as late-twentieth-century Jews. JPFO's stated reason for caring about the Amendment is that it may forestall the sort of genocide that occurred in Germany. Moreover, the political philosophy that JPFO ascribes to the Amendment--without any quotation from the Framers or even the text of the Amendment itself--is a view derived from reflecting on the experience of those threatened with genocide. In short, JPFO offers us a Second Amendment understood through the lense of the Holocaust.

Similarly, the world of JPFO's Second Amendment is populated not by abstract individuals but by situated selves possessed of ethnicity, group loyalty, and contending cultural agendas. In some respects, JPFO's message appears highly assimilationist by urging Jews to become part of the gun culture. More fundamentally, however, JPFO's argument rests on a vision of the inevitability of ethnic balkanization, since social hatred is perennial and endemic.

### **\*423  a. Assimilation to the Gun Culture**

On one hand, it is easy to find assimilationist elements in JPFO's interpretation of the Amendment. Formally, Jews with guns enjoy no special rights; rather, they are simply exercising the rights given by the Second Amendment to every American. The anti-genocidal Second Amendment may have special resonance for late-twentieth-century Jews, but it is also relevant to every person who might suffer from government pogroms--which is to say, everyone, since hatred is a given of the human condition. The lesson of the Holocaust, that "'gun control' is a lethal policy," is thus a lesson "for Jews and Gentiles alike." [215]  Indeed, JPFO argues that the Second Amendment provides a model not only for all Americans but for all nations; "every country should speedily move to imitate America and create a civil right of the law-abiding person to be armed." [216]

Similarly, it is possible to understand JPFO as an attempt by gun-owning Jews to gain admission into the gun culture. Some have argued that both Zionism and assimilation were attempts to "normalize" the Jews--assimilation, because it was "normal" to be a fully participating citizen of some nation-state, and Zionism, because it was "normal" to have a nation-state of one's own. [217]  Comparably, JPFO's work would seem to be an attempt to normalize the Jewish experience in America, for what can be more undoubtedly American than loving guns and the freedom that they allegedly procure? [218]  Notably, JPFO does not discuss Israel's importance for the safety of Jews; instead, it emphasizes the importance of Jews arming themselves in America, to secure safety here.

Compendium_Cornell
Page 1860

JPFO finds more in common with the gun culture than with other, more mainstream Jewish organizations. In one interview, Zelman explained that "two factors inspired him to found JPFO: studying the Holocaust and growing up in Tucson, Arizona."[219] The reporter "couldn't help wondering which was more formative"--suggesting that the real influence on Zelman was the Arizona gun culture.[220] Indeed, in an early advertisement, JPFO proclaimed that "Jewish gun-grabbers . . . cannot see that their gun control activities **\*424** fuel the fires of real anti-Semitism."[221] Presumably, the members of JPFO have seen this anti-Semitism close up, from inside countless gun shops, as some members of the gun culture blame the Jews for their problems. Instead of blaming the members of the gun culture for their anti-Semitism, however, JPFO blames the "Jewish gun-grabbers" for creating this hatred. Seeking acceptance in the gun culture, the founders of JPFO created an organization dedicated to the proposition that Jews can be good American gun owners.[222]

Structurally, the thinking of JPFO and the militia movement--the most extreme element of the gun culture--have a great deal in common.[223] Like JPFO, the militia movement distrusts the media and the government, believes that a conspiracy is afoot to deprive Americans of their constitutional liberties, and argues that the prime purpose of the Second Amendment was to prevent tyranny, not to guarantee hunting or self-defense rights.[224] Indeed, the militia movement has adopted a good deal of JPFO's material. The Hitler flyer appears at militia gatherings; the Free Militia (not to mention the ubiquitous Larry Pratt) reiterates the claim that the 1968 Gun Control Act was copied from the Nazi Weapons Law;[225] and more generally, **\*425** militia members rely on JPFO to buttress their claim that the federal government is preparing a Nazi-like holocaust for gun owners.[226]

**b. Ethnic Particularism**

In sum, then, JPFO exhibits a distinct tendency to assimilate to the gun culture, to build bridges and find commonality with other Second Amendment groups and gun-owning Americans generally. At the same time, however, JPFO imagines American culture as a whole as riven by ethnic animosity--united only by a common dedication to guns, suspicion of the government, and mutual distrust. Indeed, the inevitability of that animosity is the whole reason for cherishing our Second Amendment rights. Remember that in JPFO's vision, the prime reason for arms ownership is not so that abstract individuals can defend themselves against other abstract individuals. Rather, the reason is so that ethnic and religious groups can defend themselves against genocide perpetrated by other groups. JPFO explains:

Hatred between groups of people is the root cause of genocide. Such hatreds are a commonplace. But such hatreds do not usually lead to genocides. A genocide becomes possible when hatred between groups of people reaches a point where one or more parties seek a "final solution" to the problem, a "final solution" that involves murdering the other party or parties.[227] Without this constant threat of ethnic balkanization, the whole reason for the JPFO's version of the Amendment would disappear.

These two elements of JPFO's thinking--the drive to build bridges to other groups, and the fundamental suspicion of other groups--appear to be in some tension. That tension is especially acute because some of the allied groups are themselves deeply anti-Semitic, and yet JPFO blithely goes on extending the hand of peace to them.[228] Several explanations are possible. First, JPFO may just be inconsistent because it has inconsistent motives. Desiring acceptance in the gun culture, it is prepared to overlook the anti-Semitism that should be so offensive. Second, JPFO may simply be constructing alliances of temporary convenience; devoted to gun rights, it is prepared to make common cause with others who are devoted to gun rights, even if at some future date its members may have to shoot at them.

 **\*426** A third explanation, however, appears more plausible. In JPFO's view, genocide is a possibility only when a hate-group seizes control of the government: "Government . . . is the only mechanism by which a group driven by hatred can turn emotion into large-scale actions. . . . Until and unless a hate-driven group gets control of the government mechanism and disarms its intended targets, genocide simply cannot and does not occur."[229] Thus, JPFO conjures a world in which only government can threaten armed citizens because only government can effectively disarm them. This myopic focus on public violence has several important consequences for JPFO. First, it allows the organization to build bridges to other groups without particular worry. Unless those groups seize government, they cannot perpetrate genocide; until they do so, they are fundamentally in the same position as JPFO--fearful of a government that wants to disarm them. Second, it makes more plausible JPFO's claim that self-arming can prevent genocide. After all, "[g]overnment officials usually are a tiny minority of the population (about 2% in America in 1991)."[230] Moreover, in America, "[o]rdinary civilians outnumber government armed forces--military and police--by about 100-to-1."[231] As a result, "civilians armed with military-type rifles by weight of numbers . . . can at least cripple

almost any attacking military force. As a result, genocides can be prevented if civilians world-wide own military-type rifles and plenty of ammunition." [232]

JPFO has thus simplified the social world into a simple duality: average citizens against the government. In so doing, JPFO is reiterating the elements of an age-old American myth: in revolutionary times, the world will be divided between the people and the government. [233] That division, however, dangerously over-simplifies, as JPFO of all groups should know. In this country, private hate-driven violence is an enormous threat to outgroups, and it always has been, thanks in part to the gun culture's own proclivity to take up arms to further political goals. [234] Moreover, the line between private and public violence is itself very fluid. By strategic inactivity, the government can allow, even encourage, private pogroms without getting its own hands dirty. Further, private hatred can become public hatred as a result of elections or coups. Yesterday's militia leader  **\*427**  could quickly become today's senator. Finally, private people often cooperate with public hate violence. Many, perhaps most, ordinary Germans, for example, were willing participants in Hitler's final solution, not disarmed rebels, nor even innocent bystanders. [235]

In other words, a different vision of the social world is more plausible but more threatening to JPFO's project: a variety of groups existing in some tension and some amicability toward one another. Some have influence in the government, to varying degrees at various times, and some hold privately owned fertilizer bombs. Many of the latter are anti-Semitic, and in troubled times, more may join them, seeking an explanation for their woes and finding it in the Western world's traditional scapegoats. JPFO must know how plausible this vision is, because it often insists that the Jews in Nazi Germany stood alone, without aid from their neighbors or even from Jews in other countries. [236] Today, it seems much more likely that the militia movement will commit mass murder against American Jews than that the government will do so. This vision of balkanized ethnic groups is actually the world that JPFO itself imagines, except that it steadfastly refuses to recognize the danger of decentralized violence. As I will later argue, if JPFO took that danger seriously, it would be much harder for it to sustain the claim that self-arming is the answer to hatred.

### B. Women and Guns

As with Jews, the relationship of women and guns has always been more complicated than simple opposition. Frontier women used guns to defend their families alongside or in lieu of their men. The famous shooter Annie Oakley influenced the women's movement, hoping that one day all women would be able to handle guns "as naturally as they handle babies." [237] Today, many women in the gun culture would probably find the proposed opposition between women and guns quite odd. Even for these women, guns may be culturally coded as male, but they are nonetheless quite comfortable handling and using guns. As for the men around them, guns seem an  **\*428**  unremarkable part of life, and they own guns in significant percentages. [238]

In recent years, however, a new feature has appeared in the cultural landscape of the Second Amendment. According to some, urban women have begun to purchase sidearms for self-defense in record numbers, in response to specific fears rather than as a simple cultural expression. [239] In point of fact, this trend may have been greatly exaggerated. [240] Faced with slumping membership, the National Rifle Association (NRA) began a public relations and training program aimed at women. [241] At about the same time, faced with slumping sales, some of the major gun manufacturers began similar advertising campaigns. [242] Shortly thereafter, Smith and Wesson commissioned a Gallup poll which concluded that the rates of gunownership by women had skyrocketed. [243] Other studies have  **\*429**  found, by contrast, that the percentage has not increased, [244] and that the typical female gun owner remains a married resident of a rural, relatively safe, hunting household--in other words, a member of the traditional gun culture, not a frightened urban professional. [245]

Whether women actually own guns in greater numbers than ever before, however, may not be as significant as the perception that they do so. The press has issued a blizzard of stories announcing the trend, reporting the results of the Smith and Wesson poll without much scrutiny. [246] Correlatively, few press stories have questioned the reality of the trend. [247] Concurrently, Hollywood has released a series of new movies featuring women with guns as both dangerous and sexy. [248] Most importantly, women gun owners have themselves become self-conscious about the connections between their gender and their guns. Women in the gun culture are gun owners who just happen to be women. These new gun owners, by contrast, view their gun ownership as a politically significant act, a defiance of ancient and oppressive gender structures. Unlike earlier women gun owners, these new gun proponents tend to be politically liberal and to identify themselves as feminists. [249]

Unlike JPFO, this new self-consciousness is fairly broad-based. The house journal for the movement is Women & Guns magazine, which is published by the Second Amendment Foundation,[250] has a **430** readership of 25,000,[251] and claims to "function as the only voice for empowerment of women through self-defense choices."[252] Across the country, a variety of firearms training seminars for women and generally taught by women have appeared. The seminars seek to offer a supportive environment (free of the masculine culture that usually surrounds firearms) to help women overcome their aversion to guns.[253] In a number of states, women have also formed lobbying groups to fight gun control legislation, portraying the right to arms as a women's safety issue.[254]

Probably the two most prominent figures in this movement are Paxton Quigley and Naomi Wolf. They have achieved prominence in quite different ways. Quigley was once a gun control activist, helping to found the National Committee for Handgun Control and to pass the 1968 Gun Control Act.[255] When a friend was raped, she experienced a sea-change in her views about guns.[256] She wrote a book, Armed & Female, to make the case that guns are a safe, effective, and constitutionally sanctioned form of self-defense for women.[257] The book became a best-seller, and Quigley became a prominent spokeswoman for women and guns.[258] Today, she leads popular self-defense seminars for women.[259] In sum, she is the guru of the women and guns movement--the very model of a modern, armed, self-reliant woman.

By contrast, it is not at all clear that Naomi Wolf has ever touched a gun; certainly, she is no expert on women's self-defense. Instead, Wolf is a high profile, best-selling feminist author who has celebrated **431** women's self-arming as part of a new trend in feminism.[260] In Fire with Fire, she urges women to abandon what she calls "victim feminism" and instead to embrace "power feminism":

What is power feminism? It means taking practical giant steps instead of ideologically pure baby steps; practicing tolerance rather than self-righteousness. Power feminism encourages us to identify with one another primarily through the shared pleasures and strengths of femaleness, rather than primarily through our shared vulnerability and pain. It calls for alliances based on economic self-interest and economic giving back rather than on a sentimental . . . fantasy of cosmic sisterhood.[261] Rather than remaining ideologically pure in their powerlessness, therefore, power feminists should fight "fire with fire."[262] They should take up "the master's tools"--such as "the electoral process, the press, and money"--because "it is only the master's tools that can dismantle the master's house."[263]

Guns are among those tools. Wolf offers the women and guns movement as evidence to refute "[t]he premise that women are helpless victims."[264] She reports the alleged trend of women buying guns, and she describes the history and content of Women & Guns magazine.[265] Her tone is celebratory: "As violence against women reached epidemic proportions, women were not just sitting around. Quietly, carefully, with thorough training and in unprecedented numbers, while they looked after their families and tended their marriages, they were also teaching themselves to blow away potential assailants."[266] Women & Guns "addresses the unlabeled power feminism of women in the American mainstream;" in letters to the magazine, "one can hear the pioneer feminism of women who know that no one will take care of them but themselves."[267] For these women, "victim feminism's worldview is far from accurate, and less then useless. The fact is that women are psychologically burning the clothing of victimization."[268]

### *432  1. Power Feminism and Guns

Following Wolf's analysis, the women and guns movement is made up of women who generally consider themselves to be "power" feminists, who reject "victim" feminism's association of women with nonviolence.[269] This argument draws heavily on three traditional feminist themes--empowering women, gendering the subject, and maintaining that the personal is political.

### a. Empowering Women

Compendium_Cornell
Page 1863

The movement's central argument is that gun ownership can empower women to lead full, active lives, with less fear for their safety and fewer restrictions on their movements. [270] For these women, self-arming is only a logical extension of feminism's drive to empower women. [271] Women who fear guns will remain victims; they should instead transcend their fear, take responsibility for their own protection, and stop relying on men. [272] One woman summarized: "In many ways, it's an extension of the women's movement. The same way we've decided we're perfectly capable of taking care of our economic well-being . . . we're also capable of taking care of . . . our personal and physical well-being." [273]

Women & Guns advances this theme insistently, relying heavily on the language of choice and empowerment. Julianne Versnel Gottlieb, the publisher of Women & Guns, writes a monthly column entitled Dear Self-Reliant Reader. [274] In it, she takes a consistent position:

We must realize that we, and only we can--and will--be responsible for our personal safety. I do not choose to be a victim. I choose to be a woman with power and I will use whatever means I need to attain this goal. I choose to carry a firearm in certain situations. . . . It is my choice. [275]  **433** Similarly, Paxton Quigley's self-defense course is called "Women's Empowerment in the 90s," [276] and the idea is never far from her lips: "I teach empowerment"; [277] "When they learn how to use a gun, and that they can control it and often shoot well, they become empowered"; [278] "Women have finally decided they have to protect themselves. It's the last avenue to independence and liberation." [279]

Thus, for the women and guns movement, the central reason for arms ownership is self-defense, rather than hunting, target shooting, or revolution. [280] The movement maintains that armed self-defense is important to women in a variety of contexts. For example, the movement argues--against conventional wisdom--that motherhood provides an important reason to be armed: to protect one's children. [281] Armed self-reliance is also necessary to women's ability to travel and pursue employment. [282] Perhaps most centrally, guns empower women to resist rape, domestic abuse, and sexual harassment. Paxton Quigley concludes her chapter "Futile Defense" with an admonition:

If, for whatever reason, you think it is time for you to do your share to end the victim status of women, and if you can bear to undertake the attendant responsibilities, you should know that finding a gun in the hand of a potential victim is one of the most feared and avoided  **434** incidents a felon can imagine--feared and avoided even more than the police. [283] Naomi Wolf argues: "Women's relationship to violence is changing. Ordinary women are at a turning point. The fury generated by sexual abuse, which has traditionally been turned inward, is beginning to be directed outward." [284] Julianne Versnel Gottlieb writes: "[W]omen who are assaulted are victimized twice. Once by the perpetrator of the crime and the second time by the criminal justice system. . . . You cannot count on anyone to protect you or defend you except yourself." [285]

Importantly, self-arming allows women to rely on themselves, rather than the men in their lives. One woman colorfully explained: "When there aren't any warm shoulders of a man to lean on for protection, there's nothing that feels better then the cold barrel of a gun." [286] Another insisted: "I don't have, or necessarily need, a man to protect me." [287] Similarly, self-arming allows women to rely on themselves rather than on the state, which cannot or will not adequately protect women. One woman took a forgiving tone: "A big part of learning how to use a gun is self-reliance . . . . The police aren't psychic. They come when they're called. We're socialized to think some man on a white horse is going to come and rescue us. That's a fairy tale." [288] Most, however, are more critical. Safety for Women and Responsible Motherhood (SWARM), a lobbying group opposed to gun control, sarcastically instructs: "Call for a cop, an ambulance and a pizza and see who gets there first. The pizza rarely comes in second." [289] Karen MacNutt, legal consultant for the Second Amendment Foundation and the National Rifle Association, writes a monthly column for Women & Guns called Legally Speaking. [290] It stresses the inadequacy of legal mechanisms such as restraining orders  **435** to protect women; instead, MacNutt urges women to become self-reliant by arming themselves. [291]

Women in the movement have harsh words for those "victim" feminists who equate femaleness and nonviolence, especially feminist proponents of gun control--similar to JPFO's denouncement of "Jewish gun-grabbers." Karen MacNutt declaims: "What is truly amazing is the large number of otherwise intelligent, so-called 'liberated' women who blandly accept and even promote the idea that women are incapable of defending themselves with these devices." [292] Peggy Tartaro accuses feminist gun control advocates of elitism and paternalism: "This particular self-described liberalish feminist still thinks women can make

Compendium_Cornell
Page 1864

CONSTITUTIONAL TALES OF VIOLENCE: POPULISTS,..., 74 Tul. L. Rev. 387

up their own minds, thank you very much. And she thinks that while not every woman may want to include a firearm in her own self-defense options, that those who do shouldn't be subject to ridicule." [293]   When Ms. magazine criticized the idea that guns empower women, Women & Guns magazine responded:

[Naomi] Wolf's brand of feminism is unacceptable to the Ms. editorial board which apparently believes "feminism" and its attendant vocabulary can only be defined and used by themselves. . . . . In fact, none of the material presented talks directly with women gunowners, preferring to fall back on the victim mythology created by the general media. [294]   Finally, Julianne Versnel Gottlieb virtually chants her personal code:

I am not a victim feminist. I am a power feminist. I refuse to be a victim. I refuse to be a victim of crime. I refuse to be a victim of discrimination. I refuse to be a victim of someone else. I have power. I have power against crime. I have power against discrimination. I have power against someone else. I am self-reliant.  **436**  And I want you to have that choice also. [295]

### b. Gendering the Subject

Like "establishment" feminists, the women and guns movement insists that too often, public policy analysis does not take gender into account, using either a masculine or a "gender-neutral" actor as the subject. [296]   Instead, analysis of the right to arms should take both a woman's and a man's perspective--it should "gender the subject"--because the right may have different significance for women than for men. [297]   Indeed, reversing the traditional wisdom, the movement argues that the right to arms is more important to women than to men. [298]

One of the earliest essays to discuss women and guns, by Ruth Silver and Don Kates, protests the failure of both sides in the gun control debate to consider directly "the viability of women's self defense."  **437**  [299]   By contrast, the authors conclude that "a specific discussion of women's armed self-defense is appropriate, because the crimes women fear are particularly deterrable and defendable with handguns." [300]   They also argue that women have greater need of guns than do men, because of their relative physical weakness: "[Women's] freedom is made possible by the opportunity to possess a handgun. To paraphrase a saying from the Old West: God didn't make men and women equal, Colonel Colt did." [301]   The notion that guns are a gender-equalizer has become a slogan in the women and guns movement. [302]   One gun owner put the idea colorfully: "That's my equalizer with a man that's going to do me bodily harm. That makes us the same, then. We're on equal ground, and that's a good safe feeling. I'd just aim for the crotch and hit the heart." [303]

Similarly, in the movement's view, gun control falls especially heavily on women. This criticism applies to all gun control, because "women are more vulnerable to attack, and have more at stake in battling new controls on guns than men do." [304]   Particular forms of gun control also have particular problems. Peggy Tartaro condemns waiting periods as "gender biased" because women are "more likely [than men] to be first time purchasers of guns," and she concludes that "waiting periods . . . kill women." [305]   One group condemns discretionary licensing statutes because police chiefs tend to grant them primarily to men: "This discrimination against [Colorado's] women is deeply violent." [306]   As noted above, women's lobbying groups have sprung up all over the country to fight gun control at the state level. [307]

### *438  c. The Personal Is Political

The women and guns movement also echoes the feminist conviction that the world is not and should not be sharply divided into personal and political spheres. [308]   On one hand, the movement seeks to defend an individual right to keep and bear arms; it urges women as individuals to purchase and train with guns for their own personal protection. [309]   On the other hand, the movement also hopes that this self-arming will have large and long-term effects in the public realm. [310]

Those political dimensions are several and linked. First, as I have argued above, for the women and guns movement, self-arming rests on a belief that the state cannot or will not protect women, so they must protect themselves. [311]   One study concluded of recent women gunowners, "[o]wning a gun for these women is a necessary evil, as well as a political statement. They all

expressed doubt that gun control legislation would work and, therefore, defended their right to own a gun." [312] Second, as I have detailed earlier, for the movement, the choice to buy a gun entails a decision not to rely on men for protection. [313] Indeed, many of these women see the purchase of a gun as a way to upset conventional gender roles, by invading the masculine culture of guns and defying the expectation that women will be weak and passive. [314] Paxton Quigley explains:

[S]ocialization processes that connect femininity to various styles of weakness and helplessness may paralyze many women, teaching them the fear that restricts their ability to defend themselves. . . . . . . Sometimes it takes weeks or even months before these women begin to realize that they are physically and mentally capable of successfully defending themselves against an aggressor.  **\*439**  Moreover, a great many women also dislike and fear guns and consider it normal female behavior to react in that manner. These emotions may be a consequence of a myth that perpetuates the idea that guns belong to men as if they were some sort of cultural prerogative. Some women . . . perceive guns as an extension of a man's masculinity, giving him perhaps an undeserved power. [315]

Karen MacNutt proudly proclaims that society would consider her a "very bad girl" because, as she explains, "I carry a gun. I have no faith in the protective shield of some Victorian sense of innocence. . . . [I]f my .38 is too small, I'm sure my .45 will do the job." [316]

Third and cumulatively, although the movement views the right to arms as an individual right, it hopes that general self-arming by women can radically change current gender dynamics. Proponents and opponents of the movement agree that it grows out of a deep well of anger about the oppression of women. Ms. magazine explains that women possess "a certain off-the-record vein of vengefulness, a mother lode of anger, a vast buildup of unrequited insults and injuries. . . . Sweet revenge. Women's interest in guns--such as it is--isn't just about fear. It's about fighting back." [317] One gun dealer made the point in almost identical terms: "Women have suffered from purse snatchings, rapes and all kinds of humiliation. They're absolutely disgusted with government's feeble attempts to do anything for them. And they're getting p off." [318] Supporters of the movement believe that this anger can be successfully channeled into a large-scale resistance movement. Paxton Quigley explains: "If a number of women say 'Enough is enough,' we're going to see a real Take Back the Night movement." [319] Even critics of the movement see the appeal in this hope. Letty Cottin Pogrebin, founding editor of Ms., acknowledges:

[M]y reaction surprised me. I'm for gun control and nonviolent conflict resolution, yet suddenly I imagined every woman armed, powerful and instantly equalized--not as an aggressor but as a confident defender of her safety and physical integrity. Wait until some guy attacks us on an empty street: POW-- one less pervert; BANG --  **\*440**  another rapist blown away. . . . [P]istol-packin' mamas will fight back: ZAP--victims no more. [320]

In this sense, the movement seamlessly blends individual and collective aspects of the right to arms. On one hand, each woman possesses an individual right to arms--she alone has the choice to decide to buy a gun, and she alone must pull the trigger. The movement imagines that the right to arms will generally be exercised in a one-to-one confrontation with an aggressor. On the other hand, these individual exercises of the right to arms are part of a more general movement, and the movement hopes that the meaning and effect of this general self-arming will have immense political significance. In this view, when an individual woman fights off an attacker, she is fighting not only a particular man but the forces of misogyny. When she overcomes her own fear of violence, she is contributing to a large-scale shift in cultural attitudes that consign women to victimhood. And when she joins with other women in gun training classes or in reading Women & Guns magazine, she is affirming that there is strength in armed sisterhood.

The apotheosis of this line of thinking is the common claim that the solution to political violence against women is women's personal self-arming-- echoing JPFO's claim that the solution to the Holocaust was Jewish self-arming. After recounting the atrocities in Bosnia-Herzegovina, Julianne Versnel Gottlieb protests:

I have never read or heard one reporter--female or male--who has decried the fact that these women have no way to defend themselves. They never comment on, refer to, or allude to, or allow that any woman--every women--should have the right to choose not to be a victim. . . . . . . . It is time for [women's organizations'] help to expand its outreach to teach women around the world how to choose not to be a victim. [321] In a later column, Gottlieb offers the same prescription for other countries:

Compendium_Cornell
Page 1866

[T]he same horrendous practices are taking place in Haiti and Rwanda. With each new revelation, the United Nations continues to pass **\*441** economic sanctions and demand the restoration of the "rightful" governments. It's not working. It's time to do something so that the victims can protect themselves. . . . . I am not a victim feminist. I am a power feminist. [322] Even Naomi Wolf has warm words for women's self-arming in the Balkans:

In the Balkans, women have begun to take part in the violence that has engulfed the region, and to reject their submissive roles in the traditionally patriarchal culture. "Women have changed since the beginning of the war," Sarajevan Jasna Delalic said. "Women have banded together. . . . I will never slave for anybody anymore." Balkan women are reacting to their victimization with a matter-of-fact military vengefulness. . . . [A Sarajevan doctor explained,] "I've treated eighteen raped women . . . . About a third waited to have their gynecological problem resolved and then went out and picked up a gun." [323]

## 2. The Second Amendment as an Equal Rights Amendment

The interpretation of the Second Amendment offered by the women and guns movement grows directly out of its analysis of the importance of self-arming to women. In this sense, the interpretation is perspectival--it is the Second Amendment as understood through the lense of power feminism. And it rests on a vision of the social world as deeply divided by gender animus. The reason for the right to arms is that women need to defend themselves against misogynist men, not so that abstract individuals can defend themselves against other abstract individuals. In that sense, for the movement, the Second Amendment is a kind of Equal Rights Amendment. Like Colonel Colt, it equalizes the marginal difference in physical strength between men and women and so gives the latter a real-world freedom of movement and physical integrity.

Paxton Quigley's interpretation of the Amendment exemplifies these characteristics in a somewhat indirect way. Her formal analysis of the Amendment itself is actually quite gender-neutral, sounding very like the standard account offered by the individual rights school and indeed relying heavily on the work of Don Kates. [324] She begins with a number of standard passages by early American thinkers like **\*442** Samuel Adams, James Madison, and Richard Henry Lee, on the importance of the right to arms. [325] She then argues, following Don Kates, that the "militia" to which the Amendment refers is the unorganized militia, composed of every private householder. [326] And she concludes by arguing that the threat of tyranny is still very real, and so we should continue to embrace the Second Amendment. [327] On the face of things, none of these arguments is overtly connected to perspectivalism or a divided social world. Quigley's interpretation of the Amendment, however, occurs in a book devoted to the idea that women need guns to be free. [328] Her analysis of the Amendment contains no discussion of the importance of hewing to the Framer's intent or the value of a written constitution. Instead, she values the Amendment, as she interprets it, because it promises to help women in a divided social world--and she thinks that we should value the Amendment for the same reason: "[T]he real issue is not the polemics of guns versus no guns; rather, for some women it is the choice of being victor or victim." [329]

The editors of Women & Guns more directly connect their interpretation of the Amendment to perspectivalism and the vision of a divided social world. The magazine describes itself as "[a] publication primarily for women, primarily by women and presenting a strong proactive stand on the right to keep and bear arms for women." [330] For better or worse, the state has no constitutional obligation to protect women: "[M]any courts have held that police have no obligation to protect individual citizens." [331] Fortunately, the Second Amendment guarantees women the right to protect themselves. In the prose of Julianne Versnel Gottlieb, the meaning of the Second Amendment and the concerns of power feminism are so neatly blended that it becomes impossible to divine where one begins and the other ends. [332] In one column, she denounces Hillary Rodham Clinton for believing that **\*443** "government is the only entity able to make choices for you and me." [333] By contrast, "I, Julianne Versnel Gottlieb, believe that the individual can make the best choices for the individual." [334] In so doing, she follows in the footsteps of Dolley Madison, wife of "James Madison, the author of the Second Amendment," and "a woman who time and again in her long life made the choice not to be a victim." [335] Similarly, Gottlieb feels a close connection to Eleanor Roosevelt, who "carried a small handgun in her purse. She made a choice not to be a victim." [336] After claiming these women, along with Molly Pitcher, Martha Washington, and Abigail Adams, as spiritual ancestors, Gottlieb then offers her view of the Second Amendment:

Compendium_Cornell
Page 1867

If the U.S. Constitution gives me the right of privacy--the right to control the destiny of what occurs to my body--it gives me same right of privacy to choose to protect myself from assault, rape or worse. I believe that the Second Amendment of the Bill of Rights gives me the individual right to make a choice if, and/or how, I am going to do so. I believe that as a mother, I have these same rights when it comes to the protection of my children. I believe that as a wife, I have the same rights for the protection of my husband. [337]

In another column, she writes that the Second Amendment

was included in the Bill of Rights over 200 years ago to protect us from tyranny from within, as well as from without. It is what I fight for so that you and I do not become victims like those tortured women in Bosnia-Hercegovina today and who knows where tomorrow. [338]

In these passages, Gottlieb offers a power-feminist Second Amendment, predicated on the reality of a misogynist world. In place of Founding Fathers, she offers us a roster of Founding Mothers, each of whom "chose not to be a victim." [339] If the Constitution today protects women's substantive due process rights to reproductive autonomy, then it stands to reason that the Second Amendment also gives women the right to defend themselves--to choose not to be victims. Women may exercise that right as individuals, as mothers, or as wives--and the Second Amendment recognizes and celebrates all of those uses. In other words, this rendering of the Amendment is **\*444** perspectival. It offers us a Second Amendment interpreted with the concerns of power feminism in mind.

Gottlieb's version of the Amendment also rests on a vision of a socially divided world. The reason that women need the Amendment is to defend themselves against "rape, assault, or worse." [340] Indeed, the Amendment offers the only guarantee that Bosnia-like misogynistic violence will not occur here. For that reason, Gottlieb has devoted herself to defending the Amendment--as it defends her and all women. The staff of Women & Guns draw the obvious conclusion: "If we allow the gun-control lobby to chip away at our constitutional rights in the name of crime control we will be taking the first step in guaranteeing that we are victims." [341] And Gottlieb warns, "It is not possible to be selective about the Constitution. . . . This is crucial to realize when responding to the violence that pervades our lives." [342]

Recently, this rendition of the Amendment has made its way from the popular press to the law reviews. Like Don Kates and Ruth Silver, Inge Anna Larish condemns "[t]he exclusion of women's concerns in the gun control debate [[because] women are most in need of guns for self-defense. All else being held equal, women are physically weaker than men and will continue to be victimized by men whether or not men have guns." [343] Moreover, the police have been especially deficient in "preventing the crimes which greatly and disproportionately affect women, such as sexual assault and domestic violence." [344] As a result, gun control falls especially heavily on women. In practice, statutory schemes for carry permits discriminate against women, who generally do not carry large sums of cash and cannot demonstrate need. [345] In addition, a complete gun ban would help "men who perpetrate violent crime against women" because "[f]or most women, men's fists are lethal force." [346]

In Larish's view, the current discussion of the meaning of the Second Amendment wrongly ignores these women's concerns. The Framers wrote the Amendment "in gender-neutral language," but "[a] problem with gender-neutral law is its assumption that such laws **\*445** concern themselves with women's interests, when, a closer examination reveals that the interpretation, discussions and application of the law often ignores women." [347] Thus, collective rights theorists completely ignore women's need for self-defense, reading the Amendment instead to protect only the "states' right to maintain militias." [348] Even historians of the individual rights school "speak in terms of a male right, generally agreeing that one of the primary purposes of the [Second Amendment] was to guarantee an individual's right to defend 'himself." ' [349] Larish never describes how she would interpret the Amendment in detail, but it is not difficult to infer from her analysis. If we read the Amendment with women's needs in mind, we would presumably endorse a very strong personal right to own arms for self-defense, and we would find most gun control statutes unconstitutional. Like Quigley and Gottlieb, then, Larish offers a perspectival Second Amendment (indeed, Larish subtitles her article A Feminist Perspective on the Second Amendment), understood through the lense of women's particular concerns and resting on a vision of a social world saturated with misogynistic crimes against women.

## C. An Afro-Americanist Reconsideration

As explained above, most African-Americans may have not found guns alien to the extent that most women and Jews have.[350] In addition, blacks have resisted oppression by force of arms since before the creation of the republic.[351] Before the Civil War, Southern states sought to keep blacks disarmed, but slaves repeatedly rose in revolt, even though, unlike slaves in other parts of the Americas, they may never have developed a clear revolutionary tradition.[352] After the Civil War, blacks formed private militias to resist, usually unsuccessfully, attacks from white supremacist groups.[353] Later, W.E.B. DuBois called for black self-arming as a response to lynching: "[L]ynching of Negroes is going to stop in the South when the cowardly mob is faced by effective guns in the hands of the people determined to sell their souls dearly."[354] Similarly, throughout the nineteenth century,  **446**  Northern blacks organized armed militias to repel the assault of white urban mobs, again usually, but not always, without success.[355]

During the early years of the civil rights movement, Robert Williams pioneered disciplined, aggressive, and collective self-defense strategies in resisting the Klan;[356] he later authored the classic tract on the subject, Negroes with Guns.[357] Across the South, blacks organized local chapters of the Deacons for Defense and Justice to similar ends.[358] As the sixties proceeded, black violence became more widespread and less organized.[359] In the face of massive racial injustice and the assassination of Martin Luther King, rioting erupted in many of the nation's large cities.[360] Capping a decade of growing militancy, the perennially controversial Black Panther militia put the Second Amendment at the center of its political platform:

We want an immediate end to POLICE BRUTALITY and MURDER of black people. We believe we can end police brutality in our black community by organizing black self-defense groups that are dedicated to defending our black community from racist police oppression and brutality. The Second Amendment to the Constitution of the United States gives a right to bear arms. We therefore believe that all black people should arm themselves for self-defense.[361]

### 1. Before Cottrol and Diamond

In short, then, although blacks have never been part of the mainstream gun culture, African-American culture has often produced and celebrated courageous acts of armed resistance. In recent years, legal academics have begun to write a new and important chapter in this tradition. They have begun to craft an interpretation of the Second Amendment that puts black resistance at the center of focus and argues that the right to arms may be especially important to despised groups, like blacks, who have good reason to distrust the state.[362] For some  **447**  decades, individual rights theorists have been laying the foundation for this new interpretation. First, many civil rights workers in the 1960s found that a gun was an important tool to resist racist violence, and some of these workers later became central figures in the individual rights school of Second Amendment theory. Don Kates, for example, explains, "As a civil rights worker in a Southern state during the early 1960s, I found that the possession of firearms for self-defense was almost universally endorsed by the black community, for it could not depend on police protection from the KKK."[363]

Second, theorists of the individual rights school have argued that the purpose of much gun control has been to disarm blacks.[364] In the post-Reconstruction South, some states passed laws banning ownership of cheap handguns, so that only those (overwhelmingly white) people of ample means could own a handgun.[365] In other Southern states, sheriffs simply confiscated the weapons of African-Americans, even in the absence of formal laws banning black ownership.[366] Often, these sheriffs were helped in their confiscation efforts by early registration laws.[367] Still other states imposed very heavy taxes on handgun sales, comparable in effect to poll taxes.[368] And yet others hit upon the most successful scheme of all--a discretionary licensing law, under which the police could grant permits to those whom they favored and deny permits to everyone else, including "undesirables" like blacks.[369]

Some individual rights theorists further maintain that much recent gun control is really motivated by a desire to keep guns out of the hands of blacks and the poor.[370] In this view, for example, the 1968 Gun Control Act does not significantly restrict gun ownership; rather, it primarily makes guns more expensive by restricting the import of cheap foreign guns.[371] For that

reason, the 1968 Gun Control Act **\*448** functions as a "poll tax" on Second Amendment rights.[372] Similarly, many believe that the agitation for a ban on "Saturday Night" specials proceeds from a fear of blacks with guns: "It is difficult to escape the conclusion that the 'Saturday Night Special' is emphasized because it is cheap and is being sold to a particular class of people. The name is sufficient evidence--the reference is to 'nigger-town Saturday night.' " [373] Inferentially, this claim that gun control is often racist contains the heart of the Afro-Americanist reconsideration of the Second Amendment. The sorry history of racist gun control might lead one to conclude that it is unwise to entrust the state with a monopoly of force. Hence, the experience of blacks with gun control argues in favor of an individual rights interpretation of the Amendment.

## 2. Cottrol and Diamond

While this interpretation has been some years in the making, it has recently found its master expositors in Robert Cottrol and Raymond Diamond. While the women and guns movement may be the product of a large change in popular social consciousness, and JPFO is a small organization on the political fringe, the Afro-Americanist reconsideration of the Second Amendment is largely the work of these two gifted scholars.[374] The impact of their work has already been significant. Their writings have been widely reprinted,[375] and they have recently been cited by one Supreme Court Justice--perhaps evidence that their views may influence the Court if and when it ever decides the meaning of the Second Amendment.[376] **\*449** The work of Professors Cottrol and Diamond contain two central themes, one historical and the other theoretical, closely blended but analytically severable. First, they develop a careful historical exposition of the relationship of American race relations, on one hand, and the constitutional right to arms and gun control, on the other.[377] In this exposition, they emphasize that gun control has often hurt African-Americans and self-arming has helped them.[378] From this historical evidence, they develop the second of their themes--a theoretical argument that the Second Amendment should be given an individual rights reading, because a personal right to arms is an important safeguard for African-Americans and other despised groups in a country still consumed by bigotry.[379] In language that could stand as a statement of philosophy for every outgroup theorist, Professors Cottrol and Diamond write:

This article explores Second Amendment issues in light of the Afro-American experience, concluding that the individual rights theory comports better with the history of the right to bear arms in England and Colonial and post-Revolutionary America. The article also suggests that Second Amendment issues need to be explored, not only **\*450** with respect to how the right to keep and bear arms has affected American society as a whole, but also with an eye toward subcultures in American society who have been less able to rely on state protection.[380]

Cottrol and Diamond begin their historical sketch with the colonial background of the right to arms. They demonstrate that by the eighteenth century, English law had come to recognize a right to keep and bear arms, but that right was highly qualified along class and religious lines.[381] By contrast, the American legal tradition quickly eliminated those distinctions and substituted racial ones.[382] White citizens, whatever their class or religious status, had a right and usually a duty to be armed, but African-Americans enjoyed only a limited right to keep guns.[383] The reasons for this change are clear. As America was becoming a society deeply divided by race, white Americans felt threatened by Native Americans on their borders and black slaves in their midst.[384] As a result, they needed both to arm the white population and to control the access of blacks to arms.[385]

Next, Cottrol and Diamond summarize the revolutionary ideology of the Second Amendment as they understand it:

If necessity forced the early colonists to arm, the Revolution and the friction with Britain's standing army that preceded it--and in many ways precipitated it--served to revitalize Whiggish notions that standing armies were dangerous to liberty, and that militias, composed of the whole of the people, best protected both liberty and security.[386] When the new Federal Constitution gave Congress the power to organize, arm, and discipline the militia,[387] many feared that Congress would use its new powers "to both destroy state power over the militia and to disarm the people."[388] As a result, state legislatures proposed a constitutional amendment to protect the right of the population to keep and bear arms:

It is against this background that the meaning of the Second Amendment must be considered. For the revolutionary generation, the idea of the militia and an armed population were related. The principal reason for preferring a militia of the whole over

Compendium_Cornell
Page 1870

either a standing army **451** or a select militia was rooted in the idea that, whatever the inefficiency of the militia of the whole, the institution would better protect the newly won freedoms than a reliance on security provided by some more select body. [389]

At this juncture, however, the Afro-Americanist reconsideration hits its first serious snag. The presence of violent racism among white Americans before and after the founding generation may lend support to the Afro-Americanist/individual rights theory. Because African-Americans need arms to resist such violence, we should read the Amendment to protect a personal right. [390] The presence of racism in the founding generation, however, tends to undercut the Afro-Americanist/individual rights theory. Following Carl Bogus's view, the Second Amendment would protect the right of white people to own arms so as to subjugate red and black people. [391] As Bogus powerfully argues, an Afro-Americanist reconsideration of the Second Amendment would therefore have to reject the Amendment as a vestige of an oppressive and archaic worldview. [392] The provisions of the Uniform Militia Act make this problem especially pressing for Professors Cottrol and Diamond. Shortly after Congress proposed the Second Amendment, which called for a militia of the whole and hence an armed population, Congress then ostensibly defined the militia of the whole in a racially restrictive way: "The Uniform Militia Act called for the enrollment of every free, able-bodied white male citizen between the ages of eighteen and forty-five into the militia." [393]

Cottrol and Diamond avoid this problem by arguing that "while [the Uniform Militia Act] specifically included only this limited portion of the population, the statute excluded no one from militia service." [394] In other words, the statute only seems to be racially exclusive. It requires that white men enroll, but implicitly allows the states to adopt a broader definition. [395] Cottrol and Diamond offer three sources of evidence to support this reading. First, in the antebellum period, states in both the North and the South sometimes enrolled blacks into their armed forces, especially during times of invasion. [396] Second, Northern--but not Southern--states generally allowed blacks **452** to own firearms. [397] Third, "[t]he authors of the statute had experience, in the Revolution, with a militia and Continental Army considerably broad in membership" in that older and younger men, black men, and even some women had served, though the last two categories caused considerable controversy. [398] As a result, "it is likely that the framers of the 1792 statute envisioned a militia even broader than the one they specified." [399] Cottrol and Diamond then use this analysis of the Uniform Militia Act to give the Second Amendment a nonracist reading. If the drafters imagined an inclusive militia in the statute, it stands to reason that they intended the same sort of militia in the Second Amendment:

[T]he widespread use of blacks as soldiers in time of crisis and the absence of restrictions concerning the arming of blacks in the northern states may provide another clue concerning how to read the Second Amendment. . . . [[The broad militias envisioned by the 1792 statute suggest] to us how broad the term "people" in the Second Amendment was meant to be. [400]

In short, because of the demands of their theory, Cottrol and Diamond must and do portray American culture as violently racist before and after but not during the founding generation. [401] This portion of their historical account seems the least plausible. First, they offer no reason for this break in the historical pattern. Further, they offer no written evidence that the Framers intended a multiracial militia; the best contemporaneous evidence--the Uniform Militia Act--appears on its face to prescribe a uniracial militia. Cottrol and Diamond argued that the Act allowed but did not require a multiracial militia, but they offer no explanation of why the drafters of the statute would concoct such a scheme. The most obvious reason for requiring all whites but not blacks to be members of the militia is that they distrusted blacks, but that reason would lead to excluding blacks altogether. Cottrol and Diamond argue that we can infer that the Act would allow a multiracial militia from the fact that militias sometimes included blacks. [402] As Cottrol and Diamond admit, however, that inclusion was always controversial and occurred only in times of dire **453** need, as a concession to necessity. [403] Moreover, the militia sometimes included women, but even Cottrol and Diamond do not argue that the Uniform Militia Act permitted a multigender militia. There is a different, and more intuitively plausible, explanation of the language of the Act. In times of need, the militia had included blacks, but that experience had been so controversial that Congress decided to exclude them in peacetime. Should the need arise again, Congress could adopt a more expansive definition.

After this implausible rendering of the founding period, however, Professors Cottrol and Diamond resume their historical account with their customary care and scrupulousness. In the years immediately after the Revolution, American law removed many racial restrictions, but as the nineteenth century slid toward civil war, racism in both the North and South became more virulent and violent. [404] In the South, the white population feared not only slaves but also free blacks, because the latter might give the slaves a desire for freedom or might foment a slave rebellion. [405] As a result, the Southern states actually restricted the

Compendium_Cornell
Page 1871

access to arms of free blacks more than they did that of slaves, who were presumed to be under the control of their masters.[406] Lest the reader miss the implicit point that gun control has often been a means to racial oppression, Professors Cottrol and Diamond title this section "The Southern Antebellum Experience: Control of Arms as a Means of Racial Oppression."[407]

Professors Cottrol and Diamond use the Northern antebellum experience to illustrate the other side of this coin, that blacks with guns can defend themselves against racist violence.[408] Accordingly, they title this section "The Northern Antebellum Experience: Use of Firearms to Combat Racially Motivated Deprivations of Liberty."[409] Throughout the North in the years before the Civil War, blacks formed private militia units in the face of widespread mob violence and race riots because they were aware of the "potentially counterproductive nature of individual action."[410] The central example is the Cincinnati riot of September 1841.[411] On the first night, a black militia beat off a white mob; on the second night, the white militia disarmed the **454** African-Americans, and whites returned to inflict personal injury and property damage on the black community.[412] Again, Cottrol and Diamond drive the point home:

The 1841 Cincinnati riot represents the tragic, misguided irony of the city's authorities who, concerned with the safety of the black population, chose to disarm and imprison them--chose, in effect, to leave the black population of Cincinnati as southern authorities left the black population in slave states, naked to whatever indignities private parties might heap upon them, and dependent on a government either unable or unwilling to protect their rights. As a symbol for the experience of northern blacks protecting themselves against deprivations of liberty, the 1841 riot holds a vital lesson for those who would shape the content and meaning of the Fourteenth Amendment [as it relates to the Second Amendment].[413]

After the Civil War, the Southern experience provides yet more evidence of the danger of disarming blacks. The Southern legislatures passed black codes that, inter alia, restricted the access of blacks to arms, so as to keep them helpless before the intimidation of private violence.[414] Concerned, Congress wrote the Fourteenth Amendment in part to ensure that the freedmen would have the right to keep and bear arms to resist such terrorism.[415] The rest of the story is depressingly familiar. The Supreme Court sharply limited the reach of the Fourteenth Amendment, holding that it did not limit the actions of states or private individuals and that it gave Congress no authority to pass civil rights statutes controlling the actions of private parties.[416] As a result,

[w]ith the protective arm of the federal government withdrawn, protection of black lives and property was left to largely hostile state governments. In the Jim Crow era that would follow, the right to posses [sic] arms would take on critical importance for many blacks. This right, seen in the eighteenth century as a mechanism that enabled a majority to check the excesses of a potentially tyrannical national government, would for many blacks in the twentieth century become a means of survival in the face of private violence and state indifference.[417]

In the twentieth century, white violence and the black need for arms continued. In the North, race riots still threatened the safety of **455** black communities.[418] In the South, state legislatures enacted Jim Crow laws and tolerated widespread lynching and other sorts of private violence.[419] Blacks often used firearms to defend themselves, but Professors Cottrol and Diamond frankly concede that such efforts "were often partially successful but were ultimately doomed."[420] Indeed, the only real hope was collective action: "Although individual efforts of blacks to halt violence to their persons or property were largely unsuccessful, there were times that blacks succeeded through concerted or group activity in halting lynchings."[421] Accordingly, we should conclude that gun control has not generally helped blacks:

The willingness of blacks to use firearms to protect their rights, their lives, and their property, alongside their ability to do so successfully when acting collectively, renders many gun control statutes, particularly of Southern origin, all the more worthy of condemnation. This is especially so in view of the purpose of these statutes, which, like that of the gun control statutes of the black codes, was to disarm blacks.[422]

Finally, Professors Cottrol and Diamond close this historical review with a summary of the way that self-defense helped those in the civil rights movement. They recognize that nonviolence "had its adherents among the mainstream civil rights organizations," but they reject the view that nonviolence was a universal credo: "[M]any ordinary black people in the South believed in resistance and believed in the necessity of maintaining firearms for personal protection."[423] Although some black resistance to white

Compendium_Cornell
Page 1872

violence was ad hoc, much of it was organized, following in the tradition of black militias of the past. [424] In particular, as already noted, the Deacons for Defense and Justice spread throughout the South after its founder realized that not only white reactionaries but also the police opposed the civil rights movement. [425] The Deacons sought to "protect black people from violence, and they did so by extending violence to anyone who attacked. This capability and willingness to use force to protect blacks provided a deterrent to white terroristic activity." [426] Cottrol and Diamond draw the moral lesson sharply:

 **\*456** Blacks in the South found the Deacons helpful because they were unable to rely upon police or other legal entities for racial justice. This provided a practical reason for a right to bear arms: In a world in which the legal system was not to be trusted, perhaps the ability of the system's victims to resist might convince the system to restrain itself. [427]

In conclusion, Professors Cottrol and Diamond analogize the fate of the Second Amendment and African-Americans. Both have traditionally been consigned to the periphery of the attention of courts, policy makers, and scholars. That parallel treatment may not be a coincidence:

Throughout American history, black and white Americans have had radically different experiences with respect to violence and state protection. Perhaps another reason the Second Amendment has not been taken very seriously by the courts and the academy is that for many of those who shape or critique constitutional policy, the state's power and inclination to protect them is a given. But for all too many black Americans, that protection historically has not been available. [428] Moreover, even today, the state still does a very poor job of protecting black Americans. The threat of white violence is still real. Although it might seem to be waning, "many fear a decline in the quality of that atmosphere." [429] In light of the nation's past failure to live up to its promises of equality, "it is not unreasonable to fear that law, politics, and societal mores will swing the pendulum of social progress in a different direction, to the potential detriment of blacks and their rights, property, and safety." [430]

Perhaps the primary threat to blacks today, however, is no longer "the horrors of white lynch mobs . . . [but] the tragic black-on-black violence that plagues the mean streets of our inner cities." [431] To this point, Cottrol and Diamond have built their case for an individual rights reading of the Second Amendment on the specter of white violence, so this shift from collective white attacks to individual black crime seems an important break. Indeed, Cottrol and Diamond acknowledge that "a case can be made that greater firearms restrictions might alleviate this tragedy." [432] Nonetheless, they ultimately believe that the recent past gives no real discontinuity and no reason for abandoning the individual rights interpretation of the Second **\*457** Amendment. Whether the threat comes from black or white violence, American governments have never protected their black citizens:

[A] society with a dismal record of protecting a people has a dubious claim on the right to disarm them. Perhaps a re-examination of this history can lead us to a modern realization of what the framers of the Second Amendment understood: that it is unwise to place the means of protection totally in the hands of the state, and that self-defense is also a civil right. [433]

The interpretation of the Second Amendment offered by Professors Cottrol and Diamond is vastly more sophisticated, careful, and nuanced than those offered by JPFO and the women and guns movement--as I hope the above detailed summary conveys. Nonetheless, this interpretation shares two features with those. First, it is perspective-based, an interpretation from the perspective of African-American history. Professor Cottrol and Diamond are self-conscious about their perspectival approach. Their subtitle is Toward an Afro-Americanist Reconsideration. [434] Over and over, they stress their central argument--from an African-American perspective, we should be inclined to favor the individual rights theory of the Second Amendment, because blacks have not been able to rely on the state for protection.

Second, like those versions of the Amendment proffered by JPFO and the women and guns movement, this theory of the Amendment rests on a vision of the social world as fractured along lines maintained by bigotry. Traditionally, in Cottrol and Diamond's view, the reason that blacks have needed personal firearms is the constant threat of racist white violence, and that threat has not disappeared even today. Recently, the primary threat may have shifted to black-on-black violence, a product of intraracial, not interracial, division. But the reason that blacks need personal guns to defend against this intraracial threat is still interracial animus; the state, indifferent to the fate of its African-American citizens, has always failed and still fails to protect them. The vision of the social world in this interpretation of the Second Amendment is thus depressing in its clarity. At worst, all of white America--both government and private groups--has turned a violent hand against its black citizens; at best, the white

citizenry will be quiescent and the state indifferent while blacks kill one another. The implicit message to black America is also clear: in matters of violence, you may rely on no one but yourselves.

### *458  III. Outgroups, Populists, and Constitutional Violence

The outgroup theories of the Second Amendment all prescribe a scheme of decentralized violence. The state is so incompetent or so perfidious that it cannot claim a monopoly of force. As subpart A explains, however, decentralized violence is usually very dangerous to outgroups. Private ordering of the means of force usually favors self-styled populists who exile traditionally disfavored groups. As subpart B suggests, outgroup theorists might acknowledge the dangers inherent in decentralized violence, but they would insist that centralized violence is even worse. When the state has exercised a monopoly of force, it has generally failed to protect or has actively oppressed outgroups. Subpart C acknowledges the force of this argument. As a matter of policy, perhaps the state should allow outgroups to arm themselves, and as a matter of prudence, perhaps outgroups should do so.

In the world as described by these theorists, however, outgroups must choose between hopeless alternatives. In a scheme of decentralized violence, they will be oppressed by private groups; in a scheme of centralized violence, they will be oppressed or abandoned by the state. The only hope for the better treatment of outgroups would be a consensus culture more protective of outgroups; only in such a culture would the threat from private or public violence abate. In other words, if the problem is hate violence, the only answer is less hatred. These outgroup theories of the Second Amendment, however, actively frustrate the creation of such a culture. The theories do not merely counsel outgroups to take up arms against the present reality of hate violence. They also tell constitutional tales with a profoundly pessimistic story line--Americans will always be divided by hatred and must always prepare for war against one another. Telling and listening to such stories can only ensure that they will come true, and outgroups will be left to choose between hopeless options.

### A. Decentralized Violence

The analysis of Part II highlights several themes common to the new outgroup interpretations of the Second Amendment. First, the social world of the Second Amendment is fractured into identity groups based on religion, gender, and race. Second, hatred and violence or the constant threat of violence characterize much of the relationship between these groups. Third, because of this hatred and violence, the Second Amendment should be interpreted to guarantee a general right to keep and bear arms, so that outgroup members may  *459  defend themselves. Fourth, control over the means of violence should therefore be decentralized, belonging to all individuals. The state must have no monopoly of violence, either because it threatens hate violence itself or because it tolerates such violence by private parties.

For these outgroup theorists, the Second Amendment thus guarantees a right that is both individual and political/collective. It is individual in the sense that each individual has a right to keep and bear arms. It is political/collective in the sense that these individuals use arms in their status as members of collectivities. People attack them as Jews, women, or African-Americans, and they resist as such. Often, they will organize into groups to resist such violence, and often they will hope to make political change in the world by defeating the forces of anti-Semitism, misogyny, or racism. Even when each individual acts alone in self-defense, however, she acts as part of a collectivity--a Jew or woman or African-American victimized because of her membership in a despised group.

In stressing these commonalities among the various outgroup theories, I do not wish to overlook their differences in emphasis. JPFO's analysis is the most political/collective and the least individual. Simkin, Zelman, and Rice paradigmatically imagine the populace as a whole, and Jews as a group, resisting a tyrannical government, rather than individual Jews defending themselves against individual anti-Semites. [435] Because the enemy for JPFO is the government itself, the need for united action is very keen; action by random individuals would do little good. Still, even for JPFO, the right to arms ultimately belongs to individuals as individuals, not as part of some formal organization such as a state militia. The women and guns movement's analysis is the least political/collective and the most individual. The movement's paradigmatic case is an individual woman resisting an individual misogynist. [436] Still, even for this movement, the right to arms is deeply political and collective. Misogynists attack women because they are women, and women must resist for the same reason. Further, the movement itself attempts to make large scale political change, by offering women a tool of empowerment, by helping them to overcome their fear of guns, by breaking cultural stereotypes about women and power, by eliminating their dependence on men, and by generally reducing the power of misogynistic violence to oppress women as a class. [437]

Compendium_Cornell
Page 1874

**\*460**  The Afro-Americanist perspective on the Amendment is somewhere between these two. The paradigmatic exercise of Second Amendment right is less collective than that of JPFO but more collective than the women and guns movement. Cottrol and Diamond's central historical examples are African-Americans organized into private associations to resist other private associations. [438] Thus, unlike JPFO but like the women and guns movement, the paradigmatic enemy is private, but like JPFO and unlike the women and guns movement, that enemy is organized into an association, rather than being composed of disconnected individuals. For that reason, the collective aspect of the Afro-Americanist perspective on the Amendment is less intense than for JPFO but more intense than for women and guns: when you are fighting private groups rather than government, the need for broad-based action is less significant; when you are fighting an organized enemy, you need some organization yourself. Furthermore, unlike JPFO and the women and guns movement, Cottrol and Diamond imagine a range of appropriate uses of the right to arms, rather than just one paradigm--beyond combating private associations, they also imagine collective resistance to racist governments and individual resistance to racist individuals. [439] In that sense, they more fully cover the continuum between the individual and collective poles.

Despite these differences, however, the commonalities are very important. For all these theories, the social world of the Second Amendment is composed of individuals possessed of the right to arms, divided into hostile identity groups, and relating through violence, with government either contributing to the violence, indifferent to it, or incompetent to suppress it. Presumably, these various groups may also relate through peaceful politics, but these theories do not mention that possibility and do not seek to stress it. In other words, these theories reflect a profound frustration with government and the possibility of deliberative democracy; as a result, they celebrate armed action to achieve political ends when normal politics fail. In that sense, these theories are very much a part of the current social zeitgeist--distrust of government and anger among groups. [440]

In interpreting the Second Amendment in a way that recognizes both individual and collective elements, these theories are perhaps  **\*461**  closest to those individual rights theorists who stress the right of resistance to government. Both groups of theories locate the right to arms in each individual, but they also imagine that those individuals will band together to use their rights for political ends. Yet, if the outgroup theories are similar to some individual rights theorists in this regard, they are also different from all previous theories. In imagining the social world as composed of violent identity groups, these theories offer something new under the Second Amendment sun.

Earlier formal theories effectively ignored or suppressed such a vision of group discord. As argued above, the individual right of self-defense is a Lockean natural right located in abstract individuals, divorced from their social context. [441] It ignores the significance of anti-Semitism, sexism, or racism in analyzing the wisdom of an individual right to arms. Similarly, the right of revolution and resistance--for both the individual rights theory and the collective rights theory--is naively populist. It imagines the people, unified and homogeneous, or the state militias, composed of generic citizens, rising up against a tyrannical government. Effectively, the traditional right of revolution divides the world into only two social blocs--the people and the government--and it imagines only one evil--abstract tyranny through oppression of individual rights. [442]

By comparison, these outgroup theories seem much more realistic about the social world. They acknowledge the existence of multiple, hostile groups among the population, and they fear not just abstract tyranny but traditional bigotry. One might think of these theories as offering a Second Amendment for the real world of the late twentieth century, in which taxation without representation seems less of a threat than violent anti-Semitism, misogyny, or racism.

Unhappily, in offering a realistic vision of the social world, these theories also create new problems, problems that they do not adequately recognize or confront. Centralized control of the means of violence risks state tyranny, but decentralized control of the means of violence risks civil war if the population is not deeply united. As I have argued elsewhere, the Framers of the historical Second Amendment took that threat seriously. [443] They sought to recognize a right of revolution in the Second Amendment, but only because they believed that Americans were a united, homogeneous, virtuous republican citizenry. [444] As a result, under conditions of profound  **\*462**  social division, the historical Second Amendment--by its own terms--has limited relevance. [445] My present point, however, is not historical but pragmatic. The Framers were wise to worry about the threat of civil war. Under modern conditions, the use of nonstate violence for political ends most likely portends chaotic private terrorism, not a unified revolutionary movement.

In their responses to the threat of civil war, the militia movement and the outgroup theories are, in a sense, obverses of one another. As I have argued elsewhere, the militia movement implicitly recognizes the threat of civil war, but responds to it by denying the demographic reality of a fragmented citizenry. Instead, it conjures with the people--assuming, against all the evidence, that the American citizenry is highly homogeneous, or restrictively defining the "people" in such a way as to make it highly homogeneous. [446] By contrast, the outgroup theorists acknowledge that the citizenry is deeply fractured but then fail sufficiently to address the threat inherent in decentralized violence. Under conditions of civil war, outgroups are at great risk. Since the state cannot protect them, they must protect themselves--but for reasons that I will discuss below, they cannot do so.

It is important to remember that these outgroup theories all interpret the Second Amendment to guarantee a general right to arms, not just a right for Jews or blacks or women. The result is that everyone--including anti-Semites, misogynists, and racists--will possess the right to arms. Doubtless, these outgroup theorists would emphasize that they do not endorse anti-Semitic, misogynist, or racist violence. Further, they would argue that they celebrate a right to arms for purposes of self-defense, not aggression against other groups. The "genie" of a personal right to arms, however, is impossible to stuff back in the bottle once it is released. In these theories, everyone-- regardless of his politics or motivations--has a right to arms, free of all but incidental state regulation.

Moreover, these theories effectively mandate a state that is not or should not be strong enough to block hate violence. All the theories agree that the government may not disarm militant groups in advance. In addition, for slightly different reasons, all the theories maintain that the state is not or should not be strong enough to deter crime successfully by threat of punishment. For JPFO, the state should not be powerful enough to control violent political activists because the **463** state is even more untrustworthy than those activists. [447] For the women and guns movement, the state has no obligation to protect the individual and is incompetent to deter crime. [448] The Afro-Americanist theorists maintain that the state is both incompetent to block crime and too perfidious to be entrusted with a monopoly of violence. [449] In short, the point in these theories is that the state is either so corrupt or incompetent that citizens must have arms to take up the burdens of personal and collective self-defense. The result is a profound privatization of control over the means of violence-- we are on our own. That, however, is a state of affairs that outgroups should fear, not welcome, for three reasons.

### 1. Outgroups' Relative Lack of Power

First, outgroups should fear a regime of decentralized violence because they are relatively weak and powerless; they do not have as many guns as their enemies. Saul Alinsky provocatively described the Black Panther militia: "They haven't got the numbers and they know nothing about revolutionary tactics. What kind of revolutionary is it who shouts that all power comes out of the muzzle of a gun when he knows damn well the other side's got all the guns?" [450] Alinsky's comment is equally applicable to these outgroup theories of the Second Amendment. Blacks and Jews are a small fraction of the population. Women actually constitute a majority, but as a group--and the same could be said for Jews--they own fewer guns, are less comfortable with them, and are more reluctant to use them than others. [451] The women and guns movement is seeking to change that state of affairs, but despite publicity of an alleged trend, the numbers have probably not changed much. [452]

In short, as a general matter, decentralization of violence will today inevitably favor those groups with roots in the gun culture-- not members of these outgroups. It is not a coincidence that the gun culture has traditionally embraced the Second Amendment; it sees in the provision a constitutional symbol of its right to primacy. Today, the element of the gun culture most likely to exploit vigorously the decentralized regime of violence is the militia movement, a **464** development unlikely to promote the health and safety of blacks and Jews. Although JPFO has made common cause with the militia movement, and there are even Jewish and black militia members, this alliance is based largely on a shared fear of the government. [453] Such alliance is, however, extremely naive in turning a blind eye to the dangers of private racist and anti-Semitic violence. It is not true that the enemy of my enemy is necessarily my friend.

### 2. The Link Between Hate Violence and Revolutionary Conditions

Second, beyond just being outnumbered, outgroups should fear decentralized violence, especially when accompanied by attacks on the legitimacy of the state, because it seems to increase feelings of bigotry among the general population. Essentially, these outgroup theories prescribe a state of permanent, incipiently revolutionary conditions. The state can claim no monopoly of

Compendium_Cornell
Page 1876

force. The state's legitimacy is constantly suspect; indeed, the outgroup theories presuppose the state's illegitimacy vis-à-vis outgroups, as they presume that the state will not provide even the most basic security for its outgroup citizens. Finally, outgroup theorists contend that the Constitution positively empowers private groups to use violence in order to secure political change. Under these conditions, in the absence of a presumptively legitimate state, identity affiliation has typically stepped in to fill the need for order.

Recent events in Europe provide perhaps the most graphic examples of this tendency. To the surprise of many, the breakup of the old autocratic states often gave rise to a revival of ethnic hatred, both public and private, that had in some cases been held in check by a strong central government. Michael Walzer summarizes:

[E]thnic and religious differences survived, and wherever they were territorially based, local agencies, which were more or less representative, retained some minimal functions and some symbolic authority. These they were able to convert very quickly, once the empires fell, into a kind of state machine driven by nationalist ideology and aimed at sovereign power--and opposed, often enough, by established local minorities, the great beneficiaries of the imperial regime and its last and most stalwart defenders. [454] In Russia, hard-right nationalist sentiment existed even under the Soviet regime, but in the chaotic conditions after the fall of that **465** regime, such sentiment became a vigorous and significant force. [455] Pamyat was only the most notorious of many new, anti-Semitic groups dedicated to the preservation of traditional Russian culture. [456] Eventually, despite his buffoonery, Vladimir Zhirinovsky became a serious presidential candidate by tapping this well-spring of nationalist, anti-Semitic anger. [457] Similarly, Josip Tito's oppressively strong central regime managed to hold the various nationalisms of Yugoslavia together; with its demise, the Balkans have again become balkanized, and the phrase "ethnic cleansing" has entered the popular vocabulary. [458] Other contemporary examples could be listed in great number. [459]

Even the history of genocide, on which JPFO relies so heavily, illustrates the tendency of revolutionary change to increase hate violence. [460] Lethal Laws opens with a revealing discussion of "Revolution and Genocide," a comparative study of twentieth-century genocide by the late Robert Melson of Purdue University. [461] The authors quote Professor Melson to the effect that domestic genocide has killed more people in the twentieth century than has international war. [462] Lethal Laws then faults Melson, however, for failing to explain that gun control causes genocide. [463] In so arguing, JPFO ignores **466** Melson's primary thesis about what causes genocide. [464] This failure is not surprising, because Melson's thesis directly undermines JPFO's key contention that decentralized violence is good for Jews.

Melson's thesis is that the genocides that he examined--including the Holocaust, the Armenian genocide, the destruction of the Russian Kulaks, and the Cambodian autogenocide--were all the products of political revolution. [465] Melson offers a powerful explanation for this link between revolution and genocide. By his definition, "[e]very revolution results in not only the collapse of a state's political institutions but also the loss of its legitimacy and the destruction of the political myth that links rulers to the ruled." [466] Upon the demise of those old myths, the revolutionary movement must create new ones: "[P]olitical myths are basic to revolutions because, in a compelling manner, they tell the tale of the revolutionary state's origins; they identify and define the new state's true citizens, 'the people,'; they target its enemies; and they formulate its goals." [467]

This process of revolutionary myth making is very dangerous for outgroups, because in defining the true "people," these myths need also to define a contrasting class of people--the enemies of the state. Melson explains:

Revolutionary myths and ideologies have implications for genocide in that every revolutionary vanguard that has achieved state power seeks to restructure the state and give it a new basis of support. . . . . . . Having come to power in a revolutionary situation, a new regime is presented with the opportunity to shape society in its own image and to construct and redefine who is this "people" from whom this revolutionary state will seek its legitimacy. . . . The impulse to reconstruct and redefine the political community and to exclude from it whole categories derives in part from the exigencies of the postrevolutionary situation. This is always characterized by domestic disorder, a lack of legitimate authority, and often war. . . . . . . . . . [[R]ecasting the political community according to a revolutionary vision implies that groups and classes, whole categories of human beings, will not fit into the postrevolutionary society. These will have to be reshaped, reeducated, reformed, or permanently excluded from the new order. [468] **467** In short, then, Melson may or may not believe that gun control is good for Jews-- he never clearly

Compendium_Cornell
Page 1877

indicates one way or the other--but he argues quite powerfully that decentralized violence and the failure of state legitimacy is generally bad for Jews.

In this country as well, political violence has usually taken a racial and ethnic form in the absence of effective government; indeed, it would appear a distinctive aspect of American culture that political violence takes these guises, rather than class-based forms. Ted Robert Gurr, perhaps the most distinguished student of American political violence, explains:

One distinctive feature of the American experience is the relative unimportance of conflict defined in class terms compared with conflict along lines of ethnic, religious, and national cleavage. . . . [T]he participants in episodes of ethnic and racial rioting saw themselves and their opponents through the lenses of communal identification, not class ones. Communal loyalties and antagonisms were a consequence of ethnic and national diversity in a society established and dominated by English settlers. The dominant Anglo-Americans defined Indians, blacks, Irish, Jews, and Italians as separate and to varying degrees inferior people. Little wonder, then, that if and when the latter groups mobilized in conflict, they did so as communal or identity groups rather than making class alliances across ethnic lines.[469] Another student of the field offers a similar summary: "Unlike Europe, so little of the violence in the United States [has] been insurrectionary. Most [has] involved one group of citizens against another, rather than citizens against the state. Class conflict [has] been overshadowed to an extraordinary degree by ethnic, religious, and racial conflict."[470]

**\*468  3. The Failure of Decentralized Violence to Secure Progressive Ends**

The third reason that outgroups should fear decentralized violence grows out of the first two. Because outgroups are small and because decentralized violence promotes bigotry, reactionary movements can sometimes successfully use violence for political ends, but progressive elements almost always fail. Ted Gurr summarizes:

The use and threat of violence on behalf of social reform usually has stimulated a backlash of defensive violence. Campaigns of violence to reverse threatening social and political change, however, succeeded in those times and places where their purposes were widely supported. The use of intimidation and violence by the Ku Klux Klan, by lynch mobs, and by vigilantes are cases in point.[471]

The evolution of the conflict dynamic in the civil rights movement offers perhaps the most familiar and important example of this theme. In broad--and necessarily oversimplified--outline, that evolution occurred thus: in the early years of the movement, demon-strators sought in nonviolent but provocative ways to cause Southern white racists to attack them; appalled at such images of racist violence, whites elsewhere in the nation came to endorse the cause of civil rights. As a result, the movement secured impressive advances, including landmark civil rights legislation.[472] As the decade of the sixties wore on, however, the conflict dynamic of the movement gradually shifted from nonviolent provocation to violent assault, especially in the form of urban rioting.[473] This shift stirred a white backlash that led to waning white support for measures to improve the condition of African-Americans.[474] The lesson in this progression is clear. Outgroups cannot achieve their ends by violence alone. They need the support of others, and the use of widespread violence usually causes them to lose that support.

**\*469  4. The Link Between Populism and the Revolutionary Second Amendment**

For all these reasons, it seems no coincidence that as a cultural icon, the Second Amendment has always had a populist cast. As I have argued elsewhere, the Framers' Amendment rested on the idea that the right to revolution inhered in the "body of the people"--a homogeneous, united citizenry that would rise up against a small set of tyrannical usurpers.[475] As detailed above, today, the primary constituency for the Second Amendment is the gun culture, which claims to be the fundamental culture of the true American people--as opposed to arriviste interlopers with European ideas about the role of government.[476] At its most extreme end, the gun culture shades into the militia movement, which claims to represent the American people against blacks, Jews, international bankers, secular humanists, and others who do not belong.[477]

Indeed, at the most macroscopic level, it is possible to understand the Second Amendment as an icon of the imperial expansion of northern European culture. In arguing that the Second Amendment is fundamental to the American soul, individual rights

Compendium_Cornell
Page 1878

theorists stress that early in our history, Americans came to cherish the right to arms while Europeans came to disregard it. [478] The reason for this American affection was that Americans lived in a frontier society; needing constantly to be armed against attack by hostile Indians, they organized universal militias--the body of the people. [479] Americans, in other words, came to love guns through hating Indians. Later, these same militias became instruments of slave control, [480] and still later populist Americans embraced gun ownership as a way to keep deviant elements, such as new immigrants and the labor movement, in line. [481] Individual rights theorists stress this tradition to emphasize the prominence of guns in the American tradition, but it equally well highlights the close association between gun ownership and populist social control.

As a populist text, the revolutionary Second Amendment shares the advantages and disadvantages of populism generally. On one **\*470** hand, populism has a democratic and egalitarian face. Members of the people should all enjoy the same fundamental rights and status. In this aspect, populism has arrayed itself in opposition to self-styled elites, and it has often served as a force for the liberation of the common man and even sometimes the common woman. [482] On the other hand, populism has also often had a more sinister, racist, nativist, sexist, and anti-Semitic side. Although some populists sought to extend rights to women, Jews, and blacks, many others sought to keep all those groups in thrall. [483] Thus, American history has witnessed the ironic spectacle of Jacksonian democrats seeking universal enfranchisement for white males and simultaneously insisting on the subjugation of women, blacks, and Indians. [484] Similarly, at the end of the nineteenth century, populists attacked the power of urban wealth while simultaneously defending white supremacy in the South. [485] More recently, George Wallace and Pat Buchanan have built populist movements by tapping a vein of anger among "average" Americans (meaning white, Christian, and working class-- in other words, the gun culture) at immigrants, blacks, and others. [486]

This apparent contradiction between egalitarianism and hierarchical elements in American populism is only apparent. Populists believe in democracy and equal rights, but only for members of "the people," as they define "the people." Others cannot enjoy equal rights, either because they are inherently inferior or culturally too different--too "unassimilable." [487] This affection for the people as a political concept is thus the great promise and the great threat of populism. [488] The promise, for those who are unambiguously full **\*471** members of the people, has been real self-rule through egalitarian democracy. Even the insistence on exiling "unassimilable" elements grows out of this commitment to democracy, because populists understand that democracies depend on a shared civic culture and politically educated citizens. [489] If egalitarian democracy is populism's great promise, however, oppression of outgroups is its great threat. Some populists have defined the people expansively, [490] but others have deemed outgroups unworthy or less worthy of self-rule--at best, second-class citizens and at worst disenfranchised helots. [491] For outgroups, then, populism is a dangerous game to play, one that can always turn ugly because it contains the lurking potential of exclusion. If some are inside the people, then some must be outside. For that reason, it again seems no coincidence that outgroups traditionally have shied away from populism, [492] preferring instead discourses that stress the rights of individuals, regardless of race, religion, or gender, against the legislative majority. [493]

Populism has generally shown its ugly and exclusive side when it turns violent--in other words, when it embraces the Second Amendment as its master text. Again, the examples are innumerable and the reasons are not difficult to surmise. [494] In a regime of decentralized violence, citizens need some source of order and some basis for legitimacy, and they often find it in primordial affiliation with **\*472** their identity groups. [495] Private violence succeeds primarily when used to defend the conservative order against threatening social cultural changes--such as the movement of Jews, women, and blacks into positions of respect, autonomy, and power. [496] Finally, populists generally turn to the gun after becoming angry and frustrated with politics, when they believe that the political process has been captured by enemies of the people. [497] And the best evidence of that capture for populists is that the system no longer seems to value them the way that it once did; instead, it showers traditional outgroups with "special" favors. [498]

In short, then, the traditional cultural landscape of the Second Amendment actually makes a good deal of sense. The absence of state legitimacy and decentralized violence are conditions prone to produce an angry, exclusive, and belligerent populism. The gun culture might welcome that situation, but for outgroups it should represent great danger. Populism has many attractive aspects, but its great downside is precisely its ambiguous attitude toward outgroups. In other words, it makes best sense for outgroup theorists of the Amendment to issue warnings about the dangers of political violence, rather than to embrace it with enthusiasm.

**B. State Monopoly of Violence**

Despite the threat that decentralized violence poses to outgroups, outgroup theorists of the Second Amendment devote virtually no attention to how America might eliminate decentralized violence. JPFO myopically confines its concern to genocide and argues that only the state can produce genocide; as a result, JPFO has no cause to pay attention to private violence.[499] The women and guns movement and the Afro-Americanist theorists, by contrast, dwell at length on the danger of private violence; indeed, it is precisely because of that violence that they promote a right to arms.[500] Professors Cottrol and Diamond even concede that armed outgroups will usually lose, because their opponents enjoy the benefit of numbers.[501] Yet despite their acknowledgement of the danger, they propose no way to reduce **\*473** conditions of decentralized violence; instead, they propose to exacerbate those conditions, by celebrating the private use of arms.

This failure to address the danger of private violence is a charge often leveled at right-to-arms theorists.[502] In the modern dialogue about gun control and the meaning of the Second Amendment, proponents of control argue that we would all be safer if we were all disarmed.[503] Thus, Robert Spitzer compares citizen self-arming to the international arms race: "[A] national policy that encourages and implements weapons ownership as a recognized means of self-defense invites a domestic arms race."[504] He proposes that government should seek to achieve "nonproliferation of new weapons and technologies, combined with arms control for existing weapons."[505] Similarly, outgroup proponents of gun control argue that outgroup members in particular would be safer under conditions of general disarmament. Carl Bogus, for example, maintains: "The lesson to be drawn from both history and contemporary experience is not that blacks should be armed, but that all citizens should be subject to stricter gun control regulations."[506]

In fact, outgroup theorists of the Amendment do have a response to this charge. We must consider the alternative to decentralized violence, and in the modern debate, the only serious alternative is a state monopoly of violence. According to the outgroup theorists, we should all fear a state that insists on retaining complete control of violence, but outgroups have special reason to fear. On this point, the thinking of JPFO, the women and guns movement, and Professors Cottrol and Diamond all come together: outgroups cannot trust the state to protect them. At worst, the state may itself launch a campaign of genocide against its outgroup citizens; at best, the state may stand aside--out of indifference, hostility, or incompetence--to allow private violence against outgroups. The state may sometimes be able and willing to protect outgroup members, but it is never wise to count on that protection. Even if a general ban on guns were effective, it would hurt outgroups. Outnumbered, their only chance is to use guns to equalize the discrepancy. The tactic may not always work, but it is better to succeed sometimes than never.

This response is powerful and important, and it should not be ignored. Unfortunately, many gun control proponents do ignore this **\*474** response--an important example of the way that both sides in this dialogue tend to talk past one another. For example, after powerfully documenting the threat of private violence to outgroups, Carl Bogus closes his article with a surprisingly trusting vision of the relative reliability of the state:

This is not to deny that there will be times or circumstances when we mistrust public authorities. We live in an imperfect world--as cynics are fond of saying--and problems are inevitable. However, we will live in a far more imperfect world if private groups are armed and ready to defend "the security of a free state" as they themselves see fit.[507] Bogus' claim here is really only an assertion, not an argument; he has proved that private violence is dangerous, but he has done nothing to show that it is more dangerous than a state monopoly.

To resolve this disagreement between the proponents and opponents of gun control, one would have to weigh carefully the relative risks of state violence and private violence to outgroups. As a practical matter, that determination would probably be very difficult to make. The hypothetical nature of this determination makes it even harder. Control proponents would probably concede that the state has not adequately protected outgroups but then argue that we should focus all of our efforts on making the state sufficiently responsive. Control opponents would respond that the state cannot be made sufficiently responsive; control proponents would respond that it can; and the debate then would swirl off into the increasingly speculative. Perhaps because weighing such imponderables seems impossible, analysts seem to fall back on their basic presumptions about the world. Control proponents insist that the state is generally good and competent; control opponents insist that it is inherently untrustworthy.

Compendium_Cornell
Page 1880

As a result, it is perhaps not surprising that the debate on the relative dangers of private and public violence has not really occurred. Nonetheless, it should occur, because it is at the heart of the disagreement on gun control. Moreover, although these outgroup theorists do not themselves compare the relative dangers of state and private violence, they have collected a great deal of evidence suggesting that the failure of the state to protect outgroups might be endemic and inevitable. Frankly, I doubt that anyone could read these accounts and remain untouched. Many of the stories are highly personal and therefore powerful, if only anecdotal. The sheer accumulation of stories by each outgroup theorist only compounds their power, and the further accumulation across outgroups adds still **\*475** more. After a careful perusal of all these stories, it becomes difficult to believe that (1) the American state can ever be trusted to want to protect outgroups or (2) the American state will ever do what is necessary to protect them.

### C. Constitutional Tales of Violence

### 1. Prudence and Policy Versus Constitutional Storytelling

I am unable to address the prudential wisdom of outgroup self-arming, because I do not know how to weigh the relative dangers of public and private violence. I am inclined to believe that the judgment would be different in different times and places. In some places, general disarming may be a good policy; it seems to work quite well for Japan and Great Britain.[508] Further, unlike proponents of the gun culture, I am not convinced that the gun culture comprises the permanent fundament of the American soul. As a result, general disarming may be successful in some places in America today; in the future, as the culture changes, it may be successful in more places. On the other hand, it may also be wise for some outgroup members in some places and times to arm themselves. The statistical effectiveness of self-arming is a subject of heated disagreement among social scientists, criminologists, and medical professionals, but these stories are evidence that self-arming may sometimes be useful.[509] Moreover, limited outgroup violence may even provoke widespread political change when carefully used to attract the attention of a sympathetic majority.[510]

In short, then, I plead agnosticism to the wisdom of outgroup self-arming as a matter of prudence and policy. Perhaps outgroups should arm themselves, perhaps not; perhaps the state should allow them to arm themselves, perhaps not. I would like, however, to draw a distinction between outgroup self-arming as a subject of prudence and policy and as a subject of constitutional storytelling. On the former subject, I express no opinion; on the latter, I wish to argue that these outgroup tales of violence actively frustrate the very end that they are **\*476** designed to produce--the physical safety of outgroups in the American constitutional republic.

These outgroup interpretations of the Second Amendment leave outgroups with only two options, and each is hopeless. First, outgroups could commit themselves to a state monopoly of violence, only to face the state indifference or hostility documented in these stories. Alternatively, they could commit themselves to decentralized violence, only to face the private hate violence that I have described. Neither path is acceptable. The only viable future is one that these theories never mention--the creation of a consensus culture that welcomes outgroups, prizes their physical safety, and pervades the way that both the state and the private sector use violence. In other words, it does not seem especially useful to consider whether a hate-filled state with a monopoly of violence is worse than a hate-filled society composed of multiple, angry, and armed private groups. Instead, we should ask how to reduce the general level of hatred likely to erupt into violence. Reducing that level of hatred would make both the state and the private sector more trustworthy, and the debate over their relative trustworthiness would become less burning.

In arguing the necessity of such a consensus culture, I do not mean to propose that the culture need be placid, monolithic, or immutable. In fact, such a culture need serve only one end. It must provide a common account of the way that violence should be used to resolve social difference, especially differences between identity groups. As a result, the consensus in this culture may be quite limited in several ways. First, its content may be quite limited. It may address only the use of violence among identity groups, while allowing disagreement on other issues, including religion, gender, and race issues.[511] Second, the consensus need not be universal; it need only include enough of the population effectively to control hate violence. Third, hope for such a consensus need not be predicated on the belief that America can ever eliminate hatred or hate violence, or that the struggle against bigotry can ever cease.[512] By contrast, it is predicated on two more modest beliefs: (1) only general cultural change (as **\*477** opposed to private arming) can significantly control hate violence and (2) cultural change in the direction of greater intolerance for hate violence is possible. Those assumptions are borne out by history. The level of hate violence in this country has significantly diminished over time, apparently as a result of the general delegitimation of anti-Semitism, misogyny, and racism. In short, the constitutional organization of violence (and, by implication, the interpretation of the Second Amendment)

Compendium_Cornell
Page 1881

provides a necessary limit to multiculturalism. Americans need a consensus culture to control violence, so as to provide a safe field within which America's many cultures can contend in peaceful ways. Indeed, without agreement on the use of violence, peaceful disagreement and multiculturalism itself would become impossible.

Outgroup theorists, I suspect, might not directly take issue with that position. Instead, they might respond in the following way. Yes, we are in favor of a welcoming consensus culture, but we don't have such a culture now. Moreover, it is unclear whether we ever will have such a culture. In the meantime, in recognition of our current hate-filled state, outgroups should keep their guns. As noted above, I do not know how to gauge that claim as a matter of prudence and policy. Certainly, it has enough force that it cannot be rejected out of hand; maybe outgroup members should hold fast to their guns. As constitutional stories, however, these tales of violence do not simply protect outgroup gun ownership until we arrive at a less hate-filled culture; rather, they actively frustrate the creation of such a culture. They may help in the short-term, but only with unacceptable long-term damage.

### 2. Hopeless Tales of Constitutional Violence

In the absence of a common language, race, ethnicity, religion, or history, Americans have been in large measure united by their great public professions of faith,[513] and the Constitution has been central among them.[514] We have looked to the constitutional tradition for stories that unite us as a people, delimit the legitimate use of violence, and provide a common culture of inclusion, tolerance, and decency.[515]  **478** These outgroup tales of violence, by contrast, lead in the opposite direction--to fragmentation and violent anger, not merely as a short-term situation but as a constitutionally mandated state of affairs. To create the necessary culture, we need stories of unification based on justice, but these are stories of violent division rooted in mistrust. These stories share six constituent elements. Taken together and embraced as constitutional storytelling, these elements would sharply circumscribe the possibilities of our common political life.

### a. Perspective-Based Interpretations of the Second Amendment

First, these stories all adopt a perspective-based interpretation of the Second Amendment, rooted in the particularities of their group experiences. In doing so, these theories all seem to embrace a central element of postmodernism--truth is inevitably perspective-based, produced and determined by the background of the truth-seeker.[516] Moreover, again like postmodern multiculturalism,[517] these theories maintain that society is fractured into contending identity groups. As a result, consensus is virtually impossible. The best that we can hope for is the coexistence of these various cultures, living next to one another but each perceiving the world in its own way. Concomitantly, we cannot hope for a constitutional culture that would hold across society in delimiting the use of violence.

The struggle to give meaning to the Second Amendment suggests why so many feel the need for something more than perspectival truth-telling. If multiculturalism is to be more than an apology for the dominance of the strong over the weak, it must aim for the peaceful coexistence of different groups. But to have peace, we must also have widely shared norms governing the interaction of groups and specifying when violence might be justified.[518] In other words, to some degree, we must all be uniculturalists on the subject of the  **479** constitutional organization of violence.[519] Similarly, at some level we must all be proceduralists. Precisely because we may celebrate difference, we need general agreement on peaceful procedures that will allow us to cope with the fact of difference, instead of violently eliminating it.[520] This insight is at the heart of classical liberalism, and it retains its force in the face of modern social fragmentation.[521] When disagreement surfaces, as it inevitably must, societies need shared notions about how to avoid bloodshed. In short, then, a purely perspectival approach to some constitutional provisions may be appropriate, but not to the Second Amendment.

The outgroup theorists might argue that I have overcharacterized their position. They might contend that they approach the Second Amendment from a particular perspective, but they do not deny the possibility of a society-wide "perspective." Such an argument might take either of two forms, but neither would be persuasive. First, they might argue that they are offering their perspective, but they do not intend that their perspective should automatically control. Instead, constitutional interpreters should assemble a range of perspectives to produce a "generic" perspective. The problem with this argument is twofold. First, it is almost certainly not what these outgroup theorists  **480** really mean. They argue quite forcefully that we should interpret the Second Amendment to guarantee a personal right to arms because their perspective demands it. They never mention the possibility--and presumably would quite vigorously dispute the idea--that if other perspectives (i.e., those of government bureaucrats, would-be

Compendium_Cornell
Page 1882

tyrants, or just people who are afraid of guns) counsel a contrary interpretation of the Amendment, then perhaps we should read the Amendment not to protect a personal right to arms. Indeed, as I will argue below, these outgroup theories almost require the rejection of other perspectives than one's own, because it is never safe to trust the viewpoint of other identity groups in a world beset by hatred. Second, the creation of a single "generic" perspective would be impossible. Because the perspectives of different groups differ on the ultimate question of whether the Amendment should be read to protect a right to arms, it would not be possible simply to agglomerate them. [522]

Second, these outgroup theorists might argue that insights derived from their perspectives might appeal to groups from all perspectives. In particular, they might argue that we all might someday be outgroups at the mercy of a tyrannical or indifferent government, and so we all should support a universal right to arms. As a result, they would maintain, their perspectival approach is actually not limited to their perspective at all. The problem with this contention is that the very history of racism, misogyny, and anti-Semitism compiled by these outgroup theorists belies the hope that such an appeal will reach potential oppressors. As Professors Cottrol and Diamond so effectively document, Southern white supremacists enacted legislation to disarm blacks without worrying that someday the government might try to disarm them. [523] Similarly, as JPFO details, the Nazis sought to disarm Jews and other "enemies of the state" without any flicker of concern that they might someday be **481** branded enemies of the state themselves. [524] Blinded by hate, oppressors do not usually realize that they might someday be on the bottom.

In other words, we will not have a unified constitutional culture on the organization of violence as long as we consult only the perspectives of identity groups as they are presently constituted. A consensus culture can be the product only of careful and prolonged political interaction, in which groups may come to enlarge their perspectives, to accept the necessity of a shared vision, to understand themselves as members not just of identity groups but also of a constitutional republic, and so to redefine their own identity as including the perspectives of other citizens. [525] These stories--with their unrelieved focus on a single perspective--give us no hope for such an enlarged sense of perspective. Nor, as the next several subparts explain, do they offer us a vision of the political process through which such a vision might be achieved.

**b. The Necessity of Hatred and Suspicion**

The social world of the Second Amendment in these theories is composed of multiple, hostile, and violent groups. That vision of the social world is not incidental to these theories of the Amendment; rather, it is at their heart. The whole reason outgroups need guns is hate violence that the state cannot or will not control. If the state could and would control private violence, or if the general culture were safe for them, then outgroups would have no need of the right to arms, and their interpretation of the Amendment would be entirely different. In other words, these theories require the existence of hatred and division to remain viable.

Moreover, these theories require that hatred and division be permanent elements of the social world, not historically contingent. JPFO overtly asserts that such hatred is inevitable, and for that reason, the Constitution guarantees a right to arms. [526] The Afro-Americanist theorists admit that racism waxes and wanes, but argue that blacks will always need a right to arms because violent racism will always be an important force in America. [527] I have been unable to find any discussion by the women and guns movement on whether misogyny is **482** ineradicable, but an answer seems implicit in its view that the right to arms must be constitutional--and so permanent. [528]

Even if these theorists might acknowledge that a unified social world might someday be possible, they would argue that we should nonetheless always act as if that world did not exist and were not possible. The whole point in constitutionalizing these stories is that the storm of hatred can always appear, suddenly and violently, even during the calm seas and sunny skies of harmony. Only fools will release their guns and relax their suspicion just because conditions seem good right now. The Second Amendment constitutionalizes that wisdom. The people--meaning, for these theories, all the discordant groups in society--have a right to arms because they must always keep on their guard, against the state or other private groups. In short, suspicion is the fundamental relationship between each identity group, other identity groups, and the state.

The result of this suspicion is a profound circumscription of our political life together. Collective constitutional vision and action become supremely difficult, perhaps impossible. An effective civic culture depends on the existence of civic trust among citizens. [529] For these theories, however, it is only good sense to distrust the motives and perspectives of those from other groups. As a result, these theories implicitly preclude the nurturance of the reciprocal dependence, mutual respect, and dialogic

Compendium_Cornell
Page 1883

interaction necessary for a welcoming and safe consensus culture. Moreover, even if we could somehow develop a shared constitutional vision, these theories explicitly preclude us from acting on it by collectively organizing violence. For these theories, the Second Amendment gives the right to arms to each individual, to use as he or she sees fit, without the supervision, consultation, or consideration of any other individual or super-individual entity. As a result, to be effective, a consensual culture on the proper use of political violence would have to be virtually unanimous to be effective. Because such unanimity is all but impossible under the best of conditions, some groups will inevitably attack other groups, setting up a round of reprisal and counter-reprisal that will foster hatred and preclude the possibility of ever reaching consensus.

In the stories of these outgroup theories, the right to arms has entirely benign consequences. Women fight off rapists, blacks fight **\*483** off the Klan, Jews stop the Holocaust. But in a fractured world, other real-life stories feature the right to arms in a less savory light. In Northern Ireland [530] and the former Yugoslavia, [531] conditions of decentralized violence have resulted in wounds so deep that a consensus constitutional culture may never be possible. Closer to home, violence between blacks and Jews has further poisoned already strained relations between these once allied groups, so that rapprochement appears increasingly unlikely. [532] Indeed, this last example is especially ironic in that the outgroup theorists include both blacks and Jews. The former tell stories of resisting the Klan, and the latter tell stories of resisting the Nazis, but it is equally likely that some members of each group will use their personal arms to kill members of the other group. [533]

### c. The Functional Equivalence of All Constitutional Visions

In these outgroup theories, all groups retain the right to keep and bear arms alike, regardless of the malignancy of their constitutional vision. Before the fact, the state may not choose to disarm some, based on the danger that they pose to the commonweal; after the fact, the state cannot or will not punish malefactors. For all practical purposes, then, on the issue of self-arming, the state will treat all constitutional visions as if they were morally equivalent. In this sense, the Second Amendment functions rather like the First Amendment, in that the state may not regulate groups based on disagreement with their ideas. [534] Indeed, in a bizarre sense, all identity groups must treat one another as if they were morally equivalent on the issue of self-arming. To be sure, outgroups may believe that hate groups have an inferior constitutional vision, and they may even take up arms to prove the point. Nonetheless, all share the right to keep and bear arms. No group has the right to insist that the state disarm another group, no matter how threatening that group may be. As a result, all effectively have a right to maintain their point of view by force of arms, and each group has no choice but to meet opposing groups on the field of battle.

 **\*484**  In short, before the Second Amendment, all share a functional moral equivalence. This equivalence would appear to grow out of suspicion. No one is in a position to decide who should be armed and who disarmed, because no one is trustworthy enough. We must keep the means of violence decentralized because no one, including the state, holds a privileged position in determining when violence should be deployed for political ends. The result is that the decision to use violence has an irreducibly subjective and fluid quality. As we cannot trust the state or some other putatively authoritative body to make such determinations for us, we must each decide--and those decisions, inevitably, will differ.

In analyzing the actions of the Black Panthers, Professors Cottrol and Diamond seek to repudiate this subjectivity: "The Deacons for Defense and Justice are to be contrasted with the Black Panther Party for Self-Defense. The Black Panther Program included [an assertion of Second Amendment rights]. Yet, the Black Panthers deteriorated into an ineffective group of revolutionaries, at times using arguably criminal means of effectuating their agenda." [535] In other words, the main difference between the Panthers and the Deacons is that the former may have violated the criminal law; they are objectively in the wrong, whatever their subjective views. Yet this repudiation of subjectivity is inconsistent with the basic premises of Cottrol and Diamond's approach. They cannot mean that groups should never exercise their Second Amendment rights in such a way as to violate the law of the state; their whole historical exploration is sufficient proof that the state cannot always be trusted to pass just or even constitutional laws. If the state of North Carolina had criminalized the ownership of guns or the use of guns for self-defense, the Deacons for Defense and Justice would have been criminals as surely as the Panthers, yet their cause would have no less good. But if the state cannot be trusted to judge the appropriateness of violent action, then who can? Only individuals, with their personal right to arms, can make such a judgment--and in assassinating police officers, the Panthers were doing exactly that, because from their perspective, assassinations were simple acts of self-defense against the white power structure. [536] Such extreme fragmentation--the result of the moral equivalence of all groups in the eyes of the Second Amendment-- would make the creation of a unified, protective culture supremely difficult.

Compendium_Cornell
Page 1884

**\*485  d. The Erasure of Political Structures**

All of these theories assert that the solution to the political problem of hate violence is personal self-arming by all the individual members of the affected groups. Of necessity, these individuals may sometimes organize to mount collective resistance, as when women develop self-defense classes or blacks enlist in private militias. These associative efforts, however, are only--and, by the premises of these theories, can only be--the product of countless individual wills spontaneously deciding to enlist. Like eddies in the ocean, they form when individuals swirl toward one another, and then they disappear when the perceived need for collective self-defense is past. Only the individual holds Second Amendment rights, and so only the individual can decide when and how to use them.

Collective organizations thus have no rights to arms as such; their legitimacy derives entirely from the will of their members. As a result, these theories express only suspicion about more formal, more permanent, or more powerful collective organizations, such as the state, the army, or the United Nations. [537]  At best, these organizations will be ineffectual, and at worst tyrannical. In an old American tradition, Second Amendment associations must follow the model of private voluntarist groups; they must resemble mutual aid societies, religious denominations, or reform movements. [538]

These theories go to great lengths to assert the effectiveness of private armed associations, and the ineffectiveness of political structures, to solve political problems. Thus, JPFO criticizes the United States and international societies for dithering or intentionally ignoring the Holocaust; instead, the answer was to arm the Jews. [539]  Women & Guns magazine asserts that international peacekeeping will not solve misogynist violence in Bosnia; instead, the answer is to arm Bosnian women. [540]  Even Professors Cottrol and Diamond ignore the fact that only the Union army was effective in suppressing white supremacist violence during Reconstruction; [541]  instead, they praise black self-arming after withdrawal of the troops. [542]

 **\*486**  In making these assertions, these theories essentially erase political structures as a mechanism for distributing the means of violence. Indeed, in prescribing the use of guns for political ends, these theories are nonetheless resoundingly silent about the political organization of arms-bearing citizens themselves. First, the theories maintain that the state should not have a monopoly of violence, and second, they maintain that individuals should possess arms for political purposes. At that point, however, their analysis stops; they seem to lose interest in exactly how individuals will collectively organize their armed might--if at all. Apparently, merely rolling back the power of the state and vesting individuals with the right to arms will best blunt the dangers of political violence.

These accounts, then, offer no theory of the collective organization of violence beyond the simple assertion that individuals should act as seems best to them. Indeed, these theories are virtually driven to this conclusion by their starting premises. Because it is unsafe to trust the state--and presumably any other super-individual entity--with authority, only the mass of individuals can assume ultimate control of the means of violence. Thus, these theories explicitly condemn state attempts to control the means of violence, but they also implicitly condemn any association--private or public--that attempts to organize violence except through the spontaneous agreement of individuals. To put the matter another way, these theories reject the use of authoritative political structures as a means of organizing the means of violence. If individuals sua sponte cohere into a political movement, it is well and good; if not, then it is not. [543]

Earlier, I argued that the women and guns movement echoes the feminist claim that the personal is political; giving women a personal right to arms can have great political significance. [544]  In fact, however, the echo is terribly distorted. The movement--like all of these theories--actually reduces the political to the personal, by insisting that the only effective solution to hate violence is individual self-defense. Mainstream feminism takes exactly the opposite approach. For most feminists, the point in claiming that the personal is political is to seek political solutions to problems traditionally dubbed "private"  **\*487**  and thus ignored in the public sphere. [545]  Indeed, those feminists may believe that the women and guns movement actually denies that the personal is political, because the movement for all intents and purposes denies that there is a political. [546]  In the view of the movement, if police cannot protect women, then women should stop whining and protect themselves. But at that point, misogynist violence once more ceases to be a public concern and disappears again into the hidden world of private relationships.

In short, these theories are so distrustful of the state that they reject any project that would subject the realm of violence to collective ordering. Instead, they cast their lot with the mass of individuals organized only into such structures as they

Compendium_Cornell
Page 1885

spontaneously generate. They are so sensitive to the concern that state power corrupts that they will instead tolerate a regime of private ordering in the realm of armed power. Such decentralized violence may, in some situations, produce a welcoming and just culture for outgroups. As I have argued above, however, decentralized violence usually leads to hatred and bigotry. [547] If it does so, there is very little that we can collectively do to correct the situation, because these theories have erased political structures as a way of organizing cultural ideas about the just distribution of the means of violence.

### e. The Fundamentality of Relating Through Arms

These theories also maintain that violence is more basic than peaceful politics to the life of the state, and, concomitantly, citizens relate to one another more fundamentally through arms than through political participation. In part, this argument is simply a matter of tone. All of these theories repeatedly celebrate the use of guns to combat hate violence; by contrast, they never mention the possibility of changing the culture through politics. As a result, these theories offer no vision of redeeming the culture by making it protective toward outgroups. Instead, they assume the perennial existence of hatred and then urge outgroup members to arm themselves in response. Sometimes, these theories make this tonal argument more explicit. For example, all of these theories condemn the state--and, implicitly, the political process that purportedly controls the state--as unreliable and/or perfidious. By contrast, the theories describe self-arming as the most reliable self-defense tool for outgroups. For that **\*488** reason, the theories insist that outgroup members would be foolish to depend on the state for protection; instead, they should depend only on themselves and their identity group. Similarly, the theories sometimes repeat an argument central to the individual rights theory of the Second Amendment. The right to arms is our most important right, because it is the practical guarantor of all other rights. If we give up our guns, we lose control over government, which may then run roughshod over the Constitution. [548]

The image of the social world implicit in this constitutional vision flows from the basic premises of these theories. Underneath the veneer of peaceful politics lurks a more essential world of primordial hatred, waiting to boil over. We may participate in politics, but we should also hold to our guns, ready for assault. Concomitantly, we may relate to fellow citizens through politics, but we should also remember that in an instant, they could become our oppressors. Politics is no more than a precarious holding action against the forces of hatred; our ultimate bulwark of safety is our personal capacity for violence.

### f. The Constitutional Mandate of These Conditions

This element of the stories is implicit in the foregoing five themes, but it is so important that it bears separate mention. The social world described in these stories--one of mistrust, division, and violence--may be an accurate portrait of the world in which we presently live. For that reason, as a matter of prudence and policy, it may be best for outgroup members to arm themselves now. These stories, however, argue that the Second Amendment requires us to act as if the social world will always be divided and violent. Indeed, these theories maintain that this mandate of eternal vigilance is the great insight of the Second Amendment. The world may look safe now, but it could change in a moment. Mistrust, division, and violence are thus not historically contingent elements of our present social order; instead, they are permanent elements of the human condition in all times and places. Whatever cultural gains might have been made are fragile and untrustworthy; only a good gun is real protection.

 **\*489**  The Constitution, in this view, is a profoundly "realist" document. It requires us to take people at their worst, to guard against their proclivity to do evil. Thus, this vision emphatically rejects a different model of the Constitution as a redemptive force, a bridge to a better future. [549] These constitutional tales of violence tell us how to deal with a permanently fallen world; they offer no vision of a better one. Outgroups, however, cannot abjure redemptive constitutionalism, because the present and the past are too hopeless. Outgroups will not be safe under conditions of hate-filled decentralized violence, and they cannot trust a hate-filled state monopoly of violence. Their only hope is to reduce the level of hate. That path may seem hopelessly idealistic, but some idealism may be inevitable in hoping that outgroups will ever enjoy safety in a nation presently poisoned with hatred. In that sense, redemptive constitutionalism may actually be much more "realistic" than a constitutional vision that urges outgroup members to celebrate the private ordering of violence.

### 3. The Futility of Constitutionalizing Outgroup Rights of Violence

Thus, these constitutional stories of violence frustrate the creation of a consensus culture protective of outgroups because they essentially mandate conditions of hatred and violence. This tendency to frustrate the creation of such a culture is not a

coincidental feature of these particular tales; we would find a similar tendency in any outgroup interpretation of the Second Amendment as a guarantee of a personal right to arms. The reason is that any such interpretation must imagine the social world as perennially poisoned by hatred; the existence of such hatred is, after all, the reason that outgroups need a personal right to arms. As a result, the Constitution cannot be a redemptive road to a world without hatred; it can only be a compromise with present reality.

In short, then, telling these constitutional tales of violence creates real costs for outgroups. Moreover, these stories will likely create very few gains, for similar reasons. If the culture is protective of outgroups, then presumably the state will either protect them or guarantee them a right to arms as a matter of policy--even without a constitutional right to arms. Thus, constitutionalizing these stories could help outgroups only when the culture is deeply hostile. But in such a culture, it seems wildly implausible that the state will ever actually create, recognize, and protect a constitutional right to arms for outgroups. It defies common sense to believe that the state will allow the killing of outgroups but will carefully protect their Second Amendment rights. **490** As soon as these stories require us to posit a world filled with hatred and violence, they virtually preclude a world scrupulous about fidelity to the Constitution. In short, these tales make sense as stories of guerrilla resistance; they make little sense as constitutional stories. [550]

The work of Professors Cottrol and Diamond illustrate this problem. [551] In scrupulous detail, they document the way that gun control statutes have been used to disarm African-Americans, in violation of the Second Amendment as they understand it. They conclude from this survey that gun control statutes generally do not help blacks. Their work, however, might lead to another conclusion. In the face of widespread racism, the Second Amendment has not helped blacks either. Similarly, Professors Cottrol and Diamond argue that both before and after the founding period, white Americans generally feared blacks and, for that reason, sought to disarm them. According to Cottrol and Diamond, however, the founding period was utterly anomalous. In that one brief, shining moment, white Americans sought to guarantee black Americans a permanent right to arms. As I have argued, this argument is the most implausible part of Toward an Afro-Americanist Reconsideration. [552] Apparently, Cottrol and Diamond felt required to make such an implausible claim because their theory makes inconsistent demands on them. On one hand, they must assert that the culture is dangerous to blacks, so blacks need arms to resist; on the other hand, they must also assert that the culture is so benign that it recognizes the right of blacks to keep and bear arms.

In short, on balance, this style of constitutional storytelling offers little long-run hope for outgroups. Such stories undercut the only **491** long-term hope of outgroups--the creation of a protective, consensual culture on the organization of violence. Correlatively, the stories offer very little short-term hope for outgroups because a constitutional right to arms will be relatively meaningless to outgroups in the absence of precisely such a protective, consensual culture. For outgroups, fighting hatred with guns may be a necessary stopgap in a dangerous world; it cannot be an ultimate constitutional solution. [553]

## IV. Conclusion: Populism and the Second Amendment

Culturally, Second Amendment dreams have been populist dreams. They yearn for the people, organic, democratic, militant, and united, rising up against its enemies. Those dreams, like much of populism, can be noble. They have inspired campaigns for social **492** justice, resistance to unjust authority, and at least one revolution--our founding myth, the War for Independence. They hold before us a particular constitutional ideal: "The people" in its most democratic, egalitarian, unmediated, and unstructured guise, taking power into its own hands when the government fails to honor its obligations.

Such dreams, however, can become nightmares. Direct democracy always runs the risk of becoming majoritarian tyranny. The people may be wise, just, and tolerant, but they may also be angry, bitter, and intolerant. Generally, when the people feel betrayed by government and compelled to take up arms, they look for the cause of their felt disempowerment. In an old American tradition, rather than looking for the cause of their distress in an increasingly complex world, they seek out the enemies of the people that have betrayed them. Too often, they find these enemies in outgroups who, in fact, have even less power than they.

Under such conditions, outgroups may have no choice but to arm themselves, and if the state cannot or will not protect them, it may have an obligation to let them protect themselves. Such self-defense efforts, like populist dreams, can be noble. They offer us an ideal of courageous, resolute self-reliance in the face of hatred. But however noble it might be, this ideal is still only an adaptation to an unacceptable reality--a world poisoned with bigotry. While it may be important to retain armed self-reliance as one cultural ideal, it is vitally important that we not transform it into an ultimate constitutional vision. The temptation to do so is great, as the ideal rests on values that we deeply cherish. A people that finds its origin in resistance to tyranny may, perhaps

Compendium_Cornell
Page 1887

must, find these tales of violence enormously resonant. After centuries of oppression, a group declares that it will suffer no more, resolved to die free men--and women--rather than to live slaves. But like all values, these are only partial, and they must be balanced by a dream even more dear--the search for a society that is peaceful, just, harmonious, cohesive, and protective of all its citizens.

Constitutional structure is one traditional route to that society. Rather than trusting to direct democracy, the Framers sought to create a frame of government that would balance power against power, branch against branch, federal against state governments. These Framers hoped that such a system of checks and balances might better protect minority rights. [554] At least some of the Framers would therefore presumably believe that the government of a constitutional **493** republic would better protect outgroups than the populo armato. [555] Subsequent constitutional amendments further sought to extend protection to outgroups. [556] The Supreme Court has used those provisions to improve the well-being of outgroups, although it has never secured--and may never secure--the dream of perfect equality and safety. In short, many may believe that outgroups are best protected by the state, at least if that state is a constitutional republic.

These outgroup tales of violence, by contrast, highlight just how neglectful and oppressive the state has been to outgroups. In focusing on this treatment, these outgroup theories find in the Second Amendment an insight into their own history. No matter how well designed and carefully balanced a constitutional government might be, it can still become corrupt and oppressive. While the Amendment may accurately diagnose the condition of outgroups, however, its prescription will not serve them well. That prescription is an armed people with the power to intimidate and resist the state. For those who are unambiguous members of the people, that answer may be empowering and inspiring; for others, it may be only terrifying. At times in American history, populists have included all Americans in their definition of the people, but all too often, they have insisted that the only true Americans are people like themselves. Regrettably, the gun culture today continues this tradition, arguing that it alone represents the real American soul.

If outgroups can rely neither on the state nor on an armed citizenry for their ultimate protection, then they must rely on something even more diffuse-- a general culture that cherishes the well-being of all Americans. Such a culture would curtail the threat posed to outgroups by either the state or an armed citizenry. Hope for such a culture, however, may seem wildly idealistic, ephemeral, even naive. America's mainstream culture has generally been racist, misogynist, and anti-Semitic. To depend on that culture for protection from violence may seem like a counsel of suicide. Outgroups, however, have no other hope. With hate violence loose in the world, outgroups are always at peril, and their survival may seem a miracle. In the short-term, self-arming may work as a temporary strategy. But in the long-term, as a subject of constitutional storytelling, it will not bring about a better world--except, perhaps, by allowing outgroups to **494** go to their graves with dignity. In this country, the long-term gains made by outgroups have generally been the product of changes in the dominant culture, not violence. To hope for such changes may seem wildly idealistic, but to hope for the well-being of outgroups in a world choked with violent hatred may require such idealism. If we do not dream better dreams, we will have to live in a landscape of nightmare.

## Footnotes

a1     Professor of Law, Indiana University School of Law--Bloomington. B.A. 1982, Haverford College; J.D. 1985, Harvard Law School. For their insightful comments, I would like to thank Kevin Brown, Robert Cottrol, and Susan Williams. For superb research assistance, I would like to thank Patrick Mitchell.

1     At least one gay organization in New York City has also embraced the right to arms as a response to gay bashing. See Alisa Solomon, Fired Up: Should Gays Carry Guns?, Village Voice, Nov. 27, 1990, at 43, 43-44. Regrettably, I have been unable to obtain material explaining their interpretation of the Amendment in detail. I also have personal knowledge that some militant Native Americans are also great believers in the Amendment as a personal right to arms. Again, however, I have not been able to find adequate documentary evidence of their view.

2     See David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L.J. 551, 556-59 (1991).

[3]     See id. at 558.

[4]     U.S. Const. amend. II (emphasis added).

[5]     See John Hart Ely, Democracy and Distrust: A Theory of Judicial Review 94-95, 227 n.76 (1980).

[6]     See, e.g., Laurence H. Tribe, American Constitutional Law 299 n.6 (2d ed. 1988); Keith A. Ehrman & Dennis A. Henigan, The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?, 15 U. Dayton L. Rev. 5, 33-35 (1989).

[7]     See Williams, supra note 2, at 558.

[8]     See Nelson Lund, The Second Amendment, Political Liberty, and the Right to Self-Preservation, 39 U. Ala. L. Rev. 103, 106 (1987).

[9]     See Williams, supra note 2, at 558-59.

[10]    See, e.g., Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204, 211-18 (1983); Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637, 637-57 (1989); Lund, supra note 8; Glenn Harlan Reynolds, A Critical Guide to the Second Amendment, 62 Tenn. L. Rev. 461, 466-71 (1995).

[11]    See Williams, supra note 2; David C. Williams, The Militia Movement and Second Amendment Revolution: Conjuring with the People, 81 Cornell L. Rev. 879 (1996).

[12]    See Williams, supra note 11, at 892.

[13]    See id. at 904-05.

[14]    See id. at 904-22.

[15]    See id. at 906-09.

[16]    See id. at 904.

[17]    See id. at 904-09.

[18]    See Williams, supra note 2, at 554; Williams, supra note 11, at 952.

[19]    See Andrew Jay McClurg, The Rhetoric of Gun Control, 42 Am. U. L. Rev. 53, 57-59 (1992).

[20]    See Stephen P. Halbrook, That Every Man Be Armed: The Evolution of a Constitutional Right 24-32 (1984); Kates, supra note 10, at 232-35; Lund, supra note 8, at 117-21; Reynolds, supra note 10, at 466-71.

21  See Williams, supra note 11, at 911-15.

22  See, e.g., Ehrman & Henigan, supra note 6, at 33-35.

23  See id.

24  See id.

25  See Williams, supra note 2, at 577-79; Williams, supra note 11, at 904-11.

26  As autobiographical revelation seems to have become the norm in the field of Second Amendment studies, to reveal possible authorial bias, let me offer the following information. I grew up with guns and the gun culture. I have owned guns all my life, and I will probably continue owning them as long as the law allows. I do not believe that guns are inherently evil. I am, however, profoundly weary and suspicious of the culture's claim to superior virtue.

27  See B. Bruce-Briggs, The Great American Gun War, reprinted in The Gun Control Debate: You Decide 63 (Lee Nisbet ed., 1990) [hereinafter The Gun Control Debate].

28  Id. at 84.

29  Lee Kennett & James LaVerne Anderson, The Gun in America: The Origins of a National Dilemma 254-55 (1975).

30  Eugene H. Balof, Popular and Media Images of Firearms in American Culture, in The Gun Culture and Its Enemies 153, 158-60 (William R. Tonso ed., 1990) [hereinafter The Gun Culture] (emphasis omitted).

31  James D. Wright et al., Under the Gun: Weapons, Crime, and Violence in America 113 (1983).

32  Perhaps the most prominent academic partisan is William R. Tonso, a sociologist at the University of Evansville. See, e.g., William R. Tonso, A View from Inside the Gun Culture, in The Gun Culture, supra note 30, at 7.

33  Perhaps the most prominent opponent was the late historian Richard Hofstadter. See, e.g., Richard Hofstadter, America as a Gun Culture, in The Gun Control Debate, supra note 27, at 25.

34  Statistics bear out this observation: many more people per capita own arms in rural areas than in cities. See Wright et al., supra note 31, at 104-05; James D. Wright & Linda L. Marston, The Ownership of the Means of Destruction: Weapons in the United States, 23 Soc. Probs. 93, 95 (1975).

35  Some sociologists have argued that the South exhibits a distinctive subculture of violence--a set of family-transmitted values that glorifies violence. See Raymond D. Gastil, Homicide and a Regional Culture of Violence, 36 Am. Soc. Rev. 412 (1971); Sheldon Hackney, Southern Violence, in The History of Violence in America: Historical and Comparative Perspectives 505 (Hugh Davis Graham & Ted Robert Gurr eds., 1969). Others have contested this claim, arguing that the South's rural geography, rather than any distinctive culture, accounts for its gun-loving ways. See Wright et al., supra note 31, at 109-12. In either event, the South is plainly a particular center of gun culture. Per capita, Southerners own more arms, see id. at 106-07; Bureau of Justice Statistics, U.S. Dep't of Justice, Sourcebook of Criminal Justice Statistics--1987, at 169 tbl.2.50 (Timothy J. Flanagan & Katherine M. Jamieson eds., 1988) [hereinafter Sourcebook]; Wright & Marston, supra note 34, at 95, and commit more violent crimes than other Americans, see David B. Kopel, The Samurai, the Mountie, and the Cowboy: Should America Adopt the Gun Controls of Other Democracies? 159 (1992);

Bruce-Briggs, supra note 27, at 80, and Southern politicians vote against gun control in greater percentages, see Balof, supra note 30, at 153-54; Hofstadter, supra note 33, at 33.

36    See supra text accompanying note 29.

37    See Wright & Marston, supra note 34, at 95-99. In fact, while the gun culture may be concentrated in the working class, gun ownership is concentrated in the middle and upper middle classes, no doubt because those classes have the means to purchase guns. See Sourcebook, supra note 35, at 169 tbl.2.50; Wright et al., supra note 31, at 107-08; Wright & Marston, supra note 34, at 95-97.

38    See supra text accompanying note 29.

39    See infra note 44 and accompanying text.

40    See supra text accompanying notes 28-29.

41    See, e.g., Levinson, supra note 10, at 658-59.

42    See id.

43    Id. (footnote omitted) (alteration in original).

44    Wright et al., supra note 31, at 323-24. Other writers, more clearly partisans of the gun culture, argue even more emphatically that gun owners are an embattled, even victimized, class, and that the urban elite, especially the media elite, view them with disdain, ignorance, and bigotry. See, e.g., Brendan F.J. Furnish, The New Class and the California Handgun Initiative: Elitist Developed Law as Gun Control, in The Gun Culture, supra note 30, at 127, 127-39; Richard Hummel, Firearms' Stereotypes in American T.V. and Films: "Truth?" and Consequences, in The Gun Culture, supra note 30, at 143, 143-52; William R. Tonso, Social Problems and Sagecraft: Gun Control as a Case in Point, in The Gun Control Debate, supra note 27, at 35, 40-41; William R. Tonso, The Media and Gun Control: A Case Study in World-View Pushing, in The Gun Culture, supra note 30, at 185, 185-87.

45    See Kennett & Anderson, supra note 29, at 163-64.

46    See id.

47    Id.

48    Id. at 251-52.

49    Hofstadter, supra note 33, at 33. Many right-to-arms proponents do not deny these attempts by the dominant elements in society to disarm outgroups and to arm themselves; indeed, they emphasize them, arguing that the Second Amendment right to arms is important precisely because gun control has so often been a means to disarm "deviant" elements. See discussion infra text accompanying note 142. They generally fail to note, however, that such attempts to disarm outgroups are as often a product of the gun culture itself as they are of the urban elite.

50    See Richard Slotkin, Gunfighter Nation: The Myth of the Frontier in Twentieth-Century America (1992) [hereinafter Slotkin, Gunfighter Nation]; Richard Slotkin, Regeneration Through Violence: The Mythology of the American Frontier,

Compendium_Cornell
Page 1891

1600-1860 (1973); Richard Slotkin, The Fatal Environment: The Myth of the Frontier in the Age of Industrialization, 1800-1890 (1985).

51   See Slotkin, Gunfighter Nation, supra note 50, at 10.

52   Id. at 12 (emphasis omitted) (internal quotations omitted).

53   See id.

54   Id.

55   See id. at 14.

56   See id. at 18-19, 42-49.

57   See id. at 19, 549-52.

58   See id. at 544-47.

59   See id. at 649-52.

60   Id. at 655.

61   See Williams, supra note 11, at 924-46.

62   See Balof, supra note 30, at 158.

63   See Nicholas J. Johnson, Beyond the Second Amendment: An Individual Right to Arms Viewed Through the Ninth Amendment, 24 Rutgers L.J. 1, 24-27 (1992).

64   Id. at 24.

65   Id. at 25-26 (footnote omitted).

66   See Kates, supra note 10, at 227.

67   Kopel, supra note 35, at 431.

68   See id. at 45-46.

69   See id. at 96-97.



70    See id. at 392-93, 422, 431-32.

71    See id. at 431-32.

72    See id. at 419-32.

73    Id. at 419, 432.

74    See supra text accompanying note 31. Again, statistics bear out this observation. Many more men than women own guns. See Sourcebook, supra note 35, at 169 tbl.2.50; Wright et al., supra note 31, at 109, 114.

75    See Wright et al., supra note 31, at 108.

76    See Bruce-Briggs, supra note 27, at 66.

77    See, e.g., David H. Bennett, The Party of Fear: From Nativist Movements to the New Right in American History 9-10 (1988).

78    Certainly, Jews for the Preservation of Firearms Ownership-- presumably a sensitive barometer--thinks so. See infra notes 197-203 and accompanying text.

79    See discussion infra Part III.A.4.

80    See generally, e.g., Bennett, supra note 77.

81    See Wright et al., supra note 31, at 108-09.

82    See, e.g., Nathan McCall, Makes Me Wanna Holler: A Young Black Man in America 60-61 (1994).

83    See discussion infra Part III.A.

84    See Ted Ownby, Subduing Satan: Religion, Recreation, and Manhood in the Rural South, 1865-1920, at 16-17, 26 (1990).

85    See Wright & Marston, supra note 34, at 98 & n.8.

86    See infra note 488 and accompanying text.

87    See discussion infra Part III.A.4.

88    See supra notes 27-31, 84-88 and accompanying text.

89    See Kennett & Anderson, supra note 29, at 250. I am here suggesting only that men and women associate guns with penises and therefore with masculinity. I am not arguing for the much broader "priapic" theory of gun ownership--that

male gunowners are sexually insecure and buy guns in order to assuage that insecurity. See Don B. Kates Jr. & Nicole Varzos, Aspects of the Priapic Theory of Gun Ownership, in The Gun Culture, supra note 30, at 93, 93-95.

90    Militarism is not the same thing as the gun culture. As I explain in the text, however, in objecting to militarism, these feminists are centrally objecting to force as the basis for social relations. See infra text accompanying notes 91-96. Their objection therefore runs to any culture organized around the use of force.

91    Ann Scales, Militarism, Male Dominance and Law: Feminist Jurisprudence as Oxymoron?, 12 Harv. Women's L.J. 25, 42-43 (1989).

92    See Sara Ruddick, Maternal Thinking: Toward a Politics of Peace, 219-51 (1990).

93    See id. at 141-45.

94    See id. at 151-56, 221.

95    See id. at 130-34, 156-84, 205-21.

96    See id. at 185-205.

97    See Wendy Brown, Guns, Cowboys, Philadelphia Mayors, and Civic Republicanism: On Sanford Levinson's The Embarrassing Second Amendment, 99 Yale L.J. 661 (1989).

98    Id. at 665. The reference is to Levinson, supra note 10.

99    See id. at 665-66.

100   Id. at 665.

101   Id.

102   Id. at 663-64.

103   See id. at 665-66.

104   See id. at 666.

105   See id.

106   Id.

107   Id.

108    Id.

109    Id. at 666-67.

110    Id. at 667.

111    See David Biale, Power and Powerlessness in Jewish History 4-5 (1986); Paul Breines, Tough Jews: Political Fantasies and the Moral Dilemma of American Jewry 3, 26-27, 29 (1990).

112    See Biale, supra note 111, at 198; Robert Cover, The Folktales of Justice: Tales of Jurisdiction, in Narrative, Violence, and the Law: The Essays of Robert Cover 173, 179-86 (Martha Minow et al. eds., 1992) [hereinafter Cover Essays]; Charles E. Silberman, A Certain People: American Jews and Their Lives Today 360 (1985) (internal quotations omitted).

113    Michael Selzer, Zionism Reconsidered: The Rejection of Jewish Normalcy at xv (1970).

114    David S. Ariel, What Do Jews Believe?: The Spiritual Foundations of Judaism 126 (1995).

115    Mark Zborowski & Elizabeth Herzog, Life Is with People: The Culture of the Shtetl 149 (1952), quoted in Breines, supra note 111, at 108.

116    Id. (internal quotations omitted).

117    Jean-Paul Sartre, Anti-Semite and Jew 117-18 (George J. Becker trans., Schocken Books 1965). Similarly, Philip Roth recalls: "[O]ur worth as human beings, even perhaps our distinction as a people, was embodied in the incapacity to perpetuate the sort of bloodletting visited upon our ancestors." Philip Roth, The Facts: A Novelist's Autobiography 28 (1988).

118    Breines, supra note 111, at 3.

119    See Wright et al., supra note 31, at 108 n.5.

120    See infra text accompanying note 199.

121    Certainly, Jews for the Preservation of Handgun Ownership does not believe it a coincidence that Schumer is Jewish; they denounce him and the whole Jewish culture of nonviolence from which they believe he springs. See infra note 202 and accompanying text.

122    See Ownby, supra note 84, at 179.

123    See discussion infra Part II.C.

124    See Wright et al., supra note 31, at 108-09.

125    See McCall, supra note 82, at 60-69, 72-73; Hofstadter, supra note 33, at 33.

Compendium_Cornell
Page 1895

CONSTITUTIONAL TALES OF VIOLENCE: POPULISTS,..., 74 Tul. L. Rev. 387

126    See Michael Eric Dyson, Making Malcolm: The Myth and Meaning of Malcolm X at xi-xiii (1995).

127    See, e.g., Hugh Pearson, The Shadow of the Panther: Huey Newton and the Price of Black Power in America 20-21, 28-31 (1994).

128    See, e.g., Carl T. Rowan, The Coming Race War in America: A Wake-up Call 186-90, 283 (1996).

129    See, e.g., id. at 189; Carl T. Bogus, Race, Riots, and Guns, 66 S. Cal. L. Rev. 1365, 1383-87 (1993).

130    See Bogus, supra note 129, at 1387.

131    See Pearson, supra note 127, at 96, 101, 109-11, 131-32.

132    See id. at 110-11, 132.

133    See, e.g., Rowan, supra note 128, at viii, 282-83.

134    See id.

135    See Bogus, supra note 129, at 1367.

136    See id. at 1372-74.

137    Id. at 1373-74 (footnote omitted).

138    See generally Biale, supra note 111; Breines, supra note 111.

139    See Breines, supra note 111, at 97-101.

140    See id. at 105-20.

141    See id. at 132-35.

142    See id. at 77, 90, 113.

143    See Biale, supra note 111, at 72-77; Breines, supra note 111, at 81-83, 88-90.

144    See Breines, supra note 111, at 139-49.

145    See id. at 149-67.

146    See id.

Compendium_Cornell
Page 1896

147   See id. at 48-49.

148   See id. at 56-73.

149   See id. at 3-4.

150   See id. at 52-53.

151   See id. at 22, 71-73.

152   See id. at 17-18, 70, 79.

153   See id. at 70.

154   See id. at 61, 83-84.

155   See Leslie Camhi, Imaginary Jews: America Develops a Masada Complex, Village Voice, July 11, 1995, at 29, 29.

156   See id.

157   This book's copyright notice requires the following citation: Lethal Laws, Jay Simkin, Aaron Zelman, & Alan M. Rice, Jews for the Preservation of Firearms Ownership, Inc., 2872 South Wentworth Avenue, Milwaukee, WI 53207, (414) 769-0760 [hereinafter Simkin et al., Lethal Laws].

158   Jay Simkin & Aaron Zelman, "Gun Control": Gateway to Tyranny (1993).

159   See Don B. Kates, Jr. & Daniel D. Polsby, Of Genocide and Disarmament, 86 J. Crim. L. & Criminology 247 (1995) (reviewing Simkin et al., Lethal Laws, supra note 157); David B. Kopel, Book Review, 15 N.Y.L. Sch. J. Int'l & Comp. L. 355 (1995) (same).

160   See, e.g., Camhi, supra note 155, at 29; Erik Eckholm, Owners Say Mild Limits Would Lead to Handgun Ban, N.Y. Times, Mar. 12, 1992, at D21; Keith Epstein, Militias Aim for Better Image, Plain Dealer (Cleveland), June 19, 1995, at 1A; Charles Holmes, Pro-Gun Ad Targeting Jews Is Denounced, Atlanta Const., Apr. 30, 1991, at A2; Jody McPhillips, No-More-Hate Message Replaces Hitler Billboard That Caused Fury, Providence J.-Bull., Nov. 5, 1994, at 3A; New York: Schumer Shot Down by Jewish Gun Group, Hotline, Apr. 25, 1991, available in LEXIS, Cmpgn Library, Hotlne File [hereinafter Schumer Shot Down]; Charley Reese, The Best Protection Against Tyranny Is the Right to Bear Arms, Orlando Sentinel, Oct. 12, 1993, at A8; Frank Smyth, Crossfire: Wounded by Congress, the NRA's Regime Bullies Its Own Board and Launches a New Offensive on America, Village Voice, June 21, 1994, at 26; Jim Strang, Hitler's Influence on U.S. Gun Law, Plain Dealer (Cleveland), Apr. 18, 1993, at 1B; Ed Vulliamy, Cults 2, Observer (London), May 21, 1995, at 20, available in LEXIS, News Library, Obsrvr File.

161   Simkin et al., Lethal Laws, supra note 157, at 1.

162   Id. at 12 (emphasis omitted).

163    Less often, JPFO hedges this bold claim: "So long as a target group is armed, it has a chance to avoid extermination." Id. (emphasis omitted).

164    See id. at 4.

165    Id. (emphasis added). In a letter to the Atlantic Monthly, Jay Simkin denies that JPFO has argued that gun control causes genocide; rather, "murderous politicians and government bureaucrats plan and carry out genocides." Jay Edward Simkin, Letter to the Editor, Atlantic Monthly, June 1996, at 12, 12. This denial, however, is either disingenuous or a quibble: certainly, some set of human beings must carry out genocide, but Lethal Laws claims that the existence of gun control, all by itself, "promotes genocide" by such people.

166    Simkin et al., Lethal Laws, supra note 157, at 9 (internal quotations omitted).

167    See id. at 9-10.

168    Id. at 9 (internal quotations omitted).

169    Id.

170    Id. (emphasis omitted) (internal quotations omitted).

171    Id.

172    These examples include the persecutions of Armenians in Turkey (1911-1917), political dissidents in China (1949-1952), Mayans in Guatemala (1960-1981), Christians in Uganda (1971-1979), and opponents of Pol Pot in Cambodia (1975-1979). See id. at 14. JPFO's definition of genocide includes the extermination of a group defined by its political beliefs, hence the inclusion of Chinese and Cambodian dissidents. See id. at 9.

173    See id. at 151.

174    See id. at 152.

175    Id. at 11.

176    See id. at 153.

177    Id.

178    See id. at 153-54.

179    See id. at 11, 156.

180    Id. at 156-58.

181    Id. at 157 (emphasis omitted).

182    See id. at 158.

183    See id. at 21-24.

184    Id. at 24.

185    Id. at 27-29 (emphasis omitted).

186    Id. at 27.

187    Vulliamy, supra note 160, at 23 (internal quotations omitted) (quoting Jay Simkin).

188    See Strang, supra note 160, at 1B.

189    See Camhi, supra note 155, at 29 (quoting JPFO literature).

190    Vulliamy, supra note 160, at 20 (internal quotations omitted) (quoting Jay Simkin).

191    McPhillips, supra note 160, at 3A (providing a photograph of the advertisement); see also Reese, supra note 160, at A8 (describing the advertisement).

192    See Kathleen Best, Senate Panel OKs Major Gun Control Bill, St. Louis Post-Dispatch, May 8, 1991, at 4A; Joanne M. Haas, Loftus Calls NRA "Bullies," UPI, Nov. 7, 1989, available in LEXIS, News Library, Upstat File.

193    Strang, supra note 160, at 1B (internal quotations omitted) (quoting JPFO advertisement).

194    Eckholm, supra note 160, at D21 (internal quotations omitted) (quoting JPFO advertisement).

195    Vulliamy, supra note 160, at 20 (internal quotations omitted) (quoting Jay Simkin).

196    Reese, supra note 160, at A8 (internal quotations omitted) (omissions in original) (quoting JPFO member Theodore Haas).

197    JPFO has reserved its harshest criticism for Congressman Charles Schumer: "Most Jews are not stupid or pro-criminal, but Charles Schumer is both!" Schumer Shot Down, supra note 160 (internal quotations omitted) (quoting a JPFO advertisement). More pointedly, Zelman told an NRA board meeting: "Charlie Schumer, who claims to be a Jew should crawl back to the rock he came from." Smyth, supra note 160, at 30 (internal quotations omitted) (quoting Aaron Zelman).

198    Abraham H. Foxman, Jewish Pro-Gun Group, N.Y. Times, May 21, 1995, § 4, at 14 (letter to the editor) (internal quotations omitted) (quoting JPFO materials).

199    Simkin et al., Lethal Laws, supra note 157, at 159 (emphasis omitted).

200    Epstein, supra note 160, at D21 (internal quotations omitted) (quoting Aaron Zelman).

201    See Reese, supra note 160, at A8.

202    New York: Liberals to Endorse Abrams Today, Hotline, May 2, 1991, available in LEXIS, Cmpgn Library, Hotlne File [hereinafter Liberals] (internal quotations omitted) (omissions in original) (quoting a JPFO advertisement). Similarly, The New York Times has attributed to Bruce R. Chesley, JPFO's field representative in New England, the belief that "some Jewish members of Congress who favor tighter gun control measures were feeding anti-Semitism in the United States." Michael Janofsky, Two States, Two Gatherings and a Lot of Anti-Government Sentiment, N.Y. Times, May 15, 1995, at A10.

203    Simkin et al., Lethal Laws, supra note 157, at 4. Pro-gun-control Jewish leaders have, in turn, accused JPFO of promoting anti-Semitism by these attacks. Rabbi David Saperstein, director of the Religious Action Center of Reform Judaism, charges: "The injection of religious bigotry into public debate is unacceptable in America. The fact that the attack is launched by Jews does not make it any less anti-Semitic." Holmes, supra note 160, at A2 (internal quotations omitted) (quoting Rabbi David Saperstein). Similarly, Abraham Foxman, National Director of Anti-Defamation League, wrote to The New York Times, "Anti-Semitism has a long and painful history, and the linkage to gun control is a tactic by [JPFO] to manipulate the fear of anti-Semitism toward their own end.... It is a campaign that has been viewed with concern by many in the Jewish community." Foxman, supra note 198, § 4, at 14.

204    Simkin et al., Lethal Laws, supra note 157, at 69.

205    Id. at 71.

206    Id. at 69 (emphasis omitted).

207    Id. at 72.

208    Id. at 2.

209    Id.

210    See id. at 3-4.

211    Id. at 3.

212    Id. at 3-4 (footnote omitted).

213    Id. at 4.

214    Id.

215    Id. at 159 (emphasis omitted).

216    Id. at 3.

217    See Breines, supra note 111, at 47-48.

218    See id. at 114-15 (explaining that in the early twentieth century, some Jews regarded Jewish gangsters with pride, as a symbol that Jews were becoming normalized into American culture).

219    Camhi, supra note 155, at 29.

220    Id.

221    Liberals, supra note 202 (internal quotations omitted) (omission in original) (quoting a JPFO advertisement).

222    JPFO's leaders have spoken to the NRA, see Smyth, supra note 160, at 58, and to Radio Free World, an outlet for the militia movement and other fringe right-wing crusades, see Vulliamy, supra note 160, at 20. Some parts of the gun culture have been open to such alliance with JPFO, often as a response to charges of anti-Semitism. The leader of the Militia of Montana, John Trochmann, cited support from JPFO when he claimed, "We have good credentials with people who aren't white folks." William Petroski, Soviet Threat Lives On, Militia Leaders Believe, Des Moines Reg., Nov. 30, 1995, at 5M (internal quotations omitted) (quoting John Trochmann). Similarly, Larry Pratt, President of Gun Owners of America and Chair of the 1996 Buchanan for President Campaign, repudiated charges of anti-Semitism thus: "I am a member of Jews for the Preservation of Firearms Ownership, ... [which] recently issued a statement saying that JPFO and Gun Owners of America have worked hand-in-hand to restore the Second Amendment rights of all Americans and will continue to do so." Larry Pratt, Allegations Are "Outrageously False", Post & Courier (Charleston, S.C.), Feb. 26, 1996, at A9. JPFO has warmly welcomed such overtures: according to Aaron Zelman, "JPFO considers Larry Pratt to be cut of exactly the same cloth as the many righteous gentiles who risked their lives during the Holocaust to rescue Jews from the hands of Nazi murderers." Id. (internal quotations omitted) (quoting Aaron Zelman).

223    The big discrepancy--and it is a very big one--is the anti-Semitism of the militia movement. I discuss the significance of this discrepancy below. See discussion infra Part II.A.2.b.

224    See Williams, supra note 11, at 892-99, 931-44.

225    See id. at 903; see also Crossfire (CNN television broadcast May 3, 1995) (airing remarks of Larry Pratt).

226    See Camhi, supra note 155, at 29.

227    Simkin et al., Lethal Laws, supra note 157, at 10.

228    For discussion of the anti-Semitism of the militia movement, see Williams, supra note 11, at 925-30.

229    Simkin et al., Lethal Laws, supra note 157, at 10, 12 (emphasis omitted).

230    Id. at 69.

231    Id.

232    Id. at 71.

233    See Williams, supra note 11, at 904, 916, 924-25.

234    See generally discussion supra Part I.B.1, 3.

235    See generally Omer Bartov, Hitler's Army: Soldiers, Nazis, and War in the Third Reich (1991); Daniel Jonah Goldhagen, Hitler's Willing Executioners: Ordinary Germans and the Holocaust (1996).

236    Simkin et al., Lethal Laws, supra note 157, at 158-59.

237    Glenda Riley, The Life and Legacy of Annie Oakley 143 (1994) (internal quotations omitted) (quoting Annie Oakley).

238    See Wright et al., supra note 31, at 113-14.

239    See M. Elizabeth Blair & Eva M. Hyatt, The Marketing of Guns to Women: Factors Influencing Gun-Related Attitudes and Gun Ownership by Women, 14 J. Pub. Pol. & Marketing 117, 118 (1995).

240    See, e.g., Kelly Shermach, Gun Advocates Decry Study on Firearms Sales to Women, Marketing News, Jan. 16, 1995, at 14.

241    This nationwide women's safety program is entitled "Refuse To Be a Victim." Advertisements for the program (running in women's magazines like Cosmopolitan and Family Circle) feature a frightened mother, holding a small child and walking through an unlit garage. Those who call a toll-free number receive a safety tips brochure that includes advice on owning a gun. Interested persons can take an NRA safety course that includes discussion of guns as one option among others. See Ellen Neuborne, Cashing In on Fear: The NRA Targets Women, Ms., May/June 1994, at 46, 47-49.

242    For example, one Smith and Wesson advertisement features "a serious, thirtyish woman poised at a shooting range, with the headline 'What would Mom think now?' ' Blair & Hyatt, supra note 239, at 118 (quoting a Smith & Wesson advertisement). Another Smith & Wesson advertisement asserts, "Independence.... As more women have entered the job market, become heads of households, purchased their own homes, they've taken on a whole new set of responsibilities. For their own decisions. For their own lives. For their own--and their families'--security." Letty Cottin Pogrebin, Neither Pink nor Cute: Pistols for the Women of America, Nation, May 15, 1989, at 658, 668 (internal quotations omitted) (omission in original) (quoting a Smith & Wesson brochure). A Colt Firearms' advertisement "pictures a younger mother tucking her child into bed. Under this blissful domestic scene are two models of Colt semiautomatic pistols with the headline: 'Self-protection is more than your right ... it's your responsibility." ' Carrie Goerne, Gun Companies Target Women; Foes Call It 'Marketing to Fear', Marketing News, Aug. 31, 1992, at 1 (omission in original) (quoting a Colt Firearms advertisement). Significantly, the Colt advertisement appeared not in a gun magazine but in Ladies' Home Journal. See id.

243    Specifically, the poll found that gun ownership among women had increased 53% between 1983 and 1986, to an estimated 12 million women. As Smith and Wesson interprets the poll results, it also found 15.6 million "potential female gun purchasers" in 1989, twice the number for 1983. See Tom W. Smith & Robert J. Smith, Changes in Firearms Ownership Among Women, 1980-1994, 86 J. Crim. L. & Criminology 133, 136 (1995). Unfortunately, Smith and Wesson has refused to release the poll data for study by independent analysts. See id. at 141. Gallup itself has criticized Smith and Wesson for misusing the data by claiming that 15.6 million women are potential buyers. See id. at 142. Instead,

Compendium_Cornell
Page 1902

Gallup explained that the 15.6 million figure referred to women who said that there "[was] at least some chance" that they would buy a gun. See id. In reality, "only 900,000 women could be considered potential purchasers." Id. (quoting Gallup response).

244    Relying on data from the National Opinion Research Center at the University of Chicago, two researchers conclude: "According to the best available data, the ownership of firearms among women is not increasing, the gender gap is not closing, and the level of ownership is much lower than commonly stated, with about 11 to 12% of women owning a gun and 4.5 to 8% owning a handgun." Smith & Smith, supra note 243, at 145. A 1994 study conducted by the Indiana University School of Law found that gun ownership increased only 2.2% from 1980 to 1994. See Shermach, supra note 240, at 14. According to one report, the National Science Foundation has found "no increase in female gun ownership in the past decade." Colleen O'Connor, Women's Self-Defense: Big Business, Dallas Morning News, Oct. 24, 1993, at 1F.

245    See Smith & Smith, supra note 243, at 144.

246    See id. at 134 n.3 (citing sources).

247    See id. at 134-40.

248    See O'Connor, supra note 244, at 1F.

249    See discussion infra Part II.B.1.

250    The Second Amendment Foundation purchased Women & Guns in 1989. See Peggy Tartaro, Evolution, Women & Guns, Mar. 1993, at 50, 50. The publisher, Julianne Versnel Gottlieb, formerly worked for the foundation and is married to a member of its board of directors. See Julianne Versnel Gottlieb, Dear Self-Reliant Reader, Women & Guns, Apr. 1993, at 50, 50.

251    See Reggie Nadelson, Magnum Force in High Heels, Independent (London), May 5, 1992, at 14.

252    Tartaro, supra note 250, at 50.

253    See Lisa M. Bowman, Aim at Self-Defense, Urges Author of 'Armed and Female', L.A. Times, Aug. 18, 1995, at B1; Jeanne Beach Eigner, Women & Guns: They're Aiming at Personal Protection and a Sense of Empowerment, San Diego Union-Trib., Nov. 8, 1992, at D1; Sonny Jones, NRA Launches New Women's Instructor Development Program, Women & Guns, May 1993, at 39, 39-42; O'Connor, supra note 244, at 1F; Paxton Quigley, An Essay on Revolvers: A Good Choice for Beginners, Women & Guns, July 1995, at 26, 26-28.

254    See Kathryn Casey, Up in Arms, Ladies' Home J., Aug. 1995, at 89, 98 (Arming Women Against Rape and Endangerment); Tony Semerad, Utah Women for Gun Control? Not This Group, Salt Lake Trib., Sept. 5, 1994, at A1 (Women Against Gun Control); Dave Shiflett, Lock and Load, Ladies: Shooting for Some Common Sense to Gun Ownership Laws, Rocky Mtn. News (Denver), Feb. 19, 1995, at 58A (Safety for Women and Responsible Motherhood).

255    See Paxton Quigley, Armed and Female at xvii (1989).

256    See Paxton Quigley, Not An Easy Target 14 (1995).

257    See Quigley, supra note 255, at 52-53, 131-38.

258    See Bowman, supra note 253, at B1.

259    See A Call to Arms, People, Jan. 10, 1994, at 60, 63.

260    See, e.g., Naomi Wolf, Fire With Fire: The New Female Power and How It Will Change the 21st Century at xv-xix (1993); "Ms."--Understanding Women Gunowners, Women & Guns, Aug. 1994, at 8, 8.

261    Wolf, supra note 260, at 53.

262    See id. at 53-54.

263    Id. at 54.

264    Id. at 216.

265    See id. at 216-20.

266    Id. at 216.

267    Id. at 217.

268    Id. at 219-20.

269    See, e.g., id. at 216-20.

270    See infra text accompanying notes 300-303.

271    On feminism's desire to empower women, see Catherine A. MacKinnon, Toward a Feminist Theory of the State 242 (1989).

272    See Mitchell Landsberg, More Women Turning to Firearms Out of Fear, L.A. Times, Feb. 21, 1993, at A18.

273    Id. (internal quotations omitted) (quoting a female gun owner).

274    See, e.g., Gottlieb, supra note 250, at 50.

275    Julianne Versnel Gottlieb, Dear Self-Reliant Reader, Women & Guns, Sept. 1994, at 58, 58. I offer the quoted language as just one example of Gottlieb's position; virtually every column of Dear Self-Reliant Reader includes similar language of choice and empowerment.

276    Neuborne, supra note 241, at 46.

277    Eigner, supra note 253, at D1 (internal quotations omitted) (quoting Paxton Quigley).

278    Bowman, supra note 253, at B1.

279    Eigner, supra note 253, at D1 (internal quotations omitted) (quoting Paxton Quigley).

280    A voluntary survey of the readership of Women & Guns tends to confirm this point: 68% of those responding listed self-defense as their reason for owning a gun. See Peggy Tartaro, A Picture of Women Gunowners, Women & Guns, Mar. 1994, at 30, 31.

281    Julianne Versnel Gottlieb explains:

       Ironically, perhaps to some, it is the fact that I have small children that has made me more vehement in my stand to be able to defend them and myself. I do not choose to be a willing victim or allow them to become ones [sic]. Nor do I want to see that choice denied to any other woman or mother.

       Gottlieb, supra note 250, at 50. Another woman echoes: "More and more women today are separated or divorced, and the responsibility for their children's safety lies with Mommy alone." Ruth Bohan, The Firing Line: Women Are Stepping Up, Chi. Trib., Aug. 15, 1993, at 3 (internal quotations omitted) (quoting a female gun owner).

282    One woman explains: "Women have the right to work, but only in safe areas.... They have the right to go on business trips, but not at night. They are denied equal promotion opportunities because these trips require them to travel alone. This robs women of their rights." Paul Brinkley-Rogers, Guns Can Free Women, NRA Forum Told, Ariz. Republic, May 22, 1995, at B1 (internal quotations omitted) (quoting NRA member and feminist Terryl Morgan). Similarly, Women & Guns declaims: "If [women] are to compete successfully in the business world, they must be free to travel without fear.... For too long women have accepted the roll [sic] of natural victim. This must stop." Karen MacNutt, Perpetuating the Victim Status of Women, Women & Guns, Dec. 1991, at 7.

283    Quigley, supra note 255, at 39.

284    Wolf, supra note 260, at 220.

285    Julianne Versnel Gottlieb, Dear Self-Reliant Reader, Women & Guns, Aug. 1994, at 58, 58.

286    Rebecca Walsh, A Rally for Right to Bear Arms, Salt Lake Trib., Jan. 28, 1996, at B3 (internal quotations omitted) (quoting a female gun owner).

287    Joe Holleman, More Women Are Fired Up About Guns, St. Louis Post-Dispatch, Mar. 22, 1993, at 1A (internal quotations omitted) (quoting a woman who bought and learned to use a gun because a man had been threatening her).

288    Katherine Seligman, Women Taking Up Firearms, S.F. Examiner, Jan. 16, 1994, at A1 (internal quotations omitted) (quoting Nancy Bittle, founder of the group Arming Women Against Rape and Endangerment).

289    Shiflett, supra note 254, at 58A (quoting a popular phrase used in SWARM materials).

290    See, e.g., Karen MacNutt, Legally Speaking: Restraining Orders, Women & Guns, Mar. 1993, at 44.

291    See, e.g., id. ("'Nightmare Ends In Death,' read the headline. Estranged husband violates restraining order to murder wife then kills self. We did all we could, says judge ....") (omission in original); Karen L. MacNutt, Legally Speaking: Occupational Safety II, Women & Guns, July 1994, at 40, 42 ("I believe a handgun is the best defense from random violence."); Karen L. MacNutt, Legally Speaking: Better Late Than Never, Women & Guns, Sept. 1993, at 38, 38 (describing a hypothetical police officer who tells an abused woman, "We've better things to do than to get involved in a lover's quarrel").

292    MacNutt, supra note 282, at 7.

293    Peggy Tartaro, From the Editor, Women & Guns, Aug. 1995, at 6, 7.

294    "Ms."--Understanding Women Gunowners, supra note 260, at 8 (emphasis added). Similarly, according to Sonny Jones, "feminism is dying," because victim "feminists don't dance.... [B]efore you teach a person the art of war, you must teach her the art of dance. In other words, a woman must learn to love life and herself before she can deal with the concept of fighting to preserve that life." Nadelson, supra note 251, at 14 (internal quotations omitted) (quoting Sonny Jones, founding editor of Women & Guns).

295    Julianne Versnel Gottlieb, Dear Self-Reliant Reader, Women & Guns, Oct. 1994, at 58, 58. "Establishment" feminists have also had harsh words for the women and guns movement. Betty Friedan, Susan Estrich, Patricia Ireland, Representative Nita Lowey, Ms. and other women's magazines, have all attacked the NRA, the firearms industry, and the movement generally for coopting the language of feminism to serve a nonfeminist end, cynically preying on women's fears to promote sales and membership, and misleading women. See Robert Draper, Why 15 Million Women Own Guns, Glamour, May 1993, at 260, 302-03; Susan Estrich, Women, Beware of NRA, USA Today, May 25, 1995, at 13A; Steve Fishman, Up Front: What You Know About Guns Can Kill You, Vogue, Oct. 1993, at 146, 148; Melinda Henneberger, NRA Campaign Under Attack, N.Y. Times, Oct. 24, 1993, § 4, at 4; Ann Japenga, Would I Be Safer with a Gun?, Health, Mar./Apr. 1994, at 52, 54; Ann Jones, Living with Guns, Playing with Fear, Ms., May/June 1994, at 38, 40-43; Neuborne, supra note 241, at 46; Pierre Thomas, Fear Impels More Women to Buy Guns, Wash. Post, Jan. 29, 1994, at A1. One law review article even argued that recent advertising aimed at women violates FTC regulations. See Debra Dobray & Arthur J. Waldrop, Regulating Handgun Advertising Directed at Women, 12 Whittier L. Rev. 113 (1991). Charles Schumer petitioned the commission for an investigation. See William Langley, Arms and the Woman, Sunday Telegraph (London), Jan. 15, 1995, at 1, available in LEXIS, News Library, Majpap File. The response of Women & Guns is that these charges are paternalistic; women can decide for themselves whether they need a gun, without guidance from the feminist "establishment" or a government agency. See Julianne Versnel Gottlieb, Parting Shots ..., Women & Guns, Feb. 1995, at 58, 58; "Ms."--Understanding Women Gunowners, supra note 260, at 8; New NRA "Refuse To Be a Victim" Launched into Nationwide Orbit, Women & Guns, Jan. 1994, at 8, 8-10; Peggy Tartaro, From the Editor, Women & Guns, Feb. 1995, at 6, 6; Vogue Takes One-Sided Look at Women Gunowners, Women & Guns, Dec. 1993, at 8, 8-9.

296    See Katharine T. Bartlett, Feminist Legal Methods, 103 Harv. L. Rev. 829, 837-49 (1990).

297    See Wolf, supra note 260, at 216-20.

298    See, e.g., Chris Martell, Women Take Shots at Soglin Proposal, Wis. St. J., Feb. 14, 1993, at 1A.

299    Carol Ruth Silver & Don B. Kates, Jr., Self-Defense, Handgun Ownership, and the Independence of Women in a Violent, Sexist Society, in Restricting Handguns: The Liberal Skeptics Speak Out 139, 139 (Don B. Kates, Jr. ed., 1979).

Compendium_Cornell
Page 1906

300    Id. at 140.

301    Id. at 169.

302    See, e.g., Miguel A. Faria, Women, Guns, and the Medical Literature--A Raging Debate, Women & Guns, Oct. 1994, at 14, 16.

303    Blair & Hyatt, supra note 239, at 123; see also Casey, supra note 254, at 98 (noting that Camille Paglia calls a gun "the ultimate equalizer"); Miguel A. Faria, supra note 302, at 16 ("The gun is the great equalizer for women."); Laura Ingraham, Armed and Empowered, Pittsburgh Post-Gazette, May 19, 1996, at E-1 ("[F]eminist leaders [wrongly] pooh-pooh the notion that guns are 'equalizing forces' for women who are otherwise no match for a would-be attacker."); Walsh, supra note 286, at B3 (quoting the head of Women Against Gun Control, who calls guns "the great equalizer").

304    Semerad, supra note 254, at A1 (paraphrasing the head of Women Against Gun Control).

305    Peggy Tartaro, From the Editor, Women & Guns, May 1993, at 6, 6.

306    New Colorado Group Will SWARM Concealed Carry Reform, Women & Guns, Feb. 1995, at 8, 8.

307    See supra note 254 and accompanying text.

308    See, e.g., Susan Moller Okin, Justice, Gender, and the Family 124 (1989).

309    See supra Part II.B.1.a.

310    See, e.g., New Colorado Group Will SWARM Concealed Carry Reform, supra note 306, at 8.

311    See supra notes 288-291 and accompanying text.

312    Blair & Hyatt, supra note 239, at 123.

313    See supra notes 286-287 and accompanying text.

314    While the movement hopes to invade and disrupt the masculine culture of guns, it also plainly hopes to retain a good deal of conventional feminine culture as well. This blending of the two cultures leads to some of the odder elements of the movement. For example, Women & Guns published an article on whether shooting and pregnancy mix (they do), see Carolee Boyles-Sprenkel, Shooting and Pregnancy: Do They Mix?, Women & Guns, Aug. 1995, at 22, and apparel designers have produced "[g]arter-belt holsters, gabardine business suits, slinky sequined evening gowns, even the trusty headband ... to comfortably hide a pistol," O'Connor, supra note 244, at 1F.

315    Quigley, supra note 255, at 37-38.

316    Karen L. MacNutt, Legally Speaking: Comus, Women & Guns, Feb. 1996, at 48, 48 (internal quotations omitted).

Compendium_Cornell
Page 1907

317     Jones, supra note 295, at 42-43.

318     Kathleen Kernicky, Women and Guns: Shooting Away the Stereotypes, Buff. News, Aug. 15, 1995, at C1, available in 1995 WL 5495060 (quoting a gun dealer).

319     Japenga, supra note 295, at 57 (internal quotations omitted) (quoting Paxton Quigley).

320     Pogrebin, supra note 242, at 668. Similarly, a liberal talk-radio host, who finds the "passion about guns in this country ... disgusting," still finds herself conflicted: "If more women purchased guns and learned how to use them, it would be a step toward the end of victimization of women.... I am reacting to centuries of violence against women.... My fears are part of the collective conscious of all the assaults and abuse against women." Martell, supra note 298, at 1A (internal quotations omitted) (quoting Diana Summers).

321     Julianne Versnel Gottlieb, Dear Self-Reliant Reader, Women & Guns, June 1993, at 50, 50.

322     Gottlieb, supra note 295, at 58.

323     Wolf, supra note 260, at 220.

324     See Quigley, supra note 255, at 54-65.

325     See id.

326     See id.

327     See id.

328     See id. at 1-27.

329     Id. at 91.

330     Julianne Versnel Gottlieb, Dear Self-Reliant Reader, Women & Guns, Mar. 1994, at 58, 58.

331     Glamour Asks Why?, Women & Guns, July 1993, at 8, 9 (internal quotations omitted) (quoting a letter from a reader); see also Faria, supra note 302, at 15 ("[T]he police do not have a legal duty to protect the public against criminals.... '[T]here is no constitutional right to be protected by the state against being murdered by criminals or madmen.' " (quoting Bowers v. Devito, 686 F.2d 616, 618 (7th Cir. 1982)).

332     See Julianne Versnel Gottlieb, Dear Self-Reliant Reader, Women & Guns, Sept. 1993, at 50, 50.

333     Id.

334     Id.

335    Id.

336    Id.

337    Id.

338    Gottlieb, supra note 321, at 50.

339    Gottlieb, supra note 332, at 50.

340    See id.

341    Glamour Asks Why?, supra note 331, at 9.

342    Julianne Versnel Gottlieb, Parting Shots ..., Women & Guns, Apr. 1995, at 58, 58.

343    Inge Anna Larish, Why Annie Can't Get Her Gun: A Feminist Perspective on the Second Amendment, 1996 U. Ill. L. Rev. 467, 473.

344    Id. at 504.

345    See id.

346    Id. at 505.

347    Id. at 472, 503.

348    Id. at 503.

349    Id.

350    See supra notes 122-126 and accompanying text.

351    See Bogus, supra note 129, at 1370.

352    See Eugene D. Genovese, Roll, Jordan, Roll: The World the Slaves Made 587-98 (1976).

353    See Kopel, supra note 35, at 332-35.

354    W.E. Burghardt DuBois, Editorial, 12 Crisis 267, 271 (1916), quoted in Kopel, supra note 35, at 337 (alteration in original).

355   See Robert J. Cottrol & Raymond T. Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L.J. 309, 339-42 (1991).

356   See Pearson, supra note 127, at 25-28, 35-39.

357   Robert F. Williams, Negroes with Guns (Marc Schliefer ed., 1962).

358   See Cottrol & Diamond, supra note 355, at 357-58.

359   See Kopel, supra note 35, at 338-40.

360   See id. at 339-40.

361   Pearson, supra note 127, at 110-11.

362   See generally John R. Salter, Jr. & Don B. Kates, Jr., The Necessity of Access to Firearms by Dissenters and Minorities Whom Government Is Unwilling or Unable to Protect, in Restricting Handguns: The Liberal Skeptics Speak Out, supra note 299, at 185.

363   Id. at 186. Similarly, John Salter reflects on his own experience: "There is no question but that the known existence of pervasive firearms ownership in Southern Black communities prevented much (though not all) massively violent racist retaliation." John R. Salter, Jr., Social Justice Community Organizing and the Necessity for Protecting Firearms, in The Gun Culture, supra note 30, at 19, 20.

364   See Don B. Kates, Jr., Toward a History of Handgun Prohibition in the United States, in Restricting Handguns: The Liberal Skeptics Speak Out, supra note 299, at 7, 12-15.

365   Kopel, supra note 35, at 336; Kates, supra note 364, at 14.

366   See Kates, supra note 364, at 14.

367   See id. at 14-15.

368   See id. at 15.

369   Kopel, supra note 35, at 337-38; Kates, supra note 364, at 15-20.

370   See Kates, supra note 364, at 25.

371   See id.

372   See id.

Compendium_Cornell
Page 1910

373  Bruce-Briggs, supra note 27, at 74.

374  The primary work is Cottrol & Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, supra note 355. More recently, Professors Cottrol and Diamond completed a second chapter in what they describe as "our ongoing effort to explore the connections between racial conflict in American history and the evolution of the notion of the right to bear arms in American constitutionalism." Robert J. Cottrol & Raymond T. Diamond, "Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity-- The Redeemed South's Legacy to a National Jurisprudence?, 70 Chi.-Kent L. Rev. 1307, 1307-08 (1995) (footnotes omitted).

375  Toward an Afro-Americanist Reconsideration has been reprinted in several publications. See, e.g., Guns: Who Should Have Them? 127 (David B. Kopel ed., 1995); Safeguarding Liberty: The Constitution and Citizen Militias 135 (Larry Pratt ed., 1995).

376  See Printz v. United States, 521 U.S. 898, 938 n.2 (1997) (Thomas, J., concurring). In Printz, the majority held that the provision of the Brady Bill requiring local law enforcement officers to conduct background checks on potential gun purchasers violated the Tenth Amendment. See id. at 848-935. Justice Thomas joined that opinion, but he also wrote separately to emphasize that the Brady Bill might also violate the Second Amendment:

This Court has not had recent occasion to consider the nature of the substantive right safeguarded by the Second Amendment. If, however, the Second Amendment is read to confer a personal right to "keep and bear arms," a colorable argument exists that the Federal Government's regulatory scheme ... runs afoul of that Amendment's protections.

Id. at 938 (Thomas, J., concurring) (footnote omitted). Justice Thomas declined to venture a firm view on the meaning of the Amendment because the parties did not raise it, but he left little doubt that on a different occasion, he would join the individual rights theory of the Amendment. He commented in dicta: "Marshaling an impressive array of historical evidence, a growing body of scholarly commentary indicates that the 'right to keep and bear arms' is, as the Amendment's text suggests, a personal right." Id. at 938 n.2 (Thomas, J., concurring). Moreover, he plainly hopes that the Court will give the Second Amendment an individual rights interpretation: "Perhaps, at some future date, this Court will have the opportunity to determine whether Justice Story was correct when he wrote that the right to bear arms 'has justly been considered, as the palladium of the liberties of a republic.' " Id. at 939 (Thomas, J., concurring).

In light of this opinion, it is tempting to speculate that Justice Thomas might himself become an important architect of the Afro-Americanist reconsideration of the Amendment. The opinion offers no direct evidence to support such a speculation. While Justice Thomas is African-American and plainly favors an individual rights theory of the Amendment, he might not endorse an Afro-Americanist reading of the Amendment. The only bit of evidence that might lend some support to the speculation is Justice Thomas's choice of citation. In his string cite of titles from the individual rights camp, all of the sources except Toward an Afro-Americanist Reconsideration are articles about the general meaning of the Amendment. Only Toward an Afro-Americanist Reconsideration is more specifically focused, so it would seem that this article caught Justice Thomas's particular attention.

377  See Cottrol & Diamond, supra note 355, at 320-27.

378  See id.

379  See id. at 318-19.

380  Id. at 319.

381  See id. at 321-23.

382   See id. at 323-27.

383   See id.

384   See id.

385   See id.

386   Id. at 327.

387   See U.S. Const. art. I, § 8, cl. 15.

388   Cottrol & Diamond, supra note 355, at 328.

389   Id. at 330.

390   See id.

391   See Bogus, supra note 129, at 1367-74.

392   See id.

393   Cottrol & Diamond, supra note 355, at 331 (footnote omitted).

394   Id. at 332.

395   See id.

396   See id. at 331-32.

397   See id.

398   Id. at 332.

399   Id.

400   Id.

401   See id. at 324-26, 340-42.

402   See id. at 331-32.

403    See id. at 332.

404    See id. at 332-35.

405    See id. at 335-36.

406    See id. at 336-38.

407    Id. at 335.

408    See id. at 339-42.

409    Id. at 339.

410    Id. at 341.

411    See id. at 342.

412    See id.

413    Id.

414    See id. at 342-45.

415    See id. at 345-46.

416    See id. at 346-48.

417    Id. at 348-49.

418    See id. at 350-51.

419    See id. at 349-52.

420    Id. at 353.

421    Id. at 354.

422    Id. at 354-55.

423    Id. at 356.

Compendium_Cornell
Page 1913

424    See id. at 357.

425    See id.

426    Id. at 358 (footnote omitted).

427    Id.

428    Id. at 359.

429    Id. at 360.

430    Id. at 361.

431    Id. at 359.

432    Id. at 361.

433    Id.

434    See id. at 309.

435    See Simkin et al., Lethal Laws, supra note 157, at vi-vii, 159.

436    See discussion supra Part II.B.1.

437    See discussion supra Part II.B.

438    See discussion supra Part II.C.2.

439    See discussion supra Part II.C.2.

440    See, e.g., Stanley B. Greenberg, Middle Class Dreams: The Politics and Power of the New American Majority 3-19 (1995); Susan J. Tolchin, The Angry American: How Voter Rage Is Changing the Nation 1-20 (1996).

441    See supra text accompanying note 20.

442    See supra text accompanying note 21.

443    See Williams, supra note 2, at 588.

444    See id.

445     See id.

446     See Williams, supra note 11, at 915-17, 924-46.

447     See discussion supra Part II.A.

448     See discussion supra Part II.B.

449     See discussion supra Part II.C.

450     Pearson, supra note 127, at 210 (internal quotations omitted) (quoting Saul Adinsky).

451     See generally discussion supra Part II.B.

452     See supra note 244 and accompanying text.

453     See Epstein, supra note 160, at 1A.

454     Michael Walzer, On Toleration: A Theory of Judicial Review 18-19 (1997).

455     See Walter Laqueur, Black Hundred: The Rise of the Extreme Right in Russia 119-296 (1993); David Remnick, Resurrection: The Struggle for a New Russia 49 (1997).

456     See Remnick, supra note 455, at 49-50, 100.

457     See id. at 88-102.

458     See, e.g., Misha Glenny, The Fall of Yugoslavia: The Third Balkan War 12-14 (1992); Robert D. Kaplan, Balkan Ghosts: A Journey Through History 39-45 (1993). I suspect that JPFO would criticize my use of these examples and argue that while totalitarian regimes may be capable of controlling ethnic hatred (or guns), they could do so only by completely suppressing civil liberties. Therefore, under this argument, if the alternative to decentralized violence is totalitarian oppression, we should choose decentralized violence, despite the risk to outgroups. My response is that I am not arguing in favor of the political regimes of Stalin or Tito. Instead, I am simply arguing that when the legitimacy of the state (whether that state is totalitarian or liberal and democratic) comes under severe attack, the resulting conditions of decentralized violence are conducive to hate violence. If the only alternative to those conditions were totalitarianism, then we would be in a very bad way. As discussed in the next subpart, however, our options are not limited to those two.

459     For examples of ethnic hatred displacing or arising in the stead of strong state authority from outside of Europe, see Robert D. Kaplan, The Ends of the Earth: A Journey at the Dawn of the 21st Century (1996).

460     See Simkin et al., Lethal Laws, supra note 157, at 9-14.

461     See id. at vi (discussing Robert Melson, Revolution and Genocide: On the Origins of the Armenian Genocide and the Holocaust (1992)).

Compendium_Cornell
Page 1915

462 See id.

463 See id.

464 See Melson, supra note 461, at 17-18.

465 See id. at 18, 278.

466 Id. at 267.

467 Id.

468 Id. at 268-69.

469 Ted Robert Gurr, The History of Protest, Rebellion, and Reform in America: An Overview, in 2 Violence in America: Protest, Rebellion, Reform 11, 14-15 (Ted Robert Gurr ed., 1989).

470 Hugh Davis Graham, Violence, Social Theory, and the Historians: The Debate over Consensus and Culture in America, in 2 Violence in America: Protest, Rebellion, Reform, supra note 469, at 329, 342. Graham is paraphrasing the analysis of Richard Hofstadter, one of America's great historians albeit a partisan in the gun culture debate, in his introduction to American Violence: A Documentary History. See Richard Hofstadter, Reflections on Violence in the United States, in American Violence: A Documentary History 3, 10-12 (Richard Hofstadter & Michael Wallace eds., 1970).

A generation of historians has rediscovered the prevalence of ethnic and racial violence in this country's story. A full account would obviously be outside the scope of this Article, but a partial bibliography would include Bennett, supra note 77; Thomas J. Davis, A Rumor of Revolt: The "Great Negro Plot" in Colonial New York (1985); Michael Feldberg, The Turbulent Era: Riot and Disorder in Jacksonian America (1980); Paul A. Gilje, The Road to Mobocracy: Popular Disorder in New York City, 1763-1834 (1987); Thomas P. Slaughter, Bloody Dawn: The Christiana Riot and Racial Violence in the Antebellum North (1991); and Catherine McNicol Stock, Rural Radicals: Righteous Rage in the American Grain (1996).

471 Gurr, supra note 469, at 18.

472 See James Button, The Outcomes of Contemporary Black Protest and Violence, in 2 Violence in America: Protest, Rebellion, Reform, supra note 469, at 286, 288-91; Doug McAdam & Kelly Moore, The Politics of Black Insurgency, 1930-1975, in 2 Violence in America: Protest, Rebellion, Reform, supra note 469, at 255, 271-74.

473 See Button, supra note 472, at 293-94.

474 See id. at 293-94, 297-99, 302-03; McAdam & Moore, supra note 472, at 280-82.

475 See Williams, supra note 2, at 577-81.

476 See discussion supra Part I.B.1.

Compendium_Cornell
Page 1916

477    See Williams, supra note 11, at 924-46.

478    See Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 138-41 (1994).

479    See id.; Cottrol & Diamond, supra note 355, at 323-24.

480    See Cottrol & Diamond, supra note 355, at 324.

481    See Michael Kazin, The Populist Persuasion: An American History 34-42, 52-77 (1995).

482    See, e.g., id. at 1-2; Stock, supra note 470, at 3-5, 8.

483    See, e.g., Kazin, supra note 481, at 2, 7, 14-15, 34-36, 40-41; Stock, supra note 470, at 5-7, 10-13, 128-31, 139-42, 148-49.

484    See, e.g., Kazin, supra note 481, at 21-22.

485    See, e.g., id.; Stock, supra note 470, at 6, 128-30.

486    See, e.g., Kazin, supra note 481, at 4-5, 222-86; Stock, supra note 470, at 152-53.

487    See Kazin, supra note 481, at 34-36; Stock, supra note 470, at 110-11, 131-35, 142.

488    Catherine McNicol Stock powerfully describes this fusion of promise and threat in rural populism:

[T]he roots of violence, racism, and hatred can be and have been nourished in the same soil and from the same experiences that generated rural movements for democracy and equality. In many places and at many times in the American past, the best and worst, the most forgiving and most vengeful, the most egalitarian and most authoritarian, the brightest and darkest visions of American life were alive in the same men's souls, nurtured at the same dinner tables, learned in the same schools, and preached from the same pulpits. Not two sets of beliefs, then, but two expressions of the same beliefs and circumstances bound left and right together in an unwavering, desperate, synthetic embrace.

Stock, supra note 470, at 148.

489    See Kazin, supra note 481, at 34-36. Populism's promise of democracy through a shared civic culture and politically educated citizens is by no means an antiquated idea even today. See Todd Gitlin, The Twilight of Common Dreams: Why America Is Wracked by Culture Wars (1995); Robert D. Putnam, Making Democracy Work: Civic Traditions in Modern Italy (1993); Michael J. Sandel, Democracy's Discontent: America in Search of a Public Philosophy (1996). Indeed, the yoking together of radically disparate cultures into a single majoritarian democracy can be threatening for the minority cultures as well. As the polity breaks down into endless culture wars, cultural majorities simply impose their will. For that reason, American Indians have always maintained that they should have the right to self-government within racially and culturally separate tribes. See David C. Williams, The Borders of the Equal Protection Clause: Indians as Peoples, 38 UCLA L. Rev. 759, 841-50 (1991).

490    See, e.g., Stock, supra note 470, at 6.

491    See supra note 469 and accompanying text.

492    Most recently, this discomfort with populist ideologies has appeared in the very lukewarm reception that civic republicanism has received among outgroup thinkers. See, e.g., Derrick Bell & Preeta Bansal, The Republican Revival and Racial Politics, 97 Yale L.J. 1609 (1988); Brown, supra note 97; Linda K. Kerber, Making Republicanism Useful, 97 Yale L.J. 1663 (1988).

493    See, e.g., Alison M. Jaggar, Feminist Politics and Human Nature 28-34 (1983); Patricia J. Williams, The Alchemy of Race and Rights 146-56 (1991); Richard A. Epstein, The Interior Diaspora, N.Y. Times, Aug. 10, 1997, § 7, at 26 (book review).

494    See, e.g., Stock, supra note 470, at 89, 109-42, 167-76.

495    See generally discussion supra Part II.

496    See Stock, supra note 470, at 163-76.

497    See id.

498    See id. at 124, 128, 131, 140-42, 163, 171.

499    See supra notes 161-207 and accompanying text.

500    See supra notes 270-291, 362-369 and accompanying text.

501    See supra notes 420-421 and accompanying text.

502    See, e.g., Robert J. Spitzer, The Politics of Gun Control 187-97 (1995).

503    See id. at 192.

504    Id.

505    Id. at 195.

506    Bogus, supra note 129, at 1367.

507    Id. at 1388.

508    See Kopel, supra note 35, at 20-46, 59-107.

Compendium_Cornell
Page 1918

509   See, e.g., Karl P. Adler et al., Firearm Violence and Public Health: Limiting the Availability of Guns, 271 JAMA 1281 (1994); Don B. Kates et al., Guns and Public Health: Epidemic of Violence or Pandemic of Propaganda, 62 Tenn. L. Rev. 513 (1995).

510   See Button, supra note 472, at 302. This view is of course premised on the idea that violence may sometimes be an appropriate response to violence. As Sara Ruddick explains, "[a]lthough she will never celebrate violence, a peacemaker may herself act violently in careful, conscientious knowledge of the hurt she inflicts and of its cost to her as well as her victim." Ruddick, supra note 92, at 138.

511   For further amplification of this point, see discussion infra Part III.C.2. Of course, some general attitudes about religion, gender, and race might inevitably lead to violence against outgroups; such attitudes would therefore be inconsistent with the necessary consensus culture.

512   For that reason, I do not believe that my position is necessarily inconsistent with the view of many critical race theorists that racism will never cease and the struggle against it must therefore be perpetual. See, e.g., Derrick Bell, Racial Realism, 24 Conn. L. Rev. 363, 377-78 (1992). It may, however, require a belief that racial conditions can be meaningfully improved--a belief that some critical race theorists may not share. See id. at 373-74.

513   See, e.g., Seymour Martin Lipset, American Exceptionalism: A Double-Edged Sword 31, 50-51 (1996).

514   The Constitution has thus functioned as a kind of civil religion. See Sanford Levinson, Constitutional Faith 9-17 (1988); Thomas C. Grey, The Constitution as Scripture, 37 Stan. L. Rev. 1, 3 (1984).

515   The late Robert Cover strenuously insisted on the importance of paideic subcommunities in the United States; through the creation of nomic traditions, these communities generated law equal in significance and gravity to the state's law. See Robert Cover, Nomos and Narrative, in Cover Essays, supra note 112, at 95, 95-108, 121-28. Indeed, Cover maintained, these communities must generate sacred texts of resistance--tales about the way that the community relates to violence, by the state, other communities, or themselves. See id. at 148-55. Nonetheless, despite this profound respect for nonstate law, Cover also insisted that the state must be jurispathic. See id. at 138-40. In this welter of conflicting legal stories, it must kill some and keep others alive, simply in order to create conditions of peace under which paideic communities can flourish. See id. at 155.

516   See, e.g., Susan H. Williams, Feminist Legal Epistemology, 8 Berkeley Women's L.J. 63, 68-72, 72 n.28 (1993).

517   See, e.g., Walzer, supra note 454, at 87-90.

518   See Cover, supra note 515, at 105, 109, 153-55.

519   I should distinguish this claim--that a shared culture on the organization of violence is necessary for the safety of outgroups--from two other claims that I do not wish to endorse. First, although it is important that we share a single culture on this subject, it is not necessary, indeed perhaps it is undesirable, that that culture be controlled, produced, and limited by the state. In that sense, following Robert Cover, see id., I do not wish to privilege state tales of violence over others. Second, although a shared culture is necessary for the safety of outgroups, outgroups might nonetheless reject even a protective shared culture for reasons other than safety--such as fidelity to a distinct religious tradition. See id. at 121-31, 144-55. In that case, they might reasonably prefer cultural integrity to physical safety, but in such a scenario, the values of safety and integrity are in tension. These outgroup theories of the Second Amendment, by contrast, promise safety as well as integrity through self-arming, and my point is that those promises are misleading.

Compendium_Cornell
Page 1919

520    Again, to use Cover's terminology, the courts must kill some (violent and aggressive) legal stories, so as to create conditions that will allow legal stories in general to flourish; jurispathos is necessary for jurisgenesis. See id. at 155.

521    See, e.g., Thomas Hobbes, Leviathan 228 (C.B. MacPherson ed., Penguin Classics 1985) (1651) ("[A] Commonwealth ... is One Person, of whose Acts a great Multitude, by mutuall Covenants one with another, have made themselves every one the Author, to the end he may use the strength and means of them all, as he shall think expedient, for their Peace and Common Defence." (emphasis omitted)); John Locke, Two Treaties of Government § 90, at 344 (Peter Laslett ed., Cambridge Univ. Press 1960) (1690) ("[T]he end of Civil Society, being to avoid, and remedy those inconveniencies of the State of Nature, which necessarily follow from every Man's being Judge in his own Case, by setting up a known Authority, to which every one of that Society may Appeal ...." (emphasis omitted)); John Rawls, A Theory of Justice 5 (1971) ("If men's inclination to self-interest makes their vigilance against one another necessary, their public sense of justice makes their secure association together possible.").

522    Alternatively, the outgroup theorists might argue that there is a single privileged perspective--the Framers'--that should form the basis for constitutional interpretation, and luckily, both the Framers' and the outgroups' perspectives would lead to the same conclusion, a personal right to arms. Again, this rendition of the outgroups' argument seems untrue to their intent. If the Framers' perspective really does control, then the perspective of outgroups is simply irrelevant in interpreting the Second Amendment--at best an interesting digression, rather than a reason to read the provision in a certain way. Both JPFO and the women and guns movement, moreover, seem entirely uninterested in directly examining the Framers' intent. See discussion supra Part II.A-B. Professors Cottrol and Diamond, who read the Amendment as a protection for hated minorities rather than the right of a revolutionary majority, even acknowledge that the Afro-Americanist perspective would differ from the Framers' perspective. See discussion supra Part II.C.2.

523    See supra notes 364-369 and accompanying text.

524    See supra notes 172-182 and accompanying text.

525    See, e.g., Cass Sunstein, Beyond the Republican Revival, 97 Yale L.J. 1539, 1542-45, 1549-50 (1988).

526    See discussion supra Part III.A.

527    See discussion supra Part III.C.

528    See discussion supra Part III.B.

529    See, e.g., Francis Fukuyama, Trust: The Social Virtues and the Creation of Prosperity 3-57 (1995); Putnam, supra note 489, at 167-80; Adam B. Seligman, The Idea of Civil Society 169-96 (1992).

530    See generally Kevin Toolis, Rebel Hearts: Journeys Within the IRA's Soul (St. Martin's Press 1996).

531    See generally Glenny, supra note 458.

532    See, e.g., Rowan, supra note 128, at 29-35.

533    See, e.g., id.

Compendium_Cornell
Page 1920

534   For a discussion of the centrality of content neutrality to the Supreme Court's interpretation of the First Amendment, see Susan H. Williams, Content Discrimination and the First Amendment, 139 U. Pa. L. Rev. 615 (1991).

535   Cottrol & Diamond, supra note 355, at 357 n.273 (citations omitted).

536   See Pearson, supra note 127, at 110-11.

537   See discussion supra Part III.C.2.b.

538   See, e.g., Robert H. Wiebe, Self-Rule: A Cultural History of American Democracy 15, 72-75 (1995).

539   See supra text accompanying note 163.

540   See supra text accompanying note 321.

541   See Eric Foner, Reconstruction: America's Unfinished Revolution, 1863-1877, at 454-59, 569-75, 582-83, 587-88, 593-95 (1988).

542   See supra text accompanying note 417.

543   In this sense, there is an odd echo of Marxist theory in these outgroup interpretations. Only when state power withers away will humankind find its liberation, free at last of the oppression inevitable in any political system. To be sure, unlike Marxism, these theories are not naive. They imagine that a world of decentralized violence will be bloody and hate-filled. But they assert that it is better than what they believe to be the alternative--trusting the state (or other super individual organizations) for protection and thus giving up hope of personal self-defense.

544   See discussion supra Part II.B.1.c.

545   See, e.g., Okin, supra note 308, at 124.

546   See id. at 111, 124-33.

547   See discussion supra Part III.A.

548   See, e.g., Robert J. Cottrol & Raymond T. Diamond, The Fifth Auxiliary Right, 104 Yale L.J. 995, 1011 (1995) (book review) ("Far from being inferior rights, in the practical constitutional sense, Blackstone understood these auxiliary rights [such as the right to arms] as the mechanisms that protected the subjects' natural or inherent rights."); Faria, supra note 302, at 15 (asserting that the "Second Amendment is the right that secures all others").

549   For an example of such a vision, see Cover, supra note 515, at 101-03.

550   In a few situations, a constitutional right to arms might marginally help outgroups, even in a hate-filled world. First, the state might be internally divided. The courts might seek to protect outgroup rights against a bigoted legislature and executive. That scenario would hold only under the following factual conditions: (1) despite general societal bigotry, the courts are both enlightened and courageous; and (2) despite their bigotry, the political branches will obey the courts'

Compendium_Cornell
Page 1921

orders. Each of those factual conditions seem implausible, and their combination even more so. Recall the Court's failure to protect Japanese-American internees in World War II, see Korematsu v. United States, 323 U.S. 214 (1944), and Andrew Jackson's failure to protect the Cherokee Nation even after the Court had ordered him to do so, see, e.g., 2 John Spencer Bassett, The Life of Andrew Jackson 688-92 (1916).

Second, the state might be chronologically divided. At one point, under an enlightened regime, outgroups stockpile private arms; at a later point, they use them to resist oppression. Again, such a scenario seems implausible. For example, as Professors Cottrol and Diamond themselves explain, Reconstruction governments generally did protect the right of blacks to arms; those arms helped very little when southern governments and white supremacist groups later sought to disarm blacks. See Cottrol & Diamond, supra note 355, at 1326-29.

551    See discussion supra Part II.C.2.

552    See supra text accompanying notes 401-403.

553    This analysis does not directly apply to one type of outgroup armed organization: secessionist movements. I have argued that for their own safety, outgroups must seek to transform the culture of violence; they must seek to convert the bigots, not merely shoot them. Secessionist movements, however, pursue a different strategy altogether. Rather than trying to defend themselves against the culture, they seek to exit it entirely. As a result, they might not need to transform the culture, because they will have left it behind. In their new nation, these outgroup secessionists will no longer be outgroups at all but rather the people around whom the nation is constructed. In this sense, secessionist movements demand a right to arms not so much for old outgroups as for new populisms. In addition, the recognition of a right to arms for secessionist movements would be more historically resonant with the original meaning of the Second Amendment--precisely because outgroup secession would involve the separation of one people from another, as happened in the American War for Independence. Again, in this sense, the demand for secessionist rights is really a populist argument and so consistent with the general cultural tradition of the Second Amendment.

In other words, recognition of a right to the exit option would not undermine the importance of a just consensus culture but strengthen it. Groups pursue the option when they have concluded that the only way to create such a culture is separation. It is hoped that they will then produce a new constitution with more unifying tales. As a result, although I have argued for the general futility of a constitutional right to arms as a protection for outgroups, that argument does not directly apply to the special case of outgroup secessionist movements. Such movements are, however, very rare. Some Native Americans and some African-Americans have demanded separate nationhood. See George M. Fredrickson, Black Liberation: A Comparative History of Black Ideologies in the United States and South Africa 286-90 (1995); Paul Chaat Smith & Robert Allen Warrior, Like a Hurricane: The Indian Movement from Alcatraz to Wounded Knee 217-20, 227-28 (1996). Usually, however, when outgroups arm themselves, they are seeking to secure justice within the United States--as are all of the outgroup theorists that I have discussed above. Even separatists, moreover, cannot safely stake their future on the power of the gun. Even if they somehow managed to achieve independence, they would still be perennially unsafe in the face of a hostile American culture around them. Even these secessionist movements, then, must seek to tell constitutional stories that would create a common culture of justice with the United States citizenry. In other words, they would need the kind of relationship that the United States has with Canada, rather than the kind that the United States has with Central America. I will elaborate this analysis in a future article. See David C. Williams, The Second Amendment and the Sovereign State (unpublished, unfinished manuscript, on file with author).

554    See, e.g., The Federalist No. 10 (James Madison).

555    These same Framers stressed the importance of the armed citizenry but as a populist hedge against tyranny, not as a protection for outgroups. See The Federalist No. 46 (James Madison); Akhil Reed Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1162-75 (1991).

556    See, e.g., U.S. Const. amends. XIII, XIV, XV, XIX.

74 TLNLR 387

End of Document                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# John Joachim Zubly, The Law of Liberty (1775)

[EDITOR'S NOTE:  From:  Frank Moore, ed., *The Patriot Preachers of the American Revolution, with Biographical Sketches, 1766-1783* (n.p.) (1860), pp. 114-142 (text slightly edited).   Editor Moore's footnote:  "This sermon was preached at the opening of the Provincial Congress of Georgia, in 1775, and was published with a dedication to the Earl of Dartmouth."

**Note that the Provincial Congress of Georgia was opened with a sermon; thus these Americans encouraged and promoted Christianity.**]

## THE LAW OF LIBERTY

## [BY JOHN JOACHIM ZUBLY]

*So speak ye, and so do, as they that shall be judged by the law of liberty.*

<div align="right">JAMES 2:12.</div>

There was a time when there was no king in Israel, and every man did what was good in his own eyes.  The consequence was a civil war in the nation, issuing in the ruin of one of the tribes, and a considerable loss to all the rest.

And there was a time when there was a king in Israel, and he also did what was right in his own eyes--a foolish son of a wise father; his own imprudence, the rashness of his young counselors, his unwillingness to redress the grievances of the nation, and the harsh treatment he gave to those who applied for relief, also brought on a civil war, and issued in the separation of the ten tribes from the house of David.  He sent his treasurer to gather an odious duty or tribute, but the children of Israel stoned him that he died; and when he gathered one hundred and fourscore thousand men, that he might bring again the kingdom into Roboam, God sent him a message, "Ye shall not go up, nor fight against your brethren; return every man to his house, for this thing is done of me."  God disapproved of the oppressive measures and ministry of Roboam, and that king's army appears more ready to obey the command of their God, than slay their brethren by orders of a tyrant.  "They obeyed the voice of the Lord, and returned from going against Jeroboam."

The things that happened before are written for our learning.  By comparing past times and proceedings with these that are present, prudence will point out many salutary and religious lessons.  The conduct of Roboam verifies the lamentation of his father, "Woe to

thee, O land, when thy king is a child." A very small degree of justice and moderation might have preserved his kingdom, but he thought weapons of war better than wisdom; he hearkened not, neither to the people, nor to some of his more faithful counselors; and the consequence was, that, instead of enslaving the ten tribes who stood up for their liberty, God gave Judah to be servants to the king of Egypt, that they might learn the difference between his service and the service of the kingdoms of the nations. A people that claim no more than their natural rights, in so doing, do nothing displeasing unto God; and the most powerful monarch that would deprive his subjects of the liberties of man, whatever may be his success, he must not expect the approbation of God, and in due time will be the abhorrence of all men.

In a time of public and general uneasiness, it behooves both superiors and inferiors to consider. It is easy to extinguish a spark; it is folly to blow up discontent into a blaze; the beginning of strife is like the letting out of waters, and no man may know where it will end. There is a rule given to magistrates and subjects, which, if carefully attended to, would secure the dignity and safety of both; but which, if not duly regarded, is usually attended with the worst consequences. The present, my hearers, will easily be allowed is a day of trouble, and surely in this day of adversity we ought to consider. When a people think themselves oppressed, and in danger, nothing can be more natural than that they should inquire into the real state of things, trace their grievances to their source, and endeavor to apply the remedies which are most likely to procure relief. This I take to be the design of the present meeting of persons deputed from every part of the country; and as they have thought proper to open and begin their deliberations with a solemn address unto God, and the consideration of His Holy Word, I most cheerfully comply with their request to officiate on this occasion; and shall endeavor, as I may be enabled, to point out such directions from the Holy Scriptures as may make us wise in the knowledge of time, and direct us how to carry ourselves worthy of the character of good subjects and Christians: whatever may be necessary for this purpose, I take to be comprehended in the apostolic rule, which I have laid down as the subject of this discourse: "So speak, and so do, as they that shall be judged by the law of liberty." There are two things which properly come before us, viz.:

I.   That we are to be judged by the law of liberty; and

II.   The exhortation to act worthily, and under the influence of this important truth on every occasion.

A law is a rule of behavior made under proper authority, and with penalties annexed suitable to deter the transgressions. As all laws suppose man to be in a social state, so all laws ought to be made for the good of man--a law that is not made by such as have authority for so doing, is of no force; and if authority makes laws destructive in themselves, no authority can prevent things from finally taking their natural course.

Wherever there is society, there must also be law; it is impossible that society should subsist without it.  The will, minds, tempers, dispositions, views, and interests of men, are so very different, and sometimes so opposite, that without law, which cements and binds all, everything would be in endless disorder and confusion.  All laws usually wear the complexion of those by whom they were made; but it cannot be denied that some bad men, from a sense of necessity, have made good laws; and that some good men, from mistake, or other weaknesses, have enacted laws bad in themselves, and pernicious in their consequences.

All human laws partake of human imperfection; it is not so with the laws of God; He is perfect, and so are all His works and ways.   "The law of the Lord is perfect, converting the soul.  The testimony of the Lord is sure, making wise the simple.  The statutes of the Lord are right, rejoicing the heart.  The commandment of the Lord is pure, enlightening the eyes.   All His judgments are truth, and righteousness altogether."

Among men every society and country has its own laws and form of government, which may be very different, and cannot operate beyond their limits; but those laws and that form of government are undoubtedly best which have the greatest tendency to make all those that live under them secure and happy.  As soon as we consider man as formed into society, it is evident that the safety of the whole must be the grand law which must influence and direct every other (*Salus populi suprema lex*); men did not pass from a state of nature into a state of society, to render their situation more miserable, and their rights more precarious. That government and tyranny are the hereditary right of some, and that slavery and oppression are the original doom of others, is a doctrine that would reflect dishonor upon God; it is treason against all mankind; it is indeed an enormous faith that millions were made for one; transubstantiation is but a harmless absurdity, compared with the notion of a divine right to govern wrong, or of making laws which are contrary to every idea of liberty, property, and justice.

The law which the apostle speaks of in our text, is not a law of man, but of Him who is the only lawgiver, that can save and condemn, to whom all owe obedience, and whose laws none can transgress with impunity.

Though all the laws that God ever gave unto man are worthy of God, and tend to promote the happiness of those to whom they were given, yet we may observe a very striking variety in the different laws which He gave at different times and to different people.  "He showed his word unto Jacob, his statutes and his judgments unto Israel: he has not dealt so with any other nation."

To the generality of mankind He gave no written law, but yet left not Himself without a witness among them; the words of the law were written in their hearts, their conscience also bearing witness, and their thoughts the meanwhile excusing or else accusing one another; it cannot be said they were without law, while what they were to do, and what they

were to forbear, was written in their hearts.

To Israel, God came with a fiery law in His hands; it was given with the most awful solemnity upon Mount Sinai; and as the sum and substance of all their ceremonial, political, and moral law centered in the ten commandments, so the sum and substance of these are comprehended in love to God and love to man, which, as our Lord Himself informs us, contain all the law and all the prophets.

All manifestations of the will of God have been gradual; and it is probable the means of knowing God will be progressive through different ages, till eternity gives the good man a full sight of God in His immediate presence.   During the dispensation of the Old Testament and the ceremonial law, a spirit of bondage obtained unto fear, the law was a schoolmaster to bring us unto Christ; neither did the law make anything perfect, but the bringing in of a better hope; grace and truth were brought to light by Jesus Christ; and hence the dispensation of the gospel under which we live, is called the law of liberty.

Though there is a manifest distinction between law and gospel, and sometimes these two things are even opposed to one another, yet the doctrine of the gospel, is also called "the law of faith;" partly because it was usual with the Jewish writers to call every doctrine a law, and partly also because the doctrine of the gospel presents us with a rule of life, which all its professors are bound to obey; hence they are said to be "not without law, but under the law of Christ," and hence our apostle speaks of a royal law, which, though we cannot obey in perfection, nor derive any merit from our imperfect obedience, we cannot neglect without danger, nor disobey without showing our disregard to the doctrine of the gospel in general.

It deserves very particular attention, that the doctrine of the gospel is called a law of liberty.  Liberty and law are perfectly consistent; liberty does not consist in living without all restraint; for were all men to live without restraint, as they please, there would be no liberty at all; the strongest would be master, the weakest go to the wall; right, justice, and property must give way to power, and, instead of its being a blessing, a more unhappy situation could not easily be devised unto mankind, than that every man should have it in his power to do what is right in his own eyes; well regulated liberty of individuals is the natural offspring of laws, which prudentially regulate the rights of whole communities; and as laws which take away the natural rights of men are unjust and oppressive, so all liberty which is not regulated by law is a delusive phantom, and unworthy of the glorious name.

The gospel is called a law of liberty, because it bears a most friendly aspect to the liberty of man; it is a known rule, *Evangelium non tollit politias*, the gospel makes no alteration in the civil state; it by no means renders man's natural and social condition worse than it would be without the knowledge of the gospel.  When the Jews boasted of their freedom, and that they never were in bondage, our Lord does not reprove them for it, but only observes, that national freedom still admits of improvement: "If the Son shall make you

free, then are you free indeed." This leads me to observe, that the gospel is a law of liberty in a much higher sense; by whomsoever a man is overcome, of the same he is brought into bondage; but no external enemy can so completely tyrannize over a conquered enemy, as sin does over all those who yield themselves its servants; vicious habits, when once they have gained the ascendancy in the soul, bring man to that unhappy pass, that he knows better things and does worse; sin, like a torrent, carries him away against knowledge and conviction, while conscience fully convinces him that he travels the road of death, and must expect, if he so continues, to take up his abode in hell, though his decaying body clearly tells him sin breaks his constitution, as well as wastes his substance; though he feels the loss of credit and wealth, still sin has too strong a hold of him to be forsaken; though he faintly resolves to break off; yet, till the grace of God brings salvation, when he would do good, evil is present with him; in short, instead of being under a law of liberty, he is under the law of sin and death; but whenever he feels the happy influence of the grace of the gospel, then this "law of liberty makes him free from the law of sin and death:" it furnishes him with not only motives to resist, but with power also to subdue sin; sin reigns no longer in his mortal body, because he is not under the law, but under grace. By this law of liberty he is made free from sin, and has his fruit unto holiness, and the end of it eternal life.

There is another reason why the gospel is called a law of liberty, which is, to distinguish it from the ceremonial law under the Mosaic dispensation; a yoke, of which an apostle says, neither they nor their forefathers were able to bear; it was superadded on account of their transgressions, and suited to the character of a gross and stubborn nation, to whom it was originally given. They were so prone to idolatry, and so apt to forget their God, their notions were so gross and carnal, that a number of external rites and ceremonies became necessary, to put them in mind of Him and to attach them to some degree of His worship and service. This, however necessary, was a heavy burden; it bid them touch not, taste not, handle not; it required of them expensive sacrifices, and a costly and painful service; it was attended with the most fearful threatenings; if any man broke Moses' law, he died under two or three witnesses; and the very spirit they then received, was a spirit of bondage unto fear: whereas the gospel dispensation breathes a spirit of confidence, and under the law of liberty we call upon God, as Abba, Father. By this law of liberty the professors of the gospel will be judged.

Every man is a rational, and therefore accountable creature. As a creature he must needs depend on his Creator; and as a rational creature he must certainly be accountable for all his actions. Nothing is more evident than that man is not of himself; and if once we admit that he holds his existence, his faculties and favors from God that made him, it becomes a very obvious conclusion that his Maker must have had some view in giving him existence, and more understanding than to the beasts of the field, neither can it be a matter of indifference to him whether man acts agreeably or contrary to His designs. The Creator of the natural world is also its moral ruler; and if He is now the proprietor and ruler of intelligent beings, at some time or other He must also be their judge.

If God had not made His will known unto man, there could have been neither transgression nor judgment.  If it should be said that God has not manifested Himself alike unto all men, and that some have much smaller opportunities to know His will and their duty than others, it is enough to observe, that no man will be judged by a rule of which it was impossible he should have any knowledge.   Every work and every man will be brought into judgment, and the judgment of God will never be otherwise than according to truth; but those that never had the law of liberty will not be judged by that law; and those that have been favored with the revelation of the gospel, will be more inexcusable than any others if they neglect the day of their visitation.  "As many as have sinned without law, shall also perish without law; and as many as have sinned in the law, shall be judged by the law."  All men are under some law; they feel, they are conscious, that they are so; the thoughts which already excuse or condemn one another, are in anticipation of a final and decisive judgment, when every man's reward will be according to his works.

That all those who heard and professed to believe the gospel will be finally judged by that, we have the fullest assurance.  God will judge the secrets of men by Jesus Christ according to His gospel: "The word that I have spoken," says Christ, "the same will judge them that heard it on the last day."  It greatly interests us already to know what is the import and consequence of being judged by the gospel as a law of liberty, and it contains the following things:

The general character, all the thoughts, words and actions, together with the general conduct of all those who professed the gospel, will be brought to the test and tried by this rule.  Man's own opinion of himself, the good opinion of others, will here stand him in no stead; his character will not be determined by his external appearance, but by his inward reality.  "Man looketh on the outward appearance, but the Lord looketh on the heart."  The self-righteous Pharisee will be rejected, notwithstanding his fair appearance and boasting; the penitent publican will be received, though he has nothing to plead but "Lord, have mercy on me, a sinner."  The law is spiritual, and no law more so than the law of the gospel; it requires, not merely an external obedience, but an internal conformity to the will of God; it demands truth in the inward part; it looks not only to the actions that are done, but to the principle from which they flow; we must judge of man's inward disposition by his visible action, but God judges of the actions of men according to their invisible spring; thoughts are out of the reach of human cognizance, but they are the first object of divine notice.  There is not a word that drops from our tongue but what our Judge hears; whatever we do, or whatever we neglect, is all under His immediate eye; and He not only attends to our general character, but also to every thought, word, or action, and the prevailing complexion of all these taken together forms our true and real character.

In the judgment, according to this law, our character, words, thoughts, and actions will be brought to the test of this rule, our conduct will be compared with these precepts; this is the balance of the sanctuary in which the professors of the gospel shall be weighed, and as they shall be found approved or deficient, their case must be determined.  Those whose

temper and actions shall be found conformable to the law of liberty, will be acquitted, graciously accepted, and made ever happy; and those who turned the grace of God into wantonness, and made the liberty of the gospel a cloak for their sins, will be finally rejected.  The gospel informs us that a day is already appointed for that purpose; it acquaints us with the person of our Judge, and every circumstance as well as rule according to which He will proceed in judgment.  Perhaps on that day, when all nations shall appear before the Judge, and He will divide them as a shepherd divides His sheep from the goats, distinct places will also be allotted to those who are to be judged by natural conscience and the law of nature, and those who have been favored with a divine revelation, and especially with the light of the gospel: the people of Ninevah will arise against empty professors of the gospel and will condemn them.  Those who have been exalted above others in means and privileges, will sit proportionally lower than those who have made a better improvement of lesser means; and notwithstanding the fondest hope and finest profession, it is a determined rule of the law of liberty, that "except our righteousness shall exceed that of the Scribes and Pharisees, we shall in no case enter into the kingdom of heaven."

It deserves our peculiar attention, that the apostle considers the gospel as a law of liberty, at the same time when he sets it before us as the rule by which we are to be judged.  We are not to imagine, because the gospel is a law of liberty, therefore men will not be judged; on the contrary, judgment will be the more severe against all who have heard and professed the gospel, and yet walked contrary to its precepts and doctrine.  As the transgression of a law of liberty must be more inexcusable than the transgression of a law unjust or oppressive in itself, or even the ceremonial law, which was given only for a certain period, and to answer temporary purposes, so their judgment and doom must be proportionally heavier who have sinned against love and liberty, as well as against power and justice.

According to this law, the fate of men will not only be determined, but sentence will also be put into execution.  God sits on the throne of judgment every day, and judges righteously; but He has moreover appointed a particular day when He will manifest His power and justice before the whole creation; when the dead, both small and great, will stand before God; when those that acted agreeably to the law of liberty will attain the fullness of glory of the freedom of the sons of God, and when He will also take vengeance on all that have not known God, and have not obeyed His holy gospel.  This naturally leads to the second thing proposed, to take a nearer view of the importance of the exhortation: "So speak and so do as they that shall be judged by the law of liberty."

It seems as though the apostle had an eye to some particular branch of the law of liberty, i.e., the love which we owe unto our neighbor, and that his design is to obviate the mistake, as though men might be considered as fulfilling the law of Christ, in paying respect to some of its commands and prohibitions, at the same time that they were entirely regardless of the rest.  He assures them, that "whosoever shall keep the whole law, but shall transgress in one point (e.g., having respect of persons), is guilty of all."  On this principle the apostle builds the general exhortation: "So speak, and so do, as they that shall be judged by the law

of liberty."  This implies,

I.   Be thoroughly convinced of the certainty of a judgment to come, and that it extends to you, to all your thoughts, words, and actions.  There is not any truth of greater moment, nor perhaps more easily forgotten.  The belief or unbelief of this important doctrine must have the most sensible effects.  All the apostles frequently put their hearers in mind of a judgment to come; and there is not any truth more necessary to be frequently inculcated and daily thought on; and wherever this truth is really believed and felt, it will have a constant and natural influence on the behavior of those who truly believe it.

II.   See to it that in judgment you may stand.  All men will be brought into judgment, but few will be able to stand; none will be excused, or be able to withdraw, and only those who have acted worthily will meet with the divine acceptance.  The difference will be amazing, and beyond all conception--an eternity of happiness, which eye has not seen, ear has not heard, and which never entered into the heart of any man, lies on the one side; and despair, misery, and torment on the other.  Those that are able to stand, will meet with the smiles and approbation of their Judge; and to all the rest the King will say: "These mine enemies that would not have me to bear rule over them, bring them here, and slay them before mine eyes."  Those that believe and are convinced of this awful alternative, should certainly make it their care that they may be able to stand in judgment; neither should the persuasion of this only influence their conduct in general, but these words ought to be considered as a rule, which we ought to have constantly before our eyes in all our discourses and every undertaking; we should ever "so speak, and so act, as they that shall be judged by the law of liberty."

I shall draw a few inferences, before I conclude, with a more particular address to the worthy gentlemen at whose request I preach on this occasion.

I.   *The gospel is a law of liberty*.  A late writer (See a tract entitled "Chains of Slavery."  Printed, London, 1775.) asserts, "Every religion countenances despotism, but none so much as the Christian."  This is a very heavy charge against religion in general, but bears hardest on the Christian.  Whether it proceeds from malice, ignorance, or misapprehension, it is needless to determine; but if Christianity be a law of liberty, it must be obvious how ill-grounded is such a charge against it.  It cannot be denied but some Christian writers have written against the rights of mankind.   All those who stand up for unlimited passive obedience and non-resistance, may have given but too much cause for such surmises and suspicions; but the truth is, that both those who make this charge, and those who gave occasion for it, were alike ignorant of the spirit and temper of Christianity; and it may well be doubted whether the vendors of such odious doctrines, who foisted tenets so abominable and injurious to mankind, into the system of Christian religion, have not done that holy religion greater hurt, under the pretense of friendship and defense, than its most bare-faced enemies by all their most violent attacks.  Some Christian divines have taught the enormous faith, that millions were made for one; they have ascribed a divine

right to kings to govern wrong; but what then?  Are such abominable doctrines any part of Christianity, because these men say so?  Does the gospel cease to be a law of liberty, because some of its professors pervert it into an engine of tyranny, oppression, and injustice?

The assertion, that all religion countenances despotism, and Christianity more than any other, is diametrically opposite to fact.   Survey the globe, and you will find that liberty has taken its seat only in Christendom, and that the highest degree of freedom is pleaded for and enjoyed by such as make profession of the gospel.

There are but two religions which are concerned in this charge; the Jewish and the Christian.  Natural religion, writers of this kind I suppose would not include in their charge; if they do, they set all religion at variance with the rights of mankind, contrary to the sense of all nations, who are generally agreed, that, abstractly of a world to come, religion is of real service and necessity to mankind, for their better government and order.

As to the Jewish religion, it seems really strange that any should charge it with favoring despotism, when by one of its express rites at certain times it proclaimed "Liberty throughout the land, to the inhabitants thereof."  It required their kings "not to be lifted up in their hearts above their brethren."  And the whole system of that religion is so replete with laws against injustice and oppression, it pays such an extraordinary regard to property, and gives such a strict charge to rule in justice and the fear of God, and to consider those over whom they judge as their brethren, even when dispensing punishments, and forbids all excess in them, that is is really surprising any one acquainted with its precepts should declare it favorable to despotism or oppression.

The Christian religion, while it commands due respect and obedience to superiors, nowhere requires a blind and unlimited obedience on the part of the subjects; nor does it vest any absolute and arbitrary power in the rulers.  It is an institution for the benefit, and not for the distress, of mankind.  It preaches not only "glory to God on high," but also "peace on earth, and good-will among men."  The gospel gives no higher authority to magistrates than to be "the ministers of God for the good of the subject."  From whence it must surely follow, that their power is to edify, and not to destroy.  When they abuse their authority, to distress and destroy their subjects, they deserve not to be thought ministers of God for good; nor is it to be supposed, when they act so contrary to the nature of their office, that they act agreeably to the will of God, or in conformity to the doctrine of the gospel.

The gospel recommends unto masters to forbear threatenings, and to remember that they also have a Master in heaven.  It assures them that the eye of God is equally upon the servant and the master, and that with God there is no respect of persons.  It commands masters, from the most solemn considerations, to give unto servants that which is just and equal.  It says to the meanest [lowest] slave: "Art thou called, being a servant?  care not for

it; but if thou mayest be made free, use it rather."

The doctrine of the gospel has that regard to property, that it commands even soldiers: "Do violence to no man, and be content with your wages."

[* * * * *]

From the same spirit of justice, a Zaccheus, after his conversion, restored fourfold what before he had taken from any by false accusation.  Surely, then, the spirit of the gospel is very friendly to the rights and property of men.

The gospel sets conscience above all human authority in matters of faith, and bids us to stand fast in that liberty wherewith the Son of God has made us free.  Freedom is the very spirit and temper of the gospel: "He that is called in the Lord, being a servant, is the Lord's freeman.  Ye are bought with a price; be ye not the servants of men."  At the same time that it commands us to submit to every ordinance of men, it also directs us to act "as free, and not using liberty as a cloak of maliciousness, but as the servants of God."  Those, therefore, that would support arbitrary power, and require an unlimited obedience, in vain look for precedents or precepts for such things in the gospel--an institution equally tending to make men just, free, and happy here, and perfectly holy and happy hereafter.

II.   *The main design of the gospel is not to direct us in our external and civil affairs, but how we may at last stand with comfort before God, the Judge of all.*

Human prudence is to be our guide in the concerns of time; the gospel makes us wise unto salvation, and points out the means to be pursued, that it may be well with us in the world to come.  As rational creatures, we are to make use of our reason; as Christians, we are to repent and believe the gospel.  Motives of a worldly nature may very properly influence us in our worldly concerns; we are created not only for eternity, but also for time; it is not at all improper for us to have a due regard for both.  The gospel will regulate our desires and restrain our passions as to earthly things, and will raise us at the same time above time and sense, to objects of a nature more worthy of ourselves.  A due regard for, and frequent meditation on, a judgment to come, will greatly assist us in all our concerns; and this very consideration the gospel holds out to us in the clearest manner.  It not only affirms as a truth what reason and conscience might consider only as probable, but it takes away as it were the veil from between us and things to come; it gives us a present view of the future bliss of saints, and the terrors and despair of sinners--rather an historical account than a prophetic description of all the proceedings of the dreadful day; it clearly points out the road to destruction, and the way to escape; it affords us a plain and general rule to obtain safety and comfort, when it bids us "So speak, and so do, as they that shall be judged by the law of liberty."

This general rule may also be of considerable service in extraordinary and particular cases.  It is impossible to provide express directions for every particular case; and in the

course of things, circumstances may happen when a good man may be at a loss to know his duty, and find it difficult so to act as to obtain his own approbation. There may be danger of going beyond, and danger in not coming up to the mark.  To act worthy of God, who has called us, is the general rule of the Christian at all times, and upon every occasion; and did we but always follow this rule, what manner of persons should we then be!  But in cases of intricacy, we may still be in doubt what may be most for the glory of God, and most consistent with our duty.  Sometimes, also, our relative duties may seem to come in competition with one another, and we may hesitate in our own mind which for the present has the strongest call.  We should fain obey our superiors, and yet we cannot think of giving up our natural, our civil and religious rights, nor acquiesce in or contribute to render our fellow creatures or fellow citizens slaves and miserable.  We would willingly follow peace with all men, and yet would be very unwilling that others should take the advantage of a pacific disposition to injure us in hopes of doing it with impunity.  We would express duty, respect, and obedience to the king, as supreme, and yet we would not wish to strengthen the hands of tyranny, nor call oppression lawful: in such a delicate situation, it is a golden rule, "So to speak, and so to do, as they that shall be judged by the law of liberty." Nothing has a greater tendency to make men act wrong than the disbelief of a future judgment; and nothing will more effectually restrain and direct them than the full persuasion that such an event will certainly take place; nothing would have a happier tendency to make us act with prudence, justice, and moderation, than the firm persuasion that God will bring every work into judgment, and every secret thing, whether it be good or bad.

   Neither could I think on any direction more applicable to the design of our present meeting, or which I might more properly recommend to the respectable gentlemen now met together to consult on the recovery and preservation of the liberties of America, and who choose to begin their deliberations with a solemn act of worship to Almighty God, who has established government as His ordinance, and equally abhors licentiousness and oppression, whose singular blessing it is if subjects enjoy a righteous government, and under such a government lead a quiet and peaceable life in all godliness and honesty.

   You are met, gentlemen, in a most critical time, and on a most alarming occasion, not in a legislative capacity, but (while the sitting of the usual representatives is not thought for the king's service, or necessary for the good of this province) you are chosen by the general voice of this province to meet on their behalf, to consult on such measures as in our local circumstances may be most to the real advantage, and tend to the honor of our sovereign, as well as the good and safety of this province, and of all this great continent.  For the sake of the auditory [audience], I shall briefly state the immediate causes that have given rise to this provincial and a general American Congress, and then offer such humble advice as appears to me most suitable to our circumstances.

   To enforce some acts for laying on a duty to raise a perpetual revenue in America, which the Americans think unjust and unconstitutional, which all America complains of, and

some provinces have in some measure opposed,* a fleet and army have been sent to New England, and, after a long series of hardships by that province patiently endured, it is now out of all question that hostilities have been commenced against them; blood has been shed, and many lives have been taken away; thousands, never so much as suspected of having any hand in the action which is made the pretense of al the severity now used against that province, have been and still are reduced to the greatest distress.  From this, other provinces have taken the alarm; an apprehension of nearer foes, not unlikely to appear as auxiliaries in an unjust cause, has thrown our neighbors into arms; how far and wide the flame so wantonly kindled may be permitted to spread, none can tell; but in these alarming circumstances the liberty of this continent, of which we are a part, the safety and domestic peace of this province, will naturally become a subject of your deliberations; and here I may well adopt the language of old: "There was no such deed done nor seen, from the day that America was first settled unto this day; consider of it, take advice, and speak your minds."   I mean not to anticipate and direct your counsels; but, from your desire I should speak on this occasion, I take it for granted, you will permit me to offer such hints as may appear suitable to the place and design of our present meeting.

(* This opposition in some provinces consisted in sending the tea on which this duty was to be paid back, to England; not suffering it to be sold or landed, in others; and in Boston, when they were prevented from sending it back, it was entirely destroyed, but no person hurt, nor any blood shed.)

In the first place, as there is no evil in a city in which the hand of God may not be seen, so in vain is salvation looked for from the hills and from the mountains, but can come from Him only who has made heaven and earth.   This, undoubtedly, is a day of trouble, but God says to His people, "Call upon me in a day of trouble, and I will deliver thee."  "What nation has God so nigh unto them, as the Lord our God is in all things that we call upon him for."   If this be our first step, if, first of all, we look unto Him from whom our help comes, we may hope all will be well at last.  Let us be thoroughly convinced of this, we must stand well with God, else it can never be well with us at all; without Him and His help we can never prosper.  The Lord is with you if you are with Him: "if you seek him, you will find him; but if you forsake him, you will be forsaken by him."   If God be for us, who can be against us?  If He be against us, who can be for us?  Before we think on, or look anywhere else, may our eyes be unto God, that He may be gracious unto us.  Let us humbly confess and speedily turn from our sins, deprecate His judgment, and secure His favor.  "Rend your hearts, and not your garments, and turn unto the Lord your God, for he is gracious and merciful, slow to anger and of great kindness, and repenteth him of the evil; who knoweth if he will return and repent, and leave a blessing behind him, even a meat-offering and a drink-offering unto the Lord your God."

Let it be a standing rule with every one that is to sit in council upon this occasion, "so to speak, and so to do, as one that is to be judged by the law of liberty."  Let us most carefully avoid every thing that might make us incur the displeasure of God, and wound our own

consciences.  The effects of your deliberation may become very serious and extensive, and the consequences extremely important: think, therefore, before you speak, deliberate before you execute, and let the law of liberty, by which you are hereafter to be judged, be the constant rule of all your words and actions.  Far be it from us to be reduced under laws inconsistent with liberty, and as far to wish for liberty without law; let the one be so tempered with the other, that when we come to give our account to the Supreme Lawgiver, who is the great Judge of all, it may appear we had a due regard to both, and may meet with His approbation.

Such always has been, and such is still the attachment of America to the illustrious House of Hanover, that I need not put you in mind of our duty to the king as supreme.  By our law, the king can do no wrong.  But of his present majesty, who is universally known to be adorned with many social virtues, may we not justly conclude, that he would not do any wrong, even though he could?   May we not hope, that when the truth of things, the tears of his suffering subjects, the distress caused by acts extremely ill-advised, once reach his notice, a generous pity will force his heart, and that pity, when he feels it, will command redress?   "The heart of the king is in the hand of the Lord, as the rivers of water, and he turneth it as he pleaseth." (Prov. 21:1.)  Most earnestly, therefore, let us pray, that in this great and most important matter also, God may give unto the king an understanding heart, that power may be governed by wisdom, and the wheels of government roll on with justice and moderation.

Should you think that all our present distress is owing to evil counselors, nothing need to hinder you from praying that God would turn their counsels into foolishness; you may make it your earnest request, both in public and in private, that the wicked being removed from before the king, his throne may be established in righteousness; that the rod of the oppressor may be broken, and justice and equity take place of tyranny and oppression.

It may be owing to nothing but the firm attachment to the reigning family, that so many Americans look upon the present measures as a deep-laid plan to bring in the Pretender.  Perhaps this jealousy may be very groundless; but so much is certain, that none but Great Britain's enemies can be gainers in this unnatural contest. *

(* Were it designed to give the Pretender an opportunity; to raise divisions in Great Britain, starve the manufacturers, send away troops from Ireland and Scotland, and breed civil war in America, must all be circumstances too favorable, and, I may say, very tempting, to promote such a project.)

Never let us lose out of sight that our interest lies in a perpetual connection with our mother country.  Notwithstanding the present unwise and harsh measures, there are thousands in Great Britain that think with us, and wish well to the American cause, and make it their own; let us convince our enemies that the struggles of America have not their rise in a desire of independence, but from a warm regard to our common constitution, that

we esteem the name of Britons, as being the same with freemen; let every step we take afford proof how greatly we esteem our mother country, and that, to the wish of a perpetual connection, we prefer this only consideration, that we may be virtuous and free.*

(* The idea of a separation between America and Great Britain is big with so many and such horrid evils, that every friend to both must shudder at the thought.  [***] But what America detests as the greatest evil, a British ministry has taken the greatest pains to effect; has wasted British blood and treasure to alienate America and Great Britain; the breach is growing wider and wider, it is become like a great sea; every moment is a loss that is not improved toward bringing about a reconciliation.)

Let me entreat you, gentlemen, think coolly, and act deliberately; rash counsels are seldom good ones.  Ministerial rashness and American rashness can only be productive of untoward compounds.  Inconsiderable measures framed on the other side of the Atlantic, are the cause of all our mischiefs; and it is not in the least probable that inconsiderate measures in America can be productive of any good. Let nothing be done through strife and vainglory; let no private resentment nor party zeal disgrace your honest warmth for your country's welfare; measures determined on by integrity and prudence, are most likely to be carried into execution by steadiness and moderation.  Let neither the frowns of tyranny, nor the pleasure of popularity, sway you from what you clearly apprehend just and right, and to be your duty.   Consider how much lies at stake; how greatly your religion, your liberty, your property, your posterity, are interested.  Endeavor to act like freemen, like loyal subjects, like real Christians, and you will "so speak and so act, as they that shall be judged by the law of liberty."  Act conscientiously, and with a view to God, then commit your ways to Him; leave the event with God, and you will have great reason to hope that the event will be just, honorable, and happy.

And now, gentlemen, you have the wishes and prayers of every thoughtful person, that your deliberations may be carried on with candor, unanimity, and prudence; may be blessed to preserve the quietness of this province, and cooperate in restoring the rights and tranquility of all America, as well as promote the prosperity of the whole British empire. This will afford you a heart-felt satisfaction, and transmit your name to posterity with honor, when all those who had opposite views, and sought their greatness in the ruin of others, will be held in abhorrence and detestation.

I have but a few hints to give to my hearers in general.

The times are evil; this is a day of adversity, and in a time of adversity we ought to consider.  It may, perhaps, soon become impossible, even to the most indolent, to continue unconcerned; and those that wish no more than to hide themselves in quiet obscurity, may not always have it in their power to remain neuter [neutral].  To know the signs of the times is a considerable part of human prudence; and it is a still greater to walk circumspectly, and redeem the time, because the days are evil.  Whatever part you may think yourselves

obliged to take, "so speak, and so do, as they that shall be judged hereafter, and judged by the law of liberty."

In these times of confusion I would press on my hearers a most conscientious regard to the common laws of the land.  Let our conduct show that we are not lawless; by well-doing let us put to silence the reproaches of our adversaries.  Let us convince them that we do not complain of law, but of oppression; that we do not abhor these acts because we are impatient to be under government, but being destructive of liberty and property, we think them destructive also of all law.  Let us act "as free, and yet not make liberty a cloak of maliciousness, but as the servants of God."

While it is yet peace and quietness with us, let us not think ourselves inaccessible to the evils which are already come upon others; there are some evils which we would rather deprecate in private than speak of in public, against which being forewarned, we should be forearmed; every trifling report should not alarm us, but it would be folly still greater not to be on our guard against sudden dangers.

Remember them that suffer adversity, as being yourselves also in the body.  Think on those who are driven from their habitations and all their conveniences of life, or confined in their own houses by an enraged soldiery, to starve in their own country in the midst of property and plenty, not permitted to enjoy their own, and distressed in every connection, and this without any cause alleged against numbers of them, without complaint, suspicion, or a legal trial; the like was never heard since the cruel siege of Londonderry, and is a species of cruelty at which even that hard-hearted bigot James II relented.

Above all, let everyone earnestly pray, that He that is higher than the highest would soon make a righteous end of all their confusion; that He would incline the king to hear the cries of his subjects, and that no more innocent blood may be shed in America.

One thing more.  Consider the extreme absurdity of struggling for civil liberty, and yet to continue slaves to sin and lust.   "Know ye not to whom ye yield yourselves servants to obey?  his servants ye are to whom ye obey, whether of sin unto death, or of obedience unto righteousness."  Cease from evil, and do good; seek peace and pursue it: who will hurt you while you follow that which is good?  Become the willing servants of the Lord Jesus Christ; hearken to and obey the voice of His gospel, for "where the spirit of the Lord is, there is liberty;" and "if the Son makes you free," then, and not till then, "shall you be free indeed."

---

*DISCLAIMER: This website is for information purposes only. It is not intended as legal advice. This website cannot guarantee the accuracy or completeness of the materials herein. For the official version of quoted or reproduced decisions/documents, see the original source.*

---

Historical Biographies - Belcher Bulletin - Publications - Belcher History Center

About Governor Jonathan Belcher - About the Belcher Foundation - Copyright/Disclaimer - Site Index

# LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS



# Federal Assault Weapons Ban: Legal Issues

**Vivian S. Chu**
Legislative Attorney

February 14, 2013

**Congressional Research Service**

7-5700
www.crs.gov
R42957

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Summary

In the 113th Congress, there has been renewed congressional interest in gun control legislation. On January 16, 2013, President Obama announced his support for legislation on gun control, including a ban on certain semiautomatic assault firearms and large capacity ammunition feeding devices. Senator Dianne Feinstein introduced S. 150, the Assault Weapons Ban of 2013, which would prohibit, subject to certain exceptions, the sale, transfer, possession, manufacturing, and importation of specifically named firearms and other firearms that have certain features, as well as the transfer and possession of large capacity ammunition feeding devices. Representative Carolyn McCarthy introduced a companion measure, H.R. 437, in the House of Representatives. S. 150 is similar to the Assault Weapons Ban of 1994 (P.L. 103-322) that was in effect through September 13, 2004.

The Assault Weapons Ban of 1994 was challenged in the courts for violating, among other things, the Equal Protection Clause and the Commerce Clause. This report reviews the disposition of these challenges. It also discusses Second Amendment jurisprudence in light of the Supreme Court's decision in *District of Columbia v. Heller* and how lower courts have evaluated state and local assault weapons bans post-*Heller*.

# Contents

Introduction ........................................................................................................................ 1

Gun Control Act of 1968 .................................................................................................... 1

    Restrictions on Sales .................................................................................................... 2

    Restrictions on Interstate Transfers ............................................................................ 2

The 1994 Assault Weapons Ban ......................................................................................... 3

    Banned Weapons and Exemptions ............................................................................... 4

    Importation of Assault Weapons Under 18 U.S.C. §925(d)(3) ................................... 5

        S. 150 and H.R. 437 Assault Weapons Ban of 2013 .......................................... 6

Legal Challenges to the 1994 Assault Weapons Ban ......................................................... 7

    Commerce Clause ........................................................................................................ 7

    Equal Protection Clause ............................................................................................... 9

Second Amendment Consideration ................................................................................... 11

# Contacts

Author Contact Information ............................................................................................... 14

Acknowledgments ............................................................................................................. 14

Compendium_Cornell
Page 1943

# Introduction

At the outset of the 113th Congress, there has been renewed congressional interest in gun control legislation. Senator Dianne Feinstein introduced S. 150, the Assault Weapons Ban of 2013, which would prohibit, subject to certain exceptions, the sale, transfer, possession, manufacturing, and importation of specifically named firearms and other firearms that have certain features, as well as the transfer and possession of large capacity ammunition feeding devices. Representative Carolyn McCarthy introduced a companion measure, H.R. 437, in the House of Representatives. S. 150 is similar to the Assault Weapons Ban of 1994 that was in effect through September 13, 2004.[1] As Congress considers S. 150 and other gun control measures, it may be useful to review the 1994 law and its relation to federal firearms law, as well as the disposition of the legal challenges to the ban.

# Gun Control Act of 1968

Congress enacted the Gun Control Act of 1968[2] (GCA or Act) to "keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the states and their subdivisions in combating the increasing prevalence of crime in the United States."[3] The GCA establishes a comprehensive statutory scheme that regulates the manufacture, sale, transfer, and possession of firearms and ammunition.[4]

In particular, the GCA establishes nine classes of individuals who are prohibited from shipping, transporting, possessing, or receiving firearms and ammunition.[5] The individuals targeted by this provision include (1) persons convicted of a crime punishable by a term of imprisonment exceeding one year; (2) fugitives from justice; (3) individuals who are unlawful users or addicts of any controlled substance; (4) persons legally determined to be mentally defective, or who have been committed to a mental institution; (5) aliens illegally or unlawfully in the United States, as well as those who have been admitted pursuant to a nonimmigrant visa; (6) individuals who have been discharged dishonorably from the Armed Forces; (7) persons who have renounced United States citizenship; (8) individuals subject to a pertinent court order; and, finally, (9) persons who have been convicted of a misdemeanor domestic violence offense.[6]

When the GCA was enacted, the transfer and sale of ammunition appear to have been regulated in the same manner as firearms. In 1986, Congress passed the Firearm Owners' Protection Act[7]

---

[1] P.L. 103-322 (1994).

[2] P.L. 90-618 (1968).

[3] S. Rept. No. 90-1097 (1968).

[4] 18 U.S.C. §§922 *et seq.*

[5] 18 U.S.C. §922(g).

[6] The GCA also prohibits the receipt, transport, or shipment of firearms or ammunition by individuals under felony indictment. 18 U.S.C. §922(n). Furthermore, the GCA places significant restrictions on the transfer to, and possession of, firearms by persons under the age of 18. *See* 18 U.S.C. §922(x).

[7] P.L. 99-308 (1986).

Compendium_Cornell
Page 1944

(FOPA), which repealed many of the regulations regarding ammunition. Consequently, the transfer and sale of ammunition is not as strictly regulated as the transfer and sale of firearms.[8]

## Restrictions on Sales

In order to effectuate the general prohibitions outlined above, the GCA imposes significant requirements on the transfer of firearms. Pursuant to the Act, any person who is "engaged in the business"[9] of importing, manufacturing, or dealing in firearms must apply and be approved as a Federal Firearms Licensee (FFL).[10] FFLs are subject to several requirements designed to ensure that a firearm is not transferred to an individual disqualified from possession under the Act. For example, FFLs must verify the identity of a transferee by examining a government-issued identification document bearing a photograph of the transferee, such as a driver's license;[11] conduct a background check on the transferee using the National Instant Criminal Background Check System (NICS);[12] maintain records of the acquisition and disposition of firearms;[13] report multiple sales of handguns to the Attorney General;[14] respond to an official request for information contained in the licensee's records within 24 hours of receipt;[15] and comply with all other relevant state and local regulations.[16]

Not all sellers of firearms are required to be approved FFLs, however. The GCA contains a specific exemption for any person who makes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."[17] Although private sellers are not required to conduct a background check or maintain official records of transactions under federal law, they are prohibited from transferring a firearm if they know or have reasonable cause to believe that the transferee is a disqualified person.[18]

## Restrictions on Interstate Transfers

In addition to the requirements imposed upon the sale of firearms by FFLs and non-FFLs (or private individuals) generally, federal law also places significant limitations on the actual interstate transfer of weapons. Although FFLs have the ability to sell and ship firearms in interstate or foreign commerce, the GCA places several restrictions on the manner in which a transfer may occur. Specifically, while FFLs may make an in-person, over-the-counter sale of a

---

[8] *See* CRS Report R42687, *Internet Firearm and Ammunition Sales*, by Vivian S. Chu.

[9] "Engaged in the business" means one who "devotes time, attention, and labor" to manufacturing, importing, or dealing firearms "as a regular course of trade or business with the principal objective of livelihood and profit." 18 U.S.C. §§921(a)(21)-(22).

[10] 18 U.S.C. §922(a); §923.

[11] 18 U.S.C. §922(t)(1)(c).

[12] 18 U.S.C. §922(t).

[13] 18 U.S.C. §923(g)(1)(A).

[14] 18 U.S.C. §923(g)(3)(A).

[15] 18 U.S.C. §923(g)(7).

[16] 18 U.S.C. §§922(b)(2), 923(d).

[17] 18 U.S.C. §921(a)(21)(C).

[18] 18 U.S.C. §§922(d), (t).

Compendium_Cornell
Page 1945

long gun (i.e., shotgun or rifle) to any qualified individual regardless of her state of residence,[19] they may only sell a handgun to a person who is a resident of the state in which the dealer's premises are located.[20] Relatedly, FFLs are prohibited from shipping firearms, both handguns and long guns, directly to consumers in other states.[21] Instead, FFLs making a firearm sale to a non-resident must transfer the weapon to another FFL that is licensed in the transferee's state of residence and from whom the transferee may obtain the firearm after passing the required NICS background check.[22]

Firearm transfers between non-FFL sellers are also strictly regulated. Specifically, whereas FFLs may transfer a long gun to any individual regardless of her state of residence in an over-the-counter sale, the GCA specifically bars a non-FFL from directly selling or transferring any firearm to any person who is not a resident of the state in which the non-FFL resides.[23] Instead, interstate transactions between non-FFLs result in the transferring party shipping the firearm to an FFL located in the transferee's state of residence.

# The 1994 Assault Weapons Ban

Congress enacted, as part of the Violent Crime Control and Law Enforcement Act of 1994, the Public Safety and Recreational Firearms Act (referred to as the "Assault Weapons Ban"), which established a 10-year prohibition on the manufacture, transfer, or possession of "semiautomatic assault weapons," as defined by the act, as well as large capacity ammunition feeding devices.[24] The act contained several exceptions, including a "grandfather clause" allowing for the possession of such items that were otherwise lawfully possessed on the date of enactment. The Assault Weapons Ban expired on September 13, 2004.[25]

Generally speaking, an "assault weapon" is considered to be a military style weapon capable of providing by a selector switch either semiautomatic—that is, the firearm discharges one round, then loads a new round, each time the trigger is pulled until the magazine is exhausted—or a fully automatic firearm—that is, continuous discharge of rounds while the trigger is depressed until all rounds are discharged. Under federal law, a fully automatic firearm falls under the definition

---

[19] 18 U.S.C. §922(b)(3)(A).

[20] 18 U.S.C. §922(b)(3).

[21] 18 U.S.C. §922(a)(2). Regarding the mailing of firearms, federal law prohibits the shipment of any firearm other than a shotgun or rifle via the United States Postal Service, except for firearms shipped for official law enforcement purposes. 18 U.S.C. §1715. Firearms, including handguns, may be shipped by common carrier (*e.g.*, FedEx or UPS) upon disclosure and subject to the restrictions discussed above. *See* 18 U.S.C. §922(a)(2)(A); §922(3); 27 C.F.R. §178.31.

[22] 18 U.S.C. §922(b)(3); §922(t).

[23] 18 U.S.C. §922(a)(3); §922(a)(5); §922(b)(3).

[24] P.L. 103-322, Title XI (1994). The 1994 ban marked only the second time that Congress has prohibited the manufacture of specific firearms. The Undetectable Firearms Act of 1988 (P.L. 100-649 (1988)) bans the manufacture, importation, possession, transfer, or receipt of firearms that are undetectable by metal detectors at security checkpoints at certain locations. 18 U.S.C. §922(p).

[25] Prior to its expiration in 2004, several bills were introduced that would strike the expiration date and impose a ban in the importation on large capacity ammunition feeding devices, subject to the same exceptions, or make other amendments to the 1994 law that was in effect. *See* S. 1034, Assault Weapons Reauthorization Act of 2003 (108th Cong. 1st sess.); H.R. 2038, Assault Weapons Ban and Law Enforcement Protection Act of 2003 (108th Cong., 1st sess.), and S. 1431, the Assault Weapons Ban and Law Enforcement Protection Act, (108th Cong., 1st sess.).

---

Compendium_Cornell
Page 1946

"machinegun," which is defined as "any weapon that shoots ... automatically more than one shot, without manual reloading, by a single function of the trigger."[26] Semiautomatic firearms, including semiautomatic assault weapons, are "produced with semiautomatic fire capability only."[27]

## Banned Weapons and Exemptions

The 1994 act made it "unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon."[28] Weapons banned were identified either by specific make or model (including copies or duplicates thereof, in any caliber), or by specific characteristics that slightly varied according to whether the weapon was a pistol, rifle, or shotgun.[29]

For example, a semiautomatic rifle fell under the term "semiautomatic assault weapon" if it had the ability to accept a detachable magazine and possessed two of the following five features: (1) a folding or telescopic stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a bayonet mount; (4) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; or (5) a grenade launcher. *See* Former 18 U.S.C. §921(a)(30)(B).

For the feature-based definition semiautomatic pistols and semiautomatic shotguns that would be included under the term "semiautomatic assault weapon." *See* Former 18 U.S.C. §§921(a)(30)(C), (D).

The act also made it unlawful to transfer and possess large capacity ammunition feeding devices (LCAFD).[30] An LCAFD was defined as "any magazine, belt, drum, feed strip, or similar device manufactured after the date [of the act] that has the capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition."[31] LCAFDs manufactured after the date of enactment were required to have a serial number that "clearly shows" that they were manufactured after such date, as well as other markings prescribed by regulation.[32]

The 1994 act included a grandfather clause and therefore allowed for the transfer of any "semiautomatic assault weapon" or LCAFD that was otherwise lawfully possessed on the date of

---

[26] *See* 26 U.S.C. §5845. Since 1934, the National Firearms Act has regulated the traffic in, and possession of, machineguns, other weapons and destructive devices. 26 U.S.C. §§5801 *et seq.*

[27] Public Safety and Recreational Firearms Use Protection Act, Hearing Before the H. Comm. on the Judiciary, 103d Cong. at 18 (H. Rept. 103-489).

[28] Former 18 U.S.C. §922(v).

[29] Former 18 U.S.C. §921(a)(30). Specific models included: the Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models); Action Arms Israel Military Industries UZI and Galil; Beretta Ar70 (SC-70); Colt AR-15; Fabrique National FN/FAL, FN/LAR, and FNC; Steyr AUG; INTRATEC TEC-9 TEC-DC9 and TEC-22; and revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12. Former 18 U.S.C. §921(a)(30)(A).

[30] Former 18 U.S.C. §922(w).

[31] Former 18 U.S.C. §921(31). The term did not include an attached tubular device designed to accept and capable of operating only with .22 caliber rimfire ammunition.

[32] 18 U.S.C. §923(i) (as amended by P.L. 103-322). The Bureau of Alcohol, Tobacco, Firearms and Explosives issued regulations requiring that LCAFDs manufactured or imported under the act be identified with a serial number, and domestically manufactured devices bear the name, city, and state of the manufacturer. Imported devices were required to bear the manufacturer and country of origin as well as the name of the importer. Finally, LCAFDs manufactured after September 13, 1994 to be exempted by the ban were required to be marked "RESTRICTED LAW ENFORCEMENT/GOVERNMENT USE ONLY," or, in the case of devices manufactured for export (since July 5, 1995) "FOR EXPORT ONLY." 27 C.F.R. §478.92(c).

Compendium_Cornell
Page 1947

enactment.[33] Additionally, Congress exempted roughly 650 types or models of firearms, such as various models of Browning, Remington, and Berettas, deemed mainly suitable for target practice, match competition, hunting, and similar sporting purposes.[34] This list was not exhaustive and the act provided that the absence of a firearm from the exempted list did not mean it was banned unless it met the definition of "semiautomatic assault weapon." The act also exempted any firearm that (1) is manually operated by bolt, pump, lever, or slide action; (2) has been rendered permanently inoperable; or (3) is an antique firearm. The act also did not apply to any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition nor any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed of detachable magazine.[35]

Furthermore, there were exemptions that permitted semiautomatic assault weapons and LCAFDs to be manufactured for, transferred to, and possessed by law enforcement and for authorized testing or experimentation purposes. The other exemptions included a transfer for purposes of federal security pursuant to the Atomic Energy Act, as well as possession by retired law enforcement officers who are not otherwise a prohibited possessor under law.[36]

## Importation of Assault Weapons Under 18 U.S.C. Section 925(d)(3)

The 1994 Assault Weapons Ban did not address the importation of semiautomatic assault weapons, rather Section 925(d)(3) of the GCA provides that the Attorney General[37] shall authorize a firearm or ammunition to be imported or brought into the United States if it does not meet the definition of a firearm under the National Firearms Act,[38] and is "generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military rifles." Notably, the statute does not specifically describe or list any criteria that the Attorney General is required to take into consideration when determining what constitutes "suitable for or readily adaptable to sporting purposes." This provision permitting the importation of firearms is generally known as "the sporting purposes test," and its implementation appears to be left to the Attorney General's discretion.

Prior to the implementation of the 1994 Assault Weapons Ban, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) identified several semiautomatic assault rifles that it determined did not meet the sporting suitability standard of Section 925(d)(3). On July 6, 1989, ATF prohibited importation of these rifles.[39] This decision was, in part, based on ATF's finding that "these rifles have certain characteristics that are common to modern military assault rifles and that distinguish them from traditional sporting rifles."[40] Subsequent to this decision, domestic

---

[33] Former 18 U.S.C. §§922(v)(2); (w)(2).

[34] Former 18 U.S.C. §922(v)(3).

[35] Former 18 U.S.C. §922(v)(3)(B)-(D).

[36] Former 18 U.S.C. §922(4).

[37] It should be noted that the Homeland Security Act of 2002 transferred the Bureau of Alcohol, Tobacco, Firearms and Explosives to the Department of Justice from the Department of Treasury. P.L. 107-296, Title XI, Subtitle B, §1111 (2002).

[38] 26 U.S.C. §5845(a).

[39] *See* 1989 Study on ATF's website; *see also* Bureau of Alcohol, Tobacco, Firearms and Explosives, "Federal Firearms Reference Guide," General Information Question 20 at 167-68 (2005).

[40] *See* Federal Firearms Reference Guide, *supra* note 39.

Compendium_Cornell
Page 1948

manufacturing of semiautomatic assault weapons reportedly increased, and foreign manufacturers reportedly "circumvented the strictures of the [1989] ban [under President Bush] by reconfiguring their weapons and shipping them out under different models," as well as attempting to give the weapons a sporting appearance.[41]

The enactment of the 1994 Assault Weapons Ban addressed these developments to a certain degree; however, ATF subsequently determined in 1997 that certain semiautomatic assault rifles could no longer be imported even though they were permitted to be imported under the 1989 "sporting purposes test" because they had been modified to remove all of their military features other than the ability to accept a detachable magazine. Accordingly, on April 6, 1998, ATF prohibited the importation of 56 such rifles, determining that they did not meet the "sporting purposes test."

## S. 150 and H.R. 437 Assault Weapons Ban of 2013

S. 150, the Assault Weapons Ban of 2013, was introduced by Senator Dianne Feinstein in the 113th Congress. A companion measure, H.R. 437, was introduced by Representative Carolyn McCarthy in the House of Representatives. S. 150 would establish a regulatory scheme for "semiautomatic assault weapons" similar to the 1994 law with a few differences. First, it would ban approximately 157 specifically named firearms and any copies, duplicates, or variants thereof. It differs from the 1994 law because a semiautomatic firearm would be considered a "semiautomatic assault weapon" if it accepts a detachable magazine and has any one of five features (compared to two of five features in the 1994 law). The features listed in S. 150 are slightly different than those listed in the 1994 law. The bill also further provides definitions for each of the features listed.

---

For example, under S. 150, a semiautomatic rifle would fall under the term "semiautomatic assault weapon" if it has the capacity to accept a detachable magazine and any one of the following: (1) a pistol grip; (2) a forward grip; (3) a folding, telescoping, or detachable scope; (4) a grenade launcher or rocket launcher; (5) a barrel shroud; or (6) a threaded barrel.

The bill further defines "semiautomatic assault weapon" as any semiautomatic rifle that has a fixed magazine with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

With respect to rifles, it also includes under the definition of "semiautomatic assault weapon" any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machinegun.

The bill also provides altered definitions for the semiautomatic pistols and shotguns that would fall under the term "semiautomatic assault weapon."

---

Second, the bill would prohibit the importation of—in addition to the sale, manufacture, transfer, and possession of—such weapons and LCAFDs. The bill's exemptions are similar to the 1994 law; however, it would exempt more hunting and sporting rifles and shotguns by make and model (approximately 2,258), and prohibit the transfer of grandfathered semiautomatic assault weapons to other private individuals unless a background check is conducted through an FFL.

---

[41] *See* Scott Dailard, "The Role of Ammunition in a Balanced Program of Gun Control: A Critique of the Moynihan Bullet Bills," 20 J. Legis. 19, 33 (1994).

Other differences from the 1994 law include an absence of a sunset provision; requirements for safe storage of semiautomatic assault weapons by any private persons; and a requirement for the Attorney General to establish, maintain, and annually report to Congress the make, model, and if available, the date of manufacture of any semiautomatic assault weapon which the Attorney General is made aware has been used in relation to a crime under federal or state law.

# Legal Challenges to the 1994 Assault Weapons Ban

The Assault Weapons Ban of 1994 was unsuccessfully challenged as violating several constitutional provisions. While arguments that the act constituted an impermissible Bill of Attainder,[42] is unconstitutionally vague,[43] and is contrary to the Ninth Amendment[44] were readily dismissed by the courts, challenges to the ban based on the Commerce Clause and the Equal Protection Clause received more measured consideration.

## Commerce Clause

The 1994 Assault Weapons Ban was challenged on the basis that it violated the Commerce Clause.[45] The ban was evaluated under the factors delineated by the Supreme Court in *United States v. Lopez*,[46] which held that Congress had exceeded its constitutional authority under the Commerce Clause by passing the Gun Free School Zone Act of 1990[47] (School Zone Act). The Court in *Lopez* clarified the judiciary's traditional approach to Commerce Clause analysis and identified three broad categories of activity that Congress may regulate under its commerce power. These are (1) the channels of commerce; (2) the instrumentalities of commerce in interstate commerce, or persons or things in interstate commerce; and (3) activities which "substantially affect" interstate commerce.[48]

---

[42] *See* Navegar, Inc. v. United States, 192 F.3d 1050, 1066-68 (D.C. Cir. 1999), rehearing *en banc* denied, 200 F.3d, 868 (D.C. Cir. 2000), *cert. denied* 531 U.S. 816 (2000) (the assault weapons ban does not constitute a Bill of Attainder as it does not impose a legislative punishment, does not exhibit a purely punitive purpose, and does not manifest a congressional intent to punish specific individuals, but rather specifies conduct from which individuals must refrain in order to avoid punishment).

[43] *See* United States v. Starr, 945 F.Supp. 257, 259 (M.D. Ga. 1996), *aff'd* 144 F.3d 56 (11th Cir. 1998) (assault weapons ban was not unconstitutionally vague because it defines "a criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement" and court had "no difficulty finding that an ordinary person" would conclude that the provisions of the federal law applied to the firearms possessed by the defendant). The district court also cited *Boyce Motor Lines v. United States*, 342 U.S. 337 (1952), which stated: "Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."

[44] *See* San Diego Gun Rights Committee v. Reno, 98 F.3d 1121, 1125 (9th Cir.1996) (The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Joining other circuit court decisions, the Ninth Circuit concluded that the Ninth Amendment "has not been interpreted as independently securing any constitutional rights for purposes of making out a constitutional violation" and thus does not encompass a unenumerated, fundamental individual right to bear firearms.).

[45] U.S. Const., art. I, §8, cl. 3.

[46] 514 U.S. 549 (1995).

[47] P.L. 101-647 (1990). The act had made it a federal offense for "any individual to knowingly possess a firearm at a place the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. §922(q) (1988 ed. Supp. V).

[48] *Lopez*, 514 U.S. at 558-59.

Compendium_Cornell
Page 1950

In examining the School Zone Act, the Court concluded that possession of a gun in a school zone was neither a regulation of the channels nor the instrumentalities of interstate commerce.[49] Because the conduct regulated was considered to be a wholly intrastate activity, the Court concluded that Congress could only regulate if it fell within the third category and "substantially affect[ed]" interstate commerce. The Court indicated that intrastate activities have been, and could be, regulated by Congress where the activities "arise out of or are connected with a commercial transaction" and are "part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated."[50] With respect to the School Zone Act, the Court declared that the intrastate activity was not a part of the larger firearms regulatory scheme.[51] Moreover, the Court found it significant that the act did not require that interstate commerce be affected, such as by requiring the gun to be transported in interstate commerce.[52]

Commerce Clause challenges to the 1994 Assault Weapons Ban were evaluated under the framework provided by the *Lopez* decision, and lower courts readily determined that the act met minimum constitutional requirements under the Commerce Clause. For example, in *Navegar, Inc. v. United States*, the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) addressed the question of whether the act fell within one of the three categories of activity identified in *Lopez*.[53] Like the Court in *Lopez*, the D.C. Circuit determined that it was not required to analyze the act under the first or second categories because the "[it] readily falls within category 3 as a regulation of activities having a substantial [e]ffect on interstate commerce."[54] The court analyzed individually the act's prohibitions on manufacture, transfer, and possession.

Regarding the manufacturing prohibition, the D.C. Circuit declared that "[t]he Supreme Court has repeatedly held that the manufacture of goods which may ultimately never leave the state can still be activity which substantially affects interstate commerce."[55] Regarding the prohibition on transfers, the court similarly remarked that "the Supreme Court precedent makes clear that the transfer of goods, even as part of an intrastate transaction, can be an activity which substantially affects interstate commerce."[56] Based on these maxims, the court held that "it is not even arguable

---

[49] *Id*. at 559-60.

[50] *Id*. at 561 (referencing *Wickard v. Filburn*, 317 U.S. 111 (1942)).

[51] *Id*.

[52] *Id*. at 561-62. The Court found it significant that that the act "contains no jurisdictional element which would ensure, through a case-by-case inquiry, that the firearm possession in question affects interstate commerce." A jurisdictional element would also "limit [the statute's] reach to a discrete set of firearms possessions that additionally have an explicit connection with or effect on interstate commerce." *Id*. at 562. In 1996, Congress passed a new version of the Gun Free School Zone Act (P.L. 104-208) that  added a jurisdictional hook. The provision reads: "It shall be unlawful for any individual to knowingly possess a firearm that has moved in or otherwise affects interstate or foreign commerce at ... a school zone."

[53] 192 F.3d 1050, 1066-68 (D.C. Cir. 1999), rehearing *en banc* denied, 200 F.3d, 868 (D.C. Cir. 2000), *cert. denied* 531 U.S. 816 (2000).

[54] *Id*. at 1055.

[55] *Id*. at 1057 (citing *United States v. Darby*, 312 U.S. 100, 118-19 (1941); *NLRB v. Jones & Laughlin Steel*, 301 U.S. 1, 37 (1937)).

[56] *Id*. at 1058 (citing *Lopez*, 514 U.S. at 560-61 (citing *Wickard v. Filburn*, 317 U.S. 11, 127-28 (1942)(noting that farmer's home consumption of wheat substantially affected interstate commerce and that farmer's selling of homegrown wheat and local marketing substantially affects interstate commerce)).

Compendium_Cornell
Page 1951

that the manufacture and transfer of 'semiautomatic assault weapons' for a national market cannot be regulated as activity substantially affecting interstate commerce."[57]

However, with respect to the possession of a semiautomatic assault weapon, the court in *Navegar* noted that the *Lopez* decision raised a question of whether "mere possession" can substantially affect interstate commerce. The court proceeded to analyze the purposes behind the act to determine whether "it was aimed at regulating activities which substantially affect interstate commerce."[58] Analyzing the congressional hearings, the court determined that the ban on possession was "conceived to control and restrict the interstate commerce in 'semiautomatic assault weapons,'" and that the "ban on possession is a measure intended to reduce the demand for such weapons."[59] The D.C. Circuit stated that the ban on possession was "necessary to allow law enforcement to effectively regulate the manufacture and transfers where the product comes to rest, in the possession of the receiver."[60] Based on these factors, the court held that the "purpose of the ban on possession has an 'evident commercial nexus.'"[61]

Although the Supreme Court further clarified its Commerce Clause jurisprudence in later decisions, such as *Gonzales v. Raich*,[62] it appears that the Commerce Clause analysis applicable to the ability of Congress to regulate or ban certain semiautomatic assault weapons would not be fundamentally altered by these later developments.

## Equal Protection Clause

The Assault Weapons Ban of 1994 was also challenged on Equal Protection Clause grounds, with opponents arguing that it prohibited weapons that were the functional equivalents of weapons exempted under the Act, and because the prohibition of other semiautomatic assault weapons based upon their characteristics served no legitimate governmental interest.

A court must employ one of the three levels of judicial scrutiny[63] in an Equal Protection Clause analysis to determine whether a law negatively impacts a suspect class or a fundamental right. If there is such an impact, the law is subjected to strict scrutiny, requiring the government to prove

---

[57] *Id.*

[58] To determine whether an activity that does not have an clear connection with interstate commerce, the Court in *Lopez* stated that it would consider legislative findings and even congressional committee findings to determine if there was a rational basis for congressional action. *Lopez*, 514 U.S. at 562.

[59] *Navegar*, 192 F.3d at 1058-59 (citing other cases such as *United States v. Rybar*, 103 F.3d 273 (3d. Cir 1996) (holding that the Firearm Owners Protection Act of 1986 targets the mere intrastate possession of machine guns as a "demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce of machine guns"); *United States v. Rambo*, 74 F.3d 948 (9ᵗʰ Cir. 1995) (holding that the ban on possession is in effect "an attempt to control the interstate market ... by creating criminal liability for the demand-side of the market, i.e., those who would facilitate illegal transfer out of the desire to acquire mere possession" [citation omitted])).

[60] *Id.* at 1059.

[61] *Id.* (citing *Lopez*, 514 U.S. at 580 (Kennedy, J., concurring)).

[62] 545 U.S. 1 (2005) (holding that Congress' Commerce Clause authority includes the power to prohibit the local cultivation and use of marijuana in compliance with California law).

[63] Generally there are three levels of judicial scrutiny. First, strict scrutiny, the most rigorous, requires a statute to be narrowly tailored to serve a compelling state interest. Second, intermediate scrutiny, requires a statute to further a government interest in a way that is substantially related to that interest. Third, the rational basis standard merely requires the statute to be rationally related to a legitimate government function. *See* Erwin Chemerinsky, Constitutional Law: Principles and Policies §§ 6.5, 10.1.2 (3d ed. 2006).

---

Compendium_Cornell
Page 1952

that the law is necessary to satisfy a compelling governmental interest.[64] If a law does not affect a suspect class or a fundamental right, the court engages in a "rational basis" review, requiring only that the law be rationally related to a legitimate governmental interest.[65]

Applying these standards, the U.S. Court of Appeals for the Sixth Circuit (Sixth Circuit) held that the provisions of the 1994 law did not violate the Equal Protection Clause. In *Olympic Arms v. Buckles*, the Sixth Circuit first noted that the lower court had held that the plaintiffs' claim was non-cognizable, given that the "Equal Protection Clause protects against inappropriate classifications of people, rather than things."[66] However, the court stated that other rulings have held that since persons may have an interest in things, their classification may be challenged on equal protection grounds.[67] Rather than resolve this disparity on the scope of the Equal Protection Clause, the Sixth Circuit went on to declare that "even if we were to assume that equal protection analysis is appropriate here, we would have to conclude that the semi-automatic assault weapons ban meets all equal protection requirements."[68]

The court first addressed the argument "that variations in the specificity of weapon descriptions and lack of common characteristics in the list of weapons outlawed destroy the constitutional legitimacy of the 1994 Act."[69] The Sixth Circuit found this argument to be without merit for several reasons. First, the court found it significant that the list of prohibited firearms was developed to target weapons commonly used in the commission of violent crimes. Additionally, the court found that the prohibition on copies or duplicates of listed firearms was incorporated to prevent manufacturers from circumventing the act's terms "by simply changing the name of the specified weapons."[70] Finally, the court noted that the list of exempted weapons was based on the determination that they were particularly suited to sporting purposes. Taking these factors together, the Sixth Circuit held that it was "entirely rational for Congress ... to choose to ban those weapons commonly used for criminal purposes and to exempt those weapons commonly used for recreational purposes."[71] The fact that many of the protected weapons were somewhat similar in function to those that were banned does not destroy the rationality of the congressional choice.[72]

The Sixth Circuit next addressed whether prohibiting weapons based upon having two or more qualifying features was irrational, given that the act allowed a weapon to possess one such feature and that the individual features did not operate in tandem with one another. The court also rejected this argument, explaining that each characteristic served to make the weapon "potentially

---

[64] *See, e.g.*, City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439-40 (1985).

[65] *See, e.g.*, Heller v. Doe, 509 U.S. 312, 319 (1993). Intermediate scrutiny has been applied in equal protection analysis. *See, e.g.*, Craig v. Boren, 429 U.S. 190 (1976) (applying intermediate scrutiny when declaring unconstitutional an Oklahoma law that allowed women to buy low alcohol, 3.2 percent beer, at age 18, but men could not buy such beer until age 21).

[66] Olympic Arms v. Buckles, 301 F.3d 384, 388 (6th Cir. 2002) (referring to *Olympic Arms v. Magaw*, 91 F.Supp.2d 1061 (E.D. Mich. 2000)).

[67] *Id*. at 388.

[68] *Id*.

[69] *Id*. at 389.

[70] *Id*.

[71] *Id*. at 390.

[72] *Id*. The court in *Olympic Arms* further stated: "A classification does not fail because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" (citing *Dandridge v. Williams*, 397 U.S. 471, 488 (1970)).

---

Compendium_Cornell
Page 1953

more dangerous," and were not "commonly used on weapons designed solely for hunting."[73] The court also explained that "Congress could have easily determined that the greater the number of dangerous add-ons on a semi-automatic weapon, the greater the likelihood that the weapon may be used for dangerous purposes."[74] Accordingly, the Sixth Circuit concluded that the plaintiffs had "failed to meet the heavy burden required to show that the 1994 Act violates equal protection."[75]

Notably, the Sixth Circuit reviewed the equal protection claim under the rational basis test finding that "precedent does not recognize a fundamental right to individual weapon ownership or manufacture, and the plaintiffs, gun retailers and owners, are not a suspect class."[76] While the latter is still accurate, precedent regarding a fundamental right to individual weapon ownership has changed with the Supreme Court's decision in *District of Columbia v. Heller*.[77] As discussed below, the full nature of the right guaranteed by the Second Amendment has yet to be determined by the courts. Therefore, a court considering an equal protection claim in the context of a semiautomatic assault weapons ban could conceivably determine that it is necessary to first address the fundamental issue of whether assault weapons are protected by the Second Amendment.

# Second Amendment Consideration

If enacted, an assault weapons ban could also be challenged on Second Amendment grounds in light of the Supreme Court's decision in *District of Columbia v. Heller*. In *Heller*, the Court recognized that the Second Amendment protects an individual right to bear arms for lawful purposes such as self-defense within the home.[78] The decision was not an exhaustive analysis of the full scope of the right guaranteed by the Second Amendment,[79] but the Court stated that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."[80] One limitation upon the Second Amendment the Court addressed is that it "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."[81] The Court found that its prior 1939 decision in *United States v. Miller*[82] supported this conclusion. Relying on *Miller*, the Court acknowledged that this limitation is supported by the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" and that the "sorts of weapons protected were those 'in common use at the time'" because those capable of service in the militia at the time of ratification would have brought "the sorts of lawful weapons that they possessed at home to militia duty."[83]

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.* at 389.

[77] 554 U.S. 570 (2008).

[78] *Id.*

[79] *Id.* at 626.

[80] *Id.*

[81] *Id.*

[82] *United States v. Miller*, 307 U.S. 174 (1939) (holding that the Second Amendment did not protect an individual's right to transport an unregistered short-barreled shotgun in interstate commerce).

[83] *Heller*, 540 U.S. at 627. The Court recognized that "it may be true that no amount of small arms could be useful (continued...)

Compendium_Cornell
Page 1954

Since *Heller*, cases that have evaluated the constitutionality of state assault weapons bans have generally found them to be valid under the Second Amendment. In 2009, the California Court of Appeals decided *People v. James*, which held that possession of an assault weapon in California remains unlawful and is not protected by the Second Amendment.[84] California's Roberti-Roos Assault Weapons Control Act of 1989, like the 1994 federal assault weapons ban, defines "assault weapons" by providing a list of proscribed weapons and through characteristics "which render these weapons more dangerous than ordinary weapons typically possessed by law-abiding citizens for lawful purposes."[85] Relying on *Heller*'s brief discussion that the Second Amendment does not protect a military weapon, such as an M16 rifle, the court in *James* declared that the prohibited weapons on the state's list "are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather these are weapons of war."[86] It concluded that the relevant portion of the act did not prohibit conduct protected by the Second Amendment as defined in *Heller* and therefore the state was within its ability to prohibit the types of dangerous and unusual weapons an individual can use.[87]

The District of Columbia amended its firearms regulations after the *Heller* decision and enacted new firearms regulations including an assault weapons ban that is similar to California's. In 2011, the D.C. Circuit issued its decision in *Heller v. District of Columbia* (*Heller II*) which upheld the District's ban on certain semiautomatic rifles and LCAFDs.[88] Under the "common use" factor delineated in *Heller*, the D.C. Circuit acknowledged that "it was clear enough in the record that certain semi-automatic rifles and magazines holding more than 10 rounds are indeed in 'common use.'"[89] However, the court could not conclude definitely whether the weapons are "commonly used or are useful specifically for self-defense or hunting" such that they "meaningfully affect the right to keep and bear arms."[90] Therefore, the court went on to analyze the bans under a two-stepped approach to determine their validity under the Second Amendment.[91]

---

(...continued)

against modern-day bombers and tanks." However, it noted that modern day developments "cannot change our interpretation of the right." *Id.*

[84] People v. James, 94 Cal. Rptr. 3d 576 (Cal. Ct. App.2009), *rev. denied* by People v. James, 2009 Cal. LEXIS 9895 (Cal. Sept. 17, 2009), *cert. denied* James v. Cal. 2010 U.S. LEXIS 1284 (U.S., Feb. 22, 2010). Notably, a petitioner challenging an assault weapons ban could make an argument that civilian versions of military weapons, like the AR-15, should be differentiated from military weapons, like the M16, which the Supreme Court does not considered protected under the Second Amendment. However, the Supreme Court's denial of certiorari in the *James* case could indicate that the Court does not distinguish between military and civilian versions of military style weapons, considering both beyond the scope of the Second Amendment's guarantee.

[85] *James*, 94 Cal. Rptr. 3d at 579-580 (citing Cal. Penal Code §§12276, 12276.1).

[86] *Id.* at 585-86 (quoting Cal. Penal Code § 122275.5(a) (West 2006)).

[87] *James*, 94 Cal. Rptr. 3d at 586 (citing the Cal. Penal Code §§ 12280(b)-(c) which imposes penalties for possession of assault weapon or .50 BMG rifle).

[88] Heller v. District of Columbia (Heller II), 670 F.3d 1244 (D.C. Cir. 2011) (affirming in part and vacating in part the lower court's decision, remanding to the lower court the petitioner's challenge to the District's "novel registration requirements").

[89] *Id.* at 1261.

[90] *Id.*

[91] The D.C. Circuit adopted from other circuits a two-step approach to determining the constitutionality of the gun laws at issue. *See, e.g.*, United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010). This D.C. Circuit indicated that this two-step approach is taken if the challenged regulation is not one that the *Heller* decision identified as a "longstanding" regulation that is "presumptively lawful." *Id.* (citing *Heller*, 554 U.S. at 626-27, n.26).

---

Under this approach, the court first asks whether a particular provision impinges upon a right protected by the Second Amendment as historically understood. If it does, then it goes on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny.[92] Assuming that the ban impinged on the right protected under *Heller* (i.e., to possess certain arms for lawful purposes such as individual self-defense or hunting), the court found that such regulations should be reviewed under intermediate scrutiny because the prohibition "does not effectively disarm individuals or substantially affect their ability to defend themselves."[93] Under intermediate scrutiny, the government has the burden of showing that there is a substantial relationship or reasonable "fit" between the regulation and the important governmental interest "in protecting police officers and controlling crime."[94] The D.C. Circuit held that the District carried this burden and that the evidence demonstrated that a ban on both semiautomatic assault rifles and LCAFDs "is likely to promote the Government's interest in crime control in the densely populated urban area that is the District of Columbia."[95]

In 2012, the Supreme Court of Illinois decided *Wilson v. Cook County*, a case that evaluated the constitutionality of the Blair Holt Assault Weapons Ban of Cook County, a long-standing ordinance that was amended to similarly reflect provisions of the 1994 Assault Weapons Ban.[96] The plaintiffs argued that the ordinance violates the Due Process and Equal Protection Clauses of the U.S. Constitution as well as the Second Amendment. Regarding the due process claim, the court concluded that the ordinance is not unconstitutionally vague such that it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."[97] The court also dismissed the plaintiff's equal protection claim, finding that the "[o]rdinance does not arbitrarily differentiate between two owners with similar firearms because the banned firearms are either listed, a copy or duplicate, or fall under the characteristics-based test."[98] With respect to the Second Amendment claim, the court indicated that it would follow the two-step approach similar to the *Heller II* court. While the court acknowledged that the ordinance banned only a subset of weapons with particular characteristics similar to other jurisdictions, it found that it could not "conclusively say ... that assault weapons as defined in the [o]rdinance categorically fall outside the scope of the rights protected by the [S]econd [A]mendment."[99] The court ultimately remanded the Second Amendment claim to the trial court for further proceedings, because unlike the *James* and *Heller II* decisions, the county did not have an opportunity to present evidence to justify the nexus between the ordinance and the governmental interest it seeks to protect.[100]

---

[92] *Heller II*, 670 F.3d at 1252.

[93] *Id*. at 1261-62.

[94] *Id*. at 1262.

[95] *Id*. at 1263.

[96] Wilson v. Cook County, 968 N.E.2d 641 (Ill. 2012).

[97] *Id*. at 650-53.

[98] *Id*. at 658.

[99] *Id*. at 655.

[100] *Id*. at 657. ("Without a national uniform definition of assault weapons from which to judge these weapons, it cannot be ascertained at this stage of the proceedings whether these arms with these particular attributes as defined in this [o]rdinance are all well suited for self-defense or support or would be outweighed completely by the collateral damage resulting from their use, making them 'dangerous and unusual' as articulated in *Heller*. This question requires us to engage in an empirical inquiry beyond the scope of the record and beyond the scope of judicial notice about the nature of weapons that are banned under this [o]rdinance and the dangers of these particular weapons." *Id*. at 656.).

Compendium_Cornell
Page 1956

These cases demonstrate that courts evaluating various assault weapons bans, and to a limited extent LCAFD bans, have looked to the *Heller* decision and the general framework that has developed in the lower courts for analyzing claims under the Second Amendment. Based on the *Heller* decision where the Supreme Court indicated that certain weapons fall outside the protection of the Second Amendment, lower courts have examined whether the prohibited weapons are considered in "common use" or "commonly used" for lawful purposes or "dangerous and unusual." It is uncertain whether, to be protected under the Second Amendment, the weapon must be in "common use" by the people and if so, must it be in "common use" for self-defense or hunting, or what constitutes "dangerous and unusual." *Heller* could arguably be taken to indicate that if the prohibited weapons do not meet these criteria then they are not protected by the Second Amendment, in which case no heighted judicial scrutiny would be applied.

Courts also could evaluate such measures under the two-step approach laid out by the lower courts. This asks whether a ban on certain weapons and firearm accessories imposes a burden on conduct falling within the scope of the Second Amendment. If so, then a heightened level of judicial scrutiny will be applied to determine the ban's constitutionality. How the "common use" and "dangerous and unusual" criteria should be read, if at all, in connection with the two-step approach remains unclear. Neither the *James*, *Heller II*, nor *Wilson* courts appear to have fully explained the connection between the two approaches.

Lastly, while it appeared that constitutional claims under the Due Process and Equal Protection Clauses were largely dismissed when the 1994 Assault Weapons Ban was in effect, the *Wilson* case demonstrates that they are claims challengers may still consider raising.

# Author Contact Information

Vivian S. Chu
Legislative Attorney
vchu@crs.loc.gov, 7-4576

# Acknowledgments

T.J. Halstead was the initial author of RL32077, "The Assault Weapons Ban: Legal Challenges and Legislative Issues."

Compendium_Cornell
Page 1957

CAROLYN B. MALONEY
CHAIRWOMAN

JAMES COMER
RANKING MINORITY MEMBER

ONE HUNDRED SIXTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM
2157 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6143

MAJORITY   (202) 225–5051
MINORITY   (202) 225–5074
https://oversight.house.gov

## MEMORANDUM

### July 27, 2022

**To:**   **Members of the Committee on Oversight and Reform**

**Fr:**   **Chairwoman Carolyn B. Maloney**

**Re:**   **The Committee's Investigation into Gun Industry Practices and Profits**

Following mass shootings in Buffalo, New York, and Uvalde, Texas, the Committee launched an investigation into the leading manufacturers of AR-15-style assault rifles.  These companies sell weapons to civilians that are engineered to kill many people as fast as possible.  These rifles are the weapon of choice for mass murderers who have terrorized and slaughtered young children at school, worshippers at churches and synagogues, and families celebrating the Fourth of July.

On May 26, 2022, the Committee sent letters to five gun manufacturers seeking information on their sale and marketing of these deadly firearms and any efforts to monitor or track safety data related to their products.[1]  The manufacturers—Bushmaster, Daniel Defense, Sig Sauer, Smith & Wesson, and Sturm, Ruger & Company—have all made and sold AR-15-style semiautomatic weapons that have been used in mass shootings.

This memorandum details initial findings from the Committee's investigation.  The Committee has learned that gun companies collected more than $1 billion over the last decade from selling military-style assault weapons to civilians, even as gun violence increased across the United States.  These companies used disturbing sales tactics—including marketing deadly weapons as a way for young men to prove their manliness and selling guns to mass shooters on credit—while failing to take even basic steps to monitor the violence and destruction their products have unleashed.

Documents and information obtained by the Committee show:

---

[1] Committee on Oversight and Reform, *Press Release:  Chairwoman Maloney Launches Investigation into Manufacturers of Assault Weapons Used in Mass Shootings* (May 27, 2022) (online at https://oversight.house.gov/news/press-releases/chairwoman-maloney-launches-investigation-into-manufacturers-of-assault-weapons).

1

- **Gun manufacturers collected more than $1 billion from the sale of AR-15-style semiautomatic weapons in the last decade—and sales are increasing as gun deaths and mass shootings rise.**

  - **Daniel Defense**'s revenue from AR-15-style rifles tripled from $40 million in 2019 to over $120 million in 2021.

  - **Ruger**'s gross earnings from AR-15-style rifles also nearly tripled from 2019 to 2021, increasing from $39 million to over $103 million.

  - **Smith & Wesson**'s revenue from all long guns, which include AR-15-style rifles, more than doubled between 2019 and 2021, from $108 million to $253 million.

  - Combined, these five manufacturers push hundreds of thousands of military-grade AR-style rifles into communities every year.

- **Gun manufacturers employ a variety of financing tactics and manipulative marketing campaigns to sell AR-15-style rifles to civilians, including young people.**

  - Materials obtained by the Committee show how sellers tout assault rifles' military pedigree, make covert references to violent white supremacists like the Boogaloo Boys, and prey on young men's insecurities by claiming their weapons will put them "at the top of the testosterone food chain."

  - **Smith & Wesson** markets its assault rifle with advertisements that mimic first-person shooter video games popular with children.

  - **Daniel Defense** sells the assault weapon used in the Uvalde shooting on credit, bragging that financing is approved "in seconds."

  - **Sig Sauer** describes its military-style weapon sold to civilians as an "apex predator" that meets the "demands of the Special Operations community."

- **Gun manufacturers fail to track or monitor deaths, injuries, or crimes that occur using their products, and fail to track when their products have been illegally modified.**

  - All five companies acknowledged that they have no systems or process in place to gather safety data related to their products, and they were unable to produce any internal analyses of the dangers caused by selling their military-style weapons to civilians.

  - **Sig Sauer** asserted that it does "not have the means" to track deaths caused by its products, while **Ruger** said it only learns of these incidents

2

through its "customer service department," the media, or "occasionally" from lawsuits.

o **Bushmaster** claimed that, because the brand has been newly acquired by another company, it was "aware of no such deaths or injuries" caused by its products, even though the racist shooter in Buffalo killed ten people with a Bushmaster-branded assault weapon in May 2022.

## I.    USE OF ASSAULT WEAPONS IN MASS KILLINGS

The five gun manufacturers under Committee investigation are among the most prolific and profitable manufacturers and sellers of AR-15-style rifles in America.

Developed by ArmaLite in the 1950s, the original AR-15 rifle evolved into the military-use M-16, which had automatic fire capability.[2]  Such rifles fire bullets at three times the velocity of ordinary handguns.[3]  Bullets fired from an AR-15-style rifle hit their targets with such force that they rip open cavities inside the human body that then collapse, destroying far more organs and tissue than ordinary handgun rounds.[4]  In 1977, the patent on the AR-15 rifle lapsed, and many gun manufacturers began producing civilian variants of the rifle.  As the death toll and sales numbers from AR-15-style rifles have grown over the past decade, they have assumed a totemic status within gun culture.  In 2016, the National Rifle Association (NRA) dubbed the AR-15 "America's Rifle."[5]  AR-15-style rifles have been the weapon of choice for the killers responsible for the deadliest mass shootings in American history, including the recent mass murders in Buffalo, New York, and Uvalde, Texas.[6]

The companies under investigation have all sold AR-15-style weapons used in acts of mass gun violence perpetrated in the United States.

• **Bushmaster** made the assault weapon used in the Sandy Hook mass shooting in Newtown, Connecticut, in 2012, and in the recent white supremacist attack in Buffalo, New York.[7]  A Bushmaster AR-15-style rifle was also used in the sniper

---

[2] *A Brief History of the AR-15*, National Public Radio (Feb. 28, 2018) (online at www.npr.org/2018/02/28/588861820/a-brief-history-of-the-ar-15); Defense Advanced Research Projects Agency, *M16 Rifle* (online at www.darpa.mil/about-us/timeline/agile-and-m16) (accessed June 1, 2022).

[3] *The Simple Physics that make Some Bullets Deadlier than Others*, The Trace (June 21, 2017) (online at https://www.thetrace.org/2017/06/physics-deadly-bullets-assault-rifles/).

[4] *All-American Killer:  How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018) (online at www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/); Everytown Research & Policy, *Assault Weapons and High-Capacity Magazines* (online at https://everytownresearch.org/wp-content/uploads/sites/4/2020/07/EFGV02_Assault-Weapons-and-High-Capacity-Magazines_Rd2_6-1.pdf) (accessed June 1, 2022).

[5] *What Is an AR-15 Rifle, Exactly*, The Trace (June 7, 2022) (online at www.thetrace.org/2022/06/ar15-rifle-assault-weapon-ban/).

[6] *Id.*

[7] *Buffalo Supermarket Shooting:  What Do We Know So Far?*, Associated Press (May 16, 2022) (online at https://apnews.com/article/buffalo-shooting-what-to-know-bcb5e0bd2aedb925d20440c2005ffef8)(accessed July 25,

3

attacks in Washington, D.C., in 2002.[8]  The company was previously a part of Remington, the nation's largest gun company.  Remington filed for bankruptcy in 2018, and Franklin Armory purchased the Bushmaster trademark and continues to manufacture substantially similar AR-15-style rifles, trading on the reputation, history, and notoriety of the Bushmaster name.[9]

- **Daniel Defense** manufactured the AR-15-style rifle that an 18-year-old used to murder 19 children and two teachers in an elementary school in Uvalde, Texas, in May 2022.  Four Daniel Defense AR-15-style rifles were found in the arsenal of the 2017 Las Vegas shooter.[10]  Ninety percent of the company's sales are direct to civilian consumers, but the company's marketing heavily emphasizes the tactical uses of its products.[11]

- **Sig Sauer** sold the AR-15-style rifle used by a mass shooter to kill 49 people at Pulse nightclub in Orlando, Florida, in 2016, and three of the weapons used by the shooter in Las Vegas, Nevada, in 2017 to kill 60 people.[12]  The company recently won the contract to replace the U.S. Army's M-4 carbine and is selling a version of its new rifle to civilians "in a configuration that is a near match" to what America's soldiers will soon be carrying into battle.[13]

- **Smith & Wesson** sold the assault weapons used in the Fourth of July massacre in Highland Park, Illinois, as well as the mass shootings in Parkland, Florida, in

---

2022); *Main Gun in Newtown Also Used in D.C. Sniper Shootings*, USA Today (Dec. 17, 2012) (online at www.usatoday.com/story/news/nation/2012/12/17/bushmaster-assault-rifle-in-newtown-shootings/1772825/) (accessed July 25, 2022).

[8] *Expert Ties Rifle to Sniper Shootings*, Washington Post (Nov. 7, 2003) (online at www.washingtonpost.com/archive/politics/2003/11/07/expert-ties-rifle-to-sniper-shootings/826c92b4-ae9e-4cb1-987f-c33a97689fa2/).

[9] *After Another Massacre, One Gunmaker Maintains a Familiar Silence*, The Washington Post (May 29, 2022) (online at www.washingtonpost.com/business/2022/05/29/uvalde-rifle-gunmaker-morality/).

[10] *Texas School Shooting:  Shooter Legally Purchased 2 Rifles Upon Turning 18 Days Before Shooting*, Fox News (May 25, 2022) (online at www.foxnews.com/us/texas-school-shooting-legally-2-rifles-days-before); *LIST:  Guns and Evidence from Las Vegas Shooter Stephen Paddock*, KTNV Las Vegas (Jan. 19, 2018) (online at www.ktnv.com/news/las-vegas-shooting/list-guns-and-evidence-from-las-vegas-shooter-stephen-paddock).

[11] *Congressional Committee Demands Answers from Daniel Defense, Other Gun Manufacturers*, Savannah Morning News (June 3, 2022) (online at www.savannahnow.com/story/news/local/2022/06/03/uvalde-shooting-ar-15-style-rifle-daniel-defense-bryan-county-ga-house-committee/7473708001/)(accessed July 25, 2022).

[12] *Weapons Gunman Used in Orlando Shooting Are High-Capacity, Common*, USA Today (June 14, 2016) (online at www.usatoday.com/story/news/2016/06/14/guns-used-kill-49-orlando-high-capacity-common-weapons/85887260/); *LIST:  Guns and Evidence from Las Vegas Shooter Stephen Paddock*, KTNV Las Vegas (Jan. 19, 2018) (online at www.ktnv.com/news/las-vegas-shooting/list-guns-and-evidence-from-las-vegas-shooter-stephen-paddock).

[13] *Sig Wins Key Army Contract to Replace M4, M249*, Guns.com (Apr. 20, 2022) (online at www.guns.com/news/2022/04/20/sig-wins-key-army-contract-to-replace-m4-m249).

4

2018, and San Bernadino, California, in 2015.[14]  Smith & Wesson was the second largest maker of rifles in the United States in 2020.[15]

- **Sturm, Ruger & Company, Inc.**  Ruger's AR-15-style rifle and pistol variants were used by mass shooters in Sutherland Springs, Texas, in 2017 and Boulder, Colorado, in 2021.[16]  Ruger is the largest maker of rifles of all types in the United States.[17]

## II.   RECORD PROFITS, SALES—AND DEATHS—FROM GUNS

The Committee has obtained internal financial data showing that major gun manufacturers have been enjoying record-breaking sales and profits from AR-15-style rifles, even as gun deaths and mass shootings have risen in the United States.

In the past decade, these five manufacturers have collectively amassed more than $1 billion in revenue from AR-15-style firearms.  Sales skyrocketed in 2021.  According to data obtained by the Committee, in 2021, Daniel Defense and Ruger nearly doubled their revenues from the sale of AR-15-style firearms compared to the previous year, with each company accumulating more than $100 million in gross sales from these weapons.

Smith & Wesson refused to provide specific revenue and profit information for its AR-15-style firearms, instead providing aggregate "long gun" revenues that totaled over $250 million in 2021, more than doubling from 2020.  Smith & Wesson informed the Committee that assault rifles make up more than half of overall long gun sales, meaning the company brought in at least $125 million from AR-15 style rifles in 2021 alone.

---

[14] *Illinois State Police Director Defends Decision to Give Suspected Highland Park Killer a Gun Permit in 2020*, Chicago Sun Times (July 6, 2022) (online at https://chicago.suntimes.com/2022/7/6/23197100/highland-park-mass-shooting-gun-mith-wesson-mp15-semiautomatic-rifle-fourth-july-parade-robert-crimo); *Guns Used in San Bernardino Shooting Were Purchased Legally from Dealers*, Washington Post (Dec. 3, 2015) (online at www.washingtonpost.com/world/national-security/suspects-in-san-bernadino-shooting-had-a-small-arsenal/2015/12/03/9b5d7b52-99db-11e5-94f0-9eeaff906ef3_story.html); *Florida Gunman Had Extra Ammo at School, Fired for 3 Minutes*, Associated Press (Feb. 15, 2018) (online at https://apnews.com/article/health-tallahassee-north-america-us-news-ap-top-news-a6fd450470d4464ab423b8b3a911b42d).

[15] Bureau of Alcohol, Tobacco, Firearms and Explosives, *2020 Annual Firearms Manufacturers and Export Report (AFMER)* (online at www.atf.gov/resource-center/2020-annual-firearms-manufacturers-and-export-report-afmer) (accessed July 22, 2022); *6 Charts Shows Key Role Firearms Makers Play in America's Gun Culture*, Ohio Capital Journal (May 30, 2022) (online at https://ohiocapitaljournal.com/2022/05/30/6-charts-shows-key-role-firearms-makers-play-in-americas-gun-culture/).

[16] *Suspect Charged with 10 Counts of Murder in Boulder, Colo., Shooting*, New York Times (Mar. 23, 2021) (online at www.nytimes.com/live/2021/03/23/us/boulder-colorado-shooting); *Why the AR-15 Keeps Appearing at America's Deadliest Mass Shootings*, USA Today (Feb. 14, 2018) (online at www.usatoday.com/story/news/nation/2018/02/14/ar-15-mass-shootings/339519002/).

[17] Bureau of Alcohol, Tobacco, Firearms and Explosives, *2020 Annual Firearms Manufacturers and Export Report (AFMER)* (online at www.atf.gov/resource-center/2020-annual-firearms-manufacturers-and-export-report-afmer) (accessed July 22, 2022); *6 Charts Shows Key Role Firearms Makers Play in America's Gun Culture*, Ohio Capital Journal (May 30, 2022) (online at https://ohiocapitaljournal.com/2022/05/30/6-charts-shows-key-role-firearms-makers-play-in-americas-gun-culture/).

Sig Sauer claimed it did not track revenue and profits from specific product lines but stated that AR-15-style rifles make up approximately 3% of its total revenues—financial figures that it has refused to provide to the Committee.

Bushmaster claimed to the Committee that as a "new company," it had no financial data from the previous owners of the Bushmaster trademark, despite public reporting that the 2020 sale of the brand to Franklin Armory included "historic sales, vendor and customer data, and the technical data packages for numerous Bushmaster-branded firearms."[18]

| Figure 1:  AR-15-Style Rifle Revenue and Recent Mass Murders | | |
|---|---|---|
| | *AR-15-Style Rifle Revenue, 2012-2021* | *Recent Mass Murders with the Company's AR-15-Style Rifles* |
| SMITH & WESSON | At Least $695 Million | Highland Park (7 dead)<br>Parkland (17 dead)<br>San Bernadino (14 dead) |
| RUGER | $514 Million | Sutherland Springs (25 dead)<br>Boulder (10 dead) |
| DANIEL DEFENSE | $528 Million | Uvalde (21 dead)<br>Las Vegas (60 dead)* |
| SIG SAUER | REFUSED | Orlando (49 dead)<br>Las Vegas (60 dead)* |
| BUSHMASTER | $2.9 Million (2021 Only) | Buffalo (10 dead)<br>Sandy Hook (27 dead) |

* Killer used weapons from multiple companies

Figure 2 below shows annual rifle revenues for Smith & Wesson, Daniel Defense, and Ruger from 2012 through 2021.[19]  Each of these companies has seen significant increases in revenue from assault weapons since 2019.  Daniel Defense's revenue from AR-15-style rifles tripled from $40 million in 2019 to over $120 million in 2021.  Ruger's gross earnings from AR-15-style rifles also nearly tripled from 2019 to 2021, increasing from $39 million to over $103 million.  Smith & Wesson provided only data on gross revenues from all long-gun sales, which

---

[18] *Bushmaster Announces a Comeback*, Guns.com (Feb. 15, 2021) (online at www.guns.com/news/2021/02/15/bushmaster-announces-a-comeback).

[19] Smith & Wesson produced only total long-gun revenues but asserted that assault rifles make up more than half of all such sales.  Sig Sauer claimed it does not track AR-15-style revenues but estimates these weapons encompass 3% of total revenue.  Bushmaster, because it claims to be an entirely new company, produced sales figures only for 2021.

include AR-15-style rifles.  The company's revenue from that broad category of weapon more than doubled between 2019 and 2021, from $108 million to $253 million.



**Figure 2: AR-15 Style Rifle Revenues**
(2012-2021)

Legend: Daniel Defense, Smith & Wesson, Ruger

During the Committee's June 8, 2022, hearing on gun violence, gun industry expert Nick Suplina noted that "the gun industry has grown tremendously over the last two decades, business is booming, [and] profits are breaking records."  He further remarked that "so are rates of gun violence."[20]  According to data from the Centers for Disease Control and Prevention and other sources, 2020 and 2021 witnessed the highest gun-related death totals in the United States in decades.[21]

Studies by the Harvard Injury Control Research Center have found a strong correlation between an increase in gun availability and rates of homicides, suicides, and accidental gun deaths.[22]  Figure 3 below shows the annual number of gun-related deaths from 2012 through 2021.[23]  Figures 4a and 4b show internal rifle sales data from this same period.  Daniel Defense and Ruger's figures are for "AR platform" rifles only.  Smith & Wesson reported total long gun sales, although the company reported that AR-15-style rifles comprise more than half of that category.  Sig Sauer and Bushmaster refused to provide concrete information on the number of AR-15-style rifles sold during this requested time-period.

---

[20] Committee on Oversight and Reform, Testimony of Nick Suplina, *Hearing on The Urgent Need to Address the Gun Violence Epidemic* (June 8, 2022) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Suplina%20Testimony.pdf).

[21] National Safety Council, *Safety Topics:  Gun Data Details* (online at https://injuryfacts.nsc.org/home-and-community/safety-topics/guns/data-details/) (accessed June 23, 2022); Centers for Disease Control and Prevention, *Fatal Injury and Violence Data* (online at www.cdc.gov/injury/wisqars/fatal.html) (accessed July 19, 2022); Gun Violence Archive, *Past Summary Ledgers* (online at www.gunviolencearchive.org/past-tolls) (accessed July 18, 2022).

[22] Harvard T.H. Chan School of Public Health, Harvard Injury Control Research Center, *Firearms Research—Homicide* (online at www.hsph.harvard.edu/hicrc/firearms-research/guns-and-death/) (accessed July 14, 2022).

[23] Gun Violence Archive, *Past Summary Ledgers* (online at www.gunviolencearchive.org/past-tolls) (accessed July 18, 2022).







*Figures 4a and 4b include "AR platform" rifles sold by Daniel Defense and Ruger and all long guns sold by Smith & Wesson.*

The Committee's findings are consistent with longstanding trends of the gun industry. Gun sales tend to peak in the immediate aftermath of elections, civil unrest, and mass shootings, resulting partly from consumer anxieties and panic-purchasing.[24]  This pattern culminated in record-breaking sales numbers for all firearm types during the coronavirus pandemic.[25]  A June 2021 Smith & Wesson investor presentation bragged, "In a year of turmoil, we gained market

---

[24] *An Arms Race in America:  Gun Buying Spiked During the Pandemic.  It's Still Up.*, New York Times (May 29, 2021) (online at www.nytimes.com/2021/05/29/us/gun-purchases-ownership-pandemic.html); *The Pandemic and Fears of Civil Unrest Led to a Historic Boom in Gun Sales This Year*, Buzzfeed News (Nov. 3, 2020) (online at www.buzzfeednews.com/article/peteraldhous/2020-record-us-gun-sales-election).

[25] *Id.*

8

share" and concluded, "we're just getting started."[26]  The editor of a gun industry trade magazine described the first year of the coronavirus pandemic, when gun sales and gun deaths reached unprecedented levels, as a moment of "opportunity" for gun manufacturers.[27]

## III.    GUN MANUFACTURERS' MARKETING PRACTICES

The Committee's investigation found that gun manufacturers' multimillion-dollar marketing campaigns have emphasized the AR-15-style rifle's military roots and its capacity to kill.  The investigation also showed that gun makers use aggressive financing tactics to entice buyers.  This is consistent with testimony at the Committee's June 8, 2022, hearing from Nick Suplina, who explained that "in a now crowded field, manufacturers of these guns are trying to market in increasingly brazen ways, often touting the deadliness of products, glorifying combat, and attempting to appeal to younger audiences."[28]

### A.    <u>Selling Guns to Mass Shooters on Credit</u>

Documents obtained by the Committee show that gun manufacturers use a variety of incentives and tactics to increase sales, including allowing their products to be purchased easily online, and offering rebates, free gifts, and financing opportunities for purchasing their weapons. Although these sales and financing innovations are not unique to the gun industry, these products are far more dangerous than other consumer goods.  Daniel Defense, the manufacturer of the rifle purchased and used by the Uvalde shooter, offers its firearms for sale through a buy-now, pay-later, financing system advertised on the front page of its website.[29]  To order the exact weapon used by the shooter in Uvalde requires just five clicks, and a pickup at a local gun store which includes a background check and proof of age.[30]

Several Daniel Defense advertisements obtained by the Committee emphasize generous financing packages for its assault rifles.  The advertisement shown below is for the exact weapon used in the Uvalde shooting.[31]  The company's website advertises financing approvals "in

---

[26] *Shootings Have Surged—and Gun Companies Have Made Billions*, Rolling Stone (May 27, 2022) (online at www.rollingstone.com/politics/politics-news/gun-profits-surge-violence-1359155).

[27] *Id.*

[28] Committee on Oversight and Reform, Testimony of Nick Suplina, Senior Vice President for Law and Policy, Everytown for Gun Safety, *Hearing on The Urgent Need to Address the Gun Violence Epidemic* (June 8, 2022) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Suplina%20Testimony.pdf).

[29] *Buy Now, Pay Later Dragged into Uvalde Shooting Controversy*, Australian Financial Review (May 30, 2022) (online at www.afr.com/markets/equity-markets/buy-now-pay-later-dragged-into-uvalde-shooting-controversy-20220529-p5apdi); Daniel Defense, *Shooting Sports Financing* (online at https://danieldefense.com/daniel-defense-financing) (accessed June 23, 2022).

[30] *We Ordered the Same Gun Used in Uvalde.  Here's How Easy It Was.*, Quartz (May 26, 2022) (online at https://qz.com/2170207/we-ordered-the-ar-15-rifle-used-in-uvalde-heres-how-easy-it-is/).

[31] *Uvalde Victims Demand Answers from Daniel Defense—Maker of Rifle Used by Shooter*, Forbes (June 4, 2022) (online at www.forbes.com/sites/annakaplan/2022/06/04/uvalde-victims-demand-answers-from-daniel-defense-maker-of-rifle-used-by-shooter/?sh=9b16322324f9).

9

seconds," making it easier to purchase a more expensive firearm.[32]  Public reporting on prior mass shooting events uncovered that mass shooters have utilized multiple credit cards to accumulate weapons and ammunition.[33]



### B.   Emphasizing Military and Law Enforcement Connections

The Committee has obtained documents showing that gun manufacturers seek to leverage the military lineage of the AR-15 to increase sales to civilians, depicting their AR-15-style rifles with military and law enforcement units and alongside their uniforms.  These advertisements draw a direct connection between AR-15-style weapons on the civilian market and weapons of war, whose sole purpose is to inflict as many casualties in combat as possible.

One advertisement produced to the Committee—shown below—depicts a Smith & Wesson M&P rifle, a variant of the AR-15, as "the chosen one" that is "selected by professionals," featuring the insignia of police, sheriff, highway patrol, and other law enforcement.  In a complaint to the Federal Trade Commission alleging unfair and deceptive marketing practices, the Brady Center to Prevent Gun Violence and Everytown for Gun Safety have alleged that Smith & Wesson advertisements contain false endorsements from military and law enforcement.  The complaint details that "only a small percentage of Smith & Wesson's

---

[32] Daniel Defense, *Shooting Sports Financing* (online at https://danieldefense.com/daniel-defense-financing) (accessed July 11, 2022).

[33] *How Banks Unwittingly Finance Mass Shootings*, New York Times (Dec. 24, 2018) (online at https://nytimes.com/interactive/2018/12/24/business/dealbook/mass-shootings-credit-cards.html).

overall sales are to law enforcement, and those appear to be mostly handguns, not rifles."  The complaint also notes that Smith & Wesson has secured only one military contract in the past decade, a 2012 contract to deliver 250 revolvers destined for Thailand.[34]



Young people with an affinity for law enforcement and the military have purchased assault weapons marketed in this manner, and some of these young people have used them to kill civilians.  The shooters in the Parkland, Florida; Kenosha, Wisconsin; and Poway, California; synagogue shootings were all teenagers drawn to the military and law enforcement.  The Parkland shooter was a student in his Junior Reserve Officer Training Corps class and member of the school's air rifle team, while Kyle Rittenhouse, who fatally shot two people and injured a third at a Black Lives Matter protest in Kenosha, Wisconsin, planned a career in law enforcement after being turned away from the military.  The Poway, California, shooter wrote a militaristic, anti-Semitic manifesto and described himself as a soldier defending his country.  All three used Smith & Wesson M&P rifles, like the one pictured above.[35]

Sig Sauer also prominently features its military connections in advertisements to civilian gun buyers.  Sig Sauer advertisements obtained by the Committee make explicit visual and textual connections between their AR-15-style civilian rifles and the military.  The advertisement for the company's popular SIG MCX Virtus AR-15 platform, below, exemplifies several of these techniques.

---

[34] Letter from Brady:  United Against Gun Violence and Everytown for Gun Safety to Acting Director Samuel Levine, Bureau of Consumer Protection, Federal Trade Commission (Aug. 17, 2021) (online at https://everytownlaw.org/wp-content/uploads/sites/5/2021/08/2021.08.17-SW-FTC-Submission.pdf).

[35] *Id.*



Though the rifle is being advertised to civilians, the advertisement shows five men in a destroyed building in a warzone.  All are wearing military-style camouflage and tactical gear emblazoned with camouflage American flags and are carrying military versions of the Sig Sauer rifle.  The rifle held by one the central kneeling figures appears to be modified with a grenade launcher.  The text of the advertisement emphasizes that the rifle's "modularity" makes it "ready for every possible mission."

Sig Sauer's website reinforces the impression that this rifle, despite being sold to civilians, is intended for military use.  The product page for the "patrol" version of the MCX Virtus boasts that the original version of the rifle was "conceived for the demands of the Special Operations community" and describes the rifle as "the apex predator of the carbine world."[36]

---

[36] Sig Sauer, *Sig MCX Virtus Patrol* (online at www.sigsauer.com/sig-mcx-virtus-patrol.html) (accessed July 18, 2022).

12



Daniel Defense also uses military tropes and references in its marketing materials to civilians.  Although 90% of the company's sales are direct to consumers, its advertisements heavily emphasize the military lineage and tactical uses of its products.[37]  The advertisement to the left depicts a Daniel Defense rifle in the hands of a person wearing all black tactical gear and helmet, suggestive of a special forces operative.  One description in the product pages of its website emphasizes that the rail system on its AR-15-style rifle "has been in use by US Special Operations Command (SOCOM)" for many years.[38]

Ruger did not produce any marketing materials to the Committee that referenced military or law enforcement themes.  In 2010, however, the company used military themes to market weapons of war to civilians.  As documented by the Violence Policy Center, Ruger advertised its Mini-14 Tactical Rifle (below) as "Combat Customized."[39]



### C.   Linking Violence and Gun Ownership to Masculinity

Advertisements obtained by the Committee also seek to appeal to consumers' masculinity, suggesting that purchasing an assault rifle will allow the consumer to retain their "manhood."  One Bushmaster advertisement depicts an AR-15 with the caption, "Consider your mancard reissued."  Another advertisement suggests that by purchasing an AR-15, "your status at the top of the testosterone food chain is now irrevocable."  One commentator found that the

---

[37] *Congressional Committee Demands Answers from Daniel Defense, Other Gun Manufacturers*, Savannah Morning News (June 3, 2022) (online at www.savannahnow.com/story/news/local/2022/06/03/uvalde-shooting-ar-15-style-rifle-daniel-defense-bryan-county-ga-house-committee/7473708001/).

[38] Daniel Defense, *M4A1 CALIFORNIA COMPLIANT* (online at https://danieldefense.com/m4a1-california-compliant.html) (accessed July 20, 2022).

[39] Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market* (June 2011) (online at https://vpc.org/studies/militarization.pdf).

13

intended effect of these advertisements appeared to be to "humiliate men into arming themselves with combat weapons."[40]




Numerous Daniel Defense advertisements obtained by the Committee also make overt appeals to masculinity.  Multiple advertisements intended for placement in men's bathrooms depict AR-15 style weapons with the suggestive text, "Wouldn't you rather be holding a DD5V1?"  The DDD5V1 is Daniel Defense's AR-15-style rife.




Gun manufacturer advertisements often combine the promise of an adrenaline rush with violent undertones.  One Smith & Wesson advertisement obtained by the Committee depicts spent shell casings, its M&P rifle, and the caption, "Kick Brass."  The advertisement claims the rifle will deliver "Pure Adrenaline."

---

[40] *How Gun Makers Bait Insecure Young Men into Buying Weapons*, MSNBC (Feb. 20, 2022) (online at www.msnbc.com/opinion/msnbc-opinion/gun-maker-sandy-hook-settlement-exposed-predatory-ads-n1289394).

14



Other manufacturers have used similar advertising techniques.  In April 2022, Remington settled a landmark lawsuit for $73 million with the parents of children killed in Sandy Hook Elementary School, marking the first time since the enactment of the Protection of Lawful Commerce in Arms Act (PLCAA) that a firearm manufacturer was held liable for the destruction and death caused by its product.  The Sandy Hook plaintiffs argued the civil case under a recently passed New York State law that enabled manufacturers to be sued for creating a "public nuisance" that endangers the public's safety and health.  Plaintiffs successfully argued that Remington "tapped into anxieties of masculinity" to sell firearms to "impressionable" and lonely young men who are prone to violence.[41]

### D.   Marketing to Violent White Supremacists

The firearm industry has been marketing directly and indirectly to white supremacist and extremist organizations for years, playing on fears of government repression against gun owners and fomenting racial tensions.  The increase in racially motivated violence has also led to rising rates of gun ownership among Black Americans, allowing the industry to profit from both white supremacists and their targets.

Extremist imagery has frequently appeared on merchandise available at large industry-sponsored conventions such as the National Shooting Sports Foundation (NSSF) Shot Show and the NRA Annual Meeting, as well as in advertisements by major gun manufacturers.[42]  One Daniel Defense inventory catalogue from 2017 features an image of a shooter with a tattoo of a Norse symbol known as the Valknot.  This symbol is closely associated with transnational white

---

[41] *Id.*

[42] *The Gun Industry Created a New Consumer.  Now It's Killing Us*, The Atlantic (July 25, 2022) (online at www.theatlantic.com/ideas/archive/2022/07/firearms-industry-marketing-mass-shooter/670621/).

15

supremacists and is identified as a hate symbol by the Anti-Defamation League.[43]  The Valknot has become a recurring symbol in right-wing militant and extremist contexts.  The self-anointed "QAnon Shaman," who attacked the Capitol during the January 6 insurrection, has a Valknot tattoo on his chest.[44]




One example of explicit marketing to white supremacists is Palmetto State Armory's "Big Igloo Aloha" AK-47-style assault rifle, shown below.[45]  The name of the rifle is a reference to the "Boogaloo Movement," a group of anti-government extremists and white supremacists who believe a second civil war or race war is imminent, and who often wear floral print shirts with similar patterns.  Individuals associated with the "Boogaloo Movement" have been involved in numerous violent acts and criminal conspiracies, including the 2020 murder of two law enforcement and security officers in California, and a plot to kidnap Michigan Governor Gretchen Whitmer and violently overthrow the state government.[46]

---

[43] *Why Far-right Extremists Co-opt Norse Symbolism*, The Week (June 20, 2022) (online at www.theweek.co.uk/news/crime/957122/why-far-right-extremists-co-opt-norse-symbolism); Anti-Defamation League, *Hate Symbol—Valknot* (online at www.adl.org/resources/hate-symbol/valknot) (accessed June 29, 2022).

[44] *Id.*

[45] *POTD:  PSA "Big Igloo Aloha" Custom Series AK*, The Firearm Blog (Feb. 3, 2020) (online at www.thefirearmblog.com/blog/2020/02/03/potd-psa-big-igloo-aloha-custom-ak/).

[46] Southern Poverty Law Center, *"Boogaloo Boy" Arrested in Texas, Charged with Plotting to Murder Cops on Facebook Live* (May 15, 2020) (online at www.splcenter.org/hatewatch/2020/05/15/boogaloo-boy-arrested-texas-charged-plotting-murder-cops-facebook-live); *41-year Sentence for Ex-Air Force Sergeant Who Killed Guard*, Associated Press (June 3, 2022) (online at https://apnews.com/article/us-air-force-san-francisco-oakland-police-government-and-politics-54ee0fa4316354d893b691c5f8d44023); *Whitmer Conspiracy Allegations Tied to*





*Top, members of the Boogaloo Boys.  Bottom left, Palmetto State Armory's "Big Igloo Aloha" rifle. Bottom right, Daniel Defense's floral accessorized rifle.[47]*

In June 2021, Daniel Defense posted a photo of its M4A1 assault rifle, accessorized with a similar floral pattern, on its Instagram account.

Gun retailers have also used extremist advertising materials.  Big Daddy Unlimited (BDU) is a licensed retailer of all five gun manufacturers under investigation by the Committee and frequently appears at gun conventions such as the NSSF Shot Show.[48]  Following Kyle

---

*"Boogaloo" Movement*, NBC News (Oct. 8, 2020) (online at www.nbcnews.com/tech/tech-news/whitmer-conspiracy-allegations-tied-boogaloo-movement-n1242670).

[47] *What Do You Do When Extremism Comes for the Hawaiian Shirt?*, New York Times (June 29, 2020) (online at www.nytimes.com/2020/06/29/style/boogaloo-hawaiian-shirt.html).

[48] Big Daddy Unlimited, *Big Daddy Unlimited Brands* (online at https://bigdaddyunlimited.com/big-daddy-unlimited-brands) (accessed June 30, 2022); Shot Show Planner, *Big Daddy Unlimited—Exhibitor* (online at

17

Rittenhouse's 2021 acquittal on charges of homicide, BDU made a post to its company social media accounts with an image of Rittenhouse alongside its products, with the caption "Be a Man Among Men."  The text refers to the slogan of the Rhodesian colonist army, which has become a source of inspiration in white supremacist circles.[49]  White supremacist Dylann Roof, who murdered nine Black churchgoers in 2015, created a manifesto that was posted to a website called "The Last Rhodesian."  Roof's manifesto included "photographs of himself wearing a jacket with a patch of the green-and-white Rhodesian flag."[50]  BDU has claimed there was no connection between its graphic and its racist connotations.[51]

There have been an increasing number of mass shootings in recent years carried out by shooters acting on their white supremacist beliefs, including the shootings in Buffalo, El Paso, and at the Tree of Life Synagogue in Pittsburgh.[52]

As a result of the increase in racially motivated violence, firearms manufacturers profit from the business of both white supremacists and those extremists' targets.  Gun ownership among Black Americans has soared by more than 50% since 2020, in response to increasing gun violence and the spike in anti-Black hate crimes.[53]  The firearms industry has capitalized on this fear and begun marketing directly to minority communities with taglines such as "it's a jungle out there," and "mi casa no es sú casa."[54]  This marketing has increased the number of guns in these communities, which are already the most negatively impacted by rampant gun violence.  Black Americans experience gun violence and assaults at dramatically higher rates than other ethnicities.[55]

### E.        Marketing Through Video Games

---

https://n1b.goexposoftware.com/events/ss22/goExpo/exhibitor/viewExhibitorProfile.php?__id=2290) (accessed June 30, 2022).

[49] *Gun Sellers' Message to Americans:  Man Up*, New York Times (June 22, 2022) (online at www.nytimes.com/2022/06/18/us/firearm-gun-sales.html); *Rhodesia's Dead—but White Supremacists Have Given It New Life Online*, New York Times (Apr. 10, 2018) (online at www.nytimes.com/2018/04/10/magazine/rhodesia-zimbabwe-white-supremacists.html). *The Gun Industry Created a New Consumer. Now It's Killing Us*, The Atlantic (July 25, 2022) (online at www.theatlantic.com/ideas/archive/2022/07/firearms-industry-marketing-mass-shooter/670621/).

[50] *Id.*

[51] Big Daddy Unlimited Intel, *Big Daddy Unlimited in the New York Times* (June 21, 2022) (online at https://intel.bigdaddyunlimited.com/bdu-ny-times/?amp=1).

[52] *White Supremacist Extremism Takes Up Arms in the United States*, El País (May 22, 2022) (online at https://english.elpais.com/international/2022-05-22/white-supremacism-takes-up-arms-in-the-united-states.html).

[53] *Why More Black People Are Looking for Safety in Gun Ownership*, NBC News (June 14, 2022) (online at www.nbcnews.com/news/nbcblk/black-people-are-looking-safety-gun-ownership-rcna32150); *Black Americans Flock to Gun Stores and Clubs:  "I Needed to Protect Myself,"* The Guardian (Apr. 5, 2021) (online at www.theguardian.com/us-news/2021/apr/05/us-gun-ownership-black-americans-surge).

[54] Violence Policy Center, *How the Firearms Industry and NRA Market Guns to Communities of Color* (Jan. 2021) (online at www.vpc.org/studies/marketingexecsum2021.pdf).

[55] Everytown for Gun Safety, *Impact of Gun Violence on Black Americans* (online at www.everytown.org/issues/gun-violence-black-americans/) (accessed June 30, 2022).

Compendium_Cornell
Page 1975

Documents provided to the Committee show how manufacturers use the imagery of first-person shooter video games to market their products.  Below is a comparison of two Smith & Wesson M&P advertisements and the video game Call of Duty Modern Warfare, in which the player is using a similar M4 rifle.[56]

Smith and Wesson advertisements:



Call of Duty Modern Warfare video game:



Gun manufacturers also enter into licensing agreements to have their weapons featured in first-person shooter video games.  Ralph Vaughn, who negotiates licensing agreements with game developers on behalf of sniper rifle manufacturer Barrett, said:  "It is hard to qualify to

---

[56] Reddit, *Just Found Out About the Cleanest Iron Sight for the M4* (May 3, 2020) (online at www.reddit.com/r/modernwarfare/comments/gcnhdr/just_found_out_about_the_cleanest_iron_sight_for/) (accessed July 25, 2022).

Compendium_Cornell
Page 1976

what extent rifle sales have increased as a result of being in games, but video games expose our brand to a young audience who are considered possible future owners."[57]

## IV.    THE GUN INDUSTRY'S FAILURE TO TRACK CRIMES AND DEATHS CAUSED BY ITS' PRODUCTS

The Committee's investigation found that the five gun manufacturers under review do not have any systems in place to monitor and analyze deaths and injuries associated with their products.[58]  In response to the Committee's inquiries, all five companies asserted that they do not monitor or track injuries and deaths caused by their AR-15-style rifles, either from accidental discharge, product malfunction, or deliberate use, nor do they track crimes committed with the products.

- **Bushmaster** represented that it "does not formally 'monitor' or 'track'" incidents,[59] and also claimed that there were no such deaths or injuries with its products, even though the mass shooter in Buffalo used a Bushmaster-brand assault weapon to kill ten people.[60]

- **Ruger** emphasized that the company becomes aware of deaths, injuries, and crimes associated with its products only through its "customer service department, through media reports, or occasionally in connection with actual or potential litigation."  Ruger maintained that it deals with each customer claim of injuries or deaths associated with its products individually, and "does not create or maintain records based upon the nature of the injury claimed."[61]

- **Sig Sauer** asserted that it does "not have the means" to track such incidents.[62]

---

[57] These licensing agreements provide a steady source of income for the gun manufacturers, ranging from 5-10% of the retail price, or involving fixed royalties.  *Shooters:  How Video Game Fund Arms Manufacturers*, Eurogamer (May 14, 2019) (online at www.eurogamer.net/shooters-how-video-games-fund-arms-manufacturers).

[58] Committee on Oversight and Reform, *Press Release:  Chairwoman Maloney Launches Investigation into Manufacturers of Assault Weapons Used in Mass Shootings* (May 27, 2022) (online at https://oversight.house.gov/news/press-releases/chairwoman-maloney-launches-investigation-into-manufacturers-of-assault-weapons).

[59] Internal letter from Bushmaster Firearms International to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (June 3, 2022).

[60] *Buffalo Supermarket Shooting:  What Do We Know So Far?*, Associated Press (May 16, 2022) (online at https://apnews.com/article/buffalo-shooting-what-to-know-bcb5e0bd2aedb925d20440c2005ffef8).

[61] Internal letter from Sturm, Ruger & Company, Inc. to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (June 3, 2022).

[62] Internal letter from Sig Sauer, Inc. to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (June 6, 2022).

- Both **Daniel Defense** and **Smith & Wesson** asserted that they do "not monitor or track this information."[63]

In response to the Committee's request for internal company analyses of the use of their assault weapons "in mass shootings or other homicides," the "risks posed" by the marketing or sale of these weapons, and "the ability to modify these weapons to increase their lethality," none of the five companies produced a single document.

These gun companies fail to track the deaths and crimes caused by their products even though they are included in a tracing process run by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  When law enforcement seizes a gun at a crime scene, they contact ATF's National Tracing Center to track the firearm from the manufacturer, through dealers and retailers, and into the hands of the most recent buyer.[64]  During this tracing process, ATF works directly with firearm manufacturers to gain information about the gun.[65]  Despite their involvement in this tracing process, each company claimed that they do not monitor or track this information.

As the Committee has previously demonstrated, a "small number of retailers" are often responsible for supplying an inordinate number of guns used in crimes, suggesting that industry attention to where and how their products are misused by criminals could help curb violent crime or rising homicide rates.[66]

Gun manufacturers' failure to monitor injuries, deaths, and crimes associated with their products also stands in stark contrast with other consumer product industries, which are required to alert the public to risk of harm from their products through Consumer Product Safety Commission (CPSC).  Manufacturers, importers, distributors, and retailers of consumer products must notify the CPSC within 24 hours if they become aware of information suggesting their product "creates an unreasonable risk of serious injury or death."[67]

Other industries have similar requirements.  For instance, the Food and Drug Administration (FDA) requires companies with prescription drugs to submit detailed "adverse event" information to FDA, and manufacturers of medical devices are "required to report to the FDA when they learn that any of their devices may have caused or contributed to a death or serious injury."[68]

---

[63] Internal letter from Daniel Defense to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (June 6, 2022); Internal letter from Smith & Wesson to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (June 7, 2022).

[64] Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Tracing Center* (online at www.atf.gov/firearms/national-tracing-center) (accessed June 23, 2022).

[65] *Id.*

[66] *6 Gun Shops, 11,000 "Crime Guns":  A Rare Peek at the Pipeline*, New York Times (Apr. 28, 2022) (online at www.nytimes.com/2022/04/28/us/politics/gun-shops-weapons-resell.html).

[67] 15 U.S.C. § 2064(b).

[68] 21 C.F.R. § 314.80(a) (2014); Food and Drug Administration, *Mandatory Reporting Requirements: Manufacturers, Importers and Device User Facilities* (online at

Even where a product operates as intended, an industry typically will face legal liability where their distribution or marketing practices yield excessive or unintended use of the product. For instance, a pharmaceutical company will face legal liability for failing to curb negligent monitoring or distribution practices of dangerous drugs such as opioids. Yet the gun industry faces no such consequences for its failure to track deaths, injuries, or crimes committed with their products.

In 2005, Congress passed PLCAA which granted gun manufacturers and dealers extraordinary protections from civil liability for how they sell, market, or distribute their products. Under this liability shield, gun manufacturers and dealers possess little financial incentive to make safety improvements to their products or track gun data to ensure that the firearms they sell do not end up in the hands of criminals.

Recently, however, successful state suits in Pennsylvania, New York, Connecticut, and other jurisdictions have begun to erode PLCAA's blanket immunity for gun manufacturers and dealers. In 2022, the families of many of the Sandy Hook victims and Remington agreed to a $73 million settlement under the legal theory that Remington's marketing practices for the Bushmaster XM-15 rifle violated the state's consumer protection law, overcoming Remington's argument that PLCAA barred the suit.[69] Nevertheless, as this memo demonstrates, these companies continue to design and market weapons of war to the public without adequate oversight of their products' destructive potential.

## V.    CONCLUSION

The right to bear arms is protected by the Second Amendment. Firearms manufacturers, however, do not have a constitutional right to engage in the irresponsible marketing and sale of dangerous assault weapons that are used to terrorize communities across the United States.

Congress must act to rein in the irresponsible business practices of the gun industry, prohibit the sale of dangerous weapons of war to civilians, and reassess the liability protections that prevent the American people from accessing the courts to hold gun manufacturers accountable for the deadly effects of their business decisions.[70] Congress and federal agencies should also consider requiring death and crime reporting requirements for the gun industry, similar to those imposed on other industries, which will force manufacturers to develop compliance systems and take reasonable precautious to ensure their products are not misused. Additionally, Congress should consider imposing reasonable regulations on how the gun industry advertises its products, such as age limitations, content warnings, and further enabling agencies like the Federal Trade Commission to regulate misleading advertisements.

---

www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/ReportingAdverseEvents/ucm2005737.htm) (accessed July 25, 2022).

[69] *Sandy Hook Families Settle with Gunmaker for $73 Million Over Massacre*, New York Times (Feb. 17, 2022) (online at www.nytimes.com/2022/02/15/nyregion/sandy-hook-families-settlement.html).

[70] *See* H.R. 2814 (repealing PLCAA and expanding access to firearm trace data maintained by the ATF).

Compendium_Cornell
Page 1979

Finally, the Committee's investigation highlights the need for Congress to increase funding for gun research and to take additional steps to curb the gun violence epidemic in the United States.

# Founders Online

## Report on Books for Congress, [23 January] 1783

### Report on Books for Congress

MS (LC: Continental Congress Miscellany). Nine undated pages in JM's hand, with the exception of one entry. Docketed by Charles Thomson: "Report of Comee. List of Books to be imported for the use of Congress Read Jany 24. 1783. Question taken to empower Superint: finance & Secy to import them. Passed in the Negative. Comee. Mr. Madison Mr. Williamson Mr. Mifflin." The last ten unnumbered folios of NA: PCC, No. 183 comprise an undated and undocketed copy of the book list, of which a part is in Thomson's hand and the rest in several hands, none JM's. Except for some variations in spelling and capitalization, this copy is identical in contents and in the sequence of items entered in the list written by JM.

In his Notes on Debates for 23 January (q.v.), JM stated that the committee "reported" the book list on that day. This may be true in the sense that, under the fourth rule of the rules of procedure adopted on 4 May 1781, the list was "delivered" to Charles Thomson, secretary of Congress; but if that was the case, the same rule, quite in accord with Thomson's docket, provided that the report should be "read" on 24 January (JCC, XX, 476). In his manuscript "Committee Book 1781–1785," Thomson's entry, "Report Jany," is obviously not helpful. Further evidence lacking, the report is placed here so that it will precede the account by JM of the debate. It is possible that having stated the committee "reported" on 23 January, JM decided to follow the entry with a summary of the debate as of that date rather than to insert it in broken sequence when taken up on the twenty-fourth. Although Gaillard Hunt, drawing on PCC, incorporated the report as part of the journal for 24 January (JCC, XXV, 83–92), Thomson himself made no entry in the manuscript journal, in all likelihood because the report was not adopted.

#### EDITORIAL NOTE

On 1 July 1782 Theodorick Bland proposed that there be compiled "a list of books to be imported for the use of the United States in Congress Assembled." Following adoption of the motion, Bland, contrary to established usage but probably in accord with his own wish, was not named chairman or even a member of the committee designated to prepare the list. In his stead JM was appointed chairman, with his old mentor John Witherspoon (N.J.) and John Lowell (Mass.) as his colleagues (NA: PCC, No. 186, fol. 39). On 21 November the motion was renewed, presumably by JM, because Witherspoon and Lowell had left Philadelphia earlier that month (Burnett, Letters, VI, xlvi, xlviii). This second motion is not recorded in the journal, but Congress on that day reconstituted the committee by replacing these two men with Hugh Williamson (N.C.) and Thomas Mifflin (Del.) (NA: PCC, No. 186, fol. 69). JM alone seems to have prepared the report, although he may have consulted Witherspoon before the learned clergyman returned to his home in Princeton. See William W. Woodward, ed., The Works of the Rev. John Witherspoon, D.D., LL.D.... (4 vols.; Philadelphia, 1802), III, 232–574, passim.

During the latter half of 1782 the primary issues before Congress concerned finance, commerce, prisoners of war, western lands, and international affairs, including the alliance with France, the hoped-for terms of peace, the unsatisfactory relations with Spain, and the treaties with the Netherlands and Sweden. Most of the subject classifications in JM's report reflect the needs of Congress for the guidance of authoritative works on these topics. See JM Notes, 23 Jan. 1783.

Under many of his subheadings and in several of his references to individual authors JM neglected to specify what particular volumes he had in mind. See, for example, the entries numbered 24, 34, 36, 37, 55, 71, 169, 172, 175, 200, 202, 204, 250, 277, 279, 280. For this reason, neither he nor any other delegate in Congress could have known the exact number of titles and volumes in print by 1783 which were included in his list. Those culled below total approximately 550 titles in about 1,300 volumes. In making this estimate, the present editors have excluded from their count the volumes of an individual author's work or in a continuing series which would not be published by the close of 1783; works listed by JM that, although separately available in print, were included in a collection also recommended by him; and whatever number of volumes he may have envisaged under his rubric "All political tracts" (No. 280). Whenever a work on his list had appeared simultaneously in two printings, the editors have selected for tallying the set which comprised the fewer volumes.

JM certainly did not derive the names of authors and the titles of their books from a single source. Besides the modest library of James Madison, Sr., and JM's own growing collection of works, the private libraries of Donald Robertson, the Reverend John Witherspoon, and the Reverend James Madison suggest themselves, as do the institutional libraries of the College of New Jersey, the College of William and Mary, and the Library Company of Philadelphia. For the last of these, see A Catalogue of the Books Belonging to the Library Company of Philadelphia ... (Philadelphia, 1789). Again JM may have acquired much information by browsing in Philadelphia bookstores and scanning advertisements in the gazettes of that city.

Among the volumes that attracted JM's attention were the "near 4000" that Colonel Isaac Zane, Jr., had

purchased from Mary Willing Byrd, the widow of Colonel William Byrd III, and brought in October 1781 to Philadelphia for sale at Robert Bell's bookstore near St. Paul's Church on Third Street (Edwin Wolf, 2nd, "The Dispersal of the Library of William Byrd of Westover," Proceedings of the American Antiquarian Society, LXVIII [1957–58], 19–106, and esp. 23–25; Papers of Madison, I, 133, n. 1; 185, n. 1; V, 404, n. 18). At least at one of Bell's many auctions during the year beginning on 23 October 1781, JM bought a "few scarce books" from the Byrd collection (ibid., IV, 126–27, nn. 4–5; Edwin Wolf, op. cit., pp. 25–27). William Pritchard, proprietor of another bookstore, who succeeded Bell in October 1782 as Zane's agent, was still selling books from the collection at the time of JM's report to Congress and for several years thereafter (Papers of Madison, IV, 126; 127, n. 4; Edwin Wolf, op. cit., pp. 28–29, 31). Although eighty-two of the titles in the Byrd collection were also among those recommended by JM in his report to Congress, at least fifty of the eighty-two were so familiar and so obviously appropriate for inclusion in his list that he most probably jotted them down from memory (John Spencer Bassett, ed., The Writings of "Colonel William Byrd, of Westover in Virginia, Esqr." [New York, 1901], pp. 413–43).

During January 1783, when Thomas Jefferson was rooming at JM's boarding house in Philadelphia, the two men surely conversed on the subject of a reference library for Congress. By comparing entries in Jefferson's so-called "1783 catalogue" (microfilm of MS in Mass. Historical Society), especially with JM's report under the caption "America," a kinship between the two lists is made evident. Most striking are the eleven entries between "Wafer's Voyages" (No. 215) and "Ellis's voyage to Hudson's Bay" (No. 225). Except for variations in spelling and capitalization, these entries in the "catalogue" and the report are identical. They embrace a total of thirty-one explorers' accounts, but twenty-four of them were to be found only in printed collections. Of the twenty-four, twenty-one were printed only in Samuel Purchas (No. 239) or Richard Hakluyt (No. 240). Jefferson's "catalogue," which was a record of works he already possessed and of others he desired to acquire, contains on a preliminary page the date "1783, Mar. 6"; but it was an expanding record, and its contents at any given date cannot be known (Boyd, Papers of Jefferson, VI, 216). For this reason, it is at least possible that JM derived the sequence of eleven entries from the holdings of the Library Company of Philadelphia or other sources, and that Jefferson thereupon used JM's list to add to his own, rather than vice versa.

In this connection, it probably is relevant to note that the two men were together during only the last four weeks preceding the submission of the report by JM, that during this period JM was much occupied with important financial and other issues before Congress, that the closest parallel between the entries in his book list and those in Jefferson's "1783 catalogue" is under the caption "America," the final section of the list, and that JM, having been a member of the committee since 1 July, and its chairman since 21 November 1782, was not customarily laggard in fulfilling an assignment. About 35 of his definite recommendations were of titles apparently owned by the Library Company of Philadelphia in 1782 but not entered in Jefferson's "catalogue," while about 140 others could have been derived from the holdings of that company as well as from that "catalogue." See also E[mily] Millicent Sowerby, comp., Catalogue of the Library of Thomas Jefferson (5 vols.; Washington, 1952–59).

Imperfections undoubtedly remain in the titles cited. The growing number of bibliographical aids prepared by authorities of presumably equal expertness, or at least of high reputation, often disagree concerning the punctuation, capitalization, and occasionally even the spelling or wording of the same edition of a work. To reconcile these differences by scanning the title pages was in numerous instances a manifest impossibility. The editors are confident only that where JM specified a work by naming the author, suggesting the title, or both, they have correctly identified his entry.

In general the format adopted for presentation of the list represents an attempt to establish the "ideal" purchase for all JM's entries, except No. 280. Included are the date of original publication and the date of the latest, or in certain cases of an earlier, superior, edition as of 1783. Omitted, on the other hand, are references to the many editions which, though dated even later than those selected, are incomplete or obviously inferior. Abbreviated titles are used; otherwise the present footnotes would be at least four times longer than they now are. The names of translators, unless specified by JM or known to have importantly enhanced the value of a work by their editing or augmentation of it, are not mentioned. Finally, the nature and length of this report are believed to warrant numbering JM's entries sequentially and placing each footnote immediately after the volume to which it refers rather than grouping all the annotations at the close of the list.

[23 January 1783]

The Committee instructed on the motion of Col. Bland to report a list of books proper for the use of Congress, recommend that Superitendt. of Finance & the Secy. of Congress be empowered to take order for procuring the books enumerated below; the same when procured to be under the care of the said Secy.

[1]   Encyclopédie Méthodique

Charles Joseph Panckoucke (1736–1798) et al., eds., Encyclopédie méthodique, ou par ordre de matières ... (192 vols., Paris and Liège, 1782–1832). For Thomas Jefferson's and JM's interest in this work, see Sidney L. Jackson, "The Encyclopédie Méthodique, A Jefferson Addendum," Virginia Magazine of History and Biography, LXXIII (1965), 303–11.

[2]   Dictionaire de l'homme d'Etât

Jean Baptiste René Robinet (1735–1820) et al., eds., Dictionnaire universel des sciences morale, économique, etc., ou

bibliothèque de l'homme d'état … (30 vols., London [i.e., Neuchâtel], 1777–1783).

## Law of Nature and Nations

General captions, as above, were written by JM in the left margin of his manuscript and have been italicized by the present editors.

[3]   Cudworth's Intellectual System

Ralph Cudworth (1617–1688), The True Intellectual System of the Universe … (London, 1678; 2d ed., 2 vols., London, 1743).

[4]   Cumberland's Law of Nature

Richard Cumberland (1632–1718), A Treatise of the Laws of Nature … (London, 1672; 2d ed., London, 1727).

[5]   Wolfius's Law of Nature

Christian (1679–1754), Freiherr von Wolff, Institutions du droit de la nature et des gens … (Two separate Latin original works: (1) 8 parts, Frankfort, Leipzig, and Magdeburg, 1740–1748, and (2) Magdeburg, 1749; Elie Luzac [1723–1796], tr. and ed., 6 vols.; 2 vols., Leyden, 1772).

[6]   Hutchinson's Moral Philosophy

Francis Hutcheson, Sr. (1694–1747), A System of Moral Philosophy … (Latin original MS; Francis Hutcheson, Jr. [ca. 1722–ca. 1773], tr. and ed., 2 vols., London and Glasgow, 1755).

[7]   Beller's delineation of universal Law

Fettiplace Bellers (1687–1732), A Delineation of Universal Law … (Posthumous, London, 1740; 3d ed., London, 1754).

[8]   Ferguson's analysis of Mor: Philosophy

Adam Ferguson (1723–1816), Institutes of Moral Philosophy … (Original work, title according with JM's entry, Edinburgh, 1761; rev. and superseded by above title, Edinburgh, 1769; 3d ed., Edinburgh, 1773). Ferguson had served as secretary to the Carlisle peace commission in 1778 (Papers of Madison, III, 272, n. 2). See No. 156 for one of Ferguson's works owned by JM.

[9]   Rutherforth's institutes of Natural Law

Thomas Rutherforth (1712–1771), Institutes of Natural Law … (2 vols., Cambridge, 1754–1756). This is a commentary on the work next listed.

[10]   Grotius's Law of Nature and Nations

Hugo Grotius (Huig van Groot) (1583–1645), The Rights of War and Peace; Wherein Are Explained the Law of Nature and Nations … (Latin original ed., Paris, 1625; English ed., 3 vols., London, 1738). For previous references to Grotius, see Papers of Madison, IV, 16, n. 23; V, 92; 93, n. 7; 437, n. 2; for other works by the same author in the book list, see Nos. 16 and 94.

[11]   Puffendorf's Law of Nature and Nations with notes by Barbeyrac

Samuel (1632–1694), Freiherr von Pufendorf, The Law of Nature and Nations … (Latin original ed., Lund, 1672; Jean Barbeyrac [1674–1729], tr. and ed., French ed., Avec des notes, Amsterdam, 1706; English ed., variant title, London, 1710; 4th ed., above title, London, 1749). For a previous reference to this work, see Papers of Madison, V, 437, n. 2. For other works by Pufendorf, see Nos. 12 and 89; for others involving Barbeyrac, Nos. 30 and 34e.

[12]   Puffendorf de officio hominis et civis

Samuel, Freiherr von Pufendorf (see No. 11), The Whole Duty of Man, according to the Law of Nature … (Latin original ed., a résumé of No. 11, Lund, 1673; English ed., London, 1691; 4th ed., London, 1716).

[13]   Vattell's Law of Nature and Nations

Emerich de Vattel (1714–1767), The Law of Nations: or, Principles of the Law of Nature … (French original ed., Neuchâtel and Leyden, 1758; English ed., 2 vols., London, 1759–1760; 2d ed., 2 vols. in 1, London, 1760). For Vattel, see Papers of Madison, II, 132–33; 135, n. 12; IV, 16, n. 23; V, 437, n. 2.

[14]   Vattell's Questions in Natural Law

Emerich de Vattel (see No. 13), Questions de droit naturel … (Berne, 1762).

[15]   Burlamaqui's Law of Nature & Nations

Jean Jacques Burlamaqui (1694–1748), The Principles of Natural Law. In Which the True System of Morality and Civil Government Are Established … (French original ed., 2 vols., Geneva, 1747; English ed., 2 vols., London, 1748; 2d ed., 2 vols., London, 1763).

[16]   Grotius's Mare liberum

Hugo Grotius (see No. 10), Mare liberum, sive, de jure quod Batavis competit ad indicana commercia dissertatio … (Leyden, 1609; 2d ed., Leyden, 1663).

[17]   Selden's Mare clausum

John Selden (1584–1654), Mare clausum; The Right and Dominion of the Sea … (Latin original ed., London, 1635; English ed., London, 1663).

[18]   Molloy de jure maritimo

Charles Molloy (1646–1690), De jure maritimo et navali; or, A Treatise of Affairs Maritime and of Commerce … (London, 1676; 10th ed., 2 vols., London, 1778).

[19]   Beaux lex mercatoria

Wyndham Beawes (d. ca. 1777), Lex mercatoria rediviva: or, The Merchant's Directory … (London, 1750; Thomas Mortimer [1730–1810], continuator, 4th ed., London, 1783).

[20]   Jacob's lex mercatoria

Giles Jacob (1686–1744), Lex mercatoria: or, The Merchant's Companion … (London, 1718; 2d ed., London, 1729).

[21]   Lee on captures

Richard Lee, A Treatise of Captures in War … (London, 1759). The treatise, which deals exclusively with captures at sea, is chiefly a translation of part of a work by Bynkershoek, for whom see No. 30a.

[22]   Ordinances of Marine of France

Ordonnance de la marine, du mois d'août 1681. Commentée & conférée sur les anciennes ordonnances, le droit romain & les nouveaux règlemens … (2d ed., Paris, 1747).

[23]   Admiralty Laws of G. Britain

Laws, Ordinances, and Institutions of the Admiralty of Great Britain … (London, 1746; 4th ed.[?], 2 vols., London, 1776).

[24]   do.     of the several others of Europe

   Unless this sweeping entry signifies uncertainty, it betrays overconfidence. Innumerable copies of maritime ordinances, orders in council, edicts, and regulations, averaging between four and twelve pages, were constantly being printed, and the flow was accelerated by the fact of war; but the day when each maritime power of Europe would publish these promulgations as a codified whole was still largely in the future. If JM meant to indicate the collecting of admiralty laws as separately published, spatial considerations prohibit making the attempt in the present volume. If he meant that only those laws already codified should be purchased, he can be easily accommodated. There appear to have been available within this meaning in 1783 one useful general work in French; the Dutch code, years in the building; and the Russian code, published, 2 volumes in 1, St. Petersburg, in 1781. This last-named work, however, is not cited below, for it would scarcely have been included in a library of Congress in 1783.

24a. René Josué Valin (1695–1765), Nouveau commentaire sur l'ordonnance de la marine du mois d'août 1681. Où se trouve la conférence des anciennes ordonnances des us & coutumes de la mer, tant du royaume que des pays étrangers, & nouveaux règlemens concernans la navigation & le commerce maritime … (2 vols., La Rochelle, 1760; 3d ed., 2 vols., La Rochelle, 1776).

24b. Recüeil van alle de Placaten, Ordonnatien, Resolutien, Instructien, lysten en Waarchouwinger, betreffende de Admiraliteyten, Convoyen, Licenten, en verdere Zee-saarken … (11 vols., The Hague, 1701–1773; Generale Index … 2 vols., The Hague, 1773–1775).

[25]   Wiquefort's Ambassador

Abraham van Wicquefort (1598–1682), The Ambassador and His Functions, to Which Is Added, an Historical Discourse

concerning the Election of the Emperor ... (French original ed. of L'ambassadeur, 2 vols., The Hague, 1680–1681; of Discours historique, Paris, 1658; works combined, 2 vols., Cologne, 1689–1690; English ed., variant title, 2 vols. in 1, London, 1716; 3d ed., above title, 2 vols., London, 1740).

[26]   El Embaxador, par Antoine de Vera

Juan Antonio Vera Figueroa y Zúñiga (1588–1658), Conde de la Roca, Le parfait ambassadeur ... (Spanish original ed., 2 vols. in 1, Seville, 1620; French ed., 2 vols., Leyden, 1709).

[27]   L'Ambasciatore Politice Christiano, par le prince Charles Marie Carafe

Carlo Maria Caraffa (1646–1695), Prince de la Roccella e di Buteria, L'ambasciatori politiche-christiane.... This title comprises the second part of Caraffa's Opere (3 parts in one vol., Mazzarino, 1692). When L'ambasciatori was first published has not been ascertained, but in all probability it was after 1684, when the author was Spanish ambassador to Rome, and it was certainly before the date in 1688 when, translated into Spanish, it was published at Palermo.

[28]   De la charge et dignité de l'ambassadeur, par Jean Hotman

Jean Hotman (1552–1636), Sieur de Villiers Saint-Paul, The Ambassador ... ("Sieur de Villiers," only attribution, French original ed., title according with JM's entry, Paris, 1602; J. S. [probably James Shaw], tr. and ed., English ed., London, 1603). For a charge against this work, see No. 32.

[29]   Le Ministre public dans les cours etrangeres &c, par J. de la Sarraz du Franquesnay

Jean, Sieur de La Sarraz du Franquesnay, Le ministre public dans les cours étrangeres ... (Paris and Amsterdam, 1731).

[30]   De foro legatorum par Bynkershock traduit en Francois par Barbeyrac, sous le titre de traite du Juge competent des Ambassadeurs &c. with all his other works.

30a. Cornelis van Bynkershoek (1673–1743), Traité du juge compétent des ambassadeurs, tant pour le civil, que pour le criminel ... (Latin original ed., Leyden, 1702; Jean Barbeyrac [see No. 11], tr., French ed., The Hague, 1723; 3d ed., 2 vols., The Hague, 1746).

30b. ———, Cornelii van Bynkershoek, jurisconsulti ... opera omnia ... (Béat Philippe Vicat [1715–1777], comp. and ed., 2 vols. in 1, Leyden, 1767). JM and his consultants may not have known of the Vicat edition, which included the original Latin version of 30a.

[31]   De legationibus par Alberic Gentilis

Alberico Gentili (1522–1608), De legationibus libri tres ... (London, 1585; 2d ed., Hanau, 1607).

[32]   Legatus par Charles Paschal

Carlo Pasquale (1547–1625), Visconte di Quente, Legatus ... distinctum in capita septem et septuaginta ... (Rouen, 1598; 3d ed., Amsterdam and Leyden, 1645). Pasquale charged that the work of Hotman (No. 28) was no more than extracts from the above.

[33]   Legatus par Frederick Marsalaer

Fredrik van Marselaer (1584–1670), Legatus libri duo ... (Variant title, Antwerp, 1618; 2d ed., above title, Antwerp, 1626; 4th ed.[?], Antwerp, 1663).

# Treaties and Negociations

[34]   Corps diplomatique

34a. Jean Le Clerc (1657–1736), Négociations secrètes touchant la paix de Munster et d'Osnaburg ... (Variant subtitle, 4 vols., The Hague, 1724–1726; 2d ed., 4 vols., The Hague, 1725–1726).

34b. [Jean Yvres de Saint-Prest (d. 1720)], Histoire des traités de paix, et autres négotiations du six-septième siècle ... Ouvrage ... qui peut servir d'introduction au corps diplomatique ... (Posthumous, 2 vols., Amsterdam, 1725).

34c. Jean Dumont (d. 1726), Baron de Carlscroon, comp. and ed., Corps universel diplomatique du droit des gens; contenant ... des traitez ... faits en Europe depuis le règne de l'empereur Charlemagne jusques à présent ... (8 vols., The Hague; 8 vols. in 16, Amsterdam, 1726–1731).

34d. Jean Rousset de Missy (1686–1762), comp. and ed., Supplément au corps diplomatique ... (3 vols., Amsterdam, 1726–1731; 2d ed., 3 vols., Amsterdam, 1739).

34e. Jean Barbeyrac (see No. 11), L'histoire des anciens traitez … de l'antiquité depuis les tems les plus reculez jusques à l'empire de Charlemagne … (2 vols., Amsterdam, 1726–1731; 2d ed., 2 vols., Amsterdam, 1739).

[35]   Rymer's foedera

Thomas Rymer (1641–1713) and Robert Sanderson (1660–1741), comps. and eds., Foedera, conventiones, literae, et cujuscunque generis acta publica, inter reges Angliae et alios quosvis imperatores, reges, pontifices, principes, vel communitates … ab anno 1101, ad nostra usque tempora habita aut tractata … (20 vols., London, 1704–1732; George Holmes [1662–1749], comp. and ed., 2d ed., 20 vols., London, 1727–1735; 3d ed., 10 vols., The Hague, 1739–1745).

[36]   A complete collection of Treaties

As in the case of admiralty codes (No. 24), even a partial fulfillment of this recommendation would fill scores of pages with the titles of international treaties as separately published. The following six collections, in addition to the work listed next above, appear to have been the best and most nearly complete of those available in 1783.

36a. Jean Rousset de Missy (see No. 34d), comp. and ed., Recueil historique d'actes, négotiations, mémoires et traitez, depuis la paix d'Utrecht jusqu'à … celle d'Aixla-Chapelle … (21 vols., Amsterdam, Leipzig, and The Hague, 1728–1754; 2d ed., 21 vols., The Hague, 1728–1755).

36b. John Almon (1737–1805), comp. and ed., A Collection of All the Treaties … between Great Britain and Other Powers, from the Revolution in 1688, to the Present Time … (2 vols., London, 1772). For other compilations with which Almon was involved, see Nos. 36c, 120, and 247a.

36c. John Almon (see No. 36b) and John Debrett (d. 1822), comps. and eds., A Collection of Treaties … Being a Supplement to A Collection of Treaties … from the Revolution in 1688 … (London, 1781). For another work partly edited by Debrett, see No. 120.

36d. William Harris (d. 1770), comp. and ed., A Complete Collection of All the Marine Treaties Subsisting between Great Britain and France, Spain … Tunis, &c. Commencing in the Year 1546, and Including the Definitive Treaty of 1763 … (London, 1763; 2d ed., London, 1779).

36e. José Antonio de Abreu y Bertodano (1717–1775), comp. and ed., Colección de los tratados … hechos … desde antes del establecimiento de la monarchia góthica hasta el feliz reynado del rey N[uestro]. S[oberano]. D[on]. Fernando VI … (12 vols., Madrid, 1740–1752).

36f. Maciej (Matthias) Dogiel (1715–1760), comp. and ed., Codex diplomaticus Poloniae et magni ducatus Lithuaniae in quo pacta, foedera, tractatus pacis … nunc primum ex archivis publicis eruta ac in lucem protracta exhibentur … (Vols. I, IV–V, Vilna, 1758–1764; Vols. II and III never published).

[37]   Abbe Mably's public law of Europe—principles of Negociation—other political works.

37a. Gabriel Bonnot de Mably (1709–1785), Le droit public de l'Europe; fondé sur les traités … (2 vols., Geneva, 1746; 5th ed., 3 vols., Geneva, 1776). Although JM implied that Des principes des négotiations was a separate work, the phrase constituted the beginning words of the main title in earlier versions of the above.

37b. ———, Concerning Legislation: or the Principles of Laws … (French original ed., 2 vols., Amsterdam, 1776; English ed., 2 vols., Amsterdam, 1777).

37c. ———, De l'étude de l'histoire … (Paris, 1778; 2d ed., Maestricht, 1778).

37d. ———, Doutes proposés aux philosophes économistes, sur l'ordre naturel et essentiel des sociétés politiques … (The Hague, 1768).

37e. ———, Du gouvernement et des loix de la Pologne … (London, 1781). Thomas Jefferson, who while in Europe assisted JM in adding to his personal library, wrote on 2 August 1787, "You have now Mably's works complete except that on Poland" (Boyd, Papers of Jefferson, XI, 662). See also ibid., VIII, 463; XI, 666.

37f. ———, Observations on the History of Greece … (French original ed., Geneva, 1749; English ed., Geneva, 1766).

37g. ———, Observations on the Romans … (French original ed., Geneva, 1751; English ed., London, 1751).

37h. ———, Observations sur l'histoire de France … (2 vols., Geneva, 1765).

37i. ———, Parallèle des romains et des français par rapport au gouvernement … (2 vols., Paris, 1740).

37j. ———, Phocion's Conversions; or, the Relation between Morality and Politics … (Anon., French original ed.,

Amsterdam, 1763; William Macbean, tr. and ed., English ed., London, 1769; 2d ed., London, 1770).

37k. ———, Two Dialogues, concerning the Manner of Writing History ... (French original ed., Paris, 1783; English ed., London, 1783).

[38]   De la maniere de negocier avec les souverains &c. par Callier.

François de Callières (1645–1717), The Art of Negociating with Sovereign Princes ... (French original ed., Paris, 1716; English ed., London, 1716; 3d ed., London, 1738).

[39]   Discours sur l'art de negocier par Pequet

Antoine Pecquet (1704–1762), De l'art de négocier avec les souverains ... (Variant title, according with JM's entry, Paris, 1737; 3d ed., above title, Frankfort and Leipzig, 1764).

[40]   Histoire du traité de Westphalie par le P. Bougeant

(Le Père) Guillaume Hyacinthe Bougeant (1690–1743), (S.J.), Histoire du traité de Westphalie ... (2 vols., Paris, 1744; 3d ed., 3 vols., Paris, 1767).

[41]   Burche's view of negociations between F. & Engld.

Thomas Birch (1705–1766), An Historical View of the Negotiations between the Courts of England, France, and Brussels, from the Year 1592 to 1617 ... (London, 1749). For other works involving Birch, see Nos. 57, 119, and 148; for a work that may have been from his pen, 107.

[42]   Negociations du P. Jeannin

Pierre Jeannin (1540–1622), Les négotiations de Monsieur le Président Jeannin ... (Nicolas Castille, comp. and ed., 4 vols., Paris, 1656; 3d ed., 4 vols. in 2, Amsterdam, 1695).

[43]            du Cardinal D'ossat

Arnaud (1536–1604) Cardinal d'Ossat, Let[t]res du Cardinal d'Ossat ... (Abraham Nicolas Amelot de La Houssaye [1634–1706], comp. and ed., 2 vols., Paris, 1697; 9th ed.[?], 5 vols., Amsterdam, 1732).

[44]            du Maral. d'Estrades

Godefroi Louis (1607–1686), Comte d'Estrades et maréchal de France, Lettres, mémoires et négociations de Monsieur le Comte d'Estrades ... (Prosper Marchand [d. 1756], comp. and ed., 9 vols., London [i.e., The Hague], 1743; 2d ed., 9 vols., The Hague, 1763).

[45]            de la paix de Westphalie

Adam Adami (1610–1663), Relatio historica de pacificatione Osnabvrgo-Monasteriensi ex avtographo avctoris restitvta atqve actorvm pacis Vestphalicae ... (Anon., variant title, Frankfort on the Main, 1696; Johann Gottfried von Meiern [1692–1745], ed., 2d ed., above title, Leipzig, 1737; 3d ed., Ratisbon, 1739).

[46]            du Maral. de Noailles

Adrien Maurice (1678–1766), Duc de Noailles et maréchal de France, comp., Mémoires politiques et militaires, pour servir á l'histoire de Louis XIV & de Louis XV ... (Claude François Xavier Millot [1726–1785], ed., 6 vols., Paris, 1766; 2d ed., 6 vols., Paris, 1777). For a work wholly by Millot, see No. 56.

[47]            de la paix d'Utrecht

Casimir Freschot (1640–1720), The Compleat History of The Treaty of Utrecht ... (French original ed., 6 vols. in 12, Utrecht, 1714–1715; English ed., 2 vols., London, 1715).

[48]            des autres paix de ce siecle

Friedrich August Wilhelm Wenck (1741–1810), Codex ivris gentium recentissimi, e tabvlariorvm exemplorvmque fide dignorum monvmentis compositvs ... continens diplomata inde ab A. MDCCXXXV usque ad A. MDCCLXXII ... (3 vols., Leipzig, 1781–1795).

[49]   Lamberty's Memoirs & negociations

Guillaume de Lamberty (1660–1742), comp. and ed., Mémoires pour servir à l'histoire du XVIIe siècle, contenant les négociations ... (14 vols., Amsterdam and The Hague, 1734–1740).

[50]   Cardl. Mazarine's letters

Jules (1602–1661) Cardinal Mazarin, Lettres du Cardinal Mazarin où l'on voit le secret de la négociation de la paix des Pirénées ... (original ed., Amsterdam, 1690; Léonor Jean Christine Soulas d'Allainval [1700–1753], comp. and ed., 2 vols., Amsterdam, 1745).

[51]   De Witt's letters.

Johan de Witt (1625–1672) et al., Lettres et négociations ... depuis l'année 1652, jusqu'à l'an 1669, inclus ... (Two separate Dutch original works: (1) 3 vols., Amsterdam, 1719, and (2) 6 vols., The Hague, 1723–1725; French ed., 5 vols., Amsterdam, 1725). For another work partially by de Witt, see Nos. 95 and 163.

# General History

[52]   Universal History

George Sale (ca. 1697–1736) and continuators, An Universal History, from the Earliest Account of Time ... (41 vols., London, 1736–1765; 3d ed., 60 vols., London, 1779–1784).

[53]   Modern History

Thomas Salmon (1679–1767) and continuators, Modern History: or, The Present State of All Nations ... (32 small vols., London, 1725; 3d ed., 3 vols., London, 1744–1746). For another work by Salmon, see No. 67.

[54]   Raleigh's History of the World

Sir Walter Raleigh (ca. 1552–1618), The History of the World ... (Anon., London, 1614; 11th ed., 2 vols., London, 1736).

[55]   Voltaire's Historical works

For two of Voltaire's "Historical works" that JM listed separately, see Nos. 103 and 128.

55a. François Marie Arouet de Voltaire (1694–1778), The Age of Louis XV ... (French original ed., 2 vols., Berlin, 1751; English ed., 2 vols., London, 1774).

55b. ———, Annals of the Empire; from the Reign of Charlemagne ... (French original ed., 2 vols., Berlin and The Hague, 1754; English ed., London, 1781).

55c. ———, An Essay on Universal History, the Manners and Spirit of Nations from the Reign of Charlemaign to the Age of Lewis XIV ... (French original ed., 7 vols., Geneva, 1754; English ed., 3 vols., London, 1754–1757; French 2d ed., augmented, 8 vols., Geneva, 1761–1763; English 5th ed., augmented, 4 vols., London, 1782).

55d. ———, An Essay upon the Civil Wars of France ... (French original ed., London, 1727; English ed., London, 1727; 5th ed., Dublin, 1760).

55e. ———, Histoire du parlement de Paris ... ("Abbé Big," pseud., 2 vols., Amsterdam, 1769; 6th ed., 2 vols., n. p. [Paris?], 1771).

55f. ———, History of Charles XII. King of Sweden ... (French original ed., Rouen, 1731; English ed., London, 1734; 4th ed.[?], London, 1760).

55g. ———, The History of the War of Seventeen Hundred and Forty One ... (Anon., French original ed., London, 1756; English ed., London and Dublin, 1756; 3d ed., London, 1756).

55h. ———, The Philosophy of History ... ("le feu l'abbé Bazin," pseud., French original ed., Geneva, 1765; English ed., London, 1766).

[56]   Abbé Millot Histoire generale

Claude François Xavier Millot (see No. 46), Elements of General History ... (French original ed., 9 vols., Paris, 1772–1773; English ed., 5 vols., London, 1778–1779).

[57]   Dictionare of Bayle

Pierre Bayle (1647–1706), A General Dictionary, Historical and Critical ... (French original ed., 2 vols., Rotterdam, 1696; Thomas Birch [see No. 41] "and Other Hands," trs. and eds., English ed., 10 vols., London, 1734–1741).

[58]   Burnett's History of his own times

Gilbert Burnet (1643–1715), Bishop Burnet's History of His Own Time ... (Sir Thomas Burnet [1694–1753], ed., 2 vols.,

London, 1724–1734; Roger Flexman [1708–1795], ed., 2d ed., 4 vols., London, 1753–1754; 3d ed., 4 vols., London, 1766).

[59]   Mosheim's Ecclesiastical History

Johann Lorenz von Mosheim (1694–1755), An Ecclesiastical History, Antient and Modern, from the Birth of Christ, to the Beginning of the Present Century ... (Latin original ed., Frankfort, 1726; Archibald MacLaine [1722–1805], tr. and ed., English ed., 3 vols., London, 1765–1768; 6th ed., 6 vols., London, 1782).

[60]   Warner's Eccles: History of England

Ferdinando Warner (1703–1768), History of England as Relates to Religion and the Church ... (Variant title, according with JM's entry, 2 vols., London, 1756–1757; 2d ed., above title, 2 vols., London, 1759).

## Chronology

[61]   Lenglet du frenoy tablettes chronologiques de l'Histoire universelle

Nicolas Lenglet du Fresnoy (1674–1755), Chronological Tables of Universal History ... from the Creation of the World ... to the Death of King George II ... (French original ed., 2 vols., Paris, 1729; Thomas Floyd [Flloyd] [d. ca. 1763], tr. and continuator, English ed., 2 vols., London, 1762; continued to 1775 in French ed., 2 vols., Paris, 1778).

[62]   Blair's chronological tables

John Blair (d. 1782), The Chronology and History of the World ... to the Year of Christ, 1779; Illustrated in LVI. Tables ... (Variant subtitle, London, 1754; 4th ed., London, 1779).

## Geography

[63]   Bushing's Universal Geography

Anton Friedrich Büsching (1724–1793), A New System of Geography ... (German original ed., 6 vols., Hamburg, 1754–1761; English ed., 6 vols., London, 1762).

[64]   Smith's System of Geography

Atlas geographus, or A Complete System of Geography ... (Issued serially by the month, London, 1709–1712, by Ralph Smith [d. ca. 1713], bookseller; 2d ed., 5 vols., London, 1711–1717).

[65]   Guthrie's Geographical Grammer

William Guthrie (1708–1770), A New Geographical, Historical, and Commercial Grammar ... (Variant title, London, 1770; 6th ed., above title, London, 1779). The work was suspected of being that of Guthrie's fellow Scot John Knox (1720–1790), printer, bookseller, and philanthropist.

[66]   La Martinier, Dictionaire Geographique

Antoine Augustin Bruzen de la Martinière (1662–1746), Le grand dictionnaire géographique, historique, et critique ... (9 vols. in 10, The Hague, 1726–1739; 4th ed., 6 vols., Paris and Venice, 1768).

[67]   Salmon's Gazetteer

Thomas Salmon (see No. 53), The Modern Gazetteer: or, A Short View of the Several Nations of the World ... (London, 1746; 8th ed., London, 1769). See also Papers of Madison, I, 37 n.

[68]   Priestly's Historical Chart

Joseph Priestley (1733–1804), A Description of a New Chart of History Containing a View of the Principal Revolutions of Empire That Have Taken Place in the World ... (London, 1760; 5th ed., London, 1781). For another work by Priestley, see No. 69; for a previous reference to him, in his role as a political scientist, Papers of Madison, I, 145, and n. 8.

[69]   Biographical Chart

Joseph Priestley (see No. 68), A Description of a Chart of Biography; with a Catalogue of All the Names Inserted in It, and the Dates Annexed to Them ... (Warrington, Eng., 1765; 7th ed., London, 1778).

[70]   Jeffery's Historical & Chronological Chart

Thomas Jefferys (d. 1771), The Study of Geography Improved ... Being a More Certain and Expeditious Method of Conveying the Knowledge of That Science, and Fixing It in the Memory ... (London, 1767). For a previous allusion to

Jefferys, see Papers of Madison, IV, 9; 15, n. 14; for other works by him, Nos. 71f and 71h.

[71]   Collection of best maps.

71a. Jean Baptiste Bourguignon d'Anneville (1697–1782), Géographie ancienne abrégée … (3 vols., Paris, 1768; 2d ed., 2 vols., Nuremberg, 1781–1786).

71b. Rigobert Bonne (1727–1794) et al., Atlas moderne; ou collection de cartes sur toutes les parties du globe terrestre … (3 vols., Paris, 1762–1771).

71c. Thomas Kitchin (d. 1784), General Atlas, Describing the Whole Universe … (London, 1773). For another work, partially that of Kitchin, see 71e.

71d. César François Cassini de Thury (1714–1784), Carte de la France, publiée sous la direction de l'Académie des Sciences … (180 sheets, 2 tables of directions, and 1 chart of triangles, Paris, 1744–1787). For Jefferson's attempt to employ Cassini's method of astronomical triangulation for the determination of the size of Virginia in square miles, see Papers of Madison, V, 10; 14, n. 30.

71e. Thomas Kitchin (see No. 71c) et al., The Large English Atlas; or, A New Set of Maps of All the Counties of England and Wales … With Three General Maps of England, Scotland, and Ireland … (London, 1747; 6th ed., London, n. d. [1777?]).

71f. Thomas Jefferys (see No. 70), The American Atlas; or, A Geographical Description of the Whole Continent of America … (London, 1775; 3d ed., London, 1778).

71g. Thomas Hutchins (1730–1789), A Topographical Description of Virginia, Pennsylvania, Maryland and North Carolina, Comprehending the Rivers Ohio, Kenhawa, S[c]ioto, Cherokee, Wabash, Illinois, Missis[s]ippi, &c.… (London, 1778). For other allusions to this work, see Papers of Madison, III, 98, n. 1; Harrison to Delegates, 20 Mar. 1783, and n. 4.

71h. Thomas Jefferys (see No. 70), A Description of the Spanish Islands and Settlements on the Coasts of the West Indies … (London, 1762; 2d ed., London, 1774).

71i. James Rennel (1742–1830), Memoir of a Map of Hindoostan; or The Mogul's Empire … (London, 1783).

## Particular History

JM wrote each of the eighteen subheadings in the left margin.

## Greacian

[72]   Goldsmith's History of Greece

Oliver Goldsmith (1728–1774), The Graecian History, from the Earliest State to the Death of Alexander the Great … (2 vols., London, 1774). For another work by Goldsmith, see No. 77.

[73]   Stanyan's History of Greece

Temple Stanyan (ca. 1677–1752), The Graecian History. From the Original of Greece, to the Death of Philip of Macedon … (2 vols., London, 1707; 6th ed.[?], 2 vols., London, 1781).

[74]   Potter's Grecian Antiquities

John Potter (ca. 1674–1747), Archaeologia graeca: or, The Antiquities of Greece … (2 vols., London, 1697–1698; 9th ed., 2 vols., London, 1775).

## Roman

[75]   Coussin Histoire Romaine

Louis Cousin (1627–1707), comp. and tr., Histoire romaine … Traduite sur les originaux grecs … (2 vols., Paris, 1678; 2d ed., 2 vols., n. p. [Amsterdam?], 1686).

[76]   Histoire de Constantinople

Louis Cousin, comp. and tr., Histoire de Constantinople … Traduite sur les originaux grecs … (8 vols., Paris, 1672–1674; 2d ed., 8 vols., n. p. [Amsterdam?], 1685).

[77]   Goldsmith's Roman History

Oliver Goldsmith (see No. 72), The Roman History, from the Foundation of the City of Rome, to the Destruction of the Western Empire … (2 vols., London, 1769; 4th ed., 2 vols., London, 1781).

[78]   Hooke's Roman History

Nathaniel (Nathanael) Hooke (d. 1763), The Roman History; from the Building of Rome to the Ruin of the Commonwealth … (Vols. I–III of 4 vols., London, 1738–1764; [Gilbert Stuart (1742–1786), continuator], Vol. IV, London, 1771; 5th ed., 4 vols., London, 1770–1771).

[79]   Vertot's Revolutions of Rome

René Aubert de Vertot D'Aubeuf (1655–1735), The History of the Revolutions That Happened in the Government of the Roman Republic … (French original ed., 3 vols., Paris, 1719; English ed., 3 vols., London, 1720; 6th ed., 2 vols., London, 1770). For other works by Vertot, see Nos. 126 and 133; for one questionably attributed to him, No. 125b.

[80]   Gibbon's on the decline of the Rom: Empire

Edward Gibbon (1737–1794), The History of the Decline and Fall of the Roman Empire … (6 vols., London, 1776–1788). Three volumes had been published by 1783.

[81]   Kennet's Roman Antiquities

Basil Kennett (1674–1715), Romae antiquae notitia, or, The Antiquities of Rome … (London, 1696; 15th ed., London, 1773; reprint, London, 1776).

[82]   Plutarch's Lives

Plutarch (ca. 46–120), Plutarch's Lives, Translated from the Original Greek with Notes Critical and Historical … (John Langhorne [1735–1779] and William Langhorne [1721–1772], trs. and eds., 6 vols., London, 1770; 3d ed., 6 vols., London, 1778). For previous references to Plutarch, see Papers of Madison, I, 5; 27, n. 47; 42, n. 14; 91; 93, n. 4.

# Italian

[83]   Guicciardini's History

Francesco Guicciardini (1483–1540), The History of Italy, from the Year 1490, to 1532 … (Posthumous Italian original ed., 20 books, Florence, 1561–1564; English ed., 10 vols., London, 1753–1756; 3d ed., 10 vols., London, 1763).

[84]   Giannini History of Naples

Pietro Giannone (1676–1748), The Civil History of the Kingdom of Naples … (Italian original ed., 4 vols., Naples, 1723; English ed., 2 vols., London, 1729–1731).

[85]   Nani History of Venice

Giovanni Battista Felice Gasparo Nani (1616–1678), Histoire de la république de Venice … (Italian original ed., 2 parts: (1) Venice, 1662, and (2) posthumous, Venice, 1679; English ed., London, 1673; French ed., 6 vols., Cologne and Amsterdam, 1682–1702). There was also an Italian edition (2 vols. in 4, Venice) as late as 1720.

[86]   Padre Paolo on the Venetian Republic

Pietro Sarpi (1552–1623) (known to his contemporaries by his assumed religious name, Servite Paolo), The History of the Qvarrels of Pope Pavl. V. with the State of Venice … (Italian original ed., Venice, 1606; English ed., London, 1626). There was a French edition (Paris) as late as 1759. For another work by Sarpi, see No. 152.

# German and Holland

[87]   Histoire d'Allemagne par Barre

Joseph Barre (1692–1764), Histoire générale de l'Allemagne depuis l'an de Rome 648, jusqu'à l'an 1740 de Jésus Christ … (Variant title, 10 vols., Paris, 1748; above title, 10 vols. in 11, Paris, 1748).

[88]   Pfeffel Abregé chronolo: de l'hist: d'Allema:

Christian Friedrich Pfeffel von Kriegelstein (1726–1807), Nouvel abrégé chronologique de l'histoire et du droit public d'Allemagne … (Variant title, Paris, 1754; 2d ed., augmented, 2 vols., Mannheim, 1758; 6th ed., 2 vols., Paris, 1777).

[89]   Puffendorf de origine imperii german: notis Titii

Samuel, Freiherr von Pufendorf (see No. 11), De statu imperii Germanici ... ("Severini de Monzambano," pseud., Geneva, 1667; Gottlieb Gerhard Titius [1661–1714], ed., 2d ed., Leipzig, 1708; Christian Thomasius [1655–1728], ed., 3d ed., Magdeburg, 1714).

[90]   Robinson's History of Charles V

William Robertson (1721–1793), The History of the Reign of the Emperor Charles V.... (3 vols., London, 1769; American ed., variant title, 3 vols., by subscription, Philadelphia: Robert Bell [1732–1784], 1770; 3d London ed., 4 vols., 1777). For other works by Robertson, see Nos. 121 and 242.

[91]   Bentivoglio History of war in Flanders

Guido (1579–1644) Cardinal Bentivoglio, The History of the Wars of Flanders ... (Italian original ed., 3 vols., Cologne [Leyden?], 1632–1639; English ed., so-called "third" but the only one complete, 2 parts, London, 1678).

[92]   Le Clerk's History of the United Provinces

Jean Le Clerc (see No. 34a), Histoire des Provinces-Unies des Pays Bas ... (3 vols., Amsterdam, 1723–1728; 2d ed., 4 vols., Amsterdam, 1728–1737).

[93]   Strada

Famiano Strada (1572–1649), Histoire de la guerre de Flandre ... (Latin original ed., 2 vols., Rome, 1632; French ed., 2 vols., Paris, 1644–1649; 6th ed., 4 vols., Brussels, 1739).

[94]   Grotius de rebus Belgicis

Hugo Grotius (see No. 10), De rebus Belgicis; or The Annals and History of the Low-Countrey Warrs ... (Posthumous Latin original ed., Amsterdam, 1657; English ed., London, 1665).

[95]   De Witt's State of Holland

[Pieter de la Court (1618–1685)] and Johan de Witt (see No. 51), Mémoires de Jean de Witt, grand pensionnaire de Hollande ... (Dutch original ed., The Hague, 1662; 2d ed., revised and augmented, variant title, The Hague, 1667; French ed., The Hague, 1667; 3d ed., Ratisbon, 1709). For JM's entry of the same work in English translation adhering closely to the Dutch original title, see No. 163.

[96]   Watson's History of Philip II

Robert Watson (ca. 1730–1781), The History of the Reign of Philip the Second, King of Spain ... (2 vols., London, 1777; 3d ed., 3 vols., London, 1779).

# French

[97]   Histoire de France de l'abbé Veli Villaret, Garnier et continuateurs

Paul François Velly (1709–1759), Claude Villaret (1715–1766), and Jean Jacques Garnier (1729–1805), Histoire de France depuis l'établissement de la monarchie jusqu'au règne de Louis XIV ... (48 vols., Paris, 1760–1786). There were no "continuateurs" beyond Garnier, who ceased publication after recording events of the year 1564.

[98]   D'avila History of Civil Wars of France

Enrico Caterino Davila (1576–1631), The History of the Civil Wars of France ... (Italian original ed., 15 vols., Venice, 1630; English ed., 2 vols., London, 1758).

[99]   Philip de Comines

Philippe de Comines (1445–1511), Sieur d'Argenton, Memoirs of Philip de Comines ... (Denis Godefroy [1615–1681], ed., French original ed., 3 vols., Paris, 1649; successively augmented; 4th ed., 3 vols., Brussels, 1706; Thomas Uvedale [ca. 1641–1732], tr. and ed., English ed., from 4th French ed., 2 vols., London, 1712; 4th ed.[?], 2 vols., London, 1782).

[100]   Sully's memoirs

Maximilien de Béthune (1559–1641), Duc de Sully, Memoirs of Maximilien de Bethune, Duke of Sully ... (French original ed., 2 vols., Amsterdam [i. e., Chateau de Sully], n. d. [1638]; English ed., 3 vols., London, 1756; 6th ed., 3 vols., Dublin, 1781).

[101]   Prefixe Henry IV

Hardouin de Beaumont de Péréfixe (1605–1670), The History of Henry IV., King of France and Navarre ... (French original

ed., Amsterdam, 1661; English ed., London, 1663; 2d ed., London, 1672). A French edition, which was at least the tenth, was published (Paris) in 1776.

[102]   Cardinal de Retz Memoirs

Jean François Paul de Gondi (1614–1679), Cardinal de Retz, Memoirs of the Cardinal de Retz. Containing the Particulars of His Own Life … (French original ed., 3 vols., Nancy, 1717; 2d ed., augmented, 4 vols., Amsterdam, 1719; Peter Davall [d. 1763], tr. and ed., English ed., 4 vols., London, 1723; 4th ed., 4 vols., London, 1777). For JM's knowledge of this work, see Papers of Madison, I, 7–16; 24–27, nn. 1–47; 107, n. 4; III, 225, n. 5.

[103]   Voltaire's Louis XIV

François Marie Arouet de Voltaire (see No. 55), The Age of Louis XIV … (French original ed., 2 vols., Amsterdam, 1739; English ed., 3 vols., London, 1779–1781).

# British

[104]   Matthew Paris by Watts

Matthew Paris (d. 1259) et al., Monachi albanensis angli, historia major … (Latin original MSS; W[illiam] Wa[t]ts [ca. 1590–1649], comp. and ed., 2 parts, London, 1639–1640; 4th ed., London, 1684).

[105]   William of Malmbury

105a. William of Malmesbury (ca. 1093–ca. 1143). De gestis regum anglorum … in Sir Henry Savile (1549–1622), comp. and ed., Rerum anglicarum scriptores post Bedam praecipui … (London, 1596; 2d ed., Frankfort, 1601).

105b. ———, Vita Sancti Aldhelmi … in Vol. III of [William Fullman (1632–1688)], and Thomas Gale (ca. 1635–1702), comps. and eds., Historiae anglicanae scriptores (3 vols., Oxford, 1684–1691); or Vol. II of Henry Wharton (1664–1695), comp. and ed., Anglia sacra, sive collectio historiarum (2 vols., London, 1691).

[106]   Polydore Virgil

Polydorus Virgilius (Polidoro Vergilio) (ca. 1470–ca. 1555), Anglicae historiae libri viginti septem … (26 books, Basel, 1534; 27 books, 6th ed., Basel, 1555; 14th ed.[?], Leyden, 1651).

[107]   Rappin's History of England

Paul de Rapin (1661–1725), Sieur de Thoyras, The History of England from the Earliest Period to the Revolution in 1688 … (French original ed., 13 vols., The Hague, 1723–1735; Nicholas Tindal [1687–1774], tr., ed., and continuator, English ed., 15 vols., London, 1725–1731; continued to the Accession of King George II, 2 vols., 4 vols., London, 1732–1751; 6th ed. of entire work, 21 vols., London, 1757–1763). It was charged that these volumes were really written by Thomas Birch (see No. 41), with the assistance of "persons of political eminence."

[108]   Hume's History of England

David Hume (1711–1776), The History of England, from the Invasion of Julius Caesar to the Revolution in 1688 … (6 vols., London and Edinburgh, 1754–1762; 7th ed., 8 vols., London, 1778). See Papers of Madison, I, 103; 104, n. 5. For Hume as a political essayist, see No. 168.

[109]   Kennett's English History

White Kennett (1660–1728), Vol. III of A Complete History of England … to the Death of His Late Majesty King William III … ([John Hughes (1677–1720), ed.], 3 vols., London, 1706; J. S. [probably John Strype (1653–1737), ed.], 2d ed., 3 vols., London, 1719).

[110]   Clarendon's History

110a. Edward Hyde (1609–1674), Earl of Clarendon, The History of the Rebellion and Civil Wars in England … (Laurence Hyde [1641–1711], Earl of Rochester, ed., 3 vols., Oxford, 1702–1704; 13th ed.[?], 3 vols., Oxford, 1732).

110b. ———, The Life of Edward Earl of Clarendon … A Continuation of His History of the Grand Rebellion … (Original MS; posthumous, 3 vols., Oxford, 1759; 4th ed., 3 vols., Oxford, 1761).

[111]   Ludlow's Memoirs

Edmund Ludlow (ca. 1617–1692), Memoirs of Edmund Ludlow, Esq.… ([Isaac Littlebury (d. 1710), ed.(?)], 3 vols., Vevey, 1698–1699; 4th ed., London, 1771).

[112]   Littleton's History of Henry II

George Lyttleton (1709–1773), Baron Lyttleton, The History of the Life of Henry the Second … (4 vols., London, 1767–1771; 4th ed., 6 vols., London, 1777–1787).

[113]   Parliamentary History

Thomas Osborne (d. 1767) and William Sandby (ca. 1717–1799), comps. and eds., The Parliamentary or Constitutional History of England … (24 vols., London, 1751–1761; Andrew Millar [d. 1768], comp., ed., and continuator, 2d ed., 24 vols., London, 1761–1762).

[114]   Parliamentary debates

[John Torbuck (d. ca. 1755), comp. and ed.], A Collection of the Parliamentary Debates in England from 1668 to the Present Time … (Slightly variant title, 21 vols., Dublin, 1739–1742; reprint, 21 vols., London, 1741–1742; 2d ed., 24 vols., London, 1749).

[115]   Annual Register

[Edmund Burke (1729–1797)] et al., eds., The Annual Register; or, A View of the History, Politic(k)s and Literature of the Year [1758 to 1860] … (102 vols., London, 1759–1861). General index, 1758–1780, inclusive (London, 1783).

[116]   History of the Reign of Geo: III

[Robert Macfarlane (1734–1804) et al.], The History of the First Ten Years of the Reign of George the Third … (Variant title according with JM's entry, Vol. I of 4 vols., London, 1770–1796; 4th ed., above title, 4 vols., London, 1783–1796).

[117]   Cabàla

[Hercules Langrish(e) (?)], "A Noble Hand," anonym, comp., The Prince's Cabala: or, Mysteries of State … in the Reigns of King Henry the Eighth, Queen Elizabeth … and King Charles … (Variant title, 2 parts, London, 1654; 4th ed., above title, London, 1715).

[118]   Rushworth's Collection

John Rushworth (ca. 1612–1690), comp. and ed., Historical Collections of Private Passages of State … anno 1618 … to the Death of King Charles the First 1648 … (8 vols., part posthumous, London, 1659–1701).

[119]   Thurloe's State papers

John Thurloe (1616–1668), comp., and Thomas Birch (see No. 41), comp. and ed., A Collection of the State Papers of John Thurloe Esqr. from the Year 1638 to the Restoration of King Charles II. 1660 … (7 vols., London, 1742).

[120]   Parliamentary Register

John Almon (see No. 36b), John Debrett (see No. 36c), and John Stockdale (ca. 1749–1814), eds., The Parliamentary Register; or History of the Proceedings and Debates of the House of Commons (and House of Lords); Containing an Account of the Most Interesting Speeches and Motions … November, 1774[–July 1813] … (112 vols., London, 1775–1813). For JM's references in Congress to an issue of this periodical, see Papers of Madison, V, 140; 143, n. 8; 144; 146, n. 5.

## Scotch

[121]   Robinson's History of Scotland

William Robertson (see No. 90), The History of Scotland during the Reigns of Queen Mary and of King James VI. Till His Accession to the Crown of England … (2 vols., London, 1759; 7th ed.[?], 2 vols., London, 1776).

## Irish

[122]   Leland's History of Ireland

Thomas Leland (1722–1785), The History of Ireland from the Invasion of Henry II … (3 vols., London, 1773; 4th ed., 3 vols., Cork, 1775).

## Spanish & Portuguese

[123]   Mariana's History of Spain.

Juan de Mariana (1536–1624), Fernando Carmago y Salcedo (1572–1652), and Basilio Váren de Soto (d. 1673), The General History of Spain. From the First Peopling of It … to the Death of King Philip III … To Which Are Added, Two

Supplements ... (Latin original ed., 2 vols., Toledo, 1592–1601; Spanish ed., 2 vols., Toledo, 1601; Carmago's "Supplement," Madrid, 1650; Váren's, Madrid, 1678; English ed., London, 1699).

[124]   Miniana

Juan Manuel de Miñana (1671–1730), Historia de España, o continuación ... (Posthumous Latin original ed., 4 vols. in 2, The Hague, 1733; Spanish ed., Vols. XI and XII of Mariana's Historia general [No. 123], 16 vols. in 12, Lyons, 1737–1739; 2d ed., 16 vols. in 12, Lyons, 1751–1756).

[125]   Revolutions d'Espagne du P. D'Orleans [et] du Vertot

125a. Pierre Joseph D'Orléans (1644–1698) and continuators, Histoire des révolutions d'Espagne; depuis de la déstruction de l'empire des goths, jusqu'à ... réunion ... en une seule monarchie ... (Pierre Julien Rouillé [1681–1740], ed., 3 vols., Paris, 1734; reprint, 12 vols., Paris, 1737).

125b. René Aubert de Vertot D'Aubeuf (see No. 79) (author?), The History of the Revolutions in Spain, from the Decadence of the Roman Empire ... to ... the Accession of Lewis I. to the Crown ... (5 vols., London: J. Morgan, 1724). No edition of this work in French has been found. It may be that J. Morgan, who flourished in London between 1724 and 1761, was more than printer and bookseller.

[126]   Revolutions of Portugal by Vertot.

René Aubert de Vertot D'Aubeuf (see No. 79), The Revolutions of Portugal ... Revised and Considerably Enlarged ... (French original ed., Paris, 1689; 4th ed., augmented, The Hague, 1734; English ed., London, 1721; 6th English ed., augmented, Glasgow, 1758).

# Prussian

[127]   Memoirs of the House of Brandenburg

[Frederick (1712–1786) II, the Great, King of Prussia], "the Hand of a Master," anonym, Memoirs of the House of Brandenburg, from the Earliest Accounts (to the Death of Frederick William, the Present King's Father) ... (French original ed., Berlin, 1748; English ed., London, 1748). For a legal code inspired by Frederick II, see No. 194.

# Russian

[128]   History of Peter the Great by Voltaire

François Marie Arouet de Voltaire (see No. 55), The History of the Russian Empire under Peter the Great ... (French original ed., 2 vols., Geneva, 1759–1763; English ed., 2 vols., London, 1763; 3d ed., 2 vols., London, 1780).

# Danish

[129]   Molesworth's account of Denmark

Robert Molesworth (1656–1725), Viscount Molesworth, An Account of Denmark, As It Was in the Year 1692 ... (London, 1694; 4th ed.[?], London, 1738, long held to be the most "elegant"; 5th ed.[?], Glasgow, 1752).

[130]   History of Denmark by Mallet

Paul Henri Mallet (1730–1807), Histoire de Dannemarc ... depuis l'établissement de la monarchie jusques à l'avènement de la maison d'Oldenbourg au throne ... (3 vols. in 4, Copenhagen, 1758–1777; 2d ed., 6 vols., Geneva, 1763–1777).

# Sweedish

[131]   Dallin's History of Sweeden

Olof von Dalin (1708–1763), Geschichte de Reiches Schweden ... (Swedish original ed., 4 vols., Stockholm, 1747–1762; German ed., 3 parts in 2 vols., Greifswald and Rostock, 1756–1763).

[132]   Mallet's form of govt. in Sweeden

Paul Henri Mallet (see No. 130), Forme du gouvernement de Suède, avec ... les lois fondamentales et le droit public de ce royaume ... (Danish original ed., Copenhagen, 1756; French ed., Copenhagen and Geneva, 1756).

[133]   Vertot's Revolutions of Sweeden

René Aubert de Vertot D'Aubeuf (see No. 79), The History of the Revolutions in Sweden; Occasioned by the Change of Religion, and Alteration of the Government ... (French original ed., Paris, 1695; English ed., London, 1696; 7th ed.,

London, 1742).

[134]   Sheridan's do. of do.

Charles Francis Sheridan (1750–1806), A History of the Late Revolution in Sweden … (London, 1778; 2d ed., London, 1783).

## Polish

[135]   Abbe Coyer's History of J. Sobiesky.

Gabriel François Coyer (1707–1782), The History of John Sobieski, King of Poland … (French original ed., 3 vols., Amsterdam and Paris, 1761; English ed., London, 1762).

[136]   William's History of the Nortn. Govts.

John Williams (d. 1809?), The Rise, Progress, and Present State of the Northern Governments: viz., The United Provinces, Denmark, Sweden, Russia, and Poland … (2 vols., London, 1777).

## Swiss

[137]   Stanyan's History of Switzerland

[Abraham Stanyan (ca. 1669–1732)]; Temple Stanyan (see No. 73), by erroneous attribution, An Account of Switzerland, Written in the Year 1714 … (Anon., variant title, London, 1714; 2d ed., Edinburgh, 1756). Long after JM's lifetime this work was still attributed erroneously to Abraham Stanyan's younger brother.

## Genevan

[138]   Keate's History of Geneva

George Keate (1729–1797), A Short Account of the Ancient History, Present Government, and Laws of the Republic of Geneva … (London, 1761).

## Turkes

[139]   Mignot's History of the Ottoman Empire

Vincent Mignot (ca. 1730–1791), Histoire de l'empire ottoman, depuis son origine jusqu'à la paix de Belgrade en 1740 … (4 vols., Paris, 1771).

[140]   P. Recaut's do.

Richard Knolles (ca. 1550–1610), Thomas Nabbes (d. ca. 1645), and Sir Paul Rycaut (Ricaut) (1628–1700), The Turkish History, from the Original of That Nation to the Growth of the Ottoman Empire … With a Continuation to the Year MDCLXXXVII … (Knolles, variant title, London, 1603; continued by Nabbes, London, 1638; continued by Rycaut, 6th ed., above title, 3 vols., London, 1687–1700).

## Chinese

[141]   Duhaldes History of China

Jean Baptiste Du Halde (1674–1743), The General History of China … (French original ed., 4 vols., Paris, 1735; English ed., 4 vols., London, 1736; 3d ed., 4 vols., London, 1741).

## Politics

[142]   Plato's Republic by Spend

Plato (ca. 428–ca. 348 B.C.), The Republic of Plato … (Harry Spens [ca. 1713–1787], tr. and ed., Glasgow, 1763). See Papers of Madison, I, 5; 17; 28, n. 61; 35; 42, n. 10.

[143]   Aristotle's do.

Aristotle (384–322 B.C.), A Treatise on Government … (London, 1776; reprint, London, 1778). See Papers of Madison, I, 17; 35; 37; 41, n. 2.

[144]   More's Utopia

Sir Thomas More (1478–1535), Utopia: Containing an Impartial History … of That Island … (Latin original ed., London, 1516; English ed., London, 1684; 6th ed.[?], Glasgow, 1762).

[145]   Filmer on Government

145a. Sir Robert Filmer (d. 1653), baronet, Observations concerning the Original and Various Forms of Government … (Original separate works, London, 1647–1652; collected under above title, London, 1696).

145b. Sir Robert Filmer, Patriarcha; or the Natural Power of Kings Asserted … (Posthumous, London, 1680; 2d ed., London, 1685).

[146]   Hooker's Ecclesiastical polity

Richard Hooker (ca. 1554–1600), Of the Laws of Ecclesiastical Polity … (London, n. d. [1592]; 2d ed., augmented, London, 1597; John Gauden [1605–1662], comp. and ed., 8th ed., further augmented, London, 1662; 19th ed., London, 1739).

[147]   Hobbe's Works

As a youth JM became acquainted with at least one of Hobbes's works. Probably in 1782 he purchased the copy of Leviathan originally owned by William Byrd II of Westover (Papers of Madison, I. 16; 27. n. 47; 35; IV. 126; 127. n. 4).

147a. Thomas Hobbes (1588–1679), The Moral and Political Works of Thomas Hobbes, of Malmesbury … (Separate Latin original publications, some posthumous, London and various continental cities, 1629–1688; Sir Francis Thom[p]son, comp., tr., and ed., above title, London, 1750; 2d ed., London, 1759). The collection did not include 147b.

147b. ———, Elementa philosophica de cive … (Paris, 1642; 4th ed., Amsterdam, 1669).

[148]   Harrington's works

James Harrington (1611–1677), The Oceana of James Harrington Esq. and His Other Works … (Separate original works, London, 1655–1660; John Toland [1670–1722], comp. and ed., above title, London, 1700; Thomas Birch [see No. 41], comp. and ed., 2d ed., augmented, London, 1737; 4th ed., London, 1771).

[149]   Sidney on Government

Algernon Sidney (Sydney) (1622–1683), The Works of Algernon Sidney … (Separate posthumous works, London, 1696–1763; Joseph Robertson [1736–1820], comp. and ed., above title, London, 1772).

[150]   Locke on Government

John Locke (1632–1704), Two Treatises on Government … (London, 1690; Thomas Hollis [1720–1774], ed., 6th ed., superior, London, 1764; 7th ed., London, 1769; American reprint, Boston: Peter Edes [1732–1811] and John Gill [1732–1785], 1773). For "Locke on money," see No. 178. For other works by Locke, see Papers of Madison, I. 5; 21; 30. n. 85; 33; 41. n. 4; 42. n. 13; 212. nn. 5, 7; V. 84. n. 3.

[151]   Macchiavelli's works

Niccolò Machiavelli (1469–1527), The Works of Nicholas Machiavel … (Original Italian works, most posthumous, Venice, Florence, and Rome, 1524–1546; Ellis Farneworth [d. 1763], comp., tr. and ed., above title, 2 vols., London, 1762; 2d ed., 4 vols., London, 1775).

[152]   Father Paul on the Venetian Republic

Paoli Sarpi (see No. 86), The Maxims of the Government of Venice. In an Advice to the Republic; How It Ought To Govern Itself … (Italian original ed., Venice, 1606; English ed., London, 1707; 2d ed., London, 1738).

[153]   Montagu's rise & fall of antient republics

Edward Wortley Montagu (1713–1776), Reflections on the Rise and Fall of the Antient Republicks … (London, 1759; 4th ed., London, 1778).

[154]   Montesquieu's works

Charles Louis de Secondat (1689–1755), Baron de la Brède et de Montesquieu, The Complete Works of Monsieur de Montesquieu … (Separate French original works, Amsterdam, Geneva, and London, 1721–1748; François Richer [1718–1790], comp. and ed., 3 vols., Amsterdam and Leipzig, 1758; rev. ed., augmented, 6 vols., Amsterdam and Leipzig, 1764; English ed., 3 vols., London, 1767; 4 vols., London, 1777). JM regarded Montesquieu highly as a political philosopher (Papers of Madison, I. 5; 6; 307 n; 310. n. 4; II. 225; 226, and n. 7).

[155]   Beccaria's works

Cesare Bonesana (1738–1794), Marchese di Beccaria, Opere diverse di Cesare Beccaria ... (Separate Italian original works, Lucca, Brescia, and Milan, 1762–1771; compiled, 3 parts, Naples, 1770–1771).

[156]   Ferguson's History of Civil Society

Adam Ferguson (see No. 8), An Essay on the History of Civil Society ... (Edinburgh, 1767; 5th ed., London, 1782). JM owned a copy of this work (Papers of Madison, I, 131; 133, n. 1; 143; 148–49).

[157]   Miller on distinction of Ranks in Society

John Millar (1735–1801), The Origin of the Distinctions of Ranks in Society ... (Variant title, London and Dublin, 1771; 3d ed., above title, London, 1779).

[158]   Steuart's principles of Political oeconomy

Sir James Steuart (after 1773, Steuart-Denham) (1712–1780), baronet, An Inquiry into the Principles of Political Œconomy ... (2 vols., London, 1767; 2d ed., 3 vols., Dublin, 1770). For a previous reference to this work, see Papers of Madison, V. 308; 310, n. 9.

[159]   Smith on the wealth of Nations

Adam Smith (1723–1790), An Inquiry into the Nature and Causes of the Wealth of Nations ... (2 vols., London, 1776; 2d ed., 2 vols., London, 1778).

[160]   Baron Biefield's political Institutions.

Jacob Friedrich (1717–1770), Freiherr von Bielfeld, Institutions politiques ... (5 vols., Leyden, 1759–1762; augmented, 3 vols., Leyden, 1767–1772; 5th ed., Leyden, 1774).

[161]   Histoire politique du siecle par Mauberti

Jean Henri Maubert De Gouvest (1721–1767), Histoire politique du siècle ... depuis la paix de Westphalie, jusqu'à la dernière paix d'Aix la Chapelle inclusivement ... (2 vols., London [i.e., Lausanne], 1754–1755).

[162]   Richlieu's Political Testament

Armand Jean Du Plessis (1585–1652), Cardinal et Duc de Richelieu, Maximes d'état, ou, testament politique ... (Paul Hay [1620–ca. 1690], Marquis du Châtelet et al., comps. and eds., variant title, 2 parts, Amsterdam, 1688; augmented in successive editions; above title, 10th ed.[?], 2 vols., Paris, 1764; 11th ed.[?], 2 vols., London and The Hague, 1770). See Papers of Madison, I, 7; 24, n. 3.

[163]   de Witt's Maxims

   [Pieter de la Court] and Johan de Witt (see No. 51), The True Interest and Political Maxims of the Republic of Holland ... [John Campbell (1708–1775)], tr. and ed., variant title, London, 1743; Campbell's name on title page, 2d ed., above title, London, 1746). The title adheres closely to that of the Dutch original edition of 1662, but the work is the same as JM entered under No. 95. For another work, partially by Campbell, and successive references thereto, see Nos. 223 and 224a-b.

[164]   Petty's political Arithmetic

Sir William Petty (1623–1687), Essays in Political Arithmetic ... (Variant title, London, 1687; 4th ed., above title, contents corrected and augmented, London: Daniel Browne [d. 1762], 1755).

[165]   Wallace on the numbers of mankind

R[obert] W[allace] (1697–1771), A Dissertation on the Numbers of Mankind ... (Edinburgh, 1753).

[166]   Davenant's Works

Charles Davenant (1656–1714), The Political and Commercial Works of ... Charles D'Avenant ... (Separate original works, London, 1695–1712; Sir Charles Whitworth [ca. 1714–1778], comp. and ed., above title, 5 vols., London, 1771).

[167]   Temple's works

Sir William Temple (1628–1699), baronet, The Works of Sir William Temple ... (Separate original works, London, 1676–1695, and unpublished MSS; Jonathan Swift [1667–1745], comp. and ed., above title, 7 vols., London, 1700–1709; 9th ed., 4 vols., London, 1770). See JM Notes, 24 March 1783, and n. 17.

[168]   Hume's political essays

David Hume (see No. 108), Essays and Treatises on Several Subjects … (2 vols., London, 1741–1742; 10th ed., 2 vols., Dublin, 1779). See Papers of Madison, I, 303; 306–7 n.; 310, n. 2. For Hume as a philosopher, ibid., I, 73; 74, n. 7; 195–96; 212, n. 5.

[169]   Postlethwayt's works

169a. [Malachy Postlethwayt (ca. 1707–1767)], "A British Merchant," anonym, The African Trade, the Great Pillar and Support of the British Plantation Trade in America … (London, 1745).

169b. Malachy Postlethwayt, Considerations on the Making of Bar Iron with Pitt or Sea Coal Fire … (London, 1747).

169c. ———, Considerations on the Revival of the Royal-British-Assiento; between His Catholick Majesty, and the Honourable the South Sea Company … (London, 1749).

169d. ———, Great Britain's Commercial Interest Explained and Improved … (Variant title, 2 vols., London, 1757; 2d ed., above title, 2 vols., London, 1759).

169e. ———, Great-Britain's True System … To Which Is Prefixed … a New Plan of British Politicks, with Respect to Our Foreign Affairs … (London, 1757).

169f. ———, In Honour of the Administration. The Importance of the African Expedition … for the peculiar Benefit … of all British African and West-India Merchants … (London, 1758).

169g. ———, The Merchant's Public Counting House … Wherein Is Shewn the Necessity of Young Merchants Being Bred to Trade with Greater Advantages … (London, 1750).

169h. ———, The National and Private Advantages of the African Trade Considered … (Anon., London, 1746; 2d ed., London, 1772).

169i. ———, A Short State of the Progress of the French Trade and Navigation … (London, 1756).

169j. ———, The Universal Dictionary of Trade and Commerce … (Variant title, 2 vols., London, 1751; 4th ed., above title, 2 vols., London, 1774).

[170]   Anderson's Dictionary of Commerce

Adam Anderson (ca. 1692–1765), An Historical and Chronological Deduction of the Origin of Commerce, from the Earliest Accounts to the Present Time … (2 vols., London, 1762; 2d ed., 2 vols., London, 1764).

[171]   Burgh's political disquisitions

James Burgh (1714–1775), Political Disquisitions; or, An Enquiry into Public Errors, Defects, and Abuses … (3 vols., London, 1774–1775; American ed., 3 vols., Philadelphia: Robert Bell [see No. 90] and William Woodhouse [d. 1793], 1775).

[172]   Price's Political works

172a. Richard Price (1723–1791), Additional Observations on the Nature and Value of Civil Liberty, and the War with America … (London, 1777; American ed., Philadelphia: William Hall [1752–1834] and William Sellers [ca. 1725–1804], 1778). For the "Observations" to which the present work is "Additional," see No. 172e. For a reference to Price in his role as a student of human-life expectancy, see JM Notes, 25 Jan. 1783, and n. 9.

172b. ———, An Appeal to the Public on the Subject of the National Debt … (London, 1771; 4th ed., 2 vols., London, 1783).

172c. ———, A Discourse Addressed to a Congregation at Hackney … February 21, 1781, Being the Day Appointed for a Public Fast … (London, 1781).

172d. ———, An Essay on the Population of England … (London, 1780; 2d ed., London, 1780). For another "essay," to which the present work is the sequel, see No. 172j.

172e. ———, The General Introduction and Supplement to the Two Tracts on Civil Liberty … (London, 1778; 2d ed., London, 1778). For the "Two Tracts"—that is, Observations and Additional Observations—see Nos. 172f and 172a, respectively.

172f. ———, Observations on the Nature of Civil Liberty, the Principles of Government, and the Justice and Policy of the

War with America ... (London, 1776; American reprints, Boston, New York, Philadelphia, and Charleston, 1776; 15th ed.[?], 2 vols., London, 1783). For the General Introduction to this work, see No. 172e; for the sequel, No. 172a.

172g. ———, Observations on Public Loans ... (London, 1777).

172h. ———, Observations on Reversionary Payments; on Schemes for Providing Annuities for Widows, and for Persons in Old Age ... and on the National Debt ... (London, 1771; 4th ed., 2 vols., London, 1783).

172i. ———, The State of the Public Debts and Finances at Signing the Preliminary Articles of Peace in January, 1783 ... (2d ed., London, 1783).

172j. Richard Price and William Morgan (1750–1833), An Essay Containing an Account of the Progress from the Revolution and the Present State of Population in England and Wales ... (London, 1779). For the sequel to this work, see No. 172d.

172k. Richard Price and J[ohn] Home Tooke (1736–1812), Facts Addressed to Landholders ... and Generally to All the Subjects of Great Britain and Ireland ... (London, 1780).

172l. Richard Price et al., A Collection of Letters ... Addressed to the Volunteers of Ireland, on the Subject of Parliamentary Reform ... (London, 1783).

[173]   Gee on trade

Joshua Gee, The Trade and Navigation of Great-Britain Considered ... (London, 1729; 7th ed., Glasgow, 1767).

[174]   Child on trade

Sir Josiah Child (1630–1699), in 1678 created baronet, A New Discourse of Trade: Wherein Are Recommended Several Weighty Points ... (From an expanded essay, variant title, London, 1668; 2d ed., above title, London, 1694; 7th ed., London, 1775).

[175]   Tucker on trade

175a. Josiah Tucker (1712–1799), Cui Bono? Or, An Inquiry What Benefits Can Arise to the English or the Americans, the French, Spaniards, or Dutch, from the Greatest Victories ... in the Present War ... (Gloucester, 1781; 3d ed., London, 1782).

175b. ———, Dispassionate Thoughts on the American War ... (London, 1780).

175c. ———, The Elements of Commerce, and Theory of Taxes ... (Privately printed, Bristol, 1753).

175d. ———, An Essay on the Advantages and Disadvantages Which Respectively Attend France and Great Britain, with Regard to Trade ... (Glasgow and London, 1749; 4th ed., Glasgow, 1756).

175e. ———, Four Tracts, together with Two Sermons, on Political and Commercial Subjects ... (2 parts, Gloucester, 1774, including one "tract" previously published [London] in 1763; 3d ed., title unchanged but a fifth "tract" added, London, 1775; so-called "third" ed., title unchanged but a sixth "tract" added, Gloucester and London, 1776).

175f. ———, An Humble Address and Earnest Appeal to Those ... Ablest To Judge ... Whether a Connection with, or a Separation from the Continental Colonies of America, Be Most for the National Advantage ... (Gloucester, 1775; 3d ed., Gloucester and London, 1776).

175g. ———, Reflections on the Expediency of Opening the Trade to Turkey ... ("A Sincere Well-wisher to the Trade and Prosperity of Great-Britain," anonym, London, 1753; 2d ed., London, 1755).

[176]   Law on money & trade

John Law (1671–1729), of Lauriston, Money and Trade Considered ... (Anon., Edinburgh, 1705; 5th ed., Glasgow, 1760; also reprinted in Vol. IV of A Fourth Collection of Scarce and Valuable Tracts, 4 vols., London: Francis Cogan [d. ca. 1760], 1751–1752).

[177]   Arbuthnot on weights and measures

John Arbuthnot (1677–1735), Tables of Antient Coins, Weights, and Measures, Explained and Exemplified ... (Variant title, London, 1705; 2d ed., above title, London, 1727; so-called "second" 5th[?] ed., 2 parts, London, 1754).

[178]   Locke on money

John Locke (see No. 150), Several Papers Relating to Money, Interest and Trade ... (Three separate tracts, London,

1692–1695; above title comprises reprints of 2d eds., 3 parts, London, 1695–1696).

[179]   Lowndes on do.

179a. W[illiam] L[owndes] (1652–1724), A Further Essay for the Amendment of Gold and Silver Coins … (London, 1695).

179b. William Lowndes, A Report Containing an Essay for the Amendment of the Silver Coins, Made to the Right Honourable the Lords Commissioners of His Majesties Treasury … (London, 1695).

[180]   Neckar on Finance

Jacques Necker (1732–1804), State of the Finances of France, Laid before the King … Printed by Order of His Most Christian Majesty … (French original ed., Paris, 1781; English ed., London, 1781). For comments about "Neckar on Finance," see Papers of Madison, II, 223; 225, n. 2; III, 234; JM Notes, 29 Jan. 1783, n. 17.

# Law

[181]   Justinian's Institutes by Harris

Justinian (Flavius Anicius Iustinianus) I (483–565), Emperor of the East, Domini Justiniani institutionum libri quatuor. The Four Books of Justinian … (Tribonian [d. ca. 545] et al., comps. and eds., promulgations in original Greek and Latin, Byzantium, 528–534; George Harris [1722–1796], tr. and ed., English ed., 4 parts, London, 1756; 2d ed., London 1761).

[182]   Codex juris Civilis

Justinian I, Emperor of the East, Corpus juris civilis reconcinnatum, in tres partes distributum … (Tribonian [see No. 181] et al., comps. and eds., promulgations in original Greek and Latin, Byzantium, 528–565; Eusebius Beger [1721–1788], ed., Latin ed., 3 vols. in 2, Frankfort and Leipzig, 1767–1768). JM's entry is at fault. If he meant to indicate only the "Codex" for separate purchase, by 1783 it had not been republished for nearly 250 years. The "Corpus," on the other hand, included both the "Codex" and the "Institutes." See No. 181.

[183]   Taylor's elements of Civil Law

John Taylor (1704–1766), Elements of the Civil Law … (Cambridge, Eng., 1755; 3d ed., London, 1769).

[184]   Domat's Civil Law

Jean Domat (Daumat) (1625–1696), The Civil Law in Its Natural Order … (Anon., French original ed., 5 vols. in 4, Paris, 1689; William Strahan [d. 1748], tr. and ed., English ed., 2 vols., London, 1722; 2d ed., 2 vols., London, 1737).

[185]   Coke's Institutes

185a. Sir Edward Coke (1552–1634), The First Part of the Institutes of the Lawes of England; or, A Commentary upon Littleton … (London, 1628; 12th ed., London, 1738). For a previous reference to this work, see Papers of Madison, I, 108; 110, n. 4.

185b. ———, The Second Part of the Institutes of the Lawes of England, Containing the Exposition of Many Ancient and Other Statutes … (London, 1642; 6th ed., London, 1681).

185c. ———, The Third Part of the Institutes of the Lawes of England: concerning High Treason, and Other Pleas of the Crown and Criminall Causes … (London, 1644; 6th ed., London, 1680).

185d. ———, The Fourth Part of the Institutes of the Lawes of England: concerning the Jurisdiction of Courts … (London, 1644; 6th ed., London, 1681).

[186]   Blackstone's Commentaries

Sir William Blackstone (1723–1780), Commentaries on the Laws of England … Continued to the Present Time … (4 vols., Oxford, 1765–1769; Richard Burn [1709–1785], continuator, 9th ed., 4 vols., London, 1783). See Papers of Madison, I, 98; 102–3; 103, n. 3; IV, 307, n. 5.

[187]   Cunningham's Law Dictionary

Timothy Cunningham (d. 1789), A New and Complete Law-Dictionary, or General Abridgment of the Law … (2 vols., London, 1764–1765; 3d ed., 2 vols., London, 1782–1783). For another work by Cunningham, see No. 190.

[188]   Statutes at large by Rufhead

Owen Ruffhead (1723–1769), comp. and ed., The Statutes at Large, from Magna Charta, to the End of the Last Parliament ... (Partly posthumous, 18 vols., London, 1769–1800).

[189]   Lex Parliamentaria

George Petyt (Pettyt), Lex parliamentaria; or, A Treatise of the Law and Custom of the Parliaments of England ... ("G. P.," London, 1690; 3d ed., London, 1748).

[190]   Cunningham's law of Exchange

Timothy Cunningham (see No. 187), The Law of Bills of Exchange, Promissory Notes, Bank-Notes, and Insurances ... (London, 1760; 6th ed., London, 1778).

[191]   Collection of Laws to prevent frauds in the Customs

191a. Samuel Baldwin, comp. and ed., A Survey of British Customs ... as Established by 12 Car. II., cap. 4 ... to 14 Geo. III.... (Variant title, London, 1770; 2d ed, above title, London, 1774).

191b. Henry Mackay (d. 1783), comp. and ed., A Complete and Alphabetical Abridgement of All the Excise-Laws or Custom-Laws Therewith Connected, in Force in England and Wales ... (Edinburgh, 1779).

191c. 20 Geo. III., cap. 9. An Act for Allowing Ireland To Trade with Foreign Parts ... (London, 1780).

[192]   Book of rates

William Sims and Richard Frewin, comps., The Rates of Merchandise ... Compiled, by Order of the Commissioners of His Majesty's Customs ... (London, 1782).

[193]   Clarke's practice of Courts of Admiralty

Francis Clerke (Clarke) (d. ca. 1605), The Practice of the Court of Admiralty of England ... (Posthumous Latin original ed., Dublin, 1666; 3d ed., above title, Latin and English texts on facing pages, London, 1722; 4th ed.[?], augmented, London, 1743).

[194]   Fredencian Code

Frederick II, King of Prussia (see No. 127), The Fredencian Code; or, A Body of Law for the Dominions of the King of Prussia ... (Samuel von Coccéji [1679–1755], comp. and ed., Latin original ed., 2 vols., Berlin, 1747; French ed., 2 vols., Paris, 1751–1753; English ed., from the French, 2 vols., Edinburgh, 1761; 2d ed., 2 vols., London, 1766).

# War

[195]   Vauban's Works

Sébastien Le Prestre de Vauban (1633–1707), maréchal de France, Oeuvres de M. de Vauban ... (Separate original works, Paris and The Hague, 1685–1707; above title, 2 vols., The Hague, 1737; 2d ed., 2 vols., Amsterdam and Leipzig, 1771).

[196]   Bellidore's Works

196a. Bernard Forest de Bélidor (ca. 1697–1761), Oeuvres diverse concernant l'artillerie et le génie ... (Separate original works, Paris, 1720–1757; above title, Amsterdam, Leipzig, and Paris, 1764).

196b. ———, Dictionnaire portatif de l'Ingénieur ... (Paris, 1755; Charles Antoine Jombert [1712–1784], augmenter, 2d ed., Paris, 1768).

[197]   Fouquier's Memoirs

Antoine Manassès de Pas (1648–1711), Marquis de Feuquières, Memoirs of the Late Monsieur de Feuquières, Lieutenant General of the French Army ... (French original ed., Paris, 1711; English ed., 2 vols., London, 1735–1736; 2d ed., 2 vols., London, 1737; also 4 vols., London, 1740).

# Marine

[198]   Falconer's Universal Dictionary of Marine

William Falconer (1732–1769), An Universal Dictionary of the Marine: or, A Copious Explanation of the Technical Terms ... of a Ship ... (London, 1769; 3d ed., London, 1780).

[199]   Burchett's Naval History

Josiah Burchett (ca. 1666–1746), A Complete History of the Most Remarkable Transactions at Sea ... (London, 1720).

[200]   History of the several Voyages round the Globe

200a. John Hamilton Moore (d. 1807), comp. and ed., A New and Complete Collection of Voyages and Travels ... (2 vols., London, 1778). For another work, partially contained in Moore, see No. 234.

200b. David Henry (1710–1792), comp. and ed., An Historical Account of All the Voyages round the World, Performed by English Navigators ... (4 vols., London, 1773–1774). For another work, partially contained in Henry, see No. 216.

200c. Johann Georg Adam Forster (1754–1794), more commonly known as George Forster, Voyage round the World, in His Britannic Majesty's Sloop Resolution, Commanded by Captain James Cook, during the Years 1772, 3, 4, and 5 ... (2 vols., London, 1777).

200d. Pierre François Marie (1748–1793), Vicomte de Pagès, Voyages autour du monde, et vers les deux pôles, par terre et par mer, pendant les années 1767, 1768, 1769, 1770, 1771, 1773, 1774 & 1776 ... (2 vols., Paris, 1782).

200e. William Ellis, An Authentic Narrative of a Voyage Performed by Captain Cook and Captain Clerke, in His Majesty's Ships, Resolution and Discovery, during the Years 1776–1780 ... (2 vols., London, 1782).

[201]   Murray's Ship Building and navagation

Mungo Murray (d. 1770), A Treatise on Ship-building and Navigation ... (London, 1754; 2d ed., London, 1765).

[202]   Collection of best Charts

202a. Jacques Nicolas Bellin (1703–1772), Le petit atlas maritime, recueil des cartes et plans des quatre parties du monde ... (5 vols., Paris, 1764). For other works by Bellin, see Nos. 202g and 2021.

202b. John Seller (d. ca. 1700) et al., comps. and eds., The English Pilot ... Describing the Southern Navigation upon the Coasts of England, Scotland, Ireland ... to the Canary ... and Western Islands ... the Whole Mediterranean Sea ... the Whole Northern Navigation ... the West-India Navigation, from Hudson's Bay to the River Amazones ... (4 vols., London, 1671–1675; 16th ed.[?], 4 vols., London, 1773).

202c. Joseph Frederick Walsh (Wallet) Des Barres (Desbarres) (1722–1824), The Atlantic Neptune, Published for the Use of the Royal Navy of Great Britain ... (2 vols., London, 1777; 3d ed., augmented, 4 vols., London, 1781).

202d. Cyprian Southark (1662–1745), The New England Coasting Pilot from Sandy Point of New York, unto Cape Canso in Nova Scotia, and Part of Island Breton ... (London, n. d. [ca. 1720]; 4th ed., London, 1775).

202e. A New and Accurate Chart of the Bay of Chesapeake ... Drawn from the Several Draughts Made by the Most Experienced Navigators ... (London: Robert Sayer [ca. 1724–1794] and James Bennet [d. ca. 1830], 1776). For another work published by Sayer and Bennet, see No. 202j.

202f. A Map of East and West Florida, Georgia, and Louisiana, with the Islands of Cuba, Bahama, and the Countries Surrounding the Gulf of Mexico, with the Tract of the Spanish Galleons, and of Our Fleets thro' the Straits of Florida ... (London: John Bew [d. 1793], 1781).

202g. Jacques Nicolas Bellin (see No. 202a), Remarques sur la carte réduite de l'océan septentrionale compris entre l'Asie et l'Amérique suivant les découvertes qui ont été faites par les Russes ... (Paris, 1766).

202h. Alexander Dalrymple (1737–1808), Memoirs of the Chart of Part of the Coast of China ... (London, 1771). For other charts by Dalrymple, see Nos. 202i, 202k, and 202m.

202i. Alexander Dalrymple, Memoir of a Chart of the Southern Ocean ... (London, n. d. [ca. 1769]).

202j. Jean Baptiste Nicolas Denis d'Aprè de Mannevillette (1707–1780), The East-India Pilot, or Oriental Navigator: Containing a Complete Collection of Charts, Maps, Plans, &c.... Chiefly Composed, from the Last Edition of the Neptune Oriental ... (French original ed. of Neptune oriental, Paris, 1745; "Last Edition," Paris and Brest, 1775; with supplément, Paris and Brest, 1781; English ed., London: "R. Sayer and J. Bennet" [for whom see No. 202e], n. d. [ca. 1782]).

202k. Alexander Dalrymple (see No. 202h), A Collection of Views of Lands in the Indian Navigation ... (149 plates, London, 1771–1796).

202l. Jacques Nicolas Bellin (see No. 202a), Remarques sur la carte de la presqu'île de l'Inde, contenant les côtes de

Malabar, Coromandel, etc., depuis le golphe de Cambaye jusqu'aux bouches du Gange ... (Paris, 1766).

202m. Alexander Dalrymple (see No. 202h), Memoir of a Chart of the East Coast of Arabia, from Dofar to the Island of Maziera ... (London, 1783).

[203]   Fol. £6.6 Naval architecture. By Marmaduke Stalkartt.

This entry is not in JM's hand.

Marmaduke Stalkartt (d. 1782), Naval Architecture; or, The Rudiments and Rules of Ship Building Exemplified in a Series of Draughts and Plans ... (231 pp. "Fol[io]" of text and 14 folding plates, London, 1781, when marketed for £6.6s. sterling).

## Languages

[204]   Best latin Dictionary with best grammar & dictionary of each of the modern languages

The present editors have limited their choices to works suitable for use by persons whose native tongue was English. Dictionaries or grammars of American Indian languages are also omitted.

204a. Robert Ainsworth (1660–1743), Thesaurus linguae latinae compendarius, or A Compendious Dictionary of the Latin Tongue ... (3 parts, London, 1736; Thomas Morell [1708–1784], reviser and augmenter, 5th ed., 3 vols., London, 1773; 7th ed., 3 vols., London, 1783).

204b. John Richardson (1741–ca. 1811), A Grammar of the Arabic Language ... (London, 1776).

204c. John Richardson, A Dictionary of Persian, Arabic, and English ... (2 vols., Oxford, 1777).

204d. Nathaniel Brassy Halhed (1751–1830), A Grammar of the Bengal Language ... (Hugli, Bengal, 1778).

204e. A Short Introduction to the Danish Language for the Use of Those Who Choose To Learn It in a Methodical Way ... (London: R. Hilton, 1774).

204f. Andreas Berthelson, An English and Danish Dictionary, Containing the Words of Both Languages ... (London, 1754).

204g. Willem Sewel (1654–1720), A Complete Dictionary, English and Dutch, to Which Is Added a Grammar for Both Languages ... (Variant title, 2 vols., Amsterdam, 1691; Egbery Buys [d. 1769], reviser and augmenter, 6th ed., above title, 2 vols., Amsterdam, 1766).

204h. James Wood (ca. 1751–1815), Grammatical Institutes; or A Practical English Grammar on a New Plan ... (London, 1778).

204i. Samuel Johnson (1709–1784), A Dictionary of the English Language ... (2 vols., London, 1755; 4th ed., 2 vols., London, 1775). For a reference to this work, see No. 204o.

204j. Abel Boyer (1667–1729), The Complete French Master ... (London, 1694; 18th ed., London, 1756).

204k. Louis Chambaud (d. 1776), Nouveau dictionnaire ... (A New Dictionary, English and French, and French and English) ... (London, 1761; Jean Perrin [d. post-1800], reviser and augmenter, 2d ed., 2 vols., London, 1778). For another dictionary, partly French, see No. 204o.

204l. William Shaw (1749–1831), An Analysis of the Galic Language ... (London, 1778; 2d ed., Edinburgh, 1778).

204m. William Shaw, A Galic and English Dictionary ... (2 vols., London, 1780).

204n. Gebhard Friedrich August Wendeborn (1742–1811), Elements of German Grammar ... (London, 1774; 2d ed., London, 1775).

204o. Christian Ludwig (1660–1728), A Dictionary, English, German and French ... Augmented with More Than 12,000 Words Taken out of Samuel Johnson's English Dictionary, and Other's ... (Variant subtitle, 2 vols., Leipzig, 1706–1716; John Bartholomew Rogler [1728–1791], augmenter, 3d ed., above subtitle, Leipzig, 1763). For Samuel Johnson's dictionary, see No. 204i.

204p. John Fergusson (d. 1791), A Dictionary of Hindostan ... (London, 1773). The work was rare by 1783 because of loss at sea of the greater part of the stock.

204q. David Francesco Lates (d. 1777), A New Method of Easily Attaining the Italian Tongue … (London, 1762; 2d ed., London, 1766).

204r. Giuseppe Marc' Antonio Baretti (1719–1789), A Dictionary of the English and Italian Languages … (2 vols., London, 1760; 2d ed., 2 vols., London, 1771). For another dictionary by Baretti, see No. 204x.

204s. Thomas Bowrey (ca. 1630–1713), A Dictionary, English and Malayo … To Which Is Added Some Short Grammar Rules … (London, 1701).

204t. Sir William Jones (1746–1794), A Grammar of the Persian Language … (London, 1771). For a Persian dictionary, see No. 204c.

204u. Antonio Vieyra (1712–1797), A New Portuguese Grammar … (Variant title, London, 1768; 2d ed., above title, London, 1778).

204v. Antonio Vieyra, A Dictionary of the Portuguese and English Language … (2 vols., London, 1773).

204w. Hippolyto San José Giral del Pino, A New Spanish Grammar, or The Elements of the Spanish Language … (London, 1767; 2d ed., London, 1777).

204x. Giuseppe Marc' Antonio Baretti (see No. 204r), A Dictionary, Spanish and English … (2 parts, London, 1778; 2d ed., 2 vols., London, 1778).

204y. Jacob Serenius (1700–1776), English and Swedish Dictionary … (Hamburg, 1734; 2d ed., Harg and Stenbro, 1757).

204z. John Philip Fabricius and John Christian Breihaupt, Dictionary Malabar and English Wherein the Words and Phrases of the Tamulian Language … Are Explained … (2 vols., Wepery, India, 1779–1786).

## America.

[205]   Les nouvelles descouverts dans l'Amerique Septentrionale. Paris 1697

Louis Hennepin (1640–ca. 1710), A Discovery of a Large, Rich, and Plentiful Country in North America; Extending above 4000 Leagues … (French original ed., Paris, 1697; English ed., London, 1720). For the sequel to this work, see No. 229; for a third work by Hennepin, No. 287.

[206]   Tonti's account of la Sale's voiage to N. America

Henri, Chevalier de Tonti (ca. 1650–1704) (author by attribution), An Account of M. de La Salle's Last Expedition and Discoveries in North America … (French original ed., Paris, 1697; English ed., London, 1698). Tonti denied having any hand in this work and described the real author as being "un Aventurier Parisien."

[207]   Histoire de l'Amerique Septentrionale par Baquiville de la Poterie. Rouen 1722

Claude Charles Le Roy (ca. 1668–1738), Sieur de Bacqueville de la Potherie, Histoire de l'Amérique Septentrionale … (4 vols., Paris, 1721–1722; 2d ed., 4 vols., Amsterdam, 1723; alleged "new" ed., 4 vols., Paris, 1753, being the 1st ed. with only a new title page). No evidence has been found of an edition published at Rouen.

[208]   Discription geographique et historique des cotes de l'Amerique Septenle. par le Sieur Denys

Nicolas Denys (1598–1688), Description géographique et historique des costes de l'Amérique Septentrionale … (2 vols., Paris, 1672; 2d ed., 2 vols., Paris, 1688).

[209]   Oldmixon's Brit: Empire in America

John Oldmixon (1673–1742), The British Empire in America, Containing the History of the Discovery, Settlement, Progress and Present State of All the British Colonies … (2 vols., London, 1708; 2d ed., 2 vols., London, 1741).

[210]   Kalm's travels through N. America

Pehr Kalm (1715–1779), Travels into North America; Containing Its Natural History … (Swedish original ed., 3 vols., Stockholm, 1753–1761; English ed., 3 vols., Warrington, Eng., 1770–1771; 2d ed., 2 vols., London, 1772).

[211]   Carver's travels through N. America

Jonathan Carver (1732–1780), Travels through the Interior Parts of North America, in the Years 1766, 1767, and 1768 … (London, 1778; 3d ed., London, 1781).

[212]   Ogilvie's America

John Ogilby (1600–1676), comp., tr., and ed., America: Being the Latest, and Most Accurate Description of the New World Collected from the Most Authentic Authors ... (London, 1671; 2d ed., London, 1673).

[213]   Novus orbis, autore Joanne de Laet: fol: Basiliac 1555

Johannes de Laet (1593–1649), L'histoire du nouveau monde ou description des Indes Occidentales ... (Dutch original ed., Leyden, 1625; Latin ed., Leyden, 1633; French ed., containing new materials, Leyden, 1640). JM's note following the author's name is erroneous.

[214]   Novae novi orbis historiae, i. e. rerum ab Hispanis in India occidentali gestarum Calvetonis Geneva 1578

Girolamo Benzoni (1519–ca. 1570), Novae novi orbis historiae, id est, rerum ab Hispanis in India Occidentali hactenus gestarum ... (Italian original ed., Venice, 1565; Urbain Chauveton, tr., Latin ed., Geneva, 1578; 5th ed.[?], Cologne, 1612).

[215]   Wafer's Voyages

Lionel Wafer (ca. 1660–ca. 1705), A New Voyage and Description of the Isthmus of America, Giving an Account of the Author's Abode There ... (London, 1699; 2d ed., London, 1703).

[216]   Dampier's Voyages

William Dampier (1652–1715), The Voyages and Adventures of William Dampier ... (Separate original works, London, 1697–1709; above title, 2 vols., London, 1776; 2d ed., 2 vols., London, 1777). Dampier's "Voyages," although combined with much questionable material, could also be found in Vols. I–III of the Knaptons (No. 224c), and in part they were reprinted in Vol. I of Moore (No. 200a) and Vol. I of Henry (No. 200b).

[217]   Chancellor's

217a. Clement Adams (ca. 1519–1587), The Newe Nauigation and Discouerie of the Kingdom of Moscouia, by the Northeast, in the Yeere 1553 ... Performed by Richard Chancelor ... (Latin original ed., no copy of which is known to be extant, London, 1554; reprinted, with accompanying English text, in Vol. I of Hakluyt [No. 240]).

217b. Richard Chancellor (d. 1556), A Letter of Richard Chancellor ... Touching His Discouerie of Moscovia ... in Vol. III of Purchas (No. 239).

217c. Clement Adams, Some Additions for the Better Knowledge of This Voyage ... from the Mouth of Captaine Chancelor ... in Vol. III of Purchas (No. 239).

[218]   Borough's

218a. Stephen Burrough (1525–1584), The Nauigation and Discouerie toward the Riuer of Ob ... Passed in the Yeere, 1556 ... in Vol. I of Hakluyt (No. 240).

218b. ———, The Voiage ... an. 1557. from Colmogro to Wardhouse ... in Vol. I of Hakluyt (No. 240).

[219]   Forbishers

219a. Christopher Hall, The First Voyage of Master Martin Frobisher, to the Northwest, for the Search of the Straight or Passage to China ... in the Yeere 1576 ... in Vol. III of Hakluyt (No. 240).

219b. Dionyse Settle, A True Reporte of the Laste Voyage into the West and North-west Regions, &c., 1577, Worthily Atchieved by Captaine Frobisher ... (Two separate eds., one incomplete, London, 1577; complete version reprinted in Vol. III of Hakluyt (No. 240).

219c. Thomas Ellis, The Third and Last Voyage unto Meta Incognita, Made by Master Martin Frobisher, in the Yeere 1578 ... in Vol. III of Hakluyt (No. 240).

219d. George Best (d. ca. 1584), A Trve Discourse of the Late Voyages of Discouerie, for the Finding of a Passage to Cathaya by the Northweast, under the Conduct of Martin Frobisher ... (London, 1578, very rare; also reprinted in Vol. III of Hakluyt (No. 240).

[220]   Hudson's

220a. Henry Hudson (d. 1611) and John Playse, Divers Voyages and Northerne Discoveries ... in Vol. III of Purchas (No. 239).

220b. ———, A Second Voyage … for Finding a Passage to the East Indies by the North-east … (Hessel Gerritsz [ca. 1581–1632], ed., separate Latin and Dutch eds., Amsterdam, 1612; English version in Vol. III of Purchas [No. 239]).

220c. Robert Juet (d. 1611), The Third Voyage … toward Nova Zembla … in Vol. III of Purchas (No. 239).

220d. Henry Hudson, An Abstract of a Journall … for the Discoverie of the North-west Passage, Begunne the 17th of Aprill, 1610 … in Vol. III of Purchas (No. 239).

220e. Abacuk Prickett, A Larger Discourse of the Same Voyage, and the Successe Thereof … in Vol. III of Purchas (No. 239).

220f. Thomas Woodhouse (d. 1611), A Note Found in the Deske of Thomas Wydowse, Student of Mathematicks, Hee Being One of Them Who Was Put into the Shallop … in Vol. III of Purchas (No. 239).

[221] Davis's

221a. John James, The First Voyage of Master Iohn Dauis, Undertaken in Iune 1585. for the Discouerie of the New Passage … in Vol. III of Hakluyt (No. 240) and Vol. I of Purchas (No. 239).

221b. John Davys (ca. 1550–1605) of Sandridge, The Second Voyage Attempted … for the Discouerie of the New Passage, in anno 1586 … in Vol. III of Hakluyt (No. 240) and Vol. I of Purchas (No. 239).

221c. John James, The Third Voyage Northward, Made by Iohn Dauis Gentleman … in the Yeere, 1587 … in Vol. III of Hakluyt (No. 240).

221d. John Davys of Sandridge, A Traverse-Booke … for the Discouerie of the North-west Passage, anno 1587 … in Vol. III of Hakluyt (No. 240).

221e. Henry Morgan, The Relation of the Course Which … Two Vessels of the Fleet of M[aster]. Iohn Dauis Held After He Had Sent Them from Him To Discouer the Passage between Groenland and Island … in Vol. III of Hakluyt (No. 240).

[222] Baffin's

222a. William Baffin (d. 1622), The Fourth Voyage of James Hall to Groeneland … anno 1612 … MS; partly printed in Vol. III of Purchas (No. 239). The manuscript was not published in full during JM's lifetime.

222b. ———, A Journal of the Voyage Made to Greenland … in the Yeere 1613 … in Vol. III of Purchas (No. 239).

222c. John Gatonby, A Voyage into the North-west Passage … in Vol. V of Awnsham Churchill (d. 1728) and John Churchill (d. ca. 1714), comps. and eds., A Collection of Voyages and Travels (6 vols., London, 1704–1732; 3d ed., 6 vols., London, 1752).

222d. Robert Fotherby, A Voyage of Discoverie to Greenland &c. anno 1614 … in Vol. III of Purchas (No. 239).

222e. William Baffin, A True Relation of Such Things as Happened in the Fourth Voyage for the Discoverie of the North-west Passage … in the Yeere 1615 … in Vol. III of Purchas (No. 239). Reprinting of the original manuscript after JM's lifetime revealed the gross defects of Purchas' editing.

222f. ———, A Brief and True Relation or Journall, Contayning Such Accidents as Happened in the Fift[h] Voyage, for the Discoverie of a Passage to the Northwest … in the Yeere of our Lord 1616 … in Vol. III of Purchas (No. 239). Baffin gave to Purchas a manuscript narrative, journal, and map, none of which has subsequently been found. Purchas printed only the narrative, not the "Journall."

[223] James's

Thomas James (ca. 1593–ca. 1635), The Strange and Dangerous Voyage of Captain Thomas James in His Intended Discovery of the North-west Passage into the South Sea … (Title archaically spelled, London, 1633; 2d ed., title as above, London, 1740; also printed in Vol. II of the Churchills [No. 222c] and in Vol. II of John Harris [1667–1718], comp. and ed., Navigantium atque itinerantium biblioteca; or, A Complete Collection of Voyages and Travels, 2 vols., London, 1705; John Campbell [see No. 163], reviser and augmenter, 2d ed., 2 vols., London, 1744–1748; 3d ed., 2 vols., London, 1764).

[224] Wood's

224a. John Wood, An Account of a Voyage for the Discoverie of the North-east Passage … 1676 … in Vol. II of An Account of Several Late Voyages and Discoveries, 2 vols., London: Samuel Smith (d. ca. 1703) and Benjamin Walford (d. ca. 1710), 1694; also in Vol. I of Harris and of Harris and Campbell (No. 223).

224b. ———, Supplement to His North-east Voyage: Navigation and Observations North-west of Greenland ... in Vol. I of Harris and of Harris and Campbell (No. 223).

224c. ———, A Voyage through the Streights of Magellan ... in A Collection of Original Voyages, London: W. Hacke, 1699; also in Vol. IV of A Collection of Voyages, 4 vols., London: James Knapton (1687–1736) and John Knapton (d. 1770), 1729.

[225]   Ellis's voyage to Hudson's Bay

225a. Henry Ellis (1721–1806), A Voyage to Hudson's Bay, by the Dobbs Galley and California, in the Years 1746 and 1747, for Discovering a North-west Passage ... (London, 1748).

225b. [Theodore Swaine Drage, supposed author], "the Clerk of the California," anonym, Account of a Voyage for the Discovery of a North-west Passage by Hudsons Streights ... in the Year 1746 and 1747 ... (2 vols., London, 1748–1749).

[226]   Voyage au-pays des Hurons par Gabl. Sabard Theodat Paris 1632

Gabriel Sagard-Théodat, Le grand voyage dv pays des Hvrons, situé en l'Amérique vers la mer douce, és derniers confins de nouuelle France, dite Canada ... (Paris, 1632).

[227]   Moeurs des Sauvages de l'Amerique par Lafitau

Joseph François Lafitau (1681–1746), Moeurs des sauvages amériquains, comparées aux moeurs des premiers temps ... (Two separate eds., variant texts, 2 vols., 4 vols., Paris, 1724; 3d ed., 2 vols., 4 vols., Paris, 1734).

[228]   Adair's History of the American Savages

James Adair (ca. 1709–ca. 1783), The History of the American Indians; Particularly Those Nations Adjoining to the Missisippi, East and West Florida, Georgia, South and North Carolina, and Virginia ... (London, 1775).

[229]   Hennepin's Voyages

Louis Hennepin (see No. 205), Voyage ou nouvelle découverte d'un très-grand pays, dans l'Amérique, entre le Nouveau Mexique & la Mer Glaciale ... (Variant title, Utrecht, 1698; above title, Amsterdam, 1711, bound together with a work relating to Caribbean explorations).

[230]   La Hontan's do.

Louis Armand de Lom d'Arce (1666–ca. 1715), Baron de La Hontan, New Voyages to North-America. Containing an Account of the Several Nations of That Vast Continent ... (French original ed., 3 vols., The Hague, 1703; English ed., 2 vols., London, 1703; 2d ed., 2 vols., London, 1735). Portions of the work allegedly were by Nicolas Gueudeville (ca. 1654–ca. 1721).

[231]   Jone's Journal to the Indian nations

David Jones (1736–1820), A Journal of Two Visits Made to Some Nations of Indians on the West Side of the River Ohio, in the Years 1772 and 1773 ... (Burlington, N. J., 1774).

[232]   Voyage de la nouvelle France par le Sieur Champlain

Samuel de Champlain (1567–1635), Les voyages de la nouvelle France occidentale, dicte Canada, faits ... depuis l'an 1603. iusques en l'an 1629 ... (Paris, 1632, withdrawn; reissue, with four revised pages, Paris, 1632; reissue, with only new title page, Paris, 1640).

[233]   Histoire de la Nouvelle France par l'Escarbot Paris

Marc Lescarbot (ca. 1590–ca. 1630), Histoire de la Nouvelle-France ... depuis cent ans jusques à hui ... (2 parts, Paris, 1609; 3d ed., revised and augmented, Paris, 1618; abridged English version in Vol. IV of Purchas [No. 239]).

[234]   Histoire de la Nle. France avec les fastes chronologiques du nouveau monde par le pere Charlevoix

Pierre François de Charlevoix (1682–1761), Histoire et description générale de la Nouvelle France, avec le journal historique d'un voyage ... (3 vols.; 6 vols., Paris, 1744; a portion available in English, in Vol. II of Moore [No. 200a]). The "fastes chronologiques" were a portion of the contents of Vols. III and V of the Paris printings as respectively listed.

[235]   Memoirs des rois de France & de l'Angleterre sur les possessions &c. en Amerique 1755. 4 Vol: 4.°

Étienne de Silhouette (1709–1765) et al., comps. and eds., Mémoires des commissaires du roi et de ceux de Sa Majesté Britannique, sur les possessions & les droits respectifs des deux couronnes en Amérique ... (4 vols., quarto, Paris, 1755–1757). For a previous reference to this work, see Papers of Madison, V. 10; 13, n. 28.

[236]   Relation d'un voyage en Acadie par Dierville. Rouen 1708

[?] Diéreville, Relation du voyage du Port-Royal de l'Acadie, ou de la Nouvelle-France ... (Rouen, 1708; 2d ed., Amsterdam, 1710).

[237]   Josselyn's account of New England

John Josselyn, An Account of Two Voyages to New-England ... (London, 1674; 2d ed., London, 1675).

[238]   Thomas's account of Pennsylva. & N. Jersey

Gabriel Thomas, An Historical and Geographical Account of the Province and Country of Pensilvania; and of West-New-Jersey in America ... (London, 1698).

[239]   Purchases Pilgrimage. 5 Vol: fol:

Samuel Purchas (ca. 1575–1626), comp. and ed., Haklytus posthumus or Purchas His Pilgrimes. Contayning a History of the World, in Sea Voyages, and Lande-Travells, by Englishmen and Others ... (4 vols., London, 1625). JM's erroneous entry is explicable. He employed a short title for Purchas His Pilgrimage. Or Relations of the World and the Religions Observed in All Ages and Places ..., first published (London) in 1613. This work is unrelated to the Pilgrimes; but because of the similarity in titles, and because both works were published in folio and in volumes of the same size, cataloguers for many years listed the augmented fourth edition of the Pilgrimage (London, 1626) as being Volume V of the Pilgrimes. For other works contained in the Pilgrimes in whole or in part, see Nos. 217b-c, 220a-f, 222a-b, 222d-f, 233, and 265. See also Papers of Madison, IV, 101; 102, n. 4.

[240]   Hackluyt's Voyages

Richard Hakluyt (ca. 1552–1616), comp. and ed., The Principal Navigations, Voiages, Traffiques and Discoveries of the English Nation, Made by Sea or Ouerland ... within the Compasse of These 1500 Yeeres ... (Variant title, London, 1589; 2d ed., augmented, above title, 3 vols., London, 1598–1600). For other works contained in this collection in whole or in part, see Nos. 217a, 218a-b, 219a-d, 221a-e, 264. For a previous reference to Hakluyt, see Papers of Madison, V, 9; 11, nn. 3, 5, 7.

[241]   Abbe Reynal's Hist: Pol: & Philos: of East & W. Indies

Guillaume Thomas François Raynal (1713–1796) [and allegedly Denis Diderot (1713–1784) et al.], A Philosophical and Political History of the Settlements and Trade of the Europeans in the East and West Indies ... (Anon., French original ed., 6 vols., Amsterdam, 1770; J[ohn] O[badiah] Justamond [d. 1786], tr. and ed., English ed., 6 vols., Edinburgh, 1782; 2d ed., 8 vols., London; 6 vols., Dublin, 1783).

[242]   Robinson's History of America

William Robertson (see No. 90), The History of America ... (Partly posthumous, 3 vols., London and Dublin, 1777–1796; 2d ed., 3 vols., London, 1778–1796).

[243]   Russell's Hist: of do.

William Russell (1741–1793), The History of America, from Its Discovery ... (2 vols., London, 1778).

[244]   Colden's History of the 5 Nations

Cadwallader Colden (1688–1776), The History of the Five Indian Nations ... Depending on the Province of New-York ... (variant title, New York, 1727, best ed.; 3d ed., 2 vols., London, 1755).

[245]   Burke's account of the Europ: Settlemts. in America

[William Burke (ca. 1723–1798)], An Account of the European Settlements in America ... (2 vols., London, 1757; Edmund Burke [see No. 115], reviser, 5th ed., 2 vols., 1766; 6th ed., 2 vols., London and Dublin, 1777).

[246]   Douglas's Summary

William Douglass (ca. 1691–1752), A Summary, Historical and Political ... of the British Settlements in North-America ... ("W. D., M. D." continuing "numbers," Boston, 1747–1751, left uncompleted by death of author; 3d ed., 2 vols., London, 1760). See Papers of Madison, I, 184, and n. 1.

[247]   Collection of Charters

247a. John Almon (see No. 36b), comp. and ed., The Charters of the British Colonies in America ... (London, 1774; 2d ed., Dublin, 1776). Although not included in this work, "The Grants, Concessions, and Original Constitution" of New Jersey were a portion of the contents of No. 278z.

247b. Richard Parker (d. ca. 1725), comp. and ed., The Two Charters Granted by King Charles IId. to the Proprietors of Carolina … (London, 1705). See Papers of Madison, V. 10; 13, n. 27.

[248]   Neal's History of New England

Daniel Neal (1678–1743), The History of New-England … to the Year of Our Lord, 1700 … (2 vols., London, 1720; 2d ed., 2 vols., London, 1747).

[249]   Prince's Chronological History of N. England

Thomas Prince (1687–1758), A Chronological History of New-England … In the Form of Annals … (2 vols., Vol. II with variant main title, Annals of New-England, Boston, 1736–1755).

[250]   Tracts relating to N. England by Cotton Mather

250a. Cotton Mather (1663–1728), The Bostonian Ebenezer. Some Historical Remarks, on the State of Boston … (Boston, 1698).

250b. [Cotton Mather], The Declaration of the Gentlemen, Merchants, and Inhabitants of Boston, and the Country Adjacent … (Boston and London, 1689).

250c. Cotton Mather, Late Memorable Providences relating to Witchcraft and Possessions … (Boston, 1689; 3d ed., Boston and Edinburgh, 1697).

250d. ———, A Letter on the Character of the Inhabitants of New England … (Boston, 1718).

250e. ———, The Present State of New-England … upon the News of an Invasion by Bloody Indians and French-men … (Boston, 1690).

250f. ———, The Short History of New England. A Recapitulation of Wonderfull Passages Which Have Occurr'd … (Boston, 1694).

250g. ———, Some Few Remarks, upon a Scandalous Book, against the Government and Ministry of New-England … (Boston, 1701).

250h. ———, Souldiers Counselled and Comforted … in the Just War of New-England against the Northern & Eastern Indians … (Boston, 1689).

250i. ———, A True Account of the Tryals, Examinations, Confessions, Condemnations, and Executions of Divers Witches, at Salem, in New-England … (London, 1693).

250j. ———, The Wonders of the Invisible World: Being an Account of the Tryals of Several Witches, Lately Ex[e]cuted in New England … (Boston and London, 1693).

[251]   Mather's ecclesiastical History of N. England

Cotton Mather (see No. 250), Magnalia Christi americana; or, The Ecclesiastical History of New England … unto the Year of Our Lord, 1698 … (London, 1702).

[252]   Hubbards History of N. England

William Hubbard (ca. 1621–1704), A Narrative of the Indian Wars in New-England, from … 1607, to the Year 1677 … (Boston, 1677; imperfect ed., London, 1677; 3d ed.[?], Boston, 1775).

[253]   Morton's New England's Memorial

Nathaniel Morton (1613–1685), New-England's Memorial: or, A Brief Relation of the Most Memorable and Remarkable Passages of the Providence of God, Manifested to the Planters … (Boston, 1669; 3d ed., Newport, R. I., 1772).

[254]   Hutchinson's History of Massachusetts bay

Thomas Hutchinson (1711–1780), The History of the Colony of Massachusetts Bay … (3 vols., Vols. I–II, Boston, 1764–1767; John Hutchinson [1793–1865], ed., Vol. III, London, 1828; 2d ed., London, 1760 [for 1765]–1828).

[255]   Collection of papers relating to the History of do.

Thomas Hutchinson, A Collection of Original Papers relative to the History of the Colony of Massachusetts-Bay … (Boston, 1769).

[256]   Smiths History of N. York.

William Smith (1728–1793), The History of the Province of New-York, from the First Discovery … (London, 1757; 2d ed., London, 1776).

[257]   Smith's History of N. Jersey

Samuel Smith (1720–1776), The History of the Colony of Nova-Caesaria, or New-Jersey … to the Year 1721. With Some Particulars Since … (Burlington, N.J., 1765).

[258]   Historical review of Pennsa.

[Richard Jackson (d. 1787), Benjamin Franklin (1706–1790), et al.], An Historical Review of the Constitution and Government of Pennsylvania … (London, 1759). After "Pennsa." JM wrote and canceled "by Franklyn," possibly because of uncertainty of attribution.

[259]   Franklin's other works

Benjamin Franklin, Political, Miscellaneous, and Philosophical Pieces … (Benjamin Vaughan [1751–1835], comp. and ed., London, 1779). For Vaughan, see Comment by Jefferson, 25 Jan. and n. 1; JM Notes, 19 Mar. 1783, n. 9. The "Vaughan" was the only authorized compilation of Franklin's works available in 1783. Even Franklin himself probably could not have assembled all his "other works," including many of concealed authorship, occasional pamphlets, and newspaper ephemerae. That assembling would await twentieth-century scholarship.

[260]   Smith's History of Virga.

260a. John Smith (1580–1631), The Generall Historie of Virginia, New-England, and the Summer Isles … ano. 1584 to This Present 1626 … (Variant subtitle, London, 1624; so-called "second" ed., London, 1626, and six succeeding so-called eds., pages of all printed in 1624 and subtitle updated, as above; so-called "eighth" ed., London, 1632). For other works by Smith, see Nos. 260b and 280a.

260b. John Smith, The True Travels, Adventures and Observations of Captaine John Smith … Together with a Continuation of His Generall Historie … since 1624, to This Present 1629 … (London, 1630; 3d ed., London, 1744; also in Vol. II of the Churchills [No. 222c]).

[261]   Beverley's do. of do.

[Robert Beverley (ca. 1673–1722?)], "a Native and Inhabitant of the Place," anonym, The History and Present State of Virginia … ("R: B: gent:," London, 1705; 2d ed., revised and augmented, London, 1722).

[262]   Keith's do. of do.

Sir William Keith (1680–1749), baronet, The History of the British Plantations in America … Part I. Containing the History of Virginia … (London, 1738; no other "Part" was ever published).

[263]   Stith's do. of do.

William Stith (1707–1755), The History of the First Discovery and Settlement of Virginia … (Two separate eds., one superior, the other with type readjusted and on poor paper, Williamsburg, 1747; reissue of each ed. with new title page, London, 1753). For previous references to Stith, see Papers of Madison, V, 9; 11, n. 7; 12, nn. 8–9.

[264]   De incolis Virginiae ab Anglico Thoma. Heriot

Thomas Harriot (1560–1621), Admiranda narratio fida tamen, de commodis et incolarvm ritibus Virginiae … (Original English ed., A Briefe and True Report of the New Found Land of Virginia…. London, 1588, very rare; Latin ed. in Part I of Theodor de Bry [1528–1598] et al., comps., trs., and eds., Collectiones peregrinationum in Indiam Orientalem et Indiam Occidentalem [25 parts, Frankfort, 1590–1634]). JM and his consultants either did not know or had forgotten that the English version was reprinted in Vol. III of Hakluyt (No. 240).

[265]   Discourses of Virginia

Ralph Hamor, A Trve Discourse of the Present State of Virginia, and the Successe of the Affaires There till the 18 of June. 1614 … (London, 1615; also partly reprinted in Purchas [No. 239]).

[266]   Virginia by E. W.

Edward Williams, Virginia in America: More Especially the South Part Thereof … the Fertile Carolana, and No Lesse Excellent Isle of Roanoak … (Variant title, London, 1650; 2d ed., containing an additional chapter, London, 1650; 3d ed., above title, London, 1651).

[267]   Jones's present State of Virginia

Hugh Jones (ca. 1670–1760), The Present State of Virginia. Giving a Particular and Short Account of the Indian, English, and Negroe Inhabitants … (London, 1724).

[268]   A discourse & view of Virga. by Sir Wm. Berkeley Govr. 1663

Sir William Berkeley (ca. 1608–1677), A Discourse and View of Virginia … (London, 1662; 2d ed., London, 1663).

[269]   An account of the life & death of Nat: Bacon. 1677.

Strange News from Virginia: Being a Full and True Account of the Life and Death of Nathaniel Bacon … (London: William Harris, 1677).

[270]   History of the present State of Virginia

James Blair (1656–1743), Edward Chilton, and Henry Hartwell, The Present State of Virginia, and the College … (London, 1727).

[271]   A short collection of the most remarkable passages from the original to the dissolution of the Virga. Company. 1651.

Arthur Wodenoth (Woodnoth) (ca. 1590–ca. 1650), A Short Collection of the Most Remarkable Passages from the Originall to the Dissolution of the Virginia Company … (London, 1651).

[272]   Lederer's discoveries in Virginia and Carolina in 1669. & 1670. by Sr. Wm. Talbot 1672.

John Lederer (b. ca. 1644), The Discoveries of John Lederer, in Three Several Marches from Virginia, to the West of Carolina, and Other Parts of the Continent: Begun in March 1669, and Ended in September 1670 … (Latin original MSS; Sir William Talbot, baronet, tr. and ed., London, 1672).

[273]   Brickell's History of North Carolina

John Brickell (ca. 1710–1745), The Natural History of North-Carolina. With an Account of the Trade, Manners and Customs of the Christian and Indian Inhabitants … (Dublin, 1737, an almost verbatim plagiarism of Lawson [No. 274]; 2d ed., Dublin, 1743).

[274]   Lawson's do. of do.

John Lawson (d. 1712), The History of Carolina; Containing the Exact Description and Natural History of That Country, … and a Journal of a Thousand Miles, Travel'd thro' Several Nations of Indians … (Variant title, London, 1709; 3d ed., above title, London, 1718).

On 15 July 1831 the aged Madison, having observed "in a Newspaper paragraph" referring to a fire in Raleigh that "nothing was saved from the Library of the State, particularly 'Lawson's History of it,'" autographed and forwarded a personal copy of the work to Governor Montfort Stokes of North Carolina (LC: Madison Papers). For a plagiarism of the work, see No. 273.

[275]   Description of South Carolina with its civil Natural and commercial History 1762.

[James Glen], A Description of South Carolina; Containing Many Curious and Interesting Particulars relating to the Civil, Natural and Commercial History of That Colony … (London, 1761). If JM's pen did not slip, he was misinformed; there was no edition of 1762.

[276]   Huet's History of S. Carolina

Alexander Hewat (ca. 1745–1829), An Historical Account of the Rise and Progress of the Colonies of South Carolina and Georgia … (2 vols., London, 1779).

[277]   Collection of papers relative to Georgia

In attempting to cover the deficiencies in the published history of Georgia, JM would have found a "Collection of papers" to contain a surprisingly large number of printed items—that number not sufficing, however, to cover serious gaps in the historical record. A limited but typical selection from the De Renne collection of Georgiana is here presented (Azalea Clizbee, comp., Catalogue of the Wymberley Jones De Renne Georgia Library at Wormsloe, Isle of Hope near Savannah, Georgia [3 vols., Wormsloe, 1931], I, 1–226 passim).

277a. George Cadogan, The Spanish Hireling Detected: Being a Refutation of the Several Calumnies and Falshoods in a Late Pamphlet, Entitul'd "An Impartial Account" … (London, 1743). For "An Impartial Account," see No. 277f; for a rejoinder to this "Refutation," No. 277e.

277b. James Johnston, comp. and ed., Account of the Siege of Savannah, by the French and Rebels, Commanded by

Count d'Estaing and General Lincoln ... (Savannah, 1780).

277c. [Benjamin Martyn (1699–1763)], An Account Shewing the Progress of the Colony of Georgia, from Its First Establishment ... (London, 1741; reprint, Annapolis, 1742). This work also has been attributed to Lord John Perceval, for whom see No. 277g.

277d. Benjamin Martyn, Reasons for Establishing the Colony of Georgia ... With Some Account of the Country and the Design of the Trustees ... (Anon., London, 1733; 2d ed., London, 1733).

277e. [James Edward Oglethorpe (1696–1785)], A Full Reply to Lieut. Cadogan's Spanish Hireling, &c.... (London, 1743). For the work to which this was "A Full Reply," see No. 277a.

277f. [James Edward Oglethorpe], An Impartial Account of the Late Expedition against St. Augustine under General Oglethorpe ... (London, 1742). For an attack on this work, see No. 277a.

277g. [Lord John Perceval (1711–1770), later Earl of Egmont, supposed author], Faction Detected by the Evidence of Facts. Containing an Impartial View of Parties at Home, and Affairs Abroad ... (London, 1742; 5th ed., London, 1743). The work has also been attributed to William Pulteney (1684–1764), later Earl of Bath.

277h. [Lord John Perceval], Remarks upon a Scandalous Piece, Entitled a Brief Account of the Causes That Have Retarded the Progress of the Colony of Georgia ... (London, 1743). For the "Scandalous Piece," see No. 277k.

277i. Georg Philipp Friedrich von Reck (1710–1798) and Johann Martin Bolzius (1703–1765), An Extract of the Journals of Mr. Commissary von Reck, Who Conducted the First Transport of the Saltzburgers to Georgia; and of the Reverend Mr. Bolzius ... (London, 1734).

277j. South Carolina (Colony), Report of the Committee Appointed To Examine into the Proceedings of the People of Georgia ... and the Dispute Subsisting between the Two Colonies ... (Charleston, 1737).

277k. Thomas Stephens, A Brief Account of the Causes That Have Retarded the Progress of the Colony of Georgia ... A Proper Contrast to A State of the Province of Georgia ... (London, 1743). For the "State" to which this work was allegedly a "Proper Contrast," see No. 277l, and for a counterblast to the above assertedly "Scandalous Piece," No. 277h.

277l. William Stephens (1671–1753), A Journal of the Proceedings in Georgia, Beginning October 20, 1737 ... (3 vols., London, 1742). The appendix of Vol. II is the author's A State of the Province of Georgia, Attested upon Oath in the Court of Savannah, November 10, 1740, also separately published (London) in 1742. Against this "State" was directed the "Brief Account" which purported to be a "Proper Contrast" (No. 277k).

277m. Patrick Sutherland, An Account of the Late Invasion of Georgia ... (London, 1743).

277n. Patrick Tailfer et al., A True and Historical Narrative of the Colony of Georgia, in America, from the First Settlement Thereof ... (Charleston, 1741).

277o. Trustees for Establishing the Colony of Georgia in America, An Account Shewing the Progress of the Colony of Georgia in America from Its First Establishment ... (London, 1741).

277p. John Wesley (1703–1791), An Extract of the Rev. Mr. John Wesley's Journal, from His Embarking for Georgia to His Return to London ... (Bristol, n.d. [1739?]).

277q. George Whitefield (1714–1770), A Continuation of the Reverend Mr. White-field's Journal, After His Arrival in Georgia ... (London, 1741).

[278]   Laws of each of the United States

Scores of single acts or ordinances were published separately. For this reason, the citations below are confined to volumes containing the statutes enacted during an entire legislative session or during more than one session.

278a. Acts and Laws, Passed by the General Court or Assembly of His [Her] Majesties Province of New-Hampshire in New England ... (Boston, 1669, 1706, 1716, 1718–1719, 1721–1722, 1726–1728).

278b. Acts and Laws of His Majesty's Province of New-Hampshire, in New-England ... (Portsmouth, 1761–1766).

278c. Acts and Laws of the Colony of New-Hampshire ... (Exeter, 1776).

278d. Acts and Laws of the State of New-Hampshire ... (Exeter, 1780). The text comprises laws enacted from 1776 through 1780.

278e. The General Laws and Liberties of the Massachusetts Colony in New-England, Revised and Reprinted … (Cambridge, Mass., 1672; reprint, London, 1675).

278f. Several Laws and Orders Made at the General Court Holden [Held] at Boston … (Cambridge, 1672–1684).

278g. At the Convention of the Governour and Council, and Representatives of the Massachusetts Colony … (Cambridge, 1689).

278h. Acts and Laws Passed by the Great and General Court or Assembly of the Province of Massachusetts-Bay in New England, from 1692 to 1719 … (London, 1724).

278i. Acts and Laws, Passed by the Great and General Court or Assembly of Their [His, Her] Majesties [Majesty's] Province of the Massachusetts-Bay, in New-England, Begun and Held at Boston [Cambridge, Concord, Roxbury, Salem] … (Boston, 1719–1774).

278j. In the Fifteenth Year of the Reign of George the Third, King &c. Acts and Laws, Passed by the Great and General Court or Assembly of the Colony of Massachusetts-Bay in New-England … (Watertown, 1775).

278k. In the Year of Our Lord, 1776 [1777]. Acts and Laws, Passed by the Great and General Court or Assembly of the Colony of Massachusetts-Bay in New-England … (Watertown and Boston, 1776–1777).

278l. Acts and Laws, Passed by the Great and General Court or Assembly of the State of Massachusetts Bay, in New England … (Boston, 1778–1780).

278m. Acts and Laws, Passed by the Great and General Court or Assembly of the Commonwealth of Massachusetts … (Boston, 1781–1783).

278n. Acts and Laws of the English Colony of Rhode-Island and Providence-Plantations, in New-England … (Boston, 1719; 4th revision, Newport, 1767).

278o. Acts and Laws of the English Colony of Rhode-Island and Providence Plantations, in New-England, in America. Made and Passed Since the Revision in June, 1767 … (Newport, 1772).

278p. At a General Assembly of the Governor and Company of the English Colony of Rhode-Island, and Providence Plantations, in New-England … (Newport and Providence, 1773–1776).

278q. At a General Assembly of the Governor and Company of the State of Rhode-Island and Providence Plantations … (Providence and Attleborough, 1777–1783).

278r. Acts and Laws of His Majesties Colony of Connecticut in New-England … (New London and Hartford, 1715–1727).

278s. Acts and Laws Passed by the General Court or Assembly of His Majesty's Colony of Connecticut in New-England … (New London, 1728–1748).

278t. Acts and Laws Passed by the General Court or Assembly of His Majesty's [English] Colony of Connecticut in New-England … (New London, 1750–1776).

278u. Acts and Laws, Made and Passed by the General Court or Assembly of the State of Connecticut, in New-England … (New London, 1777–1783).

278v. Peter Van Schaack (1747–1832), ed., Laws of New-York from the Year 1691 to 1773 Inclusive … (2 vols., New York, 1774).

278w. Acts of the General Assembly of the Colony of New-York, February-March, 1774 … (New York, 1774).

278x. Laws of the State of New-York, Commencing with the First Session of the Senate and Assembly, After the Declaration of Independence … (Poughkeepsie, 1782).

278y. Laws of the State of New-York, Passed at Kingston … (Poughkeepsie, 1783).

278z. "Some Gentlemen Employed by the General Assembly," anonym, eds., The Grants, Concessions, and Original Constitution of the Province of New-Jersey, the Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne … (Philadelphia, 1757).

278aa. Samuel Allinson, ed., Acts of the General Assembly of the Province of New-Jersey, from the Surrender of the

Government to Queen Anne, in the Year of Our Lord 1702, to the 14th Day of January 1776 … (2d ed., Burlington, 1776).

278ab. Acts of the General Assembly of the State of New-Jersey … (Burlington and Trenton, 1777–1780).

278ac. Acts of the Fifth [-Seventh] General Assembly of the State of New-Jersey … (Trenton, 1781–1783).

278ad. [Joseph Galloway (ca. 1731–1803), ed.], The Acts of the Assembly of Pennsylvania … And an Appendix, Containing Such Acts and Parts of Acts, relating to the Proprietary, as Are Expired, Altered or Repealed … (Philadelphia, 1775).

278ae. [Thomas McKean (1734–1817), ed.], The Acts of the General Assembly of Pennsylvania … And an Appendix, Containing Laws Now in Force, Passed between the Thirtieth Day of September 1775, and the Revolution … (2 vols., Philadelphia, 1782–1786). Vol. II contains laws passed through the year 1786.

278af. [Caesar Rodney (1728–1784) and Thomas McKean (see No. 278ae), eds.], Laws of the Government of Newcastle, Kent, and Sussex, upon Delaware … (2 vols., Philadelphia and Wilmington, 1752–1763).

278ag. Anno regni sexto [-quinto decimo] Georgii III regis. At a General Assembly Begun at New-Castle … the Following Acts Were Passed by the Honourable John Penn [Richard Penn], Esquire; Governor … (Wilmington, 1766–1767, 1769–1770, 1772–1773, 1775).

278ah. Acts of the General Assembly of the Delaware State … (Wilmington, 1779).

278ai. Anno millesmo septingentesimo octuagesimo [-primo]. At a General Assembly Begun at Dover in the Delaware State … the Following Acts Were Passed … (Wilmington, 1780–1781).

278aj. Acts of the General Assembly of the Delaware State, at a Session Begun at Dover … (Wilmington, 1782–1783).

278ak. Thomas Bacon (ca. 1700–1768), ed., Laws of Maryland at Large … Now First Collected into One Compleat Body, and Published from the Original Acts and Records … (Annapolis, 1765).

278al. Laws … of the Dominion of the Right Honourable Frederick [Henry Harford], Absolute Lord and Proprietary of the Provinces of Maryland and Avalon, Lord Baron of Baltimore, &c.… (Annapolis, 1768, 1770–1774).

278am. Laws of Maryland, Made and Passed at a Session of Assembly, Begun and Held at the City of Annapolis … (Annapolis, 1777–1783).

278an. The Acts of Assembly, Now in Force, in the Colony of Virginia. With an Exact Table to the Whole … (Williamsburg, 1769).

278ao. Acts of the General Assembly, 10 [-12] Geo. III. With an Index … (Williamsburg, 1770–1772).

278ap. At a General Assembly, Begun and Held at the Capitol, in the City of Williamsburg … (Williamsburg, 1773).

278aq. Ordinances Passed at a Convention Held at the Town of Richmond, in the Colony of Virginia, on Monday the 17th of July, 1775 … (Williamsburg, n. d. [1775]).

278ar. Ordinances Passed at a Convention Held in the City of Williamsburg, in the Colony of Virginia, on Friday the 1st of December, 1775 … (Williamsburg, n. d. [1775]).

278as. Ordinances Passed at a General Convention … Held at the Capitol, in the City of Williamsburg, on Monday the 6th of May, anno Dom: 1776 … (Williamsburg, n. d. [1776]).

278at. At a General Assembly, Begun and Held at the Capitol, in the City of Williamsburg … (Williamsburg, 1777–1779).

278au. Acts Passed at a General Assembly, Begun and Held in the Town of Richmond … (Richmond, n. d. [1780–1781]).

278av. Acts Passed at a General Assembly of the Commonwealth of Virginia, Begun and Held at the Public Buildings in the Town of Richmond … (Charlottesville and Richmond, n. d. [1781–1783]).

278aw. A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use … (New Bern, 1773).

278ax. Acts Passed by the Assembly, of the Province of North-Carolina … (New Bern, 1774).

278ay. The Acts of Assembly of the State of North-Carolina … (n.p., New Bern, and Halifax, 1777–1783).

278az. Nicholas Trott (1662–1740), ed., The Laws of the Province of South-Carolina … (Charleston, 1736).

278ba. Acts Passed by the General Assembly of South-Carolina at [a] Session[s] Begun and Holden at Charles-Town … (Charleston, 1736–1737, 1760).

278bb. Anno regni Georgii III. regis Magnae Britanniae, Franciae & Hiberniae quinto [sexto], At a General Assembly Begun and Holden at Charles-Town … (Charleston, 1765–1766).

278bc. Acts and Ordinances of the General Assembly of the State of South-Carolina … (Charleston, 1776–1778).

278bd. Acts Passed at a General Assembly Begun and Holden at Jacksonburg, in the State of South-Carolina … (Philadelphia, 1782).

278be. Acts and Ordinances Passed at a General Assembly of the State of South-Carolina … (Charleston, 1783).

278bf. Acts Passed by the General Assembly of Georgia from February 17, 1755 to May 10, 1770 … (Savannah, 1763–1770).

278bg. Acts Passed by the General Assembly of Georgia at a Session Begun the 9th Day of December, 1772 … (Savannah, 1773).

[279]   All Treaties entered into with the natives of N. America.

This portion of the order could be filled, at least to the point of supplying copies of all treaties known to be in print; of these a limited number are presented below. An indeterminable multiplicity of written agreements "entered into" with various Indian tribes existed only in manuscript form, for examples of which see Papers of Madison, III, 249; 250, n. 7; IV, 125–26; 156, n. 9; V, 62, n. 18; 405, n. 29.

279a. Articles of Peace between the Most Serene and Mighty Prince Charles II…. and Several Indian Kings and Queens, &c. Concluded the 29th Day of May, 1677 … (London, 1677).

279b. An Account of the Treaty between His Excellency Benjamin Fletcher, Captain-General and Governour in Chief of the Province of New-York, &c. and the Indians of the Five Nations … (New York, 1694).

279c. The Particulars of an Indian Treaty at Conestogoe, between His Excellency Sir William Keith, Bart. Governor of Pennsylvania, and the Deputies of the Five Nations, in June, 1722 … (Philadelphia, 1722; reprint, London and Dublin, 1723).

279d. A Treaty of Peace and Friendship Made and Concluded between His Excellency Sir William Keith … and the Chiefs of the Indians of the Five Nations, at Albany, in the Month of September 1722 … (Philadelphia, 1722).

279e. Two Indian Treaties the One Held at Conestogoe in May 1728. And the Other at Philadelphia in June Following, between the Honourable Patrick Gordon Esq. Lieut. Governour of the Province of Pennsylvania, and Counties … upon Delaware, and the Chiefs of the Conestogoe, Delaware, Shawanese and Canawese Indians … (Philadelphia, 1728).

279f. A Treaty of Friendship Held with … the Six Nations, Philadelphia, September, and October, 1736 … (Philadelphia, 1737).

279g. The Treaty Held with the Indians of the Six Nations at Philadelphia, in July, 1742 … (Philadelphia, 1743).

279h. A Treaty … at the Town of Lancaster, in Pennsylvania, by the Honourable the Lieutenant-Governor of the Province, and … the Commissioners for the Provinces of Virginia and Maryland, with the Indians of the Six Nations, in June, 1744 … (Philadelphia, 1744).

279i. An Account of the Treaty Held at the City of Albany, in the Province of New-York, by His Excellency the Governor … and … the Commissioners for the Provinces of Massachusetts, Connecticut, and Pennsylvania, with the Indians of the Six Nations, in October, 1745 … (Philadelphia, 1746).

279j. A Treaty, between His Excellency the Honourable George Clinton, Captain General and Governor in Chief of the Province of New-York … and the Six United Indian Nations, and Other Indian Nations … Held at Albany in the Months of August and September, 1746 … (New York, 1746).

279k. A Treaty between the President and Council of the Province of Pennsylvania, and the Indians of Ohio, Held at Philadelphia, Nov. 13, 1747 … (Philadelphia, 1748).

279l. A Treaty Held by ... Members of the Council of the Province of Pennsylvania, at the Town of Lancaster, with Some Chiefs of the Six Nations at Ohio, and Others ... in the Month of July, 1748 ... (Philadelphia, 1748).

279m. A Treaty Held with the Ohio Indians, at Carlisle, in October, 1753 ... (Philadelphia, 1753).

279n. Treaty, or, Articles of Peace and Friendship Renewed between His Excellency Peregrine Thomas Hopson, Esq.; Captain General and Governor in Chief, in and over His Majesty's Province of Nova-Scotia or Accadie ... and Major Jean Baptiste Cope, Chief Sachem of the Chiben Accadie Tribe of Mickmack Indians ... (Halifax, 1753).

279o. An Account of Conferences Held, and Treaties Made, between Major-General Sir William Johnson, Bart. and the Chief Sachems and Warriours of the ... Indian Nations in North America, at Their Meeting on Different Occasions at Fort Johnson, in the County of Albany, in the Colony of New-York, in the Years 1755 and 1756 ... (London, 1756).

279p. A Treaty between the Government of New-Jersey, and the Indians, Inhabiting the Several Parts of Said Province, Held at Croswicks ... the Eighth and Ninth Day of January, 1756 ... (Philadelphia, 1756).

279q. A Treaty Held with the Catawba and Cherokee Indians, at Catawba-Town and Broad River, in the Months of February and March, 1756. By Virtue of a Commission Granted by the Honorable Robert Dinwiddie, Esquire, His Majesty's Lieutenant-Governor, and Commander in Chief of the Colony and Dominion of Virginia, to the Honorable Peter Randolph and William Byrd, Esquires ... (Williamsburg, 1756).

279r. Proceedings and Treaty with the ... Indians, Living at Otsiningo, on One of the West Branches of the Susquehanna River. Negotiated at Fort-Johnson ... New-York; by the Honourable Sir William Johnson, Bart, &c.... (New York and Boston, 1757).

279s. The Minutes of a Treaty Held at Easton, in Pennsylvania, in October, 1758. By the Lieutenant Governor of Pennsylvania, and the Governor of New-Jersey; with ... the Mohawks, Nanticokes & Conoys, Oneydos, Chugnuts, Onondagas, Delawares, Cayugas, Unamies, Senecas, Mohickons, Tuscaroras, Minisinks, Tuteloes, and Wapings ... (Woodbridge, N. J., 1758).

279t. Samuel Wharton (1732–1800), View of the Title to Indiana ... Containing ... the Deed of the Six Nations to the Proprietors of Indiana—the Minutes of the Congress at Fort Stanwix, in October and November, 1768—the Deed of the Indians, Settling the Boundary Line between the English and Indian Lands ... (Philadelphia, 1776).

[280]   All the political tracts which have been or may be published & may be judged of sufficient importance

For "tracts" which had drawn or would draw JM's attention prior to the close of 1783, see Papers of Madison, I, 43; 44, n. 4; 115; 117, n. 7; 133, n. 5; II, 79; 80, nn. 1, 2; 147; 148, n. 11; III, 11; 14, n. 17; IV, 143; 144, n. 2; 155; 157, n. 13; 196; 198, n. 12; 228, n. 7; V, 319; 321, n. 13; Address to the States, 25 Apr. 1783, n. 38. Even if the phrase "of sufficient importance" is narrowly interpreted, a list of "All the political tracts" published during a time-span of 175 years would fill a large volume. A list, satisfactory to JM, might begin and end, respectively, with the following entries.

280a. [John Smith (see No. 260a)], "Th. Watson Gent.," pseud., A Trve Relation of Such Occurrences and Accidents of Noate as Hath Hapned in Virginia since the First Planting of That Collony ... (London, 1608).

280b. Ethan Allen (1738–1789), The Present State of the Controversy between the States of New-York and New-Hampshire, on the One Part and the State of Vermont on the Other ... (Hartford, 1782).

[281]   Brown's History of Jamaica

Patrick Browne (ca. 1720–1790), The Civil and Natural History of Jamaica ... (London, 1756; 2d ed., lacking the valuable illustrations of the 1st, London, 1769).

[282]   History of Barbadoes

Richard Hall (d. 1786), The History of Barbadoes, from 1643 to 1762 ... (London, 1765).

[283]   Garcilasso de la Vega's History of Florida

Garcilaso de la Vega (ca. 1540–1616), called el inca, Histoire de la conquête de la Floride: ou relation de ce qui s'est passé dans découverte de ce païs par Ferdinand de Soto ... (Spanish original ed., 2 vols., Lisbon, 1605; French ed., 2 vols., Paris, 1670; 5th ed., 2 vols., Leyden, 1735). For other works by Vega, see Nos. 297 and 298.

[284]   Cox's Account of Florida

Daniel Coxe (1673–1739), A Description of the English Province of Carolana. By the Spaniards Call'd Florida, and by the French, la Louisiane ... (Variant title, London, 1722; 2d ed., above title, London, 1741; 2d reprint, London, 1741).

[285]   Romans's History of Florida

Bernard Romans (ca. 1720–ca. 1784), A Concise Natural History of East and West-Florida ... (New York, 1775; 2d ed., New York, 1776).

[286]   Memoirs sur la Louisiane par du Pratz

LePage du Pratz (d. 1775), The History of Louisiana, or The Western Parts of Virginia and Carolina; Containing a Description of the Countries That Lie on Both Sides of the River Missis[s]ippi ... (French original ed., 3 vols., Paris, 1758; English ed., variant title, 2 vols., London, 1763; 2d ed., above title, London, 1774).

[287]   Description de la Louisiane par Hennepin

Louis Hennepin (see No. 205), Description de la Louisiane, nouvellement découverte au sud'oüest de la Nouvelle France ... (Paris, 1683; reprint, Paris, 1688).

[288]   Bossu's travels through Louisiane

Jean Bernard Bossu (1720–1792), Travels through That Part of North-America Formerly Called Louisiana ... (French original ed., 2 vols., Paris, 1768; Johann Reinhold Forster [1729–1798], tr. and augmenter, 2 vols., London, 1771).

[289]   Venegas's History of California

Miguel Venegas (1680–ca. 1764), A Natural and Civil History of California ... (Spanish original ed., 3 vols., Madrid, 1757; English ed., 2 vols., London, 1759).

[290]   Muratori il christianissimo felice

Lodovico Antonio Muratori (1672–1750), Il cristianismo felice nelle missioni de' padri della compagnia di Gesù nel Paraguai ... (2 vols., Venice, 1743–1749). An English edition of 1759 was only of the first volume.

[291]   Voyages et descouverts des Espagnols dans les Indes occidentales par Don Bernardo de las casas

Bartolomé de las Casas (1474–1566), La découverte des Indes Occidentales, par les espagnols et les moyens dont ils se sont servis pour s'en rendre maitres ... (Spanish original ed., 9 tracts, Seville, 1552–1553; French ed., Paris, 1697; reprint, Paris, 1701; one tract in English, in Vol. IV of Purchas [No. 239]).

[292]   Herrera's History of the Spanish Colonies in America

Antonio de Herrera y Tordesillas (1549–1625), The General History of the Vast Continent and Islands of America, Commonly Call'd the West-Indies ... (Spanish original ed., 4 vols., Madrid, 1601–1615; English ed., somewhat abridged, 6 vols., London, 1725–1726).

[293]   de Solis's History of the Conquest of Mexico by F. Cortez

Antonio de Solis y Ribadeneyra (1610–1686), The History of the Conquest of Mexico by the Spaniards ... (Spanish original ed., Madrid, 1684; English ed., 3 parts, London, 1724; Nathaniel Hooke [see No. 78], ed., 2d, corrected, ed., 2 vols., London, 1738; 3d ed., 2 vols., London, 1753).

[294]   Voyages de Gage

Thomas Gage (d. 1656), A New Survey of the West-Indies. Being a Journal of Three Thousand and Three Hundred Miles within the Main Land of America ... (Variant title, London, 1648; 2d ed., augmented, main title as above, London, 1655; 4th ed., main and subtitle as above, London, 1699; reprint, London, 1711). A new French translation of the work (2 vols., Paris) was published in 1776.

[295]   Houston's Memoirs

James Houstoun (ca. 1690–post-1753), The Works of James Houstoun, M. D., Containing Memoirs of His Life and Travels in Asia, Africa, America, and Most Parts of Europe ... (2 separate printings, titles varying from above and from each other, London, 1747; 2d ed., above title, London, 1753).

[296]   Bouguer voyage au Perou.

Pierre Bouguer (1698–1758), La figure de la terre, déterminée par les observations de MM. Bouguer, & de la Condamine ... envoyés par ordre du roy au Pérou ... avec une relation abregée de ce voyage ... (Paris, 1749).

[297]   Garcilasso de la Vega's History of the Incas of Perou

Garcilaso de la Vega el inca (see No. 283), Histoire des incas, rois du Pérou ... (Part I, Spanish original ed. of Commentaries reales, 2 parts, Lisbon and Cordova, 1609–1617; Thomas François Dalibard [1703–1799], tr. and ed.,

French ed., 2 vols., Paris, 1744).

[298]   Histoires des Guerres civiles des Espagnols dans les Indes, de Garcilasso de la Vega

Garcilaso de la Vega el inca (see No. 283), Histoire des gverres civiles des espagnols dans les Indes … (Part II, Spanish original ed. of Commentarios reales, 2 parts, Lisbon and Cordova, 1609–1617; French ed., 2 vols., Paris, 1658; 3d ed., 2 vols., Amsterdam, 1706).

[299]   Histoire de l'Orenoque par Gumilla

José Gumilla (1690–1758), Histoire naturelle, civile et géographique de l'Orénoque: et des principales rivières qui s'y jettent … (Spanish original ed., Madrid, 1741; 2d ed., 2 vols., Madrid, 1745; French ed., from Spanish 2d ed., 3 vols., Avignon, 1758).

[300]   Bancroft's Natural History of Guiana

Edward Bancroft (1744–1821), An Essay on the Natural History of Guiana, in South America … (London, 1769).

[301]   Les voyages de Coreal. 1722.

Francesco Coreal (ca. 1648–1708), Recueil de voyages dans l'Amérique Méridionale … touchant le Pérou, la Guiane, le Brésil, &c.… (Variant title, according closely with JM's entry, 2 vols., Paris; 3 vols., Amsterdam, 1722; 4th ed., above title, 3 vols., Amsterdam, 1738). Although the French version was allegedly a translation de l'espagnol, no Spanish original edition is known to exist.

[302]   Falkner's description of Patagonia

Thomas Falkner (1707–1784), A Description of Patagonia, and the Adjoining Parts of South America … [William Combe (1741–1823), comp. and ed.], (Hereford, Eng., 1774).

[303]   Nouveau voyage aux îles de l'Amerique

Jean Baptiste Labat (1663–1738), Nouveau voyage aux isles de l'Amérique, contenant l'histoire naturelle de ce pays … (Author's name only at end of dedication, 2 separate printings, 6 vols. each, Paris, 1722; 2d ed., augmented, 6 vols., The Hague, 1724; 3d ed., 8 vols., Paris, 1742).

[304]   Histoire de St. Domingue par Charlevoix

Pierre François Xavier de Charlevoix (see No. 234), Histoire de l'isle espagnole ou de S. Domingue … (2 vols., Paris, 1730–1731; 2d ed., 4 vols., Amsterdam, 1733).

[305]   Chanvalon's Voyage à la Martinique

Jean Baptiste Thibault de Chanvalon, Voyage à la Martinique, contenant diverses observations … faites en 1751 & dans les années suivantes … (Paris, 1763).

[306]   Acuogna's relation of the river of Amazons

Cristóbal de Acuña (1597–1680), Voyages and Discoveries in South-America. The First up the River of Amazons to Quito, in Peru, and Back Again to Brazil … (Spanish original ed., Madrid, 1641; English ed., bound with the accounts of two other travelers, London, 1698).

[307]   Techo's History of Paraguay.

Nicolás del Techo (earlier Du Toict) (1611–1685), Decades virorum illustrium Paraguariae Societatis Jesu ex historia ejusdem provinciae … Cum synopsi chronologica historiae Paraguariae … (Liège, 1673; 3 vols. in 2, Frankfurt and Leipzig, 1767–1768; much abridged English version in Vol. IV of the Churchills [No. 222c]).

*Note:* The annotations to this document, and any other modern editorial content, are copyright © University of Chicago Press. All rights reserved.

Back to top

| | |
|---|---|
| SOURCE PROJECT | Madison Papers |
| TITLE | Report on Books for Congress, [23 January] 1783 |
| AUTHOR | Madison, James |
| DATE | 23 January 1783 |
| CITE AS | "Report on Books for Congress, [23 January] 1783," Founders Online, National Archives, https://founders.archives.gov/documents/Madison /01-06-02-0031. [Original source: The Papers of James |

Madison, vol. 6, 1 January 1783—30 April 1783, ed.
William T. Hutchinson and William M. E. Rachal. Chicago:
The University of Chicago Press, 1969, pp. 62—115.]

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

Founders Online is an official website of the U.S. government, administered by the National Archives and Records Administration through the NHPRC, in partnership with the University of Virginia Press, which is hosting this website.

# NEWS ARTICLES

# The Washington Post

*Democracy Dies in Darkness*

# Companies made more than $1B selling powerful guns to civilians, report says

House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence.

By Mark Berman and Todd C. Frankel

July 27, 2022 at 7:19 p.m. EDT

Five gun companies made more than $1 billion over the last decade selling powerful "military-style assault weapons to civilians," with their revenue surging amid an increase in firearm violence nationwide, a House committee reported on Wednesday.

The House Committee on Oversight and Reform assailed the gun companies, saying they deployed "manipulative marketing campaigns" that sought to connect masculinity with purchasing rifles. Some of the gun manufacturers have seen revenue more than double or triple in recent years, the committee said.

"The gun industry has flooded our neighborhoods, our schools and even our churches and synagogues with these deadly weapons, and has gotten rich doing it," House Oversight Committee Chairwoman Carolyn B. Maloney (D-N.Y.) said during a hearing on the issue Wednesday.

The committee, which said it had studied manufacturers that sold AR-15-style weapons used in mass killings, released its findings after a string of such shootings, including this year in Highland Park, Ill.; Uvalde, Tex.; and Buffalo. Mass killings account for a small share of overall gun violence in the United States; both have increased in recent years.

Appearing before the committee on Capitol Hill, chief executives from two of the companies defended their products as well as ownership of such powerful rifles. The core issue, they said, was not the guns themselves, but the people who might use them to inflict mass carnage.

"Mass shootings were all but unheard of just a few decades ago," said Marty Daniel, chief executive of Daniel Defense, the gunmaker that produced the weapons used in the Uvalde elementary school massacre, which killed 19 children and two teachers, and a deadly attack in Las Vegas in 2017 that killed 60 people. "So what changed? Not the firearms."

"I believe our nation's response needs to focus not on the type of gun, but on the type of persons who are likely to commit mass shootings," Daniel said. He called the massacres in Uvalde, Buffalo and Highland Park "pure evil" and "unfathomable."

The other companies named in the report were Bushmaster, Sig Sauer, Smith & Wesson, and Sturm, Ruger & Co. Christopher Killoy, president and chief executive of Ruger, also appeared at the hearing Wednesday, and he acknowledged "tension between our constitutional right to own firearms and the harm inflicted by criminals who acquire them."

But, he said, the latter should not prevent people from exercising the former.

"We firmly believe that it is wrong to deprive citizens of their constitutional right to purchase the lawful firearm they desire because of the criminal acts of wicked people," Killoy said. "A firearm, any firearm, can be used for good or for evil. The difference is in the intent of the individual possessing it, which we respectfully submit should be the focus of any investigation into the root causes of criminal violence involving firearms."

Deadly gun violence has surged across the country, with fatal shootings nationwide spiking in 2020 and 2021 to the highest levels in a quarter-century. At the same time, Americans have bought a flood of new guns, with more than 43 million firearms purchased over those years, according to a Washington Post analysis.

Even as the testimony was unfolding in Washington, communities across the country were still confronting the aftermath of recent mass shootings. The gunman accused of opening fire in Highland Park earlier this month, killing seven people during an Independence Day parade, was indicted Wednesday on 117 counts by a grand jury, including charges of first-degree murder, attempted murder and aggravated battery.

And in South Florida, a jury continued to hear testimony in a trial meant to determine whether a gunman who killed 17 people in a Parkland, Fla., high school in 2018 should be sentenced to death.

The House committee launched its investigation into gun manufacturers in May, following the back-to-back killings in Uvalde and Buffalo, which galvanized enough public response to fuel the passage of modest gun-control legislation for the first time in decades.

Maloney pointed to the committee's findings in criticizing the gun companies for how they promoted guns, which she said "includes marketing to children, preying on young men's insecurities and even appealing to violent white supremacists."

Rep. James Comer (R-Ky.), the committee's ranking Republican, spoke skeptically of laws that limit firearms ownership and pushed back on criticism of the gun companies.

"Gun manufacturers do not cause violent crime," he said. "Criminals cause violent crime."

Gun companies, he said, sell firearms to people "allowed to exercise their Second Amendment right to keep and bear arms for their protection and other lawful purposes."

The committee had also asked the gunmakers to provide information about efforts to track deaths and injuries caused by their AR-15-style weapons. All five of the gunmakers told the committee they don't do that.

But others have tried. In 2018, a group of investors in Ruger pushed the company to report on the violence associated with its guns. The board of directors objected. But a majority of shareholders — led by a group of nuns, and supported by Ruger's largest investor at the time, the asset firm Blackrock — passed the proposal. The vote occurred just a few months after the Parkland massacre.

The following year, Ruger grudgingly produced the report, which was criticized by activists for failing to include adequate details. The company said monitoring the criminal use of its products "is not feasible." In June, a majority of shareholders approved a new resolution asking the company to study the deadliness of its products and impact on human rights.

*Eugene Scott contributed to this report.*



**Santa Clara Law Review**

Volume 50 | Number 4                                              Article 1

1-1-2010

# The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation

Saul Cornell

Justin Florence

Follow this and additional works at: http://digitalcommons.law.scu.edu/lawreview

 Part of the Law Commons

Recommended Citation

Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 Santa Clara L. Rev. 1043 (2010).
Available at: http://digitalcommons.law.scu.edu/lawreview/vol50/iss4/1

This Article is brought to you for free and open access by the Journals at Santa Clara Law Digital Commons. It has been accepted for inclusion in Santa Clara Law Review by an authorized administrator of Santa Clara Law Digital Commons. For more information, please contact sculawlibrarian@gmail.com.

# THE RIGHT TO BEAR ARMS IN THE ERA OF THE FOURTEENTH AMENDMENT: GUN RIGHTS OR GUN REGULATION?

## Saul Cornell & Justin Florence*

Reminiscing fifty years after the end of Reconstruction, attorney Louis Post recalled the murder of Jim Williams, a Freedman and captain in South Carolina's so-called "Negro militia."[1]   The crime was so heinous it had become permanently etched in Post's memory, and his description of the event was chilling: "On the dangling corpse, those despicable savages then pinned a slip of paper inscribed, as I remember it, with these grim words 'Jim Williams gone to his last muster.'"[2]   In *District of Columbia v. Heller*, Justice Stevens invoked this image as a cautionary reminder to Justice Scalia and the other members of the *Heller* majority that the militia purpose of the Second Amendment could not be so easily cast aside without doing violence to the text and history of this provision of the Bill of Rights.[3]

Just two years after deciding *Heller*, the Court has taken on another major gun rights case, *McDonald v. City of Chicago*.[4]  This case will not only determine the future course

---

*Saul Cornell is Paul and Diane Guenther Chair in American History, Fordham University.   Justin Florence is an Associate at O'Melveny & Myers LLP in Washington, DC.  He clerked for Judge Diana Gribbon Motz on the U.S. Court of Appeals for the Fourth Circuit.  He received his J.D. from Yale Law School and a Master's Degree in History from Harvard.  The authors thank Matthew Shors, Anton Metlitsky, Micah Smith, Geoff Wyatt, Andrew Eveleth, and students in the Harvard Law School Supreme Court clinic for research and advice on the issues discussed in this article, and the members of the Santa Clara Law Review for organizing this symposium.

1. SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 184–85 (Oxford University Press 2006).

2. *Id.*

3. Dist. of Columbia v. Heller, 128 S. Ct. 2783, 2842 (2008) (Stevens, J., dissenting).

4. Nat'l Rifle Ass'n of America, Inc. v. City of Chicago, 567 F.3d 856 (7th

1043

of gun regulation in America, but it will provide an occasion for the Roberts Court to shape its own approach to, and establish its place in, history.

The issue before the Court—the relationship between the Second and Fourteenth Amendments—is historically and doctrinally complex. Because the statute at issue in *Heller* regulated arms in the District of Columbia, a federal district, the Court did not have occasion to resolve whether (and if so, how) the Constitution's right to bear arms limits states and their political subdivisions. The *McDonald* petitioners and their allies argue that the gun control regulations in Chicago and Oak Park, Illinois violate the right to bear arms guaranteed in the U.S. Constitution.[5] The petitioners' brief draws heavily on historical materials, as do several amicus curiae briefs supporting the constitutional challenge.[6] These briefs present a pro-gun rights version of history that is plagued by half-truths, anachronisms, and ideological distortion—one that bears little relationship to the actual history of the Second and Fourteenth Amendments.

In *McDonald*, the Court must decide whether to correct the historical and interpretive errors it made in *Heller*, or to exacerbate them. And it must determine whether it will rely on history in a way that is responsible and that best equips it to grapple with the full complexity of the provisions that come before it. If the Court does so, it will see that in the era surrounding the adoption of the Fourteenth Amendment, states regularly enacted robust firearms regulations to protect the public safety, including bans on dangerous weapons of the type before the Court.[7] The historical record thus supports Chicago's position, not that of the petitioners.

## I. SETTING THE STAGE: *HELLER*'S MISUSE OF HISTORY

The *Heller* majority's misuse of history is well

---

Cir. 2009), *cert. granted sub nom.* McDonald v. City of Chicago, 130 S. Ct. 48 (2009).

    5. Petitioners' Brief at 3–4, McDonald v. City of Chicago, No. 08-1521 (Nov. 16, 2009).

    6. *Id.*; *e.g.*, Brief for Academics for the Second Amendment as Amici Curiae Supporting Petitioners, McDonald v. City of Chicago, No. 08-1521 (Nov. 23, 2009); Brief for Respondents the Nat'l Rifle Ass'n of America, Inc. et al. in Support of Petitioners, McDonald v. City of Chicago, No. 08-1521 (Nov. 16, 2009) [hereinafter Brief for the NRA].

    7. *See infra* Part III.

documented.[8]  Although the Court's opinion is couched in an originalist veneer, *Heller*'s use of historical materials has drawn fire from historians and constitutional scholars across the contemporary political spectrum.[9]   Reva Siegel, for example, notes that Justice Scalia's logic appears to exclude military weapons but give preferred status to handguns.[10]  If one applied the logic of Justice Scalia's opinion during the Founding era itself, it would seem to give greater constitutional protection to the pistols used by Alexander Hamilton and Aaron Burr in their ill-fated duel than to a musket owned by a Concord Minuteman—an outcome that is hard to reconcile with the original vision of a well-regulated militia.   Pistols were not standard military issue for the eighteenth-century militiamen (apart from the horsemen's pistol carried by mounted soldiers and the pistols carried by some officers), but muskets certainly were.[11]  This fact is hard to square with the *Heller* Court's decision to give more constitutional protection to civilian guns than to militia weapons.

Perhaps the most significant interpretive error of the *Heller* majority—given Justice Scalia's proclaimed textualism—was its ahistorical approach to reading the text of the Second Amendment.  Justice Scalia used nineteenth-century interpretive sources to support making the Second Amendment's preamble subservient to the statement of the right.  The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[12]  Rather than construe the second clause in light

---

8.  Richard A. Posner, *In Defense of Looseness: The Supreme Court and Gun Control*, THE NEW REPUBLIC, Aug. 27, 2008, at 32, 32–33; J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253 (2009); Cass R. Sunstein, *Second Amendment Minimalism:* Heller *as* Griswold, 122 HARV. L. REV. 246, 260, 263–64 (2008).

9.  *See, e.g.*, Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller, 122 HARV. L. REV. 191 (2008); *see* Saul Cornell, *Originalism on Trial: The Use and Abuse of History in* District of Columbia v. Heller, 69 OHIO ST. L.J. 625, 639–40 (2008).

10.  *See* Siegel, *supra* note 9, at 193.

11.  New York's militia law was typical; it required militia men to obtain a musket or rifle and the "Captain of the Troop of Horse" to certify that his men had either a "carbine" or set of "good pistols." *See* Act of Mar. 11, 1780, ch. 55, 1780 N.Y. Laws 237.

12.  U.S. CONST. amend. II.

of the preamble, as the Founding generation would have, Justice Scalia adopted a nineteenth-century interpretive approach. He interpreted the latter part of the Second Amendment first, effectively rewriting the Amendment and undoing the work of the First Congress, which had consciously rewritten the text to place the right to bear arms after the militia clause.[13] This upends the claim that the opinion's application of originalism is a neutral interpretive method.

Justice Scalia has famously claimed that we do not have a living Constitution, but rather a dead one.[14] It might be more apt to describe the majority's interpretation in *Heller* as something akin to a constitutional etch a sketch. Like the popular children's toy, inconvenient fragments magically disappear and then miraculously reappear at the whim of the interpreter. In *Heller*, the preamble effectively vanishes and only reappears after the Court has interpreted the meaning of the right to bear arms. This "Cheshire Cat Rule of Construction"—now you see the preamble, now you don't—represents a surrealist turn in constitutional interpretation.[15] Indeed, this approach prompted Justice Stevens to wryly note in dissent that this method was not how courts typically read texts.

> The Court today tries to denigrate the importance of this clause of the Amendment by beginning its analysis with the Amendment's operative provision and returning to the preamble merely "to ensure that our reading of the operative clause is consistent with the announced purpose." That is not how this Court ordinarily reads such texts, and it is not how the preamble would have been viewed at the time the Amendment was adopted.[16]

---

13. On the drafting of the Amendment, see Jack N. Rakove, *The Second Amendment: The Highest Stage of Originalism*, 76 CHI.-KENT L. REV. 103, 158 (2001).

14. All Things Considered, *Scalia Vigorously Defends a "Dead" Constitution*, NPR, Apr. 28, 2008, http://www.npr.org/templates/story/story.php?storyId=90011526.

15. On *Heller's* use of a "Cheshire Cat Rule of Construction," see Saul Cornell, Heller, *New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss*," 56 UCLA L. REV. 1095, 1101–06 (2009) (discussing orthodox Blackstonian modes of construction and contrasting them with Scalia's approach).

16. Dist. of Columbia v. Heller, 128 S. Ct. 2783, 2826 (2008) (Stevens, J., dissenting) (citation omitted).

Justice Scalia defended his approach to interpreting the Second Amendment by relying on rules of interpretation drawn from nineteenth-century treatises written many decades after the Founding era.[17]  In this version of history, presumably, Washington Irving's Rip Van Winkle would have awoken to find nothing changed in America after his long slumbers.[18]  Historian Gordon Wood begins his magisterial contribution to the *Oxford History of America* with Irving's classic tale.[19]  The story of Rip Van Winkle captured the profound changes that had swept over America in the period between the Revolution and the Jeffersonian era.  Wood's characterization seems apt: "In a few short decades Americans had experienced a remarkable transformation in their society and culture, and, like Rip and his creator, many wondered what had happened and who they really were."[20]

The Federalist and Jeffersonian eras were deeply contentious periods in American constitutional life, and the rules governing the interpretation of constitutional texts were among the most bitterly contested questions that jurists faced in the new nation.[21]  These fierce debates extended to the use of preambles in legal texts.[22]  The most high profile examples of this conflict occurred within the context of the battle over the Alien and Sedition Acts.[23]  There, the Federalists used an expansive reading of preambles to justify the Acts, which led to a backlash against such latitudinarian constructions.[24]

Even more illuminating is an 1807 opinion of the New Jersey Supreme Court, which focused precisely on the proper mode of interpreting preambles—a case not mentioned by

---

17.  *See id.* at 2789–90 & nn.3–4.

18.  Washington Irving, *Rip Van Winkle: A Posthumous Writing of Diedrich Knickerbocker*, *in* HEATH ANTHOLOGY OF AMERICAN LITERATURE 941 (concise ed. 2004).

19.  *See* GORDON S. WOOD, EMPIRE OF LIBERTY: A HISTORY OF THE EARLY REPUBLIC, 1789–1815, at 1 (Oxford University Press 2009).

20.  *Id.* (citation omitted).

21.  *Id.* at 400–68.

22.  *Id.* at 95–173.

23.  OBSERVATIONS ON THE ALIEN AND SEDITION LAWS 25 (John Colerick printer, Telegraphe 1799); An Act for the Punishment of Certain Crimes Against the United States, ch. 74, 1798 Stat. 596 (1848).

24.  For a more detailed discussion of the constitutional struggle over preambles, see David Thomas Konig, *Why the Second Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written Constitutions in Revolutionary America*, 56 UCLA L. REV. 1295, 1299–1307 (2009).

*]*

Justice Scalia or Eugene Volokh, the scholar whose work informed *Heller*'s reading of preambles.[25]  The New Jersey Court addressed the suggestion "that the enacting clause [of a legal text] being couched in clear and positive terms, must be literally obeyed, without regard to the preamble;" and "that a preamble cannot control the plain enacting clause of a statute, but it is only called in when the *intention* of the legislature is doubtfully expressed."[26]   Although Justice Scalia claimed this was a standard interpretive approach at the Founding, the New Jersey Court squarely rejected it.  The majority opinion invoked Blackstone's authority, particularly his paramount rule for interpreting statutes:

> But I confess, I cannot find either in the authorities cited, or in many others which I have carefully searched, any thing which does away that great fundamental principle, that *the clear reason and spirit* of a law should govern *in its construction*.  In 1 *Blac. 59*, we find it laid down that, "The fairest and most rational method to interpret the will of the Legislature is, by exploring his intentions at the time when the law was made."[27]

The dissenting opinion, in contrast, supported Justice Scalia's view, claiming that:

> It appears to me, to be a settled principle of law, that the preamble cannot control the enacting part of the statute, in cases where the enacting part is expressed in clear, unambiguous terms; but in case any doubt arises on the enacting part, the preamble may be resorted to, to explain it, and show the intention of the law maker.  The enacting part of this statute is clear and explicit; there is no ambiguity on the face of it.  Shall we then go out of the enacting part, which is clear and intelligible, and resort to the preamble, to create an ambiguity, and then have recourse to the same preamble, to explain this ambiguity?[28]

In contrast to Justice Scalia's *Heller* opinion, though, this New Jersey high court dissent written by Justice Pennington was conversant with the relevant English authorities and

---

25.  Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. REV. 793 (1998); Dist. of Columbia v. Heller, 128 S. Ct. 2783, 2790 n.4 (2008).

26.  Lloyd v. Urison, 2 N.J.L. 197, 202 (1807) (quoting the contentions of one of the parties).

27.  *Id.* at 202–03.

28.  *Id.* at 210 (Pennington, J., dissenting).

noted that they were divided on the appropriate use of preambles. The restrictive view of preambles advocated by Lord Cowper—the one adopted by Justice Scalia—had been articulated at the start of the eighteenth-century but rejected at the end of the century by "Lord Chief Baron PARKER and Lord HARDWICKE, in the case of *Ryal v. Rowles*."[29]   The New Jersey dissent's preference for Cowper's views over those of Hardwicke are enlightening, and show how much of an outlier Justice Scalia's approach would have been at the time of the Founding.  The dissent explained:

> Preambles are often very loosely drawn, and not very minutely attended to, by the members of the Legislature, in giving their assent to a law.  The enacting clause being reasonable and proper, is, in all ordinary cases, sufficient to gain their approbation and assent to an act.  But may not the Legislature have had a further intent, than what is expressed in the preamble?[30]

To justify using the Pennington's dissent over Rossell's majority view of preambles, then, one would have to assume that the First Congress had written the Second Amendment without much thought or attention.  But that is not the case; the Framers carefully considered the text of the Amendment.

The New Jersey Supreme Court case was not alone in instructing that a preamble cannot be set aside when seeking the intent of the legislator.  Justice John Jay, riding circuit in a 1790s case, stated the Founding era's view of the role of preambles in unambiguous terms: "A preamble cannot annul enacting clauses; but when it evinces the intention of the legislature and the design of the act, it enables us, in cases of two constructions, to adopt the one most consonant to their intention and design."[31]  Jay's advice seems especially useful given that the court was trying to determine two different constructions of the phrase "bear arms."[32]

Although Justice Scalia claimed the mantle of originalism, his approach rejected the Founding Era's preferred method for handling preambles in favor of interpretive techniques at odds with that practice.  Citing nineteenth-century treatises to support this interpretive

---

29. *Id.* at 211 (Pennington, J., dissenting).
30. *Id.* (Pennington, J., dissenting).
31. Jones v. Walker, 13 F. Cas. 1059, 1065 (C.C.D. Va. 1800).
32. *Id.*

move is the worst sort of "law office history"—cherry-picking sources and ignoring the full historical context.[33] Put simply, *Heller* demonstrates that Justice Scalia's version of originalism is not the neutral interpretive tool he fancies it to be.[34]

The *Heller* majority's faux originalism is particularly troubling because it uses a purportedly neutral method to cloak a profoundly anti-democratic decision. It is important to recall that the *Heller* Court struck down laws enacted by the democratically elected representatives of the District of Columbia, and did so through a novel reading of the Second Amendment contrary to long-standing precedent. Moreover, the Court was not defending an insular minority, but rather a "self proclaimed majority" that has used the political process to successfully forward its agenda across the nation.[35] As Cass Sunstein has noted, Justice Scalia's *Heller* opinion seems to represent a form of living constitutionalism driven by a powerful popular constitutionalist support for gun rights.[36] The problem for Justice Scalia was that Washington is one locality in which popular support favored gun control, not gun rights. But rather than acknowledge that the Court was striking down the democratic law because of the majority's own ideological views on the issue, the majority purported to apply a neutral theory.

## II. THE IRONIES OF THE PRO-*McDONALD* BRIEFS

The briefs filed on behalf of the *McDonald* petitioners evidence the same tendency toward law office history found in the *Heller* majority's opinion.[37] If good history forms a rich tapestry drawn from a variety of different sources, this results-oriented exercise looks rather different. The petitioners and their amici have presented the Court with a

---

33. For a useful discussion of the problem of law office history in recent legal scholarship, see Matthew J. Festa, *Applying a Usable Past: The Use of History in Law*, 38 SETON HALL L. REV. 479 (2008).

34. *See* Wilkinson, *supra* note 8.

35. *See, e.g.*, Michael C. Dorf, *Identity Politics and the Second Amendment*, 73 FORDHAM L. REV. 549 (2004); Kristin A. Goss, *Policy, Politics, and Paradox: The Institutional Origins of the Great American Gun War*, 73 FORDHAM L. REV. 681 (2004). Without a gun census, it is impossible to tell if the majority of American households actually own firearms.

36. Sunstein, *supra* note 8, at 265–67.

37. *See* discussion *infra* Part I.

Compendium_Cornell
Page 2033

flat monochromatic version of the past, drained of its complexity.   According to this simplistic account, the Fourteenth Amendment protects a constitutional right to possess any arms that could possibly be used for self-defense, and it precludes the states from enacting reasonable gun regulations—even regulations that are non-discriminatory, do not interfere with the militia, and serve the purpose of protecting the public from harm.

The *McDonald* petitioners' and their amici's arguments are profoundly ahistorical.[38]  Second Amendment scholarship has often been the worst sort of law office history, packaged in originalist rhetoric.   Rather than faithfully portray the Founders' world, it has conjured up a mirror image of the world it purports to represent—a carnivalesque inversion of reality[39]—in which the Dissent of Pennsylvania's Anti-Federalist Minority matters more than the debates of the First Congress that actually wrote the Second Amendment.[40] The use of history by the *McDonald* petitioners and their amici fails on its own terms.  Moreover, as explained in Part III, these parties entirely ignore the dominant understanding of the relationship between states and gun regulation in the era following adoption of the Fourteenth Amendment—in particular, the fact that states had broad power to enact non-discriminatory firearms regulations to protect the public safety.[41]

### A. The Founding Era's Self-Defense Theory Versus the Modern Gun Rights Theory

One historically flawed aspect of the majority opinion in *Heller* is the claim that the Second Amendment was intended or understood to effectively constitutionalize the common law right of self-defense.[42]  These two rights (to bear arms in a militia, and bear a gun for personal self-defense) were legally

---

38.  *See generally* ROBERT SPITZER, SAVING THE CONSTITUTION FROM LAWYERS: HOW LEGAL TRAINING AND LAW REVIEWS DISTORT CONSTITUTIONAL MEANING (2008); *see also* Jack N. Rakove, *Confessions of an Ambivalent Originalist*, 78 N.Y.U. L. REV. 1346, 1354–55 (2003).

39.  Larry D. Kramer, *When Lawyers Do History*, 72 GEO. WASH. L. REV. 387, 405–07 (2003).

40.  Saul Cornell, *A New Paradigm for the Second Amendment*, 22 LAW & HIST. REV. 161 (2004).

41.  *See infra* Part III.

42.  Dist. of Columbia v. Heller, 128 S. Ct. 2783, 2817–18 (2008).

distinct in the Founding era. Certainly, some proposals were made to constitutionalize the right to self-defense, including Jefferson's alternative model for the Virginia Declaration of Rights and the rejected alternatives framed by two Massachusetts towns during the debate over the state's 1780 Constitution.[43] By 1790 the most forward-looking legal thinkers, such as James Wilson, had started to think about the issue in more individualistic terms, yet it would take several decades before this view gained a foothold in American law. Once this new theory took root, it provided an alternative to the traditional common law understanding of self-defense embodied in eighteenth-century Anglo-American law.[44]

The debates in state constitutional conventions and legislatures during the decades following the adoption of the Second Amendment, which include the waves of constitutional revision that swept across the nation throughout the nineteenth century, demonstrate that by the middle of the nineteenth century two opposing views of the right to bear arms had gained currency in American law.[45] Indeed, the two competing visions of the right to bear arms— one militia-based and the other rooted in the right of private self-defense—generated two opposing constitutional visions in antebellum American jurisprudence, a fact revealed by the radically different holdings in the antebellum cases of *State v. Buzzard* and *Bliss v. Commonwealth.*[46]

By the time the Fourteenth Amendment was adopted, constitutional experts (including those cited by the *Heller* majority) recognized this divide. In his comprehensive review of this body of law, John Foster Dillon, an eminent late nineteenth-century legal authority, recognized that

---

43. Oscar Handlin & Mary Handlin, The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, at 574, 624 (Harvard University Press 1966); Library of Congress, Virginia Colonial Convention, August 1774, Declaration of Rights, http://memory.loc.gov/cgi-bin/query/P?mtj:1:./temp/~ammem_NENu::  (last visited Apr. 14, 2010).

44. Cornell, *supra* note 1, at 148–55.

45. *Id.* at 137–166; Cornell, *supra* note 40, at 161.

46. *Compare* Bliss v. Commonwealth, 12 Ky. 90 (1822) (declaring that Kentucky's concealed-weapons ban conflicted with the state constitution), *superseded by state constitutional amendment*, Ky. Const. of 1850 art. XII, § 25, *with* State v. Buzzard, 4 Ark. 18, 21 (1842) (upholding arms regulation statute against constitutional challenge).

Compendium_Cornell
Page 2035

competing paradigms existed.[47]   Dillon shared the view of
another celebrated legal theorist, Joel Prentiss Bishop, who
argued that the more limited militia-based conception of
arms-bearing articulated in *Buzzard* was the dominant
paradigm.[48]  Both Dillon and Bishop recognized it was beyond
dispute that the more expansive individual right discussed in
*Bliss* was not (yet) the orthodox view in American law.[49]

Although the militia purpose of the Second Amendment
and similar state arms-bearing provisions controlled the
meaning of the Amendment, this is not to say that
Americans, including leading commentators, did not believe
in a right of individual self-defense.   Neither Bishop nor
Dillon would have doubted that such a right was well
established under common law and that the right included
the liberty to use firearms or any other item of property
legally possessed.   Dillion's discussion of this notion was
particularly thoughtful.   He argued that society may
extensively regulate the right of self-defense, but cannot
abrogate it.[50]  Echoing the ruling in *Andrews v. State*,[51] an
influential Reconstruction-era case, Dillon confidently
declared that "every good citizen is bound to yield his
preference as to the means [of self-defense] to be used, to the
demands of the public good."[52]   Dillon also explained that
each state might "regulate the bearing of arms in such a
manner as it may see fit, or restrain it altogether."[53]  And, as
discussed in Part III, the states did just that in the era
surrounding the adoption of the Fourteenth Amendment.[54]

Part of the problem with the modern gun rights theory is
that it has effectively misconstrued the connection between
the right to have guns and the right to keep and bear arms.
For modern gun rights advocates, the Constitution protects
an individual right to have guns for self-defense, which
makes it possible to have a well-regulated militia.   The

---

47. John Foster Dillon, *The Right to Keep and Bear Arms for Public and Private Defense*, 1 CENT. L.J. 259 (1874).

48. *See generally* JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW (Boston, Little, Brown, and Co. 1868) (1856).

49. Dillon, *supra* note 47, at 286.

50. *Id.*

51. Andrews v. State, 50 Tenn. 165 (1871).

52. Dillon, *supra* note 47, at 286.

53. *Id.* at 296.

54. *See infra* Part III.

Founders had the opposite view: the necessity of having a well-regulated militia meant that the people had the right to have certain weapons, which they were entitled to use for self defense, under common law and subject to reasonable state regulation.[55]

## B. *The Continuing Relevance of the Militia in the Reconstruction Era*

To sustain their self-defense theory, gun rights advocates have once again tried to erase the first clause of the Second Amendment by falsely claiming that Republicans in the era of the Fourteenth Amendment's adoption had little interest in gun regulation and had abandoned their belief that the Second Amendment right to bear arms was linked to participation in the militia. For example, one brief filed in *McDonald* argues that by the middle of the nineteenth century the original militia-based view of the Amendment had largely disappeared and been supplanted by an individual rights conception of arms-bearing.[56] That brief does not come to terms with the leading legal authorities writing during that period and cannot be reconciled with the relevant scholarly literature on American constitutional development in this era. Historians have devoted an enormous amount of energy to charting the bumpy and disjointed transformation of American politics from a civic republican culture to a more liberal one.[57] No serious historian would doubt that over the course of the nineteenth

---

55. For a clear statement of the gun rights view, see Don B. Kates Jr., *The Second Amendment And The Ideology Of Self-Protection*, 9 CONST. COMMENT. 87 (1992). Rather than approach the right of self defense in a rigorous historical fashion, Kates plucks quotes out of context, cherry-picking snippets from a variety of philosophers from Plato to the Founders. The essay shows little historical understanding of early modern political thought, eighteenth-century social contract theory, or Anglo-American common law.

56. *See* Brief for Academics for Second Amendment, *supra* note 6. The table of authorities for this brief relies largely on publications of pro-gun rights activists such as Clayton Cramer, David Hardy, Stephen Halbrook, and Dave Kopel. *See id.* at vi–x. Indeed, the brief cites a forthcoming article written by one of the authors of the brief that appears to have been written with the idea of influencing the Court in *McDonald*. *See id.* at 12 n.15. The brief therefore effectively cites itself for authority.

57. *See* Festa, *supra* note 33; Daniel T. Rodgers, *Republicanism: The Career of a Concept*, 79 J. AM. HIST. 11, 30–34 (1992); Suzanna Sherry, *Civic Virtue and the Feminine Voice in Constitutional Adjudication*, 72 VA. L. REV. 543, 551 n.23 (1986).

century a more democratic and individualistic culture gradually emerged in the United States.[58] But this does not mean that the older vision was obliterated.

The Second Amendment presents no exception to this general rule. The dominant understanding of the Amendment in the eighteenth century was unquestionably civic republican.[59] A more liberal, individualistic, and ultimately democratic conception of arms-bearing emerged at the end of the eighteenth century, and developed most fully in the early decades of the nineteenth.[60] It is, however, far too simplistic to assert that one view simply supplanted the other. The notion that the Second Amendment right to bear arms had been decoupled from the militia purpose of the Amendment would have shocked most of the leading legal minds of the late nineteenth century.

One leading authority writing in the late nineteenth century, John Norton Pomeroy, construed the Second Amendment using the Blackstonian method adopted by Justice Stevens and eschewed by Justice Scalia in *Heller*.[61] He observed that the meaning of the Second Amendment was to be gleaned from its preamble, noting that "[a]ll such provisions, all such guaranties, must be construed with reference to their intent and design."[62] He was insistent on this point:

> The object of this clause is to secure a well-armed militia. It has always been the policy of free governments to dispense, as far as possible, with standing armies, and to rely for their defence, both against foreign invasion and domestic turbulence, upon the militia. Regular armies have always been associated with despotism.[63]

While these sentiments are sure to please modern proponents of gun control, Pomeroy's views are not easily assimilated to the simple dichotomies of modern gun politics.

---

58. WOOD, *supra* note 19, at 701–38 (suggesting that this change had taken place by the second decade of the nineteenth-century). For more on the changing view of the right to bear arms, see CORNELL, *supra* note 1.

59. *See* sources cited *supra* note 57.

60. WOOD, *supra* note 19, at 701–38.

61. *See generally* JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES (New York, Hurd and Houghton 3d ed. 1875).

62. *Id.* at 152.

63. *Id.*

Pomeroy continued to believe that the Amendment was defined by its militia purpose, but he viewed that purpose in expansive terms. Thus, Pomeroy was equally quick to point out that "a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons"[64]—a sentiment more likely to bring a smile to the faces of modern gun rights advocates.

Pomeroy was hardly alone in championing this understanding of the Second Amendment; Joel Prentiss Bishop articulated a similar view. After noting that state authority over the manner of carrying weapons was extensive (including the regulation of open carry and concealed carry), Bishop went on to discuss the more limited scope of the right to keep and bear arms. Bishop was emphatic that the right only protected military arms and, even then, only when used in a "military way."[65]   Contrary to claims of gun rights advocates, the dominant view of the Second Amendment in the late nineteenth-century continued to be shaped by the preamble.[66]

### C. The Incorporation Conundrum: What Did the Fourteenth Amendment Prohibit?

Much of the recent academic scholarship on the Fourteenth Amendment, particularly as espoused by those supporting full incorporation of the Bill of Rights against the states, has stressed its abolitionist origins.   While this intellectual genealogy is important, it is not the only significant historical tradition relevant to the Fourteenth Amendment.[67]   Republicans were also heirs to an older Whig

---

64. *Id.*
65. BISHOP, *supra* note 48, at 75.
66. *Id.* at 75–76.
67. For pro-incorporation arguments, see MICHAEL KENT CURTIS, NO STATE SHALL ABRIDGE: THE FOURTEENTH AMENDMENT AND THE BILL OF RIGHTS 57–91, 215–20 (3d prtg. 2001). For the opposing argument, see WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 114–24 (1988).   The most measured and even-handed evaluation of the evidence and scholarship to date concludes that the evidence for total incorporation of the Bill of Rights fails to meet any reasonable historical standard of proof.   Of course, depending on which theory of originalism the Court utilizes, the lack of compelling historical evidence for a broad consensus on incorporation among the framers, ratifiers, and the general public may not pose a serious bar to incorporation of the Second Amendment. Indeed, given the Court's "new originalist" methodology employed in *Heller*

vision of a well-regulated state.   And while a more individualistic conception of arms-bearing had taken root among the most radical wing of the abolitionist movement, this was not the view of more mainstream Republicans who remained committed to the idea of well regulated society.[68]

Although the scholarly pendulum has shifted noticeably toward incorporation in recent years, no clear consensus has emerged on this issue.   Few contemporary scholars would defend the extreme anti-incorporationist views of Charles Fairman or Raoul Berger.[69]   Moreover, some points of agreement have emerged in this debate.   If the meaning of the Fourteenth Amendment was to be gleaned from the intent of its primary architects, as evidenced by utterances made in the *Congressional Globe*, the case for something like incorporation is strong.[70]   The problem, however, becomes increasingly complex if one moves beyond Bingham and Howard's speeches in Congress.   The most recent effort to tally up the views of those Congressmen who spoke on the issue concluded that the case for incorporation remains inconclusive at best.[71]   As one moves beyond congressional debate to try to survey the public understanding of the Amendment at the time of its adoption, the evidence becomes less clear, more fragmentary, and even more contradictory.[72]

The connection between the Second and Fourteenth Amendments is even more complex.   Gun rights advocates claim that the right to bear arms was the pre-eminent right sought by supporters of the Fourteenth Amendment.   Even allowing for the hyperbole that often appears in amicus briefs, such a simplistic claim strains credulity.   While the

---

there are almost no constraints on what the Court might do because any evidence, no matter how un-representative, can be used to construct an original public meaning argument.

68. RONALD M. LABBÉ & JONATHAN LURIE, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT 230 (2003).

69. For an explanation of these views, see RAOUL BERGER, GOVERNMENT BY JUDICIARY: THE TRANSFORMATION OF THE FOURTEENTH AMENDMENT 155–89 (2d ed. 1997), and Charles Fairman, *Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding*, 2 STAN. L. REV. 5 (1949).

70. Petitioners' Brief, *supra* note 5, at 24–26.

71. *See* George Thomas, III, *The Riddle of the Fourteenth Amendment: A Response to Professor Wildenthal*, 68 OHIO ST. L.J. 1627 (2007).

72. BERGER, *supra* note 69, at 155–89; Fairman, *supra* note 69.

outrages of the Black Codes, including the selective
disarmament of Blacks, were widely reported in the North,[73]
there is almost no evidence to support the contention that
this was a general concern during public debate over the
Fourteenth Amendment. Indeed, considering that Bingham
and others were mercilessly attacked by Democrats who
conjured up a host of horrors (including miscegenation) that
would follow the Fourteenth Amendment's adoption,[74] it
would have been political suicide to champion the rights of
gun toting African-Americans to Northern or Midwestern
audiences. Indeed, when Bingham took to the stump to sell
the Fourteenth Amendment he stressed that the purpose of
Section One was to "secur[e] equal political rights to all
natural born or naturalized Citizens."[75]

Significantly, even Bingham expressly affirmed that the
new Amendment would not diminish the powers of the states
and would maintain the balance of power within the federal
system. He expressly declared that the state would continue
to be responsible for all issues of "local administration and
personal security."[76] As described below, states had regulated
weapons to protect public safety in the years leading up to the
Fourteenth Amendment, and Bingham's public remarks seem
a clear indication that he did not intend the new Amendment
to alter that practice. Striking down a local gun control law
seems hard to reconcile with Bingham's own view that the
goal of Section One was to secure equal rights and preserve
state power to protect and regulate matters relevant to
personal security.[77]

73. *See* Brief of Constitutional Law Professors as Amici Curiae in Support
of Petitioners at 25–27, McDonald v. City of Chicago, No. 08-1521 (Nov. 23,
2009) [hereinafter Brief of Constitutional Law Professors]; Petitioners' Brief,
*supra* note 5, at 11; Brief for the NRA, *supra* note 6, at 14.

74. James E. Bond, *The Original Understanding of the Fourteenth
Amendment in Illinois, Ohio, and Pennsylvania*, 18 AKRON L. REV. 435 (1985).

75. John Bingham, Speech, *in* CINCINNATI DAILY GAZETTE, Sept. 2, 1867.

76. *Id.*

77. For two other speeches by Bingham which stress equal rights, not
incorporation, as the essence of Section One, see John A. Bingham, Politics in
Ohio (Aug. 8, 1866), *in* CINCINNATI COMMERCIAL, Aug. 10, 1866, and John A.
Bingham, The Constitutional Amendment (Aug. 24, 1866), *in* CINCINNATI
COMMERCIAL, Aug. 27, 1866. For a useful summary of the scholarship on the
public debate over Section One, see Lawrence Rosenthal, *Second Amendment
Plumbing after* Heller*: Of Incorporation, Standards of Scrutiny, Well-Regulated
Militias and Criminal Street Gangs*, 41 URB. LAW. 1 (2009). Rosenthal
concludes that even the most ardent advocates for total incorporation have not

It is not just Bingham who is hard to fit into the gun rights incorporation paradigm. Even among those who believed that the Fourteenth Amendment had incorporated the right to bear arms, the theory of incorporation they advanced does not fit into the simple dichotomous model of the Second Amendment that dominated pre-*Heller* scholarship. Nor can this vision of incorporation be easily reconciled with *Heller*'s holding itself. Consider the view presented in the National Rifle Association (NRA) brief and a brief filed by Constitutional Law Professors in *McDonald*.[78] These briefs describe reactions from Congressmen concerned that the Black Codes in Mississippi, South Carolina, and elsewhere explicitly discriminated against the rights of freedmen and other African-Americans, preventing them from possessing the types of arms that others were permitted to own. Petitioners and the NRA, for example, cite an order from General Sickles, issued in January 1866, to suspend the South Carolina Black Codes.[79] Both quote the order selectively, however, cutting off the provision mid-sentence. Read in full, the order affirms: "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent."[80]

The same provision further provides that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms."[81] The non-discrimination principle of the Sickles order was thus entirely consistent with reasonable safety regulation. Nor was the right to bear arms one that all individuals could claim even in the era of the Fourteenth Amendment's adoption. Rather, the right was limited to loyal Americans able to demonstrate some permanent attachment to the community by showing, for instance, that they were not vagrants (i.e., they either held property or were gainfully

---

been able to muster a compelling case that total incorporation was widely understood to be the public understanding of Section One. *Id.  See generally* Thomas, *supra* note 71.

78. *See* Brief of Constitutional Law Professors, *supra* note 73; Brief for the NRA, *supra* note 6.

79. *See* Petitioners' Brief, *supra* note 5; Brief for the NRA, *supra* note 6.

80. CONG. GLOBE, 39th Cong., 1st Sess. 908–09 (1866).

81. *Id.*

employed). Thus, during this time, the right to bear arms was not universal and was indeed subject to far greater restrictions than were core First Amendment freedoms, including some forms of prior restraint that would not have been allowable for speech.[82]

Likewise, the NRA and Constitutional Law Professors both place great emphasis on the second Freedman's Bureau Bill, which Congress enacted in response to the discriminatory laws enacted and enforced by Southern States.[83] But, that bill focused on barring state action that discriminated against African-Americans. The relevant provision protected the freedmen's right:

> [T]o have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color or previous condition of slavery.[84]

Although petitioners' amici highlight the portion of this provision noting a "right to bear arms," they ignore the text surrounding that phrase, *viz.* "equal benefit of all laws" and "without respect to race or color or previous condition of slavery."[85] Likewise, other legislation enacted by the Reconstruction Congress targeted discriminatory state action. For example, the Civil Rights Act of 1866, which the Fourteenth Amendment was meant to constitutionalize,[86] explicitly enacted an antidiscrimination rule.[87] Senator Trumbull reasoned that the Act would "in no manner interfere[] with the municipal regulations of any State which

---

82. By rejecting Justice Breyer's balancing test, the *Heller* Court seemed to come close to treating the Second Amendment as though it were structurally the same as the First Amendment's protection for political speech. Although political speech triggers strict scrutiny, other types of speech do not. Of course as Winkler notes, most provisions of the Bill of Rights are not precluded from employing balancing tests. Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 706–26 (2007).

83. *See* Brief of the Constitutional Law Professors, *supra* note 73, at 29; Brief for the NRA, *supra* note 6, at 12.

84. Act of July 16, 1866, ch. 200, § 14, 14 Stat. 173, 176–77.

85. *Id.*; *see also* Rosenthal, *supra* note 77, at 73.

86. *See, e.g.*, Bond, *supra* note 74, at 444.

87. *See* Rosenthal, *supra* note 77, at 58–59.

protects all alike in their rights of person and property."[88]

The NRA also relies heavily on Pomeroy's treatise,[89] but ignores its clear statement of the Amendment's non-discrimination principle. Pomeroy observed that if a state statute provided that "certain classes of the inhabitants—say negroes—are required to surrender their arms," the federal Bill of Rights offered no relief.[90] The "first section" of the Fourteenth Amendment "now pending before the people," however, "would give the nation complete power to protect its citizens against local injustice and oppression."[91] Indeed, Pomeroy's explication of how Section One would function to protect rights merits closer scrutiny. Pomeroy posited a scenario in which a state enacts a discriminatory law disarming Freedmen.[92] Interestingly, he further posited another crucial fact ignored by the NRA brief: not only did the hypothetical state enact a discriminatory act, but its constitution also contained an arms-bearing provision.[93] If Pomeroy believed that the right to bear arms was a privilege and immunity of citizenship or an element of substantive due process liberty, there would have been no need to construct the fact pattern in this manner. In the absence of a discriminatory law and a state arms-bearing provision there would have been no means for the Fourteenth Amendment to trigger federal intervention. The reason for this is evident in Pomeroy's forceful statement that the individual state's police powers remained undiminished after the Fourteenth Amendment. Pomeroy was emphatic on this point, declaring that the Amendment would not "interfere with any of the rights, privileges, and functions which properly belong to the individual states."[94] Among those rights was the power to regulate "dangerous" weapons.

Indeed, Pomeroy's view—that the first section of the Fourteenth Amendment prohibited state statutes directed at "certain classes of inhabitants," but did not prohibit reasonable and neutral regulations aimed at protecting the

---

88. CONG. GLOBE, 39th Cong., 1st Sess. 1761 (1866).
89. Brief for the NRA, *supra* note 6, at 17, 46.
90. POMEROY, *supra* note 61, at 150.
91. *Id.* at 151, *quoted in* Brief for the NRA, *supra* note 6, at 17.
92. POMEROY, *supra* note 61, at 150.
93. *Id.*
94. *Id.* at 151.

public[95]—also reflected the view of the Reconstruction Congress. Senator Morrill (R-Me.), for example, emphasized that the "principle of equality before the law . . . does not prevent the State from qualifying the rights of the citizen according to the public necessities."[96]  Representative Stevens (R-Pa.) explained that the Fourteenth Amendment "allow[ed] Congress to correct the unjust legislation of the States, so far that the law which operates on one man shall operate equally upon all."[97]  Representative Hotchkiss (R-N.Y.) understood the Amendment to mean "no State shall discriminate between its citizens and give one class of citizens greater rights than it confers upon another."[98]  As a result of the Fourteenth Amendment, states could thus no longer enact or enforce firearms laws that discriminated against particular "classes of inhabitants."[99]  But no contemporary evidence suggests that the Fourteenth Amendment was intended or understood to preclude neutral, non-discriminatory regulations.

### D. *Second Amendment Incorporation Comes Before the Court*

One glaring omission in the briefs filed on behalf of the *McDonald* petitioners is that not one brief discusses the two cases in which the federal government pressed a Second Amendment claim by arguing in favor of something like incorporation.  Why would gun rights advocates ignore an on-point case that argued for Second Amendment incorporation?  If one examines the two cases, *United States v. Mitchell* and *United States v. Avery*, the answer becomes clear.[100]  These cases highlight the historical flaws in the *McDonald* petitioners' attempt to erase the relevance of the militia while creating a constitutional right to self-defense in the Fourteenth Amendment.[101]

---

95.  *Id.* at 150.
96.  CONG. GLOBE, 39th Cong., 2d Sess. 40 (1866).
97.  CONG. GLOBE, 39th Cong., 1st Sess. 2459 (1866).
98.  *Id.* at 1095.
99.  POMEROY, *supra* note 61, at 150.
100.  United States v. Avery, 80 U.S. 251 (1871) (noting, but not addressing, the division between two lower court judges on the prosecution's Second Amendment theory); United States v. Mitchell, 26 F. Cas. 1283 (C.C.D.S.C. 1871).
101.  The claim of petitioners' amici—that in the Reconstruction era, "[a]rms were needed not as part of political and politicized militia service," Brief of Constitutional Law Professors, *supra* note 73, at 28 (quoting AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 258–59 (1998))—is

Both cases were part of the South Carolina Ku Klux Klan (KKK) trials—the prosecution triggered by the crimes that haunted Louis Post. The lead attorney on the cases, U.S. Attorney Daniel Corbin, developed a strategy to use the Fourteenth Amendment to pursue the Klan's violations of the Second Amendment rights of Jim Williams and other members of the Negro militia.[102] The South Carolina KKK trials were the only instance that the U.S. government pressed a Second Amendment claim in court by using the Fourteenth Amendment. The case confounds the categories of modern Second Amendment analysis; the KKK trials vindicate the notion of Second Amendment incorporation, but in a way that hardly fits with the gun rights ideology or *Heller*'s account of the Amendment. For gun rights advocates, the problem is that Corbin and the Department of Justice prosecuted the Klan for disarming members of the Negro militia.[103] Even more troubling to gun rights advocates is that the individual rights self-defense view was championed by the South Carolina KKK as a justification for violating the Second Amendment rights of the members of the Negro militia.

---

belied by this history. The Brief of Constitutional Law Professors relies on Akhil Amar's erroneous claim that militias had become irrelevant to Republican policy in the era of the Fourteenth Amendment. *See* Brief of Constitutional Law Professors, *supra* note 73 (citing AMAR, *supra* note 101, at 258–29). The importance of the Negro militias was first documented by OTIS A. SINGLETARY, NEGRO MILITIA AND RECONSTRUCTION (Greenwood Press 1957). For the most recent vindication of the importance of the Negro militias, see STEVEN HAHN, A NATION UNDER OUR FEET: BLACK POLITICAL STRUGGLES IN THE RURAL SOUTH FROM SLAVERY TO THE GREAT MIGRATION (2003). The attempt by Academics for the Second Amendment to dismiss these subsequent events is equally flawed. The very source that is relied on by the Brief of the Academics for the Second Amendment describes the Republicans' desire to re-form militias in the South in early 1868—the precise time of the Fourteenth Amendment's ratification. *See* SINGLETARY, *supra* note 101, at 7. For additional evidence that the militia-based view did not simply fade away, see the discussion of POMEROY, *supra* note 61, and accompanying text and the cases discussed *infra* Part II.D. Moreover, as Michael Benedict notes, the growing problem posed by the Klan sharpened conceptions about the meaning of Section One that were inchoate at the time it was framed. *See* MICHAEL LES BENEDICT, PRESERVING THE CONSTITUTION: ESSAYS ON POLITICS AND THE CONSTITUTION IN THE RECONSTRUCTION ERA 24 (2006).

102. CORNELL, *supra* note 1, at 179–80.

103. Kermit L. Hall, *Political Power and Constitutional Legitimacy: The South Carolina Ku Klux Klan Trials, 1871–1872*, 33 EMORY L.J. 921, 926–27 (1984); *see also* LOU FALKNER WILLIAMS, THE GREAT SOUTH CAROLINA KU KLUX KLAN TRIALS, 1871–1872, 22–29 (1996).

Corbin's opening statement laid out a constitutional theory quite unlike any presented to the Supreme Court in the *McDonald* briefs arguing for incorporation of the Second Amendment. Here is what Corbin said in his opening remarks in the trial:

> Imagine, if you like—but we have not to draw upon the imagination for the facts—a militia company, organized in York County, and a combination and conspiracy to rob the people of their arms, and to prevent them from keeping and bearing arms furnished to them by the State Government. Is not that a conspiracy to defeat the right of citizens, secured by the Constitution of the United States, and guaranteed by the Fourteenth Amendment?[104]

In contrast to Justice Scalia, Corbin viewed the right to bear arms as tethered to the militia. That view made perfect sense to Republicans trying to restore political stability to the South. The newly formed Negro militias, heavily armed by the Republican-controlled Southern governments, not only helped restore order, but also provided a potent means of organizing and rallying Freedmen. It was the political power of the militias, as much as their firepower, that frightened the Klan.[105] In the end the judges divided over the issue of incorporation, providing additional evidence that there was no consensus on this issue in the era of the Fourteenth Amendment.

The true stories of Jim Williams, the Klan, and the Negro militias can have no place in the *McDonald* petitioners' or the NRA's history of the Second and Fourteenth Amendments. The argument that the Fourteenth Amendment was about gun rights, not civil rights, has become a central dogma of the modern gun rights movement. This fact was made evident in a remarkable exchange between gun rights lawyer Alan Gura

---

104. *The Case of Robert Hayes Mitchell, Sylvanus Shearer and Others*, *in* PROCEEDINGS IN THE KU KLUX TRIALS AT COLUMBIA, S.C. IN THE UNITED STATES CIRCUIT COURT 148 (Negro Univ. Press 1969) (transcript of the Ku Klux Trials (1872)). On the newly created Department of Justice's support for Corbin, see ROBERT J. KACZOROWSKI, THE NATIONALIZATION OF CIVIL RIGHTS: CONSTITUTIONAL THEORY AND PRACTICE IN A RACIST SOCIETY, 1866–1883, at 153 (1987) (noting that Akerman was committed to enforcing the rights of citizens through the Fourteenth Amendment); ROBERT J. KACZOROWSKI, THE POLITICS OF JUDICIAL INTERPRETATION: THE FEDERAL COURTS, DEPARTMENT OF JUSTICE AND CIVIL RIGHTS, 1866–1876, at 122–29 (1985).

105. *See* HAHN, *supra* note 101.

(one of the gun rights lawyers in *Heller* and *McDonald*) and the United States Court of Appeals for the Seventh Circuit during oral argument in the *McDonald* case. When asked if Northern Republicans were averse to restrictive gun controls laws in the South, Gura boldly claimed that gun rights ideology was so pervasive that Northerners were even willing to allow Klansmen to retain their guns.[106] The KKK cases demonstrate that nothing could be further from the truth. The Republicans who drafted, debated, and adopted the Fourteenth Amendment were not blindly pro-gun. These individuals resolutely opposed discriminatory gun regulations, but favored neutrally applicable ones intended to promote public safety.[107]

Rather than acknowledge this history, gun rights advocates have attempted to rewrite it by eliminating the Negro militia from the story and casting the Fourteenth Amendment as if it were written by the most violent and radical wing of the abolitionist movement. The radical individualist conception of the right to bear arms championed by Lysander Spooner or John Brown has become central to modern gun rights ideology.[108] It is no surprise that gun rights advocates treat John Bingham and Jacob Howard as if they are simply clones of radical Republicans such as Charles Sumner. While abolitionism was certainly an important

---

106. For the exchange between Gura and the Seventh Circuit during oral argument, see List of Documents in *National Rifle Association v. City of Chicago*, http://www.ca7.uscourts.gov/fdocs/docs.fwx?caseno=08-4241&submit=showdkt&yr=08&num=4241 (last visited Apr. 8, 2010).

107. *See id.*

108. For the most recent effort to read the Fourteenth Amendment through the lens of pre-war radical abolitionist thought, see Clayton E. Cramer et al., *This Right Is Not Allowed by Governments That Are Afraid of the People: The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. (forthcoming 2010). Although this essay provides multiple citations to the work of other gun rights advocates, such as STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866–1876 (1998), and Stephen P. Halbrook, *Personal Security, Personal Liberty, and "the Constitutional Right to Bear Arms": Visions of the Framers of the Fourteenth Amendment*, 5 SETON HALL CONST. L.J. 341 (1995), it ignores the key work of the most respected authorities on Reconstruction. For instance, it fails to cite Michael Les Benedict, the leading authority on Congressional politics during Reconstruction. Benedict noted the important conservative strains within Republican thought, and expressly warned about the dangers of viewing the Fourteenth Amendment as the product of the most radical wing of the Republican party. *See* BENEDICT, *supra* note 101, at 24.

strand of Republican thought, it was by no means the only
one. Abraham Lincoln's party, it is worth recalling, also had
roots in antebellum Whig thought. Nothing was more central
to this vision than the idea of a well-regulated society, which
was reflected in the expansive theory of the police power that
evolved during the antebellum era.[109] As explained below, it
is impossible to understand the Fourteenth Amendment's
connections to the Second Amendment without recognizing
this tradition.

### III. STATE REGULATION OF GUNS IN THE ERA OF THE FOURTEENTH AMENDMENT'S ADOPTION

Rather than mark a retreat from the robust regulation of
firearms enacted before the Civil War, the era of the
Fourteenth Amendment's adoption saw no diminution in the
scope of firearms regulation at the state level; indeed, the
scope of regulation actually increased. Although modern
Americans have come to view the Wild West as the
embodiment of a radical gun rights ideology, the high levels of
gun violence in this region spurred among the most far-
reaching gun control laws in the nation's history. Wyoming
forbade anyone from "bear[ing] upon his person, concealed or
openly, any fire arm or other deadly weapon, within the limits
of any city, town or village."[110] Similar bans were enacted by
Arkansas and Texas,[111] and other states outlawed the sale of
non-military pistols.[112]

If one looks at the language of judicial opinions from this
period, the evidence demonstrates not only a continuing
recognition of a robust police power, but an actual expansion
of the scope of permissible regulation. In *Hill v. State*, the
Supreme Court of Georgia elaborated at great length on the
meaning of the right to bear arms and the proper mode of
interpreting a constitutional text.[113] Needless to say, the
views of the Georgia Supreme Court in *Hill* flatly contradict
Justice Scalia's claims in *Heller*. The *Hill* Court held that:

---

109. WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN
NINETEENTH-CENTURY AMERICA 86 (1996).

110. Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Sess. Laws 352.

111. *See* Act of Apr. 1, 1881, No. 96, § 1, 1881 Ark. Acts 191; Act of Apr. 12,
1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25.

112. Act of Mar. 14, 1879, ch. 96, 1879 Tenn. Pub. Acts 135.

113. Hill v. State, 53 Ga. 472 (1874).

Compendium_Cornell
Page 2049

> The language of the constitution of this state, as well as that of the United States, guarantees only the right to keep and bear the "arms" necessary for a militiaman. It is to secure the existence of a well regulated militia; that by the express words of the clause, was the object of it . . . .[114]

Indeed, in contrast to modern gun rights ideology and the *Heller* decision, the *Hill* Court expressed some puzzlement over how anyone might arrive at the opposite conclusion: "I have always been at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day."[115]

The *Hill* Court reaffirmed the traditional Blackstonian method employed by Justice Stevens and rejected by Justice Scalia in *Heller*. Rather than apply the Cheshire Cat Rule of Construction, the *Hill* Court accepted that the preamble of the Second Amendment defined its purpose: "The preamble to the clause is the key to the meaning of it."[116] In regard to the suggestion that the right to bear arms included weapons possessed for private as well as public purposes, Georgia continued to treat the term as a legal term of art. "The very words, 'bear arms,' had then and now have, a technical meaning. The 'arms bearing' part of a people, were its men fit for services on the field of battle."[117] Whatever popular variation in meaning might have occurred in the decades after the adoption of the Second Amendment, the Justices of the Georgia Supreme Court expressed grave doubt that any of the authors of the Second Amendment would have thought that "word arms when applied to a people," also included "pocket-pistols, dirks, sword-canes, toothpicks, [and] Bowie-knives."[118]

Nor was Georgia's high court alone in this view. The Tennessee Supreme Court pursued a similar line of

---

114. *Id.* at 474.

115. *Id.*; *cf.* Nunn v. State, 1 Ga. 243 (1846) (including arguments from gun rights advocates about the orthodox view of the right to bear arms in antebellum jurisprudence). For a discussion of how leading commentators in the era of the Fourteenth Amendment interpreted antebellum case law, see *supra* Part II.A.

116. *Hill*, 53 Ga. at 474.

117. *Id.*

118. *Id.* at 475.

reasoning.[119]   According to that court, the Constitution protected only "the usual arms of the citizen of the country."[120]   Justice Scalia's claim that pistols were part of the ordinary arms of eighteenth-century militiamen is historically inaccurate.   Yet even if one sets aside this additional glaring historical error in *Heller*, the situation by the time of the Fourteenth Amendment's adoption had become even less favorable to Justice Scalia's claims about handguns.   By this time, weapons such as the pocket pistol and revolver were clearly not within the orbit of constitutional protection and could, therefore, be prohibited altogether.[121]   Even the use of protected weapons such as "the rifle . . . the shot gun, the musket, and repeater," could "be subordinated to such regulations and limitations as are or may be authorized by the law of the land, passed to subserve the general good."[122]

Modern debate on the Second Amendment and incorporation has been deeply anachronistic.[123]   In modern-day America, one is likely to be either pro-gun or pro-regulation—yet this Hobson's choice is an artifact of modern politics.   Earlier generations saw the matter differently. Prior to the modern era, regulation was the necessary pre-condition for the exercise of the right to bear arms, not its antithesis.   Pomeroy's views were typical.   He was neither a proponent of gun rights nor gun control in the modern sense; he was both pro-gun and pro-regulation.   It is this position that has been effectively erased from the pages of history and it is this ideal that is essential to understand if we wish to grapple with the connections between the Second and Fourteenth Amendments.   Gun regulation was not inimical to the Second Amendment during Reconstruction; it remained the indispensable foundation for its fulfillment as a constitutional ideal.   As historian Carole Emberton has documented, Republicans enacted a variety of gun control regulations in the South, including a prohibition on the sale

---

119. *See* Andrews v. State, 50 Tenn. 165 (1871).
120. *Id.* at 179.
121. *Id.*
122. *Id.* at 179–80.
123. For a discussion of the problems with modern Second Amendment debate, see Cornell, *supra* note 40.

of pistols in the city of Charleston.[124]   Such laws were absolutely necessary to deal with the widespread violence directed at Republicans and Blacks.  Rather than mark an end to gun regulation, the era of the Fourteenth Amendment's adoption saw new and unprecedented efforts to regulate guns.[125]

Pomeroy's influential treatise echoed the dominant pro-regulation vision of the Fourteenth Amendment.  After stating the militia purpose of the Amendment, he went on to declare in unambiguous terms that "this constitutional inhibition is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons, or laws forbidding the accumulation of quantities of arms with the design to use them in a riotous or seditious manner."[126]  There is absolutely no evidence from this time period to suggest that the Fourteenth Amendment was intended to limit the scope of the state's police powers, including those that allowed the states to pass non-discriminatory gun regulations aimed at promoting public safety.[127]

In *McDonald*, the NRA and their supporters have ignored this history altogether.  Inspired by Justice Scalia's approach in *Heller*, they take the view that an "originalist" reading of the Fourteenth Amendment simply requires stringing together a few isolated historical anecdotes and quotes and using them to reconstruct the original public meaning of the Fourteenth Amendment.   Only by ignoring the actual meaning and understanding of the Constitution—as reflected by the state legislatures that ratified the Fourteenth Amendment, judicial decisions in the post-Fourteenth Amendment period, and leading treatise-writers of the time—can such a view be maintained.   If the Court in *McDonald* takes that history seriously, it could only conclude that regulations like Chicago's would have been constitutionally

---

124.  Carole Emberton, *The Limits of Incorporation*, 17 STAN. L. & POL'Y REV. 621 (2006).

125.  *See* Brief of Thirty-Four Professional Historians and Legal Historians as Amici Curiae in Support of Respondents, McDonald v. City of Chicago, 130 S. Ct. 48 (Jan. 6, 2010) (No. 08-1521).

126.  POMEROY, *supra* note 61, at 152–53.

127.  On the scope of the police power, see LEONARD W. LEVY, THE LAW OF THE COMMONWEALTH AND CHIEF JUSTICE SHAW: THE EVOLUTION OF AMERICAN LAW 183–86 (1957); NOVAK, *supra* note 109; Harry N. Scheiber, *Public Rights and the Rule of Law in American Legal History*, 72 CAL. L. REV. 217 (1984).

permissible in 1868.

## CONCLUSION

The pro-gun rights version of American constitutional history is resolutely ahistorical. Rather than try to understand what the Second Amendment meant to Americans in the past, it tries to make historical texts choose sides in contemporary debates over gun control. The great difficulty in interpreting the meaning of the right to bear arms is not that technology has changed, but rather that the political and constitutional assumptions at the root of the Second Amendment have changed.

Justice Scalia and gun rights advocates believe that the Second Amendment protects an individual right that facilitates the possibility of a well-regulated militia. The Founders and many Americans during the era of the Fourteenth Amendment saw it in reverse. To have a well-regulated militia, it was necessary to have a population that was well armed, well trained, and most importantly, well regulated. The Founders understood the difference between an armed mob and a well-regulated militia, and this distinction remained important during Reconstruction, when paramilitary groups such as the KKK embarked on a campaign of terror throughout much of the Reconstructed South. Gun regulation was not inimical to the right to bear arms for Reconstruction era Republicans; it was the only sensible foundation for the proper exercise of any such right.

Akhil Amar has argued that the meaning of the Second Amendment morphed in the era of the Fourteenth Amendment from a collective right to an individual right.[128] While Amar's theory about constitutional change may be correct, his history is wrong. Amar is surely right that there was an important change in the meaning and application of the Second Amendment between the Founding era and Reconstruction. But the right to bear arms had not been, as Amar suggests, decoupled from its original militia purpose. Rather, the scope of regulation increased. While antebellum courts were divided over the scope of acceptable gun regulation, courts and leading commentators in the era of the Fourteenth Amendment's adoption agreed that the individual

---

128. AMAR, *supra* note 101.

state's police powers gave them vast powers to regulate firearms, including a right to ban pistols, as long as this did not impair the ability of citizens to keep and bear those arms most needed for militia service—long guns.

If the Supreme Court is true to history, it ought to recognize that, by the time the Fourteenth Amendment was adopted, handguns were indisputably outside the scope of protection afforded by the Constitution. This is a view that even those who supported incorporation would have been hard pressed to dispute. Applying the logic of the pro-*McDonald* briefs to the laws in place during the era of the Fourteenth Amendment would have resulted in far more violence in the Reconstructed South and untold carnage in the cattle towns of the West. If the Roberts Court is genuinely committed to an originalist methodology, it ought to uphold Chicago's law—a regulation no more restrictive than many statutes on the books at the time of the Fourteenth Amendment's adoption.

***

Business

# Why Gunmakers Would Rather Sell AR-15s Than Handguns

Not all firearms are equally profitable.



Guns in America

Guns in America

By Polly Mosendz
June 20, 2018, 3:00 AM PDT

The American retail marketplace for firearms is a tale of two guns: There's the handgun, and there's the modern sporting rifle. Both sell by the millions each year, but the modern sporting rifle–a category whose best-known product is the AR-15–commands far more attention from manufacturers, retailers and buyers as well as gun-control activists.

For the industry, this lopsided dynamic has less to do with how these guns are misused–handguns are more often used in crimes–and more to do with pricing power and profit margins. For every 100 newly manufactured guns sold in America, according to industry estimates, as many as 35 are modern sporting rifles that are variants of the AR-15. But that portion of the market accounts for a disproportionate amount of gun-industry profits.

"Most companies say long guns are more profitable than handguns," said Rommel T. Dionisio, a firearms analyst and the managing director of equity research at Aegis Capital Corp. "They're very profitable products for the firearms manufacturers."

The business disparity between handguns and long guns can't be attributed to sales. Industry observers believe that annual unit sales are split roughly evenly between handguns and long guns, a category that also includes shotguns and hunting rifles. There's no precise tally because the U.S. government doesn't track all purchases. In 2017, 42 percent of federal background checks (which don't

cover all transactions) were performed in the purchase of a long gun. Dionisio said that the AR-15 and other modern sporting rifles account for most sales of long guns.



The reason manufacturers can mine bigger profits from military-style rifles such as the AR-15 is a matter of manufacturing and customization. Classic revolvers are forged from costly steel, tamping down margins. Modern handguns made of a polymer plastic are cheaper to produce, but prices taper

off at a lower level compared to modern sporting rifles. An AR-15 and its similarly designed counterparts, while also made of polymer plastic, fetch premium prices.

The double-barreled version made by Silver Shadow Advanced Security Systems Ltd., an Israeli company, has a sticker price of $2,299. The Daniel Defense DDM4V11, rated by one industry publication as the best AR-15 of the year, retails for $1,519. Best of all, for manufacturers and retailers, is that these firearms are endlessly customizable through a wide range accessories, which can also yield high margins.

No one company dominates the modern sporting rifle. Publicly traded gunmakers such as American Outdoor Brands Corp. and Sturm, Ruger & Co. turn out tens of thousands each month. These weapons compete with offerings from boutique manufacturers and private companies such as Windham Weaponry, founded by the creator of the Bushmaster. American Outdoor, which will report earnings on Wednesday, shipped 81,000 long guns in the three-month period that ended on January 31.



A double-barreled AR-15 made by Silver Shadow.  *Source: Silver Shadow*

It wasn't always a big seller. The AR-15 was first developed in the late 1950s by Armalite, which was eventually acquired by Colt Industries Inc. The U.S. military used a fully automatic version, the M-16, and eventually law enforcement adopted the weapon as well. A semi-automatic version was pitched to civilians: "If you're a hunter, camper or collector, you'll want the AR-15 Sporter," reads a 1964 ad from Colt.

For almost three decades, sales remained modest. In 1990, before the Federal Assault Weapons Ban, 74,000 modern sporting rifles were produced or imported for sale in the U.S., according to data from the National Shooting Sporting Foundation.

The modern sporting rifle hasn't changed much over the decades to captivate gun buyers. "Today's iterations of the platform would be easily recognizable to a person from the mid-1960s," said Mike Bazinet, a spokesman for the NSSF. But interest in the weapon has evolved dramatically.

A federal law in 1994 blocked the manufacturing of most assault weapons for 10 years but didn't stem growing interest in military-style rifles, said Adam Winkler, author of "Gunfight" and professor at the University of California, Los Angeles School of Law. "The assault weapons ban itself didn't prevent the rise of AR-15 culture," he said. "It was already gaining a lot of steam."

The military and police legacy helped with civilian sales. "One of the key reasons why the AR-15 platform is so popular now is that there have been decades of former ex-military and law enforcement personnel who knew how to use it," said Dionisio.

In 2006, two years after the ban expired, the number of modern sporting rifles sold in the U.S. jumped to 398,000. By 2016, the last year for which NSSF data is available, more than 2.3 million new weapons in the style of the AR-15 were introduced into the civilian marketplace. "This has become America's rifle," said Bazinet.

"Once the expiration lapsed, the market absolutely exploded," Dionisio said. "It went from virtually zero to 70 percent" of the market for modern sporting rifles.

# "You can add these attachments, trick them out, customize them."

The popularity of the AR-15 style has been a coup for gunmakers. Not only are these firearms relatively easy to manufacture and higher-priced, they have the virtue of what Dionisio calls the "Mr. Potato Head effect," allowing for endless consumer customization with grips, optics, sights and more–all for an additional price.

The website for national outdoor-gear retailer Cabela's Inc. features a section devoted to AR-15 parts and accessories, listing more than 190 items. Prices range from $4.99 for a wedge that prevents rattling to $699.99 for an upper receiver, which houses the firing mechanism.

"You can add these attachments, trick them out, customize them," Dionisio said. "Those are very high-margin."

The AR-15 and its rivals mirror the individual choice that Americans consumers have come to expect in technology products. And permitting a deeper degree of consumer choice has become an increasingly important tool for manufacturers, who have become more focused on sales to "super-owners," the 3 percent of American adults who own an average of 17 firearms each.

"I think these particular weapons are going largely to people who already own guns," Winkler said. "These are really guns for people who really want to go to the range and shoot and want to have a variety of options. I think this market is largely among people who have multiple firearms."

The idea of super-owners emerged from a survey conducted by Harvard and Northeastern universities in 2015. Researchers determined that roughly 133 million guns–or half of all guns estimated to exist in the U.S.–are owned by just 3 percent of Americans. This figure is a loose extrapolation, because the exact number of firearms in the nation is unknown. Other estimates for the total number of American guns range from 270 million to 310 million, according to the Pew Research Center.

Repeat customers have become crucial to the U.S. firearms industry in recent years. Gun sales, as well as the shares of firearms manufacturers, soared under President Barack Obama in an atmosphere widely characterized as fear-based buying. With Republicans in control of the White House and Congress, there's been less concern of legislation that might curb gun sales–and sales have been sluggish, dragging down share prices. Gun enthusiasts seemed had little motivation to buy their 18th firearm.

# "This market is largely among people who have multiple firearms."

That changed after a February mass shooting at a high school in Parkland, Florida. President Donald Trump called for a ban on bump stocks and discussed some gun control measures; nationwide protests seeking additional gun control followed.

Long gun sales rose two months in a row following the Florida shooting, with sales in March soaring more than 17 percent, according to data collected by the Federal Bureau of Investigation. Analysts declared fear-based buying back–and long guns, more than any others, reaped the rewards.

Although sales went up, so did scrutiny of gunmakers. BlackRock Inc., the world's largest asset manager, pushed American Outdoor Brands to consider the risks of producing military-style rifles.

The shooter used an AR-15 variant made by the company.

The gunmaker stood its ground, telling BlackRock that the risk of taking political positions its customers don't agree with outweighed the mega-investor's concerns about gun safety. Part of the consideration, of course, was the bottom line: Even though American Outdoor is well known for handguns, about 21 percent of the firearms it shipped from May 2017 to January 2018 were long guns, according to a company filing. Dionisio said the company's long gun business is dominated by modern sporting rifles. (American Outdoor did not reply to requests for comment.)

The pending ban on bump stocks, an accessory for semi-automatic weapons that was used in the Las Vegas mass shooting in October 2017, prompted far less pushback from manufacturers and their lobbyists. That also points to how much more significant the modern sporting rifle is to the gun business.

"The truth is this is a popular product line for the gun manufacturer, unlike bump stocks," said Winkler. "Gunmakers don't have much interest in protecting bump stocks. They have a lot of interest in protecting an important product line, like the AR-15 and its copies."

Terms of Service  Do Not Sell My Info (California)   Trademarks Privacy Policy
©2022 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices     Help

Thanks for trying out Immersive Reader. Share your feedback with us. 👍 👎   ✕

# Why assault rifle sales are booming



*An AR-15 style rifle is displayed at the Firing-Line indoor range and gun shop in Aurora, Colo. (Alex Brandon, AP)*

"The most wanted gun in America" is what The New York Times dubbed the AR-15-style semiautomatic in February 2013. Even though assault weapons — guns originally designed for combat use and rapid fire — constitute only about 1 percent of all 300 million firearms in America, lately they've been flying off the shelves. Demand has outpaced production.

Weapons like the AR-15 represent the leading edge of the gun debate. Successfully enacted on a limited basis at the national level in 1994, the assault weapons ban lapsed in 2004. After the Sandy Hook school shooting, a new ban was introduced in Congress, and although the effort failed, it raised an enduring question: What is their appeal to some gun owners?

The case against assault-weapon restrictions is familiar: Such guns are really no different from conventional rifles, they are useful for self-protection and hunting, and bans infringe on 2nd Amendment rights. But these arguments don't amount to an explanation for the guns' popularity (in fact the first point begs the question). If every last assault weapon disappeared tomorrow, thousands of other weapons would still be readily available for all of these purposes.

Here's the real story.

First, assault weapons acquisition has become a form of political expression. Many have noted increases in firearms sales keyed both to the election cycle, notably Barack Obama's elections in 2008 and 2012, and to mass shootings. The very purchase of guns, and especially assault weapons, is a statement that they should remain legal and unregulated, that guns themselves are not the problem. It's also a way to express opposition to Obama. Within the gun industry, this pattern is called "political sales."

Second, some buy these weapons because of their enticement as "forbidden fruit." After all, they were restricted nationwide for 10 years, and even today seven states plus the District of Columbia limit access to these weapons.

Imagine if the government announced that the speed limit on interstate highways would be raised temporarily from 65 to 120 miles per hour. Undoubtedly, some drivers would jump to test out the new law, for the sheer sake of the experience, and the thrill of doing something that is normally illegal. Although such driving would be, at the least, less than prudent, the very fact of a brief window of opportunity would attract many.

The once-forbidden fruit of assault weapons holds a similar appeal to gun owners. As one gun dealer told CNBC, "When you tell the American public that they're not going to have something, they want it."

Even though the prospect of significant new regulation is nil for the foreseeable future, gun consumers fed a steady diet of political paranoia about our impending tyrannical government are quick to envision a time when all firearms will be illegal (even though the Supreme Court and our own history say otherwise).

The third reason appears everywhere, yet hides in plain sight. To some, assault weapons, especially with larger-capacity magazines, are fun to shoot — a fact hardly lost on gun advocates.

In its defense of assault weapons (which the industry now prefers to label "tactical" or "sporting" weapons), the National Shooting Sports Foundation's Pocket Fact Card says that "they are a lot of fun to shoot!" In fact, an NSSF gun owners' survey reported that the most frequently cited reason for owning an assault weapon is recreational shooting. Owners say they experience stress relief, satisfaction and pleasure on the firing range.

Even seasoned journalist and former New York Times reporter Craig Whitney acknowledged, "I can attest that AK-47 'assault weapons' are great fun to shoot at a firing range." Another veteran reporter, Terry Greene Sterling, concluded her story on firing large-capacity weapons with "Man, was that fun."

As "Gun Guys" author Dan Baum has argued, much of what's "fun" about shooting an assault weapon is that it feels masculine; it's an implicit expression of male sexuality. Some gun enthusiasts even refer to assault weapons, and especially the ARs, as "Barbie dolls for men" because of their connection to sexuality and because they have interchangeable parts that can be added and removed, like Barbie accessories.

Although pleasure is a perfectly legitimate reason to own an AR-15, dramatic invocations of constitutional rights, American heritage or direly expressed needs related to self-defense have more gravitas in the national gun debate. That is why gun-rights spokespeople, when asked to comment after the latest mass shooting committed with an assault weapon, will never say that such firearms should remain legal because they're so much fun to shoot.

*Tribune Content Agency*

*Spitzer is a professor and chair of the Political Science Department at the State University of New York at Cortland. His most recent book is "Guns Across America: Reconciling Gun Rules and Rights."*

# OTHER SOURCES

ase 3:19-cv-01537-BEN-JLB   Document 154-3   Filed 10/22/22   PageID.19517   Page 646
715

· O u r forefathers were ftronger believers, when they enacted by
ftatute 33 Hen. VIII. c. 8. all witchcraft and forcery to be felony
without benefit of clergy ; and again by ftatute 1 Jac. I. c. 12. that
all perfons invoking any evil fpirit, or confulting, covenanting
with, entertaining, employing, feeding, or rewarding any evil
fpirit ; or taking up dead bodies from their graves to be ufed in
any witchcraft, forcery, charm, or inchantment ; or killing or
otherwife hurting any perfon by fuch infernal arts ; fhould be
guilty of felony without benefit of clergy, and fuffer death. And,
if any perfon fhould attempt by forcery to difcover hidden trea-
fure, or to reftore ftolen goods, or to provoke unlawful love, or
to hurt any man or beaft, though the fame were not effected,
he or fhe fhould fuffer imprifonment and pillory for the firft of-
fence, and death for the fecond. Thefe acts continued in force
till lately, to the terror of all antient females in the kingdom :
and many poor wretches were facrificed thereby to the prejudice
of their neighbours, and their own illufions ; not a few having,
by fome means or other, confeffed the fact at the gallows. But
all executions for this dubious crime are now at end ; our le-
giflature having at length followed the wife example of Louis
XIV in France, who thought proper by an edict to reftrain the
tribunals of juftice from receiving informations of witchcraft °.
And accordingly it is with us enacted by ftatute 9 Geo. II. c. 5.
that no profecution fhall for the future be carried on againft any
perfon for conjuration, witchcraft, forcery, or inchantment. But
the mifdemefnor of perfons pretending to ufe witchcraft, tell
fortunes, or difcover ftolen goods by fkill in the occult fciences,
is ftill defervedly punifhed with a year's imprifonment, and
ftanding four times in the pillory.

VII. A s e v e n t h fpecies of offenders in this clafs are all *re-
ligious impoftors :* fuch as falfely pretend an extraordinary com-

° Voltaire *Siecl. Louis xiv.* ch. 29. Mod.     forcery and witchcraft among the crimes
Univ. Hift. xxv. 215. Yet Vouglans *(de*        punifhable in France.
*droit criminel,* 353. 459.) ftill reckons up

miffion

cution. But it is a fettled rule at common law, that no counfel
fhall be allowed a prifoner upon his trial, upon the general iffue,
in any capital crime, unlefs fome point of law fhall arife proper to
be debated[s]. A rule, which (however it may be palliated under
cover of that noble declaration of the law, when rightly under-
ftood, that the judge fhall be counfel for the prifoner; that is,
fhall fee that the proceedings againft him are legal and ftrictly
regular[t]) feems to be not at all of a piece with the reft of the
humane treatment of prifoners by the Englifh law. For upon
what face of reafon can that affiftance be denied to fave the life
of a man, which yet is allowed him in profecutions for every
petty trefpafs? Nor indeed is it ftrictly fpeaking a part of our
antient law : for the mirrour[u], having obferved the neceffity of
counfel in civil fuits, "who know how to forward and defend
"the caufe, by the rules of law and cuftoms of the realm,"
immediately afterwards fubjoins; "and more neceffary are they
"for defence upon indictments and appeals of felony, than upon
"other venial caufes[w]." And, to fay the truth, the judges
themfelves are fo fenfible of this defect in our modern practice,
that they feldom fcruple to allow a prifoner counfel to ftand by

---

[s] 2 Hawk. P. C. 400.

[t] Sir Edward Coke (3 Inft. 137.) gives
another additional reafon for this refufal,
"becaufe the evidence to convict a prifoner
"fhould be fo manifeft, as it could not be
"contradicted." It was therefore thought
too dangerous an experiment, to let an ad-
vocate try, whether it could be contradicted
or no.

[u] c. 3. §. 1.

[w] Father Parfons the jefuit, and after
him bifhop Ellys, (of Englifh liberty. ii. 26.)
have imagined, that the benefit of counfel
to plead for them was firft denied to pri-
foners by a law of Henry I, meaning (I
prefume) chapters 47 and 48 of the code
which is ufually attributed to that prince.
"De caufis criminalibus vel capitalibus nemo
"quaerat confilium; quin implacitatus ftatim

"perneget, fine omni petitione confilii.——In
"aliis omnibus poteft et debet uti confilio." But
this confilium, I conceive, fignifies only an
imparlance, and the petitio confilii is craving
leave to imparl; (See Vol. III. pag. 298.)
which is not allowable in any crimi-
nal profecution. This will be manifeft by
comparing this law with a co-temporary
paffage in the grand couftumier of Noman-
dy, (ch. 85.) which fpeaks of imparlances
in perfonal actions. "Apres ce, eft tenu le
"querelle a refpondre; et aura congie de foy
"confeiller, s'il le demande: et, quand il fera
"confeille, il peut nyer le faict dont il eft ac-
"cufe." Or, as it ftands in the Latin text,
(edit. 1539.) "Querelatus autem poftea tene-
"tur refpondere; et habebit licentiam confit-
"lendi, fi requirat : habito autem confilio, de-
"bet factum negare quo accufatus eft."

him


Stanford Law School

# The Assault Weapon Ban Saved Lives

October 15, 2019
By
John J. Donohue III (https://law.stanford.edu/directory/john-j-donohue-iii/)
Theodora Boulouta

Our recent *New York Times* article (https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html) provided important new empirical evidence that the federal assault weapons ban (AWB) – in place from 1994-2004 – was an important tool in the effort to reduce the death toll from public mass shootings.  Within 24 hours, *Reason* magazine published a piece by Jacob Sullum (https://reason.com/2019/09/05/a-suspiciously-selective-logically-shaky-analysis-of-mass-shooting-data-claims-the-federal-assault-weapon-really-did-work/) that tried to challenge our results. Ironically, the first portion of Sullum's title perfectly describes his own article: "A Suspiciously Selective, Logically Shaky Analysis of Mass Shooting Data."  The heart of Sollum's attempted criticism is that it was "suspiciously selective" to define gun massacres as involving at least six deaths and that the definition should involve four individuals killed. Essentially, Sollum offers the "let's kick sand into the faces of our readers so they won't see the truth" approach to policy analysis.  Here, we offer our evidence to refute his feckless challenge.

Figures 1 and 2 tell the story graphically:  the body count from gun massacres was visibly restrained during the AWB and rose sharply after 2004 when President Bush reneged on his campaign promise to renew it. Moreover, the number of deaths per gun massacre fell during the ban and has risen sharply over the next 15 years as the gun industry has flooded the market with increasingly more lethal weaponry.

Figure 1



Figure 2



The decline in gun massacre fatalities during the AWB was not simply a product of declining violent crime, which has continued downward, even as mass shooting fatalities have skyrocketed.  Note that in the last five years alone, we have already surpassed any previous *decade* in the number of deaths in these horrific gun massacres.  Importantly, *every* gun massacre in the last 5 years has used weaponry – a prohibited assault weapon or high-capacity magazine or both — banned by the federal AWB.  Without dedicated governmental action, there is no reason to believe this ghastly trend will abate.

As Figures 3 and 4 show, the evident restraining impact of the AWB on gun massacre fatalities is not altered by using Sollum's preferred definition of four individuals killed (Sollum's numbers are off because he occasionally and inconsistently errs in including the mass shooter as a victim, while we do not).

Figure 3



Figure 4



Our research and analysis was inspired by Louis Klarevas' important work on mass shootings (https://www.amazon.com/Rampage-Nation-Securing-America-Shootings-ebook/dp/B011G4E1VC), which offered the initial evidence on the effectiveness of the AWB.  We retained Klarevas' 6+ definition but did our own assessment of *public* mass shootings (rather than all gun crimes) and used a different data set than Klarevas.  Importantly, even with these changes, we confirmed Klarevas' findings, which were strengthened by our analysis of five additional years of data.  The pattern is extremely robust, across different datasets, different exclusions decisions (eliminating or retaining gang and domestic violence killings), using the Sollum preferred 4+ standard, or even looking at more extreme mass shootings that kill more than ten:  the empirical evidence supports the view that the federal assault weapons ban saved lives.

The *Reason* article does inadvertently make two rather good points, which its author would likely be unhappy to learn. First, it buttresses the point that the gun lobby did try to dampen the effectiveness of the assault weapons ban by restricting the array of weapons that would come within its prohibition.  Sollum apparently thought he had issued a fatal blow by showing two rifles – an AR-15 (pictured immediately below) and a Mini-14 (pictured thereafter) – when only the AR-15 would be deemed a prohibited assault weapon.

But this point fails for two reasons.  First, gun industry imagery is very moving to many of the troubled young men who contemplate mass murder, and if one of them was trying to assert his power and manliness, the AR-15 is a far more gratifying weapon.  There is a reason that assault weapons are advertised under slogans like "Consider your Man card reissued," while the Mini-14 is not (and indeed the Mini-14 has *never* been used in any of the mass shootings captured in the Mother Jones dataset during the period of the assault weapons ban or since).  If there is any force to Sollum's point, though, it is that a renewed federal assault weapons ban should be more comprehensive – perhaps following the more expansive 1996 ban on semi-automatic weaponry that eliminated the previously serious public mass shooting problem in Australia.

But the second point that needs to be emphasized is that Sollum ignores the critical importance that the AWB ban *included a limit on the size of large-capacity magazines*.  Thus, *all* guns that could accept magazines, whether handguns, assault weapons, or the Mini-14 were less deadly when high-capacity magazines were restricted.  It is unclear whether Sollum just did not know the details of the federal AWB that he was trying to criticize or was simply trying to confuse his readers, but the point should be emphasized that restrictions on high-capacity magazines are absolutely essential if one wants to reduce the risk of Las Vegas style killings that wound hundreds of individuals (https://www.nytimes.com/2017/10/02/us/las-vegas-shooting.html).

Of course, it is not surprising that the libertarian ideologues at *Reason* would continue their efforts to thwart any restrictions on guns.  In one of their recent articles, they proclaim that "Grieving Parents' Policy Preferences Are Irrelevant to the Constitutionality of Gun Laws." (https://reason.com/2018/09/05/the-policy-preferences-of-grieving-paren/)  But our work was about empirical evidence, and the preferences of libertarian zealots and gun merchants are irrelevant to the facts about the beneficial impact of the federal assault weapons ban.

Figure 5



AR-15 (top picture) and a Mini-14 (below)



**Category:**

Uncategorized

RSS Feed (https://law.stanford.edu/feed/)

Trackback URL (https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/trackback/)

Post Pagination

Previous Article Stanford Law Experts on Johnson & Johnson's Product Liability Exposure (https://law.stanford.edu/2019/10/14/stanford-law-experts-on-johnson-johnsons-product-liability-exposure/)

Next Article The Banality of Bigotry (https://law.stanford.edu/2019/10/16/the-banality-of-bigotry/)

© Stanford University, Stanford, California, 94305-8610 | https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/

Evans Early American
Imprint Collection

All Digital Collections | Login
Your bookbag has 0 items

Home      Search      Browse      Bookbag      Help

**An oration; pronounced in Princeton, Massachusetts, on the anniversary of American independence, July 4, 1799. By Joseph Russell, A.M.**
Russell, Joseph, 1775-1861.

Table of contents | Add to bookbag | How to cite

Page  [unnumbered]

Page  [unnumbered]

AN ORATION; PRONOUNCED IN PRINCETON, *MASSACHUSETTS*, ON THE ANNIVERSARY OF AMERICAN INDEPENDENCE, JULY 4, 1799.

BY JOSEPH RUSSELL, A. M.

PRINTED AT WORCESTER: BY ISAIAH THOMAS, JUN. July—1799.

Page  [unnumbered]

*PRINCETON,*July 5, 1799.

AT a meeting at the *CENTRE SCHOOL HOUSE*. Voted that the *Committee* of yesterday's arrangement, be appointed to wait on the *REV. JOSEPH RUSSELL* with the thanks of this meeting for his very spirited and ani|mated *ORATION* on the *FOURTH DAY* of *JULY,* and request of him a copy for the *PRESS*. The *Committee* wait|ed upon the *ORATOR* for those purposes, who expressed his sense of the honor which had been done him and compli|ed with their request.

*ABIJAH HARRINGTON,* Chairman.

Page  [unnumbered]

**AN ORATION.**

_THIS DAY, my FELLOW CITIZENS, completes the Twentythird year of A|MERICAN INDEPEN|DENCE. On this mem|orable day, AMERICA was

severed from the British empire, and three millions of people liberated from foreign domination, and raised to a level with the independent sovereignties on the globe. On this day, the thirteen UNITED STATES▪ by their Delegates in General Congress as|sembled, after appealing to Heaven for the rectitude of their cause, signed the instru|ment of separation from Britain, and pledg|ed their estates, reputation and lives, to support their declaration of rights, and defend the liberties of their suffering country.

———————————

Page  4

THANKS to that band of PATRIOTS for their wisdom and firmness amid the dark and gloomy scenes which followed in quick succession. When Britain threaten|ed; when fleets and armies crossed the wide Atlantic, in confident expectation that the colonies would fall an easy sacrifice to their victorious arms; and when, in several in|stances, our own armies were greatly re|duced, and our political prospects darkened, by repeated losses and embarrassments, our civil Fathers stood, like a rock in the midst of the sea, firm and unmoved, and bore the waves of opposition without dismay. Let their memory be forever dear to every American; and may future generations rise up and call them blessed.

PRECIOUS are the privileges! invaluable the rights and freedom which we enjoy! We welcome the day—we hail the auspi|cious morn, when liberty first dawned upon these western shores—when the chains of ty|ranny were broken asunder—and a nation of freemen born in the world. May our minds gladden at the thought, as this an|niversary

———————————

Page  5

reminds us, that we are the free citizens of an independent nation, that our laws are formed by men of our own choos|ing, that all power originates in the peo|ple, that our Constitutions of government can be altered whenever the people please, and that we are under obligation to obey no superior power but that of the GREAT SUPREME.

IN most parts of the world, the govern|ment is the government of *men*. The will of *one* man, or the interest and caprice of a *few*, constitute the *law*, by which the peo|ple are governed. Here the government is that of *laws*, framed by the united wisdom, and enacted by the voluntary consent of the people, with a view to their common good. Our government, therefore, is as free in its principles, and as mild in its op|erations as it can be, and have energy suffi|cient to render it effectual.

THE happiness of a people depends much on their *improvement* of their rights and privileges. The greatest blessings bestowed by Providence on men may be perverted

———————————

Page  6

to their misery. Liberty well understood and well improved, is an invaluable priv|ilege, a pearl of great price, and will al|ways be conducive to the happiness of a people. But, if they are ignorant of its principles, and ignorant of its use and de|sign; and, in addition, inclined to counter|act its principles, it will inevitably prove a curse. Witness the wretched situation of Ireland and France. When the people of France threw off the chains of tyranny, they expected to be free from all the re|straints of law, and to have liberty to pur|sue, every man his own private inclination. The nation in general have acted on this principle. And what has been the effect? The whole country, ever since the revolu|tion, has been filled with cruelties unpar|alleled in history, and with the most un|warrantable invasion upon private property and safety. The same error has existed and produced disturbance in some parts of our own country. The emigrants from Europe, now settled in this country, made no distinction between *tyranny* and *the restraints*

---
*Page 7*

of law—between a *mild, rational liberty* and *libertinism* or *licentiousness* in the extreme. With this error they crossed the ocean, set|tled down in the southern States, and when called to submit to *government* were imme|diately exasperated and hurried into arms.

LIBERTY, in the extreme, becomes the worst of tyranny. There must be restraint and power in the hands of some, or there can be no order, no safety in society. True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect our persons and property. On this principle there is among individuals a re|ciprocation of right and power. By every individual some rights are relinquished and as many acquired. As much as we are obliged to serve others, so much we are sure to be, directly, or indirectly, served by them. This forms a spacious level on which all the members of society are natur|ally equal.

---
Page 8

IT is true, as property naturally gives power to the owner, the unequal distribu|tion of property, which we must always expect in every country, will, in many in|stances, destroy this equal, reciprocal influ|ence in society. To prevent this evil, with|out introducing a greater, is a task too great for the human genius. The attempt has been repeatedly made, but without suc|cess. Trade of every kind must regulate itself. From the great diversity in the a|bilities of men, some will rise, and others fall; some will be rich, and others poor. And that government is most perfect which encourages best an improvement in all those arts, labors, and sciences, which have for their object the advancement of human felicity. And with that government we ought to be satisfied—submitting to all its restraints from a fixed principle, that laws are made not for *individuals* but for *com|munity*, and that *private interest* must always yield to the *general good*.

ELEVATED to the rank of an indepen|dent nation, and holding an honorable

sta|tion

––––––––––––––––

among the sovereign States on the earth, we have now an extensive and fertile country to defend, an admirable constitu|tion of government to support, and per|sons, families and estates to protect, against foreign invasion on the one hand, and in|ternal faction and disturbance on the other. Nations, like individuals, are always an object of ambition or envy, in the view of some, according as they are affluent, or happy. In consequence of this, they are ever exposed to the pride of learning, the obstinacy of ignorance, the intrigue of faction, the violence of power, and the rage of lust and prejudice. The eye of malice is continually searching for some vulnerable part, where a mortal blow may be levelled at the vitals of society. In|numerable are the devices of political in|trigue to effect the ruin of the devoted na|tion. The blackest designs are often clothed in the specious garb of perfect cordiality, and unsuspecting innocence abused, as a medium for insuring the most deadly pois|on.

––––––––––––––––

THIS remark derives a striking illustra|tion from the conduct of that perfidious nation whom we all, without a suspicion of treachery, were too ready to embrace as our cordial friends. With strong professions of the warmest friendship, they reached out to us a helping hand for our defence against the armies of Britain, while with fixed pur|pose, so far as Frenchmen are capable of it, they were busily pursuing an infernal plan to wrest from us our independence, to de|stroy our national dignity, and to reduce us to the same contemptible level on which Holland, Switzerland and Italy are at the present day. *This* was the design, *this* the work of Frenchmen, at a time when our united prayers were ascending, from the al|tar of a sincere and grateful heart, to Heaven in their behalf; and that *their kindnesses*, which we, in the overflowings of gratitude, considered too *important* for *us*, ever to re|pay, might receive from above an adequate reward. Thank GOD their treachery is discovered, and their villainy brought forth to light, to the astonishment of the world,

––––––––––––––––

and the shame and confusion of wickedness itself.

AMERICANS! we are under no obliga|tion to the French. We owe them not a farthing. For the money and military stores which we received from them, dur|ing our war with Britain, we have made re|mittances to the full amount. We owe them not the least gratitude. They never *sought* our *happiness*—they never *wished* us to be *independent*. Private emolument, the ruin of Britain, and the extension of their own influence into these states, was their governing and only motive. Judge then,

my Fellow Countrymen, if we are under any obligation to aid them in their war, to give them our trade, or to seek their friendship and interest to the displea|ure and injury of other nations.

AMERICANS are on the West—French|men on the East side the Atlantic. There let them live, and there may they be hap|py! We neither desire nor need any imme|diate connexion with them or with Britons. By bitter experience we have found the

———————————

Page  12

tender mercies of *both* to be cruelty. We cannot confide in the friendship or faith of either. We ought to be fortified on every side against the influences of *both*. And it can never be safe for America to be connected with either of them by any treaty but that of commerce.

IN forming treaties, we ought ever to act in character, as a sovereign state, with a view to the benefit of our own commerce, without consulting the inclination of any other nation. To a treaty of commerce, lately formed with Britain, it has been ob|jected—"It will displease the French."— And are WE to ask the *French* what nations we shall treat with, and upon what terms? On the other hand▪ shall the *British* dictate what treaties we must form with France? The answer in either case is equally posi|tive, NO. We are not to be influenced, or controled, by any power on the globe. To admit the agency of any foreign nation would be a sacrifice of our independence— a prostration of our national dignity.

———————————

Page  13

WITHOUT consulting the French, our Envoy to the Court of Britain *formed*, and our Executive, by the advice of the Senate, ratified a treaty with that power, which, in their opinion, was the best that, in the then existing circumstances, could be ob|tained. In this affair they used the powers given them by the Constitution. They acted the part of able, independent men, and merited the approbation of their Country. And may our supreme Executive ever be equally firm and impartial, and never be influenced by a desire of pleasing, or a fear of offending, foreign nations, any further than the public interest requires.

THE internal resources of the United States are so ample, that, if well improved, they will enable us to support this decided character, on the political theatre of the world. Separated as we are from every powerful nation, by an intervening ocean of three thousand miles in extent, and having no immediate connexion with them, we need never be entangled in the intricate policies and interwoven interests of European courts.

———————————

Page  14

But, should a war be inevitable, our ene|mies must contend amid insuperable em|barrassments, and from the greatness of the expense attending the prosecution of a war at a vast distance from home, and the im|practicability of affording seasonable sup|plies, their operations must, in a short time, inevitably fail.

AS it will be difficult for our enemies to invade with success, so on the other hand, it will be easy for us to defend our borders. A country, like ours, intersected by innu|merable rivers, and covered with hills, val|leys, woods and morasses, forms a natural barrier against the progress of an enemy. Our country abounds with provisions of every kind, and with materials for ship|building, fortification, gunpowder, swords, bayonets, and small arms of every descrip|tion. The American Shipbuilders, En|gineers and artists, are equal to any in Eu|rope. Fortifications, and the manufactory of gunpowder, cannon, and other warlike implements, are carried on rapidly in ma|ny parts of the country. In the course of

_____

Page  15

two years, we have equipped nine frigates, and a larger number of smaller vessels of war, for the defence of our maritime towns and cities, and the protection of our for|eign trade. The regular forces in the U|nited States exceed five hundred thousand; the greatest part of which, are well equip|ped, and can be called into active service whenever occasion may require.

TO every true American it must be pe|culiarly grateful to behold, as we pass from Hampshire on the north, to Georgia on the south, five millions of strong, healthy, and well enlightened people, very generally united in their resolution to de|fend their country's rights, and to hazard their lives in defen•• of her constitution and independence. The general voice of America is—"We are determined to be free. Our country and constitution we are able to *defend*. And, if the violence and aggression of our enemies should ren|der it necessary for us to enter again on the field of battle, *we will go determined to conquer or die*. Refering our cause to the

_____

Page  16

court of Heaven, and trusting in the GOD of armies for success, we will spend the last drop of blood in the glorious cause, and if we die, it shall be our consolation that, *we die fighting for our country*."

WHEN this is the sentiment and spirit of a people, inhabiting a country enriched by every production necessary for their support and defence, what may we not expect from their united exertions! And with an ADAMS, the great political luminary of the age, to stand at the helm of govern|ment, and direct in the cabinet of state; and, with a magnanimous WASHINGTON, the pride of America and wonder of the world, to head our armies and conduct them on the field of battle, we may bid de|fiance to every earthly power.

WERE the colonies, when they had no arms, no military stores, no disciplined

ar|my, no government, able to oppose the ar|mies of Britain, when in their zenith of glory? And may we not be animated to stand firm in our own defence now we are well supplied with arms and military stores,

———————————

Page  17

now we have well disciplined forces, officers and men inured to war, and a vigorous government which can command the assist|ance of every state and employ the whole strength of the nation for the public safe|ty? Let Americans retain the patriotism and firmness of seventysix and they have nothing to fear!

OUR preservation and prosperity as a nation, depend, under GOD, upon the sup|port of our confederation. United we are truly a powerful nation—divided we are weak. United we shall certainly stand—divided we shall certainly fall. The glori|ous issue of our war with Britain, proves what a small community can do when the members of it go hand in hand. To this we must ascribe it, that the citizens of Syracuse opposed the Athenians with success; that a few states in the Netherlands withstood for thirty years the whole force of the Spanish monarchy and finally gained their liberty; and that the inhabitants of Swit|zerland emancipated themselves from the tyranny of Austria and supported their in|dependence

———————————

Page  18

IT is most ardently to be wished that all the citizens of America, let them live in the North or South, on the East or West side the Allegany, would consider one an|other as BROTHERS, and the several states members of one political whole. For this end would it not be adviseable to avoid in private conversation and in all public proceedings, every thing that looks like *party*, and speak and act as though we nei|ther knew nor admitted the existence of *par|ties, discordant opinions▪ oppositions* of *interest*, or *clashing prejudices* to prevail, in any part of the United States? Let the names *Jaco|bin, Democrat, Frenchman and United Irish|man*, as applied to our own citizens, be bu|ried in eternal oblivion; and let us recog|nize all orders and classes of men by the honorable title of AMERICANS! From the happy crisis in our political prospects, the party to which these opprobrious epithets have been applied are sinking fast from public view; and if we do not contribute to their reanimation, by trumping their im|portance, will, soon, be buried forever

———————————

Page  19

from our sight. Party spirit *lives* by op|position. Sectaries in politics, as in reli|gion, always increase in consequence▪ the more they are opposed. Let them alone, cease to speak concerning them, still be guarded against them, and they will die of themselves.

CONSIDERING the several states as mem|bers of one political body, nothing which ef|fects the other states is to be considered by us as foreign or unimportant. If they suf|fer, we suffer; if they are prospered, we have reason to rejoice. Though a *member* only is wounded, the whole body feels the pain. When poison is communicated to the most distant part it sickens the whole constitu|tion. A consideration that the other states have separate governments, and *laws, cus|toms*, and institutions in some respects *dif+ferent* from our's is no reason why we should consider them as foreign. They have united with us in forming and adopt|ing a constitution the most perfect in theo|ry and equal in practise ever produced by man. The business of the government es|tablished

———————————
Page  20

by this constitution is to provide for the peace, safety and prosperity of the whole; their laws are binding on every state and they sustain the same relation to every one. Our government, therefore, is the same. And as our government is the same, we of consequence, have one common interest and one character to support. Having sworn obedience to the general gov|ernment, we are bound by solemn *oath* to seek the prosperity of the whole confedera|cy; and, in doing that, we establish for ourselves the surest barrier, and lay the most permanent foundation for lasting felicity.

OUR prosperity depends much on a gen|eral diffusion of political information. The maxim of Tyrants. "The people's igno|rance is the Rulers safety" has long been exploded. Our administration shuns not the light of day nor seeks support from the gloom of ignorance. As the private citizen depends on the public magistrate, so the magistrate, in his turn, depends on the private citizen; and the more and better informed the latter, the more safe is the

———————————
Page  21

former. Generally speaking, if the people *know* what is right, they will judge right.[*] Let them know the principles and design of a law, and, provided the law be good, the ruler may be almost sure of their support.

IN every insurrection against good gov|ernment, the majority are blinded and de|ceived by the artifices of a few. And ex|perience has ever proved that, the better a people are acquainted with the nature and principles of civil liberty, the more they know of the measures of government, and of the design of particular laws, the more easily are they governed. And I will hazard the opinion, that, if political information was defused through all classes of people as it ought to be; if they were from the highest to the lowest instructed in their

———————————
Page  22

duty, and in the measures of government, there never would be another insurrection, nor any considerable number to join with any foreign power, in opposition to the de|signs of government. Some men of aban|doned characters and ruined fortunes we must expect in every country—men who have no hope of promotion or emolument while things continue in peace. Men of this character we cannot hope to reclaim by increasing the fund of public information. Their knowledge and segacity render them the more dangerous members of society. But, when the public mind is thoroughly enlight|ened, the community will more easily discov|er their treacherous designs and be defended against them. General information is, there|fore, a principal pillar in our political edifice. This enlarges the human genius, improves all the faculties of the soul, and gives to the mind a discernment, an understanding, and judgment adequate to all the labors and trials of life.

THAT Americans are capable of im|proving in all those arts and sciences, which

------------------------

Page  23

tend to increase the wealth and alleviate the labors of man, has been abundantly proved. The contemptuous sneer of Buf|fon, that, America is unfavorable to strength and brilliancy of genius, has been sufficiently refuted. In philosophy she has produced a Franklin and Rittenhouse; in Poetry a Barlow and Trumbull; in Law and Policy, an Adams and Ellsworth; and in the art of war a Washington. The superiority of our artists has been acknowl|edged in Europe. And, in spite of every thing which can be said by Buffon and others against us, it must be granted, that America, comparing her age with that of other nations, has produced the greatest number of learned men. Greece had been settled 600 years before she produced a Homer. The Romans lived in Italy 700 years before they could boast of a Virgil, Horace and Cicero. And the English na|tion had existed more than 800 years before they were honored with a Bacon, Milton, Locke and Newton. But, two centuries have not yet elapsed since the first settle|ments

------------------------

Page  24

were made on these western shores. Judge then if America has not been favor|able to genius.

RAPID improvements have been made in agriculture since the settlement of the coun|try. The wilderness, in many places, has been converted into a garden and the desert made to rejoice and blossom. New settle|ments are begun and flourishing towns ris|ing up, where but a little time since, dwelt the tawny savage and wild beasts of the desert. Ontario's waves are now loaded with the fruits of industry, and the shores of Erie fertilized by the hand of cultivation. The Ohio now rejoices in the prosperity of her sons, and Tennessee beholds, on each side her placid stream, a flourishing people. And we may with pleasure anticipate the time as not far distant, when our settle|ments will be extended from the remote

shores of Huron and superior to the sultry climes of Florida; and when the Missisip|pi shall receive the productions of a wide extended and flourishing country, and con|duct them down on her swelling tide to be

Page  25

conveyed in ships to the most distant coun|tries on the globe.

OUR commerce is already extensive and flourishing. Our ships now hail the re|mote shores of Kamtschatka, traverse the widest oceans, and encompass the globe; bringing home the manufactures of Eu|rope, the rich productions of Asia, and the treasures of both the Indies. The Ameri|can merchants and seamen, now vie with those of Europe, and, with equal dexterity and success, perform the longest voyages. May *agriculture* ever be the strength and support, *manufactures* the ornament and lus|tre, and *commerce* the emolument and aggran|dizement of America. May her sons ever delight to till the soil, and to pursue with in|dustry, the arts and labors of life, and may temperance, frugality and virtue, ever be the strength of their hearts and crown of their days.

WHILE on this day we offer our sacrifice at the altar of liberty; while we rejoice in the possession of good government, and of internal peace, health and prosperity, it be|comes

Page  26

us to remember our suffering, bleed|ing brothers in Europe. On the eastern continent, nation is fighting against nation, garments are rolled in blood, and the con|fused noise of war, penetrates the abodes of retirement and chills the mind with horror and dismay. What scenes of cruelty are there exhibited! What perfidy and wicked|ness are practised! How great has been the destruction of the human species! Even now they are levying troops, increasing their armies, and sharpening their swords, as though they were beginning the war. All Europe is engaged. Hurried on by the most furious passions, they go determined to strike a last and fatal blow. We leave them with that eternal GOD, who taketh up the nations as a very little thing, and who can change their hearts, disappoint their expectations, and make all their wrath and fightings terminate in good.

AND while we compare our situation with theirs, let us feel grateful to that Om|nipotent Being, who conducted our armies on the field of battle, and who led us on

Page  27

through scenes of trouble and hardship, to the enjoyment of independence and peace. As a people we have received much from him, and may we never forget to

praise him for his goodness.

TO enjoy the patronage of heaven, and to have our liberties permanent, and our happiness lasting, the laws of *moral obliga|tion* must be acknowledged and observed. A people, abandoned in principle and prac|tice, must be unhappy. Vice, like a deadly consumption, enfeebles the nerves, impairs the strength, and wastes the body of society; and wherever it prevails, will, inevitably, prove fatal. To this it must be ascribed that the once mighty empires of Babylon and Persia, of Greece and Rome, are now no more. Take warning then, O America, from the calamities which have fallen on ancient nations, and avoid that fatal rock on which they were ruined! Let wisdom and knowledge, let industry and frugality, let benevolence and piety, be inscribed on all thy proceedings, and thou shalt be that happy people whose God is the LORD.

_____

Page  28

AS we contemplate our political prospects, and view the numerous sources of emol|ument and felicity, which concentre in A|merica, we see nothing wanting but *good morals*: From the progress of *vice, infidelity* and *atheism*, we have much reason to fear. And, perhaps, we cannot, in any other way, more faithfully serve the interest of our country, than by vindicating the truth of Christianity. The mind is lost in pleas|ing admiration, at a prospect of the glory and beatitude with which America would rise to be chief among the nations, were all her citizens the cordial friends of the im|maculate JESUS. This would heal every political division and wither the nerves of opposition. This would make our Repub|lic durable as the hills and firm as the earth itself.

AMERICANS! Do you wish to be pros|perous and happy? Then fear the GOD, and love and practise the religion of your Fathers. To enjoy their religion unmolest|ed, they left their native country, crossed the boisterous deep, and settled down in this

_____

Page  29

western world. May their descendants never undervalue those privileges for which they endured persecution, the perils of the deep, and hardships of the wilderness. Through the kindness of heaven, we are placed in a pleasant fertile land, illuminated by the re|ligion of the glorious Savior. Let us all then bow, with one heart, at the sceptre of his government, and acknowledge King Jesus as our Lord and Sovereign. Let us walk in the light of his gospel, during our appointed time, that we may hereafter inhabit the regions of unclouded day, and be all of us forever happy in the LORD.

FINIS

Powered by DLXS
To comment or inquire about content, contact evanstcp-info@umich.edu
To report errors, contact DLPS Help



An official website of the United States government, Department of Justice.

Here's how you know

**NIJ** National Institute of Justice

STRENGTHEN SCIENCE. ADVANCE JUSTICE.

Home

# Why Is the United States the Most Homicidal Nation in the Affluent World?

December 1, 2013

*Review the* YouTube Terms of Service *and the* Google Privacy Policy



See reuse policy

**Series:** [Research for the Real World](#)

**Speakers:** Randolph Roth, Professor of History and Sociology at the Ohio State University

Ohio State University Since World War II, the homicide rate in the U.S. has been three to ten times higher than in Canada, Western Europe, and Japan. This, however, has not always been the case. What caused the dramatic change? Dr. Roth discussed how and why rates of different kinds of homicide have varied across time and space over the past 450 years, including an examination of the murder of children by parents or caregivers, intimate partner violence, and homicides among unrelated adults.

### Transcript

**Greg Ridgeway**: Okay, welcome, everyone, to our Research for the Real World. I hope you all had a good Thanksgiving. Welcome back. I'm really excited about this presentation. I went to a National Academy of Sciences meeting about six months ago. Both Professor Roth and I are on the crime trends panel there. NIJ has been really interested in the issue of crime trends. It's interesting that it's one of the top-tier, most important questions in criminal justice that we just don't have an answer to: What makes crime go up and down?

I talk a lot about other fields that have already sort of addressed their top-tier issues, like in dentistry we sort of know what causes cavities and that we need to brush to prevent them. That top-tier question is resolved. In agriculture they know how to grow drought-resistant wheat and drought-resistant soy beans and now they're moving on to Roundup-resistant soy beans and Roundup-resistant corn. So a lot of those top-tier questions are answered in other fields, but here we are in criminal justice not knowing what makes crime go up and down.

So NIJ, about a year or two ago, started this idea of "let's really figure out and try to answer this question." So we started a roundtable at the National Academy of Sciences to address this question. So both Professor Roth and I attended the first meeting, and it was the first time I had heard Randy talk. And I was just fascinated by the discussion. So much of my thinking has been thinking, "Well, what's made crime go up and down right here in the United States over the last, say, 30, 40 years?"

And he just brought a much more expansive view, from around the world, through different time periods, and in the abstract to today's talk you saw that he would be talking about the last 450 years of homicide data. And I hope for you, as it was for me, this will be sort of mind-opening and fascinating.

So, a little bit about Professor Roth: He is a professor of history and sociology at Ohio State University. He is a fellow of AAAS, the American Association for the Advancement of Sciences.

His best known book, *American Homicide*, came out just a couple years ago, maybe 2009? And that won the Michael J. Hindelang Award, which is given out by the American Society of Criminology for most outstanding contribution in the field. So I'm really looking forward to his talk today, and I hope you get as much out of it as I do. Without further ado, Professor Roth.

**Professor Randy Roth**: Thank you very much. I've got to say that since my book came out in 2009, a lot of very nice things have happened. But the coolest thing is I actually made it onto the History Channel for an entire minute. I can't tell you how excited I was. We don't have cable, so I've never seen the show, but I know that you'll want to run out and see the show because my mom said I did a really good job. So, you know, as long as you don't embarrass Mom, you know you did what you needed to do.

I'm real excited to be here, and thanks so much. I mean, I follow your work and I'm just excited. I appreciate the dedication. All of us have been working on these projects on crime. And I think the one thing when we talk about the cost of crime, we're quite aware of it in a way that most Americans aren't actually, because many of us count. You know, we count things. So when we talk about the burden of murder or the cost of homicide, when we look at a rate, say, that for two-thirds of the 20th century you're running a rate of 9 per 100,000 per year.

And people think, "Well! Nine out of 100,000 get murdered — that's kind of small." But what we know is that that's a homicide rate; that's not a homicide risk. You've got to multiply that figure by your life expectancy to really find out how likely it is you're going to be murdered. And so when you look at a rate of 9 per 100,000, what we're really saying if that's sustained over the course of your life, right now with life expectancy is up around 76 or 77 years, that's a lot of death. That means that if we sustain that rate, it means 1 out of every 140 children born in this country will be murdered.

And the way those rates work out if you project them for various groups — and, again, I'm using the categories that say the National Center for Health Statistics which is white, non-white, male, female. We know with those rates, 1 of every 460 white females would be murdered, 1 out of every 160 white males, 1 out of every 110 non-white females and 1 out of every 27 non-white males. Those rates are tremendously high, and even if we look at the rate where we've been — 5 to 6 per 100,000 — we're talking about nearly 1 out of every 200 children born in America is going to be murdered. And that's a tremendously high burden.

And we are aware of that, and I hope that someday we'll start to talk about those risks. We were talking about mass murder, and that that tends to be a crime that white males commit. It was a teachable moment back in late last year for my criminal justice history class. So I got an entire week behind; we spent an entire week talking about mass murder. I said, "What is it" — we were talking about depressed males — I said, "What is the suicide rate for white males?" Well, it's been very stable at 20 per 100,000 per year. And what that means is, I told my students, that means 1 out of every 65 white males in our society kills himself.

How hard is it to recruit out of that group some mass murderers? That's a huge group, a huge reservoir of people that you could recruit somebody depressed enough to do something terrible. So I think when we talk about the cost, it's tremendous. And what's important to know about the United States is it hasn't always been that way. If you take a look at the period after the Revolution, say between the founding of our country — the 1790s, when we achieved political stability after the Revolution — and look down to the Mexican War, the homicide rates in the North and the mountain South were probably the lowest in the Western world.

It's a stunning thing to think that a society that has a reputation as being the most violent was actually at one point, we think — now that we've really done the numbers and done the comparative work — we used to be the least homicidal. How could that be and when did we change is the real question. And even when we look at the slave South in that period — outside of Texas, Florida, the contested frontiers — the homicide rate is moderate by European standards. That doesn't mean that's not a brutal, vicious, violent society, but being brutal and vicious doesn't mean homicidal. We shouldn't confuse the two.

In part, we see tremendous solidarity within the African-American community in that period right through Reconstruction, where they're less likely to kill each other than their oppressors are to kill each other. And you'll see that the economics of it is that masters were far less likely to murder a slave than employers of indentured servants in the 17th century were willing to kill their indentured servants. The most deadly labor system we've had in terms of murder was indentured servitude. It was not slavery.

When you think of the economics and that starts to make a little bit of sense — you following me here? — that that could make a little bit of sense. So, in other words, this is not an apology for slavery in any way, shape, or form. It's a brutal system psychologically and physically, but do you kill the people who work for you and how do African Americans respond to that brutal repression? You see that the homicide rates shifted in the 1890s through the 1930s, when you develop the modern pattern where African Americans are more likely to kill each other than European Americans. But that is, historically in time, a recent phenomenon.

So these patterns have changed dramatically over the course of our history. What we see today has not always been. And have we been a time when a diverse, robust, dynamic, contentious society has had a low homicide rate? Absolutely, it's possible. So I don't want to — I see a kind of optimism in this. It doesn't mean because we're diverse, because we're different, because we have a lot of immigrants, because we're racially diverse, that we need to have a high homicide rate. That is not inevitable.

But we have to think about the complexity of these changes and why these homicide rates change so dramatically over time. That's what we do. And so I look not just back over the last 40, 50 years — if you want to go back to the Middle Ages, I've been working on the Middle Ages, we can go back 1,000 years, that's okay. Just ask anything you want; I've been working on that. Now, one of the first things — and I changed what I wanted to do in my talk a little bit.

So I'm going to talk about child murders by parents or caregivers to begin with, because one of the first things we do as historians is we disaggregate. We say, "Are the causes of intimate partner violence different from the causes of murders of children by parents or caregivers? Is it different from homicides among unrelated adults?" And they are, historically. If you look at broad periods of time, you can start to really disaggregate these patterns. So I want to talk about child murders up, say, from the 16th century through the 19th century. That's a little odd way to start, but please bear with me, okay?

What we see when we look at those is a very straightforward pattern. And everywhere I've looked, these patterns are the same. I could talk about the methods that we use, but we're not only using our historical epidemiology — looking at coroners' records, newspapers, jail records, diaries — we look at everything we can. And we use our mathematics because we have independent sources, somewhat independent sources. We can actually estimate the number of these crimes that came to the attention of the public that didn't end up in the surviving record. So we're not just going with counts of many times; we're going with estimates of those that came to the attention of the public.

And we also now have forensic archaeology. We can't study soft tissue injuries. And many murders of young children, particularly infants, are soft tissue injuries. In other words, this is strangulation or suffocation. It's not a bone thing. But what we can look for in the historical record is signs of child abuse. One of the tells for that that a forensic archaeologist will look at is repeated twisting spiral fractures of the arms or legs. One of those can happen to anybody — skiing accident, falling down, it could happen. But when it's repeated twisting spiral fractures, it means this child was being thrown, being tossed. And what we find is, where we have the bone studies, as we do in the 19th century from graveyards in, say, England and the United States, it maps out perfectly with the historical epidemiology that I've been able to work on. So in other words, we've got bones working together with our historical epidemiology. So we're starting the field with these multiple sources that we're finding out how child abuse has changed over time, and it has changed dramatically over time. What is it? Everywhere I've looked it's the inverse of the birth rate.

And I was stunned to find this. When the birth rate is high, the rate at which children at all ages, from neonates to infants to older children aged 15, are murdered at a lower rate. When that birth rate's high, essentially the world is welcoming to young parents and their children, that murder rate is low. And when that birth rate goes down, either because of economic pressures or rising ambitions, that's one of the things about the dynamics of it. If my ambitions are higher, the cost of that children, that child is more for me, isn't it?

In other words, so if my ambition is going up, those children can be at risk if they come in the wrong number at the wrong times with the wrong qualities. So what we see is that it's the inverse of the birth rate, and it measures out, it correlates with every measure that we have of the well-being of children and their parents. In other words, the murder rate of children is correlated inversely with life expectancy. In other words, when children

grow up to be tall because they're well nourished, when they have a longer life expectancy at birth, they're less likely to be murdered.

What we see is that when there's a high percentage of women who were able to marry at least once, the murder rate is low because they can form families. One of the things that's surprising is when the premarital pregnancy rate is high, the murder rate is low, because it means that people aren't being as cautious. It means there is more hope, if you get pregnant, so what. And we can see in periods when they re-stigmatize births out of wedlock, like in the great spiritual awakening of the 18th century, you see a bump over those 15 years in the number of neonaticides. When you re-stigmatize that sort of thing, young women feel the pressure to kill newborns.

So, in other words, we're seeing a pattern that's extremely robust. And it even comes down to the present. If you take a look at the new studies that are being done by my colleagues at Nationwide Children's Hospital in Columbus, we're partnering with the Children's Hospital in Pittsburgh and with law enforcement and with social services to really get a more accurate look at child abuse. You can actually, they said, "We knew when the recessions of the mid-2001 and the recession of December 2007 started before the economists did. At least half a year to a year before the economists knew we were in recession, we knew we were in recession. Why? Because you see it in the battered bodies of children."

If we really want to use our knowledge to make money in the stock market for most of the public employees on a public pension plan, and we know what's happening to those, we could actually use this as an investment group, I'd hate to say it. But we could actually look at that and we could actually make money in the stock market by following child abuse, because it's a leading economic indicator of familial distress. And when we think about this biologically, it starts to make sense, too. We're trying to link not only the historical epidemiology with the contemporary social science of medical science, but when we think about this biologically, what happens?

When we think about the first two years of life, it's the mothers who are most likely to commit these murders. And we know what cortisol does, what a high level of stress does to a human body. What's interesting is when a young woman is feeling stressed and has a high level of cortisol in her body, which can come from chronic stress in utero that she suffered as a child. It could come from a damaged relationship, economic stress; anything can raise your cortisol level. What happens to your body, the science

shows, that you are actually less likely to conceive a child. In other words, that high cortisol rate is telling your body, "This is not the time to have another child. Focus on the ones you have or wait."

If you have a high level of cortisol in your body, you are three times more likely to miscarry in the first three weeks of pregnancy because your body is telling you, "This is not a good time." And we find that high level of cortisol interferes with your ability to bond with your child. If you have a normal stress response, when your child cries you are suddenly attentive, alert and engaged. But if your stress level is here, that noise comes one level more agitation, and you can't bond. So, in other words, what we're seeing when you look at the stress that young parents and families are under at certain periods of time, and think of what that does to their cortisol level.

And this is very common, interestingly enough, among primates, and here I'm getting into evolution. It's very common among primates like us who are what we call collective childrearers. In other words, there's a group of primates, one out of five primates, where the mother cannot produce enough calories on her own to raise a child. In other words, it takes 13 million calories or something to raise a human child to maturity. That's a lot of calories. You need help, you need significant others, you need a community, you need help. And this is the same for tamarins; this is the same for marmosets.

And they're, interestingly enough, the great colonizers. When there's space out there to colonize, they take over. We take over. But when there's not space there, we cut back, we limit our family size. And so what you'll find is the tamarins and the marmosets respond in the same way that human beings do. When there's not enough around there, when the litters are too high, they commit maternal infanticide, neonaticide, whereas those other primates where the mother can produce by herself enough calories, there's very low levels of maternal aggression in the first year or two of life.

Does this make sense? You see what I'm trying to get at. So what we're trying to do is pull together the biology, the historical epidemiology, the forensic archaeology, the medical science, contemporary social science to try to build an understanding of how these things change over time. And we're starting to feel now that when it comes to violence against children by parents or caregivers, that we're getting much closer to actually having the answer. So I think we're really making progress. But where do we really stand out?

What's stunning for the United States is, if you look in the 18th century, the 19th century for African Americans and European Americans, our children may have suffered the least violence in the Western world. In part that's because for African Americans, raising that child in the face of oppression is our way of resistance. You can see that in the literature, you can see that in the testimony, you can see that in behavior. "My goal in life is to keep my child alive so someday they will be free."

You see that kind of investment, you see that kind of collective investment in childrearing, so even though those children are undernourished, because the slave owners do not allow them a sufficient diet, their growth is stunted. There's high rates of stillbirth; there's high rates of early infant death because of that nutritional deprivation. This is a brutal system, but in terms of parental violence, it looks like those levels are very low. And when you look at European Americans, because of the tremendous economic opportunities for self-employment in the 18th century, the early 19th century, we had very low levels of violence against children.

Now what happens to Native Americans who lose their land? You take a look at the Native Americans in New England when they're tremendously under stress, when they really finally lose all their land in the 1740s, '50s and '60s. Their rate of child homicide is 20 times that of African Americans and European Americans in New England. So in other words, that kind of stress does a lot of damage. So they're on the wrong side of history. But for those other people, they're not committing those homicides. So we used to be one of the best places for a child, at least African American children, and European American children to be.

But what's happened to our ranking internationally since World War II? It has really gone downhill, whereas right now I think among affluent nations we have the third highest rate of child abuse and child murder. Things have gone in a different direction, and we have to think about what that is, what exactly the plight is for young parents and children in this society versus others. So we can talk about that somewhat.

And if you have questions, feel free to break in. I'm totally happy to be interrupted. I'm a teacher; I'm used to that.

So, but now what I'm going to do is switch over to really talk about homicides among unrelated adults, because that's what we want to think about. You look at that chart there. What do you get? Look at that giant hole in the middle of that chart. Why is that?

And we've got another hole in it. We're still have, by far — even where we are right now at about 5 per 100,000 — we still have by far the highest homicide rate of affluent nations. And we're looking at a rate that has been fairly stable, really, since 2000. It's really not a constant drop. We had a sudden drop in the 1990s and we've been pretty flat since then. So we're trying to figure out what happens to these dramatic things — you notice how rapidly it goes up and down? Like, you can mark this — that first drop, 1933. Then 1934 is actually when it went down. It's the second year of FDR's presidency that it drops. And it keeps dropping pretty much, except for the little postwar peak, right on down to 1959, 1960, '61. And then you see this sudden surge in the mid-1960s boom. And this is typical — that is dominated by murder rates among unrelated adults. That's what, really — those rates, unlike child murder rates, move jaggedly. When you look at the murder rates of children by parents or caregivers, it follows these long, smooth curves that take hundreds of years to inflect as fertility behavior changes.

But these rates can double or triple almost overnight and then drop suddenly overnight, murder rates among unrelated adults. It's a very different phenomenon. And if we look at intimate partner violence, what I can see is the major shifts in that happened in the periods, the decades when the shift in the economic balance of power, in the cultural balance of power, shift towards women: the 1830s and '40s, the 1960s and '70s. And you find in those periods of tremendous shift towards empowerment of women, towards greater equality of income, towards more opportunities outside the home, you find that even though the typical relationship becomes, I believe, less violent and more satisfying, that minority of men who can't make that transition, who can't accept that transition to new way of life, become more violent. And so you'll see less day-to-day abuse, but on the other hand more lethal violence by the men who can't change. So those are different patterns. We could talk about that more. But this is homicides among unrelated adults. What seems to be driving this? And that's the big puzzle. And one thing that is really difficult here, and I talk about this a lot, is that the causes confound our political intuition as conservatives and liberals.

I certainly am one who thinks that both conservativism and liberalism have made valuable contributions to human progress. I deeply believe that; I engage in nonpartisan politics on a local level; I've campaigned for Republicans and Democrats; and I believe in this sort of — I wish we could do things more like that that we work on the local level. But can liberal and conservative ideology explain why murder rates go up and down? I would argue the real reason we have trouble understanding this, Greg, is because most

of us are liberals or conservatives. And that we are so deeply committed to our ideologies that we can't see — we can't accept failure. We just can't accept failure.

So if I try, if I were a liberal, do I believe that it would be a better world if we had full employment, if we end discrimination, if we have more empowerment of people, would that be a better world? Absolutely, yes. Would it necessarily drop the homicide rate among unrelated adults? No. In other words, full employment — where were we towards full employment? In the 1960s. We were at full employment right to '73. What happens to the homicide rate? Poverty rate was dropping because of the Great Society programs. There's lot of misrepresentations about that, but the number of people in poverty declined.

Of course, it's primarily among senior citizens that it declined, but it still declines. There's more help for poor families. Full employment and, boom, what happened to the homicide rate? And look what happened in the 1930s. Are things rosy? Did the New Deal solve the unemployment problem? We know it didn't, despite its efforts. But the homicide rate went down. That makes no sense in terms of liberalism, does it? In other words, you look at that chart and you think about it as a liberal and you have to confront a certain fact. Your ideology can help build a better world — I believe that — but doesn't solve the homicide rate.

And the same thing goes for conservatives. Do I believe that swift and certain punishment would create a better world? I deeply believe that. Do I believe that law enforcement is essential? When you look at what happens in societies where law enforcement breaks down, the homicide rates reach catastrophic levels. But can a strong policing drive homicide rates down to very low levels? No, it takes more than that. Law enforcement can cap those levels at about 10 per 100,000 a year, but beyond that, law enforcement needs the help of the society. It needs more than it can do, so it doesn't line up.

And when you look at the 1950s and '60s, who had the most people in prison? The United States did. Who had the most personnel in law enforcement and criminal justice? We did. What help did that do when the homicide rate went up? Nothing. And you see tremendous — in the '70s and '80s — you see that sudden surge in investment in law enforcement, imprisonment. Did the homicide rate go down in the next 20 years? It didn't. It went down later. So when I take a look at these sorts of arguments, they just don't fit the data. And so what we have — the toughest thing that I have to sell, because

one of the great things about bringing this message is I find I just get attacked by everybody. It's so wonderful.

And I don't mean this as an attack, but man, people say nasty things. You're in Washington, you know how it goes. But the thing is is that our ideologies fail and that's what I try to tell my students, you know? Our ideologies fail us, and what we try to do in college is not only ask our students to overcome their ideology, we ask ourselves as faculty to overcome our ideology, to try to say look at the evidence, be an empiricist, and it doesn't mean that your ideology is immoral. It doesn't mean that your ideology doesn't have important things to contribute to human progress, but it means you're wrong about crime, damn it. And you've got to get that through your heads.

And so, in other words, you know, when we have these debates about all these laws and things, I never get asked by any politician to speak to it. Why would they? I'm going to tell them, "Well, you know, it just doesn't work — the world doesn't work the way you say it works." No one wants to hear that, and I think that's the plight you're in, right, at the NIJ? You do all this work and then it kind of goes into the publications, and then public policy's a hard thing to affect, isn't it? That's why I got into local politics, I've managed campaigns. And I find if you manage campaigns that elect your friends, you deal direct. So this is it, so of course as public employees you can't get that involved, but it's something to think about.

So when I look at broad patterns over long periods of time, what do we see? What we see is just, you know, we see all these kinds of trends that I talked about. Here's our whole thing; does policing, incarceration, do abortion rates fit? Well, abortion rates don't fit. Why? Because all you have to do is go back to the 1850s. Abortion rates soared tremendously in the 1840s, '50s and '60s. Beginning in the 1830s it starts to go up and I can do that through abortion-related deaths; I've actually got abortion-related death rates, and they're stunningly high. And the fact is is when did we surge in our murder rate as a nation? The late 1840s and '50s and '60s. Exactly when those children who were first being aborted started to come of age. So, in other words, it doesn't work. It just doesn't work when you look at it historically. When we look at alcohol consumption, here's my favorite one, you know, think drunkenness. When were we the most drunk in the United States? When did we — we actually know this. By God, we work hard as historians.

When were we — in fact, one of my colleagues wrote the wonderful book on this, Bill Rorabaugh, and the title of his book is *The Alcoholic Republic*. The time when it peaked, we drank — right after the American Revolution down to the 1820s, we drank three times as much ethanol per year per capita as we did today. Think of the horse and buggy accidents. Think of if they actually could drive. It would have been horrible. Lots of firearms accidents, you know? They especially drank on patriotic holidays. So they'd get out for the militia training days and these are young, drunk guys. They'd actually — your officers — the goal is, is if you're elected officer, you have to treat the men beginning at 6 in the morning. You have grog and you have whiskey, and they're drinking all day with their firearms. Yeah, they shoot each other, they shoot into the crowd. Their girlfriends are there to watch the parade, they shoot their girlfriends. They're totally drunk. And so, in other words, this is an alcoholic republic. That's our lowest murder rate in American history. And, you know, of course, as my students say, that's because they were too drunk to use a muzzle-loading gun. You know, maybe that is.

But the thing is is you look at these substance abuse patterns and they don't line up the way you would want them to either. So, in other words, all these theories just, you know, they don't work. So, this is version 12B. I'd have to say that every theory I had died a horrible death in the face of the evidence. My book took me 25 years to write. I'm glad I had tenure, I would have been fired. Everybody assumed that, "Well, what's Randy doing? He's not doing much of anything." Well, I was being terribly confused and I couldn't quite figure this out, but a number of us independently in the mid-'90s started to come to this conclusion.

Manuel Eisner, who teaches at Cambridge, Manuel started to see this; Gary LaFree at University of Maryland started seeing it; the late Roger Gould, Yale, he started to see these patterns. We each started to realize we were looking at the same elephant. We were touching it from different points of view. But all of us were independently thinking along these lines. And I came to the conclusion that if I looked at these homicide rates, I'd be looking at political stability as the key. The belief that government is stable and that its legal and judicial institutions are unbiased and will redress wrongs to protect lives and property.

In other words, political stability seemed to be critical; feelings and beliefs towards government seemed to drive things more than the economy or policing or imprisonment. Secondly, a legitimate government, a feeling of confidence in government and the officials who run it and a belief in their legitimacy. Fellow feeling, the third thing,

empathy, a feeling that patriotism, empathy and kinship with other members of society are rising from racial, religious or political solidarity. And I think a legitimate status hierarchy with a belief that the social hierarchy is legitimate, that one's position in society is or can be satisfactory, and that one can command the respect of others without resorting to violence.

What I'm saying is is these, if you think about these, are the attributes of successful nation-building. If you want to have a successful nation — we talk about nation-building in Afghanistan, we talk about nation-building in Iraq. What are we trying to achieve? That's what we're trying to achieve, isn't it? That's what we're trying to achieve. And this is not always a benign process. In other words, we can think of ways to build a strong sense of nationality as we did after our Revolution in the northern United States by empowering, including, opening up opportunities, building togetherness, building patriotism in a powerful, strong way.

But you can also create a strong sense of nationality like Napoleon did, like Mussolini did. When they came into power and got things engaged, did the homicide rate go down? Yes, it did. One of the horrible things about nation-building is sometimes the best way to drop a homicide rate is to be on the winning side of a race war. You know, the winning side stops killing each other in those circumstances. I don't want to know that about human nature. I didn't want to know that, I still don't want to know that, but that's the truth of it. We know that nation-building is not always a moral process, don't we? Not all one that we would cheer, but in many cases it has been.

And so that's what we're trying to think about. And when these components are in place, homicide rates can get down to 1 or 2 per 100,000 per year. Very low levels. But, boy, when these are not in place, when the bottom three are not in place, you get up towards 10 per 100,000. And when that top one is missing, political stability, you can go up to 100 per 100,000 a year, or even thousands per 100,000 per year. Yes?

**David Marimon**: Do you mind if I ask a question?

**Roth**: No!

MARIMON: When I look at this, all I can think is that we're heading for more murder because we have less political stability — the legitimacy of the government, yes, but there are plenty who do not see our President as legitimate. There is no empathy or patriotism, and we are not where we were at 9/11.

**Roth**: Okay, I will get to that because, you know, we're getting ahead here, but in a divided society, legitimacy is perceived differently by different people. I went out on a limb on the History News Network, you can look it up, what would happen if candidate Obama won the election to the homicide rates in the United States? It said right after the election the homicide rate in American cities is going to drop like a rock right after the election, because of what this historic moment means to African Americans and other minorities.

And I thought there would a broader, feel-good feeling in the country at large about doing this, but I said I'm deeply worried about what's going to happen in those places that are most resistant to the idea of an African American President. And I was very worried what would happen to homicide rates, particularly in parts of the South, the former Confederacy. And when the statistics came out — we don't have the right statistics yet — but the global statistics, that's exactly what happened. Fifteen percent drop in homicide in American cities right after the election. By February, we were down 15 percent in American cities, but in the upper South, where you see that most resistant, where the birther movement turned out to be, what happened to homicide rates? It was up 10 percent. It went the other way of the nation as a whole. And you take a look at the opinion polls for African Americans in 2009, despite the depression — because all my friends said, "Homicide rate's going to go up because the economy's doing badly." I said, "No, that's not what drives the homicide rate."

And I said what this election would mean to African Americans, and you look at those opinion polls in 2009: African Americans were more optimistic about their future and their children's future than they had been in a generation. Well, duh. What do they see every day on TV? What are young people seeing? They're seeing a black President and First Family there doing the best they can, a dignified job. That's very important, and it had a powerful effect, I believe, on young African Americans. And since they commit most of the murders in this society, that had a powerful downward effect. So certainly, but what does it do to those groups that feel disempowered?

They're more likely to kill each other, and that's the irony of all of this. I don't want people to kill people that they don't like politically, but the fact is you kill your best friend, you kill your acquaintance, you kill the people in your own neighborhood when you're mad. And so the theory here is, as you know, it's about emotions. In other words, if I feel included, if I feel empowered, if I feel that I matter, it doesn't mean that I get my way on everything, but it means that I matter to the society, that society somehow has my back. And I feel a kinship with people I don't know really well beyond my friends.

If I get challenged, somebody disrespects me, it can roll off my back. But if I feel disempowered, disincluded — disenfranchised, every little slight matters and I can react violently. And so that's the kind of psychology that we're looking at here. And when we take a look at this, this goes back to — we're getting a little bit ahead — but we look at the biology of this. When we think about how chimpanzees behave — I get into a lot of trouble with this, so I'm just going to say it, I'm going to talk about evolution and, by God, that's it.

Someone spliced this together to try to turn people against me. This is all, I mean, really nice; people spliced me so that I call certain political groups chimpanzees. They did that to me on YouTube; I really appreciate that deeply, that level of dishonesty. But, you know, this is what happens. But if you take a look at what happens when there's political instability in a chimpanzee troop, in other words their dominant structure is in play. What they found is that the levels of testosterone go up in both males and females, the level of serotonin goes down and they start hitting each other at a rate three times, four times they would otherwise. And they don't just fight for position. They hit their friends. They're beating everybody up. And in fact, you can manipulate their diet so their serotonin goes down. If you want to have a high level of serotonin and feel good about life, eat a lot of ground turkey. Tryptophan, they'd eat a high level of tryptophan. And what they did is they created a — they didn't tell the observers watching the chimpanzees that they had lowered the level of tryptophan in the diet, which you need to synthesize serotonin. And the observers are saying, "Gee, the chimpanzees are hitting each other at a horrible rate, three or four times!" And then they put the diet back: "Gee, they're not killing — they're not hitting each other; what's going on?" Well, it's about those hormone levels.

And what's interesting is when you have political instability, the hormones that facilitate, prepare us for aggression, testosterone goes up, the serotonin goes down, which — serotonin, you know, prevents impulsive aggression. And you see it go up. And what happens when the dominant structure comes back? Serotonin goes up, testosterone goes down, and there's peace. You take a look when that dominant structure's in play, who goes to the top when it's most violent? It happens to be the males with the lowest levels of serotonin and the highest levels of testosterone.

But once you have political stability, which chimpanzees come to the top? Those that have moderate levels of both. In other words, they're not generally aggressive, but they can't be imposed upon and they happen to be the best coalition builders, the best at befriending people, the best at reaching out to other people. So when I look at

chimpanzees and I look at us, I'll show you how we behave. I go, "Oh, that's who we are." There's a lot of these things that we could start to see in the way that we behave. So let me show you big patterns in the past, and then we'll talk more about the present, okay?

But — and, again, everybody wants me to say what's going to happen. You know, what happened just the last two years as the bloom is off the rose? What's our 2011, 2012 [inaudible]? Starting to go back up. I said — 9/11: People said the homicide risk is going to go down, and I said no. And it didn't; it was flat. So, in other words — and I said child murders would go up with the recession, but the others would go in a different direction and they did. I mean it's sort of like what do I have to do? I mean, I just, you know, I keep saying this is what's going to happen and it happens, for goodness sakes. I'm trying. So anyway, let me go on and do this first and then I'll get back to you.

Okay, here we have France. So let's go outside of the United States. Look at political instability. If you know French history in the 19th century, when would you expect the homicide rate to spike? 1830, '31; 1848, '50; 1870, '71, right? What does it do? It does that, and notice what this is. This is not Paris, where the political violence is. This is in Corsica. They can't even speak French. All of this is honor violence and political violence, and they respond exactly the way people do in the capital. This is the same thing I found in the 19th century: When the homicide rate goes up in New York City, when the political system starts to break down after the Mexican War, it goes up in New York City.

But it doesn't just go up in New York City. It goes up in Amish and Mennonite country in Ohio! In other words, this is felt so deeply across. Of course the homicide rate's lower in Amish and Mennonite country in Ohio than it is in New York City, but you watch them going up and down in synchronicity and the question is how do they know? How would Corsica know that this is the time to kill people? This is what happens. Political instability has tremendous political effect on our bodies, on our minds. And so when that state breaks down, this happens.

And when we take a look at lower homicide rates, I'm going to show you some things about — I'm going to try to measure political instability by looking at death rates and riots and rebellions. How many people have died in the United States since 1992 in a riot? 1992 was the last year we've seen any significant loss of life in a public demonstration. And when did the homicide rates drop? Right after '92. And so I look at this sort of thing, and when did we start dying in riots? The mid-'60s, right? Right when this went up was '64, '5.

And so I look at this, looking at measures of political instability, and I'd say that despite the fact we're politically polarized, we're not killing each other over politics right now, are we? We aren't. Thank God, you know. And except for a few terrorists like Timmy McVeigh, you know, and Terry Nichols, we're not doing this. In other words, we've made a decision that we don't want to go back to that. And I think we have to talk about seeing more progress in our society than we're willing to give ourselves credit because of this political polarization that we have. It's bad-spirited, but it's not necessarily a murderous kind of aggression. Does that make sense?

So that is what I tracked out, so I'm looking — I really look for dead bodies.

Here is Great Britain. If you know your British history, this makes tremendous sense. There was a contract really executed during the Napoleonic wars that the British elite made it clear: "We don't want to go the way of revolution in France. But once this war is over, we're going to empower and we're going to include and we're going to change." And what happened at Peterloo in 1819 was the democracy demonstrators were killed. Oppression of the democracy demonstrators.

And if you take a look at what happens to the homicide rate in Great Britain from the 1820s through the 1860s, the period of Chartist protest, upset with the lack of inclusion. You see the homicide rate in England and Wales was higher than in the United States right into the 1840s. It's higher there. When does it drop radically? See the radical drop right here? That's the Second Reform Act, 1867, which enfranchised propertyless household heads in the cities. The second big drop, suddenly: the Third Reform Act, which enfranchised propertyless household heads in the countryside. In other words, enfranchising, including, legitimizing suddenly dropped the homicide rate by 50 percent and then by 50 percent again.

You'll see that what many people keep trying to drive what they call a "civilization thesis"; they say, "Oh look, that's a gradual decline." It's not a gradual decline. It's *blam*, it's *blam*. It's very jagged, and it revolves around politics. So that's what we're taking a look at. And if we take a look at how high homicide rates can be, let me just look at this one here. Let's take a look at what happened in the former Soviet Union in — with a breakdown of the state there, the failure of the Soviet Union. Look at how those homicide rates spiked. You're getting up, look up here, you're getting in the Russian Federation and in Estonia, you're getting homicide rates 25 to 35 per 100,000 per year. Disastrous and catastrophic. And everywhere you see them spike.

What is interesting about this is that the rates spike most dramatically where? Where there's a high percentage of ethnic Russians in the population, of people who saw their political system and their place in the world shattered. In other words, Estonia is 50 percent ethnic Russian; Latvia is a third ethnic Russian; but Lithuania is only 9 percent and it's down with the others at 10 to 15 per 100,000. It's only those three places with a large number of ethnic Russians who saw their world shattered that went up to 25 to 35. And if you take a look at this, every one of these places that made a swift and smooth transition to democratic capitalism went back to a low rate very quickly: the Czech Republic, Slovakia, Slovenia.

So, in other words, what you're seeing there is politics being played out in day-to-day murder rates, and it has to do with these questions of solidarity. Okay. Question, go ahead.

DIANA TURONIS: How does this compare to the child-on-child murders?

**Roth**: Child-on-child murders. That's a good question. What I find is that, in other words if we're talking about an unrelated child killing an unrelated child, it follows the patterns of murder among unrelated adults. In other words, they mimic the behavior of elders, and I think I can even see about an eight-year lag. In other words, once the kids start to see the adults doing it to each other, they do it. So, in other words, you see that rise in the late 1840s in the homicide rate among unrelated adults, and you'll see the child-on-child murder rates going up in the late 1850s and '60s. They start to move it.

In other words, you'll see one fellow — one young man was upset that his — one 6-year-old boy was upset that his 8-year-old sister in Vermont was playing with an Irish girl. Irish are dirt. He told the Irish girl, the little 8-year-old girl, to get off his porch. "We don't want any damned Irish on my porch." She said, "Well, your sister said" she could stay here. So he went inside, got dad's gun, blew her away. That's what happens. In other words, he's imitating the behavior he's seeing in adults, and one of the things that I tend to say if I have to put it simply: What youth homicide problem? It's an adult homicide problem, and the kids imitate our behavior.

Sometimes the trends can go slightly different, as they did in the '80s. You know, it's going up faster for the children, but again there's that lag. So, in other words, they're seeing what adults are doing to adults and they mimic that behavior. If adults behave themselves, the kids do.

TURONIS: Has it been normalized for the size of the population?

**Roth**: Oh, I do everything by rates, absolutely. And I do age-specific rates. Every time I can get an age-specific rate, I do. I try to normalize it. I'm a — I love math.

TURONIS: So the most dangerous age bracket becomes — ?

**Roth**: In the 19th century, the most dangerous age bracket is in their 30s. You know, homicide, and it's one of the problems with the whole homicide spike in the '60s. You know, it's blamed on the baby boomers. The baby boomers were too young to be responsible for the spike between '65 and '72. This homicide spike was being done by people well into their 20s and 30s. And they were born before the baby boom. So in other words, there's a lot of this stuff that's just mathematically — what can I say. It just frustrates me how badly people will look at that data, because they want to have a demographic understanding. It's simpler to say it's hydraulic, the number of young people in the society. That's an easy way to think about it. It's compelling, it's common sense, and it's wrong. But, you know, arguing against common sense is as hard as arguing against ideology. It's just, you know, you, just — anyway, I'll stop.

I get upset about it because I think we really have knowledge that is very valuable here, and that we just can't get it across to people, because of the way they want to think in common sense. Does that help? Is there another question? Yeah, go ahead.

NAZGOL GHANDNOOSH: Hi, my name is Nazgol Ghandnoosh. I'm from the Sentencing Project. And I wanted to ask you about when you were first talking about parental homicide rates, you seemed to be really focused on economics and perceptions of economic stability.

**Roth**: And ambition, yeah.

GHANDNOOSH: And then in focusing on the unrelated adults, you made a shift to politics.

**Roth**: Yeah, all of that's irrelevant, yeah. It doesn't correlate.

GHANDNOOSH: Even perceptions of economic stability?

**Roth**: It doesn't. We're trying now to see if the consumer price index — and this is Rick Rosenfeld's work — because we're trying to find a better measure. We used to have a

wonderful measure of trust, and I'll show you that, because people used to say, "Do you trust the government to do the right thing most of the time?" This is in the Michigan surveys. And, "Do you believe most public officials are honest?" People answered that question in a deep sense, not in a partisan sense, right up until this political polarization really hit in 2008, '9.

And now that question that we used for years is totally fouled, because it's a way of saying, "I hate Obama." And what we find is that this does not track with presidential approval ratings. It's something deeper about how we feel with our country. So in other words, the fact that Obama administration is right now very unpopular, including with Democrats who are so frustrated they didn't hand this whole thing to Amazon. You know, why when we have the best people in the country — and for goodness sakes, the people, they're Democrats, what are you thinking, you know? Put it with people who give a darn whether or not you succeed.

So in other words, everybody's angry right now. But that's not going to translate into a higher homicide rate, because that's not how we feel about our country; that's how we feel at this moment about something. So you'll watch, I've actually done the homicide rates back to 1938 against the approval ratings, the presidential approval ratings, Gallup poll — very low level of correlation. But if you take those trust-in-government issues — I'll come to that — very high level of correlation. Because it has to be something more deeply about how we feel about the country.

And as I said, since '92 we were killing each other in political demonstrations from 1964 to 1992, and then we stopped. We weren't doing it in the '50s or early '60s. And think about that. That's what I look at as a historian, so I look at those deep things and we get caught up in the moment and think, "Oh, that's how we're feeling." Well no, look at our behavior. Our behavior suggests that we believe in the legitimacy of the system. And what you can see across the world, just to get ahead of ourselves, across the world homicide rates have dropped everywhere in the affluent world.

What's the turning point? 1988 to 1992, the end of the Cold War. What did the collapse of communism say about capitalism and democracy? How many people envisioned a different world than democracy and capitalism? The alternatives have died, and what's interesting is when you look at how much more popular capitalism is right now in this country than it was in the '60s and '70s, it's amazing to think about these deep changes.

And we don't — when we are in a position of political polarization, we often don't see the deep story. That's what I'm getting at, okay?

Let me show you how this works, then, in an evidentiary sense. If I take a look at the homicide rates in the 17th and 18th century of the United States, what you'll find is that our homicide rates were fairly high right until the mid-1670s, and they drop suddenly between the mid-1670s and the early 1690s. They drop to a third of what they were before in Maryland and Virginia. They drop to a sixth of what they were in New England. So suddenly you see this sudden drop, and so we become less violent suddenly in the late 17th century and then what happens when the Revolution comes? You come to 1765 and the Stamp Act, it starts to go up again. Stamp Act crisis. It peaks during the Revolution and then as we achieve political stability, it goes down again.

I was trying to figure out, how would I measure political stability? How would I measure community solidarity? So what I tried to do is, I said, "Let's take a look at the number of deadly riots and rebellions." How many people die in deadly riots or rebellions? And some of these are political; they have to do with contests for power. And those I'm putting in the political category. There are also deadly riots over community issues. You know, they riot to kill people they think are immoral. You know, there's a house of prostitution, they murder, they riot, and they kill people there. There's fighting amongst different religious groups. There's fighting between the Tories, you know, the Whigs; that would be political. There's fighting about this religious stuff; that's more communitarian violence. So I map that out. I look at banishments and forced exiles. In other words, "You're on the wrong side of this." So when Tories are forced out and they have to move to Canada or the Antinomians are forced out of Massachusetts, forced out. In other words, we're saying, "This community is deeply divided and they're willing to write other people out of their community completely, drive them out on threat of death."

We can also look at executions for sedition or treason, which I see as a measure of political instability. We can look at executions for moral offenses or religious offenses. In other words, you're a Baptist, so we'll hang you; you're a Quaker, we'll hang you; you've committed adultery, we'll hang you; you are gay, you've committed the crime of buggery, we'll execute you. What you'll find is they were doing those executions, they were killing each other, doing all of these things right up into the mid-1670s. And then by the 1690s they virtually stop. And then suddenly — so, in other words, this is the period of low murder rates. Look at that. Here's your period of higher murder rates, and for these

political ones, the community regulation ones, you'll notice it maps out the homicide rate.

If you look at the best correlate of the homicide rate in the United States from the 1640s through end of the 1920s is the percentages of new county in any decade that we named after national heroes. Is that weird? In other words, you know if we name our counties after national heroes, which would be British heroes, British noble citizens in the Colonial period or about American heroes in the American period. When we just unconsciously name people after our country and its great leaders, we don't kill each other. And when we stop doing that, we do.

So after the Glorious Revolution of 1688, when there's this surge of patriotism throughout the British Empire and a sense that this government is more constitutional and legitimate and Protestant, what happens to the murder rate? It drops like a rock. But what happens to the number of new counties that are named after national heroes? It goes from 40 percent to 80 percent. When does that drop? During the Revolution. It drops in the 1760s and '70s when we start to kill each other. The new American patriotism doesn't come in until the 1810s and '20s, but what did I tell you about the 1810s and '20s? It was the least homicidal period in our history, and we think whatever kinds of measures we can come up with, that's the most patriotic we've been in our history. The most believing. And, again, did we have political polarization in the 1830s? Of course we did. Rambunctious democracy. But did we hate democracy? Did we hate the country? No. Despite the fact we were deeply divided politically, we behaved in a way that showed faith in this great experiment. And so we didn't kill each other at as high a rate.

Hate speech. You take a look at the hate speech in the 17th century. It was on religious lines. Calling someone a heretic or a zealot. Or it's on class lines. Working-class people were commonly called rogues and whores. If you take a look at this measure, we knew this as historians, as humanists, but now with Google Ngrams we can map out the use of these words. We're using those words into the 1670s and then that hate speech disappeared.

What replaces it? Racism. In other words, we have the disastrous Indian Wars in the 1670s and '80s, we have the rise of racial slavery, and who's the outgroups? So, in other words, what's going to happen is the rate at which European Americans kill each other drops with the rise of racial slavery and these destructive Indian Wars. They pull together

and all of these divisions over class or race start to go away. And people who disagree with you religiously, you don't call them a heretic or a zealot; you don't call working-class people rogues or whores, because they're white. And so that stops. This is not a benign process, this is not happy time. Catholics are not included. This is not a more perfect world, but it is a less homicidal world, because you're starting to build a stronger sense of nationality throughout the British Empire to those who are included, and it's based on race.

That make sense? Starting to see how that pattern goes? Okay, so here's the 19th century. And again, the break point in terms of these deadly riots and rebellions is exactly the period I talked to you about. The late 1840s is when we start to spike, and if you want to look at one word that maps out the homicide rate in the 19th century, it's the n-word. Now the n-word is used to describe not only hatred of African Americans, but hatred of whites who are allied with African Americans. And when you see the country break down in the late 1840s, the Mexican war, when the homicide rates spike, boom, the n-word. End of Reconstruction, homicide rate goes down, 1890s and 1900 when Jim Crow, disenfranchisement comes back in, all that hatred, homicide rate goes up.

And we can see the same way for the Slave Power, which is the hate word that the anti-slavery people and the pro–civil rights people used to describe those whites who they hated who were either slave owners or were sympathetic to the slave owners. Look at it; it's the same chart, essentially. So, in other words, it maps out with hate speech, it maps out with patriotism, it maps out with deadly riots and rebellions. So we are really trying in every way — well, you know, Doug and I are trying, my friend Doug Eckberg, we are trying, we're historical criminologists. And so we're really trying to come up with measures of this.

And, again, what I would say is humanistic historians have known about these break points for years, but because we're humanists, people who are scientifically or social scientifically inclined tend not to believe us when we say, "When did white solidarity become important? 1670s or '80s. When did British patriotism flourish? In the 1690s and early 1700s." We've known that, and if I had to choose between a political opinion poll or the work of a humanistic historian, to understand the feelings of people at a time, I'd pick a humanist historian any day of the week. But what we need to do as historians is try to market to scientists and social scientists and to journalists, so we need to come up with these proxies.

But what I'm trying to tell you is this really is what we've known as historians for a long time. I'm the one who's trying to quantify it because I'm a quant, and I deal in this kind of world. But if we take a look at the trust-in-government polls — this is work that Gary Lafree did, in 1998 he published this. This is the homicide rate and the percentage of people who trust the government to do the right thing the most time. So in other words, the homicide rate, the dashed line goes up when trust in government goes down. Trust in government went up in the 1990s, homicide rate went down.

And, interestingly enough, divided government is preferable; divided government, you know, both conservatives and liberals, oddly enough, can feel empowered at the same time, even with all this complaining. That's something that when you look at deep history you can see that. You know, as a historian, I look at the United States today and we're not killing each other over politics, and I'm thinking, "Wow, that's great." And, of course, everybody who's not a historian is saying, "This is horrible!" I'm thinking, "Well, no, no, we're not killing each other. Thank God."

 [audience laughter]

That's — oh, I know what that is. That's showing you what's happening with the end of the Cold War. That's what's happening with the end of the Cold War across the Western world. This is Manuel Eisner's work, my friend Manuel Eisner. So in other words, we're all working on a very similar wavelength. Do you see what my argument is and how this is going? So in other words, we're trying to figure this out and we're working on it at a very deep level trying to sort this all out. Okay, well, I'll stop now. Thank you.

TURONIS: I'm Diana Turonis with Immigration and Customs Enforcement Office of Human Capital Strategy and Technology. And I'm wondering if you've looked at the correlation with the psychotropic drugs, the pharmaceuticals, the different changes in the American Psychological Association diagnosis criteria and how that relates to the trends.

**Roth**: With drugs?

TURONIS: No, the whole psychological profile and the changes in the pharmaceutical industry and the changes in the AMA diagnostic codes.

**Roth**: I'm not sure that I understand exactly what you're asking me, because I'm not really familiar with all of that terminology. What exactly do you want — I'm sorry I don't

understand, I'm being very dense.

TURONIS: Okay, you've looked at political, economic, I presume education levels and those different drivers, age levels, abortion rates, things like that.

**Roth**: Have I looked at schizophrenia, for instance, you're asking me?

TURONIS: Well, those things, other things that may end up correlating seem to be more predictive. I do a lot with predictive analytics.

**Roth**: Thank you; well, that's a good question. One of the things that I've found and one of the issues that Greg and I talked about before, is we know on an individual level that there are predictors that are very predictive of how the likelihood of violence is in an adult offender. We know that there's a certain minority, small group, of mental illnesses that predispose one to violence against oneself and others, particularly forms of schizophrenia and delusions. We see that with certain forms of bipolar disorder, deep psychosis, depression. Absolutely those things — so if you look at any period in time and you look at the murderers, a higher percentage than randomly of the murderers would be those people.

But what's interesting is how highly suggestible people who are schizophrenic are. In other words, if they grew up in an — if they're in an adult society where people aren't killing each other, they don't kill at as high a rate, even though those who do kill are more likely to have those disorders, the whole homicide rate goes down because they're highly suggestible. I'll give you an example from the 1830s and I have a confidentiality agreement, can't use names, but looking at the hospital records of the state hospital in New Hampshire.

But in the 1830s when the homicide rate is low, what did delusional people do? They fantasized about how to make the world a better place. So, in other words — and what's interesting is I'm going to talk about a guy who actually everybody thought was crazy but actually had the absolute right idea. Back then everybody had a different kind of bank note, the 1830s, and they're arguing about the currency. And Andrew Jackson vetoes the bank and how are we going to have a single bank note, and every bank has its own currency, so counterfeiting is running rampant. And the currency, deflation, inflation, it's a mess!

And so this guy's completely schizophrenic. He's delusional. And what he does is he walks around his home town of Hudson, New Hampshire — and you'll love this as someone in D.C. He's marking a six-mile-on-a-side perimeter, which he's marking out the District of Columbia around Hudson, and he says, "This is where we're going to put our national bank, because we have to have one currency." And he said, "Everybody needs to send me their bank notes now and I will send you back a bank note of the National Bank of Hudson, New Hampshire. Then we'll all have the same currency. And we'll have one monetary system and everybody will believe in it because I printed these notes."

Now, of course, everybody said he's crazy. He was absolutely right; that's the Federal Reserve System. But the thing is is here's a guy in a nonviolent society who is totally just trying to fix something. And, again, you know, when we look at it, you know, with the two recent incidents in D.C., all this concern about the NSA. We are a violent society. Both those people thought that President Obama was spying on them. That's a delusion, of course. But in a violent society, they're going to take that in a violent direction. Same with "Taxi Driver," same with the Batman movie.

In other words, but again, so what I see is that mentally ill people are highly suggestible, and so that what we who are normal, what we do gets picked up by them in either a violent or a nonviolent way so that individual predisposition washes — is overwhelmed by this broader effect. And that's what you see. In other words, when we talk about child abuse, are the generations that are most like — the most heavily abused in history, do they grow up to be the most violent? If you take a look at the homicide rates in the 19th century, children were very unlikely to be abused in the 1820s and the early 1830s. What do they do when the political crisis comes? They become the most violent generation in our nation's history.

What happens to the kids who are raised in that most violent period against children, the 1860s, and '70s? Homicide rate drops in the '80s and '90s. So in other words, it's not that abused children are — if you've got a group of murderers, there's always going to be disproportionate representation with children who've been abused. But that doesn't mean that abused generations become violent adults. Does that make sense? So in other words, it's one of the real challenges is to deal with this disjunct between those individual-level facilitators and these big historical events that just swamp them out.

And how we get those two levels of scholarship to talk to each other, it's one of the things we talked about is with the Frontiers for Research for Young Scholars is to get

those systems to talk to each other, okay? So I did understand your question finally. I am so sorry that I was dense. But then, it took me 25 years to figure this out. I'm not a quick study. So I say, the great thing about doing historical research is you don't have to be a genius, because once you — it's going to tell you you're wrong and you're wrong and you're wrong. But finally, the data's just out there.

Like, you look at Eastern Europe. And you know anything about the history of Eastern Europe and you look at that data and you just go, "Well duh!" But, you know, it takes time to get it through your thick skull. Okay, another question.

CARRIE MULFORD: I'm Carrie Mulford at the National Institute of Justice. I couldn't help but notice that you didn't mention gun availability, gun laws, anything like that, so I was curious —

**Roth**: Because I don't like being abused and having my life threatened. [audience laughter] Because I've had both. I've been, you know, my scholarly credentials have been, you know, when I — because guns aren't the problem. I mean, I say this, and as I say, I went to graduate school, many of us went to graduate school. We had very expensive and rigorous educations to learn that the answer to every important question is yes, no and maybe, right? And the answer to the question, "Are guns responsible for our homicide rate?" Yes, no and maybe. And that's the truth.

And you try to tell that truth, and you get — I mean from the left and from the right. I mean it's been more vicious from the right because they're more vicious, but I'm sure if I said that in the 1960s when the left was more violent than the right, I would have gotten the death threats from them. So, you know, it's a hard thing to really deal with, but I do talk about it in the book and I think about it extensively. Do you want me to talk about this? Because I know that people will watch this video, and they'll doctor it. You can look at YouTube at how they've chopped things I've said to make me look — like one of their favorites was to chop what I said about Democrats and Republicans with what I said about chimpanzees. So they chopped it so I called Republicans chimpanzees, so they started a campaign to get me fired in Ohio. This is the kind of stuff that people will do, and I don't want to be a coward about it, so I'll answer your question, but this won't go well for me if this gets on the Web. They will make sure that I get punished for saying what I'm going to say.

We've had, we've always had, a high level of gun ownership from, say, the colonial period right down into the 1940s. And at times we've been the most violent society in the affluent world, and at times we've been the least homicidal, haven't we? So is it just guns?

When you take a look at the muzzle-loading era, and this is in the book, when it takes you time to load that gun? You know, "I'm mad now, but you've got three minutes to run, I suggest you do that." Did you see, you know, the movie "Lincoln," did you see that wonderful scene where he shoots and misses, and the guy's trying to reason with him while he's trying to reload his derringer, because you only got one shot? And he's waiting, you know, he gives him about 20 seconds, and then he decides, "Uh oh, it's time to run." And he does. That's how it goes. So when you look at that, what's interesting is that gun use, the percentage of homicides committed with guns, goes up and down with the murder rate.

When that murder rate is high as it is in the mid- and early 17th century, the majority of homicides among unrelated adults are committed with guns. You look at this low period from the 1690s to the 1760s, only 10 percent of all homicides among unrelated adults are committed with guns. You go back up to the Revolution, it goes up to over half. Up and down in the Embargo crisis, up and down going into the crisis of the 1840s. So what it means is when people are feeling hostile or defensive, they will go to that dispute with their neighbor with their gun loaded. When they're not feeling hostile or defensive, they go and cuss them out when their cattle come across the line and destroy their crop. They'll go to the law.

So you'll see that, you know, they'll go to property disputes, they'll go to political disputes with the guns loaded, and they kill each other. And so you have to kind of plan that out. And so what you see is that it goes up and down like that. And one of the experiments I would love to do, I'd love to run American history back to 1857 and dis-invent modern firearms. What do I mean by modern firearms? Those, the great invention of Smith and Wesson when they put everything together in 1857 and the first rimfire handgun that the black powder was totally enclosed within the cartridge, so you could keep your gun loaded all the time. Because if you know, black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house. You're trying to keep that gun going. So the thing is is when you see that firearm's gunstock change between 1857 and 1910, it took that long for us to move to the breech-loading guns with self-

contained ammunition, reliable manufactured ammunition. You will see the percentage of homicides committed with guns go up and up and up regardless of whether the homicide rate was going up or down.

And what you see, the dramatic thing is all through the colonial period, when you look at intimate partner homicides, family homicides, only 10 percent were committed with guns whether the homicide rate was high or low among unrelated adults. But when you see that modern firearm come in, you'll see the rate at which intimate partner violence was committed goes up to be the same level as with unrelated violence. And you'll see who's most likely to be killed with a handgun in the late 19th century is not an unrelated adult. It's a woman who rejected her lover. Because now I can take this gun around and I can stalk her. I can go with this gun — concealed if I am suicidal, I can conceal it, I can go talk to her. And very often she wants to be friends, she want to — rejected me, but the family wants to be friends. You go over to her house, he'll say, "Will you take me back?" She gives the wrong answer, she says, "No, I can't come back, but I'd like to be friends." Shoots her, shoots himself, done. Seventy percent of those homicides are being committed with a handgun in the 1850s, '60s and '70s because that's the perfect murder weapon. And because they love you, of course, the guys love you, so they don't want to shoot you in the face, they don't want to disfigure you. They love you, they shoot you in the back of the head or through the heart. They want it to be quick, they want it to be relatively painless, and they want to go too.

So in other words, what I would you say is that when you have this gender problem coming up, you can see that throwing guns into that is deadly. And when that homicide rate goes up, having guns there means the completion rate of an assault goes up. So, yeah, I think that when you have that homicide rate go up, having this many guns in the society makes it works than it would otherwise be. And I say one of the reasons why we probably had a tough time during the 1950s getting down to 1 or 2 per 100,000, why were we stuck at 4 to 5, part of that is the fact that we were so heavily armed, and because we'll engage in this kind of impulsive violence.

So in other words, what I told you was that guns aren't the fundamental problem, we'd be killing each other with rolling pins because we hate each other, we hate our country. Europeans have a tough time understanding why Americans hate their government so much. So I say there's a very elaborate form of self-hatred in a democratic society, isn't it? But I think that that's there. So in other words, you can see why everybody hates me

by what I say, okay. It's not an ideological response, and, you know, it's based on years of research, it's based on hard work that they don't respect. I'll be blunt.

ARTHUR L. BURNETT, SR.: Good morning, I'm Judge Burnett, Chief Executive Officer of the National African American Drug Policy Coalition. From all this history, what can we do in the future, especially with African Americans, with reference to reducing the homicide rate? And it's been suggested to me three [inaudible], but I want your comments on them: Number one, full employment with reference to young black males and so forth, to what extent that would deal with that anger and frustration and reduce the homicide rate. Number two, the disintegration of the African American family, and 72 percent of youngsters being born to mothers without fathers, without families at home. And the third one deals with the whole idea of what you talked about, empathy, teaching youngsters from 1 to 3 or 4 the value of life and self-worth and the role of religion. I want to hear what your answers are on that, so what we can do in the future to benefit from your historical analysis?

**Roth**: Yeah, that's a great question. I would love for us to have stronger families. You know, having come from one, there's just something about it that's just helpful. And at an individual level — some of the things we're talking about at the National Academy of Sciences — on an individual level, whether or not I become an offender is deeply correlated in the Pittsburgh Youth Study with whether or not I feel connected to my family, whether or not I feel respected by my family, whether or not I'm involved in family activities. At an individual level, that works. But at the global level, does it work?

In other words, the big homicide rate drivers aren't involved in that. And so I do think that we would certainly have, you know, we could — since that makes someone more likely to be an offender, I would certainly want to see that happen. But the fact is, is that going to eliminate these homicide surges and declines? No, because when that homicide rate goes up, kids from good families, happy families are committing murder, and that's the puzzle that we have to deal with.

Secondly, when we talk about faith, there's no question that empathy can come from faith and that that sense of kinship, where there's a strong sense of commonality as there were with Protestants generally in the mid-18th century, you can see the homicide rate go down. But one of the great puzzles is we are the most churchgoing people in the Western world. We're the most likely to believe in God, yet we have by far the highest homicide rate. And I have talked to ministers about this, they say, "Well that's not true

religion." And I think that's probably true. How many Christians hate their fellow Americans, denounce them, call them traitors? It happens all of the time.

And so — but that's a politicization of religion. And the question is, is faith powerful enough to overcome and help us pull together politically? So far, you know, I wrote a piece on "can faith change the world?" I used to be a historian of religion. And the answer was yes, no and maybe. [audience laughter] And, you know, I've been doing this for years. And it's true! You take a look at the religions, the religious revival of the early 19th century, it drew people together. But it also divided them in new ways. And so you can see families pulled together by faith, but you can see families torn apart by faith, which leads to violence if one converts and the other doesn't. If a husband refuses to become Christian, the wife is a Christian, they get in these disputes, it can end even in murder.

So in other words, you know, faith can be destabilizing, as well as integrating. Take a look at what's happening in the Middle East. There's no question that Islam is more central to many people's lives than it was 40 years ago. But is that creating a less violent society? It's not, because it becomes politicized; it becomes part of this division. And I think you can see it with the polarization in the 1840s. That's when the Northern and Southern branches of the churches, the Methodist church, the Baptist church, they split apart about slavery. Exactly the time the murder rate went up. They're all devout Christians. They all believe that they are speaking for God. And they want to kill each other.

**Nicholas Zill**: Hi, Nick Zill, retired from Westat. I want you to, following up on the previous question, here in the District of Columbia, if you live in upper Northwest on the western side of Rock Creek Park, there are virtually no murders. Your chance of being murdered is zero. If you live on the other side, if you live in Anacostia, your chance is among the highest in the country. So from a practical point of view, no matter what these trends are, no matter what these changes are, I'd do much better for my personal safety, the community I live in, and the stability of it in terms of family stability, educational achievement, than moving across the river. How does that play out in terms of the trends you've been talking about?

**Roth**: Well, I think the thing is I go back to the way I've been answering all along. I certainly see that reality. And, you know, my work looking over hundreds and hundreds of years of history, I don't ignore that. And many of my colleagues who work on

neighborhood things say, "Well, I disagree with your theory." And they don't see that I agree with theirs. I absolutely agree that there are places that are more dangerous in our society, that there are these neighborhood-level effects, there are these individual-level effects — mental illness, child abuse, deprivation.

We know these things. The problem is how do we integrate that with the macro trends. And what I'm really arguing is that if we build a strong nation, if we build a strong nation, that homicide rate's going to drop in those dangerous neighborhoods. That's the most effective way to see that homicide rate drop. And the thing is is how do you build a strong nation? [snaps fingers] You can't snap your fingers. So, you know, why we want to go after things like unemployment is because we know that's a risk factor. Why we want to build stronger families is because we know that's an individual risk factor and we'll be working around the margins of the problem is what I'm saying.

But very productively on those margins, and I want to do that. But what I'm saying is is that how do you build a strong sense of nationhood? And being a democracy, we have to do it through inclusion and through empowerment. And the problem right now is when some groups are empowered, the others grew less empowered. If you take a look at what's happening politically on the gun issue, et cetera, you'll see white men feel that they're victims. This ideology that white men in America are victims is so powerful today. Speaking as a white male, there's been no wealthier, more powerful group of people on the planet than white male Americans today.

And we have this giant pity party going on. I don't understand it, I don't get it, but it's there. And we know for many people who've lost their place in this world because of deindustrialization, it's a real sense of disempowerment. If you're a white supremacist, how do you feel about the way the country's going? It's not good. If you believe in traditional gender relations, how's your life going? It's not going well. And you see a future where you are losing. And so, yeah, and playing out, I mean, "stand your ground." That's a statement about an older notion of masculinity, isn't it? That's what it's about. "I'm a real man because I'm not going to back down in a public place." It's a different idea of manhood than one that says, "A real man walks away from a confrontation when it starts to threaten violence. A real man is somebody who walks around with confidence because he believes in his country, courageous, can defend himself without the need for a gun." That's a different concept of masculinity than the one that is constantly ready, prepared to use force. And again, you see that playing out. That's shrinking in our

country, but as I said, when that small group feels threatened with change, it can become more violent.

And so even though we see gun use, gun ownership is dropping, we see that older idea of manhood declining, I think, that older idea of gender relationships declining, for those who don't want to make that change, who can't make that change, who've been disrespected by women, who feel disempowered, their world is falling apart. It's like for the ethnic Russians who saw their world fall apart. They're at risk of becoming more violent. And I think that's what we're kind of looking at. Does that make sense? I think that's what we're talking about.

And so how do you deal with that level of anger? How do you deal with changing that idea of manhood? Because, you know, my dad grew up in one of the most violent, dangerous neighborhoods in the country, Globeville, out in Denver. And they used to have gangs and he has to go out fully armed all the time. I remember when Alex joined the Boy Scouts, Dad sent all his old gang knives, switchblades, everything. "Hey Alex, they're all yours," we looked at these like, "Ah! Dad!" But, you know, my father just thought, "My God, I'm so happy to be beyond that." You know, he wanted nothing to do with that. And he just changed his idea — you know, his idea of manhood was "get me the hell out of here." You know, "I don't want to be that kind of man."

And the thing is, how do you get out of that? It's very hard. And my dad did not fully escape it. I can't say that he fully did. He was still conflicted, all through his life about what kind of man he was. You could just see his temper just [snaps fingers] like that, because that's how he was raised. In a violent, deadly neighborhood, high level of child mortality, half the kids were dead, including in our family, by adulthood. Bad place.

And how do you get out of that? My father got out of it farther than his father did, but it's a different idea of masculinity. Scary, I'm just thinking about how the only thing I heard about my grandfather — because I didn't know him, he died before I was born — "There's nothing your grandfather couldn't pick up or tear apart with his bare hands." That's all I ever knew about my grandfather, I knew he was a very violent guy. So, you know, that kind of manhood, you know, I've heard stories. You know, how do you get away from that? It's very hard.

**Ridgeway**: Professor Roth, thanks for coming, and thanks to all of you for attending.

🔗 https://supremecourthistory.org/history-of-the-courts/the-marshall-court-1801-1835/

🕐 18 min read

# History of the Court: The Marshall Court, 1801-1835 | Supreme Court Historical Society

"My gift of John Marshall to the people of the United States was the proudest act of my life." John Adams, President

Marshall skillfully asserted the Court's mightiest power and dignity in its first great crisis. In Congress, the lame-duck Federalists had passed a law to reduce the Court's membership to five (one less Justice for a Republican President to name). Abolishing circuit duties for the Justices and providing other reforms, this law set up new circuit courts with 16 judges. Before leaving office, Adams had quickly named his judicial appointees — the famous "midnight judges." Enraged, one Republican from Kentucky called Adams's tactics "the last effort of the most wicked, insidious and turbulent faction that ever disgraced our political annals."

Jefferson took the oath of office on March 4, 1801. Without precedents and with passions running high, the Presidency and the Congress passed for the first time from one party to another. And some citizens were afraid that the judiciary was in mortal danger.

Soon after his Inauguration, Jefferson wrote that the Federalists had "retreated into the judiciary as a stronghold, the tenure of which renders it difficult to dislodge them."

But the Republicans repealed the lame-duck Judiciary Act, while horrified Federalists lamented, "the Constitution has received a wound it cannot long survive," and "the angels of destruction are making haste."

Meanwhile William Marbury of Washington went straight to the Supreme Court, looking for a commission as justice of the peace for the District of Columbia. Adams had appointed 42 such officials, the Senate frantically confirmed them, and Adams sat at his desk until late on his last night in office to sign their commissions. Then a messenger rushed the papers to the State Department for Marshall, still acting as Secretary, to affix the great seal of the United States. In the confusion some of the commissions went undelivered, Marbury's among them.

In December 1801, Marbury applied to the Court for a writ of mandamus ordering James Madison, the new Secretary of State, to give him his commission. The Court agreed to hear the case — a bold action, for rumor was saying the Justices "must fall" by impeachment. Then the Republican Congress repealed the Judiciary Act of 1801, which mandated sessions in December and June, and eliminated the August Term of the Court. As a result, the Justices did not sit from April 1802 to February 1803, when they heard argument in Marbury's case.

If the Court ordered Madison to produce that commission, he could simply ignore the order; President Jefferson would defend him. If the Court denied Marbury's right to his commission, Jefferson could claim a party victory. Either way the Court's prestige — and perhaps its members — must fall.

Marshall found an escape from his dilemma. He announced the decision on February 24, and proclaimed the most distinctive power of the Supreme Court, the power to declare an Act of Congress unconstitutional. Point by point he analyzed the case. Did Marbury have a legal right to his commission? Yes. Would a writ of mandamus enforce his right? Yes. Could the Court issue the writ? No.

Congress had said it could, in the Judiciary Act of 1789. It had given the Court an original jurisdiction in such cases — power to try them for the first time. But, said Marshall triumphantly, the Constitution defined the Court's original jurisdiction and Congress could not change it by law. Therefore that section of the law was void. Marshall declared for all time the supremacy of the Constitution over any conflicting law. Other judges had said as much, but Marshall added: "It is, emphatically, the province and duty of the judicial department, to say what the law is."

In renouncing a minor jurisdiction he asserted a great one, perhaps the greatest in the long annals of the law. The Supreme Court's power as interpreter of the Constitution rests on this precedent to this day.

A few days after the decision in *Marbury v. Madison*, the Court again amazed the Jeffersonians. They had passed a Judiciary Act in Congress, restoring the Court's old membership and circuit duties. The Justices ruled that it was constitutional and for a while talk of impeachment died down.



The Justices are seated on the dais on the far side of the chamber in this evening session of the House of Representatives, c. 1822. The Corcoran Gallery of Art.

"Oyez! Oyez! Oyez! . . . the grand inquest of the nation is exhibiting to the Senate . . . articles of impeachment against Samuel Chase, Associate Justice. . . ." The Supreme Court was on trial; if Chase fell, Marshall might be next.

Feared as a "ringleader of mobs, a foul mouthed and inflaming son of discord" when he led the Sons of Liberty in 1765, Chase was "forever getting into some . . . unnecessary squabble" as a Judge 40 years later. He campaigned openly for Adams. On circuit he tried Republicans without mercy. In 1803 he told a Baltimore grand jury that "modern doctrines" of "equal liberty and equal rights" were sinking the Constitution "into a mobocracy, the worst of all popular governments."

His enemies saw their chance. The House of Representatives voted to bring him before the Senate for trial, charging that his partisan behavior–in and out of court–amounted to "High Crimes and Misdemeanors" under the Constitution.

Vice President Aaron Burr had arranged a special gallery for ladies when the "grand inquest" opened on February 4, 1805. Burr had killed Alexander Hamilton in a duel and New Jersey wanted him for murder, but he presided sternly, rebuking Senators who were eating cake and apples. "We are indeed fallen on evil times," said one. "The high office of President is filled by an *infidel*; that of Vice-President by a *murderer*."

Representative John Randolph of Roanoke, the brilliant, erratic Virginian, fought to prove Chase unfit for the Court. Luther Martin of Maryland, who could hold more law and more brandy than any other attorney of his time, led Chase's defense. Marshall and 51 other witnesses testified.

Amid "a vast concourse of people . . . and great solemnity," the Senators acquitted Chase on March 1. Jefferson called impeachment of Justices "a farce which will not be tried again," and he was right.

For all his differences with the Republicans, John Marshall was no son of discord. Born in a log cabin near Germantown, Virginia, in 1755, he grew up near the frontier, with some tutoring for an education. He fought as an officer in the Revolution, almost freezing at Valley Forge.

After the war he practiced law, and became the leading Federalist of his state. As a young attorney and an aging Chief Justice, he was sloppily dressed and wonderfully informal out of court, fond of spending hours with friends in taverns, law offices, and drawing rooms. Even in his sixties, Marshall was still one of the best quoits players in Virginia.

When the Court met in Washington, the Justices stayed in a boardinghouse – – the trip was too long, the session too short for their wives to accompany them — and Marshall's geniality brightened their off-duty hours.

A disheveled Chief Justice Marshall (in torn breeches, at left) was elegant in speech as he chatted in taverns while riding circuit. Library of Congress.

Justice Joseph Story handed down a tale still told at the Court. On rainy days the Judges would enliven their conferences with wine; on other days Marshall might say, "Brother Story, step to the window and see if it doesn't look like rain." If the sun was shining, Marshall would order wine anyway, since "our jurisdiction is so vast that it might be raining somewhere."

Congress expanded that domain in 1807, creating a new circuit for Kentucky, Tennessee, and Ohio, and adding a seat to the Court. Jefferson appointed Thomas Todd, who had helped create the State of Kentucky out of his native Virginia.

Life in Washington went on peacefully for months during the War of 1812. "Mrs. Madison and a train of ladies" visited the Supreme Court one day in early 1814, just as William Pinkney of Maryland, one of the country's most celebrated lawyers, was ending an argument; "he recommenced, went over the same ground, using fewer arguments, but scattering more flowers."

Rudely interrupting such diversions, the British arrived in August and burned the Capitol. Congress found shelter in the makeshift "Brick Capitol" where the Supreme Court building stands today.

The Court, forced to shift for itself, met for a while in a house on Pennsylvania Avenue. Then it got temporary space in the Capitol. In 1819 it returned to its own semicircular room below the Senate Chamber.

"A stranger might traverse the dark avenues of the Capitol for a week," reported a visitor from New York, "without finding the remote corner in which Justice is administered to the American Republic. . . ."

Strangers traversing the Republic had other troubles. "I passed away my 20-dollar note of the rotten bank of Harmony, Pennsylvania, for five dollars only," a disgusted traveler complained at Vincennes, Indiana. State-chartered banks, private banks, towns, sawmills, counterfeiters — all issued notes freely. "Engravings," a Scotsman called them; no law required anyone to accept them at face value as legal tender. Everyone suffered from this chaos.

Congress had chartered the second Bank of the United States in 1816 to establish a sound national currency, to issue notes it would redeem in gold or silver. By law, the government owned a fifth of the Bank's stock and named a fifth of its directors; private investors had the rest. Unscrupulous characters got control of the Bank and mismanaged its affairs.

In the South and West, where "engravings" flourished, the Bank's branches made bad loans until the home office at Philadelphia issued new orders in August 1818: Call in those loans. Don't accept any payments but gold and silver or our own notes. Panic spread. Local banks demanded payment on their own loans, and refused to extend credit; people scrambled for money they couldn't find; land went for a song at sheriffs' auctions; shops closed; men who lost their last five dollars said bitterly, "the Bank's saved and the people are ruined."

State legislators decided to drive the Bank's branches out of their domain. Maryland passed a tax law giving the Baltimore branch its choice: pay up handsomely or give up and leave. The branch ignored it. Maryland sued the cashier, James McCulloch, and won in its own courts. McCulloch took his case- – that is, the Bank's- – to the Supreme Court where argument began on February 22, 1819.

Splendid in his blue coat with big brass buttons, Daniel Webster spoke for the Bank- – Congress has power to charter it; Maryland has no power to tax it, for the power to tax involves

a power to destroy; and never under the Constitution, may the states tax the Union into destruction.

The Supreme Court affirmed the legitimacy of the Bank of the United States (depicted here as a large woman vomiting coins to state banks) when Maryland mounted a challenge in 1819. Library of Congress

Luther Martin, Maryland's Attorney General, argued for his state. Where does the Constitution say Congress has power to create a national bank? He asked. Nowhere! He thundered. It lists specific powers, and making banks is not one of them. Mr. Webster says it *implies* such a power. Nonsense!

For the Court, Marshall defined the controversy: "a sovereign state denies the obligation, of a law . . . of the Union." An "awful" question, but "it must be decided peacefully." Because the Union is "emphatically, and truly, a government of the people," it must prevail over the states. To specific powers of Congress, the Constitution adds powers to make all laws "necessary and proper" for carrying them into effect.

Marshall invoked "letter and spirit" to give that clause its meaning: "Let the end be legitimate, let it be within the scope of the Constitution," and Congress may use "all means which are appropriate . . . which are not prohibited." So the Bank was constitutional; no state might tax it. Maryland's law was "unconstitutional and void."

The Court's ruling settled the conflict of law but not the political fight over the Bank's power and states' rights. Virginia's legislature made a "most solemn protest" against the decision in *McCulloch v. Maryland*; Ohio officials took money by force from one Bank branch. Not until President Andrew Jackson vetoed the Bank's recharter did that controversy die down.

States' rights against the powers of the Union – the issue became more explosive than ever when the country faced its first great quarrel over slavery, in 1819. Southerners in Congress threatened secession and civil war; a Georgian foresaw "our houses wrapt in flames." When the House was discussing a bill to make Missouri Territory a state, a New York Representative suggested that Congress forbid slavery there. Southerners warned, "the Union will be dissolved." The reply flashed, "let it be so!"

For months the furious debate went on. Then, in February 1820, Senator Jesse B. Thomas of Illinois offered a compromise: Maine to be a free state, Missouri a slave state, and the rest of the Louisiana Purchase north of 36′ 30′ free soil forever. Henry Clay supported the plan; early in March, President James Monroe signed the laws to carry it out. Apparently the crisis was over.

But trouble flared again as Congress debated Missouri's proposed constitution and states' rights in general, and what had been a trivial criminal case quickly became a rallying point for states' rights advocates and proponents of secession. In Norfolk, Virginia, P. J. and M. J. Cohen were charged with violating a state law by selling six tickets in a lottery established by Congress to pay for improvements in the District of Columbia. The law forbade all lotteries except the state's own. A Norfolk court convicted the Cohens; they turned to the Supreme Court, pointing out that their lottery tickets were authorized by federal law.

Virginia rose in wrath. Her General Assembly declared that the Court had no jurisdiction. Her lawyers fought the Cohens' request for a hearing. They warned the Supreme Court against "exciting the hostility of the state governments," which would decide how long the Union should endure.

Then, in March 1821, a second compromise was reached, bringing Missouri into the Union five months later as a slave state, but with guarantees designed to protect the rights of free Negroes and mulattoes. The issues of slavery and secession subsided, eventually to be resolved in blood.

Undeterred by the impassioned controversy, Marshall gave an uncompromising ruling in Cohens v. Virginia. The Court would hear the case; it existed to resolve such "clashings" of state and Union power, to keep the national government from becoming "a mere shadow." Insisting on the power of his Court, the Chief Justice boldly met the threat of secession and the claims of

state sovereignty; he upheld the Union as the supreme government of the whole American people.

Then the Court heard argument on the merits of the case, and affirmed the sentence of the Norfolk court. The Cohens lost $100 — their fine — and costs.

Southerners fumed at Marshall's stand in the Cohens' case. But in 1824, for once, a Marshall ruling met popular acclaim. Huzzas from the wharves greeted the steamboat *United States* as she chuffed triumphantly into New York harbor, her crew firing a salute, her passengers "exulting in the decision of the United States Supreme Court." That case was *Gibbons v. Ogden*.

Robert Fulton successfully demonstrated a steam-powered vessel on the Seine at Paris in 1803. With his partner, Robert R. Livingston, he held an exclusive right from New York's legislature to run steamboats on state waters, including New York harbor and the Hudson River. In 1807 his steamer splashed up the Hudson to Albany; soon money flowed into their pockets. Anyone else who wanted to run steamboats on those waters had to pay them for the privilege; some Albany men attacked the monopoly in state courts, and lost.

In 1811 the territorial legislature in New Orleans gave the partners a monopoly on the Mississippi. Now they controlled the two greatest ports in the country.

New Jersey passed a law allowing its citizens to seize steamboats owned by New Yorkers; other states enacted monopolies and countermeasures until the innocent side-wheeler was turning into a battleship.

Meanwhile three men of property went into business, then into rages, then into court. Robert Livingston's brother John bought rights in New York Bay; then he sublet his waters to former Governor Aaron Ogden of New Jersey, a quarrelsome lawyer. Ogden took a partner, Thomas Gibbons, equally stubborn and hot tempered.

Under an old Act of Congress, Gibbons had licensed two steamboats for the national coasting trade, and now he invoked this federal law to get a suit against Ogden before the Supreme Court.

The once obscure Supreme Court was now a focus of public interest. Ladies crowded lawyers to hear the case. Daniel Webster spoke for Gibbons on February 4, 1824; Ogden's attorneys quoted established law and precedents for two days. But Marshall avoided shoals of precedents and veering winds of state laws to set his course by the Constitution – the clause giving

Congress power to regulate commerce among the states. For the first time the Court defined these words; in them Marshall found vast new currents of national strength.

More than buying and selling, he proclaimed, commerce is intercourse among nations and states; it includes navigation. For all this rich activity Congress may make rules; if its rules collide with state restrictions the latter must sink. New York's law went down before an Act of Congress.

State monopolies could not scuttle ships "propelled by the agency of fire." Steamboats would be as free as vessels "wafted on their voyage by the winds."

With monopolies swept away, steamboat trade spread fast and freely. Soon, by that precedent, steam cars on rails spread across state lines, across the continent.

Marshall watched, as changes came and went. "We must never forget," he said, "that it is a constitution we are expounding . . . a constitution, intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." His actions made his words unforgettable.

When Marshall gave the Presidential oath to his cousin Thomas Jefferson in 1801, the Supreme Court was a fortress under attack. It had become a shrine when he gave the oath to Andrew Jackson in 1829.

The Court's ruling settled the conflict of law but not the political fight over the Bank's power and states' rights. Virginia's legislature made a "most solemn protest" against the decision in *McCulloch v. Maryland*; Ohio officials took money by force from one Bank branch. Not until President Andrew Jackson vetoed the Bank's recharter did that controversy die down.

New crises arose during Jackson's Administration. Marshall carried on his work, concerned for the country's future but not for his failing health. Jay had resigned after five years, Ellsworth after four; Marshall served from 1801 until his death in 1835. When he took the judicial oath the public hardly noticed; when he died the Nation mourned him. "There was something irresistibly winning about him," said the *Richmond Enquirer* and *Niles' Register*, which had long denounced his decisions, said, "Next to Washington, only, did he possess the reverence and homage of the heart of the American people."

Generated with Reader Mode

🔗 https://supremecourthistory.org/history-of-the-courts/taney-court-1836-1864/

🕐 11 min read

# History of the Court: The Taney Court, 1836-1864 | Supreme Court Historical Society

About Marshall's successor, a New York journal sputtered: "The pure ermine of the Supreme Court is sullied by the appointment of that political hack, Roger B. Taney." Daniel Webster confided, "Judge Story . . . thinks the Supreme Court is *gone* and I think so too." The Senate debated the nomination for almost three months.

Born in Maryland in 1777, Taney attended Dickinson College, read law, and plunged into Federalist politics. While other lawyers took pride in oratory, he spoke simply in low tones that convinced juries.

Invoking freedom of speech, Taney won acquittal in 1819 for a Methodist preacher whose sermon on national sins provoked the charge of trying to stir up slave rebellion.

Suspicious of the Bank of the United States, Taney campaigned for Andrew Jackson. In 1831 President Jackson wrote, "I have appointed Mr. Tauney atto. Genl." (His spelling gives the right pronunciation.) Taney supplied legal weapons in Jackson's war with the Bank, when passion ran so high that Vice President Martin Van Buren wore pistols to preside in the Senate.

Presiding over the Supreme Court for the first time, in January 1837, Taney wore plain democratic trousers, not knee breeches, under his robe. The Court was entering a new era. A law passed in March added two new judicial circuits in the southwest and two Associates Justices. The Court became unmistakably Jacksonian; conservatives dreaded what it might do to property.



The Charles Bridge linking Boston with Cambridge, Massachusetts became subject of a landmark case establishing modern contract law. Library of Congress

But property survived. Its rights were "sacredly guarded," Taney wrote in the *Charles River Bridge* case, but "we must not forget that the community also have rights, and that the happiness and well being of every citizen depends on their faithful preservation." He interpreted corporation charters more strictly, state powers more generously, than Marshall had.

Meanwhile, a new agitation over human rights was growing. If it went on, wrote a Georgia planter, "we will be compelled to arm our Militia and shoot down our property in the field . . . tell the agitators we had rather fight them than our own negroes, and that we will do it too. . . ."

In 1846 the United States and Mexico went to war. A suit filed in a Missouri court by a Negro named Dred Scott went unnoticed. Twelve years earlier, John Emerson, an Army surgeon, had taken his slave Scott from Missouri to Illinois, where the Northwest Ordinance and state law forbade slavery. Then he had taken Scott to Fort Snelling, a frontier Army post in territory where the Missouri Compromise banned slavery forever. In 1838 he had taken Scott back to Missouri. Emerson died, and Scott sued the widow, claiming that this sojourn on free soil had made him a free man. In 1850 the Missouri court declared him free.

Mrs. Emerson appealed. The state's highest court ruled in 1852 that, free or not on free soil, Scott became a slave under state law when he went back to St. Louis.

Scott's was becoming a test case. To get it into a federal court—because federal courts have jurisdiction in suits between citizens of different states—title to Scott passed to Mrs. Emerson's

brother, John F. A. Sanford of New York (misspelled "Sandford" in the records).



Dred Scott. Library of Congress

Claiming Missouri citizenship, Scott sued Sanford for his freedom in the federal court in St. Louis. Sanford's lawyers argued that Scott could not be a citizen because he was a slave and a Negro. The court ruled against Scott on May 15, 1854.

Congress passed the Kansas-Nebraska Act two weeks later, opening areas of the West to slavery where it had been banned by the Missouri Compromise. Furious northerners burned its author, Stephen A. Douglas, in effigy. On July 4, abolitionist William Lloyd Garrison publicly burned a copy of the Constitution, crying, "So perish all compromises with tyranny."

Fighting broke out in Kansas and made the expansion of slavery the issue in the 1856 Presidential campaign, won by James Buchanan. The Supreme Court heard argument in *Dred Scott. v. Sandford* in February 1856, reached the end of its term, then heard argument again in December.

By then the whole country had heard of Dred Scott. "The Court, in trying this case, is itself on trial," said the *New York Courier*.

In February 1857, a majority of the Justices agreed to follow precedent and say that the ruling of the highest state court was final—that Scott was a slave under state law. Such a narrow finding would leave unresolved two dangerously controversial issues: Whether or not a free Negro

might be a citizen of the United States, and whether or not the 1820 Missouri Compromise was constitutional.

When it was learned that two dissenting Justices planned to argue that Congress in fact had the power to regulate slavery in the territories, that under the Missouri Compromise Scott was a free man and a citizen, the majority decided to enlarge the scope of the decision and deny the power of Congress. Some members hoped the Court's opinion would resolve the question, win acceptance, and possibly save the Union.

Newly elected President James Buchanan may have shared that hope; in his Inaugural Address on March 4, he promised that "in common with all good citizens" he would "cheerfully submit" to the Court's decision.

Two days later the Justices began to deliver eight separate opinions. The majority ruled that Scott was still a slave. Three, including Taney, said no Negro, even if free, could hold citizenship in the United States.

And for the first time since 1803, the Court held an Act of Congress null and void. Under the Constitution, it announced, Congress had no power to limit the expansion of slavery by law, as the Missouri Compromise of 1820 had done.

Hopes that the decision would temper the confrontation were shattered by attacks on the Court from the abolitionist press and antislavery leaders—attacks that have never been surpassed in bitterness. Almost unnoticed, Scott's owner set him free. Before the case was decided, Sandford had gone insane; before the slavery question was settled, more than 600,000 Americans would lose their lives in civil war.

"Have we ever had any peace on this slavery question?" asked Abraham Lincoln. The Illinois crowd yelled "No!" It was 1858; Lincoln was challenging Stephen A. Douglas for a Senate seat — challenging the Supreme Court's ruling on slavery.

Douglas defended the decision in Dred Scott's case as the pronouncement of "the highest tribunal on earth," in spite of his own objections to it. "From that decision there is no appeal this side of Heaven," he cried.

One decision settles one case, retorted Lincoln; it does not even settle the law, still less the future of the country.

Douglas won the Senate seat; in 1860 he lost the race for the Presidency, and the Republicans came to power with Lincoln.

Chief Justice Taney administered the oath of office to Lincoln on March 4, 1861, and heard him disclaim "any assault upon the Court." But Lincoln warned solemnly: "if the policy of the Government, upon vital questions affecting the whole people, is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made, in ordinary litigation . . . the people will have ceased to be their own rulers. . . ."

That day the first banner of the Confederate States of America flew over the statehouse at Montgomery, Alabama.

Secession divided the Supreme Court. Justice John A. Campbell, who thought disunion wrong, resigned and went sadly home to Alabama. Justice James Moore Wayne of Georgia, last survivor of Marshall's Court, remained; until his death in 1867, he voted to sustain all the war measures the Court passed judgment on.

Loyal Unionists guard the provost marshal's office against Southern sympathizers during the Baltimore Riots, 1861. Library of Congress

In Maryland, part of Taney's circuit, many favored the Union, some the South. Washington's only railroad to the north ran through Baltimore, where an angry crowd mobbed troops hurrying to defend the capital. Lincoln told the Army to suspend the writ of habeas corpus and establish martial rule, if necessary, to keep Maryland safe.

The military jailed citizens on mere suspicion; troops arrested John Merryman for taking part in the Baltimore riot and blowing up railroad bridges. Locked up in Fort McHenry, he applied for a writ of habeas corpus—a court order for proof that a prisoner is lawfully confined.

Only in "Rebellion or Invasion" when "the public safety may require it" may the privilege of habeas corpus be suspended, says the Constitution.

Hurrying to Baltimore, Chief Justice Taney issued a writ to Gen. George Cadwalader: Bring Merryman to court and explain his arrest. The general sent a letter—he had to consult the President. Taney ordered a marshal to seize the general, but a sentry barred the marshal from Fort McHenry. The Chief Justice challenged the President's right to take legislative and judicial power, calling on him to uphold the law and the courts.

Lincoln did not reply; Congress upheld him. But when the emergency had passed, the government quietly brought Merryman's case to a federal court; later still, it quietly let him go free.

Resignation and death left three seats vacant at the Supreme Court. Lincoln appointed Noah H. Swayne of Ohio, Samuel F. Miller of Iowa, and his old friend from Illinois, David Davis. But no one knew what the Court would do when it heard the Prize Cases in 1863.

Before calling Congress into special session, Lincoln had authorized martial rule in Maryland, called for volunteers, pledged government credit for huge sums, and proclaimed a blockade of southern ports. To meet the crisis of war, the President swept into the realm of legislative power like an invading general. A legal battle over four merchant ships seized under Lincoln's blockade orders tested his actions before the Supreme Court.

The owners brought suit for the vessels and cargo, arguing that war alone warrants a blockade and only Congress may declare war; they denied that Lincoln's emergency powers had any reality in constitutional law.

If the Court upheld the blockade as a legal war measure, England and France might recognize the Confederacy; if it did not, the government would have to pay huge damages for captured ships, and other war measures would be in question. Either decision would endanger the Union.

Justice Robert C. Grier spoke for himself, Wayne, and Lincoln's three appointees: The President had to meet the war as "it presented itself, without waiting for Congress to baptize it with a name"; and rebellion did not make the South a sovereign nation. Four dissenters said the conflict was the President's "personal war" until Congress recognized the insurrection on July 13, 1861. But the prairie lawyer had won his case.

Chief Justice Taney died, aged 87, in October 1864. Lincoln's Attorney General Edward Bates wrote that his "great error" in the Dred Scott case should not forever "tarnish his otherwise well earned fame." And not long after Taney's death, victory for the Union brought vindication of his defiant stand for the rule of law.