George M. Lee (SBN 172982)
    gml@seilerepstein.com
**Seiler Epstein LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

John W. Dillon (SBN 296788)
    jdillon@dillonlawgp.com
**Dillon Law Group APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al., | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **Plaintiffs' Response to Defendants' Supplemental Brief re *New York State Rifle & Pistol Ass'n v. Bruen* [ECF 137]** |
| vs. | |
| ROB BONTA, in his official capacity as Attorney General of California, et al., | Hon. Roger T. Benitez |
| Defendants. | |

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  THE PROPER STANDARD .......................................................................... 2

III.  THE AWCA PROHIBITS CONDUCT PROTECTED BY THE PLAIN TEXT OF THE
SECOND AMENDMENT ............................................................................... 3

    A.  ALL OF THE FIREARMS IN QUESTION ARE "ARMS" PROTECTED BY THE
SECOND AMENDMENT'S PLAIN TEXT. ............................................ 3

IV.  THE FIREARMS BANNED AS ASSAULT WEAPONS UNDER THE AWCA
ARE IN COMMON USE FOR LAWFUL PURPOSES ...................................... 6

V.  THE STATE HAS FAILED TO SHOW ANY RELEVANT HISTORICAL TRADITION
TO JUSTIFY ITS ASSAULT WEAPONS BAN .............................................. 8

    A.  THE STATE FINDS NO FOUNDING-ERA ANALOGUE RELEVANT TO A
BAN ON A CLASS OF FIREARMS. ...................................................... 9

    B.  ANTEBELLUM AND POSTBELLUM HISTORY, AND RECONSTRUCTION ........... 12

    C.  TWENTIETH CENTURY HISTORY .................................................... 19

    D.  THE AWCA DOES NOT ADDRESS "UNPRECEDENTED SOCIETAL
CONCERNS" OR "DRAMATIC TECHNOLOGICAL CHANGES" IN FIREARMS...... 21

VI.  OBJECTIONS TO DEFENDANTS' EVIDENCE AND REQUEST FOR DISCOVERY ........... 23

VII.  CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................................ 3, 5, 6, 7

*Dimick v. Schiedt*, 293 U.S. 474 (1935) ................................................ 9

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................ *passim*

*Funk v. United States*, 290 U.S. 371 (1933) ................................................ 9

*Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960 (2019) ................................................ 13

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ............ 18

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022),
   *opinion vacated on reh'g*, 47 F.4th 1124 (Mem) (Sep. 7, 2022) ................................ 7

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................ 17, 18

*Miller v. Bonta*, 542 F.Supp.3d 1009 (S.D. Cal. 2021) ................................................ 6, 22, 23

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ................................................ 23

*New York State Rifle & Pistol Ass'n v. Bruen,* 142 S.Ct. 2111 (2022) ................ *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Beach*,
   354 F. Supp.3d 143 (N.D.N.Y. 2018) ................................................ 24

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007),
   *aff'd sub nom. Heller*, 554 U.S. 570 ................................................ 21

*Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) ................................................ 8

*Rocky Mountain Gun Owners v. Town of Superior, Colo.*,
   1:22-CV-01685, Doc. 18 at 9 (D. Colo. July 22, 2022) ................................................ 7

*Staples v. United States*, 511 U.S. 600, 612 (1994) ................................................ 7

**Constitutional Provisions**

U.S. Const., Amend. II ................................................ *passim*

U.S. Const., Amend. XIV ................................................ 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Statutes**

1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the
  Prudent Storage of Gun Powder within the Town of Boston, § 2 ........................... 10

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the
  Unwarrantable and too Prevalent use of Deadly Weapons, § 4 ............................... 13

1865 Miss. Laws 166 (Nov. 29, 1865) ........................................................................ 13

Cal. Fish & G. Code § 2007 ...................................................................................... 11

Cal. Pen. Code § 30515(a) .......................................................................................... 5

**Other Authorities**

Charles Lane, *The Day Freedom Died: The Colfax Massacre,*
  *the Supreme Court, and the Betrayal of Reconstruction* (1st ed. 2008).................. 17

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and*
  *Injuries from Mass Shootings Through Restrictions on Assault Weapons*
  *and Other High-Capacity Semiautomatic Firearms*, 19 CRIM'Y & PUB.
  POL'Y 147 (2020) ................................................................................................... 7

David B. Kopel, *The History of Firearm Magazines and Magazine*
  *Prohibitions*, 78 ALB. L. REV. 849 (2015) ....................................................... 15, 16

Greg Lee Carter, *Guns in American Society: An Encyclopedia of History,*
  *Politics, Culture, and the Law* (2002) ................................................................... 20

John Keegan, *Battle at Sea* (2d Pimlico ed., 2004) ................................................... 10

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment*
  (3d ed. 2022) ...................................................................................................... 13, 16

Norm Flayderman, *The Flayderman's Guide to Antique American*
  *Firearms… and their Values*. (9th ed. 2019) ........................................................ 15

# I.   INTRODUCTION

The State has assembled an array of historians, academics, and social scientists, in an all-hands quest to find some historical support for its assault weapons ban. And yet, despite this effort, none of their experts or scholars was able to cite to even *one* founding-era law, regulation, or practice showing that the founders endorsed a prohibition on the possession of arms based upon their features or capacities. That is because they did not.

All the King's Horses could not put together the historical analogues demanded by *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S.Ct. 2111 (2022). This dearth of constitutionally relevant analogues should end the State's assault weapons law, once and for all.

Here, the State disregards the clear standard for considering Second Amendment challenges affirmed in *Bruen*, and attempts to advance entirely new standards, in defiance to controlling Supreme Court authority in *District of Columbia v. Heller*, 554 U.S. 570 (2008), affirmed in *Bruen*. The State's efforts fail in many respects.

First, the State starts with the incorrect premise that *Bruen* somehow "fundamentally altered the legal standard for evaluating Second Amendment challenges to firearms regulations." (Def. Brief at 1:3-4).

Second, the State attempts to relitigate the meaning of its own evidence, when it claims that its ban does not prohibit "arms" per se, but is now some sort of benign ban on accessories. Then the State attempts to relitigate this Court's prior findings under the dangerous *and* unusual test, by literally overwriting the Supreme Court, to manufacture a dangerous *or* unusual test, which is glaringly incorrect.

Third, the State attempts to salvage yet another interest-balancing test in the aftermath of *Bruen*, by somehow suggesting that its newly rebranded "accessories ban" does not actually burden the right to self-defense.

