Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| **v.** | **DEFENDANTS' RESPONSE TO PLAINTIFFS' ADDITIONAL BRIEF RE *NEW YORK STATE RIFLE & PISTOL ASS'N V. BRUEN*** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:    5A |
| | Judge:           Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................ 1

I. Plaintiffs Cannot Demonstrate that the Plain Text of the Second Amendment Covers the Combat-Oriented Accessories or Configurations Regulated under the AWCA ....................................... 2

    A. The Accessories Regulated Under the AWCA Are Not Bearable Arms Subject to Second Amendment Protection ........ 3

    B. Firearms Equipped with Accessories Prohibited Under the AWCA Are Not in Common Use for Self-Defense .................. 5

II. The Challenged Provisions of the AWCA Are Consistent with the Nation's Historical Traditions of Firearms and Weapons Regulation ........................................................................... 10

    A. If the AWCA Burdens Conduct Covered by the Plain Text of the Second Amendment, the Court Must Examine the Historical Analogues ........................................... 11

    B. The AWCA Is Relevantly Similar to Historical Analogues ..... 12

Conclusion ...................................................................................... 20

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

**CASES**

5

*Andrews v. State*
    50 Tenn. 165 (1871) ............................................................................ 15

6

7

*Def. Distributed v. Bonta*
    No. 22-cv-6200-GW (AGRx) (C.D. Cal. Oct. 21, 2022) (Dkt. 19) .................... 2

8

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ....................................................... 6, 8, 10, 12

9

10

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011) ............................................................ 18

11

12

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) ......................................................... 7

13

14

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) .................................................... 6, 7, 9

15

16

*McDonald v. City of Chi.*
    561 U.S. 742 (2010) ................................................................ 12, 20

17

18

*Miller v. Bonta*
    542 F. Supp. 3d 1009 (S.D. Cal. 2001) ...................................... 2, 6, 7

19

20

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*
    804 F.3d 242 (2d Cir. 2015) ............................................................ 7

21

22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
    142 S. Ct. 2111 (2022) ...........................................................*passim*

23

24

*Ocean State Tactical, LLC v. Rhode Island*
    No. 22-cv-00246-JJM-PAS (D.R.I.) (Dkt. 19-7) ............................... 4, 5

25

26

*People v. Grubb*
    63 Cal. 2d 614 (1965) .................................................................... 14

27

28

*Staples v. United States*
    511 U.S. 600 (1994) ........................................................................ 8

ii

1
2

## TABLE OF AUTHORITIES
### (continued)

Page

3
4

*State v. Philpotts*
    194 N.E.3d 371 (Ohio 2022) ............................................................... 10

5

**CONSTITUTIONAL PROVISIONS**

6
7
8

United States Constitution
    Second Amendment.................................................................*passim*
    Fourteenth Amendment ..........................................................*passim*

9

**STATUTES**

10

Assault Weapons Control Act ................................................................*passim*

11
12

California Penal Code
    § 30515 .................................................................................*passim*
    § 30515(e)..................................................................................... 2

13
14

1689 English Bill of Rights ......................................................................... 13

15

1801 Tenn. Acts pp. 260–61 ...................................................................... 14

16

1838 Va. Acts 76, ch. 101, § 1 .................................................................. 13

17

1837 Ala. Laws 7, No. 11, § 2 ................................................................... 13

18

1837 Ga. Laws 90, § 1 ............................................................................... 13

19
20

1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2.............................................. 13

21
22

1838 Fla. Laws 36, No. 24, § 1 .................................................................. 13

23

1839 Ala. Acts 67, Chapter 77 .................................................................. 13

24

1850 Mass. Acts 401, Chapter 194 ........................................................... 13

25

1858-1859 N.C. Sess. Laws 34-36, ch. 25, § 27, pt. 15 ........................... 14

26

1868 Ala. Laws 11 ..................................................................................... 14

27

1868 Fla. Laws 95, Chapter 7, § 11 .......................................................... 14

28

1869 Minn. Laws 50-51, Chapter 39 § 1 .................................................. 16

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

John Lellyett, Ordinances of the City of Nashville 244 § 9 (1872) ........................ 16

1873 Minn. Stats. 993 .............................................................................. 16

1875 Mich. Pub. Acts 136, No. 97 § 1 ...................................................... 16

**OTHER AUTHORITIES**

5D Tactical.com, AR-15 Gas Systems Guide (Feb. 2021) ........................................ 8

Dep't of the Army, Rifle and Carbine (TC 3-22.9) (May 2016) ............................... 8

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places"*
    *Doctrine*, 13 Charleston L. Rev. 205 (2018) ...................................................... 13

David B. Kopel et al., *Knives and the Second Amendment*, 47 U. Mich.
    J.L. Reform 167 (Fall 2013) ............................................................... 13

M4 Carbine, Military.com ........................................................................ 9

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual":*
    *Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016) ............................ 15

Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U.
    Pa. L. Rev. 261 (2019) ........................................................................ 4

iv

## INTRODUCTION

As explained in Defendants' supplemental brief and supporting declarations, Dkt. 137, California's Assault Weapons Control Act ("AWCA") satisfies the text-and-history standard adopted in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Plaintiffs' additional brief does not dispel those arguments and ignores the portions of *Bruen* that support the AWCA's constitutionality. The challenged provisions of the AWCA do not burden conduct protected by the plain text of the Second Amendment, and even if they did, Defendants have amply demonstrated that the provisions are consistent with long-accepted traditions of regulating firearms and other dangerous weapons. Throughout American history, state and local governments have retained broad authority to restrict access to, and possession of, weapons deemed to pose significant public-safety risks at the time, as demonstrated by the legion of dangerous weapons restrictions and limitations on the storage and configuration of firearms enacted since the founding.

