# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **OCEAN STATE TACTICAL, LLC,** | : | |
| **d/b/a BIG BEAR HUNTING AND** | : | |
| **FISHING SUPPLY; JONATHAN** | : | |
| **HIRONS; JAMES ROBERT** | : | |
| **GRUNDY; JEFFREY GOYETTE;** | : | |
| **and MARY BRIMER** | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | **C.A. NO. 1:22-cv-00246-JJM-PAS** |
| | : | |
| **STATE OF RHODE ISLAND** | : | |
| *Defendant.* | : | |

## DECLARATION OF DENNIS BARON

1. My name is Dennis Baron. I am a Research Professor of English and Linguistics at the University of Illinois. I have been retained by the State of Rhode Island's Office of the Attorney General to provide an expert opinion in the above-captioned matter.

2. I am an expert in the field of linguistics with a special emphasis on historical language usage. Attached hereto is my curriculum vitae, Exhibit 1.

3. I have been retained by the Rhode Island Office of the Attorney General to perform original historical language and Corpus Linguistics research in this case at a rate of $350.00 per hour. The expert report I have prepared is attached as Exhibit 2. I hold all opinions expressed in Exhibit 2 to a reasonable degree of professional certainty.

_____

Dennis Baron, Ph.D.

Date: 14 October 2022

# Exhibit 1

**DENNIS BARON**

Professor of English, Emeritus                                    *mobile:* +1-217-419-8377
Research professor of English                                    *email:* debaron@illinois.edu
University of Illinois at Urbana-Champaign      Web Page *url:* http://faculty.las.illinois.edu/debaron/
Home: 1801 Foxborough Ct
Champaign IL 61822-8501

VITA

**Education:**

> Ph.D., University of Michigan (English Language and Literature), 1971.
> M.A., Columbia University (English and Comparative Literature), 1968.
> A.B., Brandeis University (English and American Literature), 1965.

**Positions held:**

> Research Professor of English and linguistics, University of Illinois, 2018–present.
> Professor English, Emeritus, University of Illinois, 2018–present.
> Professor of English and Linguistics, University of Illinois at Urbana-Champaign, 1984–2018.
> Head, Department of English, University of Illinois at Urbana-Champaign, 1998–2003.
> Acting Head, Department of English, Univ. of Illinois at Urbana-Champaign, 1997–98.
> Director of Rhetoric, University of Illinois, 1985–97.
> Director, Writing Outreach Workshop, Univ. of Illinois, 1985–88.
> Professor, Campus Honors Faculty, Univ. of Illinois, 1988–2018.
> Professor, College of Education, UIUC, Summer 1988.
> Associate Professor of English and Linguistics, Univ. of Illinois, Urbana-Champaign, 1981–84.
> Assistant Professor of English and Linguistics, Univ. of Illinois, Urbana-Champaign, 1975–81.
> Assistant Professor of English, The City College of CUNY, 1973–74.
> Assistant Professor of English, Eastern Illinois University, 1971–73.

**Fellowships and Grants:**

> John Simon Guggenheim Memorial Foundation Fellow, 2016–17.
> Faculty Fellow, Program for the Study of Cultural Values and Ethics, Univ. of Illinois, Spring 1992.
> National Endowment for the Humanities Fellowship, calendar year 1989.
> Newberry Library National Endowment for the Humanities Fellowship, 1988–89 (offered, not held).
> IBM Project Excel Grant C-41, 1986-87: "Computer Analysis of Student Writing."
> Associate, Center for Advanced Study, University of Illinois 1984–85.
> Fulbright Lecturer, University of Poitiers, France, 1978–79.
> Fellow, Center for Advanced Study, University of Illinois, 1978 (offered, not held).
> University of Illinois Research Board grants, multiple years, 1978–2017.

**Books:**

1. ***You Can't Always Say What You Want: The Paradox of Free Speech.*** Cambridge University Press, 2023. (In press; available Dec., 2022).

Dennis Baron, *Vita,*  2

2. ***What's Your Pronoun? Beyond He and She.*** Liveright, 2020; paperback, 2021. Reviews: *New York Times Book Review, The Times* (London); *The London Review of Books; Harpers; The Atlantic; The Economist; Attitude.*

3. ***A Better Pencil: Readers, Writers and the Digital Revolution.*** Oxford University Press, 2009, pp. xviii + 259. Paperback edition, 2012. Chinese translation, 2012. Reviews: *Salon*; *City Journal*; History News Network; *The Scotsman; Library Journal; internet review of books; Montreal Mirror*; Innovation Leadership Network; mantex.com (Manchester, England)*; The Star* (Malaysia); *Times Higher Education; International Journal of Communication; The Guardian; Choice; American Scientist; 3quarksdaily, The New Yorker*; *Arts Journal.*

4. *Guide to Home Language Repair* (questions, answers, and essays on the English language)*.* National Council of Teachers of English (1994), viii + 165. Reviews: *Boston Book Review*; *New York Times Magazine.*

5. ***The English-Only Question: An Official Language for Americans?*** Yale University Press, 1990; paper ed., 1992. Reviews: *Publishers Weekly; Washington Post Book World; Booklist; Library Journal; Education Week;* Hazel *New York City Tribune; The Bookwatch—Midwest Book Review; Change; Choice; The Jerusalem Post; Times Literary Supplement; American Political Science Review; Book Review Digest; American Journal of Sociology; Publishers Weekly; College English; Modern Language Journal; Language Problems and Language Planning; Language.*

6. ***Declining Grammar and Other Essays on the English Vocabulary*** National Council of Teachers of English. Reviews: *Newsweek* (Dec. 11, 1989), p. 71; William Safire, *New York Times Magazine; The State Journal-Register* (Springfield, IL); *The Chicago Tribune; The Chicago Sun-Times; The Denver Post*; *Library Materials Guide; Book Report; NATE News; Language; Young Adult Paperback Book Guide.*

7. ***Grammar and Gender*** Yale University Press, 1986; paper ed., 1987. Reviews: *Kirkus Reviews; Publishers Weekly; Patriot Ledger* (Quincy, MA); *The Washington Times Magazine;* John Simon, *The New Leader; Chronicle of Higher Education; Los Angeles Times; Library Journal; Insight; Champaign-Urbana News-Gazette; Choice; Language Monthly; The Times Literary Supplement; Psychology Today; Virginia Quarterly Review; The Toronto Star; ETC.; Book Review Digest; Chicago Tribune; Akron* (OH) *Beacon Journal; Clearwater* (FL) *Sun; Corpus Christi* (TX) *Caller-Times*; *Wilkes-Barre* (PA) *Times Leader; Troy* (NY) *Record; The Editorial Eye; Studies in the American Renaissance; Lingua; Modern Language Review; Review 9; American Speech; Southern Quarterly Review; Signs; Language; JEGP; Frontiers; Anglia; Journal of English Linguistics* Nominated for the Mina P. Shaughnessy Medal of the Modern Language Association.

8. ***Grammar and Good Taste: Reforming the American Language*** Yale University Press, 1982; paper ed., 1984. Reviews: *Library Journal; America; The New York Times Book* Review; *The Washington Post Book World; Chronicle of Higher Education; The Times* (London); *The Los Angeles Times Book Review; Journal of American History; Encounter; American Literature; Journal of American Studies; Amerikastudien; Book Review Digest; Journal of English and Germanic Philology; Technical Communication; The Augusta Chronicle, Augusta Herald; American Studies; South Atlantic Quarterly; English Language Notes; World Literature Today; History of Education Quarterly;* Caroline Bokinsky, *Studies in the American* Renaissance; *Etudes Anglaises; Review of English Studies; College Composition and Communication; American Speech; Anglia; Book Review Digest; ESQ; English Journal.* Selected for the "Editor's Choice" section of *The New York Times Book Review.* Selected by the Library of Congress for recording for the blind. Nominated for the 1982 Mina P. Shaughnessy Medal and the 1987 James Russell Lowell award of the Modern Language Association; selected by the Editorial Board of the National Council of Teachers of English for distribution as an affiliate publication of the NCTE.

Dennis Baron, *Vita,* 3

9. ***Going Native: The Regeneration of Saxon English.*** *Publication of  The American Dialect Society,* No. 69, University of Alabama Press, 1982.

10. ***Case Grammar and Diachronic English Syntax.*** Mouton, 1974. Reviews: *Linguistics; Indogermanische Forschungen; The Year's Work in Old English Studies; Revue Belge de Philologie et d'Histoire.*

**Supreme Court Amicus Briefs:**

Brief for Corpus Linguistics Professors and Experts as Amici Curiae Supporting Respondents. *New York State Rifle and Pistol Assn. v. Bruen,* No. 20-843 (2022). [Cited by J. Breyer in his dissent]

Brief for Professors of Linguistics and English Dennis E. Baron, Ph.D., Richard W. Bailey, Ph.D., and Jeffrey P. Kaplan, Ph.D. in support of petitioners. *District of Columbia, et al., v. Dick Anthony Heller.* 554 U.S. 570 (2008)

**Recent Media:**

"Does the Second Amendment Actually Give You the Right to Own a Gun?" *Think,* with Andrew Miller, NBC News, May 26, 2022. https://www.nbcnews.com/think/video/does-the-2nd-amendment-actually-give-you-the-right-to-own-a-gun-140886597910

"The Plain Language Movement." Part of Stephen Fry's series "English Delight,"  BBC Radio 4, August 2014.

"Latinos in America." PBS Documentary aired in Oct. 2013. In episode 6 of the 6-part series I discuss official English, bilingualism, and minority language rights.

