ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3479
Fax: (415) 703-1234
E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

**JAMES MILLER et al.,**

Plaintiffs,

**v.**

**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**

Defendants.

Case No. 3:19-cv-01537-BEN-JLB

**COMPENDIUM OF WORKS CITED IN DEFENDANTS' RESPONSE TO PLAINTIFFS' ADDITIONAL BRIEF RE *NEW YORK STATE RIFLE & PISTOL ASS'N V. BRUEN***

**VOLUME 2 OF 3**

Courtroom: 5A
Judge: Hon. Roger T. Benitez

Action Filed: August 15, 2019

**INDEX**

| Works | Br. Page[1] | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 1776 Md. Laws 146. | Ex. A (Baron Decl.) at 33, ¶ 53 | 2 |
| 1801 Tenn. Acts 260–61, ch. 22, § 6 | 14 | 4 |
| 1837 Ala. Laws 7, No. 11, § 2 | 13 n.14 | 8 |
| 1837 Ga. Laws 90, § 1 | 13 n.14 | 10 |
| 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2 | 13 n.14 | 13 |
| 1838 Fla. Laws 36, No. 24, § 1 | 13 n.14 | 16 |
| 1838 Va. Acts 76, ch. 101, § 1 | 13 n.14 | 18 |
| 1839 Ala. Acts 67, ch. 77 | 13 n.14 | 21 |
| 1850 Mass. Acts 401, ch. 194 | 13 n.14 | 22 |
| 1858-1859 N.C. Sess. Laws 34-36, ch. 25, § 27, pt. 15 | 13 n.14 | 32–33 |
| 1868 Ala. Laws 11 | 13 n.14 | 62 |
| 1868 Fla. Laws 95, ch. 7, § 11 | 14 n.14 | 64 |
| 1869 Minn. Laws 50-51, ch. 39 § 1 | 15 n.15 | 68 |
| John Lellyett, Ordinances of the City of Nashville 244, § 9 (1872) | 15 n.15 | 71 |

[1] Defendants respectfully submit this compendium of works cited, consistent with the Court's minute order of October 14, 2022 (Dkt. No. 138) directing Defendants to submit a similar compendium in connection with Defendants' Supplemental Brief in Response to the Court's Order of August 29, 2022.

| | | |
|---|---|---|
| 1873 Minn. Stats. 993 | 15 n.15 | 72 |
| 1875 Mich. Pub. Acts 136, no. 97, § 1 | 15 n.15 | 73 |
| Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa 206-207 (1887) | 13–14 | 75 |
| 1895 N.D. Rev. Codes 1293 | 15 n.15 | 76 |
| 1919 Me. Laws 193 | Ex. A at 33, ¶ 55 | 77 |
| 1923 Vt. Acts and Resolves 127, no. 130, § 1 | Ex. A at 33, ¶ 56 | 78 |
| 1927 Mass. Acts 413–14, ch. 326, § 1 | Ex. A at 33, ¶ 56 | 80 |
| 1927 R.I. Pub. Laws 256, ch. 1052, § 1 | Ex. A at 33, ¶ 56 | 85 |
| 1933 Tex. Laws 219, ch. 82, § 1 | Ex. A at 34 | 93 |
| Firearms Act of 1934, 48 Stat. 1236 (Pub. L. 73-474) | Ex. A at 34 | 96 |
| **BOOKS** | | |
| The American jest book: containing a curious variety of jests, anecdotes, stories, bon mots, &c., Part I (Philadephia: M. Carey, 1789), 6 | Ex. A at 10 | 105 |
| William Cobbett, French arrogance; or, "The cat let out of the bag;" a poetical dialogue between the envoys of America, and X. Y.Z. and the lady (Philadelphia: Peter Porcupine, 1798), 23 | Ex. A at 28, ¶ 31 | 118 |
| Accoutrement, *Oxford English Dictionary*, (3rd ed., 2011) | Ex. A at 26, ¶¶ 25–27 | 124, 126 |

| | | |
|---|---|---|
| Magazine, *Oxford English Dictionary* (3rd ed., 2011) | Ex. A at 32, ¶ 50 | 129–130 |
| **Law Reviews and Journals** | | |
| Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016) | 14-15 | 142 |
| David B. Kopel et al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 179 (Fall 2013) | 13 | 199 |
| David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 235 (2018) | 12 n.13 | 249 |
| Thomas R. Lee & Stephen Mouritsen, *Judging Ordinary Meaning*, 127 Yale L. J. 788 (2018) | Ex. A at 22, ¶ 12 | 340 |
| Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261, 267 (2019) | 4 | 432 |
| **Legislative Materials and Government Records** | | |
| George Washington, General Orders, Jan. 22, 1780 | Ex. A at 28, ¶ 31 | 509 |
| U.S. Dep't of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016), ch. 2 | 8 n.10 | 511, 537 |
| U.S. Dep't of Education, Adult Literacy in America (1993) | Ex. A at 23, ¶ 15 | 548 |
| **News Articles** | | |
| *Boston Evening-Post*, Sept. 10, 1750, p.2. | Ex. A at 29, ¶ 36 | 750 |
| *Cedar Falls Gazette*, Jan. 10, 1868, p.3 | Ex. A at 31, ¶ 44 | 751 |

| | | |
|---|---|---|
| *The Daily Morning Chronicle*, Jan. 7, 1868, p.4 | Ex. A at 31–32, ¶ 39 | 752 |
| *The Derby Mercury*, Mar. 19, 1756, p.3 | Ex. A at 28, ¶ 34 | 753 |
| *Gloucestershire Chronicle*, Jan. 4 1868, p.2 | Ex. A at 30–31 | 754 |
| *Jackson's Oxford Journal,* Mar. 20, 1756, p.2 | Ex. A at 29, ¶ 35 | 755 |
| *The Jeffersonian*, Jan. 9, 1868, p.2 | Ex. A at 31, ¶ 45 | 756 |
| *Pittsburgh Gazette*, Feb. 14, 1789, p. 1 | Ex. A at 29, ¶ 37 | 757 |
| **OTHER SOURCES** | | |
| Tentative Ruling on Mot. for Prelim. Inj., *Defense Distributed v. Bonta*, No. 22-cv-6200-GW (AGRx) (C.D. Cal. Oct. 21, 2022) (Dkt. 19) | 1 n.1; 3 n.4 | 761 |
| Order, *Defense Distributed v. Bonta*, No. 22-cv-6200-GW (AGRx) (C.D. Cal. Oct. 24, 2022) (Dkt. 21) | 3 n.4 | 772 |
| Decl. of Dennis Baron, Ex. 2, *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-00246-JJM-PAS (D.R.I.) (Dkt. 19-7) | 4-6; Ex. A | 773 |
| *AR-15 Gas Systems Guide*, 5D Tactical.com (Feb. 2021) | 8 n.10 | 807 |
| *M4 Carbine*, Military.com. | 9 n.12 | 811 |
| Search results (accoutrement), Corpus of Early Modern English, Brigham Young University Center for Law and Corpus Linguistics. | Ex. A at 28, ¶ 32 | 823 |
| Search results (accoutrement), Corpus of Founding Era American English, Brigham Young University Center for Law and Corpus Linguistics. | Ex. A at 28, ¶ 32 | 889 |

| | | |
|---|---|---|
| Search results (accoutrement /6 arms), Corpus of Early Modern English, Brigham Young University Center for Law and Corpus Linguistics. | Ex. A at 26, ¶ 28 | 994 |
| Search results (accoutrement /6 arms), Corpus of Founding Era American English, Brigham Young University Center for Law and Corpus Linguistics. | Ex. A at 26, ¶ 28 | 1006 |

6

Compendium of Works Cited in Defendants' Response to Plaintiffs' Additional Brief (3:19-cv-01537-BEN-JLB)

# LAW REVIEWS AND JOURNALS

**102 Va. L. Rev. 687**

**Virginia Law Review**
May, 2016

**Article**

Samuel L. Bray [a1]

Copyright (c) 2016 Virginia Law Review Association; Samuel L. Bray

# "NECESSARY AND PROPER" AND "CRUEL AND UNUSUAL": HENDIADYS IN THE CONSTITUTION

INTRODUCTION 688
I. HOW HENDIADYS WORKS 695
II. "CRUEL AND UNUSUAL" 706
*A. The Modern Trend to Read the Terms as Separate Requirements* 706
*B. Textual Difficulties with Reading the Terms as Separate Requirements* 709
*C. Reading "Cruel and Unusual" as a Hendiadys* 712
III. "NECESSARY AND PROPER" 720
*A. The Modern Trend to Read the Terms as Separate Requirements* 720
*B. Revisiting the Evidence for Two Requirements* 726
*C. Reading "Necessary and Proper" as a Hendiadys* 732
*D. New Light on Three Puzzles* 740
*E. How Many Things Is It Proper for "Proper" To Do?* 746
*F. Implications for Judicial Enforcement* 751
*G. Testing the Hypothesis: Two Case Studies from Marshall's Defense of* McCulloch 757
CONCLUSION 761

> *"Unfortunately, no one, including the constitutional framers, knows the point of the phrase 'necessary and proper."'* [1]

> *"Those who object to the [Necessary and Proper Clause] as a part of the Constitution, . . . have they considered whether a better form could have been substituted?"* [2]

## *688 INTRODUCTION

FOR more than two centuries, no clause of the U.S. Constitution has been more central to debates over federal power than the Necessary and Proper Clause. [3] For an interpreter today, it is inevitable to wonder if everything worth saying has already been said. Yet the Clause remains at the heart of major debates in this country, including the recent landmark case of *National Federation of Independent Business v. Sebelius*. [4] In that case the Court eventually got around to upholding the Affordable Care Act under the taxing power, but only after holding that the individual mandate could not be justified under the Necessary and Proper Clause. The individual mandate, the Chief Justice wrote, might be "'necessary' to the Act's insurance reforms," but it was "not a 'proper' means for making those reforms effective." [5] Necessary, but not proper. Whether the conclusion was right or not, it was exactly the kind of close reading that one would expect a court to give to the Clause, since it authorizes only congressional actions that are "necessary *and* proper." [6] Or does it?

This Article attempts to shed new light on the original meaning of the Necessary and Proper Clause, and also on another Clause of the U.S. Constitution, the Cruel and Unusual Punishments Clause. The phrases "necessary and proper" and "cruel and unusual" can be read as instances of an old but now largely forgotten figure of speech. That figure is *hendiadys*, in which two terms separated by a conjunction work together as a single complex expression. [7] The two terms in a hendiadys are not synonymous, ***689** and when put together their meanings are melded. (Hendiadys is pronounced *hen-DIE-u-dus*.)

This figure can be found in many languages and registers of speech. It is widespread, for example, in colloquial English. If a farmer says that his cow is "*nice and fat*," he is not praising two qualities of the cow -- niceness and, separately, fatness -- but rather expressing that the cow is nicely fat, quite fat. Or, to use the standard example from Latin poetry, when Virgil writes "we drink from *cups and gold*," he does not mean drinking from two things, but from one: golden cups. [8] Other uses of hendiadys are more complex than simple modification of one term by another. Sometimes there is a reciprocity where each term in the hendiadys modifies the other. Sometimes the individual terms are dissolved and replaced by something new, with each term contributing to the meaning of this new whole. [9] In all these various uses, hendiadys is not mere duplication, such as "cease and desist." [10] Rather it is two terms, not fully synonymous, that together work as a single unit of meaning. It is distinct from a term of art; hendiadys does not require an established technical meaning. [11]

This Article explains what hendiadys is, what it does, and how it can help us understand the Necessary and Proper Clause and the Cruel and Unusual Punishments Clause. [12] The argument here is not that "necessary and proper" and "cruel and unusual" must each be read as a hendiadys. Rather, the argument is that these phrases may be persuasively read that way, and that doing so solves puzzles that have long perplexed courts and commentators.

***690** First consider "cruel and unusual." These are often understood as two separate requirements: punishments are prohibited only if they are cruel *and* unusual. [13] Yet this phrase can easily be read as a hendiadys in which the second term in effect modifies the first: "cruel and unusual" would mean "unusually cruel." When this reading is combined with the work of Professor John Stinneford, which shows that "unusual" was used at the Founding as a term of art for "contrary to long usage," [14] it suggests that the Clause prohibits punishments that are innovatively cruel. In other words, the Clause is not a prohibition on punishments that merely happen to be both cruel and innovative. It is a prohibition on punishments that are innovative *in their cruelty*.

This reading has an elegant simplicity. It solves textual puzzles about how "cruel" and "unusual" work together. [15] It also suits the evidence, sparse as it is, that the purpose of the Clause was not to constrain existing punishments, but rather to constrain punishments that might be invented in the future. [16] Furthermore, this reading can lead to an inquiry that is more amenable to judicial resolution. Judges need not determine the quantum of cruelty that is constitutionally permissible (as in other readings); they need only make a comparative determination about whether a punishment is innovative in its cruelty. [17]

Next consider "necessary and proper." Article I enumerates the powers of Congress, and the Necessary and Proper Clause affirms that Congress has not only its enumerated powers but also the incidental powers that are necessary for executing those powers. [18] In other words, for its ***691** own enumerated ends, and for carrying out the powers of the other branches, Congress may use the necessary means. But how close must the specified ends be to the necessary means? After all, "necessary" has a wide semantic range, and if taken strictly it might authorize only The One Thing We Must Do Or The Sky Will Fall. [19] But "necessary" is paired with a more lax word, "proper." [20] If taken as a hendiadys, the phrase suggests that congressional action need not be "strictly necessary"; it must only be "properly necessary," something like "appropriately necessary." Thus the second term serves as a rule of construction against taking "necessary" in its strictest sense. As Chief Justice Marshall said in *McCulloch v. Maryland*, the word "proper" has the effect of "qualify[ing] that strict and rigorous meaning" that might otherwise be given to "necessary." [21]

This reading of the phrase as a hendiadys suggests that there should not be sequenced inquiries into "necessary" and "proper." There is one single inquiry into how close the connection is between the congressional action and the enumerated power it is intended to carry out. The Clause leaves vague what degree of connection is required. Yet this affirmation of incidental powers is precisely the sort of thing for which a determinate form of words will always be elusive. As a hendiadic phrase, "necessary and proper" does not eliminate that indeterminacy, but it gives it a smaller middling space. There is a rigorous word ("necessary")

and a warning against construing that word with too much rigor (“proper”). Moreover, “proper” reminds us that the incidental power Congress is exercising must belong to -- one could say, it must be *proper to* -- one of the enumerated powers. [22]

The reading of “necessary and proper” offered here solves a textual puzzle. [23] And it is a better fit with the debates about the Clause at ratification ***692** and in the early republic. In those debates the canonical interpretations did not treat “necessary” and “proper” as separate requirements. [24] Moreover, three features of those debates are puzzling if the terms are read separately. First, it was repeatedly said that the Necessary and Proper Clause does nothing more than make explicit that Congress has incidental powers that were already an “unavoidable implication” of its enumerated powers. [25] Second, the early debates over the Clause were dominated, on both sides, by *reductio ad absurdum* arguments. [26] Third, Madison made an unusual claim: The Clause might be worded imperfectly but there was no better way to put it. [27] These are puzzles if the Clause divides crisply into two requirements. As this Article shows, however, none of these three features remains a puzzle if the Necessary and Proper Clause instead invoked a general principle of incidental powers, drawing a line for congressional action that is on the leeway side of a strict word.

There is of course more than one way to read “necessary and proper” and “cruel and unusual.” Each phrase could be read as two requirements. [28] Or each phrase could be read as a tautology. [29] Syntax does not answer these questions. There is no acid test for whether two terms separated ***693** by a conjunction actually work as one term or two. [30] It is ultimately a matter of which reading makes the most sense all things considered. And whatever reading of the text of these Clauses is adopted, there are other modalities of constitutional interpretation that lie beyond the scope of this Article. [31]

Nevertheless, these are persuasive readings. And if they are accepted, there will be implications. These readings close some avenues of interpretation and open up others; they strengthen the arguments in some judicial opinions and weaken the arguments in others. The central lesson could be summarized in the words of George Wright: “Because phrases involving hendiadys are not often understood as such, their meanings are jumbled, *reduced to a stricter logic than the verbal situation can justify*, or even entirely misread.” [32] These Clauses have not been “entirely misread,” and the older interpretations are largely consistent with the readings here. In recent times, however, there has been a tendency for courts and commentators to read these Clauses dissectingly, to make every word stand alone instead of recognizing each phrase's essential unity. [33] It is this unity, in its varied and elusive forms, that is emphasized by the figure of speech hendiadys.

Although this Article considers only these two Clauses of the Constitution, the analysis has implications for other paired terms in legal texts. Whenever there is a pair of terms separated by a conjunction, it can be read in various ways: as two requirements, as a tautology, or as a term of ***694** art (i.e., a term that has technical meaning known to specialists). [34] This Article demonstrates another possibility.

This Article also speaks to how interpreters should think about “text” when interpreting the Constitution. Some scholars would limit arguments from text to a fairly mechanical set of readings. [35] But the possibility of hendiadys is a reminder that there is more to reading a text than taking one word at a time. Hendiadys also illustrates the limits of the bare text. Whether “necessary and proper” and “cruel and unusual” should be understood as instances of hendiadys cannot be determined from the text of the Constitution alone. One must read the text in its setting in life, in its historical context. This point provides support for, among other arguments, Dean William Treanor's critique of those who would read the text of the Constitution apart from the disputes and decisions surrounding its ratification. [36] There is a point of difference, however. Where Treanor criticizes “close reading,” this Article suggests that the problem with the existing “close readings” of these Clauses is that they have not been close enough.

This Article proceeds as follows. Part I explains the figure of speech hendiadys. Part II reads “cruel and unusual” as a hendiadys that refers to innovation in cruelty. Part III reads “necessary and proper” as a hendiadys that affirms that Congress has incidental powers to carry into execution the other powers granted by the U.S. Constitution. “Necessary” means the connection between the enumerated end and the incidental power must be close, while “proper” reaffirms that connection and clarifies that “necessary” is not to be taken in its strictest sense.

***695 I. HOW HENDIADYS WORKS**

Hendiadys is a figure of speech in which two terms, separated by a conjunction, are melded together to form a single complex expression. The word *hendiadys* is a Latin word formed from three Greek words (<<foreign language>>) meaning "one by means of two." The "two" in the hendiadys may be nouns, adjectives, or verbs. The "one" is the new meaning or meanings that emerge from the two. In a hendiadys, "a single conceptual idea is realized by two distinct constituents." [37] Or, as one scholar put it, "hendiadys might be thought of as the building of a hybrid representation developed from two distinct concepts, which produces a wider array of implicatures than can be recovered from each of the two original parts." [38]

Yet it is important to qualify the definition used here. Because hendiadys is only a slice of the phenomenon of coordinate construction, any definition exaggerates the difference between what falls just inside and just outside the definitional lines. [39] As defined here, hendiadys is relatively broad. Narrower definitions are restricted to nouns, or to instances in which one term is subordinate to the other. [40] Those limitations are hard to justify, however, and *hendiadys* is commonly used by linguists and literary scholars in this broader sense. [41]

***696** Many instances of this figure of speech can be found in ancient texts, especially in Akkadian, [42] Hebrew, [43] Greek, [44] and Latin. [45] The standard example is from Virgil's *Georgics*: "we drink from *cups and gold*," meaning "golden cups." [46] In German, hendiadys was employed to good effect by Johann Gottfried von Herder. [47] And scholars have identified this figure of speech in many other languages, including Rotinese, a language predominantly spoken on the Indonesian island of Roti. [48]

***697** Among English writers, hendiadys is most associated with William Shakespeare. By the count of one scholar, there are sixty-six instances in *Hamlet* alone. [49] Some have the same straightforward quality that the Virgilian example does: "*law and heraldry*" refers to heraldric law. [50] But for other examples in *Hamlet* the meaning of the hendiadic phrase is more complex. When Hamlet speaks of "*sense and secrecy*," he means not a secret sense but "good sense, which calls for secrecy." [51] And when Hamlet refers to the streets that "lend a *tyrannous and damned* light" to a murder, he might mean a light that is "damnably pitiless, or the kind of pitiless light that shines on the damned." [52] Other examples could be given, including ones from Old and Middle English, [53] and in Modern English from Thomas Cranmer, [54] Christopher Marlowe, [55] the translators of the King James Version of the Bible, [56] John Milton, [57] John Locke, [58] ***698** George Berkeley, [59] William Blackstone, [60] Edward Gibbon, [61] William Hazlitt, [62] Charles Dickens, [63] Elizabeth Gaskell, [64] William Makepeace Thackeray, [65] E.M. Forster, [66] Dylan Thomas, [67] and many others. [68] Although this figure of speech was not included in the editions of Dr. Johnson's *Dictionary* published in his lifetime, it can be found in the 1827 edition of the *Dictionary* augmented by another hand, [69] and it was included ***699** in some older English-Latin dictionaries. [70] In the late eighteenth and early nineteenth centuries, hendiadys was noted in other English dictionaries, [71] in commentaries on Shakespeare, in commentaries on the Bible, [72] and in Latin grammars. [73]

In more recent English usage, hendiadys tends to be colloquial. When Julia Child makes Boeuf Bourguignon in an episode of *The French Chef*, she says that to brown the beef it needs to be "*good and dry*." [74] We know by instinct that she used those two words to mean one thing: it needs to be really dry. If I say "I will *try and do better*," I mean one thing, not two. But neither the trying nor the doing better is redundant. I want to do better but I need to try. Other familiar examples include "*cakes and ale*" and "*law and order*" [75] (both instances of nominal hendiadys); "*hot and bothered*," "*high and mighty*," and "*tried and true*" [76] ***700** (adjectival hendiadys); and "*rise and shine*" (verbal hendiadys). [77] Sometimes, but more rarely, a hendiadys in English combines two different parts of speech: "the *rough and tumble* of politics." [78]

Little attention has been paid to hendiadys in legal texts. [79] But that is not to say it does not exist. This figure of speech has been identified, for example, in ancient Greek and Roman law, [80] and in contemporary Italian legal texts. [81] There are phrases in the Internal Revenue Code of the United States that are good candidates for being read as a hendiadys, including "*ordinary and necessary* expenses." [82] Another likely hendiadys is the "*open and notorious*" requirement for adverse possession. [83] "*Arbitrary and capricious*" may be one. [84] And a commentator has noted that New Jersey and Ohio courts have read the requirement that the state fund a "*thorough and efficient*" school system as if it were a hendiadys. [85] Hendiadys is used in other official documents. For example, on the first page of British passports it is said that the Queen "*requests and* ***701** requires" that the

bearer be permitted to move freely. [86] (In addition, there are linguistic phenomena in legal texts that are not technically examples of hendiadys but which are similar, such as a statutory list of conjoined terms that is not reducible to its component parts. [87])

Hendiadys is thus a figure of speech that can be found in many languages, eras, and registers of speech. [88] In all these diverse contexts, a pair of words separated by a conjunction can be a single unit of meaning. There is no reason to think it would be impossible for this figure to appear in the Constitution. Before considering that question, however, three more introductory points need to be made.

First, hendiadys is distinct from other semantic relationships, such as a term of art or a mere doubling, but the line between these various relationships is not always sharp, and it can change over time. [89] For example, often two words are paired but their meanings are synonymous. "Cease and desist" is a lawyerly duplication, at least at present, and it means no more than either "cease" or "desist" alone would mean. [90] Such a pairing of synonymous words is a tautology, not a hendiadys. [91] Or consider a term of art, which has an accepted, technical meaning, often ***702** one that has been worn smooth by use. [92] For example, in ordinary usage "equity" often means justice, but in legal usage it has a technical meaning, referring to the set of doctrines and remedies developed by the English Court of Chancery. [93] For hendiadys no such established, specialized meaning is required. Yet these concepts cannot always be crisply distinguished, and a hendiadys in a legal text can become a tautology or a term of art. Thus over time a phrase can be protean, shifting shapes, and sometimes -- for a while or for good -- it can be wrestled to the ground and captured in one form. [94]

Second, although hendiadys is not a particularly common figure of speech, it has long been the case that it is more commonly *used* than it is recognized and commented on. Although the phenomenon can be found in a number of classical texts, the first clear attestation of a name for it does not come until the early third century AD. [95] Although Shakespeare's use of this figure was perceived at least as early as the eighteenth century, [96] its pervasiveness in the plays seems not to have been ***703** recognized until the 1980s. [97] And when this figure of speech is identified, there are sometimes skeptics. [98] (With good reason, too, because those who know the figure can be enthusiastic and exaggerated, finding it everywhere. [99]) But a writer does not need to know this figure of speech in order to use it. Hendiadys is one of the "mechanisms of language that we use without thinking and without naming." [100]

Third, there is no one thing that hendiadys "means." To recognize that a pair of words with a conjunction is a single complex expression does not establish how the components interact. The uses and possible meanings of hendiadys are multiple, overlapping, and not sharply defined. [101] Context is crucial. Still, something can be said about the figure's use.

The most common and straightforward use of hendiadys is for one term to modify another. In Greek and Latin, the second term usually modifies the first (e.g., "*cups and gold*"), but that pattern does not hold ***704** in English. [102] When a hendiadys is used this way, compared to the more common alternative -- having one word modify the other explicitly (e.g., "golden cups") -- the figure has a tendency away from subordination. Hendiadys can let each word have its due, instead of letting one serve the other syntactically, even though one word does serve the other semantically. [103] Sometimes either term in the hendiadys could modify the other, and it is unclear in which direction the modification runs, or even whether the ambiguity is intended. [104]

Sometimes the terms in the hendiadys will remain distinct, but their relationship will be more dynamic than simply B-modifies-A. [105] The identity of the terms may be dissolved and replaced by something new, with each term contributing something to the meaning of the whole. [106] When Polonius, a hendiadys heavy hitter if there ever was one, speaks of "[t]he *flash and outbreak* of a fiery mind," we cannot pry apart the flash and the outbreak. [107] When he refers to "this *encompassment and drift* of question," it is what Frank Kermode calls "a doublet of which the parts ***705** cannot be made distinct, to be glossed clumsily as meaning by casual, indirect enquiry or something of the sort." [108] Yet another example of a complex hendiadys can be found in Laertes's dialogue with Ophelia. Laertes refers to the "*perfume and suppliance* of a minute," which, Kermode says, "means something like 'a pleasant, transitory amusement,' but the two nouns are interlocked; one can't remove either of them without destroying the sense." [109]

In some of these instances there is an intensification of the two terms by their being conjoined.[110] In other instances the new unitary meaning is not more intense than the sum of its parts.[111] Sometimes the new meaning even seems to lie intermediate to the two terms.[112] When Polonius speaks of his "*lecture and advice*," we cannot tell where the lecture ends and the advice begins; perhaps he is saying that his words fell somewhere between a formal lecture and a friendly chat.[113] Similarly, ***706** the requirement that a state fund a "*thorough and efficient*" school system[114] may suggest an intermediate level of funding: less than would be required with "thorough" standing alone, but more than would be required with just "efficient."

Thus the terms in a hendiadys may be related in multiple ways. One term may modify the other, or the terms may be joined in a more subtle or complex relationship, sometimes one that is ambiguous or even mysterious. We may be uncomfortable with thinking of such ambiguity and mystery in legal texts, but their presence is more intelligible when one thinks of drafting compromises and of the fact that sometimes language is a limit. Sometimes one cannot put the point more precisely, or if one tried it would be over-precise, or faux precise, as in a rule that everyone knows is really a standard.

## II. "CRUEL AND UNUSUAL"

The last Clause of the Eighth Amendment is often read as prohibiting punishments only if they are both cruel and unusual. But the phrase "cruel and unusual" may be read as a hendiadys in which the second term modifies the first: "unusually cruel." There is strong evidence that "unusual" is a term of art in the Eighth Amendment, meaning "contrary to long usage."[115] Given that evidence, the hendiadys can be glossed as "innovatively cruel."[116] This is a clear and simple reading. It solves the difficult problem of how "cruel" and "unusual" are related, and it fits the evidence, sparse as it is, about the historical purpose of the Cruel and Unusual Punishments Clause.[117] In sum, if the phrase is read as a hendiadys, the Clause would prohibit new cruelty in punishment.

### *A. The Modern Trend to Read the Terms as Separate Requirements*

The Eighth Amendment contains several prohibitions:

> ***707** Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.[118]

The text of the Eighth Amendment is understood by some as prohibiting punishments that meet two requirements: they are "cruel" and they are "unusual." That view has roots in some cases from the late nineteenth and early twentieth centuries,[119] and it has more recently been advanced by Justices Scalia, Thomas, and Breyer.[120] Scholars who have considered the relationship of these terms in detail, especially Professor David Hershenov and Professor Meghan Ryan, also reach the conclusion that "cruel" and "unusual" are separate requirements.[121] Other scholars have addressed the question in passing, ones as diverse in their methodology of constitutional interpretation as Professors Akhil Amar, Bradford Clark, Ronald Dworkin, and John Hart Ely: They, too, have described the Clause as prohibiting only punishments that are both cruel and unusual.[122]

***708** There are judges and scholars who resist that conclusion, but they usually concede that their view is in some tension with the text.[123] It is true that the U.S. Supreme Court has not structured its recent decisions on the Clause in terms of two requirements.[124] But those decisions have only a tenuous connection to the constitutional text;[125] they rest primarily on other modalities of constitutional interpretation.[126]

The preceding sketch is not quite complete, for two scholars -- Professors John Stinneford and Kent Greenawalt -- have maintained that the terms are related in some way, even "interlocked."[127] Even so, to the extent that courts and commentators derive their conclusions about the Eighth Amendment from the fine grain of the text, it is widely thought that "cruel" and "unusual" are independent requirements.

***709** ***B. Textual Difficulties with Reading the Terms as Separate Requirements***

It is possible to read "cruel" and "unusual" as separate requirements that must both be met for a punishment to be prohibited. But when the terms are read that way certain difficulties emerge. Consider briefly the two terms in the Clause.

*Cruel* is ambiguous, in the technical sense of having multiple meanings. It might be a word about extremity; cruel punishments would be ones that are "exceptionally brutal"[128] or "inhuman."[129] Or *cruel* might refer to an absence of justification. Then cruel punishments would be ones that inflict pain "without good reason."[130] Or it might refer to punishments that are disproportionate to the offense.[131] Or it might refer to punishments that reflect "the disposition of human agents to take delight in or be indifferent to the serious and unjustified suffering their actions cause to their victims."[132] Each of these conceptions is evaluative, and each has something like an implicit adverb: *cruel* is taken to mean inhumanly cruel, unjustifiably cruel, disproportionately cruel, or malevolently cruel. Yet it is not obvious that the word must be limited this way. It could be taken, as David Hershenov has argued, to mean something harsh, without any implication of wrongfulness.[133] In that case, it would ***710** apply to most punishments, whether in the eighteenth century or the twenty-first.

*Unusual* might seem to be an odd way to constrain punishment.[134] Yet as John Stinneford's recent work shows, the word had two different senses at the Founding. One sense was about frequency. For it, the glosses include "rare," "uncommon," and "out of the ordinary."[135] But in law the word could also be a term of art meaning "contrary to long usage" or "contrary to immemorial usage."[136] Stinneford has advanced strong evidence and arguments for "unusual" being a term of art in the Eighth Amendment.[137] Given the strength of Stinneford's work, the premise here is that "unusual" is used as a term of art.[138]

Now fit "cruel" and "unusual" together. First consider "cruel" as an evaluative term, one that could be glossed, for example, as "unjustifiably severe."[139] The phrase might then refer to punishments that are (1) unjustifiably severe and (2) innovative. But once "cruel" is given an evaluative meaning, it becomes harder to understand why there is a separate requirement that the punishment be innovative. Why would the Eighth ***711** Amendment not prohibit *all* unjustifiably severe punishments, instead of prohibiting only those unjustifiably severe punishments that also happen to be new?[140] Unsurprisingly, then, scholars who take the first term of the phrase as evaluative tend to sideline the second term.[141]

As already noted, "cruel" can also be taken as a broader and more descriptive term, something like "harsh."[142] Read as two requirements, the phrase would refer to punishments that are (1) harsh and (2) innovative. On this understanding, most punishments would be harsh. What would sort the constitutional harsh punishments from the unconstitutional harsh punishments would be innovation. But there is a problem. A new punishment may be less harsh than what came before, but still be harsh. If most punishments are "cruel" and new punishments are by definition "unusual," then the Clause would prohibit almost all new punishments -- even ones that are *less* cruel than the punishments they replace.[143] It is hard to see why the Eighth Amendment would prohibit nearly all innovation in punishment.[144]

In sum, when the phrase "cruel and unusual" is understood as having two separate requirements that must be met for a punishment to be prohibited, there are textual oddities. Either one term seems superfluous, or the Clause prohibits even ameliorative development in punishment. The ***712** terms might appear to be separate requirements, but if they are read apart, they do not work well together.

There is a further problem with the two-requirements reading. The prohibited punishments are ones that merely happen to be both cruel and unusual. The Clause might not prohibit death by hanging, but it would prohibit the same old hanging with a newly invented microfiber rope.[145] The scope of the prohibition would turn on an accident, a mere coincidence. Is there another way to understand the relationship of these terms?

***C. Reading "Cruel and Unusual" as a Hendiadys***

A reader who has made it to this point knows what comes next: "cruel and unusual" can be read as a hendiadys. That is, "cruel and unusual" can be read not as two separate requirements, but as a single complex expression. The hendiadys is a straightforward

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

instance of the second term modifying the first, like Virgil's "we drink from cups and gold" (i.e., "we drink from golden cups"). Read as a hendiadys, "cruel and unusual" would mean "unusually cruel."[146] If "unusual" is taken as a term of art meaning "contrary to long usage," then the hendiadys would mean "innovatively cruel."[147]

If "cruel and unusual" means "innovatively cruel," then there are no sequenced inquiries into whether a punishment is "cruel" and then "unusual." There is a single inquiry into innovation in cruelty. It is true that one could break this single inquiry into two analytical steps. First, is this punishment innovative? Second, does this punishment's innovation increase cruelty? Yet that is very different from the two steps associated with a two-requirements view. Those who see the phrase as containing two requirements typically ask first whether a punishment is cruel and ***713** then whether it is unusual, treating the two as distinct and unrelated inquiries.[148] But if the phrase is taken as a hendiadys, as an essential unity, then these two inquiries -- is the punishment innovative? and does the innovation increase cruelty? -- are not really distinct at all. One tells the interpreter to look for innovation; the other tells the interpreter what type of innovation to look for.

In short, if the phrase is taken as a hendiadys, the prohibited punishments would not be ones that merely happen to be both cruel and unusual.[149] Rather, the Clause would prohibit punishments that are new *in their cruelty*. A new, more painful form of capital punishment; a new, more damaging mode of incarceration (perhaps such as solitary confinement); a new, more demeaning restriction on the freedom of movement of released offenders -- all would be "innovatively cruel."

Two implementing questions would be especially important. First, the baseline: punishments are prohibited if they are new in their cruelty *compared to what*? One could try to identify innovation relative to the baseline of 1791 for the national government (under the Eighth Amendment), and 1791 or 1868 for the state governments (under the Eighth Amendment as incorporated by the Fourteenth Amendment).[150] Or one could try to identify innovation relative to "long usage," a kind of rolling tradition that from any moment in time stretches backwards a few decades, generations, or centuries.[151] If "unusual" is a term of art for "contrary to long usage," then this approach is the right one. "Unusual" would not point to punishment practices in a particular year. Rather, it would point to traditional punishment practices, and a tradition can change.[152]

***714** Second, should an interpreter look to whether there is innovative cruelty relative to punishments generally or relative to punishments for this particular crime? This question cannot be resolved here, but the reception of the case of Titus Oates would suggest the latter. His punishments were considered "cruel and unusual," not because they were contrary to long usage generally, but because they were contrary to long usage as punishments for the crime of perjury.[153]

As far as the text of the Eighth Amendment goes, it is straightforward to read "cruel and unusual" as a hendiadys meaning "innovatively cruel." A hendiadys often works like this, with one term in effect modifying the other.[154] In this hendiadys, the two terms "cruel" and "unusual" work together so closely and well that their order in the gloss could even be reversed: "cruelly innovative." Either way, the meaning is the same.

But can anything else be said for this reading besides its textual plausibility? First, the "innovatively cruel" reading fits the evidence, slender as it is, for why the Cruel and Unusual Punishments Clause was included in the Bill of Rights.[155] It appears to have been meant to check the possibility that new, more savage punishments would in the future be ***715** invented or borrowed from civil-law countries.[156] It was a response to a charge made by Anti-Federalists such as Abraham Holmes and Patrick Henry. In the Massachusetts ratifying convention, Holmes warned that under the unamended Constitution, Congress would be "nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes."[157] In the Virginia ratifying convention, Henry warned that Congress could invent or borrow "unusual punishments,"[158] and he condemned the proposed Constitution of the United States because it failed to restrain congressional invention. By contrast, he praised the Virginia Declaration of Rights for its prohibition on "cruel and unusual punishments."[159] (That provision of the Virginia Declaration of Rights would later be described as having been "framed . . . so that no future Legislature, in a moment perhaps of great and general excitement, should be tempted to disgrace our Code by the introduction of any of those odious modes of punishment."[160]) There was even a point of common ground with James Iredell, an opponent of including a constitutional prohibition on "cruel and unusual punishments." Iredell assumed that the goal would be to constrain cruel innovation, and he disagreed with the Anti-Federalists only about whether a constitutional prohibition would in fact achieve that goal.[161]

The fears expressed by the Anti-Federalists were not without foundation. Indeed, the first Congress prescribed the death penalty for anyone convicted of murder in a place under exclusive federal jurisdiction -- adding, for the benefit of science and for greater deterrence, that the ***716** court could require "that the body of [the] offender . . . be delivered to a surgeon for dissection." [162]

In other words, the concern behind the Cruel and Unusual Punishments Clause was about progress. But it was not Herbert Spencer's view of social progress as much as it was William Hogarth's view of the rake's progress. [163] Times change and things can go downhill, and when they do, there needs to be something in the Constitution to resist the devolving standards of decency. [164]

A slide into severe punishments was not, however, thought to be inevitable. Although there was little discussion of the Cruel and Unusual Punishments Clause at the time of its ratification, what discussion there was shows a more subtle, two-sided view of innovation: Legislators should be constrained from innovations that increase cruelty, but they should be encouraged to adopt innovations that ameliorate it. [165] The reading given here exactly fits that two-sided view: "Cruel and unusual" ***717** is a hendiadys that prohibits not all innovation in punishment, but only innovation that brings new cruelty. [166]

Second, this reading can lead to an inquiry that is better suited to judicial decision making. What makes this second advantage possible is that a hendiadic reading of the phrase allows a broad, non-evaluative reading of "cruel." If "cruel" is taken as an evaluative term, judges are forced to make absolute judgments about what is or is not cruel. That is a difficult question. Of course some punishments are more cruel than others, but the point of difficulty is the constitutional cut-off. If punishments are being judged on whether they are cruel in a sense like "unjustifiably cruel" or "malevolently cruel" -- then the question is an inescapably moral one, a question on which individual judgments are likely to vary widely. [167] If the question is shifted to an inquiry into the subjective intentions and knowledge of government officials, that inquiry too is one on which individual judgments will diverge. [168] Nor is the question made easier by directing it towards a moment in history, as in, "What was considered cruel in 1791?" That is still an abstract moral question, [169] yet with the added difficulty of being a question the present is asking of the past.

But the judicial task changes if the phrase is read as a hendiadys and "cruel" is understood in the sense of "harsh." If what sorts the constitutional punishments from the unconstitutional ones is not whether they are "unjustifiably cruel," but whether they are "innovatively harsh," then the judicial inquiry is a comparative one. Judges would not be determining the quantum of cruelty that is constitutionally permissible, but they would instead be asking whether a punishment shows innovation in its harshness. This task is comparative, and such a task tends to be more amenable to judicial competence. [170]

***718** The hendiadic reading given here builds on the work of two scholars who have offered close readings of the text of the Eighth Amendment, namely David Hershenov and John Stinneford. [171] Both present evidence that the evil towards which the Clause was directed was the invention of savage punishments in the future. Both skillfully analyze the Clause. But each struggles with some aspect of the Clause because of trying to take "cruel" and "unusual" as separate requirements. [172] The reading given in this Article has the strengths of Hershenov's and Stinneford's work without the textual weaknesses. It keeps their insights about each term, and it shows that the Clause is well-designed to constrain the creation of future punishments. Understanding the phrase as a hendiadys avoids needless complexity, as well as the danger that the Clause would prohibit nearly all change in punishment.

It should be noted that the phrase could be read as a hendiadys without "unusual" being a term of art. "Unusual" could be taken as a term about frequency. [173] The hendiadys would mean "uncommonly cruel," and it would be a prohibition on punishments that show a degree of cruelty that is rare, as measured against some baseline. A variety of different baselines would be imaginable: 1791 (Justice Scalia [174]), states right now (Justice Kennedy, sometimes [175]), liberal democracies right now ***719** (Justice Kennedy, other times [176]), and similarly situated defendants (Justice Douglas [177]).

Which baseline is selected would do most of the work in determining the effect of the Clause. Once a baseline was chosen, the judicial task would involve a comparison -- an advantage shared with the other hendiadic reading. But the "uncommonly

cruel” reading is hard to square with the evidence of how the Clause was originally understood and the evil to which the Clause was directed.[178]

Two concluding points. First, the reading given here does not conform to the Court's recent Eighth Amendment jurisprudence. But that jurisprudence is based on other constitutional modalities. Text is not its strong suit.[179] In one respect, however, this reading does support the recent jurisprudence. In recent cases, a majority of the Justices have been unwilling to read the Clause as having two requirements;[180] that unwillingness is supported by taking the phrase as a hendiadys.

Second, there is an affinity here with those, like Justice Brennan, who would read the Eighth Amendment as embodying a principle. They might find a principle of dignity, or a principle against inhumanity.[181] Their principles are vulnerable to a critique that they take flight from the text and never return. But if “unusual” is understood as a term of art, and the Clause is read as a hendiadys, then the principle is no innovation that ***720** heightens the cruelty of punishment. This principle would be one that is derived from a close reading, but not a mechanical reading, of the text itself. This is not to say it is a better principle as a matter of political morality, only that it is closer to “cruel and unusual” in the Eighth Amendment.

* * *

On the reading here, the Cruel and Unusual Punishments Clause is more than a sequence of separate elements. What the Clause prohibits is not punishments that happen to be both cruel and new. Rather, it prohibits punishments that are new *in their cruelty*. “Cruel and unusual” is a principle of no innovation in cruelty, and with this unitary reading, the phrase is more coherent than the sum of its parts.

## III. “NECESSARY AND PROPER”

It has recently become common for courts and scholars to insist that the Necessary and Proper Clause authorizes congressional action only if it meets two separate requirements: The action is “necessary” and it is “proper.” Here that reading is considered, and an alternative is offered: “Necessary and proper” is a single unit of meaning, a hendiadys. The Clause affirms that Congress has the incidental powers that accompany its enumerated powers. In the reading given here, the Clause does not draw a sharp line for how extensive those incidental powers are. “Necessary” is a rather strict word, but “proper” serves as a rule of construction to prevent it from being given a meaning that is overly strict. “Proper” is also a reminder that an incidental power must belong to an enumerated power.

### *A. The Modern Trend to Read the Terms as Separate Requirements*

The Necessary and Proper Clause authorizes Congress:

> To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.[182]

***721** This Clause has been the subject of a vast amount of commentary and a great number of cases.[183] In recent years, the trend has been towards reading the phrase “necessary and proper” as imposing two requirements on any congressional action that is justified under this Clause: It must be “necessary” *and* it must be “proper.”

In *National Federation of Independent Business v. Sebelius*, where the Court upheld the Affordable Care Act as an exercise of the taxing power, it first held that the statute could not be justified under the Necessary and Proper Clause: “Even if the individual mandate is ‘necessary’ to the Act's insurance reforms, such an expansion of federal power is not a ‘proper’ means for making those reforms effective.”[184] That conclusion built on several prior cases in which the Court had treated the two terms as separate requirements. Under “necessary,” the Court analyzes whether the legislation is conducive to the exercise of an enumerated

power,[185] and under "proper" it considers whether the legislation strikes at a provision or principle in the Constitution.[186] As Professor John Manning recently wrote, "the Court now reads the term 'proper' as authorization to determine not only whether an act of Congress complies with specified constitutional limitations, but also whether it fits with ***722** background principles of federalism and, presumably, also separation of powers."[187]

Accompanying this shift in the Court, and providing impetus for it, is a wave of scholarship that has distinguished "necessary" and "proper" on one ground or another. The leading article, by Professor Gary Lawson and Patricia Granger, argues from text and structure that "proper" is a separate requirement.[188] "Proper," they say, makes the Clause not merely an affirmation of federal power but also a restriction, nothing less than "a textual guardian of principles of separation of powers, principles of federalism, and unenumerated individual rights."[189]

Since Lawson and Granger wrote, many other scholars have argued that "proper" is a separate requirement. Professor Robert Natelson has researched certain aspects of the legal background of the Clause, and he concludes that "proper" is an independent requirement that imports fiduciary duties.[190] "To be proper" a law must "be within constitutional authority, reasonably impartial, adopted in good faith, and with due care -- that is, with some reasonable, factual basis."[191] Professor Geoffrey Miller has analyzed the use of "necessary" and "proper" in Founding-era corporate charters; he concludes, more tentatively, that "proper" might be a requirement that Congress consider the effect of its legislation on citizens, much like a requirement of "proper" action compelled corporate ***723** managers to consider the effect of their actions on shareholders or employees.[192] Professor Stephen Gardbaum argues that "proper" is an independent requirement that national legislation be consistent with federalism; he differs from Lawson and Granger in that he sees the relevance of this federalism principle not so much in protecting areas of exclusive state authority as in moderating federal preemption in areas of concurrent authority.[193] Professor Randy Barnett suggests that "proper" might channel congressional action towards less intrusive forms, such as "regulating" commerce instead of "prohibiting" it.[194] Professor Ilya Somin argues that "proper" is a separate requirement that "excludes legislation that can only be justified by a line of reasoning that would give Congress unlimited power to impose other mandates, or render large parts of the rest of the Constitution redundant."[195] And other scholars have embraced, to varying degrees and in varying forms, the suggestion that "proper" has separate force.[196]

***724** Some scholars have dissented from the ascendant view that the phrase has two requirements. They argue either that "necessary and proper" is a tautology,[197] or, more modestly, that if "proper" is meant to cross-reference other constitutional principles, then the hard work is specifying those principles.[198] But most scholars writing on these cases, even those who reject the Court's recent applications of "proper," have not taken issue with the Court's treatment of the two terms as separate requirements.[199] In short, although it would be an overstatement to say ***725** there is a consensus, many scholars would agree with Professor Richard Epstein about how to approach the Necessary and Proper Clause: "The secret of sound constitutional interpretation is to take it one word at a time, by asking first what is 'necessary' and then what is 'proper.'"[200]

The reasons for treating "necessary" and "proper" as separate requirements are fairly obvious. Both words are in the Constitution. The separation of these words with *and* seems to indicate a conjunctive reading.[201] There are alternative readings, but they are unattractive. There is little historical support for reading the phrase "necessary and proper" as a term of art, a known technical usage.[202] To read "and" as disjunctive (thus "necessary *or* proper") is even worse.[203] And to read the phrase as a tautology seems like giving up too quickly.[204] It is easy to see why the ***726** view is now widespread that these terms impose two separate requirements, even if there is significant disagreement about what exactly may be the difference between the requirements.

### *B. Revisiting the Evidence for Two Requirements*

Despite the seeming plausibility of the two-requirements reading, there is one point that should give us pause. It is actually hard to find early interpretations that treat "necessary" and "proper" as separate requirements.[205] In the ratification debates, that view is unmistakably present in only a single source -- a Federalist pamphlet by "An Impartial Citizen."[206] There is also an ambiguous phrase in James Madison's speech introducing the first amendments to the Constitution. Then there are three sources from the early nineteenth century: an 1811 speech in the House of Representatives, Maryland's argument in *McCulloch*

*v. Maryland*, and perhaps Spencer Roane's "Hampden" essays criticizing *McCulloch*. This Section considers these sources, and it then raises the question of how to understand the paucity of early references to two requirements.

The first source treating "necessary" and "proper" as separate requirements was apparently a pamphlet defending the proposed Constitution. The pamphlet responded to George Mason, who had warned that the Necessary and Proper Clause would allow Congress to "grant monopolies in trade, constitute new crimes, inflict unusual punishments, and in short, do whatever they please."[207] In rebuttal, "An Impartial Citizen" ***727** objected that "the laws which Congress can make, for carrying into execution the conceded powers, must not only be *necessary*, but *proper*."[208] And, the pamphleteer said, the statutes Mason warned of "would be manifestly *not proper*."[209] This pamphlet takes the Clause as having two requirements, and it understands "proper" as the more restrictive term. It does not offer further analysis; it does not say why Mason's hypotheticals would fall afoul of "proper."

The next source to clearly adopt a two-requirements reading appears more than two decades later. In 1811, in a debate over the Second Bank of the United States, Representative William Taylor Barry (later the Postmaster General for President Jackson) argued that "proper" was a distinctive requirement. A proper means was one "confined" to the end, not one "entirely distinct from, and independent of the power to the execution of which it was designed as a mean."[210]

The third instance came in 1819, in the arguments in *McCulloch*. One of the attorneys for the State of Maryland, Walter Jones, argued that "proper" was a separate requirement. A constitutional means, he argued, "must be, not merely convenient-fit-adapted-proper, to the accomplishment of the end in view; it must likewise be necessary for the accomplishment of that end. Many means may be *proper*, which are not *necessary*; because the end may be attained without them."[211]

The fourth instance is less certain. It came later in 1819, after *McCulloch* was decided, in the essays published by a leading justice of the Virginia Supreme Court, Spencer Roane, under the name "Hampden."[212] In Roane's extensive criticism of the decision, there is one passage where he glosses *necessary* as "indispensably requisite" and *proper* as "peculiar." ***728** [213] In Roane's usage, "proper" seems to mean belonging uniquely to,[214] with the implication that the Necessary and Proper Clause allows the use of an incidental power only if it is connected to exactly one enumerated power. He therefore faults Congress and the Supreme Court for failing to say which of the enumerated powers the bank was uniquely connected with. Roane may be treating the two terms as separate requirements, but that is not clear. He is certainly thinking of both terms as involving some aspect of incidental-powers analysis.[215] Then Roane moves on quickly from "proper": his main concern is "necessary."[216]

In addition, there is a phrase from Madison, in his speech in the House of Representatives presenting what became the Bill of Rights, which might be taken as suggesting the terms are separate requirements. But it is not free from doubt. In describing laws that might make it useful to have a Bill of Rights, Madison notes that Congress might abuse its powers under the Necessary and Proper Clause.[217] He raises the possibility that laws will "be considered necessary and proper by Congress" when they are in fact "neither necessary or proper." He then immediately proceeds to give a hypothetical: Congress might consider general warrants to be "necessary" for raising federal revenue.[218] At this point, if Madison thought "proper" was a separate requirement, one would expect that he would say whether general warrants would be "proper." He does ***729** not. Nor does he mention any possibility of a law being necessary but not proper, or proper but not necessary. Nor does he suggest any way that "necessary" and "proper" differ. In context, then, it is hard to say what exactly Madison meant by "neither necessary or proper." It certainly could mean that he thought the Clause had two requirements, but it could also be rhetorical or imprecise.[219] Instead of taking this phrase as the secret key to Madison's views, the better course is to see what Madison says about the Necessary and Proper Clause more plainly in his other writings, which are considered below.[220]

Apart from the phrase from Madison's speech on the Bill of Rights, the four sources just discussed appear to be the early interpretations that most clearly read the Necessary and Proper Clause as having two requirements.[221] All of these sources stand at some distance from the modern ***730** two-requirements readings. None of these sources expressly treats "proper" as a textual hook for various other constitutional provisions and principles (e.g., state sovereignty) like Lawson and Granger, *Printz v. United States*, *Alden v. Maine*, or *NFIB*. None of them makes "proper" a font of fiduciary duties, as Natelson argues.[222] Rather, each of these sources seems to treat "proper" as an aspect of incidental-powers analysis.[223] Some see "proper" as a

requirement that a congressional act be "proper to" some particular enumerated power.[224] Note, too, that there is no consistent position in these sources about the relative strength of "necessary" and "proper."[225]

Even more striking is the fact that none of the classic texts on the Necessary and Proper Clause makes a two-requirements argument. This is a silence that speaks. Many of those who argued about the Necessary and Proper Clause in the ratification debates and the debates over the various Banks of the United States would have had strong reasons for advancing a two-requirements reading.[226] Some of the major early interpretations, especially the essays of Hamilton and Madison in *The Feder* ***731** *alist*, are concerned with persuading others that the Clause has a limited scope;[227] they could have been aided by pointing to not one but two requirements in the Clause. Other major early interpretations tried to limit the scope of the Clause, especially Madison and Jefferson in the debates over the First Bank of the United States;[228] they would have availed themselves of this argument if they had thought of it. Still others, like Chief Justice Marshall in *McCulloch*, wanted a robust national power but also wanted to allay resistance from those who feared an all-powerful national government; they, too, would have had reason to note a second requirement.

But when Hamilton and Madison urged ratification, they did not appeal to "proper" as an independent requirement to assuage the concerns of the state conventions.[229] In the Bank debate, neither Jefferson nor Madison invoked "proper" as a separate hurdle.[230] In fact, not a single ***732** speaker in the House debate over the First Bank of the United States treated "proper" as a distinct requirement.[231] In *McCulloch*, Marshall saw no need to raise, nor to resist, the reading of "proper" as a separate limitation on the establishment of a national bank.

In short, none of these classic texts emphasizes a distinction between "necessary" and "proper." None of them organizes the analysis into two separate steps. To find a clear example of a two-requirements reading, one has to venture to texts that are either peripheral or later or both -- the "Impartial Citizen" pamphlet, the speech of Representative Barry in the debate over the Second Bank, Walter Jones's argument in *McCulloch*, and Spencer Roane's criticism of *McCulloch* -- and these still treat "proper" in ways that diverge sharply from the modern two-requirements reading. The lack of any clear evidence for the two-requirements interpretation in the classic texts should give us pause.[232]

### *C. Reading "Necessary and Proper" as a Hendiadys*

There is a long tradition in American law of reading "necessary" with latitude in the Necessary and Proper Clause.[233] This was Alexander Hamilton's position, but one he expressed only *after* the Constitution ***733** was ratified.[234] This is widely thought to be Chief Justice Marshall's position in *McCulloch*.[235] This was Justice Story's position in his *Commentaries*.[236] But the view expressed by Hamilton, Marshall, and Story was a response to this problematic phrase, and first the problem needs to be grasped.

*Necessary* is a stark word. It had (and still has) a broad semantic range, running from The One Thing We Must Do Or The Sky Will Fall[237] to something like "appropriate."[238] But the breadth of this semantic range should not make us forget the word's usual connotation was stronger than the postratification Federalist position. Professor Mark Graber has said, "[n]o one besides John Marshall and Alexander Hamilton . . . seriously contends that 'necessary . . . means no more than needful, requisite, incidental, useful or condusive to.'"[239]

***734** It is easiest to see the force of this word if one imagines the Necessary and Proper Clause without the words "and proper." If every congressional act had to be "necessary" for furthering an enumerated power, there might be something like strict scrutiny of most federal statutes. If Congress had any other way to execute the enumerated power, could the statute really be necessary?[240] One could think of the members of Congress, every time they passed a statute that did not fall directly under a heading of an enumerated power, as resembling trespassers who break into a cabin for food and have to justify themselves with a necessity defense. The preceding sentence is of course a *reductio ad absurdum*. But that is exactly the form of argument that dominates every one of the classic Federalist statements about the Necessary and Proper Clause.[241] They would not have presented this parade of horrible limitations unless they needed to. They needed to because *necessary* is a strong word.

None of these classic Federalist arguments invoked a *reductio ad absurdum* about the dangers of rigorously interpreting "proper." There was no need to. "Proper," too, had a broad semantic range, but it was less restrictive. This conclusion is supported, for example, by the relative strictness of "necessary" and "proper" as standards elsewhere in the Constitution.[242] It is further supported by the use of "necessary" and "proper" in roughly contemporaneous corporate charters.[243]

That "proper" is the more lax term is further evident from the controversies over the First and Second Banks. In the debate in the House of ***735** Representatives, one critic concentrated on the word "necessary,"[244] but none concentrated on the word "proper."[245] There is still more evidence from *McCulloch*: Chief Justice Marshall saw "necessary" as a potential threat to effective national government and devoted all of his rhetorical powers to subduing that word; he gave almost no attention to "proper."[246] It is also evident from the criticism of *McCulloch* by those who feared an expansive national government: They concentrated their criticism on how *McCulloch* read "necessary," not how it read "proper."[247] This pattern of usage and argumentation is exactly what one would expect if "necessary" was understood as the more restrictive word. Lawson and Granger argue otherwise, but their sources are generally unpersuasive in showing that "proper" was the more restrictive term.[248]

***736** Finally, the notion that "proper" is the less restrictive term gains support from the drafting history of the Clause. The Committee of Detail took a draft of the Constitution that had the word "necessary," and added the words "and proper." The particular member of the committee who added those words was James Wilson, a stalwart supporter of national power.[249] (It is a coincidence, perhaps, that he was also a sometime teacher of Latin.[250])

Yet if the Clause were the Proper Clause (without "necessary and" in the text) it would still be puzzling. Whether legislation is proper looks like a quintessential legislative judgment. Congress should enact laws it thinks are proper; it should not enact laws it thinks are improper. To have courts inquire into the propriety of a law (again, by hypothesis "proper" is standing alone) looks like a question about whether a judge would have voted for the bill. Or, to vary the analogy, it looks like the discretionary veto of the President.

***737** Now the Clause gets more puzzling when the two terms are put together. If both terms can be placed along a spectrum of strictness,[251] not as points but as zones, then why use both terms? If each term is taken as an independent requirement -- "necessary" being strict, and "proper" being lax -- what is the point of including the weaker term? These are the problems with a straightforward reading of the Necessary and Proper Clause: "necessary" may be construed as too strict, "proper" may be construed as too lax, and the force of "proper" hardly matters at all because it is pointlessly duplicative. These problems can be mitigated, however, if the phrase is read as a hendiadys.

The starting point is the context in which the phrase appears. The Constitution grants to the national government certain defined and limited powers; all other powers are retained by the people and the states (a structural inference confirmed by the Tenth Amendment). In particular, Article I enumerates the powers of the national legislature. But as soon as there is an enumeration of powers, the question is how much Congress can do to carry out those powers. The Scylla and Charybdis are obvious: If Congress may do anything at all to carry out the enumerated powers, then the very scheme of a national government with defined and limited powers is overthrown; but if Congress may only do the exact things specified in Article I, without any flexibility as to means, then the national government would be almost as weak and restricted as the government operating under the Articles of Confederation. This is a classic Goldilocks problem.

Enter the word "necessary." This is a relatively strict word, and by itself it would probably avoid the problem of unlimited means. But there are difficulties with "necessary": its semantic range is broad, one end of that range is much too strict, and it is vague.

Now add the word "proper." In the hendiadys, it modifies and moderates "necessary." It serves as a rule of construction against taking "necessary" in its strict, Jeffersonian sense. It thus narrows the range of possible meaning for "necessary." But it still leaves the standard vague.

If the phrase is read as a hendiadys, neither word stands alone. The choice of "necessary" suggests a close connection between the congressional action and the constitutionally specified end, while "proper" ***738** counsels against an overly rigorous understanding of "necessary." The phrase starts with a strict word, then leans in a latitudinous direction. What is required is not that the congressional action be "strictly necessary," or that it be merely "proper," but that it be "properly necessary." Precisely

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

because both words have such wide semantic ranges, and their extremes would be so destructive to the delicate balance of the constitutional system, those extremes need to be avoided. That is achieved, on paper, by joining the words in a hendiadys.

How, if at all, can this be squared with *McCulloch*? Chief Justice Marshall did not call the phrase a hendiadys. But there are several aspects of Chief Justice Marshall's opinion that fit this reading better than the reading of the Clause as imposing two separate requirements.

One is the emphasis of Chief Justice Marshall's opinion. He concentrated almost entirely on the meaning of "necessary." He never applied "proper" as an independent requirement;[252] rather, he invoked it in only a single paragraph, and then only to use it as guidance for how to construe "necessary."[253] Indeed, he expressly said that including the word "proper" had the effect of "qualify[ing] that strict and rigorous meaning" that might otherwise be given to "necessary."[254] That was all that Marshall did with "proper." But if the Clause contained two independent requirements -- especially if "proper" were the more restrictive one -- then Marshall could hardly have decided the case by holding that the Bank was "necessary" without also considering whether it was "proper."[255]

Then there is the famous sentence in which Marshall summed up the meaning of the Necessary and Proper Clause:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.[256]

***739** This, too, is easier to fit with reading the Clause as a single unit of meaning. Unlike some of his later interpreters,[257] Marshall does not associate some parts of this sentence with "necessary" and other parts with "proper." He draws one line. It is a blurry jumbled sort of line. But it is one line for the Necessary and Proper Clause.[258]

In sum, *McCulloch* does not apply "necessary" and "proper" as separate requirements. It treats "proper" as excluding a strict reading of "necessary." And it offers a famous summation of the legislation permitted by the Clause, a summation that draws a line falling between the possible extremes of "necessary" and "proper." Each of these points is exactly what one would expect if the Clause were read as a hendiadys.[259]

Now the reading just given to the Necessary and Proper Clause is not conclusive. The relationship of the terms is ambiguous: The syntax allows ***740** these terms to be taken as separate requirements, as a tautology, as a term of art, or as a hendiadys.[260] And no matter what relationship is posited, the terms themselves are still vague.[261] But exactly *how* the terms are vague depends on which reading is adopted. If the terms are read as independent requirements, then there are two vague requirements. If the terms are read as a hendiadys, then there is one vague requirement, and its vagueness is bounded by a rule of construction.

***D. New Light on Three Puzzles***

What has been established so far is that reading "necessary and proper" as a hendiadys is possible, and also that it fits certain aspects of the discussion in *McCulloch*. But there is something else to be said for taking the phrase as a hendiadys. Doing so helps to solve several puzzles about how the Clause was described and debated at the Founding.

First, an extraordinary number of early interpreters said that the Clause added no powers but only affirmed ones that would have been implicit in the rest of the Constitution. This view was expressed both before and after ratification, by both friends and foes of robust national power.[262] In Madison's words before ratification, "Had the Constitution ***741** been silent on this head, there can be no doubt that all the particular powers, requisite as means of executing the general powers, would have resulted to the government, by unavoidable implication."[263]

What is the background principle that is affirmed by the Necessary and Proper Clause? It is a principle of implied powers, and more specifically -- since "implied powers" is now easily misunderstood -- it is the principle that the grant of a general power includes the grant of incidental powers for carrying it out. [264] That is, that when powers are granted, ***742** "the means of carrying [those powers] into execution . . . are included in the grant." [265] Many examples were given of powers that were or were not incidental to other powers. [266] Although there was substantial agreement that there was a meaningful principle of incidental powers, it was also a principle that was hard to formulate with specificity. It was a principle found in the common law and the law of nations, [267] and also in legal instruments that established an agency relationship. [268]

***743** Consider how Madison, in a single speech on the Bank bill in the House of Representatives, glossed the meaning of the principle in five different ways. Included, Madison said, in the grant of an express power are (1) "means *necessary* to the *end,* and *incident* to the *nature* of the specified powers"; (2) "what would have resulted by unavoidable implication, as the appropriate, and as it were, technical means of executing those powers"; (3) "direct and incidental means"; (4) "[whatever is] evidently and necessarily involved in an express power"; and (5) "an accessary or subaltern power, to be deduced by implication, as a means of executing another power." [269] These are not descriptions of five different things, but five descriptions of the same thing: the incidental powers for carrying out an express power are included with it. This principle is what Hamilton called "*the great and essential truth* which it is manifestly the object of that provision to declare." [270]

If the Necessary and Proper Clause is an affirmation of what would otherwise be an implicit grant of authority, then which reading of the text is better? The incidental-powers principle does not have the crisp, two-part logic suggested by *Printz* and *NFIB*. [271] It does not have two requirements. Rather, it is fuzzy, indeterminate, and unitary -- just like the hendiadic reading is fuzzy, indeterminate, and unitary. Recall George Wright's warning about hendiadys in *Hamlet*: "Because phrases involving hendiadys are not often understood as such, their meanings are jumbled, *reduced to a stricter logic than the verbal situation can justify*, or even entirely misread." [272] Here, too, an interpretation that makes each word a separate, independent requirement imposes "a stricter logic" on the incidental-powers principle than it can bear.

***744** Second, the dominant rhetorical move in debates about the Necessary and Proper Clause, on both sides, was the *reductio ad absurdum*. Martin Luther once said that human nature is like a drunk peasant riding a horse, always falling off one side or the other. [273] That is the impression one receives about the prospects of the national government from the early debates over the Necessary and Proper Clause. We are told that a loose construction of the Clause might lead to a national government that is so powerful that every counterweight shrivels into nothing, [274] and that a rigorous construction will lead to a national government that itself shrivels into nothing. [275] Leviathan or Lilliputian, with nothing in between. Whatever their merits, both arguments assume that the Necessary and Proper Clause could easily be a slippery slope. [276] The problem both ***745** sides confront is about degree. No one was concerned about structure, about the interaction between the elements of "necessary and proper." If the Clause should be read as having two independent requirements, then there would need to be discussion of its structure. But if not, if the Clause imposes a single vague requirement, then it is easy to see why the rhetoric would be so dominated by slippery slopes. This sense is further confirmed by Madison's double-slippery-slope description of the analogous Clause of the Articles of Confederation, which put the legislature to "the alternative of construing the term ' *expressly*' with so much rigor as to disarm the government of all real authority whatever, or with so much latitude as to destroy altogether the force of the restriction." [277] It is not a quirk in the wording of the Necessary and Proper Clause that makes it the location of so many slippery-slope arguments, but rather the difficulty of definition that is inherent in questions about incidental powers.

A third puzzle is the trope of impossible drafting. Both Madison and Story push back on critics by saying, in effect, "You suggest a better way to draft it." [278] Implicit in this rejoinder is the idea that whatever the Clause does is difficult to put into words. It is a little elusive.

Now these three puzzles can be seen together. It is clear that from the beginning the Necessary and Proper Clause has been interpreted in many different ways. It is therefore fruitless to seek any sharply defined, uniformly accepted meaning for the Clause. But some readings can still be stronger than others. The two-requirements reading and the hendiadic reading both fail to receive explicit endorsement in the canonical interpretations of the Necessary and Proper Clause. But one of these readings better fits the uncertainties, confusions, and points of conflict in the ratification and postratification literature. If the Clause had two requirements, we would expect to see debate about their interaction, about the cases that might meet one requirement but fail the other one, and about the mechanics of this machine with two moving parts. But instead we see the confusion that would

come from an affirmation of a vague background principle, a single hard-to-define line that would be in constant ***746** danger of being pulled to one extreme or the other. Taking the phrase as a hendiadys means it is unclear in all the right places.

***E. How Many Things Is It Proper for "Proper" To Do?***

In the reading given above, "necessary" suggests a close connection between the incidental power and the enumerated power (i.e., between the congressionally chosen means and the constitutionally specified end). And "proper" works as a rule of construction against an overly rigorous interpretation of "necessary." Given the complex interaction that is possible between the terms in a hendiadys,[279] it is at least open to argument that "proper" has another duty, serving as a reminder that an incidental power must belong to an enumerated one.[280]

The place to begin is with Lawson and Granger's argument. Recall that when they argue for "necessary" and "proper" as two separate requirements, they give "proper" what they call a jurisdictional meaning.[281] That is, congressional action under the Clause must be within the jurisdiction of Congress, which means it must comply with other constitutional provisions and principles, including federalism, the separation of powers, and unenumerated rights.[282] It is that ultimate conclusion which has been invoked by the Court in *Printz*, *Alden*, and *NFIB*.

As support for this, Lawson and Granger appeal to one of the meanings of "proper" in Dr. Johnson's *Dictionary*: "1. Peculiar; not belonging to more; not common."[283] This shade of meaning is rather technical, and it continues today mostly in theological and philosophical writing. The idea is that some characteristic or action is "proper to" an entity of some sort, in the sense that it belongs to, and in some cases belongs only to, ***747** that entity (e.g., for Heidegger, "to philosophize is proper to the human species"[284]). Lawson and Granger are certainly on good ground to say that "proper" can bear this sense. They give this sense a decidedly legal gloss by calling it "jurisdictional," but a better word might be "proprietary." We might say that the Clause authorizes carrying-into-execution powers that are "necessary and proprietary."

At this point, Lawson and Granger make two mistakes. First, they confuse sense and reference. They adduce many passages where "proper" is used and the *referent* is jurisdiction, but where the *sense* of the word is not "jurisdictional" (to use their term).[285] Second, they overlook one of the implications of using "proper" in this sense: It would not mean that Congress could act only in ways permitted by the Constitution, but rather that Congress could act only in ways unique to Congress. The fact that something could be done by the executive or the judiciary would mean that it was not "proper" to Congress.[286]

Given these mistakes, one might think that this proprietary sense of "proper" has nothing to add to the interpretation of the Necessary and Proper Clause. But that would be too quick. There is an important, but tacit, assumption in Lawson and Granger's analysis. They assume that the incidental power must be proper to *Congress*. And that is an unsurprising answer if we put the question this way: To *whom* must this power be proper? But consider a question that is slightly but tellingly different: ***748** To *what* must this power be proper? An answer suggests itself at once: The incidental power must be proper to the enumerated power.[287]

This question -- whether the power to incorporate a bank is an incident of any of the Article I enumerated powers -- is exactly the ground on which the House of Representatives debated the constitutionality of the First Bank of the United States.[288] Moreover, this way of thinking about the Clause has explicit support in Chief Justice Marshall's defense of *McCulloch*.[289] He says that the means must "belong peculiarly" to the enumerated end.[290] Intriguingly, he attributes this idea not to the word "proper" itself but rather to the entire Clause:

> That court has said: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited," "are constitutional." The word "appropriate," if Johnson be authority, means "peculiar," "consigned to some particular use or person," -- "belonging peculiarly."

> Let the constructive words used by the supreme court, in this their acknowledged sense, be applied to any of the powers of Congress. Take for example, that of raising armies. The court has said that "all means which are appropriate," that is, "all means which are peculiar" to raising armies, which are "consigned to that particular use," which "belong peculiarly" to it, all means which are "plainly adapted" to the end, are constitutional. [291]

What Marshall does here is fascinating. He embraces the proprietary sense of "proper" that Lawson and Granger point to, [292] but he reads this not as a link between the incidental power and what Congress may permissibly do, but as a link between the incidental power and the enumerated power it is executing. The incidental power must be proper to the enumerated power. Marshall does not, however, rely on the word "proper" for this concept, but rather on the whole idea of means-end fit. Indeed, ***749** the word he is defining from Dr. Johnson's *Dictionary* is not even "proper" at all, but "appropriate." [293]

One logical and practical objection must immediately be faced. Certain actions might well be useful means of carrying out multiple enumerated powers. How could such an action be proper to -- belong *only* to -- one enumerated power? For example, if Congress were to set up a special court to hear cases involving vessels seized from pirates, that might be well calculated to execute at least three enumerated powers:

> To constitute Tribunals inferior to the supreme Court;

> To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations;

> To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water. [294]

But one need not understand the proprietary sense of "proper" quite so restrictively. When used in a proprietary sense, the word "proper" can mean "belonging only to" or simply "belonging to." [295] What Marshall has in mind is a close connection between the incidental power and the enumerated power, not a unique connection. He shows this when he equates "belong peculiarly" with a means-end fit that is close, but not so close that it excludes all congressional choice. [296]

***750** In the end, the propriety sense of "proper" that Lawson and Granger pointed to does have something to say about the Clause. It does not make "proper" into a separate requirement for congressional action, but it does once again direct our attention to the importance of the fit between the enumerated power and the incidental power.

When this Article suggests that "necessary and proper" is a hendiadys, the core claim is that these terms work together to make explicit that Congress has incidental powers to "carry into execution" the powers given by the Constitution. There must be a close relationship, not one of *Palsgraf*ian remoteness, between the congressionally chosen means and the constitutionally specified end (hence "necessary"), but the relationship required is not one of Jeffersonian strictness (hence "proper"). This is vague, but inevitably so.

What the proprietary sense of "proper" does is reinforce the need to read the two terms together. Like the Cruel and Unusual Punishments Clause, the Necessary and Proper Clause is more than a sequence of separate elements. What it affirms is not that Congress has the power to enact legislation that both happens to be needed and happens to be proper to an enumerated power. [297] Rather, the Clause affirms that Congress has the incidental powers that are proper to each of its enumerated powers precisely because they are the powers ordinarily needed to carry those enumerated powers into execution.

Now one could go further, and draw on other shades of meaning for "proper." Within a hendiadys, this kind of multiplicity of meaning is familiar. But it is a constitution we are interpreting, not a sonnet. Cases must be decided, and so one cannot

indulge an infinite freedom of creative readings with no end to the *différance*. Even so, the shade of "proper" just discussed -- the proprietary sense -- is pervasive in the early interpretations of the Clause. It again suggests that the Necessary and Proper Clause is not easily reduced to two requirements. The fact that those who made this point often did so not under the banner of "proper" but under the banner of "necessary and proper," is another reminder not to sunder the Clause.

***751** ***F. Implications for Judicial Enforcement***

The reading of the Necessary and Proper Clause given here does not compel a view of who decides its meaning and application. But this reading does point towards some views and away from others. In particular, understanding "necessary and proper" as a hendiadys points away from two views. The first is what might be called the bifurcated-deference view, i.e., the view, reflected in *NFIB* and some recent scholarship, that courts should be more deferential about what is "necessary" but less deferential about what is "proper." The second is John Manning's view that the Clause is an "empty" delegation, and thus an area in which courts should give a high degree of deference to congressional judgments.

The starting point is recalling that incidental powers cannot be fully spelled out in advance.[298] Nor is it possible to specify in advance exactly what the right degree of means-end fit is -- that is the reason for the hendiadys in the first place. Remember Madison's argument: you draft it better.[299] Inevitably, then, the judgment in the first instance will belong to Congress. That is, Congress will decide whether a statute is necessary and proper to an enumerated power.[300] As a practical matter, there is likely to be deference from the courts when assessing the decision Congress made, for three reasons.

First, means-end fit may involve policy questions that are matters for legislative judgment. This point, however, can be easily overstated. The principle of incidental powers that is affirmed in the Necessary and Proper Clause should not be treated as merely a question of policy. Indeed, those who wanted a broader interpretation of the Clause, such as Hamilton, and those who wanted a narrower interpretation, such as St. George Tucker, agreed that the scope of the power affirmed by the Clause was an analytical question suited to judicial resolution, not a policy ***752** question that was a matter of legislative competence.[301] Indeed, Hamilton laid great stress on this point:

> The *degree* in which a measure is necessary, can never be a test of the *legal* right to adopt it. That must ever be a matter of opinion; and can only be a test of expediency. The *relation* between the *measure* and the *end*, between the *nature* of *the mean* employed towards the execution of a power and the object of that power, must be the criterion of constitutionality not the more or less of *necessity* or *utility*.[302]

A similar point seems to be made in *McCulloch* itself. Chief Justice Marshall observed that the Court will not "inquire into the degree of [a statute's] necessity."[303] That observation is usually taken to be a statement of great deference to Congress. But given the similarity to Hamilton's statement, and Marshall's evident familiarity with Hamilton's opinion on the Bank and his reliance upon it in *McCulloch*,[304] Marshall ***753** may instead have been reiterating Hamilton's point that policy is not the criterion under the Necessary and Proper Clause.[305]

Second, Congress and the courts operate at different times when deciding that a law is beyond the scope of the incidental powers affirmed by the Clause. Congress decides before a bill is passed, and less harm is done if members of Congress refrain from enacting a statute because they have constitutional doubts. Courts decide after the bill is passed, and usually after the law has gone into effect. The disruption from a judicial decision that the law is unsupported by the Constitution may be severe, though it would obviously vary from case to case.

Third, striking down a law as not "necessary and proper" for carrying into effect an enumerated power raises distinctive questions of severability when the provisions are interlocking: Taking out this provision as not "necessary and proper" might lead to another one falling for the same reason, and another, and another. These three problems -- policy judgments, disruption costs, and severability domino effects -- mean that on purely practical grounds there is likely to be some deference to legislative judgments under the Clause.

The question is whether there should be deference beyond these practical considerations. Here the two-requirements reading of the Clause has a clever answer: Whether the statute is "necessary" is a quintessential policy judgment for which the legislature is best suited (hence great deference), but whether the statute is "proper" depends on reading the text and structural principles of the Constitution and that is an inquiry for which the courts are best suited (hence little deference). [306] If the two-requirements reading were right, this would be at least a plausible approach to judicial enforceability. It would offer some deference and some review, not randomly, but with a division of labor. One weakness would be the inchoate standards for what counts as "proper"; [307] another would be the denigration of Congress's ability and duty to make judgments about the Constitution. But if the two-requirements reading is ***754** wrong, then there is no support at all for this bifurcated deference. There would be only one requirement under the Necessary and Proper Clause, and the question would be whether that one requirement should be given any enforcement beyond the "political safeguards of federalism" [308] and of the separation of powers.

In a recent Foreword for the *Harvard Law Review*, John Manning says no, mostly. [309] He argues that the Clause embodies a broad delegation, a kind of "empty standard" that must be filled in by someone. That someone, Manning argues, is Congress and thus the courts should defer to any reasonable determination made by Congress that a statute is "necessary and proper" for carrying into execution an enumerated power. It is a Thayerian position for the Necessary and Proper Clause. [310]

Yet Manning's argument is weakened by thinking of the Clause as a hendiadys. If the Clause is read this way, it turns out not to be as "empty" as he suggests. It is vague, but that is not the same thing. As "necessary" is qualified by "proper," an extreme interpretation is ruled out and the indeterminacy is lessened. The background principle of incidental powers is fuzzy but not content-free. [311] What Manning has ably critiqued is the effort to give "proper" force as an independent requirement. [312] But once "proper" is no longer taken to be an independent requirement, his argument for Thayerian deference is eroded.

***755** The reading of the Clause given here does support the arguments by Manning and others that the content of the Clause is meant to be filled in over time (or "liquidated," to use a Madisonian term). [313] As Professor John Harrison has aptly said, the Necessary and Proper Clause

> is the sort of thing that drafters use when their confidence in their own foresight is substantial but not complete, or, more specifically, when they think they have sorted out the big issues to their own satisfaction and want to make sure that strict construction does not interfere with sorting out the details later. [314]

And recall Madison's words about the impossibility of specifying all the incidental powers that would be necessary. [315] In other words, ex ante specification is impossible and so ex post specification is needed.

This problem of retreating to ex post specification is a familiar one in many areas of law, from the equitable interpretation of statutes [316] to agency law and fiduciary law. [317] In many of these contexts there is some deference given to the decision maker (e.g., a trustee), but that deference is not quasi-absolute. Thus the need for ex post specification does not provide a reason for Congress to do all the ex post specifying. [318]

Indeed, that conclusion is buttressed by the fact that other clauses in the Constitution make a government actor the sole judge of a matter: e.g., the President's duty under the Recommendations Clause to recommend to Congress "such Measures as he shall judge necessary and expedient." ***756** [319] But the Necessary and Proper Clause does not. And Madison and Marshall expressly argued that the executive and the judiciary would need to push back if Congress were to exceed its powers under this Clause. [320] Nor should Marshall's point be seen as merely tactical. The early nationalist position was that the judiciary had a duty "to review" whether the acts of Congress had "an appropriate connection" to its constitutionally defined powers. [321]

Thus, if the Necessary and Proper Clause is read as a hendiadys, it casts doubt on some widely held views about the nature and degree of deference the courts show to Congress. A strategy for *increasing* judicial review under the Clause -- bifurcating the rigor of review, so it can be more strict for "proper" -- is undermined. And a strategy for *decreasing* judicial review under the Clause -- urging the courts to adopt a Thayerian approach because it is an empty delegation -- is also undermined. The courts are

left with the duty of making decisions about the powers that are incident to the enumerated powers. Or, to put the task in more familiar ***757** terms, courts must consider, as courts often do, the fit between an agent's prescribed ends and chosen means.

### *G. Testing the Hypothesis: Two Case Studies from Marshall's Defense of* McCulloch

In *McCulloch*, Chief Justice Marshall famously said that the means must be "appropriate" and "plainly adapted" to an end that is legitimately constitutional.[322] In his essays defending *McCulloch*, Marshall further discusses the analysis of incidental powers under the Clause with several hypothetical cases. By considering these essays here, I do not mean to suggest that Marshall in his extrajudicial writings can exert control over the meaning of *McCulloch*. The point is rather that "even authors can act as good readers of their own texts."[323]

When discussing these hypothetical cases, Marshall makes clear that he does not see the analysis of means and incidental powers as purely mechanical. There is an irreducibly evaluative element in the consideration of whether the chosen means were "appropriate."[324] Responding to an example given by his interlocutor Amphictyon, Marshall describes a tenant at will who has a right to grow crops, and does grow crops, before being evicted. "To this right," Marshall says, "is annexed as a necessary incident, the power of carrying away the crop."[325] And yet Marshall adds:

> ***758** Undoubtedly the person allowed to carry away his crop, would not be permitted to thrown down the fences, trample the enclosed fields, and trespass at will on the landholder. But he has a choice of "appropriate" means for the removal of his property, and may use that which he thinks best.[326]

In another example in the same essay, Marshall takes up an old hypothetical case -- what if Congress imposed a land tax, and to make it easier to collect, prohibited the states from taxing land?[327] Marshall said:

> Now I deny that a law prohibiting the state legislatures from imposing a land tax would be an "appropriate" means, or any means whatever, to be employed in collecting the tax of the United States. It is not an instrument to be so employed. It is not a means "plainly adapted," or "conducive to" the end. The passage of such an act would be an attempt on the part of Congress, "under the pretext of executing its powers, to pass laws for the accomplishment of objects not intrusted to the government."[328]

This passage is striking, and it offers a way to test the diverging analytical pathways (though not diverging results) from a two-requirements reading and a hendiadic reading. Note how different the analysis of this hypothetical case would be under *Printz*, *Alden*, and *NFIB*. Under those precedents this would be an easy decision: the statute would be "necessary" -- it would aid federal taxation -- but it would not be "proper," because the prohibition on state land taxes would fail to respect state sovereignty. In other words, if this case were decided today, the textual hook would be "proper" and the relevant language in *McCulloch* would be that the chosen means are "prohibited" and not "consist[ent] with the ***759** letter and spirit of the constitution."[329] But Marshall never invokes "proper" as the ground of his objection, even though he manifestly objects to this intrusion on the reserved powers of the states. Nor is this because he is treating the policy choice as somehow ineffective or futile -- to the contrary, he treats the policy choice of Congress as being in some constitutional sense *wrong*. And yet he does not attack it as "prohibited" or contrary to the Constitution's "letter and spirit." Rather, he treats the defect of the statute as something exposed through ordinary means-end analysis.[330]

This very passage from Marshall's defense of *McCulloch* is quoted by Lawson and Granger. It is worth quoting at length their assessment of Marshall's treatment of this hypothetical case, because it will show the perceptiveness of their analysis, but also what can be missed by not considering "necessary and proper" as a single unit of meaning:

> If Chief Justice Marshall meant that such a law could not be an efficacious, and hence a "necessary," means of fostering federal tax collection, he was so clearly wrong that the claim would be disingenuous. Nor could he plausibly claim that such a law was not linked to the execution of an enumerated power; the federal government is

> expressly given the power to levy taxes. If he were serious that such a law was not, and could not be, a constitutional exercise of the Sweeping clause power, he must have based that conclusion on something in the clause other than the word "necessary" -- he must have meant that the law ***760** would not be "proper" because it would infringe on the protected rights of the states. [331]

What is perceptive here is the recognition by Lawson and Granger that Marshall is not analyzing the statute in terms of effectiveness. [332] But Lawson and Granger have two buckets to put this analysis in -- it can go in the effectiveness bucket ("necessary"), or it can go in the constitutional-principles bucket ("proper"). Since it doesn't go in the first, it has to go in the second. But this is not how Marshall proceeds. He does not mention "proper"; *he* does not have two buckets.

Finally, note that Marshall clearly thinks that a court should strike down this statute as unsupported by the Necessary and Proper Clause (the "pretext" quote leaves no doubt, since that is what the quoted language meant in *McCulloch*). Thus Marshall is arguing that the Necessary and Proper Clause is judicially enforceable -- that the language to this effect in *McCulloch* was not an empty platitude. And in this argument it is plain that he does not consider the only ground for such judicial action to be the positive violation of another constitutional provision. When a congressional act requires the support of the Necessary and Proper Clause, but receives none, that act is not constitutional.

And so we are back to *McCulloch*, a decision that protected the national government from an extremely rigorous interpretation of the Necessary and Proper Clause, but a decision that did not give Congress free rein. [333] If "the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government," then a court does not over-scrutinize the judgment of Congress. [334] But the Court also said:

> Should Congress, in the execution of its powers, adopt measures which are prohibited by the constitution; or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government, it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land. [335]

***761 CONCLUSION**

Sometimes a familiar text needs to be reread. When it is, we may discover a seemingly new reading that has been there all along, hiding in plain sight. This Article has offered a new reading of two familiar Clauses of the Constitution. It is now common to read the Necessary and Proper Clause as authorizing congressional action only if it is both "necessary" and "proper" for carrying into execution an enumerated power. But reading the phrase "necessary and proper" as a hendiadys makes better sense of the text, the early history, and *McCulloch*. It is common now to read the text of the Cruel and Unusual Punishments Clause as prohibiting punishments only if they are both "cruel" and "unusual." But this phrase, too, makes more sense when it is read as a hendiadys.

This reading of the Necessary and Proper Clause is a blow to a line of argument some Justices have been developing in *Printz*, *Alden*, and *NFIB*, a line of argument that lays great stress on the distinction between "necessary" and "proper." Perhaps it is not a fatal blow. One might justify the conclusions from that line of argument on other grounds -- free-standing structural principles, policy, or even a kind of hydraulic originalism that makes up for the loss of one original power or limit by developing another one. [336] Some of the considerations in the Court's recent cases about "proper" might rightly belong in the analysis of incidental powers. [337] But those arguments would have to be developed, and they would need to stand on some firmer basis than the word "proper." Another implication of the reading here is that there needs to be renewed attention to the closeness of the fit between an enumerated power and the congressional action that purports to be carrying it into execution.

For the Cruel and Unusual Punishments Clause, the reading here points in a different direction than the Supreme Court's cases about "evolving standards of decency." This reading would not help the Justices ***762** eliminate a punishment they consider passé. What it would do is give them the grounds -- and the duty -- to stand up to democratic majorities that seek to punish with newfound cruelty. Moreover, reading "cruel and unusual" as a hendiadys casts doubt on two approaches to the Clause's

text. Some Justices, most often liberal ones, read out "unusual" and treat the Clause as requiring only an inquiry into what is "cruel."[338] But if the phrase is a hendiadys, "cruel" cannot be read alone. It must be read with "unusual." Other Justices, most often conservative ones, argue that "cruel" and "unusual" are separate requirements.[339] But they are not, if the phrase is a hendiadys.

This Article does not pretend to determine the exact construction that contemporary courts should give to these Clauses. The interpretations advanced here are persuasive, but not conclusive, and the only modalities of constitutional interpretation that have been considered in detail are text and history.[340] There is more to constitutional law. Yet these readings do have implications. For example, if this reading of the text of the Necessary and Proper Clause were adopted, the textual support for some cases would be undermined, either because they depend on a reading of "proper" that is difficult or impossible to fold into means-end analysis (e.g., *NFIB*[341]), or because they treat so cavalierly the fit between a statute and an enumerated power (e.g., *Wickard v. Filburn*[342]). Other cases might have their reasoning undermined but still be right on different grounds (e.g., *Printz*[343]).

This Article also speaks to the place of text in American constitutional discourse. Some consider these phrases to be crude, "inadvertent,"[344] ***763** even "constitutional stupidities."[345] But the readings here suggest something quite different. These Clauses are subtle, and they show an adroit recognition of the limits of language and the passage of time. It is not possible to fully specify the incidental powers of Congress; thus "necessary and proper." Times change, and new occasions can bring new savagery; thus "cruel and unusual."

What led to the rise of two-requirements readings of the Necessary and Proper Clause and the Cruel and Unusual Punishments Clause? Why do the readings that are given in this Article, which have affinity with older ones, seem so new? Only speculations can be offered. For legal rules this is an Age of Dissection. Equitable principles that were once overlapping and a bit inchoate are separated into a four-part test.[346] Justiciability principles are fragmented.[347] Phrases like "necessary and proper" and "cruel and unusual" get pulled apart. One might think that this tendency is aided and abetted (that is an alliterative repetition, not a hendiadys) by the rise of textualism and originalism. If so, the fault seems to lie with the friends and the foes of these approaches, for both too often present the reading of a text as a narrow, almost mechanical exercise.[348] But a legal text cannot be read like a telegram -- a word said, then "Stop," then another word, then another "Stop."

For some readers, this Article may seem destabilizing. If there was one word in the Constitution that you thought you knew the meaning of, it was *and*. But if that word turns out to contain significant ambiguity, what hope does the interpreter have? Other readers may be suspicious of what they regard as linguistic archaeology, an excavation to dig up new meanings that have lain below the surface of the constitutional text for centuries.[349] But those concerns misconceive this project. It is true that the term *hendiadys* has not previously been applied to the Constitution. But it is just a term that enables us to recognize a semantic relationship that is common in many languages and texts. This figure of speech is ***764** one "we use without thinking and without naming."[350] Seeing these two constitutional phrases as examples of hendiadys does not give them meanings that are radical, unprecedented, or wide-open. In fact, reading "necessary and proper" and "cruel and unusual" as instances of hendiadys brings us closer to the understandings of the earliest interpreters.

## Footnotes

a1 Assistant Professor, UCLA School of Law. I am grateful for the criticisms and comments of Will Baude, Jud Campbell, Nathan Chapman, Beth Colgan, Marc DeGirolami, Sharon Dolovich, Stephen Gardbaum, Philip Hamburger, David Hershenov, Allison Hoffman, Albertus Horsting, Joshua Jensen, Andy Kelly, Gary Lawson, Daniel Lowenstein, Michael McConnell, Hashim Mooppan, Michael Moreland, Robert Natelson, Zachary Price, Richard Re, Stephen Sachs, Steve Smith, John Stinneford, Eugene Volokh, Adam Winkler, and participants in law faculty workshops at Berkeley, Notre Dame, and UCLA.

1 Mark A. Graber, Unnecessary and Unintelligible, 12 Const. Comment. 167, 168 (1995).

2 The Federalist No. 44, at 299, 303 (James Madison) (Jacob E. Cooke ed., 1961).

3 See, e.g., David P. Currie, The Constitution in Congress: The Jeffersonians, 1801-1829, at 250-58 (2001) (First and Second Banks of the United States); Stephen Gardbaum, Rethinking Constitutional Federalism, 74 Tex. L. Rev. 795, 807-11 (1996) (New Deal); John F. Manning, Foreword: The Means of Constitutional Power, 128 Harv. L. Rev. 1, 30-42 (2014) (Rehnquist and Roberts Courts).

4 132 S. Ct. 2566 (2012).

5 Id. at 2592.

6 See Gary Lawson & Patricia B. Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L.J. 267, 271-72 (1993); see also Jack M. Balkin, Living Originalism 179 (2011); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116-17 (2012).

7 *Hendiadys* is defined by the Oxford English Dictionary as: "A figure of speech in which a single complex idea is expressed by two words connected by a conjunction; e.g. by two substantives with *and* instead of an adjective and substantive." Hendiadys, 7 The Oxford English Dictionary 142 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1991). In English it has also been spelled *endiadis*, *hendiadis*, and *hendyadis*, and has been called "the figure of Twynnes." See, e.g., George Puttenham, The Arte of English Poesie 177-78 (Gladys Doidge Willcock & Alice Walker eds., Cambridge Univ. Press 1936) (1589).

8 David Sansone, On Hendiadys in Greek, 62 Glotta 16, 19 & n.10 (1984); George T. Wright, Hendiadys and *Hamlet*, 96 PMLA 168, 168 (1981).

9 E.g., William Shakespeare, Hamlet act 1, sc. 3, l. 9, at 42 (Susanne L. Wofford ed., 1994) ("The *perfume and suppliance* of a minute"). For exposition, see infra text accompanying note 109.

10 On "cease and desist," see infra note 90 and accompanying text.

11 On terms of art and hendiadys, see infra note 34 and notes 92-93 and accompanying text.

12 There may be other instances of hendiadys in the U.S. Constitution, and phrases worth considering include "Piracies and Felonies," U.S. Const. art. I, § 8, cl. 10; "Powers and Duties," U.S. Const. art. II, § 1, cl. 6; "Advice and Consent," U.S. Const. art. II, § 2, cl. 2; "necessary and expedient," U.S. Const. art. II, § 3; "keep and bear," U.S. Const. amend. II; and "searches and seizures," U.S. Const. amend. IV.

13 See Glossip v. Gross, 135 S. Ct. 2726, 2772 (2015) (Breyer, J., dissenting); Helling v. McKinney, 509 U.S. 25, 42 (1993) (Thomas, J., dissenting); Harmelin v. Michigan, 501 U.S. 957, 976 (1991) (opinion of Scalia, J.); In re Kemmler, 136 U.S. 436, 447 (1890); Scalia & Garner, supra note 6, at 116; David B. Hershenov, Why Must Punishment Be Unusual as Well as Cruel to Be Unconstitutional?, 16 Pub. Aff. Q. 77 (2002); Meghan J. Ryan, Does the Eighth Amendment Punishments Clause Prohibit Only Punishments that Are Both Cruel *and* Unusual?, 87 Wash. U. L. Rev. 567 (2010).

14 John F. Stinneford, The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation, 102 Nw. U. L. Rev. 1739 (2008).

15 See infra Section II.B.

16 See Hershenov, supra note 13; Stinneford, supra note 14.

17 Accord Stinneford, supra note 14, at 1745. Professor Stinneford's reading of the entire phrase, however, differs from the one in this Article. See John F. Stinneford, Rethinking Proportionality Under the Cruel and Unusual Punishments Clause, 97 Va. L. Rev. 899, 972 (2011) ("If a punishment is found to be unusual, the next question is whether it is cruel."). The comparative-inquiry advantage depends on the meaning given to "cruel."

18 On incidental powers and the Necessary and Proper Clause, see Gary Lawson, Geoffrey P. Miller, Robert G. Natelson & Guy I. Seidman, The Origins of the Necessary and Proper Clause (2010); John Harrison, Enumerated Federal Power and the Necessary and Proper Clause, 78 U. Chi. L. Rev. 1101 (2011) (reviewing Lawson et al.); John F. Manning, The Necessary and Proper Clause and Its Legal Antecedents, 92 B.U. L. Rev. 1349 (2012) (same). On the terminology of "incidental powers" and "means," see infra note 325.

19 See Thomas Jefferson, Opinion on the Constitutionality of the Bill for Establishing a National Bank, *in* 19 The Papers of Thomas Jefferson, 24 January to 31 March 1791, at 275, 278 (Julian P. Boyd ed., & Ruth W. Lester assistant ed., 1974) (glossing "the *necessary* means" as "those means without which the grant of the power would be nugatory").

20 On "proper" as the more lax term, see infra notes 242-50 and accompanying text.

21 McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 418-19 (1819).

22 This sense of "proper" is not supported by *McCulloch*, but it is supported by Chief Justice Marshall's essays defending *McCulloch*. See infra Section III.E.

23 See infra text accompanying note 251.

24 These include The Federalist No. 33, at 203 (Alexander Hamilton) (Jacob E. Cooke ed., 1961), No. 44, supra note 2, the opinions of Jefferson and Hamilton regarding the constitutionality of the First Bank of the United States, and the lengthy debate in the House of Representatives over the First Bank of the United States, especially the first speech by Madison. These sources, as well as the early interpretations that *did* read "necessary" and "proper" as separate requirements, are discussed below. See infra Section III.B.

25 See infra notes 262-70 and accompanying text.

26 See infra notes 273-77 and accompanying text.

27 The Federalist No. 44, supra note 2; see also 3 Joseph Story, Commentaries on the Constitution of the United States §§ 1232-1236, at 109-13 (Boston, Hillard, Gray & Co. 1833).

28 On the Necessary and Proper Clause, see, for example, Lawson and Granger, supra note 6. On the Cruel and Unusual Punishments Clause, see, for example, Hershenov, supra note 13, and Ryan, supra note 13.

29 This reading is easier for "necessary and proper." See Eric A. Posner & Adrian Vermeule, Interring the Nondelegation Doctrine, 69 U. Chi. L. Rev. 1721, 1728 n.20 (2002); see also H. Jefferson Powell, The Regrettable Clause: *United States v. Comstock* and the Powers of Congress, 48 San Diego L. Rev. 713, 724 n.42 (2011) ("It is very likely that Chief

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Justice Marshall viewed necessary and proper as a pleonasm with the second adjective proper importing no additional, legally significant, or justiciable meaning." (emphasis omitted)). For discussion, see infra note 204. It has also been suggested that "cruel and unusual" could be a tautology. John D. Bessler, Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment 180-81 (2012). On the overlap between "cruel," "cruel and unusual," and "cruel or unusual," see infra note 155.

30 The Concise Oxford Dictionary of Literary Terms 97 (Chris Baldick ed., 1990) ("The status of this figure is often uncertain, since it usually cannot be established that the paired words actually express a single idea.").

31 See Philip Bobbitt, Constitutional Fate: Theory of the Constitution 3-92 (1982).

32 Wright, supra note 8, at 181 (emphasis added). This Article generally follows the convention of italicizing the phrase that is being read as a hendiadys without marking the alteration. That convention is found in Wright and in H. Poutsma, Hendiadys in English, Together with Some Observations on the Construction of Certain Verbs, 2 Neophilologus 202 (1917).

33 For previous suggestions that "necessary and proper" could be read as a single unit of meaning, see Mark A. Hall, Commerce Clause Challenges to Health Care Reform, 159 U. Pa. L. Rev. 1825, 1854 (2011); John T. Valauri, Originalism and the Necessary and Proper Clause, 39 Ohio N.U. L. Rev. 773, 784 (2013). Hall almost anticipates the argument of this Article when he suggests that "necessary and proper" could be "a single construct," with an analogy being the phrase "cruel and unusual." Hall, supra, at 1854. Yet he makes the point only in passing and treats "proper" as a separate requirement that congressional action comport with "constitutional norms." Id. at 1852-54. For previous suggestions that "cruel" and "unusual" fit together, see infra notes 127 and 146.

34 These options shade into one another and can overlap. For example, a phrase may be a term of art known to specialists, yet what the specialists know might simply be *that* the phrase is read as two independent requirements, as two synonyms, or as a hendiadys. On another possibility, a disjunctive reading, see infra note 203.

35 One example is the reading of "Congress" in the First Amendment at issue in Nicholas Quinn Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev. 1209, 1252-55 (2010); and Curtis A. Bradley & Neil S. Siegel, Constructed Constraint and the Constitutional Text, 64 Duke L.J. 1213, 1243-47 (2015).

36 See William Michael Treanor, Taking Text Too Seriously: Modern Textualism, Original Meaning and the Case of Amar's *Bill of Rights*, 106 Mich. L. Rev. 487 (2007).

37 Paul Hopper, Hendiadys and Auxiliation in English, *in* Complex Sentences in Grammar and Discourse: Essays in Honor of Sandra A. Thompson 145, 146 (Joan Bybee & Michael Noonan eds., 2002).

38 Nigel Fabb, Is Literary Language a Development of Ordinary Language?, 120 Lingua 1219, 1229 (2010).

39 Cf. Sandra Mollin, The (Ir)reversibility of English Binomials: Corpus, Constraints, Developments 9-10 (2014) (noting that the choice of definition for *hendiadys* determines how much it overlaps with another category).

40 E.g., Fowler's Dictionary of Modern English Usage, at ix (Jeremy Butterfield ed., 4th ed. 2015) [hereinafter Fowler's Dictionary]. On the variety of definitions for hendiadys in biblical Hebrew, see Rosmari Lillas-Schuil, A Survey of Syntagms in the Hebrew Bible Classified as *Hendiadys*, *in* Current Issues in the Analysis of Semitic Grammar and Lexicon II: Oslo-Göteborg Cooperation 4th-5th November 2005, at 79, 81-84 (Lutz Edzard & Jan Retsö eds., 2006).

41 E.g., Edward Hirsch, A Poet's Glossary 278-79 (2014); Frank Kermode, Shakespeare's Language 100-01 (2000); Fabb, supra note 38, at 1229; Wright, supra note 8. The restrictions in the definition here are not pointless. The reference to a conjunction helps the reader grasp the concept, with no loss of scope. (Some languages, such as Akkadian and Latin, do use asyndetic hendiadic constructions, but English does not.) The limitation to two terms is traditional and economical for this Article. There is another figure of speech called *hendiatris*, and yes, it means what you think it means. See Hirsch, supra, at 279; Lillas-Schuil, supra note 40, at 98.

42 John Huehnergard, A Grammar of Akkadian 125-26 (3d ed. 2011). On hendiadys in Assyrian (which developed from Akkadian), see W. F. Albright, Notes on Assyrian Lexicography and Etymology, 16 Revue D'Assyriologie et D'Archéologie Orientale 173, 178 (1919).

43 See, e.g., Bill T. Arnold & John H. Choi, A Guide to Biblical Hebrew Syntax, 148-49 (2003); Herbert Chanan Brichto, Toward a Grammar of Biblical Poetics: Tales of the Prophets 40-42 (1992); Lillas-Schuil, supra note 40; see also E. A. Speiser, Introduction to Genesis, at lxx-lxxi (1964) (noting occurrences of hendiadys in Genesis); Jacob Bazak, The Meaning of the Term "Justice and Righteousness" (org]) in the Bible, 8 Jewish L. Ann. 5 (1989) (analyzing the common biblical phrase "justice and righteousness" as a hendiadys that "refers to a system of law free from the usual defects ... [of] legal systems"); J. Kenneth Kuntz, Hendiadys as an Agent of Rhetorical Enrichment in Biblical Poetry, With Special Reference to Prophetic Discourse, in 1 God's Word for Our World 114, 123-133 (J. Harold Ellens et. al. eds., 2004) (giving examples of hendiadys in the Prophets). One of the more familiar examples from the Hebrew Bible is Genesis 1:2, where the earth is described as "*waste and void*" (English Revised Version). Some translations eliminate the hendiadys: e.g., "a vast waste" (Revised English Bible).

44 Sansone, supra note 8, at 17. For expressions from Plato that are close to, if not quite, hendiadys, see J. G. Warry, 21 Greek Aesthetic Theory: A Study of Callistic and Aesthetic Concepts in the Works of Plato and Aristotle 40-41 (2013). There appears to be at least one example in Middle Hittite, another Indo-European language. See Terumasa Oshiro, Hendiadys in Hittite, *in* Indogermanische Forschungen: Zeitschrift Für Indogermanstik und Allgemeine Sprachwissenschaft 98 (1993).

45 E.g., Cicero, Catilinarians 276 (Andrew R. Dyck ed., 2008) (listing text and commentary citations for eleven instances of the figure). On precursors to the more developed hendiadys in Virgil, see Walter Stockert, Wood and Wax: "Hendiadys" in Plautus, *in* 6 Papers of the Leeds International Latin Seminar 1 (Francis Cairns & Malcolm Heath eds., 1990).

46 This line from Virgil is "often taken as the definitive example of hendiadys." Sansone, supra note 8, at 19 & n.10. Other examples from Virgil include "by *force and arms*" (i.e., "by force of arms") and "I fear *the Greeks and bearing gifts*" (i.e., "I fear the gift-bearing Greeks"). Hopper, supra note 37, at 146.

47 Johann Gottfried von Herder, How Philosophy Can Become More Universal and Useful for the Benefit of the People, *in* Philosophical Writings 3, 28 & n.62 (Michael N. Forster ed. & trans., 2002); see also Michael N. Forster, Introduction to Philosophical Writings, supra, at ix (hinting that Herder's use of hendiadys was conscious).

48 See Fabb, supra note 38, at 1229. Fabb includes as instances of hendiadys terms that are not adjacent. Some writers on hendiadys in English do the same. See Poutsma, supra note 32, at 215 ("*Conjures* the wandering stars, *and makes* them stand" from Macbeth).

49 Wright, supra note 8, at 176.

50 John Upton, Critical Observations on Shakespeare 336 (London, G. Hawkins 1748).

51 Wright, supra note 8, at 187.

52 Id. at 186.

53 Hopper, supra note 37, at 147, 151, 152.

54 Daniel Swift, The Book of Common Prayer, *in* The Oxford Handbook of English Prose 1500-1640, at 576, 584 (Andrew Hadfield ed., 2013) (giving two examples from the General Confession that begins Morning Prayer and Evening Prayer in the Book of Common Prayer: "*Almighty and most merciful* Father, we have *erred and strayed* from thy ways, like lost sheep."); cf. Kermode, supra note 41, at 101 (noting the "doubles, antitheses, and repetitions" in *Hamlet*, and suggesting that "[t]his way of writing was, in its essence, familiar from the English liturgy, and its remote origin is probably in the parallelisms found in the Psalms").

55 Christopher Marlowe, Doctor Faustus: A 1604-Version Edition, at 78 (Michael Keefer ed., 2d ed. 2007) ("*the Institute / And universal body* of the law").

56 Examples from the earliest chapters of Genesis in the King James Version include "*without forme, and voyd*" (1:2), "*[b]e fruitfull, and multiply*" (1:22, 28), "*created and made*" (2:3), "*thy sorowe and thy conception*" (3:16), "*[a] fugitiue and a vagabond*" (4:12), and "*a fugitiue, and a vagabond*" (4:14). With the exception of Genesis 2:3, each of these phrases is also a hendiadys in the Hebrew original.

57 Wright, supra note 8, at 172, 184 n.14. *Paradise Lost* has, among others, bees "on thir *mirth and dance*, / Intent" (i.e., mirthful dance), "*ancient and prophetic* fame" (i.e., anciently prophesied fame), and "*joy and tidings*" (i.e., joyful tidings). John Milton, Paradise Lost, bk. I, ll. 786-87 (Barbara K. Lewalski ed., 2007) (1674); id. at bk. II, l. 346; id. at bk. X, ll. 345-46.

58 Govert den Hartogh, Made by Contrivance and the Consent of Men: Abstract Principle and Historical Fact in Locke's Political Philosophy, *reprinted in* Locke's Moral, Political and Legal Philosophy 337, 355-57 (J.R. Milton ed., 1999) (positing that "Locke is rather fond of the figure of hendiadys," and proceeding to analyze "consent" in terms of the words with which Locke pairs it, as in "*Agreement and consent* of Men" and "*contrivance, and the Consent* of Men").

59 A.A. Luce, Berkeley and Malebranche: A Study in the Origins of Berkeley's Thought 156 (2d prtg. 2002) (suggesting that Berkeley's "all *knowledge and demonstration*" is probably "a hendiadys, whose real import is 'all demonstrative knowledge'").

60 For example, Blackstone says foreign laws that have "been *introduced and allowed* by our laws, so far they oblige, and no farther; their authority being wholly founded upon that *permission and adoption*." 1 William Blackstone, Commentaries *14. Here there are two instances of hendiadys, chiastically arranged, referring to a treatment of foreign laws that falls somewhere between full reception (i.e., introduction and adoption) and mere tolerance (i.e., allowance and permission). A less intricate example can be found on the next page of the *Commentaries*, where Blackstone says that a civilian or canonist needs to know "how far the English laws have given sanction to the Roman" in order to act "with *prudence and reputation* as an advocate," i.e., in order to act with the prudence that redounds to one's reputation. Id. at *15.

61 Paul Cartledge, Vindicating Gibbon's Good Faith, 158 Hermathena 133, 141 (1995) (understanding Gibbon's "an *historian and philosopher*" as a hendiadys meaning "a philosophical historian").

62 William K. Wimsatt, Jr., Parallelism, *in* Perspectives on Style 127, 151-52 (Frederick Candelaria ed., 1968) (suggesting three instances of hendiadys in Hazlitt's lecture *On Dryden and Pope*: "'*Brilliance and effect*' might be 'brilliant effect'; ' *smooth and polished* verse' might be 'smoothly polished verse'; ' *tug and war*' suggests 'tug of war."').

63 Poutsma, supra note 32, at 290 (taking "I felt it was time for *conversation and confidence*" from *David Copperfield* as meaning "confidential conversation"); Garrett Stewart, "Written in the Painting": Word Pictures from Italy *in* Imagining Italy: Victorian Writers and Travellers 216, 233 (Catherine Waters, Michael Hollington & John Jordan eds., 2010) (taking Dickens's "*grace and youth*" to be a hendiadys meaning either "graceful youth" or "youthful grace"); id. at 232 (finding a hendiadys in Dickens's assertion that for the traveler Roman ruins could "*people and restore*" the past).

64 Poutsma, supra note 32, at 290 (glossing Gaskell's "*a sin and a shame*" as "shameful sin").

65 Id. (taking Thackeray's "*verses and nonsense*" to mean "nonsensical verses").

66 See E.M. Forster, Howards End 27-28 (Everyman's Library ed., 1992) ("To think that because you and a young man meet for a moment, there must be all these *telegrams and anger*."); Philip R. Berk, Canto VII: The Weal of Fortune, *in* Lectura Dantis: Inferno, a Canto-by-Canto Commentary 101, 107 (Allen Mandelbaum, Anthony Oldcorn, & Charles Ross eds., 1998) (understanding "all these *telegrams and anger*" as a hendiadys).

67 Wright, supra note 8, at 171-72 (finding several examples in Dylan Thomas, including "*strut and trade*," which "surely means something like 'parading for money'").

68 Numerous examples are collected in Poutsma, supra note 32.

69 Compare Samuel Johnson, A Dictionary of the English Language (6th ed. London, William Pickering 1785) (no entry for "Hendiadys" or "Hendiadis"), with Samuel Johnson & John Walker, A Dictionary of the English Language 342 (R.S. Jameson ed., London, William Pickering 1827) (defining "Hendiadis" as "[a] rhetorical figure, when two noun substantives are used instead of a substantive and adjective").

70 E.g., Elisha Coles, A Dictionary, English-Latin, and Latin-English (London, John Richardson, 2d ed. enlarged 1679) (defining "Hendiadis" as "*one thing expressed by two terms*").

71 E.g., George William Lemon, English Etymology; or, a Derivative Dictionary of the English Language: In Two Alphabets (London, G. Robinson 1783) ("*hendiadis; a rhetorical figure; when one thing is split into two* "). Webster included it, but defined it more narrowly: "A figure, when two nouns are used instead of a noun and an adjective." 1 Noah Webster, An American Dictionary of the English Language (Mario Pei ed., Johnson Reprint Corporation 1970) (1828). On the scope of hendiadys, see supra notes 40-41 and accompanying text.

72 E.g., H. Dimock, Notes Critical and Explanatory on the Books of Psalms and Proverbs 57 (Glocester, R. Raikes 1791) ("*vanity and riches*," in Psalm 39:7, "by an Hendiadis, signif[ies] *vain riches*"); Thomas Wintle, Daniel, an Improved Version Attempted; with a Preliminary Dissertation, and Notes Critical, Historical, and Explanatory 84 (London, Thomas Tegg & Son 1792) ("*light and understanding*" in Daniel 5:11 is "Hendiadys" for "an enlightened understanding"). Dimock notes the possibility of the figure in a number of other passages. Dimock, supra, at 65, 255, 379, 391, 417-18, 469, 471.

73 E.g., Alexander Adam, The Principles of Latin and English Grammar 182 (Edinburgh, A. Kincaid and W. Creech 1772) ("When that, which is in reality one, is so expressed, as if there were two, it is called *Hendiadys;* as, *Pateris libamus et auro*, for *aureis pateris*. Virg."); Farther English Examples, or, Book of Cautions for Children, In Rendering English into Latin; with the Signification, and Use of Certain English Particles 102 (Eton, J. Pote, new ed. 1782) ("HENDYADIS

*is when one Thing is expressed as if it were two*."); George B. Gardiner & Andrew Gardiner, A Latin Anthology for Beginners with Notes and Vocabulary 96, 105, 114, 124 (London, Edward Arnold 1804) (noting the figure four times).

74    The French Chef (WGBH television broadcast Feb. 11, 1963). Another example comes from H.L. Mencken, A Little Book in C Major 19 (1916): "Democracy is the theory that the common people know what they want, and deserve to get it *good and hard*."

75    The Concise Oxford Dictionary of Literary Terms, supra note 30, at 97.

76    Brichto glosses "*tried and true*" as "proved true by trial." Brichto, supra note 43, at 40.

77    James M. Rose, The Law and the Hendiadys, 23 Westchester B.J. 207, 208 (1996). On verbal hendiadys in English, see Hopper, supra note 37.

78    See Gareth B. Matthews, On Not Being Said to Do Two Things, 31 Analysis 204, 207 (1971) (glossing that phrase as "the rough tumble of politics"); Poutsma, supra note 32, at 289 (glossing the phrase as "rough tumbling" (emphasis omitted)).

79    For example, Peter Tiersma discusses various conjoined phrases, but he emphasizes their redundancy and never considers the possibility of hendiadys. Peter M. Tiersma, Legal Language 15, 61-65 (1999).

80    E.g., Michael Gagarin, The Thesmothetai and the Earliest Athenian Tyranny Law, 111 Transactions Am. Philological Ass'n 71, 72 n.6 (1981); see Stockert, supra note 45, at 6 (suggesting that in Latin the origin of using pairs of near synonyms was in "Roman religious and legal language").

81    See Giuseppe Franco Ferrari, Fundamental Rights and Freedoms, *in* Introduction to Italian Public Law 255, 276 (Giuseppe Franco Ferrari ed., 2008); Antonello Tarzia, Public Administration, *in* Introduction to Italian Public Law, supra, at 97, 112-13.

82    26 U.S.C. § 162(a) (2012). I am grateful to Eric Zolt for this suggestion.

83    These are not separate requirements, for "open and notorious" is *one* of the requirements for adverse possession. Nor do these appear to be synonyms, for adverse possession can be hidden from sight but known to all. Rather, each term contributes something to the whole, either visibility or salience. I am grateful to Stuart Banner for this suggestion and to Thomas Merrill for comments.

84    Perhaps "capricious" indicates the kind of arbitrariness that is illegal, or perhaps each term contributes a distinct notion, as with "open and notorious." On the possibility of a hendiadys turning into a term of art, see infra note 94 and accompanying text.

85    Jeffrey J. Grieve, Note, When Words Fail: How Idaho's Constitution Stymies Education Spending and What Can Be Done About It, 50 Idaho L. Rev . 99, 129-31 (2014). Grieve uses the term *hendiadys*.

86    For discussion of how this phrase can be translated into other languages, including the suggestion that the translator use an adverb or preposition instead of reproducing the structure of the English phrase, see Enrique Alcaraz & Brian Hughes, Legal Translation Explained 39 (2002).

87 See, e.g., Moskal v. United States, 498 U.S. 103, 120-21 (1990) (Scalia, J., dissenting) ("The entire phrase 'falsely made, forged, altered, or counterfeited' is self-evidently not a listing of differing and precisely calibrated terms, but a collection of near synonyms which describes the product of the general crime of forgery.").

88 See Fabb, supra note 38; Poutsma, supra note 32, at 203.

89 See, e.g., Stockert, supra note 45, at 1-2. In the same work in which Wright counts sixty-six instances of hendiadys in *Hamlet*, he gives another twenty-three doublings that are "not convincing examples" of hendiadys, yet are "close." Wright, supra note 8, at 189-90.

90 See David Mellinkoff, Mellinkoff's Dictionary of American Legal Usage 68 (1992) ("two French-based English words joined in saying *stop*, *stop*"). Mellinkoff says "cease and desist" has "been so welded by usage as to have the effect, in proper context, of a single word." Id. at 129. As Justice Scalia said, "Lawmakers sometimes repeat themselves -- whether out of a desire to add emphasis, a sense of belt-and-suspenders caution, or a lawyerly penchant for doublets (aid and abet, cease and desist, null and void)." King v. Burwell, 135 S. Ct. 2480, 2498 (2015) (Scalia, J., dissenting).

91 Bazak, supra note 43, at 6 (distinguishing hendiadys from tautology, because "in a tautology the second word is synonymous with the first and is added only for the sake of emphasis"); Stockert, supra note 45, at 1-2, 4-5 (noting that hendiadys requires a "semantic gap," some "semantic discontinuity" between the two terms).

92 Term of Art, Black's Law Dictionary (10th ed. 2014) (defining *term of art* as "[a] word or phrase having a specific, precise meaning in a given specialty, apart from its general meaning in ordinary contexts").

93 Harrison, supra note 18, at 1116; see also Samuel L. Bray, The Supreme Court and the New Equity, 68 Vand. L. Rev. 997, 1012-14 (2015) (noting the use of "equitable" as a term of art in federal statutes). Similarly, Chief Justice Ellsworth was treating "Appeal" and "Writ of Error" as terms of art when he said they have a "fixed and technical sense." Wiscart v. Dauchy, 3 U.S. (3 Dall.) 321, 327 (1796).

94 One instance of such a process -- two terms being used as a hendiadys that becomes a legal term of art -- is over three thousand years old. According to Moshe Weinfeld, the Akkadian phrase "bond and oath" (*riksu u mamitu*) was used to refer to a treaty: "*riksu* originally express[d] the demands presented by the overlord or ally while *mamitu* reflect[ed] the acceptance of the demands by the other party," but "the original meaning of these terms fell into oblivion after they were combined into a hendiadys and turned into a technical term for 'treaty."' M. Weinfeld, Covenant Terminology in the Ancient Near East and Its Influence on the West, 93 J. Am. Oriental Soc'y 190, 190-91 & n.3 (1973).

95 The first attested naming of this figure of speech appears in Pomponius Porphyrio (early third century AD). The term also appears in the *Homeric Dictionary* of Appollonius the Sophist (first century AD), though it is possible the term was added by a later hand. For the information in this note I am grateful to Albertus Horsting. E-mail from Albertus Horsting, to author (May 8, 2015, 12:49 PDT) (on file with author).

96 For example, see 18 The Dramatick Writings of Will. Shakespeare, With the Notes of All the Various Commentators; Printed Complete from the Best Editions of Sam. Johnson and Geo. Steevens 7 (London, John Bell 1788) (noting that Shakespeare "sometimes expresses one thing by two substantives," such as "*law and heraldry*," i.e., "herald law," and "*death and honour*, i.e. honourable death").

97 See Wright, supra note 8; Frank Kermode, Cornelius and Voltemand: Doubles in *Hamlet*, *in* Forms of Attention 33 (1985).

98 See E. Adelaide Hahn, Hendiadys: Is There Such a Thing? (Based on a Study of Vergil), 25 Classical Wkly. 193 (1922). Brichto calls hendiadys "rather rare in English." Brichto, supra note 43, at 40; see also Matthews, supra note 78, at 207 ("Hendiadys is an ancient trope recognized to be common in Biblical Hebrew and in classical Greek and Latin but thought to be rare in English."). This perception may be incorrect, however. The English examples given above, see supra notes 53-67, have not been previously collected, and there are doubtless many more.

99 Cf. Jeanne Fahnestock & Marie Secor, The Rhetoric of Literary Criticism, *in* Textual Dynamics of the Professions: Historical and Contemporary Studies of Writing in Professional Communities 76, 87 (Charles Bazerman & James Paradis eds., 1991) (maintaining that "one of the most persuasive endeavors that a literary scholar can engage in is to find something (a device, an image, a linguistic feature, a pattern) that no one else has seen -- and to find it everywhere," and giving as an example George Wright's analysis of hendiadys in *Hamlet*). For example, one scholar has persuasively argued that "true and fair" is a hendiadys in accounting standards, but when she identifies the same phrase as a hendiadys in Shakespeare and Donne the conclusion is much less convincing, because the context of the quotations suggests that each term should be read separately. See A. Zanola, The 'True and Fair' Legal Formula: Hendiadys or Tautology?, 1 New Ground Res. J. Leg. Stud. Res. & Essays 1 (2013).

100 Fowler's Dictionary, supra note 40, at ix.

101 See Kuntz, supra note 43, at 134; cf. Jacques Derrida, Et Cetera... (and so on, und so weiter, and so forth, et ainsi de suite, und so überall, etc.) (Geoffrey Bennington trans.), *reprinted in* Deconstruction: A User's Guide 282, 283 (Nicholas Royle ed., 2000) (listing a series of phrases of the form "deconstruction *and* x," and then saying that "in each of these great sets, the conjunction 'and' is resistant not only to association but also to serialization, and it protests against a reduction which is at bottom absurd and even ridiculous").

102 English usage is varied, but in the colloquial examples the first term tends to be more general; it modifies or intensifies the second ("good and warm," "hot and bothered," "nice and fat"). See Hopper, supra note 37, at 148.

103 Other implications of this straightforward use of hendiadys are seemingly less relevant for legal texts, including the rhetorical value of repetition, see Kuntz, supra note 43, at 134; the indication of verbal aspect in a narrative, see Hopper, supra note 37, at 147-48; and the metrical possibilities created by having another way of putting the point. This last implication may explain the seeming predominance of hendiadys in English poetry, at least before the *vers libre* revolution. When meter matters, hendiadys is valuable.

104 An example from *Hamlet*:

When Horatio says he would not believe in the Ghost "Without the *sensible and true* avouch / Of mine own eyes" (1.i.57-58), he must mean "the sensorily accurate testimony" of his eyes -- that is, the first adjective must modify the second -- or, if one prefers, "the accurate sensory testimony," with "sensory testimony" taken as a compound unit modified by "accurate." Either way the two elements of the hendiadys, though grammatically parallel, are not semantically parallel, and the most likely paraphrases would change the coordinate structure and make one of the two elements subordinate to the other or to a unit that includes the other.

Wright, supra note 8, at 174.

105 Some authorities restrict the term to instances where one part is "subordinate in sense to the other." Fowler's Dictionary, supra note 40, at 372. On the scope of hendiadys, see supra notes 40-41 and accompanying text.

106 Fabb, supra note 38, at 1229; R.W.L. Moberly, Whose Justice? Which Righteousness? The Interpretation of Isaiah V 16, 51 Vetus Testamentum 55, 60 (2001) ("[T]he combination [of <<foreign language>>] with *mišpa*t generally creates what is in effect a hendiadys with a differing semantic range from that of <<foreign language>> on its own.").

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

107    Kermode, supra note 41, at 109 ("[T]he flash cannot be distinct from the outbreak, and both depend on the fire in 'fiery.'").

108    Id.

109    Id. at 106. Numerous other instances could be given where a hendiadys is more complex than one term modifying another. For example, in *Hamlet*, "*will and matter*" can be understood as "a complicated hendiadys" that means something like "'purposed business.'" Id. at 113. In *Measure for Measure*, there is "a *Hamlet*-like hendiadys: ' *the fault and glimpse* of newness,' which a reader or spectator must expand into something like 'a display of new authority that may be seen as a fault.'" Id. at 150. And in the book of Isaiah, the Lord says: "I cannot endure *iniquity and assembly*." Isaiah 1:13b (author's translation). This is not an accumulation of two separate facts: the people are guilty of moral failure ("iniquity"), and the people engage in religious devotion ("assembly"). Rather it is the conjunction of the two that brings this assertion of divine displeasure. The moral failure of the worshippers makes their worship a moral failure.

110    Kermode, supra note 41, at 102 (describing hendiadys as a figure by which "the meaning of the whole depends upon a kind of unnaturalness in the doubling, a sort of pathological intensification," one that "can introduce unease and mystery into an expression"); Wright, supra note 8, at 169. Intensification is common for English hendiadys in the pattern of "good and x," as well as for hendiadys in biblical Hebrew, see supra note 56 (listing examples of hendiadys in Genesis 1-4).

111    See, e.g., supra note 75 and accompanying text ("cakes and ale"); supra note 50 and accompanying text and note 96 ("law and heraldry" and "death and honour"); supra note 8 and accompanying text ("cups and gold"); supra note 108 and accompanying text ("encom-passment and drift"); supra note 109 ("will and matter" and "the fault and glimpse of new-ness"); cf. Harley Granville-Barker, 1 Prefaces to Shakespeare 169 (1952) (suggesting that where "repetition by complement," i.e., hendiadys, appears in Hamlet, the meaning of the constituents of the phrase is sometimes "amplified or intensified," sometimes "enlarged," and sometimes "modified").

112    In addition to the examples given in the text, see supra note 60.

113    Admittedly this phrase could be taken in other ways: as both rather than each one singly (a "lecture" and "advice") or as both reciprocally (an "advising lecture" and "lecturing advice"). Cf. Kermode, supra note 41, at 110 (suggesting the two are tautologous); Poutsma, supra note 32, at 290 ("= the advice of, or contained in, my former lecture." (emphasis omitted)).

114    See supra note 85 and accompanying text.

115    See Stinneford, supra note 14.

116    In this Article, "innovative" is understood to be synonymous with "contrary to long usage." Drawing and quartering would not be unprecedented in its cruelty, but it would be innovative in its cruelty.

117    See Hershenov, supra note 13; Stinneford, supra note 14, at 1800-10.

118    U.S. Const. amend. VIII.

119 See In re Kemmler, 136 U.S. 436, 447 (1890); cf. U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson, 255 U.S. 407, 430 (1921) (Brandeis, J., dissenting) ("And the punishment inflicted -- denial of a civil right -- is certainly unusual. Would it also violate the Eighth Amendment?").

120 Glossip v. Gross, 135 S. Ct. 2726, 2772 (2015) (Breyer, J., dissenting) ("The Eighth Amendment forbids punishments that are cruel and *unusual*."); Helling v. McKinney, 509 U.S. 25, 42 (1993) (Thomas, J., dissenting) ("a party must prove... that the challenged conduct was both cruel and unusual"); Harmelin v. Michigan, 501 U.S. 957, 976 (1991) (opinion of Scalia, J.) (describing the Eighth Amendment as "forbidding 'cruel *and unusual* punishments'"); Stanford v. Kentucky, 492 U.S. 361, 378 (1989) (plurality) ( "The punishment is either 'cruel *and* unusual' (i.e., society has set its face against it) or it is not."), overruled by Roper v. Simmons, 543 U.S. 551 (2005); see also Scalia & Garner, supra note 6, at 116 ("[T]he *and* signals that cruelty or unusualness alone does not run afoul of the clause: The punishment must meet both standards to fall within the constitutional prohibition.").

121 See Hershenov, supra note 13, at 83-85; Ryan, supra note 13; Joshua L. Shapiro, And Unusual: Examining the Forgotten Prong of the Eighth Amendment, 38 U. Mem. L. Rev. 465, 469 (2008); see also Stinneford, supra note 17, at 972 ("If a punishment is found to be unusual, the next question is whether it is cruel.").

122 John Hart Ely, Democracy and Distrust: A Theory of Judicial Review 14 (1980); Akhil Reed Amar, America's Lived Constitution, 120 Yale L.J. 1734, 1777-79 (2011); Bradford R. Clark, Constitutional Structure, Judicial Discretion, and the Eighth Amendment, 81 Notre Dame L. Rev. 1149, 1200 (2006); Ronald Dworkin, The Arduous Virtue of Fidelity: Originalism, Scalia, Tribe, and Nerve, 65 Fordham L. Rev. 1249, 1253 (1997); Ronald Dworkin, Comment, *in* Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 115, 120 (1997); see also Michael J. Zydney Mannheimer, When the Federal Death Penalty Is "Cruel and Unusual", 74 U. Cin. L. Rev. 819, 831-32 (2006) (treating the text of the Eighth Amendment as if punishments were prohibited only if both "cruel" and "unusual," though also, inconsistently, suggesting the first term is adverbial). Other scholars speak of "cruel" and "unusual" independently, though without explicitly saying that the Eighth Amendment prohibits only punishments that are both. E.g., Vicki C. Jackson, Constitutional Comparisons: Convergence, Resistance, Engagement, 119 Harv. L. Rev. 109, 126 (2005).

123 E.g., Furman v. Georgia, 408 U.S. 238, 376 (1972) (Burger, C.J., dissenting) ("Although the Eighth Amendment literally reads as prohibiting only those punishments that are both 'cruel' and 'unusual,'...."); Sharon Dolovich, Cruelty, Prison Conditions, and the Eighth Amendment, 84 N.Y.U. L. Rev. 881, 883 n.3 (2009) ("The conjunction 'and' in 'cruel and unusual' notwithstanding...."); Tom Stacy, Cleaning Up the Eighth Amendment Mess, 14 Wm. & Mary Bill Rts. J. 475, 491 (2005) ("The Justices sometimes have said that an unconstitutional punishment must be both cruel and unusual, just as the literal text provides.").

124 For example, in Graham v. Florida, 560 U.S. 48 (2010), apart from quotations, the majority opinion only used the words *cruel* and *unusual* as part of the phrase "cruel and unusual." See also Stacy, supra note 123, at 491 (noting that "the Justices have made conflicting declarations about the relationship between the terms 'cruel' and 'unusual'").

125 Corinna Barrett Lain, Lessons Learned from the Evolution of "Evolving Standards," 4 Charleston L. Rev. 661, 673-74 (2010).

126 Cf. David A. Strauss, The Modernizing Mission of Judicial Review, 76 U. Chi. L. Rev. 859, 864 (2009) (finding the U.S. Supreme Court's "modernization approach" to the Cruel and Unusual Punishments Clause to be just "one among many plausible ways to interpret the text" and suggesting that where it has "take[n] root" is in judicial precedent).

127 Kent Greenawalt, Interpreting the Constitution 113, 119 (2015) (noting that at the Founding "the inquiries about the two terms were apparently seen as interlocked"); Stinneford, supra note 17, at 968-69 (treating a punishment that is "unusual," in the sense of contrary to long usage, as presumptively "cruel"); cf. Hugo Adam Bedau, Death is Different: Studies in the Morality, Law, and Politics of Capital Punishment 96 (1987) (accepting what he describes as the Supreme Court's treatment of the phrase as if it were "a ligature, 'cruel-and-unusual punishments,' designating a complex of

intertwined and inseparable properties”). Professor Caleb Nelson once reserved the question whether the phrase was “a term of art” that could not “usefully be broken down into its individual components.” Caleb Nelson, Originalism and Interpretive Conventions, 70 U. Chi. L. Rev. 519, 545 n.120 (2003).

128 Meghan J. Ryan, Judging Cruelty, 44 U.C. Davis L. Rev. 81, 124 (2010).

129 In re Kemmler, 136 U.S. 436, 447 (1890).

130 Margaret Jane Radin, The Jurisprudence of Death: Evolving Standards for the Cruel and Unusual Punishments Clause, 126 U. Pa. L. Rev. 989, 1043-44 (1978); see Gregg v. Georgia, 428 U.S. 153, 183 (1976) (Powell, Stewart, & Stevens, JJ., plurality opinion). For critique, see Youngjae Lee, The Constitutional Right Against Excessive Punishment, 91 Va. L. Rev. 677, 736-42 (2005).

131 See Graham v. Florida, 560 U.S. 48, 60 (2010), modified (July 6, 2010) (if “‘grossly disproportionate,’ the sentence is cruel and unusual” (quoting Harmelin v. Michigan, 501 U.S. 957, 1005 (1991))).

132 John Kekes, Cruelty and Liberalism, 106 Ethics 834, 838 (1996); see also Dolovich, supra note 123, at 924-26 (understanding “cruelty” to include indifference to the suffering of others).

133 Hershenov, supra note 13, at 78-81. Bedau says that “judging a punishment to be cruel is already condemning it strongly, [and] the idea of a ‘tolerably cruel punishment’ verges on an oxymoron.” Bedau, supra note 127, at 96. But Hershenov provides numerous examples to the contrary from contemporary English speech, as well as an example from the brief debate over the Eighth Amendment. Scholars who look to definitions of the word *cruel* in early dictionaries tend to give less attention to the relatively mundane glosses, such as “causing pain” or “destructive” and “causing pain, grief, or distress.” See Ryan, supra note 128, at 121; Stinneford, supra note 17, at 911. In Dr. Johnson's *Dictionary*, the entry for *cruel* contains the following definition for “things”:

2. [Of things.] Bloody; mischievous; destructive; causing pain.

Consider mine enemies; for they are many, and they hate me with *cruel* hatred. *Psalm* xxv.19.

We beheld one of the *cruelest* fights between two knights, that ever hath adorned the most martial story. *Sidney*.

1 Johnson, supra note 69 (CRÚEL). Similarly, the preamble to the Pennsylvania Constitution of 1776 condemns King George's “most cruel and unjust war,” Pa. Const. of 1776, pmbl -- a formulation which simultaneously suggests that cruelty is a matter of degree and that what was “cruel” was not necessarily considered “unjust.”

134 Cf. Bedau, supra note 127, at 97 (“Were we to try to isolate the unusualness of a punishment from its cruelty, we would focus on a property of punishments that has little or nothing to do with moral condemnation.”).

135 Stinneford, supra note 14, at 1767.

136 Id. Ronald Dworkin once speculated about a term in the Cruel and Unusual Punishments Clause having a different meaning now than it did at the Founding, but in his hypothetical the term was *cruel*. Ronald Dworkin, Bork's Jurisprudence, 57 U. Chi. L. Rev. 657, 661-62 (1990). According to Dworkin, the sense of the term that would control would be the one from the eighteenth century. Id. at 662.

137   See Stinneford, supra note 14, at 1766-815. Stinneford leaves no doubt about his conclusion. Referring to the "contrary to long usage" sense of "unusual," he says: "This is the only plausible meaning of the word as used in the Eighth Amendment." Id. at 1810.

138   Without that premise the phrase may still be read as a hendiadys. See infra text accompanying notes 173-78.

139   As noted above, a variety of evaluative glosses of "cruel" are possible, and only one is given here for simplicity. The argument works equally well if another evaluative gloss is used.

140   Exactly the same point could be made if "unusual" were taken to refer to frequency. If the death penalty is cruel, why does it matter that it is rare? But cf. Glossip v. Gross, 135 S. Ct. 2726, 2772 (2015) (Breyer, J., dissenting) (taking the term "unusual" to refer to frequency of use and stating that "[t]he Eighth Amendment forbids punishments that are cruel and *unusual*").

141   E.g., Dolovich, supra note 123, at 883 n.3 ("What seems hard to credit is the notion that a given punishment should be judged constitutional however cruel it may be, so long as its use is sufficiently widespread."). Stinneford is an exception.

142   See Hershenov, supra note 13, at 78-81; see also Anthony F. Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 860 (1969) (suggesting that *cruel* once "had a less onerous meaning," and offering as synonyms from seventeenth and eighteenth century English "severe," "hard," and "excessive"); supra note 133 and accompanying text (noting Dr. Johnson's definition of *cruel*).

143   Hershenov tries to avoid this objection to his broad reading of "cruel," but not persuasively. See Hershenov, supra note 13, at 94 n.27.

144   Note that the same difficulties just described also apply if "unusual" is taken to refer to frequency or distribution, not innovation. If "cruel" is an evaluative term, it would be odd to make frequency or distribution the criterion for sorting between the unjustifiably severe punishments that are constitutional and the ones that are not. See Dolovich, supra note 123, at 883 n.3. If "cruel" is taken as meaning only harsh and "unusual" is understood as a term about frequency or distribution, the Clause would turn out to be a prohibition either of rare punishments or of unevenly applied punishments.

145   For the pithy expression I thank Steve Sachs.

146   A suggestion along these lines was made in passing in Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv. L. Rev. 635, 638 n.16 (1966) ("'Unusual' is probably best thought of as adverbially modifying 'cruel.'"), and it was repeated in Mannheimer, supra note 122, at 831-32. But see Bedau, supra note 127, at 96 (raising and rejecting this possibility). In addition, Corinna Barrett Lain suggests that in older cases "the words 'cruel' and 'unusual' were read as one, prohibiting punishments that were unusually cruel." Lain, supra note 125, at 665. But what she has in mind is something quite different from the reading here -- not a prohibition on cruel innovation, but only a prohibition on torture.

147   If "unusual" refers to frequency, the phrase can still be read as a hendiadys. See infra text accompanying notes 173-78.

148   Stinneford reverses the order, first asking if the punishment is unusual and then if it is cruel. Stinneford, supra note 17, at 972. Although he takes a finding that a punishment is "unusual" as evidence that it is also "cruel" -- and to that extent does not divorce the inquiries -- he still treats "cruel" as a distinct question that "involves an exercise of the Court's own judgment." Id.

149 For a parallel point about "necessary and proper," see infra text accompanying note 297.

150 See Robinson v. California, 370 U.S. 660, 667 (1962).

151 Cf. Stinneford, supra note 17, at 968-72 ("[W]hat the Court should really be asking is whether the punishment meets the standards that have prevailed up until today." (emphasis omitted)).

152 See Greenawalt, supra note 127, at 113 ("If 'long usage' is assessed at the time of a modern court's decision rather than what was being done in 1791, this approach also allows a particular form of evolution over time.").

153 See id. at 112-13 (concluding that the "more convincing account" of why Oates's punishments were cruel and unusual is "that the punishment was out of proportion for the crime of perjury and was not contemplated by the common law or by statute *for that crime*"). There would of course be further questions -- how long exactly is long or immemorial usage, what counts as an aberration not altering the tradition (for example, Titus Oates), whether usage is determined at the time of the offense or the time of sentencing, and so on. Questions like these are not unique to a hendiadic reading. They are inevitable where the governing law is vague and has to be made more precise through the resolution of cases.

154 See supra Part I.

155 On "unusual" in English and early American law, see Stinneford, supra note 14, at 1766-815. At the Founding some state constitutions prohibited punishments that were "cruel," some "cruel or unusual," and some "cruel and unusual." Stinneford offers a good explanation for why these would all be roughly similar, and his argument is strengthened by the hendiadic reading offered here. If there was a consensus that "the government should not impose cruel punishments" and that "the common law was essentially reasonable, so that governmental efforts to 'ratchet up' punishment beyond what was permitted by the common law were presumptively contrary to reason," id. at 1798-99, then there would not be much difference between prohibiting cruel punishments (as determined by their being contrary to long usage), cruel or unusual punishments (largely overlapping concepts), or cruel and unusual punishments (a hendiadys). Even though sharp distinctions should not be drawn between these formulations, it remains true that each has a different range of interpretive possibilities.

156 See Hershenov, supra note 13; Stinneford, supra note 14, at 1800-10; see also Stinneford, supra note 17, at 943-47 (surveying the concerns that led to the Eighth Amendment).

157 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787, at 109-11 (Jonathan Elliot ed., 2d ed. Philadelphia, J. B. Lippincott Co. 1891).

158 See Stinneford, supra note 14, at 1803-08 (examining Patrick Henry's arguments).

159 Id. at 1806-07.

160 Aldridge v. Commonwealth, 4 Va. (2 Va. Cas.) 447, 450 (1824).

161 James Iredell ("Marcus"), Answers to Mr. Mason's Objections to the New Constitution, *in* 5 The Founders' Constitution 376 (Philip B. Kurland & Ralph Lerner eds., Liberty Fund reprt. 1987) (1788). Iredell thought a general prohibition would be too vague, and a list of prohibited punishments would fail of its purpose: "[I]f our government [were] disposed to be cruel their invention would only [be] put to a little more trouble." Id. at 376.

162 David P. Currie, The Constitution in Congress: The Federalist Period 1789-1801, at 95 (1997) (quoting 1 Stat. 113); cf. Simon Devereaux, Inexperienced Humanitarians? William Wilberforce, William Pitt, and the Execution Crisis of the 1780s, 33 L. & Hist. Rev . 839, 853-70 (2015) (describing the circumstances behind the Felons Anatomy Bill proposed in Parliament in 1786). On more recent innovations in cruelty, see Stinneford, supra note 14, at 1754-55; see also Stinneford, supra note 17, at 969-70 ("The government has a pronounced tendency to react to perceived crises by ratcheting up the harshness of punishments.").

163 Compare Herbert Spencer, Social Statics: Or, the Conditions Essential to Human Happiness Specified, and the First of Them Developed 65 (London, George Woodfall & Son 1851) ("Progress, therefore, is not an accident, but a necessity.... [T]he things we call evil and immorality [must] disappear; so surely must man become perfect."), with William Hogarth, A Rake's Progress in Sir John Soane's Museum, London (1732-1733).

164 Whatever the present merits of these two views -- the Court as a pathfinder for evolving standards, and the Court as a pathblocker for devolving standards -- the pathfinder conception is almost inconceivable for the Eighth Amendment before incorporation. Of course these are not the only possible views of the Cruel and Unusual Punishments Clause. The Clause could be understood as requiring judges to undertake a moral analysis of cruelty that is independent of popular views and legislative enactments, whether past or present. That view has difficulty, however, with the word *unusual*.

165 See, e.g., 1 The Debates and Proceedings in the Congress of the United States 754 (Joseph Gales ed., Washington, Gales & Seaton 1834) (Rep. Livermore) (speaking against the Eighth Amendment, but stating that "[i]f a more lenient mode of correcting vice and deterring others from the commission of it could be invented, it would be very prudent in the Legislature to adopt it"). The same two-sided view of innovation in punishment can be found in the Pennsylvania Constitution of 1776, but it took a different tack: instead of prohibiting innovation that led to more cruelty, it encouraged innovation that led to less cruelty. See Pa. Const. of 1776, §§ 38-39.

166 Cf. Stinneford, supra note 17, at 970 ("The English and early American case law confirms that both versions of the Cruel and Unusual Punishments Clause were directed at *new punishments that were harsher than permitted by prior practice*." (emphasis added)).

167 Hershenov, supra note 13, at 81-82. For agreement that American society is divided but disagreement about the implication, compare Richard A. Epstein, The Classical Liberal Constitution: The Uncertain Quest for Limited Government 57-61 (2014), with Radin, supra note 130, at 1064.

168 See Alice Ristroph, State Intentions and the Law of Punishment, 98 J. Crim. L. & Criminology 1353, 1404 (2008).

169 See Antonin Scalia, Response, *in* Scalia, supra note 122, at 129, 145.

170 This can be seen in how judges sometimes take a seemingly absolute inquiry and turn it into a relative one. For example, a plaintiff seeking an equitable remedy must show that there is "no adequate remedy at law." In practice judges treat the inquiry as a comparative one: not "are the legal remedies adequate?" but "are the legal remedies *more* adequate?" See Samuel L. Bray, The System of Equitable Remedies, 63 UCLA L. Rev. 530, 584 (2016) ( "[W]hen a court considers the adequacy of legal remedies, it takes into account a range of considerations... such as 'the burden an injunction will place on the court."' (quoting Emily Sherwin et al., Ames, Chafee, and Re on Remedies 410 (2012))).

171 See Hershenov, supra note 13; Stinneford, supra note 14; Stinneford, supra note 17. There is of course a large body of scholarship on the Cruel and Unusual Punishments Clause that does not examine the original understanding. E.g., Lee, supra note 130.

172 In more detail: Hershenov argues persuasively that "cruel" is not a highly restrictive term and that "unusual" is what sorts the cruel punishments that are constitutionally permissible from the ones that are not. But he is less convincing in his reading of "unusual" as "the subjective expectation that something is uncommon." And he struggles to avoid the implication of his reading that the Clause would prohibit almost all new punishments, even if they ameliorate cruelty. See Hershenov, supra note 13, at 94 n.27. Stinneford offers extensive evidence that "unusual" was a term of art for "contrary to long usage." He recognizes that the Clause is a restriction on "Cruel Innovation" (in the title of Stinneford, supra note 17), but he still treats "cruel" as a distinct inquiry, see Stinneford, supra note 14, at 972-73. If the phrase "cruel and unusual" is read as a hendiadys, that treatment is needlessly complex.

173 See text accompanying supra note 135.

174 See Harmelin v. Michigan, 501 U.S. 957, 975 (1991) (opinion of Scalia, J.) (calling "the ultimate question" about the Clause "what its meaning was to the Americans who adopted the Eighth Amendment").

175 See Kennedy v. Louisiana, 554 U.S. 407, 422-34 (2008), as modified (Oct. 1, 2008), opinion modified on denial of reh'g, 554 U.S. 945 (2008).

176 See Graham v. Florida, 560 U.S. 48, 80-82 (2010), as modified (July 6, 2010).

177 Furman v. Georgia, 408 U.S. 238, 240, 256 (1972) (Douglas, J., concurring); see also Ely, supra note 122, at 97, 173; Laurence Claus, The Antidiscrimination Eighth Amendment, 28 Harv. J.L. & Pub. Pol'y 119 (2004).

178 See Hershenov, supra note 13 ; Stinneford, supra note 14.

179 See Lain, supra note 125, at 673-74. One could go further and say that the Court's Eighth Amendment jurisprudence and the reading given here draw on different conceptions of the purpose of judicial review. David Strauss captures this difference when he asks: "The real question about modernization is whether the proper function of judicial review is to try to correct, rather than simply to facilitate, the operations of democracy." Strauss, supra note 126, at 907.

180 See supra note 124.

181 Furman v. Georgia, 408 U.S. 238, 281 (1972) (Brennan, J., concurring) (finding the "primary" principle for determining "whether a particular punishment is 'cruel and unusual'" to be that it "must not by its severity be degrading to human dignity"); William J. Brennan, Jr., Constitutional Adjudication and the Death Penalty: A View from the Court, Oliver Wendell Holmes, Jr. Lecture at Harvard University (Sept. 5, 1986), *in* 100 Harv. L. Rev. 313, 330 (1986) ("A punishment is 'cruel and unusual' if it does not comport with human dignity."). Justice Scalia has also described the Eighth Amendment as containing an "abstract principle" against cruelty, but one "rooted in the moral perceptions *of the time*." Scalia, supra note 169, at 145.

182 U.S. Const. art. I, § 8, cl. 18.

183 The following sources offer entry points to the literature on the Clause: For a brief survey of major conceptual questions, see Harrison, supra note 18, at 1102-09; on the legal background, see Lawson et al., supra note 18; Juliana Gisela Dalotto, Comment, American State Constitutions of 1776-1787: The Antecedents of the Necessary [and Proper] Clause, 14 U. Pa. J. Const. L. 1315 (2012); on the drafting history, see John Mikhail, The Necessary and Proper Clauses, 102 Geo. L.J. 1045, 1086-106 (2014); and on the relationship between Congress and the courts in interpreting the Clause, see Manning, supra note 3.

184 Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2592 (2012). In her dissent from the Necessary and Proper Clause holding, Justice Ginsburg did not object to "necessary" and "proper" as separate requirements. Id. at 2626-28 (Ginsburg, J., concurring and dissenting).

185 E.g., Jinks v. Richland Cty., 538 U.S. 456, 462-64 (2003).

186 E.g., id. at 464-65 (finding a law "proper"); Printz v. United States, 521 U.S. 898, 923-24 (1997) (finding a law not "proper" because it "violates the principle of state sovereignty" that is "reflected in... various constitutional provisions"); Alden v. Maine, 527 U.S. 706, 732-33 (1999) (quoting and leaning on *Printz*'s conclusion that laws in violation of state sovereignty are not "proper"); see also Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S. Ct. 2076, 2105-07 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part) (treating "proper" as a separate limitation on congressional action); Gonzales v. Raich, 545 U.S. 1, 39 (2005) (Scalia, J., concurring in the judgment) (noting precedents that affirm that a federal statute violating state sovereignty is not "proper").

187 Manning, supra note 3, at 54-55 (footnote omitted); see Eugene Gressman, Some Thoughts on the Necessary and Proper Clause, 31 Seton Hall L. Rev. 37, 44 (2000). For an opinion including separation-of-powers principles in "proper," see *Zivotofsky*, 135 S. Ct. at 2105-07 (Thomas, J., concurring in the judgment in part and dissenting in part).

188 Lawson & Granger, supra note 6. Lawson and Granger's article was cited in *Printz*, 521 U.S. at 924. On the antecedents, see Lawson & Granger, supra note 6, at 271 n.15. On the article's influence, see Gary Lawson, Making a Federal Case Out of It: *Sabri v. United States* and the Constitution of Leviathan, 2003-2004 Cato Sup. Ct. Rev. 119, 153-54; John F. Manning, Separation of Powers as Ordinary Interpretation, 124 Harv. L. Rev. 1939, 1987 n.251 (2011).

189 Lawson & Granger, supra note 6, at 271-72. If "proper" required conformity to express constitutional provisions, it would be odd to include that requirement only here and not for all of Congress's enumerated powers. See David P. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789-1888, at 327 n.297 (1985). Similarly, if "proper" required non-abridgment of the rights retained by the people, it would be odd to confine the requirement only to the exercise of power under the Necessary and Proper Clause. See Michael W. McConnell, Natural Rights and the Ninth Amendment: How Does Lockean Legal Theory Assist in Interpretation?, 5 N.Y.U. J.L. & Liberty 1, 8 n.34 (2010).

190 Robert G. Natelson, The Framing and Adoption of the Necessary and Proper Clause, *in* Lawson et al., supra note 18, at 84, 89-91.

191 Id. at 119.

192 Geoffrey P. Miller, The Corporate Law Background of the Necessary and Proper Clause, *in* Lawson et al., supra note 18, at 144, 174.

193 Gardbaum, supra note 3, at 813 n.64.

194 Randy E. Barnett, The Original Meaning of the Necessary and Proper Clause, 6 U. Pa. J. Const. L. 183, 219-20 (2003) [hereinafter Barnett, The Original Meaning of the Necessary and Proper Clause]. For an earlier view, see Randy E. Barnett, Necessary and Proper, 44 UCLA L. Rev. 745 (1997) [[hereinafter Barnett, Necessary and Proper].

195 Ilya Somin, The Individual Mandate and the Proper Meaning of "Proper," *in* The Health Care Case: The Supreme Court's Decision and Its Implications 146, 152 (Nathaniel Persily, Gillian E. Metzger & Trevor W. Morrison eds., 2013).

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Somin offers an alternative understanding of "proper" as excluding "new claims of authority that are major independent powers." Id. at 159.

196 See, e.g., Akhil Reed Amar, America's Constitution: A Biography 112-13, 543 n.28 (2005); Balkin, supra note 6, at 179; Currie, supra note 189, at 163 n.37; Scalia & Garner, supra note 6, at 116-17; Akhil Reed Amar, Intratextualism, 112 Harv. L. Rev. 747, 758 n.46 (1999); Jack M. Balkin, Commerce, 109 Mich. L. Rev. 1, 49 (2010); William Baude, Rethinking the Federal Eminent Domain Power, 122 Yale L.J. 1738, 1811 & n.407 (2013); Steven G. Calabresi & Saikrishna B. Prakash, The President's Power to Execute the Laws, 104 Yale L.J. 541, 587 (1994); Michael G. Collins & Jonathan Remy Nash, Prosecuting Federal Crimes in State Courts, 97 Va. L. Rev. 243, 294 (2011); Thomas P. Crocker, Presidential Power and Constitutional Responsibility, 52 B.C. L. Rev. 1551, 1607-14 (2011); David E. Engdahl, The Necessary and Proper Clause as an Intrinsic Restraint on Federal Lawmaking Power, 22 Harv. J.L. & Pub. Pol'y 107, 116 (1998); Richard W. Garnett, The New Federalism, the Spending Power, and Federal Criminal Law, 89 Cornell L. Rev. 1, 79 (2003); Andrew Koppelman, "Necessary," "Proper," and Health Care Reform, *in* The Health Care Case, supra note 195, at 105, 111; Lawrence Lessig & Cass R. Sunstein, The President and the Administration, 94 Colum. L. Rev. 1, 67 n.278 (1994); Thomas W. Merrill, Rethinking Article I, Section 1: From Nondelegation to Exclusive Delegation, 104 Colum. L. Rev. 2097, 2130 (2004); Mikhail, supra note 183, at 1132; Richard W. Murphy, Separation of Powers and the Horizontal Force of Precedent, 78 Notre Dame L. Rev. 1075, 1082 (2003); Michael Stokes Paulsen, Abrogating Stare Decisis by Statute: May Congress Remove the Precedential Effect of *Roe* and *Casey*?, 109 Yale L.J. 1535, 1568 (2000); Saikrishna Prakash, The Essential Meaning of Executive Power, 2003 U. Ill. L. Rev. 701, 737; Neomi Rao, Removal: Necessary and Sufficient for Presidential Control, 65 Ala. L. Rev. 1205, 1229 (2014); Nicholas Quinn Rosenkranz, Federal Rules of Statutory Interpretation, 115 Harv. L. Rev. 2085, 2102 & n.63 (2002); Somin, supra note 195, at 146-47; Ilya Somin, Taking Stock of *Comstock*: The Necessary and Proper Clause and the Limits of Federal Power, 2009-2010 Cato Sup. Ct. Rev. 239, 264-65; Ernest A. Young, Is There a Federal Definitions Power?, 64 Case W. Res. L. Rev. 1269, 1284-85 (2014).

197 Eric Posner and Adrian Vermeule say: "A more plausible reading because a less dramatic one, is just that the phrase 'necessary and proper' is an example, among many in the Constitution, of an internally redundant phrase." Posner & Vermeule, supra note 29, at 1728 n.20; see also Powell, supra note 29, at 724 n.42 ("It is very likely that Chief Justice Marshall viewed necessary and proper as a pleonasm with the second adjective proper importing no additional, legally significant, or justiciable meaning."). There is some support for that view. See McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 324 (1819) (argument of Webster); Opinion of Edmund Randolph, Attorney Gen. of the U.S., to President Washington (February 12, 1791), *in* Legislative and Documentary History of the Bank of the United States 86, 89 (M. St. Clair Clarke & D. A. Hall comp., Washington, Gales & Seaton 1832) (doubting whether proper "has any meaning"). For critique, see infra note 204.

198 Evan H. Caminker, State Sovereignty and Subordinacy: May Congress Commandeer State Officers to Implement Federal Law?, 95 Colum. L. Rev. 1001, 1031 n.115 (1995); Posner & Vermeule, supra note 29, at 1762 n.20; see also Ernest A. Young, *Alden v. Maine* and the Jurisprudence of Structure, 41 Wm. & Mary L. Rev. 1601, 1628-30 (2000) (making the same point, not as a criticism of Lawson and Granger but as a careful description of their argument).

199 See, e.g., Koppelman, supra note 196, at 111 (criticizing the idea that the mandate was not "proper," but voicing no objection to the idea of "proper" as a separate requirement); Peter J. Smith, Federalism, Lochner, and the Individual Mandate, 91 B.U. L. Rev. 1723, 1736-37 (2011) (same); see also Manning, supra note 3, at 48-49, 54-60 (assuming for the sake of analysis that "necessary" and "proper" are separate requirements). Some scholars take "proper" as only requiring conformity with other constitutional provisions -- a second requirement, but a minimal one. See Stephen L. Carter, The Political Aspects of Judicial Power: Some Notes on the Presidential Immunity Decision, 131 U. Pa. L. Rev. 1341, 1378 (1983); Hall, supra note 33, at 1852-54 & n.124, 1863. Randy Beck takes "proper" as a second requirement, but only an "internal limitation" that requires close means-end fit, see J. Randy Beck, The New Jurisprudence of the Necessary and Proper Clause, 2002 U. Ill. L. Rev. 581, 636-48-- a position close to the proprietary sense of "proper" discussed below in Section III.E.

200 Epstein, supra note 167, at 211.

201 Lawson & Granger, supra note 6, at 275-76; Somin, supra note 195, at 148.

202 See Harrison, supra note 18, at 1116-18; see also Mikhail, supra note 183, at 1121 (rejecting the idea that "necessary and proper" is a term of art). The leading work on the legal background of the Clause -- Lawson et al., supra note 18-- treats the phrase as having many antecedents but not as being a term of art. Accord Harrison, supra note 18, at 1117; Manning, supra note 18, at 1352-53. Contra Mikhail, supra note 183, at 1115. Another useful discussion of legal background is Dalotto, supra note 183. Dalotto's work also does not treat "necessary and proper" as a term of art. Nor was "necessary and proper" treated as a term of art in the early debates discussed below, such as the debate over the First Bank of the United States and the essays of Marshall and Roane. Instead, the words were defined individually and then applied as a unit (see, e.g., *McCulloch*, 17 U.S. (4 Wheat.) at 418-21) -- which is what one would expect for a hendiadys, but not for a term of art.

203 See Robert G. Natelson, The Agency Law Origins of the Necessary and Proper Clause, 55 Case W. Res. L. Rev. 243, 265-67 (2004). Not coincidentally, there has also been a suggestion that "cruel and unusual" might be disjunctive. See Treanor, supra note 36, at 499 n.51.

204 Eric Posner and Adrian Vermeule take the phrase as a tautology, and there is support for that view. See supra note 197. But there are also difficulties. First, there is ample evidence that "necessary" was understood to be more strict than "proper" as a standard of permissible action. See infra notes 242-50 and accompanying text. Second, two synonymous terms might be added at the same time, but the Committee of Detail took a draft with "necessary" and added "and proper" -- which is hard to explain if the terms meant the same thing. Accord Robert G. Natelson, The Framing and Adoption of the Necessary and Proper Clause, *in* Lawson et al., supra note 18, at 84, 89. Third, the trope of impossible drafting, see infra note 278 and accompanying text, is difficult to understand if the terms are interchangeable. The Clause could have had only "necessary" or only "proper," and if critics of the Constitution feared one word or the other, its supporters could have alleviated their fears by removing the superfluous but offending word. Note that the arguments given in this footnote are about why "necessary and proper" is not best read as a pair of synonyms in Article I of the U.S. Constitution. Because these words have overlapping semantic ranges, they certainly could be used tautologously, and it seems that in at least some legal texts they were. E.g., sources cited in Robert G. Natelson, The Legal Origins of the Necessary and Proper Clause, *in* Lawson et al., supra note 18, at 52, 77 n.115.

205 See Beck, supra note 199, at 638-39 ("[I]t must be said that the historical evidence for treating the propriety requirement as an external limitation on congressional power seems relatively thin."); McConnell, supra note 189, at 8 n.34 (expressing some skepticism of Lawson and Granger's argument that "proper" protects retained rights, for "[i]t is difficult to know how widespread this interpretation was at the time" and "[t]hose who defended the Constitution without a bill of rights did not take advantage of this argument").

206 An Impartial Citizen V, Petersburg Va. Gazette, Feb. 28, 1788, *reprinted in* 8 Documentary History of the Ratification of the Constitution 428 (John P. Kaminski & Gaspare J. Saladino eds., 1988). Other examples may have eluded me. For contestable ones, see infra note 221.

207 An Impartial Citizen V, supra note 206, at 431. The pamphleteer's use of "unusual" is further support for Stinneford's thesis about the term's meaning. See supra notes 135-37 and accompanying text.

208 An Impartial Citizen V, supra note 206, at 431.

209 Id.

210 22 Annals of Cong. 694, 696 (1811) (statement of Rep. Barry).

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

211 *McCulloch*, 17 U.S. (4 Wheat.) at 367 (argument of Jones). For David Currie's inclination towards Jones's argument that the terms are separate requirements, though not seemingly towards the way Jones read those requirements, see Currie, supra note 189, at 163 n.37; see also id. at 326-27 & n.297.

212 "Tradition has it that Jefferson intended to appoint Roane" as Chief Justice of the U.S. Supreme Court, "but was forestalled by Ellsworth's resignation and the appointment of John Marshall by John Adams shortly before Jefferson's inauguration." Note, Judge Spencer Roane of Virginia: Champion of States' Rights -- Foe of John Marshall, 66 Harv. L. Rev. 1242, 1242 n.4 (1953).

213 Roane's "Hampden" Essays, No. 3 (June 18, 1819), *reprinted in* John Marshall's Defense of *McCulloch v. Maryland* 106, 125, 133 (Gerald Gunther ed., 1969) [hereinafter Marshall's Defense] (giving multiple definitions from Dr. Johnson's *Dictionary* for each word).

214 See id. at 133.

215 Id. at 133-35. Roane combines the two terms into a single statement summarizing the Clause: "To justify a measure under the constitution it must, therefore, be either 'necessary and proper,' or which is the same thing 'indispensably requisite' and 'peculiar' to the execution of a given power." Id. at 133.

216 Nor was Roane's point about "proper" taken up by the Virginia General Assembly, when it sent instructions to Virginia's U.S. Senators about their "concern and alarm" regarding *McCulloch*. The Virginia General Assembly criticized what Chief Justice Marshall did to "necessary," but not what he did to "proper." Instructions from the General Assembly of Virginia, to James Barbour and James Pleasants, junr., Senators from the State of Virginia, in the Congress of the United States (Dec. 22, 1819), *in* Journal of the House of Delegates of the Commonwealth of Virginia, Begun and Held at the Capitol, in the City of Richmond, on Monday the Sixth Day of December, One Thousand Eight Hundred and Nineteen 56, 57 (Richmond, Thomas Ritchie 1819).

217 James Madison, Amendments to the Constitution (House of Representatives, June 8, 1789), *in* 12 The Papers of James Madison 196, 197, 205 (Charles F. Hobson et al. eds., 1979).

218 Id. at 205-06.

219 Compare the abundant negation in Voltaire's *bon mot* that the Holy Roman Empire was "neither holy, nor Roman, nor an empire." The Oxford Dictionary of Quotations 797 (Elizabeth Knowles ed., 5th ed. 1999) (quoting Volatire).

220 See infra notes 229-30 and accompanying text. Elsewhere Madison asked "Whether any part of the powers transferred to the general government be unnecessary or improper?" The Federalist No. 41, at 268 (James Madison) (Jacob E. Cooke ed., 1961). He proceeded to treat that question as unitary, glossing it as: "[i]s the aggregate power of the general Government greater than ought to have been vested in it?" and answering it without distinguishing "unnecessary" and "improper." Id.

Nevertheless, I do not put much weight on this example. It is one of the myriad occurrences of these terms in *The Federalist* that have nothing to do with the Necessary and Proper Clause, and reasoning from "unnecessary" and "improper" to the meaning of "necessary" and "proper" is a mistake, see infra note 248.

221 Other early interpretations that are sometimes read to suggest two requirements are doubtful. In some, only a single term is used, either "necessary" or "proper," but it is not clear whether the source is referring to one of two requirements or is instead using a shorthand for the entire Clause. E.g., The Federalist No. 33, supra note 24 ("The propriety of a law in a constitutional light, must always be determined by the nature of the powers upon which it is founded."); Letter from Thomas Jefferson, to Edward Livingston (Apr. 30, 1800), *in* 31 The Papers of Thomas Jefferson, 1 February 1799 to 31

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

May 1800, at 546, 547 (Barbara B. Oberg ed., 2004) (repeatedly using "necessary" in describing the chain of reasoning -- in the style of "this is the house that Jack built" -- that purported to justify the federal incorporation of a copper mining company). In other instances, both terms (or cognates) are used in close proximity, but the usage appears to be elegant variation or otherwise rhetorical rather than analytic. See, e.g., The Federalist No. 44, supra note 2 ("For in every new application of a general power, the *particular powers*, which are the means of attaining the *object* of the general power, must always necessarily vary with the object; and be often properly varied whilst the object remains the same."); James Wilson, Pennsylvania Ratifying Convention, *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787, supra note 157, at 415, 468 ("Whether it will be proper at all times to keep up a body of troops, will be a question to be determined by Congress; but I hope the necessity will not subsist at all times."). In addition, Story refers to "necessary" and "proper" distinctly, but he does not clearly refer to them as separate requirements. Story, supra note 27, § 1248, at 122 ("But if the intention was to use the word 'necessary' in its more liberal sense, then there is a peculiar fitness in the other word. It has a sense at once admonitory, and directory. It requires, that the means should be, *bonâ fide*, appropriate to the end."); see also id., §§ 1232, 1238, at 110, 114 ("If it be not *expressed*, the next inquiry must be, whether it is properly an incident to an express power, and necessary and proper to its execution.").

222   See supra notes 190-91 and accompanying text.

223   For example, in "An Impartial Citizen V," the sentence immediately prior to the two-requirements point reads:

When a power is vested any where, from the nature of things it must be understood to be attended by such other incidental powers as are necessary to give it efficacy; for to say, that a power is given, without the power of enforcing it, is a solecism in language.

An Impartial Citizen V, supra note 206, at 431.

224   For more on this proprietary sense of "proper," see infra Section III.E.

225   "An Impartial Citizen V" reads "proper" as more restrictive, while Jones reads it as less so. See An Impartial Citizen V, supra note 206, at 431 (arguing that laws made by Congress under the Clause "must not only be *necessary*, but *proper*"); *McCulloch*, 17 U.S. (4 Wheat.) at 367 (argument of Jones) (arguing that "[m]any means may be *proper*, which are not *necessary* "). Representative Barry does not say which he considers more restrictive. But he does seem to accept the narrow view of "necessary" rejected by *McCulloch*, namely that a necessary means is only "*that mean* without which the end could not be produced." 22 Annals of Cong. 696 (1811) (emphasis added); see id. at 697, 699 (glossing "necessary" as "strictly appropriate" and "strictly necessary").

226   The exception is the Anti-Federalists, who had no reason to lay stress on two requirements before ratification.

227   The Federalist No. 33, supra note 24; The Federalist No. 44, supra note 2.

228   See Jefferson, supra note 19; James Madison, The Bank Bill (House of Representatives, Feb. 2, 1791), *in* 13 The Papers of James Madison 372 (Charles F. Hobson et al. eds., 1981). On the connection between Madison's view of the Necessary and Proper Clause and his theory of republican government, see Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution 354-55 (1996).

229   In The Federalist No. 44, supra note 2, for example, Madison argues that the Clause gives only powers that would already exist "by unavoidable implication" from the need to execute the enumerated powers. Although he uses a variety of phrases ("necessary and proper," "unnecessary or improper," "not necessary or proper") he never suggests a particular power might be necessary, or proper, but not both. The one place he alternates the use of the terms appears to be an elegant variation, because repeating "necessarily and properly" in two consecutive clauses would be ungainly. Moreover, when he presented the case for the Bill of Rights in the House of Representatives, he argued that the national government

was not sufficiently constrained by the scheme of enumerated powers paired with the Necessary and Proper Clause. 1 Annals of Cong. 431, 438 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison). His example was that general warrants might be "necessary" for collecting revenue. If "proper" were a separate requirement, the logic of Madison's example would fail: General warrants could be "necessary" but not "proper," in which case the Constitution would restrain the national government without the addition of a Bill of Rights. Cf. Beck, supra note 199, at 638-39 (noting those who argued that a Bill of Rights was unnecessary did not do so on the grounds that "proper" already protected individual liberty).

230 Thus Madison, in his speech on the Bank bill in the House of Representatives, never discussed separately whether the bill was "necessary" and "proper," and he glossed the meaning of a power that was necessary and proper in terms that cannot be divided into those terms: For example, "an accessary or subaltern power, to be deduced by implication, as a means of executing another power." Madison, supra note 228, at 379. Similarly, Jefferson attacked the Bank bill as not being "necessary," with no separate treatment of "proper." Jefferson, supra note 19, at 278. Jefferson did not even point to "proper" when arguing that the Necessary and Proper Clause does not allow Congress to "break down the most antient and fundamental laws of the several states" and to launch "invasions" of "the rights... of the states and state legislatures." Id. at 279-80.

231 The House debate can be found in Legislative and Documentary History of the Bank of the United States, supra note 197, at 37-85. Instead, the debate included many arguments about whether the incorporation of a bank would be incidental to any of the enumerated powers of Article I. In addition to Madison's first speech, cited in the preceding note, see, e.g., Rep. Ames (House of Representatives, Feb. 3, 1791) *in* Legislative and Documentary History of the Bank of the United States, supra note 197, at 45, 49 (arguing in favor of the constitutionality of incorporating a bank on the ground that it was "fairly relative, and a necessary incident to" several constitutional powers).

232 A further implication of the missing two-requirements reading will become apparent after the hendiadys reading is introduced: If "necessary and proper" had been a studied ambiguity -- a response to disagreement about the scope of national power that left open whether or not "proper" should be read as a separate requirement -- then Madison and Jefferson would have had strong incentives to argue after ratification that "proper" restricted the national government. That they still did not suggests that they did not think that "necessary and proper" could reasonably be read as containing two requirements.

233 There is also a long tradition of reading it more strictly. See, e.g., Jefferson, supra note 19, at 278-79 (glossing "necessary means" not as "those which are merely 'convenient' for effecting the enumerated powers" but rather as "those means without which the grant of the power would be nugatory").

234 Compare The Federalist No. 33, supra note 24, with Alexander Hamilton, Final Version of an Opinion on the Constitutionality of an Act to Establish a Bank (Feb. 23, 1791), *in* 8 The Papers of Alexander Hamilton, February 1791-July 1791, at 97, 102-05 (Harold C. Syrett & Jacob E. Cook eds., 1965). Even so, Hamilton's view was not wide-open. See Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 206-07. On Hamilton's insistence that means-end fit under the Necessary and Proper Clause is not a question of policy, see infra note 301 and accompanying text.

235 For doubts about how minimal the reading of "necessary" is in *McCulloch*, see Currie, supra note 189, at 160-68; Gerald Gunther, Introduction, *in* Marshall's Defense, supra note 213, at 1, 18-21; see also David S. Schwartz, Misreading *McCulloch v. Maryland*, 18 U. Pa. J. Const. L. 1, 72-79 (2015) (noting ambiguities in *McCulloch*); cf. Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 207-08 ("Even Marshall's opinion in *McCulloch* can be read as taking a more circumspect view of congressional power than is commonly taught."); Martin S. Flaherty, John Marshall, *McCulloch v. Maryland*, and "We the People": Revisions in Need of Revising, 43 Wm. & Mary L. Rev. 1339, 1342 (2002) (critiquing Justice Thomas's less nationalist reading of *McCulloch*, but concluding that it is "wrong for the right reasons").

236 Story, supra note 27, § 1243, at 118.

237 See Jefferson, supra note 19, at 278.

238 For examples from Founding-era corporate charters, see Miller, supra note 192, at 161-62.

239 Graber, supra note 1, at 168 (quoting Hamilton, supra note 234). Graber has Madison and Amphictyon on his side. See Madison, supra note 228, at 376-77 (posing a rhetorical question about "whether it was possible" to view terms such as "conducive to" as being "synonimous" with, or even "a fair and safe commentary on," the terms "*necessary* and *proper*"); A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), *reprinted in* Marshall's Defense, supra note 213, at 64, 65 ("Would they not have said, if they so intended it, that Congress shall have power to make all laws which may be *useful*, or *convenient*, or *conducive to* the effectual execution of the foregoing powers? Will any man assert that the word ' *necessary*' is synonymous with those other words? It certainly is not. Why then should we change its meaning?"). For doubts about whether the views of Hamilton and Marshall were quite so lax, see supra notes 234-35.

240 Richard Epstein similarly invokes the analogy of tiers of scrutiny in thinking about the Necessary and Proper Clause, and to the same effect: the Clause requires a means-end fit that is at neither end of the spectrum. See Epstein, supra note 167, at 218.

241 The Federalist No. 44, supra note 2; *McCulloch*, 17 U.S. (4 Wheat.) at 416-18; Story, supra note 27, §§ 1239-40, at 114-17. *Reductio ad absurdum* also dominates the arguments on the other side, but more on that shortly.

242 "Proper" is consistently used as a lax standard of wide discretion. See U.S. Const. art. I, § 9; id. art. II, § 2; id art. II, § 3. "Necessary" is a stricter term in Article I, Section 7; Article I, Section 10; Amendment XII (twice); it is the standard for a discretionary but solemn decision in Article V; and it is the stricter term in what is likely another hendiadys in Article II, Section 3, which gives the President the duty of recommending to Congress "such Measures as he shall judge *necessary and expedient*."

243 See Miller, supra note 192, at 160-62. Miller tries to distinguish "proper" from "necessary" in some way other than degree, but that part of the argument is more conjectural and seems to confuse sense and reference. What his examples demonstrate, at least for the corporate charters, is that "necessary" tended to be a more restrictive term than "proper." Id. at 161.

244 Rep. Giles (House of Representatives, Feb. 7. 1791), *in* Legislative and Documentary History of the Bank of the United States, supra note 197, at 69, 72.

245 See supra text accompanying note 229.

246 It has been suggested that the Court did not actually consider "proper" in *McCulloch* "because neither side raised the issue." Robert H. Bork & Daniel E. Troy, Locating the Boundaries: The Scope of Congress's Power to Regulate Commerce, 25 Harv. J.L. & Pub. Pol'y 849, 875 n.97 (2002). But the entire Clause was at issue. Daniel Webster argued that the two terms were "probably to be considered as synonimous," and Walter Jones, that the terms were separate requirements. See *McCulloch*, 17 U.S. (4 Wheat.) at 324 (argument of Webster); id. at 367 (argument of Jones). See supra notes 211 & 225 and accompanying text.

247 See supra note 216 and accompanying text.

248 The "Impartial Citizen V" pamphlet does support their view. See Lawson & Granger, supra note 6, at 299 & nn.132-33. But not the other sources they adduce. Some treat "necessary" as more restrictive. Id. at 289-90 & nn.93 & 95 (Spencer, Iredell, Hamilton, Roane). Another says that "proper" qualifies the meaning of "necessary." Id. at 290 n.95 (Clopton). Two others seem to support their conclusion, id. at 289 & n.93 (Wilson: "not only unnecessary, but improper"; Madison: "improper, or at least unnecessary"), but are inapt for two reasons. First, the semantic ranges of "necessary" and "proper" cannot be determined from the semantic ranges of "unnecessary" and "improper." In particular, "unnecessary" can mean something gratuitous, which is not a mere negation of "necessary." Second, in these quotations what is doing the work is not vocabulary but syntax. An English speaker can say "not only x but y," and either term ("unnecessary," "improper") can take either spot. *This construction* does not tell you that one word is stronger or weaker, or more restrictive or less restrictive than the other, only that the meaning of the terms has sufficient plasticity that our expectations for their relationship may be overpowered by clear syntax. Similarly, an English speaker may say, "you listened to me, but you didn't hear me." Or "you heard me, but you didn't listen to me." Both statements are intelligible and they mean the same thing: not because in one of them "listen" is stronger and in the other "hear" is stronger, nor because the terms are indistinguishable, but because their meaning is sufficiently malleable that it can be subordinated to the syntax. The Randolph quotation is mysterious because of how he uses "expedient," especially given that he clearly recognizes its laxity in his second opinion on the Bank. See Opinion No. 2 of Edmund Randolph, Attorney Gen. of the U.S., (Feb. 12, 1791), *in* Legislative and Documentary History of the Bank of the United States, supra note 197, at 89, 90 (questioning whether there are any "who construe the words, ' *necessary and proper*,' so as to embrace every expedient power"). That leaves the quotation from Representative Barry, which supports part of Lawson and Granger's thesis, namely that "proper" is a distinctive requirement. But Barry treats "proper" as part of means-end analysis, and he does not suggest that it is the more restrictive term. See supra notes 210 & 225 and accompanying text.

249 See Mikhail, supra note 183, at 1099. On Wilson's life and thought, see William Ewald, James Wilson and the Drafting of the Constitution, 10 U. Pa. J. Const. L. 901 (2008). Note that one member of the Convention drafted, but never made, a motion with alternative language that would have removed "and proper." See Supplement to Max Farrand's The Records of the Federal Convention of 1787, at 231 (James H. Hutson ed., 1987). I do not put much weight on arguments from unmade motions in Philadelphia, but the drafter of the motion was Pierce Butler of South Carolina, who may have wanted to narrow the incidental powers conferred by the Clause. Two hypotheses have been suggested for why he did not make the motion. The first is tactics: Making the motion might have disrupted bargains already struck, ones favorable to South Carolina. Joseph M. Lynch, Negotiating the Constitution: The Earliest Debates over Original Intent 20 (1999). The second is learning: Perhaps "someone pointed out to Butler that the effect of the word 'proper' was to *confine* rather than expand the scope of congressional authority." Natelson, supra note 190, at 91. The first is plausible; the second is not. If Butler decided he was wrong about the meaning of "and proper," then surely he would have recognized that others could be wrong, too -- and it would thus be dangerous to retain words that were susceptible to such misunderstanding. There is a coincidence too striking to omit: Twelve years after James Wilson added "and proper" to the Clause, when he was a Justice of the U.S. Supreme Court, he was imprisoned for debt. The creditor who had him imprisoned was Pierce Butler. See Ewald, supra, at 914-15.

250 Ewald, supra note 249, at 904.

251 I borrow this way of putting the point from Geoffrey Miller, who gives a list of the various formulations in colonial and early republican corporate charters, and he suggests that they can be placed "on a scale of severity of restriction." Miller, supra note 192, at 161.

252 Accord Thomas B. McAffee, The Federal System As Bill of Rights: Original Understandings, Modern Misreadings, 43 Vill. L. Rev. 17, 56 (1998).

253 *McCulloch*, 17 U.S. (4 Wheat.) at 418-19.

254 *Id.*; see also Story, supra note 27, § 1244, at 118-19; cf. A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 66 (making the reverse argument, i.e., that "necessary" ruled out a lax reading of "proper").

255    See supra note 246.

256    *McCulloch*, 17 U.S. (4 Wheat.) at 421.

257    United States v. Comstock, 560 U.S. 126, 160-61 (2010) (Thomas, J., dissenting); Barnett, Necessary and Proper, supra note 194, at 772; Beck, supra note 199, at 644-45; Gardbaum, supra note 3, at 815-19; Somin, supra note 195, at 150-51; see also United States v. Kebodeaux, 133 S. Ct. 2496, 2507 (2013) (Roberts, C.J., concurring in the judgment) (finding a federal power to protect the public inconsistent "'with the letter and spirit of the constitution,' and thus not a 'proper [means]'" (citations omitted)).

258    Similarly, when a Virginian critic argued that *McCulloch* gave too liberal a construction to congressional power, he offered a gloss that again drew a single line:

When a law is about to pass, the enquiry which ought to be made by Congress is, does the constitution expressly grant this power? if not, then, is this law one *without which* some power cannot be executed? If it is not, then it is a power reserved to the states, or to the people, and we may not use the means, nor pass the law.

A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 70. But see John Marshall, A Friend to the Union, No. 2 (Apr. 28, 1819), *reprinted in* Marshall's Defense, supra note 213, 91, 93-96 (critiquing Amphictyon's gloss). Justice Story offered a similar gloss on what the Clause required, and though he used "necessary" and "proper" in separate clauses, he does not appear to be drawing a distinction between them (i.e., again a single line):

Whenever, therefore, a question arises concerning the constitutionality of a particular power, the first question is, whether the power be *expressed* in the constitution. If it be, the question is decided. If it be not *expressed*, the next inquiry must be, whether it is properly an incident to an express power, and necessary to its execution. If it be, then it may be exercised by congress. If not, congress cannot exercise it.

Story, supra note 27, §§ 1232, 1238, at 110, 114.

259    A similar treatment of "necessary and proper" as a unitary phrase can be seen in two contemporaneous opinions of Attorney General Wirt that were not concerned with the Necessary and Proper Clause. See Saline Springs in Illinois, 1 Op. Att'y Gen. 420-22 (1820) (treating a statutory reference to any lands that the President "deemed necessary and proper for working the said salt springs" to be a reference to presidential discretion, and glossing the phrase with only the word "necessary" (emphasis omitted)); Case of the Late Collector at Savannah, 1 Op. Att'y Gen. 639 (1824) (answering in a unitary fashion the question "whether it be necessary and proper to bring a suit" against the late collector of Savannah).

260    Each possibility could be expressed less ambiguously: "both necessary and proper"; "necessary, that is, proper"; "'necessary and proper' in the technical sense"; and "necessary-and-proper." All four of these more explicit formulations would, to varying degrees, be stylistically jarring in the Constitution, and at any rate it is no surprise that a semantic relationship can be expressed more and less explicitly.

261    See Timothy A.O. Endicott, Vagueness in Law 54 (2000).

262    See, e.g., The Federalist No. 33, supra note 24, at 204-05 ("[T]he constitutional operation of the intended government would be precisely the same, if these clauses [i.e., the Necessary and Proper Clause and the Supremacy Clause] were entirely obliterated, as if they were repeated in every article.... The declaration itself, though it may be chargeable with tautology or redundancy, is at least perfectly harmless."); The Federalist No. 44, supra note 2; Wilson, supra note 221, at 468 ("It is saying no more than that the powers we have already particularly given, shall be effectually carried into execution."); James Madison, Virginia Ratifying Convention, *in* 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787, supra note 157, at 438-39 ("It is only a superfluity.... [I]t gives no supplementary power. It only enables them to execute the delegated powers."); Madison, supra note 228, at 376 ("The clause is in fact merely declaratory of what would have

resulted by unavoidable implication, as the appropriate, and as it were, technical means of executing those powers."); Hamilton, supra note 234, at 106 ("[I]t will not be contended... that the clause in question gives any *new* or *independent* power."); St. George Tucker, View of the Constitution of the United States, *in* 1 Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia 140, 287 (St. George Tucker ed., Philadelphia, William Young Birch & Abraham Small 1803) ("It neither enlarges any power specifically granted, nor is it a grant of new powers to congress, but merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those otherwise granted, are included in the grant."); A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 69-70; Marshall, supra note 258, at 96-97 (referring to the famous passage in *McCulloch* -- "Let the end be legitimate..." -- as a "rule of construction," and adding: "I think, as the Supreme Court has thought, that it would be the proper rule, were the grant which has been the subject of so much discussion [i.e., the Necessary and Proper Clause], expunged from the constitution."); Story, supra note 27, §§ 1232, 1238, at 110, 113-14 ("It neither enlarges any power specifically granted; nor is it a grant of any new power to congress. But it is merely a declaration for the removal of all uncertainty...."). But see Rep. Gerry (House of Representatives, Feb. 7, 1791) *in* Legislative and Documentary History of the Bank of the United States, supra note 197, at 75, 78. *McCulloch* is sometimes read to the contrary, but Marshall argued otherwise: "The court [in *McCulloch*] then has not contended that this grant enlarges, but that it does not restrain the powers of Congress; and I believe every man who reads the opinion will admit that the demonstration of this proposition is complete." Marshall, supra note 258, at 97. For additional sources to the same effect, see Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 185-87; Beck, supra note 199, at 592 n.58; Natelson, supra note 203, at 296-314; see also Akhil Reed Amar, Seegers Lecture in Jurisprudence at the Valparaiso University School of Law (Oct. 26, 1998), *in* Constitutional Redundancies and Clarifying Clauses, 33 Val. U. L. Rev. 1, 7-10 (1998) (noting that although *McCulloch* says the Necessary and Proper Clause does not restrict national power, the opinion does not say that the Clause augments national power, and concluding that it "might well be a declaratory or clarifying provision designed to remove all doubts"). This view accords with Professor Jack Rakove's description of the debate over the Necessary and Proper Clause: "the lack of controversy over this clause suggests that [the framers] did not regard it as augmenting the powers already vested in the national government." Rakove, supra note 228, at 180.

263 The Federalist No. 44, supra note 2, at 304. On background principles and the Constitution, see Caleb Nelson, The Legitimacy of (Some) Federal Common Law, 101 Va. L. Rev. 1 (2015); Stephen E. Sachs, Constitutional Backdrops, 80 Geo. Wash. L. Rev. 1813 (2012).

264 The Founders used "incidental powers" and "implied powers" interchangeably: there were implied powers, and they were the incidental powers. In present usage, however, "implied powers" often refers to something quite different, e.g. Mikhail, supra note 183, and so this Article uses "incidental powers." On the relationship between "incidental powers" and "means," see infra note 325.

265 Tucker, supra note 262, at 287-88 (describing the Clause as "merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those [powers] otherwise granted, are included in the grant"). The language from St. George Tucker also appears in Story, supra note 27, § 1238, at 113-14. Randolph also saw the Necessary and Proper Clause as affirming incidental powers, but he attributed this to the word "necessary." Randolph, supra note 197, at 89 ("To be necessary is to be incidental, or in other words, may be denominated the natural means of executing a power."). See also Marshall, supra note 258, at 101 (expressly equating the famous standard of *McCulloch* -- "Let the end be legitimate..." -- with the principle of incidental powers); Letter from William Johnson, to James Monroe (June 1822), *in* Jefferson Powell, Languages of Power: A Sourcebook of Early American Constitutional History 324, 324-25 (1991) ("The principle assumed in the case of the Bank is that the grant of the principal power carries with it the grant of all adequate and appropriate means of executing it").

266 See, e.g., *McCulloch*, 17 U.S. (4 Wheat.) at 416-17; The Federalist No. 33, supra note 24, at 206; Hamilton, supra note 234; Jefferson, supra note 19, at 279; Madison, supra note 228, at 377; Letter from James Madison, to Spencer Roane (Sept. 2, 1819), *in* 8 The Writings of James Madison , 1808-1819, t 447, 449-50 (Gaillard Hunt ed., 1908); Marshall, supra note 258, at 94-100, 102; Roane's "Hampden" Essays, No. 2 (June 15, 1819), supra note 213, at 118-21; Roane's "Hampden" Essays, No. 3 (June 18, 1819), supra note 213, at 134; Tucker, supra note 262, at 287-89; A Virginian's

"Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 66-70; Story, supra note 27, § 1253, at 126 n.1; see also Natelson, supra note 204, at 60-68 (giving examples of principals and incidents from English law).

267 For an example from the common law, see infra text accompanying note 325.

268 There is a growing literature that associates the Necessary and Proper Clause with the law of agency and fiduciary relationships, along with doubts about how robust the implications are. See, e.g., Lawson et al., supra note 18; Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 217-18; Harrison, supra note 18; Manning, supra note 18; Natelson, supra note 203; Valauri, supra note 33, at 819-20; cf. Manning, supra note 3 (analogizing the Clause not so much to agency as to agencies). The authors of the leading work on the subject, Lawson et al., supra note 18, often use a two-step analysis, starting with a specific context in which incidental powers were important (e.g., corporate charters, equitable doctrines for trustees) and then moving directly to the Necessary and Proper Clause. I find a three-step analysis more plausible, starting with specific contexts, moving to a more general and less-defined principle of incidental powers, and then moving to the Necessary and Proper Clause. See Harrison, supra note 18, at 1116-18, 1131; Manning, supra note 18, at 1369-74; see also Seth Davis, The False Promise of Fiduciary Government, 89 Notre Dame L. Rev. 1145, 1176-77 (2014) (criticizing an emphasis on trust law as the background for the Necessary and Proper Clause); Eric Lomazoff, Speak (Again), Memory: Rethinking the Scope of Congressional Power in the Early American Republic, 47 Tulsa L. Rev. 87, 89 (2011) (praising the materials on the background of the Clause produced by Lawson, Miller, Natelson, and Seidman, while also noting that their chapters can be considered "competing hypotheses"). What results is less determinate, but more congruent with how the principle of incidental powers was invoked during the ratification and Bank debates.

269 Madison, supra note 228, at 376, 378-79. In his speech presenting what became the Bill of Rights, Madison also described the Clause as giving Congress "certain discretionary powers with respect to the means," so that it may "fulfil every purpose for which the government was established." Madison, supra note 217, at 205.

270 The Federalist No. 33, supra note 24, at 206 (emphasis added).

271 *NFIB* does not speak with one voice here. Although the decision holds to a two-requirements view of the Clause, it also states that the Clause is only an affirmation that Congress has the powers incidental to its enumerated powers. 132 S. Ct. at 2591.

272 Wright, supra note 8, at 181 (emphasis added).

273 See William Hazlitt, Table Talk; or, Original Essays 351 (London, John Warren 1821) ("Or as Luther complained long ago, 'human reason is like a drunken man on horse-back: set it up on one side, and it tumbles over on the other.'").

274 For Anti-Federalist examples, see Brutus, No. 1, *in* 2 The Complete Anti-Federalist 363, 367-68 (Herbert J. Storing ed., 1981); Centinel, No. 5, *in* 2 The Complete Anti-Federalist, supra, at 166, 168-69; An Old Whig, No. 2, *in* 3 The Complete Anti-Federalist, supra, at 22, 24-26. For examples from Jefferson and Madison, see Jefferson, supra note 19, at 278 (describing a broad construction as one that "would swallow up all the delegated powers, and reduce the whole to one phrase"); Madison, supra note 228, at 376, 378 ("If implications, thus remote and thus multiplied, can be linked together, a chain may be formed that will reach every object of legislation, every object within the whole compass of political economy."); Madison, supra note 266, at 448 (criticizing *McCulloch* for setting aside the Clause's "definite connection between means and ends" and substituting "a Legislative discretion as to the former to which no practical limit can be assigned"). For other examples, see Randolph, supra note 197, at 89 ("[L]et it be propounded as an eternal question to those who build new powers on this clause, whether the latitude of construction, which they arrogate will not terminate in an unlimited power in Congress."); John Taylor, Construction Construed and Constitutions Vindicated 170 (Richmond, Shepherd & Pollard 1820); A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 73-75.

275     Hamilton, supra note 234, at 103 (criticizing a narrow construction of "necessary," because "[t]here are few measures of any government, which would stand so severe a test"); *McCulloch*, 17 U.S. (4 Wheat.) at 416-18; cf. The Federalist No. 33, supra note 24, at 205-06 (explaining the existence of the Clause on the grounds that it would ward off "the danger which most threatens our political welfare": "that the State Governments will finally sap the foundations of the Union").

276     Madison and Hamilton seem to have recognized the double *reductio*. Madison, though rejecting a latitudinarian interpretation, noted that "very few acts of the legislature could be proved essentially necessary to the absolute existence of government." 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787, at 417 (Jonathan Elliot ed., Washington, 2d ed. 1836). Hamilton, though rejecting a cramped interpretation, recognized that "[t]he moment the literal meaning is departed from, there is a chance of error and abuse." Hamilton, supra note 234, at 106.

277     The Federalist No. 44, supra note 2, at 303.

278     See id.; Story, supra note 27, §§ 1232-36, at 110-13; see also Madison, supra note 262, at 438-39 (arguing that the Necessary and Proper Clause is stated in general terms because "to delineate on paper all those particular cases and circumstances in which legislation by the general legislature would be necessary... is not within the limits of human capacity").

279     See supra Part I, especially notes 105-14 and accompanying text.

280     For a prior suggestion that "proper" may have multiple functions, see McAffee, supra note 252, at 70-71 & n.207. The sense of "proper" discussed here is anticipated in Beck, supra note 199, at 641-48. Because Beck does not see the phrase as a hendiadys, he draws sharper distinctions between "necessary" or "proper," and he also takes some sources to be using "proper" in a technical sense when they may only be using the word as a shorthand for the entire phrase (e.g., The Federalist No. 33, supra note 24).

281     Lawson & Granger, supra note 6, at 291-98; see also Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S. Ct. 2076, 2105 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part) ("[T]he best interpretation of 'proper' is that a law must fall within the peculiar jurisdiction of Congress.").

282     Lawson & Granger, supra note 6, at 271-72.

283     Id. at 291; see also Zivotofsky, 135 S. Ct. at 2105 (Thomas, J., concurring in the judgment in part and dissenting in part) (endorsing this definition).

284     Marc Froment-Meurice, That Is to Say: Heidegger's Poetics 24 (Werner Hamacher & David E. Wellbery eds., Jan Plug trans., 1998) ("Even Heidegger (at least the 'early' Heidegger) subscribes to the credo, repeated from Plato to Kant and beyond, that to philosophize is proper to the human species, is what signs the human as such, and is inscribed for all time as its 'nature.'"). For a theological example, see Thomas Aquinas, Summa Theologica, pt. III, question 7, art. 10 (Fathers of the English Dominican Province trans., 1913).

285     See the examples in Lawson & Granger, supra note 6, at 291-97. Some of their examples can be read either way, but in some "proper" is clearly better read as "fitting" than as "within the jurisdiction of." One of the latter is the statement in the Vermont Constitution of 1786 that "[c]ourts of justice shall be maintained in every county in this State, and also in new counties when formed; which courts shall be open for the trial of all causes *proper* for their cognizance." Id. at 292 (alteration and emphasis in Lawson & Granger). Jurisdiction is being referred to and set up by this provision of the state constitution, but that is the force of the entire sentence, not of the word "proper."

286 Lawson and Granger might have slipped this band if they had relied not on Dr. Johnson's first sense for "proper" but on his third: "3. One's own." 2 Johnson, supra note 69 ("PRÓPER"). This sense strikes a note of "belonging to" rather than "belonging only to."

287 This point is made in Beck, supra note 199, at 641.

288 See supra note 231.

289 It also has explicit support in Justice Roane's criticism of *McCulloch*. See Roane's "Hampden" Essays, No. 3 (June 18, 1819), supra note 213, at 133. For more discussion of this passage in the third Hampden essay, see supra notes 213-16 and accompanying text.

290 Marshall, supra note 258, at 102.

291 Id. at 101-02.

292 Lawson and Granger cite Marshall's essay, but not this passage.

293 On "proper" in Dr. Johnson's *Dictionary*, see supra note 286 and text accompanying note 283.

294 U.S. Const. art. I, § 8, cls. 9-11.

295 See supra note 286.

296 Marshall finds no distinction between (1) "means which directly and necessarily tend to produce the desired effect" and (2) "means which 'belong peculiarly' to the production of that effect," but finds a sharp distinction between both of these formulations, and (3) "means... *without which* the effect *cannot* be produced." Marshall, supra note 258, at 102. The argument that Marshall is rejecting is that the Clause permits Congress to "employ no means but those *without which* the end *could not* be obtained." Id. at 92-102. Despite Marshall's criticism, this view has not disappeared. Later Justices have sometimes pointed to possible alternatives when assessing whether a challenged statute was truly "necessary and proper." See, e.g., *NFIB*, 132 S. Ct. at 2647 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) ("With the present statute, by contrast, there are many ways other than this unprecedented Individual Mandate by which the regulatory scheme's goals of reducing insurance premiums and ensuring the profitability of insurers could be achieved."); Trop v. Dulles, 356 U.S. 86, 114 (1958) (Brennan, J., concurring in judgment) (pointing to "alternative methods" as reason to conclude that "the statute is not 'really calculated to effect any of the objects entrusted to the government'" and thus "falls beyond the domain of Congress") (quoting *McCulloch*, 17 U.S. (4 Wheat.) 316).

297 For a parallel point about "cruel and unusual," see supra note 149 and accompanying text.

298 The Federalist No. 44, supra note 2, at 304; Madison, supra note 262, at 438-39; Marshall, supra note 258, at 103. Iredell made similar arguments against the idea of specifying punishments that were forbidden to Congress. See Iredell, supra note 161.

299 See supra note 278 and accompanying text.

300 See 1 Annals of Cong. 431, 438 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison) ("for it is for them [i.e., Congress] to judge of the necessity and propriety to accomplish those special purposes which they may have in

contemplation"). The care that Congress shows in making that constitutional judgment has not been constant. Compare Currie, supra note 162, with Keith E. Whittington, James Madison Has Left the Building, 72 U. Chi. L. Rev. 1137, 1155-58 (2005) (reviewing J. Mitchell Pickerill, Constitutional Deliberation in Congress: The Impact of Judicial Review in a Separated System (2004)).

301    Hamilton, supra note 234, at 104; see Tucker, supra note 262, at 288-89 (distinguishing the question whether "the powers implied in the specified powers, have an immediate and appropriate relation to them, as means, necessary and proper for carrying them into execution," from "questions of mere policy, and expediency"); cf. Story, supra note 27, § 1241, at 117 (arguing that Congress's incidental powers do not depend on circumstances that vary over time).

302    Hamilton, supra note 234, at 104. For echoes of this point in later literature, see Epstein, supra note 167, at 215 ("As a legal matter, the question of constitutional power to establish a national bank must be resolved independent of any view of the success of the bank in its commercial operations, which in this instance were substantial."); Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 208 ("[I]f one adopts the view of Jefferson and Madison that 'necessary' means that a given law must be incidental and closely connected to an enumerated power, then this is a matter of constitutional *principle* and within the purview of the Courts to assess."); Gardbaum, supra note 3, at 820-22; Stephen E. Sachs, The Uneasy Case for the Affordable Care Act, 75 L. & Contemp. Probs . 17, 23-25 (2012) ( "To the extent that current doctrine still requires implicit powers to be 'plainly adapted' or 'incidental' to those granted in the Constitution, Congress can't do *everything* necessary to keep its choices from proving unwise."). There is some tension between the idea that incidental powers are not a matter of policy and the idea that the Necessary and Proper Clause was meant to adapt to changing circumstances. See infra note 313 and accompanying text.

303    *McCulloch*, 17 U.S. (4 Wheat.) at 423.

304    See 8 The Papers of John Marshall: Correspondence, Papers, and Selected Judicial Opinions, March 1814-December 1819, at 257 (Charles F. Hobson, ed., Laura S. Gwilliam, ed. assoc., 1995).

305    Accord The Legal Tender Cases, 110 U.S. 421, 450 (1884); see also United States v. Kebodeaux, 133 S. Ct. 2496, 2505-08 (2013) (Roberts, C.J., concurring in the judgment) (declining to join the majority opinion because its policy arguments in favor of the challenged statute were not relevant for deciding whether the statute was supported by the Necessary and Proper Clause).

306    Stephen Gardbaum has also argued for different levels of deference on the two inquiries, Gardbaum, supra note 3, at 817, though he warns against making the review of means-end fit too perfunctory, id. at 819-22.

307    See Beck, supra note 199, at 640; Manning, supra note 3, at 55-57.

308    Herbert Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum. L. Rev . 543 (1954).

309    Manning, supra note 3.

310    James Bradley Thayer, and especially his argument for highly deferential judicial review, are discussed in One Hundred Years of Judicial Review: The Thayer Centennial Symposium, 88 Nw. U. L. Rev. 1 (1993).

311    Accord Sachs, supra note 263, at 1861-63. For starting points on the content of the incidental-powers principle, see Robert G. Natelson, The Legal Origins of the Necessary and Proper Clause, *in* Lawson et al., supra note 18, at 52; Harrison, supra note 18; Manning, supra note 18; see also supra notes 264-68 and accompanying text. In addition, Manning's argument for deference depends on the premise that the Clause is a delegation of lawmaking power. Manning,

supra note 18, at 50 ("Bedrock principles of administrative law teach us that deference, at least in the strong sense, depends on both the existence and the recipient of a delegation."). For the vertical aspect of the Clause, however, it is not obvious that "delegation" is apt here. If the Clause affirms that Congress has incidental powers to execute the enumerated powers -- powers that Congress would have even if the Clause did not exist -- then it is hard to get much mileage out of the Clause being a delegation, and the analogues from administrative law are less apt. As to the horizontal aspect of the Clause, however, Manning's delegation premise would seem to hold.

312 For scholarly views about what content "proper" has as an independent requirement, see supra notes 188-96 and accompanying text.

313 Manning, supra note 18, at 10-11; see also Madison, supra note 266, at 450-51 (noting that it "was foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter... and that it might require a regular course of practice to liquidate & settle the meaning of some of them").

314 Harrison, supra note 18, at 1124; see also Nelson, supra note 127, at 544; cf. The Federalist No. 44, supra note 2, at 304 (rejecting the possibility that the Constitutional Convention might have "attempted a positive enumeration of the powers necessary and proper for carrying their other powers into effect," in part because it would have to be "accommodated... to all the possible changes which futurity may produce"); *McCulloch*, 17 U.S. (4 Wheat.) at 415.

315 See supra note 27 and accompanying text.

316 See McConnell, supra note 189.

317 Henry E. Smith, Why Fiduciary Law Is Equitable, *in* Philosophical Foundations of Fiduciary Law 261 (Andrew S. Gold & Paul B. Miller eds., 2014).

318 See William Baude, Sharing the Necessary and Proper Clause, 128 Harv. L. Rev. F. 39, 45 (2014) ("To be sure, those who exercise power will usually take the first cut at interpreting their own authority, but that tells us nothing about who gets the final say.").

319 See Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 209-10; Lawson & Granger, supra note 6, at 276-81. Similarly, other legal documents of the time included clauses that expressly gave an agent or fiduciary the power to determine what were incidental powers. See Miller, supra note 192. On "necessary and expedient" as a probable hendiadys, see supra note 242.

320 For example, in The Federalist No. 44, supra note 2, at 305, Madison raises the question: "If it be asked, what is to be the consequence, in case the Congress shall misconstrue this part of the Constitution, and exercise powers not warranted by its true meaning?" His answer has three parts. First, contra Manning, he says the Necessary and Proper Clause is no different in this regard than any other provision of the Constitution ("I answer the same as if they should misconstrue or enlarge any other power vested in them...."). Second, he looks to the President and the courts: "In the first instance, the success of the usurpation will depend on the Executive and Judiciary departments, which are to expound and give effect to the Legislative acts." There is no tempering of this with talk of the clarity of the mistake or the egregiousness of the wrong. Finally, he looks to the people: "[A]nd in the last resort, a remedy must be obtained from the people, who can, by the election of more faithful representatives, annul the acts of the usurpers." See also *McCulloch*, 17 U.S. (4 Wheat.) at 423; id. at 358-59 (argument of Wirt); Lawson & Granger, supra note 6, at 280-85, 301-03. St. George Tucker also expressly recognizes both judicial enforcement and political safeguards in his discussion of the Necessary and Proper Clause, and like Madison as between these two he gives priority to judicial enforcement. See Tucker, supra note 262, at 288-89.

321 H. Jefferson Powell, Enumerated Means and Unlimited Ends, 94 Mich. L. Rev. 651, 671-72 (1995) ("As an early nationalist judge wrote, 'A comparison of the law with the constitution is the right of the citizen.'" (quoting United States v. The William, 28 F. Cas. 614, 615 (D. Mass. 1808) (No. 16,700))). As for the actual practice, see Keith E. Whittington, Judicial Review of Congress Before the Civil War, 97 Geo. L.J. 1257 (2009).

322 *McCulloch*, 17 U.S. (4 Wheat.) at 421.

323 Umberto Eco, Experiences in Translation 62 n.1 (Alastair McEwen trans., 2001).

324 Marshall, A Friend to the Union No. 2, supra note 258, at 96.

325 Id. Marshall's example shows why "incidental powers" and "means" seem not to be fully interchangeable concepts -- the carrying away is an incident of the growing, but it is not a means to the growing. Similarly, the power to declare war may carry with it, as an incident, the power to conclude a peace, see Natelson, supra note 311, at 63, but not even Clausewitz would call peacemaking a means for war. It may be that the incidental powers that *are* means are best supported by the Necessary and Proper Clause (they "carry into Execution"), while the incidental powers that are not means are best supported by the enumerated powers themselves. Compare Madison's statement that the meaning of the Necessary and Proper Clause is "limited to means *necessary* to the *end*, and *incident* to the *nature*, of the specified powers." Madison, supra note 228, at 372, 376. Note that Marshall did urge a sharp distinction between "incidental powers" and "means." John Marshall, A Friend of the Constitution, No. 2 (July 1, 1819), *reprinted in* Marshall's Defense, supra note 213, at 162-64; John Marshall, A Friend of the Constitution, No. 3 (July 2, 1819), *reprinted in* Marshall's Defense, supra note 213, at 171-74. This was in response to Roane's call for using only the former term. See Roane's "Hampden" Essays, No. 2 (June 15, 1819), *reprinted in* Marshall's Defense, supra note 213, at 122-24. There is a logic to Marshall's point, but it seems driven by tactics, because it conveniently let him sidestep some of Roane's arguments. See Marshall, A Friend of the Constitution, No. 4 (July 3, 1819), supra note 213, at 177-78 ("Can he already have forgotten that all his quotations and all his arguments apply to 'incidental' or 'additional' powers, not to the *means* by which powers are to be executed?"). Ultimately, though, the claims that Roane and Marshall were making about terminology were not consistent with the earlier debates, as can be seen from the variegated langauge used by Madison in the debate over the First Bank of the United States. See supra text accompanying note 269.

326 Marshall, A Friend to the Union No. 2, supra note 258, at 96.

327 The hypothetical appears in both Federalist No. 33 (Hamilton) and in A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 66-67 .

328 Marshall, A Friend to the Union No. 2, supra note 258, at 100 (quoting *McCulloch*, 17 U.S. (4 Wheat.) 316).

329 *See* United States v. Comstock, 560 U.S. 126, 160-61 (2010) (Thomas, J., dissenting) (interpreting *McCulloch* as distinguishing between "necessary" and "proper": "The means Congress selects will be deemed 'necessary' if they are 'appropriate' and 'plainly adapted' to the exercise of an enumerated power, and 'proper' if they are not otherwise 'prohibited' by the Constitution and not '[in]consistent' with its 'letter and spirit.'") (quoting *McCulloch*, 17 U.S. (4 Wheat.) 316)); Somin, supra note 195, at 150-51.

330 For another instance of this approach, see St. George Tucker's discussion of a hypothetical "law prohibiting any person from bearing arms, as a means of preventing insurrections." Tucker, supra note 262, at 289. This is exactly the sort of thing that the analysis in *Printz* and *NFIB* might suggest was "necessary" but not "proper." But Tucker says the courts "would be able to pronounce decidedly upon the constitutionality of these means" and they would do so "under the construction of the words necessary and proper." Id. The same hypothetical case was discussed by Roane, and he reached

a similar conclusion: disarming the people is not incidental to quelling insurrections. Roane's "Hampden" Essays, No. 3 (June 18, 1819), supra note 213, at 134-35.

331    Lawson & Granger, supra note 6, at 306 (footnote omitted); see also Somin, supra note 195, at 149 (reaching the same conclusion).

332    For arguments against seeing incidental-powers analysis primarily in terms of policy, see supra notes 301-05 and accompanying text.

333    Marshall, A Friend to the Union No. 2, supra note 258, at 91-105; see supra note 235.

334    *McCulloch*, 17 U.S. (4 Wheat.) at 423.

335    Id.

336    See Lawrence Lessig, Translating Federalism: United States v. Lopez, 1995 Sup. Ct. Rev . 125; Ernest A. Young, Making Federalism Doctrine: Fidelity, Institutional Competence, and Compensating Adjustments, 46 Wm. & Mary L. Rev. 1733 (2005). But cf. Bradford R. Clark, Translating Federalism: A Structural Approach, 66 Geo. Wash. L. Rev . 1161 (1998). A related but narrower question is whether it is important that *something* lies beyond federal power, even if the line being drawn is not itself otherwise persuasive. On that question in relation to the Necessary and Proper Clause, compare 1 Laurence H. Tribe, American Constitutional Law 798-99, 801-02 (3d ed. 2000), with Koppelman, supra note 196, at 115. More generally, see Powell, supra note 321; Richard Primus, The Limits of Enumeration, 124 Yale L.J. 576 (2014).

337    See supra Section III.G, especially the text accompanying notes 324-30.

338    E.g., Furman v. Georgia, 408 U.S. 238, 270 (1972) (Brennan, J., concurring) ("A punishment is 'cruel and unusual,' therefore, if it does not comport with human dignity.").

339    E.g., Harmelin v. Michigan, 501 U.S. 957, 976 (1991) (opinion of Scalia, J.).

340    An exception is *McCulloch*, but no attempt is made to align these readings with recent precedents.

341    132 S. Ct. 2566 (2012). If "proper" is not an independent requirement, the close fit between the individual mandate and the regulations of commerce in the Affordable Care Act would have made the mandate considerably less vulnerable to challenge.

342    317 U.S. 111 (1942). For *Wickard*'s treatment of the regulation of intrastate activity under the Necessary and Proper Clause, see Gardbaum, supra note 3, at 809.

343    521 U.S. 898 (1997). The arguments made against commandeering under "proper" might well fit within an analysis of incidental powers, but any such effort would have to come to terms with the potent historical critique in Wesley J. Campbell, Commandeering and Constitutional Change, 122 Yale L.J .1104 (2013).

344    Furman v. Georgia, 408 U.S. 238, 318 (1972) (Marshall, J., concurring) ("The use of the word 'unusual' in the final draft appears to be inadvertent.").

"NECESSARY AND PROPER" AND "CRUEL AND UNUSUAL"..., 102 Va. L. Rev. 687

345 Graber, supra note 1.

346 See Mark P. Gergen, John M. Golden, & Henry E. Smith, The Supreme Court's Accidental Revolution? The Test for Permanent Injunctions, 112 Colum. L. Rev . 203 (2012).

347 See Richard H. Fallon, Jr., The Fragmentation of Standing, 93 Tex. L. Rev . 1061 (2015).

348 See supra note 35.

349 Cf. Suzanna Sherry, Too Clever by Half: The Problem with Novelty in Constitutional Law, 95 Nw. U. L. Rev. 921 (2001).

350 Fowler's Dictionary, supra note 40, at ix; see also 1 P. Vergili Maronis Opera, with a Commentary by John Conington 236, n.192 (2d ed., rev. and corrected, London, Whittaker and Co. 1865) (figures of speech such as hendiadys "are not so much rules which the poets followed, as helps devised by the grammarians for classifying the varieties of language in which the poets indulged").

102 VALR 687

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

University of Michigan Journal of Law Reform

Volume 47

2013

# Knives and the Second Amendment

David B. Kopel
*Denver University, Sturm College of Law*

Clayton E. Cramer
*College of Western Idaho*

Joseph Edward Olson
*Hamline University School of Law*

Follow this and additional works at: https://repository.law.umich.edu/mjlr

 Part of the Second Amendment Commons, and the Supreme Court of the United States Commons

**Recommended Citation**
David B. Kopel, Clayton E. Cramer & Joseph E. Olson, *Knives and the Second Amendment*, 47 U. MICH. J. L. REFORM 167 (2013).
Available at: https://repository.law.umich.edu/mjlr/vol47/iss1/4

https://doi.org/10.36646/mjlr.47.1.knives

This Article is brought to you for free and open access by the University of Michigan Journal of Law Reform at University of Michigan Law School Scholarship Repository. It has been accepted for inclusion in University of Michigan Journal of Law Reform by an authorized editor of University of Michigan Law School Scholarship Repository. For more information, please contact mlaw.repository@umich.edu.

# KNIVES AND THE SECOND AMENDMENT

David B. Kopel,[1] Clayton E. Cramer[2] & Joseph Edward Olson[3]

*This Article is the first scholarly analysis of knives and the Second Amendment. Under the Supreme Court's standard in* District of Columbia v. Heller*, knives are Second Amendment "arms" because they are "typically possessed by law-abiding citizens for lawful purposes," including self-defense.*

*There is no knife that is more dangerous than a modern handgun; to the contrary, knives are much less dangerous. Therefore, restrictions on carrying handguns set the upper limit for restrictions on carrying knives.*

*Prohibitions on carrying knives in general, or of particular knives, are unconstitutional. For example, bans of knives that open in a convenient way (e.g., switchblades, gravity knives, and butterfly knives) are unconstitutional. Likewise unconstitutional are bans on folding knives that, after being opened, have a safety lock to prevent inadvertent closure.*

---

1. Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law. Research Director, Independence Institute, Denver, Colorado. Associate Policy Analyst, Cato Institute, Washington, D.C. Professor Kopel is the author of fifteen books and over eighty scholarly journal articles, including the first law school textbook on the Second Amendment: NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (Vicki Been et al. eds., 2012). Kopel's website is DAVE KOPEL, http://www.davekopel.org (last visited Aug. 20, 2013).

2. Adjunct History Faculty, College of Western Idaho. Mr. Cramer is the author of CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999) (cited by Justice Breyer in McDonald v. City of Chicago, 130 S. Ct. 3020, 3132 (2010) (Breyer, J., dissenting)), and ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE (2006), and co-author of, among other articles, Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 GEO. J.L. & PUB. POL'Y 511 (2008) (cited by Justice Scalia in District of Columbia v. Heller, 554 U.S. 570, 588 (2008)), and Clayton E. Cramer, Nicholas J. Johnson & George A. Mocsary, *"This Right is Not Allowed by Governments that Are Afraid of the People": The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823 (2010) (cited by Justice Alito in *McDonald*, 130 S. Ct. at 3039 n.21, 3041 n.25, 3043). Mr. Cramer's website is CLAYTON CRAMER'S WEB PAGE, http://www.claytoncramer.com (last visited Aug. 20, 2013).

3. Professor of Law, Hamline University School of Law, A.B. University of Notre Dame, J.D. (distinction) Duke University, LL.M. University of Florida. Professor Olson is the author of a book on federal taxation, thirteen articles in various fields, and four amicus briefs to the U.S. Supreme Court on Second Amendment issues, as well as co-author of Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 GEO. J.L. & PUB. POL'Y 511 (2008).

The authors thank Michael P. O'Shea, Eugene Volokh, Robert Dowlut, and Rhonda L. Thorne Cramer for their comments and suggestions.

## Introduction

Although Second Amendment cases and scholarship have focused on guns, the Second Amendment does not protect the right to keep and bear firearms. The Amendment protects "arms," of which firearms are only one category. Only about half of U.S. households possess a firearm, and many of those households have only one or two firearms.[4] In contrast, almost every household possesses several knives, not including table knives. This Article analyzes Second Amendment protection for the most common "arm" in the United States—the knife.

Part I explains the differences among various types of edged weapons. It covers bayonets, swords, folding knives, automatic knives, switchblades, gravity knives, butterfly knives, and the targets of knife control in the nineteenth century, namely Bowie knives and Arkansas Toothpicks. After a review of the knives, Part II provides criminological data in support of the intuitively obvious proposition that knives are less dangerous than guns. Part III then analyzes the important nineteenth century jurisprudence involving Bowie knives and Arkansas Toothpicks. Part IV concludes the background review for why knives, as weapons, are constitutionally protected arms and argues that the Second Amendment protects knives generally, thus including all of the knives discussed in the earlier parts (with the possible exception of the now-obscure Arkansas Toothpick).

Part V considers the various standards of review that have been used for Second Amendment cases after the Supreme Court's standard-setting decision in *District of Columbia v. Heller*. Applying even the weakest relevant standard of review, intermediate scrutiny, it seems clear that some knife laws are unconstitutional, namely: bans on knives that open in a convenient manner, such as switchblades, gravity knives, and butterfly knives; bans on folding knives that have a safety lock; and laws that restrict carrying knives more stringently than carrying handguns. Part VI of this Article bolsters the argument that knives are constitutionally protected arms and describes some of the more oppressive, and likely unconstitutional, knife control laws in various states and cities.

---

4. *Variable Owngun: Have Gun in Home*, General Social Survey, http://www3.norc.org/GSS+Website/Browse+GSS+Variables/Subject+Index/ (follow "G" hyperlink; then follow "Guns" hyperlink; then follow "Ownership" hyperlink; then follow "HAVE GUN IN HOME" hyperlink) (last visited Aug. 20, 2013) (when asked if they had a gun in their home, 44.3 percent of those polled said yes, 54.9 percent no, and 0.8 percent refused to answer); Gary Kleck, Point Blank: Guns and Violence in America 54 (1991).

## I. KNIVES BY TYPE

In the movie *Crocodile Dundee* (1986), when the hero is threatened by a New York City criminal with a switchblade, he says, "That's not a knife" and then pulls out a much larger blade and says, "*That's* a knife!"[5] Defining the different types of knives is a necessary first step because so much of the history of laws regulating knives is built around distinguishing which types of knives were regulated. Even so, the definition of many knife terms, as used in legislation and common parlance, is very unclear.

For modern general usage of the word knife, Wiktionary.com is a good guide. The website offers three definitions:

> 1. A utensil or a tool designed for cutting, consisting of a flat piece of hard material, usually steel or other metal (the blade), usually sharpened on one edge, attached to a handle. The blade may be pointed for piercing.
> 2. A weapon designed with the aforementioned specifications intended for slashing and/or stabbing and too short to be called a sword. A dagger.[6]
> 3. Any blade-like part in a tool or a machine designed for cutting, such as the knives for a chipper.[7]

This Article will ignore the third definition, which relates to the knives or blades in machines, such as wood-chippers. For the first definition (tools and utensils) and the second definition (short weapons), the physical description is the same; only the purpose of the knife is different. This Article focuses on "knife" as used in both the first and second definitions. In practice, most knives are suitable as tools and as weapons, but, of course, the reason that the Second Amendment is relevant to knives is their use as a weapon, which the first two definitions, and not the third, cover.

This Part presents an overview of knife use, the different types of knives, and how they are distinguished for legal and functional purposes. In addition, it details how many of the legal distinctions

---

5. Actually, the knife in the movie was a prop, and there was no real knife like it. In response to consumer demand, one company has started making a real knife that is a near-replica of the movie knife. *See* Fletcher Knives, *Crocodile Dundee Knife Finally in Production!!!!*, BLADEFORUMS.COM (May 1, 2010, 9:10 AM), http://www.bladeforums.com/forums/showthread.php/737272-Crocodile-Dundee-knife-finally-in-production!!!!. Of course, in New York City, carrying either of those knives is illegal. *See* N.Y.C., N.Y., ADMIN. CODE § 10-133 (2010).

6. In the interest of precision, it should be noted that a "dagger" is a type of knife; all daggers are knives, but most knives are not daggers.

7. *Knife*, WIKTIONARY, http://en.wiktionary.org/wiki/knife (last updated July 11, 2013, 10:19 PM).

between different types of knives are based on perception, rather than objective definitions related to public safety or the nature of the right to keep and bear arms.

### *A. Knives as Tools*

By far the most frequent use of a knife is as a tool. As the Oregon Supreme Court observed in 1984 while summarizing the history of knives in America, "[i]t is clear, then, that knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th century has been commonly carried by men in America and used primarily for work, but also for fighting."[8]

The twentieth century, the penknife was an essential accessory for every student or literate adult.[9] As the name suggests, the penknife was used for cutting and slitting a quill or sharpening a pencil.[10] Even after the steel pen rendered the quill obsolete, the term persisted for any small, folding pocketknife.[11] Schoolchildren frequently carried penknives, as is attested by the knife's frequent appearance in elementary school readers of the nineteenth century.[12] Of course, the penknife was also often used for the many other common purposes of knives.

Knives are important tools in many activities, such as hunting, where they are used by sportsman to fillet a fish or skin an animal. Many occupations continue to rely upon utility knives, such as

8. State v. Delgado, 692 P.2d 610, 614 (Or. 1984).

9. *See* Simon Moore, Penknives and Other Folding Knives 25–27 (1988); *see also* John Mason, Mason's First Home & School Reader 75–76 (1874); Charles W. Sanders, The School Reader: Third Book 58 (50th ed. 1846).

10. *See* Moore, *supra* note 9, at 25.

11. *Id.* at 27.

12. *See, e.g.*, Richard Edwards & J. Russell Webb, Analytical Third Reader 161 (1867); Mason, *supra* note 9, at 75–76; Lewis B. Monroe, The Fourth Reader 39–40 (1872); Sanders, *supra* note 9, at 58. As an anecdotal example of this, one of the authors has carried a pocketknife every day of his life since third grade in 1955. He has never given a moment's thought to the legality of this common practice.

roofers,[13] electricians,[14] and construction workers.[15] Knives are often part of combination tools that many Americans carry with them, such as Swiss Army knives and Leatherman Multi-Tools. However, knives with even the most utilitarian purposes, such as box cutters (with a one inch blade), can be used as weapons, as the hijackers demonstrated on 9/11.[16]

### *B. Bayonets*

A bayonet is designed to be mounted on the muzzle of a firearm.[17] Historically, some bayonets were just thrusting weapons with a point and without a sharpened edge.[18] Over the last century, bayonets have become shorter, shrinking from the size of a short sword to the size of a typical knife,[19] and modern bayonets have sharpened edges. Post-World War II designs evolved to recognize the more frequent use of the bayonet as a tool—for example, for opening ration cases or for use as a handheld weapon.[20] As a result, the

13. *See, e.g.*, BLACK & DECKER, THE COMPLETE GUIDE TO ROOFING & SIDING 58 (Brett Martin et al. eds., 2004). See *United States v. Irizarry*, 509 F. Supp. 2d 198 (E.D.N.Y. 2007), for details of a prosecution of a person that started when a police officer noticed that the defendant was carrying a "Husky Sure-Grip Folding Knife," which the defendant used at the direction of his employer "for cutting sheet rock." *Id.* at 199–203.

14. *See, e.g.*, GREG FLETCHER, RESIDENTIAL CONSTRUCTION ACADEMY: HOUSE WIRING 67 (2004) (describing use of a knife by electricians for opening boxes, stripping insulation, and as a substitute screwdriver for small screws).

15. *See, e.g.*, MYRON R. FERGUSON, DRYWALL: PROFESSIONAL TECHNIQUES FOR GREAT RESULTS 51 (Matthew Teague & Jessica DiDonato eds., 4th ed. 2012).

16. *Box Cutters Found on Other September 11 Flights*, CNN.COM (Sept. 24, 2001), http://archives.cnn.com/2001/US/09/23/inv.investigation.terrorism/.

17. Note that a rifle with a bayonet on it and without ammunition is functionally equivalent to a Roman spear or javelin. Both are arms.

18. *See* J.H. Bill, *Sabre and Bayonet Wounds; Arrow Wounds*, *in* 2 THE INTERNATIONAL ENCYCLOPEDIA OF SURGERY 101, 101 (John Ashhurst, Jr., ed., 1882) (discussing the nature of bayonet wounds and explaining that the edges of such wounds reflect the unsharpened nature of the edges).

19. *See* STEPHEN BULL, ENCYCLOPEDIA OF MILITARY TECHNOLOGY AND INNOVATION 36 (2004). Older bayonets, such as the World War I version designed for the Springfield 1903-A3 rifle, were thinner, lighter, seventeen-inch versions of the Roman gladius sword and could be used as a short sword. Military fashion in bayonets continued to evolve so that hundreds of thousands of these bayonets were cut down to eight inches in length for use during World War II on the M1 Garand rifle. *See* MARTIN J. BRAYLEY, BAYONETS: AN ILLUSTRATED HISTORY 228-35, 249 (2004); ANTHONY CARTER, THE BAYONET: A HISTORY OF KNIFE AND SWORD BAYONETS 1850–1970, at 115, 121 (1974).

20. *See, e.g.*, JOHN BURGESS, THE WAR COMES TO ME: AN AUTOBIOGRAPHIC HISTORY OF WORLD WAR II 45 (2007) (use of bayonet to open C-rations); HONDON B. HARGROVE, BUFFALO SOLDIERS IN ITALY: BLACK AMERICANS IN WORLD WAR II 136 (1985) (concerning use of bayonets and knifes as handheld weapons in combat).

blade design became shorter, wider, and thicker, playing multifaceted roles for the late-twentieth-century soldier.[21]

Although anything with a blade can be used as an offensive or defensive arm, World War II saw the introduction of the M4 bayonet, which was specifically designed to be useful as a handheld weapon.[22] In the post-Cold War era, bayonets were designed to serve not only as fighting knives but also as wire cutters, box cutters, or improvised pry bars.[23]

U.S. M9 BAYONET[24]

### C. Swords

A sword is "[a] long-bladed weapon having a handle and sometimes a hilt and designed to stab, cut or slash."[25] There is no precise distinction between a short sword and a long knife (such as a long bayonet). Indeed, the long, sharpened-edged bayonets of the late nineteenth and early twentieth centuries were called "sword bayonets."[26] An 1881 dictionary observed a change in social customs: a sword is "a blade of steel, having one or two edges, set in a hilt, and used with a motion of the whole arm. . . . In the [eighteenth] century every gentleman wore a sword; now the use of the weapon is almost confined to purposes of war."[27]

A person can look at a pocketknife, then look at a medieval broad sword with a forty-eight-inch blade, and readily identify which is the "knife" and which is the "sword." However, for intermediate blade length, the distinction is not so clear. What about a

21. *See* BULL, *supra* note 19, at 36 (discussing changing nature of the bayonet post-World War II).

22. *See* BRAYLEY, *supra* note 19, at 232; CARTER, *supra* note 19, at 121.

23. *See* BRAYLEY, *supra* note 19, at 249; BULL, *supra* note 19, at 36; FRED J. PUSHIES, WEAPONS OF DELTA FORCE 64 (2002).

24. From author Cramer's personal collection.

25. *Sword*, WIKTIONARY, http://en.wiktionary.org/wiki/sword (last updated July 11, 2013, 12:22 PM).

26. *See* B.E. Sargeaunt, *The History of the Bayonet*, 44 J. MILITARY SERVICE INST. U.S. 251, 255–56 (1909).

27. THOMAS WILHELM, A MILITARY DICTIONARY AND GAZETTEER 565 (rev. ed. 1881).

fixed blade knife with a fourteen-inch blade or an eighteen-inch machete?

As a Second Amendment issue, the knife/sword distinction is not particularly important. If the Second Amendment protects one, it protects the other.[28] This Article concentrates on knives, but most of the analysis applies equally to swords.

### *D. Folding Knives*

Many state and local regulations distinguish between fixed blade knives and folding knives,[29] possibly because of the misguided assumption that a fixed blade knife is a weapon whereas a folding knife is just a tool. Of course, many utility knives, such as those used for linoleum installation and wood veneering, are fixed blade, as are many sportsmen's knives and virtually all kitchen cutlery.[30]

Some folding knife laws make further distinction between knives that lock open and those that do not; some statutes put folding knives that lock in the same category as fixed blade knives.[31] Legislators may think that a locking, folding knife can be used as a weapon, whereas a folding knife that does not lock is a tool. The reason for this view is simplistic: a locking knife will not close on your hand when it meets resistance in a fight. While this is true, a locking knife also will not close on your hand when it meets resistance when used as a tool. The lock prevents the blade from closing on your fingers; this is equally important when roofing a house and when fighting for your life. The distinction between folding knives that lock and those that do not is therefore not a sound basis upon which to make distinctions of what is a weapon and what is a tool.

Furthermore, most folding knives possess the very useful feature that they can be opened with one hand, which is particularly advantageous when the other hand is otherwise occupied. The traditional

28. Just as handguns and long guns are both Second Amendment arms.

29. *E.g.*, KAN. STAT. ANN. § 21-6301(2) (2012) (prohibiting concealed carry of "a dagger . . . dangerous knife, straight-edged razor, [or] stiletto," but exempting "an ordinary pocket knife with no blade more than four inches in length").

30. *See, e.g.*, MIKE BURTON, VENEERING: A FOUNDATION COURSE 28 (rev. ed. 2006).

31. *Compare* CAL. PENAL CODE § 171b (West 2013) (locking folding knives and fixed blade knives where blade exceeds four inches prohibited in government buildings), *and id.* § 626.10(a) (fixed blade knives where the blade exceeds two and one half inches and locking folding knives, regardless of blade length, prohibited on primary and secondary school grounds), *with id.* § 626.10(b) (locking folding knives allowed on college campuses regardless of length, while fixed blade knives longer than two and one half inches prohibited on college campuses).

tall ships motto, "[o]ne hand for yourself and one for the ship,"[32] presents an obvious application for such a knife. Similarly, a rancher holding an animal's lead with one hand can use the other to open a knife and free the beast from an entanglement. This feature shows that folding knives, whether locking or not, can as easily be viewed as tools as they can be viewed as weapons.

In addition to distinctions between folding and fixed blade knives, precisely how the knife opens makes a great deal of difference in many state laws. For example, if the blade is opened by inserting a thumb into a small indentation, hole, or post near the top of the blade and pushing, then it is legally unrestricted in almost all jurisdictions.[33] If, after the thumb has begun pushing on the indentation to open the blade, a spring helps finish the job, then the knife is called an "assisted opening" (AO) knife.[34] Popular models of AO knives include the Kershaw Leek, Benchmade Torrent, and Buck Rush.[35] These knives are legally unrestricted under federal law and most state laws.

Suppose instead that the knife has a button in the handle, and when the button is pushed, a spring then pushes the blade open automatically. Then, the knife is called a "switchblade," which is one type of "automatic knife."[36] Under federal law and a minority of state laws, automatic knives face far greater restrictions.[37]

### *E. Automatic and Gravity Knives*

An automatic knife is biased towards opening via a spring; some type of latch or lock must keep the blade retained in the handle until needed. For example, when the switchblade knife is folded, the internal spring is always pressuring the blade towards opening. The blade is restrained by a latch or lock. When the user presses a button, the latch or lock is released. The blade automatically springs open and typically locks in the open position.

---

32. THE OXFORD DICTIONARY OF PROVERBS 146 (Jennifer Speake & John Simpson eds., 5th ed. 2008).

33. *See infra* notes 40–41, 50–52 and accompanying text.

34. *See* Actuating Opening System for Folding Knife, U.S. Patent No. 8,359,753 (filed Jan. 30, 2008).

35. *See, e.g.*, *Kershaw Assisted Openers & SpeedSafe Knives*, KERSHAW KNIVES DIRECT, http://www.kershawknivesdirect.com (follow "Assisted Openers" hyperlink under "Categories") (last visited Aug. 20, 2013).

36. *See* Commonwealth v. Lawson, 977 A.2d 583, 583 n.2 (Pa. Super. Ct. 2009) (explaining that automatic knives are forms of switchblades).

37. *See, e.g.*, 15 U.S.C. § 1241(b) (2006); 18 PA. CONS. STAT. ANN. § 908 (West 2013); HAW. REV. STAT. § 134–52 (2011).

A second automatic knife is the "out the front" knife (OTF). An OTF is not a folding knife.[38] When the button is pushed, the blade is pushed out the front of the handle by the spring. A third automatic knife is the gravity, or inertia, knife. This knife has no spring; the weighting of the blade and the absence of a bias towards closure are such that, as soon as a lock is released, gravity (if the tip of the knife blade is facing down) or a modest amount of centrifugal force will cause the blade to move into the open position.[39] Then, the blade must be manually locked into the open position or else it will slide back into the handle as soon as any force is applied (e.g., during cutting or thrusting).

Thus, there are three types of knives that are particularly easy to open with one hand: switchblade, out the front, and gravity. Of these, the first two are properly called "automatic knives." However, poorly written statutes create confusion about the definitions. The 1958 Federal Switchblade Act (FSA) limits the importability and interstate commerce of "switchblades."[40] Many state and local laws copy the federal definition.[41] Unfortunately, the federal definition of "switchblade" includes out the front knives, gravity knives, and real switchblades.[42]

Automatic knives were first produced in the 1700s,[43] with the earliest custom made for wealthy customers.[44] By the mid-nineteenth century, factory production of automatic knives made them affordable for ordinary consumers.[45] During World War II, American paratroopers were issued switchblade knives "in case they [became] injured during a jump and needed to extricate themselves from

38. *See* JERRY AHERN, ARMED FOR PERSONAL DEFENSE 77–78 (2010) (explaining how an "out the front" knife works).

39. *See* N.Y. PENAL LAW § 265.00(5) (2013). Gravity knives can be either out-the-front or side-openers. *See* RICHARD V. LANGSTON, THE COLLECTOR'S GUIDE TO SWITCHBLADE KNIVES 30 (2001).

40. 15 U.S.C. § 1242 (1958). Another statute prohibits possession of switchblade knives in territories, overseas, or in "Indian country," except for "any individual who has only one arm" and who uses a blade less than three inches in length. *Id.* §§ 1243–44. Some state laws prohibiting possession or carrying of switchblades also exempt any "one-armed person" from these prohibitions. *E.g.*, MICH. COMP. LAWS ANN. § 750.226a (West 2004).

41. *E.g.*, HAW. REV. STAT. § 134-52 (2011).

42. 15 U.S.C. § 1241(b) (1958). By interpretation, some state laws also cover butterfly knives, which are discussed *infra* Part I.F.

43. *See* LANGSTON, *supra* note 39, at 5–6.

44. *See id.* ("For the most part, these old (going back to the 1700s) mostly European (e.g., English, German, Spanish) knives were hand-produced custom pieces for the very rich, not factory made.").

45. *See id.* One of the first U.S. factories was the Waterville Cutlery Company, founded in 1843 in Waterbury, Connecticut. *Id.* at 7.

their parachutes."[46] The switchblade enabled them to cut themselves loose with only one hand.[47]

In the 1950s, there was great public concern about juvenile delinquency.[48] This concern was exacerbated by popular motion pictures of the day, such as *Rebel Without a Cause* (1955), *Crime in the Streets* (1956), *12 Angry Men* (1957), and *The Delinquents* (1957), as well as the very popular Broadway musical *West Side Story*. These stories included violent scenes featuring the use of automatic knives by fictional delinquents. Partly because of Hollywood's sensationalism, the public associated the switchblade with the juvenile delinquent, who would flick the knife open at the commencement of a rumble with a rival gang or some other criminal activity. This was an important part the origin of the many statutes imposing special restrictions on switchblades.[49]

Recently, there have been two attempts to blur the distinction between automatic knives and non-automatic knives. In 2009, U.S. Customs and Border Protection issued a new regulatory interpretation of the Federal Switchblade Act that would treat most one-hand opening folding knives as automatics.[50] This new interpretation contradicted decades of previous Customs interpretation of the federal switchblade statute and would have covered the non-automatic, assisted opening knives, which have an indentation, hole, or stud to assist opening as opposed to a button that activates a spring.[51] The proposed new interpretation caused such an uproar that Congress

---

46. United States v. Irizarry, 509 F. Supp. 2d 198, 204 (E.D.N.Y. 2007).

47. *Id.*

48. For a general analysis of the interaction between concerns about mass media and its perceived effects on juvenile delinquency in the 1950s, see JAMES GILBERT, A CYCLE OF OUTRAGE: AMERICA'S REACTION TO THE JUVENILE DELINQUENT IN THE 1950s (1986), and FRANKIE Y. BAILEY & DONNA C. HALE, POPULAR CULTURE, CRIME, AND JUSTICE (1998). For a differing point of view emphasizing a failure to understand teenage culture, see David Matza & Gresham M. Sykes, *Juvenile Deliquency and Subterranean Values*, 26 AM. SOC. REV. 712 (1961).

49. *See* GILBERT, *supra* note 48, at 160 (stating that switchblade laws were passed as a result of concerns over juvenile delinquency); THOMAS DOHERTY, TEENAGERS AND TEENPICS: JUVENILIZATION OF AMERICAN MOVIES 40 (rev. ed. 2002) (discussing the media focus on juvenile delinquency and switchblades).

50. *See* U.S. Customs & Border Prot., *Proposed Revocation of Ruling Letters and Revocation of Treatment Relating to the Admissibility of Certain Knives with Spring-Assisted Opening Mechanisms*, CUSTOMS BULL. & DECISIONS, May 22, 2009, at 5.

51. *See id.* A federal switchblade is a knife which "opens automatically . . . by hand pressure applied to a button or other device in the handle of the knife," or where gravity or inertia allows the blade to slide out of the handle. *See* 15 U.S.C. § 1241(b) (2006). New York State law refers to "centrifugal force" (not inertia) in the state definition. N.Y. PENAL LAW § 265.00(5) (2013). Both statutes are attempting to describe the same kind of knife.

quickly revised the federal statute to make it clear that non-automatic folding knives with a bias towards closure are not within the federal definition of "switchblade."[52]

As detailed below, Manhattan District Attorney Cyrus Vance, Jr. has been doing something similar with the New York State switchblade and gravity knife statute.[53] He has been bringing criminal cases against persons who possess, carry, or sell non-automatic folding knives with a bias towards closure and charging them with violation of the state's ban on gravity knives and switchblades. These prosecutions are abusive. Unfortunately, many persons or businesses charged under the statute have lacked the resources to fight the charges by bringing in expert witnesses who can explain knife mechanics to the court.[54] Thus, there have been many out-of-court settlements with retailers, from whom Vance's office has pocketed significant amounts of money.[55]

Partly because of Vance's prosecutions, some state legislatures are proactively preventing similar abuses. These legislatures have repealed their decades-old ban on switchblades, gravity knives, or other banned knives such as dirks, daggers, and stilettos.[56] Other legislatures have enacted preemption statutes that eliminate local

52. *See* Department of Homeland Security Appropriations Act of 2010, Pub. L. No. 111-83, sec. 562, § 4, 123 Stat. 2142, 2183 (2009) (codified at 15 U.S.C. § 1244 (2012)).

53. *See* Press Release, N.Y. Cnty. Dist. Attorney's Office, District Attorney Vance Announces Major Investigation of Illegal Knives in New York (June 6, 2010), *available at* http://www.kniferights.org/VancePressRelease062010.pdf; *Knife Rights Contests DA's Claims, Tactics in Knife Retailer Shakedown*, KNIFE RIGHTS, http://www.kniferights.org/index.php?option=com_content&task=view&id=113&Itemid=1 (last visited Oct. 3, 2013). *Cf.* United States v. Irizarry, 509 F. Supp. 2d 198, 209 (E.D.N.Y. 2007) (case arising from a police search of a workman who was seen carrying a Husky Sure-Grip Folding Knife).

54. *Manhattan District Attorney Shakes Down Honest Knife Retailers*, KNIFE RIGHTS, http://www.kniferights.org/index.php?option=com_content&task=view&id=113&Itemid=1 (last visited Oct. 3, 2013). For a civil rights lawsuit based on the Vance prosecutions, see Complaint, *Knife Rights, Inc. v. Vance*, 2011 WL 7567075 (S.D.N.Y. 2011) (No. 11 CV 3918). However, Vance has not exclusively targeted the legally defenseless. *See* Press Release, N.Y. Cnty. Dist. Attorney's Office, *supra* note 53.

55. *Manhattan District Attorney Shakes Down Honest Knife Retailers*, *supra* note 54.

56. *See* H.R. 1665, 2010 Gen. Ct., Reg. Sess. (N.H. 2010) (removing all references to knives in section 159:16 of the New Hampshire Code, which prohibits the carrying of certain weapons); S. 489, 96th Gen. Assemb., 2d Reg. Sess. (Mo. 2012) (repealing switchblade ban in section 571.020 of the Missouri Code); H.R. 2347, 62nd Leg., Reg. Sess. (Wash. 2012) (narrowing and clarifying definition of "spring-blade" knives in section 9.41.250 of the Washington Code); H.R. 2033, 2013 Leg., Reg. Sess. (Kan. 2013) (preempting local ordinances, plus repealing ban on switchblades, dirks, daggers, and stilettos); H.R. 33, 28th Leg., Reg. Sess. (Alaska 2013) (preempting local ordinances; repealing ban on switchblades); H.R. 1563, 118th Gen. Assemb., 1st Reg. Sess. (Ind. 2013) (repealing ban on switchblades); H.R. 1862, 83d Leg., Reg. Sess. (Tex. 2013) (repealing ban on switchblades).

Narrowly defined, a stiletto has "one slender bayonet-type blade with the point area back to about one-third of the blade" and is partially or fully double-edged. Historically, it was particularly popular in Italy, France, Spain, and Germany. LANGSTON, *supra* note 39, at 26.

bans on switchblades and other local knife ordinances that are more restrictive than state law.[57]

### *F. Butterfly Knives*

Butterfly knives, also known as balisongs, are sometimes named explicitly in state or local knife laws and are occasionally considered to fall within a state or local definition of "switchblade."[58] A butterfly knife consists of two handle sections that, when the knife is closed, completely cover the blade.

A BUTTERFLY KNIFE OPEN AND CLOSED[59]

By holding one handle and rotating the other handle away from the closed position, it is possible to open the knife and bring the two handles together. The handles may then lock together, although not all do. In some states, the lock is the difference between

57. *See* S. 1015, 108th Gen. Assemb., Reg. Sess. (Tenn. 2013); *supra* note 54.

58. *See, e.g.*, State v. Riddall, 811 P.2d 576, 578–80 (N.M. Ct. App. 1991) (holding that a balisong is a switchblade as defined by New Mexico statute); People v. Quattrone, 260 Cal. Rptr. 44, 44 (Cal. Ct. App. 1989) (holding that a balisong was a switchblade under California statute). *But see, e.g.*, Taylor v. McManus, 661 F. Supp. 11, 14 (E.D. Tenn. 1986) (ruling that balisongs are not switchblades under federal law); State v. Strange, 785 P.2d 563, 566 (Alaska Ct. App. 1990) (ruling that balisongs are neither switchblades nor gravity knives); People v. Mott, 522 N.Y.S.2d 429, 430 (N.Y. Cnty. Ct. 1987) (ruling that balisongs are not gravity knives).

59. Photograph supplied by Knife Rights, Inc.

a legal and an illegal knife.[60] Many experts believe that a butterfly knife is the strongest and safest folding knife because the blade cannot fold closed inadvertently on the operator so long as the operator has a firm grasp on the handles.[61] In contrast, a lock-blade folding knife can experience a lock failure, although this is rare for well-constructed knives.

An experienced operator can also flip the butterfly handle into the open position using only one hand. Like the switchblade, the butterfly knife's use in movies has given it an undeserved reputation as a criminal's weapon.[62] As with the switchblade, opening one is visually interesting and frightening to some persons unfamiliar with knives, creating a belief that it is an extremely dangerous weapon necessitating special legislative attention.[63]

All the knives described above are primarily tools, although they can also be used as weapons. Conversely, knives may be designed as weapons but used primarily as tools. A judge or juror's perception of the purpose of a knife may be quite different from the owner's or the designer's perception. The knives discussed below, however, are ones that some governments have historically believed to need special regulation or prohibition.

### *G. Bowie Knives and Arkansas Toothpicks*

America's first period of knife control was in 1837–1840, when the nation experienced a panic over the Bowie knife and the Arkansas Toothpick.[64] This Section discusses the knives' historical use, while the strange legal history of Bowie knives and Arkansas Toothpicks in the nineteenth century is detailed below in Part III.

---

60. *See, e.g.*, Taylor, 661 F. Supp. at 14–15 (holding that the required step of locking the knife into an open position takes it out of the category of automatic knives).

61. *See Paradox*, COLD STEEL, http://www.coldsteel.com/Product/24P/PARADOX.aspx (last visited Aug. 20, 2013) ("They are designed to rotate 180 degrees around the blade's unique split tang and use strong opposing spring tension to lock the blade open or hold it firmly closed. Don't worry about it taking two hands to get it into action, since once it's opened it will never close inadvertently.").

62. For a representative list of films in which balisongs are used, see *Balisongs in the Movies*, BALISONGCOLLECTOR.COM, http://www.balisongcollector.com/movies.html (last visited Aug. 20, 2013).

63. *See* Michael Burch, *Butterfly Knives Take Wing*, 28 KNIVES 26, 26, 30 (2008).

64. *See* CLAYTON E. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC 85–96, 105–12 (1999) (discussing the tragedies and breathless newspaper coverage associated with this panic).

The Bowie knife became famous when used by Colonel Jim Bowie at the "Sandbar Fight" by the lower Mississippi River on September 19, 1827.[65] Rezin Bowie, Colonel Jim's brother, was the actual maker of the knife. He described his creation thusly: "The length of the knife was nine and a quarter inches, its width one and a half inches, single-edged, and blade not curved."[66] According to Rezin, the knife was designed for bear hunting.[67] Based on the known details of Rezin's knife, absolutely nothing about it was novel. Its fame soon made this style of knife in high demand and increasingly popular.[68]

Yet, the knife gained such popularity that many people use "Bowie knife" to describe knives that have curved blades or blades much longer than nine inches.[69] Today, a common description of the "Bowie knife" is a large fixed blade (almost always much longer than Rezin's nine inch long blade), sharpened on one edge (per Rezin's original model), with a relatively thick spine and a clip point.[70] This modern usage does not describe Rezin Bowie's original knife. Ironically, it also does not describe the custom knives that professional cutlers later produced for Rezin or Jim Bowie.[71]

The problem of the Bowie knife's notoriety as a fighting knife extends back to the first weeks after the Sandbar Fight. Newspaper and magazine reports of the event were often highly inaccurate.[72] The term "Bowie knife" entered the American vocabulary from these reports and then crossed the Atlantic. American and English manufacturers began using the term for a wide variety of large knives. Some knives had clip points, and others did not; some were straight, and others were curved; some were single-edged, and others were double-edged; some had crossguards, and others did not. There was also great variance in length. The only thing these knives had in common was that they were big, and all of them were considered particularly suitable for self-defense and hunting.[73] Historian Norm Flayderman, an expert in Bowie and other knives,

65. *See* RAYMOND W. THORP, BOWIE KNIFE 6–8 (1948); NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING AN AMERICAN LEGEND 285–89 (2004).

66. R.P. Bowie, *Letter to the Editor*, PLANTER'S ADVOCATE, Aug. 24, 1838, *reprinted in* MARRYAT, 1 A DIARY IN AMERICA, WITH REMARKS ON ITS INSTITUTIONS 291 (1839).

67. *Id.*

68. *See* FLAYDERMAN, *supra* note 65, at 491–92.

69. *See* Sears v. State, 33 Ala. 347, 348 (1859); J.R. EDMONDSON, THE ALAMO STORY: FROM EARLY HISTORY TO CURRENT CONFLICTS 122–23 (2000).

70. *See* Jim Woods, *How to Pick a Perfect Knife*, POPULAR MECHANICS, Aug. 1982, at 78, 78–80.

71. *See* FLAYDERMAN, *supra* note 65, at 491–92.

72. *See id.* at 289–91.

73. *See id.* at 490–92.

both antique and modern, concludes that "there is no one specific knife that can be exactingly described as a Bowie knife."[74]

Today, several states outlaw carrying a "Bowie knife" without defining the term.[75] Thus, today's citizens who are subject to Bowie knife laws have no way of knowing whether they are forbidden to carry a straight knife that closely matches Rezin Bowie's design or the curved knives that are commonly called "Bowie knives." The state's definition may even include a knife that is neither, but has the words "Bowie Knife" written on it.[76] The chilling effect of this vagueness is obvious.

The Arkansas Toothpick's history is interwoven with that of the Bowie knife. There are some Mississippi tax receipts from the antebellum era, as well as some other writings, which expressly distinguish an "Arkansas Toothpick" from a "Bowie knife."[77] Narrowly defined, Arkansas Toothpicks have triangular blades up to eighteen inches long, sharpened on both edges.[78]

ARKANSAS TOOTHPICK[79]

However, Flayderman concludes that "Arkansas Toothpick" was, in its predominant usage, simply another marketing term for "Bowie knife."[80]

## II. CRIMINOLOGICAL CONSIDERATIONS: IS A KNIFE MORE DANGEROUS THAN A GUN?

Under the Supreme Court's decision in *District of Columbia v. Heller*, handguns, as a general class, are protected by the Second

74. *Id.* at 490.

75. *See* ALA. CODE § 13A-11-50 (LexisNexis 2005); GA. CODE ANN. § 16-11-127.1 (2011); ME. REV. STAT. ANN. tit. 25, § 2001-A (2012); MISS. CODE ANN. § 97-37-1 (2012); N.C. GEN. STAT. § 14-269 (2011); OKLA. STAT. tit. 21, § 1272 (2011); R.I. GEN. LAWS § 11-47-42 (2012); TEX. PENAL CODE ANN. § 46.01 (West 2012); VA. CODE ANN. § 18.2-308 (2009).

76. *See generally* FLAYDERMAN, supra note 65, at 490.

77. *Id.* at 265–66.

78. *See* WILLIAM FOSTER-HARRIS, THE LOOK OF THE OLD WEST 120–22 (2007).

79. Drawing by Rhonda L. Thorne Cramer.

80. FLAYDERMAN, *supra* note 65, at 265–74.

Amendment.[81] This is so notwithstanding the frequent use of handguns in violent crimes, including homicide. *Heller* acknowledged that, even though handgun misuse represents a major public safety problem, "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."[82] If handguns may not be prohibited, in spite of the clear public safety concerns, then a category of arm that is less dangerous clearly may not be prohibited, either.

Are knives more dangerous than guns? Quite the opposite. In 2010, "[k]nives or cutting instruments" were used in 13.1 percent of U.S. murders, behind firearms (67.5 percent) and handguns specifically (46.2 percent), but ahead of blunt objects (4.2 percent), shotguns (2.9 percent), and rifles (2.8 percent).[83] The thirteen percent includes *all* knives, including steak knives, butcher knives, linoleum knives, and other "cutting instruments," such as screwdrivers (sharpened and otherwise), straight razors, and other instruments made into weapons by the inventiveness of criminals.[84]

Robberies for which the FBI has detailed information are overwhelmingly committed with firearms (47.9 crimes/100,000 people), not knives or other cutting instruments (9.1/100,000).[85] Knives and other cutting instruments are actually in last place in the FBI statistics for robbery, even behind "other weapon."[86] Similarly, in the category of aggravated assault, sharp objects are in last place for weapon type (47.9/100,000 people), behind firearms (51.8), personal weapons (69.0), and other weapons (83.3). [87]

81. District of Columbia v. Heller, 554 U.S. 570, 628–29 (2008) ("The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster.") (quoting Parker v. District of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007)).

82. *Id.* at 2822 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution.")

83. *See Crime in the United States 2010, Expanded Homicide Data Table 11*, FBI, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10shrtbl11.xls (last visited Aug. 20, 2013). For some homicides, the type of firearm is unknown, which is why the "firearm" figure is higher than the figures for handguns, rifles, and shotguns added together.

84. *See id.*

85. *Crime in the United States 2010, Table 19*, FBI, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl19.xls (last visited Aug. 20, 2013).

86. *Id.*

87. *Id.*

Unsurprisingly, data show that gunshots are more lethal than knife wounds. Harwell Wilson and Roger Sherman's 1960 study of hospital admissions for abdominal wounds found that abdominal stabbing cases ended in death 3.1 percent of the time, while 9.8 percent of abdominal gunshot wounds were lethal.[88] An examination of 165 family and intimate assaults (FIA) in Atlanta, Georgia in 1984 found similar results. Firearms-associated FIAs were three times more likely to result in death than "FIAs involving knives or other cutting instruments."[89]

Another study examined all penetrating traumas ("firearm or stabbing injury") in New Mexico that "presented to either the state Level-1 trauma center or the state medical examiner" from 1978 to 1993.[90] This study found that, although nonfatal injury rates were similar for firearms and stabbing (34.3 per 100,000 persons per year for firearms, 35.1 per 100,000 persons per year for stabbing), firearm fatality rates were much higher than for knives: 21.9 vs. 2.7.[91] In other words, thirty-nine percent of firearm penetrating traumas were fatal, compared to 7.1 percent of knife penetrating traumas. Thus, firearm injuries were 5.5 times more likely to result in death than were knife injuries. Not all of the penetrating traumas in New Mexico were criminal attacks. Fifty-five percent of the penetrating deaths were suicides, and four percent of the penetrating deaths were accidents. There was insufficient information to determine the breakdown of weapon type by category.[92]

Knives in general are far less regulated than firearms. There are no mandatory background checks, no prohibitions on interstate sales (except for switchblades),[93] and no serial number requirements. The least expensive knives are considerably less expensive than the cheapest firearms.[94] Only about half of American homes

88. Harwell Wilson & Roger Sherman, *Civilian Penetrating Wounds of the Abdomen*, 153 ANNALS SURGERY 639, 640 (1961).

89. Linda E. Saltzman et al., *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 JAMA 3043, 3043 (1992).

90. Cameron Crandall et al., *Guns and Knives in New Mexico: Patterns of Penetrating Trauma, 1978–1993*, 4 ACAD. EMERGENCY MED. 263, 263 (1997).

91. *Id.*

92. *Id.* at 264. As for the remaining firearm deaths classified as "homicide," about six to twelve percent of them were probably justifiable homicides committed with firearms by persons who were not law enforcement officers. This is calculated by multiplying the 7.1–12.9 percent of civilian legal defensive homicides by the percentage of those homicides committed with firearms. KLECK, *supra* note 4, at 114, 148. It is unknown whether a similar percent of the knife homicides were justifiable.

93. *See* 15 U.S.C. § 1242 (2006).

94. Searching Amazon.com on September 29, 2012 found more than 298 matches for "combat knife" under 25 dollars, and 114 matches under 10 dollars. By comparison, even the cheapest single-shot .22 rifles (which would only be used by *very* stupid criminals) at the

have a gun, but almost every home has several knives, including tools, steak knives, and butcher knives. At the same time, these easily obtained arms are used far less often than firearms for murder, robbery, and aggravated assault. Thus, knives are far less dangerous than guns. Any public safety justification for knife regulation is necessarily less persuasive than the public safety justification for firearms regulation.

## III. BOWIE KNIVES AND THE NINETEENTH CENTURY CASES

During the nineteenth century, Bowie knives were commonly present in many areas of the United States. Contemporary sources leave no question that Bowie knives, Arkansas Toothpicks, and similar knives were a common part of American life until well after the Civil War—and not just for decoration, hunting, or slicing tough cuts of meat.[95] "[F]or those crossing the plains," such knives were "a necessity."[96] An account of Gold Rush California describes how masquerade balls in California would generally have "No weapons admitted" signs at the entrance.[97] An observer tells us that:

> [I]t was worth while to go, if only to watch the company arrive, and to see the practical enforcement of the weapon clause. . . . Most men draw a pistol from behind their back, and very often a knife along with it; some carried their bowie-knife down the back of the neck, or in their breast; demure, pious looking men . . . lifted up the bottom of their waistcoast, and revealed the butt of a revolver; others, after having already disgorged a

---

Cabela's website on the same date was $99.99. The cheapest repeating .22 rifle, the Mossberg 702 Plinkster, was $139.99.

95. A few representative articles of the period illustrating the widespread violence associated with edged weapons (along with many other deadly weapons) include: *Scenes at New Orleans*, THE LIVING AGE, Oct.–Dec. 1852, at 528; *Editor's Easy Chair*, 11 HARPER'S NEW MONTHLY MAG. 411, 411–12 (1855); MARRYAT, *supra* note 66, at 106–10; *Colonel Bowie and his Knife*, TEMPLE BAR, July 1861, at 120; GEORGE COMBE, 2 ON THE UNITED STATES OF NORTH AMERICA 93–95 (1841); AMERICAN ANTI-SLAVERY SOCIETY, AMERICAN SLAVERY AS IT IS 202–05 (1839). Among the well-known authors whose writings about America during this period included mention of Bowie knives were: CHARLES DICKENS, AMERICAN NOTES (1842) and GREAT EXPECTATIONS (1861); OLIVER WENDELL HOLMES, AUTOCRAT OF THE BREAKFAST TABLE (1857) (Americans are the "Romans of the modern world . . . our army sword is the short, stiff pointed gladius of the Romans; and the American bowie knife is the same tool, modified to meet the daily want of civil society."); JULES VERNE, FROM THE EARTH TO THE MOON (1st English ed. 1873) (1865); Bret Harte, *The Outcasts of Poker Flat*, OVERLAND MONTHLY, Jan. 1869; MARK TWAIN, ROUGHING IT (1872); *all cited in* FLAYDERMAN, *supra* note 65, at 72–73.

96. FLAYDERMAN, *supra* note 65, at 88.

97. J.D. Borthwick, *Three Years in California*, 2 HUTCHINGS' ILLUSTRATED CAL. MAG. 169, 171 (1857).

> pistol, pulled up the leg of their trousers, and abstracted a huge bowie-knife from their boot; and there were men, terrible fellows, no doubt, but who were more likely to frighten themselves than any one else, who produced a revolver from each trouser pocket, and a bowie knife from their belt. If any man declared that he had no weapon, the statement was so incredible that he had to submit to be searched.[98]

During the 1850s, because of conflict in the Territory of Kansas between free soil and pro-slavery settlers, anti-slavery groups in New England sent arms to the free soilers, including rifles, revolvers, and Bowie knives.[99]

An important reason that the Bowie knife was typically possessed for self-defense was that it was, in some respects, superior to firearms. The black gunpowder used in the early and mid-nineteenth century was vulnerable to atmospheric moisture. At close quarters, a single-shot firearm has obvious limitations for self-defense. The widespread adoption of the metallic cartridge in the late 1850s, and the Colt's multi-shot revolvers in the 1840s, solved some of these problems, though it was not until the mid-1860s that medium caliber (.38 or larger) firearms with metallic cartridges became common. Before then, the Bowie knife often had a better chance than the handgun of stopping a criminal attacker; at least, a prudent defender would often want to carry a Bowie as a back-up arm.[100]

About a decade after the first appearance of the Bowie knife, some southern states began passing laws against the knife. Alabama imposed a one hundred dollar tax on the transfer of any Bowie knife or Arkansas Toothpick[101]—the equivalent of at least $5,000 in today's money.[102] In 1837, Tennessee prohibited carrying such

---

98. *Id.*

99. *See* FLAYDERMAN, *supra* note 65, at 106 (citing WILLIAM ELSEY CONNELLEY, THE LIFE OF PRESTON B. PLUMB, 1837–1891 (1913)) (three-term U.S. Senator from Kansas recalls receiving a shipment including 250 Bowie knives); David B. Kopel, *Beecher's Bibles*, *in* 1 GUNS IN AMERICAN SOCIETY: AN ENCYCLOPEDIA OF HISTORY, POLITICS, CULTURE, AND THE LAW 58 (Gregg Lee Carter ed., 2d ed. 2012).

100. *See* FLAYDERMAN, *supra* note 65, at 485–87.

101. An Act To Suppress the Use of Bowie Knives, no. 11, 1837 Ala. Acts Called Sess. 7 (1837).

102. The price of gold in 1840 was fixed at $20.67 per ounce. STATISTICAL ABSTRACT OF THE UNITED STATES 863 (1942). As of June 2, 2013, gold price was $1,387 per ounce, a 6,710 percent increase. *See* GOLDPRICE, http://goldprice.org/. While gold price change alone is not a completely effective measure of price inflation because of changes in production efficiencies, it is at least a good starting point for a proxy.

knives.[103] An attempt to add pistols to the 1838 Tennessee bill failed.[104]

This attempt to regulate knives produced several nineteenth century cases involving Bowie knives.[105] These cases mostly followed the Tennessee Supreme Court's 1840 case, *Aymette v. State*,[106] which was wrong on its facts and later specifically repudiated by *Heller*.[107] The Tennessee Supreme Court in *Aymette* upheld the ban on the concealed carry of Bowie knives and Arkansas Toothpicks, holding that the Tennessee Constitution's guarantee of a right to keep and bear arms for the common defense "does not mean for *private defence*, but being armed, they may as a body, rise up to defend their just rights, and compel their rulers to respect the laws."[108] According to *Aymette*, the Bowie knife was not suitable for "civilized warfare" but was instead favored by "assassins" and "ruffians."[109] Significantly, the

---

103. An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, 22 Tenn. Gen. Assemb. Acts 200 (1838).

The Bowie knife was also banned in Arkansas. The ban was repealed on February 5, 1973 in "emergency" legislation, which declared that knife manufacturing "has brought much favorable publicity to this State, that the prohibitions placed upon the sale of Bowie knives are unneeded . . . [and] that that immediate removal of such restrictions would have a favorable impact upon the economy of this state. Therefore an emergency is hereby declared to exist, and this act being necessary for the preservation of the public peace, health and safety . . . ." FLAYDERMAN, *supra* note 65, at 280.

104. *Tennessee Legislature*, DAILY REPUBLICAN BANNER (Nashville), Jan. 13, 1838, at 2.

105. One of the first problems encountered by the anti-Bowie laws was vagueness. In *Haynes v. State*, the Tennessee Supreme Court dealt with the complaint that the statute was vague and overbroad. 24 Tenn. (5 Hum.) 120, 122 (1844). The Tennessee statute applied to "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick . . . ." Ch. 137, 22 Tenn. Gen. Assemb. Acts 200.

The defendant, Stephen Haynes, was charged in Knox County with carrying "concealed under his clothes, a knife in size resembling a bowie-knife." At trial, the witnesses disagreed about whether Haynes's knife was a Bowie knife. Some said that it was too small and too slim to be a Bowie knife and would properly be called a "Mexican pirate-knife." The jury found Haynes innocent of wearing a Bowie knife but guilty on a second charge "of wearing a knife in size resembling a bowie-knife." *Haynes*, 24 Tenn. (5 Hum.) at 120–21.

The Tennessee Supreme Court agreed that the legislature could not declare "war against the name of the knife" alone. A strict application of the letter of the law might well result in some injustices: "for a small pocket-knife, which is innocuous, may be made to resemble in form and shape a bowie-knife or Arkansas tooth-pick" and would thus be illegal. The court concluded that the law must be construed "within the spirit and meaning of the law" and relied on the judge and jury to make this decision as a matter of fact. *Haynes*, 24 Tenn. (5 Hum.) at 122–23.

106. Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).

107. *See* District of Columbia v. Heller, 554 U.S. 570, 613 (2008).

108. *Aymette*, 21 Tenn. (2 Hum.), at 157–58 (1840).

109. *See id.* at 158–60. The entire decision in *Aymette* is guided by Tennessee's narrow arms provision: "[T]he words that are employed must completely remove that doubt. It is declared that they may keep and *bear* arms for their *common defence*." *Id.* at 158. The opinion repeatedly ties the right solely to the "common defence."

Tennessee Constitution's guarantee, unlike the Second Amendment, contains the qualifying phrase, "for their common defence," which the U.S. Senate considered and rejected for the Second Amendment.[110]

The other major nineteenth century Bowie knife precedent, which is not part of the *Aymette* line, comes from Texas. In 1859, the Texas Supreme Court, in *Cockrum v. State*, ruled that, under the Texas Constitution's right to arms and the Second Amendment, "[t]he right to carry a bowie-knife for lawful defense is secured, and must be admitted."[111] At the same time, the court upheld enhanced punishment for manslaughter perpetrated with a Bowie knife.[112] The court elaborated on the Bowie knife:

> It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is *the instrument of almost certain death*.[113]

A plausible explanation for this perception of the Bowie knife as "the instrument of almost certain death" is that it made a bloody mess of a person because of the size of its blade. This is especially true when compared to a pen-knife or dagger, but even more so when compared to a bullet (which had almost surgical, cosmetic consequences during the low velocity, black powder era). Hence, the Bowie Knife was a relatively gruesome weapon.[114]

Additionally, the judicial and legislative fear of Bowie knives may have come from concerns about poor people or people of color. As

*Aymette* is the urtext for the "civilized warfare" interpretation of the right to keep and bear arms, by which all persons have a right to own arms, but only arms which are useful for militia purposes. For a sympathetic treatment of the nineteenth century's "civilized warfare" cases, see Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 AM. U. L. REV. 585, 642–50 (2012).

110. S. JOURNAL, 1st Cong., 1st Sess. 129 (1789).

111. Cockrum v. State, 24 Tex. 394, 402 (1859).

112. *Id.* at 403.

113. *Id.* at 402–03 (emphasis added).

114. Even modern high velocity bullets, while producing large hydrostatic expansions within a person, produce exit wounds only two to three times the diameter of the entry wound. *See* Martin L. Fackler, *Wound Profiles*, WOUND BALLISTICS REV., Fall 2001, at 25 (examining damage in living tissue measured in experiments at the Letterman Army Institute of Research, Wound Ballistics Laboratory).

the defendant's attorney argued before the Texas Supreme Court in *Cockrum*:

> A bowie-knife or dagger, as defined in the code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen. A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.[115]

Some other state supreme court decisions picked up where *Aymette* left off, holding that some knives are not militia arms. In *English v. State*, the Texas Supreme Court apparently forgot the *Cockrum* decision and justified a ban on "the carrying of pistols, dirks [a short dagger], and certain other deadly weapons" by arguing that these are not arms of the militia: "The terms dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives, belong to no military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline."[116] *English* cites no authority for its claim with respect to the military use of the knives of various sorts, and the claim appears to be false.[117] Similar to *Aymette*, *English* recognized that bayonets and swords, unlike the knives in question, were "arms" protected by the Second Amendment.[118]

Similarly, the West Virginia Supreme Court of Appeals in *State v. Workman* held that the arms protected by the Second Amendment:

> must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets—arms to be used in defending the State and civil liberty—and not to pistols, bowie-knives, brass knuckles, billies, and such other weapons as are usually employed in brawls, street-fights, duels,

115. Cockrum, 24 Tex. at 395–96.

116. English v. State, 35 Tex. 473, 473, 477 (1872).

117. *Id.* at 477–78. For use of the bowie knife as a militia arm, see *infra* notes 124–28 and accompanying text.

118. *English*, 35 Tex. at 476 ("The word 'arms' in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine . . . .")

> and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the State.[119]

*Heller* held that *Aymette* "erroneously, and contrary to virtually all other authorities," read the right to keep and bear arms as limited to the threat to overthrow a tyrannical government.[120] *Heller* repudiated *Aymette* and its progeny, *English* and *Workman*. Moreover, even if *Heller* had adopted *Aymette*'s rule that there is an individual right to own all militia-suitable arms, the Bowie knife is a militia arm. It may not have been standard equipment for the Tennessee militia in 1840, but there is plenty of evidence of its militia use in the rest of the United States.

The Republic of Texas won its independence from Mexico at the Battle of San Jacinto on April 21, 1836. At the decisive phase of the battle, the 700 Texas volunteers were storming the Mexican breastworks. The fighting was hand-to-hand. The Texans had broken their rifles by using them as clubs against the standing army of the Mexican dictator, Antonio Lopez de Santa Anna Perez de Lebron. The Texans next fired their pistols, but had no time to reload. The Texans, "then drawing forth their bowie-knives, literally cut their way through dense masses of living flesh."[121] The Mexican army, "unused to this mode of combat with huge Bowie-knives and the buts [sic] of guns, precipitately gave way; and while the shouts of Goliad and the Alamo rung in their ears, nearly one-half of the Mexican army was laid asleep in . . . death."[122] In an eighteen-minute battle, Texas became a nation.[123]

Bowie knives were most clearly militia arms during the Civil War:

> The Mississippi Riflemen . . . [i]n addition to their rifle, . . . carried a sheath-knife, known as the bowie-knife. . . . This is a formidable weapon in a hand-to-hand fight, when wielded by men expert in its use, as many were in the Southwestern States,

---

119. State v. Workman, 14 S.E. 9, 11 (W. Va. 1891).

120. District of Columbia v. Heller, 554 U.S. 570, 613 (2008).

121. CHARLES EDWARDS LESTER, SAM HOUSTON AND HIS REPUBLIC 97 (1846), *quoted in* FLAYDERMAN, *supra* note 65, at 59.

122. EDWARD STIFF, THE TEXAN EMIGRANT 324–25 (1840), *quoted in* FLAYDERMAN, *supra* note 65, at 64. Goliad was the site of another battle, where Santa Anna had murdered 280 American prisoners.

123. *See generally* STEPHEN L. MOORE, EIGHTEEN MINUTES: THE BATTLE OF SAN JACINTO AND THE TEXAS INDEPENDENCE CAMPAIGN (2003).

> where it was generally seen in murderous frays in the streets and bar-rooms.[124]

Other Mississippi militiamen were "armed with the rifles, shot-guns, and knives which they had brought from their homes."[125] As further evidence of the prevalence of Bowie knives among Civil War soldiers, below are contemporary drawings of crudely made daggers and Bowie knives that were "in common use among the insurgent troops from the Mississippi region."[126]

WEAPONS OF THE INSURGENTS. [127]

While the then-Southwest (Mississippi, Louisiana, Arkansas, and Texas) was the Bowie knife's original territory, the knife was ubiquitous on both sides of the Civil War, carried by soldiers from every part of the nation.[128] The claims of *Aymette* and *Workman* that knives were not militia arms are clearly erroneous.

---

124. BENSON J. LOSSING, 1 PICTORIAL HISTORY OF THE CIVIL WAR IN THE UNITED STATES OF AMERICA 479 n.2 (1866).

125. *Id.* at 541 n.2.

126. *Id.*

127. *Id.* Other accounts referencing soldiers carrying Bowie knives, without apparently being in violation of military discipline, include COMTE DE PARIS, 1.3 HISTORY OF THE CIVIL WAR IN AMERICA 271 (Louis F. Tasistro trans., 1875); JAMES R. GILMORE, PERSONAL RECOLLECTIONS OF ABRAHAM LINCOLN AND THE CIVIL WAR 110–11 (1899); D.M. KELSEY, DEEDS OF DARING BY BOTH BLUE AND GRAY 300 (1883); WM. H. RUSSELL, THE CIVIL WAR IN AMERICA 175 (1861); SAMUEL M. SCHMUCKER, THE HISTORY OF THE CIVIL WAR IN THE UNITED STATES: ITS CAUSE, ORIGIN, PROGRESS AND CONCLUSION 987 (1865); SAMUEL M. SCHMUCKER, 1 A HISTORY OF THE CIVIL WAR IN THE UNITED STATES; WITH A PRELIMINARY VIEW OF ITS CAUSES 188 (1863); John G. Walker, *Jackson's Capture of Harper's Ferry*, *in* 2 BATTLES AND LEADERS OF THE CIVIL WAR 604, 607 (Robert Underwood Johnson & Clarence Clough Buel eds., 1887).

128. *See* FLAYDERMAN, supra note 65, at 125–68.

## IV. KNIVES AS CONSTITUTIONALLY PROTECTED ARMS

This Part explains how knives are protected by the Second Amendment. Section A points out that the Second Amendment is for "arms," not just for "firearms." Being a militia-suitable arm is sufficient, but not necessary, for the Second Amendment to apply, and Section B details the history of knives as militia arms. *Heller*'s determination that handguns are within the scope of the Second Amendment was mainly based on the fact that handguns are useful for self-defense; Section C shows that knives are also useful for self-defense. Courts that have interpreted the Second Amendment have recognized the enormous technological improvements in firearms since 1791. In contrast, as Section D explains, the knives of today are not very different from the knives of 1791. Accordingly, Second Amendment protection of modern knives is especially clear. Part E argues that, under modern Second Amendment doctrine, the right to carry knives in public places for lawful self-defense must at least be co-extensive with the right to carry handguns.

### A. *Which Arms does the Constitution Protect?*

According to *District of Columbia v. Heller*, the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."[129] *Heller* ruled that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," with "arms" defined (pursuant to a Founding Era dictionary) as "any thing that a man . . . takes into his hands, or useth . . . to cast at or strike another."[130]

As a starting point, all knives seem to be within the scope of the Second Amendment, just as all firearms are. Like firearms, a knife can be carried by an individual and used as a weapon. Of course, some knives, like some firearms, are better suited to this purpose than others, but all knives and all firearms can be possessed, carried, and used in case of confrontation. The *Heller* opinion, however, excludes some types of arms from Second Amendment protection: "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."[131]

129. District of Columbia v. Heller, 554 U.S. 570, 592 (2008).

130. *Id.* at 581–82 (quoting T. CUNNINGHAM, 1 A NEW AND COMPLETE LAW DICTIONARY (1764)).

131. *Id.* at 625. For an application, see *People v. Yanna*, 824 N.W.2d 241, 242, 245 (2012) (holding unconstitutional a state law "which prohibits possession of Tasers and stun guns by

*Heller* makes it clear that the protected arms are not solely those that are suitable for militia use. The right to bear arms "did not refer only to carrying a weapon in an organized military unit" but also included doing so as part "of the natural right of defense."[132] By this reasoning, any weapon that could be used for either militia duty or for private self-defense qualifies as an "arm." Although militia use is not necessary to show that something is a Second Amendment "arm," militia use is sufficient to do so. Knives are indisputably militia arms.

### B. *Knives as Militia Arms*

Knives have long been part of American military equipment. The federal Militia Act of 1792 required all able-bodied free white men between eighteen and forty-five to possess, among other items, "a sufficient bayonet."[133] This establishes both that knives were common *and* were arms for militia purposes. Colonial militia laws required that men (and sometimes all householders, regardless of sex) own not only firearms but also bayonets or swords; the laws sometimes required carrying swords in non-militia situations, such as when going to church.[134] In New England, the typical choice for

---

private individuals;" Tasers, "while plainly dangerous, are substantially less dangerous than handguns," which *Heller* found protected).

132. *Heller*, 554 U.S. at 585.

133. Militia Act, ch. 33, 1 Stat. 271 (1792).

134. For laws of the colonies of New Hampshire, New Haven, New Jersey, New Plymouth, New York, North Carolina, Rhode Island, and Virginia, see: An Act for the Regulating of the Militia, N.H. May 13, 1718, *in* ACTS AND LAWS, PASSED BY THE GENERAL COURT OR ASSEMBLY OF HIS MAJESTIES PROVINCE OF NEW-HAMPSHIRE IN NEW-ENGLAND 91 (B. Green 1726) (requiring that all soldiers and householders have "a good Sword or Cutlash"); RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649, at 25–26 (Charles J. Hoadly ed., Case, Tiffany & Co. 1857) (requiring everyone that bears arms have "a sworde"); *id.* at 131, 201 (all males aged sixteen to sixty must have "a sword"); AARON LEAMING & JACOB SPICER, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 78 (2d ed., Honeyman & Co. 1881) (1752) (every male aged sixteen to sixty must have "a sword and belt"); THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 115 (William Brigham ed., Dutton and Wentworth 1836) (every Sunday, one quarter of the men, on a rotating basis, must carry arms to church; along with a gun and ammunition, carrying a "sword" was required); 1 DOCUMENTS RELATING TO THE COLONIAL HISTORY OF THE STATE OF NEW YORK 50 (Berthold Fernow ed., Weed, Parsons & Co. 1887) (militiamen must have a good gun and bayonet); An Act for the Better Regulating the Militia of this Government, N.C. 1715, *in* 23 THE STATE RECORDS OF NORTH CAROLINA 29 (Walter Clark ed., Nash Bros. 1904) (a fine for those not appearing with a "well-fixed sword" when ordered); An Act for the Better Regulating of the Militia, *in* LAWS AND ACTS OF RHODE ISLAND, AND PROVIDENCE PLANTATIONS MADE FROM THE FIRST SETTLEMENT IN 1636 TO 1705, *reprinted in* THE EARLIEST ACTS AND LAWS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, 1647–1719 at 57, 106–07 (John D. Cushing ed., 1977) ("a Sword or Bayenet"); ACTS AND LAWS, OF HIS MAJESTIES COLONY OF RHODE-ISLAND, AND PROVIDENCE PLANTATIONS IN AMERICA 87, *reprinted in* THE

persons required to own a bayonet or a sword was the sword because most militiamen fulfilled their legal obligation to possess a firearm by owning a "fowling piece" (an ancestor to the shotgun, particularly useful for bird hunting), and these firearms did not have studs upon which to mount a bayonet.[135]

Well after the nation's founding, knives continued to be an important tool for many American soldiers. During World War II, American soldiers, sailors, and airmen wanted and purchased fixed blade knives, often of considerable dimensions.[136] At least in some units, soldiers were "authorized an M3 trench knife, but many carried a favorite hunting knife."[137] The Marine Corps issued the Ka-Bar fighting knife.[138] As one World War II memoir recounts, "[t]his deadly piece of cutlery was manufactured by the company bearing its name. The knife was a foot long with a seven-inch-long by one-and-a-half-inch-wide blade. . . . Light for its size, the knife was beautifully balanced."[139] Vietnam memoirs report that Ka-Bar and similar knives were still in use, but "not everybody is issued a Ka-Bar knife. There are not enough to go around. If you don't have one, you must wait until someone is going home from Vietnam and gives his to you."[140] Even today, some Special Forces units regularly carry combat knives.[141]

---

EARLIEST ACTS AND LAWS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, 1647–1719 at 135, 223 (John D. Cushing ed., 1977) ("one good Sword, or Baionet"); An Act for the Better Supply of the Country with Armes and Ammunition, Act 4, Va. Apr. 1684, in 3 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 13 (William Waller Hening ed., Samuel Pleasants 1812) (soldiers must furnish themselves with "a sword, musquet and other furniture fitt for a soldier"); An Act for the Better Regulation of the Militia, ch. 2, Va. Nov. 1738, in 5 THE STATUTES AT LARGE, *supra*, at 16–17 (militiamen who are "horse-men" must have a sword or cutlass).

135. *See* CLAYTON E. CRAMER, ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE 97–98 (2006).

136. *See* Walter E. Burton, *Knives for Fighting Men*, POPULAR SCIENCE, July 1944, at 150, 150, 153.

137. GORDON L. ROTTMAN, U.S. SPECIAL WARFARE UNITS IN THE PACIFIC THEATER 1941–45, at 27 (2005).

138. To be precise, "Ka-Bar" is only one manufacturer of post-WWII fighting knives. "Ka-Bar" is sometimes used in a generic sense, in the same way some people call any cola soda a "Coke."

139. E.B. SLEDGE, WITH THE OLD BREED: AT PELELIU AND OKINAWA 21 (Presidio Press 2007) (1981).

140. *See, e.g.*, JOHN CORBETT, WEST DICKENS AVENUE: A MARINE AT KHE SANH 149 (2003).

141. *See, e.g.*, PUSHIES, *supra* note 23, at 63–64.

*C. Protection Beyond Militia Arms*

The Second Amendment does not protect solely militia arms. As *Heller* points out, those in the Founding Era valued firearms in part because they were useful "for self-defense and hunting."[142] Thus, knives that are useful for self-defense or hunting are also within the scope of the Second Amendment.[143]

In the past, some states imposed special restrictions on certain types of knives while leaving swords alone.[144] Often, the particular knives singled out for extra restrictions were those that could open most easily, likely because legislatures feared that such knives would be used offensively.[145]

The distinction, however, does not make much sense. Guns can be used offensively or defensively. The very characteristic that makes a gun so useful for defense—the ability to project force at a distance, rather than in close contact—also makes the gun particularly dangerous as an offensive weapon. The difference between offensive and defensive is not the type of gun but the intent of the user and the circumstances of use. The same is true for anything with a blade; the characteristics that make any particular bladed instrument handy for self-defense will also make it usable for offense. Again, the user, not the instrument, is the difference.

The question of whether knives qualify as a type of arm suitable for self-defense seems almost trivial. Knives are self-evidently useful for self-defense. Indeed, almost every type of knife would be useful for self-defense against an attacker armed with fists or other personal weapons, a knife, or an impact weapon such as a billy club.[146] Although a knife is most definitely not an ideal defensive weapon against an attacker armed with a handgun, at very close range, as is the case with many crimes of violence, it would generally be more effective than barehanded defense or begging for mercy.

In some situations, a knife might not be the best choice for self-defense because to use it requires one to be inches from the attacker. Nonetheless, it can be an effective deterrent to attack for

142. District of Columbia v. Heller, 554 U.S. 570, 599 (2008).

143. A knife that is useful for hunting does not have to be a knife that is useful for taking the animal; a knife that can be used to clean the meat off the animal would also qualify.

144. *E.g.*, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, 22 Tenn. Gen. Assemb. Acts 200 (1838) (banning carrying or purchasing Bowie knives and Arkansas Toothpicks, but affecting no other weapon).

145. *See supra* Part I.E–F.

146. There are specialized knives whose blades are surrounded such that they can be used to cut rope or seat belts but are essentially useless as a stabbing weapon. Butter knives are also useless for self-defense. A ban on them would not violate the Second Amendment because they are only useful as tools.

the same reason that a firearm is; the attacker must decide whether the risk of being seriously injured or killed justifies continuing the attack. In at least some situations, the attacker will see the knife and remember an urgent appointment elsewhere.

Some schools of self-defense instruction, such as Michael Janich's Martial Blade Concepts, specialize in teaching defensive knife use.[147] Many people, including police officers carrying defensive handguns, also carry a backup defensive knife, in case the handgun malfunctions or runs out of ammunition.[148] The Ka-Bar TDI Law Enforcement knife is designed for this purpose, with a small fixed blade and a distinctive angled grip made for carrying on a belt.[149]

A knife may also be the best or only available defensive choice for persons who, for a variety of reasons, may choose not to own a firearm. Most knives are substantially cheaper than the cheapest firearm. The poorest Americans are also the most at risk of being victims of crime.[150] A ten-dollar knife may be an option where a $130 used rifle is not.

Similarly, a person who chooses a knife for self-defense may live in an area where firearms (even after the *McDonald v. Chicago* decision, which incorporated the Second Amendment against state and local government[151]) are more strictly regulated than knives. For example, a knife that can be bought and taken home right away provides at least some protection during the period of days, weeks, or months that it may take to get government permission to own a firearm.

A person may also be reluctant to own a firearm out of concern that he may be unable to adequately secure it from his children. Although knives are still dangerous, a parent may conclude that the danger of a knife is sufficiently self-evident to a child, and that it represents a very minor risk compared to a firearm. While many people keep their guns in a safe or lockbox, almost every home has

---

147. *See* MARTIAL BLADE CONCEPTS: PRACTICAL PERSONAL-DEFENSE SKILLS FOR TODAY'S WORLD, http://www.martialbladeconcepts.com/Home.aspx (last visited Aug. 20, 2013).

148. *See, e.g.*, Greg Ellifritz, *Should Police Officers Carry Fixed Blade Knives?*, ACTIVE RESPONSE TRAINING (Feb. 4, 2013), http://www.activeresponsetraining.net/should-police-officers-carry-fixed-blade-knives; Randall, *Police Knives: Carrying and Training*, BLUESHEEPDOG.COM, http://www.bluesheepdog.com/police-knives/ (last visited Aug. 20, 2013).

149. *TDI Law Enforcement Knife*, KA-BAR, http://www.kabar.com/knives/detail/76 (last visited Aug. 20, 2013).

150. *See* PATSY KLAUS & CATHY MASTON, BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 1995, at 21 tbl.14 (2000) (victimization rates by annual family income: 75.0/1,000 for those from families with income below $7,500, dropping consistently in every income category to 37.7/1,000 for those at $75,000 per year and above).

151. McDonald v. City of Chicago, 130 S. Ct. 3020 (2010).

several kitchen knives lying in drawers or in a block on the kitchen counter.

The fact that knives in general may be less effective for self-defense than handguns does not generally strip knives of Second Amendment protection. Whether a particular arm is the ideal choice for self-defense does not affect whether that arm is constitutionally protected. In *Heller*, Dick Heller owned a .22 caliber revolver, which is about the weakest self-defense firearm possible.[152] The Court upheld Mr. Heller's right to own the gun, despite the fact that a higher caliber handgun would be more effective at stopping an attacker.[153] Likewise, a folding knife with a three-inch blade is not as powerful a defensive arm as a sword or a handgun. The Second Amendment protects individual discretion to choose which defensive arm is most suitable for the individual, based on his or her particular circumstances.

### *D. Technological Changes*

*Heller* explicitly rejected the notion that the Second Amendment protects only the types of arms that were in existence in 1789, when Congress sent the Second Amendment to the states for ratification.[154] Claiming that the Second Amendment only protects 1789 guns is like saying that the First Amendment protects only the hand cranked printing press and not television. On the other hand, if a particular firearm model is a modern equivalent of a 1789 flintlock rifle, musket, or 1789 handgun, then it is clear that such a firearm is within the Second Amendment's scope.

Virtually every modern knife is comparable to the knives of 1789. Knives and other edged weapons were at least as common in English and U.S. society in the eighteenth century as they are today, appearing frequently in a variety of contexts. They were commonly

---

152. *Compare .22 Results in fps*, BALLISTICS BY THE INCH, http://www.ballisticsbytheinch.com/22.html (last visited Aug. 20, 2013), *with .25 Auto Results in fps*, BALLISTICS BY THE INCH, http://www.ballisticsbytheinch.com/25auto.html (last visited Aug. 20, 2013).

153. District of Columbia v. Heller, 554 U.S. 570, 629–31 (2008) (upholding Heller's right to possess a handgun in his home); *see also* Jorge Amselle, *Choosing the Best Caliber for Self-Defense*, AMERICAN RIFLEMAN (May 4, 2011), http://www.americanrifleman.org/articles/best-caliber-self-defense/ ("[The .38 special] cartridge is considered by many experts to be the minimum necessary for adequate personal protection."); Paul W. Abel, *Calibers for Defense*, SHOOT-N-IRON PRAC. SHOOTING & TRAINING ACAD., http://www.shoot-n-iron.com/calibers-for-defense.asp (last visited Aug. 22, 2013) ("I personally do not recommend either [.32 or .25 calibers] for defensive purposes. Both calibers are lacking in velocity and bullet expansion.").

154. *See Heller*, 554 U.S. at 582.

sold, carried, used as tools,[155] and occasionally misused as offensive weapons.[156]

While modern knives are made of superior materials, from a functional perspective knives have advanced far less since 1789 than have firearms, printing presses, or the myriad of other technologies whose constitutional protections are indisputable.[157] Even the switchblade is old; the first spring-ejected blades appeared in Europe in the late eighteenth century.[158]

Gun prohibition advocates have long argued that modern firearms are far more deadly than single-shot, muzzle-loading firearms of 1789 and thus do not enjoy the protections of the Second Amendment.[159] They lost that argument in *Heller*.[160] There is no similar argument with respect to knives. While firearms have changed from single-shot to multi-shot, the knives of 2013 have exactly one blade, just like the knives of 1789.

155. *See, e.g.*, W. LUDLAM, AN INTRODUCTION AND NOTES, ON MR. BIRD'S METHOD OF DIVIDING ASTRONOMICAL INSTRUMENTS 6 (1786) (for making astronomical instruments); PHILIP LUCKOMBE & WILLIAM CASLON, A CONCISE HISTORY OF THE ORIGIN AND PROGRESS OF PRINTING 351 (1770) (used in setting type); TEMPLE HENRY CROKER ET AL., 3 THE COMPLETE DICTIONARY OF ARTS AND SCIENCES, "Tanning Engines" (describing the machine used for tanning leather).

156. *See, e.g.*, King v. Hardy, in THE PROCEEDINGS IN CASES OF HIGH TREASON, UNDER A SPECIAL COMMISSION OF OYER AND TERMINER 303–05 (1794) (a merchant in London describing his sale of knives with springs that hold them open; "they lay in my show glass, and in the window for public sale."); King v. Chetwynd, NO. 8 PART 3 THE PROCEEDINGS ON THE KING'S COMMISSIONS OF THE PEACE, AND OYER AND TERMINER 313 (1743) (a dispute over a slice of a cake led to an assault involving a pocket knife); *Particulars of Margaret Nicholson's Attempt to Assassinate His Majesty*, 10 THE EUROPEAN MAG., AND LONDON REV. 117 (1786) (describing Margaret Nicholson's attempt on King George III's life).

157. *See* Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime and Public*, 44 WILLIAMETTE L. REV. 699, 716–22 (2008) (comparing firearms to other advancing technologies which enjoy constitutional protections).

158. TIM ZINSER ET AL., SWITCHBLADES OF ITALY 7–8 (2003).

159. *See Heller*, 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment.").

160. *Id.* ("We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, *e.g.*, Reno v. American Civil Liberties Union, 521 U.S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, *e.g.*, Kyllo v. United States, 533 U.S. 27, 35–36 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

### *E. The Scope of the Right to Keep and Bear Knives*

*Heller* addressed not only the right to keep a gun in the home but also the right to *bear* arms. Although *Heller* allows carry bans in "sensitive places," the opinion recognized a general right to carry.[161] Some lower courts have resisted *Heller*'s language about the right to carry, and the issue may need another Supreme Court case for a final resolution.[162]

Today, in forty-two states, adults who pass a fingerprint-based background check and a safety training class can obtain a permit to carry a handgun for lawful protection.[163] As a practical matter, the right to bear arms is already in effect in these states. In some states, these licenses are specifically for concealed *handguns* and do not allow the licensee to carry a concealed knife.[164] The reason for this peculiar situation is that these laws were enacted with the support of the National Rifle Association and other gun rights activist groups that were concerned about the right to carry firearms and did not pay attention to other arms, such as knives.[165] A few years ago, Knife Rights—the first proactive organization dedicated to

161. *See id.* at 584 ("At the time of the founding, as now, to 'bear' meant to 'carry.' When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation.") (citations omitted).

162. *See, e.g.*, Smith v. U.S., 20 A.3d 759, 764 (D.C. 2011) (affirming the conviction of a Washington, D.C. police officer, wrongfully terminated and awaiting reinstatement, who was arrested for carrying a handgun within the District); Piszczatoski v. Filko, 840 F. Supp. 2d 813, 820 (D.N.J. 2012) ("The Second Amendment does not protect an absolute right to carry a handgun for self-defense outside the home, even if the Second Amendment may protect a narrower right to do so for particular purposes under certain circumstances."); Richards v. County of Yolo, 821 F. Supp. 2d 1169, 1174 (E.D. Cal. 2011) ("Based upon this, Heller cannot be read to invalidate Yolo County's concealed weapon policy, as the Second Amendment does not create a fundamental right to carry a concealed weapon in public."). *But see* Moore v. Madigan, 702 F.3d 933, 942 (7th Cir. 2012) (overturning a ban on carrying in any form, open or concealed); People v. Aguilar, 2013 IL 112116 (Second Amendment is violated by a general ban on bearing arms).

163. Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679 (1995); O'Shea, *supra* note 109, at 598–601. With the exception of California, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Rhode Island, all the other states have an objective process by which most law-abiding adults can obtain a permit to carry, or do not need a permit. *See generally* Bureau of Alcohol, Tobacco, Firearms and Explosives, State Laws and Published Ordinances — Firearms (31st ed. 2011), *available at* https://www.atf.gov/files/publications/download/p/atf-p-5300-5-31st-editiion/2010-2011-atf-book-final.pdf.

164. Oregon is fairly typical in prohibiting concealed carry of any knife "that projects or swings into position by force of a spring or by centrifugal force [or] any dirk [or] dagger," Or. Rev. Stats. § 166.240 (2011), but allows concealed carry of a *firearm* if licensed, *id.* §§ 166.250, .291. Idaho, by comparison, prohibits carrying "any dirk, dirk knife, bowie knife, dagger, pistol, revolver or any other deadly or dangerous weapon" unless the carrier is licensed to carry a concealed *weapon*. Idaho Code Ann. § 18-3302(7) (2013).

165. *See About NRA-ILA*, NRA-ILA, http://www.nraila.org/about-nra-ila.aspx (last visited Aug. 20, 2013).

knives—was created.[166] Had such an organization existed when these concealed carry laws were enacted, inclusion of knives would have been more likely.

Given the current understanding of the Second Amendment and the criminological evidence discussed above, if a state government decides that a particular individual is responsible enough to carry a concealed, loaded handgun in public places throughout the state, the state cannot forbid that person from carrying a concealed knife.

## V. STANDARDS OF REVIEW

Post-*Heller* courts are using a wide variety of analytical tools to evaluate Second Amendment claims. Sometimes, a statute is so flagrantly unconstitutional that there is no need to formulate a multi-step test.[167] A law that prohibits activity "near" the core right of self-defense (such as a ban on target ranges) may receive "not-quite strict scrutiny."[168] Alternatively, a court might apply the "history and tradition" test.[169] Some courts have used intermediate scrutiny, particularly for laws that involve persons who have already demonstrated themselves to be more likely than most to misuse a firearm.[170] This Part tests some knife laws against the weakest possible relevant standard, intermediate scrutiny.[171] Although intermediate scrutiny is not the correct standard in all cases, these analyses are telling because if a knife control fails intermediate scrutiny, then it will fail all of the more rigorous standards as well.

As *U.S. v. Skoien* states, "[i]n its usual formulation, [the intermediate scrutiny] standard of review requires the government to establish that the challenged statute serves an important governmental interest and the means it employs are substantially related

---

166. *See* Richard Grant, *Move Over, NRA. Meet the Knife Lobby*, MOTHER JONES (Nov./Dec. 2012), http://www.motherjones.com/politics/2012/12/knife-rights-second-amendment.

167. *See, e.g.*, *Moore*, 702 F.3d at 942 (holding a near-complete ban on bearing arms unconstitutional).

168. *See, e.g.*, Ezell v. City of Chicago, 651 F.3d 684, 708–09 (7th Cir. 2011) (granting a preliminary injunction against a ban on firing ranges).

169. *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1274–75 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (suggesting that restrictions be analyzed under an approach based on text, history, and tradition).

170. *See, e.g.*, United States v. Skoien, 614 F.3d 638, 641–44 (7th Cir. 2010) (en banc) (applying something similar to intermediate scrutiny to a ban on possessing firearms for persons convicted of domestic violence misdemeanors).

171. Rational basis is not available because a fundamental right is involved. *See* District of Columbia v. Heller, 554 U.S. 570, 628 n.27 (2008); McDonald v. City of Chicago, 130 S. Ct. 3020, 3050 (2010).

to the achievement of that interest."[172] Courts have repeatedly held that, under intermediate scrutiny, it is not enough for the government to assert that it has a legitimate public interest.[173] In *Turner Broadcasting System, Inc. v. FCC*, the Court ruled that, under intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."[174]

This Part applies intermediate scrutiny to three particular types of knife laws: laws that ban possessing certain knives in the home (Section A), laws that allow carrying knives for some purposes but not for self-defense (Section B), and laws that allow carrying handguns but not knives (Section C). The Article argues that all three types of laws fail intermediate scrutiny.

### *A. Home Possession*

Criminal prosecutions for home possession of knives are rare, for the obvious reason that only in unusual circumstances would such possession come to the attention of law enforcement. Nevertheless, the statutes on home possession violate the Second Amendment because law-abiding persons are not able to possess certain knives in their homes. Most jurisdictions that have a ban on home possession of a certain knife also forbid the sale of such a knife, thus making it doubly impossible for a law-abiding person to have the knife at home.

Justifying a ban on home possession or the sale or transfer of a constitutionally protected arm requires the government to offer more than "impressionistic observations" in order to pass intermediate scrutiny.[175] The government must also demonstrate that replacing the banned category of knives with some other, equally dangerous arm would not easily defeat the ban. For example, a ban on revolvers with two-inch barrels would have no public safety benefit if semiautomatic pistols of similar dimensions remained legal. As long as the purchase and possession of a ten-inch Wusthof Chef's

---

172. U.S. v. Skoien, 587 F.3d 803, 805 (7th Cir. 2009), *vacated en banc*, 614 F.3d 638 (7th Cir. 2010).

173. *See, e.g.*, Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 661–66 (1994) ("This obligation to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence *de novo,* or to replace Congress' factual predictions with our own. Rather, it is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.").

174. *Id.* at 664.

175. *See* State v. Delgado, 692 P.2d 610, 612 (Or. 1984).

Knife is legal, can any knife ban actually produce a genuine reduction in injuries? Thus, bans on the home possession of switchblades, gravity knives, Bowie knives, and so on are probably unconstitutional.

### *B. Carrying for Limited Purposes*

Lower courts still disagree about the scope of the Second Amendment right to bear arms, and the issue may eventually be decided by the Supreme Court.[176]

Even before the Supreme Court directly recognized that the Second Amendment protects a right to keep and bear arms for personal as well as collective uses, there were still other constitutional limits on carry bans. In the 1995 case *City of Akron v. Rasdan*, the Ohio Court of Appeals upheld a city ordinance banning the carrying of knives "having a blade two and one-half inches in length or longer" against claims of overbreadth and vagueness, but ruled that the ordinance went too far in prohibiting "an *unreasonable* amount of activity that is inherently innocent, harmless, and useful. The most obvious examples of this type of innocent activity include carving, hunting, fishing, camping, scouting, and other recreational activities in which carrying a knife is an integral and often essential part of that activity."[177]

This is an accurate but not comprehensive list. One particularly important item is missing: self-defense. Because knives with blades of longer than two and one-half inches are among Second Amendment "arms" post-*Heller* and especially post-*McDonald, Rasdan* must be read as protecting a right to carry such knives for lawful defense of self and others. The *Rasdan* court distinguished the Akron ordinance from ordinances that were upheld in decisions such as *City of Seattle v. Riggins* and *People v. Ortiz* because the laws in those other states provided "a sufficient number of exceptions to criminal liability" to qualify as "reasonable exercises of the police power."[178]

176. *See, e.g.*, Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012) (holding that a near-complete ban on carrying firearms in public is unconstitutional), *reh'g denied*, 708 F.3d 901 (7th Cir. 2013); Kachalsky v. County of Westchester, 701 F.3d 81 (2d Cir. 2012) (holding that a statute requiring applicants show a special need for self-protection before being granted a license to carry did not violate Second Amendment), *cert. denied*, 133 S. Ct. 1806 (2013) (denying petition despite seven amicus briefs in support, including a brief from twenty states).

177. City of Akron v. Rasdan, 663 N.E.2d 947, 950–53 (1995).

178. *Id.* at 953 (citing City of Seattle v. Riggins, 818 P.2d 1100, 1104 (Wash. Ct. App. 1991); People v. Ortiz, 479 N.Y.S.2d 613, 619 (N.Y. Crim. Ct. 1984)).

Notably, the *Rasdan* court was using the rational basis standard, but, after *Heller* and *McDonald*, rational basis does not suffice.[179] If there is going to be a general ban, with exceptions for permissible purposes for carrying (e.g., while hunting or hiking), then there must be an exception that encompasses lawful self-defense. It is possible that laws which set forth conditions for lawful defensive carry, such as a licensing system, might be evaluated under intermediate scrutiny,[180] but a law which categorically outlaws defensive carry is necessarily unconstitutional.[181]

### *C. Bans on Carrying Certain Knives but not Handguns*

As detailed below in Part VI, some state or local laws allow carrying one knife of a certain blade length while forbidding carrying another knife that has the same blade length, based on whether the knife is a folder or a fixed blade, is a folder that can or cannot be locked, or is a folder that is opened with one mechanism rather than another. To meet even the intermediate standard of scrutiny, laws making such distinctions must be based on clear evidence that these features are a public safety problem, rather than mere conjecture.[182] Given that *Heller* tells us that a handgun ban cannot pass intermediate scrutiny,[183] it seems very doubtful that any of the distinctions in the above paragraph can pass intermediate scrutiny.

If there is a right to carry handguns, then a ban on carrying a knife longer than X inches must be based on evidence that such a knife is more dangerous than a handgun. Given the quality of twenty-first century handguns, this is an impossible showing. Any rule of interpretation that allowed more restrictive laws for the

179. *See* District of Columbia v. Heller, 554 U.S. 570, 628 n.27 (2008); McDonald v. City of Chicago, 130 S. Ct. 3020, 3050 (2010).

180. *See, e.g.*, Kachalsky (2d Cir. 2012).

181. *See, e.g.*, Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011); People v. Aguilar, No. 112116, 2013 WL 112116 (Ill. Sept. 12 2013).

182. In cases on commercial speech and in other First Amendment contexts, the Supreme Court has similarly held that "conjecture" does not satisfy the government interest requirement. *See, e.g.*, Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden."); Edenfield v. Fane, 507 U.S. 761, 770–71 (1993) (noting that the government's "burden is not satisfied by mere speculation or conjecture," but only by "demonstrat[ing] that the harms [the government] recites are real and that its restriction will in fact alleviate them to a material degree").

183. *Heller*, 554 U.S. at 628–29 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster.").

bearing of edged weapons than for firearms cannot qualify as alleviating "these harms in a direct and material way" and thus fails intermediate scrutiny.[184]

Besides lethality, there are some other ways in which knives are less dangerous than handguns. A gunshot fired in self-defense may pass through the criminal and hit an innocent bystander, or a defensive shot may miss the criminal and hit a bystander. The same is true for criminal misuse of guns.[185] These risks occur not only in public places but also from shots fired within a residence. In contrast, a knife used for self-defense has no risk to innocent bystanders similar to a stray bullet.

Because knives are less dangerous than handguns, which may legally be carried, any law that regulates the possession or carrying of knives, even the biggest and scariest knives (for those persons who find them scary), is indefensible under intermediate scrutiny. At the least, intermediate scrutiny requires an "important" government interest;[186] it is difficult to see how the government could even have a rational interest, let alone an important interest, in preventing the carrying of knives by people who can lawfully carry handguns.

## VI. EXAMPLES OF KNIFE LAWS THAT POSE CONSTITUTIONAL PROBLEMS

State and local knife laws are often bewilderingly complex, and, as a result, it is very easy for a person with no criminal intent to break these laws. Prosecutors and police do not treat the severe state and local laws as relics of the nineteenth century. Instead, the laws are often vigorously enforced today against persons who are not engaged in *malum in se* behavior.

The enormous political attention on gun regulation means that most Americans have relatively little idea of the extent to which knives are subject to startlingly severe laws. These laws frequently concern carrying but may also forbid manufacture, sale, purchase,

184. *See* Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 664 (1994); People v. Yanna, 824 N.W.2d 241, 244–45 (Mich. App. 2012).

185. *See, e.g.*, Lawrence W. Sherman et al., *Stray Bullets and "Mushrooms": Random Shootings of Bystanders in Four Cities, 1977–1988*, 5 J. QUANTITATIVE CRIMINOLOGY 297, 297 (1989) (There was a "rapid increase in both bystander woundings and killings since 1985 in all four cities. . . . [But] total bystander deaths appear to comprise less than one percent of all homicides in these cities."); H. Range Hutson et al., *Adolescents and Children Injured or Killed in Drive-By Shootings in Los Angeles*, 330 NEW ENG. J. MED. 324, 325 (1994) ("Among the victims who had firearms injuries, 122 (28 percent) had no gang affiliation . . .").

186. *See, e.g.*, Craig v. Boren, 429 U.S. 190, 197 (1976).

or even possession in one's home of a knife. In many respects, the variations in state and local knife regulation are far more curious and unexpected than the variations in gun regulation. Even within a particular state, the variations of what and where something is legal can be confusing.

One reason for the anomaly is that almost all states have some form of legislative or judicial preemption for gun control.[187] Thus, in many states, local governments are greatly restricted in what, if any, gun control laws they may enact, and gun laws are supposed to be uniform within the state.[188] In contrast, only a few states have knife preemption, and those are recent enactments.[189]

### A. *Washington*

Washington is one of the many states without knife preemption. Leslie Riggins was arrested in 1988 in Seattle while waiting for a bus because he had a knife in a sheath on his belt.[190] He was charged with possession of a fixed blade knife.[191] Riggins explained that he originally intended to go fishing with his brother outside of Seattle, but because of a change of plans, Riggins had "ended up using the knife to assist in roofing his brother's house."[192]

Riggins might well have had reason to believe that he was within his rights to carry the knife. One part of the Seattle ordinance prohibiting carrying a fixed blade knife exempted "[a] licensed hunter or licensed fisherman actively engaged in hunting and fishing activity including . . . travel related thereto."[193] When Riggins started his travels, he had planned to go fishing and thus was within the "travel related thereto" exemption.[194] Another exemption protected "[a]ny person immediately engaged in an activity related to a

187. *Firearms Preemption Laws*, NRA-ILA (Dec. 16, 2006), http://www.nraila.org/news-issues/fact-sheets/2006/firearms-preemption-laws.aspx?s=Preemption&st=&ps=.

188. *See* Stephen P. Halbrook, 2 Firearms Law Deskbook app. A (2010).

189. *See* Act of Apr. 29, 2010, ch. 204, 2010 Ariz. Sess. Laws 1005 (codified at Ariz. Rev. Stat. Ann. § 13-3120 (2012)) (first state to preempt knife laws); Restrictions on Political Subdivisions Regarding the Regulation of Knives, ch. 272, 2011 Utah Laws 1092 (codified at Utah Code Ann. §§ 10-8-47.5, 17-50-332 (2012)); An Act Relative to State Authority Over Firearms and Ammunition, ch. 139, 2011 N.H. Laws 141 (codified at N.H. Rev. Stat. Ann. § 159:26 (2012)); Act of May 2, 2012, act 753, 2012 Ga. Laws (codified at Ga. Code Ann. § 16-11-136 (2012)).

190. City of Seattle v. Riggins, 818 P.2d 1100, 1101 (Wash. Ct. App. 1991), *rev'd*, 846 P.2d 1394 (Wash. Ct. App. 1993).

191. Seattle, Wash., Mun. Code § 12A.14.080(B) (2013).

192. *Riggins*, 818 P.2d at 1101.

193. Mun. Code § 12A.14.100(A).

194. *See Riggins*, 818 P.2d at 1101.

lawful occupation which commonly requires the use of such knife, provided such knife is carried unconcealed."[195] Here is where Riggins ended up in trouble. Earlier in the day, Riggins had been using the knife for such a purpose (roofing his brother's house), but by the time he returned home by bus, he was no longer *immediately* engaged in that activity.[196] At this point, his only hope for an exemption from the "dangerous knife" carrying ban would have been "carrying such knife in a secure wrapper or in a tool box."[197]

The state appellate court held that Riggins did not fall within "any one of the three fairly broad exemptions" to Seattle's knife ordinance, and the court was unwilling to recognize that a day that had started with Riggins's knife exempted for a fishing trip had changed as his plans changed.[198] Nothing in the *Riggins* decision suggests that Riggins had engaged in any behavior that was either dangerous or criminal. Had Riggins gone fishing with his brother and, at the end of the day, been returning home by bus, there would have been no criminal conviction.

Washington has a strong state constitutional guarantee of the right to keep and bear arms, and the Washington State Supreme Court has enforced this provision conscientiously when the case has involved a firearm.[199] However, the intermediate appellate court brushed off Riggins's constitutional claim, gave the ordinance "every presumption . . . of constitutionality," and upheld the Seattle ordinance under a mere "reasonable and substantial" test.[200]

The *Riggins* decision was in 1991 and involved only the state constitution. Both *District of Columbia v. Heller* (2008) and *McDonald v. Chicago* (2010) struck down bans on the possession of handguns without even needing to resort to a standard of scrutiny; the ban on handgun possession in those cases was so plainly contrary to the constitutional text that there was no need to proceed to choosing a

195. MUN. CODE § 12A.14.100(B).

196. *See Riggins*, 818 P.2d at 1101, 1104 ("Riggins has failed to show that his conduct falls within one of the ordinance's exemptions.").

197. MUN. CODE § 12A.14.100(C).

198. *See Riggins*, 818 P.2d at 1102, 1104, *rev'd on other grounds*, 846 P.2d 1394 (Wash. Ct. App. 1993).

199. *See, e.g.*, State v. Rupe, 683 P.2d 571, 594–97 (Wash. 1984) (ordering defendant's ownership of an AR-15 excluded from penalty phase of murder trial because of chilling effect on right to keep and bear arms).

200. *Riggins*, 818 P.2d at 1102–03 ("Where legislation tends to promote the health, safety, morals, or welfare of the public and bears a reasonable and substantial relationship to that purpose, every presumption will be indulged in favor of constitutionality."), *rev'd on other grounds*, 846 P.2d 1394 (Wash. Ct. App. 1993).

level of scrutiny.[201] The *Riggins* approach to the Washington Constitution's protections is therefore contrary to the approach that the U.S. Supreme Court outlined for Second Amendment cases since, according to the Supreme Court, broad bans on ownership or carrying (keeping and bearing) are *per se* unconstitutional. Were *Riggins* to come before the Washington Supreme Court today, it would almost certainly strike down Seattle's overly broad ban on carrying such knives. An example of the federal approach to broad bans after *Heller/McDonald* occurred in 2012 when the Seventh Circuit correctly applied the *Heller/McDonald* model to Illinois, which was the only state to prohibit defensive gun carrying in public places.[202] Because the ban was per se unconstitutional, Judge Richard Posner's decision struck down the Illinois ban without needing to get into three-tiered scrutiny.[203] The Washington State Supreme Court would be obligated not simply to consider the constitutionality of the Seattle ordinance with respect to the Washington State Constitution, but with the much more demanding standards of *McDonald*.

Alternatively, a future Washington state court might simply apply the *Riggins* "substantial" test (which echoes the language of intermediate scrutiny) with some genuine rigor and ask whether there was any substantial relation to public safety in an ordinance that would have let a future defendant similarly situated to Riggins carry his knife home in one way after a day of fishing but required that he carry it in a different way after a day of roofing. As in any case involving heightened scrutiny (strict or intermediate), the burden of proof would be on the government.[204] Depending on how the Supreme Court finally decides what standard of scrutiny to apply to the Second Amendment, an appeal to the Second Amendment

---

201. *See* District of Columbia v. Heller, 554 U.S. 570, 628–29 (2008) ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster."); McDonald v. City of Chicago, 130 S. Ct. 3020, 3050 (2010) ("In Heller, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of stare decisis counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States.").

202. *See* 720 ILL. COMP. STAT. 5/24-1 (2011), *invalidated by* Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012); People v. Aguilar, No. 112116, 2013 WL 112116, at *5–8 (Ill. Sept. 12 2013) (Striking down a comprehensive ban on carrying loaded firearms in public places and by someone who was hardly an upstanding citizen: "That said, we cannot escape the reality that in this case, we are dealing not with a reasonable regulation but with a comprehensive ban.").

203. *See Madigan*, 702 F.3d at 941–42.

204. *See, e.g.*, Craig v. Boren, 429 U.S. 190, 196–204 (1976).

might produce a similar result to *Riggins*, or strike down the Seattle ordinance.

### *B. California*

Can a person legally carry a knife in California? He can carry a fixed blade knife on California's college campuses if the blade is not longer than two-and-one-half inches.[205] Folding knives are unrestricted by state law on college campuses,[206] though some campuses may have more restrictive rules. On primary and secondary school grounds, the law is the same for fixed blades as on college campuses (banned if more than two-and-one-half inches), but all folding knives are banned, regardless of blade length, if the blade can lock open.[207] On the other hand, a person can carry a knife with a fixed blade up to four inches into a government building.[208] He can also carry a folding knife into a government building with a blade up to four inches, but *only if* the blade does not lock open.[209]

*Heller* affirmed the permissibility of special restrictions on arms carrying in "sensitive places, such as schools and government buildings."[210] However, even presuming that California can legally enact some special restrictions on knife carrying in those places, the actual restrictions are irrational. There is no reason why lock-blade folders are allowed and non-locking folders are banned in one location while just the opposite is the rule in another location.

For carrying in public places in general (not in sensitive places), California law is at least coherent at the state level. A person can openly carry any knife. He can concealed carry almost any folding knife. The one exception is that he cannot carry a switchblade with a blade longer than two inches in any fashion, open or concealed.[211]

However, California has no preemption for knife laws, and some California cities, such as Los Angeles, Oakland, and San Francisco, have their own, more restrictive (and inconsistent) ordinances. Los Angeles prohibits open carry of knives with blades that are three

205. *See* CAL. PENAL CODE § 626.10(b) (West 2013).
206. *See id.*
207. *Id.* § 626.10(a). A folder that does not lock open is more dangerous because the blade might fold in unexpectedly and cut a hand. Persons who are familiar with knife safety therefore usually prefer to carry folders that lock open.
208. *See id.* § 171b(3).
209. *Id.*
210. District of Columbia v. Heller, 554 U.S. 570, 626 (2008).
211. CAL. PENAL CODE § 21510 (West 2012).

inches or longer (with some exemptions).[212] Similarly, Oakland prohibits carrying knives with blades three inches or longer, but also "any snap-blade or spring-blade knife" (older terms for switchblades), regardless of knife length.[213] San Francisco prohibits loitering while carrying a concealed knife with a blade three inches or more long, or carrying a concealed switchblade knife of any length.[214] Because of the complexity of California state laws and local ordinances, it would be very easy to unintentionally break the law while carrying a knife with no criminal intent.

### *C. District of Columbia*

The District of Columbia is already famous for its unusual and extreme firearms laws, some of which were struck down in *Heller* and others of which are the subjects of ongoing litigation.[215] The District is also the home of equally severe knife laws. D.C. law prohibits not only carrying a pistol without a license but also "any deadly or dangerous weapon capable of being so concealed."[216] This prohibition applies not simply in public places; the statute adds an additional penalty for doing so "in a place other than the person's dwelling place, place of business, or on land possessed by the person."[217]

It does not matter whether the knife is actually carried concealed. The fact that the knife is *concealable* makes open carrying a crime. The punishment for carrying in the home is "a fine of not more than $1,000 or imprisonment for not more than 1 year, or both."[218] In other words, carrying a carving knife (or even a paring knife) to the dining room table in the District of Columbia appears to be a criminal offense.

Prosecutions for home carry of knives seem to be rare in D.C., likely because such carrying would rarely come to the attention of

212. Los Angeles, Cal., Mun. Code § 55.10 (2012) (exemptions include "where a person is wearing or carrying a knife or dagger for use in a lawful occupation, for lawful recreational purposes, or as a recognized religious practice, or while the person is traveling to or returning from participation in such activity.").

213. Oakland, Cal., Mun. Code §§ 9.36.010–.020 (2012).

214. San Francisco, Cal., Mun. Police Code, art. 17 § 1291 (2012).

215. *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1248–49 (D.C. Cir. 2011) (affirming basic registration requirements for rifles and a ban on many semi-automatic rifles and on detachable rifle magazines holding more than ten rounds, while remanding for further consideration of long gun registration period and of unusual registration requirements for all guns, such as fingerprinting, training, and periodic re-registration).

216. *See* D.C. Code § 22-4504(a) (2012).

217. *Id.*

218. *Id.* § 22-4515.

law enforcement. In *Heller*, the Supreme Court struck down a similar D.C. ban on carrying guns that even prohibited a person who had a lawfully registered rifle in the home from carrying the gun from the bedroom into the kitchen in order to clean it.[219] Like the D.C. gun carry ban, the D.C. knife carry ban is grotesquely overbroad and a plain violation of the Second Amendment.

### *D. New York*

Glenn Reynolds's recent article, *Second Amendment Penumbras*, argues that, by analogy to the First Amendment, the "chilling effect" doctrine should be applied to the right to keep and bear arms.[220] While Reynolds's arguments concern firearms, they just as accurately apply to knife laws. Many restrictions and regulations adopted "[d]uring our nation's interlude of hostility toward guns in the latter half of the twentieth century" suggest that:

> the underlying goal is to discourage people from having anything to do with firearms at all. . . . At present, Americans face a patchwork of gun laws that often vary unpredictably from state to state, and sometimes from town to town. Travelers must thus either surrender their Second Amendment rights, or risk prosecution.[221]

One example of the chilling effect of knife regulation comes from New York City. Defendant John Irizarry was arrested in Brooklyn when a police officer noticed a folding knife sticking out of his pocket.[222] The police officer decided (as it turns out, incorrectly) that this was a gravity knife[223] and stopped Irizarry. Irizarry explained that he used the "Husky Sure-Grip Folding Knife" as part of his job, as did indeed turn out to be the case. The police officer arrested him anyway, leading to the discovery of a concealed pistol.

Irizarry sought to suppress the discovery of the pistol because the search was subsequent to an arrest for something that was not a crime. The federal court ruled in Irizarry's favor because the knife in question was not a gravity knife within the definition of New York

---

219. *See* District of Columbia v. Heller, 554 U.S. 570, 630–31, 635 (2008).
220. Glenn Harlan Reynolds, *Second Amendment Penumbras*, 85 S. CAL. L. REV. 247, 251 (2012).
221. *Id.* at 251–52.
222. United States v. Irizarry, 509 F. Supp. 2d 198, 199 (E.D.N.Y. 2007).
223. The precise definition of a "gravity knife" is discussed *supra* Part III.E. Irizarry's knife was plainly not a gravity knife. *See id.* at 210.

law, but also because "[t]he widespread and lawful presence of an item in society undercuts the reasonableness of an officer's belief that it represents contraband."[224] The defendant's Husky Sure-Grip Folding Knife is a proprietary product sold by Home Depot, which sold 67,341 units in 2006 in New York state alone.[225] The manufacturer of a competing but similar knife reported that it sold 1,765,091 units nationally in 2006.[226] Although the courts did eventually find in Irizarry's favor, any observer of what happened would rightly conclude that carrying even a completely legal knife in New York City is looking for trouble with the police. These onlookers would therefore choose not to exercise their constitutional right to carry knives, meaning their conduct would be chilled.

The courts ruled for Irizarry, but the New York City government did not learn its lesson. In 2010, Manhattan District Attorney Cyrus Vance, Jr. threatened criminal charges against Home Depot, Ace Hardware, and a number of hardware, general, and sporting goods retailers for selling knives that the District Attorney characterized as "illegal knives."[227] As a result of the threat of criminal prosecution and to avoid going to trial on charges, these retailers signed settlement agreements and turned over $1.9 million to finance a so-called public education campaign and other anti-knife efforts by the District Attorney.[228]

The specific claimed violations in this instance involved gravity knives or switchblades. Again, as in the *Irizarry* case, Home Depot pointed out that "[t]hese are common knives" often used in construction and home improvement projects.[229] Some of the arrests associated with these "illegal knives" demonstrate that the definition of "gravity knife" under New York law is subject to abusive prosecution. New York police arrested the noted painter John Copeland a few months after District Attorney Vance's aforementioned settlement with the chain stores for carrying a Benchmade three-inch folding knife, on the allegation that it was a "gravity knife."[230]

Although charges were eventually dropped against Copeland because his lawyer was able to show that Copeland is a serious artist

224. *Id.* at 209.

225. *Id.* at 203–04.

226. *Id.* at 204.

227. *See* Press Release, N.Y. Cnty. Dist. Attorney's Office, *supra* note 53.

228. *See id.*

229. John Eligon, *14 Stores Accused of Selling Illegal Knives,* N.Y. TIMES (June 17, 2010), http://www.nytimes.com/2010/06/18/nyregion/18knives.html?_r=1&.

230. *See* Melissa Grace, *Artist Furious for Being Busted on Weapons Possession Over a Pocket Knife He Uses for Work*, DAILY NEWS (Jan. 26, 2011), http://www.nydailynews.com/new-york/artist-furious-busted-weapons-possession-pocket-knife-work-article-1.155163#ixzz2KSCt0Z5z.

and used the knife in his work for cutting canvas,[231] it does not take much effort to imagine the results if someone who lacked a national reputation or a well-paid attorney had been arrested under the same circumstances. Police arrested Copeland because they thought that they saw a knife in his pants pockets. There was no allegation of any criminal misuse.[232]

Another example of the zeal with which New York City enforces its knife laws—with no connection to criminal misuse—is the story of Clayton Baltzer. Baltzer's "fine-arts class at Baptist Bible College & Seminary in Clarks Summit, Pa." went on a field trip to the Metropolitan Museum of Art.[233] In a subway station, a plainclothes police officer grabbed Baltzer by the arm because his pocketknife clip was visible.[234] Unlike Copeland, Baltzer was convicted and sentenced to a $125 fine and two days of community service. Baltzer has learned his lesson: "I don't plan on visiting New York unless I have to."[235]

### *E. State Regulation of Switchblades*

One of the most important state supreme court decisions regarding knives is *State v. Delgado*.[236] There, the Oregon Supreme Court struck down Oregon's ban on the manufacture, sale, transfer, carrying, or possession of switchblades on the grounds that it violated

231. *Id.*

232. *See id.*

233. Jeb Phillips, *Bible-College Student's Pocketknife Spoils Trip to New York City*, COLUMBUS DISPATCH (June 12, 2012), http://www.dispatch.com/content/stories/local/2012/06/12/knife-trouble-in-a-new-york-minute.html.

234. New York City's Administrative Code has the unusual requirement that all knives be carried concealed. *See* N.Y.C., N.Y., ADMIN. CODE § 10-133 (2010). The officer interpreted the visibility of the clip as a violation of the law:

> Baltzer has carried a pocketknife almost everywhere since he was a 14-year-old camp counselor. He clips it on his pocket so that the clip is visible, but the knife isn't. He always uses two hands to open it, the way most people would a regular pocketknife. . . .
>
> In Baltzer's telling, the officer tried to flick it open and couldn't. He handed it to another officer, who did flick it open after several tries.
>
> Baltzer was arrested and charged with the highest degree of misdemeanor under New York law. He had another knife in his backpack, a fixed-blade one he used to whittle for kids at a special-needs camp in Pennsylvania. He forgot he had it in his bag. Police confiscated that one, too.

Phillips, *supra* note 233.

235. Phillips, *supra* note 233.

236. State v. Delgado, 692 P.2d 610 (Or. 1984).

the Oregon Constitution's "right to bear arms" provision.[237] The defendant, Joseph Delgado, "was walking with a companion on a public street. The two appeared disorderly to an officer nearby, and when the defendant reached up as he passed a street sign and tapped or struck it with his hand, the officer confronted both individuals and conducted a pat down search."[238] In the course of that search, officers found a switchblade knife concealed in Delgado's pocket, which he claimed that he carried for self-defense.[239]

The Oregon Supreme Court built upon a previous decision, *State v. Kessler*, which had recognized that "the term 'arms,' as contemplated by the constitutional framers, was not limited to firearms but included those hand-carried weapons commonly used for personal defense."[240] *Kessler* had recognized that possession of billy clubs was protected in one's home.[241] *Delgado* extended *Kessler*'s decision and recognized that a switchblade knife was also a protected arm under the state's constitution.[242]

The state argued that the switchblade knife "is an offensive weapon used primarily by criminals."[243] The Oregon Supreme Court decided that the distinction between defensive and offensive weapons was unpersuasive because the characteristics of defensive and offense of weapons strongly overlap: "It is not the design of the knife but the use to which it is put that determines its 'offensive' or 'defensive' character."[244]

The Oregon Supreme Court also engaged in originalist analysis, observing that possessing and carrying pocketknives is deeply embedded in European and American history. The court wrote that "knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th century has been commonly carried by men in America and used primarily for work, but also for fighting."[245]

What about the switchblade? The state had argued that the switchblade is fundamentally different from its historical ancestor, the folding pocketknife, which would have been known when the Oregon Constitution was drafted in 1859. The Oregon Supreme Court was not persuaded:

237. *Id.* at 610.
238. *Id.* at 611.
239. *Id.*
240. *See id.* at 611 (citing State v. Kessler, 614 P.2d 94, 98 (Or. 1980)).
241. *Kessler*, 614 P.2d at 100.
242. *Delgado*, 692 P.2d at 611, 614.
243. *Id.* at 612.
244. *Id.*
245. *Id.* at 613–14.

> We are unconvinced by the state's argument that the switchblade is so "substantially different from its historical antecedent" (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally. . . . This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges and repeating rifles. The addition of a spring to open the blade of a jackknife is hardly a more astonishing innovation than those just mentioned.[246]

The Oregon Supreme Court noted that the 1958 Federal Switchblade Act was based on the theory that switchblades were "almost exclusively the weapon of the thug and the delinquent."[247] The *Delgado* court, however, observed that the relevant congressional testimony "offers no more than impressionistic observations on the criminal use of switch-blades."[248] The *Delgado* decision did not completely forbid the state from regulating the manner in which a switchblade might be carried. The state could prohibit the concealed carry of a switchblade; the complete prohibition on sale, transfer, manufacture, or possession, however, was unconstitutional.[249]

Unlike Oregon, some states continue to ban even the home possession of switchblades.[250] If switchblades are "typically possessed . . . for lawful purposes," then the bans are unconstitutional under *Heller*. Of course, in a state where switchblades are banned, everyone who owns a switchblade is, by definition, a criminal. Besides that, bans on the sale of switchblades will have made it impossible for law-abiding citizens to obtain them, so the switchblades will not be in "typical" use in that state. A law passed during a moral panic sixty years ago might thus end up trumping the Constitution because its prohibition has made that weapon "not typically possessed . . . for lawful purposes."[251]

We can see this problem in *Lacy v. State*, in which the Indiana Court of Appeals upheld a ban on the possession of automatic knives on the grounds that "switchblades are primarily used by

---

246. *Id.* at 614.

247. *Id.* at 612 (quoting S. REP. NO. 85-1980 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3435).

248. *Id.*

249. *See id.* at 614.

250. *E.g.*, COLO. REV. STAT. § 18-12-102 (2012) (possession of gravity or switchblade knives is a felony, even in one's home); TENN. CODE ANN. § 39-17-1302 (2012) (possession, manufacture, transportation, repair, or sale of a switchblade knife is a class A misdemeanor).

251. *See* District of Columbia v. Heller, 554 U.S. 570, 625 (2008).

criminals and are not substantially similar to a regular knife or jackknife."[252] If they are illegal, then by definition they will be "primarily used by criminals,"[253] as any prohibited arm would be.

Lacy quotes *Crowley Cutlery Co. v. U.S.* to refute the Oregon Supreme Court's position in *Delgado* that switchblade knives are not intrinsically different from other knives.[254] *Crowley* argued that switchblade knives "are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."[255] It requires no expert testimony to demonstrate that this claim is incorrect. A switchblade knife's handle, when closed, must be at least as long as the blade. In this respect, it is no different from any folding knife; the enclosure must be slightly longer than the blade. No switchblade knife can be any more concealable than its non-automatic counterpart.

Besides that, all one need do is look at states where switchblades are not banned, and one will see that switchblades are indeed typically possessed by law-abiding citizens for legitimate purposes.

## Conclusion

Knives are among the "arms" protected by the Second Amendment. They easily fit with the Supreme Court's *Heller* definition of protected arms, namely that they be usable for self-defense and typically owned by law-abiding citizens for legitimate purposes.

Statutes that ban or impose special restrictions based on how a knife opens, or on whether an opened knife can be locked open, cannot survive any form of heightened scrutiny analysis. Indeed, many laws regulating knives cannot even survive rational basis scrutiny. As we have previously observed, knives are among the arms that Americans have a right to bear, and their lower lethality relative to handguns means that there is not even a *rational basis* for laws that regulate carrying knives more restrictively than carrying handguns.

252. Lacy v. State, 903 N.E.2d 486, 492 (Ind. Ct. App. 2009).

253. *See id.* at 488, 491–92.

254. Delgado, 692 P.2d at 614 ("We are unconvinced by the state's argument that the switch-blade is so 'substantially different from its historical antecedent' (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally.")

255. Crowley Cutlery Co. v. United States, 849 F.2d 273, 278 (7th Cir. 1988). Note that the plaintiff's suit had far more serious problems than the question of the criminal nature of switchblades. The Court of Appeals wrote: "this is not to say that the issue of the Switchblade Knife Act's constitutionality necessarily is frivolous. It is the specific grounds articulated by Crowley that are frivolous, and make the suit frivolous." *Id.* at 279.

This Article has not aimed to resolve definitively every question about knife laws in the United States. Rather, it has endeavored to provide a starting point for further study and to examine some of the prohibitions that may be most clearly unconstitutional under the Second Amendment. In a practical sense, the most frequent way that Americans exercise their Second Amendment rights is by owning and carrying knives. Knife rights are worthy of judicial protection and of further scholarly study.



DATE DOWNLOADED: Thu Oct 27 15:52:40 2022
SOURCE: Content Downloaded from HeinOnline

Citations:

Bluebook 21st ed.
David B. Kopel & Joseph G.S. Greenlee, The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms, 13 Charleston L. REV. 205 (2018).

ALWD 7th ed.
David B. Kopel & Joseph G.S. Greenlee, The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms, 13 Charleston L. Rev. 205 (2018).

APA 7th ed.
Kopel, D. B., & Greenlee, J. (2018). The sensitive places doctrine: locational limits on the right to bear arms. Charleston Law Review, 13(2), 205-294.

Chicago 17th ed.
David B. Kopel; Joseph G.S. Greenlee, "The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms," Charleston Law Review 13, no. 2 (Winter 2018): 205-294

McGill Guide 9th ed.
David B. Kopel & Joseph G.S. Greenlee, "The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms" (2018) 13:2 Charleston L Rev 205.

AGLC 4th ed.
David B. Kopel and Joseph G.S. Greenlee, 'The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms' (2018) 13(2) Charleston Law Review 205

MLA 9th ed.
Kopel, David B., and Joseph G.S. Greenlee. "The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms." Charleston Law Review, vol. 13, no. 2, Winter 2018, pp. 205-294. HeinOnline.

OSCOLA 4th ed.
David B. Kopel & Joseph G.S. Greenlee, 'The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms' (2018) 13 Charleston L Rev 205

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use: Copyright Information

# THE "SENSITIVE PLACES" DOCTRINE: LOCATIONAL LIMITS ON THE RIGHT TO BEAR ARMS

*David B. Kopel*[1] & *Joseph G.S. Greenlee*[2]

INTRODUCTION .......... 206
- I. England .......... 208
  - A. Background .......... 208
  - B. Cicero .......... 210
  - C. The Middle Ages .......... 211
  - D. The Early Modern Period .......... 219
  - E. Sir John Knight's Case .......... 222
  - F. The 1689 Bill of Rights and Thereafter .......... 226
- II. Colonial and Founding Periods .......... 229
  - A. Legislatures and Elections .......... 235
  - B. Hunting on Private Land Without Permission .......... 236
  - C. Boston's Fire Prevention Law .......... 240
  - D. Laws Against Carrying Arms for the Purpose of Causing Terror .......... 241
- III. Nineteenth Century .......... 244
  - A. Polling Places and Courts .......... 244
  - B. Continuation of Earlier Rules Against Misconduct with Arms .......... 247
  - C. Blue Laws .......... 248

---

1. Adjunct Professor of Constitutional Law, Denver University, Sturm College of Law; Research Director, Independence Institute, Denver, Colorado; Adjunct Scholar, Cato Institute, Washington, D.C., http://davekopel.org. Parts of this article are adapted from the law school textbook NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2d ed. 2017).

2. Fellow in Constitutional Studies and Firearms Policy, Millennial Policy Center; Policy Advisor for Legal Affairs, The Heartland Institute; Steamboat Institute, Emerging Leaders Advisory Council; J.D. 2014, Denver University, Sturm College of Law, http://josephgreenlee.org.

D. Schools ............ 249
E. Bans on Carrying at Many Locations ............ 252
IV. Twentieth Century ............ 258
V. Post-*Heller* Cases ............ 266
A. Public Lands ............ 266
1. Parking Lots in National Parks: *United States v. Masciandaro* ............ 266
2. Buffer Zones Around Parks: *People v. Chairez* ............ 269
3. Army Corps of Engineers Lands: *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers* ............ 272
4. Army Corps of Engineers Lands: *Morris v. U.S. Army Corps of Engineers* ............ 274
B. Post Offices and their Parking Lots ............ 276
1. *United States v. Dorosan* ............ 276
2. *Bonidy v. U.S. Postal Service* ............ 277
C. Higher Education Buildings ............ 281
D. Common Areas in a Public Apartment Building ............ 283
E. Parking Lots of Premises with Liquor Licenses ............ 284
F. Buffer Zones Around Residential Areas, Churches, Schools, and Liquor Stores ............ 285
VI. Applying the Doctrine ............ 287
A. Structure of Judicial Review ............ 287
B. History and Precedents ............ 289
C. Considerations in Particular Cases ............ 292
VII. Conclusion ............ 294

## INTRODUCTION

Where may the government prohibit the bearing of arms? In *District of Columbia v. Heller*, the U.S. Supreme Court offered a short answer: "in sensitive places such as schools and government buildings."[3] This Article examines the historical foundation and

3. 554 U.S. 570, 626 (2008).

the modern application of the sensitive places doctrine.

*Heller*'s terse "sensitive places" dicta was part of a list of three types of "presumptively lawful regulatory measures."[4] The Court promised that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."[5]

Since the 2008 *Heller* opinion, the Court has not elaborated on the meaning of "sensitive places." Thus, lower courts have been required to find their own answers.

This Article is the first to analyze the full scope of the sensitive places doctrine.[6] Part I examines English history, starting with a 1313 law that forbade bringing arms to Parliament. Protecting government deliberation from violent interference is the core of the sensitive places tradition.

Part II looks at colonial America and the Founding. Several colonial and early state laws safeguarded government deliberation by barring arms from courts or polling places.

Some scholars have argued that in England and Early America, arms carrying was prohibited everywhere. Parts I and II address that argument.

Part III covers the nineteenth century, when more states enacted laws for protection of government deliberation. A few states enacted laws against carrying arms at most public or private gatherings.

---

4.

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27.

5. *Id.* at 635.

6. For application of the doctrine in a particular context, *see* Amy Hetzner, Comment, *Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 MARQ. L. REV. 359 (2011) (recommending that laws prohibiting firearms possession within a thousand feet of a school be changed to instead prohibit only firearms discharge).

Part IV surveys the twentieth century and the pre-*Heller* portion of the twenty-first.

Post-*Heller* precedent is covered in part V, describing how courts have tried to decide what places are "like" schools and government buildings.

Finally, Part VI consolidates the rules of the "sensitive places" doctrine, based on text, history, tradition, and precedent.

## I. England

### A. Background

According to medieval historian Frank Barlow, "[i]t is not unlikely that every freeman had the duty, and right, to bear arms" in Anglo-Saxon times.[7] Later, statutes would specify required arms. Most notably, the Statute of Winchester, enacted in 1285, required "every man between fifteen years and sixty" to possess particular arms.[8] The particular arms varied depending on a

---

7. FRANK BARLOW, EDWARD THE CONFESSOR 172 (1970).

8.

> (5) It is likewise commanded that every man have in his house arms for keeping the peace in accordance with the ancient assize; namely that every man between fifteen years and sixty be assessed and sworn to arms according to the amount of his lands and, of his chattels; that is to say,
> for fifteen pounds of land, and, forty marks worth of chattels, a hauberk [a mail shirt], a helmet of iron, a sword, a knife and a horse;
> for ten pounds worth of land and, twenty marks worth of chattels, a haubergeon [a sleeveless hauberk], a helmet, a sword and a knife;
> for a hundred shillings worth of land, a doublet [a padded defensive jacket], a helmet of iron, a sword and a knife;
> for forty shillings worth of land and over, up to a hundred shillings worth, a sword, a bow, arrows and a knife;
> and he who has less than forty shillings worth of land shall be sworn to have scythes, gisarmes [a long pole with a two-sided blade], knives and other small weapons;
> he who has less than twenty marks in chattels, swords, knives and other small weapons.
> And all others who can do so shall have bows and arrows outside the forests and within them bows and bolts [i.e., crossbows and bolts for crossbows].
> And that the view of arms be made twice a year. And in each hundred and liberty let two constables be chosen to make the view of arms

person's financial resources. The poorest had to at least have "swords, knives and other small weapons."[9] Richer people needed these, and also pole-arms (poles with a blade or spike at the end).[10] As net worth increased further, all men of the specified ages needed metal armor.[11]

The Statute of Winchester also formalized the ancient system of "hue and cry": in order to stop crimes or apprehend fleeing felons, all men in an area had the duty to come forth with their arms, when summoned.[12] The hue and cry was one of several arms-bearing duties of Englishmen. Another was militia service. Among the components of militia duty was practicing weekly with the long bow, and teaching boys how to use it.[13] Additionally, for the security of towns, English subjects had to take turns on the daily "watch" and the nightly "ward."[14] Finally, males (including those as young as 15) could be summoned by a sheriff or similar official for law enforcement duties, such as helping to serve a writ or to suppress a riot; this system was known as the *posse comitatus*.[15]

As soon as the English settlers crossed the Atlantic in 1606, a

> and the aforesaid constables shall, when the justices assigned to this come to the district, present before them the defaults they have found in arms, in watch-keeping and in highways; and present also people who harbour strangers in upland vills for whom they are not willing to answer. And the justices assigned shall present again to the king in each parliament and the king will provide a remedy therefore. And from henceforth let sheriffs and bailiffs, whether bailiffs of liberties or not, whether of greater or less authority, who have a bailiwick or forester's office, in fee or otherwise, take good care to follow the cry with the district [the hue and cry, discussed below], and, according to their degree, keep horses and arms to do this with; and if there is any who does not do it, let the defaults be presented by the constables to the justices assigned, and then afterwards by them to the king as aforesaid.

Statute of Winchester, 13 Edward I, chs. 4–6 (1285) (paragraphing added).

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. JOHNSON ET AL., *supra* note 1, at 103–105, 111 (listing statutes).

14. *Id.* at 80–81 (listing treatises).

15. *See* David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 671 (2015).

new, American arms culture began to emerge.[16] By necessity, the English in America adopted much of the American Indian arms culture.[17] As the decades passed, the new and distinctive Anglo-American synthesis became more and more different from the arms culture back in England.[18] Eventually, the exceptional American arms culture helped produce the American Revolution and the Second Amendment.[19]

Thus, historical practices in England cannot be directly applied to interpretation of the Second Amendment. The arms ethos of the American Revolution and the Early Republic was a conscious repudiation of what Americans saw as an insufficiently robust right in England. Nevertheless, the English arms culture of the middle ages was an ancestor of the later American one, and is therefore relevant to understanding the background of the American right.

## B. Cicero

One thing the medieval English and the American Founders had in common was reverence for the great Roman orator and lawyer Cicero. Unlike most other Classical writers (e.g., Livy), Cicero was not lost in the West during the dark ages and then rediscovered during the middle ages. He was always well-known to educated people.

Until the nineteenth century, Latin was a standard part of secondary education. Countless pupils studied the following

16. *See* 7 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3783, 3786 (Francis Newton Thorpe ed., 1909) (1606 Virginia Charter's perpetual guarantee of the right to import arms); JOHNSON ET AL., *supra* note 1, at 171–74 (American arms rights guarantees), 234–39 (militia culture differences).

17. JOHNSON ET AL., *supra* note 1, at 193–94, 220.

18. *Id.* at 239–40.

19. *Id.* at 240 ("Ultimately, the American Revolution came because the colonists were no longer English, having become a new people. Among the exceptional characteristics of this new people was their hybrid arms culture, the product of meeting and blending of English and Indian arms cultures."), 283–84 (American belief that their marksmanship and skill at arms were far superior to the British). "The Colonists in America were the greatest weapon using people of that epoch in the world." CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY: 1600 TO 1800, at 1 (1910). Because they were, they were able to transform themselves from British subjects into American citizens.

speech by Cicero, in defense of Titus Annius Milo:

> What is the meaning of our retinues, what of our swords? Surely it would never be permitted to us to have them if we might never use them. This, therefore, is a law, O judges, not written, but born with us—which we have not learned, or received by tradition, or read, but which we have taken and sucked in and imbibed from nature herself; a law which we were not taught, but to which we were made—which we were not trained in, but which is ingrained in us—namely, that if our life be in danger from plots, or from open violence, or from the weapons of robbers or enemies, every means of securing our safety is honorable. For laws are silent when arms are raised, and do not expect themselves to be waited for, when he who waits will have to suffer an undeserved penalty before he can exact a merited punishment.
>
> The law very wisely, and in a manner silently, gives a man a right to defend himself. . .the man who had used a weapon with the object of defending himself would be decided not to have had his weapon about him with the object of killing a man.[20]

The Cicero speech is one of the foundational self-defense texts in Western political thought. Although many students recited Cicero's Milo oration, Cicero himself was prevented from doing so, by the intimidation of friends of the man whom Milo had killed in self-defense.[21] The full story of Cicero's thwarted speech demonstrates why "sensitive places" rules may be necessary: misuse of arms may prevent the operation of courts and other institutions of a free government. As will be detailed, the origins of the sensitive places doctrine addressed the problem.

### C. The Middle Ages

A 1313 statute provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well

20. Marcus Tullius Cicero, Speech in Defence of Titus Annius Milo (52 B.C.), *in* 3 ORATIONS OF MARCUS TULLIUS CICERO 204–05 (Charles Duke Yonge trans., rev. ed. 1899), https://babel.hathitrust.org/cgi/pt?id=uc1.a0007574619;view=1up;seq=23.

21. *Id.* at 390.

and peaceably."[22] In other words, Parliament and similar assemblies should be conducted without arms present at the deliberations.

The statute also said that the English nobles and the common people all had the duty to defend civil peace against violent attackers: "straitly to defend force of armour,[23] and all other force against our peace. . ."[24]

The 1313 statute was consistent with the Statute of Winchester and other arms duties. To safeguard civil peace in general, and parliamentary operation in particular, armed and responsible people would indeed be necessary at times in English history.[25]

---

22.

> Whereas of late, before certain Persons deputed to treat upon sundry debates had between us and certain great men of our realm, amongst other things, it was accorded, That, in our next Parliament, after, provision shall be made by us and the common assent of the prelates, earls, and barons, that in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably, to the honour of us, and the peace of us and our realm ; and now, in our next parliament, at Westminster, after the said treaties, the prelates, earls, barons, and the commonalty of our realm there assembled to take advice of this business, have said, That to us it belongeth, and our part is, through our royal seigniory, straitly to defend force of armour, and all other force against our peace, at all times when it shall please us ; and to punish them which shall do contrary, according to our laws and usages of our realm ; and hereunto they are bound to aid us, as their sovereign lord at all seasons when need shall be : we command you that you cause these things to be read afore you in the said bench, and there to be enrolled. Given at Westminster the 30th day of October.

7 Edw. 2, 170 (1313).

23. At the time, "arms" and "armour" were used interchangeably. Each word referred to offensive *and* defensive equipment—such as swords and chain mail.

24. *Id.*

25. For example, in 1780, a raucous crowd of at least fifty thousand assembled outside Parliament to demand a repeal of a statute that had reduced civil disabilities on Catholics. When Parliament refused, massive riots ensued. CHRISTOPHER HIBBERT, KING MOB: THE LONDON RIOTS OF 1780 (1958). After days of government failure to stop the rioting, looting, and killing, the riots were finally suppressed by armed neighborhood patrols. *Id.* at 117–19. After peace was restored, Parliamentary debate sharply criticized a government official who had

Edward II had been king when the parliamentary protection statute was enacted. In 1327, he was overthrown by an invasion led by his wife, Queen Isabella (a French Princess—"the she-wolf France," according to her critics).[26] Isabella and her consort Roger Mortimer took over the government, whose nominal monarch was King Edward III, son of Edward II and Isabella. The monarchy's ability to enforce the law was close to non-existent.[27]

The widespread problem was "the gentry . . . using armed force to defeat the course of justice."[28] Indeed, for decades there had been a problem of "magnates maintaining criminals."[29]

The House of "Commons' complaints about armed noblemen" were congenial to Queen Isabella and Mortimer. Fearful of being overthrown, the Queen did not want armed men coming to Parliament or coming armed to meet the Queen.[30] Isabella and Mortimer found it "politically necessary to check dissent against

wanted to disarm the neighborhood patrols. *Id.* at 119; 21 PARLIAMENTARY HISTORY OF ENGLAND FROM THE EARLIEST PERIOD TO THE YEAR 1803: COMPRISING THE PERIOD FROM THE ELEVENTH OF FEBRUARY 1780, TO THE TWENTY-FIFTH OF MARCH 1781, at 691–93 (June 19, 1780) (William Cobbett ed., 1814), https://books.google.com/books/about/Cobbett_s_Parliamentary_History_of_Engla.html?id=jZk9AAAAcAAJ.

The Recorder of London (the city attorney) issued an opinion affirming the legality of the armed patrols, which the Recorder said were based on "most clearly established . . . authority of judicial decisions and ancient acts of parliament." WILLIAM BLIZARD, DESULTORY REFLECTIONS ON POLICE: WITH AN ESSAY ON THE MEANS OF PREVENTING CRIME AND AMENDING CRIMINALS 59–60 (1785), https://archive.org/details/b22390625/page/n3.

Violent threats to Parliament could come not only from the rabble, but from the top of the social order. In 1642, King Charles I sent a body of soldiers to Parliament to arrest five members who had denounced the king's increasingly despotic and lawless actions. Fortunately, the members had fled before the soldiers arrived. Parliament called forth the London militia for protection against the king. *See* JOHN FORSTER, ARREST OF THE FIVE MEMBERS BY CHARLES THE FIRST (1860), https://archive.org/details/arrestoffivememb00forsiala/page/n6; GEORGE MACAULEY TREVELYAN, ENGLAND UNDER THE STUARTS 198–200 (Folio Soc. 1996) (reprint of 3d ed. 1946).

26. *See* ALISON WEIR, ISABELLA: SHE-WOLF OF FRANCE, QUEEN OF ENGLAND (2012).

27. Anthony Verduyn, *The Politics of Law and Order during the Early Years of Edward III*, 108 ENG. HIST. REV. 842 (1993).

28. W. R. Jones, *Rex et ministri: English Local Government and the Crisis of 1341*, 13 J. BRIT. STUDS. 1, 19 (1973).

29. Verduyn, *supra* note 27, at 849.

30. *Id.*

the increasingly unpopular regime."[31]

In 1328, the Statute of Northampton was propounded (nominally by Edward III). The preeminent purpose was to prohibit arms carrying around the king's officials: "no man great nor small. . .be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace. . ."[32] Straightforwardly, the statute outlawed coming "with force and arms" against the King's officials, especially judges. The prohibition served several purposes: preventing powerful criminals from armed attacks on the functioning of courts; preventing criminal attacks on other government officials; and preventing armed overthrow of the Queen and her consort.

But the statute also went further. It prohibited "force in affray of the peace"—for example, a brawl by mutual consent in a tavern or street. The ban on affrays applied everywhere, not just in the presence of government officials.

The statute continued: "nor to go nor ride armed by night or by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere. . ."

Seven centuries later, scholars and court are still trying to discern the meaning of the three "nor" clauses. The first, "in fairs or markets" (at any hour) seems straightforward. Some towns had a fair or market periodically in part of the town. Some areas of large towns might have permanent fairs or markets.

31. *Id.* at 856.

32.

> Item, it is enacted, that no man great nor small, of what condition soever he be, except the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night or by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.

2 Edw. 3, c. 3 (1328).

The next "nor" ("in the presence of the justices or other ministers") simply repeats the previously-stated provision for government officials.

Lastly, there is "nor in no part elsewhere." Was this a comprehensive ban on arms carrying anywhere by anyone except the monarch's servants?

Read literally, the "nor in no part elsewhere" clause made it illegal to "go armed" everywhere—such as by wearing a sword on one's own land; shooting a bow at a cattle thief; taking an arm home after buying it from a merchant; or taking it to a craftsman for repair.

The principle of *noscitur a sociis* (it is known by its associates) would temper such an over-reading. When general language ("no part elsewhere") follows a specific list, the general language is to be interpreted in the context of the preceding list. For example, a statute that says "a license is required to sell grapefruits, oranges, lemons, and other food" would be interpreted to apply to all citrus fruits, but not to chickens.[33] So under *noscitur a sociis*, the Statute of Northampton would be read to ban arms carrying in markets, in courts, and in places that are like markets and courts.

Based on the text alone, one might read the Statute of Northampton in two ways: First, it could be a carry ban in selected locations (e.g., around the king's ministers, in fair and markets, and in similar locations). If so, Northampton would be one of the ancestors of the sensitive places doctrine.

Alternatively, if the final clause is interpreted as a comprehensive ban on carrying arms anywhere, then Northampton would be a negation of the right to bear arms. As such, it would be contrary to the text of the Second Amendment. More particularly, it would be contrary to the sensitive places doctrine; the sensitive places doctrine is an exception to the general right to bear arms. If there were no general right to bear arms, then the sensitive places doctrine would be superfluous.

What actually happened was something of a mixture. The ban on carrying around courts was enforced as written, and in that respect does contribute to the sensitive places lineage. In contrast,

33. The formal rule appears to date from 1672. *See Lambert's Lessee v. Paine*, 7 U.S. (3 Cranch) 97, 110 (1805).

the known historical record is bereft of enforcement directed at "fairs or markets." Nothing that lay ahead in Anglo-American law would make fairs or markets into sensitive places.

As for Northampton being a general prohibition on carrying, it was so interpreted at least sometimes, notably in London. But over the centuries, arms carrying became so common that any prohibitory interpretation had been de facto nullified by the English people and had ceased to have force as law—as the King's Bench would acknowledge in 1686.

Edward III seized power from Queen Isabella in 1330. His applications of the 1328 statute were to protect judicial function, and to protect himself personally. As to the former, he issued a 1337 order, quoting the Statute of Northampton, ordering a county sheriff to take action against men who were planning on assaulting some jurors.[34]

As applied to London, the seat of government, Edward III read the Statute broadly. He repeatedly issued edicts against the carrying of arms anywhere in London. For example, one edict instructed hostelers to tell their guests that the guests must leave their arms at the hostel or inn, and not carry them around London.[35] This indicates that carrying arms in town or while traveling was an ordinary activity and that the typical Englishman did not know that there was a ban on arms carrying in London.

The first known case under the Northampton statute comes from 1350, when a knight named Thomas Figet wore armor,

34. *Cf.* CALENDAR OF THE CLOSE ROLLS, EDWARD III, 1337-1339, at 104–05 (H.C. Maxwell-Lyte ed., 1900) (1337) (order to the Sheriff of Berks explaining that men had been plotting "to beat, wound and ill-treat jurors" and that the Sheriff should enforce the law that "no one, except the king's serjeants and ministers, shall go armed or ride with armed power before the justices at the said day and places, nor do anything against the peace.").

35. MEMORIALS OF LONDON AND LONDON LIFE 192 (Henry Thomas Riley ed. & trans., 1868) (1334) (no carrying); *id.* at 268–69 (1351; no carrying, but earls and barons may carry swords except in the presence of the king or in a parliament meeting; mentioning Northampton); 272–73 (1353, instructions to hostelers). A document stating an exception for the peers of the realm (the very highest nobility) was cited by the U.S. Supreme Court in *Heller*, as an example of a non-militia usage of the term "bear arms." *See Heller*, 554 U.S. at 588 n.10 (citing JOHN BRYDALL, PRIVILEGIA MAGNATUM APUD ANGLOS: OR, THE PRIVILEGES AND PREHEMINENCES BELONGING TO OUR ENGLISH PEERAGE 14 (1704)).

concealed underneath clothing, in the king's palace and in Westminster Hall, the home of Parliament. He said that he was wearing the armor because earlier in the week he had been attacked by another knight. The earliest surviving account of the case is from a 1584 treatise that stated: "a man will not go armed overtly, even though it be for his defense, but it seems that a man can go armed under his private coat of plate, underneath his coat etc., because this cannot cause any fear among people."[36]

Later commentary on the case, by Edward Coke in the seventeenth century, reported that Figet had been thrown in prison without trial.[37] He petitioned for a writ of mainprise (similar to bail) and was denied.[38] Based on the denial, Coke wrote that there was no concealed carry exception.[39] There is no doubt that unauthorized wearing of arms or armor in the presence of Edward III himself was the core of what Edward III's statute forbade.

Edward III was succeeded in 1377 by Richard II. He had the potential to become a good king, but after he nearly lost his crown in the Peasants Revolt of 1381, he grew paranoid, arbitrary, and despotic. Some scholars believe that he was mentally ill. But just because he was paranoid didn't mean that he didn't actually have enemies. He was overthrown by Henry IV in 1399 and executed the next year.

In 1388, a statute was enacted to prohibit servants and laborers from carrying swords and daggers, except when accompanying their masters.[40] This indicates that Northampton was not interpreted as a general ban on arms carrying. To the contrary, the 1388 statute seemed to assume that people over the rank of servants and laborers (that is, the middle and upper classes) did carry arms. Edged weapons carrying by someone in the lower class was forbidden, except when in the service of a

36. RICHARD CROMPTON, L'OFFICE ET AUCTHORITIE DE IUSTICES DE PEACE 58 (1584). The passage is written in Law French (the language of English courts and lawyers at the time) and translated by David Kopel.

37. 3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 161 (Johnson & Warner eds., 1812).

38. *Id.*

39. *Id.*

40. 12 Richard II ch. 6 (1388).

higher class.

Near the end of Richard's reign, he issued an order that reiterated the Statute of Northampton, with some minor wording changes. He noted that "the said Statute is not holden" and insisted that it "shall be fully holden and kept, and duly executed."[41]

For centuries, England had struggled to win control of Wales. Even in the fifteenth century, Wales was far from pacified to English rule.[42] So a 1400 statute forbade Welshmen to wear armor in towns.[43] In 1534, King Henry VIII issued a modernized version of Northampton, applicable to Wales.[44] (English and Welsh statutes were often separate.) First, it prohibited not only arms in court, but also arms within two miles of a court.[45] It additionally forbade arms (but without the two-mile buffer zone) in "any town,

41. 20 Richard II ch. 1 (1396–97).

42. English King Edward I brought the Welsh to subjugation in 1282. The Welsh reclaimed self-government for a while in the Welsh Revolt of 1400–15, led by Owen Glendower. The Welsh disarming laws were little enforced after 1440, and anti-Welsh laws were formally repealed in the early seventeenth century as part of a general statutory cleanup. 21 James I c. 28, § 11 (1624).

43. 2 Henry IV ch. 12 (1400–01).

44.

> And be it also enacted by authority aforesaid, That no person or persons dwelling or resiaunt within *Wales* or the lordship marchers of the same, of what estate, degree or condition so ever he or they be of, coming, resorting or repairing unto any sessions or court to be holden within *Wales* or any lordships marches of the same, shall bring or bear, or cause to be brought or borne to the same sessions or court, or to any place within the distance of two miles from the same sessions or court, nor to any town, church, fair, market or other congregation, except it be upon a hute or outcry made of any felony or robbery done or perpetrated; nor in the highways, in affray of the King's peace, or the King's liege people, any bill, long-bow, cross-bow, hand-gun, sword, staff, dagger, halbert, morespike, spear or any other manner of weapon, privy coat of armour defensive, upon pain of forfeiture of the same weapon, privy coat or armour, and to suffer imprisonment and make fine and ransom to the King's highness by the discretion of the King's commissioners of his marches for the time being, except it be by the commandment, license or assent of the said justices, steward or other officer of the commissioners or council of the marches for the time being.

26 Hen. 8, c. 6, § 3 (1534).

45. *Id.*

church, fair, market or other congregation."[46] Henry's law also banned "affray" "in the highways," whether the affray was against "the King's peace, or the King's liege people."[47]

Throughout the sixteenth and seventeenth centuries, the monarchy engaged in sporadic but futile efforts to prevent people below a certain income level from owning crossbows and handguns.[48] The usual motives for such bans were present, along with genuine concerns of the Tudor monarchs that these arms distracted people from practicing with long bows, which were considered essential to national defense by the militia.[49] Under Henry VIII, Parliament prohibited riding on a highway with a loaded gun or crossbow.[50] There was an exemption for people who met the minimum income requirements for owning such arms.[51]

### D. The Early Modern Period

An indictment or presentment for violation of the Statute of Northampton had to specify that the arms carrying was *In quorandam de populo terror*—to the terror of the people.[52] For example, as one case charged: four men "do frequently ride armed with sword and pistols, and do commit reskews and break the peace and threaten the people to do them bodily injury, to the great obstruction of law and justice and to the evill example of others to perpetrate the like."[53]

Did the indictment rule mean that peaceable defensive carry was lawful? Or did it mean that the carrying of arms was inherently terrifying? Some modern authors suggest the latter.[54]

46. *Id.*
47. *Id.*
48. JOHNSON ET AL., *supra* note 1, at 104–110.
49. *Id.*
50. 33 Henry VIII ch. 6 (1541).
51. *Id.*
52. 3 COKE INSTITUTES, *supra* note 37, at 158.
53. John Christopher Atkinson, 6 QUARTER SESSION RECORDS 23 (n.d.) (case of Oct. 4, 1659).

The Courts of General Quarter Sessions of the Peace were held quarterly in the counties. The presiding judges were two justices of the peace from the county. Formally, they had general criminal jurisdiction, but rarely heard cases that were more than low-level felonies. 4 WILLIAM BLACKSTONE, COMMENTARIES *268.

54. *E.g.*, PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS

To a modern reader, this might make intuitive sense, since today there are some people who find the mere sight of a firearm objectionable or terrifying.[55] But this is not consistent with the English world. There, seeing armed people was an everyday occurrence, including the men keeping the daily watch and the nightly ward in towns, or going to or from mandatory archery practice. The sight of ordinary people carrying arms was certainly not terrifying in itself.

However, based on context, it would be sometimes be easy to discern that a particular arms carrier was not carrying as part of community service or militia practice. A person who walked into an inn or tavern to order a meal, while wearing a sword, was presumably not keeping watch and ward, and he obviously was not carrying the sword for archery practice. Was that sight terrifying? What if the arms or armor were concealed?

In 1613, King James I took the view that there was no concealed carry exception. He proclaimed "the bearing of Weapons covertly, and specially of short Dagges [small handguns], and Pistol . . . had ever beene . . . straitly forbidden." He complained that the practice had "is suddenly growen very common."[56]

Michael Dalton's 1618 manual for justices of the peace addressed the Statute of Northampton and Henry VIII's law on loaded guns. Justices of the Peace should arrest "all such as shall go or ryde armed (offensively) in Fayres, Markets, or elsewhere; or shall weare or carry and Dagges or Pistols charged.. . .[Even]

---

FROM COLONIAL MILITIAS TO CONCEALED CARRY (2018).

55. Hoplophobia (fear of arms) is a *specific phobia,* as are ranidaphobia (fear of frogs) or arachnophobia (fear of spiders). *See* PHILIP T. NINAN & BOADIE W. DUNLOP, CONTEMPORARY DIAGNOSIS AND MANAGEMENT OF ANXIETY DISORDERS 107 (2006) (hoplophobia). Considering certain things (e.g., guns, frogs, or spiders) to be disgusting is not a mental illness. The diagnosis of a phobia is appropriate only when the mental condition significantly harms an individual, such as by inducing the individual to commit crimes. *See, e.g.*, AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013); Katie Mettler, *Man Shopping for Coffee Creamer at Walmart Attacked by Vigilante for Carrying Gun he was Legally Permitted to Have*, TAMPA BAY TRIB., Jan. 20, 2015 (unprovoked attack by middle-aged white man on older black man, who had handgun carry permit).

56. 1 STUART ROYAL PROCLAMATIONS: ROYAL PROCLAMATIONS OF KING JAMES I, 1603–1625, at 285, § 126 (James Francis Larkin & Paul L. Hughes eds., 1973) (proclamation of Jan. 16, 1613).

though those persons were so armed or weaponed for their defence; for they might have had the peace against other persons; and besides, it striketh a feare and terror into the Kings subjects."[57]

Dalton's 1622 revised version of the treatise, however, was narrower. He deleted the language that defensive carry was not allowed. Instead, he wrote that if a group of people went to church wearing "privie" (concealed) armor "to the intent to defend themselves from some adversary, this seemeth not punishable" under the riot statutes, "for there is nothing openly done, *in terrorem populi*."[58] Dalton reiterated the laws against some people carrying loaded firearms and against servants or laborers carrying swords or daggers.[59] A person could be required to post surety (bond) for good behavior if he were wearing "weapons, more than usually he hath, or more than be meet for his degree."[60] Dalton's 1623 manual for sheriffs included the Statute of Northampton in his list of anti-riot statutes. He described the Statute as applying to persons who "goe or ride armed offensively. . . in affray of the kings' people." Richard II's law about servants with daggers and swords was now said to also include "other weapons."[61] Thus, Dalton's latter treatises seemed to view arms carrying by the middle and upper classes as lawful. However, a middle-class person who carried arms that were typical of the upper class might have to post bond for good behavior.

Edward Coke's very influential 1640 treatise said that Thomas Figet had been convicted for wearing concealed armor in 1350. Coke listed the traditional government service exceptions to the statute (*posse comitatus*, etc.), and home defense. For the latter, Coke stated that it was permissible for an armed assembly to

57. MICHAEL DALTON, THE COUNTREY JUSTICE 129 (1618) ("to the terror of the people") (parenthetical in original, bracket added); *see also id.* at 30. The phrase "might have had the peace" means that the armed defenders could have brought a civil action requiring their potential assailants to post bond for good behavior—"surety of the peace." American surety of the peace laws are discussed *infra*.

58. MICHAEL DALTON, THE COUNTREY JUSTICE 204 (Arno Pr. 1972) (1622).

59. *Id.* at 31.

60. *Id.* at 169.

61. MICHAEL DALTON, OFFICIUM VICECOMITUM, THE OFFICE AND AUTHORITIE OF SHERIF 14–15 (Lawbook Exchange 2009).

defend a friend's house.[62] Necessarily, the friends who were coming to a man's house would have to carry their arms while they were on the way to the house.

In practice, the greatest exception to Northampton was that it was often flouted—a fact that would be important in the leading case interpreting the statute, from 1686, discussed in the next section. For example, in 1678–81, there were fears of a Catholic coup ("the Popish Plot"), and many people went armed with a "Protestant flail"—a pair of leaded short clubs connected by leather straps. When folded, it was only nine inches long, and easy to carry concealed.[63]

### E. Sir John Knight's Case

The leading case involving the carrying of arms was decided in 1686. The King's Bench explained that the Statute of Northampton had fallen into disuse. According to the court, the statute applied only to persons who carried arms with intent to terrify; it did not apply to carrying a gun to church for self-defense.

In 1686, political tensions were rising because King James II (grandson of James I) was trying to disarm the entire English population, except for his political supporters. Sir John Knight was an Anglican and a fierce opponent of the Catholic James II. According to the government's charges, Knight violated the Statute of Northampton because he allegedly "did walk about the streets armed with guns, and that he went into church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects."[64] Knight was prosecuted, but acquitted by a jury.[65]

---

62. 3 COKE, INSTITUTES, *supra* note 37, at 161 ("Figett" as Coke spelled it).

63. H.W. Lewer, *The Flail*, 18 ESSEX REV. 177, 184–85 (Oct. 1908), https://books.google.com/books?id=jgRBAQAAMAAJ&pg=PA177&lpg=PA177&dq=H.W.+Lewer,+The+Flail,&source=bl&ots=EKEH3REXuB&sig=ACfU3U3Dj321yi_jNRumqT5_wYgQ-SQGrA&hl=en&sa=X&ved=2ahUKEwiDp8yH2fXgAhWM1IMKHQGSCswQ6AEwBnoECAcQAQ#v=onepage&q=H.W.%20Lewer%2C%20The%20Flail%2C&f=false.

64. Sir John Knight's Case, 87 Eng. Rep. 75, 76, 3 Mod. 117 (K.B. 1686).

65. Although much smaller than London, Bristol was one of the half-dozen largest English cities at the time.

Two different reporters wrote about the case.[66] Knight's attorney had pointed to the core purpose of the Statute of Northampton: "Winnington, *pro defendente*. This statute was made to prevent the people's being oppressed by great men; but this is a private matter, and not within the statute."[67]

The Chief Justice of the King's Bench,[68] stated that to "go armed to terrify the King's subjects" was "a great offence at the *common law*, as if the King were not able or willing to protect his subjects" and that "the Act is but an affirmance of that law."[69]

The Chief Justice acknowledged that "this statute be almost gone in *desuetudinem*" (unenforceability due to long disuse) for "now there be a general connivance to gentlemen to ride armed for their security."[70] However, continued the court, "where the crime

66. The reporter published in 90 Eng. Rep. (rather than the 87 Eng. Rep. account cited above) divided the case into two parts. The first part, dealing with the meaning of the Statute of Northampton, is *Rex v. Sir John Knight*, 90 Eng. Rep. 330; Comberbach 38 (1686). The second part is the bond that Knight was required to post, even though he had been acquitted. Rex v. Sir John Knight, 90 Eng. Rep. 331, Comberbach 41 (1686). *Sir John Knight's Case* is also called *Rex v. Knight*.

At the time, English judges did not issue written opinions, but instead delivered their opinions orally from the bench. Entrepreneurial reporters attended the courts, wrote down what the judges said, and then collected their reports and sold them. Eventually, many of these reports were collected into the anthology known as "English Reports."

67. Rex v. Sir John Knight, 90 Eng. Rep. 330, 330 (K.B. 1686).

68. The King's Bench was the highest criminal court, other than the House of Lords. It had jurisdiction over all criminal cases, and the most serious cases were usually brought there.

69. Sir John Knight's Case, 87 Eng. Rep. at 76.

70. 90 Eng. Rep. at 330. *Desuetudinem* and its modern form, "desuetude," refer to a statute that has become obsolete from disuse. BLACK'S LAW DICTIONARY (10th ed. 2014) (citing 20th century sources against use of the doctrine).

The court noted that the offense in the Statute of Northampton was based on what was already a crime under common law. 87 Eng. Rep. at 76. What was the pre-1328 law? "[B]efore the end of Henry III's reign there were ordinances which commanded the arrest of suspicious persons who went about armed without lawful cause." 2 FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I, at 583 (2d ed. 1898), https://oll.libertyfund.org/titles/pollock-the-history-of-english-law-before-the-time-of-edward-i-2-vols. Pollock and Maitland cited a pair of ordinances issued by Henry III in 1233. The first ordered the Sheriff of Herefordshire that if any armed clan came into his county, the sheriff should arrest them. If he could not, he should raise the hue and cry, and follow the clan from village to village.

shall appear to be *malo animo* it will come within the act."[71]

The Chief Justice apparently thought that Knight was up to no good, "but afterwards he was found, not guilty."[72] No judge could overturn a jury acquittal. Still, the Chief Judge did what he could. After Knight was acquitted, the Attorney General moved that Knight be required to post a bond for good behavior, and the King's Bench upheld the bond.[73]

The above is what the case reports say, and the reports were all that were available to Americans for understanding *Sir John Knight's Case*. More recently, scholars have found contemporary diaries (one of them written in a secret code created by the author)[74] that illuminate the backstory of the case. Knight had made many enemies by "suppressing Protestant Coventicles" (assemblies of Protestants who did not adhere to the Church of England).[75] He also enthusiastically persecuted Catholics.

On one occasion, Knight helped break up a Catholic Mass. This brought down the wrath of the Irish Catholic community in Knight's hometown of Bristol. According to the testimony, "two Irish men" lurked around Knight's house for days, found him near the Bristol town hall and "did fall upon" him.[76] They probably would have killed Knight if bystanders had not come to his aid. According to a poor woman who testified, the two Irish men later demanded that she reveal Knight's location, and when she did not, they beat her.[77] The news got back to Sir John Knight. "[T]hereupon," he "retired to a house in the Countrey very neare the Town."[78] He "did one Lords day go to a Church in Britsol with his Sword and Gun when the two Irishmen were thought to looke

CALENDAR OF CLOSE ROLLS, 2 HENRY III (1231–1234), at 317 (1906) (July 1233). Several months later, a similar order was sent to four other sheriffs, *id.* at 328–39 (Oct. 1233).

71. 90 Eng. Rep. at 330. *Malo animo* is "With evil intent; with malice." BLACK'S LAW DICTIONARY, *supra* note 70.

72. 90 Eng. Rep. at 330.

73. *Id.* at 331.

74. ROGER MORRICE, THE ENTRING BOOK OF ROGER MORRICE 1677–1691 (Mark Goldie et al. eds., 2007).

75. 3 *id.* at 307–08 (entry of Nov. 27).

76. *Id.*

77. *Id.*

78. *Id.*

for him, and left his gun in the Church Porch with his man, to stand upon the Watch &c."[79]

With the above evidence, "It seemed to be doubted by the Court whether this came within the equity and true meaning of the Statute of Northampton. . ."[80] The Chief Justice "seemed not be severe upon Sir John."[81] Roger Morrice, an observer of the trial, was unsure whether the leniency was "because the matter would not beare it, Or for any reason of State or Composition. . ."[82] The Chief Justice "fell foule upon the Attorney Generall," and said "if there be any blinde side of the Kings business you will always lay your finger upon it."[83] The jury acquitted Knight.[84]

Another political diary similarly reports of Knight "being tried by a jury of his own city, that knew him well, he was acquitted, not thinking he did it with any ill design."[85] All this is consistent with the case report that arms carrying was illegal only when *in malo animo*.

A few days after being acquitted, Knight appeared before the King's Bench again. His bail for appearing for trial was lifted, but his surety for good behavior would be held until the end of the next term of court.[86] The Attorney General's bill for prosecuting Knight was "very high. . .and counted the higher because it had such ill success."[87] It took another court appearance, two months later, for Knight to get his bail money back. The court called Knight "a very dangerous man," and said that he had encouraged grand juries in Bristol not to indict for murder. But in light of the acquittal, the bail bond was released.[88]

The threats against Knight apparently continued. In

79. *Id.*

80. *Id.*

81. *Id.*

82. *Id.*

83. *Id.*

84. *Id.* at 308.

85. 1 NARCISSUS LUTTRELL, A BRIEF HISTORICAL RELATION OF STATE AFFAIRS FROM SEPTEMBER 1678 TO APRIL 1714, at 389 (1857), https://archive.org/details/briefhistoricalr02lutt/page/ns4.

86. 3 ENTRING BOOK, *supra* note 74, at 311 (entry of Dec. 4, 1686).

87. *Id.* at 312.

88. *Id.* at 349 (entry of Jan. 29, 1687).

November 1689, Knight asked to be excused from Parliament early, because of peril to his life. According to Knight, three members of Parliament had made threats against him. Another member had recently "thrust himself into" Knight's coach that was leaving Parliament in the evening, and had accompanied Knight home, because he said Knight's life was in danger.[89]

In sum, whatever Knight was really up to in Bristol, his defense at trial was that he was acting in self-defense. His gun toting was not in government service; to the contrary, he insisted that his carrying was a "private" matter. As the case reports explained, the Statute of Northampton was widely ignored, and it was interpreted to apply only to carrying *in malo animo*—not to carrying for lawful defense.

### F. The 1689 Bill of Rights and Thereafter

The despotic King James II was overthrown in the Glorious Revolution in 1688. In January 1689, the English Bill of Rights was enacted. Among its provisions was: "The subjects which are protestants may have arms for their defence suitable to their conditions and as allowed by law."[90]

After *Knight's Case*, arms-bearing for peaceable purposes was clearly lawful, but not for everyone in all circumstances. A 1695 statute forbade the carrying and possession of arms and ammunition by Irish Catholics in Ireland.[91] The anti-Irish statute was compliant with the English Bill of Rights, which had recognized an arms right only for Protestants. A legal manual for constables said that constables should search for arms possessed by persons who are "dangerous" or "papists."[92]

Further, the right to carry was only for individuals, and not groups. As one case put it, "Though a man may ride with arms, yet

89. 5 ENTRING BOOK, *supra* note 74, at 234–35.

90. 1 The Heads of Declaration of Lords and Commons, UK St (1688) ch. 2 s. 1). The Bill of Rights statute was enacted in January 1689. Under the calendar system that was used in England until 1752, the new year began on March 25 (the date of the Annunciation to the Virgin Mary). So the English who voted on the Bill of Rights considered January to be part of 1688. For simplicity, we cite the year at 1689, using the "New Style" calendar.

91. 7 William III ch. 5 (1695).

92. ROBERT GARDINER, THE COMPLEAT CONSTABLE 18 (3d ed. 1708).

he cannot take two with him to defend himself, even though his life is threatened; for he is in the protection of the law, which is sufficient for his defence."[93]

For peaceable individuals not subject to special disabilities (e.g., being Irish Catholic), the general rules were stated with the most detail in William Hawkins's 1724 *A Treatise on the Pleas of the Crown*. He explained the application of the common law offense of affray, and the influence of the Statute of Northampton. An "affray" was "a publick Offense, to the Terror of the People." So an assault perpetrated in private would not be an affray. Mere words could not be an affray.

> Sect. 4. But granting that no bare Word, in the Judgement of Law, carry in them so much terror as to amount to an Affray; yet it seems certain, that in some Cases there may be an Affray where there is no actual violence; as where a Man arms himself with dangerous and unusual Weapons, in such a manner as will naturally cause a Terror to the People, which is said to have always been an Offence at Common Law, and is strictly prohibited by many Statutes: [quoting the Statute of Northampton, and then citing its reissuance by Richard II].
>
> . . .
>
> Sect. 8. That a Man cannot excuse the wearing of such Armour in Publick, by alledging that such a one threatened him, and that he wears it for the Safety of his person from his Assault; but it hath been resolved, That no one shall incur the Penalty of the said Statute for assembling his Neighbours and Friends in his own House, against those who threaten to do him any Violence therein, because a Man's House is as his Castle.
>
> Sect. 9. That no Wearing of Arms is within the Meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of offending against this Statute by wearing common Weapons,[94] or having

93. Queen v. Soley, 88 Eng. Rep. 935, 937 (1707).

94. Hawkins' cautious language about "Persons of Quality" was appropriate because, separate from the Statute of Northampton, there was a prohibition against servants and laborers carrying swords and daggers, except when in service of their masters. 12 Richard II ch. 6 (1388). So lower class people carrying these particular common arms was still illegal.

> their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion to commit any Act of Violence or Disturbance of the Peace. And from the same Ground it also follows, That Persons armed with privy [concealed] Coats of Mail to the Intent to defend themselves against their Adversaries, are not within the Meaning of this Statute, because they do nothing *in terrorem populi*.[95]

In short, carrying "dangerous and unusual weapons" in public was illegal because "such Armour" was inherently terrifying, even if done with defensive intent. Imagine a person today carrying a flamethrower. Carrying "common weapons" was an offense only when done in a manner "apt to terrify."

Four decades after Hawkins, Blackstone treated the topic more tersely:

> The offense of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton, upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour.[96]

Did Blackstone's reference to the ancient Athenian law mean that arms carrying in town was *per se* unlawful, notwithstanding the rule announced in *Knight's Case*?

Subsequent case law held that peaceable carry was lawful. According to an 1820 case, "A man has a clear right to protect himself when he is going singly or in a small party upon the road where he is travelling or going for the ordinary purposes of business."[97] Likewise, a 1914 case held that the law allows one to peaceably walk down the road with a revolver.[98] But the law did not allow "firing a revolver in a public place, with the result that

95. 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136–37, ch. 63 (1724).

96. 4 Blackstone, *supra* note 53, *148–49.

97. Rex v. Dewhurst, 1 State Trials, N.S. 529, 601–02 (1820).

98. Rex v. Smith, 2 Ir. Rep. 190, 204 (K.B. 1914).

the public were frightened or terrorized."[99]

In sum, by the time of American independence, England's locational restrictions appear to have ceased to exist as a matter of enforceable law, except for Parliament and courts. Whatever the old Statute of Northampton had said about fairs, markets, or other locations was only applicable to carrying for the purpose of terrorizing other people, and not to carrying for legitimate self-defense. There were still restrictions on arms carrying by the lower classes and by Irish Catholics, great suspicion about large armed assemblies, and a prohibition on carrying "dangerous and unusual" weapons, but none of these were locational restrictions.

## II. Colonial and Founding Periods

American arms culture began to separate from its English ancestor as soon as the settlers of the Virginia Company embarked from England in 1606. Unlike the English who stayed behind, the Virginians carried with them the English-speaking-world's first written guarantee of a right to arms. The 1606 Virginia Charter issued by King James I gave the Virginians the perpetual right to import arms and ammunition from Great Britain.[100] The 1620

---

99. Rex v. Meade, 19 L. Times Rep. 540, 541 (1903).

100. 7 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3783, 3786 (Francis Newton Thorpe ed., 1909).

The king, binding his "Heirs and Successors," gave "full Power and Authority" to the leaders of the Virginia company and "so many of our subjects as shall willingly accompany them," for all of them to bring:

> sufficient Shipping, and Furniture of Armour, Weapons, Ordinance, Powder, Victual, and other things necessary for the said Plantations and for their Use and Defence there: Provided always, that none of the said Persons be such, as shall hereafter be specially restrained by Us, our Heirs or Successors.

*Id.*

The English crown perpetually guaranteed the right of the Virginia company's leaders and "their Associates . . . by their Deputies, Ministers, and Factors" [commercial agents] to import goods from England, Ireland, and other royal dominions. In particular, "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or

New England Charter contained the same guarantee.[101] The geographical scope of these early charters covered all of what would become the original thirteen American States.[102]

The Virginia and New England Charters, as well as subsequent charters, also guaranteed that Americans would enjoy all rights of Englishmen.[103] So the right to arms in the 1689 English Bill of Rights applied to them as well.

Post-independence, Americans were contemptuous of what they considered to be the constricted nature of the English right to arms. Madison said so in his speech introducing the Second Amendment in Congress.[104] The leading legal treatise in the Early

otherwise." For the first seven years, there would be no taxes on these Virginia-bound exports. *Id.* at 3787–88. Although the English who lived in England had no written guarantee of arms rights until 1689, the Virginians had their guarantees from the start: to bring arms for their use and defense, and to import arms for "defence or otherwise"—such as hunting.

101. *Id.* at 1835.

102. Based on the boundaries of the territories in the Virginia and New England charters, the 1606 Virginia Charter is one of the founding legal documents of all thirteen original states, plus West Virginia and Kentucky (both formerly part of Virginia) and Maine (formerly part of Massachusetts). The 1620 New England Charter is one of the founding legal documents of the New England states (except Vermont), plus New York, New Jersey, and Pennsylvania. 1 *id.* at iv-xiii.

103. 7 *id.* at 3788 (Virginia, 1606); 3 *id.* at 1839 (New England, 1620) (slight differences in phrasing and spelling).

Guarantees of the rights of Englishmen were common in other American colonial charters. *See* 1 *id.* at 533 (Connecticut); 2 *id.* at 773 (Georgia); 3 *id.* at 1681 (Maryland); 3 *id.* at 1857 (Massachusetts Bay); 5 *id.* at 2747 (Carolina, later divided into North and South Carolina); 6 *id.* at 3220 (Rhode Island).

104. Although speeches in the First Congress were not transcribed, Madison's notes for his speech introducing the amendments showed that he viewed the English Bill of Rights as a good start, but too weak. He wrote that his amendments "relate 1st. to private rights." A Bill of Rights was "useful—not essential." There was a "fallacy on both sides—especy as to English Decln. of Rts." First, the English Bill of Rights was a "mere act of parlt." In other words, because it was a statute, it could be over-ridden, explicitly or implicitly, by any future Parliament. Thus, the Bill of Rights constrained the king but not future Parliaments.

Second, according to Madison, the scope of the English Bill of Rights was too small; it omitted certain rights and protected others too narrowly. In particular, there was "no freedom of press—Conscience." There was no prohibition on "Gl. Warrants" and no protection for "Habs. corpus." Nor was there a guarantee of "jury in Civil Causes" or a ban on "criml. attainders." Lastly, the Declaration protected only "arms to Protestts." James Madison, Notes for Speech in Congress

Republic was St. George Tucker's 1803 American Blackstone. Tucker added many footnotes to Blackstone's text, as well as a volume on the American Constitution, to describe when and how American law differed from British law. He denounced statutory infringements of the English right to arms, particularly the English game laws, which he thought had disarmed almost the entire population.[105] Other leading authors of treatises on

---

Supporting Amendments, June 8, 1789, *in* THE ORIGIN OF THE SECOND AMENDMENT 645 (David E. Young ed., 1991).

105. Tucker was a militia colonel during the Revolutionary War, a Virginia Court of Appeals judge, a federal district judge, and professor of law at the College of William and Mary. Tucker's *Blackstone* was not merely a reproduction of the famous English text. It contained numerous annotations and other material suggesting that the English legal tradition had developed in new directions in its transmission across the Atlantic, generally in the direction of greater individual liberty. As for arms:

> The right of the people to keep and bear arms shall not be infringed. Amendments to C.U.S. Art. 4, and this without any qualification as to their condition or degree, as is the case in the British government.

WILLIAM BLACKSTONE, 1 COMMENTARIES 143-44 n.40 (St. George Tucker ed., Lawbook Exchange, Ltd. 1996) (1803).

> Whoever examines the forest and game laws in the British code, will readily perceive that the right of keeping arms is effectually taken away from the people of England. The commentator himself [Blackstone] informs us, Vol. II, p. 412, "that the prevention of popular insurrections and resistance to government by disarming the bulk of the people, is a reason oftener meant than avowed by the makers of the forest and game laws."

*Id.* n.41.

Tucker's *Blackstone* also included a lengthy appendix on the new American Constitution. This appendix was the first scholarly treatise on American constitutional law; it has been frequently relied upon by the United States Supreme Court and scholars. Tucker's primary treatment of the Second Amendment appeared in the appendix's discussion of the Bill of Rights. Regarding England, he wrote:

> In England, the people have been disarmed, generally, under the specious pretext of preserving the game: a never failing lure to bring over the landed aristocracy to support any measure, under that mask, though calculated for very different purposes. True it is, their bill of rights seems at first view to counteract this policy: but the

American constitutional law, such as William Rawle[106] and

---

> right of bearing arms is confined to protestants, and the words suitable to their condition and degree, have been interpreted to authorise the prohibition of keeping a gun or other engine for the destruction of game, to any farmer, or inferior tradesman, or other person not qualified to kill game. So that not one man in five hundred can keep a gun in his house without being subject to a penalty.

Appendix to Vol. 1, Part D, p. 300.

Tucker's prominence and his proximity to the framing of the Bill of Rights have made him an important source for the original understanding of the Second Amendment. *See, e.g.*, *Heller*, 554 U.S. at 594–95, 606–07; Stephen P. Halbrook, *St. George Tucker's Second Amendment: Deconstructing the True Palladium of Liberty*, 3 TENN. J.L. & POL'Y 114 (2007).

Historian Saul Cornell argues that Tucker changed his mind about the Second Amendment. According to Cornell, Tucker's 1791–92 lecture notes for the class he taught at William & Mary described the Second Amendment in a more militia-centric way than did Tucker's 1803 book. Saul Cornell, *St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings*, 47 WM. & MARY L. REV. 1123 (2006). Justice Stevens's dissenting opinion in the *Heller* decision cited Cornell's critique of Tucker. *Heller*, 554 U.S. at 666 n.32 (Stevens, J., dissenting) (citing Cornell's article for the claim that Tucker once thought the Second Amendment was militia-only). Writing for the majority, Justice Scalia countered that the passage quoted by Cornell and Justice Stevens was about the meaning of the Militia Clauses and the Tenth Amendment, not the Second Amendment. *Id.* at 606 n.19.

Indeed, subsequent scholarly study of Tucker's lecture notes has revealed that the language quoted by Cornell, and derivatively by Justice Stevens, was from Tucker's lecture on the federal militia powers granted by Article I. Cornell's article omitted Tucker's lecture notes on the Second Amendment itself; these notes were quite similar to Tucker's treatment of the Second Amendment in his latter treatise. *See* David T. Hardy, *The Lecture Notes of St. George Tucker: A Framing Era View of the Bill of Rights*, 103 NW. U. L. REV. COLLOQUY 1527, 1533–34 (2009); *See also* Saul Cornell, *Originalist Methodology: A Critical Comment*, 103 NW. U. L. REV. COLLOQUY 1541 (2009) (responding to Hardy's article in the same issue); Saul Cornell, Heller, *New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss,"* 56 UCLA L. REV. 1095 (2009); David T. Hardy, *Originalism and Its Tools: A Few Caveats*, 1 AKRON J. CONST. L. & POL'Y 40 (2010).

106. Rawle, a prominent Pennsylvania attorney, declined President George Washington's offer to become the first Attorney General of the United States, but did serve as United States Attorney for Pennsylvania from 1792 to 1800. His analysis of the Second Amendment included a denunciation of English practice:

> In most of the countries of Europe, this right does not seem to be denied, although it is allowed more or less sparingly, according to circumstances. In England, a country which boasts so much of its

Supreme Court Justice Joseph Story, agreed.[107] They contrasted the robust American right with its feeble English counterpart.

Americans certainly did not think that bringing guns to town was a problem; to the contrary, laws typically required that arms be brought to churches or to all public meetings.[108] Nor were there

> freedom, the right was secured to protestant subjects only, on the revolution of 1688; and it is cautiously described to be that of bearing arms for their defence "suitable to their conditions, and as allowed by law.". . . An arbitrary code for the preservation of game in that country has long disgraced them. A very small proportion of the people being permitted to kill it, though for their own subsistence, a gun or other instrument, used for that purpose by an unqualified person, may be seized or forfeited. Blackstone, in whom we regret that we cannot always trace the expanded principles of rational liberty, observes however, on this subject, that the prevention of popular insurrections and resistance to government by disarming the people, is oftener meant than avowed by makers of forest and game laws.

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 121-23 (1825).

107.

> § 1891. A similar provision in favour of protestants (for to them it is confined) is to be found in the bill of rights of 1688, it being declared, "that the subjects, which are protestants, may have arms for their defence suitable to their condition, and as allowed by law." But under various pretences the effect of this provision has been greatly narrowed; and it is at present in England more nominal than real, as a defensive privilege [citing Tucker].

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 747 (1833) (brackets added).

Tucker, Rawle, and Story were incorrect in their belief that English hunting control laws had disarmed almost the entire English population. It is true that in the late seventeenth century, the despotic Stuarts had attempted to disarm most of the population, under the pretext of preventing them from hunting. JOHNSON ET AL., *supra* note 1, at 125–28. Until well into the nineteenth century, hunting was generally allowed for only the upper class. But after the 1689 Bill of Rights, possession of guns was lawful for all Protestants (almost the whole population of England), since guns could be used for purposes other than hunting. *Id.* at 133–35; 2 WILLIAM BLACKSTONE, COMMENTARIES 412 n.2 (Edward Christian ed., 12th ed. 1793–95) ("everyone is at liberty to keep or carry a gun, if he does not use it for the destruction of game.").

108. *See, e.g.*, 1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (1808) (1632 Virginia statute providing that "ALL men that are

echoes of Henry VIII's restrictions about loaded guns on the highways. Instead, statutes required arms carrying when traveling or away from home.[109] Carrying firearms when going anywhere was normal in many parts of the United States, as St. George Tucker noted.[110] As William Rawle wrote, arms carrying was lawful for individuals except under "circumstances giving just reason to fear that he purposes to make an unlawful use of them."[111]

As will be detailed in Section A, *infra*, a few jurisdictions in

---

fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1632 Virginia statute providing that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.* (1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); 2 *id.* at 126 (similar 1676 Virginia law); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."); 19 (part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 137–40 (Allen D. Candler ed., 1904) (1770 Georgia statute imposing fines on militiamen who went to church unarmed). *See also* JOHNSON ET AL., *supra* note 1, at 183–85 (Connecticut, Massachusetts Bay, Maryland, South Carolina).

109. 1 HENING, at 127 (1809) (1623 Virginia law providing "That no man go or send abroad without a sufficient partie will armed."); *id.* at 173 (similar 1632 Virginia law); 2 *id.* at 126 (1676 Virginia law that "all people" be "required to goe armed" to church and court "for their greate security"). JOHNSON ET AL., *supra* note 1, at 183–85 (Massachusetts Bay, Plymouth, Rhode Island, Maryland).

110. "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." 5 Tucker, Appendix, *supra* note 105, at 9, note B.

As Tucker pointed out, in English law there was a rebuttable presumption that a gathering of men was motivated by treason and insurrection if weapons were present. Tucker was skeptical that the simple fact of being armed "ought. . .of itself, to create any such presumption in America, where the right to bear arms is recognized and secured in the constitution itself." *Id.*

111.

> This right ought not, however, in any government, to be abused to the disturbance of the public peace.
>
> An assemblage of persons with arms, for an unlawful purpose, is an indictable offense, and even the carrying of arms abroad by an individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace.

*Id.* at 126.

the colonial or Founding periods did adopt analogues to the English laws against bringing arms to legislative proceedings or to court hearings. There were also laws against hunting on someone else's land without permission (Section B). Boston had a unique law against bringing loaded guns into buildings (Section C). And, as Rawle had noted, carrying arms in a manner intended to terrify was illegal (Section D).

A. Legislatures and Elections

In general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed.[112]

Maryland was an exception. Statutes in 1647[113] and 1650[114] forbade arms carrying in either house of the legislature.

Delaware's 1776 Constitution included an article to prevent armed intimidation of polling places: no-one could take arms to them.[115] Further, militia musters could not be held on election

112. For example, after pro-slavery U.S. Rep. Preston Brooks (D-S.C.) assaulted and nearly killed anti-slavery Sen. Charles Sumner (R-Mass.) by beating him with a cane, Brooks threatened Rep. Calvin Chafee. Chafee responded by buying a revolver and putting it in his desk on the floor of the House. As the *Springfield Republican* newspaper observed, "After that, Dr. Chaffee's southern friends were not only civil but cordial." DAVID T. HARDY, DRED SCOTT: THE INSIDE STORY, Kindle loc. 605 (2019).

113. "[N]oe one shall come into the howse of Assembly (whilst the howse is sett) with any weapon uppon perill of such fine or censure as the howse shall thinke fit." 1647 Md. Laws 216.

114. "That none shall come into eyther of the houses whilst they are sett, with any gun or weapon uppon perill of such fine or censure as the howses shall thinke fit." "Orders made & agreed vppon by the Assembly for the better ordering of Both Howses." 1650 Md. Laws 273.

115.

> TO prevent any Violence or Force being used at the said Elections, no person shall come armed to any of them, and no Muster of the Militia shall be made on that Day; nor shall any Battalion or Company give in their Votes immediately succeeding each other, if any other Voter, who offers to vote, objects thereto; nor shall any Battalion or Company, in the Pay of the Continent, or of this or any other State, be suffered to remain at the Time and Place of holding the said Elections, nor within one Mile of the said Places respectively,

days.[116] Militias could not assemble within one mile of a polling place, starting 24 hours before the opening of the polls, and until 24 hours after the polls closed.[117]

The above laws are, to the best of our knowledge, the only "sensitive places" types of laws from the colonial period and the Founding Era. The list is rather short.

### B. Hunting on Private Land Without Permission

A few other laws on arms carrying are worth noting, although none fit into the sensitive places lineage. First, three states reinforced their general laws against trespassing by enacting specific statutes against hunting on someone else's land without permission: Pennsylvania in 1721[118] and 1760,[119] New Jersey in

> for twenty-four Hours before the opening said Elections, nor within twenty-four hours after the same are closed, so as in any Manner to impede the freely and conveniently carrying on the said Election: Provided always, that every Elector may, in a peaceable and orderly Manner, give in his Vote on the said Day of Election.

DEL. CONST, art. 28 (1776).

116. *Id.*

117. *Id.*

118.

> Be it enacted by the authority aforesaid, That if any person or persons shall presume, at any time after the sixteenth day of November, in this present year on thousand seven hundred and twenty-one, to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation, and shall thereof convicted, either upon view of any justice of the peace within this province, or by the oath or affirmation of any one or more witnesses, before any justice of the peace, he shall for every such offense forfeit the sum of ten shillings. And if any person whatsoever, who is not owner of fifty acres of land and otherwise qualified in the same manners as persons are or ought to be by the laws of this province for electing of members to serve in assembly, shall at any time, after the said Sixteenth day of November, carry any gun, or hunt in the woods or inclosed lands, without license or permission obtained from the owner or owners of such lands, and shall be thereof convicted in manner aforesaid, such offender shall forfeit and pay the sum of five shillings.

1721 Pa. Laws 254, 256.

119.

> If any person or persons shall presume to carry any gun, or hunt on any enclosed or improved lands of any of the inhabitants of this province, other than his own, unless he shall have license or permission from the owner of such lands, or shall presume to fire a gun on or near any of the king's highways, and shall be thereof convicted, either upon view of any justice of the peace within this province, or by the oath or affirmation of any one or more witnesses, before any justice of the peace, he shall, for every such offence, forfeit the sum of forty shillings.

JOHN W. PURDON, A DIGEST OF THE LAWS OF PENNSYLVANIA FROM THE YEAR ONE THOUSAND SEVEN HUNDRED TO THE TWENTY-FIRST DAY OF MAY, ONE THOUSAND EIGHT HUNDRED AND SIXTY-ONE 534 (9th ed. 1862).

1741[120] and 1771,[121] and Maryland in 1715.[122] The 1721

120.

> That if any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own unless he have Licence or Permission from the Owner of such Lands or Plantation . . . And if any Person whatsoever, who is not Owner of one Hundred Acres of Land, or otherwise qualified, in the same Manner as Persons are or ought to be electing Representatives to serve in General Assembly, shall at any Time after the Publication hereof, carry any Gun, or hunt in the Woods or uninclosed Lands, without License or Permission obtained from the Owner or Owners of such Lands . . . such Offender shall forfeit and pay the Sum of *ten shillings*.

1741 N.J. Laws 101.

121.

> 1. Be it enacted by the Senate and General Assembly of the state of New Jersey, That if any person or persons shall presume, at any time after the publication hereof, to carry any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he hath license or permission in writing from the owner or owners, or legal possessor, every such person so offending, and convicted, thereof, either upon the view of any justice of the peace within this state, or by the oath or affirmation of one or more witnesses, before any justice of the peace of either of the counties, cities, or towns corporate of this state, in which the offender or offenders may be taken or reside, he, she, or they, shall, for every such offence, forfeit and pay to the owner of the soil, or his tenant in possession, the sum of five dollars with costs of suit; which forfeiture shall and may be sued for and recovered by the owner of the soil, or tenant in possession, before any justice of the peace in this state, for the use of such owner or tenant in possession.
> 2. And be it enacted, That if any person shall presume, at any time after the publication of this act, to hunt or watch for deer with a gun, or set in any dog or dogs to drive deer, or any other game, on any lands not his own, and for which the owner or possessor pays taxes, or is in his lawful possession, unless he hath license or permission in writing from such owner or owners or legal possessor; every such person so offending, and being convicted thereof in manner aforesaid, shall for every such offence, forfeit and pay to the owner of the soil, or tenant in possession, the sum of five dollars, with costs of suit; provided, that nothing herein contained shall be construed to extend to prevent any person carrying a gun upon the highway in this state.
> 3. And be it enacted, That if the person or persons offending against this act be non-residents of this state, he or they shall forfeit and pay for every such offence, fifteen dollars, and shall forfeit his or their gun or guns to any person or persons who shall inform and prosecute

Pennsylvania statute applied to all persons who hunted or carried a gun without permission on someone else's enclosed or improved lands; the statute also forbade poor people (those not eligible to vote) from hunting on unimproved land ("the woods").[123] The property requirement was repealed by the 1760 statute.[124] The 1760 law also forbade firearms discharge while hunting near highways—a safety restriction that remains common in modern American law.[125]

The 1741 New Jersey statute was similar to the 1720 Pennsylvania law: no hunting without permission by anyone on someone else's improved or enclosed land; no hunting by persons not qualified to vote on unimproved and unenclosed private property.[126] The 1771 New Jersey revision eliminated the discrimination against non-voters.[127] Maryland's 1715 law forbade convicted criminals and vagrants from hunting on private property without permission, and also provided that the offender would only be fined after first receiving one free warning.[128]

---

> the same to effect, before any justice of the peace in any county of this state, wherein the offender or offenders may be taken or apprehended.

1771 N.J. laws 346.

122.

> And, to prevent the abusing, hurting or worrying of any stock of hogs, cattle or horses, with dogs, or otherwise, BE IT ENACTED, That if any person or persons whatsoever, that have been convicted of any of the crimes aforesaid, or other crimes, or that shall be of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned, shall forfeit and pay one thousand pounds of tobacco...

1715 Md. Laws 90.

123. 1721 Pa. Laws 254, 256.

124. A DIGEST OF THE LAWS OF PENNSYLVANIA, *supra* note 119, at 534.

125. *Id.* For a modern law, see Wash. Admin. Code § 332-52-145(3)(b) (When hunting or target shooting on State Department of Natural Resources lands, "Persons shall not shoot within, from, along, across, or down roads or trails.").

126. 1741 N.J. Laws 101.

127. 1771 N.J. laws 346.

128. 1715 Md. Laws 90.

### C. Boston's Fire Prevention Law

Boston in 1782 enacted a unique ordinance, expressly for fire protection. Loaded guns could not be brought into buildings in town.[129] Strictly speaking, the law did not forbid bringing an unloaded gun into a building, and then loading it when inside. So occupants of homes or businesses remained free to keep loaded guns. However, the law did provide for seizure of loaded guns that "shall be found" in buildings.[130]

Justice Breyer's dissent in *Heller* discussed the Boston law:

> Boston's law in particular impacted the use of firearms in the home very much as the District's law does today. Boston's gunpowder law imposed a £10 fine upon "any Person" who "shall take into any Dwelling–House, Stable, Barn, Out-house, Ware-house, Store, Shop, or other Building, within the Town of *Boston*, any ... Fire–Arm, loaded with, or having Gun–Powder." An Act in Addition to the several Acts already made for the prudent Storage of Gun–Powder within the Town of *Boston*, ch. XIII, 1783 Mass. Acts pp. 218–219. . . .
>
> Moreover, the law would, as a practical matter, have prohibited the carrying of loaded firearms anywhere in the city, unless the carrier had no plans to enter any building or was willing to unload or discard his weapons before going inside. And Massachusetts residents must have believed this kind of law compatible with the provision in the

---

129.

> *Whereas the depositing of loaded Arms in the Houses of the Town of* Boston, *is dangerous to the Lives of those who are disposed to exert themselves when a Fire happens to break out in the said Town:*
>
> . . .
>
> That if any Person shall take into any Dwelling House, Stable, Barn, Out House, Ware House, Store, Shop, or other Building within the Town of *Boston*, any Cannon, Swivel, Mortar, Howitzer, Co-horn [a small mortar], or Fire Arm, loaded with, or having Gun Powder in the same, or shall receive into any Dwelling House, Stable, Barn, Out House, Store, Ware House, Shop, or other Building, within the said Town, any Bomb, Grenade, or other Iron Shell, charged with, or having Gun Powder in the same, such Person shall forfeit and pay the Sum of *Ten Pounds* . . .

2 ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 120 (1890).

130. *Id.*

> Massachusetts Constitution that granted "[t]he people ... a right to keep and to bear arms for the common defence"—a provision that the majority says was interpreted as "secur[ing] an individual right to bear arms for defensive purposes."[131]

The *Heller* majority thought that Justice Breyer was making too much of the Boston law:

> Justice BREYER has devoted most of his separate dissent to the handgun ban. He says that, even assuming the Second Amendment is a personal guarantee of the right to bear arms, the District's prohibition is valid. . . . Of the laws he cites, only one offers even marginal support for his assertion. A 1783 Massachusetts law forbade the residents of Boston to "take into" or "receive into" "any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store, Shop or other Building" loaded firearms, and permitted the seizure of any loaded firearms that "shall be found" there. Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts p. 218. That statute's text and its prologue, which makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the "depositing of loaded Arms" in buildings, give reason to doubt that colonial Boston authorities would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder (despite the law's application in that case). In any case, we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home.[132]

Boston's fire safety ordinance was not about "sensitive places," since it applied to all buildings.

### D. Laws Against Carrying Arms for the Purpose of Causing Terror

As discussed in Part I, the 1328 Statute of Northampton could be interpreted as banning all arms carrying in fairs or markets, or everywhere. But from 1686 onward, the authoritative interpretation of the little-enforced statute was that it only applied

131. Heller, 554 U.S. at 685–86 (Breyer, J., dissenting).
132. *Id.* at 631–32.

to arms carriers who deliberately terrorized the public, such as by carrying "dangerous and unusual" weapons. This is a restriction on the manner of bearing arms, and not on the place for bearing arms. Accordingly it sheds little light on the "sensitive places" doctrine.

The common law forbade carrying arms in a terrifying manner. For example, a 1736 Virginia legal manual said that a constable "may take away Arms from such who ride, or go, offensively armed, in Terror of the People" and may bring the person and the arms before a Justice of the Peace.[133]

The common law was sometimes reinforced by new statutes using some language from Northampton and other sources to outlaw carrying in a terrifying or "offensive" manner. A 1786 Virginia statute forbade persons to "go nor ride armed by night or by day, in fairs or markets, or in other places, in terror of the Country."[134] Similarly, a 1786 Massachusetts statute provided that Justices of the Peace should arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensive, to the fear or terrour of the good citizens of this Commonwealth, or such others may utter any menaces or threatening speeches."[135] Upon conviction, such a person shall be

---

133. GEORGE WEBB, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE 92 (1736).

134.

> That no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court ; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof by others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice, shall direct, and in like manner to forfeit his armour to the Commonwealth ; but no person shall be imprisoned for such offence by a longer space of time than one month.

1786 Va. Acts 33.

135.

> every Justice of the Peace, within the county for which he may be

required "to find sureties for his keeping the peace"—that is, to post a bond for good behavior.[136] New Hampshire had passed a similar law in 1759.[137] Laws that forbid carrying arms for the

> commissioned, may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the peace, and being of the good behaviour ; and in want thereof, to commit him to prison until he shall comply with such requisition.

2 Acts and Laws of the Commonwealth of Massachusetts, *supra* note 129, at 652–53.

A 1692 statute had been to the same effect. *See* Acts and Laws Passed by the Great and General Court of Assembly of Their Majesties Province of the Massachusetts-Bay 18 (1692) (Justices of the Peace should arrest persons who "Ride, or go Armed offensively before any of Their Majesties Justices, or other Their Officers or Ministers doing their Office, or elsewhere, By Night or by Day, in Fear or Affray of Their Majesties Liege People . . . ."). A 1694 statute was also to the same effect, along with other provisions about assaults and "hues and cries."

> [E]very justice of the peace, in the county where the offence is committed, may cause to be stayed and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively before any their majesties' justices, or other their officers or ministers doing their office, or elsewhere, by night or by day, in fear or affray of their majesties' liege people, and such others as shall utter any menaces or threatening speeches ; and upon . . . conviction . . .shall commit the offender to prison until he find sureties for the peace and good behavior, and seize and take away his armour or weapons and shall cause them to be apprized and to the king as forfeited ; and may further punish the breach of the peace in any person that shall smite or strike another, by fine to the king, not exceeding twenty shillings, and bond with sureties for the peace ; or bind the over to answer it at the next sessions of the peace as the nature or circumstance of the offence may be ; and make inquiry of forcible entry and detainer, and cause the same to be removed ; and make out hue and cries after runaway servants, thieves and other criminals.

1694 Mass. Laws 12, no. 6.

136. 2 Acts and Laws of the Commonwealth of Massachusetts, *supra* note 129, at 652–53.

137. Acts and Laws of His Majesty's Province of New-Hampshire in New-

purpose of causing terror are compliant with the Second Amendment. Because they are laws aimed at the "manner" of bearing arms, they are not part of the sensitive places doctrine.

Historical review shows that during the colonial and Founding periods, a few jurisdictions had laws against carrying arms into centers of government deliberation, including polling places. Boston's unusual law against carrying loaded guns into buildings was far outnumbered by statutes all over America that *required* bringing guns into churches, and sometimes to other public assemblies.

Of course misconduct with arms could be prohibited. This included hunting or gun carrying on someone else's land without permission. The anti-trespassing laws do not pertain to the sensitive places doctrine, since landowners could allow anyone to hunt or carry on their land, with permission.

## III. Nineteenth Century

During the nineteenth century, more states enacted laws against guns in polling places. Laws against misconduct with arms continued, with more statutes against armed trespass. Cases affirmed the right to bear arms and excluded terrifying misbehavior from the right.

For most of the century, there were few laws about arms at schools, and none of them attempted to make schools "gun-free." In the latter part of the century, several former slave states enacted broad laws against guns at schools and most other public assemblies, and even in private social gatherings.

### A. Polling Places and Courts

Reconstruction was a tumultuous time in the former slave states. Armed terrorist organizations, such as the Ku Klux Klan, tried to prevent blacks or white Republicans from voting.[138]

England 2 (1759) (Arrest for persons "who shall go armed offensively"; convicted defendant will not be released "until he or she find such surities of the peace and good behavior," that is, post a bond).

138. When the Klan or other terrorists took over an area, "almost universally the first thing done was to disarm the negroes and leave them defenceless." ALBION W. TOURGÉE, THE INVISIBLE EMPIRE 424–25 (1880),

Several states enacted statutes against guns at polling places.

Louisiana in 1870 forbade arms carrying on election day when the polls were open. The ban apparently had no geographical limit, and thus was more of a "time" restriction than a "sensitive places" restriction.[139] Voter registration only took place on certain days; on those days, there was a ban on arms carrying within a half-mile of registration sites.[140]

Maryland's laws focused on two troublesome counties. An 1874 law banned arms carrying on election day in Kent County.[141] An 1886 statute outlawed bearing arms within 300 yards of the polls on election day in Calvert County.[142]

---

https://babel.hathitrust.org/cgi/pt?id=osu.32435018352559;view=1up;seq=467; *See also* ADAM WINKLER, GUNFIGHT 136 (2011) (discussing white supremacist groups' disarmament of the freedmen, the KKK being the "most infamous of these disarmament posses").

139.

> That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . .

1870 La. Acts 159–60.

140. *Id.*

141.

> It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and . . . shall be fined not less than five nor more than twenty dollars . . .

2 PUBLIC LOCAL LAWS OF MARYLAND, ARTICLES 11-24, at 1457 (King Bros, ed. 1888).

142.

> It shall not be lawful for any person in Calvert county to carry, on the days of election and primary election within three hundred yards of the polls, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof by the circuit court for Calvert county . . . shall be

Texas in 1873 outlawed carrying arms within a half-mile of a polling place during polling hours.[143]

The Georgia Supreme Court in 1874 upheld a statute against carrying weapons into a court of justice.[144] As the Georgia court acknowledged, state precedent plainly protected the right to open carry handguns. However, the court pointed out the equally important right of free access to the courts:

> [T]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.[145]

This was the first judicial analysis of what would later be called the "sensitive places" doctrine. The court's reasoning was consistent with the full lesson to be drawn from the suppression of Cicero's speech in defense of Milo.[146] The reasoning was also consistent with the origins of the sensitive places laws in medieval England, which were greatly concerned about violent intimidation

---

> fined not less than ten nor more than fifty dollars for each such offence. . .

1886 Md. Laws 315.

143.

> Riots and Unlawful Assemblies at Elections Violence Used Towards Electors: (1) It shall be unlawful for any person to carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election. (2) Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the county jail for not less than one month . . .

2 A DIGEST OF THE LAWS OF TEXAS, CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 TO 1874, CAREFULLY ANNOTATED 1317–18 (4th ed. 1874).

144. State v. Hill, 53 Ga. 472 (1874).

145. *Id.* at 477–78.

146. Part I.A. *supra*.

of the courts of justice.

B. Continuation of Earlier Rules Against Misconduct with Arms

The earliest American decision to cite the Statute of Northampton was the Tennessee Supreme Court's 1833 *Simpson v. State*, affirming the legality of public arms carriage. The court rejected the rule from Hawkins' English law treatise, which had said that the nonviolent carrying of arms could sometimes constitute an offence. The court held that such a rule was inconsistent with the American right to arms.[147]

In 1843, the North Carolina Supreme Court wrote that the common law, as reflected in the Statute of Northampton, was that "the carrying of a gun per se constitutes no offence. . .. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people." Stating that the people of North Carolina did not routinely carry arms as part of their daily apparel, the court expressed its hope that Tarheel habits would never change. Even so, free citizens had the right to carry arms for "any lawful purpose—either of business or amusement."[148] "Business or amusement" was a legal term of art, to encompass all activity.[149]

Huntley's conviction was upheld because the indictment had alleged and the prosecutor had proven Huntley's terrifying conduct: he had publicly threatened "to beat, wound, kill and

147. Simpson v. State, 13 Tenn. (5 Yer.) 356 (1833).

148. State v. Huntly, 25 N.C. (3 Ired.) 418, 422–23 (1843). The North Carolina Court cited *Sir John Knight's Case* for the point that even though the North Carolina legislature had forbidden the application of English statutes in the state, the offense was still one at common law. *Huntley*, 25 N.C. (3 Ired.) at 421. For the pre-1328 common law, see *supra* note 70.

149. *See* The Schooner Exchange v. Mcfaddon & Others, 11 U.S. (7 Cranch) 116 (1812) (Marshall, C.J.) ("[T]he ports of a nation are open to the private and public ships of a friendly power, whose subjects have also liberty without special license, to enter the country for business or amusement . . . ."); Johnson v. Tompkins, 13 F. Cas. 840, No. 741 (Cir. Ct. E.D. Penn. 1833) (Supreme Court Justice Baldwin, acting as Circuit Judge) ("[A]ny traveller who comes into Pennsylvania upon a temporary excursion for business or amusement"); Baxter v. Taber, 4 Mass. 361, 367 (1808); ("[H]e may live with his family, and pursue his business, or amusements, at his pleasure, either on land or water . . . ."); Respublica v. Richards, 2 U.S. (2 Dall.) 224 (Penn. 1795) (same language as Johnson v. Tompkins).

murder" several persons, "to the terror of the people."[150] Successful prosecutions for illegal arms carrying alleged and proved the particular terrifying circumstances.[151]

As for carrying arms on private property without permission, Texas enacted a statute in 1873.[152] Oregon did the same for "enclosed premises or lands" in 1893.[153]

### C. Blue Laws

"Blue laws" against recreation on Sunday (the Christian sabbath day) became common in the latter decades of the century. The purpose was to inhibit secular activities, and thereby encourage religious observance. A Kentucky blue law forbade hunting on someone else's land (apparently, even with the landowner's permission) on the sabbath.[154] North Carolina banned

150. *Huntley*, 25 N.C. at 422-23.

151. *See* State v. Langford, 10 N.C. (3 Hawks) 381 (1824) (defendants maliciously fired guns into the home of an elderly widow); Stephen P. Halbrook, *Going Armed with Dangerous and Unusual Weapons to the Terror of the People: How the Common Law Distinguished the Peaceable Keeping and Bearing of Arms*, *in* FIREARMS AND THE COMMON LAW TRADITION (Aspen Inst., forthcoming).

152.

> It shall not be lawful for any person or persons to carry firearms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty, and any person or persons so offending shall be fined a sum not less than one nor more than ten dollars, or imprisonment in the county jail not less than ten days, or both, in the discretion of the court or jury before whom the trial is had.

2 A DIGEST OF THE LAWS OF TEXAS, *supra* note 143, at 1321–22.

153. 1893 Or. Laws 79 ("It shall be unlawful for any person other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof.").

154.

> That no person shall, within this Commonwealth, on the Sabbath day, enter or go upon the land of another person to catch, shoot, or kill any birds, fowl, or animal of any kind; and any such person having in his possession a gun at the time, or after he enters upon the premises of another as aforesaid, shall, upon proof, be guilty of a violation of this act . . .

ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF KENTUCKY, PASSED AT

Sunday hunting everywhere, and, as a prophylactic measure, forbade gun carrying outside one's property on Sundays.[155]

Virginia in 1877 went even further. It forbade all arms carrying at places of worship where religious meetings were being conducted.[156] Virginia also forbade all arms carrying outside of one's premises on Sunday "without good and sufficient cause therefor."[157]

### D. Schools

Perhaps the first notable arms ban at an American university was at the University of Virginia in 1824. The students had driven Thomas Jefferson, founder of the University, to despair with their spoiled and violent behavior.[158] They rioted and caroused, fired

---

THE SESSION OF THE GENERAL ASSEMBLY WHICH WAS BEGUN AND HELD IN THE CITY OF FRANKFORT, ON MONDAY, THE FOURTH DAY OF DECEMBER, 1865, at 52 (1866).

155.

> [I]f any person or persons whomsoever shall be known to hunt in this State on the Sabbath with a dog or dogs, or shall be found off of their premises on the Sabbath, having with him or them a shot-gun, rifle or pistol, he or they shall be subject to indictment; and, upon conviction, shall pay a fine not to exceed fifty dollars at the discretion of the Court. . .

1868 N.C. Sess. Laws 59.

As of 2016, eleven eastern states still had blue laws against Sunday hunting. *See* Allie Humphreys, Note, *Has Blue Overshadowed Green?: The Ecological Need to Eradicate Hunting Blue Laws*, 40 WM. & MARY ENVTL. L. & POL'Y REV. 623 (2016).

156.

> If any person carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place other than his own premises, shall be fined not less than twenty dollars. If any offense under this section be committed at a place of religious worship, the offender may be arrested on the order of a conservator of the peace without warrant, and held until warrant can be obtained, but not exceeding three hours.

1877 Va. Acts 305.

157. *Id.*

158.

> [S]poiled, self-indulgent scions of Southern plantation owners or prosperous merchants[,] led a life of dissipation. . .. The students

guns in the air, and shot at each other.[159] Seven months after the university had opened, "Jefferson's enemies, and they were legion, were ready to pounce and shutter the school they considered a godless playground of the rich."[160]

So in 1824, the Board of Visitors—which included Jefferson and James Madison—cracked down.[161] They banned students (but not faculty or other employees) from keeping on school premises any alcohol, chewing tobacco, or weapon, and also forbade students from having servants, horses, or dogs.[162] Because the ban was for students only, and not for faculty and staff, the 1824 discipline is not a precise fit in the "sensitive places" history.

To the north, the students at the College of New Jersey (today, Rutgers University) were apparently an easily distracted lot. In 1853, the state did not ban guns at school, nor did it attempt to

---

> brandished guns freely, sometimes shooting in the air, sometimes at each other. They drank, gambled, rioted and vandalized property (even taking a hatchet to the front doors of the Rotunda).
>
> The students' behavior was a great humiliation to Thomas Jefferson, the founder of their school and then one of the best known men in America. . . . Jefferson's enemies, and they were legion, were ready to pounce and shutter the school they considered a godless playground of the rich.

Carlos Santos, *Bad Boys: Tales of the University's tumultuous early years*, VIRGINIA (Winter 2013), http://uvamagazine.org/articles/bad_boys.

159. *Id.*

160. *Id.*

161. *Id.*

162.

> No Student shall, within the precincts of the University, introduce, keep, or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gun-powder, keep a servant, horse or dog, appear in school with a stick or any weapon, nor, while in school, be covered without permission of the Professor, nor use tobacco by snuffing or chewing, on pain of any of the minor punishments, at the discretion of the Faculty, or of the board of Censors approved by the Faculty.

MEETING MINUTES OF UNIVERSITY OF VIRGINIA BOARD OF VISITORS, 4—5 OCT. 1824, 4 OCTOBER 1824, https://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-04-02-02-4598, *codified at* ENACTMENTS BY THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, FOR CONSTITUTING, GOVERNING AND CONDUCTING THAT INSTITUTION 9 (1825), https://babel.hathitrust.org/cgi/pt?id=hvd.hn36rv;view=1up;seq=13.

prohibit students from hunting. But the state did outlaw certain places of amusement within three miles of campus.[163] The law forbade facilities for billiards, tennis, bowling, shuffleboard, faro, cock-fighting, and pistol shooting.[164] An 1874 statute added a three-mile buffer around Drew University.[165] This was undoubtedly a hardship on commercial operators of bowling alleys, tennis clubs, and pistol ranges in Drew's home town of Madison, New Jersey, but the law imposed no restriction on the ability of Drew students (or anyone else) to keep and carry arms on campus and everywhere else.

Mississippi in 1878 banned students from carrying concealed weapons at any university, college, or school.[166] The law did not

---

163. *Id.*

164.

> The opening or keeping of any room or place for playing at billiards, or A.B.C. or E.O. table or tables [predecessors of roulette], or at tennis, bowls, or shuffle board, or at faro-bank, or other bank of like kind, under any denomination whatever, or for playing at nine-pins, or any other number of pins, or for cock-fighting, or for pistol-shooting, either for money or without money, within three miles of the main building of the College of New Jersey, shall be and hereby are declared to be offences against this state; and the owner, tenant, keeper, or attendant, of such room or place, shall be prosecuted and proceeded against by indictment, and upon conviction shall be fined in a sum not exceeding two hundred dollars, or by imprisonment for a period not exceeding six months, or both, at the discretion of the court.

A DIGEST OF THE LAWS OF NEW JERSEY: CONTAINING ALL THE LAWS OF GENERAL APPLICATION, NOW IN FORCE, FROM 1709 TO 1855, INCLUSIVE, WITH THE RULES AND DECISIONS OF THE COURTS 316 (2d ed. 1855).

165.

> The opening or keeping of any room or place for playing at billiards, or A.B.C. or E.0. table or tables, or at tennis, bowls, or shuffle-board, or at faro bank, or other bank of like kind, under any denomination whatever, or for playing at nine-pins, or any number of pins, or for cock-fighting, or for pistol-shooting, either for money or without money, within three miles of the main building of the College of New Jersey, or of Rutgers College, or of Drew Seminary or University, in New Jersey, shall be and hereby are declared to be offences against this state; and the owner, tenant, keeper, or attendant of such room or place, shall be prosecuted . . .

REVISED STATUTES OF THE STATE OF NEW JERSEY PASSED 1864, at 160 (1874).

166.

apply to open carry, nor did it apply to faculty or staff.[167] However, faculty or staff could be punished for knowingly allowing students to carry concealed.[168]

None of the above laws provides support for *Heller*'s designation of "schools" as sensitive places where arms carrying may be banned. Students at the two New Jersey schools were allowed to carry on campus, although they were deprived of nearby handgun ranges. Students in Mississippi could carry arms as long as they did so openly. The riotous students at the University of Virginia were wholly disarmed, but the faculty and staff remained as well-armed as ever. Whatever one thinks about the collective punishment of the U. Va. students, the campus was not a place where arms were forbidden to responsible adults.

E. Bans on Carrying at Many Locations

In the half-century following the Civil War, the former slave states were the center of the gun control movement.[169] Although the Equal Protection Clause of the Fourteenth Amendment forbade gun laws that expressly discriminated on race, the racial subtext of Southern gun control was obvious.[170] This section

> That any student of any university, college or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the first section of this Act described, or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars . . .

1878 Miss. Laws 176.

167. *Id.*

168. *Id.*

169. JOHNSON ET AL., *supra* note 1, at 427–29 (Black Codes in unreconstructed South), 467–88 (latter nineteenth-century Tennessee, Arkansas, Texas, and Florida).

170. The Ohio case *State v. Nieto*, 130 N.E. 663 (Ohio 1920), involving a Mexican employee of a railroad, upheld a complete ban on concealed carry, even in one's own home. A dissenting judge wrote:

> I desire to give some special attention to some of the authorities cited, supreme court decisions from Alabama, Georgia, Arkansas, Kentucky, and one or two inferior court decisions from New York, which are given in support of the doctrines upheld by this court. The

examines broad laws against carrying at public events, as enacted in four jurisdictions where slavery had recently been common.

Tennessee in 1869 outlawed carrying certain arms to polling places; in this regard, the statute was nothing novel in the American tradition.[171] But the statute went further, and also applied to "any fair, race course, or other public assembly of the people."[172] Two years later, the Supreme Court of Tennessee expressed approval of such restrictions, albeit in dicta:

> While the private right to keep and use such weapons as we have indicated as arms, is given as a private right, its exercise is limited by the duties and proprieties of social life, and such arms are to be used in the ordinary mode in which used in the country, and at the usual times and places. Such restrictions are implied upon their use as are thus indicated.
>
> Therefore, a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them, nor necessary in order to his familiarity with them, and his training and efficiency in their use.[173]

Whether the 1869 Tennessee statute applied to long guns is uncertain. The forbidden arms were "any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling

> southern states have very largely furnished the precedents. It is only necessary to observe that the race issue there has extremely intensified a decisive purpose to entirely disarm the negro, and this policy is evident upon reading the opinions.

*Id.* at 669 (Wanamaker, J., dissenting).

171.

> That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.

PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE THE YEAR 1858: BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE 108 (2d ed. Supp. 1872).

172. *Id.*

173. Andrews v. State, 50 Tenn. 165, 181–82 (1871).

a Bowie-knife or Arkansas tooth-pick, or other deadly or dangerous weapon."[174] A long gun can certainly be a "deadly" or "dangerous." On the other hand, the specific items listed in the statute were pistols and certain types of knives. If the legislature had meant to include common items that can be deadly—such as long guns, swords, most types of knives, or baseball bats—the legislature likely would have said so.

The Kansas Supreme Court faced a similar issue in *Parman v. Lemmon*, interpreting a statute forbidding minors from possessing deadly weapons.[175] At first, the Kansas court said that long guns were included in the ban, since they could be deadly.[176] Then the court overturned its first opinion and made the dissent into the opinion of the court:[177] long guns were not included because they had not been enumerated, and it would be unlikely for a legislature that intended to affect something as common as long guns to not say so directly.[178]

An 1870 Texas statute did expressly apply to all firearms, not just handguns.[179] It went even further than the Tennessee law. It covered election places, "any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly," churches, schools—and even private social

174. PUBLIC STATUTES OF THE STATE OF TENNESSEE, *supra* note 171, at 108.

175. Parman v. Lemmon, 244 P. 227 (Kan. 1925).

176. *Id.* at 230.

177. *Id.* at 232–33.

178. *Id.* at 233.

179.

> That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars . . .

1870 Tex. Laws 63.

events: "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen."[180]

Missouri in 1874 did not go as far as Texas. It banned concealed carry at a variety of locations, while not restricting open carry.[181] This was consistent with the Missouri Constitution's right to arms provision, which made an express exception for concealed carry.[182] The prohibited areas were polling places on

180. *Id.*

181.

> If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than five days or more six months, or by both such fine and imprisonment.

1879 Mo. Laws § 1274.

182. Under the 1875 Constitution: "That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons." MO. CONST. art. II, § 17.

The current provision is:

> That the right of every citizen to keep and bear arms, ammunition, and accessories typical to the normal function of such arms, in defense of his home, person, family and property, or when lawfully summoned in aid of the civil power, shall not be questioned. The rights guaranteed by this section shall be unalienable. Any restriction on these rights shall be subject to strict scrutiny and the state of Missouri shall be obligated to uphold these rights and shall under no circumstances decline to protect against their infringement. Nothing in this section shall be construed to prevent the general assembly from enacting general laws which limit the rights of convicted violent felons or those duly adjudged mentally infirm by a court of competent jurisdiction.

election day, court rooms "during the sitting of the court," churches where people were "meeting for worship," "any public assemblage," and "any school-room or place where people are assembled for educational, literary or social purposes."[183]

An 1881 Missouri case, *State v. Wilforth*, came about when Wilforth violated the last-mentioned clause of the statute by concealed carrying at a church that was hosting a school exhibition "for literary purposes."[184] Wilforth appealed his conviction but did not file a brief on appeal.

At trial, the court had denied Wilforth's requested jury instruction that the jury must acquit "if they believed defendant carried the pistol for the purpose of trade, or went into the house where the exhibition was going on having reasonable cause to believe that he would be in danger of bodily harm."[185] The Supreme Court upheld the trial court's refusal to issue the instructions because "there was not a scintilla of evidence upon which to base them."[186]

Oklahoma's 1890 statute applied to all forms of carry, whether open or concealed. The list of forbidden arms did not include long guns, for which there were separate rules.[187] The areas covered were vast, and included private social events:

> any church or religious assembly, any school room, or other place where persons are assembled for public worship, for amusement, or educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or

MO. CONST. art. I, § 23 (1945 Const., 2014 amend.).

183. *Id.*

184. 74 Mo. 528, 529 (1881).

185. *Id.* at 529–30.

186. *Id.* at 530.

187. The locational portion of the statute covered a "pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword, cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense." GENERAL STATUTES OF OKLAHOMA: A COMPILATION OF ALL THE LAWS OF A GENERAL NATURE INCLUDING THE SESSION LAWS OF 1907, at 451 (1908). Carrying of long guns was covered by a separate section, allowing carrying only for hunting, killing animals, repair, public military drill, and travel. *Id.*

to any political convention, or to any other public assembly. . .[188]

While the Missouri statute merely regulated the manner of carrying, Texas, Oklahoma, and Tennessee had broad bans on carrying arms in many locations. The Texas statute included long guns, whereas application to long guns in Tennessee was unclear.

The Tennessee, Texas, and Oklahoma laws banned arms at a very wide variety of public and private gatherings. They nullified the Second Amendment whenever people exercised their First Amendment right to assemble. These were very broad prohibitions that extended far beyond sensitive places.

188.

> It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room, or other place where persons are assembled for public worship, for amusement, or educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

*Id.* at 452.

## IV. Twentieth Century

Arizona in 1901,[189] and Montana in 1903,[190] enacted statutes similar to the Oklahoma ban on arms at public and social events; the statutes covered all firearms.

Maryland in 1910 outlawed hunting on Sundays and election days.[191] Being found "in the fields or woods with on a gun" was considered prima facie evidence of illegal hunting.[192]

Tennessee strengthened its existing law against arms in

189.

> If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

1901 Ariz. Acts 1252.

190.

> *Carrying concealed weapons in places of public resort*. If any person shall go into any church or religious assembly, any school room or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct or any place of registration, on the day or days of any election or registration, where any portion of the people of the State are collected to register or vote at any election, or to any other place where people may be assembled to perform any public duty, or at any public assembly and shall have or carry concealed or partially concealed about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, knuckles, or bowie knife, he shall be punished by a fine of not less than fifty nor more than five hudred dollars.

1903 Mt. Laws 643.

191. 1910 Md. Laws 521.

192. *Id.*

polling places with a 1913 statute against election officers bringing guns to voting places or to places where returns were being tallied.[193]

The alcohol prohibition era led to the first laws about guns in cars, since bootleg alcohol vendors sometimes carried guns when making deliveries. Missouri provided extra punishment for persons illegally transporting alcohol who did so while armed.[194] An Iowa statute forbade carrying loaded long guns in automobiles, while expressly allowing loaded handguns.[195] Massachusetts prohibited wearing handguns in automobiles or having them within reach.[196]

---

193. 1913 Tenn. Priv. Acts 990 ("that no officer of election or Commissioner of Elections shall be in, at, or near any ballot box or voting precinct during any election or the canvassing of the returns armed with pistol, gun, or other deadly weapon.").

194.

> Persons or passengers guilty of a felony, when.— Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks, billy, club, or other dangerous weapon, article or thing, which could, or might, be used in inflicting bodily injury, or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years.

1923 Mo. Laws 241–42.

For applications, *see* State v. Carter, 64 S.W.2d 687, 688 (Mo. 1933) ("Ordinarily, a person has a right to carry in a vehicle a gun for sporting purposes." But the fact that defendant was returning from a hunting trip is no defense under the statute.); State v. Rector, 328 Mo. 669, 673 (1931) (defendant's argument that his revolver was rusty and non-functional should have been raised as a trial defense).

195. 1929 Iowa Acts 90 ("No person shall carry a gun or any firearms, except a pistol or revolver, in or on a motor vehicle unless the same be unloaded in both barrels and magazine, and taken down or contained in a case.").

196.

> Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty... or whoever so carries any stiletto, dagger, dirk knife, slung shot,

More hunting laws were enacted. New Jersey in 1901 banned Sunday hunting.[197] A 1904 statute outlawed hunting on private marsh or swamp land, if the owners had given notice, such as by posting signs.[198] Delaware forbade gun carrying when training dogs outside of the hunting season.[199] Mississippi prohibited hunting in wildlife sanctuaries, and deemed possession of guns or dogs thereon to be prima facie evidence of illegal hunting.[200]

---

> metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail. . .

1927 Mass. Acts 416.

197. 1901 N.J. Laws 265 ("It shall be unlawful to hunt with a hound or hounds, or with fire-arms or weapons of any kind, or to carry a gun in the woods or fields or on the waters on the Sabbath day, commonly called Sunday, under a penalty of twenty dollars for each offence.").

198.

> Any person trespassing upon any marsh, swamp or meadow grounds lying within the bounds of any meadow bank company, organized or to be organized under the provisions of the act "An act to enable the owners of the tide swamp and marshes to improve the same, and the owners of meadows already banked in and held by different persons to keep the same in good repair," passed November the twenty-ninth, one thousand seven hundred and eighty-eight, and the several supplements thereto, where the owners and possessors of the said marsh, swamp or meadow lands, lying within the bounds of such meadow bank company, have caused or permitted or suffered, or shall hereafter cause or permit or suffer the same to be subjected to the overflowing of the tide, carrying a gun, after public notice on the part of the owner, possessor, lessee or licensee of any such marsh, swamp or meadow grounds subjected to the overflowing of the tide, forbidding such trespassing, such notice being posted conspicuously adjacent to the highway binding on such lands or adjacent to any usual entrance-way to said land, shall be deemed and adjudged to be a disorderly person.

1904 N.J. Laws 178.

199. 1932 Del. Laws 771 ("That from and after the passage of this Unlawful to Act, it shall be unlawful for any person to carry a gun while training dog or dogs in closed game season.").

200.

> It shall be unlawful for any person to hunt with gun or dog on any

Michigan did the same for a particular wildlife refuge, while allowing for permits to hunt predatory game therein.[201] North Carolina prohibited guns in wildlife refuges in the western part of the state.[202]

---

> sanctuary or preserve for birds and game, or to rob or destroy the nests of any birds, or to catch, snare, trap, or net any birds within any such prescribed limits, and any person found with gun or dog on or within such prescribed limits, shall be prima facie presumed to be hunting in violation of this act.

1924 Miss. Laws 554.

201.

> It shall be unlawful for any person to hunt, trap, capture, kill or otherwise destroy any wild game animals, wild game or song birds, their young offspring or eggs in the district hereinbefore described, or to molest the homes, nests or houses of such wild game animals or wild game or song birds. A permit may be granted by the conservation commission to a person or persons to hunt carnivorous birds and animals on said premises. Nothing herein contained shall be construed to prohibit any person from keeping the animals or birds herein mentioned in captivity under a permit granted therefor by any law now in force or which may be hereinafter enacted. The state department of conservation is specifically charged with the supervision of the refuge hereby created and with the enforcement of the provisions of this act. It shall be prima facie evidence of hunting on said refuge for any person other than an officer charged with enforcing the provisions of this act to be found thereon with a loaded gun outside of his home or buildings owned or occupied by him.

1925 Mich. Pub. Acts 108.

202.

> SEC. 1. That it shall be unlawful for any person or persons to hunt, trap, capture, willfully disturb, or kill any animal or bird of any kind whatever, or take the eggs of any bird within the limits of any park or reservation for the protection, breeding, or keeping of any animals, game, or other birds, including buffalo, elk, deer, and such other animals or birds as may be kept in the aforesaid park or reservation, by any person or persons either in connection with the Government of the United States, or any department thereof, or held or owned by any private person or corporation.
>
> . . .
>
> SEC. 3. That any person who shall carry a pistol, revolver, or gun in any park or reservation such as is described in section one of this act, without having first obtained the written permission of the owner or manager of said park or reservation, shall be guilty of a misdemeanor, or shall be fined or imprisoned, in the discretion of the court, for each and every offense.

More broadly, Minnesota banned guns in state parks and in a zone a half-mile around their edges. Guns could be possessed therein only if they had been "sealed" by a park employee.[203] The seal—presumably some sort of wax or other cap—would serve as proof that the gun owner had not fired the gun on park property. Wisconsin prohibited inholders of property within state parks from hunting there; the statute also required that their guns on park property be unloaded.[204]

---

> SEC. 4. That the provisions of this act shall apply only to that part of the State of North Carolina situated west of the main line of the Southern Railway running from Danville, Virginia, by Greensboro, Sallsbury, Charlotte, and Atlanta, Georgia.

1921 N.C. Sess. Laws 53–54.

203.

> State Parks – No person shall pursue, hunt, take, catch, or kill any wild bird or animal of any kind within the limits of any territory set apart, designated, used or maintained as a state public park, or within one-half mile of the outer limits thereof or have any such bird or animal or any part thereof in his possession or under his control within said park or within one-half mile of said outer limits.
>
> No person shall have in his possession within any such park or within one-half mile of the outer limits thereof, any gun, revolver, or other firearm unless the same is unloaded, and except after the same has been sealed by the park commissioner or a deputy appointed by him, and except such gun or other firearm at all times during which it may be lawfully had in such park remains so sealed and unloaded. Upon application to the park commissioner or any deputy appointed by him, it is hereby made his duty to securely seal any gun or firearm in such manner that it cannot be loaded or discharged without breaking such seal. The provisions of this section shall apply to all persons including Indians.

1905 Minn. Laws 620.

204.

> No owner of lands embraced within any such wild life refuge, and no other person whatever, shall hunt or trap within the boundaries of any wild life refuge, state park, or state fish hatchery lands; nor have in his pssession or under his control therein any gun or rifle, unless the same is unloaded and knocked down or enclosed within its carrying case; but nothing herein shall prohibit, prevent, or interfere with the state conservation commission, or its deputies, agents or employes, in the destruction of injurious animals.

1917 Wis. Sess. Laws 1234–44.

The first federal firearms regulation to apply to national parks was created in 1936.[205] It declared: "Firearms, explosives, traps, seines, and nets are prohibited within the parks and monuments, except upon written permission of the superintendent or custodian."[206] The prohibitions on "traps, seines, and nets" indicates that a major concern was poaching—a common activity during the Great Depression.

Lastly, in a statute that likely reflected well-established practice, Georgia forbade bringing weapons or alcohol into state penitentiaries without the warden's knowledge.[207]

Based on the above statutes, *Heller*'s mention of "longstanding" laws against carrying guns in "schools" or "government buildings" has modest support in history and tradition. As of the 1930s, several states had broad laws against guns in schools. A larger number of states had laws against arms at polling places. But these were the minority approach. Widespread bans on arms in government buildings or schools came in the later part of the twentieth century.

In 1988, Congress outlawed carrying a firearm or other dangerous weapon in a "Federal facility."[208] This was defined as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties."[209] A person may not be prosecuted unless the facility has posted signs, or the person independently knows that the prohibition exists.[210] The arms ban includes adjacent parking lots that the federal government owns

205. 1 Fed. Reg. 672, 674 (June 27, 1936).

206. *Id.*

207.

> Be it enacted by the General Assembly of the State of Georgia, and it is hereby enacted by authority of the same, That from and after the passage of this Act it shall be unlawful for any person in the State of Georgia to come inside of the guard-lines established, with gun, pistol or any other weapon, or any intoxicating liquors without the knowledge and consent of the deputy wardens in charge.

1903 Ga. Laws 71.

208. 18 U.S.C. § 930; PL 100–690, § 6215 (Nov. 18, 1988), 102 Stat 4181.

209. *Id.*

210. *Id.*

or leases, and which have been posted.[211]

Bans on guns in schools are, in most places, of similarly recent vintage. For most of the twentieth century, students brought guns to school, stored them in their lockers or automobiles, and then went hunting or target shooting after school.[212] When Antonin Scalia was growing up in New York City in the 1950s, he carried a rifle on the subway on his way to school, for use as a member of his school's rifle team.[213]

But in the late 1980s and early 1990s, violent crime was rising sharply.[214] Some scholars suggest that the crime surge was in part a consequence of the "War on Drugs."[215] The large majority of states enacted laws against guns in schools.[216] The laws varied, although all of them had exceptions for instructional or sporting purposes, or for uses authorized by the school administration.[217]

---

211. *Id.*

212. *See, e.g.*, John Lane, *Permit Guns in School to Stop Massacres*, CHARLOTTE OBSERVER, Jan. 22, 2008, at 1e1A. Lane observes:

> I grew up in the 1940s and 1950s . . . [F]or one 'show and tell' I brought to school a Walther PPK pistol . . . . Later, when we were older, it was not uncommon for several of us to have shotguns in our vehicles while at school. Usually they were there because we had been in the woods at sun-up hunting. We didn't have time to take them home before school, so we left them in our trunks. . . . In researching this column, I attempted to find a 'school shooting' from that era. I came up empty.

*Id.*

213. Associated Press, *Scalia Says Don't Link Guns Only to Crime*, SEATTLE TIMES, Feb. 27, 2006, http://seattletimes.nwsource.com/cgi-bin/PrintStory.pl?slug=scalia27&date=20060227 (reporting Scalia's speech to an annual meeting of National Wild Turkey Federation).

214. *See United States Crime Rates 1960 – 2017*, DisasterCenter.com (compiling data from FBI Uniform Crime Reports), http://www.disastercenter.com/crime/uscrime.htm.

215. *See, e.g.*, JEFFREY A. MIRON, DRUG WAR CRIMES: THE CONSEQUENCES OF PROHIBITION (2004).

216. *See* United States v. Lopez, 514 U.S. 549, 581 (1994) ("over 40 States") (Kennedy, J., concurring).

217. *E.g.*, IOWA CODE § 724.4B ("A person who has been specifically authorized by the school to go armed, carry, or transport a firearm on the school grounds, including for purposes of conducting an instructional program regarding firearms.").

All the state laws applied to K-12 public schools, and many of them also covered K-12 private schools.[218] Some also applied to public institutions of higher education, and a few even to private higher education.[219]

As more and more states have enacted "shall issue" laws for concealed carry handgun permits,[220] states have adjusted their school laws for permit holders. For example, the permit-holder may be allowed to have a loaded gun inside a car on school property, but not to take the handgun out of the car.[221]

Redundantly, Congress in 1990 enacted the federal Gun-Free School Zone Act ("GFSZA"). The law sharply restricted guns at K-12 schools and within a one-thousand-foot radius around the schools.[222]

The thousand-foot radius is large enough to encompass much unsensitive land in any urban area. If there were no exceptions, the GFSZA would facially run afoul of the Second Amendment. However, the ban does not apply on private property.[223] Nor does it cover transportation of guns that are locked in containers, or for hunting.[224] Even in school buildings themselves, carrying is allowed under federal law if the carrier has a state-issued

218. *See* Hetzner, *supra* note 6, at 387–88 (listing statutes).

219. *E.g.*, DEL. CODE ANN. tit. 11, § 1457 (covering private higher education).

220. Under shall issue schemes, permits are generally issued to all applicants who meet objective criteria. *See* Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 TENN. L. REV. 679 (1995).

221. *See, e.g.*, Colo. Rev. Stats. § 18-12-214(3).

222. *See* 18 U.S.C. §§ 921(a)(25), 922(q) (defining "school zone" and restricting guns in school zones, respectively) (2008).
In 1995, the U.S. Supreme Court held the GFSZA unconstitutional as an exercise of Congress's interstate commerce power, since guns in school zones had no meaningful connection to interstate commerce. *See* United States v. Lopez, 514 U.S. 549, 551 (1994). *See also* David B. Kopel & Glenn H. Reynolds, *Taking Federalism Seriously:* Lopez *and the Partial Birth Abortion Ban Act*, 30 CONN. L. REV. 59, 68–70 (1997) (discussing interstate commerce in *Lopez*). In 1996, Congress re-enacted the law, this time limiting its application to guns which at some point after their manufacture had been moved in interstate commerce. 18 U.S.C. § 922(q)(1)(B), (C), (G), (I), (2)(A), (3)(A) (containing new language restricting the law's application to a person with a "firearm that has moved in or that otherwise affects interstate or foreign commerce").

223. *Id.* § 922(q)(2)(B)(i).

224. *Id.* § 922(q)(2)(B)(iii) & (vii).

handgun carry permit.[225]

## V. Post-*Heller* Cases

This Part examines sensitive places cases decided after the Supreme Court's 2008 decision in *District of Columbia v. Heller*.

### A. Public Lands

#### 1. Parking Lots in National Parks: *United States v. Masciandaro*

Sean Masciandaro illegally parked overnight in a national park parking lot, prompting questioning by a United States Park Police sergeant. During the questioning, Masciandaro revealed that he had a loaded 9mm semiautomatic handgun in the vehicle.[226] Masciandaro was arrested and charged with violating 36 C.F.R. § 2.4(b), which prohibited "carrying or possessing a loaded weapon in a motor vehicle" on national park land.

Masciandaro argued for strict scrutiny, explaining that at the time of his arrest he was a law-abiding citizen with no criminal record and that he carried the handgun for self-defense.[227]

The government argued that national parks—which are owned and managed by the federal government—are "sensitive places" and therefore restrictions within them are "presumptively lawful" under *Heller*. Specifically, the government stated that:

> a large number of people, including children, congregate in National Parks for recreational, educational and expressive activities. Park land is not akin to a gun owner's home and is far more analogous to other public spaces, such as schools, municipal parks, governmental buildings, and appurtenant

225. *Id.* § 922(q)(2)(B)(ii). This exception applies if the license is issued "by the State in which the school zone is located or a political subdivision of the State." This still leaves law-abiding citizens from out-of-state unfairly and unnecessarily burdened when the State does not offer licenses to out-of-state residents. *See* Royce de R. Barondes, *Federalism Implications of Non-Recognition of Licensure Reciprocity Under the Gun-Free School Zones Act*, 32 J.L. & POL. 139 (2017).

226. United States v. Masciandaro, 638 F.3d 458, 460 (4th Cir. 2011).

227. *Id.* at 469–70.

> parking lots, where courts have found firearms restrictions to be presumptively reasonable. Furthermore, as the district court noted, the locations within the National Parks where motor vehicles travel are even more sensitive, given that they are extensively regulated thoroughfares frequented by large numbers of strangers, including children.[228]

Masciandaro answered:

> The George Washington Memorial Parkway, where [he] was charged with violation of the superseded [National Park Service] weapons regulation, is a public road and a major traffic thoroughfare in the Washington metropolitan area and is not a sensitive place. . . .
>
> * * *
>
> There is a patchwork of regulations that allow people to use and possess weapons on NPS land, including parkways and remote forests and parks across the United States. Those regulations reflect the [Department of Interior's] determination that NPS land is not sensitive, as a general matter. Indeed, the very same NPS regulation [36 C.F.R. § 2.4] that prohibits possession of loaded weapons in motor vehicles indicates that it is lawful to hunt with weapons, use them for target practice, have them in residential dwellings, use them for research activities, and carry them for protection in "pack trains" or on trail rides, all on NPS land.[229]

Additionally, "Masciandaro points out that the National Park Service itself 'has explicitly distinguished between the sorts of 'sensitive places' mentioned in *Heller* (schools and government buildings) on one hand and national parks on the other' when it explained that 'nothing in [36 C.F.R. § 2.4] shall be construed to authorize concealed carry of firearms in any *Federal facility or Federal court facility* as defined in 18 U.S.C. § 930.'"[230]

Without deciding whether a national park parking lot is a sensitive place, the Fourth Circuit pondered the appropriate

228. *Id.* at 471.

229. *Id.* at 471–72 (citing 73 Fed. Reg. 74,966, 74,971 (Dec. 10, 2008)) (brackets in original).

230. *Id.* at 472 (citing 73 Fed. Reg. at 74,971) (brackets and emphasis in opinion).

method of analyzing sensitive place cases. Specifically, "whether the 'sensitive places' doctrine limits the scope of the Second Amendment or, instead, alters the analysis for its application to such places."[231] In other words, does the Second Amendment not apply at all in sensitive places? Or does the Second Amendment still apply there, and restrictions therein are easier to justify?

As the court noted, *Heller* said "the right secured by the Second Amendment is not unlimited" and in the same paragraph declared, "nothing in our opinion should be taken to cast doubt on ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."[232] "Because of the relation between the first statement and the examples," the *Masciandaro* court observed, "one might conclude that a law prohibiting firearms in a sensitive place would fall *beyond the scope* of the Second Amendment and therefore would be subject to no further analysis."[233]

On the other hand, the *Masciandaro* court continued, "the Court added a footnote to its language, calling these regulatory measures '*presumptively* lawful.' The Court's use of the word 'presumptively' suggests that the articulation of sensitive places may not be a limitation *on the scope* of the Second Amendment, but rather on the analysis to be conducted with respect to the burden on that right."[234]

The *Masciandaro* court declined to decide the proper analysis

---

231. *Id.*

232. *Id.* (quoting *Heller*, 554 U.S. at 626).

233. *Id.* (emphasis in original).

234. *Id.* Several other circuit courts have wrestled with this issue. *See* David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. LOUIS L.J. 193, 221–26 (2017). The Seventh Circuit has indicated that it views sensitive place restrictions as burdening the right but being easier to justify:

> when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need. Similarly, the state can prevail with less evidence when . . . guns are forbidden to a class of persons who present a higher than average risk of misusing a gun.

Moore v. Madigan, 702 F.3d 933, 940 (7th Cir. 2012).

for sensitive place cases, or even whether a national park is sensitive, "because even if Daingerfield Island is not a sensitive place, as Masciandaro argues, 36 C.F.R. § 2.4(b) still passes constitutional muster under the intermediate scrutiny standard."[235]

Subsequent to Masciandaro's arrest, in 2009 Congress enacted legislation to allow the possession and carrying of loaded firearms in the National Park System and the National Wildlife Refuge System—provided that the individual is legally allowed to own a firearm, and that the possession or carrying of the firearm is compliant with the laws of the host state.[236] Thus, a lawful gun owner may carry in a national park with a concealed handgun carry permit if the state requires permits, or without a permit if the state does not require permits. Masciandaro had been convicted for violating the old regulation, which at the time of his offense was still in effect.

### 2. Buffer Zones Around Parks: *People v. Chairez*

In *People v. Chairez*, the Supreme Court of Illinois held that a law prohibiting individuals from carrying or possessing arms within 1,000 feet of a public park violates the Second Amendment.[237]

Specifically, the law made it a Class 3 felony to carry or possess

235. *Id.* at 473. The court determined that the prohibition in the national park was reasonable because "national parks patrons are prohibited from possessing *loaded* firearms, and only then within their motor vehicles." *Id.* (emphasis in original). Emphasizing that "[l]oaded firearms are surely more dangerous than unloaded firearms, as they could fire accidentally or be fired before a potential victim has the opportunity to flee," the court glossed over the fact that "the need to load a firearm impinges on the need for armed self-defense" by stating that "intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective." *Id.* at 474.

236. *See* Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub.L. No. 111–24, § 512(b), 123 Stat. 1734, 1765 (2009) ("The Secretary of the Interior shall not promulgate or enforce any regulation that prohibits an individual from possessing a firearm ... in any unit of the National Park System ... if ... the individual is not otherwise prohibited by law from possessing the firearm; and ... the possession of the firearm is in compliance with the law of the State in which the unit of the National Park System ... is located."); 54 U.S.C. § 104906. *See also* 36 C.F.R. § 2.4 (regulation implementing new law).

237. 2018 IL 121417.

"in any vehicle or concealed on or about his person . . . any pistol, revolver, stun gun or taser or other firearm . . . within 1,000 feet of the real property comprising any school, public park, courthouse, public transportation facility, or residential property [of a public housing agency]."[238]

In February 2013, Julio Chairez was a passenger in a vehicle that was pulled over by police. Chairez fled the vehicle and threw his backpack over a fence. The backpack, which held a .25-caliber handgun, landed near the Virgil L. Gilman Nature Trail in Aurora, Illinois. Chairez was subsequently convicted of possessing a firearm within 1,000 feet of a public park.

The court applied the Second Amendment Two-Part Test that is used by most federal courts, and which had been adopted by the Supreme Court of Illinois in *Wilson v. County of Cook*.[239]

The court had previously held that "the second amendment protects the right to possess and use a firearm for self-defense outside the home" in *People v. Aguilar*.[240] And in *People v. Mosley*, the court had struck down a law prohibiting the carrying of an uncased, loaded, and immediately accessible firearm on a public way.[241] Thus, Chairez had the right to possess the firearm outside his home and on public property. The question was whether the public parks are "sensitive places"—and if so, whether the government can create a buffer zone around a sensitive place.

The State cited "various historical sources, chiefly the 1328 Statute of Northampton, to support its argument that possessing a firearm within a 1000 feet of a public park is not a protected right."[242]

Chairez retorted that even if public parks are sensitive places, the thousand-foot exterior zone could not be. "Defendant argues that the preposition 'in,' which precedes 'sensitive places' in *Heller*'s statement, makes the list of presumptively lawful regulations limited to the actual sensitive place, not an exclusion

238. 720 Ill. Comp. Stat. 5/24-1(a)(4), (c)(1.5).
239. 2012 IL 112026.
240. 2013 IL 112116, ¶ 21.
241. 2015 IL 115872.
242. *Chairez*, 2018 IL at ¶ 27 (citation omitted).

zone around the particular place."[243]

Chairez also pointed to a recent opinion from the Seventh Circuit: "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places."[244] Thus, the area surrounding a sensitive place cannot itself be treated as sensitive.

The court did not decide whether the buffer zone was a sensitive place. As the court noted, *Heller* had said that arms bans "in sensitive places" were "presumptively lawful." Here, even if the buffer zone enjoyed a presumption of lawfulness, the presumption had been rebutted.[245]

The court found that the law severely burdened the core of the right to bear arms, because it prohibited the carriage of weapons for self-defense and it affected the entire law-abiding population of Illinois.[246] Consequently, the court applied an "elevated intermediate scrutiny" in which "the government bears the burden of showing a very strong public-interest justification and a close fit between the government's means and its end, as well as proving that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights."[247]

To satisfy this burden, the State focused primarily on school violence and the 1,000-foot ban as it applies to schools. The State then tried to draw an analogy to public parks, since children frequent parks.[248] The State did not, however, provide any evidence regarding parks. "[T]he State's propositions are devoid of any useful statistics or empirically supported conclusions."[249] "Without specific data or other meaningful evidence," the State was unable to support its "assertion that a 1000–foot firearm ban

243. *Id.* at ¶ 28.

244. *Id.* (quoting *Moore*, 702 F.3d at 940).

245. *Id.* at ¶ 30 ("We, however, need not address whether the 1000–foot firearm restriction falls outside of the ambit of the second amendment because we agree with the approach taken by other courts that assume some level of scrutiny must apply to *Heller* 's 'presumptively lawful' regulations.").

246. *Id.* at ¶ 49.

247. *Id.* at ¶ 50 (internal quotations omitted).

248. *Id.* at ¶ 51.

249. *Id.* at ¶ 53.

around a public park protects children, as well as other vulnerable persons, from firearm violence."[250]

3. Army Corps of Engineers Lands: *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*

GeorgiaCarry.Org challenged the federal regulation[251] prohibiting loaded firearms and ammunition on U.S. Army Corps of Engineers property.[252] Initially, they sought a preliminary injunction.[253] The Eleventh Circuit answered that the case at this stage lacked historical evidence,[254] the facts needed for a sensitive places analysis,[255] and basic information needed to assess the public safety risks.[256] Because "[t]he plaintiffs in this appeal swing

250. *Id.* at ¶¶ 53-54.

251. 36 C.F.R. § 327.13.

252. GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers, 788 F.3d 1318 (11th Cir. 2015). "Army Corps manages 422 projects, mostly lakes, in forty-two states and is the steward of twelve million acres of land and water used for recreation, with 54,879 miles of shoreline." GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers, 212 F. Supp. 3d 1348, 1353 (N.D. Ga. 2016).

253. 36 C.F.R. § 327.13.

254. *GeorgiaCarry.Org, Inc.*, 788 F.3d at 1327 ("none of the parties before this Court have provided any historical evidence to inform our analysis").

255.

> Second, the preliminary injunction record does a limited job fleshing out a variety of factual issues that may bear upon a Second Amendment analysis. Thus, for example, as to the issue of whether the Corps property constitutes what *Heller* called a 'sensitive place,' we are missing basic information. Among others, we do not know the size of the Allatoona Dam, a major feature of the water resource development project and (all parties agree) a potential national security concern. Nor do we know the size of the recreational area at issue in this case—that is, where the plaintiffs seek to carry their weapons in this as-applied challenge. Moreover, we have no way of telling how far the recreational area extends beyond the dam, whether the recreational area is separated from the dam itself by a fence or perimeter, or to what extent the dam is policed. All this preliminary injunction record reveals is that the dam itself is a national security concern and that the federal government (through the Corps) has opened a large parcel of nearby land for recreation.

*Id.* at 1327–28.

256.

> In this case, the government's stated and plainly legitimate objective is promoting public safety on Corps property. But we lack much of

for the fences" and "hang their hats on a single, sweeping argument: that the regulation completely destroys their Second Amendment rights," the court denied the preliminary injunction on the limited record before it.[257]

On remand, the Corps moved for summary judgment, and the district court granted it. The district court determined that land managed by the Corps is sensitive:

> the existence of Defendant Army Corps' 'recreational facilities' is merely a byproduct of the sensitive dam construction projects nearby. Indeed, those projects often are designed with the express purposes of protecting population centers from flooding, providing hydroelectric power, improving navigation, and providing nearby developed, as well as dispersed, recreation and

> the basic information we would need to assess the risks found at Allatoona Lake. For example, we do not know how heavily trafficked the relevant area is at various times of the year, nor what types of activities the visitors engage in, nor how the visitors are distributed throughout the property. All we have before us is an affidavit from a single Corps Park Ranger that speaks in generalities about the presence of visitors and their potential sources of conflict. We also have no evidence about the dangers currently facing Allatoona visitors, including the frequency and nature of crimes committed or of altercations amongst visitors. And although we are told that the Corps has the authority to coordinate with local law enforcement to provide additional patrols during peak visitation periods, we do not know whether the Mobile District of the Corps has done so. In fact, other than a description of the general law enforcement limitations of Corps Park Rangers, we know almost nothing about the nature of the police presence at Allatoona Lake. In sum, we do not have before us any empirical data that might aid in assessing the fit between the challenged regulation and the government's asserted objective. This slim preliminary injunction record does not provide nearly enough information to enable a court to fairly engage in a thorough constitutional analysis.

*Id.* at 1328–29 (footnote omitted).

257.

> The regulation does not completely destroy the plaintiffs' right to bear arms because its effect is cabined to a limited geographic area designed for recreation. Whatever else the regulation does, it does not destroy the plaintiffs' Second Amendment right to keep and bear arms altogether. Thus, we affirm the district court's order and remand for further proceedings consistent with this opinion.

*Id.* at 1320.

quality natural resources for the local populations.[258]

Thus, "[t]hough Defendant Army Corps' property is more expansive than just a 'building,' there is no reason to doubt that the Firearms Regulation, which restricts the use of firearms on military property nearby sensitive infrastructure projects, falls squarely into the existing 'laws forbidding the carrying of firearms in sensitive places' referenced in *Heller*."[259]

### 4. Army Corps of Engineers Lands: *Morris v. U.S. Army Corps of Engineers*

The firearms ban on Army Corps land was ruled unconstitutional by the United States District Court for the District of Idaho in *Morris v. U.S. Army Corps of Engineers*.[260] In *Morris*, the plaintiffs alleged that 36 C.F.R. § 327.13 violated the Second Amendment by "(1) banning the possession of firearms in a tent, and (2) banning the carrying of firearms on Corps' recreation sites."[261]

Notably, the court held that the Army Corps' regulation went "beyond merely burdening the Second Amendment rights but 'destroys' those rights for law-abiding citizens"[262]—the same argument the Eleventh Circuit had rejected in *GeorgiaCarry.Org*.[263]

258. *GeorgiaCarry.org, Inc.*, 212 F. Supp. 3d at 1361.
The court also determined that there was no Founding Era tradition of carrying arms on Army Corps land—while acknowledging that the Corps was not entrusted with the management of any land in the Founding Era. *Id.* at 1360–67. In the alternative, the court held that the ban satisfied intermediate scrutiny. *Id.* at 1367–74.

259. *Id.* at 1362. In a previous case, GeorgiaCarry.Org challenged a statute against carrying guns in "a place of worship, unless the governing body or authority of the place of worship permits the carrying of weapons or long guns by license holders." Ga. Code Ann. § 16-11-127(b)(4) (2016). In upholding the law, the Eleventh Circuit expressly left unresolved the question of whether a church is a sensitive place: "In reaching this conclusion, we obviously need not, and do not, decide what level of scrutiny should be applied, nor do we decide whether a place of worship is a 'sensitive place' under *Heller*." GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1261 n.34 (11th Cir. 2012).

260. 60 F. Supp. 3d 1120 (D. Idaho 2014).

261. *Id.* at 1122.

262. *Id.* at 1123.

263. *GeorgiaCarry.Org, Inc.*, 788 F.3d at 1320.

Nor was the District Court of Idaho persuaded by the sensitive places argument.[264] "The Corps argues that its recreation sites are public venues where large numbers of people congregate, making it imperative that firearms be tightly regulated. The Corps also points out that the sites contain dams and power generation facilities that require heightened protection, especially given homeland security threats."[265] But the court pointed out that *Heller* "limited the 'sensitive place' analysis to facilities like 'schools and government buildings.' In contrast, the ban imposed by the Corps applies to outdoor parks."[266]

Moreover, the sensitive places language from *Heller* "confirms the right of the Corps to regulate handguns on its property. But here the Corps is attempting to ban handguns, not regulate them."[267] Thus, "[w]hile the Corps retains the right to regulate the possession and carrying of handguns on Corps property, this regulation imposes an outright ban, and is therefore unconstitutional under any level of scrutiny."[268]

The Army Corps appealed to the Ninth Circuit, but shortly before oral argument, the Army Corps asked that oral argument be cancelled because the Corps would be rewriting 36 C.F.R. § 327.13 to address the plaintiffs' concerns.[269] Ultimately, the Corps did not change the regulation, and instead issued a guidance "for considering written requests from individuals to carry firearms at U.S. Army Corps of Engineers water resources development projects."[270]

264. *GeorgiaCarry.org, Inc.*, 212 F. Supp. 3d at 1362.

265. *Morris*, 60 F. Supp. 3d at 1124.

266. *Id.* at 1123–24.

267. *Id.* at 1123.

268. *Id.* at 1125. The same court later struck down the regulation as applied to other areas on Corps land. Morris v. U.S. Army Corps of Eng'rs, 60 F. Supp. 3d 1120 (D. Idaho 2014).

269. Appellants Thomas Bostick et al., Emergency Motion to Refer Case to Mediation, no. 14-36049, ECF 10339766, Mar. 2, 2017.

270. Memorandum from the Dep't of Def. on *Command Guidance in Considering Firearm Possession Requests Under 36 C.F.R. 327.13(a), Explosives, Firearms, other Weapons and Fireworks to the Commanders, Major Subordinate Commands and District Commands, Chiefs Operation Division* , (May 14, 2018), https://corpslakes.erdc.dren.mil/employees/cecwon/pdfs/18May14-FirearmsPossessionGuidance.pdf.

B. Post Offices and their Parking Lots

1. *United States v. Dorosan*

A 1972 federal regulation bans guns in all post offices and all postal parking lots.[271] The Fifth Circuit upheld the ban in a brief, unpublished decision.[272] Clarence Paul Dorosan was a letter carrier for USPS. One day he called in sick, and a postal inspector discovered his unattended bag at the post office. The inspector searched Dorosan's bag and found a magazine loaded with twelve rounds, and three empty shell casings. When Dorosan was confronted upon returning to work the following day, he admitted to also having a firearm in the glove compartment of his vehicle parked in the USPS parking lot.[273] He was convicted of violating 39 C.F.R. § 232.1(*l*).

The Fifth Circuit upheld the conviction on three grounds. "First, the Postal Service owned the parking lot where Dorosan's handgun was found, and its restrictions on guns stemmed from its constitutional authority as the property owner."[274] Second, "the Postal Service used the parking lot for loading mail and staging its mail trucks. . . . Given this usage of the parking lot by the Postal Service as a place of regular government business, it falls under the 'sensitive places' exception recognized by *Heller*."[275] Third, "the Postal Service was not obligated by federal law to provide parking for its employees, nor did the Postal Service require Dorosan to park in the lot for work. If Dorosan wanted to carry a gun in his car but abide by the ban, he ostensibly could have secured alternative parking arrangements off site."[276]

---

271. 39 C.F.R. § 232.1(*l*) ("no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes").

272. United States v. Dorosan, No. CRIM. A. 08-042, 2008 WL 2622996 (E.D. La. June 30, 2008).

273. *Id.* The facts of the case are summarized in United States v. Dorosan, No. CRIM. A. 08-042, 2008 WL 2622996 (E.D. La. June 30, 2008).

274. *Id.* at 875.

275. *Id.*

276. *Id.* at 876.

2. *Bonidy v. U.S. Postal Service*

Tab Bonidy is a concealed carry permitholder from a rural area outside of Avon, Colorado, where there is no delivery service and residents must pick up their mail from the post office. The Avon Post Office is a freestanding building with an employee parking lot, customer parking lot, and five free parking spots on West Beaver Creek Boulevard (except that parking on that street is prohibited when there are over two inches of snow). The post office lobby is always open, postal employees work a regular schedule, and security officers are never employed.[277]

Bonidy wanted to carry a firearm to retrieve his mail, or at least keep his firearm in the car when he went inside to collect his mail. Bonidy sought declaratory and injunctive relief, arguing that § 232.1(*l*) violates the Second Amendment.

Bonidy contended that the sensitive places language in *Heller* was dicta and should be disregarded. The Tenth Circuit disagreed: "First, we have previously held that we are 'bound by Supreme Court dicta almost as firmly as by the Courts' outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'. . .Second, this dicta squarely relates to the holdings itself, and therefore is assuredly not gratuitous. Third, this dicta was subsequently repeated largely verbatim and reendorsed by the Court several years later in [*McDonald v. City of Chicago*, 561 U.S. 742, 925 (2010)]."[278]

277. Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1123 (10th Cir. 2015).

278. *Id.* at 1125. Most circuits consider Supreme Court dicta binding to some extent. *See* McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991) ("We think that federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement."); Newdow v. Peterson, 753 F.3d 105, 108 n.3 (2d Cir. 2014) ("[W]e have an obligation to accord great deference to Supreme Court *dicta*") (internal quotations omitted); Oyebanji v. Gonzales, 418 F.3d 260, 264–65 (3d Cir. 2005) ("[A]s a lower federal court, we are advised to follow the Supreme Court's considered dicta.") (internal quotation omitted); Wynne v. Town of Great Falls, 376 F.3d 292, 298 n.3 (4th Cir. 2004) ("[W]ith inferior courts, like ourselves . . . carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (internal quotations omitted); United States v. Becton, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) ("We are not bound by dicta, even of our own court . . . . Dicta of the Supreme Court are, of course, another matter.") (citation omitted); United States v. Marlow, 278 F.3d

Most importantly, "Since *Heller* and *McDonald* we have quoted that same sentence and considered ourselves bound by it. Thus, our own precedent causes us to conclude that the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices. Therefore, we uphold the District Court's ruling that 39 C.F.R. § 232.1(*l*) is constitutional as to the post office building itself."[279]

Moving next to the parking lot, the court determined that:

> the parking lot should be considered as a single unit with the postal building itself to which it is attached and which it exclusively serves. There is, in fact, a drop-off box for the post office in the parking lot, meaning that postal transactions take place in the parking lot as well as in the building. Thus, the previously quoted language in *Heller* applies with the same force to the parking lot as to the building itself.[280]

Because the parking lot presented a "closer question" than the post office building, the Tenth Circuit provided an "equal and alternative basis" for upholding the ban.[281] Assuming the right to

581, 588 n.7 (6th Cir. 2002) ("Appellate courts have noted that they are obligated to follow Supreme Court *dicta*, particularly when there is no substantial reason for disregarding it, such as age or subsequent statements undermining its rationale."); Reich v. Cont'l Cas. Co., 33 F.3d 754, 757 (7th Cir. 1994) ("In such a case the dictum provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it."); City of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 557 (8th Cir. 1993) ("[F]ederal courts 'are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . [the dicta] is of recent vintage and not enfeebled by any [later] statement.'") (citation omitted); United States v. Montero-Camargo, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) ("We do not treat considered dicta from the Supreme Court lightly. Rather, we accord it appropriate deference. As we have frequently acknowledged, Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, we do not blandly shrug them off because they were not a holding.") (internal citation and quotations omitted); Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[T]here is dicta and then there is dicta, and then there is Supreme Court dicta."); Sierra Club v. EPA, 322 F.3d 718, 724 (D.C. Cir. 2003) ("For this inferior Court . . . carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (internal citation, quotations, and brackets omitted).

279. *Bonidy*, 790 F.3d at 1125 .

280. *Id.*

281. *Id.*

bear arms applies beyond the home, the court upheld the parking lot ban under intermediate scrutiny:

> As a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate. In light of that discretion, the contrast between the regulation challenged here and the bans struck down in *Heller* and *McDonald* is stark. Those bans regulated wholly private activity and applied directly to every citizen within the respective jurisdictions. By contrast, the regulation challenged here applies only to discrete parcels of land owned by the U.S. Postal Service, and affects private citizens only insofar as they are doing business with the USPS on USPS property. And the regulation is directly relevant to the USPS's business objectives, which include providing a safe environment for its patrons and employees.[282]

Judge Tymkovich concurred in part and dissented in part. He agreed with upholding the ban in the post office building, but he would have struck down the ban in the parking lot.[283]

First, Judge Tymkovich pointed out that bans in schools and government buildings are merely *presumptively* lawful. "By explicitly listing those locations as examples of sensitive places, *Heller* placed a thumb on the scale in favor of considering them sensitive and thus presumptively regulable." But "[t]hat thumb on the scale can certainly be overcome depending on the qualities of the particular school or government building." In other words, the presumption is rebuttable:

> I do not agree that the dicta necessarily means "the Second Amendment right to bear arms has not been extended to 'government buildings.'" Maj. Op. at 1123. That overreads *Heller*'s dicta. While the list could certainly mean the right does not extend to schools or government buildings, it could just as easily (perhaps more easily) mean the right extends to those locations but that regulations in those locations presumptively survive scrutiny at step two of our two-prong

282. *Id.* at 1126–27.

283. *Id.* at 1129 (Tymkovich, J. concurring in part and dissenting in part). This was the holding of the district court. *Id.*; Bonidy v. U.S. Postal Serv., No. 10-CV-02408-RPM, 2013 WL 3448130 (D. Colo. July 9, 2013).

> Second Amendment analysis. And the fact that the *Heller* Court provided its list of exceptions in the course of explaining that the Second Amendment right is subject to certain limitations, *see Heller*, 554 U.S. at 626, 128 S.Ct. 2783, suggests it describes presumptively permissible limitations on the right, not cases where the right is not burdened at all. To say the right has not been extended to government buildings is to imply no plaintiff could ever successfully challenge a restriction in any government buildings. That goes too far.[284]

As for the USPS parking lot, "no such thumb on the scale exists," because *Heller* made no mention of such locations. "Thus, to be treated as sensitive and consequently presumptively regulable," the locations on which *Heller* expressed no view "must stand or fall on their own."[285]

> A few illustrations explain this point. The White House lawn, although not a building, is just as sensitive as the White House itself. Consequently, the presumption of lawfulness for a regulation penalizing firearm possession there might approach the categorical. At the spectrum's other end we might find a public park associated with no particular sensitive government interests—or a post office parking lot surrounding a run-of-the-mill post office. Perhaps such locations are "sensitive" in the sense that the government always has an interest in protecting its property or visitors. But without more concrete evidence of particular vulnerability, any presumption of lawfulness for a firearms regulation cannot control. One who demonstrates a real burden on his Second Amendment rights in a location that is insufficiently sensitive to justify that burden has rebutted any presumption of lawfulness that could tip the scales against him under our two-prong test.[286]

Thus, "the parking lot is insufficiently sensitive to qualify as presumptively regulable" and "the ease with which the government could alter this regulation to address its concerns while still respecting the Second Amendment rights of lawful

284. *Bonidy*, 790 F.3d at 1137 (Tymkovich, J., concurring in part and dissenting in part) (citations omitted).

285. *Id.* at 1136–37 (Tymkovich, J., concurring in part and dissenting in part).

286. *Id.* at 1137 (Tymkovich, J., concurring in part and dissenting in part).

carriers undercuts any substantial-relation argument."[287] Unlike the post office building, the parking lot is an open space, not a place where valuable transactions occur, and not an area of heightened concern for accidents. "There are surely non-building locations that are sufficiently sensitive to make regulating firearms there presumptively lawful. This parking lot is not one of them."[288]

The mere existence of a government building next to some open space was not sufficient to turn everything into a "sensitive place":

> To be sure, examining a location's similarity to the enumerated locations of schools and government buildings may aid in determining whether a particular location is "sensitive." But that means courts should look to how similar the location in question is with respect to its sensitivity, not just its proximity or lack thereof to a government building. For example, it would be odd if a government field otherwise low on the sensitivity scale could be transformed into a location where firearms could be forbidden with little justification by the erection of a public bathroom. Proximity to a government building, without more, cannot be sufficient to exempt a location from the Second Amendment.[289]

Moreover, there was a substantially less-burdensome alternative. "[R]ather than a flat ban on gun storage, the regulation could allow discretionary issuance of permits to use the parking lot with the gun in a locked vehicle concealed in a glove compartment or console."[290]

### C. Higher Education Buildings

At Virginia's George Mason University, a regulation forbids the "[p]ossession or carrying of any weapon by any person, except

287. *Id.* at 1139 (Tymkovich, J., concurring in part and dissenting in part).

288. *Id.* at 1140 n.10 (Tymkovich, J., concurring in part and dissenting in part).

289. *Id.* at 1140 (Tymkovich, J., concurring in part and dissenting in part).

290. *Id.* at 1139 (Tymkovich, J., concurring in part and dissenting in part) (quotations and citations omitted). The majority replied that the suggested alternative was administratively impractical on a national basis. *Id.* at 1128.

a police officer, . . . on university property in academic buildings, administrative office buildings, student residence buildings, dining facilities, or while attending sporting, entertainment or educational events."[291] Rudolph DiGiacinto, although not a student or employee, regularly visited the campus and used its facilities, and wished to carry a firearm with him when doing so.

DiGiacinto alleged that the campus prohibition violated his right to carry a firearm.[292] The court disagreed, ruling that GMU—a public education institution whose real estate and personal property is government owned—was a sensitive place:

> It was stipulated at trial that GMU has 30,000 students enrolled ranging from age 16 to senior citizens, and that over 350 members of the incoming freshman class would be under the age of 18. Also approximately 50,000 elementary and high school students attend summer camps at GMU and approximately 130 children attend the child study center preschool there. All of these individuals use GMU's buildings and attend events on campus. The fact that GMU is a school and that its buildings are owned by the government indicates that GMU is a "sensitive place."[293]

Moreover, "[t]he regulation does not impose a total ban of weapons on campus. Rather, the regulation is tailored, restricting weapons only in those places where people congregate and are most vulnerable—inside campus buildings and at campus events. Individuals may still carry or possess weapons on the open grounds of GMU, and in other places on campus not enumerated in the regulation."[294]

---

291. 8 Vir. Admin. Code § 35–60–20.

292. DiGiancito challenged the regulation under the Second Amendment and the Constitution of Virginia. The court held that "the protection of the right to bear arms expressed in Article I, § 13 of the Constitution of Virginia is co-extensive with the rights provided by the Second Amendment of the United States Constitution, concerning all issues in the instant case." So the court "analyze[d] DiGiacinto's state constitutional rights and his federal constitutional rights concurrently." DiGiacinto v. Rector & Visitors of George Mason Univ., 281 Va. 127, 134 (2011).

293. *Id.* at 135–36.

294. *Id.* at 136–37.

D. Common Areas in a Public Apartment Building

Homes are not "sensitive places." Under *Heller*, prohibiting arms possession in the home is categorically unconstitutional.[295] Public housing residents in Wilmington, Delaware, were forbidden to possess arms in the common areas of public housing complexes—such as laundry rooms and meeting rooms.[296] When some residents sued, a federal district court outlined the pro/con arguments on common areas being sensitive places.[297] On the one hand, the common rooms were extensions of residences.[298] *Heller* makes it very clear that guns may not be banned in residences.[299] On the other hand, the common areas were "places where people congregate, as well as administrative offices in which government work may be said to be done."[300]

The district court did not need to decide whether the common areas were "sensitive places."[301] If they were, there would be a presumption in favor of the legality of a gun ban.[302] If they were not, the government would have the burden of proving the gun ban to be lawful.[303] The court found that the common areas gun ban

295. *Heller*, 554 U.S. at 629 (because "handguns are the most popular weapon chosen by Americans for self-defense in the home, [] a complete prohibition of their use is invalid."). *See also* Jackson v. San Francisco, 746 F.3d 953 (9th Cir. 2014). The *Jackson* court explained that the storage law had nothing to do with any of *Heller*'s "presumptively lawful" gun controls:

> In analyzing the scope of the Second Amendment, we begin with the list of "presumptively lawful" regulations provided by *Heller*. Section 4512 resembles none of them, because it regulates conduct at home, not in "sensitive places"; applies to all residents of San Francisco, not just "felons or the mentally ill"; has no impact on the "commercial sale of arms," and it regulates handguns, which *Heller* itself established were not "dangerous and unusual."

*Id.* at 962.

296. Doe v. Wilmington Hous. Auth., 880 F. Supp. 2d 513 (D. Del. 2012).

297. *Id.*

298. *Id.*

299. *Id.*

300. *Id.*

301. *Id.* at 535–36.

302. *Id.*

303. *Id.*

had been proven lawful under intermediate scrutiny. "Public housing authorities . . . are generally afforded wide latitude in their ability to regulate what occurs on their property and determine the best policy for protecting the health, safety, and welfare of their residents."[304]

On appeal, the Third Circuit certified a question to the Delaware Supreme Court about the Delaware Constitution's right to arms.[305] The federal district court had ruled against the Delaware state constitution claim, but the Third Circuit wanted to hear from the Delaware Supreme Court.[306]

The Delaware Supreme Court explained that arms rights under the Delaware Constitution are broader than the Second Amendment.[307] Without addressing the *Heller* doctrine of sensitive places, the Delaware Court held that the ban violated the state constitution.[308] The Third Circuit adopted the Delaware Court's explication of the Delaware Constitution, and entered judgement against the arms ban.[309]

### E. Parking Lots of Premises with Liquor Licenses

Laws against carrying arms while drunk are common. Some states go further, and prohibit carrying arms in taverns, or even in restaurants that serve alcohol. Critics say that such laws prevent the workers in such places from having arms to defend themselves and others. The critics believe that restaurant or tavern bans should apply only to people who consume alcohol or become intoxicated therein.[310] Baton Rouge, Louisiana had an unusually restrictive ordinance. Not only did it forbid possession of firearms on premises where alcoholic beverages were sold or consumed, parking lots adjacent to such premises were also

304. *Id.*

305. art. I, § 20.

306. *Id.*

307. Doe v. Wilmington Hous. Auth., 88 A.3d 654 (Del. 2014).

308. *Id.*

309. Doe v. Wilmington Hous. Auth., 568 Fed. Appx. 128 (2014).

310. *See, e.g.*, NIKKI GOESER, DENIED A CHANCE: HOW GUN CONTROL HELPED A STALKER MURDER MY HUSBAND (2013) (effect of ban on nondrinking workers in bars and restaurants).

prohibited places.[311] For example, if a shopping mall contained a restaurant that served beer, no one transporting a firearm could park anywhere in the mall's lot.

Baton Rouge did not claim that parking lots were sensitive places. The district court applied strict scrutiny and held that the ordinance facially violated the Second Amendment.[312]

### F. Buffer Zones Around Residential Areas, Churches, Schools, and Liquor Stores

When the Chicago city council banned all shooting ranges except ranges for government employees and professional security guards, the Seventh Circuit held the ban unconstitutional.[313] In response, the council enacted legislation ordinance that allowed gun ranges in extremely restricted locations, comprising about two percent of the city.[314] All of the locational restrictions were held unconstitutional.[315] The restriction that involved the sensitive places rule was a ban on ranges within 500 feet of residences, schools, day-care facilities, places of worship, liquor retailers, children's activities facilities, libraries, museums, or hospitals.[316] Also, no two ranges could be closer than 100 feet from each other.[317]

The federal district court upheld the distance laws under the sensitive places rule.[318] To the district court, a sensitive places law was nearly immune to constitutional challenge.[319]

A 2-1 panel of the Seventh Circuit reversed.[320] The 500-foot ordinance "is not a limitation on where firearms may be carried,

311. Taylor v. City of Baton Rouge, 39 F. Supp. 3d 807 (M.D. La. 2014).
312. *Id.*
313. Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011) ("Ezell I").
314. Ezell v. City of Chicago, 846 F.3d 888, 890 (7th Cir. 2017) ("Ezell II") ("only 2.2% of the city's total acreage is even theoretically available, and the commercial viability of any of these parcels is questionable—so much so that no shooting range yet exists.").
315. *Id.*
316. *Id.*
317. *Id.* at 885.
318. Ezell v. City of Chicago, 70 F. Supp. 3d 871, 884–85 (N.D. Ill. 2014).
319. *Id.* at 895.
320. *Ezell II*, 846 F.3d 888.

so it doesn't fall within the ambit" of *Heller*'s language about laws "forbidding the carrying of firearms in sensitive places."[321] "Moreover, any suggestion that firearms are categorically incompatible with residential areas—recall that residential districts are included in the City's buffer-zone rule—is flatly inconsistent with *Heller*, which was explicit that possession of firearms in the home for self-defense is the core Second Amendment right."[322]

Accordingly, the buffer zone ordinance enjoyed no presumption of lawfulness, and the City bore the burden of proving it constitutional under heightened scrutiny.[323] The City's justification for the distancing laws was that "firing ranges attract gun thieves, cause airborne lead contamination, and carry a risk of fire."[324] However, "The City has provided no evidentiary support for these claims, nor has it established that limiting shooting ranges to manufacturing districts and distancing them from the multiple and various uses listed in the buffer-zone rule has any connection to reducing these risks."[325]

Further, "The City's own witnesses testified to the lack of evidentiary support for these assertions.[326] They repeatedly admitted that they knew of no data or empirical evidence to support any of these claims.[327] Indeed, "Patricia Scudiero, the City's zoning administrator, conceded that neither she nor anyone else in her department made any effort to review how other cities zone firing ranges. She conducted no investigation, visited no firing ranges in other jurisdictions, consulted no expert, and essentially did no research at all."[328]

The City cited a study by the National Institute for Occupational Safety and Health "explaining that improperly ventilated shooting ranges can release lead-contaminated air into the surrounding environment. But the report goes on to describe

321. *Id.*
322. *Id.*
323. *Id.*
324. *Id.*
325. *Id.*
326. *Id.*
327. *Id.*
328. *Id.*

appropriate filtering techniques that prevent this danger entirely. As for the concern about fire, the City provided no evidence to suggest that a properly constructed and responsibly operated commercial shooting range presents a greater risk of spontaneous combustion than other commercial uses."[329] In fact, Chicago already had many safety regulations for gun ranges, which addressed environmental and fire issues.[330]

"And if more were needed, the City concedes (as it must) that law enforcement and private-security ranges operate in commercial districts throughout Chicago near schools, churches, parks, and stores . . . The City doesn't even try to argue that commercial ranges create greater fire or environmental risks than law-enforcement ranges."[331] Accordingly, the distancing requirements were struck down.[332]

Dissenting in part, Judge Rovner would have upheld the distancing laws under the sensitive places rule.[333] She disagreed with the majority's rule that Chicago's evidentiary burden was just as high as it would be in a case restricting First Amendment rights.[334]

## VI. Applying the Doctrine

Synthesizing text, history, tradition, and precedent, this Part describes the methodology for analyzing sensitive places cases, discusses what rules can usefully be drawn from history, and offers suggestions for analysis of some particular types of places.

### A. Structure of Judicial Review

*Sensitive places are places where restrictions on the right to arms are easier for the government to justify.* They are *not* places where the right to arms ceases to exist. Rather, restrictions in sensitive places enjoy a presumption of legality, and the

329. *Id.*
330. *Id.*
331. *Id.* at 896.
332. *Id.*
333. *Id.* at 902–03.
334. *Id.* at 903.

presumption is rebuttable.

*A "presumptively lawful" regulation can be rebutted.* Consider an example from another "presumptively lawful" type of gun control: "conditions and qualifications on the commercial sale of arms."[335] A regulation requires that when the owner of a retail gun store goes home for the night, the guns must be locked up. This is an easy fit with the *Heller* dicta, and can speedily be held lawful.

But suppose that the anti-theft rule is that every gun in the store must be disassembled before the store closes at night. Or that the gun store may only be open for business five hours per week. Or that only persons with a college degree may work in a gun store. All of these would be "conditions and qualifications on the commercial sale of arms." These laws are manifestly oppressive, extreme, and unreasonable. They should be subject to heightened scrutiny, and with heightened scrutiny applied, would be ruled unconstitutional.

The more unreasonable, oppressive, or excessive the regulation, the better the argument that the presumption has been overcome. In this argument, it also matters whether the regulation is "longstanding."

*Laws that have been repealed are not "longstanding."* A few scattered and eccentric laws, which were later repealed and were not replaced by a similar statute, do not make a particular gun control "longstanding." Something that is "longstanding" has two characteristics: being "long" and being "standing."[336] If a law has been repealed, it is not "standing."

*Location restrictions are not limited to sensitive places.* Without need for reliance on the sensitive places doctrine, locational restrictions may be upheld if the government carries its burden under heightened scrutiny. Without need for deciding that a particular location is "sensitive," the government may prohibit gun carrying in certain locations by proving its case under intermediate scrutiny, strict scrutiny, or whatever other form of heightened scrutiny is appropriate.

335. *Heller*, 554 U.S. at 627.

336. *See* 1 SHORTER OXFORD ENGLISH DICTIONARY 1625 (1993) ("*adj.* Of long standing; that has existed a long time, not recent.").

B. History and Precedents

*History and tradition will not provide direct answers to every question*. Although the *Heller* dicta asserted that certain listed gun controls are "longstanding," scholars have shown that some of them are *not* longstanding. For example, the 1968 federal Gun Control Act imposed a lifetime prohibition on the possession of any firearm (even long guns) for any felony (even statutory offenses with no *mens rea*). There is no historical support for such a wide-ranging ban.[337] Instead, the only such restrictions that are even arguably "longstanding" are handgun bans for convicted violent felons.

While gun bans in certain government buildings and in polling places do have historical precedent, bans that apply to *all* government buildings do not.

Compared to arms bans in some "government buildings," arms bans in "schools" have very weak historical lineage. The first broad bans on carrying at schools appear in a few states in the late nineteenth and early twentieth centuries. They are tainted by their obvious overbreadth—in that they also applied to mixed-sex private social gatherings anywhere in the state. Broad laws against guns in schools come mainly from the late twentieth century, and thus are too novel to be part of history and tradition.

Nevertheless, *Heller* did say "schools and government buildings." As with the ban on felons, *Heller*'s dicta about "longstanding" laws was wrong, but the dicta are still there. Unless the Supreme Court offers further clarification, bans on arms carrying in schools and government buildings enjoy a presumption of constitutionality.

*Extensions by analogy to schools and government buildings.* It is difficult to create a rationale for extending the "sensitive places" doctrine to places that are not schools or government buildings. As discussed above, there are few "longstanding" restrictions on other locations.

Given the thin historical record, one can only guess about what factors make places "sensitive." Some of the guesses are: places

337. Kevin C. Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 698 (2009).

where most persons therein are minors (K-12 schools), places that concentrate adversarial conflict and can generate passionately angry emotions (courthouses, legislatures, polling places), or buildings containing people at acute personal risk of being targets of assassination (many government buildings).

The answer cannot be that the places are crowded. Sometimes they are, but no more so than a busy downtown sidewalk, and sidewalks are not sensitive places.

Rather than try to figure out analogies to "schools and government buildings," the better judicial approach for other locations is simply to give the government the opportunity to prove its case under heightened scrutiny.

*Buffer zones are not sensitive places. Heller* allows for carry bans "in" sensitive places—not bans "around" or "near" sensitive places. Accordingly, buffer zones are not sensitive places.[338]

*The Second Amendment sensitive places doctrine has a First Amendment parallels.* For example, encouraging people to vote a particular way is a core First Amendment right in almost all public places. Yet states may prohibit electioneering activity at polling places.[339] Newspaper censorship is generally forbidden, but student-written high school newspapers may be subject to some adult control.[340]

*Laws that broadly negate the right to arms are not legitimate precedents.* Laws that widely prohibit bearing arms are contrary to the text of the Second Amendment. Accordingly, they are not a legitimate part of the history and tradition of the right to bear arms. So no "sensitive places" precedent can be drawn from statutes that forbade bearing arms at all public assemblies or social gatherings. Although some of these laws were enacted long

338. *See* Hetzner, *supra* note 6, at 392 ("The Court's decisions in *Heller* and *McDonald* used the preposition "in" when referring to schools, as opposed to using "around" or "near" (words that might have provided better constitutional protection to the 1000-foot perimeter established by the California and Illinois laws).").

339. *See, e.g.*, Burson v. Freeman, 504 U.S. 191, 199–200, 211 (1992) (plurality op.); Minnesota Majority v. Mansky, 708 F.3d 1051, 1055, 1057–58 (8th Cir. 2013); Citizens for Police Accountability Political Comm'n. v. Browning, 572 F.3d 1213, 1215 (11th Cir. 2009); Schirmer v. Edwards, 2 F.3d 117, 122–23 (5th Cir. 1993).

340 *See* Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988).

ago, none of them are longstanding, for every one of them has been repealed. Every state that had such a law has replaced it with laws allowing licensed concealed carry, or open carry, in public places, including places of public assembly or social intercourse.

The same point can be made about the 1328 Statute of Northampton. As authoritatively interpreted in 1686, the English statute allowed peaceable bearing of arms. American law courts took the same view. Even if Saul Cornell's hyper-restrictive interpretation of the statute had been adopted in colonial America, that interpretation is textually foreclosed by the Second Amendment right to "bear arms."

*Laws about the manner of carrying are not part of the sensitive places doctrine.* In the First Amendment's familiar doctrine of "time, place, and manner" regulations, a "manner" regulation is different from a "place" regulation. Laws that ban concealed carry in certain locations, while allowing open carry in the same locations are "manner" laws, not "place" laws. To the extent that these laws allow open carry in certain locations, the laws indicate that those locations are *not* "sensitive."

*The rights of private property owners are not part of the sensitive places doctrine.* Any private property owner can prohibit guns. The government is free to reinforce the property owners' decisions by enacting relevant trespass laws—such as extra punishment for armed trespass when hunting on private land without permission. Private property in general is not part of the sensitive places doctrine. Rather, government assistance to property owners who want to exclude guns is simply an aspect of government support for property rights.

Similarly, the government may set orderly conditions for private property owners to exclude lawfully armed persons, such as by requiring private property that is open to the general public to have posted signs notifying gun carriers about the exclusion.

Today, government regulation of employer-employee or business-customer relations is common and is generally accepted as constitutional. Governments take many actions in favor of employees and customers. For example, twenty-five states prohibit employers from firing an employee for lawfully storing a

firearm in her car in a company parking lot.[341] These laws are not directly part of the sensitive places doctrine, although they do indicate a legislative judgment that parking lots are not sensitive.

C. Considerations in Particular Cases

*The government's behavior can demonstrate the true importance of the alleged government interest.* Passing a statute declaring some place to be a "gun free zone" does nothing to deter criminals from entering with guns and attacking the people inside. In contrast, when a building, such as a courthouse, is protected by metal detectors and guards, the government shows the seriousness of the government's belief that the building is sensitive. This is what Colorado law requires for government office buildings that wish to ban licensed carry on the premises.[342]

Screening and armed guards reduce the burden that is inflicted on citizens by locational arms bans. Disarmed, the citizen in a sensitive place cannot defend herself. But when there are metal detectors, the citizen is assured that criminals cannot bring in guns. When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens.

Conversely, when the government provides no security at all—such as in a Post Office or its parking lot—the government's behavior shows that the location is probably not sensitive; further, the disarmament burden inflicted on citizens is not mitigated by alternative protectors supplied by the government.

*Not all schools are the same.* Since "schools" in general are "sensitive places," common sense indicates that a public elementary school is a "sensitive place." But what about a private school of cosmetology, where all the students and teachers are adults? It would seem dubious that whatever makes many or most

[341] *See* Center for Workplace Compliance, *State "Parking Lot Gun" Laws*, Apr. 2018, https://www.cwc.org/CWC/Compliance_Tools/docs/State%20Parking%20Lot%20Gun%20Laws.pdf.

342. Colo. Rev. Stats. § 18-12-214(4) (requiring "security personnel" to use "electronic weapons screening devices" at all public entrances, and to store weapons for persons who enter the building).

schools "sensitive" would apply at the cosmetology school. Yet, the District of Columbia's version of its "gun free school zones" law applies just as much to the private, adult, cosmetology school as to the public elementary school.[343]

A court should not give a presumption of constitutionality to a gun ban as applied to the cosmetology school. Or if there is a presumption, the presumption should be readily rebuttable. Prohibiting a woman from possessing a handgun on her own business premises is unreasonable.

*Not all government buildings are the same.* Courthouses, the White House, and Governors' mansions easily fall into the "sensitive places" category, at least for visitors. But an enclosed rain shelter or restroom at a public park are not "sensitive places," even though they are "government buildings."

*Open areas, such as parking lots next to certain buildings, can be sensitive places, under certain conditions.* The White House lawn should qualify as a sensitive place. The government controls access to the lawn with the same kind of rigor (metal detectors and armed guards) that is applied to the White House itself. Parking lots, whether they are garages or just open paved areas, can be part of their building's sensitivity *if* access to the lot is controlled by the same kind of security that is used for the building itself.

A dirt parking lot at the trailhead of Bureau of Land Management ("BLM") wasteland property in Nevada is not a sensitive place. Even if there is a one-man BLM office building next to the parking lot, the parking lot is not sensitive.

As with "government buildings" themselves, the best approach is to take into account the sensitivity of the parking area. Almost always, the parking area will be less "sensitive" than the building itself, but it may still be sensitive enough to fall within the "sensitive places" rule.

*Public parks are not sensitive places.* They are not buildings. There is no practical means of preventing armed criminals from entering. They are similar to the vast majority of land in the United States, which is outdoors, not indoors.

*Government exercise of monopoly power is relevant.* As courts

343. *See* D.C. Code Ann. § 22-4502.1 (including any "vocational school").

have pointed out, the burden of a gun ban in a sensitive place can be mitigated, in the sense that the citizen can simply choose not to visit the sensitive place. But the analysis shifts when the citizen *must* visit the sensitive place because of the government's monopoly power.

By statute, the United States Postal Service is a monopoly.[344] In order to access ordinary services for day-to-day life, a citizen may have to use the Postal Service. It is true that in recent years, the monopoly has become easier to evade; for example, people can send e-mail instead of postal mail. But that does not completely eliminate the impact of the monopoly in sometimes forcing citizens to use postal services. And in places like Avon, Colorado, with no home delivery, in forcing them to use post office buildings.

If the only way to register a copyright or patent were to physically enter a government building, the same point would apply to copyright or patent offices. Again, the government can show its seriousness, and mitigate the citizen's burden, by employing metal detectors and armed guards at the Patent Office, or any other building where a government monopoly is being exercised.

## VII. Conclusion

Despite *Heller*'s dicta, wide-ranging bans on bearing arms "in sensitive places such as schools and government buildings" have a weak foundation in history and tradition. Bans in particular government buildings, such as legislatures, polling places, and courthouses, have a stronger basis. Given the relatively thin historical record in support of the sensitive places doctrine, attempts to elaborate and extend the doctrine by analogy may be difficult. Often, the simpler approach will be to uphold a locational ban on bearing arms whenever the government carries its burden of proof under heightened scrutiny.

[344] *See* 18 U.S.C. § 1696.

THE YALE LAW JOURNAL

THOMAS R. LEE & STEPHEN C. MOURITSEN

# Judging Ordinary Meaning

**ABSTRACT.** Judges generally begin their interpretive task by looking for the ordinary meaning of the language of the law. And they often end there – out of respect for the notice function of the law or deference to the presumed intent of the lawmaker.

Most everyone agrees on the primacy of the ordinary meaning rule. Yet scholars roundly bemoan the indeterminacy of the communicative content of the language of the law. And they pivot quickly to other grounds for interpretation.

We agree with the diagnosis of important scholars in this field – from Richard Fallon and Cass Sunstein to Will Baude and Stephen Sachs – but reject their proposed cures. Instead of setting aside the threshold question of ordinary meaning, we seek to take it seriously. We do so through theories and methods developed in the scholarly field designed for the study of language: linguistics.

We identify theoretical and operational deficiencies in our law's attempts to credit the ordinary meaning of the law and present linguistic theories and tools to assess it more reliably. Our framework examines iconic problems of ordinary meaning – from the famous "no vehicles in the park" hypothetical to two Supreme Court cases (*United States v. Muscarello* and *Taniguchi v. Kan Pacific Saipan, Ltd.)* and a Seventh Circuit opinion by Judge Richard Posner (in *United States v. Costello*). We show that the law's conception of ordinary meaning implicates empirical questions about language usage. And we present linguistic tools from a field known as corpus linguistics that can help to answer these empirical questions.

When we speak of ordinary meaning we are asking an empirical question – about the sense of a word or phrase that is most likely implicated in a given linguistic context. Linguists have developed computer-aided means of answering such questions. We propose to import those methods into the law's methodology of statutory interpretation. And we consider and respond to criticisms of their use by lawyers and judges.



**AUTHORS.** Thomas R. Lee is Associate Chief Justice of the Utah Supreme Court and a Distinguished Lecturer of Law at Brigham Young University. Stephen C. Mouritsen is an Associate at the University of Chicago Law School and Adjunct Professor of Law and Corpus Linguistics at Brigham Young University. The authors express thanks to those who commented on earlier drafts or offered insights in response to presentations in various conferences, symposia, and talks, including Randy Barnett, Will Baude, Ryan Doerfler, Frank Easterbrook, Ed Finegan, Jonah Gelbach, Stefan Th. Gries, Dan Klerman, Kurt Lash, John Manning, John McGinnis, Noah Messing, Greg Murphy, Gordon Smith, Larry Solan, Larry Solum, Eugene Volokh, and John Yoo. Thanks also to Brigham Young University and to the Georgetown University Law Center for cosponsoring a conference on law and corpus linguistics, at which the ideas in this piece were initially vetted, and to the Olin-Searle-Smith Fellows in Law program for making possible Mr. Mouritsen's association with the University of Chicago Law School. Special thanks to James C. Phillips for his editorial and research assistance at every stage of this project. Thanks also to John Cutler, Chauntel Lopez, Daniel Ortner, Bradley Pew, and Aaron Worthen for their research assistance.



## ARTICLE CONTENTS

INTRODUCTION 792

I. ORDINARY MEANING IN THE LAW OF INTERPRETATION 796
- A. Theoretical Shortcomings 800
  - 1. *Muscarello v. United States* 803
  - 2. *Taniguchi v. Kan Pacific Saipan, Ltd.* 804
  - 3. *United States v. Costello* 805
- B. Operational Shortcomings 806
  - 1. *Muscarello v. United States* 807
  - 2. *Taniguchi v. Kan Pacific Saipan, Ltd.* 810
  - 3. *United States v. Costello* 812

II. THEORIZING ORDINARY MEANING 813
- A. Semantic Meaning 818
  - 1. Lexicography 818
  - 2. Syntactic and Semantic Context 821
- B. Pragmatic Meaning 823
- C. Meaning as of When? 824
- D. Whose Meaning? 827

III. OPERATIONALIZING ORDINARY MEANING 828
- A. Tools 830
  - 1. Varieties of Linguistic Corpora 830
  - 2. Corpus Tools—Frequency, Collocation, and Key Word in Context 831
  - 3. Representing Speech Community and Register in a Corpus 832
  - 4. Representing Historical Language Use 833
  - 5. The BYU Corpora 833
    - a. NOW Corpus 833
    - b. Corpus of Historical American English ("COHA") 835
- B. Applications 836
  - 1. Vehicles in the Park 836
    - a. Lexical Collocation of Vehicle Through Time 837
    - b. Vehicle as a KWIC 840



   c. Searching for Vehicles in the Context of a Park     842

   d. Is Bicycle a Vehicle? Is Airplane a Vehicle?     844

  2. *Muscarello* and Carries a Firearm     845

   a. The Collocates of Carry     845

   b. Carry as a KWIC     846

  3. *Taniguchi* and the Meaning of Interpreter     848

   a. The Collocates of Interpreter     848

   b. Interpreter as a KWIC     849

  4. *Costello* and Harboring an Alien     850

   a. Collocation of Harbor     850

   b. Harbor as a KWIC     851

C. Caveats and Conclusions     851

  1. Caveats     852

   a. Semantic Meaning     852

   b. Pragmatic Meaning     853

   c. Meaning as of When?     857

   d. Whose Meaning?     857

  2. Conclusions     858

   a. Vehicles     859

   b. Carrying a Firearm     862

   c. Interpreter     863

   d. Harbor     864

IV. OBJECTIONS AND RESPONSES     865

A. Proficiency: Judges (and Lawyers) Can't Do Corpus Linguistics     865

B. Propriety: Judges Shouldn't Do Corpus Linguistics     868

C. Practicality: Corpus Linguistics Will Impose an Unbearable Burden     871

D. Corpus Data Represents Only "More Factually Common Iterations"     873

E. Political Neutrality     876

F. Potential: The Role for Corpus Linguistic Analysis in Addressing Problems of Ordinary Meaning     877

CONCLUSION     878

## INTRODUCTION

A key component of the meaning we ascribe to law concerns its "communicative content." Professor Lawrence Solum has spoken of such content as consisting of the "linguistic meaning" of the words of a statute or regulation.[1] We can also think of it as encompassing the "intended" meaning of the lawmaker, to use the words of Professor Richard Fallon,[2] or the "contextual meaning" understood by the public, as framed by Professors Will Baude and Stephen Sachs.[3] This is the threshold question for the "standard picture" of legal interpretation, which starts with a search for the "ordinary communicative content" of the words of the law.[4] That search is the focus of this article. We highlight deficiencies in the law's search for ordinary meaning and introduce a tool imported from linguistics—corpus linguistic analysis—that can help overcome some of those deficiencies.

Most everyone—not just textualists anymore—agrees that "[t]here are excellent reasons for the primacy of the ordinary meaning rule."[5] Most of the reasons stem from the purported determinacy of the ordinary meaning inquiry. We

---

1. Lawrence B. Solum, *Communicative Content and Legal Content*, 89 NOTRE DAME L. REV. 479, 480 (2013) (distinguishing the "communicative content" of a legal text from its "legal content," or in other words "the legal norms the text produces").

2. Richard H. Fallon, Jr., *The Meaning of Legal "Meaning" and Its Implications for Theories of Legal Interpretation*, 82 U. CHI. L. REV. 1235, 1249-50 (2015) (speaking of these and other conceptions of the communicative or "conversational" content of the words of the law).

3. William Baude & Stephen E. Sachs, *The Law of Interpretation*, 130 HARV. L. REV. 1079, 1106 (2017).

4. *See id.* at 1086 (speaking of the "Standard Picture," or the "view that we can explain our legal norms by pointing to the ordinary communicative content of our legal texts," in other words "an instrument's meaning as a matter of language"); *see also* Mark Greenberg, *The Standard Picture and Its Discontents*, *in* 1 OXFORD STUDIES IN PHILOSOPHY OF LAW 39, 48 (Leslie Green & Brian Leiter eds., 2011) (describing the "Standard Picture"). Here and elsewhere we sometimes conflate "communicative content" and "ordinary meaning." Yet we acknowledge that some legal terms are used in an *extra*ordinary sense—as with legal terms of art. And we recognize that legal language may be viewed as a distinct dialect, and thus that "communicative content" may sometimes be understood to encompass "extraordinary" (specialized legal) meaning. *See* John O. McGinnis & Michael B. Rappaport, *The Constitution and the Language of the Law* 4-5 (Univ. of San Diego Sch. of Law Legal Studies Research Paper Series, No. 17-262, 2017), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2928936 [http://perma.cc/2V4V-C69M] (asserting that the Constitution is written in the "language of the law," not ordinary English, and thus that its interpretation should account for the canons and legal conventions that would have been accepted by the legal community at the time of the founding).

5. WILLIAM N. ESKRIDGE, JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 35 (2016).

speak of a search for meaning "not in the subjective, multiple mind of Congress but in the understanding of the objectively reasonable person."[6] And we generally conclude that the search for such meaning "matches up well with our understanding of what the *rule of law* entails"[7]: it assures notice to the public, protects reliance interests, assures consistency of application, and respects the will of the legislative body.[8] So although we recognize that "ordinary meaning does not always yield predictable answers to statutory issues," we tend to accept that it "yield[s] greater predictability than any other *single* methodology."[9]

This premise has taken hold in our courts: "[W]e're all textualists now."[10] That holds true at least in the sense that most judges begin the interpretive inquiry with the words of a statute—and even end there if they find the meaning of those words to be "plain."[11]

Yet the academy has been less sure of the premises of this trend. Scholars like Fallon and Cass Sunstein generally have endorsed the value of determinacy but roundly doubted the judge's ability to find it in the mere "communicative content" or "ordinary meaning" of statutory text.[12] There are two dimensions to this

6. Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 HARV. J.L. & PUB. POL'Y 59, 65 (1988).

7. ESKRIDGE, *supra* note 5, at 35.

8. *See id*. ("A polity governed by the rule of law aspires to have legal directives that are known to the citizenry, that are predictable in their application, and that officials can neutrally and consistently apply based upon objective criteria.").

9. *Id*. at 36.

10. Elena Kagan, *The Scalia Lecture: A Dialogue with Justice Kagan on the Reading of Statutes*, HARV. L. TODAY (Nov. 17, 2015), http://today.law.harvard.edu/in-scalia-lecture-kagan-discusses-statutory-interpretation [http://perma.cc/3BCF-FEFR].

11. *See* JOHN F. MANNING & MATTHEW C. STEPHENSON, LEGISLATION AND REGULATION: CASES AND MATERIALS 60 (2d ed. 2013) ("Over the last quarter-century, textualism has had an extraordinary influence on how federal courts approach questions of statutory interpretation. When the Court finds the text to be clear in context, it now routinely enforces the statute as written."); Abbe R. Gluck, *The States as Laboratories of Statutory Interpretation: Methodological Consensus and the New Modified Textualism*, 119 YALE L.J. 1750, 1756-58 (2010) (concluding, based on a comprehensive study of state court approaches to statutory interpretation, that state courts are engaged in an "effort[] to increase predictability in statutory interpretation," and that they give primacy to text and decline to look to external sources of meaning if they find the text "plain").

12. *See* Fallon, *supra* note 2, at 1255-63, 1272 (exploring a range of possible meanings of communicative or "conversational" meaning, including "semantic" or "literal" meaning, "contextual" meaning embraced by "shared presuppositions of speakers and listeners," "intended meaning," and others, and asserting that there accordingly is "no single, linguistic fact of the matter concerning what statutory or constitutional provisions mean"); Cass R. Sunstein, *There Is*

skepticism—questions about the *meaning* of the law's search for "ordinary meaning" and concerns about a judge's ability to *measure* or assess it with any degree of determinacy.[13]

As Baude and Sachs say, "we can't treat the meaning of [a given text's] language as the only source of its legal effect."[14] Our law of interpretation may have good reasons to depart from the "standard picture"—to substitute "fake" answers to linguistic questions for real ones.[15] It is doubtless true, moreover, that some of our rules of interpretation dictate a "process" that "often looks nothing like a straight-forward search for linguistic meaning."[16]

We share these commentators' concerns but offer a different solution. In this Article, we show that the law has done a poor job conceptualizing the notion of ordinary meaning, and we ultimately agree that "[u]ncertainty and division" in assessing such meaning "seem inevitable" under the methods currently resorted to by judges.[17] But we do not see these problems as an invitation to *abandon* the search for the ordinary communicative content of the law in favor of case-by-case "interpretive eclecticism."[18] Nor do we find in the indeterminacy of the search for ordinary meaning a broad license for "normative judgments" about whatever "interpretation" "makes our constitutional system better rather than

---

*Nothing that Interpretation Just Is*, 30 CONST. COMMENT. 193, 194-95 (2015) (identifying possible notions of meaning, including authorial intention, public meaning, moral reading, and others).

13. *See* Fallon, *supra* note 2, at 1272 (noting that "there can be a multitude of linguistically pertinent facts, generating different senses of meaning, which in turn support a variety of claims"); *id*. at 1268-69 (asserting that "[u]ncertainty and division" in measuring ordinary meaning are "inevitable," that evidence of "communicative or assertive content, understood as a matter of linguistic fact, is often sparse, minimal, or indeterminate as applied to particular cases," and that we "cannot proceed by taking or imagining the outcome of an opinion poll" about ordinary meaning).

14. Baude & Sachs, *supra* note 3, at 1088; *see also id.* at 1096 ("We see this as one of the most important functions of a legal system: to replace real answers with fake ones. There may be real answers out there to lots of important normative and policy questions, such as how fast we should drive on the highway, what tax policy is best, and so on. But people persistently disagree on the real answers, and the legal system helpfully offers fake answers instead—answers that hopefully are somewhat close to the real ones, but on which society (mostly) agrees and which allow us (mostly) to get along.").

15. *Id*. at 1082, 1096.

16. *Id*. at 1088.

17. Fallon, *supra* note 2, at 1268.

18. *Id*. at 1305, 1308 (describing "interpretive eclecticism" as involving the choice of the "best interpretive outcome as measured against the normative desiderata of substantive desirability, consistency with rule of law principles, and promotion of political democracy, all things considered").

worse."[19] This kind of "interpretation" overrides—rather than protects—the values served by the ordinary meaning rule. It undermines reliance and fair-notice interests and gives voice to the will of judges, not lawmakers.

We may eventually throw up our hands and conclude that some questions of ordinary meaning have no good answers. Or we may conclude that the law has good reason to substitute a nonlinguistic answer that vindicates policies more important than the ones advanced by the "standard picture."[20] But we cannot skip or assume away the threshold question of ordinary meaning. While the search for ordinary meaning is hard, the premises of this inquiry are too deeply embedded in our law and too clearly rooted in important policy considerations to give up at the first sight of difficulty or indeterminacy, or to judge the enterprise on the fuzzy premises or mistaken methodologies of the past. So we take up the inquiry here.

Our thesis is that words have meaning, and that meaning can be theorized and measured using principles and methods devised in the field of linguistics. When we speak of *ordinary* meaning, we are asking an empirical question—about the sense of a word or phrase that is most likely implicated in a given linguistic context.[21] Linguists have developed computer-aided means of answering such questions. We propose to import those methods into the modern theory and practice of interpretation, and we identify problems in the methods that the law has been using to address these issues.

Our proposed methodology is a set of tools utilized in a field called corpus linguistics. Corpus linguists study language through data derived from large bodies—*corpora*—of naturally occurring language. They look for patterns in meaning and usage in large databases of actual written language. And we think their methods may easily be adapted in a manner that will allow us to conceptualize and measure the "standard picture" in a much more careful way.[22]

---

**19.** Sunstein, *supra* note 12, at 193-94.

**20.** In other words, maybe the "standard picture" doesn't claim to be a picture of American law. *Cf.* Baude & Sachs, *supra* note 3, at 1089 (arguing that there may be "real trouble for the standard picture, at least if it claims to be a picture of American law").

**21.** Judge Posner framed the ordinary meaning question in this (empirical) way in his opinion in *United States v. Costello*, 666 F.3d. 1040, 1044 (7th Cir. 2012). There he proposed to answer this question using the results of a Google search. We think Judge Posner's instincts were right but his methods fell a bit short, as explained below. *See* discussion *infra* Section I.B.3.

**22.** Corpus linguistics is not the only linguistic discipline that relies on empirical observation and experimentation. Empirical observation is a vital component of a variety of linguistic disciplines, including sociolinguistics, historical linguistics, phonetics, discourse analysis, field linguistics, computational linguistics, cognitive linguistics, and psycholinguistics. As we will discuss below, this Article focuses on corpus linguistics, but we do not mean to suggest that other

In Part I, we begin by noting the circumstances in which the "standard picture" controls under statutory interpretation, highlighting exemplary cases where the ordinary communicative content of the words of a statute seems to dictate the court's holding. Next, we identify shortcomings in the law's attempt to give effect to that communicative content—shortcomings in both the theory of ordinary meaning and in attempts to operationalize (or measure) it. In Part II, after outlining these two sets of problems, we introduce theories and empirical methods from the field of corpus linguistics that may help us deliver on the promise of an objective inquiry into ordinary meaning.[23] In Part III, we apply these tools to our exemplary cases. We close, in Part IV, by responding to actual and anticipated criticisms of our approach and by highlighting unresolved issues that must be addressed going forward.

## I. ORDINARY MEANING IN THE LAW OF INTERPRETATION

Everyone agrees that our sense of the ordinary communicative content of legal language is an important starting point for interpretation. All agree, moreover, that the law should credit that content *at least sometimes*. This holds even for those who doubt our ability to settle on a single notion of meaning or to assess it with any degree of consistency.[24]

empirical linguistic disciplines could not be brought to bear on questions of ordinary meaning. We briefly discuss a few of these approaches below.

23. Some judges (present company included) are beginning to take note of the deficiencies we highlight here and to try to address them. In a few recent cases, judges have made a studied effort to define the inquiry into ordinary meaning more precisely. And, importantly, they have presented empirical analysis in support of their conclusions. *See, e.g.*, People v. Harris, 885 N.W.2d 832, 838-39 & n.29 (Mich. 2016) (citing a Utah Supreme Court opinion in support of the methodology of corpus linguistics and relying on corpus linguistic data to buttress the court's interpretation of the term "information" in a Michigan statute forbidding the use of "information" provided by a law enforcement officer if compelled under threat of employment sanction); *id*. at 850-51 n.14 (Markman, J., concurring in part and dissenting in part) (citing another Utah Supreme Court opinion and relying on corpus linguistic data, but drawing a different inference from the data); State v. Rasabout, 2015 UT 72, ¶¶ 68-75, 356 P.3d 1258 (Lee, Associate C.J., concurring in part and concurring in the judgment) (advancing corpus linguistic data in support of his interpretation of the phrase "discharge[] a firearm" in a state statute); State v. Canton, 2013 UT 44, ¶ 27 & n.6, 308 P.3d 517 (presenting corpus linguistic data in support of the court's construction of the phrase "out of the state" in a tolling provision for criminal statutes of limitations under Utah law); J.M.W. v. T.I.Z. (*In re* Adoption of Baby E.Z.), 2011 UT 38, ¶ 89 & nn.23-24, 266 P.3d 702 (Lee, J., concurring in part and concurring in the judgment) (advocating the use of corpus linguistic data in support of his interpretation of "custody" proceeding under the federal Parental Kidnapping Protection Act, 28 U.S.C. § 1738A (2006)).

24. *See* Baude & Sachs, *supra* note 3, at 1089; Fallon, *supra* note 2, at 1239.

Judges are generally even more sanguine about the matter. The case law in this field is marked by numerous references to the "standard picture." Judges routinely advert to the idea of crediting the "ordinary meaning" of statutory text.[25] Where such meaning is viewed as "plain," moreover, judges consistently declare the interpretive enterprise to be at an end.[26] The general rule is to credit the communicative content of statutory text where it is "plain," and in that event, to close the door to the consideration of extratextual sources of meaning or intent.[27]

A variation on the theme applies in the realm of substantive canons of construction or principles of deference. The rule of lenity, for example, says that genuine ambiguities in criminal laws are resolved in favor of the defendant;[28] the converse is the notion that "the rule of lenity has no application when the statute is clear."[29] *Chevron* deference is similar: the courts defer to agencies only where the terms of the statute are ambiguous.[30]

---

**25.** *See, e.g.*, Clark v. Rameker, 134 S. Ct. 2242, 2246 (2014) ("[W]e give the term its ordinary meaning."); Bond v. United States, 134 S. Ct. 2077, 2091 (2014) ("In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term . . . ."); Mohamad v. Palestinian Auth., 566 U.S. 449, 454 (2012) ("Because the [Act] does not define the term 'individual,' we look first to the word's ordinary meaning."); Mac's Shell Serv., Inc. v. Shell Oil Prods. Co., 559 U.S. 175, 182 (2010) ("We . . . give [the relevant] terms their ordinary meanings.").

**26.** *See* William Baude & Ryan D. Doerfler, *The (Not So) Plain Meaning Rule*, 84 U. CHI. L. REV. 539, 539 (2017) (characterizing the "plain meaning rule" as a "compromise" in which "other information can't be considered" if "the statute's meaning is plain," but in which other information "comes in" if "it isn't plain").

**27.** *See, e.g.*, KENT GREENAWALT, LEGISLATION: STATUTORY INTERPRETATION: 20 QUESTIONS 35 (1999) ("No one seriously doubts that interpretation of statutes turns largely on textual meaning."); Gluck, *supra* note 11, at 1758 (stating that the "modified textualism" approach embraced in most state courts "ranks interpretive tools in a clear order – textual analysis, then legislative history, then default judicial presumptions – and it includes legislative history in the hierarchy").

**28.** How much ambiguity, of course, is a difficult question. *See* Abramski v. United States, 134 S. Ct. 2259, 2272 n.10 (2014) (asserting that the rule applies only if "there remains a grievous ambiguity or uncertainty in the statute" that cannot be resolved – if the Court is left to "simply guess as to what Congress intended" (quoting Maracich v. Spears, 133 S. Ct. 2191, 2209 (2013)); *id.* at 2281 (Scalia, J., dissenting) (suggesting that the rule should apply if "after all legitimate tools of interpretation" have been employed "a reasonable doubt persists" (quoting Moskal v. United States, 498 U.S. 103, 108 (1990))); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 299 (2012) (decrying the "multiplicity of expressed standards" for invoking the rule of lenity, "leav[ing] open the crucial question . . . of how much ambiguousness constitutes an ambiguity" (quoting United States v. Hansen, 772 F.2d 940, 948 (D.C. Cir. 1985))).

**29.** *See* SCALIA & GARNER, *supra* note 28, at 301.

**30.** *See* Michigan v. EPA, 135 S. Ct. 2699, 2707 (2015).

However, commentators are undoubtedly right to question the determinacy of the inquiry into ordinary meaning. The problem, as noted, is twofold—going both to the law's conception of ordinary meaning and to our judges' attempts to measure it. First is a problem of theory: ironically, we have no ordinary meaning of "ordinary meaning."[31] The same goes for "plain meaning." "Courts and scholars sometimes use the phrase 'plain meaning' to denote something like *ordinary* meaning," or in other words, "the meaning one would normally attribute to [the] words" of a statute "given limited information about their context."[32] Other times "plain meaning" is used to denote *obvious* meaning—i.e., "the meaning that is clear."[33] This is the sense at work in the "plain meaning rule."[34]

Second is a problem of operationalization or measurement. The concern here is that even if we could settle on a theory of ordinary or plain meaning, we are unsure how to assess it. "Uncertainty and division seem inevitable."[35] That is true because the question of intended or understood meaning is an empirical one, and judges cannot "proceed by taking or imagining the outcome of an opinion poll" as to intended or perceived meaning.[36] The problem is underscored by the tools (mis)used by judges to try to answer this empirical question (resort to dictionary definitions or even a word's etymology, for example, as explored below).

The theoretical and measurement problems plaguing the ordinary meaning inquiry are even bigger than most have acknowledged. The depth of the problem is best illustrated by reference to concrete examples in the case law. Throughout this article we consider the following:

- Is a person guilty of *carrying a firearm* (under a federal sentencing enhancement provision) in connection with a drug crime if he merely

---

**31.** WILLIAM N. ESKRIDGE, JR. ET AL., CASES AND MATERIALS ON LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 792-93 (4th ed. 2007) (noting the irony that "'plain meaning' is . . . a deeply ambiguous term" and highlighting differences in the ways courts use the terms "plain meaning," often to refer to a sense that is "quite clear in a literal sense," and "ordinary meaning," which may mean "the best (most coherent) textual understanding that emerges after close textual analysis"); Richard A. Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U. CHI. L. REV. 800, 808 (1983) (observing, as to the "'start with the words' canon," that "[i]t is ironic that a principle designed to clarify should be so ambiguous").

**32.** Baude & Doerfler, *supra* note 26, at 545.

**33.** *Id.*

**34.** *Id.*

**35.** Fallon, *supra* note 2, at 1268.

**36.** *Id.*

transports it to a drug deal in a locked glove compartment of the car he is driving? This was the question presented in *United States v. Muscarello*.[37] The *Muscarello* Court was sharply divided. All nine Justices agreed that the question came down to the "ordinary meaning" of the notion of *carrying a firearm*. Yet they divided 5-4 on whether the ordinary sense of that phrase encompassed the conveyance of a gun in a glove compartment. Each side proffered varying senses of the meaning of "ordinary meaning" and claimed support for their view in sources ill-suited to providing a reliable answer to the empirical question presented—looking to dictionaries, to isolated examples of language from literature, and even to the etymology of the verb *carry*.

- Is a litigation expert who is paid to translate written documents from one language to another an *interpreter* under a statute authorizing an award of costs for prevailing parties who utilize such an expert in litigation? This question arose in *Taniguchi v. Kan Pacific Saipan, Ltd.*[38] The Court agreed that the case came down to a matter of ordinary meaning of the term *interpreter*. Yet again the Court was divided, this time 6-3. In *Taniguchi*, the majority and dissent agreed that the more common sense of *interpreter* referred to a person engaged in simultaneous oral translation. But again, they resorted only to dictionaries and similar sources for their conclusions. They also disagreed about what the search for *ordinary meaning* ultimately entails, with the majority insisting that only the more common sense of the term is covered and the dissent asserting that a permissible sense should also count.

- Is a woman who allows her boyfriend—an undocumented immigrant—to sleep at her apartment guilty of *harboring an alien* under a federal statute criminalizing that act? This question arose in *United States v. Costello*.[39] Like *Muscarello* and *Taniguchi*, *Costello* involved a statutory term broad enough to encompass both parties' positions. Sometimes *harbor* refers to the mere act of providing shelter, but it may also indicate the sort of sheltering that is aimed at concealment. How is the court to decide which sense is the ordinary one? Writing for the majority, Judge Posner recognized the deficiencies of standard methods—principally, dictionaries—in answering that question. So he proceeded to a search

37. 524 U.S. 125 (1998).

38. 566 U.S. 560 (2012).

39. 666 F.3d 1040 (7th Cir. 2012).

for data, and he did so using the tool that is perhaps most familiar to us today. He performed a Google search.

Is this the best we can do? Below, we use these cases to highlight the theoretical and operational deficiencies in the law's search for ordinary meaning.

### A. *Theoretical Shortcomings*

The case law embraces a startlingly broad range of senses of ordinary meaning. When judges speak of ordinary meaning, they often seem to be speaking to a question of relative frequency—as in a point on the following continuum:

**POSSIBLE → COMMON → MOST FREQUENT → EXCLUSIVE**

At the left end of the continuum is the idea of a possible or linguistically permissible meaning—a sense of a word or phrase that is attested in a known body of written or spoken language. A meaning is a possible one if we can say that "you *can* use that word in that way" (as attested by evidence that other people have used the word in that way in the past). Yet a possible meaning may be an uncommon or unnatural sense of a given term. In that case, we might note that a given sense of a term is not common in a given linguistic setting, even if it is possible to speak that way. And even a common sense of a term might not be the most frequent use of it in a certain context.

The notion of plain meaning adds the final point to the continuum. When courts speak of plain meaning (as a concept distinct from ordinary meaning) they generally mean to "denote *obvious* meaning" or "meaning that is clear."[40] A plain—obvious or clear—meaning would be more than most frequent. It would be nearly exclusive.

The four points on the continuum can be illustrated by a range of senses of the term *vehicle* in the hypothetical "no vehicles in the park" provision.[41] One attested sense of *vehicle* is the notion of a "carrier" or "agent of transmission."[42] That sense could sweep broadly. If we are thinking of the *carrier* sense of *vehicle*, the "no vehicles in the park" prohibition could possibly be viewed as covering a

40. Baude & Doerfler, *supra* note 26, at 545.

41. H.L.A. Hart, *Positivism and the Separation of Law and Morals*, 71 HARV. L. REV. 593, 606-15 (1958). In this Section, we make some suppositions on the points on the continuum—on which senses of *vehicle* are possible, common, and most frequent. We do so to illustrate the range of senses of ordinary meaning. We will move from supposition to empirical analysis of these questions later. *See infra* Section III.C.2.a.

42. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2538 (1961).

dog or cat, which could be referred to as a *vehicle* (as a carrier of infection). Yet that sense of *vehicle* would not be viewed as a natural or common one in this linguistic setting. If the "no vehicles" ordinance is aimed at only common senses of *vehicle*, we likely would not deem it to prohibit pets. Alternatively, we could say that the meaning of *vehicle* in this setting is plain or clear, meaning that the exclusive sense of *vehicle* is one that eliminates the possibility of its extension to pets.

Is a bicycle a *vehicle* covered by the ordinance? Perhaps so—as encompassed by the sense of *vehicle* as "a means of carrying or transporting something: conveyance."[43] This sense of *vehicle* could easily be viewed as a common sense of vehicle—certainly more common than the sense of an infection *carrier* noted above. But conveyance may not be the *most* common—the statistically most frequent—sense of vehicle in this linguistic setting (an outdoor public park). If we are looking for the most frequent sense of *vehicle* in this context,[44] we might understand the term to encompass only *motor vehicles*, and thus not to cover the bicycle.

The four points on the frequency continuum do not completely capture the range of senses of ordinary meaning embraced by our courts. Sometimes judges seem to have reference to a fifth notion of ordinary—a notion of linguistic *prototype*.[45] A *prototype* is a sense, or example of a sense, that is viewed as most strongly associated with a given term in a given context. And that may jibe with the way we separate senses or definitions in our minds. A difference in word meaning may "be represented in cognition not as a set of criterial features with clear-cut boundaries" the way a dictionary would represent things, but instead "in terms

43. *Id.*

44. This notion of "ordinariness" is attested in the *Oxford English Dictionary*. *See* 10 THE OXFORD ENGLISH DICTIONARY 912 (2d ed. 1989) (defining "ordinary" as "Of language, usage, discourse, etc.: that most commonly found or attested . . . ."); *see also* Lawrence M. Solan & Tammy Gales, *Finding Ordinary Meaning in Law: The Judge, the Dictionary or the Corpus?*, 1 INT'L J. LEGAL DISCOURSE 253, 263 (2016) ("'Ordinary meaning,' especially as applied to particular words and phrases, is a distributional fact. A usage is 'ordinary' when it predominates.").

45. *See* McBoyle v. United States, 283 U.S. 25, 27 (1931) (Holmes, J.) (determining whether an "airplane" was a "vehicle" for the purposes of the National Motor Vehicle Theft Act of 1919, and stating: "When a rule of conduct is laid down in words that *evoke in the common mind only the picture of vehicles moving on land*, the statute should not be extended to aircraft . . . ." (emphasis added)). This notion of a "picture" "evoke[d] in the common mind" maps very well onto the concept of prototype.

of prototypes (the clearest cases, best examples) of the category."[46] Thus, prototype analysis has shown that people consider *chair* to be a more prototypical example of *furniture* than *stool*,[47] *automobile* to be a more prototypical *vehicle* than *yacht*,[48] and *robin* to be a more prototypical bird than *ostrich*.[49]

Prototype is another way to conceive of the notion of ordinary meaning in the law.[50] A judge who approaches the question of ordinary meaning by attempting to determine the most prototypical example of a given sense of a term is searching for a linguistic prototype.[51] Under this approach, the ordinary (prototype) sense of *vehicle* would be the one that is most "vehicle-like," perhaps encompassing a *passenger vehicle* with four wheels and an engine. If that is our sense of the ordinary meaning of *vehicle*, we might conclude that the hypothetical ordinance prohibits cars and trucks but not motorized scooters.[52]

This range of meaning can also be illustrated through our three feature cases. We turn to them here.

---

**46.** Eleanor Rosch, *Cognitive Representation of Semantic Categories*, 104 J. EXPERIMENTAL PSYCHOL. 192, 193 (1975).

**47.** *Id.* at 229.

**48.** *Id.* at 230.

**49.** *Id.* at 232.

**50.** *See* Lawrence M. Solan, *Law, Language, and Lenity*, 40 WM. & MARY L. REV. 57, 67-68 (1998) [hereinafter Solan, *Law, Language, and Lenity*] ("In the realm of statutory interpretation, judges often evoke the canon that they are to give words in a statute their 'ordinary' meaning. Prototype analysis tells us that the notion of ordinary meaning has a cognitive basis."); Lawrence M. Solan, *Why Laws Work Pretty Well, but Not Great: Words and Rules in Legal Interpretation*, 26 L. & SOC. INQUIRY 243, 258 (2001) ("Some Supreme Court cases concerning statutory interpretation can be seen as battles among the justices over definitions versus prototypes." (citing Smith v. United States, 508 U.S. 223 (1993))); *see also* ESKRIDGE ET AL., *supra* note 31, at 850 (discussing prototypical meaning in the context of statutory interpretation); Lawrence M. Solan, *The New Textualists' New Text*, 38 LOY. L.A. L. REV. 2027, 2042-55 (2005) [hereinafter Solan, *The New Textualists' New Text*] ("One function of the ordinary meaning approach is to use prototypical experiences as a proxy for contextualization."); *The Supreme Court, 1997 Term—Leading Cases*, 112 HARV. L. REV. 355, 362 (1998) ("[W]hen a legislature uses non-technical terms . . . it is likely that both the legislature and the general public interpret the term in accordance with its prototypical meaning.").

**51.** Solan, *Law, Language, and Lenity*, *supra* note 50, at 67-68.

**52.** This conclusion, however, cannot be derived with mere intuition. The discovery of a prototype for a given word in a given context requires the application of empirical methods, as we will discuss below.

### *1.* Muscarello v. United States

In *Muscarello* the Court was asked to interpret a statute calling for a five-year mandatory prison term for a person who "uses or carries a firearm" "during and in relation to" a "drug trafficking crime."[53] Frank Muscarello was convicted on drug charges after he was shown to have transported a gun in the locked glove compartment of his car to a drug deal. The question presented was whether that counted as "carrying" under the statute. Both the majority (Justice Breyer) and dissenting (Justice Ginsburg) opinions agreed that the proper interpretation of "carries a firearm" came down to the "ordinary English meaning" of that "phrase."[54] Yet neither opinion settled on a single sense of "ordinary." Instead, both opinions slide back and forth along the continuum, without acknowledging that they are doing so.

At some points Justice Breyer seems to employ a merely "common" sense of ordinary. For example, he asserts that the *transport in a vehicle* sense of *carry* is ordinary given that "many"—"perhaps more than one-third"—of the instances of *carrying a firearm* in the *New York Times* and *U.S. News* databases reflect that sense,[55] and he concludes that "the word 'carry' in its ordinary sense *includes* carrying in a car."[56] Yet elsewhere Justice Breyer seems to speak of the car-carrying sense as most frequent. He reasons that 1) the "ordinary English" sense of *carry* is to *transport* it in a vehicle; 2) the *bear personally* sense is "special"; and 3) "we believe Congress intended to use the word in its primary sense and *not* in this latter, special way."[57]

Justice Ginsburg's dissent is also inconsistent. In concluding that the personally *bearing* sense is ordinary, Justice Ginsburg asserts that it is "hardly implausible, nor at odds with *an accepted* meaning" of the statutory terms.[58] That is the language of possibility or commonality.[59] Elsewhere, however, Justice Ginsburg seems to speak in terms of personally *bearing* as the most frequent sense of the

---

**53.** Muscarello v. United States, 524 U.S. 125, 126 (1998) (quoting 18 U.S.C. § 924(c)(1)(A) (2012)).

**54.** *Id.* at 127; *id.* at 139 (Ginsburg, J., dissenting).

**55.** *Id.* at 129 (majority opinion).

**56.** *Id.* at 131 (emphasis added).

**57.** *Id.* at 128 (emphasis added).

**58.** *Id.* at 149 (Ginsburg, J., dissenting) (emphasis added).

**59.** *Id.* at 143-44 (asserting "that 'carry' is a word commonly used to convey various messages," and that it "could mean" either personally bear or transport in a vehicle).

term—in noting, in response to Justice Breyer's statistics, "what meaning showed up some two-thirds of the time."[60]

2. Taniguchi v. Kan Pacific Saipan, Ltd.

*Taniguchi* was a personal injury case.[61] The plaintiff was a Japanese baseball player suing for medical expenses and lost income from contracts he was unable to honor as a result of injuries at the defendant's resort.[62] The defense "paid to have various documents translated from Japanese to English,"[63] and when the district court dismissed Taniguchi's case on summary judgment, the defense submitted a request for compensation for the amounts it paid for document translation. As in *Muscarello*, the *Taniguchi* case came down to ordinary meaning. Here the operative language was from a statute allowing the prevailing party in federal litigation to recover certain costs, including those incurred by an "interpreter."[64]

This case also seems to turn on the operative notion of ordinary meaning. Writing for the majority, Justice Alito concludes that the ordinary sense of *interpreter* is *oral translator*: "an interpreter is normally understood as one who translates orally from one language to another."[65] While Justice Alito says that *written translator* is possible, he concludes that this is "hardly a common or ordinary meaning."[66] Indeed, Justice Alito characterizes the *written translator* notion of *interpreter* as "obsolete," citing dictionaries to support that conclusion.[67]

Justice Ginsburg's dissent acknowledges that *interpreter* "commonly refers to translators of oral speech" but concludes that the term "more than occasionally" is "used to encompass those who translate written speech as well."[68] This is the core basis of the view of the *Taniguchi* dissenters. They do not expressly disagree with Justice Alito's assertion that the *oral translator* notion is most common; they

60. *Id.* at 143.
61. Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560 (2012).
62. *Id.* at 562.
63. *Id.* at 563.
64. *Id.* at 562.
65. *Id.* at 569.
66. *Id.*
67. *Id.*
68. *Id.* at 576 (Ginsburg, J., dissenting).

are simply saying that both common senses of the term should count as ordinary.[69]

### 3. United States v. Costello

The defendant in *Costello* was charged with knowingly "conceal[ing], harbor[ing], or shield[ing] from detection" an "alien in any place, including any building or any means of transportation."[70] Her alleged crime was "having permitted [her] boyfriend to live with her,"[71] knowing that he was an "illegal alien."[72] The principal question presented was whether the ordinary meaning of the verb *harbor* required proof of concealment.

As in *Taniguchi*, the difference between the majority and dissent in *Costello* seems to come down largely to the conception of the meaning of ordinary meaning. Judge Posner, writing for the majority, warns of the perils of overreliance on the dictionary to resolve questions of ordinary meaning. And he directs the ordinary meaning analysis to an empirical inquiry, which he proposes to resolve by means of a Google search.[73]

Judge Posner's reliance on his Google results places his sense of ordinary meaning on the frequency continuum. He uses Google to look for relative numbers of "hits" for phrases like "harboring fugitives" and "harboring guests."[74] Because Judge Posner found more hits for the former than for the latter, he concludes that "'harboring,' as the word is actually used, has a connotation . . . of deliberately safeguarding members of a specified group from the authorities."[75] This is a "most frequent" sense of ordinariness – and a blatantly empirical example of that inquiry.

The *Costello* dissent takes a different tack. In concluding that the *providing shelter* notion of *harbor* falls within the statute, Judge Manion asserts that "the ordinary meaning of 'harboring' certainly *includes* 'providing shelter to.'"[76] In support of this point, Judge Manion cites definitions from dictionaries in print

---

**69.** *Id.* (asserting that the *written translator* sense is an "acceptable usage" even if it is "not 'the most common usage'" (quoting *id.* at 568 (majority opinion))).

**70.** United States v. Costello, 666 F.3d 1040, 1041 (7th Cir. 2012) (quoting 8 U.S.C. § 1324(a)(1)(A)(iii) (2012)).

**71.** *Id.* at 1043.

**72.** *Id.* at 1042.

**73.** *Id.* at 1044-45.

**74.** *Id.* at 1044.

**75.** *Id.*

**76.** *Id.* at 1052 (Manion, J., dissenting) (emphasis added).

at the time of the statute's enactment. He says that these dictionaries show that "[t]his was *a common understanding* of the term when the term 'harbor' was first added to the statute in 1917, and when the statute was amended and the term retained in 1952."[77]

***

What can we learn from these cases? Our judges purport to be speaking of a consistent, common sense of ordinary meaning. But they switch back and forth between different senses of ordinary meaning, usually without acknowledging the inconsistency. Sometimes (as in *Muscarello*) judges embrace varying senses of ordinary meaning within a single opinion. Elsewhere (as in *Taniguchi* and *Costello*) the seemingly nuanced distinction between different senses of ordinary meaning becomes outcome-determinative. This is problematic—not just for statutory interpretation, but also for the rule of law.[78]

### *B. Operational Shortcomings*

The theoretical deficiencies identified above are one element of the problem. Another is operational—in the way we seek to identify or measure the ordinary meaning of statutory terms. Typically, this assessment is made at a gut level, on the basis of a judge's linguistic intuition, without recognition of the empirical nature of the question.

A judge considering the prohibition on *vehicles* in the park, for example, would reject out of hand the notion that the ordinance extends to pets, insisting (without further analysis or support) that the *infection carrier* sense of *vehicle* is an outlier—an extraordinary meaning. A parallel conclusion would be likely in response to an attempt to extend the *no vehicles* ordinance to bicycles. We understand *vehicle* to encompass a *conveyance on wheels*, but again a court seems likely to jump to the conclusion that the ordinary sense of *vehicle* is *motor vehicle*, and that a bicycle does not count.

These conclusions seem uncontroversial. But the judge who makes them is making an empirical assessment. Gut-level empirics probably will not bother us if they go only to a holding that a pet or bicycle is not a *vehicle* prohibited in the

---

**77.** *Id.* (emphasis added) (first citing WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 981 (1917) (defining "harbor" as "[t]o afford lodging to; to entertain as a guest; to shelter; to receive; to give refuge to"); and then citing WEBSTER'S NEW COLLEGIATE DICTIONARY 376 (John P. Bethel et al. eds., 1953) (defining "harbor" as "to entertain as a guest; to shelter; to give a refuge to")).

**78.** *See* Baude & Sachs, *supra* note 3, at 1089-90 (noting that "we have to decide *which* meaning, produced by which *theory* of meaning, we ought to pick").

park. But what about a motorized scooter or a golf cart? These are harder questions. And here we may have more cause for concern about the lack of transparency and determinacy.

With this in mind, judges sometimes turn to other grounds for their assessment of ordinary meaning, looking up a word in a dictionary or even turning to the word's etymology. A common use of a dictionary involves simple cherry-picking. "Instead of acknowledging and rejecting contrary senses of a statutory term, judges tend to ignore them—identifying only the sense of a word they deem ordinary without acknowledging any others."[79] As to *vehicle*, for example, a judge might simply cite a definition referring to an automobile and assert, without more, that the term's ordinary meaning does not encompass a motor scooter, or maybe even a golf cart. That is troubling—a judge who cherry-picks a preferred dictionary definition while ignoring an alternative is misusing the dictionary.

Some judges, to their credit, are more transparent. Instead of ignoring a contrary definition—the *conveyance on wheels* notion of vehicle, for example—a judge may acknowledge competing senses but find a basis for embracing one as ordinary. For example, a judge might prefer the definition that appears first in a dictionary's list of senses, or cite the etymology of the statutory term. Neither of these approaches is defensible, however, for reasons explained immediately below in our critique of the Court's ordinary meaning analysis in *Muscarello* and *Taniguchi*. *Costello*, on the other hand, acknowledges some of the problems we identify and turns to Google, albeit in a manner that raises a new set of problems.

### *1.* Muscarello v. United States

The *Muscarello* majority invokes both sense ranking and etymology in support of its holding. Justice Breyer acknowledges that *carry* can be understood to mean either *transport* in a vehicle or *bear* on your person.[80] But he embraces the

---

**79.** State v. Rasabout, 2015 UT 72 ¶ 53, 356 P.3d 1258, 1274 (Lee, Associate C.J., concurring in part and concurring in the judgment); *see also, e.g.*, Kovach v. Zurich Am. Ins. Co., 587 F.3d 323, 346 (6th Cir. 2009) (McKeague, J., dissenting) (criticizing the majority for ignoring other definitions in basing its presentation of the "ordinary meaning" of "accidental" on one definition without regard to others); Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 878 (9th Cir. 2002) (ignoring broader definitions in favor of a narrow definition as "ordinary meaning" of "intercept"); United States v. Warner Bros. Well Drilling, No 89-5494, 1990 WL 37610, at *2-3 (6th Cir. Apr. 3, 1990) (citing only one definition of "operator" in determining the ordinary meaning, even though opposing definitions existed).

**80.** Muscarello v. United States, 524 U.S. 125, 128 (1998).

former sense as "primary" and dismisses the latter as "special."[81] His first argument in support of that conclusion is that "[t]he Oxford English Dictionary gives as its *first* definition 'convey, originally by cart or wagon, hence in any vehicle, by ship, on horseback, etc.'"[82] The italicized emphasis on "first" is Justice Breyer's. His opinion takes a similar tack in citing the "*first* definition" in *Webster's Third*—"move while supporting (*as in a vehicle* or in one's hands or arms)"[83]—and the "*first* definition" in the *Random House Dictionary*—"to take or support from one place to another; convey; transport."[84]

Justice Breyer reinforces his reliance on sense ranking in his reference to the personally *bear* sense of carry in the *Oxford English Dictionary*, noting that this is the "*twenty-sixth* definition" in the dictionary.[85] This is the threshold basis of Justice Breyer's conclusion that "[t]he relevant linguistic fact[]" is "that the word 'carry' in its ordinary sense includes carrying in a car."[86]

Justice Breyer also turns to etymology, in asserting that "[t]he origin of the word 'carries' explains why the first, or basic, meaning of the word 'carry' includes conveyance in a vehicle."[87] Justice Breyer states that *carry* traces from "Latin 'carum,' which means 'car' or 'cart,'" and from "Old French 'carier' and late Latin 'carricare,' which meant to 'convey in a car.'"[88] The precise premises of Justice Breyer's analysis are left implicit. But the point seems clear: the etymology of the verb *carry* confirms that the *transport* sense of the term is ordinary and the personally *bear* sense is unusual.

This is problematic. If the ordinary meaning question in *Muscarello* is an empirical question of frequency or prototype analysis, neither the dictionary nor etymology is useful. The dictionaries typically cited by our courts (including those cited by Justice Breyer) make no claims about the relative frequency of the listed senses of a given word.[89] Many commonly used, unabridged dictionaries

---

81. *Id.*

82. *Id.* (quoting 2 THE OXFORD ENGLISH DICTIONARY, *supra* note 44, at 919).

83. *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 343 (1986)).

84. *Id.* (quoting THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE—UNABRDIGED 319 (2d ed. 1987)).

85. *Id.* at 130 (citing 2 THE OXFORD ENGLISH DICTIONARY, *supra* note 44, at 921).

86. *Id.* at 131.

87. *Id.* at 128 (citing THE BARNHART DICTIONARY OF ETYMOLOGY 146 (Robert K. Barnhart ed., 1988)).

88. *Id.* (first citing THE BARNHART DICTIONARY OF ETYMOLOGY 146 (Robert K. Barnhart ed., 1988); and then citing 2 THE OXFORD ENGLISH DICTIONARY, *supra* note 44, at 919).

89. *See* Stephen C. Mouritsen, *The Dictionary Is Not a Fortress: Definitional Fallacies and a Corpus-Based Approach to Plain Meaning*, 2010 BYU L. REV. 1915, 1924-29 (discussing problems with dictionary usage by courts and identifying the "sense-ranking fallacy"). The *Random House*

arrange their definitions based on evidence of historical usage.[90] *Webster's Third* expressly disavows any attempt to establish a "hierarchy of importance" among different senses and admits that "[s]ometimes an arbitrary arrangement or rearrangement is the only reasonable and expedient solution to the problems of ordering senses."[91]

A similar problem undermines Justice Breyer's use of etymology. As the philologist Henry Sweet observed:

> The meaning of a word in a given period of a given language is a matter of usage, and the fact of its having had a certain meaning at some earlier period or in some cognate language does not necessarily afford any help in determining, and still less in remembering, its present meaning.[92]

If this were not true, then *December* would mean the tenth month, and an *anthology* would mean a bouquet of flowers.[93] Yet, so common is the assumption

---

*Dictionary of the English Language* appears to be an exception. Its front matter states "a general policy of putting the most frequently used meanings . . . at the beginning of the entry, followed by other senses in diminishing frequency of usage, with archaic, and obsolete senses coming last." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE—UNABRIDGED, at viii (2d ed. 1987). But we see grounds for skepticism of these sorts of claims. *See infra* notes 99-102, 137-140 and accompanying text. When unabridged dictionaries assembled their citation files, they were concerned about possible usage, not about making a representative, scientific sample of the speech community. So, their claims about frequency and obsolescence are suspect. *Random House* acknowledges that its sense ranking based on frequency holds only "generally." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE—UNABRIDGED, *supra*, at xxii. Without more (and there is no more in this dictionary), the reader is left to guess about which senses are ordered according to frequency and which ones follow some other organizing principle.

90. *See* 1 THE OXFORD ENGLISH DICTIONARY, *supra* note 44, at xxix ("That sense is placed first which was actually the earliest in the language: the others follow in order in which they have arisen."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 19a (1971) (indicating that the order of senses is "historical," in that "the one known to have been first used in English is entered first"; also stating that its "system of separating senses" is "only a lexical convenience," and not an "enduring hierarchy").

91. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, *supra* note 90, at 17a.

92. HENRY SWEET, THE PRACTICAL STUDY OF LANGUAGES: A GUIDE FOR TEACHERS AND LEARNERS 88 (1900).

93. THE BARNHART CONCISE DICTIONARY OF ETYMOLOGY 29 (Robert K. Barnhart ed., 1995) (providing the etymology of "anthology" as "1640, collection of the 'flowers' of verse (i.e. small, choice poems) by various authors; borrowed, perhaps by influence of French *anthologie*, from Greek *anthologíā* flower-gathering (*ánthos* flower + *légein* gather)."); *id.* at 188 (providing the etymology of "December" as "1122, borrowed from Old French *decembre*, from Latin *December*, from *decem* TEN, this being originally the tenth month of the early Roman calendar (which began with March)").

that a word's etymology shows its true meaning that the assumption has been given a name: the "etymological fallacy."[94] For this reason, Justice Breyer's analysis of the etymology of *carry* tells us nothing about its ordinary meaning.[95]

*2.* Taniguchi v. Kan Pacific Saipan, Ltd.

The *Taniguchi* opinion appears, at first glance, to employ dictionaries in a less arbitrary way. Justice Alito does not turn to sense ranking or etymology. He presents an informal "survey" of dictionary definitions, asserting that "only a handful" of dictionaries include the *written translator* sense of *interpreter*, but "all" of them speak of the *oral translator* sense.[96] And he says that the "sense divider[s]" in the cited dictionaries confirm the Court's holding in designating the *oral translator* notion as one that is "especially" indicated and flagging the *written translator* sense as "obsolete."[97]

Yet Justice Alito's approach is still problematic. The "survey" of dictionaries is far from systematic. Justice Alito presents his own set of preferred dictionaries. And within the cited dictionaries, the Court sometimes cites a definition of the noun *interpreter* and sometimes cites a definition of the verb *interpret*. We cannot tell from the opinion whether the *written translator* sense of *interpreter* is less often listed in a real "survey" of dictionaries because we are not presented with an actual *survey* of dictionaries. We have only the definitions that Justice Alito has presented for our review.[98]

---

**94.** SWEET, *supra* note 92, at 88; *see also* RANDOLPH QUIRK, STYLE AND COMMUNICATION IN THE ENGLISH LANGUAGE 86 (1982) (characterizing as "one of the most pernicious of popular *idées fixes*" the notion that a word's etymology "gives you the 'real' meaning").

**95.** It is also worth noting that neither the ordinary legislator nor the ordinary citizen are likely to have a working knowledge of the etymology of most words. Interpreting a statute according to a long-lost meaning that neither the drafter nor the citizen is aware of seems a far cry from searching for ordinary meaning.

**96.** Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 568-69 (2012).

**97.** *Id.* at 568-69; *see id.* at 567-68 & n.2 (noting that the *Concise Oxford Dictionary of Current English*, *Webster's Third New International Dictionary*, the *World Book Dictionary*, and *Cassell's English Dictionary* designate the oral translator meaning as "especially" indicated); *id.* at 569 (noting that the *Oxford English Dictionary* "designated [the written translator] meaning as obsolete").

**98.** Even a documented survey of every known dictionary might not be sufficient, moreover, for reasons explained below. *See infra* notes 99-102, 137-140 and accompanying text. Dictionaries are not trying to show ordinary meaning. But even if they were, the methods that they use to sample language use don't create a reliable sample—aggregating dictionaries isn't going to accomplish anything if none of them has a reliable sample of language usage.

Justice Alito's sense dividers are also insufficient. First, not all dictionaries designate *written translator* as obsolete or *oral translator* as special. At least one definition mentioned in the majority opinion explicitly encompasses the written sense of the term, without any indication of obsolescence.[99]

Second, sense dividers are not reliable measures. Dictionaries tell us very little about the basis for the "obsolete" sense designation. Ultimately, such a designation must be made on the basis of some underlying data that is unavailable to the reader of the dictionary. So the "obsolete" designation tells us only that the lexicographers who compiled the dictionary in question deemed a particular sense to no longer be in use; but, without more, such designation gives us only the opinion of those lexicographers and not a hard basis for an empirical conclusion.[100]

An "especially" designation may be even more unreliable. Such a designation suffers from all of the problems inherent in the "obsolete" designation, and it also masks another deficiency, going to the arbitrariness of the distinction between two senses listed in a dictionary (described further below). The fact that a given sense, or subsense, of a term is a *special* application of another highlights the interrelationship between the two senses.[101] It suggests that the two senses are not highly distinct from each other, but instead are exemplars or prototypes of a broader category. That is what the *Webster's* definition cited in *Taniguchi* seems to convey. The cited *Webster's Third* definition of *interpreter* is "'one that translates; *esp*: a person who translates orally for parties conversing in different tongues.'"[102] This is an indication that the lexicographers who formulated this definition for *Webster's* viewed the *especially* designated notion *not* as a separate sense but as an exemplar of it—perhaps a common, prototypical example.

For these reasons the *Taniguchi* opinion also employs inadequate tools of measurement. Justice Alito's "survey" and sense designations seem more sophisticated, but ultimately they are also poor tools for assessing empirical questions of ordinary meaning.

---

**99.** *Taniguchi*, 566 U.S. at 567 (citing *Interpreter*, BALLENTINE'S LAW DICTIONARY 655 (3d ed. 1969) (defining "interpreter" as "[o]ne who interprets, particularly one who interprets words written or spoken in a foreign language")).

**100.** *See* DOUGLAS BIBER ET AL., CORPUS LINGUISTICS: INVESTIGATING LANGUAGE STRUCTURE AND USE 22 (1998) (observing that "citation slips" used by lexicographers represent only those contexts "that [human] readers happen to notice").

**101.** *See infra* Part III.

**102.** *Taniguchi*, 566 U.S. at 567-68 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1182 (1976)).

### 3. *United States v. Costello*

Judge Posner rejects a dictionary-based approach to ordinary meaning in *Costello*. He rightly notes that "[d]ictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings."[103] And for that reason, Judge Posner turns to Google to get a "rough index of the frequency of [*harboring*'s] use."[104] This approach is innovative. But it is far from perfect.

Google might seem to be a good source for data-driven analysis of language usage. "The World Wide Web is enormous, free, immediately available, and largely linguistic."[105] And it is "appealing to use the Web as a data source" because "language analysis and generation benefit from big data."[106] Google has low entry costs, moreover. Even the most Luddite lawyer or judge is likely to be able to perform a basic Google search. Yet we still see a range of problems in Judge Posner's approach.

First is the black box of the Google algorithm. Google searches "are sorted according to a complex and unknown algorithm (with full listings of all results usually not permitted) so we do not know what biases are being introduced."[107] Google returns can vary by geography, by time of day, and from day to day.[108] Google search results are thus rather unscientific, if we understand good science as including replicability.

Second are problems with the Google search engine: the fact that it does not allow us to search only for verb forms of *harbor* and that it will not allow us to look at a particular speech community or period of time (only contemporary web pages, even if their content was first published in the past). If we are interested in knowing the ordinary use of *harbor* as a verb among ordinary English speakers at the time of the enactment of the statute at issue (1917), Google cannot give us that kind of parsed data.

In light of these search engine problems, Judge Posner formulated his own set of search terms – comparing hit counts for phrases like "harboring fugitives"

---

**103.** United States v. Costello, 666 F.3d 1040, 1044 (7th Cir. 2012).

**104.** *Id.*

**105.** Adam Kilgarriff, *Googleology Is Bad Science*, 33 COMPUTATIONAL LINGUISTICS 147, 147 (2007) (discussing the limitations of Google as a corpus).

**106.** *Id.*

**107.** *Id.* at 148.

**108.** *Id.*

and "harboring guests."[109] But this innovation introduces a third set of problems: Judge Posner gives no basis for his chosen set of search terms, and the terms he chose seem likely to affect the outcome.

Finally, even setting aside the problems discussed above, the hit counts that Judge Posner relies on may not be indicative of ordinariness in the sense of frequency of usage. Judge Posner implies that relative hit counts are an indication of frequency of usage in our ordinary language. But that may not hold. Google hit counts are based on the total number of web pages, not the total number of occurrences of a given phrase.[110] A single web page may have tens, hundreds, or thousands of uses of an individual word or phrase that would only register in a Google search as a single hit. So hit counts may not be a reliable indication of ordinariness, even if we could overcome the other problems identified here.

We think Judge Posner was onto something in seeking an empirical method of measurement, but we also think his Google search was inadequate.

## II. THEORIZING ORDINARY MEANING

The deficiencies in the courts' approaches to ordinary meaning are also reflected in legal scholarship. Here we outline some of the approaches to ordinary meaning reflected in the scholarly literature, in an attempt to expand on the themes discussed in Part I.

Legal scholarship posits a range of conceptions of ordinary meaning. Professor Richard Fallon's catalog is perhaps the most extensive. He speaks of the "semantic" or "literal" meaning of the words of the law; the "contextual" meaning informed by "shared presuppositions" of speakers and listeners (which we take to align with Sunstein's notion of "public meaning"[111] and Baude and Sachs's idea of the "reader's understanding"[112]); the "intended meaning" of the lawmaker; the "reasonable" or "imputed" meaning attributed to "hypothetical, reasonable legislators"; and the "interpreted meaning" of laws in judicial precedent.[113]

Not all of these conceptions of meaning are applicable to our analysis here. Certainly there is a case for respecting statutory meaning embedded in judicial precedent. If judges have deemed a statute to have a certain meaning in the past,

109. *Costello*, 666 F.3d at 1044.

110. Kilgarriff, *supra* note 105, at 147.

111. Sunstein, *supra* note 12, at 198.

112. Baude & Sachs, *supra* note 3, at 1090 (distinguishing the "author's intent" and the "reader's understanding").

113. *See* Fallon, *supra* note 2, at 1255-63.

the law of interpretation—informed by principles of stare decisis—can (and should) yield due deference to the "interpreted meaning" established by precedent.[114] But our reasons for respecting such meaning have nothing to do with the rule of law premises behind the law's search for ordinary communicative content.

Fallon's notion of "reasonable" or "imputed" meaning is also, but less obviously, a conception of extra-ordinary meaning. This construct is related to the "fair reading" method advanced by Justice Scalia and Bryan Garner in *Reading Law*.[115] The fair reading inquiry is framed in objective-sounding terms—in a search for "objectified intent."[116] But on closer review this notion of meaning has nothing to do with actual communicative content of the words of the law (or of intentions attributable to lawmakers). It is an idealized, constructive inquiry aimed at an impossibly well-informed legislator—one with "aptitude in language, sound judgment, the suppression of personal preferences regarding the outcome, and, with older texts, historical linguistic research"; "an ability to comprehend the *purpose* of the text, which is a vital part of its context," and to glean it "only from the text itself"; and even an understanding of "a word's historical associations acquired from recurrent patterns of past usage" and "a word's immediate syntactic setting—that is, the words that surround it in a specific utterance."[117]

This notion of meaning has little or nothing to do with the actual meaning intended by a legislator or understood by the public. We may well have reasons to credit this sort of idealized, constructive meaning. But if we do, it will not be because we think that any actual legislator is likely to have read the words of a law and understood it in this "reasonable" way, much less that an ordinary member of the public gleaned that understanding. It will be because we deemed other policies—policies having nothing to do with vindicating linguistic meaning—to be of greater significance.[118]

114. *See id.* at 1251 (articulating stare decisis arguments in support of the law's acceptance of "interpreted meaning").

115. SCALIA & GARNER, *supra* note 28, at 428.

116. ANTONIN SCALIA, Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws, in A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 17 (Amy Gutmann ed., 1997).

117. *Id.* at 33.

118. *See* Gary Lawson & Guy Seidman, *Originalism as a Legal Enterprise*, 23 CONST. COMMENT. 47, 48 (2006) (stating that the "touchstone" of this approach to interpretation "is not the specific thoughts in the heads of any particular historical people . . . but rather the hypothetical understandings of a reasonable person who is artificially constructed by lawyers").

That leaves, in Fallon's taxonomy, (a) semantic meaning, (b) contextual meaning (public meaning or the reader's understanding), and (c) intended meaning. Semantic meaning is meaning that the language of the law would have "for someone operating solely with dictionary definitions, rules of grammar, and other general propositions bearing on how the meaning of a sentence emerges from the combination of its elements."[119] Fallon attributes this sort of meaning to a sort of "literalist" textualism, asserting that "[p]articipants in legal discourse frequently assume or argue that a legal provision's semantic or literal meaning determines its legal meaning."[120]

The point here is the notion that "literalist" textualism excludes nonsemantic context. In contrasting his notion of "contextual" meaning, for example, Fallon distinguishes "semantics, which is concerned with the context-independent meaning of words, phrases, and sentences, and pragmatics, which involves the meaning of utterances in particular contexts."[121] Here he cites an example from *Reading Law*: "*Nail* in a regulation governing beauty salons has a different meaning from *nail* in a municipal building code."[122] He also distinguishes semantic meaning from "contextual meaning" because the latter is "framed by the shared presuppositions of speakers and listeners."[123]

We agree that judges often frame their discussion of ordinary meaning in terms of literalist versus contextual meaning. But our theory of ordinary meaning parts company with Fallon at his suggestion that what he calls the "semantic meaning" of an utterance should be distinguished from its "contextual meaning," or that these two competing notions of meaning allow for a "choice among multiple candidates to supply legal or conversational meaning."[124]

Whenever we engage in the act of communication—whenever a speaker speaks and a hearer hears—our minds take in the relevant interpretative information at once. We take account of the formal aspects of an utterance (its lexical, syntactic, and semantic content), as well as the pragmatic (in the linguistic sense of the term) aspects of the utterance (for example, the physical or social setting in which it is uttered). We interpret an utterance as part of a community of

**119.** Fallon, *supra* note 2, at 1245.

**120.** *Id.*

**121.** *Id.* at 1246.

**122.** *Id.* (quoting SCALIA & GARNER, *supra* note 28, at 20). We use the phrase "semantic meaning" more specifically to refer to the formal linguistic features of an utterance (i.e., syntax and argument structures, semantic features, and functional roles), but we do not suggest that semantic meaning can ever be derived with reference to pragmatics or the "meaning of utterances in particular contexts."

**123.** *Id.*

**124.** *Id.* at 1266.

speakers of a language (with shared linguistic conventions and a shared understanding of different linguistic registers), and we necessarily interpret the utterance according to the shared linguistic conventions that exist at the time of the utterance.

If we are to have a theory of ordinary meaning that tracks the way we actually use and interpret language, we cannot artificially separate out formal and pragmatic considerations. Literalist semantic meaning alone is not an indication of ordinary communicative content. Real human beings do not derive meaning from dictionary definitions and rules of grammar alone. Everyone takes nonsemantic context—pragmatics—into account in deriving meaning from language.[125] And for that reason we see no basis to credit semantic meaning without consideration of pragmatic context.[126] If no lawmaker would read the text that is voted into law purely semantically—devoid of pragmatic context—then there is no reason to credit that kind of meaning as a means of vindicating the intent of a lawmaker. The same goes for the public governed by the law. If no one reads

**125.** As Lawrence Solum has noted:

> The word "pragmatic" is ambiguous. In contemporary legal theory, "pragmatism" refers to an antifoundationalist approach that is strongly associated with Judge Richard A. Posner. Legal pragmatism is related to the philosophical pragmatism that is associated with philosophers Professor John Dewey, Professor William James, and Charles Sanders Peirce. As used in the philosophy of language and theoretical linguistics, pragmatics is a technical term with a contested and evolving meaning.

Lawrence B. Solum, *Originalist Methodology*, 84 U. CHI. L. REV. 269, 286 n.58 (2017) (citations omitted). Often in linguistics, pragmatics is used to refer to the study of specific linguistic phenomena like conversational implicature or deixis. ALAN CRUSE, MEANING IN LANGUAGE: AN INTRODUCTION TO SEMANTICS AND PRAGMATICS 332-37, 355-94 (2d ed. 2004). But pragmatics is also "sometimes defined as being concerned with the role or effects of context." *See* Solum, *supra*, at 286 n.59. Unless otherwise specified, we use the term pragmatics in this paper to refer to nonverbal context that may affect meaning.

**126.** As we will demonstrate below, a significant amount of contextual information may be derived from corpus data. In this respect, the corpus can provide insight into the context of an utterance. Yet there are some aspects of nonverbal context that are harder to derive from corpus data. These include notions of contextual enrichment like implicature, impliciture, presupposition, and modulation. *See* Solum, *supra* note 125, at 288-91 (discussing types of contextual enrichment). The use of linguistic corpora to analyze these linguistic phenomena has only recently begun to be explored by linguists. *See* Christoph Rühlemann & Karin Aijmer, *Introduction: Corpus Pragmatics: Laying the Foundations*, *in* CORPUS PRAGMATICS: A HANDBOOK 1, 1 (Karin Aijmer & Christoph Rühlemann eds., 2015) ("For a long time pragmatics and corpus linguistics were regarded as 'parallel but often mutually exclusive.' However, in recent years corpus linguists and pragmaticists have actively begun exploring their common ground." (citation omitted)).

laws literally by pure semantics, we have no reason to protect reliance interests or notice concerns rooted in that kind of understanding.

This does not mean that it is never worthwhile to consider the formal aspects of an utterance. Humans do take verbal, semantic context into account in interpreting language. It is just that humans also take nonverbal, pragmatic context into account. In developing a more robust theory of ordinary meaning, we think it important to highlight each of these elements of context that might affect our understanding—and to clarify the determinants of ordinary meaning that our law might seek to measure.

Before we turn to that endeavor, however, we first finish our treatment of Fallon's taxonomy by addressing "intended" meaning. Is the law's search for meaning aimed at finding the "public" meaning inferred by a "reader" of the law or a more private "intended" sense of a lawmaker? On this we agree with Baude and Sachs. "There may be good reasons for a legal system to prefer" either public meaning or intended meaning.[127] And "neither has to win every time," because the "right" answer "depends on our reasons" for the resort to ordinary meaning "in the first place."[128]

Intended meaning is an appropriate construct to the extent we are aiming to vindicate the preferences of lawmakers. This is a viable, distinct basis for crediting ordinary meaning. We may say, as does Professor Larry Alexander, "that the reason we should seek the actual authors' intended meaning is that the actual authors possessed the legal authority to promulgate norms, and their texts just *are* their communications of the norms they intended to promulgate."[129] If that is our premise for looking to the ordinary communicative content of the law then we will certainly look to the intended meaning of lawmakers (informed by relevant elements of context, as presented below). Even the reader, at least arguably, would seek this meaning.[130] But if we are to seek the intended meaning of the authors of the law, we must have some objective means of doing so.

---

**127.** Baude & Sachs, *supra* note 3, at 1091.

**128.** *Id.* at 1090.

**129.** Larry Alexander, *Telepathic Law*, 27 CONST. COMMENT. 139, 140 (2010).

**130.** *See* Larry Alexander, *Originalism, the Why and the What*, 82 FORDHAM L. REV. 539, 540 (2013) (asserting that "our job is to determine the uptake the legislator(s) intended us to have"). We also agree with Professor Ryan D. Doerfler, however, that legislative intent is ultimately a fiction—not only because "Congress is a 'they,' not an 'it,'" or because "Members of Congress . . . share no . . . intention to treat as authoritative the views of a statute's 'principal sponsors' or 'others who worked to secure enactment,'" but also because language must be understood in light of context consisting of "information salient to both author and audience." Ryan Doerfler, *Who Cares How Congress Really Works?*, 66 DUKE L.J. 979, 982–83 (2017). This suggests that the line between intended meaning and public meaning is thin or perhaps nonexistent, a point we return to below. *See infra* Section III.C.1.

There is also a case for the public or "reader's" understanding. This sort of meaning makes sense to the extent we are seeking to vindicate the notice rationale for the "standard picture"—the protection of reliance interests and the avoidance of unfair surprise.[131] Enforcing "hard-to-find intentions" of lawmakers "would make the law unpredictable or arbitrary."[132] So to the extent our search for ordinary meaning is aimed at protecting these interests, we should seek to assess the public's understanding of the law at the time it was passed.

In summary, before framing the theory of meaning in a manner that may allow us to measure it, we must first delineate the components of such meaning. At a broad level, those components encompass semantic meaning and pragmatic meaning. To assess meaning, linguists would tell us that we must also take into account the relevant speech community (*whose* meaning?) and the relevant timeframe (meaning *as of when*?). We explore each of these components below.

### *A. Semantic Meaning*

Semantic meaning encompasses several components: lexicography, syntax, and semantics.

#### *1. Lexicography*

The search for "semantic" meaning often distills to a question of *word sense*. In *Muscarello*, *Taniguchi*, and *Costello*, for example, the courts were considering a problem of competing word senses—senses numbered separately from each other in the cited dictionaries.

Judges tend to assume that a dictionary's division of senses (by numbers and letters) represents an immutable linguistic fact about the universe. We tend to "ignore the fact," as Professor Larry Solan has put it, "that someone sat there and wrote the dictionary, and we speak as though there were only one dictionary,

---

**131.** *See* Michael Herz, *Purposivism and Institutional Competence in Statutory Interpretation*, 2009 MICH. ST. L. REV. 89, 102 (arguing that "the case for textualism" is in part "[t]he claim . . . that if legal rules are embedded in publicly available texts, affected persons will be able to know, understand, and comply with those rules . . . . [T]he fair notice argument for textualism in statutory interpretation presupposes, and seeks to ensure the full benefit of, a shift from the common law to statutes"); Note, *Textualism as Fair Notice*, 123 HARV. L. REV. 542, 542 (2009) ("Perhaps the most intuitive and straightforward argument for textualism is that it promotes fair notice of the law."); *see also* SCALIA, *supra* note 116, at 17 (asserting that it is "incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated").

**132.** Baude & Sachs, *supra* note 3, at 1091.

whose lexicographer got all the definitions 'right' in some sense that defies analysis."[133] But that is not the case. Dictionaries may differ sharply in the number of senses they assign to a given term or in the divider they use to distinguish senses. "And human beings, try as they may, bring their prejudices and biases into the dictionaries they make."[134]

The question of "what is a word sense" turns out to be a very challenging one in lexical semantics. Linguists and lexicographers lack "decisive criteria for defining word senses and clearly discriminating between them."[135] And linguists also acknowledge that the sense distinctions reflected in dictionaries are "more of a descriptive device rather than a claim about psycholinguistic reality."[136]

In traditional lexicography, words are defined first by determining the class of things to which they belong (their *genus*) and second by distinguishing them from all other things in their class (their *species*).[137] Words are then divided into senses based on a variety of factors, including their part of speech, pronunciation, inflection, etymology, and shades of meaning.[138] This approach to defining words and dividing them into senses can be highly impressionistic and has a number of limitations. There is no agreed-upon formula for sense division—some lexicographers make very fine-grained distinctions between senses (they are sometimes called *splitters*), while others tend to make broader, more coarse-grained distinctions (they are sometimes called *lumpers*).[139] Moreover, the citation or quotation files from which many dictionaries are derived were collected without the benefit of modern sampling methods. Accordingly, these files cannot be relied upon for information about the frequency of a given word or word sense.[140]

133. Lawrence Solan, *When Judges Use the Dictionary*, 68 AM. SPEECH 50, 50 (1993) ("[O]ur society's reverence for dictionaries is not driven by the latest discoveries in psycholinguistic research. Rather, it is deeply embedded in our culture.").

134. JONATHAN GREEN, CHASING THE SUN: DICTIONARY MAKERS AND THE DICTIONARIES THEY MADE xiv (1996).

135. Nikola Dobrić, *The Predictive Power of the (Micro)Context Revisited—Behavioral Profiling and Word Sense Disambiguation*, 57 ZBORNIK MATICE SRPSKE ZA FILOLOGIJU I LINGVISTIKU 77 (2014).

136. Stefan Th. Gries, *Polysemy*, *in* HANDBOOK OF COGNITIVE LINGUISTICS 482 (Ewa Dabrowska & Dagmar Divjak eds., 2015); *see also* Dylan Glynn, *Polysemy and Synonymy: Cognitive Theory and Corpus Method*, *in* CORPUS METHODS FOR SEMANTICS: QUANTITATIVE STUDIES IN POLYSEMY AND SYNONYMY 7, 10 (Dylan Glynn & Justyna A. Robinson eds., 2014).

137. SIDNEY I. LANDAU, DICTIONARIES: THE ART AND CRAFT OF LEXICOGRAPHY 153 (2d ed. 2014).

138. BO SVENSÉN, PRACTICAL LEXICOGRAPHY: PRINCIPLES AND METHODS OF DICTIONARY-MAKING 204–05 (John Sykes & Kerstin Schofield trans., 1993).

139. Elizabeth Walter, *Using Corpora To Write Dictionaries*, *in* THE ROUTLEDGE HANDBOOK OF CORPUS LINGUISTICS 433-34 (Ann O'Keeffe & Michael McCarthy eds., 2010).

140. LANDAU, *supra* note 137, at 153.

Contemporary lexicographers have moved past relying on citation files alone and have begun to rely on electronic "corpora"—large bodies or databases of naturally occurring language—to gather linguistic data.[141] Corpus analysis has allowed lexicographers to address the problem of sense division with greater granularity. Lexicographers can now view a more complete range of potential uses of a given word and collect statistical information about the likelihood of a given word appearing in a particular semantic environment.[142]

Linguistic corpora allow us to make observations about the way that language is (and was) used through a less arbitrary and more readily measurable methodology than resort to dictionaries. And because language is the output of the mind, it is reasonable to assume that we can learn something about the way the mind perceives language by examining the way language is used in natural language environments. As mentioned above, there may be other ways to measure the way that language utterances are perceived.[143] Linguists in other linguistic disciplines use a variety of experimental methods to account for human perception of sense and meaning. But for now, our focus is on corpus linguistic analysis.

The challenge of sense division can be illustrated by reference to competing senses of *carry* in *Muscarello* or the alternative notions of *interpreter* in *Taniguchi*. Lexicographers may disagree about where to draw the lines between senses of these terms, or whether the two alternatives are distinct from each other.[144] But if the question of the dividing line is in some sense arbitrary and not reflective of the way in which the mind perceives and interprets language, then we ought to seek to measure—to the extent it is possible to measure—whether the mind perceives a sense distinction between two occurrences of the same word, rather than relying on the sense-divisions in the dictionaries before us.

This problem is most acute as to two senses that are viewed as closely related to each other. The two notions of *interpreter* in *Taniguchi* are illustrative. We can

---

141.  *See, e.g.*, OXFORD DICTIONARY OF ENGLISH xi (3d ed. 2010) ("The general principle on which the senses in the Oxford Dictionary of English are organized is that each word or part of speech has at least one core sense or core meaning, to which a number of subsenses may be attached. . . . Core meanings represent typical, central uses of the word in question in modern standard English, as established by analysis of the Oxford English Corpus and our other language databases."). Below we will discuss in greater detail the nature of the language databases in question and why the language in those databases is properly characterized as "naturally occurring."

142.  JOHN LYONS, LINGUISTIC SEMANTICS: AN INTRODUCTION 80 (1995) (noting that another way to think about word senses is as "the set, or network, of sense-relations that hold between [an expression] and other expressions of the same language").

143.  *See supra* note 22.

144.  *See* BIBER ET AL., *supra* note 100, at 40 (documenting the differences in the definition and sense distribution of the noun "deal" as recorded in five general-use dictionaries).

find distinct definitions encompassing *oral translator* and *written translator*. But that may not tell us how these two senses are perceived, or that one sense would be viewed as excluding the other. The notion of *oral translator* could simply be perceived as a more common "prototype" of the more general notion of "one who translates." The *written translator* idea could certainly be viewed as an *atypical* example. That may be all that dictionaries are telling us by indicating that *written translator* is "obsolete." And if so, that sort of obsolescence would not tell us that an ordinary person would not understand text providing for compensation for an *interpreter* to cover a *written translator*.

A dodo, after all, is an obsolete bird. But it is still a bird. And a person who happened to discover a remaining dodo on a remote island would certainly be understood to be in possession of a bird. Such a person would be covered, for example, by the terms of a rental agreement prohibiting tenants to keep "dogs, cats, birds, or other pets" in their apartments. If you are found in possession of a caged dodo, you are not likely to escape the wrath of the landlord by insisting that a dodo is an "obsolete" sort of a bird.

### 2. *Syntactic and Semantic Context*

The need to consider context is a staple element of the judicial inquiry into ordinary meaning. Courts often reference the notion of context when they invoke the ordinary meaning canon.[145] Yet they rarely say what they mean by context. Linguistic theory can help identify which elements of context may matter, and thereby offer some discipline for what has been haphazard judicial practice.

Context can be viewed as encompassing both verbal and non-verbal components.[146] The verbal context of a word or phrase in a statute includes its *syntactic* and *semantic* environments. Syntax is a set of rules and principles that governs sentence formation and determines which sentences will convey meaning to

**145.** *See* Johnson v. United States, 559 U.S. 133, 139 (2010) (observing that in the ordinary meaning inquiry, "[u]ltimately, context determines meaning"); Chisom v. Roemer, 501 U.S. 380, 404 (1991) (Scalia, J., dissenting) (arguing that the "regular method for interpreting the meaning of language in a statute" was to "first, find the ordinary meaning of the language in its textual context"); Braunstein v. Comm'r, 374 U.S. 65, 70 (1963) (defining the ordinary meaning of "gain" in a particular context). We are referring to linguistic context, which is a somewhat different concept than seeing if the statutory context precludes turning to ordinary meaning altogether. *See, e.g.*, Gonzales v. Carhart, 550 U.S. 124, 152 (2007) ("In interpreting statutory texts courts use the ordinary meaning of terms unless context requires a different result.").

**146.** Charles Goodwin & Alessandro Duranti, *Rethinking Context: An Introduction*, *in* RETHINKING CONTEXT: LANGUAGE AS AN INTERACTIVE PHENOMENON 1, 6-9 (Alessandro Duranti & Charles Goodwin eds., 1992).

members of the same speech community.[147] One aspect of syntax is *argument structure*, a linguistic term of art that refers to the participants in the action of a verb.[148] A transitive verb, like *carry*, has two arguments—the subject and the object. If we are interested in examining the meaning of phrases like *carries a firearm*, we would look for phrases that have a similar argument structure. And those arguments may affect our understanding of the meaning of *carry*.

*Semantic* context may also affect our perception of meaning. *Semantics* is the study of meaning at the word or phrase level.[149] Embedded within the words and phrases we use are a number of concepts that are sometimes referred to as the semantic features or semantic components of a word.[150] These features include concepts like number, animacy, gender, humanness, and concreteness (i.e., tangibleness).[151] In semantic theory, words can also be understood with reference to their functional role. A word has an *agentive* function if it is an instigator of the action of a verb, or an *objective* function if it is the entity that is affected by the action of the verb. A word may also serve an *instrumental* function if it is a force or object involved in, but not instigating, the action.[152]

An illustration of these linguistic concepts may be made by reference to the *Muscarello* statute's requirement of a mandatory minimum sentence for "anyone who . . . carries a firearm." Our understanding of *anyone who carries a firearm* is informed by the syntactic arguments—with *who* as the subject and *firearm* as the object of the verb. With respect to semantic features, we can characterize the relevant subject of the statute in *Muscarello* as *animate*, *human*, and *concrete*. Similarly, we can characterize the relevant object as *inanimate*, *concrete*, *non-human*, and even *weapon*. With respect to functional roles, *who* performs the agentive

---

**147.** 17 OXFORD ENGLISH DICTIONARY 487 (2d ed. 1989). Syntax is also the study of these rules and principles. NOAM CHOMSKY, SYNTACTIC STRUCTURES 11 (1957) ("Syntax is the study of the principles and processes by which sentences are constructed in particular languages.").

**148.** CRUSE, *supra* note 125, §§ 14.1-5, at 281-90 (3d. ed. 2011). An intransitive verb (*fall, die, yawn*) has one argument—the subject. *Id.* § 14.4.1, at 283. A di-transitive verb (*throw, send*) has three arguments—the subject, the direct object, and the indirect object. *Id.* § 14.4.3, at 287-88.

**149.** MICHAEL MORRIS, AN INTRODUCTION TO THE PHILOSOPHY OF LANGUAGE 152 (2006) ("Semantics is the attempt to give a systematic explanation of how the meaning of sentences depends upon the meaning of their parts.").

**150.** JOHN I. SAEED, SEMANTICS 260, 265 (4th ed. 2015).

**151.** *Id.*

**152.** Following Charles Fillmore, Alan Cruse lists a number of functional roles for words, including *agentive*—the instigator of the action; *instrumental*—the force or object involved in the action of the verb; *dative/experiencer*—the animate being affected by the action of the verb; *factitive*—the result of the action of the verb; *locative*—location or spatial orientation of the verb; and *objective*—the inanimate entity affected by the action of the verb. CRUSE, *supra* note 125, § 14.5, at 288-290 (3d. ed. 2011).

function, instigating the action of *carry*, and *firearm* serves an *objective* function. In the phrase *anyone who carries a firearm in a car*, *car* serves an *instrumental* function—it is involved in the action of the verb, but does not instigate it and does not receive it.

By looking to the argument structure and semantic features of the relevant statute, we are able to perform a more targeted search for language data to inform our inquiry into ordinary meaning. When we seek to measure language usage, we may wish to limit our search to uses of the verb *carry* that share the above-noted features—the syntax of a transitive verb, with the semantic features of a human subject and a weapon object.[153]

Limiting our search in this way will also inform the utility of information about frequency. We may find, for example, that the most frequent use of a given word is in fact quite rare in the syntactic and semantic context that is most similar to the statute. For example, we could find that the most common use of *carry* is to *carry on one's person*, but that the more prevalent use is different in the context of a human agent *carrying* an inanimate, weapon object—there, the *carry in a car* meaning may be most prevalent. Thus, when we search for ordinary meaning, we ought to be looking for the most common use of a given word in the contexts that are most similar to that of the statute in question.

### *B. Pragmatic Meaning*

The meaning of an utterance will not always be expressly communicated in its semantic content. Non-verbal (pragmatic) contextual considerations will also be taken into account.[154] Such considerations may encompass the physical or social setting of an utterance, and even an inference about the intent of the speaker.[155]

---

**153.** *See* Muscarello v. United States, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting) (noting that the issue presented "is not 'carries' at large but 'carries a firearm'").

**154.** *See* CRUSE, *supra* note 125, at 347; Goodwin & Duranti, *supra* note 146, at 6-9. Pragmatics includes concepts like conversational implicature, where the meaning of an utterance is strongly implied but not expressly stated—as where a spouse who says "there sure are a lot of dishes in the sink" is not just making an observation about the state of the universe but is reminding somebody about whose turn it is to do the dishes.

**155.** Careful scholars have recognized this point, and they have identified it as a basis for concluding that the space between textualism and intentionalism is small. *See* SCALIA, *supra* note 116, at 144 (conceding that "what the text would reasonably be understood to mean" and "what it was intended to mean" are concepts that "chase one another back and forth to some extent, since the import of language depends upon its context, which includes the occasion for, and hence the evident purpose of, its utterance"); Larry Alexander & Saikrishna Prakash, *"Is That English You're Speaking?": Why Intention Free Interpretation Is an Impossibility*, 41 SAN DIEGO L.

Judge Richard Posner's "Keep off the grass" problem is a good illustration. As Posner notes, a sign in a park that says "'Keep off the grass' is not properly interpreted to forbid the grounds crew to cut the grass."[156] Our understanding of the meaning of this sign is informed by more than just its semantic and syntactic content. We understand it in light of its pragmatic context, which includes inferences about the place and manner of the utterance and presumed intentions of the speaker.

Pragmatic considerations are of relevance to any attempt to assess the ordinary meaning of a statutory phrase. An utterance that merely *describes* a person carrying a firearm might be understood to convey one ordinary meaning. But a criminal prohibition—more precisely, a requirement of a mandatory minimum criminal sentence—may be understood differently. At least that is possible, and we may need to take such context into account in assessing ordinary meaning.

Pragmatic context may also inform the utility of frequency information, just as semantic and syntactic considerations do. In searching for the ordinary meaning of a given word, we might focus our search for the most frequent uses of the word that occur in contexts that share similar physical or social features to those represented in the statute. The more frequently a given use of a word occurs in circumstances that reflect a physical and social setting similar to that of the statute, the more confidence we should have that the use in question is the ordinary meaning of the word in that context.

### C. *Meaning as of When?*

Human language is in a constant state of change.[157] But it does not change at a predictable rate.[158] Nor do different linguistic features change at the same

REV. 967, 979 (2004) ("[T]he commonplace truth that all understandings of texts are contextual just demonstrates that all texts *qua* texts acquire their meaning from the presumed intentions of their authors.").

156. *See* RICHARD A. POSNER, HOW JUDGES THINK 40 (2010) ("[Pragmatism] refers to basing judgments (legal or otherwise) on consequences, rather than on deduction from premises in the manner of syllogism.").

157. JOHN LYONS, INTRODUCTION TO THEORETICAL LINGUISTICS 43 (1968) ("All languages are subject to constant change. This is an empirical fact . . . . All living languages . . . are of their nature efficient and viable systems of communication serving the different and multifarious social needs of the communities that use them. As these needs change, languages will tend to change to meet the new conditions.").

158. TERRY CROWLEY & CLAIRE BOWERN, AN INTRODUCTION TO HISTORICAL LINGUISTICS 149-51 (4th ed. 2011) (discussing criticisms of attempts to quantify the rate of language change).

time.[159] A compelling theory of ordinary meaning must take account of this variation and allow us to examine the linguistic norms prevailing at different historical periods.

Lawyers and judges are used to thinking about timeframe in constitutional interpretation. There we often acknowledge that *original meaning* may differ from *modern meaning*. But we often ignore the problem in statutory interpretation. Or sometimes we just assume it away. In *Costello*, for example, Judge Posner noted that the *harboring an alien* statute was enacted in 1917, but looked for modern data as to the ordinary sense of the verb *harbor*.[160] Perhaps he did so out of convenience or necessity, given that his Google search framework would not have allowed historical analysis. But his stated reason reflected the reality of much litigation over statutory interpretation: the parties simply didn't bother to consider the possibility that the term *harbor* may have evolved over time—both sides presented dictionary definitions from modern times—so Judge Posner appears to have concluded that this gave him license to do the same thing.

That phenomenon is sometimes reflected in our theory of statutory interpretation. At least a few courts have looked to the ordinary meaning of a statute *as of the time it was enacted*.[161] That approach seems appropriate to the extent we are seeking "intended" meaning. This is the point of the originalists who argue for the vindication of intended original meaning—that the "ratifiers of the Constitution . . . are the persons with authority to make and change constitutional norms," and thus that contemporary interpreters (and citizens) are bound by their views.[162] If we "'interpret' the Constitution as if it had been authored by someone other than its ratifiers," these originalists argue, we are "mak[ing] constitutional 'law' without authority to do so."[163] The same point can be made as to statutes. If intended meaning is the relevant construct, we must be bound by meaning as of the time of the statute's initial enactment. Otherwise, we are vindicating intentions at other times and by other people.

The "public" meaning construct could encompass either contemporary or historical meaning. If we are seeking to protect contemporary reliance interests and fair notice, we should arguably be seeking contemporary (not historical) evidence of ordinary meaning. "Normal" English speakers are guided by their con-

---

**159.** *Id.*

**160.** United States v. Costello, 666 F.3d 1040, 1043-44 (7th Cir. 2012).

**161.** *See, e.g.*, Carcieri v. Salazar, 555 U.S. 379, 388 (2009); Norfolk S. Ry. Co. v. Perez, 778 F.3d 507, 512 (6th Cir. 2015); State Bd. of Nursing v. Ruebke, 913 P.2d 142, 157 (Kan. 1996); State v. Ziska, 334 P.3d 964, 967 (Or. 2014).

**162.** Alexander, *supra* note 129, at 141.

**163.** *Id.*

temporary understanding, and they lack a sophisticated understanding of historical usage. So if we are trying to protect those interests we should arguably be seeking contemporary public meaning. But that is not the only way to think about public meaning. The premises of originalism can also be understood to seek to protect *original* public meaning—to preserve the public meaning fixed at the time of adoption or ratification.

Frequency considerations may also be applied to theories of both the "intended meaning" and "public meaning" of historical texts. If we are looking for what the ratifiers of the Constitution intended a particular word to mean, we might search for the most common way that word was used in texts drafted by the ratifiers (taking into account similarities in syntactic, semantic, and pragmatic context). If, on the other hand, we are looking for the original public meaning of a word or phrase in the Constitutional text, we might look to how that word was most commonly used by the public at large in similar contexts.

If we seek to measure historical meaning, how can we do so? One common means of assessing *historical* ordinary meaning is to consult an old dictionary. That is an approach that courts often take in seeking the original meaning of the Constitution. But that practice is fraught with all of the difficulties highlighted above as to contemporary dictionaries: historical dictionaries, just like their contemporary peers, cannot yield reliable information about which of various senses is more ordinary. Indeed, the problems are compounded for historical dictionaries.[164]

This is not to say that historical dictionaries do not have value. Historical dictionaries can be useful for defining unknown terms and attesting contested uses.[165] But we ought to regard them with skepticism when they are offered as evidence of "ordinary" or "original" meaning.

---

**164.** *See* Rickie Sonpal, *Old Dictionaries and New Textualists*, 71 FORDHAM L. REV. 2177, 2209-10 (2003) ("Supreme Court Justices are sometimes very scrupulous about choosing the dictionary and edition with a publication date close to the date the statute was enacted; yet, this practice is often of deceptively limited value. This practice is of even less value when old dictionaries are used because some popular older dictionaries were not only reprinted but even appeared in new editions without any substantive change to the body of the dictionary. . . . Accordingly, judges who carefully choose the printing or edition of an old dictionary that is most closely contemporary with the statute risk relying on a dictionary the substance of which far antecedes the statute." (footnotes omitted)).

**165.** The same is true for general-use, unabridged dictionaries. They can be useful for defining unknown terms, showing the range of potential meanings, or attesting contested meanings.

*D. Whose Meaning?*

Our understanding of meaning is also shaped by our speech community—the group of people with whom we share a set of linguistic norms, conventions, and expectations about linguistic behavior.[166] Meaning may also vary across different linguistic registers—varieties of texts, ranging from spoken communications, to newspapers, academic prose, or even congressional committee reports that tend to share linguistic features. Our theory of ordinary meaning must be able to account for the speech community we are evaluating and address the differences in various linguistic registers.

Limiting our search to a given speech community or register will have an important effect on the usefulness of information about frequency. It would not be unusual to find that a use of a word that is common in one speech community or register is quite rare in another. By limiting a search for ordinary meaning to the relevant speech community and register in question, we can have greater confidence that information about the frequency of use of a given word is telling us something useful about ordinary meaning.

The choice between "public" meaning and "intended" meaning may have implications for our identification of the relevant speech community. The public-meaning construct seems to dictate a speech community consisting of a broad cross-section of the public. The intended-meaning inquiry, on the other hand, could at least arguably point to a more limited community. Members of Congress are generally not common, ordinary people and their usage of certain words may not be colloquial. So, if our search for ordinary meaning is aimed at deriving intended meaning, we may wish to assess the usage or understanding of a more sophisticated group of English speakers. We may also wish to take into account

**166.** *See, e.g.*, MARCYLIENA H. MORGAN, SPEECH COMMUNITIES: KEY TOPICS IN LINGUISTIC ANTHROPOLOGY 1 (2014) ("Speech communities are groups that share values and attitudes about language use, varieties and practices. These communities develop through prolonged interaction among those who operate within these shared and recognized beliefs and value systems regarding forms and styles of communication."); Reed Dickerson, *Statutory Interpretation: Dipping into Legislative History*, 11 HOFSTRA L. REV. 1125, 1154 (1983) (defining *speech community* as the "group of people who share a common language (or sublanguage) and thus a common culture (or subculture), which in turn defines the context that conditions the utterances that occur within it" (footnote omitted)); John Sinclair, *Meaning in the Framework of Corpus Linguistics*, 20 LEXICOGRAPHICA 20, 22 (2004) ("The differences in interpretation between members of a speech community are small and they do not interfere much with normal communication."); Kamal K. Sridhar, *Societal Multilingualism*, *in* SOCIOLINGUISTICS AND LANGUAGE TEACHING 47, 49 (Sandra Lee McKay & Nancy H. Hornberger eds., 1996) ("A conglomeration of individuals who share the[] same norms about communication is referred to as a speech community. A *speech community* is defined as a community sharing a knowledge of the rules for the conduct and interpretation of speech.").

the pragmatic consideration that the more formal nature of legal language can affect human understanding of meaning.[167]

## III. OPERATIONALIZING ORDINARY MEANING

The above sets the stage for a more careful formulation of the law's assessment of the ordinary communicative content of the language of the law. A compelling theory of ordinary meaning recognizes that we may choose to measure either public meaning or intended meaning. And however we choose to frame the inquiry, we should account for all of the relevant semantic, pragmatic, temporal, and speech-community considerations.

That leaves the question of measurement or operationalization. We propose the use of tools employed in corpus linguistics. Corpus linguistics is an empirical approach[168] to the study of language that involves large, electronic databases of text known as corpora (the plural of corpus).[169] A corpus is a body or database of naturally occurring language.[170] Corpus linguists draw inferences about language from data gleaned from "real-world" language in its natural habitat—in books, magazines, newspapers, and even transcripts of spoken language.[171] The

**167.** *But see* Doerfler, *supra* note 130, at 983-84 (articulating a "conversation" model of "fictionalist" legislative intent in which "[a]n interpreter occupies the position of conversational participant, hearing statements directed at her and other participants" and credits "information salient both to members of Congress and to citizens").

**168.** PAUL BAKER ET AL., A GLOSSARY OF CORPUS LINGUISTICS 65 (2006) ("In linguistics, empiricism is the idea that the best way to find out about how language works is by analysing real examples of language as it is actually used. Corpus linguistics is therefore a strongly empirical methodology."); TONY MCENERY & ANDREW HARDIE, CORPUS LINGUISTICS: METHOD, THEORY AND PRACTICE 49 (2012) ("Empiricism lies at the core of corpus linguistics . . . .").

**169.** *See* MCENERY & HARDIE, *supra* note 168, at 1-3.

**170.** *See* Douglas Biber, *Corpus-Based and Corpus-Driven Analyses of Language Variation and Use*, *in* THE OXFORD HANDBOOK OF LINGUISTIC ANALYSIS 159, 159 (Bernd Heine & Heiko Narrog eds., 2010) ("Corpus linguistics is a research approach that has developed over the past several decades to support empirical investigations of language variation and use, resulting in research findings that have much greater generalizability and validity than would otherwise be feasible . . . . [I]t utilizes a large and principled collection of natural texts, known as a 'corpus,' as the basis for analysis . . . .").

**171.** *Id.* at 160-61 ("[Corpus linguistics] depends on both quantitative and qualitative analytical techniques . . . . [T]he major contribution of corpus linguistics is to document the existence of linguistic constructs that are not recognized by current linguistic theories. Research of this type—referred to as a 'corpus-driven' approach—identifies strong tendencies for words and grammatical constructions to pattern together in particular ways, while other theoretically possible combinations rarely occur . . . . [C]orpus-based research investigates the patterns of variation among the full set of spoken and written registers in a language. In speech, these

defining characteristic of corpus linguistics is "the claim that it is possible to actually 'represent' a domain of language use with a corpus of texts, and possible to empirically describe linguistic patterns of use through analysis of that corpus."[172] Through corpus analysis we can test our hypotheses about language through rigorous experimentation with observable and quantifiable data. And the results of a corpus-based conclusion will be replicable and falsifiable.[173]

Corpus data can tell us the relative frequency of different senses of *vehicle* (or of *carrying* a firearm, of *interpreter*, or of *harboring* an alien) in naturally occurring language.[174] And if the search for ordinary meaning entails analyzing the relative frequency of competing senses of a given term, then corpus linguistics seems the most promising tool.[175]

Corpus data can also help us resolve different types of linguistic uncertainty in the interpretation of legal texts.[176] We can use corpus data to address questions of vagueness, where "a word or phrase has borderline cases."[177] The scope

---

include casual face-to-face conversation, service encounters, lectures, sermons, political debates, etc.; and, in writing, these include e-mail messages, text-messaging, newspaper editorials, academic research articles, etc." (citation omitted)).

172. DOUGLAS BIBER & RANDI REPPEN, THE CAMBRIDGE HANDBOOK OF ENGLISH CORPUS LINGUISTICS 1 (2015).

173. *See* MCENERY & HARDIE, *supra* note 168, at 66 ("As a key goal of corpus linguistics is to aim for replicability of results, data creators have an important duty to discharge in ensuring that the data they produce is made available to analysts in the future.").

174. Assuming, of course, the corpora used are properly constructed such that they enable us to make generalizations about a larger population. *See generally* Douglas Biber, *Representativeness in Corpus Design*, 8 LITERARY & LINGUISTIC COMPUTING 243 (1993) (addressing a number of issues related to achieving "representativeness" in linguistic corpus design).

175. One problem in finding ordinary meaning is the problem of modulation, the idea that "a conventional semantic meaning can be adjusted or modulated to fit the context—essentially, a new meaning is created (sometimes on the spot) so that an old word is used in a new way." Solum, *supra* note 125, at 290. It is possible that corpus data establishing the prevailing use of a given word in a given period could also be used to triangulate instances of modulation. It is similarly possible that historical corpus data could be used to trace circumstances in which modulation resulted in new coinages with important legal implications. *See id.* (arguing that the "Constitution contains a variety of modulations"). We do not address these phenomena here, however.

176. *See id.* at 286 n.60 ("Lawyers sometimes use the words 'ambiguity' and 'vagueness' interchangeably to refer to a lack of clarity."); Lawrence M. Solan, *Pernicious Ambiguity in Contracts and Statutes*, 79 CHI.-KENT L. REV. 859, 860 (2004) ("When discussing indeterminacy in meaning, linguists and philosophers often distinguish between ambiguity and vagueness. . . . Legal writers, and judges in particular, use the word 'ambiguity' to refer to all kinds of indeterminacy, whatever their source. Because this Article focuses heavily on what judges say, I will generally use the word ambiguity in this looser, legal sense.").

177. Solum, *supra* note 125, at 286.

of the term *vehicle* in the *no vehicles* ordinance is perhaps an example of vagueness. We can also use corpus data to address questions of ambiguity, where a word or phrase has more than one potential meaning in a given context.[178] *Muscarello* seems to fit here; the choice between the competing senses of *carry* is largely a question of ambiguity.

Such data can also inform our assessment of linguistic prototype.[179] If the corpus data reveal that most *vehicles* that we speak of are automobiles, or that most instances of *carrying* a firearm involve bearing it on your person, we may infer that those senses are more likely to be prototypical senses of the operative terms.

Below we drill down further on the proposed means of measurement. First we present linguistic tools and means of measuring the components of ordinary meaning identified above. We then illustrate the utility of those tools by applying them to the cases and examples discussed throughout the Article. We conclude this Part with some observations about inferences that can be drawn from the data about the ordinary meaning of *vehicle*, *carry a firearm*, *interpreter*, and *harbor*.

### *A. Tools*

Corpus linguistic tools can be employed to measure ordinary meaning as conceptualized in this Article. Here we explore the range of available corpora and the functionalities they encompass.

#### 1. *Varieties of Linguistic Corpora*

Linguistic corpora come in a number of varieties, each tailored to suit the needs of a particular set of empirical questions about language use. Corpora may be *general* or *special*. A *general* corpus endeavors to represent the language used by a broad (often national) speech community. *Special* corpora are limited to a

**178.** *See id.* (defining ambiguity as "cases in which a word or phrase has more than one sense.").

**179.** Intuitively, we might assume that frequency and prototype would map onto one another with some precision, but this is not always the case. *See* John R. Taylor, *Prototype Theory*, *in* 1 SEMANTICS: AN INTERNATIONAL HANDBOOK OF LANGUAGE MEANING, 643, 649-50 (Claudia Maienborn et al. eds., 2011) ("In response to the question 'where does prototypicality come from?', many people are inclined to say that prototypes (or prototypical instances) are encountered more frequently than more marginal examples and that that is what makes them prototypical. Although frequency of occurrence certainly may be a factor (our prototypical vehicles are now somewhat different from those of 100 years ago, in consequence of changing methods of transportation) it cannot be the whole story." (citation omitted)).

particular genre, register, or dialect.[180] There are *monitor* corpora that are continuously updated with new texts in order to track contemporary language use, and there are *historical* or *sample* corpora that reflect the language use of a particular period. We will rely on both monitor and historical corpora in the analysis below.

Corpora may also be *raw*, *tagged*, or *parsed*. A *raw* corpus contains almost no linguistic metadata (e.g., a .txt file containing the complete works of Shakespeare would be a raw corpus). *Tagged* corpora typically contain metadata from a grammatical "tagging" program that automatically marks each word with a part of speech. A tagged corpus can dramatically improve corpus analysis by allowing a researcher to look for all different forms of a single word in a single search (e.g., a search for the verb *carry* would automatically include every verb inflection, including *carries, carrying,* and *carried*) and to limit results to a particular part of speech (e.g., the verb *harbor*, not the noun *harbor*). This type of search is called a *lemmatized* search—a search for the base form of a word that reveals its permutations. *Parsed* corpora contain phrase-, clause-, or sentence-level annotation, revealing the syntactic relationships among the words in the corpus. While automated tagging is highly accurate, automated parsing is not. Thus, parsed corpora tend to require a significant amount of human editing and annotation, which increases the costs of their production dramatically. For that reason, parsed corpora tend to be smaller than tagged corpora. The corpora we rely on in the analysis below are tagged, but not parsed.[181]

### 2. *Corpus Tools—Frequency, Collocation, and Key Word in Context*

Linguistic corpora can perform a variety of tasks that cannot be performed by human linguistic intuition alone. For example, as noted above, corpora can be used to measure the statistical *frequency* of words and word senses in a given speech community and over a given time period.[182] Whether we regard the ordinary meaning of a given word to be the *possible*, *common*, or the *most common*

---

**180.** For example, the Linguistic Data Consortium at the University of Pennsylvania produced a corpus of recorded Egyptian Arabic telephone calls. *See* Alexandra Canavan et al., *CALLHOME Egyptian Arabic Speech*, LINGUISTIC DATA CONSORTIUM (1997), http://catalog.ldc.upenn.edu/LDC97S45 [http://perma.cc/P6NQ-MUT5].

**181.** The corpora relied on in this paper were tagged by the Constituent Likelihood Automatic Word-tagging System (CLAWS-7) program. Mark Davies, *The 385+ Million Word* Corpus of Contemporary American English *(1990-2008+): Design, Architecture, and Linguistic Insights*, 14 INT'L J. CORPUS LINGUISTICS 159, 164 (2009).

**182.** TONY MCENERY & ANDREW WILSON, CORPUS LINGUISTICS: AN INTRODUCTION 82 (2d ed. 2001).

sense of that word in a given context, linguistic corpora allows us to determine empirically where a contested sense of a term falls on that continuum.

Corpora can also show *collocation*, "which is the tendency of words to be biased in the way they co-occur."[183] As we have seen, words are often interpreted according to the semantic environment in which they are found. A collocation program can show the possible range of linguistic contexts in which a word typically appears and can provide useful information about the range of possible meanings and sense divisions.[184]

Corpora also have a *concordance* or *key word in context* ("KWIC") function, which allows their users to review a particular word or phrase in hundreds of contexts, all on the same page of running text. This allows a corpus user to evaluate words in context systematically.

Commonly accepted canons of interpretation like *ejusdem generis* and *noscitur a sociis* already counsel legal interpreters to look for meaning in the surrounding linguistic context of an utterance—to know a word by the company it keeps.[185] The data made available through a linguistic corpus allows one to make such inquiries systematically, and to gain meaningful and quantifiable insight about the range of possible uses of a word and the frequency of its different senses.[186]

### 3. *Representing Speech Community and Register in a Corpus*

Linguistic corpora can be built from the ground up using text or speech from any given speech community or register. As Professor Larry Solan has noted:

> When the legal system decides to rely on the ordinary meaning of a word, it must also determine which interpretive community's understanding it wishes to adopt. This choice is made tacitly in legal analysis, but becomes overt when the analysis involves linguistic corpora because the software displays the issue on a screen in front of the researcher.[187]

---

**183.** SUSAN HUNSTON, CORPORA IN APPLIED LINGUISTICS 68 (2002); *see also* John R. Firth, *A Synopsis of Linguistic Theory, 1930-1955*, *in* STUDIES IN LINGUISTIC ANALYSIS 1, 14 (1957) ("Collocations are actual words in habitual company.").

**184.** HUNSTON, *supra* note 183, at 69.

**185.** ESKRIDGE, *supra* note 5, at 76-78 (discussing the *ejusdem generis* and *noscitur a sociis* canons).

**186.** Early discussions of collocation analysis used language very similar to the *noscitur a sociis* canon. *See, e.g.*, Firth, *supra* note 183, at 11 ("You shall know a word by the company it keeps!").

**187.** Solan, *The New Textualists' New Text*, *supra* note 50, at 2059 (footnotes omitted).

In this Article we rely on a pair of corpora of standard written American English (one contemporary and one historical). But a corpus can be constructed to represent the language use of a wide variety of speech communities or registers.[188]

One possibility worth highlighting is that of a distinct *legal* corpus. Some of the language of the law, of course, is written in a distinct legal dialect.[189] Where a given term is thought to be a legal term of art, a legal corpus could be built to analyze its meaning in the legal vernacular. Such a corpus could be employed to compare the ordinary sense of a given term and its legal term-of-art usage.

#### 4. *Representing Historical Language Use*

Finally, a linguistic corpus can be built from texts representing the language use from any period in history. To the extent our understanding of ordinary meaning should be informed by the linguistic norms and conventions prevailing at the time that a given legal text was drafted, corpus linguistics can provide powerful evidence of historic language use.

#### 5. *The BYU Corpora*

Below we will tackle the interpretive problems posed by the *Muscarello*, *Taniguchi*, and *Costello* cases using data from two linguistic corpora: the News on the Web ("NOW") Corpus and the Corpus of Historical American English ("COHA"), both developed at Brigham Young University and referred to here as the BYU Corpora. Here we outline the parameters of each corpus and highlight their differences.

##### a. *NOW Corpus*

The NOW Corpus is a database of "5.2 billion words of data from web-based newspapers and magazines from 2010 to the present time."[190] It is a monitor corpus that "grows by about 5-6 million words of data each day (from about 10,000

---

**188.** While corpora vary in size and sophistication, anyone can build a corpus using freely available software like AntCorGen. *See AntCorGen*, LAURENCE ANTHONY'S WEBSITE, http://www.laurenceanthony.net/software/antcorgen [http://perma.cc/NJV9-5JVP].

**189.** *See generally* McGinnis & Rappaport, *supra* note 4, at 4 (asserting that the Constitution is written in the "language of the law," not ordinary English).

**190.** *NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now [http://perma.cc/UTD2-BC86].

new articles), or about 150 million words each month."[191] The NOW Corpus downloads content every night from dozens of websites listed on Google News, using an automated software program.[192] These texts are then automatically tagged and lemmatized (adding part-of-speech metadata to each word) and integrated into the existing corpus.[193] Because of this extraordinary rate of growth, the NOW Corpus is currently the largest tagged corpus of English in the world.

"[T]here is no data like more data,"[194] and the chief virtues of the NOW Corpus are its size and immediacy. With the NOW Corpus, the user is able to examine what is happening in the language at the moment. And because of the size and scope of the corpus, lower frequency linguistic phenomena (words, word senses, syntactic structures, etc.) are more likely to be attested, while the distribution of higher frequency phenomena will be better and more completely represented.

The NOW Corpus has a few limitations. First, even with searches limited to U.S. sources, the NOW Corpus records the language use of a single, large speech community (the United States) in a single linguistic register (newsprint). But if the interpretation of a federal statute requires us to consider the linguistic norms and conventions of the citizens subject to that statute, then U.S. newsprint may be the appropriate speech community and register. Spoken dialects of American English show sharp (and increasing) differences in vocabulary, grammar, and phonology,[195] but the norms and conventions of the written variety of American English (sometimes called standard written American English) tend to be more uniform. Since we are interpreting a written text, evaluating that text through the lens of standard written American English (from newsprint) may be the right approach.

The NOW Corpus is also limited with respect to timeframe. NOW tracks the linguistic norms and conventions over the past decade. So if we want to evaluate interpretive problems against the backdrop of linguistic norms prevailing at the enactment of the Constitution, we will need to turn elsewhere.

---

**191.** *Id.*

**192.** *Id.*

**193.** *Id.*

**194.** Kenneth Church, *Has Computational Linguistics Become More Applied?*, *in* COMPUTATIONAL LINGUISTICS AND INTELLIGENT TEXT PROCESSING 1, 3 (Alexander Gelbukh ed., 2009) (internal quotation marks omitted) (attributing the statement to Robert Mercer).

**195.** *See* WILLIAM LABOV, DIALECT DIVERSITY IN AMERICA: THE POLITICS OF LANGUAGE CHANGE 1–2 (2012).

### *b. Corpus of Historical American English ("COHA")*

The COHA is "the largest structured corpus of historical English."[196] It contains "more than 400 million words of text from the 1810s-2000s (which makes it 50-100 times as large as other comparable historical corpora of English) and the corpus is balanced by genre decade by decade."[197] Using data from the COHA, we can gather linguistic information from the decade that a statute was enacted, going back approximately 200 years.

Like the NOW Corpus, the COHA is limited in terms of speech community and register. Though it has texts from a wider variety of registers than the NOW Corpus (including fiction, magazines, and non-fiction), these tend to fall within the ambit of standard written American English. In addition, the 400 million words of the COHA are spread out over 200 years. Consequently, the COHA is essentially a collection of twenty separate corpora (one for each decade from 1810 to 2010) averaging just over twenty million words).[198]

There is a lot of linguistic information to be gleaned from a twenty-million-word corpus. But as we have seen, in the specialized setting of statutory interpretation it is important to evaluate words in context. These contexts may be poorly represented (or not represented at all) in the corpus with limited data for a given period. The earliest texts in the COHA date from the period of 1810 to 1820. These texts come in twenty to thirty years shy of the Founding Era, leaving us without a data source for the prevailing linguistic norms during the drafting and ratification of the Constitution.[199]

---

**196.** *Corpus of Historical American English*, BYU, http://corpus.byu.edu/coha [http://perma.cc/N44U-NQ8T].

**197.** *Id.*

**198.** For a breakdown of the total number of words in the COHA for each decade, go to http://corpus.byu.edu/coha and click on "400 million words." Note that any searches performed will normalize frequency measurements in words-per-million, so that measurements of statistical frequency over multiple decades will not be adversely affected by differences in the number of words in the corpus for each decade.

**199.** There are good reasons for this omission. Prior to the 1806 publication of Noah Webster's influential text, *A Compendious Dictionary of the English Language*, American spelling was very much in disarray, with many common words having as many as a half dozen potential spellings. This makes the construction of a corpus interface and the automated tagging of corpus data very difficult (and expensive). Moreover, because of widely varied orthographic practices, many historical texts are difficult, if not impossible, to subject to optimal character recognition ("OCR"). BYU Law School is seeking to fill this gap. It is currently working on a Corpus of the Founding Era American English ("COFEA"). *See Law & Corpus Linguistics Conference*, BYU LAW: LAW & CORPUS LINGUISTICS, http://lawcorpus.byu.edu [http://perma.cc/S256-N8FQ].

With all of that said, the COHA remains the largest corpus of historical American English and it contains significant linguistic information relevant to the statutes at issue in *Muscarello*, *Taniguchi*, and *Costello*.

### *B. Applications*

#### *1. Vehicles in the Park*

The "no vehicles" problem seems a mandatory subject for any serious treatment of statutory interpretation. It was introduced initially by Professor H.L.A. Hart[200] in his famous debate with Professor Lon Fuller,[201] but seemingly everyone has treated the problem since then.[202] There is also no shortage of extensions of the hypothetical. Hart says that "[p]lainly" the rule "forbids an automobile," but asks "about bicycles, roller skates, toy automobiles" and airplanes.[203] The airplane example invokes an actual case—*McBoyle v. United States*,[204] in which the U.S. Supreme Court held that an airplane was not a vehicle under the National Motor Vehicle Theft Act, which prohibited transporting stolen "vehicles" across state or national borders.[205]

The scholars cited throughout this Article have offered their own views on the scope of "vehicle." Justice Scalia and Garner's *Reading Law* says that the Hart prohibition should extend to any "*sizable* wheeled conveyance," and thus to automobiles—including "ambulances, golf carts, mopeds, motorcycles, and (perhaps) Segways"—but not "remote-controlled model cars, baby carriages, tricycles, or perhaps even bicycles."[206] Professor Fallon objects to the extension to ambulances. He says the "reasonable meaning" of vehicle should not be understood to extend to ambulances—at least those responding to emergencies.[207] Professor William Eskridge disagrees with Justice Scalia and Garner's suggestion as to bicycles; he says that "bicycles are commonly considered vehicles," a conclusion he claims to confirm using corpus data.[208]

---

**200.** Hart, *supra* note 41, at 607.

**201.** Lon L. Fuller, *Positivism and Fidelity to Law—A Reply to Professor Hart*, 71 HARV. L. REV. 630, 662-69 (1958).

**202.** *See, e.g.*, ESKRIDGE, *supra* note 5, at 45-46; SCALIA & GARNER, *supra* note 28, at 36-39; Fallon, *supra* note 2, at 1260-62.

**203.** Hart, *supra* note 41, at 607-08.

**204.** 283 U.S. 25, 26-27 (1931).

**205.** 18 U.S.C. § 2312 (2012).

**206.** SCALIA & GARNER, *supra* note 28, at 37-38.

**207.** *See* Fallon, *supra* note 2, at 1260-61.

**208.** ESKRIDGE, *supra* note 5, at 45-46.

Yet there has been very little attempt to assess the ordinary meaning of *vehicle* with any data. We present some relevant data below, concerning the frequency or prototypicality of various senses of this term.

*a. Lexical Collocation of Vehicle Through Time*

One way to examine the most common context in which a word appears is collocation. The collocation function of the corpus can show us the words that are statistically most likely to appear in the same context as *vehicle* for a given period. We can use collocation to get a snapshot of the semantic environment in which *vehicle* appears and the kinds of vehicles that tend to appear in that environment.

We can view the most common contemporary collocates[209] of *vehicle* in the NOW Corpus.[210] In NOW, the fifty most common collocates of *vehicle* are as follows:

*electric, motor, plug-in, unmanned, armored, connected, cars, aerial, charging, pure, launch, owners, hybrid, traffic, fuel, driving, gas, autonomous, struck, operating, road, safety, accidents, battery, ownership, emergency, batteries, emissions, seat, advanced, driver, primary, demand, gmv, commandeered, fuel-efficient, uavs, automakers, demonstrators, excluding, lunar, passenger, fleet, gasoline, luxury, drove, parking, retirement, vehicles, infrastructure*[211]

Many of the collocates of *vehicle* in the NOW Corpus strongly indicate *automobile* as a likely candidate for the most common use of the term. The NOW Corpus lists a number of automotive collocates like *motor*, *car*, *traffic*, *fuel*, *driving*,

209. The NOW Corpus and other BYU corpora are available without a subscription. To access NOW, go to http://corpus.byu.edu/now. To generate a list of collocates in NOW, take the following steps: (1) Select "Collocates" on the NOW Corpus homepage; (2) Enter "VEHICLE_n" in the "Word/phrase" field (capitalization makes the search lemmatized—assuring that we find all inflections of the word; the "_n" is to limit the search to noun forms); (3) Enter an asterisk "*" (a wildcard) in the "Collocates" field; (4) Select "Sections" and select "United States" in column "1" (ignoring column "2"); (5) Select "Sort/Limit" and set the "Minimum" to "MUT INFO"; and (6) Click "Find collocates."

210. The following link will reproduce the search above, except that the user would need to repeat step four, select "Sections," and select "United States," which doesn't repopulate automatically. *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=54596680 (last visited Mar. 8, 2017).

211. The search results are saved at the following link. *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=52902048 (last visited Dec. 21, 2016).

*gas*, *battery*, *batteries*,[212] *emissions*, *driver*, *fuel-efficient*, *automakers*, *gasoline*, *drove*, and *parking*. It also includes more recent automotive collocates of *vehicle* like *electric*, *plug-in*, *connected*, *charging*, and *hybrid*. Some of the collocates by themselves have a range of possible uses (*owners*, *operating*, *safety*, *accidents*, *ownership*, *emergency*, *seat*, *primary*, *infrastructure*), but when examined in context almost always indicate an automotive meaning.[213] *Airplane* does not appear, though two particular types of aircraft are attested in the collocates—unmanned aerial vehicles (drones) and spacecraft.[214] Similarly, *bicycle* does not appear among the collocates of *vehicle* in contemporary usage.

We can also examine the collocates of *vehicle* during the 1950s, the decade of the Hart/Fuller debate, in the COHA. These collocates are listed below:

> *motor, space, trucks, moving, wheeled, tax, self-propelled, passenger, unit, tracked, orbit, test, b.g., launching, highways, tanks, license, robot, emergency, units, taxes, streets, equipment, manned, armored, vehicles, fees, vehicle, traveling, operate, loaded, fuel, commercial, driver, ride, traffic, designed, weight, speed, cars, carrying, operation, unsafe, horse-drawn, high-powered, amphibious, administrators, tactical, registration, delivery*[215]

We can see from this data that the meaning of *vehicle* has evolved significantly from the 1950s, though the automotive use of *vehicle* predominated then as well. The decade is remarkable as the first in which the spacecraft sense of *vehicle* appears, but also the last in which the *horse-drawn* collocate of *vehicles* appears.[216] *Unmanned* does not appear, but *manned* vehicle does (*spacecraft* in this case). Still, the overwhelmingly most common use of *vehicle* is the *automotive* sense, while a number of context-specific possible senses are attested. Again, none of the top fifty collocates of *vehicle* include the notions of *airplane* or *bicycles*.

---

212. Collocates are not lemmatized in the BYU corpora, so the singular and plural form of a given collocate are counted separately. In this case, that means that *battery* and *batteries* both make the list separately.

213. To the extent that there is any doubt that any of these collocates suggest the automotive meaning of *vehicle*, clicking on any of the listed collocates in the NOW Corpus interface will display the context in which it appears and confirm the automotive meaning is intended. For example, it is possible to speak of *bicycle traffic* or *airplane emissions*, but in the context of the word *vehicle*, the words *traffic* and *emissions* are used in the automotive sense.

214. *NOW Corpus (News on the Web)*, *supra* note 211.

215. *See The Corpus of Historical American English*, BYU, http://corpus.byu.edu/coha/?c=coha&q=52600298 (last visited Dec. 21, 2016).

216. An additional *vehicle* is added to our collection with *amphibious vehicle*, and *tanks* makes an appearance again. Two collocates (the abbreviation *b.g.* for background, and *robot*) are the result of including science fiction screenplays in the corpus. In both cases the vehicles in question are spacecraft.

We can also use the COHA to examine the collocates of *vehicle* from the period relevant to the *McBoyle* case. Because the statute at issue in *McBoyle* was enacted in 1919,[217] and because the COHA only allows us to search in ten-year increments, it may make sense to include data from 1910 through 1930.

Whether or not the use of the word *vehicle* "evoke[s] in the common mind only the picture of vehicles moving on land," as Justice Holmes suggests, may not be a question that can be addressed with a corpus.[218] But the collocate data from this period (consistent with the collocate data above) allow us to draw a similar inference that the automotive use is the most common use of *vehicle*, and that the *airplane* sense remains unattested:

> *motor, horse-drawn, wheeled, horses, pedestrians, kinds, expression, driver, passing, moving, various, horse, automobiles, tax, heavy, drawn, carry, roadless, rickety, trucks, communication, approaching, traffic, electric, mental, physical, 3,500,000, astral, belonging, steam, transportation, commissioner, rear, total, carrying, propulsion, propelled, oncoming, carriages, registration, ego, conceivable, tires, drivers, vehicle, carriers, 45, loaded, halted, manufacturers*[219]

The collocates from this period add a few interesting *vehicles* to our growing list, including *astral vehicle* (a reference to the theosophical notion of an "intermediate between the intelligent soul and the mental body, composed of a subtle material").[220] It should also be noted that only a few of the collocates in this period occur more than once, and only four—*motor*, *horse-drawn*, *wheeled*, and *horses*—occur ten times or more, with *motor* occurring twice the number of times as the other three combined.[221]

From the collocates of *vehicle* displayed by the NOW Corpus and the COHA, we can make the following preliminary observations (observations that we can later confirm by reviewing KWIC data). First, the collocates of *vehicle* strongly suggest that the most common use of *vehicle* is with reference to automobiles. Second, the absence of *airplane* and *bicycle* in the top fifty collocates of *vehicle*

---

**217.** *See* McBoyle v. United States, 283 U.S. 25, 25-26 (1931) (citing the National Motor Vehicle Theft Act, 18 U.S.C. § 408 (1928)).

**218.** *Id.* at 27.

**219.** *See The Corpus of Historical American English*, BYU, http://corpus.byu.edu/coha/?c=coha&q=53847214 (last visited Feb. 8, 2017).

**220.** *See Astral Body*, WIKIPEDIA, http://en.wikipedia.org/wiki/astral_body [http://perma.cc/R98L-A57F]. This notion also explains the presence of *ego* and *mental* in the collocates of *vehicle*.

**221.** *See supra* note 219.

raises an important question for our frequency continuum.[222] If we accept that the necessary and sufficient conditions of *vehicle* are "[a]ny means of carriage, conveyance, or transport"[223] or "a means of carrying or transporting something,"[224] then there seems little question that both an *airplane* and a *bicycle* are *possible* readings of *vehicle*. But if *vehicle* is never used to refer to *bicycle* or *airplane* in the corpus data, then we may end up with an even further extension of our frequency continuum from *possible but rare* to *possible but unattested.* Before jumping to the conclusion that the *airplane* and *bicycle* uses of *vehicle* are entirely unattested in the corpora or the language at large, however, we should evaluate the use of *vehicle* in the concordance data.

*b. Vehicle as a KWIC*

We can extract concordance data from the NOW Corpus.[225] A NOW search for concordance lines of *vehicle* will yield an output along these lines:

222. It is worth noting that while the words *airplane* and *plane* do not appear among the collocates of *vehicle* during any of the timeframes examined above, there are, at least, a number of aircraft terms that do appear, including reference to two specific types of aircraft: *spacecraft* and *unmanned aerial drones*. It is not clear why the more general terms *airplane* and *plane* do not appear in the collocate data for *vehicle*, while terms like *spacecraft* and *unmanned aerial drone* do appear.

223. 19 OXFORD ENGLISH DICTIONARY 480 (2d ed. 1989).

224. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2538 (1961).

225. The concordance line search in NOW is executed as follows: (1) Select "KWIC" on the NOW Corpus homepage; (2) Enter "VEHICLE_n" in the "Word/phrase" field; (3) Click on "Sections" and select "United States"; (4) Click "Keyword in Context (KWIC)." *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=54499369 (last visited Mar. 5, 2017). By selecting "Options" and "# KWIC," the corpus user can select the number of randomized concordance lines to be reviewed. While the search parameters can be saved in a link, the corpus randomizes the results, and, in the case of the NOW Corpus, the corpus updates with millions of new words on a nightly basis. Therefore, until the BYU corpora develop the ability to save the exact content of a particular randomized search, it is useful to copy the results of the search into a spreadsheet.

**TABLE 1.**
**KWIC OF *VEHICLE*[226]**

| | | |
|---|---|---|
| the driver, Bhaskar Jha, apparently lost control of the | vehicle | because he was traveling too fast for the wet road conditions. |
| of the troopers. Parrott says the suspects in the | vehicle | began showing aggression and shots rang out. Corporal Shane |
| injury and leaving a child under 12 unsupervised in a motor | vehicle | but released on a written promise to appear.) Risk |
| Hybrid electric vehicles use regenerative braking (when the | vehicle | captures energy that would be otherwise lost from braking) and |
| pushed onto the property because of the speed of which these | vehicles | collide," said Dr. Tom Lawrence, of Clinical Nutrition |
| , 2009. That day the two officers saw a | vehicle | connected to a domestic violence case in which shots had been |
| say automakers would be better. Wakefield says autonomous | vehicles | could erode the image of certain brands more than others. Brands |
| biogas, and Daimler, which supplies a number of experimental | vehicles | designed to run on natural gas. The German Federal Ministry of |
| is that they aren't kept on file with the Motor | Vehicle | Division or any other entity. By contrast, beneficiary |

The KWIC output in the NOW Corpus allows us to select anywhere from one hundred to one thousand randomized sample uses of *vehicle(s)* and display them in their semantic environment. To the extent that the snippet view above fails to provide sufficient evidence of usage, the corpus interface allows us to click through to an expanded passage from the article referenced in a given concordance line.

In order to examine the sense distribution of *vehicle*, we reviewed one hundred randomized concordance lines of *vehicle* in the NOW Corpus. Of those, ninety-one were *automobiles*. There was a single reference to a bus, and one reference to an ambulance, but in every other instance, a passenger car was referenced. Of the remaining *vehicles,* there was one cargo ship, one jet ski, and an ambiguous reference to a military ground vehicle of an unknown type. There were three metaphorical uses of *vehicle* (e.g., the role of the city as a vehicle for

226. Note that these concordance lines have been shortened to fit this page. Moreover, because the content of the corpus is constantly updated, and because the results of the search are typically randomized, a search performed on any given day will provide a different data set.

development). The results also contained a reference to the military's efforts to create a flying Humvee/helicopter hybrid.[227]

The NOW Corpus data included no *airplanes*, *bicycles*, *tricycles*, *skateboards*, *roller-skates*, *toy cars*, or any of what Hart and others have characterized as penumbral, disputed cases. To the extent that our notion of ordinary meaning has a frequency component, this data suggests that *automobile* is overwhelmingly the most common use of the word *vehicle* in the modern written American English represented in the NOW Corpus. The corpus data also suggest that there are numerous possible (if much less common) uses of *vehicle*, and that some seemingly *possible* meanings are unattested and may not be current.

A similar review of data from the COHA for the 1950s showed a wider range of *vehicles*. Still, approximately sixty-five percent of the usages of *vehicles* during this timeframe referred to *automobiles.* Another thirty percent referred to the space program or missile defense, while the remaining five percent referred to metaphorical uses of *vehicle* (e.g., a film as a starring vehicle for an actor). For the period spanning the 1910s and 1920s, *automobiles* made up approximately sixty percent of the instances of *vehicle.* References to carriages or horse-drawn *vehicles* were more common, and there were a significant number of cases where the choice between automobile and horse-drawn vehicle was not clear. (When a text from 1915 says that Fifth Avenue was crowded with vehicles, it is not clear from context whether automobiles, carriages, or both were intended.) Finally, there were a number of references to theosophy and the notion of an astral vehicle. The COHA data also included no references to *airplanes*, *bicycles*, *tricycles*, *skateboards*, *roller-skates*, or *toy cars* for either period.

#### c. *Searching for Vehicles in the Context of a Park*

Hart's interpretive puzzle is not simply about *vehicles* at large, but *vehicles in the park*. As we have discussed, with the corpus we can examine the question of ordinary meaning in the relevant semantic and syntactic context. We can search for *vehicles* that collocate with the term *park*.[228]

---

**227.** We are not making this up. *See Aerial Reconfigurable Embedded System*, WIKIPEDIA, http://en.wikipedia.org/wiki/Aerial_Reconfigurable_Embedded_System [http://perma.cc/9HVS-82R9].

**228.** (1) Select "Collocates" on the NOW Corpus homepage; (2) Enter "VEHICLE_n" in the "Word/phrase" field; (3) Enter "PARK_n" in the "Collocates" field; (4) Select "Sections" and select "United States"; (5) Select "Sort/Limit" and set the "Minimum" to "FREQUENCY" and "15"; (6) Click "Find collocates"; and (7) Click "PARK" or "PARKS." *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=63434268 (last visited Mar. 5, 2017).

A review of the concordance data from this search reveals at least one limitation of the corpus. We can search for specific parts of speech (e.g., nouns, verbs), but not specific senses. That means that our search for *vehicles in the park* must begin by eliminating the approximately forty percent of the concordance lines that refer to *vehicles* that are *in park* as opposed to *in reverse*, *neutral*, or *drive*. Approximately five percent of the concordance lines refer to recreational vehicles in recreational vehicle parks. Of the remaining instances of vehicle, more than fifty percent refer specifically to *automobiles*. *Bicycles* are not attested in this context, nor are *airplanes, skateboards,* or *roller skates*.

Our understanding of a prohibition on *vehicles in the park* may depend largely on the physical and spatial characteristics of the park itself. If a municipal park has no means of ingress or egress for automobiles, then we might assume that cutting across the grass in a car would be prohibited. It is not surprising then that where municipal parks are concerned, the *vehicle* most likely to show up in the context of *park* in the corpus data (i.e., automobiles) is often not *in the park*, as in (1) and (2) below:

> (1) *juvenile[s] were taken into custody Wednesday, accused of discharging a BB gun at passing vehicles near Sunset Park.*
> (2) *two males in another vehicle near a park on Toledo's west side when one of those males opened fire*

In the very rare circumstance in which there is any actual debate about vehicles in municipal parks, such debates tend to center around closing off existing roads through the park, as in (3) below:

> (3) *A revived plan to remove vehicle traffic from the center of San Diego's Balboa Park was moved forward Monday by the City Council, which agreed to spend $1 million to complete planning and documentation.*

Yet even in the specific *park* context, where the physical and spatial features of a park might seem to preclude the entrance of an automobile, it is the *automobile* usage of *vehicle* that predominates.

*d. Is Bicycle a Vehicle? Is Airplane a Vehicle?*

We can use the KWIC function of the corpus to perform targeted searches for concordance lines featuring two key terms raised in the Hart/Fuller debate—*bicycle* and *airplane*.[229]

Professor Eskridge has asserted that "[a] corpus search reveals that bicycles are commonly considered vehicles—a quantitative result in striking contrast to the understanding advanced by linguist Bryan Garner, who joined Justice Scalia in opining that the ordinary meaning of 'vehicles' excludes bicycles."[230] Professor Eskridge is certainly correct that there are numerous instances of the co-occurrence of *bicycle* with *vehicle*. Some of these instances establish that the *bicycle* sense of *vehicle* is, at the very least, attested, as in (1) and (2) below:

(1) *There are a lot of potholes. It is hard to ride bicycles and other vehicles.*
(2) *In New Jersey, bicycles are considered vehicles and must follow the same laws as motorists.*

Yet other instances show that *bicycle* is often used in contrast to the word *vehicle*, as in (3) and (4) below:

(3) *there were 68 collisions between bicycles, pedestrians and vehicles*
(4) *side mirrors to detect hazards (bicycles, humans, vehicles, pets, etc.)*

Based on the corpus data reviewed above, *bicycle* is certainly a possible sense of *vehicle*, but from the standpoint of statistical frequency, it is not a common meaning and certainly not the most common.

With respect to the use of *vehicle* to reference *airplane*, the answer is simpler. In both the contemporary NOW Corpus and the COHA (for the relevant periods of the 1910s, 1920s, and 1950s), we were unable to find a single collocation or concordance line that reflected the use of *vehicle* to mean *airplane*. *Vehicle* is neither most commonly used nor even commonly used when discussing airplanes, and based on its absence from any of our corpus data, we might ask if *airplane* is even a possible sense of *vehicle*. To the extent that *airplane* fits what some lexicographers have regarded as the necessary and sufficient conditions for

229. (1) Select "Collocates" on the NOW Corpus homepage; (2) Enter "VEHICLE_n" in the "Word/phrase" field; (3) Enter "BICYCLE_n" in the "Collocates" field; (4) Select "Sections" and select "United States"; (5) Select "Sort/Limit" and set the "Minimum" to "MUT INFO" and "3"; (6) Click "Find collocates"; and (7) Click "BICYCLES." *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=54497865 (last visited Mar. 5, 2017).

230. ESKRIDGE, *supra* note 5, at 45-46.

inclusion in the class of *vehicles* (i.e., anything that is a "means of carriage, conveyance, or transport"), all that can be said of *airplane* is that it may be a possible meaning of *vehicle*, but it is unattested in the corpus data.

Thus, corpus linguistics can advance the theory of ordinary meaning by, on the one hand, allowing judges and lawyers to more specifically define what they mean by *ordinary* and, on the other hand, providing objective data illustrating the way in which words are used in particular contexts.

### 2. Muscarello *and Carries a Firearm*

The *Muscarello* question—of the meaning of *carry*—is likewise susceptible to measurement. We can assess the relative frequency of the *personally bear* sense and the *transport* sense using corpus analysis.

#### a. *The Collocates of Carry*

We can view collocation data for *carry* in the NOW Corpus. The fifty most common collocates of *carry* in the NOW Corpus are listed as follows:

> *out, yards, concealed, weight, gun, attacks, weapons, guns, sentence, weapon, exchange, maximum, margin, passengers, heavy, penalty, bag, signs, opinions, firearm, express, burden, permit, thoughtful, load, bags, plane, firearms, virus, tradition, flag, capable, torch, handgun, cargo, openly, permits, duties, pipeline, mosquitoes, touchdowns, ships, executions, loads, trucks, felony, tasks, handguns, experiments, knife*[231]

These collocates suggest that a number of uses of *carry* do not fit neatly into the syntactic structure and the semantic relationships we have previously identified. There are instances in which an inanimate object serves as *carry*'s subject (*planes carrying passengers*, *trucks carrying loads*, *ships carrying cargo*). There are also a number metaphorical uses of *carry* (*felonies carrying certain penalties*, *people carrying opinions*). There are also references to *carrying out of attacks* and *executions*, and sporting references (*carrying the ball for so many yards* or *for so many touchdowns*).[232]

---

231. Follow the same steps set forth in note 209, substituting "CARRY_v" for "VEHICLE_n." *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=54015027 (last visited Feb. 15, 2017).

232. We can see similar results in the COHA using the same instructions in note 231, except that when we click on "Sections" we select "1960." The results of this search in the COHA can be viewed at the link below. *See Corpus of Historical American English*, BYU, http://corpus.byu

Yet "[a]t issue here is not 'carries' at large, but 'carries a firearm.'"[233] And a list of collocates simply tending to show that there are a variety of small, inanimate, concrete objects (including weapons) that can be carried on your person or in your car does not get us much closer to determining which of these senses of *carry* is the most frequent.[234] But as we will see, this search reveals common collocates of *carry* that have similar semantic features to *firearm* (i.e., *pistol*, *handgun*, *rifle*, *gun*) that will help us better evaluate the contexts in which *carry a firearm* occurs.

*b. Carry as a KWIC*

The KWIC data give us a clearer picture of the use of *carry*.[235] The NOW Corpus gives us a randomized sample of concordance lines featuring *carry*,[236] and we can review these concordance lines to determine both the range of possible meanings of *carry* and the comparative frequency of those meanings. We can also locate (and determine the comparative frequency) of instances of *carry* with the same syntactic and semantic features as § 924(c)(1).

Yet we might be able to eliminate a lot of irrelevant uses of *carry* by searching instead for *carry* within a few words of *firearm*.[237] A search for concordance lines containing these terms will require coding. Because every interpretative question is different, the process of coding concordance lines will vary with each task.

.edu/coha/?c=coha&q=54015512 (last visited Feb. 15, 2017). The COHA, when divided by decade, results in a functionally smaller corpus for that decade. As a consequence, it is more susceptible to being offset by unusual collocations.

233. Muscarello v. United States, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting).

234. As we will see, in the case of *carry*, the collocates do help us in identifying words with similar semantic features as *firearm*—*gun(s)*, *weapon(s)*, *handgun(s)*, *rifle(s)*, *pistol(s)*—and that would serve similar functional roles in a sentence. This will help us locate relevant concordance data, but does not answer the question of which sense of *carry* is most common.

235. One way to examine carry in context is simply to enter a search similar to that in note 225, but substituting "CARRY_v" for "VEHICLE_n."

236. As we have already seen, *carry* has a transitive argument structure and, in the relevant context of § 924(c)(1), *carry* has a human subject and a non-human, inanimate, weapon object. *See supra* Section II.A.2. If we are going to take context into consideration, we should be looking for uses of *carry* that reflect the same or similar syntactic structure and semantic relationship.

237. Such a search can be executed as follows: (1) Select "Collocates" on the NOW Corpus homepage; (2) Enter "CARRY_v" in the "Word/phrase" field; (3) Enter "FIREARM_n" in the "Collocates" field; (4) Click on "Sections" and select "United States"; (5) Select "Sort/Limit" and set the "Minimum" to "FREQUENCY" and "3"; and (6) Click "Find collocates." *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=63434628 (last visited Feb. 15, 2017).

Here, after examining only a few concordance lines, a problem emerges: a significant majority of the instances of *carry* in the context of *firearm* in the NOW Corpus refer back to the statutory prohibition in § 924(c)(1) or similar statutes. In order to ensure that we have sufficient data from outside of a legal context, we also examined instances of *carry* in the context of a number of common synonyms of *firearm* listed among the most common collocates of *carry*—*gun(s)*, *pistol(s)*, *handgun(s)*, and *rifle(s)*. These synonyms share the same semantic features with *firearm*, but less commonly appear in statutory prohibitions against carrying a firearm.

Our search parameters eliminate a number of irrelevant uses of *carry*.[238] All that is left is to review the concordance lines and determine in how many instances *carry a firearm* refers to *carry on one's person* or *carrying in a car*. Here, the physical and spatial context can be helpful, as with the physical locations in (1), (2), and (3) below:

(1) *Dressed in body armor and carrying two handguns, [the suspect] tried to flee out a back door* . . . .
(2) *adults with the proper permits no longer need to hide the handguns they carry in their shoulder or belt holsters* . . . .
(3) *the crowd was sedate and well-behaved with those carrying guns checking their ammunition at the door.*

A number of concordance lines were unclear, and a number of them, as noted, refer to statutory provisions similar to § 924(c)(1).

All told, we reviewed 271 concordance lines from the NOW Corpus in which *carry* co-occurred with *firearm(s)*, *gun(s)*, *pistol(s)*, *handgun(s)*, and *rifle(s)*. Of these instances of *carry*, we found that 104 instances indicated a sense of *carry a firearm on one's person*, while only five instances suggested a *carry a firearm in a car* sense. The remaining senses either were unclear (i.e., the appropriate sense could not be determined by context) or were senses of *carry* unrelated to the question at hand. As would be expected, much less data was available for *carry* in the COHA. We found twenty-eight concordance lines from the COHA, in which *carry* co-occurred with *firearm(s)*, *gun(s)*, *pistol(s)*, *handgun(s)*, and *rifle(s)*. Of these instances of *carry*, we found that eighteen were instances of *carry on one's person*, and two were instances of *carry in a car*. The remaining instances were either unclear or reflected a different sense of *carry.*

238. For example, the metaphorical sense (*carry a tune*), senses where the subject or agent is an inanimate object (*the ship carries cargo*), and the sporting sense (*carried the football nine yards*) were all eliminated.

To the extent that we view the question of ordinary meaning as involving statistical frequency, the analysis above tells us that carry on one's person is overwhelmingly the most common use, while carry in a car is a possible but far less common use.

### 3. Taniguchi *and the Meaning of Interpreter*

We can also measure the relative frequency of the *written translator* and *oral translator* senses of *interpreter*. We can do so using collocation and concordance analysis.

#### *a. The Collocates of Interpreter*

The fifty most common collocates of *interpreter* in the NOW Corpus are as follows:

> *an, through, language, sign, spanish, via, speaking, afghan, translators, iraqi, certified, served, english, qualified, translator, army, basic, deaf, spoke, moderator, sign-language, asl, costumed, interpreter, translate, full-time, dream, trained, soldiers, yun, interpreters, arabic, translated, translation, freelance, certification, courts, maladies, requests, spanish-language, communicate, cespedes, languages, troops, carlotto, simultaneous, somali, listened, proceedings, employed*[239]

A number of the collocates tend to support the *Taniguchi* majority's position that *interpreter* most commonly refers to an *interpreter of spoken language*. These include *speaking*, *spoke*, and *listen*. A number of the collocates refer to battlefield *interpreters* (such as *Afghan* or *Iraqi*),[240] where context would suggest their role is primarily as spoken interpreters. The collocates *an* and *through* both come from the very common phrase that a public figure is *speaking through an interpreter*. These collocates stand in contrast to the collocates of *translator* in the NOW Corpus, which make a number of references to the writing and publishing contexts, including *bible*, *writer*, *poet*, *editor*, *literary*, *publisher*, *journalist*, *Borders*,

---

**239.** *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=54018483.

**240.** We do not need to assume that the Afghan or Iraqi interpreters listed in the collocate display are battlefield interpreters. By clicking on each individual collocate in the display, we can view concordance lines – lines of running text showing the word in context. This expanded context feature shows a battlefield context for these interpreters in numerous instances.

and even *Wycliffe*.[241] The collocates from the 1970s, when the Court Interpreters Act was passed, suggest a similar conclusion.[242]

*b. Interpreter as a KWIC*

With respect to Key Words in Context, we reviewed 188 concordance lines from the NOW Corpus in which *interpreter* occurred.[243] In a number of instances, *interpreter* referenced an artistic expression or the interpretation of works of art (*a noted interpreter of modern music*). Another common sense refers to the interpretation of documents written in a primary language (*interpreters of the Constitution*). There were numerous instances in both corpora of cases of the spoken language conversion from a primary language to a second language notion of *interpreter*, as in (1) and (2) below:

(1) *civil rights violations for not providing professional interpreters for patients who do not feel comfortable speaking English*
(2) *Motto was speaking in French, through a volunteer interpreter*

In addition, there were numerous transcripts of spoken interviews from news sites with the annotation "through interpreter," referencing a spoken interview facilitated by an interpreter. There was one instance of an interpreter translating a foreign language document into spoken English, included below:

(3) *In 1992, during a top-level meeting in Moscow, Russia finally released the cockpit voice recorder transcript. It was 10 p.m. in a dimly lit meeting room of the Presidential Hotel when an interpreter for the U.S. ambassador translated the Russian transcript into English for Ephraimson-Abt and other delegates.*

---

241. *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=54609539 (last visited Mar. 9, 2017).

242. *Interpreter* has very few frequent collocates during the 1970s. The two most common collocates of *interpreter* from this period are *an* and *through*, function words that mutual information scoring typically eliminates if other options are available. A review of the concordance lines associated with these collocates reveals their origin in the extremely common phrase *speaking through an interpreter*, or related phrases. *See Corpus of Historical American English*, BYU, http://corpus.byu.edu/coha/?c=coha&q=54495283 (last visited Mar. 5, 2017).

243. The statute at issue in *Taniguchi* states: "A judge or clerk of any court of the United States may tax as costs the following: . . . (6) Compensation of interpreters . . . ." 28 U.S.C. § 1920 (2012). The noun phrase *compensation of interpreters* is part of a standalone enumeration that has an attenuated relationship to the argument structure of the verb *to tax*. What we can say about the relevant context for *interpreter* is that we are looking for individuals who are capable of decoding a foreign language into a native one. The operative variable is whether the language at issue is spoken or written.

Absent from all of these concordance lines was a single instance of anyone referred to as an *interpreter* performing a text-to-text translation from a foreign language into a primary language like English. To the extent that our notion of ordinary meaning has a frequency component, we can say from this data that the *text-to-text translation* sense of interpreter is neither the most common nor even a common use of *interpreter*. We might question whether it is even a possible sense of *interpreter* as the *text-to-text translator* sense of *interpreter* is entirely unattested in our data.

#### *4.* Costello *and Harboring an Alien*

The interpretive issue in *Costello* bears some similarity to the question at issue in *Muscarello*. In both cases the question turns on the meaning of a transitive verb and its relation to its object, though in the case of *harbor* our object has the semantic features of *human*, *animate*, etc. We would therefore look to the corpus data to tell us which senses of *harbor* are the most frequent, common, or possible senses of *harbor*, and to help us make informed decisions about sense division. We will look at the use of *harbor* in contemporary English, using the NOW Corpus, and in the decade 1910-1919, the period during which the relevant statute was enacted.[244]

##### *a. Collocation of Harbor*

With respect to the collocation data, it is immediately apparent from a review of the collocates of *harbor* that the overwhelmingly most common use of the term *harbor* refers to *harboring feelings*:

> *bacteria, feelings, resentment, doubts, terrorists, species, secret, mariners, views, ambitions, immigrants, fugitive, planets, illusions, hatred, dreams, cells, mutations, ocean, hopes, animosity, virus, secrets, anger, grudge, suspicions, fantasies, planet, fears, sentiments, desire, pathogens, galaxy, viruses, suspicion,*

244. *See NOW Corpus (News on the Web)*, BYU, http://corpus.byu.edu/now/?c=now&q=54496834 (last visited Mar. 5, 2017). This search examines only the nominal (noun) collocates of *harbor*. *Harbor* is a low frequency verb and as such instances of *harbor* are rare in the COHA for the period of 1910-1919. Even expanding the search through the 1920s reveals only a sparse number of collocates. While some of these are relevant to our present inquiry (such as *alien* and *refugee*), no other relevant collocate appears more than once in the COHA. *See Corpus of Historical American English*, BYU, http://corpus.byu.edu/coha/?c=coha&q=54496926 (last visited Mar. 5, 2017).

*persons, thoughts, fugitives, germs, mutation, tumors, aliens, moon, bias, genes, gene, hole, diversity, grudges, resentments*[245]

This use of *harbor* does not match the semantic features in the relevant statute. We are looking for objects of *harbor* that are human, animate, concrete, etc. With that in mind, we tailored our searches to those nominal objects of *harbor* reflected in the collocates listed above that had these same semantic features—*fugitives*, *terrorists*, *criminals*, *aliens*, and *refugees*.

#### b. *Harbor as a KWIC*

In the NOW Corpus, we examined 140 concordance lines in which *harbor* occurred in the same environment as *fugitives*, *terrorists*, *criminals*, *aliens*, and *refugees*. Of these, twenty-three instances of *harbor* referred to *concealment* while thirty-two referred to *shelter*. In an additional eighty-three instances, the distinction could not be determined by context. There were also three instances of unrelated senses of *harbor*. In the COHA, there were only three clear-cut cases of the *shelter* sense. The remaining five instances of *harbor* could not be determined by context.

This data raises more questions than it answers. With respect to frequency, we would be hard-pressed to say that either the *shelter* meaning or the *conceal* meaning of *harbor* are the most common. We might say that both are common meanings, and they are both certainly possible and attested meanings. But where more than half of the instances of *harbor* are unclear as to whether they include *shelter* or *concealment* or both, it is hard to state from the standpoint of frequency what the ordinary meaning actually is.

### C. *Caveats and Conclusions*

Such are the data. But what to make of them? Do corpus data yield means of measuring ordinary meaning? We think the answer is a resounding yes—with a few caveats. Certainly, the answer is yes by comparison with existing means of measurement. If ordinary meaning is an empirical construct—and we think it is—then corpus analysis is superior to an intuitive guess (or, worse, crediting a dictionary or a word's etymology).

We also think that corpus data are well suited to give reliable answers to the question of ordinary meaning. To support this conclusion (as applied to the problems analyzed throughout the Article), here we provide a more careful synthesis of the theory of ordinary meaning discussed above. We then offer some

---

**245**. *See id.*

conclusions about what the corpus data tell us about the ordinary meaning of *vehicle*, *carry a firearm*, *interpreter*, and *harbor*.

### 1. *Caveats*

Corpus analysis may be applied to the range of issues bearing on ordinary meaning identified above – to semantic context, pragmatic context, the temporal aspects of meaning, and speech community and register. Through data from the COHA, the NOW Corpus, or other corpora, we can assess the relative frequency of competing senses of a statutory term or phrase. From frequency and collocation data we can draw inferences about the semantic meaning of the language of the law and even about intended or public meaning. Yet we see some possible limitations on the strength of the inferences to be drawn from this sort of data.

#### a. *Semantic Meaning*

One possible limitation stems from the vagaries of word sense division. Sense division is subjective.[246] Linguists, as noted above, have no agreed-upon formula for distinguishing senses of a word.[247] They concede that distinctions among senses may be "more of a descriptive device rather than a claim about psycholinguistic reality."[248] This seems particularly true as regards closely related or fine-grained sense distinctions. The space between some senses will be sufficient to justify a strong inference from clear corpus data. Consider the above-cited example of the use of the term *nail* in *Reading Law*: "*Nail* in a regulation

**246.** Nikola Dobrić, *Word Sense Disambiguation Using ID Tags – Identifying Meaning in Polysemous Words in English*, *in* PROCEEDINGS OF THE 29TH INTERNATIONAL CONFERENCE ON LEXIS AND GRAMMAR/LGC 97, 97 (Dusko Vitas & Cvetana Krstev eds., 2010) (explaining that polysemy – multiple word meaning – is "[o]ne of the persisting issues in modern lexicography").

**247.** No one is quite sure where to draw the line – research "show[s] that different polysemy criteria (i.e., criteria that may be invoked to establish that a particular interpretation of a lexical item constitutes a separate sense rather than just being a case of vagueness or generality) may be mutually contradictory, or may each yield different results in different contexts." DIRK GEERAERTS, THEORIES OF LEXICAL SEMANTICS 196 (2009). And there is no agreed-upon taxonomy of polysemy. While some linguists speak of senses and subsenses, *see, e.g.*, Glynn, *supra* note 136, at 17, others speak of more or less prototypical exemplars of senses, *see, e.g.*, Dagmar Divjak & Antti Arppe, *Extracting Prototypes from Exemplars: What Can Corpus Data Tell Us About Concept Representation?*, 24 COGNITIVE LINGUISTICS 221, 222-30 (2013).

**248.** Gries, *supra note* 136, at 482. The "problem of an apparent lack of decisive criteria for defining word senses and clearly discriminating between them has always been a burning issue of lexical semantics to the point that it fundamentally questions the possibility to provide a clear account of polysemy." Dobrić, *supra* note 135, at 78.

governing a beauty salon has a different meaning from *nail* in a municipal building code."[249] Surely we could confirm that using corpus data. We could show that the term *nail* as used in the context of a beauty salon is almost always with reference to a fingernail or toenail. We would likely feel confident concluding that such data supports the conclusion that the ordinary understanding of *nail* in this semantic setting is not a piece of metal used to attach pieces of wood.

But what about more closely related senses? The two competing notions of *carry* in *Muscarello* are closely related. Both get at the idea of *transport*; the difference concerns the mechanism—on one's person or in a vehicle. Accordingly, it seems hard to know whether this difference is reflected in the way that human beings perceive the different uses of *carry*. The *bear personally* sense seems to be the notion of *carry* that we speak of almost always, and for that reason it may also be the sense we think of most often. But if pressed, we might well concede that the *transport by vehicle* sense may be encompassed within the way in which we perceive the notion of carrying a firearm. It could be that most ordinary people first think of the *bear personally* sense but on reflection agree that the *transport* sense is included.

### b. *Pragmatic Meaning*

Even with a very large corpus, some pragmatic information may be elusive—because the relevant physical or social setting is rare, for example, or the pragmatic information needed is not of the type that would appear in a corpus of written texts.

Consider the two illustrations referenced above: Posner's "Keep off the grass" sign at a park and Fallon's extension of the "no vehicles" rule. Posner rightly says that the park sign would "not properly [be] interpreted to forbid the grounds crew to cut the grass."[250] And Fallon understandably asserts that the lawmaker adopting the "no vehicles in the park" rule would "reasonably" be understood to intend for the "gatekeeper" at the park to allow an ambulance to enter in the event of an emergency.[251]

We may be able to examine these questions from a corpus-based perspective. If we had a large enough database, that contained a sufficient number of park prohibitions (together with references to groundskeepers, ambulances, etc.), we might be able to draw conclusions about the pragmatic circumstances in which such prohibitions are most commonly invoked and how they are most commonly interpreted. To find any ordinary exceptions to the "Keep off the grass"

---

**249.** SCALIA & GARNER, *supra* note 28, at 20.

**250.** RICHARD A. POSNER, REFLECTIONS ON JUDGING 180 (2013).

**251.** Fallon, *supra* note 2, at 1260-61.

or the "no vehicles" rules we might look for park owners who have these rules in place. If park owners and municipalities routinely allow ambulances into their parks or routinely allow groundskeepers access, we can infer something about how these prohibitions are ordinarily used or understood. The point is that corpus analysis often contains at least some pragmatic data and is at least theoretically capable of providing information about the pragmatic context. But there is no guarantee that even a very large and targeted corpus would contain sufficient examples of circumstances with similar pragmatic content. And the question for corpus linguistics is how much of the relevant pragmatic context is reflected in the formal record found in the corpus.[252]

In many cases such meaning may be beyond the reach of most corpora that are currently available. As to *Muscarello*, for example, it might be impossible to find a corpus sufficient to identify the pragmatic components of the intended meaning of a sentencing enhancement for carrying a firearm in connection with a drug crime. If we are looking at the question of the intended meaning of Congress, the right corpus may be one that would reflect dialogue among the 535 members that voted on the sentencing enhancement in § 924(c)(1). If we had such a corpus, and if it recorded extensive discussion among them about the kind of gun carrying they were talking about when they enacted this statute, we might be able to get data of relevance to the intended meaning of this provision. Perhaps it would reveal only examples of personal *bearing* of firearms and never of *transporting* in a vehicle. If so, that might tell us that the intended meaning is limited to the former.

Even then, however, the *might* qualifier is necessary. The limitation here is whether a preponderance of examples of uses of one sense of *carry* may indicate only that this is the first sense to come to mind, and whether a broader sense that might occur to a lawmaker on reflection should count as ordinary. Moreover, data from a general, balanced corpus could tell us something about the way the human mind conceptualizes the notion of carrying a firearm. But that might not be the right question to ask. We might be missing an important element of pragmatic context if we ask only about *carrying a firearm* in the abstract. Another relevant element of such context may be the legal nature of the language of this law. The human mind may react differently to a criminal prohibition—a law imposing harsh consequences like a sentencing enhancement—than to a mere statement of description. Thus, we may form one understanding when listening to a

**252.** Not all corpora are collections of written texts. Recent work in corpus-based pragmatics includes "'multi-modal' corpora" with audio and visual components that allow researchers to study "feedback in the form of gesture, body posture and gaze as well as their integration with discourse." Christoph Rühlemann & Karin Aijmer, *Introduction: Corpus Pragmatics: Laying the Foundations*, *in* CORPUS PRAGMATICS: A HANDBOOK 1, 4-5 (Karin Aijmer & Christoph Rühlemann eds., 2015).

descriptive narrative of a person *carrying a firearm* in connection with a drug crime, and another when warned that the punishment for a drug crime could be significantly enhanced if we *carry a firearm* in that circumstance. That sort of context may be impossible to suss out with corpus analysis alone. We may have to turn to other empirical approaches to language meaning and perception.

How might a judge answer this question? Some such questions may be framed within the standard picture. Where the question is presented as one of the likely intended meanings of rules like the "Keep off the grass" sign or the prohibition on "vehicles," we think judges are in a good position to assess likely intended meaning (even absent hard data about actual usage). We say that because we think the relevant pragmatic context of these rules is likely to be apparent in the cited circumstances. It seems difficult to think of a legislative "compromise" that would call into question the inference of uniform legislative intent to allow groundskeepers on the grass or ambulances in the park.[253] If so, it seems safe to conclude that the intended communicative content of these rules would sustain exceptions for groundskeepers and ambulances.

That will not always be so, however. *Muscarello* may be a good example. If we lack confidence in the corpus data on *carry*, we may be left to make an inference about likely legislative intent. Here that seems hard. As the majority and dissenting opinions in that case demonstrate, it is easy to contemplate legislative intent running in either of two directions—to call for a sentencing enhancement (a) whenever a gun is available to the defendant in a drug deal, since a gun may

253. *See* MANNING & STEPHENSON, *supra* note 11, at 54 (stating that "laws will be messy, uneven, and ill-fitting with their apparent purposes not because Congress is short-sighted or imprecise, but rather because legislation entails compromise, and compromise is untidy by nature"); SCALIA & GARNER, *supra* note 28, at 39 ("Not only is legal drafting sometimes imperfect, but often the imperfection is the consequence of a compromise that it is not the function of the courts to upset—or to make impossible for the future by disregarding the words adopted."); Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 68 (1994) (noting that if a particular outcome under a statute seems "unprincipled," it may be the "way of compromise" in the legislative process and that "[l]aw is a vector rather than an arrow," "[e]specially when you see the hand of interest groups").

always be used in a harmful way if it is available,[254] or (b) only if the gun is being carried on the defendant's person, since that kind of availability is even riskier.[255]

*Muscarello* is thus an example of a case in which pragmatic judgments about legislative intention are likely to be difficult. If we cannot decide the case on the basis of usage, informed by semantic context, and if we lack reliable evidence from similar pragmatic contexts, then we may be left to resolve it on other grounds. Here we could simply turn to the law of interpretation—giving the law legal content that does not pretend to be based on communicative content (because we have not been able to find it).[256] We could do so, for example, on the basis of a substantive canon like the rule of lenity. Reliance on that canon may make sense doctrinally, as lenity appears appropriate given genuine ambiguity about statutory meaning. Such a move, moreover, would be more open and transparent than a false assertion about communicative content. For that reason, we would favor it, even though it might not obviously vindicate the principles motivating the law's baseline devotion to ordinary meaning.

254. Muscarello v. United States, 524 U.S. 125, 133 (1998) ("How persuasive is a punishment that is without effect until a drug dealer who has brought his gun to a sale (indeed has it available for use) actually takes it from the trunk (or unlocks the glove compartment) of his car? It is difficult to say that, considered as a class, those who prepare, say, to sell drugs by placing guns in their cars are less dangerous, or less deserving of punishment, than those who carry handguns on their person.").

255. *Id.* at 145 (Ginsburg, J., dissenting) ("It is reasonable to comprehend Congress as having provided mandatory minimums for the most life-jeopardizing gun-connection cases (guns in or at the defendant's hand when committing an offense), leaving other, less imminently threatening, situations for the more flexible Guidelines regime.").

256. An alternative formulation would follow under the interpretive premises of the original methods originalists. *See* John O. McGinnis & Michael B. Rappaport, *The Constitution and the Language of the Law* (San Diego Legal Studies Paper No. 17-262, 2017), http://papers.ssrn.com/abstract_id=2928936 [http://perma.cc/TD97-EJ6Q] (articulating premises of original methods originalism, including the idea that the Constitution is written in the "language of the law," not ordinary English, and thus that it should be interpreted in accordance with the canons and legal conventions that would have been accepted by the legal community at the time of the founding). To the extent the law is written in a specialized legal dialect, we can think of the "law of interpretation" as a mere component of the "communicative content" of the law. We can do so by treating canons of construction not as departing from communicative content but as informing our understanding of the peculiar dialect of the law.

We have no problem with the framing proposed by McGinnis and Rappaport. But we mostly speak here of a distinction between ordinary communicative content and the law of interpretation—because we think the distinction helps highlight a component of the inquiry that corpus linguistics can help us improve.

### c. *Meaning as of When?*

Judges sometimes make reference to the temporal aspects of interpretation and insist that they are seeking the meaning of the text at the time it was drafted. Yet in practice judges often ignore the temporal aspect of interpretation or attempt to address it using tools of questionable utility, like historical dictionaries. Our linguistic intuitions about usage and meaning in our own time and our own speech community can be highly unreliable. But this problem is amplified when we are interpreting a text that dates from a period of which we have no linguistic memory or experience. To the extent that the law wishes to take into account the meaning of a text at the time of its enactment, some empirical measure of historical usage is necessary and corpus linguistics presents itself as an attractive option.

Of course, historical data from linguistic corpora face the same challenges that contemporary data face. If it is not clear whether carrying a firearm on one's person or carrying a firearm in an automobile would be perceived as two distinct senses in contemporary usage, it may not be clear from historical data either. Moreover, while we may be able to address the sense division problem using other linguistic empirical methods (discussed below), these methods generally involve attempting to measure the perceptions of living, human study participants. In many cases of historical interpretation, test subjects from the relevant speech community will not be available. In a historical context, corpus data may not just be a type of linguistic evidence; it may be the only type available.

### d. *Whose Meaning?*

Corpus linguistics allows us to take account of variations in usage among different speech communities and linguistic registers. Because the interpretive problems addressed above have to do with the interpretation of federal statutes—written texts meant to be applied broadly to the population of the United States—we have relied on linguistic corpora that present evidence of usage from standard written American English.

Linguistic corpora are not limited to broad-based, standardized dialects or speech communities. We can well imagine interpretive problems that require appeal to language data from more narrowly drawn speech communities (including language use from different geographical regions) and registers (including language use from different professions or industries). Corpora can be created and corpus data made available to address questions of interpretation from these narrowly drawn speech communities and registers.

But sometimes the public will interpret statutory language in pragmatic context differently than a legislative body would interpret it. And that implicates the "whose meaning" and "speech community" questions.

The speech community question, as we have noted, has implications for the selection of a relevant corpus. If we are trying to measure intended meaning, we might want to gather data from a corpus of a community of speakers who look demographically like Congress. Yet if we are interested in public meaning, we would want to turn to a broader corpus.

What if our sense of public meaning differs from our sense of intended meaning? If that happens we would need to decide which data set to rely on. That is a problem for legal theory—and essentially a choice of which of two sets of justifications for the "standard picture" we seek to vindicate. In the *Muscarello* setting, the answer may well be the fair notice rationale. The law of interpretation may already have given that answer in the rule of lenity. In criminal cases the rule of lenity suggests that the notice rationale predominates. It indicates that a criminal defendant is entitled to the benefit of the doubt in cases of ambiguity as to the law's communicative content.

The question may be harder to answer in civil cases. But again, that is a problem for legal theory. As above, we will simply say for now that transparent answers are better than opaque ones. Further thinking on this problem is needed. Yet surely we will be better off with an open, transparent discussion about whether (and when) to give primacy to intended meaning and when to credit public meaning. Once we speak more carefully about the meaning we are looking for and proceed more reliably in trying to measure it, we can have a better dialogue about these difficult questions of legal theory.

### 2. *Conclusions*

Here we offer some data-backed conclusions about the ordinary sense of *vehicles* in the park, *carrying* a firearm, *interpreter*, and *harboring* an alien. In so doing, we highlight strengths of the corpus analysis while also acknowledging some drawbacks and unresolved questions.

In each of the test cases, we start with a premise of ordinary meaning that is susceptible to both definition and measurement. The premise is that the ordinary sense of a term is that which occurs most frequently in a properly controlled linguistic context—namely, a context that controls for relevant syntactic and semantic considerations, that is aimed at the relevant speech community, and that is limited to the appropriate time frame. In other words, the sense of a word that is most frequent (after taking semantic factors into account) is prima facie also the sense most likely to avoid unfair notice (public meaning) and to vindicate the will of the legislature (intended meaning).

Yet we also recognize some possible grounds for questioning this prima facie showing. One possible response would be to question the viability of the relevant sense division—to suggest that the less frequent sense is just the dodo bird (an unusual example of a bird, but no less a bird). Another would be to identify pragmatic considerations that are not adequately assessed through a corpus search. In circumstances in which either of these concerns is present, we think the conclusion that the most frequent sense of a term is the ordinary one may be in doubt. In that event, we may turn to alternative means of empirical analysis (discussed below) or, ultimately, considerations that go to legal content rather than communicative content.

*a. Vehicles*

Based on the common collocates of *vehicle* and our analysis of its use in concordance lines, we can conclude that the most common sense of this term is in reference to automobiles. Airplanes and bicycles appear on our frequency continuum: they are attested in the data as possible examples of *vehicle*. But they are unusual—not the most frequent and not even common. If we accept the most common use of the word as the ordinary meaning, we can conclude that the ordinary meaning of *vehicle* is *automobile*.

We can also make a strong case for crediting the most common meaning as the ordinary one, in that it will best avoid unfair surprise (public meaning) and vindicate the presumed intent of the lawmaker (intended meaning). A decision to extend the law to bicycles or airplanes could upset reliance interests of those who—according to the data—are likely to think of automobiles when they read the law prohibiting vehicles. And the data give us no reason to think that those who enacted this prohibition were thinking of airplanes, bicycles, or toy cars. In our view, this weighs against treating these examples as falling under the ordinary sense of *vehicle*. But, as discussed above, that is a question for legal theory.

A similar question for legal theory concerns the ambulance question. Again, *ambulance* is attested as a *vehicle* in the corpus data. Ambulance also easily fits within the ordinary (automobile) sense of *vehicle*. So the question here is one of intended meaning or pragmatic public meaning—another question for legal theory.

What about golf carts? We found no examples of golf carts as vehicles in the corpus. But does that mean they do not qualify under the ordinary meaning of *vehicle*? Like the ambulance, a golf cart shares a number of features with the most common vehicles: automobiles. On the other hand, we would not expect to see a lot of golf carts on the Autobahn. The question whether a golf cart fits into the ordinary meaning of *vehicle* (an ordinary meaning that the corpus data tells us is the *automotive* use of *vehicle*) is accordingly a difficult one. It turns on the viability

of the sense divisions at work—on whether the golf cart is an unusual example or perceived as a distinct linguistic construct. That is not an easy question to answer. It depends, as noted in Part II above, on the sufficient conditions for the *automobile* sense of *vehicle*.

There is more than one way to answer questions like this one. One way would be through further corpus analysis. With sufficient corpus data, we could assemble a list of criteria for things we speak of as an automobile, and then ask whether a golf cart has those criteria.[257]

In addition to corpus analysis, there are other empirical linguistic techniques that could be employed. One alternative may be empirical methods employed in the field of psycholinguistics. Psycholinguists use a variety of experimental techniques in order to measure how we perceive and interpret language, including cross-modal priming,[258] visual world paradigm analysis,[259] and eye tracking during reading.[260] Yet it is costly to design and implement psycholinguistic experiments of this sort; both specialized equipment and a high degree of expertise are required. While psycholinguistic approaches to ordinary meaning are promising, the current hurdles are significant.

---

**257.** Possible criteria, for example, would likely include a steering wheel, motor, wheels for passage on land, and seats for passengers. If those are the criteria, then a golf cart might count. But we can also imagine other criteria, like usual usage on paved roads or highways, or licensure by the state motor vehicle division. And if those are the criteria, then a golf cart might not count.

**258.** Simon Garrod, *Psycholinguistic Research Methods*, *in* 10 ENCYCLOPEDIA OF LANGUAGE & LINGUISTICS 251, 252 (Keith Brown et al. eds., 2d ed. 2006) ("Cross-modal priming can indicate the immediate interpretation of an ambiguous word, such as *bug*, in contexts that promote either one or other meaning of the word (e.g., 'insect' or 'listening device'). As participants listen to *bug* in the different contexts, they are presented with a written word (ANT or SPY) or a nonword (AST) and have to decide as quickly as possible whether the target is a word or not (this is called lexical decision).").

**259.** *Id.* at 253 (explaining that the visual world paradigm uses eye-tracking technology to measure "the focus of attention correspond[ing] to the words being looked at [at] any time or it can be used to measure which part of a scene a participant attends to as they interpret spoken utterances about that scene").

**260.** *Id.* at 254 ("Eyetracking has been used to study a wide range of linguistic processes, including lexical access, resolving lexical ambiguities, syntactic analysis, and various discourse processing phenomena, such as anaphora resolution. It is particularly effective in determining precisely when the reader makes a decision about some aspect of the linguistic input during sentence or discourse processing.").

Cognitive linguists[261] and sociolinguists[262] assemble language data through surveys or interviews with test subjects. Analysts in these fields may view the mind's conception of words as "represented in cognition not as a set of criterial features with clear-cut boundaries but rather in terms of prototype (the clearest cases, best examples) of the category."[263] In an important study, participants ranked words as "good examples" of particular categories, including *toys, fruits, birds*, *weapon*, and *vehicle*,[264] and demonstrated "high agreement" on these rankings.[265] *Chair* was found to be a more prototypical example of *furniture* than *stool,*[266] *automobile* was found to be a more prototypical *vehicle* than *yacht,*[267] and *robin* was found to be a more prototypical *bird* than *ostrich.*[268]

Similar survey methodologies have been employed to address questions of ordinary meaning, both in statutory interpretation[269] and the interpretation of contracts.[270] Yet there are significant barriers to using survey data to address questions of ordinary meaning. If we want to find meaning as of the date of a statute's enactment, we will never be able to measure it through survey data. And survey data is notoriously susceptible to context effects and response bias.[271]

---

261. Dirk Geeraerts & Hubert Cuyckens, *Introducing Cognitive Linguistics*, *in* THE OXFORD HANDBOOK OF COGNITIVE LINGUISTICS 3, 3 (Dirk Geeraerts & Hubert Cuyckens eds., 2010) (explaining that cognitive linguistics is a linguistic discipline that "focuses on language as an instrument for organizing, processing, and conveying information" and as "the analysis of the conceptual and experiential basis of linguistic categories").

262. BERNARD SPOLSKY, SOCIOLINGUISTICS 3 (1998) ("Sociolinguistics is the field that studies the relation between language and society, between the uses of language and the social structures in which the users of language live.").

263. Rosch, *supra* note 46, at 193.

264. *Id.* at 197-98.

265. *Id.* at 198.

266. *Id.* at 229.

267. *Id.* at 230.

268. *Id.* at 232.

269. Clark D. Cunningham et al., *Plain Meaning and Hard Cases*, 103 YALE L.J. 1561, 1599-1601 (1994); J.P. Sevilla, Measuring Ordinary Meaning Using Surveys (Sept. 28, 2014) (unpublished manuscript), http://papers.ssrn.com/abstract_id=2466667 [http://perma.cc/BK82-GM2C].

270. Omri Ben-Shahar & Lior Strahilevitz, *Interpreting Contracts via Surveys and Experiments* (Coase-Sandor Inst. for Law & Econ., Working Paper No. 791, 2017), http://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=2464&context=law_and_economics [http://perma.cc/Z8JY-CTG8].

271. *See* Stephen C. Mouritsen, *Hard Cases and Hard Data: Assessing Corpus Linguistics as an Empirical Path to Plain Meaning*, 13 COLUM. SCI. & TECH. L. REV. 156, 202 (2011) (discussing the limitations of survey data when applied to questions of ordinary meaning).

Nevertheless, these alternative empirical linguistic methods provide possible approaches to addressing questions of ordinary meaning beyond the use of corpus linguistics.

The limitations of the empirical methods discussed here may be prohibitive. They may lead us to conclude that we cannot give a conclusive answer to the question of whether the ordinary understanding of *vehicle* extends to the *golf cart*—or to related questions about go-karts or four-wheelers. At that point it may be time to abandon the standard picture—to fall back on "fake" answers giving legal content to the law that is not necessarily in line with its communicative content. That seems fine, but as a fallback. As our sense of the law's communicative content becomes less clear, the reasons for crediting it are much weaker. Our point is just that this should not be the law's first instinct.

*b. Carrying a Firearm*

The corpus data tend to support the dissenting position in *Muscarello*. In both the NOW Corpus and the COHA, the vast majority of concordance lines involved the *bearing on your person* sense of *carry*. That gives us some meaningful empirical data about language usage. It tells us that when people speak of carrying a firearm they are almost always talking about carrying it on their person. That provides a prima facie basis for concluding that the ordinary communicative content of the mandatory minimum sentencing provision in § 924(c)(1) is limited to the personally *bearing* notion of *carry*.

Solan and Tammy Gales might observe that the data may merely be an artifact of the greater commonality of the personally *bearing* notion of *carrying* in the real world.[272] That is probably correct, but not necessarily a reason to distrust the data. If most every time we speak of carrying a firearm we are talking about personally *bearing* it, then the first sense of *carrying* to come to mind is likely to be that sense. Extending the statute to the *transporting* in a car sense may therefore jeopardize significant reliance interests.

That leaves, as above, the question of whether *bearing* and *transporting* are two distinct linguistic constructs or just alternative examples within the same construct. Again, we could test this by further empirical analysis—by finding (through corpus or other empirical linguistic study) the sufficient conditions of *carrying*, and asking whether *bearing* and *transporting* both qualify.

Perhaps we will not ultimately find a satisfactory answer to this question in any empirical data. But even then the data will have been helpful. They will allow us to avoid the smokescreen grounds for assessments of ordinariness articulated

272. *See* Solan & Gales, *supra* note 44.

by the competing opinions in *Muscarello*, and provide a sufficient basis for turning to other means of assessment.

One such means could be an attempt to assess intended meaning. This inquiry may be a difficult one, as noted above. But again, at least a decision on this basis will be a transparent one—rooted in a disagreement about whether Congress was likely concerned only about firearms on a drug dealer's person, or might also have been concerned about guns within relative reach in the dealer's vehicle. That sort of debate may seem an empty one to a judge seeking determinacy in the ordinary meaning of the text; but where such meaning is indeterminate, this debate seems preferable to a completely fabricated answer—like one rooted in a dictionary or etymology.

### c. *Interpreter*

The data seem to provide support for Justice Alito's majority view in *Taniguchi*. We did not find a single instance of *interpreter* in the context of text-to-text written translation in the concordance lines we reviewed in the NOW Corpus. That strongly indicates that this is not the kind of interpreter that first comes to mind when we use this term.

That leaves the same question highlighted in the other examples: whether the *written translator* sense would be perceived as separate from the *oral translator* notion.[273] Here we see reason to suspect that these are just alternative examples of a single linguistic construct. There is at least some indication of that in the fact that some lexicographers treat these as just alternative examples of a single sense.[274] And, again, that is likely a question that could be tested empirically.

We have not sought to study intended meaning in our corpus analysis. But as noted above we think such a study is possible. One approach would be to think of *interpreter* as a term used by lawmakers, and to look for evidence of usage in this speech community. If we assembled such evidence, then we could have

273. *See* Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 580 (2012) (Ginsburg, J., dissenting) (asserting that "[d]istinguishing written from oral translation" is a "dubious" endeavor, noting that "some translation tasks do not fall neatly into one category or another," and asserting that an oral interpreter "may be called upon to 'sight translate' a written document").

274. *See id.* ("[A]s the Court acknowledges, *ante*, at [567-568], and n. 2, 'interpreters' is more than occasionally used to encompass those who translate written speech as well. See Webster's Third New International Dictionary of the English Language 1182 (1976) (hereinafter Webster's) (defining 'interpreter' as 'one that translates; *esp*: a person who translates orally for parties conversing in different tongues'); Black's Law Dictionary 895 (9th ed. 2009) (defining 'interpreter' as a 'person who translates, esp. orally, from one language to another'); Ballentine's Law Dictionary 655 (3d ed. 1969) (defining 'interpreter' as '[o]ne who interprets, particularly one who interprets words written or spoken in a foreign language')." (alteration in original)).

the debate flagged above – as to whether intended meaning should win out over public meaning, or whether they ought to collapse together as a matter of theory.

#### *d. Harbor*

Our *harbor* data seem inconclusive. We found a significant number of instances of both the *conceal* sense and the *shelter* sense of this term. That suggests that both senses are common and attested. To the extent we regard the ordinary meaning as a common or attested sense, then the data indicate that both are "ordinary." To the extent we regard the ordinary meaning as the most common sense of a word, however, the data appear to indicate that neither sense is "ordinary."

It is hard to know what conclusion to draw from these inferences (even accepting that we have a statistical basis for doing so). One possibility is to say that both senses are ordinary in that they are both commonly attested. This is presumably the dissenting view in *Costello*, and in line with the approach at least sometimes taken on the "carry" question in *Muscarello* (that both personal carrying and car carrying count as ordinary).

Another alternative is simply to abandon our search for the "standard picture." If we lack probative data on the most frequent sense of a given term, we may conclude that we cannot determine the ordinary communicative content of the law – and thus that we need a "fake" answer, like that provided by the rule of lenity. Yet even here the data will have proven useful. The application of the rule of lenity requires an antecedent finding that the criminal statute is ambiguous – that the words of the statute are susceptible of two competing interpretations.[275] Often, such determinations are highly impressionistic.[276] Here, the antecedent finding of ambiguity necessary to the application of the rule of lenity is based not on intuitions or dictionaries, but on quantifiable data about real-world usage – data that establishes that both senses of *harbor* are attested and comparatively common. The standard picture here yields to the law of interpretation, but only after the necessary work has been done.

---

**275.** Barber v. Thomas, 560 U.S. 474, 500-01 (2010) (Kennedy, J., dissenting) ("When a penal statute is susceptible of two interpretations, the one more favorable to the defendant must be chosen unless 'text, structure, and history . . . establish that the [harsher] position is unambiguously correct.'" (alteration in original)).

**276.** Ward Farnsworth, Dustin F. Guzior & Anup Malani, *Ambiguity About Ambiguity: An Empirical Inquiry into Legal Interpretation*, 2 J. LEGAL ANALYSIS 257, 276 (2010) ("[T]here is no avoiding the fact that impressionistic judgments are doing important work. Some judges read the text and say that it just seems clear. Other judges read the same text and say that it just doesn't.").

## IV. OBJECTIONS AND RESPONSES

We have little doubt of the need and basis for corpus linguistic analysis of ordinary meaning. But we anticipate—and already have seen—significant objections to the use of these new tools of interpretation. In a few recent cases, judges have proffered corpus linguistic analysis in support of their assessment of the ordinary meaning of statutory terms.[277] Some of these attempts have prompted doubt and criticism from fellow judges.[278] And even the judges who have advocated for this approach (present company included) have acknowledged cause for concern and care in this endeavor.[279]

The criticisms that we have considered fall into three categories: proficiency, propriety, and practicality. Each concern has an element of viability but crumbles under careful scrutiny.

After addressing these concerns, we close with some observations about the potential role for corpus linguistic analysis going forward—about the extent to which corpus data can address the deficiencies in the ordinary meaning analysis highlighted herein. We also highlight the ideological or theoretical neutrality of this methodology, explaining why corpus analysis is not just for textualists (or originalists), but for anyone who takes language seriously.

### A. *Proficiency: Judges (and Lawyers) Can't Do Corpus Linguistics*

Judges and lawyers are not linguists. Most all of us, at least, are not professionally trained ones. From that premise it is easy to jump to the conclusion that judges and lawyers should leave the linguistic analysis to professional linguists—meaning, in practice, to expert witness reports or testimony. A majority of the Utah Supreme Court has so concluded in recent cases.[280]

---

**277.** *See, e.g.*, People v. Harris, 885 N.W.2d 832 (Mich. 2016); State v. Rasabout, 2015 UT 72, 356 P.3d 1258 (Lee, Associate C.J., concurring in part and concurring in the judgment); J.M.W. v. T.I.Z. (*In re* Adoption of Baby E.Z.), 2011 UT 38, 266 P.3d 702 (Lee, J., concurring in part and concurring in the judgment).

**278.** *See, e.g.*, *Rasabout*, 2015 UT 72, 356 P.3d 1258; *In re Adoption of Baby E.Z.*, 2011 UT 38, 266 P.3d 702.

**279.** *See, e.g.*, *Rasabout*, 2015 UT ¶ 97, 356 P.3d at 1282-83 (Lee, Associate C.J., concurring in part and concurring in the judgment).

**280.** *Id.* ¶ 18, 356 P.3d at 1265 (majority opinion) ("The knowledge and expertise required to conduct scientific research are 'usually not within the common knowledge' of judges, so 'testimony from relevant experts is generally required in order to ensure that [judges] have adequate knowledge upon which to base their decisions.'" (quoting Bowman v. Kalm, 2008 UT 9 ¶ 7, 179 P.3d 754, 755-56)); *In re Adoption of Baby E.Z.*, 2011 UT ¶ 19 n.2, 266 P.3d at 708 n.2

The "proficiency" critique has some bite. For reasons noted above, we concede that corpus linguistics is not "plug and play" analysis. Corpus data can be gathered and analyzed properly only with care and a little background and training in the underlying methodology. A judge who proceeds willy-nilly may, either consciously or unwittingly, proffer data that has only the appearance of careful empiricism.[281] For these and other reasons we wholeheartedly agree that the judicial analysis of ordinary meaning will be improved in cases in which the parties or their experts proffer corpus analysis that can be tested by the adversary system.[282]

So we take the "proficiency" critique as an appropriate word of warning. Judges should acknowledge the pitfalls and limitations of the tool of corpus linguistics. They should not overstate its utility, ignore the care required to use it properly, or overlook the potential for subjectivity or even strategic manipulation.

But that is as far as this critique can take us. The fact of the matter is that judges and lawyers *are* linguists. We may not be trained in linguistic methodology, but our work puts us consistently and inevitably in the position of resolving ambiguities in legal language. Judges and lawyers are experts, in other words, in interpreting the law.[283] So the question, ultimately, is not whether we trust judges to engage in linguistic analysis. It is whether we want them to "do so with

("Unless this linguistic 'context' is placed in its proper context, it is of little analytical or persuasive value.").

**281.** *See Rasabout*, 2015 UT ¶ 21, 356 P.3d at 1266 (noting that a potentially significant portion of corpus data "require[s] an interpretive assumption" or retains some level of ambiguity); Michael Stubbs, *Corpus Semantics*, *in* THE ROUTLEDGE HANDBOOK OF SEMANTICS 106, 107 (Nick Riemer ed., 2016) (noting that "a constant background question is whether a corpus can ever, strictly speaking, provide semantic data, since intuition is always required to interpret the data," but concluding that "corpora allow us to study language 'with a degree of objectivity [ . . . ] where before we could only speculate'" (quoting Adam Kilgarriff, *Putting Frequencies in the Dictionary*, 10 INT'L J. LEXICOGRAPHY 135, 137 (1997))); Ben Zimmer, *The Corpus in the Court: 'Like Lexis on Steroids*,*'* ATLANTIC (Mar. 4, 2011), http://www.theatlantic.com/national/archive/2011/03/the-corpus-in-the-court-like-lexis-on-steroids/72054 [http://perma.cc/KBQ5-BSQ4] ("While the corpus revolution promises to put judicial inquiries into language patterns on a firmer, more systematic footing, the results are still prey to all manner of human interpretation.").

**282.** *Rasabout*, 2015 UT ¶ 97, 356 P.3d at 1287 (Lee, Associate C.J., concurring in part and concurring in the judgment) (agreeing that judicial analysis of any kind is "better when adversary briefing is complete and in-depth").

**283.** *Id.* ¶ 107, 356 P.3d at 1285 (explaining that although they do not have "the kind of training possessed by 'linguistics experts' . . . judges *are* experts on one thing—interpreting the law").

the aid of—instead of in open ignorance of or rebellion to—modern tools developed to facilitate that analysis."[284]

Judges are likewise not historians. And it may rightly be said that many lawyers and judges are even "bad historians" that tend to "make up an imaginary history and use curiously unhistorical methods."[285] As one of us recently noted, "[J]udges of all stripes engage in historical analysis, particularly in their interpretation of the [C]onstitution."[286] "So the response to our lack of historical training is not to back away from the enterprise; it is to arm ourselves with the tools necessary to do the best history we can."[287]

The same goes for linguistic analysis. "We could continue to judge the ordinary meaning of words based on intuition, aided by the dictionary. But those tools are problematic."[288] Thus "it is our *current* methodology and tools that involve bad linguistics produced by unscientific methods."[289] Therefore, "[i]f the concern is reliability, the proper response is to embrace—and not abandon—corpus-based analysis."[290]

The potential for subjectivity and arbitrariness is not heightened but reduced by the use of corpus linguistics.[291] Without this tool, judges will tap into their linguistic memory to make assessments about the frequency or prototypicality of a given sense of a statutory term. Such recourse to memory and judicial intuition is neither transparent nor replicable. Nothing is statistically worse than one data point—especially a biased one. The potential for motivated reasoning is evident.[292]

---

**284.** *Id.*

**285.** MAX RADIN, LAW AS LOGIC AND EXPERIENCE 138 (1940).

**286.** *Rasabout*, 2015 UT ¶ 109, 356 P.3d at 1285 (Lee, Associate C.J., concurring in part and concurring in the judgment).

**287.** *Id.*

**288.** *Id.* ¶ 112, 356 P.3d at 1285.

**289.** *Id.*

**290.** *Id.*

**291.** As one of us has noted, while a judge may "go looking for supporting evidence in a corpus," it is possible that "after reviewing a few hundred concordance lines, a salient meaning contrary to the judge's initial conclusion becomes harder to ignore." Mouritsen, *supra* note 271, at 202.

**292.** A common critique of the use of legislative history comes to mind: "It sometimes seems that citing legislative history is still, as [Judge] Harold Leventhal once observed, akin to 'looking over a crowd and picking out your friends.'" Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L. REV. 195, 214 (1983). A parallel problem appears in cases in which judges summon examples of word usage in literary works. *See, e.g.*, Whitfield v. United States, 135 S. Ct. 785, 788 (2015) (interpreting the ordinary meaning of "to accompany" using a host of sources, including quotes from a Jane Austen as well as

Corpus linguistics, by contrast, facilitates transparency and scrutiny.[293] It is "an empirical check on our (imperfect) linguistic intuition."[294] And it is not, ultimately, a terribly complex or difficult endeavor. "Corpus analysis is like math"—everyone can do it at some basic level; at more advanced levels it becomes too complicated for all but the experts.[295] We're advocating rudimentary linguistic analysis that most anyone can do.[296] We "just think we should be using a calculator instead of doing it in our heads."[297]

The path forward is for judges and lawyers to identify the corpus analysis that we can perform sufficiently and reliably to supplement the tools we are now using (and the sort of analysis we must leave to linguists). In time, the law and corpus linguistics movement will develop standards and best practices for this field. Until then we should proceed cautiously and carefully in a direction that will allow us to be the best linguists we can. Paraphrasing an observation made by Justice Scalia and his co-author Garner regarding judges performing historical analysis, we may or may not be able to do corpus linguistics with the precision of an expert, but "[o]ur charge is to try."[298]

### B. *Propriety: Judges Shouldn't Do Corpus Linguistics*

The law puts limits on judicial analysis of matters that exceed the bounds of the briefing and record in a particular case. Our rules of judicial ethics say that "[a] judge shall not investigate facts in a matter independently," but shall "consider only the evidence presented and any facts that may properly be judicially

a Charles Dickens novel). That kind of data cherry-picking is fraught with risk of hindsight bias or motivated reasoning.

293. *See* Mouritsen, *supra* note 271, at 203 ("[C]orpus analysis brings these subconscious assumptions about language and meaning out in the open."); Zimmer, *supra* note 281 ("[A]t least these ideological arguments can proceed on a basis of concrete facts about how we use language, rather than on a welter of idiosyncratic assumptions, as has too often been the case.").

294. *Rasabout*, 2015 UT ¶ 66, 356 P.3d at 1277 (Lee, Associate C.J., concurring in part and concurring in the judgment).

295. *Id.* ¶ 115, 356 P.3d at 1286.

296. While the COHA and similar linguist-designed corpora are more foreign than Google or Westlaw, they are being employed in the same way. In short, we are advocating using a corpus as a search tool or database to find uses of language that are as easy to read as a Google search result. The results are just more reliable.

297. *Rasabout*, 2015 UT ¶ 115, 356 P.3d at 1286 (Lee, Associate C.J., concurring in part and concurring in the judgment).

298. SCALIA & GARNER, *supra* note 28, at 400.

noticed."[299] With this in mind, a majority of the Utah Supreme Court has challenged the "sua sponte" use of corpus linguistics as falling beyond the proper domain of the judge.[300]

The analogy here may arguably be to cases in which judges perform their own experiments to assess the factual assertions of the parties in a particular case. A prominent example appears in Judge Posner's opinion in *Mitchell v. JCG Industries*.[301] A question in that case was how long it took poultry processing workers to change in and out of the safety clothing they used to do their jobs. Judge Posner's opinion included a reference to an experiment he conducted on that question in chambers—in which he ordered the clothing in question and asked "three members of the court's staff" to change in and out of it "as they would do if they were workers at the plant."[302] "Their endeavors were videotaped,"[303] and "[t]he videotape automatically recorded the time consumed in donning and doffing and also enabled verification that the 'workers' were neither rushing nor dawdling."[304] Posner referred to the results of this experiment in support of "the common sense intuition that donning and doffing a few simple pieces of clothing and equipment do not eat up half the lunch break."[305]

Chief Judge Wood, in dissent, asserted that the Posner majority went "beyond the proper appellate role" in conducting an experiment of relevance to a factual question in the case.[306] She complained that the results of Judge Posner's experiment "cannot be considered as evidence in the case," which is limited to matters placed in the record pursuant to applicable rules of civil procedure.[307]

This may be the paradigm that critics of corpus linguistics have in mind when they question the viability of sua sponte use of this tool. The governing rules of judicial ethics prohibit judges from "investigat[ing] facts in a matter independently" and only allow the courts to consider "facts that may properly be judicially noticed."[308] But the analogy is inapt. Judges who consider corpus data

---

**299.** MODEL CODE OF JUDICIAL CONDUCT r. 2.9(C) (AM. BAR ASS'N 2011).

**300.** *Rasabout*, 2015 UT ¶ 17, 356 P.3d at 1264-65 (majority opinion).

**301.** 745 F.3d 837 (7th Cir. 2014).

**302.** *Id.* at 842.

**303.** *Id.*

**304.** *Id.*

**305.** *Id.*

**306.** *Id.* at 847 (Wood, C.J., dissenting).

**307.** *Id.* at 849.

**308.** UTAH CODE OF JUDICIAL CONDUCT r. 2.9(C) (2017); MODEL CODE OF JUDICIAL CONDUCT r. 2.9(C) (AM. BAR ASS'N 2011).

in assessing the ordinary meaning of a statute are not investigating the *adjudicative facts* of a case; they are considering facts of relevance to the proper interpretation of the law. These are known as *legislative facts*, and their investigation is the inevitable—and quite proper—domain of the judge's sua sponte analysis.

The point is supported by the law of evidence. Governing rules of evidence typically state that limitations on the judge's judicial notice power are addressed to "an adjudicative fact only, not a legislative fact."[309] The distinction is this: "[L]egislative facts are matters that go to the policy of a rule of law as distinct from the true facts that are used in the adjudication of a controversy."[310] Such facts "are not appropriate for a rule of evidence."[311] They are "best left to the law-making considerations by appellate and trial courts."[312] And that is precisely what is involved in the corpus linguistic analysis of the meaning of statutory text. Corpus analysis has nothing to do with adjudicative facts—with the who, what, when, or where of an underlying controversy. It has only to do with the proper construction of the applicable law. For that reason, there is no ethical or evidentiary prohibition on sua sponte corpus analysis by a judge.[313]

"A contrary conclusion would call into question a wide range of" inquiries routinely conducted by our courts, including the use of dictionaries:[314]

> If we were foreclosed from considering outside material that informs our resolution of open questions of law, we would be barred from engaging in historical analysis relevant to a question of original meaning of a provision of the [C]onstitution, or from considering social science literature

309. FED. R. EVID. 201(a) ("This rule governs judicial notice of an adjudicative fact only, not a legislative fact."); UTAH R. EVID. 201(a) (same).

310. UTAH R. EVID. 201(a) advisory committee note; *see also* Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 HARV. L. REV. 364, 402–03 (1942) ("When an agency wrestles with a question of law or policy, it is acting legislatively, just as judges have created the common law through judicial legislation, and the facts which inform its legislative judgment may conveniently be denominated legislative facts. The distinction is important; the traditional rules of evidence are designed for adjudicative facts, and unnecessary confusion results from attempting to apply the traditional rules to legislative facts.").

311. UTAH R. EVID. 201(a) advisory committee note.

312. *Id.*

313. For further commentary on the distinction between adjudicative and legislative facts, see, for example, *Bulova Watch Co. v. Hattori & Co.*, 508 F. Supp. 1322, 1328 (E.D.N.Y. 1981), which explains that the "court's power to resort to less well known and accepted sources of data to fill in the gaps of its knowledge for legislative and general evidential hypothesis purposes must be accepted because it is essential to the judicial process." *See also* ROBERT E. KEETON, JUDGING 38–39 (1990) (discussing the distinction between legislative and adjudicative facts).

314. State v. Rasabout, 2015 UT 72 ¶ 106, 356 P.3d 1258, 1285 (Lee, Associate C.J., concurring in part and concurring in the judgment).

in resolving a difficult question under the common law. Linguistic analysis is no different; to the extent we charge our judges with resolving ambiguities in language, we cannot (*and do not*) reasonably restrict their ability to do so on a well-informed basis – even on grounds not presented by the parties, and not within the domain of judges' professional training.[315]

For better or worse, judges do that all the time. State court judges decide questions of common law that require us to consider and weigh questions implicating literature in fields of social science about which we are hardly experts.[316] No one bats an eye when judges do their own research and thinking on a broad range of "legislative facts." The matter should be no different for linguistic analysis of ordinary meaning.

*C. Practicality: Corpus Linguistics Will Impose an Unbearable Burden*

The widespread use of corpus linguistics could put a strain on parties and the courts. This is another criticism that has appeared in majority opinions in the Utah Supreme Court. The argument is that turning the analysis of ordinary meaning into an empirical, data-driven enterprise will introduce the "dueling expert" problem and make statutory cases more costly and time-consuming.[317] The effects of the proliferation of expert testimony are a matter meriting careful consideration. For every question on which we require expert analysis, we compound the expense and time it takes for a case to be resolved. We should not do that without a good reason.

Yet we find this objection to corpus analysis unpersuasive for several reasons. First is the fact that not all problems of statutory interpretation lend themselves to corpus linguistic analysis. The utility of this tool, as currently conceived, is limited to problems of *lexical ambiguity* – of a contest between two meanings of the terms of the statutory text. That excludes a category of problems of *semantic* (or in other words *structural ambiguity*) – a problem, for example, as to whether a modifier is understood to apply to all items in a statutory list or only the "last

315. *Id.*

316. Recent examples in the Utah Supreme Court include the question whether a medical practitioner owes a duty to third parties who are foreseeably injured by the negligent prescription of pharmaceuticals, B.R. & C.R. *ex rel.* Jeffs v. West, 2010 UT 11, 275 P.3d 228; and the question of the appropriate age at which a child may be required to defend against a claim for negligence, Nielsen *ex rel.* C.N. v. Bell *ex rel.* B.B., 2016 UT 14, 370 P.3d 925.

317. *Rasabout*, 2015 UT ¶ 19, 356 P.3d at 1265 (majority opinion).

antecedent."[318] Even as to the class of cases of lexical ambiguity, moreover, not all cases will call for corpus analysis. In our view "[c]orpus analysis is something of a last resort."[319] "It comes into play only if we find that the legislature is not using words in some specialized sense, and only if we cannot reject one of the parties' definitions based on the structure or context of the statute."[320] This yields a limited but important domain for corpus linguistics. Judges should turn to an empirical analysis of frequency only in cases in which they have "no better way" of resolving a contest between probabilities of meaning.[321] That is a relatively rare case.[322]

Second, corpus-based analysis will not always require an expert. This "isn't rocket science."[323] Lawyers are crafty, ingenious creatures with the capacity to learn and even master new tools, technologies, and methodologies. Witness the way attorneys have learned to parse historical materials and present them when litigating the original meaning of the Constitution. In a way, lawyers have been doing corpus analysis for a long time; they scour Westlaw or Lexis to determine how courts have interpreted a phrase or concept. So it is undoubtedly true that lawyers will have to bone up on some basic linguistic methodology. But continuing education is an ongoing element of the legal profession. And a familiarity with and capacity for corpus analysis can take root just like Westlaw and Lexis searches did.[324] The rising generation of millennials is particularly suited to the

318. *See* Lockhart v. United States, 136 S. Ct. 958, 962 (2016) (describing the "rule of the last antecedent" and applying it to interpret a statute imposing a mandatory minimum sentence on defendants who violate the federal child pornography statute and have previously been convicted of certain crimes); CRUSE, *supra* note 125, at 107-08 ("Ambiguity has been presented here as a lexical phenomenon; it is important to emphasize, however, that there are other sources of ambiguity. One of these, of course, is syntax, as in *Mary saw the man with the telescope*. Many syntactic ambiguities arise from the possibility of alternative constituent structures, as here: *with the telescope* is either a manner adverbial modifying *saw*, or a prepositional phrase modifying *the man*.").

319. *Rasabout*, 2015 UT ¶ 118, 356 P.3d at 1286 (Lee, Associate C.J., concurring in part and concurring in the judgment).

320. *Id.*

321. *Id.*

322. *Id.* ¶ 118, 356 P.3d at 1287 (asserting that in "five years" on the Utah Supreme Court, Associate Chief Justice Lee had "employed such analysis only a very few times," and that "[i]n the many other statutory cases" that have arisen, he "disposed of the matter using more traditional tools of interpretation").

323. *Id.* ¶ 114, 356 P.3d at 1286.

324. The advent of computer-aided legal research is now an accepted staple. But it wasn't always thought to be so. Early reactions paralleled some of the responses to corpus linguistics. *See, e.g.*, Robert C. Berring, *Legal Research and the World of Thinkable Thoughts*, 2 J. APP. PRAC. & PROCESS 305, 316 (2000) (declaring that it "scares" the author "[i]f search engines like *Google*

task. They have never known life without a computer, and are constantly embracing new applications and tools for computer analysis. In time we may see competing corpus presentations as a matter of course in adversary briefing.[325] There will often be no need for dueling experts, just as there is often no need for dueling historical experts in constitutional litigation, or dueling dictionary experts on a statutory question.

Finally, if in the rare case there is a need for the parties to retain corpus linguistic experts, that is hardly cause for alarm. Where the issue is complex enough and the stakes are high enough, expert analysis could be helpful—and certainly preferable to deciding a matter as significant as, say, the applicability of a federal sentencing enhancement on the basis of an unreliable source like a dictionary or an opaque one like a judge's intuition. Some problems are important enough to merit expert analysis. We should leave that matter to the marketplace—to the clients and lawyers who decide how best to formulate and present a legal position.

### *D. Corpus Data Represents Only "More Factually Common Iterations"*

Solan and Gales have observed that corpus data may reflect only the fact that a given sense of a certain term is a more factually common iteration of that term

move into legal information"); Barbara Bintliff, *From Creativity to Computerese: Thinking Like a Lawyer in the Computer Age*, 88 LAW LIBR. J. 338, 339 (1996) (warning that computer-aided legal research will undermine the ability to think like a lawyer); Molly Warner Lien, *Technocentrism and the Soul of the Common Law Lawyer*, 48 AM. U. L. REV. 85, 85-86 (1998) (arguing that computer-aided legal research "may be harmful to the process of legal reasoning" and that lawyers should be aware of the "negative impacts" of using technology in this way); Scott P. Stolley, *Shortcomings of Technology: The Corruption of Legal Research*, FOR THE DEFENSE 39 (Apr. 2004) (viewing the likes of LexisNexis and Westlaw as leading to a generation of lawyers who can't find cases on point). Most of us view this criticism as downright silly today. We realize that computer research tools can be misused, and may be improved if supplemented by more traditional methods. But they cannot properly be rejected on the basis of their unfamiliarity.

**325.** This will hold if, but only if, our courts continue to embrace this methodology—as has happened recently in Michigan. If we (judges) build it, they (attorneys) will surely come. *See* Appellants' (Third) Supplemental Authority, *In re* Estate of Cliffman, 892 N.W.2d 380 (Mich. 2017) (No. 67-151998), 2016 WL 4480882 (submitting supplemental authority with exhibits "show[ing] the relative frequency with which the words or word combinations appear in the COCA database," and noting that "[i]n *Harris*, this Court approved the use of the *corpus linguistics* in determining the common usage and meaning of statutorily undefined words"). But lawyers need not wait on the courts to begin incorporating corpus analysis in their briefing. Courts, including the United States Supreme Court, have already proven amenable to well-executed corpus-based analysis. *See* Zimmer, *supra* note 281 (discussing Neal Goldfarb's influential, corpus-based amicus brief in FCC v. AT&T, Inc., 562 U.S. 397 (2011)).

in the real world.[326] If that is true, there may be reason to doubt the probity of the data in establishing the semantic meaning[327] perceived by lawmakers or the public.

These are important concerns. And anyone turning to corpus analysis would do well to consider these limitations before jumping too quickly to an inference about ordinary meaning. But we do not view the sense-division problems noted here to be fatal to the probity of corpus linguistic analysis (even for related senses of a statutory term). We propose a range of responses to this concern.

First, the Solan-Gales point seems overstated. Let's apply it to the *carry* data. It may be likely, as Solan and Gales might suggest, that the corpus data we found is indicative of the fact that most iterations of carrying a firearm in the real world involve personally *bearing* it. Yet we do not see that as depriving the data of probative value. If most iterations of firearm carrying involve personally *bearing*, then that sense of carrying seems likely to be the one that first comes to mind when we think of this term. That top-of-mind sense, as noted, may not exhaust the breadth of human perception of this term. If pressed, some people might concede that the term encompasses the *transport* sense too. As discussed below, there may be a way to measure such perceptions of meaning.

This raises the question of whether to credit only the top-of-mind sense or a possibly broader, "reflective" sense as ordinary. But this is not a deficiency in corpus data—or even in linguistic theory. It is a question for law—"we have to decide *which* meaning, produced by which *theory* of meaning, we ought to pick."[328] We think the answers to these questions are dictated in part by the rationales that drive us to consider ordinary meaning. A concern for fair notice and protection of reliance interests may well direct us to stop at the top-of-mind sense of a statutory term. If the personally *bear* sense of *carry* is the first one that comes to mind, then that may be the sense that the public will have in mind upon reading the terms of a statute, and if we are interested in protecting reliance interests and avoiding unfair surprise, we may want to stop short of including the broader *transport* sense that the public might concede to be covered upon reflection.

We emphasize that corpus analysis does not take place in an acontextual vacuum. A corpus-based approach to ordinary meaning, as noted, does *not* simply evaluate which of two competing uses is the most common. Instead, the corpus

326. Lawrence M. Solan & Tammy Gales, *Corpus Linguistics as a Tool in Legal Interpretation*, 2017 BYU L. REV. (forthcoming 2018).

327. The point is not to suggest that mere semantic meaning is the right framing. Above we conceded that the pragmatic context of relevance to so-called "intended" or "public" meaning is the correct focus. But for now we are speaking only of semantic meaning. We add the wrinkle of pragmatic context below.

328. Baude & Sachs, *supra* note 3, at 1089–90.

allows us to examine the use of a word or phrase in a particular syntactic, semantic, or pragmatic context, in the speech or writing of a particular speech community or register, and at a particular point in time. Our analysis of *carry*, for example, does not simply examine the use of *carry* at large. We look for sentences in which the verb *carry* has a human agent performing the carrying and a weapon object (*firearm* or one of its synonyms) being carried. We look for such instances in what we have argued is the relevant speech community and in texts dating from the era in which the relevant statute was enacted. With this level of granularity, we are often able to find not only common ways to describe common real-world occurrences, but also the most common ways in which highly particularized and highly contextualized occurrences are described in a given speech community at a given point in time. If there are cases where "it is natural to use a particular expression, but the circumstances do not arise often,"[329] as Solan and Gales suggest, an appropriately designed corpus search (performed in a sufficiently robust corpus) will help us identify these instances and make informed, evidence-based judgments about them.

Second, above we were considering data at the right end of the frequency continuum—an indication that one of two senses is clearly the most frequent, or even almost exclusive. But what if the data is less clear? What if the data suggests that each of two senses is about equally possible? Or that one is a bit more frequent but not clearly so?

Sometimes an indication that *both* senses of a term are relatively frequent will be telling. If two senses are closely related and both appear relatively equally in the data, that may tell us that both are about equally likely to be called to mind. In that event it may be difficult to exclude either as *extra*ordinary.

The salience of inconclusive data may also depend on the nature of the question presented. We have been speaking here of isolated questions of ambiguity and ordinary meaning. But sometimes the question of whether the language of a statute is plain or ordinary is bound up with questions of whether or not the court will consider extrinsic evidence of meaning like legislative history, or apply a substantive canon, or defer to an agency interpretation. In such cases, inconclusive data about which meaning is ordinary may be quite conclusive—it may tell us that there is ambiguity sufficient to proceed past the threshold "standard picture." Corpus data can bring rigor to this range of questions too; instead of guessing about plainness we can summon data.

In some cases, that data may be too mixed to yield any helpful answers. Even then that does not require us to abandon the standard picture. We could, for example, look to other empirical methods for measuring perceptions of meaning. Barring that kind of help, we can fall back on a principle of interpretation

329. Solan & Gales, *supra* note 326 (manuscript at 3).

framed by something other than a view of the standard picture—as in a rule of interpretation that has to do with "legal content" of the law, like the rule of lenity. But we see no reason to fall back too quickly. The law commits to the standard picture for good reason. We think the courts should try their best to find real answers to linguistic questions before falling back on fake ones.

### *E. Political Neutrality*

A final potential concern goes to the utility of the methodology of corpus linguistics across a range of theories of interpretation. The utility of this methodology may be most apparent to the textualist or the originalist. But we see much broader applications for corpus linguistics. We also see reason for those who are skeptical of textualism and originalism to resort to this new tool with equal alacrity.

The textualist finds statutory meaning in the words of a legal text. For that reason, the textualist would have a natural affinity for a tool that promises to help uncover the meaning of the text. That affinity would be sharpened to the extent the tool can help deliver on the promise of determinacy—a promise at the heart of this theory.

The originalist's expected attraction to corpus analysis rests on similar grounds. An originalist who seeks the original public meaning of the words of the Constitution,[330] for example, would quickly see the value of data-based answers to questions previously left to more impressionistic analysis. The data would be viewed as delivering on a core promise of originalism—"fixation," which is the idea that written constitutions are viewed as carrying fixed content as of the time of their adoption.[331]

Yet it would be a mistake to dismiss corpus linguistic analysis as a methodology of likely interest only to the textualist and the originalist. Even the most jaded skeptics of these two approaches should find this methodology significant. A threshold reason was discussed above: even those who search for legislative intent or purpose view the text as the "best evidence" of intent or purpose.[332]

330. *See* John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751, 761 (2009) ("[O]riginal public meaning, in contrast to original intent, interpret[s] the Constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment . . . . [and] is now the predominant originalist theory.").

331. *See* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1, 1 (2015).

332. *See id.* at 52 n.130, 65 n.154 and accompanying text.

"We're all textualists now" in that most all of us at least start with the text.[333] If we're going to start with the text, we should seize the best tools for discerning its meaning.

Yet even an avowed "anti-textualist" should be attracted to corpus linguistics, here for an instrumental or strategic reason. A key move for the anti-textualist is to challenge the purported determinacy of statutory text (or fixation of constitutional language). Corpus analysis can often help in that endeavor.[334] Where the data show that there is no ordinary meaning, or that there is a wide range of ordinary meanings, the interpreter will be free to dismiss the notion of determinacy (or fixation) and turn to other theories or tools of interpretation.

For these reasons, we see corpus linguistic analysis as a tool without any necessary connection to a theory of interpretation or an often-corresponding political ideology. It is a neutral tool with broad utility for anyone interested in data of relevance to the analysis of ordinary meaning.

### *F. Potential: The Role for Corpus Linguistic Analysis in Addressing Problems of Ordinary Meaning*

Another critique is one not yet made by critics but implicitly acknowledged in our analysis throughout this Article. For all our bemoaning of the deficiencies in the law's construct of ordinary meaning, and touting of the insights provided by corpus linguistic analysis, we have not really offered our own grand theory of corpus-based ordinary meaning. Because we acknowledge that corpus data may at least sometimes be indeterminate, we cannot claim that corpus linguistic analysis will definitively resolve ongoing debates about the ordinary meaning of the language of the law.

In that sense, we are left to concede that the methodology we propose is not an answer to the many facets of the ordinary meaning problem highlighted herein. That said, we are not shy in asserting that corpus linguistic analysis is an essential step in improving the quality of the ordinary meaning inquiry going forward. At a minimum, the data that can be compiled through corpus linguistic analysis will allow lawyers and judges to have a transparent debate informed by real data instead of inferences from sources (like dictionaries or etymology or intuition) that are both opaque and ill-suited to the task to which they are applied. The corpus methodology that we have introduced promises three contri-

333. Kagan, *supra* note 10.

334. Mouritsen, *supra* note 271, at 161 (arguing that textualist analysis may be "vulnerable" to attack from corpus data because textualist claims about meaning "can be proven true or false using empirical linguistic methods").

butions to ordinary meaning analysis going forward. First is a diagnostic contribution: the methodology of corpus linguistics helps to identify shortcomings in the law's current approach to identifying and assessing ordinary meaning. Second, corpus linguistic analysis can help advance the theory of interpretation. The tools and methodologies presented herein will aid in the development of a more sophisticated legal conception of ordinary meaning. Third, having identified the problem and laid out the requirements for a proposed solution, we advance the methodology of corpus linguistics as the best mechanism for yielding a satisfactory solution.

We grant that some problems of ordinary meaning will require resort to other tools or principles of interpretation for their resolution. Where the corpus data are inconclusive, or the distinction between two proposed definitions seems so thin that we doubt that it represents any real difference in human perception, we may need to look elsewhere to resolve the interpretive question presented. But that does not mean that the corpus data were unhelpful. It means that we looked at data—at comparatively empirical, falsifiable grounds for assessing ordinary communicative content—as a threshold step and decided we needed to go further to find a satisfactory answer.

## CONCLUSION

Some points of analysis outlined here are necessarily tentative. That seems inevitable in the course of breaking new ground. We trust that some of the value in our contribution will be to spark further analysis and scholarship on the questions we have raised.

Moving forward, judges, lawyers, and linguists will need to collaborate to settle on some best practices in this emerging field. Some important questions to answer include methods for selecting the best corpus for a given type of ambiguity, standards for the appropriate sample size for a given search, standards for determining appropriate search terms and search methods for various types of inquiries, and the identification of suitable coding methods. Scholars have begun to explore these and other related questions.[335] Further work is in order. But we are confident that lawyers and linguists can work together to develop an orthodox set of methods that will refine an approach that is now in its infancy.

---

**335.** *See* James C. Phillips & Jesse A. Egbert, *A Concise How-To Guide for Law and Corpus Linguistics: Importing Principles and Practices from Survey and Content-Analysis Methodologies To Improve Corpus Design and Analysis*, 2017 BYU L. REV. (forthcoming 2018) (arguing that principles and methodologies from survey and content-analysis methodologies need to be applied to corpus design, selection, and coding).

Linguists have observed that corpus linguistics generally "has not yet reached the stage where it can present a stable set of methodological procedures coupled to specific descriptive questions."[336] That is undoubtedly all the more true for the application of this tool to a brand new field. The law, after all, asks questions that linguists historically have not deemed important—concerning the average or "ordinary" understanding of a given term in a given linguistic setting. The methodology of corpus linguistics will undoubtedly experience growing pains as it is employed for new purposes. Yet linguists have noted elsewhere (more generally) that "[t]he observation that distributional corpus analysis has not reached" the stage at which we have embraced a set of widely accepted norms "is certainly not a reason to abandon the approach; rather, it defines a promising and exciting research [program]."[337] That is certainly true as to the application of corpus linguistics to the enterprise of judging ordinary meaning. Whatever its current limitations, "semantic analysis can, and indeed, should, turn to corpus methods."[338]

The need is acute when the interpretive task involves questions of law. Too much rides on the resolution of legal ambiguity to resolve the matter by means "fraught with the potential for bias and error."[339] If and when the law turns on an assessment of ordinary communicative content we must at least try to define and operationalize the inquiry with greater care. We see the approach outlined here as a step in that direction.

336. GEERAERTS, *supra* note 247, at 178.

337. *Id.*

338. Glynn, *supra* note 136, at 7.

339. State v. Rasabout, 2015 UT 72 ¶ 134, 356 P.3d 1258, 1290 (Lee, Associate C.J., concurring in part and concurring in the judgment).

UNIVERSITY *of* PENNSYLVANIA
LAW REVIEW

Founded 1852

Formerly
AMERICAN LAW REGISTER

© 2019 *University of Pennsylvania Law Review*

VOL. 167 JANUARY 2019 NO. 2

ARTICLE

# DATA-DRIVEN ORIGINALISM

THOMAS R. LEE† & JAMES C. PHILLIPS††

*The threshold question for all originalist methodologies concerns the original communicative content of the words of the Constitution. For too long this inquiry has been pursued through tools that are ill-suited to the task. Dictionaries generally just*

† Thomas R. Lee is Associate Chief Justice of the Utah Supreme Court, Distinguished Lecturer of Law at Brigham Young University, and Visiting Lecturer at Harvard Law School.

†† James C. Phillips is a Nonresident Fellow with the Constitutional Law Center at Stanford Law School. The authors express their thanks to the organizers of the Ninth Annual Hugh & Hazel Darling Foundation Originalism Works-in-Progress Conference at the University of San Diego for the opportunity to present this paper. Thanks also to the following for their comments on earlier drafts: Jack Balkin, Will Baude, Christopher Green, Michael McConnell, John Mikhail, Christina Mulligan, Mike Rappaport, Eric Segall, Lee Strang, and David Upham. Last but not least, thanks to Jordan Call, Neal Hoopes, Paxton Lewis, and Jacob Crump for their able research assistance.

*define individual words; they don't typically define phrases or allow for consideration of broader linguistic context. And while dictionaries can provide a list of possible senses, they can't tell us which sense is the most ordinary (or common).*

*Originalists have also turned to other methods, but those methods have also fallen short. But all is not lost. Big data—and the tools of linguists—have the potential to bring greater rigor and transparency to the practice of originalism. This article will explore the application of corpus linguistic methodology to aid originalism's inquiry into the original communicative content of the Constitution. We propose to improve this inquiry by use of a newly released corpus (or database) of founding-era texts: the beta version of the Corpus of Founding-Era American English.*

*This paper will showcase how typical tools of a corpus—concordance lines, collocation, clusters (or n-grams), and frequency data—can aid in the search for original communicative content. We will also show how corpus data can help determine whether a word or phrase in question is best thought of as an ordinary one or a legal term of art. To showcase corpus linguistic methodology, this paper will analyze important clauses in the Constitution that have generated litigation and controversy over the years (commerce, public use, and natural born citizen) and another whose original meaning has been presumed to be clear (domestic violence). We propose best practices, and also discuss the limitations of corpus linguistic methodology for originalism.*

INTRODUCTION ........................................................................ 264
I. THE CENTRALITY OF THE INQUIRY INTO ORIGINAL COMMUNICATIVE CONTENT .................................................. 268
*A. Public Meaning Originalism* ........................................................ 268
*B. Original Intentions Originalism* .................................................... 269
*C. Methods Originalism* .................................................................... 271
II. PREVAILING APPROACHES TO THE DEFINITION AND MEASUREMENT OF ORIGINAL COMMUNICATIVE CONTENT ...... 272
*A. The Meaning of Meaning: Prevailing Approaches to Communicative Content* ....................................................................... 273
1. Commerce ............................................................................ 275
2. Public Use ............................................................................ 277
*B. The Measurement of Meaning: Prevailing Tools for Assessing Communicative Content* ............................................................ 278
1. Commerce ............................................................................ 280
2. Public Use ............................................................................ 281
*C. Shortcomings of Existing Methodologies* ........................................... 282
1. Problems with Founding-Era Dictionaries ............................ 283
*a. Insufficient Semantic Context* ............................................ 283

   *b. Polysemy* .......... 284
*c. Wrong Timeframe* .......... 287
2. The Fallacy of Etymology .......... 288
3. Linguistic Intuition and Sample Sentences from Founding-Era Literature .......... 288
III. CORPUS LINGUISTIC ANALYSIS: A BETTER MEANS OF MEASURING ORIGINAL COMMUNICATIVE CONTENT .......... 289
*A. The Purpose of Corpus Linguistics* .......... 289
*B. Corpora* .......... 290
*C. Tools* .......... 290
*D. COFEA* .......... 293
IV. DATA-DRIVEN ANALYSIS .......... 296
*A. Domestic Violence* .......... 296
*B. Commerce* .......... 300
1. Frequency .......... 301
2. Collocates .......... 302
3. Clusters (or n-grams) .......... 304
4. Sense Differentiation .......... 308
*C. Public Use* .......... 311
1. Frequency .......... 311
2. Sense Differentiation .......... 312
*D. Natural Born* .......... 316
V. CONTRIBUTIONS AND CAVEATS .......... 319
*A. Contributions* .......... 320
1. Corpus Analysis Addresses Shortcomings of Traditional Inquiries .......... 320
2. Corpus Analysis Sharpens the Debate Over When and How to Resolve Ambiguity in Original Meaning. .......... 321
3. Corpus Analysis Facilitates the Debate on Whether the Constitution is Written in Ordinary English or in the Dialect of the Law .......... 325
*B. Caveats* .......... 327
1. Scope of Applicability of Corpus Linguistic Analysis .......... 327
2. Indeterminate Data .......... 329
3. Judicial Capacity for Corpus Linguistic Analysis .......... 331
CONCLUSION: CONSTRAINT THROUGH DATA-DRIVEN ORIGINALISM .......... 333

## INTRODUCTION

A threshold inquiry for any problem of interpretation concerns the "communicative content" of the text. Any attempt to give legal meaning to the words of the law begins with "linguistic meaning."[1] Sometimes we stop there. If the communicative content of the law is clear, we give that content controlling legal significance.[2]

This is the "standard picture" of interpretation.[3] Most of the difficulties arise in cases where the standard picture is unclear. The divisions among textualists and purposivists in statutory interpretation, for example, go to the likelihood of finding ambiguity in the search for communicative content, and to the proper tools and course for resolving such ambiguity. But everyone starts at the same place—at communicative content—and ends there if the standard picture is sufficiently clear.

Constitutional interpretation is no different in this respect. In this field, we also start with the operative text. And again we end there where the communicative content of the Constitution is clear.

We may not often end there. We may rarely conclude that the standard constitutional picture is clear, particularly on questions that get litigated in our courts. But still this is the starting point. And no one doubts that the standard picture is sometimes crystal clear. Article II, Section 1 of the United States Constitution says that no person "who shall not have attained to the Age of thirty-five Years" is "eligible" to serve as President of the United States.[4] No one who is trying to interpret those words would say that a thirty-year-old is eligible for the presidency.[5] That's because we can all agree on what it means

1 *See* Lawrence B. Solum, *Communicative Content and Legal Content*, 89 NOTRE DAME L. REV. 479, 480 (2013) (distinguishing the "communicative content" of a legal text from its "legal content," or in other words "the legal norms the text produces").

2 There are caveats, of course—like the doctrine of absurdity. But this is the general rule. *See* Abbe R. Gluck, *The States as Laboratories of Statutory Interpretation: Methodological Consensus and the New Modified Textualism*, 119 YALE L.J. 1750, 1756–58 (2010) (concluding, based on a comprehensive study of state court approaches to statutory interpretation, that such courts give primacy to text and decline to look to external sources of meaning if they find the text "plain," and asserting that "these state efforts . . . respond directly to the leading academic proposals advanced to make federal statutory interpretation more determinate").

3 *See* William Baude & Stephen E. Sachs, *The Law of Interpretation*, 130 HARV. L. REV. 1079, 1086 (2017) (speaking of the "standard picture," or "view that we can explain our legal norms by pointing to the ordinary communicative content of our legal texts," or, in other words, "an instrument's meaning as a matter of language"); *see also id.* at 1082 n.2 (borrowing the "standard picture" terminology from Mark Greenberg, *The Standard Picture and Its Discontents*, *in* 1 OXFORD STUDIES IN PHILOSOPHY OF LAW 39, 48 (Leslie Green & Brian Leiter eds., 2011)).

4 U.S. CONST. art. II, § 1.

5 *But see* Michael Stokes Paulsen, *Is Bill Clinton Unconstitutional: The Case for President Strom Thurmond*, 13 CONST. COMMENT. 217, 220 (1996) (presenting a tongue-in-cheek case for the

to have "attained to the Age of thirty-five Years"; the communicative content of that proviso is clear in foreclosing the eligibility of anyone younger.

A principal complication for *constitutional* interpretation, of course, is the added time dimension.[6] Thus, most of the action in the theory of constitutional interpretation concerns the question of how to deal with the fact that the Constitution (unlike most operative statutes) was written centuries ago, in a dialect that is, at least in some respects, unfamiliar to the twenty-first-century ear. This is the problem of linguistic drift—the notion that language usage and meaning shifts over time. And this raises the question of *which* standard picture to credit: the picture as it would have been viewed at the time of the Constitution's founding, or the picture as seen by the modern jurist?

For some constitutional questions, the time difference won't matter. We can assume (though this proposition could be tested—more on that below), for example, that our system for accounting a person's age has not changed since the founding of the Constitution. And if so, then a commitment to following the communicative content of the law should foreclose the eligibility of our thirty-year-old candidate.[7]

But of course there are other provisions of the Constitution for which that would not hold. One example is the Domestic Violence Clause—the provision in Article IV, Section 4 that provides that "[t]he United States . . . shall protect" each state in the union "against Invasion" and "on Application of the Legislature . . . against domestic Violence."[8] This clause is viewed as having undergone linguistic drift in the relevant timeframe. It apparently meant *insurrection* or *uprising* in the eighteenth  century, but "domestic violence" is understood to refer to an assault against a member of a person's household today. This can also be tested; we do so below.

That frames the threshold question for constitutional interpretation. When the language of the Constitution is understood in one way today but can be shown to have had a different communicative content historically (at its adoption), which is the relevant standard picture? If a state legislature

---

proposition that the age standard in Article II should be allowed to evolve over time; asserting that "[m]aturity is the key, as measured by a proportion of the normal expected lifespan"; and concluding that the comparable standard of maturity in our era is "something more like 'fifty-nine-and-a-half'").

6  Another is the fact that the Constitution, in some instances, speaks in sweeping vagaries with weak communicative content. We address that complication later. *See infra* Part II.

7  That candidate might mount other arguments against this conclusion. But he would not be in any position to challenge the threshold communicative content of Article II, Section 1. In this sense the language of the Constitution is at least *sometimes* constraining—or at least to some extent. *Cf.* William Baude, *Originalism as a Constraint on Judges*, 84 U. CHI. L. REV. 2213, 2215 (2017) (suggesting that proponents of the "constraint" premise of originalism "no longer have a clear champion"); Thomas B. Colby, *The Sacrifice of the New Originalism*, 99 GEO. L.J. 713, 714–15 (2011) (asserting that "[j]udicial constraint" was once the "heart and soul" of originalism but has since "sold its soul to gain respect and adherents").

8  U.S. CONST. art. IV, § 4.

declares a "domestic violence" epidemic in the twenty-first century sense of that phrase, is the federal government obliged to marshal national guard forces in response to the state's request for protection?

Here again we find more consensus than dispute. If the eighteenth-century understanding of "domestic violence" is clear in its reference to an insurrection, then all prevailing approaches to originalism would credit that understanding. Most of the action in the interpretive battle in this field concerns what to do in the face of ambiguity as to the original meaning of the constitutional text. Where the original meaning is clear, almost everyone agrees that that meaning controls. The hypothetical request for federal troops to deal with modern *domestic violence* would be laughed out of court. And that's because almost everyone agrees with what Professor Larry Solum calls the "Fixation Thesis"—the notion that the communicative content of an historical legal document is fixed at the time it was adopted—at least in the (rare) circumstance in which its original communicative content is clear.[9]

Even careful "living" originalists presumably would agree with this proposition. They are just less likely to believe that many principles of the Constitution have a clearly ascertainable original meaning. Jack Balkin, for example, draws a distinction between the basic "framework" of the Constitution (which is conceded to be clearly established, fixed, and limiting) and the "build out" on top of the established framework (the details of which are not prescribed by any fixed original meaning, and which can be added on top of the original framework in a process of "construction" that is not constrained by original meaning).[10] Even for a living originalist like Jack Balkin, the question is which of the provisions of the Constitution have clear communicative content. Most everyone would agree that some provisions are clear. The key problems concern (a) how to figure out whether they are clear; (b) what degree of clarity is required before we deem the document to constrain; and (c) what to do when the required clarity is absent.

All the action in the theory of constitutional interpretation is thus after the threshold inquiry into original communicative content.[11] Within the

9 Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1 (2015).

10 *See* Jack M. Balkin, *Framework Originalism and the Living Constitution*, 103 NW. U. L. REV. 549, 560-61 (2009) ("Living constitutionalism concerns the process of constitutional construction. Framework originalism leaves space for future generations to build out and construct the Constitution-in-practice. Living constitutionalism occupies this space. It explains and justifies the process of building on and building out.").

11 This is not to say that every constitutional case begins with originalist analysis. There are many fields of constitutional law that have been completely overtaken by precedent. When an extent of the precedent in a particular field is rich and the communicative content of the underlying constitutional provision is poor (as with doctrines of substantive due process), we may expect a court to begin and end its analysis with the body of precedent without stopping to inquire into original

family of originalist theories, we may disagree on the proper means of resolving ambiguity as to original meaning—by resort to tools for assessing language usage among members of the general public, by reference to writings of framers or ratifiers, by incorporation of tools of interpretation employed by lawyers and jurists at the time of the framing, or otherwise. And we may disagree on what to do if we cannot ultimately resolve the problem of ambiguity by use of these tools—on whether to fall back on presumption of constitutionality premised in a burden of proof, or whether to acknowledge a zone of "construction" that invites tools aimed at establishing "legal content" having nothing to do with the threshold inquiry into communicative content. But we all start at the same place—and agree to stop there if the standard picture is clear.

For all our agreement on the significance of this important starting point, we have no established methodology for assessing the original communicative content of the Constitution.[12] To date we have paid little attention to the reliability of our methods for this assessment. And the means we have used fall short in several ways. In this Article, we highlight some problems with the standard approach to this inquiry and propose a tool for addressing the deficiencies.

In Part I, we show that the inquiry into original communicative content is the starting point for all originalist methodologies—and can be the end point if such content is unambiguous. In Part II, we describe prevailing methods for assessing original communicative content and identify shortcomings of these methods. Part III introduces a tool for assessing original communicative content—a tool used in a field called corpus linguistics, a field that looks for patterns in meaning and usage in large databases (*corpora*) of naturally occurring language. Part IV shows how this tool can be used to find the original communicative content of provisions of the Constitution. Here and elsewhere, we consider the original meaning of *domestic violence* as well as three important questions of originalist inquiry addressed in high-profile cases—the scope of the *commerce* power under Article I, Section 8; the nature of *public use*

communicative content. *See, e.g.*, Obergefell v. Hodges, 135 S. Ct. 2584, 2596-2605 (2015) (detailing the "substantial body of law considering all sides" of the issue of same-sex marriage). But that doesn't mean that originalism isn't the threshold inquiry; it just means that there is a body of precedent that gives the court a platform for bypassing it.

12 *See* ERIC J. SEGALL, ORIGINALISM AS FAITH 116 (2018) (asserting, in contrasting the inquiry into original intent with the inquiry into original public meaning, that the former has "at least" one advantage over the latter—it is "an empirical question requiring investigation into the words, minds, and actions" of the framers or ratifiers; and contending that "[t]he search for original objective meaning, by contrast, is a theoretical inquiry requiring the judge to don the mantle of a hypothetical objective person living centuries ago," a purportedly "much more difficult, if not impossible, task"); *see also* Thomas B. Colby & Peter J. Smith, *Living Originalism*, 59 DUKE L.J. 239, 254-55 (2009) ("[A] newer generation of originalists . . . do not concern themselves with how the words of the Constitution were actually understood by the Framers, the ratifiers, the public, or anyone else, but rather with how a hypothetical, reasonable person should have understood them.").

under the Takings Clause; and the meaning of *natural born citizen* in Article II, Section 5. Then in Part V, we conclude with some observations about how we see corpus analysis fitting into prevailing originalist methodologies, and some concessions on limitations of this tool. And we conclude with some observations about how corpus linguistics could help provide both external and internal restraint to judges.

## I. THE CENTRALITY OF THE INQUIRY INTO ORIGINAL COMMUNICATIVE CONTENT

Others have laid some of the groundwork that we begin with here. Recent scholarship has shown that the "originalist family" of theories "agree that the communicative content of the constitutional text was fixed at the time each provision was framed and ratified."[13] The differences among originalists go to the nature and means of the inquiry into original communicative content. Yet all originalists effectively begin with an inquiry into the original communicative content of the constitutional text. Below we highlight the centrality of the inquiry into original communicative content in each of three prevailing theories of originalism (public meaning, original intent, and methods originalism).

### A. *Public Meaning Originalism*

The case for the primacy of original communicative content is straightforward under public meaning originalism. The whole point of this "new originalist" theory was to shift the focus away from mere intentions of the framers and to inquire instead into the public meaning of the constitutional text. This was a response to criticisms highlighting "the difficulty of ascertaining *the* original intentions of a document drafted by a multimember constitutional convention and ratified by an even larger group who met in conventions convened in each state."[14] To address that concern, original public meaning originalists turned the focus away from framers' *intentions* and toward the public's understanding of the *text*. For the original public meaning originalist, the original meaning of the Constitution "that was proposed in 1787 was necessarily determined in large part by the conventional semantic meanings of the words and phrases that make up the text and the regularities of usage that are sometimes summarized as rules of grammar and syntax."[15]

13 Solum, *supra* note 9, at 7; *accord* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 7, at 78 (2012) ("Words must be given the meaning they had when the text was adopted.").

14 Solum, *supra* note 9, at 4.

15 *Id.* at 28.

This is an originalist "standard picture." It is an inquiry into the communicative content of provisions of the Constitution as they would have been understood by the public in the late eighteenth century. And it looks for evidence of "conventional semantic meaning" in the usage and linguistic conventions of that time.

### B. *Original Intentions Originalism*

An "original intentions" originalist looks for meaning that is "fixed by the intentions of the framers of the text."[16] Thus, this variation on originalism may seem more interested in the writings and advocacy of the framers—in the Federalist Papers, for example, or the records of the constitutional convention—than in semantic evidence of the meaning of the words they wrote in the constitution. If so, original intent originalism might be thought of as eschewing the inquiry into the communicative content of the text.

But a more careful consideration of this branch of originalism uncovers more common ground than disagreement. For thoughtful original intent originalists, the relevant "original intentions" are not "applicative" but "communicative": "Thus, the intent of a constitutional provision is a mental state that specifies the communicative content which the framers of that provision intended to convey *through the provision*."[17] We can think of "intentions" as "mental states." Yet the relevant mental state is not an aspiration privately held by the framers; it is an intention "encoded in linguistic representations" in the text of the Constitution.[18] This means that the framers' writings or advocacy are not direct evidence of the relevant original communicative content; they are indirect evidence that could help fill in gaps of underdeterminacy.[19] And that brings us back to a search for the original communicative content of the text of the Constitution.[20]

---

16 *Id.* at 7.

17 *Id.* at 26 (emphasis added).

18 *Id. at 27*.

19 *See* Lawrence B. Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 B.Y.U. L. REV. 1621, 1671 [hereinafter *Triangulating Public Meaning*] ("[D]rafting history can provide evidence of conventional semantic meaning, but this role is evidential."); *see also* Lawrence B. Solum, *Originalist Methodology*, 84 U. CHI. L. REV. 269, 284 (2017) (speaking of corpus linguistics as providing "primary evidence" of the relevant "patterns of usage" and original semantic meaning).

20 Larry Alexander and Saikrishna Prakash thoughtfully question the notion of "intention free textualism"—"the position that texts can be interpreted without any reference, express or implied, to the meaning intended by the author of the text." Larry Alexander & Saikrishna Prakash, *"Is That English You're Speaking?" Why Intention Free Interpretation is an Impossibility*, 41 SAN DIEGO L. REV. 967, 968 (2004). They identify persuasive grounds for questioning our ability to resolve ambiguities in the meaning of a given text without resort to authorial intention. But they do not seem to ultimately question the salience of the author's text—or to suggest that an author's privately held "intention" could override clear meaning in the words he uses.

There is a parallel here to contemporary approaches to statutory interpretation.[21] "We are all textualists now"[22] in the sense that even purposivist inquiries to statutory interpretation find the text to be the best evidence of legislative purpose, and deem themselves bound by the clear meaning of the purpose as stated in the text when it is unambiguous.[23] In a similar sense, it could be said that we are all "original public meaning" originalists now.[24] That holds true to the extent that the original communicative content of the words of the Constitution is clearly established. Where that holds, no thoughtful "original intent" originalist would seek to override the original public meaning with evidence of a framer's privately held intentions.

The above-noted example under the Domestic Violence Clause illustrates the point. If *domestic violence* is shown widely to have been understood to refer to a rebellion or uprising, and (almost?) never to speak of an act of assault in a person's household, then that should be the end of the inquiry even for a proponent of "original intent" originalism. That original communicative

Instead, these authors' thesis seems to be that *ambiguities* in the meaning of a text cannot be resolved without consideration of authorial intent. Thus, Alexander and Prakash argue that it is not possible to discern the "man on the street" meaning a of text by a "sample of average members of the public." *Id.* at 984. A principal concern here is "how much background context" to attribute to the "average interpreter." *Id.* "If we take the law to mean whatever it would mean to a collection of people who are provided no context whatsoever—other than, perhaps, that its authors were English speakers and enacted the law on a given date—then we might as well construct a computer program that incorporates dateable dictionaries and rules of syntax, grammar, and punctuation and ask the computer to spit out the law's meaning." *Id.* We think Alexander and Prakash were partly onto something here. We see corpus linguistic analysis as a means of finding "average interpreter" meaning. And we try to show that this tool can (at least sometimes) provide reliable empirical evidence of "average interpreter" meaning, and can do so in light of relevant linguistic context.

21 *See* Chris Wallace, Interview with Supreme Court Justice Antonin Scalia, Fox News Sunday (July 29, 2012) (Justice Scalia, asserting that "[o]riginalism is sort of a subspecies of textualism"), https://www.realclearpolitics.com/2012/07/29/interview_with_supreme_court_justice_antonin_scalia_286094.html [https://perma.cc/Q2VH-9BCS].

22 Elena Kagan, *The Scalia Lecture: A Dialogue with Justice Kagan on the Reading of Statutes* at 8:28, HARV. L. TODAY (Nov. 17, 2015), http://today.law.harvard.edu/in-scali-lecture-kagan-discusses-statutory-interpretation [http://perma.cc/3BCF-FEFR].

23 *See* JOHN F. MANNING & MATTHEW C. STEPHENSON, LEGISLATION AND REGULATION 60 (2d ed. 2013) ("Over the last quarter-century, textualism has had an extraordinary influence on how federal courts approach questions of statutory interpretation. When the Court finds the text to be clear in context, it now routinely enforces the statute as written."); Gluck, *supra* note 2, at 1756–58 (showing that state supreme courts consistently give primacy to text and decline to look to external sources of meaning if they find the text "plain").

24 Justice Elena Kagan and Professor Lawrence Tribe have made similar observations. *See* Laurence H. Tribe, Comment (summarizing Ronald Dworkin's comments in the same volume), *in* ANTONIN SCALIA, A MATTER OF INTERPRETATION 65, 67 (1997) ; Jonathan H. Adler, *The Judiciary Committee Grills Elena Kagan*, WASH. POST (June 29, 2010, 1:18 PM), http://www.washingtonpost.com/wp-dyn/content/article/2010/06/29/AR2010062902652.html [https://perma.cc/PS3F-9CTB] (reporting that during her confirmation hearings, Elena Kagan declared, "We are all originalists").

content, after all, is the best evidence of the framers' intentions as encoded in the Domestic Violence Clause. And even a committed original intentionalist would not be in a position to argue for overriding that intention with contrary evidence of a framer's idiosyncratic views. This should hold, at least, where the evidence of intent as encoded in the text is clear. And that suggests that the threshold inquiry for original intentionalists should be the same—they should look first for the original communicative content of the words of the Constitution.

### C. *Methods Originalism*

This should also hold for "original methods" originalists. The principal contribution of this theory is to posit that the Constitution was written in a distinct "dialect"—in the language of the law of the eighteenth century—and to suggest that we can decode this dialect only by immersing ourselves in the language community of that dialect.[25] This move was aimed, at least in part, at questioning the basis for "construction" of the Constitution to extend its terms beyond the "interpretation" of its communicative content. John McGinnis and Mike Rappaport are the chief proponents of this methodology. They have advocated that gaps in the Constitution's communicative content can be filled in by acknowledging the distinct dialect of the Constitution and by ascertaining the communicative content of the words of the document using canons and methods of interpretation that would have been used by lawyers and judges in the eighteenth century.

But this approach does not at all eschew a threshold inquiry into the communicative content of the constitutional text. It doesn't even deny that some provisions of the Constitution are framed in ordinary language—and not the language of the law. Thus, a principal difference (to the extent there is one) between the original public meaning originalists and the original methods originalists concerns the degree to which each believes that the Constitution speaks in ordinary terms or in a distinct dialect of the law. And that means that original methods originalists should also begin with an inquiry into the communicative content of the words of the Constitution (at least for terms used in their ordinary sense—a question often begged by theorists, and which we can also measure using the tools that we introduce below).[26]

---

25 *See* John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Originalism and the Case Against Construction*, 103 NW. U. L. REV. 751, 751-52 (2009) (stating that "original methods originalism provides the most accurate method for determining the original meaning of the Constitution").

26 In this sense, the divide between public-meaning originalism and methods originalism seems more apparent than real. Both are aiming for public meaning *in the relevant dialect*. And both acknowledge that the Constitution seems to speak in two dialects. The real difference between these

McGinnis and Rappaport root their theory in the proposition that the Constitution is written in legal language that "overlays ordinary language."[27] So although they view the document as having been "written in the language of the law," they also concede that it "contains both ordinary language and legal language."[28] This suggests that courts should give *legal* terms *legal* meaning. But it also suggests, as Professors McGinnis and Rappaport note, that "[t]erms that have only *ordinary* meanings are given their *ordinary* meanings."[29]

McGinnis and Rappaport seek to categorize legal terms that appear in the Constitution. They first assert that thirteen terms are unambiguously legal terms—such as *writ of habeas corpus*, *original jurisdiction*, and *attainder of treason*.[30] Next they identify another forty-four terms as ambiguous, suggesting that the terms in this category have both a legal meaning and an ordinary meaning.[31] A third group of terms are those the authors see as "possibly" having "a legal meaning in addition to their ordinary meaning."[32] This latest group includes *natural born citizen*; perhaps it could also include *commerce* and *public use*.

In light of the above, we infer that these theorists would view *domestic violence* as an ordinary term—not legalese. (This is a testable hypothesis, as we show in Part IV below.) And so we conclude that the original methods originalist (like the public meaning and intent originalist) would find controlling significance in the determination that the phrase *domestic violence* would have been understood by the general public to refer to an uprising or a rebellion—and not an assault against a member of a household.

## II. Prevailing Approaches to the Definition and Measurement of Original Communicative Content

The above highlights the centrality of the inquiry into original communicative content for originalist interpretation of the Constitution (and even for the nonoriginalist who believes that original meaning at least sometimes is fixed). That leaves the question of how to define and measure that content. Here we describe prevailing approaches to the definition and measurement of original communicative content. We also highlight shortcomings in our existing methodologies.

two theories goes to the means of closing the gap in indeterminate communicative content—whether by recognition of a construction zone or by original methods.

27 John O. McGinnis & Michael B. Rappaport, *The Constitution and the Language of the Law*, 59 Wm. & Mary L. Rev. 1321, 1326 (2018).

28 *Id.*

29 *Id.* at 1326-27 (emphasis added).

30 *Id.* at 137071.

31 *Id.* at 1371.

32 *Id.* at 1374.

### A. *The Meaning of Meaning: Prevailing Approaches to Communicative Content*

When originalist theorists speak of the original communicative content of the Constitution, they begin by considering "the conventional semantic meaning of the words and phrases" as they appear in the Constitution, "composed into larger units by syntax."[33] Yet they also acknowledge a role for what linguists speak of as "pragmatics"—the nonsemantic "context" of a given provision of the Constitution, which is understood to affect the understanding of communicative content.

Scholars have identified several "forms of contextual enrichment" that may be relevant to discerning the communicative content of the Constitution. These include (1) *impliciture*, essentially an implied ellipsis, as in the idea that the Article I, Section 9 proviso that "No Bill of Attainder or ex post facto Law shall be passed" includes an implied "[by Congress] as an impliciture;"[34] (2) *presupposition*, or an implication "that is presupposed by what is said in a particular context," as exemplified by the Ninth Amendment, which states that the Constitution's enumeration of rights "shall not be construed to deny or disparage others retained by the people," and thus presupposes that "there are rights that are retained by the people;"[35] and (3) *modulation*, the use of "an old word [] in a new way" in a particular context, as with the use of "recess" in the Recess Appointments Clause.[36]

33 Solum, *Originalist Methodology*, *supra* note 19, at 272; *see also* KURT T. LASH, THE FOURTEENTH AMENDMENT AND THE PRIVILEGES AND IMMUNITIES OF AMERICAN CITIZENSHIP 277 (2014) ("I have defined original meaning as the likely original understanding of the text at the time of its adoption by competent speakers of the English language who are aware of the context in which the text was communicated for ratification. Rather than seeking framers' intentions or linguistically possible interpretations, my effort has been to identify patterns of usage that signal commonly accepted meaning."); Christopher R. Green, *The Original Sense of the (Equal) Protection Clause: Pre-Enactment History*, 19 GEO. MASON U. C. R. L.J. 1, 12 (2008) ("[O]ne should look for what readers of the historically-situated text would have understood the constitutional language to express."); Vasan Kesavan & Michael Stokes Paulsen, *Is West Virginia Unconstitutional?*, 90 CALIF. L. REV. 291, 398 (2002) (trying to determine "the meaning the language [of the Constitution] would have had . . . to an average, informed speaker and reader of that language at the time of its enactment into law"); Vasan Kesavan & Michael Stokes Paulsen, *The Interpretive Force of the Constitution's Secret Drafting History*, 91 GEO. L.J. 1113, 1118, 1131 (2003) (seeking to understand "the meaning the words and phrases of the Constitution would have had, in context, to ordinary readers, speakers, and writers of the English language, reading a document of this type, at the time adopted"—the "meaning [words and phrases of the Constitution's text] would have had at the time they were adopted as law, within the [legal] and linguistic community that adopted the text as law"). .

34 Solum, *Triangulating Public Meaning*, *supra* note 19, at 1635.

35 *Id.* at 1636.

36 *Id.* .

Careful theorists also distinguish "original expected applications" from the original communicative content of the constitutional text.[37] One scholar makes the distinction by reference to the Second Amendment. He says that the inquiry into the original communicative content of the "right to bear arms" is aimed at discerning the understanding of that phrase in its semantic and pragmatic context. And he distinguishes that content from expected applications—e.g., the belief "that muskets and flintlocks were 'arms' within the meaning of the Second Amendment," or the belief that a particular individual was old enough to be eligible to serve as President of the United States under Article Two, Section 1.[38]

"Original expected applications" are relevant under this view, but they bear only evidentiary significance. "Thus, if the framers believed that muskets and flintlocks were 'arms' within the meaning of the Second Amendment, that fact is evidence that favors any theory of the meaning of arms that encompasses muskets and flintlocks and is evidence that disfavors any interpretation that would exclude them."[39] Yet there may also "be cases where application expectations are incorrect."[40] Here we can return to the Article II age requirement. "[I]f the members of the Philadelphia Convention had a false belief about the age of a potential presidential candidate, such that the individual would not have been eligible for election to the presidency in 1782 (because the individual was actually thirty-two and not thirty-six), the expectation that the Article Two requirement that the President be 35 years of age would be satisfied does not provide evidence that the phrase 'the age of thirty five years' had some weird meaning . . . ."[41] Where the communicative content of a provision is clear, we can simply assume the existence of a "factual error" about an expected application. And, in that instance, the probative value of the expected application will fail to override our clear understanding of original communicative content.

The original communicative content will not, of course, always be clear. Originalist theory recognizes that the bare communicative content will be "sparse" for some provisions of the Constitution and "rich" for others.[42] And there is extensive, ongoing debate about the proper response to "sparse" communicative content—whether by "construction" in light of means and

37 *See* Jack M. Balkin, *Abortion and Original Meaning*, 24 CONST. COMMENT. 291, 296-97 (2007) ("[C]onstitutional interpretation is not limited to those applications specifically intended or expected by the framers and adopters of the constitutional text.").

38 Solum, *Triangulating Public Meaning*, *supra* note 19, at 1638 .

39 *Id.*

40 *Id.*

41 *Id.*

42 *See* Solum, *Originalist Methodology*, *supra* note 19, at 271 ("The phrase 'freedom of speech' has sparse communicative content, but the legal content of free speech doctrine is very rich.").

methods aimed at something other than discerning communicative content, application of "original methods" to resolve ambiguity, deference to political branches of government, or application of a presumption of constitutionality and concomitant burden of proof.[43]

These are some basic tenets of the originalist inquiry into the communicative content of the terms of the Constitution. Originalist practice, of course, is not always in line with the more careful tenets of the theory. In the rest of this Article, we examine three test cases:

1. of the communicative content of Congress's power to regulate "commerce" under Article I, Section 8,
2. of the nature of the "public use" element of the Takings Clause, and
3. the conditions of the requirement in Article II that the President be a "natural born citizen."

We begin by examining two originalist opinions of Justice Thomas on the first two of our three test cases—on *commerce* and *public use*. Our aim is to highlight some shortcomings of current originalist practice, while recognizing, in fairness, that much of the refinement in originalist methodology is the product of fairly recent scholarship, and thus could not properly be expected of judges lacking the benefit of recent developments (much less the familiarity with the tools we advocate).[44]

### 1. Commerce

Our analysis of the communicative content of the Commerce Clause focuses on Justice Thomas's opinion in *United States v. Lopez*, as that is the opinion that focuses on this question most directly. Justice Thomas concurred separately in the Court's decision in *Lopez* striking down the Gun-Free School Zones Act of 1990 as exceeding Congress's power under Article I, Section 8. He did so based on an analysis aimed at "show[ing] how far" the court's precedents had "departed from the original understanding" of this provision.[45]

---

43 On this last point, see Gary Lawson, *Proving the Law*, 86 NW. U. L. REV. 859, 859-60 (1992).

44 We also note that Justice Thomas's recent opinions seem to be moving in the direction we advocate here. In *Lucia v. Securities & Exchange Commission*, Justice Thomas bolstered his conclusion that SEC Administrative Law Judges are "Officers of the United States" subject to the Appointments Clause by reference to the corpus linguistic analysis of the original meaning of "officers" presented in Jen Mascott, *Who Are "Officers of the United States"?*, 70 STAN. L. REV. 443 (2018). *See* 138 S. Ct. 2044, 2056-57 (2018) (Thomas, J., concurring). And in *Carpenter v. United States*, 138 S. Ct. 2206, 2238 n.4 (2018) (Thomas, J., dissenting), Justice Thomas looked to the Corpus of Founding-Era American English for evidence of use of the phrase "expectation(s) of privacy" for his analysis of whether "[t]he word 'search' was . . . associated with 'reasonable expectation of privacy'" in the founding era.

45 United States v. Lopez, 514 U.S. 549, 585 (1995) (Thomas, J., concurring).

This formulation seems to cue an inquiry into the original communicative content of the text of the Commerce Clause. That also seems confirmed by the lead points in Justice Thomas's analysis—his citation to founding-era dictionaries, which he cites as establishing that "'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes."[46]

Justice Thomas also seems to recognize the significance of semantic context. In footnote 2 of his opinion, Justice Thomas contextualizes the clause by emphasizing that the full text does not give Congress the "authority to regulate all commerce."[47] Justice Thomas notes that "[e]ven to speak of 'the Commerce Clause' perhaps obscures the actual scope of that Clause," given that the full text empowers Congress only to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[48]

Justice Thomas supports his conclusions about the original communicative content of the Commerce Clause by citing historical sources such as "exchanges during the ratification campaign" that show the "relatively limited reach of the Commerce Clause and of federal power generally."[49] He also cites Hamilton's writings that congressional control over "the recesses of domestic life" and "the private conduct of individuals" would have been "just cause for rejecting the Constitution."[50] But in raising Hamilton's writings in this way, Justice Thomas seems to be resorting to evidence of original *expected applications* rather than original *communicative content*.

The opinion unambiguously shifts into original expected applications by identifying agriculture as a concern that the Founders thought "would remain outside the reach of the Federal Government" but that "substantially affected" commerce.[51] Justice Thomas cites Hamilton as writing that "the supervision of agriculture and of other concerns of a similar nature" "would be as troublesome as it would be nugatory."[52] And this shift occurs without acknowledging the difference between original communicative content and original expected applications.[53] Granted, because he begins with an inquiry into original understanding, it is certainly possible to view the applications evidence as mere evidence, and not as an indication of an inquiry into pure framers' intent.

---

46 *Id.* at 585–86 (citing SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE 361 (4th ed. 1773); NATHAN BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (26th ed. 1789); THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1796)).

47 *Id.* at 587 n.2 (Thomas, J., concurring).

48 *Id.*

49 *Id.* at 590.

50 *Id. at 592.*

51 *Id.* at 590.

52 *Id.* at 591 (citing THE FEDERALIST NO. 17 (Alexander Hamilton)).

53 *Id.*

2. Public Use

We also focus on Justice Thomas's dissent in *Kelo v. Town of New London*. In *Kelo*, Justice Thomas analyzes the original communicative content of the *public use* proviso in the Takings Clause. Justice Thomas wrote separately to criticize the majority's approach, which required only a "public purpose," and not any "use" of property in the sense of the government actively employing the property in some way.

Justice Thomas says that *public use* in the Takings Clause, "originally understood, is a meaningful limit on the government's eminent domain power."[54] He first focuses on original semantic meaning of the terms in the public use provision to illustrate the original communicative content. He searches for the original meaning of the operative words by consulting founding-era dictionaries and tracing the etymology of the words.[55]

The Thomas opinion also invokes the semantic context of the Clause, noting that the original meaning of the term *use* must be narrow because the Constitution employs the term narrowly in other contexts. Justice Thomas shows that "[e]lsewhere, the Constitution twice employs the word 'use,' both times in its narrower sense."[56] In this way, Justice Thomas excludes other possible contemporary dictionary definitions.[57]

Justice Thomas also contextualizes the clause in his attempt to show the original communicative content by contrasting the term *public use* with other constitutional terms—*general welfare* and *necessary and proper*. Justice Thomas writes that "[t]he Framers would have used some such broader term [general welfare] if they had meant the Public Use Clause to have a similarly sweeping scope."[58] And he argues that the majority's "interpretation of the Public Use Clause also unnecessarily duplicates a similar inquiry required by the Necessary and Proper Clause."[59]

Justice Thomas last uses evidence of founding-era practices to show original communicative content. He cites Blackstone's writings, which state that private property was held in such high regard that the law "will not authorize the least violation of it; no, not even for the general good of the whole community."[60] He also shows that early state practices "shed light on the original meaning of the same words contained in the Public Use Clause." And he says that states during the founding era used their eminent domain

54 Kelo v. City of New London, 545 U.S. 469, 506 (2005) (Thomas, J., dissenting).

55 *Id.* at 508.

56 *Id.* at 509.

57 *See* Akhil Reed Amar, *Intratextualism*, 112 HARV. L. REV. 747, 748 (1999) (classifying this method of constitutional exegesis as intratextualism).

58 *Kelo*, 545 U.S. at 509 (Thomas, J., dissenting).

59 *Id.* at 511.

60 *Id.* at 510 (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES *135).

power to provide only for "quintessentially public goods, such as public roads, toll roads, ferries, canals, railroads, and public parks."[61]

In citing founding-era writings and referring to early state practices, Justice Thomas does not distinguish between original public meaning and original intent. In citing the founders' views on private property, he seems to be adhering to an original intent theory—though he could simply be using these sources as evidence of how the public would have understood the clause. But he also seems to shift to original public meaning when citing early state practices, without acknowledging a shift in methodology.

### B. *The Measurement of Meaning: Prevailing Tools for Assessing Communicative Content*

The scholarship in this field has often skated over the question of our methodology for measuring original communicative content. But a few scholars have begun to highlight some important issues.

A pathbreaking piece was Randy Barnett's study of the original meaning of the Commerce Clause. Barnett sought to assess the communicative content of *commerce* by examining every use of that word in the Pennsylvania Gazette from 1728 to 1800.[62] Barnett did so because he recognized the limitations of traditional originalist methods, noting that they make it "difficult to know whether the evidence of usage offered by a particular [scholar] was typical or cherry-picked."[63] He acknowledged that "the general public [may] have taken the word [commerce] in its broader sense notwithstanding how participants in the drafting or ratification processes [may] have used the term." So he sought "to conduct comprehensive empirical surveys" of ordinary founding-era material.[64] We view this as an important scholarly development—an early recognition of a point we develop below (that the inquiry into original public meaning is an empirical one requiring representative data).[65]

61 *Id.* at 512.

62 *See* Randy E. Barnett, *New Evidence of the Original Meaning of the Commerce Clause*, 55 ARK. L. REV. 847, 856-57 (2003) ("Rather than sample these uses, each assistant separately . . . examined *every* appearance of [commerce] to see whether it was being used in its narrower or broader sense."). While Professor Barnett cites historians who claim that the newspaper is representative, that is an empirical claim without much linguistic proof. For other, more recent scholarship trying to build on Barnett's methodological breakthrough, see Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 STAN. L. REV. 443, 468 (2018); James Cleith Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760–1799*, 59 S. TEX. L. REV. 181, 183 (2018); Lee J. Strang, *The Original Meaning of "Religion" in the First Amendment: A Test Case of Originalism's Utilization of Corpus Linguistics*, 2017 BYU L. REV. 1683, 1696.

63 Barnett, *supra* note 62, at 856.

64 *Id.* at 856 & n.30.

65 *See also* Randy E. Barnett, *Interpretation and Construction*, 34 HARV. J.L. & PUB. POL'Y 65, 66 (2011) (observing that the Constitution's original public meaning "can typically be discovered by

Barnett's *Arkansas Law Review* piece builds on his earlier work on the original meaning of *commerce*. In a 2001 piece in the *University of Chicago Law Review*, Barnett inquired into whether Justice Thomas was correct in *Lopez* that commerce was "limited to *trade or exchange* of goods" or whether it could "refer to *any gainful activity*."[66] His study recognized the need to go beyond evidence of the founders' intended meaning. Thus, Barnett sought to determine the original communicate content of *commerce* by conducting a systematic linguistic survey of the constitutional record. He surveyed each usage of the term *commerce* in the text of the Constitution itself, contemporary dictionaries, the Constitutional Convention, the Federalist Papers, ratification conventions, and judicial opinions. And he found that in the Constitutional Convention, ratification debates, and the Federalist Papers, the "term 'commerce' was consistently used in the narrow sense and that *there is no surviving example of it being used in either source in any broader sense*."[67]

More recently, Larry Solum has noted that the inquiry into original communicative content often relies on (1) "prereflective beliefs" of contemporary readers "about the meanings of the words and phrases that make up the text," and (2) "dictionaries from the historical periods in which the various provisions of the text were authored."[68] To this list we would add (3) reliance on examples of English usage in writings from the relevant time period—writings that may or may not be a part of the legal "record" involved in the ratification of the Constitution, and which are cited to show usage or meaning of a particular word or phrase in relevant linguistic context; and (4) invocation of the etymology of words in the Constitution.

Solum helpfully identifies a range of problems with "an intuition-and-dictionary-based methodology for discovering the meaning of the constitutional text."[69] And he proposes a more systematic inquiry comprised of three components: (1) corpus linguistic analysis (our subject here); (2) "immersion" in "texts from the relevant period" to allow judges of original meaning "to 'train up' their linguistic intuitions"; and (3) study of the "constitutional record," including "precursor provisions and proposals," drafting history, ratification debates, early historical practice, and early judicial decisions.[70] We discuss these components in greater detail in Part V.

empirical investigation"); Green, *supra* note 33, at 44 (implying that one must "survey[] a mass of historically-prominent and framing-era material" because "[r]ecovering the historic textually-expressed constitutional sense requires the interpreter to put herself as much as possible in the position of informed people at the time that language was made part of the Constitution").

66 Randy Barnett, *The Original Meaning of the Commerce Clause*, 68 U. CHI. L. REV. 101, 112 (2001).

67 *Id.* at 104.

68 Solum, *Triangulating Public Meaning*, *supra* note 19, at 1639.

69 *Id.*

70 *Id.* at 1655.

For now, we simply note the importance of Solum's contribution to the question of the proper methodology.

A key point made by Solum concerns the relationship between direct linguistic inquiries into original communicative content and more traditional studies of the constitutional record. Too often we collapse these inquiries into one overarching search for "original meaning." But if we are seeking to distinguish communicative content from legal content, or interpretation from construction, we should recognize that the study of the constitutional record is of secondary (circumstantial) significance. We may use the drafting history or ratification debates as *evidence* of the communicative content of the constitutional text.[71] But it is mere evidence. And if we are confident that the words adopted in the Constitution would have been understood by the public in a certain way (if the standard picture is clear), then we could find the circumstantial evidence in the drafting history to be overridden by direct evidence of original communicative content.

Courts that have considered these questions have not always appreciated these nuances. Again, this is not surprising. But we highlight the inquiries into *commerce* and *public use* here to set the stage for our proposal for a different approach below.

### 1. Commerce

Justice Thomas begins his opinion in *Lopez* by focusing on tools aimed at establishing the original semantic meaning of the words. He cites to founding-era dictionaries to establish that "'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes."[72] He also cites the etymology of the word— "which literally means 'with merchandise'"—in support of the term's limited scope.[73]

But he quickly shifts to examples of usage from prominent founders such as Alexander Hamilton. He notes that the founders often used the term *commerce* "in contradistinction to productive activities such as manufacturing and agriculture."[74] Hamilton, for instance, wrote that the "supervision of agriculture . . . can never be desirable cares of a general jurisdiction."[75] Justice Thomas uses these sources as tools to infer that the original communicative content of the

71 See *id.* at 21 ("[T]he drafting history can provide evidence of conventional meaning, but this role is evidential.").

72 United States v. Lopez, 514 U.S. 549, 585 (1995) (Thomas, J., concurring) (citing SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE 361 (4th ed. 1773); NATHAN BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (26th ed. 1789); THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1796)).

73 *Id.* at 586.

74 *Id.*

75 *Id.* at 591 (citing THE FEDERALIST NO. 17 (Alexander Hamilton)).

term *commerce* could not have been gainful activity generally; otherwise Hamilton and others would not have made the distinction between the concepts.

The Thomas opinion also cites sources that illustrate the founders' views on government generally. He notes that "comments of Hamilton and others about federal power reflected the well-known truth that the new Government would have only the limited and enumerated powers found in the Constitution."[76] And if the federal government was to be one of limited authority, Thomas concludes that the original communicative content of the Commerce Clause could not have been one giving Congress boundless power.

2. Public Use

In *Kelo*, Justice Thomas again begins his inquiry into original communicative content by citing founding-era dictionaries. He cites Samuel Johnson's 1773 dictionary as defining *use* as "[t]he act of employing any thing to any purpose."[77] And he notes that when the property is devoted to private use, "it strains language to say that the public is 'employing' the property."[78] As in *Lopez*, Justice Thomas also again turns to etymology. He traces the English word *use* to the Latin word *utor*, meaning "to use, make use of, avail one's self of, employ, apply, enjoy, etc."[79]

The Thomas opinion also tries to infer the original communicative content of the words *public use* from founding-era views on property generally. He cites Blackstone's writings that private property rights are so highly regarded that the law "will not authorize the least violation of it."[80] And he infers from these early sources that the Public Use Clause "embodied the Framers' understanding that property is a natural, fundamental right."[81]

Justice Thomas also uses a survey of early state practices as tool for determining the original communicative content of the clause. He acknowledges that some early states "tested the limits of their state-law eminent domain power."[82] But he notes that most states limited their eminent domain for "quintessentially public goods" such as roads, ferries, canals, and parks.[83] And he says that all other uses of eminent domain were "hotly contested."[84] Justice Thomas suggests that these early practices are strong evidence of the original public understanding of the clause.

76 *Id.* at 592.
77 Kelo v. City of New London, 545 U.S. 469, 508 (2005) (Thomas, J., dissenting).
78 *Id.*
79 *Id. (quoting JOHN LEWIS, LAW OF EMINENT DOMAIN § 165, at 224 n.4 (1888)).*
80 *Id.* at 510.
81 *Id.*
82 *Id* at 513.
83 *Id.* at 512–13.
84 *Id.* at 513.

### C. *Shortcomings of Existing Methodologies*

The above sets the stage for some observations about shortcomings in our existing methods of measuring original communicative content.[85] We do so with some caveats and with a degree of hesitation. A principal caveat is an acknowledgement that the practice of originalism is in a state of refinement. Many refinements in originalist methodology have come in recent years, so it is unfair to criticize judges who have approached originalist questions without the benefit of recent thinking.

We hope that this project will be an element of that refinement. And it is even less fair to charge judges confronting originalist questions in cases decided decades ago with the methods we propose here. The judges who confronted the questions in *Lopez* and in *Kelo* could not possibly have pursued the inquiries we propose here—not only because they likely were not aware of the linguistic tools we propose, but also because the digitized databases that we employ have been created recently.

For these reasons, we don't want to be heard as lambasting the originalist analysis in the *Lopez* and *Kelo* opinions. We think *any* originalism is better than no originalism. And we laud the judges whose work we discuss here,[86] even while proceeding to identify shortcomings in the methods that they have employed (and hoping that our criticisms will be seen in the constructive spirit in which they are intended).

With these caveats, we identify here a series of concerns with the common course of the originalist inquiry into communicative content, highlighting the *Lopez* and *Kelo* opinions we have discussed above (and as a preview to our further inquiry into the *commerce* and *public use* questions presented in those cases in Part IV below).[87]

85 For some related critiques of traditional originalist methodology, see Lee J. Strang, *How Big Data Can Increase Originalism's Methodological Rigor: Using Corpus Linguistics to Reveal Original Language Conventions*, 50 U.C. DAVIS L. REV. 1181, 1200 (2017) ("Critics insisted that originalism's reliance on history continued to open it to the Inaccuracy Critique.").

86 In full disclosure, this includes present company. One of us is an appellate judge, the other his former law clerk. And our own originalist inquiries undoubtedly have fallen short in some of the respects enumerated here. So if it sounds like we're pointing the finger at the *Lopez* and *Kelo* opinions, we concede that we have other fingers pointing back at ourselves.

87 We don't delve here into another originalist methodology—an inquiry into early practice as evidence of the original public understanding of the clause. *See, e.g.*, NLRB v. Noel Canning, 134 S. Ct. 2550, 2559 (2014) (declaring that "in interpreting the Clause, we put significant weight upon historical practice" (emphasis omitted)). We see this as more of a behavioral than a linguistic inquiry. Perhaps evidence of historical practice could tell us something about communicative content. But such evidence would have only indirect—circumstantial—evidentiary significance.

1. Problems with Founding-Era Dictionaries

We (and others) have written elsewhere of the shortcomings of dictionaries in any inquiry into the communicative content of words.[88] We catalog and expand on those shortcomings here.

a. *Insufficient Semantic Context*

A threshold point is that dictionaries often lack the semantic context necessary to assess the communicative content of a constitutional phrase. Dictionaries typically define individual words, not phrases.[89] And because the human brain understands words not in isolation but in their broader semantic (and pragmatic) context, we may often miss the import of a given constitutional term if we just separately look up its component words in the dictionary.[90]

The *public use* question most easily illustrates this point. We can look up the word *use* in a founding-era dictionary, as Justice Thomas did in *Kelo*. And that will tell us something of relevance to the meaning of the phrase *public use*. But that may not be conclusive. The communicative content of *public use* may conceivably be derived by looking up *public* and *use* in a dictionary. But that use of a dictionary can also be misleading. That's because the communicative content of a phrase isn't always the sum of its parts.[91] This is the linguistic problem of "compositionality": the "meaning of a complex expression" is sometimes a "compositional function of the meanings of its semantic constituents,"[92] and sometimes not—as where "the combination of words has a meaning of its own that is not a reliable amalgamation of the

88 *See* Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788, 808 (2018) (noting that "[t]he dictionaries typically cited by our courts . . . make no claims about the relative frequency of the listed senses of a given word") ; Phillips & White, *supra* note 62, at 189 ("[M]odern dictionaries can usually note what has been 'linguistically permissible' at a particular time, but not what was likely in a given scenario.").

89 *See* Lee & Mouritsen, *supra* note 88, at n.141 (citing OXFORD DICTONARY OF ENGLISH xi (3d ed. 2010) ("The general principle on which the senses in the Oxford Dictionary of English are organized is that each word . . . has at least one core sense or core meaning . . . .").

90 Some dictionaries (even founding-era ones) sometimes give examples of word usage in context. But those examples are unlikely to give sufficient semantic context, for a number of reasons. First, again, we're not dealing with phrases, but just words. So the dictionary providing a sentence using the word *public* and another using the word *use* tells us nothing about how *public use* is used in context. Second, example sentences in founding-era dictionaries, at least, tend to be sentences from a much older time period from a famous source or author. This tells us little about contemporary usage by "ordinary" folks. Finally, one or two example sentences is too small a sample size to generalize to an era's greater population of language users.

91 *See generally* Samuel L. Bray, *"Necessary AND Proper" and "Cruel AND Unusual": Hendiadys in the Constitution*, 102 VA. L. REV. 687, 692 (2016) ("There is of course more than one way to read 'necessary and proper' and 'cruel and unusual.' Each phrase could be read as two requirements. Or each phrase could be read as a tautology." (footnote omitted)).

92 ALAN CRUSE, MEANING IN LANGUAGE 83-84 (2011).

components at all, e.g. *no fear*, *at all*, *for good*."[93] A related problem is the "idiom principle," or the existence of "semi-preconstructed phrases that constitute single choices [in communication], even though they might appear analyzable into segments"[94]—like *of course* or *in fact*. We could look up *of* and *course* in the dictionary, but in doing so we would probably incorrectly determine what the idiom *of course* means.

*Public use* could be one of those sorts of phrases. Or it could be a phrase with distinct meaning in the dialect of "legalese."[95] If so we could not accurately construct the communicative content of *public use* by looking up *public* and *use* in a dictionary.[96]

The same almost certainly goes for *domestic violence*. We could look up the word *domestic* and the word *violence* in a founding-era dictionary, piece together the definitions, and come with a very modern sense of *domestic violence*—of an act causing bodily injury to a member of a person's household. But that could be a linguistic mistake (and is, as we show in Part IV.A.)

b. *Polysemy*

A second problem stems from what linguists call *polysemy*—the existence of multiple senses of a given term. This is a common source of indeterminacy in our search for communicative content. And when a word is polysemous we cannot resolve the question of original communicative content by resort to a dictionary—for several reasons.

The first reason stems from the nature of historical dictionaries.[97] The most commonly cited founding-era dictionaries are Samuel Johnson's 1773 *Dictionary of the English Language* and Noah Webster's 1828 publication. And these two dictionaries, like many others over history, are a product of "piracy."[98] Webster plagiarized from Johnson, and Johnson, in turn, borrowed

93 Alison Wray, *Why Are We So Sure We Know What a Word Is?*, *in* THE OXFORD HANDBOOK OF THE WORD 737 (John R. Taylor ed., 2015).

94 John McH. Sinclair, *Collocation: A Progress Report*, *in* LANGUAGE TOPICS: ESSAYS IN HONOUR OF M. HALLIDAY 320 (Ross Steele & Terry Threadgold eds., 1987).

95 *See infra* Section IV.B.

96 A founding-era legal dictionary could conceivably solve this problem. If *public use* was a legal term of art with a settled meaning in the law at the time of the founding, perhaps we could find evidence of that in a founding-era legal dictionary. Yet we have found no evidence of that. The founding-era legal dictionaries we consulted do not define public use. *See* TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW-DICTIONARY (3d ed. 1783); GILES JACOB, A NEW LAW-DICTIONARY (4th ed. 1739).

97 For further analysis of pros and cons of other founding-era dictionaries, see Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 GEO. WASH. L. REV. 358 (2014).

98 *See* SIDNEY I. LAUNDAU, DICTIONARIES: THE ART AND CRAFT OF LEXICOGRAPHY 43 (3d ed. 2001) ("The history of English lexicography usually consists of a recital of successive and often successful acts of piracy.").

extensively from his predecessors.[99] This is significant. It means that dictionaries of this era can create a false sense of consensus. If we consult a couple of founding-era dictionaries and find a single definition of *commerce*, we might be tempted to conclude that that is the accepted sense of the term. But it might not be. The commonality might just be the result of plagiarism. If Johnson left out an alternative sense of *commerce*, then Webster is likely to have continued the oversight.

A second, and related, problem is that any single founding-era dictionary was generally the work of one or two minds—with the two most influential dictionaries of the period (Johnson's and Webster's) the epitome of this phenomenon.[100] Thus, the idiosyncratic nature of dictionaries contemporaneous with the Constitution means that these dictionaries may reflect more of what the dictionary writer thought than the general understanding of the public. While all dictionaries do not "emerge from some lexicographical Sinai" and "are the products of human beings," a dictionary written by just one or two people is even more susceptible to the fact that "human beings, try as they may, bring their prejudices and biases into the dictionaries they make."[101] So it's unclear how much Johnson's dictionary reflected common usage of the era or just Johnson's views.

A third reason founding-era dictionary definitions may not be up to the task of telling us the ordinary meaning of the words they define is the prescriptive rather than descriptive nature of dictionaries at the time (and up until the last half of the twentieth century).[102] Normative (or prescriptive) dictionaries "establish what is right in meaning and pronunciation," providing users with what the lexicographer deems the "proper" usage of each word.[103]

99 *See, e.g.*, ALLEN REDDICK, THE MAKING OF JOHNSON'S DICTIONARY, 1746-1773 11 (1996); Maggs, *supra* note 97, at 383 ("Samuel Johnson apparently relied on Bailey's definitions when he prepared his dictionary.").

100 *See* JONATHON GREEN, CHASING THE SUN: DICTIONARY MAKERS AND THE DICTIONARIES THEY MADE 4 (1997) [hereinafter CHASING THE SUN]:

> Johnson and Webster stand as the ultimate personifications of the solo artistes. Johnson had his amanuenses . . . Webster had a single proofreader, enlisted toward the end of the project. But these assistants were secondary figures. In neither case did the man whose name adorns the title page allow such helpers to influence his end product.

101 *Id.* at xiv.

102 Webster's Third International Dictionary was the first to break this mold. *See also* Green, *supra* note 100, at 449-57; HERBERT C. MORTON, THE STORY OF WEBSTER'S THIRD: PHILIP GOVE'S CONTROVERSIAL DICTIONARY AND ITS CRITICS 202–06 (1994); JAMES SLEDD & WILMA R. EBBIT, DICTIONARIES AND THAT DICTIONARY 79 (1962) (quoting the editor-in-chief of Webster's Third as stating that "the dictionary's purpose was to report the language, not to prescribe what belonged in it"); ; Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 BUFF. L. REV. 227, 242 (1999).

103 Webster's Way Out Dictionary, Bus. Week, Sept. 16, 1961, at 89, *reprinted in* DICTIONARIES AND THAT DICTIONARY 57 (James Sledd & Wilma R. Ebbitt eds., 1962).

Because of this, "the prescriptive school of thought relie[d] heavily on the editors of dictionaries to define and publish the proper meaning and usage of the terms."[104] On the other hand, "the editors of a descriptive dictionary describe how a word is being used and, unlike their prescriptive counterparts, do not decide how a word should be used."[105] And "[l]exicographical prescriptivism in the United States is exactly as old as the making of dictionaries, because of the role played by the dictionary in a society characterized by a great deal of linguistic insecurity."[106] Thus, the prescriptive nature of founding-era dictionaries makes them less useful for determining how people actually used language during that time, just as Strunk and White's *Elements of Style* is more indicative of how people in the twentieth century were encouraged to write than how they actually wrote.[107]

Lexicographers also tend to be either lumpers (combining senses) or splitters (distinguishing senses).[108] Given the difficulties of creating a dictionary in the founding era when just one or two shouldered the workload, limited resources would tend to push founding-era lexicographers toward lumping rather than splitting, entirely missing some senses of words or providing definitions that are overly broad.

Even if we can trust the list of definitions in a dictionary, we are still unlikely to find a reliable indicator of communicative content just by looking there. Descriptive dictionaries are "museums" of word meanings.[109] That is, they list the attested senses of listed words. The point of this function is to list all known definitions or senses. So if there are alternative senses of a given term, a dictionary would list both of them. And it wouldn't tell you which one is the one likely to be understood in a given linguistic context.

---

104 Thumma & Kirchmeier, *supra* note 102, at 242.

105 *Id.*

106 HENRI BÉJOINT, TRADITION AND INNOVATION IN MODERN DICTIONARIES 116 (1994).

107 Prescriptive dictionaries are not completely irrelevant to understanding language use since they could have influenced how people understood and thus used language, but this is a one-step-removed type of argument rather than directly looking at how people actually used language.

108 *See* KORY STAMPER, WORD BY WORD: THE SECRET LIFE OF DICTIONARIES 119 (2017) ("Lumpers are definers who tend to write broad definitions that can cover several more minor variations on that meaning; splitters are people who tend to write discrete definitions for each of those minor variations."); *see also* ANNE O'KEEFFE & MICHAEL MCCARTHY, THE ROUTLEDGE HANDBOOK OF CORPUS LINGUISTICS 434 (2010) (discussing "lumpers" and "splitters").

109 *See, e.g.*, Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 67 (1994) (referring to dictionaries as "museum[s] of words"); *see also* HENRY M. HART, JR. & ALBERT M. SACKS, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1375-76 (William N. Eskridge, Jr. & Philip P. Frickey eds., 1994) ("Unabridged dictionaries are historical records (as reliable as the judgment and industry of the editors) of the meanings with which words have in fact been used by writers of good repute. They are often useful in answering hard questions of whether, in an appropriate context, a particular meaning is *linguistically permissible*.") (emphasis added).

When we speak of finding the communicative content of the words of the law, we sometimes speak of finding "ordinary" meaning. And ordinary meaning seems to implicate an empirical question—the sense of a term that is more commonly used or understood.[110] Yet dictionaries can't answer that question. That's because "[t]he dictionaries typically cited by our courts . . . make no claims about the relative frequency of the listed senses of a given word."[111] For this reason we couldn't look to the dictionary to determine which of two alternative senses of "commerce" is the more ordinary one. We would likely find both senses listed, leaving us in the dark about how to interpret that term.

c. *Wrong Timeframe*

A third problem with reliance on the dictionary is a timeframe problem. Noah Webster's *Dictionary of the English Language* is in a sense not old enough: It was published in 1828—almost 40 years after the Constitution was ratified. For that reason, Webster's dictionary may reflect English usage of the wrong era; it could be affected by any linguistic drift that occurred in the 40-year period after ratification.

There's another sense, however, in which Webster's 1828 dictionary is too old: This dictionary, like others of its era, draws upon usage examples from much earlier periods—two of the most common being Shakespeare and the Bible. To the extent it does so, Webster's would miss the extensive linguistic drift that occurred over *centuries* leading up to the founding era.

That problem is more acute, of course, for Samuel Johnson's dictionary. "Johnson's dictionary reports English usage in Great Britain from a period that ended thirty-two years before the drafting of the United States Constitution in 1787."[112] (And to the extent Johnson was plagiarizing earlier dictionaries or sources, his definitions are even older.) Lest one think that thirty-two years before or forty-years after are insufficiently short time periods for linguistic drift, below we document how such drift occurred in just a decade or two for the term *domestic violence*.[113]

110 *See* Lee & Mouritsen, *supra* note 88, at 808 (making this point in the context of statutory interpretation).

111 *Id.*

112 Solum, *Triangulating Public Meaning*, *supra* note 19, at 1642 .

113 Even dictionaries published much closer to the writing of the Constitution, such as in the late 1780s or early 1790s, may not be from the correct time frame; there is still a problem if they plagiarized older dictionaries. And if they are, they would be unlikely to capture linguistic drift. Granted, dictionaries, even those published a bit before or after the time period at issue have some value in determining original meaning, but they are more of a starting point than an ending point in the inquiry.

### 2. The Fallacy of Etymology

The problem with invoking the etymology of a word or phrase is even easier to establish. If our usage and understanding of a word have evolved over time, as they often will, the historical pedigree of a word may direct us to an outmoded or even obsolete definition.[114] Thus, if we are trying to recreate the ordinary understanding of a given word or phrase in a given language at a particular time, we cannot do so by tracing back the origins of the word to another language centuries before. That approach would lead us to the conclusion that *December* is the tenth month of the year, or that an *anthology* is a bouquet of flowers.[115] We have no reason to believe that ordinary Americans in the late eighteenth century were familiar with the etymology of *commerce* or *public use*. And for that reason, it makes no sense to seek to derive the original communicative content of these English terms in this period by turning to their etymological origins in other languages.

### 3. Linguistic Intuition and Sample Sentences from Founding-Era Literature

Some of the shortcomings of the dictionary can be addressed by resort to a judge's linguistic intuition—with confirmation by reference to examples of actual usage in literature from the founding era. So if we think that *domestic violence* or *public use* bear meanings not evident in a sum of the definitions of the words in these phrases, we can look for examples of the full phrases in founding-era literature. And if we find multiple examples of use of these phrases, we can perhaps overcome the plagiarism or false-consensus-bias problems noted above. We may even be able to amass enough examples to convince ourselves that we have derived the common or ordinary sense of a given phrase.

A twenty-first-century judge's linguistic intuition may not be a reliable measure of communicative content of usage that has now drifted for almost two and a half centuries. Judges of our era are much more likely to be affected by our sense of contemporary usage, and thus to miss the effects of drift.[116]

114 *See* Lee & Mouritsen, *supra* note 88, at 809–10 (developing this point in critiquing judicial reliance on etymology in statutory interpretation).

115 *December*, THE BARNHART CONCISE DICTIONARY OF ETYMOLOGY 188 (Robert K. Barnhart ed., 1995) ("1122, borrowed from Old French *decembre*, from Latin *December*, from *decem* TEN, this being originally the tenth month of the early Roman calendar (which began with March)."); *Anthology*, THE BARNHART CONCISE DICTIONARY OF ETYMOLOGY 29 (Robert K. Barnhart ed., 1995) ("1640, collection of the 'flowers' of verse (i.e., small, choice poems) by various authors; borrowed, perhaps by influence of French *anthologie*, from Greek *anthologíā* flower-gathering (*ánthos* flower + *légein* gather) . . . .").

116 *See* Solum, *Triangulating Public Meaning*, *supra* note 19, at 1641-42 ("Because of the phenomenon of linguistic drift (or semantic shift), contemporary linguistic intuitions are not a reliable guide to the conventional semantic meanings of older provisions of the constitutional text.")

So our intuitions are likely to be affected by our biases "about what the constitutional language 'ought to mean.'"[117] "The influence of these beliefs on [judicial] intuitions may not be fully transparent;" in other words [judges] may have strong beliefs about what the constitutional language 'ought to mean,' and thus "not recognize the role of their own biases and preconceptions."[118]

What about the practice of finding and listing naturally occurring examples of language usage—in writings of the framers or even the general public? Again, this is commendable in that it lets us home in on the right timeframe and consider a full phrase (with more semantic context). But looking at sample sentences introduces another set of problems—arising out of the limited nature of the dataset, the opaque nature of the method of selecting sample sentences, and the risk of confirmation bias or motivated reasoning. If we are looking for empirical evidence of common usage or meaning of a particular word or phrase, our dataset should be larger and more representative.

## III. Corpus Linguistic Analysis: A Better Means of Measuring Original Communicative Content

For all these reasons, we propose the use of a better tool for measuring the original communicative content of the Constitution. This tool is one we import from a field called corpus linguistics. Here we describe the nature of corpus linguistic analysis and identify the corpora (databases) and tools used in this field. Then we highlight the features of the corpus we will use to analyze the interpretive questions addressed in Part IV.

### A. *The Purpose of Corpus Linguistics*

Corpus linguistics is the study of language (linguistics) through systematic analysis of data derived from large databases of naturally occurring language (*corpora*, the plural of *corpus*, a body of language). Corpus linguists teach that "the best way to find out about how language works is by analyzing real examples of language as it is actually used."[119] To gauge the common meaning of a given phrase, a corpus linguist would examine a large number of naturally occurring uses of that phrase in a database or corpus of language.

Corpus linguists engage in "both quantitative and qualitative analy[sis]."[120] A "key goal of corpus linguistics is to aim for replicability of

117 *Id.* at 12.

118 *Id.*

119 Paul Baker, Glossary of Corpus Linguistics 65 (2006).

120 Douglas Biber, *Corpus-Based and Corpus-driven Analyses of Language Variation and Use*, *in* The Oxford Handbook of Linguistic Analysis 160 (Bernd Heine & Heiko Narrog eds., 2010).

results."[121] The point is to preserve "research findings that have much greater generalizability and validity than would otherwise be feasible."[122] Corpus linguistic analysis also avoids the Hawthorne Effect—the tendency of people to alter their behavior when they know they are being observed.[123] It does so by examining preexisting, naturally occurring language.

### B. *Corpora*

The naturally occurring language studied by corpus linguists appears in databases called *corpora*. Familiar examples of linguistic corpora are databases of newspaper articles, books, or legal texts.

Corpus linguists focus on the development of an appropriate corpus. Size matters, as does representativeness.

A *general corpus* is aimed at representing a broad speech community, like an entire country. A *special corpus*, on the other hand, would aim at capturing the language of a more limited speech community, such as that spoken in a region or among those who speak a particular dialect.

A corpus can either be static or dynamic. A *historical corpus* is static; it captures language usage from a particular time period. A *monitor corpus*, by contrast, is a dynamic one that is continuously updated to track ongoing developments in language usage.

A corpus may bear embedded linguistic metadata. A *parsed corpus*, for example, bears metadata identifying the syntactic characteristics of words. Other corpora are merely *tagged*. A *tagged corpus* contains metadata on the part of speech borne by each work in the corpus, while a *raw corpus* includes no linguistic metadata—just the bare words.

### C. *Tools*

Linguists have developed tools and methods for analyzing language usage and meaning through systematic searches of such databases. These tools can yield linguistic insights that are generally not possible "by human linguistic intuition alone."[124]

Corpus linguists analyze frequency data. They can assess how often a word is used—either over time or across different genres or registers. And

---

121 TONY MCENERY & ANDREW HARDIE, CORPUS LINGUISTICS: METHOD, THEORY AND PRACTICE at 66 (2011).

122 Biber, *supra* note 120, at 159.

123 *See generally* HENRY A. LANDSBERGER, HAWTHORNE REVISITED: MANAGEMENT AND THE WORKER, ITS CRITICS, AND DEVELOPMENTS IN HUMAN RELATIONS IN INDUSTRY (1958) (critiquing the Hawthorne Experiments).

124 Lee & Mouritsen, *supra* note 88, at 831.

that may provide insights into meaning.[125] Frequency analysis may also extend to different senses of a given word or phrase. By tabulating the relative frequencies of different senses of a word or phrase within a corpus, a linguist can do what a dictionary can't—discern the more common sense of a given term in a given linguistic context.

The tabulation of frequency data requires "coding," or classification of search results. In corpus linguistics, coding increasingly draws on principles and practices from survey and content analysis methodologies.[126] The first step is to perform a search in the corpus to identify each instance (or "hit") of the word or phrase in question. In the case of a relatively small number of hits (around 100), the coders may analyze each concordance line; where there are more hits, the analysis looks at a random sample of results.[127]

By looking at "concordance lines" of text from a corpus, a linguist can examine a large number of examples of a given term or phrase in naturally occurring language. This lets the linguist assemble much more information than could be derived from a mere dictionary. And it can yield a broad, representative sample instead of a set of isolated—possibly cherry-picked—sentences. Sense–distribution coding (from concordance-line analysis) is arguably the most important use of a corpus; other tools are more exploratory than confirmatory in nature (or at best provide only weak evidence of meaning). Such coding is also the most qualitative in nature, thus requiring the most work. To code the senses of the words and terms we analyzed in this paper, we read the approximate equivalent of a Harry Potter novel's worth of context[128]—in reading at least a paragraph before and after a word or term.[129]

Corpus linguists also analyze word meaning or usage by considering a word's common *collocates*. A collocate is a word-neighbor—a word commonly used in association with another. Common collocation of one word or phrase with another can tell us something useful about meaning or communicative content. This is a linguistic phenomenon that has long been embraced by the law. Our law of interpretation has long embraced the *noscitur a sociis* canon of

---

125 TONY MCENERY & ANDREW WILSON, CORPUS LINGUISTICS: AN INTRODUCTION 82 (2d ed. 2001).

126 *See generally* James C. Phillips & Jesse Egbert, *Advancing Law and Corpus Linguistics: Importing Principles and Practices from Survey and Content-Analysis Methodologies to Improve Corpus Design and Analysis*, 2017 BYU L. REV. 1589.

127 *See* EARL BABBIE, THE PRACTICE OF SOCIAL RESEARCH 206-08 (12th ed. 2010) (discussing the process of sampling).

128 We read an estimated 150,000 words of context. The average Harry Potter novel was 154,881 words. *See How Many Words Are There in the Harry Potter Book Series?*, WORDCOUNTER (Nov. 23, 2015), https://wordcounter.net/blog/2015/11/23/10922_how-many-words-harry-potter.html.

129 We sought to follow the methodology laid out in Phillips & Egbert, *supra* note 126. To that end, we used two coders (one an author and another a research assistant) to code materials separately from each other and then compared results.

construction ("it is known by its associates").[130] And that is reflected in linguistic analysis through collocation—reflected in the idea that "you shall know a word by the company it keeps."[131]

Corpus linguistic analysis also "looks at variation in somewhat fixed phrases, which are often referred to as lexical bundles."[132] Generally, lexical bundles are defined as a repeated series or grouping of three or more words.[133] In other linguistic circles these lexical bundles are referred to as N-grams or clusters. Here, we will refer to them as clusters because this is what they are referred to in the corpus linguistics software used in this study. ("Do you want me to" and "I don't know what" are two of the most common clusters in conversational English.[134]) Clusters are "not complete phrases" and "are statistically defined (identified by their overwhelming co-occurrence)."[135]

A corpus search allows an analysis not just at the word level but of multi-word phrases. It also allows the consideration of syntactic context—by examination of the term or phrase in question in a particular syntactic structure, as a noun modified by a particular adjective. So instead of turning to a dictionary to look up *public* and *use*, we can instead look for examples of *public use* because a phrase may mean more than the sum of its parts. Moreover, a corpus search can generate data of relevance to the empirical question of relative frequency—of how often a given term is used in each of two (or more) competing senses. After all, if one sense predominates over another, it's strong evidence that meaning is how that term or phrase was most commonly understood at the founding.

Corpus analysis also brings the advantage of transparency. Most people don't have access to the founding-era dictionaries (though more are being placed on Google Books) or to obscure historical sources traditionally relied on in originalist scholarship and judicial opinions. But anyone with Internet access can pull up an online corpus and run the same searches and analyze the same data that was relied on in an article, brief, or opinion. With traditional originalist tools, there's a take-my-word-for-it element. But corpus analysis democratizes the inquiry, opening up the data and the conclusions drawn from it to everyone. No one has to take the originalist's word for it. Anyone

130 *Noscitur a sociis*, BLACK'S LAW DICTIONARY (10th ed. 2014).

131 JOHN RUPERT FIRTH, *A Synopsis of Linguistic Theory, 1930-1955, in* STUDIES IN LINGUISTIC ANALYSIS 11 (1957).

132 GENA R. BENNETT, USING CORPORA IN THE LANGUAGE LEARNING CLASSROOM: CORPUS LINGUISTICS FOR TEACHERS 9 (2010).

133 *Id.*; *see also* DOUG BIBER ET AL., LONGMAN GRAMMAR OF SPOKEN AND WRITTEN ENGLISH 990 (1999) ("A lexical bundle is defined here as a recurring sequence of three of more words.").

134 BIBER ET AL., *supra* note 133, at 994.

135 BENNETT, *supra* note 132, at 9.

can look at the same data and try to replicate or falsify the conclusions. This in itself is progress.

D. *COFEA*

If we wish to assess the general public usage of a given term in the late eighteenth century, we would need a database that widely represents usage across a range of genres—or *registers*—in the language community of this era. And we would need a large enough database that a search will reveal enough "hits" to yield representative samples for frequency, collocation, and concordance line analysis.

Until recently, no such corpus existed. The Corpus of Historical American English (COHA) came close. But this corpus traced back only to 1810—a couple of decades too late for founding-era analysis. COHA also does not contain legal materials.

This shortcoming will soon be remedied. The Corpus of Founding-Era American English (COFEA) is currently being developed at the law school at Brigham Young University. COFEA will cover the period of 1760–1799—the beginning of the reign of King George III until the death of George Washington.[136]

COFEA was under construction while we did our analysis, so it wasn't yet publicly available.[137] But we have had some involvement in its development, and have been able to tap into its core component parts for the analysis in this Article. Those parts include the Evans Early Imprint Series, the National Archives Founders Papers Online project, and materials from Hein Online. Together these corpora comprise a *raw*, *historical corpus*. Viewed individually, one of them is a *general corpus*, one is a *special corpus* (aimed at assessing language usage in a specialized sub-community or dialect—legal language), and one is a hybrid of the two.

The Evans Early Imprint Series consists of "nearly two-thirds of all books, pamphlets, and broadsides known to have been printed in this country between 1640 to 1821."[138] This is a *general*, *historical corpus*. Of the nearly 40,000 titles available in Evans, the University of Michigan's Text Creation Partnership worked in cooperation with the owners of the Evans series "to create 6,000 accurately keyed and fully searchable . . . text editions . . . . [that are] fully available to the public."[139] The COFEA database that we used for this Article includes all the searchable Evans texts that fell within the time period of 1760–99.

136 BYU Law & Corpus Linguistics, https://lawcorpus.byu.edu.

137 COFEA is now publicly available. *See* https://lawcorpus.byu.edu/cofea.

138 TEXT CREATION PARTNERSHIP, http://www.textcreationpartnership.org/tcp-evans/ [https://perma.cc/9Y6J-48XU] (last visited Oct. 16, 2018).

139 *Id.*

The National Archives' "Founders Online" database contains the "correspondence and other writings of six major shapers of the United States: George Washington, Benjamin Franklin, John Adams (and family), Thomas Jefferson, Alexander Hamilton, and James Madison."[140] The Founders Online collection also contains letters written to these founders by a variety of Americans, including both other founders and more ordinary citizens. Again, we limited the date range to 1760–1799. The COFEA database that we used includes all the Founders Online documents downloaded by the fall of 2015.

The final component of the COFEA database that we used consists of materials from Hein Online. Hein is partnering with BYU by providing materials for the creation of COFEA. Our Hein corpus consists of legal materials from 1760–1799—statutes, case law, legal papers, legislative debates and materials, etc.

The goal was to assemble a corpus that is both large and representative. Our COFEA corpus as now assembled consists of over 100,000 total texts and over 150 million words. The database is also balanced and representative. It includes not just legal materials but the writings of ordinary Americans. Evans is indicative of usage among the general public. Hein, on the other hand, gives us a window into legal usage. And the Founders Online collection provides material not available in the other two databases—letters from both founders and others. Together these component databases give us a pretty comprehensive picture of language usage at the time of the American founding.

Because the component databases of our COFEA corpus are different, they can provide a window into comparative usage—to gauge whether a given term is used one way (or more or less often) in legal materials, and another in ordinary writings. This may map onto the various subspecies of originalist analysis. The Evans materials can best give us a sense of usage among members of the general public. The Founders Online materials, however, may be of particular interest to original intent inquiries. And the Hein database may be most useful to those interested in how American lawyers of the founding era may have understood the language of the Constitution. In other words, COFEA will be a helpful tool to all originalists. It can yield sample sentences and data of relevance to original public meaning, original intent, or original legal meaning.[141]

We acknowledge, however, that COFEA is not perfectly representative of our target speech community—the American public during the founding era—in at least three ways. First, the speech represented in COFEA comes overwhelming from white males. That means that both women and nonwhites (principally blacks and American Indians) are underrepresented. That could matter if the language

140 Founders Online, National Archives, https://founders.archives.gov/ [https://perma.cc/GD48-CDCH] (last visited October 16, 2018).

141 We recognize that it may not be equally helpful for all those inquiries.

usage of founding-era women and nonwhites differed from usage among white men. And COFEA cannot answer that empirical question.

Second, and a related point, COFEA is representative of mostly elite voices. Even documents in the Evans materials and letters written by more ordinary folk in the Founders' materials are written by educated people who have at least some societal prominence—sufficient to get a book published or beg for a job from George Washington. Not everyone could read at the time the Constitution was ratified.[142] And even those who could did not always have their writings preserved. Societal elites were much more likely to have their writings saved and digitized than those lower on the social ladder. And this is another sense in which COFEA is imperfectly representative (though we hasten to add that this is hardly a defect unique to COFEA—this is always a problem in dealing with historical documents).

Third, COFEA doesn't contain sufficient samples of every genre of English-language document at the founding. One current glaring omission is newspapers. Although this is less serious than in a modern corpus because of the nature of founding-era newspapers—a collection of articles, letters, essays, etc., rather than news articles written in a distinctive style—it is still an omission. Similarly, COFEA doesn't currently have the state ratification debates—an especially important source for those who look to the ratifiers' understanding for constitutional meaning.

Thus, COFEA isn't perfect in its representativeness. But it's a vast improvement over current sources, and the best tool we currently have.[143] There is an additional virtue worth highlighting: the overwhelming majority of the documents in COFEA were not created by their authors in an attempt to understand the Constitution's meaning, and the documents were not selected for inclusion in COFEA with any constitutional question in mind, but were in fact selected by others—the editors of the National Archives' Founders Papers Project, the editors of the Evans Early American Imprint Series, and the editors of Hein Online. These are important features (not bugs). The materials in COFEA yield a true window into linguistic meaning. Materials revealing debates and discussion of the Constitution itself may be

142 At least one scholar has estimated that literacy among white males in New England was about ninety percent during the time period of 1787–1795, and about forty-eight percent for white New England women during that same time. *See* KENNETH A. LOCKRIDGE, LITERACY IN COLONIAL NEW ENGLAND 39 (1979).

143 We also note that not all the tools of COFEA are fully operative. The underlying metadata, for example, is not yet fully entered. For that reason, a year-delimited search is not yet fully available. This could be significant, particularly if a word or phrase that is used in the Constitution impacts usage patterns in the greater society (in a manner influencing sense distributions). For this reason, it seems important to be able to cut off the inquiry at 1787, or at least to be able to compare results before and after the Constitution was made public. This function is not a currently available function in COFEA; but it should be available in time.

helpful to discern original intent. But they can also be misleading if the point of the inquiry is the communicative content of the Constitution's words. People engaged in debate, after all, will not always be aiming to convey the semantic meaning of the words of a legal document; their goal may be more political.[144] COFEA, in this sense, is essentially "double-blind"—both the creator and the compiler of the documents had no idea that these documents would be used to investigate specific constitutional questions. And in that sense, it reduces the potential for bias in the originalist inquiry.

## IV. DATA-DRIVEN ANALYSIS

The previous discussion sets the stage for the need and basis for data-driven analysis of the communicative content of terms of the Constitution. Here we show how that can be done.

We present replicable, falsifiable data of relevance to the likely communicative content of provisions of the Constitution in the late eighteenth century. The goal is to respond to the limitations of existing methods of assessing original communicative content. We show how corpus analysis allows for an assessment of communicative content in light of a wider range of semantic context, provides information of relevance to disambiguation of polysemy, and can focus on the relevant timeframe.

We employ the databases in our COFEA corpus to analyze four clauses of the Constitution considered above—the Domestic Violence Clause, the Commerce Clause, the public use proviso in the Takings Clause, and the Natural Born Citizen Clause. And we present corpus linguistic analysis of each of these provisions.

### A. *Domestic Violence*

We begin with a relatively clear-cut example—domestic violence. The communicative content of this clause has never been litigated. But scholars have helpfully identified it as a term that has experienced linguistic drift. Today the term is almost always used to refer to "violent or aggressive behavior within the home, esp[ecially] violent abuse of a partner."[145] Yet at the founding, this phrase apparently carried a different meaning; it was understood as a reference to insurrection, rebellion, or rioting within a state (in contrast to *domestic tranquility* in the Preamble).

That seems uncontroversial. It feels consistent with our linguistic intuition (and confirmed by the semantic context of the Domestic Violence

144 Granted, there are a few materials like this in COFEA, but they are pretty rare given COFEA's make-up.

145 *Domestic Violence*, OXFORD ENGLISH DICTIONARY: ONLINE, http://www.oed.com/ [https://perma.cc/4TU8-7HWR] (added March 2006).

Clause, which appears in a provision in Article IV that provides not only for protection of a *state* against "domestic Violence" but also "against Invasion"[146]). But can we know that this is correct? We can look up "domestic" and "violence" in founding-era dictionaries and come up with an understanding that is consistent with our modern construct of the phrase "domestic violence."[147] How can we be sure that a guarantee for federal protection "against domestic violence" would not have been understood as an assurance of protection against assaults on a member of a person's household?

Perhaps our intuition tells us otherwise. And we could find isolated examples of the full phrase "domestic violence" that might seem to override the dictionary definitions of the component parts of the phrase. But how can we trust our intuition of a dialect that is so far removed from our current language community? And how can we be confident that the sample sentences we find are representative, and not cherry-picked (and the product of motivated reasoning)?

The answer is that we can assemble a data set of the eighteenth-century usage of "domestic violence" that is both transparent and falsifiable. And that data set can give us an empirical basis for (or disprove) our intuition.

We performed the relevant analysis and have confirmed the above intuition. Our data show that *domestic violence* today is almost always used in reference to an assault on a member of a person's household, but the term was a reference to an insurrection or rebellion in the late eighteenth century.

To show this, we used both the beta version of COFEA and also the Corpus of Historical American English (COHA). And we first assembled some frequency data, which show that *domestic violence* was used infrequently in the founding era and for many, many decades after—up to the decade of the 1980s:

**Figure 1: Domestic Violence Frequency in COHA & COFEA**

146 U.S. CONST. art. IV, § 4.

147 The sense of *domestic* meaning "[o]f or belonging to the home, house, or household; pertaining to one's place of residence or family affairs; household, home, 'family'" entered the English lexicon by at least the early 1600s. *Domestic*, OXFORD ENGLISH DICTIONARY, sense 2a (2d ed. 1989). And the sense of *violence* meaning "[t]he exercise of physical force so as to inflict injury on, or cause damage to, persons or property; action or conduct characterized by this; treatment or usage tending to cause bodily injury or forcibly interfering with personal freedom" entered the English lexicon by the early 1300s. *Violence*, OXFORD ENGLISH DICTIONARY, sense 1a.

The frequency data does not tell us anything about the meaning of *domestic violence*. It could just mean that a term previously irrelevant suddenly became relevant due to changes in society. But the pattern does point towards something to investigate further. So to explore why there is such an uptick in use of the term, we next turn to collocates. We divide the analysis on the lines of the two time periods displayed by the above pattern—the long period of consistent but limited usage (1760–1979) and the recent period of much more frequent usage (1980–2009). Our collocation analysis showed the following:

**Table 1: Domestic Violence Collocates**

| 1760-1979 | | 1980-2009 | |
|---|---|---|---|
| *Collocate* | *Number* | *Collocate* | *Number* |
| Against | 50 | Women | 30 |
| State(s) | 23 | Abuse(d) | 13 |
| Protect* | 23 | Honor | 11 |
| Convened | 17 | National | 11 |
| Invasion | 13 | Victims | 11 |
| Suppress* | 11 | Killings | 9 |
| Legislature | 11 | Coalition | 9 |
| Foreign | 9 | Issues | 9 |
| Congress | 9 | Violence | 8 |
| Article | 8 | Domestic | 6 |
| United | 6 | Cases | 6 |
| President | 5 | Issue | 6 |
| Insurrection(s) | 5 | Law | 6 |
| Constitution(al) | 5 | Ordinary | 5 |
| Application | 5 | Sexual | 5 |
| Conditions | 4 | Drug | 5 |
| Aid | 4 | Services | 5 |
| | | Rate | 5 |
| | | County | 5 |
| | | Support | 5 |
| | | Police | 5 |
| | | Battered | 4 |
| | | Rape | 4 |
| | | Statistics | 4 |
| | | Shelter | 4 |

| Murder | 4 |
|---|---|
| Race | 4 |
| Studies | 4 |
| Project | 4 |
| Group | 4 |

* = all tenses of the verb; minimum of 4 results

The difference in collocates of the same term in the two different periods is as striking as the frequency usage in the two different periods. For most of our history, *domestic violence* has been associated with states, invasion, various forms of the verb suppress, insurrection, and other political actors or terms. Yet in the later period, *domestic violence* has nothing to do with the earlier associations, instead being associated with women, abuse, victims, things sexual, and rape. This is confirmed by a comparison of the most frequent noun (*state(s) v. women*), verb (*protect vs. abuse*), and adjective collocate (*foreign vs. national*) from each period. Clearly the collocates of the term, and thus its semantic context, has dramatically shifted. This points towards a concurrent shift in meaning of *domestic violence*, but to confirm that we need to code the senses of the term.

The surest way to document linguistic drift is to code for the sense being used and see the pattern that emerges over time by reading the term in context from a concordance line search. As with the collocates, we compared the percentage of the two senses (as well as whether it was some third sense or ambiguous) based on the two time periods. And we saw drastic differences in frequency of usage:

**Figure 2: Percentage of Senses of *Domestic Violence*, COHA & COFEA**



It's hard to imagine a starker contrast. We never found a clear use of the family abuse sense of the term until the 1980s. And since 1980, the insurrection sense—the dominant sense for over two centuries—almost completely vanishes, being used once in the early 1980s, and then never appearing again in COHA. This wasn't linguistic drift; it was linguistic divorce. The corpus data back up the intuition that the Constitution isn't speaking of family abuse when it uses the term *domestic violence*.

### B. *Commerce*

The Constitution grants power to Congress to "regulate Commerce . . . among the several States."[148] The word *commerce* presents a different set of challenges than those noted above under *domestic violence*. Here we can look up the operative term in founding-era dictionaries—subject, of course, to all the shortcomings catalogued in subsection II.B.1 above. But we face the polysemy problem—of competing senses, with no indication of which one to attribute to the constitutional context. And without some corpus data we will have a difficult time disambiguating the polysemous text.

Before exploring the data, we describe the various senses discussed in the literature that we coded for:

1. Sense 1: the trading, bartering, buying, and selling of goods (and the incidents of transporting those goods within the definition)
2. Sense 2: the production of goods for trade; manufacturing
3. Sense 3: any market-based activity having an economic component (this would include trade, manufacturing, agriculture, labor, and services)
4. Sense 4: all forms of social and economic intercourse between persons, including, but not limited to, traffic (i.e., trade)
5. Sense 5: indeterminate

We also coded for whether there was some other sense of *commerce* not discussed in legal scholarship, but we didn't find an additional sense.

One complication here is that these senses are not mutually exclusive. While the trade sense and the production sense may be distinct, they both could fit within the broad market-based economic-activity sense. And the trade sense also fits within the broader intercourse sense. A Venn diagram helps illustrate the overlap between the senses.[149]

148 U.S. CONST. art. I, § 8, cl. 3.

149 While this overlap may appear to complicate the analysis, it can make coding easier. For instance, if something is not the trade sense, it cannot be the market-based economic activity or social- and economic-intercourse sense either, and so it must be the manufacturing sense.

Case 3:19-cv-01537-BEN-JLB Document 158-2 Filed 10/28/22 PageID.20239 Page 338 of 625

**Figure 3: Polysemy Venn Diagram**

1. Frequency

Turning to the data, we first looked at the frequency of the use of *commerce* across the three smaller corpora of COFEA—Evans, Founders, and Hein—we are using. Again, to standardize the comparison, we use words per million.

**Figure 4: Frequency of Commerce by Corpus**

Frequency of *commerce* by corpus

| Corpus | Per million words |
| --- | --- |
| Evans (ordinary) | 99.8 |
| Founders | 229.6 |
| Legal | 197.6 |

While no one that we're aware of has argued that *commerce* is a legal term-of-art, it appears twice as frequently in legal contexts as in ordinary ones. Of course, a word can have an ordinary meaning but appear more often in legal than ordinary contexts. The word *police* might be an example of that. To more confidently determine whether a word is a legal term-of-art, we would need to compare sense distributions across genres of material. If we saw one sense of a word appearing ninety-five percent of the time a word is used in legal

materials, for example, but almost never in ordinary materials, then we could conclude that the term has a distinct term-of-art sense in the law.

Also of note, *commerce* appears most frequently in the letters of founders, which may not be overly surprising given their letters were focused on running the military and the government. But since this does not appear to be a scenario where we have two competing senses with one being legal and one being ordinary, this frequency distribution does not shed much light on which sense of *commerce* is the most common.

### 2. Collocates

We next analyze the top thirty collocates of commerce using COFEA.[150] We do so not because collocate analysis is the best tool for determining the meaning of words, but because it can point us in directions to further explore. We thus turn to exploratory tools before confirmatory ones, recognizing that a very strong finding on an exploratory tool could rise to the level of a weak confirmation of meaning.

**Table 2: Commerce Collocates**

| RANK | COLLOCATES | FREQUENCY | MIS[151] | PERCENT[152] | ALL[153] |
|---|---|---|---|---|---|
| 1 | AMITY | 939 | 7.94 | 46% | 2,032 |
| 2 | INTERDICTING | 10 | 7.06 | 25% | 40 |
| 3 | FRANCO-AMERICAN | 11 | 6.99 | 24% | 46 |
| 4 | EXEMPTIONS | 96 | 6.95 | 23% | 415 |
| 5 | RECAPTURES | 13 | 6.93 | 23% | 57 |
| 6 | SPOLIATIONS | 138 | 6.84 | 21% | 643 |
| 7 | MANUFAAURES | 13 | 6.83 | 21% | 61 |
| 8 | AGRI | 25 | 6.81 | 21% | 119 |
| 9 | MANUFADURES | 12 | 6.76 | 20% | 59 |
| 10 | VIGATION | 12 | 6.76 | 20% | 59 |

150 Our collocate search span was six words to the right and left of *commerce*. We removed foreign words from the results.

151 Mutual Information Score. *See* Kenneth Ward Church & Patrick Hanks, *Word Association Norms, Mutual Information, and Lexicography*, 16 COMPUTATIONAL LINGUISTICS 22, 23 (1990) (explaining that a mutual information score "compares the probability of observing [word] *x* and [word] *y together* (the joint probability) with the probabilities of observing [word] *x* and [word] *y independently* (chance)").

152 This is the percent of all the instances a particular collocate occurs in the COFEA that it appears nears *commerce*.

153 This is the total number of times a particular collocate appeared in COFEA.

| | | | | | |
|---|---|---|---|---|---|
| 11 | CONCLURE | 12 | 6.67 | 19% | 63 |
| 12 | SHACKLE | 13 | 6.65 | 19% | 69 |
| 13 | LIAISONS | 19 | 6.54 | 17% | 109 |
| 14 | AGRICULTURE | 576 | 6.51 | 17% | 3,375 |
| 15 | NAVIGATION | 1,457 | 6.41 | 16% | 9,137 |
| 16 | MANUFA | 38 | 6.38 | 16% | 243 |
| 17 | AGRICUL | 15 | 6.36 | 15% | 97 |
| 18 | ILLICIT | 63 | 6.04 | 12% | 510 |
| 19 | DEPREDATIONS | 278 | 6.03 | 12% | 2,275 |
| 20 | INTERDICT | 10 | 6 | 12% | 83 |
| 21 | NAVIGA | 14 | 5.96 | 12% | 120 |
| 22 | SHACKLED | 14 | 5.95 | 12% | 121 |
| 23 | RELATIVEMENT | 21 | 5.88 | 11% | 190 |
| 24 | VEXATIONS | 37 | 5.85 | 11% | 343 |
| 25 | STAGNATION | 31 | 5.84 | 11% | 289 |
| 26 | MONOPOLIZE | 15 | 5.83 | 11% | 141 |
| 27 | INTERDICTED | 15 | 5.77 | 10% | 146 |
| 28 | CONCLU | 26 | 5.76 | 10% | 256 |
| 29 | MANUFACTURES | 682 | 5.74 | 10% | 6,816 |
| 30 | SPOLIATION | 11 | 5.7 | 10% | 113 |

A few patterns emerge that shed some, but not a lot, of light on the interpretive question at hand. First, the highest-ranked collocate—meaning the collocate that appears more often near *commerce* than near other words—was *amity*. (Its raw frequency was also very high.) This is due to the context of treaties of Amity and Commerce that the United States entered into with various nations. These weren't treaties to increase the social intercourse between nations, nor to increase some kind of joint manufacturing or agricultural ventures between countries. They were treaties of trade.

A few other collocates seem related to the trade sense of *commerce*. For instance, *navigation* in some form appears four times, and while navigation can be related to some of the other senses, it would be to transport goods and thus would be for trade. Other collocates that appear to be more related to trade than the other senses include *Franco-American* (likely on the context of a trade agreement or alliance), *recaptures*, *shackle(d)*, *liaisons*, *illicit*,

*depredations*,[154] and *spoliation*.[155] This is all very soft evidence that the trade sense of *commerce* might be the most common one in the founding era. Taken alone, these findings are insufficient to answer the communicative content question at hand.[156]

### 3. Clusters (or n-grams)

Another way to parse the data is to explore clusters (or n-grams). Below we report the ten most frequent 3-, 4-, and 5-word clusters where *commerce* is on the far left or far right.[157]

**Table 3: Commerce N-Gram**

| Commerce on the left (3-word cluster) | Freq. | Commerce on the right (3-word cluster) | Freq. |
|---|---|---|---|
| commerce, and | 1401 | treaty of commerce | 1187 |
| commerce of the | 1104 | of our commerce | 653 |
| commerce and navigation | 618 | committee of commerce | 595 |
| commerce with the | 427 | amity and commerce | 553 |
| commerce between the | 296 | trade and commerce | 405 |
| commerce, which | 275 | of the commerce | 375 |
| commerce. The | 262 | on our commerce | 314 |
| commerce, the | 255 | navigation and commerce | 277 |
| commerce and manufactures | 243 | treaties of commerce | 277 |

154 "The act of making a prey of; plundering, pillaging, ravaging; . . . an act of spoliation and robbery." *Depredation*, OXFORD ENGLISH DICTIONARY: ONLINE.

155 "The act of spoliating, despoiling, pillaging, or plundering; seizure of goods or property by violent means; depredation, robbery." *Spoliation*, OXFORD ENGLISH DICTIONARY: ONLINE.

156 Another way to do collocate analysis, besides the word of interest, is to compare the collocate patterns to potential synonyms, such as *trade* and *manufacturing* (and variations of the term). We found that *trade* shares six top-thirty collocates with *commerce*, often similarly ranked: *illicit* (4th); *interdicting* (5th); *exemptions* (10th); *monopolize* (11th); *naviga* (27th); and *stagnation* (29th). On the other hand, *manufacturing* shares just two—*agri* (7th) and *agriculture* (14th)—and further exploration shows they are actually just evidence that the three often appear together in a list. Thus, the fact that commerce and trade have more overlap in collocate networks than commerce and manufacturing do is evidence that the trade sense is likely more common than the manufacturing sense.

157 The corpus software we used counted punctuation as a word.

| commerce; and | 190 | amity, commerce | 253 |
|---|---|---|---|
| Commerce on the left (4-word cluster) | | Commerce on the right (4-word cluster) | |
| commerce of the united | 532 | the committee of commerce | 566 |
| commerce and navigation. | 244 | a treaty of commerce | 553 |
| commerce, and navigation | 174 | of amity and commerce | 534 |
| commerce, and the | 173 | the treaty of commerce | 323 |
| commerce and navigation, | 167 | of amity, commerce | 248 |
| commerce with Great Britain | 166 | the protection of commerce | 198 |
| commerce and manufactures, | 107 | of trade and commerce | 95 |
| commerce between the two | 106 | depredations on our commerce | 85 |
| commerce with foreign nations | 106 | of navigation and commerce | 80 |
| commerce, and to | 105 | no treaty of commerce | 74 |
| Commerce on the left (5-word cluster) | | Commerce on the right (5-word cluster) | |
| commerce of the United States | 510 | treaty of amity and commerce | 425 |
| commerce, and navigation, | 127 | treaty of amity, commerce | 236 |
| commerce between the United States | 87 | to the committee of commerce | 206 |
| commerce with the United States | 78 | of the treaty of commerce | 141 |
| commerce between the two countries | 67 | for the protection of commerce | 121 |
| commerce with foreign nations, | 65 | of the committee of commerce | 88 |
| commerce and navigation. -LSB- | 64 | of a treaty of commerce | 70 |

| commerce with Great Britain, | 61 | make a treaty of commerce | 70 |
|---|---|---|---|
| commerce with the defence of | 50 | from the committee of commerce | 65 |
| commerce and navigation. Statement | 42 | that the committee of commerce | 63 |

A few interesting patterns emerge. First, some of the most common words that follow *commerce* in these clusters when it is on the left are *with* and *between*, and they are often followed by some proper noun representing a polity. These two words would fit with a sense of trade or intercourse, but not manufacturing or all economic activity that would include things like agriculture or labor.

Second, a few clusters point towards areas of additional research: treaties of commerce, committees of commerce, and protection of commerce. What did these treaties cover? What did these committees do vis-à-vis commerce? How was commerce protected? The answers to these questions will shed further light on what commerce meant during the time period. Relatedly, and as noted above, the idea of a treaty with another country over agriculture, domestic labor, or manufacturing seems odd. A treaty over trade, however, does not.

Third, certain three-word patterns emerge, such as *commerce and navigation*, or *amity and commerce*. Sometimes such word patterns are not interchangeable in their order, which can indicate a specialized meaning. In linguistics, these types of phrases or groupings of words are often referred to as binomials or multinomials. A binomial is "a coordinated pair of linguistics units of the same word class which show *some* semantic relation," and is often, but not limited to, a noun pair.[158] An example of this from legal language would be *cease and desist* or *aid and abet*, which are sometimes called legal doublets.[159] "Multinomials are similarly chained by semantic and syntactic links, but consist of longer sequences of related words."[160] Examples include *hold, defend, and favor* or *lock, stock, and barrel*.[161] Binomials have been found to be characteristic of legal language and have been observed to be five times more frequent in modern legal writing than nonlegal writing, making

158 Joanna Kopaczyk & Hans Sauer, *Defining and Exploring Binomials*, *in* BINOMIALS IN THE HISTORY OF ENGLISH: FIXED AND FLEXIBLE 1, 3 (Joanna Kopaczyk & Hans Sauer eds., 2017).

159 *See* BRYAN A. GARNER, THE REDBOOK: A MANUAL ON STYLE 192-94 (2d ed. 2006) (explaining that "[t]he doublet and triplet phrasing common in Middle English still survives in legal writing, especially contracts, wills, and trusts," including the phrases "aid and abet" and "cease and desist").

160 Anu Lehto, *Binomials and Multinomials in Early Modern Parliamentary Acts*, *in* BINOMIALS, *supra* note 158, at 262.

161 Kopaczyk & Sauer, *supra* note 158, at 3.

binomial usage "clearly a style marker in law language."[162] Examples of multinomials in legal language include *give, devise and bequeath* or *right, title, and interest*. This frequent occurrence of binomials and multinomials in legal writing is because of their ability to "increase the precision and all-inclusiveness of the documents, although they are also used for stylistic reasons and belong among the key features of the genre."[163] If the clusters found in this paper are binomials and multinomials, then it is likely that at the time they were used they had become or were in the process of becoming technical or legal terms of art.[164]

Finally, we noted some larger multinomials of interest. For instance, the multinomial *amity, commerce, and navigation* occurred 153 times, no doubt in the context of treaties. Substituting in *trade* for *commerce* makes sense in that multinomial, but substituting synonyms for other senses makes less sense, particularly in a treaty context:

1. *amity, manufacturing, and navigation* (not implausible, but amity and navigation seem to have less to do with manufacturing than trade);

162 Marita Gustafsson, *The Syntactic Features of Binomial Expressions in Legal English*, 4 TEXT-INTERDISC. J. FOR THE STUDY OF DISCOURSE 123, 125 (1984).

163 Lehto, *supra* note 160, at 261; *see also* VIJAY KUMAR BHATIA, ANALYSING GENRE: LANGUAGE USE IN PROFESSIONAL SETTINGS 108 (1993) (explaining that "[e]xpressions like these . . . [are] an extremely effective linguistic device to make the legal document precise as well as all inclusive.").

164 We thus investigated the most frequent clusters that appeared as though they might be binomials, examining them in reverse order as well. As the table below shows, ordering usually matters.

**Table 4: Clusters**

| Selected Clusters | Freq |
|---|---|
| amity and commerce | 553 |
| commerce and amity | 7 |
| agriculture and commerce | 81 |
| commerce and agriculture | 54 |
| manufactures/ing and commerce | 90 |
| commerce and manufactures/ing | 250 |
| navigation and commerce | 277 |
| commerce and navigation | 618 |
| trade and commerce | 405 |
| commerce and trade | 24 |

While agriculture and commerce are used somewhat interchangeably when in a binomial or doublet, they do not occur relatively equally regardless of order. For example, *trade and commerce* appears nearly 17 times more often than *commerce and trade*. And *amity and commerce* appear a staggering 79 times more often than *commerce and amity*. This may mean that some of these doublets have begun to take on a meaning that is more than the sum of their semantic parts. Both collocate and concordance line analysis of these binomials could help show if this is the case.

2 *amity, agriculture/manufacturing/domestic labor, and navigation* (again possible, but not as good of a fit given the items substituted for *commerce* seem less relevant to the other two items on the list);

3. *amity, all social and economic intercourse, and navigation* (the social intercourse aspect seems out of place with navigation).

And the multinomial *agriculture, commerce, and* ___ occurred 49 times in COFEA, with the following terms making up that last word:

**Table 5: Multinomials**

| agriculture, commerce, and ___ | Freq |
|---|---|
| manufactures | 31 |
| (the) arts/all the arts (of peace) | 4 |
| trades | 3 |
| industry | 2 |
| navigation | 2 |
| domestic economy | 1 |
| everything useful | 1 |
| fisheries | 1 |
| literature | 1 |
| mechanics | 1 |
| policies | 1 |
| political relations | 1 |

The fact that about two-thirds of the time this multinomial occurs as *agriculture*, *commerce, and manufactures* would point towards a trade sense of *commerce*: the manufacturing sense would be redundant; an all market-based economic activity would also be redundant because it would already include agriculture and manufacturing; and all social and economic intercourse seems too broad as the social-intercourse aspect would be out of place in a list with agriculture and manufacturing. Also, the fact that no word found in that final slot was synonymous with trade further bolsters a trade-sense of *commerce* in that multinomial.

4. Sense Differentiation

The last point of our analysis of *commerce* is our coding of the senses we found sampling concordance lines. This is the meat-and-potatoes of

determining meaning from corpus analysis—the previous tools (pure frequency data, collocates, and clusters) pale in comparison in the insight they add (if any) to the inquiry into communicative content. In other words, we saved the most important tool for last. Below are our results.[165]

**Figure 5: *Commerce* Sense Distribution**

The results here are consistent with the analysis we've seen from the collocates and clusters: the trade-sense of *commerce* appears to be the dominant sense. This is especially so in the Legal (Hein) and Founders corpora, where the other senses are nonexistent or hardly appear in our random sample. As might be expected, in more ordinary contexts (the Evans Corpus), the trade sense appears slightly less often than the context being indeterminate,[166] and the other senses occur the most, though still much less than the trade sense.

165 The word *commerce* appeared in the three smaller corpora as follows: Evans (5330), Founders (10,071), and Hein (9,600). We then randomly sampled 125 instances from each of these three smaller corpora, sampling based on document rather than instance of *commerce*. We used two coders, making sure they had at least seventy percent agreement on practice materials before coding the random sample. For more on coding methodology, see generally Phillips & Egbert, *supra* note 126.

166 A search result was coded indeterminate if, after reading the surrounding context (usually at least reading the equivalent of a paragraph before and after the word), one of three things occurred: (1) there was not enough information to code a sense; (2) we couldn't tell between two or more competing senses; (3) we leaned towards one sense, but were not confident enough to say that it's that sense (we called these "leaners").

We also combined the results that were indeterminate but leaning towards a sense with those coded as a particular sense to see how that might change the sense distribution.

**Figure 6: *Commerce* Sense Distribution by Corpus with "Leaners"**

Adding the instances where we leaned towards a sense to instances where we were more confident that was the particular sense shows even stronger evidence that the trade sense is the most common sense across corpus genres. And it makes sense that the Evans results would look different than the other two corpora. While the Founders materials are not legal in nature—they're mostly letters—they were on topics that had a much higher overlap with the Legal Corpus (running a country and the military) than the Evans Corpus. This suggests that the genre alone may not make a difference, but that the substance of the genre also matters.

Thus, the trade sense of commerce seems confirmed by collocation patterns, cluster patterns, and sense distribution. This triangulation of all the tools of the corpus pointing, some more strongly than others, at the same meaning increases our confidence in the results. Of course, further research could be done. One could look at the sense distribution just in the narrow context of when some version of the phrase "regulate commerce" occurs. The value of a corpus is the ability to slice and dice context to get to the most relevant semantic context for the inquiry.

### C. *Public Use*

We next turn to the term *public use* as found in the Constitution's Takings Clause. The relevant constitutional language states: "nor shall private property be taken for public use, without just compensation."[167] As illustrated in the *Kelo* decision, and discussed above, there are several traditional tools we could use to discern the meaning of the term. Our linguistic intuition might indicate that *public use* means something the public actually gets to use. Yet individual intuition is based on the corpus of English we have in our head, a corpus that is highly idiosyncratic and highly modern. We could turn to founding era dictionaries, but we will then have to deal with all the problems we've highlighted above, including perhaps the biggest one in this context: the term doesn't appear and must be constructed from its constituent parts—*public* and *use*. Finally, we could rely on a handful of examples of usage of the term from founding-era sources, such as the Federalist Papers. But that would only give us a likely unrepresentative sample too small in size to generalize from to American English usage at the time. So we could get an answer, but not one we could have any confidence was actually correct.

#### 1. Frequency

The first mode of analysis in peeling back the communicative content of *public use* in more rigorous fashion is to compare the frequency of occurrence of this term across the three smaller corpora that make up COFEA.[168] A term that occurs much more frequently in the Evans Corpus, with its more ordinary genre of documents from (at least some) more ordinary users of English, than in the Legal Corpus (Hein) would perhaps indicate a term that has an ordinary meaning. And the reverse might indicate a term that has a legal meaning, or at least a meaning that is more common in a legal context (though sense distribution is what more confidently answers this question). To standardize the comparison since the three corpora are not identical in size, we report the frequency per million words:

167 U.S. CONST., amend. V.

168 Due to nonstandardized spelling in the Founding era, we used the following search: public* use*. This picked up alternate spellings, such as *publick*, as well as the plural form of *use*.

**Figure 7: Frequency of *Public Use* by Corpus**

*Public use* occurs six times more frequently in legal language than ordinary language, and three-and-a-half times more frequently in Founders' letters than in other types of ordinary documents authored by, on average, less elite folks. This is evidence that the term either has a legal meaning, or at least has more relevance to a legal context compared to an ordinary one. But we can't tell which is the explanation because these results suffer from observational equivalence—the phenomenon in which two things that are distinct appear outwardly to be the same. Only widely disparate sense distributions across materials (ordinary v. legal) will provide evidence of a legal term-of-art.

### 2. Sense Differentiation

While we did collocate and cluster (n-gram) analysis on *public use,* the results did not shed any light on which sense was most common at the founding. This is not surprising since both of those tools tend to be more exploratory than confirmatory in nature. So we next turn to the most important type of corpus analysis: the hard work of qualitatively analyzing concordance lines. And for legal questions, this type of analysis seems the most relevant and most likely to provide useful data.

Based on Justice Thomas's discussion in *Kelo* of the potential meanings of *public use* at the Founding, we used the following categories:

1. Sense 1: government, military, or public owns or directly employs for a purpose
2. Sense 2: increases the convenience of or helps in some way the government or public, including indirect benefits; i.e., broad public purpose
3. Sense 3: some other meaning
4. Sense 4: indeterminate

We were not just coding for the senses discussed in *Kelo*, since that discussion may not have completely or accurately captured founding-era senses; instead we left the door open to other possible meanings of the term not discussed. And, in fact, we found one: a sense that appears to mean "making known to the public" or "or obtaining some kind of public advantage," and was used in the context of information or documents of some kind.[169] This is not a sense one could necessarily construct from dictionary definitions, nor that anyone was discussing. So we were not just using the corpus data to falsify others' theories of meanings, but also to look for meaning.

Below we report the sense distribution we found in the sampled material. We present the material both centered around the results in each corpus as well as centered around each sense.[170]

**Figure 8: Distribution of Senses of *Public Use* by Sense**



169 An example is in the Letter from Alexander Hamilton to James Madison (May 19, 1788):

> "The language of the Antifederalists is, that if all the other states adopt, New York ought still to hold out. I have the most direct intelligence, but in a manner which forbids a public use being made of it, that Clinton has, in several conversations, declared his opinion of the *inutility* of the UNION."

*in* 9 THE WORKS OF ALEXANDER HAMILTON, 430, 431 (Henry Cabot Lodge ed., 2nd ed. 1904) (1886). This sense of *public use* may have some similarities to a sense of the term found in patent-law doctrine. *See* The Act July 4, 1836, ch. 357, 5 Stat. 117. But the usages we found had nothing to do with patents or inventions.

170 We searched for the following terms: *public use*, *public uses*, *publick use*, and *publick uses*. We found the following totals for each of the smaller corpora: Evans (86), Founders (237), and Hein (460). We coded all but 3 of the results from Evans (one was a typo and so not *public use* and the other two quoted the Constitution). We randomly sampled 125 from Founders and Hein, coding all the Founders sample and all but one from Hein (the excluded sample quoted the Constitution).

The direct sense that Justice Thomas argued for is much more common than the broader, indirect sense that the *Kelo* majority adopted. Depending on the corpus, the direct sense is 5.3 times (Evans), 53 times (Founders), or infinitely (Legal) more common than the indirect, broad sense. In fact, a third sense—"making information public; gaining public advantage through revealing something"—was more common than the indirect sense.

These findings come with the caveat that we coded almost as many hits as *indeterminate* as we coded as *direct*. And any inquiry into the communicative content of *public use* would therefore require us to decide what to make of all the ambiguity. It is theoretically possible that all the hits we coded as *indeterminate* could have been an example of the *indirect* sense of the term, making the distribution of the two senses about equal. That's why we also coded the sense we were leaning towards when we thought the usage was indeterminate (more on that below).

**Figure 9: Distribution of Senses of *Public Use* by Corpus**

The distributions of senses across the various corpora also highlights a point we noted above: the direct sense predominates even more in a legal context than in more ordinary ones, though the other two senses are still not common in ordinary contexts. Again, however, the high level of indeterminacy clouds these results. Below we combine the instances where we were confident enough to assign a sense with the instances where we leaned towards a sense, but thought the use was sufficiently indeterminate (sometimes even then we didn't lean to a particular sense).

**Figure 10: Distribution of *Public Use* Senses by Corpus With "Leaners"**

When we leaned toward a sense in an indeterminate context, we leaned overwhelmingly toward the first sense. By treating those results we coded as indeterminate but leaning towards a sense as having coded the result as the sense, the likelihood of *public use* being used in the direct compared to the indirect sense ranges from 5.7 times (Evans), to 29.3 times (Founders), to 97.8 times (Legal) more likely. We don't necessarily take a position on where the line is to determine that a particular sense is the operative one.[171] One could imagine the line-drawing could be just if the differences between the percentages of the coded sense are larger than the margin of error, and therefore are statistically significant. Or one could imagine a higher standard where the percentage of a particular sense must reach a certain threshold (or the ratio between one sense and the next highest sense as to be a certain minimum value). The data here would likely be clear under any standard.

For reasons noted above it is unclear whether the direct sense of *public use* is a legal term-of-art. (The fact that the direct sense is the predominate sense in ordinary texts as well probably reduces the odds it's a legal term.) But given that the Constitution is a legal text, the fact that in the legal materials of COFEA (as well as the Founders' letters) the direct sense is even more common than the indirect sense compared to ordinary materials is further evidence as to what the Constitution's communicative content is for the term *public use*. Thus, while perhaps we can only speak of probabilities here, the evidence is strong that Justice Thomas was correct: when the Constitution uses the term *public use* it means the government, military, or public owns or

171 It could be possible to import standards of proof from criminal or civil contexts, though scholars and courts would still need to figure out numbers for what is beyond a reasonable doubt or a preponderance of the evidence, for example. This would be somewhat arbitrary, though the .05 cut-off for statistical significance in the sciences is also arbitrary.

directly employs the item for a purpose, rather than the indirect-, broad-benefit sense the *Kelo* majority proposed.

### D. *Natural Born*

Except for those who were already "a Citizen of the United States at the time of the Adoption of th[e] Constitution," only a person who is "a natural born Citizen" of the United States "shall be eligible to the Office of President."[172] Here we run into the same dilemmas we faced with *domestic violence* and *public use* if we rely on traditional originalist tools: we're stuck with looking up two different words in problematic founding-era dictionaries, relying on a few examples of the term in context, or checking our modern, idiosyncratic linguistic gut. And it's not clear what the latter would tell us—perhaps that the term refers to those not born via C-section? Again, without a properly designed corpus with its tools, the confidence we'll have in the answer to what that term meant in the Constitution in the founding era will be quite limited.

Below we report the frequency of *natural born* across corpora, which may shed light on whether the term is an ordinary one, a legal one, or perhaps has some other specialized meaning (though frequency data cannot fully answer the question).

**Figure 11: *Natural Born* Frequency Per Million Words by Corpus**

The results are not surprising given the types of definitions we note below: *natural born* is more common in legal contexts than in more ordinary ones, 2.75–2.87 times more frequent. If there were both a legal and nonlegal sense of *natural born*, this would lead us to believe that the odds of the legal sense being the operative one in the Constitution are increased by these findings; but that can only be confirmed by analyzing the sense distribution.

172 U.S. CONST. art. II, § 1, cl. 5.

Yet here all the senses seem to be legal. Based on scholarship in the area,[173] we created the following sense categories for *natural born*:

1. Sense 1: someone born in sovereign territory, no matter the status of their parents (including those born outside of sovereign territory to diplomats)
2. Sense 2: someone born outside of sovereign territory to a natural born father[174]
3. Sense 3: someone whose natural born status is bestowed by legislative act
4. Category 4: indeterminate

We also coded for the possibility that *natural born* was being used in some other sense but found no such examples. All these senses appear to be legal in nature—there does not appear to be an ordinary sense of the term. Thus, to try to answer the question of which legal sense is the operative one, we turn to the sense distribution from concordance line analysis.[175]

**Figure 12: *Natural Born* Sense Distribution by Sense**

173 *See generally* Thomas H. Lee, *Natural Born Citizen*, 67 AM. U. L. REV. 327 (2017); Mary Brigid McManamon, *The Natural Born Citizen Clause as Originally Understood*, 64 CATH. U.L. REV. 317 (2015); Polly J. Price, *Natural Law and Birthright Citizenship in* Calvin's Case *(1608)*, 9 YALE J.L. & HUMAN. 73 (1997); Michael D. Ramsey, *The Original Meaning of "Natural Born"*, 20 U. PA. J. CONST. L. 199 (2017).

174 This sometimes included a grandfather or just parents generically.

175 Collocate and cluster (n-gram) analysis did not yield results that helped answer which sense was more common.

The percentage of the time the use of *natural born* was too indeterminate to confidently code as a particular sense is extremely high. This severely undermines the ability to draw much, if any, of a conclusion from the data.[176]

**Figure 13: *Natural Born* Sense by Corpus**

When looking at the results based on the corpus, interestingly, even though the three senses of *natural born* all seem to be legal ones, the lowest indeterminacy occurs in corpus with the most ordinary materials and authors. Perhaps that's because the most common legal sense of *natural born* was sufficiently known in ordinary contexts, but the lesser known legal senses had not seeped in as much into ordinary Founding-era American English.

We next report the results when the leaning senses, noted when we primarily think the use of *natural born* is indeterminate, are included with instances where we didn't think it was indeterminate (or at least sufficiently so to code it as such). Sometimes, with leaners, it was clear it was not the legislative-bestowal sense, but we could not tell whether the likely sense was location- or parent-based. So we also report those instances as their own category below.

176 We found the following totals from each smaller corpus: Evans (52), Founders (41), and Hein (130). We coded all but four of the Evans results, one of the Founders results, and fourteen of the Hein results because those excluded instances were either quoting the Constitution or not readable.

**Figure 14: *Natural Born* Sense Distribution by Corpus with Leaners**

The addition of the leaners paints a picture that is still high in indeterminacy. But the location-based sense of *natural born*—one gets natural-born status by where they are born rather than who they are born to (with the exception of the children of ambassadors born abroad)—appears to be the most common sense when indeterminacy is ignored. Again, this greater frequency of the location-based sense is more prominent in more ordinary contexts—Evans and even the Founders Corpus—and less so in the legal context. It's unclear what this means. Perhaps an ordinary American at the Founding would have been more likely to understand *natural born* in the location-based sense, whereas an American lawyer from that same period would have seen the meaning as less clear, or at least would have taken a more nuanced view of the meaning of the clause. *Natural born* is a good example of the limits of corpus analysis. Sometimes it does not yield clear answers. That can be a function of the data, the ability of the tools to actually answer the question, or both. Here, given the high percentage of indeterminate results, we are not confident declaring the most likely communicative content of *natural born* in the Constitution. Other originalist methods need to be brought to bear on this question.

## V. Contributions and Caveats

We have no hesitation in advocating the use of corpus linguistic analysis as a central element of the first stage of any inquiry into the original communicative content of the Constitution. Our traditional tools fall short

to some degree. And data-driven originalism—of some form and to some degree—is an essential response.

That said, the application of this linguistic tool is in its infancy. Numerous questions remain as to how and when to implement this data-driven inquiry.

In the paragraphs below, we first highlight the unique contributions that flow from corpus linguistic analysis of original meaning. Then we acknowledge some caveats—limitations inherent in this tool as applied to originalist questions—and begin the task of mapping out possible responses to the caveats as we see them.

### A. *Contributions*

We see three unique contributions stemming from the use of corpus linguistic analysis of the original communicative content of the Constitution. Corpus analysis (1) addresses shortcomings of traditional methods of inquiry into communicative content (dictionaries and small, nonrandom samples of usage); (2) sharpens the debate over when and how to resolve ambiguity in original meaning; and (3) facilitates the (up to now mostly unexplored) debate over whether and to what extent the Constitution is written in ordinary English or in the distinct dialect of the law.

#### 1. Corpus Analysis Addresses Shortcomings of Traditional Inquiries

Traditional tools for measuring original communicative content fall short in the various respects highlighted above. Dictionaries do not consider sufficient semantic context, cannot tell us which of the various senses of a given term is more ordinary, and are usually not calibrated to the relevant timeframe. And the use of linguistic intuition—as confirmed by a handful of sample sentences from founding-era documents—may be the product of motivated reasoning and cherry-picking and is not transparent or falsifiable.

A principal contribution of corpus linguistic analysis is its ability to overcome these deficiencies. The point is most easily made by reference to the *domestic violence* example. As noted above, we can now point to data that show that the phrase *domestic violence* was used almost exclusively to refer to an insurrection or rebellion, and never as a reference to household assault. We can present that data in a systematic, transparent way that provides some assurance that we are not cherry-picking isolated examples in a motivated attempt to get at a preferred outcome.[177] And, importantly, we can preserve

177 *See also* Strang, *supra* note 85, at 1213 (arguing that one of the biggest pay-offs to originalists using corpus linguistics is that it allows for a culture of scholarship where the participants make claims that other scholars can review and then affirm or rebut).

our dataset (and methodology of assembling it) in a manner that invites replication and falsification by anyone wishing to question our analysis.

These features have never been available using traditional originalist methods. Existing methods either suffer from the many shortcomings of the dictionary or open themselves up to concerns of motivated reasoning or cherry-picking. Corpus linguistic analysis is an essential step in overcoming these problems. It sharpens the debate at the threshold inquiry into the "standard picture" for interpretation. It thereby establishes common ground for discussion on the basis of transparent data that is subject to falsification. This is an important move. It is an significant improvement over a world in which each side picks its preferred dictionary definitions or sample sentences and then insists it has the better of the argument.

2. Corpus Analysis Sharpens the Debate Over When and How to Resolve Ambiguity in Original Meaning.

Corpus linguistics can also help sharpen points of debate among subtheories of originalism. One key point of disagreement in this field is over how to deal with the problem of ambiguity (or vagueness or other forms of underdeterminacy). Some originalists posit the existence of a "construction zone" that opens up upon a determination of ambiguity—a zone that no longer is dependent on the inquiry into original communicative content, but that instead can take account of any of a range of policy grounds for establishing rules or standards of constitutional law.[178] Others propose to close the gap of ambiguity in other ways—by resort to "original methods" of interpretation[179] or by application of a presumption of constitutionality (or in other words a heavy burden of proof for claims of unconstitutionality).[180]

178 *See, e.g.*, Barnett, *supra* note 65, at 72 ("If construction is inevitable because the information contained in the text runs out before we have enough information [sic] resolve a case or controversy, then originalists need to debate not only the appropriate approach to constitutional interpretation but also the appropriate approach to construction. Some may wish to avoid this normative discussion, but cases still need to be decided.").

179 *See generally* McGinnis & Rappaport, *supra* note 25, at 751 ("Under [the original methods] approach, the Constitution should be interpreted using the interpretative methods that the constitutional enactors would have deemed applicable to it.").

180 *See* SEGALL, *supra* note 12, at 235 (noting that "some of the Original Originalists such as Raoul Berger and Lino Graglia" advocated for a standard of judicial review "where judges do not invalidate state or federal laws absent clear proof that such laws contradict clear text or almost universally accepted understandings of what the language means"); *see also* Michael D. Ramsey, *Beyond the Text: Justice Scalia's Originalism in Practice*, 92 NOTRE DAME L. REV. 1945, 1946 (2017) (observing that when constitutional text would not yield answers, Justice Scalia would turn to other methodologies, including "structural reasoning and background assumptions," "English law background," and "post-ratification practice").

This debate has often skated over an important threshold question—of the nature and extent of the ambiguity necessary to trigger the need for a closure rule. Proponents of construction posit that "textual indeterminacies"[181] leave room for judges (or other governmental actors) to step in and build out the "skyscraper" of constitutional law on top of the "framework" dictated by its clear original meaning.[182] And critics of construction dispute the basis or need for construction, insisting that the better means for closing the gap is through original methods of interpretation, or a presumption of constitutionality.

Yet all participants in this debate beg the question of the nature and extent of the ambiguity necessary to trigger the need for a closure rule. Professors McGinnis and Rappaport helpfully acknowledge the theoretical difficulty. They note that there is a key ambiguity "about what constitutes [the sort of] ambiguity" necessary to open up the door to construction (or to other means of closing the gap).[183] Thus, McGinnis and Rappaport helpfully ask whether the originalist inquiry calls for a closure rule whenever there are two plausible original meanings but there is "stronger evidence for one over the other," or only when each of those two meanings "are absolutely in equipoise."[184] And they plausibly assert that the latter sort of ambiguity seems "very unlikely" while the former is not really an ambiguity, but a case in which the party advocating the view with "stronger evidence" should prevail as an original matter.[185]

Yet no one, to date, has ventured any further into this thicket. Perhaps for good reason: We have never had the means of measuring the extent of the ambiguity of the communicative content of a particular provision of the Constitution; the degree of ambiguity has always been a theoretical construct (as with the McGinnis and Rappaport assertion that "equipoise" is "very unlikely"). That's no longer always the case. For at least some questions of original meaning, we can assemble and analyze data on the degree of ambiguity of the communicative content of the Constitution. And the data can facilitate a more reasoned debate about the propriety and basis for the application of a closure rule.

This point can be amplified by reference to the *commerce* question. As with *domestic violence*, the corpus data on *commerce* give us a window into

181 *See* KEITH WHITTINGTON, CONSTITUTIONAL CONSTRUCTION: DIVIDED POWERS AND CONSTITUTIONAL MEANING 3–9 (1999) (describing a process whereby the political process fills in "textual indeterminacies").

182 *See* Balkin, *supra* note 10, at 560 ("Framework originalism leaves space for future generations to build out and construct the Constitution-in-practice.").

183 McGinnis & Rappaport, *supra* note 25, at 773.

184 *Id.* (raising this point in highlighting an unresolved question for proponents of constitutional construction).

185 *Id.* at 773–74.

details that would never be visible upon consulting a founding-era dictionary or examining cherry-picked sentences from historical literature. Those materials could tell us that the various senses of *commerce* (trade, production, all economic activity, or all intercourse) are linguistically possible; but they could never give us empirical data on the relative frequency of these senses in the relevant time period. We can now consider hard data on that question—assembled in a systematic, transparent manner that is subject to falsification. And that data, at least arguably, tells us that the original meaning of *commerce* is the trade sense of the term.

Thus far we are just reiterating the principal contribution of corpus linguistics in Part V.A.1. above, as applied to *commerce*. But the *arguably* caveat goes to the second contribution we are highlighting here. Corpus linguistics can give us data on the extent of the ambiguity in the communicative content of the Commerce Clause. And that data can sharpen the debate over the propriety and basis for a closure rule (like construction or resort to an original legal rule of interpretation). The data on *commerce* show that the trade sense of the term appears overwhelmingly more frequently than the other proffered senses of the term. But they also reveal numerous uses of the term that we were unable to code—and thus that could conceivably represent an alternative sense of the term (production, all economic activity, or all intercourse). That suggests some degree of ambiguity—but nothing approaching "equipoise."

This can help to sharpen the debate about what to do next. With data about the degree of ambiguity, we can have a more structured debate about how to deal with it. One response might be to say that there is no real ambiguity here, and thus no need for a closure rule (like construction). If all the determinate semantic data available point in favor of the "trade" notion of *commerce*, then we could plausibly conclude that our best attempt at understanding the original communicative content of this clause leads us to this narrow understanding. And that could be the end of the matter—cutting off the need for construction or any other sort of closure rule.

But that is not the only possibility (and our point here is not to suggest a single answer from the corpus data, but only to highlight the ways in which the data can sharpen the debate). Another possible response could be to highlight the number of concordance lines that were deemed indeterminate or uncodable. Because there is a relatively large number of lines that fall in that category for *commerce*, one could argue that there is sufficient ambiguity to open the door for further analysis.

The point here is to note that McGinnis and Rappaport probably oversimplified when they suggested the possibility of either "equipoise" or a confident conclusion that the originalist case for one construction over

another is clearly "stronger."[186] There may be other cases where the "standard picture"—the view of communicative content—is simply unclear. And corpus data can help define the degree of ambiguity.

We take no position here on whether the number of indeterminate concordance lines for *commerce* is sufficient to establish ambiguity. But we note the possibility as a step to highlight what we see as a decision tree for a problem like this one. If and when the originalist inquiry leads to an ambiguity deemed sufficient to proceed beyond the first-order inquiry into corpus linguistic data, the next question is how to resolve it. For a problem like *commerce*, where most of the determinate concordance lines line up with the "trade" sense but many other concordance lines are indeterminate, the next step could be to look for other means of closing the gap.

One such means could be to parse the corpus databases further—in a manner that might resolve the ambiguity in favor of *original intent*. On *commerce* we could point to a difference in the data among the various corpora: The "trade" sense of *commerce* is even more predominately evident in the Founders corpus (seventy-four percent), and fewer of the concordance lines in this corpus were deemed indeterminate (twenty-six percent). Perhaps that could be enough to resolve any ambiguity. That conclusion could be a fairly comfortable one for the original-intent originalist. But we see no reason to foreclose this approach even for the original public-meaning originalist. The latter is principally interested in deriving the meaning that would have been evident to the public; but in a case of some doubt about that meaning, the doubt could be resolved in favor of the presumed understanding of the public about the intentions of the framers or ratifiers.[187]

An alternative would be to look to other originalist means of resolving the ambiguity. Perhaps "immersion" in "texts from the relevant period" would let judges resolve apparent indeterminacies in the corpus.[188] Or perhaps a careful study of the "constitutional record"—of "precursor provisions and proposals," drafting history, ratification debates, early historical practice, and early

186 *Id.* at 773.

187 *See* Solum, *supra* note 1, at 490-91 (arguing that "the speaker must know what the audience knows about the speaker's intentions *and vice versa* [and] so long as the author of the text and the reader of the text could satisfy the conditions for common knowledge of the author's beliefs regarding audience recognition of the author's intentions . . . the 'author's meaning' of a text would be the uptake that the author intended to produce in the reader on the basis of the reader's recognition of the author's intention" (emphasis added)); *see also* Solum, *Originalist Methodology*, *supra* note 19, at 277 ("The communicative content of a writing is the content the author intended to convey to the reader via the audience's recognition of the author's communicative intention." (emphasis omitted)).

188 Solum, *Triangulating Public Meaning*, *supra* note 16, at 1649.

judicial decisions—would help remove any remaining ambiguities and paint a sufficiently clear picture.[189]

If not, we could then have a more informed debate about the propriety of and basis for a closure rule—of a practice of judicial construction, or of resolving any remaining doubt by application of an originalist tool of interpretation (like a canon or a presumption of constitutionality).

Our point, again, is not to advocate for a single orthodoxy in approaching these problems. It is to highlight the contribution that corpus linguistic analysis makes for these kinds of questions—in helping to quantify the nature or extent of ambiguity in the communicative content of the Constitution, and thus to set the stage for a more informed debate about the propriety and basis for construction or some other closure rule.

### 3. Corpus Analysis Facilitates the Debate on Whether the Constitution is Written in Ordinary English or in the Dialect of the Law

Corpus linguistics can also help sharpen another debate among competing sub-theories of originalism. A key question at the intersection of public-meaning originalism and methods originalism concerns the degree to which the Constitution is written in ordinary English or in a distinct dialect—the language of the law. Both sides agree that both dialects are present. But neither has offered a reasoned basis for drawing the distinction as to specific clauses. Instead the discussion is marked by gestalt linguistic intuition—with McGinnis and Rappaport listing some clauses of the Constitution they believe to be distinctly legal, others they see as having both a legal meaning and an ordinary meaning, and a third category of terms that "possibly have a legal meaning in addition to their ordinary meaning."[190]

This question is a pivotal one for the originalist inquiry into original communicative content. To the extent the Constitution is written in the language of the law, the methods originalists have a strong case for closing the gap on any apparent ambiguity by resorting to the shared communicative conventions used within the dialect of "legalese" (canons of construction and the like). Yet no one has proposed a means for identifying the terms in the Constitution that are written in this dialect.

Corpus linguistics can fill this void. A first step, as we have noted, is to compare the frequency of usage of a given term in legal documents to the frequency of the same term in nonlegal documents. To the extent a given term is used much more frequently in legal documents we can reason that it *may* be a legal term of art. We say *may* because we do not see frequency data as

189 *Id.* at 1655.

190 McGinnis & Rappaport, *supra* note 25, at 1374.

dispositive. Certain ordinary terms may be used more frequently in legal materials but not have a distinctive meaning in a legal dialect. Words like *testimony* or *lawyer* or *verdict* may be examples. Those terms presumably are used in the same sense in ordinary parlance even though they occur more frequently in the dialect of the law.

But other terms may develop a distinct meaning in law. And a more probing use of corpus analysis can help suss that out. To evaluate whether a term is used in a distinct sense in the law, we would need to code and compare senses of the term in concordance lines in both a legal and an ordinary English corpus. If the sense of the term is distinct in the legal corpus, then we may discern that the term has a distinct meaning in the law.

Our corpus analysis in Part IV sheds some light on the usage of *public use* and *natural born citizen*. Both of these terms appear much more frequently in the legal corpus than in the Evans (ordinary English) corpus. That is a *prima facie* indication that these may be legal terms of art. Drilling further, we can see that *public use* seems to have a distinct meaning in legal parlance: At a minimum, we can say that the "direct" sense of *public use* appears more frequently in the legal corpus (78.2%) than in the corpus of ordinary English (61.4%), while the "indirect" sense appears relatively more frequently in ordinary parlance (10.8%) than in legal terminology (0.8%). That's an indication that *public use* may have a distinct meaning in law (subject to the caveat presented in subsection IV.B.2 below). If those numbers were more distinct, such as the direct sense consisting of ninety percent of the senses of *public use* in the legal corpus but only twenty percent in the corpus of ordinary English, then we would be even more confident that the direct sense was a legal term of art.

The *natural born citizen* data is more difficult to decode. Again, we see that this phrase appears more frequently in the legal corpus. But that doesn't necessarily mean that this phrase has a distinct meaning in law. Here, as noted, the data are mostly indeterminate; for the most part we just can't tell whether instances of *natural born citizen* contemplate location-based, parent-based, or legislative-bestowal notions of this term. The location-based notion appears more prominently in the Evans corpus. But we see no reason to believe that this is a distinct meaning of this phrase in ordinary parlance (different from the meaning of the phrase in legal parlance). Instead, it appears that all three of the competing senses are *legal senses*. And that renders the debate on legalese versus ordinary language moot.

That tees up a response to the McGinnis and Rappaport formulation of the categories of terms in the Constitution. McGinnis and Rappaport suggest three categories of constitutional terms: those that are "unambiguously legal," those that are "ambiguous" (presumably in the sense of having both legal and

ordinary meaning), and those that seem to have "a legal meaning in addition to their ordinary meaning." Our data and analysis suggest a different way to conceptualize the relevant categories. If a given term is used only in the legal lexicon, or in other words in only a legal sense, then presumably any inquiry into communicative content will lead to the same place. Consider the examples identified by McGinnis and Rappaport for this category: *habeas corpus*, *original jurisdiction*, and *attainder of treason*. Any attempt to discern the meaning of these terms would lead to the same conclusion. If these are purely legal terms with meaning only in the dialect of the law, then it won't matter where we go looking for evidence of its meaning (in a legal corpus or an ordinary one). The other categories are in this sense more important. The question whether the Constitution is using terms in a legal or ordinary sense matters only if a term bears meaning in both dialects—and only if that meaning differs across the dialects. This suggests that the point of debate between methods originalism and public-meaning originalism requires careful parsing of the terms of the Constitution as it appears in distinct corpora. And it highlights the need for corpus analysis to further the debate, as no other tool is capable of sussing out the distinction contemplated by this debate.

### B. *Caveats*

The above highlights originalist questions that corpus linguistics is uniquely suited to answer. Here we enumerate some caveats in this use of the tool. Our caveats go to the range of questions for which corpus analysis seems to lend itself: the question of what to do when the data are indeterminate, and the question whether judges are capable of corpus linguistic analysis.

#### 1. Scope of Applicability of Corpus Linguistic Analysis

A threshold question for corpus-based originalism concerns the scope of its applicability. We began this Article by reference to the "standard picture" of constitutional interpretation—a view of the communicative content of the words of the Constitution. And we have highlighted what we see as shortcomings of traditional methods of assessing that content while emphasizing the promise that corpus linguistics holds for addressing these concerns.

But we need to mention an important caveat: The constitutional questions we have highlighted in this Article do not run the gamut of the range of problems of indeterminacy in the communicative content of the Constitution. The questions we propose to analyze using corpus data are problems of lexical ambiguity—ambiguity in the form of a contest between two alternative senses of a constitutional term. All the problems we discuss here—the meaning of *domestic violence*, *commerce*, *public use*, and *natural born*

*citizen*—are all ambiguities of this sort. We chose these examples for good reason. Corpus analysis, to date, has been applied most comfortably to these types of problems.[191] And that has been our focus here.

Yet of course this is not the only kind of indeterminacy that appears in the Constitution. The document also has examples of semantic or structural ambiguity[192]—ambiguity stemming from the semantic structure of the words (as opposed to competing senses of the terms). An example is the "well regulated Militia" clause in the Second Amendment. A key point of ambiguity here is semantic or structural—whether the "well regulated Militia" clause modifies or somehow limits the right to bear arms, or is instead merely prefatory.[193] Corpus analysis—or at least the methods we present in this Article—may not be of obvious use to this kind of problem.[194]

That's not to say that corpus analysis is clearly unhelpful for this kind of ambiguity. More thought and analysis are needed. But the cited Second Amendment problem presumably could benefit from some form of corpus analysis.[195] If the question is whether prefatory clauses in law are viewed as capable of limiting an operative provision, then an extensive analysis of a legal corpus might be just the tool that is needed. We have not tried this inquiry and are not in a position to opine on its viability. But we see no reason to foreclose the possibility of this kind of analysis. If a legal corpus includes sufficient examples of prefatory clauses, and enough linguistic information to let a careful reader discern how the clause is understood as applied to operative provisions, then corpus linguistics could also be extended to this sort of problem of semantic ambiguity.

191 *See* Lee & Mouritsen, *supra* note 88, at 871 (noting that corpus linguistics, "as currently conceived," has been comfortably extended only to problems of "lexical ambiguity").

192 *Id.* at 872 n.318 (explaining that "syntactic ambiguities arise from the possibility of alternative constituent structures"; giving the example of "*Mary saw the man with the telescope*," while noting that "with the telescope *is* either a manner adverbial modifying *saw*, or a prepositional phrase modifying *the man*").

193 *See* McGinnis & Rappaport, *supra* note 25, at 767 (discussing this question and defending the decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), on the ground that "the law at the time of the Constitution's enactment had an accepted interpretive canon that clarified the issue"—a canon that "held that a prefatory clause could resolve an ambiguity, but could not otherwise limit or expand the operative clause").

194 *See* Phillips & White, *supra* note 58, at 185, 233-34 (concluding that corpus linguistic analysis cannot determine the meaning of the Foreign Emoluments Clause because of the structural ambiguity introduced by the phrase "of any kind whatever").

195 *See* Josh Blackman & James C. Phillips, *Corpus Linguistics and the Second Amendment*, HARV. L. REV. BLOG (Aug. 7, 2018), https://blog.harvardlawreview.org/corpus-linguistics-and-the-second-amendment/.

### 2. Indeterminate Data

A second question concerns the problem of indeterminate data. We see two potential sources of indeterminacy. The first is the more obvious—indeterminacy in the data mined from the relevant corpus. This is featured most prominently in the *natural born citizen* analysis above. We are hesitant to make an inference from the corpus data on *natural born citizen* because so many of the concordance lines that we coded were ultimately indeterminate. That problem is surely not unique to this clause of the Constitution. And the existence of indeterminate data will be a hurdle for other problems of constitutional interpretation.

Yet this is not the only source of indeterminacy in the use of corpus-based originalism. Another is inherent in lexicography—in the division of senses in the dictionary. The division among senses of a given term is at some level arbitrary. Clearly there's a great deal of subjectivity in the way that senses are divided.[196] Linguists have no agreed-upon formula for distinguishing senses of a word.[197] That means that our identification of a relevant set of senses will in some sense be arbitrary. And that complicates the attempt to derive useful information from the corpus data.[198]

That's one reason why the *domestic violence* example seems to lend itself so well to corpus analysis. The *insurrection* and *household assault* senses of this phrase are sufficiently distinct that it is fairly easy to offer confident conclusions from the data that we compiled. If one clearly distinct sense of a constitutional term is used overwhelmingly more frequently in the corpus, we can say fairly confidently that that is the communicative content of the term.

---

196 Nikola Dobric, *Word Sense Disambiguation Using ID Tags—Identifying Meaning in Polysemous Words in English*, *in* PROCEEDINGS OF THE 29TH INTERNATIONAL CONFERENCE ON LEXIS AND GRAMMAR/LGC 97, 97 (Dusko Vitas & Cvetana Krstev eds., 2010) (explaining that polysemy—multiple word meaning—is "[o]ne of the persisting issues in modern lexicography").

197 No one is quite sure where to draw the line—research "show[s] that different polysemy criteria (i.e., criteria that may be invoked to establish that a particular interpretation of a lexical item constitutes a separate sense rather than just being a case of vagueness or generality) may be mutually contradictory, or may each yield different results in different contexts." DIRK GEERAERTS, THEORIES OF LEXICAL SEMANTICS 196 (2009). And there is no agreed-upon taxonomy of polysemy; some linguists speak of senses and sub-senses, see Dylan Glynn, *Polysemy and Synonymy: Cognitive Theory and Corpus Method*, *in* CORPUS METHODS FOR SEMANTICS: QUANTITATIVE STUDIES IN POLYSEMY AND SYNONYMY 7, 17 (Dylan Glynn & Justyna A. Robinson eds., 2014), others of more or less prototypical exemplars of senses, see, e.g., Dagmar Divjak & Antti Arppe, *Extracting Prototypes from Exemplars: What Can Corpus Data Tell Us About Concept Representation?*, 24 COGNITIVE LINGUISTICS 221 (2013), and others of hyponomy and hypernomy in polysemy, see Glynn, *supra,* at 10.

198 *See* James Cleith Phillips, Jacob Crump, & Benjamin Lee, *Investigating the Original Meaning of "Officers of the United States" with the Corpus of Founding-Era American English*, 37 https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3126975 (struggling to classify various senses of *officer*, and instead, among other things, looking at specific officers mentioned to get an idea of the scope of the word).

But other sense distinctions will be less clear. And difficult problems arise when the competing senses are closely related to each other—as where one is a more general sense encompassing the other. This seems to be the case for the two senses of *public use*. We refer to one sense as *direct* and the other *indirect*. But the *indirect* notion of public use can be thought of as the general category (benefit to the public), of which the *direct* notion (the government owning or directly employing) can be viewed as a specific example. And if that is the right way to think of this relationship, then it is difficult to know what to do with a predominance of direct uses of *public use* in the corpus. Does that tell us that the original communicative content of the public use proviso of the Takings Clause is a direct notion of use? Or does it suggest that the indirect notion should also be included, in that the direct notion encompasses the indirect one?

These are difficult questions to answer. And they are another ground for a degree of hesitation in touting corpus linguistics as the answer to all originalist inquiries.

That said, this does not diminish the significance of the contribution of corpus-based originalism. At a minimum, the move to data-driven analysis can remedy shortcomings in existing tools for finding original communicative content. With systematic data instead of cherry-picked sample sentences, we can have a more informed debate about the likely understanding of a given term or phrase in the founding era. Some such terms (like *domestic violence*) will yield clear data on distinctly separate senses of the operative language. And where that occurs, the inquiry into original communicative content may end with corpus linguistic analysis.

That will not always be the case, of course. But even where the data are inconclusive, the contribution of corpus linguistics will be significant. In some cases, corpus analysis will just be the first step on the originalist inquiry. If the data are inconclusive, that can tell us that we need to look elsewhere to find an answer—to an original method of interpretation, to evidence of founders' or ratifiers' intent, or to a decision to open the door to a "construction zone."

This in itself is a contribution of corpus linguistic analysis. Our existing tools of interpretation make wild, opaque guesses about when the "standard picture" is fuzzy enough to open the door to the above and other closure rules. Corpus linguistics, at a minimum, can put some meat on the bones of the question whether the original communicative content of a given term is sufficiently ambiguous to call for construction or some other means of resolution.

The degree of indeterminacy may itself be helpful in the originalist inquiry—depending on your chosen theory. A high degree of indeterminacy, for example, could properly sustain the invocation of a presumption of

constitutionality under a Thayerian burden of proof.[199] And corpus linguistics, unlike any other tool of originalist inquiry, can help quantify the degree of clarity in the communicative content of a given provision. This itself is an important advancement. And it's an advancement that stands despite the caveats set forth here.

The question of when corpus linguistic analysis is enough (and when more research will be needed) is a difficult one. But we propose a threshold decisional rubric. An originalist inquiry into original communicative content should begin with two questions, each going to the conclusiveness of the corpus data. If the answer to either question is *no*, that suggests that some other originalist methodology or closure rule is likely needed.

1. The first question is whether the corpus data points clearly in favor of a predominant sense of the constitutional term.

2. The second is whether the senses of the term are sufficiently distinct from each other to treat them as separate.

We would answer *yes* to both of those questions for our *domestic violence* analysis—and thus propose to end the originalist inquiry there. For *commerce*, we would answer *yes* to the first and *no* to the second question. That at least arguably opens the door to further originalist analysis. The same holds for *public use* (though the answer to the first question is even closer). And for *natural born* we probably do not even get to the second question because the answer to the first appears to be *no*. Granted, what is "sufficiently clear" and what is "sufficiently distinct" can be debated and will have to be fleshed out. But that's a better debate to have than previous ones we've been having with traditional originalist methodology.

### 3. Judicial Capacity for Corpus Linguistic Analysis

A familiar critique of any originalist inquiry challenges the capacity of judges to do justice to the enterprise. Judges are not historians. It may rightly be said that many judges are even "bad historians" who tend to "make up an imaginary history and use curiously unhistorical methods."[200] This is sometimes cited as a reason to eschew originalism. If judges are incapable of conducting a reliable originalist inquiry, perhaps they shouldn't try.

If that critique sticks (and we think it can't, for reasons explained below), then the problem is perhaps compounded as applied to data-driven originalism. Judges are also not corpus linguists. And it may be unrealistic to

199 *See* Segall, *supra* note 12, at 28–40 (discussing founding-era practices of and views on judicial review, including Alexander Hamilton's famous "irreconcilable variance" standard and St. George Tucker's "absolutely and irreconcilably contradictory" standard of judicial review).

200 MAX RADIN, LAW AS LOGIC AND EXPERIENCE 138 (1940).

expect them to acquire the expertise and proficiency needed to perform the corpus-based analysis that we propose here.[201]

This is a caveat worth noting. "Corpus data can be gathered and analyzed properly only with care and a little background and training in the underlying methodology."[202] Further, "[a] judge who proceeds willy-nilly may, either consciously or unwittingly, proffer data that has only the appearance of careful empiricism."[203] And for these reasons, we share the hesitation set forth here. We agree that judges will be aided by expert analysis and full adversary briefing. And we think judges and lawyers going forward will benefit from a little training in the use of corpus-based methods of inquiry.

But again the caveat does not defeat the importance of this project. "The fact of the matter is that judges and lawyers *are* linguists."[204] That's true in the sense that we are consistently called upon to resolve ambiguities in the language of the law. And we think that is the principal response to this final caveat. "[T]he question, ultimately, is not whether we trust judges to engage in linguistic analysis. It is whether we want them to 'do so with the aid of—instead of in open ignorance of or rebellion to—modern tools developed to facilitate that analysis."[205] The tools, moreover, are not ultimately that complex or difficult. "Corpus analysis is like math"[206]—everyone can do it at some basic level, while more advanced inquiries will require some real expertise. Much corpus analysis is fairly rudimentary. We "just think we should be using a calculator instead of doing it in our heads."[207]

In time, the law and corpus linguistics movement will develop standards and best practices for this field. And budding generations of lawyers will learn to employ the tools of corpus linguistics in tackling a wide range of problems of ambiguity in the law. Until then, we should proceed cautiously and carefully. However, we cannot afford to ignore this important tool. We may not be expert linguists or even historians. Yet for those of us who think of constitutional interpretation as we do (as an historical exercise), we can do no

201 This point has been raised by a majority of the Utah Supreme Court, in opinions criticizing the proposed use (by one of us) of corpus linguistics as applied to problems of statutory interpretation. *See* State v. Rasabout, 356 P.2d 1258, 1265 (Utah 2015) (asserting that "[t]he knowledge and expertise required" to perform this kind of analysis is "'not within the common knowledge' of judges" and thus requires testimony from expert witnesses).

202 Lee & Mouritsen, *supra* note 88, at 866 (making this point as applied to problems of statutory interpretation).

203 *Id.*

204 *Id.*

205 *Id.* at 866-67.

206 *Rasabout*, 356 P.2d at 1236 (Lee, A.C.J., concurring in part and concurring in the judgment) (making this point in proposing the use of corpus linguistics in a case involving statutory interpretation).

207 *Id.*

better than to close by quoting Justice Scalia and his co-author Bryan Garner: "Our charge is to try."[208]

## CONCLUSION: CONSTRAINT THROUGH DATA-DRIVEN ORIGINALISM

Some originalists have begun to question a founding tenet of the originalist enterprise—the idea that this approach to interpretation "constrains" judicial discretion.[209] Perhaps it's true that originalism, as often conceived, is not the *most constraining* theory of interpretation that we can imagine.[210] But concerns about the demise of this premise—constraint—are surely exaggerated. And we think the theory and methodology of this Article can help to show why.

Will Baude suggests that "there are . . . probably methodologies that are . . . better at" imposing "external constraint" on judges.[211] The examples he gives are "heavy deference to other branches or strong stare decisis."[212] But these aren't freestanding theories of interpretation. No one believes in *always* deferring to other branches of government on constitutional matters. And even an ironclad rule of deference to precedent leaves new constitutional questions not resolved by precedent. So to get to the theories that Baude imagines to be more constraining you would have to start with a threshold theory—a theory for discerning the bedrock foundation of the Constitution that other branches of government are held to, or that tells you what to do when you have no controlling precedent.

That leaves us with either originalism or some form of anti-originalism like pragmatism. And originalism is easily more constraining than some free-form notion of pragmatism.[213] Constraint, moreover, is more than just precise determinacy—the identification of a single right answer that everyone would agree on.[214] The originalist inquiry, at a minimum, reduces the breadth of a

208 SCALIA & GARNER, *supra* note 13, at 400.

209 *See* Baude, *supra* note 7, at 2215 (suggesting that proponents of the "constraint" premise of originalism "no longer have a clear champion"); Colby, *supra* note 7, at 714-15 (2011) (asserting that "[j]udicial constraint" was once the "heart and soul" of originalism but that originalism has since "sold its soul to gain respect and adherents").

210 See Baude, *supra* note 7, at 2223 (suggesting that "theories centered around heavy deference to other branches or strong stare decisis . . . could make it easier to judge the judiciary's behavior, because it is comparatively transparent when a law is being struck down or a precedent is being overruled").

211 *Id.*

212 *Id.*

213 *See id.* (explaining that originalism "compares favorably to 'pragmatism'—under which it's wickedly difficult to tell whether its practitioners are doing it right or wrong"); Michael Stokes Paulsen, *How to Interpret the Constitution (and How Not To)*, 115 YALE L.J. 2037, 2062 (2006) ("The existence of reasonably firm criteria [in originalism] makes it easier to check up on originalist interpretations for the soundness of their reasoning and their adherence to correct principles.").

214 See Christopher R. Green, *Constitutional Truthmakers*, NOTRE DAME J.L. ETHICS & PUB. POL'Y (forthcoming) (manuscript at 18) (on file with authors) (noting that originalism may fail "to

judge's discretion.[215] And it yields at least "internal constraints"—in allowing "individual interpreters to come up with their own best assessments of constitutional meaning."[216] This sort of constraint may not "easily yield *consensus* or rule most interpretations out of bounds as *implausible*"; yet originalism can "still provide a method that can be divorced from various nonlegal considerations."[217] And corpus linguistics, in our view, can help to discipline all the foregoing mechanisms of constraint.

Corpus analysis may yield data-backed grounds for more points of clear "consensus" in the communicative content of the Constitution. And it may let us more clearly rule out more interpretations of the document as "implausible." The tool, at a minimum, gives us the ability to assemble empirical support for conclusions along these lines. And where we have such data we may have a solid basis for an external constraint on judges.

The *domestic violence* example illustrates the point. Without the data we present herein a judge could plausibly contend that the original meaning of the Domestic Violence Clause could be understood to encompass problems of household assault. Through dictionary analysis or otherwise, a degree of doubt could be cast on the view that there is only one clear way to understand *domestic violence*, or that the household assault sense of the term is untenably implausible. But the corpus data rules that out. We now know that the Domestic Violence Clause is limited to acts of insurrection. And we can point to originalism as a basis for an external constraint on a judge who is inclined to rule otherwise.

The *commerce* data is less constraining. But it *is* somewhat constraining. For reasons noted above we may not be able to say conclusively that the founding-era notion of *commerce* is clearly limited to the trade sense of the term—too many of our concordance lines were indeterminate to be certain, and some of the competing senses of *commerce* are too closely related to deem them exclusive of others. Yet the data can still provide a degree of constraint—and at least an internal limitation allowing interpreters to come up with their own best sense of constitutional meaning. A judge who takes original meaning seriously, for example, would have a very difficult time

produce unique and indisputable answers" to some constitutional questions (quoting Andrew Koppelman, *Originalism, Abortion, and the Thirteenth Amendment*, 112 COLUM. L. REV. 1917, 1919 (2012)).

215 See Baude, *supra* note 7, at 2217 (suggesting that originalism may meaningfully limit judicial discretion without eliminating it); Colby, *supra* note 7, at 751 (noting that "New Originalists" posit that originalism is "still meaningfully constraining" even if it "does not completely eliminate judicial subjectivity"); Neil M. Gorsuch, *Of Lions and Bears, Judges and Legislators, and the Legacy of Justice Scalia*, 66 CASE W. RES. L. REV. 905, 917 (2016) (noting that there is "[n]o reason . . . why we cannot conclude for ourselves that one side has the better of" the originalist argument, "even if by a nose, and even while admitting that a disagreeing colleague could see it the other way").

216 Baude, *supra* note 7, at 2226.

217 *Id.*

justifying a production sense of commerce in light of our data. The all-intercourse sense is almost equally implausible. What about the economic activity sense? Perhaps that could not be rejected outright as utterly untenable (for reasons we noted). But the data would provide a basis for choosing the trade sense of *commerce* over the others. And that basis could yield at least internal constraint in the sense noted above—of giving the judge a method "divorced from nonlegal considerations" for deciding the case. The transparency of the methodology, moreover, means that others can more easily check a judge's conclusions from the data. That also provides an internal check to the judge, who will have an incentive to be more careful with his methodology and conclusions.

Corpus analysis is useful—and in a sense constraining—even to the extent it leaves a given question of original meaning indeterminate. The data, at a minimum, can tell us when we cannot be sure of the original communicative content of a provision of the Constitution. And that in itself is useful. It will cue up further steps in an originalist decision tree—as to the invocation of any of a series of closure rules (in opening the construction zone, employing a presumption of constitutionality, or turning to original methods of interpretation). These methods themselves may not always lead to a single answer of universal acclaim. But they will at least narrow the bounds of debate. And the data will have been the first step in getting there.

* * * * *

# LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS

# Founders Online

## General Orders, 22 January 1780

### General Orders

Head-Quarters Morristown saturday
Jany 22nd 80.

Parole Sacharissa—
C. Signs Saint. Simple.

In future the column, "On Command"—in returns is to comprehend none but men detached on military duty—There is to be an additional column under the head of "Extra Service"— which is to comprehend Waggoners, Artificers and all others who are so employed as not to be counted upon as part of the effective force of the army.

Conductors are immediately to be appointed to those brigades that are deficient.[1]

The woolen caps and mittens lately issued to the detachment under command of Major General Lord Sterling are as soon as possible to be collected and returned to the Clothier General[2]—The officers commanding brigades will see this order executed with respect to those men who have rejoined their corps, and Colonel Hazen will attend to it in that part of the detachment remaining under his command.

Brigade returns, regimentally digested, are to be made to the Adjutant General on wednesday next of the arms, ammunition, accoutrements, drums and fifes in possession of the respective regiments; and on the same day the brigade Conductors (or Quarter Masters where there are no Conductors) are to make a return of all those articles in their possession.

The officers commanding brigades will take care to have the men completed with bayonets as speedily as possible.

---

Varick transcript, DLC:GW.

Adj. Gen. Alexander Scammell's orderly book entry for this date includes the following additional general orders: "A Fatigue party of one Captain one subaltern 4 serjeants 4 Corporals and Forty Privates, from Hands & Maxwells Brigades to parade tomorrow Morning 9 o'Clock at Coll Gumbys Quarters provided with spades & axes for mending the roads. Orders will be left for the Commanding Officer" (orderly book, 17 Oct. 1779–22 March 1780, DNA: RG 93, Orderly Books, 1775–1783, vol. 33).

1. The orders refer to the conductors assigned to each brigade to supervise the work of the brigade's armorers and the receipt and issue of arms, ammunition, and equipment (see Henry Knox to GW, 5 March 1779, and n.2 to that document).

2. For GW's issue of this clothing, see his first letter to Major General Stirling of 14 January.

---

*Note:* The annotations to this document, and any other modern editorial content, are copyright © The Rector and Visitors of the University of Virginia. All rights reserved.

Back to top

| | |
|---|---|
| SOURCE PROJECT | Washington Papers |
| TITLE | General Orders, 22 January 1780 |
| AUTHOR | Washington, George |
| DATE | 22 January 1780 |
| CITE AS | "General Orders, 22 January 1780," *Founders Online*, National Archives, https://founders.archives.gov/documents/Washington/03-24-02-0175. [Original source: *The Papers of George Washington*, Revolutionary War Series, vol. 24, *1 January–* |

*9 March 1780*, ed. Benjamin L. Huggins. Charlottesville: University of Virginia Press, 2016, pp. 210–211.]

---

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

---

Founders Online is an official website of the U.S. government, administered by the National Archives and Records Administration through the NHPRC, in partnership with the University of Virginia Press, which is hosting this website.

**TC 3-22.9**

# Rifle and Carbine

## MAY 2016

**Distribution Restriction: Approved for public release; distribution is unlimited.**

*This publication supersedes FM 3-22.9, 12 August 2008.

## Headquarters, Department of the Army



**This publication is available at the Army Publishing Directorate site (http://www.apd.army.mil), and the Central Army Registry site (https://atiam.train.army.mil/catalog/dashboard).**

**TC 3-22.9 (FM 3-22.9)**

*Training Circular
No. 3-22.9

Headquarters
Department of the Army
Washington, DC, 13 May 2016

# Rifle and Carbine

## Contents

| | | Page |
|---|---|---|
| | **PREFACE** | **viii** |
| | **INTRODUCTION** | **ix** |
| **Chapter 1** | **OVERVIEW** | **1-1** |
| | Safe Weapons Handling | 1-2 |
| | Rules of Firearms Safety | 1-2 |
| | Weapon Safety Status | 1-4 |
| | Weapons Control Status | 1-10 |
| | Overmatch | 1-10 |
| **Chapter 2** | **RIFLE AND CARBINE PRINCIPLES OF OPERATION** | **2-1** |
| | Army Standard Service Rifle | 2-1 |
| | Upper Receiver | 2-2 |
| | Lower Receiver | 2-3 |
| | Cycle of Function | 2-4 |
| | Cooling | 2-13 |
| **Chapter 3** | **AIMING DEVICES** | **3-1** |
| | Units of Angular Measurement | 3-2 |
| | Optics | 3-8 |
| | Thermal Sights | 3-15 |
| | Pointers / Illuminators / Lasers | 3-19 |
| **Chapter 4** | **MOUNTABLE EQUIPMENT** | **4-1** |
| | Adaptive Rail System | 4-1 |
| | Mountable Weapons | 4-2 |
| | Mountable Aiming Devices | 4-4 |
| | Mountable Accessories | 4-5 |

**Distribution Restriction: Approved for public release, distribution is unlimited.**

***This publication supersedes FM 3-22.9, 12 August 2008.**

Contents

**Chapter 5 EMPLOYMENT ................................................ 5-1**
Shot Process ................................................ 5-2
Functional Elements of the Shot Process ................................................ 5-3
Target Acquisition ................................................ 5-4

**Chapter 6 STABILITY ................................................ 6-1**
Support ................................................ 6-1
Muscle Relaxation ................................................ 6-4
Natural Point of Aim ................................................ 6-4
Recoil Management ................................................ 6-5
Shooter–Gun Angle ................................................ 6-5
Field of View ................................................ 6-5
Carry Positions ................................................ 6-6
Stabilized Firing ................................................ 6-13
Firing Positions ................................................ 6-15

**Chapter 7 AIM ................................................ 7-1**
Common Engagements ................................................ 7-1
Common Aiming Errors ................................................ 7-5
Complex Engagements ................................................ 7-6
Target Conditions ................................................ 7-10
Environmental Conditions ................................................ 7-16

**Chapter 8 CONTROL ................................................ 8-1**
Trigger Control ................................................ 8-2
Breathing Control ................................................ 8-4
Workspace Management ................................................ 8-4
Calling the Shot ................................................ 8-5
Rate of fire ................................................ 8-6
Follow-Through ................................................ 8-7
Malfunctions ................................................ 8-8
Transition to Secondary Weapon ................................................ 8-14

**Chapter 9 MOVEMENT ................................................ 9-1**
Movement Techniques ................................................ 9-1
Forward Movement ................................................ 9-2
Retrograde Movement ................................................ 9-2
Lateral Movement ................................................ 9-3
Turning Movement ................................................ 9-4

**Appendix A AMMUNITION ................................................ A-1**

**Appendix B BALLISTICS ................................................ B-1**

**Appendix C COMPLEX ENGAGEMENTS ................................................ C-1**

**Appendix D DRILLS ................................................ D-1**

**Appendix E ZEROING ................................................ E-1**

**Appendix F 10-METER BORESIGHT OFFSETS AND 25-METER ZERO**

**Glossary ................................................ Glossary-1**

**References ............................................ Referrences-1**

**Index ................................................ Index-1**

## Figures

Figure 1-1. Employment skills ........................................ 1-1
Figure 1-2. Small unit range overmatch ................................ 1-12
Figure 2-1. Upper receiver ............................................ 2-2
Figure 2-2. Lower receiver ............................................ 2-3
Figure 2-3. Feeding example ........................................... 2-5
Figure 2-4. Chambering example ........................................ 2-6
Figure 2-5. Locking example ........................................... 2-7
Figure 2-6. Firing example ............................................ 2-8
Figure 2-7. Unlocking example ......................................... 2-9
Figure 2-8. Extraction example ........................................ 2-10
Figure 2-9. Ejection example .......................................... 2-11
Figure 2-10. Cocking example .......................................... 2-12
Figure 3-1. Minute of angle example ................................... 3-2
Figure 3-2. Mil example ............................................... 3-3
Figure 3-3. Close combat optic / Rifle combat optic reticle / Thermal reticle examples ..................... 3-4
Figure 3-4. Stadia reticle example .................................... 3-5
Figure 3-5. Electromagnetic spectrum .................................. 3-7
Figure 3-6. Carrying handle with iron sight example ................... 3-9
Figure 3-7. Back up iron sight ......................................... 3-10
Figure 3-8. CCO Reticle, Comp M2 examples ............................. 3-12
Figure 3-9. RCO reticle example ....................................... 3-14
Figure 3-10. Thermal weapon sight example ............................. 3-15
Figure 3-11. Weapon thermal sights by version ......................... 3-17
Figure 3-12. Thermal weapons sight, narrow field of view reticle example ........................ 3-18
Figure 3-13. Thermal weapons sight, wide field of view reticle example .......................... 3-18

Figure 3-14. AN/PEQ-2 ....................3-21
Figure 3-15. AN/PEQ-15, ATPIAL ....................3-23
Figure 3-16. AN/PEQ-15A, DBAL-A2 ....................3-25
Figure 3-17. AN/PSQ-23, STORM ....................3-27
Figure 4-1. M320 attached to M4 series carbine example ....................4-2
Figure 4-2. M203 grenade launcher example ....................4-2
Figure 4-3. M26 shotgun example ....................4-3
Figure 4-4. Bipod example ....................4-5
Figure 4-5. Vertical foregrip example ....................4-6
Figure 6-1. Stock weld ....................6-4
Figure 6-2. Hang carry example ....................6-7
Figure 6-3. Safe hang example ....................6-8
Figure 6-4. Collapsed low ready example ....................6-9
Figure 6-5. Low ready position ....................6-10
Figure 6-6. High ready position ....................6-11
Figure 6-7. Ready position or up position ....................6-12
Figure 6-8. Firing position stability example ....................6-14
Figure 6-9. Standing, unsupported example ....................6-16
Figure 6-10. Standing, supported example ....................6-17
Figure 6-11. Squatting position ....................6-18
Figure 6-12. Kneeling, unsupported example ....................6-19
Figure 6-13. Kneeling, supported example ....................6-20
Figure 6-14. Sitting position—crossed ankle ....................6-21
Figure 6-15. Sitting position—crossed-leg ....................6-22
Figure 6-16. Sitting position—open leg ....................6-23
Figure 6-17. Prone, unsupported example ....................6-24
Figure 6-18. Prone, supported example ....................6-25
Figure 6-19. Prone, roll-over example ....................6-26
Figure 6-20. Reverse roll-over prone firing position ....................6-27
Figure 7-1. Horizontal weapon orientation example ....................7-2
Figure 7-2. Vertical weapons orientation example ....................7-3
Figure 7-3. Front sight post/reticle aim focus ....................7-4
Figure 7-4. Immediate hold locations for windage and lead example ....................7-8
Figure 7-5. Immediate hold locations for elevation (range) example ....................7-9

Figure 7-6. Front sight post method example.................................... 7-11
Figure 7-7. Immediate holds for range to target ................................ 7-13
Figure 7-8. Immediate holds for moving targets example .................. 7-14
Figure 7-9. Oblique target example .................................................... 7-15
Figure 7-10. Wind value ...................................................................... 7-17
Figure 7-11. Wind effects .................................................................... 7-18
Figure 7-12. Wind hold example ......................................................... 7-19
Figure 8-1. Arc of movement example .................................................. 8-2
Figure 8-2. Natural trigger finger placement......................................... 8-3
Figure 8-3. Workspace example ........................................................... 8-5
Figure 8-4. Malfunction corrective action flow chart........................... 8-12
Figure A-1. Small arms ammunition cartridges ....................................A-1
Figure A-2. Cartridge case ...................................................................A-2
Figure A-3. Propellant...........................................................................A-3
Figure A-4. 5.56mm primer detail ........................................................A-4
Figure A-5. Bullet example, Armor-piercing cartridge ..........................A-5
Figure A-6. Ball cartridge......................................................................A-6
Figure A-7. Ball with tracer cartridge ....................................................A-6
Figure A-8. Armor-piercing cartridge ....................................................A-7
Figure A-9. Short range training ammunition cartridge ........................A-7
Figure A-10. Blank cartridge.................................................................A-8
Figure A-11. Close combat mission capability kit cartridge..................A-8
Figure A-12. Dummy cartridge .............................................................A-9
Figure B-1. Internal ballistic terms........................................................B-2
Figure B-2. External ballistic terms.......................................................B-3
Figure B-3. Trajectory...........................................................................B-4
Figure B-4. Lethal zone example .........................................................B-11
Figure C-1. Mil Relation Formula example...........................................C-2
Figure C-2. Standard dismount threat dimensions example .................C-3
Figure C-3. RCO range determination using the bullet drop compensator reticle.........................................................C-4
Figure C-4. Reticle relationship using a stadiametric reticle example...............................................................................C-5
Figure C-5. Deliberate lead formula example.......................................C-7

Figure C-6. Deliberate trapping method example ................................ C-8
Figure C-7. Oblique target example ..................................................... C-9
Figure C-8. Wind value ........................................................................ C-11
Figure C-9. Wind effects ...................................................................... C-12
Figure C-10. Wind formula and ballistics chart example ................... C-14
Figure C-11. Hold-off example ............................................................ C-15
Figure C-12. Quick high angle formula example................................ C-17
Figure C-13. Compound wind and lead determination example......... C-18
Figure E-1. Wind effects on zero at 300 meters ................................. E-3
Figure E-2. M16A2 / M16A4 weapons 25m zero target....................... E-5
Figure E-3. M4-/M16-series weapons 25m zero short range and pistol marksmanship target.............................................. E-6
Figure E-4. Grouping ........................................................................... E-7
Figure E-5. Marking shot groups ......................................................... E-8
Figure E-6a. Horizontal diagnostic shots ........................................... E-12
Figure E-6b. Vertical diagnostic shots ............................................... E-13
△ Figure F-1. 10-meter target offset symbols ..........................................F-2
△ Figure F-2. Blank 10-meter target offset ..............................................F-3
△ Figure F-3. M16A2 10-meter boresighting target..................................F-4
△ Figure F-4. 300-meter zero of the advanced combat optical gunsight ................................................................................F-9
△ Figure F-5. Advanced combat optical gunsight points of aim (100 to 300 meters)...........................................................F-10

# Tables

Table 1-1. General safe condition of the weapon for each weapon safety status..........................................................................1-4
Table 1-2. Weapons Control Status ....................................................1-10
Table 2-1. Model Version Firing Methods Comparison .........................2-4
Table 3-1. Laser Aiming Devices for the M4 and M16.........................3-19
Table 4-1. Attachment Related Technical Manuals and Mounting ........4-4
Table 5-1. Shot Process example ........................................................5-2
Table A-1. Small Arms Color Coding and Packaging Markings ......... A-10
Table A-2. 5-56mm, M855, Ball ......................................................... A-11

Table A-3. 5.56mm, M855A1, Enhanced Performance Round (EPR), Ball ........ A-12
Table A-4. 5.56mm, M856A1, Tracer ........ A-13
Table A-5. 5.56mm, Mk301, MOD 0, DIM Tracer ........ A-14
Table A-6. 5.56mm, M995, Armor Piercing ........ A-15
Table A-7. 5.56mm, M862, Short Range Training Ammunition ........ A-16
Table A-8. 5.56mm, M1037, Short Range Training Ammunition ........ A-17
Table A-9. 5.56mm, M1042 Close Combat Mission Capability Kit ........ A-18
Table A-10. 5.56mm, M200, Blank ........ A-19
Table C-1. Standard holds beyond zero distance example ........ C-16
△ Table F-1. Offset mounting ........ F-5

Chapter 1

# Overview

This TC is designed to provide Soldiers the critical information on their rifle or carbine to properly and effectively engage and destroy threats in a direct fire engagement. It relies on the Soldier's understanding of the weapon, how it functions, its capabilities, the capabilities of the optics and ammunition, and how to properly employ those capabilities to achieve mastery through the application of the functional elements of the shot process.

This chapter describes the principles of proper weapons handling, tactical applications and control measures for handling the weapons, and an overview of the concepts of overmatch as it pertains to a Soldier's individual weapon.

1-1. Each Soldier is responsible for placing accurate and effective fires on threat targets with their individual weapon. This manual defines the functional elements of the shot process, the principles of operation of the weapon, the characteristics and description of ballistics and ammunition, and the various engagement techniques that are essential to build Soldier proficiency with their weapon. It includes standard drills and techniques that assist the Soldier to build, improve, and sustain their skills to achieve accurate and precise shots consistently during combat operations (see figure 1-1).

**Figure 1-1. Employment skills**

## SAFE WEAPONS HANDLING

1-2. Safe weapons handling procedures are a consistent and standardized way for Soldiers to handle, operate, and employ the weapon safely and effectively. Weapons handling is built on three components; the Soldier, the weapon, and the environment:

- The **Soldier** must maintain situational understanding of friendly forces, the status of the weapon, and the ability to evaluate the environment to properly handle any weapon. The smart, adaptive, and disciplined Soldier is the primary safety mechanism for all weapons under his control.
- The **weapon** is the primary tool of the Soldier to defeat threats in combat. The Soldier must know of and how to operate the mechanical safeties built into the weapons they employ, as well as the principles of operation for those weapons.
- The **environment** is the Soldier's surroundings. The Soldier must be aware of muzzle discipline, the nature of the target, and what is behind it.

1-3. To safely and effectively handle weapons, Soldiers must be cognitively aware of three distinct weapons handling measures:

- **The rules of firearms safety**.
- **Weapons safety status**.
- **Weapons control status**.

1-4. These measures directly support the components of safe weapons handling. They are designed to provide redundant safety measures when handling any weapon or weapon system, not just rifles and carbines.

1-5. This redundancy allows for multiple fail-safe measures to provide the maximum level of safety in both training and operational environments. A Soldier would have to violate two of the rules of firearms safety or violate a weapon safety status in order to have a negligent discharge.

> ***Note.*** Unit standard operating procedures (SOPs), range SOPs, or the operational environment may dictate additional safety protocols; however, the rules of firearms safety are always applied. If a unit requires Soldiers to violate these safety rules for any reason, such as for the use of blank rounds or other similar training munitions during training, the unit commander must take appropriate risk mitigation actions.

## RULES OF FIREARMS SAFETY

1-6. The Rules of Firearms Safety are standardized for any weapon a Soldier may employ. Soldiers must adhere to these precepts during training and combat operations, regardless of the type of ammunition employed, except as noted above.

## Rule 1: Treat Every Weapon as if it is Loaded

1-7. Any weapon handled by a Soldier must be treated as if it is loaded and prepared to fire. Whether or not a weapon is loaded should not affect how a Soldier handles the weapon in any instance.

1-8. Soldiers must take the appropriate actions to ensure the proper weapon status is applied during operations, whether in combat or training.

## Rule 2: Never Point the Weapon at Anything You Do Not Intend to Destroy

1-9. Soldiers must be aware of the orientation of their weapon's muzzle and what is in the path of the projectile if the weapon fires. Soldiers must ensure the path between the muzzle and target is clear of friendly forces, noncombatants, or anything the Soldier does not want to strike.

1-10. When this is unavoidable, the Soldier must minimize the amount of time the muzzle is oriented toward people or objects they do not intend to shoot, while simultaneously applying the other three rules of fire arms safety.

## Rule 3: Keep Finger Straight and Off the Trigger Until Ready to Fire

1-11. Soldiers must not place their finger on the trigger unless they intend to fire the weapon. The Soldier is the most important safety feature on any weapon. Mechanical safety devices are not available on all types of weapons. When mechanical safeties are present, Soldiers must not solely rely upon them for safe operation knowing that mechanical measures may fail.

1-12. Whenever possible, Soldiers should move the weapon to mechanical safe when a target is not present. If the weapon does not have a traditional mechanical safe, the trigger finger acts as the primary safety.

## Rule 4: Ensure Positive Identification of the Target and its Surroundings

1-13. The disciplined Soldier can positively identify the target and knows what is in front of and what is beyond it. The Soldier is responsible for all bullets fired from their weapon, including the projectile's final destination.

1-14. Application of this rule minimizes the possibility of fratricide, collateral damage, or damage to infrastructure or equipment. It also prepares the Soldier for any follow-on shots that may be required.

# WEAPON SAFETY STATUS

1-15. The readiness of a Soldier's weapon is termed as its ***weapon safety status (WSS)***. It is a standard code that uses common colors (green, amber, red, and black) to represent the level of readiness for a given weapon.

1-16. Each color represents a specific series of actions that are applied to a weapon. They are used in training and combat to place or maintain a level of safety relevant to the current task or action of a Soldier, small unit, or group.

1-17. The WSS ratings are evaluated by the level of safety measures applied to the weapon itself. Table 1-1 describes the general safe condition of the weapon for each WSS, based on the standard color scheme found in ADP 1-02.

> ***Note.*** If the component, assembly, or part described is unclear, refer to the weapon's technical manual (TM) or chapter 2 of this publication.

**Table 1-1. General safe condition of the weapon for each weapon safety status**

| Weapon Safety Status | General Description | Color Amplifier |
|---|---|---|
| GREEN | Fully Safe | |
| AMBER | Substantially Safe | |
| RED | Marginally Safe | |
| BLACK | Not Safe | |

1-18. All firers and leaders must be fluent in the general meaning of each WSS, how it pertains to the weapon being employed, and the responsibilities of the firer to own each shot or burst. The following are the basic definitions for each WSS:

- Green, "Fully Safe" – the weapon is clear, no ammunition is present the chamber is empty, and the fire selector switch is set to SAFE.
- Amber, "Substantially Safe" – a leader must clear and verify that the weapon's bolt is forward, the chamber is empty, and ammunition is introduced to the weapon. This is an administrative or preparatory WSS. Leaders use amber primarily for mounted operations and during combat operations when directed to maintain a substantially safe weapon with the ability to rapidly transition and escalate to red or black, based on the situation.

> ***Note.*** WSS amber is not used in the live-fire events described in this publication.

Case 3:19-cv-01537-BEN-JLB Document 158-2 Filed 10/28/22 PageID.20291 Page 390 of 625

- Red, "Marginally Safe" – the fire selector switch is set to SAFE, the magazine is locked in the magazine well, a round is in the chamber, and the bolt is locked in the forward position.

- Black, "Not Safe" – Indicates when the weapon is fully prepared to fire, the firer has positively identified the target, the fire selector switch is set to FIRE, and the firer's finger is on the trigger, and the fire is in the process of engaging the target.

***Note.*** WSS black is used to describe the actions of the firer when in a red status and entering an engagement sequence. WSS black describes the distinct difference between red and actively and deliberately engaging a threat.

1-19. Figures 1-2 through 1-5 on pages 1-6 through 1-9 describe the standard color code for the M4-series/M16-series rifle and carbine. The Soldier performs actions described in figures 1-2 through 1-5 to move from one color code to the next.

Compendium_Responsive Brief
Page 524





M4-Series/M16-Series/Sniper Weapon Systems

GREEN STATUS

GREEN
- Selector lever is set to SAFE.
- Magazine is removed from the weapon.
- Chamber is empty.
- Bolt is locked open or forward (based upon the situation).

Go from GREEN to AMBER.
- Firer is directed to PREPARE AMBER.
- Verify GREEN and CLEAR.
- Bolt is FORWARD.
- Ammunition is introduced to the weapon; magazine locked into the magazine well.

Go from GREEN to RED.
- Firer is directed to MAKE READY.
- Selector switch is set to SAFE.
- Magazine is locked into the magazine well.
- Bolt is forward and locked (a round in the chamber).
- Ejection port cover should be closed.

Go from GREEN to BLACK.
- Firer is authorized to enter the SHOT PROCESS.
- Magazine is locked into the magazine well.
- Weapon is charged (racked).
- A round is chambered, bolt is forward and locked.
- Firer enters the SHOT PROCESS.
- Weapon is on FIRE.

**Command given to direct a GREEN weapon safety status:**

**GREEN AND CLEAR or GO GREEN**

**Figure 1-2. M4-/M16-series weapons, green weapon safety status**

M4-Series/M16-Series/Sniper Weapon Systems

AMBER STATUS

AMBER
- Firer is directed to PREPARE AMBER.
- Verify GREEN and CLEAR.
- Slide is FORWARD.
- Ammunition is introduced to the weapon; magazine locked into the magazine well.

Go from AMBER to GREEN .
- Clear weapon.

Go from AMBER to RED.
- Firer is directed to MAKE READY.
- Place the weapon on SAFE.
- Charge or rack the weapon.
- Round is chambered.
- Bolt is FORWARD.

Go from AMBER to BLACK.
- Firer is authorized to enter the SHOT PROCESS.
- Charge or rack the weapon.
- Round is chambered.
- Bolt is FORWARD.
- Firer enters the SHOT PROCESS.
- Weapon is on FIRE.

AMBER is a preparatory status and is ony used at the discretion of the commander.

Command given to direct an AMBER weapon safety status:

PREPARE AMBER

**Figure 1-3. M4-/M16-series weapons, amber weapon safety status**

**Figure 1-4. M4-/M16-series weapons, red weapon safety status**





**Figure 1-5. M4-/M16-series weapons, black weapons safety status**



## WEAPONS CONTROL STATUS

1-20. A ***weapons control status (WCS)*** is a tactical method of fire control given by a leader that incorporates the tactical situation, rules of engagement for the area of operations, and expected or anticipated enemy contact. The WCS outlines the target identification conditions under which friendly elements may engage a perceived threat with direct fire.

1-21. Table 1-2 provides a description of the standard WCS used during tactical operations, both in training and combat. They describe when the firer is authorized to engage a threat target once the threat conditions have been met.

**Table 1-2. Weapons Control Status**

| WEAPONS CONTROL STATUS | DESCRIPTION |
|---|---|
| WEAPONS HOLD | Engage only if engaged or ordered to engage. |
| WEAPONS TIGHT | Engage only if target ***is positively identified*** as ***enemy***. |
| WEAPONS FREE | Engage targets ***not positively identified*** as ***friendly***. |

1-22. A weapon control status and a weapons safety status are both implemented and available to leaders to prevent fratricide and limit collateral damage. These postures or statuses are typically suited to the area of operation or type of mission and should always be clearly outlined to all Soldiers, typically in the operations order (OPORD), warning order (WARNORD), or fragmentary order (FRAGORD).

## OVERMATCH

1-23. Overmatch is the Soldier applying their learned skills, employing their equipment, leveraging technology, and applying the proper force to create an unfair fight in favor of the Soldier. To achieve and maintain overmatch against any threat, this publication focuses on providing information that develops the Soldier's direct fire engagement skills using the following attributes:

- **Smart** – the ability to routinely generate understanding through changing conditions.
- **Fast** – the ability to physically and cognitively outmaneuver adversaries.
- **Lethal** – deadly in the application of force.
- **Precise** – consistently accurate in the application of power to ensure deliver of the right effects in time, space, and purpose.

1-24. This requires the Soldier to understand the key elements that build the unfair advantage and exploit them at every opportunity during tactical operations. The components of overmatch are:



- **Target detection, acquisition, and identification** – the ability of the Soldier to detect and positively identify any suspected target as hostile at greater distances than their adversary. This relies upon Soldier training and their ability to leverage the capabilities of their optics, thermals, and sensors.
- **Engagement range** – provide the Soldier with weapons, aiming devices, and ammunition capable of striking and defeating a threat at a greater range than the adversary can detect or engage the friendly force with effective fires.
- **Limited visibility** – provide the Soldier to make operations during limited visibility an advantage through technology and techniques, and compound their adversary's disadvantages during those conditions.
- **Precision** – provide a weapon and ammunition package that enhances the Soldier's consistent application of shots with a level of precision greater than the adversary's.
- **Speed** – the weapon, aiming devices, and accessories a Soldier employs must seamlessly work in unison, be intuitive to use, and leverage natural motion and manipulations to facilitate rapid initial and subsequent shots during an engagement at close quarters, mid-, and extended ranges.
- **Terminal performance** – ensures that precise shots delivered at extended ranges provide the highest probability to defeat the threat through exceptional ballistic performance.

1-25. Although not a component of overmatch, exceptional training is critical to create smart, fast, lethal, and precise Soldiers. Training builds proficiency in a progressive, logical, and structured manner and provides Soldiers the skills necessary to achieve overmatch against any adversary. This requires the training program to provide experience to the Soldier in all the components of overmatch to their fullest extent possible in the shortest amount of time.

## Target Detection, Acquisition, and Identification

1-26. The first component of overmatch at the Soldier level is the ability to detect targets as far away as possible during limited and low visibility conditions. This manual describes the aiming devices for the service rifle that enhance the Soldier's target detection and acquisition skills. The Soldier must be able to detect, acquire, and identify targets ***at ranges beyond*** the maximum effective range of their weapon and ammunition.

1-27. This publication also provides key recognition information to build the Soldier's skills in correctly identifying potential targets as friend, foe, or noncombatant (neutral) once detected.

## Engagement Range

1-28. To ensure small unit success, the Soldier requires weapon systems that can effectively engage threats at ranges greater than those of their adversaries. This creates a standoff distance advantage that allows friendly forces to destroy the target outside the threat's maximum effective range.

1-29. Range overmatch provides a tactical engagement buffer that accommodates the Soldier's time to engage with precision fires. For example, a Soldier that has the capability to effectively engage personnel targets at a range of 500 meters will have range overmatch of 10 to 20 percent over a threat rifleman. That 10 to 20 percent range difference is equivalent to a distance of 40 to 80 meters, which is approximately the distance a maneuvering threat can traverse in 15 to 40 seconds.

△ 1-30. Figure 1-6 portrays the battlefield from the Soldier's perspective. With mobile, maneuvering threats, the target acquisition capabilities must compliment the engagement of those threats at the maximum effective range of the weapon, optic, and ammunition.

△ **Figure 1-6. Small unit range overmatch**

## LIMITED VISIBILITY

1-31. Soldiers must be able to detect, acquire, identify, and engage threats in all light conditions, regardless of the tactical situation. To provide that capability, aiming devices are provided that minimize the effects of limited visibility, but not completely.

1-32. Image intensifiers and thermal optics provide a significant overmatch capability, but they also have limitations and disadvantages. A general discussion of their capabilities, particularly what those systems can view within the spectrum of light is provided. Soldiers must understand what can be "seen" or viewed and what cannot when using their assigned equipment. Understanding the advantages and limitations of their equipment has a direct impact on force protection, fratricide and collateral damage prevention, and maintaining overmatch during tactical operations.

## PRECISION

1-33. The Army standard service rifle is designed with a specific level of accuracy out to its maximum effective range. This level of accuracy is more consistent and reliable

through the use of magnified aiming devices and superior ammunition. The Soldier must build the skills to use them effectively to deliver precision fires during tactical engagements.

### SPEED

1-34. The close fight requires rapid manipulations, a balance of speed and accuracy, and very little environmental concerns. Soldiers must move quickly and efficiently through their manipulations of the fire control to maintain the maximum amount of muzzle orientation on the threat through the shot process. This second-nature efficiency of movement only comes from regular practice, drills, and repetition.

1-35. The foundation of speed of action is built through understanding the weapon, ammunition, ballistics, and principles of operation of the associated aiming devices. It is reinforced during drills (appendix D), and the training program of the unit.

1-36. The goal of training to overmatch is to increase the speed at which the Soldier detects a threat, identifies it as hostile, and executes the shot process with the desired target effect. This manual is constructed to provide the requisite information in a progressive manner to build and reinforce Soldier understanding, confidence, and ability to execute tactical operations with speed and smooth fluidity of motion.

### TERMINAL BALLISTIC PERFORMANCE

1-37. Terminal ballistic performance is the actions of a projectile from the time it strikes an object downrange until it comes to rest. The ammunition used with the service rifle performs exceptionally well out to its maximum effective range and beyond. This manual provides information on the various munition types available for training and combat, their capabilities and purpose, and the service (combat) round's terminal ballistic performance (see appendix A, Ammunition, and appendix B, Ballistics).

1-38. Soldiers must understand the capabilities of their ammunition, whether designed for training or combat use. That understanding creates a respect for the weapon and ammunition, reinforces the precepts of safe weapons handling, and an understanding of the appropriate skills necessary to deliver lethal fires.

1-39. Soldiers that understand the "how" and "why" of their weapon system, aiming devices, ammunition, and procedures work or function develops a more comprehensive understanding. That level of understanding, coupled with a rigorous training program that builds and strengthens their skills create more proficient Soldiers. The proficiencies and skills displayed during training translate into smart, fast, lethal and precise Soldiers for the small unit during decisive action combat operations.

This page intentionally left blank.

Chapter 2

# Rifle and Carbine Principles of Operation

This chapter provides the general characteristics, description, available components, and principles of operation for the M4- and M16-series weapons. It provides a general overview of the mechanics and theory of how weapons operate, key terms and definitions related to their functioning, and the physical relationship between the Soldier, the weapon, and the optics/equipment attached to the weapon.

## ARMY STANDARD SERVICE RIFLE

2-1. The Army standard service rifle is either the M16-series rifle or M4-series carbine. These weapons are described as a lightweight, 5.56-mm, magazine-fed, gas-operated, air-cooled, shoulder-fired rifle or carbine. They fire in semiautomatic (single-shot), three-round burst, or in automatic mode using a selector lever, depending on the variant. The weapon system has a standardized mounting surface for various optics, pointers, illuminators, and equipment, to secure those items with common mounting and adjustment hardware.

2-2. Each service rifle weapon system consists of components, assemblies, subassemblies, and individual parts. Soldiers must be familiar with these items and how they interact during operation.

- **Components** are uniquely identifiable group of fitted parts, pieces, assemblies or subassemblies that are required and necessary to perform a distinctive function in the operation of the weapon. Components are usually removable in one piece and are considered indivisible for a particular purpose or use.
- **Assemblies** are a group of subassemblies and parts that are fitted to perform specific set of functions during operation, and cannot be used independently for any other purpose.
- **Subassemblies** are a group of parts that are fitted to perform a specific set of functions during operation. Subassemblies are compartmentalized to complete a single specific task. They may be grouped with other assemblies, subassemblies and parts to create a component.
- **Parts** are the individual items that perform a function when attached to a subassembly, assembly, or component that serves a specific purpose.

2-3. Each weapon consists of two major components: the upper receiver and the lower receiver. These components are described below including their associated assemblies, subassemblies, and parts.

# UPPER RECEIVER

2-4. An aluminum receiver helps reduce the overall weight of the rifle/carbine and allows for mounting of equipment and accessories. The upper receiver consists of the following (see figure 2-1):

- Barrel assembly.
  - **Barrel**. The bore and chamber of the barrel are chrome-plated to reduce wear and fouling over the life of the weapon.
  - **Flash hider or compensator**. Located at the end of the barrel, is provided to reduce the signature of the weapon during firing and reduce barrel movement off target during firing.
  - **Sling swivel**. The attachment hardware for the sling system used to properly carry the weapon.
  - **Front sight assembly**. Includes an adjustable front sight post that facilitates zeroing the weapon, serves as the forward portion of the iron sight or back up iron sight, and assists with range determination.
  - **Adapter rail system (ARS)**. Provided in varying lengths, depending on the variant applied. Used to attach common aiming devices or accessories.
  - **Slip ring**. Provides a spring loaded locking mechanism for the weapon's hand guards.
  - **Ejection port**. Provides an opening in the upper receiver to allow ammunition or spent casing ejection from the weapon.
  - **Ejection port cover**. Provides a dust cover for the ejection port, protecting the upper receiver and bolt assembly from foreign objects.
  - **Forward assist assembly**. Provides a Soldier applied mechanical assist to the bolt assembly during operations.

**Figure 2-1. Upper receiver**

## LOWER RECEIVER

2-5. The lower receiver shown in figure 2-2, on page 2-3, consists of the following components, assemblies, and parts:

- **Trigger assembly**. Provides the trigger, pins, springs, and other mechanical components necessary to fire the weapon.
- **Bolt catch**. A mechanical lever that can be applied to lock the bolt to the rear by the Soldier, or automatically during the cycle of function when the magazine is empty (see page 2-4).
- **Rifle grip**. An ambidextrous pistol-type handle that assists in recoil absorption during firing.
- **Magazine catch assembly**. Provides a simple, spring-loaded locking mechanism to secure the magazine within the magazine well. Provides the operator an easy to manipulate, push-to-release textured button to release the magazine from the magazine well during operation.
- **Buttstock assembly**. Contains the components necessary for proper shoulder placement of the weapon during all firing positions, returning the bolt assembly to battery, and managing the forces of recoil during operation.
  - The M4-/M4A1-series carbine has a four position collapsible buttstock assembly: Closed, ½ open, ¾ open, and fully-open.
  - M16-series rifles have a fixed buttstock with cleaning kit compartment or an applied modified work order (MWO) collapsible buttstock.
- **Action spring**. Provides the stored energy to return the bolt carrier assembly back into battery during operation.
- **Lower receiver extension**. Provides space for the action spring and buffer assembly during operation.

**Figure 2-2. Lower receiver**

2-6. Additional information on the characteristics and components of the M4-/M4A1-/M16-series weapons can be found in technical manual (TM) 9-1005-319-10. Soldiers will use the technical manual for preventative maintenance checks and services (PMCS),

and operation under normal conditions, as well as more detailed information on the principles of operation.

2-7. Each variant of the rifle and carbine have subtle capabilities differences. The primary differences are shown in table 2-1, and are specific to the weapon's selector switch, buttstock, and barrel length.

**Table 2-1. Model Version Firing Methods Comparison**

| *Weapon* | *Selector Switch Position* | | | *Buttstock* | *Barrel Length* |
|---|---|---|---|---|---|
| M16A2 | SAFE | SEMI | BURST | Full | 20 inches |
| M16A3 | SAFE | SEMI | AUTO | Full | 20 inches |
| M16A4 | SAFE | SEMI | BURST | Full | 20 inches |
| M4 | SAFE | SEMI | BURST | Collapsible | 14.5 inches |
| M4A1 | SAFE | SEMI | AUTO | Collapsible | 14.5 inches |
| **Legend:**<br>SEMI: semi-automatic firing selection<br>AUTO: fully automatic firing selection<br>BURST: three-round burst firing selection | | | | | |

# CYCLE OF FUNCTION

2-8. The ***cycle of function*** is the mechanical process a weapon follows during operation. The information provided below is specific to the cycle of function as it pertains specifically to the M4- and M16-series weapons.

2-9. The cycle starts when the rifle is ready with the bolt locked to the rear, the chamber is clear, and a magazine inserted into the magazine well with at least one cartridge. From this state, the cycle executes the sequential phases of the cycle of functioning to fire a round and prepare the weapon for the next round. The phases of the cycle of function in order are—

- Feeding.
- Chambering.
- Locking.
- Firing.
- Unlocking.
- Extracting.
- Ejecting.
- Cocking.

2-10. For the weapon to operate correctly, semiautomatic and automatic weapons require a ***system of operation*** to complete the cycle of functioning. The M4- and M16-series weapons use a direct impingement gas operating system. This system uses a portion of the high pressure gas from the cartridge being fired to physically move the assemblies and subassemblies in order to complete the cycle of function.

## FEEDING

2-11. Feeding is the process of mechanically providing a cartridge of ammunition to the entrance of the chamber (see figure 2-3).

**FEEDING**

1. Bolt catch is released, either physically by the firer or automatically during operation.
2. The action spring exerts its force, pushing the bolt carrier assembly forward.
3. One of the two bottom locking lugs on the bolt face strike the uppermost round in the magazine, pushing it by the cartridge case head.
4. The front bottom edge of the bullet (projectile) is guided to the chamber area by following the corresponding feed ramp.

**Figure 2-3. Feeding example**

## CHAMBERING

2-12. Chambering is the continuing action of the feeding round into the chamber of the weapon (see figure 2-4).

| CHAMBERING |
|---|
| 1. The cartridge is driven up the corresponding feed ramp and enters the chamber. |
| 2. Chambering is completed when the shoulder of the cartridge (where the case tapers) and makes contact with the corresponding shoulder area of the chamber. |

**Figure 2-4. Chambering example**

Case 3:19-cv-01537-BEN-JLB Document 158-2 Filed 10/28/22 PageID.20307 Page 406 of 625

## LOCKING

2-13. Locking is the process of creating a mechanical grip between the bolt assembly and chamber with the appropriate amount of headspace (clearance) for safe firing (see figure 2-5). With the M4- and M16-series weapons, locking takes place simultaneously with the final actions of chambering.

**LOCKING**

1. At the end of the chambering phase, the bolt assembly stops forward movement at the face of the chamber.
2. Although the bolt assembly has stopped its forward movement, the bolt carrier assembly continues to travel forward, causing the operating cam to follow the operating cam groove.
3. The operating cam is guided by a slow rotational groove in the bolt assembly, and rotates the bolt and locking lugs counter-clockwise.
4. As the operating cam rotates, the bolt assembly's locking lugs rotate behind corresponding lugs in the barrel extension at the face of the chamber.
5. As the bolt carrier assembly finishes its forward movement, the gas key creates a seal around the gas tube fitting.

**Figure 2-5. Locking example**

## FIRING

2-14. Firing is the finite process of initiating the primer detonation of the cartridge and continues through shot-exit of the projectile from the muzzle (see figure 2-6).

**FIRING**

1. Firing is initiated when the weapon is on SEMI or BURST/AUTO, a round is chambered, and the trigger is pressed.
2. Once the trigger is pressed, the sear releases the hammer.
3. As the sear releases the hammer, the hammer spring exerts its force rotating the hammer forward through the bolt carrier assembly opening.
4. The hammer strikes the firing pin, pushing the loaded firing pin forward to the primer of the cartridge case.
5. The firing pin crushes the cartridge primer, igniting the primer's charge.
6. The burning primer charge ignites the round's propellant.
7. As the propellant burns, the cartridge case expands to the fullest extent of the chamber area and to the face of the bolt, sealing the gases within the bore.
8. The expending gas propels the projectile down the length of the bore.

**Figure 2-6. Firing example**

## UNLOCKING

2-15. Unlocking is the process of releasing the locking lugs on the bolt face from the corresponding recesses on the barrel extension surrounding the chamber area (see figure 2-7).

**UNLOCKING**

1. Once the round has fired and the projectile passes the gas port inside the bore, the impinged gases follow the path of least resistance up and rearward down the gas tube.
2. The rearward gases traveling down the gas tube apply their force through the gas key, filling the area inside the bolt carrier assembly behind the gas rings on the bolt assembly.
3. The expanding gas pushes the bolt carrier assembly rearward while the gas seal rings retain the bolt forward.
4. While the bolt carrier assembly moves rearward, the operating cam follows the operating cam groove, and rotates the bolt and its locking lugs clockwise.

**Figure 2-7. Unlocking example**

## EXTRACTING

2-16. Extracting is the removal of the expended cartridge case from the chamber by means of the extractor (see figure 2-8).

1
BOLT CARRIER ASSEMBLY
(CUT AWAY FOR CLARITY)
4
3
CARTRIDGE
CASE
EXTRACTOR
2
EXTRACTING
1. The bolt carrier assembly and bolt continue to move rearward.
2. The extractor on the right side of the bolt pulls the expended cartridge case from the chamber using its grip on the cartridge rim.
3. Initially, the extractor breaks the seal of the expended cartridge case from the chamber area.
The extractor's spring loaded force maintains pressure on the cartridge rim while it continues to pull the cartridge out of the chamber.
4. The extracting phase continues until the cartridge case is clear of the chamber area but has not exited the weapon.

**Figure 2-8. Extraction example**

## EJECTING

2-17.    Ejecting is the removal of the spent cartridge case from the weapon itself (see figure 2-9.)



**Figure 2-9. Ejection example**

## COCKING

2-18.     Cocking is the process of mechanically positioning the trigger assembly's parts for firing (see figure 2-10). The cocking phase completes the full cycle of functioning.



**Figure 2-10. Cocking example**

## COOLING

2-19. Cooling is the process of dissipating heat from the weapon during firing. Although not part of the cycle of functioning, cooling the weapon during firing is critical to ensure the weapon continues to operate efficiently. Firing a round generates heat and pressure within the chamber and bore, which radiates outward through the metal of the barrel.

2-20. The temperature generated by the burning of propellant powders is over one thousand degrees Fahrenheit. Some of the heat produced during firing is retained in the chamber, bore, and barrel during firing and poses a significant hazard to the firer.

2-21. How this heat is absorbed by the weapon and dissipated or removed, is a function of engineering and design. Lightweight weapons like the M4 and M16 do not have sufficient mass to withstand thermal stress efficiently. The weapon system must have a means to radiate the heat outward, away from the barrel to allow continuous firing.

2-22. There are three methods to reduce the thermal stress on a weapon. The M4- and M16-series of weapons use all three of these methods to varying degrees to cool the chamber, bore, and barrel to facilitate continuous operation. These methods of cooling are—

- **Radiational cooling** – allows for the dissipation of heat into the surrounding cooler air. This is the least efficient means of cooling, but is common to most small arms weapons, including the rifle and carbine.
- **Conduction cooling** – occurs when a heated object is in direct physical contact with a cooler object. Conduction cooling on a weapon usually results from high chamber operating temperatures being transferred into surrounding surfaces such as the barrel and receiver of the weapon. The transfer from the chamber to the cooler metals has the net effect of cooling the chamber. Thermal energy is then carried away by other means, such as radiant cooling, from these newly heated surfaces.
- **Convection cooling** – requires the presence of a moving air current. The moving air has greater potential to carry away heat. The hand guards and ARS of the rifle and carbine are designed to facilitate air movement. The heat shield reflects heat energy away from the hand guard and back towards the barrel. The net effect is an updraft that brings the cooler air in from the bottom. This process establishes a convection cycle as heated air is continually replaced by cooler air.

2-23. Soldiers should be aware of the principles of the weapon's cooling methods' direct effects on their line of sight when viewing a target through an aiming device. Dissipating heat along the length of the barrel can create a mirage effect within the line of sight which can cause a significant error to the true point of aim when using magnified optics.

This page intentionally left blank.

NATIONAL CENTER FOR EDUCATION STATISTICS

# ADULT LITERACY in America

## A First Look at the Findings of the National Adult Literacy Survey

U.S. Department of Education
Office of Educational Research and Improvement

NCES 1993–275

NATIONAL CENTER FOR EDUCATION STATISTICS

April 2002

Third Edition

# Adult Literacy in America

**A First Look at the Findings of the National Adult Literacy Survey**

Irwin S. Kirsch
Ann Jungeblut
Lynn Jenkins
Andrew Kolstad

U.S. Department of Education
Office of Educational Research and Improvement

NCES 1993-275

**U.S. Department of Education**

Richard W. Riley
Secretary

**Office of Educational Research and Improvement**

Sharon P. Robinson
Assistant Secretary

**National Center for Education Statistics**

Emerson J. Elliott
Commissioner

**National Center for Education Statistics**

"The purpose of the Center shall be to collect, analyze, and disseminate statistics and other data related to education in the United States and in other nations." — Section 406(b) of the General Education Provisions Act, as amended (20 U.S.C. 1221e-1).

APRIL 2002

*Contact*: Andrew Kolstad, 202-502-7374

**Ordering Information**

For information on the price of single copies or bulk quantities of this book, call the U.S. Government Printing Office Order Desk at 202-783-3238.

The GPO stock number for this book is 065-000-00588-3

**For more information,**

**write to:**
Education Information Branch
Office of Educational Research and Improvement
U.S. Department of Education
555 New Jersey Avenue, N.W.
Washington, D.C. 20208-5641

**or call:**
1-800-424-1616
(in the Washington, D.C. metropolitan area, call 202-219-1651), or FAX 202-219-1970.

THIRD EDITION

The work upon which this publication is based was performed for the National Center for Education Statistics, Office of Educational Research and Improvement, by Educational Testing Service.

Educational Testing Service is an equal opportunity, affirmative action employer.

*Educational Testing Service*, *ETS*, and are registered trademarks of Educational Testing Service.



# CONTENTS

**Acknowledgments** . . . . . . . . . . ix

**Preface** . . . . . . . . . . xi

**Executive Summary** . . . . . . . . . . xv
The Literacy Skills of America's Adults . . . . . . . . . . xvi
Literacy and Social and Economic Characteristics . . . . . . . . . . xix
Reflections on the Results . . . . . . . . . . xx

**Introduction** . . . . . . . . . . 1
Defining and Measuring Literacy . . . . . . . . . . 2
Conducting the Survey . . . . . . . . . . 5
Reporting the Results . . . . . . . . . . 8
About This Report . . . . . . . . . . 12
A Note on Interpretations . . . . . . . . . . 13

**Section I: The Prose, Document, and Quantitative Literacies of America's Adults** . . . . . . . . . . 15
Results for the Total Population . . . . . . . . . . 16
Trends in the Literacy Skills of Young Adults . . . . . . . . . . 22
Results by Level of Education . . . . . . . . . . 25
Results by Parents' Level of Education . . . . . . . . . . 28
Results by Age . . . . . . . . . . 30
Results by Race/Ethnicity . . . . . . . . . . 32
Educational Attainment and Racial/Ethnic Differences . . . . . . . . . . 34
Age and Racial/Ethnic Differences . . . . . . . . . . 38
Country of Birth and Racial/Ethnic Differences . . . . . . . . . . 40
Results by Type of Illness, Disability, or Impairment . . . . . . . . . . 42
Results by Region . . . . . . . . . . 45
Results by Sex . . . . . . . . . . 46
Results for the Prison Population . . . . . . . . . . 46
Summary . . . . . . . . . . 50

**Section II: The Connection Between Adults' Literacy Skills and Their Social and Economic Characteristics** . . . . . . . . . . . . . . 53
Literacy and Voting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Literacy and Reading Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Frequency of Newspaper Reading . . . . . . . . . . . . . . . . . . . . . . . . 55
Aspects of Newspaper Reading . . . . . . . . . . . . . . . . . . . . . . . . . 56
Reliance on Print and Nonprint Sources of Information . . . . . . . 59
Literacy and Economic Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
Poverty Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
Sources of Nonwage Income and Support . . . . . . . . . . . . . . . . . . 61
Literacy and Employment, Earnings, and Occupations . . . . . . . . . . . 62
Employment Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
Weeks Worked . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Occupations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**Section III: Interpreting the Literacy Scales** . . . . . . . . . . . . . . . . . 69
Building the Literacy Tasks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
Defining the Literacy Levels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
Interpreting the Literacy Levels . . . . . . . . . . . . . . . . . . . . . . . . . . 73
Prose Literacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
Document Literacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
Quantitative Literacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
Estimating Performance Across the Literacy Levels . . . . . . . . . . . . 101
Missing Responses to Literacy Tasks . . . . . . . . . . . . . . . . . . . . . . . 103
Performance in the Lowest Literacy Level . . . . . . . . . . . . . . . . . . . 105
Population Diversity within the Lowest Literacy Level . . . . . . . . . . . 108

**Appendix A — Overview of Procedures** . . . . . . . . . . . . . . . . . . . . . . . . 113
Sampling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
Weighting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
Background Questionnaires . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
Literacy Assessment Booklets . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
Survey Design: BIB Spiralling. . . . . . . . . . . . . . . . . . . . . . . . . . . 120
Training the Data Collection Staff . . . . . . . . . . . . . . . . . . . . . . . . 121

Administering the Data Collection Instruments . . . . . . . . . . . . . . . . . 122
Response Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
Data Collection Quality Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
Scoring the Literacy Exercise Booklets . . . . . . . . . . . . . . . . . . . . . . 125
Data Entry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
Editing and Quality Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
Scaling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
Overview of Linking the National Adult Literacy Survey (NALS) Scales to the Young Adult Literacy Survey (YALS) Scales . . . . . . . 127
Statistical Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

**Appendix B** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
Definitions of All Subpopulations and Variables Reported . . . . . . . 131
Data Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137
Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
About the Authors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

## *Figures and Tables*

| | | |
|---|---|---|
| Table 1 | The National Adult Literacy Survey Sample | 7 |
| Figure 1 | Difficulty Values of Selected Tasks Along the Prose, Document, and Quantitative Literacy Scales | 10 |
| Figure 2 | Description of the Prose, Document, and Quantitative Literacy Levels | 11 |
| Figure 1.1 | Literacy Levels and Average Literacy Proficiencies for the Total Population | 17 |
| Table 1.1 | Percentages of Adults with Selected Characteristics, Prose Level 1 and Total Populations | 18 |
| Table 1.2 | Percentages of Adults Who Reported Not Being Able to Read or Write English Well, by Literacy Level | 20 |
| Table 1.3 | Percentages of Adults Who Reported Getting A Lot of Help from Family Members or Friends With Various Types of Everyday Literacy Tasks, by Literacy Level | 21 |
| Figure 1.2 | Average Literacy Proficiencies of Young Adults, 1985 and 1992 | 24 |
| Figure 1.3 | Literacy Levels and Average Literacy Proficiencies, by Highest Level of Education Completed | 26 |
| Figure 1.4 | Average Literacy Proficiencies, by Level of Education Attained by Adults and Their Parents | 29 |
| Figure 1.5 | Average Literacy Proficiencies, by Age | 31 |
| Table 1.4 | Average Years of Schooling, by Age | 32 |
| Figure 1.6 | Literacy Levels and Average Literacy Proficiencies, by Race/Ethnicity | 33 |
| Table 1.5 | Average Years of Schooling, by Race/Ethnicity | 35 |
| Figure 1.7 | Average Literacy Proficiencies, by Highest Level of Education Completed and Race/Ethnicity | 36 |
| Table 1.6 | Differences in Average Literacy Proficiencies Between Various Racial/Ethnic Groups, Overall and by Level of Education | 37 |
| Figure 1.8 | Differences Between Adults in Various Racial/Ethnic Groups in Average Literacy Proficiencies and Average Years of Schooling, by Age | 39 |
| Table 1.7 | Percentages of Adults Born in the United States and in Other Countries, by Race/Ethnicity | 40 |
| Figure 1.9 | Average Literacy Proficiencies, by Country of Birth and Race/Ethnicity | 41 |
| Table 1.8 | Percentages of Adults Who Reported Having a Physical, Mental, or Other Health Condition | 43 |

| | | |
|---|---|---|
| Figure 1.10 | Literacy Levels and Average Literacy Proficiencies, by Type of Physical, Mental, or Other Health Condition, Compared with the Total Population | 44 |
| Figure 1.11 | Literacy Levels and Average Literacy Proficiencies, by Region and Sex | 47 |
| Table 1.9 | Percentages of Adults Born in Other Countries or Territories, and Average Years of Schooling, by Region | 48 |
| Table 1.10 | Percentages of Adults in Various Demographic Groups, Prison and Total Populations | 49 |
| Figure 1.12 | Literacy Levels and Average Literacy Proficiencies for the Prison and Total Populations | 51 |
| Figure 2.1 | Percentages of Adults Who Voted in a National or State Election in the Past Five Years, by Literacy Level | 54 |
| Figure 2.2 | Percentages of Adults Who Read the Newspaper, by Literacy Level | 55 |
| Figure 2.3 | Among Adults Who Read the Newspaper at Least Once a Week, Percentages Who Read Certain Parts, by Literacy Level | 57 |
| Table 2.1 | Among Adults Who Read the Newspaper at Least Once a Week, Average Literacy Proficiencies, by Newspaper Reading Practices | 58 |
| Figure 2.4 | Percentages of Adults Who Get Information About Current Events from Various Sources, by Literacy Level | 59 |
| Figure 2.5 | Percentages of Adults in Poverty, by Literacy Level | 61 |
| Figure 2.6 | Percentages of Adults Who Received Certain Types of Nonwage Income or Support in the Past 12 Months, by Literacy Level | 62 |
| Figure 2.7 | Percentages of Adults In and Out of the Labor Force, by Literacy Level | 63 |
| Table 2.2 | Average Literacy Proficiencies, by Labor Force Status | 64 |
| Figure 2.8 | Average Number of Weeks Worked in the Past 12 Months, by Literacy Level | 65 |
| Figure 2.9 | Median Weekly Wages, by Literacy Level | 66 |
| Figure 2.10 | Percentages of Adults in Certain Occupational Categories, by Literacy Level | 67 |
| Figure 3.1 | Probabilities of Successful Performance on Two Prose Tasks by Individuals at Selected Points on the Prose Scale | 72 |
| Figure 3.2 | Average Probabilities of Successful Performance by Individuals with Selected Proficiency Scores on the Tasks in Each Literacy Level | 102 |

Table 3.1: Percentages and average proficiencies of adults on each scale, by assessment completion status . . . . . . . . . . . . . . . . . . . . . 105

Table 3.2: Percentages and average proficiencies on each scale of adults in Level 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Table 3.3: Percentages and average proficiencies of adults in Level 1 with at least one task correct, by assessment completion status . . 107

Table 3.4: Percentages and average proficiencies of adults in Level 1 with no tasks correct, by assessment completion status. . . . . . . . . 108

Table 3.5P: Percentages of adults in selected groups, by membership in total U.S. population, in Level 1, and in Level 1 with no tasks correct. . 109

Table 3.5D: Percentages of adults in selected groups, by membership in total U.S. population, in Level 1, and in Level 1 with no tasks correct .. . 110

Table 3.5Q: Percentages of adults in selected groups, by membership in total U.S. population, in Level 1, and in Level 1 with no tasks correct. . 111



# ACKNOWLEDGMENTS

We extend our deep appreciation to the many individuals who contributed to this project and helped to create this first report on the results. In particular, thanks are due to the members of the Literacy Definition Committee, the Technical Review Committee, the Literacy of Older Adults Review Group, and the Literacy of Incarcerated Adults Review Group. These individuals, whose names appear in the appendices, guided the project from beginning to end, and we enjoyed the opportunity to collaborate with them.

NALS was a cooperative effort planned by the National Center for Education Statistics and the Division of Adult Education and Literacy, of the U.S. Department of Education. Emerson Elliott, commissioner, provided consistent support and guidance. We also thank Gary Phillips, Sue Ahmed, Joan Seamon, and Ron Pugsley, who played crucial roles in the project.

Thanks to our colleagues at Westat, Inc., for their outstanding work in managing the complex sampling, data collection, and composite weighting processes for the survey. We especially wish to thank project director Martha Berlin, senior statistician Joe Waksberg, statisticians Leyla Mohadjer and Jim Green, field director Sue Rieger, and field managers Rich Hilpert, Merle Klein, Judy Meader, and Cindy Randall. The hundreds of field supervisors and interviewers who carried out the survey deserve special thanks for their efforts. We are grateful to Renee Slobasky, senior vice president of Westat, for her continuing support.

At Educational Testing Service, we wish to thank Sam Messick for serving as corporate officer for the survey. Anne Campbell deserves special recognition for her excellent work in leading test development activities and managing the scoring and processing of the assessment materials. Mary Michaels coordinated the committee meetings, the publication of the assessment framework booklet, and other aspects of the project, ensuring that the work proceeded smoothly.

Doug Rhodes coordinated the state adult literacy survey project as well as printing and shipping operations for the national survey, assisted by Cathy Shaughnessy. Jules Goodison provided senior guidance and support, particularly in the operations process, and we are grateful to him for his many contributions. We would also like to express our appreciation to Dave Hobson for his sense in financial and other matters.

Our thanks go to all those who carried out the enormous volume of operations work — in particular, Debbie Giannacio, who ably coordinated the receipt of the survey materials, followup activities, and quality control. She was assisted by Kathy Miller, who also provided administrative support for the project. We acknowledge the contributions of Joanne Antonoff, who helped prepare the NALS proposal and whose memory we cherish.

We thank Don Rock and Kentaro Yamamoto of Educational Testing Service, who directed the statistical and psychometric activities and provided invaluable guidance on technical matters. Robert Mislevy helped us reflect on statistical as well as philosophical questions, and we are grateful for his contributions. Charlie Lewis, Neal Thomas, and Ming-Mei Wang were available for statistical advice.

Norma Norris deserves special honors for conducting the statistical work and managing the data analyses under impossibly tight deadlines. Her support went above and beyond the call of duty, and we are grateful for her dedication to the project. Additional thanks are extended to Jim Ferris, Dave Freund, Tom Jirele, Bruce Kaplan, Jennifer Nelson, Inge Novatkoski, Kate Pashley, and Lois Worthington, who shared responsibility for conducting the data analyses. Thanks to John Barone for helping to oversee data analysis activities.

As this report took shape, many reviewers asked questions and provided insights that helped us sharpen our thinking and writing. In particular, we wish to thank Kent Ashworth, Paul Barton, Anne Campbell, Archie Lapointe, Peter Mosenthal, and Ron Solarzano for their suggestions. We also appreciate the thoughtful comments we received from the government's reviewers, including Nabeel Alsalam, Janet Baldwin, John Burkett, Ruth Childs, Mary Anne Nester, Linda Roberts, Peter Stowe, and David Sweet.

Beverly Cisney provided invaluable assistance in word processing and desktop publishing for this report. Her commitment to the project is appreciated.

We also extend many thanks to Susan Busfield, who designed and prepared the tables and graphs for this report under the most difficult deadlines. Thanks also go to the test development consultants, whose names are listed at the end of the report, and to the individuals who scored the responses to the assessment tasks.

Producing this report was a challenge, and it would not have been possible without the excellent work of the ETS Publications Division. In particular, we thank Robin Matlack, who conceived the beautiful design for the report; Joyce Martorelli, who typeset the manuscript; Peter Stremic, who ensured that the report met the highest standards; Fred Marx, who managed the production stages; Kathy Benischeck, who coordinated the production process; and Kiyo Toma,
who answered our technical questions. We thank editors Shilpi Niyogi and Carol Carlson for their careful reviews of the manuscript.

Finally, we wish to thank the thousands of adults across the country who gave their time to respond to the survey. Without their participation, this study would not have been possible.

Irwin S. Kirsch — Lynn Jenkins
Ann Jungeblut — Andrew Kolstad



# PREFACE

The United States has always been a mosaic of cultures, but the diversity of our population has increased by striking proportions in recent years. As Barbara Everitt Bryant, director of the Bureau of the Census, has written: "If you gave America a face in 1990, it would have shown the first sign of wrinkles [and] it would have been full of color." [1] The median age of Americans continues to rise, growing from 30 to almost 33 years during the 1980s. It is projected that by the year 2080, nearly 25 percent of the adults in this nation will be over 65, compared with only about 12 percent today. The racial and ethnic composition of the nation also continues to change. While 3.7 million people of Asian or Pacific Islander origin were living in this country in 1980, there were 7.2 million a decade later — a change of almost 100 percent. The number of individuals of Hispanic origin also rose dramatically over this time period, from roughly 6 to 9 percent of the population, or more than 22 million people. Our increasing diversity can not only be seen but also heard: today, some 32 million individuals in the United States speak a language other than English, and these languages range from Spanish and Chinese to Yupik and Mon-Khmer. [2]

Given these patterns and changes, this is an opportune time to explore the literacy skills of adults in this nation. In 1988, the U.S. Congress called on the Department of Education to support a national literacy survey of America's adults. While recent studies funded by the federal government explored the literacy of young adults and job seekers, the National Adult Literacy Survey is the first to provide accurate and detailed information on the skills of the adult population as a whole — information that, to this point, has been unavailable.

Perhaps never before have so many people from so many different sectors of society been concerned about adult literacy. Numerous reports published in

---

[1] B.E. Bryant. (1991). "The Changing Face of the United States." *The World Almanac and Book of Facts, 1992*. New York, NY: Pharos Books. p. 72.

[2] United States Department of Commerce. (1993, April). "Number of Non-English Language Speaking Americans Up Sharply in 1980s, Census Bureau Says." *United States Department of Commerce News*.

the last decade — including *A Nation at Risk*, *The Bottom Line*, *The Subtle Danger*, *Literacy: Profiles of America's Young Adults*, *Jump Start: The Federal Role in Adult Education*, *Workforce 2000*, *America's Choice: High Skills or Low Wages*, and *Beyond the School Doors* — have provided evidence that a large portion of our population lacks adequate literacy skills and have intensified the debate over how this problem should be addressed.

Concerns about literacy are not new. In fact, throughout our nation's history there have been periods when the literacy skills of the population were judged inadequate. Yet, the nature of these concerns has changed radically over time. In the past, the lack of ability to read and use printed materials was seen primarily as an individual problem, with implications for a person's job opportunities, educational goals, sense of fulfillment, and participation in society. Now, however, it is increasingly viewed as a national problem, with implications that reach far beyond the individual. Concerns about the human costs of limited literacy have, in a sense, been overshadowed by concerns about the economic and social costs.

Although Americans today are, on the whole, better educated and more literate than any who preceded them, many employers say they are unable to find enough workers with the reading, writing, mathematical, and other competencies required in the workplace. Changing economic, demographic, and labor-market forces may exacerbate the problem in the future. As a recent study by the American Society for Training and Development concluded, "These forces are creating a human capital deficit that threatens U.S. competitiveness and acts as a barrier to individual opportunities for all Americans."[3]

Whether future jobs will have greater literacy requirements than today's jobs, or whether the gap between the nation's literacy resources and its needs will widen, are open questions. The evidence to support such predictions is scarce. What many believe, however, is that our current systems of education and training are inadequate to ensure individual opportunities, improve economic productivity, or strengthen our nation's competitiveness in the global marketplace.

There is widespread agreement that we as a nation must respond to the literacy challenge, not only to preserve our economic vitality but also to ensure that every individual has a full range of opportunities for personal fulfillment and participation in society. At the historic education summit in Charlottesville, Virginia, the nation's governors — including then-Governor Clinton — met with then-President Bush to establish a set of national education goals that would guide this country into the twenty-first century. As adopted in 1990 by members of the National Governors' Association, one of the six goals states:

[3] A.P. Carnevale, L.J. Gainer, A.S. Meltzer, and S.L. Holland. (1988, October). "Workplace Basics: The Skills Employers Want." *Training and Development Journal*. pp. 20-30.

***By the year 2000, every adult American will be literate and will possess the knowledge and skills necessary to compete in a global economy and exercise the rights and responsibilities of citizenship.***

The following year, Congress passed the National Literacy Act of 1991, the purpose of which is "to enhance the literacy and basic skills of adults, to ensure that all adults in the United States acquire the basic skills necessary to function effectively and achieve the greatest possible opportunity in their work and in their lives, and to strengthen and coordinate adult literacy programs."

But how should these ambitious goals be pursued? In the past, whenever the population's skills were called into question, critics generally focused on the educational system and insisted that school reforms were necessary if the nation were to escape serious social and economic consequences. Today, however, many of those who need to improve their literacy skills have already left school. In fact, it is estimated that almost 80 percent of the work force for the year 2000 is already employed. Moreover, many of those who demonstrate limited literacy skills do not perceive that they have a problem. Clearly, then, the schools alone cannot strengthen the abilities of present and future employees, and of the population as a whole. A broad-based response seems necessary.

To initiate such a response, we need more than localized reports or anecdotal information from employers, public leaders, or the press; accurate and detailed information about our current status is essential. As reading researchers John Carroll and Jean Chall observed in their book *Toward a Literate Society*, "any national program for improving literacy skills would have to be based on the best possible information as to where the deficits are and how serious they are."[4] Surprisingly, though, we do lack accurate and detailed information about literacy in our nation — including how many individuals have limited skills, who they are, and the severity of their problems.

In 1988, Congress asked the U.S. Department of Education to address this need for information on the nature and extent of adult literacy. In response, the Department's National Center for Education Statistics and Division of Adult Education and Literacy called for a national household survey of the literacy skills of adults in the United States. A contract was awarded to Educational Testing Service and a subcontract to Westat, Inc. to design and conduct the National Adult Literacy Survey, the results of which are presented in these pages.

---

[4] J.B. Carroll and J.S. Chall, eds. (1975). *Toward a Literate Society: A Report from the National Academy of Education*. New York, NY: McGraw-Hill. p. 11.

During the first eight months of 1992, trained staff conducted household interviews with nearly 13,600 individuals aged 16 and older who had been randomly selected to represent the adult population in this country. In addition, approximately 1,000 adults were surveyed in each of 12 states that chose to participate in a special study designed to produce state-level results that are comparable to the national data. Finally, some 1,100 inmates from 80 federal and state prisons were interviewed to gather information on the skills of the prison population. Each individual was asked to spend about an hour responding to a series of diverse literacy tasks and providing information on his or her background, education, labor market experiences, and reading practices.

The results of the National Adult Literacy Survey comprise an enormous set of data that includes more than a million responses to the literacy tasks and background questions. More important than the size of the database, however, is the fact that it provides information that was previously unavailable — information that is essential to understanding this nation's literacy resources.

To ensure that the survey results will reach a wide audience, the committees that guided the project recommended that the findings be issued in a series of reports. This first volume in the series offers an overview of the results. Additional reports offer a more detailed look at particular issues that are explored in a general way in this report, including:

- literacy in the work force
- literacy and education
- literacy among older adults
- literacy in the prison population
- literacy and cultural diversity
- literacy practices

A final report conveys technical information about the survey design and the methods used to implement it.

Although these reports focus almost exclusively on the results of the National Adult Literacy Survey, their contents have much broader implications. The rich collection of information they contain can be used to inform policy debates, set program objectives, and reflect on our society's literacy resources and needs.

Irwin S. Kirsch
Project Director



# EXECUTIVE SUMMARY

This report provides a first look at the results of the National Adult Literacy Survey, a project funded by the U.S. Department of Education and administered by Educational Testing Service, in collaboration with Westat, Inc. It provides the most detailed portrait that has ever been available on the condition of literacy in this nation — and on the unrealized potential of its citizens.

Many past studies of adult literacy have tried to count the number of "illiterates" in this nation, thereby treating literacy as a condition that individuals either do or do not have. We believe that such efforts are inherently arbitrary and misleading. They are also damaging, in that they fail to acknowledge both the complexity of the literacy problem and the range of solutions needed to address it.

The National Adult Literacy Survey (NALS) is based on a different definition of literacy, and therefore follows a different approach to measuring it. The aim of this survey is to profile the English literacy of adults in the United States based on their performance across a wide array of tasks that reflect the types of materials and demands they encounter in their daily lives.

To gather the information on adults' literacy skills, trained staff interviewed nearly 13,600 individuals aged 16 and older during the first eight months of 1992. These participants had been randomly selected to represent the adult population in the country as a whole. In addition, about 1,000 adults were surveyed in each of 12 states that chose to participate in a special study designed to provide state-level results that are comparable to the national data. Finally, some 1,100 inmates from 80 federal and state prisons were interviewed to gather information on the proficiencies of the prison population. In total, over 26,000 adults were surveyed.

Each survey participant was asked to spend approximately an hour responding to a series of diverse literacy tasks as well as questions about his or her demographic characteristics, educational background, reading practices, and other areas related to literacy. Based on their responses to the survey tasks,

adults received proficiency scores along three scales which reflect varying degrees of skill in prose, document, and quantitative literacy. The scales are powerful tools which make it possible to explore the proportions of adults in various subpopulations of interest who demonstrated successive levels of performance.

This report describes the types and levels of literacy skills demonstrated by adults in this country and analyzes the variation in skills across major subgroups in the population. It also explores connections between literacy skills and social and economic variables such as voting, economic status, weeks worked, and earnings. Some of the major findings are highlighted here.

## The Literacy Skills of America's Adults

- Twenty-one to 23 percent — or some 40 to 44 million of the 191 million adults in this country — demonstrated skills in the lowest level of prose, document, and quantitative proficiencies (Level 1). Though all adults in this level displayed limited skills, their characteristics are diverse. Many adults in this level performed simple, routine tasks involving brief and uncomplicated texts and documents. For example, they were able to total an entry on a deposit slip, locate the time or place of a meeting on a form, and identify a piece of specific information in a brief news article. Others were unable to perform these types of tasks, and some had such limited skills that they were unable to respond to much of the survey.

- Many factors help to explain why so many adults demonstrated English literacy skills in the lowest proficiency level defined (Level 1). Twenty-five percent of the respondents who performed in this level were immigrants who may have been just learning to speak English. Nearly two-thirds of those in Level 1 (62 percent) had terminated their education before completing high school. A third were age 65 or older, and 26 percent had physical, mental, or health conditions that kept them from participating fully in work, school, housework, or other activities. Nineteen percent of the respondents in Level 1 reported having visual difficulties that affect their ability to read print.

- Some 25 to 28 percent of the respondents, representing about 50 million adults nationwide, demonstrated skills in the next higher level of proficiency (Level 2) on each of the literacy scales. While their skills were more varied than those of individuals performing in Level 1, their repertoire was still quite limited. They were generally able to locate information in text, to make low-level inferences using printed materials, and to integrate easily

identifiable pieces of information. Further, they demonstrated the ability to perform quantitative tasks that involve a single operation where the numbers are either stated or can be easily found in text. For example, adults in this level were able to calculate the total cost of a purchase or determine the difference in price between two items. They could also locate a particular intersection on a street map and enter background information on a simple form.

- Individuals in Levels 1 and 2 were much less likely to respond correctly to the more challenging literacy tasks in the assessment — those requiring higher level reading and problem-solving skills. In particular, they were apt to experience considerable difficulty in performing tasks that required them to integrate or synthesize information from complex or lengthy texts or to perform quantitative tasks that involved two or more sequential operations and in which the individual had to set up the problem.

- The approximately 90 million adults who performed in Levels 1 and 2 did not necessarily perceive themselves as being "at risk." Across the literacy scales, 66 to 75 percent of the adults in the lowest level and 93 to 97 percent in the second lowest level described themselves as being able to read or write English "well" or "very well." Moreover, only 14 to 25 percent of the adults in Level 1 and 4 to 12 percent in Level 2 said they get a lot of help from family members or friends with everyday prose, document, and quantitative literacy tasks. It is therefore possible that their skills, while limited, allow them to meet some or most of their personal and occupational literacy needs.

- Nearly one-third of the survey participants, or about 61 million adults nationwide, demonstrated performance in Level 3 on each of the literacy scales. Respondents performing in this level on the prose and document scales were able to integrate information from relatively long or dense text or from documents. Those in the third level on the quantitative scale were able to determine the appropriate arithmetic operation based on information contained in the directive, and to identify the quantities needed to perform that operation.

- Eighteen to 21 percent of the respondents, or 34 to 40 million adults, performed in the two highest levels of prose, document, and quantitative literacy (Levels 4 and 5). These adults demonstrated proficiencies associated with the most challenging tasks in this assessment, many of which involved long and complex documents and text passages.

- The literacy proficiencies of young adults assessed in 1992 were somewhat lower, on average, than the proficiencies of young adults who participated in a 1985 literacy survey. NALS participants aged 21 to 25 had average prose, document, and quantitative scores that were 11 to 14 points lower than the scores of 21- to 25-year-olds assessed in 1985. Although other factors may also be involved, these performance discrepancies are probably due in large part to changes in the demographic composition of the population — in particular, the dramatic increase in the percentages of young Hispanic adults, many of whom were born in other countries and are learning English as a second language.

- Adults with relatively few years of education were more likely to perform in the lower literacy levels than those who completed high school or received some type of postsecondary education. For example, on each of the three literacy scales, some 75 to 80 percent of adults with 0 to 8 years of education are in Level 1, while fewer than 1 percent are in Levels 4 and 5. In contrast, among adults with a high school diploma, 16 to 20 percent are in the lowest level on each scale, while 10 to 13 percent are in the two highest levels. Only 4 percent of adults with four year college degrees are in Level 1; 44 to 50 percent are in the two highest levels.

- Older adults were more likely than middle-aged and younger adults to demonstrate limited literacy skills. For example, adults over the age of 65 have average literacy scores that range from 56 to 61 points (or more than one level) below those of adults 40 to 54 years of age. Adults aged 55 to 64 scored, on average, between middle-aged adults and those 65 years and older. These differences can be explained in part by the fact that older adults tend to have completed fewer years of schooling than adults in the younger age groups.

- Black, American Indian/Alaskan Native, Hispanic, and Asian/Pacific Islander adults were more likely than White adults to perform in the lowest two literacy levels. These performance differences are affected by many factors. For example, with the exception of Asian/Pacific Islander adults, individuals in these groups tended to have completed fewer years of schooling in this country than had White individuals. Further, many adults of Asian/Pacific Islander and Hispanic origin were born in other countries and were likely to have learned English as a second language.

- Of all the racial/ethnic groups, Hispanic adults reported the fewest years of schooling in this country (just over 10 years, on average). The average years of schooling attained by Black adults and American Indian/Alaskan Native

adults were similar, at 11.6 and 11.7 years, respectively. These groups had completed more years of schooling than Hispanic adults had, on average, but more than a year less than either White adults or those of Asian/Pacific Islander origin.

- With one exception, for each racial or ethnic group, individuals born in the United States outperformed those born abroad. The exception occurs among Black adults, where there was essentially no difference (only 3 to 7 points). Among White and Asian/Pacific Islander adults, the average differences between native-born and foreign-born individuals range from 26 to 41 points across the literacy scales. Among Hispanic adults, the differences range from 40 to 94 points in favor of the native born.

- Twelve percent of the respondents reported having a physical, mental, or other health condition that kept them from participating fully in work or other activities. These individuals were far more likely than adults in the population as a whole to demonstrate performance in the range for Levels 1 and 2. Among those who said they had vision problems, 54 percent were in Level 1 on the prose scale and another 26 percent were in Level 2.

- Men demonstrated the same average prose proficiencies as women, but their document and quantitative proficiencies were somewhat higher. Adults in the Midwest and West had higher average proficiencies than those residing in either the Northeast or South.

- Adults in prison were far more likely than those in the population as a whole to perform in the lowest two literacy levels. These incarcerated adults tended to be younger, less well educated, and to be from minority backgrounds.

## Literacy and Social and Economic Characteristics

- Individuals demonstrating higher levels of literacy were more likely to be employed, work more weeks in a year, and earn higher wages than individuals demonstrating lower proficiencies. For example, while adults in Level 1 on each scale reported working an average of only 18 to 19 weeks in the year prior to the survey, those in the three highest levels reported working about twice as many weeks — between 34 and 44. Moreover, across the scales, individuals in the lowest level reported median weekly earnings of about $230 to $245, compared with about $350 for individuals performing in Level 3 and $620 to $680 for those in Level 5.

- Adults in the lowest level on each of the literacy scales (17 to 19 percent) were far more likely than those in the two highest levels (4 percent) to report receiving food stamps. In contrast, only 23 to 27 percent of the respondents who performed in Level 1 said they received interest from a savings or bank account, compared with 70 to 85 percent in Levels 4 or 5.

- Nearly half (41 to 44 percent) of all adults in the lowest level on each literacy scale were living in poverty, compared with only 4 to 8 percent of those in the two highest proficiency levels.

- On all three literacy scales, adults in the higher levels were more likely than those in the lower levels to report voting in a recent state or national election. Slightly more than half (55 to 58 percent) of the adults in Level 1 who were eligible to vote said they voted in the past five years, compared with about 80 percent of those who performed in Level 4 and nearly 90 percent of those in Level 5.

## Reflections on the Results

In reflecting on the results of the National Adult Literacy Survey, many readers will undoubtedly seek an answer to a fundamental question: Are the literacy skills of America's adults adequate? That is, are the distributions of prose, document, and quantitative proficiency observed in this survey adequate to ensure individual opportunities for all adults, to increase worker productivity, or to strengthen America's competitiveness around the world?

Because it is impossible to say precisely what literacy skills are essential for individuals to succeed in this or any other society, the results of the National Adult Literacy Survey provide no firm answers to such questions. As the authors examined the survey data and deliberated on the results with members of the advisory committees, however, several observations and concerns emerged.

Perhaps the most salient finding of this survey is that such large percentages of adults performed in the lowest levels (Levels 1 and 2) of prose, document, and quantitative literacy. In and of itself, this may not indicate a serious problem. After all, the majority of adults who demonstrated limited skills described themselves as reading or writing English well, and relatively few said they get a lot of assistance from others in performing everyday literacy tasks. Perhaps these individuals are able to meet most of the literacy demands they encounter currently at work, at home, and in their communities.

Yet, some argue that lower literacy skills mean a lower quality of life and more limited employment opportunities. As noted in a recent report from the American Society for Training and Development, "The association between skills and opportunity for individual Americans is powerful and growing. . . . Individuals with poor skills do not have much to bargain with; they are condemned to low earnings and limited choices."[1]

The data from this survey appear to support such views. On each of the literacy scales, adults whose proficiencies were within the two lowest levels were far more likely to receive food stamps and to be in poverty. Moreover, they were far less likely than their more literate peers to be employed full-time, to earn high wages, to rely on print sources (such as newspapers and magazines) for information about current events, public affairs, and government, and far less likely to vote.

Literacy is not the only factor that contributes to how we live our lives, however. Some adults who displayed limited skills reported working in professional or managerial jobs, earning high wages, and participating in various aspects of our society, for example, while others who demonstrated high levels of proficiency reported being unemployed or out of the labor force. Thus, having advanced literacy skills does not necessarily guarantee individual opportunities.

Still, literacy can be thought of as a currency in this society. Just as adults with little money have difficulty meeting their basic needs, those with limited literacy skills are likely to find it more challenging to pursue their goals — whether these involve job advancement, consumer decision making, citizenship, or other aspects of their lives. Even if adults who performed in the lowest literacy levels are not experiencing difficulties at present, they may be at risk as the nation's economy and social fabric continue to change.

Beyond these personal consequences, what implications are there for society when so many individuals display limited skills? The answer to this question is elusive. Still, it seems apparent that a nation in which large numbers of citizens display limited literacy skills has fewer resources with which to meet its goals and objectives, whether these are social, political, civic, or economic.

If large percentages of adults had to do little more than be able to sign their name on a form or locate a single fact in a newspaper or table, then the levels of literacy seen in this survey might not warrant concern. We live in a nation, however, where both the volume and variety of written information are growing and where increasing numbers of citizens are expected to be able to read, understand, and use these materials.

[1] A.J. Carnevale and L.J. Gainer. (1989). *The Learning Enterprise. Washington* , DC: U.S. Department of Labor, Employment and Training Administration.

Historians remind us that during the last 200 hundred years, our nation's literacy skills have increased dramatically in response to new requirements and expanded opportunities for social and economic growth. Today we are a better educated and more literate society than at any time in our history.[2] Yet, there have also been periods of imbalance — times when demands seemed to surpass levels of attainment.

In recent years, our society has grown more technologically advanced and the roles of formal institutions have expanded. As this has occurred, many have argued that there is a greater need for all individuals to become more literate and for a larger proportion to develop advanced skills.[3] Growing numbers of individuals are expected to be able to attend to multiple features of information in lengthy and sometimes complex displays, to compare and contrast information, to integrate information from various parts of a text or document, to generate ideas and information based on what they read, and to apply arithmetic operations sequentially to solve a problem.

The results from this and other surveys, however, indicate that many adults do not demonstrate these levels of proficiency. Further, the continuing process of demographic, social, and economic change within this country could lead to a more divided society along both racial and socioeconomic lines.

Already there is evidence of a widening division. According to the report *America's Choice: High Skills or Low Wages!*, over the past 15 years the gap in earnings between professionals and clerical workers has grown from 47 to 86 percent while the gap between white collar workers and skilled tradespeople has risen from 2 to 37 percent. At the same time, earnings for college educated males 24 to 34 years of age have increased by 10 percent while earnings for those with high school diplomas have declined by 9 percent. Moreover, the poverty rate for Black families is nearly three times that for White families.[4] One child in five is born into poverty, and for minority populations, this rate approaches one in two.

---

[2] L.C. Stedman and C.F. Kaestle. (1991). "Literacy and Reading Perfor mance in the United States from 1880 to the Present," in C.F. Kaestle et al., *Literacy in the United States: Readers and Reading Since 1880.* New Haven, CT: Yale University Press. T. Snyder (ed.). (1993). *120 Years of American Education: A Statistical Portrait*. Washington, DC: National Center for Education Statistics.

[3] U.S. Department of Labor. (1992, April). *Learning a Living: A Blueprint for High Performance.* Washington, DC: The Secretary's Commission on Achieving Necessary Skills (SCANS). R.L. Venezky, C.F. Kaestle, and A. Sum. (1987, January). *The Subtle Danger: Reflections on the Literacy Abilities of America's Young Adults*. Princeton, NJ: Educational Testing Service.

[4] National Center on Education and the Economy. (1990, June). *America's Choice: High Skills or Low Wages! The Report of The Commission on the Skills of the American Workforce.* p. 20.

In 1990, then-President Bush and the nation's governors, including then-Governor Clinton, adopted the goal that *all* of America's adults be literate by the year 2000. The responsibility for meeting this objective must, in the end, be shared among individuals, groups, and organizations throughout our society. Programs that serve adult learners cannot be expected to solve the literacy problem alone, and neither can the schools. Other institutions — ranging from the largest and most complex government agency, to large and small businesses, to the family — all have a role to play in ensuring that adults who need or wish to improve their literacy skills have the opportunity to do so. It is also important that individuals themselves come to realize the value of literacy in their lives and to recognize the benefits associated with having better skills. Only then will more adults in this nation develop the literacy resources they need to function in society, to achieve their goals, and to develop their knowledge and potential.



# INTRODUCTION

*Development is a process that increases choices. It creates an environment where people can exercise their full potential to lead productive, creative lives. . . . At the heart of development is literacy —the ability to recognize, interpret, and act on symbolic representations of our world through various forms of language and cultural expression. Facility in manipulating these symbols, whether through the written word, numbers or images, is essential to effective human development. Thus, meeting the basic learning needs of all is a major goal of sustainable and lasting improvement in the human condition.*

— William H. Drapper III, Letters of Life

Few would deny the importance of literacy in this society or the advantages enjoyed by those with advanced skills. This shared belief in the value of literacy, though, does not imply consensus on the ways it should be defined and measured. In fact, opinions vary widely about the skills that individuals need to function successfully in their work, in their personal lives, and in society, and about the ways in which these skills should be assessed. As a result, there have been widely conflicting diagnoses of the literacy problem in this country. The National Adult Literacy Survey was initiated to fill the need for accurate and detailed information on the English literacy skills of America's adults.

In the Adult Education Amendments of 1988, the U.S. Congress called upon the Department of Education to report on the definition of literacy and on the nature and extent of literacy among adults in the nation. In response, the Department's National Center for Education Statistics (NCES) and the Division of Adult Education and Literacy planned a national household survey of adult literacy. In September 1989, NCES awarded a four-year contract to Educational Testing Service (ETS) to design and administer the survey and to analyze and report the results. A subcontract was given to Westat, Inc., for sampling and field operations.

The plan for developing and conducting the National Adult Literacy Survey (NALS) was guided by a panel of experts from business and industry, labor, government, research, and adult education. This Literacy Definition Committee worked with ETS staff to prepare a definition of literacy that would guide the development of the assessment objectives as well as the construction and selection of assessment tasks. A second panel, the Technical Review Committee, was formed to help ensure the soundness of the assessment design, the quality of the data collected, the integrity of the analyses conducted, and the appropriateness of the interpretations of the final results.

This introduction summarizes the discussions that led to the adoption of a definition of literacy for the National Adult Literacy Survey, the framework used in designing the survey instruments, the populations assessed, the survey administration, and the methods for reporting the results.

## Defining and Measuring Literacy

The National Adult Literacy Survey is the third and largest assessment of adult literacy funded by the federal government and conducted by ETS. The two previous efforts included a 1985 household survey of the literacy skills of 21- to 25-year-olds, funded by the U.S. Department of Education, and a 1989-90 survey of the literacy proficiencies of job seekers, funded by the U.S. Department of Labor.[1] The definition of literacy that guided the National Adult Literacy Survey was rooted in these preceding studies.

Building on earlier work in large-scale literacy assessment, the 1985 young adult survey attempted to extend the concept of literacy, to take into account some of the criticisms of previous surveys, and to benefit from advances in educational assessment methodology. The national panel of experts that was assembled to construct a definition of literacy for this survey rejected the types of arbitrary standards — such as signing one's name, completing five years of school, or scoring at a particular grade level on a school-based measure of reading achievement — that have long been used to make judgements about adults' literacy skills. Through a consensus process, this panel drafted the following definition of literacy, which helped set the framework for the young adult survey:

> **Using printed and written information to function in society, to achieve one's goals, and to develop one's knowledge and potential.**

---

[1] I.S. Kirsch and A. Jungeblut. (1986). *Literacy: Profiles of America's Young Adults*. Princeton, NJ: Educational Testing Service. I.S. Kirsch, A. Jungeblut, and A. Campbell. (1992). *Beyond the School Doors: The Literacy Needs of Job Seekers Served by the U.S. Department of Labor*. Princeton, NJ:  Educational Testing Service.

Unlike traditional definitions of literacy, which focused on decoding and comprehension, this definition encompasses a broad range of skills that adults use in accomplishing the many different types of literacy tasks associated with work, home, and community contexts. This perspective is shaping not only adult literacy assessment, but policy, as well — as seen in the National Literacy Act of 1991, which defined literacy as "an individual's ability to read, write, and speak in English and compute and solve problems at levels of proficiency necessary to function on the job and in society, to achieve one's goals, and to develop one's knowledge and potential."

The definition of literacy from the young adult survey was adopted by the panel that guided the development of the 1989-90 survey of job seekers, and it also provided the starting point for the discussions of the NALS Literacy Definition Committee. This committee agreed that expressing the literacy proficiencies of adults in school-based terms or grade-level scores is inappropriate. In addition, while the committee recognized the importance of teamwork skills, interpersonal skills, and communication skills for functioning in various contexts, such as the work place, it decided that these areas would not be addressed in this survey.

Further, the committee endorsed the notion that literacy is neither a single skill suited to all types of texts, nor an infinite number of skills, each associated with a given type of text or material. Rather, as suggested by the results of the young adult and job-seeker surveys, an ordered set of skills appears to be called into play to accomplish diverse types of tasks. Given this perspective, the NALS committee agreed to adopt not only the definition of literacy that was used in the previous surveys, but also the three scales developed as part of those efforts:

**Prose literacy** — the knowledge and skills needed to understand and use information from texts that include editorials, news stories, poems, and fiction; for example, finding a piece of information in a newspaper article, interpreting instructions from a warranty, inferring a theme from a poem, or contrasting views expressed in an editorial.

**Document literacy** — the knowledge and skills required to locate and use information contained in materials that include job applications, payroll forms, transportation schedules, maps, tables, and graphs; for example, locating a particular intersection on a street map, using a schedule to choose the appropriate bus, or entering information on an application form.

**Quantitative literacy** — the knowledge and skills required to apply arithmetic operations, either alone or sequentially, using numbers

embedded in printed materials; for example, balancing a checkbook, figuring out a tip, completing an order form, or determining the amount of interest from a loan advertisement.

The literacy scales provide a useful way to organize a broad array of tasks and to report the assessment results. They represent a substantial improvement over traditional approaches to literacy assessment, which have tended to report on performance in terms of single tasks or to combine the results from diverse tasks into a single, conglomerate score. Such a score fosters the simplistic notion that "literates" and "illiterates" can be neatly distinguished from one another based on a single cutpoint on a single scale. The literacy scales, on the other hand, make it possible to profile the various types and levels of literacy among different subgroups in our society. In so doing, they help us to understand the diverse information-processing skills associated with the broad range of printed and written materials that adults read and their many purposes for reading them.

In adopting the three scales for use in this survey, the committee's aim was not to establish a single national standard for literacy. Rather, it was to provide an interpretive scheme that would enable levels of prose, document, and quantitative performance to be identified and allow descriptions of the knowledge and skills associated with each level to be developed.

The prose, document, and quantitative scales were built initially to report on the results of the young adult survey and were augmented in the survey of job seekers. The NALS Literacy Definition Committee recommended that a new set of literacy tasks be developed to enhance the scales. These tasks would take into account the following, without losing the ability to compare the NALS results to the earlier surveys:

- continued use of open-ended simulation tasks
- continued emphasis on tasks that measure a broad range of information-processing skills and cover a wide variety of contexts
- increased emphasis on simulation tasks that require brief written and/or oral responses
- increased emphasis on tasks that ask respondents to describe how they would set up and solve a problem
- the use of a simple, four-function calculator to solve selected quantitative problems

Approximately 110 new assessment tasks were field tested, and 80 of these were selected for inclusion in the survey, in addition to 85 tasks that were administered in both the young adult and job-seeker assessments. By administering

a common set of simulation tasks in each of the three literacy surveys, it is possible to compare results across time and across population groups.

A large number of tasks had to be administered in NALS to ensure that the survey would provide the broadest possible coverage of the literacy domains specified. Yet, no individual could be expected to respond to the entire set of 165 simulation tasks. Accordingly, the survey was designed to give each person participating in the study a subset of the total pool of literacy tasks, while at the same time ensuring that each of the 165 tasks was administered to a nationally representative sample of adults. Literacy tasks were assigned to sections that could be completed in about 15 minutes, and these sections were then compiled into booklets, each of which could be completed in about 45 minutes. During a personal interview, each survey respondent was asked to complete one booklet.

In addition to the time allocated for the literacy tasks, approximately 20 minutes were devoted to obtaining background and personal information from respondents. Two versions of the background questionnaire were administered, one in English and one in Spanish. Major areas explored included: *background and demographics* — country of birth, languages spoken or read, access to reading materials, size of household, educational attainment of parents, age, race/ethnicity, and marital status; *education* — highest grade completed in school, current aspirations, participation in adult education classes, and education received outside the country; *labor market experiences* — employment status, recent labor market experiences, and occupation; *income* — personal as well as household; and *activities* — voting behavior, hours spent watching television, frequency and content of newspaper reading, and use of literacy skills for work and leisure. These background data make it possible to gain an understanding of the ways in which personal characteristics are associated with demonstrated performance on each of the three literacy scales.[2]

## Conducting the Survey

NALS was conducted during the first eight months of 1992 with a nationally representative sample of some 13,600 adults. More than 400 trained interviewers, some of whom were bilingual in English and Spanish, visited nearly 27,000 households to select and interview adults aged 16 and older, each of whom was asked to provide personal and background information and to complete a booklet of literacy tasks. Black and Hispanic households were

[2] A more detailed description of the NALS design and framework can be found in an interim report: A. Campbell, I.S. Kirsch, and A. Kolstad. (1992, October). *Assessing Literacy: The Framework for the National Adult Literacy Survey.* Washington, DC: National Center for Education Statistics.

oversampled to ensure reliable estimates of literacy proficiencies and to permit analyses of the performance of these subpopulations.

To give states an opportunity to explore the skill levels of their populations, each of the 50 states was invited to participate in a concurrent assessment. While many states expressed an interest, 11 elected to participate in the State Adult Literacy Survey. Approximately 1,000 adults aged 16 to 64 were surveyed in each of the following states:

| | | |
|---|---|---|
| California | Louisiana | Pennsylvania |
| Illinois | New Jersey | Texas |
| Indiana | New York | Washington |
| Iowa | Ohio | |

To permit comparisons of the state and national results, the survey instruments administered to the state and national samples were identical and the data were gathered at the same time. Florida also participated in the state survey, but its data collection was unavoidably delayed until 1993.

Finally, more than 1,100 inmates in some 80 federal and state prisons were included in the survey. Their participation helped to provide better estimates of the literacy levels of the total population and make it possible to report on the literacy proficiencies of this important segment of society. To ensure comparability with the national survey, the simulation tasks given to the prison participants were the same as those given to the household survey population. However, to address issues of particular relevance to the prison population, a revised version of the background questionnaire was developed. This instrument drew questions from the 1991 Survey of Inmates of State Correctional Facilities sponsored by the Bureau of Justice Statistics of the U.S. Department of Justice. These included queries about current offenses, criminal history, and prison work assignments, as well as about education and labor force experiences.

Responses from the national household, the state, and prison samples were combined to yield the best possible performance estimates. Unfortunately, because of the delayed administration, the results from the Florida state survey could not be included in the national estimates. In all, more than 26,000 adults gave, on average, more than an hour of their time to complete the literacy tasks and background questionnaires. Participants who completed as much of the assessment as their skills allowed were paid $20 for their time. The demographic characteristics of the adults who participated in NALS are presented in Table 1.

## The National Adult Literacy Survey Sample

**Total Population**

| | Assessed Sample | National Population (in thousands) | Percentage of National Population |
|---|---|---|---|
| **Total** | 26,091 | 191,289 | 100% |
| **Sex** | | | |
| Male | 11,770 | 92,098 | 48 |
| Female | 14,279 | 98,901 | 52 |
| **Age** | | | |
| 16 to 18 years | 1,237 | 10,424 | 5 |
| 19 to 24 years | 3,344 | 24,515 | 13 |
| 25 to 39 years | 10,050 | 63,278 | 33 |
| 40 to 54 years | 6,310 | 43,794 | 23 |
| 55 to 64 years | 2,924 | 19,503 | 10 |
| 65 years and older | 2,214 | 29,735 | 16 |
| **Race/Ethnicity** | | | |
| White | 17,292 | 144,968 | 76 |
| Black | 4,963 | 21,192 | 11 |
| Asian or Pacific Islander | 438 | 4,116 | 2 |
| American Indian or Alaskan Native | 189 | 1,803 | 1 |
| Other | 83 | 729 | 0* |
| Hispanic/Mexican | 1,776 | 10,235 | 5 |
| Hispanic/Puerto Rican | 405 | 2,190 | 1 |
| Hispanic/Cuban | 147 | 928 | 0* |
| Hispanic/Central or South American | 424 | 2,608 | 1 |
| Hispanic/Other | 374 | 2,520 | 1 |

**Prison Population**

| | Assessed Sample | National Population (in thousands) | Percentage of National Population |
|---|---|---|---|
| **Total** | 1,147 | 766 | 100% |
| **Sex** | | | |
| Male | 1,076 | 723 | 94 |
| Female | 71 | 43 | 6 |
| **Race/Ethnicity** | | | |
| White | 417 | 266 | 35 |
| Black | 480 | 340 | 44 |
| Asian or Pacific Islander | 7 | 4 | 1 |
| American Indian or Alaskan Native | 27 | 18 | 2 |
| Other | 5 | 4 | 1 |
| Hispanic groups | 211 | 134 | 17 |

Notes: The total population includes adults living in households and those in prison. The sample sizes for subpopulations may not add up to the total sample sizes due to missing data. The race/ethnicity categories are mutually exclusive. Some estimates for small subgroups of the national population may be slightly different from 1990 Census estimates due to the sampling procedures used.

*Percentages below .5 are rounded to 0.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Further information on the design of the sample, the survey administration, the statistical analyses and special studies that were conducted, and the validity of the literacy scales will be available in a forthcoming technical report, to be published in 1994.

## Reporting the Results

The results of the National Adult Literacy Survey are reported using three scales, each ranging from 0 to 500: a prose scale, a document scale, and a quantitative scale. The scores on each scale represent degrees of proficiency along that particular dimension of literacy. For example, a low score (below 225) on the document scale indicates that an individual has very limited skills in processing information from tables, charts, graphs, maps, and the like (even those that are brief and uncomplicated). On the other hand, a high score (above 375) indicates advanced skills in performing a variety of tasks that involve the use of complex documents.

Survey participants received proficiency scores according to their performance on the survey tasks. A relatively small proportion of the respondents answered only a part of the survey, and an imputation procedure was used to make the best possible estimates of their proficiencies. This procedure and related issues are detailed in the technical report.

Most respondents tended to obtain similar, though not identical, scores on the three literacy scales. This does not mean, however, that the underlying skills involved in prose, document, and quantitative literacy are the same. Each scale provides some unique information, especially when comparisons are made across groups defined by variables such as race/ethnicity, education, and age.

The literacy scales allow us not only to summarize results for various subpopulations, but also to determine the relative difficulty of the literacy tasks included in the survey. In other words, just as individuals received scale scores according to their performance in the assessment, the literacy tasks received specific scale values according to their difficulty, as determined by the performance of the adults who participated in the survey. Previous research has shown that the difficulty of a literacy task, and therefore its placement on the literacy scale, is determined by three factors: the *structure of the material* — for example, exposition, narrative, table, graph, map, or advertisement; the *content* of the material and/or the *context* from which it is drawn — for

example, home, work, or community; and the *nature of the task* — that is, what the individual is asked to do with the material, or his or her purpose for using it.[3]

The literacy tasks administered in NALS varied widely in terms of materials, content, and task requirements, and thus in terms of difficulty. This range is captured in Figure 1, which describes some of the literacy tasks and indicates their scale values.

Even a cursory review of this display reveals that tasks at the lower end of each scale differ from those at the high end. A more careful analysis of the range of tasks along each scale provides clear evidence of an ordered set of information-processing skills and strategies. On the prose scale, for example, tasks with low scale values ask readers to locate or identify information in brief, familiar, or uncomplicated materials, while those at the high end ask them to perform more demanding activities using materials that tend to be lengthy, unfamiliar, or complex. Similarly, on the document and quantitative scales, the tasks at the low end of the scale differ from those at the high end in terms of the structure of the material, the content and context of the material, and the nature of the directive.

In an attempt to capture this progression of information-processing skills and strategies, each scale was divided into five levels: *Level 1* (0 to 225), *Level 2* (226 to 275), *Level 3* (276 to 325), *Level 4* (326 to 375), and *Level 5* (376 to 500). The points and score ranges that separate these levels on each scale reflect shifts in the literacy skills and strategies required to perform increasingly complex tasks. The survey tasks were assigned to the appropriate point on the appropriate scale based on their difficulty as reflected in the performance of the nationally representative sample of adults surveyed. Analyses of the types of materials and demands that characterize each level reveal the progression of literacy demands along each scale (FIGURE 2).

While the literacy levels on each scale can be used to explore the range of literacy demands, these data do not reveal the types of literacy demands that are associated with particular contexts in this pluralistic society. That is, they do not enable us to say what specific level of prose, document, or quantitative skill is required to obtain, hold, or advance in a particular occupation, to manage a household, or to obtain legal or community services, for example. Nevertheless, the relationships among performance on the three scales and various social or economic indicators can provide valuable insights, and that is the goal of this report.

[3] I.S. Kirsch and P.B. Mosenthal. (1990). "Exploring Document Literacy: Variables Underlying the Performance of Young Adults," *Reading Research Quarterly*, 25. pp. 5-30. P.B. Mosenthal and I.S. Kirsch. (1992). "Defining the Constructs of Adult Literacy," paper presented at the National Reading Conference, San Antonio, Texas.

NALS

Figure 1

## Difficulty Values of Selected Tasks Along the Prose, Document, and Quantitative Literacy Scales

| Scale | Prose | | Document | | Quantitative | |
|---|---|---|---|---|---|---|
| 0 | 149 | Identify country in short article | 69 | Sign your name | 191 | Total a bank deposit entry |
| | 210 | Locate one piece of information in sports article | 151 | Locate expiration date on driver's license | | |
| | 224 | Underline sentence explaining action stated in short article | 180 | Locate time of meeting on a form | | |
| | | | 214 | Using pie graph, locate type of vehicle having specific sales | | |
| 225 | 226 | Underline meaning of a term given in government brochure on supplemental security income | 232 | Locate intersection on a street map | 238 | Calculate postage and fees for certified mail |
| | 250 | Locate two features of information in sports article | 245 | Locate eligibility from table of employee benefits | 246 | Determine difference in price between tickets for two shows |
| | | | 259 | Identify and enter background information on application for social security card | 270 | Calculate total costs of purchase from an order form |
| 275 | 275 | Interpret instructions from an appliance warranty | 277 | Identify information from bar graph depicting source of energy and year | 278 | Using calculator, calculate difference between regular and sale price from an advertisement |
| | 280 | Write a brief letter explaining error made on a credit card bill | 296 | Use sign out sheet to respond to call about resident | 308 | Using calculator, determine the discount from an oil bill if paid within 10 days |
| | 304 | Read a news article and identify a sentence that provides interpretation of a situation | 314 | Use bus schedule to determine appropriate bus for given set of conditions | | |
| | 316 | Read lengthy article to identify two behaviors that meet a stated condition | 323 | Enter information given into an automobile maintenance record form | | |
| 325 | 328 | State in writing an argument made in lengthy newspaper article | 342 | Identify the correct percentage meeting specified conditions from a table of such information | 325 | Plan travel arrangements for meeting using flight schedule |
| | 347 | Explain difference between two types of employee benefits | 348 | Use bus schedule to determine appropriate bus for given set of conditions | 331 | Determine correct change using information in a menu |
| | 359 | Contrast views expressed in two editorials on technologies available to make fuel-efficient cars | | | 350 | Using information stated in news article, calculate amount of money that should go to raising a child |
| | 362 | Generate unfamiliar theme from short poems | | | 368 | Using eligibility pamphlet, calculate the yearly amount a couple would receive for basic supplemental security income |
| | 374 | Compare two metaphors used in poem | | | | |
| 375 | 382 | Compare approaches stated in narrative on growing up | 379 | Use table of information to determine pattern in oil exports across years | 375 | Calculate miles per gallon using information given on mileage record chart |
| | 410 | Summarize two ways lawyers may challenge prospective jurors | 387 | Using table comparing credit cards, identify the two categories used and write two differences between them | 382 | Determine individual and total costs on an order form for items in a catalog |
| | 423 | Interpret a brief phrase from a lengthy news article | 396 | Using a table depicting information about parental involvement in school survey to write a paragraph summarizing extent to which parents and teachers agree | 405 | Using information in news article, calculate difference in times for completing a race |
| 500 | | | | | 421 | Using calculator, determine the total cost of carpet to cover a room |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

NALS

Figure 2

**Description of the Prose, Document, and Quantitative Literacy Levels**

| | Prose | Document | Quantitative |
|---|---|---|---|
| **Level 1** *0-225* | Most of the tasks in this level require the reader to read relatively short text to locate a single piece of information which is identical to or synonymous with the information given in the question or directive. If plausible but incorrect information is present in the text, it tends not to be located near the correct information. | Tasks in this level tend to require the reader either to locate a piece of information based on a literal match or to enter information from personal knowledge onto a document. Little, if any, distracting information is present. | Tasks in this level require readers to perform single, relatively simple arithmetic operations, such as addition. The numbers to be used are provided and the arithmetic operation to be performed is specified. |
| **Level 2** *226-275* | Some tasks in this level require readers to locate a single piece of information in the text; however, several distractors or plausible but incorrect pieces of information may be present, or low-level inferences may be required. Other tasks require the reader to integrate two or more pieces of information or to compare and contrast easily identifiable information based on a criterion provided in the question or directive. | Tasks in this level are more varied than those in Level 1. Some require the readers to match a single piece of information; however, several distractors may be present, or the match may require low-level inferences. Tasks in this level may also ask the reader to cycle through information in a document or to integrate information from various parts of a document. | Tasks in this level typically require readers to perform a single operation using numbers that are either stated in the task or easily located in the material. The operation to be performed may be stated in the question or easily determined from the format of the material (for example, an order form). |
| **Level 3** *276-325* | Tasks in this level tend to require readers to make literal or synonymous matches between the text and information given in the task, or to make matches that require low-level inferences. Other tasks ask readers to integrate information from dense or lengthy text that contains no organizational aids such as headings. Readers may also be asked to generate a response based on information that can be easily identified in the text. Distracting information is present, but is not located near the correct information. | Some tasks in this level require the reader to integrate multiple pieces of information from one or more documents. Others ask readers to cycle through rather complex tables or graphs which contain information that is irrelevant or inappropriate to the task. | In tasks in this level, two or more numbers are typically needed to solve the problem, and these must be found in the material. The operation(s) needed can be determined from the arithmetic relation terms used in the question or directive. |
| **Level 4** *326-375* | These tasks require readers to perform multiple-feature matches and to integrate or synthesize information from complex or lengthy passages. More complex inferences are needed to perform successfully. Conditional information is frequently present in tasks at this level and must be taken into consideration by the reader. | Tasks in this level, like those at the previous levels, ask readers to perform multiple-feature matches, cycle through documents, and integrate information; however, they require a greater degree of inferencing. Many of these tasks require readers to provide numerous responses but do not designate how many responses are needed. Conditional information is also present in the document tasks at this level and must be taken into account by the reader. | These tasks tend to require readers to perform two or more sequential operations or a single operation in which the quantities are found in different types of displays, or the operations must be inferred from semantic information given or drawn from prior knowledge. |
| **Level 5** *376-500* | Some tasks in this level require the reader to search for information in dense text which contains a number of plausible distractors. Others ask readers to make high-level inferences or use specialized background knowledge. Some tasks ask readers to contrast complex information. | Tasks in this level require the reader to search through complex displays that contain multiple distractors, to make high-level text-based inferences, and to use specialized knowledge. | These tasks require readers to perform multiple operations sequentially. They must disembed the features of the problem from text or rely on background knowledge to determine the quantities or operations needed. |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## About This Report

This report is written in three sections. The next two sections present the results of the survey. Section I provides information on the distribution of literacy skills in the population as a whole and in an array of subgroups defined by level of education, age, race/ethnicity, country of birth, region of the country, and disability status. Section II explores how literacy levels relate to employment and earnings, poverty status, sources of income, voting behavior, and reading activities.

Section III describes the levels of literacy for each scale, providing contextual information that illuminates the proficiency results presented in the first and second sections. Sample tasks are reproduced to illustrate the characteristics of specific tasks as well as to show the range of performance demands on each scale. In addition, the knowledge and skills reflected in these tasks are analyzed.

In interpreting the results herein, readers should bear in mind that the literacy tasks contained in this assessment and the adults invited to participate in the survey are samples drawn from their two respective universes. As such, they are subject to some measurable degree of uncertainty. Scientific procedures employed in the study design and the scaling of literacy tasks permit a high degree of confidence in the resulting estimates of task difficulty. Similarly, the sampling design and weighting procedures applied in this survey assure that participants' responses can be generalized to the populations of interest.

In an effort to make this report as readable as possible, numbers throughout have been rounded and presented without standard errors (or estimates about their accuracy). Where differences between various subpopulations are discussed, the comparisons are based on statistical tests that consider the magnitude of the differences (for example, the difference in average document proficiency between high school and college graduates), the size of the standard errors associated with the numbers being compared, and the number of comparisons being made. Only statistically significant differences (at the .05 level) are discussed herein. Readers who are interested in making their own comparisons are therefore advised not to use the numbers alone to compare various groups, but rather to rely on statistical tests.[4]

Throughout this report, graphs are used to communicate the results to a broad audience, as well as to provide a source of informative displays which

[4] To determine whether the difference between two groups is statistically significant, one must estimate the degree of uncertainty (or the standard error) associated with the difference. To do so, one squares each group's standard error, sums these squared standard errors, then takes the square root of this sum. The difference between the two groups plus or minus twice the standard error of the difference is the confidence interval. If the confidence interval does not contain zero, then the difference between the two groups is said to be statistically significant.

policymakers and others may wish to use for their own purposes. More technical information is presented in the appendices at the end of the report.

The goal of this report is to provide useful information to all those who wish to understand the current status of literacy among America's adults and to strengthen existing adult literacy policies and programs. In considering the results, the reader should keep in mind that this was a survey of literacy in the English language — not literacy in any universal sense of the word. Thus, the results do not capture the literacy resources and abilities that some respondents possess in languages other than English.

## A Note on Interpretations

In reviewing the information contained in this report, readers should be aware that no single factor determines what an individual's literacy proficiencies will be. All of us develop our own unique repertoire of competencies depending on a wide array of conditions and circumstances, including our family backgrounds, educational attainments, interests and aspirations, economic resources, and employment experiences. Any single survey, this one included, can focus on only some of these variables.

Further, while the survey results reveal certain characteristics that are related to literacy, the nature of the survey makes it impossible to determine the direction of these relationships. In other words, it is impossible to identify the extent to which literacy shapes particular aspects of our lives or is, in turn, shaped by them. For example, there is a strong relationship between educational attainment and literacy proficiencies. On the one hand, it is likely that staying in school longer does strengthen an individual's literacy skills. On the other hand, it is also true that those with more advanced skills tend to remain in school longer. Other variables, as well, are likely to play a role in the relationship between literacy and education. In interpreting such relationships in this report, the authors strive to acknowledge the many factors involved.

A final note deserves emphasis. This report describes the literacy proficiencies of various subpopulations defined by characteristics such as age, sex, race, ethnicity, and educational background. While certain groups demonstrated lower literacy skills than others on average, within every group there were some individuals who performed well and some who performed poorly. Accordingly, when one group is said to have lower average proficiencies than another, this does not imply that all adults in the first group performed worse than those in the second. Such statements are only intended to highlight general patterns of differences among various groups and therefore do not capture the variability within each group.

14 . . . . . . Introduction

Compendium_Responsive Brief
Page 586



# SECTION I

## *The Prose, Document, and Quantitative Literacies of America's Adults*

The National Adult Literacy Survey gathered information on multiple dimensions of adult literacy. This section of the report profiles the prose, document, and quantitative literacy skills of the adult population and examines the complex relationships between literacy proficiencies and various demographic and background characteristics. For example, we compare the literacy proficiencies that adults demonstrated in this assessment with their self-reported evaluations of their reading and writing skills in English. Performance results are also reported for adults in terms of their level of educational attainment, age, race/ethnicity, region, and sex. The literacy skills of the total adult population and the prison population are compared, and the results for various racial/ethnic groups are described with respect to age, country of birth, and education.[1]

The results of the National Adult Literacy Survey are examined in two ways. General comparisons of literacy proficiency are made by examining the average performance of various subpopulations on each of the literacy scales. This information is interesting in and of itself, but it says little about how literacy is distributed among America's adults. To explore the range of literacy skills in the total population and in various subpopulations, the percentages of adults who performed in each level on the prose, document, and quantitative literacy scales are also presented. As described in the Introduction, five literacy levels were defined along each of the scales: *Level 1* (ranging from 0 to 225), *Level 2* (226 to 275), *Level 3* (276 to 325), *Level 4* (326 to 375), and *Level 5* (376 to 500).[2]

Because each literacy level encompasses a range on a given scale, the tasks in any particular level are not homogeneous, and neither are the individuals who performed in that level. Tasks in the high end of the range for a given level

---

[1] All subpopulations and variables discussed in this report are defined in the appendices.

[2] An overview of the literacy levels on each scale is provided in the Introduction. Section III describes the levels in more detail and includes examples of the types of tasks that were likely to be performed successfully by individuals in each level.

are more challenging than those in the low end, just as individuals whose proficiencies are in the high end of a level demonstrated success on a more challenging set of literacy tasks than individuals in the low end. The group of adults in Level 1 is especially heterogeneous, as it includes individuals who successfully performed only the relatively undemanding literacy tasks, those who attempted to perform these tasks but did not succeed, and those with such limited skills (or such limited English proficiency) that they did not try to respond at all. Thus, while the literacy levels are discussed as distinct units in this section, the heterogeneity of performance within each level should be kept in mind.

## Results for the Total Population

Twenty-one percent of adults performed in Level 1 on the prose scale, while 23 percent performed in this level on the document scale and 22 percent were in this level on the quantitative scale (FIGURE 1.1). Translated into population terms, between 40 and 44 million adults nationwide demonstrated skills in the lowest literacy level defined.

What do these results mean? As noted earlier, there was a range of performance within Level 1. Some individuals in this level displayed the ability to read relatively short pieces of text to find a single piece of information. Some were able to enter personal information, such as their name, onto a document, or to locate the time of an event on a form. Some were able to add numbers on a bank deposit slip, or to perform other simple arithmetic operations using numbers presented to them. Other adults in Level 1, however, did not demonstrate the ability to perform even these fairly common and uncomplicated literacy tasks. There were individuals who had such limited skills that they were able to complete only part of the survey, and others who attempted to perform the literacy tasks they were given and were unsuccessful.

To understand these results, it is helpful to examine the characteristics of adults who demonstrated performance in Level 1. On the prose scale, for example, approximately one-quarter of the individuals who performed in this level reported that they were born in another country, and some of them were undoubtedly recent immigrants with a limited command of English (TABLE 1.1). In addition, 62 percent of the individuals in Level 1 on the prose scale said they had not completed high school; 35 percent, in fact, had finished no more than 8 years of schooling. Relatively high percentages of the respondents in this level were Black, Hispanic, or Asian/Pacific Islander, and many — approximately 33 percent — were age 65 or older. Further, 26 percent of the adults who performed in Level 1 said they had a physical, mental, or health condition that

**Figure 1.1**

**Literacy Levels and Average Literacy Proficiencies for the Total Population**

**PROSE**

**DOCUMENT**

**QUANTITATIVE**

**Level 1** (0 to 225) **Level 2** (226 to 275) **Level 3** (276 to 325) **Level 4** (326 to 375) **Level 5** (376 to 500)

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

**NALS** **Table 1.1**

**Percentages of Adults with Selected Characteristics, Prose Level 1 and Total Populations**

| | Prose Level 1 Population | Total Population |
|---|---|---|
| **Country of Birth** | | |
| Born in another country | 25 | 10 |
| **Highest Level of Education Completed** | | |
| 0 to 8 years | 35 | 10 |
| 9 to 12 years | 27 | 13 |
| High school diploma | 21 | 27 |
| GED | 3 | 4 |
| **Race/Ethnicity** | | |
| White | 51 | 76 |
| Black | 20 | 11 |
| Hispanic | 23 | 10 |
| Asian/Pacific Islander | 4 | 2 |
| **Age** | | |
| 16 to 24 years | 13 | 18 |
| 65 years and older | 33 | 16 |
| **Disability or Condition** | | |
| Any physical, mental, or health condition | 26 | 12 |
| Visual difficulty | 19 | 7 |
| Hearing difficulty | 13 | 7 |
| Learning disability | 9 | 3 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

kept them from participating fully in work and other activities, and 19 percent reported having vision problems that made it difficult for them to read print. In sum, the individuals in Level 1 had a diverse set of characteristics that influenced their performance in the assessment.

Across the three literacy scales, between 25 and 28 percent of the individuals surveyed — representing as many as 54 million adults nationwide — performed in Level 2. On the prose scale, those whose proficiencies lie within the range for this level demonstrated the ability to make low-level inferences based on what they read and to compare or contrast information that can easily be found in text. Individuals in Level 2 on the document scale were generally able to locate a piece of information in a document in which plausible but

incorrect information was also present. Individuals in Level 2 on the quantitative scale were likely to give correct responses to a task involving a single arithmetic operation using numbers that can easily be located in printed material.

Nearly one-third of the respondents, representing some 61 million adults across the country, performed in Level 3 on each of the literacy scales. Those in this level on the prose scale demonstrated the ability to match pieces of information by making low-level inferences and to integrate information from relatively long or dense text. Those in the third level on the document scale were generally able to integrate multiple pieces of information found in documents. Adults in Level 3 on the quantitative scale demonstrated the ability to perform arithmetic operations by using two or more numbers found in printed material and by interpreting arithmetic terms included in the question.

Seventeen percent of the adults performed in Level 4 on the prose and quantitative scales, while 15 percent were in this level on the document scale. These respondents, who completed many of the more difficult assessment tasks successfully, represent from 29 to almost 33 million individuals nationwide. Looking across the scales, adults in Level 4 displayed an ability to synthesize information from lengthy or complex passages, to make inferences based on text and documents, and to perform sequential arithmetic operations using numbers found in different types of displays. To give correct responses to these types of tasks, readers were often required to make high level text-based inferences or to draw on their background knowledge.

Only 3 percent of the respondents performed in Level 5 on the prose and document scales, and 4 percent performed in this level on the quantitative scale. Some tasks at this level required readers to contrast complex information found in written materials, while others required them to make high level inferences or to search for information in dense text. On the document scale, adults performing in Level 5 showed the ability to use specialized knowledge and to search through complex displays for particular pieces of information. Respondents in the highest level on the quantitative scale demonstrated the ability to determine the features of arithmetic problems either by examining text or by using background knowledge, and then to perform the multiple arithmetic operations required. Between 6 and 8 million adults nationwide demonstrated success on these types of tasks — the most difficult of those included in the survey.

One of the questions that arises from these data is whether people with restricted skills perceived themselves as having inadequate or limited English literacy proficiency. To address this question, we identified the percentages of individuals in each level on the scales who responded "not well" or "not at all" to the questions, "How well do you read English?" and "How well do you write English?" (TABLE 1.2)

**Percentages of Adults Who Reported Not Being Able to Read or Write English Well, by Literacy Level**

| | Total Population | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|---|
| **Reading** | | | | | | |
| Prose | 7 | 29 | 3 | 1 | 0* | 0* |
| Document | 7 | 25 | 3 | 1 | 0* | 0* |
| Quantitative | 7 | 26 | 3 | 1 | 0* | 0* |
| **Writing** | | | | | | |
| Prose | 10 | 34 | 6 | 2 | 1 | 0* |
| Document | 10 | 30 | 6 | 3 | 1 | 0* |
| Quantitative | 10 | 30 | 7 | 3 | 1 | 0* |

*Percentages below .5 are rounded to 0.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

When these self-reported evaluations of English literacy are compared with the data on actual performance, an interesting contrast appears. Of the 40 to 44 million adults who performed in Level 1 on the prose scale (as shown in Figure 1.1), only 29 percent said they did not read English well and 34 percent said they did not write English well. Similarly, on the document scale, 25 percent of the adults who performed in Level 1 reported having limited reading skills and 30 percent reported having limited writing skills. On the quantitative scale, 26 percent of the respondents in Level 1 reported not being able to read well and 30 percent said they did not write well.

The gap between performance and perception continues in Level 2. On each scale, only 3 to 7 percent of the individuals in this level said they did not read or write English well. These data indicate that the overwhelming majority of adults who demonstrated low levels of literacy did not perceive that they had a problem with respect to reading or writing in English. Such a mismatch may well have a significant impact on efforts to provide education and training to adults: Those who do not believe they have a problem will be less likely to seek out such services or less willing to take advantage of services that might be available to them.

Another way to determine how adults view their ability to read and write in English is to ask how often they receive help from others in performing everyday prose, document, and quantitative literacy tasks. Such questions were included in the survey, and the responses indicate that individuals who performed in the Level 1 range on each scale were far more likely than those in the higher levels to say that they get a lot of assistance with everyday literacy tasks (TABLE 1.3). Specifically, individuals in the lowest level of prose literacy were more likely than those in the higher levels to get a lot of help in reading printed information; adults in the lowest level of document literacy were more likely to get a lot of assistance in filling out forms; and adults in the lowest level of quantitative literacy were more likely to get a lot of help in using basic arithmetic.

Overall, 9 percent of the adults surveyed said they get a lot of help from family members or friends with printed information associated with government agencies, public companies, private businesses, hospitals, and so on. Yet, a much higher percentage of respondents in Level 1 on the prose scale — 23 percent — reported getting a lot of help with these types of materials. Relatively small proportions of the adults in the other literacy levels said they receive assistance with everyday prose tasks.

**NALS** **Table 1.3**

**Percentages of Adults Who Reported Getting A Lot of Help from Family Members or Friends With Various Types of Everyday Literacy Tasks, by Literacy Level**

| | Total Population | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|---|
| **Prose tasks: printed information** | 9 | 23 | 8 | 5 | 2 | 1 |
| **Document tasks: filling out forms** | 12 | 25 | 12 | 7 | 4 | 2 |
| **Quantitative tasks: using basic arithmetic** | 5 | 14 | 4 | 2 | 1 | 0* |

*Percentages below .5 are rounded to 0.

Note: The first row presents responses for adults in each level of *prose* literacy; the second row presents responses for adults in each level of *document* literacy; and the third row presents responses for adults in each level of *quantitative* literacy.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Twelve percent of the total population reported getting a lot of help from family members or friends with filling out forms. Again, however, those in the lowest level of document literacy were far more likely than those in the higher levels to report getting a lot of help with these types of everyday document tasks. One-quarter of those in Level 1, 12 percent of those in Level 2, and smaller percentages of those in the higher levels said they get a lot of help with forms.

Just 5 percent of the total adult population reported getting a lot of assistance in using basic arithmetic when filling out order forms or balancing a checkbook. Yet, a much higher percentage of adults in Level 1 on the quantitative scale — 14 percent — said they receive a lot of help from family and friends on these types of quantitative tasks. Smaller proportions of adults in Levels 2 through 5 on this scale reported getting a lot of help from others in using basic arithmetic.

Two patterns are apparent in the responses to these questions. First, individuals in Level 1 on each scale were considerably more likely than those in the higher proficiency levels to say they get a lot of help from family or friends with prose, document, and quantitative literacy tasks encountered in everyday life. Second, the proportions of adults in Level 1 on each scale who said they get a lot of help with these types of tasks are lower than might be expected. Across the scales, just 14 to 25 percent of the respondents in the lowest literacy level reported getting a lot of help reading printed information, filling out forms, and using basic arithmetic.

Taken together, the data in Tables 1.1 and 1.2 indicate that most adults who performed in the lowest level on each literacy scale believed they read and write English well, and most reportedly did not get a lot of assistance from friends or family with everyday literacy tasks. Of the 40 to 44 million adults who demonstrated the most limited skills, only about 14 million or fewer said they do not read or write English well, and as few as 6 million said they get a lot of assistance with everyday prose, document, and quantitative literacy tasks.

## Trends in the Literacy Skills of Young Adults

In examining the literacy proficiencies of the adult population, one of the questions that naturally arises is whether skills are improving or slipping over time. Using the NALS data, this question can be addressed by comparing the performance of 21- to 25-year-olds assessed in 1985 first with young adults in the same age group who were assessed in 1992, and second with 28- to 32-year-olds assessed in 1992, who were 21 to 25 years old in 1985. These comparisons are possible because the same definition of literacy was used in this survey and

the young adult survey and because a common set of prose, document, and quantitative literacy tasks was administered in both assessments.

Since the earlier study assessed the skills of individuals aged 21 to 25 who were living in households, the NALS data were reanalyzed to determine the proficiencies of adults in the 21 to 25 age group and those in the 28 to 32 age group who were living in households at the time of the 1992 survey. Adults in prison were excluded from the analyses to make the samples more comparable.[3]

These comparisons reveal that the average prose, document, and quantitative proficiencies of America's young adults were somewhat lower in 1992 than they were seven years earlier (FIGURE 1.2). While 21- to 25-year-olds assessed in 1985 demonstrated average proficiencies of about 293 on each of the literacy scales, the scores of 21- to 25-year-olds assessed in 1992 were 11 to 14 points lower: 281 on the prose and document scales and 279 on the quantitative scale. The average proficiencies of adults aged 28 to 32 who participated in the 1992 survey were also lower than those of 21- to 25-year-olds in the earlier survey, by 10 to 11 points across the three scales.

Many factors may be involved, but the discrepancies in literacy performance between the 1985 and 1992 respondents can be explained at least in part by changes in the composition of the young adult population. While the proportions of young Black adults changed little from one survey to the next (13 percent to 11 percent), and the percentages of White adults decreased (from 76 to 70 percent), the percentages of young Hispanic adults doubled, rising from 7 percent of the 1985 survey participants to 15 percent of the 21- to 25-year-old NALS participants. Many of these Hispanic individuals were born in other countries and are learning English as a second language.

When one examines the trends in literacy proficiencies within various racial or ethnic groups, different patterns are visible.[4] Among White adults, those aged 21 to 25 who were assessed in 1992 demonstrated lower average proficiencies than adults in this same age group who participated in the 1985 survey. Performance declined from 305 to 296 on both the prose and document scales, and from 304 to 295 on the quantitative scale. In contrast, the average prose, document, and quantitative proficiencies of 28- to 32-year-olds assessed in 1992 were not significantly different from those of adults aged 21 to 25 who were assessed in 1985.

---

[3] To further enhance the comparability of the 1985 and 1992 survey results, the 1985 data were reanalyzed using the same statistical procedures that were used in NALS. For example, respondents who completed only part of the survey were eliminated from the 1985 analyses but were included in the analyses for the current study. As a result of such adjustments, the 1985 survey results reported here are slightly different from those in previous reports. These issues and procedures are to be discussed in the technical report.

[4] Trends in the performance of White, Black, and Hispanic adults are discussed here; the numbers of Asian/Pacific Islanders who participated in the 1985 survey were too small to permit reliable comparisons across the two surveys.

NALS

Figure 1.2

**Average Literacy Proficiencies of Young Adults, 1985 and 1992**

**PROSE**

**DOCUMENT**

**QUANTITATIVE**

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

The pattern for Black individuals is somewhat different. The average prose, document, and quantitative proficiencies of 21- to 25-year-old Black adults assessed in 1992 were comparable to those of young Black adults assessed in 1985. Black NALS participants in the 28 to 32 age group demonstrated similar prose and document proficiencies but lower quantitative scores (240 compared with 252) than participants in the young adult survey.

When the literacy skills of young Hispanic adults assessed in 1985 are compared with the skills of those assessed in 1992, still a different pattern is seen. Hispanic adults aged 21 to 25 who participated in the earlier assessment demonstrated an average prose score of 251, an average document score of 243, and an average quantitative score of 253. Their same-age peers who participated in the 1992 assessment demonstrated quantitative proficiencies that were 24 points lower. While their average prose and document scores were also lower, the 10- to 20-point differences did not reach statistical significance. Hispanic adults aged 28 to 32 who participated in the 1992 survey demonstrated lower average prose and quantitative proficiencies than young Hispanic adults who participated in the 1985 survey. The proficiency gap on the prose scale was 28 points, while on the quantitative scale, it was 30 points. Although large, the 18-point difference on the document scale did not reach statistical significance. Again, these performance differences between the 1985 and 1992 surveys can be explained, at least in part, by demographic changes in the young adult population over the seven-year period.

## Results by Level of Education

A primary means of transmitting literacy to succeeding generations is the school system. Not surprisingly, then, among all the variables explored in the survey, the level of education attained in the United States has the strongest relationship with demonstrated literacy proficiency (FIGURE 1.3). Adults with higher levels of education demonstrated much higher average proficiencies than those with fewer years of schooling. As previously observed, however, the relationship between schooling and literacy is complex. Schooling surely increases an individual's skills, but it is also true that individuals with higher proficiencies are more likely to extend their schooling.

What is most interesting is the steady rise in average literacy proficiencies across the entire range of education levels. (Throughout this section, "level of education" refers to the highest level of education that respondents reported having completed at the time of the survey.) The average prose proficiency of adults who did not go beyond eighth grade was 177, compared with 270 for those who completed high school but went no further, 322 for those whose

NALS

Figure 1.3

**Literacy Levels and Average Literacy Proficiencies, by Highest Level of Education Completed**

**PROSE**

**DOCUMENT**

**QUANTITATIVE**

*Percentages below .5 are rounded to 0.

**Level 1** (0 to 225) **Level 2** (226 to 275) **Level 3** (276 to 325) **Level 4** (326 to 375) **Level 5** (376 to 500)

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

highest level of education was a four-year college degree, and 336 for those who had completed some graduate studies beyond the four-year degree. Similar patterns are evident on the document and quantitative scales, where those with higher levels of education also displayed more advanced literacy skills.

Stated another way, the difference in average prose proficiencies between those who completed no more than 8 years of education and those who had completed at least some graduate work is nearly 160 points. This translates to a gap of roughly three proficiency levels, representing, on average, a very large difference in literacy skills and strategies. This may mean the difference, for example, between being able to identify a piece of information in a short news article and being able to compare and contrast information in lengthy text. While adults with less than a high school education performed primarily in Level 1, those who finished secondary school performed, on average, in the high end of Level 2, those who received a college degree demonstrated average proficiencies associated with the high end of Level 3, and those who had completed some work beyond the four-year degree performed within the range of Level 4.

On the whole, the performance of high school graduates was not as strong as might be desired. On each scale, between 16 and 20 percent of adults with high school diplomas performed in Level 1, and between 33 and 38 percent performed in Level 2. Conversely, only 10 to 13 percent of high school graduates reached the two highest levels. As expected, the performance of adults with General Educational Development (GED) certificates was nearly identical to that of adults with high school diplomas. The average proficiencies and the distributions across the literacy levels were highly similar for these two groups.

Large percentages of four-year college graduates reached the higher levels on each of the literacy scales. Fifty percent were in Levels 4 or 5 on the prose and quantitative scales, while 44 percent reached those levels on the document scale. Still, the percentages who performed in the two lowest levels are quite large: 15 percent on the prose scale, 19 percent on the document scale, and 16 percent on the quantitative scale.

The relationship between education and literacy will be further explored in an upcoming special report.

## Results by Parents' Level of Education

The differences in literacy proficiencies among various groups are the result of many factors, some of which can be controlled by individuals and some of which cannot. Previous work investigating the intergenerational nature of literacy has revealed the major role that parents' economic status and educational attainment play in their children's success in school. Accordingly, adults participating in the NALS were asked to indicate the highest level of education that each of their parents had completed, and the highest level of education attained by either parent was used in these analyses.

Given that parents' education is a proxy for socioeconomic status, interests, and aspirations, one would expect to find that adults whose parents completed more years of education demonstrate more advanced literacy skills than those whose parents have limited education. This pattern is, in fact, evident in the NALS results. Individuals who reported that their parents earned college degrees demonstrated higher prose, document, and quantitative proficiency scores, on average, than those whose parents had not continued this far in their education. On the prose scale, for example, adults whose parents completed a college degree had an average score of 305, while those whose parents had not finished high school had an average proficiency of 264.

The important role of parents' education in the literacy skills of their offspring is underscored when the data on respondents' educational attainment are viewed as a function of their parents' educational attainment. For example, adults with high school diplomas had an average prose score of 255 if their parents completed 0 to 8 years of education; 267 if their parents attended high school but did not receive a diploma; 275 if their parents graduated from high school; and 286 if their parents earned a four-year degree (FIGURE 1.4). These trends are similar for each scale and each level of educational attainment, although not all comparisons are statistically significant.

While parents' education is clearly related to adults' proficiencies, the relationship between literacy proficiency and respondents' own level of education is even stronger. Within each category of parental education, adults who had completed more years of education demonstrated higher average proficiencies than those who had completed fewer years. For example, among individuals whose parents had completed no more than eight years of education, those who had attended high school but did not earn a diploma outperformed those with 0 to 8 years of education; the average prose proficiencies of these two groups were 218 and 174, respectively. Adults who completed high school attained an average prose score of 255, while those who earned a four-year college degree had an average score of 296.

**Figure 1.4**

**Average Literacy Proficiencies, by Level of Education Attained by Adults and Their Parents**

**PROSE**

**DOCUMENT**

**QUANTITATIVE**

Notes: This figure presents results for only part of the population: those adults who represent a range of educational attainments. The numbers of adults with 0 to 8 years of education whose parents had a four year degree are too small to provide reliable proficiency estimates.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Results by Age

The variations in performance across the age groups are highly similar for the prose and quantitative scales. On both of these scales, average scores increased from the teenage years up to the middle forties, with the largest increase occurring between 16- to 18-year-olds and 19- to 24-year-olds (FIGURE 1.5). Average proficiencies then declined sharply, falling approximately 25 points between the 40 to 54 age group and the 55 to 64 age group, and another 30 points or so between that group and the oldest adults.

On the document scale, the performance of the first four age groups (16 to 18, 19 to 24, 25 to 39, and 40 to 54) seems to be more similar than is the case on the prose and quantitative scales. Again, however, there are sharp declines in performance between adults aged 40 to 54 and those aged 55 to 64, and then for individuals 65 years and older. These decreases are 29 and 32 points, respectively, while the largest difference among the younger four age groups is 6 points.

To understand these declines in performance, it is helpful to compare the educational attainments of adults in the various age groups. These data clearly show that older adults (that is, individuals between the ages of 55 and 64 and those 65 and older) completed fewer years of schooling, on average, than did adults in the younger age groups (TABLE 1.4). The one exception is for 16- to 18-year-olds, many of whom are still in school.

The differences across the age groups in years of schooling parallel the differences in literacy proficiencies. Just as average performance declines among adults in the two oldest age groups, so too do the average years of schooling. Thus, it appears that some of the decrease in literacy skills across the age cohorts can be attributed to fewer years of schooling. Different immigration patterns may also help to explain the decline, as may other factors not examined in this survey. These patterns and relationships will be explored more fully in forthcoming reports on literacy among older adults and on literacy and education.

NALS

**Figure 1.5**

## Average Literacy Proficiencies, by Age

PROSE
300
280
260
240
220
200
Average Proficiency
271
280
284
286
260
230
16 to 18
19 to 24
25 to 39
40 to 54
55 to 64
65+
Age Group in Years

DOCUMENT
300
280
260
240
220
200
Average Proficiency
274
280
282
278
249
217
16 to 18
19 to 24
25 to 39
40 to 54
55 to 64
65+
Age Group in Years

QUANTITATIVE
300
280
260
240
220
200
Average Proficiency
268
277
283
286
261
227
16 to 18
19 to 24
25 to 39
40 to 54
55 to 64
65+
Age Group in Years

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Section I . . . . . . 31
Compendium_Responsive Brief
Page 603

**Table 1.4**

**Average Years of Schooling, by Age**

| Age | Average Years of Schooling* |
| --- | --- |
| **16 to 18 years**** | 10.8 |
| **19 to 24 years**** | 12.5 |
| **25 to 39 years** | 12.9 |
| **40 to 54 years** | 13.1 |
| **55 to 64 years** | 11.8 |
| **65 years and older** | 10.7 |

*in this country.
**Many adults in these age groups are still in school.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Results by Race/Ethnicity

Because such a large number of adults participated in this survey, it is possible to report performance results for many more racial/ethnic groups than has been possible in the past.

The average prose literacy of White adults is 26 to 80 points higher than that of any of the other nine racial/ethnic groups reported here (FIGURE 1.6). Similar patterns are evident on the document and quantitative scales. On the document scale, the average scores of White adults are between 26 and 75 points higher than those of other groups, while on quantitative scale they are from 31 to 84 points higher.

With the exception of Hispanic/Other adults, the average proficiencies of the Hispanic subpopulations are not significantly different from one another. On average, Mexican and Central/South American adults were outperformed by Black adults. In contrast, Hispanic/Other adults outperformed Black adults on the prose and document scales by more than 20 points. (On the quantitative scale, the difference is not significant.) Their performance was, on average, similar to that of Asian/Pacific Islander adults and American Indian/Alaskan Native adults.

**NALS**

**Figure 1.6**

**Literacy Levels and Average Literacy Proficiencies, by Race/Ethnicity**

**PROSE**

**DOCUMENT**

**QUANTITATIVE**

*Percentages below .5 are rounded to 0.

**Level 1** (0 to 225) **Level 2** (226 to 275) **Level 3** (276 to 325) **Level 4** (326 to 375) **Level 5** (376 to 500)

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

When one compares the average proficiency results for White and Black adults and for White and Asian/Pacific Islander adults, one sees very different patterns across the three literacy scales. While the proficiency gap between White and Black adults *increases* across the prose, document, and quantitative scales (from 49 to 63 points), the gap between White and Asian/Pacific Islander adults *decreases* (from 44 to 31 points). On the prose scale, the average proficiencies of White and Black adults differ by 49 points, compared with a difference of 44 points between White and Asian/Pacific Islander adults. On the document scale, the proficiency gap between White and Black adults is 50 points, whereas between White and Asian/Pacific Islander adults it is 35 points. On the quantitative scale, the average proficiency of White adults is 63 points higher than that of Black adults, but only 31 points higher than that of Asian/Pacific Islander adults.

The differences in average performance between Black and Asian/Pacific Islander respondents are even more striking. The two groups performed similarly on the prose and document scales, but Asian/Pacific Islander adults outperformed Black adults by 32 points on the quantitative scale. Such differences in the patterns of performance reflect the different backgrounds and experiences of these adults. If performance were reported on a single literacy scale, such important variations across the scales would be masked.

The racial/ethnic differences in performance reflect the influence of many variables. Data on some of these variables were collected as part of the National Adult Literacy Survey, including information on educational attainment, age, and country of birth.

## Educational Attainment and Racial/Ethnic Differences

Given the strength of the relationship between adults' level of education and their literacy performance, it was hypothesized that proficiency differences among the various racial/ethnic groups might be related to varying educational attainments. The average years of schooling in this country reported by respondents in different racial/ethnic groups are presented in Table 1.5. Because the numbers of adults in each of the Hispanic subpopulations are relatively small, analyses of the nine levels of educational attainment within each group result in unreliable estimates. Therefore, the five Hispanic subpopulations are combined for these analyses.

Hispanic adults reported having had the fewest years of schooling of all the groups — just over 10 years, on average. The average years of education attained by Black adults and respondents of American Indian/Alaskan Native origin are similar: 11.6 and 11.7 years, respectively. Thus, these groups had

**Average Years of Schooling, by Race/Ethnicity**

| Race/Ethnicity | Average Years of Schooling* |
|---|---|
| **White** | 12.8 |
| **Black** | 11.6 |
| **Asian or Pacific Islander** | 13.0 |
| **American Indian or Alaskan Native** | 11.7 |
| **Hispanic groups** | 10.2 |

*in this country.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

completed more years of school than Hispanic adults, on average, but at least a year less than either White or Asian/Pacific Islander adults.

While these differences in years of education may help explain some of the gaps in performance among the various racial/ethnic groups, they do not explain all of the disparities that are found. Another way to examine the relationship between years of schooling and racial/ethnic differences is to compare proficiencies across levels of educational attainment (FIGURE 1.7).

For the most part, differences in average proficiencies among minority subgroups are reduced when comparisons are made only among individuals with the same levels of education. Even when one controls for level of education, however, large differences in average performance continue to be observed (TABLE 1.6).

The average differences in prose, document, and quantitative proficiencies between White and Black adults are 49, 50, and 63 points, respectively. When level of education is taken into account, the average proficiency differences across the nine levels of education decrease to 36, 37, and 48 points, respectively. The remaining disparities in performance between White and Black adults may be the result of numerous factors. One plausible explanation is the variation in the quality of education available to these two populations. Differences in socioeconomic status are also likely to be a factor.

When comparing the differences between White and Hispanic adults, the effects of controlling for education are even greater than for White and Black adults. This reflects the larger difference between these two groups in years of

Case 3:19-cv-01537-BEN-JLB Document 158-2 Filed 10/28/22 PageID.20375 Page 474 of 625

**Figure 1.7**

## Average Literacy Proficiencies, by Highest Level of Education Completed and Race/Ethnicity

Note: The numbers of Asian/Pacific Islander adults who had completed 0 to 8 years or 9 to 12 years of education, a GED, or a two year degree are too small to provide reliable proficiency estimates.

W: White B: Black H: Hispanic groups A/P: Asian/Pacific Islander

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



**Table 1.6**

**Differences in Average Literacy Proficiencies Between Various Racial/Ethnic Groups, Overall and by Level of Education**

| Differences Between: | Overall Difference | Average Difference by Level of Education* |
|---|---|---|
| **White and Black Adults** | | |
| Prose | 49 | 36 |
| Document | 50 | 37 |
| Quantitative | 63 | 48 |
| **White and Hispanic Adults** | | |
| Prose | 71 | 40 |
| Document | 67 | 35 |
| Quantitative | 75 | 41 |
| **White and Asian/Pacific Islander Adults** | | |
| Prose | 44 | 54 |
| Document | 35 | 45 |
| Quantitative | 31 | 40 |

*The "average difference" column reflects the weighted average of the proficiency differences between each pair of groups across the levels of education. For the White-Black and White-Hispanic comparisons, the average is based on all nine levels of education. For the White-Asian/Pacific Islander comparisons, the average is based on the four levels of education for which there are reliable estimates.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

schooling, as reported in Table 1.5. The average difference across the three scales is reduced by almost 50 percent when level of education is taken into consideration. Overall, the average differences in prose, document, and quantitative proficiencies between White and Hispanic adults are 71, 67, and 75 points, respectively. When one takes levels of education into account, however, these differences decline to 40, 35, and 41 points across the three literacy scales.

In contrast, given the similarity in the number of years of schooling completed by White and Asian/Pacific Islander adults, the differences in average performance do not change significantly when level of education is taken into account. That is, whereas the average differences in prose, document, and quantitative performance between White adults and respondents of Asian/ Pacific Islander origin are 44, 35, and 31 points, respectively, the average differences are 54, 45, and 40 points on the three scales when one compares performance while controlling for level of education.

## Age and Racial/Ethnic Differences

While there continue to be disparities in educational attainment among individuals with different racial/ethnic characteristics, levels of education have risen for all individuals throughout the last century. Therefore, it seems important to explore racial/ethnic group differences in various age cohorts. One might expect that the differences in average years of education among the racial/ethnic groups would be smaller for younger adults, and that the differences in average proficiencies would therefore be higher for older adults.

Figure 1.8 shows the differences in average literacy proficiencies and in average years of schooling between White adults and those in the other minority groups by age. The differences in average years of schooling between White and Black adults and between White and Hispanic adults increase across the age groups, and so it is not surprising to see that these are mirrored by rising disparities in literacy performance. For example, across the scales, the average proficiency difference between Black and White adults in the 16 to 18 age group is 36 to 47 points. The accompanying difference in years of schooling is .2 years. In contrast, in the 40 to 54 age group, the average performance gap between White and Black adults is much larger, ranging from 65 to 75 points. The corresponding difference in average years of education is 1.6 years.

Across the age groups, there are even larger differences in average literacy proficiencies and years of schooling between White adults and respondents of Hispanic origin. Among 16- to 18-year-olds, the difference in average years of schooling between these two groups is 1.1 years, and the proficiency differences range from 47 to 53 points across the scales. Among 40- to 54-year-olds, on the other hand, the difference in average years of schooling is 3.2 years, and the proficiency gap is between 84 and 89 points on each scale.

For White adults and those of Asian/Pacific Islander origin, a different pattern is evident. The numbers of Asian/Pacific Islander adults in the 16 to 18, 55 to 64, and 65 and older age groups are too small to provide reliable proficiency estimates. In the age categories for which data are available, however, White adults outperformed Asian/Pacific Islander adults, but there are no significant differences between the two groups in average years of schooling. It is noteworthy that the performance gap between White and Asian/Pacific Islander adults is relatively small in the 19 to 24 age group.

In making the comparisons between White adults and those of either Hispanic or Asian/Pacific Islander origin, it is important to remember that first language spoken and country of birth may contribute substantially to the proficiency differences that are observed.

**Differences Between Adults in Various Racial/Ethnic Groups in Average Literacy Proficiencies and Average Years of Schooling, by Age**

### Differences Between White and Black Adults

### Differences Between White and Hispanic Adults

### Differences Between White and Asian/Pacific Islander Adults*

*The number of adults of Asian/Pacific Islander origin who were in the 16 to 18, 55 to 64, and 65 and older age groups were too small to provide reliable proficiency estimates.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Country of Birth and Racial/Ethnic Differences

Many adults immigrate to the United States from places where English is not the national language. Not surprisingly, individuals born in this country tend to be more proficient in English than those born outside of this country, who are likely to have learned English as a second language. To better understand the differences in performance among various racial/ethnic groups, then, it is helpful to examine the proportion of each group that was born inside and outside the United States.

Nearly all White (96 percent) and Black (95 percent) adults and most respondents of Puerto Rican origin (80 percent) said they were born in the United States or one of its territories (TABLE 1.7). On the other hand, relatively small proportions of Asian/Pacific Islander (22 percent), Central/South American (21 percent), and Cuban (11 percent) adults were born in this country. About half of the Mexican adults and approximately 68 percent of the Hispanic/Other adults reported being born in the United States.

With one exception, individuals born in the United States tended to outperform their peers who were born abroad (FIGURE 1.9). The exception

**NALS** **Table 1.7**

**Percentages of Adults Born in the United States and in Other Countries, by Race/Ethnicity**

| Race/Ethnicity | Born in the U.S. or a Territory | Born in Other Countries |
|---|---|---|
| **White** | 96 | 4 |
| **Black** | 95 | 6 |
| **Asian or Pacific Islander** | 22 | 78 |
| **American Indian or Alaskan Native** | 100 | 0* |
| **Other** | 24 | 76 |
| **Hispanic/Mexican** | 54 | 46 |
| **Hispanic/Puerto Rican** | 80 | 20 |
| **Hispanic/Cuban** | 11 | 89 |
| **Hispanic/Central or South American** | 21 | 79 |
| **Hispanic/Other** | 68 | 32 |

*Percentages below .5 are rounded to 0.
Note: Adults born in a U.S. territory were counted as being born in the U.S.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

**Figure 1.9**

## Average Literacy Proficiencies, by Country of Birth and Race/Ethnicity

### PROSE

### DOCUMENT

### QUANTITATIVE

Note: The numbers of "Other" and Hispanic/Cuban adults who were born in the United States, and of American Indian/Alaskan Native adults who were born in other countries, are too small to provide reliable proficiency estimates.

US: United States or territory OC: Other Country

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

appears among Black adults, where the differences in average performance range only from 3 to 7 points across the scales and are not significant. Across the three literacy scales, the average proficiencies of native-born Mexican, Puerto Rican, Central/South American, and Hispanic/Other adults are 40 to 94 points higher than those of their foreign-born peers. For White and Asian/ Pacific Islander adults, the differences range from 26 to 41 points across the scales.

Indeed, when the differences in literacy proficiencies among various racial/ethnic groups are viewed through the lens of country of birth, the pattern of results that appears in Figure 1.6 changes substantially. When one takes country of birth into consideration, there are no significant differences between the prose and document proficiencies of native-born Central/South American or Hispanic/Other adults and the proficiencies of native-born White adults. Further, on all three scales, native-born Black and Puerto Rican individuals demonstrated about the same average proficiencies. The average scores of native-born Asian/Pacific Islander adults were similar to those of White adults, and to those of respondents who reported Central/South American and Hispanic/Other origins. Though some of the differences among these groups appear to be large, they did not reach statistical significance.

## Results by Type of Illness, Disability, or Impairment

The National Adult Literacy Survey included a series of questions about illnesses and disabilities, making it possible to examine the literacy skills of adults with various types of conditions. One question asked respondents whether they had a physical, mental, or other health condition that kept them from participating fully in work, school, housework, or other activities. Two other questions asked whether they had visual or hearing difficulties. Finally, respondents were asked whether they had a learning disability, any mental or emotional condition, mental retardation, a speech disability, a physical disability, a long-term illness (for six months or more), or any other health impairment. Respondents were permitted to report each type of disability or condition they had.

Overall, 12 percent of the total population said they had a physical, mental, or other health condition that kept them from participating fully in work, housework, school, or other activities (TABLE 1.8). Between 6 and 9 percent reported vision or hearing difficulties, physical disabilities, long-term illnesses, or other health impairments, and about 3 percent reported having a learning disability. Very few individuals — 2 percent or less of the population — reported having some form of mental retardation, a mental or emotional condition, or a speech disability.

**Percentages of Adults Who Reported Having a Physical, Mental, or Other Health Condition**

| Type of Condition | Total Population |
|---|---|
| Physical, mental, or other health condition | 12 |
| Visual difficulty | 7 |
| Hearing difficulty | 7 |
| Learning disability | 3 |
| Mental or emotional condition | 2 |
| Mental retardation | 0* |
| Speech disability | 1 |
| Physical disability | 9 |
| Long-term illness | 8 |
| Other health impairment | 6 |

*Percentages below .5 are rounded to 0.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

When the literacy levels and proficiencies of respondents who said they had an illness, disability, or impairment are compared with the literacy levels and proficiencies of adults in the total population, sharp contrasts are evident. Without exception, adults with any type of disability, difficulty, or illness were more likely than those in the total population to perform in the lowest literacy levels. Some conditions appear to have a stronger relationship with literacy than others, however (FIGURE 1.10).

Adults with mental retardation, for example, were about four times more likely than their peers in the total population to perform in Level 1 on the prose, document, and quantitative scales. On the prose scale, 87 percent of the respondents with mental retardation were in this level, compared with 21 percent of adults in the population as a whole.

NALS

Figure 1.10

## Literacy Levels and Average Literacy Proficiencies, by Type of Physical, Mental, or Other Health Condition, Compared with the Total Population

### PROSE

### DOCUMENT

### QUANTITATIVE

*Percentages below .5 are rounded to 0.

**Level 1** (0 to 225) **Level 2** (226 to 275) **Level 3** (276 to 325) **Level 4** (326 to 375) **Level 5** (376 to 500)

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

The performance gaps were smaller for the other disability groups, but they were still substantial. On each scale, more than half of the individuals with vision difficulties performed in Level 1 (54 to 56 percent), for example, and another 24 to 26 percent performed in Level 2. A similar pattern appears for those who reported having speech or learning disabilities; between 53 and 60 percent of the respondents with either of these disabilities had scores in the range for Level 1 on each scale, and 21 to 28 percent performed in Level 2.

These differences in the distributions of performance across the literacy levels are echoed in the average proficiency scores. Adults who reported having mental retardation demonstrated the weakest skills of all the groups examined. On the quantitative scale, for example, their average score was 115, which lies in the low end of Level 1. Respondents with learning disabilities had an average score of 197 on this scale, while the scores of those with a speech (208) or visual difficulty (210) or a mental or emotional condition (214) were slightly higher. The average quantitative proficiency of respondents who reported having a physical, mental, or health condition that impaired their ability to participate fully in activities was 220.

Groups whose average proficiency scores were in the low end of the Level 2 range on the quantitative scale included adults who said they had a long-term illness (227). Individuals with hearing difficulties had higher average quantitative proficiencies (242), as well as higher prose and document proficiencies (243 and 236, respectively), than adults who reported other disabilities or conditions.

Finally, it is interesting to note the average performance differences between individuals who reported having certain disabilities and adults in the population as a whole. The smallest gap was between those who said they had difficulty hearing and adults in the population overall; the difference was 29 to 31 points on each literacy scale. Across the other groups, the performance gap between those who reported having a particular disability or illness and those in the total population ranged from 35 to 74 points. The only exception was among adults who reported having some form of mental retardation; here the gap ranged from 122 to 156 points across the scales.

## Results by Region

Regional differences in average literacy proficiency are found on all three scales (FIGURE 1.11). Adults living in the Northeast and those living in the South performed similarly, on average. Further, the average proficiencies of adults in the Midwest and those in the West are comparable. However, adults in the Northeast and South demonstrated lower proficiencies, on average, than adults living in the Midwest and West regions of the country.

These differences may be attributable partly to regional variations in demographic characteristics such as country of birth or average years of schooling. These variables by themselves, however, do not provide a simple explanation for the proficiency differences across the regions (TABLE 1.9).

Comparing the data in Figure 1.11 and Table 1.9, it is apparent that adults residing in the West outperformed adults in the South and the Northeast regions, yet the West also had the highest percentage of individuals born outside the United States. Further, while adults living in the Midwest and the West outperformed those in the Northeast, the average number of years of schooling completed by adults in these regions was about the same. In contrast, adults in the West demonstrated higher average proficiencies than their peers in the South, and also reported significantly higher average years of schooling. It therefore appears that no single variable accounts for the regional variations in literacy proficiencies.

## Results by Sex

The performance results for men and women differ across the three literacy scales (FIGURE 1.11). On the prose scale, the average proficiencies of women (273) and men (272) are about the same; the difference of 1 point is not significant. In contrast, men's average document (269) and quantitative proficiencies (277) are significantly higher than those of women (265 and 266). The sex differences on these scales are 4 and 11 points, respectively.

The fact that women tend to live longer than men and that literacy proficiencies tend to be lower for older adults, as seen earlier in this section, may contribute to the performance differences between the two sexes. So may other variables such as years of schooling, country of birth, and racial/ethnic background.

**Figure 1.11**

## Literacy Levels and Average Literacy Proficiencies, by Region and Sex

### PROSE

### DOCUMENT

### QUANTITATIVE

**Level 1** (0 to 225) **Level 2** (226 to 275) **Level 3** (276 to 325) **Level 4** (326 to 375) **Level 5** (376 to 500)

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

**Percentages of Adults Born in Other Countries, and Average Years of Schooling, by Region**

| | Northeast | Midwest | South | West |
|---|---|---|---|---|
| **Percentage of adults born in other countries** | 14 | 3 | 7 | 18 |
| **Average years of schooling** | 12.5 | 12.5 | 12.2 | 12.6 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Results for the Prison Population

In addition to assessing individuals residing in households, the National Adult Literacy Survey evaluated a national sample of inmates in federal and state prisons. The survey included only those adults incarcerated in prisons both because more than half the nation's inmates are in these institutions and because prisons hold individuals for longer periods of time than do either jails or community-based facilities. Imprisoned adults make up a relatively small percentage of the total adult population in the United States, but their inclusion in this survey ensures better estimates of the literacy proficiencies of the adult population and allows for separate reporting of the literacy skills of adults in this important population.

The demographic characteristics of adults in prison were not representative of the characteristics of the total population (TABLE 1.10). The prison population tended to be both younger and less educated than adults in the nation as a whole, and most adults in prison were male. For example, males made up 48 percent of the total population but constituted 94 percent of those in prisons. In addition, only 20 percent of imprisoned adults reported having completed some postsecondary education or a college degree, while 42 percent of the adult population as a whole had gone beyond high school or a GED. Fully 80 percent of prisoners were below age 40, compared with 51 percent of the total population.

**Table 1.10**

**Percentages of Adults in Various Demographic Groups, Prison and Total Populations**

| | Prison Population | Total Population |
|---|---|---|
| **Race/Ethnicity** | | |
| White | 35 | 76 |
| Black | 44 | 11 |
| Asian or Pacific Islander | 1 | 2 |
| American Indian or Alaskan Native | 2 | 1 |
| Other | 1 | 0* |
| Hispanic groups | 17 | 10 |
| **Sex** | | |
| Male | 94 | 48 |
| Female | 6 | 52 |
| **Highest Level of Education Completed** | | |
| 0 to 8 years | 14 | 10 |
| 9 to 12 years | 35 | 13 |
| High school diploma | 14 | 27 |
| GED | 17 | 4 |
| Some college | 16 | 21 |
| College degree | 4 | 21 |
| **Age** | | |
| 16 to 18 | 2 | 5 |
| 19 to 24 | 21 | 13 |
| 25 to 39 | 57 | 33 |
| 40 to 54 | 17 | 23 |
| 55 to 64 | 2 | 10 |
| 65 and older | 1 | 16 |

*Percentages below .5 are rounded to 0.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Individuals in prison were also considerably different from the total population in terms of their racial/ethnic characteristics. Adults in prisons were considerably less likely to be White (35 percent) than adults in the total population (76 percent), and less likely to be Asian/Pacific Islander (1 percent, compared with 2 percent). In contrast, adults of Hispanic origin were overrepresented in the prison population. Seventeen percent of those in prison reported being of Hispanic origin, compared with 10 percent in the population as a whole. Similarly, Black and American Indian/Alaskan Native adults were

overrepresented in the prison population. For example, Black adults made up 11 percent of the total population but accounted for about 44 percent of adults held in state and federal prisons.

Given the relationship between level of education and literacy and between race/ethnicity and literacy, it is not surprising that the prison population performed significantly worse (by 26 to 35 points) than the total population on each of the literacy scales (FIGURE 1.12).

In terms of the five literacy levels, the proportion of prisoners in Level 1 on each scale (31 to 40 percent) is larger than that of adults in the total population (21 to 23 percent). Conversely, the percentage of prisoners who demonstrated skills in Levels 4 and 5 (4 to 7 percent) is far smaller than the proportion of adults in the total population who performed in those levels (18 to 21 percent).

## Summary

On each of the literacy scales, between 21 and 23 percent of the adults surveyed, representing some 40 to 44 million individuals nationwide, demonstrated proficiencies in the range for Level 1. Though all adults in this level displayed limited skills, their characteristics were quite diverse. Some of these adults succeeded in performing the less challenging assessment tasks, while others had such limited skills that they were able to respond to only a part of the survey. Many of the individuals in this level were born in other countries; had not attended school beyond the eighth grade; were elderly; or had a disability, illness, or impairment.

Across the literacy scales, some 25 and 28 percent of the adults surveyed, representing another 48 to 54 million adults nationwide, demonstrated performance in Level 2. Nearly one-third, representing some 60 million adults, performed in Level 3, and another 15 to 17 percent — or approximately 30 million — were in Level 4. Only 3 to 4 percent of the respondents performed in the highest level of prose, document, or quantitative literacy. In population terms, this represents only 6 to 8 million adults nationwide.

The survey results reveal an interesting contrast between individuals' demonstrated English literacy skills and their perceptions of their level of proficiency. Of the adults who performed in the lowest level on each scale, the vast majority said they were able to read or write English well. Similarly, although individuals in the lowest literacy level were more likely than those in the higher levels to say that they get a lot of help from family members and friends in performing everyday literacy tasks, the proportions who said they get such help were lower than might be expected.

**Figure 1.12**

**Literacy Levels and Average Literacy Proficiencies for the Prison and Total Populations**

**PROSE**

**DOCUMENT**

**QUANTITATIVE**

*Percentages below .5 are rounded to 0.

**Level 1** (0 to 225) **Level 2** (226 to 275) **Level 3** (276 to 325) **Level 4** (326 to 375) **Level 5** (376 to 500)

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

A strong relationship exists between education and literacy. Adults who had completed high school demonstrated significantly higher average prose, document, and quantitative proficiencies than those who had not, and individuals whose highest level of education was a college degree performed far better, on average, than those with high school diplomas or lower levels of education. The survey results also reveal a strong association between adults' literacy proficiencies and their parents' educational attainments, although the impact of one's own education appears to be greater.

An analysis of the performance of adults in different age groups indicates that prose and quantitative literacy skills increase from the teenage years up to the middle forties, then decline sharply across the older age groups. On the document scale, the rise in proficiency scores across the younger age groups is more gradual, but still there are marked declines across the two older age groups. One variable that helps to explain the proficiency decline across the age groups is education; older adults tended to have completed fewer years of schooling than adults in all but the youngest age group.

Differences in performance are also evident across the various racial and ethnic populations studied. The average prose, document, and quantitative proficiencies of White adults, for example, were significantly higher than those of adults in all the other racial/ethnic groups examined. These differences in performance can be explained in part by differences in average years of schooling and by respondents' country of birth.

Respondents who reported having any type of physical, mental, or health condition demonstrated much more limited literacy skills than those in the population as a whole. Some conditions — such as mental retardation, learning disabilities, or vision problems — appear to have a stronger relationship with literacy than other conditions.

Adults residing in the Northeast and South demonstrated lower average skills than adults living in the Midwest and West. Further, while the average prose literacy scores of men and women were nearly identical, men outperformed women in document and quantitative literacy.

Finally, incarcerated individuals were far more likely than adults in the total population to be in the lower levels on the prose, document, and quantitative scales. The relatively weak performance of the prison population can be attributed at least in part to the demographic characteristics of incarcerated individuals, which differ substantially from the characteristics of the adult population as a whole.



# SECTION II

## *The Connection Between Adults' Literacy Skills and Their Social and Economic Characteristics*

The first section of this report provided a portrait of literacy in the United States, describing the literacy levels and proficiencies of the adult population and of many different subpopulations. In this section, the focus shifts to the connections between literacy and particular aspects of adults' lives.

Previous studies have identified certain practices and conditions that are related to literacy.[1] Accordingly, adults participating in this survey were asked to report on their voting experience, reading practices, economic status, recent employment, and occupations. Their responses make it possible to examine how various aspects of adults' lives vary according to their literacy proficiencies — that is, to see what connections exist between literacy and an array of social and economic variables. Are those in the higher literacy levels more likely to get information from print than those in the lower levels? Are they more likely to be employed, hold certain kinds of jobs, or earn better wages? These types of questions are addressed in the pages that follow.

### Literacy and Voting

One question in the survey asked respondents to indicate whether or not they had voted in a state or national election in the United States in the past five years. A clear relationship was found between literacy skills and voting practices. On all three scales, there was a significant increase across the literacy levels in the percentages of adults who reported voting in a recent state or national election (FIGURE 2.1). On the prose scale, for example, 89 percent of the individuals in Level 5 who were eligible to vote said they had voted in the past five years, compared with just over half (55 percent) of the individuals in Level 1.

[1] G. Berlin and A. Sum. (1988). *Toward a More Perfect Union.* New York, NY: Ford Foundation. Statistics Canada. (1991). *Adult Literacy in Canada: Results of a National Study.* Ottawa, Canada: Statistics Canada. I.S. Kirsch and A. Jungeblut. (1992, September). *Profiling the Literacy Proficiencies of JTPA and ES/UI Populations: Final Report to the Department of Labor.* Princeton, NJ: Educational Testing Service.

**NALS** **Figure 2.1**

**Percentages of Adults Who Voted in a National or State Election in the Past Five Years, by Literacy Level**

Note: This figure represents the percentages of adults who voted, of those who were eligible to vote.

**Level 1** 0 to 225
**Level 2** 226 to 275
**Level 3** 276 to 325
**Level 4** 326 to 375
**Level 5** 376 to 500

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Literacy and Reading Practices

Many different types of newspapers are published in this country, ranging from long, comprehensive daily newspapers to shorter and more informal community newspapers, which tend to be published on a weekly or biweekly basis. Together these print media keep readers informed about current events in their communities, the nation, and the world.

Because the newspaper plays such an important role in disseminating information in this society, the National Adult Literacy Survey asked participants to indicate how often they read the newspaper and to identify the parts of the newspaper that they generally read. Respondents were also asked to report to what extent they relied on newspapers or magazines, radio or television, and family or friends for information about current events, public affairs, and government.

The responses indicate that newspaper reading was very common among readers in all levels of literacy, although adults in the lower levels were less likely than those in the higher levels to report that they read the newspaper every day and were more likely to say that they never read it. Finally, while virtually all adults — regardless of their literacy levels — reported getting some or a lot of information about current events from television or radio, those in the higher literacy levels were more likely than those in the lower levels to say they also get some or a lot of information from print media.

## Frequency of Newspaper Reading

On all three literacy scales, adults in the lowest level were less likely than those in the higher levels to report reading the newspaper every day; 35 to 40 percent of those in Level 1, approximately half of the adults in Levels 2 and 3, and between half and two-thirds of those in Levels 4 and 5 said they read the paper this often (FIGURE 2.2). Likewise, respondents who performed in the lowest level (19 to 21 percent across the scales) were much more likely than those in the highest level (1 percent) to say they never read the newspaper.

**NALS** **Figure 2.2**

**Percentages of Adults Who Read the Newspaper, by Literacy Level**

| Frequency | Level | Prose | Document | Quantitative |
|---|---|---|---|---|
| Every day | 1 | 35 | 39 | 35 |
| | 2 | 49 | 51 | 48 |
| | 3 | 52 | 51 | 52 |
| | 4 | 57 | 55 | 58 |
| | 5 | 61 | 55 | 62 |
| A few times a week | 1 | 19 | 18 | 20 |
| | 2 | 24 | 24 | 25 |
| | 3 | 25 | 26 | 25 |
| | 4 | 25 | 26 | 24 |
| | 5 | 25 | 28 | 23 |
| Once a week | 1 | 16 | 15 | 16 |
| | 2 | 15 | 15 | 15 |
| | 3 | 14 | 14 | 14 |
| | 4 | 12 | 12 | 11 |
| | 5 | 8 | 11 | 9 |
| Less than once a week | 1 | 9 | 9 | 9 |
| | 2 | 8 | 8 | 8 |
| | 3 | 6 | 7 | 7 |
| | 4 | 5 | 6 | 5 |
| | 5 | 5 | 6 | 5 |
| Never | 1 | 21 | 19 | 20 |
| | 2 | 3 | 3 | 4 |
| | 3 | 2 | 2 | 2 |
| | 4 | 1 | 1 | 1 |
| | 5 | 1 | 1 | 1 |

| | |
|---|---|
| **Level 1** | 0 to 225 |
| **Level 2** | 226 to 275 |
| **Level 3** | 276 to 325 |
| **Level 4** | 326 to 375 |
| **Level 5** | 376 to 500 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Aspects of Newspaper Reading

Participants were asked to indicate which parts of the newspaper they generally read, and their answers were combined with the responses to the previous question to determine what percentages of those who read the newspaper at least once a week read certain parts. The ten categories listed in the survey questionnaire, each of which reflects somewhat different literacy demands, were grouped into five categories for reporting purposes: the news, editorial, and financial pages; sports; home, fashion, health, and reviews of books, movies, and art; TV, movie, and concert listings, as well as classified ads and other advertisements; and comics, horoscopes, and advice columns.

Among adults who read the newspaper at least once a week, the vast majority — even of those who performed in Level 1 on each scale — said they generally read the news, editorial, or financial sections (FIGURE 2.3). Virtually all adults in the higher levels said they read these sections of the newspaper at least once a week.

Though many of the differences are small, there are variations across the literacy levels in the percentages of adults who reported reading other parts of the newspaper. For example, about 45 percent of the newspaper readers who performed in Level 1 on the quantitative scale said they generally look at the sports pages, compared with 58 percent of those in Level 5. Some 74 percent of the newspaper readers in Level 1 on the prose scale reported reading the home, fashion, health, or reviews sections, compared with 86 percent in Level 5. Across the levels on each scale, 76 to 88 percent said they read the classifieds and listings, and 66 to 73 percent reported reading the comics, horoscopes, or advice columns.

Another perspective on the relationship between literacy and reading practices can be gained by comparing the average proficiencies of respondents who read certain sections of the newspaper and those who do not (TABLE 2.1). On each of the literacy scales, newspaper readers who generally skip the news, editorials, or financial sections had average proficiency scores of 248 on the prose and document scales and 250 on the quantitative scale. These scores are significantly lower (by 28 to 34 points) than the scores of those who said they read these sections on a regular basis. When one reexamines the responses shown in Figure 2.3, the reason for these differences is clear. The relatively few adults (1 to 8 percent) who said they tend to skip these sections were much more likely to be in the lowest levels. As a result, on each scale, they demonstrated considerably lower average scores than the vast majority of newspaper readers who said they generally do read these sections.

Sports reporting in newspapers often includes tables, lists, and quantitative measures of performance. There are significant differences in

**NALS** **Figure 2.3**

**Among Adults Who Read the Newspaper at Least Once a Week, Percentages Who Read Certain Parts, by Literacy Level**

**Percentage in Each Level Who Read Each Part of the Newspaper**

**Level 1** 0 to 225
**Level 2** 226 to 275
**Level 3** 276 to 325
**Level 4** 326 to 375
**Level 5** 376 to 500

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

average document and quantitative performance between those who choose to read the sports pages and those who do not. While on the quantitative scale the proficiency gap is 8 points, on the document scale it is only 3 points. On the prose scale, the 2-point difference between sports page readers and nonreaders is not statistically significant. Once again, these results can be better understood by reexamining the differences across the literacy levels in the percentages of newspaper readers who reported choosing the sports pages, particularly for the quantitative scale. In this dimension of literacy, readers in the lowest level (45 percent) were considerably less likely than those in the highest level (58 percent) to say they generally read this section. On the other hand, there were relatively small differences (of 5 to 6 points) across the prose

**Table 2.1**

**Among Adults Who Read the Newspaper at Least Once a Week, Average Literacy Proficiencies, by Newspaper Reading Practices**

| | Average Prose Proficiency | | Average Document Proficiency | | Average Quantitative Proficiency | |
|---|---|---|---|---|---|---|
| | **Yes** | **No** | **Yes** | **No** | **Yes** | **No** |
| **News, editorials, financial** | 282 | 248 | 276 | 248 | 281 | 250 |
| **Home, fashion, reviews** | 284 | 267 | 277 | 264 | 282 | 271 |
| **Classified ads, listings** | 280 | 282 | 274 | 274 | 280 | 282 |
| **Comics, advice, horoscope** | 282 | 277 | 276 | 271 | 280 | 279 |
| **Sports** | 282 | 280 | 276 | 273 | 284 | 276 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

and document literacy levels in the percentages of adults who said they generally read this section.

The home, fashion, health, and reviews sections typically consist of connected prose with some illustrations and tables. Newspaper readers who performed in the higher levels on each scale were more likely to report that they read these sections, while those in the lowest level were more likely to report skipping them. The differences were greatest on the prose scale, and this is reflected in the average proficiency results: The average prose scores of newspaper readers who generally read these sections were considerably higher (284 compared with 267) than those of readers who said they tend to skip them.

Different patterns are evident for the other aspects of newspaper reading. On each scale, the percentages of newspaper readers who said they generally look at the classified ads and listings varied across the literacy levels, rising from 84 percent of those in Level 1 to 88 percent in Level 2 before declining to some three-quarters of the respondents in Level 5. Yet there are no significant differences in average prose, document, or quantitative proficiency between newspaper readers who said they generally read these sections and those who do not. In contrast, newspaper readers who reported that they generally read the comics, horoscopes, or advice columns demonstrated average prose and document proficiencies that were slightly (5 points) higher than those of

individuals who said they do not generally read these sections. As shown in Figure 2.3, though, the percentages of adults who reported reading these parts of the newspaper varied little across the levels on each literacy scale.

## Reliance on Print and Nonprint Sources of Information

Survey participants were asked to indicate the sources from which they get information about current events, public affairs, and government. Their responses indicate that while many adults get their information from family members and friends, the overwhelming majority get either some or a lot of news from nonprint media — between 93 and 97 percent reported using radio or television to obtain information about current events, public affairs and government. (FIGURE 2.4).

**NALS** **Figure 2.4**

**Percentages of Adults Who Get Information About Current Events from Various Sources, by Literacy Level**

| | |
|---|---|
| **Level 1** | 0 to 225 |
| **Level 2** | 226 to 275 |
| **Level 3** | 276 to 325 |
| **Level 4** | 326 to 375 |
| **Level 5** | 376 to 500 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Individuals in the lower literacy levels were less likely to use print media as an information source than were adults in the higher levels. Across the scales, only 68 to 71 percent of the respondents in Level 1 said they get information from newspapers or magazines. Adults performing in the higher literacy levels, on the other hand, were more likely to get information from print media: 88 to 92 percent of those in Levels 3, 4, and 5 on the scales said they obtain information from newspapers or magazines.

While one might expect adults in the lower literacy levels to rely more heavily on friends or family for information, this hypothesis was not supported by the results. Across the levels, there are small but significant differences in the percentages of adults who said they get some or a lot of information from personal sources. For example, on the prose scale, larger percentages of adults in Levels 3 and 4 than in Levels 1 and 2 reported getting some or a lot of information on current events from friends or family. On the document and quantitative scales, the percentages of adults who reported getting information from personal sources increased from Level 1 to Level 3, then declined significantly between Levels 4 and 5.

## Literacy and Economic Status

To explore the connection between literacy and economic status, the National Adult Literacy Survey gathered information on respondents' income. Some of the questions requested data on wages, while others asked for information on sources of income. When the responses to these questions are examined by literacy level, strong relationships between literacy and economic status are evident. Adults in the lower literacy levels were far more likely than those in the higher levels to be in poverty and were far more likely to be on food stamps than to report receiving interest from savings.

### Poverty Status

Adults who participated in the NALS were asked to indicate their personal and household income. These self-reported data were then used to divide adults into two categories — poor or near poor, and not poor — using federal poverty guidelines. Across the three scales, 41 to 44 percent of those in Level 1 were in poverty, compared with only 4 to 6 percent of the adults in the highest level (FIGURE 2.5). These results underscore literacy's strong connection to economic status.

Figure 2.5

**Percentages of Adults in Poverty, by Literacy Level**

Note: Adults in poverty are those who are either poor or near poor.

| | |
|---|---|
| **Level 1** | 0 to 225 |
| **Level 2** | 226 to 275 |
| **Level 3** | 276 to 325 |
| **Level 4** | 326 to 375 |
| **Level 5** | 376 to 500 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Sources of Nonwage Income and Support

Survey participants provided detailed information on the types of nonwage income and support they or anyone in their family had received in the year preceding the survey. Two particular types of nonwage income which reflect socioeconomic status are contrasted here. The skills of those who received food stamps are of interest, because this program is publicly funded. Further, the competencies of adults who received interest from savings or other bank accounts are of interest, because savings help to provide a buffer in the event of interruptions in earnings.

Adults who performed in Level 1 on the prose scale were far more likely than those who performed in Level 5 to report that their family received food stamps (FIGURE 2.6). Only 1 percent of those in the highest prose level received food stamps, compared with 17 percent in the lowest level. Similar patterns are seen on the document and quantitative scales.

Conversely, the percentages of adults who reported receiving interest from savings in the past year increases significantly across the five levels on each scale. For example, 85 percent of adults in Level 5 on the quantitative scale earned interest from savings, compared with only 53 percent of those in Level 3 and just 23 percent of those in Level 1.

Figure 2.6

**Percentages of Adults Who Received Certain Types of Nonwage Income or Support in the Past 12 Months, by Literacy Level**

| | |
|---|---|
| **Level 1** | 0 to 225 |
| **Level 2** | 226 to 275 |
| **Level 3** | 276 to 325 |
| **Level 4** | 326 to 375 |
| **Level 5** | 376 to 500 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Literacy and Employment, Earnings, and Occupations

While our nation's concern over literacy skills appropriately encompasses all areas of life, much attention in recent years has been focused on the role literacy plays in the workplace. Recent reports have called into question the adequacy of America's current education and training system to fulfill its expected role in ensuring individual opportunity, increasing productivity, and strengthening America's competitiveness in a global economy.

The NALS background questionnaire asked respondents to report on their employment status, their weekly earnings, the number of weeks they worked in the previous year, and the type of job they held, if they worked. On average, individuals in the higher levels of literacy were more likely to be employed, earn higher wages, work more weeks per year, and be in professional, technical, or managerial occupations than respondents who displayed lower levels of skill.

### Employment Status

Respondents were asked to indicate what their employment situation had been during the week before the survey. When their responses are compared with the performance results, it is clear that individuals with more limited literacy skills are less likely to be employed than those who demonstrated more advanced skills. On each of the literacy scales, more than half of the adults who

demonstrated proficiencies in Level 1 were out of the labor force — that is, not employed and not looking for work — compared with only 10 to 18 percent of the adults performing in each of the two highest levels (FIGURE 2.7). On the other hand, some 30 percent of the individuals in Level 1 and nearly 45 percent of those in Level 2 had full-time employment, compared with about 64 to 75 percent of the respondents who performed in the two highest literacy levels.

The average proficiency results offer another perspective on the connection between literacy and labor force status. As seen in Figure 2.7, adults in the highest literacy levels were far more likely than those in the lowest levels to report being employed full time. As a result, the average proficiencies of full-time employees are quite high — 288, 284, and 290, across the three literacy scales (TABLE 2.2).

**NALS** **Figure 2.7**

**Percentages of Adults In and Out of the Labor Force, by Literacy Level**

| | |
|---|---|
| **Level 1** | 0 to 225 |
| **Level 2** | 226 to 275 |
| **Level 3** | 276 to 325 |
| **Level 4** | 326 to 375 |
| **Level 5** | 376 to 500 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Table 2.2

**Average Literacy Proficiencies, by Labor Force Status**

| | Prose | Document | Quantitative |
|---|---|---|---|
| **Employed full time** | 288 | 284 | 290 |
| **Employed part time** | 284 | 277 | 280 |
| **Unemployed** | 260 | 257 | 256 |
| **Out of labor force** | 246 | 237 | 241 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Working part time was more prevalent among adults in the higher literacy levels, though the differences across the levels were small. Accordingly, the average prose, document, and quantitative scores of part-time workers are only 4 to 10 points below those of adults working full time. Unemployment, on the other hand, was more prevalent among individuals who performed in the lowest literacy levels, and as a result, the average literacy proficiencies of unemployed adults are 27 to 34 points lower than those of full-time employees.

The average proficiencies of adults who were out of the labor force — 246, 237, and 241, across the three scales — were 42 to 49 points lower than those of individuals who were employed full time. These disparities can be attributed to the relatively high percentages of adults in the lower literacy levels who were out of the labor force.

## Weeks Worked

All individuals who participated in the survey, regardless of their current or recent employment status, were asked how many weeks they had worked in the past 12 months. On each scale, individuals scoring in Levels 3, 4, and 5 worked more weeks in the past year than those performing in Level 2, who, in turn, worked more weeks than those in Level 1 (FIGURE 2.8).

NALS **Figure 2.8**

**Average Number of Weeks Worked in the Past 12 Months, by Literacy Level**

| | |
|---|---|
| **Level 1** | 0 to 225 |
| **Level 2** | 226 to 275 |
| **Level 3** | 276 to 325 |
| **Level 4** | 326 to 375 |
| **Level 5** | 376 to 500 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Clearly, the number of weeks worked increases dramatically across the literacy levels. While respondents who demonstrated proficiency in the lowest level on each scale worked, on average, only about 19 weeks a year, individuals in the three highest levels reported working about twice as many weeks — between 34 and 44.

## Earnings

Individuals who were either working full time or part time or were on leave from their jobs the week before the survey were asked to report their weekly wage or salary before deductions. Given that individuals who performed in the higher levels were more likely than those in the lower levels to be in the work force and to have worked more weeks in the past year, it is not surprising that these individuals reported earning significantly more money each week (FIGURE 2.9).

On each literacy scale, the median earnings of individuals performing in Level 1 were approximately $230 to $240 each week. In comparison, those who performed in Level 3 reported earning $340 to $350 (or about $110 more), while those in Level 4 reported earning $462 to $472 (or nearly $250 more). For those who attained Level 5, the financial rewards were even greater. Individuals performing in this level on the quantitative scale, for example, had median earnings of $681 each week — roughly $450 more than individuals performing in Level 1 on that scale.

NALS

Figure 2.9

**Median Weekly Wages, by Literacy Level**

| | |
|---|---|
| **Level 1** | 0 to 225 |
| **Level 2** | 226 to 275 |
| **Level 3** | 276 to 325 |
| **Level 4** | 326 to 375 |
| **Level 5** | 376 to 500 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Occupations

While it would be useful to know the level of literacy skills required to find, hold, and succeed in various types of jobs, research is limited in this area. Some perspective on this question can be gained, however, by looking at the percentages of people within certain occupational categories who demonstrated various levels of literacy. Survey participants were asked to describe the type of work they performed in their current or most recent job, and this information was sorted into occupational categories using the Census Classification for Industries and Occupations. These categories were then recombined into four occupational groupings, and the percentages of respondents who worked in these categories of jobs were calculated. Twenty-four percent of the adults surveyed worked in managerial, professional, or technical jobs; 28 percent were in sales or clerical occupations; 29 percent worked in craft or service occupations; and 19 percent were in laborer, assembler, fishing, or farming jobs.

In all but the group of adults holding sales or clerical positions, the data show a strong relationship between the type of job that individuals held and their demonstrated level of literacy proficiency (FIGURE 2.10). This figure displays the percentages of adults in each literacy level who reported holding a particular type of job.

On all three literacy scales, individuals who performed in the highest levels were much more likely to report holding managerial, professional, or technical jobs than were respondents who performed in the lowest levels.

**NALS** **Figure 2.10**

## Percentages of Adults in Certain Occupational Categories, by Literacy Level

Note: Overall, 24 percent of the adults surveyed reported holding managerial, professional, or technical jobs; 28 percent reported holding sales or clerical jobs; 29 percent reported holding craft or service jobs; and 19 percent reported holding laborer, assembler, fishing or farming jobs.

| | |
|---|---|
| **Level 1** | 0 to 225 |
| **Level 2** | 226 to 275 |
| **Level 3** | 276 to 325 |
| **Level 4** | 326 to 375 |
| **Level 5** | 376 to 500 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

From 65 to 70 percent of those in Level 5 held these positions, compared with approximately 13 percent of the respondents performing in Level 2, and 6 percent of those performing in Level 1. Thus, the likelihood of being in a managerial, professional, or technical position declines sharply from Level 5 to Level 1. It is interesting to note, however, that small percentages of individuals in Levels 1 and 2 reported being in managerial, professional, or technical positions. While these data do not reveal what specific types of positions these individuals held, or how successful they were in negotiating the demands of these positions, it does appear that at least some individuals with limited skills are able to obtain managerial and professional jobs.

In contrast with these data, a far different pattern is evident among those holding craft or service jobs: On each scale, adults whose proficiency was in the Level 1 range were far more likely than individuals who performed in the Level 5 range to hold these types of jobs. On the quantitative scale, for example, 10 percent of those performing in Level 5 reported being in craft or service jobs, compared with approximately 18 percent in Level 4, 27 percent of those in Level 3, 35 percent in Level 2, and 43 percent of those in Level 1. A similar pattern is shown for those adults reporting laborer, assembler, fishing, or farming occupations.

The greatest variability in literacy proficiencies seems to occur among adults reporting sales or clerical jobs. The percentages of adults in these positions increase between Levels 1 and 2 and again between Levels 2 and 3, then decrease across the two highest levels.

These data show a strong relationship between one's literacy skills and one's occupation. It should be noted, however, that this relationship is likely to be quite complex. While adults with better literacy skills almost certainly have greater opportunities to obtain professional, managerial, or technical positions, it is also likely that many of these positions enable individuals to strengthen their literacy skills.

## Summary

Individuals who participated in the National Adult Literacy Survey were asked to provide information on various aspects of their lives that have been found in previous research to be related to literacy. This self-reported information was used to explore the connections between literacy and various social and economic outcomes.

Newspaper reading appears to be very common among American adults, regardless of their demonstrated literacy skills. However, those who performed in the lowest literacy level were far more likely than those in the higher levels to say they never read a newspaper. Similarly, the vast majority of adults reported getting some or a lot of information about current events from television or radio, but those in the lower literacy levels were less likely than those in the higher levels to say they also get some or a lot of information from print media. In addition to these differences in reading practices by literacy level, the survey results reveal that adults with limited literacy proficiencies were far less likely to have voted in a recent state or national election than were those with more advanced competencies.

Strong relationships between literacy and economic status are also evident in the survey findings. Relatively high proportions of adults in the lower literacy levels were in poverty and received food stamps. On the other hand, relatively few reported receiving interest from savings, which helps to protect individuals from interruptions in earnings.

Further, individuals who performed in the lower levels of literacy proficiency were more likely than their more proficient counterparts to be unemployed or out of the labor force. They also tended to earn lower wages and work fewer weeks per year, and were more likely to be in craft, service, laborer, or assembler occupations than respondents who demonstrated higher levels of literacy performance.



# SECTION III

*Interpreting the Literacy Scales*

Building on the two earlier literacy surveys conducted by Educational Testing Service (ETS), the performance results from the National Adult Literacy Survey are reported on three literacy scales — prose, document, and quantitative — rather than on a single conglomerate scale. Each of the three literacy scales ranges from 0 to 500.

The purpose of this section of the report is to give meaning to the literacy scales — or, more specifically, to interpret the numerical scores that are used to represent adults' proficiencies on these scales. Toward this end, the section begins with a brief summary of the task development process and of the way in which the literacy levels are defined. A detailed description of the prose, document, and quantitative scales is then provided. The five levels on each scale are defined, and the skills and strategies needed to successfully perform the tasks in each level are discussed. Sample tasks are presented to illustrate the types of materials and task demands that characterize the levels on each scale. The section ends with a brief summary of the probabilities of successful performance on tasks within each level for individuals who demonstrated different proficiencies.

## Building the Literacy Tasks

The literacy scales make it possible not only to summarize the literacy proficiencies of the total population and of various subpopulations, but also to determine the relative difficulty of the literacy tasks administered in the survey. That is, just as an individual receives a score according to his or her performance on the assessment tasks, each task receives a value according to its difficulty as determined by the performance of the adults who participated in the survey. Previous research conducted at ETS has shown that the difficulty of a literacy task, and therefore its placement on a particular literacy scale, is determined by three factors: the structure or linguistic format of the material,

the content and/or the context from which it is selected, and the nature of the task, or what the individual is asked to do with the material.

*Materials.* The materials selected for inclusion in NALS reflect a variety of linguistic formats that adults encounter in their daily activities. Most of the prose materials used in the survey are expository — that is, they describe, define, or inform — since most of the prose that adults read is expository in nature; however, narratives and poetry are included, as well. The prose materials include an array of linguistic structures, ranging from texts that are highly organized both topically and visually to those that are loosely organized. They also include texts of varying lengths, from multiple-page magazine selections to short newspaper articles. All prose materials included in the survey were reproduced in their original format.

The document materials represent a wide variety of structures, which are characterized as tables, charts and graphs, forms, and maps, among other categories. Tables include matrix documents in which information is arrayed in rows and columns — for example, bus or airplane schedules, lists, or tables of numbers. Documents categorized as charts and graphs include pie charts, bar graphs, and line graphs. Forms are documents that require information to be filled in, while other structures include such materials as advertisements and coupons.

The quantitative tasks require the reader to perform arithmetic operations using numbers that are embedded in print. Since there are no materials that are unique to quantitative tasks, these tasks were based on prose materials and documents. Most quantitative tasks were, in fact, based on document structures.

*Content and/or Contexts.* Adults do not read printed or written materials in a vacuum. Rather, they read within a particular context or for a particular purpose. Accordingly, the NALS materials represent a variety of contexts and contents. Six such areas were identified: home and family; health and safety; community and citizenship; consumer economics; work; and leisure and recreation.

In selecting materials to represent these areas, efforts were made to include as broad a range as possible, as well as to select universally relevant contexts and contents. This was to ensure that the materials would not be so specialized as to be familiar only to certain groups. In this way, disadvantages for individuals with limited background knowledge were minimized.

*Types of Tasks.* After the materials were selected, tasks were developed to accompany the materials. These tasks were designed to simulate the ways in which people use various types of materials and to require different strategies for successful task completion. For both the prose and document scales, the tasks can be organized into three major categories: *locating, integrating,* and

*generating* information. In the locating tasks, readers are asked to match information that is given in a question or directive with either literal or synonymous information in the text or document. Integrating tasks require the reader to incorporate two or more pieces of information located in different parts of the text or document. Generating tasks require readers not only to process information located in different parts of the material, but also to go beyond that information by drawing on their knowledge about a subject or by making broad text-based inferences.

Quantitative tasks require readers to perform arithmetic operations — addition, subtraction, multiplication, or division — either singly or in combination. In some tasks, the type of operation that must be performed is obvious from the wording of the question, while in other tasks the readers must infer which operation is to be performed. Similarly, the numbers that are required to perform the operation can, in some cases, be easily identified, while in others, the numbers that are needed are embedded in text. Moreover, some quantitative tasks require the reader to explain how the problem would be solved rather than perform the calculation, and on some tasks the use of a simple four-function calculator is required.

## Defining the Literacy Levels

The relative difficulty of the assessment tasks reflects the interactions among the various task characteristics described here. As shown in Figure 1 in the Introduction to this report, the score point assigned to each task is the point at which the individuals with that proficiency score have a high probability of responding correctly. In this survey, an 80 percent probability of correct response was the criterion used. While some tasks were at the very low end of the scale and some at the very high end, most had difficulty values in the 200 to 400 range.

By assigning scale values to both the individuals and tasks, it is possible to see how well adults with varying proficiencies performed on tasks of varying difficulty. While individuals with low proficiency tend to perform well on tasks with difficulty values equivalent to or below their level of proficiency, they are less likely to succeed on tasks with higher difficulty values. This does not mean that individuals with low proficiency can never succeed on more difficult literacy tasks — that is, on tasks whose difficulty values are higher than their proficiencies. They may do so some of the time. Rather, it means that their probability of success is not as high. In other words, the more difficult the task relative to their proficiency, the lower their likelihood of responding correctly.

The response probabilities for two tasks on the prose scale are displayed in Figure 3.1. The difficulty of the first task is measured at the 250 point on the scale, and the second task is at the 350 point. This means that an individual would have to score at the 250 point on the prose scale to have an 80 percent chance (that is, a .8 probability) of responding correctly to Task 1. Adults scoring at the 200 point on the prose scale have only a 40 percent chance of responding correctly to this task, whereas those scoring at the 300 point and above would be expected to rarely miss this task and others like it.

In contrast, an individual would need to score at the 350 point to have an 80 percent chance of responding correctly to Task 2. While individuals performing at the 250 point would have an 80 percent chance of success on the first task, their probability of answering the more difficult second task correctly is only 20 percent. An individual scoring at the 300 point is likely to succeed on this more difficult task only half the time.

**NALS** **Figure 3.1**

**Probabilities of Successful Performance on Two Prose Tasks by Individuals at Selected Points on the Prose Scale**

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

An analogy may help clarify the information presented for the two prose tasks. The relationship between task difficulty and individual proficiency is much like the high jump event in track and field, in which an athlete tries to jump over a bar that is placed at increasing heights. Each high jumper has a height at which he or she is proficient. That is, he or she is able to clear the bar at that height with a high probability of success, and can clear the bar at lower

levels almost every time. When the bar is higher than their level of proficiency, however, they can be expected to have a much lower chance of clearing it successfully.

Once the literacy tasks are placed on their respective scales, using the criterion described here, it is possible to see how well the interactions among the task characteristics explain the placement of various tasks along the scales.[1] In investigating the progression of task characteristics across the scales, certain questions are of interest. Do tasks with similar difficulty values (that is, with difficulty values near one another on a scale) have certain shared characteristics? Do these characteristics differ in systematic ways from tasks in either higher or lower levels of difficulty? Analyses of the interactions between the materials read and the tasks based on these materials reveal that an ordered set of information-processing skills appears to be called into play to perform the range of tasks along each scale.

To capture this ordering, each scale was divided into five levels that reflect the progression of information-processing skills and strategies: *Level 1* (0 to 225), *Level 2* (226 to 275), *Level 3* (276 to 325), *Level 4* (326 to 375), and *Level 5* (376 to 500). These levels were determined not as a result of any statistical property of the scales, but rather as a result of shifts in the skills and strategies required to succeed on various tasks along the scales, from simple to complex.

The remaining pages of this section describe each scale in terms of the nature of the task demands at each of the five levels. After a brief introduction to each scale, sample tasks in each level are presented and the factors contributing to their difficulty are discussed. The aim of these discussions is to give meaning to the scales and to facilitate interpretation of the results provided in the first and second sections of this report.

## Interpreting the Literacy Levels

### Prose Literacy

The ability to understand and use information contained in various kinds of textual material is an important aspect of literacy. Most of the prose materials administered in this assessment were expository — that is, they inform, define, or describe — since these constitute much of the prose that adults read. Some narrative texts and poems were included, as well. The prose materials were drawn from newspapers, magazines, books, brochures, and pamphlets and reprinted in their entirety, using the typography and layout of the original source. As a result, the materials vary widely in length, density of information,

[1] I.S. Kirsch and P.B. Mosenthal. (1990). "Exploring Document Literacy: Variables Underlying the Performance of Young Adults." *Reading Research Quarterly, 25.* pp. 5-30.

and the use of structural or organizational aids such as section or paragraph headings, italic or bold face type, and bullets.

Each prose selection was accompanied by one or more questions or directives which asked the reader to perform specific tasks. These tasks represent three major aspects of information-processing: locating, integrating, and generating. Locating tasks require the reader to find information in the text based on conditions or features specified in the question or directive. The match may be literal or synonymous, or the reader may need to make a text-based inference in order to perform the task successfully. Integrating tasks ask the reader to compare or contrast two or more pieces of information from the text. In some cases the information can be found in a single paragraph, while in others it appears in different paragraphs or sections. In the generating tasks, readers must produce a written response by making text-based inferences or drawing on their own background knowledge.

In all, the prose literacy scale includes 41 tasks with difficulty values ranging from 149 to 468. It is important to remember that the locating, generating, and integrating tasks extend over a range of difficulty as a result of interactions with other variables including:

- the number of categories or features of information that the reader must process
- the number of categories or features of information in the text that can distract the reader, or that may seem plausible but are incorrect
- the degree to which information given in the question is obviously related to the information contained in the text
- the length and density of the text

The five levels of prose literacy are defined, and sample tasks provided, in the following pages.

**Prose Level 1** Scale range: 0 to 225

*Most of the tasks in this level require the reader to read relatively short text to locate a single piece of information which is identical to or synonymous with the information given in the question or directive. If plausible but incorrect information is present in the text, it tends not to be located near the correct information.*

Average difficulty value of tasks in this level: 198
Percentage of adults performing in this level: 21%

Tasks in this level require the reader to locate and match a single piece of information in the text. Typically the match between the question or directive and the text is literal, although sometimes synonymous matches may be necessary. The text is usually brief or has organizational aids such as paragraph headings or italics that suggest where in the text the reader should search for the specified information. The word or phrase to be matched appears only once in the text.

One task in Level 1 with a difficulty value of 208 asks respondents to read a newspaper article about a marathon swimmer and to underline the sentence that tells what she ate during a swim. Only one reference to food is contained in the passage, and it does not use the word "ate." Rather, the article says the swimmer "kept up her strength with banana and honey sandwiches, hot chocolate, lots of water and granola bars." The reader must match the word "ate" in the directive with the only reference to foods in the article.

Underline the sentence that tells what Ms. Chanin ate during the swim.

**Swimmer completes Manhattan marathon**

The Associated Press

NEW YORK—University of Maryland senior Stacy Chanin on Wednesday became the first person to swim three 28-mile laps around Manhattan.

Chanin, 23, of Virginia, climbed out of the East River at 96th Street at 9:30 p.m. She began the swim at noon on Tuesday.

A spokesman for the swimmer, Roy Brunett, said Chanin had kept up her strength with "banana and honey" sandwiches, hot chocolate, lots of water and granola bars."

Chanin has twice circled Manhattan before and trained for the new feat by swimming about 28.4 miles a week. The Yonkers native has competed as a swimmer since she was 15 and hoped to persuade Olympic authorities to add a long-distance swimming event.

The Leukemia Society of America solicited pledges for each mile she swam.

In July 1983, Julie Ridge became the first person to swim around Manhattan twice. With her three laps, Chanin came up just short of Diana Nyad's distance record, set on a Florida-to-Cuba swim.

Reduced from original copy.



**Prose Level 2**                                Scale range: 226 to 275

*Some tasks in this level require readers to locate a single piece of information in the text; however, several distractors or plausible but incorrect pieces of information may be present, or low-level inferences may be required. Other tasks require the reader to integrate two or more pieces of information or to compare and contrast easily identifiable information based on a criterion provided in the question or directive.*

Average difficulty value of tasks in this level: 259
Percentage of adults performing in this level: 27%

Like the tasks in Level 1, most of the tasks in this level ask the reader to locate information. However, these tasks place more varied demands on the reader. For example, they frequently require readers to match more than a single piece of information in the text and to discount information that only partially satisfies the question. If plausible but incomplete information is included in the text, such distractors do not appear near the sentence or paragraph that contains the correct answer. For example, a task based on the sports article reproduced earlier asks the reader to identify the age at which the marathon swimmer began to swim competitively. The article first provides the swimmer's current age of 23, which is a plausible but incorrect answer. The correct information, age 15, is found toward the end of the article.

In addition to directing the reader to locate more than a single piece of information in the text, low-level inferences based on the text may be required to respond correctly. Other tasks in Level 2 (226 to 275) require the reader to identify information that matches a given criterion. For example, in one task with a difficulty value of 275, readers were asked to identify specifically what was wrong with an appliance by choosing the most appropriate of four statements describing its malfunction.

A manufacturing company provides its customers with the following instructions for returning appliances for service:

| When returning appliance for servicing, include a note telling as clearly and as specifically as possible what is wrong with the appliance. |
|---|

A repair person for the company receives four appliances with the following notes attached. Circle the letter next to the note which best follows the instructions supplied by the company.

A — The clock does not run correctly on this clock radio. I tried fixing it, but I couldn't.

C — The alarm on my clock radio doesn't go off at the time I set. It rings 15-30 minutes later.

B — My clock radio is not working. It stopped working right after I used it for five days.

D — This radio is broken. Please repair and return by United Parcel Service to the address on my slip.

Readers in this level may also be asked to infer a recurring theme. One task with a difficulty value of 262 asks respondents to read a poem that uses several metaphors to represent a single, familiar concept and to identify its theme. The repetitiveness and familiarity of the allusions appear to make this "generating" task relatively easy.

**Prose Level 3** Scale range: 276 to 325

*Tasks in this level tend to require readers to make literal or synonymous matches between the text and information given in the task, or to make matches that require low-level inferences. Other tasks ask readers to integrate information from dense or lengthy text that contains no organizational aids such as headings. Readers may also be asked to generate a response based on information that can be easily identified in the text. Distracting information is present, but is not located near the correct information.*

Average difficulty value of tasks in this level: 298
Percentage of adults performing in this level: 32%

One of the easier Level 3 tasks requires the reader to write a brief letter explaining that an error has been made on a credit card bill. This task is at 280 on the prose scale. Other tasks in this level require the reader to search fairly dense text for information. Some of the tasks ask respondents to make a literal or synonymous match on more than a single feature, while other tasks ask them to integrate multiple pieces of information from a long passage that does not contain organizational aids.

One of the more difficult Level 3 tasks (with a difficulty value of 316) requires the reader to read a magazine article about an Asian-American woman and to provide two facts that support an inference made from the text. The question directs the reader to identify what Ida Chen did to help resolve conflicts due to discrimination.

List two things that Chen became involved in or has done to help resolve conflicts due to discrimination.

**IDA CHEN is the first Asian-American woman to become a judge of the Commonwealth of Pennsylvania.**

*She understands discrimination because she has experienced it herself.*

Soft-spoken and eminently dignified, Judge Ida Chen prefers hearing about a new acquaintance rather than talking about herself. She wants to know about career plans, hopes, dreams, fears. She gives unsolicited advice as well as encouragement. She instills confidence.

Her father once hoped that she would become a professor. And she would have also made an outstanding social worker or guidance counselor. The truth is that Chen wears the caps of all these professions as a Family Court judge of the Court of Common Pleas of Philadelphia County, as a participant in public advocacy for minorities, and as a particularly sensitive, caring person.

She understands discrimination because she has experienced it herself. As an elementary school student, Chen tried to join the local Brownie troop. ''You can't be a member,'' she was told. ''Only American girls are in the Brownies.''

Originally intent upon a career as a journalist, she selected Temple University because of its outstanding journalism department and affordable tuition. Independence being a personal need, she paid for her tuition by working for Temple's Department of Criminal Justice. There she had her first encounter with the legal world and it turned her career plans in a new direction — law school.

Through meticulous planning, Chen was able to earn her undergraduate degree in two and a half years and she continued to work three jobs. But when she began her first semester as a Temple law student in the fall of 1973, she was barely able to stay awake. Her teacher Lynne Abraham, now a Common Pleas Court judge herself, couldn't help but notice Chen yawning in the back of the class, and when she determined that this student was not a party animal but a workhorse, she arranged a teaching assistant's job for Chen on campus.

After graduating from Temple Law School in 1976, Chen worked for the U.S. Equal Employment Opportunity Commission where she was a litigator on behalf of plaintiffs who experienced discrimination in the workplace, and then moved on to become the first Asian-American to serve on the Philadelphia Commission on Human Relations.

Appointed by Mayor Wilson Goode, Chen worked with community leaders to resolve racial and ethnic tensions and also made time to contribute free legal counsel to a variety of activist groups.

The ''Help Wanted'' section of the newspaper contained an entry that aroused Chen's curiosity — an ad for a judge's position. Her application resulted in her selection by a state judicial committee to fill a seat in the state court. And in July of 1988, she officially became a judge of the Court of Common Pleas. Running as both a Republican and Democratic candidate, her position was secured when she won her seat on the bench at last November's election.

At Family Court, Chen presides over criminal and civil cases which include adult sex crimes, domestic violence, juvenile delinquency, custody, divorce and support. Not a pretty picture.

Chen recalls her first day as judge, hearing a juvenile dependency case — ''It was a horrifying experience. I broke down because the cases were so depressing,'' she remembers.

Outside of the courtroom, Chen has made a name for herself in resolving interracial conflicts, while glorying in her Chinese-American identity. In a 1986 incident involving the desecration of Korean street signs in a Philadelphia neighborhood, Chen called for a meeting with the leaders of that community to help resolve the conflict.

Chen's interest in community advocacy is not limited to Asian communities. She has been involved in Hispanic, Jewish and Black issues, and because of her participation in the Ethnic Affairs Committee of the Anti-Defamation League of B'nai B'rith, Chen was one of 10 women nationwide selected to take part in a mission to Israel.

With her recently won mandate to judicate in the affairs of Pennsylvania's citizens, Chen has pledged to work tirelessly to defend the rights of its people and contribute to the improvement of human welfare. She would have made a fabulous Brownie.

— *Jessica Schultz*



**Prose Level 4** Scale range: 326 to 375

*These tasks require readers to perform multiple-feature matches and to integrate or synthesize information from complex or lengthy passages. More complex inferences are needed to perform successfully. Conditional information is frequently present in tasks in this level and must be taken into consideration by the reader.*

Average difficulty value of tasks in this level: 352
Percentage of adults performing in this level: 17%

A prose task with a difficulty value of 328 requires the reader to synthesize the repeated statements of an argument from a newspaper column in order to generate a theme or organizing principle. In this instance, the supporting statements are elaborated in different parts of a lengthy text.

A more challenging task (with a difficulty value of 359) directs the reader to contrast the two opposing views stated in the newspaper feature reprinted here that discusses the existence of technologies that can be used to produce more fuel-efficient cars.

Contrast Dewey's and Hanna's views about the existence of technologies that can be used to produce more fuel-efficient cars while maintaining the size of the cars.

# Face-Off: Getting More Miles Per Gallon

## Demand cars with better gas mileage

By Robert Dewey
Guest columnist

WASHINGTON — Warning: Automakers are resurrecting their heavy-metal dinosaurs, aka gas guzzlers.

Government reports show that average new-car mileage has declined to 28.2 miles per gallon — the 1986 level. To reverse this trend, Congress must significantly increase existing gas-mileage standards.

More than half our Nobel laureates and 700 members of the National Academy of Sciences recently called global warming "the most serious environmental threat of the 21st century." In 1989, oil imports climbed to a near-record 46% of U.S. consumption. Increasing gas mileage is the single biggest step we can take to reduce oil imports and curb global warming. Greater efficiency also lowers our trade deficit (oil imports represent 40% of it) and decreases the need to drill in pristine areas.

Bigger engines and bigger cars mean bigger profits for automakers, who offer us the products they want us to buy. More than ever, Americans want products that have less of an environmental impact. But with only a few fuel-efficient cars to choose from, how do we find ones that meet all our needs?

Government studies show automakers have the technology to dramatically improve gas mileage — while maintaining the 1987 levels of comfort, performance and size mix of vehicles. Automakers also have the ability to make their products safer. The cost of these improvements will be offset by savings at the gas pump!

Cars can average 45 mpg and light trucks 35 mpg primarily by utilizing engine and transmission technologies already on a few cars today. Further improvements are possible by using technologies like the two-stroke engine and better aerodynamics that have been developed but not used.

When the current vehicle efficiency standards were proposed in 1974, Ford wrongly predicted that they "would require either all sub-Pinto-sized vehicles or some mix of vehicles ranging from a sub-subcompact to perhaps a Maverick." At that time, Congress required a 100% efficiency increase; raising gas mileage to 45 mpg requires only a 60% increase.

Americans want comfortable, safe and efficient cars. If automakers won't provide them, Congress must mandate them when it considers the issue this summer.

Let's hope lawmakers put the best interest of the environment and the nation ahead of the automakers' lobbyists and political action committees.

*Robert Dewey is a conservation analyst for the Environmental Action Foundation.*

*Reprinted by permission of USA Today.*

## Don't demand end to cars people want

By Thomas H. Hanna
Guest columnist

DETROIT — Do Americans look forward to the day when they'll have to haul groceries, shuttle the kids to and from school or take family vacations in compact and subcompact cars?

I doubt it — which is why U.S. and import carmakers oppose the 40-miles-per-gallon to 45 mpg corporate average fuel economy mandates that some are pushing in Congress, either to curb tailpipe carbon dioxide emissions because of alleged global warming or for energy conservation.

Since the mid-1970s, automakers have doubled the fleet average fuel economy of new cars to 28 mpg — and further progress will be made.

Compact and subcompact cars with mileage of 40 mpg or better are now available, yet they appeal to only 5% of U.S. car buyers.

But to achieve a U.S. fleet average of 40 mpg to 45 mpg, carmakers would have to sharply limit the availability of family-size models and dramatically trim the size and weight of most cars.

There simply are not magic technologies to meet such a standard.

Almost every car now sold in the USA would have to be drastically downsized, and many would be obsolete.

As a result, Americans each year would be unable to buy the vehicles most suited for their needs: mid- and family-size models, luxury automobiles, mini-vans, small trucks and utility vehicles.

The fleet shift to compacts and subcompacts could also force the closing of assembly plants, supplier firms and dealerships, at a cost of thousands of U.S. jobs.

Although a growing number of scientists are skeptical of global warming, the issue deserves thorough international scientific evaluation, not premature unilateral U.S. action.

Carbon dioxide emissions from U.S. vehicles total less than 2.5% of worldwide "greenhouse" gases. Even doubling today's corporate average fuel economy for U.S. cars — if technically possible — would cut those gases about .5%

Whatever the motivation — alleged global warming or energy conservation — the stakes are high for millions of Americans and thousands of U.S. jobs in unrealistic corporate average fuel economy mandates.

*Thomas H. Hanna is president and chief executive officer of the Motor Vehicle Manufacturers Association of the United States.*

*Reprinted by permission of USA Today.*

Reduced from original copy.

Two other tasks in Level 4 on the prose scale require the reader to draw on background knowledge in responding to questions asked about two poems. In one they are asked to generate an unfamiliar theme from a short poem (difficulty value of 362), and in the other they are asked to compare two metaphors (value of 374).

**Prose Level 5** Scale range: 376 to 500

*Some tasks in this level require the reader to search for information in dense text which contains a number of plausible distractors. Others ask readers to make high-level inferences or use specialized background knowledge. Some tasks ask readers to contrast complex information.*

Average difficulty value of tasks in this level: 423
Percentage of adults performing in this level: 3%

Two tasks in Level 5 require the reader to search for information in dense text containing several plausible distractors. One such task (difficulty value of 410) requires the respondent to read information about jury selection and service. The question requires the reader to interpret information to identify two ways in which prospective jurors may be challenged.

Identify and summarize the two kinds of challenges that attorneys use while selecting members of a jury.

## DO YOU HAVE A QUESTION?

QUESTION: What is the new program for scheduling jurors?

ANSWER: This is a new way of organizing and scheduling jurors that is being introduced all over the country. The goals of this program are to save money, increase the number of citizens who are summoned to serve and decrease the inconvenience of serving.

The program means that instead of calling jurors for two weeks, jurors now serve only one day, or for the length of one trial if they are selected to hear a case. Jurors who are not selected to hear a case are excused at the end of the day, and their obligations to serve as jurors are fulfilled for three years. The average trial lasts two days once testimony begins.

An important part of what is called the One Day – One Trial program is the ''standby'' juror. This is a person called to the Courthouse if the number of cases to be tried requires more jurors than originally estimated. Once called to the Courthouse, the standby becomes a ''regular" juror, and his or her service is complete at the end of one day or one trial, the same as everyone else.

Q. How was I summoned?

A. The basic source for names of eligible jurors is the Driver's License list which is supplemented by the voter registration list. Names are chosen from these combined lists by a computer in a completely random manner.

Once in the Courthouse, jurors are selected for a trial by this same computer and random selection process.

Q. How is the Jury for a particular trial selected?

A. When a group of prospective jurors is selected, more than the number needed for a trial are called. Once this group has been seated in the courtroom, either the Judge or the attorneys ask questions. This is called *voir dire*. The purpose of questions asked during *voir dire* is to ensure that all of the jurors who are selected to hear the case will be unbiased, objective and attentive.

In most cases, prospective jurors will be asked to raise their hands when a particular question applies to them. Examples of questions often asked are: Do you know the Plaintiff, Defendant or the attorneys in this case? Have you been involved in a case similar to this one yourself? Where the answer is yes, the jurors raising hands may be asked additional questions, as the purpose is to guarantee a fair trial for all parties. When an attorney believes that there is a legal reason to excuse a juror, he or she will challenge the juror for cause. Unless both attorneys agree that the juror should be excused, the Judge must either sustain or override the challenge.

After all challenges for cause have been ruled upon, the attorneys will select the trial jury from those who remain by exercising peremptory challenges. Unlike challenges for cause, no reason need be given for excusing a juror by peremptory challenge. Attorneys usually exercise these challenges by taking turns striking names from a list until both are satisfied with the jurors at the top of the list or until they use up the number of challenges allowed. Challenged jurors and any extra jurors will then be excused and asked to return to the jury selection room.

Jurors should not feel rejected or insulted if they are excused for cause by the Court or peremptorily challenged by one of the attorneys. The *voir dire* process and challenging of jurors is simply our judicial system's way of guaranteeing both parties to a lawsuit a fair trial.

Q. Am I guaranteed to serve on a jury?

A. Not all jurors who are summoned actually hear a case. Sometimes all the Judges are still working on trials from the previous day, and no new jurors are chosen. Normally, however, some new cases begin every day. Sometimes jurors are challenged and not selected.

A somewhat more demanding task (difficulty value of 423) involves the magazine article on Ida Chen reproduced earlier. This more challenging task requires the reader to explain the phrase "recently won mandate" used at the end of the text. To explain this phrase, the reader needs to understand the concept of a political mandate as it applies to Ida Chen and the way she is portrayed in this article.

## Document Literacy

Another important aspect of being literate in modern society is having the knowledge and skills needed to process information from documents. We often encounter tables, schedules, charts, graphs, maps, and forms in everyday life, both at home and at work. In fact, researchers have found that many of us spend more time reading documents than any other type of material.[2] The ability to locate and use information from documents is therefore essential.

Success in processing documents appears to depend at least in part on the ability to locate information in complex arrays and to use this information in the appropriate ways. Procedural knowledge may be needed to transfer information from one source or document to another, as is necessary in completing applications or order forms.

The NALS document literacy scale contains 81 tasks with difficulty values that range from 69 to 396 on the scale. By examining tasks associated with various proficiency levels, we can identify characteristics that appear to make certain types of document tasks more or less difficult for readers. Questions and directives associated with these tasks are basically of four types: *locating, cycling, integrating,* and *generating.* Locating tasks require the readers to match one or more features of information stated in the question to either identical or synonymous information given in the document. Cycling tasks require the reader to locate and match one or more features, but differ in that they require the reader to engage in a series of feature matches to satisfy conditions given in the question. The integrating tasks typically require the reader to compare and contrast information in adjacent parts of the document. In the generating tasks, readers must produce a written response by processing information found in the document and also making text-based inferences or drawing on their own background knowledge.

[2] J.T. Guthrie, M. Seifert, and I.S. Kirsch. (1986). "Effects of Education, Occupation, and Setting on Reading Practices." *American Educational Research Journal, 23*. pp. 151-160.

As with the prose tasks, each type of question or directive extends over a range of difficulty as a result of interactions among several variables or task characteristics that include:

- the number of categories or features of information in the question that the reader has to process or match
- the number of categories or features of information in the document that can serve to distract the reader or that may seem plausible but are incorrect
- the extent to which the information asked for in the question is obviously related to the information stated in the document and
- the structure of the document

A more detailed discussion of the five levels of document literacy is provided in the following pages.

**Document Level 1** Scale range: 0 to 225

*Tasks in this level tend to require the reader either to locate a piece of information based on a literal match or to enter information from personal knowledge onto a document. Little, if any, distracting information is present.*

Average difficulty value of tasks in this level: 195
Percentage of adults performing in this level: 23%

Some of the Level 1 tasks require the reader to match one piece of information in the directive with an identical or synonymous piece of information in the document. For example, readers may be asked to write a piece of personal background information — such as their name or age — in the appropriate place on a document. One task with a difficulty value of 69 directs individuals to look at a Social Security card and sign their name on the line marked “signature.” Tasks such as this are quite simple, since only one piece of information is required, it is known to the respondent, and there is only one logical place on the document where it may be entered.

Here is a Social Security card. Sign your name on the line that reads "signature."

Respondents were given a copy of a Social Security card to complete this task.

Other tasks in this level are slightly more complex. For example, in one task, readers were asked to complete a section of a job application by providing several pieces of information. This was more complicated than the previous task described, since respondents had to conduct a series of one-feature matches. As a result, the difficulty value of this task was higher (193).

You have gone to an employment center for help in finding a job. You know that this center handles many different kinds of jobs. Also, several of your friends who have applied here have found jobs that appeal to you.

The agent has taken your name and address and given you the rest of the form to fill out. Complete the form so the employment center can help you get a job.

Birth date ________ Age ___ Sex: Male ___ Female ___
Height __________ Weight __________ Health ___________
Last grade completed in school ____________

Kind of work wanted:

Part-time __________ Summer _____________
Full-time __________ Year-round ___________

Other tasks in this level ask the reader to locate specific elements in a document that contains a variety of information. In one task, for example, respondents were given a form providing details about a meeting and asked to indicate the date and time of the meeting, which were stated in the form. The difficulty values associated with these tasks were 187 and 180, respectively. The necessary information was referred to only once in the document.

**Document Level 2** Scale range: 226 to 275

*Tasks in this level are more varied than those in Level 1. Some require the reader to match a single piece of information; however, several distractors may be present, or the match may require low-level inferences. Tasks in this level may also ask the reader to cycle through information in a document or to integrate information from various parts of a document.*

Average difficulty value of tasks in this level: 249
Percentage of adults performing in this level: 28%

Some tasks in Level 2 ask readers to match two pieces of information in the text. For example, one task with a difficulty value of 275 directs the respondent to look at a pay stub and to write "the gross pay for this year to date." To perform the task successfully, respondents must match both "gross pay" and "year to date" correctly. If readers fail to match on both features, they are likely to indicate an incorrect amount.

What is the gross pay for this year to date?

| HOURS | | | |
|---|---|---|---|
| REGULAR | 2ND SHIFT | OVERTIME | TOTAL |
| 500 | | | 500 |

| PERIOD ENDING | REGULAR | OVERTIME | GROSS | DEF. ANN | NET PAY |
|---|---|---|---|---|---|
| 03/15/85 | | | | | |
| CURRENT | 62500 | | 62500 | | 45988 |
| YEAR TO DATE | | | 426885 | | |

| TAX DEDUCTIONS | FED. W/H | STATE W/H | CITY W/H | FICA |
|---|---|---|---|---|
| CURRENT | 10894 | 1375 | | 3831 |
| YEAR TO DATE | 73498 | 8250 | | 26167 |

| OTHER DEDUCTIONS | | | | | |
|---|---|---|---|---|---|
| CR UNION | | UNITED FD | PERS INS. | MISC. | MISC CODE |
| | | | | | |

| OTHER DEDUCTIONS | | | | | |
|---|---|---|---|---|---|
| CODE | TYPE | AMOUNT | CODE | TYPE | AMOUNT |
| 07 | DEN | 412 | | | |

NON-NEGOTIABLE

Reduced from original copy.

A second question based on this document — What is the current net pay? — was also expected to require readers to make a two-feature match. Accordingly, the difficulty values of the two items were expected to be similar. The task anchored at about the 224 point on the scale, however, and an analysis of the pay stub reveals why its difficulty was lower than that of the previous task. To succeed on the second task, the reader only needs to match on the feature "net pay." Since the term appears only once on the pay stub and there is only one number in the column, this task requires only a one-feature match and receives a difficulty value that lies within the Level 1 range on the document scale.

Tasks in Level 2 may also require the reader to integrate information from different parts of the document by looking for similarities or differences. For example, a task with a difficulty value of 260 asks respondents to study a line graph showing a company's seasonal sales over a three-year period, then predict the level of sales for the following year, based on the seasonal trends shown in the graph.

You are a marketing manager for a small manufacturing firm. This graph shows your company's sales over the last three years. Given the seasonal pattern shown on the graph, predict the sales for Spring 1985 (in thousands) by putting an "x" on the graph.

Reduced from original copy.

**Document Level 3** Scale range: 276 to 325

*Some tasks in this level require the reader to integrate multiple pieces of information from one or more documents. Others ask readers to cycle through rather complex tables or graphs which contain information that is irrelevant or inappropriate to the task.*

Average difficulty value of tasks in this level: 302
Percentage of adults performing in this level: 31%

Tasks within the range for Level 3 ask the reader to locate particular features in complex displays, such as tables that contain nested information. Typically, distractor information is present in the same row or column as the correct answer. For example, the reader might be asked to use a table that summarizes appropriate uses for a variety of products, and then choose which product to use for a certain project. One such task had a difficulty value of 303. To perform this task successfully, the respondent uses a table containing nested information to determine the type of sandpaper to buy if one needs "to smooth wood in preparation for sealing and plans to buy garnet sandpaper." This task requires matching not only on more than a single feature of information but also on features that are not always superordinate categories in the document. For example, "preparation for sealing" is subordinated or nested under the category "wood," while the type of sandpaper is under the main heading of "garnet." In addition, there are three other types of sandpaper that the reader might select that partially satisfy the directive.

You need to smooth wood in preparation for sealing and plan to buy garnet sandpaper. What type of sandpaper should you buy?

ABRASIVE SELECTION GUIDE

| MATERIAL & OPERATION | PRODUCTION® | | | | | GARNET | | | | WETORDRY® | | | | FRE-CUT® | | EMERY | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | EC | C | M | F | EF | C | M | F | EF | VF | EF | SF | UF | VF | EF | C | M | F |
| **WOOD** | | | | | | | | | | | | | | | | | | |
| Paint Removal | ■ | ■ | | | | | | | | | | | | | | | | |
| Heavy Stock Removal | ■ | ■ | | | | ■ | | | | | | | | | | | | |
| Moderate Stock Removal | | | ■ | | | | ■ | | | | | | | | | | | |
| Preparation for Sealing | | | | ■ | | | | ■ | | | | | | | | | | |
| After Sealer | | | | | ■ | | | | ■ | | ■ | | | | | | | |
| Between Coats | | | | | | | | | | | ■ | ■ | | | ■ | | | |
| After Final Coat | | | | | | | | | | | | ■ | ■ | | | | | |
| **METAL** | | | | | | | | | | | | | | | | | | |
| Rust and Paint Removal | ■ | ■ | | | | | | | | | | | | | | ■ | | |
| Light Stock Removal | ■ | ■ | | | | | | | | | | | | | | ■ | | |
| Preparation for Priming | | | ■ | ■ | | | | | | | | | | ■ | | | ■ | |
| Finishing and Polishing | | | | | ■ | | | | | ■ | ■ | ■ | ■ | | | | | ■ |
| After Primer | | | | | ■ | | | | | | ■ | ■ | | | ■ | | | |
| Between Coats | | | | | | | | | | | | ■ | | | ■ | | | |
| After Final Coat | | | | | | | | | | | | | ■ | | | | | |
| **PLASTIC & FIBERGLASS** | | | | | | | | | | | | | | | | | | |
| Shaping | ■ | ■ | | | | | | | | | | | | | | | | |
| Light Stock Removal | | | ■ | | | | | | | | | | | | | | | |
| Finishing & Scuffing | | | | ■ | ■ | | | | | ■ | | | | ■ | | | | |

EC = Extra Coarse   C = Coarse   M = Medium   F = Fine   VF = Very Fine   EF = Extra Fine   SF = Super Fine   UF = Ultra Fine

**SAFETY INFORMATION:**
■ Wear approved safety goggles when sanding.
■ Use particle/dust mask or other means to prevent inhalation of sanding dust.
■ When using power tools, follow manufacturer's recommended procedures and safety instructions.

Reprint by permission of and copyrighted by the 3M Co.

Reduced from original copy.

At the same level of difficulty (307), another task directs the reader to a stacked bar graph depicting estimated power consumption by source for four different years. The reader is asked to select an energy source that will provide more power in the year 2000 than it did in 1971. To succeed on this task, the reader must first identify the correct years and then compare each of the five pairs of energy sources given.

**Document Level 4** Scale range: 326 to 375

*Tasks in this level, like those in the previous levels, ask readers to perform multiple-feature matches, cycle through documents, and integrate information; however, they require a greater degree of inferencing. Many of these tasks require readers to provide numerous responses but do not designate how many responses are needed. Conditional information is also present in the document tasks in this level and must be taken into account by the reader.*

Average difficulty value of tasks in this level: 340
Percentage of adults performing in this level: 15%

One task in this level (348) combines many of the variables that contribute to difficulty in Level 4. These include: multiple feature matching, complex displays involving nested information, numerous distractors, and conditional information that must be taken into account in order to arrive at a correct response. Using the bus schedule shown here, readers are asked to select the time of the next bus on a Saturday afternoon, if they miss the 2:35 bus leaving Hancock and Buena Ventura going to Flintridge and Academy. Several departure times are given, from which respondents must choose the correct one.

On Saturday afternoon, if you miss the 2:35 bus leaving Hancock and Buena Ventura going to Flintridge and Academy, how long will you have to wait for the next bus?

**ROUTE 5**

# VISTA GRANDE

This bus line operates Monday through Saturday providing *"local service"* to most neighborhoods in the northeast section.
Buses run thirty minutes apart during the morning and afternoon rush hours Monday through Friday.
Buses run one hour apart at all other times of day and Saturday.
**No Sunday, holiday or night service.**

**OUTBOUND** from Terminal / **INBOUND** toward Terminal

*You can transfer from this bus to another headed anywhere else in the city bus system*

| | OUTBOUND: Leave Downtown Terminal | Leave Hancock and Buena Ventura | Leave Citadel | Leave Rustic Hills | Leave North Carefree and Oro Blanco | Arrive Flintridge and Academy | INBOUND: Leave Flintridge and Academy | Leave North Carefree and Oro Blanco | Leave Rustic Hills | Leave Citadel | Leave Hancock and Buena Ventura | Arrive Downtown Terminal | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AM | | | | | | | 6:15 | 6:27 | 6:42 | 6:47 | 6:57 | 7:15 | |
| | | | | | | | 6:45 | 6:57 | 7:12 | 7:17 | 7:27 | 7:45 | Monday through Friday only |
| | 6:20 | 6:35 | 6:45 | 6:50 | 7:03 | 7:15 | 7:15 | 7:27 | 7:42 | 7:47 | 7:57 | 8:15 | |
| | 6:50 | 7:05 | 7:15 | 7:20 | 7:33 | 7:45 | 7:45 | 7:57 | 8:12 | 8:17 | 8:27 | 8:45 | Monday through Friday only |
| | 7:20 | 7:35 | 7:45 | 7:50 | 8:03 | 8:15 | 8:15 | 8:27 | 8:42 | 8:47 | 8:57 | 9:15 | |
| | 7:50 | 8:05 | 8:15 | 8:20 | 8:33 | 8:45 | 8:45 | 8:57 | 9:12 | 9:17 | 9:27 | 9:45 | Monday through Friday only |
| | 8:20 | 8:35 | 8:45 | 8:50 | 9:03 | 9:15 | 9:15 | 9:27 | 9:42 | 9:47 | 9:57 | 10:15 | |
| | 8:50 | 9:05 | 9:15 | 9:20 | 9:33 | 9:45 | 9:45 | 9:57 | 10:12 | 10:17 | 10:27 | 10:45 | Monday through Friday only |
| | 9:20 | 9:35 | 9:45 | 9:50 | 10:03 | 10:15 | 10:15 | 10:27 | 10:42 | 10:47 | 10:57 | 11:15 | |
| | 10:20 | 10:35 | 10:45 | 10:50 | 11:03 | 11:15 | 11:15 | 11:27 | 11:42 | 11:47 | 11:57 | 12:15 | |
| | 11:20 | 11:35 | 11:45 | 11:50 | 12:03 | 12:15 | 12:15 | 12:27 | 12:42 p.m. | 12:47 p.m. | 12:57 p.m. | 1:15 p.m. | |
| PM | 12:20 | 12:35 | 12:45 | 12:50 | 1:03 | 1:15 | 1:15 | 1:27 | 1:42 | 1:47 | 1:57 | 2:15 | |
| | 1:20 | 1:35 | 1:45 | 1:50 | 2:03 | 2:15 | 2:15 | 2:27 | 2:42 | 2:47 | 2:57 | 3:15 | |
| | 2:20 | 2:35 | 2:45 | 2:50 | 3:03 | 3:15 | 3:15 | 3:27 | 3:42 | 3:47 | 3:57 | 4:15 | |
| | 2:50 | 3:05 | 3:15 | 3:20 | 3:33 | 3:45 | 3:45 | 3:57 | 4:12 | 4:17 | 4:27 | 4:45 | Monday through Friday only |
| | 3:20 | 3:35 | 3:45 | 3:50 | 4:03 | 4:15 | 4:15 | 4:27 | 4:42 | 4:47 | 4:57 | 5:15 | |
| | 3:50 | 4:05 | 4:15 | 4:20 | 4:33 | 4:45 | 4:45 | 4:57 | 5:12 | 4:17 | 5:27 | 5:45 | Monday through Friday only |
| | 4:20 | 4:35 | 4:45 | 4:50 | 5:03 | 5:15 | 5:15 | 5:27 | 5:42 | 5:47 | 5:57 | 6:15 | |
| | 4:50 | 5:05 | 5:15 | 5:20 | 5:33 | 5:45 | 5:45 | 5:57 | 6:12 | 6:17 | 6:27 | 6:45 | Monday through Friday only |
| | 5:20 | 5:35 | 5:45 | 5:50 | 6:03 | 6:15 | | | | | | | |
| | 5:50 | 6:05 | 6:15 | 6:20 | 6:33 | 6:45 | | | | | | | Monday through Friday only |
| | 6:20 | 6:35 | 6:45 | 6:50 | 7:03 | 7:15 | | | | | | | |

To be sure of a smooth transfer tell the driver of this bus the name of the second bus you need.



Other tasks involving this bus schedule are found in Level 3. These tasks require the reader to match on fewer features of information and do not involve the use of conditional information.

**Document Level 5** Scale range: 376 to 500

*Tasks in this level require the reader to search through complex displays that contain multiple distractors, to make high-level text-based inferences, and to use specialized knowledge.*

Average difficulty value of tasks in this level: 391
Percentage of adults performing in this level: 3%

A task receiving a difficulty value of 396 involves reading and understanding a table depicting the results from a survey of parents and teachers evaluating parental involvement in their school. Respondents were asked to write a brief paragraph summarizing the results. This particular task requires readers to integrate the information in the table to compare and contrast the viewpoints of parents and teachers on a selected number of school issues.

Using the information in the table, write a brief paragraph summarizing the extent to which parents and teachers agreed or disagreed on the statements about issues pertaining to parental involvement at their school.

**Parents and Teachers Evaluate Parental Involvement at Their School**

*Do you agree or disagree that . . . ?*

| | Total | Level of School | | |
|---|---|---|---|---|
| | | Elementary | Junior High | High School |
| | | *percent agreeing* | | |
| Our school does a good job of encouraging parental involvement in sports, arts, and other nonsubject areas | | | | |
| **Parents** | 77 | 76 | 74 | 79 |
| **Teachers** | 77 | 73 | 77 | 85 |
| Our school does a good job of encouraging parental involvement in educational areas | | | | |
| **Parents** | 73 | 82 | 71 | 64 |
| **Teachers** | 80 | 84 | 78 | 70 |
| Our school only contacts parents when there is a problem with their child | | | | |
| **Parents** | 55 | 46 | 62 | 63 |
| **Teachers** | 23 | 18 | 22 | 33 |
| Our school does not give parents the opportunity for any meaningful roles | | | | |
| **Parents** | 22 | 18 | 22 | 28 |
| **Teachers** | 8 | 8 | 12 | 7 |

Source: The Metropolitan Life Survey of the American Teacher, 1987

## Quantitative Literacy

Since adults are often required to perform numerical operations in everyday life, the ability to perform quantitative tasks is another important aspect of literacy. These abilities may seem, at first glance, to be fundamentally different from the types of skills involved in reading prose and documents and, therefore, to extend the concept of literacy beyond its traditional limits. However, research indicates that the processing of printed information plays a critical role in affecting the difficulty of tasks along this scale.[3]

[3] I.S. Kirsch and A. Jungeblut. (1986). *Literacy: Profiles of America's Young Adults, Final Report.* Princeton, NJ: Educational Testing Service. I.S. Kirsch, A. Jungeblut, and A. Campbell. (1992). *Beyond the School Doors: The Literacy Needs of Job Seekers Served by the U.S. Department of Labor.* Princeton, NJ: Educational Testing Service.

The NALS quantitative literacy scale contains some 43 tasks with difficulty values that range from 191 to 436. The difficulty of these tasks appears to be a function of several factors, including:

- the particular arithmetic operation called for
- the number of operations needed to perform the task
- the extent to which the numbers are embedded in printed materials and
- the extent to which an inference must be made to identify the type of operation to be performed

In general, it appears that many individuals can perform simple arithmetic operations when both the numbers and operations are made explicit. However, when the numbers to be used must be located in and extracted from different types of documents that contain similar but irrelevant information, or when the operations to be used must be inferred from printed directions, the tasks become increasingly difficult.

A detailed discussion of the five levels of quantitative literacy is provided on the following pages.

**Quantitative Level 1** Scale range: 0 to 225

*Tasks in this level require readers to perform single, relatively simple arithmetic operations, such as addition. The numbers to be used are provided and the arithmetic operation to be performed is specified.*

Average difficulty value of tasks in this level: 206
Percentage of adults performing in this level: 22%

The least demanding task on the quantitative scale (191) requires the reader to total two numbers on a bank deposit slip. In this task, both the numbers and the arithmetic operation are judged to be easily identified and the operation involves the simple addition of two decimal numbers that are set up in column format.

You wish to use the automatic teller machine at your bank to make a deposit. Figure the total amount of the two checks being deposited. Enter the amount on the form in the space next to TOTAL.

**Availability of Deposits**

Funds from deposits may not be available for immediate withdrawal. Please refer to your institution's rules governing funds availability for details.

Crediting of deposits and payments is subject to verification and collection of actual amounts deposited or paid in accordance with the rules and regulations of your financial institution.

**PLEASE PRINT**

YOUR MAC CARD NUMBER (No PINs PLEASE)
111 222 333 4

YOUR FINANCIAL INSTITUTION
Union Bank

YOUR ACCOUNT NUMBER
987 555 674

YOUR NAME
Chris Jones

CHECK ONE ___ DEPOSIT or ____ PAYMENT

| CASH | $ | 00 |
|---|---|---|
| LIST CHECKS BY BANK NO. | ENDORSE WITH NAME & ACCOUNT NUMBER | |
| | 557 | |
| | 19 | |
| | 75 | 00 |
| | | |
| | | |
| TOTAL | | |

DO NOT DETACH TICKET

DO NOT FOLD NO COINS OR PAPER CLIPS PLEASE

**Quantitative Level 2** Scale range: 226 to 275

*Tasks in this level typically require readers to perform a single operation using numbers that are either stated in the task or easily located in the material. The operation to be performed may be stated in the question or easily determined from the format of the material (for example, an order form).*

Average difficulty value of tasks in this level: 251
Percentage of adults performing in this level: 25%

In the easier tasks in Level 2, the quantities are also easy to locate. In one such task at 246 on the quantitative scale, the cost of a ticket and bus is given for each of two shows. The reader is directed to determine how much less attending one show will cost in comparison to the other.

The price of one ticket and bus for "Sleuth" costs how much less than the price of one ticket and bus for "On the Town"?

THEATER TRIP

A charter bus will leave from the bus stop (near the Conference Center) at 4 p.m., giving you plenty of time for dinner in New York. Return trip will start from West 45th Street directly following the plays. Both theaters are on West 45th Street. Allow about 1½ hours for the return trip.

| | | | |
|---|---|---|---|
| Time: | 4 p.m., Saturday, November 20 | | |
| Price: | "On the Town" | Ticket and bus | $11.00 |
| | "Sleuth" | Ticket and bus | $8.50 |
| Limit: | Two tickets per person | | |

In a more complex set of tasks, the reader is directed to complete an order form for office supplies using a page from a catalogue. No other specific instructions as to what parts of the form should be completed are given in the directive. One task (difficulty value of 270) requires the reader to use a table on the form to locate the appropriate shipping charges based on the amount of a specified set of office supplies, to enter the correct amount on an order form, and then to calculate the total price of the supplies.

**Quantitative Level 3** Scale range: 276 to 325

*In tasks in this level, two or more numbers are typically needed to solve the problem, and these must be found in the material. The operation(s) needed can be determined from the arithmetic relation terms used in the question or directive.*

Average difficulty value of tasks in this level: 293
Percentage of adults performing in this level: 31%

In general, tasks within the range for Level 3 ask the reader to perform a single operation of addition, subtraction, multiplication, or division. However, the operation is not stated explicitly in the directive or made clear by the format of the document. Instead, it must be inferred from the terms used in the directive. These tasks are also more difficult because the reader must locate the numbers in various parts of the document in order to perform the operation.

From a bar graph showing percentages of population growth for two groups across six periods, a task at the 279 point on the scale directs the reader to calculate the difference between the groups for one of the years.

A more difficult task in Level 3 (321) requires the use of a bus schedule to determine how long it takes to travel from one location to another on a Saturday. To respond correctly, the reader must match on several features of information given in the question to locate the appropriate times.

Suppose that you took the 12:45 p.m. bus from U.A.L.R. Student Union to 17th and Main on a Saturday. According to the schedule, how many minutes is the bus ride?



| | BUS LEAVES from U.A.L.R. Student Union | Bus arrives at 20th & Woodrow | Bus arrives at 17th & Main | BUS ENDS at Capitol & Louisiana |
|---|---|---|---|---|
| **WEEKDAYS** | | | | |
| A.M. | 5:38 | 5:51 | 6:00 | 6:09 |
| | 6:11 | 6:25 | 6:35 | 6:45 |
| | 6:41 | 6:55 | 7:05 | 7:15 |
| | 7:11 | 7:25 | 7:35 | 7:45 |
| | 7:41 | 7:55 | 8:05 | 8:15 |
| | 8:11 | 8:25 | 8:35 | 8:45 |
| | 8:41 | 8:55 | 9:05 | 9:15 |
| | 9:14 | 9:27 | 9:36 | 9:45 |
| | 9:44 | 9:57 | 10:06 | 10:15 |
| | 10:14 | 10:27 | 10:36 | 10:45 |
| | 10:44 | 10:57 | 11:06 | 11:15 |
| | 11:14 | 11:27 | 11:36 | 11:45 |
| | 11:44 | 11:57 | 12:06 | 12:15 |
| P.M. | 12:14 | 12:27 | 12:36 | 12:45 |
| | 12:44 | 12:57 | 1:06 | 1:15 |
| | 1:14 | 1:27 | 1:36 | 1:45 |
| | 1:44 | 1:57 | 2:06 | 2:15 |
| | 2:14 | 2:27 | 2:36 | 2:45 |
| | 2:44 | 2:57 | 3:06 | 3:15 |
| | 3:14 | 3:27 | 3:36 | 3:45 |
| | 3:43 | 3:56 | 4:05 | 4:15 |
| | 4:13 | 4:26 | 4:35 | 4:45 |
| | 4:43 | 4:56 | 5:05 | 5:15 |
| | 5:13 | 5:26 | 5:35 | 5:45 |
| | 5:45 | 5:58 | 6:07 | 6:17 |
| | 6:11 | 6:22 | 6:30 | – |
| | 6:46 | 6:57 | 7:05 | – |
| **SATURDAY** | | | | |
| A.M. | 5:38 | 5:51 | 6:00 | 6:09 |
| | 6:45 | 6:57 | 7:06 | 7:15 |
| | 7:45 | 7:57 | 8:06 | 8:15 |
| | 8:45 | 8:57 | 9:06 | 9:15 |
| | 9:45 | 9:57 | 10:06 | 10:15 |
| | 10:45 | 10:57 | 11:06 | 11:15 |
| | 11:45 | 11:57 | 12:06 | 12:15 |
| P.M. | 12:45 | 12:57 | 1:06 | 1:15 |
| | 1:45 | 1:57 | 2:06 | 2:15 |
| | 2:45 | 2:57 | 3:06 | 3:15 |
| | 3:45 | 3:57 | 4:06 | 4:15 |
| | 4:45 | 4:57 | 5:06 | 5:15 |
| | 5:45 | 5:57 | 6:06 | 6:15 |
| | 6:44 | 6:56 | 7:05 | – |

Reduced from original copy.



**Quantitative Level 4** Scale range: 326 to 375

*These tasks tend to require readers to perform two or more sequential operations or a single operation in which the quantities are found in different types of displays, or the operations must be inferred from semantic information given or drawn from prior knowledge.*

Average difficulty value of tasks in this level: 349
Percentage of adults performing in this level: 17%

One task in this level, with a difficulty value of 332, asks the reader to estimate, based on information in a news article, how many miles per day a driver covered in a sled-dog race. The respondent must know that to calculate a "per day" rate requires the use of division.

A more difficult task (355) requires the reader to select from two unit price labels to estimate the cost per ounce of creamy peanut butter. To perform this task successfully, readers may have to draw some information from prior knowledge.

Estimate the cost per ounce of the creamy peanut butter. Write your estimate on the line provided.

| **Unit price** | | **You pay** |
|---|---|---|
| 11.8¢ per oz. | | 1.89 |
| rich chnky pnt bt | | |
| 10693 | 0 51144 09071 | 16 oz. |

| **Unit price** | | **You pay** |
|---|---|---|
| 1.59 per lb. | | 1.99 |
| creamy pnt butter | | |
| 10732 | 0 51144 09071 | 20 oz. |



**Quantitative Level 5** Scale range: 376 to 500

*These tasks require readers to perform multiple operations sequentially. They must disembed the features of the problem from text or rely on background knowledge to determine the quantities or operations needed.*

Average difficulty value of tasks in this level: 411
Percentage of adults performing in this level: 4%

One of the most difficult tasks on the quantitative scale (433) requires readers to look at an advertisement for a home equity loan and then, using the information given, explain how they would calculate the total amount of interest charges associated with the loan.

You need to borrow $10,000. Find the ad for Home Equity Loans on page 2 in the newspaper provided. Explain to the interviewer how you would compute the total amount of interest charges you would pay under this loan plan. Please tell the interviewer when you are ready to begin.

**FIXED RATE • FIXED TERM**

**HOME EQUITY LOANS** **14.25%**

**SAMPLE MONTHLY REPAYMENT SCHEDULE**

| Amount Financed | Monthly Payment |
| --- | --- |
| $10,000 | $156.77 |
| $25,000 | $391.93 |
| $40,000 | $627.09 |

**120 Months 14.25% APR**

Reduced from original copy.

## Estimating Performance Across the Literacy Levels

The literacy levels not only provide a way to explore the progression of information-processing demands across the scales; they can also be used to explore the likelihood that individuals in each level will succeed on tasks of varying difficulty.

The following graphs (Figure 3.2) display the probability that individuals performing at selected points on each scale will give a correct response to tasks with varying difficulty values. We see, for example, that a person whose prose proficiency is 150 has less than a 50 percent chance of giving a correct response to the Level 1 tasks. Individuals whose proficiency scores were at the 200 point, on the other hand, have an almost 80 percent probability of responding correctly to these tasks.

In terms of task demands, we can infer that adults performing at the 200 point on the prose scale are likely to be able to locate a single piece of information in a brief piece of text where there is no distracting information, or when any distracting information is located apart from the desired information. They are likely to have far more difficulty with the types of tasks that occur in Levels 2 through 5, however. For example, they would have only about a 30 percent chance of performing the average task in Level 2 correctly and only about a 10 percent chance of success, or less, on the more challenging tasks found in Levels 3, 4, and 5.

In contrast, readers at the 300 point on the prose scale have an 80 percent (or higher) likelihood of success on tasks in Levels 1, 2, and 3. This means that they demonstrate skill identifying information in fairly dense text without organizational aids. They can also integrate, compare, and contrast information that is easily identified in the text. On the other hand, they are likely to have difficulty with tasks that require them to make higher level inferences, to take conditional information into account, and to use specialized knowledge. The probabilities of their performing these Level 4 tasks successfully are just under 50 percent, and on the Level 5 tasks their likelihood of responding correctly falls to under 20 percent.

**NALS** **Figure 3.2**

**Average Probabilities of Successful Performance by Individuals with Selected Proficiency Scores on the Tasks in Each Literacy Level**

**PROSE**

**DOCUMENT**

**QUANTITATIVE**

Adults' Proficiency Scores: 150 ● 200 ○ 250 ■ 300 □ 350 ▲ 400 △

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Similar interpretations can be made using the performance results on the document and quantitative scales. For example, an individual with a proficiency of 150 on the quantitative scale is estimated to have only a 50 percent chance of responding correctly to tasks in Level 1 and less than a 30 percent chance of responding to tasks in each of the other levels. Such an individual demonstrates little or no proficiency in performing the range of quantitative tasks found in this assessment. In contrast, someone with a proficiency of 300 meets or exceeds the 80 percent criterion for the average tasks in Levels 1, 2, and 3. They can be expected to encounter more difficulty with tasks in Levels 4 and 5.

## Missing Responses to Literacy Tasks

In any educational, social, or political opinion survey, missing responses are always present. Sometimes missing data can be ignored when tabulating and reporting survey results. If the reasons the data are missing are related to the outcome of the study, however, the missing responses will bias the results unless some adjustment can be made to counter the bias. In this survey, there were reasons to believe that the literacy performance data were missing more often for adults with lower levels of literacy than for adults with higher levels. Field test evidence and experience with surveys indicated that adults with lower levels of literacy would be more likely than adults with higher proficiencies either to decline to respond to the survey at all or to begin the assessment but not to complete it. Ignoring the pattern of missing data would have resulted in overestimating the literacy skills of adults in the United States.

For this survey, several procedures were developed to reduce biases due to nonresponse, based on how much of the survey the respondent completed.[4] Individuals who refused to participate in the survey before any information about them was collected were omitted from the analyses. Because they were unlikely to know that the survey intended to assess their literacy, it was assumed that their reason for refusing was not related to their level of literacy skills.

Some individuals began the interview, but stopped before they completed at least five tasks on each literacy scale.[5] The interviewers were trained to record accurately their reasons for stopping. The reasons were subsequently

[4]For a full discussion of the procedures used in scoring, scaling, weighting, and handling nonresponse problems, see the forthcoming *Technical Report of the 1992 National Adult Literacy Survey*.

[5]Five was the minimum number of completed tasks needed for accurate proficiency estimation. No special procedures were needed to estimate the proficiencies of those who broke off the assessment after attempting five or more tasks on each scale.

classified as either related or unrelated to literacy skills. Literacy-related reasons included difficulty with reading or writing, inability to read or write in English, and mental or learning disabilities. Reasons unrelated to literacy included physical disabilities, time conflicts, and interruptions. Some adults gave no reason for stopping the assessment.

Overall, 88 percent of respondents completed the assessment (at least five tasks on each literacy scale). Twelve percent started the survey but stopped before completing five tasks. About half of these individuals, or 6 percent of the adult population, did not complete the assessment for reasons related to their literacy skills, while the other 6 percent did not complete it for reasons unrelated to literacy or for no stated reason.

The missing data were treated differently depending on whether nonrespondents' reasons were related or unrelated to their literacy skills. The missing responses of those who gave literacy-related reasons for terminating the assessment were treated as wrong answers, based on the assumption that they could not have correctly completed the literacy tasks. The missing responses of those who broke off the assessment for no stated reason or for reasons unrelated to literacy were essentially ignored, since it could not be assumed that their answers would have been either correct or incorrect. The proficiencies of such respondents were inferred from the performance of other adults with similar characteristics.

Table 3.1 shows the proficiency scores resulting from these procedures. Adults who completed the assessment had average proficiencies ranging from 279 to 285 on the three literacy scales. Because the missing responses of adults who did not complete the assessment for reasons related to literacy were treated as wrong answers, the average scores of these adults were considerably lower, ranging from 114 to 124. Nearly all adults who terminated the assessment for literacy-related reasons scored in the Level 1 range (below 225). Adults who stopped for other reasons or for unstated reasons had scores between those of the other two groups, ranging from 228 to 237. These adults were not found only in the lowest literacy level, but were distributed across the five levels.

It is likely that there were some errors in classifying nonrespondents' reasons for not completing the assessment. Some adults may have given an explanation that reflected badly on their literacy skills simply because they found completing the assessment too burdensome. Perhaps they could have performed better if they had tried harder. The assumption that such adults are unable to succeed with the literacy tasks may be too strong, and the assignment of wrong answers may underestimate their skills. Other adults may have anticipated failure in the assessment, yet concealed their lack of literacy

**Table 3.1: Percentages and average proficiencies of adults on each scale, by assessment completion status**

| | | Literacy scale | | |
|---|---|---|---|---|
| | | Prose | Document | Quantitative |
| Assessment completion status | CPCT | PROF (se) | PROF (se) | PROF (se) |
| Total | 100 | 272 (0.6) | 267 (0.7) | 271 (0.7) |
| Completed assessment | 88 | 285 (0.6) | 279 (0.6) | 284 (0.6) |
| Did not complete assessment for literacy-related reasons | 6 | 124 (1.5) | 116 (1.4) | 114 (1.9) |
| Did not complete assessment for reasons unrelated to literacy | 6 | 237 (3.0) | 228 (2.8) | 231 (3.6) |

Notes: CPCT = column percentage; PROF = average proficiency; se = standard error.
SOURCE: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

skills by citing other reasons for not responding, or by refusing to explain their reason. The assumption that these adults are just like others in their demographic group may also be too strong, and the failure to assign wrong answers may overestimate their skills. To some extent the errors can be expected to counterbalance one another, but the available data are insufficient to assess which kind of classification error occurred more often.

## Performance in the Lowest Literacy Level

Level 1 is somewhat different from the other literacy levels. For Levels 2 through 5, adults who can consistently perform the tasks in a given level (that is, at least 80 percent of the time) are said to perform in that level. For example, adults in Level 2 have a high probability of success on the tasks in that level, and more than an 80 percent likelihood of success on the Level 1 tasks. Likewise, adults in Level 3 have a high probability of success on the tasks in that level, as well as on the tasks in Levels 1 and 2.

Level 1, on the other hand, includes adults with a wide range of literacy skills, including some who performed the Level 1 tasks consistently and others who did not. Individuals who do not have an 80 percent probability of success with Level 1 tasks are still grouped in Level 1. Thus, some but not all adults in this level met the relatively undemanding requirements of the Level 1 tasks. This section describes how many adults in Level 1 did not meet the demands of the tasks in this level.

The failure to perform correctly at least one of the literacy tasks can be taken as an indicator of not being able to meet the demands of tasks in Level 1. Table 3.2 provides information on the size of the groups that met or did not meet the relatively undemanding requirements of the Level 1 tasks.

Most adults in the lowest literacy level on each scale performed at least one literacy task correctly. Nearly three-quarters (72 percent) of adults in Level 1 on the prose scale performed at least one task correctly, as did 83 percent of those in Level 1 on the document scale and 66 percent of those in Level 1 on the quantitative scale. The difference in performance among the scales occurs because the least difficult document task had a value of 68, while the least difficult prose task had a value of 149 and the least difficult quantitative task had a value of 191.

**Table 3.2: Percentages and average proficiencies on each scale of adults in Level 1**

| | Literacy scale | | | | | |
|---|---|---|---|---|---|---|
| | Prose | | Document | | Quantitative | |
| Performance | CPCT | PROF | CPCT | PROF | CPCT | PROF |
| Total in Level 1 | 100 | 173 | 100 | 172 | 100 | 167 |
| At least one task correct | 72 | 190 | 83 | 182 | 66 | 190 |
| No tasks correct | 21 | 113 | 11 | 94 | 26 | 110 |
| No performance data | 7 | 177 | 6 | 177 | 8 | 159 |

Notes: CPCT = column percentage; PROF = average proficiency.

SOURCE: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

A small proportion of adults in Level 1 did not perform any literacy tasks correctly. Some of these adults completed the survey, while others did not for literacy-related or other reasons. Those who did not succeed on any literacy tasks constitute 21 percent of adults in Level 1 on the prose scale, 11 percent of adults in Level 1 on the document scale, and 26 percent of adults in Level 1 on the quantitative scale. There are wide disparities in average proficiencies between those who performed at least one task correctly (182 to 190 across the scales) and those who did not (94 to 113 across the scales).

For some adults in Level 1 (6 to 8 percent) there are no literacy performance data because they did not respond to any of the literacy tasks for reasons unrelated to their literacy skills or for unknown reasons. These persons could not be described as either meeting or failing to meet the demands of the literacy tasks, so they are distinguished as a separate group. Their proficiencies

were inferred from the performance of other adults with similar demographic backgrounds and fell in the middle range between the other two groups. Nearly all adults who correctly responded to at least one literacy task also completed the assessment. Still, some adults broke off the assessment after already having shown some initial success. Table 3.3 divides adults in Level 1 who were successful with at least one task into two groups: those who completed the assessment (at least five literacy tasks) and those who did not.

Across the scales, from 83 to 90 percent of those in Level 1 who correctly responded to at least one task also completed the assessment. Their average scores ranged from 192 to 196. The remainder (10 to 17 percent) performed at least one task correctly before breaking off the assessment. Their average scores were much lower, ranging from 132 to 153.

**Table 3.3: Percentages and average proficiencies of adults in Level 1 with at least one task correct, by assessment completion status**

| | Literacy scale | | | | | |
|---|---|---|---|---|---|---|
| | Prose | | Document | | Quantitative | |
| Completion status | CPCT | PROF | CPCT | PROF | CPCT | PROF |
| Total in Level 1 with at least one task correct | 100 | 190 | 100 | 182 | 100 | 190 |
| Completed assessment | 87 | 196 | 83 | 192 | 90 | 194 |
| Did not complete assessment | 13 | 153 | 17 | 132 | 10 | 153 |

Notes: CPCT = column percentage; PROF = average proficiency.

SOURCE: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

The population of adults who scored in Level 1 on each scale includes not only those who demonstrated success with at least some of the tasks in Level 1 — who constituted the majority — but also those who did not succeed with any of the tasks in this level. Nearly all of those in Level 1 who did not perform any literacy tasks correctly also failed to complete the assessment (86 to 98 percent), as shown in table 3.4. Their average scores range from 93 to 107 across the scales. Most of these adults either did not start or broke off the assessment for literacy-related reasons, so that any literacy tasks that remained unanswered were treated as incorrect.

**Table 3.4: Percentages and average proficiencies of adults in Level 1 with no tasks correct, by assessment completion status**

| | Literacy scale | | | | | |
|---|---|---|---|---|---|---|
| | Prose | | Document | | Quantitative | |
| Completion status | CPCT | PROF | CPCT | PROF | CPCT | PROF |
| Total in Level 1 with no tasks correct | 100 | 113 | 100 | 94 | 100 | 110 |
| Completed assessment | 14 | 148 | 2 | ---- | 14 | 146 |
| Did not complete assessment | 86 | 107 | 98 | 93 | 86 | 98 |

Notes: CPCT = column percentage; PROF = average proficiency.
---- indicates that the cell size is too small to provide reliable proficiency estimates.

SOURCE: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Two to 14 percent of the adults in Level 1 who did not succeed on any of the literacy tasks did, in fact, complete the assessment. Their average scores were 148 on the prose scale and 146 on the quantitative scale; too few cases were available to estimate an average document score.

The pattern of Level 1 proficiencies associated with various combinations of missing and incorrect answers shows the consequences of including, rather than excluding, adults who did not complete the assessment for literacy-related reasons. In general, the very low scores of these adults bring down the average for any group in which they are a significant component. Omitting these persons from the assessment would have resulted in inflated estimates of the literacy skills of the adult population overall and particularly of certain subgroups.

## Population Diversity within the Lowest Literacy Level

Certain populations of adults were disproportionately likely not to meet the demands of the Level 1 tasks. This section describes the characteristics of adults in Level 1 who did not meet the relatively undemanding requirements of the tasks in this level. Tables 3.5P, D, and Q provide information on the demographic composition of the total adult population in this country, of adults in Level 1 on each literacy scale, and of those adults in Level 1 who did not succeed on any of the assessment tasks.

**Table 3.5P: Percentages of adults in selected groups, by membership in total U.S. population, in Level 1, and in Level 1 with no tasks correct**

| | Prose scale | | |
|---|---|---|---|
| | Total U.S. population | Level 1 population | Level 1 no tasks correct |
| Population group | CPCT | CPCT | CPCT |
| Weighted sample size (in millions) | 191.3 | 40.0 | 8.2 |
| **Country of birth** | | | |
| Born in another country | 10 | 25 (1.3) | 55 (2.2) |
| **Highest level of education** | | | |
| 0 to 8 years | 10 | 35 (1.6) | 61 (2.3) |
| 9 to 12 years | 13 | 27 (1.3) | 17 (1.5) |
| HS diploma or GED | 30 | 24 (1.4) | 14 (1.5) |
| **Race/Ethnicity** | | | |
| White | 76 | 51 (0.6) | 29 (2.3) |
| Black | 11 | 20 (1.0) | 15 (1.4) |
| Hispanic | 10 | 23 (1.4) | 49 (2.1) |
| Asian/Pacific Islander | 2 | 4 (3.9) | 5 (0.9) |
| **Age** | | | |
| 16 to 24 years | 18 | 13 (0.8) | 10 (1.2) |
| 65 years and older | 16 | 33 (1.5) | 28 (1.8) |
| **Disability or condition** | | | |
| Any condition | 12 | 26 (1.0) | 26 (1.7) |
| Visual difficulty | 7 | 19 (1.5) | 20 (1.5) |
| Hearing difficulty | 7 | 13 (1.6) | 13 (2.0) |
| Learning disability | 3 | 9 (2.1) | 15 (1.4) |

Notes: CPCT = column percentage; se = standard error.

SOURCE: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

**Table 3.5D: Percentages of adults in selected groups, by membership in total U.S. population, in Level 1, and in Level 1 with no tasks correct**

| | Document scale | | |
|---|---|---|---|
| | Total U.S. population | Level 1 population | Level 1 no tasks correct |
| Population group | CPCT | CPCT | CPCT |
| Weighted sample size (in millions) | 191.3 | 44.0 | 4.7 |
| Country of birth | | | |
| Born in another country | 10 | 22 (1.3) | 67 (3.2) |
| Highest level of education | | | |
| 0 to 8 years | 10 | 33 (1.5) | 65 (3.1) |
| 9 to 12 years | 13 | 26 (1.5) | 12 (1.7) |
| HS diploma or GED | 30 | 26 (1.7) | 13 (2.1) |
| Race/Ethnicity | | | |
| White | 76 | 54 (0.7) | 21 (3.0) |
| Black | 11 | 20 (0.9) | 9 (1.1) |
| Hispanic | 10 | 21 (1.7) | 62 (3.2) |
| Asian/Pacific Islander | 2 | 3 (3.2) | 5 (1.6) |
| Age | | | |
| 16 to 24 years | 18 | 11 (0.6) | 11 (1.8) |
| 65 years and older | 16 | 35 (1.5) | 25 (2.2) |
| Disability or condition | | | |
| Any condition | 12 | 26 (1.2) | 22 (2.5) |
| Visual difficulty | 7 | 18 (1.3) | 17 (2.3) |
| Hearing difficulty | 7 | 13 (2.0) | 12 (2.0) |
| Learning disability | 3 | 8 (2.3) | 14 (1.6) |

Notes: CPCT = column percentage; se = standard error.

SOURCE: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

While 10 percent of the adult population reported that they were born in another country, from 22 to 25 percent of the individuals who performed in Level 1 on the three scales and 54 to 67 percent of those in Level 1 who did not perform any tasks correctly were foreign born. Some of these individuals were undoubtedly recent immigrants with a limited command of English.

**Table 3.5Q: Percentages of adults in selected groups, by membership in total U.S. population, in Level 1, and in Level 1 with no tasks correct**

| | Quantitative scale | | |
|---|---|---|---|
| | Total U.S. population | Level 1 population | Level 1 no tasks correct |
| Population group | CPCT | CPCT | CPCT |
| Weighted sample size (in millions) | 191.3 | 42.0 | 10.6 |
| Country of birth | | | |
| Born in another country | 10 | 22 (1.2) | 54 (2.0) |
| Highest level of education | | | |
| 0 to 8 years | 10 | 33 (1.6) | 58 (2.5) |
| 9 to 12 years | 13 | 27 (1.5) | 20 (1.5) |
| HS diploma or GED | 30 | 25 (1.6) | 13 (1.3) |
| Race/Ethnicity | | | |
| White | 76 | 50 (0.5) | 34 (2.2) |
| Black | 11 | 23 (0.9) | 19 (1.2) |
| Hispanic | 10 | 22 (1.3) | 40 (1.9) |
| Asian/Pacific Islander | 2 | 3 (3.6) | 5 (0.9) |
| Age | | | |
| 16 to 24 years | 18 | 14 (0.8) | 10 (0.9) |
| 65 years and older | 16 | 32 (1.5) | 32 (1.7) |
| Disability or condition | | | |
| Any condition | 12 | 26 (1.2) | 28 (1.4) |
| Visual difficulty | 7 | 19 (1.4) | 21 (1.4) |
| Hearing difficulty | 7 | 12 (2.1) | 13 (1.5) |
| Learning disability | 3 | 8 (2.7) | 15 (1.0) |

Notes: CPCT = column percentage; se = standard error.

SOURCE: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

Adults who did not complete high school were also disproportionately represented at the low end of the literacy scales. While 23 percent of the adult population reported that they had not completed high school, 59 to 62 percent of adults who performed in Level 1 on the three scales and 77 to 78 percent of those in Level 1 with no tasks correct said they had not completed high school or its equivalent.

Relatively high percentages of the respondents in Level 1 were Black, Hispanic, or Asian/Pacific Islander. The largest group among those who did not perform any tasks correctly were Hispanic. Hispanics and Asian/Pacific Islanders are more likely than others to be recent immigrants with a limited command of English.

Older adults were overrepresented in the Level 1 population as well as in the population of adults who did not meet the demands of the Level 1 tasks. While 16 percent of the total U.S. population was age 65 or older, approximately one-third of the Level 1 population and 25 to 32 percent of the adults in Level 1 who performed no literacy tasks correctly were in this age group. In contrast, compared with their representation in the total U.S. population (18 percent), younger adults were underrepresented in Level 1 (11 to 14 percent) and in the subgroup of Level 1 that did not succeed on any of the literacy tasks (10 to 11 percent).

Disabilities are sometimes associated with low literacy performance. While 12 percent of the adult population reported having a physical, mental, or health condition that kept them from participating fully in work and other activities, 26 percent of adults who performed in Level 1 and 22 to 28 percent of those in Level 1 who did not succeed on any of the literacy tasks had such conditions. Further, while only 3 percent of the U.S. population reported having a learning disability, 8 to 9 percent of the adults who performed in Level 1 on the prose, document, and quantitative scales and 14 to 15 percent of those in Level 1 who did not succeed on any task had this type of disability.

These results show that adults in some population groups were disproportionately likely to perform in the lowest literacy level, and among those who performed in this level, were disproportionately likely not to succeed on any of the literacy tasks in the assessment.



# APPENDIX A

*Overview of Procedures*

This appendix provides information about the methods and procedures used in the National Adult Literacy Survey. The forthcoming technical report will provide more extensive information about procedures. In addition, more detailed information on the development of the background questionnaires and literacy tasks can be found in *Assessing Literacy*.[1]

## Sampling

The National and State Adult Literacy Surveys included the following three components: a national household sample, 11 individual state household samples, and a national prison sample. The national and state household components were based on a four-stage stratified area sample with the following stages: the selection of Primary Sampling Units (PSUs) consisting of counties or groups of counties, the selection of segments consisting of census blocks or groups of blocks, the selection of households, and the selection of age-eligible individuals. One national area sample was drawn for the national component; 11 independent, state-specific area samples were drawn for the 11 states participating in the state component (i.e., California, Illinois, Indiana, Iowa, Louisiana, New Jersey, New York, Ohio, Pennsylvania, Texas, Washington.) The sample designs used for all 12 samples were similar, except for two principal differences. In the national sample, Black and Hispanic respondents were sampled at a higher rate than the remainder of the population in order to increase their representation in the sample, whereas the state samples used no oversampling. Also, the target population for the national sample consisted of adults 16 years of age or older, whereas the target population for the state samples consisted of adults 16 to 64 years of age.

[1] A. Campbell, I. Kirsch, and A. Kolstad. (1992). *Assessing Literacy: The Framework for the National Adult Literacy Survey*. Washington, DC: Government Printing Office.

The sample designs for all 12 household samples involved four stages of selection, each at a successively finer level of geographic detail. The first stage of sampling involved the selection of PSUs, which consist of counties or groups of counties. The PSUs were stratified on the basis of region, metropolitan status, percent Black, percent Hispanic, and, whenever possible, per capita income. The national component used the WESTAT 100 PSU master sample with the Honolulu, Hawaii PSU added to the sample with certainty, to make 101 PSUs in total. The national frame of PSUs was used to construct individual state frames for the state component and a sample of eight to 12 PSUs was selected within each of the given states. All PSUs were selected with probability proportional to the PSU's 1990 population.

The second stage of sampling involved the selection of segments (within the selected PSUs) which consist of census blocks or groups of census blocks. The segments were selected with probability proportional to size where the measure of size for a segment was a function of the number of year-round housing units within the segment. The oversampling of Black and Hispanic respondents for the national component was carried out at the segment level, where segments were classified as high minority (segments with more than 25 percent Black or Hispanic population) or not high minority. The measure of size for high minority segments was defined as the number of White non-Hispanic households plus three times the number of Black or Hispanic households. High minority segments were therefore oversampled at up to three times the rate of comparable, non-highminority segments. The measure of size for nonminority segments was simply the number of year-round housing units within the segment, as was the measure of size for all segments in the state components. One in 7 of the national component segments was selected at random to be included in a "no incentive" sample. Respondents from the remaining segments in the national component received a monetary incentive for participation, as did respondents in the state component. (Respondents from the "no incentive" segments are not included in the household sample of this report.)

The third stage of sampling involved the selection of households within the selected segments. Westat field staff visited all selected segments and prepared lists of all housing units within the boundaries of each segment as determined by the 1990 census block maps. The lists were used to construct the sampling frame for households. Households were selected with equal probability within each segment, except for White non-Hispanic households in high minority segments in the national component, which were subsampled so that the sampling rates for White non-Hispanic respondents would be about the same overall.

The fourth stage of sampling involved the selection of one or two adults within each selected household. A list of age-eligible household members (16 and

older for the national component, 16 to 64 for the state component) was constructed for each selected household. One person was selected at random from households with fewer than four eligible members; two persons were selected from households with four or more eligible members. The interviewers, who were instructed to list the eligible household members in descending order by age, then identified one or two household members to interview, based on computer-generated sampling messages that were attached to each questionnaire in advance.

The sample design for the prison component involved two stages of selection. The first stage of sampling involved the selection of state or federal correctional facilities with probability proportional to size, where the measure of size for a given facility was equal to the inmate population. The second stage involved the selection of inmates within each selected facility. Inmates were selected with a probability inversely proportional to their facility's inmate population (up to a maximum of 22 interviews in a facility) so that the product of the first and second stage probabilities would be constant.

## Weighting

Full sample and replicate weights were calculated for each record in order to facilitate the calculation of unbiased estimates and their standard errors. The full sample and replicate weights for the household components were calculated as the product of the base weight for a record and a compositing and raking factor. Demographic variables critical to the weighting were recoded and imputed, if necessary, prior to the calculation of base weights.

The base weight was calculated as the reciprocal of the final probability of selection for a respondent, which reflected all stages of sampling. The base weight was then multiplied by a compositing factor which combined the national and state component data in an optimal manner, considering the differences in sample design, sample size, and sampling error between the two components. Twelve different compositing factors were used, one for each of the 11 participating states, and a pseudo factor (equal to one) for all national component records from outside the 11 participating states. The product of the base weight and compositing factor for a given record was the composite weight.

The composite weights were raked so that several totals calculated with the resulting full sample weights would agree with the 1990 census totals, adjusted for undercount. The cells used for the raking were defined to the finest combination of age, education level, race, and ethnicity that the data would allow. Raking adjustment factors were calculated separately for each of the 11 states and then for the remainder of the United States. The above procedures were repeated

for 60 strategically constructed subsets of the sample to create a set of replicate weights to be used for variance estimation using the jackknife method. The replication scheme was designed to produce stable estimates of standard errors for national estimates as well as for the 11 individual states.

The full sample and replicate weights for the incarcerated component were calculated as the product of the base weight for a record and a nonresponse and raking factor. The base weight was calculated as the reciprocal of the final probability of selection for a respondent, which reflected both stages of sampling. The base weights were then nonresponse adjusted to reflect both facility and inmate nonresponse. The resulting nonresponse adjusted weights were then raked to agree with independent estimates for certain subgroups of the population.

## Background Questionnaires

One of the primary goals of the National Adult Literacy Survey is to relate the literacy skills of the nation's adults to a variety of demographic characteristics and explanatory variables. Accordingly, survey respondents were asked to complete background questionnaires designed to gather information on their characteristics and experiences. To ensure standardized administration, the questionnaires were read to the respondent by trained interviewers.

As recommended by the Literacy Definition Committee, the development of the background questionnaire was guided by two goals: to ensure the usefulness of the data by addressing issues of concern, and to ensure comparability with the young adult and Department of Labor (DOL) job-seeker surveys by including some of the same questions. With these goals in mind, the background questionnaire addressed the following areas:

- general and language background
- educational background and experiences
- political and social participation
- labor force participation
- literacy activities and collaboration
- demographic information

Questions in the first category asked survey participants to provide information on their country of birth, their education before coming to the United States, language(s) spoken by others at home, language(s) spoken while growing up, language(s) spoken now, participation in English as a Second

Language courses, and self-evaluated proficiency in English and other languages. This information makes it possible to interpret the performance results in light of the increasing racial/ethnic and cultural diversity in the United States.

The questions on educational background and experiences asked respondents to provide information on the highest grade or level of education they had completed; their reasons for not completing high school; whether or not they had completed a high school equivalency program; their educational aspirations; the types and duration of training they had received in addition to traditional schooling; the school, home, or work contexts in which they learned various literacy skills; and any physical, mental, or health conditions they have that may affect their literacy skills. Information on respondents' education is particularly important because level of education is known to be a predictor of performance on the prose, document, and quantitative literacy scales.

The questions on political and social participation asked participants about the sources from which they get information, their television viewing practices, their use of library services, and whether or not they had voted in a recent election. Because an informed citizenry is essential to the democratic process, information was collected on how adults keep abreast of current events and public affairs. Information on adults' use of library services is also important, because libraries promote reading and often provide literacy programs. These questions make it possible to explore connections between adults' activities and their demonstrated literacy proficiencies.

The questions on labor force participation asked participants to provide information on their employment status, weekly wages or salary, weeks of employment in the past year, annual earnings, and the industry or occupation in which they work(ed). These questions respond to concerns that the literacy skills of our present and future work force are inadequate to compete in the global economy or to cope with our increasingly technological society. The questions were based on labor force concepts widely used in economic surveys and permit the exploration of a variety of labor market activity and experience variables.

Questions on literacy activities and collaboration covered several important areas. Some of the questions focused on the types of materials that adults read, such as newspapers, magazines, books, and brief documents, making it possible to investigate the relationship between reading practices and demonstrated literacy proficiencies. Another set of questions asked respondents about the frequency of particular reading, writing, and mathematics activities. Respondents were asked to provide information on their newspaper, magazine, and book reading practices; reading, writing, and mathematics activities engaged in for personal use and for work; and assistance received from others with particular literacy tasks.

Finally, the survey collected information on respondents' race/ethnicity, age, and gender, as well as the educational attainment of their parents, their marital status, the number of people in their family who were employed full-time and part-time, sources of income other than employment, and family and personal income from all sources. This demographic information enabled researchers to analyze the characteristics of the adult population, as well as to investigate the literacy proficiencies of major subpopulations of interest, such as racial/ethnic groups, males and females, and various age cohorts.

Because some questions included in the household survey were inappropriate for the prison population, a revised version of the background questionnaire was developed for these respondents. Most of the questions in the household background questionnaire on general and language background and on literacy activities and collaboration were included. Many questions concerning education, political and social participation, labor force participation, family income, and employment status were not appropriate, however, and were omitted. In their place, relevant questions were incorporated from the 1991 Survey of Inmates of State Correctional Facilities, sponsored by the Bureau of Justice Statistics of the U.S. Department of Justice.

## Literacy Assessment Booklets

The National Adult Literacy Survey measures literacy along three scales — prose, document, and quantitative — composed of literacy tasks that simulate the types of demands that adults encounter in everyday life. The literacy tasks administered in this survey included 81 new tasks as well as 85 tasks that were included in the previous young adult and job-seeker surveys. The administration of a common pool of tasks in each of the three surveys allows for valid comparisons of results across time for different populations.

The new literacy tasks developed for the survey serve to refine and extend the three existing literacy scales and provide a better balance of tasks across the three scales. The framework used to develop these tasks reflects research on the processes and strategies that respondents used to perform the literacy tasks administered in the young adult survey. In creating the new tasks, one goal was to include diverse stimulus materials and to create questions and directives that represent the broad range of skills and processes inherent in the three domains of literacy. Another goal was to create tasks that reflect the kinds of reading, writing, and computational demands that adults encounter in work, community, and home settings. Because the tasks are meant to simulate real-life literacy activities, they are open-ended — that is, individuals must produce a written or

oral response, rather than simply choose the correct response from a list of options.

The new literacy tasks were developed with attention to the following elements:

- the structure of the stimulus material — for example, exposition, narrative, table, graph, map, or advertisement

- the content represented and/or the context from which the stimulus is drawn — for example, work, home, or community

- the nature of what the individual is asked to do with the material — that is, the purpose for using the material — which in turn guides the strategies needed to complete the task successfully

These factors, operating in various combinations, affect the difficulty of a task relative to others administered in the survey.

The printed and written materials selected for the survey reflect a variety of structures and formats. Most of the prose materials are expository — that is, they describe, define, or inform — since most of the prose that adults read is expository; however, narratives and poetry are included as well. The prose selections include an array of linguistic structures, ranging from texts that are highly organized both topically and visually, to those that are loosely organized. Texts of varying lengths were chosen, ranging from full-page magazine selections to short newspaper articles. All prose materials included in the survey were reproduced in their original format.

The document materials represent a wide variety of structures, including tables, charts and graphs, forms, and maps. Tables include matrix documents in which information is arrayed in rows and columns (for example, bus or airplane schedules, lists, or tables of numbers). Documents categorized as charts and graphs include pie charts, bar graphs, and line graphs. Forms are documents that must be filled in, while other structures include advertisements and coupons.

Quantitative tasks require the reader to perform arithmetic operations using numbers that are embedded in print. Since there are no materials that are unique to quantitative tasks, they were based on prose materials and documents. Most quantitative tasks were, in fact, based on documents.

Adults do not read printed or written materials in a vacuum. Rather, they read within a particular context or for a particular purpose. Accordingly, the survey materials were chosen to represent a variety of contexts and contents. Six such areas were identified: home and family, health and safety, community and citizenship, consumer economics, work, and leisure and recreation. Efforts were

made to include as broad a range as possible and to select universally relevant contexts and contents to ensure that the materials would be familiar to all participants. In this way, the disadvantages for individuals with limited background knowledge were minimized.

After the materials were selected, accompanying tasks were developed. The tasks were designed to simulate the way in which people use various types of materials and to require different strategies for successful performance. For both the prose and document scales, the tasks can be organized into three major categories: locating, integrating, and generating information. In the *locating* tasks, readers were asked to match information given in a question or directive with either literal or synonymous information in the text or document. *Integrating* tasks asked the reader to incorporate two or more pieces of information from different parts of the text or document. *Generating* tasks required readers not only to process information located in different parts of the material, but also to draw on their knowledge about a subject or to make broad, text-based inferences.

Quantitative tasks required readers to perform one or more arithmetic operations (addition, subtraction, multiplication, or division) either singly or in combination. The type of operation to be performed was sometimes obvious from the wording of the question; in other tasks the readers had to infer which operation was to be performed. In some cases the numbers required to perform the operation could be easily identified; in others they were embedded in text. Some quantitative tasks asked the reader to explain how he or she would solve a problem, rather than to perform the actual calculation. The use of a simple, four-function calculator was required for some tasks.

## Survey Design: BIB Spiralling

No individual could be expected to respond to the entire set of 166 simulation tasks administered as part of the survey. Accordingly, the survey design gave each respondent a subset of the total pool of literacy tasks, while at the same time ensuring that each of the 166 tasks was administered to a nationally representative sample of the adult population. Literacy tasks were assigned to blocks or sections that could be completed in about 15 minutes, and these blocks were then compiled into booklets so that each block appeared in each position (first, middle, and last) and each block was paired with every other block. Thirteen blocks of simulation tasks were assembled into 26 booklets, each of which could be completed in about 45 minutes. During a personal interview, each participant was asked to complete one booklet of literacy tasks and the background questionnaire, which required approximately 20 minutes.

## Training the Data Collection Staff

For the national and state samples, 24 field supervisors, 24 field editors, and 421 field interviewers were recruited and trained in January and February of 1992. The 24 supervisors were trained first at a session in Bethesda, Maryland. The seven-day program included the interviewer training. Additionally, Westat provided training specific to supervisory responsibilities, including the use of Westat's Automated Survey Control System, a computer-based system for managing the data collection effort. Finally, supervisors and editors were trained to perform an item-by-item edit for each data collection instrument received from the field interviewers.

After the training offered in Bethesda, interviewers attended training sessions geographically closest to their homes, either San Francisco (January 31-February 2) or Dallas (February 7-9). Four training groups were formed at each of the two training sites. Each group was led by a Westat home office field manager. Within each of the four groups, the trainees were divided into "learning communities" with approximately 18 interviewers each. Each community was led by the field supervisor who would supervise the interviewers during the data collection phase.

The training program was modeled closely after Westat's general approach for training field staff. This approach uses a mix of techniques to present study material, focusing heavily on trainee participation and practice. The training program was standardized with verbatim scripts and a detailed agenda to ensure comparability in presentation across groups.

The key training topics were the data collection instruments — the household screener, the background questionnaire, and the interview guide and literacy exercise booklet. The majority of training time was devoted to instructions for administering these documents. In addition, sessions were used to present instructional material on gaining respondent cooperation, keeping records of nonresponse cases, editing completed work, and completing administrative forms. A bilingual field supervisor provided Spanish speaking interviewers with training on the Spanish translations of the screener and background questionnaires.

Prior to project-specific training, new interviewers attended an additional one-half day of training on general interviewing techniques. Interviewers selected to work on the prison sample received an additional day of training on interview procedures unique to that sample.

## Administering the Data Collection Instruments

Data collection instruments included the screener, which was designed to enumerate household members and select survey respondents, the background questionnaire, and the literacy exercise booklets. Interviewers were given their first assignments and began work immediately after training. The interviewer was given a call record folder and screener for each sampled dwelling unit in his or her assignment. A computer-generated label attached to the front of each folder and screener provided the case identification number, address, and assigned exercise booklet number. Additionally, interviewers were provided with all other field materials necessary to conduct interviews and meet reporting requirements.

Case assignments were made by the field supervisors, who also mailed letters to households about one week before the interviewers planned to contact the household. When making contact, the interviewer first verified that the address was in the sample and the unit was, in fact, an occupied dwelling. If the unit did not meet the definition of a year-round housing unit or was vacant, or for some other reason the interviewer was unable to complete a screener at an assigned address, she or he documented the situation in a noninterview report form.

The interviewer introduced the study using an introduction printed on the front of the screener. As part of the introduction, the interviewer indicated that if someone from the household was selected for an interview, the respondent would be paid $20 for participating. After introducing the study, the interviewer proceeded to conduct the screening interview with any household member 16 years of age or older. If the household members spoke only a language other than Spanish or English, the interviewer could obtain the services of a translator to complete the screener interview.

The screener was used to collect names, relationships, sex, age and race/ethnicity of all household members at the selected dwelling unit. For the national sample, household members aged 16 years and older were eligible for selection. For the state sample, however, household members 16 to 64 years of age were eligible. In households with three or fewer eligible household members, one was randomly selected for the interview. In households with four or more eligibles, two respondents were selected. To select respondents, interviewers first listed the names and ages (in descending age order) of all eligible household members. They then referred to a sampling table which selected one or two respondents from the household.

Once the Screener was completed and a respondent(s) selected, the interviewer proceeded to administer the background questionnaire and the exercise booklet. If the selected respondent was not available at the time the

screener was conducted, the interviewer returned to administer the background questionnaire and exercise booklet, which were administered on the same visit.

The background questionnaire took approximately 20 minutes to administer and could be conducted in English or Spanish (using the Spanish printed version) only. In the introduction to the background questionnaire, the respondent was told that he or she would be given a check for $20 in appreciation of the time and effort involved in completing the interview, questionnaires, and assessment. The background questionnaire was divided into six sections and collected demographic data as well as data on literacy-related behaviors. Respondents from each of the 11 participating states were asked five state-specific questions, which appeared at the end of the questionnaire.

When the background questionnaire was completed, the interviewer administered the exercise booklet, which took approximately 45 minutes. There were 26 different versions of the exercise booklet, and each version had a corresponding interview guide, which the interviewer used to facilitate the respondent's completion of tasks in the booklet.

For the prison population, the interviewer informed the selected inmate about the study using an introduction printed in the background questionnaire since there was no screener. As part of the introduction, the interviewer indicated that the inmate would receive a certificate of participation if he or she completed the survey. Because of varying prison regulations, it was not possible to pay inmates $20 for their participation and so they received the certificate. The background questionnaire and exercise booklet were administered using the same procedures as for the household population.

## Response Rates

Since there were three instruments — screener, background questionnaire, and exercise booklet — required for the administration of the survey, it was possible for a household or respondent to refuse to participate at the time of the administration of any one of these instruments. Thus, response rates were calculated for each of the three instruments. For the prison sample there were only two points at which a respondent could refuse — at the administration of either the background questionnaire or exercise booklet. The response rates presented below reflect the percentage of those who had the opportunity to participate at each stage of the survey. The response rates for the national household and prison samples are as follows.

| Instrument | Response Rates National | Prison |
|---|---|---|
| Screener | 89.1% | N/A |
| Background Questionnaire | 81.0% | 85.7% |
| Exercise Booklet | 95.8% | 96.1% |

## Data Collection Quality Control

Several quality control procedures relating to data collection were used. These included the interviewer field edit, a complete edit of all documents by a trained field editor, validation of 10 percent of each interviewer's close-out work, and field observation of both supervisors and interviewers.

At the interviewer training session, interviewers were instructed on procedures for performing a field edit of all data collection documents. The main purpose of this edit was to catch and correct or explain any errors or omissions in recording, to learn from mistakes so they were not repeated, and to remove stray marks and completely fill in bubbles on the documents that were to be optically scanned.

Additionally, a complete edit was performed on all documents by a trained field editor. An item-by-item review was performed on each document, and each error was fully documented on an edit form. The supervisor reviewed the results of the edit with the interviewer during his or her weekly telephone conference.

Validation is the quality control procedure used to verify that an interview was conducted and it took place at the correct address and according to specified procedures, or that nonresponse statuses (e.g., refusals, vacancies, language problems) were accurately reported by the interviewers. Interviewers knew that their work would be validated but did not know to what extent or which cases. A 10 percent subsample of dwelling units were selected and flagged in the supervisor's log and in the automated survey control system (ASCS). The supervisors performed validation interviews by telephone if a phone number was available. Otherwise, validation was performed in person by the supervisor or by another interviewer.

Field observations of both supervisors and interviewers were performed by Westat field management staff. One purpose of the interviewer observation was to provide home office staff with an opportunity to observe effectively both performance of field procedures and respondents' reactions to the survey. Another purpose was to provide feedback to weak interviewers when there was concern about their skills and/or performance. In addition to in-person observations, interviewers were required to tape record one complete interview

and assessment. The field supervisor selected the particular case in advance and listened to the tape to "observe" each interviewer.

Finally, nine of the 24 supervisors were visited by field management staff and evaluated on their editing, coding, office organization, ability to maintain up-to-date records on production data, and supervision of interviewers.

## Scoring the Literacy Exercise Booklets

As the first shipments of exercise booklets were received at ETS, copies were made of actual responses to the tasks. These sample responses were then scored by various staff, including the test developer and scoring supervisor, using either the scoring guides developed for the young adult tasks or guides prepared during the development of the new tasks. As the sample responses were scored, adjustments were made to the scoring guides for the new tasks to reflect the kinds of answers that the respondents were providing.

The sample papers comprised the training sets used to train a group of readers who would score the exercise booklets. The purposes of the training were to familiarize the readers with the scoring guides and to ensure a high level of agreement among the readers. Each task and its scoring guide were explained and sample responses representative of the score points in the guide were discussed. The readers then scored and discussed an additional 10 to 30 responses. After group training had been completed, all the readers scored all the tasks in over a hundred booklets to give them practice in scoring actual booklets, as well as an opportunity to score more responses on a practice basis. A follow-up session was then held to discuss responses on which readers disagreed. The entire training process was completed in about four weeks.

Twenty percent of all the exercise booklets were subjected to a reader reliability check, which entailed a scoring by a second reader. To prevent the second reader from being influenced by the first reader's scores, the first reader masked the scores in every fifth booklet that he or she scored. These booklets were then passed on for a second reader to score. When the second reader had scored every item, the first reader's scores were unmasked. If there was a discrepancy between the two scores for any response, the scoring supervisor reviewed the response and discussed it with the readers involved.

The statistic used to report inter-reader reliability is the percentage of exact agreement — that is, the percentage of times the two readers agreed exactly in their scores. There was a high degree of reader reliability across all the tasks in the survey, ranging from a low of 88.1 percent to a high of 99.9 percent with an average agreement of 97 percent. For 133 out of 166 open-ended tasks, the agreement was above 95 percent.

## Data Entry

The background questionnaire was designed to be read by a computerized scanning device. For most questions, field personnel filled in ovals next to the respondent's answers. Open-ended items in the background questionnaire were coded and the ovals filled in by ETS staff before they were shipped to the scanning department. Responses on the screener were transferred to scannable documents by ETS personnel when the check-in process was complete, and the screener documents were batched and sent to the scanning department on a regular basis. Exercise booklet scores were transferred to scannable documents by the readers who scored the items, and these were also batched and sent to the scanning department at regular intervals. The scanned data from screeners, background questionnaires, and exercise booklets were transmitted to magnetic tape, which was then sent to the ETS computer center. As each of the different instruments were processed, the data were transferred to a database on the main computer for editing.

## Editing and Quality Control

Editing included an assessment of the internal logic and consistency of the data received. For example, data were examined for nonexistent housing locations or booklets, illogical or inconsistent responses, and multiple responses. Where indicated, an error listing was generated and sent back to the processing area, where the original document was retrieved and the discrepancies were corrected. If resolution of a conflict in the data was not possible, the information was left in the form in which it was received. Wherever possible, however, conflicts were resolved. For example, in the infrequent cases in which field personnel provided more than one response to a single-response noncognitive item, specific guidelines were developed to incorporate these responses consistently and accurately. The background questionnaires were also checked to make sure that the skip patterns had been followed and all data errors were resolved. In addition, a random set of booklets was selected to provide an additional check on the accuracy of transferring information from booklets and answer sheets to the database.

## Scaling

The results from the National Adult Literacy Survey are reported on three scales established by the NAEP 1985 Young Adult Literacy Survey: prose literacy, document literacy, and quantitative literacy. With scaling methods, the

performance of a sample of examinees can be summarized on a series of subscales even when different respondents have been administered different items. Conventional scoring methods are not suited for assessments like the national survey. Statistics based on the number of correct responses, such as proportion of correct responses, are inappropriate for examinees who receive different sets of items. Moreover, item-by-item reporting ignores similarities of subgroup comparisons that are common across items. Finally, using average percent correct to estimate means of proficiencies of examinees within subpopulations does not provide any other information about the distribution of skills among the examinees.

The limitations of conventional scoring methods can be overcome by the use of item response theory (IRT) scaling. When several items require similar skills, the response patterns should have some uniformity. Such uniformity can be used to characterize both examinees and items in terms of a common scale attached to the skills, even when all examinees do not take identical sets of items. Comparisons of items and examinees can then be made in reference to a scale, rather than to percent correct. IRT scaling also allows distributions of groups of examinees to be compared.

Scaling was carried out separately for each of the three domains of literacy (prose, document, and quantitative). The NAEP reading scale, used in the young adult survey, was dropped because of its lack of relevance to the current NAEP reading scale. The scaling model used for the national survey is the three-parameter logistic (3PL) model from item response theory.[2] It is a mathematical model for estimating the probability that a particular person will respond correctly to a particular item from a single domain of items. This probability is given as a function of a parameter characterizing the proficiency of that person, and three parameters characterizing the properties of that item.

## Overview of Linking the National Adult Literacy Survey (NALS) Scales to the Young Adult Literacy Survey (YALS) Scales

Prose, document, and quantitative literacy results for the National Adult Literacy Survey are reported on scales that were established in the Young Adult Literacy Survey. For each scale, a number of new items unique to the national survey were added to the item pool that was administered in the original young adult survey. The NALS scales are linked to the YALS scales based upon the commonality of the two assessments, namely, the original young adult survey

[2] A. Birnbaum. (1968). "Some Latent Trait Models." In F.M. Lord and M.R. Novick, *Statistical Theories of Mental Test Scores*. Reading, MA: Addison-Wesley. F.M. Lord. (1980). *Applications of Item Response Theory to Practical Testing Problems*. Hillsdale, NJ: Erlbaum.

common items. Fifty-one percent of the items administered in the national survey were common to young adult survey. The composition of the item pool is presented in table A.1.

A unidimensional IRT model like the three-parameter logistic model employed in this study assumes that performance on all the items in a domain can, for the most part, be accounted for by a single (unobservable) proficiency variable. Subsequent IRT linking and scaling analyses treat each scale separately, that is, a unique proficiency is assumed for each scale. As a result, the linking of corresponding scales was carried out for each pair of scales separately. The three steps used to link the scales are listed below.

1. Establish provisional IRT scales through common item parameter calibration based on a pooling of the NALS and YALS items.
2. Estimate distribution of proficiencies on the provisional IRT scales using "plausible value" methodology.
3. Align the NALS scale to the YALS scale by a linear transformation based upon the commonality of proficiency distribution of the YALS sample.

NALS — Table A.1

**Composition of the Item Pool for the National Adult Literacy Survey**

| | Number of Items | | |
|---|---|---|---|
| SCALE | YALS items | New item | NALS total |
| Prose | 14 | 27 | 41 |
| Document | 56 | 25 | 81 |
| Quantitative | 15 | 28 | 43 |
| **Total** | 85 | 81 | 165 |

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

## Statistical Procedures

The statistical comparisons in this report were based on the t statistic. Generally, whether or not a difference is considered significant is determined by calculating a t value for the difference between a pair of means, or proportions, and comparing this value to published tables of values at certain

critical levels, called *alpha levels*. The alpha level is an a priori statement of the probability of inferring that a difference exists when, in fact, it does not.

In order to make proper inferences and interpretations from the statistics, several points must be kept in mind. First, comparisons resulting in large t statistics may appear to merit special note. This is not always the case, because the size of the t statistic depends not only on the observed differences in means or the percentage being compared, but also on the standard error of the difference. Thus, a small difference between two groups with a much smaller standard error could result in a large t statistic, but this small difference is not necessarily noteworthy. Second, when multiple statistical comparisons are made on the same data, it becomes increasingly likely that an indication of a population difference is erroneous. Even when there is no difference in the population, at an alpha level of .05, there is still a 5 percent chance of concluding that an observed t value representing one comparison in the sample is large enough to be statistically significant. As the number of comparisons increases, the risk of making such an error in inference also increases.

To guard against errors of inference based upon multiple comparisons, the Bonferroni procedure to correct significance tests for multiple contrasts was used. This method corrects the significance (or alpha) level for the total number of contrasts made with a particular classification variable. For each classification variable, there are (K*(K-1)/2) possible contrasts (or nonredundant pairwise comparisons), where K is the number of categories. The Bonferroni procedure divides the alpha level for a single t test (for example, .05) by the number of possible pairwise comparisons in order to give a new alpha that is corrected for the fact that multiple contrasts are being made.

The formula used to compute the t statistic is as follows:

$$t = \frac{P_1 - P_2}{\sqrt{se_1^2 + se_2^2}}$$

where $P_1$ and $P_2$ are the estimates to be compared and $se_1$ and $se_2$ are their corresponding standard errors.

130 . . . . . . Appendix A

Compendium_Responsive Brief
Page 702



# APPENDIX B

## *Definitions of All Subpopulations and Variables Reported*

*[In Order of Appearance]*

### Total Population

The total population includes adults aged 16 and older who participated in the national household survey, the state surveys, and the survey of prisoners.

### 1985 Young Adult Literacy Survey Population

A national household survey of the literacy skills of young adults (aged 21 to 25) was conducted in 1985. Because the NALS also assessed young adults and readministered a set of tasks, it is possible to compare the literacy skills of individuals assessed in 1985 and those assessed in 1992 - including not only 21- to 25-year-olds but also 28- to 32-year-olds, who were 21 to 25 years of age in 1985.

### English Literacy

Respondents were asked two questions about their English literacy skills. One question asked how well they read English, and the other asked how well they write it. Four response options were given: very well, well, not well, and not at all. Adults who answered "very well" or "well" to either question were counted as reporting that they read or write English well. All others were counted as reporting that they do not read or write English well.

### Help with Everyday Literacy Tasks

Respondents were asked how much help they get from family members or friends with various types of everyday literacy tasks. Four response options were given: a lot, some, a little, and none. The percentages of adults in each level who reported getting a lot of help with printed information, filling out forms, and using basic arithmetic were analyzed.

### Highest Level of Education Completed

Respondents were asked to indicate the highest level of education they completed in this country. The following options were given:

- Still in high school
- Less than high school
- Some high school
- GED or high school equivalency
- High school graduate
- Vocational, trade, or business school after high school
- College: less than 2 years
- College: associate's degree (A.A.)

College: 2 or more years, no degree
College graduate (B.S. or B.A.)
Postgraduate, no degree
Postgraduate degree (M.S., M.A., Ph.D., M.D., etc.)

In one education variable (Education 1), GED recipients and high school graduates were separate groups and the following four groups were created: adults who had completed some postsecondary education but who had not earned a degree, individuals who had earned a two year degree, individuals who had earned a four year degree, and individuals who had completed some graduate work or received a graduate degree. In a second variable (Education 2), GED recipients and high school graduates were combined into one category, and adults who had completed some education beyond high school were divided into two categories: those who had not received a degree and those who had.

### Parents' Level of Education

Respondents were asked to indicate the highest level of education completed by their mother (or stepmother or female guardian) and by their father (or stepfather or male guardian). The analyses in this report are based on the highest level of education attained by either parent.

### Age

Respondents were asked to report their date of birth, and this information was used to calculate their age. One age variable (Age 1) included the following categories: 16 to 18, 19 to 24, 25 to 39, 40 to 54, 55 to 64, and 65 and older. A second variable (Age 2) included these categories: 16 to 24, 25 to 34, 35 to 44, 45 to 54, 55 to 64, and 65 and older.

### Average Years of Schooling

Responses to the question on the highest level of education completed were used to calculate the average number of years of schooling completed. Individuals who were still in school were left out of this analysis. Adults who had not graduated from high school were asked to indicate exactly how many years of schooling they had completed (0 through 12). Individuals who did not provide this information were assigned a value equal to the average number of years of schooling completed by those who did provide this information. For adults in the category "0 to 8 years of education," the average number of years of schooling was 6.10. For adults in the category "9 to 12 years of education," the average number of years of schooling was 10.11. The remaining adults were assigned values representing the number of years of schooling completed, as follows:

| | |
|---|---|
| GED, high school equivalency | 12 |
| High school graduate | 12 |
| Vocational, trade, or business school | 13 |
| College: less than 2 years | 13 |
| College: associate's degree (A.A.) | 14 |
| College: 2 or more years, no degree | 14.5 |
| College graduate (B.S. or B.A.) | 16 |
| Postgraduate, no degree | 17 |
| Postgraduate degree | 18 |

Using these values, the average number of years of schooling was calculated for various reporting groups (such as age and race/ethnicity).

### Race/Ethnicity

Respondents were asked two questions about their race and ethnicity. One question asked them to indicate which of the following best describes them. The interviewer recorded the races of respondents who refused to answer the question.

White
Black (African American)
American Indian
Alaskan Native
Pacific Islander
Asian
Other

The other question asked respondents to indicate whether they were of Spanish or Hispanic origin or descent. Those who responded "yes" were asked to identify which of the following groups best describes their Hispanic origin:

Mexicano, Mexican, Mexican American, Chicano
Puerto Rican
Cuban
Central/South American
Other Spanish/Hispanic

Adults of Pacific Islander origin were grouped with those of Asian origin, and Alaskan Natives were grouped with American Indians, due to small sample sizes. All other racial/ethnic groups are reported separately. In some analyses, however, the Hispanic subpopulations are combined to provide reliable estimates.

### Country of Birth

Respondents were asked to indicate whether they were born in the United States (50 states or Washington, D.C.), a U.S. territory, or another country. Based on their responses, they were divided into two groups: adults born in this country, and those born in another country. Adults who reported they were born in a U.S. territory were counted as being born in the U.S.

### Type of Physical, Mental, or Other Health Condition

Respondents were asked to identify whether they had any of the following:

- a physical, mental, or other health condition that keeps them from participating fully in work, school, housework, or other activities
- difficulty seeing the words or letters in ordinary newspaper print even when wearing glasses or contact lenses, if they usually wear them
- difficulty hearing what is said in a normal conversation with another person even when using a hearing aid, if they usually wear one
- a learning disability
- any mental or emotional condition
- mental retardation
- a speech disability
- a physical disability
- a long-term illness (6 months or more)
- any other health impairment

Respondents were able to indicate each physical, mental, or health condition they had. Thus, these categories are not mutually exclusive.

### Region

Census definitions of regions are used in the National Adult Literacy Survey. The four regions analyzed are the Northeast, Midwest, South, and West. The states in each region are identified below.

*Northeast:* Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania

*Midwest:* Ohio, Indiana, Illinois, Michigan, Wisconsin, Minnesota, Iowa, Missouri, North Dakota, South Dakota, Nebraska, Kansas

*South:* Delaware, Maryland, District of Columbia, Virginia, West Virginia, North Carolina, South Carolina, Georgia, Florida, Kentucky, Tennessee, Alabama, Mississippi, Arkansas, Louisiana, Oklahoma, Texas

*West:* Montana, Idaho, Wyoming, Colorado, New Mexico, Arizona, Utah, Nevada, Washington, Oregon, California, Alaska, Hawaii

### Sex

The interviewers recorded the sex of each respondent.

### Prison Population

The incarcerated sample includes only those individuals who were in state or federal prisons at the time of the survey. Those held in local jails, community-based facilities, or other types of institutions were not surveyed.

### Voting

The survey asked whether respondents had voted in a national or state election in the past five years. Some participants reported being ineligible to vote, and they were excluded from the analyses. The results reported herein reflect the percentages of adults who voted, of those who were eligible to vote.

### Frequency of Newspaper Reading

Respondents were asked how often they read a newspaper in English: every day, a few times a week, once a week, less than once a week, or never.

### Newspaper Reading Practices

Respondents were given a list of different parts of the newspaper and asked to identify which parts they generally read. Their responses were grouped as follows:

news, editorial pages, financial news and stock listings

home, fashion, and health sections, and book, movie, or art reviews

classified ads, other ads, and TV, movie, or concert listings

comics, horoscope or advice columns

sports

The responses to this question and the prior question on the frequency of newspaper reading were then combined, to determine the percentage of adults who read the newspaper at least one a week who read various parts.

### Sources of Information

Respondents were asked how much information about current events, public affairs, and the government they usually get from newspapers, magazines, radio, television, and family members, friends, or coworkers. The responses to these questions were used to construct a new variable that reflects the extent to which adults get information from different sources:

*Print media:* Adults who get "some" or "a lot" of information from either newspapers or magazines, and those who do not

*Nonprint media:* Adults who get "some" or "a lot" of information from either television or radio, and those who do not

*Personal sources:* Adults who get "some" or "a lot" of information from family, friends, or coworkers, and those who do not

### Poverty Status

Respondents were asked to report the number of persons living in their household as well as their family's total income from all sources during the previous calendar year. Their responses to these questions were used to construct the poverty status variable. Based on the 1991 poverty income thresholds of the federal government, the following criteria were used to identify respondents who were poor or near poor:

| Respondents whose family size was: | And whose annual household income was at or below: |
|---|---|
| 1 | $ 8,665 |
| 2 | $11,081 |
| 3 | $13,575 |
| 4 | $17,405 |
| 5 | $20,570 |
| 6 | $23,234 |
| 7 | $26,322 |
| 8 | $29,506 |
| 9 | $34,927 |

### Sources of Nonwage Income and Support

Respondents were asked to indicate which of the following types of income and support they or anyone in their family received during the past 12 months: Social Security, Supplemental Security Income, retirement payments, Aid to Families with Dependent Children, food stamps, interest from savings or other bank accounts, dividend income, and income from other sources. Each source was treated as a separate variable, and respondents were divided into two groups: those who had received this type of income or support, and those who had not. This report analyzes results for adults who reported receiving food stamps or interest from savings.

### Employment Status

Respondents were asked what they were doing the week before the survey:

1) working at a full-time job for pay or profit (35 hours or more)
2) working two or more part-time jobs for pay, totaling 35 or more hours
3) working for pay or profit part time (1 to 35 hours)
4) unemployed, laid off, or looking for work
5) with a job but not at work
6) with a job but on family leave (maternity or paternity leave)
7) in school
8) keeping house
9) retired
10) doing volunteer work

Respondents were then divided into four groups: adults working full time (or working two or more part-time jobs); those working part time; those unemployed, laid off, or looking for work; and those out of the labor force. Adults in categories 1 and 2 above were counted as being employed full time; those in category 3 were counted as being employed part time; those in category 4 were counted as unemployed; those in categories 5 and 6 were counted as being not at work; and those in categories 7 through 10 were counted as being out of the labor force.

### Weeks Worked

All respondents, including those who were unemployed or out of the labor force the week before the survey, were asked to indicate how many weeks they worked for pay or profit during the past 12 months, including paid leave (such as vacation and sick leave).

### Weekly Wages

Respondents who were employed either full time or part time or were on leave the week before the survey were asked to report their average wage or salary (including tips and commissions) before deductions. They reported their wage or salary per hour, day, week, two-week period, month, year, or other unit of time, and these data were used to calculate their weekly wages.

### Occupational Categories

Respondents were asked two questions about their current or most recent job, whether full time or part time. The first question asked them to identify the type of business or industry in which they worked - for example, television manufacturing, retail shoe store, or farm. The second question asked them to indicate their occupation, or the name of their job - for example, electrical engineer, stock clerk, typist, or farmer. Their responses were used to create four occupational categories: management, professional, and technical; sales and clerical; craft and service; and labor, assembly, fishing, and farming.

# *Data Tables*

Table 1.1A Average Prose Proficiency and Literacy Levels by Total Population, Gender, Census Region, and Race/Ethnicity . . . . . . . . 139

Table 1.1B Average Document Proficiency and Literacy Levels by Total Population, Gender, Census Region, and Race/Ethnicity . . . . . . . . 140

Table 1.1C Average Quantitative Proficiency and Literacy Levels by Total Population, Gender, Census Region, and Race/Ethnicity . . . . . . . . 141

Table 1.2A Average Prose Proficiency and Literacy Levels by Education Level and Age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Table 1.2B Average Document Proficiency and Literacy Levels by Education Level and Age . . . . . . . . . . . . . . . . . 143

Table 1.2C Average Quantitative Proficiency and Literacy Levels by Education Level and Age . . . . . . . . . . . . . . . . . 144

Table 1.3A Characteristics of Respondents by Prose Literacy Levels . . . . . . . . 145

Table 1.3B Characteristics of Respondents by Document Literacy Levels . . . 146

Table 1.3C Characteristics of Respondents by Quantitative Literacy Levels . . 147

Table 1.4A Average Prose Proficiency and Literacy Levels Incarcerated Sample by Total, Education Level, and Age . . . . . . . 148

Table 1.4B Average Document Proficiency and Literacy Levels Incarcerated Sample by Total, Education Level, and Age . . . . . . . 149

Table 1.4C Average Quantitative Proficiency and Literacy Levels Incarcerated Sample by Total, Education Level, and Age . . . . . . . 150

Table 1.5 Average Proficiency on Each Literacy Scale for the 1985 YALS and 1992 NALS Populations . . . . . . . . . . . . . . . 151

Table 1.6 Average Proficiency on Each Literacy Scale Respondents' Education Level by Parents' Education Level . . . . . 152

Table 1.7 Average Proficiency on Each Literacy Scale Education Level by Race/Ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . 153

Table 1.8 Average Proficiency on Each Literacy Scale Age by Race/Ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Table 1.9A Average Years of Schooling by Age, Race/Ethnicity, and Census Region . . . . . . . . . . . . . . . . . . . . . . . . . 155

Table 1.9B Difference in Average Proficiencies and in Average Years of Schooling, by Race/Ethnicity and Age . . . . . . . . . 157

Table 1.10 Average Proficiency on Each Literacy Scale Race/Ethnicity by Country of Birth . . . . . . . . . . . . . . . . . . . . . . . . . 158

Table 1.11 Average Proficiency on Each Literacy Scale Census Region by Country of Birth . . . . . . . . . . . . . . . . . . . . . . . . 160

| | | |
|---|---|---|
| Table 1.12A | Average Prose Proficiency and Literacy Levels by Type of Physical, Mental, or Health Condition | 161 |
| Table 1.12B | Average Document Proficiency and Literacy Levels by Type of Physical, Mental, or Health Condition | 162 |
| Table 1.12C | Average Quantitative Proficiency and Literacy Levels by Type of Physical, Mental, or Health Condition | 163 |
| Table 2.1A | Newspaper Reading Practices, Help from Others, and English Literacy by Prose Literacy Levels | 164 |
| Table 2.1B | Newspaper Reading Practices, Help from Others, and English Literacy by Document Literacy Levels | 165 |
| Table 2.1C | Newspaper Reading Practices, Help from Others, and English Literacy by Quantitative Literacy Levels | 166 |
| Table 2.2A | Labor Status, Sources of Information, Voting, and Occupation by Prose Literacy Levels | 167 |
| Table 2.2B | Labor Status, Sources of Information, Voting, and Occupation by Document Literacy Levels | 168 |
| Table 2.2C | Labor Status, Sources of Information, Voting, and Occupation by Quantitative Literacy Levels | 169 |
| Table 2.3 | Average Proficiency on Each Literacy Scale and Literacy Levels by Poverty Level and Sources of Nonwage Income | 170 |
| Table 2.4 | Median Weekly Wages and Average Weeks Worked in the Past 12 Months by Literacy Levels | 171 |



# TABLE 1.1A

## Average Prose Proficiency and Literacy Levels by Total Population, Gender, Census Region, and Race/Ethnicity

| DEMOGRAPHIC SUBPOPULATIONS | PROSE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Total Population** | | | | | | | | |
| Total | 26,091 | 191,289 | 21 ( 0.4) | 27 ( 0.6) | 32 ( 0.7) | 17 ( 0.4) | 3 ( 0.2) | 272 ( 0.6) |
| **Gender** | | | | | | | | |
| Male | 11,770 | 92,098 | 22 ( 0.6) | 26 ( 0.9) | 31 ( 1.2) | 18 ( 0.5) | 4 ( 0.3) | 272 ( 0.9) |
| Female | 14,279 | 98,901 | 20 ( 0.5) | 28 ( 0.7) | 33 ( 0.7) | 17 ( 0.5) | 3 ( 0.2) | 273 ( 0.8) |
| **Census Region** | | | | | | | | |
| Northeast | 5,425 | 39,834 | 22 ( 0.8) | 28 ( 1.5) | 31 ( 1.1) | 16 ( 0.7) | 3 ( 0.3) | 270 ( 1.1) |
| Midwest | 7,494 | 45,318 | 16 ( 0.8) | 28 ( 1.0) | 35 ( 1.2) | 18 ( 0.7) | 3 ( 0.3) | 279 ( 1.1) |
| South | 7,886 | 65,854 | 23 ( 1.1) | 28 ( 1.1) | 30 ( 0.9) | 15 ( 1.1) | 3 ( 0.3) | 267 ( 1.9) |
| West | 5,286 | 40,282 | 20 ( 1.2) | 23 ( 1.5) | 33 ( 1.5) | 21 ( 1.1) | 4 ( 0.5) | 276 ( 1.8) |
| **Race/Ethnicity** | | | | | | | | |
| Black | 4,963 | 21,192 | 38 ( 1.1) | 37 ( 1.3) | 21 ( 1.0) | 4 ( 0.5) | 0† ( 0.1) | 237 ( 1.4) |
| Hispanic/Mexicano | 1,776 | 10,235 | 54 ( 1.9) | 25 ( 1.6) | 16 ( 1.3) | 5 ( 0.8) | 0† ( 0.3) | 206 ( 3.3) |
| Hispanic/ Puerto Rican | 405 | 2,190 | 47 ( 5.0) | 32 ( 5.5) | 17 ( 3.6) | 3 ( 1.7) | 0† ( 0.3) | 218 ( 6.1) |
| Hispanic/Cuban | 147 | 928 | 53 ( 6.7) | 24 ( 7.0) | 17 ( 4.2) | 6 ( 4.7) | 1 ( 2.1) | 211 ( 8.7) |
| Hispanic/ Central/South | 424 | 2,608 | 56 ( 3.8) | 22 ( 3.4) | 17 ( 3.9) | 4 ( 1.5) | 0† ( 0.3) | 207 ( 5.8) |
| Hispanic/Other | 374 | 2,520 | 25 ( 3.2) | 27 ( 5.9) | 33 ( 5.2) | 13 ( 3.4) | 2 ( 1.6) | 260 ( 5.3) |
| Asian/ Pacific Islander | 438 | 4,116 | 36 ( 4.4) | 25 ( 3.8) | 25 ( 3.1) | 12 ( 1.9) | 2 ( 0.7) | 242 ( 6.7) |
| American Indian/ Alaskan Native | 189 | 1,803 | 25 ( 5.9)! | 39 ( 7.1)! | 28 ( 7.3)! | 7 ( 2.9)! | 1 ( 1.5)! | 254 ( 4.1)! |
| White | 17,292 | 144,968 | 14 ( 0.4) | 25 ( 0.6) | 36 ( 0.8) | 21 ( 0.5) | 4 ( 0.3) | 286 ( 0.7) |
| Other | 83 | 729 | 53 ( 9.9) | 23 ( 7.0) | 15 (10.7) | 9 ( 4.5) | 0† ( 0.4) | 213 (17.5) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 1.1B

### Average Document Proficiency and Literacy Levels by Total Population, Gender, Census Region, and Race/Ethnicity

| DEMOGRAPHIC SUBPOPULATIONS | DOCUMENT SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Total Population** | | | | | | | | |
| Total | 26,091 | 191,289 | 23 ( 0.4) | 28 ( 0.5) | 31 ( 0.5) | 15 ( 0.4) | 3 ( 0.2) | 267 ( 0.7) |
| **Gender** | | | | | | | | |
| Male | 11,770 | 92,098 | 23 ( 0.6) | 27 ( 0.5) | 31 ( 0.8) | 17 ( 0.5) | 3 ( 0.2) | 269 ( 0.9) |
| Female | 14,279 | 98,901 | 23 ( 0.6) | 30 ( 0.7) | 31 ( 0.6) | 14 ( 0.5) | 2 ( 0.2) | 265 ( 0.9) |
| **Census Region** | | | | | | | | |
| Northeast | 5,425 | 39,834 | 24 ( 0.9) | 29 ( 1.1) | 30 ( 1.1) | 14 ( 1.0) | 2 ( 0.3) | 264 ( 1.2) |
| Midwest | 7,494 | 45,318 | 19 ( 0.8) | 30 ( 1.1) | 33 ( 1.3) | 16 ( 0.9) | 2 ( 0.3) | 274 ( 1.3) |
| South | 7,886 | 65,854 | 26 ( 1.2) | 29 ( 0.8) | 29 ( 1.0) | 14 ( 0.7) | 2 ( 0.3) | 262 ( 1.9) |
| West | 5,286 | 40,282 | 22 ( 1.0) | 24 ( 1.3) | 32 ( 1.2) | 18 ( 1.1) | 3 ( 0.4) | 271 ( 1.6) |
| **Race/Ethnicity** | | | | | | | | |
| Black | 4,963 | 21,192 | 43 ( 1.0) | 36 ( 1.2) | 18 ( 0.9) | 3 ( 0.4) | 0† ( 0.1) | 230 ( 1.2) |
| Hispanic/Mexicano | 1,776 | 10,235 | 54 ( 2.1) | 25 ( 1.9) | 16 ( 1.6) | 4 ( 0.8) | 0† ( 0.2) | 205 ( 3.5) |
| Hispanic/ Puerto Rican | 405 | 2,190 | 49 ( 3.8) | 29 ( 5.1) | 18 ( 2.6) | 3 ( 1.1) | 0† ( 0.3) | 215 ( 6.6) |
| Hispanic/Cuban | 147 | 928 | 48 ( 8.1) | 30 ( 6.2) | 16 ( 4.3) | 4 ( 3.9) | 2 ( 1.2) | 212 (11.3) |
| Hispanic/ Central/South | 424 | 2,608 | 53 ( 3.9) | 25 ( 3.8) | 16 ( 3.6) | 4 ( 1.5) | 0† ( 0.5) | 206 ( 5.5) |
| Hispanic/Other | 374 | 2,520 | 28 ( 3.0) | 26 ( 3.6) | 32 ( 4.4) | 12 ( 4.4) | 2 ( 1.8) | 254 ( 5.3) |
| Asian/ Pacific Islander | 438 | 4,116 | 34 ( 3.5) | 25 ( 3.6) | 28 ( 3.7) | 12 ( 2.3) | 2 ( 0.9) | 245 ( 5.6) |
| American Indian/ Alaskan Native | 189 | 1,803 | 27 ( 4.1)! | 37 ( 5.0)! | 29 ( 5.7)! | 7 ( 3.3)! | 0† ( 0.5)! | 254 ( 4.9)! |
| White | 17,292 | 144,968 | 16 ( 0.5) | 27 ( 0.6) | 34 ( 0.7) | 19 ( 0.5) | 3 ( 0.2) | 280 ( 0.8) |
| Other | 83 | 729 | 52 (10.4) | 22 ( 7.6) | 15 ( 6.0) | 9 ( 4.3) | 2 ( 1.8) | 213 (15.5) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.1C

## Average Quantitative Proficiency and Literacy Levels by Total Population, Gender, Census Region, and Race/Ethnicity

| DEMOGRAPHIC SUBPOPULATIONS | QUANTITATIVE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Total Population** | | | | | | | | |
| Total | 26,091 | 191,289 | 22 ( 0.5) | 25 ( 0.6) | 31 ( 0.6) | 17 ( 0.3) | 4 ( 0.2) | 271 ( 0.7) |
| **Gender** | | | | | | | | |
| Male | 11,770 | 92,098 | 21 ( 0.7) | 23 ( 0.5) | 31 ( 0.6) | 20 ( 0.4) | 5 ( 0.3) | 277 ( 0.9) |
| Female | 14,279 | 98,901 | 23 ( 0.5) | 28 ( 0.9) | 31 ( 1.0) | 15 ( 0.6) | 3 ( 0.3) | 266 ( 0.9) |
| **Census Region** | | | | | | | | |
| Northeast | 5,425 | 39,834 | 24 ( 0.8) | 25 ( 0.8) | 31 ( 0.8) | 16 ( 0.6) | 4 ( 0.4) | 267 ( 1.2) |
| Midwest | 7,494 | 45,318 | 17 ( 1.0) | 26 ( 1.5) | 34 ( 1.4) | 19 ( 0.9) | 4 ( 0.3) | 280 ( 1.7) |
| South | 7,886 | 65,854 | 25 ( 1.0) | 27 ( 1.0) | 29 ( 1.1) | 15 ( 0.8) | 4 ( 0.3) | 265 ( 2.0) |
| West | 5,286 | 40,282 | 20 ( 1.0) | 22 ( 0.9) | 32 ( 1.0) | 20 ( 1.0) | 5 ( 0.4) | 276 ( 1.8) |
| **Race/Ethnicity** | | | | | | | | |
| Black | 4,963 | 21,192 | 46 ( 1.0) | 34 ( 1.1) | 17 ( 1.0) | 3 ( 0.4) | 0† ( 0.1) | 224 ( 1.4) |
| Hispanic/Mexicano | 1,776 | 10,235 | 54 ( 1.7) | 25 ( 2.0) | 17 ( 2.0) | 4 ( 0.8) | 0† ( 0.2) | 205 ( 3.6) |
| Hispanic/ Puerto Rican | 405 | 2,190 | 51 ( 3.3) | 28 ( 4.8) | 17 ( 3.2) | 3 ( 1.3) | 1 ( 0.4) | 212 ( 7.2) |
| Hispanic/Cuban | 147 | 928 | 46 ( 6.4) | 20 ( 6.1) | 25 ( 5.2) | 6 ( 5.6) | 3 ( 2.5) | 223 (12.9) |
| Hispanic/ Central/South | 424 | 2,608 | 53 ( 3.7) | 25 ( 4.1) | 18 ( 2.8) | 4 ( 1.5) | 0† ( 0.4) | 203 ( 5.7) |
| Hispanic/Other | 374 | 2,520 | 31 ( 3.0) | 25 ( 4.6) | 31 ( 3.1) | 11 ( 4.7) | 1 ( 0.7) | 246 ( 6.9) |
| Asian/ Pacific Islander | 438 | 4,116 | 30 ( 3.9) | 23 ( 3.4) | 27 ( 3.0) | 16 ( 2.4) | 4 ( 1.7) | 256 ( 6.7) |
| American Indian/ Alaskan Native | 189 | 1,803 | 33 ( 5.6)! | 32 ( 6.1)! | 28 ( 5.9)! | 7 ( 2.9)! | 1 ( 1.0)! | 250 ( 5.1)! |
| White | 17,292 | 144,968 | 14 ( 0.5) | 24 ( 0.6) | 35 ( 0.7) | 21 ( 0.4) | 5 ( 0.2) | 287 ( 0.8) |
| Other | 83 | 729 | 49 ( 8.5) | 21 ( 7.4) | 22 (10.1) | 6 ( 4.1) | 2 ( 2.3) | 220 (13.1) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 1.2A

## Average Prose Proficiency and Literacy Levels by Education Level and Age

| EDUCATION LEVEL AND AGE SUBPOPULATIONS | PROSE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Education Level 1** | | | | | | | | |
| Still in high school | 973 | 8,268 | 16 ( 1.8) | 36 ( 2.2) | 37 ( 2.6) | 11 ( 1.9) | 0† ( 0.5) | 271 ( 2.0) |
| 0 to 8 years | 2,167 | 18,356 | 75 ( 1.7) | 20 ( 1.4) | 4 ( 0.9) | 0† ( 0.3) | 0† ( 0.0) | 177 ( 2.6) |
| 9 to 12 years | 3,311 | 24,982 | 42 ( 1.4) | 38 ( 1.1) | 17 ( 1.0) | 2 ( 0.4) | 0† ( 0.1) | 231 ( 1.5) |
| GED | 1,062 | 7,224 | 14 ( 1.6) | 39 ( 2.5) | 39 ( 2.8) | 7 ( 1.2) | 0† ( 0.6) | 268 ( 1.8) |
| High school | 6,107 | 51,290 | 16 ( 0.8) | 36 ( 1.3) | 37 ( 1.7) | 10 ( 0.9) | 1 ( 0.2) | 270 ( 1.1) |
| Some college (no degree) | 6,567 | 39,634 | 8 ( 0.5) | 23 ( 0.8) | 45 ( 0.9) | 22 ( 0.8) | 3 ( 0.3) | 294 ( 1.0) |
| 2 year college degree | 1,033 | 6,831 | 4 ( 1.1) | 19 ( 2.3) | 41 ( 2.9) | 32 ( 2.5) | 4 ( 0.9) | 308 ( 2.4) |
| 4 year college degree | 2,534 | 17,804 | 4 ( 0.7) | 11 ( 1.2) | 35 ( 2.0) | 40 ( 1.5) | 10 ( 1.3) | 322 ( 1.6) |
| Graduate studies/degree | 2,263 | 16,306 | 2 ( 0.4) | 7 ( 1.0) | 28 ( 1.4) | 47 ( 1.8) | 16 ( 1.1) | 336 ( 1.4) |
| **Education Level 2** | | | | | | | | |
| Still in high school | 973 | 8,268 | 16 ( 1.8) | 36 ( 2.2) | 37 ( 2.6) | 11 ( 1.9) | 0† ( 0.5) | 271 ( 2.0) |
| 0 to 8 years | 2,167 | 18,356 | 75 ( 1.7) | 20 ( 1.4) | 4 ( 0.9) | 0† ( 0.3) | 0† ( 0.0) | 177 ( 2.6) |
| 9 to 12 years | 3,311 | 24,982 | 42 ( 1.4) | 38 ( 1.1) | 17 ( 1.0) | 2 ( 0.4) | 0† ( 0.1) | 231 ( 1.5) |
| GED/high school diploma | 7,169 | 58,514 | 16 ( 0.7) | 36 ( 1.1) | 37 ( 1.4) | 10 ( 0.8) | 1 ( 0.2) | 270 ( 1.0) |
| Some college (no degree) | 6,567 | 39,634 | 8 ( 0.5) | 23 ( 0.8) | 45 ( 0.9) | 22 ( 0.8) | 3 ( 0.3) | 294 ( 1.0) |
| College degree (2 or more years) | 5,820 | 40,941 | 3 ( 0.4) | 11 ( 0.8) | 33 ( 1.2) | 41 ( 1.2) | 12 ( 0.7) | 325 ( 1.1) |
| **Age 1** | | | | | | | | |
| 16 to 18 years | 1,237 | 10,424 | 16 ( 1.3) | 35 ( 1.9) | 38 ( 2.4) | 11 ( 1.7) | 1 ( 0.4) | 271 ( 1.8) |
| 19 to 24 years | 3,344 | 24,515 | 14 ( 1.1) | 29 ( 1.7) | 37 ( 1.8) | 18 ( 1.3) | 2 ( 0.4) | 280 ( 1.3) |
| 25 to 39 years | 10,060 | 63,278 | 15 ( 0.5) | 24 ( 0.7) | 34 ( 0.8) | 22 ( 0.8) | 5 ( 0.4) | 284 ( 0.9) |
| 40 to 54 years | 6,310 | 43,794 | 15 ( 0.7) | 23 ( 1.0) | 34 ( 1.4) | 22 ( 0.9) | 5 ( 0.4) | 286 ( 1.4) |
| 55 to 64 years | 2,924 | 19,503 | 26 ( 1.5) | 31 ( 1.3) | 30 ( 1.5) | 12 ( 1.1) | 1 ( 0.3) | 260 ( 1.8) |
| 65 years and older | 2,214 | 29,735 | 44 ( 1.6) | 32 ( 1.6) | 19 ( 1.3) | 5 ( 0.9) | 1 ( 0.3) | 230 ( 2.1) |
| **Age 2** | | | | | | | | |
| 16 to 24 years | 4,581 | 34,939 | 15 ( 0.9) | 31 ( 1.4) | 37 ( 1.4) | 16 ( 1.1) | 2 ( 0.3) | 278 ( 1.0) |
| 25 to 34 years | 6,701 | 41,326 | 16 ( 0.7) | 25 ( 1.0) | 34 ( 0.8) | 21 ( 0.9) | 4 ( 0.4) | 282 ( 1.2) |
| 35 to 44 years | 5,930 | 39,755 | 14 ( 0.6) | 21 ( 1.0) | 35 ( 1.2) | 24 ( 0.8) | 6 ( 0.5) | 289 ( 1.3) |
| 45 to 54 years | 3,728 | 25,992 | 16 ( 0.9) | 25 ( 1.3) | 34 ( 1.6) | 21 ( 1.0) | 5 ( 0.5) | 282 ( 1.7) |
| 55 to 64 years | 2,924 | 19,503 | 26 ( 1.5) | 31 ( 1.3) | 30 ( 1.5) | 12 ( 1.1) | 1 ( 0.3) | 260 ( 1.9) |
| 65 years and older | 2,214 | 29,735 | 44 ( 1.6) | 32 ( 1.6) | 19 ( 1.3) | 5 ( 0.9) | 1 ( 0.3) | 230 ( 2.1) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992



# TABLE 1.2B

## Average Document Proficiency and Literacy Levels by Education Level and Age

| EDUCATION LEVEL AND AGE SUBPOPULATIONS | DOCUMENT SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Education Level 1** | | | | | | | | |
| Still in high school | 973 | 8,268 | 15 ( 1.5) | 35 ( 2.3) | 38 ( 2.6) | 12 ( 1.5) | 1 ( 0.6) | 274 ( 1.9) |
| 0 to 8 years | 2,167 | 18,356 | 79 ( 1.7) | 18 ( 1.6) | 3 ( 0.8) | 0† ( 0.1) | 0† ( 0.0) | 170 ( 2.4) |
| 9 to 12 years | 3,311 | 24,982 | 46 ( 1.7) | 37 ( 1.6) | 15 ( 1.3) | 2 ( 0.4) | 0† ( 0.1) | 227 ( 1.6) |
| GED | 1,062 | 7,224 | 17 ( 2.0) | 42 ( 2.7) | 34 ( 2.3) | 7 ( 1.1) | 0† ( 0.5) | 264 ( 2.2) |
| High school | 6,107 | 51,290 | 20 ( 0.8) | 38 ( 1.0) | 33 ( 1.1) | 9 ( 0.6) | 1 ( 0.2) | 264 ( 1.1) |
| Some college (no degree) | 6,587 | 39,634 | 9 ( 0.4) | 27 ( 0.8) | 42 ( 1.0) | 20 ( 0.8) | 2 ( 0.4) | 290 ( 0.9) |
| 2 year college degree | 1,038 | 6,831 | 6 ( 1.4) | 23 ( 2.0) | 43 ( 2.6) | 25 ( 2.7) | 3 ( 0.9) | 299 ( 2.6) |
| 4 year college degree | 2,534 | 17,804 | 4 ( 0.5) | 15 ( 1.3) | 37 ( 1.5) | 36 ( 1.2) | 8 ( 1.2) | 314 ( 1.4) |
| Graduate studies/degree | 2,253 | 16,306 | 3 ( 0.6) | 10 ( 0.9) | 34 ( 1.8) | 41 ( 1.9) | 12 ( 1.1) | 326 ( 1.8) |
| **Education Level 2** | | | | | | | | |
| Still in high school | 973 | 8,268 | 15 ( 1.5) | 35 ( 2.3) | 38 ( 2.6) | 12 ( 1.5) | 1 ( 0.6) | 274 ( 1.9) |
| 0 to 8 years | 2,167 | 18,356 | 79 ( 1.7) | 18 ( 1.6) | 3 ( 0.8) | 0† ( 0.1) | 0† ( 0.0) | 170 ( 2.4) |
| 9 to 12 years | 3,311 | 24,982 | 46 ( 1.7) | 37 ( 1.6) | 15 ( 1.3) | 2 ( 0.4) | 0† ( 0.1) | 227 ( 1.6) |
| GED/high school diploma | 7,169 | 58,514 | 19 ( 0.8) | 38 ( 0.9) | 33 ( 1.0) | 9 ( 0.5) | 0† ( 0.2) | 264 ( 1.0) |
| Some college (no degree) | 6,587 | 39,634 | 9 ( 0.4) | 27 ( 0.8) | 42 ( 1.0) | 20 ( 0.8) | 2 ( 0.4) | 290 ( 0.9) |
| College degree (2 or more years) | 5,820 | 40,941 | 4 ( 0.5) | 14 ( 0.8) | 37 ( 0.8) | 36 ( 1.2) | 9 ( 0.8) | 316 ( 0.9) |
| **Age 1** | | | | | | | | |
| 16 to 18 years | 1,237 | 10,424 | 15 ( 1.4) | 34 ( 2.2) | 38 ( 2.5) | 12 ( 1.9) | 1 ( 0.5) | 274 ( 1.8) |
| 19 to 24 years | 3,344 | 24,515 | 14 ( 1.0) | 29 ( 1.4) | 37 ( 1.6) | 18 ( 1.1) | 2 ( 0.4) | 280 ( 1.3) |
| 25 to 39 years | 10,050 | 63,278 | 16 ( 0.6) | 25 ( 0.7) | 35 ( 0.6) | 21 ( 0.8) | 4 ( 0.4) | 282 ( 1.0) |
| 40 to 54 years | 6,310 | 43,794 | 17 ( 0.8) | 27 ( 0.9) | 33 ( 1.0) | 19 ( 1.0) | 3 ( 0.5) | 278 ( 1.3) |
| 55 to 64 years | 2,824 | 19,503 | 30 ( 1.4) | 34 ( 1.4) | 26 ( 1.3) | 8 ( 0.8) | 1 ( 0.3) | 249 ( 1.9) |
| 65 years and older | 2,214 | 29,735 | 53 ( 1.5) | 32 ( 1.2) | 13 ( 1.0) | 2 ( 0.5) | 0† ( 0.1) | 217 ( 2.1) |
| **Age 2** | | | | | | | | |
| 16 to 24 years | 4,581 | 34,939 | 14 ( 0.7) | 30 ( 1.2) | 37 ( 1.5) | 16 ( 1.1) | 2 ( 0.3) | 278 ( 1.1) |
| 25 to 34 years | 6,701 | 41,326 | 16 ( 0.7) | 25 ( 0.7) | 35 ( 0.8) | 21 ( 0.9) | 4 ( 0.3) | 281 ( 1.2) |
| 35 to 44 years | 5,930 | 39,755 | 15 ( 0.8) | 24 ( 1.0) | 35 ( 1.1) | 22 ( 1.1) | 5 ( 0.5) | 283 ( 1.4) |
| 45 to 54 years | 3,729 | 25,992 | 18 ( 1.1) | 29 ( 0.8) | 33 ( 1.4) | 17 ( 0.8) | 3 ( 0.6) | 273 ( 1.4) |
| 55 to 64 years | 2,824 | 19,503 | 30 ( 1.4) | 34 ( 1.4) | 26 ( 1.3) | 8 ( 0.8) | 1 ( 0.3) | 249 ( 1.9) |
| 65 years and older | 2,214 | 29,735 | 53 ( 1.5) | 32 ( 1.2) | 13 ( 1.0) | 2 ( 0.5) | 0† ( 0.1) | 217 ( 2.1) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 1.2C

## Average Quantitative Proficiency and Literacy Levels by Education Level and Age

| EDUCATION LEVEL AND AGE SUBPOPULATIONS | QUANTITATIVE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Education Level 1** | | | | | | | | |
| Still in high school | 973 | 6,266 | 19 ( 1.7) | 35 ( 3.0) | 32 ( 2.3) | 12 ( 2.0) | 1 ( 0.9) | 269 ( 2.2) |
| 0 to 8 years | 2,167 | 18,356 | 76 ( 2.0) | 18 ( 1.8) | 5 ( 1.1) | 1 ( 0.3) | 0† ( 0.2) | 169 ( 3.1) |
| 9 to 12 years | 3,311 | 24,982 | 45 ( 1.6) | 34 ( 1.6) | 17 ( 1.3) | 3 ( 0.6) | 0† ( 0.1) | 227 ( 1.7) |
| GED | 1,062 | 7,224 | 16 ( 2.0) | 38 ( 2.5) | 35 ( 2.5) | 10 ( 1.4) | 1 ( 0.5) | 268 ( 2.7) |
| High school | 6,107 | 51,290 | 18 ( 0.8) | 33 ( 1.1) | 37 ( 1.1) | 12 ( 0.5) | 1 ( 0.2) | 270 ( 1.1) |
| Some college (no degree) | 6,587 | 39,634 | 8 ( 0.6) | 23 ( 1.2) | 42 ( 1.4) | 23 ( 1.3) | 4 ( 0.4) | 295 ( 1.4) |
| 2 year college degree | 1,033 | 6,631 | 4 ( 0.8) | 19 ( 2.0) | 43 ( 2.0) | 29 ( 2.7) | 5 ( 1.3) | 307 ( 2.8) |
| 4 year college degree | 2,534 | 17,804 | 4 ( 0.5) | 12 ( 1.0) | 36 ( 1.4) | 38 ( 1.4) | 12 ( 1.1) | 322 ( 1.2) |
| Graduate studies/degree | 2,253 | 16,306 | 2 ( 0.5) | 9 ( 0.8) | 30 ( 1.4) | 42 ( 1.7) | 17 ( 1.4) | 334 ( 1.3) |
| **Education Level 2** | | | | | | | | |
| Still in high school | 973 | 6,266 | 19 ( 1.7) | 35 ( 3.0) | 32 ( 2.3) | 12 ( 2.0) | 1 ( 0.9) | 269 ( 2.2) |
| 0 to 8 years | 2,167 | 18,356 | 76 ( 2.0) | 18 ( 1.8) | 5 ( 1.1) | 1 ( 0.3) | 0† ( 0.2) | 169 ( 3.1) |
| 9 to 12 years | 3,311 | 24,982 | 45 ( 1.6) | 34 ( 1.6) | 17 ( 1.3) | 3 ( 0.6) | 0† ( 0.1) | 227 ( 1.7) |
| GED/high school diploma | 7,169 | 58,514 | 18 ( 0.7) | 34 ( 1.1) | 36 ( 1.0) | 11 ( 0.5) | 1 ( 0.2) | 270 ( 1.0) |
| Some college (no degree) | 6,567 | 38,634 | 8 ( 0.6) | 23 ( 1.2) | 42 ( 1.4) | 23 ( 1.3) | 4 ( 0.4) | 295 ( 1.4) |
| College degree (2 or more years) | 5,820 | 40,941 | 3 ( 0.3) | 12 ( 0.6) | 34 ( 1.0) | 38 ( 1.0) | 13 ( 0.7) | 324 ( 1.0) |
| **Age 1** | | | | | | | | |
| 16 to 18 years | 1,237 | 10,424 | 20 ( 1.7) | 35 ( 2.6) | 33 ( 1.9) | 12 ( 1.5) | 1 ( 0.5) | 268 ( 1.8) |
| 19 to 24 years | 3,344 | 24,515 | 16 ( 1.1) | 28 ( 1.4) | 37 ( 1.4) | 16 ( 1.0) | 2 ( 0.5) | 277 ( 1.6) |
| 25 to 39 years | 10,050 | 63,278 | 17 ( 0.6) | 23 ( 0.7) | 33 ( 0.6) | 21 ( 0.6) | 5 ( 0.4) | 283 ( 0.9) |
| 40 to 54 years | 6,310 | 43,794 | 16 ( 0.9) | 22 ( 1.0) | 33 ( 1.1) | 23 ( 1.1) | 6 ( 0.4) | 286 ( 1.2) |
| 55 to 64 years | 2,924 | 19,503 | 25 ( 1.5) | 30 ( 1.9) | 30 ( 1.6) | 13 ( 1.2) | 2 ( 0.6) | 261 ( 2.0) |
| 65 years and olde | 2,214 | 29,735 | 45 ( 1.6) | 26 ( 1.2) | 20 ( 1.2) | 7 ( 0.7) | 2 ( 0.4) | 227 ( 2.6) |
| **Age 2** | | | | | | | | |
| 16 to 24 years | 4,581 | 34,939 | 17 ( 0.9) | 30 ( 1.1) | 36 ( 1.0) | 15 ( 0.9) | 2 ( 0.4) | 274 ( 1.1) |
| 25 to 34 years | 6,701 | 41,326 | 17 ( 0.7) | 24 ( 0.7) | 34 ( 0.8) | 20 ( 0.8) | 5 ( 0.5) | 281 ( 1.1) |
| 35 to 44 years | 5,930 | 39,755 | 15 ( 0.8) | 21 ( 1.1) | 33 ( 1.0) | 25 ( 0.7) | 6 ( 0.5) | 289 ( 1.4) |
| 45 to 54 years | 3,729 | 25,992 | 17 ( 1.1) | 24 ( 1.2) | 33 ( 1.2) | 21 ( 1.4) | 5 ( 0.5) | 282 ( 1.6) |
| 55 to 64 years | 2,924 | 19,503 | 25 ( 1.5) | 30 ( 1.9) | 30 ( 1.6) | 13 ( 1.2) | 2 ( 0.6) | 261 ( 2.0) |
| 65 years and older | 2,214 | 29,735 | 45 ( 1.6) | 26 ( 1.2) | 20 ( 1.2) | 7 ( 0.7) | 2 ( 0.4) | 227 ( 2.6) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence)

† Percentages less than 0.5 are rounded to zero.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.3A

## Characteristics of Respondents by Prose Literacy Levels

| DEMOGRAPHIC SUBPOPULATIONS | PROSE SCALE n | WGT N (/1,000) | Level 1 225 or lower CPCT ( SE ) | Level 2 226 to 275 CPCT ( SE ) | Level 3 276 to 325 CPCT ( SE ) | Level 4 326 to 375 CPCT ( SE ) | Level 5 376 or higher CPCT ( SE ) | Overall Proficiency PROF ( SE ) |
|---|---|---|---|---|---|---|---|---|
| **Country of Birth** | | | | | | | | |
| Born in the USA | 23,378 | 172,162 | 75 ( 0.6) | 92 ( 0.6) | 95 ( 0.6) | 96 ( 0.4) | 97 ( 1.0) | 279 ( 0.7) |
| Born in another country or territory | 2,715 | 19,127 | 25 ( 1.3) | 8 ( 0.9) | 5 ( 1.0) | 4 ( 0.7) | 3 ( 1.0) | 212 ( 2.4) |
| **Education Level 1** | | | | | | | | |
| Still in high school | 973 | 8,268 | 3 ( 1.5) | 6 ( 1.9) | 5 ( 2.0) | 3 ( 1.4) | 1 ( 0.6) | 271 ( 2.0) |
| 0 to 8 years | 2,167 | 18,356 | 35 ( 1.6) | 7 ( 1.3) | 1 ( 0.7) | 0† ( 0.3) | 0† ( 0.0) | 177 ( 2.6) |
| 9 to 12 years | 3,311 | 24,982 | 27 ( 1.3) | 19 ( 1.0) | 7 ( 1.0) | 2 ( 0.4) | 0† ( 0.3) | 231 ( 1.5) |
| GED | 1,062 | 7,224 | 3 ( 1.4) | 6 ( 1.8) | 5 ( 2.4) | 2 ( 1.1) | 1 ( 0.7) | 268 ( 1.8) |
| High school | 6,107 | 51,290 | 21 ( 0.8) | 36 ( 1.3) | 31 ( 1.2) | 16 ( 1.0) | 4 ( 1.0) | 270 ( 1.1) |
| Some college (no degree) | 6,587 | 39,634 | 8 ( 0.5) | 18 ( 0.8) | 29 ( 0.9) | 26 ( 0.8) | 17 ( 0.9) | 294 ( 1.0) |
| 2 year college degree | 1,033 | 6,831 | 1 ( 0.8) | 3 ( 1.8) | 5 ( 2.2) | 7 ( 2.4) | 4 ( 0.9) | 308 ( 2.4) |
| 4 year college degree | 2,534 | 17,804 | 2 ( 0.6) | 4 ( 1.1) | 10 ( 1.2) | 22 ( 1.3) | 30 ( 2.5) | 322 ( 1.6) |
| Graduate studies/degree | 2,253 | 16,306 | 1 ( 0.4) | 2 ( 0.8) | 8 ( 1.2) | 23 ( 1.3) | 43 ( 3.0) | 336 ( 1.4) |
| **Race/Ethnicity** | | | | | | | | |
| Black | 4,963 | 21,192 | 20 ( 1.0) | 15 ( 1.2) | 7 ( 0.8) | 2 ( 0.4) | 1 ( 0.4) | 237 ( 1.4) |
| Hispanic | 3,126 | 18,481 | 23 ( 1.4) | 9 ( 1.3) | 6 ( 1.1) | 3 ( 0.6) | 2 ( 0.8) | 215 ( 2.2) |
| Asian/Pacific Islander | 438 | 4,116 | 4 ( 3.9) | 2 ( 2.6) | 2 ( 2.7) | 1 ( 1.6) | 1 ( 0.6) | 242 ( 6.7) |
| American Indian/ Alaskan Native | 189 | 1,803 | 1 ( 4.5)! | 1 ( 3.7)! | 1 ( 4.1)! | 0† ( 1.9)! | 0† ( 0.9)! | 254 ( 4.1)! |
| White | 17,292 | 144,968 | 51 ( 0.6) | 72 ( 0.9) | 84 ( 0.7) | 92 ( 0.6) | 96 ( 1.4) | 286 ( 0.7) |
| Other | 83 | 729 | 1 ( 8.9) | 0† ( 5.6) | 0† ( 9.1) | 0† ( 3.7) | 0† ( 0.2) | 213 (17.5) |
| **Age 2** | | | | | | | | |
| 16 to 24 years | 4,581 | 34,939 | 13 ( 0.8) | 21 ( 1.3) | 21 ( 1.1) | 17 ( 1.1) | 10 ( 0.9) | 278 ( 1.0) |
| 25 to 34 years | 6,701 | 41,326 | 16 ( 0.7) | 20 ( 1.0) | 23 ( 0.8) | 26 ( 1.0) | 27 ( 1.5) | 282 ( 1.2) |
| 35 to 44 years | 5,930 | 39,755 | 14 ( 0.6) | 16 ( 0.9) | 23 ( 0.9) | 29 ( 0.9) | 36 ( 1.3) | 289 ( 1.3) |
| 45 to 54 years | 3,729 | 25,992 | 11 ( 0.8) | 13 ( 1.1) | 14 ( 1.3) | 16 ( 0.9) | 19 ( 1.0) | 282 ( 1.7) |
| 55 to 64 years | 2,924 | 19,503 | 13 ( 1.4) | 12 ( 1.2) | 10 ( 1.1) | 7 ( 0.9) | 4 ( 0.7) | 260 ( 1.9) |
| 65 years and older | 2,214 | 29,735 | 33 ( 1.5) | 18 ( 1.5) | 9 ( 1.1) | 4 ( 0.8) | 4 ( 1.1) | 230 ( 2.1) |
| **Any Physical, Mental, Health Condition** | | | | | | | | |
| Yes | 2,806 | 22,205 | 26 ( 1.0) | 13 ( 1.2) | 7 ( 1.1) | 3 ( 0.7) | 2 ( 0.8) | 227 ( 1.6) |
| No | 23,256 | 168,879 | 74 ( 0.5) | 87 ( 0.7) | 93 ( 0.7) | 97 ( 0.6) | 98 ( 0.8) | 278 ( 0.6) |
| **Visual Difficulty** | | | | | | | | |
| Yes | 1,801 | 14,296 | 19 ( 1.5) | 7 ( 1.3) | 3 ( 1.1) | 2 ( 1.1) | 1 ( 0.5) | 217 ( 2.4) |
| No | 24,260 | 176,764 | 81 ( 0.4) | 93 ( 0.6) | 97 ( 0.5) | 98 ( 0.5) | 99 ( 0.5) | 277 ( 0.6) |
| **Hearing Difficulty** | | | | | | | | |
| Yes | 1,611 | 14,202 | 13 ( 1.6) | 8 ( 1.6) | 6 ( 1.2) | 4 ( 0.9) | 2 ( 0.8) | 243 ( 2.6) |
| No | 24,417 | 176,818 | 87 ( 0.4) | 92 ( 0.7) | 94 ( 0.6) | 96 ( 0.6) | 98 ( 0.8) | 275 ( 0.6) |
| **Learning Disability** | | | | | | | | |
| Yes | 875 | 5,820 | 9 ( 2.1) | 2 ( 2.0) | 1 ( 1.4) | 1 ( 1.1) | 1 ( 0.6) | 207 ( 3.7) |
| No | 25,171 | 185,190 | 91 ( 0.4) | 98 ( 0.6) | 99 ( 0.5) | 99 ( 0.4) | 99 ( 0.4) | 275 ( 0.5) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.3B

## Characteristics of Respondents by Document Literacy Levels

| DEMOGRAPHIC SUBPOPULATIONS | DOCUMENT SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE) | CPCT ( SE) | CPCT ( SE) | CPCT ( SE) | CPCT ( SE) | PROF ( SE) |
| **Country of Birth** | | | | | | | | |
| Born in the USA | 23,376 | 172,162 | 78 ( 0.5) | 92 ( 0.4) | 94 ( 0.5) | 96 ( 0.5) | 97 ( 0.4) | 273 ( 0.7) |
| Born in another country or territory | 2,715 | 19,127 | 22 ( 1.3) | 8 ( 1.0) | 6 ( 1.0) | 4 ( 0.7) | 3 ( 0.4) | 212 ( 2.3) |
| **Education Level 1** | | | | | | | | |
| Still in high school | 973 | 8,268 | 3 ( 1.3) | 5 ( 2.0) | 5 ( 2.0) | 3 ( 1.2) | 2 ( 0.9) | 274 ( 1.9) |
| 0 to 8 years | 2,167 | 18,356 | 33 ( 1.5) | 6 ( 1.5) | 1 ( 0.6) | 0† ( 0.1) | 0† ( 0.0) | 170 ( 2.4) |
| 9 to 12 years | 3,311 | 24,982 | 26 ( 1.5) | 17 ( 1.3) | 6 ( 1.1) | 2 ( 0.4) | 1 ( 0.3) | 227 ( 1.6) |
| GED | 1,062 | 7,224 | 3 ( 1.7) | 6 ( 1.9) | 4 ( 2.1) | 2 ( 0.9) | 1 ( 0.7) | 264 ( 2.2) |
| High school | 6,107 | 51,290 | 23 ( 0.8) | 36 ( 0.9) | 29 ( 0.9) | 15 ( 0.7) | 5 ( 1.5) | 264 ( 1.1) |
| Some college (no degree) | 6,587 | 39,634 | 8 ( 0.5) | 20 ( 0.8) | 28 ( 0.9) | 27 ( 0.9) | 20 ( 1.7) | 290 ( 0.9) |
| 2 year college degree | 1,033 | 6,831 | 1 ( 1.3) | 3 ( 1.7) | 5 ( 2.1) | 6 ( 2.1) | 5 ( 1.0) | 299 ( 2.6) |
| 4 year college degree | 2,534 | 17,804 | 2 ( 0.4) | 5 ( 1.1) | 11 ( 1.2) | 22 ( 1.0) | 28 ( 2.6) | 314 ( 1.4) |
| Graduate studies/degree | 2,253 | 16,306 | 1 ( 0.4) | 3 ( 0.7) | 9 ( 1.1) | 23 ( 1.4) | 39 ( 3.7) | 326 ( 1.8) |
| **Race/Ethnicity** | | | | | | | | |
| Black | 4,963 | 21,192 | 20 ( 0.9) | 14 ( 1.0) | 6 ( 0.8) | 2 ( 0.3) | 1 ( 0.2) | 230 ( 1.2) |
| Hispanic | 3,126 | 18,481 | 21 ( 1.7) | 9 ( 1.3) | 6 ( 1.1) | 3 ( 0.7) | 2 ( 0.9) | 213 ( 2.5) |
| Asian/Pacific Islander | 438 | 4,116 | 3 ( 3.2) | 2 ( 2.4) | 2 ( 2.6) | 2 ( 2.0) | 1 ( 0.6) | 245 ( 5.6) |
| American Indian/ Alaskan Native | 189 | 1,803 | 1 ( 4.0)! | 1 ( 4.2)! | 1 ( 5.1)! | 0† ( 3.0)! | 0† ( 0.3)! | 254 ( 4.9)! |
| White | 17,292 | 144,968 | 54 ( 0.7) | 73 ( 0.7) | 85 ( 0.7) | 92 ( 0.5) | 95 ( 0.9) | 280 ( 0.8) |
| Other | 83 | 729 | 1 ( 9.7) | 0† ( 5.8) | 0† ( 5.5) | 0† ( 4.1) | 0† ( 0.4) | 213 (15.5) |
| **Age 2** | | | | | | | | |
| 16 to 24 years | 4,581 | 34,939 | 11 ( 0.6) | 20 ( 1.0) | 22 ( 1.0) | 19 ( 1.3) | 14 ( 0.9) | 278 ( 1.1) |
| 25 to 34 years | 6,701 | 41,326 | 15 ( 0.7) | 19 ( 0.7) | 24 ( 0.7) | 29 ( 1.0) | 30 ( 1.6) | 281 ( 1.2) |
| 35 to 44 years | 5,930 | 39,755 | 14 ( 0.8) | 18 ( 1.0) | 23 ( 1.1) | 29 ( 1.1) | 36 ( 1.6) | 283 ( 1.4) |
| 45 to 54 years | 3,729 | 25,992 | 11 ( 1.0) | 14 ( 0.8) | 14 ( 1.0) | 15 ( 0.7) | 15 ( 2.3) | 273 ( 1.4) |
| 55 to 64 years | 2,924 | 19,503 | 13 ( 1.3) | 12 ( 1.1) | 9 ( 1.1) | 5 ( 0.7) | 4 ( 0.9) | 249 ( 1.9) |
| 65 years and older | 2,214 | 29,735 | 35 ( 1.5) | 17 ( 1.2) | 7 ( 0.9) | 2 ( 0.5) | 2 ( 0.6) | 217 ( 2.1) |
| **Any Physical, Mental, Health Condition** | | | | | | | | |
| Yes | 2,806 | 22,205 | 26 ( 1.2) | 12 ( 1.1) | 6 ( 0.7) | 3 ( 0.6) | 2 ( 0.8) | 219 ( 1.9) |
| No | 23,256 | 168,879 | 74 ( 0.5) | 88 ( 0.5) | 94 ( 0.5) | 97 ( 0.4) | 98 ( 0.8) | 273 ( 0.6) |
| **Visual Difficulty** | | | | | | | | |
| Yes | 1,801 | 14,296 | 18 ( 1.3) | 7 ( 1.3) | 3 ( 1.1) | 2 ( 0.7) | 2 ( 0.5) | 212 ( 2.6) |
| No | 24,260 | 176,764 | 82 ( 0.5) | 93 ( 0.6) | 97 ( 0.6) | 98 ( 0.4) | 98 ( 0.5) | 271 ( 0.6) |
| **Hearing Difficulty** | | | | | | | | |
| Yes | 1,611 | 14,202 | 13 ( 2.0) | 8 ( 1.7) | 5 ( 1.2) | 4 ( 0.8) | 2 ( 0.7) | 236 ( 2.8) |
| No | 24,417 | 176,619 | 87 ( 0.5) | 92 ( 0.5) | 95 ( 0.5) | 96 ( 0.5) | 98 ( 0.7) | 269 ( 0.6) |
| **Learning Disability** | | | | | | | | |
| Yes | 875 | 5,820 | 8 ( 2.3) | 2 ( 2.2) | 1 ( 1.1) | 1 ( 0.8) | 2 ( 1.0) | 201 ( 4.0) |
| No | 25,171 | 185,190 | 92 ( 0.4) | 98 ( 0.5) | 99 ( 0.4) | 99 ( 0.4) | 98 ( 0.7) | 269 ( 0.7) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.
! Interpret with caution – the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.3C

## Characteristics of Respondents by Quantitative Literacy Levels

| DEMOGRAPHIC SUBPOPULATIONS | QUANTITATIVE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | PROF ( SE ) |
| **Country of Birth** | | | | | | | | |
| Born in the USA | 23,376 | 172,162 | 78 ( 0.5) | 91 ( 0.6) | 94 ( 0.5) | 95 ( 0.4) | 96 ( 1.1) | 278 ( 0.6) |
| Born in another country or territory | 2,715 | 19,127 | 22 ( 1.2) | 9 ( 1.0) | 6 ( 0.9) | 5 ( 0.6) | 4 ( 1.1) | 214 ( 2.8) |
| **Education Level 1** | | | | | | | | |
| Still in high school | 973 | 8,268 | 4 ( 1.4) | 6 ( 2.2) | 4 ( 2.0) | 3 ( 1.4) | 1 ( 1.0) | 269 ( 2.2) |
| 0 to 8 years | 2,167 | 18,356 | 33 ( 1.6) | 7 ( 1.3) | 2 ( 0.8) | 0† ( 0.2) | 1 ( 0.3) | 169 ( 3.1) |
| 9 to 12 years | 3,311 | 24,982 | 27 ( 1.5) | 17 ( 1.3) | 7 ( 1.0) | 2 ( 0.6) | 1 ( 0.2) | 227 ( 1.7) |
| GED | 1,062 | 7,224 | 3 ( 1.6) | 6 ( 2.1) | 4 ( 2.1) | 2 ( 1.2) | 1 ( 0.5) | 268 ( 2.7) |
| High school | 6,107 | 51,290 | 22 ( 0.9) | 35 ( 1.1) | 31 ( 1.1) | 18 ( 0.6) | 7 ( 0.9) | 270 ( 1.1) |
| Some college (no degree) | 6,587 | 39,634 | 8 ( 0.6) | 19 ( 1.1) | 28 ( 1.0) | 28 ( 1.3) | 20 ( 1.2) | 295 ( 1.4) |
| 2 year college degree | 1,033 | 6,831 | 1 ( 0.7) | 3 ( 1.6) | 5 ( 1.6) | 6 ( 2.2) | 5 ( 1.2) | 307 ( 2.8) |
| 4 year college degree | 2,534 | 17,804 | 2 ( 0.5) | 4 ( 0.8) | 10 ( 1.2) | 20 ( 1.1) | 28 ( 1.5) | 322 ( 1.2) |
| Graduate studies/degree | 2,253 | 16,306 | 1 ( 0.4) | 3 ( 0.7) | 8 ( 1.2) | 21 ( 1.5) | 38 ( 2.1) | 334 ( 1.3) |
| **Race/Ethnicity** | | | | | | | | |
| Black | 4,963 | 21,192 | 23 ( 0.9) | 15 ( 0.8) | 6 ( 0.8) | 2 ( 0.4) | 1 ( 0.1) | 224 ( 1.4) |
| Hispanic | 3,126 | 18,481 | 22 ( 1.3) | 10 ( 1.1) | 6 ( 1.0) | 3 ( 0.8) | 2 ( 0.4) | 212 ( 2.5) |
| Asian/Pacific Islander | 438 | 4,116 | 3 ( 3.6) | 2 ( 2.9) | 2 ( 2.8) | 2 ( 2.0) | 2 ( 1.5) | 256 ( 6.7) |
| American Indian/ Alaskan Native | 189 | 1,803 | 1 ( 5.0)! | 1 ( 5.4)! | 1 ( 3.4)! | 0† ( 1.4)! | 0† ( 0.8)! | 250 ( 5.1)! |
| White | 17,292 | 144,968 | 50 ( 0.5) | 72 ( 0.6) | 85 ( 0.6) | 93 ( 0.6) | 95 ( 0.8) | 287 ( 0.8) |
| Other | 83 | 729 | 1 ( 7.5) | 0† ( 6.6) | 0† ( 9.1) | 0† ( 2.3) | 0† ( 0.6) | 220 (13.1) |
| **Age 2** | | | | | | | | |
| 16 to 24 years | 4,581 | 34,939 | 14 ( 0.8) | 22 ( 0.9) | 21 ( 0.8) | 16 ( 0.9) | 9 ( 1.7) | 274 ( 1.1) |
| 25 to 34 years | 6,701 | 41,326 | 17 ( 0.7) | 21 ( 0.7) | 23 ( 0.7) | 25 ( 0.8) | 26 ( 1.6) | 281 ( 1.1) |
| 35 to 44 years | 5,930 | 39,755 | 14 ( 0.7) | 17 ( 1.0) | 22 ( 0.8) | 29 ( 0.7) | 33 ( 0.7) | 288 ( 1.4) |
| 45 to 54 years | 3,729 | 25,992 | 11 ( 1.0) | 13 ( 0.9) | 14 ( 0.9) | 16 ( 1.3) | 19 ( 1.3) | 282 ( 1.6) |
| 55 to 64 years | 2,924 | 19,503 | 12 ( 1.3) | 12 ( 1.2) | 10 ( 1.4) | 8 ( 0.9) | 6 ( 1.0) | 261 ( 2.0) |
| 65 years and older | 2,214 | 29,735 | 32 ( 1.5) | 16 ( 1.1) | 10 ( 1.1) | 6 ( 0.7) | 7 ( 0.9) | 227 ( 2.6) |
| **Any Physical, Mental, Health Condition** | | | | | | | | |
| Yes | 2,806 | 22,205 | 26 ( 1.2) | 12 ( 0.9) | 7 ( 1.0) | 4 ( 0.7) | 3 ( 0.7) | 220 ( 2.4) |
| No | 23,256 | 168,879 | 74 ( 0.5) | 88 ( 0.5) | 93 ( 0.5) | 96 ( 0.3) | 97 ( 0.7) | 278 ( 0.6) |
| **Visual Difficulty** | | | | | | | | |
| Yes | 1,801 | 14,296 | 19 ( 1.4) | 7 ( 1.3) | 4 ( 1.2) | 2 ( 0.7) | 2 ( 0.6) | 210 ( 2.7) |
| No | 24,260 | 176,764 | 81 ( 0.5) | 93 ( 0.5) | 96 ( 0.5) | 98 ( 0.5) | 98 ( 0.5) | 276 ( 0.7) |
| **Hearing Difficulty** | | | | | | | | |
| Yes | 1,611 | 14,202 | 12 ( 2.1) | 7 ( 1.7) | 6 ( 1.7) | 4 ( 1.1) | 4 ( 1.0) | 242 ( 3.6) |
| No | 24,417 | 176,618 | 88 ( 0.5) | 93 ( 0.5) | 94 ( 0.5) | 96 ( 0.6) | 96 ( 1.0) | 274 ( 0.7) |
| **Learning Disability** | | | | | | | | |
| Yes | 875 | 5,820 | 8 ( 2.7) | 3 ( 2.3) | 1 ( 1.3) | 1 ( 1.1) | 1 ( 0.5) | 197 ( 4.2) |
| No | 25,171 | 185,190 | 92 ( 0.4) | 97 ( 0.4) | 99 ( 0.4) | 99 ( 0.3) | 99 ( 0.3) | 274 ( 0.7) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.4A

## Average Prose Proficiency and Literacy Levels Incarcerated Sample by Total, Education Level, and Age

| DEMOGRAPHIC SUBPOPULATIONS | PROSE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Total Population** | | | | | | | | |
| Total | 1,147 | 766 | 31 ( 1.7) | 37 ( 2.0) | 26 ( 1.6) | 6 ( 0.8) | 0† ( 0.2) | 246 ( 1.9) |
| **Education Level** | | | | | | | | |
| 0 to 8 years | 157 | 107 | 66 ( 4.2) | 24 ( 3.8) | 10 ( 4.0) | 1 ( 0.6) | 0† ( 0.0) | 196 ( 5.0) |
| 9 to 12 years | 385 | 271 | 41 ( 3.1) | 44 ( 3.5) | 14 ( 2.4) | 1 ( 0.6) | 0† ( 0.0) | 230 ( 3.0) |
| GED | 183 | 130 | 10 ( 3.1) | 44 ( 4.9) | 39 ( 5.6) | 6 ( 3.0) | 0† ( 0.3) | 270 ( 4.3) |
| High school | 154 | 107 | 25 ( 5.3) | 39 ( 5.0) | 32 ( 6.0) | 5 ( 2.0) | 0† ( 0.0) | 255 ( 5.0) |
| Some college (no degree) | 211 | 120 | 10 ( 2.2) | 28 ( 4.2) | 42 ( 4.4) | 18 ( 4.4) | 2 ( 1.4) | 285 ( 4.2) |
| 2 year college degree | 27 | 15 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 4 year college degree | 17 | 9 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| Graduate studies/degree | 9 | 5 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| **Age** | | | | | | | | |
| 16 to 18 years | 19 | 12 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 19 to 24 years | 262 | 162 | 27 ( 3.3) | 42 ( 4.6) | 26 ( 4.1) | 6 ( 2.1) | 0† ( 0.2) | 252 ( 3.6) |
| 25 to 39 years | 641 | 438 | 32 ( 2.0) | 36 ( 2.4) | 26 ( 2.5) | 5 ( 0.9) | 0† ( 0.4) | 245 ( 2.5) |
| 40 to 54 years | 192 | 132 | 32 ( 4.0) | 36 ( 4.0) | 24 ( 3.3) | 8 ( 2.6) | 0† ( 0.5) | 241 ( 5.8) |
| 55 to 64 years | 20 | 13 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 65 years and older | 10 | 7 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

*** Sample size is insufficient to permit a reliable estimate (fewer than 45 respondents).

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.4B

## Average Document Proficiency and Literacy Levels Incarcerated Sample by Total, Education Level, and Age

| DEMOGRAPHIC SUBPOPULATIONS | DOCUMENT SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Total Population** | | | | | | | | |
| Total | 1,147 | 766 | 33 ( 2.1) | 38 ( 2.1) | 25 ( 1.5) | 4 ( 0.9) | 0† ( 0.2) | 240 ( 2.2) |
| **Education Level** | | | | | | | | |
| 0 to 8 years | 157 | 107 | 69 ( 3.6) | 23 ( 4.1) | 7 ( 2.6) | 1 ( 0.5) | 0† ( 0.0) | 176 ( 6.1) |
| 9 to 12 years | 385 | 271 | 41 ( 3.0) | 43 ( 3.9) | 14 ( 2.7) | 2 ( 1.0) | 0† ( 0.0) | 230 ( 2.8) |
| GED | 183 | 130 | 16 ( 3.3) | 47 ( 6.2) | 32 ( 5.0) | 4 ( 2.7) | 0† ( 0.3) | 263 ( 4.3) |
| High school | 154 | 107 | 27 ( 4.9) | 37 ( 5.7) | 32 ( 4.7) | 4 ( 2.4) | 0† ( 0.0) | 251 ( 5.6) |
| Some college (no degree) | 211 | 120 | 12 ( 2.5) | 30 ( 3.5) | 45 ( 4.5) | 13 ( 3.4) | 1 ( 1.0) | 280 ( 3.7) |
| 2 year college degree | 27 | 15 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 4 year college degree | 17 | 9 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| Graduate studies/degree | 9 | 5 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| **Age** | | | | | | | | |
| 16 to 18 years | 19 | 12 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 19 to 24 years | 262 | 162 | 26 ( 3.4) | 41 ( 5.0) | 27 ( 4.3) | 5 ( 2.2) | 0† ( 0.2) | 251 ( 3.6) |
| 25 to 39 years | 641 | 436 | 33 ( 2.7) | 37 ( 2.7) | 25 ( 2.4) | 4 ( 1.3) | 0† ( 0.2) | 240 ( 3.2) |
| 40 to 54 years | 192 | 132 | 38 ( 5.3) | 37 ( 4.5) | 19 ( 3.1) | 6 ( 1.9) | 0† ( 0.4) | 230 ( 6.3) |
| 55 to 64 years | 20 | 13 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 65 years and older | 10 | 7 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.
*** Sample size is insufficient to permit a reliable estimate (fewer than 45 respondents).

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 1.4C

## Average Quantitative Proficiency and Literacy Levels Incarcerated Sample by Total, Education Level, and Age

| DEMOGRAPHIC SUBPOPULATIONS | QUANTITATIVE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Total** | | | | | | | | |
| Total | 1,147 | 766 | 40 ( 1.9) | 32 ( 2.2) | 22 ( 1.9) | 6 ( 1.0) | 1 ( 0.4) | 236 ( 3.1) |
| **Education Level** | | | | | | | | |
| 0 to 8 years | 157 | 107 | 70 ( 5.1) | 21 ( 3.5) | 7 ( 2.6) | 2 ( 1.4) | 0† ( 0.4) | 182 ( 8.4) |
| 9 to 12 years | 385 | 271 | 51 ( 2.8) | 34 ( 3.4) | 13 ( 2.1) | 2 ( 0.9) | 0† ( 0.3) | 219 ( 3.5) |
| GED | 183 | 130 | 21 ( 5.2) | 40 ( 5.6) | 32 ( 5.7) | 7 ( 2.5) | 0† ( 1.4) | 263 ( 4.6) |
| High school | 154 | 107 | 36 ( 5.0) | 32 ( 5.8) | 26 ( 4.3) | 6 ( 3.0) | 0† ( 0.3) | 244 ( 6.7) |
| Some college (no degree) | 211 | 120 | 15 ( 3.0) | 31 ( 4.7) | 36 ( 4.8) | 15 ( 3.5) | 3 ( 1.2) | 276 ( 3.6) |
| 2 year college degree | 27 | 15 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 4 year college degree | 17 | 9 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| Graduate studies/degree | 9 | 5 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| **Age** | | | | | | | | |
| 16 to 18 years | 19 | 12 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 19 to 24 years | 262 | 162 | 39 ( 3.8) | 33 ( 3.4) | 22 ( 4.5) | 5 ( 1.5) | 1 ( 1.3) | 241 ( 4.4) |
| 25 to 39 years | 641 | 438 | 40 ( 2.0) | 32 ( 2.5) | 22 ( 2.4) | 6 ( 1.3) | 1 ( 0.4) | 236 ( 3.5) |
| 40 to 54 years | 192 | 132 | 40 ( 4.6) | 30 ( 4.5) | 23 ( 3.4) | 6 ( 1.6) | 1 ( 0.9) | 232 ( 7.3) |
| 55 to 64 years | 20 | 13 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |
| 65 years and older | 10 | 7 | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) | *** ( ****) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.
*** Sample size is insufficient to permit a reliable estimate (fewer than 45 respondents).

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 1.5

## Average Proficiency on Each Literacy Scale for the 1985 YALS and 1992 NALS Populations

| TOTAL AND RACE/ETHNICITY BY RESPONDENTS' AGE | n | WGT N (/1,000) | Prose CPCT ( SE ) PROF ( SE ) | Document CPCT ( SE ) PROF ( SE ) | Quantitative CPCT ( SE ) PROF ( SE ) |
|---|---|---|---|---|---|
| **1985 Age 21-25** | | | | | |
| Total Population | 3,618 | 21,158 | 100 ( 0.0)<br>293 ( 2.3) | 100 ( 0.0)<br>292 ( 2.2) | 100 ( 0.0)<br>293 ( 2.0) |
| White | 2,016 | 16,115 | 76 ( 1.6)<br>305 ( 1.9) | 76 ( 1.6)<br>305 ( 1.9) | 76 ( 1.6)<br>304 ( 1.8) |
| Black | 991 | 2,801 | 13 ( 1.1)<br>248 ( 2.6)! | 13 ( 1.1)<br>248 ( 2.6)! | 13 ( 1.1)<br>252 ( 2.5)! |
| Hispanic | 478 | 1,481 | 7 ( 1.0)<br>251 ( 8.1)! | 7 ( 1.0)<br>243 ( 9.4)! | 7 ( 1.0)<br>253 ( 8.9)! |
| Other | 133 | 761 | 4 ( 0.6)<br>289 ( 8.0)! | 4 ( 0.6)<br>285 ( 6.1)! | 4 ( 0.6)<br>286 ( 7.2)! |
| **1992 Age 21-25** | | | | | |
| Total Population | 2,690 | 20,300 | 100 ( 0.0)<br>281 ( 1.7) | 100 ( 0.0)<br>281 ( 1.7) | 100 ( 0.0)<br>279 ( 1.8) |
| White | 1,654 | 14,252 | 70 ( 1.2)<br>296 ( 2.1) | 70 ( 1.2)<br>296 ( 1.9) | 70 ( 1.2)<br>295 ( 2.3) |
| Black | 494 | 2,226 | 11 ( 0.7)<br>256 ( 2.5)! | 11 ( 0.7)<br>254 ( 3.2)! | 11 ( 0.7)<br>244 ( 3.1)! |
| Hispanic | 445 | 2,974 | 15 ( 1.0)<br>231 ( 5.3) | 15 ( 1.0)<br>233 ( 5.7) | 15 ( 1.0)<br>229 ( 5.5) |
| Other | 97 | 848 | 4 ( 0.7)<br>278 ( 6.5)! | 4 ( 0.7)<br>277 ( 6.2)! | 4 ( 0.7)<br>278 ( 6.9)! |
| **1992 Age 28-32** | | | | | |
| Total Population | 3,265 | 21,215 | 100 ( 0.0)<br>283 ( 1.9) | 100 ( 0.0)<br>281 ( 1.8) | 100 ( 0.0)<br>282 ( 1.7) |
| White | 2,069 | 15,017 | 71 ( 1.2)<br>301 ( 1.7) | 71 ( 1.2)<br>300 ( 1.5) | 71 ( 1.2)<br>301 ( 1.6) |
| Black | 628 | 2,609 | 12 ( 0.5)<br>251 ( 2.5) | 12 ( 0.5)<br>245 ( 2.5) | 12 ( 0.5)<br>240 ( 2.5) |
| Hispanic | 468 | 2,749 | 13 ( 0.7)<br>223 ( 5.2) | 13 ( 0.7)<br>225 ( 4.9) | 13 ( 0.7)<br>223 ( 5.1) |
| Other | 100 | 838 | 4 ( 0.7)<br>253 (11.0)! | 4 ( 0.7)<br>257 ( 9.1)! | 4 ( 0.7)<br>264 ( 7.9)! |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



**TABLE 1.6**

**Average Proficiency on Each Literacy Scale**
**Respondents' Education Level by Parents' Education Level**

| RESPONDENTS' EDUCATION LEVEL | n | WGT N (/1,000) | PARENTS' EDUCATION LEVEL: 0 to 8 years RPCT ( SE ) PROF ( SE ) | 9 to 12 years RPCT ( SE ) PROF ( SE ) | High school RPCT ( SE ) PROF ( SE ) | 4 years college (degree) RPCT ( SE ) PROF ( SE ) |
|---|---|---|---|---|---|---|
| **0 to 8 years** | 1,412 | 11,983 | | | | |
| Prose | | | 77 ( 1.6) | 8 ( 1.0) | 13 ( 1.4) | 2 ( 0.5) |
| | | | 174 ( 2.8) | 191 ( 7.4)! | 208 ( 7.7)! | *** ( ****) |
| Document | | | 77 ( 1.6) | 8 ( 1.0) | 13 ( 1.4) | 2 ( 0.5) |
| | | | 166 ( 2.9) | 182 ( 7.4)! | 202 ( 7.0)! | *** ( ****) |
| Quantitative | | | 77 ( 1.6) | 8 ( 1.0) | 13 ( 1.4) | 2 ( 0.5) |
| | | | 169 ( 3.8) | 181 ( 7.8)! | 200 ( 8.5)! | *** ( ****) |
| **9 to 12 years** | 2,245 | 16,932 | | | | |
| Prose | | | 46 ( 1.4) | 19 ( 1.1) | 30 ( 1.5) | 5 ( 0.7) |
| | | | 218 ( 2.1) | 235 ( 3.5) | 244 ( 2.7) | 255 ( 7.1)! |
| Document | | | 46 ( 1.4) | 19 ( 1.1) | 30 ( 1.5) | 5 ( 0.7) |
| | | | 211 ( 2.3) | 232 ( 4.3) | 243 ( 2.8) | 257 ( 7.0)! |
| Quantitative | | | 46 ( 1.4) | 19 ( 1.1) | 30 ( 1.5) | 5 ( 0.7) |
| | | | 217 ( 2.8) | 232 ( 4.6) | 242 ( 3.2) | 256 ( 6.6)! |
| **High school** | 4,577 | 37,485 | | | | |
| Prose | | | 28 ( 1.0) | 15 ( 0.7) | 48 ( 1.0) | 9 ( 0.6) |
| | | | 255 ( 2.5) | 267 ( 3.1) | 275 ( 1.7) | 286 ( 3.5) |
| Document | | | 28 ( 1.0) | 15 ( 0.7) | 48 ( 1.0) | 9 ( 0.6) |
| | | | 245 ( 2.5) | 260 ( 2.3) | 271 ( 1.6) | 286 ( 4.4) |
| Quantitative | | | 28 ( 1.0) | 15 ( 0.7) | 48 ( 1.0) | 9 ( 0.6) |
| | | | 255 ( 2.5) | 266 ( 3.4) | 277 ( 1.8) | 284 ( 3.5) |
| **4 year college degree** | 1,487 | 10,683 | | | | |
| Prose | | | 14 ( 1.1) | 7 ( 0.9) | 43 ( 2.0) | 35 ( 1.7) |
| | | | 296 ( 4.1)! | 308 ( 5.9)! | 318 ( 2.2) | 324 ( 2.3) |
| Document | | | 14 ( 1.1) | 7 ( 0.9) | 43 ( 2.0) | 35 ( 1.7) |
| | | | 284 ( 4.0)! | 294 ( 6.9)! | 310 ( 2.2) | 320 ( 2.4) |
| Quantitative | | | 14 ( 1.1) | 7 ( 0.9) | 43 ( 2.0) | 35 ( 1.7) |
| | | | 303 ( 4.8)! | 313 ( 7.1)! | 320 ( 2.2) | 324 ( 2.4) |
| **Total Population** | 17,266 | 126,380 | | | | |
| Prose | | | 31 ( 0.6) | 13 ( 0.4) | 41 ( 0.6) | 16 ( 0.4) |
| | | | 233 ( 1.5) | 264 ( 1.7) | 284 ( 0.9) | 305 ( 1.4) |
| Document | | | 31 ( 0.6) | 13 ( 0.4) | 41 ( 0.6) | 16 ( 0.4) |
| | | | 225 ( 1.6) | 258 ( 1.7) | 279 ( 0.7) | 302 ( 1.5) |
| Quantitative | | | 31 ( 0.6) | 13 ( 0.4) | 41 ( 0.6) | 16 ( 0.4) |
| | | | 233 ( 1.7) | 264 ( 2.0) | 284 ( 0.9) | 304 ( 1.9) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

*** Sample size is insufficient to permit a reliable estimate (fewer than 45 respondents).
! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.7

## Average Proficiency on Each Literacy Scale Education Level by Race/Ethnicity

| EDUCATION LEVEL | n | WGT N (/1,000) | Black RPCT (SE)<br>PROF (SE) | Hispanic RPCT (SE)<br>PROF (SE) | Asian/Pacific Islander RPCT (SE)<br>PROF (SE) | American Indian/Alaskan Native RPCT (SE)<br>PROF (SE) | White RPCT (SE)<br>PROF (SE) | Other RPCT (SE)<br>PROF (SE) |
|---|---|---|---|---|---|---|---|---|
| **Still in high school** | 873 | 6,268 | | | | | | |
| Prose | | | 16 ( 1.5)<br>247 ( 3.9) | 13 ( 1.1)<br>246 ( 6.7)! | 2 ( 0.7)<br>*** ( ****) | 1 ( 0.8)<br>*** ( ****) | 67 ( 1.9)<br>263 ( 2.2) | 1 ( 0.5)<br>*** ( ****) |
| Document | | | 16 ( 1.5)<br>248 ( 3.9) | 13 ( 1.1)<br>246 ( 6.1)! | 2 ( 0.7)<br>*** ( ****) | 1 ( 0.8)<br>*** ( ****) | 67 ( 1.9)<br>266 ( 2.3) | 1 ( 0.5)<br>*** ( ****) |
| Quantitative | | | 16 ( 1.5)<br>234 ( 4.7) | 13 ( 1.1)<br>241 ( 6.5)! | 2 ( 0.7)<br>*** ( ****) | 1 ( 0.8)<br>*** ( ****) | 67 ( 1.9)<br>263 ( 2.4) | 1 ( 0.5)<br>*** ( ****) |
| **0 to 8 years** | 2,167 | 18,358 | | | | | | |
| Prose | | | 13 ( 0.8)<br>159 ( 3.9) | 25 ( 0.9)<br>135 ( 3.6) | 2 ( 0.8)<br>*** ( ****) | 1 ( 0.3)<br>*** ( ****) | 57 ( 1.6)<br>202 ( 3.1) | 1 ( 0.3)<br>*** ( ****) |
| Document | | | 13 ( 0.8)<br>151 ( 2.8) | 25 ( 0.9)<br>131 ( 3.6) | 2 ( 0.8)<br>*** ( ****) | 1 ( 0.3)<br>*** ( ****) | 57 ( 1.6)<br>191 ( 3.1) | 1 ( 0.3)<br>*** ( ****) |
| Quantitative | | | 13 ( 0.8)<br>140 ( 4.0) | 25 ( 0.9)<br>128 ( 3.7) | 2 ( 0.8)<br>*** ( ****) | 1 ( 0.3)<br>*** ( ****) | 57 ( 1.6)<br>195 ( 3.8) | 1 ( 0.3)<br>*** ( ****) |
| **9 to 12 years** | 3,311 | 24,980 | | | | | | |
| Prose | | | 18 ( 0.6)<br>213 ( 2.3) | 13 ( 0.7)<br>200 ( 4.8) | 1 ( 0.3)<br>*** ( ****) | 1 ( 0.4)<br>*** ( ****) | 66 ( 1.1)<br>243 ( 1.6) | 0† ( 0.1)<br>*** ( ****) |
| Document | | | 18 ( 0.6)<br>207 ( 2.2) | 13 ( 0.7)<br>197 ( 4.9) | 1 ( 0.3)<br>*** ( ****) | 1 ( 0.4)<br>*** ( ****) | 66 ( 1.1)<br>238 ( 1.9) | 0† ( 0.1)<br>*** ( ****) |
| Quantitative | | | 18 ( 0.6)<br>197 ( 2.9) | 13 ( 0.7)<br>196 ( 5.4) | 1 ( 0.3)<br>*** ( ****) | 1 ( 0.4)<br>*** ( ****) | 66 ( 1.1)<br>242 ( 2.1) | 0† ( 0.1)<br>*** ( ****) |
| **GED** | 1,062 | 7,224 | | | | | | |
| Prose | | | 10 ( 1.1)<br>243 ( 4.1)! | 12 ( 1.3)<br>240 ( 6.8)! | 1 ( 0.3)<br>*** ( ****) | 3 ( 1.1)<br>*** ( ****) | 74 ( 2.1)<br>270 ( 2.0) | 1 ( 0.4)<br>*** ( ****) |
| Document | | | 10 ( 1.1)<br>235 ( 4.2)! | 12 ( 1.3)<br>236 ( 6.4)! | 1 ( 0.3)<br>*** ( ****) | 3 ( 1.1)<br>*** ( ****) | 74 ( 2.1)<br>272 ( 2.2) | 1 ( 0.4)<br>*** ( ****) |
| Quantitative | | | 10 ( 1.1)<br>235 ( 4.5)! | 12 ( 1.3)<br>240 ( 7.8)! | 1 ( 0.3)<br>*** ( ****) | 3 ( 1.1)<br>*** ( ****) | 74 ( 2.1)<br>277 ( 3.1) | 1 ( 0.4)<br>*** ( ****) |
| **High school diploma** | 6,107 | 61,290 | | | | | | |
| Prose | | | 11 ( 0.4)<br>242 ( 1.6) | 7 ( 0.4)<br>242 ( 4.4) | 1 ( 0.2)<br>209 (16.0)! | 1 ( 0.3)<br>*** ( ****) | 79 ( 0.8)<br>278 ( 1.2) | 0† ( 0.1)<br>*** ( ****) |
| Document | | | 11 ( 0.4)<br>235 ( 1.7) | 7 ( 0.4)<br>242 ( 4.9) | 1 ( 0.2)<br>214 (13.2)! | 1 ( 0.3)<br>*** ( ****) | 79 ( 0.8)<br>271 ( 1.2) | 0† ( 0.1)<br>*** ( ****) |
| Quantitative | | | 11 ( 0.4)<br>232 ( 2.0) | 7 ( 0.4)<br>240 ( 4.8) | 1 ( 0.2)<br>227 (12.5)! | 1 ( 0.3)<br>*** ( ****) | 79 ( 0.8)<br>279 ( 1.2) | 0† ( 0.1)<br>*** ( ****) |
| **Some college (no degree)** | 6,587 | 30,634 | | | | | | |
| Prose | | | 10 ( 0.5)<br>267 ( 1.9) | 8 ( 0.3)<br>265 ( 3.5) | 2 ( 0.2)<br>264 ( 8.3)! | 1 ( 0.4)<br>*** ( ****) | 78 ( 0.8)<br>302 ( 1.2) | 0† ( 0.1)<br>*** ( ****) |
| Document | | | 10 ( 0.5)<br>261 ( 2.2) | 8 ( 0.3)<br>263 ( 3.4) | 2 ( 0.2)<br>261 (10.2)! | 1 ( 0.4)<br>*** ( ****) | 78 ( 0.8)<br>297 ( 1.0) | 0† ( 0.1)<br>*** ( ****) |
| Quantitative | | | 10 ( 0.5)<br>258 ( 2.2) | 8 ( 0.3)<br>265 ( 3.5) | 2 ( 0.2)<br>273 ( 7.7)! | 1 ( 0.4)<br>*** ( ****) | 78 ( 0.8)<br>304 ( 1.5) | 0† ( 0.1)<br>*** ( ****) |
| **2 year college degree** | 1,035 | 6,831 | | | | | | |
| Prose | | | 8 ( 1.1)<br>276 ( 4.8)! | 6 ( 0.7)<br>291 ( 6.5)! | 2 ( 0.6)<br>*** ( ****) | 1 ( 0.5)<br>*** ( ****) | 83 ( 1.3)<br>313 ( 2.6) | 0† ( 0.1)<br>*** ( ****) |
| Document | | | 8 ( 1.1)<br>263 ( 4.8)! | 6 ( 0.7)<br>288 ( 6.0)! | 2 ( 0.6)<br>*** ( ****) | 1 ( 0.5)<br>*** ( ****) | 83 ( 1.3)<br>305 ( 2.6) | 0† ( 0.1)<br>*** ( ****) |
| Quantitative | | | 8 ( 1.1)<br>267 ( 3.5)! | 6 ( 0.7)<br>286 ( 7.6)! | 2 ( 0.6)<br>*** ( ****) | 1 ( 0.5)<br>*** ( ****) | 83 ( 1.3)<br>313 ( 2.9) | 0† ( 0.1)<br>*** ( ****) |
| **4 year college degree** | 2,634 | 17,804 | | | | | | |
| Prose | | | 6 ( 0.5)<br>288 ( 3.3)! | 4 ( 0.6)<br>282 ( 8.2)! | 4 ( 0.6)<br>271 ( 8.8)! | 0† ( 0.1)<br>*** ( ****) | 85 ( 0.7)<br>328 ( 1.7) | 0† ( 0.0)<br>*** ( ****) |
| Document | | | 6 ( 0.5)<br>279 ( 4.1)! | 4 ( 0.6)<br>285 ( 7.3)! | 4 ( 0.6)<br>275 ( 8.6)! | 0† ( 0.1)<br>*** ( ****) | 85 ( 0.7)<br>320 ( 1.5) | 0† ( 0.0)<br>*** ( ****) |
| Quantitative | | | 6 ( 0.5)<br>280 ( 3.1)! | 4 ( 0.6)<br>286 ( 8.6)! | 4 ( 0.6)<br>286 ( 9.2)! | 0† ( 0.1)<br>*** ( ****) | 85 ( 0.7)<br>329 ( 1.4) | 0† ( 0.0)<br>*** ( ****) |
| **Graduate studies/degree** | 2,263 | 16,308 | | | | | | |
| Prose | | | 5 ( 0.5)<br>296 ( 5.2)! | 3 ( 0.5)<br>312 ( 9.2)! | 4 ( 0.6)<br>301 ( 5.7)! | 0† ( 0.1)<br>*** ( ****) | 88 ( 0.9)<br>341 ( 1.4) | 0† ( 0.1)<br>*** ( ****) |
| Document | | | 5 ( 0.5)<br>285 ( 5.2)! | 3 ( 0.5)<br>306 (10.3)! | 4 ( 0.6)<br>298 ( 6.2)! | 0† ( 0.1)<br>*** ( ****) | 88 ( 0.9)<br>330 ( 1.9) | 0† ( 0.1)<br>*** ( ****) |
| Quantitative | | | 5 ( 0.5)<br>285 ( 4.9)! | 3 ( 0.5)<br>312 ( 9.1)! | 4 ( 0.6)<br>314 ( 7.4)! | 0† ( 0.1)<br>*** ( ****) | 88 ( 0.9)<br>336 ( 1.4) | 0† ( 0.1)<br>*** ( ****) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

*** Sample size is insufficient to permit a reliable estimate (fewer than 45 respondents).

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.8

## Average Proficiency on Each Literacy Scale
## Age by Race/Ethnicity

| AGE | RACE/ ETHNICITY n | WGT N (/1,000) | Black RPCT ( SE ) PROF ( SE ) | Hispanic RPCT ( SE ) PROF ( SE ) | Asian/ Pacific Islander RPCT ( SE ) PROF ( SE ) | American Indian/ Alaskan Native RPCT ( SE ) PROF ( SE ) | White RPCT ( SE ) PROF ( SE ) | Other RPCT ( SE ) PROF ( SE ) |
|---|---|---|---|---|---|---|---|---|
| **16 to 18 years** | 1,237 | 10,424 | | | | | | |
| Prose | | | 16 ( 1.3) | 13 ( 1.1) | 2 ( 0.6) | 2 ( 0.7) | 66 ( 1.8) | 1 ( 0.4) |
| | | | 248 ( 3.6) | 237 ( 6.7) | *** ( ****) | *** ( ****) | 284 ( 2.0) | *** ( ****) |
| Document | | | 16 ( 1.3) | 13 ( 1.1) | 2 ( 0.6) | 2 ( 0.7) | 66 ( 1.8) | 1 ( 0.4) |
| | | | 248 ( 3.7) | 237 ( 5.7) | *** ( ****) | *** ( ****) | 287 ( 2.2) | *** ( ****) |
| Quantitative | | | 16 ( 1.3) | 13 ( 1.1) | 2 ( 0.6) | 2 ( 0.7) | 66 ( 1.8) | 1 ( 0.4) |
| | | | 236 ( 4.0) | 230 ( 5.9) | *** ( ****) | *** ( ****) | 283 ( 2.0) | *** ( ****) |
| **19 to 24 years** | 3,344 | 24,515 | | | | | | |
| Prose | | | 13 ( 0.6) | 15 ( 0.8) | 3 ( 0.5) | 1 ( 0.5) | 68 ( 1.3) | 0† ( 0.2) |
| | | | 254 ( 1.7) | 238 ( 4.9) | 279 ( 6.6)! | *** ( ****) | 295 ( 1.5) | *** ( ****) |
| Document | | | 13 ( 0.6) | 15 ( 0.8) | 3 ( 0.5) | 1 ( 0.5) | 68 ( 1.3) | 0† ( 0.2) |
| | | | 251 ( 1.9) | 238 ( 5.4) | 278 ( 6.4)! | *** ( ****) | 295 ( 1.4) | *** ( ****) |
| Quantitative | | | 13 ( 0.6) | 15 ( 0.8) | 3 ( 0.5) | 1 ( 0.5) | 68 ( 1.3) | 0† ( 0.2) |
| | | | 241 ( 2.0) | 234 ( 5.1) | 281 ( 6.3)! | *** ( ****) | 293 ( 1.9) | *** ( ****) |
| **25 to 39 years** | 10,050 | 63,278 | | | | | | |
| Prose | | | 12 ( 0.3) | 12 ( 0.4) | 2 ( 0.3) | 1 ( 0.4) | 72 ( 0.8) | 0† ( 0.1) |
| | | | 251 ( 2.0) | 215 ( 3.5) | 250 ( 5.8)! | 270 ( 6.7)! | 303 ( 0.9) | *** ( ****) |
| Document | | | 12 ( 0.3) | 12 ( 0.4) | 2 ( 0.3) | 1 ( 0.4) | 72 ( 0.8) | 0† ( 0.1) |
| | | | 245 ( 1.9) | 216 ( 3.7) | 253 ( 4.6)! | 268 ( 8.6)! | 300 ( 1.0) | *** ( ****) |
| Quantitative | | | 12 ( 0.3) | 12 ( 0.4) | 2 ( 0.3) | 1 ( 0.4) | 72 ( 0.8) | 0† ( 0.1) |
| | | | 239 ( 1.9) | 214 ( 3.7) | 263 ( 5.3)! | 263 ( 6.7)! | 303 ( 0.9) | *** ( ****) |
| **40 to 54 years** | 6,310 | 43,794 | | | | | | |
| Prose | | | 10 ( 0.3) | 7 ( 0.4) | 2 ( 0.2) | 1 ( 0.2) | 80 ( 0.5) | 0† ( 0.1) |
| | | | 235 ( 2.3) | 211 ( 4.5)! | 246 ( 7.6)! | *** ( ****) | 300 ( 1.6) | *** ( ****) |
| Document | | | 10 ( 0.3) | 7 ( 0.4) | 2 ( 0.2) | 1 ( 0.2) | 80 ( 0.5) | 0† ( 0.1) |
| | | | 226 ( 2.0) | 206 ( 4.4)! | 243 ( 8.1)! | *** ( ****) | 292 ( 1.4) | *** ( ****) |
| Quantitative | | | 10 ( 0.3) | 7 ( 0.4) | 2 ( 0.2) | 1 ( 0.2) | 80 ( 0.5) | 0† ( 0.1) |
| | | | 226 ( 2.6) | 212 ( 5.0)! | 260 ( 7.4)! | *** ( ****) | 301 ( 1.4) | *** ( ****) |
| **55 to 64 years** | 2,924 | 19,503 | | | | | | |
| Prose | | | 10 ( 0.5) | 8 ( 0.7) | 1 ( 0.3) | 1 ( 0.4) | 80 ( 1.1) | 0† ( 0.2) |
| | | | 212 ( 4.0)! | 192 ( 7.4)! | *** ( ****) | *** ( ****) | 273 ( 2.1) | *** ( ****) |
| Document | | | 10 ( 0.5) | 8 ( 0.7) | 1 ( 0.3) | 1 ( 0.4) | 80 ( 1.1) | 0† ( 0.2) |
| | | | 201 ( 3.9)! | 187 ( 8.2)! | *** ( ****) | *** ( ****) | 262 ( 2.1) | *** ( ****) |
| Quantitative | | | 10 ( 0.5) | 8 ( 0.7) | 1 ( 0.3) | 1 ( 0.4) | 80 ( 1.1) | 0† ( 0.2) |
| | | | 203 ( 3.9)! | 195 ( 8.9)! | *** ( ****) | *** ( ****) | 275 ( 2.3) | *** ( ****) |
| **65 years and older** | 2,214 | 29,735 | | | | | | |
| Prose | | | 8 ( 0.6) | 5 ( 0.5) | 2 ( 0.4) | 1 ( 0.2) | 85 ( 1.0) | 0† ( 0.1) |
| | | | 187 ( 4.5) | 170 ( 8.8)! | *** ( ****) | *** ( ****) | 240 ( 2.1) | *** ( ****) |
| Document | | | 8 ( 0.6) | 5 ( 0.5) | 2 ( 0.4) | 1 ( 0.2) | 85 ( 1.0) | 0† ( 0.1) |
| | | | 173 ( 3.0) | 151 ( 6.6)! | *** ( ****) | *** ( ****) | 226 ( 2.1) | *** ( ****) |
| Quantitative | | | 8 ( 0.6) | 5 ( 0.5) | 2 ( 0.4) | 1 ( 0.2) | 85 ( 1.0) | 0† ( 0.1) |
| | | | 163 ( 5.6) | 144 ( 9.6)! | *** ( ****) | *** ( ****) | 240 ( 2.5) | *** ( ****) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.
*** Sample size is insufficient to permit a reliable estimate (fewer than 45 respondents).
! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 1.9A

## Average Years of Schooling by Age, Race/Ethnicity, and Census Region

| DEMOGRAPHIC SUBPOPULATIONS | Average Years of Schooling* | ( SE) |
|---|---|---|
| **Age** | | |
| 16 to 18 years | 10.8 | ( 0.1) |
| 19 to 24 years | 12.5 | ( 0.0) |
| 25 to 39 years | 12.9 | ( 0.0) |
| 40 to 54 years | 13.1 | ( 0.1) |
| 55 to 64 years | 11.8 | ( 0.1) |
| 65 years and older | 10.7 | ( 0.1) |
| **Race/Ethnicity** | | |
| Black | 11.6 | ( 0.1) |
| Hispanic | 10.2 | ( 0.1) |
| Asian/Pacific Islander | 13.0 | ( 0.3) |
| American Indian/ Alaskan Native | 11.7 | ( 0.2) |
| White | 12.8 | ( 0.0) |
| **Age by Race/Ethnicity** | | |
| 16 to 18 years | | |
| White | 11.0 | ( 0.2) |
| Black | 10.8 | ( 0.2) |
| Hispanic | 9.9 | ( 0.3) |
| Asian/Pacific Islander | 11.3 | ( 0.9) |
| 19 to 24 years | | |
| White | 12.8 | ( 0.0) |
| Black | 12.1 | ( 0.1) |
| Hispanic | 11.4 | ( 0.2) |
| Asian/Pacific Islander | 12.9 | ( 0.3) |
| 25 to 39 years | | |
| White | 13.4 | ( 0.0) |
| Black | 12.5 | ( 0.1) |
| Hispanic | 10.5 | ( 0.2) |
| Asian/Pacific Islander | 13.9 | ( 0.3) |
| 40 to 54 years | | |
| White | 13.5 | ( 0.1) |
| Black | 11.9 | ( 0.1) |
| Hispanic | 10.3 | ( 0.3) |
| Asian/Pacific Islander | 14.1 | ( 0.5) |
| 55 to 64 years | | |
| White | 12.3 | ( 0.1) |
| Black | 10.7 | ( 0.3) |
| Hispanic | 8.8 | ( 0.4) |
| Asian/Pacific Islander | 13.3 | ( 0.9) |
| 65 years and older | | |
| White | 11.2 | ( 0.1) |
| Black | 9.0 | ( 0.2) |
| Hispanic | 6.5 | ( 0.4) |
| Asian/Pacific Islander | 8.7 | ( 1.3) |



## TABLE 1.9A (continued)

### Average Years of Schooling by Age, Race/Ethnicity, and Census Region

| DEMOGRAPHIC SUBPOPULATIONS | Average Years of Schooling* | |
|---|---|---|
| | | ( SE) |
| **Census Region** | | |
| Northeast | 12.5 | ( 0.1) |
| Midwest | 12.5 | ( 0.1) |
| South | 12.2 | ( 0.1) |
| West | 12.6 | ( 0.1) |

*in this country.

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

!   Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 1.9B

## Difference in Average Proficiencies and in Average Years of Schooling, by Race/Ethnicity and Age

| DEMOGRAPHIC SUBPOPULATIONS | Difference in Average Prose Proficiency | ( SE) | Difference in Average Document Proficiency | ( SE) | Difference in Average Quantitative Proficiency | ( SE) | Difference in Average Years of Schooling | ( SE) |
|---|---|---|---|---|---|---|---|---|
| **White and Black Adults** | | | | | | | | |
| 16 to 18 years | 36 | ( 4.1) | 39 | ( 4.3) | 47 | ( 4.5) | .2 | ( 0.3) |
| 19 to 24 years | 41 | ( 2.3) | 44 | ( 2.4) | 52 | ( 2.8) | .7 | ( 0.1) |
| 25 to 39 years | 52 | ( 2.2) | 55 | ( 2.1) | 64 | ( 2.1) | .9 | ( 0.1) |
| 40 to 54 years | 65 | ( 2.8) | 66 | ( 2.4) | 75 | ( 3.0) | 1.6 | ( 0.1) |
| 55 to 64 years | 61 | ( 4.5) | 61 | ( 4.4) | 72 | ( 4.5) | 1.6 | ( 0.3) |
| 65 years and older | 53 | ( 5.0) | 53 | ( 3.7) | 77 | ( 6.1) | 2.2 | ( 0.2) |
| **White and Hispanic Adults** | | | | | | | | |
| 16 to 18 years | 47 | ( 7.0) | 50 | ( 6.1) | 53 | ( 6.2) | 1.1 | ( 0.4) |
| 19 to 24 years | 57 | ( 5.1) | 57 | ( 5.6) | 59 | ( 5.4) | 1.4 | ( 0.2) |
| 25 to 39 years | 88 | ( 3.6) | 84 | ( 3.8) | 89 | ( 3.8) | 2.9 | ( 0.2) |
| 40 to 54 years | 89 | ( 4.8) | 84 | ( 4.6) | 89 | ( 5.2) | 3.2 | ( 0.3) |
| 55 to 64 years | 81 | ( 7.7) | 75 | ( 8.5) | 80 | ( 9.2) | 3.5 | ( 0.4) |
| 65 years and older | 70 | ( 9.0) | 75 | ( 6.9) | 96 | ( 9.9) | 4.7 | ( 0.4) |
| **White and Asian/ Pacific Islander Adults** | | | | | | | | |
| 19 to 24 years | 16 | ( 8.7) | 17 | ( 8.5) | 12 | ( 8.5) | -0.1 | ( 0.3) |
| 25 to 39 years | 53 | ( 3.6) | 47 | ( 4.9) | 40 | ( 5.4) | -0.5 | ( 0.3) |
| 40 to 54 years | 52 | ( 8.0) | 49 | ( 8.2) | 41 | ( 7.5) | -0.6 | ( 0.5) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 1.10

## Average Proficiency on Each Literacy Scale
## Race/Ethnicity by Country of Birth

| RACE/ETHNICITY | n | WGT N (/1,000) | Born in the USA or US Territory RPCT ( SE ) PROF ( SE ) | Born in Another Country RPCT ( SE ) PROF ( SE ) |
|---|---|---|---|---|
| **Black** | 4,963 | 21,192 | | |
| Prose | | | 95 ( 0.5)<br>237 ( 1.4) | 6 ( 0.5)<br>230 ( 6.4) |
| Document | | | 95 ( 0.5)<br>230 ( 1.2) | 6 ( 0.5)<br>225 ( 8.7) |
| Quantitative | | | 95 ( 0.5)<br>224 ( 1.4) | 6 ( 0.5)<br>227 ( 7.1) |
| **Hispanic/Mexicano** | 1,776 | 10,235 | | |
| Prose | | | 54 ( 2.2)<br>247 ( 3.2) | 46 ( 2.2)<br>158 ( 3.7) |
| Document | | | 54 ( 2.2)<br>245 ( 3.0) | 46 ( 2.2)<br>158 ( 4.3) |
| Quantitative | | | 54 ( 2.2)<br>244 ( 3.1) | 46 ( 2.2)<br>158 ( 4.5) |
| **Hispanic/Puerto Rican** | 405 | 2,190 | | |
| Prose | | | 80 ( 2.9)<br>226 ( 6.9) | 20 ( 2.9)<br>186 (10.3)! |
| Document | | | 80 ( 2.9)<br>225 ( 6.7) | 20 ( 2.9)<br>171 (12.4)! |
| Quantitative | | | 80 ( 2.9)<br>223 ( 6.6) | 20 ( 2.9)<br>166 (16.0)! |
| **Hispanic/Cuban** | 147 | 928 | | |
| Prose | | | 11 ( 2.8)<br>*** ( ****) | 89 ( 2.8)<br>202 (10.9) |
| Document | | | 11 ( 2.8)<br>*** ( ****) | 89 ( 2.8)<br>204 (13.0) |
| Quantitative | | | 11 ( 2.8)<br>*** ( ****) | 89 ( 2.8)<br>217 (14.6) |
| **Hispanic/Central/South** | 424 | 2,608 | | |
| Prose | | | 21 ( 3.1)<br>281 ( 6.3)! | 79 ( 3.1)<br>187 ( 6.0) |
| Document | | | 21 ( 3.1)<br>277 ( 5.0)! | 79 ( 3.1)<br>188 ( 5.9) |
| Quantitative | | | 21 ( 3.1)<br>275 ( 5.1)! | 79 ( 3.1)<br>185 ( 6.4) |
| **Hispanic/Other** | 374 | 2,520 | | |
| Prose | | | 68 ( 5.5)<br>283 ( 7.7) | 32 ( 5.5)<br>210 (10.5)! |
| Document | | | 68 ( 5.5)<br>277 ( 7.5) | 32 ( 5.5)<br>204 (11.1)! |
| Quantitative | | | 68 ( 5.5)<br>271 ( 8.2) | 32 ( 5.5)<br>191 (13.1)! |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

*** Sample size is insufficient to permit a reliable estimate (fewer than 45 respondents).

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: Educational Testing Service, National Adult Literacy Survey, 1992.



## TABLE 1.10 (continued)

## Average Proficiency on Each Literacy Scale
## Race/Ethnicity by Country of Birth

| RACE/ETHNICITY | COUNTRY OF BIRTH n | WGT N (/1,000) | Born in the USA or US Territory RPCT ( SE ) PROF ( SE ) | Born in Another Country RPCT ( SE ) PROF ( SE ) |
|---|---|---|---|---|
| **Asian/Pacific Islander** | 438 | 4,116 | | |
| Prose | | | 22 ( 2.5)<br>274 (11.2)! | 78 ( 2.5)<br>233 ( 7.2) |
| Document | | | 22 ( 2.5)<br>266 (12.4)! | 78 ( 2.5)<br>240 ( 5.4) |
| Quantitative | | | 22 ( 2.5)<br>279 (10.0)! | 78 ( 2.5)<br>249 ( 7.9) |
| **American Indian/Alaskan Native** | 189 | 1,803 | | |
| Prose | | | 100 ( 0.4)<br>254 ( 4.1)! | 0†( 0.4)<br>*** ( ****) |
| Document | | | 100 ( 0.4)<br>254 ( 5.0)! | 0†( 0.4)<br>*** ( ****) |
| Quantitative | | | 100 ( 0.4)<br>250 ( 5.1)! | 0†( 0.4)<br>*** ( ****) |
| **White** | 17,292 | 144,968 | | |
| Prose | | | 96 ( 0.2)<br>287 ( 0.8) | 4 ( 0.2)<br>258 ( 4.3) |
| Document | | | 96 ( 0.2)<br>281 ( 0.9) | 4 ( 0.2)<br>255 ( 3.3) |
| Quantitative | | | 96 ( 0.2)<br>288 ( 0.8) | 4 ( 0.2)<br>260 ( 4.2) |
| **Other** | 83 | 729 | | |
| Prose | | | 24 ( 7.8)<br>*** ( ****) | 76 ( 7.8)<br>197 (16.3) |
| Document | | | 24 ( 7.8)<br>*** ( ****) | 76 ( 7.8)<br>203 (15.5) |
| Quantitative | | | 24 ( 7.8)<br>*** ( ****) | 76 ( 7.8)<br>202 (12.3) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to 0.
*** Sample size is insufficient to permit a reliable estimate (fewer than 45 respondents).
! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: Educational Testing Service, National Adult Literacy Survey, 1992.



## TABLE 1.11

## Average Proficiency on Each Literacy Scale Census Region by Country of Birth

| CENSUS REGION | COUNTRY OF BIRTH | | Born in the USA or US Territory | Born in Another Country |
|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE )<br>PROF ( SE ) | RPCT ( SE )<br>PROF ( SE ) |
| **Northeast** | 5,425 | 39,834 | | |
| Prose | | | 86 ( 0.7)<br>279 ( 1.3) | 14 ( 0.7)<br>213 ( 3.3) |
| Document | | | 86 ( 0.7)<br>272 ( 1.4) | 14 ( 0.7)<br>210 ( 3.4) |
| Quantitative | | | 86 ( 0.7)<br>276 ( 1.3) | 14 ( 0.7)<br>211 ( 4.5) |
| **Midwest** | 7,494 | 45,318 | | |
| Prose | | | 97 ( 0.3)<br>281 ( 1.1) | 3 ( 0.3)<br>223 ( 7.9) |
| Document | | | 97 ( 0.3)<br>275 ( 1.3) | 3 ( 0.3)<br>227 ( 8.5) |
| Quantitative | | | 97 ( 0.3)<br>281 ( 1.7) | 3 ( 0.3)<br>229 ( 9.3) |
| **South** | 7,886 | 65,854 | | |
| Prose | | | 93 ( 0.5)<br>271 ( 2.1) | 7 ( 0.5)<br>219 ( 4.2) |
| Document | | | 93 ( 0.5)<br>265 ( 2.1) | 7 ( 0.5)<br>219 ( 4.5) |
| Quantitative | | | 93 ( 0.5)<br>269 ( 2.2) | 7 ( 0.5)<br>224 ( 4.5) |
| **West** | 5,286 | 40,282 | | |
| Prose | | | 82 ( 0.9)<br>292 ( 1.9) | 18 ( 0.9)<br>204 ( 5.0) |
| Document | | | 82 ( 0.9)<br>285 ( 1.7) | 18 ( 0.9)<br>204 ( 4.9) |
| Quantitative | | | 82 ( 0.9)<br>290 ( 1.9) | 18 ( 0.9)<br>208 ( 5.9) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

Source: Educational Testing Service, National Adult Literacy Survey, 1992.



## TABLE 1.12A

## Average Prose Proficiency and Literacy Levels by Type of Physical, Mental, or Health Condition

| DISABILITIES | PROSE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Physical, Mental, Health Condition** Yes | 2,806 | 22,205 | 46 ( 1.1) | 30 ( 1.6) | 18 ( 1.5) | 5 ( 0.9) | 1 ( 0.2) | 227 ( 1.6) |
| **Visual Difficulty** Yes | 1,801 | 14,296 | 54 ( 1.6) | 26 ( 1.4) | 15 ( 1.6) | 5 ( 1.3) | 0† ( 0.2) | 217 ( 2.4) |
| **Hearing Difficulty** Yes | 1,611 | 14,202 | 36 ( 1.9) | 30 ( 2.0) | 24 ( 1.9) | 9 ( 1.4) | 1 ( 0.4) | 243 ( 2.6) |
| **Learning Disability** Yes | 875 | 5,820 | 58 ( 2.4) | 22 ( 2.4) | 14 ( 1.6) | 4 ( 1.1) | 1 ( 0.6) | 207 ( 3.7) |
| **Mental or Emotional Condition** Yes | 597 | 3,631 | 48 ( 3.2) | 24 ( 2.7) | 18 ( 2.3) | 8 ( 1.8) | 2 ( 0.9) | 225 ( 4.8) |
| **Mental Retardation** Yes | 63 | 370 | 87 ( 6.0) | 3 ( 4.4) | 5 ( 4.1) | 3 ( 3.2) | 1 ( 1.7) | 143 (13.6) |
| **Speech Disability** Yes | 383 | 2,767 | 53 ( 4.0) | 26 ( 3.8) | 13 ( 2.7) | 7 ( 2.4) | 0† ( 0.4) | 216 ( 6.6) |
| **Physical Disability** Yes | 2,129 | 17,144 | 44 ( 1.3) | 30 ( 1.5) | 19 ( 1.6) | 6 ( 1.0) | 1 ( 0.2) | 231 ( 1.8) |
| **Long-term Illness 6 months or more** Yes | 1,880 | 14,627 | 41 ( 1.5) | 29 ( 1.3) | 21 ( 1.4) | 7 ( 1.1) | 1 ( 0.4) | 236 ( 2.4) |
| **Any Other Health Impairment** Yes | 1,509 | 12,058 | 39 ( 2.1) | 30 ( 2.7) | 23 ( 2.2) | 7 ( 1.2) | 1 ( 0.3) | 237 ( 2.6) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to 0.

Source: Educational Testing Service, National Adult Literacy Survey, 1992.



## TABLE 1.12B

## Average Document Proficiency and Literacy Levels by Type of Physical, Mental, or Health Condition

| DISABILITIES | DOCUMENT SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Physical, Mental, Health Condition** | | | | | | | | |
| Yes | 2,806 | 22,205 | 51 ( 1.3) | 30 ( 1.2) | 15 ( 0.9) | 4 ( 0.6) | 1 ( 0.2) | 219 ( 1.9) |
| **Visual Difficulty** | | | | | | | | |
| Yes | 1,801 | 14,296 | 56 ( 1.5) | 26 ( 2.1) | 13 ( 1.8) | 4 ( 0.8) | 1 ( 0.3) | 212 ( 2.6) |
| **Hearing Difficulty** | | | | | | | | |
| Yes | 1,611 | 14,202 | 39 ( 2.1) | 31 ( 1.9) | 22 ( 1.6) | 7 ( 1.1) | 1 ( 0.4) | 236 ( 2.8) |
| **Learning Disability** | | | | | | | | |
| Yes | 875 | 5,820 | 60 ( 2.6) | 22 ( 2.9) | 13 ( 1.3) | 4 ( 1.0) | 1 ( 0.9) | 201 ( 4.0) |
| **Mental or Emotional Condition** | | | | | | | | |
| Yes | 597 | 3,631 | 47 ( 3.2) | 27 ( 2.8) | 18 ( 2.1) | 7 ( 1.9) | 2 ( 0.7) | 223 ( 4.7) |
| **Mental Retardation** | | | | | | | | |
| Yes | 63 | 370 | 87 ( 6.3) | 5 ( 4.9) | 5 ( 3.1) | 3 ( 2.6) | 0† ( 0.7) | 145 (13.5) |
| **Speech Disability** | | | | | | | | |
| Yes | 383 | 2,767 | 55 ( 4.1) | 28 ( 4.0) | 12 ( 2.6) | 5 ( 1.9) | 0† ( 0.4) | 212 ( 5.7) |
| **Physical Disability** | | | | | | | | |
| Yes | 2,129 | 17,144 | 48 ( 1.4) | 29 ( 1.5) | 17 ( 1.4) | 5 ( 0.7) | 0† ( 0.1) | 222 ( 2.1) |
| **Long-term Illness 6 months or more** | | | | | | | | |
| Yes | 1,880 | 14,627 | 46 ( 1.7) | 30 ( 2.2) | 17 ( 1.6) | 5 ( 0.8) | 1 ( 0.3) | 225 ( 2.2) |
| **Any Other Health Impairment** | | | | | | | | |
| Yes | 1,509 | 12,058 | 45 ( 2.0) | 30 ( 2.2) | 19 ( 1.8) | 5 ( 1.1) | 1 ( 0.2) | 226 ( 2.4) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to 0.

Source: Educational Testing Service, National Adult Literacy Survey, 1992.



# TABLE 1.12C

## Average Quantitative Proficiency and Literacy Levels by Type of Physical, Mental, or Health Condition

| DISABILITIES | QUANTITATIVE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | RPCT ( SE ) | PROF ( SE ) |
| **Physical, Mental, Health Condition** | | | | | | | | |
| Yes | 2,806 | 22,205 | 49 ( 1.2) | 25 ( 1.1) | 19 ( 1.2) | 6 ( 0.7) | 1 ( 0.4) | 220 ( 2.4) |
| **Visual Difficulty** | | | | | | | | |
| Yes | 1,801 | 14,296 | 55 ( 1.7) | 24 ( 1.7) | 16 ( 1.6) | 5 ( 1.1) | 1 ( 0.4) | 210 ( 2.7) |
| **Hearing Difficulty** | | | | | | | | |
| Yes | 1,611 | 14,202 | 37 ( 2.3) | 25 ( 1.9) | 26 ( 2.0) | 10 ( 1.6) | 2 ( 0.6) | 242 ( 3.6) |
| **Learning Disability** | | | | | | | | |
| Yes | 875 | 5,820 | 60 ( 2.9) | 21 ( 2.5) | 13 ( 1.4) | 4 ( 1.3) | 1 ( 0.6) | 197 ( 4.2) |
| **Mental or Emotional Condition** | | | | | | | | |
| Yes | 597 | 3,631 | 51 ( 3.2) | 22 ( 2.6) | 16 ( 2.5) | 8 ( 1.9) | 2 ( 1.3) | 214 ( 5.7) |
| **Mental Retardation** | | | | | | | | |
| Yes | 63 | 370 | 90 ( 4.2) | 3 ( 3.7) | 6 ( 4.8) | 1 ( 0.9) | 0† ( 1.6) | 115 (14.1) |
| **Speech Disability** | | | | | | | | |
| Yes | 383 | 2,767 | 55 ( 3.2) | 22 ( 3.3) | 16 ( 2.6) | 6 ( 2.3) | 1 ( 0.9) | 208 ( 7.2) |
| **Physical Disability** | | | | | | | | |
| Yes | 2,129 | 17,144 | 47 ( 1.7) | 26 ( 1.6) | 20 ( 1.2) | 7 ( 0.8) | 1 ( 0.3) | 223 ( 2.4) |
| **Long-term Illness 6 months or more** | | | | | | | | |
| Yes | 1,880 | 14,627 | 44 ( 1.5) | 25 ( 1.4) | 22 ( 1.7) | 7 ( 0.8) | 2 ( 0.4) | 227 ( 2.7) |
| **Any Other Health Impairment** | | | | | | | | |
| Yes | 1,509 | 12,058 | 41 ( 1.8) | 26 ( 1.7) | 23 ( 1.9) | 8 ( 1.1) | 2 ( 0.7) | 232 ( 3.2) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); RPCT = row percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to 0.

Source: Educational Testing Service, National Adult Literacy Survey, 1992.



# TABLE 2.1A

## Newspaper Reading Practices, Help from Others, and English Literacy by Prose Literacy Levels

| NEWSPAPER READING PRACTICES, HELP FROM OTHERS, ENGLISH LITERACY | PROSE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | PROF ( SE ) |
| **Newspaper Reading** | | | | | | | | |
| Every day | 12,157 | 93,536 | 35 ( 0.5) | 49 ( 0.9) | 52 ( 0.7) | 57 ( 1.2) | 61 ( 3.1) | 285 ( 0.7) |
| A few times a week | 6,482 | 45,127 | 19 ( 0.8) | 24 ( 1.1) | 25 ( 1.0) | 25 ( 1.2) | 25 ( 3.1) | 280 ( 1.2) |
| Once a week | 3,676 | 27,075 | 16 ( 0.9) | 15 ( 1.0) | 14 ( 1.2) | 12 ( 1.0) | 8 ( 1.3) | 267 ( 1.4) |
| Less than once a week | 2,076 | 13,923 | 9 ( 1.5) | 8 ( 1.4) | 6 ( 1.6) | 5 ( 1.1) | 5 ( 1.0) | 259 ( 2.3) |
| Never | 1,686 | 11,511 | 21 ( 1.5) | 3 ( 1.2) | 2 ( 0.9) | 1 ( 0.6) | 1 ( 0.2) | 174 ( 2.8) |
| **Read News, Editorials** | | | | | | | | |
| No | 870 | 6,574 | 8 ( 2.4) | 5 ( 2.6) | 3 ( 1.9) | 1 ( 1.1) | 0† ( 0.3) | 248 ( 2.7) |
| Yes | 21,444 | 159,164 | 92 ( 0.5) | 95 ( 0.6) | 97 ( 0.5) | 99 ( 0.4) | 100 ( 0.3) | 282 ( 0.6) |
| **Read Sports** | | | | | | | | |
| No | 11,641 | 85,383 | 52 ( 0.7) | 53 ( 1.2) | 52 ( 1.2) | 50 ( 1.1) | 47 ( 2.4) | 280 ( 0.8) |
| Yes | 10,673 | 80,355 | 48 ( 0.7) | 47 ( 1.3) | 48 ( 1.2) | 50 ( 1.1) | 53 ( 2.4) | 282 ( 0.8) |
| **Read Home, Fashion** | | | | | | | | |
| No | 3,788 | 30,892 | 26 ( 1.0) | 20 ( 1.3) | 17 ( 1.3) | 14 ( 0.9) | 14 ( 0.7) | 267 ( 1.6) |
| Yes | 18,526 | 134,846 | 74 ( 0.7) | 80 ( 0.7) | 83 ( 0.6) | 86 ( 0.7) | 86 ( 0.7) | 284 ( 0.5) |
| **Read Ads, Listings** | | | | | | | | |
| No | 2,918 | 23,564 | 16 ( 1.1) | 12 ( 1.3) | 13 ( 1.2) | 17 ( 1.1) | 24 ( 1.9) | 282 ( 1.7) |
| Yes | 19,396 | 142,174 | 84 ( 0.7) | 88 ( 0.6) | 87 ( 0.8) | 83 ( 0.6) | 76 ( 1.8) | 280 ( 0.6) |
| **Read Comics, Advice** | | | | | | | | |
| No | 6,300 | 48,452 | 34 ( 1.1) | 28 ( 1.0) | 28 ( 1.1) | 29 ( 0.7) | 31 ( 1.7) | 277 ( 1.3) |
| Yes | 16,014 | 117,286 | 66 ( 1.0) | 72 ( 0.8) | 72 ( 0.8) | 71 ( 0.5) | 69 ( 1.7) | 282 ( 0.6) |
| **English Reading Ability** | | | | | | | | |
| Very well/well | 24,135 | 177,718 | 71 ( 0.4) | 97 ( 0.6) | 99 ( 0.5) | 100 ( 0.4) | 100 ( 0.2) | 282 ( 0.5) |
| Not well/not at all | 1,906 | 13,214 | 29 ( 1.5) | 3 ( 1.2) | 1 ( 0.7) | 0† ( 0.2) | 0† ( 0.0) | 150 ( 2.6) |
| **English Writing Ability** | | | | | | | | |
| Very well/well | 23,455 | 172,519 | 66 ( 0.4) | 94 ( 0.6) | 98 ( 0.5) | 99 ( 0.4) | 100 ( 0.2) | 283 ( 0.6) |
| Not well/not at all | 2,544 | 18,128 | 34 ( 1.4) | 6 ( 1.1) | 2 ( 0.8) | 1 ( 0.2) | 0† ( 0.1) | 174 ( 2.4) |
| **Help With Forms** | | | | | | | | |
| A lot | 2,763 | 23,034 | 27 ( 1.4) | 12 ( 1.2) | 8 ( 1.2) | 4 ( 0.6) | 2 ( 0.5) | 221 ( 2.2) |
| Some/None | 23,294 | 168,062 | 73 ( 0.4) | 88 ( 0.6) | 92 ( 0.5) | 96 ( 0.4) | 98 ( 0.5) | 280 ( 0.6) |
| **Help With Information** | | | | | | | | |
| A lot | 2,230 | 17,123 | 23 ( 1.4) | 8 ( 1.2) | 5 ( 1.3) | 2 ( 0.6) | 1 ( 0.4) | 210 ( 2.5) |
| Some/None | 23,790 | 173,731 | 77 ( 0.4) | 92 ( 0.6) | 95 ( 0.5) | 98 ( 0.4) | 99 ( 0.4) | 279 ( 0.6) |
| **Help With Basic Math** | | | | | | | | |
| A lot | 1,219 | 9,293 | 15 ( 1.8) | 4 ( 1.8) | 2 ( 1.1) | 1 ( 0.7) | 0† ( 0.2) | 192 ( 3.2) |
| Some/None | 24,838 | 181,761 | 85 ( 0.4) | 96 ( 0.7) | 98 ( 0.5) | 99 ( 0.4) | 100 ( 0.2) | 277 ( 0.5) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 2.1B

## Newspaper Reading Practices, Help from Others, and English Literacy by Document Literacy Levels

| NEWSPAPER READING PRACTICES, HELP FROM OTHERS, ENGLISH LITERACY | DOCUMENT SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | PROF ( SE ) |
| **Newspaper Reading** | | | | | | | | |
| Every day | 12,157 | 93,536 | 39 ( 0.6) | 51 ( 0.8) | 51 ( 0.9) | 55 ( 1.4) | 55 ( 1.8) | 276 ( 0.8) |
| A few times a week | 6,482 | 45,127 | 18 ( 0.6) | 24 ( 0.8) | 26 ( 0.9) | 26 ( 1.2) | 28 ( 2.3) | 277 ( 1.2) |
| Once a week | 3,875 | 27,075 | 15 ( 1.1) | 15 ( 0.9) | 14 ( 1.2) | 12 ( 0.9) | 11 ( 1.4) | 265 ( 1.4) |
| Less than once a week | 2,076 | 13,923 | 9 ( 1.5) | 8 ( 1.2) | 7 ( 1.6) | 6 ( 1.4) | 6 ( 1.2) | 257 ( 2.2) |
| Never | 1,686 | 11,511 | 19 ( 1.5) | 3 ( 1.2) | 2 ( 1.0) | 1 ( 0.4) | 1 ( 0.4) | 170 ( 2.9) |
| **Read News, Editorials** | | | | | | | | |
| No | 870 | 6,574 | 7 ( 1.9) | 4 ( 2.4) | 3 ( 2.2) | 2 ( 0.9) | 1 ( 0.5) | 248 ( 3.1) |
| Yes | 21,444 | 159,164 | 93 ( 0.5) | 96 ( 0.5) | 97 ( 0.5) | 98 ( 0.6) | 99 ( 0.4) | 276 ( 0.6) |
| **Read Sports** | | | | | | | | |
| No | 11,641 | 85,383 | 53 ( 0.9) | 53 ( 0.7) | 51 ( 0.8) | 49 ( 1.4) | 47 ( 0.9) | 273 ( 0.9) |
| Yes | 10,673 | 80,355 | 47 ( 1.0) | 47 ( 0.8) | 49 ( 0.9) | 51 ( 1.4) | 53 ( 0.9) | 276 ( 1.0) |
| **Read Home, Fashion** | | | | | | | | |
| No | 3,788 | 30,892 | 24 ( 1.1) | 19 ( 1.1) | 17 ( 1.3) | 15 ( 1.1) | 15 ( 1.1) | 264 ( 1.6) |
| Yes | 18,526 | 134,846 | 76 ( 0.6) | 81 ( 0.8) | 83 ( 0.6) | 85 ( 1.0) | 85 ( 1.0) | 277 ( 0.6) |
| **Read Ads, Listings** | | | | | | | | |
| No | 2,918 | 23,564 | 16 ( 1.1) | 12 ( 1.1) | 13 ( 1.2) | 17 ( 1.1) | 22 ( 1.8) | 274 ( 1.7) |
| Yes | 19,396 | 142,174 | 84 ( 0.5) | 88 ( 0.6) | 87 ( 0.7) | 83 ( 0.7) | 78 ( 1.7) | 274 ( 0.6) |
| **Read Comics, Advice** | | | | | | | | |
| No | 6,300 | 48,452 | 33 ( 0.9) | 27 ( 0.7) | 29 ( 1.1) | 28 ( 1.1) | 30 ( 2.2) | 271 ( 1.2) |
| Yes | 16,014 | 117,286 | 67 ( 0.7) | 73 ( 0.6) | 71 ( 0.8) | 72 ( 0.9) | 70 ( 2.2) | 276 ( 0.7) |
| **English Reading Ability** | | | | | | | | |
| Very well/well | 24,136 | 177,713 | 75 ( 0.4) | 97 ( 0.5) | 99 ( 0.5) | 100 ( 0.4) | 100 ( 0.1) | 276 ( 0.6) |
| Not well/not at all | 1,906 | 13,214 | 25 ( 1.3) | 3 ( 1.0) | 1 ( 0.6) | 0† ( 0.4) | 0† ( 0.0) | 151 ( 2.6) |
| **English Writing Ability** | | | | | | | | |
| Very well/well | 23,455 | 172,519 | 70 ( 0.4) | 94 ( 0.4) | 97 ( 0.5) | 99 ( 0.4) | 100 ( 0.3) | 277 ( 0.6) |
| Not well/not at all | 2,544 | 18,129 | 30 ( 1.6) | 6 ( 1.3) | 3 ( 0.7) | 1 ( 0.2) | 0† ( 0.3) | 175 ( 2.4) |
| **Help With Forms** | | | | | | | | |
| A lot | 2,763 | 23,034 | 25 ( 1.3) | 12 ( 1.4) | 7 ( 0.8) | 4 ( 0.7) | 2 ( 0.4) | 217 ( 2.0) |
| Some/None | 23,294 | 168,062 | 75 ( 0.5) | 88 ( 0.6) | 93 ( 0.5) | 96 ( 0.5) | 98 ( 0.4) | 274 ( 0.6) |
| **Help With Information** | | | | | | | | |
| A lot | 2,230 | 17,123 | 21 ( 1.3) | 8 ( 1.2) | 5 ( 0.9) | 2 ( 0.6) | 1 ( 0.4) | 206 ( 2.3) |
| Some/None | 23,790 | 173,731 | 79 ( 0.5) | 92 ( 0.4) | 95 ( 0.4) | 98 ( 0.5) | 99 ( 0.4) | 273 ( 0.6) |
| **Help With Basic Math** | | | | | | | | |
| A lot | 1,219 | 9,293 | 14 ( 1.4) | 4 ( 1.2) | 2 ( 1.1) | 1 ( 0.5) | 0† ( 0.2) | 187 ( 2.9) |
| Some/None | 24,835 | 181,761 | 86 ( 0.5) | 96 ( 0.4) | 98 ( 0.4) | 99 ( 0.4) | 100 ( 0.2) | 271 ( 0.6) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



# TABLE 2.1C

## Newspaper Reading Practices, Help from Others, and English Literacy by Quantitative Literacy Levels

| NEWSPAPER READING PRACTICES, HELP FROM OTHERS, ENGLISH LITERACY | QUANTITATIVE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | PROF ( SE ) |
| **Newspaper Reading** | | | | | | | | |
| Every day | 12,157 | 93,536 | 35 ( 0.6) | 48 ( 0.8) | 52 ( 0.8) | 58 ( 0.8) | 62 ( 2.0) | 285 ( 0.9) |
| A few times a week | 6,482 | 45,127 | 20 ( 0.6) | 25 ( 1.0) | 25 ( 0.8) | 24 ( 0.8) | 23 ( 1.7) | 278 ( 1.2) |
| Once a week | 3,675 | 27,075 | 16 ( 1.1) | 15 ( 0.9) | 14 ( 0.9) | 11 ( 0.8) | 9 ( 0.9) | 266 ( 1.5) |
| Less than once a week | 2,076 | 13,923 | 9 ( 1.4) | 8 ( 1.5) | 7 ( 1.2) | 5 ( 1.0) | 5 ( 1.0) | 258 ( 2.4) |
| Never | 1,686 | 11,511 | 20 ( 1.5) | 4 ( 1.3) | 2 ( 0.9) | 1 ( 0.7) | 1 ( 0.3) | 163 ( 2.9) |
| **Read News, Editorials** | | | | | | | | |
| No | 870 | 6,574 | 7 ( 1.8) | 5 ( 1.7) | 3 ( 1.8) | 2 ( 1.1) | 1 ( 0.6) | 250 ( 2.8) |
| Yes | 21,444 | 159,164 | 93 ( 0.4) | 95 ( 0.4) | 97 ( 0.5) | 98 ( 0.4) | 99 ( 0.5) | 281 ( 0.7) |
| **Read Sports** | | | | | | | | |
| No | 11,641 | 85,383 | 55 ( 0.7) | 54 ( 0.9) | 51 ( 0.7) | 47 ( 1.0) | 42 ( 2.2) | 276 ( 1.0) |
| Yes | 10,673 | 80,355 | 45 ( 0.7) | 46 ( 0.8) | 49 ( 0.8) | 53 ( 1.0) | 58 ( 2.2) | 284 ( 0.9) |
| **Read Home, Fashion** | | | | | | | | |
| No | 3,788 | 30,892 | 23 ( 1.2) | 18 ( 0.9) | 18 ( 1.3) | 17 ( 1.1) | 17 ( 1.3) | 271 ( 1.7) |
| Yes | 18,526 | 134,846 | 77 ( 0.6) | 82 ( 0.7) | 82 ( 0.5) | 83 ( 0.8) | 83 ( 1.3) | 282 ( 0.7) |
| **Read Ads, Listings** | | | | | | | | |
| No | 2,918 | 23,564 | 16 ( 1.0) | 12 ( 1.2) | 12 ( 0.9) | 17 ( 1.0) | 23 ( 1.6) | 282 ( 1.9) |
| Yes | 19,396 | 142,174 | 84 ( 0.6) | 88 ( 0.7) | 88 ( 0.5) | 83 ( 0.5) | 77 ( 1.5) | 280 ( 0.7) |
| **Read Comics, Advice** | | | | | | | | |
| No | 6,300 | 48,452 | 32 ( 0.7) | 27 ( 0.8) | 28 ( 0.9) | 30 ( 0.9) | 33 ( 1.6) | 279 ( 1.1) |
| Yes | 16,014 | 117,286 | 68 ( 0.5) | 73 ( 0.6) | 72 ( 0.5) | 70 ( 0.9) | 67 ( 1.5) | 280 ( 0.7) |
| **English Reading Ability** | | | | | | | | |
| Very well/well | 24,135 | 177,713 | 74 ( 0.4) | 97 ( 0.5) | 99 ( 0.5) | 100 ( 0.3) | 100 ( 0.2) | 281 ( 0.6) |
| Not well/not at all | 1,906 | 13,214 | 26 ( 1.5) | 3 ( 0.9) | 1 ( 0.9) | 0† ( 0.3) | 0† ( 0.1) | 148 ( 2.6) |
| **English Writing Ability** | | | | | | | | |
| Very well/well | 23,456 | 172,519 | 70 ( 0.4) | 93 ( 0.5) | 97 ( 0.5) | 99 ( 0.3) | 100 ( 0.2) | 282 ( 0.7) |
| Not well/not at all | 2,544 | 18,129 | 30 ( 1.4) | 7 ( 1.1) | 3 ( 0.9) | 1 ( 0.4) | 0† ( 0.2) | 173 ( 2.7) |
| **Help With Forms** | | | | | | | | |
| A lot | 2,763 | 23,094 | 26 ( 1.6) | 12 ( 1.6) | 7 ( 0.9) | 4 ( 0.7) | 2 ( 0.2) | 216 ( 2.3) |
| Some/None | 23,294 | 168,062 | 74 ( 0.5) | 88 ( 0.9) | 93 ( 0.6) | 96 ( 0.5) | 98 ( 0.2) | 279 ( 0.7) |
| **Help With Information** | | | | | | | | |
| A lot | 2,230 | 17,123 | 22 ( 1.5) | 8 ( 1.3) | 5 ( 0.9) | 3 ( 0.8) | 1 ( 0.5) | 201 ( 2.8) |
| Some/None | 23,790 | 173,731 | 78 ( 0.4) | 92 ( 0.6) | 95 ( 0.5) | 97 ( 0.5) | 99 ( 0.5) | 278 ( 0.6) |
| **Help With Basic Math** | | | | | | | | |
| A lot | 1,219 | 9,293 | 14 ( 1.7) | 4 ( 1.4) | 2 ( 1.3) | 1 ( 0.6) | 0† ( 0.2) | 181 ( 3.2) |
| Some/None | 24,835 | 181,761 | 86 ( 0.4) | 96 ( 0.4) | 98 ( 0.4) | 99 ( 0.3) | 100 ( 0.3) | 276 ( 0.7) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

† Percentages less than 0.5 are rounded to zero.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 2.2A

## Labor Status, Sources of Information, Voting, and Occupation by Prose Literacy Levels

| LABOR STATUS, INFORMATION, VOTING AND OCCUPATION | PROSE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | PROF ( SE ) |
| **Labor Force Status** | | | | | | | | |
| Full-time employed | 12,466 | 89,723 | 30 ( 0.9) | 43 ( 0.9) | 54 ( 0.9) | 64 ( 1.2) | 72 ( 1.9) | 288 ( 0.9) |
| Part-time employed | 3,051 | 23,600 | 9 ( 0.7) | 12 ( 1.4) | 15 ( 1.4) | 15 ( 1.1) | 14 ( 0.9) | 284 ( 1.4) |
| Unemployed | 1,942 | 13,557 | 8 ( 1.1) | 10 ( 1.4) | 7 ( 1.7) | 4 ( 1.2) | 3 ( 0.7) | 260 ( 2.1) |
| Out of labor force | 6,721 | 58,202 | 52 ( 0.9) | 35 ( 1.0) | 25 ( 1.0) | 17 ( 1.1) | 11 ( 1.7) | 246 ( 1.1) |
| **Info. from Newspapers or Magazines** | | | | | | | | |
| A lot or some | 20,842 | 159,870 | 68 ( 0.4) | 85 ( 0.8) | 89 ( 0.7) | 91 ( 0.5) | 92 ( 1.3) | 280 ( 0.5) |
| A little or none | 4,086 | 30,549 | 32 ( 1.2) | 15 ( 1.1) | 11 ( 1.1) | 9 ( 0.8) | 8 ( 1.3) | 234 ( 1.7) |
| **Info. from Radio or Television** | | | | | | | | |
| A lot or some | 23,955 | 182,599 | 94 ( 0.4) | 97 ( 0.6) | 97 ( 0.5) | 96 ( 0.5) | 93 ( 1.7) | 273 ( 0.6) |
| A little or none | 973 | 7,822 | 6 ( 2.1) | 3 ( 1.7) | 3 ( 1.8) | 4 ( 1.9) | 7 ( 2.0) | 257 ( 4.0) |
| **Info. from Family** | | | | | | | | |
| A lot or some | 16,710 | 126,593 | 62 ( 0.7) | 66 ( 0.7) | 69 ( 0.7) | 69 ( 0.6) | 67 ( 1.8) | 275 ( 0.8) |
| A little or none | 8,191 | 63,633 | 38 ( 0.8) | 34 ( 0.8) | 31 ( 0.7) | 31 ( 0.7) | 33 ( 1.9) | 268 ( 1.2) |
| **Voted in the Past Five Years** | | | | | | | | |
| Yes | 15,484 | 117,379 | 55 ( 0.6) | 61 ( 0.9) | 69 ( 0.6) | 81 ( 0.8) | 89 ( 1.2) | 285 ( 0.7) |
| No | 7,616 | 58,510 | 45 ( 0.8) | 39 ( 1.1) | 31 ( 0.7) | 19 ( 0.8) | 11 ( 1.2) | 257 ( 1.0) |
| **Most Recent Occupation** | | | | | | | | |
| Prof/Managers | 5,461 | 35,599 | 5 ( 0.5) | 12 ( 0.9) | 23 ( 0.8) | 46 ( 1.1) | 70 ( 2.6) | 322 ( 1.0) |
| Sales | 6,544 | 41,713 | 15 ( 0.6) | 28 ( 0.9) | 34 ( 0.9) | 30 ( 1.0) | 20 ( 2.1) | 293 ( 1.1) |
| Craft | 5,614 | 42,187 | 43 ( 1.0) | 36 ( 1.1) | 27 ( 1.0) | 17 ( 0.8) | 8 ( 1.4) | 264 ( 1.1) |
| Laborer | 3,479 | 27,671 | 37 ( 1.3) | 24 ( 1.3) | 16 ( 1.1) | 7 ( 0.7) | 2 ( 0.5) | 249 ( 1.8) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 2.2B

## Labor Status, Sources of Information, Voting, and Occupation by Document Literacy Levels

| LABOR STATUS, INFORMATION, VOTING AND OCCUPATION | DOCUMENT SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE) | CPCT ( SE) | CPCT ( SE) | CPCT ( SE) | CPCT ( SE) | PROF ( SE) |
| **Labor Force Status** | | | | | | | | |
| Full-time employed | 12,466 | 89,723 | 29 ( 0.8) | 44 ( 0.6) | 56 ( 0.7) | 66 ( 1.0) | 74 ( 1.0) | 284 ( 0.9) |
| Part-time employed | 3,051 | 23,600 | 9 ( 0.8) | 13 ( 1.1) | 14 ( 1.3) | 14 ( 1.0) | 13 ( 0.7) | 277 ( 1.3) |
| Unemployed | 1,942 | 13,557 | 8 ( 1.1) | 9 ( 1.3) | 7 ( 1.3) | 5 ( 0.9) | 4 ( 0.9) | 257 ( 1.8) |
| Out of labor force | 6,721 | 58,202 | 53 ( 1.1) | 34 ( 0.8) | 23 ( 0.8) | 15 ( 0.8) | 10 ( 0.5) | 237 ( 1.3) |
| **Info. from Newspapers or Magazines** | | | | | | | | |
| A lot or some | 20,842 | 159,870 | 71 ( 0.5) | 86 ( 0.5) | 89 ( 0.5) | 90 ( 0.5) | 89 ( 0.9) | 274 ( 0.6) |
| A little or none | 4,086 | 30,549 | 29 ( 1.2) | 14 ( 0.8) | 11 ( 0.9) | 10 ( 0.7) | 11 ( 0.9) | 232 ( 1.8) |
| **Info. from Radio or Television** | | | | | | | | |
| A lot or some | 23,955 | 182,599 | 94 ( 0.4) | 97 ( 0.4) | 96 ( 0.5) | 96 ( 0.4) | 94 ( 1.2) | 268 ( 0.7) |
| A little or none | 973 | 7,822 | 6 ( 2.2) | 3 ( 2.0) | 4 ( 1.8) | 4 ( 1.2) | 6 ( 1.3) | 252 ( 3.4) |
| **Info. from Family** | | | | | | | | |
| A lot or some | 16,710 | 126,593 | 62 ( 0.6) | 67 ( 0.8) | 69 ( 0.9) | 69 ( 0.5) | 65 ( 2.2) | 269 ( 0.9) |
| A little or none | 8,191 | 63,633 | 38 ( 0.7) | 33 ( 0.9) | 31 ( 0.9) | 31 ( 0.5) | 35 ( 2.2) | 263 ( 1.1) |
| **Voted in the Past Five Years** | | | | | | | | |
| Yes | 15,484 | 117,379 | 58 ( 0.6) | 63 ( 0.6) | 68 ( 0.6) | 78 ( 0.7) | 86 ( 1.8) | 277 ( 0.8) |
| No | 7,616 | 58,510 | 42 ( 0.6) | 37 ( 0.8) | 32 ( 0.7) | 22 ( 0.7) | 14 ( 1.8) | 255 ( 1.0) |
| **Most Recent Occupation** | | | | | | | | |
| Prof/Managers | 5,461 | 35,599 | 6 ( 0.8) | 13 ( 0.8) | 26 ( 1.1) | 46 ( 1.3) | 66 ( 2.1) | 315 ( 1.0) |
| Sales | 6,544 | 41,713 | 16 ( 0.7) | 30 ( 0.8) | 33 ( 1.2) | 29 ( 1.4) | 19 ( 1.2) | 287 ( 1.0) |
| Craft | 5,614 | 42,187 | 41 ( 0.7) | 34 ( 1.0) | 26 ( 1.1) | 18 ( 1.0) | 10 ( 1.2) | 262 ( 1.2) |
| Laborer | 3,479 | 27,671 | 36 ( 1.5) | 23 ( 1.3) | 15 ( 1.2) | 8 ( 0.6) | 4 ( 0.9) | 247 ( 1.7) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 2.2C

## Labor Status, Sources of Information, Voting, and Occupation by Quantitative Literacy Levels

| NEWSPAPER READING, INFORMATION, VOTING AND OCCUPATION | QUANTITATIVE SCALE | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | PROF ( SE ) |
| **Labor Force Status** | | | | | | | | |
| Full-time employed | 12,466 | 89,723 | 29 ( 0.7) | 43 ( 0.9) | 55 ( 1.0) | 64 ( 1.1) | 73 ( 1.0) | 290 ( 0.9) |
| Part-time employed | 3,051 | 23,600 | 9 ( 0.9) | 14 ( 1.2) | 15 ( 1.4) | 13 ( 1.1) | 11 ( 0.8) | 280 ( 1.5) |
| Unemployed | 1,942 | 13,557 | 9 ( 1.2) | 9 ( 1.4) | 6 ( 1.5) | 4 ( 1.0) | 3 ( 0.5) | 256 ( 1.9) |
| Out of labor force | 6,721 | 58,202 | 53 ( 1.0) | 34 ( 0.8) | 24 ( 0.8) | 18 ( 1.1) | 13 ( 1.4) | 241 ( 1.6) |
| **Info. from Newspapers or Magazines** | | | | | | | | |
| A lot or some | 20,842 | 159,870 | 70 ( 0.5) | 85 ( 0.5) | 88 ( 0.5) | 90 ( 0.5) | 90 ( 1.3) | 279 ( 0.6) |
| A little or none | 4,086 | 30,549 | 30 ( 1.1) | 15 ( 1.0) | 12 ( 1.3) | 10 ( 0.8) | 10 ( 1.3) | 231 ( 2.1) |
| **Info. from Radio or Television** | | | | | | | | |
| A lot or some | 23,955 | 182,599 | 94 ( 0.5) | 97 ( 0.5) | 97 ( 0.4) | 96 ( 0.3) | 94 ( 0.9) | 272 ( 0.7) |
| A little or none | 973 | 7,822 | 6 ( 1.9) | 3 ( 1.7) | 3 ( 1.9) | 4 ( 1.7) | 6 ( 1.2) | 257 ( 4.2) |
| **Info. from Family** | | | | | | | | |
| A lot or some | 16,710 | 126,593 | 63 ( 0.7) | 67 ( 0.8) | 68 ( 0.8) | 67 ( 0.9) | 62 ( 1.2) | 273 ( 1.0) |
| A little or none | 8,191 | 63,633 | 37 ( 0.9) | 33 ( 0.8) | 32 ( 0.8) | 33 ( 1.0) | 38 ( 1.2) | 269 ( 1.3) |
| **Voted in the Past Five Years** | | | | | | | | |
| Yes | 15,484 | 117,379 | 55 ( 0.5) | 61 ( 0.6) | 69 ( 0.6) | 79 ( 0.6) | 88 ( 1.6) | 284 ( 1.0) |
| No | 7,616 | 58,510 | 45 ( 0.7) | 39 ( 0.8) | 31 ( 0.8) | 21 ( 0.5) | 12 ( 1.6) | 255 ( 1.1) |
| **Most Recent Occupation** | | | | | | | | |
| Prof/Managers | 5,461 | 35,599 | 6 ( 0.6) | 13 ( 0.9) | 24 ( 1.0) | 43 ( 0.8) | 65 ( 1.5) | 322 ( 1.0) |
| Sales | 6,544 | 41,713 | 16 ( 0.6) | 29 ( 0.8) | 34 ( 1.2) | 29 ( 1.3) | 20 ( 0.8) | 292 ( 1.1) |
| Craft | 5,614 | 42,187 | 43 ( 1.1) | 35 ( 1.0) | 27 ( 1.1) | 18 ( 0.8) | 10 ( 1.7) | 264 ( 1.3) |
| Laborer | 3,479 | 27,671 | 34 ( 1.4) | 23 ( 1.4) | 16 ( 1.3) | 10 ( 1.3) | 5 ( 0.7) | 253 ( 2.0) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 2.3

### Average Proficiency on Each Literacy Scale and Literacy Levels by Poverty Level and Sources of Nonwage Income

| SUBPOPULATIONS BASED ON POVERTY LEVEL AND NONWAGE INCOME SOURCES | LITERACY LEVELS | | Level 1 225 or lower | Level 2 226 to 275 | Level 3 276 to 325 | Level 4 326 to 375 | Level 5 376 or higher | Overall Proficiency |
|---|---|---|---|---|---|---|---|---|
| | n | WGT N (/1,000) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | CPCT ( SE ) | PROF ( SE ) |
| **Prose** | | | | | | | | |
| **Poverty Level** | | | | | | | | |
| Not poor | 14,868 | 113,929 | 57 ( 0.4) | 77 ( 0.8) | 88 ( 0.6) | 92 ( 0.5) | 96 ( 0.8) | 290 ( 0.7) |
| Poor/near poor | 3,968 | 26,353 | 43 ( 1.3) | 23 ( 1.2) | 12 ( 0.7) | 8 ( 0.9) | 4 ( 0.8) | 239 ( 2.2) |
| **Food Stamps** | | | | | | | | |
| No | 21,754 | 171,115 | 83 ( 0.8) | 87 ( 0.6) | 94 ( 0.5) | 97 ( 0.5) | 99 ( 0.8) | 276 ( 0.6) |
| Yes | 3,001 | 17,953 | 17 ( 1.4) | 13 ( 1.2) | 6 ( 1.1) | 3 ( 0.7) | 1 ( 0.9) | 236 ( 1.8) |
| **Interest from Savings** | | | | | | | | |
| No | 13,871 | 100,702 | 76 ( 0.7) | 63 ( 1.0) | 48 ( 0.8) | 29 ( 0.8) | 15 ( 1.8) | 251 ( 0.9) |
| Yes | 10,884 | 88,365 | 24 ( 0.5) | 37 ( 1.0) | 52 ( 0.9) | 71 ( 0.9) | 85 ( 1.9) | 297 ( 0.7) |
| **Document** | | | | | | | | |
| **Poverty Level** | | | | | | | | |
| Not poor | 14,868 | 113,929 | 59 ( 0.7) | 80 ( 0.8) | 88 ( 0.7) | 92 ( 0.6) | 94 ( 1.4) | 284 ( 0.8) |
| Poor/near poor | 3,968 | 26,353 | 41 ( 1.5) | 20 ( 1.3) | 12 ( 0.9) | 8 ( 0.9) | 6 ( 1.4) | 234 ( 2.3) |
| **Food Stamps** | | | | | | | | |
| No | 21,754 | 171,115 | 83 ( 0.5) | 89 ( 0.4) | 94 ( 0.5) | 97 ( 0.4) | 99 ( 0.6) | 271 ( 0.8) |
| Yes | 3,001 | 17,953 | 17 ( 1.4) | 11 ( 1.3) | 6 ( 1.1) | 3 ( 0.6) | 1 ( 0.6) | 232 ( 1.9) |
| **Interest from Savings** | | | | | | | | |
| No | 13,871 | 100,702 | 73 ( 0.7) | 61 ( 0.7) | 46 ( 0.6) | 29 ( 0.7) | 17 ( 0.9) | 247 ( 0.9) |
| Yes | 10,884 | 88,365 | 27 ( 0.6) | 39 ( 0.8) | 54 ( 0.7) | 71 ( 0.8) | 83 ( 1.0) | 289 ( 0.9) |
| **Quantitative** | | | | | | | | |
| **Poverty Level** | | | | | | | | |
| Not poor | 14,868 | 113,929 | 56 ( 0.7) | 78 ( 1.0) | 88 ( 0.6) | 93 ( 0.6) | 96 ( 1.1) | 291 ( 0.7) |
| Poor/near poor | 3,968 | 26,353 | 44 ( 1.3) | 22 ( 1.3) | 12 ( 1.0) | 7 ( 1.0) | 4 ( 1.1) | 233 ( 2.4) |
| **Food Stamps** | | | | | | | | |
| No | 21,754 | 171,115 | 81 ( 0.6) | 88 ( 0.6) | 94 ( 0.5) | 97 ( 0.4) | 99 ( 0.6) | 276 ( 0.7) |
| Yes | 3,001 | 17,953 | 19 ( 1.2) | 12 ( 1.2) | 6 ( 1.1) | 3 ( 0.6) | 1 ( 0.7) | 228 ( 1.9) |
| **Interest from Savings** | | | | | | | | |
| No | 13,871 | 100,702 | 77 ( 0.7) | 64 ( 0.7) | 47 ( 0.7) | 29 ( 1.1) | 15 ( 1.2) | 248 ( 1.0) |
| Yes | 10,884 | 88,365 | 23 ( 0.6) | 36 ( 0.7) | 53 ( 0.7) | 71 ( 1.2) | 85 ( 1.2) | 298 ( 0.9) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); CPCT = column percentage estimate; PROF = average proficiency estimate; (SE) = standard error of the estimate (the reported sample estimate can be said to be within 2 standard errors of the true population value with 95% confidence).

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.



## TABLE 2.4

## Median Weekly Wages and Average Weeks Worked in the Past 12 Months, by Literacy Levels

| WAGES AND WEEKS WORKED | LITERACY LEVEL n | WGT N (/1,000) | Level 1 225 or lower | ( SE) | Level 2 226 to 275 | ( SE) | Level 3 276 to 325 | ( SE) | Level 4 326 to 375 | ( SE) | Level 5 376 or higher | ( SE) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Weekly Wages** | 14,927 | 108,672 | | | | | | | | | | |
| Prose | | | 240 | ( 2.2) | 281 | ( 4.8) | 339 | ( 16.9) | 465 | ( 19.0) | 650 | ( 61.5) |
| Document | | | 244 | ( 5.2) | 288 | ( 8.9) | 350 | ( 0.6) | 462 | ( 28.7) | 618 | ( 34.6) |
| Quantitative | | | 230 | ( 10.5) | 274 | ( 11.4) | 345 | ( 3.8) | 472 | ( 14.9) | 681 | ( 49.5) |
| **Weeks Worked** | 24,944 | 190,523 | | | | | | | | | | |
| Prose | | | 19 | ( 0.5) | 27 | ( 0.4) | 35 | ( 0.4) | 38 | ( 0.4) | 44 | ( 0.7) |
| Document | | | 19 | ( 0.5) | 29 | ( 0.3) | 35 | ( 0.4) | 40 | ( 0.4) | 43 | ( 0.8) |
| Quantitative | | | 18 | ( 0.5) | 29 | ( 0.4) | 34 | ( 0.4) | 39 | ( 0.4) | 40 | ( 0.8) |

n = sample size; WGT N = population size estimate / 1,000 (the sample sizes for subpopulations may not add up to the total sample sizes, due to missing data); (SE) = standard error of the estimate (the reported sample estimate can be said tobe within 2 standard errors of the true population value with 95% confidence).

! Interpret with caution -- the nature of the sample does not allow accurate determination of the variability of this statistic.

Source: U.S. Department of Education, National Center for Education Statistics, National Adult Literacy Survey, 1992.

172 . . . . . . Appendix B

Compendium_Responsive Brief
Page 744



# PARTICIPANTS

*in the Development Process*

**Literacy Definition Committee**

Ms. Barbara Clark
Regional Manager
Central Region
Los Angeles Public Library

Ms. Nancy Cobb
Manager
Human Resources Development Department
Nabisco Biscuit Company

Ms. Hanna Fingeret
Director
Literacy South

Ms. Evelyn Ganzglass
Director
Employment and Social Services Policy Studies
Center for Policy Research
National Governors' Association

Mr. Ronald Gillum
Director
Adult Extended Learning Services
Michigan Department of Education

Mr. Karl Haigler
President
The Salem Company

Mr. Carl Kaestle
Professor of Educational Policy Studies
Wisconsin Center for Educational Research
University of Wisconsin

Mr. Reynaldo Macías
(Liaison to the Technical Review Committee)
Professor of Education and Director
UC Linguistic Minority Research Institute
University of California, Santa Barbara

Mr. David Neice
Director of Research and Analysis Directorate
Department of the Secretary of State
Canada

Honorable Carolyn Pollan
(ex-officio member)
State Representative
Arkansas State Legislature

Ms. Lynne Robinson
Director of Support Services
Division of ACE
Sweetwater Union High School District

Mr. Anthony Sarmiento
Director
Education Department
AFL-CIO

Ms. Gail Spangenberg
Vice President and Chief Operating Officer
Business Council for Effective Literacy

**Technical Review Committee**

Ms. Susan Embretson
Professor
Department of Psychology
University of Kansas

Mr. Jeremy Finn
Professor
Graduate School of Education
SUNY Buffalo

Mr. Robert Glaser
Director
Learning Research and Development Center
University of Pittsburgh

Mr. Ronald Hambleton
Professor
School of Education
Laboratory of Psychometric and Evaluative Research
University of Massachusetts

Mr. Huynh Huynh
Professor
Department of Educational Psychology
University of South Carolina at Columbia

Ms. Sylvia Johnson
Professor
Howard University

Mr. Frank Schmidt
Professor
Industrial Relations and Human Resources
College of Business
University of Iowa

Mr. Richard Venezky
(Liaison to the Literacy Definition Committee)
Professor
Department of Educational Studies
University of Delaware

### Literacy of Older Adults Review Group

Ms. Michele Adler
Disability Policy Analyst
Office of Assistant Secretary for Planning and Evaluation
Department of Health and Human Services

Ms. Helen Brown
(Liaison to the Literacy Definition Committee
and the Technical Review Committee)
Research Analyst/Associate
American Association of Retired Persons

Ms. Bella Jacobs
Consultant
National Council on the Aging

Mr. Robert H. Prisuta
Senior Research Associate
Research and Data Resources Department
American Association of Retired Persons

### Literacy of Incarcerated Adults Review Group

Ms. Caroline Wolf Harlow
Statistician
Bureau of Justice Statistics

Mr. Christopher Koch
Education Program Specialist
Office of Correctional Education
U.S. Department of Education

Ms. Harriet Lebowitz
Social Science Research Analysis
Federal Bureau of Prisons

Mr. Ronald Pugsley
Office of Vocational and Adult Education
U.S. Department of Education

Ms. Gail Schwartz
Chief for the Office of Correctional Education
U.S. Department of Education

**Test Development Consultants**

Ms. Valerie de Bellis
Center for Mathematics, Science, and Computer Education
Rutgers University

Mr. John Dawkins
Language and Literature Department
Bucks County Community College

Ms. Harriet L. Frankel
Secondary and Higher Education Programs
Educational Testing Service

Ms. Bonnie Hole
The Bureau of Evaluation and Student Assessment
Connecticut State Department of Education

Mr. Richard Lesh
Division of Cognitive and Instructional Science
Educational Testing Service

Ms. Ave M. Merritt
Secondary and Higher Education Programs
Educational Testing Service

Mr. Peter Mosenthal
Reading and Language Arts Center
Syracuse University

Ms. Pam Smith
Secondary and Higher Education Programs
Educational Testing Service

Ms. Wallie Walker-Hammond
Secondary and Higher Education Programs
Educational Testing Service

## *About the Authors*

*Irwin S. Kirsch* is project director of the National Adult Literacy Survey and executive director of the Literacy Learning and Assessment Group at Educational Testing Service.

*Ann Jungeblut* is a senior research associate at Educational Testing Service.

*Lynn Jenkins* is a program administrator in the Literacy Learning and Assessment Group at Educational Testing Service.

*Andrew Kolstad* is project monitor for the National Adult Literacy Survey at the National Center for Education Statistics, U.S. Department of Education.

# NEWS ARTICLES

*Boston Evening-Post*, Sept. 10, 1750, p.2

# *All Gentlemen Volunteers, and Others,*

THAT have a Mind to ſerve his Majeſty King GEORGE the Second for a limited Time, in the Independant Companies of Rangers, now in *Nova Scotia*, may apply to Lieutenant *Alexander Callender*, at Mr. *Jonas Leonard*'s, at the Sign of the *Lamb* at the South End of *Boſton*, where they ſhall be kindly entertained, enter into preſent Pay, and have good Quarters, and when they join their reſpective Companies at *Halifax*, ſhall be compleatly Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Proviſions, and all other Things neceſſary for a Gentleman Ranger. And for their further Encouragement, his Excellency Governor CORNWALLIS has by Proclamation lately publiſhed, promiſed a Reward of *Five Hundred Pounds*, Old Tenor, for every *Indian* Scalp or Priſoner brought in, which Sum will be immediately paid by the Treaſurer of the Province, upon the Scalp or Priſoner being produced.

*N. B.* Lieutenant *Callender* has obtained Leave from His Honour the Lieutenant Governor, to beat up for Rangers in any part of this Province. *Boſton, September* 8. 1750.

*Province of the* Maſſachuſetts-Bay, *Court of Vice-Admiralty.* } *Boſton, September* 8. 1750.

*Cedar Falls Gazette*, Jan. 10, 1868, p. 3.

ARMS.—Adjutant General Baker requests that all persons having in their possession any arms, accoutrements or ammunition belonging to the State, to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property.

*The Daily Morning Chronicle*, Jan. 7, 1868, p.4.

# GOVERNMENT SALES.

## GOVERNMENT SALE.

At Watertown Arsenal, Massachusetts, on WEDNESDAY, the 23d day of January, 1868, "by authority of the Secretary of War," the following Arms, &c., will be sold:

10,699 rifled and smooth-bore Muskets, various kinds; 261 Carbines, various kinds; 305 Sabres, artillery and cavalry; lot of cavalry accoutrements, consisting of Cartridge Boxes, Pistol Holsters, Sabre Belts, Knots, &c.; lot of infantry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c.; 8 sets Horse Equipments, complete; lot of Appendages, (for carbines, rifled muskets, and pistols:) lot of parts of rifled Muskets, various kinds.

Catalogues supplied on application at Watertown Arsenal Office. A. B. BUFFINGTON,
Capt. Ord., Brt. Maj. U. S. A., Comd'g.
ja6-6tC

*The Derby Mercury*, Mar. 19, 1756, p. 3.

*L O N D O N, March* 20.

Thurſday was preſented to the Court of Aldermen and Common Council, at Guildhall, a Petition from the Goldſmiths and Workers of Silver, praying the Court to give Inſtructions to the Members for the City to oppoſe the Bill for laying a Tax on Perſons poſſeſſed of Plate. The Court taking the ſame into Conſideration, reſolved to petition the Houſe of Commons againſt the impoſing of the ſaid Tax.

A Scheme is, we hear, on Foot to raiſe a general Militia, conſiſting of 770 Companies at 80 Men each, which with the Officers will amount to 67,000 Men, the Expence of which, to the Community, is calculated at about 175,000 l. annually. It is propoſed, that this Militia ſhall receive their Arms, Accoutrements, and Ammunition from the Ordnance; and that the Money to be raiſed for this Purpoſe, ſhall make a Part of the current Services of the Year.

At Paris they talk of four Embarkations to be made before the End of this Month, at the different Ports of France; one of which is to conſiſt of upwards of ſixty Sail.

Private Letters from Marſeilles adviſe, that a Company is already formed at that Port, who have eſtabliſhed a Fund for fitting out Privateers to cruize on the Engliſh, in which each Action, or Share, is to conſiſt of 1000 Livres. It is reported the French King hath advanced to the Company three Millions: It is certain, that he hath granted it very great Privileges; and ſuch of the Captains as ſhall advantageouſly diſtinguiſh themſelves, are to be immediately promoted in the Royal Navy.

We hear that by the Treaty of Alliance, concluded with the King of Sardinia, that Monarch is to act, in caſe of Need, with a Body of 35,000 Men, in Favour of Great Britain.

We hear that on the 25th of laſt Month there were eleven Ships of the Line and ten Frigates at Breſt ready to put to Sea, and about the like Number not then equipp'd; that they were making great Preparations all round Breſt, fortifying the Outworks, erecting new ones, and planting double Guards. The Garriſon conſiſted of 4000 Men, and the French King intended to ſend 4000 Men to Canada; for which Expedition ſeveral Ships were making ready.

Thurſday Morning between four and five hundred Horſes, which are to be employed to draw the Train of Artillery, Baggage-Waggons, &c. were aſſembled by the Contractors on Walworth-Common. They are order'd to be ready at an Hour's Warning. The Drivers are all clad in white Frocks, with the Letters G. R. in Red on their Backs.

*The Gloucestershire Chronicle*, Jan. 4, 1868, p. 2.

COUNTY PRISON.

The Governor reported that the Prison rules and regulations had been complied with. The new matron had discharged her duties satisfactorily. There had been several severe cases of illness among the prisoners during the quarter, but there had been no fatal case, and the health of the prisoners was now improving. The daily average of prisoners during the quarter had been 200, against 192 in the corresponding quarter of the previous year; and the number of committals had been 355, against 342 in the corresponding quarter of last year. The CHAIRMAN remarked that there had been a general increase throughout the country. On the 30th October the Visiting Justices had before them a letter from the Secretary of State, requesting to know if the arms of the Enrolled Pensioners could be stored for safety in the County Prison, as had been suggested by the staff officer. The Justices, while desirous of co-operating in every way with the authorities, pointed out that there were no means of defence for the prison but a wall, and that the staff of officers would be unable to resist an attack to obtain the arms. The arms were therefore now stored in the Militia Barracks. The magistrates seemed to have made a reasonable answer, for on the 14th Dec. a letter was received from the Home Secretary, pointing out the danger of permitting an accumulation of arms and accoutrements to take place in prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot. The magistrates had, therefore, only to refer to their former letter, in which they declined to accede to the request that the arms might be stored in the County Prison. The Chairman afterwards explained that a sub-committee of the Visiting Justices had revised the rules as to the discharge of the duties of the Prison Chaplain, with regard to the classes of prisoners which the Chaplain had to teach. He read the report, and the revised regulations, which had been unanimously recommended by the Visiting Justices to be adopted by the Court. The revision had been rendered necessary by the Prisons' Act. It was necessary that the regulations should form part of the bye-laws, and those bye-laws were authorised by the Court, not by the Visiting Justices. Doubtless the Court would adopt the recommendation of the Visiting Justices, who devoted their time and attention to the affairs of the Prison.—Mr. BROOKE HUNT remarked that the Chaplain had rather demurred to a regulation which required that the female classes should be held in the afternoons of two days a week. Unfortunately, the Chaplain had met with an accident: he had slipped and hurt himself, and could not be present that day. Mr. Hunt said he was not at all prepared to admit that the Chaplain's objection to the new rules should be accepted.—The CHAIRMAN re-

*Jackson's Oxford Journal*, Mar. 20, 1756, p.2.

L O N D O N.

By Letters from Cambridge we are aſſured, that Serjeant R——n has been there beating up for Volunteers; and that the learned and loyal Youth of that Univerſity with ſo much Alacrity, and in ſuch Numbers, repair to the Serjeant's Quarters, that 'tis expected the Regiment intended to be raiſed by that ever-loyal Univerſity, for the Service of the Government in this perilous and critical Juncture, will ſoon be compleated. And we are farther informed, that Application will very ſhortly be made to the Chancellor of that Univerſity, for his Approbation and Conſent, that the new Building intended for a publick Library, which by all Men of true Taſte and Judgment hath been pronounced improper for that Purpoſe, may be converted into a Barrack, and be ſupplied with Proviſions, Arms, and Accoutrements, at the Expence of the Univerſity.

If it be Matter of Fact (as aſſerted in Col. Yorke's Memorial to the States General, demanding the 6000 Dutch Troops ſtipulated by Treaty to be furniſhed when theſe Kingdoms are attacked) that the French Miniſters at all the Courts of Europe have publickly declared the King their Maſter intends to invade Great Britain and Ireland; one may be allowed to ſuppoſe that no ſuch Thing is intended, becauſe French Stateſmen have never been remarkable for blabbing their Deſigns; or elſe it muſt be ſuppoſed they have no other Game to play, and therefore need not make a Secret of it. But leſt this Inference ſhould not be ſatisfactory, let us further ſuppoſe, that they have two Strings to their Bow; that they have carried the firſt Point they had in View in alarming us with an Invaſion, which was only to get the Start of us this Seaſon in a Race to America; and then the Inference

*The Jeffersonian*, Jan. 9, 1868, p.2.

The report of Gen. Grant mentions the remarkable fact that during the past year no fewer than 13,000 men have deserted from the army. The greater part of these desertions, we presume, occurred on the plains, where it is well known that men often enlist in westward bound regiments for the express purpose of getting cheap and safe conveyance to the mining regions. During the season, for example, more than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana. A desperado, who wishes to reach the diggins, has only to enroll himself in some command bound for the Indian country, and he is pretty sure of an opportunity to make off when he has marched as far as he chooses to go. The number of recruits during the year was 34,000, so that the desertions reach the enormous ratio of nearly 40 per cent. of the enrollment.

*Pittsburgh Gazette*, Feb. 14, 1789, p. 1.

A Circular Letter from his Excellency George Washington, Commander in Chief of the Armies of the United States of America.

(Concluded from our laſt.)

FOR my own part, conſcious of having acted while a ſervant of the public, in the manner I conceived beſt ſuited to promote the real intereſts of my country; having, in conſequence of my fixed belief, in ſome meaſure, pledged myſelf to the army, that their country would finally do them complete and ample juſtice, and not willing to conceal any inſtance of my official conduct from the eyes of the world, I have thought proper to tranſmit to your excellency the incloſed collection of papers, relative to the half pay and commutation granted by Congreſs to the officers of the army: from theſe communications, my decided ſentiment will be clearly comprehended, together with the concluſive reaſons which induced me at an early-period, to recommend the adoption of this meaſure in the moſt earneſt and ſerious manner. As the proceedings of Congreſs, the army, and myſelf, are open to all, and contain, in my opinion, ſufficient information to remove the prejudice and errors which may have been entertained by any, I think it unneceſſary to ſay any thing more, than juſt to obſerve, that the reſolutions of Congreſs, now alluded to, are as undoubtedly and abſolutely binding upon the United States, as the moſt ſolemn acts of confederation or legiſlation.

As to the idea, which I am informed, has in ſome inſtances prevailed, that the halfpay and commutation are to be regarded merely in the odious light of a penſion, it ought to be exploded for ever: that proviſion ſhould be viewed, as it really was, a reaſonable compenſation offered by Congreſs, at a time when they had nothing elſe to give to officers of the army, for ſervices then to be performed: it was the ... total dereliction of the ſer-

vice: it was a part of their hire. I may be allowed to ſay, it was the price of their blood, and of your independency; it is therefore more than a common debt, it is a debt of honor; it can never be conſidered as a penſion or gratuity, nor cancelled until it is fairly diſcharged.

With regard to the diſtinction between officers and ſoldiers, it is ſufficient that the uniform experience of every nation of the world, combined with our own, proves the utility and propriety of the diſcrimination. Rewards in proportion to the aid the public draws from them, are unqueſtionably due to all its ſervants. In ſome lines, the ſoldiers have perhaps generally had as ample compenſation for their ſervices, by the large bounties which have been paid them, as their officers will receive in the propoſed commutation; in others, if beſides the donation of land, the payment of arrearages of clothing and wages [in which article all the component parts of the army muſt be put upon the ſame footing] we take into the eſtimate, the bounties many of the ſoldiers have received, and the gratuity of one year's full pay, which is promiſed to all, poſſibly their ſituation [every circumſtance being duly conſidered] will not be deemed leſs eligible than that of the officers. Should a farther reward, however, be judged equitable, I will venture to aſſert, no man will enjoy greater ſatiſfaction than myſelf, an exemption from taxes for a limited time [which has been petitioned for in ſome inſtances] or any other adequate immunity or compenſation granted to the brave defenders of their country's cauſe: but neither the adoption or rejection of this propoſition will, in any manner affect, much leſs militate againſt the act of Congreſs, by which they have offered five years full pay, in lieu of the halfpay for life, which had been before promiſed to the officers of the army.

Before I conclude the ſubject on public juſtice, I cannot omit to mention the obligations this country is under to that meritorious claſs of veterans, the non-commiſſioned officers & privates, who have been diſcharged for inability, in conſequence of the reſolution of Congreſs, of the 23d of April, 1782, on an annual penſion for life: their peculiar ſufferings, their ſingular merits and claims to that proviſion

annual penſion for life: their peculiar ſufferings, their ſingular merits and claims to that proviſion need only to be known, to intereſt the feelings of humanity in their behalf; nothing but a punctual payment of their annual allowance can reſcue them from the moſt complicated miſery; and nothing could be a more melancholy and diſtreſſing ſight, than to behold thoſe who have ſhed their blood, or loſt their limbs in the ſervice of their country, without a friend, without a friend, and without the means of obtaining any of the comforts or neceſſaries of life, compelled to beg their daily bread from door to door. Suffer me to recommend thoſe of this deſcription, belonging to your ſtate, to the warmeſt patronage of your excellency, and your legiſlature.

It is neceſſary to ſay but a few words on the third topic which was propoſed, and which regards particularly the defence of the republic. As there can be little doubt but Congreſs will recommend a proper peace eſtabliſhment for the United States, in which a due attention will be paid to the importance of placing the militia of the union upon a regular and reſpectable footing; if this ſhould be the caſe, I ſhould beg leave to urge the great advantage of it in the ſtrongeſt terms.

The militia of country muſt be conſidered as the palladium of our ſecurity, and the firſt effectual reſort in caſe of hoſtility: it is eſſential, therefore, that the ſame ſyſtem ſhould pervade the whole; that the formation and diſcipline of the militia of the continent ſhould be abſolutely uniform; and that the ſame ſpecies of arms, accoutrements, and military apparatus, ſhould be introduced in every part of the United States. No one who has not learned it from experience, can conceive the difficulty, expence, and confuſion which reſult from a contrary ſyſtem, or the vague arrangements which have hitherto prevailed.

If, in treating of political points, a greater latitude than uſual has been taken in the courſe of the addreſs, the importance of the criſis, and the magnitude of the objects in diſcuſſion, muſt be my apology: it is, however, neither my wiſh nor expectation, that the preceding obſervations ſhould claim any