1  George M. Lee (SBN 172982)
2      gml@seilerepstein.com
   **SEILER EPSTEIN LLP**
3  4 Embarcadero Center, 14th Floor
4  San Francisco, California 94111
   Phone: (415) 979-0500
5  Fax: (415) 979-0511

6
   John W. Dillon (SBN 296788)
7      jdillon@dillonlawgp.com
   **DILLON LAW GROUP APC**
8  2647 Gateway Road
9  Suite 105, No. 255
   Carlsbad, California 92009
10 Phone: (760) 642-7150
11 Fax: (760) 642-7151

12
   *Attorneys for Plaintiffs*
13

14 UNITED STATES DISTRICT COURT

15 FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al., | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **PLAINTIFFS' RESPONSE BRIEF RE: DEFENDANTS' HISTORICAL SURVEYS [ECF 163] ORDERED BY THE COURT** |
| vs. | |
| ROB BONTA, in his official capacity as Attorney General of California, et al., | Hon. Roger T. Benitez |
| Defendants. | |

TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. RESPONSE AND OBJECTIONS TO DEFENDANTS' SUBMISSIONS ................................ 2

   A. THE RELEVANT HISTORY IS THE FOUNDING ERA. ........................................ 2

   B. THE STATE'S SURVEY COVERING PRE-FOUNDING THROUGH 1888 FAILS TO MEET THE *BRUEN* STANDARD. ............................................. 4

     1. Defendants' Pre-Founding English Laws are Not Historically Relevant. ............................................................. 4

     2. There Are No Founding-Era Laws Which Prohibited the Mere Possession of an Entire Class of Weapons. ........................ 5

     3. Trap Gun Laws ............................................................................... 6

     4. Gunpowder Storage Laws ............................................................. 7

     5. Illegal Conduct "While Carrying" ................................................. 8

     6. Concealed Carry Restrictions ........................................................ 9

     7. Racist and Unconstitutional Laws ............................................... 11

     8. Tax Laws, City/Town Authorizations, and Age-Based Restrictions Offer No Justification for the State's Assault Weapons Ban .............................................................................. 11

   C. THE STATE'S 20TH CENTURY LAWS ARE NOT CONSTITUTIONALLY RELVANT. ................................................................. 13

III. CONCLUSION .................................................................................................. 14

## TABLE OF AUTHORITIES

**Cases**

*Dimick v. Schiedt*, 293 U.S. 474 (1935) .................................................................... 4

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................... *passim*

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) ................................................................ 11

*Funk v. United States*, 290 U.S. 371 (1933) .................................................................. 5

*Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960 (2019) ................................ 2, 3

*Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ............... 14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................................... 4

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ......... *passim*

*Nunn v. State*, 1 Ga. 243 (1846) ........................................................................ 6, 9, 10

*Virginia v. Moore*, 553 U.S. 164 (2008) ....................................................................... 3

## I.  INTRODUCTION

Pursuant to this Court's Minute Order of December 15, 2022 [ECF 161], Plaintiffs James Miller, *et al*. ("Plaintiffs") hereby submit this response brief addressing Defendants' submission of two historical surveys [ECF No. 163-1 and 163-2] in response to the Court's, which provides:

> The state defendants shall create, and the plaintiffs shall meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in chronological order. The listing shall begin at the time of the adoption of the Second Amendment and continue through twenty years after the Fourteenth Amendment. For each cited statute/law/regulation, the survey shall provide: (a) the date of enactment; (b) the enacting state, territory, or locality; (c) a description of what was restricted (e.g., dirks, daggers, metal knuckles, storage of gunpowder or cartridges, or use regulations); (d) what it was that the law or regulation restricted; (e) what type of weapon was being restricted (e.g., knife, Bowie Knife, stiletto, metal knuckles, pistols, rifles); (f) if and when the law was repealed and whether it was replaced; (g) whether the regulation was reviewed by a court and the outcome of the courts review (with case citation). Defendants may create a second survey covering a time period following that of the first list....

[ECF 161].

In response to this Order, Defendants State of California, through the Attorney General, *et al*. ("State") have offered their Survey of Relevant Statutes (Pre-Founding – 1888) [ECF 163-1] and their Survey of Relevant Statutes (1889 – 1930s) ECF 163-2. The State asserts that their surveys are "relevantly similar" to the challenged California assault weapons ban and justify the State's assault weapons ban under the constitutional standard established in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and affirmed in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S.Ct. 2111 (2022). Plaintiffs submit this response brief, as well as Plaintiffs' comments/objections added to the State's surveys, filed concurrently herewith.

