ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3479
Fax: (415) 703-1234
E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Allison Mendoza, in their official capacities*[1]

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

**JAMES MILLER et al.,**

Plaintiffs,

**v.**

**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**

Defendants.

Case No. 3:19-cv-01537-BEN-JLB

**DEFENDANTS' BRIEF IN RESPONSE TO THE COURT'S ORDER ENTERED ON DECEMBER 15, 2022**

Courtroom: 5A
Judge: Hon. Roger T. Benitez
Action Filed: August 15, 2019

[1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the Attorney General of the State of California, and Allison Mendoza is the current Acting Director of the Bureau of Firearms. Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Bonta and Acting Director Mendoza, in their respective official capacities, are substituted as the defendants in this case.

# TABLE OF CONTENTS

**Page**

Introduction .... 1
Argument .... 4
I. Section 30515 Does Not Burden Conduct Covered by the "Plain Text" of the Second Amendment .... 4
A. Plaintiffs Cannot Demonstrate that the Combat-Oriented Accessories and Configurations Regulated Under Section 30515 Are "Arms" .... 5
B. Firearms That Qualify as "Assault Weapons" Under Section 30515 Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense .... 7
II. The Challenged Provisions of the AWCA Are Consistent with the Nation's Traditions of Weapons Regulation .... 11
A. This Case Requires a "More Nuanced" Analogical Approach .... 12
1. Assault Weapons Represent a Dramatic Technological Change from the Firearms Technologies Widely Available During the Founding and Reconstruction Eras .... 13
2. The AWCA Addresses the Unprecedented Social Problem of Mass Shootings .... 14
B. California's Restrictions on Assault Weapons Are Consistent with Historical Laws Regulating Other Dangerous Weapons .... 15
1. The Surveys of Relevant Dangerous Weapons Laws .... 16
a. Medieval to Early Modern England (1300–1776) .... 18
b. Colonial and Early Republic (1600–1812) .... 19
c. Antebellum and Reconstruction Periods (1813–1877) .... 20
d. Late 19th and Early 20th Centuries (1878–1930s) .... 22
2. The Surveyed Weapons Restrictions Are Relevantly Similar to the Challenged Provisions of the AWCA .... 23
Conclusion .... 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Accuracy Firearms, LLC v. Pritzker*
2023 Ill. App. (5th) 230035 (Jan. 31, 2023) ........ 1

*Aymette v. State*
21 Tenn. 154 (1840) ........ 21

*Bliss v. Commonwealth*
12 Ky. (2 Litt.) 90 (1822) ........ 20

*Defense Distributed v. Bonta*
2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ........ 4

*District of Columbia v. Heller*
554 U.S. 570 (2008) ........ *passim*

*Duncan v. Bonta*
19 F.4th 1087 (9th Cir. 2021) ........ 6, 8, 10, 11

*Ezell v. City of Chicago*
651 F.3d 684 (7th Cir. 2011) ........ 22

*Fouts v. Bonta*
561 F. Supp. 3d 941 (S.D. Cal. 2021) ........ 4

*Friedman v. City of Highland Park*
784 F.3d 406 (7th Cir. 2015) ........ 13

*Kolbe v. Hogan*
849 F.3d 114 (4th Cir. 2017) ........ 9, 10, 23, 25

*Miller v. Bonta*
542 F. Supp. 3d 1009, 1029 (S.D. Cal. 2021) ........ 8

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
142 S. Ct. 2111 (2022) ........ *passim*

*Ocean State Tactical, LLC v. State of Rhode Island*
2022 WL 17721175 (D.R.I. Dec. 14, 2022) ........ *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Or. Firearms Fed'n, Inc. v. Brown*
2022 WL 17454829 (D. Or. Dec. 6, 2022)................................................*passim*

*Rocky Mountain Gun Owners v. Bd. of Cnty. Comm'rs of Boulder Cnty.*
2022 WL 4098998 (D. Colo. Aug. 30, 2022) ....................................................3

*Rupp v. Becerra*
401 F. Supp. 3d 978 (C.D. Cal. 2019)......................................................10, 24

*State v. Mitchell*
3 Blackf. 229 (Ind. 1833) ..............................................................................20

*State v. Reid*
1 Ala. 612 (1840)...........................................................................................21

*United States v. Cox*
906 F.3d 1170 (10th Cir. 2018).........................................................................6

*United States v. Kelly*
2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ...................................3, 4, 16

*United States v. Reyna*
2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ...........................................4, 8

*Worman v. Healey*
922 F.3d 26 (1st Cir. 2019) ..............................................................................9

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**STATUTES**

California Penal Code
§ 16350 .......... 1
§ 16790 .......... 1
§ 16890 .......... 1
§ 30500-31115 .......... 1
§ 30515 .......... *passim*
§ 30515(a)(1) .......... 5
§ 30515(a)(1)–(8) .......... 1, 2
§ 30515(a)(1)(A) .......... 6
§ 30515(a)(1)(B) .......... 6
§ 30515(a)(1)(C) .......... 6
§ 30515(a)(1)(D) .......... 6
§ 30515(a)(1)(E) .......... 6
§ 30515(a)(1)(F) .......... 6
§ 30515(a)(2) .......... 6, 25
§ 30515(a)(3) .......... 7
§ 30515(a)(4)(A) .......... 7
§ 30515(a)(4)(B) .......... 7
§ 30515(a)(4)(C) .......... 7
§ 30515(a)(4)(D) .......... 7
§ 30515(a)(5) .......... 6, 25
§ 30515(a)(6)(A) .......... 6
§ 30515(a)(6)(B) .......... 6
§ 30515(a)(7) .......... 7
§ 30515(a)(8) .......... 7

720 Ill. Comp. Stats. §§ 5/24-1.09(a), 5/24-1.9(b)-(c) .......... 1

Conn. Gen. Stat. §§ 53-202a – 53-202o .......... 1

DC Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c) .......... 1

Del. Code Ann. Title 11, § 1466(a) .......... 1

Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8 .......... 1

## TABLE OF AUTHORITIES
## (continued)

**Page**

Ind. Rev. Stat. 192, Chapter 24 .......... 20

Mass. Gen. Laws Chapter 140, §§ 121, 122, 123, 131M .......... 1

Md. Code Ann., Crim. Law §§ 4-301 – 4-306 .......... 1

Md. Code Ann., Pub. Safety §§ 5-101(r), 5-133(b) .......... 1

Minn. Stat. §§ 624.712, 624.713, 624.7131, 624.7132, 624.7141 .......... 2

N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5(f), 2C:58-5, 2C:58-12, 2C:58-13 .......... 1

N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a) .......... 1

Va. Code Ann. §§ 18.2-287.4, 18.2-308.2:01, 18.2-308.2:2, 18.2-308.7, 18.2-308.8 .......... 2

Wash. Rev. Code Title 9, §§ 9.41.090 .......... 2

**CONSTITUTIONAL PROVISIONS**

Ky. Const. Article XIII, § 25 (1850) .......... 20

United States Constitution
- Second Amendment .......... *passim*
- Fourteenth Amendment .......... *passim*
- Thirteenth Amendments .......... 17

