ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Allison Mendoza, in their official capacities*[1]

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| **v.** | **DECLARATION OF JOHN D. ECHEVERRIA IN SUPPORT OF DEFENDANTS' BRIEF IN RESPONSE TO THE COURT'S ORDER ENTERED ON DECEMBER 15, 2022** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | |
| Defendants. | Courtroom:     5A<br>Judge:          Hon. Roger T. Benitez<br>Action Filed:  August 15, 2019 |

---

[1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the Attorney General of the State of California, and Allison Mendoza is the current Acting Director of the Bureau of Firearms.  Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Bonta and Acting Director Mendoza, in their respective official capacities, are substituted as the defendants in this case.

1

I, John D. Echeverria, declare as follows:

1.      I am a Deputy Attorney General with the California Department of Justice and serve as counsel to Defendants in the above-captioned matter.  Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness I could testify competently as to those facts.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Declaration of Dennis Baron, dated November 7, 2022, filed in the matter, *Duncan v. Bonta*, U.S. District Court for the Southern District of California, Case No. 17-cv-1017-BEN-JLB.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of the Supplemental Expert Report and Declaration of Colonel (Ret.) Craig Tucker, dated January 6, 2023, filed in the matter, *Rupp v. Bonta*, U.S. District Court for the Central District of California, Case No. 8:17-cv-00746-JLS-JDE.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the Declaration of Kevin Sweeney, dated February 5, 2023, filed in the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 10, 2023, at San Francisco, California.

*s/ John D. Echeverria*
John D. Echeverria

## INDEX OF EXHIBITS

| Exhibit | Description | Page No. |
|:---:|:---|:---:|
| 1 | Declaration of Dennis Baron, dated November 7, 2022, filed in the matter, *Duncan v. Bonta*, U.S. District Court for the Southern District of California, Case No. 17-cv-1017-BEN-JLB | 1-22 |
| 2 | Supplemental Expert Report and Declaration of Colonel (Ret.) Craig Tucker, dated January 6, 2023, filed in the matter, *Rupp v. Bonta*, U.S. District Court for the Central District of California, Case No. 8:17-cv-00746-JLS-JDE | 23-39 |
| 3 | Declaration of Kevin Sweeney, dated February 5, 2023, filed in the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM | 40-73 |

# EXHIBIT 1

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA 90013-1230
     Telephone: (213) 269-6177
6    Fax: (916) 731-2144
     E-mail: Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
8  *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                        CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**            Case No. 17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**
    **CHRISTOPHER WADDELL, and**            **DECLARATION OF DENNIS**
15  **CALIFORNIA RIFLE & PISTOL**           **BARON**
    **ASSOCIATION, INC., a California**
16  **corporation,**                        Courtroom:    5A
                                            Judge:        Hon. Roger T. Benitez
17                          Plaintiffs,     Action Filed: May 17, 2017

18        v.

19
    **ROB BONTA, in his official capacity as**
20  **Attorney General of the State of**
    **California; and DOES 1-10,**
21
                            Defendants.
22

23

24

25

26

27

28

## DECLARATION OF DENNIS BARON

I, Dennis Baron, declare under penalty of perjury that the following is true and correct:

1.     I have been retained by the State of California to provide expert opinion and testimony regarding Corpus Linguistics research.  I am being compensated at a rate of $350 per hour.

2.     I have evaluated the historical use of the terms *arms* and *accoutrements* in order to show that large-capacity magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

## BACKGROUND AND QUALIFICATIONS

3.     I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and

1

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

1    law. I have also published books on language reform, on usage, and on gender in
2    language.

3         4.    Most relevant for this report, I published two books on language and
4    law: *The English-Only Question: An Official Language for Americans?* (Yale Univ.
5    Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free*
6    *Speech* (Cambridge Univ. Press, January 2023). In addition, I served as lead author
7    on what came to be called "the Linguists Brief" in *District of Columbia v. Heller*
8    (2008), a brief cited both by J. Scalia in his opinion in the case, and by J. Stevens in
9    his dissent. I was a co-author on another brief by professors of linguistics and
10   corpus linguistics, in *New York State Rifle and Pistol Ass'n. v. Bruen* (No. 20-843,
11   2022), which J. Breyer cited in his dissent. In that dissent, J. Breyer also quoted
12   directly from my essay "Corpus evidence and the meaning of 'bear arms'"
13   (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical
14   meaning and the Second Amendment at the Federalist Society at the Univ. of
15   Chicago Law School, at the Neubauer Symposium on Historical Semantics at the
16   Univ. of Chicago, at Brigham Young Univ. Law School, at Stanford University,
17   and at the conference "*Heller* after Ten Years" at Hastings College of Law. I've
18   also written opinion essays on historical meaning and the Second Amendment for
19   the *Washington Post* and the *Los Angeles Times*. And I have submitted a
20   declaration on behalf of the State of Rhode Island in *Ocean State Tactical, LLC, et*
21   *al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.). In the
22   past twenty years I have been an expert consultant in perhaps a dozen cases
23   involving document interpretation.

24        5.    My forthcoming essay, "Look It Up in Your *Funk and Wagnalls*: How
25   Courts Define the Words of the Law," an analysis of how courts incorporate
26   information from dictionaries and digitized corpora as they ascertain legal meaning,
27   will appear in the next issue of the academic journal of the Dictionary Society of
28   North America, *Dictionaries*.

2

6.     This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large digitized corpora consisting of many millions of words.

**OPINIONS**

I.   **SUMMARY OF CONCLUSIONS**

7.     Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements*. Nor does *arms* refer to *parts* of weapons, for example the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets. Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition; arms and accoutrements;* or *arms, ammunition, and accoutrements*. A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier or militia member's kit, or equipment. For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term *accoutrements* occurs alone, as *in the accoutrements of a soldier*, it may include both arms and accessories. But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories. And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

8.     Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks). And they often specified, separately, the

1  different accessories that officers and the rank and file soldiers were also required
2  to have.

3  **II.   THEORY AND METHODOLOGY**

4       9.    Corpus linguistics as a field developed in the late 1960s, when scholars
5  began using computer programs to analyze large bodies of digitized text. Initial
6  work in corpus linguistics did not typically involve legal issues. Literary scholars
7  developed computerized concordances to the works of Shakespeare, Milton, and
8  other major English writers. Scholars plotted the frequency of words and phrases in
9  order to develop a picture of an author's style, and to determine authorship of a
10  particular work when the provenance was in doubt. Soon, in addition to solving
11  literary mysteries, the methodologies developed by corpus linguists were
12  successfully applied in a number of criminal cases in the US and in England
13  involving, for example, the authorship of a ransom note or an email.

14       10.    Lexicographers, who began compiling large analog databases of text in
15  the late 19th century, began to digitize their libraries of paper data and to add to that
16  material, assembling computerized databases of historical and contemporary text
17  and, more recently, of spoken language as well, in order to arrive at more precise
18  definitions of the multiple senses of words and phrases.

19       11.    As a graduate student at the Univ. of Michigan in 1970, I coded analog
20  texts from the *Oxford English Dictionary* files to help build the computerized
21  database for the Dictionary of Early Modern English, the period from 1500–1800
22  that is particularly relevant to the language of the Founding Era. Today, major
23  dictionaries like the *Oxford English Dictionary* and the Merriam‑Webster suite of
24  dictionaries rely on public databases of oral and written language, as well as their
25  own proprietary databases, in order to revise older definitions and to track the
26  spread of new words and meanings. The great dictionary makers of Europe use
27  similar databases in their own work.

28

4

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

12. Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a subset of Corpus Linguistics. LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as Original Public Meaning (OPM)—in statutes and in the Constitution. The promise of LCL attracted jurists as well as scholars with a specific interest in language and law. In *Muscarello v. United States* (524 US 125 1998), a case which held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or truck, can be deemed to be within the scope of the statutory phrase 'carries a firearm,'" J. Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to clarify the meaning of the words *carry*, *vehicle*, and *weapon*. In her dissent, J. Ginsburg expressed skepticism that either dictionary evidence, or Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question. Her critique did not deter courts from performing other computerized data searches to determine legal meaning. In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute (*United States v. Costello*, 2012). Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean 'provide shelter' as well as the narrower sense, 'hide someone from the authorities.' But in the context of the Immigration Act, *harbor* appears alongside other terms involving secret, illegal activity, and so even though, using more rigorous parameter's showed that Posner's Google search may have been flawed, his understanding of the word *in context* seems clearly to be correct.

13. More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, published "Judging Ordinary Meaning" (*Yale Law Journal* 127), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity. Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary*, as well, allowing a more precise interpretation of historical text data.

14. In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by J. Alito in his concurrence in *Facebook v. Duguid* (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

15. Several large databases have come online in the past few years that facilitate LCL research. They have proved invaluable to me in compiling this report. Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), covering the years 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth

6

1   century, the Corpus of Historical American English (COHA), which was initially

2   developed at BYU as well but is now independent of that institution, currently

3   contains 475 million words of text from 1820–2020. The size of these databases

4   continues to grow as more works are digitized, coded, and added to the corpora.

5   16.   Critics of LCL have complained that databases like COFEA and COEME

6   contain only texts written by "elites," whose language may differ from that of

7   "ordinary people" who do not write at all, or who for various reasons do not write

8   texts likely to be included in the available corpora. It is certainly the case that many

9   printed books and periodicals, along with documents like the Constitution, its

10   amendments, and state and federal statutes, tend to be written by educated

11   specialists and professional writers, and although ordinary people are expected to

12   understand the language of the Constitution, the Declaration of Independence, and

13   other founding documents, as well as the laws that govern the nation, such texts

14   typically require specialized knowledge. A reading-difficulty formula like the

15   commonly-used Flesch-Kincaid scale suggests that the Declaration of

16   Independence and the Constitution require a fifteenth-grade reading level, while

17   according to one comprehensive study, *Adult Literacy in America* (US Department

18   of Education, 1993), the average American today tends to have a seventh-grade

19   reading level.

20   17.   In order to counter any "elite" bias that may be found in databases like

21   COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases

22   covering the period 1750–1900, focusing for this report on the Founding Era and on

23   the period of Reconstruction after the passage of the Fourteenth Amendment. Print

24   technology remained relatively static between the 1450s, when printing presses first

25   appeared in Europe, and the early 19th century, when the Industrial Revolution

26   drastically changed print technology. The first printing press was adapted by

27   Gutenberg from the design of the traditional wine press, and printing was a slow

28   and labor intensive process. As a result, newspapers in the founding era were small,

averaging four to eight pages. Publication was less frequent as well. Papers tended to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news. Even though newspaper subscribers tended to be "elites," newspaper content was widely shared by word-of-mouth: ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

18.   The invention of the steam engine in the 19th century, along with growth of paper mills that facilitated the production from wood pulp of large and inexpensive rolls of newsprint, led to a revolution in print technology. This led to an explosion in the size of newspapers and the frequency of their publication, to the point where, at their height, papers in big cities were publishing several editions a day. This growth in newspapers, along with a substantial increase in periodical and book production, paralleled a growth in literacy in the US and Europe that tracked the industrial revolution and the subsequent rise in universal public education. By the end of the Civil War, there were more readers than ever, and they demanded more reading material.

19.   As for the question of "elites," as the principal means of communicating news and information, the newspapers of the 18th and 19th centuries embodied much of the language of the "ordinary people" who read them. Newspapers also provide researchers with more data for the 19th century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader.

20.   Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though for obvious reasons, none of the databases for the Founding Era and for the post-Civil War period cover the

8

1   spoken language of Americans. Although scholars can reconstruct some of that oral
2   language, we are always doing so through the lens of print versions purporting to
3   represent or comment on ordinary speech.

4       21.   The newspaper databases I have examined are Readex Historical
5   American Newspapers; Chronicling America (newspapers digitized by the Library
6   of Congress); the British Newspaper Archive (digitized by the British Library); and
7   two private subscription services, newspapers.com and newspaperarchive.com. For
8   this report, newspapers.com provides the most-complete picture of the language of
9   the Founding Era newspapers as well as the ordinary language of the later 19th
10   century.

11       22.   All the databases contain some duplicates. COFEA and COEME digitize
12   multiple editions of the same work; and the newspaper databases contain a number
13   of duplicate stories because, particularly in the period of newspaper growth during
14   the 19th century—in an age before the wire services and syndication appeared, and
15   before the larger papers began to set up news bureaus in key areas around the
16   country and around the world—newspapers routinely printed each other's stories,
17   sometimes acknowledging their source and sometimes not. Still, the databases often
18   offer more insight into the meaning of words and phrases than simply going to a
19   dictionary. Jurists from Learned Hand to Felix Frankfurter to Frank Easterbrook
20   and Richard Posner have warned their colleagues not to make a fortress of the
21   dictionary. The corpora are by necessity incomplete. LCL doesn't replace
22   dictionary look-ups, but it does provide an important supplement to them.

23   **III.   THE MEANING OF ARMS AND ACCOUTREMENTS IN THE DATABASES**

24       23.   I was asked to look at the meaning of *arms* and *accoutrements*, along
25   with the phrase *arms* and *accoutrements,* current in the Founding Era and during
26   the period immediately following the adoption of the Fourteenth Amendment,
27   focusing on whether the word *accoutrements* may be considered analogous to the
28   present-day use of the term *magazine* in reference to firearms.

9

24.   In the eighteenth and nineteenth centuries, *magazine* was a word that meant 'storehouse, depot.' A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits. The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the nineteenth century, and the term was relatively rare until the 1920s. Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms*.

25.   The data on *accoutrements* suggest that the analogous LCMs are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military. *Cartridges, cartridge boxes* and later, *magazines*, are not arms in and of themselves.

26.   The *Oxford English Dictionary* (OED), the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement*; the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

27.   *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxes, and other formal attire). But the military sense of *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers. The example given to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here

10

1   Wellington, recognized by all as a consummate soldier who would soon defeat
2   Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms*
3   and *accoutrements*.

