1  George M. Lee (SBN 172982)
       gml@seilerepstein.com
2  **SEILER EPSTEIN LLP**
3  4 Embarcadero Center, 14th Floor
   San Francisco, California 94111
4  Phone: (415) 979-0500
5  Fax: (415) 979-0511

6
   John W. Dillon (SBN 296788)
7      jdillon@dillonlawgp.com
   **DILLON LAW GROUP APC**
8  2647 Gateway Road
9  Suite 105, No. 255
   Carlsbad, California 92009
10 Phone: (760) 642-7150
11 Fax: (760) 642-7151

12
   *Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>ROB BONTA, in his official capacity as Attorney General of California, *et al.*,<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**PLAINTIFFS' RESPONSE RE: DEFENDANTS' BRIEF [ECF 167]**<br><br>Hon. Roger T. Benitez |

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................1

II. RESPONSE TO DEFENDANTS' BRIEF ........................................................2

    A.   DEFENDANTS' BRIEF IS SIMPLY A RENEWED CALL
         FOR INTEREST-BALANCING TESTS. ............................................................2

        1.    The Defendants' Appeal to 'Mass Shootings' Fails. ...........................6

    B.   THE HISTORICAL ANALYSIS THAT *BRUEN* DEMANDS
         REQUIRES NO EXPERTS ..............................................................................9

    C.   DEFENDANTS' "MOST ANALOGOUS" HISTORICAL SUPPORT
         IS INSUFFICIENT TO JUSTIFY CALIFORNIA'S AWCA .................................10

III. CONCLUSION ................................................................................................12

## TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)..................................................9

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................3, 4, 5, 9

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*)..................4

*Ilott v. Wilkes*, 3 B. & Ald. 304 (1820)..................................................................12

*McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819)..........................................3

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................................9

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S.Ct. 2111 (2022)..........*passim*

*People v. Ceballos*, 12 Cal.3d 470, 16 Cal.Rptr. 233 (1974) ..............................11, 12

*United States v. Jones*, 565 U.S. 400, 132 S.Ct. 945 (2012) ..........................................3

**Statutes**

1763-1775 N.J. Laws 346, ch. 539, § 10....................................................................10

7 & 8 Geo. IV, ch. 18 (Eng.) ......................................................................................12

Cal. Fish & G. Code § 2007 ......................................................................................11

Cal. Pen. Code § 30510 ..............................................................................................6

Cal. Pen. Code § 30515(a)......................................................................................6, 10

**Other Authorities**

3 Jonathan Elliot, *Debates in the Several State Conventions
    on the Adoption of the Federal Constitution* (1827).................................................7

Bernard Bailyn, *The Barbarous Years* (2012).............................................................6

Bohlen & Burns, *The Privilege to Protect Property by
    Dangerous Barriers and Mechanical Devices*, 35 Yale L.J. 525 (1926)..................12

David McCullough, *John Adams* (2001)..................................................................6

*Debates and other Proceedings of the Convention of Virginia*,
  taken in shorthand by David Robertson of Petersburg, Va. (2d ed. 1805) .................7

Noah Feldman, *The Three Lives of James Madison* (2017)..........................................7

## I. INTRODUCTION

Pursuant to this Court's Minute Order of December 15, 2022 [ECF 161], Plaintiffs James Miller, *et al*. ("Plaintiffs") hereby submit this brief responding to DEFENDANTS' BRIEF IN RESPONSE TO THE COURT'S ORDER ENTERED ON DECEMBER 12, 2022 [ECF 167] ("Defendants' Brief").

The Defendants' Brief goes well beyond the mandate of this Court, which asked for an additional brief "focusing on relevant analogs." [Minute Order, ECF 161]. It also goes against this Court's instructions from the December 12, 2022 case management hearing that no expert testimony was to be submitted, as it is well established that courts are more than capable of interpreting the law. Instead, the State takes the opportunity to fill all 25 of its pages to relitigate this case *ab initio*, questioning among other things whether "assault weapons" are *really* in common use, *really* used in self-defense, and aren't *really* "dangerous and unusual" weapons. Further, the State attempts to introduce additional expert testimony on these points, already litigated. *See*, ECF 167-1.

