ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3479
  Fax: (415) 703-1234
  E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Allison Mendoza, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| v. | **DEFENDANTS' BRIEF IN RESPONSE TO PLAINTIFFS' BRIEF FILED ON FEBRUARY 10, 2023** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom: 5A |
| Defendants. | Judge: Hon. Roger T. Benitez |
| | Action Filed: August 15, 2019 |

# INTRODUCTION

The Assault Weapons Control Act's ("AWCA") restrictions on firearms defined as "assault weapons" under California Penal Code section 30515(a)(1)-(8) ("Section 30515") fully comport with the Second Amendment at both stages of the text-and-history standard adopted in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022).[1] Plaintiffs' responsive brief ("Pls.' Br.") (Dkt. 166) does not address their burden at the textual stage of the *Bruen* standard. And their historical analysis conflicts with *Bruen* and would require governments to identify "dead ringer[s]" from the founding period, despite *Bruen*'s assurance that the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. Properly analyzed under *Bruen*, the challenged AWCA provisions are consistent with the Nation's historical tradition of firearm regulation and should be upheld.[2]

# ARGUMENT

## I. PLAINTIFFS CANNOT SHOW THAT SECTION 30515 BURDENS CONDUCT COVERED BY THE "PLAIN TEXT" OF THE SECOND AMENDMENT.

Plaintiffs' response brief does not address the myriad shortcomings of their Second Amendment claim at the textual stage of the *Bruen* standard, which makes clear that the Second Amendment covers only weapons "'in common use' today for self-defense," such as "the quintessential self-defense weapon," the handgun. *Bruen*, 142 S. Ct. at 2143; *see* Dkt. 137 at 20–41; Dkt. 157 at 2–10; Dkt. 167 at 4–11. The conclusory assertion that the AWCA "ban[s] firearms in common use," Pls.' Br. at 2, does not come close to satisfying their burden.[3] And it is wrong.

---

[1] Defendants incorporate by reference their prior briefing and evidence, *see* Dkts. 137, 157, 167, 168, as well as the pre-remand trial record.

[2] Defendants preserve their objections to the current proceedings and maintain that a reasonable discovery period is warranted. *See* Dkt. 167 at 3 n.7. Expert testimony is appropriate here because, unlike *Bruen*, this case is not "straightforward." *Bruen*, 142 S. Ct. at 2131.

[3] Plaintiffs must define their proposed course of conduct with greater specificity. *See* Dkt. 168 at 4 n.8; *Oakland Tactical Supply, LLC v. Howell Twp.*,

Section 30515 regulates the use of certain *accessories* that are not bearable "Arms," and "assault weapons" defined under Section 30515, including their listed accessories, are not "in common use" for self-defense.[4]  *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *11–15 (D.R.I. Dec. 14, 2022) (analysis of large-capacity magazines); *Or. Firearms Fed'n, Inc. v. Brown* (*Oregon Firearms*), 2022 WL 17454829, at *8–11 (D. Or. Dec. 6, 2022) (same).

A prohibition on the manufacture, sale, and possession of firearms defined as "assault weapons" under Section 30515 is "constitutionally sound" because these "particularly 'dangerous' weapons" are not in common use for self-defense. *Bevis v. City of Naperville, Ill.*, 2023 WL 2077392, at *9 & n.8 (N.D. Ill. Feb. 17, 2023) (denying motion for preliminary injunction of Illinois' assault weapons ban because "particularly 'dangerous' weapons are unprotected").  Rather, AR-platform rifles are extraordinarily lethal weapons and serve no legitimate self-defense purpose.  *See* Echeverria Decl. (Dkt. 167-1), Ex. 2 (Col. Tucker Decl.) ¶¶ 13–22.  Indeed, they are "like" the M16 or M4 and "may be banned." *E.g.*, *Oregon Firearms*, 2022 WL 17454829, at *10-11 & n.13 (same as to large-capacity magazines).[5]

Supporting this view, a report of the federal government's Advanced Research Projects Agency ("ARPA")—now, the Defense Advanced Research Projects Agency, or "DARPA"—on the performance of the AR-15 in the Vietnam War concluded that it was "superior in virtually all respects" to other military small

---

2023 WL 2074298, at *3 (E.D. Mich. Feb. 17, 2023) (noting that "[t]he proposed conduct could not be simply 'training with firearms'" where challenged zoning ordinance did not prohibit "training with firearms").

