No. 23-2979

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
—————————————

JAMES MILLER, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE
OF CALIFORNIA, ET AL.,

*Defendants-Appellants.*
—————————————

## On Appeal from the United States District Court
## for the Southern District of California
No. 3:19-cv-1537-BEN-JLB
The Honorable Roger T. Benitez, Judge
—————————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR A STAY PENDING APPEAL AND FOR AN INTERIM
## ADMINISTRATIVE STAY

## RELIEF REQUESTED BY OCTOBER 29, 2023
—————————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
HELEN H. HONG
MICA L. MOORE
*Deputy Solicitors General*

R. MATTHEW WISE
*Supervising Deputy Attorney General*
ANNA FERRARI
JOHN D. ECHEVERRIA
*Deputy Attorneys General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3479
John.Echeverria@doj.ca.gov
*Attorneys for Defendants-Appellants Rob
Bonta and Allison Mendoza, in their
official capacities*

October 23, 2023

## TABLE OF CONTENTS

**Page**

Introduction .................................................................................................1

Background...................................................................................................5

      A. The Assault Weapons Control Act .................................................5

      B. Pre-*Bruen* Litigation .....................................................................8

      C. Post-*Bruen* Litigation....................................................................8

Argument....................................................................................................10

    I.  The Attorney General Is Likely to Succeed on the Merits.....................12

    II.  The Equitable Factors Weigh Strongly in Favor of a Stay.....................21

Conclusion..................................................................................................25

Statement of Related Cases ........................................................................26

Certificate of Compliance ..........................................................................27

# TABLE OF AUTHORITIES

**Page**

CASES

*Barnett v. Raoul*
2023 WL 3160285 (S.D. Ill. Apr. 28, 2023)......................................................13

*Barnett v. Raoul*
No. 23-1825, Dkt. 30 (7th Cir. May 12, 2023) ................................................13

*Bevis v. City of Naperville, Ill.*
2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) .......................................... 12, 16, 17

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997)...............................................................................21

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
2023 WL 2655150 (D. Del. Mar. 27, 2023) .......................................... 12, 16, 17

*District of Columbia v. Heller*
554 U.S. 570 (2008).................................................................................*passim*

*FTC v. Qualcomm Inc.*
935 F.3d 752 (9th Cir. 2019)...............................................................................1

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*
512 F.3d 1112 (9th Cir. 2008)...........................................................................21

*Grant v. Lamont*
2023 WL 5533522 (D. Conn. Aug. 28, 2023) ............................... 12, 14, 15, 16

*Hartford v. Ferguson*
2023 WL 3836230 (W.D. Wash. June 6, 2023).......................................*passim*

*Herrera v. Raoul*
2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ............................................. 12, 16

*Hilton v. Braunskill*
481 U.S. 770 (1987)...........................................................................................11

ii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Leiva-Perez v. Holder*
   640 F.3d 962 (9th Cir. 2011)......................................................10, 11

*Maryland v. King*
   567 U.S. 1301 (2012)..................................................................2, 21

*Nat'l Ass'n of Gun Rights v. Lamont*
   2023 WL 4975979 (D. Conn. Aug. 3, 2023)............................*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*
   142 S. Ct. 2111 (2022)..............................................................*passim*

*Nken v. Holder*
   556 U.S. 418 (2009)....................................................................2, 10

*Or. Firearms Fed'n v. Kotek*
   2023 WL 4541027 (D. Or. July 14, 2023)........................................19

*Rhode v. Becerra*
   2020 WL 9938296 (9th Cir. May 14, 2020)....................................11

*Rocky Mountain Gun Owners v. Bd. of Cnty. Comm'rs of Boulder Cnty.*
   2022 WL 4098998 (D. Colo. Aug. 30, 2022)..................................13

*Silveira v. Lockyer*
   312 F.3d 1052 (9th Cir. 2002)..........................................................5

**CONSTITUTIONAL PROVISIONS**

United Stated Constitution
   Second Amendment.................................................................*passim*

**STATUTES**

Assault Weapons Control Act.........................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

**Page**

California Penal Code

§ 30505(a)................................................................................5

§ 30510................................................................................5, 7, 8

§ 30515..............................................................................*passim*

§ 30515(a)............................................................................5, 6

§ 30515(a)(1).......................................................................6, 7, 8

§ 30515(a)(2).......................................................................6, 7, 8

§ 30515(a)(3).......................................................................6, 7, 8

§ 30515(a)(4)..........................................................................7, 8

§ 30515(a)(5)..........................................................................7, 8

§ 30515(a)(6)..........................................................................7, 8

§ 30515(a)(7)..........................................................................7, 8

§ 30515(a)(8)..........................................................................7, 8

§ 30515(e)..............................................................................18

§ 30600(a)................................................................................8

