No. 23-2979

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

JAMES MILLER, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, ET AL.,

*Defendants-Appellants.*

———————————

## On Appeal from the United States District Court
## for the Southern District of California
No. 3:19-cv-1537-BEN-JLB
The Honorable Roger T. Benitez, Judge

———————————

## DECLARATION OF JOHN D. ECHEVERRIA
## IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR A STAY PENDING APPEAL AND FOR AN INTERIM
## ADMINISTRATIVE STAY

## RELIEF REQUESTED BY OCTOBER 29, 2023

———————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
HELEN H. HONG
MICA L. MOORE
*Deputy Solicitors General*

R. MATTHEW WISE
*Supervising Deputy Attorney General*
ANNA FERRARI
JOHN D. ECHEVERRIA
*Deputy Attorneys General*
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  Email:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants-Appellants Rob
Bonta and Allison Mendoza, in their
official capacities*

October 23, 2023

## DECLARATION OF JOHN D. ECHEVERRIA

I, John D. Echeverria, declare:

1.      I am a Deputy Attorney General with the California Department of Justice and serve as counsel to defendants-appellants Rob Bonta, in his official capacity as Attorney General of the State of California, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms, in the above-captioned matter.  I make this declaration in support of defendants' Emergency Motion under Circuit Rule 27-3 for a Stay Pending Appeal and for an Interim Administrative Stay, for which relief is requested by October 29, 2023. Except as otherwise stated herein, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently as to those facts.

2.      This case is an appeal from the district court's decision, entered on October 19, 2023, declaring certain provisions of California's Assault Weapons Control Act (AWCA) unconstitutional under the Second Amendment and enjoining their enforcement.  D. Ct. Dkt. 175.  The district court stayed enforcement of its order for ten days, and that temporary stay will expire on October 29, 2023.  D. Ct. Dkt. 175 at 78-79.  Attached hereto as **Exhibit 1** is a true and correct copy of the decision permanently enjoining enforcement of provisions of the AWCA.

1

3.      On August 15, 2019, the initial complaint was filed in this action, asserting a Second Amendment challenge to provisions of California Penal Code section 30515 (Section 30515) defining as "assault weapons" semiautomatic, centerfire rifles and semiautomatic pistols with fixed firearm magazines capable of holding more than ten rounds of ammunition.  *See* Cal. Penal Code § 30515(a)(2), (a)(5); D. Ct. Dkt. 1.

4.      The case was initially assigned to United States District Judge John A. Houston of the United States District Court for the Southern District of California.  On August 16, 2019, plaintiffs filed of a Notice of Related Case, stating that this action was related to *Duncan v. Becerra*, No. 3:17-cv-1017-BEN-JLB (S.D. Cal.), a Second Amendment challenge to California's restrictions on "large-capacity magazines," defined as firearm magazines capable of holding more than ten rounds of ammunition, which are codified at California Penal Code section 32310.  *Duncan* is presided over by United States District Judge Roger T. Benitez.  On August 20, 2019, this action was transferred to United States District Judge Roger T. Benitez.  D. Ct. Dkt. 6.

5.      Shortly thereafter, on September 27, 2019, plaintiffs James Miller; Patrick Russ; Wendy Hauffen; Neil Rutherford; Adrian Sevilla; Ryan Peterson; Gunfighter Tactical, LLC; John Phillips; PWGG, L.P.; San Diego County Gun Owners PAC; California Gun Rights Foundation; Second Amendment Foundation;

and Firearms Policy Coalition, Inc. filed the operative First Amended Complaint, expanding this action to challenge all of the features-based definitions of an "assault weapon" set forth in Section 30515(a)(1)-(8) and a range of California statutes and regulations relating to assault weapons:  California Penal Code sections 30600, 30605, 30800, 30910, 30915, 30925, 30945, 30950, 31000, and 31005 and sections 5460 and 5471 of title 11 of the California Code of Regulations.  D. Ct. Dkt. 9 at 41-42.[1]  Plaintiffs do not challenge the definition of "assault weapon" in California Penal Code section 30510 or section 5499 of title 11 of the California Code of Regulations, which identify certain firearms as "assault weapons" by make and model.

6.     Section 30515(a) defines as "assault weapons" certain semiautomatic rifles, semiautomatic pistols, and shotguns that are configured with certain listed features.  In particular, a semiautomatic, centerfire rifle qualifies as an assault weapon if (1) it lacks a fixed magazine and is equipped with a pistol grip beneath the action, a thumbhole stock, a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, or a forward pistol grip; (2) has a fixed magazine

---

[1] After the filing of the First Amended Complaint, plaintiffs voluntarily dismissed without prejudice Patrick Russ as a plaintiff, D. Ct. Dkt. 20, and withdrew their challenge to California Penal Code section 30925, D. Ct. Dkt. 46 at 2 (denying defendants' motion to dismiss certain claims, but accepting plaintiffs' consent to dismissal of their claim challenging California Penal Code section 30925).

with a capacity to accept more than 10 rounds; or (3) has an overall length of less than 30 inches.  Cal. Penal Code § 30515(a)(1)-(3); *see* Cal. Code Regs. tit. 11, § 5471.

7.      A semiautomatic pistol qualifies as an assault weapon if it (1) lacks a fixed magazine and has a threaded barrel (capable of accepting a flash suppressor, a forward handgrip, or a silencer), a second handgrip, a barrel shroud, or the capacity to accept a detachable magazine at a location outside the pistol grip; or (2) has a fixed magazine with a capacity to accept more than 10 rounds.  Cal. Penal Code § 30515(a)(4)-(5); *see* Cal. Code Regs. tit. 11, § 5471.

8.      A shotgun qualifies as an assault weapon if it (1) is semiautomatic and has both a folding or telescoping stock and a pistol grip beneath the action, a thumbhole stock, or a vertical handgrip; (2) is semiautomatic and does not have a fixed magazine; or (2) has a revolving cylinder.  Cal. Penal Code § 30515(a)(6)-(8); *see* Cal. Code Regs. tit. 11, § 5471.

9.      Under Section 30515(a), the following firearms are not considered "assault weapons":  semiautomatic, centerfire rifles without a fixed magazine and without any of the prohibited features; semiautomatic, centerfire rifles with a fixed magazine holding ten or fewer rounds, even if they have any of the listed features; semiautomatic, rimfire rifles, even if they have any of the listed features; semiautomatic pistols with a fixed magazine holding ten or fewer rounds, even if

4

they have any of the listed features; and semiautomatic pistols and semiautomatic shotguns without any of the prohibited features.  Unless they are separately defined as an "assault weapon" under California Penal Code section 30510 or section 5499 of title 11 of the California Code of Regulations, such "featureless" firearms, including AR-platform rifles, are lawful to purchase and possess within California.

10.    On December 6, 2019, plaintiffs filed a motion for preliminary injunction, seeking to enjoin the Attorney General, his agents, employees, and those working in active concert with him from enforcing California Penal Code sections 30515(a) and (b), 30600, 30605, 30800, 30910, 30915, 30925, 30945, 30950, 31000, and 31005 and sections 5460 and 5471 of title 11 of the California Code of Regulations.  D. Ct. Dkt. 22 at 2.

11.    Defendants opposed the motion for preliminary injunction on January 23, 2020.  D. Ct. Dkt. 33.

12.    The district court held an evidentiary hearing on the preliminary injunction in October 2020, D. Ct. Dkts. 53-55, after which it set a trial to commence approximately three months later, D. Ct. Dkt. 59 at 115.  The court consolidated the trial on the merits with the hearing on plaintiffs' preliminary injunction motion under Federal Rule of Civil Procedure 65(a)(2).  *Id.*  The parties engaged in expedited discovery and pretrial proceedings during the intervening months, and a two-day bench trial was held in February 2021. The two-day non-

jury trial was held on February 3, 2021 and February 5, 2021.  D. Ct. Dkt. 96, 97; *see also* D. Ct. Dkt. 113, 114 (copies of the official trial transcripts).

13.     Attached hereto as **Exhibit 2** is a true and correct copy of the Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction, dated January 23, 2020, previously marked as Defendants' Trial Exhibit A.

14.     Attached hereto as **Exhibit 3** is a true and correct copy of the Declaration of Christopher B. Colwell in Support of Defendants' Opposition to Motion for Preliminary Injunction, dated January 9, 2020, previously marked as Defendants' Trial Exhibit B.

15.     Attached hereto as **Exhibit 4** is a true and correct copy of the Declaration of Blake Graham in Support of Defendants' Opposition to Motion for Preliminary Injunction, dated January 22, 2020, previously marked as Defendants' Trial Exhibit D.

16.     Attached hereto as **Exhibit 5** is a true and correct copy of the Declaration of Professor Louis Klarevas in Support of Defendants' Opposition to Motion for Preliminary Injunction, dated January 22, 2020, previously marked as Defendants' Trial Exhibit E.

17.     Attached hereto as **Exhibit 6** is a true and correct copy of Bureau of Alcohol, Tobacco & Firearms, Report and Recommendation on the Importability

6

of Certain Semiautomatic Rifles (1989), previously marked as Defendants' Trial Exhibit H.

18.     Attached hereto as **Exhibit 7** is a true and correct copy of Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. of Urban Health 313 (2017), previously marked as Defendants' Trial Exhibit Y.

19.     On June 4, 2021, the district court issued a decision and thereafter entered final judgment in favor of plaintiffs, enjoining all of the challenged provisions of the AWCA.  D. Ct. Dkt. 115, 116.  The district court stayed its judgment for 30 days to allow defendants to appeal and to seek a stay from this Court.  D. Ct. Dkt. 115 at 93-94.

20.     On June 10, 2021, defendants appealed the judgment, D. Ct. Dkt. 117, and defendants moved for a stay of the judgment and an interim administrative stay if a stay were not entered before the expiration of the 30 days afforded by the district court, C.A. No. 21-55608, Dkt. 2.

21.     On June 21, 2021, a three-judge panel of this Court issued an order staying the district court's order and judgment pending resolution of *Rupp v. Bonta*, C.A. No. 19-56004, and the stay was to remain in effect until further order of the Court.  C.A. No. 55608, Dkt. 13.

7

22.     *Rupp v. Bonta* involves a similar Second Amendment challenge to provisions of the AWCA regulating certain semiautomatic rifles defined as assault weapons under California Penal Code section 30510(a) (defining specified rifles as assault weapons by make and model), section 5499(a) of title 11 of the California Code of Regulations (defining specified rifles as assault weapons by make and model), and Section 30515(a)(1)-(3) (defining certain semiautomatic, centerfire rifles as assault weapons by feature).  *Rupp* was pending on appeal before this Court at the time of the stay order.  In *Rupp*, the plaintiffs had appealed a decision of the United States District Court for the Central District of California, granting the Attorney General's motion for summary judgment and upholding the challenged provisions of the AWCA.  *Rupp v. Becerra*, 401 F. Supp. 3d 978, 994 (C.D. Cal. 2019), *vacated and remanded sub nom. Rupp v. Bonta*, 2022 WL 2382319 (9th Cir. June 28, 2022).  At the time of the stay order, the Court was holding *Rupp* in abeyance pending resolution of en banc proceedings in *Duncan v. Bonta*, C.A. No. 19-55376, and the issuance of the *Duncan* mandate and further order of the Court.  *Rupp*, C.A. No. 19-56004, Dkt. 65 (9th Cir. Feb. 25, 2021).

23.     The en banc Court issued its opinion in *Duncan* on November 30, 2021, C.A. No. 19-55376, Dkt. 191-1 (9th Cir. Nov. 30, 2021) (en banc), and stayed the issuance of the mandate for 150 days or until final disposition of the case if the plaintiffs filed a petition for a writ of certiorari, C.A. No. 19-55376,

Dkt. 193 (9th Cir. Dec. 20, 2021) (en banc).  The *Duncan* plaintiffs then filed a

petition for writ of certiorari with the U.S. Supreme Court on February 28, 2022.

U.S. No. 21-1194, Dkt. 1.

24.     On June 23, 2022, the U.S. Supreme Court issued its decision in

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  In *Bruen*,

the Court declined to adopt the two-step framework that the Ninth Circuit and most

other federal courts of appeals had adopted for resolving Second Amendment

claims.  *Id.* at 2126.  The Court announced a new standard "rooted in the Second

Amendment's text, as informed by history."  *Id.* at 2127.

25.     Two days before the U.S. Supreme Court issued its order in

*Duncan*—granting the petition for writ of certiorari, vacating the en banc Court's

judgment, and remanding the case for further consideration in light of *Bruen*, 142

S. Ct. 2895 (2022)—this Court sua sponte vacated the judgment in the *Rupp* appeal

and remanded the matter for further proceedings consistent with *Bruen*.  *Rupp v.*

*Bonta*, C.A. No. 19-56004, Dkt. 71 (9th Cir. June 28, 2022).  Since remand of

*Rupp*, the district court presiding over that action ordered supplemental discovery,

*Rupp v. Bonta*, No. 17-cv-00746-JLS-JDE, Dkt. 131 at 2 (C.D. Cal. Oct. 19, 2022),

and after the close of supplemental discovery, the parties filed cross motions for

summary judgment, *Rupp v. Bonta*, No. 17-cv-00746-JLS-JDE, Dkt. 149, 150

(C.D. Cal. May 26, 2023).  The district court heard argument on the motions for

summary judgment on September 8, 2023 and took the motions under submission. *Rupp v. Bonta*, No. 17-cv-00746-JLS-JDE, Dkt. 160 (C.D. Cal. Sept. 8, 2023).

26.     On June 30, 2022, after the Court's remand of *Rupp*, plaintiffs in this action filed a motion before this Court to lift the stay immediately and to permit the district court's prior judgment to go into effect.  C.A. No. 21-55608, Dkt. 21.  Defendants opposed the motion, and moved the Court to instead remand the case back to the district court to "allow the parties [to] compile the kind of historical record that *Bruen* requires."  C.A. No. 21-55608, Dkt. 22 at 1-2.

27.     On August 1, 2022, the Court granted defendants' motion and remanded the case to the district court for "further proceedings consistent with the United States Supreme Court's decision in [*Bruen*]."  C.A. No. 21-55608, Dkt. 27. The Court denied plaintiffs' motion to lift the stay as moot.  *Id.*

28.     Before this Court issued the mandate from the appeal, on August 8, 2022, the district court ordered the parties to submit simultaneous briefs addressing *Bruen* within 20 days.  D. Ct. Dkt. No. 125.  The mandate later issued on August 23, 2022.  D. Ct. Dkt. 133.  Once the mandate issued, the district court set a hearing on the mandate for August 29, 2022.  D. Ct. Dkt. 127.

29.     In their supplemental brief, defendants requested that the district court set a schedule for expedited discovery followed by dispositive motions to be filed in March 2023.  D. Ct. Dkt. 129 at 17-18.  During the hearing on August 29,

2022, defendants repeated their request for an expedited discovery period to assemble and examine effectively the historical record under *Bruen*. Attached hereto as **Exhibit 8** is a true and correct copy of the transcript of the August 29, 2022 mandate hearing.

30. At the hearing, the district court stated that "the history of the Second Amendment regulation has been hashed out in every circuit in this country." Ex. 8 at 2. The court denied defendants' request for discovery and set a 45-day deadline for the parties to file simultaneous briefs, followed by simultaneous responses due 15 days later. *Id.* at 17. The court explained to defendants' counsel, "You've got 45 days to file briefings, declarations, anything you want to file in support of your position, keeping in mind that you have the burden to justify the restriction on the Second Amendment." *Id.*

31. The order was memorialized in a minute order issued on August 30, 2022. D. Ct. Dkt. 131.

32. On October 13, 2022, defendants filed a supplemental brief, including nine declarations from historians, academics, and social scientists, addressing issues relevant to the *Bruen* standard. D. Ct. Dkt. 137.

33. Attached hereto as **Exhibit 9** is a true and correct copy of the Supplemental Declaration of Lucy P. Allen, dated October 13, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-1).

11

34.     Attached hereto as **Exhibit 10** is a true and correct copy of the Declaration of Ryan Busse, dated October 13, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-2).

35.     Attached hereto as **Exhibit 11** is a true and correct copy of the Declaration of Saul Cornell, dated October 13, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-3).

36.     Attached hereto as **Exhibit 12** is a true and correct copy of the Supplemental Declaration of John J. Donohue, dated October 12, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-4).

37.     Attached hereto as **Exhibit 13** is a true and correct copy of the Supplemental Declaration of Louis Klarevas, dated October 13, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-5).

38.     Attached hereto as **Exhibit 14** is a true and correct copy of the Declaration of Brennan Rivas, dated October 12, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-6).

39.     Attached hereto as **Exhibit 15** is a true and correct copy of the Declaration of Randolph Roth, dated October 12, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-7).

40.     Attached hereto as **Exhibit 16** is a true and correct copy of the Declaration of Robert Spitzer, dated October 13, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-8).

41.     Attached hereto as **Exhibit 17** is a true and correct copy of the Declaration of Michael Vorenberg, dated October 13, 2022 and submitted with defendants' October 13 supplemental brief (D. Ct. Dkt. 137-9).

42.     Plaintiffs also filed a supplemental brief on October 13, 2022.  D. Ct. Dkt. 136.

43.     The day after the parties filed their supplemental briefs, the district court ordered the parties to file "a compendium of works, articles, studies, internet articles, etc., cited or referred to in the briefs and attached declarations and provide a printed courtesy copy of the compendium to chambers within one week."  D. Ct. Dkt. 138.  Defendants filed the compendia as ordered.  *See* D. Ct. Dkts. 144-154.

44.     In accordance with the district court's order, on October 28, 2022, the parties filed responsive briefs.  D. Ct. Dkts. 156, 157.  In their responsive brief, defendants requested that the court stay any adverse judgment pending appeal.  *See* D. Ct. Dkt. 157 at 1 n.1.

45.     On November 7, 2022, the district court set a hearing for December 12, 2022, on a third party's motion for reconsideration of a prior order denying its

motion for leave to participate as an amicus curiae (D. Ct. Dkt. 141).  D. Ct. Dkt. 159.  The court ordered all attorneys to appear at the hearing.  *Id.*

46.     On December 12, 2022, the district court held the hearing in this matter on the third party's motion for reconsideration, and consolidated that hearing with hearings in three other Second Amendment cases pending before the Court in which the Attorney General is a defendant:  *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.) (challenge to large-capacity magazine restrictions); *Rhode v. Bonta*, No. 3:18-cv-00802-BEN-JLB (S.D. Cal.) (challenge to background check requirement for ammunition purchases); and *Fouts v. Bonta*, No. 3:19-cv-01662-BEN-JLB (S.D. Cal.) (challenge to restrictions on billy clubs). The third party's motion for reconsideration was not addressed at the hearing. Attached hereto as **Exhibit 18** is a true and correct copy of the transcript of the December 12 hearing.

47.     During that hearing, counsel for the Attorney General requested time to conduct expert discovery in support of the historical analysis required by *Bruen*, but the district court explained, "I see no point in [expert testimony]; nor do I think any additional discovery is necessary or additional expert work is necessary." Ex. 18 at 12.  The court denied the Attorney General's request and ordered the Attorney General to prepare spreadsheets or surveys of relevant historical laws within 30 days.  *Id.* at 38.  The court ordered the Attorney General

14

to prepare a survey of laws "in effect at the time the Second Amendment was adopted" through the year 1888 (20 years after ratification of the Fourteenth Amendment to the United States Constitution). *Id.* at 29-30. The court also permitted the Attorney General to prepare a second survey of laws enacted after 1888. *Id.* at 32-33. This order was issued in all four cases heard during the December 12 hearing.

48. On December 15, 2022, the Court entered the same order in all four Second Amendment cases heard at the consolidated hearing. That order required the Attorney General to "create, and the plaintiffs shall meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in chronological order" that shall "begin at the time of the adoption of the Second Amendment and continue through twenty years after the Fourteenth Amendment." D. Ct. Dkt. 161. The order also permitted defendants to "create a second survey covering a time period following that of the first list." *Id.*

49. On January 11, 2023, defendants filed two surveys of relevant state, territorial, and local laws, ordinances, regulations, and authorities that defendants view as relevantly similar analogues to the challenged AWCA provisions: one survey of laws enacted from the pre-founding period to 1888 and a separate survey from 1889 through the 1930s. D. Ct. Dkt. 163. Attached hereto as **Exhibit 19** is a true and correct copy of the Declaration of John D. Echeverria re Submission of

Surveys, including the two annexed surveys of relevant laws assembled by defendants.  D. Ct. 163.

50.     Despite the district court's December 15 order, plaintiffs did not meet and confer with defendants in the preparation of these surveys.  *See* Ex. 19 (Decl. of John D. Echeverria re Submission of Surveys) ¶ 3.

51.     On February 7, 2023, the district court issued an order requiring defendants to file an additional brief identifying "the best historical regulation that is a proper analogue and relevantly similar to a statewide prohibition on possession of a firearm with listed features."  D. Ct. Dkt. 164.  This additional brief was to be filed on February 10, 2023, three days after entry of the order.

52.     On February 10, 2023, the parties filed supplemental briefs.  D. Ct. Dkts. 166, 167, 168.  Plaintiffs' brief attached two appendices providing their responses to the laws listed on defendants' surveys.  D. Ct. Dkts. 166-1, 166-2. Defendants filed a brief in response to the district court's December 15, 2022 order, D. Ct. Dkt. 167, and a declaration of counsel, attaching copies of additional expert-witness declarations relevant to this action that were prepared after the filing of defendants' December 13 supplemental brief, D. Ct. Dkt. 167-1.

53.     Attached hereto as **Exhibit 20** is a true and correct copy of the Declaration of Dennis Baron, dated November 7, 2022, filed in *Duncan v. Bonta*,

No. 17-cv-1017-BEN-JLB, Dkt. 118-2 (S.D. Cal.), and submitted with defendants' February 10 supplemental brief in this matter (D. Ct. Dkt. 167-1).

54.     Attached hereto as **Exhibit 21** is a true and correct copy of the Supplemental Expert Report and Declaration of Colonel (Ret.) Craig Tucker, dated January 6, 2023, served in *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.), and submitted with defendants' February 10 supplemental brief in this matter (D. Ct. Dkt. 167-1).

55.     Attached hereto as **Exhibit 22** is a true and correct copy of the Declaration of Kevin Sweeney, dated February 5, 2023, filed in *Oregon Firearms Fed'n v. Brown*, Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM (D. Or.), *appeal docketed*, Nos. 23-35478 (9th Cir. July 17, 2023), 23-35479 (9th Cir. July 17, 2023), 23-35539 (9th Cir. Aug. 15, 2023), 23-35540 (9th Cir. Aug. 15, 2023), and submitted with defendants' February 10 supplemental brief (D. Ct. Dkt. 167-1).

56.     On February 10, 2023, defendants also filed a brief in response to the district court's February 7 order, directing the Attorney General to identify "the best historical regulation that is a proper analogue and relevantly similar to a statewide prohibition on possession of a firearm with listed features" (D. Ct. Dkt. 164).  D. Ct. Dkt. 168.  This brief explained that defendants do not rely on any single analogue to defend the constitutionality of the challenged AWCA provisions

and that restrictions on the carrying of certain dangerous weapons traced back to the pre-founding era are relevantly similar to the AWCA's restrictions on assault weapons. *Id.* at 1. As required by the district court's order, the brief focused on one law among other relevantly similar analogues prohibiting the keeping of any firearm configured as a trap gun, 1763-1775 N.J. Laws 346, ch. 539, § 10 (1771). *Id.*

57.    On February 21, 2023, the parties filed supplemental responsive briefs. D. Ct. Dkts. 169, 170. Defendants' brief was accompanied by a declaration of counsel, attaching a copy of a report of the federal government's Advanced Research Projects Agency—now, the Defense Advanced Research Projects Agency, or "DARPA"—on the performance of the AR-15 in the Vietnam War. Attached hereto as **Exhibit 23** is a true and correct copy of the Advanced Research Projects Agency, Field Test Report, AR-15 Armalite Rifle (Aug. 20, 1962) (D. Ct. Dkt. 170-1).

58.    On October 19, 2023, the district court issued a decision holding that the challenged provisions of the AWCA violate the Second Amendment and issued a permanent injunction enjoining their enforcement. Ex. 1. The court stayed enforcement of its injunction for 10 days, Ex. 1 at 79, and that temporary stay is set to expire on Sunday, October 29, 2023. Defendants filed a Notice of Appeal later that day. D. Ct. Dkt. 176.

59.     On October 23, 2023, I conferred with plaintiffs' counsel, John Dillon, by telephone to inform plaintiffs that defendants were planning to file a motion later that day for a stay pending appeal before this Court, consistent with the district court's decision.  I inquired whether plaintiffs oppose the motion for a stay.  I was informed that plaintiffs oppose this emergency motion.

60.     Defendants seek an immediate stay of the judgment pending appeal to preserve the more than 20-year status quo of the challenged AWCA provisions remaining in full force and effect.  An immediate stay is needed to prevent irreparable harm to defendants that would result if the challenged provisions of the AWCA were enjoined during this appeal; if the judgment is ultimately reversed on appeal, it would be impracticable, if not impossible, to remove assault weapons that enter the State during the appeal.  Ex. 4 (Graham Decl.) ¶¶ 72-77.  A stay pending appeal will preserve enforcement of a vital public safety measure that has been in effect for decades and is in the public interest.

61.     The Attorney General's concerns are not theoretical, in light of what occurred in 2019 after the district court issued its prior judgment in *Duncan* without any stay.  *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1186 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted*, 988 F.3d 1209 (2021), *rev'd*, 19 F.4th 1087 (9th Cir. 2021) (en banc), c*ert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *vacated and remanded*, 49 F.4th 1228 (9th Cir.

2022). While the Attorney General promptly applied to the district court *ex parte* for an immediate stay pending appeal and a temporary stay pending disposition of the stay application, the district court did not issue a stay pending appeal until four days later, making the stay effective the following day and permitting anyone who acquired a large-capacity magazine during the interim following the entry of judgment to keep them during the appeal. *Duncan v. Becerra*, 2019 WL 1510340, at *3 (S.D. Cal. Apr. 4, 2019). During the period between the entry of judgment on March 29, 2019 and the eventual stay pending appeal that took effect on April 4, 2019, over one million large-capacity magazines reportedly flooded into the State. Many remain in the State to this day. Attached hereto as **Exhibit 24** is a true and correct copy of Matthew Green, *Gun Groups: More than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, *available at* https://bit.ly/3wfinEU (last visited October 23, 2023).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2023, at San Francisco, California.


_____s/ John D. Echeverria_____
John D. Echeverria

# INDEX OF EXHIBITS

| Exhibit | Document Description |
|---|---|
| 1 | Decision, dated October 19, 2023 (D. Ct. Dkt. 175) |
| 2 | Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction, dated January 23, 2020 (Defs.' Trial Ex. A) |
| 3 | Declaration of Christopher B. Colwell in Support of Defendants' Opposition to Motion for Preliminary Injunction, dated January 9, 2020 (Defs.' Trial Ex. B) |
| 4 | Declaration of Blake Graham in Support of Defendants' Opposition to Motion for Preliminary Injunction, dated January 22, 2020 (Defs.' Trial Ex. D) |
| 5 | Declaration of Professor Louis Klarevas in Support of Defendants' Opposition to Motion for Preliminary Injunction, dated January 22, 2020 (Defs.' Trial Ex. E) |
| 6 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles* (1989) (Defs.' Trial Ex. H) |
| 7 | Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. of Urban Health 313 (2017) (Defs.' Trial Ex. Y) |
| 8 | Reporter Transcript of the August 29, 2022 Legal Mandate Hearing, *Miller v. Bonta*, No. 3:19-cv-1537-BEN-JLB (S.D. Cal.) |
| 9 | Supplemental Declaration of Lucy P. Allen, dated October 13, 2022 (D. Ct. Dkt. 137-1) |
| 10 | Declaration of Ryan Busse, dated October 13, 2022 (D. Ct. Dkt. 137-2) |

## INDEX OF EXHIBITS

| Exhibit | Document Description |
|---|---|
| 11 | Declaration of Saul Cornell, dated October 13, 2022 (D. Ct. Dkt. 137-3) |
| 12 | Supplemental Declaration of John J. Donohue, dated October 12, 2022 (D. Ct. Dkt. 137-4) |
| 13 | Supplemental Declaration of Louis Klarevas, dated October 13, 2022 (D. Ct. Dkt. 137-5) |
| 14 | Declaration of Brennan Rivas, dated October 12, 2022 (D. Ct. Dkt. 137-6) |
| 15 | Declaration of Randolph Roth, dated October 12, 2022 (D. Ct. Dkt. 137-7) |
| 16 | Declaration of Robert Spitzer, dated October 13, 2022 (D. Ct. Dkt. 137-8) |
| 17 | Declaration of Michael Vorenberg, dated October 13, 2022 (D. Ct. Dkt. 137-9) |
| 18 | Reporter Transcript of the December 12, 2022 Consolidated Hearing/Status Conference, *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Miller v. Bonta*, No. 3:19-cv-1537-BEN-JLB (S.D. Cal.); *Rhode v. Bonta*, No. 3:18-cv-00802-BEN-JLB (S.D. Cal.); and *Fouts v. Bonta*, No. 3:19-cv-01662-BEN-JLB (S.D. Cal.) |
| 19 | Declaration of John D. Echeverria re Submission of Surveys, dated January 11, 2023 (D. Ct. Dkt. 163) |

2

## INDEX OF EXHIBITS

| Exhibit | Document Description |
|---------|---------------------|
| 20 | Declaration of Dennis Baron, *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. Nov. 7, 2023) (Decl. of John D. Echeverria in Supp. of Defs.' Br. in Resp. to the Court's Order Entered on Dec. 15, 2022, Ex. 1) (D. Ct. Dkt. 167-1) |
| 21 | Supplemental Expert Report and Declaration of Colonel (Ret.) Craig Tucker, *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Jan. 6, 2023) (Decl. of John D. Echeverria in Supp. of Defs.' Br. in Resp. to the Court's Order Entered on Dec. 15, 2022, Ex. 2) (D. Ct. Dkt. 167-1) |
| 22 | Declaration of Kevin Sweeney, *Oregon Firearms Fed'n v. Brown*, Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM (D. Or. Feb. 5, 2023) (Decl. of John D. Echeverria in Supp. of Defs.' Br. in Resp. to the Court's Order Entered on Dec. 15, 2022, Ex. 3) (D. Ct. Dkt. 167-1) |
| 23 | Advanced Research Projects Agency, Field Test Report, AR-15 Armalite Rifle (Aug. 20, 1962) (Decl. of John D. Echeverria in Supp. of Defs.' Br. in Resp. to Pls.' Br. Filed on Feb. 10, 2023, Ex. 1) (D. Ct. Dkt. 170-1) |
| 24 | Matthew Green, *Gun Groups: More than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, https://bit.ly/3wfinEU |

# EXHIBIT 1

1
2
3
4
5     UNITED STATES DISTRICT COURT
6     SOUTHERN DISTRICT OF CALIFORNIA
7

8     JAMES MILLER, et al.,                  Case No.:  19-cv-01537 BEN (JLB)
9                         Plaintiffs,
                                             **DECISION**
10    v.

11    ROB BONTA, in his official capacity as
      Attorney General of the State of
12    California, et al.,

13                        Defendants.
14

15    **I. INTRODUCTION**

16         Like the Bowie Knife which was commonly carried by citizens and soldiers in the

17    1800s, "assault weapons" are dangerous, but useful.  But unlike the Bowie Knife, the

18    United States Supreme Court has said, "[t]here is a long tradition of widespread lawful

19    gun ownership by private individuals in this country."[1]

20         Americans have an individual right to keep and bear firearms.[2]  The Second

21    Amendment to the United States Constitution "guarantee[s] the individual right to

22    possess and carry weapons in case of confrontation."[3]  Whether citizens ever fire or need

23
24
25    _____

26    [1] *Staples v. United States*, 511 U.S. 600, 610 (1994).
      [2] *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008).
27    [3] *Id.* at 606 (quoting 2 Tucker's Blackstone 143) ("This may be considered as the true
28    palladium of liberty …. The right to self defence is the first law of nature:  in most

1

1   to fire their weapons, is not important.  This guarantee is fully binding on the States and

2   limits their ability to devise solutions to social problems.[4]  And the guarantee protects

3   "the possession of weapons that are 'in common use,'"[5] or arms that are "typically

4   possessed by law-abiding citizens for lawful purposes."[6] These are the decisions this

5   Court is bound to apply.  "It's our duty as judges to interpret the Constitution based on

6   the text and original understanding of the relevant provision—not on public policy

7   considerations, or worse, fear of public opprobrium or criticism from the political

8   branches."[7]

9        This case is about California laws that, in contrast to these constitutional

10   principles, make it a crime to acquire and possess many common modern semiautomatic

11   firearms.[8]  Modern semiautomatic rifles like the AR-15 platform rifle are widely owned

12

13   _____

14   governments it has been the study of rulers to confine the right within the narrowest
     limits possible.").
15
     [4] *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 785 (2010) (emphasis in original).
16   [5] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022).
     [6] *Caetano v. Massachusetts*, 577 U.S. 411, 416 (Alito and Thomas concurring) (quoting
17   *Heller,* 554 U.S. at 625, in turn quoting *United States v. Miller,* 307 U.S. 174, 179
     (1939)) ("We therefore read *Miller* to say only that the Second Amendment does not
18   protect those weapons not typically possessed by law-abiding citizens for lawful
     purposes.").
19   [7] *United States v. Rahimi*, 61 F.4th 443, 462 (5th Cir. 2023), *cert. granted*, 143 S. Ct.
     2688 (Ho, J., concurring) (citations omitted).
20   [8] California Penal Code § 30600 imposes a felony criminal penalty for anyone who
     manufactures, distributes, imports, keeps for sale, offers for sale, or lends an "assault
21   weapon." The prescribed prison sentences for violations of these malum prohibitum
     crimes are four, six, or eight years.  One who merely possesses an "assault weapon" in
22   California is guilty of a misdemeanor under California Penal Code § 30605(a) or a felony
     pursuant to California Penal Code § 1170(h)(1).  If one possesses only one or two
23   properly registered pre-ban "assault weapons," the crime is a misdemeanor for the first
     offense.  Cal. Pen. Code § 30605(b).  A prosecutor may in lieu of criminal prosecution
24   for mere possession of an "assault weapon," institute a civil action for an injunction, fine,
     and destruction of the firearm as a nuisance.  Cal. Pen. Code §30800.

25

26

27

28

2

by law-abiding citizens across the nation.  Other than their looks (the State calls them "features" or "accessories") these prohibited rifles are virtually the same as other lawfully possessed rifles.  They have the same minimum overall length, they use the same triggers, they have the same barrels, and they can fire the same ammunition, from the same magazines, at the same rate of fire, and at the same velocities, as other rifles.  What is it, then, that animates the State's criminalization of possessing certain rifles as "assault weapons"?  It is that similar rifles have been used in some mass shootings and that by virtue of this law, the legislature hoped to keep these modern weapons out of the hands of mass shooters.  The California legislature, at a time in the past when the lower courts did not recognize an individual's right to keep firearms and in a state that has no constitutional analogue to the Second Amendment, balanced that interest above and against its law-abiding citizens who wanted these firearms for self-defense.[9]

That was then.  Today, the Supreme Court has very clearly ended modern interest balancing when it comes to the Second Amendment.  The Second Amendment, the Court said, "is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense."[10] It is "this balance—struck by the traditions of the American people—that

---

[9] In the year 1989, the California Legislature was not concerned with maintaining room for a citizen's constitutional right to have a common firearm of one's choosing to defend hearth and home.  In making its policy choice, the California Legislature neither mentioned a modern rifle as a means of self-defense, nor did the core Second Amendment right appear to have been any part of its consideration.  The formal legislative findings say nothing about self-defense.  See § 30505(a).  The balance was simply about criminal use, on the one hand, versus sporting or recreational activities, on the other hand.  When the features-based definition (California Penal Code § 30515(a)) was added for the year 2000, a citizen challenging the law in a federal court was still (incorrectly) regarded as lacking basic Article III standing.  Judicial recognition of an individual right to keep and bear arms to be respected by the states would come later with the *Heller* decision in 2008 and the *McDonald* decision in 2010.
[10] *Bruen*, 142 S. Ct. at 2131 (simplified).

demands our unqualified deference."[11] The American tradition is rich and deep in protecting a citizen's enduring right to keep and bear common arms like rifles, shotguns, and pistols. However, among the American tradition of firearm ownership, there is nothing like California's prohibition on rifles, shotguns, and handguns based on their looks or attributes. Here, the "assault weapon" prohibition has no historical pedigree and it is extreme. Even today, neither Congress nor most states impose such prohibitions on modern semiautomatic arms. In contrast, laws that punish criminal acts committed with any gun, like the crime of assault with a deadly weapon, remain perfectly constitutional. Those criminal laws are not at issue here.

The State says criminals already have and favor using guns described as "assault weapons." Rather than being outgunned, many citizens want these same firearms as a defense against criminal attacks. Americans today own 24.4 million modern rifles (*i.e.*, AR-15 platform and AK-47 platform rifles), according to the State's expert.[12] Of the AR-15 rifle owners surveyed, 61% said one reason they acquired their gun is for home defense.[13] Consequently, while criminals already have these modern semiautomatics, the State prohibits its citizens from buying and possessing the same guns for self-defense. At the same time these firearms are commonly possessed by law-abiding gun owners elsewhere across the country. Guns for self-defense are needed a lot because crime happens a lot. A recent large-scale survey estimates that guns are needed defensively approximately 1,670,000 times a year.[14] Another report, originally commissioned and

---

[11] *Id.*

[12] *See* Suppl. Decl. of Louis Klarevas, Dkt. 137-5 ("Suppl. Klarevas Decl."), at ¶ 15 and n.12 (the 24.4 million estimate may include some AR-15s in possession of law enforcement).

[13] William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 7, 33 and figure 15 (Geo. McDonough Sch. of Bus. Rsch. Paper No. 4109494, 2022), https://ssrn.com/abstract=4109494 [https://perma.cc/83XT-75YG].

[14] *Id.* at 35.

long cited by the Centers for Disease Control and Prevention estimated that there are between 500,000 and 3,000,000 defensive gun uses in the United States each year.[15] That is a lot of situations where Jane Doe needs a firearm to defend herself and her family.  Trial testimony from hoodlums is not needed to prove that a homeowner brandishing an AR-15 can be a strong deterrent to criminal attackers.  But when brandishing does not stop an attack, Jane needs an effective defense.  That is where an AR-15 style semiautomatic rifle can come to the rescue.  And although this Court focuses its analysis on rifles, California's ban also includes such common weapons as semiautomatic shotguns with removable magazines and semiautomatic handguns with threaded barrels.

People have heard about the Robb Elementary School shooting in Uvalde, Texas. They have heard about Sandy Hook, Parkland, the Pulse nightclub, and other tragic mass shootings.  But they do not hear of the AR-15 used in Florida by a pregnant wife and mother to defend her family from two armed, hooded, and masked home intruders.  As soon as the armed intruders entered the back door of her home they pistol-whipped her husband -- fracturing his eye socket and sinus cavity.  Then they grabbed the 11-year old daughter.  The pregnant wife and mother was able to retrieve the family AR-15 from a bedroom and fire, killing one of the attackers while the other fled.[16]  It does not require

---

[15] *See* Inst. of Med. & Nat'l Rsch. Council, *Priorities for Research to Reduce the Threat of Firearm-Related Violence* 15 (The Nat'l Acads. Press ed., 2013), https://doi.org/10.17226/18319 [https://perma.cc/K3N4-FEXQ].  The CDC's "fast facts" page referred to page 45 of the same report estimating 60,000 to 2,500,000 defensive gun uses in America.  *See* Internet Archive Wayback Machine, CDC Firearm Violence Prevention, captured July 26, 2021, https://web.archive.org/web/20210726233739/https://www.cdc.gov/violenceprevention/firearms/fastfact.html.  The Court notes that the CDC has changed its reporting to delete reference to this study and the Court will not comment on how or why that happened as the CDC website does not reflect why it was deleted.

[16] Decl. of Emanuel Kapelsohn in Supp. of Mot. for Prelim. Inj., Dkt. 22-12 ("Kapelsohn Decl."), Exhibit 1 at 26.

1  much imagination to think what would have happened next if the woman had lived in

2  California and could not possess such a firearm.

3       People do not remember the disabled 61 year-old man living alone on a 20-acre

4  property in Florida with dense woods and a long dirt driveway.  After the homeowner had

5  gone to bed, three men armed with a shotgun, pistol, and BB gun invaded.  One wore a

6  "Jason" hockey mask.  The disabled victim said he was awakened by a loud noise and

7  grabbed the AR-15 laying near his bed.  He saw the masked man and a second man

8  coming toward him inside his home.  Gunfire was exchanged.  By the time police arrived,

9  one attacker had run away, one lay wounded outside, and one was dead on the dining

10 room floor.  Police found the disabled man in his bedroom alive, but bleeding from a

11 gunshot wound to the stomach.  The AR-15 lay across his legs.[17]  Without his modern

12 rifle, the victim would have become an evidence tag and a forgotten statistic.

13       People do not hear about the AR-15 used by a young man in Oklahoma to defend

14 himself from three masked and armed home invaders clothed in black.  The three

15 intruders broke through a rear glass door.  Though outnumbered, the homeowner put up a

16 successful defense with his AR-15.[18]  People do not hear about the AR-15 that was

17 needed when seven armed and masked men burst through a front door at 4:00 a.m. firing

18 a gun.  Outnumbered seven to one, it took the resident 30 rounds from his AR-15 to stop

19 the attackers.[19]

20       California's "assault weapon" ban takes away from its residents the choice of using

21 an AR-15 type rifle for self-defense.  Is it because modern rifles are used so frequently

22 for crime?  No.  The United States Department of Justice reports that in the year 2021, in

23 the entire country 447 people were killed with rifles (of all types).  From this one can say

---

[17] Austin L. Miller, *Deadly Invasion*, Ocala StarBanner (July 11, 2019),
https://www.ocala.com/story/news/local/2019/07/11/summerfield-homeowner-injured-
kills-2-intruders-with-ar-15/4663503007/ [https://perma.cc/EE6W-DN9H].
[18] Kapelsohn Decl., Exhibit 7 at 43.
[19] Kapelsohn Decl., Exhibit 2 at 29.

1    that, based on a national population of 320 million people in the United States, rifles of

2    any kind (including AR-15s) were used in homicides only 0.0000014% of the time. Put

3    differently, if 447 rifles were used to commit 447 homicides and every rifle-related

4    homicide involved an AR-15, it would mean that of the approximately 24,400,000 AR-

5    15s in the national stock, less than .00001832% were used in homicides. It begs the

6    question: what were the other AR-15 type rifles used for? The only logical answer is that

7    24,399,553 (or 99.999985%) of AR-15s were used for lawful purposes.

8          In California, while modern semiautomatics are not rare, they are rarely the

9    problem. For example, in 2022, only three "assault weapons" were used in violent

10   California crimes, according to the Attorney General's annual report, "Firearms Used in

11   the Commission of Crimes."[20]   For the preceding year, the report announced that only

12   two assault weapons were used in violent crimes, while the 2020 report identified zero

13   "assault weapons" used.[21, 22]   Other government homicide statistics do not track "assault

14   rifles," but they do show that killing by knife attack is far more common than homicide

15

16

17   [20] See Off. of the Att'y Gen. Rob Bonta, *Firearms Used in the Commission of Crimes*
     (2022), https://oag.ca.gov/publications#crime [https://perma.cc/UX88-4LZZ].

18   [21] The report collects data from the State's ten regional crime laboratories which serve 46

19   of the State's 58 counties. The report observes that "*there has been very little change
     overall in the number of assault weapons examined in the last 20 years; as a category,*

20   *their numbers have been nominal relative to the total number of firearms examined.*"
     (Emphasis added.) The report also notes that an "absence of data from the local

21   laboratories that serve population-dense regions means this report may not reflect gun use

22   trends in urban areas or across California as a whole." Apparently, the Attorney General
     does not have that data. The State did not provide its *Firearms Used* report for the record

23   in this case, but it may be considered as a relevant legislative fact. *See e.g., Teter v.*

24   *Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023) (describing difference between legislative
     facts and adjudicative facts when applying *Bruen*).

25   [22] A cross check with the Gun Violence Archive reveals some errors in over-counting but

26   generally confirms the Attorney General's reports that assault weapons are rarely used in

27   crime. *Gun Violence Archive 2023*, Gun Violence Archive
     https://www.gunviolencearchive.org/ (last visited June 5, 2023).

28

19-cv-01537 BEN (JLB)

by any kind of rifle.  In California, with a population close to 39 million people, murder by knife occurs seven times more often than murder by rifle.[23]  Of course, this is a type of means-end scrutiny that *Bruen* has made irrelevant for judging the constitutionality of a firearm ban because the People of the United States have already made the decision long ago to protect a citizen's choice to possess and use any common firearm for self-defense.[24]

This Court understands the unquestionable tragedy caused by lawless individuals using modern semi-automatic guns or any gun to injure or kill innocent men, women, or children.  Their lives are important.  But are their lives any more important than Jane Doe's or the lives of her family?  We hear constantly about mass shootings for days and weeks and on anniversaries.  But how often do we celebrate the saving of the life of Jane Doe because she was able to use a semi-automatic weapon to defend herself and her family from attackers?  Are the lives of Jane, John, and Junior Doe worth any less than others?  Are they less important?

The State of California posits that its "assault weapon" ban, the law challenged here, promotes an important public interest of disarming some mass shooters even though it makes criminals of law-abiding residents who insist on acquiring these firearms for self-defense.  Nevertheless, more than that is required to uphold a ban.  The discussion that follows will sound repetitive to astute readers of this Court's decision in *Duncan v. Bonta*, 17cv1017 BEN (JLB).  Many of the same arguments and historic laws are relied on by the State in both cases.

---

[23] In 2021, 39 people were killed with some type of rifle—not necessarily an assault rifle or modern rifle, while California saw 303 people murdered with a knife, according to California Department of Justice crime statistics.

[24] *Baird v. Bonta*, 2023 WL 5763345, *5 (9th Cir. Sept. 7, 2023) ("In *Bruen*, the Supreme Court expressly rejected the use of such 'means-end scrutiny in the Second Amendment context' and described the two-step approach as 'one step too many.'").

1       *Bruen* makes clear that, "[t]o justify its regulation, the government may not simply

2   posit that the regulation promotes an important interest."[25] After all, "the very

3   enumeration of the right takes out of the hands of government—even the Third Branch of

4   Government—the power to decide on a case-by-case basis whether the right is really

5   worth insisting upon."[26] Still focused on balancing interests, the State objects that

6   "assault weapons" are unusually dangerous.  As this Court has previously agreed, all

7   firearms are dangerous.  The Second Amendment is unconcerned with Nerf guns and

8   foam baseball bats.  The Supreme Court carefully uses the phrase "dangerous and

9   unusual arms," while the State, throughout its briefing, refers to "dangerous [or] unusual

10  arms."  That the State would advocate such a position is disheartening.  Justice Alito took

11  pains to point out that this is a conjunctive test.  "As the *per curiam* opinion recognizes,

12  this is a conjunctive test: A weapon may not be banned unless it is both dangerous and

13  unusual . . . . If *Heller* tells us anything, it is that firearms cannot be categorically

14  prohibited just because they are dangerous."[27]  In *Heller*, the Supreme Court said the

15  firearms that are protected are firearms "that are not dangerous and unusual and typically

16  possessed by law abiding citizens for lawful purposes like self-defense."  This Court

17  assumes that the Supreme Court does not use language frivolously…that it says what it

18  means and it means what it says.  The "dangerous *and* unusual" test is the test that this

19  Court will apply.  If there is a different test, the Circuit or the Supreme Court will tell us,

20  but for now, this Court applies the plain meaning of the language used in *Heller*.[28]  As the

---

[25] *Bruen*, 142 S. Ct. at 2126.

[26] *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).

[27] *Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring).

[28] *Teter*, 76 F.4th at 949-50 ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the 'historical tradition of prohibiting the carrying of dangerous and unusual weapons.'  It did not say that dangerous and unusual weapons are not arms.") (citation omitted); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("The Court also concluded that the historical tradition of prohibiting the carrying

1   Supreme Court says, "[d]espite their potential for harm, guns generally can be owned in

2   perfect innocence."[29]

3         In any event, the arms the State bans as "assault weapons" are no more dangerous

4   than other arms the State does not ban.  The banned arms are just modern versions of

5   rifles, shotguns, and pistols.  For example, a Springfield 1911 pistol *with* a threaded

6   barrel is an "assault weapon," according to California law.  The same 1911 pistol

7   (standard issue for the United States military for decades) without a threaded barrel, is

8   fine.  An AR-15 with normal parts is banned, but the same AR-15 with an awkward shark

9   fin grip, an unmovable stock, and a barrel compensator in place of a flash hider, shooting

10  the same ammunition, is fine.

11        Falling back on an old, recycled justification, the State says that its ban should

12  stand because a person can have as many *other* rifles, shotguns, and pistols as one wants.

13  The problem is that the alternatives-remain argument has no limiting principle and would

14  justify incremental firearm bans until there is only a single-shot derringer remaining for

15  lawful self-defense.  *Heller* demolished that argument.  The same argument – that a

16  handgun ban might be justified because government-approved alternatives are available –

17  was rejected in *Heller* and it is rejected here.  *Heller* said quite clearly that it is no

18  constitutional answer for government to say that it is permissible to ban some guns so

19  long as other guns are allowed.[30]  This is not the way American Constitutional rights

20  _____

21

22  of 'dangerous and unusual weapons' limits the right to keep and carry arms.") (citation
    omitted); *United States v. Kittson*, 2023 WL 5015812 *5 (D. Ore. Aug. 7, 2023)

23  ("Because *Heller* was undisturbed by *Bruen*, and *Henry* reached its holding by relying on
    *Heller*, *Henry* is binding precedent on this Court.") (citation omitted).

24  [29] *Staples*, 511 U.S. at 611.

25  [30] *Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible

26  to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long
    guns) is allowed."); *cf. Renna v. Bonta*, No. 20-cv-02190-DMS-DEB, 2023 WL 2846937

27  at *7, n.8 (S.D. Cal. Apr. 3, 2023) (disagreeing with similar argument that the state may
    ban state-of-the-art pistols because older pistols are permitted).

28

19-cv-01537 BEN (JLB)

1  work.  It is not permissible for a state to ban some books simply because there are other

2  books to read, or to close synagogues because churches and mosques are open.  In their

3  normal configurations, the so-called "assault weapons" banned in California are modern

4  firearms commonly-owned by law-abiding citizens for lawful purposes across the

5  nation.[31] Under *Heller*, *McDonald*, *Caetano*, and *Bruen*, they may not be banned.

6  　　　Like a cut diamond, the uniquely American right to keep and bear arms is multi-

7  faceted.  The unalienable right to have firearms for self-defense existed before the Bill of

8  Rights and today remains the central protection of the Second Amendment.  It is a right

9  that was recognized in English common law and in the American colonies.  There is a

10  corollary right, perhaps important in the future and unquestioned at the time of the

11  founding, to have firearms useful to bring to militia service.  *United States v. Miller* held

12  that sawed-off shotguns were not protected because there was no evidence that they were

13  useful for military purposes.[32]  The obvious corollary was that weapons that could be

14  useful for military purposes would be protected by the Second Amendment.  It would be

15  a mistake to think *Heller* and *Miller* are inconsistent.

16  　　　The State argues, and some courts have reasoned, that modern semiautomatic rifles

17  are "most useful in military service" and therefore, can be banned.[33]  The Supreme Court

18  said no such thing.  *Caetano* addresses this question and says, "*Heller* rejected the

19  proposition 'that only those weapons useful in warfare are protected.'"[34] *Heller* was

20

21  ───────────────

22  [31] That AR-15s are commonly owned and number in the millions across the nation and

23  are rarely used to commit crimes, is detailed in depth in this Court's prior decision.  *See*
   *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1020–21 (S.D. Cal. 2021); *see also* Suppl.

24  Klarevas Decl. at ¶ 15 and n.13.

25  [32] 307 U.S. 174, 178 (1939).

26  [33] *See, e.g.*, *Hanson v. D.C.*, No. CV 22-2256-RC, 2023 WL 3019777, at *8 (D.D.C. Apr.
   20, 2023) ("*Heller* established that weapons that are 'most useful in military service' are

27  excluded from Second Amendment protection."); *Rupp v. Becerra*, 401 F. Supp. 3d 978,
   987 (C.D. Cal. 2019) (same).

28  [34] *Caetano*, 577 U.S. at 412 (quoting *Heller*, 554 U.S. at 624-25).

19-cv-01537 BEN (JLB)

1  explaining *Miller*.  In *Miller*, the Supreme Court applied a reasonable-relationship-to-

2  militia-use test to a short-barreled shotgun, asking whether the shotgun would have a

3  reasonable relationship to the preservation or efficiency of a well-regulated militia.

4  Finding none, it decided the Second Amendment did not guarantee the right to keep that

5  particular firearm.  *Miller*'s realm of Second Amendment protection encircled a firearm if

6  it was reasonably related to militia use.  This "reasonably-related" construct received a

7  nod again in *Lewis v. U.S.*, where the Supreme Court approved *Miller* again, saying, "the

8  Second Amendment guarantees no right to keep and bear a firearm that does not have

9  'some reasonable relationship to the preservation or efficiency of a well regulated

10  militia.'"[35]  There was no undermining of *Miller* in *Heller* or *Bruen*.   Rather, *Heller*

11  endorsed *Miller* and understood that *Miller* constructed an outer fence line.  "We

12  therefore read *Miller* to say only that the Second Amendment does not protect those

13  weapons not typically possessed by law-abiding citizens for lawful purposes, such as

14  short-barreled shotguns.  That accords with the historical understanding of the scope of

15  the right."[36] And *Bruen* "quoted, explained, re-affirmed, and then applied" *Miller*.[37]

16  *Heller* acknowledged the already expansive zone of protection for weapons that could be

17  used by the militia and focused instead on the core use of firearms for self-defense.

18        In other words, *Heller* made the logical connection between weapons commonly

19  possessed by law-abiding citizens for lawful purposes that would also be useful for

20  military purposes, *i.e.*, in the militia.  Since *Miller*, the Supreme Court has described a

21  large circle of firearms protected by the Second Amendment which includes commonly

22  owned firearms useful for the core right of self-defense and other lawful purposes like

23  hunting, sporting, and target shooting.  Unless the Supreme Court clearly says otherwise,

24

25

----

26  [35] 445 U.S 55, 65, n.8 (1980).

27  [36] *Heller*, 554 U.S. at 625.

28  [37] *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at *7
(W.D.N.C. Mar. 2, 2023).

19-cv-01537 BEN (JLB)

commonly owned weapons that may be useful for war and are reasonably related to militia use are also fully protected, so long as they are not useful solely for military purposes.  Modern semiautomatic rifles, shotguns, and pistols are such reasonably-related arms.  In *Staples*, the Supreme Court identified some types of weapons that do lay beyond the fence of absolute constitutional protection -- and they are not modern semiautomatic rifles, normal shotguns, or threaded barrel pistols.[38]

## II.  *BRUEN* AND THE ASSAULT WEAPONS CONTROL ACT

Plaintiffs challenge a net of interlocking statutes known as the Assault Weapons Control Act which impose strict criminal restrictions on common firearms that fall under California's complex definition of an "assault weapon."[39]  The firearms deemed "assault weapons" are fairly ordinary, popular, modern semi-automatic firearms.

### A.  "Assault Weapons" Defined

Under California Penal Code § 30515(a), a semi-automatic rifle is labeled an "assault weapon" if it is one of three principal types.  The first type is a centerfire[40] rifle that does not have a fixed magazine and has one of the following prohibiting features: a pistol grip that protrudes conspicuously beneath the action of the rifle, a thumbhole stock,

---

[38] *Staples*, 511 U.S. at 611–12 ("[C]ertain categories of guns—no doubt including the machineguns, sawed-off shotguns, and artillery pieces" are subject to regulation notwithstanding the Second Amendment.); *see also United States v. Freed*, 401 U.S. 601, 616 (1971) ("[T]he firearms covered by the [National Firearms] Act are major weapons such as machineguns and sawed-off shotguns; deceptive weapons such as flashlight guns and fountain pen guns; and major destructive devices such as bombs, grenades, mines, rockets, and large caliber weapons including mortars, antitank guns, and bazookas.").

[39] *See* California Penal Code §§ 30515(a)(1) through (8) (defining an "assault weapon" by prohibited features), 30800 (deeming those "assault weapons" a public nuisance), 30915 (regulating those "assault weapons" obtained by bequest or inheritance), 30945 (restricting use of registered "assault weapons"), and the penalty provisions §§ 30600, 30605 and 30800 as applied to "assault weapons" defined in Code §§ 30515(a)(1) through (8).

[40] "Centerfire" refers to the most commonly used type of ammunition cartridge, as opposed to the much smaller rimfire cartridge.

a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, or a forward pistol grip. The second type is a centerfire rifle that has a fixed magazine able to hold more than 10 rounds. The third type is a centerfire rifle that has an overall length of less than thirty inches. Cal. Penal Code § 30515(a)(1)–(3). The statute also deems a semiautomatic pistol an "assault weapon" if it has a threaded barrel (or some other features not detailed here). Cal. Penal Code § 30515(a)(4)–(5). A semiautomatic shotgun is deemed an "assault weapon" if it has a telescoping stock and a pistol grip or a revolving cylinder or a removable magazine. Cal. Penal Code § 30515(a)(6)–(8). Antique firearms and certain pistols designed expressly for Olympic events are exempted.

Under California's law one commits a crime by simply possessing one of these firearms called "assault weapons." Likewise, one commits a felony by lending, giving, exposing for sale, offering for sale, keeping for sale, importing into the state, transporting, distributing, manufacturing, or causing to be manufactured one of these firearms. Since possessing one of these prohibited firearms is protected by the Constitution, it should go without saying that criminalizing selling, lending, and manufacturing also impinges on a citizen's constitutional right to acquire these firearms for self-defense. "This acquisition right is protected as an 'ancillary right' necessary to the realization of the core right to possess a firearm for self-defense."[41] After all, testimony supports what is generally observed: people want to buy AR-15s for home and self-defense,[42] so much so that modern semi-automatic rifles like the AR-15 are as

_____

[41] *Renna v. Becerra*, 535 F. Supp. 3d 931, 940 (S.D. Cal. 2021) (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (*en banc*) ("[T]he core Second Amendment right 'wouldn't mean much' without ability to acquire arms.")).

[42] During the evidentiary hearing on October 22, 2020, a gun store owner testified that he sells a lot of AR-15 type firearms for home and self-defense explaining, "it's been my observation, working in my shop every single day, or most days, that my customers don't feel a handgun is adequate. They see cities being burned, on fire, and people being attacked, you know, sucker-punched in groups where it's, you know, 10, 12 people

1  ubiquitous as Ford F-series pickup trucks (which are the most popular vehicles in

2  America).

3      **B.  Remand for *Bruen* Review**

4          This case was remanded from the United States Court of Appeals for the Ninth

5  Circuit specifically to consider the challenged laws under the recent decision in *Bruen*.

6  This Court reaffirms all of its relevant findings of fact and conclusions of law from its

7  prior decision.[43]  Under *Bruen*, the government must affirmatively prove that its firearm

8  regulation is part of a constitutional historical tradition.  It is the same text, history, and

9  tradition standard the Court used in *Heller* and *McDonald*.  What is different is that the

10  old means-end, interest balancing, tiers-of-scrutiny, test is no longer viable.  The State

11  now has a second chance to defend its "assault weapon" prohibitions and must do so

12  applying the *Bruen* test.

13          *Bruen* says,

14              When the Second Amendment's plain text covers an
                individual's conduct, the Constitution presumptively protects
15              that conduct.  *The government must then justify its regulation
                by demonstrating that it is consistent with the Nation's*
16              *historical tradition of firearm regulation.*  Only then may a
                court conclude that the individual's conduct falls outside the
17              Second Amendment's "unqualified command."[44]
18

19          *Bruen* continues,

20              The test that we set forth in *Heller* and apply today requires
21              courts to assess whether modern firearms regulations are
                consistent with the Second Amendment's text and historical
22

23

24  ——————————————————

25  against a single person.  I've heard many customers tell me they don't feel comfortable
    with a handgun, they want something with more fire power."  Hr'g Tr., Day 3, Dkt. No.
26  59, at 20:21–21:5

27  [43] *Miller v. Bonta,* 542 F. Supp. 3d 1009 (S.D. Cal. 2021).

28  [44] 142 S. Ct. at 2129–30 (emphasis added).

19-cv-01537 BEN (JLB)

understanding.[45]

And *Bruen* confirms, once again, that the Second Amendment applies to modern arms. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense,"[46] such as modern semiautomatic rifles, shotguns, and pistols.

## 1. Already Determined: No Historical Pedigree

This Court has previously determined that the State's ban on modern semi-automatics has no historical pedigree. Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers, or threaded barrels. In fact, prior to California's 1989 ban, so-called "assault weapons" were lawfully manufactured, acquired, and possessed throughout the United States. Before the *Bruen* decision, the State had unpersuasively argued that its laws are analogous to a handful of state machinegun firing-capacity regulations from the 1920s and 1930s and one District of Columbia law from 1932—a law that the Supreme Court ignored while dismantling the District of Columbia's handgun ban in *Heller*. While that argument remains unpersuasive today, *Bruen* invites a look farther back into the Nation's history.

## 2. The State Asked for Time for Discovery

The State has been given generous time and leeway to satisfy its new burden. Additional time to study history is not needed. The State's experts have been studying historic firearm regulations for more than twenty years.[47] This Court has reviewed all of

---

[45] *Id.* at 2131.

[46] *Id.* at 2132.

[47] The State's expert, professor Robert Spitzer, has studied gun policy for 30 years. *See* Decl. of Robert Spitzer, Dkt 137-8 ("Spitzer Decl."), at ¶ 5. The State's expert, professor Saul Cornell, said that he has been studying gun regulations for 20 years, and that was in

19-cv-01537 BEN (JLB)

1  the declarations of the State's experts and historians as well as many of their cited

2  sources, and finds no support for the State's ban.

3  ### 3.  **Some Text, History, and Tradition Analysis is Already Done**

4       Some of the work of analyzing text, history, and tradition, has already been done

5  by the Supreme Court.  To begin, "the 'textual elements' of the Second Amendment's

6  operative clause—'the right of the people to keep and bear Arms, shall not be

7  infringed'—'guarantee the individual right to possess and carry weapons in case of

8  confrontation.'"[48]  Further, "the right to 'bear arms' refers to the right to 'wear, bear, or

9  carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being

10  armed and ready for offensive or defensive action in a case of conflict with another

11  person.'"[49]  The term "bear" naturally encompasses public carry.[50]  The Court explained

12  that the terms "keep" and "bear" mean that the Second Amendment's text protects

13  individuals' rights to "'keep' firearms in their home, at the ready for self-defense," and to

14  carry arms on one's person in and outside the home in case of confrontation.[51]

15       As to the types of weapons the Second Amendment protects, *Bruen* echoes *Heller*,

16

17  _____

18  2017.  *See* Saul Cornell, Five Types of Gun Laws the Founding Fathers Loved, Salon

19  (Oct. 22, 2017, 7:29 a.m.), https://www.salon.com/2017/10/22/five-types-of-gun-laws-the-founding-fathers-loved_partner/ [https://perma.cc/73SL-VAKV].  Ten years ago,

20  Mark Anthony Frasetto compiled a list of over 1,000 historical gun laws spanning the

21  years 1607 to 1934 and is available on the Social Science Research Network.
[https://perma.cc/Q2L8-SW6U].  His law collection was not unknown.  It was described

22  in detail in 2017 by professor Spitzer in his article *Gun Law History in the United States

23  and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017), and included in

24  professor Cornell's Compendium of Works cited in his Declaration, Dkt. 154-3, at 1707–33.

25  [48] *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).

26  [49] *Id.* (quoting *Heller*, 554 U.S. at 584).

27  [50] *Id.* at 2134–35 (noting that while the need for armed self-defense is most acute in the home, the need for self-defense exists beyond the home).

28  [51] *Id.*

19-cv-01537 BEN (JLB)

1   *McDonald*, *Caetano*, *Miller*, and Blackstone, pronouncing that "the Second Amendment

2   protects the possession and use of weapons that are 'in common use at the time.'"[52]

3       Plaintiffs want to possess and carry firearms deemed "assault weapons" by

4   California Penal Code § 30515.  Plaintiffs are law-abiding citizens who want to possess

5   (or keep) and carry (or bear), firearms like the AR-15 rifle that are commonly-owned for

6   lawful purposes.  The conduct is covered by the plain text of the Second Amendment.

7   Therefore, Plaintiffs have met their burden of showing that the prohibited firearms fall

8   within the text of the Second Amendment.

9       *Bruen* next instructs courts to assess whether the initial conclusion is confirmed by

10   the historical understanding of the Second Amendment.  For conducting a historical

11   inquiry, *Bruen* identifies a number of guidelines.  First, "when a challenged regulation

12   addresses a general societal problem that has persisted since the 18th century, the lack of

13   a distinctly similar historical regulation addressing that problem is relevant evidence that

14   the challenged regulation is inconsistent with the Second Amendment."[53]  Second, "if

15   earlier generations addressed the societal problem, but did so through materially different

16   means, that also could be evidence that a modern regulation is unconstitutional."[54]  Third,

17   "if some jurisdictions actually attempted to enact analogous regulations during this

18   timeframe, but those proposals were rejected on constitutional grounds, that rejection

19   surely would provide some probative evidence of unconstitutionality."[55]  Fourth, "cases

20   implicating unprecedented societal concerns or dramatic technological changes may

21   require a more nuanced approach."[56]  Fifth, "[w]hen confronting such present-day

22   firearm regulations, this historical inquiry that courts must conduct will often involve

23

24   _____

25   [52] *Id.* at 2128 (citations omitted).
      [53] *Id.* at 2131.
26   [54] *Id.*
      [55] *Id.*
27   [56] *Id.* at 2132.

28

19-cv-01537 BEN (JLB)

reasoning by analogy."[57] "Determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"[58] *Bruen* notes,

> analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.  On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risks endorsing outliers that our ancestors would never have accepted."  On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.[59]

In surveying American history, the task is to stay within *Bruen*'s guardrails.  The road ahead leads back to 1791.

### C.  1791 to 1868

*Bruen* teaches that the most significant historical evidence comes from 1791, and secondarily 1868.  For the Second Amendment (and other protections in the Bill of Rights), "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."[60]  The Second Amendment was adopted in 1791.  "[W]e

---

[57] *Id.*

[58] *Id.*

[59] *Id.* at 2133.

[60] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35); *cf. Kennedy v. Bremerton*, 142 S. Ct. 2407, 2428 (2022) ("[T]his Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings.  The line . . . has to accord with history and faithfully reflect the understanding of the Founding Fathers.") (cleaned up); *Riley v. California*, 573 U.S. 373, 403 (2014) ("Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era.").

have generally assumed that the scope of the [Second Amendment] protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."[61]  Consequently, whatever evolving standards of gun regulation the state legislature thought was good policy in the year 1989 when the Assault Weapon Control Act was passed, or the year 2000 when it was amended, or today, is not the test for constitutional scrutiny.

Courts are to "afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification."[62]  British sources pre-dating the Constitution are not particularly instructive because the American Revolution was a rejection of British rule.  Sources post-enactment are not particularly helpful.[63]  "[T]o the extent later history contradicts what the text says, the text controls . . . . Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."[64]  Late nineteenth century evidence is not particularly instructive, "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"[65]

---

[61] *Bruen*, 142 S. Ct. at 2137.

[62] *Rahimi*, 61 F.4th at 456; *contra Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) ("For most cases, the Fourteenth Amendment Ratification Era understanding of the right to keep and bear arms will differ from the 1789 understanding.  And in those cases, the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States.").

[63] *Bruen*, 142 S. Ct. at 2136 ("Similarly, we must also guard against giving postenactment history more weight than it can rightly bear.").

[64] *Id.* at 2137 (citations omitted) (cleaned up).

[65] *Id.* (quoting *Heller*, 554 U.S. at 614).  There is little reason to rely on laws from the later part of the 1800s or the 1900s rather than ones put into effect at the time of the founding in view of *Bruen*'s central question about the meaning of the Second

*Bruen* and *Heller* have already considered some of the historical firearm statutes. Consequently, we know that colonial laws restricting handguns that were dangerous and unusual in the 1690s do not justify modern laws restricting handguns. The Court explains that even if handguns were considered "dangerous and unusual" in the 1690s, it would not matter because handguns are common today. As *Bruen* puts it,

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.[66]

On this ground alone, that part of the "assault weapon" ban on semiautomatic pistols with threaded barrels is suspect. They are handguns and they are in common use for self-defense today.

---

Amendment as understood by the people who adopted it. *See Worth v. Harrington*, No. 21-cv-01348-KMM-LIB, 2023 WL 2745673, at *12 (D. Minn. Mar. 31, 2023) ("But the Commissioner offers no persuasive reason why this Court should rely upon laws from the second half of the nineteenth century to the exclusion of those in effect at the time of the founding in light of *Bruen*'s warnings not to give post-Civil War history more weight than it can rightly bear."); *Firearms Pol'y Coalition, Inc. v. McCraw*, No. 4:21-cv-01245-P, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022); *United States v. Harrison*, No. CR 22-00328-PRW, 2023 WL 1771138, at *8 (W.D. Okla. Feb. 3, 2023) (quoting *Bruen*, 142 S. Ct. at 2136 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.")); *but see Hanson*, No. CV 22-2256-RC, 2023 WL 3019777, at *16 ("In this case, it is appropriate to apply 20th century history to the regulation at issue.").

[66] *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627, 629).

19-cv-01537 BEN (JLB)

## D. <u>The State's List of Relevant Laws</u>

To aid in the task of looking for a national historical tradition of firearm regulation, the State was directed to create a list of relevant laws regulating arms dating from the time of the Second Amendment (1791) to twenty years after the Fourteenth Amendment (1868 + 20). This was not an acknowledgement that 20 years after the Fourteenth Amendment is a relevant period. Twenty years after the Fourteenth Amendment is an admittedly arbitrary limit and probably includes laws too late to shed much light.

The State went far beyond. The State produced a list of 316 laws covering 550 years—from 1383 to 1933.[67] Many of the entries are not relevant because they came much earlier or later than the most significant time period of 1791–1868. The first fourteen laws pre-date the Second Amendment.[68] At the other end, the last 225 laws post-date the adoption of the Fourteenth Amendment. Also, two-thirds of the State's list (199 laws) are restrictions on *use*—not on possession. Here, the "assault weapon" laws prohibit possession, manufacturing, giving, lending, offering for sale, etc, instead of regulating the *use* or *manner* of carrying guns. The laws challenged here impose no additional taxes on prohibited firearms, yet, the State's historical list also includes 22 tax

---

[67] *See* Defs.' Survey of Relevant Statutes, Dkt. 163-1 and 163-2 (citations to these entries herein are indicated by brackets [--]).

[68] The State includes in its list a conceal carry statute in East New Jersey from 1686 which treated pocket pistols as "unusual" weapons. [6]. *Bruen* bulldozed that citation. The East New Jersey statute was too old and too different. *Bruen* found little there to commend a present-day ban on carrying pistols. The statute prohibited only the concealed carrying of pocket pistols; it did not prohibit possession or public carrying. *Bruen*, 142 S. Ct. at 2143. The statute did not apply to all pistols, much less all firearms. Moreover, even if pocket pistols were uncommon in 1686 in East New Jersey, they were commonly used by the time of the founding. *Id.* at 2144 and n.13. The statute did not survive the merger of East and West New Jersey in 1702. Consequently, the Court made short work of the history summing it up, "[a]t most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment." *Id.* at 2144.

laws.  Incredibly, the State asks this Court to treat as analogues 38 laws on the State's list which applied only to particular disfavored people groups, such as slaves, Blacks, or Mulattos.  Those laws are not relevant to the "assault weapon" ban challenged in this case.  Even if they were, this Court would give such discriminatory laws little or no weight.

## III.  IN AMERICA PEOPLE WERE GENERALLY FREE TO CARRY FIREARMS PUBLICLY AND PEACEABLY FROM 1791 to 1868

### A. <u>Traditions</u>

The history and tradition of the United States of America is a tradition of widespread gun ownership and expertise.  *Bruen* says, "those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so."[69]  Thomas Jefferson pointed out that our soldiers were good shots because they had practiced with guns since they were children.  Jefferson wrote,

> I inclose you a list of the killed, wounded, and captives of the enemy from the Commencement of hostilities at Lexington in April 1775, until November 1777, since which there has been no event of any consequence ... I think that upon the whole it has been about one half the number lost by them.  In some instances more, but in others less. *This difference is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy.*[70]

Then, having firearms was commonplace.  Carrying firearms was accepted.  Proficiency

---

[69] 142 S. Ct. at 2146.

[70] Letter from Thomas Jefferson, to Giovanni Fabbroni, *Founders Online*, National Archives (June 8, 1778), https://founders.archives.gov/documents/Jefferson/01-02-02-0066 [https://perma.cc/8VTV-K9HB]; [Original source: *The Papers of Thomas Jefferson*, vol. 2, *1777–18 June 1779*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1950, pp. 195–98] (emphasis added).

1    with firearms was encouraged.  Readiness with firearms was required.  Then, as now,

2    terrorizing with a firearm or carrying a firearm with the intent to assault another was

3    punishable.  But, "[n]one of the[] historical limitations on the right to bear arms . . .

4    operated to prevent law-abiding citizens with ordinary self-defense needs from carrying

5    arms in public for that purpose."[71]

6        The national tradition of gun ownership and expertise continues to the present day.

7    In 1903, Congress established the Civilian Marksmanship Program (or "CMP") with the

8    Department of the Army running the program.[72]  Through the CMP, surplus Army

9    firearms are sold to civilians and marksmanship training and competitions are held.  In

10   1996, Congress privatized the program by creating a federally chartered, non-profit

11   corporation.[73]  Even today, the CMP sells surplus *actual* weapons of war to citizens,

12   including the .45 caliber M1911 pistol and the .30 caliber M1 Garand rifle and the M1

13   Carbine.  The M1 Carbine came standard with 15 and 20-round detachable magazines.

14   According to the Government Accountability Office, since 1996, the Army has

15   transferred 700,000 surplus military rifles to the CMP for sale to citizens.[74]  The M1

16   Carbine, which the federal government has sold to citizens over the years, could easily be

17   deemed an "assault weapon" under California's definition.  It is certainly the case for the

18   World War II M1A1 Carbine paratrooper version with its folding stock and 15-round

19   detachable magazine and flash suppressor.  The M1 Carbine, a centerfire, semi-

20   automatic, large caliber rifle, has been used by the military of many nations, as has the

21   Ruger Mini-14.  The AR-15, on the other hand, is not used by any military as a standard

22

23   _____

24   [71] *Bruen*, 142 S. Ct. at 2150.

25   [72] The CMP was then known as the National Board for the Promotion of Rifle Practice.
     [73] *See* 36 U.S.C. §§ 40701, *et seq*.

26   [74] *See* U.S. Gov't Accountability Off., *Civilian Marksmanship Program: Information on*
     *the Sale of Surplus Army Firearms—Fast Facts* (Feb. 14, 2019),

27   https://www.gao.gov/products/gao-19-287.

28

1    issue piece.[75]

2           In the United States, with its long tradition of gun ownership, there are no

3    historical laws prohibiting simple possession of any type of firearm until long after the

4    1868 adoption of the Fourteenth Amendment.  That is too late.  "[P]ost-ratification

5    adoption or acceptance of laws that are *inconsistent* with the original meaning of the

6    constitutional text obviously cannot overcome or alter that text."[76]  From this alone, a

7    student of *Heller*, *McDonald*, and *Bruen* can see the writing on the wall for California's

8    "assault weapon" ban.

9           Notwithstanding having significant time to do so, the State has identified no

10   national tradition of firearm regulation so broad in its coverage or so far reaching in its

11   effect as its extreme "assault weapon" statutes.  So, what are the traditions of firearm

12   regulation evidenced by the State's law list?

13          Historical regulations are considered chronologically, "mindful that greater weight

14   attaches to laws nearer in time to the Second Amendment's ratification."[77]  The Court has

15   reviewed every law cited in the State's list.  It has sometimes searched for the actual text

16   of a cited law rather than the parties' summary in order to understand any legal nuance.

17   It has reviewed the laws with a view to understanding the tradition of all the states rather

18   than in an isolated frontier state.  Frontier states often had different social and security

19   concerns than did the interior of the new nation.  The Court sought to understand how

20   states responded to new technological developments in revolvers, repeaters, and high-

21   capacity, fast-shooting, lever-action rifles.

22          The State's experts opine that gun laws were plentiful and widespread and firearm

23   regulation was the norm.  But, if the test were to look at gun laws with that level of

---

[75] Testimony of U.S. Army General Allen Youngman (Ret.), Hr'g Tr., Oct. 30, 2020, Dkt. 58.

[76] *Bruen*, 142 S. Ct. at 2137 (citation omitted) (emphasis in original).

[77] *Rahimi*, 61 F.4th at 456.

19-cv-01537 BEN (JLB)

1   generality, no gun law would ever fail scrutiny and *Heller*, *McDonald* and *Bruen* could

2   not have been decided as they were.  Furthermore, as will be shown, it is an exaggeration.

3   The State also says regulations on dangerous or unusual *weapons* existed throughout

4   American history.  By "weapons," the State means bladed or melee weapons – not

5   firearms.  Relevantly similar regulations are *firearm* prohibitions—not bladed or melee

6   weapon regulations.  And neither "dangerous or unusual" nor "unusually dangerous" is

7   the test, although the State cannot point to an outright prohibition on even unusual or

8   unusually dangerous *firearms* until Alabama's 1868 prohibition on the dangerous and

9   unusual rifle-walking cane.  [87]

10         Because the State cannot find a historic regulation of *firearms*, it turns to the

11   historic regulations of *weapons*, whether bladed weapons, melee weapons, blunt

12   weapons, or lead-filled weapons.  Yet, the Supreme Court does not look to knife laws

13   when reviewing a restriction about guns.  *Bruen* teaches that a state's burden is to identify

14   a historical tradition of *firearm* regulation, not a tradition of knife regulation.

15   Underscoring the importance of its words, three different times *Bruen* repeats the specific

16   phrase "firearm regulation," as in the following instances: (1) "Rather, the government

17   must demonstrate that the regulation is consistent with this Nation's historical tradition of

18   *firearm regulation*;[78] (2) "The government must then justify its regulation by

19   demonstrating that it is consistent with the Nation's historical tradition of *firearm*

20   *regulation*;"[79] and (3) "[T]he burden falls on respondents to show that New York's

21   proper-cause requirement is consistent with this Nation's historical tradition of *firearm*

22   *regulation*."[80]  In contrast, the *Bruen* majority opinion did not mention bowie knives at

23   all.  The Supreme Court was not interested in traditions of knife regulation or melee

24

25   _____

26   [78] *Bruen*, 142 S. Ct. at 2126 (emphasis added).

27   [79] *Id.* at 2130 (emphasis added).

28   [80] *Id.* at 2135 (emphasis added).

regulation.  Even in the dissent, bowie knife laws were hardly mentioned.  Consequently, when the State asserts, "weapons restrictions proliferated," it misses the mark by referring to non-firearm weapon restrictions or concealed carrying restrictions.[81]

During the most important period of history, there were relatively few gun restrictions.  This conclusion can be drawn from inspecting the State's comprehensive historic law list and it is confirmed by at least one historian.  "Between 1607 and 1815 ... the colonial and state governments of what would become the first fourteen states neglected to exercise any police power over the ownership of guns by members of the body politic . . . . These limits on colonial and early state regulation of arms ownership outlined a significant zone of immunity around the private arms of the individual citizen."[82]  More importantly, it is a conclusion confirmed by the Supreme Court.  *Bruen* says, "[a]part from a few late 19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense."[83]

There were regional differences, to be sure.[84]  As the nation aged, the southern states tended to prohibit concealed carrying while the northern states remained free from almost any restrictions on guns.[85]  In short, California weakly argues that because some

---

[81] Def's Br. in Resp., Dkt. 142, at 20.

[82] Robert H. Churchill, *Forum: Rethinking the Second Amendment*, 25 L. & Hist. Rev. 139, 161 (2007); *see also*, Don B. Kates, Jr., *Restricting Handguns* 12 (North River Press ed., 1979), found in Compendium Works Cited in Decl. of Randolph Roth, Dkt. 153-26, at 0349 ("By 1850, every Western state barred the carrying of concealed weapons.  In contrast, none of the Northeastern states adopted even that mild a restriction until nearly the turn of the twentieth century.  Until 1924, for instance, the only gun law in New Jersey was the prohibition of dueling.").

[83] *Bruen*, 142 S. Ct. at 2156.

[84] "[T]here were profound regional differences in early America."  Decl. of Saul Cornell, Dkt. 137-3 ("Cornell Decl.") at ¶ 26, n.46.

[85] It is true that there were laws criminalizing the *use* of guns for criminal acts such as carrying with intent to assault another or displaying a gun in a threatening manner.  These

27

1  states have regulated in some ways the use of some weapons, that translates into the State

2  being able to regulate any weapon in any way.  This is a non sequitur and particularly in

3  this case—a bridge too far.

### 1.  <u>No Prohibitions on Possessing Guns</u>

5  It is remarkable to discover that there were no outright prohibitions on keeping or

6  possessing guns.  No laws of any kind.[86]  Based on a close review of the State's law list

7  and the Court's own analysis, there are no Founding-era categorical bans on firearms in

8  this nation's history.[87]  Though it is the State's burden, even after having been offered a

9  clear opportunity to do so, the State has not identified any law, anywhere, at any time,

10  between 1791 and 1868 that prohibited simple possession of a gun.[88]

11  With 315 other entries in the State's law list, there must be many other laws in the

12  relevant time period of American history to demonstrate a tradition of firearm regulation

---

were crimes of violence, not crimes of possession.  California has similar laws today, such as California Penal Code § 245(a)(2) & (3) (assault with a deadly weapon - firearm) and § 417(a)(2) (exhibition of a firearm in a rude, angry, or threatening manner).  These assault and exhibition laws are not being challenged in this case.

[86] According to one scholar, the first prohibition on simple ownership of a gun came in 1911.  Churchill, *supra*, at 139, n.61 ("The first law restraining gun ownership by citizens mentioned in the secondary literature is New York's 1911 Sullivan Law, which prohibited the ownership of concealable arms without a police permit."); *see also* David B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900* 50 J. of Legis., Apr. 25, 2023, at 45–46 (2024), https://ssrn.com/abstract=4393197 ("Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory.  Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787 . . . . There is no evidence that any of the Founders were concerned about individuals having too much firepower.  After a long, grueling war against the world's strongest military, limiting individuals' capabilities was not a concern.").

[87] Pls.' Resp. Br. Re: Defs.' Hist. Surveys, Dkt. 166, at 6.

[88] (Unless the person was an African-American or a slave or a mulatto).

19-cv-01537 BEN (JLB)

1    analogous to the "assault weapon" ban.  What else is there?

2                        **2.   No Gun Laws In The Northern States For 50 Years**

3            From the adoption of the Second Amendment through the next 50 years, there

4    were no firearm restrictions in any states north of the Mason-Dixon Line.[89]  Imagine that.

5    One could live in any of the northern states without restrictions of almost any kind.[90]  A

6    _____

7

8    [89] The Mason-Dixon Line established the boundary line between Pennsylvania and
     Maryland.  Beyond its importance as a literal boundary between states, "the Mason-
9    Dixon Line has become known as the boundary between the North and the South.  When
     Mason and Dixon surveyed the land in the late 18th century, the border was never about
10   slavery, yet it took on that association on March 1, 1790, when the Pennsylvania
     Assembly passed legislation ending slavery in the state.  They made the Mason-Dixon
11   Line as the boundary between slave territory and free land, since slavery was still allowed
     in Maryland.  The border between Pennsylvania and Maryland became tied to the North
12   and South divide, especially after the Missouri Compromise was passed in 1820, which
     prohibited slavery north of the Mason-Dixon Line.  To the many slaves who used
13   whatever means necessary to reach free land, the Mason-Dixon Line became important to
14   their freedom.  For the slaves located in Maryland, they only needed to get to the state
     line to secure their freedom, although many continued traveling north in an attempt to get
15   as far away from their former masters as possible."  Kathryn DeVan, *Our Most Famous
16   Border: The Mason-Dixon Line*, Pa. St. Univ. (fall 2008),
     https://pabook.libraries.psu.edu/literary-cultural-heritage-map-pa/feature-articles/our-
17   most-famous-border-mason-dixon-line.
18
     [90] The State lists one New Jersey statute from 1799 as a law purportedly prohibiting the
19   carrying of a pistol with the intent to assault (*see* Dkt. 139-3, [19]), but this appears to be
20   a sentencing enhancement statute applicable only if one was apprehended for burglary.
     *See* Duke Center for Firearms Law collection of firearm statutes.  "[An Act to Describe,
21   Apprehend and Punish Disorderly Persons (1799)], § 2.  And whereas diverse ill disposed
22   persons are frequently apprehended, having upon them implements for house-breaking,
     or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-
23   houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens
24   belonging to houses, with intent to commit theft, misdemeanors or other offences; and
     although their evil purposes are thereby manifested, the power of the justices of the peace
25   to demand of them sureties for their good behavior hath not been of sufficient effect to
26   prevent them from carrying their evil purpose into execution; Be it further enacted, That
27   if any person shall be apprehended, having upon him or her any picklock, key, crow,
     jack, bit or other implement, with an intent to break and enter into any dwelling-house or
28

                                                29

1    gun owner enjoyed freedom with no infringing prohibitions from 1789 to 1845 in

2    Pennsylvania, New York, Connecticut, Massachusetts, New Hampshire, Rhode Island,

3    Vermont, Maine, Ohio, Illinois, Michigan, or Indiana.  One might never be subject to a

4    later surety statute in Massachusetts (1836) [29] and Maine (1841) [46].[91]  In fact, if

5    anything, regulations were not about what kind of firearm one was *not* allowed to keep,

6    but about the kind of firearm one was *required* to buy and have ready for militia duties.

7         The same was largely true south of the Mason-Dixon Line (disregarding laws

8    concerning slaves and Indians, neither of which were considered citizens).  Like the

9    northern states, from the time of the adoption of the Second Amendment to the time of

10   the adoption of the Fourteenth Amendment, there were no state gun laws in Delaware,

11   North Carolina, South Carolina, Mississippi, Florida, West Virginia, and Texas,

12   according to the State's law list.  A citizen could reside in any of the northern states and

13   half of the southern states for the first fifty years free from state government firearm

14   restrictions.  This understanding is not based on expert opinion, but a methodical reading

15   and assessment of the laws set out in the government's survey.  The parties' own experts

16   express some disagreements but are unpersuasive.

17        In the Northern States there was no tradition of criminalizing the simple act of

18   keeping or carrying any firearm.  There were hardly any firearm laws at all.  In the

19   District of Columbia, governed by Congress, there were no firearm laws for the first

20   _____

22   out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other
23   offensive weapon, with intent to assault any person; or shall be found in or upon any
     dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in
24   any enclosed yard or garden, or area belonging to any house, with an intent to steal any
     goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person."
25   Duke Ctr. For Firearms L., *Charles Nettleton, Laws of the State of New-Jersey Page 474,*
26   *Image 501 (1821) available at The Making of Modern Law: Primary Sources*,
     https://firearmslaw.duke.edu/laws/charles-nettleton-laws-of-the-state-of-new-jersey-page-
27   474-image-501-1821-available-at-the-making-of-modern-law-primary-sources/.
     [91] That the two states would share similar laws makes sense since Maine was part of the
28   Commonwealth of Massachusetts prior to its statehood in 1820.

1  eighty years until a concealed carry prohibition was enacted in 1871.  [97].  Maine

2  enacted its first law, a gunpowder storage regulation to prevent fires, in 1821.  [27].

3  Massachusetts enacted its first state firearm law in 1836 as a surety law [29] with Maine

4  following suit in 1841.  [46].  *Bruen* already notes that under the surety laws everyone

5  started out with robust carrying rights and *Bruen* saw little evidence that the laws were

6  enforced.

7       Illinois was admitted to the Union in 1818.  In 1845, Illinois enacted its first

8  firearm statute criminalizing carrying a gun *with the intent to assault another person*.

9  [49].  Indiana became a state in 1816.  In 1855, its first law was passed, according to the

10  State's law list.  [62].  Indiana criminalized shooting a gun at a train or throwing stones or

11  sticks at a train.  The law did not concern keeping any gun whatsoever, or carrying a gun

12  anywhere, in any manner whatsoever.[92]  Ohio became a state in 1808.  Ohio had no state

13  laws respecting firearms until 1859, according to the State's law list.  [70].  Not until

14  almost 70 years after the adoption of the Second Amendment did Ohioans have a gun

15  law.  The first gun law was one that prohibited carrying a pistol, bowie knife, dirk, or

16  other dangerous weapon *concealed*.  California enacted its first gun regulation in 1853.

17  That law criminalized the act of having "upon him any pistol, gun, knife, dirk, bludgeon,

18  or other offensive weapon, with intent to assault any person."  [57].

19       In short, the history and tradition of the northern states was to leave firearm

20  ownership and use completely unregulated.  From the time of the adoption of the Second

21  Amendment to the time of the adoption of the Fourteenth Amendment, there were no

---

[92] The State's law list erroneously describes the 1855 Indiana law as one prohibiting the carrying of a pistol with the intent to injure another.  This appears to be a scrivener's error.  Although the State does not include it in its law list, Indiana may have enacted an earlier statute prohibiting carrying a pistol concealed, with an exception made for travelers.  "In *State v. Mitchell*, 3 Blackf. 229, 1833 WL 2617 (Ind. 1833), the Supreme Court of Indiana, in a one-sentence opinion, upheld a state statute prohibiting the general public from carrying concealed weapons."  *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 933 (9th Cir. 2016).

state gun laws in Pennsylvania, New York, Connecticut, Rhode Island, Vermont, New Hampshire, Michigan, Wisconsin, Minnesota, Iowa, Nebraska, Kansas, Missouri, or the District of Columbia.  In Massachusetts and Maine there were only surety statutes.  In New Jersey there was a sentencing enhancement.  In this half of the nation, keeping and bearing firearms was done freely without government interference.

### 3.  <u>No Gun Laws In The Southern States For 50 Years</u>

South of the Mason-Dixon Line, where slavery was practiced, there were many laws restricting firearms for slaves, African-Americans, and Indians.  Setting aside that obviously unconstitutional tradition, among the southern states firearm ownership was largely unregulated for at least the first 50 years after 1791.  Like the northern states, from 1791 to 1868 there were no state gun laws in Delaware, North Carolina, South Carolina, Mississippi, Florida, West Virginia, or Texas, according to the State's law list.

The few laws in other southern states that did exist concerned: (1) carrying a pistol *with the intent to assault another*; and (2) carrying a pistol in a *concealed* manner.  Twelve years after the adoption of the Second Amendment, Tennessee enacted the first firearm regulation in the southern states in 1801 in the form of a surety law.  [20].  The Tennessee law was discussed in *Bruen*, as mentioned earlier.  A decade later in 1811, Maryland passed the second firearm regulation in the south. [23].  The Maryland law was a sentencing enhancement for carrying a pistol *with the intent to assault another*.

In 1813, Louisiana passed the first law prohibiting the carrying of a *concealed* gun.  [24].[93]  *Bruen* noticed that a Louisiana court found the prohibition on concealed carrying constitutional only because it permitted openly carrying a firearm.[94]  Kentucky passed a prohibition on carrying a *concealed* pistol that year, although it is omitted from the

---

[93] Louisiana reenacted similar, if not the same, statutes two more times, in 1842 and again in 1855.  [63].

[94] 142 S. Ct. at 2146 and n.19 (quoting *State v. Chandler*, 5 La. 489, 490 (1850) ("Louisiana concealed-carry prohibition 'interfered with no man's right to carry arms (to use its words) "in full open view," which places men upon an equality'")).

19-cv-01537 BEN (JLB)

State's law list.  Perhaps it is omitted because Ketuncky's concealed carry law was struck down as unconstitutional a short time later.  The only other firearm regulation in the south during this time was Georgia's 1816 law prohibiting the carrying of a pistol *with intent to assault* another person.  [25].

Around 50 years after the Second Amendment, four southern states passed their first firearms regulations taking the form of *concealed* carry prohibitions.  In 1837, Arkansas prohibited carrying a pistol concealed unless on a journey.  [32].  In 1837, Georgia added its own prohibition on carrying a pistol concealed.  [33].  The constitutionality of the Georgia law was upheld because open carry was unregulated.[95]  In 1838, Virginia prohibited carrying a pistol concealed.  [40].  In 1839, Alabama prohibited carrying a firearm concealed [41], adding exceptions for self-defense and for travelers, two years later.  [45].[96]

Three more recent regulations were enacted in the south in the years leading up to the adoption of the Fourteenth Amendment.  In 1856, Tennessee passed its first prohibition in the form of selling or lending a pistol to a minor, except for hunting.  [65].  In 1868 Florida enacted a prohibition on carrying secretly "arms of any kind whatever" and the outright carrying of a pistol or other arm or weapon.  [90].  The 1868 Florida law was not tested in a published court decision.[97]

---

[95] *Nunn v. State*, 1 Ga. 243, 251 (1846) ("We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.").

[96] *Lockett v. State*, 47 Ala. 42, 45–46 (1872) ("Nor is it required that he should have any necessity for the use of his pistols.  It is enough if he was traveling on a journey, long or short.").

[97] However, an 1867 court decision considered an earlier law where only *concealed* carrying was prohibited.  *See Sutton v. State*, 12 Fla. 135, 136 (1867) ("The statute under which this indictment was found provides, 'that hereafter it shall not be lawful for any

19-cv-01537 BEN (JLB)

1    The first restriction on a *dangerous and unusual* firearm did not occur until 1868,

2  the year the Fourteenth Amendment was adopted.  In that year, Alabama prohibited

3  carrying a rifle walking cane or a shotgun walking cane.  [87].  A rifle walking cane was

4  a single shot rifle disguised to appear as a walking cane with a variety of handles.  When

5  fired, one bullet would exit through the bottom of the cane.  It was patented in 1858 and

6  manufactured by the E. Remington & Sons company until approximately 1888, with less

7  than 2,000 produced.[98]  Remington was the only major gun maker to produce a rifle cane

8  gun.  California currently has a law prohibiting possession of a "cane gun."  *See* Cal.

9  Penal Code § 24410.

10    In short, the history and tradition of the southern states was to leave firearm

11  ownership and use mostly unregulated.  At least for the first half of the century, in this

12  half of the nation, keeping and bearing firearms was done freely, with a handful of states

13  enacting prohibitions on carrying pistols in public in a concealed manner, and Maryland

14  and Georgia making it a crime to carry a firearm with the intent to assault another person.

15    **4.  <u>Territories</u>**

16    The State includes in its law list a number of regulations from nineteenth century

17  United States territories.  *Bruen* has already considered such laws and decided that they

18  are not particularly helpful for several reasons.  "First, the bare existence of these

---

21  person in this State to carry arms of any kind secretly on or about their person, &c.:

22  Provided, that this law shall not be so construed as to prevent any person from carrying

23  arms openly outside of all their clothes' . . . . The statute was not intended to infringe

    upon the rights of any citizen to bear arms for the 'common defense.'  It merely directs

24  how they shall be carried, and prevents individuals from carrying concealed weapons of a

    dangerous and deadly character, on or about the person, for the purpose of committing

25  some malicious crime, or of taking some undue advantage over an unsuspecting

26  adversary.").

    [98] *See* Remington Soc'y of Am., *Remington Cane Guns*,

27  https://www.remingtonsociety.org/remington-cane-guns/ [https://perma.cc/A74W-EHPT]

    (last visited May 26, 2023).

28

19-cv-01537 BEN (JLB)

localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition . . . ."[99]  "These territorial 'legislative improvisations,' which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'"[100]  "Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality. . . . we fail to see how they inform 'the origins and continuing significance of the Amendment.'"[101]  "Finally, these territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived . . . . Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation."[102]  One commentator disagrees and argues that territorial regulations should enjoy more Second Amendment significance because they were adopted with consideration for the Bill of Rights.[103]  Even so, they suggest an absence of gun bans during the most important historical period.  Though territorial regulations are not instructive, fail to inform the continuing significance of the Second Amendment, and deserve little weight, the State has listed some.

None of the territorial regulations from 1791 to 1868 prohibited a firearm.  There were no prohibitions on owning firearms of any type.  There were no prohibitions on keeping a firearm of any type for self-defense, whether in the home or in public.  The first territorial regulation came approximately 47 years after the Second Amendment (in 1839) and addressed the carrying of a firearm in a *concealed* manner in the Florida

---

[99] *Bruen*, 142 S. Ct. at 2154.
[100] *Id.* (quoting *Heller*, 554 U.S. at 614).
[101] *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 592).
[102] *Id.* (citations omitted).
[103] *See* Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash. Univ. L. Rev. (2023), https://ssrn.com/abstract=4372185.

19-cv-01537 BEN (JLB)

1 Territory. [42]. In other words, throughout the first 40 years of the nation's history, the
2 only territorial restriction on firearms, anywhere, was in the Florida territory taken from
3 Spain in 1819.

4      In 1853, the New Mexico Territory also adopted a *concealed* carrying law. [58].
5 In 1854, the Washington Territory addressed *exhibiting* a pistol in a rude, angry, or
6 threatening manner, reenacting a similar law in 1859. [60, 71]. The Nebraska Territory
7 made it a crime to carry a pistol *with the intent to assault* another person in 1858. [68]
8 The Colorado Territory (in 1862 and again in 1867) and the Montana Territory (in 1864)
9 restricted the *concealed* carrying of a pistol in a city, town, or village. [75, 79, 84].
10 These territorial laws do not evidence a history or tradition of prohibiting firearms of any
11 type. They do evidence some later restrictions on the manner of carrying firearms in
12 some public places.

13                **5.  The State Tries Four Longshots**

14      With nothing else to go on, the State tries to identify a tradition of firearm
15 regulation based on four laws that the State claims banned possession of "dangerous
16 weapons."[104]  Because a law criminalizing mere possession of a firearm in one's home
17 kept for self-defense, like California's Assault Weapon Control Act, is *so extreme*, it
18 would be very important if the State could at least point to a historical tradition of
19 banning the simple possession of any kind of firearm. Unfortunately, the State is unable
20 to find such a tradition. The four laws it offers up either did not ban firearms or they did
21 not ban possession. Moreover, the four longshot laws came too late in time to establish a
22 new tradition and cannot be used to confirm a non-existent earlier tradition.

23      The biggest miss is that three of the four laws the State cites for a tradition of
24 firearm regulation did not ban possession of a *firearm.*  Law [81] was an 1866 New York
25 statute banning a slungshot, billy, sandclub, dirk, dagger, sword cane, air-gun, or metal

26
27 _____

28 [104] Defs.' Br. in Resp., Dkt. 170, at 8 (citing [81, 150, 170, 171]).

knuckles.  Law [150] was an 1881 iteration of the same New York law about slungshots, billys, etc.  Law [171] was a third iteration of the New York law.  These three statutes spanning twenty years from New York did not infringe on one's right to possess a firearm.

The second miss is that the fourth law [170], an 1885 law from the Montana Territory, does not go as far as the State imagines.  One problem is that, coming 94 years after the adoption of the Second Amendment and 20 years after the Fourteenth Amendment, the Montana regulation appears too late to be indicative.  While it could be indicative of a tradition *if* it were consistent with earlier laws of the same caliber, there were no such earlier laws.  Another problem is that it was a territorial law to which *Bruen* says should be given little weight.  The biggest problem is that the Montana regulation did not ban possession.  The State's law list summary contains a scrivener's error that becomes apparent when reading the actual text of the law.  The law's formal title ("Threateningly drawing deadly weapons prohibited") gives it away.  The 1885 Montana territorial ordinance [170] punished drawing or exhibiting a gun in a rude, angry, or threatening manner.[105]  It did not criminalize simply possessing or keeping a gun.  In fact, unlike the "assault weapon" ban, this territorial law even provides an exception

---

[105] The Montana Territory's 1885 amendment to § 62 provided:  "Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, *who shall, in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner*, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory, shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court…" *See Laws, Resolution and Memorials of the Territory of Montana* 74–75 (1885), reproduced at the HathiTrust Digital Library, https://hdl.handle.net/2027/uc1.a0005193305?urlappend=%3Bseq=93%3Bownerid=1351 0798903325764-113 (emphasis added).

permitting one to possess and exhibit a gun in self-defense.

To sum up, the three New York laws had nothing to do with firearms and the Montana territorial law did not prohibit mere possession.[106]  As some scholars have observed, "[d]uring Reconstruction, no government in the United States attempted to prohibit the possession of any particular type of firearm."[107]

**B. Historical Twins**

*Bruen* concluded that "[n]one of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."[108]  The same can be said about California's "assault weapon" ban.  To paraphrase the Supreme Court, none of these historical limitations on the right to bear arms approach California's complete ban on "assault weapons."  None of the early nation's laws operated to prevent law-abiding citizens with ordinary self-defense needs from possessing rifles, shotguns, or pistols.

So, what analogue for the "assault weapon" ban does the State rest its case upon?  There are no founding era dead ringers or historical twins.  A historical twin is not unimaginable.  It could have been the case that the early states prohibited ownership of rifles and muskets with bayonet attachments or firearms capable of multiple shots without reloading.  One could imagine the states prohibiting private possession of canons or Gatling guns.  There were no such restrictions.

---

[106]  The State also mentions an Alabama tax on bowie knives that "effectively banned" most people from owning the knife.  Defs.' Br. in Resp., Dkt. 170, at 8.  Of course, a bowie knife is not a gun and the AWCA goes well beyond "effectively banning most people" from possessing a modern semiautomatic rifle, to actually banning and making criminals of people possessing a modern semiautomatic rifled deemed an "assault weapon" (with statutory exceptions).  A tax on bowie knives is not a close analogue.
[107]  Kopel & Greenlee, *This History of Bans*, *supra*, at 60.
[108]  142 S. Ct. at 2150.

19-cv-01537 BEN (JLB)

## IV.  ANALOGUES

Although the State does not identify a historical twin of its "assault weapon" ban, it may not have to.  After all, it can be argued that "assault weapons" represent a dramatic change in technology and the State is attempting to address a modern societal concern of mass shootings.[109]  Where that is the case, *Bruen* calls for a more nuanced approach.  On one hand, a modern rifle like the AR-15 clearly represents a dramatic technological advancement when compared to a musket.  On the other hand, the lever-action repeating Henry and Winchester rifles that were popular at the time of the Fourteenth Amendment were also dramatic technological advancements in firearms.  These popular lever-action rifles had large tubular magazines and could be fired multiple times in succession very accurately and quickly.  Yet, there are no state prohibitions on the possession or manufacture of these lever-action rifles in the State's law list.  In the same way, a semiautomatic pistol with a threaded barrel (*i.e*, an "assault weapon") is is not much of a technological advancement over an 1868 navy revolver with a smooth barrel.  And is a semiautomatic shotgun with a pistol grip and adjustable stock (*i.e*, an "assault weapon") really a dramatic technological advancement over common multi-shot shotguns from the 1800s?

Large capacity, rapid-firing rifles appeared in large numbers in 1860 with the fast shooting Henry lever-action rifle equipped with a 30-round tubular magazine.  By 1866, Winchester began mass marketing its amazing Model 1866 (a rifle capable of firing 15 rounds in half as many seconds).[110]  And long before these popular lever-action repeaters was the Girandoni air rifle, developed in 1779, with a 22-round capacity famously carried on the Lewis and Clark expedition.[111]  The Henry and Winchester lever-action large-

---

[109] Defs.' Resp., Dkt. 167, at 13–14.
[110] *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020); Decl. of Michael Vorenberg, Dkt. 137-9 ("Vorenberg Decl."), at ¶ 17.
[111] *Duncan*, 970 F.3d at 1147.

capacity repeating multi-shot rifles were not novelties; they were common among civilians by the end of the Civil War and in the years thereafter.  "[O]ver 170,000" Winchester 66's "were sold domestically."[112]  The successors that replaced the Model 1866, the deadly Model 1873 holding 15 rounds and Model 1892, sold more than 1,700,000 in the ensuing decades.[113]  In fact, so common were the lever-action Winchester rifles that anyone could order one from the Sears Roebuck & Co. catalog and have it delivered to their door in 1898.[114]

During the Civil War, Union soldiers used 8,500 Henry repeating rifles and at the end of the war kept 7,500 for their personal use.[115]  Unfortunately, the Army did not fully embrace the Henry/Winchester rifles, leading to its ignominious defeat at the Battle of Little Big Horn in 1876.  Plains Indians, using Winchester repeating rifles, wiped out George Custer's army equipped with only Springfield single-shot rifles.[116]  One author explains that the smaller caliber and the rapid fire, which was unattractive to military authorities, made it popular among hunters and frontiersmen.[117]

These technologically advanced rifles were also used to great advantage for self-defense.  In 1865, two Civil War veterans who kept their Henry repeating rifles were mining borax in the Blackfoot Indian country of the Rocky Mountains when 40 warriors

---

[112] *Id.* at 1148

[113] Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 305 (9th ed. 2007) (14,000 Henry rifles were sold between 1860 and 1866).

[114] *See* 1898 Sears, Roebuck & Co., *Our Line of Winchester Repeating And S. S. Rifles*, Catalogue No. 107, at 372–73, viewed at Internet Archive https://bit.ly/3VeUhHo, cited by State expert Brennan Rivas, Decl. of Brennan Rivas, Dkt. 137-6 ("Rivas Decl."), at n.2.

[115] Vorenberg Decl. at ¶ 24.

[116] *Id.* at ¶ 58.

[117] Harold F. Williamson, *Winchester: The Gun That Won the West* 41 (Washington D.C.; Combat Force Press, 1952), found in Compendium of Works Cited in Decl. of Vorenberg, Dkt. 150-8, at 458.

attacked.  The attackers made a fatal mistake of assuming the miners had only single shot rifles.  The two miners were able to keep firing at the attackers, eventually wiping them out and discouraging all future attacks.[118]  It is a perfect example of civilians outnumbered by attackers successfully using high-capacity rifles for self-defense.  Another example comes from the 1863 story of James E. Wilson.  Wilson was attacked in his home with his family by seven armed men firing shots.  Grabbing his Henry repeating rifle, Wilson defended himself by killing the seven home invaders with eight shots.[119]  With the popularity of these deadly, high-capacity, lever action rifles, it is telling that there are no state laws banning possession or manufacturing of these firearms in the State's law list.

### A.  The State's Best Historic Analogue: Guns Set As Traps

The State argues the best analogue to the "assault weapon" ban are *trap gun laws*.[120]  With the benefit of academic historians who have studied historic gun laws for more than 20 years, the State was asked to identify its best analogous historical regulation.  The State identified its best analogue: a 1771 statute from the colony of New Jersey restricting the use of *guns set as traps*.  It is an odd choice.

First, what the State does not admit or seem to recognize is that "trap guns" are not guns at all.  They are a method by which a gun, any gun, can be set up to fire indiscriminately through the use of springs, strings, or other atypical triggering mechanisms without an operator.  Second, there was no history and tradition of trap gun restrictions in the important years between 1791 and 1868.  Predating the Second Amendment by twenty years, the Declaration of Independence, and New Jersey statehood,[121] the 1771 trap gun law cannot be said to reflect a national understanding of

---

[118] *Id.* at 459–60.
[119] *Id.* at 456.
[120] Defs' Brief in Response, Dkt 168, at 3-5; Defs' Brief in Response, Dkt 167, at 23.
[121] New Jersey was one of the few states that did not have in its state constitution a provision like the Second Amendment.  (Six states do not have provisions protecting a

the Second Amendment right.  More importantly, ninety-five years passed before a second restriction on setting a gun as a trap appeared -- and that law applied only to the Utah Territory (1865).  [80].  Remember that *Bruen* discounted territorial laws.  In the years following the adoption of the Second Amendment, the first state law on setting a gun as a trap came in 1873 (Minnesota).  [109].  Two more states followed in 1875 (Michigan) and 1884 (Vermont).[122]  In other words, trap guns were not prohibited by law in the District of Columbia or 36 of the 37 states, until 1873.  California waited to enact its own trap gun law until 1957.[123]  If this is what a national tradition of trap gun regulation looks like, it is a strange look, indeed.[124]

Third, and perhaps most important, trap gun laws did not prohibit possession or use of particular guns.  Trap gun laws restricted only the particular manner of using any gun.[125]  Trap gun laws did not prohibit the simple possession of the gun even when set as

---

right to arms in their state constitutions:  California, New Jersey, New York, Maryland, Minnesota, and Iowa.)  *See* David B. Kopel and Clayton E. Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 Santa Clara L. Rev 1113, 1145, n.51 (2010).

[122] Defs.' Br. in Resp., Dkt. 168, at n.6.  The State's expert (Spitzer) also notes a Wisconsin law from 1872, and laws from South Carolina (1855), Rhode Island (1890), and North Dakota (1891) that are about proscribing the use of a trap gun or set gun solely as a disfavored hunting technique.

[123] *See* Cal. Fish & Game Code § 2007.

[124] Some argue that a complete absence of historical laws does not necessarily mean that states lacked constitutional authority to enact such laws.  If that were the case, however, one would expect to find other indicia of that silent authority.  For example one might find a court opinion observing that it is well known throughout the country that trap guns are criminal implements.  Defendants have offered no such interstitial evidence and it is the government that bears the burden.  Instead, there are relevant period court decisions that fill the silence with a different explanation: trap guns were lawful to use for defense of persons and property.

[125] *People v. Ceballos*, 12 Cal. 3d 470, 477 (1974) (*en banc*) ("Where the actor is present, there is always the possibility he will realize that deadly force is not necessary, but deadly mechanical devices are without mercy or discretion.") (citation omitted).

19-cv-01537 BEN (JLB)

1   a trap with a string.

2         The State says the New Jersey law imposed a burden "comparable" to § 30515 by

3   prohibiting certain configurations of firearms, including inside the home.[126] Not

4   according to the terms of the statute.  The 1771 Act concerns, *inter alia*, using oversized

5   hunting traps and trespassing while hunting with guns and dogs.  No prohibition is made

6   of setting a trap gun within a home.[127]  A predecessor law from 1751 focused almost

7   entirely on setting traps and spring guns *on the properties of others*.[128]  Most importantly,

8   the colonial lawmakers of New Jersey deemed it important to clarify that in all events, it

9   remained lawful to carry a gun.  Section 2 of the Act says, "*nothing herein contained*

10  *shall be construed to extend to prevent any person carrying a gun upon the king's*

11  *highway in this colony.*"[129]

12        Grasping at straws, the State also argues that trap guns were designed to injure or

13  kill individuals.  The text of the 1771 law, on the other hand, suggests that trap guns were

14  designed to kill deer.  The State argues that trap gun laws sought to avoid harm to the

---

18  [126] Defs.' Br. in Resp., Dkt. 168, at 4.

19  [127] Compare, the section the State relies on (§ 10), to § 7 which prohibits unusually large
20  deer traps.  Section 7 specifically penalizes possession or keeping unusually large traps
    "in their house."  So, New Jersey knew how to prohibit a trap within one's house.  That
21  language was not used for setting guns as traps.   Further, it can be argued that these
    hunting regulations did not apply at all in one's own lands.  *See* § 12.
22  [128] *Koons v. Platkin*, No. 22-7364-RMB-AMD, 2023 U.S. Dist. LEXIS 85235, at *201
23  (D.N.J. May 16, 2023) (the law was designed to discourage poaching).
    [129] (Emphasis added.)  The notion that hunting laws regulating firearms were not intended
24  to apply beyond the hunting context, is not novel.  The California Supreme Court in 1898
25  recognized the distinction, explaining, "[t]he legislature did not mean to make it a
    misdemeanor to use a No. 8 gun in any possible or conceivable way, or for any possible
26  purpose.  Taking the whole context of the act, it is apparent that the intention was to
27  prohibit the use of guns of large caliber for the purpose of killing game or other animals."
    *Ex parte Peterson*, 119 Cal. 578, 578 (1898).

1   public.  Instead, it is the trespasser, that the law sought to protect.[130]

2          Lastly, the State asserts that its best analogue, trap gun laws, are also designed to

3   prevent unintended injury to innocent bystanders.  In reality, the "problem" addressed by

4   a trap gun law is that the gun hits precisely what it is aimed at, not that it injures human

5   bystanders.  Some trap gun laws had no connection to protecting the public from gun

6   shots.  For example, an 1855 South Carolina law protected deer, turkeys, and ducks while

7   an 1892 Rhode Island law protected quail and partridge.  North Dakota's 1891 law

8   concerned only particular wildlife like South Dakota's law in 1909.

9          To sum up, by the year 1900, there were 45 states in the Union.  From before the

10  adoption of the Second Amendment, for the next 100 years, only New Jersey had a law

11  prohibiting setting a gun, any gun, as a trap, and that law concerned the manner of

12  hunting deer.  Court decisions between 1791 and 1868 recognized that in other states it

13  was entirely lawful to use guns set as traps (or spring guns, as they were sometimes

14  called) to defend one's property.[131]  And in every case, it was the manner and setting of a

15

16

---

17  [130] *State v. Green*, 118 S.C. 279, 110 S.E. 145, 148 (1921) (quoting *Simpson v. State*, 59

18  Ala. 1 (1877) ("In the one case, if the trespasser came not with an unlawful intent--if his
    trespass was merely technical--if it was a child, a madman, or an idiot, carelessly,

19  thoughtlessly entering and wandering on the premises, the owner would withhold all

20  violence.  Or, he could exercise a discretion, and graduate his violence to the character of
    the trespass.  The mechanical agency, is sensitive only to the touch; it is without mercy,

21  or discretion; its violence falls on whatever comes in contact with it.")).

22  [131] *See, e.g.*, *Gray v. Combs*, 7 J. J. Marsh 478 (Ky. 1832) (one who sets traps or spring
    guns to protect valuable property by means of which another is killed while attempting to

23  enter the premises is guilty of no crime); *Loomis v. Terry*, 1837 WL 2808 (N.Y. Sup. Ct.

24  1837) ("It is not like setting spring guns with public notice of the fact; for even that has
    been held warrantable as being necessary (*Ilott v. Wilkes*, 3 Barn. & Ald. 304).");  *State v.*

25  *Moore*, 31 Conn. 479, 479–80 (Conn. 1863) ("Breaking and entering a shop in the night
    season with intent to steal, is by our law burglary, and the placing of spring guns in such

26  a shop for its defense, would be justified if a burglar should be killed by them.");

27  *Maenner v. Carroll*, 46 Md. 193, 208 (Md. Ct. App. 1877) ("While it is decided that

28  traps, spring-guns, and other dangerous instruments, may be lawfully placed on private

1  firearm that was proscribed; possession of a firearm by itself, whether a string or rope or

2  some other thing was attached to the firearm, was never prohibited.

3      **B. The State's Other Analogues**

4          **a. Gunpowder Storage Laws**

5          For another possible analogue, the State identifies historic gunpowder storage

6  laws. These were *fire* safety regulations—nothing more.[132] "Boston in 1782 enacted a

7  unique ordinance, expressly for fire protection."[133] "The ordinance did not prohibit

8  *carrying* loaded firearms within the City of Boston—only leaving them unattended in a

9  building—and . . . this law was for the protection of those fighting fires."[134] In fact, one

10

11  ─────────────

12  grounds, for the purpose of deterring trespassers or catching strange animals doing

13  damage . . . ."); *see also Simpson*, 59 Ala. at 18 (citing *Moore*, 31 Conn. at 479) ("The

    setting a spring-gun on his premises, by the owner, is culpable only because of the intent

14  with which it is done. Unless the public safety is thereby endangered, it is not indictable.

    If dangerous to the public, it is indictable as a nuisance."); *United States v. Gilliam*, 25 F.

15  Cas. 1319, 1320 and n.2 (D.C. Crim. Ct. 1882) ("The setting of a spring-gun as a

16  protection for property, though not in itself unlawful and indictable, is certainly

    undeserving of encouragement. . . .") (citing English common law and the court of King's

17  Bench, *Ilott v. Wilkes*, 3 Barn. & Ald. 304 ('A trespasser, having knowledge that there are

18  spring-guns in a wood, although he may be ignorant of the particular spots where they are

    placed, cannot maintain an action for an injury received in consequence of his accidental

19  treading on the latent wire connecting with the gun, and thereby letting it off.')).

20  [132] *See* Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the

    Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of

21  Boston, § 2; s*ee also Renna*, 20-cv-02190-DMS-DEB, 2023 WL 2846937, *12–13 (citing

22  *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014) (stating

    "Boston's firearm-and-gunpowder storage law is historically distinct from the challenged

23  firearm regulation in light of *Heller*" and dismissing argument that Massachusetts

24  gunpowder storage law is analogous for Second Amendment purposes to California's

    unsafe gun roster).

25  [133] David B. Kopel and Joseph G. S. Greenlee, *The Sensitive Places Doctrine*, 13

26  Charleston L. Rev. 205, 240 (2018); Defs.' Compendium of Works, Dkt. 158-2, at 151.

27  [134] Clayton E. Cramer and Joseph Edward Olson, *Pistols, Crime, and Public: Safety in

    Early America*, 44 Willamette L. Rev. 699, 705 (2008) (emphasis in original).

28

scholar mused, "Strictly speaking, the law did not forbid bringing an unloaded gun into a building, and then loading it when inside.  So, occupants of homes or businesses remained free to keep loaded guns."[135]  In contrast, the State's expert witness, professor Cornell, opined that the gunpowder storage law prohibited Bostonians from storing a loaded weapon in one's home within the town.  However, the statutory text does not support his view.

In 1783, gunpowder presented a fire danger and a fire could quickly get out of control.[136]  In neighboring New York City, there had been two great fires the previous decade.  In 1776, New York City experienced "the most destructive fire in colonial North America," which burned much of Manhattan to the ground.[137]  Shortly thereafter, a second fire swept through the city in 1778.[138]  The point of the Boston gunpowder storage statute and others like it was, as it proclaimed, to protect communities from fire and

---

[135] *Id.*

[136] Gunpowder remained a fire threat for years.  For example, in 1841, the *New York Herald* published: "Another dreadful calamity – Terrible Explosion at Syracuse – Thirty Lives Lost, Fifty Wounded.  We have to chronicle another awful calamity by which upwards of thirty persons have been killed and fifty seriously wounded.  We learned that last Friday night a fire broke out at Syracuse in a carpenter's shop near the Oswego Canal.  It spread with great rapidity and the building was soon enveloped in flames.  Crowds of citizens flocked to the scene, and soon after a great number had collected, a barrel of gunpowder which had been placed in the shop, exploded, and sent death and destruction all around.  As near as could be ascertained, upwards of thirty persons were killed outright, and no less than fifty wounded, some very seriously, and perhaps fatally.  From ten to fifteen were so mangled and cut to pieces that it was impossible to recognize them."  OnonDaga Hist. Ass'n, *Gunpowder Explosion on Oswego Canal Kills 25, Injures 60* (Aug. 23, 1841), https://www.cnyhistory.org/2016/08/gunpowder-explosion/ [https://perma.cc/XCU8-34E6].

[137] New York City Fire Museum, *The Great New York Fire of 1776* (Mar. 21, 2023), https://www.nycfiremuseum.org/greatfire1776 [https://perma.cc/A3BW-TQRP].

[138] Richard Howe, *Notes on the Great Fires of 1776 and 1778* (2014), The Gotham Center for New York City History, https://www.gothamcenter.org/blog/notes-on-the-great-fires-of-1776-and-1778 [https://perma.cc/WJ4V-3QKP].

explosion during a time when towns had many wood buildings, fire departments were ill-equipped, and gunpowder was susceptible to accidental ignition.[139] These types of fire safety laws are analogous to laws requiring gasoline to be stored in state-approved gas cans and fire sprinklers and fire escapes for city buildings.

If the State's proposed analogy is that an AR-15 is dangerous like gunpowder was dangerous, the analogy is inapt. While gunpowder storage was regulated, acquisition and possession of gunpowder was not prohibited. The same cannot be said for an AR-15 today. Even the State's expert professor Cornell notes that, "[e]arly Americans were permitted to *own* more gunpowder than they could physically *possess*."[140] The 1784 New York City gunpowder storage law was passed in response to its devastating fires. Yet it did not prohibit possession of gunpowder. Keeping up to 28 pounds of gunpowder was still lawful.[141] And professor Cornell notes, "[t]wenty to thirty pounds of gunpowder is certainly not an inconsiderable amount."[142] The State's gunpowder-storage law analogue is newly urged here, but it is not new. The State's proposed analogue has been rejected before. *Heller* said,

> . . . gunpowder-storage laws . . . did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an

---

[139] Saul Cornell & Nathan DeNiro, *A Well Regulated Right*, 73 Fordham L. Rev. 487, 512 (2004) (citing Mass. laws enacted in 1780 and 1801).

[140] *Id.* at 511 (emphasis in original).

[141] 1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof, ch. 28 (". . . and the said quantity of twenty-eight pounds weight, which shall be lawfull for any person to have and keep at any place within this city, shall be seperated into four stone jugs or tin canisters . . . .").

[142] Cornell & DeNiro, *supra*, at n.173.

19-cv-01537 BEN (JLB)

1    absolute ban on handguns.[143]

2    *Bruen* looked at whether historical regulations were enforced.  For example, it looked at
3    surety laws, saw little evidence "that authorities ever enforced [historical] surety laws,"
4    and as a result discounted them as analogues.[144]  Here, the State offers no evidence that
5    the Boston gunpowder storage law was enforced.  This Court's own search of *Thacher's*
6    *Reports*, a collection of reports of criminal cases tried in the City of Boston Municipal
7    Court from 1823–1843 reveals no such prosecutions.[145] The lack of enforcement
8    evidence further undercuts using Boston's gunpowder regulation as an analogue to
9    today's "assault weapon" regulations.

10          The remaining handful of historic gunpowder storage laws are like Boston's and
11    New York's.  They affected only city dwellers in places like Hartford, Connecticut,
12    Chicago Illinois, and St. Paul, Minnesota, amongst a mostly agrarian society.  They did
13    not prohibit the possessing of weapons.  They did not prohibit keeping loaded firearms
14    within the home.  These few laws across the years do not evidence a national tradition of
15    firearm restrictions.  The gunpowder storage laws were rejected in *Heller* as a basis to
16    ban handguns and the gunpowder storage fire regulations are not reasonably analogous to
17    the State's ban of modern rifles like the AR-15.[146]

18          Remarkably, the early Boston gunpowder storage law implies that a variety of very
19    dangerous arms were, in fact, lawful to keep at home.  The law begins with the following

20

21    _____

22    [143] *Id*. at 631–32.
23    [144] 142 S. Ct. at 2149.
24    [145] *Thacher's Reports* may be found at https://www.mass.gov/info-details/historical-
      massachusetts-cases#1800-1899-.
25    [146] *Cf. Boland v. Bonta*, No. SA CV 22-01421-CJC-ADSx, 2023 WL 2588565, at *8
26    (C.D. Cal. Mar. 20, 2023) ("The main goal of the gunpowder storage laws was to prevent
      fire."); *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901 (N.D. Cal.
27    2022) ("[T]he regulations themselves were often specific to gunpowder and not easily
28    translatable to firearm regulations.").

19-cv-01537 BEN (JLB)

language: "That all cannon, swivels, mortars, howitzers, cohorns,[147] firearms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling house . . . charged with, or having in them any gun-powder, shall be liable to be seized . . . ." The inference can be drawn that, in the years between the signing of the Declaration of Independence and the adoption of the Second Amendment, some Bostonians owned and kept at home cannons, howitzers, grenades, and bombs, all of which may have been more lethal than is an AR-15 today.[148]  At least one historian agrees.[149]

### b. Dirks, Daggers, and Bowie Knives

The State argues that a historical tradition of restricting the concealed carrying of pistols, dirks, daggers, and bowie knives is an analogue for its present day "assault weapon" ban.[150] Of course, some might find it ironic that the State now wants to compare "assault weapons" like the AR-15 to dirks, daggers, and knives.  Undoubtedly, dirks, daggers, and bowie knives are dangerous—even Swiss Army Knives.  Many have forgotten, or worse yet intentionally ignored, that the most horrible, single, mass killing in America's history was facilitated by terrorists with Swiss Army Knives and other

---

[147] A cohorn is a small bronze mortar used for throwing light shells.  Merriam-Webster, *cohorn*, https://www.merriam-webster.com/dictionary/cohorn (last visited May 26, 2023).

[148] Elsewhere, owning and using a cannon was lawful in Ohio as late as 1877 as long as it was not fired too close to a roadway.  1877 Ohio Laws 278, Offenses Against Public Policy, § 60: Whoever, except in case of invasion by a foreign enemy, or to suppress insurrection or a mob, or for the purpose of raising the body of a person drowned, or for the purpose of blasting or removing rock, fires any cannon, or explodes at any time more than four ounces of gunpowder, upon any public street or highway, or nearer than ten rods to the same, shall be fined not more than fifty nor less than five dollars.

[149] Cramer & Olson, *Pistols, Crime, and Public*, *supra*, at 706 ("The law also clearly considered the possession of firearms, cannon, and grenades to be unremarkable, and the carrying of loaded firearms a sufficiently common practice as to need no separate regulation – and no prohibition while walking the streets of Boston.").

[150] Defs.' Suppl. Br. in Resp., Dkt. 137, at 67–68.

19-cv-01537 BEN (JLB)

1  short-bladed instruments.[151]

2      But dirks, daggers, and bowie knives were not guns.  (Pistols are addressed

3  separately below.)  They were bladed instruments; they were not firearms.  Knife laws

4  may not be completely irrelevant, but they are pretty close.  The Supreme Court does not

5  look to knife laws for a gun ban.  This is not to say that bowie knives are not "arms"

6  imbued with Second Amendment protection.[152]  Historical knife laws would be relevant

7  in evaluating a modern prohibition on knives.[153]  It is simply to say that historical *firearm*

8  regulations will obviously be more likely to be analogous to modern firearm restrictions.

9      Even if knife regulations were relevant, they would not help the State much.  There

10  were laws restricting bowie knives in some states in the 1800's, but not the vast majority

11  of states.  There is little evidence of actual prosecutions for simply possessing a bowie

12  knife, much less a judicial opinion on constitutionality.  One court observed that the

13  Tennessee bowie knife law was generally disregarded.[154]  The argument that a cluster of

14  laws prohibiting the carrying of dangerous knives could justify a gun ban, lost its wind in

15  *McDonald*.  The argument did not win the day.  If the regulation of knives was not a

16

17

_____

18  [151] Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report* 530
19  and n.145 ("Atta had a stopover in Zurich, where he bought two Swiss Army knives. . . .
    He may have intended to use the knives during the attacks."); *id.* at 476 and n.57
20  ("Knives with blades under 4 inches, such as Swiss Army Knives, scout knives, pocket
21  utility knives, etc., may have been allowed to enter the sterile area."), https://www.9-
    11commission.gov/report/911Report.pdf [https://perma.cc/W235-EBKV].
22  [152] *See, e.g.*, David B. Kopel, Clayton E. Cramer and Joseph E. Olson, *Knives and the*
23  *Second Amendment*, 47 U. Mich. J. L. Reform 167, 168 (2013); Defs.' Compendium of
    Works, Dkt. 158-2, at 65, 67 ("This Article analyzes Second Amendment protection for
24  the most common 'arm' in the United States – the knife.").
25  [153] *See, e.g., Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (finding butterfly knife ban
    violates the Second Amendment).
26  [154] *See, e.g., Day v. State*, 37 Tenn. 496, 499 (Tenn. 1858) ("It is a matter of surprise that
27  these sections of this act, so severe in their penalties, *are so generally disregarded* in our
    cities and towns.") (describing state law prohibiting the concealed carrying of bowie
28  knives) (emphasis added).

1  sufficient analogue for restricting handguns in Chicago, neither are regulations of dirks,

2  daggers, and bowie knives useful analogues for prohibiting modern rifles.

3  ### C. Prohibitions on Carrying Concealed Pistols

4  Some antebellum laws prohibited carrying concealed pistols.  If there is a history

5  and tradition of government regulation related to guns, this is it.  Among the thirty-seven

6  states and the District of Columbia in 1868, about a dozen states had laws that prohibited

7  carrying concealed pistols.  Importantly, the concealed carry laws did not prohibit either

8  keeping pistols for all lawful purposes or carrying all guns openly.  None of the

9  concealed carry laws included long guns in their restrictions.

10  Kentucky passed the first concealed carry law in 1813.  The Kentucky law

11  imposed a fine on any person who wore a pocket pistol, dirk, large knife, or sword in a

12  cane, concealed as a weapon.  It was an inauspicious start for outlawing the carrying of a

13  gun in a concealed manner.  The law was struck down as unconstitutional nine years

14  later.[155]  Before *Bliss* was decided, Louisiana passed the second such law, also in 1813.

15  [24].  That law was also tested in court.  Louisiana's law was upheld specifically because

16  it did not impinge on the right to carry a gun openly.  The Louisiana Supreme Court

17  explained the difference:

18
19              The act of the 25th of March, 1813, makes it a misdemeanor to
20              be "found with a concealed weapon, such as a dirk, dagger,
21              knife, pistol, or any other deadly weapon concealed in his
                 bosom, coat, or any other place about him, that does not appear
21              in full open view."  This law became absolutely necessary to
22              counteract a vicious state of society, growing out of the habit of
                 carrying concealed weapons, and to prevent bloodshed and
23

24  _____

25  [155] *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) (declaring unconstitutional state
26  law banning the carrying of concealed weapons finding "in principle, there is no
    difference between a law prohibiting the wearing concealed arms, and a law forbidding
27  the wearing such as are exposed; and if the former be unconstitutional, the latter must be
    so likewise.").
28

19-cv-01537 BEN (JLB)

> assassinations committed upon unsuspecting persons.  It interfered with no man's right to carry arms (to use its words) "in full open view," which places men men upon an equality.  This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.[156]

According to the State, Indiana passed the third concealed carry law in 1820 and again in 1831.  The 1831 law was also tested in court and upheld—but with no explanation in a one sentence decision.[157]  The fourth state was Arkansas, which prohibited (in 1837) a person from carrying concealed a pistol or large knife, unless on a journey.  [32].  The Arkansas law was the first *not* tested in court.  The fifth state to pass a concealed carry law was Georgia, also in 1837.  [33].  The Georgia law was tested in *Nunn v. State* and resulted in a decision recognizing the continuing constitutional right to carry firearms openly.[158]  In 1838, Virginia passed the next concealed carry law which prohibited "habitually or generally" carrying a concealed pistol, dirk, bowie knife, or any other kind of weapon.  [40].  The Virginia law escaped judicial review.  In 1839, Alabama passed a similar law.  [41].  It was tested in court and upheld.[159]  Nevertheless, in 1841, Alabama amended its statute to include an exception for self-defense and for travelers.  [45].  No

---

[156] *State v. Chandler*, 5 La. Ann. 489, 489–90 (La. 1850).

[157] *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833).  Even then, travelers continued to enjoy a right to carry concealed guns.  *Id*. ("It was held in this case, that the statute of 1831, prohibiting all persons, except travellers, from wearing or carrying concealed weapons, is not unconstitutional.").

[158] 1 Ga. 243 (1846) ("So far as the [challenged state] act . . . seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.").

[159] *State v. Reid*, 1 Ala. 612 (1840).

other southern states enacted concealed carry laws prior to the Fourteenth Amendment.

In the northern and western states, only two such laws were passed between 1791 and the Fourteenth Amendment.  The first concealed carry prohibition appeared in Ohio in 1859.  [70].  California enacted the second concealed carry prohibition in 1863.  [78].  The California statute prohibited the concealed carrying of any dirk, pistol, sword cane, slungshot, or other dangerous weapon.  After realizing it only hurt law-abiding citizens, the statute was repealed in 1870.[160]  The District of Columbia, governed directly by Congress, waited 80 years after the Second Amendment to restrict concealed carrying.  [97].  Three territories also adopted concealed carry restrictions during the period.

In all, about one-fourth of the states and three territories had laws that prohibited the carrying of a pistol in a concealed manner.  The statutes were often tested in court, suggesting that any broad carrying restriction ran close to the constitutional line.  Today's "assault weapon" ban prohibits carrying firearms openly or concealed, and even more restrictively prohibits simple possession.  The history and tradition of concealed carry prohibitions are not nuanced analogues for California's "assault weapon" ban.  At best, it is a historical twin for California's present laws restricting the concealed carrying of firearms.  *See* Cal. Penal Code §§ 25400–25700, 26150–26225.

The concealed carry laws identified by the State did not outlaw openly carrying pistols or rifles.  The concealed carry laws did not outlaw the home possession of pistols or rifles.  In fact, the laws did not ban keeping and carrying rifles of any type and did not ban carrying long guns concealed or openly.  Today, California law prohibits the carrying of all rifles openly (*see* Cal. Penal Code § 17030, with exceptions for hunting or training, Cal. Penal Code § 25640) and altogether prohibits the simple possession, anywhere, of guns that fit the "assault weapon" definition.  Were today's statute analogous, open carrying of guns would be lawful everywhere.  Antebellum society was comfortable with

---

[160] Roth Decl. at ¶ 32 and n.82.

19-cv-01537 BEN (JLB)

seeing people openly armed with guns and uncomfortable with the knowledge that some carried guns concealed.  Today, at least in metropolitan California, the opposite is true, giving the notion of the constitutional open carrying of firearms an air of unreality.[161]

### D. Surety Statutes

The State includes in its collection an 1801 surety statute from Tennessee.  [20]. Early surety statutes are evidence that carrying a gun was normal.  But, historic surety statutes could not justify the District of Columbia's modern handgun ban.  State courts recognized that even the common law did not punish the carrying of deadly weapons *per se*.  "All told," notes *Bruen*, "under surety laws . . . everyone started out with robust carrying rights."[162]  Historic surety statutes are not analogous to the State's ban on acquiring and possessing "assault weapons."

### E.  Machinegun Laws

The State also cites twentieth century machinegun restrictions.  These laws do not evidence a long enough historical tradition of prohibiting particular firearms.  These few and ephemeral regulations mostly came and went with little fanfare during the twentieth century, as discussed in the Court's original decision.  The argument that machinegun laws of the twentieth century are analogues to the "assault weapon" ban fares no better today.

---

[161] Eugene Volokh, *Symposium: The Second Amendment and the Right to Bear Arms After D.C. v. Heller: Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1521 (2009) ("To be sure, any discussion of open carry rights has a certain air of unreality.  In many places, carrying openly is likely to frighten many people, and to lead to social ostracism as well as confrontations with the police.  Most people are aware that many neighbors own guns, and even that many people are licensed to carry concealed guns and many others carry them illegally, but this abstract knowledge doesn't cause much worry.  But when a gun is visible, it occupies people's attention in a way that statistical realities do not.").

[162] *Bruen*, 142 S. Ct. at 2149.  The Supreme Court was skeptical that surety laws were actually enforced.

### F.  Racist Laws

Among the State's list of firearm laws are a number of statutes based on a person's race, color, or slave status.  The State agrees that these old reprehensible laws are morally repugnant and would obviously be unconstitutional today.[163]  Though the State suggests that these despicable legislative efforts might somehow be relevant to determining the traditions that define the scope of the Second Amendment, that makes little sense.  One reason is that these laws treated our citizens as non-citizens that were not entitled to fully enjoy constitutional rights.  In other words, the legislators who passed these embarrassments were not concerned with the Second Amendment rights of citizens.  Here, they are disregarded.

## V. EXPERT WITNESSES

### A. Historians Opine

When a historian overgeneralizes about past laws, it is not helpful.[164]  For example, the State's expert, professor Spitzer, opines that, "[c]urrent restrictions on assault weapons and detachable ammunition magazines are historically grounded.  They are part of a pattern in America's history of legislative restrictions on particular weapons stretching back centuries."[165]  Unfortunately, when one digs a little deeper, it turns out that his first example comes from twentieth-century machinegun laws.  *Bruen* puts very little weight on machinegun laws so far removed from the nation's beginnings.

Professor Spitzer also says that, "[b]y the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other

---

[163] Defs.' Resp., Dkt. 167, at n.17.

[164] *See* Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U. L. Rev. 1518, 1521 (2003) ("At trial, however, the pressures of the adversary system routinely push historians toward interpretations of the past that are compressed and categorical.").

[165] Spitzer Decl. at ¶ 2.

1   weapons carrying."[166] Once again, late-in-time laws at the end of the nineteenth century

2   provide less guidance on how the Second Amendment was understood at the time it was

3   adopted in 1791.  During the more important years from 1791 to 1868, only 25% of the

4   states had enacted concealed carrying restrictions on pistols.

5          Wandering out of his field of history into the area of law, professor Spitzer

6   incompletely comments on a Tennessee court decision.  He quotes from *Aymette v.*

7   *State*,[167] but omits the court's admonition that "[t]he right to keep and bear arms for the

8   common defence is a great political right."[168]   Historians and political scientists are to be

9   forgiven if they misapprehend the full meaning of an old court decision, as they are not

10  trained in law.  However, it is for courts to decide whether knife laws, or laws restricting

11  blunt weapons, are proper analogues to current gun laws (they are not).

12         Another expert witness for the State, Michael Vorenberg, is a history professor.

13  He also makes a sweeping observation that is not very helpful.  He opines that,

14              [t]here were high-capacity firearms during Reconstruction, and

15              all of them . . . were regarded in all the states at the time as

16              weapons suitable only for law enforcement officers, not for

17              ordinary citizens.  With very few exceptions . . . high-capacity

                firearms during the era were understood to be weapons of war

18              or anti-insurrection, not weapons of individual self-defense.[169]

19  From where does he get this notion?  Curiously, he concedes that his evidence does not

20  take the form of state statutes or reasoned court decisions.  He concedes that, "[n]o

21  statutes or court opinions can be found during the period that banned civilian possession

22  of artillery pieces, hundreds of which existed unused after the Civil War."  Nevertheless,

23

24  ────────────────

25  [166] *Id.* at ¶ 30 (citing Spitzer, *supra*, *Gun Law History in the United States*, at 63–67).

26  [167] 21 Tenn. 154, 159 (1840).  *Aymette* concerned a prohibition on carrying a concealed bowie knife.

27  [168] *Id.*; Spitzer Decl. at ¶ 38.

28  [169] Vorenberg Decl. at ¶ 7.

19-cv-01537 BEN (JLB)

1  the absence of laws or court cases does not bother the professor.   He continues, "but of

2  course the absence of such express prohibitions cannot be read as evidence that civilians

3  were allowed to possess such pieces.  Rather, policy and practice dictated that only the

4  United States army and its allied military units could possess such weapons."[170] But in

5  one source referred to by professor Vorenberg, two lone borax miners effectively used

6  their Henry repeating rifles to repel an Indian surprise attack.[171] Professor Vorenberg's

7  claims are unusual.  In essence, he says although there were no laws on high-capacity

8  firearms and artillery pieces, they were still "restricted," as evidenced by the conspicuous

9  absence of government support for civilian use.  It is one way to interpret history.

10       *Bruen* suggests a more traditional way of looking for a history and tradition of

11  governmental arms regulation based on laws actually enacted by state legislatures.  If one

12  looks for laws regulating high-capacity firearms, the first one appears in history only in

13  the State of Florida in 1893 and it was constitutionally defective from the start.[172]  The

14  statute was reviewed by the Florida Supreme Court in 1941.[173]  In his concurring opinion,

15

16

17  [170] *Id.* at ¶ 8.

18  [171] *See* Williamson, *Winchester: The Gun That Won the West* 41 (Washington D.C.;
    Combat Force Press, 1952), found in Compendium of Works Cited in Decl. of
19  Vorenberg, Dkt. 150-8, at 458.

20  [172] *See* 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147,
    §1 ("That in each and every county of this State, it shall be unlawful to carry or own a
21  Winchester or other repeating rifle or without first taking out a license from the County
    Commissioner of the respective counties, before such persons shall be at liberty to carry
22  around with him on his person and in his manual possession such Winchester rifle or
    other repeating rifle.").  Duke Ctr. For Firearms L., *1893 Fla. Laws 71-72, An Act to*
23  *Regulate the Carrying of Firearms, chap. 4147, §§ 1-4,*
    https://firearmslaw.duke.edu/laws/1893-fla-laws-71-72-an-act-to-regulate-the-carrying-
24  of-firearms-chap-4147-%c2%a7%c2%a7-1-4/; *see also* Gen. Stats of Fla. (1906) Title VI,
    Chap I § 496 ("No merchant, storekeeper, or dealer shall keep for sale or sell pistols,
25  Springfield rifles, other *repeating rifles*, bowie knives or dirk knives, without first paying
26  a license tax of ten dollars.") (emphasis added).
    [173] *See Watson v. Stone*, 148 Fla. 516 (Fla. 1941) (*en banc*).
27

28

1    one Justice said that he was familiar with the racist history of the law.  Justice Buford

2    recalled,

3              The statute was never intended to be applied to the white
             population and in practice has never been so applied.  We have
4            no statistics available, but it is a safe guess to assume that more
             than 80% of the white men living in the rural sections of
5            Florida have violated this statute.  It is also a safe guess to say
             that not more than 5% of the men in Florida who own pistols
6            and repeating rifles have ever applied to the Board of County
             Commissioners for a permit to have the same in their
7            possession and there had never been, within my knowledge, any
             effort to enforce the provisions of this statute as to white
8            people, because it has been generally conceded to be in
             contravention of the Constitution and non-enforceable if
9            contested.[174]

10

11        There appears to be no other law in the nation's history that prohibited high-

12   capacity repeating rifles such as the Winchester lever-action repeater rifles or the Gatling

13   gun.  And at least one court around the time of the Fourteenth Amendment specifically

14   protected repeating firearms.  "[W]e would hold, that the *rifle of all descriptions*, the shot

15   gun, the musket, and *repeater*, are such arms; and that under the Constitution the right to

16   keep such arms, cannot be infringed or forbidden by the Legislature."[175]  To his credit,

17   professor Vorenberg did see that Governor Scott of South Carolina had said in 1870, "the

18   Winchester rifle is the best law that you can have."[176]

19        The State's expert, professor Cornell, has been studying and writing about historic

20   gun laws for decades.  His opinions tend to reach out beyond historical facts and over-

21   interpret judicial decisions.  One example is his sweeping opinion that at the time of the

22   Fourteenth Amendment Americans were apprehensive about "the proliferation of

---

[174] *Id.* at 524 (Buford, J., concurring).
[175] *Andrews v. State*, 50 Tenn. 165, 179–80 (1871) (emphasis added).
[176] Vorenberg Decl. at ¶ 78.

1   especially dangerous weapons and the societal harms they caused."  In support he cites

2   *McDonald*.[177]  *McDonald* says no such thing.

3   　　　Another example is his overly-elevated view of state police power.  He opines,

4   "[t]he power to regulate firearms and gunpowder was therefore at the very core of the

5   police power . . . ."[178]  He discusses three cases that mention gunpowder but say little

6   about actual firearms.[179]  The first case, *Brown*, was about the constitutional grant of

7   interstate commerce regulatory power to the federal government.  *Brown* does not

8   mention firearms.  The second case, *Alger*, was about a municipal ordinance regulating

9   the construction of buildings over the waters of Boston Harbor.  In passing, it describes

10  the police power as one would expect, giving as an example the storing of gunpowder

11  near houses and highways.  *Alger* describes typical police powers for pedestrian

12  matters.[180] But *Alger* does not mention regulating firearms at all (except in the positive

13  sense that Boston Harbor was formerly a defense against Dutch attack used "to play guns

14  upon").[181]  The third case, *Thorpe*, was about the state police power to require a railroad

15  to construct cattle guards because railroads were dangerous businesses and fences were

16  reasonable provisions for the protection of domestic animals.  Like *Brown* and *Alger*,

17  *Thorpe* does not mention firearms.

18

19  _____

20  [177] Cornell Decl. at ¶ 43 (citing *McDonald*, 561 U.S. at 767–68).

    [178] Cornell Decl. at ¶ 37.

21  [179] *See id.* at ¶¶ 37–39 and n.79 (citing *Brown v. Maryland*, 25 U.S. 419, 442-43 (1827);

22  *Commonwealth v. Alger*, 61 Mass. 53 (1851); *Thorpe v. Rutland*, 27 Vt. 140, 149 (1855)).

    [180] "Such are the laws to prohibit the use of warehouses for the storage of gunpowder

23  near habitations or highways; to restrain the height to which wooden buildings may be

    erected in populous neighborhoods, and require them to be covered with slate or other

24  incombustible material; to prohibit buildings from being used for hospitals for contagious

    diseases, or for the carrying on of  noxious or offensive trades; to prohibit the raising of a

25  dam, and causing stagnant water to spread over meadows, near inhabited villages,

26  thereby raising noxious exhalations, injurious to health and dangerous to life."

27

    [181] 61 Mass. at 73.

28

1      Professor Cornell follows up with a quote about state police power from *Thurlow*

2  *v. Massachusetts*.[182]  He mis-describes the quote as from the majority opinion of the

3  Supreme Court, rather than from Justice McClean's dissent, but it makes no difference.

4  *Thurlow* is a case about the intersection of state police power to license the sale of

5  alcohol and the federal government's power to regulate interstate commerce.  Other than

6  to note in passing that a state can regulate its militia, neither the majority opinion nor the

7  dissent in *Thurlow* mentions firearms.  Professor Cornell finishes his discussion of the

8  antebellum era as he begins.  He extols a court case from Alabama because it upheld a

9  conviction for concealed carry while he discounts a case from Kentucky striking down a

10  concealed carry law, labeling it an outlier.[183]

11      The Alabama criminal case of *State v. Reid* is an odd duck in that the defendant

12  convicted of carrying a concealed pistol was the county sheriff.[184]  Yet, professor Cornell

13  praises *Reid* as an excellent illustration of the way state police power was used to regulate

14  gun rights.[185]  Nevertheless, *Reid* construed the police power as permitting the legislature

15  to regulate only *the manner* of bearing arms.  Decided 50 years after the Second

16  Amendment, the Alabama court was aware of the limiting force of constitutional rights.

17  *Reid* explained, "[w]e do not desire to be understood as maintaining, that in regulating the

18  manner of bearing arms, the authority of the Legislature has no other limit than its own

19  discretion.  A statute which, under the pretense of regulating, amounts to a destruction of

20  _____

21

22  [182] 46 U.S. 504, 592 (1847); Cornell Decl. at ¶ 41 and n.84.

[183] Cornell Decl. at ¶ 42 and n.87.

23  [184] *Reid*, 1 Ala. at 621 ("[T]he defendant needed no arms for his protection, his official

24  authority furnished him an ample shield.").

[185] Cornell Decl. at ¶ 42 ("One of the most important early American gun-related cases . .

25  . . [A] classic example of antebellum police power jurisprudence.").  There is, however, a

bit of irony in the admiration of *Reid,* because the court decided that a county sheriff, the

26  embodiment of the state's police power, did not have the authority to carry a pistol

27  concealed even for his self-protection.

28

19-cv-01537 BEN (JLB)

1  the right, or which requires arms to be so borne as to render them wholly useless for the

2  purpose of defense, would be clearly unconstitutional."[186]  In his rendition of *Reid*,

3  professor Cornell implies the opposite was true.

4  On the other hand, the Kentucky case discounted by professor Cornell, *Bliss v.*

5  *Commonwealth*, struck down a similar concealed carry law.  *Bliss* said, "it is the right to

6  bear arms in defense of the citizens and the state, that is secured by the constitution, and

7  whatever restrains the full and complete exercise of that right, though not an entire

8  destruction of it, is forbidden by the explicit language of the constitution."[187]

9  Among the handful of antebellum cases recorded, but not mentioned by professor

10  Cornell, is *State v. Huntly*.[188]  *Huntly* upheld a conviction for making public threats of

11  violence with a firearm because the threats were attacks on the public order.  This is an

12  uncontroversial example of state police power.  The state may punish crimes carried out

13  with a gun.  But prohibiting the carrying of a gun, by itself, is not within the police power

14  of the state.  *Huntly* reminds its readers, "it is to be remembered that the carrying of a gun

15  *per se* constitutes no offence.  For any lawful purpose--either of business or amusement--

16  the citizen is at perfect liberty to carry his gun.  It is the wicked purpose--and the

17  mischievous result--which essentially constitutes the crime."[189] The United States

18  Supreme Court makes special mention of *Huntly* in *Bruen*.[190] Reading *Huntly* and other

19  cases, the United States Supreme Court concludes, "those who sought to carry firearms

20  publicly and peaceably in antebellum America were generally free to do so."[191]

21  So, when professor Cornell opines that the very core of the police power was the

22

23

_____

24  [186] *Reid*, 1 Ala. at 616–17.

25  [187] *Bliss*, 12 Ky. at 91–92.

26  [188] 25 N.C. 418 (1843)
    [189] *Id.* at 422–23.

27  [190] *Bruen*, 142 S. Ct. at 2145 ("Perhaps more telling was the North Carolina Supreme Court's decision in *State v. Huntly*, 25 N. C. 418 (1843).").

28  [191] *Id.* at 2146.

19-cv-01537 BEN (JLB)

power to regulate firearms and gunpowder, his opinion is only half right.  Gunpowder was regulated because of its fire danger—not its danger for use in a firearm.  Possession of firearms, on the other hand, was not regulated at all.  The antebellum court decisions upon which professor Cornell rests, do not say what he contends they say.  Perhaps he is to be forgiven because he is a historian rather than a member of the bar, but his opinions are not persuasive and are entitled to no weight.

Dr. Randolph Roth is a historian.  He opines that in the eighteenth century laws restricting the use or ownership of firearms by colonists of European ancestry were rare.[192]  The State's list of laws bears this out.  He reports that "household ownership of firearms was widespread" but firearm use in homicides was rare.[193]

Dr. Brennan Rivas is a historian.  Professor Rivas opines in overly-broad terms like other historians.  For example, he opines about a flurry of "public carry" regulations without reference to the State's list of laws and without explaining how laws in the late 1800s are relevant to the original understanding of the Second Amendment in 1791.[194]  His opinions are not persuasive.  Professor Rivas opines that the experiences with pocket pistols and revolvers in three states (Arkansas, Tennessee, and Texas), in contrast to the other 35 states at the time of the Fourteenth Amendment, amount to a historical precedent for California's "assault weapon" ban.[195]  While these three exceptional situations may suggest a precedent, they do not demonstrate a historical tradition, or confirm a pre-existing tradition, or represent a broad understanding of the Second Amendment.  He reports that Tennessee prohibited the carrying of pistols in an 1871 law.[196]  The law does

---

[192] Roth Decl. at ¶ 9.
[193] *Id.* at ¶ 13.
[194] Rivas Decl. at ¶ 12.
[195] *Id.* at ¶ 25.
[196] *Id.* at ¶ 16 and n.12 (1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1).

not appear in the State's law list.  The law comes later in time than the adoption of the Second and Fourteenth Amendments.  The law was upheld by the Tennessee Supreme Court, but on the basis of the state's unique constitutional provision.[197]  He cites as another example an Arkansas law enacted in 1881.[198]  Once again, this law comes 90 years after the adoption of the Second Amendment, 13 years after the adoption of the Fourteenth Amendment, and cannot be said to be consistent with a history and tradition of pistol carrying prohibitions because there was no such tradition prior to 1868.[199]  Moreover, Arkansas court decisions took an odd turn in 1882.  A few years earlier, in *Wilson v. State*, the Arkansas court reasonably held the view that, "to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms."[200]

     As one might expect, *Wilson* reminded legislators that the solution to gun violence in 1878 was the enforcement of criminal laws rather than prohibiting the carrying of guns.  Unfortunately, Arkansas lawmakers may have missed that message.  And four years later, the court must have forgotten its own tutelage.  In 1882, in *Haile v. State* the court upheld a conviction for carrying a large revolver (known as a Colt's army pistol)

---

[197] *State v. Wilburn*, 66 Tenn. 57, 58–59 (1872) ("By sec. 26 of the Declaration of Rights, art. 1 of the Constitution of 1870, 'the citizens of this State have a right to keep and bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime.'").

[198] Rivas Decl. at ¶ 16 and n.13 (1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1–2) (excepting pistols that are used by the Army or Navy).

[199] *Cf. Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring) ("But if 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little).").

[200] 33 Ark. 557, 560 (1878).

63

1   uncovered around the waist when it should have been held in the hand.[201]  Admitting only

2   a cramped understanding of the Second Amendment, *Haile* saw the right as limited to

3   carrying a handgun: (1) on one's own premises; or (2) elsewhere only inconveniently

4   carried in an open hand.[202]  According to some scholars, "*Haile* marked an abrupt shift in

5   Arkansas jurisprudence, and was contrary to the three cases decided just a few years

6   before.  In essence, the court had now agreed with the legislature that the right to bear

7   arms was a bad idea."[203]  Professor Rivas may be correct when says that the 1881

8   Arkansas law received no notable challenge.  What is notable is that the Arkansas court

9   seems to have veered far off the constitutional course.  All in all, Professor Rivas'

10  opinions are entitled to little weight.

11          **B.  Non-Historian Expert Witnesses**

12          The State offers declarations from a number of other expert witnesses to address

13  subjects other than historical analogues.  In general, these are subjects that this Court has

14  already addressed in its earlier opinion and is beyond the Court of Appeals remand order.

15  Nevertheless, some of these opinions are mentioned here.

16          Dr. Louis Klarevas reports that there are now an estimated 24.4 million rifles like

17  the AR-15 rifles and AK-47 rifles in circulation in the United States.[204]  He estimates 7.9

18  million individuals own a modern sporting rifle.[205]  He also reports that his search of

19

20

21  [201] 38 Ark. 564, 566 (1882).

22  [202] *Haile* said, "[t]he Legislature, by the [1881] law in question, has sought to steer
    between such a condition of things, and an infringement of constitutional rights, by

23  conceding the right to keep such arms, and to bear or use them at will, upon one's own
    premises, and restricting the right to wear them elsewhere in public, unless they be

24  carried uncovered in the hand.  It must be confessed that this is a very inconvenient mode
    of carrying them habitually, but the habitual carrying does not seem essential to 'common

25  defense.'" *Id*.

26  [203] Kopel & Cramer, *State Court Standards of Review*, *supra*, at 1145.

27  [204] Suppl. Klarevas Decl. at ¶ 15.

28  [205] *Id.*

1   newspaper archives found no mass shootings of ten or more deaths until 1949.[206]  In

2   looking, he excluded from the search incidents of large-scale, intergroup gun violence

3   such as mob violence and rioting.  Certainly, such events have occurred in the nation's

4   history, such as the Philadelphia nativist riots in the spring and summer of 1844.[207]

5          Ryan Busse is a Giffords senior advisor and former firearm industry executive for

6   a manufacturer and seller that specializes in pistols and revolvers, but not AR-15 platform

7   rifles.  The few rifles sold by his former firm are traditional-style bolt action models.

8   Busse opines that a firearm does not need any of the devices, accessories, or

9   configurations listed in the "assault weapon" ban to operate as a gun as intended or to use

10  a gun effectively for self-defense.[208]  It is not at all clear what expertise Busse has to

11  support his opinion.  He does not describe any professional experience using AR-15

12  platform rifles for sport or self-defense.  In any event, this type of opinion is not relevant

13  to the question of whether the State may ban a firearm that is commonly owned by law-

14  abiding citizens for lawful purposes and does not fit the prerequisites for Federal Rule of

15  Evidence 702.

16         Another expert witness for the State, economist Lucy Allen, has supplemented her

17  earlier testimony.[209]  Today, she opines on the frequency of rifles reported in defensive

18  gun uses.  The State asserts that Allen's statistics prove "assault weapons" are not being

19  commonly fired for self-defense.[210]  To support this notion, Allen looks at a very small

20

21
_____

22  [206] Suppl. Klarevas Decl. at ¶ 11.

23  [207] *See* Zachary M. Schrag, *The Fires of Philadelphia*, Pegasus (2021) (the State offered
    Professor Schrag as an expert historian to buttress its request for more time for

24  discovery); *see also* Roth Decl. at ¶ 8 (from the colonial era to the early twentieth

25  century, mass murders "were carried out by large groups of individuals acting in concert,
    rather than by individuals or small groups").

26  [208] Decl. of Ryan Busse, Dkt. 137-2, at ¶¶ 22–24.

27  [209] Suppl. Decl. of Lucy P. Allen, Dkt. 137-1 ("Suppl. Allen Decl.").

28  [210] Defs.' Suppl. Br. in Resp., Dkt. 137, at 40–41.

19-cv-01537 BEN (JLB)

database of defensive gun uses collected from news broadcasts or publications, where 54% of the time the gun type is *unknown*. From this, she implies that using a rifle to defend oneself is incredibly rare. Her charts misleadingly suggest that rifles are used in just 2–4% of defensive gun uses and actually occurred only 51 times across three and one-half years.[211] Other evidence suggests that guns are needed and used defensively thousands of times each year, and that rifles are used far more frequently than Allen's statistics suggest.

How does Allen arrive at her opinion? She looks at a database maintained by the Heritage Foundation. The database explicitly states that it is not intended to be comprehensive. It attempts to highlight some successful defensive gun uses that are reported by news organs.[212] Allen counts 2,714 total defensive gun uses in the database between January 2019 and October 2022.[213] Her results cannot be tested because she does not identify the specific incidents or how she scored the gun-type variables attributed to each incident. Consequently, there is no way to check her analysis or her math. Her study cannot be reproduced. Unfortunately, this means her opinion lacks classic indicia of reliability. "Reliability and validity are two aspects of accuracy in measurement. In statistics, reliability refers to reproducibility of results."[214]

Validity is another concern. Of the 2,714 total incidents studied, less than half (1,241) of the events indicated a known firearm. Trying to perform a study about the frequency of a particular type of gun used in self-defense, where more than 50% of the

---

[211] Suppl. Allen Decl. at ¶ 10.
[212] *Id.* at ¶ 9.
[213] *Id.* at ¶ 10.
[214] Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed.), 211 Reference Guide on Statistics, 2011 WL 7724256, 10 and n.37 ("*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 n.9 (1993), for example, distinguishes "evidentiary reliability" from reliability in the technical sense of giving consistent results. We use "reliability" to denote the latter.).

1   time the gun type is unknown, is of questionable validity.  Doing just that, she opines that
2   a rifle was used only 4% of the time when gun type is known.[215]  Next, she factors in the
3   1,471 "unknowns" and lowers her result to 2%.

4   But this calculation, incredibly, requires one to assume that none of the unknown
5   incidents involved a rifle.  She factors in a zero for rifles every time there is an unknown
6   firearm type.  What if one instead assumed that all of the unknown incidents involved a
7   rifle—then it could be said that rifles had been used over 50% of the time.  Of course,
8   neither the 0% nor the 100% assumption is useful.

9   Along the way, Allen fails to mention that the Heritage Foundation webpage she
10  linked to notes that guns are probably used in self-defense between 500,000 and
11  3,000,000 times a year.  Nor does Allen mention any of the incidents where AR-15s were
12  used that are linked on the Heritage Foundation defensive gun use visualization web
13  page.  For example, Allen skips over mentioning the disabled 61-year-old, though
14  attacked and shot in his home, saved by his AR-15.[216]  Nor does Allen cite the Georgia
15  man with an AR-15 who shot at three attackers after they approached his home at 4 a.m.
16  with their faces covered and firing shots.[217]  Allen also could have found the report of the
17  pregnant wife and mother who used an AR-15 to defend against multiple armed
18  attackers.[218] These are just three incidents from three months of reports that appear on the

19
20
21  [215] *Id.* at ¶ 11.
22  [216] Lucas Drill, *Guns Saved These Americans From Assault and Robbery in July*, The
    Daily Signal (Aug. 7, 2019), https://www.dailysignal.com/2019/08/07/guns-saved-these-
23  americans-from-assault-and-robbery-in-july/ [https://perma.cc/EE6W-DN9H].
24  [217] Mairead Mcardle, *Georgia Homeowner Uses 'Semi-Automatic' Rifle to Repel Three
    Armed Home Invaders*, Nat'l Rev. (Sept. 18, 2019, 8:52 a.m.),
25  https://www.nationalreview.com/news/georgia-homeowner-uses-semi-automatic-rifle-to-
    repel-three-armed-home-invaders/ [https://perma.cc/UY7F-5Y2G].
26  [218] Amy Swearer, *These Law-Abiding People Used Guns to Defend Themselves in
27  October*, The Daily Signal (Nov. 20, 2019),
28  https://www.dailysignal.com/2019/11/20/these-law-abiding-people-used-guns-to-defend-

19-cv-01537 BEN (JLB)

1   Heritage Foundation webpage that should have been counted in Allen's chart.  Allen's

2   study is suspect for larger reasons.  The whole statistical exercise is based on hearsay

3   (anecdotes) upon hearsay news reporting, rather than police investigatory reports.  There

4   are no police reports or eyewitness declarations collected for Allen's study.  A limited

5   collection of news articles lacks the usual indicia of accuracy and reliability of admissible

6   evidence.

7        Without hard facts, one is left to drawing inferences.  With between 500,000 and

8   3,000,000 defensive gun uses each year, it is not hard to visualize a great many more than

9   51 incidents involving an AR-15 rifle being used defensively.  In what its author

10  describes as the largest survey of its kind, a 2021 survey of 54,000 United States

11  residents identified 16,708 gun owners who described their personal self-defense uses of

12  firearms.  Compared to Allen's chart, the survey paints a vastly different picture.

13  William English estimates from his survey results that guns are used defensively

14  approximately 1,670,000 times each year.[219]  Disturbingly, English found 51.2% of

15  defensive gun uses involve more than one assailant.[220]  In contrast to Allen's estimate,

16  English estimates that rifles are used defensively approximately 13% of the time.[221]

17  English also estimates about 24,600,000 individuals have owned AR-15 styled rifles.[222]

18  The evidence, once again, suggests that modern rifles are commonly owned and useful

19  for self-defense.

20        Using the English survey results, defensive gun uses happen *1,670,000 times per*

21  *year* (which falls comfortably within the CDC's report estimate of 500,000 to 3,000,000

22

23  _____

24  themselves-in-october/ (hyperlinking to

25  https://www.baynews9.com/fl/tampa/news/2019/11/01/victim-of-violent-home-invasion-
    speaks--credits-wife-with-saving-his-life  [https://perma.cc/AD8Y-EJW6]).

26  [219] *See* English, *supra*, at n. 13.

27  [220] *Id.* at 10.

    [221] *Id*. at 10–11.

28  [222] *Id*. at 35.

times per year).  If rifles, some of which would be AR-15 platform rifles, are being used defensively 13% of those 1,670,000 times, that would imply that rifles are used defensively *217,100 times each year*, rather than Allen's number of 51.  In all, Allen's statistics and opinion are unreliable and misleading.

John J. Donohue is a professor of law.  His supplemental declaration is not particularly helpful.  For example, professor Donohue describes a 2018 medical study published on the JAMA Network Open about 511 gunshot victims in Boston.  He opines that the study "applies directly to bans on assault weapons and high-capacity magazines."[223]  Yet, the study noted that *only one* of the 511 victims studied was shot with a rifle caliber round (7.62 x 39 mm.).[224]  Why the study applies directly to bans on "assault weapons," as professor Donohue opines, is not at all obvious.  Handgun wounds were the main point of study.

Professor Donohue also opines that the dangers of weapons like the AR-15 will outpace any legitimate crime-reducing benefit the firearms provide, citing the 2017 Sutherland Springs Baptist Church shooting.[225]  He picked an ironic example.  A neighbor, Stephen Willeford, stopped the mass shooter in that tragedy with four shots from his own AR-15.[226]

---

[223] Suppl. Decl. of John J. Donohue, Dkt. 137-4 ("Suppl. Donohue Decl."), at ¶ 19.
[224] *See* Anthony A. Braga and Philip J. Cook, *The Association of Firearm Caliber with Likelihood of Death from Gunshot Injury in Criminal Assaults*, JAMA Network Open (2018), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536 ("Most interpersonal gun violence involves handguns, and Boston is no exception.  Only 1 gun homicide was committed with a rifle caliber (7.62 × 39 mm fired from an AK-47 assault rifle).")  [https://perma.cc/LPL5-N3BH].
[225] Suppl. Donohue Decl. at ¶ 23.
[226] *The Hero of the Sutherland Springs Shooting Is Still Reckoning With What Happened That Day*, Texas Monthly (Nov. 2018), https://www.texasmonthly.com/true-crime/stephen-willeford-sutherland-springs-mass-murder/ [https://perma.cc/HMP6-TAZ9].

1    Professor Donohue previously commented on the lawful-to-own Ruger Mini-14

2  rifle which is similar to the banned rifles.  He offered that the Mini-14's current legality

3  is because the firearm restrictions are to be increased "incrementally."  He concludes with

4  abject conjecture imagining the January 6, 2021 Capitol rally would have turned out like

5  the 1970 Kent State University shootings, *but for* the District of Columbia's prohibition

6  on "assault weapons."[227]  Professor Donohue's opinions are entitled to no weight.

7  **VI.   OTHER NEW ARGUMENTS**

8    The State asserts over 120 discreet arguments in its main 77-page

9  brief.[228]  Approximately 80 arguments are focused on history while 40 address other

10  topics.  The State makes further arguments in its later 20-page brief (Dkt. 157), 25-page

11  brief (Dkt. 167), six-page brief (Dkt. 168), and ten-page brief (Dkt. 170).  For the sake of

12  brevity, not all arguments are addressed herein, but all have been considered.

13    **A.   "Commonly Owned"**

14    A new twist on an old argument is that standard AR-15-type rifles are not

15  commonly owned by law-abiding persons for lawful purposes.  An expert witness for the

16  State suggests that although such rifles number more than 24.4 million among

17  Americans, a smaller number of people (7.9 million) might own most of them.  Seven

18  million nine hundred thousand persons is still a large number of citizens choosing to own

19  AR-15 type firearms.  When the Supreme Court vacated Caetano's conviction for mere

20  possession of a stun gun, 200,000 owners of stun guns was all it took.

21    The burden of proof is on the government, as this Court pointed out in its earlier

22  decision.  "The constitutional imperative is on the government to not infringe.  The

23  correct starting orientation is that no arm may be prohibited.  If a plaintiff challenges the

24  government's prohibition, it is on the government first to prove the banned arm is

25  dangerous and unusual, and if not, that it is not commonly possessed, or not commonly

26  —————————————

27

28  [227] Suppl. Donohue Decl. at ¶ 27.
   [228] Defs.' Suppl. Br. in Resp., Dkt. 137.

19-cv-01537 BEN (JLB)

possessed by law-abiding citizens, or not commonly possessed for lawful purposes or militia readiness. If the state cannot so prove, the challenged prohibition must be struck down. The presumption in favor of rightfully possessing a citizen's arm was made during the adoption of the Second Amendment."[229] Guns that fall under the California definition of an "assault weapon" are presumptively covered by the text of the Second Amendment.

### B. "Used for Self-Defense"

The State offers a word game for another new argument. The State suggests that standard AR-15-type rifles might be commonly owned, but are not *used* for self-defense. The State says that there is no evidence that firearms equipped with the prohibited accessories or semiautomatic centerfire rifles of less than 30 inches in length are "commonly used" for self-defense.[230] Once again, the burden is on the government to prove that remarkable claim. It does not take a Nobel laureate to figure out that if Americans own 400 million guns and 400 million gun crimes are not being committed, that Americans are using their guns for something other than crime. If Americans own 24.4 million AR-15s and 24.4 million gun crimes are not being committed with AR-15s, Americans must be using them for lawful purposes.[231] Some people actively use AR-15s for hunting or sport or target practice. Probably the vast majority of Americans that own guns keep them and use them for self-defense the same way that a driver puts on a seat belt in the case of a collision. Though collisions rarely happen, the seat belt is used for

---

[229] *Miller*, 542 F. Supp. 3d at 1029.

[230] *See* Defs.' Suppl. Br. in Resp. Dkt. 137, at 19, 27; Defs.' Resp., Dkt. 167, at 5–8.

[231] The State argues that prevalence alone is insufficient to establish common use, citing a concurring opinion in *Duncan v. Bonta*, 19 F.4th 1087, 1127 (9th Cir. 2021) (*en banc*), *vacated*, *Duncan v. Bonta*, No. 21-1194 (2022). *See* Defs.' Br. in Resp., Dkt 167, at 8. A concurring opinion in a decision vacated and remanded by the Supreme Court is not the most persuasive authority. Even so, the very large number of AR-15s owned by citizens who are not using them to commit crimes is sufficient evidence of common use for lawful purposes to be covered by the text of the Second Amendment.

protection and to be ready for the unexpected collision. A reserve canopy is being used on a parachute jump, although it is not deployed, in case the main parachute fails. A cell phone in one's pocket is being used when waiting for a telephone call or when one might need to make a call. An AR-15 under one's bed at night is being used for self-defense even when the night is quiet. A person may happily live a lifetime without having to fire their gun in self-defense. But that is not to say that such a person does not *use* their gun for self-defense when he or she keeps it under the bed with a hope and a prayer that it never has to be fired.

Here is an illustrative example. In Uniontown, Pennsylvania, an 81-year old man and his elderly sister were at home when an intruder broke in. In the middle of the ensuing struggle, the victim fired one shot from his gun. The victim said he had never before fired the gun and that it had been sitting on his nightstand for thirty years.[232] Had his gun been an AR-15 he kept under his bed, the State would say that he did not "use" his AR-15 for self-defense during those preceding thirty years. And this Court would disagree. This Court would say that the elderly man "used" his AR-15 for self-defense every night for the thirty years he kept it ready under his bed, including the night of the burglary. In exactly the same way, the disabled man in Florida who was shot, but shot back with his AR-15, "used" his rifle on the night of his attack and on all of the other nights when his gun sat ready in case of attack.[233] But the State seems to say that citizens have no right to keep an AR-15 for self-defense unless they often use it to shoot attackers. That is incorrect. "There is no reason to think that semi-automatic rifles are not effective for self-defense in the home, which *Heller* explained is a core purpose of the

---

[232] *81-year-old fatally shoots home invasion suspect, says gun had never been used in 30 years*, WXPI-TV 11 News (Nov. 4, 2016), https://www.wpxi.com/news/81-year-old-fatally-shoots-home-invasion-suspect-says-gun-had-never-been-used-in-30-years/464100332/

[233] *See* n. 17, supra.

19-cv-01537 BEN (JLB)

1   Second Amendment right."[234]  If the test was concerned with the actual firing of a

2   weapon, the *Heller* court would have looked at statistical averages about how often

3   handguns were fired for self-defense.  The statistic was never mentioned.

4          **C.  Regulating the Use of Certain Accessories**

5          The State downplays the "assault weapon" ban by saying that it does not prohibit

6   anyone from keeping and bearing an arm because it "merely regulates the use of certain

7   accessories that can be attached to a semiautomatic rifle."[235]  The State says that the

8   accessories are not "arms."  The State says that "the prohibited accessories are not

9   integral to the functioning of any firearm; and semiautomatic centerfire rifles that are at

10  least 30 inches in length are plainly operable."  But the "assault weapon" laws do not ban

11  one's possession of individual accessories or parts.  They ban one's possession of whole

12  rifles, entire shotguns, and working pistols.  The State also says that the accessories are

13  combat-oriented features which turn a modern rifle into a weapon of war and therefore is

14  not protected by the Constitution.  That "weapon of war" nostrum has been previously

15  rejected by this Court and need not be re-visited here.

16         The "assault weapon" ban does not ban possession or manufacture or sales of a

17  pistol grip, or a flash suppressor, or an adjustable stock, or a threaded pistol barrel.  If the

18  law made a pistol grip, unattached to a gun, a crime to possess, the State's argument

19  would have some symmetry.  But to say a semi-automatic rifle with a pistol grip and

20  adjustable stock and a flash suppressor is not a "bearable arm" is to ignore the forest for

21  the trees.  It is the modern semiautomatic gun with these parts installed that the laws

22  criminalize.  Yet, it is the rifle with these parts integrated that is a bearable arm covered

23  by the text of the Second Amendment.

---

[234] *Heller v. District of Columbia*, 670 F.3d 1244, 1290 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

[235] *See, e.g.*, Defs.' Suppl. Br. in Resp., Dkt. 137, at 2, 19, 23–25; Defs.' Resp., Dkt. 167, at 8–9.

19-cv-01537 BEN (JLB)

### D. <u>Weapons Most Like the M-16</u>

The State makes a passing argument that weapons with the configurations prohibited by the "assault weapon" ban "are military weapons that are practically indistinguishable from assault rifles 'like' the M-16 and thus 'may be banned' consistent with *Heller*."[236]  *Staples* explained the relevant difference, *i.e.*, the M-16 is a fully automatic machinegun.[237]  Undercutting its own argument, the State says machineguns may be banned, while at the same time the State acknowledges in its own briefing that machineguns are not banned under federal law.  In fact, there are 700,000 machineguns lawfully registered in the nation.[238]  So many lawfully owned machineguns suggests the State's approach of banning semiautomatic AR-15's is infringing.  This Court will not engage in the specious argument about whether AR-15s can fire almost as fast as a machinegun.  Nor will it venture a discussion of effective versus theoretical firing capability.  No one with any knowledge of firearms would accept such an argument.

### E. <u>Firearms in the Regulated Configurations Are Not Commonly Owned?</u>

Like Baghdad Bob during the first Gulf War in 1991, the State clings to a wish. The State wants to believe that the firearms prohibited by the "assault weapon" ban are not commonly owned or are not commonly owned for self-defense.[239]  The argument remains unconvincing.  Normal AR-15s are still massively popular.  *See, e.g.*, *The Gun That Divides A Nation*, Washington Post (Mar. 27, 2023) ("Today, the AR-15 is the best-selling rifle in the United States, industry figures indicate.  About 1 in 20 United States adults—or roughly 16 million people—own at least one AR-15, according to polling data

---

[236] Defs.' Suppl. Br. in Resp., Dkt. 137, at 3 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017)).
[237] 511 U.S. at 603.
[238] Defs.' Suppl. Br. in Resp., Dkt. 137, at n.33.
[239] Defs.' Suppl. Br. in Resp., Dkt. 137, at 29–31.

19-cv-01537 BEN (JLB)

1    from The Washington Post and Ipsos.").[240]

2              **F.  Regulated Configurations Are Not Suitable or Needed for Self-Defense?**

3          The State argues that the prohibited firearms, designed and configured as they are,

4    are somehow not suitable for self-defense.[241]  It has already been determined in the initial

5    decision that the prohibited firearm configurations are well suited for self-defense and

6    they are well-suited for militia use.  The Court of Appeals remand order says nothing

7    about re-visiting those types of fact findings.  Even so, if a firearm is not unusual, it is

8    protected.  Government simply does not have the authority to dictate a list of firearms or

9    configurations that it finds "suitable" for citizen self-defense, hunting, target practice,

10   militia use, or some other lawful use.

11             **G. State Police Powers Override the Second Amendment?**

12         The State claims that the Second Amendment is not to be read literally.  Instead, it

13   claims that the "history of the Second Amendment demonstrates that governments

14   enjoyed robust police powers to regulate weapons—including who may possess them,

15   where they may be possessed, and what weapons may be possessed and used."[242]  But as

16   was shown above, that is inaccurate.

17         Governments did, and do, enjoy a police power to criminalize *the use of a firearm*

18   *to commit another crime* such as assault.  And the police power could be said to include

19   restricting carrying a firearm *concealed* as long as it does not also restrict openly

20   carrying.  However, governments did not possess the power to regulate who among law-

21   abiding citizens could possess firearms.  And governments did not possess the police

22   power to regulate which firearms could be possessed and used.  The only state law in the

23   first 100 years purporting to prohibit the mere possession of any firearm was the 1868

24   _____

25   [240] Todd C. Frankel et al*., The gun that divides a nation*, The Wash. Post (Mar. 27, 2023

26   at 6:13 a.m.), https://www.washingtonpost.com/nation/interactive/2023/ar-15-america-

27   gun-culture-politics/.
     [241] Defs.' Suppl. Br. in Resp., Dkt. 137, at 32–39.

28   [242] *Id.* at 42–43.

1  Alabama law prohibiting possession of the dangerous and unusual rifle walking cane.

2  [87].  So, it is patently incorrect to say that governments enjoyed a robust police power to

3  decide what firearms could be prohibited.

4  **VII.  FINAL CONSIDERATIONS**

5       It is still true that, "[t]he very purpose of a Bill of Rights was to withdraw certain

6  subjects from the vicissitudes of political controversy, to place them beyond the reach of

7  majorities and officials and to establish them as legal principles to be applied by the

8  courts.  One's right to life, liberty, and property, to free speech, a free press, freedom of

9  worship and assembly, and other fundamental rights may not be submitted to vote; they

10  depend on the outcome of no elections."[243]

11       The question remains, in an age where weapons run the gamut from fighter jets to

12  tanks and anti-aircraft missiles down to AR-15s to handguns to pocketknives, which

13  weapons are protected by the Second Amendment and which are not?  As one judge

14  understood, "this case and others like it demonstrate, we cannot rely on insular federal

15  judges to weigh which weapons are appropriate for self-defense—they honestly don't

16  have a clue, and their intuitions about firearms are not good.  And we can't rely on

17  governments to decide—that's who the Second Amendment was intended to protect

18  against.  But as *Heller* discusses, we can look to what weapons law-abiding citizens have

19  chosen to defend themselves—that is, what weapons are currently 'in common use . . .

20  for lawful purposes.'"[244]  It is the common firearms, in this case semiautomatic rifles,

21  shotguns, and pistols, chosen for whatever the lawful reason, that are protected by the

22  Second Amendment.

23

24

25

26

27

28  [243] *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).
    [244] *Duncan*, 19 F.4th at 1171 (VanDyke, J., dissenting).

19-cv-01537 BEN (JLB)

## VIII.  CONCLUSION

The State's attempt to ban these popular firearms creates the extreme policy that a handful of criminals can dictate the conduct and infringe on the freedom of law-abiding citizens.  As *Heller* explains, the Second Amendment takes certain policy choices and removes them beyond the realm of permissible state action.  California's answer to the criminal misuse of a few is to disarm its many good residents.  That knee-jerk reaction is constitutionally untenable, just as it was 250 years ago.[245]  The Second Amendment stands as a shield from government imposition of that policy.

There is only one policy enshrined in the Bill of Rights.  Guns and ammunition in the hands of criminals, tyrants and terrorists are dangerous; guns in the hands of law-abiding responsible citizens are necessary.  To give full life to the core right of self-defense, every law-abiding responsible individual citizen has a constitutionally protected right to keep and bear firearms commonly owned and kept for lawful purposes.  In early America and today, the Second Amendment right of self-preservation permits a citizen to "'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent that injury.'"[246]  Unfortunately, governments tend to restrict the right of armed self-defense.  Punishing every good citizen because bad ones misuse a gun offends the Constitution.  A state supreme court in 1878 said it succinctly: "If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a

---

[245] Cesare Beccaria, *On Crimes and Punishments* (1766), chap. 40, recorded by Thomas Jefferson: laws "which forbid to wear arms, disarming those only who are not disposed to commit the crime which the laws mean to prevent . . . makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder, as it requires less courage to attack unarmed than armed persons." *Jefferson's Legal Commonplace Book* 521 (Princeton Univ. Press ed., 2019).

[246] *Heller*, 554 U.S. at 594.

1  constitutional privilege."[247]  "Today . . . many Americans have good reason to fear that
2  they will be victimized if they are unable to protect themselves.  And today, no less than
3  in 1791, the Second Amendment guarantees their right to do so."[248]

4  Plaintiffs in this case challenge California Penal Code §§ 30515(a)(1) through (8)
5  (defining an "assault weapon" by prohibited features), 30800 (deeming certain "assault
6  weapons" a public nuisance), 30915 (regulating "assault weapons" obtained by bequest
7  or inheritance), and 30945 (restricting use of registered "assault weapons").  It is declared
8  that these statutes unconstitutionally infringe the Second Amendment rights of American
9  citizens.  These statutes and the penalty provisions §§ 30600, 30605 and 30800 as applied
10  to "assault weapons" defined in §§ 30515(a)(1) through (8) are hereby enjoined.

11  **IT IS HEREBY ORDERED that:**

12  Judgment is entered for Plaintiffs.  The Attorney General respectfully requests a
13  stay of any judgment in Plaintiffs' favor for a sufficient period to seek a stay from the
14  Court of Appeals.  That request is granted.  Therefore, the enforcement of the injunction
15  is hereby stayed for ten (10) days.

16  The following permanent injunction will be entered:

17  1.  Defendant Attorney General Rob Bonta, and his officers, agents, servants,
18  employees, and attorneys, and those persons in active concert or participation
19  with him, and those duly sworn state peace officers and federal law
20  enforcement officers who gain knowledge of this injunction order or know of
21  the existence of this injunction order, are enjoined from implementing or
22  enforcing California Penal Code §§ 30515(a)(1) through (8) (defining an
23  "assault weapon" by prohibited features), 30800 (deeming those "assault
24  weapons" a public nuisance), 30915 (regulating those "assault weapons"

25
26  _____

27  [247] *Wilson v. State*, 33 Ark. 557, 560 (1878).
28  [248] *Bruen*, 142 S. Ct. at 2161 (Alito, J., concurring).

19-cv-01537 BEN (JLB)

obtained by bequest or inheritance), 30945 (restricting use of registered "assault weapons"), and the penalty provisions §§ 30600, 30605 and 30800 as applied to "assault weapons" defined in Code §§ 30515(a)(1) through (8).

2. Defendant Rob Bonta shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.

**3.** This injunction is stayed for ten (10) days from the date of this Order.

**IT IS SO ORDERED.**

Dated: October 19, 2023

**HON. ROGER T. BENITEZ**
Senior United States District Judge

19-cv-01537 BEN (JLB)

**EXHIBIT 2**

XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6249
 Fax:  (916) 731-2124
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Xavier Becerra, in*
*his official capacity as Attorney General of*
*the State of California, and Brent E. Orick,*
*in his official capacity as Interim Director of*
*the Department of Justice Bureau of*
*Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES MILLER, et al.,** | 19-cv-1537 BEN-JLB |
| Plaintiffs, | |
| v. | **DECLARATION OF LUCY P. ALLEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| **CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,** | |
| Defendants. | |

**DEFENDANTS' EXHIBIT A**

### DECLARATION OF LUCY P. ALLEN

I, Lucy P. Allen, declare:

1.      I am a Managing Director of NERA Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice and Chair of NERA's Product Liability and Mass Torts Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.

2.      In my over 20 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving economic and statistical analysis. I have been qualified as an expert and testified in court on various economic and statistical issues relating to the flow of guns into the criminal market. I have testified at trials in Federal District Court, before the New York City Council Public Safety Committee, the American Arbitration Association and the Judicial Arbitration Mediation Service, as well as in depositions.

3.      I have an A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers.  My resume with recent publications and testifying experience is included as Appendix A.

4.      This declaration reports the results of my analyses with respect to the following issues: (a) the number of rounds of ammunition fired by individuals using a gun in self-defense; and (b) the outcomes when assault weapons (as defined under California law) and large-capacity magazines are used in public mass shootings, including the associated number of casualties.

DEF0002

# BACKGROUND

5.      California law bans the manufacture, sale and possession of certain firearms, defined as assault weapons ("Assault Weapons").[1] California law defines Assault Weapons based on either their "make and model" or on certain "features."[2] Plaintiffs, in this current case, are challenging the provisions of California law related to firearms that would qualify as Assault Weapons under California Penal Code sections 30515(a).[3]

6.      California Penal Code section 30515(a) defines a semiautomatic, centerfire rifle as an Assault Weapon if it: (1) lacks a fixed magazine and has one or more listed features (*e.g.* a pistol grip); (2) has a fixed magazine with the capacity to accept more than 10 rounds of ammunition; or (3) has an overall length of less than 30 inches.[4]

7.      California Penal Code section 30515(a) defines a semiautomatic pistol as an Assault Weapon if it: (1) lacks a fixed magazine and has a threaded barrel (capable of accepting a flash suppressor, a forward handgrip, or a silencer), a second handgrip, a barrel shroud, or the capacity to accept a detachable magazine at some location other than the pistol grip; or (2) has a fixed magazine with the capacity to accept more than 10 rounds of ammunition.[5]

8.      California Penal Code section 30515(a) defines a shotgun as an Assault Weapon if it: (1) is semiautomatic and has both an adjustable stock (*i.e.*, folding or telescoping) and a pistol grip, thumbhole stock, or vertical handgrip; (2)

---

[1] See California Penal Code sections 30600 & 30605. See, also, California Department of Justice: "What is considered an assault weapon under California law?" and "What are AK and AR-15 series weapons?" https://oag.ca.gov/firearms/regagunfaqs, accessed October 25, 2018.

[2] California Penal Code sections 30510 & 30515.

[3] First Amended Complaint, ¶31.  Magazines capable of accepting more than 10 rounds of ammunition are referred elsewhere in the California Penal Code as "large-capacity magazines." See California Penal Code section 16740.

[4] California Penal Code section 30515(a)(1)-(3). See, also, First Amended Complaint, ¶32.

[5] California Penal Code section 30515(a)(4)-(5). See, also, First Amended Complaint, ¶32.

2

DEF0003

is semiautomatic and has the ability to accept a detachable magazine; or (3) has a revolving cylinder.[6]

## OPINIONS

### A.    Number of rounds fired by individuals in self-defense

9.    Plaintiffs claim the banned "large-capacity magazines" (which are magazines capable of holding more than ten rounds) are commonly used for lawful purposes, including for self-defense in the home.[7]

10.    In *Duncan v. Becerra*, No. 17-cv-1017-BEN-JLB (S.D. Cal.), I prepared a declaration that was submitted in connection with plaintiffs' motion for a preliminary injunction (dated June 5, 2017) and an expert report (dated October 6, 2017), and I provided deposition testimony as an expert witness (dated January 18, 2018). Below are my findings concerning the number of rounds fired in self-defense based on data that was current through May 2017 and relied upon for my declaration and expert report in *Duncan v. Becerra*.

11.    The number of rounds commonly needed by individuals to defend themselves cannot be practically or ethically determined with controlled scientific experiments and there is no source that systematically tracks or maintains data on the number of rounds fired by individuals in self-defense. Due to these limitations, I have analyzed available data sources to estimate the number of rounds fired by individuals to defend themselves in the home. In particular, I have analyzed data from the NRA Institute for Legislative Action, the largest collection of accounts of citizen self-defense that I am able to find, as well as my own study of news reports on incidents of self-defense with a firearm. In all, I have analyzed almost 1,000 incidents of self-defense with a firearm and found that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

---

[6] California Penal Code section 30515(a)(6)-(8). See, also, First Amended Complaint, ¶32.
[7] See, for example, First Amended Complaint, ¶¶91 and 97.

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0004

12.     The NRA maintains a database of "Armed Citizen" stories describing private citizens who have successfully defended themselves, or others, using a firearm ("NRA Armed Citizen database"). According to the NRA, the "Armed Citizen" stories "highlight accounts of law-abiding gun owners in America using their Second Amendment rights to defend self, home and family."[8] Although the methodology used to compile the NRA Armed Citizen database of stories is not explicitly detailed by the NRA, and the database itself is not readily replicable, the NRA Armed Citizen database is a useful data source in this matter for at least three reasons. First, the Armed Citizen database is the largest collection of accounts of citizen self-defense compiled by others that I am able to find. Second, the incidents listed in the Armed Citizen database highlight the very conduct that Plaintiffs claim the California law impedes (*i.e.*, the use of firearms by law-abiding citizens for self-defense).[9] Third, the Armed Citizen database is compiled by an entity that actively opposes restrictions on magazine capacity and restrictions on the possession and use of firearms in general.[10] In light of the positions taken by the entity compiling the data, I would expect that any selection bias would be in favor of stories that put use of guns in self-defense in the best possible light and might highlight the apparent need of guns and/or multiple rounds in self-defense incidents.

13.     In addition to analyzing incidents in the NRA Armed Citizen database (2011 through May 2017), I performed my own systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, covering the same time period.

---

[8] NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017.

[9] First Amended Complaint, ¶39.

[10] See, for example, NRA Civil Rights Defense Fund website, http://www.nradefensefund.org/current-litigation.aspx, accessed October 12, 2018.

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0005

14.     My team and I performed an analysis of incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017. For each incident, the city/county, state, venue (whether the incident occurred on the street, in the home, or elsewhere) and the number of shots fired were tabulated.[11] The information was gathered for each incident from both the NRA synopsis and, where available, an additional news story. An additional news story was found for over 95% of the incidents in the NRA Armed Citizen database.

15.     According to this analysis of incidents in the NRA Armed Citizen database, defenders fired 2.2 shots on average. Out of 736 incidents, there were two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets.[12] In 18.2% of incidents, the defender did not fire any shots, and simply threatened the offender with a gun. For incidents occurring in the home (56% of total), defenders fired an average of 2.1 shots, and fired no shots in 16.1% of incidents.[13] The table below summarizes these findings:

[11] The following incidents were excluded from the analysis: (1) duplicate incidents, (2) wild animal attacks, and (3) one incident where the supposed victim later pleaded guilty to covering up a murder. When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

[12] Note that the only two incidents with more than 10 bullets fired were added to the NRA Armed Citizen database in 2016 and 2017 after an earlier analysis that I had conducted of the database had been submitted to and cited by the Court in *Stephen V. Kolbe, et al. v. Martin O'Malley, et al.*

[13] A separate study of incidents in the NRA Armed Citizen database for an earlier period (the five-year period from 1997 through 2001) found similar results. Specifically, this study found that, on average, 2.2 shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. See, Claude Werner, "The Armed Citizen – A Five Year Analysis," http://gunssaveslives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables, accessed January 10, 2014.

**Number of Shots Fired in Self-Defense
Based on NRA Armed Citizen Incidents in the United States
January 2011 - May 2017**

| | Shots Fired by Individual in Self-Defense | |
| --- | --- | --- |
| | Overall | Incidents in Home |
| Average Number of Shots Fired | 2.2 | 2.1 |
| Number of Incidents with No Shots Fired | 134 | 66 |
| Percent of Incidents with No Shots Fired | 18.2% | 16.1% |
| Number of Incidents with >10 Shots Fired | 2 | 2 |
| Percent of Incidents with >10 Shots Fired | 0.3% | 0.5% |

**Notes and Sources:**
Data from NRA Armed Citizen database covering 736 incidents (of which 411 were in the home) from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

16.     We also performed the same analysis of the NRA Armed Citizen database limited to incidents that occurred in the state of California. According to this analysis, defenders in California fired 2.0 shots on average. Out of 47 incidents, there were no incidents in which the defender was reported to have fired more than 10 bullets. In 27.7% of incidents, the defender did not fire any shots, and simply threatened the offender with a gun. For incidents occurring in the home (60% of total), defenders fired an average of 1.9 shots, and fired no shots in 32.1% of incidents. The table below summarizes these findings for California:

6

DEF0007

**Number of Shots Fired in Self-Defense**
**Based on NRA Armed Citizen Incidents in California**
**January 2011 - May 2017**

| | Shots Fired by Individual in Self-Defense | |
| --- | --- | --- |
| | Overall | Incidents in Home |
| Average Number of Shots Fired | 2.0 | 1.9 |
| Number of Incidents with No Shots Fired | 13 | 9 |
| Percent of Incidents with No Shots Fired | 27.7% | 32.1% |
| Number of Incidents with >10 Shots Fired | 0 | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% | 0.0% |

**Notes and Sources:**
Data from NRA Armed Citizen database covering 47 incidents in California (of which 28 were in the home) January 2011 through May 2017. Excludes duplicate incidents and wild animal attacks.

17.     In addition to our analysis of incidents in the NRA Armed Citizen database, we performed a systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, focusing on the same types of incidents as the NRA stories and covering the same time period.

18.     To identify relevant news stories to include in our analysis, we performed a comprehensive search of published news stories using Factiva, an online news reporting service and archive owned by Dow Jones, Inc. that aggregates news content from nearly 33,000 sources. The search was designed to return stories about the types of incidents that are the focus of the NRA Armed Citizen database and that Plaintiffs claim the California law impedes – in particular, the use of firearms for self-defense in the home.[14] The search identified all stories

---

[14] NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017. See, also, First Amended Complaint, ¶39.

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0008

that contained the following keywords in the headline or lead paragraph: one or more words from "gun," "shot," "shoot," "fire," or "arm" (including variations on these keywords, such as "shooting" or "armed"), plus one or more words from "broke in," "break in," "broken into," "breaking into," "burglar," "intruder," or "invader" (including variations on these keywords) and one or more words from "home," "apartment," or "property" (including variations on these keywords).[15] The search criteria match approximately 90% of the NRA stories on self-defense with a firearm in the home, and an analysis of the 10% of stories that are not returned by the search shows that the number of shots fired in these incidents was no different than in other incidents.[16] The search covered the same period used in our analysis of incidents in the NRA Armed Citizen database (January 2011 to May 2017). The region for the Factiva search was set to "United States." The search returned approximately 35,000 stories for the period January 2011 to May 2017.[17]

19.    Using a random number generator, a random sample of 200 stories was selected for each calendar year, yielding 1,400 stories in total.[18] These 1,400 stories were reviewed to identify those stories that were relevant to the analysis, *i.e.*, incidents of self-defense with a firearm in or near the home. This methodology

[15]  The precise search string used was: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"). An asterisk denotes a wildcard, meaning the search includes words which have any letters in place of the asterisk. For example, a search for shoot* would return results including "shoots," "shooter" and "shooting." The search excluded duplicate stories classified as "similar" on Factiva.

[16] The analysis and search would have used criteria to match actual incidents involving Plaintiffs or California residents, but, based on the First Amended Complaint, Plaintiffs have not identified any incidents of the type they claim the California law will impede.

[17]  The effect of using alternative keywords was considered. For example, removing the second category ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and including incidents in which the assailant was already inside the home and/or was known to the victim was considered. *A priori*, there was no reason to believe that a larger number of shots would be used in these incidents and based on an analysis of the NRA stories we found that the number of shots fired in incidents when defending against someone already in the home was not different than those with an intruder.

[18]  The random numbers were generated by sampling with replacement.

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0009

yielded a random selection of 200 news stories describing incidents of self-defense with a firearm in the home out of a population of approximately 4,800 relevant stories. Thus, we found that out of the over 70 million news stories aggregated by Factiva between January 2011 and May 2017, approximately 4,800 news stories were on incidents of self-defense with a firearm in the home. We analyzed a random selection of 200 of these stories.

20.    For each news story, the city/county, state and number of shots fired were tabulated. When tabulating the number of shots fired, we used the same methodology as we used to analyze stories in the NRA Armed Citizen database.[19] We then identified other stories describing the same incident on Factiva based on the date, location and other identifying information, and recorded the number of times that each incident was covered by Factiva news stories.

21.    According to our study of a random selection from approximately 4,800 relevant stories on Factiva describing incidents of self-defense with a firearm in the home, the average number of shots fired per story was 2.61. This is not a measure of the average shots fired *per incident*, however, because the number of stories covering an incident varies, and the variation is not independent of the number of shots fired. We found that there was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering an incident.[20] We found that on average the more shots fired in a defensive gun use incident, the greater the number of stories covering an

[19]  When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

[20]  Based on a linear regression of the number of news stories as a function of the number of shots fired, the results were statistically significant at the 1% level (more stringent than the 5% level commonly used by academics and accepted by courts. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980).)

DEF0010

incident. For example, as shown in the table below, we found that incidents in Factiva news stories with zero shots fired were covered on average by 1.8 news stories, while incidents with six or more shots fired were covered on average by 10.4 different news stories.

**Average Number of News Stories by Number of Shots Fired In Factiva Stories on Incidents of Self-Defense with a Firearm January 2011 - May 2017**

| Number of Shots Fired By Defender | Average Number of News Stories |
|---|---|
| 0 | 1.8 |
| 1 to 2 | 2.8 |
| 3 to 5 | 3.8 |
| 6 or more | 10.4 |

**Notes and Sources:**
Based on news stories describing defensive gun use in a random selection of Factiva stories between 2011 and May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 19.

22.     After adjusting for this disparity in news coverage, we find that the average number of shots fired per incident covered is 2.34.[21] Note that this adjustment does not take into account the fact that some defensive gun use incidents

---

[21] The adjustment reflects the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home. The formula used for the adjustment is:

$$\frac{\sum_{i=1}^{n}\left(Shots\ Fired_i \times \frac{R_i}{C_i}\right)}{\sum_{i=1}^{n}\left(\frac{R_i}{C_i}\right)}$$

where:

$n$ = random selection of news stories on incidents of self-defense with a firearm in the home

$R_i$ = number of search results on Factiva in the calendar year of incident $i$

$C_i$ = number of news stories covering incident $i$

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0011

may not be picked up by *any* news story. Given the observed relationship that there are more news stories when there are more shots fired, one would expect that the incidents that are not written about would on average have fewer shots than those with news stories. Therefore, the expectation is that these results, even after the adjustment, are biased upward (*i.e.*, estimating too high an average number of shots and underestimating the percent of incidents in which no shots were fired).

23.    As shown in the table below, according to the study of Factiva news stories, in 11.6% of incidents the defender did not fire any shots, and simply threatened the offender with a gun. In 97.3% of incidents the defender fired 5 or fewer shots. There were no incidents where the defender was reported to have fired more than 10 bullets.

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0012

<table>
<tr><td colspan="2" align="center"><b>Number of Shots Fired in Self-Defense in the Home<br>Based on Random Selection of News Stories in Factiva<br>January 2011 - May 2017</b></td></tr>
<tr><td>Estimated population of news reports in Factiva on self-defense with a firearm in the home</td><td>4,841</td></tr>
<tr><td>Random selection of news reports</td><td>200</td></tr>
<tr><td>Average Number of Shots Fired</td><td>2.34</td></tr>
<tr><td>Median Number of Shots Fired</td><td>2.03</td></tr>
<tr><td>Number of Incidents with No Shots Fired</td><td>23</td></tr>
<tr><td>Percent of Incidents with No Shots Fired</td><td>11.6%</td></tr>
<tr><td>Number of Incidents with ≤5 Shots Fired</td><td>195</td></tr>
<tr><td>Percent of Incidents with ≤5 Shots Fired</td><td>97.3%</td></tr>
<tr><td>Number of Incidents with >10 Shots Fired</td><td>0</td></tr>
<tr><td>Percent of Incidents with >10 Shots Fired</td><td>0.0%</td></tr>
</table>

**Notes and Sources:**
Based on news stories describing defensive gun use in a random selection of Factiva stories between 2011 and May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 19. Number of incidents probability-weighted as per footnote 21.

24.     In sum, an analysis of incidents in the NRA Armed Citizen database, as well as our own study of a random sample from approximately 4,800 news stories describing incidents of self-defense with a firearm, indicates that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

**B.     Public Mass Shootings**

25.     We analyzed the use of Assault Weapons and large-capacity magazines in public mass shootings using four sources for identifying public mass

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0013

shootings: Mother Jones,[22] the Citizens Crime Commission of New York City,[23] the Washington Post[24] and the Violence Project.[25, 26] The analysis focused on public mass shootings because it is my understanding that the state of California is concerned about public mass shootings and enacted the challenged laws, in part, to address the problem of public mass shootings.

26.     The type of incident considered a mass shooting is generally consistent across the four sources. In particular, all four sources consider an event a mass shooting if four or more people were killed in a public place in one incident, and exclude incidents involving other criminal activity such as a robbery.[27]

[22] "US Mass Shootings, 1982-2018: Data From Mother Jones' Investigation," *Mother Jones*, updated December 11, 2019, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data.

[23] "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, February 2018 update. Additional details on the mass shootings were obtained from an earlier source by the Citizens Crime Commission. "Mass Shooting Incidents in America (1984-2012)," *Citizens Crime Commission of New York City*, http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[24] "The terrible numbers that grow with each mass shooting," *The Washington Post*, updated December 18, 2019, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[25] "Mass Shooter Database," *The Violence Project*, https://www.theviolenceproject.org/mass-shooter-database/, accessed January 17, 2020.

[26] When I began research in 2013 on mass shootings in response to a challenge to New York state law, I found Mother Jones and Citizens Crime Commission to maintain the most comprehensive lists of relevant mass shootings. More recently, two additional sources, the Washington Post and The Violence Project, have compiled lists of public mass shootings. The Violence Project began work on its mass shootings database in September 2017 and its database first went online in November 2019, while the Washington Post first published its mass shootings database in February 14, 2018. There is substantial overlap between the mass shootings in all four sources. For example, the Mother Jones data contains 93% of the mass shootings in the Citizens Crime Commission data for the years covered by both data sources, 1984 to 2016, while the Washington Post contains 94% of the mass shootings in The Violence Project data for the years covered by both data sources, 1966 to 2019.

[27] Citizen Crime Commission describes a mass shooting as "four or more victims killed" in "a public place" that were "unrelated to another crime (e.g., robbery, domestic violence)." Citizen Crime notes that its sources include "news reports and lists created by government entities and advocacy groups." "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, February 2018 update.

Mother Jones describes a mass shooting as "indiscriminate rampages in public places resulting in four or more victims killed by the attacker," excluding "shootings stemming from more conventionally motivated crimes such as armed robbery or gang violence." Although in January

27.     Each of the four sources contains data on mass shootings covering different time periods. The Mother Jones data covers 98 mass shootings from 1982 to December 11, 2019,[28] the Citizens Crime Commission data covers 80 mass shootings from 1984 to February 2018,[29] the Washington Post data covers 172 mass shootings from 1966 to December 18, 2019,[30] and The Violence Project data covers 171 mass shootings from 1966 to 2019.[31]

2013 Mother Jones changed its definition of mass shooting to include instances when three or more people were killed, for this declaration we only analyzed mass shootings where four or more were killed to be consistent with the definition of the other three sources. "A Guide to Mass Shootings in America," *Mother Jones*, updated December 11, 2019, http://www.motherjones.com/politics/2012/07/mass-shootings-map. See also, "What Exactly is a Mass Shooting," *Mother Jones*, August 24, 2012. http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting.

The Washington Post source describes a mass shooting as "four or more people [] killed by a lone shooter (two shooters in a few cases)," excluding "shootings tied to robberies that went awry" and "domestic shootings that took place exclusively in private homes." The Washington Post notes that its sources include "Grant Duwe, author of 'Mass Murder in the United States: A History,' Mother Jones and Washington Post research," as well as "Violence Policy Center, Gun Violence Archive; FBI 2014 Study of Active Shooter Incidents; published reports." "The terrible numbers that grow with each mass shooting," *The Washington Post*, updated December 18, 2019, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

The Violence Project indicates that it uses the Congressional Research Service definition of a mass shooting: "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project notes that its sources include "Primary Sources: Written journals / manifestos / suicide notes etc., Social media and blog posts, Audio and video recordings, Interview transcripts, Personal correspondence with perpetrators" as well as "Secondary Sources (all publicly available): Media (television, newspapers, magazines), Documentary films, Biographies, Monographs, Peer-reviewed journal articles, Court transcripts, Law Enforcement records, Medical records, School records, Autopsy reports." "Mass Shooter Database," *The Violence Project*, https://www.theviolenceproject.org/methodology/, accessed January 17, 2020.

[28] "A Guide to Mass Shootings in America," *Mother Jones*, updated December 11, 2019, http://www.motherjones.com/politics/2012/07/mass-shootings-map. Excludes mass shootings where only three people were killed. Note this analysis of the Mother Jones data may not match other analyses because Mother Jones periodically updates its historical data.

[29] "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, February 2018 update.

[30] "The terrible numbers that grow with each mass shooting," *The Washington Post*, updated December 18, 2019. https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[31] "Mass Shooter Database," *The Violence Project*  https://www.theviolenceproject.org/mass-

14

DEF0015

28.     Note that the two more recently compiled sources of mass shootings, the Washington Post and The Violence Project, include additional mass shootings that were not covered by either Mother Jones or Citizens Crime Commission.  In general, we found that these additional mass shootings were less covered by the media and involved fewer fatalities and/or injuries than the ones previously identified by Mother Jones or Citizens Crime Commission. For example, we found that the median number of news stories for a mass shooting included in Mother Jones and/or Citizen Crime Commission was 317, while the median for the additional mass shootings identified in the Washington Post and/or The Violence Project was 28.[32] In addition, we found an average of 21 fatalities or injuries for a mass shooting included in Mother Jones and/or Citizen Crime Commission, while only 6 fatalities or injuries for the additional mass shootings identified in the Washington Post and/or The Violence Project.

29.     We combined the data from the four sources for the period 1982 through 2019, and searched news stories on each mass shooting to obtain additional details on the types of weapons used as well as data on shots fired where available. We compared the details on the weapons used in each shooting to the list of prohibited firearms and features specified in California law to identify, based on this publicly available information, which mass shootings involved the use of Assault Weapons. In addition, we identified, based on this publicly available information, which mass shootings involved the use of large-capacity magazines. See attached Appendix B for a summary of the combined data, and Appendix C for a summary of the weapons used in each public mass shooting based on Mother Jones, Citizens Crime Commission, the Washington Post and news reports.

shooter-database/, accessed January 17, 2020.

[32] The search was conducted over all published news stories on Factiva. The search was based on the shooter's name and the location of the incident over the period from one week prior to three months following each mass shooting.

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0016

### 1.    Use of Assault Weapons in public mass shootings

30.    Based on the data, we found that Assault Weapons are often used in public mass shootings. Whether an Assault Weapon was used in a mass shooting can be determined in 147 out of the 161 incidents (91%) considered in this analysis. Out of these 147 mass shootings, 32 (or 22%) involved Assault Weapons. Even assuming the mass shootings where it is not known whether an Assault Weapon was used *all* did not involve an Assault Weapon, 32 out of 161 mass shootings, or 20%, involved Assault Weapons.

31. Based on our analysis, casualties were higher in the mass shootings that involved Assault Weapons than in other mass shootings. In particular, we found an average number of fatalities or injuries of 38 per mass shooting with an Assault Weapon versus 10 for those without. Focusing on just fatalities, we found an average number of fatalities of 12 per mass shooting with an Assault Weapon versus 6 for those without. (See table below.)

### 2.    Use of large-capacity magazines in public mass shootings

32.    Based on the data, we found that large-capacity magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in public mass shootings. Magazine capacity is known in 105 out of the 161 mass shootings (or 65%) considered in this analysis. Out of the 105 mass shootings with known magazine capacity, 63 (or 60%) involved large-capacity magazines. Even assuming the mass shootings with unknown magazine capacity *all* did not involve large-capacity magazines, 63 out of 161 mass shootings or 39% of mass shootings involved large capacity magazines. (See table below.)

33. Based on our analysis of the public mass shootings data, casualties were higher in the mass shootings that involved weapons with large-capacity magazines than in other mass shootings. In particular, we found an average number of fatalities or injuries of 27 per mass shooting with a large-capacity magazine versus 9 for those without. Focusing on just fatalities, we found an average number of fatalities

16

DEF0017

of 10 per mass shooting with a large-capacity magazine versus 6 for those without. (See table below.)

34. In addition, we found that casualties were higher in the mass shootings that involved both Assault Weapons *and* large-capacity magazines. In particular, we found an average number of fatalities or injuries of 43 per mass shooting with both an Assault Weapon and a large-capacity magazine versus and 8 for those without either. Focusing on just fatalities, we found an average number of fatalities of 13 per mass shooting with both an Assault Weapon and a large-capacity magazine versus 6 for those without either. (See table below.)

### Numbers of Fatalities and Injuries in Public Mass Shootings

| Weapon Used | # of Incidents | Average # of | | |
| --- | --- | --- | --- | --- |
| | | Fatalities | Injuries | Total |
| Assault Weapon | 32 | 12 | 26 | 38 |
| No Assault Weapon | 115 | 6 | 4 | 10 |
| Unknown | 14 | 6 | 1 | 7 |
| Large-Cap. Mag. | 63 | 10 | 17 | 27 |
| No Large-Cap. Mag. | 42 | 6 | 3 | 9 |
| Unknown | 56 | 5 | 3 | 7 |
| Assault Weapon & Large-Cap. Mag. | 27 | 13 | 30 | 43 |
| Large-Cap. Mag. only | 34 | 8 | 7 | 15 |
| No Assault Weapon or Large-Cap. Mag. | 41 | 6 | 3 | 8 |
| Unknown | 59 | 5 | 3 | 8 |

**Notes and Sources:**

Casualty figures exclude the shooter. LCM classification and casualties based on review of stories from Factiva/Google searches.

35. Our results are consistent with those of other studies that have analyzed mass shootings. Note that although the other studies are based on alternate sets of mass shootings, including covering different years and defining mass

17

DEF0018

shootings somewhat differently, the results are similar in finding that fatalities and injuries are larger in mass shootings in which large capacity magazines and/or assault weapons are involved. A 2019 academic article published in the *American Journal of Public Health* by Klarevas, Conner and Hemenway found that "[a]ttacks involving LCMs resulted in a 62% higher mean average death toll."[33] This study found an average number of fatalities of 11.8 per mass shooting with a large-capacity magazine versus 7.3 for those without. The results in this study were based on 69 mass shootings between 1990 and 2017.[34] An analysis of the mass shootings detailed in a 2016 article by Gary Kleck yielded similar results (21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without).[35] The Kleck study covered 88 mass shooting incidents between 1994 and 2013.[36] In a 2018 study, Koper et al. found that mass shootings involving assault weapons and large-capacity magazines resulted in an average of 13.7 victims versus 5.2 for other cases.[37] The Koper et al. study covered 145 mass shootings between 2009 and 2015.[38]

### 3. Number of rounds fired in public mass shootings with Assault Weapons or large-capacity magazines

36.     The data on public mass shootings indicates that it is common for offenders to fire more than ten rounds when using an Assault Weapon. Of the 32

[33] Louis Klarevas PhD, Andrew Conner BS, and David Hemenway PhD, "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017," *American Journal of Public Health* (2019).

[34] The Klarevas, Conner and Hemenway study defines mass shootings as "intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators."

[35] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[36] The Kleck study defines a mass shooting as "one in which more than six people were shot, either fatally or nonfatally, in a single incident."

[37] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," *Journal of Urban Health* (2018)

[38] The Koper et al. study defined mass shooting as "incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed."

Declaration of Lucy P. Allen (19-cv-1537 BEN-JLB)

DEF0019

mass shootings that involved an Assault Weapon, there are 22 in which the number of shots fired is known. Shooters fired more than ten rounds in *all* 22 incidents, and the average number of shots fired was 152.

37.   In addition, the data indicates that it is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings. Of the 63 mass shootings that involved a large-capacity magazine, there are 43 in which the number of shots fired is known. Shooters fired more than ten rounds in 40 of the 43 incidents, and the average number of shots fired was 103.

### 4.   Percent of mass shooters' guns legally obtained

38.   The data on public mass shootings indicates that the majority of guns used in these mass shootings were obtained legally.[39] Of the 161 mass shootings, there are 100 where it can be determined whether the gun was obtained legally. According to the data, shooters in 77% of mass shootings obtained their guns legally (77 of the 100 mass shootings) and 79% of the guns used in these 100 mass shootings were obtained legally (184 of the 234 guns). (Note that even if one assumes that *all* of the mass shootings where it is not known were assumed to be illegally obtained, then one would find 48% of the mass shootings and 61% of the guns were obtained legally.)

---

[39] The determination of whether guns were obtained legally is based on Mother Jones and Washington Post reporting.

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed on January 23, 2020 at New York, New York.



Lucy P. Allen

DEF0021



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

Appendix A

## MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present     **National Economic Research Associates, Inc.**
<u>Managing Director</u>. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
<u>Senior Vice President (2003-2016)</u>.
<u>Vice President (1999-2003)</u>.
<u>Senior Consultant (1994-1999)</u>.

1992-1993     **Council of Economic Advisers, Executive Office of the President**
<u>Staff Economist</u>.  Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*.  Working Group member of the President's National Health Care Reform Task Force.

1986-1988     **Ayers, Whitmore & Company (General Management Consultants)**
1983-1984     <u>Senior Associate</u>.  Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.
Marketing plan to increase international market share for major accounting firm.

DEF0022

Lucy P. Allen

| | |
|---|---|
| Summer 1985 | **WNET/Channel Thirteen, Strategic Planning Department**<br>Associate.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support. |
| 1981-1983 | **Arthur Andersen & Company**<br>Consultant.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company. |

## Teaching

1989- 1992 **Teaching Fellow, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

**DEF0023**

Lucy P. Allen

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Expert Reports, Depositions & Testimony (4 years)

Testimony before the United States District Court Southern District of Iowa in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Expert Report before the United States District Court Middle District of Tennessee *in Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

DEF0024

Lucy P. Allen

Declaration before the United States District Court Western District of Oklahoma in *In re: Samsung Top-Load Washing Machine Marketing, Sales Practices and Products Liability Litigation*, 2019.

Testimony and Expert Report before the United States District Court Southern District of New York in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Expert Report before the Court of First Instance Central Section Macau in *Asian American Entertainment Corporation Limited v. LVS (Nevada) Int. Holdings, Inc.*, 2019.

Rebuttal Report and Expert Report before the Superior Court of the State of California, Los Angeles County, in *In re MRV Communications, Inc., Stockholder Litigation*, 2019.

Expert Report before the Federal Court of Australia, New South Wales, in *Kenquist Nominees Pty Ltd. v. Peter Campbell and others*, 2019.

Declaration before the United States District Court Southern District of Iowa in *Mahaska Bottling Company, Inc., et al. v. Pepsico, Inc. and Bottling Group, LLC*, 2019.

Deposition Testimony, Rebuttal Report and Expert Report before the United States District Court Middle District of Florida in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

Deposition Testimony, Rebuttal Report and Expert Report before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc.*, 2018.

Deposition Testimony, Supplemental Report and Expert Report before the United States District Court Middle District of Tennessee in *Nikki Bollinger Grae v. Corrections Corporation of America et al.*, 2018.

Deposition Testimony, Rebuttal Report and Expert Report before the District Court for the State of Nevada in *Dan Schmidt v. Liberator Medical Holdings, Inc., et al.*, 2018.

Deposition Testimony and Expert Report before the United States District Court Northern District of Illinois Eastern Division in *In re the Allstate Corporation Securities Litigation*, 2018.

Expert Report before the United States District Court Central District of Californian Southern Division in *Steven Rupp et al. v. Xavier Becerra et al.*, 2018.

Supplemental Report and Expert Report before the United States District Court Middle District of Tennessee in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation, et al.*, 2018.

Lucy P. Allen

Declaration before the Superior Court of the State of Vermont in *Vermont Federation of Sportsmen's Club et al. v. Matthew Birmingham et al.,* 2018.

Testimony and Expert Report before the American Arbitration Association in *Arctic Glacier U.S.A, Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Deposition Testimony and Expert Report before the United States District Court Southern District of New York in *Marvin Pearlstein v. Blackberry Limited et al.*, 2018.

Deposition Testimony, Rebuttal Report and Expert Report before the United States District Court Eastern District of Texas in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Deposition Testimony, Surrebuttal Report, Rebuttal Report and Expert Report before the United States District Court Southern District of Iowa in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2018.

Testimony, Deposition Testimony and Declaration before the United States District Court District of New Jersey in *Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Gurbir Grewal et al.,* 2018.

Deposition Testimony, Supplemental Report and Expert Report before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Expert Report before the District Court for Douglas County, Nebraska in *Union Pacific Railroad Company v. L.B. Foster Company and CXT Incorporated, 2018.*

Deposition Testimony and Declarations before the United States District Court Southern District of New York in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Deposition Testimony before the United States District Court Southern District of California in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

Expert Report and Declaration before the United States District Court Southern District of California in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2017.

Deposition Testimony and Expert Report before the United States District Court for the Western District of Texas, Austin Division in *City of Pontiac General Employees' Retirement System v. Dell, Inc., et al.,* 2017.

Deposition Testimony and Expert Report before the United States District Court for the Southern District of Texas, Houston Division in *In re Willbros Group, Inc. Securities Litigation,* 2017.

DEF0026

Lucy P. Allen

Declaration before the United States District Court Eastern District of California in *William Wiese, et al. v. Xavier Becerra, et al.*, 2017.

Deposition Testimony and Expert Report before the United States District Court for the Southern District of Texas, Houston Division in *In re Cobalt International Energy Inc. Securities Litigation.,* 2017.

Testimony, Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *DEKA Investment GmbH, et al. v. Santander Consumer USA Holdings, Inc., et al*., 2017.

Deposition Testimony before the Superior Court of the State of North Carolina for Mecklenburg County in *Next Advisor, Inc. v. LendingTree, Inc.*, 2017

Deposition Testimony and Expert Report before the Supreme Court of the State of New York, County of New York in *Iroquois Master Fund Ltd., et al. v. Hyperdynamics Corporation*, 2016.

Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *The Archdiocese of Milwaukee Supporting Fund, Inc., et al. v. Halliburton Company, et al.*, 2016.

Expert Report before the United States District Court for the Northern District of Georgia, Atlanta Division, in *In re Suntrust Banks, Inc. ERISA Litigation,* 2016.

DEF0027

## Public Mass Shootings Data
## 1982 – 2019

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
| 1. Jersey City Kosher Supermarket | Jersey City, NJ | 12/10/19 | MJ/WaPo | - | No | 4 | 3 | 7 | - | Yes | 5 |
| 2. Football-watching party | Fresno, CA | 11/17/19 | WaPo | - | No | 4 | 6 | 10 | - | - | 2 |
| 3. Halloween Party | Orinda, CA | 11/1/19 | WaPo | - | - | 5 | 0 | 5 | - | - | 1 |
| 4. Tequila KC bar | Kansas City, KS | 10/6/19 | WaPo | - | No | 4 | 5 | 9 | - | No | 2 |
| 5. Midland-Odessa Highways | Odessa, TX | 8/31/19 | MJ/VP/WaPo | - | Yes | 7 | 25 | 32 | - | No | 1 |
| 6. Dayton | Dayton, OH | 8/4/19 | MJ/VP/WaPo | Yes | Yes | 9 | 27 | 36 | 41 [f] | Yes | 1/2 |
| 7. El Paso Walmart | El Paso, TX | 8/3/19 | MJ/VP/WaPo | Yes | Yes | 22 | 26 | 48 | - | Yes | 1 |
| 8. Casa Grande Senior Mobile Estates | Santa Maria, CA | 6/19/19 | WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 9. Virginia Beach Municipal Center | Virginia Beach, VA | 5/31/19 | MJ/VP/WaPo | Yes | No | 12 | 4 | 16 | - | Yes | 2 |
| 10. Henry Pratt Co. | Aurora, IL | 2/15/19 | MJ/VP/WaPo | No | No | 5 | 6 | 11 | - | No | 1 |
| 11. SunTrust Bank | Sebring, FL | 1/23/19 | MJ/VP/WaPo | - | No | 5 | 0 | 5 | - | Yes | 1 |
| 12. Borderline Bar & Grill | Thousand Oaks, CA | 11/7/18 | MJ/VP/WaPo | Yes | No | 12 | 1 | 13 | 50 [g] | Yes | 1 |
| 13. Tree of Life Synagogue | Pittsburgh, PA | 10/27/18 | MJ/VP/WaPo | - | Yes | 11 | 6 | 17 | - | Yes | 4 |
| 14. T&T Trucking | Bakersfield, CA | 9/12/18 | MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 15. Capital Gazette | Annapolis, MD | 6/28/18 | MJ/VP/WaPo | - | No | 5 | 2 | 7 | - | Yes | 1 |
| 16. Santa Fe High School | Santa Fe, TX | 5/18/18 | MJ/VP/WaPo | No | No | 10 | 13 | 23 | - | - | 2 |
| 17. Waffle House | Nashville, TN | 4/22/18 | MJ/VP/WaPo | - | Yes | 4 | 4 | 8 | - | Yes | 1 |
| 18. Detroit | Detroit, MI | 2/26/18 | VP | - | No | 4 | 0 | 4 | - | - | - |
| 19. Stoneman Douglas HS | Parkland, FL | 2/14/18 | CC/MJ/VP/WaPo | Yes | No | 17 | 17 | 34 | - | Yes | 1 |
| 20. Pennsylvania Carwash | Melcroft, PA | 1/28/18 | MJ/VP/WaPo | - | - | 4 | 1 | 5 | - | - | 3 h |
| 21. Rancho Tehama | Rancho Tehama, CA | 11/14/17 | MJ/VP/WaPo | Yes | Yes | 4 | 10 | 14 | 30 [i] | No | 2 |
| 22. Texas First Baptist Church | Sutherland Springs, TX | 11/5/17 | CC/MJ/VP/WaPo | Yes | Yes | 26 | 20 | 46 | 450 [j] | Yes | 1 |
| 23. Las Vegas Strip | Las Vegas, NV | 10/1/17 | CC/MJ/VP/WaPo | Yes | Yes | 58 | 422 | 480 | 1100 [k] | Yes | 23 |
| 24. Taos and Rio Arriba counties | Abiquiu, NM | 6/15/17 | WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 25. Fiamma Workplace | Orlando, FL | 6/5/17 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 26. Marathon Savings Bank | Rothschild, WI | 3/22/17 | VP/WaPo | - | No | 4 | 0 | 4 | - | - | 2 |
| 27. Club 66 | Yazoo City, MS | 2/6/17 | VP/WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 28. Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/17 | CC/MJ/VP/WaPo | No | No | 5 | 6 | 11 | 15 [l] | Yes | 1 |
| 29. Cascade Mall | Burlington, WA | 9/23/16 | CC/MJ/VP/WaPo | Yes | No | 5 | 0 | 5 | - | - | 1 |

DEF0028

## Public Mass Shootings Data
## 1982 – 2019

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|------|----------|------|--------|-------------------------|--------------------|--------------|------------|-------------------------------|----------------|------------------------------|------------------------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
| 30. Dallas Police | Dallas, TX | 7/7/16 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 11 | 16 | - | Yes | 3 |
| 31. Walgreens Parking Lot | Las Vegas, NV | 6/29/16 | WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 32. Orlando Nightclub | Orlando, FL | 6/12/16 | CC/MJ/VP/WaPo | Yes | Yes | 49 | 53 | 102 | 110 [m] | Yes | 2 |
| 33. Franklin Avenue Cookout | Wilkinsburg, PA | 3/9/16 | VP/WaPo | Yes | Yes | 6 | 3 | 9 | 48 [n] | No | 2 |
| 34. Kalamazoo | Kalamazoo County, MI | 2/20/16 | MJ/VP/WaPo | Yes | No | 6 | 2 | 8 | - | Yes | 1 |
| 35. San Bernardino | San Bernardino, CA | 12/2/15 | CC/MJ/VP/WaPo | Yes | Yes | 14 | 22 | 36 | 150 [o] | Yes | 4 |
| 36. Tennessee Colony campsite | Anderson County, TX | 11/15/15 | VP/WaPo | - | No | 6 | 0 | 6 | - | - | 1 |
| 37. Umpqua Community College | Roseburg, OR | 10/1/15 | CC/MJ/VP/WaPo | - | No | 9 | 9 | 18 | - | Yes | 6 |
| 38. Chattanooga Military Center | Chattanooga, TN | 7/16/15 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 2 | 7 | - | Yes | 3 |
| 39. Charleston Church | Charleston, SC | 6/17/15 | CC/MJ/VP/WaPo | Yes | No | 9 | 3 | 12 | - | Yes | 1 |
| 40. Marysville High School | Marysville, WA | 10/24/14 | CC/MJ/VP/WaPo | Yes | No | 4 | 1 | 5 | - | No | 1 |
| 41. Isla Vista | Santa Barbara, CA | 5/23/14 | MJ/VP/WaPo | No | No | 6 | 13 | 19 | 50 [p] | Yes | 3 |
| 42. Alturas Tribal | Alturas, CA | 2/20/14 | MJ/VP/WaPo | - | No | 4 | 2 | 6 | - | - | 2 |
| 43. Washington Navy Yard | Washington, D.C. | 9/16/13 | CC/MJ/VP/WaPo | No | No | 12 | 8 | 20 | - | Yes | 2 |
| 44. Hialeah | Hialeah, FL | 7/26/13 | CC/MJ/VP/WaPo | Yes | No | 6 | 0 | 6 | 10 [q] | Yes | 1 |
| 45. Santa Monica | Santa Monica, CA | 6/7/13 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 3 | 8 | 70 [r] | Yes | 2 |
| 46. Federal Way | Federal Way, WA | 4/21/13 | MJ/VP/WaPo | - | No | 4 | 0 | 4 | - | Yes | 2 |
| 47. Upstate New York | Herkimer County, NY | 3/13/13 | MJ/VP/WaPo | - | No | 4 | 2 | 6 | - | Yes | 1 |
| 48. Newtown School | Newtown, CT | 12/14/12 | CC/MJ/VP/WaPo | Yes | Yes | 27 | 2 | 29 | 154 | No | 4/3 |
| 49. Accent Signage Systems | Minneapolis, MN | 9/27/12 | CC/MJ/VP/WaPo | Yes | No | 6 | 2 | 8 | 46 | Yes | 1 |
| 50. Sikh Temple | Oak Creek, WI | 8/5/12 | CC/MJ/VP/WaPo | Yes | No | 6 | 4 | 10 | - | Yes | 1 |
| 51. Aurora Movie Theater | Aurora, CO | 7/20/12 | CC/MJ/VP/WaPo | Yes | Yes | 12 | 70 | 82 | 80 | Yes | 4 |
| 52. Seattle Café | Seattle, WA | 5/30/12 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 2 |
| 53. Oikos University | Oakland, CA | 4/2/12 | CC/MJ/VP/WaPo | No | No | 7 | 3 | 10 | - | Yes | 1 |
| 54. Su Jung Health Sauna | Norcross, GA | 2/22/12 | MJ/WaPo | - | No | 4 | 0 | 4 | - | Yes | 1 |
| 55. Seal Beach | Seal Beach, CA | 10/14/11 | CC/MJ/VP/WaPo | No | No | 8 | 1 | 9 | - | Yes | 3 |
| 56. IHOP | Carson City, NV | 9/6/11 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 7 | 11 | - | Yes | 3 |
| 57. Akron | Akron, OH | 8/7/11 | VP | No | No | 7 | 2 | 9 | 21 [s] | - | - |
| 58. Forum Roller World | Grand Prairie, TX | 7/23/11 | WaPo | - | No | 5 | 4 | 9 | - | - | 1 |

DEF0029

**Public Mass Shootings Data**
**1982 – 2019**

| | Case | Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|------|----------|------|--------|------|------|------|------|------|------|------|------|
| | | | | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
| 59. | Grand Rapids | Grand Rapids, MI | 7/7/11 | CC | Yes | No | 7 | 2 | 9 | 10 | - | 1 |
| 60. | Family law practice | Yuma, AZ | 6/2/11 | WaPo | - | - | 5 | 1 | 6 | - | - | 1 |
| 61. | Tucson | Tucson, AZ | 1/8/11 | CC/MJ/VP/WaPo | Yes | No | 6 | 13 | 19 | 33 | Yes | 1 |
| 62. | Jackson | Jackson, KY | 9/11/10 | VP | No | No | 5 | 0 | 5 | 12[t] | - | - |
| 63. | City Grill | Buffalo, NY | 8/14/10 | VP/WaPo | - | No | 4 | 4 | 8 | 10[u] | - | 1 |
| 64. | Hartford Beer Distributor | Manchester, CT | 8/3/10 | CC/MJ/VP/WaPo | Yes | No | 8 | 2 | 10 | 11 | Yes | 2 |
| 65. | Yoyito Café | Hialeah, FL | 6/6/10 | CC/VP/WaPo | No | No | 4 | 3 | 7 | 9[v] | - | - |
| 66. | Hot Spot Café | Los Angeles, CA | 4/3/10 | WaPo | - | No | 4 | 2 | 6 | 50[w] | - | 1 |
| 67. | Coffee Shop Police | Parkland, WA | 11/29/09 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | - | No | 2 |
| 68. | Fort Hood | Fort Hood, TX | 11/5/09 | CC/MJ/VP/WaPo | Yes | No | 13 | 32 | 45 | 214 | Yes | 1 |
| 69. | Worth Street | Mount Airy, NC | 11/1/09 | VP/WaPo | - | Yes | 4 | 0 | 4 | 16[x] | No | 1 |
| 70. | Binghamton | Binghamton, NY | 4/3/09 | CC/MJ/VP/WaPo | Yes | No | 13 | 4 | 17 | 99 | Yes | 2 |
| 71. | Carthage Nursing Home | Carthage, NC | 3/29/09 | CC/MJ/VP/WaPo | No | No | 8 | 2 | 10 | - | Yes | 2 |
| 72. | Skagit County | Alger, WA | 9/2/08 | VP/WaPo | - | No | 6 | 4 | 10 | - | No | 2 |
| 73. | Atlantis Plastics | Henderson, KY | 6/25/08 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 74. | Black Road Auto | Santa Maria, CA | 3/18/08 | VP/WaPo | - | No | 4 | 0 | 4 | 17[y] | - | 1 |
| 75. | Northern Illinois University | DeKalb, IL | 2/14/08 | CC/MJ/VP/WaPo | Yes | No | 5 | 21 | 26 | 54 | Yes | 4 |
| 76. | Kirkwood City Council | Kirkwood, MO | 2/7/08 | CC/MJ/VP/WaPo | No | No | 6 | 1 | 7 | - | No | 2 |
| 77. | Youth With a Mission and New Life Church | Colorado Springs, CO | 12/9/07 | VP/WaPo | Yes | Yes | 4 | 5 | 9 | 25[z] | - | 3 |
| 78. | Westroads Mall | Omaha, NE | 12/5/07 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 5 | 13 | 14 | No | 1 |
| 79. | Crandon | Crandon, WI | 10/7/07 | CC/MJ/WaPo | Yes | - | 6 | 1 | 7 | 30[aa] | Yes | 1 |
| 80. | Virginia Tech | Blacksburg, VA | 4/16/07 | CC/MJ/VP/WaPo | Yes | No | 32 | 17 | 49 | 176 | Yes | 2 |
| 81. | Trolley Square | Salt Lake City, UT | 2/12/07 | CC/MJ/VP/WaPo | No | No | 5 | 4 | 9 | - | No | 2 |
| 82. | Amish School | Lancaster County, PA | 10/2/06 | CC/MJ/VP/WaPo | No | No | 5 | 5 | 10 | - | Yes | 3 |
| 83. | The Ministry of Jesus Christ | Baton Rouge, LA | 5/21/06 | VP/WaPo | - | No | 5 | 1 | 6 | - | - | 1 |
| 84. | Capitol Hill | Seattle, WA | 3/25/06 | CC/MJ/VP/WaPo | Yes | Yes | 6 | 2 | 8 | - | Yes | 4 |
| 85. | Goleta Postal | Goleta, CA | 1/30/06 | CC/MJ/VP/WaPo | Yes | No | 7 | 0 | 7 | - | Yes | 1 |
| 86. | Sash Assembly of God | Sash, TX | 8/29/05 | VP/WaPo | - | No | 4 | 0 | 4 | - | - | 2 |
| 87. | Red Lake | Red Lake, MN | 3/21/05 | CC/MJ/VP/WaPo | No | No | 9 | 7 | 16 | - | No | 3 |

DEF0030

## Public Mass Shootings Data
## 1982 – 2019

| | Case | Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
| 88. | Living Church of God | Brookfield, WI | 3/12/05 | CC/MJ/VP/WaPo | Yes | No | 7 | 4 | 11 | - | Yes | 1 |
| 89. | Fulton County Courthouse | Atlanta, GA | 3/11/05 | VP/WaPo | - | No | 4 | 0 | 4 | - | No | 1 |
| 90. | Damageplan Show | Columbus, OH | 12/8/04 | CC/MJ/VP/WaPo | No | No | 4 | 3 | 7 | 15 [ab] | Yes | 1 |
| 91. | Hunting Camp | Meteor, WI | 11/21/04 | CC/VP/WaPo | Yes | Yes | 6 | 2 | 8 | 20 | - | 1 |
| 92. | ConAgra Foods Plant | Kansas City, KS | 7/3/04 | VP/WaPo | - | No | 6 | 1 | 7 | 10 [ac] | - | 2 |
| 93. | Stateline Tavern | Oldtown, ID | 10/24/03 | VP/WaPo | Yes | No | 4 | 0 | 4 | 14 [ad] | - | 1 |
| 94. | Windy City Warehouse | Chicago, IL | 8/27/03 | CC/VP/WaPo | No | No | 6 | 0 | 6 | - | - | 1 |
| 95. | Lockheed Martin | Meridian, MS | 7/8/03 | CC/MJ/VP/WaPo | - | No | 6 | 8 | 14 | - | Yes | 5 |
| 96. | Labor Ready | Huntsville, AL | 2/25/03 | VP/WaPo | - | No | 4 | 1 | 5 | - | - | 1 |
| 97. | Bertrand Products | South Bend, IN | 3/22/02 | VP/WaPo | - | No | 4 | 2 | 6 | - | - | 2 |
| 98. | Burns International Security | Sacramento, CA | 9/10/01 | VP/WaPo | Yes | Yes | 5 | 2 | 7 | 200 [ae] | - | 2 |
| 99. | Bookcliff RV Park | Rifle, CO | 7/3/01 | VP/WaPo | No | No | 4 | 3 | 7 | 6 [af] | - | 1 |
| 100. | Navistar | Melrose Park, IL | 2/5/01 | CC/MJ/VP/WaPo | Yes | No | 4 | 4 | 8 | - | Yes | 4 |
| 101. | Houston | Houston, TX | 1/9/01 | VP | - | No | 4 | 0 | 4 | - | - | - |
| 102. | Wakefield | Wakefield, MA | 12/26/00 | CC/MJ/VP/WaPo | Yes | - | 7 | 0 | 7 | 37 | Yes | 3 |
| 103. | Mount Lebanon | Pittsburgh, PA | 4/28/00 | VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 104. | Mi-T-Fine Car Wash | Irving, TX | 3/20/00 | VP/WaPo | - | No | 5 | 1 | 6 | - | - | - |
| 105. | Hotel | Tampa, FL | 12/30/99 | CC/MJ/VP/WaPo | No | No | 5 | 3 | 8 | - | Yes | 2 |
| 106. | Xerox | Honolulu, HI | 11/2/99 | CC/MJ/VP/WaPo | Yes | No | 7 | 0 | 7 | 28 | - | 1 |
| 107. | Wedgwood Baptist Church | Fort Worth, TX | 9/15/99 | CC/MJ/VP/WaPo | Yes | No | 7 | 7 | 14 | 30 | - | 2 |
| 108. | Atlanta Day Trading | Atlanta, GA | 7/29/99 | MJ/VP/WaPo | - | No | 9 | 13 | 22 | - | Yes | 4 |
| 109. | Albertson's Supermarket | Las Vegas, NV | 6/3/99 | VP/WaPo | - | No | 4 | 1 | 5 | - | - | 1 |
| 110. | Columbine High School | Littleton, CO | 4/20/99 | CC/MJ/VP/WaPo | Yes | Yes | 13 | 23 | 36 | 188 | No | 4 |
| 111. | New St. John Fellowship Baptist Church | Gonzalez, LA | 3/10/99 | VP/WaPo | - | No | 4 | 4 | 8 | - | - | 1 |
| 112. | Thurston High School | Springfield, OR | 5/21/98 | CC/MJ/VP/WaPo | Yes | No | 4 | 25 | 29 | 50 | No | 3 |
| 113. | Westside Middle School | Jonesboro, AR | 3/24/98 | CC/MJ/VP/WaPo | Yes | No | 5 | 10 | 15 | 26 | No | 9/10 |
| 114. | Connecticut Lottery | Newington, CT | 3/6/98 | CC/MJ/VP/WaPo | Yes | No | 4 | 0 | 4 | 5 | Yes | 1 |
| 115. | Caltrans Maintenance Yard | Orange, CA | 12/18/97 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 2 | 6 | 144 | Yes | 1 |
| 116. | Erie Manufacturing | Bartow, FL | 12/3/97 | VP | - | No | 4 | 0 | 4 | 12 [ag] | - | - |

## Public Mass Shootings Data
## 1982 – 2019

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|------|----------|------|--------|-------|-------|-------|-------|-------|-------|-------|-------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
| 117. R.E. Phelon Company | Aiken, SC | 9/15/97 | CC/MJ/VP/WaPo | No | No | 4 | 3 | 7 | - | No | 1 |
| 118. News and Sentinel | Colebrook, NH | 8/20/97 | VP/WaPo | - | Yes | 4 | 4 | 8 | - | - | 2 |
| 119. Fire Station | Jackson, MS | 4/25/96 | VP/WaPo | - | No | 5 | 3 | 8 | - | - | 3 |
| 120. Fort Lauderdale | Fort Lauderdale, FL | 2/9/96 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | 14 [ah] | Yes | 2 |
| 121. Little Chester Shoes | New York, NY | 12/19/95 | VP/WaPo | Yes | No | 5 | 3 | 8 | - | - | 1 |
| 122. Piper Technical Center | Los Angeles, CA | 7/19/95 | CC/VP/WaPo | Yes | No | 4 | 0 | 4 | - | - | - |
| 123. Walter Rossler Company | Corpus Christi, TX | 4/3/95 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | Yes | 2 |
| 124. Puppy creek | Hoke County, NC | 12/31/94 | VP | - | - | 5 | 1 | 6 | - | - | - |
| 125. Air Force Base | Fairchild Base, WA | 6/20/94 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 23 | 27 | 50 [ai] | Yes | 1 |
| 126. Chuck E. Cheese | Aurora, CO | 12/14/93 | CC/MJ/VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 127. Long Island Railroad | Garden City, NY | 12/7/93 | CC/MJ/VP/WaPo | Yes | No | 6 | 19 | 25 | 30 | Yes | 1 |
| 128. Unemployment Office | Oxnard, CA | 12/2/93 | VP/WaPo | - | - | 4 | 4 | 8 | - | - | - |
| 129. Family Fitness Club | El Cajon, CA | 10/14/93 | VP/WaPo | - | No | 4 | 0 | 4 | - | Yes | 1 |
| 130. Luigi's Restaurant | Fayetteville, NC | 8/6/93 | CC/MJ/VP/WaPo | No | No | 4 | 8 | 12 | - | Yes | 3 |
| 131. Washington County Bar | Jackson, MS | 7/8/93 | WaPo | - | - | 5 | 0 | 5 | - | - | 1 |
| 132. 101 California Street | San Francisco, CA | 7/1/93 | CC/VP/WaPo | Yes | Yes | 8 | 6 | 14 | 75 | No | 3 |
| 133. Card club | Paso Robles, CA | 11/8/92 | VP/WaPo | - | No | 6 | 1 | 7 | - | - | 1 |
| 134. Watkins Glen | Watkins Glen, NY | 10/15/92 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | - | Yes | 1 |
| 135. Lindhurst High School | Olivehurst, CA | 5/1/92 | CC/MJ/VP/WaPo | No | No | 4 | 10 | 14 | - | Yes | 2 |
| 136. Phoenix | Phoenix, AZ | 3/15/92 | VP | - | - | 4 | 0 | 4 | - | - | - |
| 137. Royal Oak Postal | Royal Oak, MI | 11/14/91 | CC/MJ/VP/WaPo | Yes | No | 4 | 4 | 8 | - | Yes | 1 |
| 138. Restaurant | Harrodsburg, KY | 11/10/91 | VP/WaPo | No | No | 4 | 0 | 4 | 6 [aj] | No | 1 |
| 139. University of Iowa | Iowa City, IA | 11/1/91 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 140. Luby's Cafeteria | Killeen, TX | 10/16/91 | CC/MJ/VP/WaPo | Yes | No | 23 | 20 | 43 | 100 | Yes | 2 |
| 141. Post office | Ridgewood, NJ | 10/10/91 | VP/WaPo | Yes | No | 4 | 0 | 4 | - | - | 2 |
| 142. GMAC | Jacksonville, FL | 6/18/90 | CC/MJ/VP/WaPo | Yes | No | 9 | 4 | 13 | 14 | Yes | 2 |
| 143. Standard Gravure Corporation | Louisville, KY | 9/14/89 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 12 | 20 | 21 | Yes | 5 |
| 144. Stockton Schoolyard | Stockton, CA | 1/17/89 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 29 | 34 | 106 | Yes | 2 |
| 145. Montefiore School | Chicago, IL | 9/22/88 | VP/WaPo | No | No | 4 | 2 | 6 | - | - | 1 |

DEF0032

## Public Mass Shootings Data
## 1982 – 2019

| | Case | Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
| 146. | Old Salisbury Road | Winston-Salem, NC | 7/17/88 | VP/WaPo | - | No | 4 | 5 | 9 | - | - | 1 |
| 147. | ESL | Sunnyvale, CA | 2/16/88 | CC/MJ/VP/WaPo | No | No | 7 | 4 | 11 | - | Yes | 7 |
| 148. | Shopping Centers | Palm Bay, FL | 4/23/87 | CC/MJ/VP/WaPo | Yes | No | 6 | 14 | 20 | 40 [ak] | Yes | 3 |
| 149. | United States Postal Service | Edmond, OK | 8/20/86 | CC/MJ/VP/WaPo | No | - | 14 | 6 | 20 | - | Yes | 3 |
| 150. | Anchor Glass Container Corporation | South Connellsville, PA | 3/16/85 | VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 151. | Other Place Lounge | Hot Springs, AR | 7/24/84 | VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 152. | San Ysidro McDonald's | San Ysidro, CA | 7/18/84 | CC/MJ/VP/WaPo | Yes | Yes | 21 | 19 | 40 | 257 | Yes | 3 |
| 153. | Dallas Nightclub | Dallas, TX | 6/29/84 | CC/MJ/VP/WaPo | Yes | No | 6 | 1 | 7 | - | No | 1 |
| 154. | Alaska Mining Town | Manley Hot Springs, AK | 5/17/84 | VP/WaPo | No | No | 7 | 0 | 7 | - | - | 1 |
| 155. | College Station | Collge Station, TX | 10/11/83 | VP | No | No | 6 | 0 | 6 | - | - | - |
| 156. | Alaska Back-County | McCarthy, AK | 3/1/83 | VP/WaPo | - | No | 6 | 2 | 8 | - | - | 2 |
| 157. | Upper West Side Hotel | New York, NY | 2/3/83 | VP | No | No | 4 | 1 | 5 | - | - | 1 |
| 158. | The Investor | Noyes Island, AK | 9/6/82 | WaPo | - | No | 8 | 0 | 8 | - | - | 1 |
| 159. | Welding Shop | Miami, FL | 8/20/82 | MJ/VP/WaPo | No | No | 8 | 3 | 11 | - | Yes | 1 |
| 160. | Western Transfer Co. | Grand Prairie, TX | 8/9/82 | VP/WaPo | - | No | 6 | 4 | 10 | - | - | 3 |
| 161. | Russian Jack Springs Park | Anchorage, AK | 5/3/82 | VP/WaPo | - | No | 4 | 0 | 4 | - | No | 1 |
| | | **Assault Weapon Average** | | | | | 11.6 | 26.5 | 38.1 | 152.2 | | |
| | | **Non-Assault Weapon Average** | | | | | 6.1 | 3.9 | 10.0 | 37.9 | | |
| | | **Large-Capacity Magazine Average** | | | | | 10.1 | 16.7 | 26.7 | 103.3 | | |
| | | **Non-Large Capacity Magazine Average** | | | | | 5.7 | 2.9 | 8.6 | 16.4 | | |

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982-2019: Data from Mother Jones' Investigation," updated December 11, 2019). MJ indicates a mass shooting identified by Mother Jones.

The Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017). CC indicates a mass shooting identified by Citizens Crime Commission of New York City data.

The Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting," updated December 18, 2019). WaPo indicates a mass shooting identified by The Washington Post.

The Violence Project ("Mass Shooter Database," accessed January 17, 2020). VP indicates a mass shooting identified by the Violence Project.

[a] Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition. Stories from Factiva and Google searches reviewed to determine whether an LCM was involved.

DEF0033

## Public Mass Shootings Data
## 1982 – 2019

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|------|----------|------|--------|-------------------------|--------------------|---------------|-------------|--------------------------------|----------------|------------------------------|------------------------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |

[b]  See Appendix C for details.

[c]  Offender(s) are not included in counts of fatalities and injuries. Stories from Factiva and Google searches reviewed to determine number of fatalities and injuries.

[d]  Except where noted, all data on shots fired obtained from CC.

[e]  The determination of whether guns were obtained legally is based on Mother Jones and Washington Post reporting.

[f]  "The Dayton gunman killed 9 people by firing 41 shots in 30 seconds. A high-capacity rifle helped enable that speed," CNN, August 5, 2019.

[g]  "Authorities Describe 'Confusion And Chaos' At Borderline Bar Shooting In California," NPR, November 28, 2018.

[h]  "Suspect in quadruple killing at car wash dies," CNN, January 30, 2018.

[i]  "California gunman fired 30 rounds at elementary school, left when he couldn't get inside," ABC News, November 15, 2017.

[j]  "'Be quiet! It's him!' Survivors say shooter walked pew by pew looking for people to shoot,"CNN, November 9, 2017.

[k]  "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," Las Vegas Review Journal , November 22, 2017

[l]  "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond,"Washington Post , January 9, 2017.

[m]  "'We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando,"The Telegraph , June 13, 2016.

[n]  "Two men charged with homicide in connection with Wilkinsburg backyard ambush,"Pittsburgh's Action News , June 24, 2016.

[o]  "San Bernardino Suspects Left Trail of Clues, but No Clear Motive,"New York Times , December 3, 2015.

[p]  "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage,"Los Angeles Times , June 4, 2014.

[q]  "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage,"NBC News , July 28, 2013.

[r]  "Police Call Santa Monica Gunman 'Ready for Battle,'"New York Times , June 8, 2013.

[s]  "Questions linger in slayings; investigation continues in rampage as community searches for answers on why gunman shot eight people,"The Beacon Journal , August 14, 2011.

[t]  "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops,"CBS News , September 13, 2010.

[u]  "Ex-gang member guilty of shooting 5 in deadly 17-second rampage,"NBC , April 1, 2011.

[v]  "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead,"Sun-Sentinel , June 7, 2010.

[w]  "Man convicted of killing 4 at Los Angeles restaurant,"Associated Press , March 15, 2016.

DEF0034

## Public Mass Shootings Data
## 1982 – 2019

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |

[x] "4 Victims In Mount Airy Shooting Related, Police Say," *WXII 12 News* , November 2, 2009.

[y] "Arrested suspect might have warned of Santa Maria shooting", *Associated Press* , March 20, 2008.

[z] "Profile: New information released on Matthew Murray, gunman in church-related shootings in Colorado; Larry Bourbannais, wounded in one of the shootings, discusses his experience, *NBC News* , December 11, 2007.

[aa] "Small Town Grieves for 6, and the Killer," *Los Angeles Times* , October 9, 2007.

[ab] "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," *New York Times* , January 15, 2005.

[ac] "Sixth person dies of injuries from shooting at Kansas meatpacking plant," *Associated Press* , July 3, 2004.

[ad] "Four Killed In Oldtown Shooting," *The Miner* , October 30, 2003.

[ae] "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press* , September 14, 2001.

[af] "Gunman kills 3, wounds 4 in Rifle rampage; mental patient is arrested," *The Denver Post* , April 2, 2015.

[ag] "Unfinished business," *Dateline NBC* , December 21, 2006.

[ah] "5 Beach Workers in Florida are Slain by Ex-Colleague," *New York Times* , February 10, 1996.

[ai] "Man Bent On Revenge Kills 4, Hurts 23 -- Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," *The Seattle Times* , June 21, 1994.

[aj] "Man Killed Estranged Wife, Three Others as They Drove to Dinner," *Associated Press* , November 11, 1991.

[ak] "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," *Chicago Tribune* , April 25, 1987.

DEF0035

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Assault Weapon? [d] |
|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1. | Jersey City Kosher Supermarket | Jersey City, NJ | 12/10/19 | - | - | mossberg 12-gauge; .22-caliber ruger Mark IV; AR-15-style rifle; Ruger 9mm semiautomatic pistol; 9mm glock 17 | No |
| 2. | Football-watching party | Fresno, CA | 11/17/19 | - | - | two semiautomatic handguns | No |
| 3. | Halloween Party | Orinda, CA | 11/1/19 | - | - | - | - |
| 4. | Tequila KC bar | Kansas City, KS | 10/6/19 | - | - | Handgun | No |
| 5. | Midland-Odessa Highways | Odessa, TX | 8/31/19 | - | **semiautomatic rifle** | **AR-style rifle** | Yes [e] |
| 6. | Dayton | Dayton, OH | 8/4/19 | - | **AR-15-style rifle**, with a **100-round capacity** ammunition drum | 23 caliber anderson AM-15 pistol **modified to function like an AR-15 rifle**, shotgun | Yes |
| 7. | El Paso Walmart | El Paso, TX | 8/3/19 | - | **AK-47-style rifle**, per authorities | 7.62 caliber **AK-47 style rifle** | Yes |
| 8. | Casa Grande Senior Mobile Estates | Santa Maria, CA | 6/19/19 | - | - | - | - |
| 9. | Virginia Beach Municipal Center | Virginia Beach, VA | 5/31/19 | - | .45-caliber handguns; noise suppressor (silencer); several high-capacity magazines | .45 caliber handgun with noise suppressor, .45 caliber handgun | No |
| 10. | Henry Pratt Co. | Aurora, IL | 2/15/19 | - | Smith & Wesson handgun, with a green sighting laser | .40-caliber Smith & Wesson semiautomatic handgun | No |
| 11. | SunTrust Bank | Sebring, FL | 1/23/19 | - | 9 mm handgun | 9mm semiautomatic handgun | No |
| 12. | Borderline Bar & Grill | Thousand Oaks, CA | 11/7/18 | - | Glock 21, .45 caliber; high-capacity magazine | Glock 21 .45-caliber handgun | No |
| 13. | Tree of Life Synagogue | Pittsburgh, PA | 10/27/18 | - | **AR-15**; Glock .357 | **Colt AR-15 semiautomatic rifle**, three glock .357 pistols | Yes [f] |
| 14. | T&T Trucking | Bakersfield, CA | 9/12/18 | - | - | .50-caliber Smith & Wesson 500 | No [g] |
| 15. | Capital Gazette | Annapolis, MD | 6/28/18 | - | 12-gauge pump-action shotgun | 2 gauge shotgun | No |
| 16. | Santa Fe High School | Santa Fe, TX | 5/18/18 | - | shotgun; .38 revolver | .38 caliber revolver, shotgun | No |
| 17. | Waffle House | Nashville, TN | 4/22/18 | - | **AR-15** | **AR-15-style semiautomatic rifle** | Yes [h] |
| 18. | Detroit | Detroit, MI | 2/26/18 | - | - | - | No |
| 19. | Stoneman Douglas HS | Parkland, FL | 2/14/18 | - | AR-15 | .223 caliber smith & wesson M&P 15 semiautomatic ar 15 rifle | No [i] |
| 20. | Pennsylvania Carwash | Melcroft, PA | 1/28/18 | - | semiautomatic rifle and semiautomatic handgun | AR-15 .223-caliber semiautomatic rifle; 9mm handgun | - [j] |
| 21. | Rancho Tehama | Rancho Tehama, CA | 11/14/17 | - | Two illegally modified rifles | **two semiautomatic rifles**; two handguns | Yes [k] |
| 22. | Texas First Baptist Church | Sutherland Springs, TX | 11/5/17 | - | **Ruger AR-556**; Kelley also possessed semiautomatic handguns | 9mm Glock pistol; Ruger .22-caliber; **Ruger AR-556** | Yes [l] |

**DEF0036**

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | | | Weapon Description From | | | Assault |
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
|------|----------|------|-------------------------------|-----------------|---------------------|------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 23.  Las Vegas Strip | Las Vegas, NV | 10/1/17 | - | **AR-15-style and AK-47-style rifles** and "a large cache of ammunition"; four **Daniel Defense DDM4 rifles**, three FN-15s and other rifles made by Sig Sauer. | - | Yes [m] |
| 24.  Taos and Rio Arriba counties | Abiquiu, NM | 6/15/17 | - | - | .38 caliber revolver | No |
| 25.  Fiamma Workplace | Orlando, FL | 6/5/17 | - | semiautomatic handgun | semiautomatic rifle (2); handgun (2) | No |
| 26.  Marathon Savings Bank | Rothschild, WI | 3/22/17 | - | - | Rifle, handgun | No |
| 27.  Club 66 | Yazoo City, MS | 2/6/17 | - | - | - | - |
| 28.  Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/17 | - | Walther 9mm semi-automatic pistol | 9mm semiautomatic handgun | No |
| 29.  Cascade Mall | Burlington, WA | 9/23/16 | - | Ruger .22-caliber | Ruger .22-caliber rifle | No [n] |
| 30.  Dallas Police | Dallas, TX | 7/7/16 | - | **Izhmash-Saiga 5.45mm (AK-style) semiautomatic rifle** with large capacity magazines; Glock 9mm handgun, .25-caliber semiautomatic handgun | **SKS-type semiautomatic rifle** | Yes [o] |
| 31.  Walgreens Parking Lot | Las Vegas, NV | 6/29/16 | - | - | - | - |
| 32.  Orlando Nightclub | Orlando, FL | 6/12/16 | - | **Sig Sauer MCX rifle**, Glock 17 9mm; high-capacity magazines (30 rounds) | **.223-caliber Sig Sauer MCX semiautomatic rifle**; 9mm semiautomatic glock 17 pistol | Yes [p] |
| 33.  Franklin Avenue Cookout | Wilkinsburg, PA | 3/9/16 | - | - | **AK-47-style rifle**, .40-caliber handgun | Yes |
| 34.  Kalamazoo | Kalamazoo County, MI | 2/20/16 | - | 9 mm handgun (ammo used unclear) | Walther P-99 9mm semiautomatic handgun | No |
| 35.  San Bernardino | San Bernardino, CA | 12/2/15 | - | **Two semiautomatic AR-15-style rifles—one a DPMS A-15, the other a Smith & Wesson M&P15**, both with .223 caliber ammunition. Two 9mm semiautomatic handguns. High capacity magazines. | **DPMS AR-15-style rifle; Smith & Wesson M&P AR-15-style rifle**; Llama semiautomatic 9mm pistol; Smith & Wesson semiautomatic 9mm pistol | Yes [q] |
| 36.  Tennessee Colony campsite | Anderson County, TX | 11/15/15 | - | - | - | - |
| 37.  Umpqua Community College | Roseburg, OR | 10/1/15 | - | 9 mm Glock pistol, .40 caliber Smith & Wesson, .40 caliber Taurus pistol, .556 caliber Del-Ton; (ammo details unclear) | rifle; five pistols | No [r] |
| 38.  Chattanooga Military Center | Chattanooga, TN | 7/16/15 | - | **AK-47**, AR-15, and 30-round magazines; 9mm handgun | AR-15-style semiautomatic rifle; 9mm pistol; **AK-47-type semiautomatic rifle** | Yes [s] |
| 39.  Charleston Church | Charleston, SC | 6/17/15 | - | .45-caliber Glock (model 41, with 13-round capacity magazine) | .45-caliber glock 41 pistol | No |
| 40.  Marysville High School | Marysville, WA | 10/24/14 | - | Beretta .40-caliber handgun | .40-caliber beretta pistol | No |

DEF0037

## List of Firearms Used in Public Mass Shootings
## 1982 – 2019

| | Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|---|
| | | | | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 41. | Isla Vista | Santa Barbara, CA | 5/23/14 | - | Two Sig Sauer P226 semiautomatic pistols and Glock 34 pistol, and hundreds of rounds of ammo. A 6- inchand 8-inch "SRK" and "Boar Hunter" hunting knives. | Sig Sauer P226s pistol; Glock 34 pistol; Sig Sauer P226s pistol | No |
| 42. | Alturas Tribal | Alturas, CA | 2/20/14 | - | 9mm semi-automatic handgun | Unknown | No |
| 43. | Washington Navy Yard | Washington, D.C. | 9/16/13 | - | Remington 870 Express 12-gauge shotgun; Beretta handgun | beretta pistol; Remington 970 Express 12-gauge shotgun | No |
| 44. | Hialeah | Hialeah, FL | 7/26/13 | - | Glock 17 | Glock 17 pistol | No |
| 45. | Santa Monica | Santa Monica, CA | 6/7/13 | - | **.223-caliber semi-automatic assault rifle**, about 40 high capacity magazines, "black powder" handgun (likely antique) | Black powder .33-caliber handgun; **AR-15 type .223-caliber semiautomatic rifle** | Yes [t] |
| 46. | Federal Way | Federal Way, WA | 4/21/13 | - | .40 caliber semi-automatic handgun, pistol grip shotgun | .40 caliber semiautomatic pistol; pistol grip shotgun | No [u] |
| 47. | Upstate New York | Herkimer County, NY | 3/13/13 | - | Unknown | Unknown | No [v] |
| 48. | Newtown School | Newtown, CT | 12/14/12 | An unknown make and model .22-caliber rifle, a **Bushmaster XM15 .223-caliber semiautomatic assault rifle** equipped with a 30-round large capacity ammunition magazine, and a GLOCK 10mm handgun were used. According to the Danbury State's Attorney, police also recovered in Lanza's possession a SIG SAUER P226 9mm handgun and three loaded 30-round large capacity ammunition magazines for the Bushmaster. Six additional 30-round large capacity ammunition magazines were recovered at the scene. A loaded unknown make and model 12-gauge shotgun was found in the passenger compartment of the car (later moved to the trunk by police). All of the guns used in the shooting were purchased by Lanza's mother. | 10mm Glock, 9mm SIG Sauer P226 semiautomatic handguns; **.223 Bushmaster XM15-E2S semiautomatic rifle**; Izhmash Saiga-12 12-gauge semiautomatic shotgun | 9mm SIG Sauer P226 pistol ;Savage Mark II bolt-action .22-caliber rifle; **.223 Bushmaster XM15-E2S semiautomatic rifle**; izhmash Saiga 12-gauge semiautomatic shotgun; 10mm Glock pistol | Yes [w] |
| 49. | Accent Signage Systems | Minneapolis, MN | 9/27/12 | **GLOCK 19 9mm semiautomatic pistol equipped with a 15-round large capacity ammunition magazine.** Engeldinger purchased the firearm one year before the shooting at KGS Guns and Ammo in Minneapolis after passing a background check and obtaining a permit to purchase. Police reportedly found packaging for 10,000 rounds of ammunition and another handgun in Engeldinger's home. | 9mm Glock semiautomatic handgun | 9mm glock pistol | No |

DEF0038

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| Case | Location | Date | Weapon Description From — Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Assault Weapon? [d] |
|------|----------|------|------------------------------|-------------|----------------|----------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 50. Sikh Temple | Oak Creek, WI | 8/5/12 | **Springfield Armory XD(M) 9mm semiautomatic handgun equipped with a 19-round large capacity ammunition magazine. Weeks before the shooting, Wade legally purchased the handgun and three 19-round large capacity ammunition magazines from a federal firearms licensed dealer in nearby West Allis, WI. According to media reports, Wade served in the U.S. Army from 1992 until 1998, when he was given an other-than-honorable discharge or general discharge. In 1994, while stationed at Fort Bliss in Texas, he was arrested by El Paso police, and pled guilty to a misdemeanor charge of criminal mischief. Federal law does not prohibit persons with convictions for misdemeanors other than domestic violence misdemeanors or persons who have been discharged from the military for reasons other than "dishonorably" from purchasing firearms.** | 9mm Springfield Armory XDM semiautomatic handgun | 9mm springfield armory XDM pistol | No |
| 51. Aurora Movie Theater | Aurora, CO | 7/20/12 | **A Smith & Wesson M&P15 assault rifle equipped with a 100-round drum large capacity ammunition magazine, a Remington Model 870 12-gauge pump shotgun, and two GLOCK .40 caliber handguns, were recovered at the scene by police. In the months leading to the shooting, Holmes purchased the weapons and 6,000-rounds of ammunition at gun shops and over the Internet. In addition to the weapons used in the shooting, Holmes booby-trapped his apartment, rigging trip wire to detonate 30 plastic shells stuffed with gunpowder, several glass jars filled with gasoline and gunpowder, and 10 gallons of gasoline in canisters.** | Two .40-caliber Glock semiautomatic handguns; **.223-caliber Smith & Wesson M&P15 semiautomatic rifle**; 12-gauge Remington 870 pump-action shotgun | .40-caliber glock pistol; 12-gauge pump-action Remington 870 shotgun; **.223-caliber Smith & Wesson M&P15 semiautomatic AR-15-style rifle** | Yes [x] |
| 52. Seattle Café | Seattle, WA | 5/30/12 | - | Two .45-caliber semiautomatic handguns | .45-caliber pistol (2) | No |
| 53. Oikos University | Oakland, CA | 4/2/12 | - | .45-caliber semiautomatic handgun | .45-caliber pistol | No |
| 54. Su Jung Health Sauna | Norcross, GA | 2/22/12 | - | .45-caliber semiautomatic handgun | - | No |
| 55. Seal Beach | Seal Beach, CA | 10/14/11 | - | .45-caliber Heckler & Koch, 9mm Springfield semiautomatic handguns; .44 Magnum Smith & Wesson revolver | - | No |
| 56. IHOP | Carson City, NV | 9/6/11 | **AK-47 type assault rifle** equipped with a 30-round large capacity ammunition magazine. Two additional guns and two more magazines were found in his vehicle. | **AK-47 Norinco Arms variant, AK-47 Romarm Cugir variant rifles**; .38-caliber Colt revolver | **AK-47 variant semiautomatic rifle** | Yes [y] |
| 57. Akron | Akron, OH | 8/7/11 | - | - | - | No [z] |
| 58. Forum Roller World | Grand Prairie, TX | 7/23/11 | - | - | - | No [aa] |
| 59. Grand Rapids | Grand Rapids, MI | 7/7/11 | **GLOCK 9mm semiautomatic pistol (unknown model) equipped with a 30-round large capacity ammunition magazine.** | - | - | No |
| 60. Family law practice | Yuma, AZ | 6/2/11 | - | - | - | - |

Page 4 of 15

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|---|
| | | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 61. | Tucson | Tucson, AZ | 1/8/11 | GLOCK 19 9mm semiautomatic pistol equipped with a 33-round large capacity ammunition magazine. Loughner was also carrying two 15-round large capacity ammunition magazines, and a knife. The ATF determined Loughner legally purchased the GLOCK pistol with an extended magazine and one box of Winchester ammunition on November 30, 2010, from Sportsman's Warehouse in Tucson. | 9mm Glock 19 semiautomatic handgun | 9mm glock 19 pistol | No |
| 62. | Jackson | Jackson, KY | 9/11/10 | - | - | - | No [ab] |
| 63. | City Grill | Buffalo, NY | 8/14/10 | - | - | 9mm pistol | No |
| 64. | Hartford Beer Distributor | Manchester, CT | 8/3/10 | Two Ruger SR9 9mm semiautomatic pistols equipped with 17-round magazines. Thornton purchased both firearms legally from an East Windsor, CT gun dealer. | Two 9mm Ruger SR9 semiautomatic handguns | 9mm Ruger SR9 pistol (2) | No |
| 65. | Yoyito Café | Hialeah, FL | 6/6/10 | - | - | .45-caliber Glock pistol | No [ac] |
| 66. | Hot Spot Café | Los Angeles, CA | 4/3/10 | - | - | - | No [ad] |
| 67. | Coffee Shop Police | Parkland, WA | 11/29/09 | - | 9mm Glock 17 semiautomatic handgun; .38-caliber Smith & Wesson revolver | .38-caliber Smith & Wesson revolver; 9mm Glock 17 pistol | No |
| 68. | Fort Hood | Fort Hood, TX | 11/5/09 | FN Herstal 5.7 Tactical Pistol equipped with 20-round large capacity ammunition magazine. When Hasan was apprehended, investigators found in his possession 177-rounds in 30-round and 20-round large capacity ammunition magazines, another handgun, a revolver, and two gunsights (for different lighting conditions). Hasan purchased the FN Herstal 5.7 Tactical Pistol legally at Guns Galore, a shop in Killeen, TX | FN Five-seven semiautomatic handgun | FN Five-seven pistol | No |
| 69. | Worth Street | Mount Airy, NC | 11/1/09 | - | - | High-powered **assault-style rifle** | Yes |
| 70. | Binghamton | Binghamton, NY | 4/3/09 | Beretta .45-caliber semiautomatic pistol, Beretta 9mm semiautomatic pistol (models unknown), and two 30-round large capacity ammunition magazines and two 15-round large capacity ammunition magazines. | 9mm Beretta, .45-caliber Springfield semiautomatic handguns | 9mm Beretta pistol; .45-caliber Springfield pistol | No |
| 71. | Carthage Nursing Home | Carthage, NC | 3/29/09 | - | Winchester 1300 pump-action shotgun; .357 Magnum revolver | .357 magnum revolver; Winchester 1300 pump-action shotgun | No |
| 72. | Skagit County | Alger, WA | 9/2/08 | - | - | lever-action winchester rifle, handgun | No |
| 73. | Atlantis Plastics | Henderson, KY | 6/25/08 | - | .45-caliber Hi-Point semiautomatic handgun | .45-caliber Hi-Point pistol | No |
| 74. | Black Road Auto | Santa Maria, CA | 3/18/08 | - | - | semiautomatic handgun | No |

DEF0040

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 75. Northern Illinois University | DeKalb, IL | 2/14/08 | SIG SAUER Kurz 9mm semiautomatic pistol, Hi-Point CF380 .380 caliber semiautomatic pistol, GLOCK 19 9mm semiautomatic pistol, Remington Sportsman 48 12-gauge shotgun, and 33-round and 15-round large capacity ammunition magazines. Kazmierczak purchased all four weapons from Tony's Gun & Ammo in Champaign, IL between August 3, 2007 and February 9, 2008. Kazmierczak also purchased gun accessories from a website operated by TGSCOM, Inc., the same company patronized by the VA Tech shooter. | 9mm Glock 19, Hi-Point CF380, 9mm Kurz SIG Sauer P232 semiautomatic handguns; 12-gauge Remington Sportsman 48 sawed-off shotgun | 12-gauge Remington Sportsman 48 sawed-off shotgun; 9mm glock 19 pistol; 9mm Kurz SIG Sauer P232 pistol; Hi-Point CF380 pistol | No [ae] |
| 76. Kirkwood City Council | Kirkwood, MO | 2/7/08 | - | .40-caliber Smith & Wesson semiautomatic handgun; .44 Magnum Smith & Wesson Model 29 revolver | .40-caliber Smith & Wesson pistol; .44 Magnum Smith & Wesson Model 29 revolver | No |
| 77. Youth With a Mission and New Life Church | Colorado Springs, CO | 12/9/07 | - | - | A pistol, **.223-caliber Bushmaster XM16 rifle**, .40-caliber Beretta pistol | Yes |
| 78. Westroads Mall | Omaha, NE | 12/5/07 | WASR-10 semiautomatic assault rifle and two 30-round large capacity ammunition magazines. | **WASR-10 Century Arms** semiautomatic rifle | **WASR-10 Century Arms** semiautomatic rifle | Yes [af] |
| 79. Crandon | Crandon, WI | 10/7/07 | - | AR-15 SWAT semiautomatic rifle | AR-15-style semiautomatic rifle | - [ag] |
| 80. Virginia Tech | Blacksburg, VA | 4/16/07 | GLOCK 19 9mm semiautomatic pistol and Walther P22 .22-caliber semiautomatic pistol. Investigators found a total of 17 empty magazines at the scene of the shooting, a mix of several 15-round, and 10-round magazines loaded with hollow-point rounds (bullets with the tip hollowed out, designed to expand upon impact). He possessed over 400 rounds of ammunition. Cho ordered the Walther P22 from a website operated by TGSCOM, Inc. Kazmierczak patronized the same company before the NIU shooting. On February 9, 2007, Cho picked up the pistol from J-N-D Pawn-brokers, located across the street from the VA Tech campus. In compliance with the state law limiting handgun purchases to one every 30 days, Cho purchased the GLOCK 19 on March 13, 2007. He also purchased five 10-round magazines from eBay in March. Cho's purchase of these firearms was in violation of federal law; he was disqualified from purchasing or possessing a firearm and ammunition, because a special justice of the Montgomery County General District Court had found him to be a danger to himself on December 14, 2005. | 9mm Glock 19, .22-caliber Walther P22 semiautomatic handguns | .22-caliber Walther P22 pistol; 9mm Glock 19 pistol | No |
| 81. Trolley Square | Salt Lake City, UT | 2/12/07 | - | Mossberg Maverick 88 Field shotgun; .38-caliber Smith & Wesson M36 revolver | .38-caliber Smith & Wesson M36 revolver; Mossberg Maverick 88 Field shotgun | No |
| 82. Amish School | Lancaster County, PA | 10/2/06 | - | Springfield semiautomatic handgun; .30-06 Ruger bolt-action rifle; 12-gauge Browning pump-action shotgun | 12-gauge Browning pump-action shotgun; .30-06 Ruger bolt-action rifle; Springfield 9mm semiautomatic handgun | No [ah] |
| 83. The Ministry of Jesus Christ | Baton Rouge, LA | 5/21/06 | - | - | - | No [ai] |

DEF0041

## List of Firearms Used in Public Mass Shootings
## 1982 – 2019

| | | | Weapon Description From | | | Assault |
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 84. Capitol Hill | Seattle, WA | 3/25/06 | - | .40-caliber Ruger, one other semiautomatic handgun; **Bushmaster XM15 E2S semiautomatic rifle**; 12-gauge Winchester Defender pump-action shotgun with extended tube and pistol grip | 12-gauge pump-action Winchester Defender shotgun; .40-caliber Ruger pistol | Yes [aj] |
| 85. Goleta Postal | Goleta, CA | 1/30/06 | **Smith & Wesson 915 9mm semiautomatic handgun equipped with a 15-round large capacity ammunition magazine. San Marco purchased the firearm at a pawn shop in New Mexico in August 2005.** | 9mm Smith & Wesson 915 semiautomatic handgun | 9mm Smith & Wesson 915 pistol | No |
| 86. Sash Assembly of God | Sash, TX | 8/29/05 | - | | 9mm semiautomatic pistol, .38-caliber revolver | No |
| 87. Red Lake | Red Lake, MN | 3/21/05 | - | .40-caliber Glock 23, .22-caliber Ruger semiautomatic handguns; 12-gauge Remington 870 shotgun | .22-caliber Ruger pistol (2); 12-gauge Remington 870 shotgun | No |
| 88. Living Church of God | Brookfield, WI | 3/12/05 | - | 9mm Beretta semiautomatic handgun | 9mm beretta pistol | No |
| 89. Fulton County Courthouse | Atlanta, GA | 3/11/05 | - | - | 9mm pistol | No |
| 90. Damageplan Show | Columbus, OH | 12/8/04 | - | 9mm Beretta 92FS semiautomatic handgun | 9mm beretta 92FS pistol | No |
| 91. Hunting Camp | Meteor, WI | 11/21/04 | **SKS 7.62mm semiautomatic assault rifle equipped with a 20-round large capacity ammunition** magazine. | - | **7.62mm SKS semiautomatic rifle** | Yes [ak] |
| 92. ConAgra Foods Plant | Kansas City, KS | 7/3/04 | - | - | 9mm pistol, revolver | No |
| 93. Stateline Tavern | Oldtown, ID | 10/24/03 | - | - | semiautomatic pistol | No |
| 94. Windy City Warehouse | Chicago, IL | 8/27/03 | - | - | .38-caliber Walther pistol | No [al] |
| 95. Lockheed Martin | Meridian, MS | 7/8/03 | - | .45-caliber Ruger P90 semiautomatic handgun; .22-caliber rifle with scope, .223-caliber Ruger Mini-14 rifle; 12-gauge Winchester 1300 shotgun; .22 Magnum derringer | .223-caliber Ruger Mini-14 rifle; 12-gauge Winchester 1300 shotgun | No [am] |
| 96. Labor Ready | Huntsville, AL | 2/25/03 | - | - | semiautomatic 9mm pistol | No |
| 97. Bertrand Products | South Bend, IN | 3/22/02 | - | - | .22-caliber rifle, sawed-off shotgun | No |
| 98. Burns International Security | Sacramento, CA | 9/10/01 | - | - | **AK-47-type semiautomatic rifle**, 9mm pistol | Yes [an] |
| 99. Bookcliff RV Park | Rifle, CO | 7/3/01 | - | - | .38 caliber Charter Arms revolver | No |
| 100. Navistar | Melrose Park, IL | 2/5/01 | - | SKS 1954R, .30-caliber Winchester rifles; 12-gauge Remington pump-action shotgun; .38-caliber revolver | 12-gauge Remington pump-action shotgun; SKS 1954R rifle; .30-caliber Winchester rifle; .38-caliber revolver; | No [ao] |
| 101. Houston | Houston, TX | 1/9/01 | - | - | - | No [ap] |

DEF0042

## List of Firearms Used in Public Mass Shootings
## 1982 – 2019

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|-------------------------|-|-|----------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 102. Wakefield | Wakefield, MA | 12/26/00 | **AK-47-type semiautomatic assault rifle**, unknown make and model 12-gauge shotgun, unknown make and model .32-caliber semiautomatic pistol, and 60-round large capacity ammunition magazine. | .32-caliber Retolaza semiautomatic handgun; **AK-47 variant semiautomatic rifle**; 12-gauge Winchester 1300 pump-action shotgun | .32-caliber Retolaza pistol; AK-47 variant semiautomatic rifle; 12-gauge Winchester 1300 pump-action shotgun | - [aq] |
| 103. Mount Lebanon | Pittsburgh, PA | 4/28/00 | - | - | .357 Magnum revolver | No |
| 104. Mi-T-Fine Car Wash | Irving, TX | 3/20/00 | - | - | semiautomatic .9mm pistol | No |
| 105. Hotel | Tampa, FL | 12/30/99 | - | 9mm Lorcin semiautomatic handgun; .38-caliber Charter Arms revolver | .38-caliber Charter Arms revolver; 9mm Lorcin pistol | No |
| 106. Xerox | Honolulu, HI | 11/2/99 | **GLOCK 17 9mm semiautomatic pistol and three 17-round large capacity ammunition magazines, loaded with hollow point bullets (bullets with the tip hollowed out, designed to expand upon impact). Uyesugi legally purchased the GLOCK in 1989.** | 9mm Glock 17 semiautomatic handgun | 9mm Glock 17 pistol | No |
| 107. Wedgwood Baptist Church | Fort Worth, TX | 9/15/99 | **Ruger P85 9mm semiautomatic pistol, unknown make and model .380 caliber semiautomatic pistol, and three 15-round large capacity ammunition magazines. Ashbrook legally acquired both weapons from federally licensed firearms dealers in 1992.** | .380-caliber, 9mm Ruger P85 semiautomatic handguns | .380-caliber revolver; 9mm Ruger P85 pistol | No |
| 108. Atlanta Day Trading | Atlanta, GA | 7/29/99 | - | .45-caliber Colt 1911-A1, 9mm Glock 17, .25-caliber Raven Arms MP-25 semiautomatic handguns; .22-caliber Harrington & Richardson revolver | .45-caliber Colt 1911-A1 pistol; .22-caliber Harrington & Richardson revolver; .25-caliber Raven Arms Mp-25 pistol; 9mm Glock 17 pistol | No |
| 109. Albertson's Supermarket | Las Vegas, NV | 6/3/99 | - | - | 12-gauge pump-action shotgun | No |
| 110. Columbine High School | Littleton, CO | 4/20/99 | **Savage Springfield 67H 12-gauge pump-action shotgun, Savage Stevens 311D 12-gauge sawedoff shotgun, Hi-Point 995 9mm semiautomatic rifle, INTRATEC TEC-DC9 9mm semiautomatic pistol,** and thirteen 10-round magazines, one 52-, one 32-, one 28-round large capacity ammunition magazines. Harris and Klebold illegally acquired the shotguns and Hi- Point rifle through a "straw purchase" (a transaction in which a legal buyer makes a purchase for someone who cannot legally purchase the firearm). Their friend, Robyn Anderson, purchased the three firearms at the Tanner Gun Show from unlicensed sellers in December of 1998. A pizza shop employee, Mark Manes, illegally sold them the INTRATEC TEC-DC9. | **9mm Intratec DC-9 semiautomatic handgun; 9mm Hi-Point 995 carbine rifle;** 12-gauge sawed-off Savage Stevens 311D, 12-gauge sawed-off Savage Springfield 67H pump-action shotguns | **9mm Hi-Point 995 carbine**; 12-gauge sawed-off Savage Stevens 311D pistol; 12-gauge sawed-off Savage Springfield 67H pump-action shotgun; **9mm Intratec DC-9 machine pistol** | Yes [ar] |
| 111. New St. John Fellowship Baptist Church | Gonzalez, LA | 3/10/99 | - | - | semiautomatic pistol | No |
| 112. Thurston High School | Springfield, OR | 5/21/98 | **GLOCK 19 9mm semiautomatic pistol, Ruger (unknown model) .22-caliber semiautomatic pistol, Ruger (unknown model) .22-caliber rifle, and a 50-round large capacity ammunition magazine. The GLOCK and rifle were legally purchased by Kinkel's father.** | 9mm Glock, .22-caliber Ruger semiautomatic handguns, .22-caliber Ruger rifle | 9mm Glock pistol; .22-caliber Ruger pistol; .22-caliber Ruger rifle | No [as] |

DEF0043

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | | | Weapon Description From | | | Assault |
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 113. Westside Middle School | Jonesboro, AR | 3/24/98 | **Universal M1 Carbine .30-caliber replica, Davis Industries .38-caliber two-shot derringer, Double Deuce Buddie .22-caliber two-shot derringer, Charter Arms .38-caliber revolver, Star .380-caliber pistol, FIE .380-caliber pistol, Ruger Security Six .357-caliber revolver, Ruger .44 magnum rifle, Smith & Wesson .38-caliber revolver, Remington 742 .30-06-caliber rifle, 15-round large capacity ammunition magazines, three 30-round large capacity ammunition magazines, and over 150-rounds of ammunition.** | FIE 380, .380-caliber Star semiautomatic handguns; .44 Magnum Ruger, .30-06 Remington 742, .30-caliber Universal M-1 carbine replica rifles; .38-caliber Charter Arms, .357-caliber Ruger Security Six, .38-caliber Smith & Wesson revolvers; .22-caliber Double Deuce Buddie two-shot, .38-caliber Davis Industries two-shot derringers | .22-caliber Double Deuce revolver; .380-caliber Star pistol; .357-caliber Ruger Security six revolver; .44 Magnum Ruger revolver; .30-caliber Universal M-1 carbine; .38-caliber Charter Arms revolver; .38-caliber Smith & Wesson revolver; FIE 380 pistol; .30-06 Remington 742 rifle | No [at] |
| 114. Connecticut Lottery | Newington, CT | 3/6/98 | **GLOCK model unknown 9mm semiautomatic pistol equipped with a 19-round large capacity ammunition magazine. Beck had a permit for the 9mm pistol used in the shooting.** | 9mm semiautomatic handgun | 9mm pistol | No |
| 115. Caltrans Maintenance Yard | Orange, CA | 12/18/97 | **Chinese-made AK-47-type 7.62mm semiautomatic assault rifle and five 30-round large capacity ammunition magazines. Torres legally purchased the rifle on April 30, 1988, from B&B Gun Sales in Orange County, CA.** | 7.62mm **AK-47** Chinese variant semiautomatic rifle | 7.62mm **AK-47** Chinese variant semiautomatic rifle | Yes |
| 116. Erie Manufacturing | Bartow, FL | 12/3/97 | - | - | - | No [au] |
| 117. R.E. Phelon Company | Aiken, SC | 9/15/97 | - | 9mm semiautomatic handgun | 9mm pistol | No |
| 118. News and Sentinel | Colebrook, NH | 8/20/97 | - | - | 9mm pistol, AR-15-style rifle | Yes [av] |
| 119. Fire Station | Jackson, MS | 4/25/96 | - | - | Mac 11 machine pistol, Tec 9 automatic pistol, .45-caliber semiautomatic handgun | No |
| 120. Fort Lauderdale | Fort Lauderdale, FL | 2/9/96 | - | 9mm Glock semiautomatic handgun; .32-caliber revolver | 9mm Glock pistol; .32-caliber revolver | No |
| 121. Little Chester Shoes | New York, NY | 12/19/95 | - | - | .9mm semiautomatic pistol | No |
| 122. Piper Technical Center | Los Angeles, CA | 7/19/95 | - | - | Glock semiautomatic pistol | No [aw] |
| 123. Walter Rossler Company | Corpus Christi, TX | 4/3/95 | - | 9mm Ruger semiautomatic handgun; .32-caliber revolver | .32-caliber revolver; 9mm Ruger pistol | No |
| 124. Puppy creek | Hoke County, NC | 12/31/94 | - | - | - | - |
| 125. Air Force Base | Fairchild Base, WA | 6/20/94 | **Chinese-made Mak-90 semiautomatic assault rifle equipped with a 75-round drum large capacity ammunition magazine. He purchased the assault rifle on June 15, 1994, five days before the shooting, and the following day purchased 80 rounds of 7.62x39mm ammunition and a 75-round drum large capacity ammunition magazine.** | **MAK-90 semiautomatic rifle** | MAK-90 semiautomatic AK-style rifle | Yes [ax] |
| 126. Chuck E. Cheese | Aurora, CO | 12/14/93 | - | .25-caliber semiautomatic handgun | .25-caliber pistol | No |
| 127. Long Island Railroad | Garden City, NY | 12/7/93 | **Ruger P89 9mm semiautomatic pistol and four 15-round large capacity ammunition magazines. Ferguson legally acquired the weapon in California at an outlet of Turner's Outdoorsman.** | 9mm Ruger P89 semiautomatic handgun | 9mm Ruger P89 pistol | No |

DEF0044

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 128. Unemployment Office | Oxnard, CA | 12/2/93 | - | - | Rifle | - |
| 129. Family Fitness Club | El Cajon, CA | 10/14/93 | - | - | 12-gauge shotgun | No |
| 130. Luigi's Restaurant | Fayetteville, NC | 8/6/93 | - | .22-caliber rifle; two 12-gauge shotguns | 12-gauge shotgun (2); .22-caliber rifle | No [ay] |
| 131. Washington County Bar | Jackson, MS | 7/8/93 | - | - | - | - |
| 132. 101 California Street | San Francisco, CA | 7/1/93 | **Two INTRATEC TEC-DC9 semiautomatic pistols**, Colt (unknown model) .45-caliber semiautomatic pistol, and 40-round and 50-round large capacity ammunition magazines loaded with a mix of Black Talon and standard ammunition. According to the Las Vegas Metropolitan Police Department, Ferri purchased the pistols from two stores in Las Vegas: Super Pawn and Pacific Tactical Weapons. | **Two Intratec DC-9**, .45-caliber Colt semiautomatic handguns | .45-caliber Colt pistol; **Intratec DC-9 machine pistols** | Yes [az] |
| 133. Card club | Paso Robles, CA | 11/8/92 | - | - | - | No [ba] |
| 134. Watkins Glen | Watkins Glen, NY | 10/15/92 | - | 9mm Llama semiautomatic handgun | 9mm Llama pistol | No |
| 135. Lindhurst High School | Olivehurst, CA | 5/1/92 | - | .22-caliber sawed-off rifle; 12-gauge pump-action shotgun | .22-caliber sawed-off rifle; 12-gauge pump-action shotgun | No [bb] |
| 136. Phoenix | Phoenix, AZ | 3/15/92 | - | - | - | - |
| 137. Royal Oak Postal | Royal Oak, MI | 11/14/91 | - | .22-caliber Ruger sawed-off semiautomatic rifle | .22-caliber Ruger sawed-off semiautomatic rifle | No [bc] |
| 138. Restaurant | Harrodsburg, KY | 11/10/91 | - | - | .357 Magnum | No |
| 139. University of Iowa | Iowa City, IA | 11/1/91 | - | .38-caliber Taurus revolver | .38-caliber Taurus revolver | No |
| 140. Luby's Cafeteria | Killeen, TX | 10/16/91 | **GLOCK 17 9mm semiautomatic pistol, Ruger P89 semiautomatic pistol, and 17-round and 15- round large capacity ammunition magazines. Hennard legally purchased the weapons from Mike's Gun Shop in Henderson, NV, in February and March of 1991.** | 9mm Glock 17, 9mm Ruger P89 semiautomatic handguns | 9mm Glock 17 pistol; 9mm Ruger P89 pistol | No |
| 141. Post office | Ridgewood, NJ | 10/10/91 | - | - | **9mm Uzi machine pistol**, .22-caliber machine gun | Yes |
| 142. GMAC | Jacksonville, FL | 6/18/90 | Universal M1 **.30-caliber semiautomatic assault rifle,** unknown make and model **.38-caliber revolver, and a 30-round large capacity ammunition magazine.** | .30-caliber Universal M1 carbine rifle; .38-caliber revolver | .30-caliber Universal M1 carbine; .38-caliber revolver | No [bd] |
| 143. Standard Gravure Corporation | Louisville, KY | 9/14/89 | **Chinese-made AK-47-type semiautomatic assault rifle,** two INTRATEC MAC-11 semiautomatic assault pistols, SIG SAUER unknown model 9mm semiautomatic pistol, unknown make and model .38-caliber revolver, and 30-round large capacity ammunition magazines. Wesbecker legally purchased the AK-47-type assault rifle from Tilford's Gun Sales in Louisville. | Two Intratec MAC-11, 9mm SIG Sauer semiautomatic handguns; **AK-47 Chinese variant semiautomatic rifle**; .38-caliber revolver | 9mm SIG Sauer pistol; **AK-47 Chinese variant semiautomatic rifle**; Intratec MAC-11 machine pistol; .38-caliber revolver; 9mm SIG Sauer pistol | Yes |

DEF0045

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| Case (1) | Location (2) | Date (3) | Weapon Description From | | | Assault Weapon?[d] (7) |
|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission[a] (4) | Mother Jones[b] (5) | Washington Post[c] (6) | |
| 144. Stockton Schoolyard | Stockton, CA | 1/17/89 | **Chinese-made AK-47-type semiautomatic assault rifle**, Taurus unknown model 9mm semiautomatic pistol, a 75-round large capacity ammunition drum magazine, a 75-round large capacity ammunition rotary magazine, and four 35-round large capacity ammunition banana magazines. Purdy legally purchased the AK-47-type rifle at Sandy Trading Post, in Sandy, OR on August 3, 1988, and the Taurus 9mm pistol at Hunter Loan and Jewelry Co. in Stockton, CA on December 28, 1988. | 9mm Taurus semiautomatic handgun; **AK-47 Chinese variant semiautomatic rifle** | 9mm Taurus pistol; **AK-47 Chinese variant semiautomatic rifle** | Yes |
| 145. Montefiore School | Chicago, IL | 9/22/88 | - | - | .38-caliber revolver | No |
| 146. Old Salisbury Road | Winston-Salem, NC | 7/17/88 | - | | .22-caliber rifle | No |
| 147. ESL | Sunnyvale, CA | 2/16/88 | - | .380 ACP Browning, 9mm Smith & Wesson semiautomatic handguns; Ruger M-77 .22-250 bolt-action rifle with scope; Mossberg 12-gauge pump-action, 12-gauge Benelli semiautomatic shotguns; .357 Magnum Smith & Wesson, .22 Sentinel WMR revolvers | .22 Sentinel WMR revolver; 9mm Smith & Wesson pistol; Mossberg 12-gauge pump-action shotgun; Ruger M-77 .22-250 bolt-action rifle with scope; .380 AP Browning pistol; 12-gauge Benelli semiautomatic shotgun; .357 Magnum Smith & Wesson revolver; | No [be] |
| 148. Shopping Centers | Palm Bay, FL | 4/23/87 | **Strum, Ruger Mini-14 semiautomatic assault rifle equipped with a 30-round large capacity ammunition magazine, five 30-round large capacity ammunition magazines, 180 rounds of ammunition, a shotgun (unknown make and model), and a pistol (unknown make and model). Cruse ordered the assault rifle on March 21, 1987. On April 17, 1987, he purchased 100-rounds of ammunition and six 30-round large capacity ammunition magazines.** | Sturm, Ruger Mini-14 semiautomatic rifle; 20-gauge Winchester pump-action shotgun; .357 Ruger Blackhawk revolver | .357 Ruger Blackhawk revolver; Ruger Mini-14 semiautomatic rifle; Sturm; 20-gauge Winchester pump-action | No [bf] |
| 149. United States Postal Service | Edmond, OK | 8/20/86 | - | .22-caliber, two .45-caliber Colt Model 1911-A1 semiautomatic handguns | .45-caliber Colt Model 1911-A1 pistol; .45-caliber Colt Model 1911-A1 pistol; .22-caliber pistol | - [bg] |
| 150. Anchor Glass Container Corporation | South Connellsville, PA | 3/16/85 | - | - | .38-caliber snub-nosed revolver | No |
| 151. Other Place Lounge | Hot Springs, AR | 7/24/84 | - | - | .45-caliber semiautomatic pistol | No |
| 152. San Ysidro McDonald's | San Ysidro, CA | 7/18/84 | - | 9mm Browning P35 Hi-Power semiautomatic handgun; **9mm Israeli Military Industries Uzi Model A carbine semiautomatic rifle**; 12-gauge Winchester 1200 pump-action shotgun | **9mm Israeli Military industries Uzi Model A machine pistol**, 12-gauge Winchester 1200 pump-action shotgun, 9mm Browning P35 Hi-Power pistol | Yes |
| 153. Dallas Nightclub | Dallas, TX | 6/29/84 | - | 9mm Smith & Wesson 459 semiautomatic handgun | 9mm Smith & Wesson 459 pistol | No [bh] |
| 154. Alaska Mining Town | Manley Hot Springs, AK | 5/17/84 | - | - | .30-06-caliber Ruger single-shot rifle | No |
| 155. College Station | Collge Station, TX | 10/11/83 | - | - | - | No [bi] |

DEF0046

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | | | Weapon Description From | | | Assault |
| | Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 156. | Alaska Back-County | McCarthy, AK | 3/1/83 | - | - | .223-caliber Ruger Mini-14 semiautomatic rifle, .22-caliber pistol | No |
| 157. | Upper West Side Hotel | New York, NY | 2/3/83 | - | - | - | No [bj] |
| 158. | The Investor | Noyes Island, AK | 9/6/82 | - | | .22-caliber | No |
| 159. | Welding Shop | Miami, FL | 8/20/82 | - | Mossberg 500 Persuader pump-action shotgun with pistol grip | 12-gauge shotgun | No |
| 160. | Western Transfer Co. | Grand Prairie, TX | 8/9/82 | - | - | .38-caliber revolver, .25-caliber semiautomatic pistol, carbine rifle | No |
| 161. | Russian Jack Springs Park | Anchorage, AK | 5/3/82 | - | - | .38-caliber pistol | No |

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982-2019: Data from Mother Jones' Investigation," updated December 11, 2019), the Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017), Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting,", updated December 18, 2019) and The Violence Project ("Mass Shooter Database," accessed January 17, 2020). Identified Assault Weapons are in bold.

[a] Description of weapons from "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017.

[b] Description of weapons from Mother Jones ("US Mass Shootings, 1982-2017: Data from Mother Jones' Investigation," updated December 11, 2019).

[c] Description of weapons from Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting,", updated December 18, 2019).

[d] California Penal Code sections 30510 and 30515 and California Code of Regulations, title 11, section 5499.

[e] "From Midland to Odessa, shooter cut a 64-minute path of terror," *Houston Chronicle*, September 8, 2019.

[f] "11 Killed in Synagogue Massacre; Suspect Charged With 29 Counts," *New York Times*, October 27, 2018.

[g] "Bakersfield mass shooting 'very calculated,' came after ugly divorce, officials say," *Los Angeles Times*, September 14, 2018; "Model S&W500," Smith & Wesson, https://www.smith-wesson.com/firearms/model-sw500-0, accessed September 25, 2018.

[h] "Authorities seized Waffle House shooting suspect's AR-15 after arrest, dad gave them back," *The Mercury News*, April 23, 2018; "Family of murder victim sues Waffle House suspect and his father for $100 million," *CBSWJTV*, July 11, 2018; "Family of Waffle House victim in Nashville sues accused shooter's father," Reuters, May 15, 2018.

[i] "Florida shooting suspect bought gun legally, authorities say," *USA Today*, February 15, 2018; "Florida school shooter's AR-15 may have jammed, saving lives, report says,"*Miami Herald*, February 27, 2018.

[j] "Suspect in quadruple killing at car wash dies," *CNN*, January 30, 2018.

[k] "California mass shooter made his own rifles," *NBC News*, November 16, 2017; "California shooter built his own illegal guns, officials say," *USA Today*, November 15, 2017.

[l] "What we know about the rifle used in the Texas church massacre," *CNN*, November 6, 2017; "The Latest: 2 men who pursued gunman attend shooting vigil," *The Associated Press*, November 6, 2017; "Ruger AR-556," *Ruger*, https://ruger.com/products/ar556/specSheets/8500.html, accessed October 22, 2018.

[m] "List: Guns and evidence from Las Vegas shooter Stephen Paddock," *KTNV*, January 19, 2018; "47 guns, loaded high-capacity magazines found in Vegas shooter's hotel suite and Nevada home," *ABC News*, October 4, 2017; "The 'tricked out' guns Las Vegas shooter used in massacre," *New York Post*, October 3, 2017.

DEF0047

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

n  "Washington shooting victims ranged in age from 16 to 95, coroners say," *CNN*, September 27, 2016; Brown, Jason, "What You Should Know About .22 Rimfire," NRA, August 16, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

o  "Exclusive: Photo of the Saiga AK-74 Rifle Used at Dallas Shooting," *Law Officer*, July 10, 2016.

p  "Sig MCX Owners Manual: Handling & Safety Instructions," *Sig Sauer*, https://www.sigsauer.com/wp-content/uploads/2016/07/MCX.pdf, accessed October 23, 2018; Sig Sauer website,

   https://www.sigsauer.com/products/firearms/rifles/?state_compliant=1103, accessed October 24, 2018.

q  "San Bernardino Guns Originally Bought Legally, Later Modified," *The Wall Street Journal*, December 4, 2015.

r  "Umpqua Community College 2015 shooting report: What we've learned," *The Oregonian*, September 8, 2017.

s  "Chattanooga Shooting Reignites Gun Control Debate After Mohammad Youssef Abdulazeez Used AK-47 Assault Weapon To Kill Marines," *International Business Times*, July 17, 2015; "Purple Hearts just approved for Marines and sailor targeted in

   Chattanooga attack," *The Washington Post*, December 17, 2015.

t  "John Zawahri, suspected gunman in deadly Santa Monica shooting, left farewell note, police say," *CBS News*, June 14, 2013.

u  "Names of victims emerge after deadly Federal Way shooting," *Federal Way Mirror*, April 24, 2013.

v  "Upstate New York Shooting Update: Kurt Myers, suspected gunman, killed by police in shootout," *CBS News*, March 14, 2013.

w  "Fate of Sandy Hook lawsuit against gun maker could be decided by a slingshot," *NBC News*, November 14, 2017; "Embargo firing a run on Russian-made guns: Added restrictions put arms in short supply," *San Antonio Express-News*, August 11, 2014.

x  "Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol," *New York Times*, July 24, 2012; "M&P15 Centerfire Rifles Safety & Instruction Manual," *Smith & Wesson*,

   https://www.smith-wesson.com/sites/default/files/owners-manuals/M%26P15_CF_Rifle_Manual_10-20-15.pdf, accessed October 25, 2018.

y  "IHOP gunman used illegally altered AK-47, sheriff says," *Las Vegas Review-Journal*, October 5, 2011.

z  "The mass killer, the cop and the armed citizen.(THE AYOOB FILES)," *The American Handgunner*, November 1, 2013.

aa  "6 Killed In Grand Prairie Roller Rink Shooting," *CBS DFW*, July 23, 2011.

ab  "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops," *CBS News*, September 13, 2010.

ac  "Hialeah: Only the Latest Mass Shooting by a Concealed Carry Killer," Huffington Post, July 30, 2013; "Hialeah gunman's rage over estranged wife leaves 5 dead," *Sun Sentinel*, June 7, 2010.

ad  "Man convicted of killing 4 at Los Angeles restaurant," *Associated Press*, March 15, 2016.

ae  "Instructions for Operation and Care of the Remington Model 11-'48, Sportsman-'48 Autoloading Shotguns," https://www.remington.com/sites/default/files/Model%2011-48.pdf, accessed October 24, 2018.

af  "Images, suicide note released in mall massacre," *Nation World News*, December 7, 2007; "Romanian Kalashnikov Rifles," guns.net, accessed at http://www.gunsnet.net/Linx310/model.htm on July 28, 2005 via the Internet Archive WayBack Machine

   (accessed September 26, 2018).

ag  "What happened in Crandon on Oct. 7," *Los Angeles Times*, June 8, 2008.

ah  "Firearms Tutorial: Terminology," https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

ai  "5 Dead After Louisiana Church Shooting," *New York Times*, May 21, 2006.

aj  "Police: Seattle shooter said 'plenty for everyone'," *NBC News*, March 27, 2006.

DEF0048

## List of Firearms Used in Public Mass Shootings
### 1982 – 2019

| | | | Weapon Description From | | | Assault |
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

[ak] "Both sides cite anger, hostility in killings; Hearings begin with law officers' testimony, grisly images," *Pioneer Press* , September 11, 2005.

[al] "Seven die in Chicago warehouse shooting," *CNN* , August 27, 2003.

[am] "Man Kills 5 Co-Works at Plant and Himself," *New York Times* , July 9, 2013; "Instruction Manuals & Product History," *Ruger* , https://ruger.com/service/productHistory.html, accessed October 23, 2018; Ruger Mini-14

manuals https://ruger-docs.s3.amazonaws.com/_manuals/mini14-180.pdf, https://ruger-docs.s3.amazonaws.com/_manuals/mini14-181-186.pdf, https://ruger-docs.s3.amazonaws.com/_manuals/mini14-580.pdf, accessed October 23, 2018; "What You Should

Know About .22 Rimfire," *NRA* , August 16, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

[an] "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press* , September 14, 2001.

[ao] "Workplace Deaths Leave No One Untouched," *Chicago Tribune* , February 7, 2001; "Update 1-Source of guns used in US factory shootings sought,"*Associated Press* , February 6, 2011; "SKS Rifle: Simonov Type 56,"*Department of the Army* , October 1969,

http://pdf.textfiles.com/manuals/FIREARMS/sks_56.pdf, accessed October 24, 2018; "Why .30-30 Winchester Will Never Die,"*NRA* , February 2, 2016; "Firearms Tutorial: Terminology,"

https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

[ap] "Houston Rampage Leaves 4 Victims, Gunman Dead,"*The Record* , January 10, 2001.

[aq] "Man Charged in Killings Evaded Strict Gun Laws,"*New York Times* , December 28, 2000.

[ar] "How they were equipped that day," *Jefferson County Sheriff* , http://www.cnn.com/SPECIALS/2000/columbine.cd/Pages/EQUIPMENT_TEXT.htm, accessed September 26, 2018.

[as] "What You Should Know About .22 Rimfire," *NRA* , August 16, 2017, Kipland Philip Kinkel v. Rob Persson, 13C13698;A155449 (2018); Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

[at] "Powerful, semiautomatic rifles in Jonesboro killers' arsenal," *Associated Press* , April 3, 1998; "Post WWII Commercially Manufactured M1 Carbines," *Universal Firearms* , http://www.m1carbinesinc.com/carbine_universal.html, accessed September 26,

2018; "77-Series Ruger 77/44," Ruger, https://ruger.com/products/77Series7744/models.html, accessed October 24, 2018; "Model 742," Remington, https://www.remington.com/sites/default/files/Model742.pdf, accessed October 24, 2018.

[au] "Unfinished business," *Dateline NBC* , December 21, 2006.

[av] "Explosive hoarded by killed of 4," *Chicago Tribune* , August 21, 1997

[aw] "High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States,"*Violence Policy Center* , accessed September 9, 2018.

[ax] "An Airman's Revenge: 5 Minutes of Terror,"*The New York Times* , June 22, 1994.

[ay] "Soldier from Pasco held in N.C. killings," St. Petersburg Times, August 8, 1993; "What You Should Know About .22 Rimfire," *NRA* , August 16, 2017.

[az] "San Francisco massacre prompts families' suits," *The Las Vegas Review-Journal* , May 19, 1994; "Death Over the Counter," *The Washington Post* , July 27, 1993; "TEC-DC9 Manual," Intratec Firearms,

http://pdf.textfiles.com/manuals/FIREARMS/intratec_tec_dc9.pdf, accessed October 22, 2018.

[ba] "Morro Bay changed forever by killings,"*The Fresno Bee* , November 10, 1992

[bb] "Gunman may have blamed teacher who flunked him," *Houston Chronicle* , May 3, 1992;  "What You Should Know About .22 Rimfire,"*NRA* , August 16, 2017.

[bc] "3 Killed, 8 Injured in Shooting Rampage at Post Office Center," *Los Angeles Times* , November 15, 1991; "A 'Primer' About Rimfire Vs. Centerfire Ammunition," *NRA* , November 21, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

[bd] "Post WWII Commercially Manufactured M1 Carbines," *Universal Firearms* , http://www.m1carbinesinc.com/carbine_universal.html, accessed September 26, 2018.

[be] "Firearms Tutorial: Terminology," https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

DEF0049

**List of Firearms Used in Public Mass Shootings**
**1982 – 2019**

| | | | Weapon Description From | | | Assault |
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| --- | --- | --- | --- | --- | --- | --- |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

bf   "Sales Of Exotic Weapons Are Mostly Cash And Carry," *Orlando Sentinel* , May 18, 1987; "Instruction Manuals & Product History," *Ruger* , https://ruger.com/service/productHistory.html, accessed October 23, 2018; and Ruger Mini-14 manuals,

bg   https://ruger-docs.s3.amazonaws.com/_manuals/mini14-180.pdf, https://ruger-docs.s3.amazonaws.com/_manuals/mini14-181-186.pdf; https://ruger-docs.s3.amazonaws.com/_manuals/mini14-580.pdf, accessed October 23, 2018.

    "Authorities Piece Together Tragedy Gunman at Edmond Post Office 'Knew Where to Shoot People'," *The Oklahoman* , August 22, 1986.

bh   "6 Die in Dallas Club as Enraged Man Fires Wildly," *New York Times* , June 30, 1984.

bi   "Multiple charges filed in murder, kidnapping spree," *UPI Archives* , October 12, 1983.

bj   "Gunman kills four and wounds a fifth at west side hotel," *The New York Times* , February 4, 1983.

DEF0050

# EXHIBIT 3

XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6249
 Fax:  (916) 731-2124
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Xavier Becerra, in
his official capacity as Attorney General of
the State of California, and Brent E. Orick,
in his official capacity as Interim Director of
the Department of Justice Bureau of
Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES MILLER, et al.,**<br><br>                              Plaintiffs,<br><br>         v.<br><br>**CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,**<br><br>                              Defendants. | 19-cv-1537 BEN-JLB<br><br>**DECLARATION OF CHRISTOPHER B. COLWELL, M.D., IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

**DEFENDANTS' EXHIBIT B**

DEF0051

## DECLARATION OF CHRISTOPHER B. COLWELL, M.D.

I, Christopher B. Colwell, declare:

1.    I am the Chief of Emergency Medicine at Zuckerberg San Francisco General Hospital and Trauma Center and Professor and Vice Chair in the Department of Emergency Medicine at the University of California at San Francisco School of Medicine. I am over the age of 18, and I make this declaration in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction. This declaration is based on my own personal knowledge and experience, and if called as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

2.    I am currently the Chief of Emergency Medicine at Zuckerberg San Francisco General Hospital and Trauma Center and Professor and Vice Chair in the Department of Emergency Medicine at the University of California at San Francisco School of Medicine. I was previously the Chief of Emergency Medicine at Denver Health Medical Center and Professor and Executive Vice Chair in the Department of Emergency Medicine at the University of Colorado School of Medicine. I received my Emergency Medicine training at Denver General Hospital in the Denver Affiliated Residency in Emergency Medicine and am board certified by American Board of Emergency Medicine (ABEM) in both Emergency Medicine and Emergency Medical Service (EMS). I am licensed to practice medicine in the states of California and Colorado.

3.    I have over 25 years of experience treating gunshot wound victims in the Emergency Department at large urban level I trauma centers and in that time have treated over a thousand patients with gunshot wounds. I am qualified to offer opinions as to the physiologic trauma caused by gunshot wounds and other penetrating injuries.

1

DEF0052

1    4.   I have provided expert testimony in *Worman v. Healey*, No. 1:17-cv-
2    10107-WGY (D. Mass. Nov. 8, 2017) (by deposition), and *Rupp v. Becerra*,
3    No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Dec. 20, 2018) (by deposition).
4    5.   A list of my work history, educational background, publications,
5    expert witness testimony, is included in my curriculum vitae, which is attached to
6    this report.

### OPINIONS

8    6.   I have experienced first-hand the extensive damage caused by assault
9    weapons, and I have witnessed both victims and on occasion even shooters
10   experience the horror of what these weapons can do.
11   7.   In one instance, a man who had shot his girlfriend with an assault rifle
12   said he had had no idea how destructive assault weapons can be.  He admitted to me
13   that he had used a newly acquired AR-15 in the shooting.  I have seen the
14   devastating impact these events have on the lives of my patients and their families.
15   I have spoken extensively around the country on the experience of caring for
16   victims of mass shootings and have testified as the treating physician on multiple
17   occasions to describe the extent of injuries due to gunshot wounds from all
18   weapons, including assault weapons, in criminal trials.  I was subpoenaed in these
19   cases by the prosecuting district attorney and was not compensated for that
20   testimony.
21   8.   Firearm injuries are an important public health problem in the United
22   States, accounting for more than 30,000 deaths each year in addition to significant
23   illness and disability.  I have extensive experience with the different wounds caused
24   by assault and non-assault weapons and the consistently more serious nature of the
25   injuries from assault weapons.  Gunshot wounds from assault weapons, such as
26   AR-15 platform rifles and Intratec TEC-9 pistols, tend to be higher in complexity
27   with higher complication rates than such injuries from non-assault weapons,
28   increasing the likelihood of morbidity in patients that present injuries from assault

2

1  weapons.  In my experience, assault weapons tend to cause far greater damage to
2  the muscles, bones, soft tissue, and vital organs.  They are too often shredded
3  beyond repair.
4      9.    My first-hand experience treating victims of gunshot wounds includes
5  being the physician at the scene of the Columbine High School shooting on
6  April 20, 1999, in which a TEC-DC 9 pistol and a Hi-Point 995 rifle were used, and
7  as an Emergency Department physician treating victims of the Aurora Theater
8  shooting on July 20, 2012, in which an AR-15 rifle was used.  I have treated many
9  other patients that have been both victims and shooters of assault weapons,
10  including AK-47s and AR-15s, and have also treated many victims and shooters of
11  non-assault weapons and other weapons.  While significant injury can certainly
12  result from non-assault weapons, my experience has been that individuals who have
13  been shot by assault weapons tend to have more wounds and injuries that are far
14  more extensive.  These weapons cause significantly more damage and have resulted
15  in higher morbidity and mortality than other weapons.
16      10.   There is no doubt in my mind that victims of assault weapons are at far
17  greater risk of both immediate and long-term complications.  These complications
18  include higher amputation rates and higher infection rates.  A vivid example was a
19  victim of a shooting from a Glock handgun who presented to our Emergency
20  Department with an elbow wound.  We were able to treat this wound and release
21  the patient from the Emergency Department.  Just three months earlier, I had seen a
22  patient shot in the exact same spot with an AK-47 and the arm needed to be
23  amputated just below the shoulder.  This is just one example of the additional
24  damage and destruction assault weapons cause, which I have witnessed in the
25  course of treating trauma patients.  In each of these examples, law enforcement
26  informed me of the weapon used in the shooting.
27      11.   Assault weapons, especially when equipped with large capacity
28  magazines that can hold 30, 50, or even 100 rounds of ammunition, can fire more

3

DEF0054

1  shots without reloading, causing more injuries per victim (and thus more

2  complications), and many of the most devastating injuries I have managed in my

3  over 25 years of experience treating gunshot wound victims.

4      12.    It is my opinion that while all weapons pose risk, assault weapons,

5  especially when equipped with large capacity magazines, pose a far greater risk to

6  the public from a medical standpoint than non-assault firearms.

7      I declare under penalty of perjury that the foregoing is true and correct.

8      Executed on January 9, 2020 at San Francisco, California.

9

10

11      Christopher B. Colwell, M.D.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

DEF0055

Curriculum Vitae
# Christopher Beall Colwell, M.D

**Current Position:**

**Chief, Department of Emergency Medicine**
**Zuckerberg San Francisco General Hospital and Trauma Center**
**Professor and Vice Chair, Department of Emergency Medicine**
**UCSF School of Medicine**

**Work Address:**

Zuckerberg San Francisco Hospital and Trauma Center
Department of Emergency Medicine
1001 Potrero Ave. #6A02
San Francisco, CA 94110

Christopher.Colwell@ucsf.edu
Phone: (415) 206-2518
Fax: (415) 206-5818

**Board Certification:**

1) American Board of Emergency Medicine 1997
   Re-certification 2007, 2017
2) American Board of Emergency Medicine – Emergency Medical Services 2015

NPI number – 1629092788
California license – G142756 (active)
Colorado license – 34341 (not active)
Michigan license – 4301059401 (not active)

**Education:**

| | |
|---|---|
| **Undergraduate:** | **University of Michigan** |
| | **Ann Arbor, Michigan** |
| | **Bachelor of Science Degree, 1988** |
| **Medical School:** | **Dartmouth Medical School** |
| | **Hanover, New Hampshire** |
| | **Medical Doctorate, 1992** |

DEF0056

**Internship:**  **St. Joseph Mercy Hospital/University of Michigan**
       **Ann Arbor, Michigan**
       **Transitional Medicine, 1993**

**Residency:**  **Denver Affiliated Residency in Emergency Medicine**
       **Denver, Colorado, 1993-1996**
       **Chief Resident 1995-1996**

**Academic appointments:**

1. **Professor and Vice Chair**
   **Department of Emergency Medicine**
   **University of California at San Francisco School of Medicine**
   **2016 - Present**

2. **Professor of Emergency Medicine**
   **Department of Emergency Medicine**
   **University of Colorado School of Medicine**
   **2012-2016**

3. **Executive Vice Chair, Department of Emergency Medicine, 2010 - 2016**
   **University of Colorado School of Medicine**
   **2010-2016**

4. **Associate Professor of Emergency Medicine**
   **Department of Emergency Medicine**
   **University of Colorado School of Medicine**
   **2010-2012**

5. **Associate Professor of Emergency Medicine**
   **Division of Emergency Medicine, Department of Surgery**
   **University of Colorado Health Sciences Center**
   **2004-2009**

6. **Assistant Professor of Emergency Medicine**
   **Division of Emergency Medicine, Department of Surgery**
   **University of Colorado Health Sciences Center**
   **Denver, Colorado**
   **1998-2004**

7. **Assistant Professor of Emergency Medicine**

DEF0057

Department of Emergency Medicine, University of Michigan School of Medicine
Ann Arbor, Michigan
1996-1998

**Clinical appointments:**

1. Chief of Emergency Medicine, 2016-present
   Department of Emergency Medicine
   Zuckerberg San Francisco General Hospital and Trauma Center
   San Francisco, California

2. Director of Emergency Medicine, 2010 – 2016
   Interim Director of the Department of Emergency Medicine, 2009-2010
   Associate Director, 2000-2009
   Attending Physician, 1998-2016
   Department of Emergency Medicine
   Denver Health
   Denver, Colorado

3. Program Director, EMS Fellowship
   2000-2012

4. Medical Director, Denver Paramedic Division
   2000-2012

5. Medical Director, Denver Fire Department
   2000-2010

6. Associate Director, Denver Paramedic Division
   1998-2000

7. Senior Associate Director, Denver Health Residency in Emergency Medicine
   2009 - 2016

8. Attending Physician, 1996-1998
   St. Joseph Mercy Hospital/University of Michigan
   Ann Arbor, Michigan

**Honors and Awards:**        2017-2018 Quarterly Resident Bedside Teaching Award
                              UCSF Department of Emergency Medicine

DEF0058

**Outstanding Contributions - Best Authors in Adult Emergency Medicine**
**UpToDate – Wolters Kluwer**
**March, 2017**

**2016 Career Service Award**
**Denver Health and Hospital Association**
**Medical Staff Awards**
**September 21st, 2016**

**The Peter Rosen Leadership Award**
**Presented by the 2016 Emergency Medicine Residency at Denver Health for Outstanding Departmental Leadership**
**June 27th, 2016**

**2016 Financial Vitality Pillar Award**
**For largest increase in charges and revenue while maintaining same cost**
**June 9th, 2016**

**Meritorious Service Award**
**Presented by the Colorado Chapter of the American College of Emergency Physicians for Achievements that have Enhanced Colorado's Health Care System and the Profession of Emergency Medicine in Colorado.**
**January 20th, 2015**

**2015 Patient Safety and Quality Pillar Award**
**For meticulous, high-quality, and thoughtful design and implementation of Denver Health's Ebola Preparedness Plan**
**June, 2015**

**The Corey M. Slovis Award for Excellence in Education. U.S. Metropolitan Municipalities EMS Medical Directors Consortium, February, 2015**

**Positively Collaborative Award for outstanding collaboration towards the improvement of Colorado's trauma system. Trauma Program, Colorado Department of Public Health and Environment, January, 2012**

DEF0059

**The Vincent J. Markovchick Program Director's Award 2011**

**Distinctive Service Award – Denver Paramedic Division 2010**

**Chief Executive Officer Special Commendation Award for expert medical leadership of Denver's 911 system, 2009**

**Mayor's Award of Appreciation for assistance and aid to Hurricane Katrina evacuees. 2005**

**Ernest E. Moore Award for Outstanding Contributions in Trauma Care, 2000**

**Outstanding Senior Resident, 1996**

**Chief Resident, Emergency Medicine Residency, 1995-1996**

**Membership in professional organizations:**

1. **American College of Emergency Physicians (ACEP), 1994-present**
   a. **Fellow, 1999-present**
   b. **Colorado ACEP, 1993-1996, 1998-present**
   c. **Michigan ACEP, 1996-1998**
2. **American Medical Association (AMA), 1993-2000, 2006-present**
3. **National Association of EMS Physicians (NAEMSP), 2002-present**
4. **Society for Academic Emergency Medicine (SAEM), 1995-2000, 2008-present**
5. **Emergency Medicine Residents Association (EMRA), 1992-1997**

**Major Committee, Teaching, and Service Responsibilities:**

1. Section Editor, Traumatic Emergencies. Corependium Emergency Medicine Textbook
2. UCSF Ad Hoc Committee for Faculty Misconduct Investigations, Standing Panel. 2019 – 2022
3. San Francisco Pride Parade - Medical Coverage (with San Francisco Fire Department). June 30th, 2019
4. Medical Executive Committee, Zuckerberg San Francisco General Hospital and Trauma Center. 2016-present

5. ZSFG CPG Board of Directors. 2016-present
6. UCSF Department of Emergency Medicine Incentive Review Committee. 2016 – present
7. Zuckerberg San Francisco General Hospital and Trauma Center Trauma Peer Review Committee. 2016-present
8. Board of Directors, American College of Emergency Physicians – Colorado Chapter, 2007-2011
9. Conference Director, Annual Rocky Mountain Conference in Trauma and Emergency Medicine, 2003 – 2016
10. American Board of Emergency Medicine (ABEM) Oral Board Examiner, 2011 - present
11. Course Director, <u>Introduction to Traumatic Emergencies</u>, (SURG 6623) University of Colorado School of Medicine, 1999
    a. A course for second year medical students that introduces the student to selected traumatic emergencies and their management
12. Course Director, <u>Prehospital Medicine (SURG 6626)</u>, University of Colorado at Denver School of Medicine, 2005-2016
    a. A course for first and second year medical students that introduces them to prehospital medicine and includes clinical time riding on an ambulance
13. Course Director, <u>Flight Medicine (SURG 6628)</u>, University of Colorado at Denver School of Medicine, 2009-2016
    a. A course for second year medical students (SURG 6626 is a pre-requisite) that introduces the student to flight medicine and includes clinical time riding in a helicopter as well as fixed wing airplane transport
14. Instructor, <u>Introduction to Traumatic Emergencies</u>, (SURG 6623) University of Colorado School of Medicine, 1999-2016
15. Lecturer, <u>Injury Epidemiology and Control</u> (PRMD 6637), University of Colorado School of Medicine, 2003
16. Instructor, <u>Emergency Medicine at Denver Health Medical Center</u> (SURG 8005), University of Colorado School of Medicine, 1998-2016
17. Instructor, <u>Integrated Clinicians Course</u> (ICC) 8005: Preparing for Internship: Reading and Understanding EKGs
18. Instructor, <u>Integrated Clinicians Course (ICC) IDPT 7003: Management of Trauma</u>, University of Colorado School of Medicine, 2011
19. Instructor, <u>Integrated Clinicians Course (ICC) IDPT 7004: Management of Trauma</u>, University of Colorado School of Medicine, 2010. Lecturer and small group leader
20. Instructor, <u>Integrated Clinicians Course (ICC) IDPT 7004: Management of Trauma</u>, University of Colorado School of Medicine, 2009. Lecturer and small group leader
21. Member, Medical Staff Executive Committee, 2009-present
22. Member, Denver Health Executive Committee for Patient Safety and Quality, 2006-2016

DEF0061

23. Council Member, Colorado's Mile High Regional Emergency and Trauma Advisory Council (RETAC), Denver County appointed representative, 2000-2016
24. Committee chair, Destination and Diversion committee, Mile High RETAC 2002-2016
25. Member, State EMS Formulary Task Force, 2006 – 2009
26. Member, Pediatric Trauma Committee, 2006-present
27. Member, Rocky Mountain Center for Medical Response (RMCMR), 2002-2016
28. Member, Colorado State Advisory Council on Emergency Medical Services, 1998-2000
29. Ute Mountain Ute EMS Program medical director, 1994-1996
30. Steering Committee member, Denver Health Residency in Emergency Medicine, 1998-2016
31. Denver Health Residency in Emergency Medicine Compliance Committee, 2006-2014
32. Pharmacy and Therapeutics Committee member, Denver Health Medical Center, 1998-2006
33. EMS Education committee member, Denver Health Medical Center, 1998-2016
34. Safety Committee member, Denver Health Medical Center, 1998-2001
35. Residency Advisory Committee, Denver Health Medical Center Residency in Emergency Medicine, 1998-2016
36. Moderator, Case Presentations, Rocky Mountain Critical Care Transport Conference, May, 2003
37. Instructor, Difficult Airway Lab, Rocky Mountain Critical Care Transport Conference, May, 2003
38. Trauma Center Site Surveyor, State of Florida Department of Health and Rehabilitative Services, Office of Emergency Medical Services, 2003-present
    a. Trauma site review – 10/23 – 10/25, 2019
39. Member, Denver EMS Council, 1998-2016
40. Member, Denver Metro Physician Advisors, 1999-2016
41. Medical Expert and Faculty, Boulder Trial Academy, International Association of Defense Counsel, 1998-2002
42. Member, Medical Advisory Group (MAG), to the Colorado State EMS Director, 2003-2008
43. Transfusion Committee member, St. Joseph Mercy Hospital, Ann Arbor, Michigan. 1996-1998

DEF0062

**Editorial Positions**

1. Section Editor, Trauma, UpToDate, 2009 - present
2. Section Editor, Abstracts
   The Journal of Emergency Medicine, 1999-2002
3. Review Editor, The Journal of Emergency Medicine, 1999-2008
4. Review Editor, Western Journal of Emergency Medicine, 2008 - present
5. Manuscript reviewer, Academic Emergency Medicine, 2003 – present
6. Manuscript reviewer, Critical Care, 2008-present
7. Manuscript reviewer, Patient Safety in Surgery, 2009-present
8. Guest Editor, EM International, Prehospital Care

**Publications:**

**Peer Reviewed Journal Articles**

1. Shapiro M, Dechert, **Colwell C**, Bartlett R, Rodriguez: Geriatric Trauma: Aggressive Intensive Care Management is Justified.  American Surgeon 1994;60(9):695-8
2. **Colwell C**, Pons PT, Blanchet J, Mangino C: Claims Against a Paramedic Ambulance Service: A Ten Year Experience. J Emerg Med 1999, 17(6):999-1002
3. Apfelbaum J, **Colwell C**, Roe E: Precipitous Breech Delivery of Twins: A Case Report. Prehospital Emerg Care 2000; 4(1):78-81
4. Gnadinger CA, **Colwell C**, Knaut AL: Scuba Diving-Induced Pulmonary Edema in a Swimming Pool. J Emerg Med 2001; 21(4):419-421
5. Houry D, **Colwell C**, Ott C: Abdominal Pain in a Child after Blunt Abdominal Trauma: An Unusual Injury. J Emerg Med 2001; 21(3):239-241
6. Barton E, Ramos J, **Colwell C**, Benson J, Bailey J, Dunn W: Intranasal Administration of Naloxone by Paramedics. Prehosp Emerg Care 2002; 6:54-8
7. **Colwell C**, Pons PT, Pi R: Complaints Against an EMS System. J Emerg Med 2003;25(4):403-408
8. **Colwell C,** McVaney K, Haukoos J, Wiebe D, Gravitz C, Dunn W, Bryan T: An Evaluation of Out-of-Hospital Advanced Airway Management in an Urban Setting. Acad Emerg Med 2005; 12(5):417-22
9. McVaney KE, Macht M, **Colwell CB**, Pons PT: Treatment of Suspected Cardiac Ischemia with Aspirin by Paramedics in an Urban Emergency Medical Services System. Prehospital Emerg Care 2005, 9(3):282-284
10. Barton E, **Colwell CB**, Wolfe TR, Fosnocht D, Gravitz C, Bryan T, Dunn W, Benson J, Bailey J: The Efficacy of Intranasal Naloxone as a Needleless Alternative for Treatment of Opiate Overdose in the Prehospital Setting. J Emerg Med 2005;29(3):265-71
11. Levine SD, **Colwell CB**, Pons PT, Gravitz C, Haukoos JS, McVaney KE: How Well do Paramedics Predict Admission to the Hospital? A Prospective Study. J Emerg Med 2006;31(1):1-5

DEF0063

12. **Colwell CB**: <u>Case Studies in Infectious Disease: Travel-Related Infections</u>. Emerg Med 2006;38(10):35-43

13. Bonnett CJ, Peery BN, Cantril SV, Pons PT, Haukoos JS, McVaney KE, **Colwell CB:** <u>Surge capacity: a proposed conceptual framework</u>. Am J Emerg Med 2007;25:297-306.

14. **Colwell C**. Initial evaluation and management of shock in adult trauma. In: UpToDate, Basow DS (Ed), UpToDate, Waltham, MA, 2007 - present

15. Bonnett CJ, **Colwell CB**, Schock T, McVaney KE, Depass C: <u>Task Force St. Bernard: Operational Issues and Medical Management of a National Guard Disaster Response.</u>  Prehospital and Disaster Medicine 2007;22(5):440-447

16. **Colwell CB**: <u>Heat Illness.</u> Emerg Med 2008; 40(6): 33-39

17. **Colwell CB**, Cusick JC, Hawkes AP and the Denver Metro Airway Study Group: <u>A prospective study of prehospital airway management in an urban EMS system.</u> Prehosp Emerg Care 2009; 13:304-310

18. **Colwell CB**, Mehler P, Harper J, Cassell L, Vazquez J, Sabel A: <u>Measuring quality in the prehospital care of chest pain patients.</u> Prehospital Emerg Care 2009;13:237-240

19. Kashuk JL, Halperin P, Caspi G, **Colwell CB**, Moore EE: <u>Bomb explosions in acts of terrorism: Evil creativity challenges our trauma systems.</u> J Am Coll Surg 2009; 209(1):134-140

20. Stone SC, Abbott J, McClung CD, **Colwell CB**, Eckstein M, Lowenstein SR: <u>Paramedic knowledge, attitudes, and training in end-of-life care.</u> Prehospital Disaster Medicine 24(6):529-34, Nov-Dec 2009.

21. Gaither JB, Matheson J, Eberhardt A, **Colwell CB**: <u>Tongue engorgement associated with prolonged use of the King-LT laryngeal tube device.</u>  Ann Emerg Med, 2009. Ann Emerg Med 2010; 55(4):367-9.

22. Bookman SJ, Eberhardt AM, Gaither JB, **Colwell CB**: <u>Hospital Group Preparation for the 2008 Democratic National Convention.</u> Journal of Homeland Security and Emergency Management 2010; Vol. 7: Iss. 1, Article 16.

23. Haukoos JS, Witt G, Gravitz C, Dean J, Jackson D, Candlin T, Vellman P, Riccio J, Heard K, Kazatomi T, Luyten D, Pineda G, Gunther J, Biltoft J, **Colwell CB**: <u>Out-of-hospital cardiac arrest in Denver, Colorado: Epidemiology and outcomes.</u> Acad Emerg Med 2010; 17(4):391-8.

24. Haukoos JS, Byyny RL, Erickson C, Paulson S, Hopkins E, Sasson C, Bender B, Gravitz C, Vogel JA, **Colwell CB**, Moore EE. <u>Validation and refinement of a rule to predict emergency intervention in adult trauma patients.</u> Ann Emerg Med 2011;58:164-171

25. **Colwell CB**, Eberhardt A. <u>Less Lethal Force</u>. Emergency Medicine Reports 2011, 32(18):1-12

26. Soriya G, McVaney KE, Liao MM, Haukoos JS, Byyny RL, Gravitz C, **Colwell CB.** <u>Safety of prehospital intravenous fentanyl for adult trauma patients</u>. J Trauma Acute Care Surg 2012;72(3):755-59

27. Gudnik MR, Sasson C, Rea TD, Sayre MR, Zhang J, Bobrow BJ, Spaite DW, McNally B, Denninghoff K, Stolz U, Levy M, Barger J, Dunford JV, Sporer K, Salvucci A, Ross D, **Colwell CB**, Turnbull D, Rosenbaum R, Schrank K,

Waterman M, Dukes R, Lewis M, Fowler R, Lloyd J, Yancey A, Grubbs E, Lloyd J, Morris J, Boyle S, Johnson T, Wizner C, White M, Braithwaite S, Dyer S, Setnik G, Hassett B, Santor J, Swor B, Chassee T, Lick C, Parrish M, Radde D, Mahoney B, Todd D, Salomone J, Ossman E, Myers B, Garvey L, Camerson J, Slattery D, Ryan J, McMullan J, Keseg D, Leaming J, Sherwood BK, Luther J, Slovis C, Hinchey P, Harrington M, Griswell J, Beeson J, Persse D, Gamber M, Ornato J. Increasing hospital volume is not associated with improved survival in out of hospital cardiac arrest of cardiac etiology. Resuscitation 2012; 83(7):862-8

28. Mascolo M, Trent S, **Colwell CB**, Mehler PS. What the Emergency Department needs to know when caring for your patients with eating disorders. Int J Eat Disord 2012;45(8):977-81

29. **Colwell CB**, Bookman S, Johnston J, Roodberg K, Eberhardt AM, McVaney KE, Kashuk J, Moore EE. Medical Preparation for the 2008 Democratic National Convention. J Trauma Acute Care Surg 2012 Dec;73(6):1624-8

30. Trent SA, Moreira ME, **Colwell CB**, Mehler P. ED management of patients with eating disorders. Am J Emerg Med 2013 May;31(5):859-65

31. French AJ, **Colwell CB**. Atlas of Emergency Ultrasound. J Trauma Acute Care Surg 2013:75:919.

32. Cleveland N, **Colwell C**, Douglass E, Hopkins E, Haukoos JS. Motor Vehicle Crash Severity Estimations by Physicians and Prehospital Personnel. Prehosp Emerg Care 2014;18(3):402-7

33. Macht M, Mull AC, McVaney KE, Caruso EH, Johnston JB, Gaither JB, Shupp AM, Marquez KD, Haukoos JS, **Colwell CB**. Comparison of Droperidol and Halperidol for use by paramedics: Assessment of safety and effectiveness. Prehosp Emerg Care 2014:18(3):375-80

34. Nassel AF, Root ED, Haukoos JS, McVaney K, **Colwell C**, Robinson J, Eigel B, Magid DJ, Sasson C. Multiple cluster analysis for the identification of high-risk census tracts for out-of-hospital cardiac arrest (OHCA) in Denver, Colorado. Resuscitation 2014;85:1667-73

35. Vogel JA, Seleno N, Hopkins E, **Colwell CB**, Gravitz C, Haukoos JS. Denver Emergency Department Trauma Organ Failure Score outperforms traditional methods of risk stratification in trauma. Am J Emerg Med 2015;33(10):1440-4

36. Vogel JA, Newgard CD, Holmes JF, Diercks DB, Arens AM, Boatright DH, Bueso A, Gaona SD, Gee KZ, Nelson A, Voros JJ, Moore EE, **Colwell CB**, Haukoos JS; Western Emergency Services Translational Research Network. Validation of the Denver Emergency Department Trauma Organ Failure Score to Predict Post-Injury Multiple Organ Failure. J Am Coll Surg 2016;222(1):73-82

37. Joseph D, Vogel JA, Smith CS, Barrett W, Bryskiewicz G, Eberhardt A, Edwards D, Rappaport L, **Colwell CB**, McVaney KE. Alcohol as a Factor in 911 Calls in Denver. Prehosp Emerg Care 2018, 22(4):427-35

38. Hsia RY, Huang D, Mann NC, **Colwell C**, Mercer MP, Dai M, Niedzwiecki MJ. A US National Study of the Association Between Income and Ambulance

<u>Response Time in Cardiac Arrest.</u> JAMA Network Open 2018;1(7):e185202. doi:10.1001/jamanetworkopen.2018.5202


**Invited Articles, Book Chapters, and Editorials**

1. **Colwell C**, Harken A: <u>*Cardiac Arrhythmias*</u>. In: Markovchick V, Pons P(eds) <u>Emergency Medicine Secrets.</u> Hanley & Belfus, Inc., Philadelphia, PA; 2nd Edition, 1999, pp. 119-123
2. Murphy P, **Colwell C**: <u>*Prehospital Management of Epiglottitis*</u>. EMS 2000; 29(1):41-9
3. Murphy P, **Colwell C**: <u>*Prehospital Management of Neck Trauma.*</u> EMS 2000; 29(5):53-71
4. Murphy P, **Colwell C**: <u>*Heatwave: Prehospital Mangement of Heat Related Conditions.*</u> EMS 2000; 29(6):33-49
5. Murphy P, **Colwell C**: <u>*Prehospital Management of Diabetes.*</u> EMS 2000; 29(10):78-85
6. Murphy P, **Colwell C**, Bryan T: <u>*Noncardiac Chest Pain.*</u> EMS 2001; 30(4):66-71
7. Murphy P, **Colwell C**: <u>*Communication Breakdown: When Medic and Medical Control Don't Agree.*</u> Cover Story, EMS 2001 30(5):61-2
8. Murphy P, **Colwell C**, Linder G: <u>*Assessment Clues.*</u> EMS 2001; 30(7):45-8
9. **Colwell C**, Murphy P, Bryan T: <u>*Mechanism of Injury: An Overview*</u> Cover Story, EMS 2003; 32(5):52-64
10. **Colwell C**, Harken A: <u>*Cardiac Arrhythmias*</u>. In: Markovchick V, Pons P(eds) <u>Emergency Medicine Secrets.</u> Hanley & Belfus, Inc., Philadelphia, PA; 3rd Edition, 2003, pp. 140-143
11. Kendall J, **Colwell C**: <u>*Pericarditis and Myocarditis*</u> In: Markovchick V, Pons P (eds) <u>Emergency Medicine Secrets.</u> Hanley & Belfus, Inc., Philadelphia, PA; 3rd Edition, 2003, pp. 149-154
12. **Colwell CB,** Murphy P, Bryan T. <u>*Prehospital Management of the Pregnant Patient.*</u> EMS 2004; 33(3):59-67.
13. **Colwell CB,** Murphy P, Bryan T. <u>*Pulseless Electrical Activity.*</u> EMS 2004; 33(9):63-8.
14. **Colwell CB,** Murphy P, Bryan T, Nelson S. <u>*Psychological Disorders: A General Overview.*</u> EMS 2004;33(11):74-83.
15. **Colwell C:** <u>*Traumatic Shock*</u>  In: Harwood-Nuss A, Wolfson A (eds) <u>The Clinical Practice of Emergency Medicine.</u> Lippincott Williams & Wilkins, Philadelphia, PA; 4th Edition, 2005; 907-12.
16. **Colwell C**, Murphy P, Bryan T. *Pediatric Potpourri: An Overview of Select Pediatric Conditions.* EMS 2005;34(7):50-58
17.  **Colwell C,** Murphy P, Bryan T. *Uncompleted Suicide Attempts.* EMS 2005;34(11):73-86
18. Murphy P, **Colwell CB,** Pineda G, Bryan T: *Breaking Down Barriers: How EMS providers can communicate with autistic patients.* EMS 2006;35(4):84-89

19. Murphy P, **Colwell CB**, Pineda G, Bryan T: *Traumatic Amputations.* EMS 2006; 35(6):90-96
20. **Colwell CB**, Murphy P, Bryan T: *Geriatric Trauma*. EMS 2006;35(9):135-140
21. **Colwell CB**: *Cardiac Dysrhythmias, Pacemakers, and Implantable Defibrillators* In: Markovchick V, Pons P (eds) Emergency Medicine Secrets. Mosby Elsevier, Philadelphia, PA; 4th Edition, 2006: 194-204
22. Kendall JL, **Colwell CB**: *Pericarditis and Myocarditis* In: Markovchick V, Pons P (eds) Emergency Medicine Secrets. Mosby Elsevier, Philadelphia, PA; 4th Edition, 2006: 213-218
23. **Colwell CB**: *Disasters* In: Chapleau W, Pons P (eds) Emergency Medical Technician. Mosby JEMS Elsevier, St. Louis, MO, 2007:708-725
24. **Colwell CB**: *Hyperkalemia* In: Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (eds): Rosen and Barkin's 5-Minute Emergency Consult Lippincott Williams & Wilkins, Philadelphia, PA; 3rd Edition, 2007: 550-551
25. **Colwell CB**: *High Altitude Illness* In: Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (eds): Rosen and Barkin's 5-Minute Emergency Consult Lippincott Williams & Wilkins, Philadelphia, PA; 3rd Edition, 2007:522-523
26. **Colwell CB**: *Dialysis Complications* In: Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (eds): Rosen and Barkin's 5-Minute Emergency Consult Lippincott Williams & Wilkins, Philadelphia, PA; 3rd Edition, 2007:310-311
27. **Colwell CB**: *Gastroenterology* In: Chapleau W, Burba AC, Pons PT, Page D (eds): The Paramedic McGraw-Hill, New York, NY; 2008:839-861
28. **Colwell CB**: *Lightning and Electrical Injuries* In: Adams JG (Ed): Emergency Medicine Elsevier, Philadelphia, PA, 2008;131:1451
29. Murphy P, **Colwell CB**, Pineda G, Bryan T: *Cerebral hemorrhage. What EMS providers need to know about cerebral anatomy and common forms of cerebral hemorrhage*. EMS 2009; 38(5):46-55
30. **Colwell CB**, Johnston J, Schimpf B, Nieberlein D, Petre B, Bookman S, Robinson J, Jackamore S, Gaither J, Eberhardt A, Benson J, Crowl D. *The response and lessons learned from the crash at Denver International Airport.* JEMS 2009; 34(9):36-45.
31. Murphy P, **Colwell CB**, Pineda G, Bryan T. *Shortness of breath: A review of select conditions.* EMS 2009, 38(7):51-63.
32. **Colwell CB**, Moore EE: *Traumatic Shock* In: Wolfson AB (ed): Harwood-Nuss' Clinical Practice of Emergency Medicine Lippincott Williams &Wilkins, Philadelphia, PA, 5th Edition, 2009:142-148
33. **Colwell CB**, Markovchick V: *Radiation Injuries* In: Marx JA, Hockberger RS, Walls RM (eds): Rosen's Emergency Medicine: Concepts and Clinical Practice Mosby Elsevier Philadelphia, PA 7th Edition, 2009:1933-1941
34. Murphy P, **Colwell CB**, Pineda G, Bryan T: *Burning issues: By understanding the pathophysiology of burns, providers can give patients their best chance at good outcomes.* EMS 2009, 38(10):83-90.
35. Murphy P, **Colwell CB**, Pineda G, Bryan T: *Abdominal Pain: A review of select conditions.* EMS 2010, 39(1):68-74

36. Murphy P, **Colwell CB**, Pineda G, Bryan T: *A Shocking Call: Prehospital assessment and management of electrical injuries and lightning strikes.* EMS 2010, 39(2):46-53

37. Murphy P, **Colwell CB**, Pineda G, Bryan T: *Shootings: What EMS providers need to know: the assessment and treatment of victims of gunshot wounds.* EMS 2010, 39(4):37-45

38. **Colwell CB**: *Managing the Acutely Agitated Patient.* EMS Innovations 2010 EMS 2010, 39(7):I-8-I-9

39. Soriya G, **Colwell CB**: *Basic Life Support.* In: Moore EE (ed): Encyclopedia of Intensive Care Medicine Springer, 1st Edition, 2010

40. Soriya G, **Colwell CB**: *Emergency Medical Services* In: Moore EE (ed): Encyclopedia of Intensive Care Medicine Springer, 1st Edition, 2010

41. Mull A, **Colwell CB**: *Prehospital Care* In: Moore EE (ed): Encyclopedia of Intensive Care Medicine Springer, 1st Edition, 2010

42. Murphy P, **Colwell CB**, Pineda G, Bryan T: *Hemochromatosis.* EMS 2010; 39(10):53-57

43. **Colwell CB**: *Hyperkalemia* In: Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin AZ, Shayne P, Rosen P (eds): Rosen and Barkin's 5-Minute Emergency Medicine Consult Lippincott Williams & Wilkins, a Wolters Kluwer, PA 4th Edition, 2011: 552-553

44. **Colwell CB**: *High Altitude Illness* In: Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin AZ, Shayne P, Rosen P (eds): Rosen and Barkin's 5-Minute Emergency Medicine Consult Lippincott Williams & Wilkins, Wolters Kluwer, PA 4th Edition, 2011: 524-525

45. **Colwell CB**: *Dialysis Complications* In: Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin AZ, Shayne P, Rosen P (eds): Rosen and Barkin's 5-Minute Emergency Medicine Consult Lippincott Williams & Wilkins, a Wolters Kluwer, PA 4th Edition, 2011: 310-311

46. **Colwell CB**, Mull AC: *Cardiac Dysrhythmias, Pacemakers, and Implantable Defibrillators.* In: Markovchick VJ, Pons PT, Bakes KM (eds): Emergency Medicine Secrets Elsevier Mosby, St. Louis MO 5th Edition, 2011:208-218

47. Kendall JL, **Colwell CB**: *Pericarditis and Myocarditis* In: Markovchick VJ, Pons PT, Bakes KM (eds): Emergency Medicine Secrets Elsevier Mosby, St. Louis MO 5th Edition, 2011:229-234

48. **Colwell CB**, Soriya G: *Heat Illness* In: Markovchick VJ, Pons PT, Bakes KM (eds): Emergency Medicine Secrets Elsevier Mosby, St. Louis MO 5th Edition, 2011:407-410

49. Murphy P, **Colwell CB,** Pineda G: *Smoke Inhalation.* EMS World 2011; May issue

50. Eberhardt A, **Colwell CB**: *Prehospital Care.* In: Legome E, Shockley LW (eds): Trauma: A Comprehensive Emergency Medicine Approach Cambridge University Press, New York, 2011:653-662

51. Crowl D, **Colwell CB**, Mettera CJ: *Double trouble: Don't get fooled when assessing the pregnant trauma patient.* JEMS 2011; Sept:52-59

52. Mehler PS, **Colwell CB**, Stahel PF: *A structured approach to improving patient safety: Lessons from a public safety-net system.* Patient Safety in Surgery 2011; 5:32 (1 December, 2011)

53. Murphy P, **Colwell CB**, Pineda G: *Understanding the Trauma Triad of Death*. EMS World 2012, 41(2):44-51

54. Thomas SH, Colwell CB, Deslandes J, Dyer S, Goodloe JM. Prehospital Care. Emerg Med International 2012, Article ID 965480

55. **Colwell CB.** *On-Line Medical Direction*. In: Pons PT, Markovchick VJ (eds): Prehospital Care: Pearls and Pitfalls. People's Medical Publishing House, Shelton, CT, 2012:79-82

56. **Colwell CB**. *Incident Management*. In: Pons PT, Markovchick VJ (eds): Prehospital Care: Pearls and Pitfalls. People's Medical Publishing House, Shelton, CT, 2012:137-45

57. **Colwell CB**. *Chest Pain*. In: Pons PT, Markovchick VJ (eds): Prehospital Care: Pearls and Pitfalls. People's Medical Publishing House, Shelton, CT, 2012:239-44

58. Prehospital Care. Emergency Medicine International Special Edition. Thomas SH, **Colwell C**, Deslandes JC, Dyer S, Goodloe JM, Guest Editors. Hindawi Publishing Corp, 2012

59. Thomas SH, **Colwell C**, Deslandes JC, Dyer S, Goodloe JM. Prehospital Care. Emergency Medicine International 2012; article ID 965480

60. **Colwell CB**. *Lightning and Electrical Injuries*. In: Adams (ed): Emergency Medicine: Clinical Essentials Elsevier Saunders, Philadelphia, PA 2nd Edition 2013:1148-52

61. **Colwell CB.** Book review: *An Introduction to Clinical Emergency Medicine, 2nd ed.* In: J Trauma and Acute Care Surgery 2013 Jan;74(1):344

62. **Colwell CB.** *Radiation Injuries* In: Marx (ed): Rosen's Emergency Medicine; Concepts and Clinical Practice Elsevier Saunders, Philadelphia, PA 8th Edition, 2014:1945-53

63. Murphy P, **Colwell C**, Pineda G. *All You Need to Know About Bariatrics*. EMS World 2014, 43(3):26-35

64. **Colwell CB**, Moore EE. *Traumatic Shock*. In: Wolfson AB (ed): Harwood Nuss' Clinical Practice of Emergency Medicine Lippincott Williams &Wilkins, Philadelphia, PA, 6th Edition, 2014:137-142

65. **Colwell CB**. *High Altitude Illness* In: Schaider et al (ed): Rosen and Barkin's 5- Minute Emergency Medicine Consult. Wolters Kluwer, Philadelphia, PA 5th Edition, 2015:534-5

66. **Colwell CB**. *Dialysis Complications* In: Schaider et al (ed): Rosen and Barkin's 5- Minute Emergency Medicine Consult. Wolters Kluwer, Philadelphia, PA 5th Edition, 2015: 312-3

67. **Colwell CB**. *Hyperkalemia* In: Schaider et al (ed): Rosen and Barkin's 5-Minute Emergency Medicine Consult. Wolters Kluwer, Philadelphia, PA 5th Edition, 2015: 562-3

68. **Colwell CB.** *Refusal in the Field: When can an uncooperative patient refuse care and transport?* Journal of Emergency Medical Services (JEMS) July, 2016

DEF0069

69. **Colwell CB**, Moore E. *Initial evaluation and management of abdominal gunshot wounds in adults.* In: UpToDate, Post TW (Ed), UpToDate, Waltham, MA. (Accessed July 12, 2019 – 10,156 views in 2018)

70. **Colwell CB**, Moore E. *Initial evaluation and management of abdominal stab wounds in adults*. In: UpToDate, Post TW (Ed), UpToDate, Waltham, MA. (Accessed July 12, 2019 – 10,383 views in 2018)

71. **Colwell CB**. *Initial evaluation and management of shock in adult trauma and management of non-hemorrhagic shock*. In: UpToDate, Post TW (Ed), UpToDate, Waltham, MA. (Accessed July 12, 2019 – 17,317 views in 2018)

72. **Colwell CB**. *Geriatric trauma: Initial evaluation and management.* In: UpToDate, Post TW (Ed), UpToDate, Waltham, MA. (Revision – July, 2019. 17,777 views in 2018)

73. **Colwell CB**. *Supply, Demand, and Crisis: Emergency Department Diversion of Ambulances in San Francisco.* San Francisco Medicine (Journal of The San Francisco Medical Society), 90(3):15-17, April, 2017

74. **Colwell CB,** Fox CJ. *Abdominal Aortic Aneurysm.* In: Rosen's Emergency Medicine – Concepts and Clinical Practice. Elsevier, Philadelphia, PA. 9th Edition, 2018:1027-35.

75. **Colwell CB**. *Imaging in trauma.* Audio Digest Emergency Medicine 35:16 (August 21), 2018

76. **Colwell CB.** *Geriatric trauma.* Audio Digest Emergency Medicine 35:16 (August 21), 2018

77. Mason J, **Colwell CB,** Grock A. *Agitation Crisis Control.* Ann Emerg Med 2018;72:371-3

78. Mason J, Mallon B, **Colwell CB**. *Restraining the Agitated Patient.* EM:RAP October 2018, Volume 18, Issue 10.

79. **Colwell CB.** *Initial management of moderate to severe hemorrhage in the adult trauma patient.* In UpToDate. Post TW (Ed), UpToDate, Waltham, MA. (Accessed July 12, 2019 – 73,983 views in 2018)

80. **Colwell CB**. *Media Communication.* In: Communication in Emergency Medicine. Moreira ME and French AJ (Eds). Oxford University Press, New York, NY, 2019: 259-267

**Letters to the Editor**

1. **Colwell C**, Markovchick V, Pons P: **Drug Concern** J. Emerg. Med. Services 2000;25:10

2. Abboud P, **Colwell C**: **Critically reappraising the literature-driven practice of analgesia administration for acute abdominal pain in the emergency room prior to surgical evaluation.** Am J Surg, 2004; Jul 188(1):102-3, Author reply 103-4

3. **Colwell C,** McVaney K, Haukoos J: Reply to: **Out-of-hospital Endotracheal Intubation-It's Time to Stop Pretending that Problems Don't Exist.** Acad Emerg Med 2005;12(12):1245-6

4. **Colwell C: Reply to: EMS Response to Columbine: Lessons Learned**. The Internet Journal of Rescue and Disaster Medicine 2006; Vol. 5, No. 2

**Abstracts Presented**

1. **Colwell C,** Wolfe R, Moore E, Cairns C: **Differences in Hemodynamic Data Between Geriatric and Younger Adult Trauma Patients.** Poster Presentation; 21st Annual Rocky Mountain Conference on Emergency Medicine and Nursing, Jan. 30th, 1995
2. **Colwell C,** Wolfe R, Moore E, Cairns C: **Differences in Hemodynamic Data Between Geriatric and Younger Adult Trauma Patients.** Presented as an oral presentation at the 25th Annual Meeting of the Society for Academic Emergency Medicine, Denver, Colorado, May, 1995.
3. Branney S, **Colwell C,** Aschenbrenner J, Pons P: **Safety of Droperidol for Sedating Out-of-control ED Patients.** Presented at the Annual Meeting of the Society for Academic Emergency Medicine, Denver, Colorado, 1996. (Acad Emerg Med 1996; 3:527)
4. Barton E, Ramos J, **Colwell C: Intranasal Administration of Naloxone by Paramedics: Could this be a better practice?** Presented at American College of Emergency Physicians (ACEP) Research Forum, October 2001. (Ann Emerg Med 2001; 38(4):Supplement p. S18)
5. Barton E, **Colwell C,** Ramos J: **Intrnasal Administration of Naloxone by Paramedics: Could this be a better practice?** Presented at The First Mediterranean Emergency Medicine Congress, Stressa Convention Center, Stressa, Italy, September 2001
6. Levine S, **Colwell C,** Pons P, Gravitz C, Haukoos J: **How well do paramedics predict admission to the hospital?** Presented at AAEM Resident Research Competition, San Diego, California, February 2005
7. **Colwell C,** Mehler P, Sabel A, Harper J, Johnson L, Cassell L: **Determining the Quality of Comprehensive Care for Non-Traumatic Chest Pain through a Composite Measure.** Presented at SAEM Western Regional Research Forum, Portland, Oregon, March, 2007.
8. **Colwell C,** Mehler P, Sabel A, Harper J, Johnson L, Cassell L. **Analysis of Ambulance Response for Patients with Medical Chest Pain Based on the Severity of Potential Cardiac Symptoms.** Presented at SAEM Western Regional Research Forum, Portland, Oregon, March 2007.
9. Haukoos JA, Witt G, **Colwell C. The Epidemiology of Out-of-Hospital Cardiac Arrest in Denver, Colorado. Results from Phase I of the Denver Cardiac Arrest Registry.** Presented at SAEM Annual Meeting, May 30th, 2008, Washington D.C.
10. Kashuk JL, Moore EE, Barnett C, Berlew CC, **Colwell CB,** Brody A, Johnson J, Biffl W, Sabel AL. **Implementation of an in-hospital mass casualty incident (MCI) plan based upon the Israeli model: The challenges of shifting to the battlefield mentality in the civilian setting.** International

DEF0071

Preparedness & Response to Emergencies & Disasters Conference. Tel –Aviv, Israel. January 11th, 2010.

11. Moore EE, Kashuk JL, **Colwell CB**, Barnett C, Burlew CC, Biffl WL, Johnson JL, Brody A, Sabel A**. Live victim volunteers (LVV) enhance performance improvement for in-hospital mass casualty incident (MCI) drills: listen to the patient!** International Preparedness & Response to Emergencies and Disasters (IPRED). Tel-Aviv, Israel. January 12th, 2010.

12. Barnett C, Kashuk J, Moore EE, **Colwell CB**, Johnson JL, Biffl W, Burlew CC, Brody A, Sabel A. **Notification and Communication: Critical initial steps in mass casualty incident drills.** International Preparedness & Respons to Emergencies and Disasters (IPRED). January 12th, 2010. Tel Aviv, Israel

13. **Colwell CB**, Moore EE, Kashuk J, Robinson J, Bookman S. **Lessons learned from the 2008 Democratic National Convention**. International Preparedness & Response to Emergencies and Disasters (IPRED). Tel-Aviv, Israel. January 12th, 2010.

14. Soriya G, **McVaney K**, **Liao M**, **Haukoos J**, **Byyny R**, **Colwell C**. **Safety of pre-hospital single-dose fentanyl in adult trauma patients**. 13th Annual Western Regional Society for Academic Emergency Medicine Meeting, Sonoma, CA, 2010 (Oral).

15. Soriya G, McVaney K, **Liao M**, **Haukoos J**, **Byyny R**, **Colwell C**. **Safety of pre-hospital single-dose fentanyl in adult trauma patients**. Society for Academic Emergency Medicine Annual Meeting, Scottsdale, Phoenix, AZ, 2010 (Poster).

16. Sasson C, **Colwell C**, McNally B, Haukoos J. **"Associations Between Individual-level and Census Tract-level Characteristics and Performance of Bystander CPR Among Patients Who Experience Out-of-Hospital Cardiac Arrest."** Oral Presentation American Heart Association November 2010.

17. Sasson C, **Colwell C**, McNally B, Dunford J, Haukoos J. "Using the Cardiac Arrest Registry to Enhance Survival to Examine Regional Variation in the Utilization of Automated External Defibrillators." Poster Presentation Resuscitation Science Symposium American Heart Association November 2010.

18. Macht M, **Colwell CB**, Mull A, Johnston J B, Shupp A, Marquez KD, Gaither J, Haukoos J. "Droperidol versus haloperidol for prehospital sedation of acutely agitated patients." Poster presentation at NAEMSP 2012 Annual Meeting, January 2012

19. Nassel A, Haukoos J, McNally B, **Colwell CB**, Severyn F, Sasson C. "Using Geographic Information Systems and Cluster Analysis to identify Neighborhoods with High Out of Hospital Cardiac Arrest Incidence and Low Bystander Cardiopulmonary Resuscitation Prevalence in Denver, Colorado." Oral Presentation, Society of Academic Emergency Medicine Annual Meeting, May 2012, Chicago, Illinois. Acad Emerg Med 2012 19(4) Suppl.1, #513:S271-272

20. Vogel JA, Arens A, Johnson C, Ruygrok M, Smalley C, Byyny R, **Colwell CB**, Haukoos J. "Prehosptial and Emergency Department Intubation is

Associated with Increased Mortality in Patients with Moderate to Severe Traumatic Brain Injury". Oral Presentation, Society of Academic Emergency Medicine Annual Meeting, May 2012, Chicago, Illinois. Acad Emerg Med 2012 19(4) Suppl. 1, #517:S273-S274

21. Vogel JA, Sasson C, Hopkins E, **Colwell CB**, Haukoos J. "Systems-Wide Cardiac Arrest Interventions Improve Neurologic Survival after Out-of-Hosptial Cardiac Arrest". Moderated Poster Presentation, Society of Academic Emergency Medicine Annual Meeting, May 2012, Chicago, Illinois. Acad Emerg Med 2012 19(4) Suppl. 1, #615:S324

22. Muramoto S**, Colwell C**, Mehler P, Bakes K. "Cost analysis of a hospital-based violence intervention program: At-risk intervention and mentoring program (AIM)." Poster presentation at 25th Annual Interprofessional Research and EBP Symposium, March 2014, Denver, CO.

23. Huang D, Niedzwiecki M, Mercer M, **Colwell CB**, Mann C, Hsia R. "Poor Neighborhoods Have Slower Response and Transport Times". Oral Presentation, National Association of EMS Physicians (NAEMSP) 2017 Annual Meeting, New Orleans, LA, January 26th, 2017.

24. Kanzaria HK, Mercer MP, To J, Costa B, Luna A, Bilinski J, Staconis D, Pitts M, Dentoni T, Williams T, Singh MK, **Colwell CB**, Marks JD. "Using Lean Methodology to Create a Care Pathway for Low Acuity Emergency Department Patients in a Safety-Net Hospital". Poster presentation, Society for Academic Emergency Medicine (SAEM) 2017. Orlando, FL. May 17th, 2017.

25. Niedzwiecki M, Huang D, Mercer M, **Colwell CB**, Mann NC, Hsia RY. "Do Poor Neighborhoods Have Slower EMS Times? Oral presentation, Society for Academic Emergency Medicine (SAEM) 2017. Orlando, FL, May 18th, 2017

**Invited Lectures, Presentations, and Visiting Professorships:**

1. Hypertensive Emergencies
   Interdepartmental Grand Rounds, University of Michigan
   Ann Arbor, Michigan, May 1997
2. Pediatric Meningitis
   Emergency Medicine Grand Rounds, University of Michigan
   Ann Arbor, Michigan, October, 1997
3. Antibiotic Use in the Emergency Department
   Attending Lecture in Emergency Medicine
   Denver Health Medical Center, Denver, Colorado, October 1998
4. The Myth of EMS Response Times
   26th Annual Rocky Mountain Trauma and Emergency Medicine Conference
   Breckenridge, Colorado, July 1999
5. Geriatric Trauma
   26th Annual Rocky Mountain Trauma and Emergency Medicine Conference
   Breckenridge, Colorado, July 1999
6. Mass Casualty and Disaster Management: The Columbine Shootings
   Multidisciplinary Trauma Conference, Denver Health Medical Center

Denver, Colorado, September 1999

7. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
Northeast EMS Conference
Boston, Massachusetts, September 1999

8. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
Keynote Address, Winnipeg EMS Conference
Winnipeg, Canada, October 1999

9. <u>Mass Casualty and Disaster Management</u>
Grand Rounds
Harvard Medical School and Harvard Affiliated Emergency Medicine Residency
October 26th, 1999
Boston, Massachusetts

10. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
Pediatric Emergency Care Conference
Grand Rapids, Michigan, March 2000

11. <u>Geriatric Trauma</u>
Trauma Care Appreciation Day
Denver, Colorado, May 2000

12. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
Fifth International Conference on Pediatric Trauma
Beaver Creek, Colorado, June 2000

13. <u>Complaints Against EMS</u>
27th Annual Rocky Mountain Trauma and Emergency Medicine Conference
Steamboat, Colorado, July 2000

14. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
Sixth Annual Trauma Symposium, Cleveland Clinic Health System
Cleveland, Ohio, October 2000

15. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
EMS TEST Conference
Columbus, Georgia, October 2000

16. <u>Myocardial Infarction</u>
Colorado State EMS Conference 2000
Breckenridge, Colorado, October 2000

17. <u>Hypothermia</u>
Colorado State EMS Conference 2000
Breckenridge, Colorado, October 2000

18. <u>Complaints Against EMS</u>
Colorado State EMS Conference 2000
Breckenridge, Colorado, October 2000

19. <u>Hypothermia</u>
Rocky Mountain Winter Trauma and Emergency Medicine Conference
Copper Mountain, Colorado, January 2001

20. <u>Mechanism of Injury</u>
Grand Rounds, Longmont Community Hospital
Longmont, Colorado, March 2001

DEF0074

21. <u>Stabilization of the Trauma Patient</u>
    Trauma Care Appreciation Day, Denver Health Medical Center
    Denver, Colorado, April 2001
22. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    El Paso EMS Conference
    El Paso, Texas, September 2001
23. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    Memorial Medical Center Trauma Conference
    Johnstown, Pennsylvania, October 2001
24. <u>Mechanism of Injury</u>
    Colorado State EMS Conference 2001
    Breckenridge, Colorado, October 2001
25. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    Massachusetts EMS Conference
    Worcester, Massachusetts, December 2001
26. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    Sierra-Cascade Trauma Society
    Crested Butte, CO, February, 2002
27. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    Emergency Medicine Grand Rounds, University of Massachusetts
    Worcester, Massachusetts, March 2002
28. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    Multidisciplinary Trauma Conference, Denver Health Medical Center
    Denver, Colorado, March 2002
29. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    Grand Rounds, Day Kimball Hospital
    Putnam, Connecticut, May 2002
30. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    Grand Rounds, Legacy Emanuel Hospital & Health Center
    Portland, Oregon, June 2002
31. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>
    Trauma Grand Rounds, Scripps Memorial Hospital
    La Jolla, California, September 2002
32. <u>High Altitude Illness</u>
    Annual Meeting, Sierra Cascade Trauma Society
    Vail, Colorado, January 2003
33. <u>ALS in Trauma: Should We Even Bother?</u>
    30th Annual Rocky Mountain Trauma and Emergency Medicine Conference
    Breckenridge, Colorado, August 2003
34. <u>Hypothermia</u>
    30th Annual Rocky Mountain Trauma and Emergency Medicine Conference
    Breckenridge, Colorado, August 2003
35. <u>Research in EMS</u>
    Grand Rounds, Denver Paramedic Division
    Denver, Colorado September, 2003
36. <u>High Altitude Illness</u>

Colorado State EMS Conference 2003
Keystone, Colorado, October, 2003

37. <u>Controversies in EMS</u>
Colorado State EMS Conference 2003
Keystone, Colorado, October 2003

38. <u>Hypothermia</u>
Sierra Cascade Trauma Society, 2004
Aspen, Colorado, February 9, 2004

39. <u>Current Research in Prehospital Care</u>
Rocky Mountain Critical Care Transport Conference
Denver, Colorado, May 6th, 2004

40. <u>Blood Substitutes in the Field</u>
Clinical Conference on Pre-Hospital Emergency Care, 2004
Orlando, Florida, July 10th, 2004

41. <u>Management of Potential C-spine Injuries: Clearance and Beyond</u>.
31st Annual Rocky Mountain Trauma and Emergency Medicine Conference
Copper Mtn, Colorado. July 18th, 2004

41. <u>Mass Casualty and Disaster Management: The Columbine Shootings</u>.
Grand Rounds, North Colorado Medical Center
Greeley, Colorado. September 14, 2004

42. <u>Research in EMS and Trauma</u>
12th Annual EMS and Trauma Grand Rounds Conference
Aurora, Colorado. September 15, 2004

43. <u>Blood Substitutes in the Field: The Prehospital Trials</u>
2004 Colorado State EMS Conference
Keystone, Colorado. November 5th, 2004

44. <u>Cadaver Anatomy Lab: Dissection and Procedure Review on a Human Cadaver</u>. Preconference workshop, 2004 Colorado State EMS Conference
Keystone, Colorado. Novemeber 5th, 2004

45. <u>Prehospital Management of Trauma</u>
32nd Annual Rocky Mountain Trauma and Emergency Medicine Conference
Breckenridge, Colorado. June 14th, 2005

46. <u>Difficult Airway Lecture/Lab</u>
32nd Annual Rocky Mountain Trauma and Emergency Medicine Conference
Breckenridge, Colorado. June 15th, 2005

47. <u>Bleeding Disorders</u>
32nd Annual Rocky Mountain Trauma and Emergency Medicine Conference
Breckenridge, Colorado. June 15th, 2005

48. <u>Travel-Related Infectious Disease</u>
ACEP Scientific Assembly 2005
September 28th, Washington D.C.

49. <u>The Hot Joint</u>
ACEP Scientific Assembly 2005
September 29th, Washington D.C.

50. <u>Mass Casualty and Disaster Management</u>
Trauma and Critical Care Conference

DEF0076

San Juan Regional Medical Center, Farmington, New Mexico
February 18th, 2006

51. Dialysis Related Emergencies
33rd Annual Rocky Mountain Trauma and Emergency Medicine Conference
Breckenridge, Colorado. June 14th, 2006

52. Show Me Where it Hurts: Pain Management in the Field
33rd Annual Rocky Mountain Trauma and Emergency Medicine Conference
Breckenridge, Colorado. June 15th, 2006

53. Environmental Emergencies
2006 Rocky Mountain Rural Trauma Symposium
September 14, 2006. Billings, Montana.

54. Drugs of Abuse
2006 Rocky Mountain Rural Trauma Symposium
September 15, 2006. Billings, Montana.

55. Cadaver Anatomy Lab: Dissection and Procedure Review on a Human
Cadaver. Preconference workshop, 2006 Colorado State EMS Conference
Keystone, Colorado.

56. Dialysis-Related Emergencies
2006 Colorado State EMS Conference
November 3rd, 2006, Keystone, Colorado

57. High-Altitude Illness
2006 Colorado State EMS Conference
November 3rd, 2006. Keystone, Colorado

58. Drugs of Abuse
34th Annual Rocky Mountain Trauma and Emergency Medicine Conference
Breckenridge, Colorado. June 20th, 2007

59. Environmental Emergencies
34th Annual Rocky Mountain Trauma and Emergency Medicine Conference
Breckenridge, Colorado. June 22th, 2007

60. Ultrasound Use in the Acutely Traumatized Patient
Instuctor, Ultrasound Workshop
34th Annual Rocky Mountain Trauma and Emergency Medicine Conference
Breckenridge, Colorado. June 22th, 2007

61. Jigawatts: Back to the Future of Electrical Injuries
American College of Emergency Physicians - Scientific Assembly,
October 8-11, 2007. Seattle, Washington

62. What's Hot, What's Not: Hypo to Hyperthermia, and All Things in Between
American College of Emergency Physicians - Scientific Assembly,
October 8-11, 2007. Seattle, Washington

63. Environmental Emergencies
Colorado State EMS Conference, November 8th-11th, 2007
Keystone, Colorado

64. Cadaver Anatomy Lab: Dissection and Procedure Review.
Colorado State EMS Conference 2007 – Pre-conference Workshop
Keystone, Colorado

65. Drugs of Abuse

DEF0077

Colorado Society of Osteopathic Medicine: The Medical "Home Improvements" Course. February 24th, 2008
Keystone, Colorado

66. Initial Evaluation of the Trauma Patient
Colorado Society of Osteopathic Medicine: The Medical "Home Improvements" Course. February 24th, 2008
Keystone, Colorado

67. Geriatric Trauma
35th Annual Rocky Mountain Trauma and Emergency Medicine Conference June 25th, 2008
Breckenridge, CO

68. What's Hot, What's Not: Hypo to Hyperthemia and All Things in Between
ACEP Scientific Assembly 2008, October 28th
Chicago, Il

69. Triage Out Debate: Efficient or Unethical?
ACEP Scientific Assembly 2008, October 28th
Chicago, Il

70. Update in EMS Literature: What's Hot and What's Not
ACEP Scientific Assembly 2008, October 29th
Chicago, Il

71. Cadaver Disection Lab
2008 Colorado State EMS Conference, November 6th
Breckenridge, CO

72. Geriatric Trauma
2008 Colorado State EMS Conference, November 7th
Breckenridge, CO

73. Lessons Learned from the DNC
Colorado Front Range MMRS Hospital Response to a Mass Casualty Incident, December 8th, 2008
Denver, CO

74. Lessons Learned from the DNC
The EMS State of the Sciences Conference: A Gathering of Eagles 2009 February 20th, 2009
Dallas, TX

75. Nightmare EMS Communications
The EMS State of the Sciences Conference: A Gathering of Eagles 2009 February 21st, 2009
Dallas, TX

76. Mass Casualty and Disaster Management
Trauma Perspectives 2009 (4/10/09)
Durango, CO

77. Airway Management and Pitfalls
Trauma Perspectives 2009 (4/10/09)
Durango, CO

78. Trauma Management
Integrated Clinicians Course (ICC) 7004

University of Colorado at Denver School of Medicine
May 5th, 2009

79. EMS Update, 2009
Grand Rounds, Beth Israel/Deaconess Department of Emergency Medicine
May 6th, 2009

80. EMS Update – Panel Discussion
36th Annual Trauma and Emergency Medicine Conference
June 18th 2009, Breckenridge, CO

81. Trauma in Pregnancy
36th Annual Trauma and Emergency Medicine Conference
June 19th 2009, Breckenridge, CO

82. Cadaver Lab: Anatomical Dissection
2009 Colorado State EMS Conference
November 5th, Keystone, Colorado

83. Trauma in Pregnancy
2009 Colorado State EMS Conference
November 6th, Keystone, Colorado

84. Update in EMS Literature: What's Hot and What's Not
2009 Colorado State EMS Conference
November 6th, Keystone, Colorado

85. Lessons Learned from the DNC
International Preparedness and Response to Emergencies and Disasters (IPRED)
January 12th 2010
Tel Aviv, Israel

86. Geriatric Trauma
Second Annual BCFFA EMS Conference
January 23rd 2010, Boulder, Colorado

87. Pharmaceutical Restraints: A New Medication Approach to the Agitated Patient
The EMS State of the Sciences Conference: A Gathering of Eagles 2010
February 26th, 2010
Dallas, Tx

88. Transfer of the Rural Trauma Patient
Second Annual Western Colorado Trauma Conference
May 21st 2010, Delta, Colorado

89. Moderator, EMS Medical Director Panel: "Refusal of Care in the Prehospital Setting"
37th Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 17th 2010, Breckenridge, Colorado

90. Critical Issues in Triage
37th Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 18th 2010, Breckenridge, Colorado

91. Field Triage Guidelines: State of the Art or State of the Science?
ACEP Scientific Assembly 2010
September 28th, Las Vegas, Nevada

DEF0079

92. <u>Less Lethal Force: An Emerging Problem in Prehospital Care</u>
    ACEP Scientific Assembly 2010
    September 29th, Las Vegas, Nevada
93. <u>Trauma Case Panel: Stump the Experts</u>
    Carlo Rosen (Moderator), Christopher B. Colwell MD, John Fildes MD, Julie
    A. Mayglothling MD.
    ACEP Scientific Assembly 2010
    September 29th, Las Vegas, Nevada
94. <u>Critical Issues in Triage</u>
    Trauma and Critical Care Conference
    October 22nd, 2010
    Durango, Colorado
95. <u>Trauma Panel Case Review</u>
    Christopher B. Colwell, Moderator
    October 23rd, 2010
    Durango, Colorado
96. <u>Lightning and Electrical Emergencies</u>
    Trauma and Critical Care Conference
    October 23rd, 2010
    Durango, Colorado
97. <u>Cadaver Dissection Lab</u>
    Colorado State EMS Conference 2010
    November 4th, 2010
    Keystone, Colorado
98. <u>Accidental Hyper And Hypothermia And All Things In Between</u>
    Colorado State EMS Conference 2010
    November 5th, 2010
    Keystone, Colorado
99. <u>Biophone Calls: The Good, The Bad, And The Ugly</u>
    Colorado State EMS Conference 2010
    November 5th, 2010
    Keystone, Colorado
100. <u>Geocoding Cardiac Arrest in Denver</u>
    ECCU 2010 (Emergency Cardiac Care Update)
    December 8th, 2010
    San Diego, California
101. <u>Management of the Agitated Patient</u>
    ECCU 2010 (Emergency Cardiac Care Update)
    December 9th, 2010
    San Diego, California
102. <u>The Nose Knows: Intranasal Medication Options are Growing</u>
    EMS State of the Sciences: A Gathering of Eagles XIII 2011
    February 26th, 2011
    UT Southwestern Medical Center, Dallas, Texas
103. <u>Beyond Agitated Delirium: Dealing with the Issue of In-Custody Deaths</u>
    The EMS State of the Sciences: A Gathering of Eagles XIII 2011

DEF0080

February 26th, 2011
UT Southwestern Medical Center, Dallas, Texas

104.  ED Operations 101: Follow the Money
Council of Emergency Medicine Residency Directors (CORD) Academic
Assembly 2011 (March 4th)
San Diego, California

105.  CPR, Defibrillation, and Drugs: What is the right VF mix?
EMS Regional Conference: Resuscitation Excellence
May 15th, 2011
New York, New York

106.  We Don't Need No Stinking Breaths! Compressions Only Pre-Arrival
Instructions.
EMS Regional Conference: Resuscitation Excellence
May 15th, 2011
New York, New York

107.  Moderator – Panel Discussion: Optimizing Colorado's Trauma System
38th Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 22nd, 2011
Breckenridge, Colorado

108.  Pitfalls in Trauma Care
38th Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 24th, 2011
Breckenridge, Colorado

109.  Deleterious Delirium Deliberations: Modern Pitfall is Managing Agitated
EMS Patients
Advanced EMS Practitioner's Forum and Workshop
ACEP Scientific Assembly
October 14th, 2011
San Francisco, California

110.  Certifiable Behaviors: Preparing for EMS Subspecialty Board
Certification
Advance EMS Practitioner's Forum and Workshop
ACEP Scientific Assembly
October 14th, 2011
San Francisco, California

111.  Cadaver Dissection and Anatomy Lab
Colorado State EMS Conference 2011
November 3rd, 2011
Keystone, Colorado

112.  On the Wings of Eagles: Hot Topics in EMS
Colorado State EMS Conference 2011
November 4th, 2011
Keystone, Colorado

113.  Droperidol for Agitation
Advanced Topics in Medical Direction
NAEMSP National Meeting, 2012

January 11th, 2012
Tucson, Arizona

114.   Trauma in Pregnancy
Children's Hospital EMS Conference
Aurora, Colorado
January 20th, 2012

115.   Withdrawing Support: A Prehospital Protocol for Alcohol Withdrawal
EMS State of the Science: A Gathering of Eagles XIV
February 24th, 2012
Dallas, Texas

116.   A Sanguine Approach: The Use of Blood Products and Substitutes in the Field
EMS State of the Science: A Gathering of Eagles
February 24th, 2012
Dallas, Texas

117.   Blast Injuries
1st Annual Trauma Symposium
March 15th, 2012
Burlington, Colorado

118.   Rural Trauma
1st Annual Trauma Symposium
March 15th, 2012
Burlington, Colorado

119.   Trauma in Pregnancy
2012 NE Colorado EMS Symposium
April 21st, 2012
Fort Morgan, Colorado

120.   Hemorrhage Control in the Field: Tourniquets and Beyond
Grand Rounds – St. Mary's and Convent Health Care/Synergy Medical Center Hospitals
May 10th, 2012
Saginaw, Michigan

121.   Mass Casualty and Disaster Management
Invited Lecture – Convent Health Care/Synergy Medical Center
April 21st, 2012
Saginaw, Michigan

122.   Trauma in Pregnancy
39th Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 29th, 2012
Breckenridge, Colorado

123.   Taking it on the QT: What are the Cardiac Effects of Sedation Practices?
Emergency Cardiac Care Update (ECCU) 2012
Pre-conference Workshop
September 12th, 2012
Orlando, Florida

124.   Withdrawing Support: Managing Alcohol Withdrawal in the Field

Emergency Cardiac Care Update (ECCU) 2012
Pre-conference Workshop
September 12th, 2012
Orlando, Florida

125.    <u>Making Waves Diagnostically: Identifying Subtle Critical Emergencies with Capnography</u>
Emergency Cardiac Care Update (ECCU) 2012
Conference Session – Eagles: State of the Science
September 13th, 2012
Orlando, Florida

126.    <u>Two Carbon Fragmentations: A Prehospital Protocol for Ethanol Withdrawal</u>.
2012 ACEP Advanced EMS Practitioners' Forum and Workshop
October 7th, 2012
Denver, Colorado

127.    <u>How to Break the Ache: 2012 Approaches to Prehospital Pain Control</u>
2012 ACEP Advanced EMS Practitioners' Forum and Workshop
October 7th, 2012
Denver, Colorado

128.    <u>I'd Scan That! Effective Diagnostic Trauma Imaging</u>
ACEP Scientific Assembly
October 9th, 2012
Denver, Colorado

129.    <u>Evidence-Based Minor Trauma Management</u>
ACEP Scientific Assembly
October 9th, 2012
Denver, Colorado

130.    <u>Trauma Talk: The Latest and the Greatest Trauma Literature</u>
ACEP Scientific Assembly
October 10th, 2012
Denver, Colorado

131.    <u>The Combative, Uncooperative, Arrested, and Threatening Trauma Patient: A Legal, Ethical, and Medical Minefield</u>
ACEP Scientific Assembly
October 10th, 2012
Denver, Colorado

132.    <u>MCI Medical Response: Are We Prepared?</u>
Denver Health Critical Care Conference
October 12th, 2012
Denver, Colorado

133.    <u>The Colorado Shootings: Lessons Learned from Mass Casualty Events</u>
Grand Rounds – Beth Israel/Deaconess Medical Center
November 7th, 2012
Boston, Massachusetts

134.    <u>The Colorado Shootings: Lessons Learned from Mass Casualty Events</u>
Keynote Speaker: Hillsborough County Medical Association

DEF0083

November 13th, 2012
Tampa Bay, Florida

135.   The Colorado Shootings: Lessons Learned on Disaster Management and Mass Casualty Events
Grand Rounds: Scripps Memorial Hospital
December 11th, 2012
La Jolla, California

136.   EMS in the Cross-Hairs: The Columbine, Aurora and Safeway Shootings
EMS State of the Science: A Gathering of Eagles XV
February 22nd, 2013
Dallas, Texas

137.   Oh, What a Relief It Is! Revisiting Pain Medication Use in EMS
EMS State of the Science: A Gathering of Eagles XV
February 22nd, 2013
Dallas, Texas

138.   ED Operations 101: Follow the Money
Council of Emergency Medicine Residency Directors (CORD)
Academic Assembly 2013
March 7th, 2013
Denver, Colorado

139.   Disaster Planning & Response: Lessons Learned from the Colorado Shootings
Trauma, Critical Care, and Acute Care Surgery 2013 – Medical Disaster Response
March 17th, 2013
Las Vegas, Nevada

140.   Case Management Interactive Session: Practical Issues & Dilemmas in Mass Casualty Preparedness
Trauma, Critical Care, and Acute Care Surgery 2013 – Medical Disaster Response
March 17th, 2013
Las Vegas, Nevada

141.   Trauma Surgeons Emergency Physicians and Trauma Care
Trauma, Critical Care, and Acute Care Surgery 2013
March 20th, 2013
Las Vegas, Nevada

142.   Mass Casualty and Disaster Management – The Colorado Shootings
Visiting Professorship/Grand Rounds
Southern Illinois University School of Medicine
April 18th, 2013
Springfield, Illinois

143.   Mass Casualty and Disaster Management – The Colorado Shootings
Sangamon County Medical Society
April 18th, 2013
Springfield, Illinois

144.   Lessons Learned from the Colorado Shootings

DEF0084

12th Annual Trauma Symposium
Mississippi Coastal Trauma Region
May 1st, 2013
Biloxi, Mississippi

145.  Mass Casualty and Disaster Management – The Colorado Shootings
Grand Rounds – Indiana University Hospital-Methodist
May 10th, 2013
Indianapolis, Indiana

146.  Prehospital Panel
Moderator
40th Annual Rocky Mountain Trauma & Emergency Medicine
Conference
June 27th, 2013
Breckenridge, Colorado

147.  Environmental Emergencies
40th Annual Rocky Mountain Trauma & Emergency Medicine Conference
June 28th, 2013
Breckenridge, Colorado

148.  Lessons Learned from the Colorado Shootings
43rd Annual Wyoming Trauma Conference
August 16th, 2013
Cheyenne, Wyoming

149.  Oh What a Relief It Is: Evolving Trends in Prehospital Pain Management
IAFF Advanced EMS Practitioners, Chiefs, & Medical Directors Forum
August 24th, 2013
Denver, Colorado

150.  EMS in the Cross-Hairs: The Columbine, Aurora, and Safeway Shootings
IAFF Advanced EMS Practitioners, Chiefs, & Medical Directors Forum
August 24th, 2013
Denver, Colorado

151.  The Reality of the New Specialty: What Will Be the Impact of the New
EMS Boards for Fire?
IAFF Advanced EMS Practitioners, Chiefs, & Medical Directors Forum
August 24th, 2013
Denver, Colorado

152.  I'd Scan That!: Use of CT Scans in Trauma Care
Grand Rounds – University of Wisconsin School of Medicine
August 29th, 2013
Madison, Wisconsin

153.  Evidence-Based Minor Trauma Management
Grand Rounds – University of Wisconsin School of Medicine
August 29th, 2013
Madison, Wisconsin

154.  Mass Casualty and Disaster Management: EMS Lessons from the
Colorado Shootings
EMS World Expo 2013

September 11th, 2013
Las Vegas, Nevada

155. <u>2013 Approaches to Pain Management and Sedation</u>
EMS World Expo 2013
September 11th, 2013
Las Vegas, Nevada

156. <u>Mass Casualty and Disaster Management: Lessons Learned from the Colorado Shootings</u>
DuPage County Medical Society Annual Meeting
October 9th, 2013
Chicago, Illinois

157. <u>Mass Casualty Management: The Colorado Shootings</u>
Northern Colorado Emergency and Trauma Care Symposium
October 11th, 2013
Loveland, Colorado

158. <u>The Combative, Uncooperative, Arrested and Threatening Trauma Patient: A Legal, Ethical and Medical Minefield!</u>
ACEP Scientific Assembly 2013
October 15th, 2013
Seattle, Washington

159. <u>Skip the Scan! Effective Diagnostic Trauma Imaging</u>
ACEP Scientific Assembly 2013
October 16th, 2013
Seattle, Washington

160. <u>I Survived: Domestic Disasters – Lessons Learned from the Trenches</u>
ACEP Scientific Assembly 2013
October 16th, 2013
Seattle, Washington

161. <u>Managing Ballistic Injuries in the Pre-Hospital Setting</u>
World Extreme Medicine Expo 2013
Harvard Medical School
October 28th, 2013
Boston, Massachusetts

162. <u>Cadaver Lab – Trauma Procedures</u>
Colorado State EMS Conference 2013
November 7th, 2013
Keystone, Colorado

163. <u>Mass Casualty and Disaster Management: Lessons Learned from the Colorado Shootings</u>
2013 Trauma and Critical Care Conference
November 8th, 2013
Durango, Colorado

164. <u>Mass Casualty and Disaster Management: The Colorado Shootings</u>
Lake County Medical Society Annual Meeting
December 3rd, 2013
Chicago, Illinois

165. <u>Myths in Trauma Care</u>
Yampa Valley Medical Center Trauma Conference
November 15th, 2013
Steamboat Springs, Colorado

166. <u>Myths in Pediatric Care</u>
The Brian Schimpf Memorial Prehospital Pediatric Care Conference
February 8th, 2014.
Denver, Colorado

167. <u>Child-Like Behaviors: 10 Myths of EMS Pediatric Care</u>
EMS State of the Science: A Gathering of Eagles XVI
February 28th, 2014
Dallas, Texas

168. <u>Epidemic Proportions: Dosing Ketamine in the Era of Mamba Dramas</u>
EMS State of the Science: A Gathering of Eagles XVI
March 1st, 2014
Dallas, Texas

169. <u>Covering Mental Illness and Violence</u>
Health Journalism 2014 (Association of Health Care Journalism)
March 29th, 2014
Denver, Colorado

170. <u>Wound Management: How Do you Manage Cuts and Burns</u>
American College of Emergency Physicians (ACEP) Advanced Practice
Provider Academy
April 15th, 2014
San Diego, CA

171. <u>Evaluation of Patients with Blunt Multiple Trauma and Penetrating
Trauma: A Systematic Approach</u>
American College of Emergency Physicians (ACEP) Advanced Practice
Provider Academy
April 15th, 2014
San Diego, CA

172. <u>Preparedness Put to the Test: Lessons Learned from Major Events to
Guide Hospital Disaster Preparedness</u>
Medical World Americas Conference and Expo
April 28th, 2014
Houston, TX

173. <u>Myths in Trauma Care</u>
13th Annual MS Coastal Trauma Symposium
May 14th, 2014
Biloxi, MS

174. <u>Anxiolysis for the Cardiac Care Provider: Easy Choices for Sedation in
Emergency Care</u>
Emergency Cardiac Care Update (ECCU), EMS Preconference Workshop
June 3rd, 2014
Las Vegas, NV

175. <u>Taking it on the QT: What are the Cardiac Effects of Sedation Practices?</u>

Emergency Cardiac Care Update (ECCU), EMS Preconference Workshop
June 3rd, 2014
Las Vegas, NV

176. <u>Anxiolysis for the Cardiac Care Provider: Easy Choices for Sedation in Emergency Care</u>
Emergency Cardiac Care Update (ECCU), 2014 Citizens CPR
Foundation: Clinical Solutions and Best Practices for EMS
June 4th, 2014
Las Vegas, NV

177. <u>Taking it on the QT: What are the Cardiac Effects of Sedation Practices?</u>
Emergency Cardiac Care Update (ECCU), 2014 Citizens CPR
Foundation: Clinical Solutions and Best Practices for EMS
June 4th, 2014
Las Vegas, NV

178. <u>Hyperfibrinolysis, Physiologic Fibrinolysis, and Fibrinolysis Shutdown: The Spectrum of Postinjury Fibrinolysis and Relevance to Antifibrinolytic Therapy</u>
Moderator - Denver Health Trauma Services Continuing Education Series
June 25th, 2014
Denver, CO

179. <u>Myths in Pediatric Emergency Care</u>
41st Annual Rocky Mountain Trauma and Emergency Medicine Conference
July 9th, 2014
Breckenridge, CO

180. <u>The Combative, Uncooperative, Intoxicated Patient: An Ethical, Moral and Legal Dilemma</u>
41st Annual Rocky Mountain Trauma and Emergency Medicine Conference
July 11th, 2014
Breckenridge, CO

181. <u>Myths in Pediatric Care</u>
2014 University of Colorado Health and Denver Health Trauma Consortium:
Acute Care Surgery, Trauma, and EMS Conference
August 23rd, 2014
Colorado Springs, CO

182. <u>Rural Trauma Care</u>
Great Plains Trauma Conference
September 18th, 2014
North Platte, Nebraska

183. <u>How to Break the Ache: 2014 Ways to Manage Prehospital Analgesia and Sedation</u>
Advanced EMS Practitioner's Forum and Workshop
ACEP 2014
October 26th, 2014
Chicago, Illinois

184. <u>No Small Lie: Debunking Myths in Pediatric EMS Care</u>
Advanced EMS Practitioner's Forum and Workshop

ACEP 2014
October 26th, 2014
Chicago, Illinois

185. The Combative, Uncooperative, Arrested, and Threatening Trauma Patient: A Legal, Ethical, and Medical Minefield!
American College of Emergency Physicians (ACEP) Scientific Assembly 2014
October 27th, 2014
Chicago, Illinois

186. Cruising the Literature: The Most Influential EMS Articles of 2014
American College of Emergency Physicians (ACEP) Scientific Assembly 2014
October 28th, 2014
Chicago, Illinois

187. Tales from the Rig: EMS Medical Director Words of Wisdom
American College of Emergency Physicians (ACEP) Scientific Assembly 2014
October 28th, 2014
Chicago, Illinois

188. Imagine a World Without Backboards? Controversies in Spinal Immobilization
American College of Emergency Physicians (ACEP) Scientific Assembly 2014
October 28th, 2014
Chicago, Illinois

189. Disaster Management: Lessons Learned from the Colorado Shootings
Keynote Address: 9th Annual NORTN Regional Trauma Conference
November 7th, 2014
Akron General Hospital, Akron, Ohio

190. The Combative, Uncooperative, Arrested, and Threatening Trauma Patient: A Legal, Ethical, and Medical Minefield!
9th Annual NORTN Regional Trauma Conference
November 7th, 2014
Akron General Hospital, Akron, Ohio

191. Ketamine for Excited Delirium
EMS World Expo
November 11th, 2014
Nashville, TN

192. 10 Myths of EMS Pediatric Care
EMS World Expo
November 11th, 2014
Nashville, TN

193. Biophone Communications
EMS World Expo
November 11th, 2014
Nashville, TN

DEF0089

194.    <u>EMS Medical Director Panel</u>
EMS World Expo
November 12th, 2014
Nashville, TN

195.    <u>The Combative, Uncooperative, Arrested, and Threatening Trauma Patient: A Legal, Ethical, and Medical Minefield!</u>
Boulder Community Hospital/AMR EMS Conference 2014
December 6th, 2014
Boulder, CO

196.    <u>Special K: Ketamine in EMS</u>
7th Annual Advanced Topics in Medical Direction
NAEMSP 2015
January 20th, 2015
New Orleans, LA

197.    <u>First it was Backboards, now C-Collars</u>
EMS State of the Science: A Gathering of Eagles XVII
February 20th, 2015
Dallas, TX

198.    <u>Taking it to the Streets! Prehospital Infusion of Plasma</u>
EMS State of the Science: A Gathering of Eagles XVII
February 20th, 2015
Dallas, TX

199.    <u>Street Fighting Man! When the Combative Patient is Refusing Transport</u>
EMS State of the Science: A Gathering of Eagles XVII
February 21st, 2015
Dallas, TX

200.    <u>A Hurt-Full Remark: Supporting Ketamine Use for Pain Management</u>
EMS State of the Science: A Gathering of Eagles XVII
February 21st, 2015
Dallas, TX

201.    <u>Imagine a World Without Backboards? Controversies in Spinal Immobilization</u>
2nd Annual Brain Schimpf Memorial Pediatric EMS Conference
February 28th, 2015
Denver, CO

202.    <u>Providing for the Providers: Impact of Traumatic Events on Providers</u>
Keynote address: Colorado CPR Association Annual Meeting
April 30th, 2015
Denver, CO

203.    <u>Mass Casualty and Disaster Management: Lessons Learned from the Colorado Shootings</u>
North Trauma Care Region 2015 Trauma Symposium
May 8th, 2015
Tupelo, MS

204.    <u>Management of Excited Delirium in the Era of Legalized Marijuana</u>
Vanderbilt Residency in Emergency Medicine

May 19th, 2015
Nashville, TN

205.   Mass Casualty and Disaster Management: Lessons Learned from the Colorado Shootings
Grand Rounds Presentation, Vanderbilt University School of Medicine
May 19th, 2015
Nashville, TN

206.   Active Shooter – Prehospital Forum (Moderator)
42nd Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 19th, 2015
Vail, Colorado

207.   Imagine a World without Backboards
42nd Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 20th, 2015
Vail, Colorado

208.   Mass Casualty and Disaster Management: Lessons Learned from the Colorado Shootings
Ohio EMS Lecture Series – Keynote address
August 20th, 2015
Akron, Ohio

209.   Myths in Pediatric Care
Grand Rounds, Deaconess Regional Trauma Center
EMS Trauma Symposium
September 9th, 2015
Evansville, Indiana

210.   Plasma Administration in the Field: The COMBAT Trial
World Trauma Symposium
September 16th, 2015
Las Vegas, Nevada

211.   The Combative, Uncooperative, Intoxicated Trauma Patient: A Medical, Legal, and Ethical Nightmare!
EMS World
September 17th, 2015
Las Vegas, Nevada

212.   The Medical Impact of Marijuana Legalization
EMS World
September 17th, 2015
Las Vegas, Nevada

213.   How to Deploy a New Toy for Every Girl and Boy: Implementing a Simpler System for Treating Children
ACEP 2015 Scientific Assembly Advanced EMS Practitioners Forum and Workshop
October 25th, 2015
Boston, Massachusetts

214.   For the Life of all Flesh is the Blood Thereof! Prehospital Use of Blood Products and Systemic Bleeding Control

DEF0091

ACEP 2015 Scientific Assembly Advanced EMS Practitioners Forum and Workshop
October 25th, 2015
Boston, Massachusetts

215.    Trauma STAT! Don't Miss the Visual Cue
ACEP Scientific Assembly 2015
October 28th, 2015
Boston, Massachusetts

216.    The Combative, Uncooperative Trauma Patient
ACEP Scientific Assembly 2015
October 28th, 2015
Boston, Massachusetts

217.    How to Deploy a New Toy for Every Girl and Boy: Implementing a Simpler System for Treating Children
EAGLES – Best Practices in Street Medicine: Implementing the New Guidelines and Several Exceptional Innovations in Out-of-Hospital Emergency Cardiac Care
ECCU (Emergency Cardiovascular Care Update) 2015
December 9th, 2015
San Diego, California

218.    Anxiolysis in Emergency Cardiac Care: 2015 Approaches to Safe Sedation
EAGLES – Best Practices in Street Medicine: Implementing the New Guidelines and Several Exceptional Innovations in Out-of-Hospital Emergency Cardiac Care
ECCU (Emergency Cardiovascular Care Update) 2015
December 9th, 2015
San Diego, California

219.    Latest Drugs of Abuse: The Impact of Legalization of Marijuana and Testing of EMS Personnel
EMS Today (JEMS Conference and Exposition
February 25th, 2016
Baltimore, Maryland

220.    Chemical Suicides
EMS Today (JEMS Conference and Exposition)
February 25th, 2016
Baltimore, Maryland

221.    Lightning Rounds: Ask the Eagles
EMS Today (JEMS Conference and Exposition)
February 26th, 2016
Baltimore, Maryland

222.    Deliriously Yours: 2016 Approaches to Managing the Toxic Patients
First There First Care Regional EMS Conference
May 26th, 2016
Broward County, Florida

DEF0092

223. <u>Promoting Post-Traumatic Provider Protection: Dealing with Depression, Anxiety, and Stress in EMS</u>
First There First Care Regional EMS Conference
May 26th, 2016
Broward County, Florida

224. <u>There Will Be Blood in the Streets: On-Scene Use of Plasma, Cells and Other Clot-Musters</u>
First There First Care Regional EMS Conference
May 26th, 2016
Broward County, Florida

225. <u>Trauma in Pregnancy</u>
43rd Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 18th, 2016
Denver, Colorado

226. <u>Mass Casualty and Disaster Management: Lessons Learned from the Colorado Shootings</u>
Zuckerberg San Francisco General Hospital and Trauma Center Department of Medicine Grand Rounds
September 6th, 2016
San Francisco, California

227. <u>Primum Non Nocere – to Yourself: Responding to the Malicious Mayhem of Mentally-ill Menaces</u>
2016 ACEP Scientific Assembly – Advanced EMS Practitioner's Forum and Workshop
October 15th, 2016
Las Vegas, Nevada

228. <u>No Child (or Adult) Left Behind? The Complexities of Patient Refusal & Non-Transport Decisions</u>
2016 ACEP Scientific Assembly – Advanced EMS Practitioner's Forum and Workshop
October 15th, 2016
Las Vegas, Nevada

229. <u>Taking the Pressure Off Sedation: Why Ketamine is My Pet Amine</u>
2016 ACEP Scientific Assembly – Advanced EMS Practitioner's Forum and Workshop
October 15th, 2016
Las Vegas, Nevada

230. <u>Beyond the MVC: Burned, Blasted, and Bolted Trauma Victims</u>
2016 ACEP Scientific Assembly
October 16th, 2016
Las Vegas, Nevada

231. <u>Fast Facts: Let's Chat About Trauma</u>
2016 ACEP Scientific Assembly
October 16th, 2016
Las Vegas, Nevada

232. <u>The Combative, Uncooperative, Trauma Patient</u>

2016 ACEP Scientific Assembly
October 16th, 2016
Las Vegas, Nevada

233.   Managing the Malicious Mayhem from Mentally Ill Menaces: The Evolving Roles of EMS in Active Shooter Incidents
41st Annual Alaska EMS Symposium
November 4th, 2016
Anchorage, Alaska

234.   Grass Roots Experience with Swedish Fish: A Token Presentation on Marijuana Legalization
41st Annual Alaska EMS Symposium
November 4th, 2016
Anchorage, Alaska

235.   Promoting Post-Traumatic Provider Protection: Dealing with Depression, Anxiety, and Stress in EMS
41st Annual Alaska EMS Symposium
November 4th, 2016
Anchorage, Alaska

236.   Minding Your P's and Q's: What are the Actual Cardiac Effects of Sedation Practices?
41st Annual Alaska EMS Symposium
November 4th, 2016
Anchorage, Alaska

237.   It's No Small Matter: Implementing a Simpler System for Treating Children
41st Annual Alaska EMS Symposium
November 4th, 2016
Anchorage, Alaska

238.   Calling a Code Alert on our Mental Health: Suicide in EMS
2017 NAEMSP Annual Meeting and Scientific Assembly
January 26th, 2017
New Orleans, Louisiana

239.   Child Abuse
2017 Iowa Emergency Medical Services Association Pediatric Conference
February 25th, 2017
Des Moines, Iowa

240.   Apparent Life-Threatening Events
2017 Iowa Emergency Medical Services Association Pediatric Conference
February 25th, 2017
Des Moines, Iowa

241.   Impact of Marijuana Legalization
2017 Iowa Emergency Medical Services Association Pediatric Conference
February 25th, 2017
Des Moines, Iowa

242.   Myths in Pediatric Care
2017 Iowa Emergency Medical Services Association Pediatric Conference

February 25th, 2017
Des Moines, Iowa

243.   Traumatic Shock
UCSF High Risk Emergency Medicine Conference
April 9th, 2017
Maui, Hawaii

244.   Penetrating Abdominal Trauma
UCSF High Risk Emergency Medicine Conference
April 9th, 2017
Maui, Hawaii

245.   The Combative, Intoxicated Trauma Patient: A Medical, Legal, and
Ethical Conundrum!
UCSF High Risk Emergency Medicine Conference
April 9th, 2017
Maui, Hawaii

246.   Geriatric Trauma
UCSF High Risk Emergency Medicine Conference
April 9th, 2017
Maui, Hawaii

247.   Accidental Hypothermia
Wilderness Medicine: Avoiding and Managing Outdoor Medical Emergencies
UCSF Wilderness Medicine Medical School Elective and Mini Medical
School for the Public
April 26th, 2017
San Francisco, California

248.   High Altitude Illness
Wilderness Medicine: Avoiding and Managing Outdoor Medical Emergencies
UCSF Wilderness Medicine Medical School Elective and Mini Medical
School for the Public
April 26th, 2017
San Francisco, California

249.   Managing the Crashing, Combative Trauma Patient
High Risk Emergency Medicine San Francisco
June 1st, 2017
San Francisco, California

250.   Imaging in Trauma
High Risk Emergency Medicine San Francisco
June 1st, 2017
San Francisco, California

251.   Safe Sedation in the Era of Legalized Marijuana
National EMS Safety Summit
August 21st, 2017
Denver, Colorado

252.   Safety in EMS – Panel Discussion
National EMS Safety Summit
August 22nd, 2017

Denver, Colorado

253.   <u>Lessons Learned from Active Shooter Scenarios</u>
6th Annual Medical-Legal Forum
Mile High Regional Medical and Trauma Advisory Council
September 28th, 2017
Lakewood, Colorado

254.   <u>Integration and Challenges of Local, State and Federal Medical Surge Resources – Perspectives on the SFFW Full Scale Exercise and Asset Integration</u>
Panelist – Medical Peer to Peer Exchange Seminar
San Francisco Fleet Week 2017
October 4th, 2017
San Francisco, California

255.   <u>Trauma STAT! Don't Miss This Visual Cue!</u>
American College of Emergency Physicians (ACEP) Scientific Assembly
October 31st, 2017
Washington D.C.

256.   <u>FAST FACTS: Let's Chat About Adult Trauma</u>
American College of Emergency Physicians (ACEP) Scientific Assembly
October 31st, 2017
Washington D.C.

257.   <u>Advanced Wound Care Closure in the ED: Putting the Pieces Back Together</u>
American College of Emergency Physicians (ACEP) Scientific Assembly
October 31st, 2017
Washington D.C.

258.   <u>Pediatric Resuscitation is No Small Matter: 2017 Approaches to Managing Cardiac Events in Children</u>
Emergency Cardiovascular Care Update (ECCU) 2017
December 5th, 2017
New Orleans, Louisiana

259.   <u>De-MS in EMS: Fentanyl versus Morphine for Chest Pain Management</u>
Emergency Cardiovascular Care Update (ECCU) 2017
December 5th, 2017
New Orleans, Louisiana

260.   <u>Toxic Remarks: Case Studies of Cardiac Effects of Drugs of Abuse</u>
Emergency Cardiovascular Care Update (ECCU) 2017
December 6th, 2017
New Orleans, Louisiana

261.   <u>Mass Casualty and Disaster Management: Lessons Learned from the Colorado Shootings</u>
Grand Rounds – University of Michigan Department of Emergency Medicine
January 10th, 2018
Ann Arbor, Michigan

262.   <u>Better Mind Your P's and Q;s: Subtle Cardiac Effects of Drugs of Abuse</u>
EMS State of the Science: A Gathering of Eagles XX

March 2nd, 2018
Dallas, Texas

263.   DeMSing EMS: Why I'd Get Rid of Morphine Sulfate
EMS State of the Science: A Gathering of Eagles XX
March 3rd, 2018
Dallas, Texas

264.   A Grass Roots Experience: The Medical Implications of Marijuana Legalization in Colorado
ZSFG Medicine Grand Rounds
March 27th, 2018
San Francisco, California

265.   Pitfalls in the Trauma Airway
UCSF High Risk Emergency Medicine Hawaii
April 9th, 2018
Maui, Hawaii

266.   Challenging Trauma Case Panel
Moderator
UCSF High Risk Emergency Medicine
April 11th, 2018
Maui, Hawaii

267.   Pitfalls in Patients with Stab Wounds
UCSF High Risk Emergency Medicine Hawaii
April 10th, 2018
Maui, Hawaii

268.   Pitfalls in the Patient Found Down
UCSF High Risk Emergency Medicine Hawaii
April 10th, 2018
Maui, Hawaii

269.   The Combative, Uncooperative Trauma Patient
SEMPA 360 – Society of Emergency Medicine Physician Assistants National Assembly
May 5th, 2018
San Antonio, Texas

270.   Mass Casualty: Lessons Learned from the Colorado Shootings
SEMPA 360 – Society of Emergency Medicine Physician Assistants National Assembly
May 5th, 2018
San Antonio, Texas

271.   The Medical Impact of Marijuana Legalization
SEMPA 360 – Society of Emergency Medicine Physician Assistants National Assembly
May 5th, 2018
San Antonio, Texas

272.   Update on Urologic Emergencies
Moderator – Panel Discussion on Testicular Torsion, Priapism, and Penile Fracture

DEF0097

American Urological Association (AUA) Annual Meeting 2018
May 20th, 2018
San Francisco, California

273.   Assessing Capacity in the Intoxicated Trauma Patient
Keynote Address – 45th Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 7th, 2018
Vail, Colorado

274.   Pitfalls in Patients with Stab Wounds
45th Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 8th, 2018
Vail, Colorado

275.   Trauma Panel of Experts
45th Annual Rocky Mountain Trauma and Emergency Medicine Conference
June 8th, 2018
Vail, Colorado

276.   Cruising the Literature: Trauma 2018
American College of Emergency Physicians (ACEP) National Scientific Assembly 2018
October 2nd, 2018
San Diego, California

277.   Fast Facts: Let's Chat about Adult Trauma
American College of Emergency Physicians (ACEP) National Scientific Assembly 2018
October 2nd, 2018
San Diego, California

278.   ED Thoracotomy: When, Who, and How
American College of Emergency Physicians (ACEP) National Scientific Assembly 2018
October 3rd, 2018
San Diego, California

279.   Clear as Mud: C-Spine Clearance 2018
American College of Emergency Physicians (ACEP) National Scientific Assembly 2018
October 3rd, 2018
San Diego, California

280.   Grass-Roots Experience with Rocky Mountain Highs: What Marijuana Legislation did for the C-States
South Florida EMS State of the Science
November 8th, 2018
Hollywood, Florida

281.   How to De-Code the No-Load Mode: When a Patient Declines Transport
South Florida EMS State of the Science
November 8th, 2018
Hollywood, Florida

DEF0098

282. <u>Mitigating Child-Like Behaviors: Dismantling Major Myths of EMS Care for Kids</u>
South Florida EMS State of the Science
November 8th, 2018
Hollywood, Florida

283. <u>Not Just a Breathless Experience: The Cardiac Effects of Drugs of Abuse</u>
South Florida EMS State of the Science
November 8th, 2018
Hollywood, Florida

284. <u>Altered States of Mind – Part 1: Sedation Practices in EMS</u>
South Florida EMS State of the Science
November 8th, 2018
Hollywood, Florida

285. <u>Causalities for Caustic Cautions About Precautions: 2018 Approaches to Spinal Motion Restriction</u>
South Florida EMS State of the Science
November 8th, 2018
Hollywood, Florida

286. <u>On the Wings of Eagles – Hot Topics in EMS</u>
Iowa EMS Association (IEMSA) Annual Meeting
November 9th, 2018
Des Moines, Iowa

287. <u>Myths in Pediatric Care</u>
Iowa EMS Association (IEMSA) Annual Meeting
November 10th, 2018
Des Moines, Iowa

288. <u>Impact of Legalization of Marijuana on EMS/The Combative Intoxicated Patient</u>
Iowa EMS Association (IEMSA) Annual Meeting
November 10th, 2018
Des Moines, Iowa

289. <u>Intubation and Sedation of the Critically Ill Patient</u>
High Risk Emergency Medicine 2019
February 19th, 2019
Honolulu, Hawaii

290. <u>Transfer of the Trauma Patient</u>
High Risk Emergency Medicine 2019
February 20th, 2019
Honolulu, Hawaii

291. <u>Advanced Wound Care Closure in the ED</u>
High Risk Emergency Medicine 2019
February 22nd, 2019
Honolulu, Hawaii

292. <u>Persistent Injurious Concepts: Continuing Major Myths in Trauma Care</u>
EMS State of the Science XXI: A Gathering of Eagles
March 1st, 2019

DEF0099

Dallas, Texas

293.  Electrocardiography 501: Subtle ECG Findings You Might Miss
EMS State of the Science XXI: A Gathering of Eagles
March 2nd, 2019
Dallas, Texas

294.  The History of Emergency Medicine
San Diego Trauma Society
April 12th, 2019
San Diego, California

295.  Trauma Literature 2019 – The Latest and Greatest
Grand Rounds: Mount Sinai Health System/Icahn School of Medicine
April 16th, 2019
New York, New York

296.  Hypothermia and Cold Related Injury
2019 Wilderness Medicine Elective
UCSF School of Medicine
May 1st, 2019
San Francisco, California

297.  High Altitude Illness
2019 Wilderness Medicine Elective
UCSF School of Medicine
May 1, 2019
San Francisco, California

298.  Precautionary Cautions About Precautions: 2019 Approaches to Spinal
Motion Restriction
Polk County Fire Rescue EMS Week 2019 Medical Seminar – Eagles
May 23rd, 2019
Orlando, Florida

299.  Mitigating Child-Like Behaviors: Dismantling the Major Myths about
Managing Maladies in Minors
Polk County Fire Rescue EMS Week 2019 Medical Seminar – Eagles
May 23rd, 2019
Orlando, Florida

300.  Acing the Tracing Your Facing: Subtle ECG Findings You Don't Want to
Miss
Polk Country Fire Rescue EMS Week 2019 Medical Seminar – Eagles
May 23rd, 2019
Orlando, Florida

301.  Mass Casualty and Disaster Management – Lessons Learned from the
Colorado Shootings
Grand Rounds – Department of Emergency Medicine
University Hospitals Cleveland Medical Center
June 13th, 2019
Cleveland, Ohio

302.  High Altitude Illness
University Hospitals Cleveland Medical Center

June 13th, 2019
Cleveland, Ohio

303. Sedation of the Trauma Patient
University Hospitals Cleveland Medical Center
June 13th, 2019
Cleveland, Ohio

304. Mass Casualty and Disaster Management: Lessons Learned from the Colorado Shootings
Keynote address – 31st Annual David Miller Memorial Trauma Symposium
October 11th, 2019
Springfield, Missouri

305. The Combative, Uncooperative, Arrested, and Threatening Trauma Patient: A Legal, Ethical, and Medical Minefield
31st Annual David Miller Trauma Symposium
October 11th, 2019
Springfield, Missouri

306. Management of Pelvic Trauma – Binders, REBOA, and More!
American College of Emergency Physicians (ACEP) Scientific Assembly, 2019 [ACEP19]
October 28th, 2019
Denver, Colorado

307. Life Saving Procedures in Trauma
American College of Emergency Physicians (ACEP) Scientific Assembly, 2019 [ACEP19]
October 28th, 2019
Denver, Colorado

308. Cruising the Literature – Best Trauma Articles of 2019
American College of Emergency Physicians (ACEP) Scientific Assembly, 2019 [ACEP19]
October 29th, 2019
Denver, Colorado

309. Transfer of the Trauma Patient
Grand Rounds – Kaiser San Francisco
December 3rd, 2019
San Francisco, California

310. Management of Pelvic Fractures
Grand Rounds – Vanderbilt University Medical Center
December 17th, 2019
Nashville, Tennessee

311.

**Certifications**

- NRP, 2009
- ATLS, 2003
  - ATLS Instructor
    - November 18th, 2016
    - July 23rd, 2017
    - June 25th, 2018
    - June 24th, 2019
    - October 17th, 2019
- ACLS, 1996
- PALS, 1994
- ATLS instructor, 2010 – present
- BLS, 2016

**Media**

- Tales From the Front Lines - San Francisco Magazine – September, 2017
- How to Control Bleeding – The New York Times Magazine – April 22nd, 2018
- Skinned Knees to Broken Heads: Tracking Scooter Injuries – The New York Times – August 3rd, 2018
- Interview – NBC – Scooter injuries – August 8th, 2018
- Interview – San Francisco Chronicle – Scooter Injuries – August 11th, 2018
- Wines on a Plane: Does Drinking Affect You Differently While Flying? – Wine Spectator, August 21st, 2018
- National Public Radio (NPR) segment – Heat Related Emergencies – October, 2018
- Interview – KPIX TV Channel 5 –  Scooter injuries - January 25th, 2019
- Interview – San Francisco Chronicle – Scooter Injuries – January 26th, 2019
- Interview – RTV6 Indianapolis – Marijuana use kills Indiana teen, mother speaks out. Stephanie Wade, April 11, 2019 (https://www.theindychannel.com/news/working-for-you/marijuana-use-kills-indiana-teen-mother-speaks-out)
- Interview – The New Yorker – Twenty years after Columbine. Michael Luo, April 20th, 2019. (https://www.newyorker.com/news/news-desk/twenty-years-after-columbine)
- Interview – Fox KTVU Channel 2 – San Francisco averaged one fentanyl overdose death a week last year. Amber Led, June 25th, 2019

DEF0102

(http://www.ktvu.com/news/ktvu-local-news/san-francisco-averaged-one-fentanyl-overdose-death-a-week-last-year)

- Patients Leaving AMA: Signed Forms Alone Are Not Sufficient Malpractice Defense. ED Legal Letter, Volume 30, No. 8, p. 85-88, August, 2019
- Interview – San Francisco Chronicle – Psychiatric patients in the ED. August 15, 2019
- Interview – San Francisco Examiner – ED Diversion – September 26th, 2019
- Interview – San Francisco Chronicle – Emergency department management of substance abuse – November 5th, 2019
- Interview – KTVU Channel 2 Morning News (Mornings on 2) – Holiday mishaps – December 20th, 2019 https://sfgov1-my.sharepoint.com/:v:/r/personal/maricella_miranda_sfdph_org/Documents/Media/KTVU%202_Chris%20Colwell_ED%20holidays_2019/IMG_0571.MOV?csf=1&e=RQGwJN
- 

**Additional Activities**

- American Board of Emergency Medicine (ABEM) Oral Board Examiner
  - October 8-11, 2016
  - October 14-17, 2017
  - October 13-16, 2018
  - October 5-8, 2019
- President, Sigma Phi Epsilon fraternity, Ann Arbor, MI  1987-1988 Active Member: 1984-1988
- Varsity Tennis, University of Michigan, Ann Arbor, MI 1984-1988 Big Ten Team Champions: 1985, 1986, 1988.   NCAA Team Semifinals: 1988
- Psi Chi Honor Society 1987-1988
- Captain, Varsity Tennis Team, La Jolla High School, La Jolla, CA
- Michigan Alumnae Scholarship recipient, San Diego Chapter 1984-1985

**Languages**      Fluent in Spanish

DEF0103

# EXHIBIT 4

XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6249
 Fax:  (916) 731-2124
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Xavier Becerra, in his official capacity as Attorney General of the State of California, and Brent E. Orick, in his official capacity as Interim Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES MILLER, et al.,**<br><br>             Plaintiffs,<br><br>   v.<br><br>**CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,**<br><br>             Defendants. | 19-cv-1537 BEN-JLB<br><br>**DECLARATION OF BLAKE GRAHAM IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

**DEFENDANTS' EXHIBIT D**

DEF0195

## DECLARATION OF BLAKE GRAHAM

I, Blake Graham, declare:

1.       I am a Special Agent in Charge for the California Department of Justice, Bureau of Firearms.  I make this declaration in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction.  This declaration is based on my own personal knowledge and experience, and if called as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

2.       I received a Bachelor of Science degree in May 1992 in Criminal Justice from the California State University Sacramento.  My coursework included forensics, corrections, and a number of classes in criminal justice-related topics.

3.       Since 1994, I have worked as either an investigator for the California Department of Alcoholic and Beverage Control (ABC) or as a Special Agent for the California Department of Justice (DOJ).  My job responsibilities in all of these positions have involved the recovery, investigation, and identification of firearms, the ammunition used for those firearms, and the magazines used for feeding ammunition for those firearms.

4.       My work as an Investigator for ABC between 1994 and 1999 included the recovery of firearms, magazines, and ammunition.

5.       Between 1999 and 2002, I worked as a Special Agent for DOJ, and was assigned to the Violence Suppression Program in the Bureau of Narcotic Enforcement.  In this job, I investigated violent crimes and various violations occurring at California gun shows.  As a gun-show enforcement agent, I attended gun shows in the San Francisco Bay Area to monitor, and if necessary, seize, firearms, ammunition, and magazines sold illegally to felons, parolees, and probationers.

DEF0196

6.      From October 2002 to March 2019, I was a Special Agent and Special Agent Supervisor, for the DOJ's Bureau of Firearms (BOF).  In that capacity, I was assigned to recover firearms from prohibited individuals, monitor gun shows for illegal activities, conduct surveillance on gun dealers suspected of illegal activity, and investigate illegal trafficking of firearms, manufacturing of assault weapons and machine guns, and illegal possession of various magazines and ammunition. From April, 2019 to the present, I have been a Special Agent in Charge, for the BOF.  In this capacity, I supervise teams of Special Agents who are assigned to recover firearms from prohibited individuals, monitor gun shows for illegal activities, conduct surveillance on gun dealers suspected of illegal activity, and investigate illegal trafficking of firearms, manufacturing of assault weapons and machine guns, and illegal possession of various magazines and ammunition.

7.      Since 2008, I have been responsible for reviewing handguns that are submitted by manufacturers for inclusion in California's roster of handguns certified for sale.  A copy of the roster can be found on the DOJ website: http://certguns.doj.ca.gov/.

8.      During my career, I have attended at least 40 gun shows and have become knowledgeable about current laws pertaining to the sales of firearms, assault weapons identification, assault weapons registration, the Automated Firearms System (AFS), ammunition, and ammunition containers—including large-capacity magazines (LCMs)—in the State of California.

9.      I have been trained and qualified to carry several different types of firearms, including the Glock Model 17 (9 mm semiautomatic pistol), multiple Glock .40 caliber semiautomatic pistols, the Heckler & Koch MP5 (9 mm submachine gun), the Smith & Wesson, Model 60 (.38 Special revolver), multiple .45 caliber semiautomatic pistols, and the Colt, Model M4 (5.56 mm machine gun). I have access to other Department-owned handguns, shotguns, submachine guns, machine guns, rifles, shotguns and 40 mm "less lethal" launchers.

10.     Throughout my career, I have conducted training programs in the identification and handling of firearms.  I have also trained other Special Agents of BOF on assault weapons and firearms identification.  I also have given firearms identification classes to members of the multiple District Attorney's offices in the State of California.

11.     I have also completed at least 15 firearms training courses since 1994. These courses covered the assembly and use of specific firearms, cartridge composition (bullet, propellant, and casing), common calibers used by law enforcement, and training on rifle and handgun ammunition.  I have been certified as a California Peace Officer Standards and Training (POST)-approved Firearms Instructor/Rangemaster since 2002.

12.     During my career, I have become proficient in the use and disassembly of various revolvers, pistols, submachine guns, shotguns, and rifles.  I have effected or assisted in the arrest of at least thirty persons for illegal weapons possession.  In the course of my employment, I have participated in more than 30 search warrants involving the illegal possession of firearms.

13.     I have been qualified as an expert witness regarding the use of firearms in 16 cases in both federal and state court since 2007.

**OPINIONS**

14.     I am aware of the current state and former federal laws restricting the manufacture and sale of assault weapons and large-capacity magazines (LCMs) in California.

15.     California's Roberti-Roos Assault Weapons Control Act (AWCA) prohibits the sale of assault weapons and ownership of unregistered assault weapons.  The AWCA prohibits the manufacture, sale, and possession of specified rifles, pistols, and shotguns, which are defined as assault weapons by their make and model.  The lists of prohibited assault weapons are provided in Penal Code section 30510 and section 5499 of title 11 of the California Code of Regulations;

3

DEF0198

these lists are commonly referred to as Category 1 and Category 2 weapons, respectively.  Some of the firearms listed in Penal Code section 30510 are weapons that were prohibited under the federal assault weapons ban, which was in effect from 1994 to 2004.  In general, the firearms listed in Penal Code section 30510 and the additional ones listed in the regulations could be considered semiautomatic versions of military weapons.  It is my understanding that the Plaintiffs in this litigation are not challenging the assault weapons listed in section 30510 of the Penal Code or section 5499 of title 11 of the California Code of Regulations.

16.     In response to attempts by firearm manufacturers to circumvent the AWCA, in 2000, the California Legislature amended the AWCA to include an alternative definition of assault weapons based on certain features or characteristics of the firearm instead of their make or model.  The features-based definitions are provided in Penal Code section 30515; firearms subject to the AWCA under these alternative definitions are generally referred to as Category 3 weapons.  While it is not necessary for a Category 1 or Category 2 assault weapon to have certain features, those listed weapons usually share one or more of the features listed in Penal Code Section 30515.  For semiautomatic rifles that qualify as assault weapons, the most common feature of prohibited assault weapons is likely the pistol grip.  The next most common features are probably telescoping stocks and flash suppressors.  In my experience, assault pistols and assault shotguns are much less common in California than assault rifles.  .

17.     I understand that Plaintiffs in this case are challenging California's restrictions on assault weapons that apply to rifles, pistols, and shotgun deemed to be assault weapons under Penal Code section 30515(a), i.e., Category 3 assault weapons.

18.     The California Attorney General's Office has released an Assault Weapons Identification Guide (last updated in November 2001).  The guide provides photographs of Category 1 and Category 2 assault weapons, as well as a

4

discussion of the features-based definitions for Category 3 assault weapons.  A true and correct copy of the Assault Weapons Identification Guide is attached as Exhibit A to this declaration.    As noted, many of the Category 3 assault weapons have the same features as Category 1 and Category 2 weapons, so the photographs of those categories are illustrative of the features for Category 3 weapons.  While the terms "assault rifle," "assault pistol," and "assault shotgun" are not used in the Penal Code, I use those terms in this declaration to refer to rifles, pistols, and shotguns, respectively, that qualify as assault weapons under the statute.

## I.   ASSAULT-WEAPON DEFINITIONS BASED ON PROHIBITED FEATURES OR CHARACTERISTICS

### A.   Assault Rifles (Section 30515(a)(1)-(3))

19.    Penal Code section 30515(a)(1) defines an assault weapon to include "a semiautomatic, centerfire rifle that does not have a fixed magazine but has any one" of the following features:[1]

a.    A pistol grip that protrudes conspicuously beneath the action of the weapon.

b.    A thumbhole stock.

c.    A folding or telescoping stock.

d.    A grenade launcher or flare launcher.

e.    A flash suppressor.

f.    A forward pistol grip.

#### 1.   Semiautomatic

20.    As a threshold matter, this features-based definition applies to only semiautomatic, centerfire rifles that lack a fixed magazine.  A semiautomatic rifle is "a firearm functionally able to fire a single cartridge, eject the empty case, and reload the chamber each time the trigger is pulled and released."  California Code

---

[1] These features have been defined for purposes of assault-weapon registration in section 5471 of title 11 of the California Code of Regulations (hereafter, Section 5471).  A true and correct copy of Section 5471 is attached as Exhibit B.

DEF0200

of Regulations, Title 11, § 5471(hh).  An automatic firearm, otherwise known as a "machine gun or sub-machinegun," by contrast, fires multiple rounds with a single pull of the trigger.  The California Penal Code defines "machinegun" to mean "any weapon that shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  Penal Code, § 16880(a).  Some machineguns and submachine-guns can be set to fire in "burst" mode with a fixed number of rounds being fired with each pull of the trigger.  More commonly, a functional and fully loaded machine gun or sub-machine gun can fire or continuously until the trigger is released.  Select-fire rifles can alternate between semiautomatic fire and automatic and/or burst fire depending on the setting selected by the shooter.  Law enforcement officers are generally issued semiautomatic rifles.

### 2.   Centerfire

21.    The next threshold requirement for the features-based definition is that the rifle be a "centerfire" rifle.  "Centerfire" refers to the type of ammunition the firearms were built to fire, namely a "cartridge with its primer located in the center of the base of the case."  California Code of Regulations, Title 11, § 5471(j).  This excludes all semiautomatic rimfire (usually .22 caliber) rifles that might have one or more listed features.

22.    Centerfire rifles generally use rounds that are associated with increased lethality.  The United States military uses various centerfire rifle rounds (5.56 mm and 7.62 x 51, for example) in multiple weapons systems.  Some California assault rifles are capable of firing the same centerfire rounds as these military weapons and could have the same high capacity for firepower as the military weapons.  In my experience being around the California gun industry and gun culture for nearly 20 years, rounds most commonly used with assault rifles are rifle-caliber rounds such as .223 caliber, 5.56 mm, or 7.62 x 39 mm.  These rounds will typically defeat normal bullet resistant body armor used by law enforcement.  While rifle resistant

Declaration of Blake Graham (19-cv-1537 BEN-JLB)

DEF0201

plates can be added to most law enforcement body armor, the rifle plates are not going to block or resist rifle-caliber rounds fired at all angles.  Some rifle rounds are strong enough to defeat even the rifle-resistant plates available to law enforcement.

23.     Some assault rifles are chambered in traditional pistol-caliber rounds, such as 9 mm, .40, and .45 calibers.  Pistol-caliber rounds fired from assault rifles chambered in these calibers may or may not be stopped by traditional law enforcement body armor.  Generally, the longer the barrel the faster the bullet will travel.  A rifle and handgun both shooting the same ammunition may have different results in terms of penetrating body armor of equal protection levels.  The shorter barrel lengths usually associated with a normal semiautomatic handgun might be 3-5 inches long. By state and federal law, a rifle generally must have at least a 16-inch long barrel.  The rifle barrel being at least three times longer than most semiautomatic handgun barrels leads to the bullet leaving the barrel at a higher rate of speed (or higher muzzle velocity).  In general, the faster the bullet is traveling, the more likely it is to defeat body armor.  For example, the higher muzzle velocity of .223 rounds shot out of a rifle can penetrate the soft body armor worn by most law enforcement personnel, and can have greater range depending on the weapon.

### 3.     Lacking a Fixed Magazine Capable of Holding No More than 10 Rounds

24.     In addition to applying to only semiautomatic, centerfire rifles, the features-based definition applies to rifles that lack a "fixed magazine," which the Penal Code defines as "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action."  Penal Code § 30515(b).  Generally, ammunition is supplied to semiautomatic rifles by magazines, which hold a certain number of rounds and can be either detachable or fixed to the firearm.  A rifle that lacks a fixed magazine allows the shooter to rapidly exchange a depleted magazine

with a fully loaded one, enabling a shooter to fire a large number of rounds near-continuously.  In the event of a public shooting, this may deprive an opportunity for law enforcement or the public to intervene to save lives.

25.     As with the former federal assault weapons ban, California defines large-capacity magazines (LCMs) as any ammunition feeding device with the capacity to accept more than 10 rounds.  Some LCMs can hold 20, 30, 50, 75 or 100 rounds of ammunition at a time.  Because semiautomatic, centerfire rifles that have fixed LCMs qualify as assault weapons under section 30515(a)(2), the features-based definition will not apply to a rifle that has a fixed magazine capable of holding no more than 10 rounds.

26.     LCMs are often used in conjunction with assault weapons that lack a fixed magazine.  California separately restricts the manufacture, sale, and importation of LCMs in Penal Code section 32310.  In 2016, California amended the law to generally prohibit the possession of LCMs, but as of this writing, the possession restrictions have been enjoined.  LCMs are also illegally sold to California residents or illegally imported from other states.

27.     LCMs enable a shooter to fire many more rounds without having to reload, which, as with rifles that lack a fixed magazine discussed above, may reduce the frequency of pauses during shootings and further reduces opportunities for law enforcement or the public to intervene to save lives.  A person intent on doing harm to the public or law enforcement will often pair assault weapons and multiple LCMs to maximize the lethality of their attacks.  As discussed below, assault weapons with LCMs have been used in numerous mass shootings and gun violence against peace officers.

### 4.    Prohibited Features

28.     A "pistol grip that protrudes conspicuously beneath the action of the weapon" is "a grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below

8

the top of the exposed portion of the trigger while firing." California Code of Regulations, title 11, § 5471. In my experience, this feature is the most prevalent feature of assault rifles prohibited under the AWCA. Pistol grips are used in most modern military machine guns and civilian semiautomatic rifle versions of these firearms. The designers of military-style firearms are including this feature more and more. A pistol grip on an assault rifle enhances the ergonomics of the weapon. A shooter using an assault rifle without a pistol grip may shoot less accurately with repeated—and especially rapid—shots if the shooter's trigger hand is in an awkward position for a significant amount of time.

29. Mr. Kapelsohn claims in his declaration that a pistol grip is not necessary to prevent muzzle rise when firing a semiautomatic AR-15 platform rifle, suggesting that muzzle rise is only a problem for fully automatic fire. (Kapelsohn Decl. ¶ 28.) While this may be true for the firing of a single shot, it is generally not true when firing multiple shots in quick succession. When a semiautomatic rifle, like an AR-15, is fired rapidly, the rifle will generally exhibit muzzle rise, and a pistol grip would help the shooter maintain accurate fire when shooting rapidly. Furthermore, depending on the weapons system and the shooter's skill level, the pistol grip may help a shooter complete magazine exchanges quicker. In addition, a pistol grip may help a shooter maintain aim on a target while reloading, and perhaps even fire a chambered round while reloading.

9

DEF0204

30.     A "thumbhole stock" is "a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing."  California Code of Regulations, title 1, § 5471(qq).  It allows for a grip similar to that offered by a pistol grip and can provide similar benefits to a shooter firing a rifle rapidly. Below is a photograph showing a thumbhole stock on a rifle.



31.     A "telescoping stock" is "a stock which is shortened or lengthened by allowing one section to telescope into another portion."  California Code of Regulations, title 11, § 5471(oo).  On AR-15 style firearms, the buffer tube or receiver extension acts as the fixed part of the stock on which the telescoping butt stock slides or telescopes.   A "folding stock" is "a stock which is hinged in some fashion to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm."  California Code of Regulations, title 11, § 5471(nn).   A folding stock or telescoping stock that still allows the shooter to fire the rifle while the stock is folded or shortened and would likely provide a shooter with a tactical advantage because it is more versatile.

32.     The tactical advantage provided by a telescoping or folding stock include decreased overall length of the rifle by the shooter if desired for concealability.  This feature is beneficial for law enforcement purposes.  For example, when law enforcement personnel conduct room to room searches of a building, they would not want to give away their locations.  More compact weapons with folding or telescoping stocks may maintain the advantage of surprise. Semiautomatic weapons deployed by law enforcement with extremely long overall lengths may be seen by antagonists who mean to do harm to law enforcement.

Telescoping or folding stocks also allow for easier transportation and storage of the weapon and to more quickly allow the user to adjust the weapon for a better fit, but these are secondary considerations, particularly in the civilian context.

33.     Subjects intent on shooting one or more persons may have a tactical advantage by using a weapon with a shorter overall length.  This tactical advantage described above for law enforcement can also be used by a shooter wishing to remain undetected for as long as possible.  A weapon with a shorter overall length could also permit the shooter to smuggle the weapon undetected (by, for example, hiding the weapon in a backpack or bag) or to hide in the crowd without telegraphing the shooter's location.  A smaller weapon can also be concealed on the shooter's person underneath loose or bulky clothing.

34.     A "grenade launcher" is "a device capable of launching a grenade," which are classified under federal law as destructive devices.  California Code of Regulations, title 11, § 5471(v).  There is no conceivable civilian need for a grenade launcher.

35.     A "flare launcher" is "a device used to launch signal flares," California Code of Regulations, title 11, § 5471(q), which can be used in emergency situations or in military operations.  While flares may serve legitimate safety and rescue purposes in certain circumstances, for example on ships in open water, I can think of no legitimate reason for a civilian to launch flares from a rifle.

36.     A "flash suppressor" is "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision. A hybrid device that has either advertised flash suppressing properties or functionally has flash suppressing properties would be considered a flash suppressor.  A device labeled or identified by its manufacturer as a flash hider would also be considered a flash suppressor."  California Code of Regulation, title 11, § 5471(r).

37.     Most everyone has experienced a flash from a camera in our lifetimes. This camera flash can cause vision problems for people viewing the flash.   A firearm, in low light conditions may produce muzzle flash with each round fired. The muzzle flash may create vision problems for the shooter, which may cause the shooter to shoot less accurately.  Two rifles, one with a flash suppressor and one without, shooting the same ammunition with the same length barrels should perform differently in terms of reducing the amount of flash created.  The rifle with the flash suppressor should be easier to shoot in low light conditions because the shooter should have less problems aiming accurately.  Additionally, a flash suppressor can help conceal the location of a shooter in low light conditions. Mr. Kapelsohn claims that flash concealment is primarily for military purposes. (Kapelsohn Decl. ¶ 33.)  But a shooter intent on shooting people in public at night could take advantage of this effect and frustrate law enforcement efforts to stop the shooting.

38.     A "forward pistol grip" is a grip that allows for a pistol-style grasp forward of the trigger.  Many modern military machine guns, submachine guns and assault rifles worldwide have built-in forward pistol grips or locations that allow for forward pistol grips to be attached.  This feature can aid the shooter by offering an optional grip location on the rifle for the shooter's non-trigger hand to stabilize the weapon during repeated semiautomatic fire.

39.     Overall, in my experience, the challenged features described in Penal Code section 30515(a)(1), individually and especially when combined with other listed features, may assist shooters in being more effective and efficient while rapidly firing semiautomatic, centerfire rifles.  They are not merely "cosmetic" as suggested by Mr. Kapelsohn.  (Kapelsohn Decl. ¶ 38.)  (And if they were merely cosmetic, the plaintiffs would have no need for the features to engage in effective self-defense.)

12

40.     I have observed the videotaped demonstration of one of the Plaintiffs' declarants, Adam Kraut, which purports to show that a "featureless" rifle fires as rapidly and accurately as—or, according to the demonstration, more accurately than—a rifle with certain prohibited features.  This demonstration, however, was not performed under controlled circumstances, does not indicate how many repeated "takes" were filmed to obtain the results, and does not account for other tactical advantages that may be gained from some of the features, such as enhanced concealment from flash suppressors or adjustable stocks.  In my experience, assault rifles with one or more of the prohibited features will shoot more accurately when fired rapidly.  And as discussed below, many mass murders choose to use assault rifles to carry out their attacks.

### 5.   Additional Assault Rifles

41.     Penal Code section 30515(a)(2) also defines an "assault weapon" as a "semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds"—in other words, a semiautomatic, centerfire rifle with a fixed LCM.  As discussed previously, LCMs enable a shooter to fire more rounds in a given period of time, by reducing the frequency by which the shooter needs to reload the firearm.  LCMs are used frequently in mass shootings, such as the 2015 shooting in San Bernardino or the 2018 shooting in Thousand Oaks.  LCMs can also enable criminals to engage in sustained firefights with law enforcement personnel, causing more deaths and injuries, such as the 1997 bank robbery in North Hollywood.

42.     Detachable large-capacity magazines have been used in numerous mass shootings, such as the 1989 shooting at Cleveland Elementary School in Stockton, California, which prompted the enactment of the original AWCA.  Generally, a rifle equipped with a fixed 30-round LCM would have the capability of firing more rounds in a given period of time than an identical rifle with a fixed 10-round magazine because it would hold more rounds and would need to be

reloaded less frequently.  In other words, a shooter firing a semiautomatic rifle would conceivably be able to fire for a longer period of time before exhausting his or her ammunition and having to reload a LCM than for a 10-round magazine.  And even fixed magazines can be reloaded quickly—almost as quickly as a detachable magazine—when a rifle is assembled or modified in a way that allows for the rapid separation and reconnection of the lower and upper receivers.  Thus, a "fixed" LCM may not prevent the rapid reloading of a rifle, which would produce the same public-safety threats posed by detachable LCMs.

43.     Penal Code section 30515(a)(3) also defines an assault weapon as a "semiautomatic, centerfire rifle that has an overall length of less than 30 inches." According to California Code of Regulations, title 11, section 5471(x), the length of the rifle is measured in the shortest possible configuration in which the weapon will function or fire.  A shorter rifle is more concealable.  As with the adjustable stocks discussed above, the enhanced concealability of a rifle raises significant public safety concerns.

### 6.     The Suitability of Assault Rifles for Military and Law Enforcement Uses

44.     Semiautomatic rifles that qualify as assault weapons are generally modeled after successful military machine guns and submachine guns. Generally, rifles currently deemed to be assault weapons under California law have had a similar version issued to a military or police force somewhere in the world.  For example, the AR-15 is the civilian version of the military M-16.  The main difference between those military-issue firearms and firearms deemed to be assault weapons under California law is that assault weapons are semiautomatic. In some cases, military or police forces might issue semiautomatic rifles that are functionally the same as defined California assault weapons in terms of "rate of fire" or "capacity for firepower."

45.     The photo below depicts a Sturm Ruger, Mini-14/Ranch Rifle with no prohibited features listed in Penal Code section 30515.  It is a semiautomatic center fire rifle that is not an assault weapon.  It is effectively "featureless" in terms of Penal code section 30515.   These types of rifles are currently legal for sale in California and can be lawfully transferred and possessed by California residents who follow state and federal laws.  It has a traditional wooden stock, no pistol grip and no muzzle device:



46.     The semiautomatic centerfire rifle depicted below is a Sturm Ruger, Mini-14/Ranch Rifle with a folding stock, pistol grip and flash suppressor on the end of the barrel.  These types of rifles are currently not legal for sale in California and cannot be lawfully transferred by California residents.



47.     Rifles that qualify as assault weapons under Penal Code Section 30510, typically will have one or more features that are listed in Penal Code Section 30515 (pistol grip, etc.).  One or more of these features are also seen in many if not most of the firearms depicted in the Assault Weapon Identification Guide.

48.     As noted by Mr. Kapelsohn, assault rifles have reportedly been used by law-abiding individuals for self-defense.  (Kapelsohn Decl. ¶¶ 19-24.)  That

15

1    does not mean, however, that those rifles were particularly suitable for self-defense

2    or that a different firearm would have been less effective.  Any weapon, even a

3    fully automatic machine gun or a grenade launcher, could conceivably be used for

4    self-defense.  But machine guns and grenade launchers are not particularly suitable

5    for civilian self-defense applications.

6         49.    Nevertheless, assault rifles are suitable for law enforcement use.

7    There are many instances in which law enforcement and civilians have been hurt

8    and killed by criminals using assault weapons.  Law enforcement personnel need to

9    have equal or better weapons than those subjects they are confronting—commonly

10   referred to as a "force multiplier"—so that they are not outgunned by criminals with

11   assault weapons.

12        50.    And unlike civilians, law enforcement personnel are often required to

13   enter into dangerous situations to take a shooter into custody.  Law enforcement

14   personnel must often affirmatively put themselves in dangerous situations to subdue

15   shooters or other criminal suspects or to protect civilians.

16        51.    Law enforcement personnel undergo regular, specialized training to

17   safely and effectively use assault weapons.   Each round fired by law enforcement

18   personnel has the potential to cause criminal and/or civil ramifications for

19   individuals employed in this field and their agency they work for.  We are trained to

20   consider the backdrop (area behind whatever is being aimed at) to make sure

21   persons or property are not needlessly injured or damaged.  Law enforcement

22   agencies commonly require peace officers to maintain regular qualification with

23   duty firearms.  These qualifications can sometimes include varied distances from

24   the officer to the target, partially concealed targets, and scenarios in which the best

25   option available to the officer is to not shoot the target ("shoot/don't shoot"

26   scenarios).  Verbal commands and less lethal options are among the options

27   employed by law enforcement in conjunction with potentially lethal force.

28

Declaration of Blake Graham (19-cv-1537 BEN-JLB)

DEF0211

**B.     Assault Pistols (Section 30515(a)(4)-(5))**

52.     California Penal Code section 30515(a)(4) defines any semiautomatic pistol as an assault weapon if it does not have a fixed magazine and has any one (or more) of the following features:  (1) a threaded barrel capable of accepting a flash suppressor, a (second) forward hand grip, or a silencer, (2) a second handgrip, (3) a barrel shroud, and (4) the ability to accept a detachable magazine at some location other than the pistol grip beneath the action.  The Assault Weapon Identification Guide provides some examples of assault pistols on pages 40 through 48.

53.     A threaded barrel has grooves on the outside of the barrel that allow any of the listed features to be "screwed" onto the front of the pistol.  In addition to a threaded barrel, a "lugged barrel" has lugs at the end of the barrel, which can allow a silencer to be easily attached.  California regulates lugged barrels as threaded barrels.  (Section 5471(rr).)  A threaded barrel would make it relatively easy for a shooter to attach one of the listed features to the weapon quickly, making the weapon more deadly.  As I previously discussed in connection with the rifle features, a flash suppressor can help a shooter maintain accurate fire while firing the weapon rapidly in low light settings, and a second, forward pistol grip can help stabilize a firearm during repeated semiautomatic fire.  A silencer can help a shooter avoid detection while firing the weapon.  During the May 31, 2019 mass shooting in Virginia Beach, Virginia, for example, the shooter used a silencer in an incident that claimed 12 lives and injured 4 others.

54.     A semiautomatic pistol with a second handgrip—for example a forward pistol grip—can help a shooter maintain rapid fire during a shooting by counteracting muzzle rise.  And a barrel shroud can enable a shooter to hold onto the barrel while shooting rapidly without burning the non-shooting hand, which can help with accurate rapid fire in a similar way to a forward handgrip.

55.     A pistol that has the ability to accept a detachable magazine at a different location than the pistol grip, such as the Bushmaster pistol depicted on

DEF0212

page 40 of the Assault Weapons Identification Guide, is indicative of military firearms and is not commonly seen on most civilian handguns.  Semiautomatic pistols that accept a detachable magazine allow for reloading inside the pistol grip.

56.     Finally, California Penal Code section 30515(a)(5) defines a semiautomatic pistol as an assault weapon if it has a fixed LCM.  As I discussed earlier in connection with rifles, a pistol with a fixed LCM would enable a shooter to fire more rounds in a given period than an identical pistol with a fixed 10-round magazine, because the pistol would hold more ammunition and would need to be reloaded less frequently.  A LCM would permit a shooter firing a semiautomatic pistol to fire for a longer period of time before exhausting his or her ammunition and having to reload compared to a 10-round magazine.

57.     In my experience, semiautomatic pistols that qualify as assault weapons are not commonly owned by civilians.  They have, however, been used for criminal purposes.  One of the shooters in the Columbine mass shooting, for example, used an Intratec TEC-9 assault pistol, which is depicted on page 43 of the Assault Weapons Identification Guide.

## C.    Assault Shotguns (Section 30515(a)(6)-(8))

58.     The California Penal Code defines a shotgun to mean "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger."  Penal Code § 17190. Penal Code section 30515(a)(7) and (8) define shotguns as assault weapons if they have certain features or characteristics.  In addition to birdshot, a shotgun can fire shells containing more lethal buckshot or metal slugs that can cause significant damage at short and long ranges.

59.     California Penal Code section 30515(a)(6) defines a semiautomatic shotgun as an assault weapons if it has *both* an adjustable stock (either folding or

telescoping) and a pistol grip that protrudes conspicuously beneath the action of the shotgun, a thumbhole stock, or a vertical handgrip.  As with rifles, an adjustable stock can enhance the concealability of a shotgun, which can help a shooter smuggle the weapon into a sensitive place to engage in crime, such as a shooting or a robbery.  A vertical handgrip can enable a shooter to accurately fire multiple shotgun rounds rapidly.  Examples of assault shotguns are depicted on pages 50 through 53 of the Assault Weapons Identification Guide.  Each of the depicted shotguns has a pistol grip beneath the action of the firearm.

60.    California Penal Code section 30515(a)(7) defines a semiautomatic shotgun as an assault weapon if it can accept a detachable magazine.  Typically, shotguns must be reloaded manually by inserting the shells individually into the firearm.  Detachable magazines, by contrast, enable a shooter to reload a shotgun rapidly, allowing the shooter to fire more shells in a given period.

61.    Finally, California Penal Code section 30515(a)(8) defines a shotgun as an assault weapon if it has a revolving cylinder to feed ammunition into the firearm.  This includes the "Streetsweeper," depicted on page 52 of the Assault Weapons Identification Guide, and the "Striker-12," on page 53 of the guide.  Generally, a revolving cylinder can enable a shotgun to hold more shells and enables a shooter to fire those rounds without having to reload as often as a shotgun without a revolving cylinder.

62.    In my experience, shotguns that qualify as assault weapons are not commonly owned or used by civilians.

**II.    USE OF ASSAULT WEAPONS IN MASS SHOOTINGS.**

63.    I am familiar with the use of assault weapons by subjects intending to do harm to civilians and law enforcement.

64.    Often assault weapons are paired with LCMs during these crimes by the suspects.  LCMs are ammunition feeding devices that can hold more than ten rounds, and sometimes up to 100 rounds, of ammunition.

65.     Semiautomatic assault weapons when loaded with LCMs enable a shooter to potentially fire more than 10 rounds without the need for the shooter to reload the weapon.

66.     Because LCMs enable a shooter to fire repeatedly without needing to reload every 10 rounds, they significantly increase a shooter's ability to kill and injure large numbers of people quickly.

67.     Assault weapons have been a popular weapon used in several mass shootings in California and elsewhere.

68.     Based on my research, all of the shootings listed below involved persons who shot and wounded and/or killed one or more persons, including peace officers, while using assault weapons.

    a.     On July 18, 1984, an individual used a semiautomatic UZI and a Browning Hi-Point rifle to kill 21 people and injure 19 others at a McDonald's restaurant in San Ysidro, California.

    b.     On January 17, 1989, an individual shot and killed 5 and wounded 32 others at the Cleveland Elementary School in Stockton, California. He used an AK-47 style rifle and LCMs in the shooting.  The Roberti-Roos Assault Weapon Control Act of 1989 was enacted shortly after this shooting.

    c.     On April 20, 1999, 2 individuals used LCMs and an assault rifle and an assault pistol (an Intratec TEC-9) to murder 13 individuals and injure 24 others at Columbine High School in Littleton, Colorado.

    d.     On January 9, 2005, an individual used a LCM and illegal assault weapon to shoot and kill Ceres Police Sgt. Howard Stevenson in Ceres, California.

    e.     On June 15, 2008, an individual used an assault rifle and LCM to shoot and kill Yolo County Sheriff's Deputy Tony Diaz after a traffic stop near Dunnigan, California.

20

f.      On February 25, 2010, an individual used multiple weapons (including an assault weapon) and LCMs to shoot and kill Fresno County Sheriff's Detective Joel Wahlenmaier and Reedley Police Officer Javier Bejar in Minkler, California.

g.      On July 20, 2012, an individual used an assault weapon and LCMs, including a drum magazine, to kill 12 people and wound 70 others in a movie theater in Aurora, Colorado.

h.      On December 14, 2012, an individual used LCMs and multiple firearms (including an assault weapon) to kill 20 children and 6 adults at Sandy Hook Elementary School in Newtown, Connecticut.

i.      On June 7, 2013, an individual —who was previously denied purchase of a firearm by the California Department of Justice—used a home-built AR-15 rifle and LCMs to kill his father and brother at their family home, and then kill 3 and wound 4 others at the Santa Monica, California Community College.

j.      On December 2, 2015, two individuals used assault weapons and LCMs in killing 14 people and wounding 22 others at the Inland Regional Center in San Bernardino, California.

k.      On June 12, 2016, an individual used an assault rifle and LCMs to shoot and kill 49 people and wound 53 others inside a nightclub in Orlando, Florida.

l.      On July 7, 2016, an individual used an assault rifle and a LCM to shoot and kill 5 police officers and wound 9 others in Dallas, Texas.

m.      On July 17, 2016, an individual used an assault rifle and LCMs to shoot and kill 3 police officers and wound 3 other officers in Baton Rouge, Louisiana.

n.      On October 1, 2017, an individual used assault rifles and LCMs to fire over 1,000 rounds on concertgoers at an outdoor music festival

21

DEF0216

1        in Las Vegas, Nevada, killing 58 people and wounding more than

2        500 others.  To date, this is the deadliest mass shooting in U.S.

3        history.

4    o.   On October 3, 2018, an individual used an assault rifle in Florence,

5        South Carolina to shoot and kill 2 law enforcement officers.  Another

6        6 officers were also shot.

7    p.   On October 27, 2018, an individual used an assault rifle with LCMs

8        to kill 11 individuals and injure 6 others at the Tree of Life

9        synagogue in in Pittsburg, Pennsylvania.

10   q.   On June 19, 2019, Sacramento Police Officer Tara O'Sullivan was

11       killed by a suspect who shot her with an assault rifle while

12       responding to a domestic disturbance.

13   r.   On July 28, 2019, an individual used an AK-47 style rifle with

14       LCMs, which were purchased in Nevada weeks earlier, to kill 3

15       people and injure 12 others at the Gilroy Garlic Festival in Gilroy,

16       California.

17   s.   On August 3, 2019, an individual used an assault rifle with LCMs to

18       kill 22 people and injure 26 others at a Walmart in El Paso, Texas.

19   t.   Shortly after the El Paso shooting, on August 4, 2019, an individual

20       used an assault pistol with a 100 round drum magazine to kill 9 and

21       injure 27 others in Dayton, Ohio.

22   u.   On August 31, 2019, an individual used an assault rifle with LCMs to

23       engage in a shooting spree, including a firefight with law

24       enforcement officers, in Odessa and Midland, Texas.

25   v.   On December 10, 2019, two individuals used assault rifles and LCMs

26       to kill 4 people and injure 3 others in Jersey City, New Jersey.  One

27       of the dead was Jersey City Police Detective Joseph Seals.  The

28       shooters engaged in a lengthy firefight with law enforcement

22

1    personnel at a kosher grocery market and 3 law enforcement

2    personnel were injured as a result.

3    69.    Assault weapons have also been used in other countries to devastating

4    effect.  On April 28, 1996, in Port Arthur, Tasmania, an individual used an AR-15

5    rifle to murder 35 people and injure 23 others in a shooting spree that prompted the

6    government to enact restrictions on semiautomatic rifles, including a mandatory

7    buy-back program.  And on March 15, 2019, an individual used several firearms,

8    including an AR-15 platform rifle, to murder 51 people and injure 49 others at two

9    mosques in Christchurch, New Zealand.  After the Christchurch shootings, New

10   Zealand enacted a ban on semiautomatic firearms and magazines.

11   70.    Assault weapons have been used in gun violence against the public and

12   law enforcement, in California, in other states, and abroad.  While California's

13   restrictions on assault weapons cannot be expected to stop all gun violence or

14   prevent all mass shootings, it is my opinion that they have contributed positively to

15   the safety of the public and law enforcement personnel.

16   71.    It is my opinion that the AWCA enhances public safety by limiting

17   civilian access to prohibited weapons that are unreasonably dangerous for

18   unrestricted civilian use and are often used by those who intend on committing

19   crimes, such as mass shootings.

20   **III.  AN INJUNCTION WOULD DISRUPT ENFORCEMENT OF CALIFORNIA'
     FIREARMS LAWS BEYOND THE CHALLENGED LAWS AND WOULD

21   REQUIRE TIME TO IMPLEMENT**

22   72.    If enforcement of the challenged provisions of the AWCA is enjoined,

23   it would likely disrupt the State's ability to enforce the existing scheme of firearms

24   laws, beyond the challenged provisions themselves, and could potentially cause

25   irreversible harm.

26   73.    As I stated above, there have been numerous mass shootings in

27   California where the shooter had used assault weapons.  The AWCA seeks to

28   reduce the number of these firearms in circulation in the state.  If the challenged

23

1    provisions of the AWCA are enjoined, even if the injunction is later reversed, the

2    state would be left with many more of these firearms than before the injunction.

3         74.    An injunction would also disrupt enforcement of other laws.

4    California law requires all lawfully possessed assault weapons acquired before

5    December 31, 2016 to be registered with the California Department of Justice.

6    Penal Code § 30900.  The most recent registration period ended on July 1, 2018.

7    Penal Code § 30900(b)(1).  Therefore, if a law enforcement officer encounters an

8    assault weapon in the field, and, upon checking the Automated Firearms System,

9    determines that the firearm is not registered, the officer would deem that firearm to

10   be illegally possessed and take appropriate action.

11        75.    However, if the challenged provisions of the AWCA are enjoined,

12   residents of California would be permitted to acquire and possess new assault

13   weapons.  If a law enforcement officer encounters an unregistered assault weapon

14   in the field, the officer may have difficulty determining whether the firearm is new

15   and outside the existing registration requirement, and therefore potentially legally

16   possessed, or whether it was a firearm that should have been registered previously

17   (for example, a self-manufactured assault weapon built during the registration

18   window or an assault rifle acquired prior to 2014 that is not in the AFS) and the

19   owner had violated the registration laws.

20        76.    If the challenged provisions of the AWCA is enjoined, it would also

21   impose administrative burdens on law enforcement agencies at multiple levels and

22   the injunction that would require time to be implemented.  Law enforcement

23   agencies statewide have been enforcing the AWCA for decades.  If an injunction is

24   issued, all law enforcement agencies in the state would have to be informed of the

25   injunction, the scope of the injunction, and how an injunction might affect their

26   duties despite the AWCA still being on the books.

27        77.    If law enforcement agencies are not properly informed of the

28   injunction and the scope of the injunction, officers in the field may inadvertently

1  violate the injunction by enforcing the law as they have been aware of it for the past
2  20 years.

3      I declare under penalty of perjury that the foregoing is true and correct.

4      Executed on January 22, 2020 at Sacramento, California.

Blake Graham

25

DEF0220

# EXHIBIT A

DEF0221

# California Attorney General



# Assault Weapons Identification Guide

as listed or described in Penal Code Sections 12276, 12276.1, and 12276.5

(Includes selected recent legislation)
3rd EDITION - November 2001

DEF0222

DEF0223

**State of California**
**Office of the Attorney General**
**Sacramento, California**

The purpose of this guide is to assist peace officers, firearms dealers, and the general public in the identification of assault weapons and to promote the better understanding of some of the more significant recently enacted legislation.

**This booklet may be reproduced without permission for noncommercial purposes, downloaded from the Firearms Division website at www.ag.ca.gov/firearms/awguide/, or purchased from the Firearms Division for $2 per copy at the address below.**

**Department of Justice**
**Firearms Division - AW Guide**
**P.O. Box 820200**
**Sacramento, California 94203-0200**

**Questions or requests for assistance may be directed to:**

**Telephone:**       (916) 227-3703
**Fax:**              (916) 227-3744

**Training for law enforcement agencies and firearms dealers on the subject of assault weapons or any matter concerning firearms or firearm law enforcement may be scheduled by calling (916) 263-0815.**

DEF0224

## INTRODUCTION

For the purposes of this guide, assault weapons are divided into three categories.  These are:  Category 1 - Penal Code section 12276 subdivisions (a), (b), (c) (Roberti Roos Assault Weapons Control Act of 1989); Category 2 - Penal Code section 12276 subdivisions (e) and (f) (*Kasler v. Lockyer*, AK and AR-15 series assault weapons); and Category 3 - Penal Code section 12276.1 (SB 23 - generic characteristic assault weapons).  **A combined listing of Category 1 and Category 2 assault weapons can be found on page 82.**

**Category 1**.  The Roberti-Roos Assault Weapons Control Act of 1989
This was California's first assault weapons act.  Under this act, any firearm on a list specified in Penal Code section 12276 is considered an assault weapon.  Such assault weapons are controlled (i.e., may not be legally purchased, kept for sale, offered for sale, exposed for sale, given, lent, manufactured, distributed, or imported) after December 31, 1991, and were required to be registered as assault weapons with the Department of Justice on or before March 31, 1992.  In addition, the Roberti-Roos Assault Weapons Control Act controlled AK and AR-15 series assault weapons (Penal Code section 12276, subd (e) and (f) - see Category 2).  These assault weapons are controlled regardless of whether they have Category 3 (Penal Code section 12276.1 - SB 23) characteristics.  The only legal option for Category 1 assault weapons that were not registered on or before March 31, 1992, is to surrender them to law enforcement pursuant to Penal Code section 12288.

**Category 2**.  AK and AR-15 Series Weapons
The California Supreme Court upheld the constitutionality of the Roberti-Roos Assault Weapons Control Act of 1989 in *Kasler v. Lockyer.*  This decision took effect August 16, 2000.  Effective August 16, 2000, firearm models that are variations of the AK or AR-15, with only minor differences from those two models, are assault

DEF0225

weapons under the original Roberti-Roos Assault Weapons Control Act of 1989.  AK and AR-15 series weapons were controlled as of August 16, 2000, and must have been registered as assault weapons with the Department of Justice on or before January 23, 2001.  The only legal option for Category 2 assault weapons that were not registered on or before January 23, 2001, is to surrender them to law enforcement pursuant to Penal Code section 12288.  These assault weapons are controlled regardless of whether they have Category 3 (Penal Code section 12276.1 - SB 23) characteristics.

**Category 3**.  Generic Characteristics

As of January 1, 2000, Senate Bill 23 (Chapter 129, Statutes of 1999) provided that firearms that have characteristics falling under any of the categories listed in Penal Code section 12276.1 are assault weapons.  These assault weapons were controlled as of January 1, 2000, and must have been registered as assault weapons with the Department of Justice on or before December 31, 2000.  However, a person arrested for possession of an unregistered Category 3 assault weapon on or before December 31, 2001 could have registered it under conditions specified in Penal Code section 12280(c) pursuant to reducing the charge to an infraction.  On and after January 1, 2002, the only legal option for Category 3 assault weapons that are not registered is to surrender them to law enforcement pursuant to Penal Code section 12288.  An exception for peace officers is addressed on the next page.

### *Punishment*
- Possession – Felony or misdemeanor -- **(Penal Code § 12280(b))**
    Infraction under limited time and conditions -- **(Penal Code § 12280(c))**
- Manufacture, distribution, transportation, importation, sale, and transfer of assault weapons -- Felony.  **(Penal Code § 12280(a))**

DEF0226

**PEACE OFFICER EXEMPTION EFFECTIVE JANUARY 1, 2002**
Effective January 1, 2002, a peace officer member of a police department, sheriffs' office, or other law enforcement agency specified in Penal Code section 12280(f) who possesses or receives an assault weapon prior to January 1, 2002, may, with the authorization of his or her agency head, retain and personally possess that firearm provided he or she registers it as an assault weapon with the Department of Justice on or before April 1, 2002. Any such-identified peace officer may also, with the authorization of his or her agency head, purchase or receive an assault weapon on or after January 1, 2002, provided he or she registers it as an assault weapon with the Department of Justice within 90 days of receipt. Agency authorization must be in the form of verifiable written certification from the head of the agency identifying the recipient or possessor of the assault weapon as a peace officer and authorizing him or her to receive or possess the specific assault weapon. The peace officer must include a copy of this authorization with the assault weapon registration. Assault weapon registration forms may be obtained from the Department of Justice by calling (916) 227-3694.

**CONFIRMATION OF REGISTRATION (Law Enforcement Agencies Only)**
A law enforcement agency may verify an assault weapon registration by consulting the Automated Firearms System (AFS), which is accessible through the California Law Enforcement Telecommunications System (CLETS). Each AFS assault weapon record includes the date of registration, information identifying the registrant, and information identifying the weapon. Please note that the assault weapon registrant is not required to be in possession of his or her registration documentation.

DEF0227

# Contents

**CATEGORY 1.  Roberti-Roos Assault Weapons Control Act of 1989 ...................... 1**

   **LISTING** ........................................................................................................................... 3

   **RIFLES** ............................................................................................................................. 5

      AK Series (See Category 2, p. 57-61 for additional makes and models) ............................... 6

      Norinco 86S ........................................................................................................................... 7

      Colt AR-15 Series (See Category 2, p. 62-67 for additional makes and models) ................... 8

      Armalite AR-180 .................................................................................................................... 9

      Beretta AR-70 ...................................................................................................................... 10

      Bushmaster Assault Rifle ..................................................................................................... 11

      Calico M-900 ........................................................................................................................ 12

      CETME Sporter .................................................................................................................... 13

      Daewoo K-1, Max 1, AR 110C .............................................................................................. 14

      Daewoo K-2, Max 2,  AR 100 ................................................................................................ 15

      Fabrique Nationale FAL, LAR, and 308 Match ..................................................................... 16

      Fabrique Nationale FNC and Sporter .................................................................................... 17

      Galil ...................................................................................................................................... 18

      HK-91 and HK-93 ................................................................................................................. 19

      HK-94 ................................................................................................................................... 20

      HK-PSG-1 ............................................................................................................................. 21

      J&R ENG M-68 ..................................................................................................................... 22

      MAC Types ........................................................................................................................... 23

      MAS 223 .............................................................................................................................. 24

DEF0228

SAR 48 ............................................................................................................ 25

SIG AMT ......................................................................................................... 26

SIG PE-57 ....................................................................................................... 27

SG 550 and SG 551 ........................................................................................ 28

SKS with detachable magazine ....................................................................... 29

Springfield Armory BM 59 ............................................................................... 30

Sterling MK-6 ................................................................................................... 31

Steyr* AUG ...................................................................................................... 32

Uzi ................................................................................................................... 33

Valmet M62S ................................................................................................... 34

Valmet M71S ................................................................................................... 35

Valmet M78S ................................................................................................... 36

Weaver Arms Nighthawk ................................................................................. 37

**PISTOLS** ............................................................................................................ 39

Bushmaster Pistol ........................................................................................... 40

Calico M-950 ................................................................................................... 41

Encom MP-9 and MP-45 .................................................................................. 42

Intratec TEC-9 ................................................................................................. 43

MAC Types ...................................................................................................... 44

Sites Spectre ................................................................................................... 45

Sterling MK-7 ................................................................................................... 46

Uzi ................................................................................................................... 47

\* Statute spelling of "Steyer" is incorrect.

DEF0229

**SHOTGUNS** ........................................................................................................... **49**
    Franchi Law 12 .................................................................................................... 50
    Franchi SPAS 12 ................................................................................................ 51
    The Streetsweeper Type S/S Inc. ..................................................................... 52
    Striker 12 ............................................................................................................ 53

**CATEGORY 2.  AK and AR-15 Series Weapons (Kasler v. Lockyer)** ..................... **55**
  **AK and AR-15 Series Weapons** ........................................................................ **56**
    AK Series Weapons ........................................................................................... 57
    AR-15 Series Weapons ...................................................................................... 62

**CATEGORY 3.  Assault Weapons Defined and Identified based on Generic Characteristics (Penal Code section 12276.1)** ........................................................ **70**

**LARGE CAPACITY MAGAZINES** .............................................................................. **73**
  **Restrictions and Exemptions (Penal Code section 12020)** ............................ **74**
**Recent Firearms-Related Legislation** ....................................................................... **77**
    Handgun Safety Testing (Penal Code section 12125, et seq.) ........................... 78
    Firearm Safety Device Requirement (Penal Code section 12087, et seq.) ......... 78
**Glossary** ..................................................................................................................... **79**

**Combined Listing of Category 1 and Category 2 Assault Weapons** .... **82**

DEF0231

# Category 1.

## Penal Code Section 12276, subdivisions (a)-(c)

# Roberti-Roos Assault Weapons Control Act of 1989

1

2

## CATEGORY 1

The Roberti-Roos Assault Weapons Control Act of 1989

The Roberti-Roos Assault Weapons Control Act of 1989 was California's first assault weapons act. The Act is still in effect and specifically identifies assault weapons by make and model. Assault weapons under this act include those firearms that are marked as specified in Penal Code section 12276, as well as those makes and models specified by the Attorney General pursuant to Penal Code section 12276.5. As of October 2001, the Attorney General has not utilized the add-on provisions of Penal Code section 12276.5 subdivisions (a)-(f).

2 Except as otherwise noted, firearms described in this publication have been physically identified as assault weapons by their markings. Those markings generally, but not always, include both the name or trademark of the manufacturer and the model name or number of the firearm. Each description includes identification markings and an indication of where those markings, if any, are found on the firearm.

Caution must be used in identifying Roberti-Roos assault weapons because of the ease in which their appearance may be altered with attachments or different types of stocks; however, removing a characteristic does not change a firearm's status as a a Category 1 assault weapon. A firearm specified in Penal Code section 12276 by make and model is a controlled assault weapon even if it is not identical to its picture in this publication. If in doubt about the identity of a particular firearm, or if identifying marks have been removed or altered, please consult the Department of Justice Firearms Division at (916) 263-4887.

# CHAPTER 2.3. ROBERTI-ROOS ASSAULT WEAP-ONS CONTROL ACT OF 1989 LISTING

The ACT provides in part:

**12276.** As used in this chapter, "assault weapon" shall mean the following designated semiautomatic firearms:

**(a) All of the following specified rifles:**
(1) All AK series including, but not limited to, the models identified as follows:
　(A) Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 84S, and 86S.
　(B) Norinco 56, 56S, 84S, and 86S.
　(C) Poly Technologies AKS and AK47.
　(D) MAADI AK47 and ARM.
(2) UZI and Galil.
(3) Beretta AR-70.
(4) CETME Sporter.
(5) Colt AR-15 series.
(6) Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR 110C.
(7) Fabrique Nationale FAL, LAR, FNC, 308 Match, and Sporter.
(8) MAS 223.
(9) HK-91, HK-93, HK-94, HK-PSG-1.
(10) The following MAC types:
　(A) RPB Industries Inc. sM10 and sM11.
　(B) SWD Incorporated M11.
(11) SKS with detachable magazine.
(12) SIG AMT, PE-57, SG 550, and SG 551.
(13) Springfield Armory BM59 and SAR-48.
(14) Sterling MK-6.
(15) Steyer AUG.
(16) Valmet M62S, M71S, and M78S.
(17) Armalite AR-180.
(18) Bushmaster Assault Rifle.
(19) Calico M-900.
(20) J&R ENG M-68.
(21) Weaver Arms Nighthawk.

**(b) All of the following specified pistols:**
(1) UZI.
(2) Encom MP-9 and MP-45.
(3) The following MAC types:
　(A) RPB Industries Inc. sM10 and sM11.
　(B) SWD Incorporated M-11.

**3**

DEF0234

**4**

(C) Advance Armament Inc. M-11.

(D) Military Armament Corp. Ingram M-11.

(4) Intratec TEC-9.

(5) Sites Spectre.

(6) Sterling MK-7.

(7) Calico M-950.

(8) Bushmaster Pistol.

**(c) All of the following specified shotguns:**

(1) Franchi SPAS 12 and LAW 12.

(2) Striker 12.

(3) The Streetsweeper type S/S Inc. SS/12.

**(d) Any firearm declared by the court pursuant to Section 12276.5 to be an assault weapon that is specified as an assault weapon in a list promulgated pursuant to Section 12276.5.**

**(e) The term "series" includes all other models that are only variations with minor differences, of those models listed in subdivision (a), regardless of the manufacturer.**

**(f) This section is declaratory of existing law, as amended, and a clarification of the law and the Legislature's intent, which bans the weapons enumerated in this section, the weapons included in the list promulgated by the Attorney General pursuant to Section 12276.5, and any other models which are only variations of those weapons with minor differences, regardless of the manufacturer. The Legislature has defined assault weapons as the types, series, and models listed in this section because it was the most effective way to identify and restrict a specific class of semiautomatic weapons.**

**4**

DEF0235



**RIFLES**

5

DEF0236

# AK Series

**6**

12276(a)(1)

**AK Series**

**9**



*MANUFACTURER:*  various

*MARKINGS:*  **AK, AKM, AKS, AK47, AK47S, 56, 56S, 86S.  Also See Category 2.**

*Comments:*  The firearm pictured represents the general appearance of the AK series; however, these firearms may be found in various configurations.

DEF0237



**Norinco 86S**

*MANUFACTURER:* Chinese Government

*MARKINGS:* **86S located on left side of receiver near the rear.  Also See Category 2.**

*Comments:*  The firearm pictured here is included in the AK series and was originally identified by the Department of Justice as an assault weapon because the internal operation is similar to other AK type firearms.

**Norinco 86S**                    **7**                    12276(a)(2)

DEF0238

## Colt AR-15 Series  12276(a)(5)



*MANUFACTURER*:  Colt

*MARKINGS*:  **AR-15.  Also See Category 2.**

*Comments:*  The firearm pictured represents one general appearance of the Colt AR-15.  These firearms may be found in various configurations.

DEF0239



6

MANUFACTURER:   various manufacturers

MARKINGS:  **Armalite AR-180** located on the right side of the receiver.

*Comments:*  Various other markings, including the name of manufacturer, are found on the firearm, but they are not material to identifying it as an assault weapon.

**Armalite AR-180**

**Armalite AR-180**          9          12276(a)(17)

DEF0240

# Beretta AR-70  12276(a)(3)

Beretta AR-70



*MANUFACTURER:*    Pietro Beretta SPA

*MARKINGS:*    **AR 70** on the left side of the receiver near the top.

*Comments:*    May be marked Mod 70S or Mod 70 Sport. However, only the mark **AR 70** is essential to identify the firearm as an assault weapon.



*MANUFACTURER:*   Bushmaster Firearms
*MARKINGS:*   **Bushmaster Assault Rifle** located on the left side of the receiver above the magazine.
*Comments:*   none

## Bushmaster Assault Rifle   11

12276(a)(18)

Bushmaster Assault Rifle

## Calico M-900      12276(a)(19)



MANUFACTURER:   Calico Light Weapons Systems

MARKINGS:   **M-900** usually on the left side of the receiver.

Comments:   An unconventional spiral magazine may be located on the top of the receiver as pictured here.



13

*MANUFACTURER:*   Made in Spain

*MARKINGS:*   **CETME "Sport"** usually found on the left side of the magazine well.

*Comments:*   none

**CETME Sporter**

**CETME Sporter**                    13                    12276(a)(4)

## Daewoo K-1, Max 1, AR 110C  14                    12276(a)(6)



*MANUFACTURER:*    Daewoo Precision Industries Ltd.

*MARKINGS:*    **K1**, **Max1**, or **AR110C** usually located on the left side of the receiver on the magazine well.

*Comments:*    Markings may include **A1** and other designations, but these additional markings are not material to identifying the firearm as an assault weapon.

Daewoo K-1, Max 1, AR 110C



**Daewoo K-2, Max 2, AR 100**

*MANUFACTURER:*   Daewoo Precision Industries Ltd.

*MARKINGS:*   **K2**, **Max II** or **AR100** usually located on the left side of the receiver on the magazine well.

*Comments:*   none

**Daewoo K-2, Max 2,  AR 100**   15      12276(a)(2)

DEF0246

**Fabrique Nationale FAL, LAR, and 308 Match** **16**          12276(a)(7)



MANUFACTURER:   FN Herstal SA (Fabrique Nationale Herstal)

MARKINGS:   **FAL**, **LAR**, or **.308 Match** usually located on the left side of the receiver.

Comments:   none

**16**

**Fabrique Nationale FAL, LAR, and 308 Match**

DEF0247





MANUFACTURER:   FN Herstal SA (Fabrique Nationale Herstal)
MARKINGS:   **FNC** or **Sporter** usually located near the top on the left side of the receiver.
Comments:   none

**Fabrique Nationale FNC and Sporter**

**Fabrique Nationale FNC and Sporter**   17   12276(a)(7)

DEF0248

# Galil

18

12276(a)(2)



MANUFACTURER:   IMI (Israel Military Industries)

MARKINGS:   **GALIL** usually found on the left side of the receiver above the pistol grip.

Comments:   Various other model markings located on the firearm are not material to identifying it as an assault weapon.

DEF0249



**19**

MANUFACTURER:   HK (Heckler and Koch GmbH)

MARKINGS:   **HK91** or **HK93** usually found on the left side of the receiver on the magazine well.

Comments:   The **HK91** and **HK93** appear substantially the same but are in different calibers.

## HK-91 and HK-93

**19**

12276(a)(9)

HK-91 and HK-93

## HK-94  12276(a)(9)

HK-94

20



*MANUFACTURER:*   HK (Heckler and Koch GmbH)
*MARKINGS:*   **HK94** usually found on the top of the receiver.

*Comments:*   none

DEF0251



*MANUFACTURER:*   HK (Heckler and Koch GmbH)

*MARKINGS:*  The designation **PSG-1** is located on the left side of the receiver on the magazine well.

*Comments:*  none

**HK-PSG-1**

21

12276(a)(9)

**HK-PSG-1**

## J&R ENG M-68

22

12276(a)(20)



*MANUFACTURER:*   various  manufacturers

*MARKINGS:*   **J&R ENG. M68** located on the back end of the receiver above the stock.

*Comments:*   none

DEF0253



*MANUFACTURER:*   RPB Industries Inc. or SWD Inc.

*MARKINGS:*   **RPB Industries Inc. sM10** or **sM11** are usually marked on the right side of the lower receiver. **SWD Inc. M-11** is usually marked on the right side of the lower receiver.

*Comments:*   The appearance of this type of assault weapon may vary because of the type of stock or barrel attached, but those differences are not material to identifying the firearms as an assault weapon.

**MAC Types**

**MAC Types**

23

12276(a)(10)

DEF0254

## MAS 223

 12276(a)(8)



MANUFACTURER:   MAS (Manufacture Nationale d'Armes de St Etienne)

MARKINGS:   The designation **MAS .223** appears on the right side of the receiver on the magazine well.

Comments:   none

DEF0255



*MANUFACTURER:*   Springfield Armory

*MARKINGS:*   **S.A.R.- 48** is found on the left side of the receiver above the pistol grip.

*Comments:*   The bipod, which folds up under the barrel, is shown here extended.

**SAR 48**                    25                    12276(a)(13)

# SIG AMT

 12276(a)(12)

SIG AMT



MANUFACTURER:   SIG (Swiss Industrial Company)

MARKINGS:   **AMT** usually found on top of the receiver near the barrel.

Comments:   none



MANUFACTURER:   SIG (Swiss Industrial Company)
MARKINGS:  **PE-57**

*Comments:*  none

**SIG PE-57**

27

**SIG PE-57**

12276(a)(12)

DEF0258

## SG 550 and SG 551  12276(a)(12)



MANUFACTURER:   SIG (Swiss Industrial Company)

MARKINGS:   **SG550** or **SG551** usually found on the left side of the receiver above the magazine well.

Comments:   These firearms have a similar appearance; however, the **550** is longer than the **551** model which is pictured here.



**SKS with detachable magazine**



*MANUFACTURER:*   Various

*MARKINGS:*   **SKS** usually found on the left side of the receiver.

*Comments:*   The SKS rifle was originally manufactured with a fixed 10 round magazine. However, modified versions accept detachable magazines and are assault weapons.

**SKS with detachable magazine**      12276(a)(11)

DEF0260

# Springfield Armory BM 59  12276(a)(13)



Springfield Armory BM 59

*MANUFACTURER:*   Springfield Armory

*MARKINGS:*   **BM59** found in various locations on the firearm.

*Comments:*   Shown here without the detachable magazine. The marking "Beretta" may also be found but is not material to identifying it as an assault weapon.

DEF0261



*MANUFACTURER:*   Sterling Armament Co Ltd. (England)

*MARKINGS:*   **MK6** located on top of the magazine well.

*Comments:*   The magazine extends horizontally from the left side of the receiver.

**Sterling MK-6**

**Sterling MK-6**

31

12276(a)(14)

DEF0262

# Steyr* AUG
**32**
12276(a)(15)

**32**



**Steyr\* AUG**

MANUFACTURER:   Steyr*-Manlicher AG (member of the Steyr*-Daimler-Puch AG group)

MARKINGS:   **AUG** usually molded in the right side of the polymer stock and followed by **/SA**.

Comments:   This firearm is in a bullpup configuration and is shown here with a muzzle cap and without the detachable magazine.

*Spelling of "Steyer" in the statute is a typographical error.

DEF0263



**33**

*MANUFACTURER:*   IMI (Israel Military Industries)

*MARKINGS:*   **UZI** usually located on the left side of the receiver near the rear.

*Comments:*   Various other model markings located on the firearm are not material to identifying it as an assault weapon.  The UZI is shown here with stock collapsed.

**Uzi**   **33**   12276(a)(2)

**Uzi**

## Valmet M62S



12276(a)(16)

Valmet M62S

*MANUFACTURER:*   Valmet (Finland)

*MARKINGS:*   **M62/S** usually located on right side of the receiver to the rear.

*Comments:*   none

DEF0265



35

MANUFACTURER:   Valmet (Finland)
MARKINGS:   **M71/S** usually located on the right side of the receiver.

Comments:   Shown here without the detachable magazine.

**Valmet M71S**

## Valmet M71S

35

12276(a)(16)

DEF0266

## Valmet M78S  12276(a)(16)



MANUFACTURER:   Valmet (Finland)

MARKINGS:   **M78S**

Comments:   Shown here without the detachable magazine.

DEF0267



**37**

MANUFACTURER:   Weaver Arms Ltd.

MARKINGS:  **Nighthawk** located  on the left side of the receiver.

Comments:  none

## Weaver Arms Nighthawk        **37**

**Weaver Arms Nighthawk**

12276(a)(21)

DEF0268

38

38

DEF0269



PISTOLS

39

39

DEF0270

# Bushmaster Pistol  12276(b)(8)



**Bushmaster Pistol**

*MANUFACTURER:*   Bushmaster Firearms

*MARKINGS:*   **Bushmaster Pistol** usually appears on the left side of the receiver.

*Comments:*   This firearm is in bullpup configuration.



**41**

MANUFACTURER:   Calico Light Weapons Systems

MARKINGS:   **M-950** is usually located on the left side of the receiver, below the magazine.

Comments:   An unconventional spiral magazine may be located on the top of the receiver as pictured here.

**Calico M-950**

**Calico M-950**

41

12276(b)(7)

DEF0272

## Encom MP-9 and MP-45  12276(b)(2)



*MANUFACTURER:*   Encom America

*MARKINGS:*   **MP9** (or **MP45**) usually found on the left rear of the receiver.

*Comments:*   The MP9 and MP45 appear substantially the same but are in different calibers.



43

MANUFACTURER:   Intratec

MARKINGS:   **TEC-9** is usually molded in the plastic on the left side of the magazine well.

Comments:   Shown here without the detachable magazine.

**Intratec Tec-9**

**Intratec TEC-9**                    43                    12276(b)(4)

# MAC Types



12276(b)(3)

**MAC Types**



*MANUFACTURER:*   various manufacturers

*MARKINGS:*   **RPB sM10** or **sM11**, **SWD Inc. M11**, **Advanced Armament Corp. M11,** and **Military Armament Corp. M-11**.  These weapons are usually found with the appropriate marks on the right side of the receiver above the pistol grip.

*Comments:*   none



45

*MANUFACTURER:*   Sites SpA (Italy)

*MARKINGS:*   **Spectre** is usually located on the right side of the receiver.

*Comments:*   Shown here without the detachable magazine.

**Sites Spectre**

## Sites Spectre

45

12276(b)(5)

# Sterling MK-7



12276(b)(6)

**Sterling MK-7**



*MANUFACTURER:*   Sterling Armament Co. Ltd. (England)

*MARKINGS:*   **MK7** usually appears on the top of the magazine well.

*Comments:*   The magazine well extends horizontally from the left side of the receiver.



*MANUFACTURER:*   IMI (Israel Military Industries)

*MARKINGS:*   **UZI** usually located on the left side of the receiver below the rear sight.

*Comments:*   none

**Uzi**                    47                    12276(b)(1)

48

48

DEF0279



SHOTGUNS

49

49

DEF0280

# Franchi Law 12  12276(c)(1)





*MANUFACTURER:*   Luigi Franchi SPA

*MARKINGS:*   **LAW 12** usually appears on the right side of the receiver above the trigger.

*Comments:*   none



**51**

**Franchi SPAS 12**

*MANUFACTURER:*   Luigi Franchi SPA

*MARKINGS:*   **SPAS 12** usually appears on the right side of the receiver above the trigger.

*Comments:*   This shotgun fires in semiautomatic or pump-action modes.

**Franchi SPAS 12**          **51**          12276(c)(1)

DEF0282

## The Streetsweeper Type S/S Inc.  12276(c)(3)



*MANUFACTURER:*   S/S Inc. (may have the Cobray insignia).

*MARKINGS:*   **SS /12** is usually located on the front of the receiver above the winding key.

*Comments:*   none

DEF0283



*MANUFACTURER:*   various manufacturers

*MARKINGS:*   **Striker-12** usually appears on the left side of the receiver where the barrel affixes to the receiver.

*Comments:*   Shown here with a short barrel and without a stock attached.

**Striker 12**

53

12276(c)(2)

Striker 12

DEF0284

54

DEF0285



# Category 2.

## Penal Code Section 12276, subdivision (e)
# AK and AR-15
# Series Weapons
# (Kasler v. Lockyer)

55

# AK and AR-15 Series Weapons $^{56}$

## CATEGORY 2

### AK and AR-15 Series Weapons (Kasler v. Lockyer)

This California Supreme Court decision took effect on August 16, 2000.  Under this decision, any firearm of minor variation of the AK or AR-15 type (i.e., series weapon), regardless of the manufacturer, is a Category 2 (*Kasler v. Lockyer*) assault weapon under the original Roberti-Roos Assault Weapons Control Act of 1989. **All AK and AR-15 series weapons had to be possessed before August 16, 2000 and must have been registered on or before January 23, 2001**.  The Department of Justice is required to identify these series weapons and includes in this publication a listing of identified AK and AR-15 series weapons.

**It is important to note that removal of a firearm's characteristics does not affect its status as a Category 2 assault weapon.  A Category 2 assault weapon is still an assault weapon even if it has no Category 3 (SB 23 - generic characteristics) features.**

**Category 2 assault weapons may be of any caliber, including .22 caliber rimfire.**

AK and AR-15 Series Weapons

DEF0287

**AK Series Weapons**

The following pages show markings and illustrations of AK series weapons subsequently identified as Roberti-Roos assault weapons as a result of the California Supreme Court's ruling in *Kasler v. Lockyer* on August 16, 2000. Listed weapons were required to be purchased on or before August 16, 2000 and registered as assault weapons on or before January 23, 2001, with the exception of original Category 1 (Roberti-Roos) assault weapons, which were required to be registered on or before March 31, 1992. Category 1 weapon models on the list are noted with asterisks.

The markings on each of these firearms can usually be found on the receiver. In some cases, the markings appear on the trundle (between the barrel and the receiver).

Caliber has no bearing on a weapon's status as a series weapon and should be disregarded when making an identification. For example, a ROMAK AK-47 is a series weapon whether it is in .223 cal, .308 cal, or 7.62 X 39 mm.

The makes and models provided in this guide include those which the Department of Justice was able to locate prior to printing this booklet. It is probable that some series weapons unknown to the Department of Justice are in circulation. If you encounter a suspected series weapon that is not specifically identified in this booklet, please contact the Firearms Division at (916) 263-4887 for identification of that weapon. Additional assault weapon models as they are identified will be included in future versions of this guide and will be posted on our website at www.ag.ca.gov/firearms/awguide/.

# AK Series Weapons

57

## Penal Code § 12276(e)

**AK Series Weapons**

57

DEF0288

# AK Series Weapons

**58**

# Penal Code § 12276(e)

**AK Series Weapons**

**58**

## _AK Series markings include, but are not limited to, the following:_

**_American Arms_**
AK-Y 39
AK-F 39
AK-C 47
AK-F 47

**_Arsenal_**
SLR (all)
SLG (all)

**_B-West_**
AK-47 (all)

**_Hesse Arms_**
Model 47 (all)
Wieger STG 940 Rifle

**_Inter Ordnance - Monroe, NC_**
AK-47 (all)
RPK
M-97

**_Kalashnikov USA_**
Hunter Rifle /Saiga

**_MAADI CO_**
*AK47
*ARM
MISR (all)
MISTR (all)

**_Made in China_**
*AK
*AKM
*AKS
*AK47
*56
*56S
*84S
*86S

**_MARS_**
Pistol

**_Mitchell Arms, Inc._**
AK-47 (all)
AK-47 Cal. 308 (all)
M-76
RPK
M-90

**_Norinco_**
AK-47 (all)
Hunter Rifle
NHM 90, 90-2, 91 Sport
RPK Rifle
*56
*56 S
81 S (all)
*84 S
86 (all)
*86 S
MAK 90

**_Ohio Ordnance Works (o.o.w.)_**
AK-74
ROMAK 991

**_Poly Technologies_**
*AKS
*AK47

**_Valmet_**
Hunter Rifle
76 S

**_WUM_**
WUM (all)

**\*** These weapons were required to be registered on or before March 31, 1992.



*Comments:* The firearms pictured represent the general appearance of the AK series; however, these firearms may be found in various configurations as pictured in this section.

**AK Series Weapons (Continued)**

**AK Series Weapons (Continued)**   59   Penal Code § 12276(e)

DEF0290



**AK Series Weapons (Continued)** — 60 — Penal Code § 12276(e)



*Comments:*   The firearms pictured represent the general appearance of the AK series; however, these firearms may be found in various configurations as pictured in this section.



*Comments:*  The firearms pictured represent the general appearance of the AK series; however, these firearms may be found in various configurations as pictured in this section.

**AK Series Weapons (Continued)**  61  Penal Code § 12276(e)

AK Series Weapons (Continued)

61

DEF0292

# AR-15 Series Weapons 

### AR-15 Series Weapons

The following pages show markings and illustrations of AR-15 series weapons. The Colt AR-15 was the only AR-15 series weapon to be originally identified as an assault weapon under the Roberti-Roos Assault Weapons Control Act of 1989, and was required to be registered on or before March 31, 1992. With the exception of the Colt AR-15, all of the listed AR-15 series weapons were subsequently identified by the Department of Justice as Category 2 assault weapons as a result of the *Kasler v. Lockyer* California Supreme Court ruling effective August 16, 2000. Category 2 (*Kasler v. Lockyer*) weapons were required to be purchased on or before August 16, 2000 and registered as assault weapons on or before January 23, 2001. The markings on these firearms usually appear on the left side of the lower receiver.

Caliber has no bearing on a weapon's status as a series weapon and should be disregarded when making an identification. For example, upper receiver conversion kits are available to convert almost any AR series weapon into .45 ACP, .40 S&W, 7.62 X 39 mm, 9 mm, 10 mm, or .223 caliber.

The makes and models provided in this guide include those which the Department of Justice was able to locate prior to printing this booklet. It is probable that some series weapons in circulation are unknown to the Department of Justice. If you encounter a suspected series weapon that is not specifically named in this booklet, please contact the Firearms Division at (916) 263-4887 for identification of that weapon. Additional assault weapon models as they are identified will be included in future versions of this guide and will be posted on the Firearms Division website at www.ag.ca.gov/firearms/awguide/.

DEF0293

### _AR-15 Series markings include, but are not limited to, the following:_

_**American Spirit**_
ASA Model

_**Armalite**_
AR 10 (all)
M15 (all)
Golden Eagle

_**Bushmaster**_
XM15 (all)

_**Colt**_
*AR-15 (all)
Sporter (all)
Match Target (all)
Law Enforcement (6920)

_**Dalphon**_
B.F.D.

_**DPMS**_
Panther (all)

_**Eagle Arms**_
M15 (all)
EA-15 A2 H-BAR
EA-15 E1

_**Frankford Arsenal**_
AR-15 (all)

_**Hesse Arms**_
HAR 15A2 (all)

_**Knights**_
SR-15 (all)
SR-25 (all)
RAS (all)

_**Les Baer**_
Ultimate AR (all)

_**Olympic Arms**_
AR-15
Car-97
PCR (all)

_**Ordnance, Inc.**_
AR-15

_**Palmetto**_
SGA (all)

_**Professional Ordnance, Inc.**_
Carbon 15 Rifle
Carbon 15 Pistol

_**PWA**_
All Models

_**Rock River Arms, Inc.**_
Standard A-2
Car A2
Standard A-4 Flattop
Car A4 Flattop
NM A2 - DCM Legal
LE Tactical Carbine

_**Wilson Combat**_
AR-15

**\*** These weapons were required to be registered on or before March 31, 1992.

# AR-15 Series Weapons 

**AR-15 Series Weapons**

**AR-15 Series Weapons (Continued)**  Penal Code § 12276(e)



*Comments:*   The firearm pictured represents one general appearance of the AR-15 series. However, these firearms may be found in various configurations.

DEF0295



**AR-15 Series Weapons (Continued)**



*Comments:*  The firearm pictured represents one general appearance of the AR-15 series. However, these firearms may be found in various configurations.

**AR-15 Series Weapons (Continued)**        Penal Code § 12276(e)

DEF0296

**AR-15 Series Weapons (Continued)**  Penal Code § 12276(e)



*Comments:*  The firearm pictured represents one general appearance of the AR-15 series. However, these firearms may be found in various configurations.



*Comments:* The firearm pictured represents one general appearance of the AR-15 series. However, these firearms may be found in various configurations.

**AR-15 Series Weapons (Continued)**   67   Penal Code § 12276(e)

AR-15 Series Weapons (Continued)

67

DEF0298

68

89

DEF0299



# Category 3.

## Penal Code Section 12276.1

# Assault Weapons Defined and Identified based on Generic Characteristics

69

70

## CATEGORY 3

## Assault Weapon Generic Characteristics (Penal Code Section 12276.1)

The Roberti-Roos Assault Weapons Control Act of 1989 (Penal Code section 12276) regulates specific assault weapons by makes and models.  Since its passage in 1989, many manufacturers created new firearm models that have very similar characteristics to controlled assault weapons.  In response, the Legislature passed and the governor signed SB 23 (Chapter 129, Statutes of 1999), which created Penal Code section 12276.1 to define assault weapons by generic characteristics.  It is important to understand that the Roberti-Roos Assault Weapons Control Act of 1989 (Penal Code section 12276), which lists assault weapons by make and model, is still the law and those weapons were required to be registered on or before March 31, 1992 (with the exception of certain AK series and AR-15 series weapons, which were required to be registered on or before January 23, 2001).  (Penal Code §§ 12276.1)

Penal Code section 12276.1 complements rather than supersedes the Roberti-Roos Assault Weapons Control Act of 1989.  A firearm that is of a type specified in Penal Code Section 12276.1 that has any of the specified characteristics listed for that type of firearm is considered a Category 3 (generic characteristics) assault weapon. Under Penal Code section 12276.1, a firearm's make, model, or markings have no bearing on whether it is an assault weapon.  A firearm's status as an assault weapon under this category is determined solely by its characteristics.  There are three general types of firearms that are controlled by the generic characteristics assault weapons laws.  These types include semiautomatic centerfire rifles, semiautomatic pistols, and semiautomatic or revolving cylinder shotguns.

DEF0301

## <u>Generic Characteristics Defining Assault Weapons:</u>

**12276.1  (a) Notwithstanding Penal Code section 12276, "assault weapon" shall also mean the following:**
   <u>Rifles</u>
   (1) A semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following:
   (A) A pistol grip that protrudes conspicuously beneath the action of the weapon.
   (B) A thumbhole stock.
   (C) A folding or telescoping stock. 
   (D) A grenade launcher or flare launcher.
   (E) A flash suppressor.
   (F) A forward pistol grip.
   (2) A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.
   (3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

**Note:  Bayonets and bayonet lugs are not assault weapon characteristics under California law.**

71

72

**Pistols**

(4) A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

(A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer**.**

(B) A second handgrip.

(C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel.

(D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

(5) A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

**Shotguns**



(6) A semiautomatic shotgun that has both of the following:

(A) A folding or telescoping stock.

(B) A pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

(7) A semiautomatic shotgun that has the ability to accept a detachable magazine.

(8) Any shotgun with a revolving cylinder.

73

# LARGE CAPACITY MAGAZINES

73

DEF0304

74

**Large Capacity Magazine Restrictions and Exemptions (Penal Code Section 12020)**

A large capacity magazine is defined as "any ammunition feeding device with a capacity to accept more than 10 rounds but shall not be construed to include a feeding device that is permanently altered so that it cannot accommodate more than 10 rounds nor shall it include any .22 caliber tube ammunition feeding device (or, effective January 1, 2002, a tubular magazine contained in a lever-action firearm)." It is important to understand that a large capacity feeding device may be detachable or fixed, and includes any tube ammunition feeding device (other than .22 caliber or, effective January 1, 2002, a tubular magazine contained in a lever-action firearm) that can accommodate more than 10 rounds. A large capacity magazine also includes linked ammunition with more than 10 rounds linked together or an ammunition belt with the capacity to accept more than 10 rounds.

74

**Possession** of large capacity magazines, whether by peace officers or private citizens, **is not** controlled.

**The manufacturing, importation into the state, offering for sale, keeping for sale, exposing for sale, giving, and lending of a large capacity magazine is** controlled. No person may participate in these activities without a permit issued by the Department of Justice. For exceptions, see Penal Code §§12020(b)(19)-(32).

Specified law enforcement agencies and their employees are exempt from these restrictions. These agencies and employees include any federal, state, county, city and county, or city, law enforcement agencies and employees of those agencies while discharging their official duties, whether on-duty or off-duty, where the use is authorized by the agency within the scope of their duties. This exemption includes the sale of, giving of, lending of, importation into the state, or purchase of any large capacity magazine.

DEF0305

Peace officers (distinct from law enforcement agencies) who are authorized to carry firearms in the course and scope or their duties are exempted.  This exemption includes the sale to, lending to, purchase of, purchase by, receipt of, or importation into the state of large capacity magazines.  For record keeping purposes, a peace officer who purchases large capacity magazines from a firearms dealer is required to provide that firearms dealer with a copy of his or her peace officer photo identification.  In the event the magazine is stamped "RESTRICTED LAW ENFORCEMENT/GOVERNMENT USE ONLY," federal regulations require the law enforcement officer to provide the firearms dealer with:  1) A written statement from the officer, under penalty of perjury, that the magazine is being purchased for use in performing official duties and the it is not being acquired for personal use or for purposes of transfer or resale; and 2) a written statement from a supervisor of the purchasing officer, stating under penalty of perjury that the officer is acquiring the magazine for use in official duties, that the magazine is suitable for use in performing official duties, and that the magazine is not being acquired for personal use or for purposes of transfer or resale.

Other allowances are made for firearms dealers; the loaning of large capacity magazines under specified conditions; the importation into the state of previously owned magazines by residents who lawfully possessed those magazines prior to January 1, 2000 and who lawfully took them out of the state; the repair of magazines; importation of large capacity magazine by permitted individuals; the armored car industry; manufacturing large capacity magazines for specified purposes; and prop masters (Penal Code §§ 12020(b)(21)-(32)).

*Punishment* – Felony or Misdemeanor. **(Penal Code § 12020(a)(2))**
*Law Enforcement Exemption* – Agencies and sworn peace officers. **(Penal Code §§ 12020(b)(19), (20))**



DEF0306

76

DEF0307

# Selected Recent Firearms-Related Legislation

77

DEF0308

**78**

### Peace Officer Registration and Acquisition of Assault Weapons (Penal Code Section 12280(g))

Effective January 1, 2002, a peace officer member of the Department of Justice, police departments, sheriffs' offices, marshals' offices, the Youth and Adult Corrections Agency, the Department of the California Highway Patrol, district attorneys' offices, Department of Fish and Game, Department of Parks and Recreation, or the military or naval forces of this state or of the United States, or any federal law enforcement agency, who possesses or receives an assault weapon prior to January 1, 2002, may, with the authorization of his or her agency, retain and personally possess that firearm provided he or she registers it as an assault weapon with the Department of Justice on or before April 1, 2002.  Such a peace officer may also, with the authorization of his or her agency, personally purchase or receive an assault weapon on or after January 1, 2002, provided he or she registers it as an assault weapon with the Department of Justice within 90 days after possession or receipt.  Assault weapon registration forms are available from the Department of Justice and may be obtained by calling (916) 227-3694.

Acceptable agency authorization is defined as verifiable written certification from the head of the agency identifying the recipient or possessor of the assault weapon as a peace officer and authorizing him or her to receive or possess the specific assault weapon.  The peace officer must include a copy of this authorization with the assault weapon registration.

### Large-Capacity Magazines (Penal Code Section 12020)

Effective January 1, 2002, tubular magazines contained in lever-action firearms are excluded from the definition of "large capacity magazine."  This change removes statutory prohibitions against manufacturing, selling, giving, lending, etc., many "old west" style lever-action rifles.

Effective January 1, 2002, technical amendments to Penal Code section 12020 expressly allow properly licensed persons to manufacture large-capacity magazines.  Prop masters may also purchase and loan large-capacity magazines.

### Criminal Storage of a Firearm (Penal Code Sections 12035 & 12036)

Effective January 1, 2002, the age under which persons are considered "children" for purposes of criminal storage of a firearm is increased from 16 years to 18 years.  Any person guilty of criminal storage of a firearm is guilty of an additional misdemeanor and a fine of up to $5,000 if the child took the firearm to a school or school-sponsored activity.

DEF0309



# Glossary

DEF0310

80

**Automatic firearm** -  An automatic firearm continues to self-load and fire as long as the trigger is held back and a supply of ammunition is present.  In an automatic firearm, one pull on the trigger may result in multiple shots being fired.

**Caliber** -  The caliber of a firearm is the approximate diameter of the bore measured before rifling (or the diameter of a circle formed by the tops of the rifling lands).

**Flash suppressor -** Any device designed, intended, or that functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.

**Forearm** -  The forward portion of a two-part stock which is usually under the barrel.

**Magazine** -  Any ammunition feeding device.

**Magazine, fixed** -  A magazine which remains affixed to the firearm during loading.  Frequently a fixed magazine is charged (loaded) from a clip (en bloc or stripper) of cartridges inserted through the open breech into the magazine.

**Magazine, detachable** -  An ammunition feeding device that can be removed readily from the firearm with neither disassembly of the firearm action nor use of a tool being required.  A bullet or ammunition cartridge is considered a tool.  Ammunition feeding device includes any belted or linked ammunition, but does not include clips, en bloc clips, or stripper clips that load cartridges into the magazine.

**Pistol Grip, conspicuously protruding** -  A grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing.

**Pistol Grip, forward** -  A grip that allows for a pistol style grasp forward of the trigger.

**Receiver** - The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled. The receiver may consist of two sections. In some autoloading pistols and other firearms, the terms receiver and frame are used interchangeably.

DEF0311

**Receiver, lower** -  In a receiver composed of two parts, the lower receiver usually contains the trigger and firing mechanism.

**Receiver, upper** -  In a receiver composed of two parts, the upper receiver usually contains the barrel and breech mechanism.

**Semiautomatic firearm** -  This refers to a firearm which is self-loading but not self firing.  A single pull on the trigger results in a single shot being fired.

**Stock** -  The part of a rifle, carbine or shotgun to which the barrel assembly is attached and which provides a means for holding the weapon to the shoulder.

**Stock, collapsing** -  A stock which is shortened by allowing one section to telescope into another.

**Stock, folding** -  A stock which is hinged to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm.

**Stock, thumbhole -** A stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing.

81

DEF0312

82

# Combined Listing of Category 1 and Category 2 Assault Weapons

Italicized models are Category 1 and were required to be registered on or before March 31, 1992.  Non-italicized models are Category 2 and were required to be registered with the Department of Justice on or before January 23, 2001.  Category 3 assault weapons are not included in this listing.

## *Rifles*

**American Arms**
AK-C 47
AK-F 39
AK-F 47
AK-Y 39

**American Spirit**
ASA Model

**Armalite**
AR 10 (all)
*AR-180*
Golden Eagle
M15 (all)

**Arsenal**
SLG (all)
SLR (all)

**B-West**
AK-47 (all)

**Beretta**
*AR-70*

**Bushmaster**
*Assault Rifle*
XM15 (all)

**Calico**
*M-900*

**Colt**
*AR-15 (all)*
Law Enforcement (6920)
Match Target (all)
Sporter (all)

**Daewoo**
*AR100, AR110C*
*K-1, K-2*
*Max 1, Max 2*

**Dalphon**
B.F.D.

**DPMS**
Panther (all)

**Eagle Arms**
EA-15 A2 H-BAR
EA-15 E1
M15 (all)

**Fabrique Nationale**
*308 Match, Sporter*
*FAL, LAR, FNC*

**Frankford Arsenal**
AR-15 (all)

**Hesse Arms**
HAR 15A2 (all)
Model 47 (all)
Wieger STG 940 Rifle

**HK**
*91, 94, PSG-1*
*93*

**IMI**
*Galil*
*Uzi*

**Inter Ordnance - Monroe, NC**
AK-47 (all)
M-97
RPK

**J&R ENG**
*M-68*

**Kalashnikov USA**
Hunter Rifle / Saiga

**Knights**
RAS (all)
SR-15 (all)
SR-25 (all)

**Les Baer**
Ultimate AR (all)

**This listing does not include firearms whose characteristics alone make them assault weapons (Category 3)**

DEF0313

**MAADI CO**
*AK 47*
*ARM*
MISR (all)
MISTR (all)

**Made in China**
*56*
*56S*
*84S*
*86S*
*AK*
*AK47*
*AKM*
*AKS*

**Made in Spain**
*CETME Sporter*

**MAS**
*223*

**Mitchell Arms, Inc.**
AK-47 (all)
AK-47 Cal .308 (all)
M-76
M-90
RPK

**Norinco**
*56*
*56 S*
*81 S (all)*
*84 S*
*86 (all)*
*86 S*
AK-47 (all)
Hunter Rifle
MAK 90
NHM 90, 90-2, 91 Sport
RPK Rifle
*SKS w/ detachable magazine*

**Ohio Ordnance Works (o.o.w.)**
AK-74
ROMAK 991

**Olympic Arms**
AR-15
Car-97
PCR (all)

**Ordnance, Inc.**
AR-15

**Palmetto**
SGA (all)

**Poly technologies**
*AK47*
*AKS*

**Professional Ordnance, Inc.**
Carbon 15 Rifle

**PWA**
All Models

**Rock River Arms, Inc.**
Car A2
Car A4 Flattop
LE Tactical Carbine
NM A2 - DCM Legal
Standard A-2
Standard A-4 Flattop

**RPB Industries, Inc.**
*sM10, sM11*

**SIG**
*AMT, PE-57*
*SG 550, SG 551*

**Springfield Armory**
*BM59, SAR-48*

**Sterling**
*MK-6*

**Steyr**
*AUG*

**SWD Incorporated**
*M11*

**Valmet**
76 S
Hunter Rifle
*M62S, M71S, M78S*

**Weaver Arms**
*Nighthawk*

**Wilson Combat**
AR-15

**WUM**
WUM (all)

**This listing does not include firearms whose characteristics alone make them assault weapons (Category 3)**



DEF0314

84

## _Pistols_

Advance Armament Inc.
_M11_

Bushmaster
_Pistol_

Calico
_M-950_

Encom
_MP-9, MP-45_

IMI
_UZI_

84

Intratec
_TEC-9_

MARS
Pistol

Military Armament Corp.
_M-11_

Professional Ordnance, Inc.
Carbon 15 Pistol

RPB Industries Inc.
_sM10, sM11_

Sites
_Spectre_

Sterling
_MK-7_

SWD Incorporated
_M11_

## _Shotguns_

Cobray
_Streetsweeper, S/S Inc., SS/12_
_Striker 12_

Franchi
_SPAS 12, LAW 12_

**This listing does not include firearms whose characteristics alone make them assault weapons (Category 3)**

This listing includes models of Category 1 (Roberti-Roos) and Category 2 (AK & AR-15 series) assault weapons that have been brought to our attention and examined.  If you have a suspected Category 2 assault weapon that does not appear on this list, please contact the Department of Justice at (916) 263-4887 for an identification of that firearm.  This listing does not include Category 3 (Penal Code section 12276.1) assault weapons, which are defined by their characteristics, not by make/model.  Category 2 assault weapons must have been registered with the California Department of Justice on or before January 23, 2001.  Category 3 assault weapons must have been registered with the Department of Justice on or before December 31, 2000.

# EXHIBIT B

DEF0316

Barclays Official California Code of Regulations CurrentnessTitle 11. LawDivision 5. Firearms Regulations Chapter 39. Assault Weapons and Large-Capacity Magazines Article 2. Registration Requirement, What Qualifies for Registration, and Definitions

11 CCR § 5471

§ 5471. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Explanation of Terms Related to Assault Weapon Designation.

For purposes of Penal Code section 30900 and Articles 2 and 3 of this Chapter the following definitions shall apply:

(a) "Ability to accept a detachable magazine" means with respect to a semiautomatic shotgun, it does not have a fixed magazine.

(b) "Action" means the working mechanism of a semiautomatic firearm, which is the combination of the receiver or frame and breech bolt together with the other parts of the mechanism by which a firearm is loaded, fired, and unloaded.

(c) "Barrel" means the tube, usually metal and cylindrical, through which a projectile or shot charge is fired. Barrels may have a rifled or smooth bore.

(d) "Barrel length" means the length of the barrel measured as follows: Without consideration of any extensions or protrusions rearward of the closed bolt or breech-face the approved procedure for measuring barrel length is to measure from the closed bolt (or breech-face) to the furthermost end of the barrel or permanently attached muzzle device. Permanent methods of attachment include full-fusion gas or electric steel-seam welding, high-temperature (1100$^{\circ}$ F) silver soldering, or blind pinning with the pin head welded over. Barrels are measured by inserting a dowel rod into the barrel until the rod stops against the closed bolt or breech-face. The rod is then marked at the furthermost end of the barrel or permanently attached muzzle device, withdrawn from the barrel, and measured.

(e) "Bullet" means the projectile expelled from a gun. It is not synonymous with a cartridge. Bullets can be of many materials, shapes, weights, and constructions such as solid lead, lead with a jacket of harder metal, round-nosed, flat-nosed, hollow-pointed, et cetera.

(f) "Bullet-button" means a product requiring a tool to remove an ammunition feeding device or magazine by depressing a recessed button or lever shielded by a magazine lock. A bullet-button equipped fully functional semiautomatic firearm does not meet the fixed magazine definition under Penal Code section 30515(b).

(g) "Bore" means the interior of a firearm's barrel excluding the chamber.

(h) "Caliber" means the nominal diameter of a projectile of a rifled firearm or the diameter between lands in a rifled barrel. In the United States, caliber is usually expressed in hundreds of an inch; in Great Britain in thousandths of an inch; in Europe and elsewhere in millimeters.

DEF0317

(i) "Cartridge" means a complete round of ammunition that consists of a primer, a case, propellant powder and one or more projectiles.

(j) "Centerfire" means a cartridge with its primer located in the center of the base of the case.

(k) "Contained in" means that the magazine cannot be released from the firearm while the action is assembled. For AR-15 style firearms this means the magazine cannot be released from the firearm while the upper receiver and lower receiver are joined together.

(*l*) "Department" means the California Department of Justice.

(m) "Detachable magazine" means any ammunition feeding device that can be removed readily from the firearm without disassembly of the firearm action or use of a tool. A bullet or ammunition cartridge is considered a tool. An ammunition feeding device includes any belted or linked ammunition, but does not include clips, en bloc clips, or stripper clips that load cartridges into the magazine.

An AR-15 style firearm that has a bullet-button style magazine release with a magnet left on the bullet-button constitutes a detachable magazine. An AR-15 style firearm lacking a magazine catch assembly (magazine catch, magazine catch spring and magazine release button) constitutes a detachable magazine. An AK-47 style firearm lacking a magazine catch assembly (magazine catch, spring and rivet/pin) constitutes a detachable magazine.

(n) "Disassembly of the firearm action" means the fire control assembly is detached from the action in such a way that the action has been interrupted and will not function. For example, disassembling the action on a two part receiver, like that on an AR-15 style firearm, would require the rear take down pin to be removed, the upper receiver lifted upwards and away from the lower receiver using the front pivot pin as the fulcrum, before the magazine may be removed.

(o) "Featureless" means a semiautomatic firearm (rifle, pistol, or shotgun) lacking the characteristics associated with that weapon, as listed in Penal Code section 30515.

(p) "Fixed magazine" means an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action.

(q) "Flare launcher" means a device used to launch signal flares.

(r) "Flash suppressor" means any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision. A hybrid device that has either advertised flash suppressing properties or functionally has flash suppressing properties would be deemed a flash suppressor. A device labeled or identified by its manufacturer as a flash hider would be deemed a flash suppressor.

(s) "FMBUS" means a Firearm Manufactured By Unlicensed Subject.

DEF0318

(t) "Forward pistol grip" means a grip that allows for a pistol style grasp forward of the trigger.

(u) "Frame" means the receiver of a pistol.

(v) "Grenade launcher" means a device capable of launching a grenade.

(w) "Permanently attached to" means the magazine is welded, epoxied, or riveted into the magazine well. A firearm with a magazine housed in a sealed magazine well and then welded, epoxied, or riveted into the sealed magazine well meets the definition of "permanently attached to".

(x) "Overall length of less than 30 inches" with respect to a centerfire rifle means the rifle has been measured in the shortest possible configuration that the weapon will function/fire and the measurement is less than 30 inches. Folding and telescoping stocks shall be collapsed prior to measurement. The approved method for measuring the length of the rifle is to measure the firearm from the end of the barrel, or permanently attached muzzle device, if so equipped, to that part of the stock that is furthest from the end of the barrel, or permanently attached muzzle device. (Prior to taking a measurement the owner must also check any muzzle devices for how they are attached to the barrel.)

(y) "Pistol" means any device designed to be used as a weapon, from which a projectile is expelled by the force of any explosion, or other form of combustion, and that has a barrel less than 16 inches in length. This definition includes AR-15 style pistols with pistol buffer tubes attached. Pistol buffer tubes typically have smooth metal with no guide on the bottom for rifle stocks to be attached, and they sometimes have a foam pad on the end of the tube farthest from the receiver.

(z) "Pistol grip that protrudes conspicuously beneath the action of the weapon" means a grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing. This definition includes pistol grips on bullpup firearm designs.

(aa) "Receiver" means the basic unit of a firearm which houses the firing and breech mechanisms and to which the barrel and stock are assembled.

(bb) "Receiver, lower" means the lower part of a two part receiver.

(cc) "Receiver, unfinished" means a precursor part to a firearm that is not yet legally a firearm. Unfinished receivers may be found in various levels of completion. As more finishing work is completed the precursor part gradually becomes a firearm. Some just have the shape of an AR-15 lower receiver for example, but are solid metal. Some have been worked on and the magazine well has been machined open. Firearms Manufactured by Unlicensed Subjects (FMBUS) began as unfinished receivers.

(dd) "Receiver, upper" means the top portion of a two part receiver.

DEF0319

(ee) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(ff) "Rimfire" means a rimmed or flanged cartridge with the priming mixture located in the rim of the case.

(gg) "Second handgrip" means a grip that allows the shooter to grip the pistol with their non-trigger hand. The second hand grip often has a grip texture to assist the shooter in weapon control.

(hh) "Semiautomatic" means a firearm functionally able to fire a single cartridge, eject the empty case, and reload the chamber each time the trigger is pulled and released. Further, certain necessary mechanical parts that will allow a firearm to function in a semiautomatic nature must be present for a weapon to be deemed semiautomatic. A weapon clearly designed to be semiautomatic but lacking a firing pin, bolt carrier, gas tube, or some other crucial part of the firearm is not semiautomatic for purposes of Penal Code sections 30515, 30600, 30605(a), and 30900.

   (1) A mechanically whole semiautomatic firearm merely lacking ammunition and a proper magazine is a semiautomatic firearm.

   (2) A mechanically whole semiautomatic firearm disabled by a gun lock or other firearm safety device is a semiautomatic firearm. (All necessary parts are present, once the gun lock or firearm safety device is removed, and weapon can be loaded with a magazine and proper ammunition.)

   (3) With regards to an AR-15 style firearm, if a complete upper receiver and a complete lower receiver are completely detached from one another, but still in the possession or under the custody or control of the same person, the firearm is not a semiautomatic firearm.

   (4) A stripped AR-15 lower receiver, when sold at a California gun store, is not a semiautomatic firearm. (The action type, among other things, is undetermined.)

(ii) "Shotgun with a revolving cylinder" means a shotgun that holds its ammunition in a cylinder that acts as a chamber much like a revolver. To meet this definition the shotgun's cylinder must mechanically revolve or rotate each time the weapon is fired. A cylinder that must be manually rotated by the shooter does not qualify as a revolving cylinder.

(jj) "Shroud" means a heat shield that is attached to, or partially or completely encircles the barrel, allowing the shooter to fire the weapon with one hand and grasp the firearm over the barrel with the other hand without burning the shooter's hand. A slide that encloses the barrel is not a shroud.

(kk) "Spigot" means a muzzle device on some firearms that are intended to fire grenades. The spigot is what the grenade is attached to prior to the launching of a grenade.

DEF0320

(*ll*) "Stock" means the part of a rifle, carbine, or shotgun to which the receiver is attached and which provides a means for holding the weapon to the shoulder. A stock may be fixed, folding, or telescoping.

(mm) "Stock, fixed" means a stock that does not move, fold, or telescope.

(nn) "Stock, folding" means a stock which is hinged in some fashion to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm. This definition includes under folding and over folding stocks.

(oo) "Stock, telescoping" means a stock which is shortened or lengthened by allowing one section to telescope into another portion. On AR-15 style firearms, the buffer tube or receiver extension acts as the fixed part of the stock on which the telescoping butt stock slides or telescopes.

(pp) "Those weapons with an ammunition feeding device that can be readily removed from the firearm with the use of a tool" includes functional semiautomatic rifles, pistols, and shotguns with bullet-button style magazine releases. These weapons do not have a fixed magazine.

(qq) "Thumbhole stock" means a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing.

(rr) "Threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer" means a threaded barrel able to accept a flash suppressor, forward handgrip, or silencer, and includes a threaded barrel with any one of those features already mounted on it. Some firearms have "lugs" in lieu of threads on the end of the barrel. These lugs are used to attach some versions of silencers. For purposes of this definition a lugged barrel is the same as a threaded barrel.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

## HISTORY

1. New section filed 7-31-2017; operative 7-31-2017. Submitted to OAL for filing and printing only pursuant to Penal Code section 30900(b)(5) (Register 2017, No. 31). For prior history, see Register 2011, No. 52.

This database is current through 1/3/20 Register 2020, No. 1

11 CCR § 5471, 11 CA ADC § 5471

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

DEF0321

**EXHIBIT 5**

XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6249
 Fax:  (916) 731-2124
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Xavier Becerra, in his official capacity as Attorney General of the State of California, and Brent E. Orick, in his official capacity as Interim Director of the Department of Justice Bureau of Firearms*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES MILLER, et al.,** | 19-cv-1537 BEN-JLB |
| Plaintiffs, | |
| v. | **DECLARATION OF PROFESSOR LOUIS KLAREVAS IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| **CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,** | |
| Defendants. | |

**DEFENDANTS' EXHIBIT E**

1

## DECLARATION OF PROFESSOR LOUIS KLAREVAS

2

3    I, Louis Klarevas, declare:

4        1.    I make this Declaration in support of defendants' opposition to

5    plaintiffs' motion for a preliminary injunction.  This Declaration is based on my

6    own personal knowledge and experience, and if I am called as a witness, I could

7    and would testify competently to the truth of the matters discussed in this

8    Declaration.

9

10    **I.    QUALIFICATIONS AND BACKGROUND**

11

12        2.    I am a security policy analyst and, currently, Research Professor at

13    Teachers College, Columbia University, in New York.  I am also the author of the

14    book *Rampage Nation*, one of the most comprehensive studies on gun massacres in

15    the United States.[1]

16        3.    I am a political scientist by training, with a B.A. from the University of

17    Pennsylvania and a Ph.D. from American University.  My current research

18    examines the nexus between American public safety and gun violence.

19        4.    During the course of my 20-year career as an academic, I have served

20    on the faculties of the George Washington University, the City University of New

21    York, New York University, and the University of Massachusetts.  I have also

22    served as a Defense Analysis Research Fellow at the London School of Economics

23    and Political Science and as United States Senior Fulbright Scholar in Security

24    Studies at the University of Macedonia.

25        5.    In addition to having made well over 100 media and public-speaking

26    appearances, I am the author or co-author of more than 20 scholarly articles and

27    _____

28    [1] Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016).

1

DEF0323

over 70 commentary pieces.  My most recent project—a peer-reviewed article published in the *American Journal of Public Health*—assessed the effectiveness of restrictions on large-capacity magazines (ammunition-feeding devices holding more than 10 rounds of ammunition) in reducing gun massacres.[2]

6.      Besides the present case, I have been previously retained by the California Attorney General's Office in *Duncan v. Becerra*, Case No. 17-cv-1017-BEN-JLB, Southern District of California, and *Wiese v. Becerra*, Case No. 2:17-cv-00903-WBS-KJN, Eastern District of California.  *Duncan* and *Wiese* both involve challenges to California's regulation of large-capacity magazines.  In 2017, I served as an expert for the State of Colorado, as it defended a legal challenge to its restrictions on large-capacity magazines in *Rocky Mountain Gun Owners, et al. v. Hickenlooper*, Case Number 2013CV33879, District Court, City and County of Denver, Colorado.  While I was never deposed in *Wiese*, I was deposed in *Duncan* and *Rocky Mountain Gun Owners*.  I also testified in court in *Rocky Mountain Gun Owners*.  These are the only times that I have testified or been deposed in legal proceedings in the past five years.

7.      A more detailed list of my credentials and professional experiences can be found in my curriculum vitae (*see* Exhibit 1).

---

[2] Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 Am. J. of Pub. Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed January 6, 2020).

DEF0324

## II.   OPINIONS

8.     It is my professional opinion, based upon my extensive review and analysis of data from the past four decades, that (1) gun massacres involving six or more fatalities presently pose the deadliest criminal threat, in terms of individual acts of intentional violence, to the safety and security of American society in the post-9/11 era, and the problem is growing nationwide; (2) gun massacres involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons; and (3) jurisdictions that restrict the possession of assault weapons experience fewer gun massacres, per capita, than jurisdictions that do not restrict assault weapons.  Based on these findings, it is my opinion that restrictions on assault weapons have the potential to significantly reduce the frequency and lethality of gun massacres (*see* Exhibit 2 for a tabular overview of how gun massacres are definitionally a subset of mass shootings).[3]

### A.     Gun Massacres Are a Growing Threat to Public Safety

9.     In 1984, a gunman armed with, among other firearms, an Uzi assault weapon walked into a restaurant in San Ysidro, California, and murdered 21 people and injured 19 others, making it the deadliest mass shooting in American history at

---

[3] In my book *Rampage Nation*, I defined a mass shooting as "any violent attack that results in four or more individuals incurring gunshot wounds."  I then differentiated between three different categories of mass shooting: (1) Nonfatal are those mass shootings in which no one dies; (2) Fatal are those mass shootings in which at least one victim dies; and (3) High-Fatality are those mass shootings in which six or more victims die.  Throughout my book and in this Declaration, I use the terms "high-fatality mass shooting" and "gun massacre" interchangeably.  Of the three categories of mass shooting, gun massacres are the deadliest, resulting in the highest fatality tolls per individual incidents.  Klarevas, *supra* note 1, at 47-48.

the time.  In the years since, the United States has experienced several deadlier shootings: 27 people killed, including 20 first-graders, in Newtown, Connecticut, in 2012; 49 people killed in Orlando, Florida, in 2016; and 58 people killed in Las Vegas, Nevada, in 2017.  All of these gun massacres were perpetrated with assault weapons (*see* Exhibit 3 for details on how gun massacres involving assault weapons have been coded for purposes of this Declaration).

10.     Since the coordinated attack by terrorists on September 11, 2001, gun massacres—like the Newtown, Orlando, and Las Vegas shootings—have been the deadliest individual acts of violence in the United States.  In fact, the ten deadliest acts of intentional violence since 9/11 have all been gun massacres (*see* Table 1). In terms of the number of victims-per-incident, mass shootings are presently the most lethal criminal threat to the security and safety of American society.[4]

Table 1.  The 10 Deadliest Acts of Intentional Violence in the U.S. since 9/11

| Deaths | Date | Location | Involved Assault Weapon(s) |
|---|---|---|---|
| 58 | October 1, 2017 | Las Vegas, NV | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ |
| 32 | April 16, 2007 | Blacksburg, VA | |
| 27 | December 14, 2012 | Newtown, CT | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ |
| 22 | August 3, 2019 | El Paso, TX | ✓ |
| 17 | February 14, 2018 | Parkland, FL | ✓ |
| 14 | December 2, 2015 | San Bernardino, CA | ✓ |
| 13 | April 3, 2009 | Binghamton, NY | |
| 13 | November 5, 2009 | Fort Hood, TX | |

11.     Since 1980, there have been a total of 103 gun massacres (high-fatality mass shootings resulting in six or more victims being shot to death), claiming a combined 1,007 lives (*see* Exhibit 3).  The data show that the past decade

---

[4] Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in this Declaration are drawn from the list of all gun massacres since 1980 in Exhibit 3.

4

DEF0326

(2010-2019) has been the worst on record, accounting for over one-third of all gun-massacre incidents from the past four decades (37 out of 103) and over 45% of all deaths lost in such high-fatality mass shootings (457 out of 1,007).  In other words, mass shootings pose a grave threat to the United States, and the threat is growing (*see* Figures 1 and 2).

Figure 1.  Gun-Massacre Incidents by Decade, 1980-2019



Figure 2.  Gun-Massacre Deaths by Decade, 1980-2019



Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

DEF0327

**B.      The Use of Assault Weapons Is a Major Factor in the Rise of Gun-Massacre Violence**

12.     A review of the data from the past 40 years indicates that gun massacres have grown in terms of frequency and lethality.  The data also point to another striking pattern: the use of assault weapons in the commission of gun massacres has risen in vast proportions (*see* Figures 3 and 4).

Figure 3.  Assault Weapon Gun-Massacre Incidents by Decade, 1980-2019



Figure 4.  Assault Weapon Gun-Massacre Deaths by Decade, 1980-2019



6

DEF0328

13.     A comparison of the 1980s with the most recent decade shows that the proportion of gun massacres involving assault weapons has increased significantly. During the 1980s, less than 20% of all gun massacres involved assault weapons (5 out of 26 incidents).  In the 2010s, 35% of all gun massacres involved assault weapons (13 out of 37 incidents).  The resort to assault weapons has been growing over the past 40 years.  It is particularly marked of late, with 67% of all gun massacres in the last three years perpetrated with an assault weapon (*see* Figure 5).

Figure 5.  Percentage of Gun-Massacre Incidents Involving Assault Weapons



14.     Even more pronounced, the proportion of deaths attributable to gun massacres involving assault weapons has more than doubled between the same two 10-year periods, from 26% to 58% (54 out of 209 deaths during the 1980s compared to 267 out of 457 deaths during the 2010s).  Indeed, deaths attributable to gun massacres involving assault weapons have risen steadily in the past four decades, with the percentage in the last three years reaching 79% (*see* Figure 6).

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

DEF0329

Figure 6.  Percentage of Gun-Massacre Deaths Involving Assault Weapons



15.     It is also worth noting that the 13 gun massacres involving assault weapons from the past decade account for 46% of all 28 gun massacres involving assault weapons since 1980, and the 267 deaths attributable to these 13 incidents account for 67% of all 399 deaths resulting from gun massacres involving assault weapons since 1980.  This reflects a growing preference for using assault weapons to commit high-fatality mass shootings (*see* Figure 7).

Figure 7.   Gun-Massacre Incidents and Deaths Involving Assault Weapons per Decade as a Percentage of All Gun-Massacre Incidents and Deaths Involving Assault Weapons, 1980-2019

Figure 7a.  Incidents                                   Figure 7b. Deaths




8

DEF0330

16.     The growing use of assault weapons to carry out gun massacres is a clear theme reflected in the data.  The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another obvious theme.  According to the Declaration of James Curcuruto of the National Sport Shooting Foundation (NSSF) in the present case, as of December 2019, "modern sporting rifles" made up approximately 4% of all firearms in circulation in American society (17.7 million out of 423 million firearms).[5]  If assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 4% of all gun massacres would involve assault weapons.  Yet, in 2019 (the year corresponding to NSSF's survey data), 75% of all gun massacres were committed with assault rifles (*see* Exhibit 3), far outpacing their relative prevalence in society.

17.     Of the 103 gun massacres since 1980, 28 involved assault weapons, resulting in a cumulative 399 deaths (*see* Exhibit 3).  The average death toll for these 28 gun massacres involving assault weapons is 14.3 fatalities per shooting (*see* Table 2).  By contrast, the average death toll for the 75 incidents in which assault weapons were not used is 8.1 fatalities per shooting.  In other words, the use of assault weapons in gun massacres resulted in a 77% increase in fatalities per incident.  In the past decade, the difference is even more pronounced—far more than double: 7.9 versus 20.5 deaths per incident (*see* Table 2).  This amounts to a 159% increase in the average death toll, attributed to the use of assault weapons.  Moreover, since 1980, assault weapons have been used in 80% of all gun massacres with 25 or more deaths—establishing a relationship between assault weapons and the deadliest gun massacres.  The data demonstrate that assault weapons are dangerous force multipliers when used to perpetrate high-fatality mass shootings.

_____

[5] Declaration of James Curcuruto in Support of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra* (S.D. Cal. Dec. 6, 2019), No. 19-cv-1537-BEN-JLB, Doc. 22-13, para. 15.

Table 2.  The Dangerous Death Tolls Associated with the Use of Assault Weapons in Gun Massacres

| | Average Death Toll for Gun Massacres That Did Not Involve the Use of Assault Weapons | Average Death Toll for Gun Massacres That Did Involve the Use of Assault Weapons | Percent of Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1980-2019 | 8.1 Deaths | 14.3 Deaths | 77% |
| 2010-2019 | 7.9 Deaths | 20.5 Deaths | 159% |

## C.  Restrictions on Assault Weapons Reduce the Incidence of Gun Massacres, Resulting in Lives Saved

18.     In light of the growing threat posed by mass shootings, legislatures have enacted measures aimed at reducing the occurrence and lethality of such deadly acts of firearm violence.  Prominent among these measures are restrictions on assault weapons.  In 1989, California became the first state to enact an assault weapons ban.  The Roberti-Roos Assault Weapons Control Act (AWCA) was passed by the California legislature in 1989 in response to an attack on Cleveland Elementary School in Stockton earlier that year.  The gunman in this mass shooting used an AK-47 to kill five children and wound another 30 individuals, 29 of whom were children.  In the process of enacting the AWCA, the legislature codified its findings and intent (at Cal. Penal Code § 30505(a)):

> The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of the state.  The Legislature has restricted the assault weapons specified in [California's statutes] based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a

legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.

19.    In the years since, the state legislature has revised the law to make it more effective.  In the deliberations over SB 880 in 2016, which was ultimately enacted to close the so-called "bullet button" loophole, the author of that bill stated:

> [Assault weapons] are designed only to facilitate the maximum destruction of human life.  Such weapons have been used in a number of recent gun attacks, including the recent terrorist attack in San Bernardino that left 14 Californians dead and 21 injured.  Too many Californians have died at the hands of these dangerous weapons.[6]

20.    In considering SB 880, the Assembly Committee on Public Safety noted that the assault weapon is considered "an effective tool of *mass murder*."[7] This sentiment was echoed in the Senate Committee on Public Safety, which, in its report on SB 880, reproduced the following rationale in support of the bill:

> The rapid and controlled spray of bullets associated with assault weapons is a threat to police officers, families, and communities.  As was shown by the tragedy at Sandy Hook School and more recently in San Bernardino, an assault weapon escalates the lethality and number of victims in a *mass shooting incident*.[8]

---

[6] Report of the Assembly Committee on Public Safety on SB 880 (Hall), May 17, 2016, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520160SB880 (last accessed January 10, 2020).

[7] *Id.* (emphasis added).

[8] Report of the Senate Committee on Public Safety on SB 880 (Hall), March 28, 2016, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520160SB880 (last accessed January 10, 2020) (emphasis added).

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

DEF0333

21.     The legislative intent of California is not significantly different from that of the other states that have since restricted assault weapons.  *The primary objective of every assault weapons ban is reducing the frequency and lethality of mass shootings.*  Because, on average, the use of assault weapons results in higher death tolls in mass shootings, the rationale for imposing tight restrictions on assault weapons is to reduce the loss of life attributable to the increased kill potential of such dangerous firearms.

22.     In 1994, the United States enacted the Federal Assault Weapons Ban (AWB).  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).  Modelled after California's AWCA, the federal AWB was also aimed primarily at reducing mass-shooting violence.  The law, which was in effect for only 10 years before sun-setting, regulated certain firearms and their components.  Among its provisions, the AWB prohibited the manufacture, sale, transfer, or possession of *new* assault weapons.[9]

23.     The AWB had a positive impact in reducing the number and deadliness of gun massacres (*see* Exhibit 4).  Comparing the 10-year periods before, during, and after the AWB shows that the implementation of the law coincided with a 37% drop in gun massacres and a 40% drop in gun massacres involving assault weapons (*see* Table 3).  Likewise, when compared to the 10-year period immediately prior to the AWB, the 10-year period that the AWB was in effect reflected a 43% decline in gun-massacre deaths and a 26% decline in deaths resulting from gun massacres involving assault weapons (*see* Table 3).  When the AWB expired, the 10-year period that immediately followed experienced substantially greater gun-massacre violence.  In particular, when compared to the

---

[9] Assault weapons lawfully in circulation prior to the AWB's date of effect (September 13, 1994) were exempted (i.e., grandfathered) from the ban.  Former 18 U.S.C. § 922 (v)(2) (1994).

12

DEF0334

10-year period that the AWB was in effect, the succeeding 10-year period coincided with a 183% increase in gun-massacre incidents and a 167% increase in gun-massacre incidents involving assault weapons (*see* Table 3).  Fatalities tracked a similar, albeit steeper, upward trajectory.  The 10-year period immediately following the AWB coincided with a 239% increase in gun-massacre deaths and a 223% increase in gun-massacre deaths resulting from incidents involving assault weapons (*see* Table 3).

24.    Even when comparing incidence and fatality rates—which respectively measure the onset of new cases and deaths per population under examination—the pattern holds.  The incidence and fatality rates for all gun massacres as well as only for gun massacres involving assault weapons all fell during the 10-year period of the AWB, only to skyrocket during the 10-year period that immediately followed the expiration of the ban (*see* Table 3).  The data pertaining to gun massacres immediately before, during, and immediately after the AWB point to an obvious conclusion: the AWB ushered in a period marked by stark reductions in gun-massacre violence, which increased drastically following the ban's end.

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

DEF0335

Table 3.  The Impact of the Federal Assault Weapons Ban on Gun Massacres

|  | 10-Years Before AWB (9/13/84-9/12/94) | 10-Years During AWB (9/13/94-9/12/04) | Percentage of Change from Period Before to Period During AWB | 10-Years During AWB (9/13/94-9/12/04) | 10-Years After AWB (9/13/04-9/12/14) | Percentage of Change from Period During to Period After AWB |
|---|---|---|---|---|---|---|
| All Gun-Massacre Incidents | 19 | 12 | - 37% | 12 | 34 | +183% |
| Gun-Massacre Incidents Involving Assault Weapons | 5 | 3 | -40% | 3 | 8 | +167% |
| Deaths in All Gun-Massacre Incidents | 155 | 89 | -43% | 89 | 302 | +239% |
| Deaths in Gun-Massacre Incidents Involving Assault Weapons | 35 | 26 | -26% | 26 | 84 | +223% |
| Incidence Rate for All Gun-Massacre Incidents | 0.76 | 0.43 | -43% | 0.43 | 1.11 | +158% |
| Incidence Rate for Gun-Massacre Incidents Involving Assault Weapons | 0.20 | 0.11 | -45% | 0.11 | 0.26 | +136% |
| Fatality Rate for All Gun-Massacre Incidents | 6.22 | 3.18 | -49% | 3.18 | 9.82 | +209% |
| Fatality Rate for Gun-Massacre Incidents Involving Assault Weapons | 1.40 | 0.93 | -34% | 0.93 | 2.73 | +194% |

Note: Incidence and fatality rates are calculated as annual rates per 100 million population, using mean population for each 10-year period under examination.

14

DEF0336

25.    California's AWCA took effect on January 1, 1990, making California the first state to regulate assault weapons, although the District of Columbia has been regulating semiautomatic firearms with enhanced firing capacity, including assault weapons, since 1932.  Six other states and the District of Columbia have also prohibited the possession of certain assault weapons in an effort to reduce the loss of life in mass shootings.  The following is a list of those jurisdictions and the effective dates of their bans: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Connecticut (October 1, 1993); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); New York (November 1, 2000); and the District of Columbia (updating its pre-existing regulations on March 31, 2009).[10]

26.    In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect.  This measure, known as the incidence rate, allows public health experts and criminologists to identify discernable differences, while accounting for variations in the population, over a set period of time.  Relevant to the present case, calculating incidence rates across jurisdictions, in a manner that captures whether or not assault weapons bans were in effect during the period of observation, allows for the assessment of the effectiveness of such bans.  In addition, fatality rates—the number of deaths, per

---

[10] For a review of state laws that regulate assault weapons, including the effective dates of each state assault weapons ban currently in effect in the United States, *see* Giffords Law Center to Prevent Gun Violence, "Assault Weapons," *available at* https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons (last accessed January 10, 2020).

population, that result from particular events across different jurisdictions—also provide insights into the impact of assault weapons bans on gun massacres.[11]

27.    Since January 1, 1990, when the first state ban on assault weapons took effect, there have been 77 gun massacres in the United States (*see* Exhibit 3).[12] Calculating gun-massacre rates for the time-period 1990-2019, across jurisdictions with and without bans on the possession of assault weapons, reveals that states that restricted possession of certain assault weapons experienced a 46% decrease in the incidence rate and a 57% decrease in the fatality rate for all gun massacres, regardless of the weaponry used by the mass murderers (*see* Table 4).[13]  When calculations go a step further and are limited to gun massacres involving assault weapons, the difference between the two jurisdictional categories (non-ban states and ban states) is even more pronounced.  In the past 30 years, accounting for population, states with assault weapons bans in place experienced 54% fewer gun massacres involving the use of assault weapons and 67% fewer deaths resulting from such attacks perpetrated with assault weapons (*see* Table 4).  All of the above epidemiological calculations lead to the same conclusion: when bans on assault

---

[11] For purposes of this Declaration, incidence and fatality (i.e., mortality) rates are calculated in accordance with the methodological principles established by the Centers for Disease Control and Prevention.  *See* Centers for Disease Control and Prevention, Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 10, 2020).

[12] There were no state bans on assault weapons in effect prior to 1990.  Therefore, 1990 is the logical starting point for an analysis of the impact of state assault weapons bans.

[13] For purposes of coding, between September 13, 1994, and September 12, 2004, the federal AWB was in effect.  During that 10-year period, all 50 states and the District of Columbia were under legal conditions that banned the possession of certain prohibited assault weapons.  As such, the entire country is coded as being under an assault weapons ban during the timeframe that the AWB was in effect.

weapons are in effect, per capita, fewer gun massacres occur and fewer people die in such high-fatality mass shootings.

Table 4.  Incidence and Fatality Rates for Gun Massacres, by Whether or Not Assault Weapons Bans Were in Effect, 1990-2019

| | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| **All Gun Massacres** | | | | | |
| Non-AW Ban States | 150.6 | 51 | 1.13 | 566 | 12.53 |
| AW Ban States | 142.1 | 26 | 0.61 | 232 | 5.44 |
| Percentage Decrease in Rate for AW Ban States | | | 46% | | 57% |
| **Gun Massacres Involving Assault Weapons** | | | | | |
| Non-AW Ban States | 150.6 | 16 | 0.35 | 263 | 5.82 |
| AW Ban States | 142.1 | 7 | 0.16 | 82 | 1.92 |
| Percentage Decrease in Rate for AW Ban States | | | 54% | | 67% |

Note: Population data are from U.S. Census Bureau's State Intercensal Datasets, *available at* https://www.census.gov/data/datasets.All.html (last accessed January 7, 2020).

## D.  Response to Declaration of John Lott in Support of Plaintiffs' Motion for Preliminary Injunction

28.  In support of their Motion for Preliminary Injunction, the Plaintiffs include a Declaration from John Lott.  The overall conclusion of Lott's Declaration is that "there is no credible evidence that so-called 'assault weapons' bans have any meaningful effect on reducing gun homicides and no discernable crime-reduction impact."[14]  Lott has a long history of employing questionable and faulty practices to advance arguments against firearms regulations, resulting in accusations that his

---

[14] Declaration of John Lott in Support of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra* (S.D. Cal. Dec. 6, 2019), No. 19-cv-1537-BEN-JLB, Doc. 22-18, para. 63.

gun violence research is "junk science."[15]  Lott's Declaration in the present case suffers from similar problems.

29.    The major arguments that Lott attempts to advance in his Declaration can be summed up as follows:

A.    Studies show that criminals do not acquire their firearms through legal channels, meaning that bans on weapons generally will not influence criminals' use of those prohibited weapons; and

B.    "All credible studies" have found that bans on assault weapons have not had any meaningful effect on crime, implying that bans on assault weapons do not work.

30.    As discussed above, the legislative intent of bans on assault weapons is primarily to reduce the frequency and lethality of massacres perpetrated with firearms, especially military-style firearms.  With that in mind, it is noteworthy to identify what is conspicuously absent from Lott's Declaration.  In particular, Lott fails to mention how (1) legislatures enacting assault weapons bans are primarily targeting the use of military-style firearms to commit mass murder, as opposed to all gun violence in general; (2) the number of victims losing their lives in gun massacres nationwide, especially those involving assault weapons, has been on the rise since the expiration of the federal AWB in 2004; (3) the use of assault weapons in gun massacres has been disproportionately higher than the percentage of assault weapons in circulation; and (4) the use of assault weapons in gun massacres has

---

[15] Evan DeFilippis & Devin Hughes, *Shooting Down the Gun Lobby's Favorite 'Academic': A Lott of Lies*, Armed with Reason, December 1, 2014, *available at* http://www.armedwithreason.com/shooting-down-the-gun-lobbys-favorite-academic-a-lott-of-lies (last accessed on January 13, 2020); and Piers Morgan, *Lawyer Alan Dershowitz on the Research of Author John Lott Jr.: 'Junk Science … Paid for by the National Rifle Association'*, CNN.com, July 24, 2012, *available at* http://piersmorgan.blogs.cnn.com/2012/07/24/lawyer-alan-dershowitz-on-the-research-of-author-john-lott-jr-junk-sciencepaid-for-by-the-national-rifle-association (last accessed January 13, 2020).

resulted in substantially higher average death tolls, when compared to incidents that do not involve assault weapons.  As discussed above, there is an evidentiary basis for these four relevant factual patterns that Lott overlooks.

31.    Nevertheless, the two major conclusions advanced by Lott in his Declaration (summarized above in para. 29) deserve a response.  First, Lott asserts that "criminals do not buy their firearms legally."[16]  He goes on to claim that "criminals have guns and they get them illegally, primarily from drug dealers…. Arbitrary bans of firearm features will do little to stop this."[17]  Leaving aside the unsubstantiated and unsourced claim that criminals obtain their illegal firearms "primarily from drug dealers," Lott fails to mention that multiple investigations have determined that the vast majority of gunmen who used a firearm to commit mass murder obtained their weapons legally.[18]  Knowing that mass murderers tend to acquire their assault weapons legally suggests that assault weapons bans can assist in reducing the occurrence of gun massacres.  In fact, a recent study in the *British Medical Journal* (which Lott did not reference) found that "States with more permissive gun laws and greater gun ownership have higher rates of mass shootings, and a growing divergence is noted in recent years as rates of mass

---

[16] Declaration of John Lott, *supra* note 14, para. 10.

[17] *Id.*, para 13.

[18] Larry Buchanan et al., *How They Got Their Guns*, N.Y. Times, February 16, 2018, *available at* https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-guns.html (last accessed January 13, 2020); Luis Melgar & Lisa Dunn, *Since 1982, 74 Percent of Mass Shooters Obtained Their Guns Legally*, Guns and America (WAMU Public Radio), November 2, 2018, *available at* https://gunsandamerica.org/story/18/11/02/since-1982-74-percent-of-mass-shooters-obtained-their-guns-legally (last accessed January 13, 2020); Jillian K. Peterson and James A. Densley, *The Violence Project Database of Mass Shootings in the United States, 1966-2019*, November 2019, *available at* https://www.researchgate.net/publication/337261684_The_Violence_Project_Database_of_Mass_Shootings_in_the_United_States_1966-2019 (last accessed January 13, 2020).

shootings in restrictive states have decreased and those in permissive states have increased."[19]

32.     Second, Lott asserts that "all *credible* evidence shows that assault weapon bans have little to no effect in reducing *mass shootings*, homicides, or violent crime."[20]  There is a solid evidentiary foundation for rejecting this assertion. Focusing on mass shootings, which is the primary focus of assault weapons bans, scholarly research shows that bans on assault weapons have indeed been effective. As the bulk of Lott's Declaration deals with the impact of assault weapons bans and given that he devoted one-third of his Declaration to my research, a discussion of the flaws in his analysis is warranted.

33.     In support of his claim, Lott cites four studies that, according to him, offer evidence that assault weapons bans are ineffective.[21]  The four particular studies referenced by Lott are a 2004 preliminary report on the 1994 federal AWB led by Christopher Koper that ultimately concluded "it is premature to make definitive assessments of the ban's impact on gun crime";[22] an article by Gary Kleck on the use of large-capacity magazines in mass shootings that did not assess the effectiveness of any firearms bans whatsoever;[23] a short research note by Mark

---

[19] Paul M. Reeping et al., *State Gun Laws, Gun Ownership, and Mass Shootings in the U.S.: Cross Sectional Time Series*, British Medical Journal, 364, no. 8190, (2019), *available at* https://www.bmj.com/content/364/bmj.l542 (last accessed January 13, 2020).

[20] Declaration of John Lott, *supra* note 14, para. 64 (emphasis added).

[21] *Id.*, paras. 19-30.

[22] Christopher S. Koper et al., An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003, Report to the National Institute of Justice, Jerry Lee Center for Criminology, University of Pennsylvania 2 (2004), *available at* Declaration of John Lott, *supra* note 14, Exhibit 7.

[23] Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 Justice Research & Policy 28 (2016), *available at* Declaration of John Lott, *supra* note 14, Exhibit 8.

20

DEF0342

Gius that did not address mass shootings;[24] and Lott's own three-page "simple before-and-after" assessment of assault weapons bans from his controversial and much challenged book *More Guns, Less Crime*.[25]  As none of these studies offer an evidentiary basis that is directly related to the legislative intent of assault weapons bans, they are largely irrelevant.

34.     Lott also cites four other studies that found evidence that assault weapons bans have been effective at reducing mass shooting violence in the United States.  However, Lott concludes that all four of these studies can be dismissed because, according to him, they are not "credible."

35.     The first study that Lott dismisses is a 2018 study led by Christopher Koper, the lead author of the 2004 preliminary report on the 1994 federal AWB.  According to Lott, the 2018 Koper et al. study "provides no evidence that murders or mass public shootings were reduced by the [federal] assault weapon ban."[26]  However, Koper and his colleagues actually state, "available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of [mass murder] incidents.  Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts."[27]  This led the authors to conclude that their study "provides further evidence that the federal ban curbed

---

[24] Mark Gius, *An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates*, 21 Applied Economics Letters 265, *available at* Declaration of John Lott, *supra* note 14, Exhibit 9.

[25] John R. Lott, Jr., More Guns, Less Crime: Understanding Crime and Gun Control Laws 327 (3d ed. 2010), *available at* Declaration of John Lott, *supra* note 14, Exhibit 10.

[26] Declaration of John Lott, *supra* note 14, paras. 31-33.

[27] Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 Journal of Urban Health 313, 319 (2018), *available at* Declaration of John Lott, *supra* note 14, Exhibit 11.

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

DEF0343

the spread of high-capacity semiautomatic weapons when it was in place and, in doing so, may have had preventive effects on gunshot victimizations."[28]

36.     The second study that Lott dismisses is a 2019 article by Charles DiMaggio and his colleagues.[29]  After comparing trends from 1981-2017, the authors concluded that "the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States."[30]  Lott is critical of this study for applying a time-series analysis (which is a form of trend analysis that observes data points across time intervals), even though this is an acceptable methodology in the social sciences (as will be shown below).[31]  In fact, Lott himself has performed such "simple before-and-after" assessments, including in his Declaration.[32]  Lott is also critical of the DiMaggio et al. study for not "attempt[ing] to differentiate states with and without their own assault weapons bans," even though the main purpose of the study was to evaluate the impact of the federal AWB.[33]

37.     The third study that Lott dismisses is a 2015 article by Mark Gius on the impact of both the federal AWB as well as state assault weapons bans on public mass shootings.[34]  After surveying public mass shootings from 1982-2011, Gius found that "fatalities due to mass shootings were lower during both the federal and

---

[28] *Id.*, at 320.

[29] Declaration of John Lott, *supra* note 14, paras. 34-37.

[30] Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. of Trauma & Acute Care Surgery 11, 15 (2019), *available at* Declaration of John Lott, *supra* note 14, Exhibit 12.

[31] Declaration of John Lott, *supra* note 14, para. 34.

[32] *Id.*, paras. 50-53.

[33] *Id.*, para. 34.

[34] *Id.*, paras. 38-42.

state assault weapons ban periods."[35] This led him to conclude that "the present study's focus on mass shootings shows the effectiveness of these gun control measures in reducing murders due to mass shootings."[36]  Lott takes issue with this study because its data is drawn from the *Mother Jones* database of mass shootings, which he finds to be "arbitrarily selective in its data collection" and, therefore, "problematic."[37]  (The "problematic" nature of the *Mother Jones* dataset did not prevent Lott from using it as one of the data sources for his own analysis that he undertakes later in his Declaration at paras. 50-53.)  Lott also criticizes the 2015 Gius study for not observing the rate at which assault weapons were employed (as a percentage of all firearms used) in a mass shooting.  But as will be shown below, this is a flawed criticism that displays a limited understanding of how regulations can impact outcomes.[38]

38.     The last study on the effectiveness of the federal AWB that Lott dismisses is that from my book *Rampage Nation*.[39]  To repeat the findings reported above (para. 23), I found that, when compared to the 10-year period immediately before the 1994 AWB, the 10-year period that the federal ban was in effect corresponded with a 37% reduction in gun massacre incidents and a 43% reduction in gun massacre deaths.  After the AWB expired, the 10-year period that immediately followed corresponded with a 183% increase in gun massacre incidents and a 239% increase in gun massacre deaths.  Even after accounting for population growth, these trajectories in gun massacre violence remain consistent.

---

[35] Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, 22 Applied Economics Letters 281, 283 (2015), *available at* Declaration of John Lott, *supra* note 14, Exhibit 13.

[36] *Id.*

[37] Declaration of John Lott, *supra* note 14, para. 40.

[38] *Id.*, para. 38.  Lott also leveled a similar criticism against the 2019 DiMaggio study.  *Id.*, para. 35.

[39] *Id.*, paras. 43-53.

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

DEF0345

As Lott notes, the evidence from my research has been used by members of Congress to propose a new federal assault weapons ban.[40]

39.     Lott levels three criticisms against my work: (1) I only analyzed high-fatality mass shootings, resulting in six or more fatalities (not including the gunmen), as opposed to a lower threshold of fatalities; (2) I analyzed all categories of mass shooting, regardless of motive or location, as opposed to only those that were public rampages that targeted random victims; and (3) I employed a time-series analysis.

40.     The first two criticisms speak to my outcome variable, so I will address them together.  Lott contends:

> In forming his analysis and conclusions, Klarevas limits his research to shootings with 6 or more fatalities.  *I don't know of any other study that does this, and Klarevas doesn't provide an explanation.  Nor does he explain why he lumps in public shootings with gang shootings, failing to draw any distinction.*  These factors single out Klarevas' analysis as no other studies use these limitations or fail to make such distinctions.[41]

41.     Just in this short, three-sentence statement, Lott makes several inaccurate statements.  First, Lott claims that the he is unaware of "any other study" that uses six fatalities as a threshold for studying mass-scale gun violence.  Yet, in the sentence immediately preceding this statement, Lott discusses an analysis by John Donohue and Theodora Boulouta which employed the six-fatality threshold as one of its measures.[42]  And there have been other studies that have used six fatalities as a measure as well.[43]  Second, Lott claims that I do not "provide an

---

[40] *Id.*, para. 44.

[41] *Id.*, para. 43 (emphasis added).

[42] *Id.*

[43] Klarevas et al., *supra* note 2; Gary Kleck, Targeting Guns: Firearms and Their Control (1997); Sherry Towers et al., *Temporal Trends in Public Mass Shootings: High-Capacity Magazines Significantly Increase Fatality Counts, and Are Becoming More Prevalent*, medRxiv (2019), available at

explanation" for why I employed a six-fatality threshold.  I do, however, make the case in my book that gun massacres are a unique subset of mass shootings.[44]  In short, gun massacres are the deadliest category of mass shootings.  As such, they deserve particular attention.  Third, Lott claims that I lump together all gun massacres (despite differences in their motives) without drawing any distinctions.  This, too, is something that I discussed at length in Chapter Two of my book, where I argued that high-fatality mass shootings are troubling, regardless of motive or target.[45]  Indeed, legislatures that enact laws seek to prevent all such large-scale acts of firearm violence, not just the ones in public that target random victims.  Fourth, Lott claims that "no other studies use these limitations or fail to make such distinctions."  Again, there are several studies that treat mass shootings as incidents broader than merely what Lott refers to as "public mass shootings."[46]

42.     The third criticism that Lott levels against my work is that it employs a time-series approach.  According to Lott, "Few academics would make the types of comparisons that Klarevas makes."[47]  Contrary to this assertion, Lott in his own Declaration cites several time-series analyses undertaken by the following scholars: Christopher Koper, Daniel Woods, Jeffrey Roth, William Johnson, Jordan Nichols, Ambrozine Ayers, Natalie Mullins, Charles DiMaggio, Jacob Avraham, Cherisse Berry, Marko Bukur, Justin Feldman, Michael Klein, Noor Shah, Manish Tandon, Spiros Frangos, John Donohue, Theodora Boulouta, and James Alan Fox.  The

---

https://www.medrxiv.org/content/10.1101/2019.12.12.19014738v1 (last accessed January 13, 2020).

[44] Klarevas, *supra* note 1; *see also* Klarevas et al., *supra* note 2.

[45] Klarevas, *supra* note 1, at 31-48.

[46] Klarevas et al., *supra* note 2; Reeping et al., *supra* note 20; Marisa Booty et al., *Describing a 'Mass Shooting': The Role of Databases in Understanding Burden*, 6 Injury Epidemiology (2019), *available at* https://injepijournal.biomedcentral.com/articles/10.1186/s40621-019-0226-7 (last accessed January 13, 2020).

[47] Declaration of John Lott, *supra* note 14, para. 45.

25

DEF0347

bottom line is that employing a time-series analysis is a legitimate methodological practice.  In fact, Lott even cites the 2004 Koper report, which relies in part on time-series analyses to assess trends affected by the 1994 federal AWB, as a credible study in support of his argument.[48]  Perhaps the legitimacy of this methodology explains why Lott, himself, employs it for purposes of the analysis he performs in his Declaration.[49]

43.     In addition, Lott makes inaccurate statements in his Declaration concerning mass-casualty violence and how weapons restrictions can function to reduce such violence.  For starters, Lott suggests that small differences in the number of incidents before, during, and after the federal AWB are not "large enough to prove that the ban had any impact on the frequency of attacks."[50]  Extreme events are incidents that do not happen frequently, but, when they do occur, they have tremendous consequences.  To put it in simple terms, the Oklahoma City and the September 11 terrorist attacks were both extreme events.  No credible scholar would judge post-9/11 counter-terrorism policies as ineffective because the decrease in such extreme terrorist attacks amounted to only two fewer incidents—from two to zero—in the years since 2001.  Given the nature of extreme events, like gun massacres, a small decrease in the number of such incidents do matter, especially to the numerous lives saved that such decreases might represent.

44.     Lott also argues that "if assault weapons bans reduced these attacks [i.e., gun massacres], the share of attacks committed with 'assault weapons' should have decreased."[51]  Lott is suggesting that the number of gun massacres involving assault weapons as a percentage or share of all gun massacres must go down

---

[48] *Id.*, paras. 19-23.

[49] *Id.*, paras. 50-53.

[50] *Id.*, para. 49.

[51] *Id.*, para. 46.

substantially in order to establish that an assault weapons ban was effective. Furthermore, Lott is implying that, should an assault weapons ban be repealed, establishing its effectiveness would depend on showing that the share of gun massacres involving assault weapons relative to all gun massacres increased.  These assertions are offered without any sound logical or empirical basis.  In particular, Lott fails to address recognized phenomena in the academic literature (e.g., spillover effects and substitution effects) that capture how regulations can lead to additional benefits, including reductions in different forms of mass-casualty firearm violence.  Such a dynamic could explain why the federal AWB was effective while, at the same time, the share of gun massacres involving assault weapons, as a percentage of all gun massacres, remained constant.

45.     There are also empirical grounds for rejecting Lott's claims regarding patterns and trends related to the federal AWB.  Specifically, he uses faulty data in his analysis of gun massacres before, during, and after the AWB.  To provide one example, in the 10-year period following the AWB (September 13, 2004, to September 12, 2014), Lott states that there were 35 gun massacres, 5 of which involved assault weapons.  He then calculates the share of incidents involving assault weapons to be 14% (5 divided by 35 equals 0.14).  Actually, there were 34 gun massacres during that timeframe, 8 of which involved assault weapons.  In other words, the share was 24% (8 divided by 34 equals 0.24).  Lott's errors result in a significant undercount of the share of incidents involving assault weapons relative to all incidents.  Moreover, his mistakes are not limited to the post-AWB timeframe.  Lott's analysis of gun massacres occurring in the 10-year periods before and during the AWB also contains incorrect data points.  Despite these errors, Lott's data (as presented in his Declaration) still show that gun massacres involving assault weapons went down after the AWB went into effect, only to go up after the AWB expired.

46.     When the studies and underlying data are analyzed in a comprehensive and accurate manner, the outcome is clear: there is ample evidence to reasonably conclude that assault weapons bans reduce gun massacres and save lives.

## III.   SUMMARY

47.     It is my professional opinion, based upon my extensive review and analysis of data from the past four decades, that (1) gun massacres involving six or more fatalities presently pose the deadliest criminal threat, in terms of individual acts of intentional violence, to the safety and security of American society in the post-9/11 era, and the problem is growing nationwide; (2) gun massacres involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons; and (3) jurisdictions that restrict the possession of assault weapons experience fewer gun massacres, per capita, than jurisdictions that do not restrict assault weapons.  Based on these findings, it is my opinion that restrictions on assault weapons have the potential to significantly reduce the frequency and lethality of gun massacres.

48.     The main purpose of an assault weapons ban is to restrict the availability of assault weapons.  The rationale is that, if there are fewer assault weapons in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearms, resulting in fewer lives lost.  The epidemiological data buttress this line of reasoning, supporting the California legislature's determination that restricting civilian access to assault weapons will enhance public safety.

49.     While imposing constraints on assault weapons will not prevent all future mass shootings, the data suggest that legislative efforts to deny gunmen access to assault weapons should result in a significant number of lives being saved.

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

DEF0350

1     I declare under penalty of perjury that the foregoing is true and correct.

2     Executed in New York, New York, on January 22, 2020.

3

4

5

6

7

8

9                                      Louis Klarevas

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

DEF0351

# EXHIBIT 1

DEF0352

**Louis J. Klarevas**
**ljk2149@tc.columbia.edu**

**Education**

Ph.D.   International Relations, 1999
School of International Service
American University

B.A.   Political Science, *Cum Laude*, 1989
School of Arts and Sciences
University of Pennsylvania

**Current Position**

Research Professor, Teachers College, Columbia University, New York, NY

**Representation**

*Book/Print*
Don Fehr
Trident Media Group
41 Madison Avenue
New York, NY 10010

*Film/TV*
Kim Yau
Paradigm Talent Agency
360 North Crescent Drive
Beverly Hills, CA 90210

**Experience**

*Academic Experience (Presented in Academic Years)*
Research Professor, Teachers College, Columbia University, New York, NY, 2018-

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

DEF0353

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*
Expert for State of California, *Miller v. Becerra*, United States District Court for Southern District of California, Case Number 19-cv-1537-BEN-JLB, San Diego, CA, 2019-

Expert for Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019-

Opinion Contributor, *New York Daily News*, New York, NY, 2017-

Expert for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 17-cv-1017-BEN-JLB, San Diego, CA, 2017-

Expert for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2017-

DEF0354

Expert for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, Denver, CO, 2016-2017

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, Academy for International Conflict Management and Peacebuilding, United States Institute of Peace, Washington, DC, 2008-2009

Consultant, United States Institute of Peace, Washington, DC, 2005

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*
Counter-Terrorism and Homeland Security
International Political Economy
International Politics in a Post-Cold War Era
International Security
Machinery and Politics of American Foreign Policy
Role of the United States in World Affairs
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy

*Undergraduate*
American Government and Politics
European-Atlantic Relations
International Political Economy
International Relations
Transnational Terrorism
United States Foreign Policy

**Books**

*Rampage Nation: Securing America from Mass Shootings* (2016)

**Scholarship**

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

DEF0355

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, forthcoming (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

DEF0356

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti*, University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis)

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

DEF0357

**Commentaries and Correspondence**

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

6

DEF0358

"Cold Turkey," *Washington Times*, March 16, 1998

"Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993


**Commentaries Written for *New York Daily News* –**
**https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007


**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

DEF0359

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

DEF0360

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)

**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

DEF0361

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Columns Written (in Greek) for *To Vima* Newspaper (Athens)**

"Time to Pay," August 2003

"Does Turkey Have an Ulterior Motive?" July 2003

"Will They Make Up?" June 2003

"Don't Take the Bait," May 2003

"If the Cheers Turn to Jeers," April 2003

"The Power of a Niche Identity," April 2003

"If You Can't Beat Them, Join Them," April 2003

"Show Me the Euros," March 2003


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

DEF0362

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

11

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

DEF0364

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

DEF0365

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

DEF0366

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge


**Service to University, Profession, and Community**

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Expert for Victims of Sutherland Springs, TX, Mass Shooting, 2019-

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Expert for State of California, 2017-

Expert for State of Colorado, 2016-2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

DEF0367

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

16

DEF0368

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

DEF0369

**Associations and Organizations (Past and Present)**

Academy of Political Science

American Political Science Association

Anderson Society of American University

Carnegie Council Global Ethics Network

International Political Science Association

International Studies Association

Museum of Modern Art

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Sigma Nu Fraternity

Social Science Research Network

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Honors and Awards**

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

DEF0370

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

DEF0371

# EXHIBIT 2

DEF0372

**Excerpt from *Rampage Nation***

**Table 2.1**

# Table 2.1. The Concept of a Mass Shooting.

## Definition of a Mass Shooting:

Any violent attack that results in four or more individuals incurring gunshot wounds.

## Categories of Mass Shooting:

1. *Nonfatal*
   Mass shootings in which no one dies.

2. *Fatal*
   Mass shootings in which at least one victim dies.

3. *High-Fatality / Gun Massacre*
   Mass shootings in which six or more victims die.

★ ★ ★

Source: Louis Klarevas, Rampage Nation: Securing America from Mass Shootings 48 (2016).

DEF0373

# EXHIBIT 3

DEF0374

## Gun Massacres in the United States, 1980-2019

|   | Date | City | State | Deaths | Involved Assault Weapon(s) |
|---|------|------|-------|--------|----------------------------|
| 1 | 1/3/1981 | Delmar | IA | 6 | N |
| 2 | 1/7/1981 | Richmond | VA | 6 | N |
| 3 | 5/2/1981 | Clinton | MD | 6 | N |
| 4 | 8/21/1981 | Indianapolis | IN | 6 | N |
| 5 | 2/17/1982 | Farwell | MI | 7 | N |
| 6 | 8/9/1982 | Grand Prairie | TX | 6 | N |
| 7 | 8/20/1982 | Miami | FL | 8 | N |
| 8 | 9/7/1982 | Craig | AK | 8 | N |
| 9 | 9/25/1982 | Wilkes-Barre | PA | 13 | Y |
| 10 | 2/18/1983 | Seattle | WA | 13 | N |
| 11 | 3/3/1983 | McCarthy | AK | 6 | N |
| 12 | 10/11/1983 | College Station and Hempstead | TX | 6 | N |
| 13 | 4/15/1984 | Brooklyn | NY | 10 | N |
| 14 | 5/19/1984 | Manley Hot Springs | AK | 8 | N |
| 15 | 6/29/1984 | Dallas | TX | 6 | N |
| 16 | 7/18/1984 | San Ysidro | CA | 21 | Y |
| 17 | 10/18/1984 | Evansville | IN | 6 | N |
| 18 | 8/20/1986 | Edmond | OK | 14 | N |
| 19 | 12/8/1986 | Oakland | CA | 6 | Y |
| 20 | 2/5/1987 | Flint | MI | 6 | N |
| 21 | 4/23/1987 | Palm Bay | FL | 6 | Y |
| 22 | 7/12/1987 | Tacoma | WA | 7 | N |
| 23 | 9/25/1987 | Elkland | MO | 7 | N |
| 24 | 12/30/1987 | Algona | IA | 6 | N |
| 25 | 2/16/1988 | Sunnyvale | CA | 7 | N |
| 26 | 9/14/1989 | Louisville | KY | 8 | Y |

1

DEF0375

| | Date | City | State | Deaths | Involved Assault Weapon(s) |
|---|---|---|---|---|---|
| 27 | 6/18/1990 | Jacksonville | FL | 9 | N |
| 28 | 1/26/1991 | Chimayo | NM | 7 | N |
| 29 | 8/9/1991 | Waddell | AZ | 9 | N |
| 30 | 10/16/1991 | Killeen | TX | 23 | N |
| 31 | 11/7/1992 | Morro Bay and Paso Robles | CA | 6 | N |
| 32 | 1/8/1993 | Palatine | IL | 7 | N |
| 33 | 5/16/1993 | Fresno | CA | 7 | Y |
| 34 | 7/1/1993 | San Francisco | CA | 8 | Y |
| 35 | 12/7/1993 | Garden City | NY | 6 | N |
| 36 | 4/20/1999 | Littleton | CO | 13 | Y |
| 37 | 7/12/1999 | Atlanta | GA | 6 | N |
| 38 | 7/29/1999 | Atlanta | GA | 9 | N |
| 39 | 9/15/1999 | Fort Worth | TX | 7 | N |
| 40 | 11/2/1999 | Honolulu | HI | 7 | N |
| 41 | 12/26/2000 | Wakefield | MA | 7 | Y |
| 42 | 12/28/2000 | Philadelphia | PA | 7 | N |
| 43 | 8/26/2002 | Rutlegde | AL | 6 | N |
| 44 | 1/15/2003 | Edinburg | TX | 6 | Y |
| 45 | 7/8/2003 | Meridian | MS | 6 | N |
| 46 | 8/27/2003 | Chicago | IL | 6 | N |
| 47 | 3/12/2004 | Fresno | CA | 9 | N |
| 48 | 11/21/2004 | Birchwood | WI | 6 | Y |
| 49 | 3/12/2005 | Brookfield | WI | 7 | N |
| 50 | 3/21/2005 | Red Lake | MN | 9 | N |
| 51 | 1/30/2006 | Goleta | CA | 7 | N |
| 52 | 3/25/2006 | Seattle | WA | 6 | N |
| 53 | 6/1/2006 | Indianapolis | IN | 7 | Y |
| 54 | 12/16/2006 | Kansas City | KS | 6 | N |
| 55 | 4/16/2007 | Blacksburg | VA | 32 | N |

DEF0376

|    | Date | City | State | Deaths | Involved Assault Weapon(s) |
|----|------|------|-------|--------|----------------------------|
| 56 | 10/7/2007 | Crandon | WI | 6 | Y |
| 57 | 12/5/2007 | Omaha | NE | 8 | Y |
| 58 | 12/24/2007 | Carnation | WA | 6 | N |
| 59 | 2/7/2008 | Kirkwood | MO | 6 | N |
| 60 | 9/2/2008 | Alger | WA | 6 | N |
| 61 | 12/24/2008 | Covina | CA | 8 | N |
| 62 | 1/27/2009 | Los Angeles | CA | 6 | N |
| 63 | 3/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Y |
| 64 | 3/29/2009 | Carthage | NC | 8 | N |
| 65 | 4/3/2009 | Binghamton | NY | 13 | N |
| 66 | 11/5/2009 | Fort Hood | TX | 13 | N |
| 67 | 1/19/2010 | Appomattox | VA | 8 | Y |
| 68 | 8/3/2010 | Manchester | CT | 8 | N |
| 69 | 1/8/2011 | Tucson | AZ | 6 | N |
| 70 | 7/7/2011 | Grand Rapids | MI | 7 | N |
| 71 | 8/7/2011 | Copley Township | OH | 7 | N |
| 72 | 10/12/2011 | Seal Beach | CA | 8 | N |
| 73 | 12/25/2011 | Grapevine | TX | 6 | N |
| 74 | 4/2/2012 | Oakland | CA | 7 | N |
| 75 | 7/20/2012 | Aurora | CO | 12 | Y |
| 76 | 8/5/2012 | Oak Creek | WI | 6 | N |
| 77 | 9/27/2012 | Minneapolis | MN | 6 | N |
| 78 | 12/14/2012 | Newtown | CT | 27 | Y |
| 79 | 7/26//2013 | Hialeah | FL | 6 | N |
| 80 | 9/16/2013 | Washington | DC | 12 | N |
| 81 | 7/9/2014 | Spring | TX | 6 | N |
| 82 | 9/18/2014 | Bell | FL | 7 | N |

3

| | Date | City | State | Deaths | Involved Assault Weapon(s) |
|---|---|---|---|---|---|
| 83 | 2/26/2015 | Tyrone | MO | 7 | N |
| 84 | 5/17/2015 | Waco | TX | 9 | N |
| 85 | 6/17/2015 | Charleston | SC | 9 | N |
| 86 | 8/8/2015 | Houston | TX | 8 | N |
| 87 | 10/1/2015 | Roseburg | OR | 9 | N |
| 88 | 12/2/2015 | San Bernardino | CA | 14 | Y |
| 89 | 2/21/2016 | Kalamazoo | MI | 6 | N |
| 90 | 4/22/2016 | Piketon | OH | 8 | N |
| 91 | 6/12/2016 | Orlando | FL | 49 | Y |
| 92 | 5/27/2017 | Brookhaven | MS | 8 | N |
| 93 | 9/10/2017 | Plano | TX | 8 | Y |
| 94 | 10/1/2017 | Las Vegas | NV | 58 | Y |
| 95 | 11/5/2017 | Sutherland Springs | TX | 25 | Y |
| 96 | 2/14/2018 | Parkland | FL | 17 | Y |
| 97 | 5/18/2018 | Santa Fe | TX | 10 | N |
| 98 | 10/27/2018 | Pittsburgh | PA | 11 | Y |
| 99 | 11/7/2018 | Thousand Oaks | CA | 12 | N |
| 100 | 5/31/2019 | Virginia Beach | VA | 12 | N |
| 101 | 8/3/2019 | El Paso | TX | 22 | Y |
| 102 | 8/4/2019 | Dayton | OH | 9 | Y |
| 103 | 8/31/2019 | Midland and Odessa | TX | 7 | Y |

Notes: Gun massacres are defined as high-fatality mass shootings resulting in 6 or more people shot to death, not including the perpetrators. A gun massacre was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban; (2) the statutes of the state where the gun massacre occurred; or (3) a legal or judicial

DEF0378

declaration issued by a state official.  Incidents in gray shade are those incidents that occurred at a time when and in a state where legal restrictions on assault weapons were in effect.

Sources: Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 Am. J. of Pub. Health 1754 (2019), available at *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed January 6, 2020); and "Past Summary Ledgers," Gun Violence Archive, available at https://www.gunviolencearchive.org/past-tolls (last accessed January 21, 2020).

5

# EXHIBIT 4

DEF0380

## Excerpt from *Rampage Nation*

## Figure 7.2



| | Decade Before AWB | Decade During AWB | Decade After AWB |
|---|---|---|---|
| ▪ Incidents | 19 | 12 | 34 |
| ▪ Deaths | 155 | 89 | 302 |

Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.
Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.
The data are drawn from Table 3.2.

Source: Louis Klarevas, Rampage Nation: Securing America from Mass Shootings 242 (2016).

# EXHIBIT 6



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

JUL 06 1989

MEMORANDUM T0:   Director

          FROM:   Associate Director (Compliance Operations)

    SUBJECT:   Report and Recommendation on the
                 Importability of Certain Semiautomatic Rifles

The working group has completed its evaluation of the semiautomatic rifles whose importation was suspended pending a determination as to whether these weapons are, as required by 18 U.S.C. § 925(d)(3), of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes".

Attached for your review and approval is the report and recommendation on the importability of these rifles.

*Daniel R. Black*
Daniel Black

Attachment

Approved: *Stephen E. Higgins 7/6/89*

Disapprove: _____

Page 1

**Report and Recommendation on the Importability of Certain Semiautomatic Rifles**

# DEFENDANTS' EXHIBIT H

DEF0411

## REPORT AND RECOMMENDATION OF THE ATF WORKING GROUP
## ON THE IMPORTABILITY OF CERTAIN
## SEMIAUTOMATIC RIFLES

### SUSPENSION OF ASSAULT-TYPE RIFLE IMPORTATIONS

On March 14, 1989, ATF announced that it was suspending, effective immediately, the importation of several makes of assault-type rifles, pending a decision as to whether these weapons meet the statutory test that they are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The announcement stated that ATF would not approve, until further notice, the importation of AKS-type weapons, Uzi carbines, FN/FAL-type weapons, FN/FNC-type weapons and Steyr Aug semiautomatic weapons. On April 5, 1989, the suspension was expanded to include all similar assault-type rifles.

For purposes of this suspension, assault-type rifles were rifles which generally met the following criteria:

     a.  military appearance

     b.  large magazine capacity

     c.  semiautomatic version of a machinegun

Based on these criteria, ATF suspended action on pending applications and suspended outstanding permits covering certain firearms listed in Attachment 1. These included both centerfire and .22 rimfire caliber firearms. At that time, ATF indicated that the reexamination of these weapons would take approximately 90 days.

This ATF working group was established to conduct the reevaluation of the importability of these semiautomatic rifles. This report represents the findings and recommendations of the working group.

### BACKGROUND

Section 925(d)(3) of Title 18, United States Code, as amended, provides in pertinent part that:

     The Secretary shall authorize a firearm. . .to be imported or
     brought into the United States . . if the firearm . .

          (3) is of a type that does not fall within the definition
          of a firearm as defined in section 5845(a) of the
          Internal Revenue Code of 1954 and is generally
          recognized as particularly suitable for or readily

DEF0412

> adaptable to sporting purposes, excluding surplus
> military firearms. . .

This provision was originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, and was also contained in Title I of the Gun Control Act of 1968, which amended Title IV later that year. According to the Senate Report on Title IV, this provision was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167.

Moreover, there is legislative history which indicates that Congress intended the standard to allow the importation of traditional sporting rifles, while excluding military-type rifles. The Senate Report on the Gun Control Act observed that the importation standards ". . . are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms." S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968). Significantly, the rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.[1]

An explanation of the effect of this section by one of the sponsors of the bill specifically stated that military firearms would not meet the "sporting purposes" test for importation. The mere fact that a military firearm may be used in a sporting event does not make it importable as a sporting firearm[2].

There is a reference in the Senate Report on Title IV which notes that the importation prohibition ". . . would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes, or for personal protection." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167. However, this language is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting since firearms particularly suitable for those purposes can obviously be used for other purposes such as recreational shooting and personal protection.

The determination of a weapon's suitability for sporting purposes "rest[s] directly with the Secretary of the Treasury." 114 Cong. Rec. 27465 (1968) (Statement of Sen. Murphy). While the legislative history suggests that the term "sporting purposes" refers to the traditional sports of target shooting, trap and skeet shooting, and hunting, the statute itself provides no criteria beyond the "generally recognized" language of section 925(d)(3). S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2167. The Senate Report on the Gun Control Act stated:

> The difficulty of defining weapons characteristics to meet this target [of eliminating importation of weapons used in crime] without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0413

Following enactment of the Gun Control Act in 1968, the Secretary established a Firearms Evaluation Panel to provide guidelines for implementation of the "sporting purposes" test of section 925(d)(3). This panel was composed of representatives from the military, law enforcement, and the firearms industry. The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction. An evaluation sheet (ATF Form 4590) was developed thereafter by ATF and put into use for evaluating handguns pursuant to section 925(d)(3). Attachment 2.

The 1968 Firearms Evaluation Panel did not propose criteria for evaluating rifles and shotguns under section 925(d)(3). Other than surplus military firearms which Congress addressed separately, long guns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes. Thus, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns. Until recently, all rifles and shotguns were approved for importation so long as they were not otherwise excluded by section 925(d)(3). Only rifles and shotguns covered by the National Firearms Act (NFA), 26 U.S.C. S 5845(a) (for example, machineguns and short-barreled rifles and short-barreled shotguns), and surplus military rifles and shotguns had been denied importation.

The Firearms Evaluation Panel did briefly comment on whether a model BM59 Beretta, 7.62mm NATO Caliber Sporter Version Rifle was suitable for sporting purposes. Minutes of the Firearms Advisory Panel, December 10, 1968. Attachment 3. It was the consensus of the Panel that this rifle did have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of the Beretta BM59, together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle, be authorized for importation. (The Beretta BM59 and the Cetme, the predecessor to the HK91, are two of the rifles whose importation has been suspended. The SIG-AMT is no longer being produced.) However, the Panel recommended that importation of these weapons should include the restriction that they not possess combination flash suppressors/grenade launchers.

The working group found the Panel's consideration of these rifles to be superficial and unpersuasive. The vast majority of the work of the 1968 Panel was devoted to handguns and the establishment of the factoring criteria for the importation of handguns. Indeed, we found compelling evidence that these rifles are not generally recognized as particularly suitable for sporting purposes.

The first time that ATF looked beyond the restrictions on NFA and surplus military rifles and shotguns and undertook a meaningful analysis under the "sporting purposes" test was in 1984. At that time, ATF was faced with a new breed of imported shotgun. It was clear that the historical assumption that all shotguns were sporting was no longer viable. Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes. This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to provide evidence of sporting purposes for the weapon, ATF was provided information that the weapon was suitable for police/combat style competitions. ATF determined that this type of competition did not constitute "sporting purposes" under the statute, and that this shotgun was not suitable for traditional sporting purposes, such as hunting, and trap and skeet shooting. Accordingly, importation was denied. Attachment 4.

Page 4

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Thereafter, in 1986, the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). After examination and testing of the weapon, ATF found that it was a semiautomatic version of a selective fire military-type assault shotgun. In this case, ATF determined that, due to its weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS-12 was not particularly suitable for or readily adaptable to sporting purposes. Again, ATF refused to recognize police/combat competitions as a sporting purpose under section 925(d)(3). The shotgun was reviewed on the basis of its suitability for traditional shotgun sports of hunting, and trap and skeet shooting and its importation was denied. Attachment 5. This decision was upheld by the United States District Court in Gilbert Equipment Company, Inc. v. Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989). The case is currently on appeal to the Eleventh Circuit.

These two cases involving shotguns represent ATF's first thorough examination of the suitability of certain combat-type weapons for sporting purposes. In these cases ATF adopted an interpretation of sporting as being limited to certain traditional sports and not simply any lawful activity in which the weapons might be employed.

## ANALYSIS

A. Defining the type of weapon under review.

As noted above, section 925(d)(3) expressly provides that the Secretary shall authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, in its explanation of section 925(d)(3), the Senate Report on the Gun Control Act stated:

> This subsection gives the Secretary authority to permit the importation of ammunition and certain types of firearms--(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machinegun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, et seq.) and suitable for sporting purposes (in the case of surplus military weapons this type is limited to shotguns and rifles) and those taken out of the United States. (Emphasis added.)

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

In light of the statutory mandate that types of firearms be scrutinized, the working group first attempted to determine whether the semiautomatic rifles suspended from importation fall within a type of firearm.

The working group determined that the semiautomatic rifles in question are generally semiautomatic versions of true selective fire military assault rifles.[3] As a class or type of firearm they are often referred to as "assault rifles," "assault-type rifles," "military style rifles," or "paramilitary rifles."[4] Since we are only concerned with semiautomatic rifles, it is somewhat of a misnomer to refer to these weapons as "assault rifles." True assault rifles are selective fire

Page 5

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0415

weapons that will fire in a fully automatic mode.[5] For the purposes of this paper, it was necessary to settle on one term that best describes the weapons under consideration, and we will refer to these weapons as "semiautomatic assault rifles." They represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle. The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK47, is a weapon designed for killing or disabling the enemy and, as described below, has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles.[6] These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. These features and characteristics are as follows:

1. Military Configuration.

   a. Ability to accept a detachable magazine. Virtually all modern military firearms are designed to accept large, detachable magazines.[7] This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less.[8] That a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

   b. Folding/telescoping stocks. Many military firearms incorporate folding or telescoping stocks.[9] The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

   c. Pistol grips. The vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon.[10] In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions.

   d. Ability to accept a bayonet. A bayonet has distinct military purposes.[11] First, it has a psychological affect on the enemy. Second, it enables soldiers to fight in close quarters

with a knife attached to their rifles. We know of no traditional sporting application for a bayonet.

e.  Flash suppressor. A flash suppressor generally serves one or two functions. First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired fully automatic.[12] From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Those flash suppressors which also serve to dampen "muzzle climb" have a limited benefit in sporting uses by allowing the shooter to reacquire the target for a second shot. However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result. There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb. In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

f.  Bipods. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.[13] The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired fully automatic. Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability. However, traditional sporting rifles do not come equipped with bipods, nor are they specifically designed to accommodate them. Instead, bipods for sporting firearms are generally designed to attach to a detachable "sling swivel mount" or simply clamp onto the firearm.

g.  Grenade launcher. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.[14] Such launchers are generally of two types. The first type is a flash suppressor designed to function as a grenade launcher. The second type attaches to the barrel of the rifle either by screws or clamps. We are not aware of any particular sporting use for grenade launchers.

h.  Night sights. Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.[15] Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally illegal to hunt at night.

2.  Whether the weapon is a semiautomatic version of a machinegun.

The vast majority of modern military firearms are selective fire, i.e., they can shoot either fully automatic or semiautomatic. Since machineguns are prohibited from importation (except for law enforcement use) the manufacturers of such weapons have developed semiautomatic versions of these firearms.[16]

3.  Whether the rifle is chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.

Page 7

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0417

Modern military assault rifles and submachineguns are generally chambered to accept a centerfire cartridge case of 2.25 inches or less.[17] On the other hand, while many traditional sporting rifles will fire a cartridge of 2.25 inches or less, such firearms usually do not have the other military features outlined in Items 1a-h.

These features and characteristics are not usually found on traditional sporting firearms.[18] This is not to say that a particular rifle having one or more of the listed features should necessarily be classified as a semiautomatic assault rifle. Indeed, many traditional sporting firearms are . semiautomatic or have detachable magazines. Thus, the criteria must be viewed in total to determine whether the overall configuration places the rifle fairly within the semiautomatic assault rifle category.

Using these criteria, we determined that, on balance, all of the firearms on the original suspension list are properly included in the semiautomatic assault rifle category, with the exception of the .22 rimfire caliber rifles and the Valmet Hunter. While the .22 rimfire caliber rifles bear a striking resemblance to the true assault rifle, these rifles employ, by and large, conventional .22 rimfire caliber semiautomatic mechanisms.[19] Moreover, they are not semiautomatic versions of a machinegun and contain only a few of the other relevant characteristics. Further, the working group determined that, in general, .22 caliber rifles are generally recognized as suitable for small game hunting. The Valmet Hunter, while based on the operating mechanism of the AK47 assault rifle, has been substantially changed so that it is now akin to a traditional sporting rifle and does not properly fall within the semiautomatic assault rifle category. More specifically, its receiver has been modified and its pistol grips, bayonet, and flash suppressor have been removed. The trigger mechanism has been moved to the rear of the modified receiver to facilitate its use with a traditional sporting stock. Also, its military-style sights have been replaced with traditional sporting-style sights. See Attachment 6.

## B. Scope of "Sporting Purposes".

The second step of our process was to determine the scope of "sporting purposes" as used in the statute. This is a critical aspect of the process. The broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test. A narrower interpretation which focuses on the traditional sports of hunting and organized marksmanship competition would result in a more selective importation process.[20]

To determine the proper interpretation, we consulted the statute itself, its legislative history, applicable case law, the work of the original Firearms Evaluation Panel, and prior interpretations by ATF. In terms of the statute itself, the structure of the importation provisions would suggest a somewhat narrow interpretation. In this regard, firearms are prohibited from importation (section 922(1)) with certain specific exceptions (section 925(d)(3)). A broad interpretation which permits virtually any firearm to be imported because someone may wish to use it in some lawful shooting activity would render the statute meaningless.

As discussed earlier, the legislative history suggests a narrow meaning and indicates that the term "sporting purposes" refers to the traditional sports of target shooting, skeet and trap shooting, and hunting. Moreover, the history discussed earlier strongly suggests that Congress intended the provision to allow the importation of traditional sporting type rifles while excluding military type rifles. There is nothing in its history to indicate that it was intended to recognize every conceivable

type of activity or competition which might employ a firearm. To the contrary, the history indicates that mere use in some competition would not make the rifle a sporting rifle.

Finally, the 1968 Firearms Evaluation Panel specifically addressed at least one informal shooting activity and determined that it was not a legitimate sporting purpose under the statute. The panel addressed what is commonly referred to as "plinking" (shooting at randomly selected targets such as bottles and cans). It was the Panel's view that "while many persons participated in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . ."
See Attachment 3.

Based on the above, the working group determined that the term "sporting purpose" should properly be given a narrow reading. It was determined that while hunting has been a recognized rifle sport for centuries, and competitive target shooting is a recognized rifle sport, the so-called activity of plinking is not a recognized sport. Moreover, we believe that reference to sporting purposes was intended also to stand in contrast to military and law enforcement applications. Consequently, the working group does not

believe that police/combat-type competitions should be treated as sporting activities. This position is supported by the court's decision in Gilbert Equipment Company, Inc., v Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989) and is consistent with prior interpretations of ATF as noted on pages 4 and 5 in discussing the Striker-12 shotgun and USAS-12 shotgun.

C. Suitability.

The final step in our review involved an evaluation of whether semiautomatic assault rifles are a type of rifle generally recognized as particularly suitable for or readily adaptable to the traditional sporting applications discussed above.

The criminal misuse of semiautomatic assault rifles is a matter of significant public concern and was an important factor in the decision to suspend their importation. Nevertheless, the working group did not consider criminal misuse as a factor in its analysis of the importability of this type of rifle. Instead, the working group confined its analysis to the question of whether this type of rifle meets the test provided in section 925(d)(3).

Rather than criminal misuse, our comprehensive examination of this issue focused on the legal analysis and technical assessment of these firearms discussed earlier. In addition, the working group used the information gathered under Items 1-7 outlined in the next section in determining whether this type of firearm is generally recognized as particularly suitable for sporting purposes. These items take into account technical and marketing data, expert opinions, the recommended uses of the firearms, and data on the actual uses for which the weapons are employed in this country.

In evaluating these firearms, we believe that all rifles which are fairly typed as semiautomatic assault rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability.[21] Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0419

This is consistent with the approach taken with respect to handguns since 1968. Although certain handguns may be used or recommended for sporting purposes, they may fall within the type of easily concealable handguns barred from importation by the administrative factoring criteria used by ATF to determine the importability of handguns. Furthermore, a pistol specifically designed for target shooting, but lacking a safety as required by the factoring criteria, would be a type of handgun prohibited from importation as not particularly suitable for sporting purposes for this reason. Finally, just as ATF allows handguns to be modified so as to meet the factoring criteria, a semiautomatic assault rifle could be modified into a sporting configuration and be importable, as was done in the case of the Valmet Hunter referred to earlier.

D. Evaluation of Information from Outside Sources

As part of our comprehensive analysis as to whether semiautomatic assault rifles meet the statutory criteria for importation, the following sources of information were also considered:

1. How has the weapon been advertised, marketed and categorized by the manufacturer and/or importer?

2. How has the use of the rifle been described by firearms technical writers?

3. What is the rifle's reported use by importers?

4. Do hunting guides recommend the rifle?

5. Do editors of hunting magazines recommend the rifle?

6. Is the rifle used in target shooting competitions?

7. Do State game commissions allow the use of the rifle to hunt?

Items 1-6 focus upon how the rifles are marketed, advertised, and recommended for use. Item 7 addresses the legal restrictions pertaining to the use of the weapons for sporting purposes.

The working group reviewed the advertising and marketing literature concerning each of the weapons (Item 1) and reviewed evaluations of the firearms by technical writers (Item 2). In addition, the working group solicited information from the importers of the weapons and other knowledgeable sources (Items 3-6).

Questionnaires were drafted and sent out to licensed hunting guides, State game and fish commissions, local hunting associations, competitive shooting groups, and hunting/shooting magazine editors to determine the extent to which the weapons are used for sporting purposes or recommended for such use. The working group believed that the actual uses of the weapons for sporting purposes would be a factor to be considered in determining whether this type of rifle meets the sporting purposes test.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0420

The review of advertising and marketing literature indicates that these rifles are not generally marketed for hunting or competitive shooting. The review of the technical evaluations revealed that these rifles are not regarded as suitable for these sporting activities.22

To the extent that the technical evaluations made recommendations with respect to the use of the rifles suspended from importation, the majority recommended them for law enforcement or military use or for activities such as collecting, plinking, home and self-defense, and combat target shooting. Only 5 of over 50 evaluations reviewed contained recommendations for the use of these firearms for hunting purposes.

The importers were asked to submit information concerning the sporting uses of the semiautomatic rifles they import. Thirty-nine importers were asked to submit this information and 19 responded. In general, their comments were conclusory and stated that their weapons could be used for sporting purposes. A small number of importers, e.g., Gun South, Inc., and Heckler & Koch, Inc., provided more specific data showing the sporting uses made of their firearms by their customers.

Of 3 hunting associations to whom questionnaires were sent, 2 responded. They stated that they place no restrictions on the use of semiautomatic rifles by their members, on the minimum caliber of ammunition used to hunt large game, or on the number of rounds allowed in semiautomatic rifle magazines. However, over 1,800 hunting guides were sent questionnaires and, of these, 706 responded. Over 73 percent of those responding indicated that their patrons used either bolt or lever action rifles for hunting. Only 10 of the 706 guides indicated that their patrons had used any of the rifles whose importation had been temporarily suspended.

Of the 20 hunting/shooting editors to whom questionnaires were sent, 14 responded. Nine of the fourteen editors recommended semiautomatic rifles for use in hunting large game, including 5 who recommended use of any of the rifles subject to the temporary suspension. Eleven of the fourteen editors recommended semiautomatic rifles for target competitions, including 7 who recommended semiautomatic assault rifles for such use.

The recommendations of editors were contradictory. One editor pointed out that what made the assault rifle successful as a military weapon made the semiautomatic version totally unfit for any other use. On the other hand, another editor stated that semiautomatic rifles had certain advantages over conventional sporting rifles especially for the physically disabled and left-handed shooters. While this may be true, there appears to be no advantage to using a semiautomatic assault rifle as opposed to a semiautomatic sporting rifle.

A total of 54 competitive shooting groups were sent a questionnaire and 53 groups responded (some of the responses were from unsolicited groups). Fifty of these groups indicated that they sponsor high power rifle competition events. While none of the groups prohibited the use of the semiautomatic assault rifles in their competitions, none stated that any of the rifles covered by the temporary suspension were used in a specific event.

Finally, the information gathered under Item 7 reveals that most of these weapons could legally be used in most States for most hunting purposes.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0421

The working group reviewed all of the information gathered under Items 1-6 and determined that while these weapons may legally be used for sporting purposes in most States, the evidence was compelling that, as a type of firearm, the semiautomatic assault rifle is not generally recognized as particularly suitable for sporting purposes. The working group found persuasive the technical and expert evaluations of these firearms which generally did not recommend them as particularly suitable for sporting purposes. The group was also impressed by the comments of the hunting guides which showed that these rifles were not widely used for hunting purposes. The comments of the hunting guides are consistent with the opinion of the technical experts who generally do not recommend the rifles for hunting purposes.

The opinions of the editors were fairly divided with respect to the sporting uses of these rifles. The importers generally recommended their own weapons for such uses. The competitive shooting groups indicated that the rifles could be used in certain shooting events. Thus, while there was some evidence that these rifles could be used for hunting and target shooting, there was no evidence of any widespread use for such purposes. The mere fact that they are not generally prohibited from use for sporting purposes does not mean that the rifles meet the test for importation.

## CONCLUSIONS

The working group has dealt with a complex issue, the resolution of which has required the group to take into account interpretations of law, technical assessments of firearms and their physical characteristics, marketing data, the assessment of data compiled from responses to questionnaires and, finally, Bureau expertise with respect to firearms. We fully recognize that particular findings as well as the results will be controversial.

From the cross section of representation within ATF, we have brought to bear our technical, legal, and administrative expertise to resolve the issues in what we believe to be a fair manner, taking into consideration all points of view. While some of the issues were difficult to resolve, in the end we believe that the ultimate conclusion is clear and compelling. These semiautomatic assault rifles were designed and intended to be particularly suitable for combat rather than sporting applications. While these weapons can be used, and indeed may be used by some, for hunting and target shooting, we believe it is clear that they are not generally recognized as particularly suitable for these purposes.

The purpose of section 925(d)(3) was to make a limited exception to the general prohibition on the importation of firearms, to preserve the sportsman's right to sporting firearms. This decision will in no way preclude the importation of true sporting firearms. It will only prevent the importation of military-style firearms which, although popular among some gun owners for collection, self-defense, combat competitions, or plinking, simply cannot be fairly characterized as sporting rifles.

Therefore, it is the finding of the working group that the semiautomatic assault rifle is not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes and that importation of these rifles should not be authorized under 18 U.S.C. § 925(d)(3).

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0422

Based on our evaluation, we recommend that the firearms listed on Attachment 7 not be authorized for importation. For the reasons discussed in this report, we recommend that the firearms listed on Attachment 8 be authorized for importation. These are the .22 rimfire caliber rifles and the Valmet Hunter which we do not believe are properly included in the category of semiautomatic assault rifles. Attachment 9 is a compilation of the responses from the questionnaires. Attachment 10 combines the criteria for identifying semiautomatic assault rifles and the items considered in assessing suitability. Attachments 11 and 12 contain the data compiled for each of the criteria listed in Attachment 10. Finally, Attachment 13 contains the source materials used in locating persons and organizations who were sent questionnaires.

## NOTES

1. Paul Wahl, ed., <u>Gun Trader's Guide</u>, 13th Edition, (South Hackensack, NJ. 1987), 155-162.

2. Although a firearm might be recognized as "suitable" for use in traditional sports, it would not meet the statutory criteria unless it were recognized as <u>particularly</u> suitable for such use. Indeed, Senator Dodd made clear that the intent of the legislation was to" [regulate] the importation of firearms by excluding surplus military handguns; and rifles and shotguns that are not <u>truly</u> suitable for sporting purposes." 114 Cong. Rec. 13325 (1968) (Statement of Sen. Dodd) [emphasis added].

Similarly, it is apparent that the drafters of the legislation did not intend for "sports" to include every conceivable type of activity or competition which might employ a firearm; otherwise a "sporting purpose" could be advanced for every firearm sought to be imported. For example, in response to Sen. Hansen's question concerning the meaning of "sporting purposes" in the bill which became section 925(d), Senators Dodd and Hansen engaged in the following colloquy:

Mr. HANSEN. Would the Olympic shooting competition be a "sporting purpose? "

Mr. DODD. I would think so.

Mr. HANSEN. What about trap and skeet shooting?

Mr. DODD. I would think so. I would think trap and skeet shooting would certainly be a sporting activity.

Mr. HANSEN. Would the Camp Perry national matches be considered a "sporting purpose?"

Mr. DODD. Yes: that would not [sic] fall in that arena. It should be described as a sporting purpose.

Mr. HANSEN. I understand the only difference is in the type of firearms used at Camp Perry which includes a wide variety of military types as well as commercial.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0423

Would all of these firearms be classified as weapons constituting a "sporting purpose?"

Mr. DODD. No. I would not say so. I think when we get into that, we definitely get into military type of weapon for use in matches like these at Camp Perry; but I do not think it is generally described as a sporting weapon. It is a military weapon. I assume they have certain types of competition in which they use these military weapons as they would in an otherwise completely sporting event. I do not think that fact would change the nature of the weapon from a military to a sporting one.

Mr. HANSEN. Is it not true that military weapons are used in Olympic competition also?

Mr. DODD. I do not know. Perhaps the Senator can tell me. I am not well informed on that.

Mr. HANSEN. It is my understanding that they are. Would the Senator be inclined to modify his response if
I say that is true? (27461)

Mr. DODD. It is not that I doubt the Senator's word. Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event. I think the Senator would agree with that. I do not know how else we could describe it.

Mr. HANSEN. If I understand the Senator correctly, he said that despite the fact that a military weapon may be used in a sporting event it did not, by that action become a sporting rifle Is that correct?

Mr. DODD. That would seem right to me ..... As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons...... I think the Senator and I know what a genuine sporting gun is.

114 Cong. Rec. 27461-62 (1968).(Emphasis added.)

3.  Ken Warner, ed., Gun Digest 1989, (Northbrook, Il. 1988), pp. 293-300; William S. Jarrett, ed., Shooter's Bible, No. 80, (Hackensack, NJ. 1988), pp. 345-363; Edward Clinton Ezell, Small Arms of the World, (Harrisburg, Pa. 1983), p. 844; Pete Dickey, "The Military Look-Alikes," American Rifleman, (April 1980), p. 31. Also, see generally, Ian V. Hogg, ed., Jane's Infantry Weapons, 1987-88, (New York 1987); Jack Lewis, ed., The Gun Digest Book of Assault Weapons, (Northbrook, Il. 1986).

4.  Art Blatt, "Tomorrow's State-of-the-Art Sporting Rifle," Guns & Ammo, (July 1981), p. 48; Jarrett, pp. 345-363; Warner, pp. 293-300.

5.  Daniel D. Musgrave and Thomas B.Nelson, The World's Assault Rifles, (Virginia, 1967), p. 1.

6.  See generally, Angus Laidlaw, ed., Paul Wahl's Big_Gun Catalog/1, (Bogota, NJ. 1988); Musgrave and Nelson; Hogg; Jarrett; and Warner.

**Report and Recommendation on the Importability of Certain Semiautomatic Rifles**

DEF0424

7. Ibid.

8. Arizona, 5 rounds; Colorado, 6 rounds; Michigan 6 rounds; New Hampshire, 5 rounds; New York, 6 rounds; North Carolina, 6 rounds; North Dakota, 8 rounds; Oregon, 5 rounds; Pennsylvania, semiautomatic rifles prohibited; Vermont, 6 rounds.

9. See generally, Hogg; Musgave and Nelson; Ezell; Warner; Jarrett; Laidlaw; and Lewis.

10. Ibid.

11. Ibid.

12. Ibid.

13. Ibid.

14. Ibid.

15. Ibid.

16. Ezell, p. 844; Dickey, p. 31.

17. Musgrave and Nelson, pp. 11-29; and, see generally, Hogg; and Ezell.

18. Ezell, pp.844-866; and, see generally, Warner; Jarrett; and Laidlaw.

19. See, for example, Walter Rickell, "The Plinker's AK GunsMagazine, (July 1986) p. 21; John Lachuk, "Bantam Battle Rifles," Guns & Ammo, (January 1987), p. 37; John Lachuk, ".22 Erma Carbine," Guns & Ammo, (May 1968), p. 58; JackLewis, "Something New: The AK in Twenty-Two," Gun World, (July 1985), p. 32; Roger Combs, "A Most Unique Carbine," Gun World, (December 1985), p. 28; Garry James, "Mitchell Arms AK-22," Guns & Ammo, (November 1985), p. 72.

20. See note 2, colloquy between Senators Dodd and Hansen.

21. Ibid.

22. See generally, bibliography.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0425

BIBLIOGRAPHY

"Armalite AR-180 Rifle," <u>American Rifleman</u>, (February 1981), 65-66.

"Beretta AR. 70 Rifle," <u>American Rifleman</u>, (March 1988), 64-66.

Blatt, Art. "Beretta M-70/Sport Rifle," <u>Guns & Ammo</u>, (December 1983), 64-65.

Blatt, Art. "Tomorrow's Sporting Rifles," <u>Guns & Ammo</u>, (July 1981), 48-57, 78, 79.

Bruce, Robert. "The AUG Assault System," <u>Guns Magazine</u>, (September 1986), 37-39, 42,43, 57-61.

Clapp, Wiley. "Great To-Do With the Daewoo," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 82-87.

Combs, Roger. "A Most Unique Carbine," <u>Gun World</u>, (December 1985), 28-31, 47.

Combs, Roger. "Galil 7.62mm Nato Rifle", <u>Gun World</u>, (October 1985), 32-36.

Combs, Roger. "The Avtomat Kalashnikov Goes .22," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 182-195.

Combs, Roger. "The Uniquely Unique F-11," <u>The Gun Digest Book of Assault Weapons</u>, (1988), 188-195.

"Cooking and Heckling with H & K's HK94A3," <u>Gun World</u>, (August 1984), 18-20.

Davis, Russ. "Have Your AK and Shoot it, Too," <u>Guns Magazine</u>, (February 1987), 39, 62-64.

Dickey, Pete. "The Military Look-Alikes," <u>American Rifleman</u>, (April 1980), 30-31, 76.

Egolf, Dick. "Heckler & Koch's Super Semi-Auto," <u>American Rifleman</u>, (June 1985), 29-32, 65-67.

Ezell, Edward Clinton. <u>Small Arms of the World</u>. Harrisburg: Stackpole Books, 1983.

"FN FNC Rifle," <u>American Rifleman</u>,(January 1988), 58-60.

Ferguson, Tom. "A Hard Look at The AR-180", <u>The Gun Digest Book of Assault Weapons</u>, (1986), 121-127.

French, Howard. "H & K's 9mm Paracarbine," <u>Guns & Ammo</u>, (November 1983), 42-44.

Grennell, Dean A. "The Mitchell AK-47," <u>Gun World</u>, (September 1986), 40-41.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

"Heckler & Koch 91," <u>American Rifleman</u>, (October 1981), 56-58.

"Heckler & Koch Model 94 Carbine," American Rifleman, (February 1988), 46-48.

Hogg, Ian V., ed. <u>Janes' Infantry Weapons. 1987-1988</u>. New York: Jane's Publishing Company, 1987.

Hunnicutt, Robert W. "The Bullpups Have Arrived", <u>American Rifleman</u>, (March 1987), 30-35, 70-71.

James, Frank W. "The Springfield Armory SAR-3, " <u>Special Weapons and Tactics</u>, (July 1989), 42-46.

James, Garry. "Austrailian L1A1A Rifle," <u>Guns & Ammo</u>, (December 1987),

James, Garry. "Chinese AK-47 .223," <u>Guns & Ammo</u>, (August 1986), 84-86.

James, Garry. "Mitchell Arms AK-22," <u>Guns & Ammo</u>, (November 1985), 72-73, 97.

James, Garry. "Mitchell Heavy Barrel AK-47," <u>Guns & Ammo</u>, (November 1986), 83-84.

James, Garry. "PTK Chinese M-14S Rifle," <u>American Rifleman</u>, (July 1988), 81-82.

James, Garry. "The SAR-48 Rifle, Springfield Armory Reproduces a Classic," <u>Guns & Ammo</u>, (August 1985), 64-66.

Jarrett, William S., ed. <u>Shooter's Bible. No. 80</u>. Hackensack: Stoeger Publishing Company, 1988.

Kapelsohn, Emanuel. "Steyr's Space-Age AUG," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 45-49.

Karwan, Chuck. "The Fetching Famas," <u>Gun World</u>, (October 1988), 18-21, 78.

Karwan, Chuck. "The Rugged Rifles of Springfield Armory," <u>Gun World</u>, (March 1989), 72-76.

Karwan, Chuck. "ilalmet's Assault Family," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 70-75.

Lachuk, John. ".22 Erma Carbine," <u>Guns & Ammo</u>, (May 1968), 58-60.

Lachuk, John. "Bantam Battle Rifles," <u>Guns & Ammo</u>, (January 1987), 36-39, 75-76.

Laidlaw, Angus, ed. <u>Paul Wahl's Big Gun Catalog/l</u>. Bogatao Paul Wahl Corporation, 1988.

Lewis, Jack, ed. <u>The Gun Digest Book of Assault Weapons</u>. Northbrook: DBI Books, Inc., 1986.

Lewis, Jack. "A Family Affair," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 76-81.

DEF0427

Lewis, Jack. "EMF's Look-Alike AP-74," The Gun Digest Book of Assault Weapons, (1986), 166-171.

Lewis, Jack. "Something New: The AK in Twenty-Two," Gun World, (July 1985), 32-35.

Lewis, Jack. "Springfield's S.A.R. 48," The Gun Digit Book of Assault Weapons, (1968), 88-93.

Lewis, Jack. "The Why and How of Rimfires," The Gun Digest Book of Assault Weapons, (1986), 160-171.

Mason, James D. "The Maadi in America," Guns Magazine, (January 1983), 33-35, 78.

Musgrave, Daniel D. and Nelson, Thomas B. The World's Assault Rifles. Washington, DC: Goetz Company, 1967.

O'Meara, Robert. "The Guns of Israel," Guns Magazine, (January 1989), 33-35, 51.

Paige, Alan. "The AK-47 As A Bullpup?" Firepower, (January 1989), 48-53.

Rees, Clair. "Valmet M71-S," Guns & Ammo, (October 1976), 86, 137.

Rickell, Walter. "The Plinker's AK," Guns Magazine, (July 1986), 21.

Roberts, J.B. "Bernosky Wins His Fourth," American Rifleman, (Oct. 1980), 49-51.

Sanow, Ed. "National Match AK-47/S," Firepower, (January 1989), 66-71.

Shults, Jim. "The Mean Machine," Gun World, (April 1982), 26-28.

"Springfield Armory S.A.R. 48," American Rifleman, (March 1986), 57-58.

Steele, Kevin E. "Beretta BM-59," Guns Magazine, (January 1983), 14.

Steele, Kevin E. "Sporting Firearms Update," Guns Magazine, (Feburary 1980), 52-55, 79, 84-85.

"Steyr-AUG: The Terrible Toy," Gun World, (December 1984), 32-35.

Swenson, Thomas J. "The Incredible Uzi," Guns & Ammo, (Jaunary 1982), 32-36, 76.Tappan, Mel. "Survive: Survival Rifles-Part 2, " Guns & Ammo, (August 1978), 68, 96-97.

Traister, John. "AK Rifle: Chinese AKS or Type 56S," American Rifleman, (May 1988), 50-51.

"UZI Semi-Automatic .45 Carbine," American Rifleman, (January 1986), 59.

"Uzi Semi-Automatic Carbine," American Rifleman, (August 1981), 55-57.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0428

"Valmet M78 Rifle," <u>American Rifleman</u>, (April 1988), 64-66

Wahl, Paul, ed. <u>Gun Trader's Guide</u>, 13th Edition, South Hackensack: Stoeger Publishing Company, 1987.

Warner, Ken, ed. <u>Gun Digest 1989</u>. Northbrook: DBI Books, Inc., 1988.

Wood, J.B. "Beretta's AR70 Sporter," <u>Guns Magazine</u>, (March 1986), 38-39, 65-66.

Woods, Jim. "Firepower From the Far East-Daewoo," <u>Guns Magazine</u>, (February 1986), 28-29, 60-61.

Zwirz, Bob. "Valmet's Military Look," <u>Gun World,</u> (September 1988), 28-30.

---

<u>NOTE</u>: This information was extracted from the document titled, **"Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles",** published in a memorandum to the Director, Stephen E. Higgins from the Associate Director, Daniel R. Black and approved on July 6, 1989.

---

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF0429

# EXHIBIT 7

J Urban Health
DOI 10.1007/s11524-017-0205-7

CrossMark

# Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources

Christopher S. Koper · William D. Johnson ·
Jordan L. Nichols · Ambrozine Ayers · Natalie Mullins

© The New York Academy of Medicine 2017

**Abstract** Policies restricting semiautomatic assault weapons and large-capacity ammunition magazines are intended to reduce gunshot victimizations by limiting the stock of semiautomatic firearms with large ammunition capacities and other military-style features conducive to criminal use. The federal government banned such weaponry from 1994 to 2004, and a few states currently impose similar restrictions. Recent debates concerning these weapons have highlighted their use in mass shootings, but there has been little examination of their use in gun crime more generally since the expiration of the federal ban. This study investigates current levels of criminal activity with assault weapons and other high-capacity semiautomatics in the USA using several local and national data sources including the following: (1) guns recovered by police in ten large cities, (2) guns reported by police to federal authorities for investigative tracing, (3) guns used in murders of police, and (4) guns used in mass murders. Results suggest assault weapons (primarily assault-type rifles) account for 2–12% of guns used in crime in general (most estimates suggest less than 7%) and 13–16% of guns used in murders of police. Assault weapons and other high-capacity semiautomatics together generally account for 22 to 36% of crime guns, with some estimates upwards of 40% for cases involving serious violence including murders of police. Assault weapons and other high-capacity semiautomatics appear to be used in a higher share of firearm mass murders (up to 57% in total), though data on this issue are very limited. Trend analyses also indicate that high-capacity semiautomatics have grown from 33 to 112% as a share of crime guns since the expiration of the federal ban—a trend that has coincided with recent growth in shootings nationwide. Further research seems warranted on how these weapons affect injuries and deaths from gun violence and how their regulation may impact public health.

**Keywords** Firearms · Assault weapons · Violence

## Introduction

Firearm violence imposes a significant burden on public health in the USA. From 2010 through 2012, the nation experienced an annual average of 11,256 firearm homicides and 48,534 non-fatal assault-related gunshot victimizations that cost society nearly $22 billion a year in lifetime medical and work-related costs[1]. One type of policy response to reduce gun violence involves restricting or mandating design changes in particular types of firearms that are considered to be especially dangerous and/or attractive for criminal use.

Restrictions on assault weapons (AWs) represent one particularly controversial and highly contested form of such legislation that has featured prominently in gun policy debates in recent decades. In general, AW laws

C. S. Koper (✉) · W. D. Johnson · J. L. Nichols ·
A. Ayers · N. Mullins
Center for Evidence-Based Crime Policy, Department of
Criminology, Law and Society, George Mason University, Fairfax,
VA, USA
e-mail: ckoper2@gmu.edu

Published online: 02 October 2017

∯ Springer

AG00001808

DEF0748

**DEFENDANTS' EXHIBIT Y**

C. Koper et al.

restrict manufacturing, sales, and ownership of semiautomatic firearms with large ammunition capacities and other military-style features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense [2]. Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and barrel shrouds on pistols. AW laws also commonly include restrictions on large-capacity magazines (LCMs), which are typically defined as ammunition feeding devices holding more than ten rounds of ammunition (some laws have higher limits). LCM restrictions are arguably the most important components of AW laws in that they also apply to the larger class of high-capacity semiautomatic firearms without military-style features. In the broadest sense, AW-LCM laws are thus intended to reduce gunshot victimizations by limiting the stock of semiautomatic firearms with large ammunition capacities and other features conducive to criminal use. The federal government enacted a national ban on AWs and LCMs in 1994 but allowed it to expire in 2004. Currently, eight states and the District of Columbia have AW and/or LCM restrictions, as do some additional localities [3].

Recent discussion and debates concerning these weapons have largely focused on their use in mass shootings. However, there has been little examination of the use of AWs and LCMs in gun crime more generally since the expiration of the federal ban. Studies conducted around the time of the federal ban found that AWs accounted for up to 8% of guns used in crime (generally between 1 and 6% and averaging around 2%) and that the broader class of firearms equipped with LCMs (including AWs and other semiautomatic firearms equipped with LCMs) accounted for up to a quarter [2, 4–12]. Criminal use of such weaponry declined during the years of the federal ban [2, 13, 14], but trends since then have only been examined in the state of Virginia, where LCM use rose following the ban's expiration [14]. Semiautomatic weapons with LCMs and/or other military-style features are common among models produced in the contemporary gun market [15, 16], but precise estimates of their production and ownership are unavailable. Growth in the use of such weapons could have important implications for public health as these weapons tend to produce more lethal and injurious outcomes when used in gun violence [2, 17]. This study provides an updated examination of the AW issue by investigating current levels of criminal activity with AWs and other LCM firearms as measured in a variety of national and local data sources.

## Data and Methods

There is no national data source that can be used to count the numbers of homicides, non-fatal shootings, or other crimes committed with AWs and other LCM firearms. Therefore, criminal use of these weapons was approximated by examining and triangulating across several local and national data sources on guns used in different types of crimes.

### Local Data Sources

The local-level analyses are based on guns recovered by police over multiple years (defined below) in a convenience sample of ten cities including Hartford (CT), Rochester (NY), Syracuse (NY), Baltimore (MD), Richmond (VA), Minneapolis (MN), Milwaukee (WI), Kansas City (MO), Seattle (WA), and Sacramento (CA). Large cities were selected for the analysis (these cities range in size from roughly 124,000 to 684,500) due to the concentration of gun violence in urban areas [18, 19]. Patterns and trends in these particular cities may not be indicative of those elsewhere; further, some (Baltimore, Hartford, Rochester, Syracuse, and Sacramento) are covered by state AW and LCM restrictions that were in effect during all or portions of the study period (this study does not attempt to evaluate the implementation and effects of these laws or variations therein). Nonetheless, these cities constitute a geographically diverse set of ban and non-ban locations, thus strengthening generalizations. The data were obtained from law enforcement authorities in these jurisdictions except where otherwise noted. Information available in most of the police databases included the type, make, model, and caliber of each confiscated firearm; the date when it was recovered; and the type of crime with which it was associated.

Guns recovered by police (often referred to as "crime guns") are the only readily available data with which to study patterns and trends in the types of guns used in crime across jurisdictions, and they are commonly used in research on gun markets, gun violence, and gun policy [2, 9, 20–37]. Guns confiscated by police include guns recovered in violent crime investigations as well as those recovered in connection with weapon offenses

🖄 Springer

AG00001809

(illegal possession, carrying, and discharges), drug violations, property crimes, and other incidents. These samples thus represent guns known to have been used in violence as well as guns possessed and/or carried by criminal and otherwise high-risk persons. As others have noted, they represent a sample from the population of guns that are at greatest risk of misuse [24] and thereby provide a probable sample of guns used to commit crimes [21]. As caveats, nonetheless, it should be noted that police do not recover all guns used and possessed illegally, and it is possible that the types of guns they confiscate differ from those of unrecovered guns linked to illegal possessors and users. The analyses highlighted below are based on all confiscated firearms in the study jurisdictions. Additional analyses conducted with just those guns clearly connected to a violent offense, which represented at least 13 to 19% of guns across the cities, produced very similar results except where noted (separate offense-type analyses could not be conducted with the Syracuse and Rochester gun data or the Richmond LCM data).

National Data Sources

National-level analyses were conducted using three data sources and compilations. The first consists of information on firearms recovered by law enforcement agencies throughout the nation and reported to the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) for investigative tracing of their sale histories. Guns reported to ATF provide a national sample of crime guns numbering in the hundreds of thousands annually (predominantly from urban jurisdictions), but they do not constitute a statistically representative sample for the nation given that gun tracing is voluntary (agencies trace guns as needed for specific investigations and/or analysis of illegal gun markets) and varies between agencies and over time [24, 27, 38–40]. Further, publicly available data on traced guns are limited to aggregate figures on basic types and calibers of the weapons, thus limiting the analyses that could be conducted as described below. The other national data sources included information on guns used in murders of police officers and mass murder incidents. Prior research has shown that AWs and LCM firearms are used in a higher share of these crimes, due presumably to their lethality and attractiveness to the types of offenders who commit these offenses [2, 4], and this has been a prominent issue in the AW debate. Information on firearms used in murders of police,

including the type, make, model, and caliber of each weapon, was obtained from the Federal Bureau of Investigation (FBI), which compiles these data from reports by police agencies throughout the country. Information on firearms used in mass murder shooting incidents was collected from lists and reports compiled by several organizations since there is no single official data source that regularly provides detailed and comprehensive information on mass murders and the guns used in these incidents [41–50]. Consistent with many prior studies of this issue, firearm mass murders were defined as incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed. This increased the number of sources that could be used to gather information. As described below, however, detailed weapon information could not be found in public sources for many of the cases.

Methods

There is no universal definition of an AW that applies across current and past AW laws. For example, the expired federal ban and some current state laws define AWs as having two military-style features, whereas other state bans and a recent (2013) proposal for a new federal ban use a one feature criterion [2, 51]. For this study, AWs were defined based on the weapons that have most commonly been identified as such based on the old federal ban, current state laws, and the recently proposed federal ban. This list included more than 200 make-model combinations covered by either of the federal lists (2004 and 2013) or at least two of the state laws. Based on preliminary analyses showing that most recovered AWs are assault rifles (as opposed to assault pistols or assault shotguns), an additional ceiling estimate of AW use was calculated based on the prevalence of semiautomatic rifles. This was also done to compensate for imprecision in the AW estimates (due, for example, to missing or partial gun model data, lack of information about the specific features or configurations of the weapons that could affect their AW status, and possible omissions from the operational AW list).

Use of guns with LCMs could only be measured precisely for the Syracuse, Baltimore, and Richmond analyses, which are based on data sources having an indicator for magazine capacity (which is typically

Ⓐ Springer

AG00001810

missing from police gun databases), and some of the mass murder incidents. For most analyses, use of LCM firearms was approximated based on recoveries of semi-automatics that are commonly manufactured and sold with LCMs, referred to below as LCM-compatible firearms. Identification of these models was based on gun catalogs (such as the *Blue Book of Gun Values* and *Gun Digest*) and examination of gun manufacturers' websites. This method likely overstates LCM use to some degree since many LCM compatible firearms can also be equipped with smaller magazines. As a rough guide, inspection of all recoveries of a small number of LCM-compatible handgun models in the Baltimore data revealed that approximately four of five were equipped with LCMs. Conversely, LCM use can also be undercounted for guns that were missing complete model information or equipped with aftermarket LCMs, which are available for some guns not sold with LCMs at retail. LCM use was not estimated for Rochester and Sacramento since New York and California have had longstanding restrictions on magazines with more than ten rounds (hence, it seems less likely that LCM-compatible guns recovered in those jurisdictions were actually equipped with LCMs).

Data were collected from 2014 through 2016. Current estimates of AW and LCM use were developed using the most recent 2–3 years of data from the local police databases and ATF data. Data spanning the most recent 5–6 years were used to generate contemporary estimates of AW and LCM use in murders of police and mass murders due to the rarity of these events. As described below, some data sources were also used to estimate trends in the use of semiautomatic rifles and LCM firearms since the expiration of the federal ban. Reported figures highlight AWs and LCM firearms as a share of crime guns in order to control for differences in the volume of gun crime and overall gun recoveries between places and over time. Other noteworthy aspects of the data and analyses are discussed below.

## Results

### Local Analyses

Results of the local analyses are presented in Table 1. For each site, estimates are based on data spanning different portions of the 2011–2014 period. The number of guns

analyzed ranged from 281 in Syracuse to 4994 in Kansas City and totaled 21,551 across all data sources.

Estimates of the prevalence of AWs among crime guns ranged from a low of 2.4% in Baltimore to a high of 8.5% in Syracuse. Assault rifles (e.g., variations of the AR-15 or AK-47) accounted for the majority of AWs in all sites and more than three-quarters in all but one (Richmond). The remaining AWs consisted entirely (or nearly so) of assault pistols (e.g., the TEC-9 or TEC-22). The share of crime guns consisting of semiautomatic rifles of any sort is also displayed in Table 1 for localities that had gun databases with gun-type designations (i.e., handgun/rifle/shotgun, semiautomatic/non-semiautomatic). These estimates ranged from a low of 4.1% in Hartford to 12.4% in Rochester but were less than 9% for most cities. (The Milwaukee estimate is based on the percentage of crime guns that were rifles of any sort as semiautomatic/non-semiautomatic designations were unavailable.) As noted, the semiautomatic rifle estimates, which include both AW-type and non-AW-type rifles, provide a likely ceiling for estimates of AW prevalence.

The percentage of crime guns clearly equipped with an LCM (including AWs and other high-capacity semi-automatics, most of which are pistols) was 16.5% in Baltimore during the 2012–2014 period, but this figure rose to 21.5% for guns that were connected to a violent crime. These findings are similar to those from a recent news report (involving a separate and independent analysis of Baltimore data) indicating that 18.4% of guns recovered in Baltimore had LCMs for the period of 2010 through 2016 [52]. In Richmond, 22% of crime guns were equipped with LCMs during 2008 and 2009 based on data collected by the Virginia State Police and initially reported by *The Washington Post* [14] (the *Post's* reported figures have been reanalyzed here to focus on the most recent available years and to assess trends). Crime guns were least likely to be equipped with LCMs in Syracuse (14.6%), where New York State LCM restrictions have been in effect since the early 2000s.

For the other sites, the prevalence of LCM-compatible guns ranged from 22.2% in Hartford to 36.2% in both Kansas City and Seattle, with the majority of the estimates (3 of 5) higher than one-third. In most of these cities, the prevalence of LCM guns was similar whether focusing on all guns or those connected to a violent crime. In Hartford, however, 30% of violent crime guns were LCM compatible in contrast to 22.2% for all guns. Further, a supplemental analysis of guns linked to assault-

Springer

AG00001811

**Table 1** Prevalence of assault weapons, semiautomatic rifles, and semiautomatics with large-capacity magazines among guns recovered by police: estimates for selected cities and years

| Location and sample | Assault weapons as % of guns | Semiautomatic rifles as % of guns | Semiautomatics with large-capacity magazines as % of guns |
|---|---|---|---|
| Hartford, CT (2011–2012, $N$ = 854) | 2.6% | 4.1% | 22.2% overall, 30% for guns linked to violent crime |
| Rochester, NY (2012 July 2014, $N$ = 1687) | 4.9% | 12.4% | Not estimated |
| Syracuse, NY (2012 May 2014, $N$ = 281) | 8.5% | 12.1% | 14.6% |
| Baltimore, MD (2012 Sep. 2014, $N$ = 4680) | 2.4% | 5.4% | 16.5% overall, 21.5% for guns linked to violent crime |
| Richmond, VA (AW analysis: 2012–2013, $N$ = 1180) (LCM analysis: 2008 2009, $N$ = 1960) | 2.7% | Not estimated | 22.0% |
| Minneapolis, MN (2012 Aug. 2014, $N$ = 2178) | 3.4% | 6.4% | 25.1% overall, 46.3% for guns linked to shootings |
| Milwaukee, WI (Jul. 2013 Jun. 2014, $N$ = 1868) | 4.6% | < 9.4% | 35.5% |
| Kansas City, MO (2012 Aug. 2014, $N$ = 4994) | 6.1% | 6.3% | 36.2% |
| Seattle, WA (2012 July 2014, $N$ = 596 guns linked to violent crimes or weapons violations) | 6.4% | 7.9% | 36.2% |
| Sacramento, CA (Aug. 2013 Jul. 2014, $N$ = 1273) | 6.0% | Not estimated | Not estimated |

Estimates are based on general gun recovery samples except where noted. Estimates were similar for guns known to have been connected to violent crimes except where noted. Large-capacity magazine (LCM) estimates for Syracuse, Baltimore, and Richmond are based on known LCM recoveries (the Richmond estimates are based on Virginia State Police data initially reported by *The Washington Post*). Other LCM estimates are based on recoveries of LCM compatible firearm models. The Milwaukee semiautomatic rifle estimate is based on the prevalence of all rifles

related shootings in Minneapolis (using gunshot victimization data provided by Minneapolis police) revealed that 46.3% were LCM compatible, though this was based on a small sample ($n$ = 80 guns).

National Analyses

Results of the national analyses are presented in Table 2. AW prevalence was approximated in the national ATF tracing data for 2012 and 2013 ($n$ = 481,632) based on traces of guns in calibers .223, 5.56, and 7.62 mm. These are common calibers for AW-type semiautomatic rifles, though not all firearms in these calibers are AWs, and not all AWs fall into these calibers. This method nonetheless yielded an estimate of 5%, which is within the range of estimates provided by the local analyses. Further estimates of semiautomatic rifles and LCM firearms were not possible given the limitations of published tracing data.

Guns used in murders of police were analyzed for the years 2009 through 2013 ($n$ = 219, excluding cases involving the officers' own weapons, which are often LCM firearms). AWs accounted for an estimated 13.2% of the firearms used in these crimes overall and varied

between 8 and 18% from year to year. Virtually all of the AWs (97%) were assault rifles. Semiautomatic rifles overall accounted for 15.5% of the firearms used in these cases and ranged from 5 to 23% annually. LCM-compatible firearms more generally constituted 40.6% of the murder weapons, ranging from 35 to 48% annually.

AW and LCM use in firearm mass murders was examined for a sample of 145 incidents that occurred from 2009 through 2015 but could only be estimated within broad ranges due to high levels of missing weapons data in public accounts. AWs were used in at least 10.3% of these incidents. However, only 42 incidents had sufficiently detailed weapon information to make a definitive determination regarding AW use; among these cases, 35.7% involved AW use. All but one AW case involved an assault rifle. (A separate estimate for semiautomatic rifle use is not presented because only two additional cases clearly involved a semiautomatic rifle with an unclear or non-AW designation.) LCM firearms overall were involved in at least 18.6% of the incidents based on cases that involved clear possession of LCMs, AWs, or other LCM-compatible models. Although many additional cases involved semiautomatic firearms, an LCM coding could

🖄 Springer

AG00001812

C. Koper et al.

**Table 2** Prevalence of assault weapons, semiautomatic rifles, and semiautomatics with large-capacity magazines among national samples of guns recovered by police, guns used in murders of police, and guns used in mass murders

| Data source and sample | Assault weapons as % of guns | Semiautomatic rifles as % of guns | Semiautomatics with large-capacity magazines as % of guns |
| --- | --- | --- | --- |
| Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF): guns recovered by police and reported to ATF for investigative tracing (2012–2013, N = 481,632) | 5% | Not estimated | Not estimated |
| Federal Bureau of Investigation: guns used in murders of police (2009–2013, N = 219) | 13.2% | 15.5% | 40.6% |
| Public reports of firearm mass murders (4+ killed) (2009–2015, N = 145) | 10.3–35.7% | Not estimated | 18.6–57.4% |

Assault weapon estimate for ATF data is based on reported firearms in calibers .223, 5.56, and 7.62 mm. LCM estimates are based on recoveries of LCM compatible firearm models in the FBI data and recoveries of both LCMs and LCM compatible firearms in the mass murder data

only be made for 47 cases, 57.4% of which involved an LCM firearm. The identified AW and LCM cases typically occurred in public locations (80%) and resulted in more than twice as many people shot on average as did other incidents (13.7 victims on average for AW-LCM cases versus 5.2 for other cases; $t$ test $p$ level < 0.01).

Trend Analyses

Trends in the use of AWs and LCM firearms since the end of the federal AW ban or the early post-ban years were also estimated using selected data sources that had sufficiently detailed weapon information and spanned the period of interest. First, trends in recoveries of semiautomatic rifles were used to approximate trends in crime with AWs using the FBI national data on police murders (2003–2013) and data from the following cities and time periods: Baltimore (2004–2014), Rochester (2004–2014), Syracuse (2004–2014), Milwaukee (2006–2014, based on all rifles), Seattle (2008–2014), Minneapolis (2006–2014), and Kansas City (2008–2014). In summary, these analyses (not shown) revealed little evidence of upward trends in the use of semiautomatic rifles across sites.

Second, trends in crimes with LCM firearms were estimated based on guns used in murders of police (2003–2013) as well as guns used in murders of police in Baltimore (2004–2014), Richmond (2003–2009), and Minneapolis (2006–2014). Table 3 shows changes over time in the percentage of guns that were LCM firearms using the earliest and latest years of each data source. In relative terms, the prevalence of LCM firearms increased from 33 to 49% in the Baltimore, Minneapolis, and national (FBI) data (note that Maryland restricted LCMs with more than 20 rounds throughout this period and extended these restrictions to LCMs with more than 10 rounds in late 2013). The largest increase occurred in Richmond, where LCM firearms increased 111.5%, rising from 10.4% of recovered guns in 2003–2004 (the final years of the federal AW ban) to 22% in 2008–2009. Similar trends have also been reported for the state of Virginia overall [14]. All of these changes were statistically significant ($p < 0.05$) based on chi-square tests of the equality of proportions.

**Discussion**

Subject to caveats noted above, this examination of several national and local data sources suggests that AWs are used in between 2 and 9% of gun crimes in general with most estimates being less than 7%. Upper bound estimates of AW use based on semiautomatic rifles range from 4 to 12% in most data sources and are typically less than 9%. These estimates are broadly similar to those generated in the early 1990s prior to the federal AW ban [2], though they are perhaps somewhat higher on average. However, comparisons of these estimates with others should be made cautiously, as operational definitions of an AW have varied across studies and estimates presented here are based on the most contemporary definitions of AWs. One clearly notable

 Springer

AG00001813

DEF0753

Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms

**Table 3**  Changes in prevalence of semiautomatics with LCMs: estimates for selected local and national data sources and time frames, 2003–2014

| Data source/location | LCM firearm prevalence: early time period | LCM firearm prevalence: late time period | Change in LCM firearm prevalence |
|---|---|---|---|
| Baltimore crime guns | 11.1% (2004, 2006, N = 5369 total firearms) | 16.5% (2012–Sep. 2014, N = 4381 total firearms) | + 48.6%** |
| Richmond, VA crime guns | 10.4% (2003–2004, N = 2413 total firearms) | 22.0% (2008–2009, N = 1960 total firearms) | + 111.5%** |
| Minneapolis crime guns | 16.8% (2006–2007, N = 2564 total firearms) | 25.1% (2012–Aug. 2014, N = 2178 total firearms) | + 49.4%** |
| National (FBI): guns used in murders of police | 30.4% (2003–2007, N = 224 total firearms) | 40.6% (2009–2013, N = 219 total firearms) | + 33.6%* |

Change in proportions statistically significant at $p < 0.05$ (*) or $p < 0.01$ (**)

Estimates are based on general gun recovery samples except where noted. LCM estimates for Baltimore and Richmond are based on known LCM recoveries (the Richmond estimates are based on Virginia State Police data initially reported by *The Washington Post*). The early period estimate for Baltimore excludes the year 2005 due to an unusually large number of guns appearing that year within the buyback/turn-in/safekeeping category. Other LCM estimates are based on recoveries of LCM compatible firearm models

recent change is that assault rifles, rather than assault pistols, now account for a substantial majority of AWs used in crime in contrast to prior estimates [2]. This implies an increase over time in the average lethality of AWs used in violence.

LCM firearms, which include AWs as well as other high-capacity semiautomatics, appear to account for 22 to 36% of crime guns in most places, with some estimates upwards of 40% for cases involving serious violence. These estimates are comparable to or higher than earlier estimates of LCM use. However, the higher-end estimates may overstate LCM use somewhat as most are based on measurement of LCM-compatible guns that may not all have been equipped with LCMs.

Consistent with prior research, this study also finds that AWs and LCM firearms are more heavily represented among guns used in murders of police and mass murders. AWs account for 13–16% of guns used in murders of police, while LCM weapons overall account for about 41% of these weapons. Estimates for firearm mass murders are very imprecise due to lack of data on the guns and magazines used in these cases, but available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of such incidents. Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts.

Importantly, trend analyses suggest that LCM firearms have grown substantially as a share of crime guns since the expiration of the federal ban on AWs and LCMs. This implies possible increases in the level of

gunfire and injury per gun attack during this time. Consistent with this inference, national statistics from the Centers for Disease Control and Prevention (CDC) and the FBI show that the ratio of gun homicides and assaultive non-fatal shootings to overall reported violent gun crimes (homicides, assaults, and robberies) rose from an average of 0.163 for 2003–2005 to an average of 0.21 for 2010–2012 (calculated from CDC [53] and FBI [54] data). This change was driven by non-fatal shootings, which have been trending upward since the early 2000s and recently reached their highest levels since 1995 [1]. The findings presented in this study suggest the possibility that greater use of high-capacity semiautomatics has contributed to this upward trend in shootings.

Further study would seem warranted on LCM use trends with additional jurisdictions and data sources. Research on this issue could be facilitated by more systematic efforts to collect detailed information on crime guns and magazines in local police databases as well as through national data collection systems like the Supplemental Homicide Reports and the National Violent Death Reporting System. Study of these weapons is also hampered by lack of public data on production of LCMs and LCM-compatible firearms. The need for better data on this issue may become more pressing if there continue to be significant changes in the lethality of commercially available firearms.

Additional research is also needed to quantify the effects that LCM use has on injuries and deaths from gun attacks—and by extension on the costs to society

🙲 Springer

AG00001814

from gun violence. Research suggests that gunfire attacks involving semiautomatics produce more lethal and injurious outcomes [2, 10, 17, 55] and that 4–5% of assault-related gunshot victims are wounded in attacks involving more than ten shots fired [2]. However, such evidence is extremely limited at present. Studies of this issue, combined with evaluation research on the effects of current state and local LCM laws, could provide additional insights into the efficacy of expanding LCM restrictions at the local, state, and/or national levels. Research illuminating the public health and safety benefits of AW-LCM restrictions could also inform the courts as they continue to adjudicate recent challenges to the constitutionality of these statutes. Although this study does not directly evaluate any AW-LCM law, it provides further evidence that the federal ban curbed the spread of high-capacity semiautomatic weapons when it was in place and, in so doing, may have had preventive effects on gunshot victimizations.

**Acknowledgments**  The authors thank the police agencies that provided data for this study: the Hartford (CT) Police Department, the New York State Police, the Baltimore Police Department, the Richmond (VA) Police Department, the Minneapolis Police Department, the Milwaukee Police Department, the Kansas City (MO) Police Department, the Sacramento Police Department, the Seattle Police Department, and the Federal Bureau of Investigation. The authors also thank Grace Beya, Mark Ecko, and Thomas Prifti for additional research assistance. The opinions expressed in this manuscript are those of the authors and should not be attributed to any of the aforementioned organizations or individuals.

**References**

1. Fowler KA, Dahlberg LL, Haileyesus T, Annest JL. Firearm injuries in the United States. *Prev Med.* 2015;79:5–14.
2. Koper CS. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003.* Report to the National Institute of Justice, U.S. Department of Justice. Philadelphia, PA: Jerry Lee Center of Criminology, University of Pennsylvania; 2004.
3. Law center to prevent gun violence. http://smartgunlaws.org. Accessed May 2016.
4. Adler WC, Bielke FM, Doi DJ, Kennedy JF. *Cops under fire: law enforcement officers killed with assault weapons or guns with high capacity magazines.* Washington, DC: Handgun Control, Inc.; 1995.
5. Beck A, Gilliard, D, Greenfeld L, et al. *Survey of state prison inmates,* 1991. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 1993.
6. Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms involved in fatalities. *JAMA.* 1996;275:42–5.
7. Hutson HR, Anglin D, Pratts MJ Jr. Adolescents and children injured or killed in drive-by shootings in Los Angeles. *N Engl J Med.* 1994;330:324–7.
8. Hutson HR, Anglin D, Kyriacou DN, Hart J, Spears K. The epidemic of gang-related homicides in Los Angeles county from 1979 through 1994. *JAMA.* 1995;274:1031–6.
9. Kleck G. *Targeting guns: firearms and their control.* New York: NY: Aldine de Gruyter; 1997.
10. McGonigal MD, Cole J, Schwab CW, Kauder DR, Rotondo MF, Angood PB. Urban firearm deaths: a five-year perspective. *J Trauma.* 1993;35:532–7.
11. New York State Division of Criminal Justice Services. *Assault weapons and homicide in New York City.* Albany, NY: Author; 1994.
12. Zawitz MW. *Guns used in crime.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 1995.
13. Koper CS. America's experience with the federal assault weapons ban, 1994–2004: key findings and implications. In: Webster DW, Vernick JS, editors. *Reducing gun violence in America: informing policy with evidence and analysis,* vol. 2013. Baltimore MD: Johns Hopkins University Press; 2013. p. 157–71.
14. Fallis D VA. Data show drop in criminal firepower during assault gun ban. *The Washington Post.* 2011; January 23.
15. Lee J, editor. *Gun digest 2015.* Iola, WI: Krause Publications; 2014.
16. Violence Policy Center. *The militarization of the U.S. civilian firearms market.* Washington, DC: Author; 2011.
17. Reedy DC, Koper CS. Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. *Injury Prevention.* 2003;9:151–5.
18. Planty M, Truman JL. *Firearm violence, 1993–2011.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 2013.
19. Smith EL, Cooper A. *Homicides in the U.S. known to law enforcement, 2011.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 2013.
20. Bureau of Alcohol, Tobacco, and Firearms. Crime gun trace reports. In: *National report.* Washington, DC: United States Department of the Treasury; 2000. p. 2002.
21. Brill S. *Firearm abuse: a research and policy report.* Washington, DC: Police Foundation; 1977.
22. Braga AA, Wintemute GJ, Pierce GL, Cook PJ, Ridgeway G. Interpreting the empirical evidence on illegal gun market dynamics. *J Urban Health: Bull New York Acad Med.* 2012;89:779–93.
23. Braga AA, Pierce GL. Disrupting illegal firearms markets in Boston: the effects of operation ceasefire on the supply of new handguns to criminals. *Criminal Public Policy.* 2005;4(4):717–48.
24. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Review.* 2001;43:277–309.
25. Koper CS. Federal legislation and gun markets: how much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers? *Criminol Public Policy.* 2002;1:151–78.
26. Koper CS. Crime gun risk factors: buyer, seller, firearm, and transaction characteristics associated with gun trafficking and criminal gun use. *J Quant Criminol.* 2014;30:285–315.

🖄 Springer

AG00001815

DEF0755

27. Pierce GL, Braga AA, Hyatt RR Jr, Koper CS. Characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. *Justice Q.* 2004;21:391 422.

28. Vernick JS, Webster DW, Hepburn LM. Effects of Maryland's law banning saturday night special handguns on crime guns. *Injury Prev.* 1999;5:259–63.

29. Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning saturday night special handguns on homicides. *Am J Epidemiol.* 2002;155:406 12.

30. Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. *Injury Prev.* 2006;12:255 30.

31. Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *J Urban Health: Bull New York Acad Med.* 2006;83:778–87.

32. Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun sales laws and the source state of crime guns. *Injury Prev.* 2006;7:184 9.

33. Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *J Urban Health: Bull New York Acad Med.* 2009;86: 525–37.

34. Wintemute GJ. *Ring of fire: the handgun makers of southern California.* Davis, CA: Violence Prevention Research Program, University of California, Davis; 1994.

35. Wintemute GJ, Romero MP, Wright MA, Grassel KM. The life cycle of crime guns: a description based on guns recovered from young people in California. *Ann Emerg Med.* 2004;43:733 42.

36. Wintemute GJ, Cook PJ, Wright MA. Risk factors among retail handgun dealers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prev.* 2005;11:357 63.

37. Wright MA, Wintemute GJ, Webster DW. Factors affecting a recently purchased handgun's risk for use in crime under circumstances that suggest gun trafficking. *J Urban Health: Bull New York Acad Med.* 2010;87:352 64.

38. Koper CS. Purchase of multiple firearms as a risk factor for criminal gun use: implications for gun policy and enforcement. *Criminol Public Policy.* 2005;4:749–78.

39. Kleck GBATF. Gun trace data and the role of organized gun trafficking in supplying guns to criminals. *Saint Louis Univ Public Law Rev.* 1999;18:23 45.

40. National Research Council. *Firearms and violence: a critical review.* Washington, DC: The national academies press; 2005.

41. Citizens Crime Commission of New York City. *Mass shooting incidents in America (1984–2012).* http://www.nycrimecommission.org/mass-shooting-incidents-america.php. Accessed March 2015.

42. Everytown for Gun Safety. *Analysis of recent mass shootings.* New York: NY; Author; 2014.

43. Everytown for Gun Safety. *Mass shootings in the United States:* 2009-2016. New York: Author; 2017.

44. Mass shooting tracker, gun violence archive. http://www.shootingtracker.com/. Accessed Aug. 2016.

45. Federal Bureau of Investigation. *A study of active shooter incidents in the United States between 2000 and 2013.* Washington, DC: U.S. Department of Justice.

46. Kaminski Ledue JL. *Weapons used in mass shootings.* Report 2013-R-0057. Hartford: Connecticut: Office of Legislative Research, Connecticut General Assembly; 2013.

47. Aronsen G, Follman M, Pan D. A guide to mass shootings in America. *Mother Jones.* http://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed Feb. 2015, Jul. 2016.

48. New York City Police Department. *Active shooter: recommendations and analysis for risk mitigation.* New York: counterterrorism bureau, New York City Police Department; New York, NY; 2012.

49. Violence Policy Center. *Mass shootings in the United States involving high-capacity ammunition magazines.* http://www.vpc.org/fact_sht/VPCshootinglist.pdf. Accessed June 18, 2017.

50. Berkowitz B, Gamio L, Lu D, Uhrmacher K, and Lindeman T. The math of mass shootings. *The Washington Post* https://www.washingtonpost.com/graphics/national/mass-shootings-in-america/. Accessed Aug. 2016.

51. Assault Weapons Act of 2013. OLL13047, 113th Cong. (2013).

52. Freskos B. Baltimore police are recovering more guns loaded with high-capacity magazines, despite ban on sales. *The trace.* 2017; Apr. 1. https://www.thetrace.org/2017/03/high-capacity-magazine-ban-baltimore-police/ Accessed Apr. 1, 2017.

53. Centers for Disease Control and Prevention. Injury Center. https://www.cdc.gov/injury/wisqars/. Accessed March 2015.

54. Federal Bureau of Investigation. Uniform crime reporting. https://ucr.fbi.gov/ucr. Accessed March 2015.

55. Richmond TS, Branas CC, Cheney RA, Schwab CW. The case for enhanced data collection of gun type. *J Trauma.* 2004;57:1356 60.

Springer

AG00001816

# EXHIBIT 8

<pre>
 1                    UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF CALIFORNIA

 3

    JAMES MILLER, an individual;    )
 4  PATRICK RUSS, an individual;    ) CASE NO.: 3:19-cv-1537
    RYAN PETERSON, an individual;   )
 5  and SAN DIEGO COUNTY GUN OWNERS; ) DATE: MONDAY, AUGUST 29, 2022
    POLITICAL ACTION COMMITTEE, a   )
 6  membership organization,        ) SAN DIEGO, CALIFORNIA
                                    )
 7                     Plaintiffs,  ) LEGAL MANDATE HEARING
                                    )
 8  v.                              ) HONORABLE ROGER T. BENITEZ
                                    ) UNITED STATES DISTRICT JUDGE
 9  XAVIER BECERRA, in his official ) SOUTHERN DISTRICT OF CALIFORNIA
    capacity as Attorney General of )
10  California; and MARTIN HORAN, in )
    his official capacity as Chief  )
11  of the Department of Justice    )
    Bureau of Firearms,             )
12                                  )
              Defendants.           )
13  _____)

14  APPEARANCES:

15  For the Plaintiffs:

16  DILLON LAW GROUP, APC
    2647 Gateway Road, Suite 105, #255
17  Carlsbad, California  92009
    (760) 642-7150
18  BY:  JOHN W. DILLON, ESQ.
             jdillon@dillonlawgp.com
19

20  For the Defendants:

21  CALIFORNIA ATTORNEY GENERAL
    455 Golden Gate Avenue, Suite 11000
22  San Francisco, California 94102
    (415) 510-3479
23  BY: JOHN DARROW ECHEVERRIA, ESQ.
             john.echeverria@doj.ca.gov

24

25  Reported by:  Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891
    tricia_rosate@casd.uscourts.gov
</pre>

1       SAN DIEGO, CALIFORNIA; MONDAY, AUGUST 29, 2022

2              10:00 A.M. - 10:37 A.M.

3                  -  -  -  -

4       (Court called to order.)

5       THE COURT:  Good morning.

6       THE CLERK:  1 on calendar, 19-cv-1537,

7    Miller, et al. v. Becerra, et al., legal mandate hearing.

8       THE COURT:  Counsel, please register your

9    appearances for the record.

10       MR. DILLON:  This is John Dillon, counsel for

11    plaintiffs.

12       MR. ECHEVERRIA:  John Echeverria for the

13    defendants.

14       THE COURT:  All right.  Today we have spreading of

15    the mandate.  The Ninth Circuit has sent this case back to me

16    after the Supreme Court decision in Bruen.

17       I had asked for briefing to be submitted before

18    today.  In response, what I have is -- I have plaintiff's

19    notice or a letter advising me that they wish to amend the

20    complaint to challenge the new law that will go into effect in

21    January that would, as I understand the plaintiff's position,

22    deter people from being able to exercise their constitutional

23    rights by imposing attorneys' fees on them.

24       The second thing I have is I have a request by the

25    State to allow time for discovery, expert discovery.  It was

1   filed late last night; however, I have had a chance to skim

2   through it.

3         So let me give you my thoughts, preliminary

4   thoughts.  First of all, regarding the request for an

5   amendment, I don't think we need to enmesh this case and this

6   Court in the battle that you are foreseeing or think is

7   coming.  I think that's a battle to be fought some other day

8   but not in connection with this lawsuit.  It may possibly be

9   filed and heard by this court, but it may not.  I don't know.

10  So I don't really see any reason to grant additional time to

11  allow you to amend your complaint in that regard.  So my

12  tentative -- unless you have something really, really, really

13  persuasive that leads me to conclude otherwise, my tentative

14  is to deny your request.

15        Turning my attention to the State's late filing of

16  last night, I've read the expert's report, if you will.

17  Frankly, I have no doubt that he's a well-qualified expert,

18  but 702 provides that the reason for having an expert witness

19  is if by virtue of the expert's training, skill, or

20  experience, he would be of assistance to the trier of fact to

21  determine the issues that are before the Court.

22        So the history of the Second Amendment regulation

23  has been hashed out in every circuit in this country.  It has

24  been hashed out in this court in at least three -- maybe

25  four -- cases that I've handled, not because I chose to handle

them but because I got them as a result of the related
caseload.  It has been hashed out, as I said, in the
Ninth Circuit; it's been hashed out before the Supreme Court.
I just don't really know what there is that this expert would
be able to provide me that competent counsel from the
State Attorney General's office in the State of California has
not been able to provide for me in four cases that I've heard
before.

I know, Mr. Echeverria, that in this case, as I
recall, you devoted a considerable amount of time to arguing
about the historical bases for justifying this legislation.  I
frankly thought you did a pretty good job.  So I don't know
what this expert really could do for us.

Besides, what we'd really be looking at is:  Are
there any statutes or regulations of historical precedence
that would be of long standing and that would be persuasive
for my denying the plaintiff's request.  Frankly, I think
that's probably something that's best left to lawyers like the
Attorney General's office.  You have basically an unlimited
budget; you have an unlimited staff.  As I said before, so
far, you've done a really good job.  So I don't know why I
need an expert to help me after that.

So my tentative would be to deny any further expert
discovery.  It's just a delay.  Obviously some people don't
think that the Second Amendment is an important right, but I

1    disagree, and I think the founding fathers did, as well, when

2    they enacted it, and now I believe that the Supreme Court has

3    also said that it's an important right, notwithstanding the

4    fact that some people may disagree.  So I don't know what this

5    expert really would do for us other than delay, and I can't

6    see any reason for that.

7         So, frankly, my tentative would be to deny the

8    request for additional expert discovery.

9         I would grant you additional time, however, if you

10   wish to go back.  Not long.  Not long, because I don't think

11   we need it.  But I would be willing to give you additional

12   time to brief the issue and to provide any evidence that, at

13   anytime in the course of the history of this country, there

14   was sufficient statutes and regulations that would be

15   analogous to the regulation that's at issue here.

16        So before I go any further, I guess I'll dissolve

17   the injunction that I had issued previously in response to the

18   Ninth Circuit's decision remanding the matter back to me

19   following the Bruen Supreme Court decision.

20        Those are my thoughts, gentlemen.  I'll be happy to

21   hear from you if you have anything else you want to add.

22        Let's see.  I guess I'll start with plaintiff.

23        MR. DILLON:  With regard to Your Honor's tentative

24   ruling on the amended complaint, we're not going to try to

25   argue with you.  We feel that it's your decision, and what you

1    feel is right is probably the correct way to go.

2           With regard to the additional time to provide for

3    briefing, do we have an idea of what time frame the Court's

4    thinking of for the additional historical briefing?

5           THE COURT:  I think 30 days.

6           MR. DILLON:  30 days?

7           And would the Court be willing to grant plaintiffs

8    an additional couple days to at least have a response to

9    anything that the State provides?

10          THE COURT:  No, but I think what I would do is I

11   would grant both sides maybe 10 days to respond.

12          MR. DILLON:  Okay.

13          THE COURT:  So I don't --

14          Look.  Here's the way I see it:  This Court did a

15   lot of historical research on its own and found cases,

16   statutes, and so on.  You both can do the same thing without

17   having to rely on each other, as we normally do.  You know,

18   one side presents their position, the other side argues

19   against it, and so on.  But both of you can essentially do the

20   same thing.  You can do the same historical research --

21   right? -- and you can submit it, and then if you see something

22   in the other side's briefing that you think is incorrect, then

23   I'll give you 10 days to try to rebut it or tell me why that's

24   not correct.

25          Does that kind of a timeframe work for you,

1    Mr. Dillon?

2              MR. DILLON:  Yes, it does, Your Honor.

3              THE COURT:  How about you, Mr. Echeverria?

4              MR. ECHEVERRIA:  It does not, Your Honor.  I mean --

5         We would like to address some of the points that you

6    just made about the submission that we made this morning and

7    the declaration of Professor Schrag.  I think there's more to

8    discuss before we settle on a schedule.

9              THE COURT:  Okay.  All right.  Fine.  Great.

10        So let's hear from you.

11             MR. ECHEVERRIA:  So this morning in response to the

12   Court's order of August 8th requesting a briefing addressing

13   the Bruen decision, we submitted our brief and proposed that

14   the Court allow for expert discovery that would be focused on

15   the text and history standard that the Supreme Court announced

16   in Bruen.  In support of that request, we submitted a

17   declaration of Professor Schrag, who is a historian, to

18   elucidate the difficulties and nuances that are required to

19   conduct the kind of historical research and the analogical

20   reasoning that the Supreme Court has now required of the

21   courts and of the parties.

22             We are not offering Professor Schrag as an expert to

23   explain the history of firearms regulation.

24             THE COURT:  I'm sorry.  I hate to interrupt you.

25             MR. ECHEVERRIA:  Yes, sir.

1          THE COURT:  So tell me again what his role would be.

2          MR. ECHEVERRIA:  So his role would be limited to the

3     submission he already made.  We would not be offering any

4     further testimony from Professor Schrag in this matter.

5          THE COURT:  Okay.

6          MR. ECHEVERRIA:  His testimony was limited to

7     explain that the historical method is not as simple as going

8     on Westlaw or Google Books and using search terms to try to

9     find statutes in the past; that history is much more

10    complicated.  In order to develop the historical traditions

11    that the Supreme Court has said that the State can rely upon,

12    that is a fairly involved process.  Your Honor is correct --

13    that the attorneys and the Court have a very important role in

14    interpreting that history and in framing that history and in

15    crediting the constitutional import of that history -- but

16    still the hard work of developing the history must be done by

17    experts, not by us.  So that is why the State has asked for

18    discovery, discovery allowing for historical experts; not

19    Professor Schrag, but additional historians and political

20    scientists.

21          In the prior proceeding before the Court's

22    injunction, the parties did not have an opportunity to conduct

23    fulsome discovery including expert discovery.  So we think

24    that the State is entitled to have discovery in this case.

25          THE COURT:  Go ahead.  I'm sorry.  I hate to

1   interrupt.

2           MR. ECHEVERRIA:  Please, Your Honor.

3           THE COURT:  But I remember there was all this

4   discussion about the 1933-era --

5           MR. ECHEVERRIA:  Yes.

6           THE COURT:  -- ban on fully automatic weapons.

7   There was discussion about the historical precedent for the

8   statute.

9           As I recall, a similar approach was taken in the

10  Duncan case, if I'm not mistaken, and I think the same was

11  argued in the Rhodes case, which was the ammunition case,

12  which is still floating around in the ether somewhere.

13          I'm having a hard time understanding what it is that

14  these experts would tell me that would be of assistance to me.

15  If I found --

16          I mean, if the declaration from --

17          How do you pronounce his name?

18          MR. ECHEVERRIA:  Schrag.

19          THE COURT:  Schrag.

20          Yeah, from George Mason -- an excellent law school,

21  by the away -- but if, in fact, he somehow told me that that's

22  going to help resolve the issue, here's the issue.  The issue

23  is if we go back to the founding of this country, are there

24  any status, regulations, that were of any important or

25  significance that could possibly be analogous to the state [*]

1    state ate ban on misstates testimony ey automatic rifles like

2    the AR-15 or semiautomatic AK-47?

3            No.  That would be one thing.  But that's something

4    that can be accomplished in 30 days.  You county need

5    six months.  So I'm just -- I'm just having a Hartford time

6    understanding what it is you're really asking for.

7            MR. ECHEVERRIA:  Let me try to help with that.

8            So in the primarily proceeding when the

9    Supreme Court in Heller MacDonald explained that the state can

10   rely upon long-standing regulations, the Court had not

11   explained what that really means.  So the state relied upon

12   laws that were quite close in national to the assault weapon

13   ban.  These were instructions to the firing capacity of both

14   automatic and semiautomatic weapons that were enacted in the

15   1920s and the 1930s.  The Superior Court in brand-new has

16   since clarified that laws in the 1900s, they're not as

17   probative of what the original meaning and understanding of

18   the scope of the Second Amendment was at the founding in 1791

19   or when the Fourteenth Amendment was ratified.

20           So now we have more guidance from the Superior Court

21   in brand-new as to what kind of historical laws the state can

22   rely upon.  Now, the state doesn't need to find restrictions

23   on firearms that are analogous to the AR-15 or the AK-47.

24   These are weapons where the technology just wasn't available

25   at the founding or at the ratification of the

1    Fourteenth Amendment.  These are new weapons, and they're

2    addressing new problems, mass shootings.  Mass shootings

3    didn't happen in 1791 or 1868.  This is a new phenomenon.

4            The Supreme Court has clarified that the historical

5    method of analogy must allow the State to have more

6    flexibility when we're dealing with new technologies or new

7    problems.

8            A more nuanced approach, in the words of the

9    majority the phrase of the majority, is required.  So that

10   kind of more nuanced approach is going to require a

11   substantial amount of work, because there aren't a lot of laws

12   that existed at the time of the ratification of the

13   Fourteenth Amendment or thereabouts, restrictions on specific

14   types of weapons.  There were also restrictions that were

15   analogous at the founding that we need to provide the Court

16   with more information about, and to also draw the type of

17   analogy that the Supreme Court requires.

18           The Court stated that the state can rely upon

19   historical laws if they are analogous in two respects.  There

20   must be a comparable burden and a comparable justification.

21   The comparable burden is the burden on the right to armed

22   defense; not the burden to possess or carry any particular

23   weapon, but the burden on individuals to exercise their

24   Second Amendment right to self-defense.

25           THE COURT:  Wasn't that fully addressed in Heller?

1    I mean I thought Heller --

2              I mean, I remember reading -- of course, I've read

3    Heller now I-don't-know-how-many times, but I seem to recall

4    that Justice Breyer did his own analysis, the historical

5    record, on Second Amendment issues and what restrictions had

6    occurred in the past, back to --

7              Gosh, what was the statute?

8              MR. ECHEVERRIA:  North Hampton?

9              THE COURT:  Yeah.  It goes back to --

10             What was that?  That was, like, 17-something, wasn't

11   it?

12             MR. ECHEVERRIA:  Much earlier.

13             THE COURT:  I can't even remember the date, but it

14   goes back a long, long, long, long ways.  Justice Scalia did

15   the same thing.  They went through and they looked at all of

16   that.  And I remember discussions about the fact that judges

17   are not historians, but if you follow --

18             I mean, circuit courts all over the country,

19   Mr. Echeverria have gone through and have talked about the

20   history of the Second Amendment, what was intended, what the

21   drafters wanted to accomplish by it.  I don't know what --

22             Look, I don't mean any disrespect to professors --

23   don't get me wrong -- but I don't know what they could do for

24   me that you, a really good lawyer, came to do.  So that's why

25   I'm saying, "Look, all I need from you is you brief this."

1     You tell me what you think, and I'll let Mr. Dillon do the

2     same thing.  Then I'll take a look at it.  I'll decide -- if I

3     think I need more, you know -- as you know, I've never been

4     afraid to ask for more.  I'll ask for more.  We'll bring the

5     historians in.  I'll cross-examine them if I have to.  But I

6     just don't -- I don't want to slow-walk this.  This is a

7     really important case for the people, both for people who want

8     gun control and for the people who want the freedom to

9     exercise the Second Amendment.  I don't think there's any

10    reason that I can think of why this should be delayed.

11            I interrupted you.  I'm sorry.  If you want to keep

12    going, go ahead.

13            MR. ECHEVERRIA:  You can interrupt me whenever you

14    want, Your Honor.

15            So in terms of the historical analysis that's

16    already been conducted by the Supreme Court in Heller and

17    McDonald and again in Bruen, the historical record that the

18    Court was looking at was focused on what I refer to as -- it's

19    the right to carry firearms:  where can people carry firearms,

20    under what circumstances can people carry firearms in public,

21    when can they possess firearms in the home.

22            This case presents a qualitatively different

23    historical question.  This is a "what" case.  What kind of

24    firearms can the State restrict and how can the State regulate

25    those firearms?

1    There are also cases -- like age restriction cases,

2    for example -- that are "who "cases.

3    THE COURT:  I'm sorry.  There are what?

4    MR. ECHEVERRIA:  There are also cases that present a

5    different historical question, which could be referred to as

6    "who" cases:  Who has the right to keep and bear arms; for

7    example, age restriction cases; restrictions on the ability of

8    18- to 20-year-olds to purchase firearms, for example.

9    The historical record concerning "what" questions --

10   what kind of weapons can be regulated -- has been

11   underdeveloped and underexamined in the courts.  This type of

12   historical tradition needs to be built up, and we have a lot

13   of original work that must be done.  The historical --

14   THE COURT:  But will you agree with me that the

15   historical record already exists?

16   MR. ECHEVERRIA:  Well, the historical record exists,

17   but it must be excavated.  It must be interpreted.  There is a

18   substantial amount of work that remains to be done in

19   examining the types of weapons that have historically been

20   restricted by government consistent with the Second Amendment

21   and consistent with the Fourteenth Amendment.

22   THE COURT:  I can tell you that I did --

23   Sorry about that.  They sort of meld together.

24   Bob, which one was my billy club case?

25   MR. ECHEVERRIA:  Fouts?

1          THE COURT:  So I remember doing a whole lot of

2  research on the Fouts case, because that was a significant

3  issue of the type of weapon that could be carried and who

4  could carry them and when they could carry them.  There was

5  all kinds of --

6          Again, that one also went back -- that case also

7  went back -- all the way back to before the 1700s; the 1500s,

8  I think it was.

9          So the record exists.  It's there.  So all that

10  somebody has to do, Mr. Echeverria, is sit down and catalog

11  what is there and then tell me -- basically say, "This is what

12  exists.  This is what the historical record is, and this is

13  how it's similar or analogous to what this statute says, and

14  this is why the statute should be upheld" or not.

15          I just don't think -- I mean, I could be mistaken,

16  but I just don't think that that requires the kind of

17  discovery and the kind of expert that you're asking to get.

18  All that's going to do is basically delay this case.  As I

19  know you know, important constitutional rights that -- people

20  have a right to have their constitutional rights enforced and

21  enforced in a timely fashion.  This case has been around --

22          When did I decide Miller?  2019, I believe?

23          MR. DILLON:  Yes.

24          THE COURT:  Maybe --

25          Yeah.  Here we are three years down the road, and

1    there are still people out there --

2            In fact, I just got something today on file.  Some

3    individual, someone who wants to file a friend-of-the-court

4    brief, who apparently is being prosecuted --

5            He's a retired sheriff's officer.  He's being

6    prosecuted because he has one of these weapons.  These people

7    need to know, Mr. Echeverria.  One way or another, they need

8    to be told, "Yes, you can possess these weapons," "No, you

9    cannot possess these weapons."

10           Mr. Dillon, I need to give you a chance to respond

11   to Mr. Echeverria.  I've got the rest of the calendar I've got

12   to get to.  I apologize.  I wish I had more time, but I don't.

13           MR. DILLON:  I'll make it quick, Your Honor.

14           We agree with the Court's determination.  We firmly

15   believe that Heller has already conducted the relevant

16   historical analysis when it comes to prohibiting arms.

17           We believe that this Court's prior decision in this

18   case found correctly that these firearms that the State tries

19   to ban are commonly owned, commonly possessed, both in the

20   state and throughout the country.  Because they are common,

21   they are not both dangerous and unusual.

22           Based off of the decisions in Heller and now in

23   Bruen, it seems that the Second Amendment protects all

24   bearable arms, including modern firearms, and any prohibition

25   isn't going to be justified unless the State can prove that

1   the arms in question are both dangerous and unusual.  So the

2   historical inquiry is built into that analysis, and we feel

3   that the Court's already done so.

4           We will go with the Court, and if additional

5   briefing on historical regulations is requested, we'd be more

6   than happy to provide a brief on plaintiff's behalf for that,

7   but we firmly believe that this case has already been settled

8   in the context of the Court's analysis under Heller and now

9   just affirmed under Bruen.

10          THE COURT:  All right.  Well, here's what I'm going

11  to do.  Mr. Echeverria, I'm going to give you a little longer.

12  I'll make it 45 days.

13          You've got 45 days to file briefings, declarations,

14  anything you want to file in support of your position, keeping

15  in mind that you have the burden to justify the restriction on

16  the Second Amendment.  So I'll give you 45 days to file

17  something in support.  Then I will take a look at it.

18          I will give each of you -- I'm going to give you

19  15 days to respond after that.

20          If I believe -- after having reviewed that material,

21  if I believe that additional discovery or additional witnesses

22  would be necessary for this Court to be able to make a

23  reasonable determination, as I said before, you know I'm not

24  afraid to do that.  I will do that.  We will have hearings, we

25  will call witnesses, and we'll do whatever is necessary.  But

1    I just think that the people have a right -- they have a right

2    to know -- both the people that are pro gun control and the

3    people that are pro being able to possess these weapons, they

4    have a right to know.  Enough time has gone by.

5            So that's my ruling.

6            I thank you very much, both of you, for being here.

7            The injunction previously issued is dissolved.

8            All right?  All right.

9            Thank you.  You take care.  Have a great day.

10           MR. DILLON:  Thank you.

11           MR. ECHEVERRIA:  Thank you.

12           (Proceedings concluded at 10:37 a.m.)

13                        -    -    -    -

14

15                       **CERTIFICATE**

16           I, Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891,

17   certify that the foregoing is a correct transcript from the

18   record of proceedings in the above-entitled matter.

19

20           /s/ Tricia_Rosate, CSR No. 10891  Date: October 18, 2022
             Registered Diplomate Reporter
             Registered Merit Reporter

21           Federal Certified Realtime Reporter
             Certified Realtime Reporter

22

23

24

25

# EXHIBIT 9

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>                                      Plaintiffs,<br><br>        **v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>                                      Defendants. | 3:19-cv-01537-BEN-JLB<br><br>**SUPPLEMENTAL DECLARATION OF LUCY P. ALLEN**<br><br>Dept:          5A<br>Judge:        Hon. Roger T. Benitez<br><br>Action Filed:  8/15/2019 |

## SUPPLEMENTAL DECLARATION OF LUCY P. ALLEN

I, Lucy Allen, declare under penalty of perjury that the following is true and correct:

1.      I previously submitted a Declaration in Support of Defendant's Opposition to Motion for Preliminary Injunction, which was filed with this Court on January 23, 2020 ("2020 Allen Declaration").[1]  I make this supplemental declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of August 8, 2022, filed on August 29, 2022.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.      I am an economist and a Managing Director of NERA Economic Consulting ("NERA").  I have been retained by the California Department of Justice to provide certain statistical analyses in this matter.  NERA is being compensated for my work on this matter at a rate of $1,050 per hour and at lower rates for work performed by other NERA professionals and staff.

## BACKGROUND AND QUALIFICATIONS

4.      My background and qualifications were summarized in the 2020 Allen Declaration.

5.      My current resume is attached as Exhibit A.

## OPINIONS

6.      I have been asked by the California Department of Justice to provide supplemental testimony based on an analysis of The Heritage Foundation's "Defensive Gun Uses in the U.S." database ("Heritage DGU Database"), which was

---

[1] My 2020 Declaration was marked as Defendants' Trial Exhibit A and was filed publicly at Docket Number 33-1.

1

1  first published after the 2020 Allen Declaration.[2] In particular, I have been asked to

2  analyze the percent of incidents in which rifles were used in self-defense according

3  to this database.

4      7.    This testimony supplements the opinions I previously provided in the

5  2020 Allen Declaration.  I stand by the opinions expressed in that declaration,

6  which were based on the data that were available and considered at that time.[3]

7      8.    The Heritage Foundation is a think tank focused on "formulat[ing] and

8  promot[ing] public policies based on the principles of free enterprise, limited

9  government, individual freedom, traditional American values, and a strong national

10  defense."[4] According to The Heritage Foundation, "[t]he right of the people to keep

11  and bear arms is a fundamental part of American liberty, serving as an important

12  individual defense against crime and a collective defense against tyranny."[5]

13      9.    In April 2020, The Heritage Foundation began publishing and

14  periodically updating a database of news stories describing incidents in the U.S. in

15  which individuals purportedly defended themselves using firearms.[6] The Heritage

16

17

18  _____

19  [2] "Defensive Gun Uses in the U.S.," *The Heritage Foundation,* as of October 7, 2022, https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us.

20

21  [3] Note that contrary to suggestions in the June 4, 2021 Court Decision (see, *Decision,* June 4, 2021, pp. 48, 50 and 53), the data used in the 2020 Allen Declaration were turned over to Plaintiffs and in fact even discussed on the record by Plaintiffs' counsel during my deposition (see, Allen Deposition at 17:23-18:20). Neither Plaintiffs nor their experts ever indicated that the data were not available or that the analysis was not replicable.

22

23

24

25  [4] "About Heritage," *The Heritage Foundation*, https://www.heritage.org/about-heritage/mission.

26

27  [5] "Firearms," *The Heritage Foundation*, https://www.heritage.org/firearms.

28  [6] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

Foundation notes that its database is not comprehensive but meant to "highlight" stories of successful self-defense.[7,8]

10.   As of October 7, 2022, the Heritage DGU Database included 2,714 incidents from January 1, 2019 through October 6, 2022.[9] The Heritage DGU Database codes the following information for each incident:[10]

- Date of the incident;
- Website link to the news story;
- Location (city and state);
- Context (e.g., domestic violence, home invasion, robbery, etc.);
- Whether the defender had a concealed-carry permit;
- Whether there where multiple assailants;
- Whether shots were fired; and
- Firearm type (handgun, shotgun, rifle, pellet rifle, long gun, or unknown).[11]

11.   I performed an analysis of all 2,714 incidents in the Heritage DGU Database as of October 7, 2022 to determine what number and percent of the incidents involved a rifle. I found there were 51 incidents indicating a rifle was

---

[7] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[8] Note that a review of the news stories cited in the database indicates that a number of the incidents may not involve individuals defending themselves. For example, in one incident ("Two Burglary Suspects Caught By Victim's Brother And Friend, Held At Gunpoint For Police," *5NewsOnline*, February 11, 2019), a homeowner's brother and friend appear to have found and apprehended burglars on the roadside.

[9] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[10] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[11] A review of the data and linked news stories from the Heritage DGU Database indicates that the firearm type corresponds to the firearm associated with the defender.

3

involved. These 51 incidents represent 2% of all incidents in the database and 4% of incidents with a known gun type.[12] The table below shows the breakdown of incidents by coded firearm type for the 2,714 incidents.

**The Heritage Foundation
Defensive Gun Use Database**

| Firearm Type | Incidents[1] | % of Total | % of Known |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Handgun | 1,113 | 41% | 90% |
| Shotgun | 78 | 3% | 6% |
| Rifle | 51 | 2% | 4% |
| Long Gun | 1 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,473 | 54% | |
| **Total known:** | **1,241** | | |
| **Total:** | **2,714** | | |

**Source:**
"Defensive Gun Uses in the U.S.," *The Heritage Foundation*.
Data as of October 7, 2022.
[1] Note that three incidents are coded as having more than one firearm type and thus the sum by firearm type is larger than the total number of incidents.

12.    I conducted the same analysis of the Heritage DGU Database excluding incidents that occurred in states that have restrictions on assault weapons. In particular, I excluded incidents in California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as Washington D.C.[13] In states

---

[12] This analysis is based on The Heritage Foundation's coding of these incidents. We have not independently verified the coding of these incidents.

[13] See, "Assault Weapons," *Giffords Law Center*, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-

(continued…)

4

1  without assault weapons restrictions, the Heritage DGU Database has 48 incidents

2  indicating a rifle was involved. These 48 incidents represent 2% of incidents in

3  these states and 4% of incidents with a known gun type in these states. The table

4  below shows the breakdown of incidents by coded firearm type for states that do

5  not restrict assault weapons.

**The Heritage Foundation
Defensive Gun Use Database
States Without Assault Weapon Restrictions**

| Firearm Type | Incidents[1] | % of Total | % of Known |
|---|---|---|---|
| **(1)** | **(2)** | **(3)** | **(4)** |
| Handgun | 1,033 | 41% | 90% |
| Shotgun | 63 | 3% | 6% |
| Rifle | 48 | 2% | 4% |
| Long Gun | 0 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,357 | 54% | |
| **Total known:** | **1,142** | | |
| **Total:** | **2,499** | | |

**Source:**
"Defensive Gun Uses in the U.S.," *The Heritage Foundation.*
Data as of October 7, 2022. Excludes the following states with
assault weapon restrictions: California, Connecticut, Hawaii,
Maryland, Massachusetts, New Jersey, and New York
as well as Washington D.C. Classification from Giffords Law
Center. Incidents in Delaware not excluded as restrictions
were enacted in June 2022.

[1] Note that three incidents are coded as having more than one
firearm type and thus the sum by firearm type is larger than
the total number of incidents.

weapons/. Delaware is not excluded since restrictions in Delaware were enacted in

June 2022.  See, "Governor Carney Signs Package of Gun Safety Legislation,"

*Delaware.gov,* June 30, 2022, https://news.delaware.gov/2022/06/30/governor-

carney-signs-package-of-gun-safety-legislation/.

Supplemental Declaration of Lucy P. Allen (3:19-cv-01537-BEN-JLB)

1   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

2   the United States of America that the foregoing is true and correct.

3        Executed on October 13, 2022, at New York, New York.

4

5

6   _____

7                Lucy P. Allen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Supplemental Declaration of Lucy P. Allen (3:19-cv-01537-BEN-JLB)

# EXHIBIT A



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# LUCY P. ALLEN
# MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present          **National Economic Research Associates, Inc.**
Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993          **Council of Economic Advisers, Executive Office of the President**
Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

1986-1988          **Ayers, Whitmore & Company (General Management Consultants)**
1983-1984          Senior Associate. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.

1

Lucy P. Allen

Marketing plan to increase international market share for major accounting firm.

| | |
|---|---|
| Summer 1985 | **WNET/Channel Thirteen, Strategic Planning Department**<br><u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support. |
| 1981-1983 | **Arthur Andersen & Company**<br><u>Consultant</u>.    Designed,  programmed  and  installed  management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company. |

**Teaching**

| | |
|---|---|
| 1989- 1992 | <u>**Teaching Fellow,**</u> **Yale University**<br>Honors Econometrics<br>Intermediate Microeconomics<br>Competitive Strategies<br>Probability and Game Theory<br>Marketing Strategy<br>Economic Analysis |

**Publications**

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

 "Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

2

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

4

Lucy P. Allen

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.*, 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC*, 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation*, 2019.

Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

Deposition Testimony before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc.*, 2018.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America et al.*, 2018.

5

Lucy P. Allen

Deposition Testimony before the District Court for the State of Nevada in *Dan Schmidt v. Liberator Medical Holdings, Inc., et al.*, 2018.

Deposition Testimony before the United States District Court, Northern District of Illinois, Eastern Division, in *In re the Allstate Corporation Securities Litigation,* 2018.

Deposition Testimony before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. Xavier Becerra et al.*, 2018.

Testimony before the American Arbitration Association in *Arctic Glacier U.S.A, Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Marvin Pearlstein v. Blackberry Limited et al.*, 2018.

Deposition Testimony before the United States District Court, Eastern District of Texas, in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Deposition Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2018.

Testimony and Deposition Testimony before the United States District Court, District of New Jersey, in *Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Gurbir Grewal et al.,* 2018.

Deposition Testimony before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Deposition Testimony before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

6

**EXHIBIT 10**

1   Rob Bonta
    Attorney General of California
2   P. Patty Li
    Supervising Deputy Attorney General
3   Anna Ferrari
    Deputy Attorney General
4   John D. Echeverria
    Deputy Attorney General
5   State Bar No. 268843
    455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
    Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
    E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and*
   *Blake Graham, in their official capacities*

9

10         IN THE UNITED STATES DISTRICT COURT

11        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12               CIVIL DIVISION

13

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **DECLARATION OF RYAN BUSSE** |
| **v.** | Courtroom:    5A<br>Judge:       Hon. Roger T. Benitez |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Action Filed:  August 15, 2019 |
| Defendants. | |

## DECLARATION OF RYAN BUSSE

I, Ryan Busse, declare under penalty of perjury that the following is true and correct:

1.      I am a former senior executive in the firearms industry and the author of *Gunfight:  My Battle Against the Industry that Radicalized America* (New York: PublicAffairs, 2021).  I make this declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of August 29, 2022.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.      I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $150 per hour.

### BACKGROUND AND QUALIFICATIONS

4.      I was raised with firearms as an integral part of my life.  I began shooting with various guns as a young boy and continued to regularly use and study guns throughout my life (I am now 52).  After graduating college, I entered the firearms industry in 1992.  I became a sales executive in the firearms industry in 1995, and I spent more than 25 years in this role.  While in the industry, I developed innovative sales teams, maintained relationships with the largest national retailers, and was responsible for worldwide sales of millions of firearms.  I built a dealer-direct sales network that included more than 2500 firearms dealers including locations in all 50 states, and I regularly visited these dealers.  In my job, I also studied and built sales programs that relied on understanding the technical nature of most firearms available in the U.S. market, including AR-platform and other types of rifles.  During my career I played an integral role in building one of the largest firearms companies in the United States, Kimber, and I was nominated by shooting industry leadership many times for the SHOT Business "Shooting Industry Person

1  of the Year" Award.[1]  I served in an executive sales capacity as Vice President of
2  Sales until August 2020.  While in the industry I served as an advisor to the United
3  States Senate Sportsmen's Caucus, and as the board chairman for Backcountry
4  Hunters & Anglers, a national wildlife conservation and hunting organization.

5       5.     I left the firearms industry because I was concerned about what I
6  believed to be irresponsible and dangerous marketing and sales practices.  Since I
7  left, I have served as an advisor to the 2020 Biden presidential campaign, I have
8  testified twice before the U.S. Congress about the firearms industry and gun policy
9  (before the House Committee on Oversight and Reform[2] and the Joint Economic
10  Committee[3], respectively), I have been called to testify in closed-door briefings at
11  the U.S. Senate, and I currently serve as a Senior Advisor to Giffords.  I remain a
12  proud and active gun owner, outdoorsman, and advocate for responsible gun
13  ownership.

14                 **OPINIONS**

15       6.     I have reviewed the statutory definitions of an "assault weapon," as
16  defined under California's Assault Weapons Control Act (AWCA) in California
17  Penal Code section 30515(a).[4]  According to those definitions, certain firearms may
18  qualify as an "assault weapon" if they have certain accessories attached to them or
19  if they are configured in certain ways.

20       7.     Under Penal Code section 30515(a), a semiautomatic centerfire rifle
21  that does not have a fixed magazine qualifies as an assault weapon if it has any of
22  the following features:  (1) a pistol grip that protrudes conspicuously beneath the

---

[1] SHOT Business is a trade publication of the shooting and firearms industry, and "Person of the Year" was the highest award given to an individual in the firearms industry.

[2] See https://bit.ly/3CVDQc4.

[3] See https://bit.ly/3My2gLJ. .

[4] See Cal. Penal Code § 30515, https://bit.ly/3CtxfEj.

1   action of the weapon; (2) a thumbhole stock; (3) a folding or telescoping stock; (4)

2   a grenade or flare launcher; (5) a flash suppressor; or (6) a forward pistol grip.[5]  A

3   semiautomatic centerfire rifle also qualifies as an assault weapon if it is equipped

4   with a fixed magazine with the capacity to hold more than 10 rounds or has an

5   overall length of less than 30 inches.[6]

6       8.      Under Penal Code section 30515(a), a semiautomatic pistol that does

7   not have a fixed magazine qualifies as an assault weapon if it has (1) a threaded

8   barrel (capable of accepting a flash suppressor, forward handgrip, or silencer; (2) a

9   second handgrip; (3) a barrel shroud that insulates the non-shooting hand from heat

10  during firing; or (4) the ability to accept a detachable magazine at any location

11  other than the pistol grip.[7]  A semiautomatic pistol can also qualify as an assault

12  weapon if it has a fixed magazine capable of holding more than 10 rounds.[8]

13      9.      Finally, a shotgun qualifies as an assault weapon if it is semiautomatic

14  and has both a folding or telescoping stock and a pistol grip beneath the action, a

15  thumbhole stock, or a vertical handgrip.[9]  A shotgun can also qualify as an assault

16  weapon if it (1) is semiautomatic and lacks a fixed magazine, or (2) has a revolving

17  cylinder that mechanically rotates after each shot.[10]

18      10.     The AWCA also qualifies any semiautomatic centerfire firearm that is

19  not a rifle, pistol, or shotgun and does not have a fixed magazine if it has any one of

20  the following:  a pistol grip beneath the action; a thumbhole stock; a folding or

21  telescoping stock; a grenade or flare launcher; a flash suppressor; a forward pistol

22  _____

23      [5] Cal. Penal Code § 30515(a)(1)(A)-(F).

24      [6] Cal. Penal Code § 30515(a)(2)-(3).

        [7] Cal Penal Code § 30515(a)(4).

25      [8] Cal. Penal Code § 30515(a)(5).

26      [9] Cal. Penal Code § 30515(a)(6).

27      [10] Cal. Penal Code § 30515(a)(7)-(8).

28

1   grip; a threaded barrel (capable of accepting a flash suppressor, forward handgrip,

2   or silencer); a second handgrip; a barrel shroud; the capacity to accept a detachable

3   magazine at a location outside the pistol grip.[11]   A semiautomatic centerfire firearm

4   that is not a rifle, pistol, or shotgun can also qualify as an assault weapon if it has a

5   fixed magazine capable of holding more than 10 rounds or is less than 30 inches in

6   length.[12]

7        11.   Semiautomatic rifles, including AR-platform rifles, as well as

8   semiautomatic pistols and shotguns, are capable of firing one shot per each pull of

9   the trigger.  Centerfire firearms are chambered with centerfire ammunition, which

10   has the primer located in the center of the base of the cartridge case (as opposed to

11   the rim of the cartridge).  Today's modern rimfire ammunition is almost always

12   confined to small and less powerful cartridges, such as the .22LR.  Bullets fired

13   from these cartridges are small and light and move slower than almost all centerfire

14   rifle ammunition.  Rimfire chamberings are common in youth and "beginner"

15   hunting rifles because they are relatively quiet, inexpensive and low recoil.

16   Conversely, modern centerfire ammunition requires a detonation of a primer in the

17   center of the cartridge (CENTERfire) and these cartridges are generally much more

18   powerful than rimfire cartridges.  As example, the .223 which is the most common

19   AR-15 cartridge, fires bullets at more than 3000FPS (feet per second) vs a rimfire

20   cartridge that propels bullets at around 1100FPS.  This increased centerfire velocity

21   greatly increases the range and lethality of centerfire cartridges.  Most handgun

22   cartridges are also now centerfire and these cartridges generally fire bullets much

23   larger than rimfire cartridges usually at velocities of between 800 and 1500FPS.

24   Generally, centerfire weapons fire higher caliber ammunition and/or fire it at higher

25   velocities.  The AR-platform, in particular, is the civilian version of the military's

26

27       [11] Cal. Penal Code § 30515(a)(9).

28       [12] Cal. Penal Code § 30515(a)(10)-(11).

1  select-fire M-16 and M-4 rifles, which are capable of fully automatic or burst firing.

2  Based on my familiarity with the firearms industry, AR-platform rifles and similar

3  semiautomatic rifles did not begin to sell in significant numbers until the late 2000s

4  and particularly after the 2012 shooting at Sandy Hook Elementary in Newtown,

5  CT.

6      12.   The AR-platform is highly modular, enabling owners to customize

7  their rifles with a variety of interchangeable components.  Some components of a

8  firearm are integral to its operation, such as a trigger mechanism or barrel, and the

9  firearm will not function properly without them.  But as I discuss here, the

10  particular components identified in the AWCA, which qualify a weapon as an

11  "assault weapon" if it is equipped with them, are not integral to the basic operation

12  of any firearm and are not necessary to use a firearm effectively for self-defense or

13  sporting purposes, such as hunting.

14      13.   **Pistol grip that protrudes conspicuously beneath the action of the**

15  **weapon.**  Pistol grips beneath the action of a rifle or shotgun are not necessary to

16  operate those weapons as designed.  A pistol grip is a feature incorporated into

17  some firearm stocks that allows the shooter control and aim the rifle during periods

18  of rapid fire such as situations encountered during military firefights.  Alternative

19  stock designs that do not incorporate this feature are currently sold in California,

20  and prominent, widely referenced firearms authorities, such as

21  www.caligunner.com, assess those options and the function of these compliant

22  (non-pistol grip) rifles in this manner: "Everyone has a preference on what looks

23  the "best" but the top picks below are *all great functioning options*."[13]  As also

24  noted on that website, while "[s]ome people that are critical of the featureless

25  

26      [13] https://caligunner.com/california-compliant-featureless-rifle/ (emphasis
added) (last visited October 13, 2022).  A true and correct copy of this
27  caligunner.com webpage is attached as Exhibit A.

28  

5

1   option complain of the aesthetics of the available options," "the overall function of

2   the rifle is mostly maintained," and "several companies continue to innovate and

3   provide new products that look decent and perform well considering the constraints

4   of the law."[14]

5      14.   **Thumbhole stocks.**  Thumbhole stocks have a hole in the stock that

6   allows the shooter to insert their thumb and mimic the effects of a pistol grip.  A

7   thumbhole stock is not necessary to operate a shoulder weapon as designed.  A

8   thumbhole stock functions in almost identical fashion to a pistol grip and assists the

9   shooter in rifle control during periods of rapid fire.  Again, the current non-

10  thumbhole and California compliant designs are advertised and sold as functioning

11  options for proper use of AR15s and their variants.

12     15.   **Folding or telescoping stock.**  The stock of a rifle or shotgun is the

13  part a firearm that allows it to be held at the shoulder for firing.  A folding or

14  telescoping stock can be collapsed to shorten the length of the rifle (or extended to

15  extend its length).  A rifle or shotgun does not need an adjustable stock to operate

16  as designed and can be equipped with fixed-length stocks instead.  Original rifles

17  on which the current existing and newly manufactured AR-15s are based and that

18  were accepted by hundreds of thousands of military officers as their weapon of

19  choice for decades, did not incorporate a folding stock and no credible firearms

20  authority claims that those firearms did not function properly.  Further, there are

21  still non-folding stock options available today and all are sold and advertised as

22  fully functioning options for semiautomatic rifles.

23     16.   **Grenade or flare launcher.**  A grenade and flare launcher is not

24  necessary to operate a firearm as designed.  These features are used on military

25  battlefields in which mass casualties or illuminating a battlefield are desirable but

26  have no relevance to civilian self-defense use.

27

28  _____
    [14] Ex. A.

6

17.     **Flash suppressor.**  A flash suppressor is a device that is attached to the muzzle of a firearm and reduces or redirects the flash when shooting.  A flash suppressor is not necessary to operate a firearm as designed.  This feature is affixed to military rifles to disguise the origin of fire (muzzle flash) from enemy forces but it has no known relevance to civilian self-defense situations.

18.     **Forward pistol grip.**  A forward pistol grip on a rifle, pistol, or shotgun enables a shooter to stabilize the weapon with the non-trigger hand during fire, and is not necessary to operate any firearm as designed.  As evidence, most AR-15s sold today—including the best-selling rifles such as the Smith and Wesson M&P15, which is generally accepted as the best-selling AR-15 in the United States—do not incorporate a forward pistol grip, and I am not aware of any credible firearms authority that states or teaches that these rifles do not function as designed.

19.     **Fixed magazine with the capacity to accept more than 10 rounds.**  A fixed magazine capable of holding more than 10 rounds of ammunition is not necessary to operate any firearm as designed.  As explained below in connection with detachable magazines, all firearms are capable of functioning with magazines capable of holding fewer than 10 rounds, including magazines that were originally capable of holding more than 10 rounds but have been permanently modified to hold 10 rounds or less.  A fixed magazine of 10 rounds or more is generally a "work around" to avoid the regulations on detachable magazines, but the same functional realties apply to both detachable and fixed magazines.

20.     **Detachable magazines.**  Detachable magazines enable a shooter to replace an empty or depleted magazine with a fresh magazine to resume firing.  Detachable magazines may hold more than 10 rounds of ammunition, which California law defines as "large-capacity magazines." [15]  Despite the recent popularization of large capacity magazines, it is important to note that I am not

_____

[15] Cal. Penal Code § 16740.

1    aware of a single existing firearm that requires a large-capacity magazine to

2    function as designed.  By this I mean that all firearms that can accept a large-

3    capacity magazine can also accept a magazine that holds 10 or fewer rounds and

4    function precisely as intended.  This is true even of AR-platform rifles.  Although

5    many AR-platform rifles are sold with a 30 round magazine, the manufacturers all

6    offer the optional purchase of 10 round of even lower capacity magazines.  There

7    are many pistols (such at the very popular Model 1911—which was the accepted

8    sidearm of the U.S. Military for decades and is still one of the most widely sold

9    guns in the United States) that are built for magazines of eight rounds or less.

10   While larger 10-plus round magazines exist for the 1911 and other similar pistols, a

11   smaller magazine (standard seven or eight round) is considered preferable by

12   almost all consumers because the physical size/profile of the shorter magazine is

13   easier to carry, shoot and conceal.  Still today the 1911 and other similar guns

14   which are built to function with sub-10 round magazines are built by many gun

15   companies (Smith and Wesson, Ruger, Kimber, Springfield, Rock Island, Dan

16   Wesson, and many other companies build and sell these 1911 pistols) and they are

17   sold in high volumes by most retailers in the United States.  These guns are still

18   considered extremely effective self-defense firearms by many of the leading

19   firearms trainers in the country.

20        21.    **Overall length of less than 30 inches.**  A firearm does not need to be

21   less than 30 inches in length to operate as designed.  There is a long-accepted

22   history of regulating "short barreled rifles" under the National Firearms Act (NFA),

23   which was implemented due to criminal actions resulting from concealing and then

24   deploying "short barreled rifles" in acts of surprise mass murder.  Generally, there

25   are only two ways to reduce the length of an AR-15 platform firearm and those are

26   the barrel length (long-regulated by the NFA) and stock (collapsible or folding

27   designs were not yet available in 1934 when the NFA was enacted).  In other

28   words, the AWCA's regulations on collapsible and folding stocks and short barrels

8

1    are merely addressing the same and historically accepted regulation on rifle length
2    as the NFA.

3        22.    **Threaded barrel.**  A threaded barrel enables a shooter to quickly
4    attach and detach a variety of accessories to and from the barrel of a firearm.  A
5    threaded barrel that accepts a flash suppressor or a forward handgrip (which were
6    discussed above) is not necessary to operate a firearm as designed.  A threaded
7    barrel capable of accepting a silencer is also not necessary to operate a firearm as
8    designed.

9        23.    **Barrel shroud.**  A barrel shroud wraps around the barrel of a pistol,
10   enabling the shooter to grasp the barrel during firing without burning the non-
11   trigger hand.  A barrel shroud is not necessary to operate a pistol as designed.

12       24.    Based on my experience, a firearm does not need any of the devices,
13   accessories, or configurations listed in the AWCA to operate as intended, and they
14   are not necessary to use a firearm effectively for self-defense or other sporting
15   purpose, like hunting.

16

17       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the
18   laws of the United States of America that the foregoing is true and correct.
19       Executed on October 13, 2022, at Kalispell, Montana.

20

21

22   _____
23                    Ryan Busse

24

25

26

27

28

Declaration of Ryan Busse (3:19-cv-01537-BEN-JLB)

# EXHIBIT A





# 2021 Featureless AR-15 Rifles: All You Need to Know!

In CA Law (https://CaliGunner.com/category/ca-law/),
Firearms (https://CaliGunner.com/category/ca-law/firearms/),
Guide (https://CaliGunner.com/category/guide/) by Jim  /

().

# <u>What is a Featureless Rifle?</u>

A Featureless Rifle is the term used to describe a semi-automatic rifle that **does not** have any of the following:

1. A pistol grip that protrudes conspicuously beneath the action of the weapon

2. A thumbhole stock

3. A folding or telescoping stock

4. A grenade launcher or flare launcher

5. A flash suppressor

6. A forward pistol grip

# <u>What do Rifles with Features Look Like?</u>

**The figure below labels the <u>features</u> a normal AR-15 has that gun owners in free states typically have (minus the grenade launcher).**



*Disclaimer: I'm not a lawyer, this is meant to be helpful information not legal advice.*

So even if you have JUST ONE of these features on your semi-automatic centerfire rifle you own what California considers to be an "assault weapon" unless your magazine is fixed. The only way for Californians to possess these features legally on a semi-automatic centerfire rifle is to either have A) the weapon registered as an "assault weapon" or B) have a fixed magazine which we will discuss later.

Case 3:19-cv-01537-BEN-JLB   Document 137-2   Filed 10/13/22   PageID.11249   Page 15 of 40

# Can I Still Register My Rifle as an Assault Weapon?

Nope. The option to register a rifle as an "assault weapon" in California only applied to guns that were built or bought before 2017, **you then had until July 1 2018 to register** with the DOJ (https://cfars.doj.ca.gov/login.do)**.** So again, if you are new to the AR game you have the choice of either fixing the magazine with some type of magazine lock or going featureless.

# How do I know if My Rifle is Legal?

We ideally don't want to be criminals, but the state sure is making things difficult. Nevertheless, Calguns.net constructed an informative flowchart to help gun owners determine if their rifle is legal. Start at the top left of the chart and answer the questions accordingly.



Here are some definitions to help understand the chart as defined by 11 CCR § 5469:

The following definitions apply to terms used in the identification of assault weapons pursuant to Penal Code section 30515:

- (a) "**Detachable magazine**" means any ammunition feeding device that can be removed readily from the firearm with neither disassembly of the firearm action nor use of a tool being required. A bullet or ammunition cartridge is considered a tool. Ammunition feeding device includes any

belted or linked ammunition, but does not include clips, en bloc clips, or stripper clips that load cartridges into the magazine.

- (b) "**Flash suppressor**" means any device designed, intended, or that functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.
- (c) "**Forward pistol grip**" means a grip that allows for a pistol style grasp forward of the trigger.
- (d) "**Pistol grip that protrudes conspicuously beneath the action of the weapon**" means a grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing.
- (e) "**Thumbhole stock**" means a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing.

# <u>Legal Barrel and Overall Rifle Lengths</u>

California requires the following minimum lengths for your rifle:

- **16″ minimum barrel length**, pinned and welded muzzle devices count for length (meaning you could have a 14.5″ barrel as long as you have a permanently attached muzzle device making the overall like 16″ or more)
- **30″ minimum overall length for centerfire-semi-automatics** (such as AR-15's chambered in .223/5.56 NATO), measured with stock in the shorted position the rifle can still fire in

- **26" for rimfires and non-semi center fires**; measured with stock in the shorted position the rifle can still fire in

So this is helpful, but maybe you want it spelled out a little more, I got it. Let's keep going.

To have a featureless rifle you must, well, remove the features! Let's address each item and discuss the options.

# Featureless Grip and Stock Options

If you have become accustomed to shooting an AR-15 with features in the past, **the grip and stock configuration will be the most drastic change when moving to a featureless rifle**. With that said,  after you spend plenty of time on the range you will eventually adapt. Everyone has a preference on what looks the "best" but the top picks below are all great functioning options.

**The Thordsen FRS Stock** (//brownells.7eer.net/c/1200207/60594/1625? u=https%3A%2F%2Fwww.brownells.com%2Frifle-parts%2Fstock-parts%2Fbuttstocks%2Far-15-frs-15-stock-assy-quick-detach-carbine-length-prod87747.aspx) is an incredibly popular choice for many California shooters. What you are essentially getting with a Thordsen is a conventional rifle stock for your AR-15. The main advantage over most other featureless options is

ergonomics. It allows for a much more natural feel since your thumb can wrap around the grip of the firearm which provides more comfort and a sense of control.



([//brownells.7eer.net/c/1200207/60594/1625?u=https%3A%2F%2Fwww.brownells.com%2Frifle-parts%2Fstock-parts%2Fbuttstocks%2Far-15-frs-15-stock-assy-quick-detach-carbine-length-prod87747.aspx)](//brownells.7eer.net/c/1200207/60594/1625?u=https%3A%2F%2Fwww.brownells.com%2Frifle-parts%2Fstock-parts%2Fbuttstocks%2Far-15-frs-15-stock-assy-quick-detach-carbine-length-prod87747.aspx)

**The Hera CQR CA Compliant Stock** (https://amzn.to/2OWuscA) is another option that many feel is more aesthetic then the Thordsen, of course this is subjective. There is a non-compliant version with a thumbhole so be sure to buy the compliant version as shown below. One thing I really like is that it has spacers available to adjust the length of pull.



(https://amzn.to/2OWuscA)

HERA CQR CALIFORNIA COMPLIANT STOCK
(HTTPS://AMZN.TO/2OWUSCA)

Another option is to use a fin grip (http://brownells.dts2xn.net/Q5dQY) like the one below. They are a cheap option that appears to appease the powers that be in Sacramento. Once installed, your thumb cannot wrap around the grip making it good to go.



[(brownells.dts2xn.net/Q5dQY)](http://brownells.dts2xn.net/Q5dQY)

AR-15 MONSTERMAN GRIP (HTTP://BROWNELLS.DTS2XN.NET/Q5DQY)

Using a "fin grip" and fixed stock is the cheapest way to convert your AR-15 into a featureless rifle (with compliant muzzle device of course).



CALIFORNIA COMPLIANT FEATURELESS AR-15 WITH MONSTERMAN GRIP

 If you do go with fin grip option, be sure to select a non-folding or non-telescoping stock. Many people will take an adjustable stock and permanently pin it while others prefer to just buy a fixed stock like the ones below.



(https://brownells.7eer.net/c/1200207/60594/1625?
u=https%3A%2F%2Fwww.brownells.com%2Frifle-

parts%2F stock-
parts%2Fbuttstocks%2Far-15-
moe-stock-fixed-mil-spec-
prod56792.aspx)

MAGPUL FIXED STOCK – SEE THE LATEST PRICE AT
BROWNELLS
(HTTPS://BROWNELLS.7EER.NET/C/1200207/60594/1625?
U=HTTPS%3A%2F%2FWWW.BROWNELLS.COM%2FRIFLE-
PARTS%2FSTOCK-PARTS%2FBUTTSTOCKS%2FAR-15-
MOE-STOCK-FIXED-MIL-SPEC-PROD56792.ASPX)



(//brownells.7eer.net/c/1200207/60594/1625?
u=https%3A%2F%2Fwww.brownells.com%2Frifle-
parts%2Fstock-
parts%2Fbuttstocks%2Far-15-
sabertube-stock-fixed-mil-spec-
prod79482.aspx)

AR-15 SABERTUBE STOCK
(HTTPS://BROWNELLS.7EER.NET/EB99R)



(https://brownells.7eer.net/eb99r)

DOUBLESTAR ACE ULTRALITE STOCK, CHECK PRICE AT
BROWNELLS (HTTPS://BROWNELLS.7EER.NET/EB99R)

# See all AR-15 Fixed Stocks (https://brownells.dts2xn.net/5V03

# Top Compliant Muzzle Brakes



Flash suppressor means any device designed, intended, or that functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision. On the other hand a "muzzle brake", also know as a compensator, is a device connected to the muzzle of a firearm that redirects propellant gases to counter recoil and unwanted rising of the barrel during rapid fire.

For this reason, muzzle brakes are a popular choice for gun owners even where flash hiders are permissible. Some of my favorite muzzle brakes include:



(http://brownells.7eer.net/c/1200207/60594/1625?u=https%3A%2F%2Fwww.brownells.com%2Frifle-parts%2Fmuzzle-devices%2Fcompensators-amp-muzzle-brakes%2Far-15-gamma-556-ex-muzzle-brake-5-56-prod105087.aspx)

GAMMA VG6 – SEE MORE DETAILS (HTTP://BROWNELLS.7EER.NET/C/1200207/60594/1625?U=HTTPS%3A%2F%2FWWW.BROWNELLS.COM%2FRIFLE-PARTS%2FMUZZLE-DEVICES%2FCOMPENSATORS-AMP-MUZZLE-BRAKES%2FAR-15-GAMMA-556-EX-MUZZLE-BRAKE-5-56-PROD105087.ASPX)



[(https://www.brownells.com/rifle-parts/muzzle-devices/compensators-amp-muzzle-brakes/miculek-compensator-22-caliber-1-2-28-steel-black-sku231000038-5573-12990.aspx?rrec=true)](https://www.brownells.com/rifle-parts/muzzle-devices/compensators-amp-muzzle-brakes/miculek-compensator-22-caliber-1-2-28-steel-black-sku231000038-5573-12990.aspx?rrec=true)

MICULEK COMPENSATOR – SEE MORE DETAILS (HTTPS://WWW.BROWNELLS.COM/RIFLE-PARTS/MUZZLE-DEVICES/COMPENSATORS-AMP-MUZZLE-BRAKES/MICULEK-COMPENSATOR-22-CALIBER-1-2-28-STEEL-BLACK-SKU231000038-5573-12990.ASPX?RREC=TRUE)

# See all Muzzle Brakes (https://brownells.dts2xn.net/LQdC

# Is Going Featureless the Only Way to Be Compliant?

No! There is another option that allows you to keep your features (pistol grip, folding/telescoping stock, forward grip and flash suppressor) while still being completely legal. This is the fixed or magazine lock option.

# Fixed or Locked Magazine Option

This option allows the use of features on your AR-15 by fixing or locking the **10 round magazine (or less)** in your rifle while the lower is attached to the upper receiver. This is often done with a device like the Juggernaut Tactical Hellfighter Kit available at Brownells. (https://brownells.7eer.net/c/1200207/60594/1625? u=https%3A%2F%2Fwww.brownells.com%2Frifle-parts%2Freceiver- parts%2Ftakedown-parts%2Fpins%2Far-15-hellfighter-california-compliant- mod-kit-black-prod117045.aspx) With a device like this you can use all the "evil features" described at the beginning of the article and still be legal. This is a great option for those that can't get over the looks of a featureless rifle.

See latest Price on Spotting Scopes (https://amzn.to/3jotQv9)



(https://amzn.to/3jotQv9)

**Important Note**: As mentioned above, the fixed or locked magazine option requires a 10 round magazine (or less). The magazine laws in California have been in flux (https://CaliGunner.com/high-capacity-magazines/) allowing opportunities for CA citizen to legally purchase standard capacity magazines (also improperly known as "large capacity magazines"). **Fixing a legally acquired 30 round magazine to your rifle with features is illegal, don't do it.**

However, using legally acquired 30 round magazines in your featureless rifle is allowed. With that said, you still might get hassled for doing so, the choice is yours.



(https://brownells.7eer.net/c/1200207/60594/1625?u=https%3A%2F%2Fwww.brownells.com%2Frifle-parts%2Freceiver-parts%2Ftakedown-parts%2Fpins%2Far-15-hellfighter-california-compliant-mod-kit-black-prod117045.aspx)

Below is a demonstration on the use of a Juggernaut Tactical AR-15 Hellfighter California-Compliant Mod Kit (https://brownells.7eer.net/c/1200207/60594/1625?u=https%3A%2F%2Fwww.brownells.com%2Frifle-parts%2Freceiver-parts%2Ftakedown-parts%2Fpins%2Far-15-hellfighter-california-compliant-mod-kit-black-prod117045.aspx).

# See also [The Complete Guide to the Hellfighter Mod Kit (https://CaliGunner.com/juggernaut-tactical-hellfighter-complete-guide/)](https://CaliGunner.com/juggernaut-tactical-hellfighter-complete-guide/)

# DIY AR-15 Fixed Magazine

There is a way to inexpensively fix a ten round magazine in your AR-15 allowing you to keep your features. This configuration requires a loader like the [BF-10 seen here (https://CaliGunner.com/bear-flag-defense-bf-10-loader-review/)](https://CaliGunner.com/bear-flag-defense-bf-10-loader-review/). For the fixed install you will need the following tools:

- <u>Drill (https://amzn.to/2yRGQXL)</u>

- <u>6-32 Drill and Tap Set (https://amzn.to/2KjSH6g)</u>

- <u>3/8" Set Screw (https://amzn.to/2Kx6sL1)</u>

**Step 1**: Remove bolt catch and magazine catch from your lower receiver (<u>for lower receiver assembly/disassembly check my article here (https://CaliGunner.com/ar-15-lower-receiver-assembly/)</u>).

**Step 2**: Drill hole for 6-32 tap through the top of your receiver at the end of the bolt catch groove like shown below.



**Step 3**: Thread hole with 6-32 tap.

**Step 4**: Reinstall magazine catch then install your 10 round magazine you want to fix in place.

**Step 5**: Thread 6-32 set screw (3/8″ long) into hole so that it is tight against the magazine catch.

**Step 6**: Reinstall bolt catch. That's it!

Just make sure you have the set screw tight so that the magazine won't release even with lots of force. The nice thing about this option is that it is easily removable if traveling to other states. Again for this option, you will want a

loader like the BF-10 (https://CaliGunner.com/bear-flag-defense-bf-10-loader-review/).

# Helpful Additions to Featureless Rifles

Several of the grip and stock options above keep the thumb of your trigger hand in an unusual position and can make it more difficult to select the safety. There two items I recommend to address these issues. The first is a thumb rest made by Juggernaut Tactical. It replaces the rear takedown pin and provides a comfortable position to rest your thumb.



(https://jtactical.com/products/59)

JT THUMB REST
(HTTPS://JTACTICAL.COM/PRODUCTS/59)

The second item we recommend is an ambidextrous safety. If you're right-handed using a featureless rifle your trigger hand will not be able to select the safety; you'll have to use the opposite hand. Once you install an ambidextrous-safety you can easily select the safety with your trigger hand.



(https://www.brownells.com/rifle-parts/safety-parts/safeties/semi-auto-ambidextrous-safety-sku231015012-5591-13010.aspx?rrec=true)

DPMS – AR-15 AMBIDEXTROUS SAFETY (HTTPS://WWW.BROWNELLS.COM/RIFLE-PARTS/SAFETY-PARTS/SAFETIES/SEMI-AUTO-AMBIDEXTROUS-SAFETY-SKU231015012-5591-13010.ASPX?RREC=TRUE)

# <u>Advantages and Disadvantages of Going Featureless</u>

From a practical perspective, the featureless rifle remains completely usable in the sense that you can reload the rifle in a conventional and timely manner without the need of any tools or disassembly of the lower receiver from the

upper receiver. From this perspective using a featureless rifle is a better option for self-defense.

Some people that are critical of the featureless option complain of the aesthetics of the available options. While that may be true for some, the overall function of the rifle is mostly maintained. Another possible downside of the featureless set up is that the authorities could eventually change the laws once more forcing law-abiding citizens to adapt again and again.

# Conclusion

For the time being, going featureless seems to be the best legal configuration when keeping the functionality of the rifle in mind. We are already seeing several companies continue to innovate and provide new products that look decent and perform well considering the constraints of the law.

If you found this article helpful, please consider subscribing!

**Email**

Subscribe

Caligunner Copyright © 2020.

All Rights Reserved. Caligunner.com (http://Caligunner.com) is a participant in the Amazon Services LLC Associates Program, an affiliate advertising program

designed to provide a means for sites to earn advertising fees by advertising and linking to amazon.com (http://amazon.com).

DEALS



(//brownells.7eer.net/c/1200207/526950/1625)

# Free Shipping on $75. Use code XAB (//brownells.7eer.net/c/1200207/5

🔍 Search

---

**RECENT POSTS**

---

Complete Guide to Spotting Scopes (https://CaliGunner.com/complete-guide-to-spotting-scopes/)

300 AAC Blackout (https://CaliGunner.com/300-aac-blackout/)

AK-47 vs AR-15 Comparison Guide (https://CaliGunner.com/ak-47-vs-ar-15-comparison-guide/)

Concealed vs Open Carry (https://CaliGunner.com/concealed-vs-open-carry/)

Complete Guide to Buying Guns Online (https://CaliGunner.com/complete-guide-to-buying-firearms-online/)

---

**CATEGORIES**

---

Ammunition (https://CaliGunner.com/category/ca-law/ammunition/)

CA Law (https://CaliGunner.com/category/ca-law/)

Firearms (https://CaliGunner.com/category/ca-law/firearms/)

Gear (https://CaliGunner.com/category/reviews/gear/)

General Gun Information (https://CaliGunner.com/category/general-gun-information/)

Guide (https://CaliGunner.com/category/guide/)

Gunsmithing (https://CaliGunner.com/category/gunsmithing/)

Reloading (https://CaliGunner.com/category/reloading/)

Reviews (https://CaliGunner.com/category/reviews/)

Safety (https://CaliGunner.com/category/safety/)

Transportation (https://CaliGunner.com/category/ca-law/transportation/)

---

**SUBSCRIBE**

Please subscribe for new articles and CA Law updates.

Email

Subscribe

THIS SITE IS OWNED AND OPERATED BY CALIGUNNER.COM (HTTP://CALIGUNNER.COM) COPYRIGHT 2018-2020.

PRIVACY POLICY (HTTPS://CALIGUNNER.COM/PRIVACY-POLICY/)    SUBSCRIBE (HTTPS://CALIGUNNER.COM/NEWSLETTER/)
CONTACT (HTTPS://CALIGUNNER.COM/CONTACT/)

# EXHIBIT 11

1    ROB BONTA
     Attorney General of California
2    P. PATTY LI
     Supervising Deputy Attorney General
3    ANNA FERRARI
     Deputy Attorney General
4    JOHN D. ECHEVERRIA
     Deputy Attorney General
5    State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8    *Attorneys for Defendants Rob Bonta and
     Blake Graham, in their official capacities*

9                IN THE UNITED STATES DISTRICT COURT

10              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                          CIVIL DIVISION

12

13

14   **JAMES MILLER et al.,**                 3:19-cv-01537-BEN-JLB

15                          Plaintiffs,       **DECLARATION OF SAUL
                                              CORNELL**
16        **v.**
                                              Dept:        5A
17                                            Judge:       Hon. Roger T. Benitez
     **CALIFORNIA ATTORNEY**
18   **GENERAL ROB BONTA et al.,**            Action Filed:  August 15, 2019

19                          Defendants.

20

21

22

23

24

25

26

27

28

                                    1
─────────────────────────────────────────────────────────
            Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

# DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare under penalty of perjury that the following is true and correct:

1.      I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.  This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past.  My report explores these issues in some detail.  Finally, I have been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.      I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in

1

1   conferences on the topic of the Second Amendment and the history of gun

2   regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA

3   Law School, the University of Pennsylvania Law School, Columbia Law School,

4   Duke Law School, Pembroke College Oxford, Robinson College, Cambridge,

5   Leiden University, and McGill University.[1]

6          4.      My writings on the Second Amendment and gun regulation have been

7   widely cited by state and federal courts, including the majority and dissenting

8   opinions in *Bruen*.[2]  My scholarship on this topic has appeared in leading law

9   reviews and top peer-reviewed legal history journals.  I authored the chapter on the

10  right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-

11  authored the chapter in *The Cambridge History of Law in America* on the Founding

12  era and the Marshall Court, the period that includes the adoption of the Constitution

13  and the Second Amendment.[3]  Thus, my expertise not only includes the history of

14  gun regulation and the right to keep and bear arms, but also extends to American

15  legal and constitutional history broadly defined.  I have provided expert witness

16  testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No.

17  14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo.

18  D. Ct., Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v.*

19  *Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D.

20  Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-

21  cv-1348 (D. Minn.).

22

23          [1] For a full *curriculum vitae* listing relevant invited and scholarly
    presentations, *see* Exhibit 1.

24

25          [2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

26          [3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE
    U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber

27  eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the*
    *Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544

28  (Christopher Tomlins & Michael Grossberg eds., 2008).

## RETENTION AND COMPENSATION

5.     I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports; $750 per hour for depositions and court appearances; and an additional $100 per hour for travel time.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

6.     The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit, my review of the local ordinances at issue in this lawsuit, my education, expertise, and research in the field of legal history. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## SUMMARY OF OPINIONS

7.     Understanding text, history, and tradition require a sophisticated grasp of historical context.  One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment.

8.     It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights claims.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4]  Each of the new states, either by

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for*

3

statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]  No legal principle was more important to the common law than the concept of the peace.[6]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8]

9.     In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England.  Specifically, Justice Kavanaugh stated in unambiguous terms that there was a "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[9]  The dominant understanding of

---

*the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms.  The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012).  It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND*

---

4

1  the Second Amendment and its state constitutional analogues at the time of their

2  adoption in the Founding period forged an indissoluble link between the right to

3  keep and bear arms with the goal of preserving the peace.[10]

4      10.   "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined

5  with the scope they were thought to have when the people adopted them."[11]

6  Included in this right was the most basic right of all: the right of the people to

7  regulate their own internal police.  Although modern lawyers and jurists are

8  accustomed to thinking of state police power, the Founding generation viewed this

9  concept as a right, not a power.[12]  The first state constitutions clearly articulated

10 such a right — including it alongside more familiar rights such as the right to bear

11 arms.[13]  Pennsylvania's Constitution framed this estimable right succinctly: "That

_____

*Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016).

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937).  For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013).  On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S. 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[11] *Heller*, 554 U.S. at 634–35; William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008).

[12] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[13] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

1  the people of this State have the sole, exclusive and inherent right of governing and

2  regulating the internal police of the same.  Thus, if Justice Scalia's rule applies to

3  the scope of the right to bear arms, it must also apply to the scope of the right of the

4  people to regulate their internal police.  The history of gun regulation in the decades

5  after the right to bear arms was codified in both the first state constitutions and the

6  federal bill of rights underscores this important point.

7      11.   In the years following the adoption of the Second Amendment and its

8  state analogues, firearm regulation increased.  Indeed, the individual states

9  exercised their police powers to address longstanding issues and novel problems

10  created by firearms in American society.  In particular, the states regulated and

11  when appropriate prohibited categories of weapons deemed to be dangerous *or*

12  unusual.

13  **I.   THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND**

14  ***HELLER***

15      12.   The United States Supreme Court's decisions in *Heller*, *McDonald*[14]*,*

16  and *Bruen* have directed courts to look to text and history for guideposts in

17  evaluating the scope of permissible firearms regulation under the Second

18  Amendment. In another case involving historical determinations, Justice Thomas,

19  the author of the majority opinion in *Bruen*, has noted that judges must avoid

20  approaching history, text, and tradition with an "ahistorical literalism."[15] Legal texts

21  must not be read in a decontextualized fashion detached from the web of historical

22  meaning that made them comprehensible to Americans living in the past. Instead,

23  understanding the public meaning of constitutional texts requires a solid grasp of

24  the relevant historical contexts.[16]

25      [14] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

26      [15] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019)

27  (Thomas, J.) (criticizing "ahistorical literalism").

28      [16] *See* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist*

1      13.    Following the mandates set out in *Heller, McDonald* and more recently

2 in *Bruen*, history provides essential guideposts in evaluating the scope of

3 permissible regulation under the Second Amendment.[17]  Moreover, as *Bruen* makes

4 clear, history neither imposes "a regulatory straightjacket nor a regulatory blank

5 check."[18]  The Court acknowledged that when novel problems created by firearms

6 are issue the analysis must reflect this fact: "other cases implicating unprecedented

7 societal concerns or dramatic technological changes may require a more nuanced

8 approach." *Bruen* differentiates between cases in which contested regulations are

9 responses to long standing problems and situations in which modern regulations

10 address novel problems with no clear historical analogues from the Founding era or

11 the era of the Fourteenth Amendment.

12      14.    In the years between *Heller* and *Bruen*, historical scholarship has

13 expanded our understanding of the history of arms regulation in the Anglo-

14 American legal tradition, but much more work needs to be done to fill out this

15 picture.[19]  Indeed, such research is still ongoing: new materials continue to emerge;

16 and in the months since *Bruen* was decided, additional evidence about the history of

17 regulation has surfaced and new scholarship interpreting it has appeared in leading

18 law reviews and other scholarly venues.[20]

19

20

21 *Translation*, 84 FORDHAM L. REV. 935 (2015).

22     [17] *Bruen*, 142 S. Ct. 2111.

23     [18] *Id.*

24     [19] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

25     [20] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of

26 History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE

27 OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

28

1      15.    Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen*

2  concurrence: "Like most rights, the right secured by the Second Amendment is

3  not unlimited.  From Blackstone through the 19th-century cases, commentators

4  and courts routinely explained that the right was not a right to keep and carry any

5  weapon whatsoever in any manner whatsoever and for whatever purpose."

6  Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point

7  toward at least two metrics:  how and why the regulations burden a law-abiding

8  citizen's right to armed self-defense."[21]

9      16.    One overarching principle regarding firearms regulation does

10  emerge from this period and it reflects not only the common law assumptions

11  familiar to the Founding generation, but it is hard-wired into the Second

12  Amendment itself.  As Justice Scalia noted in *Heller*, and Justice Thomas reiterated

13  in *Bruen*, the original Second Amendment was a result of interest balancing

14  undertaken by the people themselves in framing the federal Constitution and the

15  Bill of Rights.  Thus, from its outset the Second Amendment recognizes both the

16  right to keep and bear arms and the right of the people to regulate arms to promote

17  the goals of preserving a free state.  An exclusive focus on rights and a

18  disparagement of regulation is thus antithetical to the plain meaning of the text of

19  the Second Amendment.  Although rights and regulation are often cast as

20  antithetical in the modern gun debate, the Founding generation saw the two goals as

21  complimentary.  Comparing the language of the Constitution's first two

22  amendments and their different structures and word choice makes this point crystal

23  clear.  The First Amendment prohibits "abridging" the rights it protects.  In standard

24  American English in the Founding era, to "abridge" meant to "reduce."  Thus, the

25  First Amendment prohibits a diminishment of the rights it protects.  The Second

26  Amendment's language employs a very different term, requiring that the right to

27

28

---

[21] *Bruen*, 142 S. Ct. at 2132–33.

bear arms not be "infringed."[22]  In Founding-era American English, the word "infringement" meant to "violate" or "destroy."  In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text.  Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long such regulations did not destroy the underlying *right*.

17.    John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[23]

18.    Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[24]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[25]  Samuel Johnson's

---

[22] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation:  "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature,"  J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

[23] *Liberty,* A NEW LAW DICTIONARY (1792) *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020).

[24] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[25] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

1    *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to

2    break laws or contracts" or "to destroy; to hinder."[26]  Johnson's definition of

3    "abridge" was "to shorten" and "to diminish" or "to deprive of."[27]   And Noah

4    Webster's *An American Dictionary of the English Language* (1828) largely repeats

5    Johnson's definitions of "infringe" and "abridge."[28]

6        19.    Regulation, including robust laws, were not understood to be an

7    "infringement" of the right to bear arms, but rather the necessary foundation for the

8    proper exercise of that right as required by the concept of ordered liberty.[29]  As one

9    patriotic revolutionary era orator observed, almost a decade after the adoption of the

10   Constitution:  "True liberty consists, not in having *no government*, not in a

11   *destitution of all law*, but in our having an equal voice in the formation and

12   execution of the laws, according as they effect [*sic*] our persons and property."[30]

13   By allowing individuals to participate in politics and enact laws aimed at promoting

14   the health, safety, and well-being of the people, liberty flourished.[31]

15   ───────────────

          [26] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

16        [27] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

17        [28] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
18   (1828).

19        [29] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of
     Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally*
20   GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY,
     EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2;
21   Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001)
22   (discussing how the early modern language of rights incorporated aspects of natural
     rights and other philosophical traditions); Joseph Postell, *Regulation During the
23   American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL.
     THOUGHT 80 (2016) (examining the importance of regulation to Founding political
24   and constitutional thought).

25        [30] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on
     the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text
26   available in the Evans Early American Imprint Collection) (emphasis in original).

27        [31] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998)
     (examining neo-Roman theories of free citizens and how it impacted the

28

20.     The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty were not antithetical to one another.  The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control.  "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[32]  Rather than limit rights, regulation was the essential means of preserving rights, including self-defense.[33]  In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.  Mustering the militia required keeping track of who had weapons and included the authority to inspect

_____

development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[32] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original).  *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[33] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic.  This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

those weapons and fine individuals who failed to store them safely and keep them in good working order.[34]  The individual states also imposed loyalty oaths, disarming those who refused to take such oaths.  No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.  Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[35]

21.    In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.  As long as such laws did not destroy the right of self-defense, the individual states enjoyed broad latitude to regulate arms. [36]

## II.    FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.    Guns have been regulated from the dawn of American history.[37]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[38]

---

[34] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[35] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[36] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[37] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[38] *Id.*

1  Fortunately, a burgeoning body of scholarship has illuminated both topics,

2  deepening scholarly understanding of the relevant contexts needed to implement

3  *Bruen's* framework.[39]

4      23.    The common law that Americans inherited from England always

5  acknowledged that the right of self-defense was not unlimited but existed within a

6  well-delineated jurisprudential framework.  The entire body of the common law

7  was designed to preserve the peace.[40]  Statutory law, both in England and America

8  functioned to further secure the peace and public safety.  Given these indisputable

9  facts, the Supreme Court correctly noted, the right to keep and bear arms was never

10  understood to prevent government from enacting a broad range of regulations to

11  promote the peace and maintain public safety.[41]  To deny such an authority would

12  be to convert the Constitution into a suicide pact and not a charter of government.

13  In keeping with this principle, the Second Amendment and its state analogues were

14  understood to enhance the concept of ordered liberty, not undermine it.[42]

15      24.    *Bruen*'s methodology requires judges to distinguish between the

16  relevant history necessary to understand early American constitutional texts and a

17  series of myths about guns and regulation that were created by later generations to

18  sell novels, movies, and guns themselves.[43]  Unfortunately, many of these myths

---

21      [39] Ruben & Miller, *supra* note 19, at 1.

22      [40] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

23      [41] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

25      [42] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022).

27      [43] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[44]

25.   Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment.  A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[45]

26.   The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[46]  Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America.  These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region.  The data presented in Figure 1 is based on the pioneering research of Ohio-State historian Randolph Roth. It captures one of the essential facts necessary to understand what fears motivated

---

[44] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[45] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[46] It is important to recognize that there were profound regional differences in early America.  *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE (1988).  These differences also had important consequences for the evolution of American law.  *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

1   American gun policy in the era of the Second Amendment.  The pressing problem

2   Americans faced at the time of the Second Amendment was that citizens were

3   reluctant to purchase military style weapons which were relatively expensive and

4   had little utility in a rural society.  Americans were far better armed than their

5   British ancestors, but the guns most Americans owned and desired were those most

6   useful for life in an agrarian society: fowling pieces and light hunting muskets.[47]

7   Killing pests and hunting birds were the main concern of farmers, and their choice

8   of firearm reflected these basic facts of life.  Nobody bayoneted turkeys, and pistols

9   were of limited utility for anyone outside of a small elite group of wealthy,

10   powerful, and influential men who needed these weapons if they were forced to

11   face an opponent on the field of honor in a duel, as the tragic fate of Alexander

12   Hamilton so vividly illustrates.[48]

13         27.     Limits in Founding-era firearms technology also militated against the

14   use of guns as effective tools of interpersonal violence in this period.  Eighteenth-

15   century muzzle-loading weapons, especially muskets, took too long to load and

16   were therefore seldom used to commit crimes.  Nor was keeping guns loaded a

17   viable option because the black powder used in these weapons was not only

18   corrosive, but it attracted moisture like a sponge.  Indeed, the iconic image of rifles

19   and muskets hung over the mantle place in early American homes was not primarily

20   a function of aesthetics or the potent symbolism of the hearth, as many today

21   assume.  As historian Roth notes: "black powder's hygroscopic, it absorbs water, it

22   corrodes your barrel, you can't keep it loaded.  Why do they always show the gun

23

24         [47] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and*

25   *Eighteenth Century England and America, in* A RIGHT TO BEAR ARMS?: THE

26   CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND

        AMENDMENT (Jennifer Tucker et al. eds., 2019).

27         [48] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW

        REPUBLIC (2001).

28

over the fireplace?  Because that's the warmest, driest place in the house."[49]

Similar problems also limited the utility of muzzle-loading pistols as practical tools

for self-defense or criminal offenses.  Indeed, at the time of the Second

Amendment, over 90% of the weapons owned by Americans were long guns, not

pistols.[50]

**Figure 1**



Figure 2.3   Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

28.     As Roth's data makes clear, there was not a serious homicide problem

looming over debates about the Second Amendment.  Nor were guns the primary

weapon of choice for those with evil intent during this period.[51]  The problem the

Founding generation faced was that Americans were reluctant to purchase the type

of weapons needed to effectively arm their militias.  When the U.S. government

surveyed the state of the militia's preparedness shortly after Jefferson took office in

1800, the problem had not been solved.  Although Massachusetts boasted above

---

[49] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[50] Sweeney, *supra* note 47.

[51] HAAG, *supra* note 43.

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[52]

29.   Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities.  Gun policy in the Founding era reflected these realities, and accordingly, one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogeneous industrial society capable of producing a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation.[53]  Put another way, laws created for a society without much of a gun violence problem enacted at a time of relative gun scarcity, at least in terms of militia weapons, have limited value in illuminating the challenges Americans face today.

30.   The other aspect of gun policy that needs to be acknowledged is the active role the federal government took in encouraging the manufacturing of military arms.  The American firearms industry in its infancy was largely dependent on government contracts and subsidies.  Thus, government had a vested interest in determining what types of weapons would be produced.[54]  Government regulation of the firearms industry also included the authority to inspect the manufactures of

---

[52] Sweeney, *supra* note 47.

[53] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

[54] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

1   weapons and impose safety standards on the industry.[55]  Some states opted to tax

2   some common weapons to discourage their proliferation.[56]

3       31.    The calculus of individual self-defense changed dramatically in the

4   decades following the adoption of the Second Amendment.[57]  The early decades of

5   the nineteenth century witnessed a revolution in the production and marketing of

6   guns.[58]  The same technological changes and economic forces that made wooden

7   clocks and other consumer goods such as Currier and Ives prints common items in

8   many homes also transformed American gun culture.[59]  These same changes also

9   made handguns and a gruesome assortment of deadly knives, including the dreaded

10  Bowie knife, more common.  The culmination of this gradual evolution in both

11  firearms and ammunition technology was the development of Samuel Colt's pistols

12

13

14  [55] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . .. . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according to the provisions of the first section of the act.").

[56] 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15. ("The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation."). *See also* 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same.

[57] Cornell, *supra* note 3. at 745.

[58] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 Bus. Hist. Rev. 57 (2018).

[59] Sean Wilentz, *Society, Politics, and the Market Revolution*, in The New American History (Eric Foner ed., 1990).

1    around the time of the Mexican-American War.[60]  Economic transformation was

2    accompanied by a host of profound social changes that gave rise to America's first

3    gun violence crisis.  As cheaper, more dependable, and easily concealable handguns

4    proliferated in large numbers, Americans, particularly southerners, began sporting

5    them with alarming regularity.  The change in behavior was most noticeable in the

6    case of handguns. [61]

7         32.    The response of states to the emergence of new firearms that

8    threatened the peace was a plethora of new laws.  In sort, when faced with changes

9    in technology, consumer behavior, and faced with novel threats to public safety, the

10   individual states enacted laws to address these problems.  In every instance apart

11   from a few outlier cases in the Slave South, courts upheld such limits on the

12   unfettered exercise a right to keep and bear arms.  The primary limit identified by

13   courts in evaluating such laws was the threshold question about abridgement: did

14   the law negate the ability to act in self-defense.[62]  In keeping with the clear

15   imperative hard-wired into the Second Amendment, states singled out weapons that

16   posed a particular danger for regulation or prohibition.  Responding in this fashion

17   was entirely consistent with Founding-era conceptions of ordered liberty and the

18   Second Amendment.

19        33.    Not all guns were treated equally by the law in early America. Some

20   guns were given heightened constitutional protection and others were treated as

21   ordinary property subject to the full force of state police power authority.[63] The

22        ────────────────

23        [60] WILLIAM N. HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND (1st ed. 1996).

24        [61] Cornell, *supra* note 9, at 716.

25        [62] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell,
     *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law
26   in Context*, 125 YALE L.J. F. 121, 128 (2015).

27        [63] Saul Cornell. *History and Tradition or Fantasy and Fiction: Which
     Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49
28   HASTINGS CONST. L.Q. 145 (2022).

1  people themselves acting through their legislatures retained the fundamental right to

2  determine which dangerous weapons were exempted from the full protection of the

3  constitutional right to keep and bear arms.

4  **III.  THE POLICE POWER AND FIREARMS REGULATION**

5       34.    The 1776 Pennsylvania Constitution, the first revolutionary

6  constitution to assert a right to bear arms, preceded the assertion of this right by

7  affirming a more basic rights claim: "That the people of this State have the sole,

8  exclusive and inherent right of governing and regulating the internal police of the

9  same."[64]  The phrase "internal police" had already become common, particularly in

10  laws establishing towns and defining the scope of their legislative authority.[65]  By

11  the early nineteenth century, the term "police" was a fixture in American law.[66]

12  Thus, an 1832 American encyclopedia confidently asserted that police, "in the

13  common acceptation of the word, in the U. States and England, is applied to the

14  municipal rules, institutions and officers provided for maintaining order, cleanliness

15  &c."[67]  The Founding era's conception of a basic police right located in legislatures

16  was transmuted during the Marshall Court's era into the judicial doctrine of the

17  police power and would become a fixture in American law.

---

[64] PA. CONST. OF 1776, Ch. I, art iii.

[65] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[66] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[67] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

35.     The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[68]  The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[69]

36.     Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other  . . . ."[70]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[71]  State police power authority was at its pinnacle in

---

[68] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[69] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[70] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[71] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

matters relating to guns or gun powder.[72]  Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[73] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> [I]t shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[74]

37.    The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. The application of the police power to firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[75]  This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home.

_____

[72] CORNELL, *supra* note 33.

[73] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[74] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[75] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

38.   A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[76]

39.   Nor was Chief Justice John Marshall unique in highlighting the centrality of this idea to American law.[77]  The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety in early America.[78]  Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger*, a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power.  Shaw described the police power in the following manner:

---

[76] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864. See "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/.

[77] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[78] FREUND, *supra* note 66, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996): Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); DUBBER, *supra* note 12; GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (Princeton Univ. Press, 2015).

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise.  There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[79]

40.     In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures.  Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[80]  A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[81]

41.     No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance.  Rather, it was well understood that the exercise of this power would need to adapt to changing

---

[79] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[80] CORNELL, THE POLICE POWER, *supra* note 33.

[81] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

circumstances and new challenges as they emerged.  This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[82]  Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[83]  This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[84]

42.     One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[85]  The case is a classic example of antebellum police power jurisprudence.  The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns.  "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by

---

[82] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[83] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[84] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[85] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

1  the safety of the people and the advancement of public morals."[86]  In the court's

2  view, the regulation of arms was at the very core of state police power.[87]  The

3  judicial determination was straight forward: was the challenged law a legitimate

4  exercise of the police power or not?

5  **IV.  RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO**

6  **REGULATE FIREARMS (1863-1877)**

7        43.    Founding-era constitutions treated the right of the people to regulate

8  their internal police separately from the equally important right of the people to

9  bear arms.  These two rights were separate in the Founding era but were mutually

10  reinforcing: both rights were exercised in a manner that furthered the goal of

11  ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation

12  of the connection between these two formerly distinct rights, fusing the two

13  together as one single constitutional principle.  This change reflected two profound

14  transformations in American politics and law between 1776 and 1868.  First, the

15  judicial concept of police power gradually usurped the older notion of a police right

16  grounded in the idea of popular sovereignty.  As a result, state constitutions no

17  longer included positive affirmations of a police right.  Secondly, the constitutional

18  "mischief to be remedied" had changed as well.[88]  Constitution writers in the era of

19

20        [86] *Id.* at 616.

21        [87] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky.
     (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate
22  claims about the scope of state power to regulate arms.  For a useful discussion of
     *Bliss* in terms of the police power, *see* FREUND, *supra* note 66, at 91.

23        [88] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng.
24  Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by
     an understanding of the state of the common law prior to its enactment and the
25  mischief that the common law had failed to address and legislation had intended to
     remedy — continued to shape Anglo-American views of statutory construction, and
26  legal interpretation more generally, well into the nineteenth century.  For
     Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61.  The
27  relevance of common law modes of statutory construction to interpreting

28

1  the American Revolution feared powerful standing armies and sought to entrench

2  civilian control of the military.  By contrast, constitution writers in the era of the

3  Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart

4  Kings using their standing army to oppress American colonists.  In place of these

5  ancient fears, a new apprehension stalked Americans:  the proliferation of

6  especially dangerous weapons and the societal harms they caused.[89]

7          44.    The new language state constitutions employed to describe the right to

8  bear arms enacted during Reconstruction responded to these changed circumstances

9  by adopting a new formulation of the venerable right codified in 1776, linking the

10  right to bear arms inextricably with the states broad police power to regulate

11  conduct to promote health and public safety.[90]  For example, the 1868 Texas

12  Constitution included new language that underscored the indissoluble connection

13  that Anglo-American law had long recognized between the right to keep and bear

14  arms and regulation of guns. "Every person shall have the right to keep and bear

15  arms, in the lawful defence of himself or the government, under such regulations as

16  the Legislature may prescribe."[91]  Nor was Texas an outlier in this regard.  Sixteen

17  state constitutions adopted during this period employed similarly expansive

18

19  ―――――――――――

    antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH

20  SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S.
    Converse 1822).  For a modern scholarly discussion of the rule, *see* Samuel L.

21  Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

22      [89] *See McDonald*, 561 U.S. at 767–68

23      [90] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth
    Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War

24  America*, 55 U.C. DAVIS L. REV. 65 (2022).

25      [91] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional
    provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The

26  people have the right to bear arms for their security and defense; but the legislature
    shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6

27  ("[T]he people have the right to bear arms for their security and defense, but the
    legislature may regulate the exercise of this right by law.").

28

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

1  language.[92]  Millions of Americans living in the newly organized western states and

2  newly reconstructed states of the former confederacy adopted constitutional

3  provisions that reflected this new formulation of the right to bear arms.  Thus,

4  millions of Americans were living under constitutional regimes that acknowledged

5  that the individual states' police power authority over firearms was at its apogee

6  when regulating guns.[93]

7      45.  This expansion of regulation was entirely consistent with the

8  Fourteenth Amendment's emphasis on the protection of rights and the need to

9  regulate conduct that threatened the hard-won freedoms of recently free people of

10  the South and their Republican allies.  The goals of Reconstruction were therefore

11  intimately tied to the passage and enforcement of racially neutral gun regulations.[94]

12      46.  Reconstruction ushered in profound changes in American law, but it

13  did not fundamentally alter the antebellum legal view that a states' police powers

14  were rooted in the people's right to make laws to protect the peace and promote

15  public safety.  Nor did Reconstruction challenge the notion that these powers were

16  at their zenith when dealing with guns and gun powder.  In fact, the Republicans

17  who wrote the Fourteenth Amendment were among the most ardent champions of

18  an expansive view of state police power.  As heirs to the antebellum Whig vision of

19  a well-regulated society, Reconstruction-era Republicans used government power

20  aggressively to protect the rights of recently freed slaves and promote their vision

21  of ordered liberty.[95]

22      [92] Cornell, *supra* note 90, at 75–76.

23      [93] *Id.*

24      [94] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND
25  RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas,
   *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L.
26  REV. 2603 (2022).

27      [95] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth
   Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42
28  HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and*

47.     Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government.  The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[96]  As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good.[97]

48.     It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation.  Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[98]  Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[99]

49.     Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the

_____

*Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (20052006).

[96] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[97] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[98] *See* Spitzer, *supra* note 37, at 59–61 tbl. 1.

[99] *Id.*

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

1    determination of its limits was best left to courts on a case-by-case basis.[100]  Indeed,

2    even the most ardent critics of the police power, such as conservative legal scholar

3    Christopher G. Tiedeman, acknowledged that "police power of the State extends to

4    the protection of the lives, limbs, health, comfort and quiet of all persons, and the

5    protection of all property within the State."[101]

6        50.    In keeping with the larger goals of Reconstruction, Republicans sought

7    to protect the rights of African Americans to bear arms but were equally insistent on

8    enacting strong racially neutral regulations aimed at public safety.  Violence

9    directed against African Americans, particularly the campaign of terror orchestrated

10   white supremacist para-military groups prompted Republican dominated

11   legislatures in the Reconstruction South to pass a range of racially neutral gun

12   regulations.[102]  The racially neutral gun laws enacted by Republicans were in part a

13   reaction to the discriminatory black codes passed by neo-confederate legislatures

14   earlier in Reconstruction.  The Black Codes violated the Second Amendment, but

15   the wave of firearms legislation passed by Republican controlled state legislatures

16   in the South were consciously crafted to honor the Second Amendment and protect

17   individuals from gun violence.[103]

18

19        [100] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344
20   (2d ed., 1897).f

21        [101] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE
     POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27
22   Vt. 140, 149-50 (1854)).

23        [102] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in
     Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas,
24   *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in
     Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

25        [103] *See* Darrell A. H. Miller*, Peruta, The Home-Bound Second Amendment,
     and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J.
26   Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights:
     Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187,
27   205 (2005) (discussing Republican use of federal power to further their aims,
28   including to enforce the Fourteenth Amendment).

51.     The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns.   American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## V.   ASSAULT WEAPONS BANS, THE POLICE POWER, AND THE LATEST FACE OF TERROR

52.     Another major inflection point in the debate over firearms regulation focused on assault weapons, and was closely connected to the rise of mass shootings in the last decades of the twentieth century.[104]  California led the way with its ban on assault weapons enacted after the Stockton School Massacre in 1989.[105]  Proposals to ban assault weapons are part of a larger national movement to deal with the carnage caused by high capacity, high velocity weapons.[106]  The effort to ban such weapons parallels earlier efforts to deal with machine guns and semi-automatic weapons during the 1920s.[107]

53.     Gun rights advocates have insisted that the term "assault weapon" is an invention of gun control activists and that the term is essentially meaningless.[108]

---

[104] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al., *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020).

[105] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

[106] ROBERT SPITZER, THE POLITICS OF GUN CONTROL 14 (2012).

[107] *Supra* note 37

[108] For a good illustration of the gun rights point of view, Stephen P. Halbrook, *New York's Not So "SAFE" Act: The Second Amendment in an Alice-In-Wonderland World Where Words Have No Meaning*, 78 ALBANY L. REV. 789 (2015).

31

1   For those in the gun rights community, these "modern sporting rifles" share

2   functions and features with many other guns including some hunting rifles.[109]

3   Much of the current controversy over bans or restrictions on dangerous or unusual

4   weapons revolves around the AR-15 and similar types of weapons and

5   accessories.[110]  The debate's heavy focus on technological factors obscures the fact

6   that legislative efforts to ban these weapons fit squarely within the long Anglo-

7   American tradition of limiting public access to weapons capable of provoking

8   terror.  During America's first gun violence crisis in the Jacksonian era, states

9   targeted pistols that were easily concealed and in the New Deal era, states singled

10  out gangster weapons such as the notorious "Tommy Gun" [Thompson sub-

11  machine gun" as sufficiently dangerous or unusual to warrant extensive regulation,

12  or prohibition.  The same imperatives and constitutional logic guided both

13  regulatory regimes.[111]

14        54.     The history of the AR-15 illustrates that the earlier dynamic governing

15  firearms regulation established in the nineteenth-century continues to shape

16  American public policy and law.  Regulation of firearms follows a well-worn path.

17  Technological innovation is only part of this equation.  In addition, weapons must

18  also achieve sufficient market penetration to create a potential for criminal abuse.

19

20

21

---

22  [109] On modern marketing of firearms, *see* HAAG, *supra* note 43.  Among the most important insights of Haag's work is that breech-loading rifles introduced after the Civil War did not achieve sufficient market penetration a fact that partially accounts for the absence of any movement to limit access to these weapons which remained primarily of interest to sportsmen and the military.

25  [110] James Jacobs, *Why Ban 'Assault Weapons'?*, 37 CARDOZO L. REV. 681, 687 (2015). For a useful overview of the legal issues in regulating this class of weapons, *see* Vivian S. Chu, *Federal Assault Weapons Ban: Legal Issues Congressional Research Service*, February 14, 2013.

27  [111] Spitzer, *supra* note 37.

At this point legislatures attempt to find a means to address the problem posed by these weapons without trenching on constitutionally protected liberties.[112]

55.    The development of the AR-15 was tied to the strategic requirements of the American military to find a replacement for heavier World War II-era rifles. The military M-16 and the civilian AR-15 are closely related.  In contrast to standard issue military weapons such as the M-16, the AR-15 and other similar civilian weapons are all semi-automatic, rather than selective fire weapons capable of firing in either fully automatic or semi-automatic modes.

56.    When they were first introduced military-style AR-15 types of weapons were not especially popular.[113]  Gun makers eventually developed a more effective set of marketing strategies.[114]  When first marketed the AR-15's connection  to the military was a liability because lingering opposition to the Vietnam War slowed down early civilian interest in a weapon that was closely related to the M-16.[115]

57.    There is no doubt that many of the pragmatic and cosmetic features of AR-15 type weapons now account for their popularity among some segments of the gun-owning public. [116]  The weapons are lighter, produce less recoil, and are easier to fire than an older generation of hunting rifles.  The fact that these weapons are

---

[112] *Id.*

[113] David M. Studdert et al., *Testing the Immunity of the Firearm Industry to Tort Litigation*, 177 JAMA INTERNAL MEDICINE 102, 102-05 (2017).

[114] Joseph Blocher, *Has the Constitution Fostered a Pathological Rights Culture? The Right to Bear Arms: Gun Rights Talk*, 94 B.U. L. Rev. 813 (2014) and Joseph Blocher, *Hunting and the Second Amendment*, 91 NOTRE DAME L. REV. 133 (2015).

[115] On the insurrectionary tradition, see David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment*, 74 TUL. L. REV. 387 (1999).

[116] Rachel A. Callcut et al., *Effect Of Mass Shootings on Gun Sales-A 20-Year Perspective*, 87 J. TRAUMA ACUTE CARE SURGERY 531 (2019).

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

1  also highly customizable has increased their consumer appeal but has also rendered

2  them more lethal.  Commentators have analogized them to other consumer

3  products, describing them as an adult and hyper-masculine version of a "Barbie

4  Doll."[117]  Opponents of robust regulation of assault weapons insist that the targeted

5  weapons are neither especially dangerous nor unusual.  Moreover, gun rights

6  advocates insist that the term "assault weapons" is an invention of gun control

7  advocates and the prohibition targets cosmetic features.[118]

8       58.    Understanding the marketing strategies tying these weapons to the

9  military makes clear that efforts to regulate these weapons by using these same

10  features is hardly cosmetic.  Moreover, focusing exclusively on technology and

11  ignoring the social history of these weapons, their popularity and potential for

12  abuse, misses an important point about the history of firearms technology and

13  government regulation.  The history and tradition of arms regulation has always

14  recognized that weapons that had the ability to inspire *terrorem populi* is a

15  legitimate justification for regulation.  The perpetrator of the Sandy Hook

16  Elementary Mass Shooting used a Bushmaster AR-15-type weapon that was

17  marketed with a slogan that traded on hyper-aggressive forms of toxic masculinity:

18  "Consider Your Man Card Reissued."[119]  There is little disputing  the fact that

---

19  [117] Robert J. Spitzer, *Why Assault Rifles are Selling*, CHICAGO TRIBUNE, June
20  16, 2015.

21  [118] Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and
Second Amendment Jurisprudence*, 14 GEORGETOWN J. OF L. & PUB. POL'Y. 47
22  (2016).  For a good example of this type of flawed technological determinist
approach, *see* David B. Kopel, *Rational Basis Analysis of "Assault Weapon"
23  Prohibition*, 20 J. CONTEMP. L. 381 (1994).  For a general discussion of the
problems with technological determinism, *see* Merritt R. Smith, and Leo Marx,
24  DOES TECHNOLOGY DRIVE HISTORY? THE DILEMMA OF TECHNOLOGICAL
DETERMINISM (Cambridge, MA: MIT, 1994); Allan Dafoe, *On Technological
25  Determinism: A Typology, Scope Conditions, and a Mechanism Science*, 40 TECH.
& HUM. VALUES 1047 (2015).

26

27  [119] Alexander DeConde, GUN VIOLENCE IN AMERICA; Cornell and DeDino,
*supra* note 36.

28

despite protestations by gun rights advocates and industry executives that these weapons are merely "sporting rifles" the marketing campaigns used to sell these tells a different story.  The success of these weapons commercially was inextricably linked to marketing strategies that tied these weapons to their origins in the military.  These sales strategies deliberately evoked images of military assault capabilities.[120] The advertisement from two popular arms manufacturers pictured below are illustrative of these campaigns.[121]  Ruger explicitly employs the term "Tactical Rifle" and Sig Sauer's choice of imagery unambiguously links its weapons to images of military close quarter combat.



*(Intentionally left blank)*

---

[120] Mark Berman & Todd C. Frankel, *Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence*, WASHINGTON POST (July 27, 2022, 7:19 PM), https://www.washingtonpost.com/national-security/2022/07/27/companies-made-more-than-1b-selling-powerful-guns-civilians-report-says/.

[121] CAROLYN MALONEY, SUPPLEMENTAL MEMORANDUM: THE COMMITTEE'S INVESTIGATION INTO GUN INDUSTRY PRACTICES AND PROFITS (JUL. 27, 2022), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf.



59.     *Bruen* did not address these technology-focused arguments.  The New York law in question singled out handguns, not assault weapons.  From the perspective of text, history, and tradition, the key legal fact is that that these weapons are perceived by important segments of the public to weapons capable of provoking a terror. [122]  Even if one accepted that some of the specified features on

---

[122] Mass shootings have been rendered more deadly by the proliferation of assault weapons, *see* John Donahue III & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STANFORD LAW SCHOOL BLOGS (Oct. 15, 2019), https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/.  For the most recent assessment of the impact of assault weapons on the American gun violence problem, *see* Christopher S. Koper et. al., *Criminal Use of Assault*

1    these weapons were simply cosmetic, a point hotly contested by proponents of

2    stronger regulation, this fact does not negate the undeniable fact that these weapons

3    produce the type of terror that Anglo-American law has always recognized as a

4    threat to the peace.[123]   Firearms manufacturers created a type of weapon and

5    marketed it to distinct demographics, stressing characteristics and cultural

6    associations that tied them to war and then used these associations to effectively

7    market them.  The fact that a successful marketing strategy earned gun companies

8    over a billion dollars is a fact that contradicts the claims of gun rights advocates

9    these weapons are no different than other guns available to consumers.  If that were

10   true, then gun companies would have abandoned these marketing strategies long

11   ago and replaced them with something more effective.  It would be illogical and run

12   counter to the most basic principles of Anglo-American law to argue that people

13   themselves are powerless to regulate these weapons to mitigate the threats they

14   pose to peace and public safety.  The appeal of these weapons and their contribution

15   to gun violence are two sides of the same coin.[124]   A government's ability to

16   address the negative effects of these weapons is well within the scope of its police

17   powers, as historically understood.

18

19
20   *Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. URB. HEALTH 313 (2018).

21   [123] Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43
22   SOUTH. ILL. UNIV. L.J. 61 (2018).

23   [124] Polly Mosendz, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, BLOOMBERG (June 20, 2018, 3:00 AM),
24   https://www.bloomberg.com/news/articles/2018-06-20/why-gunmakers-would-rather-sell-ar-15s-than-handguns; John J. Donohue, *The Swerve to "Guns*
25   *Everywhere": A Legal and Empirical Evaluation*, 83 Law & Contemp. Problems 117 (2020); Christopher S. Koper, *Assessing The Potential to Reduce Deaths And*
26   *Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms*, CRIMINOLOGY & PUBLIC POLICY 147
27   (2020); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on*
28   *Public Mass Shootings,* 22 APPLIED ECON. LETTERS 281 (2014).

## VI. *Bruen*'s Framework and Modern Assault Weapons Bans

60.     The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.  At different moments in American history communities have deemed categories of weapons to be especially dangerous and have regulated them, and when it appeared necessary enacted bans on some types of weapons.  Such determinations were not made based on technological features in isolation but reflected the ancient common law tradition of singling out weapons capable of producing a terror.  Such weapons undermined the peace and the constitutional imperative embedded in the text of the Second Amendment to protect the security of a free state.  Defining exactly which category of  weapons have fallen outside of the scope of constitutional protection has shifted over time as society has addressed new developments in firearms technology, evolving societal norms, and other changes.  In short, social, and economic transformation were always accompanied by legal transformation.  Put another way, as times change, the law changes with them.[125]

61.     Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law:  "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[126]  States and localities have regulated gunpowder and arms, since the earliest days of the American Republic.  The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present.  This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.[127]  The adaptability of state

---

[125] Spitzer, *supra* note 37.

[126] *Id.*

[127] Gerstle, *supra* note 78.

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

1   and local police power provided the flexibility governments needed to deal with the

2   problems created by changes in firearms technology and gun culture.

3

4        Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the

5   laws of the United States of America that the foregoing is true and correct.

6        Executed on October 13, 2022, at Redding, Connecticut.

7

8

9   *Saul Cornell*

10  _____
    Saul Cornell

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

# EXHIBIT 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

## Prizes and Awards

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

## Book Publications

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

**"**History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"  55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 <u>Fordham Law Review</u>  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 <u>Law and Contemporary Problems</u> (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." <u>Law and History Review</u> 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in <u>Firearms and Freedom: The Second Amendment in the Twenty-First Century</u> <u>Controversies in American Constitutional Law Series</u> (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 <u>Law and Contemporary Problems</u> (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 <u>Northwestern Journal of Criminal Law</u>  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," <u>Wisconsin Law Review Forward</u>  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  <u>American</u> <u>Journal of Legal History</u> 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," <u>Yale Law Journal  Forum</u>  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" <u>Fordham Law Review *Res Gestae*</u>  84 (2015):  1-10

"The Right to Bear Arms," <u>The Oxford Handbook of the US Constitution</u>,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" <u>Constitutional Commentary</u> 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  <u>Fordham Law Review</u> 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  <u>Fordham Urban Law Journal</u> 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" <u>William & Mary  Quarterly</u> 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" <u>William & Mary Quarterly</u> 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," <u>Yale Journal of Law and the Humanities</u> 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," <u>Northwestern University Law Review</u> 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u>  56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u> 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> <u>History of  American Law</u> (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  <u>Albany Government Law  Review</u>  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u>  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u>  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," <u>Law and History Review</u>  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u> 47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," <u>Stanford Law and</u> <u>Policy Review</u> (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," <u>Fordham Law Review</u> 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> <u>History of the Early Republic</u> (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> <u>in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

### **Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

### **Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

### **<u>Presentations:</u>**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

### Interviews, Editorials, Essays, Podcasts:

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," <u>New York Daily News</u> Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved" *Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

### **Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).


**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


**Amicus Briefs:**

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]
Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]
Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]
Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]
Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court, 2010) [14th Amendment]
Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]


### **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

**EXHIBIT 12**

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
    455 Golden Gate Avenue, Suite 11000
6   San Francisco, CA  94102-7004
    Telephone:  (415) 510-3479
7   Fax:  (415) 703-1234
    E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and*
   *Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                          CIVIL DIVISION

13

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| **v.** | **SUPPLEMENTAL DECLARATION OF JOHN J. DONOHUE** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:   5A<br>Judge:        Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

---

Supplemental Declaration of John J. Donohue (3:19-cv-01537-BEN-JLB)

## SUPPLEMENTAL DECLARATION OF JOHN J. DONOHUE

I, John J. Donohue, declare under penalty of perjury that the following is true and correct:

1. I previously submitted a Declaration in Support of Defendants' Opposition to Motion for Preliminary Injunction, which was filed with this Court on January 23, 2022 ("2020 Declaration" hereinafter).[1]  I make this supplemental declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of August 29, 2022.

2. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3. I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $850 per hour.

### BACKGROUND AND QUALIFICATIONS

4. I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School.  A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

5. Since submitting my 2020 Declaration in this matter, I have provided additional testimony as an expert witness.  I filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

6. At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising out of the Sutherland Springs mass shooting that killed 26 in November 2017:

---

[1] My 2020 Declaration was marked as Defendants' Trial Exhibit E and filed in this matter at Docket Number 33-3.

1  *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.).  On

2  December 9, 2020, I submitted an expert report on behalf of the City of San

3  Francisco in a wrongful conviction lawsuit, *Caldwell v. City of San Francisco*, Case

4  No. 12-cv-1892 DMR, United States District Court, Northern District of California,

5  Oakland Division.

6        7.    I was the main author of the Brief of Amici Curiae Social Scientists

7  and Public Health Researchers in Support of Respondents, which was submitted to

8  the United States Supreme Court on September 21, 2021 in *New York State Rifle &*

9  *Pistol Association v. Bruen*, Case No. 20-843.

10        8.    On January 24, 2022, I submitted an expert declaration in *Worth v.*

11  *Harrington,* a lawsuit in the District of Minnesota (Case No. 21-cv-1348)

12  challenging how Minnesota regulates the concealed carry of firearms by individuals

13  aged 18 to 20.  I was deposed in this case on March 28, 2022.

14        9.    On May 31, 2022, I submitted an expert declaration in *Meyer v. Raoul,*

15  a lawsuit in the Southern District of Illinois (Case No. 21-cv-518-SMY)

16  challenging how Illinois regulates the concealed carry of firearms by individuals

17  aged 18 to 20.

18  **OPINIONS**

19  **I.   THE GROWING PROBLEM OF PUBLIC MASS SHOOTING IN THE UNITED**

20  **STATES**

21       10.    I have been asked by the California Department of Justice to update

22  the opinions expressed in my 2020 Declaration with currently available

23  information.  I continue to stand by the opinions and conclusions expressed in my

24  2020 Declaration.

25       11.    At the time of my 2020 Declaration, I stressed that the problem of

26  active shooter incidents, which had been on the rise, would only be getting worse if

27  significant action was not taken to address it.  Sadly, my predictions based on the

28

1  growing lethality of weaponry in the United States have been fulfilled.  As bad as
2  the active shooter problem looked in 2018, it is considerably worse today, as seen
3  in the same FBI active shooter data now extended through 2021 in Figure 1.  While
4  2017 was the peak of active shooter incidents at 30 up until that point, last year the
5  number more than doubled to 61.

Figure 1



12.    The ominous and steep upward trend in the FBI data charting the
growth in active shooter incidents is unmistakable.  Not surprisingly, the number of
mass shootings clearly is higher following the termination of the federal assault
weapons ban in 2004.  In that year, the FBI counted 4 active shooter incidents in
which 14 died.  Since then, the mayhem has accelerated so much that in 2021 the
FBI counted 61 active shooter incidents killing 103.[2]

_____

[2]  FBI, "Active Shooter Incidents in the United States in 2021,"
https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-

13.     Since my 2020 Declaration, the United States has experienced numerous, devastating mass shootings, including [list "notable" shootings] the March 22, 2021 shooting at King Soopers supermarket in Boulder, Colorado (10 killed); the May 26, 2021 shooting in San Jose, California (9 killed); the May 14, 2022 shooting in Buffalo, New York (10 killed); the May 24, 2022 shooting at Robb Elementary in Uvalde, Texas (19 children and 2 adults killed); and the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed). These figures do not reflect the countless people injured, both physically and emotionally, and the devastation inflicted on the communities in which they occurred.

14.     Tellingly, the recent 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter—a Bushmaster XM-15 semiautomatic rifle—had written, "I am well aware that my actions will effectively ruin my life.  If I'm not killed during the attack, I will go to prison for an inevitable life sentence." [3]

15.     Both the February 2018 mass killing at Parkland High School and the May 2022 mass killing in Uvalde, Texas – where police delayed entering the school during a shooting – vividly underscored how police responses to violence are impaired when the officers are confronted by a shooter armed with an assault rifle.

16.     Decades of research has shown that there is a considerable variation in the survivability of assault depending on the instrumentality employed.  A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of

052422.pdf/view.

[3] Ashley Parker, Tyler Pager, and Colby Itkowitz, "From Sandy Hook to Buffalo and Uvalde: Ten years of failure on gun control," *Washington Post*, May 22, 2022; Jesse McKinley, Jonah E. Bromwich, Andy Newman and Chelsia Rose Marcius, "Buffalo Suspect Planned Attack for Months, Online Posts Reveal," *The New York Times*, May 16, 2022; Craig Whitlock, David Willman, and Alex Horton, "Massacre Suspect Said He Modified Bushmaster Rifle to Hold More Ammunition," *Washington Post*, May 15, 2022.

1    gun assaults had a large random element, and that the power of the firearm was one
2    systematic factor influencing the likelihood that an individual with a gunshot injury
3    would survive."[4]

4        17.    A meticulous study by Anthony Braga and Phil Cook in 2018, which I
5    discussed in my 2020 Declaration, has powerfully confirmed this instrumentality
6    effect.  Braga and Cook examined the files of 511 gunshot victims kept by the
7    Boston Police Department and found that survivability from gunshot wounds varied
8    considerably based on attributes of the weapon and ammunition that generated the
9    wound.  Specifically, the death rate from handgun assault injuries increased
10   substantially as the caliber of the firearm increased—even though the caliber was
11   not correlated with observable indicators of the intent and determination to kill by
12   the shooter.  The shooter's use of a medium caliber handgun (.38, .380, and 9 mm)
13   more than doubled the odds that the wounded victim would die compared to small
14   caliber handguns (.22, .25, and .32).  Large caliber handguns (.357 magnum, or
15   greater) more than doubled the odds of death compared to medium caliber
16   handguns.

17       18.    The authors conclude that:

18       The results here support the view that the intrinsic power and lethality of
19   the weapon had a direct effect on the likelihood that a victim of a
     criminal shooting died.  For Boston, in the period studied here, simply
20   replacing larger-caliber guns with small-caliber guns with no change in
     location or number of wounds would have reduced the gun homicide rate
21   by 39.5 percent.  It is plausible that larger reductions would be associated
     with replacing all types of guns with knives or clubs (p.8, Braga and
22   Cook 2018).[5]

23

24       [4] The description of the Zimring study comes from Braga and Cook (2018),
25   infra, note 5.

26       [5] Anthony A. Braga and Philip J. Cook, "The Association of Firearm Caliber
27   with Likelihood of Death from Gunshot Injury in Criminal Assaults," *JAMA Network Open*. 2018; 1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833,
28   https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536.

Supplemental Declaration of John J. Donohue (3:19-cv-01537-BEN-JLB)

19.     Of course, the conclusion of the Braga and Cook study—that switching to less deadly firearm options could reduce firearm deaths—applies directly to bans on assault weapons and high-capacity magazines.  The greater the lethality of the weapon, the more killed and injured in active shooter incidents. This was clearly illustrated in a study for the *Journal of the American Medical Association* that examined deaths and injuries documented in the FBI Active Shooter Database from 2000-2017.[6]  The authors found that deaths and injuries were substantially higher for the 61 active shooter incidents using a semiautomatic rifle versus the 187 episodes using some other firearm.  Specifically, in the incidents in which the shooter employed a semi-automatic rifle the average number killed or wounded was 9.72 versus only 5.47 killed or wounded when other firearms were used.  (Note that the authors excluded the horrific Las Vegas shooting from the numbers above, since that case was so extreme, with 60 killed and almost 500 wounded—all with semi-automatic rifles.)

20.     This instrumentality effect was further demonstrated in an article I authored with Phil Cook since my 2020 Declaration, demonstrating that the federal assault weapons ban—which banned both new semi-automatic assault rifles with certain features that made them attractive to mass shooters *and* new ammunition magazines that could hold more than ten rounds—suppressed deaths in public mass shootings.[7]  Figure 2 below shows that the deaths that occurred from these public mass shootings over the period from 1985-2019 in five year increments.  The Figure highlights that by the second half of the ten-year existence of the federal assault weapons ban (1999-2004), fatalities from public mass shootings using

---

[6] Elzerie de Jager, et al., "Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States," *JAMA*. 2018;320(10):1034-1035. doi:10.1001/jama.2018.11009, https://jamanetwork.com/journals/jama/fullarticle/2702134.

[7] Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," *JAMA*. 2022; 328(12):1191-1192, https://jamanetwork.com/journals/jama/fullarticle/2796675.

1  banned weaponry had virtually been cut in half (falling from 30 down to 16).

2  Conversely, there was no decline in public mass shooting deaths over this period

3  with non-banned weaponry.

4      21.    After the federal ban lapsed in 2004, the deaths from public mass

5  shootings using the previously banned weaponry rose sharply:  rising from 16 in the

6  last five years of the federal ban to 271 in the five-year span from 2015-2019—with

7  the latter figure 17 times as high as the former.  Meanwhile, there was relatively

8  little movement in public mass shooting deaths using the less-lethal weaponry

9  (neither an assault weapon nor a high-capacity magazine).  Indeed, as the Figure 2

10  illustrates, there was roughly the same number of deaths from less lethal weaponry

11  in the five-years prior to the federal assault weapons ban (1990-1994) as there was

12  from 2015-2019—specifically 83 in the pre-ban period and 81 in the final period.

13      22.    Figure 2 also highlights that while there was a roughly comparable

14  number of incidents of public mass shootings that used either the most lethal

15  (previously federally banned) weaponry or less lethal firearms not subject to the

16  federal ban, the incidents involving assault weapons and/or high-capacity

17  magazines were far more lethal.  Specifically, the 18 public mass shootings

18  conducted with the most lethal weapons killed 271 (roughly 15 deaths per episode),

19  while the 14 public mass shootings with the less lethal firearms killed 81 (about 5.8

20  deaths per episode).

21

22

23

24

25

26

27

28

7

Figure 2



23.     One of the unfortunate consequences of the continuing advances in the lethality and power of modern firearms is that without appropriate government action the dangers posed by civilian weaponry will continue to outpace any legitimate crime-reducing benefit that firearms might provide.  The lesson of the November 2017 massacre at the Sutherland Springs Baptist Church in Texas highlights the growing dangers.  The killer in that case used an AR-15 that was modified to include a laser scope and features that could allow large capacity magazines to be more quickly reloaded to maintain a relentless barrage.  The killer stood outside the church and fired straight through the walls of the church as he strafed along at just above the top of the levels of the church pews, allowing him to shoot 254 shots from **outside** the church in a matter of minutes on his way to killing 26 men, women, and children.  No portable weapon in civilian hands at the time of the adoption of the Second Amendment could possibly generate this degree of

Supplemental Declaration of John J. Donohue (3:19-cv-01537-BEN-JLB)

destruction.  The evident social harms will only grow as gun technology increases firearm lethality.

24.     My 2020 Declaration explained that the increase in gun massacre incidents and fatalities closely tracks the growth in the U.S. of assault weapons sales, the removal of potential liability on the part of gun merchants, and intense advertising of the militarized upgrades, from high-capacity magazines to flash suppressors and other tactical accessories, which has only continued since my declaration.  Research published following the mass shootings in Buffalo, New York and Uvalde, Texas killing a total of 31 in May 2022 further confirms these findings.[8]  Specifically, an analysis of mass shooting data by a group of injury epidemiologists and trauma surgeons reached the following conclusion:

> We calculated that the risk of a person in the U.S. dying in a mass shooting was 70% lower during the period in which the assault weapons ban was active.  The proportion of overall gun homicides resulting from mass shootings was also down, with nine fewer mass-shooting-related fatalities per 10,000 shooting deaths.[9]

## II.   INTERNATIONAL EFFORTS TO ADDRESS ASSAULT WEAPONS AND MASS SHOOTINGS

25.     I noted in my 2020 Declaration that Australia had banned assault weapons back in 1996.  New Zealand followed the Australian lead after a horrific mass murder with an assault rifle,[10] and Canada just announced in May 2022 its plans for a similar gun buyback for its current stock of assault weapons after its

---

[8] Klein, Michael, 2022, Did the assault weapons ban of 1994 bring down mass shootings? Here's what the data tells us, *The Conversation*, June 8, 2022, https://theconversation.com/did-the-assault-weapons-ban-of-1994-bring-down-mass-shootings-heres-what-the-data-tells-us-184430.

[9] *Id*.

[10] Associated Press, "New Zealanders hand in 50,000 guns after assault weapon ban," Dec. 21, 2019, https://www.nbcnews.com/news/world/new-zealanders-hand-50-000-guns-after-assault-weapon-ban-n1106081 ("The government banned the most lethal types of semi-automatic weapons less than a month after a lone gunman in March [2019] killed 51 worshippers at two Christchurch mosques.  The police then launched a six-month program to buy the newly banned weapons from owners.").

1  own horrendous mass shooting prompted the enactment of a ban on assault

2  weapons in 2020.[11]  Tellingly, in announcing an array of stringent gun safety

3  measures, Canadian Prime Minister Justin Trudeau showed that he has learned from

4  the lamentable experience of mass killings in the United States: "We need only look

5  south of the border to know that if we do not take action, firmly and rapidly, it gets

6  worse and worse and more difficult to counter."

7  **III.  THREATS TO CIVIL PEACE AND TO DEMOCRACY ITSELF**

8       26.     There is also a larger issue at stake with the proliferation of assault

9  weapons:  their capacity to facilitate political violence and threaten American

10  democracy.  The concern is heightened by the sharp rise in the percentage of

11  Americans who think that violence against the government could be appropriate,

12  which doubled from 16 percent in 2010 to 34 percent in 2021 (over 40 percent of

13  Republicans and independents and 23 percent of Democrats agreed).[12]

14       27.     The extent and severity of these concerns have been clarified by the

15  events surrounding the "Stop the Steal" rally of January 6, 2021, which I have

16  written elsewhere has provided new insight into the dangers of such weaponry and

17  the utter folly of many of the claims of the gun lobby:

18       Consider the gun lobby protestation that "Gun control simply doesn't
         work."  Imagine for a moment what that rally would have looked like in
19       Houston, Texas, or some other "gun-friendly" jurisdiction.  Without
         Washington, DC's profoundly wise firearm restrictions [including its
20

21       [11] The Prime Minister also announced that magazine size would be restricted
     to five rounds in long guns.  Justin Trudeau, "Further strengthening our gun control
22   laws,' (May 30, 2022), https://pm.gc.ca/en/news/news-releases/2022/05/30/further-
     strengthening-our-gun-control-laws; Amanda Coletta, "Canada vows to 'freeze'
23   handgun sales, buy back assault-style weapons," *The Washington Post* (May 30,
     2022)("[T]he government banned 1,500 makes and models of "military-style
24   assault weapons" in 2020, after a gunman posing as a police officer charged across
     rural Nova Scotia, killing 22 people, including a Royal Canadian Mounted Police
25   officer, in the country's deadliest mass shooting.").

26       [12] Meryl Kornfield and Mariana Alfaro, "1 in 3 Americans say violence
     against government can be justified, citing fears of political schism, pandemic,"
27   *Washington Post*, January 1, 2022,
     https://www.washingtonpost.com/politics/2022/01/01/1-3-americans-say-violence-
     against-government-can-be-justified-citing-fears-political-schism-pandemic/.

28

assault weapons ban], a very large number of the rioters would have been marching on the U.S. Capitol armed with assault rifles equipped with high-capacity magazines and other highly lethal weapons.  When the mob storming the Capitol spun out of control, guns would have been flashing everywhere, and it is not hard to imagine that bullets would have been cutting down scores or even hundreds of victims.  Those who remember the 1970 Kent State massacre understand that once the bullets start flying in a riotous atmosphere, the consequences quickly turn lethal and dire….

The pernicious Proud Boys leader Enrique Tarrio [now under indictment for seditious conspiracy],[13] who had planned to address the crowd before the U.S. Capitol riot, was thankfully taken off the streets two days earlier when he was arrested for tearing down a Black Lives Matter banner on a Washington, DC, church and lighting it on fire.  At the time of his arrest, Tarrio was carrying two high-capacity magazines festooned with the Proud Boys logo.  Washington, DC's wise prohibition on such unnecessary accoutrements to lethal weaponry managed to keep one conspiring criminal away from the U.S. Capitol on January 6, and thousands of others, knowing of Washington, DC's strict gun laws, were dissuaded from carrying weapons because of these laws.

[Moreover, the claim that assault weapons could protect American democracy is fanciful.]  First, the thought that private gun owners could stand up to the modern U.S. military if it backed a tyrannical federal government is absurd. There is no circumstance in which private citizens in modern America could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government.  Second, the idea that gun owners can be expected to *oppose* rather than support the tyrant was dealt a fatal blow by the violence at the U.S. Capitol.[14]

## CONCLUSION

28.     As discussed in my 2020 Declaration, the problem of mass shootings in the United States is growing worse and is exacerbated by the ready availability of assault weapons.  Additional information gathered since my declaration only serves to reinforce those opinions.

---

[13] Spencer Hsu, "Proud Boys leader Tarrio, 4 top lieutenants charged with seditious conspiracy in widening Jan 6 case", *Washington Post*, June 6, 2022, https://www.washingtonpost.com/dc-md-va/2022/06/06/tarrio-proud-boys-seditious-conpiracy/.

[14] John Donohue, "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf.

11

1         Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

2    laws of the United States of America that the foregoing is true and correct.

3         Executed on October 12, 2022, at Stanford, California.

4

5

6    _____

7               John J. Donohue III

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Supplemental Declaration of John J. Donohue (3:19-cv-01537-BEN-JLB)

# EXHIBIT A

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail:  jjd@stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

## EMPLOYMENT

### Full-time Positions

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
  - William H. Neukom Professor of Law, February 2002 – June 2004.
  - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
  - Academic Associate Dean for Research, since July 2001 – July 2003.
  - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
  - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
  - Harry B. Reese Teaching Professor, 1994-1995
  - Professor of Law, May 1991-September 1994
  - Associate Professor, May 1989-May 1991
  - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

### Temporary Appointments

- Affiliated Research Professor, American Bar Foundation, September 2020 – August 2025.
- Visiting Professor, Tel Aviv University School of Law, May 2022.
- Lecturer on the Economics of Crime, Bogota Summer School in Economics, Universidad del Rosario, Bogota, Colombia,  June 2020.
- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.

1

- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009.
- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.
- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.
- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).

**EDUCATION**
**Yale University, 1981-1986**
- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation: "A Continuous-Time Stochastic Model of Job Mobility:  A Comparison of Male-Female Hazard Rates of Young Workers."  Awarded with Distinction by Yale.
  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.
- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.

**Harvard Law School, 1974-1977 (J.D.)**

- Graduated Cum Laude.

2

- <u>Activities</u>:  Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year):  (a) First Semester:  Massachusetts Advocacy Center; (b) Second Semester:  Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions.  Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against BechtelCorporation's adherence to the Arab Boycott of Israeli companies.

## Hamilton College, 1970-1974 (B.A.)

- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:

  - Brockway Prize (Highest GPA Freshman Year)
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics

- President, Root-Jessup Public Affairs Council.

## PUBLICATIONS

### Books and Edited Volumes:

- <u>Law and Economics of Discrimination</u>, Edward Elgar Publishing, 2013.

- <u>Employment Discrimination:  Law and Theory</u>, Foundation Press, 2005, 2021 (5th edition) (with George Rutherglen).

- <u>Economics of Labor and Employment Law</u>:  Volumes I and II, Edward Elgar Publishing, 2007.  http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070

- <u>Foundations of Employment Discrimination Law</u>, Foundation Press, 2003 (2d edition).

- <u>Foundations of Employment Discrimination Law</u>, Oxford University Press, 1997 (Initial edition).

### Book Chapters:

- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).

- "The Death Penalty" Chapter in <u>Encyclopedia of Law and Economics,</u> Spring (2013) and in Alain Marciano & Giovanni Battista Ramello eds., <u>Encyclopedia of Law and Economics</u> (2019).

- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, <u>Controlling Crime: Strategies and Tradeoffs</u> (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin" in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer?  The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

3

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., <u>Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business</u> (2005).
- "The Evolution of Employment Discrimination Law in the 1990s:  A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., <u>Handbook of Employment Discrimination Research</u> (2005).
- "The Impact of Concealed Carry Laws" in Jens Ludwig and Philip Cook, <u>Evaluating Gun Policy:  Effects on Crime and Violence</u> (Washington D.C.:  Brookings, 2003).

**Articles:**

- Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," JAMA. 2022;328(12):1191-1192. <u>https://jamanetwork.com/journals/jama/fullarticle/2796675</u>.

- John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook, (2022) "More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities," <u>https://www.nber.org/papers/w30190</u>.
  - Featured in <u>August 2022 Issue of NBER Digest</u>.
  - Featured in August 11, 2022 issue of *The Economist*: <u>"A Supreme Court ruling could spell even more gun crime: Right-to-carry laws are associated with increases in violence."</u>
- "The Supreme Court's gun decision will lead to more violent crime," *Washington Post*, July 8, 2022, <u>https://www.washingtonpost.com/outlook/2022/07/08/guns-crime-bruen-supreme-court/</u>.
- Daniel Cerqueira, Danilo Coelho, John J. Donohue III, Marcelo Fernandes, & Jony Pinto Junior, "A panel-based proxy for gun prevalence in US and Mexico" *International Review of Law & Economics* (2022). <u>https://www.sciencedirect.com/science/article/abs/pii/S0144818822000369</u>.

- "Increasing murders but overall lower crime suggests a growing gun problem," Am J Public Health. (2022).

- "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," <u>The Conversation</u> (December 6, 2021), <u>https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-the-rittenhouse-verdict-172741</u>.

- Lisa Vicen, Samuel Levander, & John J. Donohue III, <u>'NYSRPA v. Bruen': Studies Show Direct Link Between Right-to-Carry and Violent Crime Increase</u>, The National Law Journal, November 4, 2021. <u>https://www.law.com/nationallawjournal/2021/11/04/nysrpa-v-bruen-studies-show-direct-link-between-right-to-carry-and-violent-crime-increase/</u>.
- "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), <u>https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf</u>. This is part of the Brennan Center for Justice *Protests, Insurrection, and the Second Amendment* series.
- "We Must Confront the Threats to America's Democracy" 56 *Idaho Law Review* 119 (2020)."
- The Impact of Legalized Abortion on Crime over the Last Two Decades" *American Law and Economics Review* (Fall 2020)(with Steven Levitt), Volume 22, Issue 2, Pages 241–302.

https://academic.oup.com/aler/article/22/2/241/5973959?guestAccessKey=917acf36-918d-4310-9d22-73c713757238

■ NBER Working Paper No. 25863, May 2019,
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3391510.

  o Featured on Freakonomics Radio, "Abortion and Crime, Revisited." https://podcasts.apple.com/us/podcast/freakonomics-radio/id354668519?i=1000444184627."

• "The Swerve to 'Guns Everywhere:' A Legal and Empirical Evaluation" 83 *Law and Contemporary Problems* 117-136 (2020). https://scholarship.law.duke.edu/lcp/vol83/iss3/7.

• Daniel Cerqueira, Danilo Santa Cruz Coelho, John J. Donohue, Marcelo Fernandes & Jony Arrais Pinto, A Panel-Based Proxy for Gun Prevalence in the US (Nat'l Bureau of Econ. Research, Working Paper No. 25530, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332277.

• "That Assault Weapon Ban? It Really Did Work" *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html?action=click&module=Opinion&pgtype=Homepage.

• "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019 (with Abhay Aneja and Kyle Weber), https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

• "RTC Laws Increase Violent Crime: Moody and Marvell Have Missed the Target," *Econ Journal Watch*, Vol. 16, No. 1, 97-113, March 2019 (with Abhay Aneja and Kyle Weber), https://econjwatch.org/File+download/1103/DonohueAnejaWeberMar2019.pdf?mimetype=pdf

• "It's Going to Take More Than Background Checks and AR-15 Bans to Stop Mass Shootings," *Time.com*, November 16, 2018. http://time.com/5456015/gun-control-background-checks-ar15-mass-shootings/

• "What's in a denial? Bayesian Analysis shows that Kavanaugh lied about denials under oath and Trump was foolish to believe MBS," November 2, 2018 (with Aaron Edlin). https://works.bepress.com/john_donohue/176/

• "Brett Kavanaugh won't keep Americans safe," CNN.com, September 5, 2018. https://www.cnn.com/2018/09/05/opinions/kavanaugh-wont-keep-america-safe-donohue/

• "More Gun Carrying, More Violent Crime," *Econ Journal Watch*, Vol. 15, No. 1, 67-82, January 2018. https://econjwatch.org/articles/more-gun-carrying-more-violent-crime

• "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, January 2018 (with Abhay Aneja, and Kyle Weber).

• "Saving lives by regulating guns: Evidence for policy," *Science* Dec. 8, 2017, Vol. 358, Issue 6368, pp. 1259-1261, http://science.sciencemag.org/content/358/6368/1259.full (with Phil Cook).

• "Laws Facilitating Gun Carrying and Homicide," American Journal of Public Health, Vol 107, No. 12, 1864-1865, December 2017, http://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304144.

• "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.

- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694
  - Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html
  - Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments
- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html
- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).
- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3
- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al). http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf
- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html
- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016), http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp
- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/
- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/
- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html
- "The Demise of the Death Penalty in Connecticut," Legal Aggregate - Stanford Law School (June 2016), https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/
- "On Justice Scalia's Legacy," Legal Aggregate - Stanford Law School (February 14, 2016) https://law.stanford.edu/2016/02/15/stanford-law-faculty-on-justice-scalia/
- "Empirical Evaluation of Law:  The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.
- "Capital Punishment Does not Deter Homicides," Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides
- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227
  - Reprinted under the title "Does the Death Penalty Deter Killers?" Newsweek, August 19, 2015.

https://www.newsweek.com/does-death-penalty-deter-killers-364164

- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/

- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590

  - Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/

- "The 10 day period is reasonable," San Francisco Daily Journal, September 3, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973:  Are There Unlawful Racial, Gender, and Geographic Disparities?" 11 Journal of Empirical Legal Studies 637 (2014).

- "The Impact of Right to Carry Laws and the NRC Report:  The Latest Lessons for the Empirical Evaluation of Law and Policy," NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)

- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/

- Outlier Nation:  Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).

- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch

- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html

- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39

- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).

- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).

- "What Can Be Done to Stem Gun Violence?" San Francisco Chronicle, December 21, 2012.  http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qIkJJ2

- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.

- "Time To Kill the Death Penalty?" The California Progress Report, June 28, 2012.

- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).

7

- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," American Law and Economics Review (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang). See January 2014 Revision released as an NBER working paper above.

- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.

- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).

- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. (Fall 2009) (with Steve Shavell).

- "Estimating the Impact of the Death Penalty on Murder," 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).

- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.

- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again:  The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).

- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract

- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.

- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society  10: 333 (2008) at http://pun.sagepub.com

- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).

- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds., Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.

- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.

- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.

- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig), http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx

- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).

- "The Discretion of Judges and Corporate Executives:  An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4.  Available at: http://www.bepress.com/ev/vol3/iss8/art4

- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).

- "The Death Penalty:  No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.

  - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice:  Top Economists Take on Today's Problems (2008).

- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.

- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).

  - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology  406-407 (2d ed. 2008).

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Foundations of Law and Economics, Edward Elgar Publishing (2010).

- "Does Terrorism Increase Crime?  A Cautionary Tale," (with Daniel Ho), 2005.

- "Fighting Crime:  An Economist's View," 7 The Milken Institute Review 46 (2005).

  - Reprinted in Kurt Finsterbusch, ed., Social Problems (McGraw-Hill, 2006).

- "Guns, Crime, and the Impact of State Right-to-Carry Laws," 73 Fordham Law Review 623 (2004).

- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", The Economists' Voice: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4

- "The Employment Consequences of Wrongful-Discharge Laws: Large, Small, or None at All?" American Economic Review:  Papers and Proceedings May, 2004 (with David Autor and Stewart Schwab).

- "Further Evidence that Legalized Abortion Lowered Crime:  A Reply To Joyce," 39 Journal of Human Resources 29 (Winter 2004)(with Steven Levitt).

- "A Clarification on Data Availability," Science: Vol. 301: No. 5641. (September 26, 2003), p. 1849, http://www.jstor.org/stable/3835157.

- "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," Criminology & Public Policy (July 2003, Volume 2, Issue 3) at pp. 397-410.

- "Shooting Down the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1193 (2003)(with Ian Ayres).

- "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1371 (2003)(with Ian Ayres).

9

- "Can Guns, Or Gun Violence, Be Controlled?" (Reviewing James Jacobs, Can Gun Control Work?), The American Prospect (December 16, 2002), p. 35, http://prospect.org/article/books-review-4.

- "The Search for Truth:  In Appreciation of James J. Heckman," 27 Law and Social Inquiry 23 (2002).

- "The Schooling of Southern Blacks:  The Roles of Social Activism and Private Philanthropy, 1910-1960," Quarterly Journal of Economics (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.

   - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).

   - Reprinted in American Bar Foundation, Anaylzing Law's Reach:  Empirical Research on Law and Society (2008)

- "The Impact of Race on Policing and Arrests," Journal of Law and Economics, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.

- "The Impact of Legalized Abortion on Crime," Quarterly Journal of Economics (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.

   - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

   - Reprinted in Robert Cooter and Francesco Parisi, eds., Recent Developments In Law And Economics, Edward Elgar Publishing (2010).

- "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 Stanford Law Review 897 (2001).

   - Reprinted in Michael Zimmer, Charles Sullivan et al, Cases and Materials on Employment Discrimination (6th edition)(2003).

- "Nondiscretionary Concealed Weapons Law:  A Case Study of Statistics, Standards of Proof, and Public Policy," American Law and Economics Review 436 (1999)(with Ian Ayres).

   - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

- "Why We Should Discount the Views of Those Who Discount Discounting," 108 Yale Law Journal 1901 (1999).

- "Understanding the Time Path of Crime," 88 Journal of Criminal Law and Criminology 1423 (1998).

- "Discrimination in Employment," The New Palgrave Dictionary of Law and Economics (1998).

   - Excerpted in Lynne Dallas, Law and Public Policy:  A Socio-Economic Approach at page 261 (2003).

- "The Legal Response to Discrimination:  Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).

- "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).

- "Allocating Resources Among Prisons and Social Programs in the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).

   - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),

- "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).

- "Did Miranda Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).

- "Some Thoughts on Affirmative Action," 75 Washington University Law Quarterly 1590 (1997).

- "Executive Compensation," 3 Stanford Journal of Law, Business & Finance 1 (1997).

- "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., The Crime Conundrum:  Essays on Criminal Justice 45 (1997). Reissued by Routledge eBooks 2019.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 Journal of Legal Studies 427 (1995) (with Peter Siegelman).

- "Employment Discrimination Law in Perspective:  Three Concepts of Equality," 92 Michigan Law Review 2583 (1994).

- Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).

   - Translated into Chinese and published in Peking University Law Review (2007).

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 Journal of Legal Studies 543 (1994).

- "Liberal Law and Economics," (reviewing Rethinking the Progressive Agenda by Susan Rose-Ackerman), 13 Journal of Policy Analysis and Management 192 (1994).

- Review of Richard Epstein's Forbidden Grounds:  The Case Against Employment Discrimination Laws, 31 Journal of Economic Literature 1477 (1994).

- "Law and Macroeconomics:  Employment Discrimination Over the Business Cycle," 66 University of S. Calif. L. Rev. 709 (1993) (with Peter Siegelman).

- "Advocacy Versus Analysis In Assessing Employment Discrimination Law," 44 Stanford Law Review 1583 (1992).

   -  Reprinted in Christopher McCrudden, Anti-Discrimination Law (2003).

- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).

- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 Law and Contemporary Problems 195 (1991).

- "Re-Evaluating Federal Civil Rights Policy," 79 Georgetown Law Journal 1713 (1991) (with James Heckman).

- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 Harvard Law Review 1093 (1991).

   -  Reprinted in Saul Levmore, Foundations of Tort Law 160 (1994).

- "Continuous versus Episodic Change:  The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 Journal of Economic Literature 1603 (December 1991) (with James Heckman).

   -  Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 Harvard Journal of Law and Public Policy 41 (1991).

- "Studying the Iceberg From Its Tip:  A Comparison of Published and Unpublished Employment Discrimination Cases," 24 Law and Society Review 1133 (1990) (with Peter Siegelman).

- "Prohibiting Sex Discrimination in the Workplace:  An Economic Perspective," 56 University of Chicago Law Review 1337 (1989).

- "The Law & Economics of Tort Law:  The Profound Revolution," 102 Harvard Law Review 1047 (1989).

- "Using Market Incentives to Promote Auto Occupant Safety," 7 Yale Law and Policy Review 449 (1989).

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," 99 Yale Law Journal 549 (1989).

  - Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.

- "Reply to Professors Ellickson and Stigler," 99 Yale Law Journal 635 (1989).

- "Law and Economics:  The Road Not Taken," 22 Law and Society Review 903 (1988).

- "Further Thoughts on Employment Discrimination Legislation:  A Reply to Judge Posner," 136 U. Pa. L. Rev. 523 (1987).

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," Chicago Tribune, sec.1, pg. 15, July 22, 1987.

- "Posner's Third Symphony:  Thinking about the Unthinkable," 39 Stanford Law Review 791 (1987)(with Ian Ayres).

- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., Research in Population Economics, vol.6, Greenwich, Conn.: JAI Press (1987).

- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Is Title VII Efficient?" 134 U. Pa. L. Rev. 1411 (1986).

  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De  Gruyter, New York (1994).

- "Section I Cases," Sherman's Summations, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.

- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.

- "Godfrey v. Georgia:  Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 Catholic University Law Review 13 (1980).

- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

**Blog Posts:**

- "Packed and Loaded: Stanford's John Donohue on Supreme Court's Guns Decision," *Stanford Law School Legal Aggregate Blog* (Jun. 24, 2022), https://law.stanford.edu/2022/06/24/packed-and-loaded-stanfords-john-donohue-on-supreme-courts-guns-decision/?utm_source=june302022&utm_medium=mc&utm_campaign=law%40stanford&utm_content=Stanford-law-news.

- "Guns, Mass Shootings, and the Law in the U.S.," *Stanford Law School Legal Aggregate Blog* (Dec. 10, 2021), https://law.stanford.edu/2021/12/10/stanfords-john-donohue-on-guns-mass-shootings-and-the-law-in-the-u-s/.

- "Stanford's John Donohue on One Tragic Week, Two Mass Shootings, and the Uniquely American Gun Problem," *Stanford Law School Legal Aggregate Blog* (March 25, 2021), https://law.stanford.edu/2021/03/25/stanfords-john-donohue-on-one-tragic-week-with-two-mass-shootings-and-the-uniquely-american-gun-problem.

- "Open Carry Laws, Guns on Capitol Hill, and a Police Force Outgunned by Militias," *Stanford Law School Legal Aggregate Blog* (January 19, 2021), https://law.stanford.edu/2021/01/19/open-carry-laws-guns-on-capitol-hill-and-a-police-force-outgunned-by-militias/.

- "Remembering Justice Ginsburg," *Stanford Law School Legal Aggregate Blog* (September 19, 2020), https://law.stanford.edu/2020/09/19/stanford-laws-john-donohue-remembers-justice-ginsburg/.

- "The Assault Weapon Ban Saved Lives," (with Theodora Boulouta), *Stanford Law School Legal Aggregate Blog*, October 15, 2019, https://stanford.io/2MWNsrV.

- "Stanford Law's John Donohue on Mass Shootings and Gun Regulation in the U.S.," *Stanford Law School Legal Aggregate Blog*, August 6, 2019, https://law.stanford.edu/2019/08/06/stanford-laws-john-donohue-on-mass-shootings-and-gun-regulation-in-the-u-s/.

- "Stanford Law Faculty Remember Justice Stevens." *Stanford Law School Legal Aggregate Blog*, July 18, 2019, https://law.stanford.edu/2019/07/18/stanford-law-faculty-remember-justice-stevens/.

- "Arming Teachers Is Not a Good Option," *Scientific American*, February 28, 2018, https://blogs.scientificamerican.com/observations/arming-teachers-is-not-a-good-option/.

- "Another Mass Shooting: An Update on U.S. Gun Laws," *Stanford Law School Legal Aggregate Blog*, February 18, 2018, https://law.stanford.edu/2018/02/18/another-mass-shooting-qa-us-gun-laws/.

- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," Stanford Law School Legal Aggregate Blog, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-law-and/.

- *"Moore v. Texas* and the Pathologies that Still Mar Capital Punishment in the U.S.," *Stanford Law School Legal Aggregate Blog*, March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/.

- "Trump and Gun Policy," *Stanford Law School Legal Aggregate Blog*, November 12, 2016, http://stanford.io/2eoWnna.

- "Facts Do Not Support Claim That Guns Make Us Safer" *Stanford Law School Legal Aggregate Blog*, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/.

- "When will America wake up to gun violence?" *CNN.com*, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html.

- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).

- "Have "Woman-Protective" Studies Resolved the Abortion Debate?  Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).

- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).

13

- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

## WORKSHOPS AND ADDRESSES:

- "Can We Get Strong Gun Safety Legislation Passed?" Vi Seminar, **Palo Alto, CA**, July 18, 2022.

- Panelist, "Inside the Brain of the Mass Shooter and the Impact of Their Criminal Behavior," Symposium on "The Law and Neuroscience of Mass Shootings," held virtually at Fordham Law School, November 1, 2022.

- "*Bruen*, Permissive Gun Carrying, Constitutional Law, and Violent Crime," Faculty Workshop, **Stanford Law School**, July 13, 2022.

- "Effectiveness of Permissive Gun Laws: Carry Laws, Stand Your Ground," Annals Authors' Conference, **University of Connecticut**, Hartford, April 7, 2022.

- "Permissive Gun Carrying Laws and Violent Crime," ETH, Zurich, April 6, 2022; Law and Economics Workshop, **Tel Aviv University School of Law**, May 11, 2022.

- "Guns and Crime in American Life and Law," **University of Zurich**, April 5, 2022.

- "Do Permissive Gun Carrying Laws Increase Violent Crime?" Applied Webinar at the **Sao Paulo School of Economics**, November 17, 2021.

- "Mass Shootings, Gun Laws and the Evolution of the Second Amendment – Where Do We Go from Here?" Minnesota Continuing Legal Education Webcast, November 2, 2021.

- Discussant of Richard Berk, "Firearm Sales in California Through the Myopic Vision of an Interrupted Time Series Causal Analysis," Online Causal Inference Seminar, **Stanford University**, April 6, 2021.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," American Law and Economics Association Meetings, **NYU School of Law**, May 18, 2019; Department of Economics, **University of California, Irvine**, October 13, 2020; **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021; Crime Seminar, **Northwestern Law School**, March 3, 2022.

- Discussant of Chika Okafor, "Prosecutor Politics: The Impact of Election Cycles on Criminal Sentencing in the Era of Rising Incarceration," **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.

- "Guns and Crime," Economic Analysis of Crime course, **Bocconi University**, Dept. of Social and Political Sciences, March 8, 2021.

- Discussant, "How the Massachusetts assault weapons ban enforcement notice changed firearm sales," Firearms and Policy session, **Assoc. for Public Policy Analysis and Management (APPAM) Virtual Fall Research Conference**, November 12, 2020.

- "We Must Confront the Threats to America's Democracy," Idaho Law Review Election Law Symposium, **University of Idaho College of Law**, October 20, 2020.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," Department of Economics, **University of California, Irvine**, October 13, 2020.

- "The Death Penalty: Informing Policy Through Empirical Research," Program in Criminal Law and Policy, **University of Arizona College of Law**, October 6, 2020.

- Discussant, "Mandatory Retirement Improved Performance on State Supreme Courts," Law and Economics Session, **NBER Summer Institute**, July 22, 2020.

14

- Discussant, "Measuring Racial Discrimination in Bail Decisions," Crime Session, **NBER Summer Institute**, July 15, 2020.

- "Guns and Empirical Evidence in Second Amendment Litigation," **Columbia Law School**, March 24, 2020; **Yale Law School**, March 25, 2020 (Zoom Presentation).

- Panelist, "Guns, Schools, and Adolescents: A Disaster Waiting to Happen," Psychiatry Grand Rounds,

- Sapp Center for Science Teaching and Learning, **Stanford University School of Medicine**, February 20, 2020.

- "The Power of Data to Change Hearts, Minds, and Public Policy," Law and Policy Lab, **Stanford Law School**, February 13, 2020.

- "The Move to 'Guns Everywhere'," Inaugural Cooter-Rubinfeld Lecture, **University of California, Berkeley, Law School**, February 6, 2020.

- "The Swerve:  A Legal and Empirical Evaluation of the Move to 'Guns Everywhere,'" Law and Economic Studies Workshop, **Columbia Law School**, September 23, 2019; Conference on Gun Rights and Regulations Outside the Home, **Duke Law School**, September 27, 2019.

- "Evidence to Guide Gun-related Public Policy," Conference on Gun Violence Epidemic, **Stanford Medical School**, September 16, 2019; Lecturer, Physicians and Social Responsibility Course, **Stanford Medical School**, October 7, 2019; Lecturer, Data Science Course, **Department of Statistics, Stanford University**, November 1, 2019.

- "The Legal and Political Battle over Gun Policy in America," **Hamilton College**, June 7, 2019.

- "Impact of Right to Carry Laws on Violent Crime," Public Policy colloquium, **Stanford Economics Department**, January 22, 2018; SPILS Methods Workshop, **Stanford Law School**, January 25, 2018; Quantlaw, **University of Arizona Law School**, March 2, 2018; Stanford/Berkeley Causal Inference Conference, **Stanford Graduate School of Business**, April 23, 2019; **Baldy Center/Law School Distinguished Speaker Series**, University at Buffalo School of Law, May 3, 2019; Conference on "Synthetic Controls and Related Methods," **Institute for Data, Systems, and Society, MIT**, May 21, 2019.

- "Guns, Abortion, and the Death Penalty: Informing Policy Through Empirical Research," Politics and Public Policy Lecture Series, **Stanford University**, April 1, 2019.

- "Dangers of Guns Carried Outside the Home for Protection," **GVPedia Conference**, Denver, Colorado, April 6, 2019.

- "Understanding California's Red Flag Law: How to Remove Guns from People Who Are a Threat to Themselves or Others," **Stanford Law School**, February 12, 2019.

- "Guns and Crime: Current Empirical and Legal Debates," **Fellowship Forum**, January 22, 2019.

- "Gun Policy in America at a Critical Juncture," SAFE, **Stanford Medical School**, September 17, 2018.

- "Empirical Evaluation of Law and Policy: The Battle for Truth," **Woodside Rotary Club**, September 12, 2018.

- "Discussing America's Second Amendment," **San Jose Museum of Quilts & Textiles**, July 15, 2018.

- "The Legal Battle to End the Death Penalty in Connecticut," **Law School of the University of Reggio Calabria,** Italy, June 15, 2018.

- Panelist, "Newtown and Gun Violence in the US, Humanity is Indivisible Series, **Stanford University**, May 31, 2018.

- "Gun Policy In California and the US," Human Rights Seminar; **Stanford Medical School**, May 29, 2018.

15

- "Gun Policy in the Wake of Parkland," Sigma Alpha Epsilon Leadership Speaker Series, **Stanford Law School**, March 13, 2018; Stanford in Government event, Haas Center, **Stanford University**, April 20, 2018.

- Panelist, Town Hall Meeting on Gun Violence with Congresswoman Jackie Speier, **Burlingame High School**, April 14, 2018.

- Moderator, In Studio Conversation with Berkeley Law School Dean Erwin Chemerinsky: "Defining the Limits of Free Speech," **Palo Alto League of Women's Voters**, March 27, 2018. https://youtu.be/cqHEIAVoTLY

- "More than Thoughts & Prayers," **American Constitution Society** and the **Federalist Society, U.C. Hastings School of Law**, March 14, 2018.

- Panelist, "Addressing Gun Violence," **American Constitution Society**, Stanford Law School, March 8, 2018.

- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017.

- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.

- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, **Cornell University**, October 13, 2017.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar,** April 24, 2017, Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.

- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, **JFK University School of Law,** March 18, 2017.

- "The Evidence on Guns and Gun Laws," **Federal Bar Council Program on Guns and Gun Laws** -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School**, October 17, 2016.

- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.

- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies; **University of California, Riverside**, October 24, 2016.

- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University**, August 25, 2016.

- "The Battle Over Gun Policy In America," Physicians and Social Responsibility" seminar; **Stanford Medical School**, October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association**, April 27, 2016; **The League of Women Voters of Palo Alto**, April 19, 2016; Human Rights and Health Seminar, **Stanford University**, April 12, 2016; Bechtel International Center, **Stanford University**, February 23, 2016; Stanford in Government Seminar, Haas Center, **Stanford University**, February 2, 2016.

- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), **AEA Annual Meeting**, San Francisco, January 5-7, 2016.

- "Race and Arbitrariness in the Connecticut Death Penalty," **University of Connecticut School of Law**, Nov. 20, 2015.

- *"Connecticut v. Santiago* and the Demise of the Connecticut Death Penalty," Faculty Workshop, **Stanford Law School**, August 19, 2015.

- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, **Covington and Burling, New York**, May 14, 2015; **NBER Summer Institute**, Cambridge, MA, July 23, 2015; Faculty Workshop, **Stanford Law School**, November 11, 2015.

- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, **Bocconi University School of Law, Milan, Italy**, June 18, 2015.

- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" **Stanford Law School**, Legal Theory Workshop, March 1, 2007; Faculty Workshop, **Tel Aviv University School of Law**, May 14, 2007; Faculty Workshop, **University of Haifa Law School**, May 16, 2007; Law and Economics Workshop, **Georgetown Law School**, September 19, 2007; Law and Economics Workshop, **St. Gallen Law School**, Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 21, 2008; Faculty Workshop, **University of Virginia Law School,** October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, **Universitat Pompeu Fabra (Barcelona),** June 15, 2009; **Google, Milan**, Italy, June 8, 2015.

- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, **Columbia Law School**, May 15, 2015.

- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, **Yale Law School**, April 17, 2015.

- "Assessing the Development and Future of Empirical Legal Studies," **Stanford Law School** course on Modern American Legal Thought, February 25, 2015.

- Commentator:  "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, **Boalt Hall**, Berkeley, CA, November 7, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973:  Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, **Economics Department, Rice University**, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, **University of Virginia Law School**, September 11, 2014; Faculty Colloquium, **University of San Diego School of Law**, October 3, 2014.

- "What's Happening to the Death Penalty?  A Look at the Battle in Connecticut," **Hamilton College**, Clinton, New York, June 6, 2014.

- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School,** May 15, 2014.

- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.

- "Guns: Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.

- "The Impact of Antidiscrimination Law:  The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Reducing Gun Violence," Forum on Gun Violence Reduction, **Mountainview City Hall**, Mountainview, CA, Feb. 8, 2014.

17

- "Gun Policy Debate," **C-SPAN**. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.

- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, **Stanford Law School**, November 20, 2013.

- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16,  2010; **NBER Summer Institute** Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden, CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.

- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013;  8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.

- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.

- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013

- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?"  **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Stemming Gun Violence," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series

- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://www.fondazioneveronesi.it/scienceforpeace2012/

- Seminar Presentation, "America's Criminal Justice System," **Renaissance Weekend**, Santa Monica, CA., Feb. 19, 2012.

- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILLS Fellow's Workshop, **Stanford Law School**, February 2, 2012.

- "New Evidence in the 'More Guns, Less Crime' Debate:  A Synthetic Controls Approach," Conference on Empirical Legal Studies, **Northwestern Law School**, November 4, 2011.

- "Drug Legalization and its Alternatives," *Lessons from the Economics of Crime: What Works in Reducing Offending?* **CESifo Venice Summer Institute Workshop,** July 22 , 2011.

- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," **Yale Center for the Study of Globalization**, May 12, 2011.

- Plenary Session:  Flashes of Genius (Glimpses of <u>Extra</u>-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" **Renaissance Weekend**, Liguna Niguel, CA., Feb. 18, 2011.

- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), **Stanford Law School**, January 25, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, **Stanford Law School**, April 5, 2011.

- "Empirical Evaluation of Law:  The Dream and the Nightmare," SPILS Fellows Lecture, **Stanford Law School**, January 15, 2015; Legal Studies Workshop, **Stanford Law School**, Feb. 7, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 20, 2011; **University of Denver Sturm College of Law**, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, **Columbia University**, May 20, 2011.

- Death Sentencing in Connecticut," **American Society of Criminology Annual Meeting**, San Francisco, Nov. 17, 2010.

- "The Impact of Right to Carry Laws and the NRC Report:  Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Commentator, "A Test of Racial Bias in Capital Sentencing," **NBER Political Economy Program Meeting**, April 23, 2010.

- "The (Lack of a) Deterrent Effect of Capital Punishment," Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.

- Keynote Address, "The Evolution of Econometric Evaluation of Crime and Deterrence,"1st Paris& Bonn Workshop on Law and Economics:  The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre,** September 24, 2009.

- Comment on Cook, Ludwig, and Samaha, "Gun Control after *Heller*: Litigating Against Regulation," NBER Regulation and Litigation Conference, **The Boulders**, Carefree, Arizona, September 11, 2009.

- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona),** June 18, 2009.

- Comment on Joanna Shepherd's "The Politics of Judicial Opposition," Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany**, June 12, 2009.

- "The Great American Crime Drop of the '90s:  Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty," **Hamilton College**, Clinton, NY, June 5, 2009.

- "The Impact of the ADA on the Employment and Earnings of the Disabled," **American Law and Economics Association Meetings**, University of San Diego, May 15, 2009.

- "Crime and Punishment in the United States," **Eastern State Penitentiary, Yale Alumni Event**, Philadelphia, PA, April 26, 2009.

19

- "Measuring Culpability in Death Penalty Cases," Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.

- "Autopsy of a Financial Crisis," Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan**, March 23, 2009.

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop,**NYU Law School**, March 10, 2009.

- Intelligence-Squared Debate: "Guns Reduce Crime," **Rockefeller University**, New York, October 28, 2008.

- "The D.C. Handgun Controls: Did the Supreme Court's Decision Make the City Safer?" Debate, **The Contemporary Club of Albemarle**, Charlottesville, VA, October 23, 2008.

- "Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement,"  Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School**, October 11, 2008.

-  "Empirical Evaluation of Gun Policy," **Harvard Law School**, October 9, 2008.

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous  Decades and the Benefits on the Margin," **Russell Sage Foundation**, New York, May 3, 2007; Law and Economics Workshop, **Tel Aviv University School of Law**, May 28, 2008.

- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.

- "Evaluating Connecticut's Death Penalty Regime," Faculty Public Interest Conversation, **Yale Law School**, April 9, 2008.

- "The Death Penalty in Connecticut and the United States," **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law:  Criminal Sentencing and the Death Penalty, **Fordham Law School**, April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live. WNPR. Connecticut, March 10, 2008.

- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.

- "The Empirical Revolution in Law and Policy:  Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School,** Novermber 9, 2007.

- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.

- "Empirical Evaluation of Law:  The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School, Switzerland**, June 25, 2007.

- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.

- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, **Yale Law School, "**Rethinking the Incarceration Revolution Part II:  State Level Analysis," April 14, 2006.

- "Corporate Governance in America:  The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.22430   Page 596 of
1315
Case 3:19-cv-01537-BEN-JLB   Document 137-4   Filed 10/13/22   PageID.11365   Page 35 of
43

- "The U.S Tort System," (Latin American) Linkages Program, **Yale Law School**, February 13, 2007.

- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.

- **"**Economic Models of Crime and Punishment," Punishment: The U.S. Record: A Social    Research Conference at **The New School**, New York City, Nov. 30, 2006

- Comment on Baldus et al, "Equal Justice and the Death Penalty: The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of    Texas Law, School**, Austin, Texas, October 27, 2006.

- "Empirical Evaluation of Law: The Promise and the Peril," **Harvard Law School**, October  26, 2006.

- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland,** March 9, 2007.

- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.

- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.

- "Landmines and Goldmines: Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," **Rosenthal Lectures, Northwestern University School of Law**, April 4-6, 2006.

- "The Impact of Legalized Abortion on Crime," **American Enterprise Institute**, March 28, 2006.

- "The Impact of Damage Caps on Malpractice Claims: Randomization Inference with Difference-in-Differences,"**Conference on Medical Malpractice, The Rand Corporation**, March 11, 2006.

- "Powerful Evidence the Death Penalty Deters?" **Leighton Homer Surbeck Chair Lecture, Yale Law School**, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, **University of Connecticut Law School,** October 18, 2005; Faculty Workshop, **UCLA Law School**, February 3, 2006; Law and Economics Workshop, **Stanford Law School**, February 16, 2006; ; Law Faculty, **University of Cambridge, Cambridge, England**, February 28, 2006; **University of Illinois College of Law,** Law and Economics Workshop, March 2, 2006; Faculty Workshop, **Florida State University Law School**, March 30, 2006; **ALEA**, Berkeley, CA May 6, 2006; **University of Chicago Law School,** Law and Economics Workshop, May 9, 2006.

- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School,  January 31, 2006.

- "Witness to Deception: An Insider's Look at the Disney Trial," **2005-2006 Distinguished Lecture, Boston University School of Law**, November 10, 2005; Center for the Study of Corporate Law, **Yale Law School**, November 3, 2005; **Law Offices of Herbert Smith, London, England**, February 23, 2006; Law Faculty, **University of Cambridge, Cambridge, England**, February 27, 2006.

- "Understanding the Surprising Fall in Crime in the 1990s," **Rotary Club**, Orange, CT, August 5, 2005; Faculty Workshop, **Yale School of Management**, September 21, 2005.

- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, **Yale School of Management**, September 8, 2005.

- "Crime and Abortion," **Museo de la Cuidad de Mexico**, Mexico City, October 20, 2003.

- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," **MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice**, San Francisco, CA, February 28, 2003.

- "Shooting Down the More Guns, Less Crime Hypothesis," **Stanford Law School**, Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, **Boalt Hall**, University of California, Berkeley, Feb. 24, 2003; Development Workshop, **Stanford Law School**, April 25, 2003; Faculty Workshop, **Stanford Law School**, July 2, 2003; Law and Public Affairs Program Workshop, **Princeton University,** September 29, 2003; Stanford Alumni Weekend, **Stanford University**, October 17, 2003; Faculty Workshop, **CIDE**, Mexico City, October 20, 2003.

- **"**The Impact of Legalized Abortion on Teen Childbearing," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2002.

- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, **Stanford Law School**, October 4, 2000; First-Year Orientation, **Stanford Law School**, September 5, 2001; Faculty Workshop, **Harvard Law School**, April 26, 2002; Faculty Workshop, **Columbia Law School**, April 29, 2002.

- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.

- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations:  Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School**, Oct. 18, 2001.

- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2001; Labor and Employment Seminar, **NYU Law School**, October 16, 2001; Faculty Workshop, **Stanford Law School**, September 18, 2002;  **Yale Law School**, January, 2004.

- "Racial Profiling:  Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference**, San Francisco, CA, November 15, 2000.

- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.

- "Corporate Governance in Developing Countries:  Opportunities and Dangers," Conference on Neoliberal Policies for Development:  Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000

- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, **Yale Law School**, September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School**, October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, **Baruch College**, November 9, 1999; MacArthur Foundation Social  Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences,** October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.

- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.

- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop**, University of Wisconsin School of Social Science**, February 19, 1999.

- "What Do We Know About Options Compensation?" Institutional Investors Forum**, Stanford Law School**, May 29, 1998.

- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.

- "Understanding The Time Path of Crime," Presentation at Conference on <u>Why is Crime Decreasing?</u> **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan Law School**, February 18, 1999.

- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.

- "Some Thoughts on Affirmative Action," Presentation at a conference on <u>Rethinking Equality in the Global Society</u>, **Washington University School of Law**, November 10, 1997.

- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.

- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business**, University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.

- "Crime in America:  Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?"  TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.

- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.

- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.

- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.

- "The Power of Law:  Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?"  The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.

- "Public Action, Private Choice and Philanthropy:  Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.

23

- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.

- Commentator, Symposium on Labor Law, **University of Texas Law School**, November 10-11, 1995.

- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.

- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.

- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law**, February 27, 1995.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University**, Law and Economics Seminars, October 31, 1994.

- "Is the United States at the Optimal Rate of Crime?"  Faculty Workshop, **Indiana University School of Law**, Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law**, April 18, 1994; Law and Economics Workshop, **Stanford Law School**, April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School**, May 13, 1994; **American Bar Foundation**, September 7, 1994; Faculty Workshop, **DePaul Law School**, September 21, 1994; Law and Economics Workshop, **University of Chicago Law School**, October 11, 1994; Faculty Seminar, **Stanford Law School**, October 31, 1994; Law and Economics Luncheon, **Stanford Law School**, November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law**, Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School**, November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School**; Law and Economics Workshop, **Yale Law School**, February 1, 1996; Faculty Workshop, **Cornell Law School**, April 10, 1996; Faculty Workshop, **Tokyo University Law School**, June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.

- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law**, September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law**, September 20, 1994.

- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University**, May 17, 1994.

- "Does Law Matter in the Realm of Discrimination?"  **Law and Society Summer Institute**, Pala Mesa Lodge, Fallbrook, California, June 25, 1993.

- Commentator, "The Double Minority:  Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research**, March 28, 1993.

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," <u>Economic Analysis of Civil Procedure</u>, **University of Virginia School of Law**, March 26, 1993.

- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society**, February 23, 1993.

- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School**, May 15, 1992.

- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies**, Fairfax, Virginia, March 27, 1992.

24

- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School**, February 26, 1992.

- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School**, February 13, 1992.

- "Law & Macroeconomics:  The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University**, November 6, 1991; Faculty Workshop, **University of North Carolina Law School**, Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law**, December 11, 1991; Law and

- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.

- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.

- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.

- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.

- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.

- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?"  Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School**, February 26, 1991.

- Panel Member, "The Law and Economics of Employment Discrimination," **AALS Annual Meeting**, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.

- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.

- "The Effects of Fee Shifting on the Settlement Rate:  Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure:  Issues in Controversy," June 16, 1990.

- "Studying the Iceberg From Its Tip?:  An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," **Law and Society Meetings**, Berkeley, California, May 31, 1990.

- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.

- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.

- "Continuous versus Episodic Change:  The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.

- "Sex Discrimination in the Workplace:  An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.

- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting**; Madison, Wisconsin, June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.

- "Law & Economics:  The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.

- "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon.  **Chicago Bar Association**, May 31, 1988.

- "The Morality of the Death Penalty."  A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.

- "Models of Deregulation of International Capital Markets."  A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.

- "Is Title VII Efficient?"  A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.

- "The Senate's Role in Confirming Supreme Court Nominees:  The Historical Record," **Northwestern University School of Law**, September 22, 1987.

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," **Yale Law School** Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; **AALS Annual Meeting**, New Orleans, January 7, 1989.

- "Women in the Labor Market--Are Things Getting Better or Worse?"  **Hamilton College**, February 23, 1987.

- "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.

- "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.

- "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.

- "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## AWARDS

- **47th Tikkun Olam Award**, The Haiti Jewish Refugee Legacy Project, February 2014, "Awarded for incredibly significant work that explores and inspires the search for justice and taking serious, correct and timely action." Tikkun Olam is a Hebrew phrase that means 'repairing the world.' https://haitiholocaustsurvivors.wordpress.com/guest-posts/47th-tikkun-olam-award-to-professor-john-j-donohue-iii/

26

**PROFESSIONAL ACTIVITIES**

- Member, Stanford Law School academic reading group evaluating the criminal law opinions of U.S. Supreme Court nominee Judge Ketanji Brown Jackson for the ABA Standing Committee on the Federal Judiciary, March 2022.
- Member, USF Institute for Nonviolence and Social Justice Leadership Council, University of San Francisco, June 2021 – present.
- Member, Criminal Justice Expert Panel, @CJExpertPanel, providing information on the relevance of criminal justice research to current events, beginning April 2021.
- Statistical Consultant to the Fairness Committee of the 9th Circuit Court of Appeals investigating issues of sentencing disparities by race, ethnicity, and gender in federal criminal sentencing, March 2018 – March 2020.
- Legal Scholarship Network Advisory Board Member, SSRN.
- Member, Committee on Law and Justice, National Research Council, October 2011 – December 2018.
- Fellow of the Society for Empirical Legal Studies, 2015 - present.
- Member, International Advisory Council, Economic Order Study Center, Federal University of San Paolo, Brazil.
- Co-Editor (with Steven Shavell), American Law and Economics Review, May 2006 – August 2012.
- President, American Law and Economics Association, May 2011 – May 2012.
- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012.  Member, Board of Directors from November 2011 - November 2014.
- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011; Testified again before the Connecticut Judiciary Committee on March 14, 2012.
- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.
- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.
- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.
- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.
- Evaluated the Connecticut death penalty system: "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/.
- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004.  Resulting Publication:  National Research Council, Measuring Racial Discrimination (2004), http://www.nap.edu/catalog/10887.html.
- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.
- Editorial Board, Journal of Empirical Legal Studies, July 2003 – present.
- Editorial Board, International Review of Law and Economics, October 1999 – present.
- Editorial Board, Law and Social Inquiry, February 2000 – present.

27

- Board of Editors, <u>American Law and Economics Review</u>, August 1998 – April 2013.

- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11, 1998.

- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996.  Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.

- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).

- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.

- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).

- Chair, AALS Section on Law and Economics, January 1990-January 1991.

- Economic Consultant to Federal Courts Study Committee.  Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee.  February 1989-March 1990.

- Member, 1990 AALS Scholarly Papers Committee.

- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law.  Since December 1987.

- Associate Editor, <u>Law and Social Inquiry</u>.  Summer 1987-December 1989.

- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management.  Chicago, Illinois. May 23, 1988.

- Member, Congressman Bruce Morrison's Military Academy Selection Committee.  Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

## PRO BONO LEGAL WORK

- Co-wrote <u>amicus brief</u> for the United States Supreme Court for "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, which discusses the evidence that right-to-carry laws increase violent crime in the brief, September 21, 2021.

- Co-wrote amicus brief for the United States Supreme Court for "Public Health Researchers and Social Scientists in Support of Respondents" in *New York State Rifle & Pistol Association v. City of New York*, which quotes my article *Right-to-Carry Laws and Violent Crime* in the brief, August 12, 2019.

- Co-wrote <u>amicus brief</u> for the 9th Circuit Court of Appeals for "Empirical Scholars Concerning Deterrence and the Death Penalty In Support of Petitioner/Appellee," *Jones v. Da*vis, No. 09 Cv. 2158 CJC, which discusses the lack of deterrence of the death penalty, March 6, 2015.

- Death Penalty case:  <u>Heath v. Alabama</u>.  Fall 1986-Fall 1989.

- Wrote brief opposing death sentence in Navy spy case.  Court ruled in favor of defendant John A. Walker on September 13, 1985.

- Staff Attorney, Neighborhood Legal Services, January-July 1981.

- Appealed sentence of death for Georgia defendant to the United States Supreme Court.  Sentence vacated on May 27, 1980.  <u>Baker v. Georgia</u>.

- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

## RESEARCH GRANTS

- Stanford University Research Fund, January 1997 and January 1998.

- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.

- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

## BAR ADMISSIONS

- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 3, 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

## PROFESSIONAL and HONORARY ASSOCIATIONS

- American Academy of Arts and Sciences (since April 2009).

- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.

- Stanford Center for Racial Justice – August 2020 to present.

- American Law Institute (since September 29, 2010).

- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).

- American Bar Association

- American Economic Association

- American Law and Economics Association

## PERSONAL

- Born:  January 30, 1953.

29

# EXHIBIT 13

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **SUPPLEMENTAL DECLARATION OF LOUIS KLAREVAS** |
| **v.** | |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom: 5A<br>Judge: Hon. Roger T. Benitez |
| Defendants. | Action Filed: August 15, 2019 |

**SUPPLEMENTAL DECLARATION OF LOUIS KLAREVAS**

I, Louis Klarevas, declare under penalty of perjury that the following is true and correct:

1. I previously submitted a Declaration in Support of Defendants' Opposition to Motion for Preliminary Injunction, which was filed with this Court on January 22, 2020 ("2020 Declaration" hereinafter).[1] I make this supplemental declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of August 29, 2022.

2. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3. I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $600 per hour for testimony (in deposition and in court) and $480 per hour for all other services.

**BACKGROUND AND QUALIFICATIONS**

4. In addition to my background and qualifications summarized in my 2020 Declaration, I have subsequently submitted declarations under oath in the following cases: *Jones v. Bonta*, Case No. 19-cv-01226-L-AHG, Southern District of California; and *Nguyen v. Bonta*, Case No. 20-cv-02470-WQH-MDD, Southern District of California. *Jones* involves a challenge to California's regulation of firearm sales to individuals 18 to 20 years old. *Nguyen* involves a challenge to California's regulation limiting the sale of certain firearms to one purchase per month. While I was never deposed in *Jones*, I was deposed in *Nguyen*.

5. In 2021, I was also retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney*

---

[1] My 2020 Declaration was marked as Defendants' Trial Exhibit E and can be found at Dkt. 84-6.

1

Supplemental Declaration of Louis Klarevas (3:19-cv-01537-BEN-JLB)

1  *General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition*

2  *for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File

3  No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File

4  No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court

5  File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court,

6  Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*,

7  Federal Court, Court File No.: T-905-20.  I testified under oath in a consolidated

8  court proceeding involving all six cases in the Federal Court of Canada.

9         6.      A true and correct copy of my current curriculum vitae is attached as

10  Exhibit A to this declaration.

## OPINIONS

### I.  THE RELATIONSHIP BETWEEN MASS SHOOTINGS, ASSAULT-WEAPONS USE, AND LEGAL RESTRICTIONS ON ASSAULT WEAPONS

7.      I have been asked by the California Department of Justice to

supplement the opinions expressed in my 2020 Declaration with currently available

information.  In my 2020 Declaration, based on the review of relevant data since

1980 and the analyses performed in my 2020 Declaration, I opined:

> (1) gun massacres involving six or more fatalities presently pose the deadliest criminal threat, in terms of individual acts of intentional violence, to the safety and security of American society in the post-9/11 era, and the problem is growing nationwide; (2) gun massacres involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons; and (3) jurisdictions that restrict the possession of assault weapons experience fewer gun massacres, per capita, than jurisdictions that do not restrict assault weapons.[2]

The primary conclusion of my 2020 Declaration was that "restrictions on assault

weapons have the potential to significantly reduce the frequency and lethality of

gun massacres."[3]  I continue to stand by the opinions and conclusions expressed in

my 2020 Declaration.

---

[2] 2020 Declaration ¶ 8.

[3] Ibid.

8.      Furthermore, in the nearly three-year time period following my 2020 Declaration being filed with this Court, I have continued to analyze mass shootings, including the relationship between assault-weapons use and mass shootings rates. My research indicates that, with regard to gun massacres resulting in six or more fatalities (also known as "high-fatality mass shootings" in the academic literature), the aforementioned patterns identified in my 2020 Declaration continue to hold. Nothing has changed since January 2020 to alter my conclusions.

9.      In the time since my 2020 Declaration, I have also been able to analyze the relationship between assault-weapons use and what are commonly known as "mass public shootings," which are shootings resulting in 4 or more fatalities, not including the perpetrator(s), occurring largely in a public setting and not undertaken in pursuit of an underlying criminal objective (e.g., robbery, illicit trafficking, organized crime, gang violence, or domestic violence).[4]  When I examined this category of mass shootings since 1980, I found similar patterns. First, the incidence and lethality of mass public shootings continue to rise nationwide.  Second, mass public shootings involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons.  And third, jurisdictions that restrict the possession of assault weapons experience fewer mass public shootings, per capita, than jurisdictions that do not restrict assault weapons.

10.     Based on this recent research, it is still my opinion that, in terms of both gun massacres and mass public shootings, restrictions on assault weapons have the potential to significantly reduce the frequency and lethality of mass shooting

---

[4] The data set of mass public shootings that I analyzed is publicly available from The Violence Project.  The creation of this data set was funded by the National Institute of Justice, which is part of the U.S. Department of Justice.  In addition to basic variables, such as incident dates and locations, casualty counts, and information on offenders, The Violence Project data set also identifies whether an assault weapon was used to perpetrate a mass public shooting.  The Violence Project data set is available at https://bit.ly/3T4sXda (last accessed Sept. 30, 2022).

Supplemental Declaration of Louis Klarevas (3:19-cv-01537-BEN-JLB)

1  violence.  As I stated in my 2020 Declaration, "While imposing constraints on

2  assault weapons will not prevent all future mass shootings, the data suggest that

3  legislative efforts to deny gunmen access to assault weapons should result in a

4  significant number of lives being saved."[5]  I remain steadfast in this conclusion.

## II.  DOUBLE-DIGIT-FATALITY MASS SHOOTINGS IN AMERICAN HISTORY

6         11.    I have also been asked to examine the historical occurrence and

7  distribution of mass shootings resulting in 10 or more victims killed since 1776 (see

8  Table 1 and Fig. 1).  A lengthy search uncovered several informative findings.[6]  In

9  terms of the origins of this form of extreme gun violence, there is no known

10  occurrence of a mass shooting resulting in double-digit fatalities at any point in

11  time during the 173-year period between the nation's founding in 1776 and 1948.

12  The first known mass shooting resulting in 10 or more deaths occurs in 1949.  In

13  other words, for 70 percent of its 247-year existence as a nation, the United States

14  did not experience a mass shooting resulting in double-digit fatalities.[7]  After the

15  first such incident in 1949, 17 years pass until a similar mass shooting occurs in

16  1966.  The third such mass shooting then occurs 9 years later, in 1975.  And the

17  fourth such incident occurs 7 years after, in 1982.  Basically, the first few mass

18  shootings resulting in 10 or more deaths did not occur until the post-World War II

19  era, and they occurred with relative infrequency, although the temporal gap

20  between these first four incidents shrank with each event (Table 1 and Fig. 2).[8]

---

[5] 2020 Declaration, ¶ 49.

[6] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, available at www.newspaperarchive.com (last accessed Oct. 2, 2022).  The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607.  Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

[7] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68 percent of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[8] Figs. 1-2 are reproduced in larger form as Exhibit B of this Declaration.

4

**Table 1**

**Mass Shootings Resulting in Double-Digit Fatalities in American History, 1776-2022**

| | Date | Location | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NE | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators.  An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban; (2) the statutes of the state where the gun massacre occurred; or (3) a legal or judicial declaration issued by a state official.  An incident was coded as involving a large-capacity magazine if at least one of the firearms discharged was armed with a detachable ammunition-feeding device holding more than 10 bullets.

5





12.     The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events take place in a span of just five years (Table 1 and Fig. 2). This timeframe also reflects the first time that assault weapons are used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths). But this cluster of incidents is followed by a 20-year period in which only 2 double-

1  digit-fatality mass shootings occur (Fig. 2).  This period of time from 1987 through

2  2007 correlates with two important pieces of federal firearms legislation: the 1986

3  Firearm Owners Protection Act and the 1994 Federal Assault Weapons Ban.

4      13.     It is well-documented in the academic literature that, after the Assault

5  Weapons Ban expired in 2004, mass shooting violence increased substantially.[9]

6  Mass shootings that resulted in 10 or more deaths were no exception, following the

7  same pattern.  In the 56 years from 1949 through 2004, there were a total of 10

8  mass shootings resulting in double-digit fatalities.  In the 18 years since 2004, there

9  have been 20 double-digit-fatality mass shootings.  In other words, the average rate

10  of occurrence has increased over six-fold (Table 1 and Fig. 2).

11     14.     The other pattern that stands out from the historical plotting of the data

12  is that 100 percent of mass shootings resulting in 20 or more deaths involved large-

13  capacity magazines holding more than 10 bullets and 78 percent of mass shootings

14  resulting in 20 or more deaths involved assault weapons (including the two

15  deadliest mass shootings in American history—the 2016 Orlando massacre

16  resulting in 49 deaths and the 2017 Las Vegas massacre resulting in 60 deaths).  As

17  with the analyses of gun massacres and mass public shootings discussed in the

18  previous section, death tolls in double-digit-fatality mass shootings are related to

19  ─────────────

[9] See, for example, Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 Am. J. of Pub. Health 1754 (2019), available at https://bit.ly/3CHjjrD (last accessed Oct. 2, 2022); Charles DiMaggio, et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 Journal of Trauma and Acute Care Surgery 11 (2019), available at https://bit.ly/3ynD0lr (last accessed Oct. 2, 2022); Lori Post, et al., *Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*, 7 JMIR Public Health and Surveillance (2021), available at https://bit.ly/3Mq81en (last accessed Oct. 2, 2022); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022, available at https://bit.ly/3eaZZcE (last accessed Oct. 2, 2022).

Supplemental Declaration of Louis Klarevas (3:19-cv-01537-BEN-JLB)

1    the use of large-capacity magazines and assault weapons—firearms technologies

2    that, in terms of mass shootings, serve as force multipliers (Table 1 and Fig. 2).

3    **III.  OWNERSHIP RATES OF "MODERN SPORTING RIFLES" IN THE U.S.**

4         15.      In my 2020 Declaration, I noted that, based on National Shooting

5    Sports Foundation (NSSF) data provided in the Declaration of James Curcuruto

6    ("Curcuruto Declaration" hereafter),[10] the estimated 17.7 million rifles like AR-15-

7    platform and AK-47-platform rifles—which Curcuruto referred to as "modern

8    sporting rifles"—that were in civilian circulation at the time Curcuruto filed his

9    Declaration in January 2019 accounted for approximately 4 percent of the estimated

10   415 million firearms that made up the entire civilian stock of firearms in the United

11   States.[11]  Based on updated NSSF figures, there are approximately 24.4 million

12   such rifles presently in circulation.[12]  These largely AR-15-platform and AK-47-

13   platform rifles now account for 5 percent of the estimated 456 million firearms that

14   make up the current civilian stock.[13]  Furthermore, based on its most recent,

---

15        [10] Curcuruto Declaration, Pls.' Trial Ex. 4 (Nov. 29, 2020).

16

17        [11] 2020 Declaration, ¶ 16.  The percentage is calculated as follows: 17.7 million "modern sporting rifles" divided by 415 million total firearms equals 4.3 percent.

18

19        [12] The NSSF estimates that there are now approximately 24.4 million so-called "modern sporting rifles" in civilian hands.  NSSF, "Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation," July 20, 2022, available at

20

21   https://bit.ly/3RKp4sP (last accessed Oct. 2, 2022).  It is important to keep in mind that the NSSF is likely over-estimating the number of "modern sporting rifles" in

22   civilian circulation given that the NSSF appears to be including rifles in the possession of law enforcement agencies.  See Curcuruto Declaration, Pls.' Trial Ex.

23   4-8 at 2-3.  In addition, NSSF estimates appear to include rifles that are not

24   statutorily defined as being assault weapons in states that restrict assault weapons (i.e., state compliant rifles), meaning that using NSSF "modern sporting rifle"

25   estimates for purposes of gauging assault weapon ownership levels also likely

26   produces over-counts.  Ibid., ¶ 7.

27        [13] According to Bureau of Alcohol, Tobacco, Firearms, and Explosive (ATF) data, since 2017, when the NSSF and Plaintiffs estimated that there were 415 total

28

publicly-available survey data, the NSSF has determined that civilian owners of "modern sporting rifles" own, on average, 3.1 such rifles, with 35 percent of these owners possessing only one such rifle.[14]  Based on this data, only 7.9 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own "modern sporting rifles."[15]  In other words, less than 10 percent of all civilian gun owners in the United States own "modern sporting rifles."[16]

16.    In addition, a recent national survey of gun owners found that 1.3 percent of all owners of "AR-15 styled" rifles (approximately 103,000 people) actually own 10 or more such rifles, and an additional 0.3 percent of all owners of "AR-15 styled" rifles (approximately 24,000 people) actually own 100 or more such rifles.[17]  Based on available data, it appears that, at a minimum, nearly 90

---

firearms in civilian circulation, an additional 41 million firearms have entered the civilian stock nationwide.  This brings the estimated number of firearms in civilian circulation to approximately 456 million.  ATF, National Firearms Commerce and Trafficking Assessment: Firearms in Commerce, 2022, available at https://bit.ly/3SMW4Ss (last accessed Oct. 5, 2022).  The percentage is calculated as follows: 24.4 million "modern sporting rifles" divided by 456 million total firearms equals 5.4 percent.

[14] Curcuruto Declaration, Pls.' Trial Ex. 4-4 at 13.

[15] The estimate that approximately 7.9 million gun owners possess what the NSSF considers to be "modern sporting rifles" is calculated by dividing the 3.1 average number of such rifles that each "modern sporting rifle" owner possesses into the 24.4 million such rifles estimated to be in civilian circulation.  This calculation (24.4 million divided by 3.1) equals 7.9 million.  Based on survey data, 81 million American adults are estimated to own guns.  Andy Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight," PolitiFact, The Poynter Institute, August 3, 2022, available at https://bit.ly/3rAwi80 (last accessed Oct. 2, 2022).

[16] The finding that less than 10 percent of all gun owners possess "modern sporting rifles" is calculated by dividing the 7.9 million "modern sporting rifle" owners by the 81 million American adults estimated to be gun owners.  This calculation (7.9 million divided by 81 million) equals 9.8 percent.

[17] Overall, when the 1.3 percent of all gun owners who own between 10 and

1  percent of all "modern sporting rifles" are possessed by gun owners who own

2  multiple such rifles.[18]  This group of 90 percent includes a minimum of 3.43 million

3  "AR-15 styled" rifles that are concentrated in the hands of approximately 127,000

4  owners of "modern sporting rifles."[19]

5      17.    In deriving its estimates, the NSSF often relies on United States

6  government data, particularly ATF data.[20]  According to the ATF, since 1986

7  through 2020 (which is the most current data available), the civilian stock of

8

9  [99] "AR-15 styled" rifles is combined with the 0.3 percent of all gun owners who

10  own 100 or more "AR-15 styled" rifles, the result is that 1.6 percent of all gun

11  owners possess "AR-15 styled" rifles.  See William English, "2021 National
    Firearms Survey: Updated Analysis Including Types of Firearms Owned,"

12  Georgetown McDonough School of Business Research Paper No. 4109494, Last
    Revised September 28, 2022, available at https://bit.ly/3RKLQAM (last accessed

13  Oct. 2, 2022).  The estimations that 103,000 adults own between 10 and 99 "AR-15

14  styled" rifles and 24,000 adults own 100 or more such rifles are calculated by
    multiplying 7.9 million "modern sporting rifle" owners, respectively, by .013 (for

15  1.3 percent) and .003 (for 0.3 percent), which correspondingly equals 102,700

16  (rounded up to 103,000) and 23,700 (rounded up to 24,000).

17  [18] According to NSSF data, only 35 percent of the estimated 7.9 million
    "modern sporting rifle" owners own only one such rifle.  Multiplying 7.9 million by

18  0.35 results in a calculation that 2.8 million such rifles are in the hands of civilians

19  that own only one such rifle.  The other 21.6 million such rifles (calculated by
    subtracting 2.8 million from 24.4 million) are owned by civilians who own multiple

20  "modern sporting rifles."  Dividing 21.6 million by 24.4 million equals 89 percent.

21  [19] If approximately 103,000 "modern sporting rifle" owners possess at least
    10, but not more than 99, such rifles, totaling *at a minimum* 1.03 million such rifles

22  (103,000 multiplied by 10 equals 1.03 million) and approximately 24,000 "modern

23  sporting rifle" owners possess 100 or more such rifles, totaling *at a minimum* 2.4
    million such rifles (24,000 multiplied by 100 equals 2.4 million), then 127,000

24  "modern sporting rifle" owners (103,000 added to 24,000 equals 127,000) own *at a*

25  *minimum* 3.43 million "modern sporting rifles" (1.03 million added to 2.4 million
    equals 3.43 million).

26

27  [20] Curcuruto Declaration, Pls.' Trial Ex. 4, ¶¶ 8-9, 15; and NSSF, supra
    note 12.

28

1    firearms in the United States has been made up predominantly of handguns.[21]  As

2    Fig. 3 shows, handguns account for 50 percent of the civilian stock of firearms,

3    rifles account for 33 percent, and shotguns account for 17 percent.

4         18.    According to federal government data, handguns are the most

5    commonly owned firearms; not rifles, and most certainly not "modern sporting

6    rifles," let alone rifles that qualify as assault weapons.

---

[21] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from 2000-2020, see ATF, supra note 13.  For similar data covering 1986-1999, see ATF, Firearms Commerce in the United States: Annual Statistical Update, 2021, available at https://bit.ly/3y3krmI (last accessed Oct. 5, 2022).

Supplemental Declaration of Louis Klarevas (3:19-cv-01537-BEN-JLB)

**Figure 3**

**Share of Firearms in Civilian Circulation in the United States, 1986-2020**[22]



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 13, 2022, at Queens, New York.



Louis Klarevas

---

[22] The percentages in Fig. 3 are calculated by adding the number of firearms manufactured domestically and the number of firearms imported and then subtracting the number of firearms exported.  Miscellaneous firearms are excluded from the calculations in Fig. 3.  According to the ATF, miscellaneous firearms are "predominantly firearm frames and receivers that are sold before being assembled with other components that would allow categorization in another … weapon type category (pistol, revolver, rifle, shotgun, machinegun, any other weapon, short-barreled rifle, short-barreled shotgun, silencer)."  See ATF, supra note 13 at 21.

Supplemental Declaration of Louis Klarevas (3:19-cv-01537-BEN-JLB)

# EXHIBIT A

# Louis J. Klarevas

**Email: ljk2149@tc.columbia.edu**

## Education

Ph.D.   International Relations, 1999
       School of International Service
       American University
       Washington, DC

B.A.   Political Science, *Cum Laude*, 1989
       School of Arts and Sciences
       University of Pennsylvania
       Philadelphia, PA

## Author

*Rampage Nation: Securing America from Mass Shootings*

## Current Positions

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

## Professional Experience

*Academic Experience (Presented in Academic Years)*
Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

### *Professional Experience (Presented in Calendar Years)*

Expert for Cook County, Illinois, *Viramontes v. County of Cook*, United States District Court for Northern District of Illinois, Case Number 21-cv-04595, Chicago, IL, 2022-

Expert for Government of Canada, *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20, 2021-

Expert for Government of Canada, *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20, 2021-

Expert for Government of Canada, *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20, 2021-

Expert for Government of Canada, *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20, 2021-

Expert for Government of Canada, *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20, 2021-

Expert for Government of Canada, *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20, 2021-

Expert for State of California, *Nguyen v. Bonta*, United States District Court for Southern District of California, Case Number 20-cv-02470-WQH-MDD, San Diego, CA, 2021-

Expert for State of California, *Jones v. Bonta*, United States District Court for Southern District of California, Case Number 19-cv-01226-L-AHG, San Diego, CA, 2021-

Expert for State of California, *Miller v. Becerra*, United States District Court for Southern District of California, Case Number 19-cv-1537-BEN-JLB, San Diego, CA, 2019-

Expert for Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019-

Expert for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 17-cv-1017-BEN-JLB, San Diego, CA, 2017-

Expert for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2017-

Expert for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, Denver, CO, 2016-2017

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

### Courses Taught

| *Graduate* | *Undergraduate* |
|---|---|
| Counter-Terrorism and Homeland Security | American Government and Politics |
| International Political Economy | European-Atlantic Relations |
| International Politics in a Post-Cold War Era | International Political Economy |
| International Security | International Relations |
| Machinery and Politics of American Foreign Policy | Transnational Terrorism |
| Role of the United States in World Affairs | United States Foreign Policy |
| Security Policy | |
| Theories of International Politics | |
| Transnational Security | |
| Transnational Terrorism | |
| United States Foreign Policy | |

3

**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti*, University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-

Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

## Commentaries and Correspondence

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993


**Commentaries Written for *New York Daily News* –
https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007

**Commentaries Written for** *The Huffington Post* **– www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)

**Legal Analyses Written for *Writ* – <u>writ.news.findlaw.com/contributors.html#klarevas</u>**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

11

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

17

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

18

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Charles Branas and Sonali Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

**EXHIBIT B**





# EXHIBIT 14

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3479
 Fax:  (415) 703-1234
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**DECLARATION OF BRENNAN RIVAS**<br><br>Courtroom:    5A<br>Judge:         Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

# DECLARATION OF BRENNAN RIVAS

I, Brennan Rivas, declare under penalty of perjury that the following is true and correct:

1.    I have been retained by the State of California to provide expert opinion and testimony regarding historical regulations that prohibited the public carry and possession of certain weapons.  I am being compensated at a rate of $130 per hour.

2.    I have evaluated the historical justifications and purposes of laws restricting the carrying of certain weapons, in addition to their scope in restricting the use of certain weapons associated with urgent societal problems of the time while simultaneously protecting the right to use other weapons for constitutionally protected, lawful purposes.

## BACKGROUND AND QUALIFICATIONS

3.    I have a Ph.D. in history from Texas Christian University, awarded in 2019.  My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; earlier this year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.

4.    I am currently completing a book manuscript, based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period.

5.    A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

## OPINIONS

6.    As discussed in this declaration, the proliferation of 19th century firearm restrictions, including those enacted in Texas, Tennessee, and Arkansas,

demonstrate a robust governmental response to the scourge of gun violence that swept the Nation.  Importantly, these restrictions did not flatly ban the carry or possession of all arms, and instead targeted only those weapons that posed significant risk to public safety at that time.

## I.   BRIEF HISTORY OF THE COLT REVOLVER AND THE SPREAD OF HANDGUN VIOLENCE IN THE 19TH CENTURY

7.     The field of gun law history is a relatively young and obscure one, though it will undoubtedly continue to grow as Second Amendment jurisprudence generates a need for more and better scholarship on the subject.  My research, which represents some of the most in-depth work on nineteenth-century gun regulations, shows that there are historical firearm regulations similar to California's assault weapons restriction.  Notably, during this period, several states prohibited the sale, gift, transfer, or importation of certain types of revolvers and other pistols which people of the time associated with criminal activity.

8.     The revolver design that came to dominate American markets during the mid- and late nineteenth century was patented by Samuel Colt in 1836.  He was not the first inventor to produce a multi-shot pistol, but he was the first whose creation became technologically and socially significant.  Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

9.     The Colt revolver diverged from pistols then widely available in two critical ways.  First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.  The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process.  By about the 1870s, technological developments in the design and functionality of ammunition meant that later models of Colt's could

2

Declaration of Brennan Rivas (3:19-cv-01537-BEN-JLB)

1   use individual cartridges; these could be inserted fairly quickly into the cylinder,

2   which made the reloading process much more swift—a boon on the battlefield, but

3   a new danger in other contexts.

4       10.     Though Colt's revolver was a revolutionary device that represented a

5   paradigmatic shift in firearm technology, his company struggled to reach its

6   potential.  The expiration of Colt's patent in 1857 opened the door for other

7   manufacturers to enter the market without having to endure the same decades-long

8   startup cost.  Meanwhile, the growing crisis over slavery and its looming prospect

9   of war gave Colt what he had always wanted—substantial government patronage.

10  Southern states ordered as many revolvers as they could in the lead-up to Fort

11  Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than

12  willing to deliver.  But the far more important contracts came from the United

13  States military, whose orders for pistols like Colt's revolver skyrocketed during the

14  course of the Civil War.[1]  Wartime production by Colt, in addition to the new

15  entrants into the market (like Smith & Wesson), created an unprecedented

16  infrastructure to manufacture staggeringly large quantities of pistols.  As production

17  capacity increased and the U.S. military demobilized, more of these weapons

18  became available to and affordable for American consumers; by the 1870s, the net

19  result was more and cheaper pistols spread throughout the country[2], introducing the

20  United States to its first experience with rampant gun violence.

---

21  [1] On the life of Samuel Colt and the history of his firearm manufacturing companies, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

23  [2] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online,

11.    The Civil War Era, making up the central three decades of the nineteenth century (1840-1870), marked a sharp departure for the United States in terms of violence and homicide in comparison to other Western nations.  Distrust in governing institutions and tremendous economic change wrought by industrialization primed Americans for homicidal violence to a degree that was unprecedented in American history.  In northern cities, rising population levels accompanied urbanization, labor agitation, and poverty, which caused an increase in homicide and crime.  Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s in the north remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s northern homicide rates began ratcheting upward yet again.[3]  Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined.  That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past.  In the southern states, the revolutionary consequences of emancipation and Reconstruction created an atmosphere of distrust of government and one's neighbor, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching violence

_____

see https://bit.ly/3VeUhHo.

[3] On homicide in American history, particularly as broken down into northern and southern regions, see Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp.185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time)

1  suffered primarily by Black Americans and their political allies.  The disruption of
2  war, occupation, and frequent changes in state government and constitutional
3  structure bred attitudes of vigilantism and disregard for the judicial process.  Rates
4  of violence and homicide remained quite high in the southern states across the
5  nineteenth century.[4]  The proliferation of deadly weapons, and especially easily
6  concealable pistols, to a point of near ubiquity in American communities rendered
7  the interpersonal conflicts that erupted as a result of urbanization, Reconstruction,
8  economic hardship, and social dislocation all the more deadly.

9  **II.   GOVERNMENTAL RESPONSES TO THE RISE IN HANDGUN VIOLENCE**

10         12.     The response to this gun violence varied across the United States.  The
11  most popular approach was the enactment or strengthening of public carry laws.
12  Jurisdictions that did not already have such laws were likely to enact them, and
13  those using the older mechanism of sureties to keep the peace were likely to
14  transition toward the implementation of criminal statutes mandating fines and/or
15  jail time for violators.[5] These public carry regulations targeted concealable items
16  like pistols, sword canes, and daggers that were used in the commission of crimes
17  and generally referred to as deadly weapons.  The closing third of the nineteenth
18  century saw a flurry of this activity as states and municipalities tried new penalties,
19  added new weapons to the lists of prohibited weapons, and generally attempted to
20  eliminate small, easily concealable weapons from the public sphere.[6]

21

22  _____
        [4] Roth, *American Homicide*, 411-434.
23         [5] The Repository of Historical Gun Laws, a database maintained by the Duke
    Center for Firearms Law, reflects that American state and local governments
24  enacted statutes and ordinances specifically relating to "carrying weapons" in large
    numbers during the period from the close of the Civil War in 1865 through the end
25  of the nineteenth century.  See https://firearmslaw.duke.edu/repository/search-the-
    repository/.
26         [6] In the second half of the nineteenth century, items like metal knuckles and
27  razor blades became targets for proscription alongside bowie knives, pistols, and
    sword canes.
28

13.     Another strategy employed by state governments to reduce gun violence and gun crime was to tax certain types of firearms.  In 1894, Georgia enacted a new occupation tax law that applied to "dealers in pistols and other weapons."  A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five dollars per place of business.[7]  In 1907, the Texas legislature placed a fifty-percent sales tax upon pistols; dealers had to report their sales and pay the required tax to the state comptroller's office on a quarterly basis.[8]  Sales and occupation taxes like these tended to be less about generating revenue than regulating an activity that was frowned upon by society more generally.  Occupation tax laws applied to vendors who appealed to vices like smoking, gambling, and playing games as well as peddlers and itinerant salesmen.  When a Texas appellate court upheld the stringent sales tax (over loud complaints by dealers), the judge described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."  As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[9]

---

[7]  Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia; see https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc.  Also, there were likely many more occupation taxes, though they have not been comprehensively indexed as of yet.

[8]  An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).  See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, (PhD diss., Texas Christian University, 2019) 161-162.

[9]  *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

Declaration of Brennan Rivas (3:19-cv-01537-BEN-JLB)

14.     Arkansas and Tennessee, for example, adopted a two-pronged approach that displayed attributes of both public carry laws as well as dealer regulations.  The first prong was to prohibit the public carrying of pistols.[10]  Courts in both states struck down early versions of the laws because they applied to all revolvers, including those being issued to certain classes of soldiers by the United States military.[11]  But they were quickly amended to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand.  By exempting these models, Arkansas and Tennessee lawmakers made their gun policies comport with the reigning Second Amendment jurisprudence of their day, which held that militia arms enjoyed special protection from certain forms of regulation.

15.     Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite; case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited.  This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic and select-fire weapons for military use.

16.     When the Tennessee high court struck down the initial statute, which prohibited the carrying of *all* pistols, lawmakers swiftly wrote a replacement statute

---

[10] See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

[11] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

1  that, "it shall not be lawful for any person to publicly carry a dirk, sword cane,

2  Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such

3  as are commonly carried and used in the United States army, and in no case shall it

4  be lawful for any person to carry such army pistol publicly or privately about his

5  person in any other manner than openly in his hands."[12]  It is worth noting that even

6  the exempted army/navy pistols could not be carried concealed, or even visible

7  within a waistband or hip holster; the only way to carry legally exempted pistols

8  was to hold them in one's hand.  The purpose of this additional phrase was to

9  curtail as much as possible the carrying of these weapons in public spaces so that a

10  person would only do so in the event of a real emergency.  Arkansas's replacement

11  statute was similar to that of Tennessee.[13]  The Tennessee Supreme Court upheld

12  that state's replacement statute against constitutional challenge.[14]  The revised

13  Arkansas statute received no notable challenge.

14      17.    The second prong which these states employed was a prohibition on

15  the sale of certain pistols.  Tennessee prohibited "any person to sell, or offer to sell,

16  or bring into the State for the purpose of selling, giving away, or otherwise

17  disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except

---

[12] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[13] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[14] *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

1  army or navy pistols."[15]  Arkansas followed suit but went even further by

2  prohibiting the sale of pistol cartridges as well.  "Any person who shall sell, barter,

3  or exchange, or otherwise dispose of, or in any manner furnish to any person any

4  dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any

5  pistol, of any kind of whatever, except as are used in the army or navy of the United

6  States, and known as the navy pistol, or any kind of cartridge for any pistol, or any

7  person who shall keep such arms or cartridges for sale, shall be guilty of a

8  misdemeanor."[16]

9      18.   Throughout the nineteenth century, Americans voiced their displeasure

10  with the practice of carrying weapons in public spaces.[17]  Condemnations of such

11  behavior and calls for regulations rang out across the country and became

12  increasingly common during the late nineteenth century when economic and

13  technological developments had made them easier to produce and cheaper to

14  purchase.  Arkansas and Tennessee were no exception to this national rule, and

15  commentators there engaged in the same discourse of their counterparts elsewhere.

16  The "shocks and violent convulsions which have been so fatal to law and order in

17  the South" were well known, as was the fact that "the pistol, the knife, the shotgun

18  and the bludgeon too often do their bloody work."[18]  After the 1875 statute went

19  into effect in Arkansas, news editors began praising it as "about the best law that

20  _____

21      [15] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

22      [16] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

23      [17] For example, see Patrick Charles, Armed in America 152 (2018) (noting

24  the Georgia Supreme Court's view that it was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives,

25  and those other weapons of like character, which, as all admit, are the greatest

26  nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874))).

27      [18] "Crime in the South" *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2.

28

has ever been enacted in this state," and one that, had it been in effect since statehood in 1836, "would have saved the lives of thousands of good men who have fallen victim to the vice of carrying deadly weapons, or from the results and natural consequences thereof."[19]  Some judges in Tennessee began handing down penalties of a fifty-dollar fine plus sixty days in jail, and "as a result few persons carry deadly weapons in [that] county."[20]  Reports of this rigid enforcement in Tennessee elicited praise among Arkansans, who viewed it as a social benefit that in Tennessee "men who for years converted themselves into walking arsenals discover that they can pursue their ordinary vocations without fear that they may at any moment be called upon to defend their persons against assault."[21]  From their perspective, the distrust of one's fellow community members that went along with habitual gun-toting was a burden of fear that could only be lifted by prohibiting deadly weapons in the public sphere.  Middle-class Americans, white southerners included, held the view that carrying deadly weapons was not honorable, and that such behavior should be stopped.[22]

---

[19] *Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2.

[20] The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee.  Judge Quarles of Nashville declared his intention to follow suit.  *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.  Judge Allen of Davidson County, Tennessee pledged to "impartially enforce the law" regarding weapons and "declared that 'it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them an unfair advantage over other citizens.'" *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4.

[21] *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.

[22] For an example from Arkansas and Tennessee, see *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4 (reporting that a Tennessee district judge stated "that only ruffians carried pistols and it gave them an unfair advantage over

19.     To fully understand these regulations, it is necessary to understand the different kinds of pistols and revolvers available during this time period.  First, at the larger end of the spectrum was the "army pistol" or "holster pistol," which was originally fashioned after the "horse pistols" that had been adopted by mounted units in Europe and the United States.  Such pistols were typically designed to be carried in a saddle mounted holster and could weigh four pounds or more when loaded.  Though the firearm became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras.[23]  The Arkansas and Tennessee restrictions carved out an exception for these weapons, but only when carried openly in the hand.

20.     Second, "belt pistols" were midsized models and would have been worn in a hip holster attached to the belt.  These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War.  The Colt navy pistol took on that moniker during the antebellum years when that model featured an engraving of a naval battle.  In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened[24]; during the period in which these statutes were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological

_____

other citizens,").  See also Mark Anthony Frassetto, "The Myth of Open Carry," *UC Davis Law Review* 55 (June 2022), 2518-2519.

[23] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* (New York: Simon & Schuster, 1979).

[24] See note 23, above.

11

1   evolution by referring to the larger, heavier, higher caliber pistols with longer

2   barrels that were then issued by the United States military.  The sales bans under

3   discussion here generally included "belt" pistols, so it remains unclear whether and

4   to what extent the Colt's Navy pistol (which was technically a "belt" model) would

5   have received exemption on the basis of its name and/or its use by the military

6   forces.

7        21.    Finally, the third kind of pistol available was the "pocket pistol."

8   These were substantially smaller than the holster and belt models.  Pocket pistols

9   ranged from single-shot, muzzle-loading derringers with barrels under two inches to

10  revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel.  After the

11  Civil War, military purchases slowed, which led gun manufacturers to pivot toward

12  civilian sales.  They marketed pocket pistols heavily.  For instance, Colt's produced

13  both a "ladies' model" as well as a "house" pistol—though the latter became more

14  widely known as a "Fisk" for its use in the infamous murder of the robber baron

15  Jim Fisk in 1872.[25]  The explosion in production was all the more pronounced by

16  the entry of imitation brands that used lower quality metals with less sophisticated

17  workmanship to sell pocket pistols at much lower prices than the competition.[26]

18  These cheap revolvers could be had for a few dollars, with used ones selling for

19  even less.[27]

---

20      [25] For example, see The Pistol as a Weapon of Defence in the House and on

21  the Road: How to Choose It and How to Use It 23 (1875) (referring to pocket

22  pistols, including "the house pistol brought out some years ago by the Colt Arms
    Company, and rendered famous by the fact that it was the pistol used by [Edward]

23  Stokes in the murder of Fisk").

24      [26] See note 23, above.

25      [27] Colt's Army revolvers cost about $20 at the time of the Civil War, but

26  subsequent entrants into the market sold small pocket pistols for as little as a couple
    of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-

27  367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the

28  catalog but retailed elsewhere for something closer to $18 (see pp. 367).

Declaration of Brennan Rivas (3:19-cv-01537-BEN-JLB)

22. It is in this context that the public carry regulations and associated sales bans and prohibitory taxes mentioned above must be understood. A confluence of technical advancements and social changes resulted in the widespread adoption of new weapons, causing new societal problems that increased levels of interpersonal violence and ratcheted up public fear. In response, state legislatures enacted regulations targeting the source of that problem. In addition to other dangerous weapons, Tennessee and Arkansas targeted "pocket pistols"— designed to be concealed from public view and increasingly easy to obtain by those wishing to cause harm, were a target of these laws. The legislatures of both Tennessee and Arkansas prohibited both the public carrying of these weapons, as well as their sale to the general public. These regulations remained in force well into the twentieth century.

23. Previous scholarship addressing these statutes has cast them as racially motivated.[28] Those articles did not investigate deeply the primary sources of the time. My research shows that these accounts have misrepresented the Tennessee and Arkansas statutes, which were enacted as a public safety measure rather than an attempt to disarm Black residents. The argument made by other scholars, again based on little more than inference, has been that most white men served in the Civil War or had the means to purchase a "army/navy" pistol, and that the army/navy exception was tantamount to a whites-only exception to this policy.[29]

---

Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365). For the 1898 Sears & Roebuck catalog online, see https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

[28] For example, Stefan B. Tahmassebi, "Gun Control and Racism," *George Mason University Civil Rights Law Journal* 2, no. 1 (Summer 1991), 74-75; Robert Leider, "Our Non-originalist Right to Bear Arms," *Indiana Law Journal* 89, no. 4, 1619-1620.

[29] Tahmassebi, "Gun Control and Racism," 74-75.

1  Civil War soldiers on both sides of the conflict were unlikely to be issued a

2  revolver unless they were officers, cavalry, or artillery; a great number of enlisted

3  soldiers who possessed revolvers during the conflict had purchased them on their

4  own, and at times their carrying of the weapons caused sufficient trouble within the

5  ranks that officers confiscated them.  Others discarded heavy and seemingly

6  unnecessary pistols on long, grueling marches.[30]  Confederate service did not

7  automatically correlate to white possession of an exempted pistol.

8       24.     Rather than impute racism to these laws simply because of their

9  occurrence during Reconstruction, we should embed them within their appropriate

10  political and cultural context.  The fact that Tennessee's legislature amended the

11  public carry law so swiftly to add the army/navy exception could indicate to the

12  casual observer that white residents were dissatisfied with the original statute;

13  however, when the statutes and their constitutional challenges are placed in

14  chronological order and interpreted in light of the other primary sources of the era

15  (particularly newspapers and the widespread social contempt for publicly carrying

16  deadly weapons), it is clear that racism was not behind the army/navy exemption.

17  Instead, it represented the best effort of Tennessee lawmakers to emulate the kind

18  of comprehensive public carry prohibition that was in force in Texas[31] while also

19       [30] On pistols and other arms issued during the Civil War, see Katelyn Brown,

20  "Armed to the Teeth," *Military Images* 33, no. 4 (Autumn 2015), 32-36; Joseph G.

21  Bilby, *Civil War Firearms: Their Historical Background and Tactical Use* (Conshohcken, PA: Combined Books, 1996); Graham Smith, *Civil War*

22  *Weapons* (New York: Chartwell, 2011); Jack Coggins, *Arms and Equipment of the Civil War* (New York: Fairfax Press, 1982); *Arms and Equipment of the*

23  *Union* (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, *Arming the*

24  *Suckers: A Compilation of Illinois Civil War Weapons* (Dayton, OH: Morningside

25  House, 1989).

26       [31] Texas featured a comprehensive deadly weapon law that prohibited the

27  open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane,

spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold

28  for the purposes of offense or defense."  There were a few exceptions, such as for

1  respecting the parameters set forth by the state supreme court in *Andrews v. State*.

2  The amendatory statute did not simply provide an exemption for army/navy

3  pistols—it specified that even those pistols could not be carried in public unless

4  openly in the hand.  Just like today, it was not common at that time to see a person

5  walking along a public street carrying a gun in hand; such behavior would have

6  been understood as an emergency requiring the intervention of local officers of the

7  law.

8  **III.  CONCLUSIONS**

9      25.    Based on the experiences in Tennessee and Arkansas, among other

10  examples,[32] there is historical precedent for California's assault weapons ban.

11  These states targeted pocket pistols and other types of weapons that, due to their

12  concealability, were associated with forms of criminal activity that were threatening

13  the public at that time.  Like pocket pistols in the latter half of the nineteenth

14  century, semiautomatic firearms, including assault weapons, in the later parts of the

15  twentieth and earlier parts of the twenty-first became widely available for the first

16  time.  And they are, like pocket pistols in the mid- to late-1800s, associated with

17  new social problems and criminal use, including the rise of high-casualty mass

18  shooting incidents.  California's regulation, being a prohibition on the sale, transfer,

19  and manufacture of such firearms, is quite similar to the sale restrictions in

20  Tennessee and Arkansas.  And like the Tennessee and Arkansas laws, that

21

22  travelers, peace officers, and anyone who "has reasonable grounds for fearing an
unlawful attack on his person, and that such ground of attack shall be immediate

23  and pressing." *General Laws of Texas*, ch. XXXIV, §1 (1871).  The original
statutes in Arkansas and Tennessee indicate legislative intent to enact a

24  comprehensive law like this one, but the decisions from their state courts in *Wilson*

25  and *Andrews*, respectively, prevented them from doing so; in Texas, on the other
hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law

26  without requiring an army/navy exception.  See *English v. State of Texas*, 35 Tex.

27  473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

28      [32] For example, see note 31, above.

15

1   exempted army and navy pistols that were needed for lawful purposes, California's

2   regulation does not ban all rifles, pistols, shotguns, or other weapons that may

3   otherwise fall within its scope and may be used for self-defense.

4       26.   As stated above, and as with any historical research project, my work

5   in this area is still ongoing.  There is significant research and analysis to be done on

6   the drafting and enforcement of these statutes, as well as the attitudes of residents

7   toward them as time wore on.  Very little research that is based upon primary

8   sources, other than the review of case law and historical statutes, has yet been

9   conducted.  Still, this brief account of pistol regulations from late-nineteenth

10  century Tennessee and Arkansas demonstrates an important theme in the history of

11  firearms and weapons regulations in the United States: that states enacted

12  restrictions upon certain types of weapons, like pocket pistols, that were uniquely

13  adaptable to and associated with certain types of crime that threatened public safety

14  at the time, while also ensuring that the right of individuals to arm themselves for

15  self-defense in an emergency or upon their private property was not destroyed.

16

17      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

18  laws of the United States of America that the foregoing is true and correct.

19      Executed on October 12, 2022, at Fort Worth, TX.

20

21

22

23  *Brennan Rivas*

24      Brennan Rivas

25

26

27

28

16

Declaration of Brennan Rivas (3:19-cv-01537-BEN-JLB)

# EXHIBIT A

# Brennan Gardner Rivas
Curriculum Vitae  ·  Oct 2022

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
the Lone Star State, 1836-1930"
Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
on the Place of Guns in American Law and Society* (New York: Oxford University Press,
forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
(May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
*Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History
"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made
by History Blog* (Jun 2022)

~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West
Status: Research and writing in progress

2

## University Teaching Experience

*Instructor of Record*
Lecturer in American History, Texas Christian University                    2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University                    2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
    ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development
Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
    ~ Provide honest and confidential information to prospective graduate students
Graduate Student Mentor, 2015
    ~ Informal departmental program designed to ease the transition for incoming graduate students

**Professional Memberships**
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

**Languages**
Spanish (Proficient)
Latin (Proficient)

# EXHIBIT 15

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
    455 Golden Gate Avenue, Suite 11000
6   San Francisco, CA  94102-7004
    Telephone:  (415) 510-3479
7   Fax:  (415) 703-1234
    E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and*
   *Blake Graham, in their official capacities*
9

10           IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                    CIVIL DIVISION

13

14  **JAMES MILLER et al.,**            Case No. 3:19-cv-01537-BEN-JLB

15                       Plaintiffs,    **DECLARATION OF RANDOLPH**
                                        **ROTH**
16       **v.**
                                        Courtroom:    5A
17                                      Judge:        Hon. Roger T. Benitez
18  **CALIFORNIA ATTORNEY**
    **GENERAL ROB BONTA et al.,**       Action Filed:  August 15, 2019
19
                         Defendants.
20

21

22

23

24

25

26

27

28

_____
Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

## DECLARATION OF RANDOLPH ROTH

I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

1.      I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University.  I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently as to those facts.

2.      I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $250 per hour.

### BACKGROUND AND QUALIFICATIONS

3.      I received a B.A. in History from Stanford University in 1973 and a Ph.D. in History from Yale University in 1981.  I have taught courses in history and the social sciences since 1978, with a focus on criminology and the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

4.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Prize from the Social Science History Association for outstanding books in social science history.[2]  *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

[2] See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

1  book of 2009 by *reason.com*.  The book is an interregional, internationally
2  comparative study of homicide in the United States from colonial times to the
3  present.  I am a Fellow of the American Association for the Advancement of
4  Science, and I have served as a member of the National Academy of Sciences
5  Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board
6  of the *American Historical Review*, the most influential journal in the discipline.  I
7  am the principal investigator on the National Homicide Data Improvement Project,
8  a project funded by the National Science Foundation and the Harry Frank
9  Guggenheim Foundation to improve the quality of homicide data in the United
10  States from 1959 to the present.  I have published numerous essays on the history of
11  violence, including "Why Guns Are and Aren't the Problem: The Relationship
12  between Guns and Homicide in American History," in Jennifer Tucker, Barton C.
13  Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of*
14  *History in Contemporary Debates on the Second Amendment* (Washington, D.C.:
15  Smithsonian Institution Scholarly Press, 2019); and "The Opioid Epidemic and
16  Homicide in the United States," co-authored with Richard Rosenfeld and Joel
17  Wallman, in the *Journal of Research in Crime and Delinquency* (2021).

18    5. I am also co-founder and co-director of the Historical Violence
19  Database.  The HVD is a collaborative project to gather data on the history of
20  violent crime and violent death (homicides, suicides, accidents, and casualties of
21  war) from medieval times to the present.  The web address for the Historical
22  Violence Database is: http://cjrc.osu.edu/research/interdisciplinary/hvd.

23    6. My work on data collection has helped me gain expertise on the causes
24  of homicide and mass violence, and on the role technology has played in changing
25  the nature and incidence of homicide and mass violence.

26

27

28

# OPINIONS

## I.   SUMMARY OF OPINIONS

7.     I have been asked by the California Department of Justice to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

8.     My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state but Vermont by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies,

3

including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder.

## II.   GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A.   Homicide and Firearms in the Colonial Era (1688-1763)

9.     In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[3]  But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[4]  By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[5]  Violence among colonists was not a pressing problem on the eve of the Revolution.

---

[3] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016). Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[4] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together.  The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[5] Roth, *American Homicide*, 61-144, and especially the graphs on 38, 39, and 91.  By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services

4

Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

10.     Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.[6]  Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.[7]  And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[8]

11.     Firearm use in homicides was generally rare because muzzle-loading firearms had significant limitations as murder weapons in the colonial era.[9]  They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[10]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[11]  And more important,

---

and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year.  See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[6] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[7] Roth, "Why Guns Are and Aren't the Problem," 116.

[8] Ibid., 116-119.

[9] Ibid., 117.

[10] Ibid.

[11] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker,

muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[12]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[13]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[14]  The firing mechanism also had to be readied, often with a fresh flint.[15]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[16]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[17]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[18]

12.     The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[19]  It did not matter whether the

and Vining, *Firearms and the Common Law*, 41-44.

[12] Roth, "Why Guns Are and Aren't the Problem," 117.

[13] Ibid.

[14] Ibid.

[15] Ibid.

[16] Ibid.

[17] Ibid.

[18] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[19] Roth, "Why Guns Are and Aren't the Problem," 117.

type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[20]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[21]

13.     When colonists anticipated violence or during times of political instability gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[22] so the proportion of homicides committed with firearms was at that time forty percent and rose even higher in contested areas on the frontier.[23]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so three-fifths of homicides of Native Americans by European Americans in New England were committed with firearms.[24]  And slave catchers and posses kept their firearms at the ready, so ninety percent of runaway slaves who were killed in Virginia were shot.[25]  Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[26]  That is why firearms had a modest impact on homicide rates among colonists.

---

[20] Ibid.

[21] Ibid.  Contrary to popular belief, dueling was also rare in colonial America. Roth, *American Homicide*, 45, 158.

[22] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[23] Ibid., 116-117.

[24] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[25] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[26] Ibid., 118-119.

Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

**B.    The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

14.    The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[27]  The threats that such citizens posed to public safety could be checked in most instances by ordinary criminal statutes, drawn largely from British common law.  But at times those threats could be checked only by statutes that placed limits on basic rights.[28]

15.    The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[29]  And they recognized that more civilians, expecting trouble with

---

[27] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003).

[28] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121.

[29] Roth, *American Homicide*, 145-179; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); Alan Taylor, *Divided Ground: Indians, Settlers, and the*

---

8

neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[30] But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England.  Only New York City stood out, at 6 per 100,000 adults per year.[31]  And the proportion of domestic and nondomestic homicides committed with firearms was correspondingly low— between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[32]

---

*Northern Borderland of the American Revolution* (New York: Knopf, 2006); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[30] Roth, "Why Guns Are and Aren't the Problem," 119-120.

[31] Roth, *American Homicide*, 163, 180-198; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[32] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/research/interdisciplinary/hvd/ahsv, accessed September 9, 2022).  On weapons use in homicides in the North, see Figures 25 through 46.

9

16.     The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized.  Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[33]  And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread.  By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[34]  African Americans still faced discrimination and limits on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the North, about earning their own living and forming their own churches and voluntary organizations.[35]

17.     That is why there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels.  They took a strong stand against dueling in the wake of Alexander Hamilton's

---

[33] Roth, *American Homicide*, 180.

[34] Ibid., 180-198.

[35] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.22511   Page 677 of
1315
Case 3:19-cv-01537-BEN-JLB   Document 137-7   Filed 10/13/22   PageID.11443   Page 12 of
65

1  death, because of the threat the practice posed for the nation's democratic polity

2  and the lives of public men: editors, attorneys, military officers, and politicians.[36]

3      18.   Laws restricting the everyday use of firearms did appear, however, in

4  the early national period in a number of slave states,[37] where violence among

5  citizens increased after the Revolution to extremely high levels.  Revolutionary

6  ideas and aspirations wreaked havoc on the status hierarchy of the slave South,

7  where homicide rates ranged from 8 to 28 per 100,000 adults per year.[38]  Poor and

8  middle-class whites were increasingly frustrated by their inability to rise in a

9  society that remained class-bound and hierarchical.[39]  Prominent whites were

10  subjected to the rough and tumble of partisan politics and their position in society

11  was threatened by people from lower social positions.[40]  African Americans

12  despaired over the failure of the abolition movement in the South, and whites were

13  more fearful than ever of African American rebellion.[41]  As a result, impatience

14  with restraint and sensitivity to insult were more intense in the slave South, and

15  during this period the region saw a dramatic increase in the number of deadly

16  quarrels, property disputes, duels, and interracial killings.[42]  The violence spread to

17  frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever

18

19      [36] Joanne B. Freeman, *Affairs of Honor: National Politics in the New
Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End
of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America,"
*Vanderbilt Law Review* 54 (2001): 1805-1847.

20

21

22      [37] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic:
Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger,
1999).

23

24      [38] Roth, *American Homicide*, 199-203.

25      [39] Ibid., 182.

26      [40] Ibid.

27      [41] Ibid.

28      [42] Ibid., 182, 199-224.

Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

Southerners settled in the early national period.[43]  During the Early National period, the proportion of homicides committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[44]

19.    Citizens and public officials in these states recognized that concealable weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming proportion of the era's murders and serious assaults.[45]  They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[46]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[47]

_____

[43] Ibid., 162, 180-183, 199-243; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

[44] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[45] Roth, *American Homicide*, 218.

[46] Ibid., 281-219.  See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[47] Roth, *American Homicide*, 219.

12

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.22513   Page 679 of
1315
Case 3:19-cv-01537-BEN-JLB   Document 137-7   Filed 10/13/22   PageID.11445   Page 14 of
65

These concealed weapons laws were notably difficult to enforce, however, and did
not address underlying factors that contributed to rising homicide rates.
Nevertheless, these laws represent governmental efforts at that time to address the
use of new weapons in certain types of crime.

20.     The pistols of the early national period represented a technological
advance.  Percussion-lock mechanisms enabled users to extend the life of a charge,
because unlike flint-lock mechanisms, they did not use hydroscopic black powder
in their priming pans; they used a sealed mercury-fulminate cap as a primer and
seated it tightly on a small nipple (with an inner diameter the size of a medium
sewing needle) at the rear of the firing chamber, which restricted the flow of air and
moisture to the chamber.  Percussion cap pistols, which replaced flint-lock pistols
in domestic markets by the mid-1820s, could thus be kept loaded and carried
around for longer periods without risk of corrosion.[48]  The new types of knives
available in this era also represented technological advances over ordinary knives
because they were designed expressly for fighting.  Dirks and Bowie knives had
longer blades than ordinary knives, crossguards to protect the combatants' hands,
and clip points to make it easier to cut or stab opponents.[49]

21.     The violence in the slave South and its borderlands, and the
technological advances that exacerbated it, led to the first prohibitions against
carrying certain concealable weapons, which appeared in Kentucky, Louisiana,
Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws
differed from earlier laws that restricted access to arms by Native Americans or by
free or enslaved African Americans, because they applied broadly to *everyone* but

---

[48] Roth, "Why Guns Are and Aren't the Problem," 117.

[49] Harold L. Peterson, *American Knives: The First History and Collector's
Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting
Knives in the Western World, from the Stone Age till 1900* (New York: Walker,
1968), 67-80.

also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances.  Indiana made an exemption for travelers.[50]

      22.     Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[51]

---

[50] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws.  Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols.  See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022).  Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms.  That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[51] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States,"

### C. Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

23. By the early twentieth century, every state except Vermont either banned concealed firearms or placed severe restrictions on their possession.[52] They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse. Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[53] But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North. Americans, especially men, were more willing to kill friends, acquaintances, and strangers. And so, the United States became—and remains today—by far the most murderous affluent society in the world.[54]

---

in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361; Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[52] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.

[53] Roth, *American Homicide*, 297-299.

[54] Ibid., 297-385.

Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

24.    The increase occurred because America's heretofore largely successful effort at nation-building failed catastrophically at mid-century.[55]  As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust.[56]  Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.[57]  They were losing the sense that they were participating in a great adventure with their fellow Americans.[58]  Instead, they were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own.[59]  And most ominously, law and order broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[60]

25.    The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[61]  Because the pistols, muskets, and rifles in use

---

[55] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[56] Roth, *American Homicide*, 299-302, 384-385.  See also Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

[57] Roth, *American Homicide*, 300.

[58] Ibid.

[59] Ibid.

[60] Ibid., 299-385.

[61] Roth, "Why Guns Are and Aren't the Problem," 116-117.

1   in the early years of the crisis of the mid-nineteenth century were still
2   predominantly single-shot, muzzle-loading, black powder weapons, the proportion
3   of homicides committed with guns stayed in the range of a third to two-fifths,
4   except on the frontier.[62]  Concealable fighting knives, together with concealable
5   percussion-cap pistols, remained the primary murder weapons.  But in time, new
6   technologies added to the toll in lives, because of their lethality and the new ways
7   in which they could be used.

8         26.    Samuel Colt's cap-and-ball revolvers, invented in 1836, played a
9   limited role in the early years of the homicide crisis, but they gained popularity
10  quickly because of their association with frontiersmen, Indian fighters, Texas
11  Rangers, and cavalrymen in the Mexican War.[63]  They retained some of the
12  limitations of earlier firearms, because their rotating cylinders—two of which came
13  with each revolver—had to be loaded one chamber at a time.  Users had to seat a
14  percussion cap on a nipple at the rear of each chamber, pour powder into each
15  chamber, secure the powder with wadding, and ram the bullet down the chamber
16  with a rod or an attached loading lever.  Thus cap-and-ball revolvers, like muzzle-
17  loaders, could not be loaded quickly, nor could they be kept loaded indefinitely
18  without risk of damaging the charge or the gun.  But they were deadlier than their
19  predecessors, because they made it possible for a person to fire five or six shots in
20  rapid succession and to reload quickly with the second cylinder.[64]

21  _____

22        [62] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

23        [63] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

24

25        [64] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by*

27.     Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway.  But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers.  It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[65]  And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[66]  As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and ammunition may be carried;
>
> The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
>
> Certainty of fire in damp weather;
>
> That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[67]

28.     Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[68]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the

---

*Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[65] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

[66] Ibid., 38-57.

[67] Ibid., 39.

[68] Ibid., 38-57.

Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

1  first shot, and the difficulty and danger of reloading.  The reloading problem was

2  remedied by Colt's development in 1889 of the first double-action commercial

3  revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an

4  ejector to push out spent cartridges.[69]

5       29.    These new weapons were not the primary cause of the surge in

6  violence that occurred in the United States from the Mexican War through

7  Reconstruction.  But they did contribute to the later stages of the crisis, as they

8  superseded knives and black powder handguns as the primary weapons used in

9  interpersonal assaults, not only because of their greater lethality, but because they

10  were used in novel ways.[70]  Easily concealed, they became the weapons of choice

11  for men who stalked and ambushed estranged spouses or romantic partners, for

12  suspects who killed sheriffs, constables, or police officers, and for self-styled

13  toughs who engaged in shootouts in bars, streets, and even churchyards.[71]  And as

14  modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball

15  gunstock from the late 1850s through World War I, the proportion of homicides

16  committed with firearms continued to climb even when homicide rates fell for a

17  short time, as they did at the end of Reconstruction.[72]  Ominously, too, firearms

18  invaded families and intimate relationships, so relatives, spouses, and lovers were

19

20  [69] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media,

21  2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa
   Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

22  [70] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that

23  "Americans used the new firearms in ways they could never use muzzle-loading

24  guns [. . .] The ownership of modern breech-loading [firearms] made the homicide
   rate worse in the United States than it would have been otherwise because it

25  facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis
   added).

26  [71] Ibid., 124-125.

27  [72] Ibid., 125-127.

28

as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[73]  That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[74]  And that is why every state in the Union except one restricted the right to carrying certain concealable weapons.  The lone holdout was Vermont, the state with the lowest homicide rate.[75]

30.    It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June, 1865, to June, 1868,[76] the legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed carry of a wide range of weapons, including firearms, on social occasions;[77] and it followed in 1871 with a

[73] Ibid., 125.

[74] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[75] Roth, *American Homicide*, 184; and Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000).

[76] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192.

[77] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610.  "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so

bill banning in most circumstances the carrying, open or concealed, of small deadly weapons, including pistols, that were not designed for hunting or militia service.[78]

---

offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63.

[78] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611. Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five or more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.' An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25. The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are

These laws were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[79]

31.    California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[80] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

---

collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3."  The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces.  Also, the deadly weapon law did not apply to all guns or firearms but just pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'"

[79] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication.

[80] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183.  On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354-384.

Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons.  A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[81]

32.    But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[82]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[83]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[84]  And in 1923, the state extended the licensing requirement to

---

[81] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7.

[82] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[83] Ibid., 11.

[84] Ibid., 11-13.

23

unincorporated areas and prohibited non-citizens from carrying concealed weapons.[85]

33.    Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[86]

The burden of proof remained with the person who carried the concealed weapon.

34.    It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

## III.   ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

35.    The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the

---

[85] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[86] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

24

nineteenth century because of the limits of existing technologies.[87]  The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans or irregular warfare among citizens seeking political power.[88]  But from the 1830s into the early twentieth century, mass killings were common.

36.     Examples include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and

---

[87] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996).

[88] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644]. For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 39-31]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

1    the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871.

2    Because these mass killings were almost always spontaneous and loosely

3    organized, they were difficult for government to prevent.  Worse, in some incidents,

4    such as the Haun's Mill Massacre, state and local governments were complicit; and

5    in others, state and local governments turned a blind eye to the slaughter, as was the

6    case in the murder of Chinese farm workers in Chico, California, in 1877.[89]

7          37.    The Federal government did act during Reconstruction, however, to

8    prevent mass murder when formally organized white supremacist organizations

9    engaged in systematic efforts to deprive African Americans of their civil rights,

10   which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth

11   Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to prevent

12   assassinations and mass shootings and lynchings by white supremacist terrorists,

13   were effective when enforced by the federal government and the U.S. Army.[90]  But

14   when federal troops were withdrawn, white supremacist mass killings resumed.  In

15   New Orleans, for example, an ultimately successful effort by white-supremacist

16

17   [89] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates*, The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney*, The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

[90] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

1   Democrats to seize control of the city's government by violent means left dozens of

2   Republican officials and police officers shot dead and scores wounded.[91]  And the

3   Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely

4   organized vigilantes.  Rioters and vigilantes remained a threat well into the

5   twentieth century.  In 1921 more than three hundred African American citizens

6   were murdered in the Tulsa Race Massacre in Oklahoma.[92]

7   **IV.  ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM
      MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE
8     PRESENT**

9          38.     The character of mass murder began to change in the late nineteenth

10  and early twentieth century with the invention and commercial availability of new

11  technologies that gave individuals or small groups of people the power to kill large

12  numbers of people in a short amount of time.  These technologies proved useful to

13  criminal gangs, anarchists, and factions of the labor movement intent on killing

14  adversaries, public officials, and law enforcement officers.  The technologies that

15  were most widely used by criminals and terrorists were dynamite, invented by

16  Alfred Nobel in 1866, and the submachine gun, invented by General John T.

17  Thompson in 1918.

18

19

20         [91] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*
    (Baton Rouge: Louisiana State University Press, 1996), 151-158.  See also
21  LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White
    Terror, and the Death of Reconstruction* (New York: Oxford University Press,
22  2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil
    War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.
23

24         [92] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race
    Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott
25  Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge:
    Louisiana State University Press, 1982); and Tim Madigan, *The Burning:
26  Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas
    Dunne Books / St. Martin's Press, 2001).
27

28

39.     The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare.  The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[93]

40.     Criminals and terrorists quickly discovered how accessible and useful these new technologies were.  They could be purchased legally by private citizens. In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, when a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[94]  That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers. Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[95]  Federal, state, and

[93] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

[94] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022. The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[95] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing

1  local officials and law enforcement officers suddenly confronted novel threats to
2  their personal safety.  Submachine guns were used most notoriously in gangland
3  slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day
4  Massacre and the Kansas City Massacre.[96]  Dynamite was used in a string of
5  anarchist bombings in 1919-1920.  Those included the murder of 38 people and the
6  wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice
7  officials, newspaper editors, and businessmen (including John D. Rockefeller), and
8  a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[97]
9  Dynamite was also used effectively for malicious, private ends.  For example,
10  Osage Indians were murdered by an individual in Oklahoma in an attempt to gain
11  their headrights and profit from insurance policies on them.[98]

12  _____
13  Office, 1922), 6.  Note that a pound of dynamite would be far more expensive
   today—potentially hundreds of thousands of dollars—because it would require the
14  purchase of a blasting license, a storage bunker, and an isolated plot of land for the
   storage bunker.  See U.S Department of Justice, Bureau of Alcohol, Tobacco,
15  Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal
16  Explosives Law and Regulations, 2012*
   (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-
17  and-regulations-atf-p-54007/download), accessed October 4, 2022.

18      [96] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre:
19  The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville:
   Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

20      [97] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton:
21  Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall
   Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford
22  University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to
23  the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also
   the bombing of the office of the *Los Angeles Times* in 1910 by two union activists,
24  which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The
25  Story of Class Violence in America* (New York: Viking, 1931).

26      [98] For this and other murders of Osage people see David Grann, *Killers of the
27  Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday,
   2017).
28

29

41.     Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[99] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[100]  And the Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[101]

42.     Since 1970, public officials have continued to reserve the right to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder.  The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder.  The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in

---

[99] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238.  In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[100] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

[101] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

1   1995.[102]  And in the wake of the massacre of 58 people and wounding of hundreds

2   of others at a concert in Las Vegas in 2017, the Trump administration issued a

3   regulation that banned the sale or possession of bump stocks.  It gave owners 90

4   days to destroy their bump stocks or turn them in to the Bureau of Alcohol,

5   Tobacco, Firearms, and Explosives.[103]

6        43.    In recent decades, criminal organizations, terrorists, and lone gunmen

7   with an intent to commit mass murder have also discovered the effectiveness of

8   rapid-fire semiautomatic weapons with large capacity magazines.  These weapons,

9   which were designed for offensive military applications rather than individual self-

10  defense, emerged from technologies developed for military use during the Cold

11  War.  The signature military firearm of that era—the M-16 rifle with a 30-round

12  magazine and a muzzle velocity of over 3,000 feet per second[104]—was capable of

13  firing 750 to 900 rounds per minute when set on fully automatic.  But the M-16 was

14  used more often in combat—and more accurately, effectively, and sustainably as a

15  weapon for inflicting mass casualties—when set on semiautomatic, which was

16  standard military procedure.  That is why the U.S. Army defines "rapid fire" as 45

17  rounds per minute, not 750 to 900.[105]  And that is why in 1998 the U.S. Marine

18

19      [102] Public Law 107-296, November 25, 2002, "To Establish the Department
of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and

20  6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate
(https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J).  The

21  ammonium nitrate regulations were to be enforced no later than 90 days after

22  December 26, 2007.  Accessed August 31, 2022.

23      [103] *New York Times*, December 18, 2018

24  (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html),
accessed October 4, 2022.

25      [104] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

26      [105] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24

27  (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC

28  3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May

31

1   Corps adopted the M-16A4, which replaced the "fully automatic" switch with a

2   three-round burst—an alteration that slows the potential rate of fire, conserves

3   ammunition, and improves accuracy.[106]

4       44.    The muzzle velocity of semiautomatic handguns, like the Glock 17, is

5   far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per

6   second.  But technological advances have increased the speed at which

7   semiautomatic handguns can be fired.  An expert can fire an entire 30-round clip

8   from a Glock 17 handgun in five seconds.[107] And they are affordable.  A new

9   semiautomatic handgun can be purchased for less than $200 and equipped with a

10  33-round magazine for less than $15.[108]

11      45.    It did not take criminals, terrorists, and lone gunmen long to adopt the

12  rapid-fire semiautomatic handguns and rifles with large capacity magazines that

13  poured onto the domestic market in the 1970s and 1980s.  These firearms can inflict

14  mass casualties in a matter of seconds and maintain parity with law enforcement in

15  a standoff.

16      46.    Manufacturers soon discovered ways to increase the rate of fire of

17  these new semiautomatic weapons even further.  Some innovations, such as bump

18

19  2016).  Available at the Army Publishing Directorate Site

20  (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

21      [106] See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

22      [107] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds!

23  660 RPM."  YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs),

24  accessed September 1, 2022.

25  [108] See guns.com for the price of semiautomatic handguns

26  (https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250) and bymymags.com for the price of

27  large capacity magazines (https://www.buymymags.com/), accessed October 4,

28  2022.

Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*— a modification that doubles the rate at which semiautomatic weapons can be fired.[109]

47.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[110]

---

[109] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement. Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida. (https://lundestudio.com/are-binary-triggers-legal/), accessed October 4, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed October 4, 2022.

[110] See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed October 4, 2022.

48.     The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings. The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

Figure 1

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.[111]

---

[111] The data are from the Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022.  The Violence Project, which has compiled data on mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to

49.     And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

Figure 2

|  | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

50.     Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and 26 percent more than semiautomatic handguns.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns.  And extended magazines are two-and-a-half times more likely to be used in mass shootings with semiautomatic rifles than with semiautomatic handguns: in 30 percent versus 12

---

any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project database provides information on the weapons used in the shootings.  It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons.  Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, that fit the Violence Project's definition of a mass shooting.  Three were committed with semiautomatic rifles and three with semiautomatic handguns.  The table does not include the Las Vegas shooting of 2017 (58 killed, 887 wounded).

1  percent of incidents.  Semiautomatic rifles and extended magazines are deadly on

2  their own.  But in combination, they are extraordinarily lethal.[112]

3      51.    For these reasons, local governments have enacted bans on the sale of

4  semiautomatic rifles with features that enhance their military utility, as the federal

5  government did from 1994 to 2004.  And local governments have banned the sale

6  of large capacity magazines, because they allow mass murderers to prolong their

7  attacks before citizens or law enforcement can intervene—usually when the shooter

8  is reloading.  For example, the shooter who wounded U.S. House Representative

9  Gabby Giffords in Tucson, Arizona, in 2011 was able to fire 31 rounds with a

10  Glock 19 semiautomatic handgun in a matter of seconds before bystanders could

11  disarm him as he changed magazines.  Every one of those rounds hit an individual,

12  killing six and injuring twelve.[113]

13  **V.    CONCLUSION**

14      52.    From the Founding Generation to the present, the people of the United

15  States and their elected representatives have recognized that there are instances in

16  which the security of the republic and the safety of its citizens require government-

17  imposed restrictions.  That is why the majority of states passed and enforced laws

18  against the carrying of concealable weapons, why the federal government passed

19  the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and

20  the federal government have passed and enforced laws since World War I to restrict

21  ownership or control of modern technologies that enable criminals, terrorists, and

22  malicious or delusional individuals to commit mass murder.  Public officials are not

23  required to pass such laws, of course, but historically, they have always retained the

24  ability to do so.  There is no evidence in the historical record to suggest that they

25  _____

26  [112] The data are from the Violence Project.

27  [113] "2011 Tucson Shooting," Wikipedia
   (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2,

28  2022.

1   took their decisions lightly when they imposed these restrictions on weapons and

2   armed voluntary organizations.  And mass murders by individuals, including mass

3   shootings, are a recent phenomenon, caused by changes in technology that emerged

4   in the late nineteenth through the late twentieth century.  Public officials today are

5   confronting a criminological problem that did not exist in the Founding Era, nor

6   during the first century of the nation's existence.

7

8       I declare under penalty of perjury under the laws of the United States of

9   America that the foregoing is true and correct.

10       Executed on October 12, 2022, at Dublin, Ohio.

11

12

13                   _____

14                       Randolph Roth

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Randolph Roth (3:19-cv-01537-BEN-JLB)

# EXHIBIT A

Randolph Roth                                                                  Page 1


Curriculum Vitae

RANDOLPH ROTH

Department of History                          6987 Grandee Cliffs Drive
The Ohio State University                       Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                                  (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                        2

Education                                                           2
Academic Positions                                                  2
Honorary Positions                                                  2
Professional Honors and Awards for Scholarship                      2
Professional Honors and Awards for Teaching                         3
Grants                                                              3

**Bibliography and Research**                                       4-17

**Teaching**                                                        18-20

**Service**                                                         21-26

Randolph Roth                                                          Page 2

**Personal**

     Marital Status:      Married      Allison Sweeney
     Children:           Alexander

**Education**

     1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire? Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis and Howard R. Lamar, advisors)

     1973, B.A., with honors and distinction, in History, Stanford University (thesis, "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl Degler and Barton Bernstein, advisors)

**Academic Positions**

     1985-present, The Ohio State University: College of Arts and Sciences Distinguished Professor of History and Sociology
     1978-1985, Grinnell College: Assistant Professor of History
     1978, University of Vermont: Instructor in History
     1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

     2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

     2013-2016, Member, Roundtable on Crime Trends in America, National Research Council, National Academy of Sciences

     2012, Fellow, American Association for the Advancement of Science

     2011, Michael J. Hindelang Award, American Society of Criminology, for the outstanding contribution to criminology over the previous three years

     2010, Allan Sharlin Memorial Award, Social Science History Association, for an outstanding book in social science history

     2010, Outstanding Academic Books, *Choice*

Randolph Roth                                                                Page 3

    1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village
Research Society, for distinguished work in the history of rural society

    1982, Thorton Rockwell Field Prize, Yale University, for the outstanding
dissertation in the Humanities

    1982, George Washington Eggleston Prize, Yale University, for the
outstanding dissertation in American history

    1973, James Birdsdall Weter Prize, Stanford University, for the
outstanding senior thesis in history

**Professional Honors and Awards for Teaching**

    2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and
Mentoring, College of Arts and Humanities

    2013, Outstanding Teaching Award, College of Arts and Sciences Student
Council

    2009, Ohio State University Alumni Award for Distinguished Teaching

    2007, Distinguished Teaching Award, Ohio Academy of History

    1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in
History at Ohio State University

**Grants**

    2013-2014, Research Grant, Harry Frank Guggenheim Foundation

    2012-2015, Research Grant, National Science Foundation (SES-1228406)

    2000, Fellowship for University Teachers, National Endowment for the
Humanities

    1998-2000, Research Grant and Supplemental Research Grant, National Science
Foundation (SBR-9808050)

    1992, Fellow, Workshop on the Rhetoric of Social History, University of
Iowa

Randolph Roth                                                                                      Page 4

    1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

    1987, National Endowment for the Humanities, Summer Stipend

    1983, Research Fellowship for Recent Recipients of the Ph.D., American Council of Learned Societies

    1981, Fred Harris Daniels Fellowship, American Antiquarian Society

**Bibliography and Research**

**Books**

    *American Homicide* (an interregional study of violent crime and violent death in America from colonial times to the present). The Belknap Press of Harvard University Press (2009), 655 pp.

    *The Democratic Dilemma:  Religion, Reform, and the Social Order in the Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press (1987), 399 pp.

**Edited Volumes**

    Co-founder and co-director, Historical Violence Database (on-line database on violent crime, violent death, and collective violence).  Web address: www.sociology.ohio-state.edu/cjrc/hvd

    American Homicide Supplementary Volume (on-line supplement to *American Homicide*, including detailed appendices on methods, supplemental tables, graphs, and statistical analyses), approx. 750 pp. Web address: http://cjrc.osu.edu/researchprojects/hvd/AHsup.html

**Essays on Historical Subjects**

    "Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with Richard Rosenfeld and Joel Wallman. *Homicide Studies* (forthcoming).

    "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

Randolph Roth                                                                      Page 5

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-400.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

"Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim

Randolph Roth                                                                    Page 6

Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

"Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds., *Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708.

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary*

Randolph Roth                                                                 Page 7

*Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*. Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.

**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism?  The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods*

Randolph Roth                                                                    Page 8

(1986) 19: 103-117.

## Public History Essays

"Can Faith Change the World?  Religion and Society in Vermont's Age of Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.

## Works in Progress

*Child Murder in America*. An interregional study of murders of and by children from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of Speaking for Nature" (essay in manuscript)

## Editorial Boards

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*

## Invited Lectures

"The History of Police Involved Homicides in the United States," Mary Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime Historians Symposium, Leeds University, Great Britain, Scheduled for September 2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the Available Historical Data, and Why We Have to Worry about Learning the Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020. Postponed.

Randolph Roth                                                                    Page 9

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15, 2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

"Quantitative Analysis of the History of Crime and Violence: Achievements and Prospects," Keynote Address, Conference on "Making Sense of Violence," University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences,

Randolph Roth                                                                Page 10

and the Social Sciences in the Study of Violence." Conference on Emerging Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May 25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Presidential Plenary Address, Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the "From Borderland to Backcountry Conference: Frontier Communities in Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15, 2007

 "American Homicide: Its History," Ohio State University at Newark, Nov. 6, 2007

 "American Homicide: A Political Hypothesis" and "The Case for Social Science History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the Historical Approaches in the Social Sciences series, State University of New York at Binghamton, Oct. 12, 2006

 "The History of American Homicide," Winter College, Ohio State University, Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group, Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies?  A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

Randolph Roth                                                      Page 11

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September, 2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October, 1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the

Randolph Roth                                                                      Page 12

Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities.  The presentation was televised in Vermont.  It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999

**Papers Delivered at Professional Meetings (recent)**

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

Randolph Roth                                                               Page 13

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

 "The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports," Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of

Randolph Roth                                                          Page 14

Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent." Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6, 2005

**Reviews**

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Randolph Roth                                                          Page 15

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty:  A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic:  Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness:  Management of Christian Service Organizations* (American Historical Review, 1996).

Randolph Roth                                                                    Page 16

N. Prabha Unnithan, *The Currents of Lethal Violence:  an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love:  Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America:  Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws:  Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation:  Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen:  The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change:  Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power:  The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life:  Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture* (Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South* (International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of

Randolph Roth                                                      Page 17

*Rational Religion in New England* (New England Quarterly, 1985).


**Languages**

    German
    Spanish
    French (reading)


**Quantitative Skills**

    Probability and Statistics (including econometric techniques of political analysis, exploratory data analysis, and log-linear and logit analysis)
    Calculus and Analytical Geometry
    Linear Algebra and Nonlinear Dynamics
    Differential and Series Equations
    Abstract Algebra

Randolph Roth                                                    Page 18

## Teaching

### Graduate

| | |
|---|---|
| History 7000 | Topics in American History to 1877 |
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| | |
|---|---|
| History 2001 | American Civilization, 1607-1877 (and Honors) |
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

## Publications on Teaching

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

## Ph.D Students Supervised

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

Randolph Roth                                                                    Page 19

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Assistant Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Randolph Roth                                                                    Page 20

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities, Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017). Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points, New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West Virginia's Multiracial Community" (2010). Ph.D. candidate in early American history at the College of William and Mary. Recipient of the first Annual Prize at Ohio State for the outstanding senior honors thesis in the Department of History.

Randolph Roth                                                         Page 21

## Service

### Service in Professional Organizations

2018-present, Allen Sharlin Book Prize Committee, Social Science History Association

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

1987-1993, Chair, Methods and Theory Network, Social Science History Association

Randolph Roth                                                    Page 22

    1987, Program Committee, Social Science History Association


**Reviews of Manuscripts**

        American Historical Review
        Journal of American History
        William and Mary Quarterly
        Journal of the Early Republic
        Social Science History
        Journal of Interdisciplinary History
        Historical Methods
        Journal of Women's History
        Journal of the Family
        Crime, History, and Societies
        European Journal of Criminology
        American Journal of Sociology
        Sociological Quarterly
        Criminology
        Criminal Justice Review
        Journal of Criminal Law and Criminology
        Law and Social Inquiry
        Homicide Studies
        International Criminal Justice Review
        International Journal of Law, Crime, and Justice
        Law and Society Review
        City and Community
        Eras Review
        Western Historical Quarterly
        Canadian Journal of Sociology
        Journal of the Gilded Age


**Memberships in Professional Organizations (current)**

        American Historical Association
        Organization of American Historians
        Social Science History Association
        European Social Science History Association
        American Society of Criminology
        Homicide Studies Working Group
        American Association for the Advancement of Science


**Service at Ohio State University**

Randolph Roth                                                      Page 23

**Department**

2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

1994-2015, 2018-present, Undergraduate Teaching Committee

2017-2018, Chair of Grievance Committee

2015-2017, 1991-1993, Chair of Graduate Studies

2012-2013, Chair of Undergraduate Studies

2011-2013, Advisory Committee and Salary Committee

1987-1991, History Department Promotion & Tenure Committee

**College of Humanities**

2007-2009, Curriculum Committee, College of Humanities

2002-2005, College of Humanities Computing Advisory Committee

1996-1997, College of Humanities Committee on the Center for the Study and Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

**College of Arts and Sciences**

2006-2009, Alternate, Arts and Sciences Faculty Senate

2006- , Advisory Board, Criminal Justice Research Center, Department of Criminology and Sociology

2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of Law

2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior Sciences

**Graduate School**

2018- , Graduate Awards Review Committee

Randolph Roth                                                                    Page 24

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin: advises City Council on all matters concerning utilities, policing, transportation, parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit Badge Counselor / Eagle Scout Association / Philmont Staff Association / Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic association officers and city commission members

1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

1995-1997, Community Plan Steering Committee, City of Dublin

Randolph Roth                                                          Page 25

> 1988-present, President / Vice President / Trustee, East Dublin Civic Association
>
> 1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew Leader

## Outreach / Media Appearances

> Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on so-called "Stand Your Ground" laws.
>
> B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility Equality and Dignity), January 13, 2020, on gun violence in central Ohio.
>
> Testimony to Federalism Committee of the Ohio House of Representatives, June 12, 2019, on concealed carry laws.
>
> Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019
>
> Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S. with Undergraduate Students, April 10, 2019
>
> "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.
>
> "How the Erosion of Trust Leads to Murders and Mass Shootings," invited editorial, *Washington Post*, October 6, 2017
>
> "Mass Murder in American History," CSpan-3, April 2, 2017
>
> All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism," December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the United States," March 14, 2017.
>
> Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-2014
>
> Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-span.org/LocalContent/Columbus/)
>
> Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E Home Video)
>
> "It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009

Randolph Roth                                                     Page 26

(http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and
http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; *American Homicide* was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 (**http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column**)

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

# EXHIBIT 16

1   Rob Bonta
    Attorney General of California
2   P. Patty Li
    Supervising Deputy Attorney General
3   Anna Ferrari
    Deputy Attorney General
4   John D. Echeverria
    Deputy Attorney General
5   State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and*
    *Blake Graham, in their official capacities*

9

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                      CIVIL DIVISION

13

| | |
|---|---|
| 14   **JAMES MILLER et al.,** | 3:19-cv-01537-BEN-JLB |
| 15                    Plaintiffs, | **DECLARATION OF ROBERT SPITZER** |
| 16   **v.** | Dept:        5A |
| 17   **CALIFORNIA ATTORNEY** | Judge:      Hon. Roger T. Benitez |
| 18   **GENERAL ROB BONTA et al.,** | Action Filed:  8/15/2019 |
| 19                    Defendants. | |

20

21

22

23

24

25

26

27

28

                              1

## DECLARATION OF ROBERT SPITZER

I, Robert Spitzer, declare under penalty of perjury that the following is true and correct:

1.      I have been asked by the California Department of Justice to render an opinion on the history of firearms restrictions enacted in the early twentieth century, addressing machine guns (fully automatic firearms), semiautomatic firearms, and ammunition feeding devices, and tracing those regulations back to earlier hardware and use restrictions on other types of weapons enacted in the nineteenth century and earlier.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.      I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $500 per hour.

## BACKGROUND AND QUALIFICATIONS

4.      I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I earned my Ph.D. in Government from Cornell University.  I reside in Williamsburg, Virginia.  A copy of my curriculum vitae is attached as Exhibit A to this Declaration.

5.      I have been studying and writing about gun policy for over thirty years.  My first publication on the subject appeared in 1985.  Since then, I have published six books and over one hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge Publishers.  My two most recent books on gun policy, *Guns across*

1

1   *America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford
2   University Press, 2023), both deal extensively with the study of historical gun laws.
3   I am frequently interviewed and quoted in the national and international media on
4   gun-related matters.  For over twenty years, I have been a member of the National
5   Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun
6   Violence).

7       6.      I have provided written testimony as an expert witness in *Worman v.*
8   *Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the constitutionality of
9   Massachusetts' restrictions on assault weapons.  I have co-authored amicus briefs in
10  numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit,
11  319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court,
12  556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742
13  (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d
14  684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court,
15  No. 08 CR 12069 (2012).

16      7.      I have also presented written testimony to the U.S. Congress on "The
17  Second Amendment: A Source of Individual Rights?" submitted to the Judiciary
18  Committee, Subcommittee on the Constitution, Federalism, and Property Rights,
19  U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand
20  Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee
21  on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington,
22  D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun
23  Silencers," submitted to Committee on Natural Resources, Subcommittee on
24  Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's
25  Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C.,
26  September 12, 2017.

27

28

# OPINIONS

## I.  INTRODUCTION

1.  The current controversy surrounding legislative efforts to restrict semi-automatic assault weapons and large capacity magazines would seem to be a purely contemporary matter, responding to the modern phenomenon of mass shootings. The effort to restrict such weapons was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others.  Later that year, California enacted the first assault weapons ban in the country.  Five years later, Congress enacted a limited ten year ban.[1]  As of this writing, eight states plus the District of Columbia have similar bans in place.[2]  These jurisdictions represent approximately 89 million people, or approximately 26.8% of the U.S. population.[3] Twelve states plus the District of Columbia restrict large capacity magazines

---

[1] Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 25-26, 205-11.

[2] Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 14-15.  The nine American jurisdictions with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Maryland, Massachusetts, New Jersey, and New York.  Notably, the U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware recently enacted its assault weapons and large-capacity magazine restrictions in June 2022.  *See* Governor Carney Signs Package of Gun Safety Legislation (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[3] See U.S. Census, National Population Totals and Components of Change: 2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates). The total population in these jurisdictions is estimated to be 88,976,315 out of a U.S. total of 331,501,080.

Declaration of Robert Spitzer (3:19-cv-01537-BEN-JLB)

1   (LCMs).[4]  These jurisdictions represent more than 103 million individuals, or

2   approximately 31.2% of the U.S. population.[5]  And in 2022, the U.S. House of

3   Representatives passed a renewed nationwide assault weapons ban with LCM

4   restrictions.[6]

5       2.     These recent efforts to restrict assault weapons and LCMs are simply

6   the latest chapter in a centuries-long effort to protect the public from harm and to

7   dampen weapons-related criminality.  The pattern of criminal violence and

8   concerns for public safety leading to weapons restrictions is not new; in fact, it can

9   be traced back to the Nation's beginnings.  While the particular weapons

10  technologies and public safety threats have changed over time, governmental

11  responses to the dangers posed by certain weapons have remained constant.

12  Current restrictions on assault weapons and detachable ammunition magazines are

13  historically grounded.  They are part of a pattern in America's history of legislative

14  restrictions on particular weapons stretching back centuries.

15

16

17

18      [4] Giffords Law Center, Large Capacity Magazines,

19  https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma*, 30.  The thirteen jurisdictions are

20  California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii,

21  Maryland, Massachusetts, New Jersey, New York, Rhode Island, Vermont, and Washington.  With two exceptions, all of these restrictions impose a ten-round limit

22  on magazines, as did the 1994 federal law, and Hawaii's restrictions apply to only

23  handguns.

24      [5] U.S. Census, National Population Totals and Components of Change: 2020-

25  2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates).  The total

26  population in these jurisdictions is estimated to be 103,503,256 out of a U.S. total

27  of 331,501,080.

       [6] H.R. 1808, 117th Cong. (2022).

28

## II. REGULATORY HISTORY OF FULLY AUTOMATIC AND SEMI-AUTOMATIC FIREARMS (EARLY TWENTIETH CENTURY)

3.   A clear example of this historical pattern is provided by early twentieth-century restrictions related to fully automatic firearms.  While weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[7] it and its successors were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus, owing to the Gatlin gun's size and weight.  Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger.  The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition during World War I, and to devastating effect, where tripod-mounted machine guns on the battlefield, like the Maxim, which initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[8]

4.   Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon: the Thompson submachine gun, widely known as the

---

[7] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and the Spanish-American War of 1898.  Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367-68; "Gatling Gun," *History.com,* September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

[8] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 127; "How The Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

Tommy gun.  Though it was developed for use in World War I, it came too late in the war to have much effect.  Its inventor, John Thompson, patented his .45 caliber gun in 1920.[9]  The Tommy gun was initially unregulated after World War I and made available for civilian purchase, typically with either a 20-30 round stick magazine or a 100-round drum magazine.  (The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[10])  It was only at this point—in the early 1920s—that such hand-held weapons operated reliably, were made available to civilians, and began to circulate in society,[11] though sales in the early 1920s were sluggish.  By 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[12]  Before the early 1920s, these weapons were unregulated for the obvious reason that they did not exist or were not circulating widely in society.  When they did begin to circulate, however, their uniquely destructive capabilities rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of the 1920s.  Another automatic weapon developed for World War I was the Browning Automatic Rifle (BAR).  It fired a .30-06 caliber round, could

---

[9] Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

[10] John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 149-52.

[11] Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest*, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

[12] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 203.

receive a 20-round box magazine, and could fire up to 650 rounds per minute.  The BAR first appeared on the battlefield in 1918.[13]  It, too, made its way into civilian life and found favor among criminals and gangsters in the 1920s and early 1930s.[14]  Like contemporary assault weapons and their use in mass shootings, guns like the Tommy gun and the BAR were actually used relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929.[15]

A.     **State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century**

5.     In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws; eight of these laws were passed in 1927 alone (see Exhibits B and D).  These state (and eventual federal) enactments were anticipated, justified, and promoted by the National Conference of Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-partisan, well-conceived and well-

---

[13] Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[14] Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12.  The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example.  Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[15] Chris McNab, *Firearms and American Law Enforcement Deadly Force* (NY: Osprey Publishing, 2009), 97-98.

1  drafted legislation that brings clarity and stability to critical areas of state statutory

2  law."[16]  (Today, the organization is known as the Uniform Law Commission.)  In

3  1923, the Commission organized a special committee to draft a "Uniform Act to

4  Regulate the Sale and Possession of Firearms."  In 1928, it issued a model law

5  calling for the prohibition of the possession of "any firearm which shoots more than

6  twelve shots semi-automatically without reloading."[17]  In 1930, it issued a model

7  firearms act focusing on "guns of the pistol type."  In 1932, it issued a model act

8  "intended not only to curb the use of the machine gun, but to make it unwise for

9  any civilian to possess one of the objectionable type."  The Commission explained

10  that, between 1923 and 1930, "the infant industry of racketeering grew to

11  monstrous size, and with it the automatic pistol replaced the revolver, to be in turn

12  displaced by a partly concealable type of machine gun-the Thompson .45 inch

13  caliber submachine gun becoming most popular. . . ."[18]

14      6.    Congress enacted a machine gun ban for the District of Columbia in

15  1932 which included as a machine gun "any firearm which shoots automatically or

16  semiautomatically more than twelve shots without reloading."[19]  The National Rifle

17  Association endorsed DC's ban, stating "it is our desire [that] this legislation be

18  enacted for the District of Columbia, in which case it can then be used as a guide

19  

20  [16] Uniform Law Commission, About Us,
https://www.uniformlaws.org/aboutulc/overview.

21  

22  [17] Report of Firearms Committee, 38th Conference Handbook of the National
Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23
(1928).

24  [18] "Uniform Machine Gun Act," National Conference of Commissioners on
Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October
4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

26  [19] "Hearings Before the Committee on Ways and Means, National Firearms
Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16,
1934 (Washington, D.C.: GPO, 1934), 45 ; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

28

1   throughout the states of the Union."[20]  In his testimony before Congress in 1934 on

2   the bill that became the National Firearms Act, NRA vice president Milton A.

3   Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . .

4   the association I represent is absolutely favorable to reasonable legislation.  We are

5   responsible for the uniform firearms act. . . . in the District of Columbia.  It is on

6   the books now."[21]

7        7.    In 1934, Congress enacted the National Firearms Act, which imposed

8   a series of strict (and effective[22]) requirements on the civilian acquisition and

9   general circulation of fully automatic weapons, like the Tommy gun.  The National

10  Firearms Act imposed a tax on the manufacture, sale, and transfer of listed

11  weapons, including machine guns, sawed-off shotguns and rifles, silencers, and

12  "any other weapons" with certain firing capabilities.  Such weapons had to be

13  registered with the Treasury Department, and the owners fingerprinted and subject

14  to a background check, with the payment of a $200 tax.[23]  The early models of the

15  Tommy gun could fire "an astounding 1,500 rounds per minute.  A Tommy gun

16  could go through a 100-round drum magazine in four seconds.  Later versions fired

17  600 to 700 rounds per minute."[24]

18

19

20      [20] S. Rep. No. 72-575, at 5-6 (1932).

21      [21] "Hearings Before the Committee on Ways and Means," 36.

22      [22] Philip J. Cook and Kristin A. Goss, *The Gun Debate,* 2nd ed. (NY: Oxford
    University Press, 2020), 13; Spitzer, *The Politics of Gun Control*, 195-96.

23  According to the ATF's national registry of machine guns, 726,951 are registered
    with the government as of 2020.  Such weapons are rarely used in crimes.  Firearms

24  Commerce in the United States Annual Statistical Update 2020, United States

25  Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, 15,
    https://www.atf.gov/file/149886/download.

26      [23] 48 Stat. 1236.

27      [24] Moss, "From Gangland to the Battlefield."

28

8.      In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.[25]

As one member of the committee observed, "The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as [John] Dillinger and others."[26]

9.      To address the problem, the original version of the bill proposed regulating both semi-automatic and fully automatic firearms, as it defined restricted machine guns this way: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[27] The final version of the bill limited restrictions to fully automatic firearms. Contemporary assault weapons that fire semi-automatically, like AR-platform rifles, are excluded from the National Firearms Act.

---

[25] "Hearings Before the Committee on Ways and Means," 4.  The version of the bill that appears on page 1 of the Hearings had this definition of machine gun: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading."

[26] "Hearings Before the Committee on Ways and Means," 42.

[27] Ibid., 52.

10.     In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period, at least seven states plus the District of Columbia, and as many as eleven states, enacted laws restricting semi-automatic weapons (see Exhibit B).[28]  The reason for restricting semi-automatic firearms is not hard to discern.  With the exception of the District of Columbia's restrictions on semi-automatic weapons, these restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology: an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[29]

11.     As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time.  By that time, gun technology was now available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices.  Again, the lesson is the same: once these technologies began to spread in civil society, regulatory efforts proliferated.

---

[28] See also Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 68-71. The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[29] Spitzer, *The Gun Dilemma*, 32-33.  In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns."  While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

### B.      State Regulation of Ammunition Feeding Devices

12.      Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic weapons are predicated on some kind of mechanical loading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired.  As is the case with contemporary state limitations on ammunition magazine capacity, state laws enacted early in the twentieth century imposed restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

13.      Magazine firing limits were imposed in three categories of state laws (see Table 1 below): twelve states plus the District of Columbia regulating semi-automatic and fully automatic weapons (California, District of Columbia, Louisiana, Massachusetts, Michigan, Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Carolina, South Dakota, and Virginia[30]); nine states regulated fully automatic weapons only, where the regulation was defined by the

---

[30] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137. Two of these states enacted early laws focused on such weapons' use in hunting.  New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading." 1920 N.J. Laws 67, ch. 31, Section 9.  North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

1   number of rounds that could be fired without reloading or by the ability to receive

2   ammunition feeding devices (Illinois, Minnesota, New Jersey, North Dakota,

3   Oregon, Pennsylvania, Texas, Vermont, and Wisconsin[31]); and four states restricted

4   all guns that could receive any type of ammo feeding mechanism or round feeding

5   device and fire them continuously in a fully automatic manner (California, Hawaii,

6   Missouri, and Washington State)[32].

7

8

9

10

11

12

13

14

15

16

17

18

19   _____

20   [31] 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2; 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2; 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

27   [32] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

28

**TABLE 1**

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917-1934[33]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Louisiana (8 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Carolina (8 rounds; 1934)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

See Exhibit D for statutory text.

---

[33] Including the District of Columbia.  Note that California, Minnesota, and New Jersey appear twice in this table.  The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934.  See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

14.    A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber *in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.*[34]

The other three states in this category (Hawaii, Missouri, Washington[35]) utilized this same description.  In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).  The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[36]  (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as noted previously.[37]  The final version of the 1934 bill was limited to fully automatic firearms only and did not include any limitation by number of rounds fired.)  Regulations concerning removable magazines and magazine capacity were in fact common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality—as these

---

[34] 1927 Cal. Stat. 938 (emphasis added).

[35] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[36] "National Firearms Act," Hearings Before the Committee on Ways and Means, House of Representatives, on H.R. 9066, April 16, 18, and May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 52.

[37] Ibid., 45.

1    regulations were adopted by nearly half of all states, representing approximately

2    58% of the American population at that time.[38]

### C.   Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices in the Early Twentieth Century

6    15.    The lesson from this sequence of events early in the twentieth century

7    demonstrates that changes in gun policy followed a series of steps that respond to

8    developments in firearms technologies and their use in crime, each dependent on

9    the previous step.  *First*, a new gun or gun technology is invented.  *Second*, it may

10   then be patented, though the patenting of a design or idea by no means assures that

11   it will proceed beyond this point.  *Third*, it may then be developed with a focus on

12   military applications and supplying military needs, not directly for civilian

13   acquisition or use.  *Fourth*, some military-designed weapons may then spread to, or

14   be adapted to, civilian markets and use.  *Finally*, if such weapons then circulate

15   sufficiently in society to pose a safety, violence, or criminological problem or

16   threat, calls for government regulation or restriction then may lead to gun

17   policy/law changes.  New gun laws are not enacted when firearm technologies are

18   invented or conceived.  They are enacted when those technologies circulate

19   sufficiently in society to spill over into criminal or other harmful use, presenting

20   public safety concerns that governments attempt to address through their police and

21   policy-making powers.

22   16.    This lesson is significant because some argue that the absence of

23   government gun regulations in history—at the time of the invention of various

24   weapons or weapons developments—means that regulations now are unjustifiable,

---

26   [38] U.S. Census, Historical Population Change Data (1910-1920) (using 1920
27   census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-
28   text.html.

or have no historical basis.  For example, David Kopel argues that "[m]agazines of more than ten rounds are older than the United States."[39]  Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[40]  Kopel suggests that "magazines of more than ten rounds are older than the Second Amendment."[41]  Therefore, by Kopel's reckoning, since these weapons existed early in (or even before) the country's existence, and were not specifically regulated, ipso facto, today's governments are unable to regulate assault weapons, like AR-platform rifles, or magazines exceeding certain capacities (typically, a ten-round limit).[42]

17.   Kopel's and similar arguments[43] fail for two sets of reasons.  First, as explained in the following section, this sort of narrative misrepresents the availability and capabilities of these early weapons.  Second, the account fails to understand the relationship between firearms' technological development, their spread into civil society, and government gun policy.  As one gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single metal

---

[39] David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," *Albany Law Review* 78 (2014-2015): 851.

[40]Ibid., 852-54.

[41] Ibid., 849.

[42] Ibid., 871-72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century.").

[43] Declaration of Ashley Hlebinsky in Support Of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB, United States District Court For The Southern District Of California, filed September 27, 2019 (Plaintiffs' Trial Exhibit 2).

17

tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on its way."[44]  The firearms and firearm feeding devices regulated in the early twentieth century represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.

### D.   The History of Pre-Twentieth Century Firearms Technologies

18.   As researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier).  Kopel's example of a firearm from the late 1500s that could fire up to sixteen rounds is drawn from a book titled, *Firearms Curiosa*.  But this book's very title indicates why this narrative is irrelevant to the modern gun debate.  The definition of "curiosa" is something that is rare or unusual.  As the book's author, James Winant says, his book is about "oddity guns" and "peculiar guns."[45]  That is, they were anything but common, ordinary, or found in general circulation.  Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[46]  A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[47]  In other words, this firing process was more like lighting

---

[44] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3-4.

[45] James Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

[46] Ibid., 168.

[47] Ibid., 166.

Declaration of Robert Spitzer (3:19-cv-01537-BEN-JLB)

1    the fuse of a string of firecrackers, where their ignition occurs in a manner that

2    cannot be controlled by the operator once the initial charge is ignited.  Winant

3    concludes: "Of all the ideas for producing multishot firearms the scheme of

4    superimposing loads in one barrel is probably the oldest, the most discredited, the

5    most frequently recurring, and also the most readily accepted as new."[48]

6         19.    An early multi-shot gun, the "Puckle Gun," patented in 1718 in

7    London by James Puckle, could fire nine rounds per minute (hardly comparable to

8    the firing capabilities of semi- and fully automatic weapons of the early twentieth

9    century or modern era).  The patent drawing of this weapon shows it sitting on a

10   tripod on the ground.[49]  It was not a held-held weapon.  In the patent, Puckle

11   described it as "a portable Gun or Machine (by me lately invented) called a

12   DEFENCE."[50]  It was indeed a military weapon, as Winant says: "Of the oddities

13   among military weapons none has received more publicity than the Puckle gun. . . .

14   The Puckle invention was probably the first crank-operated machine gun.  It

15   embodied several elements that closely resemble construction features of Gatling,

16   Hotchkiss and other manually-operated machine guns."  Winant continued, "It is

17   doubtful that any of the Puckle guns that may have been actually produced ever saw

18   service.  A different account of this weapon says: "There is in fact no record of such

19   a gun ever having been built,"[51] although there are claims to the contrary.  A

20   contemporaneous poet, commenting on 'Puckle's Machine Company', wrote 'Fear

21

22

23

24   _____

25   [48] Ibid., 166.

26   [49] Ibid., 220.

     [50] Ibid., 219.

27   [51] Ellis, *The Social History of the Machine Gun,* 13.

28

Declaration of Robert Spitzer (3:19-cv-01537-BEN-JLB)

1   not, my friends, this terrible machine.  They're only wounded who have shares

2   therein.'"[52]  This weapon "never advanced beyond the prototype stage."[53]

3       20.    In short, it was an experimental weapon designed for military use, and

4   the patent's reference to "DEFENCE" was clearly a reference to military defense,

5   not personal defense.  As this account confirms, it was likely never even

6   manufactured beyond perhaps a prototype.  It was a failed effort, even though later

7   gun inventors learned from its failure.

8       21.    Kopel also cites the example of the Jennings multi-shot flintlock rifle

9   from 1821, capable of firing up to twelve "superposed" shots before reloading.[54]

10   Yet according to *Flayderman's Guide to Antique American Firearms,* its

11   production quantity was so small as to be "unknown" and therefore is "extremely

12   rare," unsurprising since it utilized fatally defective "superposed" firing (discussed

13   earlier) relying on twelve individual touchholes.[55]  Similar problems plagued or

14   doomed multi-shot flintlock pistols of the early nineteenth century.  According to

15   Carl P. Russell: "Flintlock revolving pistols had been given trials and some

16   practical use very early in the nineteenth century, but the loose priming powder in

17   the pan of each cylinder constituted a hazard that was never eliminated."[56]

18       22.    Another example often cited is the Girandoni (or Girardoni) air rifle, a

19   military weapon developed for crack shots in the Austrian army that was capable of

---

[52] Winant, *Firearms Curiosa*, 219-21.  See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.

[53] Rasenberger, *Revolver*, 3.

[54] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 853.

[55] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.

[56] Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.

Declaration of Robert Spitzer (3:19-cv-01537-BEN-JLB)

firing up to 20 rounds.  One of these was taken along on the Lewis and Clark expedition of 1804-1806.[57]  But these guns were a rarity, as they were extremely expensive, fragile, and complex, and few were made—no more than about 1,500.[58]  In fact, the rifles never caught on as they proved to be impractical on the battlefield, and even more so for civilian use.  To wit: "Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure.  Once empty the reservoirs required a significant effort and 1500 strokes to restore full power.  A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility.  The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon.  The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[59]  It was pulled from military service by 1815.[60]

---

[57] David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.  The Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but to impress the Native Americans they encountered.  Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed.  See Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

[58] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

[59] John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[60] Markowitz, "The Girandoni Air Rifle."

Declaration of Robert Spitzer (3:19-cv-01537-BEN-JLB)

23.     To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire up to "ten or greater rounds."[61]  The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations.  But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[62]  Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[63] dubbed "radical defects" by Winchester himself.[64]  In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[65]

24.     Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle. . . generally attributed to be the first semi-automatic rifle."[66]  Yet this "development" was initially a failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[67]  The true semi-automatic weapon did not become

---

[61] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 6 (Plaintiffs' Trial Exhibit 2).

[62] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51-52.

[63] "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

[64] Quoted in Haag, *The Gunning of America,* 56.

[65] Haag, *The Gunning of America*, 60.

[66] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8 (Plaintiffs' Trial Exhibit 2).

[67] Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*,

feasible and available until the beginning of the twentieth century, and the primary market was the military.[68]

25.    The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver.  The reason: pepperboxes were "heavy, lumpy, and impractical."[69]  By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[70]  Further, "[t]hey also had a nasty habit of discharging all their barrels at once.  No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[71]  Indeed, the Colt revolver was "the first widely used multishot weapon,"[72] although it took decades for this and similar revolvers to catch on.

26.    Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun

_____

May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[68] Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom,* July 2022, 32-39.

[69] Rasenberger, *Revolver*, 54.

[70] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[71] Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154.  By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison."  Winant, *Pepperbox Firearms,* 32.

[72] Rasenberger, *Revolver*, 401.

1   repeaters appeared late in the Civil War.[73]  Even so, the "standard infantry weapon

2   [in the Civil War] remained the single-shot, muzzle-loaded weapon."[74]

3        27.    As noted, the idea of an available, affordable, reliable multi-shot

4   firearm did not arise until the development of Colt's multi-shot revolver in the

5   1830s.  Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first

6   practical firearm that could shoot more than one bullet without reloading.[75]  Even

7   then, Colt could not readily manufacture multi-shot weapons for many years

8   because he could find no market for them, either from the government or the public.

9   The government, in fact, dismissed such firearms as mere "novelties."[76]  After an

10  1837 test of Colt's gun and others the government concluded that it was "entirely

11  unsuited to the general purposes of the service."[77]  The government also rejected

12  the weapon after tests in 1836, 1840, and 1850.  Colt's early failure to cultivate

13  either a military or a civilian market in the U.S. drove him to bankruptcy and then

14  to market his guns to European governments in the 1840s.  The gun made

15  appearances in the pre-Civil War West, yet even during the Civil War, "Colt's

16  revolver was a sideshow through most of the war. . . ."[78]  And though the Colt-type

17  revolver "had proved itself, the official sidearm of the United States Army [in the

18

---

19  [73] Kopel, "The history of magazines holding 11 or more rounds"; Kennett
20  and Anderson, *The Gun in America*, 112-13.

21  [74] Snow and Drew, *From Lexington to Desert Storm*, 90.  As Civil War
22  historian James M. McPherson noted, even though some repeating rifles appeared
    in the Civil War as early as 1863, single-shot muzzle-loaders "remained the
23  principal infantry weapons throughout the war."  *Battle Cry of Freedom* (NY:
    Oxford University Press, 1988), 475.
24
25  [75] Rasenberger, *Revolver*, 3-5, 401.

26  [76] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.

27  [77] Rasenberger, *Revolver*, 136.

28  [78] Ibid., 390.

1  Civil War] remained a single shot pistol."[79]  It took the Colt's use during the Civil

2  War to finally spur the post-Civil War proliferation of the Colt-type revolver and

3  similar firearms into society.[80]

4       28.      While inventor Benjamin Henry claims credit for developing the first

5  practical, lever action repeating rifle (patented in 1860), his competitor Winchester

6  "deftly gutted" the Henry Arms Company, coopting it to form the Winchester Arms

7  Company in 1866, paving the way for Winchester's dominance.[81]  The Winchester

8  rifle could fire up to fifteen rounds without reloading.  Yet the widely known

9  Winchester 1873, "was designed for sale to the Government as a military arm."[82]  A

10  gun whose legendary status wildly outdistanced its actual production and impact, it

11  was nevertheless an important firearm in the late nineteenth century, although this

12  "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s.  Its

13  celebrity biography backdated its diffusion and even its popularity."[83]  In fact, the

14  slogan stating that the Winchester "won the West" was invented by a Winchester

15  executive as a marketing ploy in 1919.[84]  Additionally, the Winchester was not a

16  semi-automatic firearm; it was a lever-action rifle that required the shooter to

17  manipulate a lever in a forward-and-back motion before each shot.  And when the

18  gun was emptied, it had to be manually reloaded, one round at a time.[85]  The

19  Winchester Model 1905, then called a "self-loading" rifle, was a true semi-

20

21       [79] Kennett and Anderson, *The Gun in America*, 91.

22       [80] Haag, *The Gunning of America,* 34-37, 46-64.  As Haag said, "the Civil War saved" the gun industrialists (65).

23       [81] Haag, *The Gunning of America*, 96.

24       [82] Koller, *The Fireside Book of Guns*, 112.

25       [83] Haag, *The Gunning of America,* 179.

26       [84] Ibid., 353.

27       [85] Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

28

automatic firearm.  It could receive a five or ten round box magazine, although from 1905 to 1920 only about 30,000 of the guns were made.  Even in World War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per minute.[86]

29.    With all this, the Winchester was by no means universally embraced by long gun users.  Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[87]  According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[88]

30.    The rise in the circulation of multi-shot handguns in society was accompanied by the rapid spread of concealed carry restrictions (see Exhibits B-E), especially in the post-Civil War period, precisely because of their contribution to escalating interpersonal violence.[89]  By the end of the nineteenth century, virtually

_____

[86] Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

[87] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

[88] Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894,* 131.

[89] Dickinson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012).

every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[90]  It was only in the post-World War I era when multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern.

31.    As noted earlier, the problems with arguments claiming that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold: they misrepresent the actual past of the weapons cited, and even more importantly fail to understand the connection between gun technology developments and the steps leading up to changes in gun-related public policy to regulate threats posed by those developments.  As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps.

32.    First, a new gun or gun technology must be invented.  Second, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination.  As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[91]  And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[92]  Third, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications.  Military weaponry is developed without consideration of potential civilian use and the

---

[90] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[91] Winant, *Firearms Curiosa*, 36.

[92] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

1  consequences of dissemination in the civilian market.[93]  Fourth, some military-

2  designed weapons may then spill over into, or be adapted to, civilian markets and

3  use.  Fifth, if such weapons then circulate sufficiently to pose a public safety or

4  criminological problem or threat, calls for government regulation or restriction then

5  may lead to gun policy/law changes.  This general sequence is echoed in works like

6  the *Buyer's Guide to Assault Weapons*.[94]

7         33.    Again, to simply assert or assume that past firearms

8  design/development, invention, or patenting equals commonality, viability, or a

9  measurable presence or impact on society, is a leap in logic without historical

10  foundation.  It would be as logical to reject modern governmental regulation of

11  electric power through such government agencies as state power commissions and

12  the Federal Energy Regulatory Commission because no such regulation was

13  enacted around the time of Benjamin Franklin's experiments with electricity in the

14  mid-eighteenth century.  The fact that inventors worked on new firearm designs and

15  modifications tells us nothing about the consequences of such designs for society

16  and public policy.  And the existence of such designs does not equal general

17  availability, much less societal circulation and use of these weapons.  Other

18  weapons subject to government restriction in our history further illustrate these

19  principles.

20

21

22

_____

23         [93] Note that the third step, and perhaps the second, do not apply to non-
24  firearms weapons discussed here—in particular the Bowie knife and various clubs.
    These weapons were mostly not developed for military use, though Bowie knives,
25  for example, were carried by some soldiers during the Civil War.  Knives and clubs
    are far simpler technologically compared to firearms (and of course do not rely on
26  ammunition) and thus were much more easily made, reproduced, and circulated.

27         [94] Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest
28  Books, 2008), 4-7.

**III.  HISTORICAL HARDWARE RESTRICTIONS ON KNIVES, BLUNT WEAPONS, PISTOLS, AND TRAP GUNS IN THE EIGHTEENTH AND NINETEENTH CENTURIES**

34.    Similar to government regulation of certain types of firearms and ammunition feeding devices in the early twentieth century, which occurred only after the weapons technologies matured, entered the civilian market, and threatened the public through criminal use, government regulation of other weapons typically followed a version of this trajectory around the time of the ratification of the Fourteenth Amendment in the 1860s and even earlier.

**A.    Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives**

35.    The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using a "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[95]  Bowie died at the Alamo in 1836.

36.    The "Bowie knife" rapidly became known in the 1830s for the distinctive type of long-bladed single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named.  The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo), and the knife's distinctive features, encouraged its proliferation,[96] referred

---

[95] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676-77).

[96] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39-63.

to by one historian as "the craze for the knives."[97]  As was true of other knives with long, thin blades,[98] they were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[99]  Indeed, such knives were known as "fighting knives"[100] that were "intended for combat."[101]  In the early nineteenth century "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[102]  In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[103]

37.   Homicide rates increased in the South in the early nineteenth century, as did laws restricting concealed weapons carrying.  Dueling also persisted during this time, even as the practice was widely deplored by religious and other groups, in

---

[97] Davis, *Three Roads to the Alamo*, 583.

[98] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[99] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485.

[100] Randolph Roth, *American Homicide* (Cambridge, MA: Harvard University Press, 2009), 218.

[101] Flayderman, *The Bowie Knife*, 59.

[102] Roth, *American Homicide*, 218.

[103] Quoted in Roth, *American Homicide*, 218-19.

1   newspapers, by anti-dueling societies and political leaders.[104]  Bowie knife expert

2   Norm Flayderman provides abundant and prolific evidence of the early criminal use

3   of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper

4   and other accounts, and providing references to literally hundreds of additional

5   articles and accounts attesting to the widespread use of Bowie knives in fights,

6   duels, brawls and other criminal activities.[105]  Flayderman concludes that, as early

7   as 1836, "most of the American public was well aware of the Bowie knife."[106]

8   (Very much like contemporary assault weapons,[107] the Bowie knife's notorious

9   reputation also, if perversely, fanned its sale and acquisition.[108])  All this led to

10  widespread enactment of laws prohibiting dueling in the states[109] and even in the

11  halls of Congress, where a constitutional amendment in the form of a joint

12  resolution prohibiting dueling was introduced as early as 1838.  In 1839, Congress

13  passed a measure barring dueling in the District of Columbia.[110]  Both pistols and

14  knives were prominently used in such affairs.[111]

15

16        [104] Baugh, *Rendezvous at the Alamo*, 51.

17        [105] Flayderman, *The Bowie Knife*, 25-64; 495-502.

18        [106] Ibid., 43.

19        [107] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12-15,65; David

20  Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,*

21  March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American*

22  *Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

23        [108] Flayderman, *The Bowie Knife*, 46.

24        [109] A search for the word "duel" in the Duke Center for Firearms Law

25  database of old gun laws yields 35 results.  See
    https://firearmslaw.duke.edu/repository/search-the-repository/.

26        [110] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838,
    https://history.house.gov/Records-and-Research/Listing/lfp_032/.

27        [111] Roth, *American Homicide*, 180-83, 210-17.

28

38.     In the 1840 case of *Aymette v. State*, the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837-1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[112]  In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[113]  The court continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens. . . ."[114]  Further, the court added that the state law existed "to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms. . . ."[115]

39.     The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[116]  In the 1830s,

---

[112] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

[113] Ibid., 156.

[114] Ibid., 157.

[115] Ibid.

[116] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53-54.

1  four states enacted laws barring the carrying of Bowie knives by name.  From then

2  to the start of the twentieth century, every state plus the District of Columbia (with

3  the sole exception of New Hampshire) restricted Bowie knives: a total of at least 38

4  states (including the District of Columbia) barred or restricted Bowie knives by

5  name; and another 12 states enacted laws barring the category or type of knife

6  embodied by the Bowie knife but without mentioning them by name (see Exhibits

7  C and E) totaling 49 states plus the District of Columbia.[117]  Several states banned

8  the possession of Bowie knives outright, and others imposed taxes on the ability for

9  individuals to acquire or possess them.  See Exhibit E.  The desirability and utility

10  of concealed carry restrictions were precisely that they pushed dangerous weapons

11  out of public spaces and places, improving public safety through the deterrent and

12  punishment effects of such laws, and also discouraging the settlement of private

13  grievances and disputes in public through weapons-fueled violence.

## B.   Historical Restrictions on Clubs and Other Blunt Weapons

15      40.     A very similar and analogous set of hardware restrictions was enacted

16  regarding clubs and other blunt weapons.  See Exhibits C and E.  Nearly all were

17  anti-carry laws, which also generally included pistols and knives.  As the table in

18  Exhibit C shows, at least six distinct types of clubs and blunt objects were regulated

19  in the United States.  Notably, every single state in the nation (except for New

20  Hampshire) had laws restricting one or more types of clubs.

21      41.     Among the six types, 15 states barred bludgeon carrying.  A bludgeon

22  is a short stick with a thickened or weighted end used as a weapon.[118] The earliest

23  state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s

24  and 1800s, and 4 in the early 1900s (as with each of these chronological categories,

---

[117] Initial bowie law enactment by decade: 1830s: 4 states; 1840s: 1 state; 1850s: 7 states; 1860s: 5 states; 1870s: 14 states; 1880s: 10 states; 1890s: 8 states; 1900s: 1 state.  See Exhibits C and E.

[118] https://www.merriam-webster.com/dictionary/bludgeon.

Declaration of Robert Spitzer (3:19-cv-01537-BEN-JLB)

1   the state law total exceeds the total number of states because some states enacted

2   the same or similar laws in multiple centuries).

3       42.    A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,

4   usually made of wood, plastic, or metal,[119] that is traditionally carried by police,

5   often called a nightstick or baton.  Seventeen states had anti-billy club laws; the

6   earliest law appears to have been enacted in 1866.  Fourteen states enacted such

7   laws in the 1800s; 10 states did so in the early 1900s.

8       43.    At least 14 states barred the carrying of "clubs" more generically,

9   without specifying the type.  The oldest anti-club law was 1664; 7 states enacted

10   these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

11       44.    Anti-slungshot carry laws were enacted by 43 states.  A slungshot (or

12   slung shot) is a hand-held weapon for striking that has a piece of metal or stone at

13   one end attached to a flexible strap or handle that was developed roughly in the

14   1840s (the first "known use" of slungshot was 1842).[120]  By one account,

15   "[s]lungshots were widely used by criminals and street gang members in the 19th

16   Century.  They had the advantage of being easy to make, silent, and very effective,

17   particularly against an unsuspecting opponent.  This gave them a dubious

18   reputation, similar to that carried by switchblade knives in the 1950s, and they were

19   outlawed in many jurisdictions.  The use as a criminal weapon continued at least up

20   until the early 1920s."[121]

21       45.    In a criminal case considered the most famous of those involving

22   lawyer Abraham Lincoln, the future president defended a man charged with

---

[119] https://www.merriam-webster.com/dictionary/billy%20club.  One of the earliest references to a "billy" was a 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c."  Local Intelligence, Delaware Republican, June 15, 1857, https://bit.ly/3V9nVO7.

[120] See https://www.merriam-webster.com/dictionary/slungshot.

[121] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

Declaration of Robert Spitzer (3:19-cv-01537-BEN-JLB)

1    murdering another using a slung shot.  In the 1858 trial of William "Duff"

2    Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[122]

3        46.    These weapons were viewed as especially dangerous or harmful when

4    they emerged in society, given the ubiquity of state enactments against carrying

5    them enacted after their invention.  These devices were invented and appeared in

6    society during an identifiable period of time in the mid-nineteenth century, sparking

7    subsequent wide-ranging prohibitions.  The earliest anti-Slungshot law was enacted

8    in 1850; 42 states legislated against them in the 1800s (including the District of

9    Columbia), and 11 states in the early 1900s (note this incorporates laws enacted in

10   more than one century by a few states).

11       47.    Sandbags, also known as sand clubs, were also a specific focus in anti-

12   carry laws as well.  Consisting of nothing more than sand poured into a bag, sack,

13   or sock (although it could also be something dense and heavy, like a lock in the end

14   of a sock),[123] their particular appeal was that they could be dispensed with by

15   simply pouring the sand out, leaving nothing more than an empty cloth bag.  The

16   first anti-sandbag law was 1866, with 10 states enacted such laws—7 in the 1800s

17   and 7 in the early 1900s.

18       48.    Only 4 states did not have any prohibitions in any of these categories,

19   but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative

20   provisions against the carrying of any concealed/dangerous/deadly weapons.  One

21

22

---

23       [122] Lincoln was able to discredit the testimony of a witness who claimed to
24   see Armstrong strike the victim at night because of the full moon.  Lincoln used as
     evidence an Almanac to prove that on the night in question, there was no full moon.
25   Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4,
26   2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

         [123] https://www.ferrislawnv.com/criminal-defense/weapons-
27   offenses/dangerous-weapons/.

28

1   state, New Hampshire, may not have enacted such a law during this time but did at

2   some point.[124]

3   **C.   Historical Restrictions on Pistol Carrying**

4   49.   Carry restriction laws were widely enacted from the 1600s through the

5   start of the twentieth century, spanning over three centuries.  As early as 1686, New

6   Jersey enacted a law against wearing weapons because they induced "great fear and

7   quarrels."[125]  Massachusetts followed in 1750.  In the late 1700s, North Carolina

8   and Virginia passed similar laws.  In the 1800s, as interpersonal violence and gun

9   carrying spread, 43 states joined the list; 3 more did so in the early 1900s (see

10  Exhibit B).  The eighteenth century laws generally restricted more general carrying

11  of firearms, usually if done in crowded places, or in groups of armed people.  The

12  laws of the nineteenth century forward generally restricted concealed weapons

13  carrying.  Among the earliest laws criminalizing the carrying of concealed weapons

14  was that of Louisiana in 1813.  Concealed carry laws normally targeted pistols as

15  well as the types of knives and various types of clubs discussed here (see Exhibit E

16  for text of most such laws).

17  **D.   Historical Restrictions on Trap Guns**

18  50.   Not to be confused with firearms used in trapshooting, trap guns were

19  devices or contraptions rigged in such a way as to fire when the owner need not be

20

21  ───────────

[124] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling Weapons.  Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state."  In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665)...

[125] The Grants, Concessions, And Original Constitutions of The Province of New Jersey 290 (1881).

present.  Typically, trap guns could be set to fire remotely (without the user being present to operate the firearm) by rigging the firearm to be fired with a string or wire when tripped.[126]  This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[127]

51.     Also sometimes referred to as "infernal machines,"[128] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders. Unlike the other weapons restrictions examined here, opinion was more divided on the relative merits or wisdom of setting such devices, with some arguing that thieves or criminals hurt or killed by the devices had it coming,[129] though the

---

[126] See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[127] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

[128] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.

[129] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window.  A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

1    weight of opinion seemed mostly against such devices.[130]  Those who set gun traps

2    typically did so to defend their places of business, properties, or possessions.  This

3    1870 newspaper account from an incident in New York City provides an example

4    where a burglar was killed by a gun-trap set by a shopkeeper, who was then

5    prosecuted: "As there is a statute against the use of such infernal machines, which

6    might cause loss of life to some innocent person, the jury censured Agostino."

7    After the verdict the man continued to be held under $2,000 bail.[131]

8        52.    Inevitably, however, the traps sometimes wound up hurting or killing

9    innocents, even including the person who set the trap.  For example, this 1891

10   newspaper account from Chillicothe, Missouri illustrated the problem: "George

11   Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.

12   Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person

13   to visit the crib and on opening the door was shot dead."[132]

14       53.    In all, at least 16 states had anti-trap gun laws (see Exhibits B and F).

15   The earliest such law encountered was the 1771 New Jersey law (above).  Nine

16   laws were enacted in the 1700s-1800s, and 9 in the early 1900s (counting states that

17   enacted multiple laws across the centuries).

18   **IV.  CONCLUSION**

19       54.    What does the law say, and what should the law be, regarding the

20   regulation of firearms and other harmful or dangerous weapons and accessories, in

21   the light of the Supreme Court's ruling in the *Bruen* decision?  Given the

---

[130] This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted. As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

[131] . "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.  See Exhibit G.

[132] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk.  See Exhibit G.

38

1   importance of history, especially, though not limited to, the founding era and the

2   Reconstruction era, the lesson is abundantly clear.  Firearms and other dangerous

3   weapons were subject to remarkably strict, consistent, and wide-ranging regulation

4   throughout our history when they entered society, proliferated, and resulted in

5   violence, harm, or contributed to criminality.  This historical record from the 1600s

6   through the early twentieth century, as seen in the examples examined here, is even

7   more remarkable given that the United States was an evolving and developing

8   nation-state that could not claim to have reached maturity until the twentieth

9   century.  The historical record summarized here makes clear that contemporary

10  restrictions among the states pertaining to assault weapons and large capacity

11  ammunition magazines are merely the latest iteration of a centuries-long tradition of

12  weapons regulations and restrictions.  Gun ownership is as old as the country.  But

13  so are gun and other dangerous weapons laws, which have adapted to changes in

14  threats to public safety.

15

16      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

17  laws of the United States of America that the foregoing is true and correct.

18      Executed on October 13, 2022, at Cortland, NY.

19

20

21      _Robert J. Spitzer_

22      Robert Spitzer

23

24

25

26

27

28

# EXHIBIT A

September 2022

## Curriculum Vitae

### Robert J. Spitzer

### Distinguished Service Professor, Emeritus
### SUNY Cortland

<u>Address</u>:   5333 Center St.
Alexandria, VA  23188
(607) 423-1781
Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
https://sites.google.com/site/robertspitzercortland/

<u>Education</u>:   A.B. (Political Science), <u>summa cum laude</u>, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

<u>Positions Held</u>:

Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, <u>Administrative Science Quarterly</u>, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

<u>Honors</u>:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.

Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.

Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.

Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.

Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.

Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.

SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.

Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."

Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.

Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.

Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.

<u>Who's Who in the World</u>, 1996.

<u>Dictionary of International Biography</u>, 1995.

<u>Who's Who in the East</u>, 1995-96; 1997-98

<u>Ex officio</u> member, Cortland County Bicentennial Committee, 1987-89.

Chair, SUNY Cortland Bicentennial Committee, 1987-89.

Phi Eta Sigma, SUNY Cortland, 1994.

Phi Kappa Phi, SUNY Cortland, 1990.

<u>Men of Achievement</u> (1986)

<u>Contemporary Authors</u>, vol. 112 (1985) and subsequent updates.

<u>International Authors and Writers Who's Who</u>, 1985-present.

<u>International Who's Who in Education</u>, Winter 1985-86.

Herbert H. Lehman Graduate Fellowship, 1975-79.

<u>Who's Who Among Students in American Universities and Colleges</u>, 1974-75.

Phi Beta Kappa Club, SUNY College at Fredonia, 1975.

Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

Publications and Papers:

Books:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert

3

Spitzer.

<u>President and Congress:  Executive Hegemony at the Crossroads of American Government</u> (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, <u>Media and Public Policy</u> (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

<u>The Politics of Gun Control</u> (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, <u>Politics and Constitutionalism: The Louis Fisher Connection</u>, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

<u>The Right to Bear Arms: Rights and Liberties Under the Law</u> (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

<u>Essentials of American Politics</u>, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

<u>The Presidency and the Constitution: Cases and Controversies</u>, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

<u>Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning</u> (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

<u>We the People: Essentials Edition</u>, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021).

<u>Gun Control: A Documentary and Reference Guide</u> (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

<u>The Gun Debate: An Encyclopedia of Gun Rights and Gun Control</u>, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

<u>Guns across America: Reconciling Gun Rules and Rights</u> (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

<u>The Gun Dilemma: How History Is Against Expanded Gun Rights</u> (New York: Oxford University Press, 2023, forthcoming). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, <u>Series on American Constitutionalism</u>, SUNY Press, 1996-present. Books include:
    Daniel Hoffman, <u>Our Elusive Constitution</u>, (1997)
    Martin Sheffer, <u>God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment</u>, (1999)
    Daniel Levin, <u>Representing Popular Sovereignty: The Constitution in American Political Culture</u>, (1999)
    Robert Spitzer, ed., <u>Politics and Constitutionalism</u>, (2000)
    Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)
    Ian Brodie, <u>Friends of the Court</u> (2002)
    Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2002)
    Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United States Supreme Court</u> (2003)

James T. McHugh, <u>Ex Uno Plura: State Constitutions and Their Political Cultures</u> (2003)

Stephen Newman, ed., <u>Constitutional Politics in Canada and the United States</u> (2004).

Stephen Kershnar, <u>Justice for the Past</u> (2004).

Timothy R. Johnson, <u>Oral Arguments and Decision Making on the U.S. Supreme Court</u> (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., <u>The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics</u> (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., <u>The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory</u> (2005).

G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform</u> (2006).

Frank P. Grad and Robert F. Williams, <u>State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments</u> (2006).

G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform</u>, 3 vols. (2006).

Cary Federman, <u>The Body and the State: Habeas Corpus and American Jurisprudence</u> (2006).

Christopher S. Kelley, ed., <u>Executing the Constitution: Putting the President Back into the Constitution</u> (2006).

David Fagelson, <u>Justice as Integrity: Tolerance and the Moral Momentum of Law</u> (2006).

Christopher Shortell, <u>Rights, Remedies, and the Impact of State Sovereign Immunity</u> (2008).

Robert Blomquist, <u>The Quotable Judge Posner</u> (2010).

Kirk A. Randazzo, <u>Defenders of Liberty or Champions of Security?</u> (2010).

Pamela Corley, <u>Concurring Opinion Writing on the U.S. Supreme Court</u> (2010).

Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2nd ed. 2010).

Julia R. Azari, et al., eds., <u>The Presidential Leadership Dilemma</u> (2013).

Stephen A. Simon, <u>Universal Rights and the Constitution</u> (2014).

Kirk A. Randazzo and Richard W. Waterman, <u>Checking the Courts</u> (2014).

Anthony Maniscalco, <u>Public Spaces, Marketplaces, and the Constitution</u> (2015).

Goirgi Areshidze et al., eds., <u>Constitutionalism, Executive Power, and the Spirit of Moderation</u> (2016).

Peter J. Galie, et al., eds., <u>New York's Broken Constitution</u> (2016).

Robert J. Hume, <u>Ethics and Accountability on the U.S. Supreme Court</u> (2017).

Michael A. Dichio, <u>The U.S. Supreme Court and the Centralization of Federal Authority</u> (2018).

Clyde H. Ray, <u>John Marshall's Constitutionalism</u> (2019).

Daniel P. Franklin, et al., <u>The Politics of Presidential Impeachment</u> (2020).

Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
Mark C. Dillon, <u>The First Chief Justice</u> (2022).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
Nancy Maveety, <u>Picking Judges</u> (2016)
Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
Andrew L. Stigler, <u>Governing the Military</u> (2019)
Graham G. Dodds, <u>The Unitary Presidency</u> (2020)

Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.

<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar,

7

closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

8

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in <u>The Oxford Companion To United States History</u> ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in <u>The Presidency and the Law: The Clinton Legacy</u>, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in Honor and Loyalty: Inside the Politics of the Bush White House, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the Encyclopedia of Guns in American Society, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the Encyclopedia of the American Presidency, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for The Encyclopedia of New York State, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," Transformed By Crisis: The Presidency of George W. Bush and American Politics, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in Debating the Presidency, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in Thinking About the Presidency, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Executing the Constitution, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in Social Issues in America: An Encyclopedia, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," The Presidency and the Challenge of Democracy, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," Encyclopedia of American Civil Liberties, 4 vols., ed. By Paul

10

Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," <u>Gun Violence: Opposing Viewpoints</u>, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," <u>Presidential Power in America</u>, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," <u>Encyclopedia of American Government and Civics</u> ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," <u>Encyclopedia of Political Communication</u> ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in <u>Leadership at the Crossroads</u>, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in <u>Encyclopedia of Issues in U.S. Public Policy</u>, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in <u>Winning the Presidency 2008</u>, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in <u>Debating Reform: Conflicting Perspectives on How to Fix the American Political System</u>, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in <u>Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi</u>, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" <u>You Asked: 20 Questions About America</u>, U.S. Department of State, 2010.

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New

11

York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for Issues: Understanding Controversy and Society, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," Encyclopedia of Applied Ethics, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" Winning the Presidency 2012, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." American Government. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," American Governance, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," American Presidents and the Constitution, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," The George W. Bush Presidency, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," Gun Control in the United States: A Reference Handbook, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," Guns: Interdisciplinary Approaches to Politics, Policy, and Practice, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," The 2020 Presidential Election: Key Issues and Regional Dynamics, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," Developments in American Politics 9, Gillian

12

Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," <u>New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society</u>, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," <u>The Conversation on Gun Control</u> (Baltimore: Johns Hopkins University Press, 2023, forthcoming).

<u>Articles</u>:

"Jamestown:  Anatomy of an All-American City," <u>Sunday Buffalo Courier Express Magazine</u>, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, <u>The Journal of Politics</u>, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," <u>Presidential Studies Quarterly</u>, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," <u>Presidential Studies Quarterly</u>, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," <u>National Civic Review</u>, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," <u>Party Line</u>, 17 (September 1984).

"Shooting Down Gun Myths," <u>America</u>, June 8, 1985, pp. 468-69.  Reprinted in: the <u>Des Moines Register</u>, October 24, 1985; <u>Criminal Justice</u>, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); <u>U.S. News and World Report</u> educational study unit on Gun Control, April/May, 1987; <u>Gun Control</u>, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and <u>The Informed Argument</u>, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," <u>America</u>, June 15, 1985.

"The Item Veto Reconsidered," <u>Presidential Studies Quarterly</u> 15(Summer, 1985):

611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," PS: Political Science and Politics, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15.  Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the Emerson Case," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

15

"Still Saving the Constitution from Lawyers: A Response," <u>Gonzaga Law Review</u> 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," <u>Government, Law and Policy Journal</u> 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," <u>Presidential Studies Quarterly</u> 42(September 2012): 637-55.

"Gun Laws," <u>New York State Bar Association Journal</u> 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," <u>Presidents and Executive Politics Report</u> 35(Fall 2012).

"Writing the Gun Debate," <u>Los Angeles Review of Books</u>, February 10, 2013.

"A Historical Look at Gun Control in America," <u>WCNY Magazine</u>, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," <u>PS: Political Science and Politics</u> 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," <u>The Islamic Monthly</u>, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," <u>White House Studies</u> 12(October 2013): 125-46.

"A Look at the 2014 Elections," <u>WNCY Magazine</u>, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," <u>Albany Law Review</u>, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," <u>Social Science Docket</u>, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," <u>The Critique</u> (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," <u>Law and Contemporary Problems</u> 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" <u>Items: Insights from the Social Sciences,</u> Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

"Federalism Run Amok: The Second Amendment Sanctuary Movement," *Publius,* forthcoming.

Op-Ed Articles

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" Christian Science Monitor, September 19, 1997.

"Assault Weapons Ban," Christian Science Monitor, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," Syracuse Post-Standard, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," <u>Intellectual Capital</u>, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," <u>Intellectual Capital</u> 5(February 10-17, 2000).

"Gun Control After Columbine," <u>Intellectual Capital</u> 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," <u>The Catholic Review</u>, March 30, 2000.

"Why Would Anyone Want the Job Now?" <u>Chicago Tribune</u>, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," <u>Syracuse Post-Standard</u>, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," <u>Syracuse Post-Standard</u>, June 12, 2001.

"Exposure Erodes Clout of NRA," <u>Columbus Dispatch</u>, April 24, 2003.

"Hazing Scandals," <u>Syracuse Post-Standard</u>, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 18, 2004.

"NRA Loses Its Political Firepower," <u>Los Angeles Times</u>, April 12, 2004. Also in the <u>Deseret News</u>.

"A 'Tortured' Interpretation of the President's Vast Powers," <u>Syracuse Post-Standard</u>, June 18, 2004.

"Clearing the Air," <u>Syracuse Post-Standard</u>, August 4, 2004.

"Why Gun Ban Died Quietly," <u>San Jose Mercury News</u>, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," <u>Christian Science Monitor</u>, August 18, 2005. Also

published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

19

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine,* June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,*

22

January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.22630   Page 796 of
1315
Case 3:19-cv-01537-BEN-JLB   Document 137-8   Filed 10/13/22   PageID.11561   Page 65 of
229

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com*, September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,*

August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.  150

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

Testimony, Briefs, and Reports:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the

27

department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

28

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.


Papers and Presentations (not including those given on the Cortland campus):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free

30

Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the <u>Washington Post</u>, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in <u>The Politics of Gun Control</u>," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit,

31

the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

34

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science

Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.

Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142: An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative

42

<u>Science Quarterly</u>, September, 1984.

<u>The Evolution of American Electoral Systems</u>, by Paul Kleppner, et al., reviewed in the <u>American Political Science Review</u>, December, 1983.

<u>A Case of Third Party Activism</u>, by James Canfield, reviewed in <u>Perspective</u>, July-August, 1984.

<u>Winners and Losers:  Campaigns, Candidates and Congressional Elections</u>, by Stuart Rothenberg, reviewed in the <u>American Political Science Review</u>, December, 1984.

<u>The Political Presidency</u>, by Barbara Kellerman, reviewed in <u>Perspective</u>, January-February, 1985.

<u>Presidents and Promises</u>, by Jeff Fishel, reviewed in the <u>American Political Science Review</u>, December, 1985.

<u>The Elections of 1984</u>, ed. by Michael Nelson, reviewed in <u>Perspective</u>, May/June, 1985.

<u>Economic Conditions and Electoral Outcomes</u>, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in <u>Perspective</u>, May/June, 1986.

<u>Presidential Transitions:  Eisenhower Through Reagan</u>, by Carl M. Brauer, in <u>Perspective</u>, January/February, 1987.

<u>Religion and Politics in the United States</u>, by Kenneth D. Wald, in <u>Journal for the Scientific Study of Religion</u>, September, 1988.

<u>Abortion and Divorce in Western Law</u>, by Mary Ann Glendon, in <u>The Annals of the American Academy of Political and Social Science</u>, September, 1988.

<u>The American Political Economy</u>, by Douglas Hibbs, in <u>Perspective</u>, Spring, 1988.

<u>God in the White House</u>, by Richard G. Hutcheson, Jr., in <u>Perspective</u>, Fall, 1988.

<u>The Reagan Legacy</u>, Charles O. Jones, ed., in <u>Social Science Quarterly</u>, June, 1989.

<u>Dilemmas of Presidential Leadership From Washington Through Lincoln</u> by Richard Ellis and Aaron Wildavsky, in <u>Perspective</u>, September, 1989.

<u>Taming the Prince</u> by Harvey Mansfield, Jr., in <u>Governance</u>, April, 1990.

<u>Public Policy and Transit System Management</u>, ed. by George M. Guess, in <u>Perspective</u>,

Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The

Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the

Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.

Professional Associations:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group),
    APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

Teaching Areas:

American Government:  courses taught include Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

Teaching-Related Awards:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

Other Professional Activities

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

Selected Community Service

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's Odyssey 2010 Project, 1996.

**EXHIBIT B**

EXHIBIT B

FIREARM HARDWARE RESTRICTIONS TABLE
(YEARS OF ENACTMENT)[1]

| STATE[2] | TRAP GUNS[3] | CONCEALED CARRY[4] | AUTOMATIC FIREARMS | SEMI-AUTOMATIC FIREARMS | AMMUNITION FEEDING DEVICES/ FIRING LIMITS |
|---|---|---|---|---|---|
| Alabama | | 1839, 1841 | | | |
| Alaska | | 1896 | | | |
| Arizona | | 1889 | | | |
| Arkansas | | 1820,1837 | | | |
| California | | 1850, 1864 | 1927, 1933 | | 1927, 1933 |
| Colorado | | 1862 | | | |
| Connecticut | | 1890, 1923 | | | |
| Delaware | | 1852 | 1931 | | |
| District of Columbia | | 1857, 1871 | 1932 | 1932 | 1932 |
| Florida | | 1887 | 1913[5], 1933 | | |
| Georgia | | 1837 | | | |
| Hawaii | | 1913 | 1933 | | 1933 |
| Idaho | | 1909 | | | |

---

[1] Further research may yield additional laws regulating firearm hardware.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

[3] Sometimes trap guns were also referred to as "infernal machines."

[4] These laws prohibited the concealed carrying of certain enumerated weapons or types of weapons. The early laws restricted general weapons carrying, whether concealed or open.

[5] "It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns."

1

| Illinois | | 1881 | 1931 | 1931[†] | 1931 |
| Indiana | | 1820 | 1927, 1929 | | |
| Iowa | | 1882, 1887, 1897, 1929 | 1927 | | |
| Kansas | | 1901 | 1933 | | |
| Kentucky | | 1812, 1813 | | | |
| Louisiana | | 1813 | 1932 | 1932[†] | 1932 |
| Maine | | 1840 | | | |
| Maryland | 1910 | 1872 | 1927 | | |
| Massachusetts | | 1751 | 1927 | 1927 | 1927 |
| Michigan | 1875, 1931 | 1887 | 1927, 1929 | 1927, 1929 | 1927 |
| Minnesota | 1873, 1903 | 1881 | 1933 | 1933 | 1933 |
| Mississippi | | 1878 | | | |
| Missouri | 1891[6] | 1873 | 1929 | | 1929 |
| Montana | | 1864, 1865 | | | |
| Nebraska | | 1881 | 1929 | | |
| Nevada | | 1881, 1925 | | | |
| New Hampshire | 1915 | | | | |
| New Jersey | 1771 | 1686 | 1927, 1934 | | 1920, 1927 |
| New Mexico | | 1852, 1853 | | | |
| New York | 1870[7] | 1891 | 1931, 1933 | | |

---

[6] Chillicothe, Mo.: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead." "Shot by a Trap-Gun," South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk.

[7] New York City, NY: A burglar was killed by a gun-trap set by a shopkeeper at 301 East 23rd St. A jury concluded that the burglar's death was caused by the trap-gun. The article notes: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured

| North Carolina | | 1792 | | | 1917 |
|---|---|---|---|---|---|
| North Dakota | 1891, 1895 | 1895 | 1931 | | 1931 |
| Ohio | | 1859 | 1933 | 1933 | 1933 |
| Oklahoma | | 1890 | | | |
| Oregon | 1925 | 1853 | 1933 | | 1933 |
| Pennsylvania | | 1851 | 1929 | | 1929 |
| Rhode Island | 1890, 1892 | 1893 | 1927 | 1927 | 1927 |
| South Carolina | 1855, 1931 | 1880 | 1934 | 1934[†] | 1934 |
| South Dakota | 1909 | 1877 | 1933 | 1933 | 1933 |
| Tennessee | | 1821 | | | |
| Texas | | 1870 | 1933 | | 1933 |
| Utah | 1865, 1901 | 1877, 1888 | | | |
| Vermont | 1884, 1912 | 1895, 1897 | 1923 | | 1923 |
| Virginia | | 1794, 1838 | 1934 | 1934 | 1934 |
| Washington | 1909 | 1881 | 1933 | | 1933 |
| West Virginia | | 1870 | 1925 | | |
| Wisconsin | 1872, 1921 | 1858 | 1929, 1933 | | 1933 |
| Wyoming | | 1876 | 1933 | | |
| Total Laws | 16 | 50 | 31 | 8–11 | 23 |

SOURCE:  Duke Law, Duke Center for Firearms Law, Repository of Historical Gun Laws, https://firearmslaw.duke.edu/repository/search-the-repository/

[†]Ambiguous law that could apply to semi-automatic in addition to automatic firearms.

---

Agostino." After the verdict the man continued to be held under $2000 bail. "The Man Trap," The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870, https://bit.ly/3SDv2Nf.

# EXHIBIT C

# EXHIBIT C

## DANGEROUS WEAPONS RESTRICTIONS
## (YEARS OF ENACTMENT)[1]

| STATE[2] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837, 1839, 1841, 1867, 1876, 1877, 1879, 1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896[†] | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871, 1875 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862, 1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890[†] | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881[†] | | | 1797 | | | 1852 | |

---

[1] Further research may yield additional laws regulating dangerous weapons.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| District of Columbia | 1871 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835, 1868, 1893† | | 1888 | | 1868, 1888 | | 1887 | |
| Georgia | 1860, 1873 | 1816 | | | 1860 | | 1837 | |
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882, 1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862, 1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840, 1841, 1884† | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872, 1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874, 1884, 1886, 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836† | | | 1750 | 1850, 1927 | | 1751 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1878 | | | 1799, 1804 | 1878 | | 1878 | |
| Missouri | 1871, 1897, 1917, 1923 | | 1871, 1897, 1923 | 1818 | 1883, 1888, 1897, 1917 | | 1873 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Montana | 1864, 1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877, 1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |
| Nevada | 1873 | 1872 | | | 1881 | | 1881, 1925 | |
| New Hampshire | | | | | | | | |
| New Jersey | 1871, 1905† | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1853, 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866, 1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1879 | | | | 1879 | | 1792 | |
| North Dakota | 1895, 1915† | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859, 1880, 1890 | | | | | | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890, 1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885† | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893, 1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903† | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838, 1856, 1863, 1867, | | | | 1879, 1882, 1893 | | 1821 | |

| | 1871, 1881, 1893 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Texas | 1871, 1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1895[†] | | | | 1895 | | 1895, 1897 | |
| Virginia | 1887 | | | 1792 | 1887 | | 1794 | |
| Washington | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 106 | 25 | 44 | 17 | 79 | 21 | 64 | 24 |

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

[†] States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

4

**EXHIBIT D**

EXHIBIT D

MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS[1]

**CALIFORNIA:**

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2.

§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.

§ 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums,

---

[1] Further research may yield additional laws regulating firearm hardware.

1

belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

## DELAWARE:

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.
On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

## DISTRICT OF COLUMBIA:

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS

2

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place

3

of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section

4

14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed -oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained

from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other

5

and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol,
machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,
or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public

6

carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.
PENALTIES
SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.
CONSTITUTIONALITY
SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

## FLORIDA:

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

## HAWAII:

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.
Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 2.
Definitions. "Firearm" as used in this Act means any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs, cannon and sub-machine guns. The specific mention herein of certain weapons does not exclude from the definition other weapons operated by explosives. "Crime of violence" as used in this Act means any of the following crimes, namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol" or "revolver" as used in this Act, means and includes any firearm of any shape whatsoever with barrel less than twelve inches in length and capable of discharging loaded ammunition or any noxious gas. ""Person" as used in this Act includes

8

individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

## ILLINOIS:

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.

§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.

Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.

Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

## INDIANA:

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.

. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.

Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

10

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.

Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

## IOWA:

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1-2.

§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun.

§ 2. No person, firm, partnership, or corporation shall do any act with the intent to enable any other person, firm, partnership, or corporation to obtain possession of such gun.

## KANSAS:

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Ulawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1-3.

§ 1. That is shall be unlawful for any person, firm, or corporation other than a sheriff or other peace officer or any military unit of the state or of the United States or any common carrier for hire, to transport or have in his possession or under his control a firearm known as a machine rifle, machine gun, or submachine gun: Provided, That banks, trust companies or other institutions or corporations subject to unusual hazard from robbery or holdup, may secure permits form the sheriff of the county in which they are located for one or more of their employees to have such firearms: Provided further, That museums, American Legions posts, and other

11

similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.

§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.

§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

## LOUISIANA:

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.

§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

## MARYLAND:

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other

dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS:

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .
§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

## MICHIGAN:

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA:

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun

14

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .

§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

## MISSOURI:

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.

§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

15

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

## NEBRASKA:

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.
§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.
§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

## NEW JERSEY:

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.
It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

16

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

§ 1. A gangster is hereby declared to be an enemy of the state.

§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least

17

three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.

§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.

§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

## NEW YORK:

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who

18

possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

## NORTH CAROLINA:

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.

That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

## NORTH DAKOTA:

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun¸ automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any

19

municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

## OHIO:

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine

20

gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OREGON:

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.
§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .
§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.
On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

## PENNSYLVANIA:

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4

§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran

22

applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.
§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

## RHODE ISLAND:

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz.murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or

similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the

24

fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

25

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase own, carry or have in his possession or under his control any firearm.

## SOUTH CAROLINA:

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store,

keep, possess, or have in possession, except as hereinafter provided, any firearm of the type defined above or commonly known as a machine gun.

§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permiteed by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date

application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA:

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace

officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

## TEXAS:

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6

§ 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. "Person" applies to and includes firm, partnership, association or corporation.

§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.

§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.

§ 4. [Excludes military, police, unusable keepsakes, prison officers.]

§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

## VERMONT:

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

## <u>VIRGINIA:</u>

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

30

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON:

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge

of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.

§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

## WEST VIRGINIA:

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b.
(b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high

powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

## WISCONSIN:

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be punished by imprisonment in the state prison for a term the minimum of which shall be one year and the maximum fifteen years. Nothing in this section shall be construed as prohibiting police officers, national guardsmen, sheriffs and their deputies from owning, using or having in their possession a machine gun while actually engaged in the performance of their lawful duties; nor shall any person or

organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06. 164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .

164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.

164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.

164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger

34

caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.
No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

## WYOMING:

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.
§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.
§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.
§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said

wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT E

EXHIBIT E

DANGEROUS WEAPONS LAWS[1]

## ALABAMA

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.
And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1
That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.
Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up

---

[1] Further research may yield additional laws regulating firearm hardware.

1

the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.
Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.

Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873

Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.

§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this

4

subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.
That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of

5

weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.

§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.

§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

6

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).
Race and Slavery Based | Arkansas | 1835
§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82 (1837).
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been

7

committed, shall be fined in any sum not less than twenty-give nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-2.
That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.

## CALIFORNIA

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | California | 1853
Compiled Laws of California, § 127.

8

If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .

Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and

9

Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.

No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Fresno, § 8.

Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

11

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.

If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)

No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | Colorado | 1886

City of Denver, Slung Shot – Brass Knuckles, § 10.

Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

Good Order and Decency § 192.

Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

14

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons || 1871
Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

## FLORIDA

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources.
An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

15

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425. Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.
Sentence Enhancement for Use of Weapon | Florida | 1868
Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868] Offences Against Public Peace, § 13.
Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.
Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the

Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Georgia | 1816

Offences Against the Public Peace, (1816) § 19.

If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

17

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every

18

such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

19

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139.
If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources.
Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]
Deadly Weapons: Selling or Giving to Minor. § 54b.
Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.

That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach, locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.

23

No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

## KANSAS

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act E ntitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.
If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.
Carrying Weapons | Louisiana | 1813
Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger,

knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).
Carrying Weapons | Louisiana | 1842
[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.
Subject(s): Sensitive Places and Times
[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.
Post-Civil War State Constitutions | Louisiana | 1879
A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

**MAINE**

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, riotously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having resonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

28

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.
Prevention of Crimes, § 10.
Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1809
If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.
Carrying Weapons | Maryland | 1872
It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

29

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife,

30

razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1886
Concealed Weapons, § 30.
Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1.
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

## MASSACHUSETTS

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled . . . (Read riot act, if don't disperse) . . . It shall be lawful for every officer . . . to seize such persons, and carry them before a justice of the peace; and if such persons shall be killed or hurt by reason of their resisting . . . officers and their assistants shall be indemnified and held guiltless.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.

Of Proceedings to Prevent the Commission of Crimes, § 16.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.

Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)

Carrying Weapons | Massachusetts | 1927

Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his

person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## MICHIGAN

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1927
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

34

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.
Concealed Weapons – License, § 1.
It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Minnesota | 1888

Making, Selling, etc., Dangerous Weapons, §§ 333-334.

§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons . . . .

§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## MISSISSIPPI

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.
That any person not being threatened with or havin good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

36

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.

Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Missouri | 1871

Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.

§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

37

§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure"
§ 1274.
If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.
It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of

38

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.22742   Page 908 of
1315
Case 3:19-cv-01537-BEN-JLB   Document 137-8   Filed 10/13/22   PageID.11673   Page 177 of
229

the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona

fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## MONTANA

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.

If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.

Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.

If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.
It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from

42

the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources. Carrying Weapons | Nebraska | 1899
Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.
It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2.
Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

## NEVADA

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.
§ 35. If any person shall by previous appointment or agreement, fight a duel with a rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous weapon, and in doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guiltily of murder in the first degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no homicide ensue or shall challenge another to fight such duel, or shall send or deliver any verbal or written message reporting or intending to be such challenge, although no duel ensue, shall be punished by imprisonment in the State prison not

less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

## **NEW JERSEY**

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686)
An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil

and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New Jersey | 1871

An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

45

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

Manufacturing, Inspection and Sale of Gunpowder and Firearms | New Jersey | 1927

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

## NEW MEXICO

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | New Jersey | 1799

[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2. And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to

47

any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.
That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.
And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).
Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing Weapons, Transportation | New Mexico | 1887
§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. . . .

## NEW YORK

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions

49

To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1881
Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.
Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a

misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1866
An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.
Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the

weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911
Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghshot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

53

## NORTH CAROLINA

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.

If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof.
. .

## NORTH DAKOTA

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.

§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.

§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec.
§ 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or

55

weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

## OKLAHOMA

1890 Okla. Laws 495, art. 47
Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.
§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.


1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.


General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oklahoma | 1890

Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.

To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oklahoma | 1891

Concealed Weapons, §§ 1, 2, 4-10.

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.
It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## **OREGON**

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.
It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oregon | 1898
An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.
It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.
Carrying Weapons | Oregon | 1917
§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.
Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.
§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7

of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law. Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.
That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Pennsylvania | 1897
An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.
No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## RHODE ISLAND

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.

No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.
Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893
§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.
§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.
§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Rhode Island | 1896
Offences Against Public Policy, §§ 23, 24, 26.
§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge

62

of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws
Carrying Weapons | Rhode Island | 1908
§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.

§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

1923 S.C. Acts 221

If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## **SOUTH DAKOTA**

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

## TENNESSEE

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.
That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.
That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall

be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.

Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.

It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.

§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.

§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be

fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.
§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources.
Elections.
§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.
§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1.

That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons.

§ 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not

68

exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; provided, that this section shall not be so contrued as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).

Art. 163.

If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code. Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by fine . . . in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor

more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.
Brandishing | Texas | 1899
Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.
If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

## **UTAH**

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14.
Any person who shall carry and slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).
§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm,
slingshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[2]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## VERMONT

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.[3]

---

[3] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## VIRGINIA

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | Virginia | 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.
§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.
§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Virginia | 1887
Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

## WASHINGTON

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or

risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956, Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Washington | 1896

Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.

If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Washington | 1897

Carrying Concealed Weapons, § 7084.

If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

## WEST VIRGINIA

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.
Carrying Weapons | West Virginia | 1891
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises,

any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925
§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

## WISCONSIN

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.
To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

77

## WYOMING

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.

Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.

If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Wyoming | 1893

Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.

It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT F

EXHIBIT F

TRAP GUN RESTRICTIONS[1]

**MARYLAND:**

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the birds or animals named in Section 12, 13, 14 and 14A of this Act, or any insectivorous birds (excepting English sparrows), in Allegany County on Sunday, or on election days, and it shall be prima facie evidence of a violation of this Act if any person is found in the fields or woods with on a gun on Sunday or on election days, or to hunt or kill in any trap or destroy any of the birds . . .

**MICHIGAN:**

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than one year, or by a fine of not more than five hundred dollars, and the killing of any person by the firing of a gun or device so set shall be manslaughter.

---

[1] Further research may yield additional laws regulating trap guns.

1

## MINNESOTA:

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1873
Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.
§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.
§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

## MISSOURI:

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891: "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[2]

---

[2] See https://bit.ly/3CtZsfk.

2

## NEW HAMPSHIRE:

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.
Dangerous or Unusual Weapons | New Hampshire | 1915
A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

## NEW JERSEY:

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
Dangerous or Unusual Weapons | New Jersey | 1771
And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

## NEW YORK:

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870: "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . . A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent

3

person, the jury censured Agostino.  He will not be released, however, but will be held under $2,000 bail."[3]

## NORTH DAKOTA:

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

## OREGON:

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod,

---

[3] See https://bit.ly/3yUSGNF.

4

stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.

§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.

## RHODE ISLAND:

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

## SOUTH CAROLINA:

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873) available at The Making of Modern Law: Primary Sources.
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

5

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

**SOUTH DAKOTA:**

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

**UTAH:**

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866).
Sentence Enhancement for Use of Weapon | Utah | 1865
§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or

6

property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.  Dangerous or Unusual Weapons | Utah | 1901
§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.
§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.
§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

## VERMONT:

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884
A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his

7

personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a spring gun or other device the object of which is to discharge a firearm shall be fined not more than five hundred dollars nor less than fifty dollars, and shall also be liable for twice the amount of the damage caused by his act to be recovered by the person sustaining the injury or loss, in an action on this section.

## WASHINGTON:

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both. 2. If injuries not fatal result therefrom to any human being, by imprisonment in the state penitentiary for not more than twenty years. 3. If the death of a human being results therefrom, by imprisonment in the state penitentiary for not more than twenty years.

**WISCONSIN:**

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Wisconsin | 1872

Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1.

Hunting | Wisconsin | 1921

(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

**EXHIBIT G**

Case 3:19-cv-01537-BEN-JLB   Document 137-8   Filed 10/13/22   PageID.11724   Page 228 of 229

Newspapers
by ancestry

https://www.newspapers.com/image/264632378

The Buffalo Commercial (Buffalo, New York) · Tue, Nov 1, 1870 · Page 4

Downloaded on Aug 8, 2022



gentleman will now be brought to a summary conclusion.

## THE MAN TRAP.

### Inquest on the Body of Tweedle, the Burglar, Blown to Pieces by a Gun-Trap.

*From the N. Y. Standard, Oct. 29th.*

Coroner FLYNN and the jury previously impanelled yesterday morning concluded the inquest on the body of GEORGE TWEEDLE, the burglar, who was shot by the trap-gun in the shop of JOSEPH J. AGOSTINO, at No. 301 East Twenty-third street, on Wednesday morning.

AGOSTINO and many of his friends were present, and some few of the intimates of the deceased also looked on with interest. The first and only witness examined was Officer OLIVER WINSHIP, of the Eighteenth Precinct. He testified that early that morning, before seven o'clock, he was informed that the body of a man was lying in the back-yard of AGOSTINO's gun-shop. He went there and found the body as described. The hat, shown to the jury, he identified as the one found lying beside the body, having evidently been worn by the burglar. It was a round black felt hat, and its tattered and riddled appearance showed how terrible must have been the charge in the weapon. It was filled with little holes made by small shot, and the whole top had been blown open. The chisel and piece of stick were also shown. The officer found a hole in one of the shutters of the rear window, which looked as if an attempt had been made to pry it open. A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow.

Nothing further was elicited from this witness, and the case was here rested, there being no more testimony. The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by JOSEPH D. AGOSTINO. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured AGOSTINO. He will not be released, however, but will be held under $2,000 bail.

Copyright © 2022 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers™

Newspapers
by ancestry

https://www.newspapers.com/image/513456592

The South Bend Tribune (South Bend, Indiana) · Wed, Feb 11, 1891 · Page 3

Downloaded on Aug 8, 2022



**Shot by a Trap-Gun.**

CHILLICOTHE, Mo., Feb. 11.— In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead.

Copyright © 2022 Newspapers.com. All Rights Reserved.


POWERED BY
Newspapers™
.com

**EXHIBIT 17**

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7  Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and
   Blake Graham, in their official capacities*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

CIVIL DIVISION

12

13

| | |
|---|---|
| 14 **JAMES MILLER et al.,** | 3:19-cv-01537-BEN-JLB |
| 15 Plaintiffs, | **DECLARATION OF MICHAEL VORENBERG** |
| 16 **v.** | Dept:       5A |
| 17 | Judge:      Hon. Roger T. Benitez |
| 18 **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Action Filed:  8/15/2019 |
| 19 Defendants. | |

20

21

22

23

24

25

26

27

28

1

# DECLARATION OF MICHAEL VORENBERG

I, Michael Vorenberg, declare under penalty of perjury that the following is true and correct:

1.    I am an associate professor of history at Brown University.  I make this declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of August 29, 2022.

2.    This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.    I received my A.B. from Harvard University in 1986, and my Ph.D. in history from Harvard in 1995.  After receiving my Ph.D., I began a postdoctoral fellowship at the W.E.B. Du Bois Institute at Harvard, and then served as an assistant professor of History at the State University of New York at Buffalo.  I joined the faculty at Brown University in 1999, and have taught history there ever since.

4.    I have concentrated my research on the history of the U.S. Civil War and Reconstruction.  My first book, *Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*, was published by Cambridge University Press in 2001.  The book was a Finalist for the Gilder Lehrman Lincoln Prize.  I am also the author of *The Emancipation Proclamation: A Brief History with Documents*, published by Bedford/St. Martin's in 2010.  I am the author of a number of articles and essays on Reconstruction and the law.  These include: "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Southern Illinois University Press, 2018); Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of*

1

1  *the Thirteenth Amendment* (Columbia University Press, 2010); "Reconstruction as a
2  Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions*
3  *in the History of Postbellum America* (Oxford University Press, 2006); and
4  "Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (Dec.
5  2005), 416-26.

6      5.      My curriculum vitae is attached as Exhibit A.

7      6.      I have been retained by the California Department of Justice to serve
8  as an expert witness in this case.  I am being compensated at a rate of $250 per
9  hour.

10                                **OPINIONS**

11  **I.   SUMMARY**

12      7.      This declaration provides results of an investigation into the existence,
13  usage, and regulation of high-capacity firearms (guns capable of firing more than
14  10 rounds without re-loading) during the Reconstruction period of U.S. History
15  (1863-1877), with special focus on the period during Reconstruction when the
16  Fourteenth Amendment to the U.S. Constitution was created, ratified, and enforced
17  (1866-1876).  The result of the investigation can be summarized as follows:  There
18  were high-capacity firearms during Reconstruction, and all of them, including those
19  that could easily be carried by a single individual, were regarded in all the states at
20  the time as weapons suitable only for law enforcement officers, not for ordinary
21  citizens.  With very few exceptions, almost all of which were in the Western
22  Territories, high-capacity firearms during the era were understood to be weapons of
23  war or anti-insurrection, not weapons of individual self-defense.

24      8.      Evidence for these assertions does not necessarily take the form of
25  statutes or court decisions, and that is entirely unsurprising:  explicit legal text
26  prohibiting civilian possession of the most dangerous weapons of war was not
27  commonly the means by which such weapons were regulated in the United States
28

1    during the Civil War and Reconstruction.[1]  Rather, prohibitions existed in the
2    policies and practices of the U.S. army and its auxiliary or allied units, such as the
3    state-wide militias that operated as law enforcement bodies during Reconstruction.
4    No statutes or court opinions can be found during the period that banned civilian
5    possession of artillery pieces, hundreds of which existed unused after the Civil War,
6    but of course the absence of such express prohibitions cannot be read as evidence
7    that civilians were allowed to possess such pieces.  Rather, policy and practice
8    dictated that only the U.S. army and its allied military units could possess such
9    weapons.  High-capacity firearms, which like artillery pieces were created as
10   weapons of war, were regulated in the same way, through policy and practice
11   limiting possession of such firearms to the U.S. army and its allied military units.
12   Unlike artillery pieces, however, high-capacity firearms during Reconstruction did
13   come to be regarded by their manufacturers as having a potential market among
14   U.S. civilians.

15        9.      However, efforts to create a market for high-capacity firearms in the
16   United States during Reconstruction failed miserably.  Americans who were not
17   part of legal law enforcement bodies rarely bought high-capacity firearms.  One
18   reason why these firearms failed to sell was the regulatory climate surrounding
19   them.  U.S. and pro-Union state authorities sometimes seized shipments of such
20   weapons on the assumption that they were intended for use by insurrectionary
21   groups.  Because of the negligible demand for such weapons, owners of gun shops
22   rarely stocked them.  The primary, almost exclusive buyers of high-capacity
23   weapons during Reconstruction were a small number of U.S. army units and state
24   law enforcement bodies.  Manufacturers of high-capacity firearms during
25   Reconstruction thus looked outside the United States for buyers.  The Winchester
26   Repeating Rifle Company, the only company to produce such weapons during post-

27
28        [1] In contrast, state and local laws did regulate other types of weapons, such as concealable weapons associated with criminal use, during this period.

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

1  Civil War Reconstruction, stayed afloat during Reconstruction only by selling high-
2  capacity firearms to foreign armies.

3      10.    During Reconstruction, high-capacity firearms did not circulate widely
4  among the civilian population; thus there was no need for legislative efforts to
5  regulate them among civilians.  Instead, during Reconstruction, high-capacity
6  firearms were possessed almost exclusively by the U.S. army and related military
7  units, and they were regulated by the policies and practices of the army and these
8  related military units.

9  **II.   SCOPE**

10     **A.    Time Period Covered**

11     11.    The time period covered by this declaration is Reconstruction,
12  typically defined as 1863-1877.  This is the time period assigned to Reconstruction
13  in the most commonly used study of the period, Eric Foner's *Reconstruction*.[2]  The
14  start point of 1863 correlates to the Emancipation Proclamation, the final version of
15  which was signed by President Abraham Lincoln on January 1, 1863.  The endpoint
16  correlates to March 1877, when a new president, the Republican Rutherford B.
17  Hayes, was inaugurated after a months-long contested election; and Hayes, once in
18  office, oversaw the removal of all remaining U.S. troops in southern states that had
19  been part of the Confederate States of America, the rebellious entity that had fought
20  the United States during the Civil War of 1861-1865.  Within the general period of
21  Reconstruction, the more narrow time period examined in this declaration is 1866-
22  1876.  This is the period covering events relevant to the relationship between the
23  Fourteenth Amendment and firearms during the greater period of Reconstruction.
24  Such events include (in chronological order):  the passage by the U.S. Congress of
25  the Civil Rights Act of 1866 and the new Freedman's Bureau Act (the initial
26  Freedman's Bureau Act, passed in March 1865, was for one year only); the passage

27  ───────────────
       [2] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877*
28  (New York: Harper and Row, 1988).

───────────────
4

1    of the Fourteenth Amendment by Congress in 1866; the passage by Congress of the

2    Reconstruction Act of 1867 (sometimes referred to as the "Military Reconstruction

3    Act"); the adoption of the Fourteenth Amendment by state ratification in 1868; the

4    enforcement of the Fourteenth Amendment by U.S. Statutes adopted in 1870-71;

5    and the first interpretation of the Fourteenth Amendment's relation to the Second

6    Amendment by the U.S. Supreme Court, in *U.S. v. Cruikshank* of 1876 (92 U.S.

7    542). This declaration also mentions the opinion in *Presser v. Illinois* (116 U.S.

8    252 (1886)), even though it came well after Reconstruction, because the events that

9    led to the case occurred in early 1879, very soon after the end of Reconstruction.

10          **B.    Geographical Focus**

11          12.    This declaration covers the geographic area of the entire United States,

12   both its states and territories, during Reconstruction. However, its particular

13   regional focus is on the southern states that had declared themselves seceded in

14   1860-61 and had joined together into the Confederacy by April 1861. These states

15   collectively represented the region during 1866-1876 where there was the most

16   frequent use of firearms, mainly because of armed conflict either between

17   contending factions within these states or between the U.S. army and insurgents in

18   these states. Even more specifically, this was the only region outside of the

19   Western Territories where Henry Rifles and Winchester Repeating Rifles were

20   used. As will be explained later, these are the weapons examined most closely in

21   this declaration (see IV. Historical Background and Terminology). In the Western

22   Territories during Reconstruction, these weapons were used primarily by the U.S.

23   army against Native Americans in the so-called "Indian Wars" that extended from

24   the 1860s to the 1890s. Some civilian U.S. citizens in the Western Territories

25   during this period also possessed these weapons. However, as with all firearms in

26   the region at the time, it is difficult to determine how common possession of Henry

27   Rifles and Winchester Repeating Rifles was in the Western Territories in the

28   Reconstruction period. Also, laws in these territories in this period were in flux, so

1    it is difficult to know whether possession by civilian U.S. citizens there was lawful.

2    Whatever the laws were at any given moment in this region during Reconstruction,

3    the number of non-army U.S. citizens in the Western Territories was always

4    negligible.

5    **III.**    **RESEARCH MATERIALS AND METHODOLOGY**

6         13.    Research materials included standard scholarly works on firearms and

7    U.S. history for the period of Reconstruction—roughly twenty scholarly books and

8    thirty scholarly articles.  Materials also included newspaper and magazine articles

9    contemporary to the period studied.  Hundreds of these are accessible and were

10    accessed via commonly used databases by scholars, such as Chronicling America,

11    Pro-Quest Historical Newspapers, and the Hathi Trust. U.S. government documents

12    and documents from U.S. states and territories were accessed via the Hein Online

13    database or the Nexis Uni database (a version of the better-known Lexis Nexis legal

14    database).

15         14.    All of these documents, whether contemporary to the period studied or

16    produced by scholars after that period, were searched for information regarding

17    firearms—especially Henry Rifles and Winchester Repeating Rifles—with special

18    attention to the presence, use, and regulation of these firearms during the

19    Reconstruction era (1863-1877).

20         15.    In all my research, I gave more weight to evidence that attested to

21    firearms being owned and/or used than to evidence that manufacturers of the

22    firearms or other sellers were trying to get people to buy and use them.

23    Advertisements for the firearms are not evidence of possession.  However, if

24    advertising material provided testimony of the firearms being owned or used, I

25    treated that testimony as legitimate evidence, albeit evidence that might have been

26    embellished, even invented, for the sake of sales.

27

28

**IV.    HISTORICAL BACKGROUND AND TERMINOLOGY**

    **A.    The Henry Rifle and the Winchester Repeating Rifle**

16.    For the purposes of this declaration, a high-capacity firearm is defined as a firearm that can hold more than 10 rounds.  The magazine holding the rounds can either be integral to the gun or external to it.  The gun itself can be carried by a single person.  Finally, the gun must have the potential for common usage:  it has to be mass-manufactured or have the potential to be mass-manufactured, thus excluding experimental weapons that were never widely adopted.

17.    Within these specifications, there were only two high-capacity firearms in the entire world that were produced during Reconstruction: the Henry Rifle and the Winchester Repeating Rifle.  I note the exclusion here of the Gatling Gun.  That weapon was indeed a high-capacity firearm produced during Reconstruction, but it could not be carried by a single person, as it was massive in size and nearly 200 pounds in weight.

18.    The Henry Rifle and the Winchester Repeating Rifle were nearly the same weapon.  Manufacturing of the Henry began soon after the weapon was patented, in 1860.  In 1866, the Winchester Repeating Rifle was established in New Haven, Connecticut.  Its owner, Oliver Winchester, hired the inventor of the Henry, who designed a slightly modified version of the Henry Rifle.  The new model was dubbed a Winchester Repeating Model.  Because it was released in 1866, it was sometimes called the "Winchester 66."  In 1873, a new model of Winchester was released, the "Winchester 73."  The rifle was nearly the same as the "Winchester 66" but used a slightly different type of ammunition.  All of these rifles, the Henry and the two models of the Winchester, had the following features: they held fifteen rounds in a chamber fixed within a stock just below the rifle barrel; they used a lever below the trigger to eject spent shells and load new rounds; and they were easily reloaded.  The Winchester was easier to reload than the Henry—it had a "gate" on the side near the trigger that allowed the user to feed rounds into the gun

1    during lulls in firing or after all the rounds in the chamber were spent).

2    Advertisements for Henrys and Winchesters claimed that the weapons could fire

3    two rounds per second (this rate might have been exaggerated—some of the same

4    ads made the false claim that the guns held eighteen rounds, not fifteen—but all

5    agreed that the rifle could fire at a rate at least as fast as any existing rifle).

6          19.     There were other individual-use weapons during the Reconstruction

7    era that could fire multiple shots in rapid sequence, but none had a higher capacity

8    than ten rounds.  Some sidearms, most notably six-shot revolvers, could fire rounds

9    in rapid sequence.  But no sidearm held more than ten rounds.  Certain rifles beside

10   the Henry and Winchester could fire multiple rounds rapidly, but none held more

11   than ten rounds. These included the Spencer Rifle (4-round capacity) and the

12   Sharps Rifle (7-round capacity).  The U.S. army and the Confederate army

13   approved the adoption of the Spencer and Sharps rifles.  These weapons were

14   known either by their company name or by the generic term "repeaters" or

15   "repeating rifles."  Henrys and Winchesters were also repeating rifles, but because

16   they were in a class of their own, due to their high capacity, they were generally

17   known only as Henrys or as Winchesters.  In the language of the day, they did not

18   fall into the generic category of "repeaters" or "repeating rifles" (thus a very well-

19   armed individual of the period might be described as having "a revolver, a repeater,

20   and a Winchester"—three distinct categories).

21         20.     This declaration occasionally uses the term "Henry-Winchester."

22   Although the Winchester Repeating Rifle effectively replaced the Henry Rifle,

23   Henry Rifles continued to be used long after Winchesters began to be produced.  At

24   certain times and places during Reconstruction, both types of weapons might be

25   found in possession of a single, armed group.  For such situations, the phrase

26   "Henry Rifles and/or Winchester Repeating Rifles" would be appropriate, but

27   seeing how cumbersome that phrase is, it has been shortened in this declaration to

28   "Henry-Winchester" or "Henry-Winchesters."

8

## B.    The Henry Rifle and the American Civil War

21.    Production and sales numbers reveal that Henry Rifles and their successors, Winchester Repeating Rifles, were uncommon during the Civil War and Reconstruction compared to other rifles.[3]  Until 1866, manufacturers of Henrys and Winchesters concentrated their marketing efforts within the United States on trying to persuade the U.S. army and pro-Union state militias to adopt the high-capacity rifles as standard weapons for soldiers.[4]  The U.S. War Department never adopted Henry-Winchesters.  The army's chief of ordnance, General James Ripley, reported early in the war that these rifles, along with lower-capacity rifles were "too complicated, too heavy, and too costly . . . and apt to waste ammunition."[5]  The ordinance department never changed its position on Henry-Winchesters.  During the Civil War, the U.S. army opted instead for single-shot rifles and, in some instances, low-capacity "repeaters" (rifles that held magazines of two to seven rounds).  The U.S. army did allow individual commanders of army units or allied units to buy Henry-Winchesters for their soldiers.  For example, of the 900 Henry rifles sold during 1862, 300 went to Kentucky's pro-Union state militia.[6]Although some military units that purchased Henry Rifles were able to do so using funds allotted to them by state governments, most of the soldiers and officers who purchased the weapons used their own money.  By the end of the Civil War in 1865, U.S. soldiers had purchased about 8,500 Henry Rifles; most of those had

---

[3] Unless otherwise noted, this declaration relies on two sources for numbers of Henry Rifles and Winchester Repeating Rifles manufactured and sold:  Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); and John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955).

[4] Haag, *The Gunning of America*, 65-81.  During the Civil War, the pro-Union border states of Kentucky and Missouri had state-wide militias that were authorized by state governments to fight for the Union.

[5] Haag, *The Gunning of America*, 70.

[6] Haag, *The Gunning of America*, 76.

9

been bought with the soldiers' own money.  By contrast, the U.S. government had purchased nearly 107,000 Spencer single-shot rifles for use by the army.[7]

22.    Meanwhile during the Civil War, the Confederate War Department also never adopted Henry Rifles.  Whether that was by choice is unclear. Oliver Winchester, who had the greatest control of the company that made Henrys, declared that he did not want the weapons sold to Confederates.  His policy may have been due to pure loyalty to the Union cause or to fear that he would be charged with treason by the U.S. government if he facilitated gun sales to the rebels.  Some Confederate soldiers were able to acquire Henrys by theft or by using agents who purchased them in the North and smuggled them to the South.[8]  Most Confederates knew about the weapon.  A widely-circulated story told of a Confederate soldier who called the gun "that damned Yankee rifle that can be loaded on Sunday and fired all week."  One of the soldiers in Robert E. Lee's Army of Northern Virginia regretted that "we never did secure the Winchester."[9]  Some Confederate soldiers did manage to obtain Henry-Winchesters, either by smuggling or, more commonly, by confiscating them from captured Union soldiers.  In late 1862, for example, a number of pro-Union Kentucky soldiers who had just acquired Henry Rifles were overrun by pro-Confederate Kentuckians and Tennesseans.  As many as 300 Henry rifles ended up in Confederate hands as a result.[10] These weapons probably did not stay with the southerners for very long.  By June 1865, all of the major Confederate armies had surrendered.  Typically, surrender required all Confederate soldiers to "stack arms."  If they had sidearms, they could keep

---

[7] Haag, *The Gunning of America*, 81.

[8] Haag, *The Gunning of America*, 65.  For evidence that U.S. authorities would have regarded the sale of Henrys to Confederates as treasonous, and thus that Winchester had good reason to avoid such sales, see Haag, *The Gunning of America*, 90.

[9] Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38.

[10] Haag, *The Gunning of America*, 76.

1  them, but any rifles had to be relinquished.  Confederate veterans would thus have

2  been prohibited from having Henry-Winchesters.  At least some ex-Confederate

3  soldiers ended up with Henry-Winchesters, however, though not legally.  If they

4  failed to turn in their rifles, they were in violation of the "parole" agreement that

5  protected them from imprisonment after surrender.  Some ex-Confederates

6  managed to get Henry-Winchesters by stealing them from U.S. army depots.

7  Others bought them from smugglers who had gotten the weapons in Mexico and

8  then carried them across the border to Texas.  Henry-Winchesters were easier to

9  find in Mexico than in the U.S. in 1864-1867.  They had been sold by the thousands

10 to the Juaristas, the rebel force that would ultimately wrest Mexico from

11 Maximilian, the self-proclaimed "Emperor" installed in Mexico City by Napoleon

12 III of France.

13      23.      Not only the Juaristas but other non-U.S., non-Confederate armies

14 possessed Henry-Winchesters.  Indeed, foreign armies were the main market for

15 Henry-Winchester manufacturers during Reconstruction.  Had it not been for the

16 war in Mexico, along with the Franco-Prussian War and the various armed conflicts

17 between the Russian and Ottoman empires—all wars involving thousands of

18 Henry-Winchesters—the manufacturers of these weapons would likely have gone

19 bankrupt.[11]

20      24.      In the United States by 1866, Henry-Winchesters did exist, to be sure,

21 but in much smaller numbers than in foreign countries.  U.S. veterans of the Civil

22 War could possess Henry rifles.  Beginning in May 1865, U.S. army volunteers

23 began mustering out in significant numbers.  The non-regular U.S. army (that is, the

24 volunteer force), nearly a million strong by April 1865, would fall well below

25 100,000 by the end of the year.  Unlike ex-Confederate soldiers, ex-U.S. soldiers

26 could keep their rifles upon discharge.  This meant that U.S. soldiers at the time

27

28      [11] Haag, *The Gunning of America*, 109-42.

1   who had Henry rifles might continue to possess them once they re-entered civilian

2   life. However, the number of such U.S. veterans who kept their Henrys was small,

3   perhaps 7,500,[12] and those that opted to keep them paid dearly.  The U.S. army did

4   not simply give weapons away for free to discharging soldiers who had acquired

5   them at no cost from their military units.  Rather, soldiers wanting to keep their

6   weapons had to buy them at market value.  A Spencer carbine (a short-barreled,

7   repeating rifle, and one of the most popular weapons among U.S. soldiers), would

8   cost a discharging soldier about $10 (roughly $175 in 2022 dollars).  A Henry

9   would cost at least $30 (roughly $525 in 2022 dollars).  A private in the U.S. army

10   typically made $13 per month.  If he had a Spencer that he wanted to buy, he would

11   have to pay less than one month's wages—not a bad deal for a perfectly sound and

12   popular rifle.  If he wanted to buy a Henry, though, that would cost him more than

13   two months' wages, and there would be little to persuade him that the difference in

14   price corresponded to the difference in value.  The result was that very few Henrys

15   were purchased by discharged U.S. soldiers.  According to a U.S. army report, 808

16   Henrys were purchased by discharging Civil War soldiers, compared to 8,289

17   Spencer Carbines.[13] Henrys that were not purchased went to the U.S. War

18   Department's ordnance department, which did not sell them.

19        25.    By the end of the Civil War in 1865, very few combatants had used

20   Henry Rifles, and fewer still had kept them once they were discharged.  The result

21   ────────────
       [12] The figure of 7,500 Henrys kept by pro-Union soldiers after the war is
22   reached in the following way. 8,500 had been purchased by or for U.S. soldiers. See
       Haag, *The Gunning of America*, 81.  Of these, roughly 2,000 were purchased for
23   soldiers (based on a count of regiments known to have bought the rifles with public
       funds).  Thus 6,500 Henrys were privately owned by soldiers.  Of the roughly 2,000
24   Henrys purchased for soldiers, 808 were known to have been bought by the soldiers
       at the end of the war.  See 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance
25   Stores," *U.S. Congressional Serial Set* (1871), pp. 167-172.  Thus, a generous
       estimate of how many U.S. veterans had Henrys after the war is 7,500.

26        [13] General Orders, No. 101, May 30, 1865, *The War of the Rebellion*
       (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43;
27   42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," *U.S. Congressional
       Serial Set* (1871), pp. 167-172.

28

1  was that only a small number of Henrys were in circulation in the United States

2  immediately after the war—perhaps 10,000, and this in a country of roughly 35

3  million people.[14]  Those veterans who possessed the guns understood that they were

4  weapons of war—they had used them as such—rather than weapons of individual

5  self-defense.  Maybe veterans kept them as souvenirs, maybe as commodities to be

6  sold at a later date, maybe as novelties to be displayed at local shooting contests or

7  social gatherings (rifle clubs and shooting galleries were common in the North).

8  Maybe they planned to travel to or through the Western Territories, where Henrys

9  were gaining a reputation as good weapons against hostile Native Americans or

10  roaming bands of criminals, known as "highwaymen" or "road agents."  Regardless

11  of why a U.S. veteran might have kept a Henry, he would have understood that it

12  was an uncommon weapon, and one not intended for individual self-defense.  It was

13  strictly a weapon of war.

14        **C.      State Secession, State Readmission, State Redemption**

15        26.      Reconstruction was a time period (1863-1877) but also a process.  The

16  process was described by President Abraham Lincoln in his last public speech

17  (April 11, 1865) as getting "the seceded States, so called," which were "out of their

18  proper practical relation with the Union," back into their "proper practical relation"

19  with the Union.[15]  To better understand this process, one must understand the

20  meaning of key terms used during the Reconstruction period: state secession, state

21  readmission, and state redemption.

22

23        [14] 11,000 Henry Rifles were produced between 1861 and 1865; see Parsons,
24  *The First Winchester*, 48.  Assuming that all were sold—a generous assumption—
   then 2,500 were sold to civilians and 8,500 to U.S. soldiers (the 8,500 figure comes
25  from note 12 above).  Of the 8,500 U.S. soldiers who had Henrys, 7,500 kept them
   after the war; see note 12 above.  Thus 10,000 Henrys were in circulation after the
26  war (again, a generous estimate).  The U.S. census of 1860 reported just over 31
   million Americans; the census of 1870 reported just over 38 million.  Thus 35
27  million is given as an estimate of the population of the United States in 1865.

        [15] Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick,
28  N.J.: Rutgers University Press, 1953), 8:403-4.

### 1.   State Secession

27.     Lincoln used the phrase "seceded States, so called" because he did not accept the constitutionality of state secession.  All eleven states of the Confederacy had declared themselves "seceded" from the Union by May 20, 1861.  The governments of all of these states regarded state secession, by which they meant a breaking-off from the Union, as constitutional.  The Lincoln administration rejected this interpretation and declared instead that the "so-called" seceded states had remained in the Union but had had their governments overtaken by disloyal, insurrectionary groups.  Reconstruction, therefore, would be complete when all of the "so-called" seceded states had governments that were loyal to the Union.  The presidential administrations of the Reconstruction era that followed Lincoln's (Andrew Johnson's and Ulysses S. Grant's) adopted this understanding of secession.  So, too, did all the Reconstruction-era Congresses, though a minority of Congressmen took a somewhat different view, claiming that secession was indeed unconstitutional but that the states in question had indeed broken off from the Union and therefore could be treated as territories.  This declaration does not delve into the question of the constitutionality of secession.  It simply notes that U.S. lawmakers of the Reconstruction era generally regarded secession as unconstitutional and a form of insurrection.

### 2.   State Readmission

28.     There were competing views among U.S. lawmakers during Reconstruction as to when a "so-called" seceded state could be deemed "readmitted" to the Union.  The dominant view among U.S. lawmakers was that a state was deemed readmitted when Congress agreed to seat Representatives and Senators from that state. This meaning of state readmission is used in this declaration. In justifying federal intervention into "so-called" seceded states and the imposition of qualifications on states for readmission, national law makers relied on two constitutional principles: 1) "war powers"; and 2) the "guarantee clause"—the

14

1    clause of the U.S. Constitution declaring that "The United States shall guarantee to

2    every State in this Union a Republican Form of Government" (U.S.C., Art. IV, Sec.

3    4).  This declaration does not delve into the question of the legitimacy and scope of

4    these constitutional principles.  It simply notes that these were the principles of the

5    time used to justify federal policy towards the "so-called" seceded states during

6    Reconstruction.

7             **3.      State Redemption**

8            29.     Between 1866 and 1871, all of the "so-called" seceded states were

9    readmitted to the Union.  At the point of readmission, each state had a government

10   that was loyal to the Union and controlled by a political party affiliated with the

11   national Republican Party, which for all the years of Reconstruction was the Party

12   in control of the U.S. government.  In 1866-68, the last years of the administration

13   of Andrew Johnson, he renounced the Republican Party and declared himself a

14   Democrat, which he had been prior to the Civil War, but the U.S. government as a

15   whole was still Republican.  The Republicans in Congress beginning in December

16   1866 had a two-thirds majority that allowed them to override Johnson's vetoes; and

17   beginning in March 1867, with the Reconstruction Act, they effectively took

18   control of the "Commander-in-Chief" powers typically vested in the Executive

19   branch. In each state after readmission there was internal conflict.  Part of that

20   conflict involved efforts by Democrats, many of whom were former Confederates

21   or Confederate-sympathizers, to take control of the state government from

22   Republicans.  By 1877, the Democrats had taken control of the governments of all

23   the states of the former Confederacy.  At the point when Democrats took control of

24   a state, they declared the state "redeemed" and began rolling back reforms instituted

25   by prior Republican state authorities.  In this declaration, state redemption means

26   the period when Democrats declared a state "redeemed" and began instituting

27   reactionary measures.

28

**D.   Militias**

30.     Militias have a long history in the United States, and they have been studied extensively by scholars investigating the Second Amendment, especially for the period of Colonial America and the Early Republic.  Militias existed during Reconstruction, but the militias of that period were fundamentally different from the militias of the earlier periods.

31.     By the time that the Civil War broke out in 1861, well-organized state militias such as had existed in the Early Republic technically existed but were practically defunct, except in frontier states like Missouri and Texas.  Militias by 1861 essentially existed as volunteer local groups authorized by state governments but were only lightly controlled by those governments.  Such militias were used, to be sure.  Local militias in Virginia in 1859, for example, had worked together with a unit of the U.S. army commanded by Robert E. Lee to put down the effort by John Brown to seize the U.S. armory at Harpers Ferry and distribute arms to enslaved Black Americans in the region.

32.     The fact that state militias did technically exist by 1861 became very important once the Civil War broke out.  The power under the U.S. Constitution for a President to call up state militias is what Abraham Lincoln invoked at the start of the war when he authorized up to 75,000 men to come together to put down the insurrection in the southern states.  The Confederate States of America, which adopted a constitution quite similar to the U.S. Constitution, invoked this same authority when calling up its national army.

33.     Although soldiers had been called to national armies in their role as state militiamen, the armed units that formed the basis of national armies during the Civil War were not state-based militia units but rather state-formed regiments approved as national army units by the U.S. War Department (hence only in rare instances would a regiment be a replica of a local militia unit).  Nonetheless, the national armies continued to be managed at times by laws designed in the pre-war

16

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

1  era to manage state militias.  In July 1862, for example, the United States passed a

2  Militia Act that standardized the terms of membership in state-wide militias even

3  though state-wide militias had grown defunct in the North prior to the war; only in

4  this way—by legislating via the old state militia system—did the U.S. War

5  Department have the authority to manage the personnel of the national army.  The

6  July 1862 Act significantly declared that Black Americans could not be denied

7  admission to state militias.  That was a pivotal development, as most state militias

8  prior to the war (all of them in the South, most of those in the North), had denied

9  membership to Black Americans.

10      34.     When the Civil War ended in mid-1865, state militias, which had been

11  given new life by the war, thrived, but not everywhere.  In the North, they fell again

12  into disuse, though they would begin to appear again with strength in the late 1870s

13  and 1880s.  In the border states of Missouri and Kentucky, which had remained

14  loyal to the Union despite being slave states, state militias continued to be

15  important, as guerrillas caused disturbances in the states long after the Civil War

16  was over.  In the states of the former Confederacy after the war, the state militias

17  had the most visible—and notorious—presence.  Invoking newly passed

18  discriminatory state laws ("Black Codes"), or simply acting on their own discretion,

19  southern state militias, which excluded all Black Americans, harassed, assaulted,

20  and even killed Black Americans and pro-Union whites.  These militias were

21  composed mostly of former Confederate soldiers, many of whom wore their

22  Confederate uniforms while in action.  These militias were regarded by U.S.

23  lawmakers as pernicious and unlawful.  Leaving aside the obvious illegality of the

24  many acts committed by these militias, they were in violation of U.S. law simply by

25  wearing Confederate uniforms.[16]

_____

26      [16] James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, *Opinions of the Attorney General*, 11:211-12. For these immediate post-
27  war southern militias, see William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel
28

1    35.    In March 1867, the U.S. Congress abolished all southern state militias,

2    with some exceptions.  Exempted were the border states, the four slave states that

3    had never seceded, though Kentucky and Missouri were the only border states with

4    state militias, and both states would disband their militias by 1868.  Also exempted

5    were two states that had joined the Confederacy:  Arkansas and Tennessee.[17]

6    Arkansas was exempted because it had proven itself to President Johnson as a

7    genuinely loyal state.  It had established a loyal state government, led by Governor

8    Powell Clayton, that conformed to the guidelines that Abraham Lincoln had laid

9    out in December 1863 and that Johnson had affirmed soon after taking office.

10   Arkansas in 1868 created a state militia that U.S. authorities regarded as a

11   legitimate armed organization loyal to the United States.[18]  Tennessee was

12   exempted because it, too, had established a loyal state government, led by Governor

13   William ("Parson") Brownlow.  It had gone one step further.  It had ratified the

14   Fourteenth Amendment, passed by Congress in mid-1866, thus becoming the first

15   southern state to do so and, as a result, becoming the first formerly seceded state to

16   be formally readmitted to the Union.  With Brownlow's urging, Tennessee in 1866

17   had created a state militia, the "Tennessee State Guard."  This organization was

18   composed of both white and black members; it was well-armed (with Enfield

19   single-shot rifles, not with Henrys or Winchesters); and it drilled regularly.  Former

20   Confederates in the state despised the force.[19]

21   36.    After Congress in 1867 abolished all but the exempted southern state

22   militias, some of the newly created pro-Union governments in the non-exempted

Hill: University of North Carolina Press, 2021), 66-67.

[17] 14 U.S. Statutes 487, Chap 70, Sec. 6 (Approved March 2, 1867); James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 112.

[18] Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," *Arkansas Historical Quarterly*, 64 (Winter 2005), 356-58.

[19] Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119.

1   southern states created new state militias that were expressly tasked with subduing

2   insurrection and anti-black activities.  Such states included Louisiana, North

3   Carolina, South Carolina, and Texas.  Loyal state governments in Alabama and

4   Florida proclaimed an intention to organize such new state militias, but they never

5   followed through.  A loyal government in Mississippi in 1870 went so far as to

6   organize such a state militia, but the force was never used.  The state militias of the

7   South that did exist and saw action, those in Arkansas, Louisiana, North Carolina,

8   Tennessee, South Carolina, and Texas, were wholly new innovations (though Texas

9   made the dubious claim that the pre-war Texas Rangers was a predecessor

10  organization).  The new, post-1867 southern state militias were under the direct

11  control of the state (the Governor and/or state adjutant general), as opposed to

12  merely authorized by the governor.  They drilled and paraded regularly.  They were

13  paid and armed by the state, with the arms kept in state-maintained, state-guarded

14  armories or arsenals.  Finally, all of the militias allowed if not encouraged Black

15  American men to join, though some, like North Carolina's, segregated white

16  companies from black companies.  The high number of Black Americans in the

17  southern state militias led some people at the time as well as some early historians

18  to call these organizations "Negro Militias."  This declaration does not use that

19  label.  Pre-Civil War state militias in the South, in contrast to these wholly new

20  post-war organizations, were unpaid, self-armed, and all-white.[20]

21      37.     Two of the new southern state militias, those of Louisiana and South

22  Carolina, are particularly relevant to the subject of this declaration.  As will be

23  discussed below, the state militias of Louisiana and South Carolina—and only those

24  state militias—were armed with Winchester Repeating Rifles.

25

26      [20] Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University
    of Texas Press, 1957), 3-33; Otis A. Singletary, "The Texas Militia During

27  Reconstruction," *Southwestern Historical Quarterly*, 60 (July 1956), 25-28; Allan
    Robert Purcell, "The History of the Texas Militia, 1835-1903" (Ph.D. diss.,

28  University of Texas, Austin, 1981), 221-27.

## E.    The U.S. Army During Reconstruction

38.    The U.S. army began occupying parts of the South as soon as the Civil War broke out and would not end its occupation until 1877, the end of Reconstruction, when it removed its last units from Florida, Louisiana, and South Carolina.  During the war, the U.S. army had exclusive police powers in the occupied South until or unless local policing institutions—courts and constabularies—were deemed loyal to the United States.  At that point, the U.S. army cooperated with local police institutions to "keep the peace."  Yet U.S. commanders retained the power, which they had had since the start of the war, to declare martial law in an area, thus suspending the civil institutions there.  This arrangement carried over from the Civil War into the early years of post-war Reconstruction.  Until April 1866, U.S. troops had unrestrained power to operate within state boundaries to keep the peace.  As part of that power, they could use troops as police and hold their own courts that could try civilians.[21]

39.    The army also was willing to use this power in states that had never declared themselves seceded.  The army had overseen arrests and prosecutions of alleged traitors in Indiana in 1864, actions that were ultimately deemed unconstitutional in the U.S. Supreme Court's post-war *Milligan* opinion. In June 1866, the army had intervened in New York and Vermont to capture Irish nationalists known as Fenians who had fought against British troops in Canada and then crossed over to the United States.  (Neither Henrys nor Winchesters were used in the conflicts between the Fenians and Canadian troops.)  General-in-Chief Ulysses S. Grant ordered General George Meade to inform the New York and Vermont governors that they should call out volunteer militia units to capture the Fenians.[22]

---

[21] Sefton, *The U.S. Army and Reconstruction*, 5-106.

[22] W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71.

20

40.    The federal-state structure of armed enforcement that took place during the 1866 Fenian crisis was the model that U.S. authorities had in mind for the South once the southern states began creating pro-Union state militias.  The hope was that the southern states would end up like New York and Vermont during the Fenian crisis:  they would develop and sustain new, pro-Republican state militias that would be the primary armed force in the states, with the U.S. army playing only an ancillary role.

41.    This plan for U.S. army-southern state militia cooperation nearly came apart beginning in April 1866. In that month, President Andrew Johnson proclaimed that a state of "cessation of hostilities" existed in all the southern states but Texas (in August 1866 he would proclaim that in Texas, too, there was a "cessation of hostilities).  Johnson thus effectively removed "war powers" as a constitutional justification for the army's presence in the South.  His move was part of his general turn against the Republican program of Reconstruction.  Also in April 1866, he vetoed the Civil Rights Act of 1866, a veto that Congress overrode. Two months earlier, he had vetoed the act renewing the Freedman's Bureau. Eventually, Congress passed a new act for the Bureau, which Johnson again vetoed but Congress overrode.  Both the Civil Rights Act and the Freedman's Bureau Act established, among other things, that the army would continue to have policing powers in the southern states.  Those powers were to be used specifically to put down insurrectionaries who threatened to undermine the civil rights of Black Americans or in any way jeopardize pro-Union citizens and institutions.  The Civil Rights Act contained a military provision that empowered the army to act reactively or preemptively against any actual or anticipated insurrectionary threat.[23]  Even though Congress was able to sustain this military provision as well as the rest of the

---

[23] Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88.

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

1   Civil Rights Act of 1866 against Johnson's veto, the military provision was

2   jeopardized by Johnson's declaration of a "cessation of hostilities." The declaration

3   signaled that Johnson might not sustain the army in its duties specified by

4   Congressional measures like the Civil Rights Act. Also in April 1866, the U.S.

5   Supreme Court announced that it was ruling in favor of the plaintiff in the *Milligan*

6   case (the actual opinion was not issued until January 1867). That case was

7   narrowly about the power of the army to try civilians in areas where civil courts

8   were operative; more broadly it was about the power of the army to have any

9   authority at all to occupy an area ostensibly at peace.

10       42.    U.S. Republican authorities moved quickly to protect their power to

11   occupy the formerly rebel South. Secretary of War Stanton prepared an order that

12   invoked the military provision of the Civil Rights Act of 1866 to justify continued

13   military occupation of the South. This was a novel move, as it allowed military

14   occupation in the absence of "war powers." The Civil Rights Act was justified not

15   by "war powers" but by the Thirteenth Amendment abolishing slavery. A small

16   number of Republicans, most notably Representative John Bingham, thought the

17   Civil Rights Act needed more justification than that. For this reason, among others,

18   Bingham pressed for a new constitutional amendment, which ultimately emerged as

19   the Fourteenth Amendment. The resolution for the amendment was passed by

20   Congress a few months after the Civil Rights Act and sent to the states for

21   ratification. Congress would ultimately declare that the Civil Rights Act of 1866

22   was authorized by the Fourteenth as well as the Thirteenth Amendments.

23       43.    The military provision of the Civil Rights Act of 1866 was not enough

24   to put U.S. military occupation of the South on sure footing. The President still

25   controlled the army in his capacity as commander-in-chief. Congress thus began to

26   wrest control of the army from President Johnson. First, it passed the

27   Reconstruction Act of 1867, which formalized military occupation and required

28   southern states to ratify the Fourteenth Amendment in order to be readmitted to the

22

1    Union.  Then Congress passed measures (most notably the Tenure of Office Act)

2    that shifted aspects of army control from the President to Congress.  Then it

3    impeached Johnson, though Johnson was ultimately acquitted by the Senate.  In the

4    meantime, the army and the U.S. Attorney General opted to take the narrowest

5    possible reading of the Milligan decision, such that the only power deemed out of

6    the army's hands in occupied areas was the power to try civilians if civilian courts

7    were operative.  By 1868, then, the year of the Fourteenth Amendment's adoption,

8    the U.S. army had secured for itself a place in the southern states as a legitimate

9    occupying force in the South.  It would affirm this status with the acts of 1870 and

10   1871 enforcing the Fourteenth Amendment as well as the Fifteenth Amendment,

11   which had been adopted in 1870.  The last of these enforcement acts, the so-called

12   "KKK Act," was aimed directly at breaking up the Ku Klux Klan and similar

13   insurrectionary, paramilitary organizations that terrorized Black Americans and

14   pro-Union whites ("terror" was one of the most commonly used words of the time

15   to describe the Klan's intent toward Black Americans).

16         44.    The reason to understand this sequence of events is to appreciate the

17   army's distinctive, unprecedented role in the era of the Fourteenth Amendment.  It

18   did not operate under martial law.  It had the power to declare martial law, but in

19   practice, it avoided using that power.  Instead, it looked to pro-Republican state

20   governors to declare martial law if martial law was deemed necessary (and such

21   gubernatorial declarations were extraordinarily rare during Reconstruction).

22   Furthermore, in the wake of *Milligan*, it yielded to the states the judicial power it

23   had wielded prior to 1866. States' attorneys and state courts were to be the main

24   sites of judicial action, though the U.S. Attorney General reserved the power to

25   remove cases to federal courts if they involved matters relating to civil and political

26   rights covered by national legislation (to help centralize federal judicial activity in

27   the South, the Department of Justice was created in 1870).  During the era of the

28   Fourteenth Amendment, then, the main role of the U.S. army was to act as an

1   ancillary police force to the state militias or other local and state policing

2   operations.  In this capacity, the army worked with states to detect and arrest

3   insurrectionaries and civil-rights violators.  Although sometimes those arrested

4   would stand trial in a federal court—this happened most famously in the South

5   Carolina Ku Klux Klan trials of 1871-72—the army and agents of the Department

6   of Justice looked to the state courts to be the primary judicial institutions of locales.

7   As an example: President Ulysses S. Grant in 1871, in his capacity as commander-

8   in-chief of the U.S. army, ordered all insurrectionaries in South Carolina to turn in

9   their firearms to legitimate authorities.  If insurrectionaries were found who had not

10   turned in their weapons, they could be arrested and denied habeas corpus rights

11   under Grant's order.[24]  However, prosecutions and trials of such insurrectionaries

12   going forward would be conducted by state authorities, if those authorities were

13   known to be loyal to the United States.  In its capacity as an ancillary police force

14   to state militias, with both armed organizations committed to subduing

15   insurrectionaries and civil-rights violators, the U.S. army sought to prevent

16   weapons from reaching unlawful insurgent groups.  Army officers relied on their

17   own intelligence operators as well as private intelligence agencies like the

18   Pinkertons to learn of arms shipments.  By the terms of the Civil Rights Act of

19   1866 and the Enforcement Acts of 1870, the U.S. army and related military units

20   were authorized to act preemptively to prevent insurrectionaries from making

21   armed assaults on loyal Unionists.  The seizure of weapons intended for

22   insurrectionaries thus represented a lawful use of military authority under the

23   Fourteenth Amendment.[25]

24   _____

[24] Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, pp. 4086-87 (March 24, 1871), 4089-90 (Oct. 12, 1871), 4090-92 (Oct. 17, 1871), 4092-93 (Nov. 3, 1871; this proclamation revoked suspension of habeas corpus in Marion County, South Carolina), 4093-4095 (Nov. 10, 1871).

[25] No U.S. court ever denied the constitutionality of such seizures of weapons

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

45.     As a result, any southern person or combination of persons considering having Henry or Winchester rifles shipped to them faced the prospect that the U.S. army or state militia might keep the shipment from reaching them and that, even if the shipment did reach them, the policing forces could arrest them and confiscate the weapons.

## V.     FINDINGS:  HIGH-CAPACITY FIREARMS DURING RECONSTRUCTION

### A.     Overview:  Henry Rifles and Winchester Repeating Rifles During Reconstruction

46.     An oft-cited scholar in legal debates over firearms contends that "the Winchester Model 1866 . . . became a huge commercial success.  So by the time the Fourteenth Amendment was ratified in 1868, rifles holding more than 10 rounds were common in America."  The first part of this statement is true: the "Winchester 66" did become a commercial success.  The author neglects to mention, however, that prior to the end of Reconstruction, that commercial success was due almost entirely to sales to foreign armies.  Thus it does not follow that the success of the company during Reconstruction is evidence of the presence of Winchesters in the United States.  Indeed, the author's second statement, that "rifles holding more than 10 rounds were common in America" at the time of the Fourteenth Amendment, is false.[26]

---

or the legislation that authorized the seizures. See Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction."

[26] David Kopel, "The History of Magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post*, May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/ (accessed September 22, 2022).  Kopel's contention also appears on page 4 of his co-authored Amicus Brief in a federal case from California, *Fyock v. City of Sunnyvale*, Case No. 14-15408 (9th Cir. 2015).  See David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.).  For the number of Henrys and Winchesters manufactured 1861-1877, as well as the number of these rifles shipped to foreign armies, see John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123.  To understand the scale of these numbers, one should contrast them to the

47.     Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction.  Furthermore, as will be discussed in more detail below, possession of such rifles—legal possession, that is—was limited almost exclusively to U.S. soldiers and civilian law enforcement officers.

**B.     Henrys and Winchesters in the Reconstruction-Era West**

48.     One of the places that Henrys and Winchesters could be found during Reconstruction was in the West, though the weapons did not proliferate there at the time at anything like the scale invented by novelists and film-makers of the late nineteenth and twentieth centuries.

49.     With the passage of the Homestead Act (1862), the end of the Civil War (1865), the completion of the first transcontinental railroad (1869), and the discovery of gold in the Black Hills of Dakota Territory, the appeal of traveling to or through the Western Territories increased.  Because law enforcement was minimal in the region, and also because the U.S. army could offer travelers and settlers little protection—they were too consumed during the era with subduing Native Americans—Americans came to regard self-defense as particularly important in the region.  The Winchester company tried to capitalize on the situation by touting the benefits of its rifle.  The "Winchester 73" model in particular was aimed at Westerners or potential Westerners.  The company emphasized that the speed and high capacity of the rifle allowed a single person to

---

production and sales of other rifles of the era.  For example, according to Parsons, the total number of Henrys and Winchesters manufactured in 1861-1877 was 164,466 (this includes the 56,000 shipped to foreign armies), whereas in the same period, 845,713 Springfield "trap-door" single-shot rifles were manufactured. See "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3; some of the data in this report is aggregated and printed at the Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoor-production-serial-numbers.htm.

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

hold off a band of outlaws or hostile Native Americans.[27]   The marketing campaign was aimed especially at Americans hoping to travel to the Western Territories. The campaign had minimal success.

50.     Many travelers to the West carried firearms, to be sure, but a very small number of those arms were Henrys or Winchesters.  Most of the accounts of privately held Winchesters during Reconstruction that I found in the research for this declaration did come from the Western Territories, but there were fewer than fifteen such accounts that were not expressly fictional.  Two such accounts became legendary, mainly because the manufacturers of the Henry-Winchesters used them to advertise their rifles.  One account was of two former U.S. soldiers who were part of a mining operation in the Rocky Mountains and used their Henry Rifles to defeat some raiding Blackfoot Indians.  Another was of a private guard hired by Wells Fargo to accompany a cash shipment to the West; he was attacked by robbers near Nevada City and used his Henry Rifle to kill them all.  It might be noted that these stories, assuming they are true, did not involve individual self-defense by ordinary civilians.  They involved defense of economic enterprises by trained gunmen.[28] Less oft-told incidents involving Henrys and Winchesters from the Western Territories involved brutal violence between thuggish combatants.  There was no heroic road warrior or "Indian fighter" in these tales, and thus they were not likely to build appeal for the rifles.  Particularly gruesome were the murder-by-

---

[27] See, for example, the ad printed over three issues in the *Wyoming Leader* (March 17, April 21, May 8, 1868, always p. 4).  Ads for Winchesters that said nothing of their possible purposes appeared occasionally in newspapers published in the in Western Territories; see for example, a gun dealer's ad for "Sharps and Winchester Rifles" as specialties: *Bismarck Tri-Weekly Tribune* (Dakota Territory), June 29, 1877, p. 4.  On the post-Reconstruction invention of the myth of Winchesters proliferating in the Reconstruction-era West, see Haag, *The Gunning of America*, 179-202, 353-68.

[28] Williamson, *Winchester*, 42-44.

1  Winchester accounts stemming from the Horrell-Higgins feud in New Mexico

2  Territory near the Texas border.[29]

3       51.    Because some Henrys and Winchesters found their way to the Western

4  Territories, and because some of the U.S. army operations against Native

5  Americans took place in Western *states* as well as the Western Territories, Henrys

6  and Winchesters may have ended up in the Western states during Reconstruction

7  (these included California, Colorado, Nevada, and Oregon).  However, I found no

8  significant evidence of Henrys or Winchesters in the Western states.[30]

9       52.    The Winchester company hoped that West-bound Americans' desire to

10  hunt, and not just their wish for protection, would fuel sales of their weapon.  The

11  great bison hunts on the Plains were famous by the late 1860s, and the Winchester

12  company tried to capitalize on the craze.  Its marketing effort failed. Bison-hunters

13  preferred other models.  It did not help that the most famous Western hunter of the

14  time, Buffalo Bill Cody, did not use a Winchester.  His famous gun, which he

15  dubbed "Lucretia Borgia," was a single-shot Springfield.

16       53.    The Winchester company had only marginally more success trying to

17  sell its guns elsewhere to hunters and "sportsmen," a term used to describe not only

18  hunters but competitive target-shooters.  The only place where Winchesters caught

19  on for hunting was in Africa, where American and European "big game" hunters

20  wanted to shoot large animals with as many rounds as possible, in as fast a time as

21  possible, in order to avoid being killed by the prey.[31]  Target-shooters demanded

22  _____

     [29] C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of*
23  *Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49.

24       [30] Exceptions to this statement about the absence of Henry-Winchesters in
     western states are the state armories in these states. Reports from these armories
25  sometimes mention the rifles. For example, the armory in the state penitentiary at
     Salem, Oregon in 1868 had 13 Henry rifles and zero Winchesters, compared to
26  hundreds of other firearms. Because this was a penitentiary armory, the Henrys that
     were there necessarily were for use by law enforcement officers, not individuals
27  seeking self-defense. "Penitentiary Report" to Legislative Assembly, September
     1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95.

28       [31] My research uncovered fewer than ten accounts of African big-game

1   accuracy of their guns, and potential buyers worried that a rifle built for capacity

2   and speed would lose something in accuracy.  To assuage such concerns, a

3   Winchester model that began selling in early 1877 (the "Winchester 76") came with

4   the option of a "set trigger," such that the shooter could set the trigger by moving it

5   very slightly forward, at which point only a tiny bit of pull would set off the shot.

6   The "set trigger" type of Winchester was more popular at shooting contests than

7   earlier Winchesters, but it still was not as popular as other rifles, especially

8   Remingtons and Springfields.  One reason why was its price.  The "set trigger"

9   version of the Winchester was typically $10 more than the "standard trigger"

10  models, which already were on the expensive side ("standard trigger" Winchesters

11  were typically 20-30% more expensive than Remingtons and Springfields).

12       54.     Meanwhile, U.S. army units in the West rarely possessed Winchesters

13  during Reconstruction.  The army had continued its Civil War-era policy of non-

14  adoption of Winchesters.  Yet soldiers in the West did understand the weapons'

15  lethality, in part because they had seen it first-hand in their skirmishes and battles

16  with the Sioux and their allies on the Plains.  U.S. soldiers in the West at first

17  assumed that the Natives were getting the weapons legally from traders who were

18  operating with the approval of the U.S. Bureau of Indian Affairs.  That assumption

19  fueled long-standing hostility of the U.S. army toward the Bureau.  The main

20  newspaper of the armed services of the time, the *Army and Navy Journal*, published

21  a satirical piece in 1867 pretending to be a Native American expressing gratitude to

22  the Bureau for allowing tribes to acquire single-shot guns and suggesting that the

23  Bureau might now "give us Spencer or Henry rifles."[32]

24

25  _____

26  hunting that appeared in U.S. publications during Reconstruction. As an example,
    see "Lovejoy," "Letter from Africa," *Fayette County Herald* (Washington, Ohio),
    Dec. 21, 1871, p.2 (by "accounts" I mean supposedly true accounts; there were
27  even more accounts that were expressly fictional).

28       [32] *Army and Navy Journal*, June 1, 1867, p. 350.

29

55.    In fact, the Sioux and their allies did not get their Henrys (or Winchesters) from the Bureau.  Many of the weapons had been seized from American emigrants and settlers whom the Natives had attacked.  Many also had been robbed from shippers heading to or through the Western Territories.

56.    Here it is important to understand that no matter who might want a Henry-Winchester, they were dependent on a successful shipping operation.  The weapons were manufactured in New Haven, Connecticut and shipped around the country to U.S. ordnance depots, state arsenals, private gun stores, and, in rare cases, individuals (individual mail-order did not become common until the 1890s, and the first mail-order guns were shipped by Sears in the early 1900s).[33]  There was no U.S. parcel post until 1913; all shipping was done by private companies like Wells Fargo.  These companies divided up regions of the country, a legal monopolistic practice, in order to maximize profits.  In practical terms, this meant that shipping costs were high, so buyers would be reluctant to ship goods that could be lost.  Loss was a very real possibility when it came to shipping weapons to hostile areas.  Shipping companies might use armed guards—some, as we have seen, armed with Henrys or Winchesters—but the guards stood little chance against an enemy that outnumbered them and was armed with the same type of guns.  The cost of the risk was passed from the manufacturers and "jobbers" who arranged for sales to the consumers.  The risk-induced increase in cost was a disincentive to prospective individual or gun-store buyers in the West.  This was one more factor providing a disincentive not only to potential private buyers but to the U.S. army to adopt Henry-Winchesters.

57.    Whatever the root causes of the minimal proliferation of Winchesters among non-Natives of the West, the result was that Natives were more likely to use Winchesters than anyone else in the region.  The most heavily armed Americans of

---

[33] Williamson, *Winchester*, 178.

1   the region, those of the U.S. cavalry units assigned to the Western Territories, used

2   for the most part their army-issued single-shot Springfield rifles.  Meanwhile, as a

3   U.S. Colonel noted, Winchesters and lower-capacity repeating rifles in the late

4   1860s transformed "the Plains Indian from an insignificant, scarcely dangerous

5   adversary into as magnificent a soldier as the world can show."[34]

6       58.    The truth of that observation was borne out at the Battle of Little Big

7   Horn in 1876.  Famously, the U.S. army commanded by George Custer was wiped

8   out by the Plains Indians.  Most of Custer's troops carried single-shot Springfield

9   rifles.  The Native Americans carried a variety of weapons, many of which were

10  Winchesters.[35]  One of Custer's underlings, Marcus Reno, wrote after the battle that

11  "the Indians had Winchester rifles and the column [of U.S. cavalry] made a large

12  target for them and they were pumping bullets into it.[36]  Weaponry was not the sole

13  reason for Custer's defeat that day at the Little Big Horn.  Still, it is worth noting

14  that "the gun that won the West" was in the hands of Native Americans, not U.S.

15  soldiers, at the most famous battle in the West of all time.

16      59.    Humiliated by Custer's defeat, the U.S. army in the West still did not

17  choose to adopt Winchesters after Little Big Horn.  However, an increasing number

18  of regiments in the West did act on their own to use ordnance funds to buy

19  Winchesters.  Although the army did not officially adopt the Winchester, it did all it

20  could to keep the weapon, along with lower-capacity repeating rifles, out of the

21  hands of the Plains Indians.  Right away after Custer's defeat the army banned

22  traders from trading any types of guns to any types of Natives, friendly or hostile.

---

23  [34] Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power*

24  (New Haven, Conn.: Yale University Press, 2019), 299. In the northwest part of the Western Territories, the Nez Perce also were fond of Winchesters. Chief Joseph

25  usually kept one close at hand. See Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42,

26  310-12.

27  [35] Hämäläinen, *Lakota America*, 340.

    [36] Haag, *The Gunning of America*, 176-77.

28

1  U.S. officers sought to arrest traders who had been selling Winchesters to Plains

2  Indians against government policy.[37]  Meanwhile, American civilians in the

3  Western Territories demanded that Canadian authorities also intervene to keep

4  Winchesters from Native Americans, specifically the Blackfoot.[38]

5      60.     It is impossible to know all the reasons why the U.S. army did not

6  adopt Henrys or Winchesters before or even soon after Little Big Horn, but one

7  reason was the same one that had lingered on Americans' minds ever since the

8  Henry Rifle was introduced in the early 1860s:  the fear that the weapon was as

9  dangerous to its user as it was to its intended target.  The stories that manufacturers

10  had helped circulate early on from the West about the power of the rifle to allow

11  one person to defeat many failed to muster much enthusiasm for the weapon.  It did

12  not help that some assessments from experts were negative.  At a showcase of

13  firearms in Switzerland soon after the Civil War, a judge rendered the verdict that

14  the rifle seemed delicate and unnecessarily lethal—"more wonderful than

15  practical."[39]  Back in the U.S., skeptics worried that the rifle would fail at a crucial

16  moment or explode.  When it came to Henrys and Winchesters, argued a writer for

17  the *New York Herald*, the most widely circulating newspaper in the country, the

18  "dangers are too many."[40]

19  **C.    Henrys and Winchesters in the Reconstruction-Era North**

20      61.     The North was the region in the United States where Henrys and

21  Winchesters were hardest to find, either because they were deemed too dangerous

22  or because northerners already felt themselves well-armed.  Recall that hundreds of

23  thousands of U.S. soldiers had returned home from the Civil War with rifles in

24  hand, almost all of the weapons Spencers or Sharps or Enfield, rarely Henrys.

25

26      [37] *Chicago Daily Tribune*, July 23, 1876, p. 4.

27      [38] *Chicago Daily Tribune*, April 15, 1878, p. 4.
        [39] Haag, *The Gunning of America*, 70.

28      [40] "Breech-Loading Arms," *New York Herald*, Oct. 12, 1866, p. 4.

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

1    62.    The near-absence of Henry-Winchester rifles in the North became

2    clear during the "Great Strike" of 1877.  The "Great Strike" began as a local labor

3    action in West Virginia and turned into a massive strike stretching from

4    Philadelphia to Chicago.  Mob violence was prevalent.  In this months-long

5    episode, during which thousands of Americans were injured and hundreds were

6    killed, there were only two incidents that I found involving Henrys or Winchesters.

7    In Chicago during the rioting, a U.S. soldier fired a Henry rifle in response to

8    civilians pelting his regiment with rocks.  He may purposefully have avoided

9    shooting anyone—no one was hit.  But the sound of the shot went a long way

10   toward quieting the crowd.  The soldier in question was from a regiment that had

11   been assigned to the Western Territories but transferred temporarily to Chicago to

12   put down the unrest.  That explained why he had a Henry.  His regiment likely

13   acquired Henrys to fight Plains Indians; now he used the weapon—albeit

14   sparingly—to subdue strikers.[41]  In Jackson County, Kansas, just north of Topeka,

15   railroad managers armed forty employees with Winchester rifles, ordering them to

16   scare off the local strikers.  To give the gang the veneer of a legitimate posse, the

17   managers arranged for the local sheriff to deputize the gunmen.  Violence ensued

18   when the "posse" confronted the strikers, and at least one of the strikers was killed,

19   though not necessarily by a Winchester.[42]

20       63.    In general, however, Henrys and Winchesters were rare to find among

21   northerners during Reconstruction.  They were sometimes mentioned in ads

22   displayed in northern publications aimed at hunters and target-shooters.  If the ads

23   were any indication of the target audience, the hoped-for buyers of the rifles were

24   elites—not the types who showed up during the mobbing of the Great Strike of

25   1877—and they were interested in peaceful shooting contests, not fending off

26   _____

     [41] Robert V. Bruce, *1877: Year of Violence* ( 1959; repr., Chicago:
     Quadrangle Books, 1970), 251-52.

27       [42] "A Tough Customer," *St. Louis Globe-Democrat*, Oct. 1, 1877, p. 4.

28

1    potential violent attackers.[43]  Reports from state adjutant generals in the North

2    sometimes show Henrys and Winchesters in arsenal inventories, but these guns

3    were always far outnumbered by the more popular rifles of the era in the region—

4    Sharps, Spencers and Springfields.

5         64.    Beginning in about the mid-1870s, northerners became more interested

6    in owning Winchesters and modern rifles in general, not for purposes of self-

7    defense but for purposes of collective defense of their communities and states.  This

8    was the period when National Guard units came into being, beginning in the

9    northern states.  They were in effect state militias.  The engine that drove their

10   creation was not a fear of tyranny or of insurrection but a nationalistic fervor fueled

11   in particular by the nation's Centennial, which began to be celebrated in the early

12   1870s even before the major exhibitions and commemorations of 1876.[44]  With the

13   rise of this movement came a perceived business opportunity for the Winchester

14   company, which began placing ads for their rifles in northern newspapers,

15   magazines, and gun catalogs.  The greatest number of ads appeared in western

16   Pennsylvania.[45]  The ads seem to have had some effect.  A newspaper published in

17   northwestern Pennsylvania reported in October 1877 that "Winchester rifles are

18   becoming quite fashionable in this section, and are rapidly displacing the old

19   double-barreled rifles. . . . The Remington rifle is highly spoken of by those who

---

[43] See, for example, an ad for many types of guns, including "Henry's Sporting Rifle," in Wilkes' *Spirit of the Times: The American Gentleman's Newspaper*, March 24, 1866, p. 59 (the ad was reprinted in the same weekly publication irregularly through June 16, 1866).

[44] Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. Hannah's dissertation is crucial for countering the assumption, now rejected by historians, that the rise of the National Guard movement in the northern states was a reaction to events in the South of the 1870s or to the Great Strike of 1877. See also, Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

[45] See, for example, *James Bown and Son's Illustrated Catalogue and Price List*, 29th annual ed. (Pittsburgh, Penn., 1877), 33.

34

1  have used it, but it is not a repeater, or 'stem-winder,' and so the Winchester is
2  ahead."[46]

3      65.    The rise of National Guard units in northern states in the late 1870s
4  inspired private armed companies to form, drill, and parade.  One of these groups
5  was the Lehr und Wehr Verein of Chicago, Illinois, led by the Socialist activist
6  Henry Presser.  Presser's company paraded one day in the spring of 1879.  They
7  carried rifles—not Winchesters but Springfields.  Socialist sympathizers nearby
8  joined with the group, and Presser was arrested and tried for organizing a private
9  militia.  His case ended up in the Supreme Court, which ruled in the *Presser* case in
10  1886 that the armed company's actions were indeed unlawful.

11      **D.    Henrys and Winchesters in the Reconstruction-Era South**

12      66.    In the South during Reconstruction, high-capacity firearms proliferated
13  far more than in any other region of the country.  The reason for this proliferation is
14  clear: Winchester Repeating Rifles were the preferred weapon of two large state
15  militias, those of Louisiana and South Carolina, that were organized to put down
16  insurrection against state and national authority as well as terrorism against Black
17  Americans.

18      67.    The story of the South Carolina state militia getting armed with
19  Winchesters begins with the inauguration of Robert K. Scott as the state's governor
20  in 1868.  Scott, a white man, was a pro-Reconstruction Republican.  He had been
21  born in Pennsylvania, he grew up in Ohio, and he became a high-ranking officer in
22  the U.S. army during the Civil War.  After the war, he was an officer in the
23  Freedman's Bureau.  As Governor of South Carolina, he endorsed and helped
24  arrange the creation of a pro-Republican state militia open to Black Americans and
25  pro-Republican whites.

26
27
28      [46] *The Forest Republican* (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4.

35

68.     The state act creating the state militia was adopted in 1868.  The militia was always a work-in-progress, so it is impossible to know exactly how many men served in it at any given time.  A reasonable estimate is that 1000 men were in the militia by 1869.  Scott hoped that the force would grow eventually to 6000.  Although the militia was open to pro-Republican whites, most of the members were Black Americans.  The state did not have enough arms to supply the men.  In the summer of 1869, the state's adjutant general traveled to Washington, D.C. to arrange with the U.S. War Department for an allotment of funds to pay for arms for the state militia.  This arrangement was a restoration of a policy that had long been in place but had often fallen into disuse:  the U.S. War Department would pay each state an annual allotment to sustain its state militia. With the funds that the South Carolina adjutant general received in mid-1869, he helped arrange the purchase of hundreds of guns, both Winchesters and Springfields.[47]

69.     By August 1869, Winchesters had begun to arrive in South Carolina, earmarked for members of the state militia.  In the middle of that month, a company of Black American state militiamen armed with Winchesters appeared at a wharf in Charleston.  The occasion was the arrival of a white baseball team from Savannah, which was scheduled to play a white team in Charleston.  A few days earlier, the team had made the same trip.  But when it arrived, Black American civilians had decided to disrupt the match as a form of protest.  They showed up on the streets, got in the way of the white players as they made their way to the field, and hurled insults.  The team turned around and headed back to Savannah.  This time, on August 15, the Mayor of Charleston was prepared to make sure that things went smoothly—though not in a way that whites in the city would approve of.  He had given the order for the company of black state militiamen to arrive at the wharf and

---

[47] Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996), 75; Singletary, *Negro Militia and Reconstruction*, 20-21.

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

1   escort the Savannah baseball team to the playing fields. The game took place. But

2   white Democrats in the city as well as the rest of the state (and throughout the

3   whole of the former Confederacy) were furious.[48]  Meanwhile, Black Americans

4   throughout the state celebrated the role that members of their race would play in the

5   keeping of the peace.

6        70.    From late 1869 to early 1871, companies of black state militiamen

7   armed with Winchesters appeared regularly across South Carolina.  At first,

8   Governor Scott was thrilled with the organization.  On March 29, 1870, he

9   delivered a speech that extolled the Black-American dominated militia as the best

10  way to ensure that peace would return to the state and that future elections would be

11  fairly held.  He particularly recommended that state militias be armed with

12  Winchesters.  He had seen first-hand how these weapons intimidated potentially

13  violent protesters even without being fired.  His neighboring state of Georgia

14  should have such a militia staffed with blacks and armed with Winchesters, Scott

15  advised. "I tell you the Winchester rifle is the best law that you can have there," he

16  declared.  Georgia, one of the states that had had its pro-Democrat, anti-black

17  militia dissolved by Congress in 1867, never did create a new militia.  Scott knew

18  that it wouldn't.  His speech was meant to announce not only to South Carolina but

19  to neighboring states that the old ways of the Confederacy were gone for good.

20  Members of the opposition to Scott and the Republicans in South Carolina became

21  furious.  Many called him "Winchester Scott" and bewailed "Scott's Winchester

22  Rifle tactics."[49]

23       71.    During the election season of 1870, Scott decided that he had erred.

24  Opposition papers regularly reprinted his "Winchester" speech and attacked Scott

25  as a tyrant trying to stir up a race war.  Much more troubling was the fact that state

26

27        [48] *Washington Evening Star*, Aug. 16, 1869, p. 1.

28        [49] See, for example, *Charleston News*, Oct. 17, 1870, p. 2.

1     chapters of the Ku Klux Klan began plotting a response to Scott's speech and the

2     existence of the militia.

3          72.     The Klan had decided to meet Winchesters with Winchesters.  They

4     sent agents to the North to buy crates of Winchesters and ship them to South

5     Carolina in crates with false labels ("Agricultural Implements" said one; "Dry

6     Goods" said another).  The state militia and the U.S. army were able to intercept

7     some of the crates, but others arrived at their destination.  The Klan and auxiliary

8     white supremacist groups distributed the weapons to Scott's opponents in towns

9     across the state.[50]  Violence broke out across the state.  That was a regular

10     occurrence during election season, but this time the lethality was more severe than

11     usual.  Both sides had Winchesters.

12          73.     With the help of the intervention of the U.S. army and his own state

13     militia, Scott was able to win re-election in 1870.  Almost immediately he tried to

14     draw down the violence in the state by attempting to remove Winchesters from the

15     population.  Aided by U.S. army units, his administration attempted to confiscate as

16     many Winchesters as they could from insurrectionary groups like the Klan.  Then

17     he asked those state militiamen who were holding onto their Winchesters instead of

18     storing them in state arsenals to turn the weapons in.  Some Winchesters did end up

19     coming back into state arsenals, either by way of confiscation from Klansmen or

20     voluntary submissions by militiamen.  But most of the Winchesters stayed in

21     circulation.  Scott suspended the state militia.

22          74.     In early 1874, South Carolina was again the site of violent uprisings

23     from insurrectionists, and the pro-Republican government responded by re-forming

24     the state militia.  The adjutant general of the state reported that he barely had any

25     guns for the men.  In fact, a report he had issued the year before declared that there

26     were 627 Winchesters in state arsenals.  Probably the official was worried that

27

      [50] Zuczek, *State of Rebellion*, 79-80.

28

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

1  widespread arming of Black Americans and white Republicans with Winchesters

2  would create a mini-civil war like the one in 1870.[51]  The re-activated state militia

3  was poorly organized and poorly armed.  For armed support between 1874 and

4  1876, the Republican administration of the state relied mostly on the U.S. army.

5      75.     Then, in 1876, came the final battles between pro-Republican, U.S.-

6  authorized armed men (the U.S. army units and state militia) and the

7  insurrectionary opposition forces, the "Red Shirts."  Of the many reasons that the

8  opposition forces could be categorized as insurrectionary, perhaps the most obvious

9  was that they regularly stole weapons, including Winchesters, from state arsenals.[52]

10  When the voting in 1876 was over, the two sides in the struggle each declared

11  victory.  Two governors then existed, and since no one was going to accept a

12  resolution of the crisis by law, the state was in political chaos, with armed groups

13  on each side ready to go to battle.  When companies of armed men marched for

14  their respective candidates, plenty of them carried Winchesters.  Only some of

15  those Winchesters had been obtained legally.  Those carried by the "Red Shirts"

16  had almost certainly been stolen from state depots.

17      76.     The Louisiana state militia was created in 1870.  The story of how

18  Louisiana state militiamen ended up armed with Winchesters starts before the

19  organization was created.  In 1868, the New Orleans metropolitan police force was

20  re-organized under Republican leadership.  It now used "Metropolitans" as its

21  nickname.  Its members included Black Americans as well as whites of varying

22  ethnicities, the city being one of the most ethnically diverse in the country.  The

23  number of Metropolitans in 1868 was small—perhaps just over 100—but by 1870

24  that number was close to 700.  During its earliest years, from 1868 to 1870, the

25  Metropolitans' superintendent, A. S. Badger, armed many of the men with

26  Winchesters.  In 1870, Governor Henry Warmoth engineered the creation of the

27      [51] Zuczek, *State of Rebellion*, 140-41.

28      [52] Zuczek, *State of Rebellion*, 171.

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

state militia.  Warmoth envisioned a state militia that would be composed of 2,500 Black Americans and 2,500 white former Confederates.  The Confederates, in theory, would be loyal to the United States and thus supportive of Reconstruction programs created by Republicans.  Anyone could see that the two sides of this force would not fit together easily.  To help foster something approaching unity across the state militia, Warmoth appointed James Longstreet, a former Confederate General, as head of the state militia.  As part of the act creating the state militia, the New Orleans Metropolitans were incorporated into the state militia.  The Metropolitans after 1870 were thus both an urban police force and a company of state militiamen.  In this latter role, they were authorized to operate outside of city limits.  The Metropolitans were the best-trained unit in the state militia.  Because many of their number carried Winchesters, they were also the best armed.[53]

77.     Between 1870 and 1874, politics in Louisiana was multifaceted and ever-shifting.  Warmoth regularly changed his political stances, outside blocs suddenly gained inside influence, and through it all, pro-Democratic factions, supported by armed "White Leagues," tried to resurrect the Old South on the soil of Louisiana.  In 1872, William Kellogg won the governorship.  Kellogg was a Republican, one more radical than Warmoth and more in line with the Republicans in the U.S. Congress. Warmoth in 1872 had sided with John McEnery, a former Confederate, an anti-Reconstruction Democrat, and a leading voice for state redemption.

78.     The state militia, composed of a group loyal to the Warmoth-McEnery faction and a group loyal to Kellogg, was rendered ineffective after 1872 by its lack of cohesion.  Individual units within the state militia were nonetheless important, as they were the only legitimate state-level armed forces.  Of these units, the

---

[53] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 130-31; Singletary, *Negro Militia and Reconstruction*, 69-70.

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

1  Metropolitans remained the most effective and best armed, as they still carried

2  Winchesters, whereas most of the other units did not.  In politics, whoever

3  controlled the Winchester-armed Metropolitans would always have an advantage

4  because, as Governor Scott of South Carolina had said in 1870, "the Winchester

5  rifle is the best law that you can have."  By late April 1873, William Kellogg, the

6  newly elected Governor, had established control of the Metropolitans.

7  Unfortunately, he had established that control too late to use the Metropolitans to

8  help avert the worst racial massacre that the state had ever seen, probably the worst

9  racial massacre of Reconstruction: the Colfax Massacre of April 13, 1873.

10       79.      The tragedy of the Colfax Massacre has been the subject of much

11  historical study, but never from the perspective of a Winchester Repeating Rifle.

12  The combatants at Colfax, in Grant Parish, about 200 miles northwest of New

13  Orleans, consisted of one legitimate armed force and one illegitimate one.  The

14  legitimate armed force was a unit of the state militia led by William Ward, a Black

15  American who had fought for the U.S. during the Civil War.  More than 100 of

16  Ward's men, perhaps more than 150, would be murdered at Colfax.  The

17  illegitimate armed force was a "posse" deputized by two local men, one who

18  claimed to be a judge and one who claimed to be a sheriff.  In fact, as all in the

19  "posse" knew, the so-called judge and so-called sheriff had held those positions

20  under the former governor, not under the current governor, who had denied them

21  commissions that would have kept them in office.  The claim of the "judge" and

22  "sheriff" was that the former governor had in fact won the 1872 election and thus

23  that they held their positions legitimately.  (Election-result denial is not a new

24  phenomenon; it was rampant in the South during Reconstruction.)  Years later,

25  when the Colfax episode came before the U.S. Supreme Court in the form of the

26  *Cruikshank* case, Justice Bradley, author of the controlling opinion, declared that

27  leaders of the so-called posse were private citizens, not state officers.  Bradley was

28  technically right.  But at the time of the Colfax Massacre, the lead murderers had

41

donned masks of state-legitimated authority.  Neither the legitimate nor the illegitimate side at Colfax carried Winchesters.  But if William Ward had had his way, his side would have had them.

80.    Two days before the massacre, Ward had left Colfax for New Orleans. He knew that violence might erupt in Colfax, and he wanted to persuade Governor Kellogg to send military support.  Almost certainly, Ward was going to ask Kellogg to send the Winchester-armed Metropolitans.  Ward never made it to New Orleans. Even if he had, the Metropolitans could not have made it to Colfax in time to stop the massacre.  They might not have been willing to go—it would be another ten days beyond the massacre before their loyalty to Kellogg was cemented.  The important point amid all these hypotheticals is this:  William Ward believed that a cadre carrying Winchesters was the best chance his men had.

81.    By October 1873, the Metropolitans had pledged their loyalty to Kellogg, and Kellogg had helped secure for them and other state militia units hundreds of new Winchesters.  Kellogg dispatched the Metropolitans to Grant Parish, the site of the Colfax Massacre, to reestablish control of the area for the Republicans.  They and their Winchesters arrived at the end of the month—more than 25 weeks after William Ward had hoped they would come.[54]

82.    The power of the Metropolitans, along with their Winchesters, would soon stripped away.  Opponents of Kellogg gained control of the Metropolitans' Board by early 1864.  They reduced the numbers of the force and limited their geographical range to New Orleans and its outskirts.  If violence broke out in a rural area like Grant Parish, there would be nothing that the Metropolitans could do about it. Then, on September 14, 1874, came the final blow: the Battle of Liberty Place, fought in the heart of New Orleans.  Thousands of White Leaguers launched a coordinated attack on the city.  Some of them may have been carrying

---

[54] *New Orleans Republican*, June 1, 1873, p. 1; *Ouachita Telegraph*, October 24, 1873, p 1.

1   Winchesters, but none of the reports from that day mentioned Winchesters in their

2   hands.  The Metropolitans had Winchesters, of course, but they were outnumbered

3   more than 10 to 1 and easily overwhelmed.  After the White Leaguers had

4   demonstrated their superior force, Governor Kellogg knew that he might soon be

5   removed, so he engineered a compromise that kept him in office.  Part of the deal

6   was the disbandment of the state militia.  Thus ended the prospect of a reign-by-

7   Winchester Republican regime in Louisiana.[55]

8        83.    In the brief time that Winchesters were in the hands of southern state

9   militias, the rifles showed that they could do much to intimidate the forces of white

10   supremacy and insurrection.  But there was a dark flip side to the positive quality of

11   this particular high-capacity firearm.

12        84.    Those opposed to the state militias and to Reconstruction in general

13   used the presence of Winchesters in state militias as fodder to attack all

14   Republicans and especially Black Americans.  At a rally in April 1870, a Georgia

15   Black-American leader, Simeon Beard, whom an opposition paper called an

16   "Augusta mulatto," pleaded for more guns so blacks could have their own militia

17   rather than relying on the U.S. army.  "We don't want soldiers; we want the power

18   to raise a militia; we want guns put in our hands, and we will see whether we

19   cannot protect ourselves.  Give us this, and we will give you the State of Georgia

20   evermore."  In response, a redeemer identified as Mr. Bullock mocked Black

21   Americans like Beard who clamored "lustily for arms," including "Winchester

22   rifles."  He then brought up the South Carolina experiment with Winchester-armed

23   state militias as evidence that the lives of ordinary white people were in grave

24   danger.  "There are thousands of white people in this State who have no arms at all,

25   not even a pistol, while there is not one negro in three who does not own some sort

26   of firearm.  They are armed now-fully armed. It is the white people who need arms,

27

28        [55] Rousey, *Policing the Southern City*, 155-56.

1    not the negroes." Bullock brought up the speech of Governor Scott of South

2    Carolina and used it to argue that the most powerful guns belonged in the hands of

3    whites, not blacks.[56]

4         85.    The Winchester was as much a symbolic weapon as a real one in the

5    battles between Republicans and Redeemers in the Reconstruction-era southern

6    states. Republicans saw the gun as the emblem of power—the sign that the cause

7    of Reconstruction had a strong, locally controlled force behind it. The Redeemers

8    saw the gun as evidence of the Republicans' tyranny and barbarity. In Texas,

9    Democrats opposed to Reconstruction howled that there must be "no money, no

10   Winchester rifles and ammunition" for Republicans—this despite the fact that

11   Republicans in the state had never suggested arming themselves with

12   Winchesters.[57]

13        86.    In terms of real as opposed to imagined Winchesters, even though the

14   weapons in Louisiana and South Carolina were housed under guarded armories,

15   they could still end up in the hands of insurrectionaries or criminals. In Louisiana,

16   as in all the states of Reconstruction, there were internal, often violent conflicts

17   over the control of the state government. By various means, from outright theft to

18   the legitimate winning of a state election, the opposition to a Republican

19   government in a state like Louisiana could gain access to Winchesters. Once these

20   weapons were in the hands of insurrectionary groups, they could end up with

21   anyone, including an outlaw with no particular political persuasion. That is

22   probably how a Winchester ended up among a large cache of arms held by the

23   husband-wife team known as the Guillorys, a pair of marauding thieves who went

24   on a rampage near Opelousas, Louisiana in the late summer of 1873. When a posse

25

26   _____

        [56] *Georgia Weekly Telegraph and Georgia Journal & Messenger*, April 5,
     1870, pp. 4, 8.

27      [57] *The Weekly Democratic Statesman* (Austin, Texas), August 24, 1871, p. 2.

28

1  caught up with them, it easily dispatched the couple, killing the husband and

2  seriously wounding the wife.[58]

3      87.    By 1874, all of the state militias had been disbanded.  Redeemers—

4  those in each state wanting state redemption from Reconstruction—had been

5  against the state militias from the start and were glad to see them go.  By the end of

6  Reconstruction, all of the southern states had reverted to their pre-1867 militia

7  system, 1867 being the year that the U.S. Congress abolished all southern militias

8  except those in Arkansas and Tennessee.[59]  Under the renewed militia system,

9  volunteer militias could form on their own with the explicit or implicit approval of

10  state governors.  Because most of the southern state governments after 1874 were

11  ruled by pro-redemption Democrats, most of the militias that formed after 1874

12  were of the sort that would have been considered insurrectionary by pro-

13  Reconstruction Republicans in the states as well as by the Congressional

14  Republicans who had abolished such militias in 1867.

15      88.    The three states that were not controlled by Redeemers after 1874 were

16  Florida, Louisiana, and South Carolina.  In Louisiana and South Carolina, the 1876

17  state elections were disputed (so, too, quite famously, was the national election of

18  1876).  In both states, as a result, the two contending sides, pro-redemption

19  Democrats and pro-Reconstruction Republicans, claimed victory and claimed that

---

[58] "Another Battle," *The Opelousas Journal*, Aug. 29, 1873, p. 3.  A side note to the episode:  No one in the posse had a Winchester, and the Guillorys in the exchange of gunfire opted not to use their Winchester, only their low-capacity rifles and shotguns.

[59] The Texas Rangers claimed to be a state militia loyal to the U.S. right up until it was disbanded in 1877, but by 1874, if not earlier, the group was clearly on the side of the Democrats in the state.  A number of Democrats in 1877 pleaded with the state government not to disband the Rangers.  One wealthy Democrat in 1877 even offered the state government a voluntary donation of Winchesters for the state militia (the militia had not used Winchesters prior to that point).  The state government rejected the offer and disbanded the militia. See Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70; Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93.

---

45

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

1   their gubernatorial candidate was the legitimate governor of the state.  In each of

2   these states, therefore, there were two governors.  Meanwhile, in Florida, there was

3   no dispute over the governor's office, but there was conflict nonetheless because

4   the electoral board of the state was controlled by pro-Reconstruction Republicans

5   while the rest of the state government was controlled by pro-redemption

6   Democrats.[60]  As a result of the internal conflicts within Florida, Louisiana, and

7   South Carolina, the U.S. army dispatched troops to the capitals of each state.  The

8   troops were intended to "keep the peace" in all the states, to ensure that the pro-

9   Reconstruction Republican governors of Louisiana and South Carolina were

10  accepted as the only legitimate governors of the states, and to protect the Florida

11  electoral board from being disbanded by pro-redemption Democrats.

12      89.     The circumstances described above had important consequences for

13  who came to possess Henrys and Winchesters by the end of Reconstruction.  In

14  Louisiana and South Carolina prior to 1874, these high-capacity firearms were

15  possessed and regulated by pro-Reconstruction Republicans, who possessed them

16  specifically for the purpose of state defense against armed insurrectionaries allied

17  with pro-redemption Democrats.  Once pro-redemption Democrats in these states

18  after 1874 claimed that their "governor" was the only legitimate governor of the

19  state—a position supported by most whites in each state—the "governor" in

20  question used his alleged authority to distribute Winchesters held in state armories

21  to pro-redemption volunteer militia groups.  In Louisiana, the pro-redemption

22  groups known as White Leaguers in 1876-77 marched through the streets of New

23  Orleans demanding that their "governor," Francis T. Nicholls, be recognized as the

24  sole governor of the state.  At least 500 of the White Leaguers, but probably

25  hundreds more, carried Winchester rifles.[61]  According to a Black American who

---

26  [60] Jerrell H. Shofner, "Florida Courts and the Disputed Election of 1876,"
27  *Florida Historical Quarterly*, 48 (July 1969), 26-46.

    [61] *Chicago Daily Inter Ocean*, January 12, 1877, p. 2; *New Orleans*

28

1  later testified about events in New Orleans at the time, some of the White Leaguers

2  not only paraded with their Winchesters but also wore their old Confederate

3  uniforms.[62]  The U.S. army regarded these marchers as insurrectionaries.

4      90.     A similar situation played out in South Carolina, though there, the pro-

5  redemption Democrats were known as Red Shirts.  Beginning in 1874 and

6  continuing through 1876, South Carolina Red Shirts created volunteer militias that

7  obtained Winchesters from pro-redemption authorities in the state government.

8  There were many Winchesters to be had in that state, as the pro-Reconstruction

9  Governor Robert "Winchester" Scott back in 1869-1870 had purportedly ordered

10  thousands of them.  The exact number that Scott had acquired remains in dispute.[63]

11  Whatever the number was, it seems that only a few hundred ended up in the hands

12  of Red Shirts in the 1874-76 period, though that was still a few hundred more than

13  Republicans of the era thought was legal.[64]

14      91.     Despite these developments, the total number of Henrys and

15  Winchesters in the southern states during Reconstruction remained small relative to

16  firearms in general in the country—no more than 8,000, I would estimate.[65]

17  *Republican*, March 13, 1877, p. 2.

18      [62] Testimony of William Murrell, *Report and Testimony of the Select
19  Committee to Investigate the Causes of the Removal of the Negroes from the
   Southern States to the Northern States* (Washington, D.C.: Government Printing
   Office, 1880), pt. 2, p. 521.

20      [63] During the U.S. Congressional investigations into Klan activities,
21  investigators tried to ascertain how many Winchesters had actually arrived in South
   Carolina for Scott's militia; they failed to learn what the number was, though one
22  witness did confirm that the Winchesters that did arrive there were intended for the
   state militia, including the Black Americans among them. See 42nd Cong., 2nd sess.,
23  "Affairs in Insurrectionary States," vol. 3 (South Carolina), *U.S. Congressional
   Serial Set* (1871), p. 467; and ibid., vol. 4 (South Carolina,), p. 767.

24      [64] Zuczek, *State of Rebellion*, 140-41, 170-71 (some of the Winchesters were
   referred to as "militia guns"; see ibid., 171).

25      [65] This estimate is based on the assumption that all 6,000 Winchesters that
26  Governor Scott ordered for the South Carolina state militia were delivered (the
   exact number delivered is unknown, and most likely is lower).  When this number
27  is combined with the roughly 1,000 Winchesters used to arm the Metropolitans in
   Louisiana over a six-year period, along with perhaps another 1,000 stolen from U.S.
28  army depots, the sum is 8,000.

Declaration of Michael Vorenberg (3:19-cv-01537-BEN-JLB)

Equally important, almost all of these high-capacity firearms were in the hands of law enforcement officers, either U.S. soldiers, pro-Reconstruction militias, or pro-Redemption militias. These last set of armed bodies were illegitimate, to be sure—chapters of the KKK were among them—but, importantly, even they regarded it essential to claim that it was their status as militiamen, and only that status, that legitimated their possession of high-capacity firearms.

92.     With only a few exceptions (fewer than five), all reliable reports in which Henrys or Winchesters were mentioned in accessible records from the Reconstruction South indicate that they were regarded solely as firearms for legitimate law enforcement officers.[66] An example of an exception comes from Marianna, Florida in September 1869. There, a group of about twenty-five Black Americans, including women and children, were having a barbecue. From the woods nearby an unseen assailant fired "thirteen or fourteen shots in rapid succession," killing and wounding many of the party. The U.S. officer who later reported on the episode assumed that the assailant had used a Henry rifle because of the speed and volume of the shots fired. He wrote to his superior asking for a "first-class detective" to be sent to the town to investigate who the perpetrator or perpetrators might be. "If detectives can't be furnished," he added, "a few Henry rifles would have an excellent moral effect here."[67]

93.     At least some state-level law enforcement officials outside of Louisiana and South Carolina ended up with Henrys or Winchesters. A pro-Republican jailer in a sheriff's office in Alabama was able to use a Winchester to fend off attacking Klansmen in January 1871.[68] In 1873, a dozen men in

---

[66] This declaration does not accept as evidence second- or third-hand rumors of Henrys or Winchesters being present, though even such rumors prior to 1870 were infrequent.

[67] J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), *U.S. Congressional Serial Set* (1871), pp. 289-90.

[68] 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama),

1    southwestern Texas deputized to fight Native Americans near the Mexican border

2    were successful in subduing the Natives and, in reward, were presented by the state

3    legislature with Winchester rifles (they had not used Winchesters to fight the

4    Natives, though the Natives that they fought might well have used Winchesters).[69]

5    The most revealing example comes from 1875 Mississippi, in the testimony of

6    Sheriff John Milton Brown of Coahoma.  Brown was the first Black American

7    sheriff anywhere in Mississippi.  He reported that Black Americans in his region

8    had no guns and implied that they had been ordered to turn in their arms to the

9    white insurrectionaries who controlled most of the state.  Brown, though, had not

10    turned in any weapons because he believed that his position as sheriff allowed him

11    to keep his weapons.  As he told an investigator, he had "one Henry rifle" and he

12    thought that he "was justified in having that, because I was sheriff."[70]

13       94.     Americans have long disputed and no doubt will continue to dispute

14    the meaning, implications, and correctness of the U.S. Supreme Court's two earliest

15    "Second Amendment" opinions, which were offered during or soon after

16    Reconstruction:  *U.S. v. Cruikshank* and *Presser v. Illinois*.[71]  But one issue

17    regarding those cases is beyond dispute: they did not involve high-capacity

18    firearms.  There were no Henrys or Winchesters at Colfax on the tragic day of the

19    massacre there in 1873.  There were none in the hands of the military companies

20    that marched on that spring day in Chicago in 1879—the episode that would lead to

21    the 1886 *Presser* decision (Presser's men carried single-shot Remington rifles).[72]

22

23    *U.S. Congressional Serial Set* (1871), pp. 414-15.

24    [69] *Texas Session Laws*, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26.

25    [70] 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of

26    Migration of Negroes from Southern to Northern States," *U.S. Congressional Serial Set* (1879-88), 357.

27    [71] *U.S. v. Cruikshank*, 92 U.S. 542 (1875); *Presser v. Illinois*, 116 U.S. 252 (1886).

28    [72] "The Reds," *Chicago Daily Tribune*, March 23, 1879, p. 7.

49

1   On the question of whether the law could treat high-capacity firearms differently

2   from other types of weapons, the Reconstruction-era Justices had nothing to say.

3   But the land they lived in, the land they ruled over, was one where high-capacity

4   firearms were held only by a select few, almost all of whom were U.S. soldiers or

5   civilian law enforcement officers sworn to uphold the U.S. government. These

6   gunmen held their distinctive weapons not to defend themselves as individuals from

7   imagined foes but to defend their state and country against all-too-real criminals

8   and insurrectionaries.

9       95.    Many of these gunmen were Black Americans, specifically the Black

10   American men who made up the largest contingents of southern state militias.

11   Serving in these militias was one of many ways that Black Americans demonstrated

12   their gun-bearing rights. Other ways that this right was demonstrated are well

13   known to scholars: Black Americans helped make sure that the U.S. government

14   and state authorities overturned white supremacist efforts to ban blacks from

15   militias, deny them access to firearms, or seize their firearms (these efforts had been

16   embodied in the southern state Black Codes of 1865-67, which were overturned by

17   the Civil Rights Act of 1866 and the Fourteenth Amendment of 1868). It is worth

18   noting, though, that a Black American who carried a Winchester for a state militia

19   was different from the much larger population of Black Americans who did not

20   belong to state militias. The Winchester-toting black militiaman held his gun only

21   with the authorization of and regulation by the state government. He did not own

22   his gun. It belonged to the state. It was supposed to be in an armory, not at a

23   private home, when not in militia-use. Hypothetically, if Black Americans wanted

24   Henrys or Winchesters at their homes, they might lawfully have been allowed to

25   have them there. But this hypothetical scenario is irrelevant. Southern Black

26   Americans for the most part lacked the means to buy Winchesters. Mostly rural

27   workers, their wages were notoriously low—sometimes only in the form of shares

28   of crops—and they would not be inclined to spend $30 to $40 on a gun that would

50

1    represent perhaps 3 to 6 months wages.  There was no necessity for them to do so:

2    perfectly adequate guns for individual self-defense, even some "repeaters," would

3    have been in their price range.

4         96.    The Fourteenth Amendment assured Black Americans that they could

5    possess firearms for self-defense but did not assure them that they could possess

6    any firearms they wanted, including high-capacity rifles.  This same principle of the

7    Amendment held equally true for whites.

8         97.    Americans in the Reconstruction-era South understood perhaps better

9    than anyone that Henrys and Winchesters were weapons for organized military use

10   that did not belong in the general population.  Except for a small number of

11   insurrectionary militias, like the Ku Klux Klan, the enemies of the Republican state

12   administrations in Louisiana and South Carolina that armed their state militias with

13   high-capacity firearms did not respond by trying to obtain the same weapons for

14   themselves.  Rather, they responded by demanding the removal of the weapons and

15   the organizations that carried them.  When these opposition factions came into

16   power in 1877, they disbanded the state militias and warehoused the Winchesters.

17   To be sure, they maintained laws that allowed citizens to possess firearms for their

18   individual self-defense, but they did not view high-capacity firearms as appropriate

19   for such a purpose.

20        98.    My examination of statutes and state-level court opinions from the

21   Reconstruction-era South revealed that firearms were sometimes mentioned as

22   weapons of individual self-defense, but in such instances, the types of firearms

23   mentioned were, with one exception, low-capacity firearms such as pistols,

24   revolvers, muskets, and rifles.[73]

25

26   _____

     [73] The survey that I conducted was of all state statutes and state-level cases in
27   the period 1863-1877 from the South relating to regulation of weapons. A list of
     state-level cases from all states appears at https://guncite.com/court/state/ (accessed
28   September 25, 2022).

99.     The one potential exception comes from a Tennessee state court opinion of 1871, *Andrews v. State*.  The court in *Andrews* ruled that among the weapons a citizen might possess were rifles "of all descriptions," including "the shot gun, the musket, and repeater."[74]  This opinion has been cited by at least one scholar as evidence that high-capacity firearms were understood to be possible weapons of individual self-defense.[75]  Yet, a "repeater" at the time of the *Andrews* opinion (1871), and during the whole of Reconstruction, would have been understood to be a low-capacity repeating rifle, such as a Spencer or Sharps, neither of which could hold more than ten rounds.  The parlance of the day put Henrys and Winchesters in a separate category from "repeaters."  Again and again during Reconstruction, from the Western Territories to the northern and southern states, when a cache of firearms was described, Henrys and Winchesters, though obviously repeating rifles, were always listed separately from "repeaters."  Furthermore, the firearms mentioned in Judge Thomas J. Freeman's majority opinion in *Andrews*— shotguns, muskets, repeaters—were mentioned exclusively in terms of what a person might possess in his role as a member of the militia.  The chief judge of the court, Alfred O. P. Nicholson, joined in that opinion.  There was one judge on the court, though, who believed that the Andrews opinion should go further—that it should allow individuals to possess any weapon, regardless of what the militias in the state did or did not possess.  That judge, Thomas A. R. Nelson, expressed his view in a concurring opinion, which he alone signed.  The opinion did not mention Henrys or Winchesters as weapons that he thought that any individual might possess.[76]

---

[74] *Andrews v. State*, 50 Tenn. (3 Heisk.) 179 (1871).

[75] See, for example, Kopel, "The Second Amendment in the 19th Century," 1418-21.

[76] *Andrews v. State*, 50 Tenn. (3 Heisk.) 193-200 (1871).

52

100.   Even more revealing evidence for Reconstruction-era officials believing that high-capacity firearms should be regulated comes from Louisiana. Of the states that had militias that carried Henrys or Winchesters, Louisiana was the only one that left behind a readily accessible record of how these high-capacity firearms were to be managed by state authorities.  All arms for the state militia were overseen by the state adjutant general, James Longstreet.  A former Confederate General who joined the Louisiana Republican Party after the Civil War—a move that forever marked him as a turncoat by his former Confederate comrades—Longstreet well understood the ongoing insurrectionary intentions of former Confederates in his state and elsewhere.  He thought it crucial to ensure that such men did not end up with Winchesters, and that they be incited as little as possible by the sight of Winchesters being carried in public by their organized enemies, Black-American militiamen foremost among them.  For these reasons, he took extraordinary precautions concerning the Winchesters that were held in the New Orleans armory.  His orders for the armory began with typical provisions such as putting guards around the building and making sure that all guns inside were racked when not in authorized use.  Then, in the last provision of his orders, he turned specifically to Winchesters.  They were not to "be taken to pieces, or any part of [them] removed . . . unless authorized by the Division Commander."  The Winchesters were also not to be used for "parade or drill upon the streets or public highways" without the Division Commander's authority.  Such restrictions were not put on the other weapons in the arsenal; they were only for the Winchesters.[77]

---

[77] Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in *Annual Report of the Adjutant General of the State of Louisiana*, for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39.

53

## VI. CONCLUSION. RECONSTRUCTION AND TODAY: CONTINUITY AND CHANGE

101.   How does the situation surrounding high-capacity firearms today compare to the Reconstruction era?  High-capacity firearms are still being sold under the name Winchester, by companies such as Browning, but the Winchester Repeating Rifle Company ceased to exist long ago.  Of course, high-capacity firearms can be found under plenty of other names today.  But whereas today the owners of such firearms might be civilians, in the Reconstruction era they would be almost exclusively soldiers or law enforcement officers.  There were civilians during Reconstruction who owned high-capacity rifles, to be sure.  Yet almost all such civilians were "frontiersmen" of the Western Territories, and the population of the Western Territories was tiny compared to the population of the United States as a whole.  Furthermore, Henrys and Winchesters, the only high-capacity firearms of the era, were not the preferred firearms of the "frontiersmen" of the region.

102.   By far the largest population possessing Henrys and Winchesters during Reconstruction were members of state-wide militias.  These organizations no longer exist under their Reconstruction name of "state militias."  They evolved into the National Guard, a term first used in place of "state militias" in the North in the 1880s but ultimately applied to all state-level forces that were auxiliary to the U.S. army, including those in the South. National Guard units today are not analogues to the Reconstruction-era state militias; they are direct descendants.[78] And they operate in exactly the same way.  They are under the command of state governors but can be used as auxiliary forces of the U.S. army—that is, they can be "federalized."[79]  Membership in the National Guard, like membership in the

---

[78] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

[79] The statutory language that enabled Abraham Lincoln to call up state militias in 1861, which was then invoked occasionally during Reconstruction to

1   Reconstruction-era state militias, is regulated.  National Guard units, like

2   Reconstruction-era state militias, are expected to have proficiency with the weapons

3   they use and to have unfailing allegiance to the recognized governments of their

4   state and nation.  Their access to high-capacity firearms is regulated.  Such weapons

5   are typically kept under guard in a central location, such as an armory, and

6   dispensed to their users only for purposes of drilling, training, or actual use on those

7   occasions when National Guard units are called out.  Beside today's National

8   Guard, other users of high-capacity firearms at present include civilian law

9   enforcement officers.  As this declaration has shown, the analogs of such officials

10  during the Reconstruction era—urban policemen, sheriffs, or U.S. marshals—also

11  were known on occasion to carry high-capacity firearms.

12      103.   What is distinctly different today compared to Reconstruction is the

13  ownership of high-capacity firearms by Americans who have no connection to the

14  military or law enforcement.  If such owners along with their weapons were

15  transported by a time machine back to the Reconstruction-era South, they would

16  find themselves suspected of being outlaws by law enforcement officers.  If they

17  then gathered together into organized companies, they would be considered

18  insurrectionary militias, which is precisely how the Ku Klux Klan was regarded

19  during Reconstruction by the U.S. army, the state militias, and other legitimate,

20  pro-Union law enforcement officials.

21

22

_____

23  federalize state militias, now resides in the statute that enables the President to
    federalize the National Guard; see 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A

24  Stat. 15; Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006, 119 Stat.
    3440).  One of the reasons for the rise in significance of the National Guard after

25  Reconstruction was the federal "Posse Comitatus Act" of 1878, which prohibited
    the direct intervention of the U.S. army into states except in extraordinary

26  circumstances.  After that legislation, the National Guard units were needed not so
    much as auxiliaries to the U.S. army as substitutes for them.  On the "Posse

27  Comitatus Act" see Gautham Rao, "The  Federal "Posse Comitatus" Doctrine:
    Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," *Law*

28  *and History Review*, 26 (Spring, 2008), 1-56.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 13, 2022, at Providence, Rhode Island.

_____
Michael Vorenberg

# EXHIBIT A

# CURRICULUM VITAE

**Michael Vorenberg**
Associate Professor of History
Brown University

**Education**   Ph.D. in History, Harvard University, November 1995 (American History)
A.M. in History, Harvard University, March 1990 (American History)
A.B. in History, Harvard University, June 1986, *summa cum laude* (Ancient History)

## Professional Appointments

Associate Professor of History (with tenure), Brown University, 2004-
Vartan Gregorian Assistant Professor, Brown University, 2002-2004
Assistant Professor, History Department, Brown University, 1999-
Assistant Professor, History Department, SUNY at Buffalo, 1996-99
Post-Doctoral Fellow, W.E.B. Du Bois Center, Harvard University, 1995-96
Lecturer, History and Literature Program, Harvard University, 1995-96

## Scholarship

### Books

*Lincoln's Peace: The Elusive End of the American Civil War* (forthcoming with Alfred A. Knopf).
*The Emancipation Proclamation: A Brief History with Documents* (Bedford/St. Martin's, 2010).
*Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*.  Cambridge: Cambridge University Press, 2001. (Paperback edition, 2004.)

### Chapters in Books

"The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88.
"The Thirteenth Amendment," in *1865: America Makes War and Peace* in *Lincoln's Final Year* (Carbondale, Ill.: Southern Illinois University Press, 2015), 7-21.
"Liberté, Égalité, and Lincoln: French Readings of an American President," in Richard Carwardine and Jay Sexton, eds., *The Global Lincoln* (New York: Oxford University Press, 2011), 95-106.
"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* (New York: Columbia University Press, 2010).

"Did Emancipation Create American Citizens?: Abraham Lincoln's View" (in Russian), in Victoria Zhuravleva, ed., *Abraham Lincoln: Lessons of History and the Contemporary World* (Moscow: Russian State University for the Humanities Press, 2010).

"Abraham Lincoln's 'Fellow Citizens'—Before and After Emancipation," in William A. Blair and Karen Fisher Younger, eds., *Lincoln's Proclamation: Emancipation Reconsidered* (Chapel Hill: University of North Carolina Press, 2009), 151-169.

"The Thirteenth Amendment Enacted," in Harold Holzer and Sara Vaughn Gabbard, eds., *Lincoln and Freedom: Slavery, Emancipation, and The  Thirteenth Amendment* (Carbondale, Ill.: Southern Illinois University Press, 2007).

"After Emancipation: Abraham Lincoln's Black Dream," in John Y. Simon, Harold Holzer, and Dawn Vogel, eds., *Lincoln Revisited* (New York: Fordham University Press, 2007)

"Slavery Reparations in Theory and Practice: Lincoln's Approach," in Brian Dirck, ed., *Lincoln Emancipated: The President and the Politics of Race* (DeKalb: Northern Illinois Univ. Press, 2007).

"Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions in the History of Postbellum America* (New York: Oxford University Press, 2006).

"The World Will Forever Applaud: Emancipation," in Aaron Sheehan-Dean, ed., *The Struggle for a Vast Future: The American Civil War* (Oxford, UK: Osprey, 2006).

"Emancipating the Constitution: Francis Lieber and the Theory of Amendment," in Charles R. Mack and Henry H. Lesesne, eds., *Francis Lieber and the Culture of the Mind* (Columbia: Univ. of South Carolina Press, 2005).

"The Chase Court (1864-1873): Cautious Reconstruction," in Christopher Tomlins, ed., *The United States Supreme Court: ThePursuit of Justice* (Boston: Houghton Mifflin, 2005).

"Bringing the Constitution Back In: Amendment, Innovation, and Popular Democracy during the Civil War Era," in Meg Jacobs, William Novak, and Julian Zelizer, eds., *The Democratic Experiment: The Promise of American Political History* (Princeton: Princeton University Press, 2003).

"The King's Cure: Abraham Lincoln and the End of Slavery," in Charles Hubbard, ed., *Lincoln Reshapes the Presidency* (Mercer, Penn.: Mercer Univ. Press, 2004).

"Rutherford B. Hayes," in Alan Brinkley and Davis Dyer, eds., *TheReader's Companion to the American Presidency*.  Boston: Houghton Mifflin, 2000.

"Abraham Lincoln and the Politics of Black Colonization," in Thomas F. Schwartz, ed., *"For a Vast Future Also": Essays from the Journal of the Abraham Lincoln Association*.  New York: Fordham University Press, 1999. (Reprint of article listed below.)

**Refereed Journal Articles**

> "Spielberg's *Lincoln*: The Great Emancipator Returns," *Journal of the Civil War Era*, 3 (December 2013), 549-72.
>
> "Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (December 2005), 416-26.
>
> "'The Deformed Child': Slavery and the Election of 1864." *Civil War History*, 47 (September 2001), 240-257.
>
> "Abraham Lincoln and the Politics of Black Colonization." *Journal of the Abraham Lincoln Association*, 14 (Summer 1993): 23-46.

**Non-Refereed Journal Articles**

> "Emancipation—Then What?," *New York Times*, "Disunion" Blog, January 15, 2013, http://opinionator.blogs.nytimes.com/2013/01/15/emancipation-then-what/?_php=true&_type=blogs&_r=0
>
> "Hearts of Blackness: Reconsidering the Abolitionists—Again," *Reviews in American History*, 32 (March 2004), 33-40.
>
> "The Battle Over Gettysburg: What Lincoln Would Have Said about September 11, 2001." *Brown Alumni Magazine*, 103 (Jan./Feb. 2003), 27.
>
> "Recovered Memory of the Civil War," *Reviews in American History*, 29 (Dec. 2001), 550-58.

**Invited Lectures**

> "A Righteous Peace: Abraham Lincoln, the Civil War, and the End of Slavery," The Humanities Forum, Providence College, Oct. 18, 2019.
>
> "How Wars End--or Don't: The Civil War as a Case Study," Henry E. Huntington Society of Fellows Lecture, May 8, 2019.
>
> "Lincoln's Peace: The Struggle to End the American Civil War," Occidental College (Billington Lecture), Feb. 21, 2019.
>
> "The Fate of Slavery after Emancipation," The Great Lectures Series (as OAH Distinguished Lecturer), New York City, October 14, 2017.
>
> "Abraham Lincoln, the Thirteenth Amendment, and the Struggle for American Peace and Freedom," University of Saint Mary Annual Lincoln Lecture, Topeka, Kansas, February 20, 2017.
>
> "The 14th Amendment as an Act of War," Boston College, Clough Center, Newton, Massachusetts, September 20, 2016.
>
> "Born in the USA—So What?" Worcester Polytechnic Institute, Constitution Day University Speaker, Worcester, Massachusetts, September 19, 2016.
>
> "The Slave Power on the Gallows: The Deeper Meaning of the Execution of Henry Wirz, Confederate Commandant," University of California, Berkeley, Legal History Workshop, March 29, 2016.
>
> Salmon P. Chase Symposium on the Thirteenth Amendment (participant), Georgetown Law Center, Dec. 4-5, 2015, Washington, DC.
>
> "The Last Surrender: Looking for the End of the Civil War," presented at The Lincoln Forum, Gettysburg, Pennsylvania, November 17, 2015.

"Voting Rights and the Meaning of Freedom: The View from the Civil War Era," Annual Lincoln Legacy Lecture, University of Illinois at Springfield, October 15, 2015.

"Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment," Roger Williams University, October 6, 2015.

"Lincoln and the Jews, Freedom and Discrimination," Brown Hillel Alumni Association, New York City, May 17, 2015.

"When Should History Say That Slavery Ended in the United States?," Center for Slavery and Justice, Brown University, May 8th, 2015.

"Lincoln, the Constitution, and the Civil War," Community College of Rhode Island, April 29, 2015.

"Judgment at Washington: Henry Wirz, Lew Wallace, and the End of the Civil War," Annual Symposium of Capitol Historical Society, Washington, DC, May 2, 2014.

"Emancipation, Lincoln, and the Thirteenth Amendment," Dole Forum, Dole Institute of Politics, University of Kansas, Lawrence, Kansas, November 21, 2013.

"Spielberg's Lincoln and the Relation between Film and History," Department of History, Loyola University, Chicago, Illinois, November 13, 2013.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Newberry Library Colloquium, Chicago, Illinois, November 6, 2013.

"Reconstruction and the Origins of Civil Rights," National Endowment for the Humanities Summer Institute on Civil Rights History, Harvard University, Cambridge, Massachusetts, July 1, 2013.

"The Origins and Process of Emancipation," Emancipation at 150 Symposium, Boston College Clough Center, Newton, Massachusetts, April 23, 2013.

"Emancipation—Then What?  Citizenship?"  Emancipation Proclamation Symposium, University of Michigan, October 26, 2012.

"Blood, Allegiance, Belief: The Meanings of Citizenship in the Civil War Era," University of Michigan Law School, January 31, 2012.

"American by War: The People and Their Nations during the Civil War," Phillips Andover Academy, Andover, MA, Nov. 17, 2011.

"Birthright and the Myth of Liberal Citizenship," JANUS Forum, Brown University, Nov. 15, 2011.

 "American by War: The People and Their Nations during the Civil War," Western Kentucky University, Bowling Green, KY, Oct. 12, 2011.

"The Elections of 1860 and 2010 and the Politics of Citizenship," Colby College Symposium on the American Civil War Sesquicentennial, Waterville, Maine, November 10, 2010.

"Americans Debate Citizenship—Then and Now," Brown Club of England, October 12, 2010, London.

"War Powers, *Ex Parte Merryman*, and the Relevance of the American Civil War," American Bar Association Workshop for High School Teachers, Washington, D.C., June 19, 2010

"Originalism and the Meanings of Freedom," Georgetown Law School, Washington, D.C., March 30, 2010.

"Abraham Lincoln, Politician," Rotary Club of Rhode Island, Warwick, R.I., November 6, 2008.

"Lincoln the Citizen," Abraham Lincoln Symposium, National Archives, Washington, D.C., September 20, 2008.

"Emancipation and its Meaning in Current Scholarship," National Endowment for the Humanities Summer Institute on "Slavery and Emancipation," Philadelphia, Pennsylvania, July 28, 2008.

"Lincoln the Citizen–Or Lincoln the Anti-Citizen?," Abraham Lincoln Symposium, Springfield, Illinois, February 12, 2008.

"The Tangled History of Civil Rights and Citizenship in the Civil War Era," University of Virginia School of Law, November 2007.

"Civil Liberties and Civil Rights: The Civil War Era," American Bar Association, Chicago, May 2006.

"Race, the Supreme Court, and the Retreat from Reconstruction," Boston College School of Law, April 2007.

"Forever Free: The Meanings of Emancipation in Lincoln's Time and Ours," St. Louis University, December 7, 2006.

"Slavery Reparations in Historical Context," Connecticut College, New London, Connecticut, March 2, 2006.

"Abraham Lincoln, The Civil War and the Conflicting Legacies of Emancipation," presented as part of the "Forever Free" series, Providence Public Library, Providence, R.I., January 26, 2006.

"Abraham Lincoln, War Powers, and the Impact of the Civil War on the U.S. Constitution," presented at symposium on "War Powers and the Constitution," Dickinson College, Dickinson, Penn., October 3, 2005.

"Reconsidering Law, the Constitution, and Citizenship," presented at "New Directions in Reconstruction" symposium, Beaufort, S.C., April 15-18, 2004.

"Abraham Lincoln, Slavery, and Modern Legacies," Public History Series, University of Las Vegas, Nevada, February 12, 2004.

"Oaths, African Americans, and Citizenship," University of Nevada at Las Vegas Law School, February 12, 2004.

"Reconsidering the Era of the Oath: African Americans Before Union Military Courts during the American Civil War," presented to the Law and History symposium, Northwestern University Law School, Chicago, Ill., November 3, 2003.

"Racial and Written Constitutions in Nineteenth-Century America," presented to the workshop of the Department of History, Boston College, Newton, Massachusetts, March 2003.

"Abraham Lincoln, Abolition, and the Impact of the Civil War on the Cult of the Constitution," presented at the Social Law Library, Suffolk University, Boston, Massachusetts, February 2002.

"Francis Lieber, Constitutional Amendments, and the Problem of Citizenship," presented at The Francis Lieber Symposium, University of South Carolina, Columbia, S.C., November 2001.

"How Black Freedom Changed the Constitution," presented at the "Writing the Civil War" symposium, Atlanta History Center, Atlanta, Georgia, September 2001.

"From a Covenant with Death to a Covenant with Life: The Constitution's Transformation during the American Civil War," presented as the Annual Constitutional Anniversary Lecture, National Archives, Washington, D.C., September 2001.

"New Perspectives on Abraham Lincoln, Emancipation, and the Civil War," presented to the Civil War Round Table of Rhode Island, Cranston, Rhode Island, June 2001.

"Historical Roots of the Modern Civil Rights Movement: The Constitution," presented at the Civil Rights Summer Institute, Harvard University, Cambridge, Massachusetts, June 2001.

"Race, Law, and the Invention of the State Action Doctrine in the Late Nineteenth Century," presented at the Columbia University Law School, New York City, April 2001.

"A King's Cure, a King's Style: Lincoln, Leadership, and the Thirteenth Amendment," presented at the "Abraham Lincoln and the Legacy of the Presidency" conference, Lincoln Memorial University, Harrogate, Tennessee, April 2001.

"The Tangled Tale of Civil War Emancipation," presented at the University of Richmond, Richmond, Virginia, March 2001.

"The King's Cure: Abraham Lincoln, the Thirteenth Amendment, and the Fate of Slavery," presented at the Abraham Lincoln Institute of the Mid-Atlantic, Washington, D.C., March 2001.

"Race, the Supreme Court, and the Retreat from Reconstruction," presented at the Boston College School of Law, Newton, Mass., April 2000.

**Papers Read or Discussed**

"Prisoners of Freedom, Prisoners of War: An Untold Story of Black Incarceration--And How it Might be Told," Brown Legal History Workshop, Oct. 28, 2019.

"Bearer of a Cup of Mercy: Lew Wallace's American Empire," Henry E. Huntington Library, Research Fellows Meeting, Feb. 6, 2019.

"Anti-Imperialism and the Elusive End of the American Civil War," presented at the "Remaking North American Sovereignty" Conference, Banff, Alberta, Canada, July 31, 2015.

"The Election of 1864: Emancipation Promised, Emancipation Deferred," presented at The Annual Meeting of the Organization of American Historians, Atlanta, Georgia, April 11, 2014.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Department of History, Northwestern University, Evanston, Ill., Nov. 15, 2013.

"Birth, Blood, and Belief: Allegiance and the American Civil War," presented at the Elizabeth Clark Legal History Workshop Series, Boston University School of Law, Nov. 16, 2011.

"French Readings of Lincoln's Role in the Creation of American Citizenship," presented at the conference on European Readings of Abraham Lincoln, His Times and Legacy, American University of Paris, Paris, France, October 18, 2009.

"Was Lincoln's Constitution Color-Blind?," presented at the Abraham Lincoln Bicentennial Symposium, Harvard University, Cambridge, Mass., April 24, 2009.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," presented at conference on Slavery, Abolition, and Human Rights: Interdisciplinary Perspectives on the Thirteenth Amendment, April 17, 2009

"Did Emancipation Create American Citizens?—Abraham Lincoln's View," presented at the conference on Abraham Lincoln: Issues of Democracy and Unity, Russian State University, Moscow, Feb. 8, 2009.

"The Racial and Written Constitutions of Nineteenth-Century America," Cogut Center for the Humanities, Brown University, Nov. 4, 2008.

"Civil War Era State-Building: The Human Cost," Boston University Political History Workshop, March 19, 2008.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," annual meeting of the *Law and Society Association*, Montreal, May 30, 2008.

"Claiming Citizenship: Black and White Southerners Make Their Cases During the Civil War," presented at the annual meeting of the *Southern Historical Association*, Memphis, November 2004.

"Imagining a Different Reconstruction Constitution," presented at the annual meeting of the Social Science History Association, Baltimore, November 2003.

"West of Reconstruction: Resolving Mexican-American Property and Citizenship in the Civil War Era," presented at the annual meeting of the *American Historical Association*, San Francisco, California, January 2002.

"The Limits of Free Soil: The Resolution of Mexican Land Claims during the American Civil War," presented at the annual meeting of the *Organization of American Historians*, St. Louis, Missouri, April 2000.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Nineteenth-Century America," presented at the annual meeting of the *American Society for Legal History*, Toronto, Ontario, October 1999.

"Law, Politics, and the Making of California Free Soil during the American Civil War," presented at the annual meeting of the *Western History Association*, Portland, Oregon, October 1999.

"Land Law in the Era of Free Soil: The Case of New Almaden," *American Society for Environmental History*, Tucson, Arizona, April 1999.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Antebellum America," presented at the annual meeting of the *Society for Historians of the Early American Republic*, Harpers Ferry, W.V., July 1998.

"The Constitution in African-American Culture: Freedom Celebrations and the Thirteenth Amendment," presented to the *W.E.B. Du Bois Institute*, Harvard University, Cambridge, Massachusetts, April 1996.

"Civil War Emancipation and the Sources of Constitutional Freedom," presented at the annual meeting of the *Organization of American Historians*, Washington, D.C., April 1995.

"The Origins and Original Meanings of the Thirteenth Amendment," presented at the annual meeting of the *American Society for Legal History*, Washington, D.C., October 1994.

"Civil War Emancipation in Theory and Practice: Debates on Slavery and Race in the Border States, 1862-1865," presented at the *Southern Labor Studies Conference*, Birmingham, Alabama, October 1993.

## Service

### University

Anna S. K. Brown Library advisory committee, member, 2016-present.

Co-Organizer (with Faiz Ahmed, Rebecca Nedostup, Emily Owens), Brown Legal History Workshop, 2015-present.

Political Theory Project, Advisory Board, 2010-2019

Organizer and Presenter, "Abraham Lincoln for the 21st Century: A Symposium honoring the Abraham Lincoln Bicentennial," John Hay Library, Brown University, Feb. 27-28, 2009.  Plenary lecture by Benjamin Jealous, president of NAACP, and six symposium participants.  Funding secured from Rhode Island Foundation, Rhode Island Lincoln Bicentennial Commission, Brown Provost, Brown Dean of Faculty, History Department, Africana Studies Department

### Profession

Program Committee, Society of Civil War Historians, 2022 annual conference, 2020-present.

Cromwell Prize Committee, American Society for Legal Historians, 2014-2017.

Board of Editors, *Law and History Review*, 2004-2013 (reappointed 2009).

Advisory Committee, United States Abraham Lincoln Bicentennial Commission, 2002-10.

Board of Advisors, Lincoln Prize, Gettysburg Institute (2000-present).

Co-Chair, Local Arrangements Committee, Annual Meeting of the Society for Historians of the Early American Republic, Providence, Rhode Island, Summer 2004.

Referee for National Endowment for the Humanities Scholarly Editions, 2002; Summer Grants, 2001-2003.

Committee Member, Local Arrangements Committee, Annual Meeting of the American Society for Environmental History, to be held in Providence, Rhode Island, Spring 2003.

Referee for article manuscripts submitted to the *Journal of American History*, *Law and History Review*, *Law and Social Inquiry*, *Journal of the Civil War Era*, and *Civil War History*.

Referee for book manuscripts submitted to Houghton Mifflin, Harvard University Press, Oxford University Press, New York University Press, University of Chicago Press, University of Illinois Press, and University of North Carolina Press.

Advisory Editor for *Proteus* (special issue devoted to the American Civil War, Fall 2000).

**Community**

Lecture on American Citizenship and Exclusion, Center for Reconciliation, Providence, R.I., July 2018.

Instructor in co-taught course at the Rhode Island Adult Correctional Institute (ACI) through the Brown University BELLS program, 2013.

Lecture on Reconstruction-Era Constitutional Amendments, Barrington, RI, Open Classroom, April 4, 2013.

Lecture on 150th Anniversary of the Emancipation Proclamation, Wheeler School, Providence, Rhode Island, January 17, 2013.

Rhode Island Civil War Sesquicentennial Commission, 2011- .

Rhode Island Abraham Lincoln Bicentennial Commission (appointed by Governor), 2005-2009.

Lecturer on the Brown Steering Committee on Slavery and Justice, The Wheeler School, Providence, Rhode Island, November 2006.

Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., April 2006.

Seminar leader for National Endowment for the Humanities "Teaching American History" initiative at Rhode Island Historical Society, Providence, R.I., September 2005.

Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., March 2005.

Advisor to the Burrillville, Rhode Island, School Department, on securing and administering a "Teaching American History" grant from the United States Department of Education, 2001-2002.

## Academic Honors and Fellowships

Ray Allen Billington Professor, Occidental College/Henry E. Huntington Library, 2018-19.

Pembroke Center for the Study of Women and Gender Fellowship, Brown University, 2016-17.

National Endowment for the Humanities Long-Term Fellowship, Massachusetts Historical Society, Boston, Massachusetts, 2014.

National Endowment for the Humanities Long-Term Fellowship, Newberry Library, Chicago, Illinois, 2013.

Finalist, CIES Fulbright Fellowship for University of Rome III (2010-11 competition)

Cogut Center for the Humanities Fellowship, Brown University, Fall 2008.

William McLoughlin Prize for Teaching in the Social Sciences, Brown University, 2007.

Karen Romer Prize for Undergraduate Advising, Brown University, 2007.

History News Network (HNN) "Top Young Historian," 2005 (1 of 12 named in the U.S.).

Vartan Gregorian Assistant Professorship, Brown University, 2002-2004.

Finalist, Lincoln Prize, 2002 (for *Final Freedom*).

American Council of Learned Societies/Andrew W. Mellon Fellowship, 2002-03.

Kate B. and Hall J. Peterson Fellowship, American Antiquarian Society, 2002-03.

Salomon Research Award, Brown University, 2002-2003.

National Endowment for the Humanities Summer Stipend, 2001.

Julian Park Fund Fellowship, SUNY at Buffalo, 1998.

Research Development Fund Fellowship, SUNY at Buffalo, 1997.

Harold K. Gross Prize for Best Dissertation at Harvard in History, 1996.

Delancey Jay Prize for Best Dissertation at Harvard on Human Liberties, 1996.

W.E.B. Du Bois Fellowship, Harvard University, 1995.

Whiting Fellowship in the Humanities, 1994.

Bowdoin Prize for Best Essay at Harvard in the Humanities, 1993.

Indiana Historical Society Graduate Fellowship, 1993.

W. M. Keck Fellowship, Henry E. Huntington Library, 1993.

Everett M. Dirksen Congressional Research Fellowship, 1993.

Mark DeWolfe Howe Fellowship, Harvard Law School, 1993.

Charles Warren Center Research Fellowship, Harvard History Dept., 1991-2.

Derek Bok Award for Distinction in Teaching at Harvard, 1991.

Philip Washburn Prize for Best Senior Thesis at Harvard in History, 1986.

# EXHIBIT 18

<div style="text-align: right;">**CERTIFIED COPY**</div>

1    UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    BEFORE THE HONORABLE
     ROGER T. BENITEZ, DISTRICT JUDGE PRESIDING

4    _____

5    VIRGINIA DUNCAN, et al.,        ) Case No: 3:17-cv-01017-BEN-JLB
                                     )
6    Plaintiffs,                     ) Motion Hearings
                                     ) Department 5A
7              v.                    )
                                     ) Date: 12/12/2022
8    ROB BONTA, in his official      )
     capacity as attorney general    )
9    of the State of California      )
                                     )
10   Defendants.                     )
                                     )
11   _____

12   KIM RHODE, et al.,              ) Case No: 3:18-cv-00802-BEN-JLB
                                     )
13   Plaintiffs,                     )
                                     )
14   v.                              )
                                     )
15   ROB BONTA, in his official      )
     capacity as attorney general    )
16   of the State of California,     )
                                     )
17   Defendants.                     )
     _____

18   JAMES MILLER, et al.,           ) Case No: 3:19-cv-01537-BEN-JLB
                                     )
19   Plaintiffs,                     )
                                     )
20   v.                              )
                                     )
21   CALIFORNIA ATTORNEY GENERAL     )
22   ROB BONTA, et al.,              )
                                     )
23   Defendants.                     )
     _____

24

25        **--- caption continued on the following page ---**

1

_____

2    RUSSELL FOUTS, et al.,          ) Case No: 3:19-cv-01662-BEN-JBL
                                     )
3    Plaintiffs,                     )
                                     )
4    v.                              )
                                     )
5    ROB BONTA, in his official      )
     capacity as attorney general    )
6    of the State of California.     )
                                     )
7    Defendants.                     )
_____

8
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
9
                     Pages 1 through 51
10

11

12

13

14

15

16

17

18

19

20

21        --- appearances continued on the following page ---
_____
22
     REPORTED BY:            Abigail R. Torres, CSR, RPR/RMR, FCRR
23                           CSR No. 13700
                             United States District Court
24                           Southern District of California
                             333 West Broadway, Suite 420
25                           San Diego, California 92101

```
 1   APPEARANCES:

 2
     For the Plaintiffs:      MICHEL & ASSOCIATES, PC
 3   Duncan, et al.           180 East Ocean Boulevard, Suite 200
                              Long Beach, California 90802
 4                           By:  ANNA M. BARVIR, ESQ.
                              By:  SEAN A. BRADY, ESQ.
 5                           By:  KONSTADINOS T. MOROS, ESQ.

 6   For the Defendants:      DEPARTMENT OF JUSTICE
     Becerra, et al.          OFFICE OF ATTORNEY GENERAL
 7                           GOVERNMENT LAW SECTION
                              300 South Spring Street, Suite 9012
 8                           Los Angeles, California 90013
                              By:  KEVIN J. KELLY, ESQ.
 9                                  -oOo-
                              DEPARTMENT OF JUSTICE
10                           OFFICE OF ATTORNEY GENERAL
                              GOVERNMENT LAW SECTION
11                           300 South Spring Street, Suite 1702
                              Los Angeles, California 90013
12                           By:  MARK R. BECKINGTON, ESQ.

13   APPEARANCES:

14   For the Plaintiffs:      MICHEL & ASSOCIATES, PC
     Rhode, et al.            180 East Ocean Boulevard, Suite 200
15                           Long Beach, California 90802
                              By:  ANNA M. BARVIR, ESQ.
16                           By:  SEAN A. BRADY, ESQ.
                              By:  KONSTADINOS T. MOROS, ESQ.
17
     For the Defendants:      DEPARTMENT OF JUSTICE
18   Becerra, et al.          OFFICE OF ATTORNEY GENERAL
                              GOVERNMENT LAW SECTION
19                           1300 I Street, Suite 125
                              Sacramento, California 95814
20                           By:  ANTHONY P. O'BRIEN, ESQ.
                                    -oOo-
21                           DEPARTMENT OF JUSTICE
                              OFFICE OF ATTORNEY GENERAL
22                           GOVERNMENT LAW SECTION
                              300 South Spring Street, Suite 1702
23                           Los Angeles, California 90013
                              By:  MARK R. BECKINGTON, ESQ.

24

25        --- appearances continued on the following page ---
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:      DILLON LAW GROUP, APC
     Miller, et al.,         2647 Gateway Road, Suite 105, No. 255
 3                           Carlsbad, California 92009
                             By:  JOHN W. DILLON, ESQ.
 4
     For the Defendants:     DEPARTMENT OF JUSTICE
 5   Becerra, et al.,        OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
 6                           300 South Spring Street, Suite 9012
                             Los Angeles, California 90013
 7                           By:  KEVIN J. KELLY, ESQ.
                                      -oOo-
 8                           DEPARTMENT OF JUSTICE
                             OFFICE OF ATTORNEY GENERAL
 9                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 1702
10                           Los Angeles, California 90013
                             By:  MARK R. BECKINGTON, ESQ.
11   APPEARANCES:

12
     For the Plaintiffs:      LAW OFFICE OF ALAN BECK
13   Fouts, et al.,          2692 Harcourt Drive
                             San Diego, California 92123
14                           By:  ALAN A. BECK, ESQ.
                                     -oOo-
15                           STAMBOULIEH LAW, PLLC
                             PO Box 428
16                           Olive Branch, Mississippi 38654
                             By:  STEPHEN D. STAMBOULIEH, ESQ.
17
     For the Defendants:     DEPARTMENT OF JUSTICE
18   Becerra, et al.         OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
19                           1300 I Street, Suite 125
                             Sacramento, California 95814
20                           By:  ANTHONY P. O'BRIEN, ESQ.
                                      -oOo-
21                           DEPARTMENT OF JUSTICE
                             OFFICE OF ATTORNEY GENERAL
22                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 1702
23                           Los Angeles, California 90013
                             By:  MARK R. BECKINGTON, ESQ.
24

25
```

| | |
|---|---|
| 1 | **SAN DIEGO, CALIFORNIA; MONDAY, DECEMBER 12, 2022; 10:38 A.M.** |
| 2 | -oOo- |
| 3 | THE COURT:  Good morning. |
| 4 | THE CLERK:  Calling 1, 2, 3, and 4 on calendar. |
| 5 | One, 17-cv-1017, *Duncan, et al., v. Becerra, et al.* |
| 6 | Two, 18-cv-0802, *Rhode, et al., v. Becerra, et al.* |
| 7 | Three, 19-cv-1537, *Miller, et al., v. Becerra, et al.* |
| 8 | Four, 19-cv-1662, *Fouts, et al., v. Becerra, et al.* |
| 9 | All set for status conference. |
| 10 | THE COURT:  All right, Counsel.  Thank you for being |
| 11 | here this morning.  Let's start with the Plaintiff. |
| 12 | If you would please identify yourself.  Please speak |
| 13 | slowly, clearly, so that my court reporter can take down your |
| 14 | names and so that I can, hopefully, do justice to them.  Okay? |
| 15 | MS. BARVIR:  Thank you, Your Honor. |
| 16 | Anna Barvir, B-a-r-v-i-r, for Plaintiff Virginia |
| 17 | Duncan, et al. |
| 18 | THE COURT:  All right. |
| 19 | MR. BRADY:  Good morning, Your Honor. |
| 20 | Sean Brady, S-e-a-n, B-r-a-d-y, on behalf of the |
| 21 | Plaintiffs. |
| 22 | MR. MOROS:  Good morning, Your Honor. |
| 23 | Konstadinos Moros on behalf of the Plaintiffs.  That's |
| 24 | K-o-n-s-t-a-d-i-n-o-s.  And last name is Moros, M-o-r-o-s. |
| 25 | THE COURT:  Okay.  And for the State? |

```
 1              MR. O'BRIEN:  Good morning, Your Honor.
 2              Deputy Attorney General Anthony O'Brien,
 3    A-n-t-h-o-n-y; O, apostrophe, B-r-i-e-n, on behalf of the
 4    Attorney General and the Fouts and Rhode matter.
 5              THE COURT:  Okay.
 6              MR. KELLY:  Your Honor, excuse me.  I'm also
 7    appearing -- I'm appearing on behalf of the State and the
 8    Attorney General in the Duncan and Miller matters.
 9              My name is Kevin Kelly.  K-e-v-i-n.  Kelly, K-e-l-l-y.
10    Deputy Attorney General.  Thank you.
11              THE COURT:  I'm sorry.  You're on Duncan and Miller?
12              MR. KELLY:  Correct, Your Honor.
13              THE COURT:  Okay.  Boy, I hope I can keep all this
14    straight.  Okay.
15              MR. BECKINGTON:  Good morning, Your Honor.
16              Mark Beckington, B-e-c-k-i-n-g-t-o-n.  I'm joining
17    Mr. O'Brien and Mr. Kelly on all four cases.
18              THE COURT:  I'm sorry?
19              MR. BECKINGTON:  I'm joining Mr. Kelly and Mr. O'Brien
20    on all four of the cases.
21              THE COURT:  On all four.  I remember you from the
22    Miller case.
23              MR. BECKINGTON:  Yes, Your Honor.
24              THE COURT:  Yeah.  Okay.  Great.
25              All right.  All right.  Let's see Plaintiff in the
```

1    Rhode case.

2           MR. BRADY:  Your Honor, Sean Brady on behalf of the

3    Plaintiffs on Rhode.

4           MS. BARVIR:  Anna Barvir on behalf of the Plaintiffs

5    and Rhode as well.

6           THE COURT:  All right.  And on the Fouts matter?

7           MR. STAMBOULIEH:  Steven Stamboulieh,

8    S-t-a-m-b-o-u-l-i-e-h, for Plaintiff Fouts.

9           THE COURT:  I'm sorry.  Just a second.

10          Can you repeat your last name again for me, please?

11          MR. STAMBOULIEH:  Stamboulieh, S-t-a-m-b-o-u-l-i-e-h.

12          MR. BECK:  Alan Beck on behalf of the Plaintiffs.

13   A-l-a-n.  Last name B-e-c-k, sir.

14          THE COURT:  Okay.  Have I missed anyone?

15          MR. DILLON:  Your Honor, this is John Dillon appearing

16   on behalf of the Plaintiffs for the Millers and --

17          THE COURT:  I'm sorry.  For Miller?

18          MR. DILLON:  Yes.

19          THE COURT:  And?

20          MR. DILLON:  John Dillon.

21          THE COURT:  Just on the Miller case?

22          MR. DILLON:  Yeah, just for Miller.

23          THE COURT:  All right.  Have I missed anyone?

24          Okay.  Well, thank you so much for being here this

25   morning.  The reason why I called the status conference -- and

I called all these cases at the same time -- is because, you

know, a great deal of my life over the last few years has been

devoted to dealing with these Second Amendment cases.

       As you probably know, I have four of these cases and

recently inherited the fee-shifting case from two other judges.

And I've spent an awful lot of time, an awful lot of time, and

read an awful lot of material and heard testimony on some of

these -- at least one of these cases, anyway.

       And so I thought that, given the fact that these cases

have been returned to me following the Bruen opinion, that I

didn't want to duplicate effort.  First of all, my time, as I'm

sure your time, my law clerk's time is valuable.

       And so I thought that perhaps there was some way that

we could approach a joint methodology for dealing with all of

these cases, essentially, at one time and in one -- in one way.

So my understanding of -- of Heller, is that Heller has not

changed.  It has not been overruled.  It is still good law.

       Bruen, the Bruen opinion, I believe, discarded the

intermediate scrutiny test that I also thought was not very

useful; and has, instead, replaced it with a text history and

tradition test.  Now, the text history and tradition issue is

pretty much common, I think, to all of these cases.

       There may be some nuance as to whether, for example,

in some case the -- the history and tradition may effect

ammunition.  In another case, it may effect the type of weapon,

1    for example, whether it's a rifle or a dirk or a dagger.  But

2    in the end, it's the same.  We're basically looking at the same

3    body of history and tradition that we're going to be looking at

4    in all of the cases.

5          So I have an idea of how this case ought to go

6    forward, and I'll tell you what I would like to have -- by the

7    way, I might add, I'm not sure, Mr. O'Brien, whether you filed

8    the supplemental brief in the Fouts case.  I'm not sure who

9    filed that.

10          MR. O'BRIEN:  Yes, Your Honor, I did.

11          THE COURT:  All right.  Well, let me compliment you on

12    that, because one of the things that I thought you did that I

13    really appreciated was you filed several declarations.  One of

14    those declarations did a historical analysis of several rules,

15    laws, regulations, and so on and so forth, all of which I have

16    read, I might add.  So --

17          You can sit down.

18          -- I found that to be very, very helpful.

19          But I would like to ask you folks to do something a

20    little bit different; very similar.  But I don't have the

21    staff.  I don't have, really, the resources to do this, at

22    least not to do it in a timely fashion.

23          So I thought that I would ask you to do something for

24    me, which is to, essentially, do a similar survey as,

25    Mr. O'Brien, you did in the -- in the Fouts case.

1           And I would like that survey, if you would.  I mean,

2    I'm sure you all have access to Excel spreadsheets and so on.

3    But I'd like to see a survey that does the following for me:

4    First of all, on a chronological bases, starting with date, the

5    date of any law, regulation, ordinance, restriction.  And I'm

6    going to refer to those from now on as "restrictions."  Okay.

7    Generically, okay, restriction or regulation.  Okay.

8           So if you could start out chronologically, if you

9    would give me the date, and then if you would tell me what was

10   it that was restricted.  So, for example, in many of those

11   regulations, they regulate dirks, daggers, metal knuckles.  In

12   some cases, it might be storage of gunpowder or cartridges.

13   Some of them, some of these, are "use" regulations.  In other

14   words, you cannot use these while committing a crime.  You

15   cannot use them while breaking and entering into somebody's

16   property.  You cannot display them in anger.

17          So what is it exactly that the law or the regulation

18   restricted?  What type of weapon?  What was the weapon that was

19   being restricted?  Was it a knife? a Bowie knife? a stiletto?

20   metal knuckles? pistols? rifles?  Then I would like to know

21   whether or not that statute was repealed and, if it was

22   repealed, what was repealed by, and was it replaced by

23   something else?  And if so, if you would do the same analysis?

24   Again, continuing a chronological order.  Right?

25          And then, finally, whether or not that regulation or

1  restriction was reviewed by court or courts?  And if so, what

2  was the -- what was the outcome?  For example, was it found to

3  be unconstitutional, or was it found to be constitutional?  And

4  if you'll give me a citation so that I can then go and look at

5  the cases and see what the cases say.

6        I think -- so to pose an example, I think there are

7  one or two regulations that I have found that restricted --

8  specifically restricted billys.  Okay.  So in the Fouts case, I

9  think that would be particularly relevant.  I think I found one

10  or two that restricted rifles and shotguns.  I think I found

11  one or two that restrict certain ammunition, cartridges.

12  Right.  I think I found one that restricts a weapon that can

13  fire more than 16 or 18 rounds.  And I found one that dealt

14  with machine guns and automatic rifles.

15        You see, that's the sort of thing that I've read

16  through that I've captured, but I can't really capture it in a

17  way that I think that the Supreme Court would like us to do it,

18  which is a chronological order, so that we can determine what

19  regulations, what tradition exists with regards to restrictions

20  at the adoption of the Second Amendment; and then I think,

21  secondarily, at the time that the Fourteenth Amendment was

22  adopted.

23        I think with that body of information, I think this

24  Court would be in a much better position to make a decision as

25  to what to do in each one of these cases.

1    So the cases have been sent back to me, given the

2    Bruen opinion, and I'm now going to attempt to deal with them,

3    but I don't want to have to deal and read the same stuff over

4    and over and over again, because I've already read some of it

5    twice.  And, frankly, there's a lot of material there.  I don't

6    know how many boxes of five-inch binders I have, but it's a

7    lot, and I have only so much time.

8    So I would suggest both sides, if you can, please do

9    that for me.  Okay.  And I think that would be very helpful.

10    Now, as far as actually setting a hearing to -- to

11    hear your arguments on these, I don't think there's any use in

12    taking any evidence, meaning testimony, from anyone in any of

13    these cases.

14    I mean, the history and tradition is what it is.  I

15    don't need, you know, Mr. Spitzer or Mr. Cornell to tell me

16    what his view of the history and tradition is.  I see no point

17    in that; nor do I think any additional discovery is necessary

18    or additional expert work is necessary.  So, anyway, that's

19    my -- that's my initial thought on this case.

20    If anyone has any suggestions on how we can go about

21    proceeding with these cases, I would love to hear your views.

22    I may not adopt your suggestion, but I'll certainly consider

23    it.  So if -- if anybody wants to address what I have said, or

24    anything else on how we proceed with these cases, please feel

25    free to speak up.

1        Maybe we'll start with Duncan, since it was the first

2   case that I dealt with.

3        So do you have anything you want to add?

4        MS. BARVIR:  Should I move here?

5        THE COURT:  Yeah.  Whatever.  If you feel comfortable

6   there at the table, that's fine.

7        MS. BARVIR:  Again, Anna Barvir for Plaintiff Virginia

8   Duncan.

9        Thank you, Your Honor, for your thoughtful

10  consideration of all four matters.  I'm sorry.  I'm -- we've

11  heard what -- that Your Honor is asking for from each party.  I

12  think that makes a lot of sense, though I do want to, I think,

13  perhaps, focus the Court a little bit on what Plaintiffs' view

14  as the kind of proper way of reviewing this case.  And in our

15  position, it doesn't really rely on -- it actually shouldn't

16  rely, and it might be improper to rely on the sorts of -- even

17  the laws that Your Honor is referencing in this survey and/or

18  spreadsheet that we were talking about just now.

19       It is our position that Heller already tells -- Your

20  Honor, tells all of us how to analyze this.  The -- this is an

21  arms banned possession case.  So the Heller court then, backed

22  up by the decision in Bruen, already handled that entire

23  analysis.  The analysis starts with --

24       THE COURT:  But if that were so, why would the Ninth

25  Circuit have kicked it back to me?  I mean, I agree with you in

```
 1    concept, but, you know, the Ninth Circuit kicked it back to me,
 2    so...
 3           MS. BARVIR:  Excuse me.  I think that's a good
 4    question, and perhaps that's why Your Honor is, I think,
 5    intelligent, smart to ask the parties to do what we're doing.
 6    But I think that -- excuse me -- the Ninth Circuit also has a
 7    lot of these -- had a lot of these cases before it.  And,
 8    obviously, all of the pro Second Amendment cases had gone up to
 9    en banc, and perhaps the Court wasn't willing to handle those
10    at that point.
11           I'm not trying to cast aspersions, but I think we can
12    all kind of agree that we've seen a lot of decisions that are
13    not upholding lower-court decisions that strike California
14    state laws, gun control laws, just overturned.
15           So perhaps they'd like to see that Your Honor do some
16    more work on this case, but I don't think it requires --
17           THE COURT:  Would you like some water?
18           MS. BARVIR:  Yes.
19           I don't think that that requires us to do a new
20    analysis of all the history that's out there.  The Heller court
21    was very -- had done a very detailed deep dive into all of the
22    historical laws that are banning possession of arms and other
23    types of gun control laws since the Founding and before.
24           And it found that the test is if it's -- excuse me --
25    that the only time the State can lawfully ban a firearm or
```

1   other type of arm that is protected by the Second Amendment is

2   if it's dangerous and unusual.  The flip side being, typically

3   possessed by law-abiding citizens for lawful purposes or

4   other -- we've also heard it called the "common use" test.  And

5   so that test came out of the Court's analysis of the history

6   and tradition.

7           So if the Court -- so the question that really is

8   posed -- that Duncan poses this Court today, is whether or not

9   magazines, and maybe more specifically magazines capable of

10  holding more than ten rounds, are protected arms, bearable

11  arms, under the Second Amendment's text.

12          And then, secondly, if there -- excuse me --

13  otherwise, if there's a longstanding tradition, meaning are

14  they dangerous and unusual.  And this Court has already found

15  that -- I mean, we have a really large record showing that

16  they're not dangerous and unusual.  And several courts have

17  agreed with that finding both in the Ninth Circuit and other

18  circuits have found it or they have been willing to accept it.

19  And I don't think that Heller or -- I mean, I'm sorry -- I do

20  not think Bruen changed that outcome.

21          So that's what we would like Your Honor to consider

22  and to look at and perhaps think about when we are doing this

23  search for more historical restrictions.

24          THE COURT:  Let me ask you a question that I think has

25  troubled me somewhat.  So I think facts matter.  And in

1    certain -- and in cases -- every case, there are parties that

2    have greater access to evidence than others.  Right.  And at

3    least in California, we have a presumption, for example, that

4    when a party has the largest body of evidence but fails to

5    present it, there's a presumption that if the evidence were to

6    be considered by the Court, that the presumption would be that

7    the party who has a greater body of evidence, that it would be

8    held against him.

9            Now, one of the things that I'm concerned about, for

10   example, is I just read someone said, "There's no evidence that

11   a homeowner has ever fired more than ten rounds in defense."

12   And I kind of think that that's -- I mean, I think probably the

13   best evidence of that would be the State.  The State would have

14   the investigative reports, police reports, and so on, to

15   explain that.

16           But I wonder if you agree with that statement, that

17   there are no cases where a homeowner or a business owner has

18   ever fired more than ten rounds in defense.  And if so, and if

19   that's the case, have you provided the Court with any

20   information to support that?

21           MS. BARVIR:  I don't -- I don't, standing here, know

22   that that's true.  I think that part of that is -- it's a kind

23   of a false thing to do when you're limited to that number,

24   anyway, but also --

25           THE COURT:  I understand you.  I understand -- I hear

```
 1   you.  I hear you.  But I -- particularly in the Miller case, I
 2   took issue with Ms. Alan's -- Ms. Alan's analysis.  And then I
 3   think I read something recently -- I can't recall which court
 4   it was -- but somebody said, "Oh, there's no evidence that a
 5   homeowner has fired more than ten rounds."
 6          And defense -- and of course all that anyone has to do
 7   is go on the Internet and do a cursory search and find out that
 8   that's not true.
 9          MS. BARVIR:  Right.
10          THE COURT:  And I wonder if you've done that.
11          MS. BARVIR:  I think when we were here on MSJ -- and
12   that's why we had this conversation several years ago.
13          THE COURT:  You know, I'm sorry.  But as I said, I
14   have four of these, and if I get you all confused with one
15   another, please forgive me.  You know, I'm not as young as I
16   used to be, so...
17          MS. BARVIR:  None of us are.
18          When we were here on MSJ, I think we had this
19   conversation as well.  And a lot of times that was coming
20   from -- you know, from Plaintiffs' side was coming from, I
21   guess you could say, anecdotal news stories.  Because we don't
22   -- we aren't the State.  We don't have access to those same
23   sorts of records.
24          I don't think that it's true that that's never
25   happened.  That there's no evidence that it's ever happened.
```

1   But, again, even if it never happened, which I find

2   extraordinarily hard to believe -- the police do it all the

3   time -- it's not a relevant matter because the test --

4           THE COURT:  Yeah, I know.

5           MS. BARVIR:  -- for common use is typically

6   possession.

7           THE COURT:  I heard you.  I know that.  But I was just

8   wondering if you agreed with that statement that there's no

9   evidence that the homeowner has ever fired more than ten

10  rounds, and just wanted to pick your brain on that.

11          Okay.  I distracted you.

12          MS. BARVIR:  That's okay.  I have nothing more to add.

13          THE COURT:  Okay.  Great.

14          MS. BARVIR:  So thank you for your time.

15          THE COURT:  Sometimes -- sometimes less is more.

16  Okay.

17          Anyone else?  No one else?  Gee, I'm so glad.

18          MR. KELLY:  Your Honor, could I be heard?

19          THE COURT:  No.  Sorry.  I've heard all I need to

20  hear.

21          No.  Go ahead.

22          MR. KELLY:  So the State would like to renew its

23  request for an addition discovery period, not a lengthy

24  discovery period in this action.  Just a three-month is all we

25  would ask for.

| | |
|---|---|
| 1 | THE COURT:  Tell me why. |
| 2 | MR. KELLY:  Sorry, Your Honor? |
| 3 | THE COURT:  Tell me why. |
| 4 | MR. KELLY:  There's two reasons:  First of all, this |
| 5 | is a brand-new area of law, and it's a brand new area of |
| 6 | historical analysis.  And a three-month period would give our |
| 7 | experts more time to actually look into this.  I think we |
| 8 | submitted a declaration from Professor Schrag, who details the |
| 9 | types of work that is required of historians when they approach |
| 10 | an issue like this. |
| 11 | And, also, Professor Cornell in his declaration also |
| 12 | said that, "This work is still ongoing, and we did our level |
| 13 | best" -- |
| 14 | THE COURT:  What happens in three months when the work |
| 15 | stops?  What's the -- what's the miracle?  Was the miracle |
| 16 | pertinent?  Drops down in three months and work stops? |
| 17 | MR. KELLY:  Well, Your Honor, obviously, I can't |
| 18 | represent that new evidence will be found, but that's also |
| 19 | because I don't know what I don't know, at this point, and |
| 20 | neither do our experts. |
| 21 | So we would, again, renew our request for an |
| 22 | additional discovery period followed by supplemental briefing. |
| 23 | And -- excuse me -- I had another point to make on |
| 24 | that. |
| 25 | THE COURT:  Okay.  Go ahead. |

1          MR. KELLY:  So we would also want an opportunity for

2     our experts to examine the evidence, the new evidence that the

3     plaintiffs included in their response to our supplemental

4     briefing.  And that would also give our experts a chance to do

5     so, and then --

6          THE COURT:  So give me an example.

7          MR. KELLY:  So I will give -- one moment, Your Honor.

8          So the Plaintiffs brought or included a declaration

9     from Ashley Hlebinsky, who claimed that "repeating rifles were

10    not commonly owned in the nineteenth century," presumably in

11    response to our declaration from Professor Vorenberg.

12         THE COURT:  I'm sorry.  They said "they were not"?

13         MR. KELLY:  They were not commonly owned in the

14    nineteenth century.

15         THE COURT:  She says they were not.

16         MR. DILLON:  No.

17         THE COURT:  No.  I think you're wrong.  I think you're

18    opposite.  I think she says --

19         MR. KELLY:  Opposing counsel will correct me if I'm

20    wrong.

21         THE COURT:  Yeah, I think you're wrong.  I think she

22    said the opposite.

23         MR. DILLON:  I don't believe that's the case that she

24    said they were not.

25              (Court reporter interruption.)

1          MR. DILLON:  John Dillon on behalf of the Miller

2   defendants.

3          THE COURT:  Yeah.  So she said they were commonly

4   owned.

5          MR. DILLON:  Yeah.

6          THE COURT:  So the Model 94 Winchester --

7          MR. DILLON:  She was rebutting Dr. Saul Cornell's

8   statement that these guns were, in fact, not common.  That's

9   what his testimony was, Your Honor.

10          THE COURT:  All you got to do, if you look at

11   Professor Cornell's declarations and you look at the website

12   that he refers to -- to Winchester -- to the Winchester

13   company, if you look at that website, you see that, in fact,

14   they were commonly owned.

15          So, I mean, what are you going to do?  You going to --

16          MR. KELLY:  Your Honor, if --

17          THE COURT:  How are you going to -- I mean, if you

18   look at Mr. Vorenberg's declaration, and you look at -- for

19   example, as I sit here right now, I can recall one instance

20   that he talks about where two miners were mining for borax.

21          Do you recall the incidents?

22          MR. KELLY:  Sorry.  Do I recall the incidents, Your

23   Honor?

24          THE COURT:  Yeah.

25          MR. KELLY:  I do not, no.

1          THE COURT:  Okay.  So two miners were mining for

2    borax.  And I can't recall whether it was Montana or Wyoming or

3    Nebraska, or whatever.  These are just two miners, two common

4    folks that were miners for miners -- I mean, mining for borax,

5    and they're attacked by a band of 40 Indians.  And these two

6    miners happen to have Henry rifles, and they were able to

7    defeat the 40 Indians that were attacking them.

8          So the point -- the point was, if you look at Mr. --

9    Professor Cornell's -- if you look at Professor Vorenberg's

10   materials, which I have looked at, you see that the statement

11   that they were not commonly owned is just not true.

12         For example, there's a statement in there about how

13   after the Civil War many of the -- of the soldiers, when they

14   were released from duty, were, in fact, allowed to buy the

15   repeating rifles and took the repeating rifles home.

16         And you can do the statistical analysis, by the way,

17   which I sat down and did because maybe I have too much time on

18   my hands.  But there was an awful lot of those weapons that

19   wound up in civilian hands.

20         So, I mean, the evidence is there.  You can call, I

21   suppose, this person for a deposition and take her deposition.

22   But I don't think, no matter what she says, it's not going to

23   contradict her own experts' declarations and the materials that

24   they themselves refer to.

25         You follow what I'm saying?  Okay.

23

1          MR. KELLY:  Your Honor, I do have another example of

2     something we would want to explore and --

3          THE COURT:  Okay.  Give me one more.

4          MR. KELLY:  So the Plaintiffs also include a

5     declaration from Clayton Cramer --

6          THE COURT:  Okay.

7          MR. KELLY:  -- presumably in response to Professor

8     Roth's position that mass murder was not a new phenomenon or --

9     excuse me -- mass murder, yes, correct, is a new phenomenon at

10    this point.  And we would want -- to my knowledge, Mr. Cramer

11    was not disclosed as an expert, was not deposed in any prior

12    proceeding in Duncan.

13         And we would first want an opportunity for Professor

14    Roth to examine the new evidence that the Plaintiffs have

15    brought, as well as potentially depose Mr. Cramer on that

16    issue.

17         THE COURT:  Well, before I get to that issue, let me

18    point out something, Mr. Kelly.  I don't know how long you've

19    been in this case.  But you said something about -- going back

20    to the reason why you needed three months; that you needed --

21    that this was a new area and so on and so forth.

22         Did I get you right?

23         MR. KELLY:  That's correct, Your Honor.

24         THE COURT:  Yeah.  How long you have been in this

25    case, Mr. Kelly?

1              MR. KELLY:  Several weeks, Your Honor.

2              THE COURT:  It's not fair to dump you into a case like

3      this.  Mr. -- Professor Cornell has gone on record and stated

4      -- in 2017, Professor Cornell stated that he had been

5      researching and writing on the history and tradition of Second

6      Amendment regulations for two decades.  That's 20 years,

7      20 years before 2017.  We're now in 2023.  Add five years to

8      that; that's 25 years.  That's a quarter of a century that

9      Professor Cornell has been writing, researching on the history

10     of and tradition of the Second Amendment.

11             And I've read an awful lot of that material.

12     Professor Cornell cites to Spitzer.  Spitzer cites to

13     Vorenberg.  Vorenberg cites to Bazilli.  Bazilli, I think it

14     is, who cites to -- these folks have been working on this for a

15     really, really long time.

16             In 2000- -- well, as you probably know in the Rhode --

17     Rhode case, I issued an opinion where I said that the State's

18     regulation had no historical pedigree, and I was right.  The

19     Ninth Circuit asked the State to file a supplemental brief on

20     the issue of the historical pedigree.

21             In response to that request from the Ninth Circuit,

22     the State at Footnote 3, page 11 of its response, cites to Saul

23     Cornell and Nathan DeNino, "A Well Regulated Right.  The Early

24     American Origins of Gun Control," 2004, surveying firearms

25     regulations from Founding era through the nineteenth century.

1          Mr. Kelly, with all due respect, Mr. Cornell and all

2    these other folks have been researching and writing on this

3    issue for 25 years.  We're not here, looking -- this is not a

4    question for the missing link.  We're not looking for truffles.

5    If it's a history and tradition, 25 years of research and

6    writing should have disclosed it by now.

7          And as you know, probably in Bruen -- I think it was

8    in Bruen.  It might have been in Heller, as well, where the

9    Court said, "Look, 'a lot of' doesn't show a history and

10   tradition."  Right.  So I don't think -- I mean, with all due

11   respect, I understand what you're doing, and I appreciate that.

12   And I'm sorry that you got dumped into this just a few -- just

13   a few weeks ago.

14         But, realistically, you don't need more time.  I might

15   give you a little more time to depose the one expert, and that

16   might be it, but that's about it.  Okay.

17         MR. KELLY:  Thank you, Your Honor.

18         THE COURT:  All right.  Is there anything else you

19   wanted to add?

20         MR. KELLY:  Actually, a point of clarification, Your

21   Honor.

22         THE COURT:  Sure.  Go ahead.

23         MR. KELLY:  Would Your Honor like us to submit one set

24   of briefing for all four matters, or one for each matter?

25         THE COURT:  I'm open to suggestions.  I don't want to

```
 1    have to be rereading the same stuff over and over and over
 2    again.  So what do you think?
 3              MR. KELLY:  Your Honor, I think they should be heard
 4    separately.  I think as Your Honor said, you know, there is
 5    some overlap here in terms of the historical analysis,
 6    et cetera.  But there's also enough nuance among the cases
 7    that, I think, both, as a matter of fairness, and to make your
 8    burden easier, they should be heard separately.
 9              For example, I think the textual analyses is different
10    in these case; the first prong under Bruen as to whether the
11    regulated items constitute arms under the Second Amendment.
12    And our position is a different analysis in each case.
13              THE COURT:  Okay.  Well, what you say makes sense.
14    All right.  So how about if what we do is we have a joint
15    historical analysis?  In other words, what I suggested at the
16    very beginning of this hearing?  How about if we have that as
17    one?
18              And, yes, I can understand how you might want to
19    argue, for example, that in the Fouts case, looking at the
20    historical analysis, there's, you know, history and tradition.
21    And that you might want to brief that separately.
22              Yeah, I can understand what you're saying.  I'll hear
23    from the Plaintiffs in just a second, see if they have a
24    different idea.  But that makes sense.  I can go along with it.
25              MR. KELLY:  Thank you, Your Honor.
```

1          THE COURT:  All right.  Thank you.

2          Anyone else?

3          All right.  Let's go back to the Plaintiffs.  Anyone

4    have anything you want to comment in response?

5          MR. BRADY:  Sure, Your Honor.  Sean Brady on behalf of

6    the Plaintiffs.

7          I agree.  I think that makes sense.  But to address

8    the nuance, there are some things that are going to sort of be

9    boilerplate with respect to this compendium of Excel

10   spreadsheet of the laws.  If the State prepares that, they're

11   going to have to prepare that for all the cases.  Right.  So it

12   wouldn't be an additional burden on them.

13         THE COURT:  I want you to look at it, and see if you

14   agree or disagree because I want to know, you know, if there's

15   disagreement.  Right.

16         MR. BRADY:  If Your Honor would like us to meet and

17   confer, you know -- I guess our position is that it's the

18   State's burden to research and present these laws, and they've

19   had adequate time for that.  We don't need to get into --

20         THE COURT:  I think I agree.  But I think it's always

21   really a good idea to meet and confer.  So if you could do

22   that, that would be wonderful.

23         MR. BRADY:  Absolutely.  And if Your Honor wants us to

24   do that prior to -- instead of dressing it in our opposition

25   and meeting and conferring beforehand, we're more than happy to

 1    do that.

 2             THE COURT:  Why don't you do that.  And then if

 3    there's any disagreement, if there's any disagreement, then we

 4    can deal with that later.  Right.

 5             So here's something that I do with jury instructions.

 6    I ask the parties to meet and confer and come up with an

 7    agreed-upon body of jury instructions.  Okay.  And then if

 8    there are any jury instructions that they disagree with, then

 9    they can file a brief to tell me what instructions they

10    disagree with and what other instructions they want me to give.

11             Perhaps this is a good policy for us to apply here.

12    If you meet and confer and agree on the historical analysis,

13    then that's great.  You can submit that.  And if there are any

14    disagreements, then you can submit that separately.

15             How's that?  That work?

16             MR. BRADY:  I think that works, Your Honor.

17             THE COURT:  Mr. Kelly?

18             MR. KELLY:  Yeah, that works for us, Your Honor.

19             THE COURT:  Great.

20             MR. BRADY:  This meet-and-confer process, though, is

21    there going to be another status conference or -- that's my

22    only concern.  Or are we just going to address it in our

23    briefing?

24             THE COURT:  No.  I don't think we need another

25    meet-and-confer conference after this.  I think -- look, I

 1   don't want to slow-walk these cases.  These are important cases

 2   both to the State and to the Plaintiffs and the people that

 3   insist that they have these rights, and I think we need to move

 4   these cases along.

 5        So a meet-and-confer.  Give me an agreed-upon

 6   historical analysis, and then what I will do is I will give you

 7   a time period for that to be filed.  I'll give you a time

 8   period for additional briefs to be filed, and then we're going

 9   to have hearings, and we're going to put these cases to bed.

10        MR. MOROS:  Your Honor, one question.

11        Is the State to be limited in the presentation of its

12   laws to laws before the year 1900?  Because I know in their

13   supplemental briefing, they went into twentieth century laws,

14   and our position is those aren't relevant.  But if you want a

15   comprehensive view, just to get everything.

16        THE COURT:  You know, frankly, I don't see much point

17   in those because I think that there would be so many laws.  I

18   mean, let's face it, after -- there came a point when -- when

19   they began to grow exponentially.

20        I think in the Bruen opinion it talks about -- the way

21   I see it, it places greater emphasis on those laws that were,

22   essentially, in effect at the time the Second Amendment was

23   adopted, and then with a secondary emphasis at the time that

24   the Fourteenth Amendment incorporated the Second Amendment by

25   reference.  I think that's the time period.

1          In fact, I think the one -- if I'm not mistaken, the

2     one statute that regulates -- that was submitted in the Fouts

3     case, it talks about machine guns and automatic rifles, is a

4     1927 statute, if I'm not mistaken; which, frankly, I thought

5     was irrelevant, anyway.

6          So why don't we limit it to -- how about this?  How

7     about, let's say, 20 years -- how about an arbitrary and

8     capricious number that I'm going to give you?  Twenty years

9     after the Second Amendment was incorporated by the Fourteenth

10    Amendment -- or the Fourteenth Amendment was adopted.  How's

11    that?

12          MR. MOROS:  So, 1888.  Okay.

13          THE COURT:  All right.  Twenty years after the

14    Fourteenth Amendment was adopted.

15          MR. KELLY:  Your Honor, we would object to that.

16          THE COURT:  Why?

17          MR. KELLY:  In Bruen, it specifically says that

18    statutes after the Fourteenth Amendment's ratification can be

19    used as evidence so long as they do not conflict with the

20    restrictions that were in place prior to then around the

21    Founding and the Reconstruction period.

22          So we would want to reserve our right to introduce

23    those laws if -- if we do, in fact, do that.

24          THE COURT:  Can you cite me to the page in Bruen?

25          MR. KELLY:  Yes, Your Honor.

```
1              THE COURT:  And if that were the case, why would --
2   why would the Supreme Court have overturned the New York
3   statute on concealed carry?  Since there were -- I would
4   imagine there's probably 100, if not 200, statutes that have
5   prohibited the methodology for obtaining concealed carry
6   permits.
7              MR. KELLY:  So, Your Honor, the page we're referring
8   to is at 142, Supreme Court page 2153, Note 28.
9              THE COURT:  Can you read it for me?  Because I -- I
10  don't have a photographic memory.
11             MR. KELLY:  Sure, Your Honor.  Just give us one
12  moment.
13             Your Honor, the footnote says:  "We will not address
14  any of the twentieth century historical evidence brought to
15  bear by respondent or their amici.  As with their
16  late-nineteenth-century evidence, the twentieth century
17  evidence presented by Respondent's in the amici --"
18             (Court reporter interruption.)
19             MR. KELLY:  "-- the twentieth century evidence
20  presented by Respondents and their amici does not provide
21  insight into the meaning of the Second Amendment when it
22  contradicts earlier evidence."
23             And we would argue that that footnote would allow us
24  to introduce statutes and regulations post-Reconstruction so
25  long as they do not contradict earlier restrictions.
```

1          THE COURT:  The problem with that, though, as I

2     said -- how many -- how many laws have been enacted?  I mean,

3     just look at California.  Let's just take, for example, the

4     Miller case, right, the AR-15-type regulations.

5          How many of those laws have been enacted since 1927?

6     Lots and lots and lots and lots.  But how does that help me

7     decide the history and tradition of regulation of rifles --

8          MR. KELLY:  I think, Your Honor --

9          THE COURT:  -- at the time the Second Amendment was

10    adopted, or at the time the Fourteenth Amendment was adopted?

11    All that tells me is -- has happened after the Civil War when

12    states found out that, yes, they could restrict certain

13    firearms.  Right.  That all of a sudden there was an explosion

14    of restrictions because the states found out, "Hey, guess what?

15    We can do this."  So then they did it.

16         But how does that help me determine the history and

17    tradition of these laws at the time the Second Amendment was

18    adopted or at the time that the Nineteenth -- I mean the

19    Fourteenth Amendment was adopted?

20         MR. KELLY:  Your Honor, I'm only speculating that

21    these laws are out there.  I personally do not know.  I think

22    we would just want to reserve our right and not be barred from

23    doing so should it come to that.

24         THE COURT:  I'll tell you what I'll do.  I'll let you

25    file a separate one.  You can file -- you can file a separate

 1   survey, and we'll call it "Post 20 years after" -- "20 Years

 2   After the Ratification of the Fourteenth Amendment."

 3           How's that?

 4           MR. KELLY:  That sounds good, Your Honor.

 5           THE COURT:  And include as many as you want.  In fact,

 6   the more the merrier.

 7           MR. DILLON:  Your Honor, if I may?

 8           THE COURT:  Yes, go ahead.

 9           MR. DILLON:  I just wanted to clarify on the parameter

10   of exactly what you're requesting.  As I heard you, you're

11   looking for a single spreadsheet-style chronological order of

12   all the statutes, ordinances, restrictions that the State can

13   come up with that identify what was restricted, what act was

14   restricted, whether it was a law that was repealed or not

15   repealed, and whether or not it was ever brought before a

16   court.

17           And then they'll present -- they'll draft that

18   document with no argument, no expert witness testimony.

19           THE COURT:  Correct.

20           MR. DILLON:  It will just be a straight list of the

21   laws.  We will have a chance to review it as Plaintiffs.  And

22   like a summary judgment, if we have a contested issue of the

23   summary of the law that they present, we can note that contest

24   in the -- you know, a joint document?  Is that what you're --

25           THE COURT:  Sounds reasonable.  Sounds reasonable to

1    me.

2         MR. DILLON:  No problem.  Thank you, Your Honor.

3         MR. KELLY:  Your Honor, I think we would object to

4    that as well.  I think we would want, if we need to, to

5    introduce experts to interpret some of the laws and the

6    standards --

7         THE COURT:  No.

8         MR. KELLY:  -- in the language --

9         THE COURT:  No.

10        MR. KELLY:  -- and the statute --

11        THE COURT:  No.  Look -- no, no.

12        Mr. Kelly, with all due respect, I don't need -- every

13   one of these experts that you've put forth, I have read, just

14   like experts that they have put forth, like Mr. Copill, for

15   example.  Your experts -- these are people that have, you know,

16   biased points of view.  I mean, Mr. Bosey, for example -- I

17   hope I'm pronouncing his name.  The fellow who worked for --

18        MR. MOROS:  Kimber, Your Honor.

19        THE COURT:  Kimber.  Yeah.  Who at some point in time

20   had an epiphany and realized that all the work that he'd been

21   doing for all these years, selling these weapons to the public

22   was not good.  And now he works -- he's a consultant for

23   Everytown -- I'm trying to remember.

24        Anyway, look.  These people's opinions of what these

25   statutes say, right, means nothing.  It means nothing.  It's

 1   like, I remember -- I think it was Justice Brier in -- I think

 2   it was Bruen, who talked about, "Well, we need to have this

 3   factual record," and this and that, what have you.

 4            No.  702 says that the admission of expert testimony

 5   is help -- is possible if, because of the expert's knowledge,

 6   skill, or experience, it will assist the trier of fact.  Okay.

 7            But there's nothing.  I mean, I've read these

 8   declarations.  Every one of these folks come in here with a

 9   biased -- it's not like they're really neutral experts, okay,

10   or they're not experts who've come up on these opinions as a

11   result of these cases, okay, doing research for these cases.

12            These are all people that already come with

13   preconceived ideas and opinions, but their opinion is not worth

14   any more than your opinion or her opinion.  They're going to

15   tell me, "Well, in my opinion, if you look at this statute,

16   this statute means that -- you know, that the State of Wyoming

17   regulated concealed carry of brass knuckles," and so I can read

18   that.  I can figure that out by myself.

19            MR. KELLY:  Well, Your Honor, I think the issue that

20   we might have with simply creating a spreadsheet and submitting

21   it to the Court doesn't take into account that restrictions

22   were found in places other than statutes.  In our supplemental

23   briefing, we -- Professor Vorenberg testified as to how, for

24   example, in the Reconstruction period, the U.S. Army acted to

25   restrict firearms with magazines or carrying more than ten

 1    rounds.

 2           THE COURT:  When was the Reconstruction period?  It

 3    was after the Civil War.

 4           MR. KELLY:  Correct, Your Honor.

 5           THE COURT:  Yeah.  It was after the Fourteenth

 6    Amendment?

 7           MR. KELLY:  It was during the same period, Your Honor;

 8    during the same time period.

 9           THE COURT:  And why would I want to give -- in fact, I

10    think there was some discussion about this.  I thought maybe it

11    was in Bruen.

12           Why would I want to give any credit to -- to what the

13    U.S. Army was doing in their territories?  In fact, I think,

14    wasn't it Bruen that somewhat criticizes applying laws that

15    were regulations that were used in territories that --

16           MR. KELLY:  Your Honor, it goes to the history and

17    tradition of firearm regulations.  That may not be a statute.

18           THE COURT:  But, look.  If it's the State's position

19    that there's a long history and tradition to regulating

20    firearms, if that's your position, you don't need to present

21    any evidence.  I'll buy that.  I understand that.

22           Any time the State can get their -- the ability to

23    regulate something, they'll do it, and they've been regulating

24    firearms for a long time.  Right.  But that doesn't mean that

25    it's an analog to the particular statute that's at issue in the

 1    cases that I have before me.

 2            So the fact that, for example, in the territories in

 3    the Reconstruction period, the Army may not have wanted to have

 4    people to have this, that or whatever, that doesn't help me.

 5    It's not an analog.

 6            Yes, we know.  We know.  We know.  We don't have -- I

 7    don't need to take testimony of the fact that there's a history

 8    and tradition in the United States in regulating firearms.

 9    Right.  But if that were the test, if that were the test,

10    Heller would not have been decided the way it was, and neither

11    would McDonald, and neither would Bruen, and neither would

12    Caetano.

13            That's not the test.  But the test is, is there a

14    reasonable analog?  It doesn't have a twin.  It doesn't have to

15    be a twin.  But is there a reasonable analog in the history and

16    tradition of firearm regulation or arms regulation?  Because in

17    the Fouts case, we're dealing with billy clubs.

18            Is there an analog in the history and tradition of

19    regulating this type of weapon, this type of conduct, this type

20    of behavior?  That's what we're looking at.

21            So, anyway, all right.  Anyone else?

22            Yes.

23            MR. O'BRIEN:  Your Honor, just wanted to check.

24            With respect to Fouts and Rhode, what the Court's

25    requesting here, what effect does it have on kind of the

```
 1   existing posture of those cases?

 2           With respect to Fouts, the Plaintiffs have an

 3   opposition brief due on the 22nd, currently.  And Rhode, there

 4   hasn't been any order with respect to briefing.  So I'm just

 5   trying to check and see what's the -- what is kind of the

 6   process going forward.

 7           THE COURT:  Thank you.  I appreciate your mentioning

 8   that.

 9           So here's what I'd like for you to do.  As I said,

10   Professor Cornell, Spitzer, and some of these other folks, they

11   have been working on this for a really long time.  So it really

12   shouldn't take them really long to be able to come up with

13   this -- with a survey that I've requested.  So I'm going to ask

14   that that be done within 30 days.  Okay.

15           I will then -- given that, I will then give each side

16   an opportunity to file a brief, and the reason why I use the

17   word "brief," it's because I want it to be brief.  Okay.  I'm

18   not going to -- I'm not going to require a 25-page maximum, but

19   I don't think it needs to be 25 pages for you to tell me what

20   the analogs are that I should apply in your case.  And I'll

21   give you 30 days to do that.  Then I'll give you 10 days to

22   each side to file a response.

23           Now, Mr. Kelly, you said you wanted to take somebody's

24   deposition, and I'm more than happy to give you a chance to

25   depose someone.  See what happens.
```

1          So who did you want to depose?

2          MR. KELLY:  Mr. Cramer, Your Honor.

3          THE COURT:  Mr. Cramer.  Whose witness is Mr. Cramer?

4          MS. BARVIR:  Clayton Cramer is the Duncan Plaintiffs'

5    declarant.  He was responding, I think, to Professor Roth.

6          I would think that if Your Honor is going to give the

7    State some time to depose our witness, we should also get the

8    chance to depose Mr. Roth.  He was also not disclosed at any

9    point prior to filing that.

10         THE COURT:  You each have 20 days to work out an

11   agreement to -- one, to depose Mr. Cramer, to depose Mr. Roth.

12   Okay.

13         MR. STAMBOULIEH:  Yes, Your Honor.  I'm with --

14   Stephen Stamboulieh for the Fouts Plaintiffs.

15         Plaintiff Cramer is also going to be our expert even

16   though we're outside the discovery deadline.  He has,

17   obviously, not been disclosed to them as an expert, just like

18   their witnesses were not disclosed to us as an expert.

19         I'm not really sure that he needs to be deposed since

20   he's just going to be responding to Mr. Spitzer's declaration

21   of what the -- what he's found the historical analogs to be.

22   So I'm not really sure, other than wasting money and time, what

23   a deposition would bring to them.

24         I did have one question, and I -- the page length for

25   the supplemental briefs, my understanding of the local rules is

1    that we were limited to 25 pages.  We have not filed motions to

2    strike.  We have not tried to burden the docket with anything.

3    I figured I would just ask the Court.

4            Do we have the same page limit that the Defendants do,

5    which I believe was 36 pages?  We're not going to burden --

6            THE COURT:  I don't think we need 36 pages, especially

7    if we're breaking it up.  Okay.  So we've got -- so we have

8    the -- so we have the historical survey.  Right.  I don't know

9    why you would need 36 pages.  So why would you need 36 pages to

10   tell me that the history and tradition of arm regulations --

11   I'm going to use the Fouts case -- for billys is consistent

12   with the history and tradition of that which has been provided

13   to me by way of that survey?  You don't need 36 pages;

14   25 pages, max, for any opening brief, and 10 pages for any

15   reply.

16           MR. STAMBOULIEH:  Let me go back one step, Your Honor.

17           They filed the supplemental brief that this Court

18   ordered.  I'm not sure the actual date; October 17th, I

19   believe.  And they took 36 pages.  Ours is coming up.  The

20   response is due on the 22nd.

21           So my question to the Court, and perhaps the Court

22   just answered me when you limited it to 25 pages.  The reason

23   that we might need to go a little bit beyond that page limit,

24   Your Honor, is they've raised this issue and said that there's

25   really been no historical analysis of the "dangerous" -- and

1    they corrected it to be "or unusual" instead of "dangerous and

2    unusual" language.

3            THE COURT:  Yeah.  I noted that.  I noted that.  I

4    found that to be rather distressing, even though in the -- in

5    the past, they have referred to some instances as "dangerous or

6    unusual."  But as Justice Alito pointed out in his concurring

7    opinion in Caetano, anyone with a ninth-grade education can

8    read the Heller opinion and determine that, in fact, it is

9    "dangerous and unusual," i.e., the conjunctive, not a

10   disjunctive.

11           So I don't know why that keeps popping up.  I mean, I

12   heard some supposedly distinguished legal scholar make that

13   same error, and I don't know whether that's intentional or not.

14   I hope that's not intentional.

15           MR. STAMBOULIEH:  Well, the Supreme Court said

16   "dangerous and unusual," Your Honor, so we're going to go with

17   what the Supreme Court --

18           THE COURT:  That's a good thing to do.

19           MR. STAMBOULIEH:  Right.

20           THE COURT:  That's a really good thing to do.

21           MR. STAMBOULIEH:  So my question, Your Honor -- and

22   I'm sorry for taking so long on this.

23           THE COURT:  It's okay.

24           MR. STAMBOULIEH:  We have briefed "dangerous and

25   unusual."  It takes us beyond 35 pages.  It's about 35 pages.

42

1   We've briefed it.  So to the extent the Court wants to see

2   it -- if the Court limits us to 25, we'll cut the "dangerous

3   and unusual" and just cite back "see Supreme Court.  See

4   Justice Alito" who references Caetano --

5           THE COURT:  Are you saying -- are you talking about

6   whether or not the weapon is dangerous and unusual, or are you

7   talking about the fact that the test that some folks referred

8   to it as "dangerous or unusual"?  You follow what I'm saying?

9   Are you talking about the weapon?  Because, certainly, I can

10  understand, particularly in your case, talking about whether or

11  not the weapon is or is not dangerous and unusual.

12          But I don't want to talk about whether or not the test

13  is "dangerous and unusual" or "dangerous or unusual."  That has

14  been decided by somebody who's way above my pay grade.  Okay.

15          MR. BECK:  Alan Beck for the Plaintiffs Fouts, Your

16  Honor.

17          Our briefing also indicates that the phrase "dangerous

18  and unusual" doesn't actually refer to any sort of intrinsic

19  property of an arm.  Historically, in Heller, the Court

20  references the tradition of prohibiting carrying "dangerous and

21  unusual" weapons.

22          And after we took a look at what that actually was,

23  that -- that typically refers to prohibitions on carrying in

24  certain manners, that were actually what terrified people.

25          So our position is that the possession of any weapon

1    cannot be justified simply through this historical tradition of

2    carrying dangerous and unusual weapons, because it doesn't

3    refer to types of weapons; it refers to certain types of

4    conduct with weapons.

5           And in light of the fact that the State's brief was

6    36 pages, we're just hoping to have an equal-length brief as

7    the brief they filed so we can demonstrate that to the Court,

8    Your Honor.

9           THE COURT:  And you've already prepared this, you're

10   telling me?

11          MR. BECK:  Yes, Your Honor.

12          THE COURT:  Okay.  File it.

13          MR. BECK:  Thank you.

14          THE COURT:  File it.  Thank you for making my life

15   that much more difficult, but whatever.  Okay.  File it.  I'm

16   done.

17          Okay.  So -- so --

18          MR. O'BRIEN:  Your Honor --

19          THE COURT:  You have 30 days to file the survey.  You

20   have 30 days after that to file any brief that you wish to

21   file.  And this goes for both sides.  Having looked at the

22   survey, having made your decisions, et cetera, you've got

23   30 days after that to file your brief.  You've got 10 days

24   after that to file any opposition that you want to in that

25   brief.  You have 20 days to depose Mr. Cramer and Mr. Roth.

1          Anything else?

2          MR. O'BRIEN:  Your Honor, if I may.  With respect to

3    the survey due in 30 days --

4          THE COURT:  Yes.

5          MR. O'BRIEN:  -- we would request, if possible, to

6    extend that to 60 days.

7          THE COURT:  I could probably do it -- if I had the

8    time and the resources, I think I could probably do that in

9    probably less than two weeks.  The State has unlimited

10   resources.  You can do this.  Trust me, you can do it.  I've

11   looked at it.  And if I had the resources and the time to do

12   it, I could do it in probably -- I could probably do it in a

13   week.

14         MR. O'BRIEN:  Well, you know, I understand where the

15   Court is coming from.

16         I think that there's a couple of issues.  One, we do

17   have a holiday period, and I think that our resources will be

18   limited at least, you know --

19         THE COURT:  Yeah.  I hear you.  I feel your pain.

20         MR. O'BRIEN:  -- to the last week, so I think to

21   expand beyond that, that takes away one week.

22         Also, as we note, even in Fouts, even, you know, in a

23   case where, you know, we provided a lot of that historical, you

24   know, information, it's still, I think with respect to what the

25   Court's asking for, is going to, you know, require, you know,

```
 1    some additional time, especially in researching each of those

 2    laws and determining whether or not they were challenged, and

 3    what the -- what the disposition was in those cases.

 4              THE COURT:  I would imagine, Mr. O'Brien, with all due

 5    respect, that whoever came up with that -- I don't know,

 6    whatever it is, 40 pages, 30 pages of statutes or whatever,

 7    already has, pretty much, that information.  And if they

 8    submitted it to the Court for purposes of persuading the Court,

 9    they should also have the information to determine, for

10    example, whether or not that statute has been previously held

11    unconstitutional or constitutional, and should be able to

12    provide me with a citation.

13              I don't think 30 days is unreasonable.  I understand,

14    but my order remains.  All right.

15              Is there anything else?  I'm sorry.  I don't --

16              Yeah, go ahead.

17              MR. O'BRIEN:  One more, Your Honor.

18              You know, we would just also request with respect

19    to -- as you're allowing for -- I believe, in the Miller or the

20    Duncan cases, for deposing Professor Cramer.  I don't know what

21    Professor Cramer or Mr. Cramer will testify to with respect to

22    Fouts.  I would -- if we need to depose him, and I don't know

23    if they're -- you know, we want to have that opportunity to do

24    so if we need.

25              THE COURT:  Well, if you don't know what you want from
```

1    them in Fouts, what's the point of deposing him?

2            MR. O'BRIEN:  Well, we need to have an opportunity to

3    review his -- his declaration and --

4            THE COURT:  Was the declaration already filed or not?

5            MR. STAMBOULIEH:  The declaration is not filed yet,

6    Your Honor.  The declaration, I would think, is probably

7    substantially complete.  It's a rebuttal of Mr. Spitzer's

8    expert report.

9            THE COURT:  Tell you what we'll do.  Let's leave that

10   up in the air.  You take a look at it.  When you get the

11   opposition -- opposition, you get the declaration.

12           I've read Mr. Spitzer's declaration.  I'd say it's

13   probably one of the better ones I think that I've read.  If

14   after you read -- and, hopefully, you'll read it pretty

15   quickly.  But it isn't Mr. Cramer -- or is it Professor or

16   Mr. Cramer?  I hate to insult people.  But whatever it is he

17   says, if you think you need to depose him, let me know and let

18   me know quickly.

19           And if I decide that, in fact, that deposition is

20   necessary, I'll probably order that deposition to be taken on

21   very short notice, in which case I will allow you to take the

22   deposition of Mr. Spitzer.  And we'll take it from there.

23           We're going to get all this done, folks, in the time

24   period that I have set.

25           As I said, these are important cases to the State and

1    to the Plaintiffs and to the -- to the People of the State of

2    California.  So I want to move it along.  And that's that.

3    Okay.  I really appreciate you all being here.

4           MR. BRADY:  Regretfully, Your Honor, I have to raise

5    one issue --

6           THE COURT:  What's that?

7           MR. BRADY:  -- about the Rhode case that may,

8    unfortunately, complicate things.

9           And that is, the Rhode case, the analysis is a little

10   bit different than these other cases which have to do with

11   whether these specific items, right, are protected.  Here we're

12   talking about -- I don't think that there's any dispute that

13   ammunition is protected, and sale of it.  But what I suspect

14   the State, and what we've seen in the Ninth Circuit briefing,

15   their position is going to be that background checks on any

16   arm, regardless, are going to be covered historically, because

17   Bruen suggested that background checks on carry license are

18   going to be protected.

19          Our position is, obviously, going to be ammunition is

20   different, right, because the State admits that this is the

21   very first time that ammunition background check has ever been

22   put in place.  So our position is going be that's treated

23   differently.

24          But I think that we need, potentially, a backup

25   argument to make in case the State's argument carries the day

48

```
1    that background checks are generally okay or outside the scope

2    of the Second Amendment, and that is to point out that even if

3    background checks on ammunition are outside of the scope of the

4    Second Amendment, at some point the burden on them becomes so

5    great that --

6              THE COURT:  Well, I already decided that.  Didn't I

7    already decide in the ammunition case --

8              MR. BRADY:  Yes.

9              THE COURT:  -- that I thought that requiring people to

10   pay $19 every time they buy ammunition is unreasonable?

11             MR. BRADY:  Correct.

12             THE COURT:  I thought I decided that.

13             MR. BRADY:  You did, Your Honor.

14             THE COURT:  So we don't need to rehash stuff that

15   we've already gone through.

16             I think the question -- I think the question is:  Is

17   there any history or tradition that supports these background

18   checks?

19             Now, with that, Counsel, let me just say this.  The

20   Bruen case did say that background checks were okay, right,

21   with regard to the concealed carry.  Now, they also said,

22   however, that you can't impose unreasonable restrictions

23   because, you know, you can regulate the Second Amendment out of

24   existence by imposing regulations on something.  Right.

25             MR. BRADY:  Correct.  And that's what I was getting
```

1   at, Your Honor.  If you're saying that your previous findings

2   are the law of the case and the findings up to this point --

3              THE COURT:  I'm not changing my mind.

4              MR. BRADY:  Okay.  Then I -- so no --

5              THE COURT:  You know, but I do want to raise

6   something, by the way.  You know, I'm glad you mentioned that.

7   I'm going to take a wild guess that your position is that any

8   background check for buying ammunition is not reasonable.  I'm

9   putting words in your mouth.  Okay.

10             Now, I said that this regulation -- which is not what

11  the legislature had originally enacted; right?

12             MR. BRADY:  Correct.

13             THE COURT:  This -- the way the bureaucracy has now

14  regulated purchases of ammunition is unreasonable.  But I guess

15  what I'm offering to you folks to talk about is whether or

16  not -- and I don't expect that this will be fruitful, but I

17  have to offer it because I think it's possible that if there

18  was a consent decree that said that the regulation of

19  purchasing ammunition as set forth by the legislature in the

20  legislative enactment would be what would be required, my

21  analysis might be very different.

22             And so I'm thinking that that perhaps might be a way

23  to compromise a resolution of that case.  I just offer that as

24  an idea, folks, but you can do with it whatever you wish.

25             I've spent about as much time on this case as I'm

```
 1    going to.  So I need to go, unless there's something really,

 2    really, really important you need to address.

 3            MR. BECKINGTON:  Your Honor, I apologize for testing

 4    your patience.  I'll be very brief.

 5            THE COURT:  Okay.

 6            MR. BECKINGTON:  Just for the clarification of the

 7    record, we did have a motion for reconsideration.  We did have

 8    requests, I think, both in the Miller and in Fouts and Rhode

 9    for the additional time to do discovery, to submit evidence,

10    et cetera.

11            Is the Court making a formal rule on those matters --

12            THE COURT:  Nothing -- nothing is -- the only thing

13    that has changed -- the only thing that has changed since I

14    issued my rulings on the cases that I've issued rulings is what

15    Bruen -- the Bruen opinion says, which is that we consider the

16    history and tradition of the firearm regulation or the arm

17    regulation.  Okay.  That's the only thing that has changed.

18            All right.  Thank you.  Thank you very much.

19            MR. O'BRIEN:  Just one other thing, Your Honor.

20    Apologize.  Is the Court going to be issuing a written order?

21    We did the best we can to kind of keep track of what you were

22    looking for with respect to the survey, but I just wanted to

23    clarify that as well.

24            THE COURT:  Well, you couldn't write that fast?

25            MR. O'BRIEN:  I tried, Your Honor.
```

1          MR. DILLON:  We have to summarize, Your Honor.

2          MR. O'BRIEN:  Yeah.

3          THE COURT:  We'll do our best.  I'll issue a written

4   order.  Thank you very much.  And I appreciate you all being

5   here.

6          (The proceedings were adjourned at 11:50 a.m.)

7                           -oOo-

8                  **C E R T I F I C A T E**

9          I, Abigail R. Torres, certify that I am a duly
    qualified and acting Official Court Reporter for the United
10  States District Court; that the foregoing is a true and
    accurate transcript of the proceedings as taken by me in the
11  above-entitled matter on December 12, 2022, and that the format
    used complies with the rules and requirements of the United
12  States Judicial Conference.

13  DATED:  December 20, 2022, San Diego.
    S/ABIGAIL R. TORRES
14  _____
    Abigail R. Torres, CSR No. 13700
15  U.S. Official Court Reporter

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 19

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7  Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and*
   *Allison Mendoza, in their official capacities*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **DECLARATION OF JOHN D. ECHEVERRIA RE SUBMISSION OF SURVEYS IN RESPONSE TO THE COURT'S ORDER ENTERED ON DECEMBER 15, 2022** |
| v. | |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | |
| Defendants. | Dept:         5A |
| | Judge:        Hon. Roger T. Benitez |
| | Action Filed:  August 15, 2019 |

19    I, John D. Echeverria, declare as follows:

20         1.    I am a Deputy Attorney General with the California Department of

21    Justice and serve as counsel to Defendants Rob Bonta, in his official capacity as

22    Attorney General of the State of California, and Allison Mendoza, in her official

23    capacity as Acting Director of the Bureau of Firearms ("Defendants"),[1] in the

24    above-captioned matter.  Except as otherwise stated, I have personal knowledge of

25         _____
           [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
26    Attorney General of the State of California, and Allison Menndoza, now Acting
      Director of the Bureau of Firearms, has succeeded former Acting Director Blake
27    Graham, who in turn succeeding former Director Luis Lopez, who succeeded
      former Interim Director Brent E. Orick.  Pursuant to Federal Rule of Civil
28    Procedure 25(d), Attorney General Bonta and Acting Director Mendoza, in their
      respective official capacities, are substituted as the defendants in this case.

1   the facts set forth in this declaration, and if called upon as a witness I could testify
2   competently as to those facts.

3       2.      On December 15, 2022, the Court entered an Order providing that
4   "[t]he state defendants shall create, and the plaintiffs shall meet and confer
5   regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in
6   chronological order." Dkt. 161.  The Order provides:

> The listing shall begin at the time of the adoption of the Second
> Amendment and continue through twenty years after the Fourteenth
> Amendment. For each cited statute/law/regulation, the survey shall
> provide: (a) the date of enactment; (b) the enacting state, territory, or
> locality; (c) a description of what was restricted (e.g., dirks, daggers,
> metal knuckles, storage of gunpowder or cartridges, or use regulations);
> (d) what it was that the law or regulation restricted; (e) what type of
> weapon was being restricted (e.g., knife, Bowie Knife, stiletto, metal
> knuckles, pistols, rifles); (f) if and when the law was repealed and
> whether it was replaced; (g) whether the regulation was reviewed by a
> court and the outcome of the courts review (with case citation).
> Defendants may create a second survey covering a time period following
> that of the first list. If opposing parties cannot agree on the inclusion of a
> particular entry on the survey, the disagreement shall be indicated and
> described on a separate list.

15      3.      On January 4, 2023, undersigned counsel for Defendants emailed
16  surveys of laws that Defendants have determined are relevant to this action.  On
17  January 10, 2023, George Lee, counsel for Plaintiffs in this action, emailed the
18  following response:  "You may indicate to the court that due to the length of
19  defendants' surveys, plaintiffs will reserve all objections to the form of the surveys,
20  and the relevance of the purported statutes contained therein, until the filing of their
21  responsive brief in thirty (30) days per the court's order of Dec. 12, 2022 (ECF
22  161)."

23      4.      In compliance with the Court's Order, Defendants are hereby
24  submitting Defendant's two surveys of relevant laws.

25      5.      Attached hereto as **Exhibit 1** is a true and correct copy of Defendants'
26  Survey of Relevant Statutes (Pre-Founding – 1888).

27      6.      Attached hereto as **Exhibit 2** is a true and correct copy of Defendants'
28  Survey of Relevant Statutes (1889 – 1930s).

2

7.     The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment.  In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause.  While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians.  The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 11, 2023, at San Francisco, California.

<div align="right">

*s/ John D. Echeverria*
John D. Echeverria

</div>

Declaration of John D. Echeverria re Submission of Surveys (3:19-cv-01537-BEN-JLB)

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)[1, 2]**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 1 | 1383 | England | 7 Rich. 2, ch. 13 (1383) | Prohibited possession of launcegays. Punished by forfeiture of the weapon. | Launcegay | | |
| 2 | 1396 | England | 20 Rich. 2, ch. 1 (1396) | Prohibited possession of launcegays. Punished by forfeiture of the weapon. | Launcegay | | |
| 3 | 1541 | England | 33 Hen. 8, ch. 6 §§ 1, 18 (1541) | Prohibited possession of any crossbow, handgun, hagbutt, or demy hake. Exempted subjects living within 12 miles of the Scottish border. Punishable by forfeiture or payment of 10 pounds. | Pistol; Crossbow | | |
| 4 | 1606 | England | 4 Jac. I, ch. 1 (1606) | Repealed exemption for subjects living with 12 miles of the Scottish border for the keeping of crossbows, handguns, and demy hakes. | Club; Other weapon | | |
| 5 | 1664 | New York | The Colonial Laws of New York from the Year 1664 to the Revolution . . ., at 687 (1894) | Prohibited a slave from possessing or using a gun, pistol, sword, club, or other kind of weapon unless in the presence | Gun; Pistol; Sword; Club; | Unconstitutional under the Thirteenth and/or Fourteenth | |

[1] In compliance with the Court's Order dated December 15, 2022 (Dkt. 161), Defendants created this survey of statutes, laws, and regulations that Defendants have determined are relevant to this action. Plaintiffs have indicated that, "due to the length of defendants' surveys, plaintiffs will reserve all objections to the form of the surveys, and the relevance of the purported statutes contained therein, until the filing of their responsive brief in thirty (30) days per the court's order of Dec. 12, 2022 (ECF 161)."

[2] The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment. In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause. While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians. The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|----------------|-----------------|
| | | | | and at the direction of their Master or Mistress. | Other kind of weapon | Amendments to the U.S. Constitution | |
| 6 | 1686 | New Jersey | The Grants, Concessions, and Original Constitutions of The Province of New Jersey 289-90 (1881) (1686) | Prohibited the carrying "privately" of any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons. Punishable by fine of 5 pounds for first conviction, and punishable by imprisonment for 6 months and a fine of 10 pounds. | Pistol; Skeines; Stilettoes; Dagger; Dirk; Other unusual or unlawful weapons | | |
| 7 | 1689 | England | English Bill of Rights of 1689, 1 Wm. & Mary ch. 2, § 7 | Provided a right for Protestants to have "Arms for their Defense . . . as allowed by law." | Arms for defense | | |
| 8 | 1750 | Massachusetts | 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 17, § 1 | Prohibited the carrying of a club or other weapon while unlawfully, riotously, or tumultuously assembling. Punishable by seizing the weapon and a hearing before the court. | Club; Other weapon | | |
| 9 | 1769 | England | 1 Blackstone ch. 1 (1769) | Recognized the "fifth and last auxiliary right," which provided that Protestant subjects had the right to "arms for their defence" "such as are allowed by law." | Arms for defense | | |
| 10 | 1771 | New Jersey | 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | Prohibited the setting of any trap gun intended to discharge by any string, rope, or other contrivance. Punishable by forfeiture of the firearm and fine of 6 pounds. | Trap gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 11 | 1783 | Massachusetts – City of Boston | 1783 Mass. Acts 37, § 2 | Prohibited the possession of any "fire arms," and among other devices, loaded with any gun powder.  Punishable by forfeiture and sale at public auction. | Gunpowder | | |
| 12 | 1784 | New York – City of New York City | 1784 Laws of N.Y. 627, ch. 28 | Prohibited any person to keep any quantity of gun powder exceeding 28 pounds and required storage in separate containers.  Punishable by forfeiture and fine. | Gunpowder | | |
| 13 | 1786 | Massachusetts | An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, MA), Nov. 17, 1786, at 1 | Prohibited being armed with a club or other weapon while rioting. | Club; Other weapon | | |
| 14 | 1788 | Ohio [Territory] | 1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . ., ch. 6 | Prohibited the carrying of any "dangerous weapon" that indicates a violent intention while committing a burglary.  Punishable by imprisonment for up to 40 years. | Any dangerous weapon | | |
| 15 | 1792 | Virginia | Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force . . . ., at 187 (1803), §§ 8-9 | Prohibited any "negro or mulatto" from possessing or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |

3

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 16 | 1797 | Delaware | Del. Laws 104, An Act for the Trial of Negroes, ch. 43, § 6 | Prohibited "any Negro or Mulatto slave" from carrying guns, swords, pistols, fowling pieces, clubs, or other arms and weapons without the master's special license. | Gun; Sword; Pistol; Fowling pieces; Club; other arms and weapons | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 17 | 1798 | Kentucky | 1798 Ky. Acts 106 | Prohibited "negro, mulatto, or Indian" from possessing or carrying a gun, powder, shot, club, or other weapon or ammunition. | Gun; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 18 | 1799 | Mississippi [Territory] | 1799 Miss. Laws 113, A Law for The Regulation of Slaves | Prohibited any "Negro or mulatto" from carrying gun, powder, shot, club, or other weapon. Also prohibits a "negro or mulatto" from possessing a gun, weapon, or ammunition. | Gun; Powder; Shot; Cub; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 19 | 1799 | New Jersey | Charles Nettleton, Laws of the State of New-Jersey, at 474 (1821), [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 20 | 1801 | Tennessee | 1801 Tenn. Act 260-61 | Prohibited the private carrying of "any dirk, large knife, pistol, or any other dangerous weapon, to | Dirk; Large knife; Pistol; | | |

4

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|------------------|
| | | | | the fear or terror of any person," unless a surety is posted. Punishable as for "breach of the peace, or riot at common law." | Other dangerous weapon | | |
| 21 | 1804 | Indiana [Territory] | 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4 | Prohibited a "slave or mulatto" from carrying or possessing a gun, powder, shot, club or other weapon and ammunition. | Gun; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 22 | 1804 | Mississippi [Territory] | 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | Prohibited a "Slave" from keeping or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 23 | 1811 | Maryland | The Laws of Maryland, with the Charter, the Bill Of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments, at 465 (1811) | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment for 3 months to 2 years. | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 24 | 1813 | Louisiana | 1813 La. Acts 172, An Act Against Carrying | Prohibited the carrying of any concealed weapon, including a | Dirk; Dagger; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 | dirk, dagger, knife, pistol, or any other deadly weapon. | Knife; Pistol; Other deadly weapon | | |
| 25 | 1816 | Georgia | Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions, at 599 (1821), Offences Against the Public Peace, (1816) § 19 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment with hard labor for a period of time to be determined by a jury. | Picklock; Key; Crow; Jack; Bit or other implement; Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 26 | 1818 | Missouri [Territory] | Organic Laws:-Laws of Missouri Territory, (Alphabetically | Prohibited "slave or mulatto" from carrying a gun, powder, shot, club or other weapon and | Gun; Powder; Shot; | Unconstitutional under the Thirteenth | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates, at 374 (1818), Slaves, § 3 | from possessing a gun or ammunition. | Club; Other weapon; Ammunition | and/or Fourteenth Amendments to the U.S. Constitution | |
| 27 | 1821 | Maine | 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 1 | Prohibited any person from possessing any gunpowder, in any quantity, unless permitted by local rules and regulations. | Gunpowder | | |
| 28 | 1835 | Arkansas [Territory] | Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | Prohibited any "slave or mulatto" from keeping or carrying a gun, powder, shot, club, or other weapon. | Firearm; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 29 | 1836 | Massachusetts | Mass. Rev. Stat., ch. 134, § 16 (1836) | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Punishable by finding sureties for keeping the peace for a term up to 6 months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 30 | 1836 | Connecticut – Cities of Hartford, New Haven, New | 1836 Conn. Acts 105, ch. 1, § 20 | Authorizing the local court of common counsel to prohibitand regulate the storage of gun powder. | Gunpowder | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | London, Norwich, and Middletown | | | | | |
| 31 | 1837 | Alabama | 1837 Ala. Acts 7, §§ 1, 2 | Imposed tax of $100 on any person selling, giving, or disposing of any Bowie knife or Arkansas toothpick. Failure to pay the tax was subject to penalty of perjury. | Knife | Tax reduced in 1851. | |
| 32 | 1837 | Arkansas | Josiah Gould, A Digest of the Statutes of Arkansas Embracing All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 1856 380 381–82 (1837) | Prohibited the concealed carrying of any pistol, dirk, butcher or large knife, sword cane, unless "upon a journey." | Pistol; Dirk; Butcher knife; Sword cane | | *State v. Buzzard*, 4 Ark. 18 (1842) (upholding law under the Second Amendment and state constitution); *Fife v. State*, 31 Ark. 455 (1876) |
| 33 | 1837 | Georgia | Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838) | Prohibited any merchant, or "any other person or persons whatsoever," to sell, offer to sell, keep, or have on their person or elsewhere any Bowie knife or "any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence," pistols, swords, sword canes, or spears. Exempted | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear | | *Nunn v. State*, 1 Ga. 243 (1846) (held unconstitutional under Second Amendment). |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | | "such pistols as are known as horseman's pistols" from these restrictions.  Punishable by a fine of up to $100-500 for the first offense and $500-1,000 for subsequent offenses. | | | |
| 34 | 1837 | Mississippi | 1837 Miss. L. 291-92 | Prohibited the use of any rifle, shotgun, sword cane, pistol, dirk, dirk knife, Bowie knife, or any other deadly weapon in a fight in which one of the combatants was killed, and the exhibition of any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon in a rude or threatening manner that was not in necessary self-defense. Punishable by liability to decedent and a fine of up to $500 and imprisonment for up to 3 months. | Rifle; Shotgun; Sword cane; Pistol; Dirk; Dirk knife; Bowie knife; Sword; Sword cane; Other deadly weapon | | |
| 35 | 1837 | Mississippi – Town of Sharon | 1837 Miss. L. 294 | Authorized the town of Sharon to enact "the total inhibition of the odious and savage practice" of carrying dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 36 | 1837 | Tennessee | 1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 2 | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, or other knife or weapon.  Punishable by fine of $200-500 and imprisonment for 3-6 months. | Bowie knife; Arkansas toothpick; Other knife or weapon | | *Haynes v. Tennessee*, 24 Tenn. 120 (1844) (upheld conviction for unlawful |

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | | | carrying of a Bowie knife). |
| 37 | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1. | Prohibited any merchant from selling a Bowie knife or Arkansas tooth pick. Punishable by fine of $100-500 and imprisonment for $1-6 months. | Bowie knife; Arkansas toothpick | | |
| 38 | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4 | Prohibited the stabbing or cutting of another person with any knife or weapon known as a "Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife," regardless of whether the person dies. Punishable by imprisonment for 3-15 years. | Bowie knife; Arkansas toothpick; Any knife or weapon that resembles a bowie knife | | |
| 39 | 1838 | Tennessee | Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-38, at 200-01, ch. 137 | Prohibited the sale or transfer of any Bowie knife or knives, Arkansas toothpicks, or "any knife or weapon that shall in form shape or size resemble a Bowie knife or any Arkansas toothpick." | Bowie knife; Arkansas toothpick; Any similar knife | | *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840) (upheld under state constitution). |
| 40 | 1838 | Virginia | Acts of the General Assembly of Virginia, Passed at the Session of 1838, at 76-77, ch. 101 (1838) | Prohibited "habitually or generally" carrying any concealed pistol, dirk, Bowie knife, or any other weapon of like kind. | Pistol; Dirk; Bowie knife; Other similar weapon | | |
| 41 | 1839 | Alabama | 1839 Ala. Acts 67, § 1 | Prohibited the concealed carrying of "any species of fire | Knife; Deadly weapon | | *State v. Reid*, 1 Ala. 612 |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." Punished by fine of $50-100 and imprisonment not to exceed 3 months. | | | (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 42 | 1839 | Florida [Territory] | John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840, at 423 (1839), An Act to Prevent any Person in this Territory from Carrying Arms Secretly | Prohibited the concealed carrying of "any dirk, pistol, or other arm, or weapon, except a common pocket-knife." Punishable by fine of $50-500 or imprisonment for 1-6 months. | Dirk; Pistol; Other arm or weapon | | |
| 43 | 1839 | Mississippi – Town of Emery | 1839 Miss. L. 385, ch. 168 | Authorized the town of Emery to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 44 | 1840 | Mississippi – Town of Hernando | 1840 Miss. L. 181, ch. 111 | Authorized the town of Hernando to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 45 | 1841 | Alabama | 1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4 | Prohibited the concealed carrying of "a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any | Knife; Pistol; Air gun; Other deadly weapon | | |

**_Miller v. Bonta_**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | species of firearms, or air gun," unless the person is threatened with an attack or is traveling or "setting out on a journey." Punished by a fine of $50-100. | | | |
| 46 | 1841 | Maine | 1841 Me. Laws 709, ch. 169, § 16. | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to six months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 47 | 1841 | Mississippi | 1841 Miss. 52, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife. | Bowie knife | Tax reduced in 1850 | |
| 48 | 1842 | Louisiana | Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842) | Prohibited the carrying of " any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Punishable by fine of $20-50. | Dirk; Dagger; Knife; Pistol; Other deadly weapon | | |
| 49 | 1845 | Illinois | Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A.D. 1844-45: Together with an Appendix | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person. Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force , at 176 (1845), Criminal Jurisprudence, § 139 | | | | |
| 50 | 1846 | North Carolina | 1846 N.C. L., ch. 42 | Prohibited "any slave" from receiving any sword, dirk, Bowie knife, gun, musket, firearms, or "any other deadly weapons of offense" without written permission. | Sword; Dirk; Bowie knife; Gun; Musket; Firearms; Other deadly weapons of offense | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 51 | 1847 | Maine | The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix, at 709 (1847), Justices of the Peace, § 16 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to one year. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 52 | 1849 | California – City of San Francisco | 1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127 | Prohibited the carrying, with intent to assault any person, any pistol, gun, knife, dirk, bludgeon, or other offensive | Pistol; Gun; Knife; Dirk; | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | | weapon with the intent to assault another person.. Punished by fine of up to $100 and imprisonment for up to 3 months. | Bludgeon; Other offensive weapon | | |
| 53 | 1850 | Mississippi | 1850 Miss. 43, ch. 1 | Imposed an annual property tax of 50 cents on each Bowie knife. | Bowie knife | Tax increased to $1 in 1854 | |
| 54 | 1851 | Alabama | 1851-52 Ala. 3, ch. 1 | Tax of $2 on "every bowie knife or revolving pistol." | Bowie knife; Pistol | Additional weapons added in 1867. | |
| 55 | 1851 | Illinois – City of Chicago | Ordinances of the City of Chicago, Ill., ch. 16, § 1 | Prohibiting the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent written permission of the authorities.  Punishable by a fine of $25 per offense. | Gunpowder | | |
| 56 | 1851 | Pennsylvania – City of Philadelphia | 1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop of Philadelphia, to Convey Certain Real Estate in the Borough of York, and a Supplement to the Charter of Said Borough, § 4 | Prohibited the willful and malicious carrying of any pistol, gun, dirk, knife, slungshot, or deadly weapon.  Punishable by imprisonment for 6 months to 1 year and security for future good behavior. | Pistol; Gun; Dirk; Slungshot; Deadly weapon | | |
| 57 | 1853 | California | S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, | Prohibited carrying of pistol, gun, knife, dirk, bludgeon, or other offensive weapon with intent to assault.  Punishable by fine of up to $100 or imprisonment for up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |

14

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Passed at the Sessions of 1850-51-52-53, § 127 | | | | |
| 58 | 1853 | New Mexico [Territory] | 1853 N.M. Laws 406, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, § 25 | Prohibited the carrying of a concealed pistol, Bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon. | Pistol; Bowie knife; Cuchillo de cinto (belt buckle knife); Arkansas toothpick; Spanish dagger; Slungshot; Other deadly weapon | *See also* 1859 N.M. L. 94-96 (same). | |
| 59 | 1854 | Mississippi | 1854 Miss. 50, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, Arkansas toothpick, sword cane, and dueling or pocket pistol. | Bowie knife; Arkansas toothpick; Sword cane; Dueling or pocket pistol | Amended in 1856 to exclude pocket pistols from the tax | |
| 60 | 1854 | Washington [Territory] | 1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon.  Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 61 | 1855 | California | 1855 Cal. L. 152-53, ch. 127 | Provided that a person who killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon" would pay the decedent's debts and be liable to | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | the decedent's family for liquidated damages. | Other dangerous weapon | | |
| 62 | 1855 | Indiana | 1855 Ind. Acts 153, An Act to Provide for the Punishment of Persons Interfering with Trains or Railroads, ch. 79, § 1 | Prohibited the carrying of any dirk, pistol, Bowie knife, dagger, sword in cane, or any other dangerous or deadly weapon with the intent of injuring another person. Exempted any person who was a "traveler." Punishable by fine up to $500. | Dirk; Pistol; Bowie knife; Dagger; Sword cane; Other dangerous or deadly weapon | *See also* 1859 Ind. L. 129, ch. 78 (same); 1881 Ind. L. 191, ch. 37. | |
| 63 | 1855 | Louisiana | 1855 La. L. 148, ch. 120 | Prohibited the concealed carrying of "pistols, bowie knife, dirk, or any other dangerous weapon." | Pistol; Bowie knife; Dirk; Other dangerous weapon | | |
| 64 | 1856 | Mississippi | 1856-1857 Miss. L. 36, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, dirk knife, or sword cane. | Bowie knife; Dirk knife; Sword cane | Modified in 1861 to preclude collection of the tax during the Civil War (1861-1862 Miss. L. 134, ch. 125) | |
| 65 | 1856 | Tennessee | 1855-56 Tenn. L. 92, ch. 81 | Prohibited the sale or transfer of any pistol, Bowie knife, dirk, Arkansas toothpick, or hunter's knife to a minor. Excepted the transfer of a gun for hunting. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| 66 | 1856 | Texas | Tex. Penal Code arts. 611-12 (enacted Aug. 28, 1856) | Provided that the use of a Bowie knife or a dagger in manslaughter is to be deemed murder. | Bowie knife; Dagger | | *Cockrum v. State*, 24 Tex. 394 (1859) (upheld under Second Amendment and Texas Constitution). |
| 67 | 1858 | Minnesota – City of St. Paul | Ordinances of the City of St. Paul, Minn., ch. 21, § 1 | Prohibited the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent payment of $5 to the City Treasurer and written permission of the authorities.  Authorized any person to "keep for his own use" no more than 1 pound of gun powder or gun cotton at any one time.  Punishable by a fine not to exceed $50 per offense. | Gunpowder | | |
| 68 | 1858 | Nebraska [Territory] | 1858 Neb. Laws 69, An Act to Adopt and Establish a Criminal code for the Territory of Nebraska, § 135 | Prohibited the carrying of a pistol, gun, knife, dirk, bludgeon or other offensive weapon with the intent to assault a person.  Punishable by fine up to $100. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 69 | 1859 | Kentucky – Town of Harrodsburg | 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23 | Prohibited the selling, giving, or loaning of a concealed pistol, dirk, Bowie knife, brass knuckles, slungshot, colt, cane-gun, or other deadly weapon to a "minor, slave, or free negro." Punishable by fine of $50. | Pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Colt; Cane-gun; | Unconstitutional under the Thirteenth and/or Fourteenth Amendments | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | | Other deadly weapon | to the U.S. Constitution | |
| 70 | 1859 | Ohio | 1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1 | Prohibited the concealed carrying of any pistol, Bowie knife, or any other "dangerous weapon." Punishable by fine of up to $200 or imprisonment of up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | | |
| 71 | 1859 | Washington [Territory] | 1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 72 | 1860 | Georgia | 1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1. | Prohibited the sale or furnishing of any gun, pistol, Bowie knife, slungshot, sword cane, or other weapon to a "slave or free person of color." Punishable by fine up to $500 and imprisonment up to 6 months. | Gun; Pistol; Bowie knife; Slungshot; Sword cane; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 73 | 1861 | California | William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in | Prohibited the display of any dirk, dirk-knife, Bowie knife, sword, sword cane, pistol, gun, or other deadly weapon in a threatening manner, or use of | Dirk; Bowie knife; Sword; Sword cane; Pistol; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., at 334 (1861) | such weapon in a fight. Punishable by a fine of $100-500 or imprisonment for 1-6 months. | Gun; Other deadly weapon | | |
| 74 | 1861 | Nevada [Territory] | 1861 Nev. L. 61 | Provided that the killing of another in a duel with a rifle, shotgun, pistol, Bowie knife, dirk, small-sword, back-sword, or other "dangerous weapon" in the killing of another in a duel is to be deemed murder. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; Other dangerous weapon | | |
| 75 | 1862 | Colorado [Territory] | 1862 Colo. Sess. Laws 56, § 1 | Prohibited the concealed carrying in any city, town, or village any pistol, Bowie knife, | Pistol; Bowie knife; Dagger; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | dagger, or other deadly weapon. Punished by fine of $5-35. | Other deadly weapon | | |
| 76 | 1863 | Kansas – City of Leavenworth | C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix, at 45 (1863), An Ordinance Relating to Misdemeanors, § 23 | Prohibited the carrying of any concealed "pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city." Punishable by a fine of $3-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Brass; lead or iron knuckles; Other deadly weapon | | |
| 77 | 1863 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 190 (1863), Offences Affecting Public Safety: Carrying Concealed Weapons, § 3 | Prohibited the carrying of a concealed pistol, Bowie knife, dirk, or any other deadly weapon. Punishable by fine of $10-50. | Pistol; Bowie knife; Dirk; Other deadly weapon | | |
| 78 | 1864 | California | Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of | Prohibited the concealed carrying of any dirk, pistol, sword cane, slungshot, or "other dangerous or deadly weapon." Exempted any peace officer or officer acting under the law of the United States. Punishable by imprisonment for 30-90 days or fine of $20-200. | Dirk; Pistol; Sword cane; Slungshot; Other deadly or dangerous weapon | Repealed 1869-70 Cal. Sess. Laws, ch. 63 (provided that pending cases be heard and tried as if not repealed) | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon, at 261, § 1 (1868) | | | | |
| 79 | 1864 | Montana [Territory] | 1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1 | Prohibited the carrying of a concealed "any pistol, bowie-knife, dagger, or other deadly weapon" within any town or village in the territory. Punishable by fine of $25-100. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 80 | 1865 | Utah [Territory] | An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866), § 102 | Prohibited the "set[ting] of any gun." Punishable by imprisonment of up to 1 year or a fine of up to $500. | Trap gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 81 | 1866 | New York | Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index, at 2512 (Vol. 3, 1882), An Act to Prevent the Furtive Possession and use of slungshot and other dangerous weapons, ch. 716, § 1 | Prohibited using, attempting to use, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, and any dirk or dagger, or sword cane or air-gun. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Sword cane; Air gun | | |
| 82 | 1866 | North Carolina | 1866 N.C. L. ch. 21, at 33-34, § 11 | Imposed a $1 tax on every dirk, Bowie knife, pistol, sword cane, dirk cane, and rifle cane used or worn during the year. | Dirk; Bowie knife; Pistol; Sword cane; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Dirk cane; Rifle cane | | |
| 83 | 1867 | Alabama | 1867 Ala. Rev. Code 169 | Tax of $2 on pistols or revolvers in the possession of private persons, excluding dealers, and a tax of $3 on "all bowie knives, or knives of the like description."  Non-payment was punishable by seizure and, unless payment was made within 10 days with a penalty of an additional 50%, subject to sale by public auction. | Pistol; Bowie knife | | |
| 84 | 1867 | Colorado [Territory] | 1867 Colo. Sess. Laws 229, § 149 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon within any city, town, or village in the territory. Punishable by fine of $5-35. Exempted sheriffs, constables, and police officers when performing their official duties. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 85 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 44 (1867), Police Regulations of the State, Offences Against Public | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, dirk, sword cane, Spanish stiletto, belt or pocket pistol, or other knife or weapon.  Also prohibited selling such a weapon or using such a weapon to threaten people. | Bowie knife; Arkansas toothpick; Dirk; Sword cane; Spanish stiletto; Belt; Pocket pistol; Other knife or weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | Peace, §§ 4746, 4747, 4753, 4757 | | | | |
| 86 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 50 (1867), Police Regulations of the State. Selling Liquors or Weapons to Minors, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling.  Punishable by fine of minimum $25 and imprisonment. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | | |
| 87 | 1868 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4111 (Act of Aug. 5, 1868, at 1) | Prohibited the carrying of any rifle or "shot-gun walking cane."  Punishable by fine of $500-1000 and imprisonment of no less than 2 years. | Rifle; Shotgun walking cane | | |
| 88 | 1868 | Florida | Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892), at 2425 | Prohibited the manufacture or sale of slungshots or metallic knuckles.  Punishable by imprisonment for up to 6 months or a fine up to $100. | Slungshot; Metallic knuckles | | |
| 89 | 1868 | Florida | 1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, ch. 7, § 10 | Prohibited the carrying of a slungshot, metallic knuckles, billies, firearms or other dangerous weapon if arrested for committing a criminal offence or disturbance of the peace.  Punishable by imprisonment up to 3 months or a fine up to $100. | Slungshot; Metallic knuckles; Billy; Firearms; Other dangerous weapon | | |

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 90 | 1868 | Florida | James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, at 403 (1881), Offences Against Public Peace, § 13 (Fla. Act of Aug. 6, 1868, ch. 1637) | Prohibited the carrying "about or on their person" any dirk, pistol or other arm or weapon, except a "common pocket knife." Punishable by fine up to $100 or imprisonment up to 6 months. | Dirk; Pistol; Other arm or weapon | | |
| 91 | 1869 | Tennessee | 1869-70 Tenn. L. 23-24, ch. 22 | Prohibited the carrying of any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." | Pistol; Dirk; Bowie knife; Arkansas toothpick; Other "deadly or dangerous weapon" | | *Andrews v. State*, 50 Tenn. 165 (1871) (upheld under state constitution) |
| 92 | 1869 | Washington [Territory] | 1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 93 | 1870 | Georgia | 1870 Ga. L. 421, ch. 285 | Prohibited the open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of | Dirk; Bowie knife; Pistol; Revolver; | Law enforcement exception added in | *Hill v. State*, 53 Ga. 472 (1874) (upheld |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | justice, or any general election ground or precinct, or any other public gathering," except for militia musters. | Any kind of deadly weapon | 1879. *See* 1879 Ga. L. 64, ch. 266 | under state constitution) |
| 94 | 1870 | Louisiana | 1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . ., § 73 | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife or other dangerous weapon on an election day during the hours the polls are open or during registration. Punishable by fine of minimum $100 and imprisonment of minimum 1 month. | Gun; Pistol; Bowie knife; Other dangerous weapon | | |
| 95 | 1870 | New York | "The Man Trap," The Buffalo Commercial, Nov. 1, 1870 | Referenced prohibition on the use of "infernal machines." | Trap gun; Infernal machine | | |
| 96 | 1871 | Arkansas – City of Little Rock | George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City 230-31 (1871) | Prohibited carrying of a pistol, revolver, Bowie knife, dirk, rifle, shot gun, slungshot, colt, or metal knuckles while engaged in a breach of the peace. Punishable by a fine of $25-500. | Pistol; Revolver; Bowie knife; Dirk; Rifle; Shotgun; Slungshot; Colt; Metal knuckles | | |
| 97 | 1871 | District of Columbia | An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872) (Dist. of Col., An | Prohibited the carrying or having concealed "any deadly or dangerous weapons, such as daggers, air-guns, pistols, Bowie knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slungshots, or brass or | Dangerous weapon; Dagger; Air-guns; Pistols; Bowie knife; Dirk; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Act to Prevent the Carrying of Concealed Weapons, 1871, ch. XXV) | other metal knuckles." Punishable by forfeiture of the weapon and a fine of $20-50. | Razor; Sword-cane; Slungshot; Metal knuckles | | |
| 98 | 1871 | Mississippi | 1871 Miss. L. 819-20, ch. 33 | Imposed property tax on pistols, dirks, Bowie knives, and sword canes. | Pistol; Dirk; Bowie knife; Sword cane | *See also* 1876 Miss. L. 131, 134, ch. 103; 1878 Miss. L. 27, 29, ch. 3; 1880 Miss. L. 21, ch. 6; 1892 Miss L. 194, ch. 74; 1894 Miss L. 27, ch. 32 | |
| 991 | 1871 | Missouri – City of St. Louis | Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City, at 491-92 (1871), Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10. | Prohibited the carrying of a concealed pistol, or revolver, colt, billy, slungshot, cross knuckles, or knuckles of lead, brass or other metal, Bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon without written permission from the Mayor.  Punishable by fine of $10-500. | Pistol; Revolver; Colt; Billy; Slungshot; Cross knuckles; Metal knuckles; Bowie knife; Razor; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| 100 | 1871 | Tennessee | James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code, at 108 (Nashville, 1871) | Prohibited the carrying of a pistol, dirk, Bowie knife, Arkansas tooth pick, or other weapon in the shape of those weapons, to an election site. Punishable by fine of minimum $50 and imprisonment at the discretion of the court. | Pistol; Dirk; Bowie knife; Arkansas toothpick | | |
| 101 | 1871 | Texas | 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons. § 1 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any other kind of knife used for offense or defense, unless carried openly for self-defense. Punishable by fine of $20-100, forfeiture of the weapon, and for subsequent offenses, imprisonment up to 60 days. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any other kind of knife used for offense or defense | | *English v. State*, 35 Tex. 473 (1872) (upheld as constitutional under Second Amendment and Texas Constitution); *State v. Duke*, 42 Tex. 455 (1875) (upheld as constitutional under Texas Constitution) |
| 102 | 1871 | Texas | Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879). Art. 163. | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife, or other dangerous weapon within a half mile of a polling site on an election day. Also prohibited generally carrying a pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass-knuckles; Bowie knife; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | other kind of knife used for offense or defense.  Punishable by fine and forfeiture of the weapon. | Other dangerous weapon; Other knife used for offense or defense | | |
| 103 | 1872 | Maryland – City of Annapolis | 1872 Md. Laws 57, An Act to Add an Additional Section to Article Two of the Code of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," to Prevent the Carrying of Concealed Weapons in Said City, § 246 | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon.  Punishable by a fine of $3-10. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Razor; Brass; Metal knuckles; Other deadly weapon | | |
| 104 | 1872 | Nebraska – City of Nebraska | Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska, at 36 (1872), Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1 | Prohibited the carrying openly or concealed of a musket, rifle, shot gun, pistol, sabre, sword, Bowie knife, dirk, sword cane, billy slungshot, brass or other metallic knuckles, or any other dangerous or deadly weapons. | Musket; Rifle; Shot gun; Pistol; Sabre; Sword; Bowie knife; Dirk; Sword cane; Billy; Slungshot; Metal knuckles; Other dangerous or | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | | deadly weapons | | |
| 105 | 1873 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4110 (Act of Apr. 8, 1873, p. 130) | Prohibited the concealed carrying of any brass knuckles, slungshots, or "other weapon of like kind or description." Punishable by a fine of $20-200 and imprisonment or term of hard labor not to exceed 6 months. | Metal knuckles; Slungshot | | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 106 | 1873 | Georgia | R. H. Clark, The Code of the State of Georgia (1873) § 4528 | Prohibited the carrying of any dirk, Bowie knife, pistol, or other deadly weapon to a court, election site, precinct, place of worship, or other public gathering site. Punishable by fine of $20-50 or imprisonment for 10-20 days. | Dirk; Bowie knife; Pistol; Any kind of deadly weapon | | |
| 107 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2, as codified in Mass. Gen. Stat., ch. 164 (1873) § 10 | Prohibited the carrying of a slungshot, metallic knuckles, bills, or other dangerous weapon if arrested pursuant to a warrant or while committing a crime. Punishable by fine. | Slungshot; Metallic knuckles; Billy; Other dangerous weapon | | |
| 108 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2 as codified in Mass. Gen. Stat., ch. 164 (1873) § 11 | Prohibited manufacturing or selling a slungshot or metallic knuckles. Punishable by fine up | Slungshot; Metallic knuckles | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | to $50 or imprisonment up to 6 months. | | | |
| 109 | 1873 | Minnesota | The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota, at 993 (Vol. 2, 1873), Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65 | Prohibited the setting of any spring or trap gun.  Punished by imprisonment for at least 6 months or a fine of up to $500 if no injury results; imprisonment for up to 5 years if non-fatal injury results; and imprisonment for 10-15 years if death results. | Spring gun; Trap gun | | |
| 110 | 1873 | Nevada | Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, | Prohibited dueling and killing a person with a rifle, shotgun, pistol, Bowie knife, dirk, small | Rifle; Shotgun; Pistol; Bowie knife; | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB

**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Inclusive, at 563 (Vol. 1, 1873), Of Crimes and Punishments, §§ 35-36 | sword, backsword, or other dangerous weapon. | Dirk; Small sword; Back sword; Other dangerous weapon | | |
| 111 | 1873 | Tennessee | Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871, at 125 (Vol. 2, 1873), Offences Against Public Policy and Economy, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling.  Punishable by fine of minimum $25 and imprisonment for a term determined by the court. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | | |
| 112 | 1874 | Alabama | 1874 Ala. L. 41, ch. 1 | Imposed $25 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Increased tax to $50 in 1875-76. | |
| 113 | 1874 | Illinois | Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-72 and 1873-74, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874, at 360 (1874), | Prohibited the carrying a concealed weapon, including a pistol, knife, slungshot, brass, steel, or iron knuckles, or other deadly weapon while disturbing the peace.  Punishable by fine up to $100. | Pistol; Knife; Slungshot; Other deadly weapon | | |

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | Disorderly Conduct: Disturbing the Peace, § 56 | | | | |
| 114 | 1874 | New Jersey – City of Jersey City | Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto, at 41 (1874), An Ordinance to Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: §§ 1-2 | Prohibited the carrying of a concealed slungshot, billy, sandclub or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, including a sword in a cane, or air-gun. punishable by confiscation of the weapon and a fine of up to $20. Exempted policemen of Jersey City. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Pistol; Other dangerous weapon; Sword cane; Air gun | | |
| 115 | 1874 | Virginia | 1874 Va. L. 239, ch. 239 | Included the value of all "rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind" in list of taxable personal property. | Rifle; Musket; Other firearm; Bowie knife; Dirk | | |
| 116 | 1875 | Alabama | 1875-1876 Ala. L. 82, ch. 1 | Imposed $50 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Added pistol cartridges in 1886 and increased the tax to $300 in 1887. | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 117 | 1875 | Alabama | 1875-1876 Ala. L. 46, ch. 2 | Imposed tax rate of 0.75% of the value of any pistols, guns, dirks, and Bowie knives. | Pistols; Guns; Dirks; Bowie knives | Tax rate reduced to 55 cents in 1882, with additional weapons added. | |
| 118 | 1875 | Arkansas | Act of Feb. 16, 1875, 1874-75 Ark. Acts 156, § 1 | Prohibited the carrying in public of any "pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by a fine of $25-100. | Pistol; Dirk; Butcher knife; Bowie knife; Sword cane; Metal knuckles | | *Wilson v. State*, 33 Ark. 557 (1878) (held unconstitutional). |
| 119 | 1875 | Idaho [Territory] | Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875), § 133. | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by imprisonment for up to 3 months or a fine up to $100. | Pick-lock; Crow-key; Bit; Other instrument or tool; Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 120 | 1875 | Indiana | 1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, and Prescribing Penalties Therefore, § 1 | Prohibited the drawing or threatening to use a pistol, dirk, knife, slungshot, or any other deadly or dangerous weapon. Punishable by fine of $1-500, and potentially imprisonment up to 6 months. | Pistol; Dirk; Knife; Slungshot; Other deadly or dangerous weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 121 | 1875 | Michigan | 1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | | |
| 122 | 1876 | Alabama | 1876-77 Ala. Code 882, § 4109 | Prohibited the carrying of a Bowie knife, pistol, or air gun, or any other weapon of "like kind or description," unless threatened with or having good cause to fear an attack or while traveling or setting out on a journey.  Punishable by a fine of $50-300 and imprisonment or hard labor for no more than 6 months. | Bowie knife; Pistol; Air gun; Other similar weapon | | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 123 | 1876 | Colorado | 1876 Colo. Sess. Laws 304, § 154 | Prohibited the carrying with intent to assault another any pistol, gun, knife, dirk, bludgeon, or other offensive weapon. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 124 | 1876 | Georgia | 1876 Ga. L. 112, ch. 128 | Prohibited the transfer of any pistol, dirk, Bowie knife, or sword cane to a minor. | Pistol; Dirk; Bowie knife; Sword cane | | |
| 125 | 1876 | Illinois – Village of Hyde Park | Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws | Prohibited the carrying a concealed pistol, revolver, slungshot, knuckles, Bowie knife, dirk knife, dirk, dagger, or any other dangerous or deadly | Pistol; Revolver; Slungshot; Knuckles; Bowie knife; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments, at 64 (1876), Misdemeanors, § 39 | weapon without written permission from the Captain of Police.  Exempted peace officers. | Dirk; Dagger; Other dangerous or deadly weapon | | |
| 126 | 1876 | Wyoming [Territory] | Wyo. Comp. Laws (1876) ch. 35, § 127, as codified in Wyo. Rev. Stat., Crimes (1887), Having possession of offensive weapons, § 1027 | Prohibited the carrying of a pistol, knife, dirk, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by fine up to $500 or imprisonment up to 6 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 127 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 6, § 4230 | Prohibited the sale, giving, or lending of any pistol, Bowie knife, or "like knife" to any boy under the age of 18. | Pistol; Bowie knife | | *Coleman v. State*, 32 Ala. 581 (1858) (affirming conviction of letting minor obtain a pistol). |
| 128 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4109 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon, unless the person was | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | threatened with, or had good reason to apprehend, an attack, or "while traveling, or setting out on a journey." Punishable by fine of $50-300 and imprisonment of not more than 6 months. | dangerous weapon | | |
| 129 | 1877 | Colorado – Town of Georgetown | Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, at 100, § 9 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon. Punishable by a fine of $5-50. | Pistol; Bowie knife; Dagger; Other deadly | | |
| 130 | 1877 | New Jersey | Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871, at 304 (1877), An Act Concerning Disorderly Persons, § 2 | Prohibited The carrying of "any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." Punishable as a "disorderly person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 131 | 1877 | South Dakota [Territory] | S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471. | Prohibited the carrying, "whether concealed or not," of any slungshot, and prohibited the concealed carrying of any firearms or sharp or dangerous weapons. | Slungshot; Firearm; Sharp or dangerous weapon | | |
| 132 | 1877 | Utah – City of Provo [Territory] | Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force | Prohibited carrying a pistol, or other firearm, slungshot, false knuckles, Bowie knife, dagger or any other "dangerous or deadly weapon." Punishable by fine up to $25. | Pistol; Other firearm; Slungshot; Metal knuckles; Bowie knife; | | |

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | 105, 106-07 (1877) (Provo, Utah). § 182: | | Dagger; Other dangerous or deadly weapon | | |
| 133 | 1878 | Alabama – City of Uniontown | 1878 Ala. L. 437, ch. 314 | Authorized Uniontown to license dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Added dealers of "brass knuckles" in 1884. Similar to law enacted in 1884 authorizing Tuscaloosa to regulate dealers in pistols, Bowie knives, shotguns or firearms, and knives "of like kind or description." 1884-1885 Ala. 323, ch. 197 | |
| 134 | 1878 | Mississippi | 1878 Miss. Laws 175, An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, § 1 | Prohibited the carrying of a concealed Bowie knife, pistol, brass knuckles, slungshot or other deadly weapon. Excepted travels other than "a tramp." Punishable by fine of $5-100. | Bowie knife; Pistol; Brass knuckles; Slungshot; Other deadly weapon | Prohibited weapons were expanded in 1896 | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| 135 | 1879 | Alabama – City of Montgomery | J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama] (1879), § 428 | Prohibited carrying of a concealed Bowie knife, pistol, air gun, slingshot, brass knuckles, or other deadly or dangerous weapon.  Punishable by a fine of $1-100. | Bowie knife; Pistol; Air gun; Slingshot; Metal knuckles; Other deadly or dangerous weapon | | |
| 136 | 1879 | Idaho – City of Boise [Territory] | Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894, at 118-19 (1894), Carrying Concealed Weapons, § 36 | Prohibited the carrying a concealed Bowie knife, dirk knife, pistol or sword in cane, slingshot, metallic knuckles, or other dangerous or deadly weapon, unless traveling or setting out on a journey.  Punishable by fine up to $25 and/or imprisonment up to 20 days. | Bowie knife; Dirk; Pistol; Sword cane; Slingshot; Metallic knuckles; Other dangerous or deadly weapons | | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution) |
| 137 | 1879 | Louisiana | La. Const. of 1879, art. III | Provided the right to bear arms, but authorizes the passage of laws restricting the carrying of concealed weapons. | Concealed weapons | | |
| 138 | 1879 | Montana [Territory] | 1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23 | Prohibited dueling and killing a person involved with a rifle, shot-gun, pistol, Bowie knife, dirk, small-sword, back-sword, or other dangerous weapon.  Punishable by death by hanging. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small sword; Back sword; Other |  | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | dangerous weapon | | |
| 139 | 1879 | North Carolina | North Carolina: N.C. Sess. Laws (1879), ch. 127, as codified in North Carolina Code, Crim. Code, ch. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, dagger, slungshot, loaded case, metal knuckles, razor, or other deadly weapon. Exemption for carrying on the owner's premises.  Punishable by fine or imprisonment at the discretion of the court. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | | |
| 140 | 1880 | Ohio | Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880, at 1633 (Vol. 2, 1879), Offences Against Public Peace, § 6892 | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, or other dangerous weapon.  Punishable by a fine of up to $200 or imprisonment for up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | | |
| 141 | 1880 | South Carolina | 1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894), § 129 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, metal knuckles, razor, or other deadly weapon. Punishable by fine up to $200 and/or imprisonment up to 1 year. | Pistol; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | | |
| 142 | 1881 | Alabama | 1880-1881 Ala. L. 38-39, ch. 44 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or | Bowie knife; Pistol; Air gun; | Amended in 2022 to remove | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | description, pistol, or firearm of "any other kind or description," or air gun.  Punishable by fine of $50-300 and imprisonment of not more than 6 months.  Further provided that fines collected under the statute would be monetary and not in-kind payments. | Slungshot; Metal knuckles; Other deadly or dangerous weapon | prohibition on concealed carry of Bowie knives. *See* Ala. Stat. § 13A-11-50. | |
| 143 | 1881 | Arkansas | 1881 Ark. Acts 191, ch. 96, § 1-2 | Prohibited the carrying of any dirk, Bowie knife, sword, spear cane, metal knuckles, razor, or any pistol (except pistols that are used in the Army or Navy if carried openly in the hand). | Dirk; Bowie knife; Sword; Spear cane; Metal knuckles; Razor; Pistol | | |
| 144 | 1881 | Colorado | Colo. Rev. Stat 1774, § 248 (1881) | Prohibited the concealed carrying of any firearms, any pistol, revolver, Bowie knife, dagger, slingshot, brass knuckles, or other deadly weapon, unless authorized by chief of police. | Pistol; Revolver; Bowie knife; Dagger; Slingshot; Metal knuckles; Other deadly weapon | | |
| 145 | 1881 | Delaware | 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1 | Prohibited the carrying of concealed deadly weapons or selling deadly weapons other than an ordinary pocket knife to minors.  Punishable by a fine of $25-200 or imprisonment for 10-30 days. | Deadly weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 146 | 1881 | Illinois | Ill. Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code 73 (1885), ch. 38, Possession or sale forbidden, § 1 | Prohibited the possession, selling, loaning, or hiring for barter of a slungshot or metallic knuckles or other deadly weapon.  Punishable as a misdemeanor. | Slungshot; Metallic knuckles; Other deadline weapon | | |
| 147 | 1881 | Illinois | Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882, at 375 (1882), Deadly Weapons: Selling or Giving to Minor, § 54b. | Prohibited selling, giving, loaning, hiring for barter any minor a pistol, revolver, derringer, Bowie knife, dirk or other deadly weapon. Punishable by fine of $25-200. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Other deadly weapon | | |
| 148 | 1881 | Indiana | The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1, at 366 (1881), Crimes, § 1957 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol, or other missile or weapon, or throwing a stone, stick, club, or other substance at a vehicle.  Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other missile or weapon; Stone; Stick; Club; Other substance | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 149 | 1881 | Nevada | David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto, at 1077 (1885), An Act to prohibit the carrying of concealed weapons by minors, § 1 | Prohibited a minor from carrying a concealed dirk, pistol, sword in case, slungshot, or other dangerous or deadly weapon. Punishable by fine of $20-200 and/or imprisonment of 30 days to 6 months. | Dirk; Pistol; Sword in case; Slungshot; Other dangerous or deadly weapon | | |
| 150 | 1881 | New York | George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects, at 321 (Vol. 1, 1881), Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9 | Prohibited using, attempting to use, or concealing a slungshot, billy, sandclub or metal knuckles, and any dirk. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk | | |
| 151 | 1881 | Tennessee – City of Nashville | William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix, at 340-41 | Prohibited the carrying of pistol, Bowie knife, dirk, slungshot, brass knuckles, or other deadly weapon. Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Metal knuckles; | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | (1881), Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1 | | Other deadly weapon | | |
| 152 | 1881 | Washington [Territory] | 1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929 | Prohibited the carrying of "any concealed weapon." Punishable by fine up to $100 or imprisonment up to 30 days. | Concealed weapon | | |
| 153 | 1881 | Washington – City of New Tacoma [Territory] | 1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15 | Authorized New Tacoma to regulate transporting, storing, or selling gunpowder, giant powder, dynamite, nitroglycerine, or other combustibles without a license, as well as the carrying concealed deadly weapons, and the use of guns, pistols, firearms, firecrackers. | Gunpowder; Giant powder; Dynamite; Nitroglycerine; Other combustible; Concealed deadly weapon; Gun; Pistol; Firearm | | |
| 154 | 1881 | Washington [Territory] | William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897, at 1956 (Vol. 2, 1897) | Prohibited exhibiting a dangerous weapon in a manner likely to cause terror. Punishable by fine up to $25. | Dangerous weapon | | |
| 155 | 1882 | Georgia | 1882-83 Gal. L. 48-49, ch. 94 | Prohibited the concealed carrying of any "pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold | Pistol; Dirk; Sword cane; speak Bowie knife; | | |

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | for the purpose of offense and defense." | Other kind of knife | | |
| 156 | 1882 | Georgia | 1882-83 Ga. L. 37, ch. 18 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | Raised to $100 in 1884. | |
| 157 | 1882 | Iowa – City of Sioux City | S. J. Quincy, Revised Ordinances of the City of Sioux City, Iowa, at 62 (1882), Ordinances of the City of Sioux City, Iowa, § 4. | Prohibited the carrying a concealed pistol, revolver, slungshot, cross-knuckles, knuckles of lead, brass or other metal, or any Bowie knife, razor, billy, dirk, dirk knife or Bowie knife, or other dangerous weapon. | Pistol; Revolver; Slungshot; Cross-knuckles; Metal Knuckles; Bowie knife; Razor; Billy; Dirk; Other dangerous weapon | | |
| 158 | 1882 | West Virginia | 1882 W. Va. Acts 421-22; W. Va. Code, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Also prohibited selling any such weapon to a minor.  Punishable by fine of $25-200 and imprisonment of 1-12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | *State v. Workman*, 35 W. Va. 367 (1891) (upheld under the Second Amendment), *abrogated by New York State Rifle & Pistol Ass'n v. Bruen*, 142 |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | | | S. Ct. 2111, 2153 (2022) |
| 159 | 1883 | Illinois – City of Danville | Revised Ordinances of the City of Danville [Illinois], at 66 (1883), Ordinances of the City of Danville. Concealed Weapons, § 22. | Prohibited the carrying of a concealed pistol, revolver, derringer, Bowie knife, dirk, slungshot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon.  Also prohibited displaying the weapon in a threatening or boisterous manner.  Punishable by fine of $1-100 and forfeiting the weapon, if ordered by the magistrate. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Slungshot; Metallic knuckles; Razor; Other deadly weapon | | |
| 160 | 1883 | Kansas | 1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading Or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, §§ 1-2 | Prohibited the selling, trading, giving, or loaning of a pistol, revolver, or toy pistol, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind.  Also prohibited the possession of such weapons by any minor.  Punishable by fine of $5-100.  Also prohibited a minor from possessing a pistol, revolver, toy pistol by which cartridges may be exploded, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapon.  Punishable by fine of $1-10. | Pistol; Revolver; Toy pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Other dangerous weapons | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| 161 | 1883 | Missouri | 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes And Criminal Procedure" § 1274 | Prohibited the carrying of a concealed fire arms, Bowie knife, dirk, dagger, slungshot, or other deadly weapon to a church, school, election site, or other public setting or carrying in a threatening manner or while intoxicated.  Punishable by fine of $25-200 and/or by imprisonment up to 6 months. | Fire arms; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon | | |
| 162 | 1883 | Washington – City of Snohomish [Territory] | 1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15 | Authorized City of Snohomish to regulate and prohibit carrying concealed deadly weapons and to prohibit using guns, pistols, firearms, firecrackers, bombs, and explosives. | Deadly weapon; Gun; Pistol; Firearm; Firecracker; Bomb | | |
| 163 | 1883 | Wisconsin – City of Oshkosh | 1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, ch. 6, § 3, pt. 56 | Prohibited the carrying of a concealed pistol or colt, or slungshot, or cross knuckles or knuckles of lead, brass or other metal or Bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon. Punishable by confiscation of the weapon. | Pistol; Colt; Slungshot; Cross knuckles; Knuckles of lead; Metal knuckles; Bowie knife; Dirk; Dagger; Any other dangerous or deadly weapon | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 164 | 1884 | Georgia | 1884-85 Ga. L. 23, ch. 52 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | Reduced to $25 in 1888. | |
| 165 | 1884 | Maine | The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884, at 928, (1884), Prevention of Crimes, § 10 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 166 | 1884 | Minnesota – City of Saint Paul | W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884, at 289 (1884), Concealed Weapons – License, § 1 | Prohibited the carrying of a concealed pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, Bowie knife, dirk knife or razor, or any other dangerous or deadly weapon. Punishable by seizure of the weapon. | Pistol; Dirk; Dagger; Sword; Slungshot; Cross-knuckles; Metal knuckles; Bowie knife; Dirk; Razor; Other dangerous or deadly weapon | | |
| 167 | 1884 | Tennessee | Tenn. Pub. Acts (1879), ch. 186, as codified in Tenn. Code (1884) | Prohibited the carrying, "publicly or privately," of any dirk, razor, sword cane, loaded cane, slungshot, brass knuckles, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol. | Dirk; Razor; Sword cane; Loaded cane; Slungshot; Metal knuckles; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | | Spanish stiletto; Pistol; Revolver | | |
| 168 | 1884 | Vermont | 1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1 | Prohibited the setting of any spring gun trap.  Punishable by a fine of $50-500 and liability for twice the amount of any damage resulting from the trap. | Spring gun | | |
| 169 | 1884 | Wyoming [Territory] | 1884 Wyo. Sess. Laws, ch. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983 | Prohibited exhibiting in a threatening manner a fire-arm, Bowie knife, dirk, dagger, slungshot or other deadly weapon.  Punishable by fine of $10-100 or imprisonment up to 6 months. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon | | |
| 170 | 1885 | Montana [Territory] | 1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63 | Prohibited possessing, carrying, or purchasing a dirk, dirk-knife, sword, sword cane, pistol, gun, or other deadly weapon, and from using the weapon in a threatening manner or in a fight.  Punishable by fine of $10-100 and/or imprisonment for 1-3 months. | Dirk; Sword; Sword cane; Pistol; Gun; Other deadly weapon | | |
| 171 | 1885 | New York | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-85, at 172 (1885), Carrying, Using, Etc., Certain Weapons, § 410 | Prohibited using or attempting to use, carrying, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, or a dagger, dirk or dangerous knife.  Punishable as a felony, and as a misdemeanor if a minor. | Slungshot; Billy; Sandclub; Metal knuckles; Dagger; Dirk; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| | | | | | Dangerous knife | | |
| 172 | 1885 | New York – City of Syracuse | Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations, at 215 (1885), [Offenses Against the Public Peace and Quiet,] § 7 | Prohibited the carrying or using with the intent to do bodily harm a dirk, Bowie knife, sword or spear cane, pistol, revolver, slungshot, jimmy, brass knuckles, or other deadly or unlawful weapon.  Punishable by a fine of $25-100 and/or imprisonment for 30 days to 3 months. | Dirk; Bowie knife; Sword; Spear cane; Pistol; Revolver; Slungshot; Jimmy; Metal knuckles; Other deadly or unlawful weapon | | |
| 173 | 1885 | Oregon | 1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2 | Prohibited the concealed carrying of any revolver, pistol, or other firearm, or any knife (other than an "ordinary pocket knife"), or any dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury.  Punishable by a fine of $10-200 or imprisonment for 5-100 days. | Revolver; Pistol; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles | | |
| 174 | 1886 | Colorado – City of Denver | Isham White, The Laws and Ordinances of the City of Denver, Colorado, at 369, § 10 (1886) | Prohibited the carrying of any slungshot, colt, or metal knuckles while engaged in any breach of the peace.  Punishable by a fine of $25-300. | Slungshot; Colt; Metal knuckles | | |
| 175 | 1886 | Georgia | 1886 Ga. L. 17, ch. 54 | Imposed $100 occupational tax on dealers of pistols, revolvers, | Pistol; Revolver; Dirk; | | |

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | dirks, Bowie knives, and "pistol or revolver cartridges." | Bowie knife; Pistol or revolver cartridges | | |
| 176 | 1886 | Maryland – County of Calvert | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1 | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day.  Punishable by a fine of $10-50. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon | | |
| 177 | 1886 | Maryland – County of Calvert | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State, at 468-69 (Vol. 1, 1888), Concealed Weapons, § 30 | Prohibited the carrying of a concealed  pistol, dirk knife, Bowie knife, slungshot, billy, sandclub, metal knuckles, razor, or any other dangerous or deadly weapon.  Punishable by fine of up to $500 or imprisonment of up to 6 months. | Pistol; Dirk; Bowie knife; Slungshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | | |
| 178 | 1886 | Maryland | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day within 300 yards of the polls.  Punishable by fine of $10-50. | Gun; Pistol; Dirk; Razo; Billy; Bludgeon | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Election in said County, Within One Mile of the Polls § 1 | | | | |
| 179 | 1887 | Alabama | 1886 Ala. L. 36, ch. 4 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridges; Bowie knife; Dirk | | |
| 180 | 1887 | Iowa – City of Council Bluffs | Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa, at 206-07 (1887), Carrying Concealed Weapons Prohibited, § 105 | Prohibited the carrying of a concealed pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sandbag, air guns of any description, dagger, Bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | | |
| 181 | 1887 | Kansas – City of Independence | O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council, at 162 (1887), Weapons, § 27 | Prohibited using a pistol or other weapon in a hostile or threatening manner.  Also prohibited carrying a concealed pistol, dirk, Bowie knife, revolver, slungshot, billy, brass, lead, or iron knuckles, or any deadly weapon.  Punishable by fine of $5-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Metal knuckles; Any deadly weapon | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 182 | 1887 | Michigan | 1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sandbag, skull cracker, slungshot, razor or other offensive and dangerous weapon or instrument. | Dirk; Dagger; Sword; Pistol; Air gun; Stiletto; Metallic knuckles; Billy; Sand bag; Skull cracker; Slungshot; Razor; Other offensive and dangerous weapon or instrument | | |
| 183 | 1887 | Montana [Territory] | 1887 Mont. Laws 549, Criminal Laws, § 174 | Prohibited the carrying of a any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon with the intent to assault a person.  Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 184 | 1887 | New Mexico [Territory] | An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887) | Defined "deadly weapons" as including pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, Bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can | Pistol; Dagger; Bowie Knife; Poniard; Butcher Knife; Dirk | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| | | | | be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slungshots, bludgeons or any other deadly weapons. | | | |
| 185 | 1887 | Virginia | The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia, at 897 (1887), Offences Against the Peace, § 3780 | Prohibited the carrying of a concealed pistol, dirk, Bowie knife, razor, slungshot, or any weapon of the like kind. Punishable by fine of $20-100 and forfeiture of the weapon. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Any weapon of the like kind | | |
| 186 | 1888 | Maryland – County of Kent | John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein, at 1457 (Vol. 2, 1888), Election Districts– Fences, § 99 | Prohibited carrying, on days of an election, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon.  Punishable by a fine of $5-20. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon | | |
| 187 | 1888 | Florida | Fla. Act of Aug. 6, 1888, ch. 1637, subch. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) | Prohibited the concealed carrying of slungshot, metallic knuckles, billies, firearms, or other dangerous weapons if arrested for committing a criminal offense or disturbance of the peace.  Punishable by | Slungshot; Metallic knuckles; Billy; Firearms; Other | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | imprisonment up to 1 year and a fine up to $50. | dangerous weapon | | |
| 188 | 1888 | Georgia | 1888 Ga. L. 22, ch. 123 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | Raised to $100 in 1890. | |
| 189 | 1888 | Maryland – City of Baltimore | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein, at 522-23 (Vol. 1, 1888), City of Baltimore, § 742 | Prohibited the carrying of a pistol, dirk knife, Bowie knife, slingshot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon if arrested for being drunk and disorderly.  Punishable by fine of $5-25, and confiscation of the weapon. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Metal knuckles; Razor; Other deadly weapon | | |
| 190 | 1888 | Minnesota | George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889, at 1006 (Vol. 2, 1888), Making, Selling, etc., Dangerous Weapons, §§ 333-34 | Prohibited manufacturing, selling, giving, or disposing of a slingshot, sandclub, or metal knuckles, or selling or giving a pistol or firearm to a minor without magistrate consent. Also prohibited carrying a concealed slingshot, sandclub, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon. | Slingshot; Sandclub; Metal knuckles; Dagger; Dirk; Knife; Pistol; Any dangerous weapon | | |
| 191 | 1888 | Utah – City of Salt Lake City | Dangerous and Concealed Weapon, Feb. 14, 1888, | Prohibited carrying a slingshot or any concealed deadly weapon | Slingshot; Deadly weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
|     |                   | [Territory]  | reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14 | without permission of the mayor. Punishable by fine up to $50. |                        |               |                 |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (1889 – 1930s)[1,2]

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 192 | 1889 | Arizona [Territory] | 1889 Ariz. Sess. Laws 16, § 1 | Prohibited carrying of any pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any knife manufactured to offensive or defensive purposes. Punishable by a fine of $25-100 and forfeiture of the weapon. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass knuckles; Bowie knife; Other offensive or defensive knife | | |
| 193 | 1889 | Idaho [Territory] | The Act of the Territory of Idaho approved February 4, 1889 (Sess. Laws 1889, p. 27) | Prohibited private persons from carrying "deadly weapons" within any city, town or village. | Deadly weapons | | *In re Brickey*, 8 Idaho 597 (1902) (held unconstitutional under the Second Amendment and state constitution) |
| 194 | 1889 | Pennsylvania – City of Johnstown | Laws of the City of Johnstown, Pa., Embracing City Charter, Act of | Prohibited the concealed carrying of any pistol, razor, dirk, Bowie knife, blackjack, | Pistol; Razor; Dirk; | | |

[1] In compliance with the Court's Order dated December 15, 2022 (Dkt. 161), Defendants created this survey of statutes, laws, and regulations that Defendants have determined are relevant to this action.  Plaintiffs have indicated that, "due to the length of defendants' surveys, plaintiffs will reserve all objections to the form of the surveys, and the relevance of the purported statutes contained therein, until the filing of their responsive brief in thirty (30) days per the court's order of Dec. 12, 2022 (ECF 161)."

[2] The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment.  In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause.  While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians.  The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions, at 86 (1897), An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12 | handy billy, or other deadly weapon.  Punishable by fine of $5-50. | Bowie knife; Blackjack; Billy; Other deadly weapon | | |
| 195 | 1890 | Connecticut – City of New Haven | Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City, at 164, § 192 (1890) | Prohibited the concealed carrying of any metal knuckles, pistol, slungshot, stiletto, or similar weapons, absent written permission of the mayor or superintendent of police.  Punishable by a fine of $5-50. | Metal knuckles; Slungshot; Stiletto | | |
| 196 | 1890 | Georgia | 1890 Ga. L. 38, ch. 131 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | | |
| 197 | 1890 | Louisiana | 890 La. L. 39, ch. 46 | Prohibiting the transfer of any pistol, dirk, Bowie knife, or "any other dangerous | Pistol; Dirk; Bowie knife; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | weapon, which may be carried concealed on a person to any person under the age of 21. | Other dangerous weapon | | |
| 198 | 1890 | Maryland – City of Baltimore | John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-92, and of 1892-1893, up to the Summer Recess of 1893, at 297-98 (1893), Ordinances of Baltimore, § 742A | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, sandclub, metal knuckles, razor or any other dangerous or deadly weapon, or who openly carries with the intent to injure a person. Punishable by fine of up to $500 and imprisonment up to 6 months. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | | |
| 199 | 1890 | Nebraska – City of Omaha | W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or | Pistol; Revolver; Colt; Billy; Slungshot; Metal knuckles Dirk; | | |

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Cities, the Constitution of the United States and the Constitution of the State of Nebraska, at 344 (1890), Ordinances of Omaha, Concealed Weapons, § 10 | deadly weapon.  Punishable by fine up to $100. | Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 200 | 1890 | Nebraska – City of Omaha | W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska, at 344 (1890), Ordinances of Omaha, Concealed Weapons, § 10. | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon.  Punishable by fine up to $100. | Pistol; Revolver; Colt; Billy; Slungshot; Metal knuckles; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 201 | 1890 | Oklahoma [Territory] | 1890 Okla. Laws 495, art. 47, §§ 1, 2, 10; Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory), at 495-96 (1891) | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or any other knife or instrument manufactured or sold solely for defense.  Also prohibited the carrying of any pistol, revolver, Bowie knife, dirk knife, loaded cane, billy, metal knuckles, or "any other offensive or defense weapon." | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Other knife; Loaded cane; Billy; Other offensive or defensive weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | | Punishable by a fine of $50-500 and imprisonment for 3-12 months. | | | |
| 202 | 1890 | Oklahoma [Territory] | 1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19 | Prohibited the manufacture, sale, giving, or disposing of any instrument or weapon usually known as a slungshot, and prohibited the carrying any slungshot or similar weapon. | Slungshot | | |
| 203 | 1890 | Oklahoma – Town of Checotah [Territory] | General Laws Relating to Incorporated Towns of Indian Territory, at 37 (1890), Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3 | Prohibited the carrying of any pistol; dirk; butcher knife; Bowie knife; sword; spear-cane, metal knuckles, razor, slungshot, sandbag, or a switchblade. | Pistol; Dirk; Butcher knife; Sword; Spear cane; Metal knuckles; Razor; Slungshot; Sandbag; Switchblade | | |
| 204 | 1891 | Michigan | 1891 Mich. Pub. Acts 409, Police Department, pt 15 | Prohibited the carrying of a concealed pistol, revolver, Bowie knife, dirk, slungshot, billie, sandbag, false knuckles, or other dangerous weapon.  Also prohibited lurking or being concealed with the intent to injure a person or property, or threatening to beat or kill a person or property. Punishable by fine up to $100 and the costs of | Pistol; Revolver; Bowie; Dirk; Slungshot; Billy; Sandbag; False knuckles; Other dangerous weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | prosecution, and in default of payment, imprisonment. | | | |
| 205 | 1891 | Missouri | "Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891 | Fined farmer for setting a trap gun that killed his wife. | Trap gun | | |
| 206 | 1891 | North Dakota | 1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1 | Prohibited the setting of any gun or gun trap to be discharged at certain animals. | Trap gun | | |
| 207 | 1891 | West Virginia | 1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon.  Also prohibited selling such a weapon to a minor.  Punishable by fine of $25-200 and imprisonment for 1-12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | |
| 208 | 1892 | Alabama | 1892 Ala. L. 183, ch. 95 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives, and clarified that cartridges that can be used in a pistol shall be deemed pistol cartridges. | Pistol; Pistol cartridges; Bowie knife; Dirk | | |
| 209 | 1892 | Georgia | 1892 Ga. L. 25, ch. 133 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, Bowie knives, and metal knuckles. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | | cartridges; Metal knuckles | | |
| 210 | 1892 | Washington – City of Tacoma | Albert R. Heilig, Ordinances of the City of Tacoma, Washington, at 333-34 (1892) | Prohibited the carrying of a concealed a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, slingshot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person. | Revolver; Pistol; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Instrument that causes injury | | |
| 211 | 1893 | Arizona [Territory] | 1893 Ariz. Sess. Laws 3, § 1 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use). | Pistol; Other firearm; Dirk; Dagger; Slungshot; Sword-cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) | | |
| 212 | 1893 | Delaware | Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the | Prohibited the concealed carrying of deadly weapons or selling deadly weapons other than an ordinary pocket knife, and prohibited discharging any firearm in any public road.  Punishable by fine of $25-100 or by | Deadly weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix, at 987 (1893), An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1 | imprisonment for 10-30 days. | | | |
| 213 | 1893 | North Carolina | 1893 N.C. L. 468-69, ch. 514 | Prohibiting the transfer of any pistol, pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane, or slingshot to a minor. | Pistol; Pistol cartridge; Metal knuckles; Bowie knife; Dirk; Loaded cane; Slingshot | | |
| 214 | 1893 | Rhode Island | 1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slingshot, pistol, or firearm of any description. | Dirk; Bowie knife; Butcher knife; Dagger; Razor; Sword Cane; Air gun; Billy; Metal knuckles; Slingshot; Pistol; Other firearm | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 215 | 1893 | Tennessee – City of Nashville | Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises, at 364-65 (1893), Ordinances of the City of Nashville, § 738 | Prohibited the carrying of a pistol, Bowie knife, dirk knife, slungshot, brass knucks, or other deadly weapon.  Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Brass knuckles; Other deadly weapon | | |
| 216 | 1893 | Wyoming – City of Rawlins | A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming, at 131-32 (1893), Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1 | Prohibited a person from possessing or carrying a pistol, revolver, knife, slungshot, bludgeon or other lethal weapon.  Punishable by fine up to $100 or imprisonment up to 30 days. | Pistol; Revolver; Knife; Slungshot; Bludgeon; Other lethal weapon | | |
| 217 | 1895 | North Dakota | 1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13 | Prohibited the carrying of any slungshot or similar weapon, and the concealed carrying of any firearm or any "sharp or dangerous weapon." | Slungshot; Firearm; Sharp or dangerous weapon | | |
| 218 | 1895 | North Dakota | The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the | Prohibited the setting of any spring or trap gun. | Trap gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Amendments Thereto, at 1259 (1895) | | | | |
| 219 | 1895 | Vermont – City of Barre | Ordinances of the City of Barre, Vermont, ch. 16, § 18 (1895) | Prohibited discharging a gun, pistol, or other loaded firearm, firecracker, serpent, or other explosive, unless on a person's own property or with the permission of the property owner.  Also prohibited making a bonfire in the street except with city council permission and the carrying of concealed steel or brass knuckles, a pistol, slungshot, stiletto, or weapon of similar character. | Steel or brass knuckles; Pistol; Slungshot; Stiletto; Weapon of similar character; Gun; Loaded firearm; Firecracker; Serpent | | |
| 220 | 1896 | California – City of Fresno | L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896, at 37, § 53 (1896) | Prohibited the transfer to any minor under the age of 18 any gun, pistol or other firearm, dirk, Bowie knife, powder, shot, bullets, or any combustible or dangerous material, absent written consent of parent or guardian. | Gun; Pistol; Dirk; Bowie knife; Powder; Shot; Bullets | | |
| 221 | 1896 | California – City of Fresno | L. W. Moultrie, Charter and Ordinances of the City of Fresno, at 30, § 8 (1896) | Prohibited the concealed carrying of any pistol or firearm, slungshot, dirk, Bowie knife, or other deadly weapon, absent written permission. | Pistol; Firearm; Slungshot; Dirk; Bowie knife; Other deadly weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| 222 | 1896 | Mississippi | 1896 Miss. L. 109-10, ch. 104 | Prohibited the carrying of a concealed Bowie knife, dirk, butcher knife, pistol, brass or metallic knuckles, slingshot, sword, or other deadly weapon "of like kind or description." | Bowie knife; Dirk; Butcher knife; Pistol; Metal Knuckles; Slingshot; Sword; Other deadly weapon of like kind | | |
| 223 | 1896 | Rhode Island | General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State, at 1010-11 (1896), Offences Against Public Policy, §§ 23, 24, 26 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slungshot, pistol, or firearm of any description.  Exempted officers or watchmen whose duties required them to make arrests or guard prisoners or property. | Dirk; Bowie knife; Butcher knife; Dagger; Razor; Sword cane; Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm | | |
| 224 | 1896 | Washington – City of Spokane | Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896, at 309-10 (1896), Ordinances of Spokane, An Ordinance to Punish the Carrying of | Prohibited the carrying of a concealed revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property. punishable by fine of $25-100, cost of prosecution, and | Revolver; Pistol; Other firearms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Concealed Weapons within the City of Spokane, § 1 | imprisonment until fines/costs are paid. | | | |
| 225 | 1897 | Alabama | William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, § 27 (1897) | Tax of $300 on the sale of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridge; Bowie knife; Dirk | | |
| 226 | 1897 | Missouri – City of Saint Joseph | William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged, at 508 (1897), Concealed Weapons – Carrying of, § 7 | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, Bowie knife, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon. | Pistol; Revolver,; Colt; Billy; Slungshot; Metal knuckles; Dirk; Dagger; Razor; Bowie knife; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 227 | 1897 | Texas | 1897 Tex. Gen. Laws 221, An Act to Prevent the Barter, Sale And Gift of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal Or Hard Substance to Any Minor Without the Written Consent of the | Prohibited the selling or giving to a minor a pistol, dirk, dagger, slungshot, sword cane, spear or knuckles made of any metal or hard substance, Bowie knife or any other knife manufactured or sold for the purpose of offense or | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Knuckles; Bowie knife; Any other knife | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| | | | Parent or Guardian of Such Minor. . ., ch. 155 | defense without the consent of their parent or guardian. Punishable by fine of $25-200 and/or imprisonment for 10-30 days. | used for offense or defense | | |
| 228 | 1897 | Washington | Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897, at 1956-57 (Vol. 2, 1897), Carrying Concealed Weapons, § 7084 | Prohibited the carrying of a concealed revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.  Punishable by fine of $25-100 and/or imprisonment for 30 days. | Revolver; Pistol; Other fire-arms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury | | |
| 229 | 1898 | Georgia | 1898 Ga. L. 60, ch. 103 | Prohibited the concealed carry of any pistol, dirk, sword cane, spear, Bowie knife, other kind of knife "manufactured and sold for purpose of offense and defense," and any "kind of metal knucks." | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear; Metal knuckles | | |
| 230 | 1898 | Oregon – City of Oregon City | The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order, 259 (1898), An | Prohibited the carrying of any slingshot, billy, dirk, pistol, or "any concealed deadly weapon," and the | Slingshot; Billy; Dirk; Pistol; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|--------------|----------|---------------------------|----------------------|--------|------|
| | | | Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2 | discharge of any firearm, air gun, sparrow gun, flipper, or bean shooter, unless in self-defense. | Concealed deadly weapon; Firearm; Air gun; Sparrow gun; Flipper; Bean shooter | | |
| 231 | 1899 | Alaska | Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905, at App. A, p. 139 (30 Stat. L. 1253 (1899)); 1896-99 Alaska Sess. Laws 1270, ch. 6, § 117 | Prohibited concealed carrying in any manner any revolver, pistol, other firearm, knife (other than an "ordinary pocket knife"), dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury to a person or property. | Pistol; Revolver; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles; Other instrument | | |
| 232 | 1899 | Nebraska – City of Fairfield | Compiled Ordinances of the City of Fairfield, Clay County, Nebraska, at 34 (1899), Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1 | Prohibited the carrying of a concealed pistol, revolver, dirk, Bowie knife, billy, slingshot, metal knuckles, or other dangerous or deadly weapons.  Punishable by forfeiture and "shall be so adjudged." | Pistol; Revolver; Dirk; Bowie knife; Billy; Slingshot; Metal knuckles; Other dangerous or deadly weapons | | |
| 233 | 1899 | Texas – City of San Antonio | Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General | Prohibited drawing in a threatening manner a pistol, gun, knife, sword cane, club or any other instrument or | Pistol; Gun; Knife; Sword cane; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| | | | Character in Force August 7th, at 220 (1899), Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4 | weapon that may cause death. | Club; Any other instrument or weapon that causes death | | |
| 234 | 1900 | Iowa – City of Des Moines | William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa, at 89-90, (1900), Ordinances City of Des Moines, Weapons, Concealed, § 209 | Prohibited the carrying of a concealed pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sandbag, air guns of any description, dagger, Bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | | |
| 235 | 1900 | New York | 1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1 | Prohibited manufacturing or selling a slungshot, billy, sandclub or metal knuckles, and prohibited selling a firearm to a minor in any city or incorporated village without written consent of police magistrate. Exempted any officer of the United States or peace officer when necessary and proper to discharge official duties. | Slungshot; Billy; Sandclub; Metal knuckles; Pistol; Other firearm | | |
| 236 | 1901 | Arizona [Territory] | 1901 Ariz. 1251-53, §§ 381, 385, 390 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, | Pistol; Other firearm; Dirk; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use).  Exempted peace officers in discharge of official duties.  Punishable by a fine of $25-100 and forfeiture of the weapon. | Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) | | |
| 237 | 1901 | Utah | 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3 | Prohibited the construction and possession of any "infernal machine," defined as a device with a loaded firearm that is capable of igniting when moved, handled, or opened. | Infernal machine | | |
| 238 | 1903 | Oklahoma [Territory] | Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25 | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or other kind of knife manufactured for defense. | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword Cane; Spear; Metal knuckles; Other knife | | |
| 239 | 1903 | South Dakota | S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471 | Prohibited the carrying of a concealed slungshot, | Slungshot; Firearm; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | firearm, or sharp or dangerous weapon. | Sharp or dangerous weapon | | |
| 240 | 1905 | Indiana | 1905 Ind. Acts 677, Public Conveyance—Attacking, § 410 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol or other weapon, or throwing a stone, stick, club or any other substance at a vehicle. Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other weapon; Stone; stick; Club; Any other substance | | |
| 241 | 1905 | New Jersey | 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1 | Prohibited the carrying of a concealed revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor.  Punishable by fine up to $200 and/or imprisonment with hard labor up to 2 years. | Revolver; Pistol; Other deadly; offensive or dangerous weapon or firearm or any stiletto; Dagger; razor | *State v. Angelo*, 3 N.J. Misc. 1014, 1015 (1925) (upheld conceal carry ban) | |
| 242 | 1908 | Rhode Island | 1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws, § 23 | Prohibited the carrying of any dirk, dagger, razor, sword cane, Bowie knife, butcher knife, air-gun, billy, metal knuckles, slungshot, pistol, other firearm. Exempted officers or watchmen. | Dirk; Dagger; Razor; Sword cane; Bowie knife; Butcher knife; Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm. | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 243 | 1909 | Idaho | 1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1 | Prohibited the carrying a concealed dirk, Bowie knife, dagger, slungshot, pistol, revolver, gun, or any other deadly or dangerous weapon in any public setting. | Dirk; Bowie knife; Dagger; Slungshot; Pistol; Revolver; Other deadly or dangerous weapon | No longer restricts concealed carrying of a slungshot. *See* Idaho Stats. Ch. 33, § 18-3302(2)(a)(b)(i). | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution) |
| 244 | 1909 | South Dakota | 1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22 | Prohibited the setting or possession of any "set gun." | Set gun | | |
| 245 | 1909 | Washington | 1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3 | Prohibited the setting of any trap, spring pistol, rifle, or other deadly weapon. Punishable by imprisonment for up to 1 year or a fine of up to $1,000.  Further punishable by imprisonment for up to 20 years for non-fatal or fatal injuries resulting from the trap or | Trap gun | | |
| 246 | 1911 | New York | 1911 N.Y. Laws 442, An Act to Amend the Penal | Prohibited the manufacture, sale, giving, or disposing of | Blackjack; Slungshot; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| | | | Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 1 | any weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, and the offering, sale, loaning, leasing, or giving of any gun, revolver, pistol, air gun, or spring-gun to a person under the age of 16. | Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Gun; Revolver; Pistol; Air gun; Spring gun | | |
| 247 | 1911 | New York | 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, or bludgeon, and the carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instrument or weapon" with intent to use the weapon unlawfully against another. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or deadly weapon | | |
| 248 | 1912 | Vermont | 1912 Vt. Acts and Resolves 261 | Prohibited the setting of any spring gun.  Punishable by a fine of $50-500 and liability for twice the amount of damage resulting from the trap. | Spring gun | | |
| 249 | 1913 | Florida | 1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8 | Prohibited hunting wild game with automatic guns. | Machine guns | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 250 | 1913 | Hawaii [Territory] | 1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons, § 3089. | Prohibited the carrying a Bowie knife, sword cane, pistol, air-gun, slungshot, or other deadly weapon. Punishable by fine of $10-250 or imprisonment for 3-12 months, unless good cause can be shown for carrying the weapon. | Bowie knife; Sword cane; Pistol; Air gun; Slungshot; Other deadly weapon | | |
| 251 | 1913 | Iowa | 1913 Iowa Acts 307, ch. 297, §§ 1, 2 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sandbag, skull cracker, slungshot, or other offensive and dangerous weapons or instruments. Also prohibited the selling, keeping for sale, offering for sale, loaning, or giving away any dirk, dagger, stiletto, metallic knuckles, sandbag, or "skull cracker." Exempted the selling or keeping for sale of "hunting and fishing knives." | Dirk; Dagger; Sword; Pistol; Revolver; Stiletto; Metallic knuckles; Picket; Billy; Sand bag; Skull cracker; Slungshot; Other offensive and dangerous weapons or instruments | | |
| 252 | 1913 | New York | 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons Carrying Weapons, Dangerous or Unusual Weapons, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb, or bombshell, and the | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instruments or weapon." | Bomb; Bombshell; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or deadly weapon | | |
| 253 | 1915 | New Hampshire | 1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18 | Prohibited the setting of a spring gun.  Punished by a fine of $50-500. | Spring gun | | |
| 254 | 1915 | North Dakota | 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5 | Prohibited the concealed carrying of any instrument or weapon usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, or any sharp or dangerous weapon, any gun, revolver, pistol, or "other dangerous fire arm," nitroglycerin, dynamite, or any other dangerous or violent explosive. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Any sharp or dangerous weapon; Any Gun; Revolver; Pistol; Dangerous firearm; Explosive | | |
| 255 | 1917 | California | 1917 Cal. Stat. 221, § 1 | Prohibited the manufacture, leasing, keeping for sale, offering, giving, or disposing of any instrument or weapon of the kind commonly known as a blackjack, | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB

**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dirk, or dagger. | Metal knuckles; Dirk; Dagger | | |
| 256 | 1917 | California | 1917 Cal. Stat. 221, § 2 | Prohibited the possession of any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, bomb, or bombshells, and the carrying of any dirk or dagger. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Bomb; Bombshells; Dirk; Dagger | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |
| 257 | 1917 | California | 1917 Cal. Stat. 221, § 5 | Prohibited the use, or carrying or possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or other "dangerous or deadly instrument or weapon." | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Loaded pistol; Revolver; Other firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bomb; Bombshell; Other deadly or dangerous weapon | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 258 | 1917 | Missouri – City of Joplin | Joplin Code of 1917, Art. 67, § 1201. | Prohibited the carrying of a concealed firearm, Bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slungshot, or other similar deadly weapons in a church, school, election site, court, or other public setting. Also prohibits using the weapon in a threatening manner, using while intoxicated, or selling to a minor. | Firearms; Bowie knife; Spring-back knife; Razor; Knuckle; Billy; Sword cane; Dirk; Dagger; Slungshot; Other deadly weapons | | |
| 259 | 1917 | North Carolina – Harnett County | 1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1 | Prohibited killing quail with a gun that shoots over two times before reloading. | Gun that shoots over two times before reloading (machine gun) | | |
| 260 | 1917 | Oregon | 1917 Or. Sess. Laws 804-08, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 7 | Prohibited the attempted use, or the carry and possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or any other "dangerous or deadly weapon." Punishable by a fine of $50-500 or | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Pistol; Revolver; Other Firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bomb; | | Oregon v. Blocker, 291 Or. 255 (1981) (struck down the ban on clubs as contrary to Oregon Constitution) |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | imprisonment for 1-6 months. | Bombshell; Other dangerous or deadly weapon | | |
| 261 | 1923 | California | 1923 Cal. Stat. 695, § 1 | Prohibited the manufacture, importation, keeping for sale, offering or exposing for sale, giving, lending, or possession of any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, and the concealed carrying of any dirk or dagger.  Punishable by imprisonment for 1-5 years. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Dirk; Dagger | Replaced in 1953 with enactment of Cal. Penal Code § 12020 | |
| 262 | 1923 | Missouri | 1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17 | Prohibited the carrying, while a passenger or operating a moving vehicle, of a revolver, gun or other firearm, or explosive, any Bowie knife, or other knife having a blade of more than two and one-half inches in length, any slingshot, brass knucks, billy, club or other dangerous weapon.  Punishable by imprisonment of minimum 2 years. | Revolver; Gun; Explosive; Bowie knife; Other knife having a blade of more than two and one-half inches in length; Slingshot; Metal knuckles; Billy; Club; Other dangerous weapon | | |
| 263 | 1923 | South Carolina | 1923 S.C. Acts 221 | Prohibited the selling or giving to a minor a pistol or | Pistol; Pistol cartridge; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane or slingshot. Also prohibited a parent from giving such a weapon to their child under 12 years old.  Punishable by fine up to $50 or imprisonment up to 30 days. | Metal knuckles; Bowie knife; Dirk; Loaded cane; Slingshot | | |
| 264 | 1923 | Vermont | 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1 | Prohibited using, carrying, or possessing a machine gun or automatic rifle while hunting. | Machine gun; Automatic rifle | | |
| 265 | 1925 | | 1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2 | Prohibited the setting of any loaded spring gun. Punishable by a fine of $100-500 or imprisonment for 30 days to 6 months. Exception for setting of trap gun to destroy burrowing rodents. | Spring gun; Set gun | | |
| 266 | 1925 | West Virginia | 1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and | Prohibited unlicensed carrying of a pistol, dirk, Bowie knife, slungshot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon.  Punishable by imprisonment for 6-12 months for the first offense, and for 1-5 years for subsequent offenses, and in | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | *City Of Princeton* v. *Buckner*, 180 W. Va. 457, 462 (1988) (held unconstitutional under state constitution); *Application of Metheney*, 182 |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | Possession of Weapons and Fire Arms. . . , ch. 3, § 7(a) | either case, a fine of $50-200. | | | W. Va. 722 (1990) |
| 267 | 1925 | West Virginia | 1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b | Prohibited publicly displaying for rent or sale any revolver, pistol, dirk, Bowie knife, slungshot, other dangerous weapon, machine gun, submachine gun, or high powered rifle. Requires dealers to keep a register.  Prohibited selling, renting, giving, or lending any of these weapons to an unnaturalized person. | Revolver; Pistol; Dirk; Bowie knife; Slungshot; Machine gun; Other dangerous weapon; Submachine gun; High powered rifle | | |
| 268 | 1925 | West Virginia | 1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b | Prohibited carrying, transporting, or possessing a machine gun, submachine gun, or high powered rifle except on their own premises and with a permit. Also provides guidelines for such a permit. | Machine gun; Submachine gun; High powered rifle | | |
| 269 | 1927 | California | 1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously | Prohibited a person, firm, or corporation possessing a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| | | | Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1 2 | | | | |
| 270 | 1927 | Indiana | 1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1 | Prohibited owning or possessing a machine gun or bomb in an automobile. Punishable by imprisonment for 1-5 years. | Machine gun; Bomb | | |
| 271 | 1927 | Indiana | 1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2 | Prohibited discharging a machine gun or bomb. Punishable by imprisonment for 2-10 years. | Machine gun; Bomb | | |
| 272 | 1927 | Iowa | 927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1 2 | Prohibited possession of a machine gun. | Machine gun | | |
| 273 | 1927 | Maryland | 1927 Md. Laws 156, § 388-B | Prohibited possession of liquor in an automobile that also carries a gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon. | Gun; Pistol; Revolver; Machine gun; Other dangerous or deadly weapon | | |
| 274 | 1927 | Massachusetts | 1927 Mass. Acts 416, An Act Relative to Machine | Prohibited the carrying of a pistol, revolver, machine gun, stiletto, dagger, dirk | Pistol; Revolver; Machine gun; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | Guns and Other Firearms, ch. 326, § 5 | knife, slungshot, metallic knuckles, or sawed off shotgun, billy, or dangerous weapon if arrested upon a warrant for an alleged crime. Punishable by imprisonment of 6 months to 2.5 years. | Stiletto; Dagger; Dirk; Slungshot; Metallic knuckles; Sawed-off shotgun; Billy; Dangerous weapon | | |
| 275 | 1927 | Massachusetts | 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123) | Prohibited selling, renting, or leasing a pistol, revolver, or machine gun to a person without a license to possess the same. | Pistol; Revolver; Machine gun | | |
| 276 | 1927 | Michigan | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, bludgeon.  Punishable by fineup to $1,000 or imprisonment. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub; Bludgeon | | |
| 277 | 1927 | Michigan | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also Prohibited the same for a muffler or silencer. Punishable by fine of $1,000 and/or imprisonment up to 5 years. | Machine gun; Silencer | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 278 | 1927 | New Jersey | 1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1 | Prohibited a pawnbroker from selling or possessing for sale, loan, or to give away a machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Punishable as a high misdemeanor. | Machine gun; Automatic rifle; Revolver; Pistol; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Dagger; Dirk; Dangerous knife; Stiletto; Bomb; Other high explosive | | |
| 279 | 1927 | New Jersey | 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | Prohibited selling, giving, loaning, delivering or furnishing, or possessing a machine gun or automatic rifle to another person without a license. | Machine gun; Automatic rifle | | |
| 280 | 1927 | Rhode Island | 1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6 | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or possessing a machine gun. | Pistol; Machine gun | | |
| 281 | 1927 | Rhode Island | 1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8. | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or | Pistol; Machine gun; Silencer | | |

29

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|------------------|
| | | | | possessing a machine gun or silencer. | | | |
| 282 | 1927 | Rhode Island | 1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3 | Prohibited a person who has previously been convicted of a violent crime from owning, carrying, or possessing any firearm (including machine gun or pistol). | Machine gun; Pistol | | |
| 283 | 1929 | Indiana | 1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch. 55, § 1 | Prohibited being armed with a pistol, revolver, rifle shotgun, machine gun, or any other firearm or dangerous weapon while committing or attempting to commit a crime of rape, robbery, bank robbery, or larceny. Punishable by imprisonment for 10-20 years, in addition to the punishment for the original crime. | Pistol; Revolver; Rifle; Shotgun; Machine gun; Dangerous or deadly weapon | | |
| 284 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, sandbag, bludgeon, or any gas ejecting device. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub, Sandbag, Bludgeon, Gas ejecting device | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 285 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also Prohibited the same for a muffler or silencer. | Machine gun; Silencer | | |
| 286 | 1929 | Missouri | 1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2 | Prohibited selling, delivering, transporting, and possessing a machine gun. Punishable by imprisonment of 2-30 years and/or fine up to $5,000. | Machine gun | | |
| 287 | 1929 | Nebraska | 1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2 | Prohibited selling or otherwise disposing of a machine gun.  Punishable by fine of $1,000-$10,000. Also Prohibited transporting or possessing a machine gun. Punishable by imprisonment for 1-10 years. | Machine gun | | |
| 288 | 1929 | Pennsylvania | 1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1 4 | Prohibited selling, giving, transferring, or possessing a machine gun. Punishable by fine up to $1,000 and imprisonment by separate or solitary confinement at labor up to 5 years. Also Prohibited using a machine | Machine gun | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | gun during an attempted crime. Punishable by separate and solitary confinement at labor for up to 10 years. | | | |
| 289 | 1929 | Pennsylvania | 1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns, § 3 | Prohibited being armed with a machine gun while committing a crime. Punishable by imprisonment with solitary confinement up to 10 years. | Machine gun | | |
| 290 | 1929 | Wisconsin | 1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1 | Prohibited owning, using, or possession a machine gun. Punishable by imprisonment of 1-15 years. | Machine gun | | |
| 291 | 1931 | Delaware | 1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1 | Prohibited a person from possessing a machine gun. Punishable by fine and/or imprisonment. | Machine gun | | |
| 292 | 1931 | Illinois | 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | Prohibited selling, loaning, or giving away, purchasing, possessing, carrying, or transporting any machine gun. | Machine gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 293 | 1931 | Illinois | 1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7 | Prohibited being armed with a machine gun while committing arson, assault, burglary, kidnapping, larceny, rioting, or robbery. Punishable by imprisonment for 5 years to life. | Machine gun | | |
| 294 | 1931 | Michigan | 1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | | |
| 295 | 1931 | New York | 1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1 | Prohibited using an imitation pistol and carrying or possessing a black-jack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or ay other dangerous or deadly weapon. | Imitation pistol; Blackjack; Slungshot; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Machine gun; Sawed-off shot gun; Other dangerous or deadly weapon | | |
| 296 | 1931 | North Dakota | 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2 | Prohibited selling, giving, loaning, furnishing, or delivering a machine gun, submachine gun, automatic rifle, or bomb (without a license). Punishable by imprisonment up to 10 years and/or fine up to $3,000. | Machine gun; Submachine gun; Automatic rifle; Bomb | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| 297 | 1931 | South Carolina | 1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1 | Prohibited the setting of any loaded trap gun or spring gun.  Punishable by a fine of $100-500 or imprisonment of 30 days to 1 year. | Trap gun; Spring gun | | |
| 298 | 1932 | District of Columbia | District of Columbia 1932: 1932, Public-No. 275-72D Congress, ch. 465 | Prohibited being armed with or having readily available any pistol or other firearm while committing a violent crime. In addition to being punished for the crime, will also be punished with imprisonment (various terms depending on the number of previous convictions). Additionally, Prohibited people convicted of violent crimes from owning or possessing a pistol. Prohibited carrying a concealed deadly or dangerous weapon. Regulates the sale and transfer of pistols. | Pistol; Deadly or dangerous weapon | | |
| 299 | 1932 | Louisiana | 1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a | Prohibited selling, loaning, giving, purchasing, possession, carrying, or transporting a machine gun. | Machine gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | Penalty for a Violation Hereof . . . , §§ 1 2 | | | | |
| 300 | 1933 | California | 1933 Cal. Stat. 1169 | Prohibited a person, firm, or corporation from selling, possessing or transporting a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun | | |
| 301 | 1933 | Florida | 1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1 | Prohibited throwing a bomb or shooting a machine gun across or along a street or highway, any public park or place where people assemble with the intent to do bodily harm. Punishable by death. | Bomb; Machine gun | | |
| 302 | 1933 | Hawaii | 1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2 | Prohibited a person, firm, or corporation from owning, possessing, selling, or transporting a machine gun, shell cartridge, or bomb containing or capable of emitting tear gas or other noxious gas. | Machine gun; Shell cartridge; Bomb | | |
| 303 | 1933 | Kansas | 1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Unlawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership | Prohibited possession of a machine rifle, machine gun, or submachine gun. | Machine gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1 3 | | | | |
| 304 | 1933 | Minnesota | 1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3 | Prohibited owning, controlling, using, possessing, selling, or transporting a machine gun. | Machine gun | | |
| 305 | 1933 | New York | 1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3 | Prohibited selling, giving, disposing of, transporting, or possessing a machine gun or submachine gun to a person guilty of a felony. | Machine gun | | |
| 306 | 1933 | Ohio | 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1 | Prohibited owning, possessing, and transporting a machine gun, light machine gun, or submachine gun without a permit. Punishable by imprisonment of 1-10 years. | Machine gun; Light machine gun; Submachine gun | | |
| 307 | 1933 | Oregon | 1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4 | Prohibited possession of a machine gun. Also Prohibited carrying a concealed machine gun, pistol, revolver, or other firearm. | Machine gun; Pistol; Revolver; Other firearm | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| 308 | 1933 | Oregon | 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2 | Prohibited a unnaturalized person and person convicted of a felony against another person or the government from owning or possessing a pistol, revolver, other firearm, or machine gun. Punishable by imprisonment for 1-5 years. | Pistol; Revolver; Other firearm; Machine gun | | |
| 309 | 1933 | South Dakota | 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8 | Prohibited possession of a machine gun during a violent crime. Punishable by imprisonment up to 15 years. Prohibited using a machine gun offensively or aggressively; punishable by imprisonment up to 15 years. Requires manufacturers to keep a register of machine guns and for owners to converted their machine guns to pistols to register the weapon. | Machine gun | | |
| 310 | 1933 | Texas | 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6 | Prohibited possession of a machine gun; punishable by imprisonment up to 10 years. Prohibited selling, leasing, giving, bartering, exchanging, or trading a machine gun; punishable by imprisonment for 2 months to 10 years. | Machine gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 311 | 1933 | Washington | 1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5 | Prohibited manufacturing, owning, buying, selling, loaning, furnishing, transporting, or possessing a machine gun. | Machine gun | | |
| 312 | 1934 | New Jersey | 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5 | Declares a person who possesses a machine gun or submachine gun a "gangster" and therefore, enemy of the state.  Also declares a person who carries a deadly weapon without a permit a "gangster." If convicted a "gangster," punishable by fine up to $10,000 and/or imprisonment up to 20 years. | Machine gun; Submachine gun; Deadly weapon | | |
| 313 | 1934 | South Carolina | 1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6 | Prohibited transporting, possessing, selling, renting, or giving a firearm or machine gun. Punishable by fine up to $1,000 and imprisonment with solitary confinement up to 20 years. | Firearm; Machine gun | | |
| 314 | 1934 | Virginia | 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain | Prohibited possession or use of a machine gun during a violent crime; punishable by death or imprisonment for a minimum of 20 years. | Machine gun | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7 | Prohibited unlawful possession or use of a machine gun for offensive or aggressive purposes; punishable by imprisonment for a minimum of 10 years. Requires manufacturers to keep a register of machine guns. | | | |
| 315 | 1931-1933 | Wisconsin | 1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01-164.06 | Prohibited using or possessing a machine gun during an attempted violent crime; punishable by imprisonment of minimum 20 years. Prohibited use of a machine gun for offensive or aggressive purposes; punishable by imprisonment of minimum 10 years. | Machine gun | | |
| 316 | 1931-1933 | Wisconsin | 1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1 | Prohibited selling, possessing, using, or transporting a machine gun, automatic firearm, bomb, hand grenade, projectile, shell, or other container that can contain tear or other gas. Punishable by imprisonment for 1-3 years. | Machine gun; Automatic firearm; Bomb; Hand grenade; Projectile; Shell; Other container that can contain gas | | |

**EXHIBIT 20**

1    ROB BONTA
     Attorney General of California
2    MARK R. BECKINGTON
     Supervising Deputy Attorney General
3    ROBERT L. MEYERHOFF
     Deputy Attorney General
4    State Bar No. 298196
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6     Fax:  (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7    *Attorneys for Defendant Rob Bonta in his*
     *official capacity as Attorney General of the*
8    *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                      CIVIL DIVISION

12

13   **VIRGINIA DUNCAN, RICHARD**       Case No. 17-cv-1017-BEN-JLB
     **LEWIS, PATRICK LOVETTE,**
14   **DAVID MARGUGLIO,**
     **CHRISTOPHER WADDELL, and**       **DECLARATION OF DENNIS**
15   **CALIFORNIA RIFLE & PISTOL**      **BARON**
     **ASSOCIATION, INC., a California**
16   **corporation,**                  Courtroom:    5A
                                        Judge:        Hon. Roger T. Benitez
17                         Plaintiffs,  Action Filed: May 17, 2017

18          v.

19   **ROB BONTA, in his official capacity as**
20   **Attorney General of the State of**
     **California; and DOES 1-10,**
21
                           Defendants.
22

23

24

25

26

27

28

## DECLARATION OF DENNIS BARON

I, Dennis Baron, declare under penalty of perjury that the following is true and correct:

1.     I have been retained by the State of California to provide expert opinion and testimony regarding Corpus Linguistics research.  I am being compensated at a rate of $350 per hour.

2.     I have evaluated the historical use of the terms *arms* and *accoutrements* in order to show that large-capacity magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

## BACKGROUND AND QUALIFICATIONS

3.     I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.23018   Page 1184 of 1315
Case 3:19-cv-01537-BEN-JLB   Document 167-1   Filed 02/10/23   PageID.21244   Page 7 of 76
Case 3:17-cv-01017-BEN-JLB   Document 118-2   Filed 11/10/22   PageID.8470   Page 3 of 21

1  law. I have also published books on language reform, on usage, and on gender in
2  language.

3      4.     Most relevant for this report, I published two books on language and
4  law: *The English-Only Question: An Official Language for Americans?* (Yale Univ.
5  Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free*
6  *Speech* (Cambridge Univ. Press, January 2023). In addition, I served as lead author
7  on what came to be called "the Linguists Brief" in *District of Columbia v. Heller*
8  (2008), a brief cited both by J. Scalia in his opinion in the case, and by J. Stevens in
9  his dissent. I was a co-author on another brief by professors of linguistics and
10 corpus linguistics, in *New York State Rifle and Pistol Ass'n. v. Bruen* (No. 20-843,
11 2022), which J. Breyer cited in his dissent. In that dissent, J. Breyer also quoted
12 directly from my essay "Corpus evidence and the meaning of 'bear arms'"
13 (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical
14 meaning and the Second Amendment at the Federalist Society at the Univ. of
15 Chicago Law School, at the Neubauer Symposium on Historical Semantics at the
16 Univ. of Chicago, at Brigham Young Univ. Law School, at Stanford University,
17 and at the conference "*Heller* after Ten Years" at Hastings College of Law. I've
18 also written opinion essays on historical meaning and the Second Amendment for
19 the *Washington Post* and the *Los Angeles Times*. And I have submitted a
20 declaration on behalf of the State of Rhode Island in *Ocean State Tactical, LLC, et*
21 *al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.). In the
22 past twenty years I have been an expert consultant in perhaps a dozen cases
23 involving document interpretation.

24     5.     My forthcoming essay, "Look It Up in Your *Funk and Wagnalls*: How
25 Courts Define the Words of the Law," an analysis of how courts incorporate
26 information from dictionaries and digitized corpora as they ascertain legal meaning,
27 will appear in the next issue of the academic journal of the Dictionary Society of
28 North America, *Dictionaries*.

6. This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large digitized corpora consisting of many millions of words.

## OPINIONS

### I. SUMMARY OF CONCLUSIONS

7. Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements*. Nor does *arms* refer to *parts* of weapons, for example the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets. Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition; arms and accoutrements;* or *arms, ammunition, and accoutrements*. A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier or militia member's kit, or equipment. For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term *accoutrements* occurs alone, as *in the accoutrements of a soldier*, it may include both arms and accessories. But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories. And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

8. Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks). And they often specified, separately, the

1   different accessories that officers and the rank and file soldiers were also required
2   to have.

3   **II.   THEORY AND METHODOLOGY**

4        9.     Corpus linguistics as a field developed in the late 1960s, when scholars
5   began using computer programs to analyze large bodies of digitized text. Initial
6   work in corpus linguistics did not typically involve legal issues. Literary scholars
7   developed computerized concordances to the works of Shakespeare, Milton, and
8   other major English writers. Scholars plotted the frequency of words and phrases in
9   order to develop a picture of an author's style, and to determine authorship of a
10  particular work when the provenance was in doubt. Soon, in addition to solving
11  literary mysteries, the methodologies developed by corpus linguists were
12  successfully applied in a number of criminal cases in the US and in England
13  involving, for example, the authorship of a ransom note or an email.

14       10.    Lexicographers, who began compiling large analog databases of text in
15  the late 19th century, began to digitize their libraries of paper data and to add to that
16  material, assembling computerized databases of historical and contemporary text
17  and, more recently, of spoken language as well, in order to arrive at more precise
18  definitions of the multiple senses of words and phrases.

19       11.    As a graduate student at the Univ. of Michigan in 1970, I coded analog
20  texts from the *Oxford English Dictionary* files to help build the computerized
21  database for the Dictionary of Early Modern English, the period from 1500–1800
22  that is particularly relevant to the language of the Founding Era. Today, major
23  dictionaries like the *Oxford English Dictionary* and the Merriam-Webster suite of
24  dictionaries rely on public databases of oral and written language, as well as their
25  own proprietary databases, in order to revise older definitions and to track the
26  spread of new words and meanings. The great dictionary makers of Europe use
27  similar databases in their own work.

28

12.   Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a subset of Corpus Linguistics. LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as Original Public Meaning (OPM)—in statutes and in the Constitution. The promise of LCL attracted jurists as well as scholars with a specific interest in language and law. In *Muscarello v. United States* (524 US 125 1998), a case which held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or truck, can be deemed to be within the scope of the statutory phrase 'carries a firearm,'" J. Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to clarify the meaning of the words *carry*, *vehicle*, and *weapon*. In her dissent, J. Ginsburg expressed skepticism that either dictionary evidence, or Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question. Her critique did not deter courts from performing other computerized data searches to determine legal meaning. In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute (*United States v. Costello*, 2012). Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean 'provide shelter' as well as the narrower sense, 'hide someone from the authorities.' But in the context of the Immigration Act, *harbor* appears alongside other terms involving secret, illegal activity, and so even though, using more rigorous parameter's showed that Posner's Google search may have been flawed, his understanding of the word *in context* seems clearly to be correct.

5

13.   More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, published "Judging Ordinary Meaning" (*Yale Law Journal* 127), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity. Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary*, as well, allowing a more precise interpretation of historical text data.

14.   In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by J. Alito in his concurrence in *Facebook v. Duguid* (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

15.   Several large databases have come online in the past few years that facilitate LCL research. They have proved invaluable to me in compiling this report. Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), covering the years 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth

1   century, the Corpus of Historical American English (COHA), which was initially
2   developed at BYU as well but is now independent of that institution, currently
3   contains 475 million words of text from 1820–2020. The size of these databases
4   continues to grow as more works are digitized, coded, and added to the corpora.

5       16.   Critics of LCL have complained that databases like COFEA and COEME
6   contain only texts written by "elites," whose language may differ from that of
7   "ordinary people" who do not write at all, or who for various reasons do not write
8   texts likely to be included in the available corpora. It is certainly the case that many
9   printed books and periodicals, along with documents like the Constitution, its
10   amendments, and state and federal statutes, tend to be written by educated
11   specialists and professional writers, and although ordinary people are expected to
12   understand the language of the Constitution, the Declaration of Independence, and
13   other founding documents, as well as the laws that govern the nation, such texts
14   typically require specialized knowledge. A reading-difficulty formula like the
15   commonly-used Flesch-Kincaid scale suggests that the Declaration of
16   Independence and the Constitution require a fifteenth-grade reading level, while
17   according to one comprehensive study, *Adult Literacy in America* (US Department
18   of Education, 1993), the average American today tends to have a seventh-grade
19   reading level.

20       17.   In order to counter any "elite" bias that may be found in databases like
21   COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases
22   covering the period 1750–1900, focusing for this report on the Founding Era and on
23   the period of Reconstruction after the passage of the Fourteenth Amendment. Print
24   technology remained relatively static between the 1450s, when printing presses first
25   appeared in Europe, and the early 19th century, when the Industrial Revolution
26   drastically changed print technology. The first printing press was adapted by
27   Gutenberg from the design of the traditional wine press, and printing was a slow
28   and labor intensive process. As a result, newspapers in the founding era were small,

7

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

1   averaging four to eight pages. Publication was less frequent as well. Papers tended

2   to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the

3   Founding Era and later, during Reconstruction, provided average Americans with

4   their principal access to all the critical events and documents of their time, along

5   with coverage of local and international news. Even though newspaper subscribers

6   tended to be "elites," newspaper content was widely shared by word-of-mouth:

7   ultimately, most Americans in the Founding Era, including those who would be

8   classified as illiterate or poorly educated by today's standards, got their news from

9   newspapers.

10      18.   The invention of the steam engine in the 19th century, along with growth

11  of paper mills that facilitated the production from wood pulp of large and

12  inexpensive rolls of newsprint, led to a revolution in print technology. This led to

13  an explosion in the size of newspapers and the frequency of their publication, to the

14  point where, at their height, papers in big cities were publishing several editions a

15  day. This growth in newspapers, along with a substantial increase in periodical and

16  book production, paralleled a growth in literacy in the US and Europe that tracked

17  the industrial revolution and the subsequent rise in universal public education. By

18  the end of the Civil War, there were more readers than ever, and they demanded

19  more reading material.

20      19.   As for the question of "elites," as the principal means of communicating

21  news and information, the newspapers of the 18th and 19th centuries embodied

22  much of the language of the "ordinary people" who read them. Newspapers also

23  provide researchers with more data for the 19th century than a corpus like COHA,

24  which covers the same period but tends to focus on literary and specialized texts

25  rather than material for the general reader.

26      20.   Since the 1960s, database compilers have been able to track

27  contemporary spoken English more successfully, though for obvious reasons, none

28  of the databases for the Founding Era and for the post-Civil War period cover the

1   spoken language of Americans. Although scholars can reconstruct some of that oral

2   language, we are always doing so through the lens of print versions purporting to

3   represent or comment on ordinary speech.

4       21.   The newspaper databases I have examined are Readex Historical

5   American Newspapers; Chronicling America (newspapers digitized by the Library

6   of Congress); the British Newspaper Archive (digitized by the British Library); and

7   two private subscription services, newspapers.com and newspaperarchive.com. For

8   this report, newspapers.com provides the most-complete picture of the language of

9   the Founding Era newspapers as well as the ordinary language of the later 19th

10   century.

11       22.   All the databases contain some duplicates. COFEA and COEME digitize

12   multiple editions of the same work; and the newspaper databases contain a number

13   of duplicate stories because, particularly in the period of newspaper growth during

14   the 19th century—in an age before the wire services and syndication appeared, and

15   before the larger papers began to set up news bureaus in key areas around the

16   country and around the world—newspapers routinely printed each other's stories,

17   sometimes acknowledging their source and sometimes not. Still, the databases often

18   offer more insight into the meaning of words and phrases than simply going to a

19   dictionary. Jurists from Learned Hand to Felix Frankfurter to Frank Easterbrook

20   and Richard Posner have warned their colleagues not to make a fortress of the

21   dictionary. The corpora are by necessity incomplete. LCL doesn't replace

22   dictionary look-ups, but it does provide an important supplement to them.

23   **III.   THE MEANING OF ARMS AND ACCOUTREMENTS IN THE DATABASES**

24       23.   I was asked to look at the meaning of *arms* and *accoutrements*, along

25   with the phrase *arms* and *accoutrements,* current in the Founding Era and during

26   the period immediately following the adoption of the Fourteenth Amendment,

27   focusing on whether the word *accoutrements* may be considered analogous to the

28   present-day use of the term *magazine* in reference to firearms.

24.   In the eighteenth and nineteenth centuries, *magazine* was a word that meant 'storehouse, depot.' A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits. The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the nineteenth century, and the term was relatively rare until the 1920s. Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms*.

25.   The data on *accoutrements* suggest that the analogous LCMs are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military. *Cartridges, cartridge boxes* and later, *magazines*, are not arms in and of themselves.

26.   The *Oxford English Dictionary* (OED), the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement*; the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

27.   *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxes, and other formal attire). But the military sense of *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers. The example given to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here

10

Wellington, recognized by all as a consummate soldier who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms* and *accoutrements*.

28.   The term *accoutrement-maker*, though not defined separately by the *OED*, is illustrated with examples referring to a manufacturer of military accessories rather than arms; and the term *accoutrement shop* has this 1831 example where guns and accoutrements are differentiated: "The crowd was so great in the Rue de Richelieu, . . . especially about the gunsmiths and accoutrement shops in the vicinity of the Palais Royal." [*United Service Jrnl*. i. 325]

29.   The *OED* definitions are instructive. But in order to determine more specifically what the term *accoutrements* refers to, I consulted two digitized historical databases, or corpora. A COFEA database search for the occurrence *accoutrements* within 6 words of *arms* returned 873 hits (including a small number of duplicates). A similar search of COEME returned 126 hits, the earliest from 1656. I determined that the two search terms, *arms* and *accoutrements*, often appear together as a single phrase, *arms and accoutrements*, typically in military contexts having to do with an army or militia unit. *Accoutrements* often occurs in a list alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition*, though when *ammunition* is not listed separately, the term *accoutrements* will generally include *ammunition*. *Accoutrements* sometimes occurs in a list alongside *clothing*, suggesting it may not always include uniforms (this finding informs the *OED* definition: military equipment other than arms and uniforms). But occasionally, *accoutrements* may include items classified as part of a uniform (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where the term usually refers to clothing associated with particular professions or activities). In sum, in the vast majority of examples, *accoutrements* functions as a catch-all term for military equipment *separate* from, and not including, *arms*.

30.   But English usage is never simple. As linguists often say, "all grammars leak"—which is to say, there are always a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation: it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military
> *accoutrements*, such as paper-caps, paper-belts, wooden swords,
> &c. were beating up for recruits in Parliament-street, Boston. [*The*
> *American jest book*: Part I[-II], 1789; emphasis added; here military
> accoutrements includes toy swords.]

31.   This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that arms may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements
> provided by the militia law.

32.   But besides a handful of exceptions, in literally hundreds and hundreds of cases, *arms* and *accoutrements* are treated as separate items of military gear. Here are some typical examples from the Founding Era:

> **1776**: Fire arms and accoutrements
>
> **1780**: arms, ammunition, accoutrements, drums and fifes in
> possession of the respective regiments.
>
> **1795**: you will march . . . with arms and accoutrements in good order.
> If any volunteer should want arms and ammunition, bring them
> forward, and they shall be supplied as well as possible. [COEME;
> the other examples are from COFEA]
>
> **1798**: To hold his powder and his ball, his gun, accoutrements

1    and all . . . [This example rhymes because it's from a poem,

2    indicating that the idiomatic phrase arms and accoutrements has

3    become part of the general language available not just to military

4    specialists but also to poets and novelists.]

5    33.   A second COFEA search, for *accoutrements* alone, returned 1,235 hits.

6    COEME yields 771 hits. These searches add a number of non-military contexts,

7    where accoutrements refers to religious gear (robes, mitres, and so on) as well as

8    other sorts of fancy or special clothing. These non-military examples do not

9    reference weapons, ammunition, or other military equipment.

10    34.   I supplemented my COFEA search with a search of the newspaper

11    database, newspapers.com, for the Founding Era period, 1750–1800. The

12    newspaper databases do not permit the kind of collocate searches that COFEA,

13    COEME, and COHA allow. Entering two search terms returns results in which

14    either one or both terms occur on the same page, though not necessarily in the same

15    sentence, or even in the same article, and not necessarily as linked terms. There are

16    1,392 hits for *accoutrements*. There are 692 matches for the exact phrases *arms and*

17    *accoutrements*.

18    35.   Here's a mid-18th century British example from the newspapers.com

19    corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:

20    36.   This Militia shall receive their Arms, Accoutrements, and

21    Ammunition from the Ordnance. *Derby Mercury*, 1756.

22    37.   Similarly, there's this "ploughshares into swords" example of a

23    Cambridge University library to be converted to a military barracks:

24    [T]he new Building intended for a publick Library . . . may be

25    converted into a Barrack, and be supplied with Provisions, Arms,

26    and Accoutrements, at the Expence of the University. 1756

27    38.   A search of the Readex database of America's Historical Newspapers

28    returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. This early

example from the colonial period appeared in the **Boston Evening Post** in 1750. It distinguishes *arms* from uniforms, accoutrements, and other military equipment:

> All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things necessary for a Gentleman Ranger.

39.   This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that arms and accoutrements are distinct categories in the new nation as well:

> The militia . . . must be considered as the palladium of our security . . . . The formation and discipline of the militia of the continent should be absolutely uniform; and that the same species of arms, accoutrements, and military apparatus, should be introduced in every part of the United States.

40.   The text of a bill in Congress to establish a uniform militia appeared in the *New York Journal*, in 1790. It confirms the Founding-Era sense that *arms, ammunition*, and *accoutrements* make up distinct and separate elements of a soldier's kit:

> There shall be appointed an adjutant general for each state . . . whose duty it shall be to . . . report[] the actual situation of their arms, accoutrements, and ammunition. . . Every non-commissioned officer or private . . . for appearing at such meeting or rendezvous without his arms, ammunition, or accoutrements, as directed by this act, shall pay the sum of twenty-five cents.

41.   And this cite from 1868 clearly distinguishes what counts as arms, and what counts, separately, as accoutrements:

> At Watertown Arsenal, Massachusetts . . . the following Arms, &c., will be sold:10,699 rifled and smooth-bore Muskets . . . ; 261 Carbines . . . ; 305 Sabres . . . ; lot of cavalry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c."

42.   The newspaper data parallels that of COFEA: the phrase *arms and*

14

1   *accoutrements* is almost always military. The phrase sometimes occurs alongside

2   *ammunition* as a separate list item. *Accoutrements*, when it appears alone, is a more

3   general term, used both for military and other gear, though in non-military contexts

4   it is more directed toward clothing rather than 'equipment' (priests' robes,

5   ministerial garb, fancy ball gowns, badges of office), as is also indicated in the

6   *OED* citations. In non-military contexts, *accoutrements* carries the suggestion of

7   ceremonial gear, and less commonly, nonmilitary tools of the trade.

8       43.   It's clear that *arms and accoutrements* was, during the 18th and 19th

9   centuries, a common military phrase, in both England and America. English often

10   yokes terms commonly found together into idiomatic pairings, sometimes called

11   binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and*

12   *battery* or *breaking and entering*. Such pairs take on the characteristics of a

13   formula, and often appear in the same order (this order may be dictated by logical

14   succession of events, or it may be random). *Eggs and bacon* is rarer than *bacon and*

15   *eggs*. And it would be unusual to find *battery and assault*. Such ordered pairs are

16   called "irreversible binomials," though there's nothing but custom (as in *salt and*

17   *pepper*) and sometimes logic (as in breaking and entering) to prevent anyone from

18   reversing the order.

19       44.   The word *accoutrements* typically occurs in a list after *arms* (more rarely,

20   it may occur before *arms* as well), and it is typically a separate category from *arms*

21   (though not always, as the above examples show).

22       45.   There are over 47,000 citations in newspapers.com for *arms* or

23   *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms*

24   *and accoutrements*. Examining a selection of the 15,799 citations of the phrase

25   confirms that both in England and the US, *arms* and *accoutrements* are separate

26   categories. Here is one example from Gloucestershire, in England, dated 1868:

27       [A] letter was received from the Home Secretary, pointing out the danger

28

1    of permitting an accumulation of arms and accoutrements to take place in

2    prisons, and requesting, if there were any arms or munitions of war stored

3    in the prison, that they should be removed to the nearest military depot.

4    46.   A similar cite from Iowa in 1868: "Persons having in their possession any

5    arms, accoutrements or ammunition belonging to the State, are requested to return

6    the same at once to the Adjutant General, as proper places have been provided by

7    the State for the safe keeping of all such property."

8    47.   And this, from Stroudsburg, PA, also 1868: "More than half of the

9    Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements,

10   and probably made their way to the gold regions of Colorado and Montana."

11   48.   The circa-1868 data confirmed the Founding Era data that *accoutrements*

12   is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the

13   terms refer to separate categories of equipment.

14   49.   One final note on *accoutrements*. The U.S. Supreme Court's recent

15   decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843,

16   2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the

17   North Carolina Supreme Court affirming Huntley's conviction for carrying a

18   shotgun illegally "to the terror of the people," as forbidden by the Statute of

19   Northampton in 1328. In that decision, the Court states, A gun is an 'unusual

20   weapon,' wherewith to be armed and clad. No man amongst us carries it about with

21   him, as one of his everyday accoutrements—as a part of his dress.

22   50.   In the citation above, *accoutrements* does not refer to weaponry, but to

23   the more general category of 'everyday attire, or clothing.' It may be normal to

24   wear a shirt, or a belt, or shoes, but it's not normal, the Court is saying, to wear a

25   gun in North Carolina in 1843. It's legal—the Court agrees—to carry a gun for any

26   lawful purpose, "either of business or amusement"—but it's not *normal* or typical

27   to do so. In affirming Huntley's conviction, the Court noted that his purpose in

28   carrying a shotgun was not a legal one.

16

## IV.  SOME HISTORICAL NOTES ON THE USE OF THE WORD MAGAZINE

51.  Since the technology of arms and ammunition was changing by the mid-nineteenth century, I also searched for new uses of the term magazine in relation to *arms* and *accoutrements*. With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term *magazine* starts to appear in the sense 'ammunition container' (replacing the earlier *cartridge box* or *cartridge case*). According to the *OED*, in the 18th and early 19th centuries, magazine referred generally to 'a storehouse,' and in military contexts it referred specifically to a storehouse for gunpowder. (The sense of 'storehouse' also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of 'depot, warehouse,' is cognate with the French word *magasin*, 'a shop or store').

52.  Although most uses of the word *magazine* still refer to printed periodicals, during the 19th century, one sense of the term *magazine* narrows, referring more and more to an 'ammunition container,' a primary sense of the word in reference to firearms today. The *OED* defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

53.  COFEA and COEME do not cover the period past 1800. COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s. Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses. Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. *Magazines* meaning 'devices for holding bullets' form only a very small subset of these citations. It took some thirty to forty years for the 'bullet holder'

17

1  sense of the word *magazine* to become more common, and even then, text
2  references to ammunition magazines often appear, not in general discourse, but in
3  legislation restricting their size or use.

4      54.   Most militia laws and regulations from the Founding Era specify
5  minimum requirements for soldiers' weapons, ammunition, and accoutrements.
6  Most laws regulating weapons in the mid-19th century restrict or ban specific kinds
7  of weapons, often enumerating them, sometimes in terms we find colorful today but
8  which were common at the time (Arkansas toothpicks, Bowie knives, slung shots,
9  swords in canes, pistols capable of being concealed in a pocket). Occasionally these
10  laws further identified such weapons as those used by "brawlers," thieves, robbers,
11  or others bent on illegal activities. Other weapons restrictions follow the English
12  tradition of limiting possession of weapons by social class, nationality, or race.

13      55.   Although militia laws do specify weapons and other required
14  accoutrements or pieces of military equipment, including horses for the officers,
15  those laws that prohibit certain kinds of weapons during the two critical periods
16  (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one
17  exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles,
18  except by the owner thereof on his removal to reside out of this province, or any
19  gun barrels, gun locks, or bayonets, be carried out of his province, without the leave
20  of the council of safety for the time being." [1776 Md. Laws 146].

21      56.   I surveyed the gun regulations in the Duke Historical Database from the
22  early medieval period through 1885 to see what terminology was used. None of the
23  laws that prohibit weapons, aside from the Maryland statute above, specifies a gun
24  part or ammunition case or accoutrements of any kind. Although many present a list
25  of banned or prohibited weapons—usually without defining them [the assumption
26  is that the reader knows what they refer to], none of the laws mention cartridge
27  boxes, bullets, barrels, or other parts of any weapons.

28

57.   Later, however, in the decades after the introduction of *magazines* as 'carriers or holders of bullets,' laws and regulations against their nonmilitary use started to appear. Here's a 1919 Maine law banning guns with loaded magazines: No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.

58.   Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states. Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

59.   A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

60.   Finally, the Federal Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms: "(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition."

61.   The Act also provides a specific definition of "machine gun": "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

19

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

## V.   CONCLUSION

62.   In effect, then, *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms. In non-military contexts this does not apply: the *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

63.   But there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

64.   In addition, 'bullet holders,' whether they are called *cartridge cases*, *magazines*, or simply, *machine guns*, both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

65.   To repeat, there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, 2022, at Champaign , IL


_____
Dennis Baron

20

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

# EXHIBIT 21

1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   State Bar No. 261579
    JOHN D. ECHEVERRIA
5   Deputy Attorney General
    State Bar No. 268843
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-3479
     Fax:  (415) 703-1234
8    E-mail:  John.Echeverria@doj.ca.gov
    *Attorneys for Defendant Rob Bonta,*
9   *in his official capacity* [1]

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                      WESTERN DIVISION

13

14

| | |
|---|---|
| 15 **STEVEN RUPP; STEVEN** | 8:17-cv-00746-JLS-JDE |
| 16 **DEMBER; CHERYL JOHNSON;** | |
| **MICHAEL JONES;** | **SUPPLEMENTAL EXPERT** |
| 17 **CHRISTOPHER SEIFERT;** | **REPORT AND DECLARATION** |
| **ALFONSO VALENCIA; TROY** | **OF COLONEL (RET.) CRAIG** |
| 18 **WILLIS; and CALIFORNIA RIFLE** | **TUCKER** |
| **& PISTOL ASSOCIATION,** | |
| 19 **INCORPORATED,** | |
| 20                   Plaintiffs, | Courtroom:   8A |
| | Judge:          The Honorable Josephine |
| 21     **v.** | L. Staton |
| 22 **ROB BONTA, in his official capacity** | Action Filed:  April 24, 2017 |
| **as Attorney General of the State of** | |
| 23 **California; and DOES 1-10,** | |
| 24                   Defendants. | |

25

26

27       ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
         [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
    Attorney General of the State of California. Pursuant to Federal Rule of Civil
28  Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as
    the defendant in this case.

                                      1

## SUPPLEMENTAL EXPERT REPORT AND DECLARATION OF COLONEL (RET.) CRAIG TUCKER

I, Colonel (Ret.) Craig Tucker, declare under penalty of perjury that the following is true and correct:

1.      I have been asked by the Office of the Attorney General of the California Department of Justice to prepare an expert report and declaration on the purpose, use, and features of certain semiautomatic firearms.  This supplemental expert report and declaration ("Report") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

### PROFESSIONAL QUALIFICATIONS

2.      I am a Colonel, US Marine Corps, (Retired).  I served as an infantry officer in the Marine Corps for 25 years.  I have commanded infantry units from platoon to regiment.  I commanded Regimental Combat Team -7 (RCT-7) in Iraq from February 2004 to April 2005.  During my time in Iraq, I commanded 22 different US Marine, US Army, and Iraqi Army battalions and exercised tactical control over Naval Special Warfare and US Special Forces, and supported National Tier 1 assets.  I commanded the Regiment in both Fallujah battles and numerous smaller battles.  I was the target of 9 assassination attempts and was wounded in Husaybah Iraq in July 2004.  Upon my return from Iraq, I was assigned to the US Marine Corps National Training Center and was responsible for training and certifying units for combat in Iraq and Afghanistan.

3.      I have received two Legion of Merit awards for exceptional meritorious conduct in the performance of outstanding combat services, the Military Order of the Purple Heart, the Navy Commendation Medal for Heroic Action, the Combat Action Ribbon, and seven Sea Service Deployment Ribbons, among other awards.

Ex. 2_Echeverria Decl.
Page 25

4.     After I retired from military service in 2006, I served as an Assistant Deputy Administrator for the Office of Secure Transportation (OST), National Nuclear Security Agency.  OST is a paramilitary organization consisting of federal agents armed with M4s.[2]  I was also the Department's Render Safe program in Albuquerque NM.

5.     In 2012, I joined Innovative Reasoning LLC, which provides professional support services to the U.S. Department of Defense and other government clients.  While at Innovative Reasoning, I developed training programs and planning capabilities for the Marine Corps, and I developed and taught a training course on tactical decision-making for law enforcement officers.

6.     Through my military service, I gained extensive knowledge and familiarity with the full range of US combat weapon systems.  The automatic rifle is the foundational combat weapon system.  Ground and aviation weapon systems are specifically designed to support the automatic rifle.  My primary purpose in the latter stages of my career was coordinating, and teaching others to coordinate, air and ground weapon systems to support the rifleman and his automatic rifle.

7.     I have fired the Colt AR-15 5.56 rifle and the Smith and Wesson 5.56 AR rifle.  Both are advertised as the civilian version of the M16 combat rifle.  In addition to my automatic rifle experience, I have extensive experience with the AK-47, having been on the receiving end of hundreds of 7.62 rounds; an experience best typified during the Battle of Hit when a single individual with one rifle and apparently inexhaustible supply of 7.62 ammo and magazines kept nine Marines pinned down for 15 minutes until a LAV-25 20mm chain gun solved the problem.  I have extensive experience with the Colt 1911 .45 caliber semi-automatic and the Berretta .9m semi-automatic pistol and used both weapons in Iraq.

---

[2] The M4 is a gas-operated, magazine-fed carbine.  It is the shortened version of the M16 assault rifle.

3

8.     I currently serve as a trainer and planner for the City of Albuquerque's Office of Emergency Management.

9.     I hold a B.S. in Criminal Justice from the University of Dayton, a Master of Military Art and Science from U.S. Army Command and General Staff College and the U.S. Army School of Advanced Military Studies, and a Master's degree in National Security and Strategic Studies from the College of Naval Warfare, where I graduated with the highest distinction.

10.    A copy of my curriculum vitae is attached as **Exhibit A** to this Report.

11.    I have been retained by the California Department of Justice to serve as an expert witness in this case.  I am being compensated at a rate of $200 per hour.

## OPINIONS

12.    I have reviewed the statutory definitions of an "assault weapon," as defined under California's Assault Weapons Control Act (AWCA) in California Penal Code section 30515(a).[3]  Under Penal Code section 30515(a), a semiautomatic centerfire rifle that does not have a fixed magazine qualifies as an assault weapon if it has any of the following features:  (1) a pistol grip that protrudes conspicuously beneath the action of the weapon; (2) a thumbhole stock; (3) a folding or telescoping stock; (4) a grenade or flare launcher; (5) a flash suppressor; or (6) a forward pistol grip.[4]  A semiautomatic centerfire rifle also qualifies as an assault weapon if it is equipped with a fixed magazine with the capacity to hold more than 10 rounds or has an overall length of less than 30 inches.[5]  I have also reviewed the list of rifles that qualify as "assault weapons"

---

[3] See Cal. Penal Code § 30515, https://bit.ly/3CtxfEj.

[4] Cal. Penal Code § 30515(a)(1)(A)-(F).

[5] Cal. Penal Code § 30515(a)(2)-(3).

1    under California Penal Code § 30510(a), which have many of the same features and

2    accessories listed in § 30515(a).

3         13.    I am familiar with the features, accessories, and capabilities of rifles

4    regulated by Penal Code § 30515(a).  The AR-15, like the M4, is an offensive

5    combat weapon system.  The only difference is the AR-15 cannot fire on full-auto

6    (continual shots fired in succession so long as the trigger is pulled) or burst (several

7    shots fired in succession with a single pull of the trigger)—a picayune difference

8    that cannot serve to support a non-combat role for the AR-15.  In my experience,

9    soldiers are trained to set select-fire weapons to semi-auto mode, so that a single

10   round is fired with each pull of the trigger.  An M4 or M16 on full-automatic is an

11   area fire weapon: the auto rate of fire makes the weapon too difficult to control on a

12   point target.  Rifle fire on full automatic is not aimed fire, uses an excessive amount

13   of ammunition and will damage the weapon if used too often.  In fact, in my 14

14   months of combat, I did not once see an M4 or M16 fired on full auto.  Semi-auto

15   function is used almost exclusively in combat.  When operated in semi-auto mode,

16   the AR-15 and M4 share the same rates of fire, the same maximum effective range,

17   the same maximum range, use the same magazines designed for combat and the

18   same ammunition.  The AR-15 and M4 are both designed to fire a .223 round that

19   tumbles upon hitting flesh and rips thru the human body.  A single round is capable

20   of severing the upper body from the lower body, or decapitation.  The round is

21   designed to kill, not wound, and both the AR-15 and M4 contain barrel rifling to

22   make the round tumble upon impact and cause more severe injury.  The

23   combination of automatic rifle and .223 round is a very efficient killing system.

24   The same can be said of the AR-15.

25        14.    Automatic rifles, like the M-16 and its more modern carbine variant

26   M4, are functionally similar to semiautomatic rifles regulated under California's

27   AWCA and  often are equipped with the very same features, like pistol grips and

28   adjustable stocks.  It is my opinion, based on my military service, that these

1    features, individually and in combination, make semiautomatic rifles more lethal

2    and most useful in combat settings, as described in more detail below.

3        15.   Detachable magazines:  In order for a rifle to qualify as an assault

4    weapon under California Penal Code § 30515(a), the rifle must have the capability

5    of accepting a detachable ammunition magazine (by not having a fixed magazine).

6    Detachable magazines improve the killing efficiency of automatic rifles, allowing

7    the combat rifleman to efficiently carry a combat load of 120 rounds in four 30-

8    round magazines, to rapidly change magazines in combat, and to increase killing

9    efficiency by significantly reducing reload time.  Changing magazines during

10   intense combat is the most important individual skill taught to Marines.  During

11   intense combat, the detachable magazine provides a rifleman the capability to fire

12   120 rounds on semi-automatic in three minutes at a high-sustained rate of 45 rounds

13   per minute.  In a civilian self-defense context, by contrast, an individual would not

14   have a need for such a high rate of fire.

15       16.   Pistol grip protruding beneath the action of a rifle:  I am a 15th Award

16   Expert on the M16 and M4.  I carried an M4 every day for 14 months during my

17   time in command of RCT-7 in Iraq.  I used an M4 in combat, and I killed with it.

18   The pistol grip beneath the action of an automatic rifle serves only two purposes.

19   First, the pistol grip allows the rifleman to pull the rifle into her shoulder with each

20   shot, an action which increases stock weld, reduces semi-automatic/automatic

21   recoil, and reduces barrel rise.  Stock weld or cheek weld refers to the firmness of

22   the contact between the rifle stock, the shooter's cheek, and the shooter's shoulder.

23   A firm stock weld is required for effective semi-automatic and automatic rapid fire.

24   Absent any pistol grip, a semi-automatic rifle would be difficult to operate when

25   fired rapidly, as the rifle barrel would seesaw up and down with each shot fired in

26   succession.  Second, the pistol grip functions as a hand rest to reduce hand/finger

27   fatigue during long combat engagements.  Both actions increase the killing

28

6

1    efficiency of automatic rifles and are necessities in sustained combat operations of

2    weeks or months when firing a rifle rapidly.

3        17.    Forward pistol grip:  The forward pistol grip provides leverage to

4    tighten a stock weld on short barrel automatic weapons and reduces recoil and

5    barrel rise on short barrel automatic rifles.  Forward pistol grips were added to the

6    M4 to increase M4 killing efficiency.

7        18.    Folding stock:  A folding stock causes weapon instability.  For that

8    reason, folding stock automatic rifles are designed for military personnel, whose

9    primary weapon is vehicle or air-mounted (tank, Bradly, Apache), who may be

10   required to escape from a mangled vehicle, or who may need to abandon a

11   destroyed weapon system and need a substitute weapon for offensive combat.

12   Outside of the military context, folding stocks that are not properly locked in place

13   can cause significant safety risks to the shooter due to recoil.

14       19.    Grenade or flare launcher:  A Marine Corps fireteam consists of a

15   fireteam leader, a rifleman, an assault gunner, and a grenadier.  The grenadier is

16   armed with a grenade launcher.  The grenadier uses the grenade launcher to

17   suppress or kill human beings so the rest of the fireteam can maneuver into position

18   to kill those humans with automatic rifle fire.  The launcher is a separate weapon

19   system attached to as few rifles as possible dependent on the combat mission.  In

20   my experience, grenade launchers attached to rifles are cumbersome, difficult to

21   aim, difficult to carry, and are not as effective as a standalone grenade launcher.

22   They have no legitimate use in self-defense.

23       20.    Flash suppressor/flash hider:  The purpose of the flash suppressor is to

24   reduce combat signature by cooling and dispersing burning gases.  This makes it

25   more difficult for the enemy to pinpoint a rifleman's location, especially in low

26   light conditions.  The flash suppressor facilitates night combat operations by

27   reducing muzzle flash and mitigating muzzle flash impact on night vision goggles.

28

1   This accessory serves specific combat-oriented purposes and is not needed for self-
2   defense.

3       21.   <u>Fixed magazine with the capacity to accept more than 10 rounds</u>:
4   Automatic rifles are offensive combat weapons systems designed to kill efficiently
5   and effectively.  Any increase to magazine capacity increases the killing efficiency
6   of the automatic rifle.  A 30-round fixed magazine can fire more rounds in a given
7   amount of time than three 10-round detachable magazines, which would need to be
8   reloaded to fire the same number of rounds, slowing down the rate of fire.
9   Similarly, a 100-round drum magazine can fire more rounds in a given period of
10  time than ten 10-round detachable magazines.  As noted above in connection with
11  detachable magazines, an individual using a rifle in self-defense would not need
12  such a high, continuous rate of fire.

13      22.   The AR-15 is an offensive combat weapon no different in function or
14  purpose than an M4.  In my opinion, both weapons are designed to kill as many
15  people as possible, as efficiently as possible, and serve no legitimate sporting or
16  self-defense purpose.  Self-defense and military combat are different.  The weapons
17  and accessories needed in one may not be needed or appropriate in the other.  For
18  instance, when I was serving in the military, I carried my M4 for offensive combat
19  and a handgun for self-defense.  Defensive combat is generally up close and very
20  personal.  At that range, it is very difficult to use a rifle as a defensive weapon,
21  except as a blunt force instrument.  My 9mm pistol was the self-defense weapon of
22  choice, and we were trained to expend only 1-2 rounds per adversary in pistol
23  combat.  The features identified in California Penal Code § 30515(a) enhance the
24  lethality of both semiautomatic and automatic rifles and are most appropriate for
25  combat applications when used in conjunction with those types of weapons
26  systems.

27

28

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed on January 6, 2023 at Sandia Park, New Mexico

3

4

5    _____

6                Col. (Ret.) Craig Tucker

# EXHIBIT A

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

**CITY OF ALBUQUERQUE OFFICE OF EMERGENCY MANAGEMENT (07/2021-PRESENT)**

- <u>Training and Education Coordinator/Acting Senior OEM Planner</u>
  - o Coordinate with County and State agencies to develop training and exercise programs that prepare the City of Albuquerque to mitigate, respond to, and recover from disasters.
  - o Develop response plans for wildfire, flood, earthquake, and weapons release and test the plans in tabletop exercises and drills.
  - o *In coordination with Albuquerque Public Schools developed and executed a school drill assessment/evaluation program.*
  - o *Created, developed, and initiated training for APS, APD, and AFR on a doctrinal, best-practices-based approach to "Command and Control, Active Shooter, in a School, School in Session"*
  - o Develop a training and exercise program to meet FEMA National Qualification Standards.
  - o Serve as the Operations Chief for EOC activations and training.
  - o Responsible for Plans updates and revisions, including a rewrite of the CABQ Comprehensive Emergency Management Plan.
  - o Write and manage OEM Grants, including SHSGP, EMPG and Hazard Mitigation Grants.

**RAVENSWOOD SOLUTIONS INC. (10/2019 – 06/2021)**

- <u>Program Manager, US Marine Corps Operations</u>

  - o Provide subject matter expertise and develop capture plans to provide live, virtual, and constructive capabilities in support of the Commandant's Planning Guidance.

  - o Project Manager for Ravenswood Solutions live-instrumented training and AAR support to MAGTF Warfighting Exercise-20 (MWX 20), the largest instrumented exercise in USMC history.

  - o Co-authored White Paper on the application of machine-learning and Artificial intelligence to support unit readiness reporting.

  - o Provided subject matter expertise to support ML/AI Wargaming prototype development.

-

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Project Director, Middle East Operations

  o Lead planner and primary proposal author of a of a multi-corporation proposal to develop an 800-structure urban live fire and maneuver range in a Gulf Coast Coalition country.

  o Lead planner and primary proposal author of a multi-corporation proposal to develop a comprehensive training program for an emergent Marine Corps in a Gulf Coast Country.

- Program Manager, National Security Operations

  o Provide subject matter expertise, develop, and supervise training services in support of Department of Energy nuclear security and non-proliferation operations.

- Independent Contractor (01/2022 – 06/2022)

  o Acted as the Ravenswood Solutions Inc. US Marine Corps subject matter expert.

  o Acted as the Ravenswood Solutions Inc., training and leadership subject matter expert.

**INNOVATIVE REASONING, LLC  (08/2012 - 09/2019)**

- Director, Studies and Analysis

  o Provided analyses, recommendations and participated as the senior tactical SME in support of the following Marine Corps Combat Development Command requirements.

    • Development of the U.S. Marine Corps post-war on terror Training Strategy.

    • Development of an adaptive planning capability employing multi-agent modeling, experiential learning theory, and machine learning.

    • Improving Small Unit Leader Decision-making through training in Recognition Primed Decision-making and experiential learning theory.

    • Chaired US Marine Corps 3d Annual Maneuver Warfare Conference (2018).

- Director, Federal Programs

  o Provided direction, supervision, and oversight to 5 program managers assigned to DOD and Department of Energy contracts in the United States and overseas.

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Program Director, Law Enforcement Tactical Decision-making

  - Created, certified, and taught tactical decision -making courses focused on making decision in high risk, low occurrence, fast moving circumstances with risk of death, serious injury.

  - Developed and taught 400+ series of National Incident Management Courses to support local law enforcement requirements.

**DEPARTMENT OF ENERGY (09/2006 – 07/2012)**

  - Render Safe, Program Manager (SES)

    - Responsible for the Department of Energy (DOE) operational elements conducting nuclear counterterrorism and nuclear accident response in support of Tier 1 elements.

    - Responsible for organizing, resourcing, developing, and executing crisis response render-safe operations in support of Presidential and National Security policy.

  - Assistant Deputy Administrator (SES), Office of Secure Transportation (OST)

    - Responsible for the safe and secure transportation of nuclear weapons, materials, and components in the continental United States.

    - Acted as the Senior Energy Official and National Nuclear Security Administration Incident Commander for incidents involving OST assets and during DHS-directed NIMS National Training Programs

    - Provided leadership, vision, and direction to a 1000+ mixed para-military and civilian workforce.

    - Developed and implemented innovative security practices focused on intelligence-driven operations, leadership, and performance-based approach to training. Resulting security Doctrine provided a blueprint for significant changes to DOE physical security doctrine.

    - Provided astute and responsible management of a $270 million budget.

**UNITED STATES MARINE CORPS (06/1981- 08/2006)**

  - Director of Training, Tactical Training Exercise Control Group (TTECG) (07/2005-08/2006)

    - Selected by the Commandant to rebuild and lead the Marine Corps

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

Service-level pre-deployment training program.

- Responsible for the successful integration of emergent and innovative urban operations with conventional combined arms operations. Trained organizations from the US and numerous allied countries.

- Managed a training budget of $30 million. Developed and implemented new approaches to training to maximize effective use of increased training budget. Increased the number of Marines/units trained per year and successfully integrated complex, multi-discipline training requirements into a coherent, effective training program

o Commanding Officer, Regimental Combat Team 7 (RCT-7) (06/2003 - 07/2005)

- Commanded U.S. Marine Corps Regimental Combat Team 7 during Operation Iraqi Freedom II.  Tour included 14 months of continuous combat command in Al Anbar Province.

- Commanded RCT-7 during major urban combat operations to include battles of Fallujah I, Al Fajr (Fallujah II), Husaybah, Ramadi, and Hit.

- Developed and implemented successful strategic plans for reconstruction of western Iraq; managed over $200 million in construction and procurement contracts. Responsibilities included establishing border security, counter-terrorism operations, infrastructure development, and security forces training.

- Acted as Superintendent for an elementary school system consisting of 12 elementary schools throughout Al AnBar province. Constructed the schools, hired teachers, hired administrators, and provided safety and security for students, teachers, and staff.

- Responsible for the Force Protection and security of US bases and approximately 20,000 military and contractor personnel.

o Director of Operations, Training and Education Command (06/2002-05/2003)

- Responsible for the Marine Corps' training programs, with an 80,000+ personnel annual throughput.

- Developed and successfully initiated programming and procurement for the Marine Corps' 10-year range modernization and instrumentation plan. Established and chaired Range Instrumentation Working Group.

- U.S. Marine Corps Service-level representative to the OSD working group responsible for developing training transformation strategies.

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- ▪ Successfully led USMC effort to meet the congressionally mandated requirement to replace Vieques Island with a CONUS based amphibious live-fire training capability within the year.

- o Commander, 2nd Battalion, 7th Marine Regiment,

- o Director of Operations, 7th Marine Regiment.

- o Director of Operations, 13th Marine Expeditionary Unit (13th MEU).

  - ▪ Responsible for leadership and performance of a task-organized team with 1000+ members.

  - ▪ Served as primary planner in Naval and Joint crisis action planning and execution, to include the development of training plans, equipment procurement, and exercise development for the organization's worldwide contingency operations.

- o Operations Planner, I Marine Expeditionary Force (I MEF). Primary planner and architect for a multi-national effort to rewrite the operations plan for defense of the Republic of Korea.

- o Commander, Presidential Security Force, Camp David, MD

  - ▪ Commanding Officer of Marine Corps Detachment responsible for the security of the Presidential Retreat at Camp David.
  - ▪ Successfully balanced a 33% reduction in force structure with implementation of an innovative physical security plan that integrated personnel reductions, new technologies, and manpower, while increasing the security posture.

- o Commanding Officer:
  - ▪ Weapons Company, Marine Infantry Battalion. (1988-1989)
  - ▪ Infantry Company, Marine Infantry Battalion. (1986-1988)
  - ▪ Guard Company, Nuclear Weapons Security, Adak, AK. (1984-1986)
  - ▪ Headquarters Company, Supply Battalion. (1983-1984)

**AWARDS**
(2) Legions of Merit with Combat Valor device, Purple Heart, Navy Commendation Medal for Heroic Action, Combat Action Ribbon, (7) Sea Service Deployment Ribbons, numerous other awards, and

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289
decorations.


**PAPERS**
- "On Demand Readiness for Army Commanders Through AI and Machine Learning" (2020) (White Paper for Army Applied Laboratory and the Office of Naval Research. (co-authored with SOMETE Technology and Lockheed Martin)

- "Band of Brothers: The 2D Marine Division and the Tiger Brigade in the Persian Gulf War" An Analysis of the Impact of Organizational Culture on Tactical Joint Warfare (School of Advanced Military Studies, US Army Command and General Staff College)

- "False Prophets: The Myth of Maneuver Warfare and the Inadequacies of FMFM 'Warfighting'" (School of Advanced Military Studies, US Army Command and General Staff College,

- "Towards an Intellectual Component to Joint Doctrine: The Philosophy and Practice of Experiential Intelligence" (Naval War College)


**EDUCATION**
- B.S. Criminal Justice, University of Dayton
- MMAS, U.S. Army Command and General Staff College
- MMAS, US Army School of Advanced Military Studies
- MA, National Security and Strategic Studies, College of Naval Warfare (Highest Distinction)

**EXHIBIT 22**

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.23055   Page 1221 of 1315
Case 3:19-cv-01537-BEN-JLB   Document 167-1   Filed 02/10/23   PageID.21281   Page 44 of 76
Case 2:22-cv-01815-IM   Document 124   Filed 02/06/23   Page 1 of 27

**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

      Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM (lead case) |
| | 3:22-cv-01859-IM (trailing case) |
| | 3:22-cv-01862-IM (trailing case) |
| Plaintiffs, | 3:22-cv-01869-IM (trailing case) |
| v. | **DECLARATION OF KEVIN SWEENEY** |
| TINA KOTEK, et al., | |
| Defendants, | |
| and | |
| OREGON ALLIANCE FOR GUN SAFETY, | |
| Intervenor-Defendant. | |

**Page 1 -   DECLARATION OF KEVIN M. SWEENEY**

| | |
|---|---|
| MARK FITZ, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| KATERINA B. EYRE, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants, | |
| and | |
| OREGON ALLIANCE FOR GUN SAFETY, | |
| Intervenor-Defendant. | |
| DANIEL AZZOPARDI, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |

## DECLARATION OF KEVIN M. SWEENEY

I, Kevin M. Sweeney, declare the following:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am a Professor of History *emeritus* at Amherst College.  From 1989 to 2016, I taught history and American Studies at Amherst.   I regularly offered courses on colonial American history, the era of the American Revolution, and early American material culture, which focused on studying the production and use of home furnishings and other artifacts in common use

**Page 2 -   DECLARATION OF KEVIN M. SWEENEY**

dating from the 1600s, 1700s, and early 1800s.  During these years, in my own research on material culture, I made use of colonial-era probate inventories to study such topics as home furnishings in an effort to discover what types of possession were commonly found in households, to measure changes in standards of living, and to gain insights into domestic architecture.[1]  I also examined critically and wrote about the strengths and weaknesses of these sources, their usefulness and pitfalls.[2]  For decades, historians who are aware of these records' usefulness and their limitations have used estate inventories to study agricultural changes in England, wealth and social structures in England and its colonies, the institution of slavery in colonial American and the lives of slaves, and household possessions in America, England, and France.[3]

3.      My current research on seventeenth and eighteenth-century firearms and militias utilizes similar types of methodologies, documentary sources, and period artifacts.  This project, which has been going on for over a decade, was initially inspired by my skepticism of the controversial claims and pretended use of evidence from probate inventories in Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A. Knopf, 2000).  As part of my on-going project, I have given papers at the annual meetings of the American Historical Association and the Organization of American Historians, at conferences on firearms and society at Stanford and Wesleyan Universities, and elsewhere, and published two essays "Firearms Militias, and the Second Amendment" (2013) and "Firearms Ownership and

---

[1] Kevin M. Sweeney, "Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800 in *Material Life in America, 1600-1860,* Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-261-290.

[2] Kevin M. Sweeney, "Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987*, Peter Benes, editor (Boston: Boston University Press, 1989), 32-40.

[3] Some notable examples which also contain informed observations on the use of probate inventories, their biases, and how to deal with the biases see: James Horn, *Adapting to a New World: English Society in the Seventeenth-Century Chesapeake* (Chapel Hill: University of North Carolina Press, 1994); Gloria L. Main, *Tobacco Colony: Life in Early Maryland, 1650-1720* (Princeton: Princeton University Press, 1982), esp. 49, 282-286171-174; Philip D. Morgan, *Slave Counterpoint: Black Culture in the Eighteenth-Century Chesapeake & Lowcountry* (Chapel Hill: University of North Carolina Press, 1998); Carole Shammas, *The Pre-Industrial Consumer in England and America* (Oxford: Oxford University Press, 1990). esp. 19-20; Lorna Weatherill, *Consumer Behaviour & Material Culture in Britain 1660-1760*, 2nd. ed. (London: Routledge, 1996), esp. 201-207.

**Page 3 -   DECLARATION OF KEVIN M. SWEENEY**

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.23058   Page 1224 of 1315
Case 3:19-cv-01537-BEN-JLB   Document 167-1   Filed 02/10/23   PageID.21284   Page 47 of 76
Case 2:22-cv-01815-IM   Document 124   Filed 02/06/23   Page 4 of 27

Militias in Seventeenth- and Eighteenth-Century England and America" (2019). A third essay is forthcoming on **"Revolutionary State Militias in the Backcountry and Along the Frontiers,"** and I am currently working on a fourth essay as well as working on a book-length manuscript. My curriculum vitae, detailing my education, experience, and publications, is attached to this declaration as **Exhibit A**.

4.      I have been retained by the State of Oregon Defendants to provide an expert opinion on repeating firearms in eighteenth-century America. I make this declaration on the basis of my training, professional expertise, and research. For my work in this case, I am being compensated at a rate of $50 per hour.

5.      During the 1700s, most gun owners in the British American colonies and in the newly independent republic of the United States possessed and used single shot, muzzle-loading, flintlock firearms. As Harold Peterson stated in his classic 1956 book -- *Arms and Armor in Colonial America, 1526-1783:*"The period began in 1689 with the muzzle-loading smooth-bore musket and pistol as the most popular weapons. In 1783, almost a hundred years later, the period ended with the same weapons [i.e. muzzle-loading smooth-bore muskets and pistols] still supreme, and without even any notable improvements in their design or construction."[4] Peterson continued: "Breech-loaders and repeaters had appeared frequently on the scene but had made little impression upon it."[5]

6.      Evidence compiled during a decade of research using eighteenth-century probate inventories, militia muster lists, newspapers, and other documentary sources confirms the validity of Peterson's basic conclusions while offering three minor modifications. First, these weapons described by Peterson [i.e., the muzzle-loading smooth-bore musket and pistol] were still "supreme" in 1800 and probably as late as 1810. Second, most muzzle-loading, flintlock long arms that were privately owned and used during this period were not muskets, but lighter firearms that were usually cheaper and had narrower bores than did muskets. Finally, it is more accurate to

---

[4] Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (Harrisburg, Penn.: Stackpole Publishing 1956), 221.

[5]      *Ibid.*, 221.

**Page 4 -   DECLARATION OF KEVIN M. SWEENEY**

say that repeaters had *occasionally* appeared on the scene and not "frequently" as Peterson believed. Here, he was probably misled by the preference that private collectors and institutional collections had (and still have) for obtaining rare examples of unusual or innovative firearms.

## I.   Firearms Owned By Eighteenth-Century Americans

7.    Today, we tend to refer to any muzzle-loading eighteenth-century gun as a musket, and this is what Peterson did in the statement quoted above. However, Peterson knew better, as did Ben Franklin. In the mid-1740s, Franklin informed the readers of his Philadelphia newspaper that a "Musket" was "the Name of a particular Kind of Gun."[6] An eighteenth-century musket was a sturdy, muzzle-loading military firearm that fired a single lead ball weighing about an ounce, had a sling for ease of carrying on long marches, and had a lug near the muzzle for attaching a bayonet. It weighed about 10 to 11 pounds and was .69 caliber in its bore if French or .75 caliber if English, with an average barrel length of 44 inches.[7] On a battlefield, a musket was more than just a firearm: because of its weight and sturdy construction and because of its bayonet, a musket also functioned as a club and a spear. These capabilities were integral to its role as an eighteenth-century military arm. The combination of these features and capabilities made a musket "a Universal Weapon."[8]

8.    Eighteenth-century muskets did have two serious drawbacks which they shared with all flintlock, muzzle-loading smoothbores. First, their accuracy and range were limited. The round ball fired by these weapons was not very aerodynamic, and this produced a great deal of drag that reduced its velocity. A musket's smooth-bore barrel also lacked rifling, which were spiral grooves cut inside the barrel. When a ball traveled down a barrel with rifling, the grooves imparted a spin to the ball that stabilized and flattened its trajectory, increasing its distance and accuracy. (The effect of rifling on a rifle ball's flight can be compared to throwing a spiral pass

---

[6]    "Form of Association" in *The Papers of Benjamin Franklin*, ed., Leonard W. Labaree, et al., 40 volumes to date (New Haven: Yale University Press, 1959-), Vol. 3, 208.

[7]    Author's estimate of barrel averages calculated from data found in George C. Neumann, *Battle Weapons of the American Revolution*, (Texarkana, Texas: Scurlock, 1998), 121-141.

[8]    Stuart Reid, *The Flintlock Musket: Brown Bess and Charleville 1715-1865*(Oxford: Osprey, 2016), 61, 55-60.

**Page 5 -   DECLARATION OF KEVIN M. SWEENEY**

in football which also flattens trajectory and improves accuracy.)  While a smooth-bore musket may have been just as accurate as an eighteenth-century muzzle-loading rifle at distances of up to 50 yards, most authorities agree that a musket was not very accurate at ranges beyond 100 yards.[9]  Today, pistols and most long arms other than shotguns have rifled barrels.

9.      Loading and reloading eighteenth-century muskets was a complicated and relatively slow process by today's standards.  To load a musket, a shooter held it in front of him parallel to the ground, pulled back the gun's cock to its half cock position to prevent a premature discharge, and then took from a cartridge box an individual paper cartridge that contained a pre-measured load of gunpowder and a ball.  Next one opened the priming pan, bit the cartridge and poured a small amount of powder into the priming pan which was then closed shut.  Following this, the shooter placed the musket upright on the ground and poured the remainder of the cartridge's gun powder down the barrel, and then crammed the paper cartridge with its ball into the barrel.  (The cartridge's paper wrapper served as wadding, holding the ball in place.)  A ramrod was used to push the cartridge paper and ball down the barrel, after which the ramrod was recovered and secured in its resting place under the barrel.  The musket was then raised, placed on full cock, aimed, and the trigger pulled.  Pulling the trigger released the cock, which held a flint that moved forward, striking a steel frizzen, creating sparks that ignited the powder in the priming pan which in turn ignited the charge of powder placed in the barrel, creating an explosion that—finally—discharged the musket ball.  As a rule, a musket could realistically be loaded and fired two or three times a minute in combat by well-equipped and trained soldiers.[10]

10.     The process of loading and reloading a musket took even longer if instead of using a prepared paper cartridge, one used gunpowder from a powder horn to prime the pan and

---

[9] Reid, *Flintlock Musket*, 34.  For a claim that a rifle had an advantage over a musket at distances greater than 50 yards see John F. Winkler, *Point Pleasant, 1774: Prelude to the American Revolution* (Oxford: Osprey, 2014), 29.  For a claim that a rifle and a musket were equally accurate at 100 yards see Alexander Rose, *American Rifle, A Biography* (New York: Delta Trade Paperbacks, 2009), 20.

[10] Jeremy Black, *European Warfare, 1660-1815* (New Haven: Yale University Press, 1994), 40; Hew Strachen, *European Armies and the Conduct of War* (London: George Allen & Unwin, 1983), 17.

**Page 6 -   DECLARATION OF KEVIN M. SWEENEY**

then poured into the horn's measuring cap the amount of powder needed to charge the barrel. With this procedure one also had to remove an individual musket ball from a shot pouch and place it in the barrel after pouring down the measured charge of powder. The ball was then rammed home. Using this method of loading not only took longer, but also lacked the wadding provided by a paper cartridge which helped hold the ball in place. According to the results of one modern test, wadding also increased a smoothbore's muzzle velocity by about 30%.[11] Most hunters, backwoods men with muzzle-loading rifles, and many colonial militiamen lacked cartridge boxes and paper cartridges and instead used powder horns and shot bags.

11.     Even with these drawbacks, colonial governments and later state governments armed troops with these muskets during the French and Indian War (1754-1763) and the Revolutionary War (1775-1783). There really weren't serious alternatives. As a result, the British Ordnance Office loaned colonial governments 22,000 muskets to arm provincial troops raised for active service in the field during the French and Indian War, and at least 100,000 European muskets—most of them French—were imported during the American War for Independence.[12] During the French and Indian War, the British also sent muskets to arm Georgia and North Carolina militiamen who lacked arms, and state governments sometimes provided arms for mobilized militiamen during the Revolutionary War.[13]

12.     As a rule, American colonists preferred lighter firearms that were better suited than muskets for pest control, birding, or hunting. Especially popular in New England were locally made or imported smoothbore and fusils that weighed only 6 to 7 pounds and had narrower bores of .60 to .65 caliber, with average barrel lengths of 50 inches.[14] The narrower

---

[11] Glenn Foard, *Battlefield Archaeology of the English Civil War* British Series 570 (Oxford: British Archaeological Reports, 2012), 105.

[12] De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I.: Mowbray, 2009), 120-123; George D. Moller, *American Military Shoulder Arm*s, 2 volumes (Albuquerque, N.M., 2011), Vol. 1, Appendix 5, 484-485.

[13] Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, eds. *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of Massachusetts Press, 2013), 335, 348, 351-352.

[14] Author's estimate of barrel averages calculated from data found in Neumann, *Battle Weapons of the American Revolution*, 150-166.

**Page 7 -   DECLARATION OF KEVIN M. SWEENEY**

bores used smaller and lighter projectiles, required less powder for each shot, and thus reduced the weight of the lead ammunition one carried.[15]  Some New England fowlers could outrange muskets and some were modified to carry a bayonet.[16]  However, because of their lighter weights and sleeker construction, they were not necessarily as sturdy or as "soldier-proof" as a musket nor as effective as a club.

13.     Many residents living in the colonies stretching from New York to Virginia owned "trade guns."  These were inexpensive, muzzle-loading, single shot, smooth-bore firearms designed and produced for trade with Native Americans.  Some of these guns weighed as little as 5.5 pounds, had bores of .57 to .62 caliber, and barrels only 36 to 40 inches long.[17]  Because of these features, they were much easier to handle than a musket and employed about half the weight of lead and powder than compared to a musket for each shot.  However, these light, often cheaply constructed firearms did not function well as clubs and were not designed to carry a bayonet.

14.     In the backcountry of Pennsylvania and the colonies further south there was a distinct minority of men who owned more expensive locally made long rifles.  As a rule, these firearms weighed from 7 to 8 pounds, had .58 to .62 caliber bores—though some were even smaller—and barrels averaging 42 inches in length, and fired projectiles weighing much less than musket balls.[18]  Because of the barrel's rifling, these guns were more accurate than smoothbore muskets and outranged them.  However, they took more time to reload because riflemen had to use powder horns and bullet pouches instead of paper cartridges, and reloading became harder as

---

[15] Steven C. Eames, *Rustic Warriors: Warfare and the Provincial Soldier on the New England Frontier, 1689-1748* (New York: New York University Press, 2011), 121-122; Neumann, *Battle Weapons of the American Revolution*, 206-210.

[16] Douglas D. Scott, et al., "Colonial Era Firearm Bullet Performance: Live Fire Experimental Study for Archaeological Interpretation" (April 2017), 26, 36**;** Tom Grinslade, *Flintlock Fowlers: The First Guns Made in America* (Texarkana, Texas: Scurlock Publishing 2005), 59,72, 73, 75.

[17] M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1497-1792* (Washington, D.C.: Smithsonian Institution Press, 1980), 283; Neumann, *Battle Weapons of the American Revolution*, 203-205.

[18] Author's estimate of barrel averages calculated from barrels lengths of individual muskets given in Neumann, *Battle Weapons of the American Revolution*, 215-225.

**Page 8 -   DECLARATION OF KEVIN M. SWEENEY**

gunpowder residue built up in the grooves of the barrel's rifling.[19]  Additionally, these long rifles were not designed to take a bayonet, and they could break if used as a club.

15.     Muzzle-loading pistols were not as popular as long arms which—as experts have pointed out—"could economically be used dually for protection and hunting."[20]  Pistols were therefore found in only a minority of eighteenth-century probate inventories (Table 1).  It took about 15 seconds to reload a pistol, and as a result, they were often made in pairs "so that the owner might have two shots at his command."[21]  Instead of taking time to reload a pistol on a battlefield, cavalry troopers used discharged pistols as clubs or threw them at enemy cavalrymen.[22]  As it was, period pistols were discharged in close proximity to their targets because their low muzzle velocity of 330-440 f/s limited the range and impact of their projectiles.  By comparison, muzzle velocities produced by reproductions of eighteenth-century muskets (780 f/s to 870 f/s), fowlers (1160 f/s to 1444 f/s) and rifles (1195 f/s to 1320 f/s) are much higher.[23]

16.     Civilian officials and military officers generally had a low opinion of trade guns, fowlers and even the period's American-made long rifles.  During the French and Indian War, firearms in use in New Hampshire were said to be "in general of the meanest Sort" while those in Connecticut "which belong to private persons [were] mostly poor and undersized and unfit for an expedition."[24]  In 1756, most of New York's militia were armed with guns "chiefly for the Indian

---

[19] John W. Wright, "The rifle in the American Revolution," *American Historical Review* Vol. 29, No. 2 (January 1924), 293-299.

[20] Jeff Kinard, Pistols: *An Illustrated History of their Impact* (Santa Barbara, CA: ABC-CLIO, 2004), 45.

[21] Harold L. Peterson, *Treasury of the Gun* (New York: Golden Press, 1962), 189.

[22] For use of muzzle-loading pistols as clubs and missiles on battlefields see C. H. Firth, *Cromwell's Army* 2nd ed. (Oxford: Oxford University Press, 1911), 142; David Blackmore, *Arms & Armour of the English Civil Wars* (London: Royal Armouries, 1990), 49.

[23] Scott, et al., "Colonial Era Firearm Bullet Performance," 26, 36; Douglas D. Scott, et al. "Firearm Bullet Performance: Phase II, Live Fire Experimental Study for Archaeological Interpretation," 31.  Both reports are available online.

[24] "Blair Report on the State of the Colonies" in Louis K. Koontz, *The Virginia Frontier, 1754-1763* (Baltimore: The Johns Hopkins Press, 1925), 170, hereafter cited as the "Blair Report"; Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755 in *Collections of the Connecticut Historical Society*, Vol. 1, 265-266.

**Page 9 -   DECLARATION OF KEVIN M. SWEENEY**

Trade," and not muskets.[25]  Later, George Washington referred to such smooth-bore long arms as "trash or light arms."[26]  Over the course of the Revolutionary War, he and his officers even phased out the use of rifles in the Continental Army, rearming soldiers with muskets fitted with bayonets.[27]  Governor Thomas Jefferson characterized most of the privately owned smoothbore guns carried by his state's militiamen as "such firelocks [i.e. flintlocks] as they had provided to destroy noxious animals which infest their farms."[28]

17.     Data drawn from group of probate inventories of males who died during the second half of the eighteenth-century confirm these period observations concerning the preferences of American gun owners (Table 1).  These sources can be particularly useful and quite reliable for assessing the preferences of period gunowners for different types of firearms.  Even cursory descriptions of firearms as "a gun" can be revealing when combined with the price that individuals taking the inventory assigned.  Most guns in the inventory were long arms valued at £1 (i.e. 20 shillings), which was the usual cost of a single shot muzzle loading firearm.  Such weapons would have been affordable given the fact that a daily wage during the period for unskilled day labor usually varied between 1 and a half and 2 shillings.  While there was an obvious preference for long arms, muskets and rifles constituted a minority of such weapons.

18.     The more expensive guns found in these 3,249 eighteenth-century probate inventories were also likely to be some type of muzzle loading, single-shot long arms.  As a rule, rifles were valued at £2 to £3, which was twice or three times the cost of common muzzle-loading smoothbore long arms.  Expensive smoothbore weapons were likely to be imported fowlers or guns ornamented with silver mountings.  Occasionally, one sees double barreled guns which, along with a pair of pistols, was the period's more realistic provision for being able to

---

[25] "Blair Report," 171.

[26] General George Washington to Gentlemen, Feb. 7, 1777 in Nathaniel Bouton, ed., *Documents and Records Relating to the State of New Hampshire during the Period of the Revolution from 1776 to 1783* (Concord, N.H.: Edward A. Jenks, State Printer, 1874), Vol. 8, 485.

[27] Wright, "Rifle in the American Revolution," 297-298.

[28] Thomas Jefferson, *Notes on the State of Virginia*, edited by William Peden (New York: W. W. Norton, 1982), 88.

**Page 10 - DECLARATION OF KEVIN M. SWEENEY**

readily discharge more than one shot. Only one gun found in this database of 3,249 probate inventories may have been a repeater: an "air gun" owned by Philippe Guillaume Chion [Philip Williamson?], Charleston merchant, who died in 1797.[29] However, as is noted below in paragraph 40, not all air guns available in America were repeaters.

**Table 1: Firearms in Probate Inventories of Male Decedents Filed between 1740-1800**

| Region | Number of Sampled Male Inventories | Percentage of Inventories with Firearms | Percentage of Inventories with Muskets | Percentage of Inventories with Rifles | Percentage of Inventories with Pistols |
|---|---|---|---|---|---|
| New England 1740-1798 | 1057 | 46.1% | 0.8% | 0.0% | 2.8% |
| New York and New Jersey 1740-1798 | 569 | 35.0% | 1.9% | 0.5% | 5.8% |
| Pennsylvania 1740-1797 | 532 | 32.0% | 0.2% | 2.3% | 5.1% |
| Maryland and Virginia 1740-1797 | 632 | 58.4% | 1.3% | 5.1% | 9.0% |
| South Carolina 1740-1797 | 459 | 62.9% | 3.7% | 4.1% | 23.3% |
| Totals | 3249 | 46.6%* | 1.4%* | 2.0%* | 7.8%* |

**Note:** *The percentages at the bottoms of the columns are not averages of the percentages in the columns, but percentages of the total of 3249 inventories found in each category: 1514 inventories with firearms, 45 inventories with muskets, 66 inventories with rifles and 254 inventories with pistols. **Sources:** The sources for the probate inventories used in this table are listed in Kevin M. Sweeney, "Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Press, 2019), 70-71.

19.     Partial militia returns from the state of Virginia dating from 1781 to 1784 provide additional evidence that American consumers preferred smoothbore firearms that were not muskets. Even though state law required "every militia-man to provide himself with arms [i.e. muskets] usual in regular service [i.e. the Continental Army] . . . this injunction was always in

---

[29] Inventory of Philippe Guillaume Choin, 1797, South Carolina Inventories and Appraisement Books, Vol. C, 1793-1800, 212-213. at Fold 3 by Ancestry https://www.fold3.com/publication/700/south-carolina-estate-inventories-and-bills-of-sale-1732-1872. <Accessed online 1/23/2023 at 6:00 P.M.>

**Page 11 - DECLARATION OF KEVIN M. SWEENEY**

differently complied with."[30]  Most did not own muskets, even in wartime.  Only about 16.7% of the privately owned long arms were muskets, while another 20.3% were rifles owned by residents of the state's western counties.[31]  By contrast, 63.0% of the privately owned long arms were smoothbores that were not muskets.[32]

**Table 2:  Partial Virginia Militia Returns Indicating Types of Arms in Use, 1781-1784**

| Year | Number of Counties | Number of public muskets | Number of private muskets | Number of private long arms* | Number of private rifles | Number of private pistols | Total Number of Guns |
|---|---|---|---|---|---|---|---|
| 1781 | 27 | 1502 | 1333 | 4225 | 1293 | 204 | 8557 |
| 1782 | 10 | 565 | 242 | 2113 | 767 | 60 | 3747 |
| 1784 | 15 | 541 | 441 | 1260 | 392 | 68 | 2702 |
| ALL | 52 | 2608 | 2016 | 7598 | 2452 | 332 | 15006 |

**Note: *Number of "private long arms" are privately owned long arms that were not muskets and not rifles.**
**Sources: Militia Returns 1777-1784, microfilm, Accession 36929; State Government Records Collection; "General Return of Arms, Accoutrements, and Military Stores, 19th May, 1784," Accession 36912, House of Delegates, Executive Communications, Library of Virginia, Richmond**

20.   A large portion of the firearms used in eighteenth-century America would have been imported from England.  At the time, most English firearms were fabricated by large-scale putting-out systems that obtained barrels from one set of suppliers, got gunlocks from other sources, and assembled the parts at yet another site where the firearms also would have been stocked by craftsmen who were woodworkers.  By the mid-eighteenth-century, gun manufacturing in Birmingham, England involved "at least thirty different 'sub-trades' or manual

---

[30]  Jefferson, *Notes on the State of Virginia*, 88.

[31]  Calculated from data in Table 2.

[32]  *Ibid.*.

**Page 12 - DECLARATION OF KEVIN M. SWEENEY**

manufacturing processes."[33] In particular, this is how firearms were made for the British army and for the export trade to Africa and England's colonies.[34]

21.    Other than American long rifles and some New England fowlers, most eighteenth-century firearms used by colonists were not likely to have been custom made or "one-off" products. During the years from 1756 to 1763, at least 36,592 firearms were imported into the thirteen American colonies from England for civilian customers.[35]  Another 18,900 trade guns were imported to sell to Native American customers.[36]  Advertisements indicate that urban gunsmiths in the colonies sold imported firearms and made use of imported gunlocks and barrels. Most of the pistols sold in the colonies were not produced in the colonies.[37]  A rare surviving account book of an inland gunsmith, John Partridge Bull of Deerfield, indicates that he made only three new guns over a period of 20 years from 1768 to 1788, while performing 452 repairs on existing firearms.[38] When it came to his gunsmithing business, this skilled craftsman may have had more in common with a twentieth-century TV repairman than he did with Samuel Colt or Eli Whitney.

## II.    References to Repeating Arms in Eighteenth-Century Media

22.    So, how common were repeating weapons in eighteenth-century America?  The short answer is not very common; they were in fact extraordinarily rare.  Information drawn from eighteenth-century advertisements and news reports found in *America's Historical Newspapers*—a searchable database of 5,000 newspapers, with 450 dating from before 1800—tells much the same story.[39]  This newspaper database was searched by entering the terms "gun,"

---

[33] David Williams, *The Birmingham Gun Trade* (Stroud, Gloucestershire, Eng.: The History Press, 2009), 21.

[34] Williams, *Birmingham Gun Trade*, 21-24; De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I: Andrew Mowbrey, 2009), 93-102.

[35] Bailey*, Small Arms*, 237.

[36] De Witt Bailey, "The Wilson Gunmakers to Empire, 1730-1832" American Society of Arms Collectors *Bulletin* No. 85, 19.

[37] Jeff Kinard*, Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 46.

[38] Susan McGowan, "Agreeable to his Genius: John Partridge Bull (1731-1813), Deerfield, Massachusetts" (M.A. thesis, Trinity College, 1988), 5, 39-40, 74-75.

[39] *America's Historical Newspapers* (Chester, VT: Readex, 2004).

**Page 13 - DECLARATION OF KEVIN M. SWEENEY**

"musket," "fowler," "rifle," "pistol," "shot" and "militia," The search turned up 9 references to what appear to be repeating guns. To the information discovered by searching period newspapers can be added one more well-known instance of an unpublicized demonstration of a repeating firearm that took place in Philadelphia in April of 1777. This makes a total of 10 references to eighteenth-century repeaters in the period from 1720 to 1800.

23.    What do these period references to repeating guns tell us about their features and how they were employed, how they were regarded, and why they remained relatively uncommon in eighteenth-century America? The earliest known reference in an American newspaper to a repeating firearm is reported in the *Boston News-Letter* of September 12, 1723: "Delegates from several Nations of Indians were Entertained with the sight of a Gun which has but one Barrel and one Lock," but fired "Eleven Bullets successively in about Two Minutes" after being loaded only once. This firearm was made by John Pimm, a Boston gunsmith, who was active in the 1720s, but had died by 1730. This gun was not being offered for sale; no examples of a repeating long-arm by Pimm survive; it was a novelty. There is, however, a six-shot revolver with a flint ignition system made by John Pimm in the collection of the Cody Firearms Museum at the Buffalo Bill Center of the West.[40]

_____

[40] John Pimm's 1715 revolver with a hand rotated cylinder and flint priming system bears an apparent resemblance to a modern Smith & Wesson .38 caliber revolver. Brown, *Firearms in Colonial America*, 255-256. Cut into the rotating cylinder were six chambers into which a small amount of gunpowder and a ball could be placed. The shooter rotated by hand the cylinder to align one of the chambers with both the barrel and firearm's hammer which held a flint. The shooter then slid open the priming vent on the cylinder for the chamber aligned with the hammer and the barrel. He then pulled back the hammer by hand. Finally, pulling the trigger caused the hammer to strike the metal frizzen with the flint, creating a flash which entered the open vent on the cylinder and set off the powder in the chamber and discharged the ball. To fire again, the shooter again rotated by hand the cylinder to align a loaded chamber with the barrel and hammer and repeated the process outlined above. Pimm's pistol could deliver six shots after being loaded once, but it was not a rapid-fire weapon, and it took time to reload the individual chambers with powder and ball.

Similar pistols and long arms with revolving cylinders moved by hand first appeared in Germany between 1490-1530. Brown, *Firearms in Colonial America*, 50. However, they remained rare in the American colonies, expensive, and suffered from mechanical problems because of the inability of gunsmiths to fit together the moving parts with enough precision to prevent loose powder from jamming the cylinder or producing an accidental discharge of the six chambers simultaneously. Brown, *Firearms in Colonial, America*, 50-51; Graeme Rimer, et al., *Smithsonian Firearms: An Illustrated History,* (New York: D. K. Publishing 2014), 56. The revolver patented by Samuel Colt in 1836 and produced in his factory in Paterson, New Jersey

**Page 14 - DECLARATION OF KEVIN M. SWEENEY**

24.     The next reference in an American newspaper to a repeating firearm is contained in an advertisement in the March 2, 1730 issue of Boston's *New-England Weekly Journal*. It was for a firearm employing an uncertain type of mechanism that made it possible to fire a succession of twenty projectiles "at once Loading." This advertisement also makes clear the novelty of such a repeating firearm. Samuel Miller, a Boston gunsmith, was charging Boston residents 9 pence each just to see the gun and 2 shillings—the equivalent of a day's wage of unskilled labor—to see it fired. Basically, this gun was being used in an eighteenth-century version of a sideshow. There is no indication that Miller was producing or selling such firearms.

25.     However, in the *Boston Gazette* for April 12, 1756, gunsmith John Cookson advertised for sale a gun capable of firing 9 bullets in rapid succession. It was "A handy Gun of 9 and a half Weight; having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said Gun will fire 9 Times distinctly, as quick, or slow as you please, which one turn with Handle or the Said Gun, it doth charge the Gun with Powder and Bullet, and doth prime and shut the Pan, and cock the Gun." The advertisement provides a spot-on description of three repeating firearms found in the collections of the Milwaukee Public Museum, Royal Armouries Museum in Leeds, and the Victoria and Albert Museum in London that were all produced sometime around 1690 by John Cookson, an English gunsmith.[41] These were expensive and heavy firearms that weighed about 9 and a half pounds unloaded and over 10 pounds when loaded with 9 balls and powder charges.

26.     Cookson's English repeater employed what was known as the Lorenzoni breech-loading system.[42] This system placed at the breech-end of the barrel a complex and delicate

_____

employed percussion caps in its priming system and remains the first practical revolver to enter production. The cylinder rotated when the gun was cocked and fired when the trigger was pulled. However, even sales of this mechanically successful firearm were insufficient to prevent the bankruptcy in 1843 of Colt's first gun manufactory. See Peterson, *Treasury of the Gun*, 211.

[41] Brown, *Firearms in Colonial America*, 144-146; David S. Weaver and Brian Goodwin, "John Cookson, gunmaker," *Arms & Armour*, Vol. 19 (June 2022), 43-63.

[42] Sometime around 1660 Michele Lorenzoni, a Florentine gunmaker, produced a repeating flintlock firearm that employed a lever system to feed into the breech powder and shot. His firearm drew upon earlier versions of this system developed by Giacomo Berselli, another Italian gunsmith, who had built upon earlier innovations by gunsmiths, Peter and Mathias Kaltoff. Brown, *Firearms in Colonial America*, 105-107, 144-145; Peterson, *Treasury of the Gun,* 229-231.

**Page 15 - DECLARATION OF KEVIN M. SWEENEY**

gunlock operated by a handle or lever attached to the left side of the lock.  Separate tubes in the stock of the firearm were filled with priming powder, gunpowder for each charge, and 9 to 11 balls.  The shooter pointed the gun barrel towards the ground and pushed the handle or lever down and forward, which rotated a mechanism located inside the gun lock that simultaneously brought forward one ball, enough gunpowder to discharge it, and enough primer to set off the charge in the barrel when the trigger was pulled.  To recharge and again fire the gun, the shooter again pointed the barrel towards the ground, pushed on the lever and then pulled the trigger.  If the parts of the gun lock did not fit tightly or if the shooter failed to lock it in the proper position when firing, flame might leak back and explode the black powder stored in the butt.  Catastrophic failures happened because the period's methods of fabrication were not reliably capable of producing the fitting precision parts needed to prevent such malfunctions caused by errant sparks.

27.     Sometime before 1701, John Cookson moved to Boston.[43]  Despite Cookson's exceptional skill as a gunsmith, he apparently stopped making repeating firearms during his 60 years in Boston.  There are no surviving eighteenth-century, American-made Cookson repeaters.[44]  This is actually not surprising given the fact that American-made guns were typically "utilitarian in nature, certainly nothing like the fine magazine breech-loading repeaters normally associated with the name John Cookson."[45]  The authors of a recent essay speculate that the 1756 newspaper advertisement "could have involved one of the repeaters which he had brought from England when he emigrated and which, at his age of 82 at the time, he had decided to sell."[46]  The four known firearms that John Cookson did make in America are different types of single-shot firearms: one is a breech-loader, the others are muzzle-loading.[47]

---

Today this type of repeating firearm is generally identified by English and American collectors and curators as employing the Lorenzoni system.

[43] Weaver and Godwin, "John Cookson, gunmaker," 51-56, 59-61

[44] *Ibid.*, 56, 60. Weaver and Godwin make clear that the firearm referred to as a "Volitional Cookson Repeating Flintlock" in the collection of the National Firearms Museum in Washington, D.C. was made in the late 1600s by John Shaw, a London gunsmith.

[45] *Ibid.*, 55.

[46] *Ibid.*, 60.

[47] *Ibid.*, 56-57.

**Page 16 - DECLARATION OF KEVIN M. SWEENEY**

28.     The next appearance of an identifiable repeating firearm dates to April of 1777 and comes from the records and correspondence of the Continental Congress.  Joseph Belton wrote to the Continental Congress claiming that he had a method "wherein a common small arm, may be maid [sic.] to discharge eight balls one after another, in eight, five or three seconds of time."[48]  He also claimed that such a gun could be made to discharge "sixteen or twenty, in sixteen, ten or five seconds."[49] Its stated range was a mere 20 to 30 yards.  On July 10, 1777, Belton demonstrated a firearm that successively discharged 16 bullets.  He also claimed that this weapon could "do execution [at] 200 yards" which would have been a dramatic—and somewhat inexplicable—increase in the weapon's supposed range of 20 to 30 yards.[50]  In any event, Belton and Congress failed to agree on a financial arrangement.  Belton requested the princely sum of £13,000—£1000 from each of the 13 states—to compensate him for inventing this system, though he subsequently reduced his demand to only £500 from each of the states.[51]  There is no documentary or physical evidence indicating that Belton produced any of these firearms in 1777.

29.     The specific design of the firearm that Belton demonstrated in 1777 remains unclear.  There is a brass-barreled, flintlock fusil in the collection of the Smithsonian Institution that has been proposed as the actual gun or a prototype for the gun that Joseph Belton demonstrated in 1777.[52] It is engraved "IOS. BELTON INVENTOR ET ARTIFEX – PHILAL-

---

[48] Quoted in Brown, *Firearms in Colonial American*, 317.  This letter and others are reproduced in their entirety at Joseph Belton to the Continental Congress, April 1, 1777 at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence_ between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[49] *Ibid.*

[50] Letter with Enclosure, Joseph Belton to the Continental Congress, July 10, 1777, at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence_ between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[51] Joseph Belton to the Continental Congress, May 7, 1777 and Joseph Belton to John Hancock, May 8, 1777 at https://en.wikkisource/ Correspondence_ between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[52] Robert Held, "The Guns of Joseph Belton Part I" *American Rifleman* (March 1987), 36-39, 68-69; *Oregon Firearms Federation v. Brown*, U.S. Dist. Ct. Civ. No. 2:22-cv-01815-IM (lead case), Declaration of Ashley Hlebinsky (ECF 72) at 18, n 24.

**Page 17 - DECLARATION OF KEVIN M. SWEENEY**

MDCCLVIII [i.e. 1758]".  An additional engraving on the gun refers to "CAPT JOSEPH BELTON OF Philad."[53]  However, the Joseph Belton who arrived in Philadelphia in 1775 and who came into contact with Benjamin Franklin and subsequently other members of the Continental Congress and the Continental Army was a 1769 graduate of the College of Rhode Island, which is today Brown University.[54]  In 1758, this Joseph Belton was not in Philadelphia; he was not a captain; and he was not then a gunsmith.  Despite claims to the contrary, it is unlikely that this particular gun was demonstrated in Philadelphia in July of 1777.[55]

30.      However as Harold Peterson suggested many years ago, it is quite likely that the firearm demonstrated in 1777 employed some version of what is known as a superimposition system.[56]  In the simplest version of a superimposed or superposed system of loading a firearm, a series of alternating powder charges and balls are loaded directly into a gun's barrel.  There is no detachable or integral magazine, just a standard barrel that is loaded from the muzzle in an alternating sequence of gunpowder and balls.  All of these charges were—ideally—set off in order from front to back by igniting the powder charge located behind the ball closest to the muzzle of the gun's barrel.  There is no magazine involved, and the ensuing discharge of balls is uncontrolled after it is initiated.

31.      The superposed system for discharging a succession of balls had been tried as early as 1580 by a German gunsmith working in London.[57]  Today, early flintlock pistols that used a simple superposed loading system are sometimes referred to as "Roman candle pistols" because they employed "the same principle as the firework" which involves setting off "a chain

---

[53] Smithsonian National Firearms Collection, :https://americanhistory.si.edu/collections/search/object,nmah_440031 Accessed 2/2/2013.

[54] Benjamin Franklin to Silas Deane, August 27, 1775 in *Papers of Benjamin Franklin*, Vol. 22, 183-185, especially footnote, 2.

[55] Quite distinct from the questions raised by what is known of Joseph Belton's biography is the claim in Adam Weinstein "I am Tired of Being Tired" December 21, 2018 that his grandfather, Kenneth Weinstein, a gunsmith, fabricated this particular firearm. adamweinstein.substack.com/p/i-am-tired-of-being-tired <Accessed 2/2/2023 at 12:00PM>.

[56] Peterson, *Arms and Armor in Colonial America*, 218.

[57] Peterson, *Treasury of the Gun*, 195.

**Page 18 - DECLARATION OF KEVIN M. SWEENEY**

reaction of multiple discharges."[58]  Other writers also liken flintlock long arms that employed a simple superposed system of multiple charges to "Roman candles".[59]

32.     Later in London, Joseph Belton was involved in producing a sophisticated and controllable version of a firearm employing a superposed system.  In 1784, Belton went to England where he failed to interest the English Ordnance Department in some version of his superposed system.  By 1786, he had entered into a partnership with London gunsmith William Jover (active 1750-1810).  Together they produced for Britain's East India Company a smoothbore repeating firearm with a sliding gunlock, that moved down the barrel to ignite a succession of powder charges that propelled a series of musket balls contained in a replaceable metal magazine holding 7 projectiles.  There are two authentic examples of this particular firearm in the collection of the Royal Armouries, National Firearms Center in Leeds, England.

33.     Belton's 1786 firearm allowed the shooter to control the weapon's discharge and aim each shot, which was not possible with the simpler superposed system.  As the 1786 firearm's moving gunlock lined up with the next powder charge and ball, the shooter primed a pan, pulled back the cock on the sliding gunlock, and then pulled a trigger firing off a single projectile.  Because of the need to cock and prime each time before pulling the trigger and firing the gun, this was not a rapid-fire repeating arm.  This firearm was also something of a challenge to handle.  It weighs 10 pounds unloaded and would have weighed close to 11 pounds when loaded.  Jonathan Ferguson, the Keeper of Firearms and Artillery at the Leeds Firearms Center observes in an on-line video that managing the weapon is "a bit of a three-handed job."[60]

34.     A much cruder version of a firearm employing a superposed system was produced in America in the early 1790s.  A July 20, 1793 newspaper report in *Philadelphia's Gazette of the United States* from Elizabeth Town, Pennsylvania describes a firearm created by "the ingenious and

---

[58] Jeff Kinard, *Pistols: An Illustrated History of their Impact (Santa Barbara,* CA: ABC-CLIO, 2004), 37.

[59] Brown, *Firearms in Colonial America*, 100; Peterson, *Treasury of the Gun*, 197.

[60] Jonathan Ferguson, "Flintlock Repeating – 1786" youtube.com/watch?v=-wOmUM40G2U.  <Accessed online 11/6/2022 at 4:00 P.M>

**Page 19 - DECLARATION OF KEVIN M. SWEENEY**

philosophic Mr. Chambers of Mercersburg in Pennsylvania." This was Joseph Gaston Chambers (1756-1829). According to the news report, this pistol "discharged six balls in succession, with only one loading and once drawing the trigger, exclusive of the reserve shot, which went off with the drawing of another trigger." Later in the year, Chambers attempted to interest the United States War Department in buying long arms employing his version of the superposed system.

35.      A drawing that was probably done later reveals that Chambers's superposed system for a musket employed two gunlocks: one near the front of the barrel and the other in the usual location at the barrel's breech. First a powder charge was poured down the barrel followed by a traditional spherical ball which was pushed down to the breech. This was the reserve shot. Next a succession of 8 special, cylindrically shaped bullets with conical tails and 8 powder charges were pushed down the barrel. Pulling a cord triggered the lock near the front of the barrel and ignited the first powder charge closest to the muzzle, which fired the first cylindrical projectile. A hole in the next projectile carried the charge through it and down its conical tail, which ignited the charge, which propelled the second cylindrical charge, and so on. Finally, the spherical ball resting at the barrel's breech was discharged by pulling the second trigger near the breech.[61] Chamber's system did not employ a detachable magazine, and once initiated, the gun's discharge could not be controlled. A drawing of this firearm is attached as **Exhibit B.**

36.      Chambers's initial efforts to win government interest in 1793 and a patent for his invention were unsuccessful. A demonstration in May of 1793 failed to impress the War Department. Later in 1813, Chambers did secure a patent and supplied the U.S. Navy with 200 repeating muskets and 100 repeating pistols and also sold weapons to the state of Pennsylvania.[62] The Navy's use of these weapons attracted the attention of the British and Dutch governments. However, in the end, Chambers's system with its unusual projectiles failed to obtain sustained interest from any government. His guns did work, but they could also produce devastating malfunctions. As historian Andrew Fagal has pointed out, cramming the gun's barrel with

---

[61] For the best description of the system and an illustration of how the gun was loaded see Fagal, "The Promise of American Repeating Weapons, 1791-1821" pages 2-3 of 6.

[62] Peterson, *Treasury of the Gun*, 197.

**Page 20 - DECLARATION OF KEVIN M. SWEENEY**

Case 3:19-cv-01537-BEN-JLB   Document 177-6   Filed 10/23/23   PageID.23075   Page 1241 of 1315
Case 3:19-cv-01537-BEN-JLB   Document 167-1   Filed 02/10/23   PageID.21301   Page 64 of 76
Case 2:22-cv-01815-IM   Document 124   Filed 02/06/23   Page 21 of 27

projectiles and gunpowder produced what was potentially a pipe bomb.[63]  All superposed weapons were difficult to load correctly, and if the bullets did not fit tightly, flame could leak around them and set off all the charges at once.[64]  In the 1820s, the "complexity and inherent dangers" of superposed systems that filled gun barrels with multiple charges of explosive gun powder "led to their wholesale abandonment."[65]

37.    A safer alternative to the systems employed by Cookson and Chambers was an air gun that did not use black powder as a propellant.  There are two advertisements—one for a demonstration and one for an auction—that contained references to an air gun able to fire 20 times with a single charging.  The February 10, 1792, issue of New York City's *Daily Advertiser* announced "To the Curious" daily exhibitions of an air gun.  This gun was supposedly made by a young man who was a native of Rhode Island, though in an advertisement almost two years later, it was claimed that the gun was made in New York City by "An American Artist."  This gun discharged twenty times without needing to renew the propellant provided by compressed air.  Each pull of the trigger provided enough air to send a ball through an inch-thick board at a distance of sixty yards.  For 6 pence, a resident of the city could see Gardiner Baker demonstrate the air gun twice a day—Tuesday and Friday afternoons excepted—at his museum located at no. 13 Maiden Lane.  There is no indication that Gardiner Baker, "the young man in Rhode Island" or the "American Artist" in New York was marketing air guns.  Instead, once again a repeater was being featured as a novelty in a show put on for paying customers.

38.    The air gun demonstrated by Baker appears to have resembled or possibly might have been an actual example of a European air rifle designed by Bartholomeo Girardoni in 1779.  A Girardoni air gun had a magazine with a capacity of 22 balls, each of which was propelled by discharges of compressed air from a replaceable cannister carried in the gun's stock.  The gun

---

[63] Fagal, "The Promise of American Repeating Weapons, 1791-1821," page 4 of 6.

[64] Peterson, *Treasury of the Gun*, 198.

[65] Andrew J. B. Fagal, "The Promise of American Repeating Weapons, 1791-1821" page 2 of 6. <Accessed online 10/25/2022 at 4:55 P.M>  Fagal is currently an assistant editor of the Papers of Thomas Jefferson at Princeton University.

**Page 21 - DECLARATION OF KEVIN M. SWEENEY**

weighed about 10 pounds—which was about the same as a musket—but was shorter, being only four feet in length overall.  As contemporaries in Europe reported, these air guns were not without their problems: "Due to their construction, these guns were much more difficult to use effectively than normal, as one had to handle them much more cautiously and carefully."[66]  In the late 1700s, the Austrian Army, which had a peacetime establishment of 304,628 men, purchased 1,500 Girardoni air rifles that, theoretically, could have armed only 0.5% of its soldiers.[67]  As it turned out, "after a while no more than one-third of them were in a usable state," and they were all phased out by 1810 if not before.[68]

39.     The American military's use of a Girardoni air rifle was more limited in number and briefer in its timespan, but is also much better known.  On their 1804-1806 expedition to the Pacific Ocean and back, Lewis and Clark and their "Corps of Discovery" carried with them a single Girardoni air rifle.[69]  While it was occasionally used for hunting, their air rifle was primarily employed to impress Natives that they encountered along the way.  As Private Joseph Whitehouse recorded in his journal: "Captain Lewis took his Air Gun and shot her off, and by the Interpreter, told them that there was medicine in her, and that she could do very great execution."  "They all stood amazed at this curiosity."[70]  Eight decades after John Pimm's repeating firearm had been used to impress Native Americans in Boston, Lewis and Clark—like the showman Philadelphia Gardiner Baker—were still able to exploit the rarity of a repeating gun to awe and entertain.

40.     It is possible that someone in the United States may have been marketing Girardoni air rifles or something very similar to them in the mid-1790s.  An announcement for a public

---

[66] Quoted in Frederick J. Chiaventone, "The Girardoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon" *Military Heritage*  Vol. 14  No. 5 (January 2015), 19.

[67] Richard Bassett, *For God and Kaiser: The Imperial Austrian Army* (New Haven: Yale University Press, 2015), 186.

[68] Chiaventone, "Girardoni Air Rifle," 19.

[69] For the identification of the air rifle on the Lewis and Clark Expedition as a Girardoni see Madeline Hiltz, "The Lewis and Clark Air Rifle: A Blast from the Past" *War History on Lin*e (June 16, 2021) https://warhistoryonline.com/war-articles/lewis-and-clark-air-rifle.html?firefox=1 <Accessed online 1/21/2023, 8:00AM>

[70] Chiaventone, "Girardoni Air Rifle," 66.

**Page 22 - DECLARATION OF KEVIN M. SWEENEY**

auction in the issue of the Boston *Columbian Centinel* for March 7, 1795 listed among the items to be sold "a Magazine Air-Gun, equipped for hunting, and will carry ball or shot." This air gun appears to be a repeating gun because of its reference to a "Magazine." However, one should not automatically assume that all early air guns were repeaters. Air rifles made by Isaiah Lukens (1779-1846) of Pennsylvania were single shot air guns, though some writers erroneously assume that they were repeaters like Girardoni's air rifle.[71] It wasn't until the 1880s that two Michigan companies—the most famous of which was the Daisy Manufacturing Company—would begin marketing the first commercially successful, mass-produced repeating air rifles, aiming them at a youth market, employing a lever-action operating system, and shooting BB-caliber pellets.

    41.    Two more references to what appear to be repeating firearms were discovered in eighteenth-century newspapers. One from the August 19, 1793 issue of the Concord, New Hampshire *Mirrour* contains a vague report of a repeating weapon supposedly designed by an "Artist in Virginia". However, this particular news report has been dismissed as a fabrication.[72] The other reference to what does appear to be an identifiable type of repeating firearm was contained in a large advertisement in the October 26, 1785 issue of the *Columbian Herald* in Charleston, South Carolina. It was placed by James Lambet Ransier, a native of Liege, which was a center of small arms manufacturing in the Low Countries. Ransier announced that he had "a beautiful and complete assortment of Firearms" and in particular, he could furnish guns "that will fire four different times, with only charging once; or, if the person pleases, he may fire four different times one after another, with only one single lock."

    42.    Ransier appears to be describing imported Belgian or French-made Segales pistols which had four rifled barrels. These were small pistols that had a box lock and a swiveling

---

[71] Nancy McClure, "Treasures from Our West: Lukens Air Rifle" August 3, 2014, Buffalo Bill Center of the West. <Accessed online on 10/31/2022, at 10:40 A.M> On November 2, 2022, I received an email from Danny Michael, Curator of the Cody Firearms Museum at the Buffalo Bill Center of the West, confirming that their Lukens air rifle is a single shot weapon.

[72] Many aspects of the news report in the *Mirrour* raise fundamental questions about its believability, as does the fact that it was immediately followed by a news report on a Sea Monster. An intensive search of Virginia newspapers in *America's Historical Newspapers* failed to uncover the supposed origin of the news report. Because it could not be confirmed and because of its lack of detail and credibility, the report was dismissed.

**Page 23 - DECLARATION OF KEVIN M. SWEENEY**

breech attached to a cluster of four separate barrels: two upper barrels placed on top of two lower barrels. The box lock had two triggers and two hammers holding two flints, while the swiveling or rotating breech had four frizzens that were attached to the barrels. Each barrel was loaded separately at the muzzle with powder and ball. The two upper barrels could be fired one at a time by pulling each of the individual triggers in succession or fired simultaneously by pulling both triggers at once (which could be risky). After discharging the two upper barrels, the shooter then swiveled the rotating breech and the cluster of four barrels by pulling on the pistol's trigger guard. Once rotated to the upper position, the two barrels formerly in the lower position could now be fired when the triggers were pulled individually or simultaneously. However, as experts have pointed out: "All revolvers, and other multibarrel guns, of the muzzle-loading type were at risk from a dangerous chain reaction, in which firing one chamber could accidently set off all the others."[73] If this happened, the gun would explode in the shooter's hand.

43.     Finally, something needs to be said about a gun which—ironically—was never found in the 13 Colonies, but has assumed an out-sized importance in the minds of some writing about colonial Americans and their presumed interest in and familiarity with repeating firearms.[74] In the early 1700s, James Puckle, an English lawyer, writer, and part-time inventor created a firearm fed by a 11-shot magazine located at the back of the gun that was rotated by a crank. Rotating the crank aligned a power charge and bullet in the magazine with the weapon's barrel. After locking the magazine and the barrel together, the operator had to manually prime each shot and pull back the cock before pulling the trigger for each discharge of the weapon. Because of the time needed to prime and cock the hammer before each shot and to change the magazine after it was emptied, the gun had a rate of fire of only 9 rounds per minute. It was

---

[73] Rimer, *Smithsonian's Firearms,* 56.

[74] Clayton E. Cramer and Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America" *Willamette Law Review* Vol. 44. No. 4 (Summer 2008), 716-717; David B. Kopel, "The History of Firearm Magazines and Magazine Prohibitions" *Albany Law Review* Vol. 78, No. 2 (2014-2015), 852.

**Page 24 - DECLARATION OF KEVIN M. SWEENEY**

never used in battle.  The company producing it went out of business before 1730.  This gun had no discernable impact on colonial Americans nor on the development of firearms technology.[75]

44.    However, the Puckle gun lives on in the imaginations of some.[76]  Because of its weight, the Puckle gun used a tripod.  Visually the weapon bears an undeniable physical resemblance to certain .30 caliber machine guns used in World War II.  As a result, some refer to it today as "an eighteenth-century machine gun."  It was not a machine gun as we understand and use the term today, in either its mode of operation or its rate of fire.  The machine gun, invented by Hiram Maxim in 1884, used the recoil action of the gun to load it continuously and discharge spent cartridges.  Just pull the trigger and it kept firing bullets as long as the operator's assistant kept feeding it an ammo belt.  Another less common version of the machine gun diverted some of the gasses produced by discharging the weapon into a tube with a piston that automatically and repeatedly loaded the gun and ejected spent cartridges.  (A modern assault rifle uses a similar system that also employs diverted gasses to operate a piston.)  The .30 caliber medium machine gun used by the American army during World War II fired approximately 500 rounds a minute.  The only thing this weapon had in common with the eighteenth-century Puckle Gun was its use of a tripod.

45.    In summary, period probate inventories and newspapers indicate that repeating firearms were extraordinarily rare in eighteenth-century America.  Like muskets, repeaters were regarded as military firearms.  In 1777, the Continental Congress demonstrated an interest in Joseph Belton's firearm, and in 1813 the United States Navy purchased 200 muskets and 100 pistols produced by Joseph Gaston Chambers.  However, such superposed systems were in the assessment of military historian Joseph G. Bilby "a developmental dead end."[77]  Well into the third-quarter of the nineteenth century, the American government armed the overwhelming

---

[75] Brown, *Firearms in Colonial America*, 239.  Brown appears to misstate the capacity of the magazine as 9-shot, when it was actually an 11-shot magazine.

[76] See note 74 above.

[77] Joseph G. Bilby, *A Revolution in Arms: History of the First Repeating Rifles* (Yardly, Penn.: Westholme Publishing, 2015), 41.

**Page 25 - DECLARATION OF KEVIN M. SWEENEY**

majority of its soldiers with muzzle-loading single-shot long arms.  Even during the Civil War, the Union army made only limited use of the much more reliable repeating long arms made by Samuel Colt, the Spencer Arms Company, and the New Haven Arms Company, which was owned by Oliver Winchester and produced a repeater designed by Benjamin Henry.[78]

46.     The earlier lack of enthusiasm for repeating firearms among eighteenth-century Americans is unsurprising given the colonists' demonstrated preferences for inexpensive, light firearms that used less gunpowder and lead than did muskets.  By contrast, most of the period's repeating arms were expensive, heavy, and required greater expenditures—that were often uncontrollable—of gunpowder and lead.  Because repeating firearms contained multiple charges of explosive black powder gunpowder, they were also more dangerous than a gun using a smaller charge of gunpowder and a single projectile.  Some of these repeating firearms had the potential to turn into a Roman candle or a pipe bomb.  As Harold Peterson has observed "As long as the powder and ball had to be loaded separately there was no hope for a simple and safe magazine repeater."[79]  For these reasons, eighteenth-century advertisements and homes were filled with muzzle-loading, single shot firearms.

47.     The fact that some repeating firearms had been produced in Europe for four centuries by 1800 does not necessarily support the conclusion that Americans in the late 1700s would have assumed that such weapons would inevitably become reliable, safe, and widely available.  An individual looking back from 1800 might have been just as likely to conclude that very little progress had been made over the previous four centuries.  It was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder.  The superposed systems employed by Belton and Chambers, the Girardoni air rifle, and the Puckle Gun proved to be dead ends.  Calling these weapons and others like them "eighteenth-century assault rifles" or "an eighteenth-century machine gun" are examples of modern-day

---

[78] Bilby, *Revolution in Arms*, 44-48, 60-91.

[79] Peterson, *Treasury of the Gun*, 233.

**Page 26 - DECLARATION OF KEVIN M. SWEENEY**

rhetoric, not evidence of inevitable developments in firearms technology.  As George Basalla, an historian of technology, has cautioned: "All too often it is assumed that the development of technology is rigidly unilinear."[80]

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this 5 day of February, 2023.

Kevin M. Sweeney

---

[80] George Basalla, *The Evolution of Technology* (New York: Cambridge University Press, 1988), 189.

**Page 27 - DECLARATION OF KEVIN M. SWEENEY**

**Curriculum Vitae: Kevin M. Sweeney**

Home Address:  9 Orchard Street,
             Greenfield, MA  01301

Home Phone:    (413) 774-5027
E-mail:        kmsweeney@amherst.edu

**Education:**  Ph.D. in History    1986, Yale University.
             B.A.   in History    1972, Williams College.

**Employment:**

2000-2016   Professor of History and American Studies, Amherst College.
1993-2000   Associate Professor of History and American Studies, Amherst College.
1989-1993   Assistant Professor of History and American Studies, Amherst College.
1986-1989   Director of Academic Programs, Historic Deerfield, Deerfield, Mass.
1985-1986   Assistant Professor, Winterthur Museum, Winterthur, Delaware.
1980-1984   Administrator-Curator, Webb-Deane-Stevens Museum, Wethersfield, Conn.
1978-1980   History Instructor, Westover School, Middlebury, Conn.

**Other Academic Appointments:**

2007        Visiting Faculty, American Studies Seminar, American Antiquarian Society, Worcester,
             Mass.
1987-1989   Assistant Professor of American Studies at Smith College under the Five
             College Program.
1985-1986   Adjunct Assistant Professor, Early American Culture, University of
             Delaware.
1982-1984   Visiting Lecturer in American Studies, Trinity College, Hartford, Conn..
1981        Adjunct, Art History Department, University of Hartford.

**Declarations Filed as an Expert Witness:**

2022        *Hanson v. District of Columbia*, Case No. 1:22-cv-02256-RC.
2023        *Delaware State Sportsmen's Assoc., Inc. v. Delaware Dept. of Safety and Homeland
             Security*, United States District Court, District of Delaware, Case No. 1:22-cv-00951-RGA.

**Academic Honors and Prizes:**

2003   Book Prize, New England Historical Association.
2003   Award of Merit, American Association for State and Local History.

1995   Harold L. Peterson Award, Eastern National Parks & Monuments Association.
1986   Jamestown Prize of the Institute of Early American History and Culture,
   Williamsburg, VA.
1986   Frederick W. Beinecke Prize in History, Yale University.
1973   Mary Cady Tew Prize in History, Yale University.
1972   William Bradford Turner Prize in American History, Williams College.
1971   Phi Beta Kappa, Williams College.

**Publications:**

 **Books**

With Evan Haefeli, co-editors, *Captive Histories: English, French and Native Narratives
 of the 1704 Deerfield Raid* (Amherst, Mass.: University of Massachusetts Press, 2006).

With Evan Haefeli, *Captors and Captives: The 1704 French and Indian Raid on
 Deerfield* (Amherst, Mass.: University of Massachusetts Press, 2003). Awarded 2003 Book Prize, New
England Historical Association and 2003 Award of Merit, American Association for State and Local
History.

 **Articles/Book Chapters/Catalogue Essays**

"Revolutionary State Militias in the Backcountry and Along the Frontiers," *The American Revolution on
 the Frontier*, edited by Seanegan Sculley, Sons of the American Revolution 2022 Conference
 Proceedings, (publication forthcoming).

"Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in
 Jennifer Tucker, Barton C. Hacker, and Margaret Vining, editors *A Right to Bear Arms? The Contested
 Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian
 Scholarly Press, 2019), 54-71.

"Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, editors*, The
 Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of
 Massachusetts Press, forthcoming August 2013), 310-382.

 "Mary Rowlandson: Taken by Indians," *American Heritage* 58:5 (Fall 2008): 23-25.

"Early American Religious Traditions: Native Visions and Christian Providence," *OAH Magazine of
 History* (January 2008):8-13.

With Jessica Neuwirth, Robert Paynter, Braden Paynter and Abbott Lowell Cummings, "Abbott Lowell
 Cummings and the Preservation of New England," *The Public Historian* 29:4 (Fall 2007):57-81.

With Evan Haefeli, "*The Redeemed Captive* as Recurrent Political Text*" The New England
 Quarterly* (September 2004):341-367.

"The 1704 French and Indian Raid on Deerfield" *New England Ancestors* 5:1 (Winter 2004): 23-26.

"Regions and the Study of Material Culture: Explorations along the Connecticut River" for *American Furniture*, Luke Beckerdite, editor (Milwaukee, Wis.: Chipstone Foundation/ the University Press of New England, 1995), 145-166.

With Evan Haefeli, "Revisiting *The Redeemed Captive*: New Perspectives on the 1704 Attack on Deerfield" *William and Mary Quarterly* 3rd ser. 52:1(January 1995):3-46. Awarded the 1995 Harold L. Peterson Award, Eastern National Parks & Monument Association, and the 1995 Essay Prize, Society of Colonial Wars.

With Evan Haefeli, "Wattanummon's World: Personal and Tribal Identity in the Algonquian Diaspora, c. 1660-1712" in William Cowan, ed., *Papers of the Twenty Fifth Algonquian Conference* (Ottawa, 1994), 212-224.

"High Style Vernacular: Lifestyles of the Colonial Elite " in *Of Consuming Interests: The Style of Life in Eighteenth-Century America*, edited by Ronald Hoffman, Cary Carson, and Peter J. Albert (Charlottesville: University of Virginia Press, 1994),1-58. Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1995.

"Meetinghouses, Town Houses, and Churches: Changing Perceptions of Sacred and Secular Space in Southern New England, 1725-1850" *Winterthur Portfolio* 28:1 (Winter 1994):59-93.

"Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987,* Peter Benes, ed. (Boston: Boston University Press, 1989), 32-40.

"Gentlemen Farmers and Inland Merchants: The Williams Family and Commercial Agriculture in Pre-Revolutionary Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1986*, Peter Benes, ed. (Boston University Press, 1988), 60-73.

"Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800," *Connecticut Antiquarian* 36:2 (1984): 10-39. Revised and reprinted in *Material Life in America, 1600-1860*, Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-290.

"From Wilderness to Arcadian Vale: Material Life in the Connecticut River Valley, 1635 to 1760" and "Gravestones" in *The Great River: Art and Society of The Connecticut Valley, 1635-1820* (Wadsworth Atheneum, Hartford, CT., 1985), 17-27, 485-523. Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1985.

"Where the Bay Meets the River: Gravestones and Stonecutters in the River Towns of Western Massachusetts, 1690-1810," *Markers III*, David Watters, ed. (Association for Gravestone Studies, 1985),1-46.

"Mansion People: Class, Kinship and Architecture in Western Massachusetts in the Mid-18th Century," *Winterthur Portfolio* (Winter 1984):231-255.

"Furniture and furniture making in mid-eighteenth-century Wethersfield, Connecticut" *Antiques* 125:5 (May 1984), 1156-1163.

"River Gods in the Making: The Williams Family in Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1981*, Peter Benes, ed. (Boston University Press, 1982), pp. 101-116. Reprinted in a *Place Called Paradise: 1654-2004*, edited by Kerry Buckley (Amherst, Mass.: University of Massachusetts Press, 2004), 76-90.

**Exhibitions:**

2007-2008    Consultant, "Shays's Rebellion," N. E. H. Funded Web-Exhibition, Springfield Technical Community College and Pocumtuck Valley Memorial Association.

2003-2005    Consultant and Contributor, "The Many Stories of 1704," N.E.H. Funded Web-exhibition, Pocumtuck Valley Memorial Association. 2005 Museums and Webs Award Winner; 2005 Award of Merit, American Association for State and Local History; 2007 Merlot History Classics Award and others.

1984-1985    Consultant and Contributor, "The Great River: Art and Society of the Connecticut Valley, - 1820" Catalogue awarded Charles F. Montgomery Prize for 1985 by the Decorative Arts Society; Award of Merit from the American Association for State and Local History, 1986; Honorable Mention, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1986.

1982    Consultant and Contributor, "Two Towns: Concord and Wethersfield - A Comparative Exhibition of Regional Culture, 1635-1850," 1982. N. E. H. Funded Exhibition.

**Films/Videos:**

2012    Contributor, *Cherry Cottage, The Story of an American House*, Dave Simonds, Williamstown, Mass.

2009    Contributor, *The Forgotten War: The Battle for the North Country,* Mountain Lake Public Television, Plattsburg, NY.

2005    Contributor, *Captive: The Story of Esther,* VisionTV and Aboriginal Peoples Television Network, Canada.

2003    Contributor, *New England's Great River: Discovering the Connecticut,* Vermont Public Television, Burlington, VT

**Memberships in Professional and Scholarly Societies:**

American Historical Association.
Colonial Society of Massachusetts.
Massachusetts Historical Society.
Organization of American Historians.
Society of Military Historians

**Other Professional Activities**

| | |
|---|---|
| 2008-2010 | Chair, History Department, Amherst College. |
| 2005-2007 | Chair, American Studies Department, Amherst College. |
| 2003-2004 | Consultant, "Remembering 1704: Context and Commemoration of the Deerfield Raid" Pocumtuck Valley Memorial Association and Historic Deerfield, Inc. |
| 1997-2001 | Consultant, "Turns of the Centuries" Project, Pocumtuck Valley Memorial Association. |
| 1997-1999 | Chair, History Department, Amherst College. |
| 1997-1998 | Consultant, Exhibition entitled "Performing Arts: The Refinement of Rural New England," Historic Deerfield., Inc. |
| 1996-1998 | Member, Advisory Committee for the Dickinson Homestead, Amherst College. |
| 1994-1995 | Chair, Committee on Priorities and Resources, Amherst College. |
| 1993-1995 | Chair, American Studies Department, Amherst College |
| 1992 | Consultant, "Forty Acres: A Reinterpretation Initiative," Porter-Phelps-Huntington Foundation, Hadley, Mass. |
| 1991 | Consultant, "Furniture-making in Central New England, 1790-1850," Old Sturbridge Village. |
| 1991-1994 | Member, Five College Standing Committee on American Indian Studies. |
| 1986-1989 | Member, Five College American Studies Steering Committee. |
| 1981-1986 | Member, Advisory Committee for Historic Deerfield. |

1/27/2023



**EXHIBIT 23**

## UNCLASSIFIED

| AD NUMBER |
|---|
| AD343778 |

### CLASSIFICATION CHANGES

**TO:** unclassified

**FROM:** confidential

### LIMITATION CHANGES

**TO:**

Approved for public release, distribution unlimited

**FROM:**

Distribution authorized to U.S. Gov't. agencies and their contractors; Administrative/Operational Use; 31 JUL 1962. Other requests shall be referred to Defense Advanced Research Projects Agency, Arlington, VA.

### AUTHORITY

31 Jul 1974, DoDD 5200.10; DARPA per DTIC Form 55

## THIS PAGE IS UNCLASSIFIED

# CONFIDENTIAL

AD **343778**

# DEFENSE DOCUMENTATION CENTER

FOR

## SCIENTIFIC AND TECHNICAL INFORMATION

CAMERON STATION, ALEXANDRIA, VIRGINIA



# CONFIDENTIAL

NOTICE: When government or other drawings, speci-
fications or other data are used for any purpose
other than in connection with a definitely related
government procurement operation, the U. S.
Government thereby incurs no responsibility, nor any
obligation whatsoever; and the fact that the Govern-
ment may have formulated, furnished, or in any way
supplied the said drawings, specifications, or other
data is not to be regarded by implication or other-
wise as in any manner licensing the holder or any
other person or corporation, or conveying any rights
or permission to manufacture, use or sell any
patented invention that may in any way be related
thereto.

NOTICE:

THIS DOCUMENT CONTAINS INFORMATION

AFFECTING THE NATIONAL DEFENSE OF

THE UNITED STATES WITHIN THE MEAN-

ING OF THE ESPIONAGE LAWS, TITLE 18,

U.S.C., SECTIONS 793 and 794. THE

TRANSMISSION OR THE REVELATION OF

ITS CONTENTS IN ANY MANNER TO AN

UNAUTHORIZED PERSON IS PROHIBITED

BY LAW.

AS AD No. _____ 343778



# CONFIDENTIAL

### ADVANCED RESEARCH PROJECTS AGENCY
#### Washington 25, D. C.

**20 August 1962**

To:        Addressees
From:      OSD/ARPA

Subject:    Field Test Report, AR-15 Armalite Rifle
Enclosure:  Final Report, OSD/ARPA Research and Development Field
            Unit - Vietnam

1.  The AR-15 Armalite rifle has been subjected to a comprehensive field evaluation under combat conditions in Vietnam.  The results of this evaluation, contained in the attached report, are forwarded for your information.

2.  Because of the controversy which has surrounded this weapon, particular care was exercised to insure that the tests were objective, thorough and adequately documented, and to insure that valid data and conclusions were derived therefrom.

3.  The suitability of the AR-15 as the basic shoulder weapon for the Vietnamese has been established.  For the type of conflict now occurring in Vietnam, the weapon was also found by its users and by MAAG advisors to be superior in virtually all respects to the - a. M-1 rifle, b. M-1 and M-2 Carbines, c. Thompson Sub-machine gun and d. Browning Automatic rifle.

4.  Test data derived from recent Service evaluations of the AR-15 in the U.S. support the technical conclusions of the report.  The Central Intelligency Agency has conducted similar tests; it is understood that the results of that evaluation are essentially identical to those contained in the report.

5.  Photographs 7 and 8, Appendix D, pictures of Viet Cong KIA showing the wound effect of the AR-15 bullet, were deleted from the attached report by this office.

6.  The conclusions and recommendations of this report have been made available to COMUSMACV and CINCPAC by the originator and to DOD and CIA by OSD/ARPA.

R. C. Phelps

R. C. Phelps
Asst Director, for AGILE

Downgraded at 3 year
intervals; Declassified
after 12 years. DOD Dir 5200.10

**CONFIDENTIAL**

# CONFIDENTIAL

**RESEARCH & DEVELOPMENT FIELD UNIT**
**Advanced Research Projects Agency**
**Office of the Secretary of Defense**
**APO 143, San Francisco, California**

MACRD                                                           31 July 1962

SUBJECT:  Report of Task No. 13A, Test of Armalite Rifle, AR-15 (U)


THRU.     Commander (3)
          U. S. Military Assistance Command, Vietnam
          APO 143, San Francisco, California


TO:       Commander in Chief, U. S. Pacific (3)
          c/o Fleet Post Office
          San Francisco, California

          Advanced Research Projects Agency (3)
          Office of the Secretary of Defense
          The Pentagon
          Washington 25, D. C.


   1.  (C)  Forward herewith is the final report of the test of the Armalite Rifle
(AR-15).  It should be noted that the report proper in its present form reflects the
views of the U. S element of CDTC only.  It is being handled in this fashion to avoid
the inference that the Vietnamese, in seeking a newer weapon, might have influenced
the recommendations in the report.

   2.  (C)  However, combat evaluations in Vietnam are necessarily joint ven-
tures and the results must be made known to appropriate GVN authorities.  This
report will now be coordinated with the Vietnamese element in CDTC and will be
officially closed out as a combined report.  It is thought that this is unlikely to

ARPA Ref. No. 1543

# CONFIDENTIAL

# CONFIDENTIAL

result in any substantive change in the report as now written.

1 Incl.                                        WILLIAM P  BROOKS, JR.
  AR-15 Report w/5 Annexes                    Colonel, Arty
                                        Chief

Copies furnished.
  CHMAAG, VIETNAM (4)

DOWNGRADED AT 3 YEAR INTERVAL
DECLASSIFIED AFTER 12 YEARS
DOD DIR 5200. 10

# CONFIDENTIAL

2

# CONFIDENTIAL

**RESEARCH & DEVELOPMENT FIELD UNIT**
**Advanced Research Projects Agency**
**Office of the Secretary of Defense**
**APO 143, San Francisco, California**

**REPORT OF TASK NO. 13A**

**TEST OF**

**ARMALITE RIFLE, AR-15 (U)**

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 8

# CONFIDENTIAL

### REPORT OF TASK NO. 13A
### TEST OF
### ARMALITE RIFLE, AR-15 (U)

1. (U) **REFERENCES**.

    a. (U) OSD Message, DEF 907037, DTG 122354Z December 1961.

    b. (U) MACRD Message 367, DTG 050203Z June 1962.

    c. (U) US Army Infantry Board Report of Project 2787, 27 May 1958, Subject: Evaluation of Small Caliber, High Velocity Rifle - Armalite (AR-15).

    d. (U) Final Report, Lightweight High Velocity Rifle Experiment, US Army Combat Development Experimentation Center, Fort Ord, California, dtd 30 May 1959.

    e. (U) Evaluation Report of the Colt Armalite AR-15 Automatic Rifle, US Air Force Marksmanship School, Lackland AFB, Texas, dtd 22 September 1960.

    f. (U) Report No. DPS-96, A Test of Rifle, Caliber .223, AR-15, Aberdeen Proving Ground, Maryland, dtd 9 January 1961.

    g. (U) Fourth Report on the Test of the US Carbine, Cal. .30, M1, ORD Program #4972, Aberdeen Proving Ground, Maryland, dtd 13 Aug 1942.

    h. (U) First Report on Test of Production Models of the Carbine, Cal .30, M2, ORD Program #4972, Aberdeen Proving Ground, dtd 1 Aug 1945.

    i. (U) US Army Infantry Board Supplemental Report of Project No 2787, "Evaluation of Small Caliber, High Velocity Rifles - Armalite (AR-15)", dtd 13 August 1958.

2. (C) **PURPOSE**.

    The purpose of this test was to determine if the AR-15 Rifle is compatible with the small stature, body configuration and light weight of the Vietnamese Soldier and to evaluate the weapon under actual combat

# CONFIDENTIAL

# CONFIDENTIAL

conditions in South Vietnam. At the request of MAAG, Vietnam, the scope of the test was expanded to include a comparison between the AR-15 and the M2 Carbine to determine which is a more suitable replacement for other shoulder weapons in selected units of the Republic of Vietnam Armed Forces (RVNAF).

3.   (U)  DESCRIPTION OF MATERIEL:

The AR-15 Rifle is a lightweight, gas-operated rifle equipped with a 20-round, detachable magazine. It is chambered for Cartridge, Caliber .223. When fired in the rifle, this round gives the 55 grain bullet a muzzle velocity of 3200 feet per second. It has a plastic stock with a rubber butt, assembled in line with the bore. This, in conjunction with its high line of sight and separate hand grip, is designed to minimize rotation about the shoulder during firing. The two piece upper hand guard is made of metal and plastic and is designed for easy disassembly and rapid dissipation of heat. A lever above the grip on the left side of the receiver provides a selector for the trigger safety, semi-automatic and automatic fire. A bolt catch holds the bolt to the rear after the last round has been fired. A cover is provided for the ejection port in the receiver. A three-pronged muzzle attachment, threaded to the barrel, serves as a flash suppressor, grenade launcher, and a front support for a bayonet. The lower part of the front sight is machined to form a bayonet lug. Standard accessories include: Bayonet w/scabbard; bipod w/case; grenade-launching sight; and a cleaning rod. Photographs of the weapon appear in Annex "D".

4.   (C)  BACKGROUND.

a.   (U)  The problem of selecting the most suitable basic weapon for the Vietnamese soldier is complicated by his small stature and light weight. The average soldier stands five feet tall and weighs ninety pounds. Principle US weapons presently issued to Vietnamese troops include the M1918A2; the Thompson Sub-Machine Gun, Caliber .45; and the US Carbine, Caliber .30, M1.

b.   (U)  Because of its availability and the results of extensive studies and previous testing by military agencies, the Colt Armalite AR-15 Rifle was selected in July 1961 as the most suitable weapon for initial tests. This weapon was developed by the Armalite Division of Fairchild Aircraft Corporation to meet the military characteristics for a lightweight rifle utilizing the high velocity small caliber principle. It was first tested by the US Army Infantry Board in 1958 (Ref 1.c.). Since then, the weapon

# CONFIDENTIAL

2

# CONFIDENTIAL

and its ammunition have undergone extensive engineering and service tests by: Aberdeen Proving Ground; the Combat Development Experimentation Center, Fort Ord, California; and the US Air Force at Lackland Air Force Base, Texas, (Refs 1.d., 1.e., 1.f.). The rifle, with several modifications resulting from these tests, is presently being manufactured by Colt's Patent Firearms Manufacturing Company, Hartford, Connecticut. (Prior to completion of this report, the U. S. Air Force adopted the AR-15 as its basic shoulder weapon, replacing the M2 Carbine, the Browning Automatic Rifle and the M3 Sub-Machine Gun).

    c.  (C) Based upon favorable observations of the AR-15 by both US Advisors and RVNAF Commanders following limited firing demonstrations conducted in Vietnam during August 1961, weapons were requested in numbers sufficient to conduct a full scale combat evaluation of the AR-15 by selected units of the RVNAF. In December 1961, the Secretary of Defense approved the procurement of 1000 AR-15 Rifles, necessary ammunition, spare parts and accessories for evaluation.

    d.  (C) OSD/ARPA negotiated a contract with the firm of Cooper-MacDonald, Inc., Baltimore, Maryland, for procurement and air shipment of all materiel. The first shipment was received on 27 January 1962 and subsequent increments arrived approximately every three weeks until the contract was fulfilled on 15 May 1962. Operational evaluation and testing began on 1 February and terminated on 15 July 1962.

    5.  (C) <u>SUMMARY OF TESTS</u>:

      a.  (C) <u>General</u>.

        (1)  (C) To accomplish the stated purpose of this test, it was divided into two parts. One part was a combat evaluation of the AR-15 in which the weapons were issued to specially selected ARVN Units for use in their operations against the Viet Cong. Along with the rifles and ammunition, Vietnamese Unit Commanders and US Military Advisors were given weapon preference and operational questionaires and requested to complete and return them after training and combat use of the AR-15. Samples of these questionnaires appear as Appendices 1, 2, and 3 of Annex "A".

        (2)  (C) The other part of the test consisted of a comparison between the AR-15 Rifle and the M2 Carbine. Areas in which the two weapons were compared included: physical characteristics; ease of disassembly and assembly; markmanship ability at known distances, semi-automatic and automatic fire; markmanship ability at unknown distances, semi-

# CONFIDENTIAL

3

# CONFIDENTIAL

automatic and automatic fire; ruggedness and durability; adequacy of safety features; effects of open storage in a tropical environment; ability to penetrate dense brush and heavy foliage; and, the individual Vietnamese soldier's preference between the two weapons.

  b. (C) <u>Results, Combat Evaluation</u>.

    (1) (C) For detailed report see Annex "A".

    (2) (C) Summary. The Vietnamese Unit Commanders and US Advisors who participated in the evaluation consider the AR-15 Rifle to be a more desirable weapon for use in Vietnam than the Ml Rifle, BAR, Thompson Sub-Machine Gun, and Ml Carbine for the following reasons:

      (a) (C) It is easier to train the Vietnamese troops to use the AR-15 than the Ml Rifle, BAR, Ml Carbine, or the Sub-Machine Gun.

      (b) (C) The AR-15's physical characteristics are well suited to the small stature of the Vietnamese soldier (see photographs 1 and 2, Annex "D").

      (c) (C) It is easier to maintain the AR-15 both in the field and in garrison than the Ml Rifle, BAR, Sub-Machine Gun, or the Ml Carbine.

      (d) (C) The ruggedness and durability of the AR-15 are comparable to that of the Ml Rifle and superior to that of the BAR, Sub-Machine Gun, and Ml Carbine.

      (e) (C) The AR-15 imposes less logistical burden than any of the four principal weapons presently being used by Vietnamese Forces.

      (f) (C) The AR-15 is tactically more versatile than any present weapon being used by Vietnamese Forces.

      (g) (C) In semi-automatic fire, the accuracy of the AR-15 is considered comparable to that of the Ml Rifle, and superior to that of the Ml Carbine.

      (h) (C) In automatic fire, the accuracy of the AR-15 is considered comparable to the Browning Automatic Rifle and superior to the Sub-Machine Gun.

# CONFIDENTIAL

## CONFIDENTIAL

    c.  (C)  <u>Results, Comparison Test of the AR-15 Rifle and the M2 Carbine</u>.

    (1)  (C)  For detailed report see Annex "B".

    (2)  (C)  Summary:

    (a)  (C)  <u>Test #1, Comparison of physical characteristics</u>

    (i)  (C)  The AR-15 is comparable to the M2 Carbine in size and weight.

    (ii)  (C)  The addition of an integral grenade launcher, telescope mount, and an accessory bipod the AR-15 Rifle capabilities that the M2 Carbine does not possess at present and attainment of which would require modification of the weapon (see photograph 3, Annex "D").

    (iii)  (C)  Both the AR-15 and the M2 Carbine are compatible with the light weight and diminutive stature of the Vietnamese soldier (see photographs 4 and 5, Annex "D").

    (b)  (C)  <u>Test #2, Comparative ease of disassembly and assembly</u>.

    (i)  (C)  The AR-15 is simpler than the M2 Carbine and requires less time to disassemble and re-assemble for normal field cleaning (see photograph 6, Annex "D").

    (ii)  (C)  The average Vietnamese soldier can be trained in the disassembly and assembly of the AR-15 in less time than for the M2 Carbine.

    (c)  (C)  <u>Test #3, Marksmanship ability, known distance</u>.

    (i)  (C)  The ARVN soldier's ability to deliver accurate semi-automatic fire at known distances up to 200 meters with the AR-15 and the M2 Carbine is comparable. (It is noted that a higher percentage of test participants fired qualifying scores with both the AR-15 and the M2 Carbine than with the M1 Rifle.)

    (ii)  (C)  The ARVN soldier can deliver far more accurate automatic fire at known distances up to 200 meters with the AR-15 than he can with the M2 Carbine.

## CONFIDENTIAL

5

## CONFIDENTIAL

(d)  (C)  <u>Test #4, Marksmanship ability, unknown distance.</u>

(i)  (C)  The ARVN soldier's ability to deliver accurate semi-automatic fire on targets of unknown range using the AR-15 and the M2 Carbine is comparable.

(ii)  (C)  The ARVN soldier can deliver more accurate automatic fire on targets of unknown range with the AR-15 than he can with the M2 Carbine.

(e)  (C)  <u>Test #5, Comparative ruggedness and durability</u>

(i)  (C)  The AR-15 is more durable than the M2 Carbine under conditions that require prolonged firing.

(ii)  (C)  The AR-15 will stand up to rough handling normally encountered in combat situations better than the M2 Carbine.

(f)  (C)  <u>Test #6, Comparison of the adequacy of safety features.</u>

(i)  (C)  The safety features on the AR-15 and the M2 Carbine are comparable with regard to their adequacy and the ARVN soldier's ability to understand how they function.

(ii)  (C)  The location of a single selector switch, which combines the functions of safety and type of fire selector, on the left side of the AR-15's receiver where it is easily accessible to the thumb, enables the ARVN soldier to get the first round off faster with the AR-15 than he can with the M2 Carbine.  He must manipulate the safety selector on the M2 Carbine with his trigger finger, then return it to the trigger to fire.  With the AR-15, he can keep his finger on the trigger while manipulating the safety selector with his thumb.

(g)  (C)  <u>Test #7, Effects of open storage in a tropical environment.</u>

(i)  (C)  The functioning capability of the AR-15 is less affected by prolonged exposure to tropical weather than that of the M2 Carbine.

6

## CONFIDENTIAL

# CONFIDENTIAL

    (h)  (C)  <u>Test #8, Brush penetration</u>

        (i)  (C)  The trajectory of the AR-15 bullet is not significantly affected when fired through dense underbrush at ranges up to 50 meters.

        (ii)  (C)  The AR-15 round will penetrate jungle undergrowth equally as well as the M2 Carbine round at ranges up to 50 meters.

    (i)  (C)  <u>Test #9, Troop opinion poll</u>

        (i)  (C)  The great majority of the ARVN soldiers who participated in the comparison test prefer the AR-15 to the M2 Carbine.

6.  (C)  <u>DISCUSSION:</u>

    a.  (C)  The extremely mobile type of offensive warfare being stressed by US Advisors in Vietnam and the small stature and light weight of the Vietnamese soldier place a high premium on small, lightweight weapons.  In addition, the violent short clashes at close ranges which are characteristic of guerrilla warfare in Vietnam make it highly desirable to have a dependable weapon capable of producing a high rate of accurate and lethal full automatic fire.

    b.  (C)  From the viewpoint of standardization and simplicity of training and the resultant long range reduction of the logistics burden, characteristics of existing weapons were studied to determine if a <u>single</u> weapon could be found that would meet the requirements for a basic shoulder weapon for Vietnamese troops.  It is believed that such a weapon should encompass the following desirable characteristics of individual weapons:

        (1)  The effective range of the M1 Rifle.

        (2)  The light weight and small size of the M1 Carbine.

        (3)  The full automatic capability of the BAR.

        (4)  The simplicity of the SMG.

Other highly desirable, if not mandatory, features would include a bayonet, grenade launching and sniper capability.

7

# CONFIDENTIAL

CONFIDENTIAL

c.  (C)  The AR-15 appeared to more nearly satisfy the above prescirbed characteristics than any other US weapon.  The import of the AR-15 weapon/ammunition weight for units that conduct extended operations without normal resupply capabilities can be seen in comparing the 24 lb. weight of an M1 with a battle load of 220 rounds of ammunition with the 12 lb. weight of the AR-15 with 220 rounds.  This weight difference equals approximately 430 rounds of AR-15 ammunition.

d.  (C)  The Comparison Test (Annex "B") shows the AR-15 to be distinctly superior to the M2 Carbine.  Although the M2 Carbine is sufficiently light for use by the Vietnamese soldier, it does not possess the essential characteristics of a basic weapon for offensive warfare.  It lacks the effective range of the M1 Rifle and has a high malfunction rate (Ref 1. e. and 1. h.).  However, it is apparently available and was considered by MAAG as the prime competitor against the AR-15.

e.  (C)  The Combat Evaluation (Annex "A") shows that all US Advisors and Vietnamese Commanders who participated in the evaluation prefer the AR-15 to any other weapon with which the RVNAF are now armed.  The lethality of the AR-15 and its reliability record were particularly impressive.  All confirmed casualties inflicted by the AR-15, including extremity hits, were fatal (see photographs 7 and 8, Annex "D").  The high degree of reliability and trouble-free performance of the weapon reflected in previous test reports (Ref 1. c., 1. d., and 1. f.) was also noteworthy during the testing and evalutaion here.  No parts breakage was encountered while firing approximately 80, 000 rounds during the Comparison Test.  Only two parts have been issued to date to replace breakage for the entire 1, 000 weapons.  Stoppages on the AR-15 are easily cleared by the individual soldier through the application of "immediate action".

f.  (C)  A thorough review of the numerous stateside AR-15 test reports referenced in paragraph 1 reveals nothing which would make the foregoing views unsound.  The reported poor performance of the AR-15 under cold weather conditions is of no concern in Vietnam.  The widely held view that the AR-15 operates poorly under rainy conditions was disproved in the weapon's second test by Aberdeen Proving Ground (Ref 1. f.).  Those results were confirmed here during field operations.  No deficiencies in the weapon requiring correction prior to adoption were found during the test in Vietnam, although two minor changes are recommended for product improvement.  These recommendations appear in Annex "C".

g.  (C)  The combat evaluation part of this test is somewhat subjective since it is based on the individual judgments of many users.  It is

8

CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 16

# CONFIDENTIAL

believed, however, that the professional judgments of the senior US Advisors and Vietnamese Commanders of the units testing the weapon, all of whom are mature, experienced soldiers, does provide for a sound combat appraisal.

h.  (C)  From an operational viewpoint, it is believed that the tests conducted in Vietnam show the superiority of the AR-15 over the M2 Carbine and over other weapons now issued to RVNAF.  It is believed that the decision as to what units might be issued the AR-15 or which weapons the AR-15 might replace is dependent on cost and logistical factors which are beyond the purview of this unit.

7.  (C)  CONCLUSIONS:  It is concluded that:

a.  (C)  The AR-15 is more compatible with the light weight and small stature of the Vietnamese soldier than the M1 Rifle, the Browning Automatic Rifle, and the Thompson Sub-Machine Gun.

b.  (C)  The AR-15 is superior to the M2 Carbine.

c.  (C)  The M2 Carbine lacks the necessary dependability and versatility for consideration as the basic shoulder weapon for Vietnamese troops.

d.  (C)  The AR-15 is capable of replacing any or all of the shoulder weapons currently being used by the Armed Forces of the Republic of South Vietnam.

e.  (C)  The AR-15 is considered by both Vietnamese Commanders and U.S. Military Advisors who participated in the tests as the best "all around" shoulder weapon in Vietnam.

8.  (C)  RECOMMENDATIONS:  It is recommended that:

a.  (C)  The AR-15 be considered for adoption as the basic weapon for all RVNAF with a view toward improving effectiveness and simplifying training and weapons/logistics systems.

b.  (C)  Priority for adoption of the AR-15 be given to those units which frequently operate in jungle environment for extended periods, because

9

# CONFIDENTIAL

# CONFIDENTIAL

of the significant operational and logistical advantages accruing to their having the lightest and most effective weapon/ammunition combination available.

       c. **(D)** The M1 and/or M2 Carbine continue to be issued only to those individuals who, because of their duty or position, can function effectively with a weapon best suited for a defensive role.

**ANNEXES:**

    **A.** Combat Evaluation w/3 Appendices
    **B.** Comparison Test
    **C.** Suggested Corrective Actions
    **D.** Photographs 1 through 8

10

# CONFIDENTIAL

# CONFIDENTIAL

### ANNEX "A"

### DETAILS OF THE
### COMBAT EVALUATION OF THE AR-15

### I.   (C) GENERAL.

Selected Vietnamese Units which had previously been engaged in considerable combat were issued AR-15 Rifles and ammunition for use against the Viet Cong.  In addition, each Unit Commander and US Military Advisor with these units was given questionnaires in which he was requested to evaluate the AR-15 in comparison with the other weapons presently used by the RVNAF.  (See Appendices 1, 2, and 3 for samples of questionnaires.)

### II.   (C) DISTRIBUTION OF WEAPONS AND AMMUNITION.

| Unit | AR-15 Rifles | Ammunition |
|------|--------------|------------|
| 7th Infantry Division | 100 | 50,000 rds |
| Rangers | 100 | 50,000 rds |
| Airborne Brigade | 390 | 195,000 rds |
| VN Marines | 100 | 50,000 rds |
| VN Special Forces | 100 | 50,000 rds |
| Special Battalions | 125 | 120,000 rds |
| 5th Infantry Division | 40 | 25,000 rds |
| Father Hoa | 10 | 10,000 rds |
| Total | 965 | 550,000 rds |

### III.   (C) DETAILS OF TEST.

A.   (C) Purpose:  To evaluate the performance of the AR-15 Rifle under actual combat conditions and to compare this performance to that of the weapons presently being used by the RVNAF.

ANNEX "A"

# CONFIDENTIAL

## CONFIDENTIAL

B. (C) **Method:** Each Unit Commander and US Military Advisor of those units receiving AR-15 Rifles evaluated its performance in combat and compared it to the performance of those weapons presently being used by the RVNAF. Areas in which the AR-15 was evaluated and compared included: training; physical characteristics; ease of maintenance; ruggedness and durability; logistical considerations; accuracy; and tactical versatility. In the questionnaires given them, Commanders and Advisors were instructed to award 5 points to the most desirable weapon, 4 points to the second, 3 points to the third, 2 points to the fourth, and 1 point to the least desirable weapon in each category delineated above.

C. (C) **Results:** The results from the questionnaires are set forth in the table below and reflect the evaluation of the AR-15 by Commanders and Advisors of most of the different types of tactical units in Vietnam (as listed in paragraph II above). The figures indicate the total number of points awarded to each weapon by Vietnamese Unit Commanders and U.S. Military Advisors in their joint responses to the questionnaires.

| 1. Training. | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Simplest to train the troops to use | 59 | 44 | 15 | 37 | 55 | 70 |
| b. Simplest to train in functioning | 61 | 50 | 15 | 37 | 47 | 70 |
| c. Simplest to train in disassembly and assembly | 63 | 48 | 14 | 37 | 48 | 70 |
| Total | 183 | 142 | 44 | 111 | 150 | 210 |

| 2. Physical Characteristics | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Easiest for soldier to aim and fire | 60 | 29 | 17 | 42 | 62 | 70 |
| b. Easiest to carry over open terrain | 59 | 29 | 14 | 43 | 64 | 70 |
| c. Easiest to carry through jungle terrain | 59 | 29 | 14 | 45 | 63 | 70 |
| d. Easiest to hold on a target while firing several rounds | 69 | 40 | 24 | 24 | 53 | 70 |
| Total | 247 | 127 | 69 | 154 | 242 | 280 |

ANNEX "A"

2

## CONFIDENTIAL

## CONFIDENTIAL

| | | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| 3. **Maintenance** | AR-15 | | | | | |
| a. Simplest to disassemble and assemble | 65 | 43 | 14 | 39 | 49 | 70 |
| b. Easiest to maintain in the field | 63 | 51 | 16 | 34 | 46 | 70 |
| Total | 128 | 94 | 30 | 73 | 95 | 140 |

| | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| 4. **Ruggedness & Durability** | | | | | | |
| a. Most rugged weapon | 52 | 59 | 33 | 35 | 31 | 70 |
| b. Had fewest stoppages or malfunctions during firing | 59 | 59 | 20 | 32 | 39 | 70 |
| c. Most reliable under all conditions | 57 | 60 | 28 | 30 | 35 | 70 |
| Total | 168 | 178 | 81 | 97 | 105 | 210 |

| | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| 5. **Logistics** | | | | | | |
| a. Imposes least logistical burden | 66 | 47 | 17 | 30 | 50 | 70 |
| Total | 66 | 47 | 17 | 30 | 50 | 70 |

| | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| 6. **Tactical** | | | | | | |
| a. Easiest to employ | 64 | 40 | 18 | 39 | 49 | 70 |
| b. Preferred in ambush/ counter-ambush situations | 69 | 28 | 36 | 48 | 29 | 70 |
| c. Preferred against massed troops | 65 | 32 | 61 | 33 | 19 | 70 |
| d. Tactically most versatile | 69 | 43 | 38 | 29 | 31 | 70 |
| Total | 267 | 143 | 153 | 149 | 128 | 280 |

3

ANNEX "A"

## CONFIDENTIAL

## CONFIDENTIAL

| 7. General | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Preferred by troops | 67 | 28 | 18 | 46 | 51 | 70 |
| b. Preferred by commanders and advisors | 64 | 33 | 21 | 39 | 43 | 70 |
| c. Most suited to VN soldier under present tactical conditions | 67 | 30 | 21 | 42 | 50 | 70 |
| d. Most effective at most common range for engaging VC (0-200 meters) | 63 | 46 | 49 | 22 | 30 | 70 |
| Total | 261 | 137 | 109 | 149 | 174 | 280 |

Recapitulation: In all aspects covered, the total ratings for all weapons were as follows:

| AR-15 | M1Rifle | BAR | SMG | M1Carbine | Maximum Possible |
|---|---|---|---|---|---|
| 1320 | 868 | 503 | 763 | 894 | 1470 |

8. Accuracy. Advisors and Unit Commanders were requested to evaluate the accuracy of the AR-15 and compare it with other present weapons in both automatic fire and semi-automatic fire. Their evaluation is reflected in the following table:

| | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Semi-automatic fire | 61 | 62 | | | 45 | 70 |
| b. Automatic fire | 65 | | 57 | 42 | | 70 |

9. (C) Remarks. Unit Commanders' and Advisors' remarks concerning the value of the AR-15 to Vietnamese Units and its worth as a combat weapon in the war in South Vietnam as opposed to existing weapons were also requested. Generally, the comments were extremely favorable to the AR-15. All of the comments received are presented below in their entirety and in the form in which they were received.

(1) (C) "On 160900 June 62, one platoon from the 340 Ranger Company was on an operation vic. YT260750 and contacted 3 armed VC in heavily forested jungle. Two VC had carbines, grenades, mines, and one had a

4

ANNEX "A"

## CONFIDENTIAL

## CONFIDENTIAL

SMG.  At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC with 3 rounds with the first burst.  One round in the head-took it completely off.  Another in the right arm, took it completely off, too.  One round hit him in the right side, causing a hole about five inches in diameter.  It cannot be determined which round killed the VC but it can be assumed that any one of the three would have caused death.  The other 2 VC ran, leaving the dead VC with 1 carbine, 1 grenade and 2 mines. " (Rangers)

(2.) (C) "On 9 June a Ranger Platoon from the 40th Inf Regt was given the mission of ambushing an estimated VC Company.  The details are as follows:
    a.  Number of VC killed:  5
    b.  Number of AR-15's employed:  5
    c.  Range of engagement:  30-100 meters
    d.  Type wounds:
        1.  Back wound, which caused the thoracic cavity to explode.
        2.  Stomach wound, which caused the abdominal cavity to explode.
        3.  Buttock wound, which destroyed all tissue of both buttocks.
        4.  Chest wound from right to left, destroyed the thoracic cavity.
        5.  Heel wound, the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip.
These deaths were inflicted by the AR-15 and all were instantaneous except the buttock wound.  He lived approximately five minutes.

The following is a list of minor deficiencies noted during this period:
    a.  The stock and heat deflector will reflect light.  This light is visible for approximately 150 feet at night.
    b.  A brass brush is needed to remove carbon from the bolt carrier. " (Rangers)

(3.) (C) "72 AR-15 Rifles were carried into this action (airborne assault).  The drop zone was barely acceptable and many troops landed in high trees.  Several LMG's and BAR's were not operational after the drop.  Only one AR-15 was reported slightly damaged (damaged pistol grip) and all were operational.  Throughout the entire operation, which lasted 6 days and covered over 40 kilometers of difficult terrain including dense jungle and frequent water crossings, the weapons (AR-15) held up exceptionally well. " (Airborne Brigade)

5

ANNEX "A"

## CONFIDENTIAL

# CONFIDENTIAL

(4.) (C) "The AR-15 proved to be an effective weapon on this operation for the following reasons:

a. The weapon held up very well on the paradrop which took place on a small drop zone surrounded by dense forests. Landings of the troopers were much rougher than normal. Many troops landed in high trees. This subjected the individual weapons to a much more severe test than usual. Some of the LMG's and BAR's were not operational after the jump. All AR-15's were functional.

b. Field maintenance on this weapon (AR-15) proved to be much simpler than on the other weapons.

c. While no decisive engagement was made so that the striking power of this weapon (AR-15) could be observed, the troops had great confidence in it and it is my belief that it would have greatly increased our overall firepower had it been tested." (Airborne Brigade)

(5.) (C) "During the period from 16 April to 11 May 1962, the 8th Battalion, Airborne Brigade, participated in two (2) operations of five (5) and four (4) days duration.

The AR-15 was carried during both operations. I was not in a position to observe the engagement of Viet Cong with the AR-15 during either operation although it was fired on different occasions.

The following remarks therefore, are confined to other observations and personal opinions on the AR-15:

a. Maintenance requirements for the AR-15 were negligible. I inspected numerous weapons throughout the entire period stated above and always found the weapons in excellent firing condition.

b. A great simplification in the small arms weapons could be effected by the adoption of the AR-15 to replace the BAR, M1, and Carbine. The effectiveness of the weapon (AR-15), however, I cannot attest to at this time.

c. The troopers have a great amount of respect for the AR-15. If the weapon were adopted as TO&E for Airborne Units, there would be a tremendous psychological uplift in the individual soldier's belief in his ability to shoot and kill. " (Airborne Brigade)

6

ANNEX "A"

# CONFIDENTIAL

# CONFIDENTIAL

(6.) (C) "One company (96 off & EM) completely equipped with the AR-15. Six operations took place prior to any real use of the weapon.

Five VC were hit, all five with body wounds, and all five killed. Four were probably killing wounds with any weapon listed, but the fifth was essentially a flesh wound. The AR-15 made it a fatal wound.

The troops have a great deal of respect for the weapon and prefer it to all others. They take excellent care of it.

One left upper handguard was cracked and broke during routing a stubborn captive from a wooded area. The soldier concerned placed the handguard against a VC head with considerable force." (7th Infantry Division)

(7.) (C) "On 23-24 May 1962, one company completely equipped with AR-15's (87) plus Bn Hq elements was involved in one light and one heavy action. No wounded were captured and all casualties were inflicted with the AR-15. 27 Viet Cong were killed (24 counted by the advisor) and 25 captured. Grenades were used for the first time and were very effectively employed at ranges of 100-500 meters. They served as the real artillery support as we could not get the artillery to fire any closer than 400 meters. About 36 grenades were utilized in the havy action, all propelled from the AR-15. The troops are very enthusiastic about the weapon and treat it with greater care than usual." (7th Infantry Division)

(8.) (C) "To date, this weapon has been used only for training. The simplicity of construction has reduced training time necessary for maintenance by approximately fifty per-cent. It is believed that this is an ideal weapon for this type weather and terrain." (Special Battalions)

(9.) (C) "On 13 April, 62, a Special Forces team made a raid on a small village. In the raid, seven VC were killed. Two were killed by AR-15 fire. Range was 50 meters. One man was hit in the head; it looked like it exploded. A second man was hit in the chest; his back was one big hole." (VN Special Forces)

(10.) (C) "This weapon is ideal for this country primarily for these reasons:

    a. Durability & ease of maintenance.
    b. Good Accuracy.
    c. Rapid rate of fire.
    d. Light weight (size & shape make it easy for Vietnamese to handle).
    e. Excellent killing or stopping power." (Airborne Brigade)

ANNEX "A"                     CONFIDENTIAL

7

# CONFIDENTIAL

**D.** (C) <u>Analysis</u>: Based on the numerical ratings and the comments of US Advisors and VN Unit Commanders, the AR-15 is the most desirable weapon for use in Vietnam for the following reasons:

    1. Ease of training.

    2. Suitable physical characteristics.

    3. It is easy to maintain.

    4. It is more rugged and durable than present weapons.

    5. It imposes the least logistical burden.

    6. It is the best weapon for all-around tactical employment.

    7. Its semi-automatic firing accuracy is comparable to that of the M1 Rifle, while its automatic firing accuracy is considered superior to that of the Browning Automatic Rifle.

    8. Vietnamese troops, Commanders and US Advisors prefer it to any other weapon presently being used in Vietnam.

APPENDICES:
1. Weapons Questionnaire
2. For the RVNAF Unit Commander
3. Questionnaire for the Senior MAAG Advisor

8

ANNEX "A"

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 26

## CONFIDENTIAL

### WEAPONS QUESTIONNAIRE

Based upon your experience and observation as the Commander or Advisor of a unit of the RVNAF, rate the weapons on the right side of this questionnaire in order of preference with respect to the characteristics and questions listed. Your answers should reflect your opinion as to the value of the weapons to the Vietnamese, not the US Forces.

Rating Key: 5 - first choice     2 - fourth choice
            4 - second choice   1 - last choice.
            3 - third choice

**A. TRAINING**

| | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon is easier to train the troops to use? | | | | | |
| 2. Which weapon is easier to train the troops in functioning? | | | | | |
| 3. Which weapon is easier to train the troops to disassemble and assemble? | | | | | |

**B. PHYSICAL CHARACTERISTICS**

| | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon, because of its size and shape, is easiest for the soldier to aim and fire? | | | | | |
| 2. Which weapon, because of size, shape and weight, is easier for the soldier to carry over open terrain? | | | | | |
| 3. Which weapon, because of size, shape and weight, is easier for the soldier to carry in the jungle? | | | | | |
| 4. Which weapon is easiest to hold on a target while firing several rounds? | | | | | |

THIS QUESTIONNAIRE IS CLASSIFIED KIN, CONFIDENTIAL, WHEN FILLED IN

APPENDIX 1, ANNEX "A"

## CONFIDENTIAL

CONFIDENTIAL

| | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| C. MAINTENANCE | | | | | |
| 1. Which weapon is simplest to disassemble and assemble? | ___ | ___ | ___ | ___ | ___ |
| 2. Which weapon is easiest for the troops to maintain in the field? | ___ | ___ | ___ | ___ | ___ |
| D. RUGGEDNESS & DURABILITY | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
| 1. Which weapon is most rugged? | ___ | ___ | ___ | ___ | ___ |
| 2. Which weapon had the fewest stoppages and malfunctions? | ___ | ___ | ___ | ___ | ___ |
| 3. Which weapon is the most reliable under all conditions? | ___ | ___ | ___ | ___ | ___ |
| E. LOGISTICS | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
| 1. Which weapon imposes the smallest logistical burden? (Consider weight, spare parts, ease of repair, etc.) | ___ | ___ | ___ | ___ | ___ |
| F. TACTICAL | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
| 1. Which weapon is easiest to employ? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 2. Which weapon would you prefer in ambush/counter-ambush situations? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 3. Which weapon would you prefer against mass attacks? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |

THIS QUESTIONNAIRE IS CLASSIFIED KIN, CONFIDENTIAL WHEN FILLED IN
APPENDIX 1, ANNEX "A"

CONFIDENTIAL

2

## CONFIDENTIAL

|  | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 4. Which weapon do you consider most versatile? (Consider all capabilities) | ___ | ___ | ___ | ___ | ___ |

| G. ACCURACY (Rate 5, 4 & 3) | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon appears most accurate when fired semi-automatically? | ___ | ___ | ___ | ___ | ___ |
| 2. Which weapon appears most accurate when fired automatically? | ___ | ___ | ___ | ___ | ___ |

| H. GENERAL | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapons do the troops prefer? | | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 2. Which weapon would you prefer for your personal use? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 3. Which weapon do you think is most suited to the Vietnamese soldier under present tactical conditions? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 4. At what range do you think most Viet Cong are engaged? | ___ | ___ | ___ | ___ | ___ |
| 5. Which weapon do you think is most effective at that range? | ___ | ___ | ___ | ___ | ___ |
| 6. If the TO&E of your unit only allowed a single weapon, which one would you choose? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |

THIS QUESTIONNAIRE IS CLASSIFIED KIN, CONFIDENTIAL WHEN FILLED IN

APPENDIX 1, ANNEX "A"   CONFIDENTIAL

3

# CONFIDENTIAL

I. **REMARKS:**   In the space below, please make any pertinent remarks you may have concerning the AR-15 Rifle, its effectiveness in South Vietnam, its assets or its shortcomings (Continue on back of page if necessary).

Unit_____

Date_____

Signature_____

THIS QUESTIONNAIRE IS CLASSIFIED KIN, CONFIDENTIAL WHEN FILLED IN

APPENDIX 1, ANNEX "A"

# CONFIDENTIAL
4

# CONFIDENTIAL

### FOR THE RVNAF UNIT COMMANDER

**QUESTION NO. 1:**

How many weapons of each of the following types were carried into the combat engagement, how many rounds of ammunition per weapon were carried, and how many rounds fired?

| | No. Weapons | Ammo rds/weap. | Ammo rds. fired |
|---|---|---|---|
| BAR | _____ | _____ | _____ |
| M1 | _____ | _____ | _____ |
| SMG | _____ | _____ | _____ |
| Carbine | _____ | _____ | _____ |
| AR-15 | _____ | _____ | _____ |

**QUESTION NO. 2:**

How many VC were killed? _____
wounded? _____

How many of the VC were KIA by the AR-15? _____

How many of the VC were wounded by the AR-15? _____

**QUESTION NO. 3:**

What percentage of the friendly fire was full automatic? _____

What percentage of the AR-15 fire was full automatic? _____

What percentage of the AR-15's had the safety device installed that allowed either full or semi-automatic fire? _____

**QUESTION NO. 4:**

What was the maximum range at which shots were fired at the VC? _____

What was the average range? _____

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONDIFENTIAL WHEN FILLED IN

APPENDIX 2, ANNEX "A"

# CONFIDENTIAL

# CONFIDENTIAL

**QUESTION NO. 5:**

Were aimed shots fired through light brush? _____

If so, about what percent of the total fire from all weapons (BAR, SMG, M1, Cargine, AR-15) were aimed shots through light brush?

Less than 5% _____          Less than 20% _____

Less than 50% _____          More than 50% _____

In your opinion were shots from the AR-15 missed because of brush deflection? _____

If your answer to this question is yes, is it your opinion that the full automatic feature of the AR-15 and the extra rounds that can be carried for a given weight allowance do or do not compensate for this bruch deflection?  Yes_____  No_____  No Opinion_____

**QUESTION NO. 6:**

Were any rifle barrels bent in air drops or other rough handling and hard usage? _____

Were any barrels damaged by being fired with water in the bore?___

Were there any malfunctions of any type? _____

If yes, please elaborate in the remarks section of this questionnaire.

**QUESTION NO. 7:**

As a unit commander of the RVNAF, how would you rate the AR-15 Rifle in the guerrilla warfare action you expect to fight as compared with the other types of weapons listed?

In each space use:  A - For the AR-15 is better than
                    B - For there is no difference
                    C - For the AR-15 is worse than
                    D - For no opinion

|                      | M1 | BAR | SMG | Carbine |
|----------------------|----|-----|-----|---------|
| Speed of employment  | ___ | ___ | ___ | ___ |
| Accuracy             | ___ | ___ | ___ | ___ |

2

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN APPENDIX 2, ANNEX "A"

# CONFIDENTIAL

# CONFIDENTIAL

| | M1 | BAR | SMG | Carbine |
|---|---|---|---|---|
| Striking power | ____ | ____ | ____ | ____ |
| Fire power | ____ | ____ | ____ | ____ |
| Reliability | ____ | ____ | ____ | ____ |
| Field maintenance | ____ | ____ | ____ | ____ |
| Weight | ____ | ____ | ____ | ____ |
| Size | ____ | ____ | ____ | ____ |
| Overall | ____ | ____ | ____ | ____ |
| Overall for ambushes only | ____ | ____ | ____ | ____ |

## QUESTION NO. 8:

If the VC tactics grow into large scale attacks and the "human sea" type tactic is used, how would you rate the AR-15 overall against these other weapons?  (Same scale as above: A, B, C, D)

| M1 | BAR | SMG | Carbine |
|---|---|---|---|
| ____ | ____ | ____ | ____ |

## QUESTION NO. 9:

Would the soldier who carried the AR-15 into this engagement choose it again over the weapon he formerly carried?

| | % would choose AR-15 | % would choose other |
|---|---|---|
| Formerly carried the BAR | ____ | ____ |
| Formerly carried the M1 | ____ | ____ |
| Formerly carried the SMG | ____ | ____ |
| Formerly carried the Carbine | ____ | ____ |

## QUESTION NO. 10:

As an RVNAF unit commander, if you had your choice of weapons consisting of all four of the following:  BAR, M1, SMG, Carbine or the AR-15, which would be your choice?

OPTION A:  BAR, M1, SMG, Carbine _____.

OPTION B:  AR-15 _____.

3

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN

APPENDIX 2, ANNEX "A"

# CONFIDENTIAL

# CONFIDENTIAL

If your answer is option A, would you choose to completely replace any of the four weapons with the AR-15?

Would completely replace:       BAR _____.

M1 _____.

SMG _____.

Carbine _____.

## QUESTION NO. 11:

Please elaborate in the space below or using extra sheets on any point not adequately covered above.

4

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN

APPENDIX 2, ANNEX "A"

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 34

# CONFIDENTIAL

### QUESTIONNAIRE FOR THE SENIOR MAAG ADVISOR

1. In the engagement with the VC covered by this questionnaire, how many of each of the following weapons were carried by your unit?

   BAR_____   SMG_____   M1_____   Carbine_____   AR-15_____

2. If the AR-15 had not been used, how many of each would have been carried?

   BAR_____   SMG_____   M1_____   Carbine_____

3. As a MAAG Advisor to the RVNAF you obtain insight into the combat situation in SVN not available to the CDTC or to other US Government officials. These questionnaires can only gain a little part of the whole individual weapons problem. Some of the questions asked of the RVNAF unit commander are, therefore, repeated here because they are considered of prime importance.

QUESTION:  How do you as a MAAG Advisor rate the AR-15 Rifle in the SVN guerrilla war as compared to the following weapons?

|  | BAR | M1 | SMG | Carbine |
|---|---|---|---|---|
| A. The AR-15 is better. | _____ | _____ | _____ | _____ |
| B. No difference. | _____ | _____ | _____ | _____ |
| C. The AR-15 is worse. | _____ | _____ | _____ | _____ |
| D. No opinion. | _____ | _____ | _____ | _____ |

How would you rate the AR-15 against these weapons for ambushes only?  _____  _____  _____  _____

How would you rate the AR-15 in a "human sea" attack against these weapons?  _____  _____  _____  _____

As a MAAG Advisor to RVNAF, if you were to recommend the TO&E of the above weapons or the AR-15 only which would you recommend?_____.

**THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN**

**APPENDIX 3, ANNEX "A"**

# CONFIDENTIAL

# CONFIDENTIAL

4.  If you would not recommend completely replacing all four of the above weapons with the AR-15, would you recommend completely replacing any one of the four?

    Would recommend completely replacing BAR _____.
    Would recommend completely replacing M1 _____.
    Would recommend completely replacing SMG _____.
    Would not completely replace any of these weapons _____.

5.  Remarks:  In the space below or on additional sheets please elaborate on any points not adequately covered above.

                                                _____
                                              **(Signature)**

2

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN

APPENDIX 3, ANNEX "A"

# CONFIDENTIAL

# CONFIDENTIAL

## ANNEX "B"

### DETAILS OF COMPARISON TEST
### BETWEEN THE AR-15 AND M2 CARBINE

I. (C)   **GENERAL.**

   Personnel from a Vietnamese company that had just completed advanced individual training were used as test subjects for most of this comparison.  The unit of 180 men was divided into two groups of 90 men each. Group A received one M2 Carbine per man, while Group B received an AR-15 for each man.  Each group was then given a course of instruction on their respective weapon.  The instruction for each was identical in time and scope of material covered.  Following this, both groups underwent an identical test program which consisted of:  assembly and disassembly; known distance firing, both semi-automatic and automatic fire; unknown distance firing, semi-automatic and automatic fire; bayonet course; and, infiltration course.  This phase lasted for one week (44 hours).  At the end of the first week, the two groups traded weapons and the course of instruction and the tests were repeated.

II.(C)   **SUMMARY OF TESTS.**

   To arrive at a valid conclusion concerning the relative suitability of the AR-15 as opposed to the M2 Carbine for possible use by selected units of the Armed Forces of the Republic of Vietnam, a total of nine tests were conducted.  They were:

   1. Comparison of Physical Characteristics.
   2. Comparative Ease of Disassembly and Assembly.
   3. Marksmanship Ability - Known Distance (semi-automatic and automatic fire).
   4. Marksmanship Ability - Unknown Distance (semi-automatic and automatic fire).
   5. Comparative Ruggedness and Durability.
   6. Adequacy of Safety Features.
   7. Effects of Open Storage in a Tropical Environment.
   8. Comparative Ability to Penetrate Dense Foliage.
   9. Troop Preference Poll.

ANNEX "B"

# CONFIDENTIAL

# CONFIDENTIAL

## III. (C)   DETAILS OF TESTS.

### Test No. 1.   Comparison of Physical Characteristics.

**Purpose:**   To compare the physical characteristics of the AR-15 Rifle and the M2 Carbine.

**Method:**   Both weapons were weighted and measured and the resulting data recorded.

**Results:**

a.   Weights (lbs.):

|  | AR-15 | M2 Carbine |
|---|---|---|
| Weapon (less sling, magazine and accessories) | 6.24 | 5.98 |
| Magazine (empty) | 0.18* | 0.25* |
| Magazine (loaded - 20 rds) | 0.68 | - |
| Magazine (loaded - 30 rds) | - | 1.02 |
| Bayonet | 0.62 | 0.72 |
| Bipod | 0.50 | (No Bipod) |
| Sling | 0.19 | 0.07 |

Totals: w/20 rd mag loaded 8.23
w/30 rd mag loaded                      7.79

*Figure not included in totals.

Relative Battle Load (lbs.) - including accessories of sling, bayonet, bipod.

| | AR-15 | M2 Carbine |
|---|---|---|
| Weapon w/12 magazines (240 rds) | 15.71 | |
| Weapon w/8 magazines (240 rds) | | 14.93 |

b.   Dimensions (inches):

|  | AR-15 | M2 Carbine |
|---|---|---|
| Length of barrel | 20.00 | 18.00 |
| Overall length | 37.50 | 35.58 |
| Overall length w/bayonet | 42.98 | 42.26 |

ANNEX "B"                    **CONFIDENTIAL**

2

# CONFIDENTIAL

Analysis:  The Ar-15 and the M2 Carbine are comparable in size and weight and both are compatible with the light weight and small stature of the VN soldier.  An integral grenade launcher and telescope mount and an accessory bipod are included in the weapon weight of the AR-15.  These are not standard items for the M2 Carbine.

Test No. 2. Comparative Ease of Disassembly and Assembly.

Purpose:   To compare the ease of disassembly and assembly of the AR-15 Rifle and the M2 Carbine and the difficulties of training encountered therein.

Method:

a.  Each group of test subjects received a two hour period of instruction in the disassembly and assembly of their respective weapons.  After completing this instruction, test personnel selected random samples of 10 men and had them disassemble and reassemble their weapons.  This procedure was repeated with each group until 100 men had been tested with each weapon.  Times were recorded by Non-Commissioned Officers and the weapons were inspected for proper assembly by Test Committee Cadre.

b.  For the purpose of this test, both weapons were disassembled only as far as was necessary for field cleaning, i.e., "field stripped".

Results:

|  |  | AR-15 | M2 Carbine |
|---|---|---|---|
| a. | Average time required for disassembly & assembly. | 1 min. 17 sec. | 3 min. 17 sec. |
| b. | Could not reassemble (percent) | 0% | 19% |
| c. | Reassembled improperly (percent) | 4% | 10% |
| d. | Number of parts handled by soldier in field stripping | 7 | 11 |

Analysis:

a.  The AR-15 is simpler and requires less time to disassemble and assemble for normal field cleaning.

ANNEX "B"

# CONFIDENTIAL
3

## CONFIDENTIAL

b.  The average Vietnamese soldier can be trained in the disassembly and assembly for field cleaning of the AR-15 in a shorter time than for the M2 Carbine.  This is further emphasized by the fact that all test subjects had previously received 12 hours of instruction on the M1 Carbine while undergoing basic combat training.

### Test No. 3.  Marksmanship Ability, Known Distance.

Purpose:  To compare the ability of ARVN soldiers to deliver accurate semi-automatic and automatic fire on targets at known ranges using the AR-15 and the M2 Carbine.

Method:

a.  Each group of test subjects received 10 hours of preliminary marksmanship training on their respective weapon.  Upon completion of formal instruction, zeroing of weapons and practice firing at 26, 100 and 200 meters, each group fired a qualification course for test purposes. Each test participant completed this qualification course with both the AR-15 and M2 Carbine.

b.  In semi-automatic fire, the course fired for the test was the standard ARVN M1 rifle qualification course.  The scores obtained by the test subject with both weapons in this firing were compared with each other and with previous scores fired by the test subjects in qualifying with the M1 Rifle while undergoing Basic and Advanced Individual Training.

c.  In automatic fire, the test subjects engaged the standard ARVN silhouette target at ranges of 75, 100 and 200 meters.  Each individual fired a total of 40 rounds from each range.  Scores were computed on the basis of 5 points per target hit and an average of 50% hits was used as the basis for qualification.

d.  Throughtout all firing, stoppages or malfunctions due to mechanical failures were noted and recorded.

e.  Throughout all firing, observations concerning the adequacy of safety features and the ARVN soldier's ability to understand them were recorded.

4

ANNEX "B"

## CONFIDENTIAL

## CONFIDENTIAL

**Results:**

|  | AR-15 | M2 Carbine | M1 Rifle |
|---|---|---|---|
| Semi-automatic:<br>Percent qualified | 26% | 27% | 15% |
| Automatic:<br>Percent qualified | 71% | 7% |  |

Analysis:

a.  The ability of the ARVN soldier to deliver accurate semi-automatic fire on targets of known range with the AR-15 and the M2 Carbine is comparable.  Test participants, as a group, fired a higher percentage of qualifying scores with both the AR-15 and M2 Carbine than they had previously fired with the M1 Rifle.

b.  The ARVN soldier's ability to deliver accurate automatic fire on targets of known range is far greater with the AR-15 rifle than with the M2 Carbine.

Test No. 4.  Marksmanship Ability, Unknown Distance.

Purpose:  To compare the ARVN soldier's ability to deliver accurate semi-automatic and automatic fire on targets of unknown range using the AR-15 Rifle and the M2 Carbine.

Method:

a.  The standard ARVN Transition firing course was used for this test.

b.  Semi-automatic fire.  Each man received 40 rounds to engage 20 targets at varying ranges from 50 to 250 meters.  For a first round hit, he was awarded 10 points.  For a second round hit, he was awarded 5 points.  Qualification score for the course was 100 points.

c.  Automatic Fire.  Each man received 80 rounds to engage 20 targets in short bursts.  Targets were located at varying ranges from 50 to 250 meters.  Scores were computed on the basis of 5 points per target hit.  Qualification score for the course was 100 points.

d.  Throughout all firing, stoppages or malfunctions due to mechanical failures were noted and recorded.

5

ANNEX "B"

## CONFIDENTIAL

## CONFIDENTIAL

e. Throughout all firing, observations concerning the adequacy of safety features and the ARVN soldier's ability to understand them were recorded.

Results:

|  | AR-15 | M2 Carbine |
|---|---|---|
| Semi-automatic run:<br>Percent qualified | 23% | 22% |
| Automatic run:<br>Percent qualified | 23% | 15% |

Analysis:

a. The ARVN soldier's ability to deliver accurate semi-automatic fire on targets of unknown range using the AR-15 and the M2 Carbine is comparable.

b. The ARVN soldier's ability to deliver accurate automatic fire on targets of unknown range is greater with the AR-15 than with the M2 Carbine.

Test No. 5.  Comparative Ruggedness and Durability.

Purpose:  To compare the ruggedness and durability of the AR-15 Rifle and the M2 Carbine.

Method:

a. Concurrent with all other testing, observations concerning the ruggedness and durability of each weapon were recorded.  During all firing excercises, any stoppage or malfunction of either weapon caused by mechanical failure was noted and recorded.

b. Fifty AR-15 Rifles and fifty M2 Carbines were each run through the standard ARVN Bayonet Assault Course twice.  At the completion of the course, the weapons were inspected and "dry fired".  Any deficiencies noted were recorded.

c. Fifty AR-15 Rifles and fifty M2 Carbines were each run through the standard ARVN Infiltration Course twice.  At the completion of the course, the weapons were inspected and "dry fired".  Any deficiencies noted were recorded.

6

ANNEX "B"

## CONFIDENTIAL

# CONFIDENTIAL

**Results:**

a. After the first week of firing, seven M2 Carbines were eliminated from the test. Six of these would not fire automatically because of defective disconnector springs; the other would not fire at all because of a broken disconnector pin. In contrast, all AR-15's functioned properly throughout the entire test period.

b. After negotiating the Bayonet Assault Course the second time, two M2 Carbines were eliminated from the test because of broken stocks. No AR-15 Rifles were damaged.

c. Both the M2 Carbine and the AR-15 were carried through the Infiltration Course twice without adverse effect.

**Analysis:**

a. The AR-15 is considered to be more rugged and durable than the M2 Carbine under conditions which require prolonged firing.

b. The AR-15 will stand up to rough handling normally encountered in combat situations better than the M2 Carbine.

**Test No. 6. Comparison of the Adequacy of Safety Features.**

**Purpose:** To compare the adequacy of the safety features of the AR-15 Rifle and the M2 Carbine with respect to their function and location and the ARVN soldier's ability to understand them.

**Method:**

a. Concurrent with all firing and tests in which ARVN soldiers handled the AR-15 and M2 Carbine, test committee cadre made observations concerning the adequacy of the safety features with respect to their function and location and the soldier's ability to understand them.

**Results:**

a. No misfires occurred throughout the firing that were attributable to improper functioning of the safety mechanism on either the AR-15 or the M2 Carbine.

b. The ARVN soldiers had no difficulty in understanding the function and operation of the safety mechanisms on either weapon.

7

ANNEX "B"          # CONFIDENTIAL

# CONFIDENTIAL

### Analysis:

a.  The safety features on the AR-15 and the M2 Carbine are considered comparable with regard to function and the ARVN soldier's ability to understand them.

b.  The location of a single selector switch which combines the functions of safety selector and rate of fire selector, on the left slide of the receiver where it is easily accessible to the thumb, enables the ARVN soldier to get the first round off faster with the AR-15 than he can with the M2 Carbine. With the M2 Carbine, he must manipulate the safety selector with his trigger finger, then return it to the trigger to fire.  With the AR-15 he can keep his finger on the trigger while manipulating the safety selector with his thumb.

### Test No. 7.  Effects of Open Storage in a Tropical Environment.

**Purpose:** To determine the effects of open storage in a tropical climate on the AR-15 Rifle and the M2 Carbine and compare the results of such storage on each weapon.

### Method:

a.  Two AR-15 Rifles and two M2 Carbines were stored in the open for a period of two weeks without any care or maintenance.  At the end of the storage, the weapons were examined and pertinent observations recorded.

### Results:

a.  M2 Carbines:

1.  Because of rust and sand which had collected in the receivers, operating handles on both weapons could not be operated manually and force was required to open the bolts.

2.  The operating slide stops would not function properly because sand and grit had fouled the operating slide stop springs.

3.  Both magazines were rusty and had collected enough sand to prevent them from operating properly without first being thoroughly cleaned.

4.  The chambers and bores of both weapons were rusty.

8

ANNEX "B"

# CONFIDENTIAL

## CONFIDENTIAL

5. The rear sights on both weapons could not be adjusted for windage due to the collection of rust and grit on the windage screws.

6. Approximately twenty minutes were required to clean each weapon before test personnel considered it safe to fire.

b. AR-15 Rifles:

1. The charging handles on both weapons were difficult to operate because sand had collected within the receiver.

2. The bolt and bolt carriers of both weapons were rusty.

3. The chambers and bores of both weapons were rusty.

4. Approximately five minutes were required to clean each weapon before test personnel considered them safe to fire.

**Analysis:** The AR-15 Rifle, because it has fewer moving parts, will function more readily than the M2 Carbine after extended periods of storage in the open under tropical conditions.

**Test No. 8. Brush Penetration.**

**Purpose:** To determine whether dense brush and undergrowth affects the trajectory of the AR-15 bullet and to compare its ability to penetrate heavy foliage with that of the M2 Carbine.

**Method:**

a. Silhouette targets were positioned behind dense underbrush which generally consisted of bamboo saplings, bush, grass and vines. From a distance of 15 meters, both the AR-15 Rifle and the M2 Carbine were fired at the targets.

b. The distance was then increased to 50 meters and the targets were fired upon again. (Beyond 50 meters it was impossible to distinguish a target, so this was considered an acceptable maximum distance for the test).

c. Procedures a and b above were repeated several times with foliage of varying density.

9

## CONFIDENTIAL

CONFIDENTIAL

**Results:**

| Type of Underbrush | Range | No. of rounds fired | No. of hits | |
|---|---|---|---|---|
| | | | AR-15 | M2 |
| Light underbrush | 15 meters | 6 | 6 | 6 |
| Moderate underbrush & bamboo thicket | 15 meters | 6 | 6 | 6 |
| Heavy underbrush & bamboo thicket inter- woven with vines | 15 meters | 6 | 6 | 6 |
| Light underbrush | 50 meters | 6 | 6 | 6 |
| Moderate underbrush & bamboo thicket | 50 meters | 6 | 6 | 6 |
| Heavy underbrush & bamboo thicket inter- woven with vines | 50 meters | 6 | 6 | 5 |

**Analysis:**

a. The trajectory of the AR-15 bullet is not significantly affected when fired through dense underbrush at ranges up to 50 meters.

b. The AR-15 round will penetrate jungle undergrowth equally as well as the M2 Carbine round at ranges up to 50 meters.

**Test No. 9. Troop Preference Poll.**

**Purpose:** To obtain subjective data concerning the ARVN soldier's individual preference between the AR-15 Rifle and the M2 Carbine.

**Method:** Upon completion of all tests by participating personnel, each individual present for duty (158) was questioned with regard to preference between the two weapons.

**Results:**

a. Thought the AR-15 had the best "feel"    129
   Thought the M2 Carbine had the best "feel"    29

10

ANNEX "B"                    CONFIDENTIAL

CONFIDENTIAL

| | | | |
|---|---|---|---|
| b. | Thought the AR-15 had the best sight | 66 | |
| | Thought the M2 Carbine had the best sight | | 92 |
| c. | Thought the AR-15 would stand up best under combat conditions | 107 | |
| | Thought the M2 Carbine would stand up best under combat conditions | | 51 |
| d. | Preferred the AR-15 grip | 129 | |
| | Preferred M2 Carbine grip | | 29 |
| e. | Thought AR-15 easier to load | 120 | |
| | Thought M2 Carbine easier to load | | 38 |
| f. | Thought AR-15 easier to get ready to use | 81 | |
| | Thought M2 Carbine easier to get ready to use | | 77 |
| g. | Thought AR-15 easier to disassemble | 140 | |
| | Thought M2 Carbine easier to disassemble | | 18 |
| h. | Liked the AR-15 better from recoil standpoint | 106 | |
| | Liked M2 Carbine better from recoil standpoint | | 52 |
| i. | Thought AR-15 easier to get back on target after firing a round | 117 | |
| | Thought M2 Carbine easier to get back on target after firing a round | | 41 |
| j. | Thought AR-15 more dependable | 107 | |
| | Thought M2 Carbine more dependable | | 51 |
| k. | Thought AR-15 best all around weapon for Infantry use | 100 | |
| | Thought M2 Carbine best all around weapon for Infantry use | | 58 |
| l. | Thought AR-15 climbed least when fired automatically | 117 | |
| | Thought M2 Carbine climbed least when fired automatically | | 41 |

11

ANNEX "B"

CONFIDENTIAL

## CONFIDENTIAL

| | | | |
|---|---|---|---|
| m. | Thought AR-15 more accurate when fired full automatic | 136 | |
| | Thought M2 Carbine more accurate when fired full automatic | | 22 |
| n. | **Would prefer AR-15 in combat** | **130** | |
| | **Would prefer M2 Carbine in combat** | | **28** |

### Analysis:

a. The majority of test subjects preferred the AR-15 Rifle to the M2 Carbine in all aspects covered by the poll, except for the sights. Further questioning of the subjects by test committee personnel disclosed that this preference was due to greater familiarity with carbine-type sights, not because of an inability to understand the AR-15 sights. This is not considered a shortcoming of the weapon but a matter of training and familiarization.

12

**ANNEX "B"**

## CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 48

# CONFIDENTIAL

## ANNEX "C"

### SUGGESTED CORRECTIVE ACTIONS

| DEFICIENCY/ SHORTCOMING | SUGGESTED CORRECTIVE ACTION | REMARKS |
|---|---|---|

### SECTION I

This section contains deficiencies requiring elimination in order to make the item acceptable for use on a minimum basis.

| None | None | None |
|---|---|---|

### SECTION II

This section lists those deficiencies and shortcomings in the item which were discovered during test and satisfactorily corrected prior to completion of the test. They no longer represent a defect in the item tested. The correction must be applied to the production model of this item.

| None | None | None |
|---|---|---|

### SECTION III

This section contains shortcomings which are desired to be corrected as practicable, either concurrent with elimination of deficiencies in Section I, or in production engineering or by product improvement.

| 1. The upper hand guard is hard to grip when hands are sweaty. | Roughen surface. | Ltr. from OSD/ARPA on 11 Jul 62 states that manufacturer is now moulding "checkering" on upper hand guards. |
|---|---|---|
| 2. The weapon cleaning rod is of minimum length and hard to grip. | Add one (1) additional section and provide "T" shaped handle. | |

ANNEX "C"

# CONFIDENTIAL

# CONFIDENTIAL

### ANNEX "D"

### PHOTOGRAPHS

This Annex contains miscellaneous photographs which visually depict

pertinent aspects of the evaluation of the AR-15 conducted in South Vietnam.

**PHOTOGRAPHS:**

1. VN Soldier with AR-15 and M1 Rifle
2. VN Soldier with AR-15 and BAR
3. M2 Carbine and AR-15 Rifle with Accessories
4. VN Soldier with AR-15 and M2 Carbine
5. M2 Carbine and AR-15 Rifle
6. M2 Carbine and AR-15 Rifle "Field Stripped"
7. VC Casualty by AR-15 - 150 Meters
8. VC Casualty By AR-15 - 15 Meters

ANNEX "D"

# CONFIDENTIAL









Carbine, Cal. .30, M2, w/standard accessories



Colt, Armalite Rifle, AR-15, ..., ... w/standard accessories.



PHOTOGRAPH 3, AR-15 ...

Ex. 1_Echeverria Decl.
Page 53



Assault Position with Carbine.

Assault Position with AR-15.





PHOTOGRAPH 6, ANNEX "D"

# EXHIBIT 24

 

**News**   **Politics**   **Science**   **Education**   **Housing**   **Immigration**   **Criminal Justice**   **Silicon Valley**

——————— THE CALIFORNIA REPORT

# Gun Groups: More Than A Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension

By Matthew Green   Apr 12, 2019

🔖 **Save Article**

   

*This article is more than 4 years old.*



A Colt AR-15 with a high-capacity magazine that holds more than 30 rounds. *(Thomas Cooper/Getty Images)*

More than a million high-capacity ammunition magazines flooded into California during a one-week window created when a federal judge temporarily threw out the state's ban, gun owners' groups estimated Thursday.

———————————

**RELATED STORIES**

 **Newsom Pushes for Tougher Gun Restrictions Following Spate of Mass Shootings**

---

 **How Effective Are California's 'Red Flag' Gun Laws? San Francisco and San Diego Are Trying to Find Out**

---

 **SFMTA's Jeffrey Tumlin | CA Gun Violence**

The magazines aren't tracked. But there are plenty of anecdotal indications that the floodgates briefly opened when U.S. District Judge Roger Benitez overturned the state's nearly 20-year-old ban in late March.

Gun control advocates, however, said the projections are inflated and self-serving as gun rights organizations try to make the case that high-capacity magazines bans are impractical.

The judge halted sales a week later, but ruled that those who bought the magazines can legally own them while the state appeals his ruling.

"Everything was all sold out. I basically took whatever I could get," said Chris Puehse, who owns Foothill Ammo in Shingle Springs, east of Sacramento.

He fielded dozens of telephone calls while buyers stacked up 20 deep in his one-man store to buy the hundreds of magazines that arrived in two shipments last week. He had just six left by the time Benitez reinstated the ban last Friday.

"People loved it. It was like we were out of prison and were not treated like bastard stepchildren of the country anymore," he said.

Puehse said that 30-round magazines for military-style rifles, handgun magazines holding 17 to 20 bullets, all selling for less than $30 each, almost immediately "disappeared."

"They wanted to grab more than I let them, otherwise they would have been gone even

faster than a few hours," he said. "Because of that one slip-up, in one week you literally had millions of magazines come into the state that were bought legally. These magazines are here to stay."

Hours before Benitez again halted sales, California Attorney General Xavier Becerra warned that the state was in danger of becoming "the wild, wild West for high-capacity magazines."

"There are those who are now trying to flood the state of California with what were until this decision illegal high-capacity magazines, the type of magazines that are used in firearms to commit the mass shootings that we've seen throughout the country," Becerra said.

The magazines allow shooters to fire more bullets without stopping to reload. Gun owners' organizations — and Judge Benitez — said that's helpful to ward off multiple home invaders, but opponents said it gives victims less time to escape or tackle a mass shooter as he reloads.

During that short window, a number of ammunition manufacturers around the country sought to take advantage of the opportunity. South Carolina-based Palmetto State Armory announced in a Facebook ad that it was "prepared to send a whole lot of freedom to our friends in California," but warned of delays due to high demand.

"The pipeline was open and it was flowing, on all platforms — people showing up (in stores), online — I'm guessing that UPS and FedEx had a field day," said Gun Owners of California president Sam Paredes. "It was a frenzy."

He said an estimate of a million magazines "seems a little bit low."
California's more than 2.5 million gun owners together have nearly 20 million guns, many of which can use the extended magazines.

Staff attorneys with the Giffords Law Center to Prevent Gun Violence in San Francisco said they've seen no evidence to back up the million-magazine estimate, and said gun rights organizations have a vested interest in inflating the number of law-abiding owners.

"They have a very specific purpose and intent here to try to set up for the court that these are devices that are very commonly used and possessed" and therefore should not be banned again, said Ari Freilich, an attorney with the center.

The problem isn't the new owners who will use them legally for target shooting or self-

defense, he said, it's that some will fall into the hands of criminals or be used by mass shooters.

Reformers expect the 9th U.S. Circuit Court of Appeals to keep the ban on sales while reinstating a 2016 state law and ballot measure banning possession even by those who purchased the magazines legally.

Opponents of California's law are counting on the U.S. Supreme Court to ultimately side with Benitez's ruling, that the bans infringe on the Second Amendment right to bear arms.

# KQED

## Stay in touch. Sign up for our daily newsletter.

Email Address:

**Sign Up**

To learn more about how we use your information, please read our privacy policy.



KQED

TV

Radio

Podcasts

Events

Newsletters

Mobile Apps

For Educators

News

Science

Arts & Culture

Donate

Help Center

About

Staff DEI Report

Careers

Accessibility

Corporate Sponsorship

Contact Us

Copyright © 2023 KQED Inc. All Rights Reserved.

Terms of Service    Privacy Policy

Contest Rules    FCC Public Files

Copyright © 2023 KQED Inc. All Rights Reserved.

Terms of Service    Privacy Policy    Inside the Reporting Process    Contact