Ultimately, the State has filed an oversized, 77-page brief that cross-references

1   thousands of pages of purportedly new evidence in the form of declarations and

2   exhibits. Plaintiffs will not fully respond to each claim and evidentiary reference due

3   to page and timing constraints. However, in summary, the State's new arguments and

4   evidence to support their unconstitutional ban on "assault weapons" should be rejected

5   outright as constitutionally irrelevant, unsupported, and evidence of the type that was

6   expressly rejected in *Bruen*.

7         For the reasons which follow, Plaintiffs respectfully request that the Court

8   reject the State's new claims and evidence, and find that its "assault weapons" ban is

9   unconstitutional under the Second Amendment.

10

11                  **II.**     **THE PROPER STANDARD**

12         In *Bruen*, the Court reasserted principles it already applied in *Heller*. Despite

13   the State's mischaracterization of the legal standard in *Bruen*, there is no real dispute

14   over the proper approach to evaluating Second Amendment claims. The Court must

15   first determine whether "the Second Amendment's plain text covers an individual's

16   conduct" that is being restricted by a challenged law or policy. *Bruen*, 142 S.Ct. at

17   2129–30. If the answer is yes, the Court should find under *Bruen* that the conduct is

18   presumptively protected, and the burden then falls on the government to justify the

19   challenged restriction by "demonstrating that it is consistent with the Nation's

20   historical tradition of firearm regulation." *Id*., at 2130. If the government cannot meet

21   its burden, the restriction is unconstitutional — full stop. No interest-balancing or

22   two-prong scrutiny analysis can or should be conducted. *Id*., at 2127.

23         *Bruen* clarified how the proper Second Amendment legal standard applies

24   specifically to firearms prohibitions, such as California's ban on the purchase,

25   possession, use, and transfer of certain types of semiautomatic firearms. Considering

26   the Second Amendment's text, the Court affirmed that "the Second Amendment

27   extends, prima facie, to *all instruments* that constitute bearable arms, even those that

28   were not in existence at the time of the founding." *Bruen*, 142 S.Ct. at 2132 (emphasis

added). Applying the proper historical inquiry, the Court in *Bruen* determined that this prima facie protection can be overcome only by a showing that any banned arms are both "dangerous and unusual" weapons at the time the analysis is being conducted. *Id*., at 2128. As stated in Plaintiffs' prior briefing [ECF Nos. 130, 136], this is the only relevant test— and this Court already has found that the firearms the State identifies as "assault weapons" are *not* both dangerous and unusual because they are in common use for lawful purposes.

### III.   THE AWCA PROHIBITS CONDUCT PROTECTED BY THE PLAIN TEXT OF THE SECOND AMENDMENT

**A.   ALL OF THE FIREARMS IN QUESTION ARE "ARMS" PROTECTED BY THE SECOND AMENDMENT'S PLAIN TEXT.**

The challenged law bans semiautomatic centerfire firearms based on certain characteristics those firearms have—for example, a rifle is banned if it can accept a detachable magazine and has a folding stock or flash hider; a pistol is banned if it has a threaded barrel. These, along with all the other firearms prohibited in the AWCA, are "arms" within the meaning of the Second Amendment's plain text, which presumptively protects Americans' rights to possess "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. It thus "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns)).

A ban on the *ownership* of a class of firearms, *ipso facto*, prohibits conduct protected by the plain text of the Second Amendment, which provides that the right to *keep* and *bear* arms shall not be infringed.

The State now pivots, rebranding its law as merely an accessories ban. The State claims that "the accessories or firearms configurations regulated under the AWCA are not suitable for self defense," nor are they "commonly used or needed for

self-defense." (Def. Brief at p. 39). But first, this bald assertion was belied by overwhelming evidence at trial, which the State did not reasonably dispute. For example, it was not disputed that certain prohibited features such as the pistol grip made long arms more accurate and controllable. "[A]ccuracy is very important for self-defense because, unlike a criminal using a firearm, the civilian or the police officer, either one is accountable for every round they fire. And any round that misses the attacker, who is attacking the civilian or the police officer, if it doesn't hit what they intended to hit, the attacker, then by definition it hits something they didn't intend to hit. That may be an innocent bystander. [¶] So the accomplishment of a good level of accuracy is paramount in civilian self-defense training with firearms, and the AR-15 permits that." (Testimony of Emanuel Kapelsohn, Tx. of 10/19/20 hearing at 27:24 – 28:9). And the State's own expert, when asked by this Court whether a self-defense weapon should be more accurate or less accurate, responded: "Accuracy — if you're firing a weapon for self-defense, accuracy would be ideal." (Testimony of Blake Graham, Tx. of 10/19/20 at 134:15-18).

Moreover, the State's beliefs about the "suitability" or "need" of certain firearms does not change the fact that the firearms in question — in the very configurations that the State prohibits — are commonly owned, bearable arms that the American people overwhelmingly favor and have a right to possess. When *Heller* struck down the District of Columbia's thirty-year ban on handguns, it did so noting that such a ban "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose[,]" *Heller*, 554 U.S. at 628, which was constitutionally untenable. State officials' beliefs and opinions are not entitled to deference. On the other hand, the choices of millions of Americans do "demand[] our unqualified deference." *Bruen*, 142 S.Ct. at 2131. Therefore, the State's arguments that the prohibited firearms are "not suitable for self-defense," nor "commonly used or needed for self-defense" are belied by the evidence, and should be rejected.

1    The State's new claim that the "combat oriented accessories and

2    configurations" are not "arms" is patently absurd. First, this Court only need to look at

3    the provisions challenged in this case. The AWCA prohibits semiautomatic firearms.

4    It does not prohibit the possession of individual features or accessories. For example,

5    Plaintiffs offered an example of a birdcage-style flash hider for an AR-15 firearm,

6    available for purchase online from an online retailer. (Plaintiffs' Trial Exh. 001-14).