The AWCA provisions challenged here are consistent with the Nation's traditions of regulating firearms and other weapons and thus are consistent with the Second Amendment itself. Just as the historical analogues singled out specific weapons for regulation while leaving alternative weapons available for effective self-defense, the AWCA merely restricts the use of certain combat-oriented accessories with certain firearms and does not prohibit possession of those underlying firearms, such as featureless AR-platform rifles, or a range of other firearms that may be used for self-defense. And that slight burden is comparable to the burdens imposed by the historical analogues and justified by comparable public-safety goals. Accordingly, at both the textual and historical stages of the analysis, the AWCA is consistent with the Second Amendment and should be upheld.[1]

---

[1] In their additional brief, Plaintiffs ask for judgment without further proceedings. *See* Pls.' Add'l Br. re *New York State Rifle & Pistol Ass'n v. Bruen* ("Pls.' Add'l Br.") at 1. As explained in Defendants' Supplemental Brief, this is

1

Defendants' Response to Plaintiffs' Additional Brief
re *New York State Rifle & Pistol Ass'n v. Bruen* (3:19-cv-01537-BEN-JLB)

## I.   PLAINTIFFS CANNOT DEMONSTRATE THAT THE PLAIN TEXT OF THE SECOND AMENDMENT COVERS THE COMBAT-ORIENTED ACCESSORIES OR CONFIGURATIONS REGULATED UNDER THE AWCA

At the textual stage of the analysis, Plaintiffs cannot establish that the firearms accessories and tactical configurations regulated by the AWCA are protected by the Second Amendment.[2]  Before Defendants can be required to bear the burden of justifying the law based on history, Plaintiffs must first show that the Second Amendment's plain text covers the manufacture, importation, sale, and possession of firearms equipped with certain combat-oriented accessories.  Only "when the Second Amendment's plain text covers an individual's conduct" is the government required to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  Pls. Suppl. Br. at 1 (quoting *Bruen*, 142 S. Ct. at 2126).[3]  Here, Plaintiffs cannot show that the regulated accessories are "bearable arms" and that they are in "common use" for self-defense.

---

not an appropriate course of action.  Defs.' Suppl. Br. in Resp. to the Court's Order of Aug. 29, 2022 ("Defendants' Supplemental Brief" or "Defs.' Suppl. Br.") at 5–6, 74–75.  But if the Court is inclined to enter judgment, Defendants respectfully request that the Court stay enforcement of any such judgment until Defendants have had an opportunity to seek a stay pending appeal from the Ninth Circuit.  This case still "involves serious questions going to the merits," and a stay would be in the public interest while any appeal proceeds, consistent with past practice in this litigation.  *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1069 (S.D. Cal. 2001), *vacated*, No. 21-55608, 2022 WL 3095986, at *1 (9th Cir. Aug. 1, 2022).

[2] Because the definitions in Penal Code section 30515 are severable, Cal. Penal Code § 30515(e), Plaintiffs must satisfy their burden as to *each* of the discrete definitions of an "assault weapon," including each of the accessories listed in the statute and the configurations defining a rifle, pistol, or shotgun as an assault weapon.

[3] *See also* Tentative Ruling on Mot. for Prelim. Inj. at 5 n.5, *Def. Distributed v. Bonta*, No. 22-cv-6200-GW (AGRx) (C.D. Cal. Oct. 21, 2022) (Dkt. 19) ("*Defense Distributed* Ruling") (explaining that *Bruen* requires "plain-text analysis *first*, *then* history *if necessary*").  The district court adopted its tentative ruling denying the motion for preliminary injunction.  Order, *Def. Distributed v. Bonta*, No. 22-cv-6200-GW (AGRx) (C.D. Cal. Oct. 24, 2022) (Dkt. 21).

### A.   The Accessories Regulated Under the AWCA Are Not Bearable Arms Subject to Second Amendment Protection

Plaintiffs acknowledge that the Second Amendment protects only *bearable* arms.  Pls. Suppl. Br. at 3.  As explained in Defendant's supplemental briefing, however, nothing in Penal Code section 30515 prevents Californians from acquiring or possessing any bearable arms, including AR-platform rifles, so long as they are not semiautomatic centerfire rifles, semiautomatic pistols, or shotguns equipped with any of the qualifying combat-oriented accessories, or are not semiautomatic centerfire rifles less than 30 inches in length (which can be accomplished by equipping a firearm with either a shortened barrel, a collapsible stock, or both).  *See* Busse Decl. ¶¶ 13–24 & Ex. A; Kapelsohn Dep. at 124 ("[T]here are clearly these featureless rifles in California that exist, that can be fired.  If one practices with them enough, one can get good with them.").  In their additional brief, Plaintiffs argue that Penal Code section 30515 merely "describe[s] the 'largely cosmetic features' found on modern semi-automatic firearms."  Pls.' Add'l Br. at 8 (quoting Hlebinsky Dep. at 21–22); *accord id.* at 9 (claiming that firearms with or without certain "exterior physical attributes," such as certain stocks, pistol grips, muzzle devices, and barrel lengths, "are, in all relevant respects, the same").  In so arguing, Plaintiffs effectively *agree* that section 30515 regulates the use of certain accessories with certain types of firearms, without prohibiting the acquisition or possession of the underlying firearms themselves.  Those accessories are not "bearable arms" warranting Second Amendment protection, nor are they necessary (like ammunition) to operate any firearm as designed.  Defs.' Suppl. Br. at 23–41; Busse Decl. ¶ 12.

This distinction between "Arms" that may be protected by the Second Amendment, and accessories that are not protected, is further supported by recent corpus linguistics analysis performed by Professor Dennis Baron, which was submitted on October 14, 2022 in a different Second Amendment case in the

District of Rhode Island.  *See* Decl. of Dennis Baron, Ex. 2 ("Baron *Ocean State Decl.*"), *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-00246-JJM-PAS (D.R.I.) (Dkt. 19-7) (filed Oct. 14, 2022).[4]  Corpus linguistics is a field that examines patterns in the meaning and usage of words in large databases of text (referred to in the field as "corpora").  Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261, 267 (2019).  These corpora contain digitized and searchable compilations of real-world sources, including books, newspapers, speeches, and transcripts, "drawn from a particular speech community" during particular times in history.  *Id.* at 290.  Professor Baron's new corpus linguistics research is relevant to further understanding the original public meaning of the terms used in the Second Amendment.