**Book Chapters:**

1. "Post on Facebook, go directly to jail." Rpt. in Roen, Duane, ed., *McGraw-Hill Guide: Writing for college, writing for life.* Forthcoming, January, 2017.
2. "Don't make English official, ban it instead." Rpt. in Roen, Duane, ed., *McGraw-Hill Guide: Writing for college, writing for life.* Forthcoming, January, 2017.
3. "Facebook multiplies genders but offers users the same three tired pronouns." Melissa Goldthwaite, *et al.,* eds. *The Norton Reader,* 14/e New York: W.W. Norton. Forthcoming, January, 2016.
4. "Facebook multiplies genders but offers users the same three tired pronouns." *The Little Norton Reader.* New York: W.W. Norton. A special edition containing 50 essays from the first 50 years, to celebrate the 50th anniversary of *The Norton Reader.* Forthcoming, 2016.
5. "Who owns global English?" *The Norton Reader,* ed. Linda H. Peterson and John C. Brereton. New York: Norton.
6. "Should Everybody Write?" In Andrea Lunsford, *Everyone's an author, with readings.* New York, NY: W. W. Norton, 2012
7.  "The Noun Game: A simple grammar lesson leads to a clash of civilizations." *The Simon and Schuster Short Prose Reader.* Robert Funk, Susan Day, et. al. Boston: Prentice Hall, 2011. Pp. 128-34.
8. "#Twitter Revolution." *They Say, I Say, with Readings 2e.* New York: W.W. Norton, 2012.
9.  "The More Things Change: Language and Education." In Anne Curzan and Michael Adams, eds., *Contours of English.* Univ. of Michigan Press (2010).
10. "The New Technologies of the Word." In Keith Walters and Michal Brody, eds., *What's Language Got to Do with It?"* New York: W. W. Norton, 2005, pp. 136-51.  Rpt. in Lynn Bloom and Louise Smith, *The Arlington Reader,* 2e., New York: Bedford/St. Martin's, 2008; rpt. 2010.

Dennis Baron, *Vita,* 4

11. "Don't Make English Official—Ban It Instead." [rpt. of 1996 essay]. In Keith Walters and Michal Brody, eds., *What's Language Got to Do with It?"* New York: W. W. Norton, 2005, pp. 477-79.

12. "Forget Everything You Learned About Writing." In Chris Anson, ed., *The WAC Casebook: Scenes for Faculty Reflection and Program Development.* New York: Oxford Univ. Press, 2003, pp. 261-65.

13. "Language Legislation and Language Abuse: American Language Policy through the 1990s." In *Language Ideologies: Critical Perspectives on the Official English Movement,* vol. 2: History, Theory and Policy, ed. Roseann D. Gonzalez with Ildiko Melis (Urbana: NCTE, and Lawrence Earlbaum Assoc., 2001), pp. 5-29.

14. "From Pencils to Pixels: The Stages of Literacy Technologies." In *Passions, Pedagogies and 21st-Century Technologies,* ed. Gail Hawisher and Cynthia Selfe (Logan: Utah State Univ. Press and the National Council of Teachers of English, 1999), pp. 15-33. [This is the lead essay in the book.] Rpt. in Ellen Cushman, Eugene R. Kintgen, Barry M. Kroll, and Mike Rose, eds., *Literacy: A Critical Sourcebook.* Boston: Bedford St. Martin's, 2001. Pp. 70-84.

15. "An Official Language."  Rpt. (from *The English Only Question*) in *Writing About Diversity: An Argument Reader and Guide*, ed. Irene L. Clark (Fort Worth: Harcourt Brace, 1994), pp. 284-302.

16. "Language Is the Enemy." Rpt. (from *Declining Grammar*) in *Dimensions of Language*, ed. Boyd Davis.  (New York: Macmillan, 1993), pp. 427-31.

17. "Language, Culture, and Society," in *Introduction to Scholarship in Modern Languages and Literatures*, ed. Joseph Gibaldi.  2nd ed. (New York: Modern Language Association, 1992), pp. 28-52.

18. "Federal English and the Constitution," rpt. in *Language Loyalties*, ed. James Crawford.  Chicago: Univ. of Chicago Press (1992), pp. 36-40.

19. "The Legal Status of English in Illinois: Case Study of a Multilingual State," in *Not Only English: Affirming America's Multilingual Heritage*, ed. Harvey A. Daniels (Urbana: National Council of Teachers of English, 1990), pp. 13-26.

20. "Watching Our Grammar: The English Language for English Teachers," in *On Literacy and Its Teaching: Issues in English Education,* ed. Gail Hawisher and Anna Soter (Albany: State Univ. of New York Press, 1990), pp. 208-23.  [Review: Sharon J. Hamilton, *College English* 55 (1993): 794-800.

21. "Watching Our Grammar" (rpt. from *Grammar and Good Taste*), in *The Story of English: Study Guide and Reader* (Dubuque, IA: Kendall/Hunt, 1986).

22. "Nonstandard English, Composition, and the Academic Establishment," 1975; rpt. in *Readings in Applied English Linguistics,* ed. Harold B. Allen and Michael Linn, 3rd. ed. (New York: Alfred Knopf, 1982), pp. 436-43.

**Recent Articles:**

1. "Look it up in your *Funk & Wagnalls*: How Courts Define the Words of the Law," *Dictionaries* (forthcoming).

2. "A brief history of singular 'they,' *Oxford English Dictionary Blog,* Sept. 4, 2018. https://public.oed.com/blog/a-brief-history-of-singular-they/#_prclt=9gZeU4Sf

3. "Antonin Scalia Was Wrong about the Meaning of 'Bear Arms," *Washington Post,* May 21, 2018. https://www.washingtonpost.com/opinions/antonin-scalia-was-wrong-about-the-meaning-of-bear-arms/2018/05/21/9243ac66-5d11-11e8-b2b8-08a538d9dbd6_story.html?utm_term=.9f23ab854a09

4. "Nowadays, 'Like' Just Means 'Uh-Huh'" *Visual Thesaurus.* August 11, 2014. http://www.visualthesaurus.com/cm/wc/nowadays-like-just-means-uh-huh/' *Vocabulary.com* http://www.vocabulary.com/articles/wc/nowadays-like-just-means-uh-huh/

5. "America's war on language." *OxfordWords Blog.* Sept. 17. http://blog.oxforddictionaries.com/2014/09/americas-war-language/ Days and Memories Blog. http://hgmsblog.weebly.com/blog/americas-war-on-language  Sept. 3.

6. "Changing gender in language isn't easy." *New York Times,* "Room for Debate" Oct. 19, 2014. http://nyti.ms/1tDISSa

Dennis Baron, *Vita,*  5

7. "Nobody likes a whistleblower, wrayer, snitch, narker, denunciator, quadruplator, or emphanist." *Visual Thesaurus.* Feb. 23, 2014.
8. "Plain English: It's the law." *Visual Thesaurus.* Feb. 7, 2014. http://www.visualthesaurus.com/wc/plain-english-its-the-law/
9. "Banning words for the new year." *Vocabulary.com.* January 20, 2914. http://www.vocabulary.com/articles/wc/banning-words-for-the-new-year/" *Visual Thesaurus.* January 20, 2014. http://www.visualthesaurus.com/cm/wc/banning-words-for-the-new-year/
10. "Dennis Baron's Word of the Year for 2013: 'marriage'" *Visual Thesaurus.* Dec. 24, 2013. http://www.visualthesaurus.com/cm/wc/dennis-barons-word-of-the-year-for-2013-marriage/
11. "The highest dictionary in the land?" *Oxford University Press Blog.* June 23, 2013. http://bit.ly/11UkV54
12. "The highest dictionary in the land?" *Visual Thesaurus.* June 24, 2013. http://bit.ly/11GYbGK
13. "Will the real Gettysburg Address please stand up?" *Visual Thesaurus.* Nov. 19, 2013. http://www.visualthesaurus.com/cm/wc/will-the-real-gettysburg-address-please-stand-up/
14. "Pens and Pencils Down: New York City's 'Banned Words' Controversy." *Visual Thesaurus.* April 4, 2012. http://www.visualthesaurus.com/wc/3212/
15. "Wikipedia: Write first, ask questions later." Rpt. in James C. McDonald, *The Reader.* New York: Pearson, 2012.
16. "Learning not to curse in Arizona." *Oxford Univ. Press blog.* May 27, 2012
17. "Why we misread." *Visual Thesaurus.* July 3, 2012. http://www.visualthesaurus.com/cm/wc/why-we-misread/
18. "Grammar freaks really *are* strange." *Cultural Weekly.* July 19, 2012. http://www.culturalweekly.com/grammar-freaks-strange.html
19. "Grammar sticklers may have OCD." *Oxford Univ. Press Blog.* Aug. 18, 2012. http://blog.oup.com/2012/08/grammar-sticklers-may-have-ocd/
20. "The e-reader over your shoulder." *Visual Thesaurus.* Nov. 12, 2012. http://www.visualthesaurus.com/cm/wc/the-e-reader-over-your-shoulder/
21. "The e-reader over your shoulder." *Oxford University Press blog,* Nov. 24, 2012. http://blog.oup.com/2012/11/the-e-reader-over-your-shoulder/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+oupblog+%28OUPblog%29
22. "Apple patents page-turning. What's next, the letter "i"? *Visual Thesaurus.* Nov. 27, 2012. http://www.visualthesaurus.com/cm/wc/apple-patents-page-turning-whats-next-the-letter-i/
23. "Dennis Baron's Word of the Year for 2012 is #hashtag." *Visual Thesaurus,* Dec. 16, 2012. http://www.visualthesaurus.com/cm/wc/dennis-barons-word-of-the-year-for-2012-hashtag
24. "No laptops: Classroom bans on digital devices are spreading." *Visual Thesaurus,* Jan. 14, 2013. http://www.visualthesaurus.com/cm/teachersatwork/no-laptops-classroom-bans-on-digital-devices-are-spreading/
25. "National Grammar Day in Wartime." *Visual Thesaurus.* Mar. 4, 2013. http://www.visualthesaurus.com/cm/wc/national-grammar-day-in-wartime/
26. "The Great Language Change Hoax." *Academe.* (The AAUP blog). April 1, 2013. http://academeblog.org/2013/04/01/the-great-language-change-hoax/
27. "English-only in the exit row." *Oxford Univ. Press Blog.* April 29, 2011. http://blog.oup.com/2011/04/exit-row/
28. "The most human computer?" *Oxford Univ. Press Blog.* May 5, 2011. http://blog.oup.com/2011/05/human-computer/
29. "Teaching commas won't help." *Visual Thesaurus,* May 16, 2011. http://www.visualthesaurus.com/cm/wc/2848
30. "Teaching commas won't help." *Oxford Univ. Press Blog.* June 14, 2011. http://blog.oup.com/2011/06/teaching-commas/
31. "Webster's lays down the law." *Visual Thesaurus Magazine.* June 15, 2011. http://www.visualthesaurus.com/cm/dictionary/2883/
32. "But the dictionary says. . ." *Oxford Univ. Press Blog.* June 27, 2011. http://blog.oup.com/2011/06/dictionary-courtroom/