For the reasons that follow, the State has offered no well-established constitutionally-relevant analogous laws or regulations from the relevant era that

would justify continuation of the State's ban on firearms in common use. In short, the State's submissions should be rejected as not "relevantly similar" under *Bruen* to justify the State's so-called "assault weapons" ban.

## II. RESPONSE AND OBJECTIONS TO DEFENDANTS' SUBMISSIONS

### A. THE RELEVANT HISTORY IS THE FOUNDING ERA.

To prevail under an historical tradition analysis required by *Bruen*, the State maintains the burden of justifying its law and regulations by offering appropriate well-established historical analogues from the relevant time period, *i.e.,* the Founding era. "Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Bruen*, 142 S.Ct. 2111, 2132.

In *Bruen*, the Court noted that respondents had offered historical evidence in their attempt to justify their prohibitions on the carrying of firearms in public. Specifically, the respondents had offered four categories of historical sources: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." 142 S.Ct at 2135-36. However, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' […] The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id.*, at 2136 (citing *Heller*, 554 U.S. at 634-35 (emphasis original). And thus, the Court cautioned against "giving postenactment history more weight than it can rightly bear." 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citing *Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960, 1987 (2019) (Thomas, J., concurring)).

In examining the relevant history that was offered, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and

bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614).

*Bruen* made note of an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen*, 142 S.Ct. at 2138. At the same time, however, the Court noted that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*, at 2137 (citations omitted). Perhaps the Court was signaling that parties in future cases should address the issue for the Court, but it was certainly not overruling cases in which it had, dispositively, "look[ed] to the statutes and common law of the founding era to determine the norms that the [Bill of Rights] was meant to preserve." *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment). And while the Court in *Heller* itself had reviewed materials published *after* adoption of the Bill of Rights, it did so to shed light on the public understanding in 1791 of the right codified by the Second Amendment, and only after surveying what it regarded as a wealth of authority for its reading — including the text of the Second Amendment and state constitutions. "The 19th-century treatises were treated as mere confirmation of what the Court had already been established." *Bruen*, 142 S.Ct. at 2137 (citing *Gamble*, 139 S.Ct. at 1976).

Therefore, under *Bruen*, 1791 must be the controlling time for the constitutional meaning of Bill of Rights provisions incorporated against the States by the Fourteenth Amendment because, as in *Heller*, the Court has looked to 1791 when construing the Bill of Rights against the federal government and, as in *McDonald*, the Court established that the incorporated Bill of Rights provisions mean the same thing when applied to the States as when applied to the federal government. *See McDonald v. City*

*of Chicago*, 561 U.S. 742, 765 (2010).

B.  **THE STATE'S SURVEY COVERING PRE-FOUNDING THROUGH 1888 FAILS TO MEET THE *BRUEN* STANDARD.**

The State's first survey provided 191 statutes, laws, and regulations starting in the pre-Founding era through 1888. However, those laws unquestionably show there is no historical pedigree justifying the State's assault weapons ban as such laws do not show well-established, historically relevant analogues justifying the State's ban.

**1. Defendants' Pre-Founding English Laws are Not Historically Relevant.**

Starting with the first nine of the State's submissions in its first survey, the State cites six pre-revolutionary English laws, and three laws from the Colonial era — all of which predate the Founding by far too long to be afforded much weight. *Bruen*, 142 S.Ct. at 2136 (citing *Heller*, 554 U.S. at 634). There is no question that the Founders acknowledged pre-existing rights not previously respected by prior nations. As such, the restrictions and prohibitions enacted England provide little insight as the Founders explicitly rejected this regime.

First, the State's submissions contravene this Court's Order [ECF 161], which expressly provides: "*The listing shall begin at the time of the adoption of the Second Amendment* and continue through twenty years after the Fourteenth Amendment." (Emphasis added.) Beyond that, *Bruen* expressly cautioned against reaching too far back into the period before the founding. "It is quite another to rely on an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was acted upon or accepted in the colonies.'" *Id.*, 142 S.Ct at 2136 (citing *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935)).