**OTHER AUTHORITIES**

Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537 (2022). .......... 18

Adam Winkler, Gunfight: The Battle Over the Right to Bear Arms in America (2011) .......... 19, 25

Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform (1999) .......... 20

H.R. 1808 (2022) .......... 2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

H.R. Rep. No. 103-489 .......... 2

John Yoon, *Shootings Revive Push for an Assault Weapons Ban*, N.Y. Times, Jan. 24, 2023 .......... 2

Philip Bump, *2023 Is Experiencing Mass Shootings at a Record Pace*, Wash. Post, Jan. 25, 2023 .......... 2

U.S. Census, State Population Totals and Components of Change: 2020–2022 .......... 2

R. Blake Stevens & Edward C. Ezell, The Black Rifle: M16 Retrospective (1994) .......... 14

William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809 (2019) .......... 17

William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019) .......... 20

## INTRODUCTION

California's restrictions on firearms that qualify as "assault weapons" under California Penal Code section 30515(a)(1)–(8) ("Section 30515") fully comport with the Second Amendment.[2] The surveys of relevant historical laws submitted in accordance with the Court's December 15 Order only reinforce that conclusion. *See* Dkt. 163. Those surveys list hundreds of laws, ordinances, and authorities that demonstrate a robust tradition of regulating certain specified weapons deemed by the government to be uniquely dangerous to the public and susceptible to criminal misuse. In the past, state and local governments restricted concealable weapons that were contributing to rising homicide rates. Today, governments are also restricting other types of weapons and accessories, including firearms that qualify as assault weapons, that are being used frequently in mass shootings and contributing to greater numbers of victims killed and injured in such shootings.

California is not alone in imposing limits on assault weapons. It is among ten states, including the District of Columbia, that have done so to date—Delaware enacted its assault-weapons restrictions in 2022, and Illinois did so just weeks ago.[3] As of today, nearly one-third of the American population resides in a state that has

---

[2] Defendants incorporate by reference their Supplemental Brief in Response to the Court's Order of August 29, 2022 ("Defs.' Suppl. Br.") and the supporting declarations. *See* Dkt. 137.

[3] *See* Cal. Penal Code §§ 16350, 16790, 16890, 30500–31115; Conn. Gen. Stat. §§ 53-202a – 53-202o; Del. Code Ann. tit. 11, § 1466(a); DC Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c); Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8; 720 Ill. Comp. Stats. § 5/24-1.9(b)-(c); Md. Code Ann., Crim. Law §§ 4-301 – 4-306; Md. Code Ann., Pub. Safety §§ 5-101(r), 5-133(b); Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131M; N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5(f), 2C:58-5, 2C:58-12, 2C:58-13; N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a). Illinois's recently enacted assault weapon restrictions (720 Ill. Comp. Stats. § 5/24-1.09(a)) are currently subject to a temporary restraining order issued by a state trial court. *See Accuracy Firearms, LLC v. Pritzker*, No. 5-23-0035, 2023 Ill. App. (5th) 230035, at *1–3, 13 (Jan. 31, 2023) (noting that no Second Amendment claims were alleged but affirming based on equal protection guarantees in the Illinois Constitution).

enacted assault-weapon prohibitions.[4]  Three additional states regulate, but do not generally prohibit, the possession of firearms that qualify as "assault weapons" under their respective laws.[5]  These laws aim to mitigate the lethality of mass shootings.  *See* Philip Bump, *2023 Is Experiencing Mass Shootings at a Record Pace*, Wash. Post, Jan. 25, 2023, http://bit.ly/3jEftsi.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court adopted a new standard "rooted in the Second Amendment's text, as informed by history," 142 S. Ct. 2111, 2127 (2022), but reaffirmed that the Second Amendment right is "not unlimited," *id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)), and does not impose a "regulatory straightjacket" on government attempts to address gun violence, *id.* at 2133.  The Second Amendment does not protect an unfettered "right to keep and carry any weapon whatsoever." *Id.* at 2128 (citation omitted).  Rather, the Second Amendment protects only those "weapons 'in common use' today for self-defense."  *Id.* at 2135 (citation omitted).

Under *Bruen*, the challenged provisions of California's Assault Weapons Control Act ("AWCA") comport with the Second Amendment at both the textual and historical stages of the analysis.  Plaintiffs cannot show that the AWCA's regulation of assault weapons defined under Section 30515(a)(1)–(8) burdens conduct covered by the "plain text" of the Second Amendment.  The challenged

---

[4] The total population in the ten jurisdictions with assault weapon restrictions is estimated to be 100,453,458, and the total U.S. population is 333,287,557.  *See* U.S. Census, State Population Totals and Components of Change: 2020–2022, http://bit.ly/40yhFSK.  All Americans lived with a ban on assault weapons while the Federal Assault Weapons Ban was in effect from 1994 to 2004.  *See* H.R. Rep. No. 103-489.  And efforts are underway at the federal level to renew those restrictions; in 2022, the U.S. House of Representatives passed a renewed assault weapons ban and the President has called for a renewal of the federal assault weapons law.  *See* H.R. 1808, 117th Cong. (2022); John Yoon, *Shootings Revive Push for an Assault Weapons Ban*, N.Y. Times, Jan. 24, 2023.

[5] *See* Minn. Stat. §§ 624.712, 624.713, 624.7131, 624.7132, 624.7141; Va. Code Ann. §§ 18.2-287.4, 18.2-308.2:01, 18.2-308.2:2, 18.2-308.7, 18.2-308.8; Wash. Rev. Code tit. 9, §§ 9.41.090; 9.41.092; 9.41.240.

AWCA provisions regulate the use of certain accessories that are not protected "Arms." But even if Plaintiffs could satisfy their initial burden, Defendants have shown that the challenged laws are "consistent with the Nation's historical tradition of firearm [and other weapons] regulation." *Bruen*, 142 S. Ct. at 2129–30. Recently, two federal district courts have held that Second Amendment challenges to restrictions on large-capacity magazines ("LCMs")—firearm accessories capable of holding more than ten rounds of ammunition—are unlikely to succeed on the merits, based on substantially similar arguments, evidence, and historical record presented here. *See Or. Firearms Fed'n, Inc. v. Brown* (*Oregon Firearms*), __ F. Supp. 3d __, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *6–14 (D. Or. Dec. 6, 2022) (denying motion for temporary restraining order), *notice of appeal filed*, No. 22-36011 (9th Cir. Dec. 7, 2022); *Ocean State Tactical, LLC v. State of Rhode Island* (*Ocean State*), No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *5–16 (D.R.I. Dec. 14, 2022) (denying motion for preliminary injunction).[6] Though those cases specifically addressed LCM restrictions, their well-reasoned analysis, based on a similar record here, is equally applicable to this case. This Court should uphold the challenged AWCA provisions under the Second Amendment.[7]

---

[6] One district court entered a TRO against enforcement of a newly enacted municipal LCM law, *Rocky Mountain Gun Owners v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, No. 1:22-cv-02113-CNS-MEH, 2022 WL 4098998 (D. Colo. Aug. 30, 2022), but did so without providing the defendant an opportunity to file an opposition. It "provides no guidance on the constitutionality of [LCM] restrictions post-*Bruen*," *Oregon Firearms*, 2022 WL 17454829, at *7 n.10, and the plaintiffs have since voluntarily dismissed their case, Not. of Voluntary Dismissal, *Rocky Mountain Gun Owners* (Oct. 12, 2022), Dkt. 30.