4        28.   The term *accoutrement-maker*, though not defined separately by the
5   *OED*, is illustrated with examples referring to a manufacturer of military
6   accessories rather than arms; and the term *accoutrement shop* has this 1831
7   example where guns and accoutrements are differentiated: "The crowd was so great
8   in the Rue de Richelieu, . . . especially about the gunsmiths and accoutrement shops
9   in the vicinity of the Palais Royal." [*United Service Jrnl*. i. 325]

10       29.   The *OED* definitions are instructive. But in order to determine more
11  specifically what the term *accoutrements* refers to, I consulted two digitized
12  historical databases, or corpora. A COFEA database search for the occurrence
13  *accoutrements* within 6 words of *arms* returned 873 hits (including a small number
14  of duplicates). A similar search of COEME returned 126 hits, the earliest from
15  1656. I determined that the two search terms, *arms* and *accoutrements*, often appear
16  together as a single phrase, *arms and accoutrements*, typically in military contexts
17  having to do with an army or militia unit. *Accoutrements* often occurs in a list
18  alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition,*
19  though when *ammunition* is not listed separately, the term *accoutrements* will
20  generally include *ammunition. Accoutrements* sometimes occurs in a list alongside
21  *clothing*, suggesting it may not always include uniforms (this finding informs the
22  *OED* definition: military equipment other than arms and uniforms). But
23  occasionally, *accoutrements* may include items classified as part of a uniform
24  (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where
25  the term usually refers to clothing associated with particular professions or
26  activities). In sum, in the vast majority of examples, *accoutrements* functions as a
27  catch-all term for military equipment *separate* from, and not including, *arms*.

28

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

30.   But English usage is never simple. As linguists often say, "all grammars leak"—which is to say, there are always a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation: it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military
> *accoutrements*, such as paper-caps, paper-belts, wooden swords,
> &c. were beating up for recruits in Parliament-street, Boston. [*The
> American jest book*: Part I[-II], 1789; emphasis added; here military
> accoutrements includes toy swords.]

31.   This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that arms may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements
> provided by the militia law.

32.   But besides a handful of exceptions, in literally hundreds and hundreds of cases, *arms* and *accoutrements* are treated as separate items of military gear. Here are some typical examples from the Founding Era:

> **1776**: Fire arms and accoutrements
> **1780**: arms, ammunition, accoutrements, drums and fifes in
> possession of the respective regiments.
> **1795**: you will march . . . with arms and accoutrements in good order.
> If any volunteer should want arms and ammunition, bring them
> forward, and they shall be supplied as well as possible. [COEME;
> the other examples are from COFEA]
> **1798**: To hold his powder and his ball, his gun, accoutrements

12

1   and all . . . [This example rhymes because it's from a poem,

2   indicating that the idiomatic phrase arms and accoutrements has

3   become part of the general language available not just to military

4   specialists but also to poets and novelists.]

5   33.   A second COFEA search, for *accoutrements* alone, returned 1,235 hits.

6   COEME yields 771 hits. These searches add a number of non-military contexts,

7   where accoutrements refers to religious gear (robes, mitres, and so on) as well as

8   other sorts of fancy or special clothing. These non-military examples do not

9   reference weapons, ammunition, or other military equipment.

10   34.   I supplemented my COFEA search with a search of the newspaper

11   database, newspapers.com, for the Founding Era period, 1750–1800. The

12   newspaper databases do not permit the kind of collocate searches that COFEA,

13   COEME, and COHA allow. Entering two search terms returns results in which

14   either one or both terms occur on the same page, though not necessarily in the same

15   sentence, or even in the same article, and not necessarily as linked terms. There are

16   1,392 hits for *accoutrements*. There are 692 matches for the exact phrases *arms and*

17   *accoutrements*.

18   35.   Here's a mid-18th century British example from the newspapers.com

19   corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:

20   36.   This Militia shall receive their Arms, Accoutrements, and

21   Ammunition from the Ordnance. *Derby Mercury*, 1756.

22   37.   Similarly, there's this "ploughshares into swords" example of a

23   Cambridge University library to be converted to a military barracks:

24   [T]he new Building intended for a publick Library . . . may be

25   converted into a Barrack, and be supplied with Provisions, Arms,

26   and Accoutrements, at the Expence of the University. 1756

27   38.   A search of the Readex database of America's Historical Newspapers

28   returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. This early

13

example from the colonial period appeared in the **Boston Evening Post** in 1750. It distinguishes *arms* from uniforms, accoutrements, and other military equipment:

> All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things necessary for a Gentleman Ranger.

39.  This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that arms and accoutrements are distinct categories in the new nation as well:

> The militia . . . must be considered as the palladium of our security . . . . The formation and discipline of the militia of the continent should be absolutely uniform; and that the same species of arms, accoutrements, and military apparatus, should be introduced in every part of the United States.

40.  The text of a bill in Congress to establish a uniform militia appeared in the *New York Journal*, in 1790. It confirms the Founding-Era sense that *arms*, *ammunition*, and *accoutrements* make up distinct and separate elements of a soldier's kit:

> There shall be appointed an adjutant general for each state . . . whose duty it shall be to . . . report[] the actual situation of their arms, accoutrements, and ammunition. . . Every non-commissioned officer or private . . . for appearing at such meeting or rendezvous without his arms, ammunition, or accoutrements, as directed by this act, shall pay the sum of twenty-five cents.

41.  And this cite from 1868 clearly distinguishes what counts as arms, and what counts, separately, as accoutrements:

> At Watertown Arsenal, Massachusetts . . . the following Arms, &c., will be sold:10,699 rifled and smooth-bore Muskets . . . ; 261 Carbines . . . ; 305 Sabres . . . ; lot of cavalry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c."

42.  The newspaper data parallels that of COFEA: the phrase *arms and*

*accoutrements* is almost always military. The phrase sometimes occurs alongside *ammunition* as a separate list item. *Accoutrements*, when it appears alone, is a more general term, used both for military and other gear, though in non-military contexts it is more directed toward clothing rather than 'equipment' (priests' robes, ministerial garb, fancy ball gowns, badges of office), as is also indicated in the *OED* citations. In non-military contexts, *accoutrements* carries the suggestion of ceremonial gear, and less commonly, nonmilitary tools of the trade.

43.   It's clear that *arms and accoutrements* was, during the 18th and 19th centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and battery* or *breaking and entering*. Such pairs take on the characteristics of a formula, and often appear in the same order (this order may be dictated by logical succession of events, or it may be random). *Eggs and bacon* is rarer than *bacon and eggs*. And it would be unusual to find *battery and assault*. Such ordered pairs are called "irreversible binomials," though there's nothing but custom (as in *salt and pepper*) and sometimes logic (as in breaking and entering) to prevent anyone from reversing the order.

44.   The word *accoutrements* typically occurs in a list after *arms* (more rarely, it may occur before *arms* as well), and it is typically a separate category from *arms* (though not always, as the above examples show).

45.   There are over 47,000 citations in newspapers.com for *arms* or *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms and accoutrements*. Examining a selection of the 15,799 citations of the phrase confirms that both in England and the US, *arms* and *accoutrements* are separate categories. Here is one example from Gloucestershire, in England, dated 1868:

[A] letter was received from the Home Secretary, pointing out the danger

15

1   of permitting an accumulation of arms and accoutrements to take place in
2   prisons, and requesting, if there were any arms or munitions of war stored
3   in the prison, that they should be removed to the nearest military depot.

4      46.   A similar cite from Iowa in 1868: "Persons having in their possession any
5   arms, accoutrements or ammunition belonging to the State, are requested to return
6   the same at once to the Adjutant General, as proper places have been provided by
7   the State for the safe keeping of all such property."

8      47.   And this, from Stroudsburg, PA, also 1868: "More than half of the
9   Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements,
10  and probably made their way to the gold regions of Colorado and Montana."

11     48.   The circa-1868 data confirmed the Founding Era data that *accoutrements*
12  is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the
13  terms refer to separate categories of equipment.

14     49.   One final note on *accoutrements*. The U.S. Supreme Court's recent
15  decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843,
16  2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the
17  North Carolina Supreme Court affirming Huntley's conviction for carrying a
18  shotgun illegally "to the terror of the people," as forbidden by the Statute of
19  Northampton in 1328. In that decision, the Court states, A gun is an 'unusual
20  weapon,' wherewith to be armed and clad. No man amongst us carries it about with
21  him, as one of his everyday accoutrements—as a part of his dress.

22     50.   In the citation above, *accoutrements* does not refer to weaponry, but to
23  the more general category of 'everyday attire, or clothing.' It may be normal to
24  wear a shirt, or a belt, or shoes, but it's not normal, the Court is saying, to wear a
25  gun in North Carolina in 1843. It's legal—the Court agrees—to carry a gun for any
26  lawful purpose, "either of business or amusement"—but it's not *normal* or typical
27  to do so. In affirming Huntley's conviction, the Court noted that his purpose in
28  carrying a shotgun was not a legal one.

16

## IV. SOME HISTORICAL NOTES ON THE USE OF THE WORD MAGAZINE

51. Since the technology of arms and ammunition was changing by the mid-nineteenth century, I also searched for new uses of the term magazine in relation to *arms* and *accoutrements*. With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term *magazine* starts to appear in the sense 'ammunition container' (replacing the earlier *cartridge box* or *cartridge case*). According to the *OED*, in the 18th and early 19th centuries, magazine referred generally to 'a storehouse,' and in military contexts it referred specifically to a storehouse for gunpowder. (The sense of 'storehouse' also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of 'depot, warehouse,' is cognate with the French word *magasin*, 'a shop or store').

52. Although most uses of the word *magazine* still refer to printed periodicals, during the 19th century, one sense of the term *magazine* narrows, referring more and more to an 'ammunition container,' a primary sense of the word in reference to firearms today. The *OED* defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

53. COFEA and COEME do not cover the period past 1800. COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s. Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses. Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. *Magazines* meaning 'devices for holding bullets' form only a very small subset of these citations. It took some thirty to forty years for the 'bullet holder'

17

1   sense of the word *magazine* to become more common, and even then, text
2   references to ammunition magazines often appear, not in general discourse, but in
3   legislation restricting their size or use.

4      54.   Most militia laws and regulations from the Founding Era specify
5   minimum requirements for soldiers' weapons, ammunition, and accoutrements.
6   Most laws regulating weapons in the mid-19th century restrict or ban specific kinds
7   of weapons, often enumerating them, sometimes in terms we find colorful today but
8   which were common at the time (Arkansas toothpicks, Bowie knives, slung shots,
9   swords in canes, pistols capable of being concealed in a pocket). Occasionally these
10  laws further identified such weapons as those used by "brawlers," thieves, robbers,
11  or others bent on illegal activities. Other weapons restrictions follow the English
12  tradition of limiting possession of weapons by social class, nationality, or race.

13     55.   Although militia laws do specify weapons and other required
14  accoutrements or pieces of military equipment, including horses for the officers,
15  those laws that prohibit certain kinds of weapons during the two critical periods
16  (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one
17  exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles,
18  except by the owner thereof on his removal to reside out of this province, or any
19  gun barrels, gun locks, or bayonets, be carried out of his province, without the leave
20  of the council of safety for the time being." [1776 Md. Laws 146].

21     56.   I surveyed the gun regulations in the Duke Historical Database from the
22  early medieval period through 1885 to see what terminology was used. None of the
23  laws that prohibit weapons, aside from the Maryland statute above, specifies a gun
24  part or ammunition case or accoutrements of any kind. Although many present a list
25  of banned or prohibited weapons—usually without defining them [the assumption
26  is that the reader knows what they refer to], none of the laws mention cartridge
27  boxes, bullets, barrels, or other parts of any weapons.

28

1      57.   Later, however, in the decades after the introduction of *magazines* as

2  'carriers or holders of bullets,' laws and regulations against their nonmilitary use

3  started to appear. Here's a 1919 Maine law banning guns with loaded magazines:

4  No person shall have a rifle or shotgun, either loaded or with a cartridge in the

5  magazine thereof, in or on any motor vehicle while the same is upon any highway

6  or in the fields or forests.

7      58.   Laws banning *machine guns* or firearms with *magazines* capable of firing

8  multiple times without reloading appear in Vermont (1923), Rhode Island (1927),

9  and Massachusetts (1927), among other states. Rhode Island's law bans magazines

10  which fire automatically or which hold more than twelve rounds: "machine gun"

11  shall include any weapon which shoots automatically and any weapon which shoots

12  more than twelve shots semi-automatically without reloading.

13      59.   A 1933 Texas law bans "machine guns" capable of firing "more than five

14  (5) shots or bullets."

15      60.   Finally, the Federal Firearms Act of 1934, which introduced a nationwide

16  system of taxes, fees, and registration requirements for the transfer of certain types

17  of guns, specifies in great detail the nature of the "firearms" covered by the statute,

18  including their barrel length and type of firing mechanisms: "(a) The term 'firearm'

19  means a shotgun or rifle having a barrel of less than eighteen inches in length, or

20  any other weapon, except a pistol or revolver, from which a shot is discharged by

21  an explosive if such weapon is capable of being concealed on the person, or a

22  machine gun, and includes a muffler or silencer for any firearm whether or not such

23  firearm is included within the foregoing definition."

24      61.   The Act also provides a specific definition of "machine gun": "(b) The

25  term 'machine gun' means any weapon which shoots, or is designed to shoot,

26  automatically or semiautomatically, more than one shot, without manual reloading,

27  by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch.

28  757, HR 9741].

## V. CONCLUSION

62. In effect, then, *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms. In non-military contexts this does not apply: the *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

63. But there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

64. In addition, 'bullet holders,' whether they are called *cartridge cases*, *magazines*, or simply, *machine guns*, both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

65. To repeat, there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, 2022, at Champaign, IL.


_____
Dennis Baron

# EXHIBIT 2

1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   State Bar No. 261579
    JOHN D. ECHEVERRIA
5   Deputy Attorney General
    State Bar No. 268843
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7     Telephone:  (415) 510-3479
      Fax:  (415) 703-1234
8     E-mail:  John.Echeverria@doj.ca.gov
    *Attorneys for Defendant Rob Bonta,*
9   *in his official capacity* [1]

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                      WESTERN DIVISION

13

14

15  **STEVEN RUPP; STEVEN**            8:17-cv-00746-JLS-JDE
    **DEMBER; CHERYL JOHNSON;**
16  **MICHAEL JONES;**                 **SUPPLEMENTAL EXPERT**
    **CHRISTOPHER SEIFERT;**           **REPORT AND DECLARATION**
17  **ALFONSO VALENCIA; TROY**         **OF COLONEL (RET.) CRAIG**
    **WILLIS; and CALIFORNIA RIFLE**   **TUCKER**
18  **& PISTOL ASSOCIATION,**
    **INCORPORATED,**
19
                       Plaintiffs,     Courtroom:    8A
20                                     Judge:        The Honorable Josephine
           **v.**                                    L. Staton
21
22  **ROB BONTA, in his official capacity**   Action Filed:  April 24, 2017
    **as Attorney General of the State of**
23  **California; and DOES 1-10,**

24                      Defendants.

25

26  ─────────────────
          [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
27  Attorney General of the State of California. Pursuant to Federal Rule of Civil
    Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as
28  the defendant in this case.