But this has all been argued already. Likewise, Plaintiffs must now respond to points that have already been submitted and argued in the multiple rounds of briefing following the Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S.Ct. 2111 (2022). *See e.g.*, PLAINTIFFS' BRIEF RE NEW YORK STATE RIFLE & PISTOL ASS'N V. BRUEN [ECF 130]; PLAINTIFFS' ADDITIONAL BRIEF RE NEW YORK STATE RIFLE & PISTOL ASS'N V. BRUEN [ECF 136]; PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF RE NEW YORK STATE RIFLE & PISTOL ASS'N V. BRUEN [ECF 156]; and PLAINTIFFS' RESPONSE BRIEF RE: DEFENDANTS' HISTORICAL SURVEYS ORDERED BY THE COURT [ECF 166]. Plaintiffs will endeavor to do so briefly.

The primary (but far from only) problem with Defendants' latest submission is that it is almost entirely an argument for interest-balancing, which directly contradicts the express directive set forth in *Bruen*. Likewise, the State's attempt to ignore this

1  Court's instructions and introduce last-minute further "expert testimony" offered in
2  other cases on the "dangerous and unusual weapons" question—which has already
3  been settled by this Court—is also a naked appeal to interest balancing and is
4  irrelevant to the question of historical analogues requested by this Court (and required
5  under *Bruen*). At this point, Defendants are simply padding the record with old (and
6  misplaced) arguments and extraneous declarations.

7  In specific response to the court's minute order of February 7, 2023 [ECF 164],
8  Defendants have further submitted their additional brief [ECF 168], asserting that
9  Founding-era trap gun laws and regulations provide the most relevant analogue to a
10 modern-day ban on what California considers "assault weapons."

11 In the end, despite sparing no effort or expense in enlisting historians, scholars,
12 and now supposed firearms "experts," Defendants have not been able to find *one*
13 *single* relevantly similar analogue from the appropriate era. Their repetitious
14 arguments and extraneous declarations offered to support their survey of 316
15 supposed "analogues"—the vast majority of which are beyond the relevant era—
16 should be rejected and the State of California's Roberti-Roos Assault Weapons
17 Control Act of 1989 ("AWCA") declared unconstitutional and permanently enjoined
18 without further delay.

## II. RESPONSE TO DEFENDANTS' BRIEF

### A. DEFENDANTS' BRIEF IS SIMPLY A RENEWED CALL FOR INTEREST-BALANCING TESTS.

23 Claiming that this case somehow requires a "more nuanced analogical
24 approach," (Def. Br. at 12, citing *Bruen*, 142 S.Ct. at 2132), Defendants' Brief
25 sidesteps the directive of this Court to focus on relevantly analogous historical laws,
26 and instead attempts simply to repackage means-end interest balancing scrutiny
27 instead of following *Bruen*'s required "text, as informed by history" approach. But
28 these are issues that have already been litigated, and Defendants' efforts fail. *Bruen*

did not open a door to litigate Second Amendment challenges under interest-balancing tests—which the opinion expressly disapproved of. Defendants, apparently aware of how little constitutionally relevant support they have for their AWCA, seek to apply "a more nuanced approach" in precisely the wrong way, as *Bruen* only suggests such an approach *with regard to the determination of what constitutes a proper historical analogue*. The relevant passage from *Bruen* reads:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 404–405, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (holding that installation of a tracking device was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted").

*Bruen*, 142 S.Ct. at 2132 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008)). The Court then went on to explain that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. And this case does not, as the Defendants wish, implicate any "unprecedented societal concerns or dramatic technological changes," as (1) the AWCA does not seek to address new criminological or sociological conditions that

were not present in the founding era, and (2) the technology banned by the AWCA was hardly unknown to the founding era framers and ratifiers of the Bill of Rights. Therefore, this Court need not consider "nuance" at all.[1]

Defendants attempt to revive interest balancing by claiming that a "more nuanced approach" means looking *beyond* their nonexistent historical support and taking us back to the policy reasons why the characteristics prohibited by the AWCA are not actually used or needed. But this they cannot do. *Heller* settled this question (in the context of handguns) and the American people have overwhelmingly chosen AR-15 and similar semiautomatic firearms for all manner of lawful purposes, *including but not limited to* self-defense.[2]