[4] The definitions in Section 30515 are severable.  Cal. Penal Code § 30515(e).  Plaintiffs must therefore satisfy their burden with respect to *each* of the enumerated definitions in Section 30515.  Dkt. 157 at 2 n.2.

[5] Recently, on January 21, 2023, a semiautomatic pistol that would likely qualify as an assault weapon under Section 30515(a)(4)(A) and (C) was used in the mass shooting in Monterey Park, California.  *See* Jeremy White & K.K. Rebecca Lai, *What We Know About the Gun Used in the Monterey Park Shooting*, N.Y. Times, Jan. 26, 2023 (describing the threaded barrel of the MAC-10 pistol and a heat shield wrapped around the suppressor), http://bit.ly/3IKmq4T.

arms, like the Thompson submachinegun and Browning Automatic Rifle. ARPA, Field Test Report, AR-15 Armalite Rifle (1962) (cover memo), https://bit.ly/41bHqsH.[6] The report vividly illustrates the combat effectiveness of the "Small Caliber, High Velocity Rifle" on a round-for-round basis. *Id.* at 1. For example, in one account, a Viet Cong soldier was struck by three AR-15 rounds at a range of 15 meters, each of which would have been fatal: "One round in the head . . . took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter." *Id.* at Annex 5 at 5. Automatic capability would not account for the extent of these injuries, each of which was caused by a single .223 round. These devastating war-time injuries are consistent with injuries sustained by civilians in mass shootings involving assault weapons, including AR-platform rifles chambered with similar ammunition. *See, e.g.*, Michael Levenson, *Parents Were Asked for DNA Samples to Help Identify Victims*, N.Y. Times, May 25, 2022, http://bit.ly/3Iuo4Yp; Defs.' Trial Ex. B (Colwell Decl.) ¶¶ 9–12 (describing assault weapon injuries). Plaintiffs cannot meet their burden at *Bruen*'s textual stage.

## II. THE CHALLENGED AWCA PROVISIONS ARE CONSISTENT WITH THE NATION'S TRADITIONS OF WEAPONS REGULATION.

At the historical stage of the *Bruen* standard, Plaintiffs improperly discount all of the historical evidence demonstrating that the AWCA is consistent with the Nation's traditions of weapons regulation.

### A. Plaintiffs' Historical Analysis Is Inconsistent with *Bruen*.

#### 1. A "More Nuanced Approach" Is Required, Rather than a "Dead Ringer."

Plaintiffs' responsive brief skips a crucial step in *Bruen*'s historical analysis. Plaintiffs do not even address—let alone rebut—Defendants' arguments that "a more nuanced approach" is required in this case. *See Oregon Firearms*, 2022 WL

---

[6] A copy of the ARPA report is attached as Exhibit 1 to the accompanying Declaration of John D. Echeverria.