§ 30605(a)................................................................................8

§ 32310..............................................................................23, 26

1999 Cal. Stat. ch. 129.................................................................5

**REGULATIONS**

California Code of Regulations, title 11

§ 5499.....................................................................................7

**COURT RULES**

Ninth Circuit Rule 27-3................................................................1

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR
A STAY PENDING APPEAL AND AN ADMINISTRATIVE STAY**

## INTRODUCTION

The district court permanently enjoined California's restrictions on every statutorily-defined category of semiautomatic rifles, semiautomatic pistols, and semiautomatic shotguns that qualify as assault weapons under California Penal Code section 30515 (Section 30515). Those firearms are defined as assault weapons because of particular features that make them uniquely dangerous to the public and to law enforcement. This emergency motion seeks a stay pending appeal of the district court's order. It is necessary for the Attorney General to seek this relief in an emergency motion because the district court refused to grant anything beyond a ten-day stay, viewing that as a "sufficient period to seek a stay from the Court of Appeals." Order 78. Absent a further stay from this Court, the district court's sweeping injunction will expire on October 29, and assault weapons that have been prohibited for decades will suddenly flood into the State.

Controversies over the application of the Second Amendment to firearms regulations can lead to spirited disagreements between litigants, as in this case. Sometimes, they can also lead to spirited disagreements between members of this Court. But the temporary relief requested by this motion should not be controversial. The purpose of a stay is to "simply suspend[] judicial alteration of the status quo," *FTC v. Qualcomm Inc.*, 935 F.3d 752, 757 (9th Cir. 2019),

1

"ensuring that appellate courts can responsibly fulfill their role in the judicial process," *Nken v. Holder*, 556 U.S. 418, 427 (2009). Because an injunction barring the enforcement of a duly enacted statute poses a substantial risk of harming the public interest, appellate courts routinely issue stays pending appeal when lower courts enjoin a statute. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1302-1303 (2012) (Roberts, C.J., in chambers). And that relief is especially appropriate here given the strength of the Attorney General's merits arguments and because the equitable considerations overwhelmingly favor maintaining the status quo until this Court has ruled on those arguments.

On the merits, the district court purported to apply the framework in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), but it ignored many of the critical lessons of that decision. The Supreme Court emphasized that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). It is "not a right to keep and carry any weapon whatsoever," *id.* (quoting *Heller*, 554 U.S. at 626), and not all weapons are presumptively protected by the text of the Second Amendment, *see, e.g.*, *Heller*, 554 U.S. at 627 ("weapons that are most useful in military service—M-16 rifles and the like—may be banned"). *Bruen* did not change that—indeed, it did not "decide anything about the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). Even

2

as to weapons that are presumptively protected, and for which courts must look to our "Nation's historical tradition," *id.* at 2126 (majority opinion), that historical inquiry is not "a regulatory straightjacket," *id.* at 2133. The State need not identify a historical statute that is a "dead ringer" for a challenged law. *Id.* And "a more nuanced approach" is appropriate where—as here—the law addresses "unprecedented societal concerns or dramatic technological changes." *Id.* at 2132.

Seven other federal district courts have applied the *Bruen* framework to similar restrictions on assault weapons. All but one of those courts found the challenge unlikely to succeed, either because assault weapons are not presumptively protected by the Second Amendment, or because the challenged law is consistent with the Nation's historical tradition of firearm regulation, or on both grounds. The record in this case fully supports those conclusions. But the district court ignored the reasoning of its sister courts. Based on the popularity of certain AR-platform rifles among some gun owners, it concluded that *all* assault weapons (including semiautomatic pistols and shotguns) are presumptively protected arms. In reaching that conclusion, it failed to give serious consideration to the State's evidence that assault weapons are not commonly used for self-defense. And the district court's historical inquiry was the opposite of the nuanced approach called for by *Bruen*. It disregarded most of the relevant analogues and asserted that "[d]uring the most important period of history, there were relatively few gun

3

restrictions" "of any kind."  Order 27-28.  Under the district court's view, it appears that no state regulation banning *any* firearm would be "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130. That cannot be correct.

The equitable considerations also powerfully support a stay pending appeal. Assault weapons are used disproportionately in crime relative to their market presence.  They are disproportionately used in mass shootings, where they materially increase the numbers of deaths and injuries when compared to other weapons.  A stay pending appeal will forestall an otherwise inevitable influx of these harmful weapons, leaving the law in effect while this Court resolves the merits of the Attorney General's appeal.  Gun owners will remain able to purchase and possess a wide range of firearms for self-defense and other lawful purposes— including featureless AR-platform semiautomatic rifles that are not prohibited because they do not contain the dangerous tactical enhancements that qualify a firearm as an "assault weapon" under Section 30515.