7    This is a completely legal, inert item to possess. One cannot be arrested for merely

8    having a flash hider in his pocket. One can, however, be arrested and subject to

9    prosecution if the flash hider is attached to a centerfire, semiautomatic rifle that does

10   not have a fixed magazine, even in the confines of his home. Pen. Code §

11   30515(a)(1)(E). The statute prohibits "arms" within the meaning of the Second

12   Amendment's plain text, which presumptively protects all Americans' rights to

13   possess "all instruments that constitute bearable arms, even those that were not in

14   existence at the time of the founding." *Heller*, 554 U.S. at 582; *accord Caetano*, 577

15   U.S. at 411.

16   The State contradicts its own contention in reference to the legislative reasoning

17   for imposing the "feature based" ban: "[T]he Legislature adopted this alternative

18   definition to address the proliferation of "copycat" weapons that were "substantially

19   similar to weapons on the prohibited list but differ[ent] in some insignificant way,

20   perhaps only the name of the weapon, thereby defeating the intent of the ban." (Def.

21   Brief, p. 8). In the Legislature's own words, the purpose and intent of the AWCA was

22   to ban a broad category of *firearms*. The features-based definition was an attempt to

23   avoid having to individually identify each prohibited firearm by its make and model.

24   By identifying certain features, the AWCA prohibitions were able to be extended to

25   cover a much more expansive list of firearms. As such, there is no merit to the State's

26   new claim that the AWCA is merely a "combat oriented accessory" ban entirely

27   distinct from a ban on firearms.

28

1   Unquestionably, the firearms California attempts to ban are commonly owned,
2   bearable "arms" under the plain text of the Second Amendment. As such, they are
3   presumptively protected unless the State can justify its ban. With respect to history,
4   the Court indicated that the historical record demonstrates that this prima facie
5   protection can be overcome only by a showing that any banned arms are "dangerous
6   and unusual weapons" at the time the analysis is being conducted; it follows that arms
7   that are "in common use today" are constitutionally protected and cannot be banned.
8   *Bruen*, 142 S.Ct. at 2143.

### IV.   THE FIREARMS BANNED AS ASSAULT WEAPONS UNDER THE AWCA ARE IN COMMON USE FOR LAWFUL PURPOSES

11   As previously noted, this Court's previously-published decision was made
12   under two separate and discrete tests. *See*, *Miller v. Bonta*, 542 F.Supp.3d 1009, 1021
13   (S.D. Cal. 2021). The Court was acutely aware of the segregable nature between the
14   *Heller* test—particularly as applied to categorical firearm bans—and the former two-
15   step, interest-balancing approach, which no longer applies. As Plaintiffs have already
16   presented overwhelming evidence as to the commonality of semi-automatic firearms
17   classifiable as "assault weapons" under California law, the Court's prior findings as to
18   the commonality of assault weapons in California, and the rest of the nation, should
19   not be relitigated or revisited here.

20   Likewise, neither should this Court's findings that the firearms in question are
21   not dangerous and unusual be relitigated. *Miller*, 542 F.Supp.3d at 1029.

22   We will note here that the State attempts to revisit the dangerous and unusual
23   question by literally rewriting what the Supreme Court said. The State repeatedly
24   attempts to pass the test off as a tradition on the prohibition of "dangerous [or]
25   unusual" weapons. (See, Def. Brief at 4:13, 41:17, 48:4, purportedly citing *Heller*, 54
26   U.S. at 627). But of course, that's not what *Heller* said. As Justice Alito later noted in
27   his concurring opinion in *Catetano*, "this is a conjunctive test: A weapon may not be
28   banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (emphasis

1   original) (Alito, J., concurring). All firearms are dangerous, and it therefore follows

2   that they cannot be prohibited merely because they are dangerous alone. *Jones v.*

3   *Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), *opinion vacated on reh'g*, 47 F.4th 1124

4   (Mem) (Sep. 7, 2022). "Thus 'the relative dangerousness of a weapon is irrelevant

5   when the weapon belongs to a class of arms commonly used for lawful purposes.'"

6   *Jones*, 34 F.4th at 716 (citing *Caetano*, 577 U.S. at 418 (Alito, J., concurring)). The

7   State is well aware of this, and notwithstanding its citation to Blackstone (Def. Br. at

8   p. 41, fn.59), its repeated attempts to recast the test as a disjunctive one, even in a

9   supposedly historical context, is not an innocent or inadvertent misquotation.

10          Since this Court's original published decision, other courts have found that

11   semiautomatic firearms, including those characterized as assault weapons, are not

12   dangerous *and* unusual, and are in common use. *See*, *Jones*, 34 F.4th at 716 ("long

13   guns and semiautomatic rifles are not dangerous and unusual weapons"); *Rocky*

14   *Mountain Gun Owners v. Town of Superior, Colo.*, 1:22-CV-01685, Doc. 18 at 9 (D.

15   Colo. July 22, 2022) (granting a temporary restraining order against enforcement of a

16   ban on certain semiautomatic rifles and noting "the Court is unaware of historical

17   precedent that would permit a governmental entitle to entirely ban a type of weapon

18   that is common use used by law-abiding citizens for lawful purposes."). *See also*,

19   Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from*

20   *Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity*

21   *Semiautomatic Firearms*, 19 CRIM'Y & PUB. POL'Y 147, 149 (2020) ("AW-type

22   firearms do not operate differently than other comparable semiautomatics, nor do they

23   fire more lethal ammunition.") Nor do the firearms California bans fire at higher rates

24   than other semiautomatics, one round per pull of the trigger. Thus, semiautomatic

25   firearms—which are the relevant class of firearms to be considered in this case—are

26   in common use and cannot be banned. And semiautomatic weapons "traditionally

27   have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S.

28   600, 612 (1994); *Jones*, 34 F.4th at 716.

In short, to uphold its assault weapons ban, the State must show that doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 142 S.Ct. at 2128. But the law, by definition, will not fit into that tradition if it bans the "possession and use of weapons that are 'in common use at the time.'" *Id.* (citing *Heller*, 554 U.S. at 627). It follows that firearms that are in "common use today" cannot be prohibited.

## V. THE STATE HAS FAILED TO SHOW ANY RELEVANT HISTORICAL TRADITION TO JUSTIFY ITS ASSAULT WEAPONS BAN

For the foregoing reasons, the government cannot show that its ban falls outside of the historical scope of the Second Amendment as established by *Heller* and *Bruen*. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 142 S.Ct. at 2126.

To prevail under an historical tradition analysis under *Bruen*, the State has the burden of justifying its regulation by offering appropriate historical analogues from the relevant time period, i.e., the founding era. "Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Bruen*, 142 S.Ct. at 2132. As we have noted in Plaintiff's *Additional Brief re Bruen* [ECF 136], the relevant history is that of the founding era (*id.*, at pp. 4-6), and we needn't repeat the argument here.