Professor Baron's corpus linguistics analysis was performed using three corpora containing text written around the time that the Second Amendment was ratified:  the Corpus of Founding Era American English ("COFEA") and the Corpus of Early Modern English ("COEME").[5]  Baron *Ocean State* Decl. ¶ 14.  COFEA includes close to 137 million words from over 126,000 sources written from 1760–1799, and COEME includes over 1 billion words from over 40,000 texts written from 1475–1800.  *Id.*  Professor Baron also examined several corpora containing text written around the time that the Fourteenth Amendment was ratified, including COEME and the Corpus of Historical American English ("COHA"),[6] which contains 475 million words of text written from 1820–2020.

---

[4] A true and correct copy of Professor Baron's declaration in *Ocean State Tactical, LLC v. Rhode Island* is attached hereto as Exhibit A.  Its contents are incorporated by reference herein.

[5] Several corpora, including COFEA and COEME, are maintained by Brigham Young University.  *See* http://lawcorpus.byu.edu.

[6] COHA, https://www.english-corpora.org/coha/.

4

*Id.*[7]  Professor Baron's analysis examined the use of the terms "arms" and "accoutrements" in the respective corpora.  *Id.* ¶¶ 24–48.  Based on relevant corpus linguistics data, Professor Baron concluded that ammunition magazines would not fall within the historical meaning of the term "arms," but rather would have been considered "accoutrements," a term used during the relevant periods to refer to "ancillary equipment associated with soldiering, or service in the military."  *Id.* ¶ 24.[8]  Professor Baron reports that the "vast majority of examples" found in the corpora involve "accoutrements" functioning as "a catch-all term for military equipment *separate* from, and not including, *arms.*"  *Id.*  And he found no data indicating that the term "arms" included "accoutrements, magazines, or any other parts of weapons."  *Id.* ¶ 61 (emphasis omitted).  Consistent with this corpus linguistics analysis, the various accessories listed in Penal Code section 30515— and a shortened barrel that could be used to render a semiautomatic centerfire rifle less than 30 inches in length—are not bearable "arms" as the term was understood when the Second and Fourteenth Amendments were ratified.

By legislative design, Penal Code section 30515 restricts only certain uses of certain firearm accessories or parts, which are not themselves bearable arms subject to Second Amendment protection.  Just as a silencer is not a protected arm, *see* Defs.' Suppl. Br. at 23–24, the accessories regulated under section 30515 are not subject to Second Amendment protection.

## B.  Firearms Equipped with Accessories Prohibited Under the AWCA Are Not in Common Use for Self-Defense

Even if the regulated accessories could qualify as bearable arms, Plaintiffs have not shown that they are "arms" in "common use" for self-defense and thus

---

[7] Professor Baron also relied on five digitized newspaper databases covering the years 1750–1900.  Baron *Ocean State* Decl. ¶¶ 16, 20.

[8] Notably, the term "*[a]ccoutrements* often occurs in a list alongside, but separate from, ammunition:  *arms, accoutrements, (and) ammunition.*"  Baron Decl. ¶ 28.

5

covered by the plain text of the Second Amendment.  Although Plaintiffs characterize the accessories listed in Penal Code section 30515 as "largely cosmetic," Pls.' Add'l Br. at 8 (citation omitted)—conceding that Plaintiffs do not view the listed accessories as necessary to operate a firearm or to use a firearm effectively for self-defense—Defendants have shown that these accessories serve specific combat-oriented functions or are uniquely susceptible to criminal misuse. Plaintiffs cannot show that they are in common use for self-defense, based on the prevalence, suitability, and actual uses of weapons equipped with those accessories. *See* Defs.' Suppl. Br. at 26–41.

Plaintiffs rely chiefly on this Court's prior decision in this case, which applied a "*Heller* test" based on the Court's interpretation of *District of Columbia v. Heller*, 554 U.S. 570 (2008), and concluded that "modern rifle[s]" in general are in "common use" based on a finding that they are "commonly owned."  Pls. Add'l Br. at 2 (quoting *Miller*, 542 F. Supp. 3d at 1021).  But as explained in Defendants' Supplemental Brief, that prior analysis has been significantly impacted by *Bruen*'s clarifications of the applicable standard.  Defs.' Suppl. Br. at 26–28.  *Bruen* indicates that mere ownership is not enough to qualify a weapon for protection under the Second Amendment; rather, the weapon must be suitable for use in self-defense and be "commonly *used*" for that purpose in practice.  *Id.* at 39–40.  In contrast to handguns, military-style rifles like AR-platform rifles—which the National Shooting Sports Foundation now refers to as "modern sporting rifles"— are not commonly owned, comprising less than 5% of the total American gun stock compared to 50% for handguns.  *Id.* at 30; Suppl. Klarevas Decl. ¶¶ 15–17.  And such rifles are not well-suited for self-defense.  Defs.' Suppl. Br. at 32–39. Tellingly, Plaintiffs point to no evidence, such as survey data or studies, showing that military-style rifles, let alone such rifles equipped with qualifying accessories, are used frequently in self-defense or have ever been needed to engage in effective self-defense.  *See Kolbe*, 849 F.3d at 127 (noting that neither "plaintiffs nor