Dennis Baron, *Vita,*  6

33. "Content-Free Prose: Death of Writing or Next Big Thing?" *Visual Thesaurus.* June 29, 2011. http://www.visualthesaurus.com/cm/wc/2893?utm_source=rss
34. "Content-Free Prose: Death of Writing or Next Big Thing?"  *Oxford Univ. Press Blog.* July 8, 2011. http://blog.oup.com/2011/07/content-free-prose/
35. "Are laws requiring English signs discriminatory?" *Oxford Univ. Press Blog.* July 21, 2011. http://blog.oup.com/2011/07/english-signs/
36. "Computers remember so you don't have to." *Oxford Univ. Press Blog.* July 28, 2011. http://blog.oup.com/2011/07/google-effect/
37. "That ugly Americanism? It could well be British." *Oxford Univ. Press Blog.* Aug. 5, 2011. http://blog.oup.com/2011/08/ugly-americanism/
38. "New words are great for back to school." *Visual Thesaurus.* Aug. 30, 2011. http://www.visualthesaurus.com/cm/dictionary/2956/?utm_source=rss
39. "New words are great for back to school." Oxford Univ. Press Blog, Sep. 1, 2011. http://blog.oup.com/2011/09/school-words/
40. "The linguistic impact of 9/11? '9/11' itself." Visual Thesaurus. Sep. 12, 2011. http://www.visualthesaurus.com/cm/dictionary/2969/
41. "The linguistic impact of 9/11". *Oxford Univ. Press Blog.* Sep. 12, 2011. http://blog.oup.com/2011/09/linguistic-impact/
42. "The only linguistic impact of 9/11 is '9/11' itself." *Cultural Weekly,* Sep. 14, 2011. http://www.culturalweekly.com/only-linguistic-impact-of-911-is-911-itself.html
43. "Are there alternatives to global English?" *Visual Thesaurus.* Sept. 27, 2011. http://www.visualthesaurus.com/cm/wc/2985/
44. "Is resistance futile? Are there alternatives to global English?" *Cultural Weekly.* Sept. 29, 2011. http://www.culturalweekly.com/is-resistance-futil-are-there-alternatives-to-global-english.html
45. "Resistance may be futile: Are there alternatives to global English?" *OUP Blog,* Oct. 11, 2011. http://blog.oup.com/2011/10/global-english/; reposted in the Daily Beast, Oct. 12, 2011. http://andrewsullivan.thedailybeast.com/2011/10/english-has-taken-over.html
46. "Is this the last print dictionary?" *Cultural Weekly.* Oct. 19, 2011. http://www.culturalweekly.com/is-this-the-last-print-dictionary.html
47. "The laws of English punctuation." *Visual Thesaurus.* Oct. 24, 2011. http://www.visualthesaurus.com/cm/wc/3011/
48. "Talk like Shakespeare Day." *Cultural Weekly.* Oct. 27, 2011. http://www.culturalweekly.com/talk-like-shakespeare-day.html
49. "Occupy Wall Street: Can the revolution be trademarked?" *Oxford University Press Blog.* Nov. 28, 2011. http://blog.oup.com/2011/11/occupy-trademark/
50. "Dennis Baron's Word of the Year for 2011: 'Volatility.'" *Visual Thesaurus.* Dec. 2, 2011. http://www.visualthesaurus.com/cm/wc/3052/
51. "How to save an endangered language." *Oxford University Press Blog.* Dec. 4, 2011. http://blog.oup.com/2011/12/endangered-language/
52. "The top language stories of 2011." *Visual Thesaurus.* Dec. 20, 2011. http://www.visualthesaurus.com/cm/wc/3072
53. "Dictionary droids write definitions untouched by human hands." *Oxford Univ. Press Blog.* Jan. 24, 2012. http://blog.oup.com/2012/01/dictionary-droids-write-definitions-untouched-by-human-hands/
54. "The Writer's Meme." *Cultural Weekly.* Feb. 22, 2012. http://www.culturalweekly.com/the-writers-meme.html
55. "Alejandrina Cabrera should be on the San Luis City Council ballot." *Oxford Univ. Press Blog.* Feb. 28, 2012. http://blog.oup.com/2012/02/alejandrina-cabrera-san-luis-city-council/
56. "Learning not to curse in Arizona." *Cultural Weekly.* Mar. 15, 2012. http://www.culturalweekly.com/learning-not-to-curse-in-arizona.html
57. "The iPad: What's a Gutenberg moment, anyway?" *Visual Thesaurus,* March 7, 2010, http://www.visualthesaurus.com/cm/wc/2240/
58. "The iPad: What's a Gutenberg moment, anyway?" *Oxford University Press Blog.* March 8, 2010. http://blog.oup.com/2010/04/ipad/
59. "Yes, we want": Who owns global English? *Visual Thesaurus,* May 4, 2010, http://www.visualthesaurus.com/cm/wc/2264/

Dennis Baron, *Vita,*  7

60. "The New Technologies of the Word." Rpt. in *The Arlington Reader* (New York: Bedford St. Martins, 2010.

61. "Don't read this: What Kindle's Highlights tell us about popular taste." The Visual Thesaurus. July 2, 2010. http://www.visualthesaurus.com/cm/wc/2339/

62. "Revising our freedom: Digital archeology and Jefferson's rough draft of the Declaration of Independence." Oxford University Press blog, July 9, 2010. http://blog.oup.com/2010/07/revising-our-freedom/

63. "Robot teachers!!! Coming soon, to a classroom near you!!!" Oxford University Press blog, July 13, 2010. http://blog.oup.com/2010/07/robot-teachers; repost, io9.com, July 28, 2010. http://io9.com/5599084/robot-teachers-coming-soon-to-a-classroom-near-you

64. "The gender-neutral pronoun: Still an epic(ene) fail." *Visual Thesaurus*. August 9, 2010. http://www.visualthesaurus.com/cm/dictionary/2384/; OUP blog, Aug. 26, 2101, http://blog.oup.com/2010/08/gender-neutral-pronoun/

65. "Technology update: Flying books can be dangerous." Oxford University Press blog, August 13, 2010. http://blog.oup.com/2010/08/ebooks-3/

66. "Is it 'Miss' or 'Ms'?" Oxford University Press blog. Aug. 16, 2010. http://blog.oup.com/2010/08/miss-or-ms/; rpt. as "What's in a Name? For "Ms.," a Long History." on *Ms. Magazine blog*, Aug. 27, 2010, http://msmagazine.com/blog/blog/2010/08/27/whats-in-a-name-for-ms-a-long-history/

67. "Good grammar leads to violence at Starbucks?" *Visual Thesaurus*. August 17, 2010. http://www.visualthesaurus.com/cm/wc/2394/

68. "Good grammar leads to violence at Starbucks?" *Oxford University Press* blog. Aug. 20, 2010. http://blog.oup.com/2010/08/starbucks/

69. "Facebook says, 'All your face are belong to us.'" Oxford University Press blog, Aug. 31, 2010. http://blog.oup.com/2010/08/facebook-trademark/

70. "Facebook says, 'All your face are belong to us.'" *Visual Thesaurus*. Sept. 9, 2010. http://www.visualthesaurus.com/cm/wc/2414/

71. "The English Language Unity Act: Big government only a tea partier could love." *Oxford University Press blog,* Sept. 24, 2010. http://blog.oup.com/2010/09/english-language-unity/; rpt *Dallas Morning News,* Sept. 24, 2010. http://topics.dallasnews.com/article/0gsfem7buy0AM; rpt. NPR quotes, Sept. 24, 2010. http://topics.npr.org/quote/0bqS3ST97z0yC; rpt. Latest Law News, Sept. 24, 2010, http://www.tollfree800legal.com/news/latest-law-news.cfm?Next-News-ID=3524647&start=51;

72. "It's alive! New computer learns language like a human, almost." *Oxford University Press blog.* Oct. 11, 2010. http://blog.oup.com/2010/10/computer-learns-language/  Picked up by NPR, the BBC, technorati, and techeye.