Second, if ancient English laws prohibiting the manner in which concealable firearms could be carried were not good enough to uphold concealed carry laws in modern day New York State, they are hardly relevant to a ban on an entire class of firearms that are widely and commonly held and used by Americans in their own homes. English history is ambiguous at best, and the Supreme Court saw "little reason

– 4 –
PLAINTIFFS' BRIEF RE DEFENDANTS' HISTORICAL SURVEYS
CASE NO. 3:19-cv-01537-BEN-JLB

to think that the Framers would have thought it applicable in the New World." *Bruen*, 142 S.Ct. at 2139. "Sometimes, in interpreting our own Constitution, 'it [is] better not to go too far back into antiquity for the best securities of our liberties,' […] unless evidence shows that medieval law survived to become our Founders' law." *Bruen*, 142 S.Ct. at 2136 (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)). Here, Defendants have not made that connection.

Third, the State's remaining colonial era laws are insufficient. The 1664 New York law (Def. Laws No. 5) is an unconsitional slave prohibition; the 1686 New Jersey law (Def. Law No. 6) is a restriction on the concealed carry of certain arms, but not a restriction on the possession or open carry of such arms; and the 1750 Massachusetts law (Def. Law #8) did not prohibit a particular weapon, but prohibited carrying certain arms "*while unlawfully, riotously, or tumultuously assembling.*" In sum, the State's reliance of laws that predate the founding are not entitled to much weight. *Bruen*, 142 S.Ct. at 2136 (citing *Heller*, 554 U.S. at 634). In addition, these laws are not "relevantly similar" to the challenged laws, *Bruen*, 142 S. Ct. at 2133, because they targeted "dangerous and unusual weapons," the regulation of which did not impact the right to possess and use firearms "that are in common use at the time." *Id*. 142 S.Ct. at 2128 (quotations omitted).

As detailed below, the State's reliance on this small sample of laws to justify its present categorical firearm prohibition are plainly insufficient and foreshadow the many inadequacies of the other laws relied on by the State to meet its burden.

### 2. There Are No Founding-Era Laws Which Prohibited the Mere Possession of an Entire Class of Weapons.

Despite having hired an array of historians and scholars, and now having submitted a list of 191 laws in their first survey alone [ECF 163-1], Defendants can *still* not point to a single Founding-era law that prohibited the mere possession of an entire class of firearms. The significance of this dearth of evidence cannot be understated. During the Founding era—the period of time most significant when

determining the scope and intent of the Second Amendment—there were no statutes, laws, or regulations that prohibited the acquisition or possession of any kind of arm. As demonstrated by the Georgia case of *Nunn v. State*, discussed *infra* at pp. 9-10. such a practice would certainly have been thought to be unconstitutional in the Founding era.

Well outside of the Founding era, the State cites four total possession/use restrictions in their first survey. (Def. Laws Nos. 81, 150, 170, and 171). The first of these laws was enacted in 1866, and the remaining enacted approximately 20 years later. Each of these laws is too far removed from the Founding era. "[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S.Ct. at 2137. Even if this Court were to accept without scrutiny that these four laws prohibited the possession of arms, this tiny fraction of regulations falls far short of the State's burden. Because they were enacted so far from the Founding era, they must not be given "more weight than [they] can rightly bear." *Bruen*, 142 S.Ct. at 2136. Any kind of outright possession ban from the mid-to-late 1900s is directly contradicted by the plain text of the Second Amendment, as well as the complete nonexistence of such laws in the Founding era. *Id*., at 2137. Thus, they are entirely unpersuasive.

In reality, the State's case ends here. There are no Founding-era categorical bans on firearms in common use in this Nation's history. Such prohibitions are in direct contradiction to the Second Amendment's plain text and are unconstitutional — full stop. Nevertheless, Plaintiffs further detail the many issues with the State's other citations to historical laws below.

**3. Trap Gun Laws**

The State lists six laws, having previously characterized them as restrictions on "dangerous and unusual weapons," only one of which is from the Founding era (Def. Law No.10), and all of which generally prohibited the setting of "trap guns" or other

1  hunting traps. (See Def. Laws Nos. 10, 80, 95, 109, 121, 168.) But as previously noted
2  in Plaintiffs' Response to Defendants' Supplemental Brief re *Bruen* (ECF 156, at p.
3  11:13-22), these laws are not relevant to an assault weapons ban. Trap gun restrictions
4  aimed to address the dangerous and unusual *practice* of arming an unmanned firearm,
5  because after they were armed/set, they were not only capable, but intended to trigger
6  without the owner/user being present. Thus, these unique arms could be triggered by
7  unintended targets. Moreover, even assuming that trap guns were "dangerous and
8  unusual weapons" at the time these laws were enacted, the restrictions relied on by the
9  State seemingly only prohibit the *act of setting/arming* a trap/spring gun. The
10 restrictions do not appear to restrict their *possession* in any way. Finally, Def. Law
11 No. 95 does not reference any law whatsoever. Thus, these laws are not "relevantly
12 similar" the challenged assault weapons law.