[7] This brief responds to the Court's December 15 Order, but the Attorney General notes that there is no motion pending. Defendants preserve their objections to the current post-remand proceedings and maintain that a reasonable discovery period is called for under *Bruen*. Defs.' Suppl. Br. at 73–77. Moreover, to the extent that the Court has suggested that expert testimony may be irrelevant and that a survey of historical laws may suffice to resolve this case, *see* Dec. 12, 2022 Hr'g Tr. at 23–25, Defendants reiterate that expert elucidation is fundamental to application of the *Bruen* standard. *Bruen*'s text-and-history standard is not an

## ARGUMENT

### I. SECTION 30515 DOES NOT BURDEN CONDUCT COVERED BY THE "PLAIN TEXT" OF THE SECOND AMENDMENT

Plaintiffs' challenge to Section 30515 fails at the threshold, textual stage of the *Bruen* analysis. The Court does not proceed to the historical step of the text-and-history standard unless the party challenging the law first establishes that the "plain text" of the Second Amendment covers the conduct in which the party wishes to engage. *See Defense Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *5 (C.D. Cal. Oct. 21, 2022) ("Much as [the plaintiff] would like to move history and tradition forward in the course of relevant analysis under *Bruen*, its attempt does not survive a careful, and intellectually-honest, reading of that decision."). As previously briefed, Plaintiffs bear the initial burden of demonstrating that the text of the Second Amendment presumptively protects their desired conduct.[8] *See* Defs.' Suppl. Br. at 20–22; *see also Oregon Firearms*, 2022 WL 17454829, at *9 (holding that "*Plaintiffs have not shown*, at this stage, that magazines specifically capable of accepting more than ten rounds of ammunition are necessary to the use of firearms for self-defense" (emphasis added)); *Ocean*

"abstract game of spot-the-analogy-across-the-ages." *United States v. Kelly*, No. 3:22-cr-00037, 2022 WL 17336578, at *6 (M.D. Tenn. Nov. 16, 2022). Instead, *Bruen* requires "an evaluation of the challenged law in light of the broader attitudes and assumptions demonstrated by those historical prohibitions." *Id.* at *5 n.7. Expert testimony is needed to provide the requisite context for interpreting the historical restrictions in the record. *Cf. Fouts v. Bonta*, 561 F. Supp. 3d 941, 951 (S.D. Cal. 2021) ("[H]istory is the work of historians rather than judges."), *vacated and remanded*, 2022 WL 4477732 (9th Cir. Sept. 22, 2022). Nevertheless, the material submitted here is "analogous enough," *Bruen*, 142 S. Ct. at 2133, to show that California's restrictions comport with the Second Amendment.

[8] Plaintiffs' proposed course of conduct cannot be characterized generally as mere possession of a firearm. *See United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) (cautioning against defining the proposed conduct generally as "mere possession," because "any number of other challenged regulations would similarly boil down to mere possession, then promptly and automatically proceed" to the historical stage of the *Bruen* analysis).

*State*, 2022 WL 17721175, at *12 ("Although *it is their burden* to show that large-capacity magazines fall within the purview of the Second Amendment, *the plaintiffs* offer no expert opinion on the meaning of the word 'Arms.'" (emphasis added)). The Supreme Court has explained that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Heller*, 554 U.S. at 623. Plaintiffs' boundless interpretation of the Second Amendment, however, would extend its protections to *any type* of weapon—provided a sufficient (and unspecified) number of people want to acquire it—and to instruments and devices that are not even weapons at all. Because Plaintiffs cannot show that Section 30515 burdens conduct covered by the Second Amendment, the Court should uphold it at the textual stage of the *Bruen* analysis. *See Oregon Firearms*, 2022 WL 17454829, at *8–11; *Ocean State*, 2022 WL 17721175, at *11–15.

### A. Plaintiffs Cannot Demonstrate that the Combat-Oriented Accessories and Configurations Regulated Under Section 30515 Are "Arms"

Plaintiffs cannot establish that Section 30515's regulation of the use of certain accessories burdens conduct covered by the "plain text" of the Second Amendment because those listed accessories are not bearable "Arms." Under Section 30515, certain firearms qualify as "assault weapons" subject to other restrictions of the AWCA only if they are equipped with certain accessories or configured in a certain way. For example, Section 30515(a)(1) does not define a semiautomatic centerfire rifle as a regulable "assault weapon" unless it is equipped with one or more of the listed accessories. Those accessories are not weapons in themselves, nor are they necessary to operate any firearm for self-defense. *See* Defs.' Suppl. Br. at 23–25. Those accessories, such as pistol grips, flash suppressors, telescoping stocks, shortened barrels for rifles, and threaded barrels for pistols, are not weapons. They are accessories like LCMs or silencers, which courts have held are not bearable "Arms." "LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another,'" *Ocean State*, 2022 WL 17721175, at *12, and they

"'generally have no use independent of their attachment to a gun,'" *id.* (quoting *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019)); *see also United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')."); *cf. Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc) (observing that California Penal Code section 32310 "outlaws *no weapon*, but only limits the size of the magazine that may be used with firearms" (emphasis added)), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).[9] This conclusion is supported by corpus linguistics analysis; historically, the term "Arms" referred to "weapons such as swords, knives, rifles, and pistols," and did not include "accoutrements," like "ammunition containers, flints, scabbards, holsters, or 'parts' of weapons." *Ocean State*, 2022 WL 17721175, at *13 (citing testimony of Professor Dennis Baron); *see also* Decl. of Dennis Baron ¶¶ 7, 24, *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. Nov. 10, 2022), Dkt. 118-2.[10]

Plaintiffs also cannot show that the accessories listed in Section 30515 are "necessary to the use of firearms for self-defense," *Oregon Firearms*, 2022 WL 17454829, at *9, such that they should be treated as bearable "Arms." *See* Defs.' Suppl. Br. at 24–25. None of the accessories listed in Section 30515 is necessary to operate a firearm: a pistol grip or vertical handgrip for a long gun, Cal. Penal Code § 30515(a)(1)(A), (a)(1)(F), (a)(6)(B); a thumbhole stock, *id.* § 30515(a)(1)(B), (a)(6)(B); an adjustable stock, *id.* § 30515(a)(1)(C), (a)(6)(A); a grenade or flare launcher, *id.* § 30515(a)(1)(D); a flash suppressor, *id.* § 30515(a)(1)(E); a fixed

[9] Although *Duncan* was vacated, it is cited for its persuasive value.

[10] Professor Baron's declaration in *Duncan* was prepared after the filing of Defendants' prior supplemental brief and includes testimony relevant to this action. Defendants respectfully submit Professor Baron's declaration in this action so that it may comprise part of the record assessed by this Court and on appeal. A true and correct copy is attached as Exhibit 1 to the accompanying Declaration of John D. Echeverria ("Echeverria Decl.").