                                  1

**SUPPLEMENTAL EXPERT REPORT AND DECLARATION
OF COLONEL (RET.) CRAIG TUCKER**

I, Colonel (Ret.) Craig Tucker, declare under penalty of perjury that the following is true and correct:

1.      I have been asked by the Office of the Attorney General of the California Department of Justice to prepare an expert report and declaration on the purpose, use, and features of certain semiautomatic firearms.  This supplemental expert report and declaration ("Report") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

**PROFESSIONAL QUALIFICATIONS**

2.      I am a Colonel, US Marine Corps, (Retired).  I served as an infantry officer in the Marine Corps for 25 years.  I have commanded infantry units from platoon to regiment.  I commanded Regimental Combat Team -7 (RCT-7) in Iraq from February 2004 to April 2005.  During my time in Iraq, I commanded 22 different US Marine, US Army, and Iraqi Army battalions and exercised tactical control over Naval Special Warfare and US Special Forces, and supported National Tier 1 assets.  I commanded the Regiment in both Fallujah battles and numerous smaller battles.  I was the target of 9 assassination attempts and was wounded in Husaybah Iraq in July 2004.  Upon my return from Iraq, I was assigned to the US Marine Corps National Training Center and was responsible for training and certifying units for combat in Iraq and Afghanistan.

3.      I have received two Legion of Merit awards for exceptional meritorious conduct in the performance of outstanding combat services, the Military Order of the Purple Heart, the Navy Commendation Medal for Heroic Action, the Combat Action Ribbon, and seven Sea Service Deployment Ribbons, among other awards.

2

4.     After I retired from military service in 2006, I served as an Assistant Deputy Administrator for the Office of Secure Transportation (OST), National Nuclear Security Agency.  OST is a paramilitary organization consisting of federal agents armed with M4s.[2]  I was also the Department's Render Safe program in Albuquerque NM.

5.     In 2012, I joined Innovative Reasoning LLC, which provides professional support services to the U.S. Department of Defense and other government clients.  While at Innovative Reasoning, I developed training programs and planning capabilities for the Marine Corps, and I developed and taught a training course on tactical decision-making for law enforcement officers.

6.     Through my military service, I gained extensive knowledge and familiarity with the full range of US combat weapon systems.  The automatic rifle is the foundational combat weapon system.  Ground and aviation weapon systems are specifically designed to support the automatic rifle.  My primary purpose in the latter stages of my career was coordinating, and teaching others to coordinate, air and ground weapon systems to support the rifleman and his automatic rifle.

7.     I have fired the Colt AR-15 5.56 rifle and the Smith and Wesson 5.56 AR rifle.  Both are advertised as the civilian version of the M16 combat rifle.  In addition to my automatic rifle experience, I have extensive experience with the AK-47, having been on the receiving end of hundreds of 7.62 rounds; an experience best typified during the Battle of Hit when a single individual with one rifle and apparently inexhaustible supply of 7.62 ammo and magazines kept nine Marines pinned down for 15 minutes until a LAV-25 20mm chain gun solved the problem.  I have extensive experience with the Colt 1911 .45 caliber semi-automatic and the Berretta .9m semi-automatic pistol and used both weapons in Iraq.

---

[2] The M4 is a gas-operated, magazine-fed carbine.  It is the shortened version of the M16 assault rifle.

3

8.     I currently serve as a trainer and planner for the City of Albuquerque's Office of Emergency Management.

9.     I hold a B.S. in Criminal Justice from the University of Dayton, a Master of Military Art and Science from U.S. Army Command and General Staff College and the U.S. Army School of Advanced Military Studies, and a Master's degree in National Security and Strategic Studies from the College of Naval Warfare, where I graduated with the highest distinction.

10.    A copy of my curriculum vitae is attached as **Exhibit A** to this Report.

11.    I have been retained by the California Department of Justice to serve as an expert witness in this case. I am being compensated at a rate of $200 per hour.

## OPINIONS

12.    I have reviewed the statutory definitions of an "assault weapon," as defined under California's Assault Weapons Control Act (AWCA) in California Penal Code section 30515(a).[3] Under Penal Code section 30515(a), a semiautomatic centerfire rifle that does not have a fixed magazine qualifies as an assault weapon if it has any of the following features: (1) a pistol grip that protrudes conspicuously beneath the action of the weapon; (2) a thumbhole stock; (3) a folding or telescoping stock; (4) a grenade or flare launcher; (5) a flash suppressor; or (6) a forward pistol grip.[4] A semiautomatic centerfire rifle also qualifies as an assault weapon if it is equipped with a fixed magazine with the capacity to hold more than 10 rounds or has an overall length of less than 30 inches.[5] I have also reviewed the list of rifles that qualify as "assault weapons"

---

[3] See Cal. Penal Code § 30515, https://bit.ly/3CtxfEj.

[4] Cal. Penal Code § 30515(a)(1)(A)-(F).

[5] Cal. Penal Code § 30515(a)(2)-(3).

under California Penal Code § 30510(a), which have many of the same features and accessories listed in § 30515(a).

13.     I am familiar with the features, accessories, and capabilities of rifles regulated by Penal Code § 30515(a).  The AR-15, like the M4, is an offensive combat weapon system.  The only difference is the AR-15 cannot fire on full-auto (continual shots fired in succession so long as the trigger is pulled) or burst (several shots fired in succession with a single pull of the trigger)—a picayune difference that cannot serve to support a non-combat role for the AR-15.  In my experience, soldiers are trained to set select-fire weapons to semi-auto mode, so that a single round is fired with each pull of the trigger.  An M4 or M16 on full-automatic is an area fire weapon: the auto rate of fire makes the weapon too difficult to control on a point target.  Rifle fire on full automatic is not aimed fire, uses an excessive amount of ammunition and will damage the weapon if used too often.  In fact, in my 14 months of combat, I did not once see an M4 or M16 fired on full auto.  Semi-auto function is used almost exclusively in combat.  When operated in semi-auto mode, the AR-15 and M4 share the same rates of fire, the same maximum effective range, the same maximum range, use the same magazines designed for combat and the same ammunition.  The AR-15 and M4 are both designed to fire a .223 round that tumbles upon hitting flesh and rips thru the human body.  A single round is capable of severing the upper body from the lower body, or decapitation.  The round is designed to kill, not wound, and both the AR-15 and M4 contain barrel rifling to make the round tumble upon impact and cause more severe injury.  The combination of automatic rifle and .223 round is a very efficient killing system.  The same can be said of the AR-15.

14.     Automatic rifles, like the M-16 and its more modern carbine variant M4, are functionally similar to semiautomatic rifles regulated under California's AWCA and  often are equipped with the very same features, like pistol grips and adjustable stocks.  It is my opinion, based on my military service, that these

features, individually and in combination, make semiautomatic rifles more lethal and most useful in combat settings, as described in more detail below.

15. <u>Detachable magazines</u>:  In order for a rifle to qualify as an assault weapon under California Penal Code § 30515(a), the rifle must have the capability of accepting a detachable ammunition magazine (by not having a fixed magazine). Detachable magazines improve the killing efficiency of automatic rifles, allowing the combat rifleman to efficiently carry a combat load of 120 rounds in four 30-round magazines, to rapidly change magazines in combat, and to increase killing efficiency by significantly reducing reload time.  Changing magazines during intense combat is the most important individual skill taught to Marines.  During intense combat, the detachable magazine provides a rifleman the capability to fire 120 rounds on semi-automatic in three minutes at a high-sustained rate of 45 rounds per minute.  In a civilian self-defense context, by contrast, an individual would not have a need for such a high rate of fire.

16. <u>Pistol grip protruding beneath the action of a rifle</u>:  I am a 15th Award Expert on the M16 and M4.  I carried an M4 every day for 14 months during my time in command of RCT-7 in Iraq.  I used an M4 in combat, and I killed with it. The pistol grip beneath the action of an automatic rifle serves only two purposes. First, the pistol grip allows the rifleman to pull the rifle into her shoulder with each shot, an action which increases stock weld, reduces semi-automatic/automatic recoil, and reduces barrel rise.  Stock weld or cheek weld refers to the firmness of the contact between the rifle stock, the shooter's cheek, and the shooter's shoulder. A firm stock weld is required for effective semi-automatic and automatic rapid fire. Absent any pistol grip, a semi-automatic rifle would be difficult to operate when fired rapidly, as the rifle barrel would seesaw up and down with each shot fired in succession.  Second, the pistol grip functions as a hand rest to reduce hand/finger fatigue during long combat engagements.  Both actions increase the killing

efficiency of automatic rifles and are necessities in sustained combat operations of weeks or months when firing a rifle rapidly.

17.  Forward pistol grip:  The forward pistol grip provides leverage to tighten a stock weld on short barrel automatic weapons and reduces recoil and barrel rise on short barrel automatic rifles.  Forward pistol grips were added to the M4 to increase M4 killing efficiency.

18.  Folding stock:  A folding stock causes weapon instability.  For that reason, folding stock automatic rifles are designed for military personnel, whose primary weapon is vehicle or air-mounted (tank, Bradly, Apache), who may be required to escape from a mangled vehicle, or who may need to abandon a destroyed weapon system and need a substitute weapon for offensive combat. Outside of the military context, folding stocks that are not properly locked in place can cause significant safety risks to the shooter due to recoil.

19.  Grenade or flare launcher:  A Marine Corps fireteam consists of a fireteam leader, a rifleman, an assault gunner, and a grenadier.  The grenadier is armed with a grenade launcher.  The grenadier uses the grenade launcher to suppress or kill human beings so the rest of the fireteam can maneuver into position to kill those humans with automatic rifle fire.  The launcher is a separate weapon system attached to as few rifles as possible dependent on the combat mission.  In my experience, grenade launchers attached to rifles are cumbersome, difficult to aim, difficult to carry, and are not as effective as a standalone grenade launcher. They have no legitimate use in self-defense.

20.  Flash suppressor/flash hider:  The purpose of the flash suppressor is to reduce combat signature by cooling and dispersing burning gases.  This makes it more difficult for the enemy to pinpoint a rifleman's location, especially in low light conditions.  The flash suppressor facilitates night combat operations by reducing muzzle flash and mitigating muzzle flash impact on night vision goggles.

This accessory serves specific combat-oriented purposes and is not needed for self-defense.

21.     <u>Fixed magazine with the capacity to accept more than 10 rounds</u>: Automatic rifles are offensive combat weapons systems designed to kill efficiently and effectively.  Any increase to magazine capacity increases the killing efficiency of the automatic rifle.  A 30-round fixed magazine can fire more rounds in a given amount of time than three 10-round detachable magazines, which would need to be reloaded to fire the same number of rounds, slowing down the rate of fire.  Similarly, a 100-round drum magazine can fire more rounds in a given period of time than ten 10-round detachable magazines.  As noted above in connection with detachable magazines, an individual using a rifle in self-defense would not need such a high, continuous rate of fire.

22.     The AR-15 is an offensive combat weapon no different in function or purpose than an M4.  In my opinion, both weapons are designed to kill as many people as possible, as efficiently as possible, and serve no legitimate sporting or self-defense purpose.  Self-defense and military combat are different.  The weapons and accessories needed in one may not be needed or appropriate in the other.  For instance, when I was serving in the military, I carried my M4 for offensive combat and a handgun for self-defense.  Defensive combat is generally up close and very personal.  At that range, it is very difficult to use a rifle as a defensive weapon, except as a blunt force instrument.  My 9mm pistol was the self-defense weapon of choice, and we were trained to expend only 1-2 rounds per adversary in pistol combat.  The features identified in California Penal Code § 30515(a) enhance the lethality of both semiautomatic and automatic rifles and are most appropriate for combat applications when used in conjunction with those types of weapons systems.

8

1     I declare under penalty of perjury that the foregoing is true and correct.

2     Executed on January 6, 2023 at Sandia Park, New Mexico

_____

Col. (Ret.) Craig Tucker

9

# EXHIBIT A

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
[catucker@protonmail.com](mailto:catucker@protonmail.com)
505-504-4289

**CITY OF ALBUQUERQUE OFFICE OF EMERGENCY MANAGEMENT (07/2021-PRESENT)**

- <u>Training and Education Coordinator/Acting Senior OEM Planner</u>
    - Coordinate with County and State agencies to develop training and exercise programs that prepare the City of Albuquerque to mitigate, respond to, and recover from disasters.
    - Develop response plans for wildfire, flood, earthquake, and weapons release and test the plans in tabletop exercises and drills.
    - *In coordination with Albuquerque Public Schools developed and executed a school drill assessment/evaluation program.*
    - *Created, developed, and initiated training for APS, APD, and AFR on a doctrinal, best-practices-based approach to "Command and Control, Active Shooter, in a School, School in Session"*
    - Develop a training and exercise program to meet FEMA National Qualification Standards.
    - Serve as the Operations Chief for EOC activations and training.
    - Responsible for Plans updates and revisions, including a rewrite of the CABQ Comprehensive Emergency Management Plan.
    - Write and manage OEM Grants, including SHSGP, EMPG and Hazard Mitigation Grants.

**RAVENSWOOD SOLUTIONS INC. (10/2019 – 06/2021)**

- <u>Program Manager, US Marine Corps Operations</u>

    - Provide subject matter expertise and develop capture plans to provide live, virtual, and constructive capabilities in support of the Commandant's Planning Guidance.

    - Project Manager for Ravenswood Solutions live-instrumented training and AAR support to MAGTF Warfighting Exercise-20 (MWX 20), the largest instrumented exercise in USMC history.

    - Co-authored White Paper on the application of machine-learning and Artificial intelligence to support unit readiness reporting.

    - Provided subject matter expertise to support ML/AI Wargaming prototype development.

-

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- <u>Project Director, Middle East Operations</u>

  o Lead planner and primary proposal author of a of a multi-corporation proposal to develop an 800-structure urban live fire and maneuver range in a Gulf Coast Coalition country.

  o Lead planner and primary proposal author of a multi-corporation proposal to develop a comprehensive training program for an emergent Marine Corps in a Gulf Coast Country.

- <u>Program Manager, National Security Operations</u>

  o Provide subject matter expertise, develop, and supervise training services in support of Department of Energy nuclear security and non-proliferation operations.

- <u>Independent Contractor (01/2022 – 06/2022)</u>

  o Acted as the Ravenswood Solutions Inc. US Marine Corps subject matter expert.

  o Acted as the Ravenswood Solutions Inc., training and leadership subject matter expert.

**INNOVATIVE REASONING, LLC  (08/2012 - 09/2019)**

- <u>Director, Studies and Analysis</u>

  o Provided analyses, recommendations and participated as the senior tactical SME in support of the following Marine Corps Combat Development Command requirements.

    • Development of the U.S. Marine Corps post-war on terror Training Strategy.

    • Development of an adaptive planning capability employing multi-agent modeling, experiential learning theory, and machine learning.