By posing and then using cherry-picked data to answer their own question of whether "assault weapons" are frequently used in self-defense (Def. Br. at 8:3-4), Defendants are simply reframing this case into a policy question: does the average citizen *really need* an assault weapon? But the premise of their question was already rejected by *Heller*, which ultimately held that it is the choices of the American People—and not their governments—which settle the question. Firstly, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis original). And ultimately, *the specific reasons or ways in which handguns were used*, as *Heller*

---

[1] But even if it did, such an analysis would only be appropriate in the context of the determination of what constitutes a proper historical analogue, which was supposed to be the focus of Defendants' brief. Instead, Defendants took the opportunity to relitigate the case *ab initio*.

[2] The Supreme Court never suggested that self-defense is the *only* lawful purpose protected by the Second Amendment, even if self-defense was the "core" purpose. *See*, *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) (*Heller II*) ("Of course, the [U.S. Supreme] Court also said the Second Amendment protects the right to keep and bear arms *for other lawful purposes*, such as hunting, but self-defense is the core lawful purpose protected.")

noted, *were not relevant to the outcome*:

> It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. *Whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Id.*, at 629 (emphasis added).

In this Court's prior Decision [ECF 115], this case was principally decided under *Heller* using the common use test. *See*, PLAINTIFFS' BRIEF RE BRUEN [ECF 130], at pp. 11-14; PLAINTIFFS' ADDITIONAL BRIEF RE BRUEN [ECF 136], at pp. 1-3; PLAINTIFFS' RESPONSE BRIEF RE BRUEN [ECF 156], at pp. 6-8. Since the plain text of the Second Amendment unquestionably covers the keeping and bearing of these incredibly popular and common arms, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." But none of the 316 supposed laws they have offered to this Court, contained within their two surveys, reflect otherwise. And notwithstanding the Defendants' contortions to foist their burden upon the Plaintiffs,[3]

---

[3] Defendants assert that Plaintiffs have failed to meet an initial supposed burden that certain weapons categorized as "assault weapons" are actually used in self-defense, and that the failure to so demonstrate is somehow "Plaintiffs' problem." (Def. Br. at 8:3-9). But firstly, Defendants are attempting to foist a burden upon Plaintiffs which doesn't exist. *Bruen* made it explicitly clear that "[u]nder *Heller*, when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and to justify a firearm regulation the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126, 2130. Secondly,

they have failed to show that the AWCA is consistent with the Second Amendment's text and historical understanding. *Bruen*, 142 S.Ct. at 2131.

### 1. The Defendants' Appeal to 'Mass Shootings' Fails.

Under the pretext of seeking a "more nuanced" approach, the Defendants claim that the AWCA addresses an allegedly "unprecedented social problem of mass shootings." (Def. Brief. at pp. 14-15). But once again, they are simply attempting to repackage and reinsert interest balancing into their analysis as a means of deflecting attention away from the fact that they did not and cannot support their laws with any constitutionally relevant analogues. Their "nuanced" analysis is not appropriate under *Bruen* and must be rejected.

And moreover, it is not as if the Founders could not have envisioned the problem of massacres and mass killings. To the contrary, they were well aware of the dispositions of humans toward mass violence. Indeed, one of the seminal events of the American Revolution occurred on March 5, 1770, when British soldiers opened fire on a crowd, resulting in the deaths of five unarmed civilians. "Samuel Adams was quick to call the killings a 'bloody butchery' and to distribute a print published by Paul Revere vividly portraying the scene as a slaughter of the innocent, an image of British tyranny, the Boston Massacre, that would become fixed in the public mind." David McCullough, *John Adams* 65-66 (2001). Thus, for the State to suppose that the Founders were not aware of mass violence using weapons is simply history reimagined.[4] Knowing full well the potential of mass violence and killings, the

---

as the State is presumably aware of its own laws, both "UZI" pistols and "Streetsweeper shotguns" are categorized as "Category 1 assault weapons" under Pen. Code § 30510. A challenge to the prohibitions under by Pen. Code § 30510 will come soon, but it is not at issue in this case.