3

17454829, at *12–13 (same for large-capacity magazine restrictions).  The AWCA implicates both "dramatic technological changes" and "unprecedented societal concerns," *Bruen*, 142 S. Ct. at 2132, either of which is sufficient to warrant greater flexibility in drawing the requisite analogies.  Dkt. 137 at 43–48; *see also* Dkt. 167 at 12–15.  First, semiautomatic firearms, including AR-platform rifles, reflect dramatically different firearm technologies than those that were widely available in 1791 or 1868.  Echeverria Decl. (Dkt. 167-1), Ex. 3 (Sweeney Decl.) ¶¶ 5–6; Vorenberg Decl. (Dkt. 137-9) ¶¶ 17–18; Spitzer Decl. (Dkt. 137-8) ¶ 30 (explaining that semiautomatic firearms did not circulate appreciably in society until after World War I).  Second, mass shootings are a modern phenomenon that arose in the mid-20th century.  *See* Suppl. Klarevas Decl. (Dkt. 137-5) ¶ 11 & tbl. 1; Roth Decl. (Dkt. 137-7) ¶ 35; *Oregon Firearms*, 2022 WL 17454829, at *13.

Even in the absence of dramatic technological changes or unprecedented societal concerns, a "nuanced approach" would be required under *Bruen*.  *United States v. Kelly*, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022).  The Supreme Court explained that in any Second Amendment challenge, the government need not identify a "historical *twin*" or a "dead ringer."  *Bruen*, 142 S. Ct. at 2133.  Yet, that is precisely what Plaintiffs appear to demand.  Plaintiffs dismiss any analogue that did not prohibit possession of weapons, *see* Pls.' Br. at 5–13, but that is not adequate under *Bruen*.  The "historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'"—a tradition reflected by many of the surveyed dangerous weapons laws—"fairly support[s]" limitations "on the right to *keep* and [not just] carry" weapons.  *Heller*, 554 U.S. at 626–27 (emphases added) (citation omitted).  What matters is whether the historical law is "analogous enough" by "impos[ing] a comparable burden on the right of armed self-defense" that is "comparably justified."  *Bruen*, 142 S. Ct. at 2133.  Indeed, it is unclear what weapons could be prohibited under Plaintiffs' skewed interpretation of *Bruen*.

4

## 2. Pre-Founding and Reconstruction Evidence Is Relevant.

In addition to erroneously insisting on a perfect match in the historical record, Plaintiffs also unduly restrict the scope of the relevant time period, attempting to prune the record of any law enacted before 1791 and around the ratification of the Fourteenth Amendment and beyond. *See* Pls.' Br. at 2–5. With respect to pre-founding evidence, English and colonial analogues inform the meaning of the Second Amendment. Dkt. 137 at 50–52; Dkt. 167 at 18–20. Defendants' citation to those laws does not "contravene this Court's Order," Pls.' Br. at 4, requiring the submission of surveys "begin[ning] at the time of the adoption of the Second Amendment," Dkt. 161. Under *Bruen*, English and colonial traditions that were accepted by the time the Second Amendment was ratified inform the scope of that right; though "[h]istorical evidence that *long* predates either [1791 or 1868] *may* not illuminate the scope of the right," *Bruen*, 142 S. Ct. at 2136 (emphasis added), historical evidence from the period leading up to the founding is relevant, and even a "long, unbroken line" of English precedent may illuminate the scope of the right inherited from England, *id.* That right was limited to the possession of arms "as allowed by law" [7, 9].[7] Plaintiffs dismiss Blackstone because his 1769 commentaries supposedly "predate[] the Founding by far too long to be afforded much weight," Dkt. 166-1 at 5, even though they were published just 7 years before the Revolution and 22 years before ratification of the Second Amendment. The Supreme Court gave great weight to Blackstone in *Heller* and *Bruen*. *See Bruen*, 142 S. Ct. at 2128. Consistent with the "as allowed by law" limitation on the right, the Court has noted that the Second Amendment does not protect a "right to keep and carry any weapon whatsoever." *Bruen*, 142 S. Ct. at 2128 (citation omitted).[8]

---

[7] Numbers in brackets refer to the numbers assigned to the laws listed on Defendants' surveys of historical analogues. Dkt. 163.