If this Court is unable to rule on this motion before October 29, the Attorney General requests that the Court enter an administrative stay until the motion is resolved.  If the Court denies the motion, the Attorney General requests a 14-day administrative stay from the date of the denial to allow time to consider whether to seek further relief.

## BACKGROUND

### A.   The Assault Weapons Control Act

The California Legislature passed the Assault Weapons Control Act (AWCA) in 1989 in response to a proliferation of shootings involving assault weapons. The AWCA initially defined as "assault weapons" certain semiautomatic rifles, pistols, and shotguns identified by make and model. *See* Cal. Penal Code § 30510. The AWCA made it a crime to manufacture, import, sell, or possess any of the listed firearms without a permit. *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir. 2002). The Legislature found that each of those weapons "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." Cal. Penal Code § 30505(a).

Gun manufacturers soon began to produce "copycat" weapons to evade the AWCA's restrictions. *Silveira*, 312 F.3d at 1058 n.5. In response, the Legislature added a features-based definition of "assault weapons" to the AWCA, now codified at California Penal Code section 30515(a). *Silveira*, 312 F.3d at 1058; *see* 1999 Cal. Stat. ch. 129. That subsection defines as an "assault weapon" specific types of rifles, pistols, and shotguns that possess certain enumerated features or configurations. Cal. Penal Code § 30515(a).[1]

---

[1] Plaintiffs only challenge this features-based definition of "assault weapon."

The features that qualify firearms as "assault weapons" under Section 30515(a) involve specific tactical enhancements or configurations that make the weapons more dangerous to the public and law enforcement and more susceptible to criminal misuse. *See* D. Ct. Dkt. 103 at 4-11; Ex. 10 (Busse Decl.) ¶¶ 15, 17.[2] Specifically, a semiautomatic centerfire rifle qualifies as an assault weapon if it lacks a fixed ammunition magazine and is equipped with:  a pistol grip that protrudes conspicuously beneath the action of the rifle; a thumbhole stock that enables the shooter to place the thumb of the trigger hand within the stock; a folding or telescoping stock attached to the receiver that allows for shoulder firing; a forward pistol grip; a flash suppressor; or a grenade or flare launcher.  Cal. Penal Code § 30515(a)(1).  In addition, a semiautomatic centerfire rifle qualifies as an assault weapon if it is equipped with a fixed magazine capable of accepting more than ten rounds of ammunition or has an overall length of less than 30 inches.  *Id.* § 30515(a)(2)-(3).

A semiautomatic pistol that lacks a fixed magazine qualifies as an assault weapon under Section 30515(a) if it is equipped with:  a threaded barrel capable of accepting a flash suppressor, a forward handgrip, or a silencer to be attached to the barrel; a second handgrip; a barrel shroud that enables the shooter to grasp the

---

[2] Exhibits are attached to the accompanying Declaration of John D. Echeverria.

barrel while firing without burning the non-shooting hand; or the capacity to accept a detachable magazine outside of the pistol grip. *Id.* § 30515(a)(4). A semiautomatic pistol also qualifies as an assault weapon if it is equipped with a fixed magazine capable of accepting more than ten rounds. *Id.* § 30515(a)(5).

A semiautomatic shotgun qualifies as an assault weapon if it is equipped with an adjustable stock and a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, or a vertical handgrip; or if it lacks a fixed magazine. *Id.* § 30515(a)(6)-(7). No other type of shotgun qualifies as an assault weapon under Section 30515—including pump-action shotguns—unless the shotgun is equipped with a revolving cylinder that holds the shotgun's ammunition. *Id.* § 30515(a)(8).

Generally, semiautomatic centerfire rifles, semiautomatic pistols, and shotguns without any of the prohibited features are not considered "assault weapons" under California law. *See generally id.* § 30515(a)(1)-(8); Echeverria Decl. ¶ 9. Unless they are separately defined as an "assault weapon" under section 30510 or section 5499 of title 11 of the California Code of Regulations, such "featureless" arms—including AR-platform rifles—are lawful to purchase and possess within California. Echeverria Decl. ¶ 9 & Ex. 10; *see also* 2021 Featureless AR-15 Rifles, https://tinyurl.com/2jehanew (last visited Oct. 23, 2023).

7

For the past three decades, California has restricted the manufacture, distribution, transportation, importation, sale, lending, and possession of firearms that qualify as "assault weapons" under Sections 30510 and 30515.  *See* Cal. Penal Code §§ 30600(a), 30605(a).