In starting its analysis, the State's brief [ECF 137] first makes reference to medieval and pre-founding English history. (Def. Brief at pp. 50-52). And yet, notwithstanding an academically interesting discussion about the American inheritance of English law, the State cites to no actual law prohibiting the possession of specific weapons by their perceived dangerousness, aside from highly vague references to "due restrictions." The discussion contained within the State's citation to *Peruta v. County of San Diego*, 824 F.3d 919, 930-931 (9th Cir. 2016) was limited to

the carrying of concealable weapons, or the *manner* in which those weapons were carried, and not to a class of weapons based upon their perceived dangerousness. In responding to this history, we make two important observations. First, *Bruen* expressly cautioned against reaching too far back into the period before the founding. "It is quite another to rely on an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was acted upon or accepted in the colonies.'" *Bruen*, 142 S.Ct at 2136 (citing *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935)). Second, if ancient English laws prohibiting the manner in which concealable firearms could be carried were not good enough to uphold concealed carry laws in modern day New York State, they are hardly relevant to a ban on an entire class of firearms that are widely and commonly held by Americans in their own homes.

"Sometimes, in interpreting our own Constitution, 'it [is] better not to go too far back into antiquity for the best securities of our liberties,' […] unless evidence shows that medieval law survived to become our Founders' law." *Bruen*, 142 S.Ct. at 2136 (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)). Here, the State has not made that connection.

## A.    THE STATE FINDS NO FOUNDING-ERA ANALOGUE RELEVANT TO A BAN ON A CLASS OF FIREARMS.

Notwithstanding the State's assembly of academics, scholars, historians, and social scientists—appending their declarations with thousands of pages of supplementary material—none of the State's academics and experts could point to *any* relevant founding-era law, regulation, or practice that allowed the government to prohibit the possession of a class of firearms. That is because the practice was unheard of by the founders.

The State asserts that during this era, "colonial and state governments imposed regulations on firearms hardware and accessories and other weapons deemed to pose threats to public safety." (Def. Br. at 52:16-18). However, in support of this

proposition, the State first cites to several examples of regulations regarding the mass storage of gunpowder, under the auspices of the police power generally. (Def. Brief at 53:7 – 54:5; Cornell Decl., ¶ 37). Of course, the combustible nature of black powder at the time made such regulations necessary to prevent catastrophic explosions, which was the primary aim of the regulations, as the State admits. (Def. Brief at 53:10-16). As anyone who is familiar with naval history knows, the greatest danger to a warship, even during the eighteenth century, was a fire extending to the ship's magazine, often causing catastrophic damage.[1] The examples that the State cites as powder storage laws were essentially fire prevention regulations due to the highly combustible nature of gun powder during that time. In fact, the specific Massachusetts law the State refers to in its brief appears only to have applied within the "town of Boston" and the regulation was enforced by the "Firewards of the said Town." Decl. of Saul Cornell, ¶ 36, fn. 73 (Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2).

Moreover, while these regulations may have restricted the manner of storage of arms that have been "charged with" gunpowder, they provide no restrictions or prohibitions on the *acquisition or possession* of any firearm, which, in the Massachusetts regulation specifically — references "canons, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells" — seemingly implying that possession of these arms would be completely legal.

Today, the acquisition and possession of explosives and explosive devices is heavily regulated by both state and federal authorities. Plaintiffs are not challenging explosive regulations here, and any founding-era gunpowder storage laws are not a relevant analogue to the possession of commonly owned semiautomatic firearms.

---

[1] "[A] fire in the magazine was the only means by which a wooden man-of-war could be destroyed outright." John Keegan, *Battle at Sea* (2d Pimlico ed., 2004), p. 76.

In offering historical analogues from the relevant period, *Bruen* explained that such "analogical reasoning requires that the government identify a well-established and representative historical analogue, not a historical twin" to the challenged regulation. 142 S.Ct at 2133. At the same time, however, to be a genuine analogue, the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the court today. *Id.*, at 2132. The Court further explained that two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*, at 2133. Here, the State's offering of gunpowder storage laws are far afield, because such regulations pertained to the manner of storage of gunpowder, and even of firearms, but did not prohibit the possession or use of any particular firearms.

Likewise, the State's reliance on founding-era restrictions on the use of "trap guns" is misplaced. Trap guns were hunting traps incorporating firearms that could be fired without the owner/user operating the device. The laws in question were enacted prevent use of these weapons in hunting and to protect personal or commercial property. These firearms were unique in that they are not operated by an individual user, but set off by whatever person or animal that may come across and trigger it. Today, the State, for example, continues to prohibit the use of trap guns in hunting or otherwise. See, e.g., Cal. Fish & G. Code § 2007. But these incredibly specific colonial-era regulations serve no legitimate bases to justify an assault weapon ban today.

Finally, the State references colonial-era prohibitions on the carrying of dangerous and unusual weapons generally. But again, looking into the matter deeply, these prohibitions were more concerned with the *manner* in which weapons were being carried concealed. For example, the 1687 New Jersey law cited in the State's Brief at 54:26, Spitzer Decl. Exh. E, specifically stated: "no person or persons after publication hereof, *shall presume privately to wear* any pocket pistol, skeines,

1  stilettoes, daggers or dirks, or other unusual or unlawful weapons within this

2  Province[.]" (Emphasis added). Likewise, the Virginia law that the State cites again

3  prohibited the carrying of certain concealable weapons.

4      These examples of carry restrictions—which are not at issue in this case—fail

5  to provide a relevant analogue to the prohibition on the outright possession of an

6  entire class of firearms or any other weapons. At any rate, as already explained, the

7  firearms at issue here are not dangerous and unusual, so the analogy fails on its own

8  terms. The State fails to cite to any founding-era law, regulation or practice by which

9  the founding generation understood that they had the right to prohibit the ownership of

10 a class of commonly-possessed firearms or other weapon. That is because the practice

11 was unheard of.

12 **B.    ANTEBELLUM AND POSTBELLUM HISTORY, AND RECONSTRUCTION**

13     Finding nothing to support its unconstitutional prohibition in the most relevant

14 period of this constitutional historical inquiry, the State quickly moves to the

15 antebellum and post-Civil War period.