6

Maryland law enforcement officials could identify a single incident in which a Marylander has used a military-style rifle or shotgun").  While most defensive gun uses involve handguns, data indicate that approximately 2–4% of all such uses involved any type of rifle, meaning that an even smaller percentage involved a military-style rifle or, more specifically, such a rifle equipped with qualifying accessories.  Defs.' Suppl. Br. at 40–41 (citing Suppl. Allen Decl. ¶ 10).  And there is no evidence concerning the actual uses of pistols or shotguns that would qualify as "assault weapons" under the AWCA.  *Id.* at 31, 40; *Miller*, 542 F. Supp. 3d at 1029 ("[T]here is very little evidence regarding the commonality of AK-47 type rifles, or semiautomatic shotguns, or 'assault pistols.'").[9]  Again, because Penal Code section 30515 is severable, Plaintiffs must show that *each* restricted weapons

---

[9] Prior federal circuit court opinions examining assault weapon restrictions under the now-defunct two-step framework for Second Amendment claims typically either assumed that the challenged law burdened protected conduct or determined that the law regulated weapons in "common use" without significant analysis prior to upholding those laws under intermediate scrutiny.  *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015) ("assum[ing] for the sake of argument that these 'commonly used' weapons and magazines are also 'typically possessed by law-abiding citizens for lawful purposes'" and noting that this assumption was "warranted at this stage" because the statutes "largely pass constitutional muster"); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (noting that the court could "not be certain whether [assault] weapons are commonly used or are useful specifically for self-defense or hunting and therefore whether the prohibitions of certain semi-automatic rifles . . . meaningfully affect the right to keep and bear arms," before proceeding to uphold the challenged restrictions under intermediate scrutiny at step two).  *But see Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017) (en banc) (holding that assault weapon restrictions did not burden protected conduct at step one), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  To the extent prior federal circuit decisions held that assault weapon restrictions regulate weapons in "common use" at step one before going on to hold that those restrictions survived constitutional scrutiny at step two, those assumptions lack persuasive value with respect to the "common use" inquiry in the wake of *Bruen*.

1    configuration—not just semiautomatic rifles or "modern sporting rifles" in

2    general—are in "common use" for self-defense.  *See supra* at pp. 2 n.2.

3        As explained in Defendants' Supplemental Brief, the weapons accessories

4    regulated under the AWCA are not protected by the Second Amendment; rather,

5    semiautomatic centerfire rifles equipped with those accessories are "like" the M16

6    and other select-fire and fully automatic military rifles in terms of their functional

7    design, rate of fire, and muzzle velocity.  *See* Defs.' Suppl. Br. at 32.  Plaintiffs'

8    continued reliance on *Staples v. United States*, 511 U.S. 600, 603 (1994), is

9    misplaced.  *See* Pls.' Add'l Br. at 7.  That case was not a Second Amendment case

10   and did not hold that all semiautomatic weapons are necessarily in "common use"

11   as that phrase was subsequently used in *Heller*.  *Staples* merely held that the

12   government was required to prove that the criminal defendant in that case

13   knowingly possessed a fully automatic weapon for purposes of establishing *mens*

14   *rea*.  511 U.S. at 619.  Indeed, as the *Staples* majority explained, its "holding [was]

15   a narrow one."  *Id.*  If anything, *Staples* confirms how easy it is to convert a

16   semiautomatic rifle into a fully automatic machine gun.  *Id.* at 603 (explaining how

17   "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to

18   convert the AR-15 into an automatic weapon").

19       As a practical matter, there is little meaningful difference between the rates of

20   fire of semiautomatic and automatic weapons.  Defs.' Suppl. Br. at 35–36 (citing

21   Kapelsohn Dep. at 81–82).  Both utilize a similar gas system that enhances their

22   rate of fire.  The gas system "redirects some of the gas used to propel [a] bullet out

23   of [a] rifle's barrel and back toward the bolt carrier group to re-cock the hammer,

24   eject the spent casing, and load the next round from the magazine all in one fell

25   motion from just gas," "allowing for a much higher firing rate."[10]  The AR-platform

---

26       [10] 5D Tactical.com, AR-15 Gas Systems Guide (Feb. 2021),

27   https://bit.ly/3SQ55JA; *see also* Dep't of the Army, Rifle and Carbine (TC 3-22.9),

28   at 2-4 (May 2016) (explaining that "semiautomatic and automatic weapons require

is "virtually indistinguishable in practical effect from" the military-issue M16 rifle and M4 carbine,[11] save for the fact that it can fire only semiautomatically (without modifications). *Kolbe*, 849 F.3d at 125 (citation omitted). And soldiers equipped with M16s or M4s are trained and advised to use semiautomatic fire over fully automatic fire or burst fire "because it is more accurate and lethal than automatic fire in many combat and law enforcement situations." *Id.*; *see also* Defs.' Suppl. Br. at 36.

The high rate of fire is not the only similarity between AR-platform rifles and the M16. Both rifles also exhibit the same "straight-line design" in which the rifle's barrel and stock are in-line, which transmits recoil backwards into the shooter's shoulder. *See* Pls.' Trial Ex. A (Kapelsohn Decl.) ¶ 28. The straight-line design differentiates the M16 and AR-15 from a traditional sporting rifle (like the Mini-14), which typically has a stock "angle[d] downward toward the user's shoulder" with the action and barrel situated "up near the user's eye," causing the firearm to recoil upwards after each shot. Kapelsohn Dep. at 122. When fired rapidly, these "conventionally-stocked rifles" "typically exhibit a great deal of muzzle rise, making it hard to keep them on target." Pls.' Trial Ex. A (Kapelsohn Decl.) ¶ 28. The purpose of the straight-line design is to significantly reduce muzzle rise and maintain fire on target when the weapon is fired rapidly. Pls.' Trial

---

a *system of operation* to complete the cycle of function" and that M4- and M16-series weapons "use[] a portion of the high pressure gas from the cartridge being fired to physically move the assemblies and subassemblies in order to complete the cycle of function" and ready the next round for firing), *available at* https://bit.ly/3gV9U75.