73. "Killer app: Seven dirty words you can't say on your iPhone." *Oxford University Press Blog.* Oct. 18, 2010. http://blog.oup.com/2010/10/dirty-words/

74. "Killer app: Will the iPhone monitor your language?" *The Visual Thesaurus.* Oct. 19, 2010. http://www.visualthesaurus.com/cm/wc/2455/

75. "A Literal Paradox." *Visual Thesaurus.* Oct. 26, 2010. http://www.visualthesaurus.com/cm/dictionary/2465/

76. "A Literal Paradox: *literally* generally means 'figuratively.' *Oxford Univ. Press Blog.* Oct. 29, 2010. http://blog.oup.com/2010/10/literal-paradox/

77. "All hail Goddess English." *Oxford University Press Blog.* Nov. 9, 2010. http://blog.oup.com/2010/11/all-hail-goddess-english/

78. "The tweet police are watching." *The Visual Thesaurus.* Nov. 17, 2010. http://www.visualthesaurus.com/cm/wc/2506/

79. " ☺ when you say that, pardner," – the tweet police are watching." *Oxford University Press Blog,* Nov. 22, 2010. http://blog.oup.com/2010/11/tweet-police/

80. "On the internet, nobody knows you can't spell." *Oxford University Press Blog,* Nov. 29, 2010. http://blog.oup.com/2010/11/you-cant-spell/

81. "The Noun Game: A simple grammar lesson leads to a clash of civilizations." Oxford Univ. Press blog. Dec. 10, 2010. http://blog.oup.com/2010/12/noun-game/

82. "President has Americans running to the dictionary." *Visual Thesaurus.* Dec. 13, 2011. http://www.visualthesaurus.com/cm/dictionary/2531/

Dennis Baron, *Vita,*  8

83. "Books by the numbers." *Visual Thesaurus.* Dec. 20, 2010.
http://www.visualthesaurus.com/cm/wc/2546/

84. "Books by the numbers." *Oxford Univ. Press Blog.* Jan. 6, 2011.
http://blog.oup.com/2011/01/books-by-the-numbers/

85. "Defending the language with bullets." *Oxford Univ. Press Blog.* Jan. 14, 2011.
http://blog.oup.com/2011/01/bullets/

86. "The government does not control your grammar." *Oxford Univ. Press Blog,* Jan. 28, 2011.
http://blog.oup.com/2011/01/grammar/

87. "The Supreme Court Debates: What does 'personal' mean?" *Visual Thesaurus.* Jan. 24, 2011.
http://www.visualthesaurus.com/cm/dictionary/2582/

88. "#twitterrevolution—reforming Egypt 140 characters at a time." *Oxford Univ. Press Blog,* Feb. 17, 2011. http://blog.oup.com/2011/02/twitter-revolution/

89. "The government's out-of-date definition of writing." *Visual Thesaurus.* Feb. 18, 2011.
http://www.visualthesaurus.com/cm/dictionary/2628/

90. "The government's definition of writing is seriously out of date." *Oxford Univ. Press Blog.* Feb. 28, 2011. http://blog.oup.com/2011/02/dictionary-act/

91. "Who cares about National Grammar Day? Or is it *whom?*" *Oxford Univ. Press Blog.* Mar. 4, 2011. http://blog.oup.com/2011/03/grammar-day

92. "When news breaks, people look it up in the dictionary." *Visual Thesaurus.* March 10, 2011.
http://www.visualthesaurus.com/cm/dictionary/2655/

93. "It's time for English teachers to stop teaching that the world is flat." *Oxford Univ. Press Blog.* Mar. 18, 2011. http://blog.oup.com/2011/03/english-teachers

94. "Happy birthday OK: the world's most-popular word turns 172," *Oxford Univ. Press Blog.* Mar. 23, 2011. http://blog.oup.com/2011/03/ok-day/

95. "OED Hearts OMG." *Visual Thesaurus*. April 11, 2011.
http://www.visualthesaurus.com/cm/dictionary/2815/

96. "TSA bans reading on international flights." *Indyposted,* Jan. 4, 2010.
http://indyposted.com/8627/tsa-bans-reading-on-international-flights/

97. "Say goodbye to the decade with no name." *Visual Thesaurus,* Dec. 18, 2009.
http://www.visualthesaurus.com/cm/wc/2100/

98. "English teachers council gives Glenn Beck the 'Doublespeak Award'." My statement was reprinted verbatim in a *Washington Post* article about the Doublespeak Award by Valerie Strauss, Nov. 23, 2009, http://voices.washingtonpost.com/answer-sheet/accountability/ncte-award-glenn-beck-the-doub.html

99. "The Noun Game." *The Visual Thesaurus.* Nov. 16, 2009.
http://www.visualthesaurus.com/cm/wc/2067/

100. "Technology reduces the value of old people, MIT computer guru warns." Oxford Univ. Press, OUPBlog, Nov. 11, http://blog.oup.com/2009/11/old-people/

101. "Happy belated 40th birthday to the internet." Oxford Univ. Press, OUPBlog, Nov. 3, http://blog.oup.com/2009/11/40th-birthday-internet/

102. "Two thumbs up? Researchers predict that by 2013, we'll all be Tweeting." Oxford Univ. Press, OUPBlog, Oct. 27 http://blog.oup.com/2009/10/universal_authorship/

103. "Blogging for pay." Oxford Univ. Press, OUPBlog, Oct. 8, http://blog.oup.com/2009/10/blogging-for-pay/

104. "Amazon sales rank: I'm being outsold by a book on tattoos." Oxford Univ. Press, OUPBlog, Sept. 25, http://blog.oup.com/2009/09/amazon-rank/

105. "The Spellings Commission, the ACT, and the ETS Just Don't Read America's Literacy Right." *College Composition and Communication* 61.1 (Sept. 2009): W424-35.

106. "The Elements of Style at 50: If You Celebrate, Use the Active Voice." Visual Thesaurus, April 6, 2009, http://www.visualthesaurus.com/cm/dictionary/1805

107. " 'Tis Talk Like Shakespeare Day in Chicago, Methinks." Visual Thesaurus, April 23, 2009.
http://www.visualthesaurus.com/cm/dictionary/1827/

108. "Amazon Fail 2.0: Orwell Removed from Kindles." Visual Thesaurus, July 21, 2009.
http://www.visualthesaurus.com/cm/wc/1922/

Dennis Baron, *Vita,*  9

109. "Amazon Fail 2.0: Bookseller's Big Brother removes Orwell's Big Brother from Kindles everywhere." Oxford Univ. Press  OUPblog. July 21, 2009. http://blog.oup.com/2009/07/amazon_fail2/

110. "Digital Text." Letters. *Wilson Quarterly* (winter, 2010), p. 6.

111. "Multitasking: Learning to teach and text at the same time." Oxford Univ. Press Blog, Jan. 25, 2010. http://blog.oup.com/2010/01/teach-and-text/#more-7305

112. "Will the iPad change your life?" Oxford Univ. Press Blog, Jan 28, 2010. http://blog.oup.com/2010/01/will-the-ipad-change-your-life/

113. "Sliced Bread 2.0." Oxford Univ. Press Blog, Feb. 24, 2010. http://blog.oup.com/2010/02/sliced-bread-2-0/

114. "Should everybody write? The destabilizing technologies of communication." Oxford Univ. Press Blog, Mar. 16, 2010. http://blog.oup.com/2010/03/should-everybody-write/   a day later, there were 25 reposts of the essay.

115. "Should everybody write?" *Visual Thesaurus.* Mar. 16, 2010. http://www.visualthesaurus.com/cm/wc/2204/

116. "Multitasking: Learning to Teach and Text at the Same Time" *Quality Teacher* (a quarterly journal of Bato Balani Foundation, the Philippines; forthcoming).

117. "The book, the scroll, and the web." Oxford Univ. Press Blog, April 2, 2010. http://blog.oup.com/2010/04/scroll-book/

118. "March 10: The telephone is 133 years old today. Call me." *Visual Thesaurus.* March 10, 2009. http://www.visualthesaurus.com/cm/dictionary/1768/

119. "Lincoln the writer at 200." *The Visual Thesaurus.* Feb 13, 2009. http://www.visualthesaurus.com/cm/wc/1722/

120. "No Students Left Behind: Why Reports on the Literacy Crisis from the Spellings Commission, the ACT, and the ETS Just Don't Read America's Literacy Right." *College Composition and Communication* 61.1 (Sept. 2009): W424-35.

121. "Noah Webster at 250: A Visionary or a Crackpot?" *The Visual Thesaurus.* Oct. 16, 2008. http://www.visualthesaurus.com/cm/dictionary/1576/

122. "Can commas shoot down gun control?" *Los Angeles Times,* March 22, 2007.  Rpt. *Oxford Magazine* no. 264 (Oxford Univ.), Spring (second week, Trinity term) 2007, pp. 12-13.; also rpt., *The Green Bag,* second series, vol. 10, no. 40 (Quarterly Law review of the George Mason School of Law), Summer 2007.

123. "Don't write off the pencil just yet." *Los Angeles Times,* Jan. 23, 2007, A15.

124. "No academic bill of rights?" *Inside Higher Education,* June 13, 2006. www.ihe.com.