### 4. Gunpowder Storage Laws

14 The State lists six gunpowder storage laws (Def. Laws Nos. 11, 12, 27, 30, 55,
15 and 67), four of which are arguably from the Founding era. As previously noted in
16 Plaintiffs' Response to Defendants' Supplemental Brief re *Bruen* (ECF 156, at pp.
17 9:26 – 10:25), none of these laws are relevant to a modern assault weapons ban as
18 they are fire safety and prevention laws aimed at preventing fire damage caused
19 through the mass storage of black powder. Thus, these restrictions are more akin to
20 fire code regulations rather than a ban on firearms. However, beginning in the 1860s,
21 black powder was gradually exchanged for more stable compounds. Unlike more
22 modern present day ammunition powders, such as smokeless powder, the black
23 powder used during the Founding era when laws were enacted was highly
24 combustible. "The other advantages of smokeless powder are its improved stability in
25 storage, its reduced erosive effects on gun bores, and the improved control obtainable
26 over its rate of burning." See https://www.britannica.com/technology/gunpowder. The
27 advancement of firearms technology solved this fire danger, making the early fire
28 safety regulations unnecessary.

### 5. Illegal Conduct "While Carrying"

Certain of the Defendants' offered laws did not outright prohibit the possession of "dangerous and unusual weapons" per se, but prohibited specific conduct while carring a weapon. For example, Defendants' citation to a Massachusetts Act "to Prevent Routs, Riots, and Tumultous assemblies, and the Evil Consequences Thereof" (Def. Law #13) did not expressly prohibit the possession, or even the carrying of a club or other weapon, but prohibited the carrying while engaged in the act of rioting.

Likewise, Defendants' offered a 1788 law from the Ohio Territory which purported to prohibit the carrying of "any dangerous weapon that indicates a violent intention while committing a burglary." (Def. Law #14). This law, again, did not prohibit the possession of any kind of "dangerous and unusual" weapon, but prohibited underlying conduct while carrying certain weapons, and is therefore not "relevantly similar" under *Bruen*. 142 S.Ct. at 2133. In other cases,[1] the State cites to various statutes, laws, and regulations that imposed criminal penalties or enhancements for committing crimes with certain weapons such as killing someone in a duel (Def. Laws No. 74), or stabbing another individual with certain weapons (Def. Laws No. 38). These are not analogous historical regulations and offer no justification for a categorical firearms ban.

In total, Defendants offer 56 laws that restricted certain conduct while carrying various types of weapons (Def. Laws Nos. 8, 13, 14, 19, 20, 23, 25, 29, 32, 34, 38, 40, 45, 46, 49, 51, 52, 56, 57, 60, 62, 68, 71, 73, 89, 91, 92, 93, 94, 96, 100, 102, 106, 107, 113, 118, 119, 120, 122, 123, 126, 128, 130, 136, 154, 161, 169, 172, 174, 176, 181, 183, 186, 187, and 189). The vast majority of these laws fall outside of the Founding era. Additionally, while these laws seemingly impose some restrictions on illegal activity while armed, or restrict the carrying of certain arms in certain "sensitive places," each and every one of these laws necessarily permit the purchase,

---

[1] Seven laws in total (Def. Laws Nos. 38, 61, 66, 74, 110, 138, and 148).

transfer, possession, use, and even the carrying of arms. As such, they are patently insufficient to justify a categorical ban on the possession of firearms in common use.

### 6. Concealed Carry Restrictions

Many of Defendants' offered laws did not prohibit even "dangerous and unusual weapons," but the manner in which they were carried, *i.e.*, in a concealed manner, which, at the time, was seen to be nefarious.