LCM, *id.* § 30515(a)(2), (a)(5); a shortened barrel that would result in an overall rifle-length of 30 inches, *id.* § 30515(a)(3); a threaded pistol barrel, *id.* § 30515(a)(4)(A); a second pistol handgrip, *id.* § 30515(a)(4)(B); a barrel shroud, *id.* § 30515(a)(4)(C); a pistol receiver capable of accepting a detachable magazine at a location other than the handgrip, *id.* § 30515(a)(4)(D); a shotgun lacking a fixed magazine, *id.* § 30515(a)(7); and a revolving shotgun cylinder, *id.* § 30515(a)(8). A firearm does not require any of those accessories or devices to "operate as intended, and they are not necessary to use a firearm effectively for self-defense or other sporting purpose, like hunting." Dkt. 137-2 (Decl. of Ryan Busse) ¶¶ 12–24; *Oregon Firearms*, 2022 WL 17454829, at *9 (crediting Busse's testimony that LCMs are not necessary to operate a firearm for self-defense).[11] Accordingly, Plaintiffs have not shown that their desired conduct falls within the "plain text" of the Second Amendment.

**B. Firearms That Qualify as "Assault Weapons" Under Section 30515 Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense**

Even if the accessories regulated under Section 30515 could qualify as bearable "Arms," Plaintiffs cannot show that firearms defined as "assault weapons" under that statute are "in common use" for self-defense, such that their possession is protected by the plain text of the Second Amendment. *See* Defs.' Suppl. Br. at 25–41; *Bruen*, 142 S. Ct. at 2134 (noting that no party disputed that handguns are "in common use" at the textual stage of the analysis). The Second Amendment covers only weapons "'in common use' today for self-defense," such as "the quintessential self-defense weapon," the handgun. *Bruen*, 142 S. Ct. at 2143. But it does not cover a weapon that is "uncommon or unusually dangerous or not

[11] Certain parts and accessories of a firearm are no doubt necessary to operate a firearm, such as ammunition, a barrel, a trigger, and (for rifles) a stock. Defendants do not suggest that all parts or accessories may be banned, but rather that there is a historical distinction between arms and accessories and that only those accessories necessary to operate a firearm warrant protection as "Arms."

typically used by law-abiding people for lawful purposes." *Reyna*, 2022 WL 17714376, at *3 (citing *Bruen*, 142 S. Ct. at 2128).

As explained in Defendants' prior supplemental brief, there is no evidence that firearms defined as "assault weapons" are frequently used in self-defense. Defs.' Suppl. Br. at 39–41. There is no evidence on the prevalence of pistols and shotguns that would qualify as "assault weapons" under Section 30515, such as UZI assault pistols and "Streetsweeper" shotguns. *See Miller v. Bonta*, 542 F. Supp. 3d 1009, 1029 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). But that is Plaintiffs' problem, because they have the initial burden of establishing that the weapons they wish to possess are "in common use." *See supra* at 7–11. For rifles that qualify as "assault weapons" under Section 30515, such as certain AR-platform rifles, Plaintiffs' industry-created estimates of production and ownership rates fail to demonstrate that those rifles are commonly *owned*; according to Plaintiffs' data, so-called "modern sporting rifles"—a rebranding of AR-platform rifles—make up less than 5% of the civilian stock of firearms, and they are owned by less than 10% of gun owners. *See* Defs.' Suppl. Br. at 30. And even if they were commonly owned, prevalence alone is insufficient to establish "common *use*." *Id.* at 27–29; *Duncan*, 19 F.4th at 1127 (Berzon, J., concurring) ("Notably, however, *Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."). Plaintiffs have failed to show that firearms defined as "assault weapons" under Section 30515 are actually used in, and are well-suited to, self-defense. A few anecdotes of assault weapons purportedly being used in self-defense do not demonstrate that they are commonly used in self-defense or well-suited for that purpose. To the contrary, such weapons are modeled after military weapons and they are most suitable for military uses. *See Ocean State*, 2022 WL 17721175, at *14–15 (finding as to LCMs).

While any weapon (or accessory) could conceivably be used in self-defense, the accessories or configurations at issue here—such as pistol grips attached to a

rifle and barrel shrouds attached to a pistol—are not well-suited for lawful self-defense. *See Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[W]ielding the proscribed [assault weapons and LCMs] for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut."), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127 n.4. The few stories in the record purportedly involving an AR-15 being used in self-defense do not demonstrate that those weapons, let alone pistols and shotguns that qualify as assault weapons, are commonly used for self-defense or well-suited for that purpose. Weapons equipped with these tactical accessories or configurations are more suitable for offensive purposes, such as military use in combat. *Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017) (en banc) (holding that "the banned assault weapons" are most useful in military service), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2126. As explained in an expert report and declaration prepared for use in another action by Colonel (Ret.) Craig Tucker—a decorated combat veteran and retired Marine Colonel who commanded soldiers in both Fallujah battles during the Iraq War—"[t]he AR-15 is an offensive combat weapon no different in function or purpose than an M4" because "both weapons are designed to kill as many people as possible, as efficiently as possible, and serve no legitimate sporting or self-defense purpose." Suppl. Expert Report & Decl. of Col. (Ret.) Craig Tucker ¶ 22, *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Jan. 6, 2023).[12] And the accessories listed in Section 30515 serve specific combat-related purposes. Pistol grips on semiautomatic or automatic rifles provide leverage during rapid fire, increasing the "killing efficiency" of the weapon. *Id.* ¶¶ 16–17. Folding stocks are "designed for military personal" to enhance troop mobility in

[12] Col. Tucker's expert report and declaration in *Rupp* was prepared after the filing of Defendants' prior supplemental brief and includes testimony relevant to this action. Defendants respectfully submit Col. Tucker's declaration in this action so that it may comprise part of the record assessed by this Court and on appeal. It is attached as Exhibit 2 to the Echeverria Declaration.

and out of close quarters, such as a vehicle, in combat. *Id.* ¶ 18. A grenade or flare launcher has "no legitimate use in self-defense." *Id.* ¶ 19. A flash suppressor's purpose is to "reduce combat signature" particularly in low-light conditions, thereby reducing the likelihood of detection during fire; it "serves specific combat-oriented purposes and is not needed for self-defense." *Id.* ¶ 20. And a fixed LCM would increase the "killing efficiency" of a firearm by increasing the number of rounds that could be fired continuously, and "an individual using a rifle in self-defense would not need such a high, continuous rate of fire." *Id.* ¶ 21. In Colonel Tucker's assessment, "these features, individually and in combination, make semiautomatic rifles more lethal and most useful in combat settings." *Id.* ¶ 14.