    • Improving Small Unit Leader Decision-making through training in Recognition Primed Decision-making and experiential learning theory.

    • Chaired US Marine Corps 3d Annual Maneuver Warfare Conference (2018).

- <u>Director, Federal Programs</u>

  o Provided direction, supervision, and oversight to 5 program managers assigned to DOD and Department of Energy contracts in the United States and overseas.

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- <u>Program Director, Law Enforcement Tactical Decision-making</u>

  - Created, certified, and taught tactical decision -making courses focused on making decision in high risk, low occurrence, fast moving circumstances with risk of death, serious injury.

  - Developed and taught 400+ series of National Incident Management Courses to support local law enforcement requirements.

**DEPARTMENT OF ENERGY (09/2006 – 07/2012)**

- <u>Render Safe, Program Manager (SES)</u>

  - Responsible for the Department of Energy (DOE) operational elements conducting nuclear counterterrorism and nuclear accident response in support of Tier 1 elements.

  - Responsible for organizing, resourcing, developing, and executing crisis response render-safe operations in support of Presidential and National Security policy.

- <u>Assistant Deputy Administrator (SES), Office of Secure Transportation (OST)</u>

  - Responsible for the safe and secure transportation of nuclear weapons, materials, and components in the continental United States.

  - Acted as the Senior Energy Official and National Nuclear Security Administration Incident Commander for incidents involving OST assets and during DHS-directed NIMS National Training Programs

  - Provided leadership, vision, and direction to a 1000+ mixed para-military and civilian workforce.

  - Developed and implemented innovative security practices focused on intelligence-driven operations, leadership, and performance-based approach to training. Resulting security Doctrine provided a blueprint for significant changes to DOE physical security doctrine.

  - Provided astute and responsible management of a $270 million budget.

**UNITED STATES MARINE CORPS (06/1981- 08/2006)**

- <u>Director of Training, Tactical Training Exercise Control Group (TTECG)</u> (07/2005-08/2006)

  - Selected by the Commandant to rebuild and lead the Marine Corps

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

Service-level pre-deployment training program.

- Responsible for the successful integration of emergent and innovative urban operations with conventional combined arms operations. Trained organizations from the US and numerous allied countries.

- Managed a training budget of $30 million. Developed and implemented new approaches to training to maximize effective use of increased training budget. Increased the number of Marines/units trained per year and successfully integrated complex, multi-discipline training requirements into a coherent, effective training program

- Commanding Officer, Regimental Combat Team 7 (RCT-7) (06/2003 - 07/2005)

  - Commanded U.S. Marine Corps Regimental Combat Team 7 during Operation Iraqi Freedom II.  Tour included 14 months of continuous combat command in Al Anbar Province.

  - Commanded RCT-7 during major urban combat operations to include battles of Fallujah I, Al Fajr (Fallujah II), Husaybah, Ramadi, and Hit.

  - Developed and implemented successful strategic plans for reconstruction of western Iraq; managed over $200 million in construction and procurement contracts. Responsibilities included establishing border security, counter-terrorism operations, infrastructure development, and security forces training.

  - Acted as Superintendent for an elementary school system consisting of 12 elementary schools throughout Al AnBar province. Constructed the schools, hired teachers, hired administrators, and provided safety and security for students, teachers, and staff.

  - Responsible for the Force Protection and security of US bases and approximately 20,000 military and contractor personnel.

- Director of Operations, Training and Education Command (06/2002-05/2003)

  - Responsible for the Marine Corps' training programs, with an 80,000+ personnel annual throughput.

  - Developed and successfully initiated programming and procurement for the Marine Corps' 10-year range modernization and instrumentation plan. Established and chaired Range Instrumentation Working Group.

  - U.S. Marine Corps Service-level representative to the OSD working group responsible for developing training transformation strategies.

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
[catucker@protonmail.com](mailto:catucker@protonmail.com)
505-504-4289

- Successfully led USMC effort to meet the congressionally mandated requirement to replace Vieques Island with a CONUS based amphibious live-fire training capability within the year.

o Commander, 2nd Battalion,7th Marine Regiment,

o Director of Operations, 7th Marine Regiment.

o Director of Operations, 13th Marine Expeditionary Unit (13th MEU).

- Responsible for leadership and performance of a task-organized team with 1000+ members.

- Served as primary planner in Naval and Joint crisis action planning and execution, to include the development of training plans, equipment procurement, and exercise development for the organization's worldwide contingency operations.

o Operations Planner, I Marine Expeditionary Force (I MEF). Primary planner and architect for a multi-national effort to rewrite the operations plan for defense of the Republic of Korea.

o Commander, Presidential Security Force, Camp David, MD

- Commanding Officer of Marine Corps Detachment responsible for the security of the Presidential Retreat at Camp David.
- Successfully balanced a 33% reduction in force structure with implementation of an innovative physical security plan that integrated personnel reductions, new technologies, and manpower, while increasing the security posture.

o Commanding Officer:
- Weapons Company, Marine Infantry Battalion. (1988-1989)
- Infantry Company, Marine Infantry Battalion. (1986-1988)
- Guard Company, Nuclear Weapons Security, Adak, AK. (1984-1986)
- Headquarters Company, Supply Battalion. (1983-1984)

**AWARDS**
(2) Legions of Merit with Combat Valor device, Purple Heart, Navy Commendation Medal for Heroic Action, Combat Action Ribbon, (7) Sea Service Deployment Ribbons, numerous other awards, and

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289
decorations.


**PAPERS**

- "On Demand Readiness for Army Commanders Through AI and Machine Learning" (2020) (White Paper for Army Applied Laboratory and the Office of Naval Research. (co-authored with SOMETE Technology and Lockheed Martin)

- "Band of Brothers: The 2D Marine Division and the Tiger Brigade in the Persian Gulf War" An Analysis of the Impact of Organizational Culture on Tactical Joint Warfare (School of Advanced Military Studies, US Army Command and General Staff College)

- "False Prophets: The Myth of Maneuver Warfare and the Inadequacies of FMFM 'Warfighting'" (School of Advanced Military Studies, US Army Command and General Staff College,

- "Towards an Intellectual Component to Joint Doctrine: The Philosophy and Practice of Experiential Intelligence" (Naval War College)


**EDUCATION**

- B.S. Criminal Justice, University of Dayton
- MMAS, U.S. Army Command and General Staff College
- MMAS, US Army School of Advanced Military Studies
- MA, National Security and Strategic Studies, College of Naval Warfare (Highest Distinction)

# EXHIBIT 3

**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

    Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

    Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> TINA KOTEK, et al., <br><br> Defendants, <br><br> and <br><br> OREGON ALLIANCE FOR GUN SAFETY, <br><br> Intervenor-Defendant. | Case No. 2:22-cv-01815-IM (lead case) <br> 3:22-cv-01859-IM (trailing case) <br> 3:22-cv-01862-IM (trailing case) <br> 3:22-cv-01869-IM (trailing case) <br><br> **DECLARATION OF KEVIN SWEENEY** |

**Page 1 -  DECLARATION OF KEVIN M. SWEENEY**

MARK FITZ, et al.,

Plaintiffs,

v.

ELLEN F. ROSENBLUM, et al.,

Defendants.

KATERINA B. EYRE, et al.,

Plaintiffs,

v.

ELLEN F. ROSENBLUM, et al.,

Defendants,

and

OREGON ALLIANCE FOR GUN SAFETY,

Intervenor-Defendant.

DANIEL AZZOPARDI, et al.,

Plaintiffs,

v.

ELLEN F. ROSENBLUM, et al.,

Defendants.

## DECLARATION OF KEVIN M. SWEENEY

I, Kevin M. Sweeney, declare the following:

1.       I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.       I am a Professor of History *emeritus* at Amherst College.  From 1989 to 2016, I taught history and American Studies at Amherst.   I regularly offered courses on colonial American history, the era of the American Revolution, and early American material culture, which focused on studying the production and use of home furnishings and other artifacts in common use

**Page 2 -   DECLARATION OF KEVIN M. SWEENEY**

dating from the 1600s, 1700s, and early 1800s.  During these years, in my own research on

material culture, I made use of colonial-era probate inventories to study such topics as home

furnishings in an effort to discover what types of possession were commonly found in households,

to measure changes in standards of living, and to gain insights into domestic architecture.[1]  I also

examined critically and wrote about the strengths and weaknesses of these sources, their

usefulness and pitfalls.[2]  For decades, historians who are aware of these records' usefulness and

their limitations have used estate inventories to study agricultural changes in England, wealth and

social structures in England and its colonies, the institution of slavery in colonial American and

the lives of slaves, and household possessions in America, England, and France.[3]

3.     My current research on seventeenth and eighteenth-century firearms and militias

utilizes similar types of methodologies, documentary sources, and period artifacts.  This project,

which has been going on for over a decade, was initially inspired by my skepticism of the

controversial claims and pretended use of evidence from probate inventories in Michael A.

Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A.

Knopf, 2000).  As part of my on-going project, I have given papers at the annual meetings of the

American Historical Association and the Organization of American Historians, at conferences on

firearms and society at Stanford and Wesleyan Universities, and elsewhere, and published two

essays "Firearms Militias, and the Second Amendment" (2013) and "Firearms Ownership and

---

[1] Kevin M. Sweeney, "Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800 in *Material Life in America, 1600-1860,* Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-261-290.

[2] Kevin M. Sweeney, "Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987*, Peter Benes, editor (Boston: Boston University Press, 1989), 32-40.

[3] Some notable examples which also contain informed observations on the use of probate inventories, their biases, and how to deal with the biases see: James Horn, *Adapting to a New World: English Society in the Seventeenth-Century Chesapeake* (Chapel Hill: University of North Carolina Press, 1994); Gloria L. Main, *Tobacco Colony: Life in Early Maryland, 1650-1720* (Princeton: Princeton University Press, 1982), esp. 49, 282-286171-174; Philip D. Morgan, *Slave Counterpoint: Black Culture in the Eighteenth-Century Chesapeake & Lowcountry* (Chapel Hill: University of North Carolina Press, 1998); Carole Shammas, *The Pre-Industrial Consumer in England and America* (Oxford: Oxford University Press, 1990). esp. 19-20; Lorna Weatherill, *Consumer Behaviour & Material Culture in Britain 1660-1760*, 2nd. ed. (London: Routledge, 1996), esp. 201-207.

**Page 3 -   DECLARATION OF KEVIN M. SWEENEY**

Militias in Seventeenth- and Eighteenth-Century England and America" (2019).  A third essay is forthcoming on **"Revolutionary State Militias in the Backcountry and Along the Frontiers,"** and I am currently working on a fourth essay as well as working on a book-length manuscript.  My curriculum vitae, detailing my education, experience, and publications, is attached to this declaration as **Exhibit A**.

4.      I have been retained by the State of Oregon Defendants to provide an expert opinion on repeating firearms in eighteenth-century America.  I make this declaration on the basis of my training, professional expertise, and research.  For my work in this case, I am being compensated at a rate of $50 per hour.

5.      During the 1700s, most gun owners in the British American colonies and in the newly independent republic of the United States possessed and used single shot, muzzle-loading, flintlock firearms.  As Harold Peterson stated in his classic 1956 book -- *Arms and Armor in Colonial America, 1526-1783:*"The period began in 1689 with the muzzle-loading smooth-bore musket and pistol as the most popular weapons.  In 1783, almost a hundred years later, the period ended with the same weapons [i.e. muzzle-loading smooth-bore muskets and pistols] still supreme, and without even any notable improvements in their design or construction."[4]  Peterson continued: "Breech-loaders and repeaters had appeared frequently on the scene but had made little impression upon it."[5]

6.      Evidence compiled during a decade of research using eighteenth-century probate inventories, militia muster lists, newspapers, and other documentary sources confirms the validity of Peterson's basic conclusions while offering three minor modifications.  First, these weapons described by Peterson [i.e., the muzzle-loading smooth-bore musket and pistol] were still "supreme" in 1800 and probably as late as 1810.  Second, most muzzle-loading, flintlock long arms that were privately owned and used during this period were not muskets, but lighter firearms that were usually cheaper and had narrower bores than did muskets.  Finally, it is more accurate to

---

[4] Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (Harrisburg, Penn.: Stackpole Publishing 1956), 221.

[5]      *Ibid.*, 221.

**Page 4 -   DECLARATION OF KEVIN M. SWEENEY**

say that repeaters had *occasionally* appeared on the scene and not "frequently" as Peterson believed.  Here, he was probably misled by the preference that private collectors and institutional collections had (and still have) for obtaining rare examples of unusual or innovative firearms.

## I.     Firearms Owned By Eighteenth-Century Americans

7.     Today, we tend to refer to any muzzle-loading eighteenth-century gun as a musket, and this is what Peterson did in the statement quoted above.  However, Peterson knew better, as did Ben Franklin.  In the mid-1740s, Franklin informed the readers of his Philadelphia newspaper that a "Musket" was "the Name of a particular Kind of Gun."[6]  An eighteenth-century musket was a sturdy, muzzle-loading military firearm that fired a single lead ball weighing about an ounce, had a sling for ease of carrying on long marches, and had a lug near the muzzle for attaching a bayonet.  It weighed about 10 to 11 pounds and was .69 caliber in its bore if French or .75 caliber if English, with an average barrel length of 44 inches.[7]  On a battlefield, a musket was more than just a firearm: because of its weight and sturdy construction and because of its bayonet, a musket also functioned as a club and a spear.  These capabilities were integral to its role as an eighteenth-century military arm.  The combination of these features and capabilities made a musket "a Universal Weapon."[8]

8.     Eighteenth-century muskets did have two serious drawbacks which they shared with all flintlock, muzzle-loading smoothbores.  First, their accuracy and range were limited.  The round ball fired by these weapons was not very aerodynamic, and this produced a great deal of drag that reduced its velocity.  A musket's smooth-bore barrel also lacked rifling, which were spiral grooves cut inside the barrel.  When a ball traveled down a barrel with rifling, the grooves imparted a spin to the ball that stabilized and flattened its trajectory, increasing its distance and accuracy.  (The effect of rifling on a rifle ball's flight can be compared to throwing a spiral pass

---

[6]     "Form of Association" in *The Papers of Benjamin Franklin*, ed., Leonard W. Labaree, et al., 40 volumes to date (New Haven: Yale University Press, 1959-), Vol. 3, 208.

[7] Author's estimate of barrel averages calculated from data found in George C. Neumann, *Battle Weapons of the American Revolution*, (Texarkana, Texas: Scurlock, 1998), 121-141.

[8] Stuart Reid, *The Flintlock Musket: Brown Bess and Charleville 1715-1865*(Oxford: Osprey, 2016), 61, 55-60.