[4] The Colonists' concern with massacres and attacks by native peoples well predated the founding. *See* Bernard Bailyn, *The Barbarous Years* 101-02 (2012) (describing a series of surprise attacks in 1622 near the Jamestown settlement). Continued westward

Founders did not suppose that a greater government would provide an antidote. To the contrary, they enshrined the pre-existing right of the People to defend themselves against such evils into this Nation's constitution and enacted an enduring bulwark against the government's infringement of that sacred right. In extoling the virtues of the militia as "our ultimate safety," Patrick Henry said in the Virginia Convention on the ratification of the Constitution: "The great object is that every man be armed. Everyone who is able may have a gun." *Debates and other Proceedings of the Convention of Virginia*, taken in shorthand by David Robertson of Petersburg, Va., at 271, 275 (2d ed. 1805); 3 Jonathan Elliot, *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 386 (1827).

But this is all well-trodden ground. Plaintiffs have already shown that the AWCA does not address "unprecedented societal concerns" or "dramatic technological changes" in our RESPONSE BRIEF RE BRUEN [ECF 156] at pp. 21-23. Indeed, we have taken numerous walks through history to show that mass shootings and massacres—many of which were sadly perpetrated with racist motivations—are nothing new to American history. Moreover, even if it were assumed (and it is not) that "unprecedented societal concerns" or "dramatic technological changes" were involved here, it would merely mean that this Court may take a "more nuanced

---

expansion by the Colonists exacerbated the tensions with the Native Americans. By 1774, James Madison feared that the native peoples were "determined in the extirpation of the inhabitants." Noah Feldman, *The Three Lives of James Madison* 15 (2017). A year later, John Adams described how the "hardy, robust" colonists had become "habituated … to carry their fuzees or rifles upon one shoulder to defend themselves against the Indians, while they carry'd their axes, scythes and hoes upon the other to till the ground."13 13 John Adams, *To the Inhabitants of the Colony of Massachusetts-Bay*, NAT'L ARCHIVES FOUNDERS ONLINE (Feb. 6, 1775), https://bit.ly/2SwaXi4. So intense was the fear of dreadful attack by the native peoples that one of the "Abuses and Usurpations" charged of King George the III in the American Declaration of Independence was that the Crown had "endeavoured to bring on the Inhabitants of our Frontiers, the merciless Indian Savages, whose known Rule of Warfare, is an undistinguished Destruction, of all Ages, Sexes and Conditions."

1  approach" in what it determines to be a proper historical analogue. It would not permit
2  the Defendants to reintroduce public policy arguments and interest balancing to justify
3  their ban.

4  Even beyond the historical considerations, Plaintiffs have already litigated and
5  proved at trial that there is no credible correlation between the effectiveness of assault
6  weapons bans and mass shootings. (PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
7  CONCLUSIONS OF LAW, [ECF 104] ("Proposed Findings of Fact"), No. 183.) And as
8  Defendants must concede through their own expert testimony, firearms classified by
9  California as "assault weapons" are not even used in a majority of mass shootings.
10 (Plaintiffs' Proposed Findings of Fact No. 184.) The most prevalent firearm found at
11 the scene of a mass shooting is a handgun. (*Id.*, No. 185.) Plaintiffs have also shown
12 that the federal Public Safety and Recreational Firearms Use Protection Act
13 ("PSRFUPA") did not result in an increase of mass shootings committed with so-
14 called "assault weapons," nor did the percentage increase after the federal regulations
15 sunset. (*Id*., No. 187.) Defendants did not provide any evidence that there was a
16 statistically significant decline in the percentage of attacks with such weapons during
17 or after the PSRFUPA was in effect, *id*., No. 192, and moreover, Defendants did not
18 provide any evidence that any mass shooter ever selected a firearm classified as an
19 "assault weapon" because of the prohibited features, or that those features had any
20 determining effect on the outcome. (*Id*., Nos. 194 – 213.)