[8] In *Bruen*, pre-founding English authorities "were not good enough to uphold concealed carry laws in modern day New York State," Pls.' Br. at 4, because the New York laws at issue made it "virtually impossible for most New

5

1    Plaintiffs also attempt to limit the consideration of 19th century laws, Pls.' Br.
2    at 2–5, even though the scope of the Second Amendment—as applied to state and
3    local governments—"depends on how the right [to keep and bear arms] was
4    understood when the Fourteenth Amendment was ratified" in 1868.  *Ezell v. City of*
5    *Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (citing *McDonald v. City of Chicago*,
6    561 U.S. 742, 769–76 (2010)).[9]  Constitutional rights are enshrined "*when the*
7    *people adopted them*"—the Second Amendment in 1791 and "the Fourteenth in
8    1868."  Pls. Br. at 2 (quoting *Bruen*, 142 S. Ct. at 2136).  But Plaintiffs' approach
9    would ignore the original understanding of "the people [who] adopted" the
10   Fourteenth Amendment.  *Bruen*, 142 S. Ct. at 2136.  While the views of that
11   generation may be less probative of the original understanding of the Second
12   Amendment when it was originally ratified, Pls.' Br. at 2–3, they are undoubtedly
13   relevant to understanding the meaning and scope of the Fourteenth Amendment.[10]

14   Contrary to Plaintiffs' argument, Pls.' Br. at 3, the Supreme Court has not
15   "dispositively" held that historical evidence from Reconstruction is irrelevant.
16   Although *Bruen* observed that the Court had "*generally assumed* that the scope of
17   the protection applicable to the Federal Government and States is pegged to the
18   public understanding of the right when the Bill of Rights was adopted in 1791," 142
19   S. Ct. at 2137 (emphasis added), the Court had not yet resolved and did not need to
20   address the issue in *Bruen*, *id.* at 2138.  Plaintiffs cite *Virginia v. Moore*, 553 U.S.

---

Yorkers" to exercise their right to bear arms, *Bruen*, 142 S. Ct. at 2159 (Alito, J., concurring).  The laws challenged here, by contrast, do not destroy any right.

[9] In addition to mid- to late-19th century laws, early 20th century laws regulating semiautomatic firearms and ammunition feeding devices, *see* Dkt. 163-2, are consistent with earlier laws and are especially relevant given that comparable technology first appeared at this time. *See* Dkt. 137 at 63–65; Dkt. 167 at 22–23.

[10] The adoption of the Fourteenth Amendment "readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings" applicable to both the federal and state governments.  Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (manuscript at 2) (cited in *Bruen*, 142 S. Ct. at 2138), http://bit.ly/3k5gYjA.

164 (2008), a Fourth Amendment case, which discusses founding-era evidence but does not even mention the Fourteenth Amendment. Pls.' Br. at 3. If anything, that case confirms that legal authority from the 1830s—decades after the ratification of the Bill of Rights—may be considered in assessing the meaning of those rights. *Id.* at 169–70. As in *Bruen*, this Court need not resolve this issue, as the Reconstruction-era dangerous weapons laws are consistent with the founding-era analogues and reflect the same tradition. *See Bruen*, 142 S. Ct. at 2138.

### 3. Local and Territorial Regulations Are Part of the Nation's Tradition.

Plaintiffs also attempt to restrict relevant analogues to statewide laws, but no such restriction is called for in *Bruen*. *See, e.g.*, Dkt. 166-1 at 6 [11]; *id.* at 35 [58]. Plaintiffs claim that state-sanctioned authority for local governments to restrict certain weapons and accessories, *e.g., id.* at 17 [30], are "dubious" because that authority might not have been exercised. Pls.' Br. at 12 & n.4. But that local *political* judgment based on local needs would not have constitutional implications; state-sanctioned authority is sufficient proof that the state viewed the regulation as constitutional. Plaintiffs also argue that local restrictions, even if passed, are irrelevant because they were not state-wide. *Id.* at 12. But such laws are part of the *Nation*'s (not just the States') tradition of firearm regulation, and this Court's Order called for Defendants to identify "relevant statutes, laws, or regulations" and "the enacting state, *territory*, or *locality*." Dkt. 161 (emphasis added). Regardless, they are consistent with the state-enacted measures surveyed by Defendants.