### B.    Pre-*Bruen* Litigation

Plaintiffs claim that the AWCA's restrictions on firearms defined as assault weapons under Section 30515(a)(1)-(8) violate the Second Amendment, and they also challenge a range of California statutes and regulations relating to assault weapons.  D. Ct. Dkt. 9 at 41-42.  They filed a motion for a preliminary injunction in 2019, D. Ct. Dkt. 22, which the district court consolidated with a bench trial that was held in February 2021.  Following that trial, the district court permanently enjoined the challenged AWCA provisions.  D. Ct. Dkt. 115.  The district court stayed that judgment for 30 days at the Attorney General's request, to allow the Attorney General to appeal and seek a stay from this Court.  D. Ct. Dkt. 115 at 93-94.  This Court then granted the Attorney General's motion for a stay pending appeal.  C.A. No. 21-55608, Dkts. 1, 13.

### C.    Post-*Bruen* Litigation

In June 2022, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  The Court announced a standard for evaluating Second Amendment claims that "centered on constitutional text and history."  142

S. Ct. at 2128-2129.  Under that standard, courts must first determine whether "the Second Amendment's plain text covers an individual's conduct."  *Id.* at 2129-2130.  If so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.

After the *Bruen* decision, this Court remanded this case to the district court for "further proceedings consistent with the United States Supreme Court's decision in [*Bruen*]."  C.A. No. 21-55608, Dkt. 27.  The parties submitted supplemental briefing to the district court addressing the relevant historical analogues and applying the *Bruen* standard to the AWCA.  *See* Echeverria Decl. ¶¶ 28-57 & Ex. 19.

On October 19, 2023, the district court again permanently enjoined the challenged AWCA restrictions in their entirety.  Order 78-79.  The district court first held that the defined assault weapons are "Arms" protected by the Second Amendment based on its view that they "are no more dangerous than other arms the State does not ban," *id.* at 10; they are "as ubiquitous as Ford F-series pickup trucks," *id.* at 14-15; and while they are "useful for war" and "reasonably related to militia use," they "are not useful solely for military purposes," *id.* at 13.

Turning to *Bruen*'s historical inquiry, the district court discounted all analogues from before 1791 and after 1868, Order 19-20; disregarded all laws that

it described as related to the "*use* or *manner* of carrying guns" and not possession of guns, *id.* at 22; and rejected all analogies to laws restricting weapons other than firearms, *id.* at 26.  After filtering out those laws, the district court concluded that "there are no historical laws prohibiting simple possession of any type of firearm until long after . . . 1868," *id.* at 25; and that "[a] citizen could reside in any of the northern states and half of the southern states for the first fifty years free from state government firearm restrictions," *id.* at 30.  The court acknowledged that assault weapons "clearly represent[] a dramatic technological advancement" and that California was "attempting to address a modern societal concern of mass shootings." *Id.* at 39.  But it asserted that a "historical twin" for the AWCA was not "unimaginable," *id.* at 38—positing, for example, that early States could have "prohibit[ed] private possession of cannons," but did not.  *Id.* at 38.

## ARGUMENT

A party seeking a stay pending appeal must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of relief, that the balance of equities tip in its favor, and that a stay is in the public interest.  *Nken*, 556 U.S. at 425-426.  To obtain a stay, a party "need not demonstrate that it is more likely than not that they will win on the merits" or that "ultimate success is probable." *Leiva-Perez v. Holder*, 640 F.3d 962, 966-967 (9th Cir. 2011).  Rather, "a substantial case on the merits" or "serious legal questions"

10

will suffice "so long as the other factors support the stay." *Id.* at 966, 968 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 778 (1987); *see, e.g.*, *Rhode v. Becerra*, 2020 WL 9938296, at *1 (9th Cir. May 14, 2020).

The Attorney General satisfies that standard. *Bruen* reiterated that the Second Amendment does not protect a right to "keep and carry any weapon whatsoever." 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626). A faithful application of the *Bruen* framework to the assault weapons prohibited by California demonstrates that those weapons are not presumptively protected by the Second Amendment and, in any event, that California's restrictions are consistent with our Nation's historical tradition of firearm regulation. Indeed, seven other federal district court decisions have applied the *Bruen* framework to similar assault weapon restrictions, and all but one of those decisions has found that the plaintiffs' Second Amendment claims were unlikely to succeed. At a minimum, that authority reflects that this case raises serious and substantial legal questions justifying a stay. And the equitable considerations overwhelmingly favor preserving the status quo during this appeal: absent a stay, long-prohibited assault weapons that are often the weapon of choice for mass shooters will soon flood into California—before this Court has had a chance to determine whether each category of prohibited assault weapons is consistent with the Second Amendment.

11

# I. THE ATTORNEY GENERAL IS LIKELY TO SUCCEED ON THE MERITS

The district court misapplied the *Bruen* framework and its decision is at odds with the great weight of lower-court authority applying that framework to statutes restricting assault weapons. As that authority illustrates, the Attorney General is likely to succeed on the merits of this appeal—and the legal questions are surely of sufficient seriousness to justify a stay pending appeal.