16     First, citing to its offered declarations of Randolph Roth, Robert Spitzer and

17 Brennan Rivas, the State cites to various nineteenth century restrictions on the act of

18 *carrying* certain weapons in a concealed manner to justify its outright ban of certain

19 semiautomatic firearms today. The State specifically references concealed carry

20 restrictions from Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia

21 between 1813 and 1838 to support its ban. The State's offered expert Randolph Roth

22 acknowledged that Georgia's 1837 law was the most restrictive of the state laws

23 restricting the concealed carrying of certain weapons. (Roth Decl., ¶ 21). But again,

24 these prohibitions were focused on the manner in which these weapons were being

25 carried, and did not prohibit them entirely.

26     For example, the Georgia law in question includes the exception: "that no

27 person or person, shall be found guilty of violating the before recited act, who shall

28 openly wear, externally, Bowie Knives, dirks, Tooth Picks, Spears, and which shall be

exposed plainly to view….” 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, § 4. Thus, even the “most restrictive” of these concealed carry laws left open the ability to own, possess, use, and even carry them openly. Likewise, the other state laws the State cites are specific restrictions on the affirmative act of *carrying a concealed weapon*—not a general ban on the possession, use, or even open carry of *concealable* weapons. It should be noted that many of the concealed carry laws from this era focused upon the allegedly immoral nature of the act of carrying a concealed weapon, and not the nature of the weapon itself.[2]

At most, the state constitutions that the State relies upon show that during this period, the *act* of carrying concealed weapons was disfavored. However, *Bruen* cautioned against, “giving postenactment history more weight than it can rightly bear.” 142 S.Ct. at 2136. And “to the extent later history contradicts what the text says, the text controls.” *Bruen*, 142 S.Ct. at 2137 (citing *Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960, 1987 (2019) (Thomas, J., concurring)). And with that in mind, these carry restrictions during this period were nevertheless insufficient to justify New York State’s concealed carry restrictions in *Bruen*. Thus, it is undeniably

---

[2] We must also acknowledge an ugly truth, which is that many of the laws during the Reconstruction era that did focus on “dangerous and unusual weapons,” such as Bowie knives, etc., were not intended to prevent ownership of a particular class of weapons, but to prevent “the wrong people” from acquiring those items. After the Civil War, and purely out of fear of Black retribution for slavery, some of the Southern states enacted “the Black Codes” that were intended to prevent Black people from owning arms. Johnson, et al., *infra*, at pp. 461-63. For example, after the war, Mississippi passed a law which stated: “That no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife[.]” *Id.*, at p. 462 (citing 1865 Miss. Laws 166 (Nov. 29, 1865)). These laws, of course, can provide no legitimate analogue to modern day weapons prohibitions.

1    insufficient to justify California's complete ban on commonly owned, bearable

2    firearms.

3    ———————

4         In Plaintiffs' Additional Brief re *Bruen* [ECF 136], we asserted that laws rooted

5    in racism were among those which would not provide an appropriate historical

6    analogue to justify the State's assault weapons ban. And on this point, we must say,

7    the State disappoints. The State refers to the fact that "the U.S. army banned trade of

8    repeating rifles to Native Americans, while law enforcement targeted for arrest traders

9    who violated this policy." (Def. Brief at 61:26-28, citing Vorenberg Decl., ¶ 59). And

10   thus, the State admits that "even where no state statute expressly banned possession of

11   high-capacity firearms, state officials acted to restrict their ownership and use through

12   other means that were tailored to the particular dangers these weapons posed when in

13   the hands of adversaries such as Native Americans and pro-Redemption Southerners."

14   (Def. Brief at 61:28 - 62:4). Somehow, the State argues that this is a legitimate "de

15   facto regulation of repeating rifles [which] effectively controlled the use and

16   circulation of these weapons […], reducing any need for legislative responses to the

17   threats that they posed to public safety and post-war efforts to unify the county." (*Id.*,

18   at 62:4-7). This is an odd way to explain the lack of legislation, that is, by saying that

19   the Army and state officials took it upon themselves to disarm Native Americans,

20   which somehow obviated the need for a legislative response. And it is unclear from

21   the context of these quotes who or what exactly "the threats that they posed" was

22   referring to. Were the threats posed by Native Americans, or by the firearms

23   themselves?

24        If, as we would imagine, the State meant to suggest that the government saw

25   *repeating arms* as a threat to public safety, then that is simply a bald assertion without

26   any factual support. The fact of the matter is, even with all the resources the State has

27   marshaled, they have not been able to point to *any* laws, even well into the nineteenth

28

1   century that sought to prohibit the ownership of repeating arms by their classification

2   as "dangerous weapons."

3        Instead, the State attempts simply to minimize that fact by disputing the

4   commonality of repeating arms in civilian hands, relying on the declaration of

5   Michael Vorenberg. But Professor Vorenberg's conclusions—which oddly focus

6   almost exclusively on the ownership of the Henry Rifle and the Winchester Repeating

7   Rifle (Vorenberg Decl., ¶¶ 16-25) during the Reconstruction era—are debatable. In

8   the first place, Professor Vorenberg's singular focus on these two rifles alone, is

9   curious. In the years leading up to and in the decades after the Civil War, there were

10  over 100 makers and manufacturers of repeaters of varying capacities in the United

11  States. Norm Flayderman, *The Flayderman's Guide to Antique American Firearms…*

12  *and their Values*. (9th ed. 2019). And Prof. Vorenberg's methodology in quantifying

13  "Winchesters" as a group leaves open many other questions.[3]

14       We can confidently say that both the Henry Repeating Rifle of 1861 and the

15  Winchester Model 1866 were mass-produced firearms that became extremely popular.

16  David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78

17  ALB. L. REV. 849, 869 (2015) ("The best of these was the sixteen-shot Henry Rifle,

18  introduced in 1861 with a fifteen-round magazine. The Henry Rifle was commercially

19  successful, but Winchester Model 1866, with its seventeen-round magazine, was

20  massively successful.") These lever action rifles, which utilized metallic cartridges,

21  represented a leap in technology, which made them popular. Nicholas J. Johnson, et

22

23  _____

24  [3] For example, from 1866-1898 alone, Winchester invented and began selling fourteen
    repeating models, of which by the end of their production runs would encompass over

25  100 variations and would be chambered in around 30 different cartridges. Flayderman,
    pp. 306-322. Ultimately, Winchester also acquired many other companies, including

26  the Evans Repeating Rifle of 1873, of which 12,220 were produced in three models,
    sporting (approx.4,350 made), military (approx. 3,200 made), and carbine (not

27  specified as military or sporting): 4,700 made. Although it is not known how many
    were made of each, more were made in the sporting model rather than military.