[11] The M4 carbine is a "shortened variant" of the M16 rifle. M4 Carbine, Military.com, https://bit.ly/3TZshGh ("Equipped with a shorter barrel, collapsible stock and detachable carrying handle (with a built-in accessory rail) [the M4] provides soldiers operating in close quarters with improved handling and the capability to rapidly and accurately engage targets at extended range, day or night.").

9

Ex. A (Kapelsohn Decl.) ¶¶ 14–15; Kapelsohn Dep. at 123.  Because fully automatic weapons, like the M16 and M4, may be banned consistent with the Second Amendment, *Heller*, 554 U.S. at 627, California may restrict similar semiautomatic weapons, like AR-platform rifles, equipped with combat-oriented accessories consistent with the Second Amendment.

Firearms equipped with the accessories regulated under the Penal Code section 30515 are not in "common use" for self-defense.  Thus, Plaintiffs have failed to meet their threshold burden in this case, and their challenge to the AWCA fails at the textual stage of the *Bruen* analysis.

## II.   THE CHALLENGED PROVISIONS OF THE AWCA ARE CONSISTENT WITH THE NATION'S HISTORICAL TRADITIONS OF FIREARMS AND WEAPONS REGULATION

Even if Plaintiffs could sustain their threshold burden at the textual stage of the analysis, Defendants have amply demonstrated the AWCA's restrictions are historically justified under *Bruen*.[12]  Defendants have submitted numerous historical analogues spanning the history of the Nation, including the pre-founding

---

[12] As explained in Defendant's Supplemental Brief, the current expedited remand proceedings prejudice Defendants and impair their ability to adequately assemble and evaluate the historical record, as required under *Bruen*.  Defs.' Suppl. Br. at 73–77.  The type of historical research called for by *Bruen* is difficult and requires time, resources, and expertise.  While Defendants have been able to marshal a substantial historical record on an accelerated timetable, relevant historical analogues remain to be discovered and interpreted through further historical research.  *See* Cornell Decl. ¶ 14 (explaining that "much more work needs to be done to fill out th[e] picture" of the "history of arms regulation in the Anglo-American legal tradition"); *State v. Philpotts*, 194 N.E.3d 371, 372 (Ohio 2022) (Brunner, J., dissenting) (describing the complexities of history and historical research, which is not a "'once-and-for-all process that will eventually produce a single, final version of what happened in the past'"); *Defense Distributed* Ruling at 8 n.9 ("There is no possibility this Court would expect [the California Attorney General] to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice).").  Defendants maintain that additional time is warranted.

Defendants' Response to Plaintiffs' Additional Brief
re *New York State Rifle & Pistol Ass'n v. Bruen* (3:19-cv-01537-BEN-JLB)

colonial and English periods, demonstrating that the government's traditional police powers have long been understood to encompass the type of regulation at issue here:  restrictions targeting certain types of weapons or devices that are susceptible to criminal misuse and are not well-suited to constitutionally protected uses like self-defense.  *See* Defs.' Suppl. Br. at 41–73.  Like the AWCA, these analogues imposed a modest burden on the constitutional right to armed self-defense and were enacted in response to prevailing threats to public safety at that time.  *See id.*

### A.   If the AWCA Burdens Conduct Covered by the Plain Text of the Second Amendment, the Court Must Examine the Historical Analogues

In their additional brief, Plaintiffs argue that judicial review of the AWCA should end at the textual stage without examining any relevant history supporting its constitutionality.  They argue that any weapon in "common use" cannot be "banned," Pls.' Add'l Br. at 2, and thus "[t]here is no need for any further historical analysis," *id.* at 3.  Setting aside the fact that the particular weapons and accessories regulated under the AWCA are not in common use for self-defense, *see supra* at pp. 5–10, and that the challenged AWCA provisions do not operate as a *ban* on any particular weapon, *see supra* at p. 3, *Bruen* expressly requires an examination of relevant history when the plain text of the Second Amendment covers a plaintiff's proposed course of conduct, *Bruen*, 142 S. Ct. at 2134.  Whether a firearm is in "common use" is determined at the textual stage of the analysis, as *Bruen* demonstrates, and this inquiry is focused on how the challenged law operates today. Defs.' Suppl. Br. at 22 n.29.  If the plain text of the Second Amendment covers "arms" (because they are in common use), those arms are only "*presumptively*" protected.  *Bruen*, 142 S. Ct. at 2134, 2126 (emphasis added).  They are not entitled to absolute protection, beyond the reach of government regulation.  The analysis then proceeds to a comparison of the challenged law to historical analogues—an inquiry focuses on accepted limitations on the scope of the right to keep and bear arms as that right was understood in the past.

11

1    Even though *Bruen* determined at the textual stage that New York's public-
2  carry law burdened conduct related to "Arms" in "common use" today (handguns,
3  *id.* at 2134, that was not the end of the analysis.  The Court proceeded to evaluate
4  relevant historical analogues, concluding that "American governments simply have
5  not broadly prohibited the public carry of commonly used firearms for personal
6  defense." *Id.* at 2156.  The handgun bans struck down in *Heller*, *McDonald*, and
7  *Bruen* involved a weapon that was not only in "common use"—it was deemed to be
8  the "quintessential self-defense weapon." *Id.* at 2143.  The Court noted that
9  historical restrictions on pistols did not support New York's law because in contrast
10  to the pistols regulated in the past, modern handguns are commonly used for self-
11  defense today.  *See* Pls. Suppl. Br. at 3 (citing *Bruen*, 142 S. Ct. at 2143).  Because
12  modern handguns are the "quintessential self-defense weapon," *Heller*, 554 U.S. at
13  629, the burdens on the right to armed self-defense imposed by New York's law
14  were not comparable to historical laws restricting pistols under *Bruen*.  However,
15  less burdensome regulations, like the AWCA's restrictions challenged here, can be
16  relevantly similar to other comparably burdensome historical analogues and thus be
17  upheld at the historical stage of the analysis.  Here, even if the AWCA burdens
18  conduct protected by the plain text of the Second Amendment, Defendants have
19  demonstrated that the AWCA's restrictions are comparable in terms of burden and
20  justification as the historical analogues.