125. "Churchill fallout: It's about academic freedom." *Inside Higher Education,* May 26, 2006. www.ihe.com.

126. "I'm not really a professor, I just play one on TV." *Inside Higher Education,* Oct. 14, 2005.

127. "The College Board's New Essay Reverses Decades of Progress Toward Literacy." *Chronicle of Higher Education.* May 6, 2005. Pp. B14-15; rpt. in *Newsletter of the Northeast Association of Pre-Law Advisors,* Fall 2005.

128. "The New Nativism: Language Policy and Linguistic Ideology in the United States." *Ryukyus Journal of American Studies* (April, 2005): 1-12.

129. "Not Searching for Skeletons." *Chronicle of Higher Education,* Jan. 14, 2005, C1;4.

130. "The Tongue Who Would Be King." *Science and Spirit,* November/December 2004, pp. 28-33.

131. "The President's Reading Lesson." *Education Week,* Sept. 8, 2004, p. 43.

132. "A Diverse Department." *Chronicle of Higher Education,* August 13, 2004, C2-3.

133. "Avoiding the Role of Straight Man." *Chronicle of Higher Education,* June 18, C1;4.

134. "Around the Clock." *Chronicle of Higher Education,* May 21, 2004, C1;4.

135. "It's Just Grammar. Whom Really Cares?" *Los Angeles Times,* May 7, 2004, B17; rpt., *Austin* (Texas) *American-Statesman, Adrian* (Michigan) *Daily Telegram,* May 12, 2004.

136. "What Am I Worth?" *Chronicle of Higher Education.* April 23, 2004, C1;4.

137. "Lessons in Department Budgeting." *Chronicle of Higher Education.* March 26, 2004, C2-3.

138. "Language and society." For PBS Documentary, "Do you speak American?" www.pbs.org/speak/words/sezwho/socialsetting.  [Rpt. in Insightful Writing, ed. David Sabrio and Mitchel Burchfield.  Boston: Houghton, Mifflin, 2008.

Dennis Baron, *Vita,* 10

139. "No Translation Needed: 'Door Is Closed.'" *Los Angeles Times,* March 14, 2004, M5 [rpt. *Atlanta Journal-Constitution, Kansas City Star; Myrtle Beach* (South Carolina) *Sun-News;* Bryan-College Station (TX) *Eagle;* translated into Finnish for *Helsingin Sanomat* (Helsinki, Finland), March 28, 2004].

140. "New Programs, New Problems." *Chronicle of Higher Education.* Feb. 27, 2004. C1;4.

141. "Intervening in the Classroom." *Chronicle of Higher Education.* Jan. 30, 2004, C1;4

142. "Sharing Inside Information." *Chronicle of Higher Education.* Dec. 19, 2003, C1; 4.

143. "McLanguage Meets the Dictionary." *Chronicle of Higher Education.* Dec. 19, 2003, B14.

144. "Not What I Signed Up For." *Chronicle of Higher Education,* Nov. 21, 2003, C1; C4.

145. "Professors Behaving Badly." *Chronicle of Higher Education,* October 24, 2003, C3-4.

146. "Learning to Be a Department Head." *Chronicle of Higher Education,* Sept. 22, 2003, C5.

147. "Life After Tenure." *Chronicle of Higher Education,* July 21, 2003.

148. "When Tenure Fails." *Chronicle of Higher Education,* June 10, 2003.

149. "Teaching Grammar Doesn't Lead to Better Writing." *Chronicle of Higher Education,* May 16, 2003, B20.

150. "Promoting Late Bloomers." *Chronicle of Higher Education,* April 25, 2003.

151. "The Tenure Files: Getting Through the College." *Chronicle of Higher Education,* Feb. 14, 2003.

152. "External Reviewers." *Chronicle of Higher Education,* January 7, 2003.

153. "A Look at the Record." *Chronicle of Higher Education,* Nov. 7, 2002.

154. "I Teach English—and I Hate Reader's Guides." *Chronicle of Higher Education,* Oct. 4, 2002, p. B5.

155. "Good Grammar and the Career Network." *Chronicle of Higher Education,* July 31, *2002.*

156. "Language Use and Grammar." The September, 2002, module for "Teaching *Composition,*" a listserv for the composition teaching community, published by McGraw-Hill. http://www.mhhe.com//socscience/english/tc.

157. "Getting Promoted." *Chronicle of Higher Education,* Sept. 5, 2002.

158. "The Job Search: You're the One." *Chronicle of Higher Education,* April 12, 2002.

159. "The Campus Visit." *Chronicle of Higher Education,* Feb. 24, 2002.

160. "Will Anyone Accept the Good News on Literacy?" *Chronicle of Higher Education,* Feb. 1, 2002, B10.

161. "The Job Interview." *Chronicle of Higher Education,* Jan. 21, 2002.

162. "To Whom It May Concern: Reading Job Applications." *Chronicle of Higher Education,* Dec, 21, 2001.

163. "The Hiring Season." *Chronicle of Higher Education,* Nov. 9, 2001.

164. "America Doesn't Know What the World Is Saying." Op-Ed essay, *The New York Times,* Oct. 27, 2001, A21. Rpt. *Cleveland Plain Dealer,* Oct. 30, 2001, B11.

165. "The End of Linguistics: a response" letter to the editor, *The American Scholar* (Spring, 2001): 155-56.

166. "The Official Secrets Act in Academic Publishing." *Chronicle of Higher Education,* Feb. 16, 2001, B5.

167. "Literacy and technology." In Linda K. Shamoon, R. M. Howard, S. Jamieson, and R. A. Schwegler, eds., *Coming of Age: The Advanced Writing Curriculum.* Portsmouth, NH: Heinemann, Boynton/Cook, 2000 and on CD-rom. Approx. 8 pp.

168. "Ebonics and the Politics of English." *World Englishes* 19 (March, 2000): 5-19.

169. "Technology's Impact on Writing." Letter. *Chronicle of Higher Education,* Jan. 21, 2000, B11.

170. "To Sir, or Ma'am, with Love." *Education Week.* Sept. 8, 1999, 45.

**The Web of Language:** a blog running from 2007 to the present dealing with issues of language and technology: http://bit.ly/1B29f6v Over 1.5 million page views..

**Recent Invited Lectures, Workshops and Conference Presentations:**

1. "Corpus Linguistics and the Original Meaning of the Second Amendment." University of Chicago Law School, 12 January, 2021.

2. Author interviews, "What's Your Pronoun?" New York Public Library, 4 February, 2020; Politics and Prose Books (Washington, DC), 5 February; Cuyahoga County Public Library. 6 February;

Dennis Baron, *Vita,* 11

Kansas City Public Library (MO), 11 February; Town Hall Seattle, 16 February; Powells Books, Portland OR, 17 February; City Lights Books, San Francisco, 18 February.

3. "Guns and Grammar: Big Data and the Meaning of 'bear arms' in the Second Amendment." Conference on Law and Corpus Linguistics, Brigham Young Univ. Law School, Feb. 6-8, 2019.

4. "Corpus evidence and the meaning of 'bear arms.'" Symposium: *District of Columbia v. Heller* 10 years on, Hastings College of Law, San Francisco, CA, Jan. 18, 2019.

5. "What's Your Pronoun?" Language Policy Forum, Sheffield Hallam University, UK, June 1, 2018.

6. "America's War on Language," Invited Lecture, University of Pennsylvania, April 19, 2018.

7. "Guns and Grammar: The Linguistics of the Second Amendment," Neubauer Symposium on Historical Semantics, University of Chicago, April 13, 2018.

8. "Speak the Language of Your Flag: Language and Immigration in the US, 1918-2018," Language and Borders Conference, University of Bristol, UK, March 26, 2018.

9. "Pronoun Showdown," Invited lecture, University of Essex, UK, Nov. 23, 2017.

10. "Going native: Brexit prompts linguistic cleansing." Conference on UK Language Policy after Brexit. Sheffield Hallam University (Sheffield, UK), Sept. 15, 2016.

11. "Pronoun Showdown: Are nonbinary pronouns and singular *they* ruining the language or making English great again?" Univ. of Tennessee (Knoxville), April 11, 2016.

12. "Speak the language of your flag." Present-Day English Discussion Group, Modern Language Association. Jan. 9, 2014.

13. "#twitterrevolution: Destabilizing the world, 140 characters at a time." Univ. of Sussex (Brighton, UK). March 21, 2013.

14. "Speak the language of your flag." In "creative" conversation, with Michael Erard. *Modern Language Association.* Boston, Jan. 3, 2013. Speakers invited by MLA Executive Director Rosemary Feal.

15. "Official English from the school house to the White House." Englishes in Europe Conference. Univ. of Sheffield. April, 2012.

16. "#twitterrevolution: Destabilizing the world, 140 characters at a time." Temple Contemporary, Temple University Art Museum. Oct. 11, 2012.

17. "Guns and grammar: Linguistic authority and legal interpretation in *Washington, D.C., v. Heller"* Stanford University. Nov. 10, 2011.

18. "Should everybody write? The destabilizing technologies of communication." Univ. of Chicago Semiotics Workshop, March 11, 2010.

**19.** "Guns and grammar: The linguistics of the Second Amendment." Law and Society Annual Conference, Denver, CO, June 30, 2009.

**20.** "Let's go to the phones." Univ. of Michigan invited lecture. Dec. 5, 2008.

21. "Policing English in America from the White House to the schoolhouse." Conference on prescriptivism in language. Univ. of Paris VII (Sorbonne), Paris, FR. Nov. 15, 2007.