Plaintiffs identified approximately 45 statute, laws, and/or regulations within the State's first survey that restricted the act of carrying certain weapons concealed.[2] Each of these concealed carry restrictions necessarily permitted the acquisition, possession, use, and open carry of said weapons. For example, the 1881 Alabama law (Def. Laws. No. 142) "probibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, or firearm of 'any other kind or description,' or air gun." However, this restriction does not restrict the possession or aother forms of carrying said weapons. Aside from the fact that many of these concealed carry restrictions come too late to shed much light on the scope of the Second Amendment (*Bruen,* 142 S.Ct. at 2137), they are plainly not "relevantly similar" to the challenged laws in this case as the State's assault weapons ban goes far beyond a limitation on the manner an individual may lawfully carry.

To prove this point, we point out that Defendants have offered an 1837 law from Georgia which purported to prohibit persons from selling, offering to sell, keeping, or having on their person any Bowie knife, or "any other kind of knives, manufactured and sold for the purpose of weaing, or carrying the same as arms of offence or defense," pistols, swords, sword canes or spears. (Def. Law #33). But as the State acknowledges, that law was held unconstitutional under *Nunn v. State*, 1 Ga. 243 (1846). In fact, the *Nunn* case expressly made the point that laws which merely inhibit

---

[2] See Def. Laws Nos. 6, 24, 36, 41, 42, 48, 58, 63, 70, 75, 76, 77, 78, 79, 84, 85, 99, 101, 102, 103, 105, 114, 125, 129, 131, 134, 135, 137, 139, 140, 141, 142, 144, 152, 155, 157, 159, 163, 166, 173, 177, 180, 182, 185, and 191.

the wearing of certain weapons in a concealed manner might be valid, but as such laws would cut off the exercise of the right of the citizen altogether to bear arms would be void as it would violate the Constitution. *Nunn*, 1 Ga. at 243. Specifically, the Court observed:

> A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*Nunn*, 1 Ga. at 249. The reasoning of that case proves Plaintiffs' point here, which is that the legislatures of this era made a clear distinction between the ownership of arms altogether, and the manner in which they were carried.

Aside from these concealed carry restrictions, Plaintiffs identified approximately ten laws/regulations that seemingly enact a general carry ban on certain firearms.[3] However, these restrictions fall short for the same reasons as the State's other historical analogues. The first of which was enacted in 1868 (Def. Laws No. 87). Four of the cited laws were only laws enacted in cities or terriroties (Def. Laws Nos. 104, 132, 151, 184) having no effect on vast majority of the larger population.

Defendants' offered laws which prohibit the manner in which weapons were carried are therefore not "relevantly similar" to an outright ban on a class of firearms that are in common use, for lawful purposes. And as we are again compelled to point out, the existence of these laws was still insufficient to justify New York State's concealed carry restrictions that were under review in *Bruen*.

---

[3] See Def. Laws Nos. 87, 90, 97, 104, 132, 143, 151, 165, 167, and 184.

### 7. Racist and Unconstitutional Laws

In Plaintiffs' Additional Brief re *Bruen* [ECF 136], we asserted that laws rooted in racism were among those which would not provide an appropriate historical analogue to justify the State's assault weapons ban. Much to our disappointment, the State has offered an entire swath of racist laws that were not even designed to prohibit the outright possession of dangerous and unusual weapons, but to ensure that "the wrong people" didn't obtain them, in the Founding and the antebellum eras, and beyond. Such laws do not inform the scope of a fundamental right today. They would be obviously unconstitutional if enacted today, and to the extent they were accepted as constitutional at earlier periods that was only because of an inappropriately narrower conception of "the people" covered by the Second Amendment. *See Bruen*, 142 S.Ct. at 2150–51 (discussing *Dred Scott v. Sandford* and Chief Justice Taney's concern that extending citizenship to blacks would entail extending them the right to keep and bear arms as well).

The State awkwardly tries to distance itself from these laws while at the same time it relies on them. (See, Defs' Survey, ECF 163-1, p. 1, n.2). But in the end, these racist and unconstitutional laws can provide no legitimate analogue to modern day weapons prohibitions. The State cannot rely on unconstitutional restrictions in order to justify another unconstitutional regulation.

### 8. Tax Laws, City/Town Authorizations, and Age-Based Restrictions Offer No Justification for the State's Assault Weapons Ban

Finally, the State offers a number of statutes, laws, and regulations that are far afield from the categorical firearms prohibition it aims to enforce. As such, these laws offer no justification for the State's assault weapons ban. Specifically, the State cites 18 tax regulations, four city/town authorizations, and ten age-based restrictions relating to various arms. The earliest of these laws was first enacted in 1837 (Def. No.