Though the Supreme Court's decision in *Heller* did not delineate "the full scope of the Second Amendment," *Heller*, 554 U.S. at 626, it did set at least one guidepost: "weapons that are most useful in military service—M16 rifles and the like—may be banned," *id.* at 627. As the Fourth Circuit held, firearms that qualify as assault weapon under Maryland's assault weapons law are not protected by the Second Amendment because they are "'like'" "'M-16 rifles,'" "'weapons that are most useful in military service,'" and thus are "beyond the Second Amendment's reach." *Kolbe*, 849 F.3d at 121 (quoting *Heller*, 554 U.S. at 627); *see also Rupp v. Becerra*, 401 F. Supp. 3d 978, 988 (C.D. Cal. 2019) (same), *vacated and remanded sub nom. Rupp v. Bonta*, 2022 WL 2382319 (9th Cir. June 28, 2022); *Oregon Firearms*, 2022 WL 17454829, at *11 (same as to LCMs). The fact that assault weapons are semiautomatic, as opposed to fully automatic or select fire like their military counterparts, is a "distinction without a difference." *Rupp*, 401 F. Supp. 3d. at 987. Semiautomatic weapons can be fired at rates approaching fully automatic fire, *see* Defs.' Trial Ex. J; Kapelsohn Dep. at 81–82, and soldiers are trained to fire in semiautomatic mode for enhanced accuracy in combat, Defs.' Trial Ex. L; Youngman Dep. at 51; Echeverria Decl. Ex. 2 (Tucker Decl.) ¶ 13. With respect to one type of military accessory (an LCM), the *Duncan* en banc panel

observed that the analogy to the M16 has "significant merit" because it has limited "lawful, civilian benefits" and "significant benefits in a military setting." *Duncan*, 19 F.4th at 1102. Nothing in *Bruen* calls into question *Heller*'s statement that weapons most useful in military service, like the M16 rifle or M4 carbine, may be banned.

Historically, "high-capacity firearms," like the Henry and Winchester rifles, were understood during the era of Reconstruction to be "weapons of war or anti-insurrection, not weapons of individual self-defense." *Ocean State*, 2022 WL 17721175, at *15 (quoting declaration of Professor Vorenberg in *Duncan*). And during the founding, such high capacity firearms were not prevalent, *see* Sweeney Decl. ¶¶ 5–6, *Oregon Firearms* (Feb. 6, 2023), Dkt. 124[13] and were not part of a militiaman's "ordinary military equipment" that he would be expected to bring to muster at that time, *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 178 (1939)). Because firearms that qualify as assault weapons under Section 30515 are modeled after military weapons, are most suitable for combat applications, and have no legitimate self-defense uses, they are not "in common use" for self-defense, as required to warrant protection under the Second Amendment. Accordingly, these accessories are not protected by the Second Amendment, and the challenged provisions of the AWCA should be upheld.

## II. THE CHALLENGED PROVISIONS OF THE AWCA ARE CONSISTENT WITH THE NATION'S TRADITIONS OF WEAPONS REGULATION

Even if Plaintiffs had met their initial burden of showing that firearms defined as assault weapons under Section 30515 are covered by the "plain text" of the

[13] Professor Sweeney is a history professor at Amherst College and is an expert on firearms of the 17th and 18th centuries. His declaration was filed in *Oregon Firearms* after submission of Defendants' supplemental brief in this case. Defendants respectfully submit Professor Sweeney's declaration in this action so that it may comprise part of the record assessed by this Court and on appeal. A true and correct copy of Professor Sweeney's declaration in *Oregon Firearms* is attached as Exhibit 3 to the Echeverria Declaration.

Second Amendment and the original public meaning of that text (they have not), Defendants have amply shown that the challenged provisions of the AWCA are consistent with the Nation's traditions of weapons regulation. In accordance with the Court's Order, Dkt. 161, Defendants assembled surveys of hundreds of relevant laws and authorities that show that, from pre-founding America through the 1930s, state and local governments regularly enacted restrictions on certain enumerated weapons viewed at the time to be particularly dangerous. *See* Dkt. 163. Under *Bruen*, these laws are relevantly similar to the challenged AWCA provisions because they impose a comparably modest burden on the right to armed self-defense and are comparably justified.

### A. This Case Requires a "More Nuanced" Analogical Approach

A "more nuanced" analogical approach is called for in assessing the similarities between the AWCA and the surveyed historical laws. *Bruen*, 142 S. Ct. at 2131–32. In a case that proceeds to the historical stage of the *Bruen* analysis, the government need not identify a "historical *twin*" or a "dead ringer"; it can justify a modern restriction by identifying a "relevantly similar" restriction enacted when the Second or Fourteenth Amendments were ratified. *Id.* at 2132–33. When the challenged law addresses "unprecedented societal concerns or dramatic technological changes," the courts should engage in a "*more* nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2131–32 (emphasis added). Here, a more nuanced approach is required because the challenged AWCA provisions implicate dramatic technological change in firearms technology and an unprecedented societal concern—mass shootings. *Oregon Firearms*, 2022 WL 17454829, at *12–13 (holding as to LCMs).

**1. Assault Weapons Represent a Dramatic Technological Change from the Firearms Technologies Widely Available During the Founding and Reconstruction Eras**

Assault weapons represent the "kind of dramatic technological change envisioned by the *Bruen* Court," requiring a more nuanced approach when evaluating the constitutionality of laws regulating them. *Oregon Firearms*, 2022 WL 17454829, at *12. High-capacity firearms, like repeaters, may have existed before and during the founding, but they were "experimental, designed for military use, rare, defective, or some combination of these features." *Id.* Multi-shot weapons were "not common in 1791." *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015) (Easterbrook, J.). Semiautomatic firearms, like those that may qualify as assault weapons under Section 30515, "are more recent developments" of the 20th century. *Id.* The few multi-shot weapons that did exist at the founding were materially different from modern semiautomatic weapons. Dkt. 137-8 (Decl. of Robert Spitzer ("Spitzer Decl.")) ¶¶ 18–30. Professor Kevin Sweeney has provided testimony in *Oregon Firearms* that "repeaters had *occasionally* appeared on the scene" during the founding Era, but they were not widely adopted at the time. Echeverria Decl., Ex. 3 (Decl. of Kevin Sweeney) ¶ 6.

And during Reconstruction, the only bearable, high-capacity repeaters were the lever-action Henry Rifle and the Winchester Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding 15 rounds in a fixed chamber within the firearm. Dkt. 137-9 (Decl. of Michael Vorenberg) ¶¶ 17–18. To the extent it is suggested that Reconstruction-era repeaters were analogous to contemporary AR-platform rifles and yet were unregulated, *see* Dkt. 156 at 14–16, they were not widely owned by civilians during Reconstruction, and they were materially different from modern semiautomatic firearms. Spitzer Decl. ¶ 28. As Professor Vorenberg explained, the Henry and Winchester repeaters were not adopted by the Union or Confederate militaries during the Civil War and were not commonly acquired by soldiers returning from the Civil War. Vorenberg Decl.

¶¶ 21–25 ("Production and sales numbers reveal that Henry Rifles and their successors, Winchester Repeating Rifles, were uncommon during the Civil War and Reconstruction compared to other rifles."). Following the Civil War, the circulation of Henry and Winchester lever-action repeating rifles remained low, with few documented instances of possession by civilians. *Id.* ¶ 91.[14] By the time the Fourteenth Amendment was ratified, the lever-action Winchester Model 1866 became a "huge commercial success" due "almost entirely to sales to foreign armies," not to Americans. *Id.* at ¶ 46. Semiautomatic firearms technologies did not spread broadly until the late 20th century. *See* Dkt. 137-6 (Decl. of Brennan Rivas) ¶ 25. And semiautomatic rifles modeled after the M16, like the AR-10 and AR-15, did not appear until the mid-20th century and were "utterly without precedent." R. Blake Stevens & Edward C. Ezell, The Black Rifle: M16 Retrospective 24 (1994). Though the Second Amendment can certainly cover modern firearms, *Bruen*, 142 S. Ct. at 2142, a more nuanced analogical approach is required here because the modern firearm technologies at issue represent "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132.