**Page 5 -   DECLARATION OF KEVIN M. SWEENEY**

in football which also flattens trajectory and improves accuracy.)  While a smooth-bore musket may have been just as accurate as an eighteenth-century muzzle-loading rifle at distances of up to 50 yards, most authorities agree that a musket was not very accurate at ranges beyond 100 yards.[9]  Today, pistols and most long arms other than shotguns have rifled barrels.

9.      Loading and reloading eighteenth-century muskets was a complicated and relatively slow process by today's standards.  To load a musket, a shooter held it in front of him parallel to the ground, pulled back the gun's cock to its half cock position to prevent a premature discharge, and then took from a cartridge box an individual paper cartridge that contained a pre-measured load of gunpowder and a ball.  Next one opened the priming pan, bit the cartridge and poured a small amount of powder into the priming pan which was then closed shut.  Following this, the shooter placed the musket upright on the ground and poured the remainder of the cartridge's gun powder down the barrel, and then crammed the paper cartridge with its ball into the barrel.  (The cartridge's paper wrapper served as wadding, holding the ball in place.)  A ramrod was used to push the cartridge paper and ball down the barrel, after which the ramrod was recovered and secured in its resting place under the barrel.  The musket was then raised, placed on full cock, aimed, and the trigger pulled.  Pulling the trigger released the cock, which held a flint that moved forward, striking a steel frizzen, creating sparks that ignited the powder in the priming pan which in turn ignited the charge of powder placed in the barrel, creating an explosion that—finally—discharged the musket ball.  As a rule, a musket could realistically be loaded and fired two or three times a minute in combat by well-equipped and trained soldiers.[10]

10.      The process of loading and reloading a musket took even longer if instead of using a prepared paper cartridge, one used gunpowder from a powder horn to prime the pan and

---

[9] Reid, *Flintlock Musket*, 34.  For a claim that a rifle had an advantage over a musket at distances greater than 50 yards see John F. Winkler, *Point Pleasant, 1774: Prelude to the American Revolution* (Oxford: Osprey, 2014), 29.  For a claim that a rifle and a musket were equally accurate at 100 yards see Alexander Rose, *American Rifle, A Biography* (New York: Delta Trade Paperbacks, 2009), 20.

[10] Jeremy Black, *European Warfare, 1660-1815* (New Haven: Yale University Press, 1994), 40; Hew Strachen, *European Armies and the Conduct of War* (London: George Allen & Unwin, 1983), 17.

Page 6 -   DECLARATION OF KEVIN M. SWEENEY

then poured into the horn's measuring cap the amount of powder needed to charge the barrel. With this procedure one also had to remove an individual musket ball from a shot pouch and place it in the barrel after pouring down the measured charge of powder.  The ball was then rammed home.  Using this method of loading not only took longer, but also lacked the wadding provided by a paper cartridge which helped hold the ball in place.  According to the results of one modern test, wadding also increased a smoothbore's muzzle velocity by about 30%.[11]  Most hunters, backwoods men with muzzle-loading rifles, and many colonial militiamen lacked cartridge boxes and paper cartridges and instead used powder horns and shot bags.

11.     Even with these drawbacks, colonial governments and later state governments armed troops with these muskets during the French and Indian War (1754-1763) and the Revolutionary War (1775-1783).  There really weren't serious alternatives.  As a result, the British Ordnance Office loaned colonial governments 22,000 muskets to arm provincial troops raised for active service in the field during the French and Indian War, and at least 100,000 European muskets—most of them French—were imported during the American War for Independence.[12]  During the French and Indian War, the British also sent muskets to arm Georgia and North Carolina militiamen who lacked arms, and state governments sometimes provided arms for mobilized militiamen during the Revolutionary War.[13]

12.     As a rule, American colonists preferred lighter firearms that were better suited than muskets for pest control, birding, or hunting.  Especially popular in New England were locally made or imported smoothbore and fusils that weighed only 6 to 7 pounds and had narrower bores of .60 to .65 caliber, with average barrel lengths of 50 inches.[14]  The narrower

---

[11] Glenn Foard, *Battlefield Archaeology of the English Civil War* British Series 570 (Oxford: British Archaeological Reports, 2012), 105.

[12] De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I.: Mowbray, 2009), 120-123; George D. Moller, *American Military Shoulder Arm*s, 2 volumes (Albuquerque, N.M., 2011), Vol. 1, Appendix 5, 484-485.

[13] Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, eds. *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of Massachusetts Press, 2013), 335, 348, 351-352.

[14] Author's estimate of barrel averages calculated from data found in Neumann, *Battle Weapons of the American Revolution*, 150-166.

**Page 7 -   DECLARATION OF KEVIN M. SWEENEY**

bores used smaller and lighter projectiles, required less powder for each shot, and thus reduced the weight of the lead ammunition one carried.[15]  Some New England fowlers could outrange muskets and some were modified to carry a bayonet.[16]  However, because of their lighter weights and sleeker construction, they were not necessarily as sturdy or as "soldier-proof" as a musket nor as effective as a club.

13.     Many residents living in the colonies stretching from New York to Virginia owned "trade guns."  These were inexpensive, muzzle-loading, single shot, smooth-bore firearms designed and produced for trade with Native Americans.  Some of these guns weighed as little as 5.5 pounds, had bores of .57 to .62 caliber, and barrels only 36 to 40 inches long.[17]  Because of these features, they were much easier to handle than a musket and employed about half the weight of lead and powder than compared to a musket for each shot.  However, these light, often cheaply constructed firearms did not function well as clubs and were not designed to carry a bayonet.

14.     In the backcountry of Pennsylvania and the colonies further south there was a distinct minority of men who owned more expensive locally made long rifles.  As a rule, these firearms weighed from 7 to 8 pounds, had .58 to .62 caliber bores—though some were even smaller—and barrels averaging 42 inches in length, and fired projectiles weighing much less than musket balls.[18]  Because of the barrel's rifling, these guns were more accurate than smoothbore muskets and outranged them.  However, they took more time to reload because riflemen had to use powder horns and bullet pouches instead of paper cartridges, and reloading became harder as

---

[15] Steven C. Eames, *Rustic Warriors: Warfare and the Provincial Soldier on the New England Frontier, 1689-1748* (New York: New York University Press, 2011), 121-122; Neumann, *Battle Weapons of the American Revolution*, 206-210.

[16] Douglas D. Scott, et al., "Colonial Era Firearm Bullet Performance: Live Fire Experimental Study for Archaeological Interpretation" (April 2017), 26, 36; Tom Grinslade, *Flintlock Fowlers: The First Guns Made in America* (Texarkana, Texas: Scurlock Publishing 2005), 59,72, 73, 75.

[17] M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1497-1792* (Washington, D.C.: Smithsonian Institution Press, 1980), 283; Neumann, *Battle Weapons of the American Revolution*, 203-205.

[18] Author's estimate of barrel averages calculated from barrels lengths of individual muskets given in Neumann, *Battle Weapons of the American Revolution*, 215-225.

**Page 8 -   DECLARATION OF KEVIN M. SWEENEY**

gunpowder residue built up in the grooves of the barrel's rifling.[19]  Additionally, these long rifles were not designed to take a bayonet, and they could break if used as a club.

15.     Muzzle-loading pistols were not as popular as long arms which—as experts have pointed out—"could economically be used dually for protection and hunting."[20]  Pistols were therefore found in only a minority of eighteenth-century probate inventories (Table 1).  It took about 15 seconds to reload a pistol, and as a result, they were often made in pairs "so that the owner might have two shots at his command."[21]  Instead of taking time to reload a pistol on a battlefield, cavalry troopers used discharged pistols as clubs or threw them at enemy cavalrymen.[22]  As it was, period pistols were discharged in close proximity to their targets because their low muzzle velocity of 330-440 f/s limited the range and impact of their projectiles.  By comparison, muzzle velocities produced by reproductions of eighteenth-century muskets (780 f/s to 870 f/s), fowlers (1160 f/s to 1444 f/s) and rifles (1195 f/s to 1320 f/s) are much higher.[23]

16.     Civilian officials and military officers generally had a low opinion of trade guns, fowlers and even the period's American-made long rifles.  During the French and Indian War, firearms in use in New Hampshire were said to be "in general of the meanest Sort" while those in Connecticut "which belong to private persons [were] mostly poor and undersized and unfit for an expedition."[24]  In 1756, most of New York's militia were armed with guns "chiefly for the Indian

---

[19] John W. Wright, "The rifle in the American Revolution," *American Historical Review* Vol. 29, No. 2 (January 1924), 293-299.

[20] Jeff Kinard, Pistols: *An Illustrated History of their Impact* (Santa Barbara, CA: ABC-CLIO, 2004), 45.

[21] Harold L. Peterson, *Treasury of the Gun* (New York: Golden Press, 1962), 189.

[22] For use of muzzle-loading pistols as clubs and missiles on battlefields see C. H. Firth, *Cromwell's Army* 2nd ed. (Oxford: Oxford University Press, 1911), 142; David Blackmore, *Arms & Armour of the English Civil Wars* (London: Royal Armouries, 1990), 49.

[23] Scott, et al., "Colonial Era Firearm Bullet Performance," 26, 36; Douglas D. Scott, et al. "Firearm Bullet Performance: Phase II, Live Fire Experimental Study for Archaeological Interpretation," 31.  Both reports are available online.

[24] "Blair Report on the State of the Colonies" in Louis K. Koontz, *The Virginia Frontier, 1754-1763* (Baltimore: The Johns Hopkins Press, 1925), 170, hereafter cited as the "Blair Report"; Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755 in *Collections of the Connecticut Historical Society*, Vol. 1, 265-266.

**Page 9 -   DECLARATION OF KEVIN M. SWEENEY**

Trade," and not muskets.[25]  Later, George Washington referred to such smooth-bore long arms as "trash or light arms."[26]  Over the course of the Revolutionary War, he and his officers even phased out the use of rifles in the Continental Army, rearming soldiers with muskets fitted with bayonets.[27]  Governor Thomas Jefferson characterized most of the privately owned smoothbore guns carried by his state's militiamen as "such firelocks [i.e. flintlocks] as they had provided to destroy noxious animals which infest their farms."[28]

17.     Data drawn from group of probate inventories of males who died during the second half of the eighteenth-century confirm these period observations concerning the preferences of American gun owners (Table 1).  These sources can be particularly useful and quite reliable for assessing the preferences of period gunowners for different types of firearms.  Even cursory descriptions of firearms as "a gun" can be revealing when combined with the price that individuals taking the inventory assigned.  Most guns in the inventory were long arms valued at £1 (i.e. 20 shillings), which was the usual cost of a single shot muzzle loading firearm.  Such weapons would have been affordable given the fact that a daily wage during the period for unskilled day labor usually varied between 1 and a half and 2 shillings.  While there was an obvious preference for long arms, muskets and rifles constituted a minority of such weapons.

18.     The more expensive guns found in these 3,249 eighteenth-century probate inventories were also likely to be some type of muzzle loading, single-shot long arms.  As a rule, rifles were valued at £2 to £3, which was twice or three times the cost of common muzzle-loading smoothbore long arms.  Expensive smoothbore weapons were likely to be imported fowlers or guns ornamented with silver mountings.  Occasionally, one sees double barreled guns which, along with a pair of pistols, was the period's more realistic provision for being able to

---

[25] "Blair Report," 171.

[26] General George Washington to Gentlemen, Feb. 7, 1777 in Nathaniel Bouton, ed., *Documents and Records Relating to the State of New Hampshire during the Period of the Revolution from 1776 to 1783* (Concord, N.H.: Edward A. Jenks, State Printer, 1874), Vol. 8, 485.

[27] Wright, "Rifle in the American Revolution," 297-298.

[28] Thomas Jefferson, *Notes on the State of Virginia*, edited by William Peden (New York: W. W. Norton, 1982), 88.

**Page 10 - DECLARATION OF KEVIN M. SWEENEY**

readily discharge more than one shot.  Only one gun found in this database of 3,249 probate inventories may have been a repeater: an "air gun" owned by Philippe Guillaume Chion [Philip Williamson?], Charleston merchant, who died in 1797.[29] However, as is noted below in paragraph 40, not all air guns available in America were repeaters.

**Table 1: Firearms in Probate Inventories of Male Decedents Filed between 1740-1800**

| Region | Number of Sampled Male Inventories | Percentage of Inventories with Firearms | Percentage of Inventories with Muskets | Percentage of Inventories with Rifles | Percentage of Inventories with Pistols |
|---|---|---|---|---|---|
| New England 1740-1798 | 1057 | 46.1% | 0.8% | 0.0% | 2.8% |
| New York and New Jersey 1740-1798 | 569 | 35.0% | 1.9% | 0.5% | 5.8% |
| Pennsylvania 1740-1797 | 532 | 32.0% | 0.2% | 2.3% | 5.1% |
| Maryland and Virginia 1740-1797 | 632 | 58.4% | 1.3% | 5.1% | 9.0% |
| South Carolina 1740-1797 | 459 | 62.9% | 3.7% | 4.1% | 23.3% |
| Totals | 3249 | 46.6%* | 1.4%* | 2.0%* | 7.8%* |

**Note:** *The percentages at the bottoms of the columns are not averages of the percentages in the columns, but percentages of the total of 3249 inventories found in each category: 1514 inventories with firearms, 45 inventories with muskets, 66 inventories with rifles and 254 inventories with pistols.  **Sources:**  The sources for the probate inventories used in this table are listed in Kevin M. Sweeney, "Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Press, 2019), 70-71.