21 But in every case, these are not proper constitutional considerations under
22 *Heller* or *Bruen*—except, perhaps, to further show that the firearms in question are *not*
23 dangerous and unusual weapons, a finding that has already been made in this case.
24 Indeed, *Bruen* has rendered such considerations subordinate to the overall question of
25 whether Defendants can "justify its [AWCA] regulation by demonstrating that it is
26 consistent with the Nation's historical tradition of firearm regulation." As all of
27 Defendants briefs and evidence clearly show, they cannot.
28

### B. THE HISTORICAL ANALYSIS THAT *BRUEN* DEMANDS REQUIRES NO EXPERTS

Defendants attempt to reintroduce, through new testimony offered in other cases (e.g., the Declarations of Dennis Barron, Craig Tucker, Kevin Sweeney), their claim that the AWCA is not a ban on arms but a ban on "combat-oriented accessories." But this is not the test. The standard has *always* been whether the prohibited arms are in common use. If an arm is in common use, it cannot be "dangerous and unusual." Full stop. Both commonality and the "dangerous and unusual weapons" question have already been settled in this case. Again, this new testimony is simply the Defendants' unwavering and misguided effort to reintroduce interest balancing into Second Amendment analysis. As argued at length, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J. concurring). Neither *Heller* nor *Bruen* requires Plaintiffs to establish that the firearms in question are in common use *solely for self-defense*. Rather, the simple and undisputed fact that the arms in question are in common use for lawful purposes is enough to carry the day.

The Defendants' reliance on expert testimony offered in other cases is not relevant to the determination here. As we have already noted in PLAINTIFFS' RESPONSE BRIEF RE BRUEN [ECF 156], the only "facts" relevant to this case are "legislative facts" regarding the history of relevant firearm prohibitions, and as such, all facts have been submitted without the actual need for expert or other evidence adduced through traditional party discovery methods. *See*, *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). Once again, we are compelled to point out that no factual development occurred in *Bruen* itself, as the district court entered judgment against the plaintiffs on the pleadings. Ultimately, the Supreme Court's application of the "text, informed by history" analysis in *Bruen* did not involve reference to adjudicative facts of the kind that are disclosed through discovery, nor did *Bruen* rely on or require "expert" witnesses. Plaintiffs must therefore object to Defendants' attempt to introduce

additional testimony [ECF 167-1, Exhs. 1-3], as such purported testimony goes beyond the scope of the briefing requested by this Court and the test established in *Bruen*.

### C. DEFENDANTS' "MOST ANALOGOUS" HISTORICAL SUPPORT IS INSUFFICIENT TO JUSTIFY CALIFORNIA'S AWCA.

When ordered to identify what they believe is the strongest analog from the constitutionally relevant era, Defendants offered "New Jersey's 1771 prohibition on the setting of trap guns" as the most relevantly similar restriction to their AWCA. (Def's Brief in Response to the Court's Order Entered on February 7, 2023 [ECF 168], at p. 3:15-18.) Defendants stated this prohibition was a "dangerous and unusual weapons law" (*id.*, at 3:23), and further stated that it was part of a "'broad tradition' of [firearms] regulation with which Section 30515 is consistent." *Id.*, at 4:1-2.

But as Plaintiffs have already noted, that restriction was not as to possession of a "dangerous and unusual weapon" *per se*, and as the Defendants concede, was a prohibition on the *conduct* of setting a trap with a gun (a protected instrument). The statute said:

> And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-[p]ayment thereof shall be committed to the common Gaol of the County for Six Months.

1763-1775 N.J. Laws 346, ch. 539, § 10 (taken from Duke Center for Firearms Law, Repository of Historical Gun Laws, available at: https://firearmslaw.duke.edu/laws/).

Nothing in the statute prohibited the *possession* of strings, ropes, or "other contrivances" that might be characterized as trap-gun accessories" In fact, there was no restriction whatsoever on what "accessories" or parts were *added* to the trap gun.