### B. California's Restrictions on Assault Weapons Are Consistent with the Nation's Traditions of Firearm Regulation.

Defendants have demonstrated that the AWCA comports with the Second Amendment. Since Blackstone, "over two centuries of American law has built upon th[e] fundamental distinction" between "traditional arms for self-defense and 'dangerous' weapons." *Bevis*, 2023 WL 2077392, at *10 (citing research of Robert Spitzer). In regulating particularly dangerous weapons and accessories, the

7

historical analogues imposed a comparably low burden on the right to armed self-defense and promoted comparable public-safety goals.[11]  If any of the specific public-safety concerns underlying the AWCA differ in kind, that is because they arise from modern technological and social developments.

*First*, the dangerous weapons laws identified by Defendants are relevantly similar to the challenged AWCA provisions.  Dkt. 137 at 67; Dkt. 167 at 23–25.[12]  In restricting certain weapons and devices that posed a particular risk to the public at the time, while leaving a range of arms available for use in lawful self-defense, these laws imposed a comparably low burden on the right to armed self-defense and were justified by comparable public safety objectives.  As discussed, the analogues do not need to have employed the same mode of regulation to be relevantly similar under *Bruen*.  Defendants' chart nonetheless includes bans on the possession of dangerous weapons [81, 150, 170, 171].[13]  And Alabama's prohibitive tax on the transfer of Bowie knives [31] effectively banned most people from owning them. *Bevis*, 2023 WL 2077392, at *10.  Plaintiffs argue that Defendants must identify an

---

[11] Determining whether analogues are "relevantly similar" to a modern law is not a revival of the interest balancing rejected in *Bruen*.  In applying *Bruen*, judges retain "the ordinary tools of reasoning that they have employed throughout the common law tradition," as *Bruen* did not create "some now-freshly-discovered species of judicial power confined to a single, rigid form of resolving ambiguity." *Kelly*, 2022 WL 17336578, at *6.

[12] Contrary to Plaintiffs' claims, Pls.' Br. at 11, laws applicable to only certain groups may still reflect a relevant tradition of firearm regulation, even if those laws were morally repugnant and would be unconstitutional today under the Equal Protection Clause or other provision of the Constitution.  *See* Dkt. 167 at 17 n.17.  By enumerating specific weapons for heightened regulation, those historical laws provide additional evidence of a regulatory tradition, even if the tradition was applied more narrowly and in an otherwise unconstitutional manner.  *See id.*

[13] Plaintiffs' reliance on *Nunn v. State*, 1 Ga. 243 (1846), is misplaced, because the court deemed Georgia's law as "destr[oying] the right" to bear arms, Pls.' Br. at 10 (quoting *Nunn*, 1 Ga. at 249), which the AWCA does not do.  That decision was "never intended to hold that [people] had some inherent right to keep and carry arms or weapons of every description." *Hertz v. Bennett*, 294 Ga. 62, 68 (2013) (quotation marks and citation omitted).

"outright ban on a class of firearms," Pls.' Br. at 10, but what constitutes a "class" of firearms is unclear; "whatever group of weapons a regulation prohibits may be deemed a 'class.'" *Worman v. Healey*, 922 F.3d 26, 32 n.2 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127 n.4.  Here, Defendants have identified a range of restrictions from the pre-founding period through the late 19th century restricting particular types of dangerous weapons.  While most of these laws restricted the carrying of weapons, *see* Dkt. 167 at 20 & n.19, that regulatory choice was understandable—those laws targeted the weapons used in opportunistic acts of public violence contributing to rising homicide rates, and it was the carrying of those weapons that made a violent altercation more likely.  *E.g.*, Roth Decl. (Dkt. 137-7) ¶¶ 19–22.[14]  Mass shootings, by contrast, are often premeditated, rendering mere carry restrictions ineffective in protecting the public.