1. In recent months, seven other federal district court decisions have applied the *Bruen* framework to assault weapon restrictions. Six have concluded that the restrictions are likely constitutional. *See Grant v. Lamont*, 2023 WL 5533522 (D. Conn. Aug. 28, 2023) (denying preliminary injunction motion to enjoin assault weapon restrictions), *appeal docketed*, No. 23-1344 (2d Cir. Sept. 28, 2023); *Nat'l Ass'n of Gun Rights v. Lamont* (*NAGR*), 2023 WL 4975979 (D. Conn. Aug. 3, 2023) (same), *appeal filed*, No. 22-cv-01118, Dkt. 86 (D. Conn. Aug. 16, 2023); *Hartford v. Ferguson*, 2023 WL 3836230 (W.D. Wash. June 6, 2023) (same); *Herrera v. Raoul*, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) (same), *appeal docketed*, No. 23-1793 (7th Cir. Apr. 26, 2023); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 2023 WL 2655150 (D. Del. Mar. 27, 2023) (same), *appeal docketed*, No. 23-1634 (3d Cir. Apr. 7, 2023); *Bevis v. City of Naperville, Ill.*, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (same), *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023).

Only the Southern District of Illinois held that a Second Amendment challenge to a law restricting assault weapons (and large-capacity magazines) is likely to succeed. *See Barnett v. Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023), *appeal docketed*, No. 23-1825 (7th Cir. May 1, 2023).[3]   But the Seventh Circuit promptly entered a stay of that order pending appeal. *Barnett v. Raoul*, No. 23-1825, Dkt. 30 (7th Cir. May 12, 2023); *see also id.*, Dkt. 9 (7th Cir. May 4, 2023) (administrative stay).   In entering the stay, the Seventh Circuit emphasized that other "district judges" had reached "differing conclusions." *Id.*, Dkt. 30 at 2.

2.   As the great weight of district court authority indicates, the restrictions challenged here are consistent with the Second Amendment under the standards announced in *Bruen*.   At the threshold, plaintiffs must establish that the "textual elements" of the Second Amendment—the right to "keep and bear" protected "Arms"—cover their desired course of conduct. *Bruen*, 142 S. Ct. at 2134; *see id.* at 2129-2130.   The Supreme Court has repeatedly recognized that the textual right "'is not unlimited.'" *Id.* at 2128.   It "extends only to certain types of weapons,"

---

[3] In *Rocky Mountain Gun Owners v. Board of County Commissioners of Boulder County*, 2022 WL 4098998 (D. Colo. Aug. 30, 2022), the court entered a 14-day temporary restraining order of a county restriction on assault weapons and large-capacity magazines.   But that order was issued without the benefit of briefing from the defendants, and it did not apply *Bruen*'s standards.   The plaintiffs voluntarily dismissed their claims before the district court could address the merits. No. 22-cv-2113, Dkt. 14, 15, 30 (D. Colo. Oct. 12, 2022).

*Heller*, 554 U.S. at 623, that are "in 'common use' today for self-defense," *Bruen*, 142 S. Ct. at 2134. It most certainly does not confer a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

Several lower courts that have analyzed assault weapon restrictions under the *Bruen* framework have recognized that the defined assault weapons are not presumptively protected by the Second Amendment. Even assuming that the challenged restrictions regulate "Arms," the firearm configurations covered by those restrictions are not "typically possessed by the average citizen for self-defense." *NAGR*, 2023 WL 4975979, at *26. The fact that some assault weapon configurations may be "commonly owned" by gun owners in some parts of the Nation does not by itself establish that they are "'in common use' today *for self-defense*." *Id.* at *12.[4] And the record here demonstrates that they are not. *See* Ex. 13 (Suppl. Klarevas Decl.) ¶¶ 15-18; Ex. 9 (Suppl. Allen Decl.) ¶¶ 11-12; Ex. 10 (Busse Decl.) ¶¶ 12-24. To the contrary, the assault weapons covered by Section 30515 are most suitable for *offensive* use—enhancing the ability of a shooter to rapidly and accurately fire semiautomatic rounds in a manner that kills or maims more people in a shorter amount of time, or to conceal or transport

---

[4] *See also Grant*, 2023 WL 5533522, at *5; *NAGR*, 2023 WL 4975979, at *22; *Hartford*, 2023 WL 3836230, at *3.

semiautomatic weapons.  *See NAGR*, 2023 WL 4975979, at *23, *26; Ex. 10 (Busse Decl.) ¶¶ 13-23.  Assault weapons are "like" M16 rifles—"weapons that are most useful in military service"—which the Supreme Court has explained "may be banned."  *Heller*, 554 U.S. at 627; *see also NAGR*, 2023 WL 4975979, at *24-26, *id.* at *25 (observing that the "marketing of assault weapons reflects [their] military roots").