28  Flayderman, p. 694. They had capacities of 28, 34, and 38 rounds. Flayderman, pp.
    694-695.

1  al., *Firearms Law and the Second Amendment* (3d ed. 2022), p. 437. And yet, despite

2  these substantial improvements in firepower, accuracy, and rate of fire, the historical

3  record shows that "no one asserted that better guns required more stringent gun

4  control." *Id*. Even Professor Vorenberg admits this fact, explaining, "[e]vidence for

5  these assertions does not necessarily take the form of statutes or court decisions, and

6  that is entirely unsurprising: explicit legal text prohibiting civilian possession of the

7  most dangerous weapons of war was not commonly the means by which such

8  weapons were regulated in the United States during the Civil War and

9  Reconstruction." (Vorenberg Decl., ¶ 8).

10      Explaining a dearth of laws by suggesting there was no need for such laws is a

11  roundabout way of admitting that the State has no relevant historical analogue, even in

12  the period following ratification of the Fourteenth Amendment. *Bruen* demanded the

13  presentation of actual historical analogues, rooted in *laws*, and not obscure

14  explanations about the lack thereof. The State thus fails to do what *Bruen* requires,

15  which is to point to relevant founding-era laws and regulations that might support an

16  historical analogue. "Like all analogical reasoning, determining whether a historical

17  regulation is a proper analogue for a distinctly modern firearm regulation requires a

18  determination of *whether the two regulations* are 'relevantly similar.'" 142 S.Ct. at

19  2132 (emphasis added).

20      The fact is, by the time the Fourteenth Amendment was ratified in 1868, rapid-

21  fire repeating firearms had become quite common. *See*, Johnson, et al., p. 474, and

22  Chapter 6.C.5; Kopel, p. 869 ("by the time ratification of the Fourteenth Amendment

23  was completed in 1868, it was solidly established that firearms with seventeen-round

24  magazines were in common use.") And yet, "[t]he legislative history of congressional

25  passage of the Fourteenth Amendment is bereft of any indication that proponents or

26  opponents of the Fourteenth Amendment thought that the technological advances

27  made any difference in the desirability (or undesirability) of stricter enforcement of

28  the right to keep and bear arms." Johnson, et al., p. 474.

1    We cannot leave the topic Reconstruction without discussing the Colfax

2    Massacre, which Professor Vorenberg describes as "probably the worst racial

3    massacre of Reconstruction." (Vorenberg Decl., ¶ 78). That infamous event in

4    American history was briefly recounted in *McDonald v. City of Chicago*, 561 U.S.

5    742 (2010), as an episode when "Dozens of blacks, many unarmed, were slaughtered

6    by a rival band of armed white men. [William] Cruikshank himself allegedly marched

7    unarmed African–American prisoners through the streets and then had them

8    summarily executed." *McDonald*, 561 U.S. at 757. The Black citizens who were

9    slaughtered on that Easter Sunday in 1873 were newly freedmen and other members

10    of a legitimate militia, as Prof. Vorenberg notes. (Vorenberg Decl., ¶ 79). This

11    slaughter of unarmed freedmen occurred after they had surrendered to a white militia

12    consisting of former Confederate soldiers, led by a literal white supremacist,

13    Christopher Columbus Nash. Charles Lane, *The Day Freedom Died: The Colfax*

14    *Massacre, the Supreme Court, and the Betrayal of Reconstruction* (1st ed. 2008).

15    Most of the freedmen were killed after surrendering the courthouse to the white

16    militia. And the reason why the Black freedmen surrendered? They were simply

17    outgunned. While Nash's force was well armed with rifles (of a kind not specified),

18    and a small, four-pound cannon, the freedmen were only armed, for the most part,

19    with smoothbore shotguns, which were not effective at long distance. Lane, p. 97. As

20    Lane described it: "Whereas nearly every white man in Nash's force was carrying

21    multiple firearms, only a half to two-thirds of the black men had even one gun. Their

22    weaponry was not 'perfect,' but measurably inferior to that of the whites, and

23    consisted mainly of shotguns and hunting pieces, with at most a dozen Enfield rifles

24    scattered among the ranks." *Id.*, p. 93. Hopelessly outgunned, outranged, and their

25    situation untenable, the freedmen surrendered to the former Confederates. And for

26    that, they were led out into the fields and slaughtered.

27    //

28    //

1       Do the horrific facts of the Colfax Massacre not illustrate—in perhaps the

2   cruelest lesson in American history—the need for parity in firearms technology? Can

3   any American read this story and not be convinced that the freedmen deserved to have

4   repeating rifles and ammunition of equal quality, to defend themselves from the

5   illegitimate mob that eventually murdered them? Does this story not show why a well-

6   regulated militia, made up of the People, is indeed necessary to the security of a free

7   state? Even Prof. Vorenberg seems to believe so, when his declaration surmises that

8   "Neither the legitimate nor the illegitimate side at Colfax carried Winchesters. But if

9   William Ward had had his way, his side would have had them." (Vorenberg Decl., ¶

10  79). The very point of this case has vividly been proven by this infamous episode in

11  our Nation's history.

12      But these brief walks through history, while interesting, are not constitutionally

13  relevant to the question at hand. As noted, it is the understanding of the right as

14  envisioned by the founding generation that matters. *Bruen* expressly noted: "As we

15  recognized in *Heller* itself, because post-Civil War discussions of the right to keep and

16  bear arms 'took place 75 years after the ratification of the Second Amendment, they

17  do not provide as much insight into its original meaning as earlier sources.'" 142 S.Ct.

18  at 2137 (quoting *Heller*, 554 U.S. at 614). And moreover, "late-19th-century evidence

19  cannot provide much insight into the meaning of the Second Amendment when it

20  contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154. *See also*, *Heller v. District of*

21  *Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J.

22  dissenting) ("post ratification adoption or acceptance of laws that are inconsistent with

23  the original meaning of the constitutional text obviously cannot overcome or alter that

24  text.").

25      It was not until 2010 that the Second Amendment was formally incorporated to

26  the states, as held in *McDonald v. City of Chicago*. When the Court did so, it

27  incorporated the Second Amendment right with the meaning it held in 1791. Here, the

28  State's meager explanations to the lack of non-racist firearms laws in 1868 only

1  confirm the original understanding of the right as it was understood in 1791, when the

2  government would never have sought to ban an entire class of firearms that was

3  widely held by its citizens, nor would they have sought to confiscate them by force, as

4  the State would do here. Such a practice would have been abhorrent, both to the

5  founding generation, and to the generation that fought an extremely bloody war less

6  than a century later to secure that right, among others, to *all* Americans.