21    **B.    The AWCA Is Relevantly Similar to Historical Analogues**

22    The ubiquity of state and local restrictions on certain enumerated weapons
23  deemed to be especially dangerous at the time of those restrictions, including Bowie
24  knives, clubs, and pistols, demonstrate that California retains the power to restrict
25  certain types of firearms equipped with certain military-grade accessories.  *See*
26  Spitzer Decl., Exs. C, E.[13]  Those restrictions are traceable to the founding

27
28    [13] The Supreme Court has not set a minimum number of analogues that are

Defendants' Response to Plaintiffs' Additional Brief
re *New York State Rifle & Pistol Ass'n v. Bruen* (3:19-cv-01537-BEN-JLB)

1    generation, and even earlier to the 1689 English Bill of Rights, which allowed

2    certain individuals to possess arms, but only "as allowed by law."  Defs.' Suppl. Br.

3    at 50.  For example, in 1686, New Jersey enacted a restriction on the carrying of

4    "dangerous or unlawful weapons," which induced "great fear and quarrels."  Spitzer

5    Decl. ¶ 49.  Most of these dangerous weapons restrictions, particularly those

6    targeting Bowie knives and other fighting knives and billies, were enacted around

7    the ratification of the Fourteenth Amendment.  In the 1830s, the country was

8    experiencing a "panic over the Bowie knife," David B. Kopel et al., *Knives and the*

9    *Second Amendment*, 47 U. Mich. J.L. Reform 167, 179 (Fall 2013), which led to a

10   flurry of state and local attempts to restrict these especially dangerous, concealable

11   weapons.[14]  *See* Defs.' Suppl. Br. at 56–63.  For example, in 1887, Iowa banned the

12   _____

13   required to establish a sufficient tradition of firearms regulation, but it did explain
     that even a few can suffice if the record does not indicate that there was significant

14   dispute over the constitutionality of the historical analogue.  *Bruen*, 142 S. Ct. at

15   2133.  Even though there were "relatively few" historical prohibitions on the
     carrying of firearms in "sensitive places," the Court nevertheless "assume[d] it

16   settled" that those locations qualified as "'sensitive places' where arms carrying
     could be prohibited consistent with the Second Amendment."  *Id.* (citing David B.

17   Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L.

18   Rev. 205, 235 (2018)).  Here, in contrast to the "few" sensitive-places analogues
     discussed in *Bruen*, Defendants have cited laws and ordinances enacted by

19   numerous states and localities during the relevant time periods.

20       [14] *See, e.g.*, 1837 Ala. Laws 7, No. 11, § 2 (prohibitive tax on Bowie knives)

21   (quoted in Spitzer Decl., Ex. E at 1); 1837 Ga. Laws 90, § 1 (prohibiting sale and
     possession of Bowie and other kinds of knives as well as "pistols, dirks, sword

22   canes, [and] spears"); 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2 (prohibiting sale
     and carrying of Bowie knives, Arkansas toothpicks, and other fighting knives)

23   (quoted in Spitzer Decl., Ex. E at 65); 1838 Fla. Laws 36, No. 24, § 1 (prohibitive

24   tax on sale and possession of pocket pistols, sword canes, and Bowie knives); 1838
     Va. Acts 76, ch. 101, § 1 (banning "keep[ing] or carry[ing]" Bowie knives and

25   other deadly weapons); 1839 Ala. Acts 67, ch. 77 (banning the concealed carry of

26   Bowie knives and other deadly weapons) (quoted in Spitzer Decl., Ex. E at 1); 1850
     Mass. Acts 401, ch. 194 (prohibiting the manufacture or sale of slung-shots)

27   (quoted in Spitzer Decl., Ex. E at 33); 1858-1859 N.C. Sess. Laws 34-36, Pub.

28

13

possession of Bowie knives in addition to other "dangerous or deadly weapon[s]. Spitzer Decl., Ex. E at 24. Similarly, California's restrictions on billies and other concealable weapons were justified by concerns that these weapons were "common to the criminal's arsenal" and "ordinarily used for criminal and unlawful purposes." *People v. Grubb*, 63 Cal. 2d 614, 620 (1965), *superseded on other grounds by statute*. Even though the AWCA's restrictions target different weapons and devices and address different threats to public safety, they impose a comparably minimal burden on the right to armed self-defense, given the range of alternative weapons available for effective self-defense, and that minimal burden is comparably justified. *See* Defs.' Suppl. Br. at 66–73.

Plaintiffs argue that Defendants must show that the weapons equipped with combat-oriented accessories are "dangerous and unusual." Pls.' Add'l Br. at 6. As explained in Defendants' Supplemental Brief, however, the source for the Supreme Court's reference to "dangerous and unusual weapons" was Blackstone, who used the disjunctive formulation of this traditional firearms regulation: "dangerous *or* unusual weapons." Defs.' Suppl. Br. at 41 n.59 (emphasis added) (quoting 4 Blackstone 148–49 (1769)). Notably, laws enacted to regulate the possession and carrying of dangerous weapons characterize those weapons in different ways. *See Bruen*, 142 S. Ct. at 2143 (noting that the 1686 New Jersey concealed weapons restriction applied to the carrying of "dangerous *or unlawful* weapons" (emphasis added)); *id.* at 2144 (describing 1801 Tennessee statute prohibiting any person from "privately carry[ing] any dirk, large knife, pistol or *any other dangerous weapon*, to the fear or terror of any person" (emphasis added) (quoting 1801 Tenn. Acts

---

Laws., ch. 25, § 27, pt. 15 (imposing $1.25 tax on "[e]very dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane," while exempting weapons "used for mustering"); 1868 Ala. Laws 11 (prohibiting the "carrying of hostile deadly weapons" known as "'rifle' walking canes" or "'gunshot' walking canes"); 1868 Fla. Laws 95, ch. 7, § 11 (prohibiting the manufacture or selling of slung shots or metallic knuckles).

pp. 260–61)).  And it does not appear that cases interpreting and applying those analogues made explicit findings that the regulated weapons, such as Bowie knives or Arkansas toothpicks, were both "dangerous" and "unusual."  For example, in *Andrews v. State*, the Tennessee Supreme Court held that a law prohibiting anyone "either publicly or privately to carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol" was constitutional, without any analysis of whether each of these weapons is "dangerous and unusual" or explanation of what that phrase may mean. 50 Tenn. 165, 186 (1871).