22. "It's All Your Fault: Who's Really to Blame for the Literacy Crisis?" Conference on College Composition and Communication. New York City, March 2007.

23. "No University Student Left Behind: Writing and the Secretary of Education's Commission on Higher Education." Conference on College Composition and Communication. Chicago, March 2006.

24. "The Perils of the new SAT Writing Test." Conference on College Composition and Communication. San Francisco. March 17, 2005.

25. "Spanish, English and the New Nativism." Modern Language Association. Philadelphia. Dec. 30, 2004.

26. "Reading and Writing in the Digital Age." Invited presentation. Illinois Library Association, Chicago, September 30, 2004.

27. "Language Policies and Language Politics in the United States." "English and Minority Languages in the 2000 Census." Invited lectures, Univ. of Ryukyu, Okinawa, Japan, June, 2004.

28. "TeknoFear." Invited lecture, Northeastern Illinois University, April 15, 2004.

29. "Standards: They're Not for Everybody." Conference on College Composition and Communication. San Antonio, TX, March 25, 2004.

Dennis Baron, *Vita,* 12

30. "The New Technologies of the Word." Plenary lecture. International Association of World Englishes Conference, Univ. of Illinois, October 17, 2002.
31. "Writing Effective Promotion Dossiers," Provost's Seminar, Univ. of Illinois, Sept. 7, 2001.
32. "Promotion and Tenure," a workshop for new executive officers, Association of Departments of English seminar, Monterey, California, June 29, 2001.
33. "From Pencils to Pixels: The New Technologies of Literacy." Invited lecture, UC Davis, March 2, 2001.
34. "The Illinois Professional Learning Partnership." Conference on College Composition and Communication, Denver, CO, March 15, 2001.
35. "Writing Effective Third-Year Faculty Reviews," Provost's Seminar, Univ. of Illinois, Feb. 26, 2001.
36. "Outreach for the Humanities," response to Graham Spanier; Chancellor's Conference, Univ. of Illinois, Jan. 31, 2001.
37. "Other Teachers' Students." Conference on College Composition and Communication, Minneapolis, MN, April 15, 2000.

**Recent Media Interviews**

1. Interviews for *What's Your Pronoun?* 2020-21: CBS Radio (NYC); NPR Weekend All Things Considered; CAP Radio (Sacramento, CA); Wisconsin Public Radio; KPBS San Diego; KWGS, Tulsa, OK; Slate: The Gist; KERA Radio; KATU TV, Portland, OR; KQED, San Francisco Public Radio; KPCC, Los Angeles; Talk the Talk (podcast); The Vocal Fries (podcast); That Word Chat (podcast).
2. "Tapestry," CBC-Radio "The Longing for Belonging," interview on pronouns, June 28, 2018.
3. "Air Talk," Larry Mantle, KPCC-NPR Los Angeles, Pronouns, Mar. 6, 2018.
4. "Do Official English laws work?" interview, KCBS, San Francisco. Aug. 24, 2017.
5. "Latinos in America." PBS documentary, aired October, 2013.
6. Various radio appearances on WILL-AM discussing language issues 1984-present.
7. "Extension 720" with Milt Rosenberg. WGN radio, Oct. 16, 2009. 2-hour interview about *A Better Pencil.*
8. Steve Fast, "The Classroom Connection" Oklahoma Public Radio, interview about *A Better Pencil.* Oct. 1, 2009.
9. Valerie Richardson Show. WPKN, Bridgeport CT, April 21, 2009. Half-hour interview about my work on usage and on technology.
10. Jim Brown, "The Current." CBC-Radio, Canada. July 15, 2008. Interview on Esperanto.
11. "The Peter Laufer Show", Green Radio 960 (San Francisco). 60 min. interview on Broadcast English, Dec. 28, 2008.
12. "Official English in Small Town America," *Eight Forty-Eight,* WBEZ-FM (Chicago public radio), June 13, 2007.  Lead interview for the show, also featured on the WBEZ web site: http://www.wbez.org/Program_848_Segment.aspx?segmentID=11395
13. "The English Language." Focus 580, WILL-AM, multiple appearances each year from 1982-present.
14. "Good English." The Robin and Maynard Show. KQBZ-FM (Seattle), May 3, 2005.
15. "Pronunciation in American English." Interview by Avi Arditti and Roseann Skirble broadcast on "Coast to Coast" by Voice of America (4/24/03); posted on voanews.com/wordmaster.
16. "The English Language," The Joan Rivers Show, WOR-AM, New York, June 25, 2001.
17. "The *New Oxford Dictionary of English*," "Sandy Rios Live," WYLL-FM, Chicago, Aug. 14, 1998.

**Editorships and Commissions:**

Chair, Committee on Public Policy, Conference on College Composition and Communication, National Council of Teachers of English, 2003-06.

Dennis Baron, *Vita,* 13

Member, Board of Advisors for the television series "Do You Speak American?" with
  Robert MacNeil.
Member, *PMLA* Advisory Committee, 1998-2001.
Member, editorial advisory board, *Liverpool Studies in Language and Discourse*, 1993-
  present.
Member, MLA Delegate Assembly, 1998-2003.
Chair, MLA Division on Language and Society, 2001-02.
Member, Commission on Language, National Council of Teachers of English, 1984-87;
  1999-2002.
Editor, *Publication of the American Dialect Society* (monograph series) 1984-93.
Member, Committee on Language and the Schools, Linguistic Society of America, 1992-
  1997.
Associate Editor, *Publication of the American Dialect Society,* 1982-84.


**Memberships in Professional Organizations:**

American Dialect Society (life member; member, Committee on New Words, 1975-82;
  member, Committee on Usage, 1982-present; member, Centennial Publications
  Committee; Centennial Publicity Committee; Centennial Documentaries Committee).
Modern Language Association (member, Delegate Assembly, 1996-99).
National Council of Teachers of English (member, Commission on the English Language,
  two terms). Chair, Committee on Public Language, 2009-12.
Conference on College Composition and Communication.
Conference of Editors of Learned Journals, 1985-93.
Linguistic Society of America; member, Committee on Language in the Schools, 1992-94.
Illinois Association of Teachers of English (member, program committee, 1987-88).

**Biographical Notices:**

  *Who's Who in America*
  *Directory of American Scholars*
  *Contemporary Authors*
  *Who's Where Among Writers*
  *International Authors and Writers Who's Who*
  *International Linguistic Directory*
  *Who's Who in American Education*
  *Who's Who in the World*
  *Who's Who in the Humanities*

**Consulting:**

  *Legal consulting and expert witness reports and testimony for a variety of law firms and
  for the Sate of California Attorney General..*

  *Media consulting for television, radio, and newspapers, including ABC's Nightline,
  Champaign-Urbana News-Gazette, The Chicago Tribune, Cincinnati Enquirer, Los
  Angeles Times, The McNeil-Lehrer Report, The New York Times, Newsweek, Orlando
  Sentinel,* Prentice-Hall, *Scripps-Howard Newspapers,* Scott-Foresman, Inc., *Springfield*
  (IL) *Register, USA Today, U.S. News and World Report***,** WICD-TV (Champaign, IL),
  William Safire**.**

  *Professional consulting for numerous academic and university presses.*

# Exhibit 2

## BACKGROUND AND QUALIFICATIONS

1.      I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and law. I have also published books on language reform, on usage, and on gender in language.

2.      Most relevant for this report, I published two books on language and law: *The English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press, January 2023). In addition, I served as lead author on what came to be called "the Linguists Brief" in *District of Columbia v. Heller* (2008), a brief cited both by J. Scalia in his opinion in the case, and by J. Stevens in his dissent. I was a co-author on another brief by professors of linguistics and corpus linguistics, in *New York State Rifle and Pistol Assn. v. Bruen* (No. 20-843, 2022), which J. Breyer cited in his dissent. In that dissent, J. Breyer also quoted directly from my essay "Corpus evidence and the meaning of 'bear arms'" (*Hastings Constitutional Law Quarterly,* 46.3: 2019). I have spoken about historical meaning and the Second Amendment at the Federalist Society at the Univ. of Chicago Law School, at the Neubauer Symposium on Historical Semantics at the Univ. of Chicago, at Brigham Young Univ. Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at Hastings College of Law. I've also written opinion essays on historical meaning and the Second

1

Amendment for the *Washington Post* and the *Los Angeles Times.* And I have been an expert consultant on historical meaning and legal interpretation of the Second Amendment for the State of California Dept. of Justice. In the past twenty years I have been an expert consultant in perhaps a dozen cases involving document interpretation.

3.    My forthcoming essay, "Look It Up in Your *Funk and Wagnalls:* How Courts Define the Words of the Law," an analysis of how courts incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, will appear in the next issue of the academic journal of the Dictionary Society of North America, *Dictionaries.*

4.    This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large digitized corpora consisting of many millions of words.

## OPINIONS

### I.    Assignment

5.    I have been asked to analyze the historical use of the terms *arms* and *accoutrements* in order to show that Large Capacity Magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

### II.    Summary of Conclusions

6.    Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements.* Nor does *arms* refer to *parts* of weapons, for example the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets. Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition; arms and accoutrements;* or

2

*arms, ammunition, and accoutrements.* A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier or militia member's kit, or equipment. For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term *accoutrements* occurs alone, as in *the accoutrements of a soldier,* it may include both arms and accessories. But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories. And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

7.      Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks). And they often specified, separately, the different accessories that officers and the rank and file soldiers were also required to have.