35 – city/town authorization)[4], with the vast majority of these restrictions being enacted well after 1850.

In total, there are 18 tax regulations cited by the State in their first survey. Of the 18, eight of the laws and regulations cited are occupational taxes on dealers of certain weapons (Def. Laws Nos. 31, 112, 116, 156, 164, 175, 179, and 188). The remaining tax regulations impose a minor property tax ranging from fifty cents to two dollors for those who possess or carry certain weapons. None of the regulations references impose any kind of prohibition on arms in common use. (Def. Laws Nos. 31, 47, 53, 54, 59, 64, 82, 83, 98, 112, 115, 116, 117, 156, 164, 175, 179, and 188).

Notably, the city/town authorizations cited to by the State (Def. Laws Nos. 35, 43, 44, 133, 153, and 162) are inadequate as they are not actual references to enacted firearms restrictions. At best, they show that these states passed *authorizations* for cities and towns to enact certain firearms restrictions. However, the State has not offered any evidence that these cities and towns subsequently enacted these restrictions. Nevertheless, even assuming, without evidence, these laws were passed in these cities and towns, they are local regulations which did not apply statewide. It would have been "irrelevant to more than 99% of the American population." *Bruen*, 142 S.Ct. at 2154-55. They therefore cannot shed much, if any light, on the scope of the Second Amendment.

The State's age-based restrictions (Def. Laws Nos. 65, 86, 111, 124, 127, 145, 147, 149, 158, 160, and 190) are also insufficient as they suffer from the same difficiencies of the State's other historical regulations. First, the earliest of these restrictions was enacted in 1856 (Def. Law No. 65). As such they offer little insight into the original meaning of the Second Amendment at the founding. Moreover, these later restrictions directly contradict the plain language of the Second Amendment as they prohibited commonly owned, bearable arms, and improperly restrict the right to

---

[4] Again, the State's reliance on these city and town authorizations is dubious, as they do not actually reference any law or regulation actually enacted within the stated cities or towns.

keep and bear arms to a limited subgroup of "the people." As stated previously, "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted).  Second, these laws are not "relevantly similar" to the challenged laws, *Bruen*, 142 S.Ct. at 2133, because these historical analogues targeted a certain class of people and denied them the right to acquire arms. The California law at issue prevents all ordinary Americans from acquiring the banned arms.

 Clearly, the statutes, laws, and regulations relied on by the state imposing minimal tax, authorizing local regulations, and improper age-based prohibitions are not "relevantly similar" to the State's assault weapons ban. As such, they offer no justification to uphold the State's modern weapons ban.

C. THE STATE'S 20TH CENTURY LAWS ARE NOT CONSTITUTIONALLY RELVANT.

As stated above, the Court in *Bruen* noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' […] The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id.*, at 2136 (citing *Heller*, 554 U.S. at 634-35 (emphasis original). Thus, the Court cautioned against "giving post enactment history more weight than it can rightly bear." 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted).

In *Bruen*, 20th-century historical evidence was not even considered. 142 S.Ct. at 2154, n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Therefore, *Bruen* makes clear that at least that some things cannot be appropriate historical analogues: 20th-century restrictions, laws that are rooted in

racism, laws that have been subsequently overturned (such as total handgun bans), and as noted, laws that are clearly inconsistent with the original meaning of the constitutional text. *Bruen*, 142 S.Ct at 2137 ("post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.") (citing *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

Accordingly, Defendants' entire offerings of laws in their second survey, from 1889-1930s [ECF 163-2] should be disregarded, because they come too late to shed relevant light on the scope of the Second Amendment. "[B]ecause post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S.Ct. at 2137.

### III.   CONCLUSION

The State has offered no constitutionally relevant analogues from the Founding era to justify their prohibition on an entire class of arms that are in common use, for lawful purposes under *Heller*. Plaintiffs must therefore prevail under *Heller* and *Bruen*, as the State has not justified its assault weapons ban by demonstrating that such a ban is consistent with our Nation's historical tradition of firearm regulation.

Dated: February 10, 2023                    SEILER EPSTEIN LLP


/s/ George M. Lee
George M. Lee

DILLON LAW GROUP APC


/s/ John W. Dillon
John W. Dillon

*Attorneys for Plaintiffs*