**2. The AWCA Addresses the Unprecedented Social Problem of Mass Shootings**

The challenged AWCA provisions also address a societal concern that did not exist at the founding or during Reconstruction: mass shootings. There are no

[14] During the December 12, 2022 hearing, the Court indicated that Professor Vorenberg discussed an episode in which two miners used Henry rifles to "defeat[] 40 Indians that were attacking them" and referred to these shooters as "common folks." Dec. 12, 2022 Hr'g Tr. at 21–22. Professor Vorenberg explained that this incident was popularized by the manufacturers of Henry-Winchesters in advertising (hardly a neutral source of history) and that this anecdote is not an example of individual self-defense (because the miners were guarding a commercial enterprise in a war-like context). Vorenberg Decl. ¶ 50. These individuals were not "common folks" using widely available weapons for lawful self-defense, and such anecdotes do not demonstrate that repeaters were widely circulated, let alone commonly used for self-defense, during the 19th century.

known shooting incidents involving ten or more fatalities before 1949, and the number of such double-digit mass shootings increased dramatically in the period before and after the federal assault weapons ban. *See* Dkt. 137-5 (Suppl. Decl. of Louis Klarevas) ¶ 11 & tbl. 1; *see Oregon Firearms*, 2022 WL 17454829, at *13 (crediting Professor Klarevas's findings). And as Professor Roth explained, from the colonial period to the early 20th century, mass killings were generally committed by groups of people because technological limitations generally limited the ability of a single person to commit mass murder. *See* Dkt. 137-7 (Decl. of Randolph Roth) ¶ 35. The development and proliferation of semiautomatic and automatic firearms technologies in the 1920s and 1930s substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies. *See* Spitzer Decl. ¶ 2–3; Roth Decl. ¶ 41. And assault weapons in particular have greatly enhanced the lethality of mass shootings. Defs.' Trial Ex. A (Allen Decl.) ¶¶ 32–34; Defs.' Trial Ex. E (Klarevas Decl.) ¶ 17 & tbl. 2; Dkt. 137-4 (Suppl. Decl. of John J. Donohue) ¶ 19; Roth Decl. ¶ 48 & fig. 1. Of all the shootings in American history involving 20 or more fatalities, 78% involved the use of an assault weapon. Klarevas Suppl. Decl. ¶ 14. Therefore, one of the primary concerns addressed by the challenged AWCA provisions—mass shootings—is a modern problem that did not exist in 1792 or 1868. For this additional reason, a more nuanced approach is required.

### B. California's Restrictions on Assault Weapons Are Consistent with Historical Laws Regulating Other Dangerous Weapons

Defendants have identified hundreds of laws from pre-founding England and colonial America through the 1930s, including clusters of relevant laws enacted around the time that the Second and Fourteenth Amendments were ratified. Dkt. 163. Even if the challenged AWCA provisions were viewed to burden conduct covered by the plain text of the Second Amendment, Defendants have provided "significant historical evidence to overcome the presumption of unconstitutionality

of a measure that infringes upon conduct covered by the Second Amendment." *Oregon Firearms*, 2022 WL 17454829, at *12.

In evaluating the relevant similarities of these laws to modern firearm regulations, the identification of relevant laws is the first step. The laws must then be contextualized historically and compared to modern laws within an appropriate analytical framework. *Bruen* focuses "not on a minutely precise analogy to historical prohibitions, but rather an evaluation of the challenged law in light of the broader attitudes and assumptions demonstrated by those historical prohibitions." *Kelly*, 2022 WL 17336578, at *5 n.7. And while there are many analogues here, it should be noted that the absence of a precise twin in the historical record would not necessarily mean that a modern firearms restriction is inconsistent with the Second Amendment. Under *Bruen*, the Second Amendment does not "forbid all laws other than those that *actually existed* at or around the time of the [Second Amendment's] adoption," but rather, "the Second Amendment must, at most, forbid laws that *could not have existed* under the understanding of the right to bear arms that prevailed at the time." *Id.* Thus, a mere "list of the laws that *happened to exist* in the founding era"—such as the laws identified in the surveys—"is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *Id.* at *2. In any event, the laws identified by Defendants are relevantly similar to the challenged AWCA provisions according to the two metrics identified in *Bruen*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133.

**1. The Surveys of Relevant Dangerous Weapons Laws**

The Court ordered Defendants to "create, and the plaintiffs shall meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in chronological order" that shall "begin at the time of the adoption of the Second

Amendment and continue through twenty years after the Fourteenth Amendment." Dkt. 161. The Order also permitted Defendants to create a second survey "covering a time period following that of the first list." *Id.* Defendants prepared and filed two surveys of relevant laws uncovered in the time permitted—one from the pre-founding era through 1888 [1–191][15] and another from 1888 through the 1930s [192–316]. Dkt. 163-1, 163-2.[16] Despite the Court's Order, Plaintiffs did not meet and confer with Defendants in the preparation of the surveys. *See* Dkt. 163 ¶ 3.

These surveys identify over 300 state and local laws, including laws enacted by the District of Columbia, and six additional laws and authorities from pre-founding England, which regulated, or authorized the regulation, of certain enumerated weapons and items.[17] As explained in Defendants' prior supplemental

[15] Numbers in brackets refer to the numbers assigned to the laws listed on Defendants' surveys of historical analogues. Dkt. 163.

[16] During the December 12 hearing, the Court characterized an 1888 cut-off as "an arbitrary and capricious number." Dec. 12, 2022 Hr'g Tr. at 30. In *Bruen*, the Supreme Court did not specify a 20-year limit after the ratification of the Fourteenth Amendment. *See Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring) (noting that the Court did not answer the question of "[h]ow long after ratification may subsequent practice illuminate original public meaning?").

[17] The vast majority of these laws were generally applicable, but some restrictions applied only to certain groups. Twelve of the surveyed laws were based on race, nationality, or enslaved status and were enacted before ratification of the Thirteenth and Fourteenth Amendments [5, 15, 16, 17, 18, 21, 22, 26, 28, 50, 69, 72]. These laws are morally repugnant and would obviously be unconstitutional today. They are provided only as additional examples of laws identifying certain weapons for heightened regulation, and they are consistent in this respect with the other generally applicable laws. Defendants in no way condone laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees. *See Bruen*, 142 S. Ct. at 2150-51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)). Reference to a particular historical analogue does not endorse the analogue's *application* in the past. Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right. *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in

brief, this history shows that governments have adopted laws like the challenged AWCA provisions, consistent with the Second Amendment—restricting particular weapons and weapons configurations that pose a danger to society and are especially likely to be used by criminals, so long as the restriction leaves available other weapons for constitutionally protected uses. Defs.' Suppl. Br. at 49–65. The enactments identified by Defendants show that the challenged AWCA provisions are a constitutionally permissible exercise of California's police powers.[18]

**a. Medieval to Early Modern England (1300–1776)**

In pre-founding England, the right to keep and bear arms was limited to arms "allowed by law" [7, 9], and the Crown prohibited the possession of certain enumerated weapons, like launcegays [1, 2], crossbows, handguns, hagbutts, and demy hakes [3, 4]. These laws are part of the tradition inherited from England when the Second Amendment was ratified. *See Bruen*, 142 S. Ct. at 2127 (noting that the Second amendment "codified a right inherited from our English ancestors" (quoting *Heller*, 554 U.S. at 599)). The 1689 English Bill of Rights included the "predecessor to our Second Amendment," *id.* at 2141 (quoting *Heller*, 554 U.S. at

---

past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.").