19.     Partial militia returns from the state of Virginia dating from 1781 to 1784 provide additional evidence that American consumers preferred smoothbore firearms that were not muskets.  Even though state law required "every militia-man to provide himself with arms [i.e. muskets] usual in regular service [i.e. the Continental Army] . . . this injunction was always in

---

[29] Inventory of Philippe Guillaume Choin, 1797, South Carolina Inventories and Appraisement Books, Vol. C, 1793-1800, 212-213. at Fold 3 by Ancestry https://www.fold3.com/publication/700/south-carolina-estate-inventories-and-bills-of-sale-1732-1872. <Accessed online 1/23/2023 at 6:00 P.M.>

**Page 11 - DECLARATION OF KEVIN M. SWEENEY**

differently complied with."[30]  Most did not own muskets, even in wartime.  Only about 16.7% of the privately owned long arms were muskets, while another 20.3% were rifles owned by residents of the state's western counties.[31]  By contrast, 63.0% of the privately owned long arms were smoothbores that were not muskets.[32]

**Table 2:  Partial Virginia Militia Returns Indicating Types of Arms in Use, 1781-1784**

| Year | Number of Counties | Number of public muskets | Number of private muskets | Number of private long arms* | Number of private rifles | Number of private pistols | Total Number of Guns |
|---|---|---|---|---|---|---|---|
| 1781 | 27 | 1502 | 1333 | 4225 | 1293 | 204 | 8557 |
| 1782 | 10 | 565 | 242 | 2113 | 767 | 60 | 3747 |
| 1784 | 15 | 541 | 441 | 1260 | 392 | 68 | 2702 |
| ALL | 52 | 2608 | 2016 | 7598 | 2452 | 332 | 15006 |

<u>Note</u>: *Number of "private long arms" are privately owned long arms that were not muskets and not rifles.
<u>Sources</u>: Militia Returns 1777-1784, microfilm, Accession 36929; State Government Records Collection; "General Return of Arms, Accoutrements, and Military Stores, 19th May, 1784," Accession 36912, House of Delegates, Executive Communications, Library of Virginia, Richmond

20.    A large portion of the firearms used in eighteenth-century America would have been imported from England.  At the time, most English firearms were fabricated by large-scale putting-out systems that obtained barrels from one set of suppliers, got gunlocks from other sources, and assembled the parts at yet another site where the firearms also would have been stocked by craftsmen who were woodworkers.  By the mid-eighteenth-century, gun manufacturing in Birmingham, England involved "at least thirty different 'sub-trades' or manual

---

[30]  Jefferson, *Notes on the State of Virginia*, 88.

[31]  Calculated from data in Table 2.

[32]  *Ibid.*.

**Page 12 - DECLARATION OF KEVIN M. SWEENEY**

manufacturing processes."[33] In particular, this is how firearms were made for the British army and for the export trade to Africa and England's colonies.[34]

21.    Other than American long rifles and some New England fowlers, most eighteenth-century firearms used by colonists were not likely to have been custom made or "one-off" products. During the years from 1756 to 1763, at least 36,592 firearms were imported into the thirteen American colonies from England for civilian customers.[35]  Another 18,900 trade guns were imported to sell to Native American customers.[36]  Advertisements indicate that urban gunsmiths in the colonies sold imported firearms and made use of imported gunlocks and barrels. Most of the pistols sold in the colonies were not produced in the colonies.[37]  A rare surviving account book of an inland gunsmith, John Partridge Bull of Deerfield, indicates that he made only three new guns over a period of 20 years from 1768 to 1788, while performing 452 repairs on existing firearms.[38] When it came to his gunsmithing business, this skilled craftsman may have had more in common with a twentieth-century TV repairman than he did with Samuel Colt or Eli Whitney.

## II.    References to Repeating Arms in Eighteenth-Century Media

22.    So, how common were repeating weapons in eighteenth-century America?  The short answer is not very common; they were in fact extraordinarily rare.  Information drawn from eighteenth-century advertisements and news reports found in *America's Historical Newspapers*—a searchable database of 5,000 newspapers, with 450 dating from before 1800— tells much the same story.[39]  This newspaper database was searched by entering the terms "gun,"

---

[33] David Williams, *The Birmingham Gun Trade* (Stroud, Gloucestershire, Eng.: The History Press, 2009), 21.

[34] Williams, *Birmingham Gun Trade*, 21-24; De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I: Andrew Mowbrey, 2009), 93-102.

[35] Bailey*, Small Arms*, 237.

[36] De Witt Bailey, "The Wilson Gunmakers to Empire, 1730-1832" American Society of Arms Collectors *Bulletin* No. 85, 19.

[37] Jeff Kinard*, Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 46.

[38] Susan McGowan, "Agreeable to his Genuis: John Partridge Bull (1731-1813), Deerfield, Massachusetts" (M.A. thesis, Trinity College, 1988), 5, 39-40, 74-75.

[39] *America's Historical Newspapers* (Chester, VT: Readex, 2004).

**Page 13 - DECLARATION OF KEVIN M. SWEENEY**

"musket," "fowler," "rifle," "pistol," "shot" and "militia,"  The search turned up 9 references to what appear to be repeating guns.  To the information discovered by searching period newspapers can be added one more well-known instance of an unpublicized demonstration of a repeating firearm that took place in Philadelphia in April of 1777.  This makes a total of 10 references to eighteenth-century repeaters in the period from 1720 to 1800.

23.    What do these period references to repeating guns tell us about their features and how they were employed, how they were regarded, and why they remained relatively uncommon in eighteenth-century America?  The earliest known reference in an American newspaper to a repeating firearm is reported in the *Boston News-Letter* of September 12, 1723:  "Delegates from several Nations of Indians were Entertained with the sight of a Gun which has but one Barrel and one Lock," but fired "Eleven Bullets successively in about Two Minutes" after being loaded only once.  This firearm was made by John Pimm, a Boston gunsmith, who was active in the 1720s, but had died by 1730.  This gun was not being offered for sale; no examples of a repeating long-arm by Pimm survive; it was a novelty.  There is, however, a six-shot revolver with a flint ignition system made by John Pimm in the collection of the Cody Firearms Museum at the Buffalo Bill Center of the West.[40]

---

[40] John Pimm's 1715 revolver with a hand rotated cylinder and flint priming system bears an apparent resemblance to a modern Smith & Wesson .38 caliber revolver.  Brown, *Firearms in Colonial America*, 255-256.  Cut into the rotating cylinder were six chambers into which a small amount of gunpowder and a ball could be placed.  The shooter rotated by hand the cylinder to align one of the chambers with both the barrel and firearm's hammer which held a flint.  The shooter then slid open the priming vent on the cylinder for the chamber aligned with the hammer and the barrel.  He then pulled back the hammer by hand.  Finally, pulling the trigger caused the hammer to strike the metal frizzen with the flint, creating a flash which entered the open vent on the cylinder and set off the powder in the chamber and discharged the ball.  To fire again, the shooter again rotated by hand the cylinder to align a loaded chamber with the barrel and hammer and repeated the process outlined above.  Primm's pistol could deliver six shots after being loaded once, but it was not a rapid-fire weapon, and it took time to reload the individual chambers with powder and ball.

Similar pistols and long arms with revolving cylinders moved by hand first appeared in Germany between 1490-1530.  Brown, *Firearms in Colonial America*, 50.  However, they remained rare in the American colonies, expensive, and suffered from mechanical problems because of the inability of gunsmiths to fit together the moving parts with enough precision to prevent loose powder from jamming the cylinder or producing an accidental discharge of the six chambers simultaneously.  Brown, *Firearms in Colonial, America*, 50-51; Graeme Rimer, et al., *Smithsonian Firearms: An Illustrated History,* (New York: D. K. Publishing 2014), 56.  The revolver patented by Samuel Colt in 1836 and produced in his factory in Paterson, New Jersey

**Page 14 - DECLARATION OF KEVIN M. SWEENEY**

24.    The next reference in an American newspaper to a repeating firearm is contained in an advertisement in the March 2, 1730 issue of Boston's *New-England Weekly Journal*.  It was for a firearm employing an uncertain type of mechanism that made it possible to fire a succession of twenty projectiles "at once Loading."  This advertisement also makes clear the novelty of such a repeating firearm.  Samuel Miller, a Boston gunsmith, was charging Boston residents 9 pence each just to see the gun and 2 shillings—the equivalent of a day's wage of unskilled labor—to see it fired.  Basically, this gun was being used in an eighteenth-century version of a sideshow.  There is no indication that Miller was producing or selling such firearms.

25.    However, in the *Boston Gazette* for April 12, 1756, gunsmith John Cookson advertised for sale a gun capable of firing 9 bullets in rapid succession.  It was "A handy Gun of 9 and a half Weight; having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said Gun will fire 9 Times distinctly, as quick, or slow as you please, which one turn with Handle or the Said Gun, it doth charge the Gun with Powder and Bullet, and doth prime and shut the Pan, and cock the Gun."  The advertisement provides a spot-on description of three repeating firearms found in the collections of the Milwaukee Public Museum, Royal Armouries Museum in Leeds, and the Victoria and Albert Museum in London that were all produced sometime around 1690 by John Cookson, an English gunsmith.[41]  These were expensive and heavy firearms that weighed about 9 and a half pounds unloaded and over 10 pounds when loaded with 9 balls and powder charges.

26.    Cookson's English repeater employed what was known as the Lorenzoni breech-loading system.[42]  This system placed at the breech-end of the barrel a complex and delicate

---

employed percussion caps in its priming system and remains the first practical revolver to enter production.  The cylinder rotated when the gun was cocked and fired when the trigger was pulled.  However, even sales of this mechanically successful firearm were insufficient to prevent the bankruptcy in 1843 of Colt's first gun manufactory.  See Peterson, *Treasury of the Gun*, 211.

[41] Brown, *Firearms in Colonial America*, 144-146; David S. Weaver and Brian Goodwin, "John Cookson, gunmaker," *Arms & Armour*, Vol. 19 (June 2022), 43-63.

[42] Sometime around 1660 Michele Lorenzoni, a Florentine gunmaker, produced a repeating flintlock firearm that employed a lever system to feed into the breech powder and shot.  His firearm drew upon earlier versions of this system developed by Giacomo Berselli, another Italian gunsmith, who had built upon earlier innovations by gunsmiths, Peter and Mathias Kaltoff.  Brown, *Firearms in Colonial America*, 105-107, 144-145; Peterson, *Treasury of the Gun,* 229-231.

**Page 15 - DECLARATION OF KEVIN M. SWEENEY**

gunlock operated by a handle or lever attached to the left side of the lock. Separate tubes in the stock of the firearm were filled with priming powder, gunpowder for each charge, and 9 to 11 balls. The shooter pointed the gun barrel towards the ground and pushed the handle or lever down and forward, which rotated a mechanism located inside the gun lock that simultaneously brought forward one ball, enough gunpowder to discharge it, and enough primer to set off the charge in the barrel when the trigger was pulled. To recharge and again fire the gun, the shooter again pointed the barrel towards the ground, pushed on the lever and then pulled the trigger. If the parts of the gun lock did not fit tightly or if the shooter failed to lock it in the proper position when firing, flame might leak back and explode the black powder stored in the butt. Catastrophic failures happened because the period's methods of fabrication were not reliably capable of producing the fitting precision parts needed to prevent such malfunctions caused by errant sparks.

27.     Sometime before 1701, John Cookson moved to Boston.[43] Despite Cookson's exceptional skill as a gunsmith, he apparently stopped making repeating firearms during his 60 years in Boston. There are no surviving eighteenth-century, American-made Cookson repeaters.[44] This is actually not surprising given the fact that American-made guns were typically "utilitarian in nature, certainly nothing like the fine magazine breech-loading repeaters normally associated with the name John Cookson."[45] The authors of a recent essay speculate that the 1756 newspaper advertisement "could have involved one of the repeaters which he had brought from England when he emigrated and which, at his age of 82 at the time, he had decided to sell."[46] The four known firearms that John Cookson did make in America are different types of single-shot firearms: one is a breech-loader, the others are muzzle-loading.[47]

_____

Today this type of repeating firearm is generally identified by English and American collectors and curators as employing the Lorenzoni system.

[43] Weaver and Godwin, "John Cookson, gunmaker," 51-56, 59-61

[44] *Ibid.*, 56, 60. Weaver and Godwin make clear that the firearm referred to as a "Volitional Cookson Repeating Flintlock" in the collection of the National Firearms Museum in Washington, D.C. was made in the late 1600s by John Shaw, a London gunsmith.

[45] *Ibid.*, 55.

[46] *Ibid.*, 60.

[47] *Ibid.*, 56-57.

**Page 16 - DECLARATION OF KEVIN M. SWEENEY**

28.     The next appearance of an identifiable repeating firearm dates to April of 1777 and comes from the records and correspondence of the Continental Congress.  Joseph Belton wrote to the Continental Congress claiming that he had a method "wherein a common small arm, may be maid [sic.] to discharge eight balls one after another, in eight, five or three seconds of time."[48]  He also claimed that such a gun could be made to discharge "sixteen or twenty, in sixteen, ten or five seconds."[49] Its stated range was a mere 20 to 30 yards.  On July 10, 1777, Belton demonstrated a firearm that successively discharged 16 bullets.  He also claimed that this weapon could "do execution [at] 200 yards" which would have been a dramatic—and somewhat inexplicable—increase in the weapon's supposed range of 20 to 30 yards.[50]  In any event, Belton and Congress failed to agree on a financial arrangement.  Belton requested the princely sum of £13,000—£1000 from each of the 13 states—to compensate him for inventing this system, though he subsequently reduced his demand to only £500 from each of the states.[51]  There is no documentary or physical evidence indicating that Belton produced any of these firearms in 1777.

29.     The specific design of the firearm that Belton demonstrated in 1777 remains unclear.  There is a brass-barreled, flintlock fusil in the collection of the Smithsonian Institution that has been proposed as the actual gun or a prototype for the gun that Joseph Belton demonstrated in 1777.[52] It is engraved "IOS. BELTON INVENTOR ET ARTIFEX – PHILAL-

---

[48] Quoted in Brown, *Firearms in Colonial American*, 317.  This letter and others are reproduced in their entirety at Joseph Belton to the Continental Congress, April 1, 1777 at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence _between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[49] *Ibid.*

[50] Letter with Enclosure, Joseph Belton to the Continental Congress, July 10, 1777, at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence _between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[51] Joseph Belton to the Continental Congress, May 7, 1777 and Joseph Belton to John Hancock, May 8, 1777 at https://en.wikkisource/ Correspondence _between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[52] Robert Held, "The Guns of Joseph Belton Part I" *American Rifleman* (March 1987), 36-39, 68-69; *Oregon Firearms Federation v. Brown*, U.S. Dist. Ct. Civ. No. 2:22-cv-01815-IM (lead case), Declaration of Ashley Hlebinsky (ECF 72) at 18, n 24.

**Page 17 - DECLARATION OF KEVIN M. SWEENEY**

MDCCLVIII [i.e. 1758]".  An additional engraving on the gun refers to "CAPT JOSEPH BELTON OF Philad."[53]  However, the Joseph Belton who arrived in Philadelphia in 1775 and who came into contact with Benjamin Franklin and subsequently other members of the Continental Congress and the Continental Army was a 1769 graduate of the College of Rhode Island, which is today Brown University.[54]  In 1758, this Joseph Belton was not in Philadelphia; he was not a captain; and he was not then a gunsmith.  Despite claims to the contrary, it is unlikely that this particular gun was demonstrated in Philadelphia in July of 1777.[55]

30.     However as Harold Peterson suggested many years ago, it is quite likely that the firearm demonstrated in 1777 employed some version of what is known as a superimposition system.[56]  In the simplest version of a superimposed or superposed system of loading a firearm, a series of alternating powder charges and balls are loaded directly into a gun's barrel.  There is no detachable or integral magazine, just a standard barrel that is loaded from the muzzle in an alternating sequence of gunpowder and balls.  All of these charges were—ideally—set off in order from front to back by igniting the powder charge located behind the ball closest to the muzzle of the gun's barrel.  There is no magazine involved, and the ensuing discharge of balls is uncontrolled after it is initiated.