1  The small handful of trap gun regulations identified by the Defendants' surveys
2  prohibited the *act* of arming a firearm such that it could be discharged without the
3  user's presence. (Even still, hardly a "broad tradition.") The challenged prohibition in
4  this case is fundamentally distinguishable. Here, there is a complete and total ban on
5  the possession, transfer, transportation, use, sale, manufacture, and acquisition on an
6  entire category of common firearms. Reviewing the two metrics identified in *Bruen*—
7  "how and why the regulations burden a law-abiding citizens' right to armed self-
8  defense"—early trap gun restrictions penalized the conduct of setting firearms up in
9  an unmanned trap to incent against the uncontrolled discharge of a firearm and harm
10 to unintended victims who might accidently set off one of these traps. These trap gun
11 laws restricted the conduct of *arming* of such traps, but they did not prohibit the arms
12 in their entirety. On the other hand, the Defendants' AWCA imposes an outright ban
13 on an entire class of commonly used firearms—even with respect to lawful conduct.

14       The early trap gun restrictions find their most modern corollary in California in
15 Cal. Fish & G. Code § 2007, a two-part statute first enacted in 1957, which defines a
16 "trap gun" as "a firearm loaded with other than blank cartridges and connected with a
17 string or other contrivance contact with which will cause the firearm to be
18 discharged[,]" and makes it "unlawful to set, cause to be set, or placed any trap gun."
19 *Id*. Section 2007 is not a law being challenged here, and moreover, it, like the
20 historical trap gun statutes, does not prohibit the possession of any firearm, but
21 prohibits a firearm from being *set as a trap*.

22       In *People v. Ceballos*, 12 Cal.3d 470, 16 Cal.Rptr. 233 (1974), the California
23 Supreme Court considered criminal liability for assault as to a person who set such a
24 trap that injured a sixteen year old boy. In reviewing criminal liability for injury that
25 arises from such a trap, the Court happened to note some history on the setting of traps
26 generally:

27
28
> At common law in England it was held that a trespasser,
> having knowledge that there are spring guns in a wood,
> cannot maintain an action for an injury received in

> consequence of his accidentally stepping on the wire of such gun. (Ilott v. Wilkes (1820) 3 B. & Ald. 304.) That case aroused such a protest in England that it was abrogated seven years later by a statute, which made it a misdemeanor to set spring guns with intent to inflict grievous bodily injury but excluded from its operation a spring gun set between sunset and sunrise in a dwelling house for the protection thereof. (7 & 8 Geo. IV, ch. 18; see Bohlen & Burns, *The Privilege to Protect Property by Dangerous Barriers and Mechanical Devices*, 35 Yale L.J. 525, 538, 539.) [¶] In the United States, courts have concluded that a person may be held criminally liable under statutes proscribing homicides and shooting with intent to injure, or civilly liable, if he sets upon his premises a deadly mechanical device and that device kills or injures another."

*Ceballos*, 12 Cal.3d at 476 (citations omitted).

At bottom, the prohibition that the Defendants held up as their strongest support for their AWCA was a ban on conduct (the setting of a trap using a firearm), not a prohibition on the possession of a "dangerous unusual weapon" or any particular set of characteristics. Thus, the Defendants' "best" and "most analogous" historical law to justify the AWCA is both distinguishable and far from a sufficient justification for California's unconstitutional ban on common semiautomatic arms.

### III.  CONCLUSION

This Court has now permitted four rounds of "supplemental briefing" following the Supreme Court's decision in *Bruen*. Defendants have responded by submitting thousands pages of declarations, history, and 316 historical laws in its two surveys. Even still, they have failed to justify their AWCA by demonstrating that it is consistent with our Nation's historical tradition of firearm regulation. The State of California's ban on so-called "assault weapons" should be declared unconstitutional and permanently enjoined without any stay of enforcement of the injunction so that the State's peaceable residents and visitors may exercise their fundamental right to keep and bear these common arms without further delay.

| | | |
|---|---|---|
| 1 | Dated: February 20, 2023 | **SEILER EPSTEIN LLP** |
| 2 | | |
| 3 | | */s/ George M. Lee* |
| | | George M. Lee |
| 4 | | |
| 5 | | **DILLON LAW GROUP APC** |
| 6 | | |
| | | */s/ John W. Dillon* |
| 7 | | John W. Dillon |
| 8 | | *Attorneys for Plaintiffs* |