    *Second*, historical trap gun laws are particularly analogous to the AWCA's "prohibition on the possession of a firearm with listed features." Dkt. 168 at 1 (quoting Dkt. 164).  They provide a "Founding-era categorical ban[]" on a type of "firearm[] in common use in this Nation's history." Pls.' Br. at 6.  Plaintiffs claim these laws regulated a "practice" and not possession, *id.* at 7, but the laws prohibited the *keeping* of a firearm configured as a "trap gun."  Plaintiffs agree that these laws "targeted the *owning* or setting of trap guns," and that trap guns were "a particular variety of dangerous and unusual weapon[s]." Pls.' Br. at 6 (emphasis added).  And contrary to Plaintiffs' claim that trap guns were not commonly used at the time, *id.*, the 1771 New Jersey law found that the possession of trap guns "ha[d] too much prevailed in th[e] Province," Spitzer Decl., Ex. F at 3.  As with the

---

[14] In fact, these laws regulated weapons that were widely possessed; a contemporary source referred to "the cowardly and almost universal practice of carrying a dirk-knife" and criticized "this practice of carrying deadly weapons [in public] and the related problems of 'rough and tumble' (as no-limits, eye-gouging, hand-to-hand combat was called)." Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform 49 (1999).

AWCA, the trap gun laws did not prohibit the possession of the underlying firearm or the accessories (e.g., "String, Rope, or other Contrivance), unless they were combined and possessed in violation of the statute [10]. The minimal burden on the right to self-defense was comparably justified, as the trap gun laws sought to protect the public from unnecessary gunshot injuries and death and aimed to prevent injury to "unintended targets." Pls.' Br. at 7; *Kolbe*, 849 F.3d at 127.

***Third***, the gunpowder and loaded-weapon restrictions enacted since the founding are also relevantly similar to the AWCA. Dkt. 137 at 67–68; Dkt. 167 at 25. Gunpowder restrictions regulated possession, including inside the home. Cornell Decl. (Dkt. 137-3) ¶ 36. Assault weapon laws similarly seek to protect bystanders from unintended harm and mass-casualty incidents. *See Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2126. Even if gunpowder restrictions were eventually phased out as gunpowder became safer, Pls.' Br. at 7, that does not change the historical tradition of regulating firearm technologies posing a threat to the public.

## CONCLUSION

For these reasons, the Court should uphold the challenged provisions of the AWCA under the Second Amendment.[15]

---

[15] Defendants respectfully repeat their request for a stay of any judgment in Plaintiffs' favor for a sufficient period to allow Defendants to seek a stay from the Ninth Circuit. Dkt. 157 at 1–2 n.1; Dkt. 167 at 25 n.21. That multiple district courts have credited many of the same arguments and historical evidence in other challenges to large-capacity magazine and assault weapon laws demonstrates that Defendants have made a "substantial case on the merits" here involving "serious legal questions." *Leiva-Perez v. Holder*, 640 F.3d 962, 966–67 (9th Cir. 2011).

| | | |
|---|---|---|
| 1 | Dated: February 21, 2023 | Respectfully submitted, |
| 2 | | ROB BONTA<br>Attorney General of California |
| 3 | | P. PATTY LI<br>Supervising Deputy Attorney General |
| 4 | | ANNA FERRARI<br>Deputy Attorney General |
| 5 | | |
| 6 | | *s/ John D. Echeverria* |
| 7 | | |
| 8 | | JOHN D. ECHEVERRIA<br>Deputy Attorney General<br>*Attorneys for Defendants Rob Bonta and Allison Mendoza, in their official capacities* |

11

Defendants' Brief in Response to the Plaintiffs' Brief Filed on February 10, 2023
(3:19-cv-01537-BEN-JLB)