And even if the acquisition or possession of assault weapons were viewed as presumptively protected conduct, the challenged AWCA provisions are "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.[5]  The Supreme Court emphasized that "[w]hile the historical analogies [in *Bruen*] and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Id.* at 2132.  That kind of approach is undoubtedly appropriate here.  "Semiautomatic assault weapons represent significant technological change."  *Hartford*, 2023 WL 3836230, at *5; Ex. 15 (Roth Decl.) ¶¶ 11-12; Ex. 16 (Spitzer Decl.) ¶¶ 18-30.  The technology in AR-platform rifles, for example, was invented in the 1950s, *see* Ex. 23 (ARPA Study) at 10, but they did not proliferate until the late 2000s, Ex. 11 (Busse Decl.) ¶ 11.  Semiautomatic

---

[5] *See, e.g.*, *Grant*, 2023 WL 55333522, at *6; *NAGR*, 2023 WL 4975979, at *26-33; *Hartford*, 2023 WL 3866230, at *3-6.

assault weapons enable more lethal rapid fire and result in substantially more deaths and injuries in mass shootings on average than when other weapons are used. *See, e.g.*, Ex. 5 (Klarevas Decl.) ¶ 17; Ex. 15 (Roth Decl.) ¶ 48. And "mass shootings carried out with assault weapons and [large-capacity magazines] that result in mass fatalities are a modern societal problem." *NAGR*, 2023 WL 4975979, at *29; *see also DSSA*, 2023 WL 2655150, at *11. Even the district court below observed that "it can be argued that 'assault weapons' represent a dramatic change in technology and [that] the State is attempting to address a modern societal concern of mass shootings." Order 39.

Under *Bruen*'s "more nuanced approach" to the historical inquiry, 142 S. Ct. at 2132, restrictions on assault weapons are consistent with a historical tradition of regulating particularly dangerous weapons technologies as they spread and cause harm. *See, e.g.*, *NAGR*, 2023 WL 4975979, at *31-33; *id.* at *32 ("governments have been passing regulations targeting specific types or characteristics of weapons that have proved problematic or dangerous since the time of the Founding"); Ex. 16 (Spitzer Decl.) ¶ 15.[6] That tradition is reflected in the history presented to the district court below, *see* Ex. 19 (D. Ct. Dkt. 163), including regulations enacted

---

[6] *See also Bevis*, 2023 WL 2077392, at *14; *DSSA*, 2023 WL 2655150, at *13; *Herrera*, 2023 WL 3074799, at *7; *Hartford*, 2023 WL 3836230, at *4; *Grant*, 2023 WL 5533522, at *6.

in the 18th and 19th centuries barring the use of "trap guns," the possession and carrying of fighting knives and melee weapons, and the concealed carry of dangerous weapons.  *See NAGR*, 2023 WL 4975979, at \*31-33; *Bevis*, 2023 WL 2077392, at \*10-11.  These historical predecessors are relevantly similar to the AWCA in terms of both burden and justification.  They imposed comparably minimal burdens by leaving available a wide range of weapons and accessories for lawful self-defense.  *Bruen*, 142 S. Ct. at 2133; *see DSSA*, 2023 WL 2655150, at \*13; *Hartford*, 2023 WL 3836230, at \*6.  And they advanced comparable public-safety goals by protecting the public from especially lethal arms and accessories.  *See NAGR*, 2023 WL 4975979, at \*32.  Early 20th-century restrictions on the use and possession of automatic and semiautomatic firearms, enacted after those technologies emerged, confirm the relevant historical tradition.  *See Hartford*, 2023 WL 3836230, at \*5.

3.  In reaching a different conclusion regarding the constitutionality of the AWCA, the district court below employed a deeply flawed analysis.  With respect to *Bruen*'s threshold inquiry, the district court announced a novel standard that would presumptively protect all "weapons that may be useful for war and are reasonably related to militia use . . ., so long as they are not useful solely for military purposes."  Order 13.  Its analysis of whether the assault weapons prohibited by California are in common use for self-defense did not give serious

attention to the State's evidence explaining why the prohibited features of semiautomatic rifles, pistols, and shotguns are *not* commonly used—or even suitable—for lawful self-defense.  *Compare* Ex. 10 (Busse Decl.) ¶¶ 13-23 (discussing each prohibited accessory or feature); Ex. 21, ¶¶ 15-21 (Tucker Decl.), *with* Order 3 (characterizing the regulated features as affecting only a firearm's "looks").  Instead, the court relied almost exclusively on the total number of AR- and AK-platform rifles purportedly circulating in the United States and the subjective reasons why some people may own them.  *See* Order 4, 5, 11, 76.