7  **C.   TWENTIETH CENTURY HISTORY**

8      The Court in *Bruen* refused to consider twentieth century laws in its historical

9  inquiry. "As we suggested in *Heller*, however, late-19th-century evidence cannot

10  provide much insight into the meaning of the Second Amendment when it contradicts

11  earlier evidence." *Bruen*, 142 S.Ct. at 2153-54. The reason for this was also made

12  clear, "*Heller*'s interest in mid- to late-19th-century commentary was secondary.

13  *Heller* considered this evidence "only after surveying what it regarded as a wealth of

14  authority for its reading — including the text of the Second Amendment and state

15  constitutions." In other words, this 19th-century evidence was "treated as mere

16  confirmation of what the Court thought had already been established." *Bruen*, 142

17  S.Ct. at 2137 (internal citations omitted).

18      The same is true in this case. The State's twentieth century references provide

19  no insight to the original meaning of the Second Amendment and contradict a long

20  history devoid of any kind of arms prohibitions. Nevertheless, this Court has already

21  considered much of the State's historical evidence and found it unpersuasive.

22  Similarly, the State's additional twentieth century evidence suffers from the same

23  deficiencies as the evidence already rejected by this Court. The additional restrictions

24  that the State has submitted are mainly restrictions on automatic firearms, not

25  semiautomatic firearms.

26      Moreover, the State's claims contradict their own expert's claims. The State

27  claims that "thirteen states enacted restrictions on semiautomatic or fully automatic

28  firearms capable of firing a certain number of rounds without reloading." (Def. Br. at

64). Yet, the State's expert Robert Spitzer claims "at least seven states plus the District of Columbia, and as many as eleven states, enacted laws restricting semiautomatic weapons (see Exhibit B)." (Spitzer Decl. ¶ 10). However, Mr. Spitzer's declaration and Exhibit D show that at least four of the state laws referenced as "ambiguous law[s] that could apply to semi-automatic in addition to automatic firearms" are, in reality, clear restrictions on machine guns, and not semiautomatic firearms (Illinois, Louisiana, Massachusetts, South Carolina). (Spitzer Decl. ¶ 10, Ex. D). Thus, only five states and the district of Columbia (D.C., Michigan, Minnesota, Ohio, Rhode Island, and Virginia) ever implemented any law seemingly regulating semiautomatic firearms and machine guns. (*Id.*) All other regulations the State references are restrictions on machine guns.

Despite the inconsistent interpretations between the State and its expert witness, the referenced restrictions show that the vast majority of these restrictions are specific to automatic firearms and not semiautomatics, and those restrictions that may be interpreted to limit semiautomatics are largely ambiguous in their meaning and intent. The State's references to various failed proposed legislation on semiautomatic firearms and to the fact that semiautomatics were almost included in the NFA provide no support for its claims.[4] These failed proposals and exclusion of semiautomatics from the NFA merely show that automatic and semiautomatic firearms are distinguishable and semiautomatics were not restricted during this period.

All of the State's argument and evidence is broadly premised on its assertion that "governments have retained substantial latitude in enacting restrictions on certain weapons deemed to be susceptible to criminal misuse and to pose significant dangers to the public – from trap guns to certain knives, blunt objects, and pistols – *provided*

---

[4] Indeed, the original NFA legislation proposed to regulate handguns in the same manner as machine guns, but handguns were eventually dropped from the bill. Greg Lee Carter, *Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law* (2002), p. 545. Of course, handguns have been found to be constitutionally protected under *Heller*.

1    *that law-abiding citizens retained access to other arms for effective self-defense*."
2    (Def. Brief at 41:19-23 (emphasis added)). But this underlying argument has already
3    been explicitly rejected in *Heller*. "It is no answer to say […] that it is permissible to
4    ban the possession of handguns so long as the possession of other firearms (i.e., long
5    guns) is allowed." *Heller*, 554 U.S. at 629; see also, *Parker v. District of Columbia*,
6    478 F.3d 370, 400 (D.C. Cir. 2007) ("The District contends that since it only bans one
7    type of firearm, 'residents still have access to hundreds more,' and thus its prohibition
8    does not implicate the Second Amendment because it does not threaten total
9    disarmament. We think that argument frivolous. It could be similarly contended that
10   all firearms may be banned so long as sabers were permitted."), *aff'd sub nom. Heller*,
11   554 U.S. 570.

12       Despite this clear instruction from the Court, the State spends considerable time
13   asserting the claim that California can ban commonly owned semiautomatic firearms
14   as long as they permit California's to acquire other firearms. But there is no
15   constitutional support for such a claim. And the State's attempt to force through
16   outright bans on common firearms by referencing a sparce amount of fire prevention
17   laws, and restrictions on concealed carry, far removed from the founding era, and
18   twentieth century laws restricting machine guns, provide absolutely no support for
19   their unconstitutional prohibitions.

**D.    THE AWCA DOES NOT ADDRESS "UNPRECEDENTED SOCIETAL CONCERNS" OR "DRAMATIC TECHNOLOGICAL CHANGES" IN FIREARMS.**

20       The State contends that because the AWCA ban addresses "unprecedented
21   societal concerns" and "dramatic technological changes" in firearms, *Bruen*
22   "require[s] a more nuanced approach" and they should receive broad latitude in
23   identifying a "relevant historical analogue." (Def. Brief at 69). However, *Bruen* stated
24   that "other cases implicating unprecedented societal concerns or dramatic
25   technological changes *may require* a more nuanced approach." *Bruen*, 142 S.Ct. at
26   2132 (emphasis added). It did not establish any kind of bright line rule as the State is
27   asserting.