The Supreme Court has not explained the meaning of the phrase "dangerous and unusual" as it relates to weapons, or suggested that the phrase imposes rigid requirements on governments attempting to regulate such weapons.  In any event, it appears that the phrase is a hendiadys—a figure of speech like "cruel and unusual" and "necessary and proper," which involve "two terms, separated by a conjunction, [that] are melded together to form a single complex expression."  Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016); *see also* Cornell Decl. ¶ 9 n.9.  For example, if the phrase "cruel and unusual" in regards to punishment is read as a hendiadys, the phrase would mean punishment that is "unusually cruel" or "innovatively cruel," rather than "ask[ing] first whether a punishment is cruel and then whether it is unusual, treating the two as distinct and unrelated inquiries."  Samuel L. Bray, *supra*, at 812.  Similarly, if viewed as a hendiadys, "dangerous and unusual" would be read as "unusually dangerous."

In addition to the dangerous weapons laws cited by Defendants, since the founding era, state and local governments have imposed restrictions on certain weapons configurations deemed to be especially dangerous, including trap guns, spring guns, and "infernal machines."  Spitzer Decl., Ex. F.  The first such restriction appears to have been enacted by New Jersey in 1771.  Defs.' Suppl. Br. at 54.  Similar restrictions were enacted throughout the mid- to late-19th century,

and continued well into the 20th century.  *See* Spitzer Decl., Ex. F.[15]  These restrictions regulated the manner in which law-abiding citizens could keep their firearms in their home, by prohibiting them from affixing to their firearms string or other devices that would enable the firearm to discharge remotely.  Similarly, colonial era restrictions regulated the way in which individuals were able to store gunpowder, an essential component to operate a musket, in the home, or even prohibited the keeping of loaded firearms inside the home.  Defs.' Suppl. Br. at 53–54; Cornell Decl. ¶¶ 35–37, 40.  These historical restrictions impose a comparable (or even greater) burden on the right to armed self-defense that the AWCA, and that burden is comparably justified by similar public safety interests.

The historical record shows that the AWCA is a permissible exercise of California's police powers, consistent with the scope of the Second Amendment as originally understood.  In defending this law, Defendants are not required to point to regulations of semiautomatic firearms equipped with the accessories regulated by the AWCA at the founding or after the Civil War.  That would not be possible, of course, because semiautomatic weapons did not exist in the period immediately after ratification of the Fourteenth Amendment.  *See* Pls.' Add'l Br. at 8 ("The first

---

[15] *See, e.g.*, 1869 Minn. Laws 50-51, ch. 39 § 1 (prohibiting "[t]he setting of a so-called trap or spring gun, pistol, rifle or other deadly weapon"); 1873 Minn. Stats. 993 (prohibiting the "setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state") (quoted in Spitzer Decl., Ex. F at 2); John Lellyett, Ordinances of the City of Nashville 244 (1872) (§ 9) (prohibiting any "sling gun, or spring shot, made from India rubber, or other elastic substances, attached to a forked stick, or other brace, to throw or shoot pebbles, gravel, shot, bullets, or other hard substances, or to use a bow and arrow"); 1875 Mich. Pub. Acts 136, No. 97 § 1 (prohibiting the setting of "any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive") (quoted in Spitzer Decl., Ex. F at 1); Revised Codes of the State of N.D. 1895 (prohibiting the "set[ting of] any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left") (quoted in Spitzer Decl., Ex. F at 4).

16

1   rifle accredited to be a semi-automatic action was the Mannlicher rifle, developed

2   in the early 1890s" (quoting Hlebinsky Dep. at 34)).  And that is not Defendants'

3   burden under *Bruen*.  Instead, Defendants may rely on other types of weapons

4   restrictions that are comparably burdensome and justified.

5         In arguing that the AWCA is not justified by history, Plaintiffs bypass a

6   crucial step in *Bruen*'s analytical process, which requires "a more nuanced

7   approach" when a challenged law addresses "unprecedented societal concerns or

8   dramatic technological changes."  *Bruen*, 142 S. Ct. at 2132.  Here, Defendants

9   have shown that the AWCA regulates firearms technology that was dramatically

10  different from the technology available around the time that the Second or

11  Fourteenth Amendments were ratified.  *See* Defs.' Suppl. Br. at 43–46; Spitzer

12  Decl. ¶¶ 18–28.  Plaintiffs claim that the particular accessories existed long before

13  the enactment of the AWCA, but they did not exist in combination with

14  semiautomatic and automatic firing mechanisms.  And while Plaintiffs claim that

15  repeating rifles existed before semiautomatic weapons, Pls.' Add'l Br. at 8, the

16  Henry and Winchester repeating rifles were not comparable to modern

17  semiautomatic weapons.  They were lever-action rifles that were not widely

18  adopted until the 1880s.  Spitzer Decl. ¶¶ 28–29.  And Professor Michael

19  Vorenberg explains that legislative regulation of repeater rifles after the Civil War

20  was not necessary because the U.S. military effectively restricted the ability of

21  civilians to obtain them.  Vorenberg Decl. ¶¶ 8–10.  In regulating the use of certain

22  accessories with certain semiautomatic weapons, the AWCA addresses dramatically

23  different firearms technologies than those that were widely available at the

24  founding or around the time of the ratification of the Fourteenth Amendment.