### III.    Theory and Methodology

8.      Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text. Initial work in corpus linguistics did not typically involve legal issues. Literary scholars developed computerized concordances to the works of Shakespeare, Milton, and other major English writers. Scholars plotted the frequency of words and phrases in order to develop a picture of an author's style, and to determine authorship of a particular work when the provenance was in doubt. Soon, in addition to solving literary mysteries, the methodologies developed by corpus linguists were successfully applied in a number of criminal cases in the US and in England involving, for example, the authorship of a ransom note or an email.

9.      Lexicographers, who began compiling large analog databases of text in the late 19th century, began to digitize their libraries of paper data and to add to that material, assembling computerized databases of historical and contemporary text and, more recently, of spoken language as well, in order to arrive at more precise definitions of the multiple senses of words and phrases.

3

10.     As a graduate student at the Univ. of Michigan in 1970, I coded analog texts from the *Oxford English Dictionary* files to help build the computerized database for the Dictionary of Early Modern English, the period from 1500–1800 that is particularly relevant to the language of the Founding Era. Today, major dictionaries like the *Oxford English Dictionary* and the Merriam-Webster suite of dictionaries rely on public databases of oral and written language, as well as their own proprietary databases, in order to revise older definitions and to track the spread of new words and meanings. The great dictionary makers of Europe use similar databases in their own work.

11.     Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a subset of Corpus Linguistics. LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as Original Public Meaning (OPM)—in statutes and in the Constitution. The promise of LCL attracted jurists as well as scholars with a specific interest in language and law. In *Muscarello v. United States* (524 US 125 1998), a case which held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or truck, can be deemed to be within the scope of the statutory phrase 'carries a firearm,'" J. Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to clarify the meaning of the words *carry, vehicle,* and *weapon.* In her dissent, J. Ginsburg expressed skepticism that either dictionary evidence, or Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question. Her critique did not deter courts from performing other computerized data searches to determine legal meaning. In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute (*United States v. Costello,* 2012). Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean 'provide shelter' as well as the narrower sense,

4

'hide someone from the authorities.' But in the context of the Immigration Act, *harbor* appears alongside other terms involving secret, illegal activity, and so even though, using more rigorous parameter's showed that Posner's Google search may have been flawed, his understanding of the word *in context* seems clearly to be correct.

12.      More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, published "Judging Ordinary Meaning" (*Yale Law Journal* 127), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity. Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary,* as well, allowing a more precise interpretation of historical text data.

13.      In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by J. Alito in his concurrence in *Facebook v. Duguid* (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

14.      Several large databases have come online in the past few years that facilitate LCL research. They have proved invaluable to me in compiling this report. Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), covering the years 1475–1800, contains over 40,000 texts

5

and 1.1 billion words. For the nineteenth century, the Corpus of Historical American English (COHA), which was initially developed at BYU as well but is now independent of that institution, currently contains 475 million words of text from 1820–2020. The size of these databases continues to grow as more works are digitized, coded, and added to the corpora.

15.     Critics of LCL have complained that databases like COFEA and COEME contain only texts written by "elites," whose language may differ from that of "ordinary people" who do not write at all, or who for various reasons do not write texts likely to be included in the available corpora. It is certainly the case that many printed books and periodicals, along with documents like the Constitution, its amendments, and state and federal statutes, tend to be written by educated specialists and professional writers, and although ordinary people are expected to understand the language of the Constitution, the Declaration of Independence, and other founding documents, as well as the laws that govern the nation, such texts typically require specialized knowledge. A reading-difficulty formula like the commonly-used Flesch-Kincaid scale suggests that the Declaration of Independence and the Constitution require a fifteenth-grade reading level, while according to one comprehensive study, *Adult Literacy in America* (US Department of Education, 1993), the average American today tends to have a seventh-grade reading level.

16.     In order to counter any "elite" bias that may be found in databases like COFEA COEME, and COHA, I rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment. Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early 19th century, when the Industrial Revolution drastically changed print technology. The first printing press was adapted by Gutenberg from the design of the traditional wine press, and printing was a slow and labor-intensive process. As a result, newspapers in the founding era were small, averaging four to eight pages. Publication was less frequent as well. Papers tended to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal

access to all the critical events and documents of their time, along with coverage of local and international news. Even though newspaper subscribers tended to be "elites," newspaper content was widely shared by word-of-mouth: ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

17.     The invention of the steam engine in the 19th century, along with growth of paper mills that facilitated the production from wood pulp of large and inexpensive rolls of newsprint, led to a revolution in print technology. This led to an explosion in the size of newspapers and the frequency of their publication, to the point where, at their height, papers in big cities were publishing several editions a day. This growth in newspapers, along with a substantial increase in periodical and book production, paralleled a growth in literacy in the US and Europe that tracked the industrial revolution and the subsequent rise in universal public education. By the end of the Civil War, there were more readers than ever, and they demanded more reading material.

18.     As for the question of "elites," as the principal means of communicating news and information, the newspapers of the 18th and 19th centuries embodied much of the language of the "ordinary people" who read them. Newspapers also provide researchers with more data for the 19th century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader.

19.     Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though for obvious reasons, none of the databases for the Founding Era and for the post-Civil War period cover the spoken language of Americans. Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

20.     The newspaper databases I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (digitized by the British Library); and two private subscription services, newspapers.com and newspaperarchive.com. For this

report, newspapers.com provides the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later 19th century.

21.     All the databases contain some duplicates. COFEA and COEME digitize multiple editions of the same work; and the newspaper databases contain a number of duplicate stories because, particularly in the period of newspaper growth during the 19th century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not. Still, the databases often offer more insight into the meaning of words and phrases than simply going to a dictionary. Jurists from Learned Hand to Felix Frankfurter to Frank Estabrook and Richard Posner have warned their colleagues not to make a fortress of the dictionary. The corpora are by necessity incomplete. LCL doesn't replace dictionary look-ups, but it does provide an important supplement to them.

## IV.   The meaning of *arms* and *accoutrements* in the databases

22.     I was asked to look at the meaning of *arms* and *accoutrements,* along with the phrase *arms and accoutrements,* current in the Founding Era and during the period immediately following the adoption of the Fourteenth Amendment, focusing on whether the word *accoutrements* may be considered analogous to the present-day use of the term *magazine* in reference to firearms.

23.     In the eighteenth and nineteenth centuries, *magazine* was a word that meant 'storehouse, depot.' A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits. The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the nineteenth century, and the term was relatively rare until the 1920s. Before that time, bullets were kept in *cartridge boxes* or *cartridge cases,* and these bullet storage containers were part of the general category of military *accoutrements,* not *arms.*

8

24.     The data on *accoutrements* suggest that the analogous LCMs are not *arms,* but *accoutrements,* the ancillary equipment associated with soldiering, or service in the military. *Cartridges, cartridge boxes* and later, *magazines,* are not arms in and of themselves.

25.     The *Oxford English Dictionary* (*OED*)*,* the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement;* the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

26.     *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxes, and other formal attire). But the military sense of *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers. The example given to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here Wellington, recognized by all as a consummate soldier who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms* and *accoutrements.*

27.     The term *accoutrement-maker,* though not defined separately by the *OED*, is illustrated with examples referring to a manufacturer of military accessories rather than arms; and the term *accoutrement shop* has this 1831 example where guns and accoutrements are differentiated:

> The crowd was so great in the Rue de Richelieu,..especially about the gun-smiths and accoutrement shops in the vicinity of the Palais Royal. [*United Service Jrnl.* i. 325]

28.     The *OED* definitions are instructive. But in order to determine more specifically what the term *accoutrements* refers to, I consulted two digitized historical databases, or corpora. A COFEA database search for the occurrence *accoutrements* within 6 words of *arms* returned 873 hits (including a small number of duplicates). A similar search of COEME returned 126 hits, the earliest from 1656. I determined that

the two search terms, *arms* and *accoutrements,* often appear together as a single phrase, *arms and accoutrements,* typically in military contexts having to do with an army or militia unit. *Accoutrements* often occurs in a list alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition,* though when *ammunition* is not listed separately, the term *accoutrements* will generally include *ammunition. Accoutrements* sometimes occurs in a list alongside *clothing,* suggesting it may not always include uniforms (this finding informs the *OED* definition: military equipment other than arms and uniforms). But occasionally, *accoutrements* may include items classified as part of a uniform (influenced, most likely, by the general, nonmilitary sense of *accoutrements,* where the term usually refers to clothing associated with particular professions or activities). In sum, in the vast majority of examples, *accoutrements* functions as a catch-all term for military equipment *separate* from, and not including, *arms.*

29.     But English usage is never simple. As linguists often say, "all grammars leak"—which is to say, there are *always* a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation: it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms,* as it does in this example:

> A few years since, some boys, equipped in mock military *accoutrements,* such as paper-caps, paper-belts, wooden swords, &c. were beating up for recruits in Parliament-street, Boston. [*The American jest book*: Part I[-II], 1789; emphasis added; here military accoutrements includes toy swords.]

30.     This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that *arms* may be a subcategory of *accoutrements*:

[He] shall be provided with a fire arm and other military accoutrements provided by the militia law.