[18] To the extent the surveys do not provide information on repeal status or judicial review, it is Plaintiffs' burden to rebut the historical record assembled by Defendants and provide potentially adverse information about the analogues. This Court's Order did not impose the burden of identifying any repeal or adverse judicial opinions solely on Defendants, but rather required Plaintiffs to provide information that they view as relevant to the Court's analysis in this regard. *See* Dec. 12, 2022 Hr'g Tr. at 9–12 ("So I would suggest *both sides*, if you can, please do that for me." (emphasis added)). And *Bruen* itself did not envision defendants providing the entire historical record for review, but rather viewed this as a task of all parties; the Court noted that judges may "decide a case based on the historical record compiled by *the parties*." *Bruen*, 142 S. Ct. at 2130 n.6 (citation omitted) (emphasis added) (citation omitted). Plaintiffs did not participate in the preparation of the surveys, as required by the Court's Order.

593), and although it was "initially limited" to Protestants and "matured" by the founding, *id.* at 2142, there is no indication that the "as allowed by law" qualification was written out of the right when the Second Amendment was ratified.

Pre-ratification English law is relevant, especially where it is consistent with laws contemporaneous with the enactment of the Second or Fourteenth Amendments. *Id.* at 2136 (suggesting that it is permissible for "courts to 'reac[h] back to the 14th century' for English practices that 'prevailed up to the period immediately before and after the framing of the Constitution'" (cleaned up)); *id.* ("A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice."). Pre-founding English law was evaluated in *Bruen*, *McDonald*, and *Heller*, and it remains relevant here.

**b. Colonial and Early Republic (1600–1812)**

"Gun safety regulation was commonplace in the American colonies from their earliest days." Adam Winkler, Gunfight: The Battle Over the Right to Bear Arms in America 115 (2011). During this period, several jurisdictions enacted restrictions on the possession of certain weapons and devices before ratification of the Second Amendment, including limitations on the keeping and storing of gunpowder [11, 12] and trap guns [10]. *See* Defs.' Suppl. Br. at 52–56. In addition, some jurisdictions prohibited the carrying of certain listed weapons, including a 1686 New Jersey law prohibiting the carrying of any pocket pistol, skein, stiletto, dagger, or dirk [6] and other laws prohibiting the carry of certain weapons in certain circumstances [8, 13, 14, 19, 20, 23]. Such pre-ratification restrictions should "guide [this Court's] interpretation" of the Second Amendment. *Bruen*, 142 S. Ct. at 2137 (internal quotation marks and citation omitted). And laws enacted after ratification of the Second Amendment during this period are relevant in showing the continuing tradition of regulating certain enumerated weapons, especially where the laws were enacted during the framers' lifetimes. Moreover,

post-ratification practice can "liquidate" indeterminacies in the meaning of constitutional provisions. *Id.* at 2136. The Supreme Court has not determined "[h]ow long after ratification may subsequent practice illuminate original public meaning." *Id.* at 2163 (Barrett, J., concurring). But some period of time post-ratification must be relevant because constitutional "liquidation" required time for "successive Legislative bodies, through a period of years and under the varied ascendancy of parties," to sanction post-ratification practice and for the public to accede to those practices. William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 18–20 (2019) (cleaned up).

**c. Antebellum and Reconstruction Periods (1813–1877)**

During the period before and after the ratification of the Fourteenth Amendment, state and municipal weapons restrictions proliferated in response to prevailing threats to public safety. Prior to the Civil War, state and local governments enacted a range of restrictions on certain weapons, particularly "fighting knives," like Bowie knives. *See* Defs.' Suppl. Br. at 56–63. From 1813 to the Mexican War, nine states and territories (Kentucky, Louisiana, Indiana, Arkansas, Georgia, Florida, Tennessee, Alabama, and Virginia) restricted the concealed carrying of particular weapons, namely Bowie knives, pistols, dirks, and sword canes.[19] Though the Kentucky Supreme Court invalidated Kentucky's 1813 concealed weapons law, *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822), the Kentucky Constitution was amended in 1850 to allow the "pass[age of] laws to prevent persons from carrying concealed arms." Ky. Const. art. XIII, § 25 (1850). The state reenacted its concealed weapons law in 1854. *See* Clayton E. Cramer,

19 In addition to the surveyed laws [24, 32, 33, 36, 40, 41, 42, 48], Kentucky enacted a similar concealed weapons law in 1813, *see* Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky, at 100-01 (1813), and Indiana did the same in 1820 and 1831, *see* Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly, at 39 (1820); 1831 Ind. Rev. Stat. 192, ch. 24. Indiana's concealed carry regime was upheld in *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833).

Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform 62 (1999).

These concealed weapons laws were "not intended as a solution to a general problem of violence," but instead "were a solution to one very specific type of violence": murders and assaults that spread throughout the South at that time as a consequence of anti-dueling measures and contributed to an alarming increase in homicides. *Id.* at 7; *see also id.* at 64-65 ("[A]ttempts to suppress dueling usually predate, and sometimes immediately predate, passage of concealed weapon laws."). Without the ability to duel, individuals turned to concealable weapons, including pistols, dirks, and Bowie knives, to ambush their political rivals or settle scores in spontaneous fights. *Id.* Concealed weapons laws targeted the specific weapons commonly used in these types of crimes. Roth Decl. ¶¶ 14–22. Other laws restricted the carrying or use of those types of weapons, Dkt. 163-1 at 5–24, and taxed them, particularly Bowie knives [31, 47, 53, 54, 59, 64, 82, 83]. In addition, several laws regulated the possession of gunpowder [27, 55, 67] and the sale of gunpowder [55, 67], and the setting of any trap gun [80].