31.     The superposed system for discharging a succession of balls had been tried as early as 1580 by a German gunsmith working in London.[57]  Today, early flintlock pistols that used a simple superposed loading system are sometimes referred to as "Roman candle pistols" because they employed "the same principle as the firework" which involves setting off "a chain

---

[53] Smithsonian National Firearms Collection, :https://americanhistory.si.edu/collections/search/object,nmah_440031 Accessed 2/2/2013.

[54] Benjamin Franklin to Silas Deane, August 27, 1775 in *Papers of Benjamin Franklin*, Vol. 22, 183-185, especially footnote, 2.

[55] Quite distinct from the questions raised by what is known of Joseph Belton's biography is the claim in Adam Weinstein "I am Tired of Being Tired" December 21, 2018 that his grandfather, Kenneth Weinstein, a gunsmith, fabricated this particular firearm. adamweinstein.substack.com/p/i-am-tired-of-being-tired <Accessed 2/2/2023 at 12:00PM>.

[56] Peterson, *Arms and Armor in Colonial America*, 218.

[57] Peterson, *Treasury of the Gun*, 195.

**Page 18 - DECLARATION OF KEVIN M. SWEENEY**

reaction of multiple discharges."[58]  Other writers also liken flintlock long arms that employed a simple superposed system of multiple charges to "Roman candles".[59]

32.     Later in London, Joseph Belton was involved in producing a sophisticated and controllable version of a firearm employing a superposed system.  In 1784, Belton went to England where he failed to interest the English Ordnance Department in some version of his superposed system.  By 1786, he had entered into a partnership with London gunsmith William Jover (active 1750-1810).  Together they produced for Britain's East India Company a smoothbore repeating firearm with a sliding gunlock, that moved down the barrel to ignite a succession of powder charges that propelled a series of musket balls contained in a replaceable metal magazine holding 7 projectiles.  There are two authentic examples of this particular firearm in the collection of the Royal Armouries, National Firearms Center in Leeds, England.

33.     Belton's 1786 firearm allowed the shooter to control the weapon's discharge and aim each shot, which was not possible with the simpler superposed system.  As the 1786 firearm's moving gunlock lined up with the next powder charge and ball, the shooter primed a pan, pulled back the cock on the sliding gunlock, and then pulled a trigger firing off a single projectile.  Because of the need to cock and prime each time before pulling the trigger and firing the gun, this was not a rapid-fire repeating arm.  This firearm was also something of a challenge to handle.  It weighs 10 pounds unloaded and would have weighed close to 11 pounds when loaded.  Jonathan Ferguson, the Keeper of Firearms and Artillery at the Leeds Firearms Center observes in an on-line video that managing the weapon is "a bit of a three-handed job."[60]

34.     A much cruder version of a firearm employing a superposed system was produced in America in the early 1790s.  A July 20, 1793 newspaper report in *Philadelphia's Gazette of the United States* from Elizabeth Town, Pennsylvania describes a firearm created by "the ingenious and

---

[58] Jeff Kinard, *Pistols: An Illustrated History of their Impact (Santa Barbara*, CA: ABC-CLIO, 2004), 37.

[59] Brown, *Firearms in Colonial America*, 100; Peterson, *Treasury of the Gun*, 197.

[60] Jonathan Ferguson, "Flintlock Repeating – 1786" youtube.com/watch?v=-wOmUM40G2U.  <Accessed online 11/6/2022 at 4:00 P.M>

**Page 19 - DECLARATION OF KEVIN M. SWEENEY**

philosophic Mr. Chambers of Mercersburg in Pennsylvania."  This was Joseph Gaston Chambers (1756-1829).  According to the news report, this pistol "discharged six balls in succession, with only one loading and once drawing the trigger, exclusive of the reserve shot, which went off with the drawing of another trigger."  Later in the year, Chambers attempted to interest the United States War Department in buying long arms employing his version of the superposed system.

35.    A drawing that was probably done later reveals that Chambers's superposed system for a musket employed two gunlocks: one near the front of the barrel and the other in the usual location at the barrel's breech.  First a powder charge was poured down the barrel followed by a traditional spherical ball which was pushed down to the breech.  This was the reserve shot. Next a succession of 8 special, cylindrically shaped bullets with conical tails and 8 powder charges were pushed down the barrel.  Pulling a cord triggered the lock near the front of the barrel and ignited the first powder charge closest to the muzzle, which fired the first cylindrical projectile.  A hole in the next projectile carried the charge through it and down its conical tail, which ignited the charge, which propelled the second cylindrical charge, and so on.  Finally, the spherical ball resting at the barrel's breech was discharged by pulling the second trigger near the breech.[61]  Chamber's system did not employ a detachable magazine, and once initiated, the gun's discharge could not be controlled.  A drawing of this firearm is attached as **Exhibit B.**

36.    Chambers's initial efforts to win government interest in 1793 and a patent for his invention were unsuccessful.  A demonstration in May of 1793 failed to impress the War Department.  Later in 1813, Chambers did secure a patent and supplied the U.S. Navy with 200 repeating muskets and 100 repeating pistols and also sold weapons to the state of Pennsylvania.[62] The Navy's use of these weapons attracted the attention of the British and Dutch governments. However, in the end, Chambers's system with its unusual projectiles failed to obtain sustained interest from any government.  His guns did work, but they could also produce devastating malfunctions.  As historian Andrew Fagal has pointed out, cramming the gun's barrel with

---

[61] For the best description of the system and an illustration of how the gun was loaded see Fagal, "The Promise of American Repeating Weapons, 1791-1821" pages 2-3 of 6.

[62] Peterson, *Treasury of the Gun*, 197.

**Page 20 - DECLARATION OF KEVIN M. SWEENEY**

projectiles and gunpowder produced what was potentially a pipe bomb.[63]  All superposed weapons were difficult to load correctly, and if the bullets did not fit tightly, flame could leak around them and set off all the charges at once.[64]  In the 1820s, the "complexity and inherent dangers" of superposed systems that filled gun barrels with multiple charges of explosive gun powder "led to their wholesale abandonment."[65]

37.     A safer alternative to the systems employed by Cookson and Chambers was an air gun that did not use black powder as a propellant.  There are two advertisements—one for a demonstration and one for an auction—that contained references to an air gun able to fire 20 times with a single charging.  The February 10, 1792, issue of New York City's *Daily Advertiser* announced "To the Curious" daily exhibitions of an air gun.  This gun was supposedly made by a young man who was a native of Rhode Island, though in an advertisement almost two years later, it was claimed that the gun was made in New York City by "An American Artist."  This gun discharged twenty times without needing to renew the propellant provided by compressed air. Each pull of the trigger provided enough air to send a ball through an inch-thick board at a distance of sixty yards.  For 6 pence, a resident of the city could see Gardiner Baker demonstrate the air gun twice a day—Tuesday and Friday afternoons excepted—at his museum located at no. 13 Maiden Lane.  There is no indication that Gardiner Baker, "the young man in Rhode Island" or the "American Artist" in New York was marketing air guns.  Instead, once again a repeater was being featured as a novelty in a show put on for paying customers.

38.     The air gun demonstrated by Baker appears to have resembled or possibly might have been an actual example of a European air rifle designed by Bartholomeo Girardoni in 1779. A Girardoni air gun had a magazine with a capacity of 22 balls, each of which was propelled by discharges of compressed air from a replaceable cannister carried in the gun's stock.  The gun

---

[63] Fagal, "The Promise of American Repeating Weapons, 1791-1821," page 4 of 6.

[64] Peterson, *Treasury of the G*un, 198.

[65] Andrew J. B. Fagal, "The Promise of American Repeating Weapons, 1791-1821" page 2 of 6. <Accessed online 10/25/2022 at 4:55 P.M>  Fagal is currently an assistant editor of the Papers of Thomas Jefferson at Princeton University.

**Page 21 - DECLARATION OF KEVIN M. SWEENEY**

weighed about 10 pounds—which was about the same as a musket—but was shorter, being only four feet in length overall.  As contemporaries in Europe reported, these air guns were not without their problems: "Due to their construction, these guns were much more difficult to use effectively than normal, as one had to handle them much more cautiously and carefully."[66]  In the late 1700s, the Austrian Army, which had a peacetime establishment of 304,628 men, purchased 1,500 Girardoni air rifles that, theoretically, could have armed only 0.5% of its soldiers.[67]  As it turned out, "after a while no more than one-third of them were in a usable state," and they were all phased out by 1810 if not before.[68]

39.     The American military's use of a Girardoni air rifle was more limited in number and briefer in its timespan, but is also much better known.  On their 1804-1806 expedition to the Pacific Ocean and back, Lewis and Clark and their "Corps of Discovery" carried with them a single Girardoni air rifle.[69]  While it was occasionally used for hunting, their air rifle was primarily employed to impress Natives that they encountered along the way.  As Private Joseph Whitehouse recorded in his journal: "Captain Lewis took his Air Gun and shot her off, and by the Interpreter, told them that there was medicine in her, and that she could do very great execution."  "They all stood amazed at this curiosity."[70]  Eight decades after John Pimm's repeating firearm had been used to impress Native Americans in Boston, Lewis and Clark—like the showman Philadelphia Gardiner Baker—were still able to exploit the rarity of a repeating gun to awe and entertain.

40.     It is possible that someone in the United States may have been marketing Girardoni air rifles or something very similar to them in the mid-1790s.  An announcement for a public

---

[66] Quoted in Frederick J. Chiaventone, "The Girardoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon" *Military Heritage*  Vol. 14  No. 5 (January 2015), 19.

[67] Richard Bassett, *For God and Kaiser: The Imperial Austrian Army* (New Haven: Yale University Press, 2015), 186.

[68] Chiaventone, "Girardoni Air Rifle," 19.

[69] For the identification of the air rifle on the Lewis and Clark Expedition as a Girardoni see Madeline Hiltz, "The Lewis and Clark Air Rifle: A Blast from the Past" *War History on Lin*e (June 16, 2021) https://warhistoryonline.com/war-articles/lewis-and-clark-air-rifle.html?firefox=1 <Accessed online 1/21/2023, 8:00AM>

[70] Chiaventone, "Girardoni Air Rifle," 66.

**Page 22 - DECLARATION OF KEVIN M. SWEENEY**

auction in the issue of the Boston *Columbian Centinel* for March 7, 1795 listed among the items to be sold "a Magazine Air-Gun, equipped for hunting, and will carry ball or shot."  This air gun appears to be a repeating gun because of its reference to a "Magazine."  However, one should not automatically assume that all early air guns were repeaters.  Air rifles made by Isaiah Lukens (1779-1846) of Pennsylvania were single shot air guns, though some writers erroneously assume that they were repeaters like Girardoni's air rifle.[71]  It wasn't until the 1880s that two Michigan companies—the most famous of which was the Daisy Manufacturing Company—would begin marketing the first commercially successful, mass-produced repeating air rifles, aiming them at a youth market, employing a lever-action operating system, and shooting BB-caliber pellets.

41.     Two more references to what appear to be repeating firearms were discovered in eighteenth-century newspapers.  One from the August 19, 1793 issue of the Concord, New Hampshire *Mirrour* contains a vague report of a repeating weapon supposedly designed by an "Artist in Virginia".  However, this particular news report has been dismissed as a fabrication.[72]  The other reference to what does appear to be an identifiable type of repeating firearm was contained in a large advertisement in the October 26, 1785 issue of the *Columbian Herald* in Charleston, South Carolina.  It was placed by James Lambet Ransier, a native of Liege, which was a center of small arms manufacturing in the Low Countries.  Ransier announced that he had "a beautiful and complete assortment of Firearms" and in particular, he could furnish guns "that will fire four different times, with only charging once; or, if the person pleases, he may fire four different times one after another, with only one single lock."

42.     Ransier appears to be describing imported Belgian or French-made Segales pistols which had four rifled barrels.  These were small pistols that had a box lock and a swiveling

_____

[71] Nancy McClure, "Treasures from Our West: Lukens Air Rifle" August 3, 2014, Buffalo Bill Center of the West. <Accessed online on 10/31/2022, at 10:40 A.M>  On November 2, 2022, I received an email from Danny Michael, Curator of the Cody Firearms Museum at the Buffalo Bill Center of the West, confirming that their Lukens air rifle is a single shot weapon.

[72] Many aspects of the news report in the *Mirrour* raise fundamental questions about its believability, as does the fact that it was immediately followed by a news report on a Sea Monster.  An intensive search of Virginia newspapers in *America's Historical Newspapers* failed to uncover the supposed origin of the news report.  Because it could not be confirmed and because of its lack of detail and credibility, the report was dismissed.

**Page 23 - DECLARATION OF KEVIN M. SWEENEY**

breech attached to a cluster of four separate barrels: two upper barrels placed on top of two lower barrels.  The box lock had two triggers and two hammers holding two flints, while the swiveling or rotating breech had four frizzens that were attached to the barrels.  Each barrel was loaded separately at the muzzle with powder and ball.  The two upper barrels could be fired one at a time by pulling each of the individual triggers in succession or fired simultaneously by pulling both triggers at once (which could be risky).  After discharging the two upper barrels, the shooter then swiveled the rotating breech and the cluster of four barrels by pulling on the pistol's trigger guard.  Once rotated to the upper position, the two barrels formerly in the lower position could now be fired when the triggers were pulled individually or simultaneously.  However, as experts have pointed out: "All revolvers, and other multibarrel guns, of the muzzle-loading type were at risk from a dangerous chain reaction, in which firing one chamber could accidently set off all the others."[73]  If this happened, the gun would explode in the shooter's hand.

43.     Finally, something needs to be said about a gun which—ironically—was never found in the 13 Colonies, but has assumed an out-sized importance in the minds of some writing about colonial Americans and their presumed interest in and familiarity with repeating firearms.[74] In the early 1700s, James Puckle, an English lawyer, writer, and part-time inventor created a firearm fed by a 11-shot magazine located at the back of the gun that was rotated by a crank.  Rotating the crank aligned a power charge and bullet in the magazine with the weapon's barrel.  After locking the magazine and the barrel together, the operator had to manually prime each shot and pull back the cock before pulling the trigger for each discharge of the weapon. Because of the time needed to prime and cock the hammer before each shot and to change the magazine after it was emptied, the gun had a rate of fire of only 9 rounds per minute.  It was

---

[73] Rimer, *Smithsonian's Firearms,* 56.