That blunderbuss approach is not a valid method for holding that each one of the several categories of prohibited "assault weapons" in Section 30515 is presumptively protected—or for enjoining all of Section "30515(a)(1) through (8)."  Order 78; *see* Cal. Penal Code § 30515(e) (severability provision).  Some of those categories do not apply to rifles, Order 5; some of the rifles included in the court's figures are not prohibited, *see* Echeverria Decl. ¶ 9; and other rifles included in the figure are "in possession of law enforcement," Order 4 n.12.[7]  In any event, if "popularity" and the subjective desire of some firearms enthusiasts to possess a weapon entitle that weapon to Second Amendment protection, that would

---

[7] AR- and AK-platform rifles comprise just 5% of the current civilian gun stock. Ex. 13 (Suppl. Klarevas Decl.) ¶ 15.  Plaintiffs submitted no evidence concerning the prevalence of the many other weapons regulated by the AWCA—including rifles with grenade launchers or shotguns with rotating cylinders.

"allow[ ] the firearms industry to control the bounds of the Second Amendment" through savvy marketing and sales practices in pursuit of its "economic interest in the increased sale of" that weapon.  *Or. Firearms Fed'n v. Kotek*, 2023 WL 4541027, at *28 (D. Or. July 14, 2023).

The district court below also concluded that the State identified no historical tradition supporting its regulation of assault weapons.  Order 25.  But it reached that conclusion only after ignoring most of the relevant historical laws that inform a nuanced approach to the analogical analysis.  For instance, the district court discounted evidence of laws from before 1791, *id.* at 28—despite the Supreme Court's instruction that laws from that era may shed light on the "pre-existing right" codified when the States ratified the Second Amendment, *Heller*, 554 U.S. at 603.  It ignored laws enacted after 1868, Order 22, despite Supreme Court guidance that post-ratification evidence can help "settle the meaning" of the Constitution, *Bruen*, 142 S. Ct. at 2136.  It disregarded other duly enacted laws on the theory that they were not adequately "enforced" by local officials.  Order 48.  And it rejected analogies to historical laws that concerned "restrictions on *use*" rather than "possession," *id.* at 22, and to laws regulating weapons other than firearms, *id.* at 50—even though *Bruen*'s central premise is that the State may draw analogies to "relevantly similar" laws that arose in different contexts but imposed

19

comparable burdens on the "right to armed self-defense" and were supported by comparable justifications.  142 S. Ct. at 2118, 2132.

That blinkered approach to the historical inquiry failed to follow *Bruen*'s guidance that modern laws addressing "dramatic technological changes" or "unprecedented societal concerns" warrant a more nuanced analysis of historical precursors.  Order 39.  And it stands in marked contrast to the district court's breezy approach when it relied on its own unfounded historical speculation—such as when the court asserted that "[a] historical twin is not unimaginable" because early States could have "prohibit[ed] private possession of cannons or Gatling guns," but did not.  *Id.* at 38.

Perhaps the most startling aspect of the district court's analysis lies in its repeated assertion that firearms were "completely unregulated" in the early part of our Nation's history.  Order 31.  In the district court's view, "there [were] no historical laws prohibiting simple possession of any type of firearm until long after" 1868, *id.* at 25; there were "relatively few gun restrictions" during "the most important period of history," *id.* at 27; "[a] citizen could reside in any of the northern states and half of the southern states for the first fifty years free from state government firearm restrictions," *id.* at 30; and "the history and tradition of the southern states was to leave firearm ownership and use mostly unregulated," *id.* at 34.  Indeed, in the court's view, "[t]he inference can be drawn that" some

founding-era residents "owned and kept at home cannons, howitzers, grenades and bombs." *Id.* at 49.  Under that view, it appears that no state regulation banning *any* firearm—or even "grenades [or] bombs," *id.*—would be "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130.  That is exactly the kind of "regulatory straightjacket" that *Bruen* disclaimed.  *Id.* at 2133.

## II.   THE EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF A STAY

The equitable considerations also overwhelmingly favor a stay.  As a general matter, the "public interest" is harmed where, as here, a lower court invalidates and enjoins a duly enacted statute.  *See, e.g.*, *Maryland*, 567 U.S. at 1303; *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008).  And a State necessarily "suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *see also Maryland*, 567 U.S. at 1303.

There is an especially grave threat of irreparable harm here.  California's restrictions on assault weapons have been in place for over three decades.  Assault weapons in general are used disproportionately in crime relative to their market presence.  Ex. 7 at 1.  And they pose particular threats to public safety.  *See supra* p. 16.  They enable a mass-shooter to deploy rapid fire in a more lethal manner. For example, pistol grips, forward pistol grips, and barrel shrouds allow a shooter

to maintain greater control and accuracy during rapid firing by counteracting muzzle rise during repeated firing.[8]  A flash suppressor allows a shooter to maintain accurate, rapid fire in low-light conditions and can help conceal the shooter's position.[9]  Other features prohibited by the AWCA pose similar dangers.