1   Nor does the State's AWCA address "unprecedented societal concerns." While

2   tragic, mass murder is not unprecedented in the United States. The State's own expert

3   Randolph Roth concedes this fact stating, "mass murder has been a fact of life in the

4   United States since the mid-nineteenth century, when lethal and non lethal violence of

5   all kinds became more common." (Roth Decl., ¶ 35). "From the 1830s into the early

6   twentieth century, mass killings were common." (*Id.*) Likewise, the State's expert

7   witness Professor Vorenberg recounts a horrific story of a mass shooting which took

8   place during Reconstruction, in 1869, when a group of Black Americans, including

9   women and children, were killed in Florida by an unseen assailant, who "fired

10  'thirteen or fourteen shots in rapid succession,' killing and wounding many of the

11  party." (Vorenberg Decl., ¶ 92). The officer who reported on the episode assumed that

12  the assailant had used a Henry rifle "because of the speed and volume of the shots

13  fired." (*Id.*) But the response there was not to prohibit rapid fire repeating firearms

14  such as the Henry rifle, but for more Henry rifles to protect against such attacks. (*Id.*)

15  With regard to mass shootings specifically, this Court has already found that

16  they are relatively rare. *Miller*, 542 F. Supp.3d at 1018. These facts do not attempt to

17  take away from the horrific nature of mass killings. They merely show that these are

18  not "unprecedented societal concerns" as the State claims. Thus, the "more nuanced

19  approach" the State contends applies to the historical inquiry— which in the State's

20  view, would permit historical justifications for nearly any gun control restriction—is

21  inappropriate.

22  Even through today, there is no dramatic technological change that has occurred

23  in the realm of semiautomatic firearms in over a century. Semiautomatic firearms

24  have been around since approximately 1856 and their ability to fire one round per

25  every pull of the trigger has not changed. The State even concedes the fact that the

26  introduction of the AR-10 was significant not because of the mechanical features of

27  the firearm, but because of the *materials used* to make the firearm. "[T]he AR

28  platform itself, which first appeared in 1955 with the AR-10, was an unprecedented

design: '[T]he experience of first viewing and handling the AR-10's *grey alloy metalwork and foam-filled plastic furniture* seemed so utterly without precedent that for many it simply suspended the critical faculties, leaving nowhere to begin any comparison with ordinary wood-and-steel rifles.'" (Def. Brief, p. 45 (emphasis added)). There were no "unprecedented technological changes" with regard to the semiautomatic nature of the firearm as semiautomatic firearms were in existence and commonly used long before the AR-10 introduction. Plaintiffs' firearms historical expert Ashley Hlebinsky also made similar comments when discussing the introduction of the AR-10 and subsequent firearms — "it's really the experimentation in new materials in the post World War II period." (Hlebinsky Depo., 127:13 – 129:25 [ECF 136-1]).

## VI.   OBJECTIONS TO DEFENDANTS' EVIDENCE AND REQUEST FOR DISCOVERY

If the submission of the declarations of the State's nine expert witnesses, appended with references to thousands of pages of additional supplementary material were not enough, the State complains that it did not have an adequate opportunity to prepare a record to satisfy its obligation under *Bruen* (Def. Brief at 73), and requests additional time to conduct "expert discovery." (*Id.*, at 77).

As noted, even after the trial in 2021, this Court had already considered approximately 14,000 pages of evidence and testimony, including relevant history. *Miller*, 542 F. Supp.3d at 1033. All in a case which this Court described, at its core, as a "simple case." *Id.*, at 1023. Throughout, Plaintiffs' rights continue to languish since this case was originally filed in 2019.

Plaintiffs therefore object to any additional discovery. Any relevant historical facts which the State may have offered to satisfy its obligation under *Bruen*, that is, relevant *laws and regulations* and other known historical facts, to support an historically appropriate analogue, are subject to judicial notice. Moreover, the only "facts" relevant to this case are "legislative facts" regarding the history of relevant

1    firearm prohibitions, and as such, all facts have been submitted without the actual

2    need for expert or other evidence adduced through traditional party discovery

3    methods. *See Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (ordering entry of

4    judgment for plaintiffs on review of order granting motion to dismiss because "[t]he

5    constitutionality of the challenged statutory provisions does not present factual

6    questions for determination in a trial . . . . Only adjudicative facts are determined in

7    trials, and only legislative facts are relevant to the constitutionality of the Illinois gun

8    law.")

9         It is noteworthy that in *Bruen* itself, no factual development occurred in the

10   district court because the plaintiffs' claims were foreclosed by circuit precedent at the

11   time the complaint was filed, and the district court accordingly entered judgment

12   against the plaintiffs on the pleadings. *See*, *New York State Rifle & Pistol Ass'n, Inc.*

13   *v. Beach*, 354 F. Supp.3d 143 (N.D.N.Y. 2018). In holding New York's may-issue

14   licensing scheme violated the Second Amendment, the Supreme Court expressly

15   rejected the argument that it could not "answer the question presented without giving

16   respondents the opportunity to develop an evidentiary record," 142 S.Ct. at 2135 n.8,

17   because "in light of the text of the Second Amendment, along with the Nation's

18   history of firearm regulation," the conclusion "that a State may not prevent law-

19   abiding citizens from publicly carrying handguns because they have not demonstrated

20   a special need for self-defense" did not turn on disputed factual questions." *Id*. The

21   same is true here. Application of *Bruen*'s text-and-history analysis does not involve

22   any analysis of adjudicative facts of the kind that are disclosed through discovery, as

23   the parties have now amply demonstrated. It is also noteworthy that *Bruen* itself did

24   not involve expert witnesses. Indeed, the Supreme Court decided the case based on a

25   motion-to-dismiss record in the district court.

26        Here, the post-trial presentation of historical facts in this case are now legal

27   issues that can and should be fully resolved on parties' briefing as submitted.

28

1    Plaintiffs further object to the submission of the State's additional declarations

2    and evidence [ECF 137-1 through -9], to the extent that they contain constitutionally

3    irrelevant facts and unsupported opinion testimony.

4

5                              **VII.   CONCLUSION**

6    The State has failed to show, through *any* appropriate historical analogues, that

7    its law is consistent with the Nation's historical tradition of firearm regulations. The

8    founders would never have countenanced a prohibition of an entire class of firearms

9    that are overwhelmingly popular among the People. As the State has failed the final

10   historical test under *Bruen*, under the plain text of the Second Amendment, the assault

11   weapons law infringes upon the right to keep and bear arms. Having failed this final

12   test, the State's assault weapons ban should be enjoined as unconstitutional.

13    October 28, 2022                    **SEILER EPSTEIN LLP**

14

15                                        /s/ George M. Lee
                                          George M. Lee

16

17                                        **DILLON LAW GROUP, APC**

18

19                                        /s/ John W. Dillon
                                          John W. Dillon

20                                        *Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28