25        In addition to regulating dramatically new firearms technologies, the AWCA

26  was also enacted to address a societal concern that did not exist around the time that

27  the Second or Fourteenth Amendments were ratified:  mass shootings.  Although

28  mass murder has been a reality throughout American history, it was generally

17

perpetrated by groups of people due to technological limitations; the development of more advanced weaponry, including semiautomatic and automatic firearms, made it possible for individuals to conduct mass violence.  Roth Decl. ¶ 38.  As explained in Defendants' Supplemental Brief, firearms and other weapons restrictions are generally enacted as regulatory needs arise, as seen by the proliferation of dangerous weapons laws that were passed only after homicide rates began to rise in the mid- to late-19th century.  Defs.' Suppl. Br. at 44; Roth Decl. ¶ 14 ("[D]uring the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.").  The AWCA is consistent with this regulatory approach and is historically justified.  Defs.' Suppl. Br. at 44.

Contrary to Plaintiffs' argument, the Court's historical analysis is not limited to regulations enacted during the founding period.  As argued in Defendants' Supplemental Brief, the period around the ratification of the Fourteenth Amendment is particularly relevant to determining the scope of the Second Amendment and the limits of the states' police powers, given that it was at this time that the right to keep and bear arms was incorporated and made applicable to the states.  The Second Amendment's limitations on traditional state police powers "depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).  At a minimum, any originalist interpretation of the historical record must account for the public understandings and historical analogues in existence around the time that the Second Amendment was made applicable to the states.  In any event, as in *Bruen*, the record here includes similar laws enacted around the ratification of both the Second and Fourteenth Amendments.  *Bruen*, 142 S. Ct. at 2138 ("We need not

18

1  address this issue today because, as we explain below, the public understanding of

2  the right to keep and bear arms in both 1791 and 1868 was, for all relevant

3  purposes, the same with respect to public carry.").

4       Defendants have also shown that the dangerous weapons laws enacted during

5  the 18th and 19th centuries were consistent with laws enacted in the early 20th

6  century targeting semiautomatic and automatic weapons after they began to

7  circulate widely in society, leading to increased criminal use of these weapons.  The

8  AWCA is a modern-day application of those traditions to the contemporary

9  problem of mass shootings and other forms of gun violence, which are exacerbated

10  by rapid-fire semiautomatic rifles, pistols, and shotguns that are designed to kill or

11  maim as many people as efficiently as possible.  Defs.' Suppl. Br. at 32–35.  And

12  here, the AWCA targets certain accessories that enhance the lethality and potential

13  criminal uses of those already extremely dangerous firearms.  These 20th century

14  laws—which are very similar to the restrictions at issue here in regulating the

15  manufacture, sale, and possession of automatic, and even semiautomatic,

16  firearms—may be considered in assessing the scope of the Second Amendment

17  because they do not "contradict[] early evidence."  *Id.* at 2154 & n.28.

18       California is not alone in enacting assault weapon restrictions like the AWCA.

19  Far from being the outlier that Plaintiffs suggest, Pls.' Br. at 10, similar assault

20  weapon restrictions have been enacted by a total of nine jurisdictions, representing

21  over a quarter of the U.S. population.  Spitzer Decl. ¶ 1.  And the federal

22  government enforced a federal assault weapons ban for a decade from 1994 to

23  2004, and the U.S. House of Representatives recently passed a renewed federal

24  assault weapons ban.  *Id.*  That the remaining states do not restrict weapons that

25  qualify as "assault weapons" *today*, is not relevant to whether those restrictions are

26  justified *historically* under an originalist framework.  Simply counting the number

27  of states that have enacted (or refrained from enacting) certain firearms laws today,

28  as Plaintiffs suggest, is not a historically grounded approach for determining what

19

Defendants' Response to Plaintiffs' Additional Brief
re *New York State Rifle & Pistol Ass'n v. Bruen* (3:19-cv-01537-BEN-JLB)

laws a state may enact consistent with the Second Amendment.  Such an approach would also stifle state and local innovation in responding to gun violence.  As states and localities experiment with different types of gun-safety laws, some jurisdictions will necessarily be early adopters and stand-out from the majority of jurisdictions.  Even if their laws are different from a majority of state laws *today*, however, they will still satisfy the text-and-history standard if they are "consistent with this Nation's *historical tradition* of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added).  Principles of federalism permit variation among the states in addressing matters of public safety and concern, consistent with the Second Amendment.  Indeed, in determining that the Second Amendment applies to the states, the Court explained that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald v. City of Chi.*, 561 U.S. 742, 784 (2010) (plurality opinion).  The right to keep and bear arms is not a "regulatory straightjacket," *Bruen*, 142 U.S. at 2133, and it accommodates state and local variation in "devis[ing] solutions to social problems that suit local needs and values," *McDonald*, 561 U.S. at 784 (plurality opinion).

The AWCA is consistent with historical regulations of certain dangerous weapons and firearm configurations.  The challenged provisions of the AWCA comport with the scope of the Second Amendment and are a permissible exercise of long-accepted and traditional police powers to promote public safety.  Defs.' Suppl. Br. at 42.

## CONCLUSION

For these reasons, the AWCA comports with the Second Amendment.

1    Dated:  October 28, 2022                    Respectfully submitted,

2                                                ROB BONTA
                                                 Attorney General of California
3                                                P. PATTY LI
                                                 Supervising Deputy Attorney General
4                                                ANNA FERRARI
                                                 Deputy Attorney General
5

6                                                s/ John D. Echeverria

7

8                                                JOHN D. ECHEVERRIA
                                                 Deputy Attorney General
                                                 *Attorneys for Defendants Rob Bonta*
9                                                *and Blake Graham, in their official*
                                                 *capacities*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Response to Plaintiffs' Additional Brief
re *New York State Rifle & Pistol Ass'n v. Bruen* (3:19-cv-01537-BEN-JLB)