31.     But besides a handful of exceptions, in literally hundreds and hundreds of cases, *arms* and *accoutrements* are treated as separate items of military gear. Here are some typical examples from the Founding Era:

> **1776**: Fire arms and accoutrements
>
> **1780**: arms, ammunition, accoutrements, drums and fifes in possession        of        the        respective        regiments. 1795 you will march . . . with arms and accoutrements in good order. If any volunteer should want arms and ammunition, bring them forward, and they shall be supplied as well as possible. [COEME; the other examples are from COFEA]
>
> **1798**: To hold his powder and his ball, his gun, accoutrements and all . . . [This example rhymes because it's from a poem, indicating that the idiomatic phrase *arms and accoutrements* has become part of the general language available not just to military specialists but also to poets and novelists.]

32.     A second COFEA search, for *accoutrements* alone, returned 1,235 hits. COEME yields 771 hits. These searches add a number of non-military contexts, where *accoutrements* refers to religious gear (robes, mitres, and so on) as well as other sorts of fancy or special clothing. These non-military examples do not reference weapons, ammunition, or other military equipment.

33.     I supplemented my COFEA search with a search of the newspaper database, newspapers.com, for the Founding Era period, 1750–1800. The newspaper databases do not permit the kind of collocate searches that COFEA, COEME, and COHA allow. Entering two search terms returns results in which either one or both terms occur on the same page, though not necessarily in the same sentence, or even in the same article, and not necessarily as linked terms. There are 1,392 hits for *accoutrements.* There are 692 matches for the exact phrases *arms and accoutrements.*

34.     Here's a mid-18[th] century British example from the newspapers.com corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:

> This Militia shall receive their Arms, Accoutrements, and Ammunition from the Ordnance. *Derby Mercury,* 1756.

35.     Similarly, there's this "ploughshares into swords" example of a Cambridge University library to be converted to a military barracks:

> [T]he new Building intended for a publick Library . . . may be converted into a Barrack, and be supplied with Provisions, Arms, and Accoutrements, at the Expence of the University. 1756

36. A search of the Readex database of America's Historical Newspapers returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. This early example from the colonial period appeared in the *Boston Evening Post* in 1750. It distinguishes *arms* from uniforms, accoutrements, and other military equipment:

> All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things necessary for a Gentleman Ranger.

37.     This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that *arms* and *accoutrements* are distinct categories in the new nation as well:

> The militia . . . must be considered as the palladium of our security . . . . The formation and discipline of the militia of the continent should be absolutely uniform; and that the same species of arms, accoutrements, and military apparatus, should be introduced in every part of the United States.

38.     The text of a bill in Congress to establish a uniform militia appeared in the *New York Journal,* in 1790. It confirms the Founding-Era sense that *arms, ammunition,* and *accoutrements* make up distinct and separate elements of a soldier's kit:

> There shall be appointed an adjutant general for each state . . . whose duty it shall be to . . . report[] the actual situation of their arms, accoutrements, and ammunition. . . Every non-commissioned officer or private . . . for appearing at such meeting or rendezvous without his arms, ammunition, or accoutrements, as directed by this act, shall pay the sum of twenty-five cents.

39.     And this cite from 1868 clearly distinguishes what counts as arms, and what counts, separately, as accoutrements:

> At Watertown Arsenal, Massachusetts . . . the following Arms, &c., will be sold:10,699 rifled and smooth-bore Muskets . . . ; 261 Carbines . . . ;

12

> 305 Sabres . . . ; lot of cavalry accoutrements, consisting of Bayonet
>
> Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c."

40.    The newspaper data parallels that of COFEA: the phrase *arms and accoutrements* is almost always military. The phrase sometimes occurs alongside *ammunition* as a separate list item. *Accoutrements,* when it appears alone, is a more-general term, used both for military and other gear, though in non-military contexts it is more directed toward clothing rather than 'equipment' (priests' robes, ministerial garb, fancy ball gowns, badges of office), as is also indicated in the *OED* citations. In non-military contexts, *accoutrements* carries the suggestion of ceremonial gear, and less commonly, nonmilitary tools of the trade.

41.    It's clear that *arms and accoutrements* was, during the 18th and 19th centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like *bacon and eggs, salt and pepper,* or, in a legal context, *assault and battery* or *breaking and entering.* Such pairs take on the characteristics of a formula, and often appear in the same order (this order may be dictated by logical succession of events, or it may be random). *Eggs and bacon* is rarer than *bacon and eggs.* And it would be unusual to find *battery and assault.* Such ordered pairs are called "irreversible binomials," though there's nothing but custom (as in *salt and pepper*) and sometimes logic (as in *breaking and entering*) to prevent anyone from reversing the order.

42.    The word *accoutrements* typically occurs in a list after *arms* (more rarely, it may occur before *arms* as well), and it is typically a separate category from *arms* (though not always, as the above examples show).

43.    There are over 47,000 citations in newspapers.com for *arms* or *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms and accoutrements*. Examining a selection of the 15,799 citations of the phrase confirms that both in England and the US, *arms* and *accoutrements* are separate categories. Here is one example from Gloucestershire, in England, dated 1868:

> [A] letter was received from the Home Secretary, pointing out the danger
>
> of permitting an accumulation of arms and accoutrements to take place in

prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot.

44.     A similar cite from Iowa in 1868: "Persons having in their possession any arms, accoutrements or ammunition belonging to the State, are requested to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property."

45.     And this, from Stroudsburg, PA, also 1868: "More than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana."

46.     The circa-1868 data confirmed the Founding Era data that *accoutrements* is primarily a military term, and that when *accoutrements* co-occurs with *arms,* the terms refer to separate categories of equipment.

47.     One final note on *accoutrements. The* U.S. Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843, 2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the North Carolina Supreme Court affirming Huntley's conviction for carrying a shotgun illegally "to the terror of the people," as forbidden by the Statute of Northampton in 1328. In that decision, the Court states, A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements—as a part of his dress.

48.     In the citation above, *accoutrements* does not refer to weaponry, but to the more general category of 'everyday attire, or clothing.' It may be normal to wear a shirt, or a belt, or shoes, but it's not normal, the Court is saying, to wear a gun in North Carolina in 1843. It's legal—the Court agrees—to carry a gun for any lawful purpose, "either of business or amusement"—but it's not *normal* or typical to do so. In affirming Huntley's conviction, the Court noted that his purpose in carrying a shotgun was not a legal one.

## V.     Some historical notes on the use of the word *magazine*

49.     Since the technology of arms and ammunition was changing by the mid-nineteenth century, I also searched for new uses of the term *magazine* in relation to *arms* and *accoutrements.* With advances in the design and manufacture of guns and

ammunition, by the mid-nineteenth century, the term *magazine* starts to appear in the sense 'ammunition container' (replacing the earlier *cartridge box* or *cartridge case*). According to the *OED,* in the 18th and early 19th centuries, *magazine* referred generally to 'a storehouse,' and in military contexts it referred specifically to a storehouse for gunpowder. (The sense of 'storehouse' also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of 'depot, warehouse,' is cognate with the French word *magasin,* 'a shop or store').

50.    Although most uses of the word *magazine* still refer to printed periodicals, during the 19th century, one sense of the term *magazine* narrows, referring more and more to an 'ammunition container,' a primary sense of the word in reference to firearms today. The *OED* defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

51.    COFEA and COEME do not cover the period past 1800. COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s. Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses. Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. *Magazines* meaning 'devices for holding bullets' form only a very small subset of these citations. It took some thirty to forty years for the 'bullet holder' sense of the word *magazine* to become more common, and even then, text references to ammunition magazines often appear, not in general discourse, but in legislation restricting their size or use.

52.    Most militia laws and regulations from the Founding Era specify minimum requirements for soldiers' weapons, ammunition, and accoutrements. Most laws regulating weapons in the mid-19th century restrict or ban specific kinds of weapons, often enumerating them, sometimes in terms we find colorful today but which were common at the time (Arkansas toothpicks, Bowie knives, slung shots, swords in canes, pistols capable of being concealed in a pocket). Occasionally these laws further

15

identified such weapons as those used by "brawlers," thieves, robbers, or others bent on illegal activities. Other weapons restrictions follow the English tradition of limiting possession of weapons by social class, nationality, or race.

53. Although militia laws do specify weapons and other required accoutrements or pieces of military equipment, including horses for the officers, those laws that prohibit certain kinds of weapons during the two critical periods (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of his province, without the leave of the council of safety for the time being." [1776 Md. Laws 146].

54. I surveyed the gun regulations in the Duke Historical Database from the early medieval period through 1885 to see what terminology was used. None of the laws that prohibit weapons, aside from the Maryland statute above, specifies a gun part or ammunition case or accoutrements of any kind. Although many present a list of banned or prohibited weapons—usually without defining them [the assumption is that the reader knows what they refer to], none of the laws mention cartridge boxes, bullets, barrels, or other parts of any weapons.

55. Later, however, in the decades after the introduction of *magazines* as 'carriers or holders of bullets,' laws and regulations against their nonmilitary use started to appear. Here's a 1919 Maine law banning guns with loaded magazines: No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.

56. Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states. Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

16

57.     A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

58.     Finally, the Federal Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms: "(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition."

59.     The Act also provides a specific definition of "machine gun": "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

## VI.    Conclusion

60.     In effect, then, *accoutrements,* when it occurs alone, in a specifically military context, may function as a general term that includes *arms,* though it does not always include arms. In non-military contexts this does not apply: the *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

61.     But there is no data that I have found showing that *arms* includes *accoutrements, magazines,* or any other *parts* of weapons.

62.     In addition, 'bullet holders,' whether they are called *cartridge cases, magazines,* or simply, *machine guns,* both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

63.     To repeat, there is no data that I have found showing that *arms* includes *accoutrements, magazines,* or any other *parts* of weapons.