Notably, just two years before the ratification of the Fourteenth Amendment, New York prohibited "furtively possess[ing]" and carrying any slungshot, billy, sandclub, metal knuckles, and dirk [81]. It was understood that states retained the power "to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens." *Aymette v. State*, 21 Tenn. 154, 159 (1840); *see also State v. Reid*, 1 Ala. 612, 616 (1840) (the Legislature retained "the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals"). This understanding continued after 1868.[20]

[20] Additionally, laws restricting unauthorized militias, enacted during this period, "demonstrate[] the government's concern with the danger associated with assembling the amount of firepower capable of threatening public safety—which, given firearm technology in the 1800s, could only arise collectively." *Oregon Firearms*, 2022 WL 17454829, at *14 (citing *Presser v. People of State of Ill.*, 116

After 1868, governments continued to regulate enumerated, unusually dangerous weapons, including prohibiting trap guns [95], restricting the carrying and use of certain specified weapons, Dkt. 1631 at 24–37, and taxing certain weapons, like Bowie knives [98, 112, 115, 116, 117]. This period is especially important because the scope of the states' police powers "depends on how the right [to keep and bear arms] was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

**d. Late 19th and Early 20th Centuries (1878–1930s)**

From the end of Reconstruction to the end of the 19th century, states and localities continued to enact restrictions on certain enumerated weapons deemed to be uniquely dangerous, like slungshots and Bowie knives. Notably, in 1881, Illinois enacted a prohibition on the possession of a slungshot or metallic knuckles [146]. And in 1885, the Territory of Montana prohibited possession of certain weapons, including dirks and sword canes [170]. In addition, states and localities continued to regulate the carrying and use of uniquely dangerous weapons, like Bowie knives and metal knuckles. Dkt. 163-1 at 41–56; Dkt. 163-2 at 1–14.

During the early 20th century, dangerous weapons restrictions continued to proliferate, including more prohibitions on the possession of certain weapons. Dkt. 163-2 at 15–39. Notably, when semiautomatic and automatic weapons began to appear more frequently in crime in the 1920s, states began to regulate semiautomatic and automatic weapons capable of firing a certain number of rounds successively and weapons capable of receiving ammunition from feeding devices. Defs.' Suppl. Br. at 63–65. These early 20th century laws are relevant because they are consistent with earlier enacted laws, in identifying certain types of weapons for heightened regulation. *Cf. Bruen*, 142 S. Ct. at 2154 n.28 (discounting probative value of 20th century laws that "contradict[ed] earlier evidence"). And they are

U.S. 252, 253 (1886)).

uniquely relevant here, where this was the earliest era in which comparable firearms technology appeared.

**2. The Surveyed Weapons Restrictions Are Relevantly Similar to the Challenged Provisions of the AWCA**

The surveyed laws enacted from the pre-founding era through the early 20th century are relevantly similar to the challenged AWCA provisions in light of their comparable burdens and justifications. Defs.' Suppl. Br. at 66–73.

***First***, the prohibitions on the setting of trap guns are relevantly similar to the challenged AWCA provisions. The trap gun laws regulated possession of firearms, even inside the home, and the manner in which they could be configured [10, 80, 109, 121, 168]. Spitzer Decl. ¶¶ 50–53. But the burden on the right to armed self-defense was minimal because the firearms themselves could still be operated for self-defense without being configured in a way to fire remotely. As with the trap gun laws, the challenged AWCA provisions regulate the manner in which certain firearms may be configured and possessed. They do not prohibit the possession of firearms that lack the accessories listed in Section 30515. The minimal burden imposed by these laws is comparably justified in seeking to protect the public from harm, including unintended harm to innocent bystanders. *See Kolbe*, 849 F.3d at 127 ("The banned assault weapons further pose a heightened risk to civilians in that 'rounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials.").

***Second***, the dangerous weapons laws [3, 4, 6, 7, 9], including the restrictions on concealable weapons enacted during the 1800s, *see supra* n.19, are also relevantly similar to the law challenged here. Those restrictions on certain unusually dangerous weapons imposed a comparable burden on "the right of armed self-defense," *Bruen*, 142 S. Ct. at 2133—a comparably modest burden given that the analogues did not restrict weapons that are well suited to self-defense and left available alternative weapons to be used for effective and lawful self-defense. *See*

*Oregon Firearms*, 2022 WL 17454829, at *13 (determining that the ban on possession of LCMs imposed a comparable burden on "the right to self-defense" as laws regulating "certain types of weapons, such as Bowie knives, blunt weapons, slungshots, and trap guns because they were dangerous weapons commonly used for criminal behavior and not for self-defense"); *id.* at *13 n.19 (crediting Professor Spitzer's declaration filed in this case); *Rupp*, 401 F. Supp. 3d at 989 (holding that the AWCA does not impose a severe burden on the core Second Amendment right because "individuals remain free to choose any weapon that is *not* restricted by the AWCA or another state law" (citation omitted)).

While it is true that many of these laws regulated the carrying of certain weapons in public, nothing in *Bruen* requires a historical regulation to use the same mode of regulation to qualify as an analogue; it need only "impose a comparable burden on the right of armed self-defense" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133. Indeed, the Supreme Court has indicated that historical restrictions on the carrying of certain weapons can support limits on what arms may be possessed—the "important limitation on the right to *keep* and carry" weapons "is fairly supported by the historical tradition of prohibiting *the carrying* of dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (citation omitted) (emphasis added). The burdens imposed by these analogues were comparably justified by public-safety concerns prevalent at the time. The concealed weapons laws targeted the specific types of weapons, such as dirks, Bowie knives, and pocket pistols, that were commonly used in the murders and serious assaults that caused an alarming rise in homicides at the time. Roth Decl. ¶ 19. Today, the challenged AWCA provisions are justified because they regulate firearms that are used frequently in another type of crime—mass shootings—and combat-oriented firearm configurations that contribute to greater numbers of casualties when used in mass shootings. The AWCA provisions are further

justified by data showing that assault weapon laws can reduce the number of casualties and the *incidence* of mass shootings. *See* Defs.' Trial Ex. E ¶ 27.

***Third***, the gunpowder restrictions enacted since the founding-Era [11, 12, 27, 30, 55, 67, 153] are relevantly similar to the laws challenged here. The gunpowder restrictions regulated possession, including inside the home. Cornell Decl. ¶¶ 36-37, Dkt. 137-3. Just as Section 30515 regulates the manner in which certain weapons may be kept and configured, the historical gunpowder storage requirements regulated the manner in which gunpowder could be kept. But the gunpowder storage laws were far more burdensome, particularly Massachusetts' 1783 prohibition on the possession of a loaded firearm [11]. Given how "time-consuming the loading of a gun was in those days," this restriction "imposed a significant burden on one's ability to have a functional firearm available for self-defense in the home," and yet "there is no record of anyone's complaining that this law infringed the people's right to keep and bear arms." Winkler, Gunfight, *supra*, at 117. And just like the ammunition-capacity limits in Section 30515(a)(2) and (5), the gunpowder storage laws limited the firepower that could be exerted for self-defense. There can be no doubt that gunpowder was "in common use" at the founding, and yet governments regulated the quantity and storage of gunpowder. Though these laws were primarily aimed at preventing accidental explosions or fires, they sought to protect the public from mass-casualty incidents and minimize the threat of harm. Assault weapon laws, like gunpowder storage laws, also seek to protect bystanders from unintended harm. *See Kolbe*, 849 F.3d at 127.

## CONCLUSION

For these reasons, the Court should uphold the challenged provisions of the AWCA under the Second Amendment.[21]

---

[21] If the Court is inclined to rule in Plaintiffs' favor, Defendants respectfully request a stay of any judgment, at least for a sufficient period to allow Defendants to seek a stay from the Ninth Circuit.

Dated: February 10, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General

*s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendants Rob Bonta and Allison Mendoza, in their official capacities*

26

Defendants' Brief in Response to the Court's Order Entered on December 15, 2022
(3:19-cv-01537-BEN-JLB)