[74] Clayton E. Cramer and Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America" *Willamette Law Review* Vol. 44. No. 4 (Summer 2008), 716-717; David B. Kopel, "The History of Firearm Magazines and Magazine Prohibitions" *Albany Law Review* Vol. 78, No. 2 (2014-2015), 852.

**Page 24 - DECLARATION OF KEVIN M. SWEENEY**

never used in battle.  The company producing it went out of business before 1730.  This gun had no discernable impact on colonial Americans nor on the development of firearms technology.[75]

44.     However, the Puckle gun lives on in the imaginations of some.[76]  Because of its weight, the Puckle gun used a tripod.  Visually the weapon bears an undeniable physical resemblance to certain .30 caliber machine guns used in World War II.  As a result, some refer to it today as "an eighteenth-century machine gun."  It was not a machine gun as we understand and use the term today, in either its mode of operation or its rate of fire.  The machine gun, invented by Hiram Maxim in 1884, used the recoil action of the gun to load it continuously and discharge spent cartridges.  Just pull the trigger and it kept firing bullets as long as the operator's assistant kept feeding it an ammo belt.  Another less common version of the machine gun diverted some of the gasses produced by discharging the weapon into a tube with a piston that automatically and repeatedly loaded the gun and ejected spent cartridges.  (A modern assault rifle uses a similar system that also employs diverted gasses to operate a piston.)  The .30 caliber medium machine gun used by the American army during World War II fired approximately 500 rounds a minute.  The only thing this weapon had in common with the eighteenth-century Puckle Gun was its use of a tripod.

45.     In summary, period probate inventories and newspapers indicate that repeating firearms were extraordinarily rare in eighteenth-century America.  Like muskets, repeaters were regarded as military firearms.  In 1777, the Continental Congress demonstrated an interest in Joseph Belton's firearm, and in 1813 the United States Navy purchased 200 muskets and 100 pistols produced by Joseph Gaston Chambers.  However, such superposed systems were in the assessment of military historian Joseph G. Bilby "a developmental dead end."[77]  Well into the third-quarter of the nineteenth century, the American government armed the overwhelming

---

[75] Brown, *Firearms in Colonial America*, 239.  Brown appears to misstate the capacity of the magazine as 9-shot, when it was actually a 11-shot magazine.

[76] See note 74 above.

[77] Joseph G. Bilby, *A Revolution in Arms: History of the First Repeating Rifles* (Yardly, Penn.: Westholme Publishing, 2015), 41.

**Page 25 - DECLARATION OF KEVIN M. SWEENEY**

majority of its soldiers with muzzle-loading single-shot long arms.  Even during the Civil War, the Union army made only limited use of the much more reliable repeating long arms made by Samuel Colt, the Spencer Arms Company, and the New Haven Arms Company, which was owned by Oliver Winchester and produced a repeater designed by Benjamin Henry.[78]

46.     The earlier lack of enthusiasm for repeating firearms among eighteenth-century Americans is unsurprising given the colonists' demonstrated preferences for inexpensive, light firearms that used less gunpowder and lead than did muskets.  By contrast, most of the period's repeating arms were expensive, heavy, and required greater expenditures—that were often uncontrollable—of gunpowder and lead.  Because repeating firearms contained multiple charges of explosive black powder gunpowder, they were also more dangerous than a gun using a smaller charge of gunpowder and a single projectile.  Some of these repeating firearms had the potential to turn into a Roman candle or a pipe bomb.  As Harold Peterson has observed "As long as the powder and ball had to be loaded separately there was no hope for a simple and safe magazine repeater."[79]  For these reasons, eighteenth-century advertisements and homes were filled with muzzle-loading, single shot firearms.

47.     The fact that some repeating firearms had been produced in Europe for four centuries by 1800 does not necessarily support the conclusion that Americans in the late 1700s would have assumed that such weapons would inevitably become reliable, safe, and widely available.  An individual looking back from 1800 might have been just as likely to conclude that very little progress had been made over the previous four centuries.  It was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder.  The superposed systems employed by Belton and Chambers, the Girardoni air rifle, and the Puckle Gun proved to be dead ends.  Calling these weapons and others like them "eighteenth-century assault rifles" or "an eighteenth-century machine gun" are examples of modern-day

---

[78] Bilby, *Revolution in Arms*, 44-48, 60-91.

[79] Peterson, *Treasury of the Gun*, 233.

**Page 26 - DECLARATION OF KEVIN M. SWEENEY**

rhetoric, not evidence of inevitable developments in firearms technology.  As George Basalla, an historian of technology, has cautioned: "All too often it is assumed that the development of technology is rigidly unilinear."[80]

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this 5 day of February, 2023.

Kevin M. Sweeney

---

[80] George Basalla, *The Evolution of Technology* (New York: Cambridge University Press, 1988), 189.

**Page 27 - DECLARATION OF KEVIN M. SWEENEY**

**Curriculum Vitae: Kevin M. Sweeney**


Home Address:  9 Orchard Street,
                 Greenfield, MA  01301


Home Phone:   (413) 774-5027
E-mail:            kmsweeney@amherst.edu


**Education:**   Ph.D. in History   1986, Yale University.
                B.A.   in History   1972, Williams College.


**Employment:**

2000-2016   Professor of History and American Studies, Amherst College.
1993-2000   Associate Professor of History and American Studies, Amherst College.
1989-1993   Assistant Professor of History and American Studies, Amherst College.
1986-1989   Director of Academic Programs, Historic Deerfield, Deerfield, Mass.
1985-1986   Assistant Professor, Winterthur Museum, Winterthur, Delaware.
1980-1984   Administrator-Curator, Webb-Deane-Stevens Museum, Wethersfield, Conn.
1978-1980   History Instructor, Westover School, Middlebury, Conn.


**Other Academic Appointments:**

2007            Visiting Faculty, American Studies Seminar, American Antiquarian Society, Worcester,
               Mass.
1987-1989   Assistant Professor of American Studies at Smith College under the Five
               College Program.
1985-1986   Adjunct Assistant Professor, Early American Culture, University of
               Delaware.
1982-1984   Visiting Lecturer in American Studies, Trinity College, Hartford, Conn..
1981            Adjunct, Art History Department, University of Hartford.


**Declarations Filed as an Expert Witness:**

2022   *Hanson v. District of Columbia*, Case No. 1:22-cv-02256-RC.
2023   *Delaware State Sportsmen's Assoc., Inc. v. Delaware Dept. of Safety and Homeland*
       *Security*, United States District Court, District of Delaware, Case No. 1:22-cv-00951-RGA.


**Academic Honors and Prizes:**

2003   Book Prize, New England Historical Association.
2003   Award of Merit, American Association for State and Local History.

1995  Harold L. Peterson Award, Eastern National Parks & Monuments Association.
1986  Jamestown Prize of the Institute of Early American History and Culture,
         Williamsburg, VA.
1986  Frederick W. Beinecke Prize in History, Yale University.
1973  Mary Cady Tew Prize in History, Yale University.
1972  William Bradford Turner Prize in American History, Williams College.
1971  Phi Beta Kappa, Williams College.

**Publications:**

**Books**

With Evan Haefeli, co-editors, *Captive Histories: English, French and Native Narratives
of the 1704 Deerfield Raid* (Amherst, Mass.: University of Massachusetts Press, 2006).

With Evan Haefeli, *Captors and Captives: The 1704 French and Indian Raid on
Deerfield* (Amherst, Mass.: University of Massachusetts Press, 2003). Awarded 2003 Book Prize, New
England Historical Association and 2003 Award of Merit, American Association for State and Local
History.

**Articles/Book Chapters/Catalogue Essays**

"Revolutionary State Militias in the Backcountry and Along the Frontiers," *The American Revolution on
the Frontier*, edited by Seanegan Sculley, Sons of the American Revolution 2022 Conference
Proceedings, (publication forthcoming).

"Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in
Jennifer Tucker, Barton C. Hacker, and Margaret Vining, editors *A Right to Bear Arms? The Contested
Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian
Scholarly Press, 2019), 54-71.

"Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, editors*, The
Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of
Massachusetts Press, forthcoming August 2013), 310-382.

"Mary Rowlandson: Taken by Indians," *American Heritage* 58:5 (Fall 2008): 23-25.

"Early American Religious Traditions: Native Visions and Christian Providence," *OAH Magazine of
History* (January 2008):8-13.

With Jessica Neuwirth, Robert Paynter, Braden Paynter and Abbott Lowell Cummings, "Abbott Lowell
Cummings and the Preservation of New England," *The Public Historian* 29:4 (Fall 2007):57-81.

With Evan Haefeli, "*The Redeemed Captive* as Recurrent Political Text*" The New England
Quarterly* (September 2004):341-367.

"The 1704 French and Indian Raid on Deerfield" *New England Ancestors* 5:1 (Winter 2004): 23-26.

"Regions and the Study of Material Culture: Explorations along the Connecticut River" for *American Furniture*, Luke Beckerdite, editor (Milwaukee, Wis.: Chipstone Foundation/ the University Press of New England, 1995), 145-166.

With Evan Haefeli, "Revisiting *The Redeemed Captive*: New Perspectives on the 1704 Attack on Deerfield" *William and Mary Quarterly* 3rd ser. 52:1(January 1995):3-46. Awarded the 1995 Harold L. Peterson Award, Eastern National Parks & Monument Association, and the 1995 Essay Prize, Society of Colonial Wars.

With Evan Haefeli, "Wattanummon's World: Personal and Tribal Identity in the Algonquian Diaspora, c. 1660-1712" in William Cowan, ed., *Papers of the Twenty Fifth Algonquian Conference* (Ottawa, 1994), 212-224.

"High Style Vernacular: Lifestyles of the Colonial Elite " in *Of Consuming Interests: The Style of Life in Eighteenth-Century America*, edited by Ronald Hoffman, Cary Carson, and Peter J. Albert (Charlottesville: University of Virginia Press, 1994),1-58.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1995.

"Meetinghouses, Town Houses, and Churches: Changing Perceptions of Sacred and Secular Space in Southern New England, 1725-1850" *Winterthur Portfolio* 28:1 (Winter 1994):59-93.

"Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987,* Peter Benes, ed. (Boston: Boston University Press, 1989), 32-40.

"Gentlemen Farmers and Inland Merchants: The Williams Family and Commercial Agriculture in Pre-Revolutionary Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1986*, Peter Benes, ed. (Boston University Press, 1988), 60-73.

"Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800," *Connecticut Antiquarian* 36:2 (1984): 10-39. Revised and reprinted in *Material Life in America, 1600-1860*, Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-290.

"From Wilderness to Arcadian Vale: Material Life in the Connecticut River Valley, 1635 to 1760" and "Gravestones" in *The Great River: Art and Society of The Connecticut Valley, 1635-1820* (Wadsworth Atheneum, Hartford, CT., 1985), 17-27, 485-523.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1985.

"Where the Bay Meets the River: Gravestones and Stonecutters in the River Towns of Western Massachusetts, 1690-1810," *Markers III*, David Watters, ed. (Association for Gravestone Studies, 1985),1-46.

"Mansion People: Class, Kinship and Architecture in Western Massachusetts in the Mid-18th Century," *Winterthur Portfolio* (Winter 1984):231-255.

"Furniture and furniture making in mid-eighteenth-century Wethersfield, Connecticut" *Antiques* 125:5 (May 1984), 1156-1163.

"River Gods in the Making: The Williams Family in Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1981*, Peter Benes, ed. (Boston University Press, 1982), pp. 101-116. Reprinted in a *Place Called Paradise: 1654-2004*, edited by Kerry Buckley (Amherst, Mass.: University of Massachusetts Press, 2004), 76-90.

**Exhibitions:**

2007-2008    Consultant, "Shays's Rebellion," N. E. H. Funded Web-Exhibition, Springfield Technical Community College and Pocumtuck Valley Memorial Association.

2003-2005    Consultant and Contributor, "The Many Stories of 1704," N.E.H. Funded Web-exhibition, Pocumtuck Valley Memorial Association. 2005 Museums and Webs Award Winner; 2005 Award of Merit, American Association for State and Local History; 2007 Merlot History Classics Award and others.

1984-1985    Consultant and Contributor, "The Great River: Art and Society of the Connecticut Valley, - 1820" Catalogue awarded Charles F. Montgomery Prize for 1985 by the Decorative Arts Society; Award of Merit from the American Association for State and Local History, 1986; Honorable Mention, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1986.

1982    Consultant and Contributor, "Two Towns: Concord and Wethersfield - A Comparative Exhibition of Regional Culture, 1635-1850," 1982. N. E. H. Funded Exhibition.

**Films/Videos:**

2012    Contributor, *Cherry Cottage, The Story of an American House*, Dave Simonds, Williamstown, Mass.

2009    Contributor, *The Forgotten War: The Battle for the North Country,* Mountain Lake Public Television, Plattsburg, NY.

2005    Contributor, *Captive: The Story of Esther,* VisionTV and Aboriginal Peoples Television Network, Canada.

2003    Contributor, *New England's Great River: Discovering the Connecticut,* Vermont Public Television, Burlington, VT

**Memberships in Professional and Scholarly Societies:**

American Historical Association.
Colonial Society of Massachusetts.
Massachusetts Historical Society.
Organization of American Historians.
Society of Military Historians

**Other Professional Activities**

| | |
|---|---|
| 2008-2010 | Chair, History Department, Amherst College. |
| 2005-2007 | Chair, American Studies Department, Amherst College. |
| 2003-2004 | Consultant, "Remembering 1704: Context and Commemoration of the Deerfield Raid" Pocumtuck Valley Memorial Association and Historic Deerfield, Inc. |
| 1997-2001 | Consultant, "Turns of the Centuries" Project, Pocumtuck Valley Memorial Association. |
| 1997-1999 | Chair, History Department, Amherst College. |
| 1997-1998 | Consultant, Exhibition entitled "Performing Arts: The Refinement of Rural New England," Historic Deerfield., Inc. |
| 1996-1998 | Member, Advisory Committee for the Dickinson Homestead, Amherst College. |
| 1994-1995 | Chair, Committee on Priorities and Resources, Amherst College. |
| 1993-1995 | Chair, American Studies Department, Amherst College |
| 1992 | Consultant, "Forty Acres: A Reinterpretation Initiative," Porter-Phelps-Huntington Foundation, Hadley, Mass. |
| 1991 | Consultant, "Furniture-making in Central New England, 1790-1850," Old Sturbridge Village. |
| 1991-1994 | Member, Five College Standing Committee on American Indian Studies. |
| 1986-1989 | Member, Five College American Studies Steering Committee. |
| 1981-1986 | Member, Advisory Committee for Historic Deerfield. |

1/27/2023