Assault weapons generally inflict more numerous and more extensive injuries than other weapons.  According to the surgeon who treated victims of two of the Nation's deadliest mass shootings, victims of assault-weapon shootings tend to exhibit injuries that are "higher in complexity with higher complication rates than such injuries from non-assault weapons, increasing the likelihood of morbidity."  Ex. 3 (Colwell Decl.) ¶ 8.  When used in mass shootings, assault weapons correlate with substantially more fatalities and injuries on average than when other weapons are used.[10]  The recent mass shootings in Orlando, Sutherland Springs, Parkland, and Uvalde all involved the use of assault weapons.  Ex. 13 (Suppl. Klarevas Decl.) ¶ 11 & tbl. 1.

---

[8] D. Ct. Dkt. 103 ¶¶ 45-47; Ex. 4 (Graham Decl.) ¶¶ 28-30, 38; Ex. 6 (ATF Report) at 6; Ex. 10 (Busse Decl.) ¶ 13.

[9] Ex. 6 (ATF Report) at 7.

[10] Ex. 2 (Allen Decl.) ¶ 34; Ex. 5 (Klarevas Decl.) ¶¶ 10-17.

The district court dismissed these concerns, asserting that the regulated accessories and features affect only a firearm's "looks."  Order 3.[11]  The evidence—and recent experience—prove otherwise.  The threatened disruption of the State's longstanding public-safety requirements warrants significant consideration in this Court's balancing of the equities.  Without relief, the district court's permanent injunction will allow a sudden surge of long-prohibited assault weapons into the State with features serving specific, combat-functional ends.  Even if this Court were to reverse the district court on appeal, it would be impracticable if not impossible for the State to restore the status quo and remove all those weapons from the State.  Ex. 4 (Graham Decl.) ¶¶ 72-77.  The State's prior experience in *Duncan* underscores these risks.  "[H]igh-capacity magazines flooded into California" after the same district court immediately halted enforcement of California Penal Code section 32310 and delayed in entering a stay for a week in 2019.  Echeverria Decl. ¶ 61 & Ex. 24.  Many remain in the State to this day.  *Id.* ¶ 61.

---

[11] The district court also suggested that assault weapons "are rarely the problem," citing to statistics about the use of assault weapons in violent crimes committed in California.  Order 7.  But the district court failed to consider whether the relatively lower incidence of assault weapon use in California is correlated to the fact that they have been banned in the State for over three decades.

Any temporary inconvenience to plaintiffs from the stay would not outweigh these harms or interfere with plaintiffs' right to self-defense.  California law allows plaintiffs and other law-abiding Californians to purchase and possess a range of authorized weapons—including AR-platform rifles that do not have the specific tactical enhancements or configurations that make assault weapons more dangerous to the public and law enforcement.  As this Court considers the important questions raised by this appeal, plaintiffs may continue to possess and use those weapons for self-defense and other lawful purposes.

## CONCLUSION

The Court should stay the district court's order and permanent injunction pending appeal.  If necessary, the Court should issue an administrative stay before October 29, 2023, to preserve the status quo until the Court resolves this motion.

Dated:  October 23, 2023        Respectfully submitted,


ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
HELEN H. HONG
MICA L. MOORE
*Deputy Solicitors General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ANNA FERRARI
*Deputy Attorney General*

s/ John D. Echeverria

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendants-Appellants Rob Bonta and Allison Mendoza, in their official capacities*

## STATEMENT OF RELATED CASES

Defendants are aware of the following related cases:

- *Duncan v. Bonta*, C.A. No. 23-55805 (9th Cir.) (en banc):  Appeal from a decision permanently enjoining enforcement of California Penal Code section 32310, which restricts large-capacity magazines, defined as firearm magazines capable of holding more than 10 rounds of ammunition.  The matter below was transferred to the district court as a case related to *Duncan* at plaintiffs' request. D. Ct. Dkts. 4, 6.

- *Or. Firearms Fed'n v. Kotek*, C.A. No. 23-35540 (9th Cir.):  Appeal from a final judgment upholding Oregon Ballot Measure 114, which imposes restrictions concerning large-capacity magazines, defined under Oregon law as firearm magazines capable of holding more than 10 rounds of ammunition.

Dated:  October 23, 2023                                      s/ John D. Echeverria

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing emergency motion complies with the type-volume limitation of Ninth Circuit Rules 27-1 and 32-3(2) because it consists of 5,595 words, excluding the documents listed at Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).  This emergency motion complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 27 because it has been prepared in a proportionally spaced typeface using 14-point font.

Dated:  October 23, 2023                                      s/ John D. Echeverria